# EXHIBIT 3

# PART 2 OF 2

standards were applicable during those years. As a means of analysis, these propositions are addressed in the above order.

## 1. Federal Standards in Addition to the Specific Numerical Standards Contained in the Regulations

The Plaintiffs argued that, in addition to the specific numerical limitations on the amount of radioactivity which can be released, the relevant federal regulations impose other standards. In particular, the Plaintiffs asserted that the Defendants' behavior is governed by ALARA, which is an acronym for "as low as reasonably achievable." The Plaintiffs pointed to evidence which they assert raises a genuine issue of material fact as to whether the Defendants violated ALARA. The Defendants did not argue that the evidence failed to raise such a genuine issue of material fact; rather, they contended that ALARA is not a standard of care, the violation of which could subject them to liability. Accordingly, the Court turned to the question of whether ALARA is such a standard of care, assuming for present purposes that the Defendants did violate ALARA (i.e., the releases of radioactivity by the Defendants were not as low as reasonably achievable).[38]

---

[38]The ALARA principle was originally known as ALAP, an acronym for "as low as practicable." As is explained above, this Court must initially decide whether the Defendants could be liable if they violated ALARA and not whether there is a genuine issue of material fact as to whether such a violation occurred. Only if the Court concludes that ALARA is applicable, will it be necessary to decide whether the Defendants violated that concept. Therefore, for present purposes, the Court will treat ALARA and ALAP as being indistinguishable.

The regulations of the NRC, which provide standards for protection against
radiation, are contained in Part 20 of Title 10 of the Code of Federal Regulations.[39]
As the Plaintiffs contended, ALARA has long been part of the NRC's standards for
protection against radiation, as they were for its predecessor, the AEC. Until
January 1, 1993, the NRC's regulations relating to ALARA provided:

> In accordance with recommendations of the Federal Radiation Council,
> approved by the President, persons engaged in activities under licenses
> issued by the Nuclear Regulatory Commission pursuant to the Atomic Energy
> Act of 1954, as amended, and the Energy Reorganization Act of 1974
> should, in addition to complying with the requirements set forth in this part,
> make every reasonable effort to maintain radiation exposures, and releases
> of radioactive materials in effluents to unrestricted areas, as low as is
> reasonably achievable. The term "as low as is reasonably achievable"
> means as low as is reasonably achievable taking into account the state of
> technology, and the economics of improvements in relation to benefits to the
> public health and safety, and other societal and socioeconomic
> considerations, and in relation to the utilization of atomic energy in the public
> interest.

10 C.F.R. § 20.1(c) (1992).[40]  In two cases, in which the plaintiffs sought to

---

[39]Part 20 governs activity by entities which are licensed by the NRC to possess,
use, transfer or dispose of radioactive material. See 10 C.F.R. § 20.1002. The
Defendants are contractors for the DOE rather than licensees of the NRC.
However, the regulations contained in Part 20 were made applicable to such
contractors by virtue of Executive Order 12088 (1978). See 43 F.R. 47707
(1978). See also, Executive Order 11752 (1973), 38 F.R. 34793 (1973).

[40]In 1991, the NRC revised Part 20 of Title 10 of the Code of Federal Regulations,
which sets the standards for protection against radiation. See 56 F.R. 23360-
23474 (1991). Operators were required to comply with the revised regulations no
later than January 1, 1993. Id. at 23395. The revised regulations, unlike
§ 20.1(c), use mandatory language. See 20 C.F.R. § 20.1101(b) ("The licensee
shall use, to the extent practicable, procedures and engineering controls based
upon sound radiation protection principles to achieve occupational doses and doses
to members of the public that are as low as is reasonably achievable (ALARA).").
In its commentary to the revised regulations, the NRC expressly stated that ALARA
was a mandatory requirement. See 56 F.R. 23367 (1991) ("The final rule
(§ 1101(b)) establishes a requirement for all licensees to have a radiation

- 33 -

recover damages from the operators of the Fernald nuclear weapons facility on the

basis of the release of radioactivity, Judge Spiegel concluded that the defendant's

violation of ALARA would prevent them from successfully raising the government

contractor defense.[41]  See Crawford v. National Lead Company, 784 F. Supp. 438

(S.D.Ohio 1989); In re Fernald Litigation, 1989 WL 267040 (S.D.Ohio 1989).  In

those decisions, Judge Spiegel did not, however, address the precise question

before this Court, to wit: whether ALARA is a standard of care, the violation of

which could subject the operator of a nuclear weapons facility to liability.  In In re

TMI, 67 F.3d 1103 (3rd Cir. 1995), cert. denied, 516 U.S. 1154 (1996), the Third

Circuit addressed the question before this Court.  The plaintiffs in that litigation

sought to recover damages for harm they alleged that they had suffered as a result

of the release of radioactivity from the Three Mile Island nuclear power plant in

1979.  In ruling on motions for summary judgment, the District Court had

concluded that ALARA was a standard of care, the violation of which could be the

basis for imposing liability upon the defendants.  In Re TMI Litigation Cases

Consolidated II, 904 F. Supp. 379 (M.D.Pa. 1994), reversed in part and affirmed in

---

protection program that includes provisions for keeping radiation doses ALARA.").
Since the Plaintiffs filed this litigation in 1991, this Court did not apply the current
version of the NRC's regulations regarding ALARA.  See In re TMI, 67 F.3d 1103
(3rd Cir. 1995) (applying version of regulations which was in effect in 1979 in
lawsuit arising out of release of radioactivity from Three Mile Island which occurred
in 1979), cert. denied, 516 U.S. 1154 (1996).  Moreover, there is no indication
that the NRC intended that § 20.1101(b) should be applied retroactively.  Landgraf
v. USI Film Products, 511 U.S. 244 (1994) (a statute should not be applied
retroactively, unless Congress expresses such an intention); Rivers v. Roadway
Exp., Inc., 511 U.S. 298 (1994) (same).

[41]The United States Supreme Court recognized the government contractor defense
in Boyle v. United Technologies Corp., 487 U.S. 500 (1988).

part, 67 F.3d 1103 (3rd Cir. 1995), cert. denied, 516 U.S. 1154 (1996). In other words, the District Court concluded that, even if the release of radiation by the defendants did not exceed the specific numerical limitations for same set forth in the relevant regulations, they could nevertheless be found liable if they violated ALARA. Upon appeal,[42] the Third Circuit reversed in relevant part, concluding that the specific numerical standards in the relevant regulations, not ALARA, supplied the applicable standard of care. Accord, Finestone v. Florida Power & Light Co., 319 F. Supp.2d 1347, 1349 (S.D.Fla. 2004); McLandrich v. Southern California Edison Co., 942 F. Supp. 457, 467 (S.D.Cal. 1996); Corcoran v. New York Power Authority, 935 F. Supp. 376, 386 (S.D.N.Y. 1996); Bohrmann v. Maine Yankee Atomic Power Co., 926 F. Supp. 211 (D.Maine 1996).[43] To reach that conclusion, the Third Circuit relied, in part, on the fact that the adoption of ALARA as a standard of care would result in the imposition of essentially a negligence standard. 67 F.3d at 1115. The Third Circuit then identified the reasons for rejecting ALARA as a standard of care:

> Adopting ALARA as part of the standard of care would put juries in charge of deciding the permissible levels of radiation exposure and, more generally, the adequacy of safety procedures at nuclear plants--issues that have explicitly been reserved to the federal government in general and the NRC specifically. See Pacific Gas & Elec. [v. Energy Resources Comm'n, 461

---

[42]The District Court had certified its decision for an interlocutory appeal under 28 U.S.C. § 1292.

[43]In McCafferty v. Centerior Service Co., 983 F. Supp. 715 (N.D.Ohio 1997), the Court held that ALARA would be applied in a personal injury action filed by a worker at the Davis-Besse Nuclear Power Station. Therein, the plaintiffs alleged that they had been injured in October, 1994; therefore, the District Court applied the ALARA principles contained in 10 C.F.R. § 20.1101(b), which were in effect when the incident occurred. Herein, in contrast, § 20.1101(b) was not in effect when the actions upon which Plaintiffs base their claims occurred.

> U.S. 190, 212 (1983)] ["[T]he Federal Government maintains complete
> control of the safety and 'nuclear' aspects of energy generation....").
> Adoption of a standard as vague as ALARA would give no real
> guidance to operators and would allow juries to fix the standard case by
> case and plant by plant. An operator acting in the utmost good faith and
> diligence could still find itself liable for failing to meet such an elusive and
> undeterminable standard. Our holding protects the public and provides
> owners and operators of nuclear power plants with a definitive standard by
> which their conduct will be measured.

67 F.3d at 1115-16 (footnotes omitted). This Court concurs with the Third

Circuit. ALARA is in essence a negligence standard which would allow juries to

become the final arbiters of how much radiation can be released without violating

federal law. Such a result would violate the Supreme Court's admonition that "the

Federal Government maintains complete control of the safety and nuclear aspects"

of nuclear energy. Pacific Gas & Elec. v. Energy Resources Comm'n, 461 U.S.

190, 212 (1983).

Moreover, 10 C.F.R. § 20.1(c) (1992), the regulation upon which the

Plaintiffs relied to support their contention that the Defendants could be liable if

they violated ALARA, expressly provided that a licensee "should, in addition to

complying with the requirements set forth in this part, make every reasonable

effort to maintain radiation exposures, and releases of radioactive materials in

effluents to unrestricted areas, as low as is reasonably achievable." (Emphasis

added). Courts have held that the use of the word "should" in a statute indicates a

recommended course of action, rather than obligatory one which is associated with

the word "shall." Qwest Corp. v. F.C.C., 258 F.3d 1191, 1200 (10th Cir. 2001);

United States v. Maria, 186 F.3d 65, 70 (2d Cir. 1999). Therefore, the language

of the regulation itself does not lead credence to Plaintiffs' assertion that ALARA is

a mandatory requirement, the violation of which could expose the Defendants to
liability.[44]

Accordingly, the Court concluded that ALARA is not part of the standard of
care with which the Defendants were obligated to comply.

The Plaintiffs also cited § 13 of the Rivers and Harbors Appropriations Act of
1899 ("RHAA"), 33 U.S.C. § 407, which, broadly speaking, prohibits discharge
refuse into any "navigable water." The Plaintiffs contended that the Defendants
had violated § 13 by discharging radioactive waste into the Great Miami River.
See Doc. #126 at 17-18. It is unquestioned that the Great Miami River is a
"navigable water" where it passes the Mound, as that term is used in the RHAA.
See Miami Valley Conservancy District v. Alexander, 692 F.2d 447 (6th Cir. 1982)
(Great Miami River is a "navigable water" under the RHAA from its mouth to mile
117, in the vicinity of Piqua, Ohio), cert. denied, 462 U.S. 1127 (1983). The
Court took judicial notice of the fact that the Mound is located between the mouth
of the Great Miami River and Piqua. However, assuming for sake of argument that
the Defendants violated § 13, this Court did not consider such a violation to be
relevant in this litigation. First, the Plaintiffs had not attempted to state a claim for
relief under § 13. Second, even if they had so attempted, their efforts would have

---

[44]In arguing that a violation of ALARA cannot serve as the basis for imposing
liability on them, the Defendants pointed to DOE Order 5400.5 (1990), which
provided that, as used therein, "ALARA is not a dose limit." Regardless of whether
Order 5400.5 (1990) bears the weight that Defendants contended, this Court,
based upon the above reasoning, concluded that liability could not be imposed
upon them based upon a violation of ALARA.

- 37 -

been fruitless. Courts have generally held that a private right of action is not
available under § 13. See e.g., Romero-Barcelo v. Brown, 643 F.2d 835, 847-50
(1st Cir. 1981) (and cases cited therein at 848, n. 19), reversed on other grounds
sub nom., Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982); National Sea
Clammers Ass'n v. City of New York, 616 F.2d 1222, 1232 (3d Cir. 1980),
reversed on other grounds sub nom., Middlesex Cty. Sewerage Auth. v. National
Sea Clammers Ass'n, 453 U.S. 1 (1981); City of Evansville v. Kentucky Liquid
Recycling, 604 F.2d 1008 (7th Cir.), cert. denied, 444 U.S. 1025 (1979); State of
New York v. United States, 620 F. Supp. 374 (E.D.N.Y. 1985). See also,
California v. Sierra Club, 451 U.S. 287 (1981) (no private right of action under
§ 10 of the RHAA). Third, the Plaintiffs have not demonstrated that the prohibition
in § 13 of the RHAA is in any way incorporated into the regulations which
governed the Defendants' release of radioactivity. Therefore, this Court concluded
that the Plaintiffs' assertion in their memorandum opposing Defendants' Second
Motion for Summary Judgment (Doc. #126), that the Defendants had violated
§ 13 of the RHAA, would not serve as the basis for imposing liability upon them,
even if the asserted violation of § 13 were established at trial.

In their memorandum opposing Defendants' Second Motion for Summary
Judgment (Doc. #96), Plaintiffs also contended that, by concealing information
pertaining to radioactive emissions from the Mound, the Defendants had violated
18 U.S.C. § 1001, which prohibits making a materially false, fictitious, or
fraudulent statement or representation in any matter within the jurisdiction of the
executive, legislative, or judicial branch of the Government of the United States.

- 38 -

Case No. 1:90-cv-00181-JLK   Document 2254-5   filed 09/25/07   USDC Colorado   pg 9 of 33

See Doc. #126 at 20. This Court concluded that, even if such violations had occurred, they would not serve as the basis for imposing civil liability upon the Defendants based upon radioactive emissions from the Mound. First, the Plaintiffs had not attempted to state a claim for relief under § 1001. Second, even if they had so attempted, their efforts would have been fruitless, given that courts have uniformly held that a private right of action is not available under § 1001. See e.g., Andrews v. Heaton, 483 F.3d 1070, 1076 (10th Cir. 2007); Federal Sav. & Loan Ins. Corp. v. Reeves, 816 F.2d 130, 138 (4th Cir. 1987); Williams v. McCausland, 791 F. Supp. 992, 1001 (S.D.N.Y. 1992). Third, the Plaintiffs have not demonstrated that the prohibitions contained in § 1001 are in any way incorporated into the standards which governed the Defendants' release of radioactivity.

Based upon the foregoing, the Court rejected Plaintiffs' contention that federal standards in addition to the numerical limitations set forth in the applicable federal regulations constitute the standard of care governing their claims (other than their claim under CERCLA). Of course, the question remains as to whether the evidence raised a genuine issue of material fact concerning a violation of the specific numerical limitations contained in the federal regulations, to which the Defendants were subject. That issue is discussed below in § IIIC.

## 2.  Do Federal Regulations Pre-empt State Tort Law?

This Court previously held that the standard of care for Plaintiffs' claims (other than their claim under CERCLA) is supplied by federal regulations relating to

radioactive emissions and that, therefore, their claims were to that degree pre-empted.[45] See Doc. #84. Nevertheless, in opposing the Defendants' Second Motion for Summary Judgment (Doc. #96), the Plaintiffs argued that their claims are not so pre-empted, supporting that premise with two propositions which are discussed in the order presented.

First, Plaintiffs argued that their claims were partially governed by the Ohio standard of care, because no federal regulations governed radioactive emissions during the years from 1949 through 1957, and that, therefore, there was no federal standard of care which could pre-empt the Ohio standard of care. In particular, Plaintiffs pointed to AEC Bulletins GM-133 and GM-SFP-3. The introductory paragraph of AEC Bulletin GM-SFP-3 provides that its purpose is "to specify minimum codes and standards that shall be used as basic guides to the physical aspects of health, safety, ... fire protection and to safe working practices."[46] That paragraph also indicated that the Bulletin is applicable to the design, construction, operation and protection activities conducted for the AEC by its contractors. Plaintiffs argued that these Bulletins did not create federal regulations, given that they merely incorporated codes prepared or sponsored by numerous governmental and non-governmental entities, such as the National Bureau of Standards, the National Safety Council and Underwriters Laboratories.

---

[45]The Court has elaborated upon that holding above.

[46]AEC Bulletin GM-SFP-3 is dated October 4, 1951, and is attached to Defendants' Supplemental Memorandum in Support of Their Motion for Summary Judgment (Doc. #88), as Landon Exhibit D. The differences between it and its predecessor, Bulletin GM-133, dated June 10, 1949, relate to the building codes which those two documents made applicable to nuclear facilities, including the Mound.

This Court could not agree with the Plaintiffs. The AEC had exercised its administrative discretion to adopt by reference the codes governing radioactive emissions promulgated by the International Commission for Radiological Protection and the National Committee on Radiation Protection and published by the National Bureau of Standards,[47] rather than restating those regulations in AEC Bulletins GM-133 and/or GM-SFP-3. The Plaintiffs failed to cite any authority, indicating that an administrative agency is without authority to adopt by reference codes promulgated by another entity. The AEC directed its contractors to comply with those codes. Accordingly, this Court concluded that the codes adopted by the International Commission for Radiological Protection and the National Committee on Radiation Protection and published by the National Bureau of Standards, which the AEC incorporated by reference into Bulletins GM-133 and GM-SFP-3, constitute federal regulations which supply the standard of care for Plaintiffs' claims during the years 1949 through 1957, supplanting the reasonable care standard of Ohio tort law.

Second, the Plaintiffs argued that the state standard of care is not pre-empted, because the AEC acknowledged the existence of more protective state and local regulations and declared that the more restrictive regulations should be observed. For instance, the Plaintiffs pointed to AEC Bulletin GM-133, which provides that, when there is a difference between the codes mentioned therein and state or local regulations, the more restrictive is applicable. In addition, the Plaintiffs pointed to other AEC publications which also recognized that contractors

---

[47]The National Bureau of Standards was part of the United States Department of Commerce.

would comply with state and local regulations. For purposes of ruling on
Defendants' Second Motion for Summary Judgment (Doc. #96), this Court
accepted that a more restrictive local or state regulation could provide the standard
of care governing Plaintiffs' claims. Nevertheless, it disagreed with Plaintiffs's
conclusion therefrom that federal regulations did not, as a result, supplant the
reasonable care standard from Ohio tort law, as the standard of care for Plaintiffs'
claims. As an initial matter, it bears noting that the Plaintiffs have not alleged in
their Complaint (Doc. #1) that radioactive emissions from the Mound have violated
an Ohio or local regulation governing that type of pollution. Nor did they present
such an argument or even identify such an Ohio or local regulation. On the
contrary, the Plaintiff's position is that federal regulations do not supplant the
reasonable care standard supplied by state tort law. There is, however, no
indication in the AEC Bulletins and Orders, upon which this contention is based,
that demonstrated an intent to include the reasonable care standard from tort law
in the phrase state and local regulations. Cf. Leipart v. Guardian Industries, 234
F.3d 1063, 1069-70 (9th Cir. 2002) (holding that state tort law does not come
within the meaning of the word "regulations," as used in the Consumer Product
Safety Act). Accordingly, this Court concluded that the standard of care for
Plaintiffs' claims was supplied by federal regulations of radioactive emissions,
notwithstanding the fact that AEC Bulletins and Orders require contractors to meet
more protective state and local regulations.

## C.  Does the Evidence Raise a Genuine Issue of Material Fact as to Whether Defendants Violated the Federal Regulations Relating to Radioactive Emissions?

In a previous Decision (Doc. #84), this Court sustained in part and overruled in part the Defendants' Motion for Summary Judgment (Doc. #35). In response, the Defendants filed their Supplemental Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. #88), with which they argued they are entitled to summary judgment, because the evidence fails to raise a genuine issue of material fact concerning the question of whether they had violated the federal regulations concerning radiological emissions. The Court, however, directed the Defendants to raise that argument by filing a bare bones motion for summary judgment, rather than presenting it with a supplemental memorandum to a motion that had previously been ruled upon. As a consequence, the Defendants have filed their Second Motion for Summary Judgment (Doc. #96), also arguing that the evidence fails to raise a genuine issue of material fact concerning the question of whether they had violated the federal regulations concerning radiological emissions. Defendants supported that request for summary judgment by incorporating by reference their Supplemental Memorandum in Support of Defendants' [Initial] Motion for Summary Judgment (Doc. #88), to which Carfagno's affidavit and numerous Exhibits have been attached,[48] and with Neff's affidavit and the Exhibits attached thereto and authenticated thereby (Doc. #37), rather than by filing an additional lengthy memorandum. The Plaintiffs have submitted a Memorandum in

---

[48]Those Exhibits were authenticated by Carfagno's and other affidavits.

Opposition (Doc. #126), to which the Defendants have responded with their Reply
Memorandum (Doc. #130).

With their Supplemental Memorandum in Support of Defendants' Motion for
Summary Judgment (Doc. #88), the Defendants argued that liability could not be
imposed upon them, given that they did not violate the federal regulations
governing the release of radioactive emissions. The Defendants made that
argument by initially setting forth their view of the applicable federal regulations,
following which they turned to the evidence of radioactive emissions. Herein, the
same analytical framework is employed. Therefore, the applicable federal
regulations are initially set forth, following which the Court addresses the question
of whether the evidence raises a genuine issue of material fact as to whether the
Defendants violated those regulations.

As is indicated above, from 1949 through 1957, the AEC regulated
radioactive emissions through AEC Bulletins GM-133 and GM-SFP-3. Those
Bulletins incorporated standards established by the International Commission for
Radiological Protection and by the National Committee on Radiation Protection and
published by the National Bureau of Standards in a number of NBS Handbooks.[49]
During those years, each applicable NBS Handbook provided, with an exception,
that exposure be limited to 300 millirem/week or 15,600 millirem/year whole body
exposure. The exception was during the years 1954 through 1957, when NBS
Handbook 59 was applicable. While that Handbook established the same
standards for adults, it limited exposure to minors to one-tenth of that which was

---

[49]During 1949 and 1950, NBS Handbook 42 was applicable. During the next two
years, the applicable standards were set forth in NBS Handbook 47, while NBS
Handbooks 52 and 59 applied, respectively, in 1953, and in 1954 through 1957.

- 44 -

permitted for adults, i.e., 30 millirem/week or 1,560 millirem/year whole body exposure.

In 1958, the AEC adopted its own regulations concerning radioactive emissions, which were set forth in AEC Manual Chapter 0524. Those regulations were applicable from 1958 through 1974. That publication limited the exposure to 500 millirem/year for whole body exposure and 1,500 millirem/year for organ exposure, limitations which were applicable during all those years. Beginning in 1975, the same limitation was set forth in ERDA Manual Chapter 0524, and continued unchanged through 1979. From 1980 through 1984, DOE Order 5480.1 and Order 5480.1A were in effect. These Orders continued the same standards that had been set forth in AEC Manual Chapter 0524 and ERDA Manual Chapter 0524. The DOE limited the permissible release of radionuclides in 1985 to 100 millirem/year effective dose equivalent. That more restrictive standard remained in effect when this litigation was initiated.

Beginning in 1977, the EPA began to regulate emissions of radioactivity into the water, under which nuclear facilities were prohibited from discharging radioactive materials into the water that will result in a dosage of more than 4 millirem/year.[50] See 40 C.F.R. § 141.16.[51] That limitation continued, unchanged,

_____

[50]With the adoption of DOE Order 5400.5 in 1990, the DOE applied the standard set forth in 40 C.F.R. § 141.16 (i.e., prohibiting the discharge of radioactive materials into the water that will result in a dosage of more than 4 millirem/year) to private drinking water systems. The EPA regulation applied only to public water systems.

[51]The regulation of radionuclides in drinking water is now governed by 40 C.F.R. § 141.66(d), which became effective on December 7, 2000. See 65 F.R. 76708, 76748. However, the regulation of radionuclides in water was contained in 40 C.F.R. § 141.16, from 1976, through the events giving rise to this litigation. See

through 1993, after the commencement of this litigation. In 1989, the EPA adopted 40 C.F.R. § 61.92 (see 54 FR 51695), under which air emissions of radionuclides were not permitted to exceed an amount which would permit any member of the public to receive an effective dose equivalent of 10 millirem/year. That regulation remained applicable when this litigation was initiated.

In arguing that the evidence fails to raise a genuine issue of material fact as to whether they violated any of the foregoing regulations, the Defendants relied upon the Mound's environmental monitoring reports. Copies of those documents have been attached to and authenticated by the affidavits of Carfagno and Neff. The Defendants have also supplied Tables which compared the amount of radioactive emissions from the Mound in a given year, as computed by Carfagno, to the standards which were applicable in that year.[52] An examination of the

_____

National Resources Defense Council, Inc. v. U.S. E.P.A., 824 F.2d 1258, 1268 (1st Cir. 1987). Section 141.66(d) contains the same 4 millirem/year limitation as was set forth in § 141.16.

[52]Seven Tables are attached to Defendants' Supplemental Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. #88). Table I sets forth the federal regulations governing radioactive emissions for the years 1949 through 1993. Table II lists the federal regulatory standards and the air doses from the Mound during the years 1949 through 1957, for the three radioactive materials processed at the Mound, to wit: polonium-210, plutonium-238 and tritium. Air doses for plutonium-238 and tritium are only given for the years during which they were processed at the Mound. Table III sets forth federal regulatory standards and air and water doses for those materials during the years 1958 through 1972. Table IV contains a listing of the maximum dose equivalents, during the years 1973 through 1984, for plutonium and tritium. Those for plutonium are set forth as maximum organ doses for lung and bone, while the whole body doses for tritium are listed. Table V sets forth the maximum committed effective dose equivalents from exposure to radiation from the Mound during the years 1985 through 1993, comparing them to DOE regulations. Table VI addresses compliance, during the years 1977 through 1993, with the EPA's regulations of the emission of radionuclides into the public water supply. Table VII compares the

supporting documentation, as well as the standards which are discussed above, causes this Court to conclude that the Tables accurately reflect that which they purport to reflect, i.e., a comparison of the annual emissions from the Mound to the regulatory standard. Although not questioning that the information set forth in the Tables accurately reflects the supporting documentation and the applicable regulatory standards,[53] the Plaintiffs argued that the evidence raises genuine issues of material fact as to whether the Defendants have complied with the requisite federal regulations.[54] In support of that broad proposition, the Plaintiffs presented two arguments, to wit: 1) that the information set forth in the documentation is not credible and that, therefore, neither the documentation nor the Tables, which are based upon that documentation, demonstrated the absence of a genuine issue of material fact; and 2) that the Defendants' own records, as well as evidence which they (Plaintiffs) supplied, demonstrated the existence of a genuine issue of material fact as to whether the Defendants have exceeded the applicable federal regulatory standards. As a means of analysis, those two arguments will be addressed in the above order.

---

effective dose equivalents, for the years 1989 through 1993, to the EPA's regulations of air emissions of radiation. As is indicated above, each of the seven Tables demonstrates that the Defendants have complied with the pertinent regulations.

[53]The Plaintiffs did, however, challenge Carfagno's computations. That matter is discussed in the text below.

[54]Of course, the Plaintiffs also argued that their claims were not governed by the applicable federal regulations of radioactive emissions. That argument has been rejected above.

- 47 -

## 1. Plaintiffs' Challenges to Defendants' Evidence

As is indicated above, Plaintiffs argued that the Court should strike Carfagno's and Neff's affidavits, because the information presented therein is fatally flawed and cannot establish that the Defendants have complied with pertinent federal regulatory standards.[55]  Plaintiffs based this argument on three premises, to wit: 1) that relying solely on environmental monitoring reports for data is inappropriate, given that the reports are both inaccurate and incomplete; 2) that Carfagno inappropriately manipulated the data; and 3) that other radioactive materials were emitted from the Mound which Carfagno had not included in his summaries.  This Court concluded that, although those premises did not serve as the basis for striking any portion of either affidavit, it would consider same in the context of determining whether the evidence raised a genuine issue of material fact.  The Plaintiffs' three premises are addressed in the above order.

First, Plaintiffs contended that Carfagno's and Neff's affidavits cannot establish the absence of a genuine issue of material fact, because they relied solely upon information contained in the environmental monitoring reports which are both incomplete and inaccurate.  In support of that contention, the Plaintiffs presented a number of arguments, which are addressed in the order in which they were presented.

---

[55]Plaintiffs presented many of their challenges to the Defendants' evidence in their Motion to Strike (Doc. #125).  Earlier in this Decision, this Court indicated that it would discuss those arguments in the context of its resolution of Defendants' Second Motion for Summary Judgment (Doc. #96).

In support of the proposition that reliance on he environmental monitoring reports is inappropriate, given that they are incomplete and inaccurate,[56] the Plaintiffs initially focused upon the reports of monitoring that had occurred in 1960. They pointed out that the reports for the fourth quarter of 1960, and for the entire year, included instances where samples registered zero emissions. That did not cause the Court to conclude that the evidence raised a genuine issue of material fact as to whether Defendants violated the federal regulations during those years, given that the reports were adjusted for background radiation. In addition, Plaintiffs pointed out that the reports for 1960 did not indicate that tritium was released from the Mound during that year, and cited a memorandum, under date of April 17, 1970, in which John Harley, then the director of the Health and Safety Laboratory at the Mound, reviewed concerns about the level of sampling for tritium emissions from the Mound.[57] He also indicated that a portable sampler had been developed, which would measure both emissions of gaseous tritium and tritium in the water. Deployment of the sampler had been delayed several times, and it was then scheduled to be put in service in May, 1970. In the absence of evidence from

---

[56]Plaintiffs also criticized Carfagno for failing to attempt to determine the accuracy of the environmental monitoring reports which are authenticated by his affidavit and from which much of the information set forth in the Tables was derived. See Doc. #125 at 10. As has been stated earlier in this Decision, those reports are admissible as business records, in accordance with Rule 803(6), given that Carfagno is a qualified witness. There is nothing in that Rule which requires the qualified witness to determine the accuracy of the statements in business records. Therefore, that alleged shortcoming by Carfagno did not cause the Court to conclude that the environmental monitoring reports could not demonstrate the absence of a genuine issue of material fact concerning violations of the federal regulatory standards by the Defendants.

[57]That memorandum is Exhibit H to Plaintiffs' Motion to Strike (Doc. #125).

the Plaintiffs that tritium emissions from the Mound in 1960, or in any year,

exceeded the permissible level set forth in the federal regulations, the Court did not

conclude that these asserted shortcomings raised a genuine issue of material fact

concerning the Defendants' compliance with the applicable federal regulations.[58]

   Next, Plaintiffs argued that there is a genuine issue of material fact, because

of a disparity between radioactive emissions described in classified environmental

monitoring reports, as opposed to that set forth on unclassified reports.[59]

According to Plaintiffs, the classified reports showed that there had been greater

levels of emissions than were shown in the unclassified reports for the same time

period. Since the classified and unclassified reports are not comparable, this Court

could not conclude that the differences between the two types of reports

established the existence of a genuine issue of material fact. In his affidavit,

Herbert Meyer ("Meyer"), a long-time employee at the Mound who had prepared

the classified reports, pointed out the differences between the classified and

unclassified reports, including, inter alia, that the classified reports focus upon on-

site monitoring at the Mound, while the purpose of the unclassified environmental

monitoring reports is to set forth off-site emissions from the Mound.[60] In addition,

---

[58]When Carfagno set forth the emissions for 1960 in the Tables, he relied upon the annual environmental monitoring report for that year. The reports for its first three quarters were missing. Plaintiffs challenged Carfagno's use of that annual report, rather than looking for and finding the reports from the first three quarters. The Court rejected that challenge, given that the annual report for 1960 included information relating to emissions for the entirety of that year.

[59]The Plaintiffs relied upon three classified reports from 1960.

[60]The Plaintiffs and the class they represent live within five miles of the Mound; they do not seek to recover for exposure suffered as a result of being employed at the Mound.

Meyer stated that, unlike the classified reports, the unclassified reports subtract
background readings from the samples to arrive at the radioactivity contributed by
emissions from the Mound. Therefore, the Court concluded that the differences
between the classified and unclassified reports do not demonstrate the existence of
a genuine issue of material fact as to whether the Defendants violated the
numerical limitations on the release of radiation, set forth in the pertinent
regulations.

The Plaintiffs also argued that the Defendants' evidence was incomplete
because, before 1972, the sampling was based upon grab samples. The Plaintiffs
asserted that using grab samples was inappropriate, because they did not
differentiate between polonium and plutonium emissions and, further, because of
the short duration of such sampling. Neither of those arguments caused this Court
to conclude that there is a genuine issue of material fact concerning the
Defendant's compliance with the applicable federal regulations. As to the failure of
the grab samples to distinguish between polonium and plutonium emissions, the
Defendants assumed, when preparing reports on emissions, that all of the radiation
obtained in a grab sample had resulted from polonium emissions, after which it
was assumed that all had come from plutonium. As to the short duration of the
monitoring with grab samples, in the absence of any evidence from the Plaintiffs, it
would be pure speculation for the Court to assume that sampling of a longer
duration would have indicated that the Defendants had violated the applicable
federal regulatory standards or created such a genuine issue of material fact.
Moreover, whenever it was determined that there had been an incident involving
the release of radioactivity from the Mound, additional sampling was conducted.
Accordingly, the Court concluded that the use of short-duration, grab samples did

not demonstrate the existence of a genuine issue of material fact as to whether the Defendants violated the numerical limitations on the release of radiation, set forth in the pertinent regulations.[61]

  Second, the Plaintiffs argued the evidence raised a genuine issue of material fact, because Carfagno inappropriately manipulated the data. In particular, the Plaintiffs asserted that Carfagno had improperly averaged data, when he had computed the Tables.[62] According to the Plaintiffs, such averaging is inappropriate, because the applicable federal regulations require the computation of exposure to the maximally exposed person. The Court agreed with Plaintiffs that averaging the samples taken from a variety of locations during a particular year does not constitute a calculation of the exposure to the maximally exposed person. Nevertheless, this Court could not agree with Plaintiffs that such improper

---

[61]In support of their assertion that the evidence supplied by the Defendants, in particular the environmental monitoring reports, is not sufficient to demonstrate that summary judgment is warranted, the Plaintiffs argued that only through the scientific process known as dose reconstruction could the Defendants demonstrate that the evidence failed to raise a genuine issue of material fact. See Doc. #125 at 19. The Plaintiffs stated that such a process would cost many millions of dollars and take many years. Plaintiffs have not suggested that they will undertake such a task. In the absence of legal authority requiring Defendants to spend millions of dollars for this or an analogous purpose, this Court could not conclude that their failure to do so meant that they could not obtain summary judgment if such were otherwise appropriate.

[62]In this regard, Plaintiffs also argued that Carfagno improperly subtracted background radiation from the amount reported on the samples. The Plaintiffs argued that such is not provided for in the pertinent federal regulations. This Court could not agree, given that AEC Manual Chapter 5024 so provides. In addition, the Court rejected the Plaintiffs' argument that Carfagno's actions in that regard were improper, because a constant level of background radiation was not subtracted. Given the numerous common sources of radiation identified by Carfagno in his affidavit, this Court concluded that background radiation can change, rather than being constant.

averaging served as the basis for concluding that the evidence raised a genuine
issue of material fact as to the Defendants' alleged violations of the applicable
federal regulations. The Plaintiffs failed to identify any of the Defendants'
documents containing test results which raise a genuine issue of material fact as to
whether the exposure of the maximally exposed individual exceeded the applicable
federal regulatory standard. Therefore, the Court concluded that the averaging of
samples by Carfagno did not demonstrate the existence of a genuine issue of
material fact as to whether the Defendants violated the numerical limitations on the
release of radiation, set forth in the pertinent regulations.

Third, the Plaintiffs argued that Carfagno did not consider other radioactive
materials which were emitted from the Mound. The two such materials mentioned
by Plaintiffs, radium and thorium, emit alpha particles, as does plutonium.
However, the maximum concentration limitations for those elements are greater
than that for plutonium. Since the Defendants monitored the release of alpha
particles and, further, given that the Plaintiffs have not pointed to a single violation
at the Mound of the standards for emission of plutonium, the failure to report
emissions of radium and thorium from the Mound did not cause the Court to
conclude that Carfagno's failure to consider radium and thorium demonstrated the
existence of a genuine issue of material fact as to whether the Defendants violated
the applicable federal regulations.

Based upon the foregoing, the Court rejected the Plaintiffs' challenges to the
Defendants' evidence, which were presented in an effort not only to cause the
Court to disregard that evidence, but also to demonstrate the existence of a
genuine issue of material fact as to whether the Defendants' emissions of

radioactivity violated the applicable federal regulations. However, there is an
additional, more fundamental reason for rejecting those challenges. The
Defendants submitted that evidence to support their Second Motion for Summary
Judgment (Doc. #96). A review of the evidence submitted by the Defendants
revealed, in the main,[63] that the Mound's environmental monitoring reports
demonstrated there was an absence of a genuine issue of material fact as to
whether the Defendants had violated the applicable federal regulations. It bears
emphasis that Plaintiffs will have the burden of persuasion concerning this issue at
trial. Under Celotex, supra, a party is entitled to summary judgment, if the party
having the burden of persuasion on a particular issue has no evidence to support
that issue.[64]  477 U.S. at 324-25. The Defendants have argued that the Plaintiffs
do not possess evidence which raises a genuine issue of material fact as to
whether they (Defendants) violated the applicable, federal regulations.
Nevertheless, the Plaintiffs argued that "the real question is whether defendants
can and do prove beyond reasonable dispute that there were not exposures and
releases above federal standards." Doc. #131 at 3. In Celotex Corp., supra, the
Supreme Court expressly rejected the argument that a party seeking summary
judgment, herein the Defendants, must submit evidence negating its opponent's
claim.  477 U.S. at 323-24. Therefore, the Court would have concluded that the
Plaintiffs had failed to demonstrate the existence of a genuine issue of material

---

[63]An exception is discussed below.

[64]Thus, if the Plaintiffs are unable to point to evidence which raises a genuine issue
of material fact regarding Defendants' alleged violation of the applicable federal
standards, Celotex does not entitle the Plaintiffs to a trial during which they would
attempt to convince the jury that the evidence submitted by the Defendants in
support of their request for summary judgment is not worthy of credence.

fact, regardless of how it had resolved the Plaintiffs' challenges to the evidence presented by the Defendants.

## 2. Defendants' Own Records and Evidence Supplied by Plaintiffs

Plaintiffs contended that the Defendants' own documents and certain evidence they (Plaintiffs) had supplied demonstrated that Defendants had violated the federal regulatory standards concerning the emission of radiation during a number of years. According to the Plaintiffs, both the air and the water standards were violated for a number of years. As a means of analysis, the Court will initially discuss the alleged violations of the air standards, before turning to the alleged violations of those pertaining to water.

To support their contention that the Defendants' documentation and their (Plaintiffs') evidence established the existence of a genuine issue of material fact concerning violations of the federal standards pertaining to emissions of radionuclides into the air, the Plaintiffs relied upon the statement of Bernd Franke ("Franke"), whom they have identified as their expert in dose reconstruction.[65] In

_____

[65]Defendants argued that Franke's statement is not evidence, because he did not either swear to it under oath before a notary, or sign it under penalty of perjury. The Defendants did not, however, move to strike it. The Court agreed with the Defendants that Franke's statement is neither an affidavit nor a declaration. Indeed, the Plaintiffs appended the affidavit of Arjun Makhijani ("Makhijani") to Franke's statement. Makhijani, the president of the entity that employed Franke, certified that Franke had prepared the statement and explained that he was not available to sign an affidavit given that he was in Germany. However, the Plaintiffs subsequently presented an affidavit from Franke, in which he certified that he had prepared his statement and that it is true and correct. See Doc. #131 at Exhibit 3; Doc. #132. The Court concluded that Franke's affidavit, authenticating his statement, made the statement the evidentiary equivalent of an affidavit.

- 55 -

his 20-page statement, Franke set forth and explained a number of conclusions he
had drawn from the Defendants' records.

To support their position that the evidence raises a genuine issue of material
fact concerning Defendants' asserted violations of the federal regulations governing
emissions of radionuclides into the air, Plaintiffs initially discussed the SM Building,
where plutonium-238 was processed at the Mound. See Doc. #126 at 3-4.
Plaintiffs asserted that this Building had been constructed in a flimsy manner and
that the Defendants operated it as if they were processing talcum powder, rather
than a deadly substance such as plutonium-238. While such evidence might raise
a genuine issue of material fact as to whether the Defendants violated ALARA, it
does not raise a factual issue as to whether the Defendants violated federal
numerical limitations on emissions of radioactivity during any particular year, since
the jury would be required to speculate that flimsy construction meant that there
was a particular level of emissions into the air in a particular year. See Greene v.
B. F. Goodrich Avionics Systems, Inc., 409 F.3d 784, 793 (6th Cir. 2005) (in the
context of reversing a jury verdict, noting that "it is well established that a jury
verdict based on speculation, supposition, or surmise is impermissible"). Accord
Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc., 243 F.3d 980, 991 (6th Cir.
2001).

In addition, the Plaintiffs pointed to the portion of Franke's statement where
he concluded that the Defendants violated federal air emission standards during the
fourth quarter of 1960 and in 1961 and 1966.[86]  Franke Statement at 12-13.  In

---

[86]In their Memorandum in Opposition to Defendants' Second Motion for Summary
Judgment, the Plaintiff set out a table which contains eighteen instances, which
are said to be revealed in the Mound's Environmental Compliance Reports, when
air samples taken on a particular day allegedly demonstrated that the emissions

particular, for 1960, he pointed to an air sample taken during the fourth quarter of that year, from the junction of Lexington Salem Road and Preble County Line Road, which had a reading of $31.53 \times 10^{-14}$ µCi/ml.[67] Franke pointed to twelve samples taken from the junction of Route 201 and Chambersburg Road, during 1961, the average of which was $12.79 \times 10^{-14}$ µCi/ml, which he stated was more than twice the permissible annual emission. In addition, Franke reported that eight samples, taken downwind from the Mound, during the period from July, 1966, through December, 1966, had an average concentration of $10.26 \times 10^{-14}$ µCi/ml.

While not disputing that the samples are reflected in their environmental compliance reports, Defendants argued that the samples relied upon by Franke did not raise a genuine issue of material fact as to whether they were not in compliance with the requisite federal standards. In particular, the Defendants

---

exceeded the maximum permissible concentrations for plutonium on that particular day. See Doc. #126 at 10-11. Nine of the samples were taken in 1960, five in 1961, two in 1963, and one each in 1966 and 1967. Id. One sample taken during 1960 and 1961, as well as the sample taken during 1966, were discussed by Franke in his statement and are addressed above in the text. With respect to the other fifteen samples, however, there was no evidence from an expert or other witness, explaining how the samples demonstrated such violations. Moreover, they did not point to the portion of Defendants' voluminous environmental compliance reports or other evidence of record where this information is contained. It bears emphasis that this Court is not "obligated to wade through and search the entire record" to determine whether the evidence raises a genuine issue of material fact. Interroyal Corp., supra, 889 F.2d at 111. Therefore, the Court concluded that the Plaintiffs' table did not raise a genuine issue of material fact as to whether Defendants had violated the pertinent federal regulations.

[67]Franke has expressed the radioactive emissions from the Mound as microcuries per milliliter (µCi/ml). Notably, the Mound reported emissions in microcuries per milliliter or cubic centimeter (the latter two being equivalent measures of volume). See also, Carfagno's Affidavit at ¶ 27 (indicating that air and water concentrations of radionuclides are expressed in microcuries per milliliter, i.e., µCi/ml).

- 57 -

asserted that the referenced samples for 1960 and 1961 were taken outside the relevant geographic area, which encompasses the area within five miles of the Mound.[68] Therefore, the Defendants' argument continued, the data for those locations "fail[s] to show that any member of plaintiffs' class was potentially exposed in excess of regulatory limits." Doc. #130 at 16. This Court could not agree with the Defendants that the location of the monitors more than five miles from the Mound meant that Franke's statement failed to raise a genuine issue of material fact as to whether they violated the applicable federal standards for air emissions during 1960 and 1961. The Defendants did not point to any evidence that demonstrated that excessive radioactive emissions at locations more than five miles from the Mound would not have also exceeded the federal regulations closer to that facility.

In addition, the Defendants argued that Franke's assertions that they committed regulatory violations in 1960, 1961 and 1966, based upon a single reading at a monitoring station on one particular day, do not raise genuine issues of material fact as to whether they committed such violations, given that the federal regulations are set in terms of average annual concentrations. Thus, Defendants' argument continued, a single reading for one or a few days does not establish a regulatory violation. Rather, Defendants concluded, a regulatory violation does not occur, unless the average concentration for an entire year at a particular location exceeds the average annual limit.[89] With respect to 1960 and 1966, this Court

---

[68]In their Complaint, the Plaintiffs so defined the class area (see Doc. #1 at ¶ 35), and this Court accepted that geographical definition, when it conditionally certified the class. See Doc. #84 at 19.

[69]Franke conceded as much in his Statement. See Franke Statement at 7 (noting that "the regulations do allow averaging over a time period of one year").

agreed with the Defendants. Indeed, in his statement, Franke indicated that there would have been violations, if one assumed that the same readings were obtained from those locations for an entire year. See Franke Statement at 13. Thus, Franke, himself, demonstrated that the asserted violations for 1960 and 1966 were predicated upon assumptions, rather than on annual averages. With respect to 1961, however, this Court is not able to agree with the Defendants. Franke identified what he asserted were all of the observations for 1961, from the location in question (Chambersburg Road and Route 201). Id. The Defendants have not supplied evidence, establishing as a matter of fact, that there were more observations at that location during 1961, than relied upon by Franke. Nor have the Defendants argued that a regulatory violation cannot be established by focusing upon testing from one particular location during a year. Therefore, while the Court agreed that Franke's Statement failed to create a genuine issue of material fact as to whether the Defendants violated the regulatory standards in 1960 and 1966, it agreed with Plaintiffs that the evidence raised a genuine issue of material fact as to whether the Defendants committed such a violation in 1961.

In addition, the Plaintiffs argued that samples taken from the stack of the SM Building are sufficient to raise a genuine issue of material fact as to whether the Defendants violated the requisite federal regulatory standards, at least in 1966 and 1967, when the samples in question were taken. See Doc. #126 at 11-13. Those samples were taken between April 4, 1966, and March 22, 1967. The Plaintiffs pointed to an internal memorandum in the Health Physics Department at the Mound, dated December 12, 1967, under which radioactive effluent from that Building for Plutonium-238 was being limited to 2,000 disintegrations per minute

- 59 -

for an eight-hour sample.[70] If the disintegrations per minute exceeded 20,000 for
an eight-hour sample, then the SM Building was to be shut down. Although all of
the samples cited by the Plaintiffs exceeded the 2,000 disintegrations per minute
limitation, that limitation was not adopted until after the samples had been taken.
Therefore, assuming for sake of argument that the memorandum established a
federal standard of care, the violation of which could subject the Defendants to
liability, this Court was unable to conclude that the samples relied upon by the
Plaintiffs raised a genuine issue of material fact as to whether the Defendants had
violated that standard, given that the samples were taken before the standard was
adopted.[71]

Accordingly, the Court concluded that, except for 1961, the evidence failed
to raise a genuine issue of material fact as to whether the Defendants violated the
federal regulatory standards for emissions into the air of radionuclides. Therefore,
the Court sustained the Defendants' Second Motion for Summary Judgment
(Doc. #96), as it related to such emissions, as to every year except for 1961, and
overruled that motion as it pertained to such emissions during that year.

In arguing that the evidence raises a genuine issue of material fact as to
whether the Defendants violated the federal regulations concerning emissions of
radionuclides into the water, the Plaintiffs relied upon the affidavit of Linda Lehman

---

[70]The memorandum is Exhibit 4 to Plaintiffs' Memorandum in Opposition to
Defendants' Second Motion for Summary Judgment (Doc. #126).

[71]The internal memorandum from the Health Physics Department at the Mound,
upon which this particular argument is based, does not indicate that it is intended
to apply retroactively to samples taken before it was adopted.

- 60 -

("Lehman"), Plaintiffs' expert in the field of hydrology. Plaintiffs pointed out that

Lehman had indicated that the Defendants had violated the EPA standards of 4

millirem/year, as set forth in 40 C.F.R. § 141.16, during 1975, 1976, 1977, 1978,

1987, 1990 and 1991. In response, the Defendants primarily argued that

Lehman's affidavit in that regard does not raise a genuine issue of material fact,

because the pertinent regulation, 40 C.F.R. § 141.16, applies only to community

water systems.[72] The samples upon which Lehman based her affidavit,

Defendants argument continued, were not from such water systems. The phrase

"community water systems" is defined by the regulations as "a public water

system which serves at least 15 service connections used by year-round residents

or regularly serves at least 25 year-round residents." 40 C.F.R. § 141.2. This

Court agreed with the Defendants, given that the Plaintiffs did not submit evidence

that those samples were taken from community water systems. On the contrary,

Lehman identified the samples from 1975, 1976, 1977 and 1978 as coming from

monitored private wells, which she did not state constituted community water

systems.[73] Lehman Affidavit at 4. In addition, Lehman indicated that samples

---

[72]As indicated above, the regulation of radionuclides in drinking water is now
governed by 40 C.F.R. § 141.66(d), which became effective on December 7,
2000. See 65 F.R. 76708, 76748. Section 141.16 was removed at that time.
Id. at 76745. Unlike § 141.16, § 141.66(d) governs all drinking water, not just
community water systems. However, there is no indication that the EPA intended
§ 141.66(d) to apply to activities that occurred as many as 24 years before its
effective date.

[73]Section 141.16 became effective on June 24, 1977. See 40 F.R. 28403.
Therefore, even if the private well which was monitored in 1975 and 1976 had
been a community water system, there would have been no basis for holding the
Defendants liable for violating that regulation in those years, since it was not then
in effect.

were taken from an abandoned production well in 1987. Once again, she did not
provide any information in her affidavit, from which a jury could infer that the
abandoned production well was part of a community water system. In addition,
the Plaintiffs have not provided such information from another source.[74] Lehman
also indicated that samples taken from the abandoned well in 1990 and 1991, and
from four seeps in 1991, violated the pertinent regulations. With the adoption of
DOE Order 5400.5 in 1990, the DOE applied the standard set forth in 40 C.F.R.
§ 141.16 (i.e., prohibiting the discharge of radioactive materials into the water that
will result in a dosage of more than 4 millirem/year) to private drinking water
systems. The Plaintiffs did not present evidence tending to show that the
abandoned production well or the seeps constituted a private drinking water
system. Accordingly, the Court concluded that the evidence failed to raise a
genuine issue of material fact as to whether the Defendants had violated the
pertinent federal regulations concerning the discharge of radionuclides into water in
any particular year.

Based upon the foregoing, the Court sustained in part and overruled in part
the Defendants' Second Motion for Summary Judgment (Doc. #96). That motion
is overruled, as it relates to the emissions of radionuclides into the air during 1961,
and is otherwise sustained. As a result of the rulings herein and in the Court's

---

[74]In her Affidavit, Lehman also identified 1986 and 1989 as years in which
samples from the abandoned well demonstrated that such violations had occurred.
However, since the Plaintiffs failed to argue in their opposing memorandum
(Doc. #126) that the Defendants committed violations in those years, the Court
assumed that the Plaintiffs did not so contend. However, even if they had made
such an argument, the Court would have concluded that the evidence fails to raise
a genuine issue of material fact as to those years for the same reason it reached
that conclusion with regard to 1987, 1990 and 1991.

other Decisions (see Docs. ##73 and 84), the following claims of the Plaintiffs remain in this litigation, to wit: 1) the emission of radionuclides into the air during 1961; 2) CERCLA, although medical expenses are not recoverable under that statute; 3) Plaintiffs' other claims, except for trespass, to the extent that they are premised upon the release of hazardous substances, other than radionuclides. In addition, the Plaintiffs may recover punitive damages only from Defendant Monsanto, and Plaintiffs are not entitled to medical monitoring as a form of relief.

Counsel should note that the Court has scheduled a telephone conference call on Tuesday, September 4, 2007, at 8:30 a.m., for the purpose of selecting a new trial date and other dates for this litigation.

August 17, 2007

WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.