**Exhibit A**



**Department of Energy**

**Environmental Management
Consolidated Business Center
250 East 5th Street, Suite 500
Cincinnati, Ohio 45202
(513) 246-0500**

JUN 0 5 2008

Lynn S. Looby, Esq.
Managing Counsel, Litigation
Litigation and Insurance Section
The Dow Chemical Company
2030 Dow Center
Midland, MI 48674

John R. Stocker, Esq.
Rockwell International Company
550 Hot Springs Road
Santa Barbara, CA 93108

EMCBC-00589-08

Dear Ms. Looby and Mr. Stocker:

**CONTRACT NUMBERS AT-(29-1)-1106 (DOW) AND DE-AC04-76DPO3533
(ROCKWELL); *COOK, et. al. v. ROCKWELL INTERNATIONAL CORP. AND THE
DOW CHEMICAL CO.,* No. 90-K-181 (DISTRICT OF COLORADO)**

I am the Contracting Officer responsible for (i) the contract executed by and between the United States Atomic Energy Commission (the contract obligations of which were transferred to the United States Department of Energy ("DOE")) and The Dow Chemical Company dated January 18, 1951, identified as Contract No. AT-(29-1)-1106, including all modifications thereto, (ii) the contract executed by and between the United States Atomic Energy Commission (the contract obligations of which were transferred to the DOE) and Rockwell International Corporation effective June 30, 1975, identified as Contract No. AT(29-2)-3533, including all modifications thereto (later re-designated as Contract No. DE-AC04-76DPO3533), and (iii) the Rocky Flats Plant Three Party Transfer Agreement between DOE, Rockwell, and EG&G Rocky Flats, Inc. effective January 1, 1990, (collectively the "Contracts"). The term "Dow" as used herein shall mean The Dow Chemical Company and all of its successors in interest. The term "Rockwell" as used herein shall mean Rockwell International Corporation and all of its successors in interest, including The Boeing Company.

I am addressing this letter to the representatives of Dow and Rockwell concerning the entry of judgment and ultimate liability associated with the plaintiffs' claims in the litigation known as Cook, et al v. Rockwell International Corp. and The Dow Chemical Co., Case No. 90-K-181, which is currently pending in the U.S. District Court for the District of Colorado (the "Cook lawsuit"). I have authority to issue direction on behalf of the United States Government with respect to the Contracts, as well as, unlimited authority to bind the United States Government

Ms. Looby and Mr. Stocker       -2-       EMCBC-00589-08

with respect to the Contracts, subject to the limitations contained in the Federal Acquisition Regulation and to the following (1) Department of Energy Acquisition Regulation; (2) EM Review and Approval Process; (3) Unlimited for Procurement Contracts, including Interagency Agreements, Sales Contracts, and Financial Assistance Instruments.

Pursuant to the Contracts, DOE has directed Dow and Rockwell to proceed with the defense of the Cook lawsuit from the very outset of this case and at all points thereafter, including up to and through the trial in this case and through all post-trial motions. See, e.g., Dow Contract Modification 112, Article XIV and Rockwell Contract Modification 124, Clause 76. On August 1, 1996, DOE refined its directions to Dow and Rockwell by determining and directing Dow and Rockwell with respect to "the Department's designation of Dow which, acting under the Department's oversight, shall be responsible for supervising the litigation and retaining counsel who will provide a common defense for all the contractor defendants effective August 1, 1996." This direction by the DOE has continued up through trial and to the present.

I and the DOE are aware that on February 14, 2006, the jury in the Cook lawsuit returned a verdict against defendants The Dow Chemical Company and Rockwell International Corporation in the amount of $176,850,340 for trespass and nuisance, as well as $110,800,000 in punitive damages against The Dow Chemical Company and $89,400,000 in punitive damages against Rockwell International Corporation. I and the DOE also are aware that on June 2, 2008, the court entered final judgment for certain plaintiffs. I have had an opportunity to review a copy of the court's June 2, 2008, final judgment. I and the DOE are aware that in its final judgment the court ordered that plaintiffs recover $725,904,087.00 in compensatory damages from Dow and Rockwell, inclusive of prejudgment interest, and $200,200,000.00 in exemplary damages against defendants, for a total of $926,104,087, exclusive of the post-judgment interest. The court separately ordered that plaintiffs recover their costs of suit. The court stayed further proceedings on costs, attorneys' fees, and related expenses pursuant to Fed.R.Civ.P. 54(d)(2).

The Department of Energy has determined that the Cook lawsuit is a public liability action arising under the Price-Anderson Act because it is an action in which plaintiffs seek to impose liability arising out of or resulting from a "nuclear incident," as defined by the Price-Anderson Act. Therefore, plaintiffs' claims are the proper subject of indemnification by the United States Government under the Price-Anderson Act. The Department of Energy has further determined that the United States Government will, and is required by the Contracts and the Price-Anderson Act to, indemnify Dow and Rockwell for any judgment or settlement arising out of or in connection with the Cook lawsuit, together with any post-judgment interest, attorneys' fees, bond costs, and related costs and expenses that are reasonable and allowable in order to defend the Cook lawsuit and/or satisfy the judgment or settlement. The Department of Energy has further determined that under the Contracts and the Price-Anderson Act, Dow and Rockwell are entitled to such indemnification for any judgment or settlement arising out of or in connection with the Cook lawsuit, together with any post-judgment interest, attorneys' fees, bond costs, and related costs and expenses that Dow and Rockwell are required to pay in order to defend the Cook lawsuit and/or satisfy any judgment or settlement. The Department of Energy has further determined that all elements of any judgment or settlement arising out of or in connection with the Cook lawsuit, together with any post-judgment interest, attorneys' fees,

Ms. Looby and Mr. Stocker                -3-                EMCBC-00589-08

bond costs, and related costs and expenses that Dow and Rockwell are required to pay in order to satisfy any judgment or settlement are allowable costs for the Cook lawsuit, provided that they are reasonable, allocable, and subject to the limitations set forth in the Federal Acquisition Regulation and the terms of the Contracts.

DOE acknowledges that, pursuant to the Contracts and the Price-Anderson Act, the ultimate financial responsibility for all costs and any judgment or settlement in the Cook lawsuit lies with the United States Government. See enclosed memorandum opinion from the Department of Justice's Office of Legal Counsel regarding a similar Price-Anderson situation.

As the Contracting Officer for the Contracts and on behalf of the DOE, I hereby direct Dow and Rockwell to appeal to the U.S. Court of Appeals of the Tenth Circuit. See, e.g., Dow Contract Modification 112, Article XIV and Rockwell Contract Modification 124, Clause 76. In that same capacity, I hereby further direct Dow and Rockwell to file a motion pursuant to Federal Rule of Civil Procedure 62(e).

In my official capacity as a Contracting Officer, I am also providing this letter to counsel for Dow and Rockwell for inclusion in any pleading that may be filed on behalf of defendants The Dow Chemical Company and Rockwell International Corporation in order to confirm to the court that any appeal by Dow and Rockwell to the Court of Appeals of the Tenth Circuit is being "directed by a department of the Government of the United States." This letter is being provided to counsel with the understanding that it may be included in support of such the Rule 62(e) motion, and in connection with related proceedings.

The above-described determinations and directions to Dow and Rockwell have been approved by duly authorized officials of the United States Government, and I have all of the authority required by law to provide these binding directions to Dow and Rockwell under the Contracts on behalf of DOE. Dow and Rockwell may communicate all or any portion of this letter to third parties and to the public, as Dow and Rockwell deem appropriate.

Sincerely,

Derrick. J.C. Franklin
Contracting Officer
for Contract AT-(29-1)-1106 (Dow) and
Contract DE-AC04-76DPO3533 (Rockwell)

Enclosure: Opinion, 1989 OLC *Lexis* 114

Concurrence:

Eric J. Fygi
Deputy General Counsel

Ms. Looby and Mr. Stocker                    -4-                    EMCBC-00589-08

cc w/enclosure
Marc Johnston, GC-30, DOE-HQ
Barry Smith, EM-52, DOE-HQ
Jack Craig, EMCBC
Mell Roy, EMCBC
Ralph Holland, EMCBC

LEXSEE 1989 OLC LEXIS 114

OPINION OF THE OFFICE OF LEGAL COUNSEL

Department of Energy Request to Use the Judgment Fund For Settlement of Fernald Litigation

*1989 OLC LEXIS 114*

December 18, 1989

**ADDRESSEE:**
[*1]

MEMORANDUM FOR DONALD B. AYER

Deputy Attorney General

**OPINIONBY:** LUTTIG

**OPINION:**

This memorandum responds to your request for our views on two related questions: (1) whether the Department of Energy had authority to obligate the United States to pay a $ 73 million settlement of the In Re Fernald Litigation, No. C-1-85-149 (S.D. Ohio), between private plaintiffs and a Department of Energy contractor and, if so, (2) whether the Attorney General may accede to the request of the Secretary of Energy to use the judgment fund to pay such a settlement. General Counsel Wakefield of DOE has answered both questions in the affirmative. See Memorandum Re: Settlement of Consolidated Class Actions, In Re Fernald Litigation, S.D. Ohio, from Stephen A. Wakefield, General Counsel, Department of Energy, to the Secretary of Energy (Oct. 12, 1989) ("Wakefield Memorandum"). Director Axelrad of the Civil Division Torts Branch likewise does not doubt DOE's settlement authority; he concludes, however, that the settlement may not be paid with monies from the judgment fund. See Memorandum In Re: Fernald (Department of Energy Request to Utilize the Judgment Fund), from Jeffrey Axelrad, Director, Torts Branch, Civil [*2] Division, to Stuart E. Schiffer, Acting Assistant Attorney General, Civil Division (Oct. 24, 1989) ("Axelrad Memorandum").

We conclude that DOE had authority under *42 U.S.C. § 2210*(h) to enter into the settlement concerning its Fernald facility. In accord with the Axelrad Memorandum, however, we conclude that the Attorney General may not accede to the Secretary of Energy's request that the settlement be paid out of the judgment fund.

I. The Settlement Authority of DOE

On June 30, 1989, DOE entered into a "Memorandum of Understanding of Settlement" with private plaintiffs on which judgment was entered by the United States District Court for the Southern District of Ohio on September 29, 1989. The settlement stemmed from a lawsuit to recover for environmental harm from DOE's government owned/contractor operated Fernald facility -- "a foundry that processes uranium metal into ingots" for use in the production of nuclear weapons. Wakefield Memorandum at 2. In that action, the plaintiffs named as the defendant the contractor for the Fernald facility but, to avoid problems of governmental immunity, did not sue either DOE or the United States. See [*3] id. The Government nonetheless retained an important stake in the litigation, since DOE had contracted to indemnify the Fernald contractor. This interest led DOE to take charge of the litigation on behalf of its contractor and, ultimately, to enter into a settlement under which it obligated the United States to pay $ 73 million into a court-administered fund.

DOE's actions obligating the United States to fund the Fernald settlement were plainly authorized under the Price-Anderson Act. *42 U.S.C. § 2210*(h). Section 2210(h) expressly authorizes the Secretary of Energy to settle claims made against DOE on indemnification obligations:

1989 OLC LEXIS 114, *

> [An agreement of indemnification] shall provide that, when . . . the Secretary [of Energy] . . . makes a determination that the United States will probably be required to make indemnity payments . . . the Secretary . . . shall collaborate with any person indemnified and may approve the payment of any claim under the agreement of indemnification, appear through the Attorney General on behalf of the person indemnified, take charge of such action, and settle or defend any such action . . . . The Secretary . . [*4] . shall have final authority on behalf of the United States to settle or approve the settlement of any such claim [under the indemnification agreement] on a fair and reasonable basis . . . .

Id. (emphases added). The Secretary's settlement authority is wholly independent of the Attorney General. The sole reference to the Attorney General comes in that portion of the section authorizing the Secretary, in his discretion, to appear in court "through the Attorney General." n1 There is no suggestion in the section that settlement by the Secretary is in any way conditioned upon approval of (or even consultation with) the Attorney General; indeed, the language granting the Secretary "final authority" to settle claims on behalf of the United States clearly indicates that Congress intended to vest the Secretary with independent settlement authority. We therefore turn to the question of whether settlement payments agreed to by the Secretary may be drawn from the judgment fund.

> n1 Neither General Counsel Wakefield nor Director Axelrad suggests that the Department of Justice entered any appearance in this case on behalf of DOE.

II. The Judgment Fund

Prior to creation [*5] of the judgment fund, payment of judgments against the United States generally required specific congressional appropriations. See United States General Accounting Office, Office of General Counsel, Principles of Federal Appropriations Law 12-3 (1982). "To provide a mechanism for prompt payment, Congress enacted in 1956 a permanent, indefinite appropriation for the payment of final judgments," Comp. Gen. B-197742 (Aug. 1, 1986) (answer to question 9), a provision subsequently expanded to include settlements. The judgment fund "operates completely independent[ly] of the congressional authorization and appropriation process. It has no fiscal year limitations, there is no limit on the amount of the appropriation, and there is no need for Congress to appropriate funds to it annually or otherwise." Id.

With respect to the question posed, the relevant statutory language specifies that "necessary amounts are appropriated to pay . . . compromise settlements" when essentially two conditions are met. *31 U.S.C. § 1304*(a). First, the settlement must be "payable" under *28 U.S.C. § 2414. 31 U.S.C. § 1304* [*6] (a)(3)(A). n2 Second, settlement "payment[s]" must not be "otherwise provided for." Id. § 1304(a)(1). n3 We address in turn each of these requirements.

> n2 The judgment fund statute lists several other statutory provisions under which, if payment is authorized, the requirement of section 1304(a)(3) is satisfied. Neither DOE nor the Civil Division suggests that any of these other provisions are applicable to the Fernald settlement.

> n3 The judgment fund statute also requires that settlement payments be "certified by the Comptroller General." *31 U.S.C. § 1304*(a)(2). This additional requirement is pro forma, however, since the Comptroller's certification follows from satisfaction of the first two requirements for payment from the judgment fund. See GAO, Principles of Federal Appropriations Law at 12-2.

A. Payment of Settlements Under *28 U.S.C. § 2414*

Section 2414 authorizes appropriations for payment of "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against . . . [United States] agencies . . . upon obligations [*7] or liabilities of the United States, made by the Attorney General or any person authorized by him . . . ." (Emphases added.) Neither DOE nor the Civil Division contends that the plaintiffs' claim was ever "referred to the Attorney General for defense." DOE concededly defended the litigation itself, without referral to the Department. Nor was the suit "against the United States, or against its agencies or officials." The suit was against the contractor, and neither the United States nor any of its agencies or officials was ever party to the suit.

In any event, for a settlement to be payable under section 2414, it must be "made by the Attorney General or [a] person authorized by him." n4 Here, DOE consulted with and obtained the approval of the Department of Justice to liti-

1989 OLC LEXIS 114, *

gate the suit on behalf of the defendant contractor. See Wakefield Memorandum at 10 (DOE "exercised its right . . . to take over the handling of this case after consulting with and obtaining the approval of the Department of Justice.") (emphasis added). It also appears that the Department of Justice played some advisory role in the litigation of the claim. DOE points out, for example, that the Department [*8] of Justice exercised control over the conduct of the Fernald litigation by "directing what arguments could and could not be made in the defense of the case, and by writing and rewriting pleadings filed in the case." Letter from Henry A. Gill, Jr., Deputy General Counsel for Litigation, Department of Energy, to Margaret C. Love, Associate Deputy Attorney General, Department of Justice at 2 (Dec. 14, 1989) ("Gill Letter"). It is clear, however, that the actual settlement with the Fernald plaintiffs was neither made by the Attorney General or any person authorized by the Attorney General to compromise the claim. n5

> n4 The legislative history of section 2414 confirms that participation of the Attorney General (or a person authorized by him) in the making of settlements is essential under the provision. The Senate Report, for example, describes section 2414 as covering "compromises effected by the Attorney General." S. Rep. No. 733, 87th Cong., 1st Sess. 3 (1961).

> n5 By letter dated January 3, 1989, Attorney General Thornburgh disqualified himself from participation in "any civil or criminal matters arising out of the operation of the government-owned, contractor-operated chemical and metallurgical plant located near Fernald, Ohio." All references to the "Attorney General" that appear throughout this opinion, therefore, are to those persons who have been, during the relevant period, authorized to act on behalf of Attorney General Thornburgh.

[*9]

It was not until after DOE had initiated settlement negotiations and actually extended a settlement offer to the Fernald plaintiffs that the Department of Justice was even apprised of DOE's intention to settle the litigation. Deputy General Counsel Gill at that point telephoned Director Axelrad to inform him of DOE's decision to settle the litigation. Mr. Axelrad recalls that, in this initial conversation, he specifically asked Mr. Gill if DOE was seeking the approval of the Department of Justice for the settlement and that Mr. Gill expressly denied that he was seeking such approval: "[Mr. Gill] specifically stated that he had been directed to engage in the negotiations and was not seeking Justice Department approval or concurrence." Axelrad Memorandum at 3 n.10 (emphasis in original). Mr. Gill does not specifically recall being asked whether he was seeking Justice Department approval, but states that he could not deny Mr. Axelrad's recollection of the conversation. Neither gentleman contends that there was any discussion of possible or proposed settlement terms during this conversation.

At the conclusion of this telephone call, Mr. Axelrad said to Mr. Gill that he would inform [*10] his superior, Stuart Schiffer, Acting Assistant Attorney General, Civil Division, of DOE's decision to settle the litigation. In a subsequent telephone conversation, Mr. Axelrad assured Mr. Gill that he had so informed Mr. Schiffer. Apparently, there was no discussion in this second conversation of any need for DOJ approval of the settlement or of any action by DOJ that would be required before finalization of the settlement. There was not in this conversation either any discussion of possible or proposed settlement terms. The only other fact that we have been provided by either DOJ or DOE bearing on the issue of settlement approval or authorization is Mr. Gill's candid acknowledgment in a meeting held last week that he would not have sought Justice Department approval of the settlement without the approval of his superior within DOE, which approval he does not recall having sought.

It is clear under these facts that the Attorney General did not actually "make" the Fernald compromise settlement and that the settlement was not made by a person explicitly authorized by the Attorney General to settle the matter. DOE does not contend otherwise; its only argument seems to be that the interests [*11] of the United States require that the settlement be paid from the judgment fund. In this instance, standing alone, this is an insufficient basis upon which to authorize payment from the judgment fund. n6

> n6 Section 2414 provides for payment from the judgment fund of "final judgments rendered by a State or foreign court or tribunal against the United States . . . after certification by the Attorney General that it is in the interest of the United States to pay the same." (Emphasis added). Because this portion of the statute authorizes payment of the final judgments of only a state or foreign tribunal, and the judgment on the Fernald settlement was rendered by a federal district court, even certification by the Attorney General that payment of the Fernald settlement would be "in the interest of the United States" would not bring the settlement within section 2414.

> The statute does not authorize payment of the final judgment of a federal district court upon Attorney General certification, where the action is not against the United States.

We can think of only two possible arguments that the requirements of section 2414 have been satisfied, both of which rest on the [*12] facts that Civil Division approved DOE's takeover of the litigation and the Division failed to object to DOE's stated intention to settle the suit. From these facts in combination, one could argue that the Attorney General (through the Civil Division) made or approved the settlement, or that DOE was implicitly "authorized" to settle the suit. We do not find either argument persuasive. As to the first, we do not believe that the Attorney General can be said to have "made" the settlement because neither he nor anyone else at the Department of Justice was informed of (or otherwise knew) the settlement terms. As to the second, we do not believe it can be said that the Attorney General implicitly authorized the settlement, because he was never asked to authorize settlement, never considered authorizing settlement, and the agent he would have authorized to settle (DOE) categorically denies that it sought settlement authority. We would be especially reluctant to find such constructive approval or implied authorization given that DOE has independent settlement authority under the Price-Anderson Act, *42 U.S.C. § 2210*(h), and the relevant DOE documentation [*13] confirms that the agency understood that it was proceeding under that authority, see Wakefield Memorandum at 10.

We conclude therefore that the settlement was not "made by the Attorney General or any person authorized by him" within the meaning of section 2414. Accordingly, because the section does not permit post hoc Attorney General "approval" of a judicially approved settlement, n7 payment of the settlement from the judgment fund would not be authorized.

> n7 Post hoc Attorney General "approval" of a judicially approved settlement would not satisfy the requirements of section 2414. Under that section, settlements must be "made by" the Attorney General or a person authorized by him. At minimum, the Attorney General or an authorized individual would have to have played some role in the settlement prior to its approval by the court. Otherwise, the statutory language that the compromise settlement be "made" by the Attorney General or someone authorized by him to settle would be meaningless.

B. Settlement Payments "Not Otherwise Provided For"

Our conclusion that the Fernald settlement is not "payable" under section 2414 is alone sufficient to prohibit resort [*14] to the judgment fund since, under the facts in this case, it is a precondition to settlement payment from the fund that the obligation be "payable" under section 2414. See *31 U.S.C. § 1304*(a)(3)(A). DOE could not avail itself of the judgment fund, however, for the additional reason that Congress has "otherwise provided for" settlement payments under the Price-Anderson Act. The settlement therefore does not satisfy the second requirement of the judgment fund statute. Id. § 1304(a)(1).

The Comptroller General has previously opined that the Price-Anderson Act "otherwise provides" for indemnification payments within the meaning of *31 U.S.C. § 1304*(a)(1):

> It seems clear to us that the Price[-]Anderson Act contemplates funding of indemnity payments through the regular appropriations process. Thus, in the event claims were to arise which exceeded the ability or willingness of the administering agency to resort to available appropriations, we think the agency would be under an obligation to seek an appropriation from the Congress.

Comp. Gen. B-197742 (Aug. 1, 1986) (unpublished opinion; answer to question [*15] 5). According to the Comptroller:

> The question of whether payment is "otherwise provided for" is a question of legal availability rather than actual funding status. As a general proposition, if payment of a particular judgment is "otherwise provided for" as a matter of law, [then] the judgment [fund] is not available, and the fact that the defendant agency may have insufficient funds at that particular time does not operate to make the judgment [fund] available. In the case of insufficient funds in an "otherwise provided for" situation, the proper re-

Page 5

1989 OLC LEXIS 114, *

course for the defendant agency is to seek a supplemental or deficiency appropriation unless Congress has provided for use of the judgment [fund] in that particular context.

Id. (answer to question 9) (emphasis added). See also *66 Comp. Gen. 157, 160 (1986)* ("It was never the intent of [Congress in enacting] the judgment [fund] to shift the source of funds for those types of judgments which could be paid from agency funds . . . .") (emphasis added). Accord GAO, Principles of Federal Appropriations Law at 12-13. The Comptroller notes that he is unaware of any instance in which DOE [*16] has drawn upon the judgment fund to make payments related to the Price-Anderson Act. Comp. Gen. B-197742 (answer to question 6).

This Office has never regarded the legal opinions of the Comptroller General as binding upon the Executive. Our independent examination of this issue, however, confirms the soundness of the Comptroller's reading of the Price-Anderson Act. Both the language of section 2210 and its legislative history support the inference that Congress has "otherwise provided for" settlement payments on claims under the Price-Anderson Act, thereby rendering the judgment fund unavailable.

Although section 2210 does not contain a specific funding mechanism for indemnity payments, n8 it does state that "in administering the provisions of this section, . . . the Secretary . . . may make contracts in advance of appropriations and incur obligations without regard to [the Antideficiency Act]." *42 U.S.C. § 2210*(j) (emphases added). The legislative history specifically indicates that Congress intended this section to permit the making of "indemnity contract[s] in advance of appropriations . . . ." S. Rep. No. 296, 85th Cong., 1st Sess. [*17] 24 (1957), reprinted in 1957 U.S. Code Cong. & Admin. News 1803, 1825. n9 Absent such an exception, the Antideficiency Act would prohibit DOE from incurring an obligation in advance of (or in excess of) its annual appropriation, *31 U.S.C. § 1341*(a)(1)(A) & (B) -- for instance, by promising to make settlement payments predicated upon an indemnity contract.

> n8 Neither the Comptroller nor this Office views the absence of a payment mechanism as necessarily determinative on the question of whether Congress has "otherwise provided for" Price-Anderson settlement payments. See Comp. Gen. B-197742 (answer to question 5). See also id. (answer to question 10) ("If there is no specific payment mechanism, it would normally be assumed that Congress anticipated funding through the appropriations process.").

> n9 Congress enacted *42 U.S.C. § 2210* in 1957, see Pub. L. No. 85-256, § 4, 71 Stat. 576 (1957), roughly a year after establishing the judgment fund.

The fair inference from the express exception to the Antideficiency Act contained in section 2210(j) is that Congress intended for indemnity [*18] obligations (and, by logical extension, settlements negotiated upon such obligations) to be satisfied out of appropriated funds. We believe therefore that Congress has "otherwise provided for" the payment of such settlements within the meaning of *31 U.S.C. § 1304*, presumably through either current appropriations, see H.R. 2696, 101st Cong., 1st Sess., Title III (1990 appropriation for "expenses incidental" to DOE "uranium supply and enrichment activities"), or guaranteed appropriations in amounts necessary to satisfy obligations incurred pursuant to the authority in section 2210(j). In fact, we are informed by DOE's Office of General Counsel that DOE routinely satisfies indemnity obligations from its appropriations.

DOE's Office of General Counsel concedes that appropriated funds "would be legally available to indemnify the defendant contractor for a settlement (or judgment) that provided for a payment by the defendant contractor." Gill Letter at 1 (emphasis added). DOE distinguishes such a settlement or judgment from one like that in the Fernald litigation, which "provides for payment to be made by the United States -- not by the defendant [*19] contractors." Id. Apparently, in DOE's view, appropriated funds are legally available to indemnify defendant contractors directly for settlement payments the contractors have made to private plaintiffs, but not to make payments directly to private plaintiffs in settlement of an action against a government contractor.

We do not believe that the legal availability of appropriated funds to pay settlements under the Price-Anderson Act turns on whether the payments are made to the plaintiff or the defendant contractor. Section 2210(h) of the Act empowers DOE to "take charge" of actions brought against a government contractor where the Secretary of Energy "determin[es] that the United States will probably be required to make indemnity payments" under its agreement with the contractor. The evident purpose of this section is to permit (indeed, encourage) resolution in a single proceeding of the claims of the private plaintiff, the government contractor, and the United States (as represented by DOE). Cf. S. Rep. No. 296 at 23. This purpose plainly would be defeated by requiring, as a condition to payment by DOE, consecutive

1989 OLC LEXIS 114, *

proceedings in which the contractor first would settle with [*20] the plaintiffs and thereafter bring a second action, seeking indemnification from the United States. As we have noted, DOE concedes that its appropriations would be legally available to satisfy a second action by a contractor who previously had settled with private plaintiffs. The source of the legal obligation of the United States -- its promise to indemnify the contractor -- is identical whether DOE protects its rights by taking charge of the original plaintiff-contractor lawsuit or awaits a separate indemnification action by the contractor. Accordingly, we see no reason why appropriated funds would not be legally available in either instance.

In light of our conclusion that the judgment fund is unavailable, DOE must seek to satisfy its indemnity obligation from appropriated funds. General Counsel Wakefield states that DOE has conducted a study of its currently available appropriations and has concluded that it will be unable to pay the $ 73 million settlement therefrom. See Wakefield Memorandum at 11 & n.4. Assuming this is correct, we believe that DOE has no choice but to seek a special or deficiency appropriation from Congress.

C. The Consequences of Secondary Litigation [*21]

General Counsel Wakefield warns that if there is a period during which the settlement is not paid, the contractor may bring a separate action against the United States on the settlement agreement as a third-party beneficiary. Wakefield Memorandum at 11 (emphasis added). If such a separate action by the DOE contractor were predicated upon the obligation of the United States to fulfill its promise of payment set forth in the settlement agreement, we believe a judgment against the United States or a settlement obligation arising from such an action could be paid from the judgment fund.

First, a judgment in (or settlement of) a separate action to enforce the Fernald settlement agreement would be "payable" under 28 U.S.C. § 2414. The contractor would be seeking to enforce the private plaintiffs' right to settlement payments -- a right that is independent of the indemnification agreement between DOE and the contractor. Since the Price-Anderson Act authorizes the settlement only of claims "under [an] agreement of indemnification," 42 U.S.C. § 2210(h), the independent settlement authority of the Secretary of Energy [*22] would not apply.

Absent DOE authority to settle the litigation, the contractor's action would proceed to either a final judgment against the United States or a (second) settlement -- presumably made by the Attorney General or a person authorized by him to settle the claim. In either event, the resulting judgment or settlement would be "payable" under section 2414, because that section provides for payment of both "final judgments . . . against the United States" and authorized settlements of actions upon "liabilities of the United States."

The second requirement of the judgment fund statute would also be satisfied. As noted above, a separate action to enforce the Fernald settlement agreement would not be based upon the United States' indemnity obligation under the Price-Anderson Act. As a result, the DOE appropriation that ordinarily "otherwise provide[s] for" payment of Price-Anderson indemnity obligations would be inapplicable. There is no other payment source; Congress has not "otherwise provided for" payment of obligations of the United States generally. The judgment fund is the only source of payment for those obligations of the United States that are not payable from agency appropriations. [*23] See GAO, Principles of Federal Appropriations Law at 12-13. Cf. S. Rep. No. 733 at 3 ("If agency funds or appropriations are not available for [payment of a settlement under section 2414], such settlements will then be payable . . . from the permanent indefinite appropriation established by the [judgment fund statute]."). Thus, a third-party beneficiary lawsuit predicated upon the Fernald settlement agreement would meet the essential requirements for access to the judgment fund.

The availability of the fund through such a sequence of events assumes, of course, that there is a good faith dispute over the obligation of the United States to pay on the extant settlement obligation, and that DOE has earnestly attempted, but failed, to obtain the necessary funding from the Congress and monies remain otherwise unavailable. Payment from the judgment fund would not be authorized were the United States now, in order to permit payment from the judgment fund, purposely to default upon its settlement obligation, were DOE to refuse to seek a special appropriation or to reprogram funds, and the United States thereafter to settle the inevitable lawsuit to enforce the indemnification [*24] agreement.

For two reasons, such a settlement would not satisfy the requirements for access to the judgment fund. First, DOE would not have met its legal obligation to seek a special appropriation or attempt a reprogramming. Thus, funds for payment of the original settlement would still be "otherwise provided for" within the meaning of section 1304. Second, the settlement would not be a bona fide "compromise settlement[]" made by the Attorney General within the meaning of section 2414 because the amount of the settlement clearly would have to be agreed upon in advance. There would have to be at least a tacit agreement that the United States would not settle the claim for less than $ 73 million, because the

1989 OLC LEXIS 114, *

plaintiffs would not settle with the contractor for less than the $ 73 million for which they now have a judgment. On the other hand, the United States could not settle with the contractor for more than $ 73 million, because to do so would expose the government to charges of impropriety for orchestrating a series of essentially fictitious events that resulted in the United States paying more than it is now obligated to pay under the existing settlement.

III. Conclusion

We conclude [*25] that:

1. The Price-Anderson Act, *42 U.S.C. § 2210*(h), provided authority for DOE to enter into the Fernald settlement on behalf of the United States, without the approval of the Attorney General.

2. The Attorney General may not accede to DOE's request to use the judgment fund to pay the settlement. If DOE is without appropriated funds to pay the settlement, it must seek a special or deficiency appropriation from Congress for that purpose.

3. In the event that Congress does not provide such funds and they are not otherwise available, bona fide litigation to enforce the Fernald settlement agreement by either the DOE contractor or the original private plaintiffs directly against the United States could reach the judgment fund.

Please let me know if we can provide any further assistance in this matter.

J. Michael Luttig

Principal Deputy

Assistant Attorney General

Office of Legal Counsel

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Civil ProcedurePretrial JudgmentsDefaultDefault JudgmentsCivil ProcedureSettlementsSettlement AgreementsGeneral OverviewTortsProcedureSettlementsMultipartiesIndemnity