# Tab C
## (PART 1 of 3)



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

90-B-180

THE BUILDING AND CONSTRUCTION TRADES DEPARTMENT, AFL-CIO,
et al.

vs.

ROCKWELL INTERNATIONAL CORPORATION and DOW CHEMICAL COMPANY

AND

90-B-181

MERILYN COOK, WILLIAM JR., et al.

vs.

ROCKWELL INTERNATIONAL CORPORATION and DOW CHEMICAL COMPANY

---

REPORTER'S TRANSCRIPT OF PROCEEDINGS
HEARING ON MOTIONS

---

Before the HONORABLE LEWIS T. BABCOCK, Judge,

United States District Court for the District of Colorado,

commencing at 10:00 a.m. on the 21st day of December, 1990,

in Courtroom C-204, United States Courthouse, Denver,

Colorado.

GWEN DANIEL
Certified Shorthand Reporter
Drawer 3572 - 1961 Stout Street
Denver, Colorado 80294
(303) 571-4084

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

2

1                          A P P E A R A N C E S

2    FOR THE PLAINTIFFS:          BRUCE H. DeBOSKEY, ESQ.
                                  STEVEN W. KELLY, ESQ.
3                                 1290 Broadway, Suite 700
                                  Denver, CO 80203-5607
4                                          AND
                                  RONALD SIMON, ESQ.
5                                 1920 L Street, N.W., 4th Floor
                                  Washington, D.C. 20036-5004
6                                          AND
                                  MERRILL DAVIDOFF, ESQ.
7                                 DAVID BERGER, ESQ.
                                  PETER NORDBERG, ESQ.
8                                 1622 Locust Street
                                  Philadelphia, PA 19103-6365
9                                          AND
                                  STANLEY M. CHESLEY, ESQ.
10                                Central Trust Tower, Suite 1513
                                  Cincinnati, Ohio 45202
11                                         AND
                                  ROBERT GOLTEN, ESQ.
12                                1881 9th Street, Suite 216
                                  Boulder, CO 80302
13
     FOR THE DEFENDANT ROCKWELL
14   INTERNATIONAL:               JOHN D. ALDOCK, ESQ.
                                  MICHAEL S. GIANNOTTO, ESQ.
15                                FRANKLIN D. KRAMER, ESQ.
                                  1800 Massachusetts Ave., N.W.
16                                Washington, D.C. 20036
                                           AND
17                                JOSEPH J. BRONESKY, ESQ.
                                  633 17th Street, Suite 3000
18                                Denver, CO 80202

19   FOR THE DEFENDANT DOW
     CHEMICAL:                    DAVID M. BERNICK, ESQ.
20                                200 East Randolph Drive
                                  Chicago, IL 60601
21                                         AND
                                  SYDNEY ROOKS, ESQ.
22                                2030 Willard H. Dow Center
                                  Midland, Michigan 48674
23

24

25

3

1           P R O C E E D I N G S

2           THE COURT:  I have two cases, 90-B-180 and

3   90-B-181, which are set for hearing on motions specified in

4   my October 11, 1990 order with respect to each case.

5           I want to advise counsel that I am going to set

6   aside two hours this morning and two hours this afternoon

7   for hearing.  We will take about an hour at noon and we

8   will recess right about 3 o'clock.

9           So I will leave it to you to divide your time as

10   you see fit.  And I am going to abide fairly strictly by

11   the time limits.  That means you have about two hours per

12   side.

13           Now there are a number of counsel who appear.  I

14   don't know how you've allocated your resources.  I think

15   the -- I don't know, I suppose you've given your

16   appearances to our courtroom deputy, so I won't take them

17   further and delay the time.

18           The motions are motions filed by defendants

19   Rockwell and Dow in each case, and because those are the

20   defendant's motions, we will go ahead and take counsel's

21   opening arguments, allocating that time as you see fit.

22           MR. ALDOCK:  Your Honor, John Aldock for

23   Rockwell.  I would like to give your Honor the outline of

24   the way we and Dow would like to proceed.

25           We think we've organized it the way that will

4

1   expedite matters as much as possible, given the

2   circumstances here, and I would like to go through with you

3   and for the convenience of the plaintiffs how we -- we have

4   at least sought to organize it to make it at least

5   intelligible and get to some of the important dispositive

6   motions within your Honor's time frame.

7        I thought we would start, your Honor, with The

8   Building and Trades Construction Department case, and we

9   would start with the defendant's motion to dismiss because

10   of the workmen's compensation bar.  It's a dispositive

11   motion of that entire case, and I would begin on that.

12        THE COURT:  Can we, for ease of reference, call

13   that the "workers case"?

14        MR. ALDOCK:  Yes, your Honor.  Thank you.

15        THE COURT:  Okay.

16        MR. ALDOCK:  I thought I would spend about -- no

17   more than about a minute at the end of my time on that case

18   and also take up the motion to dismiss the labor

19   organizations, because it fits -- it will work in fairly

20   quickly.

21        We would then move to the Cook case.  Mr. Bernick

22   would start with Dow's motion for summary judgment on the

23   statute of limitations and the defendants' motions for

24   summary judgment as to plaintiffs' claim for scientific

25   studies.  Those would be I believe somewhat more lengthy

5

1    than the workers' comp and therefore is I think useful to

2    get those done.

3         Then we would do Rockwell's motion to dismiss the

4    claims of Rice, Deimer and Sandoval.

5         Rockwell's motion to dismiss or strike claims for

6    injunction to prevent further releases will be a 30-second

7    tag-on to that.

8         Then defendant's motion to dismiss CERCLA claims,

9    punitive damages, and the pleading arguments, if the time

10   permits, which are outrageous conduct and misrepresentation

11   and concealment.

12        We've sought to do it, your Honor, in a way that

13   -- as between the defendants one of us would take the lead,

14   the other might stand up very briefly and make one or two

15   very brief points; then the plaintiffs; and then presumably

16   with luck only one person in rebuttal.

17        With your Honor's schedule and with all these

18   people, we hope to be able to move it along, and I think

19   that the -- we have also chosen the workers argument to go

20   first.

21        If I may, I am an old-fashioned lawyer and the

22   workers argument is just notes on a yellow pad - no props,

23   no movies.

24        THE COURT:  When somebody stands there and tells

25   me that you are an old-fashioned lawyer and starts kicking

6

1    the dirty, I grab my wallet.

2          MR. ALDOCK:  Well, it will at least be easier to

3    follow.

4          THE COURT:  And I don't need to today, because I

5    forgot it and left it at home.  Go ahead.

6          MR. CHESLEY:  Judge, we can lend you some money.

7          THE COURT:  Don't do that.  Only a plaintiff

8    would do that.

9          MR.  BRONESKY:  We know that.

10          THE COURT:  All right.

11          MR. ALDOCK:  Your Honor, the complaint in this

12    action - this is the workers case, Building and

13    Construction Trades case, 90-B-180 - seeks relief against

14    Rockwell and Dow Chemical for various alleged injuries

15    suffered by the plaintiffs as a result of their employment

16    at the Rocky Flats Nuclear Weapons Plant in Golden,

17    Colorado.

18          The plant is owned by the United States and

19    operates under the jurisdiction of the U.S. Department of

20    Energy.  Pursuant to contracts with the Department of

21    Energy and it's predecessors, Dow operated the plant from

22    1951 to June of 1975, Rockwell operated the plant from July

23    of 1975 to December 31st, 1989.

24          The plaintiffs are three individuals who are

25    currently employed at Rocky Flats as a painter, electrician

7

1   and sheet metal worker, two individuals who are retired

2   employees of Rocky Flats and two labor organizations, many

3   of whose members work at Rocky Flats.

4           THE COURT:  The two retired employees worked for

5   whom when?

6           MR. ALDOCK:  It is unclear from the -- from the

7   papers exactly who they worked for, but the plaintiffs may

8   have that information.

9           MR. DeBOSKEY:  Your Honor, I can answer that just

10  very quickly.  Bruce DeBoskey on behalf of the plaintiffs.

11  Virgil Owen and Patrick Kelly both worked for Dow and

12  Rockwell, both retired during Rockwell's tenure at the

13  plant.

14          THE COURT:  And the other three, give me their

15  tenure.

16          MR. DeBOSKEY:  They are presently employed at the

17  plant working for EG&G, and I believe that they all three

18  -- one second.

19      (Co-counsel conferred.)

20          MR. DeBOSKEY:  Two of them worked for Dow and

21  Rockwell, one of them worked only for Rockwell.

22          THE COURT:  Who was it that worked only for

23  Rockwell?

24          MR. DeBOSKEY:  We believe it's Mr. Saxon.

25          THE COURT:  Thank you.  Go ahead.

8

1    MR. ALDOCK:  Your Honor, the complaint also seeks

2  certification of two plaintiff classes:  (1) all current

3  employees of the plant who are members of the Colorado

4  Building and Construction Trades Council and (2) all

5  persons formerly employed at the plant.

6    The gist of plaintiffs claims against Rockwell

7  and Dow are that during their operation of the plant

8  radioactive and non-radioactive hazardous substances were

9  released into the environment, and as a result the

10  plaintiffs allege that they have or may have been exposed

11  to such hazardous substances.

12    They allege two types of harms from this

13  exposure:  an increased risk of contracting fatal or

14  otherwise serious illness, which plaintiffs term

15  substantial but as yet undetermined in magnitude, allegedly

16  causes plaintiffs to require medical detection and

17  surveillance services; and second, they seek damages for

18  adverse economic consequences, including but not limited to

19  diminished ability to secure employment and insurance.

20    Having set the case, your Honor, Rockwell and Dow

21  have moved to dismiss the entire Building and Construction

22  Trades case due to the exclusivity provisions of the

23  Colorado workers' compensation.

24    Before addressing plaintiffs' specific arguments,

25  it's important to focus on the implications of plaintiffs'

9

1    lawsuit, more specifically what the plaintiffs are asking

2    this Court to do.

3         Under plaintiffs interpretation of the law any

4    employee anywhere in Colorado, or for that matter in any

5    state with a comparable act, who has or may have been

6    exposed to a hazardous substance in the workplace, or

7    frankly any other type of workplace injury, but who has not

8    suffered a disability as a result of the exposure of the

9    risk, may bring a tort action against his employer to seek

10   remedies in the form of medical monitoring and scientific

11   studies, punitive damages, and frankly any other remedy

12   that he desires, unless the specific remedy is both

13   provided by the Colorado Workmen's Compensation Act and is

14   provided to the employee when he wants it.

15        That has never been the law of Colorado, it is

16   not the law of any other state of the union.   For very good

17   reason.

18        That law, without the exclusivity principle on

19   which workmen's compensation was based, it would spill tort

20   law back into the workplace at the whim of any employee who

21   could carve out a supposed legal injury, which could be

22   carved out creatively for any injury.

23        The result would be that employees' employers

24   would be stripped of the one benefit the legislature gave

25   them, the benefit of being insulated from tort suits for

10

1    workplace injury.

2         Workers' comp statutes are a trade-off.

3    Employees get certainty.  They get certain benefits, but

4    those benefits are less than they get in tort lawsuits.

5         Employers give up their defenses, and in exchange

6    they are shielded from tort suits.

7         The statute provides that once there is coverage,

8    the only remedies under the Act, section 8-42-102 is

9    broadly written, and I quote, "all causes of action, suits

10   in equity, and statutory and common-law rights and remedies

11   for and on account of the death of or the personal injury

12   to any employee."  It was brought broadly drafted to ensure

13   that employees got their part of the bargain.

14        Coverage under 8-52-102 requires only employer

15   insurance and a work-related injury.  The plaintiffs

16   concede the work-related injury; Dow and Rockwell bought

17   the insurance.

18        THE COURT:  Well, let me ask you a question about

19   the insurance.  You say that Dow and Rockwell bought the

20   insurance and that it is at least implicit if not explicit

21   is your statement in the motion that during the entire

22   tenure, from 1951 through June '75 Dow had policies which

23   complied with the Act - and I will refer to it as "the Act"

24   - in effect, and that thereafter during all times material

25   to this case Rockwell had policies effective that complied

11

1   with the Act, but I haven't seen either by affidavit or by

2   attachment those policies.

3        The plaintiffs seem to raise a question as to

4   whether that is true as a matter of fact or whether there

5   is a genuine dispute about that.  And if we go beyond the

6   12(b) motion to dismiss and start attaching this stuff, we

7   are in the rule 56 area.

8        But you say that there's insurance coverage and

9   has been, and this is the _sine qua non_ to application and

10  compliance of the Act.  But I don't know that if it's

11  contested, do I?

12       MR. ALDOCK:  Well, your Honor, we have cited case

13  law, numerous cases of the Tenth Circuit and the Colorado

14  courts.  For example, the _Stewart_ case in the Tenth

15  Circuit, 1982, 716 F.2d at 764 - "Finally" -- quote,

16  "Finally Rockwell did in fact obtain and maintain such

17  insurance."

18       The _Olveda_ case at 508 F.Supp. 2589 does the same

19  for Dow.

20       We've cited cases going over many years.  We have

21  filed one policy as an attachment to our brief and given

22  the policies to the plaintiffs.  We have not put in an

23  affidavit, but there have been workmen's comp cases decided

24  in this jurisdiction for 20 years or more citing the

25  policies, paying the benefits, and the courts have always

12

1   accepted the insurance.

2          There is absolutely no reason to doubt the

3   insurance, other than the fact that the plaintiffs cite to

4   a case involving the State of Washington where the State of

5   Washington was the insurer.

6          Frankly, your Honor, in order for them to

7   seriously contest this it would have to be that all of

8   those cases we've cited for all of those years were frauds

9   on the court, that all of those affidavits that were filed

10  and cited in all of those published opinions are perjured,

11  that the policies that are attached, one to our papers and

12  the others given to counsel, are forgeries.

13         We just can't conceive that that is a serious

14  issue.  If an affidavit would be useful on that issue, we

15  would be happy to put it in.

16         But to proceed with the case on the ground that

17  we have a major fact dispute on this issue, we would

18  suggest, your Honor, would be a mistake.

19         The basic error of the plaintiffs in their

20  analysis of the statute is a simple one – they confuse

21  coverage under the Act with compensability to the employee.

22         They argue, we would suggest through pretty

23  creative if not gross mischaracterization of the case law,

24  that the statutory bar extends only to situations when an

25  employee receives money or other benefits under the Act.

13

1      The fact is that an injury may be covered because

2  it is work related, but the specific facts may leave the

3  worker without a benefit.

4      For example, a worker gets headaches at work from

5  noise from the machinery.  Unless he's disabled, unless he

6  sees a doctor, he can't file a lawsuit; but he doesn't get

7  any money until he's disabled or until he sees a doctor.

8      There is a difference between coverage and

9  there's a difference between compensability.  This makes

10  sense.  The workmen's compensation statute was meant to

11  provide benefits that are narrow rather than tort system.

12  If an injury does not rise to the level where benefits

13  should be paid, it would make no sense at that point to let

14  the less injured people sue in tort, but the more seriously

15  injured people, the people who are disabled or the people

16  deceased have to go to the workmen's comp system.

17      This sensible reading of the statute is confirmed

18  by the case law.  The Tenth Circuit decision in Silkwood

19  versus Kerr-McGee is directly on point.  In Silkwood the

20  Tenth Circuit squarely held that exposure to radiation in

21  the workplace was covered under the Workmen's Compensation

22  Act because it was an injury, even though that injury was

23  not presently subject to compensation.

24      THE COURT:  That was a single incident, wasn't

25  it?  Or was that a long-time exposure?

14

1         MR. ALDOCK:  They pointed in the opinion to a --

2  several -- several incidents, but to be sure Ms. Silkwood

3  had been working there for a long time.  Her real fear, her

4  real anxiety came from a couple of things that happened,

5  but it was basically radiation exposure, her fever and

6  anxiety.  It was directly what the plaintiffs seek here.

7         THE COURT:  There was only one -- there was only

8  one employer involved over the duration of one tenure,

9  correct?

10        MR. ALDOCK:  That's right, your Honor.  The

11  Court's opinion in that regard I think is quite

12  instructive.  The Court says at pages 919 to '20, "If a

13  worker on the job received a hammer blow to the thumb

14  causing pain and suffering but no time loss, surely he or

15  she could not sue the employer in common-law tort.

16        "We believe the Oklahoma Supreme Court would hold

17  that any accidental injury incurred on the job would be

18  covered by the Workers' Compensation Act and that the

19  radiation exposure here is such a case.

20        "The fact that the Act does not compensate for

21  every aspect or degree of the injury makes no difference."

22        And that is exactly the point.  Plaintiffs

23  attempt to distinguish Silkwood on two grounds:

24        One, they argue, but make no factual basis for

25  the Oklahoma statute being different than Colorado.  In all

15

1    pertinent respects relevant to this case, it's the same.

2    Moreover, the Tenth Circuit and the Colorado courts have

3    repeatedly cited that statute as authority for

4    interpretation of the Colorado statute.

5          Second, plaintiffs claim that the Tenth Circuit's

6    analysis in Silkwood somehow depended on the existence of

7    what they call a physical component in Silkwood's claims.

8          The fact is, however, her exposure was exposure

9    to radiation, and she claimed, and I quote, "the need for

10   medical treatment and examination," at page 919.  That's

11   exactly the claim that we have here.  It had no physical

12   component.

13         The cases that the plaintiff cite demonstrate

14   that the Colorado statute covers their claim in this case.

15   In the cases they cite, the issue was uniformly whether the

16   injury was covered by the Act due to questions about

17   work-relatedness or questions about employer status.

18         For example, they rely on questions submitted to

19   the Tenth Circuit.  A rape by a co-employee.  Just the kind

20   of case that underscores the question of whether the

21   employment relationship was there.

22         We have no issue of employment relationship here.

23   Their whole case rests --

24         THE COURT:  You have a question of employment

25   relationship as to the one employee who worked only for

16

1    Rockwell.   There is as I understand it no employment

2    relationship between that -- apparently that's Mr. Saxon --

3    between that employee and Dow.   Now why isn't Dow simply a

4    third-party tortfeasor as to that employee?

5         MR. ALDOCK:   Your Honor, I am going to say two

6    things about that.   Maybe the people from Dow might want to

7    say more.

8         THE COURT:   In your -- I mean they may well, but

9    it's an important point to me.

10        MR. ALDOCK:   Let me answer it.   Let me say this:

11   First, the argument that they would have to be making,

12   which is one they did not make in their complaint, would be

13   that because Dow left the plant, leaving radioactive

14   materials to its successor, that this -- the next employee

15   that comes along, Rockwell, has the -- Rockwell now has the

16   employer's compensation insurance, but they can sue Dow,

17   because he left -- because they left the stuff there and

18   it's still there, and therefore they have some

19   responsibility.

20        That would make absolutely no sense, would cut

21   even a bigger hole in the workmen's comp situation than the

22   other things they are asking for.

23        The next day -- every time you switch general

24   contractors, you would always sue the other guy before.

25        There is law that says when the people are at the

17

1   same level, subcontractors can sue each other.  But there

2   is also law that says that the statutory employer can

3   protect the people below him in the chain.

4          And if your Honor looks at 8-48-101, sections 1

5   and 2, we have that law.  Most of it is not cited in the

6   briefs, because this claim is not pled anywhere in the

7   complaint.

8          And it would not survive but for a few employees

9   anyway, even if it did.

10          But if you look at those statutes, they say two

11  things:  one, you're the statutory employer for all your

12  subcontractors; two, the government is the statutory

13  employer for Rocky Flats.  It has been so held in a number

14  of cases - a Stewart case, Tenth Circuit, 1982 at 716 F.2d,

15  764; the Olveda case, 508 F.Supp. 255, at 258 and 259.

16          Those are cases where the government was

17  repeatedly held to be the statutory employer.

18          Under 8-48-101(2) all of DOE's employees,

19  servants and agents are entitled to the bar.

20          Rockwell and Dow are agents of the government of

21  the United States.  They are the prime agent.

22          THE COURT:  It's your position that Rockwell and

23  Dow are both subcontractors and that these employees are in

24  law employees of the Department of Energy?

25          MR. ALDOCK:  They are employees -- the Department

18

1  of Energy is the statutory employer to all of these people,

2  and the cases have so held.

3  And if your Honor looks at the case of Posey

4  versus International Royal Electric Association - again not

5  cited in the briefs, because they didn't brief this issue,

6  at 583 Pacific 2d, 303, Colorado appeal 1978 - you see the

7  application of the agency principle.

8  But our position is the government is the

9  statutory employer, and we are entitled to -- the suits up

10  the line.  It may well be that at the same level, like in

11  the Krueger case you can do something, but you don't get

12  all the way up the line on a situation like this.

13  It would make absolutely no sense that every time

14  you switched the general contractor, the guy waits one day

15  and then sues the new guy, even though the policies have

16  been in effect straight across-the-board.

17  THE COURT:  Well, I am not worried here about Mr.

18  Saxon's suing the new guy, I am worried about him suing the

19  old guy - Dow.

20  MR. ALDOCK:  Well, that's exactly the point, your

21  Honor.  I mean what -- Mr. Saxon had no claim against Dow

22  in June of 1975 for exactly the conduct that Dow was

23  engaged in.  He waits until July of the same year; he can't

24  sue Rockwell, who's taken Dow's place, but he brings the

25  suit he didn't have before against Dow.

19

1      I mean you would have a situation that every time

2   you switched, you sued the old guy, because he was

3   substituted out.  It makes no sense.  It also isn't the

4   claim.  The claim is for releases.  The releases take place

5   when the releases take place.

6      The concept that the release took place under

7   Dow's watch, but the employee's exposure took place under

8   Rockwell's watch, and therefore they get to pick and choose

9   in order to avoid workmen's compensation, would wreak havoc

10   with the statute.  It would make absolutely no sense, and

11   that's what the agency principle in the statute was meant

12   to preclude.

13      It is also, your Honor -- I would suggest for

14   purposes of this motion, it is not what they pled in this

15   lawsuit, and that kind of a claim would make no sense here.

16      With regard to the other distinctions that they

17   make with regard to exceptions to workmen's comp, they

18   don't bear scrutiny.

19      First they argue that the worker comp statute

20   only applies to physical injuries.  That cannot be.  It

21   cannot be for three reasons:

22      One, the very jurisdiction of this case is pled

23   by the plaintiffs to be Price-Anderson.  Price-Anderson

24   predicates jurisdiction on a nuclear incident that requires

25   an occurrence resulting in bodily injury, sickness, disease

20

1   or death.  If there is no physical injury, your Honor,

2   there is no jurisdiction for this lawsuit.

3          Second, the claims that they are making,

4   cancerphobia, however they want to claim them, they are

5   claims that people have physical injury as a result of

6   radiation.  They are physical claims.  They are bodily

7   claims.  You can frame any claim as freedom from something

8   else, but these are physical claims.  At bottom they have

9   to be.

10          Moreover, the statute doesn't distinguish between

11  physical and non-physical injuries anyway.

12          In 1986 the amendments typed the benefits for

13  mental injuries and emotional stress and those injuries

14  were retained within the coverage of the Act, even in

15  situations when there would be no compensation.

16          We refer, your Honor, to a case we cited in the

17  brief, the Holme, Roberts & Owen case decided by the

18  Colorado Court of Appeals on July 19th, 1990.  It clearly

19  makes the point – graphically makes the point – that the

20  legislature's purpose in those amendments was to preclude

21  some people from getting benefits, making sure that the

22  ones that got benefits met the legislative standard.

23          It is clear that it is not limited under the

24  Colorado law to physical injury.  Indeed, in four cases

25  since 1988 the courts of this jurisdiction have extended

21

1   jurisdiction to emotional claims.  Your Honor did it in

2   <u>Hoffsetz</u>.  The other courts are Farmer, Stewart and

3   <u>Montoya</u>.  Judge Finesilver did it in 1987 in Calderon.

4        The plaintiffs cite four cases - <u>Luna</u>, <u>Vigil</u>,

5   <u>Spulak</u> and <u>Kirk</u>.  They shouldn't be citing cases that are

6   decided without the benefit of the '86 amendments and the

7   intervening authority, but it is clear when you look at

8   those cases that they were.

9        Plaintiffs say that the workers' comp bar only

10  applies in case of disability or death.  <u>Silkwood</u> makes

11  clear - the hammer example - that can't be.  It also makes

12  absolutely no sense.  Can you sue in tort for a headache,

13  but if you get a brain tumor you are under worker comp?

14  That cannot be.  It would make absolutely no sense.

15       Having failed to find an existing exception to

16  workmen's comp, plaintiffs are inviting this Court to draft

17  a new one.  They are taking theories from outside this

18  jurisdiction in a variety of places - intentional tort,

19  fraud, malpractice theories.  They pull them all together,

20  and they say your Honor should make a new exception for

21  this case.

22       The Colorado law, your Honor, contains no such

23  exception.  The statute 8-42-102 says it exempts all cases

24  of action.

25       The three things they try to bring in are not the

22

1    law of Colorado and wouldn't help them if they were.

2            Intentional tort.  Colorado has declined to

3    fashion an intentional-tort exception in Eason, Kandt

4    Calderon, Hoffsetz, Stewart, Farmer and Montoya.

5            It is time not to have one now.

6            The intentional-tort exception as it applies in

7    other jurisdictions applies only to intentional torts for

8    the purpose of causing harm to a particular employee.  It

9    does not apply in the cases cited in our brief at note 23,

10   page 16 of the reply, it does not apply to workplace

11   injuries.

12           So it wouldn't apply if Colorado adopted it, and

13   Colorado has declined repeatedly to do so.

14           Fraudulent concealment.  Plaintiffs rely again on

15   cases from other jurisdictions.  Those cases - not Colorado

16   cases, it's never been adopted in Colorado – those cases

17   only apply when the employer conceals and aggregates --

18   aggravates an already-diagnosed injury or disease known to

19   it, but not known to the employee.

20           Since plaintiffs disavowed the existence of any

21   present disease, this exception for known and diagnosed

22   injury cannot possibly apply, even if Colorado were to

23   adopt it.

24           Finally, they go on the medical malpractice

25   theory, the Wright right case, where a doctor provides care

23

1   and the doctor is not integral to the operations of the

2   company.

3           Here what Rockwell has been doing at Rocky Flats

4   and what Dow has been doing at Rocky Flats and what the

5   plaintiffs complain about is the entire employment

6   relationship.  There is no frolic and detour by an employee

7   who happens to be a company doctor.

8           Those cases have absolutely no relevance.

9           Your Honor, this case should be dismissed based

10  on the Workmen's Compensation Act, the controlling

11  precedent in the Tenth Circuit, the controlling Colorado

12  authorities from the state courts.

13          The plaintiffs' invitation to rewrite the laws of

14  this case should be rejected.

15          Before finishing on the workers case and before

16  Mr. Bernick begins on the Cook case, I would like to say a

17  word about the union's standing problem.

18          If there's a workers' comp bar, we don't reach

19  union standing; there's no case; the case is dismissed.

20          If there isn't, the unions don't have standing.

21          The Supreme Court authority which we and the

22  plaintiffs both agree apply, UAW v. Brock, says, "An

23  association has standing only where neither the claim

24  asserted nor the relief requested requires the

25  participation of individual members in the lawsuit."

24

1    Plaintiffs claim "we want monitoring relief, we
2  want studies that applies to everybody."  Don't have to
3  look at any plaintiff.  They would prefer to have it that
4  way.
5    That is not the way this lawsuit would play out
6  if it were to go forward.  We have a right to shoot at the
7  named plaintiffs.  This class has not been certified.  This
8  class should not be certified.  The named plaintiffs, and
9  indeed if they would go forward with a larger group, would
10  have to put on individualized proof of a myriad of issues.
11    Exposure alone.  Every union member worked at
12  different times at different places for different people,
13  yet different actual and potential exposures, he was
14  exposed to different quantities of the hazardous
15  substances; he was exposed, if he has a risk at all, to
16  different types of exposures; his genetic makeup was
17  different, he had different habits, he may have smoked.
18  All would be relevant.  His need for monitoring is
19  individualized.
20    The Supreme Court in Warth v. Seldin said, "An
21  association lacks standing where the alleged injury is
22  peculiar to the individual member concerned and both the
23  fact and extent of the injury would require individualized
24  proof."
25    This is true whether the individuals are required

25

1   to put on their case, whether it's part of our defense,

2   whether it's part of damages.  It would also be true on

3   everything else on the case - statute of limitations,

4   reliance, misrepresentation, assumption of risk,

5   contributory negligence.

6        This is not a case of generalized relief.  The

7   plaintiffs wish it so.  It is not the case.

8        Your Honor, this case is barred by the Colorado

9   Workmen's Compensation Act and should be dismissed on that

10  basis.

11       Thank you.

12       THE COURT:  Thank you, sir.  Mr. Bernick.

13       MR. BERNICK:  Your Honor, I would like to use

14  some of the equipment we have set up here.  Would it be all

15  right if I just stood right here at my table and had a

16  scratch pad pulled over here?

17       THE COURT:  Sure.  I don't chain you to the

18  podium.  Walk wherever you need to be.

19       MR. ALDOCK:  Your Honor, he was gonna start

20  another argument.  I thought we would go with the

21  plaintiffs in response to each one, if that makes more

22  sense.

23       MR. BERNICK:  That's fine with me.

24       MR. ALDOCK:  Otherwise we will lose it as we go

25  down the frame.  But I thought the plaintiffs would respond

26

1   to this set of motions, we do rebuttal and go to the next

2   one.

3           THE COURT:  That suits me.  Is that all right

4   with the plaintiff?

5           MR. BERNICK:  That's fine.

6           THE COURT:  Mr. DeBoskey, are you going to argue?

7           MR. BERNICK:  I was just concerned about being

8   able to keep track of the time.

9           THE COURT:  I am going to keep track of the time.

10          MR. DeBOSKEY:  Morning, your Honor.  I am Bruce

11  DeBoskey of the Denver law firm of Silver & DeBoskey, one

12  of the counsel for the plaintiffs in both the workers and

13  the residents case.

14          Before we begin on the substance I would like to

15  take a minute and just introduce my co-counsel so you know

16  who is here.  Seated at the head of the table is Merrill

17  Davidoff and next to him is David Berger.  Mr. Davidoff is

18  going to be addressing the statute of limitations issue,

19  which I expect we will get to later this morning or early

20  this afternoon.  And Mr. Berger is going to be addressing

21  the issues related to medical monitoring and detection in

22  the residents case and the mootness argument raised by the

23  defendants.

24          Seated next to him is Mr. Ron Simon of the firm

25  of Connerton, Ray and Simon.  To his left is Mr. Stan

27

1    Chesley.  And seated here also at table is Mr. Steve Kelly

2    of our firm, Silver & DeBoskey.

3            Also present in the courtroom is Louise Roselle

4    with Mr. Chesley's firm, Peter Nordberg with Mr. Berger's

5    and Mr. Davidoff's firm, and Mr. Robert Golten, who is also

6    counsel of record in the case, is in the courtroom.

7            I would also point out, your Honor, that numerous

8    plaintiffs are here in the courtroom today and are present

9    for today's argument.

10           The claim in the workers case is for independent

11   medical monitoring and detection, which consists of three

12   components:  medical testing, population-based health

13   studies and scientific studies of the incidence of disease

14   and other health problems in the worker population.

15           THE COURT:  Well, the cases that you've cited

16   that have across the country fairly uniformly -- and I go

17   to the D.C. Circuit, the one that the panel of Judge Bork

18   and Judge Starr and Judge Mikva --

19           MR. DeBOSKEY:  The _Friends for All Children_.

20           THE COURT:  Sure.  That seems to be kind of one

21   of the seminal cases.  They talk in terms of the propriety

22   of adopting this hybrid tort for individual medical

23   monitoring, but they don't speak in terms of the more

24   broad-based, widespread-study issue that you've raised.

25           MR. DeBOSKEY:  And your Honor, that's correct

28

1    with respect to that case, but in toxic tort cases -- and

2    the most notable example is the Three Mile Island case in

3    which Mr. Berger has been directly involved, they have used

4    the medical monitoring technique.  Also the Fernald case in

5    which Mr. Chesley has been involved, they have used medical

6    monitoring as a basis for establishing populationwide

7    epidemiologic studies to determine the amount of the risk.

8         As we pled in this case, your Honor, we believe

9    and we believe we can demonstrate the workers have an

10   increased risk by virtue of their exposure to substances at

11   Rocky Flats.  But the purpose of medical monitoring and

12   detection in part is to quantify that risk.  And the only

13   way to do that is to do population-based studies, either

14   retroactive or prospective.  And that is precisely what has

15   happened with respect to the weapons facility in Fernald

16   and what's happened with respect to TMI.

17        And I would like to defer, if I could, to

18   questions both to Mr. Chesley and Mr. Berger on those

19   points, because they have direct experience in the courts'

20   use of the medical monitoring as a technique for

21   population-based health studies.

22        THE COURT:  Okay.  Let me lay this question out

23   there, because you are the Colorado expert, being local

24   counsel.  Assuming that workmen's compensation -- the

25   Workmen's Compensation Act doesn't apply here, there has to

29

1   be a recognized cause of action by the State of Colorado,

2   because I am sitting as I understand it essentially as a

3   court in diversity.

4        That being so, I am not aware of any Colorado

5   authority that has recognized with approval the medical

6   monitoring cause of action, either in its narrow form or in

7   the more broad-based form that you propose.

8        So I am going to need to be told why I can

9   anticipate the Colorado Supreme Court is going to buy off

10  on that cause of action.

11       MR. DeBOSKEY:  Well, there's two responses to

12  that, your Honor.  One is that they have not challenged in

13  either the residents or in the worker case whether medical

14  monitoring and detection is an appropriate remedy.  That

15  has not been their legal argument.

16       In the residents case they are saying that we

17  shouldn't do it because it's already being provided by the

18  state, but not because it isn't a recognizable cause of

19  action.

20       And in the workers case they are saying we

21  shouldn't do it because it's barred by workers'

22  compensation.

23       But as of yet that issue hasn't been raised.  But

24  more to the point, your Honor, Judge Carrigan of this Court

25  in the City of Northglenn case recognized the existence of

30

1   medical monitoring and detection for persons who have been

2   exposed to gasoline fumes in that case.

3          Are you familiar with that decision, your Honor?

4          THE COURT:  Well, vaguely.

5          MR. DeBOSKEY:  And that is the case in Colorado

6   which appears to most closely accept the principles which

7   we are asserting here.

8          Your Honor, it's also established black-letter

9   law in Colorado that you are entitled to the medical

10  testing and consequences of -- of exposures under tort law.

11         And we think it's a natural development of the

12  law in Colorado based upon the law that has been

13  established in jurisdictions around the country.  And the

14  most recent example, the Third Circuit decision in the

15  Paole case, which we've supplemented our briefs with and

16  given to you, recognizes that medical monitoring and

17  detection is an appropriate tort in incidents like this

18  where you don't have a claim of personal injury, where you

19  don't have a claim of death or disease or cancer, but yet

20  you have a population of people who have been exposed to an

21  increased risk.

22         And the elements are -- that we will have to

23  demonstrate in order to meet our burden of proof, is that

24  there has been an exposure to hazardous substances.

25         That's alleged in the complaint.  And we believe

31

1   we can demonstrate that and that there's an increased risk.

2   We believe we can demonstrate that, and that is of course

3   also set forth in the complaint, and that medical

4   monitoring is reasonably necessary to help, number one,

5   ascertain the risk, and number two, and very, very

6   important in this case, is to help people take preventive

7   measures, to help people obtain early detection of the

8   nature of their risk and perhaps the nature of their

9   disease, so that they can cure their disease before it gets

10  to be too late.

11       THE COURT:  Just to help maybe move this along,

12  let me assume for purposes of these arguments that the

13  State of Colorado would recognize in some form a medical

14  monitoring cause of action, then that would take us into

15  the question of the application of the Act.

16       MR. DeBOSKEY:  What we are not claiming here is

17  anything which is covered under the Act.  We are not

18  claiming a personal injury, we are not claiming emotional

19  distress on behalf of the workers, we are not claiming fear

20  and anxiety, we are not claiming the headache which counsel

21  for the defendants referred to, we are not claiming

22  cancerphobia.

23       We are claiming that as a result of the exposure

24  to radioactive and non-radioactive substances at Rocky

25  Flats, that are legally protected interests to be -- and

32

1    it's an economic interest -- to be free from the costs of

2    having to determine whether or not we have been injured as

3    a population and as a group of workers, has been wrongfully

4    invaded by the conduct of the defendants.

5            THE COURT:  Well, it's something more than a pure

6    economic interest -- I mean there are economic interests or

7    economic damages that flow in personal injury from tort.

8            MR. DeBOSKEY:  Absolutely.

9            THE COURT:  But this is a hybrid to the extent

10   that it is personal to ones bodily integrity, isn't it?

11           MR. DeBOSKEY:  Obviously the exposure is to a

12   person, it's to a worker, but it did not result in an

13   injury.  We are not claiming -- for example, on the

14   enhanced-risk cases, where plaintiffs come into court and

15   they say "we've been exposed and as a result of the

16   exposure we have a present injury, ourselves have been

17   altered in the sub-cellular way that radiation can alter

18   genes."

19           And that's what Radford v. Susquehanna case of

20   this Court.  Those people come into court and they say "we

21   are entitled to damages today, because we have an increased

22   risk of getting cancer tomorrow; quantify -- quantify that

23   risk today, ladies and gentlemen of the jury, and pay us

24   now for our injury, and we will tell you whether or not

25   it's more probable or not that we are gonna get cancer."

33

1    That's the enhanced-risk cases.

2        That's not what we are seeking here.  What we are

3    saying, we are over here -- we are saying we don't know how

4    badly we have been injured, if at all.  The best news would

5    be medical detection would be awarded in this case and the

6    plaintiff classes would be certified and the medical

7    monitoring would determine that they haven't been injured.

8    But they have a right to know.  They have a right based

9    upon the requirements of exposure and increased risk to

10   learn whether or not they have been injured, and if so, can

11   they take preventive and early-detection measures to

12   enhance the chance of cure.

13       We are not in here alleging that these men and

14   women who have worked for 38 years at Rocky Flats have been

15   injured, because if we were, if they -- if we said that

16   they had cancer, if we said that they had emotional

17   distress, then the statute provides that that's a covered

18   injury under the Workmen's Compensation Act of this state.

19       We are in here saying that we have been exposed,

20   we are saying that we have an increased risk.  We don't

21   want damages for the increased risk.  That's the

22   enhanced-risk case.  But we want the right to determine

23   from an independent source, someone other than Dow and

24   Rockwell, who have been telling us how safe it is to work

25   here, whether or not we have been injured and to what

34

1    extent we have been injured.

2         And that's the distinction between a personal

3    injury claim for enhanced risk and a medical monitoring

4    claim, which although it has enhanced risks or increased

5    risk as an element, is not seeking damages for any injury

6    to the person who has been exposed.

7         The statute couldn't be more clear.  The statute

8    at section 8-42-102, which is the provision which provides

9    the exclusivity of workers' compensation, talks about all

10   causes of action for such death of or personal injury to an

11   employee.

12        We are not seeking any damages for death of or

13   personal injury to an employee.

14        All of the other statutes, including the statutes

15   that talk about exposure to radiation, all provide that

16   it's workers' compensation if there's death or disease or

17   injury, personal injury as a result of that exposure.

18        We are not claiming that, we are not seeking

19   that.  Those claims are not present in this lawsuit.

20        The exclusivity provisions of the statute are to

21   be narrowly construed, because of the quid pro quo.  You

22   can't take something away unless you give something in its

23   place.  If it's not covered, then it's not barred.

24        And Dow's brief and Rockwell's brief and

25   plaintiffs' briefs agree on that fundamental point.

35

1    And the question before your Honor is whether or

2    not medical monitoring detection rises to the level of a

3    personal injury claim in order to provide workmen's

4    compensation benefits or in order to be outside the bar of

5    the workmen's compensation statute.

6    An illustrative case for your Honor is the

7    Colorado Court of Appeals decision in City of Littleton

8    versus Shum. There we have it as close to the similar

9    circumstances as we have been able to find in this state.

10    You had a fireman who worked and was exposed to

11    hepatitis. He didn't get hepatitis, didn't claim that he

12    should have damages for hepatitis, but was exposed. He

13    went and he got inoculations to pry to prevent the

14    development of the disease in him because he had the

15    exposure. And workers' compensation reimbursed him. The

16    employer appealed.

17    And the Colorado Court of Appeals held - and I

18    want to read from the opinion, because I think it's right

19    on point - quote, "The mere happening of an accident does

20    not give rise to a right to benefits. Benefits flow only

21    to a workman who has suffered a disabling injury as a

22    result of the accident. Since in this case there was no

23    disease or injury and since the statute does not provide

24    for compensation for preventive measures, the award must be

25    set aside."

1    And the Court of Appeals said that it wasn't

2 covered, it wasn't a covered injury under the Workmen's

3 Compensation Act, the laws of this state.

4    We seek preventive measures.  We seek preventive

5 information from an independent source, exactly like the

6 fireman did in City of Littleton.

7    Defendants place enormous reliance on Silkwood,

8 but Silkwood was and is a different case.  Karen Silkwood,

9 the estate of Karen Silkwood went into court and said that

10 there was an exposure and that as a result of exposure she

11 had suffered severe emotional distress.  It's a personal

12 injury case.

13    And if you look at the Silkwood decision, the

14 references to her personal injuries are throughout.  It was

15 a personal injury case for severe emotional distress, for

16 her fear of cancer and other diseases during the short

17 period of time that she was alive after her exposure.  And

18 the Tenth Circuit held that under workmen's compensation

19 that's covered.

20    And that's precisely why that case is not

21 applicable to what we are talking about here, because we

22 are not seeking a personal injury.

23    Granted, the cause, the exposure to radiation may

24 have been the same, but the claims were different.

25 Personal injury claims are covered, non-personal injury

37

1    claims are not.  Karen Silkwood did not seek medical

2    monitoring and detection because, of course, she was dead

3    and was unable to have any benefit from it.

4        So the Silkwood case really, although it's

5    interesting because it's an exposure, the claims that they

6    brought were different and necessitate a different result.

7        In Travelers versus Savio the Colorado Supreme

8    Court held that, "The exclusive liability sections apply

9    expressly only to injuries and parties covered by the Act.

10   Conversely, if either the injury or a party's status falls

11   outside the ambit of the Act, then the liability and

12   exclusivity provisions of the Act are inapplicable."

13       Here we have both the injury and the status

14   falling outside of the Act.  We really have three

15   categories of workers besides just Mr. Saxon, who we've

16   talked about, who don't have worker compensation claims.

17   We have all the current employees of Rocky Flats who never

18   worked -- many of whom never worked for Dow or Rockwell,

19   but all of whom have claims against Dow and Rockwell for

20   their ongoing exposures today that don't arise out of any

21   employment relationship with Dow and Rockwell because of

22   the mess that was left for them at their place of

23   employment.

24       THE COURT:  Run that by me again.  You have

25   employees out there who work for EG&G who have claims

38

1   against Dow and Rockwell.

2           MR. DeBOSKEY:  For their increased risk for

3   medical monitoring and detection.

4           THE COURT:  Who never worked for Dow and Rock- --

5           MR. DeBOSKEY:  Or who did work for Dow and

6   Rockwell.  All the current employees at Rocky Flats are not

7   barred by workmen's compensation on their claims for --

8   against Dow and Rockwell for their increased risk caused by

9   Dow's and Rockwell's negligence which results in exposure

10  today.

11          THE COURT:  Well, if they had worked for both Dow

12  and Rockwell and if assuming for the argument that your

13  claim was one for injury, then they are employees, aren't

14  they, under the Act?

15          MR. DeBOSKEY:  They would be employees and their

16  injury claim arising out of their employment exposures

17  would be covered by workers' comp.  But what we are

18  claiming is that there are non-injury claims arising out of

19  their post-employment exposures.

20          THE COURT:  Sure.  I mean you were telling me

21  that their status as current employees at Rocky Flats takes

22  them out of the Act as employees, and I don't understand

23  why.  That alone.  You are saying that alone, without

24  looking at the injury question.

25          MR. DeBOSKEY:  Because it's post-employment

39

1    exposure.  It's their exposure today.  It's just like what

2    you were talking about earlier with counsel for the

3    defendants.  A person who works for Rockwell, whether or

4    not he worked for Dow, has a claim against Dow for the

5    exposures that he receives during his employment at

6    Rockwell, a third-party claim, a classic third-party claim,

7    because of the negligence of Dow in creating the non-safe

8    working environment even after Dow has left.

9              THE COURT:  Doesn't the subsequent injury fund

10   come into application in that instance?

11             MR. DeBOSKEY:  Only if it results --

12             THE COURT:  Isn't that Dow Chemical versus Gabel,

13   Judge Van Cise's opinion?

14             MR. DeBOSKEY:  That comes into play when there's

15   injury or death, and we are arguing that there's no injury

16   and death, and so that there's no workers' compensation

17   coverage to begin with.

18             THE COURT:  Okay.  But you are telling me now

19   aside from the injury or death question that the mere fact

20   that they are working out there now for a new contractor

21   takes them outside the ambit of the Act in terms of their

22   status, not in terms of injury or death now.

23             MR. DeBOSKEY:  That's correct.

24             THE COURT:  Well -- okay.  Go ahead.

25             DeBOSKEY:  There's a second category of people,

40

1   and that's people who never worked for Dow who worked for

2   Rockwell, who came to work for Rockwell, and that's the

3   Saxon example.  There, there is no multiple employer

4   circumstance, there's only one employer, and that is as you

5   have described, the classic third-party tort claim against

6   a former operator of the plant for which there is no

7   subsequent injury funds involvement.

8          Finally let me just briefly address the

9   exceptions to workmen's comp.  Colorado has not been

10  generous in granting exceptions to workers' comp, but the

11  areas of exceptions to workers' comp are uniquely

12  applicable to the circumstances at Rocky Flats.  In fact,

13  Rockwell and Dow have provided a company doctor function

14  that goes far beyond just a physical examination.

15         All of the information concerning exposure to and

16  treatment of radiation exposure and non-radiation exposure

17  on the job comes from the medical department and the health

18  physics department, with company doctors treating and

19  administering drugs to employees who are exposed to

20  radiation.

21         Now we are not alleging medical malpractice in

22  this case.  But that exception combined with the

23  intentional-tort exception, we believe gives cause for

24  under these unique circumstances to allow this claim to

25  exist, even if it is somehow barred by workers' comp.

41

1  We strenuously believe that it is not barred by

2  workers' comp and so that you don't have to reach that

3  decision.  But in the event that you disagree, there is

4  ample authority we believe cited in our briefs for support

5  of an exception to the workers' compensation bar.

6  The other question that was raised in argument,

7  your Honor, has to do with the insurance policies.  We have

8  received copies of what purport to be insurance companies

9  -- insurance policies for Dow and Rockwell's tenure at

10  Rocky Flats.

11  And interestingly, an examination of those

12  policies raises more questions than answers, because it

13  shows that in some circumstances, if not all, the premiums

14  paid by Dow and Rockwell were exactly equal to the amount

15  of benefits paid under the insurance policy and were all

16  fully indemnified by the United States Atomic Energy

17  Commission or its successor agency, the DOE, in order to

18  indemnify the contractors, so that there really is no

19  genuine insurance and risk and actuarial policy in effect.

20  We do not know what agreement was in effect

21  between the U.S. Department of Energy, the contractors,

22  perhaps the Colorado Division of Labor, comparable to the

23  agreements which were discovered that existed in the State

24  of Washington and the State of Nevada, where in the

25  Prescott case the Court held that the agreement for

42

1   indemnity and the failure to provide insurance as required

2   by the Nevada law made the bar of the Workers' Compensation

3   Act not applicable.

4        Now we don't have enough information yet -- we

5   haven't had an opportunity to obtain discovery on the issue

6   of the nature of the relationship between the Division of

7   Labor, the insurance company, the contractor and the DOE.

8        But the Prescott decision, number one, and the

9   very language of the policies which have been provided,

10  number two, raise sufficient questions in our mind that we

11  don't know yet whether or not adequate insurance has been

12  purchased by these contractors for workers' compensation.

13        THE COURT:  Well, two questions.

14        MR. DeBOSKEY:  Yes, sir.

15        THE COURT:  Number one, what language are you

16  referring to in the policies?  And number two, do you

17  dispute genuinely that there have been policies written and

18  effective at all times material to this case?

19        MR. DeBOSKEY:  We do not dispute that injury

20  claims have been processed through the workers'

21  compensation system.

22        THE COURT:  Sure.  You have been responsible for

23  them.  You have plowed new ground there.

24        MR. DeBOSKEY:  I understand that.  But that's

25  what happened in Nevada and that's what happened in the

43

1    State of Washington with the DOE facility in Hanford.

2              So from our perspective it may all look the same.

3    And we are not -- we are not grasping at straws, but we

4    haven't had an opportunity to discover whether or not there

5    truly is an insurance agreement.  We haven't provided

6    insurance contracts.  But the insurance contracts provide

7    for 100 percent U.S. government indemnity of the insurance

8    company and/or the contractor.

9              And in some circumstances there's no premium paid

10   beyond the amount of benefits paid to workers' compensation

11   recipients.  It's a strange and unusual relationship.  And

12   that's all we know so far.

13             And it would be premature to decide as a matter

14   of law that there is coverage properly under the Act until

15   discovery has been fully explored and we've had an

16   opportunity to determine whether or not they have complied

17   with the requirements of the Act.

18             Obviously if you decide that there is -- that the

19   bar is not applicable, then that decision on that issue

20   becomes moot in this case.

21             THE COURT:  Let me ask you a question.  If the

22   insurance policy were void or they didn't have insurance,

23   aren't they nevertheless covered by the Act as being

24   self-insured?

25             MR. DeBOSKEY:  I don't know the answer to that,

44

1    your Honor.  We haven't had an opportunity to fully brief

2    that.  I don't think so, because I believe that insurance

3    is in fact a requirement of the Act.  And self-insurance,

4    there has to be certain steps that have to be taken in

5    order to demonstrate to the state that you are

6    self-insured, and we don't know whether or not those steps

7    have been taken.

8         As I understand it you have to qualify for

9    self-insurance, and the Division of Labor has to approve

10   you for that.  And I don't believe that those steps have

11   been taken, and we haven't had an opportunity to conduct

12   any discovery on that subject.

13        THE COURT:  Well, I don't even pretend to be an

14   expert in the area of workers' compensation, but it sticks

15   in my mind that if you are an employer under the Act and a

16   claim is made that falls within the Act and you are not --

17   you don't have insurance coverage or if you are not a

18   member of the fund, that there may be some penalties

19   provided, but nevertheless that you may be responsible to

20   provide benefits individually under the Act.  But I don't

21   know the answer to that question exactly.

22        MR. DeBOSKEY:  If your Honor deems that to be an

23   important issue in this case, after today's hearing we

24   would be happy to brief that issue and explore it more

25   fully based upon the law of the State of Colorado.

45

1      THE COURT:  Yeah, we will see.

2      MR. DeBOSKEY:  Because I think it's a little bit

3  unclear, and I think there are some statutory requirements

4  which have to be met for self-insurance, and in order to

5  have the protection for the exclusivity you have to comply

6  with the provisions.

7      And even in that circumstance where penalties may

8  be assessed, there may be circumstances and there may have

9  been decisions where because of the failure to comply with

10  either the insurance or the self-insurance provisions of

11  the Act, you don't get the benefit of the exclusivity

12  remedy.

13      THE COURT:  Okay.

14      MR. DeBOSKEY:  We would -- that's something we

15  would request an opportunity to brief, because it hasn't

16  been discussed or explored very much if at all by the

17  parties to this case.

18      THE COURT:  Okay.

19      MR. DeBOSKEY:  Your Honor, a personal experience

20  of mine I think is very telling as to why medical

21  monitoring and detection is important in this case.  We

22  tried a case in workers' comp of a man who died of cancer

23  after having worked at Rocky Flats for many years.  Last

24  fall.

25      He had hundreds of times more radiation in him

46

1   than the average Coloradan.  He had clearly an increased

2   risk of cancer from this radiation.

3          Dow and Rockwell responded to that case in

4   workers' compensation by saying there's no causation,

5   there's no bodily injury, there's no injury at all, there's

6   no increased risk.

7          In fact their chief expert testified that the

8   man's exposure to radiation was as important to him as any

9   risk that he would have received if he had worked at Dairy

10  Queen for all the years that he had been exposed at Rocky

11  Flats.

12         That response in workers' comp to legitimate

13  worker comp claims for injury or disease typifies the

14  difficult situation and somewhat the ironic situation that

15  workers today at Rocky Flats find themselves in.

16         Rockwell and Dow say "wait until you have cancer,

17  wait until you've really got a real personal injury and

18  then go over to workers' comp, and then we will fight you,

19  and then we will say that it was really like you worked at

20  Dairy Queen, you didn't really have an injury or disease

21  from Rocky Flats."

22         Here we have workers coming into court saying "we

23  don't know whether we have been injured or how much we've

24  been injured, we know we have an increased risk and we want

25  to find out once and for all whether or not that risk is

47

1   important or whether or not we have an opportunity to

2   prevent the occurrence of disease from having been exposed

3   to the most carcinogenic substances literally known to

4   man," which are in common use at the Rocky Flats plant.

5        And Dow and Rockwell will again come in and say,

6   "no, wait, wait, you have got to wait until you are dead,

7   and then your spouse has a claim, or you have to wait until

8   you get cancer, and then you have a claim."

9        And that isn't the law in Colorado.  Counsel for

10   defendants complain that this would open the floodgates of

11   medical monitoring for every case in Colorado where a

12   worker exposure has occurred.

13        Number one, that's not true, because Rocky Flats

14   is, as I am sure your Honor recognizes, an extraordinary

15   circumstance, a circumstance of operation for nearly four

16   years where unbelievable quantities of radioactive

17   materials have been released into the workplace

18   environment.

19        THE COURT:  Well, now I don't know that.  That's

20   easy to stand there and say in a 12(b)(6) motion, but that

21   assumes too much, Mr. DeBoskey.  Go ahead.

22        MR. DeBOSKEY:  I understand, your Honor.  And we

23   believe we can demonstrate that when we get down the road

24   to evidentiary hearings.

25        But the point is that Rocky Flats has not been a

48

1    safe place to work, and these men and women are merely

2    trying to have a remedy before it's too late for them to do

3    anything about their health.

4          And that's what this workmen's compensation bar

5    would prevent them from doing if your Honor rules that

6    these are injuries which are covered under the Act.

7          And I think that a clear examination of the

8    statute talks about personal injuries, talks about the

9    types of claims which are not being alleged.  We were very

10   careful not to allege them in this complaint, because we

11   are not under the coverage of the bar.

12         Finally, your Honor, Rockwell and Dow have not

13   contested the residents' right to medical monitoring and

14   detection I stated earlier.

15         Rather, they have only said that that remedy is

16   being provided by the state and so therefore the remedy

17   here is moot.  And that's an issue which Mr. Berger will be

18   addressing later on.

19         We could find ourselves in the ironic situation

20   where the residents who live downwind five miles away from

21   Rocky Flats are entitled to workers -- are entitled to

22   medical monitoring and detection, where the men and women

23   who have worked at the plant and who's had the greatest

24   opportunity to be exposed and the greatest increased risk

25   are denied that right because of the bar of workmen's

49

1    compensation.  And I think that that irony would not be

2    supported in the law and would not be just.

3            We request that the Court deny the motion to

4    dismiss and to rule that the limited relief which is being

5    sought by these workers is not barred by workers'

6    compensation, because no personal injury, no emotional

7    distress, no cancerphobia, no headache is being claimed.

8            Thank you, your Honor.

9            THE COURT:  Thank you.

10           MR. ALDOCK:  Very briefly, your Honor.

11           THE COURT:  Yes.

12           MR. ALDOCK:  Fernald and Three Mile Island cases

13   refer to settlements, not relief given by a court.  Mr.

14   DeBoskey opens and half argues the Rice motions, which are

15   not before you until later today.

16           We argue that there is no medical monitoring

17   claim in Colorado.  We don't raise the issue of the medical

18   monitoring claim in Colorado, because we argue that they

19   haven't even pled the medical monitoring claim as it has

20   been adopted in the PCB litigation in the Third Circuit and

21   other places, because they are going beyond it and they

22   haven't even pled it.  So we don't reach whether the Court

23   has to find a medical monitoring claim is viable under

24   Colorado law for purposes of the Rice motion, because we

25   say they haven't pled it even where it is viable.

50

1    None of the monitoring cases that he cites and

2 that are cited in our Rice motion where that issue was ripe

3 are worker cases, none of them.  It's no accident.

4    THE COURT:  Well, what do you -- the bottom line

5 here, what do you understand that they are asking for in

6 this case?

7    MR. ALDOCK:  They are asking us, your Honor, in

8 this case to prove their case.  They are asking us to do

9 studies to determine whether they have been exposed --

10 whether they have been exposed, the extent of their

11 exposure, and what they have been exposed to.

12    They are asking us to for the -- the relief they

13 would need for a true medical monitoring claim is to show

14 that there's substantial risk because of exposures.  No

15 plaintiffs pled that.

16    Two, they have to show that increased risk to

17 other people in the population.  Nowhere in the complaint

18 have they pled that.  If they show both of those, which

19 they must show by expert testimony under the Paoli

20 decision, their decision, the decision they filed, then

21 they wouldn't need us to do these studies that the State of

22 Colorado is doing anyway, because they would have had to

23 have had expert testimony that proved both of those.

24    They want us to do the study to determine whether

25 there's been the exposure and whether there is the excess

51

1    levels.  That's their element of proof, not their element

2    of damages.  Now that's the Rice motion, that's not the

3    workers' comp motion.

4         THE COURT:  Okay.  Well, now if the bottom line

5    of what the plaintiffs wants from you all is studies, that

6    certainly can't be compensation for disability or injury,

7    can it?

8         MR. ALDOCK:  Well, what they want is -- they want

9    two things, they want monitoring to determine if the person

10   is getting sick.  It's done at the plant.  It can be done

11   we think under workers' comp, citing Industrial Boards

12   decisions we've cited.

13        But in any event that's an injury claim.  You can

14   frame any workplace injury as "to be free from" - to be

15   free from headaches, studies to determine why I get

16   headaches, studies to determine whether lead exposure leads

17   to problems, studies to determine whether mining exposures

18   lead to problem.  Anything can be framed as studies to

19   determine whether we are "free from."  Those are not

20   studies to determine whether they are free from some

21   appropriate damage, they are studies to determine whether

22   they have a risk or a heightened risk because of exposure

23   to a personal injury.

24        Their way of framing it turns every personal

25   injury case into a monitoring case.  Whether the man goes

52

1   to the doctor to see why he gets the headaches -- why does

2   he go?

3            THE COURT:  Yeah, but he says they don't have

4   headaches.  He says there has been exposure, but he says

5   they don't have headaches yet.  He says they are not hurt

6   yet.

7            MR. ALDOCK:  The man says "I work in the -- a

8   plant that is very noisy, the power tools are terrible.  I

9   don't have headaches yet, but boy I am sure I am gonna have

10  problems.  I want to go see a doctor to see if I have got

11  hearing problems.  Forget going to the doctor.  I want the

12  plaintiffs -- I am gonna file a class action and I am gonna

13  make the employer do studies to determine whether at

14  certain noise levels you lose your hearing.  I don't even

15  have the headache yet, but I want them to pay for that

16  element of proof."  It works in every case.

17           THE COURT:  Isn't the primary premise of their

18  claim that there is no injury?  Isn't that the foundation

19  of their --

20           MR. ALDOCK:  If they claim no injury, your Honor,

21  how do they bring the case under Price-Anderson?  If they

22  claim no injury, then why is it that we are concerned with

23  risk of cancer and heightened risk of cancer?  You have to

24  have exposure and heightened risk.  You have to have

25  something.  In Silkwood, she wasn't injured yet.  She was

53

1   afraid that she would be injured.  Those were emotional

2   claims --   .

3          THE COURT:  Sure, emotional distress.  And

4   Colorado covered emotional distress under the Act.

5          MR. ALDOCK:  These are emotional distress claims,

6   and to be relieved of their emotional distress they want us

7   to do studies that will make them feel better, because the

8   studies will show, we believe, that they haven't been

9   exposed to a level that will hurt anybody.

10          THE COURT:  Well, Mr. DeBoskey says not only do

11   his clients not have headaches, but they are really not

12   emotionally distressed here today, all they want to do is

13   to be monitored from time to time so that if there comes a

14   time when they are injured, they can make their claim duly

15   as employees under the Workmen's Compensation Act.  What's

16   wrong with that?

17          MR. ALDOCK:  Your Honor, if Mr. DeBoskey says

18   that, then we know longer need to hear the emotional

19   distress claims they have, the outrageous conduct claims

20   and all those other things where they plead that they are

21   afraid, where they plead that they are concerned.

22          I mean if there's nothing wrong with these

23   people, whatsoever, which I think is probably right, we

24   would also say they haven't been exposed to a level that

25   rises to a cause of action for anything.

54

1          You need substantial exposure, and a risk that is

2     greater than the general population, all proved by expert

3     testimony, to get to the monitoring claim that the Third

4     Circuit recognizes for Pennsylvania law, but that Colorado

5     has not yet recognized.

6          They are basically seeking a personal injury

7     claim.  Exposure equals injury under the statute.  That's

8     what the workmen's comp is saying.  It says that if you

9     have got an occupational injury, an occupational exposure,

10    and you have any complaint about that of any kind, be it

11    physical or non-physical, after the '86 amendments you are

12    under workmen's comp.

13         What workmen's comp is about -- if it's in your

14    employment, if it's something that happened in your

15    employment and there's insurance, you are covered.

16         And to fancy it up with a big fund, to do all the

17    x-rays out of a fund as opposed to one-on-one, like it's

18    done on the plant or, going down to your own doctor and

19    doing it, doesn't change it.

20         THE COURT:  You tell me exposure equals injury

21    under the Act.  If you have an exposure but you have

22    absolutely no physical manifestations, no symptoms --

23         MR. ALDOCK:  Right.

24         THE COURT:  -- no disability, are you going to be

25    successful when you file your claim to the workmen's

55

1   compensation?

2          MR. ALDOCK:  You are not going to get benefits,

3   your Honor, but that's the difference between coverage and

4   compensation.  The Act says -- there are a lot -- you're

5   covered if it's occupational exposure.  You are covered for

6   the headaches.  You don't get any money for headaches.

7   That's the trade-off.  It is very clear when they put it in

8   the -- put in the emotional amendments in 1986.

9          And if you look at the Holme case, they said

10  "look, we put these in, there are gonna be a lot of people

11  with emotional claims that aren't gonna be able to recover,

12  but we gotta make sure that they also are covered within

13  the Act; they are not gonna get any money, but they are

14  covered within the Act."  Because the quid pro quo of

15  workmen's compensation is occupational exposure and

16  insurance equals coverage.  Compensation is --

17         THE COURT:  It -- well, yes --

18         MR. ALDOCK:  Coverage does not equal

19  compensation.

20         THE COURT:  That's right, coverage does not

21  necessarily equal compensation by way of benefits.  But --

22  well, I lost my train of thought.  Pardon me.  Go ahead.

23         MR. ALDOCK:  The City of Littleton case, your

24  Honor, was a case where they didn't get compensation, but

25  it didn't say they had a tort suit.  That's exactly the

56

1   point your Honor is making.   There are lots of cases.

2   Workmen's comp does not provide every remedy in the tort

3   system.   City of Littleton is just one of them.

4        With regard to the insurance points, your Honor,

5   all of the named plaintiffs work for Rockwell and all,

6   according to what we hear today at argument, but one worked

7   for Dow.

8        The fact that the premiums get reimbursed by the

9   United States government seems to me hardly relevant.   It

10   is astounding to me that the man who has argued probably

11   more workers' comp cases than anybody in this area from

12   that plant is now deciding, my goodness, we've never had to

13   file those, we could have been in tort for every one of

14   them; there hasn't been insurance; it's been a fraud on the

15   court in every case I have appeared in for 20 years; the

16   policies must be forgeries; this is an outrage; workers'

17   comp never worked."   It cannot be.

18        We've cited opinions of the Court with affidavits

19   in them.   We've given them the policies.   They are, I

20   suggest, your Honor, grasping at straws to suggest that we

21   should leave this case open so we can do a fishing

22   expedition to determine how the U.S. government reimburses

23   Rockwell.   How The Travelers pays its premiums; none of it

24   is relevant.

25        There's insurance.   The U.S. government is the

57

1   statutory employer.  Dow and Rockwell are agents of that

2   statutory employer.  All of these people either work for us

3   or work for our subcontractors.  All work for DOE.  There

4   are virtually a handful of employees that have been added

5   to EG&G since Rockwell left.  It hasn't been that long we

6   left the work force.

7         That is not this case.  This case is pled as a

8   class action for all these people.  The people they've pled

9   as the named plaintiffs are barred.  They are barred under

10  workmen's comp because there's coverage, whether or not

11  there's compensation.

12        Thank you.

13        THE COURT:  Thank you.

14        MR. BERNICK:  Your Honor, if I could address a

15  couple of remarks?

16        THE COURT:  No.  If we go back and forth we are

17  gonna be going and back and forth forever.

18        MR. DeBOSKEY:  Just one sentence.  There's no

19  authority for exposure equaling injury, and that's the

20  thrust of their argument.  Exposure does not equal injury.

21        THE COURT:  That's two sentences, unless you put

22  a semicolon in it.

23        MR. BERNICK:  Your Honor, in answer to your

24  question, there's also no authority, none that has been

25  cited, that says exposure alone gives entitlement to

58

1  medical monitoring. The Ayers case that they rely on is

2  their principle for medical monitoring, requires not just

3  exposure, it requires something else that Mr. DeBoskey has

4  said this morning, that he is not prepared to say that

5  these plaintiffs have, which is significantly increased

6  risk of cancer.

7       It is one thing to say that somebody is exposed.

8  It is another thing totally to say that somebody has a

9  significantly increased risk of cancer. That is an

10 independent requirement of the Ayers case. Ayers requires

11 exposure to hazardous materials and further requires that

12 there must be a significant increased risk of disease.

13      Now he says we are not talking about enhanced

14 risk, this is not a case where we are seeking recovery for

15 actually quantified enhanced risk. That is yet another

16 doctrine of law, which is quantitatively established

17 increased risk.

18      And then finally at the far end of the spectrum

19 there is actual injury - "I am sick today."

20      Now where do we stand in this spectrum? They say

21 "no injury today, we are not sick yet." And we accept

22 that. That's not what this case is about. They say "this

23 is not a case where there has been an actual increase in

24 risk that we are claiming for today." Those are the

25 enhanced risk cases, quantified enhanced risk. "We are

59

1   also not hurt today," they say.

2        But what was so significant that Mr. DeBoskey

3   said this morning is this is a right-to-know case.  We

4   don't even know that the plaintiffs -- that all of the

5   plaintiffs have any significant increased risk.

6        What he is saying today is that this is an

7   exposure case.  That's all that he is able to say.  And

8   indeed the request for monitoring that is being made

9   suggests that the first step of monitoring is to see

10  whether there has even been exposure to these people.

11       Now why this is so critical is that he is asking

12  you to adopt new principles of law in three different

13  areas, and he's not even giving you the authority from

14  another jurisdiction to do it.

15       Ayers requires significant increased risk.  This

16  is the subject of expert testimony.  He says "today we

17  don't know that people have significant increased risk."

18  So he's now saying "give me a new Ayers."  That's what this

19  case is all about, is a new Ayers doctrine, and it's called

20  "right to know."

21       We have a right to know and the Court has a right

22  to know what is the law that supports that new proposition.

23  Where is it?

24       They are saying we need to have studies to find

25  out whether people are at risk, whether they have been

60

1    exposed.

2         There is no case that says that.  That's not what

3    the Ayers decision says.  So that's new principle of law,

4    number one, is we are talking about a totally new doctrine

5    of law for which no precedent has been cited to this Court.

6         And then he says, "guess what, everybody who is a

7    worker is gonna have the benefit of this."

8         Well, what's the trigger?  What's the trigger?

9    What is it that this establishes whether a worker can come

10   in to federal court and say "I am not bound by the

11   workmen's comp scheme, I want to be studied, I want to have

12   the monitoring"?

13        He's not saying there's risk or really even

14   exposure.  What is the test?  How can he say that there's

15   not a floodgate that's being opened up here?  Everyone is

16   going to say "I want the right to know."

17        He's asking for a new Ayers and he's asking for a

18   totally different scheme that doesn't even involve

19   workmen's comp anymore.  The only people -- the poor people

20   are gonna have to go and undergo what Mr. DeBoskey

21   characterizes as the travail of workmen's comp.  Those are

22   the people who have actually been hurt.  Everybody else can

23   come in and say "I want the right to know under the new

24   Ayers doctrine."  That is what there is absolutely no

25   precedence for.