# Tab C
# (PART 2 of 3)

61

1          THE COURT:  Let me just ask you this question:

2   Which motion are you arguing?

3          MR. BERNICK:  The workmen's comp motion and the

4   Ayers motion, because I think both have become intertwined.

5          THE COURT:  Oh, well, okay.

6          MR. BERNICK:  Let me pursue another --

7          THE COURT:  This doesn't sound like workmen's

8   comp to me, this sounds like pure 12(b)(6), you don't state

9   a claim.

10          MR. BERNICK:  I think that is exactly what we

11   have here, but let me pull out the workmen's comp

12   dimension, because your Honor asked a very interesting

13   question, you said -- and it bears on the whole question

14   that's been raised about, gee, who's working for whom?

15          Let's assume that we have an employee -- we will

16   divide the world into Dow, Rockwell and EG&G.  Says, well,

17   what if we have somebody who just worked for Rockwell,

18   can't they sue Dow as the third party?  And the basis of

19   the suit would be "I am now being exposed to materials that

20   Dow left there."

21          There's one problem with that, and that is that

22   the exposure that he still has is a workplace exposure,

23   therefore his claims are still under the workmen's comp

24   scheme.  All he's saying is that the workplace is now a

25   workplace that's run by Rockwell instead of by Dow, so

1   there's nothing particularly unique about that.

2          But let's pull this back to --

3          THE COURT:  Well, if you get some nut that walks

4   into a plant somewhere with a machine gun and blows away

5   three or four people, I mean there may be a claim against

6   the employer of that plant, but there sure is a third-party

7   claim over against that nut that walked in with the machine

8   gun, isn't there?

9          MR. BERNICK:  Absolutely.

10         THE COURT:  What's the difference?

11         MR. BERNICK:  Because you have the last-injurious

12  rule that applies here, that is that these are all

13  workplace exposures, it's just a question of when the

14  employee happened to be exposed to them and worked for the

15  company.

16         THE COURT:  Isn't that a question that should be

17  addressed on summary judgment in terms of causation and

18  exposure --

19         MR. BERNICK:  No.  If that weren't --

20         THE COURT:  -- rather than as a matter of law?

21         MR. BERNICK:  All the claims that are made in

22  this complaint are workplace exposure claims.  They don't

23  say that somebody walked in from the outside and did

24  something that was not related to the job.  The claim is

25  that Dow operated this plant pursuant to the directions of

63

1   the AEC and that Dow created conditions on the plant cite.

2   Part of the operations of the plant.

3       THE COURT:  Well, if some third person goes into

4   the plant and booby traps it around, then leaves, and the

5   employee comes to work and opens the door and is blown

6   away, what's the difference between that scenario and what

7   we have here?

8       MR. BERNICK:  Well, because that is something

9   where clearly the employee would have a claim, a tort

10  claim, against the third party, whereas the condition that

11  we are talking about here is a workplace condition.  It is

12  generated as part of the operation of the plant.  Those are

13  precisely the types of conditions that are routinely

14  subject to the workmen's comp scheme.  If you didn't have

15  that, everybody - as Mr. Aldock pointed out - everybody

16  would be coming in and making this argument.

17      THE COURT:  Well, do you have any authority that

18  says -- I haven't been able to find one case that says

19  that.

20      MR. BERNICK:  I think this is exactly what's

21  embedded in the authorities that Mr. Aldock has referred

22  to.

23      THE COURT:  I haven't seen it in <u>Larson</u>.  Tried

24  to find it in <u>Larson</u>, I couldn't find that absent some sort

25  of a merger doctrine.

64

1    MR. BERNICK:  I think it is embedded in the

2   last-injurious exposure rule.  The guy who's working for

3   Rockwell, exposed to the workplace condition, has as

4   recovery against Rockwell.

5        That's the whole point of that rule, is that you

6   don't go through the artificiality of saying "now I am

7   gonna sue my prior employer or the prior operator or the

8   operator that operated it way back when," otherwise every

9   time that you have a change - and it's not unique to the

10  AEC operations - every time you had a change in the

11  management of a company, a new company took over, everybody

12  could sit there and sue the prior employer for workplace

13  conditions.

14       But the reason that I brought this up is it plays

15  back to the question that you asked about risk.

16       If you follow it up, the significant risk, you

17  said that there really is a risk here.  What's it from?

18  What made it there?  If you have somebody who no longer

19  works for Dow and Rockwell -- indeed no longer works at the

20  plant at all, who says "I may be at risk," how is that

21  gonna be found out?  It's something that's physical.  It's

22  something that is already there.

23       The claims that are made about plutonium are

24  claims of ingestion, it's in your body, it's a physical

25  condition.

65

1    This whole notion that you can have risk that

2    exists in the abstract, that's not attached to anybody --

3    these are physical bodily conditions, and they are directly

4    related to what's taking place in the workplace.

5    THE COURT:  Well, I will ask you the same

6    question I asked Mr. DeBoskey.  You can't go to the

7    workmen's compensation people and obtain recovery for that,

8    can you?

9    MR. BERNICK:  That may well be true.  That may

10   well be true, but the situation is no different from many

11   other conditions that exist in the workplace that are

12   physical conditions.  Their effort is to say "we are not

13   subject to the workmen's comp coverage, because there is

14   nothing actually wrong with us today," and that misses the

15   point.  The point is coverage, not compensation.

16   And clearly the workmen's comp scheme covers

17   physical conditions that may exist today but give rise to

18   future oriented risk.  It says that they are not

19   compensable.

20   It directly speaks to radiation illness.  The

21   statute covers radiation illness.  And what we have here is

22   not -- they are not even claiming it, but under Ayers -- it

23   would be a claim that there has been a radiation exposure,

24   it's a bodily condition, hasn't given rise to injury.

25   That's Silkwood.

66

1     They are asking you to create all these new

2 principles of law in derogation of the principle in

3 Silkwood.

4     And what I would submit to the Court -- and it

5 does mix the motions together, but it highlights so

6 dramatically the new grounds that they want to cover here,

7 and the absence of authority for it is that they are asking

8 you to just at a stroke revolutionize the monitoring law

9 under Ayers, revolutionize the workmen's comp scheme and

10 revolutionize the Tenth Circuit's law under Silkwood.

11     This is a bold new concept, and the justification

12 is, "gee, why can't we study people?  They worked at a

13 place that we think was dangerous."  And the law does not

14 say that.

15     MR. DAVIDOFF:  Your Honor, may I make a comment?

16 Merrill Davidoff.  Very brief.

17     THE COURT:  If he's ready to sit down you may.

18     MR. DAVIDOFF:  I thought he was.

19     MR. BERNICK:  I was coming back to point out one

20 thing.

21     THE COURT:  I don't think he's ready.  Sorry.

22 Then I will entertain your response.

23     MR. BERNICK:  On the insurance policy we attached

24 the single insurance policy to our brief, which applied

25 during our tenure at Rocky Flats.  That is the policy that

67

1    extended from '51 up through the conclusion of the

2    contract.

3           All this discussion about who pays the premiums

4    is much ado about nothing.  There are all kinds of

5    insurance policies in the world today that are basically

6    fronting policies.  The policy is out there, the premiums

7    are charged, and they are reimbursed.

8           The _Prescott_ situation that has been referred to,

9    the case in the Ninth Circuit case is a situation where --

10   and this is at 731 F.2d 1390.  It's a case where on appeal

11   the appellate court notes:  "The district court concluded

12   that since no workers' compensation insurance had been

13   purchased, Prescott could sue Reynolds and the United

14   States in tort."

15          That's a situation where there was no policy

16   whatsoever, that they didn't resort to the workmen's

17   compensation scheme whatsoever.

18          Here we have a policy.  Mr. DeBoskey knows that

19   we've got a policy.  Don't understand what the big question

20   is.  It's a bona fide insurance policy, as Mr. Aldock

21   points out, otherwise we have been sitting here operating

22   in the workmen's comp scheme pursuant to workmen's comp

23   insurance and it's all been some big hoax.

24          DeBOSKEY:  Perhaps because Mr. Bernick wasn't

25   prepared to argue the motion on the workers side, he wasn't

68

1   familiar with the workers' complaint, and I would like just

2   to refer you to paragraph 60 of the workers' complaint.  It

3   states:  "As a direct and proximate result of the above

4   negligence plaintiffs and plaintiff classes have been

5   exposed to an increased risk of harm and of contracting

6   fatal or otherwise serious illnesses."

7           That's the Ayers standard.  We are here on a rule

8   12(b)(6) motion.  And we'll of course have to produce our

9   proof of that.  But it is pled, it is in the complaint, and

10  that's why we are able to ask the Court for the relief that

11  we are requesting here.

12          MR. DAVIDOFF:  Your Honor, I will be equally

13  brief.  And two very brief comments.  First of all, it's

14  the plaintiffs who are sitting in the courtroom that are

15  asking for the relief, not Mr. DeBoskey or the plaintiffs'

16  lawyers or us.  And this "X" in this box that Mr. Bernick

17  drew, the Rockwell box, there are hundreds of class

18  members, hundreds of workers that fall within that box.

19          THE COURT:  Well, you are assuming I certify a

20  class.

21          MR. DAVIDOFF:  I am, your Honor.

22          THE COURT:  There are a lot of parallels in this

23  case to the asbestos cases.

24          MR. DAVIDOFF:  Correct, your Honor.

25          THE COURT:  And it has not been effective to

69

1    certify classes in the field of asbestosis.

2          MR. DAVIDOFF:  It hasn't been effective not to

3    certify them, but we are jumping ahead of ourselves.

4          THE COURT:  That's exactly right.  That's my

5    point.

6          MR. DAVIDOFF:  The Rockwell workers have -- it's

7    interesting that Dow's lawyer wants to put the Rockwell

8    workers claims against Dow on Rockwell's back.  But this

9    isn't a bench press that blows up and you know on whose

10   watch the bench press blows up, this is Dow burying

11   thousands of pounds of contaminated poisonous material

12   which percolate through the environment and continue to

13   cause harm and expose and multiply the exposures as time

14   goes on.

15         And so people that are working at Rockwell for 15

16   years are suffering new harm and new exposure as a result

17   of actions that Dow took on its two-decade watch at Rocky

18   Flats.  And that's very important.  That's a classic

19   third-party tort claim.  It clearly does not fall within

20   workers' comp.

21         Thank you, your Honor.

22         MR. DeBOSKEY:  Also paragraph 33 of the workers

23   complaint talks about excessive risk, which is the Ayers

24   standard as well.

25         THE COURT:  Okay.  Have we concluded the

70

1   arguments on the workers case?

2       MR. BERNICK:  I am not going to rise to those, I

3   will talk to something else.

4       MR. DeBOSKEY:  As a matter of procedure, we might

5   want to just let the defendants do all of their arguments

6   so we can avoid the back and forth on each argument, then

7   we can do it.

8       THE COURT:  Well, it might have been a good idea

9   at the time, but we have pretty well --

10      MR. DAVIDOFF:  Judge, would you want to take five

11  minutes now or --

12      THE COURT:  No, we will go until noon.  A couple

13  of hours doesn't bother me, unless anybody is

14  uncomfortable.  Okay.  We will go ahead.

15      MR. BERNICK:  Should I count on breaking at noon?

16  I know that my presentation is gonna last more than 25

17  minutes.

18      THE COURT:  Well, I expected that and -- yes, you

19  should count on breaking around then.  I am not going to be

20  to the minute, as I am in some cases, but we can go a few

21  minutes over 12, that's fine, then we will go ahead and

22  continue it after the noon hour.

23      MR. CHESLEY:  You were talking about any lawyers

24  being uncomfortable, does that include us older lawyers to

25  be excused for a minute and just keep right ongoing?

71

1      THE COURT:  Go right ahead.  If anybody wants to

2  join him, feel free.

3      MR. BERNICK:  Your Honor, I guess I would like to

4  come back to the theory that Mr. DeBoskey has chosen to

5  articulate this morning.

6      THE COURT:  Let me just make sure that we have a

7  clarity in the break here.  Now we are talking about the

8  property owners case, right?

9      MR. BERNICK:  Yes.  The statute of limitations

10  relates to the property owners case, but it also relates to

11  the workers case.  It relates to both cases.

12      Mr. DeBoskey says this is a right-to-know case

13  now, and the real force of our motion on the statute of

14  limitations is what the plaintiffs already have known.

15  That is the force of our motion.

16      I would like to, and being mindful of the time,

17  give a little bit of the history that is embedded in our

18  motion and make some observations.  I've put a little time

19  line up here.  And in case counsel can't see it, it begins

20  in 1970 and goes up to 1990.

21      Dow left Rocky Flats on June 30 of 1975.  Since

22  that time Dow has not had employees at Rocky Flats, most --

23  most of the employees stayed with the facility.  Dow has

24  not had any control over the documents at Rocky Flats.  Dow

25  has not been involved in the management, operations,

72

1    nothing to do with the Rocky Flats plant.

2         Fifteen years elapse before the claims were filed

3    in these cases on January 30th of 1975.  That's a long

4    period of time.  And obviously during this period of time

5    problems of stale evidence are going to occur.

6         And what I would like to illustrate first is just

7    how stale the claims in this case are.  The complaints that

8    have been filed, both the worker case and the property

9    owners case, go into four particular allegations about Dow:

10   first, at paragraph 16 there are the fires; second, at

11   paragraph 17 there is the 903 area; third, at paragraph 18

12   there is an allegation relating to pit burning of uranium

13   and also release of liquid effluent off-site.

14        Paragraphs 16, 17 and 18 are the totality of

15   specific claims of Dow's wrongful conduct.  There are a lot

16   of conclusory allegations.  These are the particular claims

17   that relate to Dow.

18        Now I mentioned staleness.  This is a case where

19   we are not just talking about 15 years.  The fires took

20   place in 1957 and 1969 - September 12 of 1957 and May 11 of

21   1969.  The events relating to the fires are anywhere

22   between 21 and 36 years old -- 33 years old.

23        The 903 area, the allegations in the complaint

24   say that the 903 area dates back to 1954.  That's 36 years.

25   Pit burning allegations relate to the mid-50s, so this is

73

1   going to be 30-plus years.

2           And the effluent, it's not clear what they are

3   getting at there, maybe it's the tritium release in 1973,

4   maybe it's the 771 laundry out-fall, which was earlier on.

5   This was 15-plus years in any event.

6           We are talking in this case about claims being

7   made against Dow where the evidence that Dow is gonna have

8   to use in order to defend itself is anywhere between 15 and

9   36 years old.

10           Where are the witnesses today who can take us

11   back to 1954?  I was born in 1954.  Where are the documents

12   today?  Where are the memories of what took place back in

13   the 1950s that are the subject matter of the claims that

14   they are making?  Everybody knows, itself evident that this

15   evidence is stale.

16           Now the law deals with that through the statute

17   of limitations.  And this is well-known to everybody.  But

18   it's probably worth repeating.

19           That law is Tenth Circuit law and it specifically

20   contemplates the remedy for stale evidence, quoting from

21   State of Colorado versus Western Paving, Tenth Circuit

22   decision, 1987: "Plaintiffs should not be allowed to argue

23   that no logical reason exists for applying the statute to

24   their case.  After all, statutes of limitation find their

25   justification in necessity and convenience rather than in

74

1   logic; they represent expedience rather than principles;

2   they are pragmatic, practical devices to spare the Court

3   from litigation of stale claims and a citizen from being

4   put to its defenses after memories have faded, witnesses

5   have died or disappeared, and the evidence has been lost."

6          And that is exactly what this Court is gonna face

7   with the claims that are being made about fires in 1957,

8   drums in 1954, pit burning in 1956 to 1958 and effluent in

9   1973.

10          As a result of the statute of limitations law,

11   there is an obligation which is imposed, it is imposed on

12   the plaintiffs.  It is an obligation of diligence, and that

13   obligation is triggered by notice.

14          And what I want to describe this morning is the

15   principles of notice and what notice there has been about

16   these very claims, these very wrongful acts that they are

17   alleging, dating back for years.

18          THE COURT:  Now your motion with respect to

19   statute of limitations, does that apply to the CERCLA

20   claims as well?

21          MR. BERNICK:  Everything.

22          THE COURT:  Everything?

23          MR. BERNICK:  On the statute of limitations the

24   requirement is notice.  And the Court is very familiar with

25   what "notice" means because of the Court's decision in

75

1    Miller versus Celotex Corporation.

2         THE COURT:  Which, counsel, is -- I have a

3    tendency to mix my metaphors.  The last metaphor I used was

4    "skating on thin edge," and that was picked up by the

5    Denver Post.  So I will try to get it correct here.

6         It doesn't rest on particularly sound footing

7    right now, "it" being in the Tenth Circuit and there being

8    a question certified to the Colorado Supreme Court.  And if

9    you read the way in which the Tenth Circuit has worded

10   their question, it doesn't look good for me.

11        MR. BERNICK:  That may well be, but I am here to

12   give you heart, because my principles of notice are not

13   confined to this case.

14        THE COURT:  Okay.

15        MR. BERNICK:  But this case articulates some of

16   them.  First -- and the principles I think you will hear me

17   state are not particularly controversial.

18        First, the notice is facts.  You don't have to

19   have the legal theory, it is a question of the facts.

20        Second, facts of notice can be resolved on

21   summary judgment.

22        Your Honor states:  "Where there is no genuine

23   issue of material fact that a plaintiff discovered or

24   recently should have discovered a defendant's wrongful

25   conduct as of a particular date, the issue may be decided

76

1  as a matter of law."

2      It is further the law, indeed the law of the

3  Supreme Court of the United States, that the notice can be

4  either actual or it can be constructive.

5      As the Court in <u>Wood versus Carpenter</u> said as

6  long ago as 1879, and has been quoted frequently ever

7  since:  "There must be reasonable diligence; and the means

8  of knowledge are the same thing in effect is knowledge

9  itself."

10     The cases that have taken these principles and

11 put them together and granted summary judgment are

12 numerous, and they are in our briefs.

13     I have a little cheat sheet here, because they

14 are fairly significant in their total cumulative effect.

15     All of the following cases have granted summary

16 judgment based upon record facts establishing constructive

17 notice:

18     Summary judgment.  <u>United Klans</u> case, a press

19 release caused summary judgment on statute of limitations.

20 That's Tenth Circuit.

21     <u>State of Ohio</u>, Tenth Circuit, prior lawsuits were

22 a basis for summary judgment.

23     <u>Armstrong</u> case, Second Circuit, a prior SEC

24 proceeding triggered dismissal with no discovery.

25     <u>Walsh</u> case, government investigation; dismissal,

77

1    prior government investigation.

2         Berry case, Second Circuit, SEC action; summary

3    judgment without discovery.   Just on the basis of the

4    affidavit.

5         Dayco case, Sixth Circuit, prior government suit;

6    summary judgment without discovery.

7         Herm case, District of Connecticut, government

8    lawsuit prior to that time; summary judgment.

9         Kornfeld case, Southern District of New York,

10   prior lawsuits; summary judgment without discovery.

11        The cases are legion allowing the Court to do

12   exactly what it is that we suggest should be done here.

13   And the notice need not be actual evidence.

14        There's a difference between the notice that

15   triggers the statute of limitations and being able to file

16   the claim.   And the Tenth Circuit has also articulated that

17   difference well.   It is in the State of Ohio versus

18   Peterson case.  Says, "You do not need the hard evidence.

19   Discovery under the equitable tolling doctrine merely

20   states the limitation period running.   From that point on

21   appellant had three years to find the minimum support

22   necessary for filing a complaint.   After filing it, our --

23   or Ohio would have had more time to develop the evidence or

24   to refine the issue."

25        In short, the contemplation is that statute

78

1    begins to run once there's notice.

2              THE COURT:  Notice of what?

3         MR. BERNICK:  Notice of the wrongful acts of the

4    defendant.  As your Honor yourself said in the <u>Miller</u> case,

5    that is the notice that is required.  Notice gives rise to

6    the statute of limitations period.  That is the period of

7    time for investigation.  The claim is then filed, and then

8    discovery is pursued to develop the evidence.

9              That is the sequence that the Tenth Circuit

10   contemplates.  As a result notice can be a whole bunch of

11   different things.  Notice under the <u>De Haus</u> decision,

12   another Tenth Circuit case, is notice -- is information

13   that gives rise to suspicion.

14             Under <u>Wood versus Carpenter</u> notice is something

15   that will excite inquiry.

16             It doesn't have to be hard facts, it doesn't have

17   to be claims, it doesn't have to be evidence, it is what

18   reasonably would provoke inquiry.

19             Now what is remarkable about this case is that if

20   you go back and deal with the question of notice with

21   respect to these allegedly wrongful acts - your Honor's own

22   language - if you go back and take a look at the notice, it

23   is -- this is a case that is overwhelming in terms of the

24   amount of information that has been out there in the public

25   record, dating all the way back into the early 1970s.

79

1        If you take a look at the fires, all of our

2   appendices of documented -- and these are just selections,

3   the newspaper articles that come out every week that deal

4   with the claims that are being made in this case.

5        February 12, 1970, discussion of studies done by

6   scientists about the releases that were associated with

7   these fires, dealing with the purported threat that they

8   created.

9        October of 1970 -- October 7 of 1970, the 903

10  storage area was part of an article that dealt with alleged

11  secret burials by the AEC.

12       Pit burning, August 7 of 1973, entire article on

13  uranium pits and uranium burial on the site.

14       The tritium release was the subject of newspaper

15  articles that appeared in the papers 1973-1974.

16       Effluents.  We don't have to go through them.  We

17  all know that there are literally scores of articles that

18  have filled the marketplace.

19       There is no a single case, your Honor, that we

20  have seen, including all the ones that grant summary

21  judgment, that even begin to compare with this case in

22  terms of the amount of publicity that has taken place about

23  the very events that are in the complaint.

24       And the complaint says nothing different about

25  these events that are in the newspaper articles.

80

1        Regarding the fires, the complaint says

2    contamination got off-site.  Well, that's exactly what the

3    February 12 article says.

4        Regarding the 903 area, same thing, it describes

5    what happened with the asphalt pad.

6        You take the language from the complaints, it is

7    precisely in the newspaper articles.

8        The case is distinct beyond that, though.  Not

9    only do you have actual notice in the newspapers with

10   regard to every single one of these different elements

11   here, something else is very significant.  On April 2 of

12   1975 claims were filed.  A lawsuit was filed.  It was filed

13   by plaintiffs who lived around Rocky Flats.  The litigation

14   was brought here in federal district court.  It's the

15   Church case.  April 2nd, 1975 first claims; July 15, 1975,

16   next claims; October 25, 1975, more claims that are filed.

17   This is a case that is driven not just by notice, it is

18   driven by the fact that the claims were out there.

19       Now when the first claim was filed on April 2nd

20   of 1975 a very important observation was made by the

21   plaintiffs in that case.  They attached as Exhibit A to the

22   April 2, 1975 claim a whole series of documents, and

23   basically a report about their claims in Rocky Flats.

24       And this is what they said at page 8.  They said,

25   "The operation of the Rocky Flats plant has been the cause

81

1   of an enormous amount of adverse publicity concerning the

2   Rocky Flats plant and plaintiffs' land."  And they go on to

3   list a recent history compiled by Anders, reflects some of

4   the adverse publicity present in the Rocky Mountain News,

5   The Denver Post, Look magazine, Harper's Bazaar.

6          You had plaintiffs that took the notice, saw what

7   was in the newspaper, and they said "we are finally a

8   claim."  They filed the claim, and here they point out

9   what's going on.  And what they do, in the remainder of

10  Exhibit A is they say this:  "Not all of the facts

11  constituting plaintiffs' proof of their claim are yet known

12  to them.  What facts are known have been obtained from

13  public hearings, newspaper reports, radio reports,

14  television reports and publications of various governmental

15  agencies and magazines.  Details of the facts as well as

16  the contractual arrangements for the operation of the

17  facility are known to the defendants above named."

18         These people took the notice, they satisfied

19  their obligation to pursue their claims with diligence.

20         The balance of Exhibit A, no surprise, they go

21  through exactly what you find in the complaint in this

22  case.  The 1969 fire, the 1967 fire.  They go through the

23  903 storage area, they go through the pit burning, they go

24  through the effluent claims.  Every single one of the

25  claims that are now being made here were all made by the

82

1    Church plaintiffs using the publicly-available information

2    in 1975.  Every single one of them.

3        Well, the Church case went on from 1975 through

4    1978, the Church plaintiffs pursued discovery.  And in 1978

5    this argument now takes a new twist.

6        The cases, your Honor, say notice triggers the

7    statute.  We've got not only notice, we've got claims;

8    we've gotten not only claims, the evidence that the

9    plaintiffs use to support their claims in the Church case

10   was developed by 1978, and they submitted a copyrighted

11   pretrial statement.  Here it is.  Hundreds of pages with

12   the evidence relating to these claims.

13       It will come as no surprise that I am not going

14   to get into the details of that.  All I have to do is

15   provide the Court with a table of contents, because it

16   speaks loudly.  903 storage area.  From page 210, it took

17   40 pages of their pretrial statement as an explication of

18   documents and hard evidence relating to the 903 storage

19   area.

20       1957 fire, 295 down to 358, 60 pages relating to

21   the 1957 fire.

22       The 1969 fire is obviously on the next page, from

23   358 all the way through 422.

24       The Church plaintiffs, their attorneys, very

25   diligent people, they had notice, they filed their claims,

83

1  they gathered their evidence, in detail, relating to all of

2  these different subjects.

3       Now the Court has asked, well, what was their

4  notice of?  We say there was notice of the, quote, "alleged

5  wrongful acts," the very test that this Court used in the

6  Miller case, and it has been used in other cases.

7       But the Court may be asking for something else as

8  well.  Is there any evidence of notice or claims relating

9  to - we just got done talking about it - risk?  That's what

10  they say their whole case is about.  There's some

11  equivocation about it now.  Maybe it's right-to-know rather

12  than risk.  That's what they got done telling the Court in

13  the complaint, is that this is a case that's all about

14  health risk.

15       What is the evidence on risk?  That these

16  plaintiffs, the property owners, the work -- that workers

17  were allegedly at risk?  Has that been a subject?

18       Your Honor, that has gone beyond newspaper

19  coverage, that has gone beyond claims being filed in cases.

20  Scientists have become involved.  Politicians have

21  described the risks.

22       January 13, 1970, Colorado Committee for

23  Environmental Information, Subcommittee on Rocky Flats,

24  quote, "Now that the expansion of Rocky Flats plutonium

25  processing activities, now underway, or even the

84

1   continuation of plant operations at this site represents a

2   serious threat to the health and safety of the people in

3   the Denver area."

4          By May 21, 1972:  "Rocky Flats Scene of Radiation

5   Incidents," relating to the workers.  And incidents are

6   described going back to June 14 of 1957 dealing with the

7   deposition of plutonium within the system and workers who

8   are involved in accidents.

9          1972, S. E. Poet and E. A. Martell publish an

10  article "Plutonium and Americium Contamination in the

11  Denver Area.  The plutonium in the off-site area just east

12  of Rocky Flats plant ranges up to hundreds of times that

13  from nuclear tests."

14         "Rocky Flats Workers," November 17, 1974, "Data

15  Reveals Plutonium Peril."  In the press.

16         Church plaintiffs, April 2, 1975, "Releases from

17  Rocky Flats posed an,'" quote "'unreasonable risk of harm

18  to those outside the plant.'"

19         Also on the same day:  "Over 40 curies of

20  plutonium had been released to the outside environment from

21  the plant.  This is a radiation equivalent to over 2.5

22  billion of the present maximum permissible lung doses or

23  enough to poison every American 10 times over."

24         That's the claim's claim -- that's the claim.

25  That's what these people were saying in 1975.

85

1    October 75:  "Releases from Rocky Flats plant

2    caused the land near the facility to be not safe for human

3    habitation."

4    By 1978 the pretrial statement says, "Damage has

5    been done.  Dangerous amounts of plutonium, americium and

6    uranium have been released to the uncontrolled environment

7    both on- and off-site.  The quantity, distribution and form

8    of this radioactivity is not fully documented, but such

9    evidence and expert opinion exists that the known amounts

10   present -- known amounts present serious public health

11   problems."

12   Now in 1978 was also a busy year.  Not only were

13   the pretrial statements made by the Church plaintiffs

14   describing risk, and not only had that risk been covered in

15   prior notice and prior claims, but in 1978 there are a lot

16   of other things that happen.  First, there were the protest

17   trials.  People who trespassed at Rocky Flats were brought

18   to trial, and these protests were themselves tremendous

19   events, 10,000 people, 15,000 people joining hands around

20   Rocky Flats to protest the continued existence of the

21   facility.  And arrests were made.

22   When those cases came to trial there was

23   testimony.  There was testimony by a woman named Alice

24   Stewart.  There's testimony by Gofman, there's testimony by

25   Karl Morgan.  These are scientists.  These are people who

86

1   came to testify about the perils, the threat to the public

2   from Rocky Flats.  Alice Stewart says, 1978, quote, "With

3   plutonium there's a risk of harm at the very, very lowest

4   levels.  At Rocky Flats the plutonium would be dangerous

5   even if it were found in the soil inside of the plant,

6   because it could get into the food chain.  Birds are no

7   respecters of barbed wire."

8          John Gofman says, "The threat of lung cancer

9   posed by Rocky Flats has been grossly underestimated by the

10  government."  Quote, "'The amount of plutonium that has

11  been released from Rocky Flats is just worth millions of

12  lung cancer doses.  That's going to be a lung cancer hazard

13  for ongoing generations."

14         Karl Morgan, same quotes.  I won't go through

15  this at length.  Harper's magazine.  All this is quoted all

16  over the map.

17         Johnson comes out with the studies in 1978

18  talking about excess cancer cases.  The scientific

19  community is heavily involved.

20         Who are these people?  These are Mr. DeBoskey's

21  experts.  These are the people -- these are Mr. Chesley's

22  experts.  These are the people who have testified

23  previously in radiation cases.  They are the well-known

24  plaintiffs' experts who have testified in radiation cases,

25  and they have been intimately involved in Mr. DeBoskey's

87

1    cases.  All in 1978.

2            "Johnson Studies.  Higher Birth Defects Tied to

3    Rocky Flats."

4            "Jeffco's" - Mr. Johnson was health officer for

5    Jefferson county - "Cancer Risks Higher Near Rocky Flats."

6            "EPA Concedes That Rocky Flats Contamination May

7    Cause Deaths," 1980.

8            "Cancer Rates a Concern," August 19, of 1980.

9            Carl J. Johnson, 1981:  "Cancer Incidents in an

10   Area Contaminated with Radionuclides Near a Nuclear

11   Installation."

12           The plaintiffs' lawyers in the Church case again

13   very diligent, epidemiological studies, Exhibit 4 to the

14   1981 Church amended complaint.

15           And finally, as we get into the early 1980's, the

16   Johnson studies continue, but something else comes in.

17   Congresswoman Schroeder.  Schroeder said, "Recent studies

18   have indicated increased cancer incidents in the vicinity

19   of Rocky Flats."

20           THE COURT:  Now she may run for president one of

21   these days.

22           MR. BERNICK:  Well, then she will make a great

23   witness for me, because I am sure that she will abide by

24   what's she said in 1981.

25           THE COURT:  Okay.

88

1          MR. BERNICK:  It doesn't stop there.  July 17 of

2     1983.  Now we hear from Mr. DeBoskey in the press:  "These

3     people who are workers were all exposed to radiation levels

4     that are considered permissible.  If we can continue to

5     document cancer being caused by permissible levels of

6     radiation it will ultimately require the industry to make

7     the workplace safer."

8          That's what Mr. DeBoskey is saying to the press

9     in July of 1973.

10          "'Safe' Rocky Flats Radiation Ruled Cause of

11     Death."  Mr. DeBoskey again:  "These are radiation levels

12     the government says are safe.  We proved safe -- we proved

13     that 'safe' caused his cancer and his death."

14          September 1984, Mr. DeBoskey again.

15          Your Honor, throughout this entire period of time

16     -- and all of this -- the plaintiffs are now gonna show you

17     some other charts as well.  They are no different.  All of

18     these events that they will show you are in the public

19     record.

20          Health risk is not something new.  Health risk is

21     something that has been in the press, has been the subject

22     of testimony.  Years and years have gone by where these

23     people have known, their counsel have known about these

24     types of risks.

25          There's only one unanswered question in all this

89

1    period of time.  We set out the record.  We produced all

2    the materials demonstrating the notice and the facts.

3            What about the statute of limitations obligation

4    of diligence?  What have the plaintiffs been during this

5    period of time?

6            There is not a single explanation that Mr.

7    Chesley or anyone else sitting at this table has developed

8    in any of the papers that have been submitted that suggests

9    why it is that this lawsuit wasn't brought earlier.  That

10   is their burden.  They have the burden of coming forward

11   and saying "given this notice, we exercise diligence."

12           They have the burden of coming forward and saying

13   we exercise diligence, but we couldn't find out what it is

14   that they filed in this claim.

15           Now they will tell you, as they have argued in

16   their papers, they'll say there was controversy.  That's

17   what this chart is all about, it's all about controversy.

18   What the AEC claims or that Dow claims or the Lamm-Wirth

19   Task Force.  The controversy is inbred in the litigation

20   process.

21           There is no case that they will be able to cite,

22   including the Maughan decision that they rely on, there's

23   not a single case that they will cite where there was

24   actual knowledge of all of these facts, including the risk

25   -- the health risk where nonetheless the fact of

90

1   controversy was held to toll the statute of limitations.

2   They won't cite that case.  The Maughan case was a

3   situation where these people had a problem but they didn't

4   know how to link it up to a particular facility or a

5   particular site.  If they wanted to file suit who could

6   they have sued?

7         We don't have that situation here.  We have all

8   the risks that are being outlined, but they are being

9   pegged squarely to this facility and to the defendants that

10  are sitting here.  This is not a Maughan case.

11        Where's the case that says that where you know

12  all of these things, controversy, the fact of continuing

13  debate still tolls the statute of limitations?  It is not

14  cited to the Court.  We submit that it doesn't exist.

15        They will say Dow denied its wrongdoing.  The

16  Tenth Circuit has squarely held that a denial of wrongdoing

17  by a defendant doesn't toll the statute of limitations,

18  where there is actual knowledge, where the information is

19  out there with respect to all of these events.  If that

20  were the rule, then the statute of limitations would never

21  be tolled until the defendant stood up and said "its all

22  true, I abrogate my position in this litigation."  You

23  would never have a tolling of statute of limitations.

24        And finally, your Honor, they will say "give us

25  some time, let us develop more information.  This is a

91

1   motion for summary judgment, and we've only begun this

2   case.  We don't yet no what is out there.  We don't yet

3   have the information."

4   　　　　The burden is on them, your Honor.  That's what

5   Dayco says, that's what State of Colorado says, that's what

6   State of Ohio says, the burden is on them.

7   　　　　Once the notice is there, they must come forward,

8   and they not only have to come forward in the case, they

9   have to come forward in their complaint.  And I had this

10  argument with Mr. Chesley two months ago, because we were

11  in Ohio and Ohio is in the Sixth Circuit, the Sixth Circuit

12  has the same rule, they must plead with particularity what

13  it is that they didn't know, how it is that they searched

14  for further information and why it is that all of a sudden

15  they know enough information to file a claim.

16  　　　　That information is not in their complaint, it's

17  not in any of the papers that they've filed.  They have not

18  met their burden.

19  　　　　In the end, your Honor, the burden is the one

20  that's set forward in the Western Paving case.  That burden

21  is one where with the knowledge that they had, they have an

22  obligation to come forward and say "it was not reasonably

23  possible for us to file this complaint earlier."  That's

24  what the Tenth Circuit says their obligation is.

25  　　　　How in the world can they hope to meet that

92

1    standard when the same claims were brought 15 years ago in

2    1975?

3            That's all that I have on the statute of

4    limitations, your Honor.

5            THE COURT:  Thank you.  Well, it's about five,

6    six minutes after 12.  Let's reconvene at 1 o'clock.

7        (Court was recessed at 12:05 p.m.  Reconvened at 1:00

8    p.m.)

9            THE COURT:  Please be seated.  Go ahead, counsel.

10           MR. DAVIDOFF:  Thank you, your Honor.  Good

11   afternoon.  Merrill Davidoff for the plaintiffs.  Your

12   Honor, I am a little older than Mr. Bernick, I was born

13   about seven years before he was, and so I know a little bit

14   about stale evidence.  But I've tried cases with evidence

15   that went back to 1896.  And this motion which they filed

16   under the statute of limitation seeks to excuse at the very

17   outset of this case one of the two operators of this plant

18   over a history that spans nearly four decades, an operator

19   who operated the plant for over two decades itself, from

20   virtually all liability, for all misconduct that they may

21   have conducted during that period.

22           It's a unique motion.  It's the only case in

23   history where the defendant wants to throw the case out on

24   stale evidence, and much of the stale evidence was buried

25   on the plaintiff grounds by the defendant itself.  They

1   even called it a burial mound when they buried that

2   evidence.  They want to do it in a peculiar procedural

3   posture.  They want to do it without pleading, without

4   discovery, without so much as a nod or a wink toward the

5   Federal Rules of Civil Procedure and the requirements of

6   the Federal Rules of Civil Procedure.

7          And as a practical consequence, if this motion is

8   granted, for the next few years we will be hearing one

9   consistent refrain from Rockwell, and that will be "don't

10  look at us, Dow did it."

11         Now I believe that our brief and almost every

12  controlling and pertinent case reveals this motion to be

13  fundamentally flawed.  It's fundamentally flawed now

14  primarily for procedural reasons.  It will be fundamentally

15  flawed after discovery because it's not in accord with the

16  law of the Tenth Circuit or the law of Colorado.  And I

17  believe it will be fundamentally flawed even during and

18  after trial if the jury decides against them.

19         I have to focus regrettably on four procedural

20  points before addressing the merits of the motion, because

21  I think the four procedural points are dispositive.  After

22  that I would like to take some time, your Honor, to address

23  the merits of the motion.  I may not speak as fast as Mr.

24  Bernick, and I may be a little longer.  We haven't used as

25  much time, and I hope your Honor can indulge me.

94

1      The first point is that we filed the only

2  affidavit on this motion, and that was filed under rule

3  56(f), and I don't want to belabor that procedural point,

4  because I think it's obvious to the Court, even though Dow

5  completely failed to treat it in either of its briefs.

6      The only observation I would make is that Dow

7  filed all this material, which we estimated at about 20 or

8  25 pounds, for the purpose of demonstrating that there are

9  no material issues of fact and that they are entitled to

10  judgment as a matter of law.

11      And the very submission belies the argument,

12  because under rule 56(f) once we file that affidavit --

13  actually if they had filed affidavits and we at this point

14  filed a 56 affidavit, that would be dispositive.  They

15  didn't even file affidavits.  They filed material, not

16  affidavits.

17      The second procedural point relates to the issue

18  of reasonable diligence and due diligence.  And the parties

19  necessarily have had to use cases that come up in two

20  completely different contexts.  It's important to

21  understand what those are.

22      This case is primarily -- the due diligence or

23  reasonable diligence issue comes up primarily in the

24  context of accrual or discovery of the cause of action.  In

25  many of the cases that the defendants cite and even some of

95

1    the cases on which we rely because of some of the unique

2    points that they raise, due diligence comes up in the

3    fraudulent concealment context, but we are not alleging

4    fraudulent concealment except as to part of Count V of our

5    complaint.  When I say "Count V" I am referring to the

6    complaint.  I believe it may be the same count in the

7    workers complaint, which is the concealment and

8    misrepresentation count.

9         But except as to part of that count, fraudulent

10   concealment is not a part of our allegations here.  This is

11   a case about discovery, it's not a case about fraudulent

12   concealment.

13        Now they very, very conveniently blur the

14   distinction between reasonable diligence in the discovery

15   context and due diligence in the fraudulent concealment

16   context, but it's important -- and I would refer to the

17   very case on which they primarily rely, which is not a

18   statute of limitations case, but the <u>Church</u> case and the

19   <u>Maughan</u> case.

20        This is 758 F.2d 1388.  This is out of <u>Maughan</u>:

21   "The cases cited by the defendants to support this claim

22   involve tolling under the fraudulent concealment doctrine

23   rather than under the exceptional circumstances doctrine.

24   When the claim is one of concealment and the very facts

25   allegedly concealed are available in public records, the

96

1   argument that the plaintiff should as a matter of law be

2   held to constructive knowledge of their cause of action is

3   much stronger."

4        And that's of course the <u>Maughan</u> case, which we

5   rely on, which was not cited in Dow's opening papers, but

6   which we consider to be the dispositive case on this motion

7   overall.

8        It's a full record.  But the burden that we have

9   to meet for all but Count V is a considerably attenuated

10  burden, it is not the burden that they portray in their

11  papers.

12       The third procedural point.  State Rules of

13  Decision apply in this case, state Rules of Decision, not

14  federal rules.  42 U.S.C. section 2014(hh), double "h" -

15  that's out of Price-Anderson - states that, quote, "The

16  substantive Rules of Decision in such," and I am

17  bracketing, "a Price-Anderson action, shall be derived from

18  the laws of the state in which the nuclear incident

19  involved occurs, unless such law is inconsistent,

20  inconsistent with the provisions of such section, section

21  2210."

22       Now this squares with the Rules of Decision Act,

23  28 U.S.C. section 1652, which is one of the cornerstones of

24  our federal/state system.  It's almost 200 years old.  The

25  Rules of Decision in this case are the state Rules of

97

1   Decision.   Under the supremacy clause no one disputes that

2   Congress could have set a federal statute of limitations or

3   could have set a federal tolling rule or could have set a

4   federal accrual rule.   They do that under the Federal Tort

5   Claims Act.   They had the power to do it; they expressly

6   declined to do so.   The Supreme Court in Silkwood, among

7   others.

8          Now Price-Anderson therefore is viewed best

9   merely as a limitation on aggregate state tort law

10  liability and no more.

11         And I want to cite the defendants' own Church

12  decision, but a part that they don't dwell on in their

13  brief, which is the fact that it was thrown out of court by

14  Judge Matsch the first time around, and it went up to the

15  circuit after it was thrown out as being groundless.

16         And in McKay v. U.S., 703 F.2d 464, Tenth

17  Circuit, 1983, on the appeal to the Tenth Circuit, they

18  held, "The history" -- this is of Price-Anderson,

19  "acknowledged that the intent of Congress was that the Act

20  should preempt state tort law only to limit liability for

21  damages caused by major nuclear incidents."

22         In the less severe nuclear accidents, quote, "A

23  claimant would have exactly the same rights he has today

24  under existing law, including perhaps benefit of a rule of

25  strict liability, if applicable state law so provides,"

98

1   unquote, held by the Tenth Circuit in reversing Judge

2   Matsch's initial decision to throw the Church case out of

3   court in 1983.

4        A related -- and I am finally getting to the last

5   of my procedural points, your Honor, before we address the

6   merits.  But a related point four is state rules govern the

7   Rules of Decision, including statute of limitations, which

8   even the defendants concede governs, then state Rules of

9   Decision include the state statute of limitations and most

10  important the state rules for accrual of the cause of

11  action for statute of limitations purposes.

12       And I think that I can prove this, but I observe

13  that they make a very clever leap in their brief.  They do

14  it quickly and quietly and cleverly, but they do it, and

15  they have to do it, because if they don't do it, they lose.

16       And the leap is at page 40 to 41 of their opening

17  brief, where they make the assertion, relying on State of

18  Ohio versus Peterson, that in a state law Rule of Decision

19  case filed in federal court but alleging and applying the

20  state statute of limitations in a state cause of action in

21  state tort law, they say federal rules for accrual govern

22  and not state rules.

23       That's just dead wrong.

24       THE COURT:  Well, let me ask you this:  They cite

25  -- it's always nice to cite the trial Judge's own case to

99

1   him.  They cite <u>Miller versus Celotex</u>, which is a case

2   involving application of a Colorado state statute of

3   limitation and a Colorado state rule of accrual.  So are

4   they indeed relying upon some other limitation rule as to

5   determining when a cause accrues?

6           MR. DAVIDOFF:  Well, I believe so, your Honor.

7   If your Honor reviews again pages 40 to 41 of their brief

8   -- and we do refute this in our -- in our one reply brief,

9   although they came back again.  They say that the federal

10  accrual rule governs.  And the reason they say that is that

11  all their cases construe the federal accrual rule, and they

12  are primarily securities cases.  They do cite your <u>Miller</u>

13  <u>v. Celotex</u> division because it threw a plaintiff out of

14  court where the plaintiff acknowledged that he had actual -

15  not constructive - but actual knowledge prior to the

16  beginning of the statute of limitations period.

17          But this is a constructive knowledge case, not an

18  actual knowledge case, and they do not assert in this case,

19  cannot assert, because they have taken no discovery and

20  filed no affidavits, that we had actual knowledge as

21  opposed to constructive acknowledge.

22          THE COURT:  I took Mr. Bernick's argument to be

23  that you had to have actual knowledge, that the publicity

24  was so pervasive that you could not have helped but had

25  actual knowledge.

100

1        MR. DAVIDOFF:  I think you had actual knowledge

2   of publicity, perhaps, although one of the things I was

3   gonna point out to your Honor a little later is that no

4   case in this circuit expressly holds that a plaintiff is

5   charged with constructive knowledge of the contents of the

6   Denver Post or the Rocky Mountain News.  And in fact --

7        THE COURT:  Probably a good thing.

8        MR. DAVIDOFF:  In one case it specifically

9   declines to hold that.

10       THE COURT:  Yeah, okay.

11       MR. DAVIDOFF:  But they are arguing for a federal

12  accrual rule here, even though we have a state statute of

13  limitations.

14       Can I just run through why that is clearly wrong?

15  Because that is the position in their papers.

16       We've got 2014(hh), which is state Rules of

17  Decision, unless it's inconsistent; we've got the Rules of

18  Decision Act, which is 28 U.S.C. 1652.  The next, and I

19  think dispositive case is the Maughan case, which your

20  Honor of course is I know familiar with, even though we

21  were the first ones to really discuss it at length or even

22  mention it.  In footnote 5 at page 1388 of Maughan, the

23  Maughan court points out that the defendants cite Ohio v.

24  Peterson, et al. for the proposition that in this circuit

25  due diligence is a question for the Court.  And then they

101

1  go on to distinguish it and differentiate it as solely

2  applicable to cases under 10(b)(5), which are federal

3  claims, not state law claims.

4      And in the Maughan case, of course, the state law

5  Rules of Decision are held to apply to a radiation claim

6  under state tort law.

7      Now going back from the Maughan decision, there

8  are three other decisions that are extremely relevant, one

9  is the Supreme Court's decision in Tomanio, which we said

10  -- in the letter we sent to your Honor a few days ago, we

11  cited that.  That's at 100 S. Court, 1790, 446 U.S. 478,

12  1980.  Where in a 1988 action, in a civil rights action

13  under federal law, but section 1988, even though it was

14  passed almost a century before Price-Anderson, uses the

15  same language:  "The state Rules of Decision will govern

16  unless insofar as the same is not inconsistent with the

17  Constitution and the laws of the United States."

18      And the Supreme Court in Tomanio said that given

19  that language it would be the state rules that would govern

20  in a 1988 action and not the federal rules.  And in Ohio

21  versus Peterson itself, which is the case on which Mr.

22  Bernick and his colleagues rely, they specifically

23  distinguish Tomanio and discuss it and distinguish it and

24  say here -- and this is at page 692 of Ohio, 651 -- my

25  eyesight is fading, but it's 651 F.2d 687, at page 692:

102

1   "We think, however, that the law of plaintiff's diligence

2   in private actions under section 10(b) can better develop

3   by reference to other federal securities cases rather than

4   by analogy to Colorado decisions on the diligence of

5   plaintiff in discovering grounds for an action in medical

6   malpractice."  And right before that they say, "Similarly,

7   one thing we must resolve in this case concerns the

8   respective roles of judge and jury on the issue of

9   diligence.  Colorado law would apparently leave it to a

10  jury."

11          And then they carve out an exception only for

12  section 10(b).  All the 10(b) cases, your Honor, that they

13  cited are expressly distinguished and differentiated by

14  Maughan, State of Ohio and Tomanio.  It is black-letter law

15  of this circuit and in Colorado that you can't apply into

16  this case.

17          Now what's the consequence of that?  Finally, I

18  think I start to get to the merits, it's taken me awhile.

19  The Colorado accrual rule will show that they have no right

20  even later, let alone now, to have this case thrown out

21  before the jury has a chance to hear their claim of lack of

22  reasonable diligence and our defenses.

23          By the way, I should point out that statute of

24  limitations - and this was glossed over in Dow's

25  presentation - is an affirmative defense under rule 8.  We

103

1    don't have to plead statute of limitations.  They have to

2    plead it.  They haven't pled yet.  When they plead it, I

3    suppose we can have discovery concerning statute of

4    limitations.

5         But by now it should be clear that they lose

6    anyway.  There was no discovery, there were no affidavits;

7    they used the wrong due diligence standards, the fraudulent

8    concealment standards instead of the reasonable diligence

9    standards, in federal instead of state; they use the wrong

10   accrual rule; and they buried us in paper and failed to --

11   to give us a shred of discovery.

12        Now we will see the motion again.  We will see it

13   after we have a chance to take discovery.  What is the

14   accrual rule that will apply?  Let me cite three cases.

15        The Exnicious case, I won't discuss, because we

16   cited it and discussed it in our briefs, but it holds that

17   you have to have all the elements before you have a cause

18   of action.

19        THE COURT:  Is that the rule in Colorado?

20        MR. DAVIDOFF:  Yes, your Honor.  You have to have

21   notice, constructive, at least, notice, and probably actual

22   notice of each and every element of your cause of action

23   before you have a cause of action.

24        And the case is not about a controversy or a

25   protest or a war rally, the case is about a case, a tort,

104

1   or a series of torts committed on the plaintiffs,

2   inflicting injure on them.

3       Mastro versus Brodie, 682 P.2d 1162, Colorado

4   (1984), a medical malpractice case: "Injury is not merely

5   the physical injury," which was apparent, because the

6   plaintiff was scarred, there was an ugly scar long before

7   the statute of limitations, "it also includes all essential

8   elements of the medical malpractice claim," held by the

9   Supreme Court of Colorado.  You're in time.

10       First Interstate versus Piper Aircraft, 744 P.2d

11   1197, Colorado Supreme Court (1987).  This is an

12   interesting case, Judge.  The decedent's heir stood there

13   and watched the plane take off and crash.  No suit is filed

14   within the apparent limitations period.  Six years later

15   there is an article in the Wall Street Journal about how

16   Piper Aircraft had a defect in its airplanes.

17       The decedent's heirs or someone else alerts them

18   to the article, and the exposure, the defect in the

19   newspaper article.  They now have another element of their

20   claim that was lacking.  They had injury and damage, but

21   they didn't have the nexus.

22       They get the nexus, held you're in time filing

23   your case, Supreme Court of Colorado.

24       We've looked diligently with reasonable

25   diligence, more than reasonable diligence, we have not

1   found a single Colorado case under the Colorado accrual

2   rule that -- reported case anyway, that throws an action

3   out on grounds of constructive as opposed to actual

4   knowledge.

5           Now we could argue in this case, Judge, that we

6   are early, and not merely late.  And Mr. Bernick borrowed

7   our time lines.

8           Did your Honor get these?  We tried to get the --

9           THE COURT:  No, I didn't.

10          MR. DAVIDOFF:  Could we get a small version to

11  the Court?  What we did hear, your Honor, was we -- we

12  tried to take all the things that were discussed in the

13  briefs and put them on a time line

14      (Document tendered to the Court.)

15          MR. DAVIDOFF:  I will put this picture down here.

16  And what's intriguing is that some of the things that are

17  elements of our cause of action emerge after the complaints

18  are filed, not merely before.

19          And we've got all the things that were discussed

20  here, including some of the reassurances.

21          And I may come back to this if I have time.  But

22  let me point out to your Honor the things that started to

23  happen beginning in late 1988.

24          The first is the GAO study of major problems at

25  Rocky Flats.  That's in November of 1988.  In March,

106

1    Colorado Department of Health issues its notice of intent

2    to deny the RCRA permit, which your Honor has grappled with

3    in the Sierra Club litigation.

4         Then perhaps the most shocking event, maybe one

5    of the most shocking events in the history of Colorado, in

6    June of 1989 the specter of one of the biggest, maybe the

7    major industrial facility in the State of Colorado situated

8    in this area, raided in a predawn raid by scores of armed

9    G-men investigating one branch of the federal government

10   for violating its own laws, and these defendants, Rockwell,

11   for violating the laws of the government.

12        And if that wasn't a shock -- I know your Honor

13   knows what a shock that was to this community.  Three

14   months later Rockwell is discharged, terminated, although

15   that's effective December of 1989.  Late 1989 the plant is

16   shut down.

17        Right around the time that we filed our

18   complaints in Cook and in the workers case, and of course

19   characteristically we are a little ordinary, so we

20   misspelled it here, the BEIR V study was released, two

21   months later the SPEERA panel, which was under the auspices

22   of DOE, a month later the plutonium -- 60 pounds of

23   plutonium are found in the vents, and within the last two

24   and a half weeks, the NCR adopts revised exposure

25   standards.

107

1        Each of these confirms the cause of action

2   pursued in the class complaints.

3        And I will refer briefly to what they are for

4   your Honor's benefit in the time line.  The BEIR V study

5   stands for -- and it is misspelled on there, but I think

6   it's spelled correctly on the hard copy that we

7   handed up to your Honor -- for "biological effects of

8   ionizing radiation."

9        That that was a National Academy of Scientists

10  committee which concluded by contrast to the BEIR II study,

11  which was in 1980 -- or the BEIR II and III studies in 1980

12  and 1975, that low-level radiation at a range of 10 or 20

13  percent of what had previously been considered the safe

14  threshold level could be dangerous.

15       The SPEERA panel concluded that Health and Human

16  Services and not DOE should monitor worker health because

17  of the DOE's sorry and sordid record in that regard.  And

18  finally the NRC's revised exposure standards, which have

19  just been released really within the last few weeks,

20  confirms what the protesters were protesting about 15 years

21  ago, that indeed the exposure limit should be lowered by a

22  factor of roughly 80 percent.

23       These are things that emerge after the Cook

24  complaints are filed.  And indeed even as Dow scolds us for

25  being early, Rockwell -- I mean for being late, Rockwell is

108

1    scolding us for being early and for being premature and not

2    waiting until we see what the studies disclose.

3           So we are sort of caught between a Rockwell and a

4    hard place when we are talking about Dow's motion on

5    summary judgment.

6           THE COURT:  One for the plaintiff.

7           MR. BERNICK:  That's what I should learn with

8    seven more years, your Honor.

9           THE COURT:  That's right.

10          MR. DAVIDOFF:  Well, your Honor, when you have

11   such a slow and insidious, cloaked and concealed toxic tort

12   case, and that's what's involved here, discovery is likely

13   to be placed in issue by the defendants.  They do it in

14   every case.

15          Mr. Bernick's client, Dow, does it in virtually

16   every case.  And that's why the Tenth Circuit in Maughan

17   wisely said this goes to a jury, especially where we are

18   dealing with something as esoteric and as controversial and

19   as difficult to get a handle on as radiation and radiation

20   hazards.

21          And Mr. Bernick pointed out that Dow -- and Dow

22   when they were there, they were protested by folk singers

23   and rock stars and Mr. Elsberg and anti-militarists, and

24   the like, and there were even scientists that protested.

25          Alice Stewart -- I think the names are up here on

109

1    Mr. Bernick's list.  Yes, they are.  Alice Stewart, Gofman,

2    Morgan, Johnson.  Yeah, they were brave scientist, and do

3    you know how they were treated?  They were treated the way

4    that Copernicus was treated when he said that the earth

5    revolves around the sun.

6         And it's only in 1989 and 1990 with BEIR V and

7    SPEERA and the NRC that we are starting to vindicate the

8    predictions of Stewart, Gofman and Morgan.

9         I hope your Honor gets to meet Ms. Stewart.

10   She's in her 80s.  She's a beautiful woman.  And she's

11   fought a lonely and hard vigil for 20 years to prove what

12   these people were doing to the people of Colorado and other

13   places in these plutonium weapons facilities.  I hope she

14   gets to sit on that stand before this case is over.

15        The next point - inquiry notice.  They bury this,

16   your Honor, but your not on a duty to do an investigation,

17   you are not on a duty to be reasonably diligent, you are

18   not under any duty until something puts you on inquiry

19   notice that you may have a cause of action.  It doesn't

20   arise in a vacuum.

21        You don't have a duty to be paranoid, you have a

22   duty to be diligent.

23        You don't have a duty to constantly scour the

24   newspapers, the TV and every public source because you

25   might have a cause of action as to which the clock is

110

1    running.

2         There has to be something measurable, something

3    that is such a departure from past practice, something so

4    extraordinary that it sets the clock ticking for people.

5         And in our case we are not just talking about one

6    group of people, the sophisticated Church people who were

7    developers, we are talking about a large group of people

8    who live in an area within these circles.

9         This is the residents class, one, and residents

10   and commercial class, two, five and six miles.  The Church

11   people were here.  I am gonna come back to Church a little

12   bit later.

13        This is a much larger group.  And what we say is

14   starting with the FBI raid, the events come fast, furious

15   and heavily that set that clock ticking.

16        You don't get it from an article in the

17   newspaper, you don't get it from a protest song, you get it

18   because something comes to your attention that would cause

19   a reasonable person of ordinary intelligence to be

20   diligent.

21        And three cases I have to cite for that - Beef

22   Industry -- these are mostly fraudulent concealment cases,

23   they are the defendants cases, not ours -- Beef Industry,

24   600 F.2d 1148, Fifth Circuit (1979).  Reversed summary

25   judgment against a plaintiff.  They rely on it for the

111

1    proposition that you should be aware of prior litigation,

2    but they reversed the case and said it didn't matter, you

3    had to be aware of a lot more than prior litigation and

4    prior publicity.

5        ConMar versus Mitsui, the case that we've

6    submitted to your Honor, there was an unremitting stream of

7    articles in the Wall Street Journal, the Los Angeles Times,

8    the New York Times - indictments, guilty pleas - the San

9    Francisco Chronicle.  It was a California company in San

10   Francisco.  There were literally a dozen articles in the

11   San Francisco Chronicle.  None of that was deemed

12   sufficient to start the clock ticking in a fraudulent

13   concealment context.  None of it was sufficient to yield

14   inquiry notice.  And the Ninth Circuit in that case said

15   the duty to be diligent does not arise in a vacuum, there

16   has to be something to trigger the duty of inquiry notice,

17   the duty to be diligent.

18       Finally the defendant's case, again Herm versus

19   Stafford, 663 F.2d 669, Sixth Circuit (1981).  There were

20   three events -- if I can read from that case, since it's

21   one on which the defendant so heavily relied.  There were

22   three events, not one, and in that case the Sixth Circuit

23   held:  "This is not a case in which lawsuits alone have

24   been filed against the company, rather by July 10th, 1970,"

25   this is the defendant's case, "the two agencies responsible

112

1  for regulating securities had taken serious action against

2  DBHC and the trading of its stock."

3       Well, this is what had happened.  The state of

4  Kentucky had shut the company down, suspended the stock,

5  put it into insolvency and basically closed it down.  And

6  the closest analogy I can think of to this case to Herm v.

7  Stafford is when the FBI raided this plant and when two and

8  a half to three most later Rockwell was shut down.

9       THE COURT:  What am I supposed to draw from the

10  FBI raid on the plant?  I mean the significance -- well,

11  it's a big, exciting event, sure, but there still is a

12  presumption of innocence in the country that should attend

13  in some fashion, even carry over, and I am not sure what

14  the significance is in terms of the question of statute of

15  limitations.

16       MR. DAVIDOFF:  Well, I think I would like to

17  answer that.  Your Honor is right, there is a presumption

18  of innocence, and -- but at least for the first time in 37

19  years it's clear that the government isn't backing these

20  contractors up to the hilt and saying that there's no

21  problem at this plant.

22       You've got a search warrant and a publicly -- and

23  it's not just loose papers, it's the TVs and the blare of

24  sirens and everything else, you've got the FBI raiding this

25  plant for environmental violations, which is incidentally

113

1    an indispensable part of a cause of action for a DOE-owned

2    facility or an important part of a cause of action for a

3    DOE-owned facility.

4         I mean basically one arm of the government is

5    finally saying that another arm of the government and its

6    contractors are violating environmental laws.  And it was

7    --

8         THE COURT:  Well, if that's an event that will

9    trigger the running of the statute or at least trigger the

10   diligence element of the accrual of the cause of action,

11   some of these events cited by the defense counsel much

12   earlier should be of equal significance, shouldn't they?

13        MR. DAVIDOFF:  Well, there's a slight difference

14   in this case, your Honor.  As I pointed out before, it's

15   arguable for some plaintiffs that even that's not enough

16   and we need the confirmatory facts from the SPEERA panel,

17   the NRC, BEIR V and what's coming out now.

18        However, as to these plaintiffs who initiated

19   this class action, the facts will show that that's what

20   triggered the inquiry notice.  The facts will show that

21   that's what triggered their investigation, that's what

22   triggered the duty to be diligent.  They were diligent and

23   they brought this action within six and a half months

24   thereafter.

25        So this is a case of actual knowledge.  We -- and

114

1   as Rockwell points out -- Rockwell scolds us for being

2   early.  They say we are early, we should have waited

3   longer, we should have waited until the studies emerged, we

4   shouldn't have just relied on the FBI raid; that was

5   irresponsible of us.  At least that's the intimation I get.

6         They even sort of hint darkly about rule 11.

7   And, you know, that's the -- that is the dilemma with which

8   you are placed, because once you are on inquiry notice, the

9   statute says you have to file within a certain length of

10  time.

11        And if in fact the FBI raided all the other

12  events -- I mentioned the FBI raid, but it's not the only

13  event, it's the whole series of events that begins in 1989

14  and continues into 1990 that triggers the statute in this

15  case.

16        THE COURT:  Well, I would assume that you -- that

17  in due course there would be forthcoming your clients

18  subjective reasons as to why they filed when they did, but

19  it's not a subjective test, in any event, it's an objective

20  test, isn't it?

21        MR. DAVIDOFF:  It is, your Honor, but it's

22  supposed to be done -- well, it is and it isn't.  It's a

23  subjective -- it's a subjective test -- I am not --

24        THE COURT:  It's subjective in terms perhaps of

25  actual notice, it's objective in terms of diligence.

115

1       MR. DAVIDOFF:  Exactly.  It's objective in terms

2   of whether the facts are sufficient to yield constructive

3   notice, although in Colorado that is almost always

4   entrusted to a jury.  And it is subjective in terms of when

5   there was actual -- whether it was actual knowledge as

6   opposed to constructive knowledge.

7       THE COURT:  Okay.  Now in Colorado it is true

8   that this is generally a question of fact for the jury.

9   Colorado traditionally has applied rule 56 of the Colorado

10  Rules of Civil Procedure in a fashion that is not

11  necessarily commensurate with the three cases decided by

12  the United States Supreme Court - <u>Matsushita</u>, <u>Anderson</u>

13  <u>versus Liberty Lobby</u> and <u>Celotex</u>.

14      So I think I have to treat that summary judgment

15  authority in Colorado -- well, I guess what I have to do is

16  I have to apply the federal rule of civil procedure 56 to

17  the Colorado state rule -- they may argue with that, but to

18  the Colorado state rule of what the limitation period is,

19  and the accrual rule.

20      MR. DAVIDOFF:  I think your Honor is right.  And

21  could I -- could I add my comments to that?

22      THE COURT:  Sure.

23      MR. DAVIDOFF:  Under federal rule of civil

24  procedure 56 they have utterly complied to -- failed to

25  comply with their burden, which is to give us discovery,

116

1   take discovery and submit affidavits and submit other

2   proof.

3        Then we would be obliged under <u>Celotex</u>

4   procedurally to refute that proof by filing affidavits of

5   our own.

6        However, once that we are done, the issue would

7   then under the Colorado Rules of Decision regarding accrual

8   and statute of limitations be appropriately reposed in the

9   hands of the jury, because under Colorado law, which your

10  Honor applies in the Price-Anderson context, the issue is

11  for the jury.  It's an issue of fact.  It's a Colorado

12  accrual rule, and the jury is the one that applies the

13  Colorado accrual rule.

14       THE COURT:  Well, Colorado authority says

15  ordinarily it's a rule for the jury.  And when you overlay

16  federal rule 56 law on the Colorado rule, it is a more

17  liberal approach to summary judgment than it would be in

18  the Colorado courts.

19       MR. DAVIDOFF:  I am not suggesting that your

20  Honor would be barred from hearing the summary judgment

21  motion and deciding it at the conclusion of discovery if

22  your Honor concluded that there was no genuine issue of

23  material fact as to when these plaintiffs and the class

24  that they represent were on notice of all of the elements

25  of their claim.

117

1    THE COURT:  Tell me what you expect discovery to

2    disclose.

3    MR. DAVIDOFF:  Well, discovery will help us flesh

4    out this time line, which is a sordid history of 35 years

5    of concealment and failure to disclose what they knew about

6    what the dangers of this plant were.

7    And starting with the 1957 fire and going to the

8    1969 fire, and the burial mound where they buried some of

9    the stale evidence, and then finally unearthed it and

10    buried it somewhere else, we are not sure where, the whole

11    history of this plant and the operation of this plant until

12    1988 is a history of denial, reassurance and nondisclosure.

13    And there's gonna be a lot more evidence unearthed of that

14    in their files, assuming it's still there, than what we

15    have in the public record.

16    I can't prove the case with articles from the

17    Rocky Mountain News.  And I would submit that neither can

18    Dow.

19    May I just go on on this point about inquiry

20    notice?  Even if we had read and were alarmed by the

21    articles, there's nothing in their submission that shows

22    that we were on notice of injury -- or on notice of damages

23    to our persons or property, and that's indispensable under

24    the Colorado law of accrual.

25    There has to be notice of a case.  And what they

118

1   have given us or pointed out to is notice of a controversy.

2   Controversy has surrounded nuclear weapons, your Honor,

3   since August 6th, 1945, which was the date the bomb was

4   exploded on Hiroshima.  And there have been many nuclear

5   plants picketed and marches began since then.

6   They have been protested, some of them have been

7   barred.  And if controversy were tantamount to inquiry

8   notice, any and all claims, real and imagined, against

9   these facilities would be time barred and plaintiffs would

10   be forced foolishly to rush into court to preserve

11   speculative or even potentially frivolous causes of action,

12   when the government and respected panels of scientists said

13   that there weren't any.

14   And the authority that I cite on that point is

15   the Maughan case, where the Tenth Circuit held, under the

16   much stricter Utah rules and the much stricter Utah accrual

17   rules, where you have to show exceptional circumstances,

18   unlike Colorado, to bar the statute, the Tenth Circuit held

19   that where you've got a radiation case and the link between

20   radiation and leukemia, the plaintiffs were absolutely

21   entitled to rely on the government's reassurances of the

22   scientific studies.

23   And that's what we had until the last two years,

24   government reassurances and scientific studies.

25   And I am not -- I am not aware of any case that's

119

1   held -- there are cases that hold, in the securities

2   context especially, that you don't have the right to rely

3   on the reassurances of the defendant, but I am not aware of

4   any case that holds that you don't have a right to rely on

5   the reassurances of your own government, the one that we

6   pledge allegiance to every day, the one whose flag hangs in

7   this courtroom.

8           Now another point on diligence and reasonable

9   diligence.  The reasonable diligence that's required is the

10  reasonable diligence of an ordinary person or an ordinary

11  plaintiff.

12          And let's suppose something has occurred to put a

13  plaintiff on inquiry notice, a disease with a causal nexus,

14  or as in Church, for example, a government report which

15  says your land is contaminated and you are barred from

16  developing it.

17          The Church plaintiffs were very wealthy and

18  well-heeled, sophisticated real estate developers who were

19  told directly by their local government that their land was

20  contaminated.

21          But for our class members, even the few who may

22  have had inquiry notice - the few - reasonable diligence

23  does not mean the reasonable diligence of a sophisticated

24  developer or a road scholar, a radio biologist or even a

25  rocket scientist.

120

1    THE COURT:  Or a lawyer.

2         MR. DAVIDOFF:  Or a lawyer, correct, your Honor.

3    Although I think lawyers are dumber than ordinary people in

4    some respects.

5         It's the reasonable diligence of an ordinary

6    person.  It is not the reasonable diligence of a scientist,

7    it is not the reasonable diligence of a sophisticated

8    person, it's the reasonable diligence of an ordinary

9    person.

10        And again Mastro v. Brodie, the Colorado Supreme

11   Court case, Herm v. Stafford, one of the defendants'

12   picture-window cases, specifically says a person of

13   ordinary intelligence, not a genius, not an Einstein, a

14   person of ordinary intelligence.

15        What is that person of ordinary intelligence

16   supposed to do when he gets inquiry notice that he may have

17   all of the elements of a cause of action?

18        THE COURT:  Back up a minute.  You keep talking

19   about all the elements of a cause of action, and that's why

20   I say "or a lawyer" and add that to your lexicon, to your

21   universe of who is not necessarily an ordinary person,

22   because an ordinary person doesn't have an idea of the

23   Colorado Civil Jury Instructions Third elements of

24   outrageous conduct or negligence or any other tort -

25   402(a).