# Tab C
## (PART 3 of 3)

1    So we -- I mean you don't -- you don't hold them

2  to that standard, do you?  In fact you don't even -- you

3  don't even hold the ordinary individual, ordinary person,

4  to the standard of having a theory that it's negligence or

5  outrageous conduct or any other tort.

6    MR. DAVIDOFF:  Well, there's two ways to look at

7  that.  I think your Honor is right that an ordinary person

8  is not expected to have the legal sophistication of a

9  lawyer.

10    THE COURT:  I mean otherwise the statute is never

11  gonna run until they get to the lawyer's office.

12    MR. DAVIDOFF:  Well, and that's what I was about

13  to add.

14    THE COURT:  And some lawyers don't know what the

15  theory is.  Once they get the theory, they can't find the

16  elements either.

17    MR. DAVIDOFF:  And then they have a problem, your

18  Honor.

19    THE COURT:  That's it.

20    MR. DAVIDOFF:  But the point that we are making

21  here is we never even get to the lawyer, because we don't

22  have -- we don't have -- assuming we have inquiry notice,

23  we can't find the elements of the -- the factual elements

24  of the cause of action - breach, duty, injury, damages.

25    That's what they had in Church that our class

122

1    members don't have, because they had notice of injury and

2    damages, which our class --

3         THE COURT:  Well, I have struggled with this

4    rule.  I struggled with it in Miller.  And I struggle

5    trying to apply the Colorado Supreme Court authority from

6    time to time.

7         It seems to me that it's -- that it doesn't need

8    to be so complex.  It's a rather simple common-sense rule

9    that if I have reason to believe that somebody screwed up

10   and hurt me, I have a cause of action.  And it's just that

11   simple.  I don't have to be able to pigeonhole it in terms

12   of outrageous conduct or negligence or something under

13   Price-Anderson or anything else.

14        If somebody -- somebody's wrongful conduct caused

15   me injury, I have -- I am on notice that I better do

16   something about it.  Isn't it just that simple?

17        MR. DAVIDOFF:  You are on notice to conduct a

18   reasonable investigation and bring your claim, if you can

19   establish all the elements consistent with rule 11 within

20   the statutory periods.  Yes, I would agree with that.

21        And I would agree that you don't have to have

22   legal sophistication to be on inquiry notice.  You can be

23   on inquiry notice if you are a person of ordinary

24   intelligence.

25        But those elements were not present here, the

1    elements that your Honor just iterated.

2         THE COURT:  Okay.  Let's get to that.  We have

3    some property owners and we have some workers.  And let's

4    kind of bring it down to home to the people involved in

5    this case and why there is -- the statute hasn't accrued --

6    whatever the statute is.

7         MR. DAVIDOFF:  Well, let me jump ahead and give

8    an example.  Can I do that?

9         THE COURT:  Sure.

10        MR. DAVIDOFF:  Excuse me.  I am gonna have to do

11   this in a pretty ordinary way, because I don't have all the

12   tools.  This is the Rocky Flats perimeter.  This is where

13   the Church land was abutting the perimeter and going down

14   around here.  And actually we believe, but we are not sure,

15   because the records in that case have all been sealed up --

16   or many of them -- most of them, that some of this

17   perimeter may indeed have originally been part of the

18   Church parcel.  Dow will have to tell us that when we get

19   discovery.

20        These people were told explicitly that their land

21   was contaminated.  They were told that the contamination

22   came from the Rocky Flats plant and they were barred by

23   their local governments from developing their land.

24        And they were wealthy, sophisticated real estate

25   investors with the wherewithal and the ability to hire the

124

1  lawyers and the scientists that they needed to prove their

2  claim, which is a different and more specific claim than

3  the claims of these classes.

4       They had notice of all the elements of their

5  claim.  They had notice of duty, breach - which were

6  probably legal questions that they had to get their lawyers

7  to solve for them - injury and damages.

8       That's what's been remarkably lacking for the

9  remainder of the members of the class.  And that's also the

10 factual inquiry that has to be conducted by the jury before

11 that's decided.  It can't be decided as a matter of law.

12 It's clearly a factual inquiry.

13      Now another example, and I think I may have used

14 the bench press example that blows up.  Suppose this is a

15 munitions plant and Dow buries a hand grenade and it blows

16 up in 1987.  Now he -- no, let's say in 1984, 1983, just

17 when the Matsch decision is reversed by the Tenth Circuit

18 and sent back -- Judge Matsch's decision sent back, the

19 McKay case, a box of 100 hand grenades blows up and injures

20 some people's property.

21      Well, there's no argument there as to when the

22 injury and the damages occurred and where it was and when

23 it happened.

24      But suppose they bury a box of 100 plutonium-

25 trigger hand grenades in a burial mound in 1969 and in 1984

125

1   or 1985 the leaking plutonium leaches and travels its way

2   to the plaintiffs' property, and the plaintiff learns of it

3   in 1987.  When does the cause of action arise and when does

4   it accrue?  It clearly doesn't accrue until it gets to your

5   property and it causes injury or damages.

6         And so what we have here is a more insidious, a

7   more gradual, but in every -- every bit as pernicious a

8   tort as the tort where a box of weapons is -- is buried on

9   the property.

10        Now those are the two examples that come readily

11  to mind.

12        This was a plant where most of the people, with

13  the exception of the Church plaintiffs, were not on notice

14  of some of the indispensable elements of their claim.

15        And we will contend and I think prove at trial

16  that most of the community was not on notice of any of the

17  indispensable elements of their claim.

18        And can I speak to the Church litigation for one

19  moment?  Because the defendants do rely heavily on that.

20        I pointed out that they were sophisticated and

21  wealthy investors.  It was actual notice to them that their

22  land was contaminated.  There was actual notice to them

23  that they were not allowed to develop their land, thereby

24  suffering pecuniary harm and damage.  They were barred by

25  the local governments from developing their land.  They

126

1    fought a lonely, expensive and arduous vigil in their case,

2    including one decision by Judge Matsch that threw the case

3    out entirely and a later one in 1985 saying that the whole

4    case was completely overblown.

5          And finally in 1985 they settled their claim and

6    their lips were sealed, their record was sealed.  And Judge

7    Matsch, without opposition, entered a series of findings,

8    which were reported and were duly and considerably

9    reassuring to the community.

10         Now the cases hold that the mere filing and

11   prosecution of another case is not enough even in a

12   fraudulent concealment context.  There has to be a lot more

13   than that.

14         Beef Industry, which reversed a summary judgment

15   on that ground; Herm versus Stafford, same point; ConMar

16   versus Mitsui, where there were not only cases filed and

17   publicity, but indictments.  We don't even have indictments

18   in this case.  In ConMar there were indictments, several

19   indictments more than four years before the case was filed,

20   and it was a fraudulent concealment case, not merely a

21   discovery and reasonable diligence case.  In the Ninth

22   Circuit by Judge Boochever reversed the summary judgment.

23         And all of these cases are after discovery on a

24   plenary of records, not on a motion to dismiss, which

25   metamorphosises into a summary judgment motion, after

127

1    discovery, a motion for discovery record and sometimes

2    after directed verdict.

3         Finally, after Church the plaintiffs settled.

4    They agreed to a gag order, and we haven't been able to get

5    any information out of them.   They are not allowed to talk

6    under the terms of that settlement.

7         I think that there is a considerable inequity to

8    use the example of one plaintiff who is wealthy, smart,

9    alert lucky and well-represented enough to bring these

10   people to task for what they did, to use that decision, and

11   to use that experience to throw out the claims of thousands

12   of other injured, gravely-threatened people at this

13   juncture.   I think that's a considerable inequity.

14        We don't do it in the asbestos context, which

15   your Honor mentioned.   In the asbestos cases a lot of the

16   proof comes from the 30s, and the cases started in the 50s

17   -- I am sorry in the 60s and in the 70s, and they are

18   continuing to be filed today as the injury and the damage

19   accrues.   And only where a plaintiff, as in the Miller

20   case, which your Honor has, knew himself that he -- the

21   causal nexus and his exposure and his illness well before

22   the statutory period are those asbestos cases thrown out.

23        I mean we try cases with "stale" evidence all the

24   time, quote, unquote.   Stale evidence is an equitable

25   consideration for why there are statute of limitations, but

it's not the only equitable consideration.

THE COURT: Mr. DeBoskey told me that the plaintiffs in the workers case are not, quote, "injured," unquote, and now you are telling me that they are?

MR. DAVIDOFF: They are injured in the sense that they have been exposed to a risk and they need to take precautionary measures and get help to delineate the parameters of that risk and hopefully catch some of these diseases before they -- they develop to the point where it's too late. As Mr. DeBoskey --

THE COURT: Is that a substantial risk?

MR. DAVIDOFF: Yes, your Honor, I believe a very substantial risk. Finally, the lonely prophets like Alice Stewart and Gofman are being vindicated now 15 and 20 years later for what they predicted, for what they were ridiculed about, for what the government and Dow and Rockwell castigated them as a bunch of nuts and cooks, and now their point of view is finally being vindicated.

Three weeks ago the NRC lowered by four fifth-fifths the acceptable standards for low-level radiation for surrounding communities and workers at plutonium facilities and nuclear weapons facilities such as this. I mean -- and nuclear facilities generally, just three weeks ago.

And Alice Stewart was fighting that lonely fight

129

1   15 years ago.  And the fact that she joined with some folk

2   singers on the steps of Rocky Flats is of no moment to when

3   the plaintiffs really knew that this was real.  Now they

4   know.  Now they know what the problem is, and they are

5   taking steps to address it.

6           One thing that I hope we handed to your Honor, I

7   hope it got to your Honor, was this little exhibit that we

8   prepared really last night, which -- you know, they -- they

9   told your Honor that they gave -- they gave us an index of

10  everything that they could find, because it was so

11  voluminous they only provided half the articles, so we went

12  and looked for some of the ones that they didn't include.

13  And they are pretty enlightening.

14          MR. BERNICK:  I have not seen this, your Honor.

15          THE COURT:  I haven't seen it.  I don't know what

16  you are --

17          MR. BERNICK:  Can we get one?

18          MR. DAVIDOFF:  Here's one for you, Mr. Bernick.

19          MR. BERNICK:  What do you want me to do with it?

20          MR. DAVIDOFF:  It's yours.  We've got 12 articles

21  here from 1970 to 1985 containing reassurances --

22          THE COURT:  Is this supposed to be something that

23  is an appendix or in the nature of attachment to the

24  summary judgment response?  Because it's kind of late.

25          MR. DAVIDOFF:  No, your Honor, it's --

130

1          THE COURT:  I am not sure --

2          MR. DAVIDOFF:  What it is is they had an index of

3    articles in their exhibits, but they didn't include all the

4    articles.  We couldn't find many of them.  We found some of

5    them.  And these are Dow's articles that they mentioned,

6    and we are giving your Honor the text of the articles that

7    they cited.  We have a commentary in there on the cover

8    page which describes the articles and gives the dates.

9          The doctrines of so-called stale claims must be

10   weighed against the injustice that results when a deserving

11   plaintiff is barred, who has not had an adequate

12   opportunity to investigate, prepare, and bring a claim

13   consistent with the good-faith requirement of federal rule

14   of civil procedure 11.

15         I want your Honor to ask, in conclusion here - I

16   am mercifully almost done - how equitable the defendants'

17   argument is here.

18         This is a company which played a key role in this

19   nuclear weapons facility and in the nuclear weapons

20   industry and in Rocky Flats for over two decades.  They

21   subjected the surrounding community and workers

22   surreptitiously to hazards, radiation, even toxic

23   substances, poisonous substances.  They were known to Dow,

24   they were unknown to the plaintiffs, and yet Dow and AEC

25   consistently reassured the public and the workers of the

131

1    safety of their operations.

2          In short, this is a case in which getting the

3    truth out of these defendants, and particularly out of Dow,

4    has literally been like pulling teeth out of a mule.  We

5    are finally starting to do it.

6          And now, having fought activists, scientists and

7    concerned citizens for decades to conceal the hazards of

8    this plant, the operators want to exploit their own sins

9    once again by contending that the very difficulty, the very

10   tortiousness, the very length of the process of pulling out

11   the truth sufficient to be able to file a complaint of this

12   nature in this Court invokes the bar of the statute of

13   limitations.

14         What they are asking your Honor to do is to

15   create a new doctrine that doesn't appear either in

16   Colorado law or federal law, and I would call it the

17   doctrine of inequitable tolling.  And I am asking your

18   Honor not to do that.

19         THE COURT:  Mr. Bernick.

20         MR. BERNICK:  Your Honor, very briefly, because I

21   am mindful of how much time has passed here.  Let me say

22   while I put this other chart up here, that with respect to

23   the issue of state versus federal law, there are a bunch of

24   other things that have been thrown in here, but I will -- I

25   would ask that the Court look carefully at the decision in

132

1    the Ebrahimi case.  I don't think too much actually is

2    gonna turn on this in the end.  But in the Ebrahimi case

3    the Tenth Circuit in 1988 made the critical distinctions.

4         You're in federal court, you don't have a statute

5    of limitations, you look to state law for what the statute

6    is.

7         With regard to the tolling of the statute in the

8    sense of if a lawsuit is filed and then dropped and then

9    picked up again, that is what the Komiandi -- or I am not

10   sure what the name of that case is, the Supreme Court case,

11   that's what it deals with.  When it comes to accrual of the

12   state statute of limitations the Ebrahimi case very

13   carefully says, "The instant case, however, does not

14   involve the tolling of the statute of limitations, but with

15   the accrual of the cause of action, where the cause of

16   action is based upon federal law, this circuit applies

17   federal law to determine questions relating to the accrual

18   of cause of action."

19        And that includes questions of equitable tolling,

20   which the Court in footnote six is very careful to point

21   out is really an accrual issue.

22        So federal law says --

23        THE COURT:  Points out the evil of footnotes,

24   doesn't it.

25        MR. BERNICK:  Perhaps points out the evil of --

133

1    or perhaps points out the evil of labels.

2              THE COURT:  No, footnotes.

3              MR. BERNICK:  What?

4              THE COURT:  Footnotes.  And I am just throwing

5    out a hint for future reference.

6              MR. BERNICK:  Okay.  I don't want to dwell on

7    that, because nothing in my view turns upon it.  But this

8    is a federal court dealing with a federal cause of action,

9    and accrual is governed by federal law.  That is what the

10   Ebrahimi court said, Tenth Circuit, 1988.

11             But I want to get past it, because I don't think

12   that given what I've heard from Mr. Davidoff's presentation

13   here, if his version is the proper version and the state

14   law version, I think we are halfway down the road anyhow.

15             We all agree that the issue is notice.  That's

16   what he said - inquiry notice.  When does inquiry notice

17   take place?  He used the term again and again and again -

18   "inquiry notice."

19             Not the same thing as the claim or the evidence.

20   Inquiry notice.  Also agrees the inquiry notice can be

21   established through -- could be constructive notice and

22   it's an objective standard.  And he has to agree with that,

23   because the case he keeps on talking about ConMar Corp.

24   versus Mitsui, Ninth Circuit, has a whole section on

25   constructive notice.

134

1    Constructive notice is proper notice under the

2  statute of limitations.  Indeed the ConMar case dealt with

3  questions of what is in the newspaper.  I differ with his

4  interpretation of that case.

5    He says that there were literally a stream of

6  articles in the newspaper.  The Court is very careful to

7  point out that only one article in the San Francisco

8  Chronicle dealt with the key product, which was at issue in

9  the subsequent litigation, and that was the basis of the

10  Court's decision in this case, that there was not

11  sufficient inquiry notice to put a reasonable person on

12  notice of what the claims were.

13    THE COURT:  Well, you've gotta have notice, don't

14  you, of not only of the facts of the burning, the facts of

15  area 903, but you have to have notice of wrongful conduct

16  and that that wrongful conduct caused an injury.

17    MR. BERNICK:   That's exactly -- okay.

18    THE COURT:  And what the plaintiffs are telling

19  me is that there is a history of denial, reassurance and

20  nondisclosure, or at least there's a fact, a genuine issue

21  of material fact as to those -- that denial, reassurance

22  and nondisclosure, that masked the injury, cause and

23  wrongful conduct.

24    MR. BERNICK:  Let me address that specifically.

25  I wanted to get the principles straight before getting to

135

1    that.  We are at inquiry notice.  Constructive notice is

2    good, it's good under the law.  Constructive notice can be

3    established through the public record; their own cases say

4    so.

5          So now we've reached the question:  What was out

6    there constructively?  What was out there?  And we

7    obviously treated that during the course of our opening

8    remarks.

9          They say it's gotta be notice of everything.  I

10   think the Court shares a certain amount of skepticism with

11   respect to that.

12         But what they focus on particularly, they say

13   "injury," "we didn't have the injury yet," "we didn't

14   believe that we had the injury yet."

15         This morning, though, at length we debated the

16   question of what these cases are all about, and they told

17   you repeatedly that these are not injury cases,

18   notwithstanding the fact that they are under

19   Price-Anderson, which requires injury.

20         THE COURT:  Well, now the workers cases are not,

21   quote, "injury cases," within the meaning of the Act.  I

22   think that's what was argued to me.

23         MR. BERNICK:  Let's first of all block that out.

24   So just get past that.  They are not saying that those are

25   injury cases.  We are not talking about a situation where

136

1    we've all of a sudden got people who two years ago or a

2    year ago or three years ago got sick for the first time.

3    That's not the kind of case that we've got here.

4         We have a so-called health risk case that is now

5    becoming a right-to-know case.  That stuff is spread

6    through the record in spades.  All of this stuff here deals

7    -- I went through all those articles, all those reports

8    beginning with January 13, 1970, all deal with health risk.

9    And you raise the question, well, is it unequivocal or are

10   people saying other things?

11        Yes.  The newspaper doesn't give them a shred of

12   credit.  The newspaper is out there saying they are real.

13   And the scientists are out there saying that they are real.

14        But let me focus on the question of risk and the

15   question of injury on the property owners' side as well,

16   because the property owners have the same claim.  The

17   property owners don't say that they are sick.  The property

18   owners don't say that something has happened to them, they

19   say that their property is contaminated and that there is a

20   risk associated with that contamination.

21        THE COURT:  Aren't they also claiming diminution

22   in market value of their property?

23        MR. BERNICK:  Well, yes, but there's nothing that

24   restricts that diminution to any particular period of time.

25   I mean the new claim that's being made here is that because

137

1   of the risk that has to be determined through monitoring,

2   they've got a diminution of property value.  That all --

3   that all has been out their ever since January 13 of 1970.

4       THE COURT:  They are not saying "I can't sell my

5   property for what I otherwise could but for the proximity

6   to Rocky Flats and exposure"?

7       MR. BERNICK:  I do not see in their complaint a

8   statement that diminution and property value only occurred

9   within the statutory period.  That is not in their

10  complaint.  What's in their complaint is that the conduct

11  that created this risk - and again the risk has been in the

12  public record forever - is responsible for diminution in

13  value.  We don't have a recent accrual theory articulated

14  in this complaint at all.

15      THE COURT:  Implicit in that is your argument

16  that a plaintiff must set forth with sufficient

17  particularity in the plaintiff's complaint that they fall

18  within the applicable statute of limitation.

19      MR. BERNICK:  No, I would respectfully disagree

20  with that in this respect:  We -- if they are going to say

21  that their cause of action accrued within a certain period

22  of time, or it -- however it accrued, that theory ought to

23  be articulated in the complaint as part of their overall

24  theory of what their case is about.

25      THE COURT:  Well, they are saying that here today

138

1   because you filed a motion for summary judgment on that

2   basis.

3          MR. BERNICK:   That's correct.

4          THE COURT:   Well, my question is, though -- I

5   mean if I look to the complaint -- I don't have to look to

6   the complaint to determine compliance with the statute of

7   limitations.   I mean you have the burden of showing that

8   they -- because you've raised the affirmative defense,

9   albeit not in a responsive pleading -- not in an answer,

10  you've raised the question of the statute of limitations by

11  your motion for summary judgment.

12         MR. BERNICK:   That's absolutely correct.

13         THE COURT:   So you have the burden --

14         MR. BERNICK:   Once I've made the motion for

15  summary judgment and I've got all these affidavits -- I've

16  got all these affidavits -- I've got all these materials

17  that are public record, and appropriately so, that say that

18  risk has been out there with respect to off-site

19  contamination since 1970, it seems to me that it's up to

20  them in order to oppose my motion for summary judgment to

21  submit an affidavit saying, "oh, we are not talking about

22  risk that accrued then, we are talking about something

23  particular that happened to property values yesterday or

24  within two years from yesterday."

25         And the question I am gonna have is what in the

139

1  world that has to do with Dow, that left the site in 1975,

2  and what's changed?

3      My point is this, your Honor:  When it comes to

4  their theory -- first of all, with respect to the workers,

5  they say now "injury"; this morning they said "risk" or

6  "right to know."

7      When it comes to the property owners, there's a

8  whole claim in the property owners' suit that is the same

9  claim, it is the monitoring claim.  That claim too is

10  driven by risk.  And the risk has been in the public press

11  ever since 1970.

12      So when it comes to the elements with respect to

13  which the question of notice arises, those elements

14  according to their own suit are risk, not injury; and the

15  risk has been out there, and there's nothing that says in

16  the world that it's not been out there since January 13 of

17  1970 when the NRC report was published.

18      Now I want to address the question of what

19  happens now; what their theory is.  Notice is out there,

20  constructive notice is out there, the risk has been

21  published.  What are their explanations for why the claim

22  was not filed?

23      Because I think what we are hearing today is that

24  they believe they have an explanation for why, given the

25  notice that's in the press, that the Court recognizes, they

140

1   didn't file their claims.

2        And they have given you several theories of why

3   the claim wasn't filed, and I don't think that any one of

4   them holds up.  The first thing that was mentioned was

5   fraudulent concealment.  They say "we are going to show

6   through discovery that there was fraudulent concealment."

7        Well, your Honor, there the burden is clearly on

8   them.  The Dayco case, Sixth Circuit, Tenth Circuit cases,

9   they all say the same thing, fraudulent concealment has to

10  be pled, it has to be in there, it has to be in their

11  papers, in their pleadings.

12       THE COURT:  You mean they have to anticipate your

13  statute of limitations?

14       MR. BERNICK:  That is exactly -- if their claim

15  is fraudulent concealment and that's their reason for not

16  filing suit earlier, that's exactly what the cases say.

17  That's what Western Paving says, that's what State of Ohio

18  says.  That is in fact what the Supreme Court said in Wood

19  versus Carpenter in 1879, they have the burden of coming

20  forward in their pleadings and establishing with

21  particularity what their diligence was.

22       So if their theory in this case is fraudulent

23  concealment, that is a precise answer to your Honor's

24  question.  They have gotta plead it, they have gotta prove

25  it and they have gotta do so with particularity, and they

141

1   haven't done that.  There's nothing in their papers which

2   shows the fraudulent concealment with any degree of

3   particularity.

4        They then come up with a theory that says that

5   something has changed.  There's some new event that's taken

6   place.  The only problem with that is that none of the

7   events that they have recited to your Honor this afternoon

8   have anything to do with the claims against Dow or for that

9   matter anything particularly new.

10       They say that there was an FBI raid in 1989.

11  What in the world does the FBI raid have to do with the

12  fires that had been alleged, with the burials of the

13  material in the ground?  The FBI raid related to a totally

14  different period of time, related from 1980 to the present

15  and dealt with RCRA permits.  Has nothing to do with us at

16  all.

17       There's nothing in their papers that establish

18  that it has anything to do with us at all.  So they refer

19  to more recent events in order to say that something new

20  has happened that is an event that has absolutely no

21  bearing on the claims that they filed against us.

22       What does the FBI raid have to do with us?  They

23  say "well, gee, there's this grenade out there, the stuff

24  is in the soil and it's moving in a certain" -- I would

25  really like to know what the evidence of that is going to

142

1   be.

2          But in any event, there's nothing that they -- no

3   material that they've supplied to the Court, no study, no

4   nothing, that says that somehow there has been a movement

5   of material onto a particular plaintiff's property where it

6   wasn't before.

7          The soil contamination that was referred to in

8   the Church case wasn't just on the Church property, and the

9   articles that prompted the Church case to be filed, they

10  didn't just relate to the Church property.   Those articles

11  discussed the 1972 Poet-Martell studies, discuss

12  contamination going all the way through the City of Denver.

13  That contamination has been out there published in the

14  papers since 1972.

15         So what is the new event?   It's easy to get up

16  there and say, oh we think of this happening, but this is

17  summary judgment and the notice is there on the record.

18  Where is the event that says that something has changed

19  with respect to the soils?

20         They mention the fact that "gee, these statements

21  have been made by Dow" -- well, if there are statements

22  made by Dow, their claim is a fraudulent concealment claim,

23  and they haven't pled it.

24         They say that statements have been made by the

25  government.   Well, statements have been made by the

143

1    government and people have made statements in opposition to

2    the government.  And that is, I think, what focuses your

3    Honor on the key element to their opposition to our motion,

4    and I think it's something that's gotta be put out in the

5    open and addressed as a matter of law by the Court.

6         What their position really is here today is not

7    that they couldn't have filed the claim in 1975 when the

8    Church people filed their claims.  I don't think that

9    that's what their argument is.  I don't think that they've

10   put those facts before the Court.

11        I think what their argument is, that people

12   didn't become convinced of their case, they didn't become

13   convinced of the credibility of the claims until perhaps

14   unrelated things took place in 1989 and 1990.  That is I

15   think the theory that has been articulated before the Court

16   today.

17        Alice Stewart is now becoming accepted.  I

18   disagree with that.  The BEIR V report is something new.  I

19   would love to debate the BEIR V report with Mr. Davidoff,

20   and I am sure that one day in one context we will have an

21   opportunity to do so.

22        But all of those points bear upon the question of

23   how strong do the plaintiffs believe their evidence is.

24   That is not a statute of limitations' test.  That's a test

25   that says we have to wait until the plaintiffs believe in

144

1   their case before the statute of limitations begins to run.

2   And that's not the law.  If that were the law, the statute

3   would only begin to run when the claim is actually filed.

4   And indeed if that's where the law -- you may even have a

5   situation where the plaintiff believes he's got a good

6   claim, but he's gonna wait for other things to develop so

7   that he feels that the claim is an even stronger claim, and

8   still the statute of limitations does not begin to run.

9        If we go down the path that they are laying out

10  to the Court, you can toss out constructive notice, you can

11  toss out information of reports that are released to the

12  public, and inevitably what you come down to is a

13  subjective issue of when the plaintiff becomes convinced.

14       And your Honor, we will never have statute of

15  limitations motions ever, ever granted.

16       MR. DAVIDOFF:  Your Honor, Mr. Chesley would like

17  to say something, and I will be very brief too.  First of

18  all, the Abrahimi case specifically says "for claims

19  arising under federal law."  This is not a claim arising

20  under federal law, it's a claim arising under state law,

21  which is in federal court partly on the jurisdiction of the

22  Price-Anderson Act.

23       So your Honor is in essence sitting almost as you

24  would in a diversity court.  Abrahimi doesn't apply.

25       Mr. Bernick refuted in argument that I didn't

145

1   give -- I didn't say that fraudulent concealment applied, I

2   said it didn't apply except for part of Count V, which is

3   about a ninth of our complaint.

4          THE COURT:  Well, let me just -- let me flesh

5   something out about that, and we will go ahead, and maybe I

6   can just do it on my nickel of time.

7          The fraudulent concealment count is something

8   that has been somewhat troubling to me because it smacked

9   -- or I have been wrestling with it in terms of the statute

10  of limitations question.  And I know that you've set it out

11  as a separate theory or cause of action.

12         And the thing that has been bothering me about

13  that essentially is this:  Normally -- well, you have to

14  have a duty arising in some fashion.  In terms of the tort

15  of deceit there has to be a duty owing from one to another.

16  And here I am not sure I see the duty as a matter of law.

17  What's the duty?

18         I mean there's no -- I hate to use the word

19  "privity" because that smacks of a contractual theory, but

20  what is the duty on the part of either of these defendants

21  to the plaintiffs with respect to misrepresentation or

22  omission of representation?

23         MR. DAVIDOFF:  The duty is that when you put

24  people at risk and when you expose them to harmful

25  substances, the duty is to reveal that and not conceal it,

146

1   to tell the truth and not to lie.

2            THE COURT:  Does that state a claim or a

3   cognizable claim?

4            MR. DAVIDOFF:  I will defer to my colleague Mr.

5   DeBoskey.

6            THE COURT:  What is the reliance?

7            MR. DAVIDOFF:  Well, there is no reliance -- the

8   reliance requirement is different for an omission than it

9   is for a misrepresentation.  But the reliance is you're

10  living next to a plant -- I guess it's -- in this picture

11  is maybe the best place that it is:  You are living next to

12  a plant, you're assured that everything is safe, you're

13  assured that it's the safest facility in the history of the

14  world, and you are living four or five miles away because

15  of the buffer zone here, and you think everything is fine,

16  and that's the reliance.  Otherwise you might not live

17  there, you wouldn't buy the property, and that's why our

18  clients can't sell their property now for any reasonable

19  price.

20           THE COURT:  Well, normally there's a one-on-one

21  -- what you have is you have "A" enters into an agreement

22  with "B," and makes certain representations that induce "B"

23  to enter into the agreement, and the representations turn

24  out to be false.  And "B" in reliance upon those

25  representations materially changes his or her position and

147

1    is damaged as a result.

2          That's the normal tort of deceit.  And you don't

3    have any such one-on-one relationship here.  You have

4    apparently a very diffused duty to the universe at large to

5    disclose something without any -- any tie, privity, nexus

6    whatever you want to call it, in terms of relationship.

7          MR. DAVIDOFF:  Well, the privity here is

8    proximity, your Honor.  And in the case of the workers, I

9    mean the workers have a contractual relationship, an

10   employment relationship with the tortfeasors here.

11         MR. BERNICK:  Your Honor --

12         THE COURT:  Concealment.  That gets in -- I

13   understand.  That bounces back to the question of whether

14   workmen's comp is exclusive, and I don't want to --

15         MR. CHESLEY:  Your Honor --

16         THE COURT:  Just a moment.  I am not gonna

17   recognize you right now, Mr. Bernick.

18         MR. CHESLEY:  Your Honor, I want just one minute,

19   and I can only give -- Stan Chesley.

20         THE COURT:  Mr. Chesley has been quite all day.

21         MR. CHESLEY:  Your Honor, I think I can do this

22   in one minute.  And part of what we are talking about is an

23   estoppel theory.  When the defendants went out and gave

24   half-truths or no truth, what we found in Fernald, we

25   thought we had an air emission of 60 pounds; when we got

148

1    into their documents and we got into their discovery, we

2    found that there were concealments from the public, and

3    they had lied about volume.

4            Example:  1966 they put out a statement saying

5    there was a -- some escape in uranium but nothing got

6    off-site.  That's the reliance the public had.  It turned

7    out when we got the document there was 3,600 pounds of

8    uranium.  When they also finally came clean they said 95

9    tons.  It turns out to be 800,000 pounds.

10           And the statute of limitations -- and I think you

11   are right on target, your Honor, when you say "privity."

12   The privity -- I am being old-fashioned, pre-1960.  What I

13   am suggesting is it's the defendants that want to get into

14   privity with the neighbors by getting up and giving these

15   articles and making these denials and wanting to go

16   semi-public, quasi-public whenever their -- for example,

17   the people that were marching and the protesters had

18   nothing to do with pollution, it had to do with

19   anti-nuclear and anti -- you know, peace, pro-peace.

20           And what they do with these is they -- when these

21   things occur, they then go and become a volunteer, the

22   defendant, Dow, becomes a volunteer and says to the public,

23   "we want to let you know, nothing to worry about, it's

24   safe."

25           Now when they do that --

149

1      THE COURT:  Now wait a minute.  You've converted

2   -- that's just exactly the problem I had before.  You've

3   converted an issue involving whether you state a

4   substantive claim for the tort of deceit,

5   misrepresentation, to a question of whether the statute of

6   limitations has run, and I want to stay away from the

7   statute of limitations.

8      And I am old-fashioned too.  It used to be that

9   we had contract theories and we had tort theories, and a

10  moment ago I was talking about the tort of deceit and now

11  you have led me into the realm of the contract theory of

12  promissory estoppel.

13     Now where are we with this claim?

14     MR. CHESLER:  Your Honor, what I am saying is

15  there are numerous claims, but on the issue of the

16  concealment and the issue of the deceit or the fraudulent

17  concealment, which was the question that you posed to the

18  plaintiff, what I am suggesting, your Honor, is that the

19  plaintiffs by virtue of the information that was dealt up

20  there, as contained in what Mr. -- what Dow claims makes

21  the statute of limitations run, is so fraught with fraud

22  and deceit, that the plaintiffs' statute of limitations

23  does not start to run, and they can't be heard to say that

24  they haven't been damaged because they are estopped from

25  now coming forward.

150

1    THE COURT: Okay. So it is not a substantive

2  claim for relief, it just merely goes to the question of

3  statute of limitations, correct?

4    MR. CHESLEY: I think it's statute of

5  limitations, your Honor. The other thing --

6    THE COURT: Okay. That's good to know. That's

7  gonna narrow this case down a little bit.

8    MR. CHESLEY: Right. Your Honor, one last item

9  -- that's not totally true.

10   THE COURT: Mr. DeBoskey is kind of shaking his

11  head in some consternation.

12   MR. CHESLEY: I over-simplified it. But what I

13  want to suggest to the Court is the issue that Mr. Bernick

14  raised, that what are they going to learn by letting this

15  case go forward in discovery, and what I am suggesting to

16  the Court is what we will learn is documents going -- we

17  found in Fernald documents went -- as recently as two years

18  ago, documents back to '51, '52.

19   THE COURT: Where's the duty? Where is the duty

20  with respect to the --

21   MR. CHESLEY: Fletcher v. Riley.

22   THE COURT: Huh?

23   MR. CHESLEY: Foreseeable plaintiff. And I go

24  back to -- old-fashioned. Fletcher v. Riley. You have

25  something that's noxious and terrible that you let get off

151

1   of your property and go onto your neighbors' property,

2   that's the duty.

3           THE COURT:  That's a nuisance theory, isn't it?

4           MR. CHESLEY:  So be it.

5           THE COURT:  Okay.  But it's not a fraud and

6   concealment theory.

7           MR. CHESLEY:  Thank you.  Fraud and concealment

8   is a branch by virtue of what their conduct was.

9           THE COURT:  I see the duty and nuisance, I have

10  no problem with that, but in terms of the concealment --

11  now I am gonna call on Mr. Bernick, because I told him I

12  would give him a chance to -- all right.  Mr. Davidoff.

13          MR. DAVIDOFF:  I won't touch that point, although

14  I am tempted to, and I just -- the only other thing I

15  wanted to say is most of Mr. Bernick's presentation was

16  devoted to this issue of what he does again very ably is

17  confusing diligence with discovery.

18          The issue is when did we discover it, A, and the

19  constructive issue is when did we have the duty to be

20  diligent.  And as a matter of fact, the proofs will show

21  when we get into discovery, that we discovered it during

22  this 1989 to 1990 window.

23          It's not about whether people are convinced, it's

24  about when people are aware of a claim, and that's the

25  essential confusion here.

152

1       The <u>Church</u> plaintiffs weren't convinced when they

2  filed their case, but they were aware of all the elements

3  of their claim, including contamination and diminution in

4  property value for the use that they intended it.  And our

5  plaintiffs were not.

6       MR. BERNICK:  Your Honor --

7       THE COURT:  Mr. Bernick, you are up.

8       MR. BERNICK:  I will take what counsel for the

9  plaintiffs just said, take that.  The issue is discovery

10  and when were they aware of the elements of their claim.

11       THE COURT:  I think he meant rules of civil

12  procedure discovery.  I may be wrong.

13       MR. BERNICK:  No, no, he said the issue is

14  discovery.  The issue is when did they discover.  He says

15  don't confuse -- don't confuse diligence for fraudulent

16  concealment purposes with when they discovered it.

17       Am I correct in that?

18       MR. DAVIDOFF:  I alluded to both discovery in

19  that context and discovery in the rules of civil procedure

20  context.

21       MR. BERNICK:  I guess we are both right.  I will

22  take the first one.

23       THE COURT:  That may be -- somebody mark the

24  record.

25       MR. BERNICK:  But the point is they say that the

153

1    issue is discovery.  For purposes of this motion, we agree.

2    We agree it's discovery.  When did you know what is now in

3    the complaint.  A complaint against Dow says "the fires,"

4    "903 area" and it says "risk."

5             And all that we have done in the motion is to say

6    that there was constructive notice of all of that here.

7    And if he satisfies his own test, he ought to answer the

8    question:  With that knowledge why was the complaint

9    impossible to file?  And he hasn't done that.

10            Instead what he has pointed to is 1989, 1990 and

11   1991.  And the only thing that he argued from all this is

12   nothing relating to the complaint against us.  What he uses

13   it to argue is, gee, this got people's attention.  There is

14   now evidence that Alice Stewart was right.  That all bears

15   upon the evidence.  It bears upon the question of

16   conviction.

17            And that's why I continue to believe that if you

18   adopt his test our motion is not only a strong motion, it

19   is an overwhelming motion.  And the only way that his

20   opposition can succeed is if he uses a very different test,

21   which is when did people actually become convinced, when

22   did they think that the evidence was strong, that Al

23   Stewart was -- is now established as being credible.

24            That's what his test is.  And that is not what

25   the law says.

154

1    THE COURT:  Isn't there a genuine issue of

2  material fact that some employees may not have had notice

3  of, quote, "injury," unquote, until they were turned down

4  for reemployment or turned down for certain insurance -- on

5  certain insurance applications?

6    Isn't there an issue of fact that some property

7  owners may not have been aware as to the, quote, "injury,"

8  unquote until somebody appraised the property or

9  reappraised the property or tried the sell the property and

10  somebody said "I am not gonna buy your house because it's

11  downwind from Rocky Flats, and I just read some horrible

12  article, and I think it may be contaminated"?

13    MR. BERNICK:  I think that -- I think that the

14  focus of what our motion is is on the --

15    THE COURT:  The statute of limitations, now --

16  and this isn't -- what I haven't gotten from anybody here.

17  For purposes of the statute of limitations prior to class

18  certification I have to look either combined subjectively

19  or objectively at these named plaintiffs, and nobody yet

20  has brought the issue of the statute of limitations to

21  these people individually.

22    We are about out of time on this question, but I

23  am still left in the air as to how it applies individually

24  to the named plaintiffs who are in these lawsuits today,

25  not to the class as a whole.  And not in terms of some

155

1  abstraction and generalities.

2       MR. BERNICK:  Okay.  Well, I think that obviously

3  -- I mean if you want to say, gee, there are people that

4  worked back in an early period of time who are -- have

5  moved to Europe and never have the benefit of constructive

6  notice, and that's one of the plaintiffs, I think that

7  would obviously bear upon the motion.

8       I think that we have addressed the motion to the

9  theory that's articulated in the complaint.  And the theory

10 that's articulated in the complaint makes no distinctions

11 between the individual plaintiffs.  All it says is that

12 they all may, or now this morning, may not have risk, and

13 that Dow did these things.

14      And we took the complaint as we found it, and we

15 say with respect to this complaint why in the world --

16 what's new?  Why wasn't it filed back in 1975.

17      THE COURT:  Let's take Mr. Saxon, for example.

18 Now he's interesting in this case because of his unique

19 role of having been employed only by Rockwell.  And he's

20 unique and somewhat pivotal in terms of the exclusivity

21 provisions of the Workmen's Compensation Act, and he may

22 well be pivotal, at least in terms of the employees case,

23 with respect to the statute of limitation question.

24      I haven't been told when he went to work for

25 Rockwell; I haven't been told what his job was at Rockwell;

156

1   I don't know what he did at Rockwell; I don't know what

2   kinds of accident he may have been involved with, what

3   kinds of exposure he may have been involved with.

4        I know absolutely nothing about this extremely

5   important and pivotal plaintiff.  Nothing.

6        MR. BERNICK:  I think that that's absolutely

7   correct.  And the only response --

8        THE COURT:  Well, you have the burden.

9        MR. BERNICK:  But I turn it back, and I say we

10  have the burden of only responding to what's been said in

11  the complaint.  And what's said in the complaint is a

12  generic theory.  It makes no distinction.  It doesn't point

13  out individual accruals to the individual plaintiffs,

14  doesn't point out individual injury, it doesn't point out

15  individual claims.  There's nothing individual about it.

16       This complaint is a global effort to say

17  everybody -- it's just what you heard this morning.  Mr.

18  DeBoskey says "we don't even know whether some of these

19  people in the end will have any risk at all," "we don't

20  even know that."  Why?

21       Because when they filed the complaint they didn't

22  know and list the individual circumstances for each of the

23  plaintiffs and how they became exposed and what the nature

24  of their risk is.  And that often happens in class actions.

25       They just listed an overall class, and they said

157

1   "these people are part of it and here's what our theory

2   is."

3          And all that we did is we said in our motion

4   "that's your theory of the case," "let me tell you, that's

5   the same theory as in the Church case, what's different?"

6          MR. DAVIDOFF:  Your Honor --

7          MR. BERNICK:  They are the ones who chose not to

8   make those specifications.

9          THE COURT:  For all I know Mr. Saxon has never

10  heard of the Church case.

11         MR. BERNICK:  Well, but --

12         THE COURT:  Or for all I know maybe there's no

13  reason for him to.  For all I know some of these property

14  owners have never heard of the Church case.

15         MR. BERNICK:  But if the theory that's

16  articulated in the complaint is "Dow did these things and

17  these folks are at risk," it seems to me that it's fair for

18  us to come back and say constructive notice applies and

19  constructive notice governs Mr. Saxon if he lived anywhere

20  near Rocky Flats.

21         These are all people -- maybe the answer to your

22  question, your Honor, is that these are all people who live

23  in this area.  If they are all people who live in that

24  area, they have got constructive notice of what's in these

25  newspapers.

158

1          THE COURT:  You know, if I am going to close the

2    courthouse doors, I ought to have some basis besides

3    generalities to do it, shouldn't I?  And isn't that what

4    they are asking for with respect to additional discovery

5    and why they filed a 56(f) pleading?

6          MR. BERNICK:  Let me make this proposal then.

7    Let me make a proposal.  Their 56(f) affidavit says "we

8    want to find out evidence of fraudulent concealment."

9          And my answer to that is that's fraudulent

10   concealment for statute of limitations.  That's their

11   burden under all of the precedents.  You can't ask for rule

12   56(f) discovery with respect to fraudulent concealment,

13   because that is their burden.  And there are cases that

14   squarely so hold.  I would urge the Court to take a look at

15   Volk versus Davidson, 816 F.2d 1406, it's a rule 56(f)

16   case, fraudulent concealment, the Court says "no go."

17         So if their proposal for rule 56(f) is to take

18   discovery for fraudulent concealment, that ought to be

19   clearly denied.  That's not proper.  They ought to know

20   what their fraud concealment is, because they are the

21   alleged victims.  I think that the --

22         THE COURT:  Help me out with that, would you.

23   Run that by me one more time.  Has somebody hidden

24   something from me?  I ought to know what it was they have

25   hidden from me.

159

1    MR. BERNICK:  Because they have now filed the

2  complaint -- that's precisely the point.  They are the ones

3  now able to file the claim, and because they are able to

4  file the claim presumably they have learned something, and

5  that's exactly what this case says, it says that is a

6  question that is within your knowledge and control.

7    THE COURT:  Yeah, but it's a matter of when you

8  learn it.

9    MR. BERNICK:  But they will know that as well.

10  If Mr. --

11    THE COURT:  They tell me that they learned it

12  within the applicable period of the statute of limitations.

13    MR. BERNICK:  Then that is exactly why the burden

14  --

15    THE COURT:  This time line down here.

16    MR. BERNICK:  That is exactly why the burden is

17  on them under the rules and under the Tenth Circuit

18  precedents to state with particularity in their complaint.

19    If their theory is fraudulent concealment, they

20  know what was hidden from them because they are filing the

21  complaint now, and they know when they learned.  And that's

22  all they have to say.

23    That is why the case law says you do not get rule

24  56(f) discovery on fraudulent concealment.

25    My proposal was gonna be this, your Honor:  Why

160

1   don't we have discovery of these particular plaintiffs to

2   see where they lived, when they were at the plant and what

3   they knew, and take up that issue to -- in order to find

4   out is there a different theory with respect to these

5   plaintiffs.

6           Maybe we will also find out if they really

7   believe that they have increased risk or if they are

8   right-to-know plaintiffs.

9           Because I think that would also be instructive to

10  the Court.

11          But I think that if the Court is concerned with

12  how much information we have on the plaintiffs, that's

13  fair.  It will help on the statute of limitations.  Let's

14  conduct that discovery.

15          THE COURT:  Mr. Davidoff, that's --  You have

16  asked for additional discovery.  What is it exactly that

17  you're looking for and from whom are you looking?  Because

18  if I go into a limited discovery on this question it isn't

19  gonna be a full-blown case discovery.

20          Frankly, from my problems that I am having in

21  analyzing the statute of limitations questions, the

22  information that I need is information from your named

23  identified parties, plaintiffs.

24          MR. DAVIDOFF:  Well, I have two responses.  Again

25  Dow has answered an argument that we didn't make.  The rule

161

1   56(f) affidavit and our assertion is about reasonable

2   diligence and when we were on duty to make -- under a duty

3   to make an investigation.  And we were under that duty we

4   say in the last 18 months.

5        As to his proposal, this is now -- they are now

6   finally admitting what their aim has been all along.  They

7   knew procedurally that they couldn't get summary judgment

8   now.  And what they are trying to get your Honor to do is

9   put the cart before the horse.

10        Our case has been on ice for 11 months, and they

11   want to get a free shot at the plaintiffs before we get any

12   discovery of what they knew, what they didn't disclose,

13   what they concealed that relates to, and I am quoting from

14   Mr. DeBoskey's affidavit, "plaintiffs believe defendants to

15   be in possession of documents and information directly

16   germane to the question when in the exercise of reasonable

17   diligence plaintiff should have known of their claims."

18        And more generally we want to start our case.  We

19   filed it 11 months ago.  And granted, it's been 15 years,

20   but we do want to start our case, and we have a right to

21   take generic discovery in the case and they have a right to

22   take depositions of the plaintiffs and other people.  And I

23   suppose they shall.

24        But that's not -- that's not fair, to say we file

25   a case, we get no discovery and they get a free shot at our

162

1   plaintiffs so that they can achieve their real objective,

2   which is really not to get the case thrown out now but to

3   defeat class certification by trying to invent or conjure

4   up various and sundry individual issues as to the

5   plaintiffs class representatives, who are doing a very

6   brave thing in this case, a very brave thing.

7          THE COURT:  I think you are out of time.

8          MR. BERNICK:  Your Honor, the Western Paving

9   decision, just so we can set this to rest, the pleading,

10  their pleading - "must set forth specific facts to prove

11  each of the elements of fraudulent concealment.  The

12  underlying requirement is the defendant must engage in

13  conduct meant to conceal.  Pleading requirements for

14  fraudulent concealment are very strict.  Some courts invoke

15  rule 9(b) and require plaintiff to meet the pleading

16  requirements.  The plaintiff who fails to plead and prove

17  all three elements will have its claim dismissed as barred

18  by the statute of limitations."

19         That's what the Tenth Circuit says.  Now they

20  haven't done that.

21         THE COURT:  We are talking about apples and

22  oranges.

23         MR. BERNICK:  Well --

24         THE COURT:  We have fraudulent concealment as a

25  substantive claim, as a cause of action.  That's one thing.

163

1   You have the other, quote, "fraudulent concealment,"

2   unquote, that relieves a party from the running of the

3   statute of limitations.

4          MR. BERNICK:  Right.

5          THE COURT:  They are two totally different

6   things.

7          MR. BERNICK:  All that I am speaking to is they

8   say they now want to conduct discovery on the statute of

9   limitations tolling.  I say the case law says, huh-uh, you

10  have got to know that and plead that ever since Wood versus

11  Carpenter in 1879.

12         And the only reason I raise all of this, that's

13  what the Tenth Circuit law is that -- I am trying to be

14  responsive to your Honor's proposal that we have some

15  discovery that is focused on the statute of limitations,

16  and I am suggesting that the appropriate discovery is to

17  find out where these plaintiffs were, what they learned,

18  and be able to answer the question of notice, because I

19  think that that is what your Honor is raising as a

20  question, is the question of notice.

21         In the meantime they say, oh, well, now we want

22  to open the door to all this discovery on fraudulent

23  concealment.  My answer to that is, wait a minute, that is

24  your burden in the pleadings and your pleadings aren't even

25  sufficient.

164

1          THE COURT:  Thank you, Mr. Bernick, you've made

2     your point.  Now plaintiffs have by my calculation about 20

3     minutes remaining for whatever --

4          MR. ALDOCK:  I am not sure -- we've argued

5     statute of limitations for the last --

6          THE COURT:  You've argued for two hours.

7     Defendants have argued for two hours here today.

8          MR. ALDOCK:  All the motions are defendants'

9     motions.

10         THE COURT:  I know that.  You've argued for two

11    hours.  I told you you could have two hours to argue your

12    motions and divide it up any way that you felt was

13    important.

14         MR. ALDOCK:  Our problem, your Honor, is that I

15    believe, if we look at the clock, we would see that the --

16    that the bulk of the period was this last statute of

17    limitations on the plaintiffs' side.  Maybe we need to set

18    another day.

19         THE COURT:  Well, we can set another day if you

20    want, but by my watch I've taken a total of two hours of

21    defendants' argument time.  You want another 10 minutes?  I

22    told you at the outset that you are gonna have to allocate

23    your time.

24         MR. ALDOCK:  Our problem, your Honor, is of

25    course we can't allocate their response to our time.  I am

165

1   not sure what we can do about that.

2          THE COURT:  I have calculated the time that you

3   have taken for argument.

4          MR. ALDOCK:  I see.

5          THE COURT:  You and Mr. Bernick.  I just figured

6   that you went at the workmen's compensation question and

7   statute of limitations question because it goes right to

8   the jugular and that you would just let everything else

9   fall in terms of how those issues fall.

10         MR. ALDOCK:  You are correct, your Honor.  I mean

11  we think the workers' comp motion could be decided with no

12  discovery and it's dispositive of the case, and therefore

13  we wanted to go first.  And with regard to the statute, at

14  least for one of the two of us, it goes to the jugular and

15  is important.

16         THE COURT:  Well, as I told you -- you know, I

17  told you I wasn't gonna hold you to strict time limits, but

18  within about five minutes -- in fact you've used better

19  than two hours, actually.  I've got about two hours and

20  five minutes by my watch.

21         MR. BERNICK:  Well, if we could take up one other

22  thing, I suppose it would be punitive damages.

23         THE COURT:  Yeah, punitive damages is just about

24  as clear as mud in this case.

25         MR. ALDOCK:  All right.  Why don't we take the 10

166

1   minutes on punitive damages, your Honor.

2        THE COURT:  I will take 10 minutes on punitive

3   damages from you, Mr. DeBoskey.

4        MR. DeBOSKEY:  We are gonna have 10 minutes on

5   our response to punitive damages to their motion?

6        THE COURT:  Sure, yeah.

7        MR. DeBOSKEY:  And then we have an additional 10

8   minutes to treat as we wish?  Is that how you want to

9   structure this, your Honor?

10       THE COURT:  Yeah.  Not really.  I mean I don't

11  want to just hear you get up and flap your lips.

12       MR. DeBOSKEY:  In fact I wasn't planning on

13  speaking, so -- what we would like to do then is to take 10

14  minutes of our time and have Mr. Chesley address the issue

15  of punitive damages under the Price-Anderson Act.  And then

16  we have an additional 10 minutes left, and we would like to

17  at least establish a few issues on the medical monitoring

18  and detection on the residents case by Mr. Berger.  And

19  that's how we would like to use our remaining 20 minutes.

20  And I would like to have just a couple of summary comments.

21       THE COURT:  That's fine.  In fact that gives the

22  plaintiffs an extra 10 minutes.  All right.  You better get

23  going, because I am not gonna be here all day.

24       MR. DeBOSKEY:  Your Honor, I wasn't intending to

25  give the plaintiffs any extra time, because I thought we

167

1   only had 20 minutes left for us.  Is that correct?

2          THE COURT:  Maybe not, but I just gave it to

3   them.

4          MR. DeBOSKEY:  Fine.

5          THE COURT:  Because you were so eloquent and

6   concise in your response to their arguments, upon which

7   they have the burden, by the way, that perhaps you don't

8   need all that time.  Let's take the punitive damages.

9          MR. BERNICK:  If they want to take their --

10          THE COURT:  I am gonna take your argument on the

11  punitive damages.

12          MR. ALDOCK:  But then they are gonna argue

13  another motion we don't argue.

14          THE COURT:  No, they are gonna respond to it,

15  then if they have something else that they want to fill in

16  as fillers at the end, kind of credits or something, we

17  will take that.

18          That's what I am gonna do.  I am gonna take the

19  argument on punitive damages, but you better get at it

20  because the clock is running.

21          MR. KRAMER:  Your Honor, my name is Franklin

22  Kramer, and I represent Rockwell.

23          The issue in the time we have on punitive damages

24  that I want to deal with is the issue really of who is the

25  real party in interest in this case.

168

1    It's well-established that the United States and

2    its agencies and its instrumentalities cannot be liable for

3    punitive damages.  That's been true since the decision --

4    the Supreme Court's decision in Missouri versus Ault.

5    And fundamentally what the plaintiffs are trying

6    to do here is they are trying to make the United States

7    liable for punitive damages.

8    Now there are a couple of reasons why I say that.

9    The first reason is because that's what plaintiffs' counsel

10   has said.

11   Mr. Chesley in the, if you will, parallel case in

12   Hanford in the Eastern District of Washington in October of

13   this year said before Judge McDonald there, and this is a

14   quote from the transcript, which I can hand up to your

15   Honor -- and I am sure they have copies, but I can give

16   them copies.  He said "Candidly, if you look at the United

17   States of America as Liberty Mutual in this case, because

18   they are the indemnifier, they have to indemnify under

19   Price-Anderson."

20   So under their contracts every one of the

21   contractors entered into a contract with the United States

22   of America that said we will run your plant, but we don't

23   know much about nuclear weaponry, we want you to indemnify

24   us Uncle Sam for anything that happens - negligence,

25   non-negligence, even if it is our fault.

169

1        Then it goes on to say, your Honor, the

2    government is the indemnifier, the government is the one

3    that will eventually write the check.

4        So it's clear enough to plaintiffs whose pocket

5    this is all coming out of.

6        But it's not just what plaintiffs say, it's as a

7    matter of law the U.S. here is the real party in interest.

8    And the reason for that is two-fold.

9        THE COURT:  If they are the real party in

10   interest why don't they -- well, would they be willing to

11   -- would the Department of Energy be willing to commit in

12   this action to reimburse defendants for any punitive

13   damages that might be awarded?  It's happened before -

14   Ohio.

15       MR. KRAMER:  It did happen before in the

16   contracting officers' decision.  I don't know whether they

17   would be willing to or not.  It hasn't come up.

18       THE COURT:  Isn't that absent a ripe question?

19       MR. KRAMER:  The reason, your Honor, is the

20   Department of Energy doesn't have to write us a piece of

21   paper that commits them.  This is a statutory question.

22   The Price-Anderson Act has several things in it, but one of

23   the things it has in it is the indemnification obligation.

24   The indemnification obligation is for all public liability

25   and that is for all legal liability.  The word is "all."

170

1    There's no question that whatever Rockwell and

2  Dow would have to pay, the United States would be liable

3  for.

4         The issue is whether or not sovereign immunity

5  with respect to punitive damages has been waived or not.

6         And what you have here is a situation in the

7  plaintiffs' briefs where they are trying to drive a wedge,

8  if you will, between the United States and the contractor.

9  They are trying to say they are different parties.

10  Fundamentally what I am saying to you is that in this case

11  they are really the same party.  And the reason is the two

12  factors that -- one of control and one of which pocket the

13  money is gonna be paid for and how that's done.

14         On the issue of control, as your Honor is aware,

15  the U.S. controls this lawsuit.  It assumes the contractors

16  got notice of it, had to tell the United States.  The

17  statute, section 2210(f) gives the United States the right

18  to take charge of the lawsuit, to defend it.  They have the

19  authority to settle it with or without the contractors'

20  consent.  They have an obligation to make a fair and

21  reasonable settlement.

22         That's in Senate Report -- the 1957 Senate

23  Report.  Were they to decide that this was an extraordinary

24  nuclear occurrence, they could waive all our defenses. And

25  they have an obligation under the statute to give full and

171

1   prompt compensation, section 2210(e), full and prompt

2   compensation for all the harm that's caused under the

3   statute.   The statute says they will take -- the United

4   States will take whatever action is determined to be

5   necessary to provide full and prompt public compensation.

6           Now in addition to the control they have and the

7   fact that it's a U.S. obligation for compensation, you have

8   to look at what the contractor is really doing here.   And

9   what the legislative history says is that the contractor is

10  a conduit, it's a channel for funds.

11          And if you look at the history, for example the

12  House Report, 1988, what it says is all liability is

13  channeled to the contractor, who pays all the successful

14  claims and who is entitled to full indemnification by DOE.

15          And another report says the same, any nuclear

16  incidents involving a DOE contractor ultimately would come

17  from federal funds.

18          So you have a combination of control and funding.

19  And what that creates, your Honor, is what the legislative

20  history calls a unique relationship between the DOE

21  contractor and the government.   It's not the kind of thing

22  that's found in what might be called a mere indemnification

23  agreement.   This is a primary obligation on the United

24  States administered through the contract, but it's an

25  obligation on the United States to pay full and prompt

172

1   compensation.

2          THE COURT:  From what fund does this compensation

3   flow?  Is it a specific fund?

4          MR. KRAMER:  You mean --

5          THE COURT:  If there is an award, then -- you are

6   saying that the pocket from which the payment is made, it's

7   the government's pocket, but is there a fund, specific

8   funds or --

9          MR. KRAMER:  It depends on the technicalities of

10  that, but it will either come from appropriations or budget

11  funds.  Presumably it's gonna come from appropriations

12  initially.  If you have this situation, your Honor, in

13  which you have this kind of control, 100 percent control

14  over the lawsuit, a primary obligation on the United States

15  to pay and the funding coming from the U.S., then the cases

16  are clear that that's a situation which sovereign immunity

17  is properly asserted.

18          You can take a look, for example, and we cited in

19  our brief, the Supreme Court's decision in Land versus

20  Donnelly.  And what it says there is that the general rule

21  is that it gains the sovereign immunity, quote, "if the

22  judgment sought would expend itself in the public

23  treasury."

24          To the same effect is the Supreme Court's

25  decision in Dugan versus Rank, and more recently in

173

1    Stafford versus Briggs, what the Supreme Court said is that

2    the dispositive inquiry is, quote, "who will pay the

3    judgment."

4            Now there's no question if the U.S. were paying

5    the judgment here.  The question is has the United States

6    waived its sovereign immunity.  And the answer to that is

7    no.

8            And that was the decision of the district court

9    in the Three Mile Island case.  What happened at Three Mile

10   Island is that the issue was whether punitive damages were

11   available in the Price-Anderson suit, and the Court goes

12   through an analysis and says generally, yes, they are, but

13   if -- if the payment is going to ultimately come out of the

14   U.S.'s pocket, then they are not.

15           And the reason that they were available in Three

16   Mile Island is because that was an NRC licensee who had to

17   maintain private insurance funding.  But when it was the

18   U.S.'s own pocket, that it was going to be liable, the

19   specific decision is no punitive damages can be asserted.

20           And what the defendants --

21           THE COURT:  How persuasive is that authority?

22   Wasn't that case set aside?

23           MR. KRAMER:  That case was vacated, your Honor.

24           THE COURT:  For lack of jurisdiction.

25           MR. KRAMER:  Vacated for lack of jur- --

174

1          THE COURT:  If it was vacated for lack of

2    jurisdiction that meant the Judge had no authority to say

3    what he said.  There was only one judge saying it.

4          MR. KRAMER:  That's correct.  And the case is as

5    persuasive as the argument.  It's out of this jurisdiction

6    anyway, and so your Honor is not bound by it, that's

7    obviously the case, but the analysis I think stands.

8          THE COURT:  Yeah, but they didn't even discuss in

9    that case, did they, the principle that an indemnity

10   agreement does not cloak an individual with sovereign

11   immunity?

12         MR. KRAMER:  No, I don't -- if I am understanding

13   your question correctly, your Honor, I disagree, because

14   what the Court says is it is possible that within the

15   system in federal indemnification punitive damages if

16   awarded by a jury may be paid out of the federal treasury,

17   and then it goes on to say that this Court is unable to

18   find any intent to bar the Congress to hold the United

19   States liable for payment of punitive damages awards.

20         THE COURT:  Let me ask you this, and maybe we

21   will get to what's troubling me.  As I understand it we are

22   under -- here under Price-Anderson and Price-Anderson

23   brings to play again the substantive law of the State of

24   Colorado on -- we won't call them punitives under that

25   statute, we would call them exemplary damages --

175

1      MR. KRAMER:  Right.  Same idea.

2      THE COURT:  Same idea.  And Price-Anderson -- I

3 know that the Silkwood case from the United States Supreme

4 Court talked about punitive damages there, was purely

5 dictum.  But they do leave a crack in the door as to -- for

6 a case where an award of punitive damages would be

7 inconsistent with the goals and purposes of Price-Anderson.

8 How would it be inconsistent here?

9      MR. KRAMER:  Let me say two things with respect

10 to that.

11      First, what the Silkwood case says is that the

12 party there was Kerr-McGee, was liable for punitive

13 damages.  Kerr-McGee was not under an indemnification

14 contract, it was not a Price-Anderson.  There was no issue

15 in that case as to whether the award would come out of the

16 federal fisc, out of the federal treasury, so the Court

17 simply did not deal with the issue of what would happen if

18 the money was coming out of the federal funds.

19      So not only is it dicta, but it's not on point.

20 If we are gonna deal with a contractor that would have been

21 something different.

22      What's consistent is the following:  The law is

23 plain that unless the United States has specifically waived

24 sovereign immunity with respect to the punitive damages,

25 then they are not available.

176

1    It's not a question --

2    THE COURT:  Haven't they -- well, of course we

3    get into this August 1988 amendment.  From August '88

4    forward as I understand it punitive damages are not allowed

5    in this context.

6    MR. KRAMER:  No question about that.

7    THE COURT:  Before that period of time they were.

8    And that's troublesome.

9    MR. KRAMER:  Right.  Well, let me stay with both

10   these points.  The United States can be sued.  Anyone can

11   be sued in a state court.  The fact that they would sue and

12   be sued does not mean that sovereign immunity is waived.

13   And this is the precise issue that came up in the Supreme

14   Court's decision in Missouri Pacific versus Ault.

15   And there what happened, Justice Brandeis decided

16   -- the government was running some railroads, they allowed

17   the railroads to be sued just as if they weren't being run

18   by the government.

19   The issue came up as to whether or not punitive

20   damages could be awarded, because ultimately the government

21   is going to pay.

22   And the Court says, no, they can't be.  They said

23   the government undertook to observe all existing laws -

24   Price-Anderson - and undertook to compensate any person

25   injured through a departure in the law, like

177

1    Price-Anderson, but it did not undertake to punish itself

2    by any departure by the imposition upon itself of fines and

3    penalties.  The purpose for which the government permitted

4    itself to be sued was compensation, not punishment.

5         That's precisely the purpose for which the United

6    States is allowed suit here, it's precisely the statutory

7    full and prompt compensation, which the government, the

8    Congress by the statute has promised.  They have promised

9    compensation, they haven't promised punitive damages.

10        And as to the 1988 amendment, that amendment is

11   clear with respect to Rockwell, we've actually argued in

12   our brief dispositive, because the nuclear incident carries

13   over, but it doesn't make any difference, because what that

14   amendment makes absolutely clear -- the legislative history

15   to that amendment makes clear is that the law before the

16   amendment is the same as the law after the amendment.

17        If you take a look, it's cited in our brief at

18   the Senate Report 100 dash 218, 1988 bill, it says, "The

19   bill clarifies that an award of punitive damages is

20   prohibited if the award would result in any obligation of

21   the United States," and clarifies it.

22        And also where in the legislative history -- the

23   same legislative history, it says that the bill reflects

24   the longstanding policy that the federal government should

25   not pay punitive damages.  And that bill is consistent with

178

1    established federal policy.  So it clarifies it, reflects

2    the long-standing policy, is consistent with the policy.

3    It's the same law.  And the law is the law of <u>Missouri</u>

4    <u>versus Ault</u>, and that's the law that says unless the U.S.

5    has specifically said it's going to be responsive for

6    punitive damages, then under state law or any other law you

7    can't obtain them.

8         And the situation here is that the U.S. and the

9    contractor are effectively one and the same.  The

10   contractor is under the U.S.'s control.  The U.S. is

11   undertaking the primary obligation to pay.  The contractor

12   is just the conduit and the channel.  And the whole purpose

13   of the Act, Price-Anderson Act was two-fold:  One, to

14   provide compensation, start with the 1957 legislative

15   history and go forward, and it's all compensation and not a

16   word about punitive damages.

17        THE COURT:  Okay.  You've come full circle with

18   your argument with an extra five minutes.  Thank you.  I

19   will take, Mr. Chesley, your argument.

20        MR. CHESLEY:  May it please the Court, your

21   Honor, I think we can shorten it.  I think the Court's

22   right on target.  The bottom line is if the government is

23   going to pay.  As we sit here today on a rule 12(b) we have

24   no evidence that the government is going to do anything

25   whatsoever.  And the best proof I can tell you is that the

179

1    United States of America and the Department of Energy has

2    160 lawyers and not one of them is in the courtroom today.

3    The United States of America has not moved to intervene and

4    every one of the arguments made today are made on behalf of

5    the private contractor for the claims that we have asserted

6    against the private contractor.

7         Judge Spiegel handled it in <u>Fernald</u> just the way

8    which makes the most sense.  And we believe that the

9    defendants who are the private parties may be liable for an

10   award of punitive damage to the plaintiffs.  The issue of

11   who must eventually pay the punitive damages, if any,

12   should be raised in a separate suit or separate action

13   between the government as indemnitor and defendants as

14   indemnitees.

15        As we sit here today the government is taking a

16   very hard look at the conduct of some of the contractors,

17   because it's against public policy to indemnify for

18   punitive or malicious or willful and wanton conduct.

19        It's very simple, your Honor.  This Court will

20   have at least five more opportunities to handle the issue

21   of punitive - during the course of the trial, during a

22   potential summary judgment, during a time of intervention,

23   during a commitment by the United States that they will

24   indemnify for punitive.

25        As it stands right now we have a private party.

180

1    The comment made by counsel on the issue of their

2    interpretation that the Senate is clarifying Price-Anderson

3    is frankly just not there.  The bottom line is there is no

4    clarification.  The fact that the United States Congress

5    changed the statute in 1988 and all of this action that we

6    are here for today arose prior to August 20th, 1988

7    amendment --

8           THE COURT:  Well, Mr. Chesley, the Congress

9    changed it in 1988.  Punitive damages are no longer

10   allowed, as I understand it.

11          MR. CHESLEY:  That's correct, your Honor.

12          THE COURT:  What earthly purpose would punitive

13   damages have here if they are no longer allowed?  What

14   deterrent effect would they have in this case?

15          MR. CHESLEY:  They are allowed, your Honor.  The

16   point is the cause of action, all of the actions of these

17   two defendants, both Dow and Rockwell, arose prior to

18   August 20th, 1988.  And the statute specifically states

19   that it is not retroactive.  Let me read from the statute:

20   "Shall be applicable with respect to nuclear incidents

21   occurring on or after such date."

22          Now that's as clear as one can look at the

23   English language.  It does not talk about retrospective, it

24   talks about present or future nuclear incidents.

25          The nuclear incidents that we are here about

181

1    today, your Honor, are prior to August 20th.  The proof

2    that punitive damages existed is the fact that they changed

3    the statute to take it out.  And there is nothing in the

4    legislative intent that suggests there was not punitive.

5          And I looked to the Silkwood case which the Court

6    used that the state law does apply.  There is no question

7    under Price-Anderson, state law applies, state law must

8    apply.  This Court should apply the state law.

9          Your Honor, this is not a question, a statement

10   that federal law prevents suing a DOE contractor for

11   punitive damages.  There may be -- it's very simple, your

12   Honor.  In the event that eventually somebody -- and I am

13   fascinated by the Catch 22 situation.  We have counsel

14   standing here stating that the government has total control

15   of this case.

16         Your Honor, have we seen anybody from the United

17   States of America or any commitment to this Court that the

18   United States of America has total control of this

19   litigation?

20         Counsel also says that it is the duty of the --

21   the duty of the United States of America to pay these

22   claims promptly.

23         Your Honor, this case is now 11 months old, and I

24   have not had anybody call me on the telephone telling me

25   they want to talk to me about this promptly.  To the

182

1  contrary, we are dealing with very mundane issues of

2  frankly motions to dismiss and so forth.

3        And the last comment was a question that you

4  posed to counsel, having lived with this for the last three

5  years, and that is who pays.

6        What happened in Fernald, your Honor, is the

7  issue of punitive damages went all the way to the end.  We

8  were to go to trial.  Instead Judge Spiegel had what he

9  calls a summary trial.  It's not binding, but he submitted

10  punitive to the -- to this jury, which sits in a box just

11  like we have here, as if it was real, same charges, same

12  opening statement, and they found punitive conduct.  There

13  was no question that we had not tried the case and it's not

14  a binding verdict.

15        Judge Spiegel raised the same issues, all of

16  these issues.  We then settled the case.  Who paid it?  The

17  Department of Energy did not pay it.  They went to the

18  Judgment Fund.  The Judgment Fund said "we are not gonna

19  pay it; you made the settlement, it was your ball game, you

20  go find the money."

21        So they went to Congress.  And have we been paid

22  yet?  We have been paid half of the money, your Honor, a

23  year and a half late, which is fine, we are gonna get it

24  paid, only by virtue of Congress paying the money and

25  paying the full amount of the settlement in three increment

183

1    installments plus interest.

2          The point I am making is there is no clear answer

3    as to who pays it, where it comes from or how it comes.

4          THE COURT:  Thank you.  All right.  I will take

5    the motions under advisement.  I may in due course request

6    additional briefs as we sort through them.  But we will get

7    either additional orders for further pleading or opinions

8    out in due course, just as soon as we can.  Thank you for

9    your arguments counsel.

10          (Court was recessed at 3:20 p.m.)

11                    *  *  *  *  *  *

12                   REPORTER'S CERTIFICATE

13          I certify that the foregoing is a correct

14    transcript from the record of proceedings in the

15    above-entitled matter.

16          Dated this 15th day of February, 1991.

17

18

19

20

21

22                                  _____

23                                  Gwen Daniel, CSR, CM

24

25