# EXHIBIT 3

ATOMIC ENERGY

## ATOMIC ENERGY ACT OF 1954—AMENDMENT

*For text of Act see p. 629*

Senate Report No. 296, May 9, 1957 [To accompany S. 2051]

House Report No. 435, May 9, 1957 [To accompany H.R. 7383]

**The House bill was passed in lieu of the Senate bill, but with Senate amendments.  The Senate Report is set out.**

### Senate Report No. 296

THE Joint Committee on Atomic Energy, having considered the subject matter of the amendment to the Atomic Energy Act of 1954 to protect the public by providing governmental indemnity and granting limitation of liability for persons in the atomic energy program, by establishing the Committee on Reactor Safeguards as a statutory committee, and by requiring publication of its safety reports and public hearings on certain facility license applications, report an original bill S. 2051 and recommend that the bill do pass.

### BACKGROUND

When the Atomic Energy Act of 1954 was passed, it was the hope of Congress that the provisions in the laws liberalizing the statutory restrictions which had hitherto given the Government a monopoly in the atomic energy field would encourage the entrance of private industry into the program, and speed the further development of the peaceful uses of atomic energy.

It was brought to the attention of the Joint Committee in the 1956 hearings, which the Joint Committee is required to hold under section 202 of the Atomic Energy Act of 1954, that the problem of possible liability in connection with the operation of reactors is a major deterrent to further industrial participation in the program.  While the 202 hearings held in 1957 indicate that it may not be the most important deterrent—that appears to be the current lack of economic incentive—the problem of liability has become a major roadblock.

The Joint Committee held hearings on this problem in May and June last year.  At that time it considered proposals which had been drawn up in the committee and the Atomic Energy Commission.  It voted out the committee version, but these bills were not brought up for debate on the floor of either House.  This year the committee bills were again introduced and further hearings were held on them.  The Atomic Energy Commission suggested a number of amendments to the committee bills.  The Commission recommendations are incorporated in the record of the hearings for 1957.

### SAFETY OF REACTOR OPERATIONS

The Atomic Energy Commission reports that—

Nuclear reactors have been operated in the United States since December 2, 1942, with a safety record better than that of other industry.  More than 100 reactor-years of regular operating experience have been accumulated, including experience with reactors of high power

1803



## LEGISLATIVE HISTORY

and large inventories of fission products, without a single personal injury and no significant deposition of radioactivity outside of the plant area. There have been a few accidents with research reactor installations as contrasted with the perfect record of safety of the regularly operating reactors. But even these accidents with research and experimental reactors did not affect the public.

The Commission reports that the safety record from the operation of reactors in Great Britain is equally favorable.

In the history of reactor operations there have been three incidents of public notice involving reactors. Two of these were accidental—the one at Chalk River in Canada and the one at the experimental breeder reactor at Arco. In both of these, personnel failure caused damage which was primarily limited to the reactor itself. The third incident was a deliberate forcing of a small experimental reactor to explosion to study the effects of such action. In none of these three incidents was there any damage to any person. The property damage in both of the accidental incidents was essentially confined to the reactor itself.

All of the new reactors which are being built or planned have incorporated into them every conceivable device to see that they are safe. The reactors themselves are constructed with immediate shielding designed to minimize blast damage. They also have gas-tight fragment-proof containers of concrete and steel built around them, such as the sphere which was built around the experimental submarine reactors at West Milton, N. Y. The possibility of dangerous materials escaping and causing damage outside the reactor facilities is infinitesimal. However, the possibility does still exist.

The Commission has extensive powers to protect the public health and safety through its regulatory acts, and it also has mandate for a strong Inspection Division to see that the regulations are complied with. During the hearings, the Commission explained at some length its safety precautions. All of these minimize the possibility of such damage to persons and property.

Since radioactive materials are many times more toxic and poisonous than other substances, the companies which are interested in participating in the reactor program are hesitant about assuming the liabilities which could ensue in the remote event of a reactor meltdown with the resulting release of fission products and radioactive materials into the air. At this stage in the development of atomic energy these companies do not envision any profit for many years from the research and development efforts that have to be put into the program. Yet, in the unlikely event of a runaway reactor they may be subjected to damage claims which have been estimated in the testimony before the committee at sums ranging from several hundred thousand dollars for large reactors to sums up to a billion dollars, and somewhat beyond in a few estimates.

Assuming that there were 100 large power reactors operating in the United States, the Commission has found that the most pessimistic of the probabilities involved lead to the estimate that there would be less than 1 chance in 50 million of any one person getting killed in any year in a reactor incident as compared to 1 chance in 5,000 for getting killed in an automobile accident. It also concluded that hypothetical property damages range from a lower limit of about one-half a million dollars to an upper

## ATOMIC ENERGY

limit, in the worse imaginable case, of $7 billion. This latter figure is largely due to a contamination of land with fission products. However, the estimates of experts on the occurrence of nuclear incidents at major reactors varied from those who were unable to be expressed in numbers to a range between 1 chance in 100,000 per year to 1 chance in a billion per year for such accidents. There was no disagreement that the probability of major reactor accidents was exceedingly low.

### PRIOR HEARINGS

Recognizing the importance of the problem, after it had been raised in the 202 hearings in 1956, the Joint Committee took the unusual procedure of calling a seminar of people interested in the various aspects of this problem. Some 40 persons met with the committee in executive session on March 15 and 16, 1956. They included representatives from the Atomic Energy Commission, from companies who build reactors or parts, from companies which would operate reactors, and from insurance firms. A full, free, and frank discussion of the problems between the committee and persons involved increased the desire of the committee last year to find some solution to the problem.

Two bills were introduced by Joint Committee members early in 1956: H.R. 9701 (84th Cong., 2d sess.) introduced by Mr. Price, which provided for full governmental indemnity; and H.R. 9802 (84th Cong., 2d sess.) introduced by Mr. Cole, which limited the liability of the reactor owners. After the seminar in March 1956, Chairman Anderson sent out a letter on April 26, 1956, to the industry and others interested, which suggested possible legislation incorporating features of both the Price and the Cole bills. This new proposal was based on staff studies of the indemnity problem and the results of the seminar.

On May 15, 16, 17, 18, and 21, 1956, the Joint Committee held public hearings on the problem. The witnesses who were heard were, in the order of their appearance:

Lewis L. Strauss, Chairman, Atomic Energy Commission
Dr. Willard F. Libby, Commissioner, AEC
Harold S. Vance, Commissioner, AEC
Thomas E. Murray, Commissioner, AEC
Harold L. Price, Director, Division of Civilian Application, AEC
Dr. C. R. McCullough, Director for Reactor Safeguards, AEC
William Mitchell, General Counsel, AEC
W. Kenneth Davis, Director, Division, Reactor Development, AEC
Don S. Burrows, Controller, Division of Finance, AEC
H. R. Searing, chairman of the board, Consolidated Edison Co. of New York
Charles H. Weaver, vice president of Westinghouse Electric Corp.
Walker L. Cisler, president of Power Reactor Development Co.; accompanied by Edward M. Spencer, assistant treasurer of the Detroit Edison Co., and Edward S. Reid, Jr., counsel for Power Reactor Development Co.
R. L. Schacht, general manager, Consumers Public Power District, Columbus, Nebr.
Charles J. Haugh, on behalf of the Association of Casualty & Surety Companies



## LEGISLATIVE HISTORY

Ambrose B. Kelly, general counsel, Associated Factory Mutual Fire Insurance Companies

Elmer L. Lindseth, president, Cleveland Electric Illuminating Co. and member, Edison Electric Institute Committee on Atomic Power

Willis Gale, chairman, Commonwealth Edison Co., Chicago

Francis K. McCune, president, Atomic Products Division, General Electric Co.; accompanied by William Kennedy, counsel, Atomic Products Division

Percy Chubb, American Insurance Association

Philip Sporn, president, American Gas & Electric Co. and Nuclear Power Group, Inc.

John Menke, president, Nuclear Development Corp. of America

William S. Peterson, American Public Power Association, Washington, D. C.

Ralph E. Becker, secretary-treasurer, Federation of Insurance Counsel

Herbert W. Yount, vice president of the Liberty Mutual Insurance Co.

Tom Pickett, executive vice president of the National Coal Association

William Webster, president of Yankee Atomic Electric Co.

Charles E. Oakes, president of the Pennsylvania Power & Light Co.

John N. Keen, manager, Wolverine Electric Cooperative, Big Rapids, Mich.

Donald H. Dunham, director, retirement, safety and insurance department, National Rural Electric Cooperative Association; accompanied by Robert Kabat, administrator, NRECA Atomic Energy Study Group

Kenneth E. Black, president of the Home Insurance Co., and chairman of the National Board of Fire Underwriters Committee

Stoddard M. Stevens, a member of the law firm of Sullivan & Cromwell, New York City; accompanied by George C. Kern, Jr., an attorney with the firm of Sullivan & Cromwell, New York City

Oscar M. Ruebhausen, Atomic Energy Committee, New York City Bar Association

Andrew J. Biemiller, legislative representative of the American Federation of Labor and Congress of Industrial Organizations; accompanied by Leo Goodman of the research department, AFL-CIO

At that time the Atomic Energy Commission presented its proposed bill to the Joint Committee, which Mr. Cole later introduced as H.R. 11242 (84th Cong., 2d sess.). On the basis of these hearings and following up lines of thought which had earlier been generated by staff studies, the chairman introduced S. 3929 (84th Cong., 2d sess.), which provided for a different method of approach to the problem, following along the lines of his letter of April 26, 1956.

The Joint Committee held hearings on these two bills on June 15, at which time these witnesses appeared:

Harold S. Vance, Commissioner, Atomic Energy Commission

William Mitchell, General Counsel, Atomic Energy Commission

Oscar M. Ruebhausen, atomic energy committee, New York City Bar Association

Stoddard M. Stevens, Sullivan & Cromwell, New York City

H. W. Yount, vice president, Liberty Mutual Insurance Co.

Charles J. Haugh, representing Association of Casualty Surety Companies

1806

## ATOMIC ENERGY

Andrew J. Biemiller, legislative representative, American Federation of Labor and Congress of Industrial Organizations

Donald H. Dunham, director, retirement, safety, and insurance department, National Rural Electric Cooperative Association

In addition, over 20 statements were filed for the record. The unanimous preference of all persons outside the Government agencies was for legislation along the lines of S. 3929.

Following the June 1956, hearings, and after further meetings in executive session and deliberations to consider the bills and testimony submitted, the Joint Committee voted out S. 4112 (84th Cong., 2d sess.) and H.R. 12050 (84th Cong., 2d sess.). These bills, with committee amendments, were reintroduced in the 85th Congress, 1st session, as S. 715 and H.R. 1981 by Senator Anderson and Mr. Price, respectively.

### STUDIES

The Joint Committee, in July of 1956, requested the Atomic Energy Commission to make a scientific study of the possible effects of a runaway reactor. The Atomic Energy Commission forwarded the results of this study to the Joint Committee on March 23, 1957. With respect to this study, Mr. Strauss testified:

As part of the Commission's testimony, we are submitting for the record a study of the possible consequences in terms of injury to persons and damage to property if certain hypothetical accidents should occur in a typical large nuclear power reactor.

A large team of individuals prominent in the sciences and engineering specialists participated in this study.

I am happy to report that the experts all agree that the chances that major accidents might occur are exceedingly small.

This study is a part of the Commission's continuing effort on a broad front to understand and resolve this problem of possible reactor hazards so that we may proceed with an expanding atomic-energy industry with full confidence that there will be few reactor accidents and that such as do occur would have only minor consequences. This effort and the work of translating the results into affirmative, concrete safeguards for protection of the public is, of course, our continuing responsibility.

Since the beginning of the reactor program the experts and the Congress and the public and the Commission have all been concerned with the possible causes and the possible magnitude of damage from reactor runaways, and with means of prevention. The subject commanded four sessions of the International Conference on the Peaceful Uses of Atomic Energy in Geneva 18 months ago, which, as you will recall, we initiated. In May of last year Dr. Libby presented to your committee some estimates of the possible extent of harm and damage should a major accident occur.

The current study has taken the form in which it is now presented to you as a means of responding to the committee's specific request of last July 6. To produce such a study, it was necessary to stretch possibility far out toward its extreme limits. Some of the worst possible combinations of circumstances that might conceivably occur were

1807

## LEGISLATIVE HISTORY

conjoined in the hypotheses in order that we might assess their conse-
quences. The study, therefore, ought to be regarded as an estimation of
the consequences of unlikely, though imaginable, combinations of fail-
ure and error and weather conditions; it is not in any sense a prediction
of any future condition.

It has been a difficult study to make. Fortunately, there has been
little reactor accident experience upon which to base estimates. Nu-
clear reactors have been operated in the United States since December
2, 1942, with a safety record better than that of other industry. More
than 100 reactor years of regular operating experience have been
accumulated, including experience with reactors of high power and
large inventories of fission products, without a single personal injury
and no significant deposition of radioactivity outside of the plant area.
There have been a few accidents with research reactor installations
as contrasted with the perfect record of safety of the regularly oper-
ating reactors. But even those accidents with research and experi-
mental reactors did not affect the public.

This record which shows that safe operation can be achieved is due
to skillful design, careful construction, and competent operation.

(The full letter of transmittal of this report is attached hereto as annex
A.)

A study of the insurance and indemnity problem was made by the legis-
lative drafting research fund of the Law School of Columbia University,
which was employed in November 1955, by the Atomic Industrial Forum
to prepare reports on the problem. A preliminary report was made on
March 1, 1956, and the final report was made January 7, 1957. .The sum-
mary of the problem, as developed in this report, has already been noted
above. Other pertinent portions of the report are printed in the committee
hearings.

In March 1955, the Atomic Energy Commission appointed an Advisory
Committee consisting of 10 persons representing all phases of the industry.
This Committee made a preliminary report on July 15, 1955, which empha-
sized that the primary difficulties would be in connection with third party
liability. The Committee made another interim report in January of 1956,
after the insurance companies had been able to find ways of getting to-
gether sums which could be used to protect the industry. Heretofore the
highest liability policy issued had a face value of $10 million. The stock
companies joined together in 2 pools, 1 for liability (Nuclear Energy Lia-
bility Insurance Association) and 1 for property (Nuclear Energy Property
Insurance Association). Each of these pools would issue policies for dam-
ages up to $50 million. The mutual companies were able to form similar
pools which could insure liability risks up to $10 million and property risks
up to $5 million. The policies and rates which are presently available from
these two insurance pools are discussed further on in this report.

Concerning the possible need for establishing the Committee on Reactor
Safeguards as a statutory committee, and for requiring that certain of its
reports be made public, and that public hearings be held on certain reactor
license applications, Senator Anderson, chairman of the Joint Committee
during the 84th Congress, directed the staff of the Joint Committee to un-
dertake a study in August 1956. The committee staff was assisted in this
study by two consultants, and on April 5, 1957, the study was made public

1808

## ATOMIC ENERGY

as a Joint Committee print entitled, "A Study of AEC Procedures and Organization in the Licensing of Reactor Facilities."

### CURRENT HEARINGS

The Joint Committee held hearings on S. 715 and H.R. 1981, the bills introduced in the 85th Congress, on March 25, 26, and 27, 1957. Witnesses were also requested to testify on S. 1684, 85th Congress, 1st session, a bill introduced by Senator Anderson to establish a Committee on Reactor Safeguards, to require that certain of its reports be made public, and that public hearings be held on certain facility license applications. The witnesses who were heard were, in the order of their appearance:

Lewis L. Strauss, Chairman, Atomic Energy Commission.

Dr. Willard F. Libby, Commissioner, AEC.

Harold S. Vance, Commissioner, AEC.

Thomas E. Murray, Commissioner AEC.

Kenneth E. Fields, General Manager, AEC.

William Mitchell, General Counsel, AEC.

Harold L. Price, Director, Division of Civilian Application, AEC.

W. Kenneth Davis, Director, Division of Reactor Development, AEC.

Charles J. Haugh, vice president, Travelers Insurance Co.

Hubert Yount, vice president, Liberty Mutual Insurance Co.

Kenneth E. Black, president, Home Insurance Co.

William H. Berry, vice president, American group of Fire & Insurance Companies.

Francis J. McCune, president, atomic products division, General Electric Co.

Arthur W. Murphy, Hughes, Hubbard, Blair & Reed.

Victor A. Hann, nuclear energy committee of National Association of Manufacturers.

Stoddard Stevens, partner of law firm, Sullivan & Cromwell.

Ambrose J. Kelly, general counsel, Associated Factory Mutual Fire Insurance Cos.

Gail L. Freer, Rural Cooperative Power Associates.

Edward J. Slowter, Battelle Memorial Institute.

Dr. Lee L. Davenport, president, Sylvania Corning Nuclear Corp.; accompanied by Howard Cohen, counsel.

Arthur Berard, president, National Electric Manufacturers Association.

Benjamin Sigal, general counsel, International Union of Electric Workers.

Carlos Gastambidi, president, Monroe Industrial Union Council.

Joseph R. Stanifer, president, Local 1000, United Papermakers and Paperworkers Union of America.

John Jennings, president, Local 1004, United Paper Makers and Paper Workers.

Speaking for the Atomic Energy Commission at the Hearings this year, Chairman Strauss stated:

Mr. Chairman and members of the committee, we are pleased to be here this morning because we hope that your committee is nearing

Supplemental Appendix Page No. 1802

## LEGISLATIVE HISTORY

the solution of one of our principal problems involved in the rapid development of nuclear power in the United States.

The bills which you have under consideration—that is to say, S. 715 and H.R. 1981—offer a practical approach to the necessity of providing adequate protection against liability arising from atomic hazards as well as a sound basis for compensating the public for any possible injury or damage arising from such hazards.  *  *  *

The Commission shares the hope of the committee and industry that congressional action on the legislation may be completed early in this session of the Congress, so that the United States may move forward, at an accelerated pace, toward our goal of economical, competitive, and safe nuclear power.  No single thing that your committee might do could contribute so greatly to the acceleration of nuclear power development in the United States as would early and favorable action on this subject.

### BASIC APPROACH AND PRINCIPLES

The basic approach of the legislation proposed by the Joint Committee in 1956, was to have the Commission determine the amount of financial protection which the licensee for reactors must have to protect the public against nuclear incidents.  Beyond the amount of financial protection there would be required as a condition of the license the Government would indemnify the reactor operators for sums up to $500 million.  If a runaway reactor should cause any further damages beyond that, the way was left open for Federal contributions after further congressional consideration. If the sums available were not sufficient to take care of all of the damage, limitation of liability proceedings would be made applicable in order to provide a ready technique for apportioning the moneys available among those hurt.  The Commission was given authority to use this same power in its contracts for those doing work directly for the Commission, not merely licensees.

The indemnification contracts are to protect the public by means of providing funds to the licensee and any of those who might be found liable with him for payment of public damages.  Those people who design and construct the reactor and who supply parts for it will have funds made available to them if they are found liable.

The basic principles underlying the bill are two:

1. Since the rights of third parties who are injured are established by State law, there is no interference with the State law until there is a likelihood that the damages exceed the amount of financial responsibility required together with the amount of the indemnity.  At that point the Federal interference is limited to the prohibition of making payments through the State courts and to prorating the proceeds available.

2. A system of indemnification is established rather than an insurance system, since there is no way to establish any actuarial basis for the full protection required.  The chance that a reactor will run away is too small and the foreseeable possible damages of the reactor are too great to allow the accumulation of a fund which would be adequate.  If this unlikely event were to occur, the contributions of the companies protected are likely to be too small by far to protect the public, so Federal action is going to be

1810

## ATOMIC ENERGY

required anyway. If the payments are made large enough to insure that there is an adequate fund available, the operation of the reactors will be made even more uneconomic. On the other hand, if, as the Joint Committee anticipates, there never will be any call on the fund for payments, the funds will have been accumulated to no purpose. Hence, in this instance it seemed wisest to the Joint Committee not to treat this as an insurance problem but to treat it as an indemnification problem. There seems to be no real need for establishing all of the technical mechanisms of an insurance fund in this situation. It was for the reasons above that the Joint Committee decided against the program of permissive reinsurance as suggested by the Commission in 1956.

The provisions of this bill provide governmental indemnifications to those licensees who obtain their licenses within the next 10 years. The indemnification agreement is to run for the life of the license. During the 10-year period it is hoped that there will be enough experience gained so that the problems of reactor safety will be to a great extent solved and the insurance people will have had experience on which to base a sound program of their own. In the meanwhile, the Commission is under two compelling duties:

The first, and by far the more important, is to see that the reactors which are built are designed, constructed, and operated in the safest fashion. It was in an effort to assure the continuous safe operation of reactors that the Joint Committee decided in 1957 to add to the indemnity bills provisions which would make the Committee on Reactor Safeguards a statutory committee, require publication of its reactor hazard reports prior to hearings on construction permits and require public hearings on applications for certain facility licenses.

Secondly, the Commission has a continuing duty to make available for industrial study as much of the information it now has, or will accumulate, which bears on the problems of safe operation and insurability of reactors. There appear to be many sources of information within the Commission's program other than that directly involved in the reactor work for peaceful uses which might be of help in this situation.

### PRIVATE INSURANCE CONTRACTS AND RATES

Because of the magnitude of insuring reactors, the insurance companies joined together in pools. The insurance field has been traditionally developed by stock companies and by mutual companies. These two types of companies, in turn, are split between those companies which insure against third-party liability (casualty companies) and those companies which issue property insurance on the reactor facility itself. These four segments of the insurance companies each formed their own pools to issue atomic insurance policies. The stock companies have two pools. One is the Nuclear Energy Liability Insurance Association (NELIA) and the other the Nuclear Energy Property Insurance Association (NEPIA). To the extent that the latter, merely insures the reactor and its buildings, it is not concerned with the financial protection which is required under the statute. It is understood that the NELIA policy will be issued to the licensee and will protect not only those who may be a contractor, or subcontractor, for parts, supplies, or services, but also any other person who may be liable

1811

# LEGISLATIVE HISTORY

for a nuclear incident.[1]  The policy will cover damage to the persons or property of others, regardless of whether they are located anywhere in the United States, Canada, or Mexico.

Since the only atomic insurance available will be issued to the owner for the reactor, it is not expected that there will be insurance that any company can buy to protect against damage from a runaway reactor located somewhere else.  Therefore, the NELIA policy is being reconsidered with a view of including the offsite property of the persons indemnified.  This would make the proceeds of the insurance available to them as though they were a third party.  The same result could be obtained by having the reactor incorporated as a separate corporation.

The exclusions to the standard policy are (1) for workmen's compensation;  (2) for liability assumed under contract;  (3) for the handling or use of any weapon;  (4) war damage;  and (5) the reactor property itself.  Other exclusions limit the incident to:  (1) within the United States;  (2) occurring only at the insured facility and not another;  (3) the use or retention by the insured by materials retained by the operation or use of the facility but used at another site;  and (4) arising out of materials transferred to the United States of America.  The latter exclusion seems to negate the contractor-type operations and it is understood that this exclusion is under reconsideration.

The balance of the policy appears to contain only the ordinary clauses, except that the claims must be asserted within 2 years after the termination of the policy.  It is understood that this policy has been under consideration by the industrial concerns involved since February 1957.  The Joint Committee hopes that in its final form it will cover the same scope as the bill.

The Nuclear Energy Liability Insurance Association has established some rates for liability coverage of certain reactors.  These rates appear to be high in comparison with rates for conventional electric power generating systems.  It is understood that they will be reduced if 10 years of operation should disclose no need for this high a premium.  If there is no incident, the insurance companies expect to return between two-thirds and three-fourths of the premiums.  These premiums do not appear to constitute a substantial fraction of the costs of the operation of large-scale reactors.  While the cost of insurance is an appreciable part of the operating costs of small-scale power reactors (from 0.5 to 2 mills per kilowatt-hour) the cost of construction and operation of these reactors will in any event be considerably in excess of conventional costs.  Thus insurance

---

[1] See the following:

THE TRAVELERS

Mr. CARL T. DURHAM,
    Chairman, Joint Committee on Atomic Energy,
       The Capitol, Washington, D. C.
    DEAR MR. DURHAM:  I have today sent to Mr. Ramey a series of memoranda which complete the material which your committee asked that I furnish.
    In sending that material, I have incorporated in my memorandum on S. 715 and H. R. 1981 and the amendments proposed by the Atomic Energy Commission, a statement to the effect that we are now revising the nuclear energy liability insurance policy to take care of the so-called airplane situation which was discussed extensively at the March 25 hearing.  The amendment to the policy will take care, not only of this particular sort of incident, but other similar types of incidents by affording coverage for liability of any person, or persons, in connection with claims arising out of a nuclear-energy incident.  When the revised policy phraseology has been completed and appropriate filings have been made, I shall furnish your committee copy of the revised policy contract.
    May I take this opportunity once again to thank you for affording me the opportunity to appear before you.
    Sincerely.

CHARLES J. HAUGH, Vice President.

1812

## ATOMIC ENERGY

costs should not be considered a crucial item in determining the economics of the first generation of small-scale atomic powerplants.

The Nuclear Energy Liability Insurance Association has furnished the Joint Committee with the following quotations for $50 million third-party liability insurance for these reactors:

|  | Amount | Electric kilowatts | Thermal kilowatts |
|---|---|---|---|
| Yankee Atomic Electric Co............................. | $130,000 | 134,000 | 480,000 |
| Armour Research Foundation........................ | 59,000 | 0 | 50 |
| General Electric Co. (Vallecitos, Calif.)............. | 67,000 | 3,600 | 12,000 |
| Commonwealth Edison................................ | 259,000 | 180,000 | 630,000 |
| Battelle Memorial Institute........................... | 59,500 | 0 | 1,000 |
| Elk River ............................................ | 69,430 | 22,090 | 58,000 |

These figures were determined by the following rates per million of insurance:

| Company | 1st million | Next 4 million | Next 5 million | Next 10 million | Next 20 million | Next 10 million |
|---|---|---|---|---|---|---|
| Yankee .............................. | $29,000 | $10,600 | $4,600 | $2,000 | $1,000 | $1,000 |
| Armour .............................. | 12,600 | 4,000 | 1,600 | 800 | 500 | 500 |
| General Electric .................... | 9,000 | 3,000 | 1,280 | 1,000 | 1,000 | 1,000 |
| Commonwealth .................... | 46,000 | 20,000 | 8,000 | 4,000 | 2,000 | 1,600 |
| Battelle .............................. | 6,250 | 2,250 | 1,050 | 7,750 | 750 | 750 |
| Elk River ............................ | 7,360 | 3,680 | 1,470 | 1,000 | 1,000 | 1,000 |

## REACTOR SAFEGUARDS

The provisions of S. 1684 and H.R. 6604 were added to the indemnity bill since it was felt that the Congress should not only try to give financial protection to innocent members of the public who might suffer in the unexpected case of a runaway reactor, but that the Congress should also provide all possible statutory requirements for assuring that reactors should be as safe as possible. A study of the problems of the Commission-licensed operations was made by the staff of the Joint Committee and published in April 1957, as a Joint Committee print entitled "A Study of AEC Procedures and Organization and the Licensing of Reactor Facilities."

This study summarized the facility license procedures of the AEC and the role of the Committee on Reactor Safeguards in the evaluation of the hazards in reactor construction and operation. While the Atomic Energy Act of 1954 has over 18 references to health and safety requirements, there was no body specifically established in the act whose primary responsibility would be to study and advise on the health and safety aspects of licensed operations. The Joint Committee deemed it desirable to establish formally such a body as an advisory committee to assist the Commission with respect to those facilities where the hazard is likely to be the greatest. The Commission has had a Committee on Reactor Safeguards as a committee, though it is not specifically established by the act. This Committee has examined Commission and licensee reactors and has had a very good record.

1813

## LEGISLATIVE HISTORY

Having established the Committee under the bill, it was thought that its functions would be best served if its reports should be made public, and if the facilities of the type on which its report were required should be licensed only after a public hearing.

The Joint Committee concluded that full, free, and frank discussion in public of the hazards involved in any particular reactor would seem to be the most certain way of assuring that the reactors will indeed be safe and that the public will be fully apprised of this fact.

The Joint Committee therefore added as sections 4, 5, and 6 of the indemnity bill the provisions of S. 1684 and H.R. 6604, bills previously introduced by Senator Anderson and Mr. Durham to establish the Committee, to require that its reports be made public and that hearings be held on certain reactor applications.

The Atomic Energy Commission appointed an Insurance Study Group in 1955 to undertake an examination of the insurance needs of the new industry.  One of the recommendations made by this group in its interim report was:

> 8.  In order to promote the insurability of such enterprises and increase insurance capacity, it is believed absolutely necessary that the present Reactor Safeguards Committee, or similar committee, continue to function and that stringent safety standards be maintained as a condition precedent to licensing under the 1954 act.  This would involve periodic inspection as to compliance as a condition for the continuance of the license.

Letters have been received by the Joint Committee from the insurance firms and from industry supporting the need for establishing the Committee on Reactor Safeguards.

THE TRAVELERS INSURANCE CO.,
*April 8, 1957.*

Mr. JAMES T. RAMEY,
*Executive Director, Joint Committee on Atomic Energy,*
*The Capitol, Washington D. C.*

DEAR MR. RAMEY:  Unfortunately, your letter of March 22 did not reach me until after I had returned from the March 25–27 hearings.

I am of the firm opinion that the Reactor Safeguards Committee performed an extremely useful function.  This is not merely my own opinion, but that of all of my associates on the governing and rating committees of the Nuclear Energy Liability Insurance Association.

I believe, in fact I urge strongly, that such a committee should continue in existence.  Certainly, S. 1684 would insure the continuation of such a committee.

Sincerely,

CHARLES J. HAUGH, *Vice President.*

LIBERTY MUTUAL INSURANCE CO.,
*April 2, 1957.*

Re Reactor Safeguards Advisory Committee.
Hon. CLINTON P. ANDERSON,
*Congress of the United States,*
*Joint Committee on Atomic Energy.*

DEAR SENATOR ANDERSON:  Upon my return from Washington I found a copy of your bill, S. 1684, which had been sent to me by Mr. Ramey. I am glad to see something of this sort introduced.  I have discussed the problem of this Committee with a great many people during the past year because both our mutual companies and the stock companies

## ATOMIC ENERGY

are very much concerned about the continuation of such a strong impartial committee.

My reluctance last week as to whether the reports of this Committee should become public documents is genuine, based upon uncertainty as to what the effect would be. In discussing the problem with various people I have run into the view that perhaps the most able people desirable on such a committee might be unwilling to serve if the report was to become a matter of public controversy. If this should be the case my preference would be for a strong committee with some reservation as to making the complete committee report on public document.

I share your view expressed in your remarks accompanying the bill to the effect that the safety and welfare of the public must be a primary consideration. In this connection it would seem important that such a committee would be concerned not merely with private operations conducted under the licensing provision of the 1954 act but all phases of operation in the nuclear area. If the counsel, and advice of such a committee serves a valuable purpose, as I believe it does, then it would appear appropriate to obtain their advice in all areas where unusual hazards prevail regardless of public or private financial support or operation.

In view of the present state of knowledge—or lack of it—with respect to nuclear hazards, it might be desirable to consider moving into full-scale publicity by stages. I am sure that the feeling of our insurance industry is that the presence of a good committee which would function impartially is of more importance at this stage than complete disclosure of such committee's conclusions. Ultimately we believe that the objectives of your bill must prevail but have a question as to timing.

Cordially yours,

HUBERT W. YOUNT, *Vice President.*

GENERAL ELECTRIC CO.
*April 3, 1957.*

Mr. JAMES T. RAMEY,
  *Executive Director,*
    *Joint Committee on Atomic Energy,*
      *Washington, D. C.*

DEAR MR. RAMEY: Your letter of March 22 requested my comments on Senate bill 1684 during the hearings last week. I did not have time to prepare any written testimony and the matter did not come up in discussion.

As I understand the bill, the purpose is (1) to provide a formal status in law for the Safeguards Committee, (2) to provide that its findings shall be made public, as well as the Commission's, (3) to assure that there are public hearings with regard to safeguards.

My comments are as follows:

1. I see no objection to a formal status for the Safeguards Committee. We need a committee of some permanence and continuity and will continue to need it for another 10 years at least. It seems to me that the proposed bill provides a basis under which distinguished persons in private pursuits could serve without having to withdraw from those pursuits.

2. I favor final safeguards reports being published. Also, I believe that, as is the case at present, submissions on the question of safeguards should be public. I believe that the deliberations of any group considering these should be private. They are partly jury and partly investigators, and I think must be free to deliberate in private as is the case with any jury. My concern is not with the principle of public findings —which I endorse—but with the mechanics of obtaining free discussion and competent uninhibited analysis up to the point of public release. As I read S. 1684, this is what is contemplated.

3. I am in favor of either mandatory public hearings or notice being given in some way so that a public hearing is requisite if any respon-

1815



## LEGISLATIVE HISTORY

sible group wishes such a hearing. I believe that lacking such proce-dure, findings might be subject to retroactive attack and there will be a concomitant sense of insecurity on the part of licensees.

4. There are some possible practical problems on which I think testimony might be taken from those who are actually trying to do this job. Presently the Committee is an advisory one to the Commission and the Commission has a staff charged with this responsibility. The pre-cise roles of the Commission staff and of the Committee and the rela-tionships between the two groups should be carefully considered. For example, as I understand it, a Committee member can have the Com-mission staff perform physical analysis, thermal analysis or any other type of work requisite to the formation of a sound opinion and presently can work back and forth in this manner. A complete barrier between the Committee and the working staff of the Commission would, I believe, result in the Committee requiring a complete staff of its own. I would certainly recommend that the ideas of those specifically engaged in this work should be obtained on this and other points.

I trust that the above observations will be of value to you.

Sincerely yours,

FRANCIS K. McCUNE.

The Commission has had an opportunity to consider the substance of the proposals relating to the Committee on Reactor Safeguards and to the pub-lic hearings. It had this opportunity both in connection with the study of the Commission's licensing procedures made by the staff of the Joint Com-mittee and in connection with the indemnity hearings. It has not been in favor of these provisions as a formal statutory requirement.

### SECTION-BY-SECTION ANALYSIS

Section 1 adds to the Atomic Energy Act of 1954 a new finding that it is in the interest of the general welfare and common defense that the United States can undertake both the indemnity and limitation of liability pro-grams established by this bill. The primary concern of the Federal Govern-ment is with the protection to the people who might suffer damages from the new atomic energy industry. Since many of the reactors which will be built will be producing special nuclear material which is vital for the de-fense of the country, it is in the interest of the common defense and se-curity to see that these companies are protected in their operations by hav-ing moneys available to them for payment of public liability claims and having limitations of liability proceedings available when those funds are insufficient. Since title to special nuclear material is in the United States, Congress has special powers and duties with respect to the use of that material. One of the other constitutional bases for the limitation of lia-bility program is the bankruptcy power of the United States for it is im-probable that any firm could survive claims against it of $500 million, over and above the insurance which might be available.

Section 2 modifies the clause in the section of the Atomic Energy Act of 1954 relating to the conditions which are attached to the license for special nuclear material. Up to now, this clause required the licensee to hold the United States harmless from the use of the special nuclear material. Now there has been an exception written into the clause with respect to those portions of this bill, whereby the United States agrees to indemnify the licensee and permit limitation of liability proceedings. The exception was written in this manner since the provisions of the bill with respect to in-demnity have a 10-year period of operation at this time. It was not intend-

## ATOMIC ENERGY

ed by the language of this exception that the licensee would have to complete the limitation and indemnification of liability proceedings before this section applied.

Section 3 of the bill adds five definitions to the Atomic Energy Act of 1954. These definitions are important solely to the substantive provisions of this bill. The drafting of the bill is made considerably easier through these definitions which permit the use of single phrases to be substituted for long complex clauses.

The first definition is of "financial protection" which is defined to mean the ability to respond in damages for public liability. In view of the treatment of the costs of settlement in subsection 170h, the Commission language proposing to put these costs into definition of financial protection was not accepted. If the costs of investigation of defense and settlement were included in that portion of the claims to which the limitation of liability applied, it might be difficult to find persons who would carry out these functions after a serious nuclear incident since they would not be fully reimbursed for their costs.

The language proposed by AEC which would have limited the ability to respond in damages for public liability to that private insurance which was available within the United States seemed to the committee to negate the possibility of obtaining part of the insurance from Lloyds of London, as it was contemplated.

The second definition is of "licensed activity" which means any activity for which a license is issued, pursuant to the provisions of the act, but for which the Commission requires financial protection under section 170a.

The definition of "nuclear incident" is designed to protect the public against any form of damage arising from the special dangerous properties of the materials used in the atomic energy program. It includes any damage which may result from any hazardous property of source, special nuclear, or byproduct material. It includes bodily injury or death, loss of or damage to property, and loss of use of property. While most incidents will be happenings which can be pinpointed in time—such as a runaway reactor or an inadvertent exposure to radiation—it was not thought that an incident would necessarily have to occur within any relatively short period of time. For instance, the steady exposure to radiation, such as from an undetected leak of radio-active materials from a storage bin, could constitute an incident. The occurrence which is the subject of this definition is that event at the site of the licensed activity, or activity for which the Commission has entered into a contract, which may cause damage, rather than the site where the damage may perhaps be caused. This site must be within the United States. The suggested exclusion of facilities under license for export was not accepted. This is because the definition of "nuclear incident" limits the occurrence causing damage to one within the United States. It does not matter what license may be applicable if the occurrence is within the United States. If there is anything from a nuclear incident at the licensed activity which causes injury abroad or if there is any activity abroad which causes further injury in the United States the situation will require further investigation by the Congress at that time. The words "sickness, disease" were added following bodily injury in order to make it perfectly clear that the extent of bodily injury was the same as the definition of bodily injury as specified by the standard

1817

## LEGISLATIVE HISTORY

NELIA insurance policy. The indemnification agreements are intended to cover damages caused by nuclear incidents for which there may be liability no matter when the damage is discovered, i. e., even after the end of the license. That is why the definition of "nuclear incident" has the phrase "*any* occurrence * * * causing bodily injury, sickness, disease, or death" and why the definition of "public liability" is tied to "*any* legal liability arising out of, or resulting from, a nuclear incident * * *." The suggested limitation to the loss of the use of property when evacuated under order of public authority was not accepted as being too limiting an exception. However, it is not the intention of the committee to have the damage to property which is included in the term "nuclear incident" include the diminution in value or other similar causes of action which may occur, namely, from the location of an atomic energy activity at a particular site.

The definition "person indemnified" means more than just the person with whom the indemnity agreement is executed. In the case of license this agreement will be executed with the licensee. Where the Commission and a contractor decide to take advantage of the provisions of this act, an indemnity agreement will be executed with the prime contractor. The phrase "person indemnified" also covers any other persons who may be liable. For a licensee for a reactor, this would mean in addition to the licensee that the indemnification extends to such persons as the subcontractors of the licensee, including those responsible for the design and construction of the reactor and the supplying of parts. However, it is not meant to be limited solely to those who may be found liable due to their contractual relationship with the licensee. In the hearings, the question of protecting the public was raised where some unusual incident, such as negligence in maintaining an airplane motor, should cause an airplane to crash into a reactor and thereby cause damage to the public. Under this bill the public is protected and the airplane company can also take advantage of the indemnification and other proceedings. The proposed AEC limitation to those in privity with the licensee was reconsidered by the Commission, and the Commission decided to accept the premise of the original bills which would make the person indemnified any person who might be found liable, regardless of the contractual relation.

One point mentioned several times in the hearings related to the possible liability of a carrier transporting spent fuel elements from a reactor to a processing plant. If such a company, whether through negligence or otherwise, should have an accident which would spill the radioactive materials into a stream, this bill would afford protection to the public and to the carrier, even though the carrier is not required to be a licensee under the Atomic Energy Act of 1954. However, those transmitting the material are required to be licensees and to see that appropriate safety measures are taken during the shipment. The Atomic Energy Commission has had extensive experience in shipping radioactive materials back and forth across the country without any of these possible incidents having yet occurred. Having the agreement run to the benefit of any other person who may be liable will parallel the policies which the insurance companies are planning to issue. They, too, will be entered into with the licensee or prime contractor and will run for the benefit of any other person who may be liable. This method of approach was suggested by the insurance companies since they

# ATOMIC ENERGY

did not want to have a pyramiding of insurance at a reactor. This pyramiding could result from having each of the designers, owners, contractors, and others interested in the reactor taking out separate policies of insurance.

The last definition is of "public liability" as it is used in the definition of financial protection and elsewhere in the statute. It means a legal liability arising out of, or resulting from, a nuclear incident. This definition has two exceptions. The first is to claims under State or Federal workmen's compensation acts where employees are employed in connection with the activity where the nuclear incident occurred. It is the thought that the insurance carriers who pay workmen's compensation for this group of personnel know and understand the risks which they are taking and charge accordingly. Therefore, any claims which are paid out for these personnel by the carriers should not properly be made claims for which the Government provides indemnification. For those employees who are not employed in connection with the activity, the workmen's compensation premium does not include any charge for this protection. The premium for the workmen not employed at the activity is not calculated on the possibility of any nuclear explosion. Therefore, there is a real and fair basis for permitting the carriers for these employees to have their claims included in the claims to be indemnified. Thus, if a licensee has employees who are working in connection with the activity and there should be a runaway reactor, the employees who are working on the reactor project would not have their workmen's compensation claims subrogated for payment out of the indemnity fund. However, the employees of the same company which are not working on the activity may even be in another town and would have the workmen's compensation claims made payable out of the indemnity moneys. In this definition the phrase "State or Federal Workman's Compensation Act" is intended to be descriptive and not limiting and includes any law similar to the compensation acts, such as the occupational disease acts and also any special legislation which may be enacted in the future for the protection of employees who are exposed to radiation. The suggestion which was contained in the original draft legislation of the Commission that willful damages be excluded was not accepted since the damage to the public is the same, whether caused by any means—willful or nonwillful. However, the circumstances surrounding any nuclear incident, including the willfulness, would certainly be grounds for examining and possibly suspending the operations under the license.

The second exception to the definition "public liability" is a war-damage exception. This exception to some extent parallels the exception in the private policies. It was thought that in the event of war the damages would be so great and the task of proving causation so difficult that further congressional study would be needed. This exception was not drawn to damage caused after a declaration of war since the first attack on the United States could be an unannounced attack before any declaration of war. Any single act of sabotage would be covered by the indemnification provisions of the bill if it could not be proven to be an act of war.

The definition of "public liability" has language to make it expressly applicable to damage to property of persons indemnified except that which is located at the site of, and used in connection with, the activity where the incident occurs. If there is a reactor incident, there would be no claim for the damages to the reactor which could be included in the indemnification

1819

## LEGISLATIVE HISTORY

of the Government. However, if the same organization owned property, for instance in another town, for which nuclear insurance would not be expected, that property could be included in the property to which the indemnity would be applied. Basically, however, this was included because it was brought to the attention of the Joint Committee that even a small research reactor might be located on the campus of a university—if the Commission found such a location to be safe—and there would be no way in which that educational institution could obtain atomic insurance on all the rest of its buildings. This is designed to afford protection for off-site property.

The protection of the off-site property of the persons indemnified will be available only if the basic insurance policies also cover this property. It is the understanding of the Joint Committee that this problem is under review at the moment by the insurance companies. It did not seem right that the United States Government could be forced to pick up the damages at another plant of the firm owning and operating a reactor which suffers a runaway while the private persons would obtain relief out of the insurance benefits. In setting forth this kind of protection for the off-site property it is not expected that the person indemnified would have to sue himself to prove liability. It is recognized that this is an unusual extension of the liability laws, but it seemed to be the only way to put the persons indemnified on a consistent basis with everybody else with respect to property as to which they cannot otherwise obtain atomic insurance.

In view of the basic position taken by the Joint Committee in drafting this bill, namely, to make only the minimum of changes over the bills voted out by the committee last year, the AEC proposed definition of "indemnity" and "indemnification" were not accepted. The specific problems incorporated in those definitions seem to have been adequately taken care of in other places.

Section 170 of the Atomic Energy Act is added as a new section. Subsection a makes the providing of financial protection and the signing of an indemnity agreement a condition of each license under section 103 and 104 and each construction permit under section 185. Section 103 licenses are for reactors which are found to be of practical value and section 104 licenses are for research and demonstration reactors. In addition, the Commission is given the option of requiring financial protection for any license issued under section 53, 63, or 81. Section 53 permits the licensing of special nuclear material; section 63 permits licensing of source material; section 81 permits licensing of byproducts material. It is not expected that ordinarily the Commission will use the authority given it with respect to these latter three types of materials. However, there may be rare instances in which the licensee, without at the same time being a licensee of a facility, may have such large quantities of materials or such quantities of especially dangerous or hazardous materials as to warrant the imposition of the provisions of this bill. (This authority is in addition to the authority given to the Commission in sec. 182 which permits the Commission to find that any applicant for a license is financially qualified to undertake the purposes of the license.) This authority in the Commission is the same as the language contained in the Commission proposal for this section. In view of the fact that the bill is designed to encourage indus-

## ATOMIC ENERGY

try to participate in the licensing program, it does not matter whether the license is issued to a private firm or Government agency. Those contractors, subcontractors, and any other persons who may be liable should be protected under the provisions of this bill.

Where financial responsibility is required under the provisions of this section for the protection of the public, it is a condition of the license that the licensee execute and keep in force the agreement of indemnification under subsection 170 c. The maintenance of the financial protection is also a condition of the license. Under this subsection the Commission is given authority to require that an applicant waive any immunity it may have conferred by Federal or State law. If a college or university, for instance, which is owned by a State should want to have a reactor, it may be required to shed its immunity as a part of the State sovereignty to suit by the public. This authority is not mandatory but is permissive, since there may be other courses of action which may be as satisfactory in seeing that the public is protected. This will give the Commission authority to work out such arrangements. While there is reference to a construction permit in this particular phrase, the word "license" as used in the balance of the bill includes the words "construction permit" in accordance with the last sentence of section 185 of the Atomic Energy Act of 1954 which reads:

> For all other purposes of this Act, a construction permit is deemed to be a "license."

Subparagraph b sets the maximum amount of protection which the Commission might require at the amount of private insurance available from private sources. The Commission is authorized to set lesser amounts of financial protection which is required, based on such items as the cost and terms of the private insurance, the type, size, and location of the facility and other factors pertaining to the hazard and the nature and purpose of the facility. Thus, if there is $65 million available as insurance on a 100,-000-kilowatt reactor, a 5,000-kilowatt reactor might not be required to furnish financial protection equal to the full amount of the $65 million. Also, if there is $65 million available for a reactor which is located in a relatively thickly populated area of the country, the Commission might find that a reactor located in a completely barren part of the country need not require as much financial protection. If the Commission wants to encourage a university to do research work, it might require less financial protection as an inducement to having the research work carried on. However, it is expected that the Commission would arrive at the criteria by regulation so that, as closely as possible, persons engaged in similar enterprises are treated alike. Thus, if a public or cooperative body wanted to build a large size reactor for the production of power, it would have to meet the same requirements for financial protection as a private company. One point of caution should be mentioned. The reference to the cost of insurance in this subsection is not intended to encourage the Commission to undercut the amounts of private insurance provided at reasonable rates. Since the program is so new, and no experience as to the rates established, the Commission must be in a position to set the amount of financial protection required at an amount lower than amount of private insurance offered if the rates appear high and all other factors indicate a lower amount is appropriate. It is merely to give the Commission a chance to look at

1821

## LEGISLATIVE HISTORY

the economics of the operation of the particular kind of reactor in decid-ing the amount of financial protection which may be required.

The authority given the Commission by this section to gage the hazards of a possible activity from the protection point of view, is not intended to exclude in any way or to supersede the power of the Commission under the other authorities in the Atomic Energy Act to establish safe operating con-ditions and safe operating localities for the reactors. The obligations on the Commission under these other powers continue unabated.

The Commission is given discretion as to the manner in which the finan-cial protection may be afforded. Such protection may come from private insurance, private contractual indemnities, self-insurance or other proofs of financial responsibility, including cash, other assets, bonds, etc. It could be a combination of these items.

Subsection c requires the signing of an indemnification agreement with those persons who are required to establish financial protection under sub-section d. The requirement of financial protection can be made applicable to licenses issued from August 30, 1954—the date of signing the Atomic Energy Act of 1954—and August 1, 1967—about 10 years after the expect-ed effective date of the bill. In view of the provisions in section 187 of the Atomic Energy Act of 1954, making all licenses subject to later amend-ment of the act, there is no need to incorporate language here amending the licenses where this financial protection may be required. Under these agreements the Commission will agree to indemnify the licensee for dam-ages arising from nuclear incidents which are in excess of the financial pro-tection. However, the limit of the Commission's responsibility under these agreements is to be $500 million. This limit could be subject to upward revision by the Congress in the event of any one particular incident in which, after further congressional study, the Congress felt more appro-priations would be in order. The protection of indemnification afforded by the Government under the agreement of indemnification is intended only to start when the damages exceed the face sum or the level of the financial protection required by the Commission. This means that if there are any exceptions in the scope of coverage of the underlying financial pro-tection which may be applicable to a particular incident the indemnification does not pick up from the ground up but still picks up only after the amount of damage reaches the level of the financial protection required of the li-censee.

This limit of $500 million is for each incident and it is to cover the inci-dent occurring during the period of the license, and to protect those who design and make parts for a reactor and who may have engaged in those activities before any licenses may have been issued. If they are found to be liable because of nuclear incidents occurring during the period of the license, the interests of the public and of these contributors are well pro-tected under this bill. This protection covers those persons who supply standard items of equipment as well as those who may supply specialized items to the same extent. The use of phrases qualifying the terms "nu-clear incidents" in this subsection, as in others, is not intended in any way to change the definition given to that phrase in section 3 of the bill. It is expected that the basic financial protection required of a licensee will be

1822

## ATOMIC ENERGY

continuous, even though there may, for one reason or another, be a termination of the particular license involved.

Subsection d authorizes the Commission to treat with its own contractors in the same way it can treat with licensees under the provisions of this bill. This authority is in addition to any other authority which the Commission already has and under which the Commission has entered into the indemnity clauses such as were set out in the 1956 testimony of the General Counsel of the Commission. It is hoped that the Commission will adopt a policy of extending indemnity provisions to contractors and subcontractors consistent with that extended to licensees and their suppliers and subcontractors. Many industrial participants sought to make the authority contained in this subsection mandatory. The Joint Committee decided, however, that it would observe the operations of the Commission under this subsection for a year before considering any further steps to make this authority mandatory instead of merely permissive.

In this subsection, however, the Commission is allotted discretion as to the amount of financial protection which may be required of its contractors before the $500 million guaranteed indemnity attachés. This authority is to be available for any type of contract which the Commission may enter into, as well as to contracts and projects which the Commission may enter into jointly with other agencies of the Government. The joint contracts and projects are usually with one of the armed services or with the Department of Defense. Such projects have in the past included development of submarine reactors and the development of reactors for the propulsion of airplanes. Although the matter was raised, it was not deemed appropriate at this time to include protection for the prime contractors of the Department of Defense alone in this bill. This is a problem which has substantial differences and should be resolved only after further and full investigation of the scope of the operations. All other agencies of the Government will be licensees of the AEC and therefore will have their operations protected by this bill. As in subsection c, the $500 million limitation on the Government's agreement to indemnify can be increased by special congressional action for any particular nuclear incident if it is ever found to be desirable.

Subsection e limits the liability of the persons indemnified for each nuclear incident to $500 million, together with the amount of financial protection required. Of course, Congress can change this act at any time after any particular incident. The Joint Committee wanted to be sure that any such changes in the act would be considered by it in the light of the particular incident.

In order to provide a framework for establishing the limitation of liability, the Commission or any person indemnified is permitted to apply to the appropriate district court of the United States which has venue in bankruptcy matters over the site of the nuclear incident. Again it should be pointed out that the site is where the occurrence takes place which gives rise to the liability, not the place where the damage may be caused. The district court is authorized to issue orders declaring the liability limited and staying the payment of claims and the execution of court judgments. By this procedure the right of the State courts to establish the liability of the persons involved in the normal way is maintained, but the payment

1823

## LEGISLATIVE HISTORY

of those liabilities can be stayed. This will permit a payment to all persons who suffer damage on a prorated basis and it will not permit full payment to the first claimants with no payment to the last claimants. In order to alleviate the financial losses of those who may have incurred damages, the court is permitted to order partial payments. Since it is possible that there may be damages which are not discovered for a period of years, the court is authorized to set aside a portion of the funds available to cover such later claims on the basis of such scientific evidence as may be available to it.

Subsection f establishes the charges for reactors which have been proven to be of commercial value under section 103 at $30 per year per thousand kilowatts of thermal energy capacity. The thermal energy capacity is a rough indication of the amount of special nuclear material which is put into the reactor and is therefore a rough guide to the amount of hazard involved in operating a reactor. For the research and development reactors which can be licensed under section 104, the Commission is authorized to charge less than $30 per year for the indemnity. This reduction is permitted because some research and development reactors do not involve the hazards that the section 103 reactors would entail. It is also authorized because the policy of the Commission may be to encourage research and development work by having the Commission render these indemnification services without charge—or at a reduced charge—to those engaged in the research and development work. The Commission is also authorized to make a lesser charge for an indemnity granted under the construction permit since the hazards in building a reactor are not as great as those hazards which accompany the operation of a reactor. Of course these fees are applicable to those types of facilities which have a capacity for generating heat. Those facilities which may be licensed or contracted for, such as separation plants, and do not fit this particular method of determining the fees will have the fees set under the alternate optional authority given to the Commission of setting a nominal fee for any other operation. A minimum fee of $100 a year is set.

Subsection g requires the Commission to use to the greatest extent practicable the facilities and services of private insurance organizations. Under the bill, as drafted, the Commission is authorized to use the services of those organizations which could provide real services to the Commission without requiring the Commission to build up an organization of its own. The brokers and others who give advice to the persons indemnified and provide services in connection with the financial protection would, of course, be agents of those persons and not of the Government. They can look to the persons indemnified for their fee except to the extent that they might provide services to the Commission.

Subsection h contains some of the clauses which it was felt the Commission should have in its agreements for indemnification. In addition to giving the Commission specific authority to write the indemnification agreements with clauses that it deems appropriate, the Commission is required to collaborate with the person indemnified if it seems probable that the United States will be required to make indemnity payments. The Commission may be permitted to appear in any action through the Attorney General and is given final authority on behalf of the United States to settle a claim

1824

## ATOMIC ENERGY

on a fair and reasonable basis. This latter authority is put into this bill so that the Commission need not be bound by legal technicalities, such as rules of legal proof in a situation in which the courts have not yet had a chance to establish new rules for new problems arising from radiation. This authority is also given to the Commission so that its settlements need not be required to pass through technical governmental accounting procedures before payment. In addition, this authority is given to the Commission so it need not wait for an action to go to final judgment but can be settled when it seems fair and reasonable. In giving the Commission additional authority to include reasonable expenses to the person indemnified, it is expected that such expenses could include reasonable attorney's fees incurred by the person indemnified in examining any claims.

Subsection i requires the Commission to make a survey in any incident where it appears likely that indemnity payments will be made under the bill. This survey is an aid to the Congress in establishing the causes of a nuclear incident. It is, in part, an aid to the parties in any action where it is unlikely that the public would be able to obtain the full amount of technical information which might be required. The final findings are required to be made public except to the extent that they contain classified information. In addition, the Commission is required to report every year to the Joint Committee on the operations of this bill.

Subsection j permits the Commission to enter into an indemnity contract in advance of appropriations and without advertising.

Section 5 of the act adds a new section 29 to the Atomic Energy Act to formally establish a Committee on Reactor Safeguards. There are to be a maximum of 15 members, serving for 4-year terms. This Committee is to review license applications and to advise the Commission with respect to the hazards involved at any facility.

The main reason for making this Committee a statutory committee was to insure that any features of new reactors would be as safe as possible. This subject was felt to be so important as to require a committee established by statute.

Another reason prompting the insertion of the provision in the bill was the strong reliance placed by the insurance companies on the continuance of the Commission safety programs, including the continuance of some body similar to the present Reactor Safeguard Committee. One of the main reasons for the sources of the Commission's reactor safety activities in the past has been the close scrutiny of AEC-built reactors and great prestige of its present Reactor Safeguards Committee. The Joint Committee desired this same type of scrutiny and prestige to be maintained with respect to privately built power and testing reactors.

Section 6 requires the Committee on Safeguards, as part of the administrative procedures in chapter 16 of the act, to review the applications for licenses for those facilities which are most likely to affect the public. These facilities at the moment are those facilities licensed under section 103 (those facilities which have been found to be of practical value for industrial or commercial purposes), those facilities under 104b (those facilities which are involved in the conduct of research and development activities to demonstrate the practical value of a type of facilities for industrial or commercial purposes), and testing facilities licensed under section 104c (re-



## LEGISLATIVE HISTORY

search facilities which have an unusually high degree of possible hazard to the public). The Commission is also authorized to refer any other application under section 104, for even medical and research facilities, to the committee if it should appear to be one in which the public would have an unusual interest. The report of the committee is to be made public so that all concerned may be apprised of the safety or possible hazards of the facility. It is the belief of the Joint Committee that when the public is adequately and accurately informed that it will be in a better position to accept the construction of any reactors.

Section 7 requires the Commission to hold hearings after 30 days' notice for applications for licenses filed under section 103 or 104b or for any application for license for testing facility filed under section 104c. Under the present provisions of section 189a the Commission is not required to hold a hearing on all applications, but merely on those applications for which a hearing is requested by any interested party.

The provisions of sections 5, 6, and 7 apply to construction permits, in view of the last sentence in section 185 as quoted above, in the discussion of section 170a.

### ANNEX A

UNITED STATES ATOMIC ENERGY COMMISSION,
*Washington, D. C., March 22, 1957.*

HON. CARL T. DURHAM,
*Chairman, Joint Committee on Atomic Energy,*
*Congress of the United States.*

DEAR MR. DURHAM: There is transmitted herewith a report of a study of the possible consequences in terms of injury to persons and damage to property, if certain hypothetical major accidents should occur in a typical large nuclear power reactor.

More than two score leading experts in the sciences and engineering specialties participated in this study.

We are happy to report that the experts all agree that the chances that major accidents might occur are exceedingly small.

This study constitutes a part of the Commission's continuing effort on a broad front to understand and resolve this problem of possible reactor hazards, so that we may proceed with an expanding atomic-energy industry with full confidence that there will be few reactor accidents and that such as do occur will have only minor consequences. This effort and the work of translating the results into affirmative, concrete safeguards for protection of the public will, of course, be continued and expanded.

Since the beginning of the reactor program the experts and the Congress and the public and the Commission have all been concerned with the causes of and the possible magnitude of damage from reactor accidents and with means of prevention. The subject was considered important enough to command 4 of the sixty-odd sessions of the International Conference on the Peaceful Uses of Atomic Energy in Geneva 18 months ago, which, as you will recall, we initiated. One conference paper in particular gave estimates of the theoretical magnitude of damage. In May of last year, Dr. Libby presented to your committee some estimations of the possible extent of harm and damage should a major accident occur.

This study has taken the form in which it is now presented to you as a means of responding to the committee's specific request of last July 6. To produce such a study, it was necessary to stretch possibility far out toward its extreme limits. Some of the worst possible combinations of

1826

## ATOMIC ENERGY

circumstances that might conceivably occur were included in the hypotheses in order that we might assess their consequences. The study must be regarded only as a rough estimation of the consequences of unlikely though conceivable combinations of failure and error and weather conditions; it is not in any sense a prediction of any future condition.

This has been a difficult study to make. There has fortunately been little reactor accident experience upon which to base estimates. Nuclear reactors have been operated since December 2, 1942, with a safety record far better than that of even the safest industry. More than 100 reactor years of regular operating experience have been accumulated, including experience with reactors of high power and large inventories of fission products, without a single personal injury and no significant deposition of radioactivity outside of the plant area. There have been a few accidents with experimental reactor installations as contrasted with the perfect record of safety of the regularly operating reactors. But even these accidents did not affect the public.

This record, which shows that safe operation can be achieved, is due to skillful design, careful construction, and competent operation.

Looking to the future, the principle on which we have based our criteria for licensing nuclear power reactors is that we will require multiple lines of defense against accidents which might release fission products from the facility. Only by means of highly unlikely combinations of mechanical and human failures could such releases occur. Furthermore, the Government and industry are investing heavily in studies to learn more about the principles of safe reactor design and operation.

Framing even hypothetical circumstances under which harm and damage could occur and arriving at estimations of the theoretical extent of the consequences proved a complex task.

To make the study we enlisted the services of a group of scientists and engineers of the Brookhaven National Laboratory and of another group of experts, to serve as a steering committee. Through recent months these men have met with many additional expert advisers to test out judgments on the estimates arrived at.

We are not aware of such a study having been undertaken for any other industry. We venture to say that if a similar study were to be made for certain other industries, with the same free rein to the imagination, we might be startled to learn what the consequences of conceivable major catastrophic accidents in those other industries could be in contrast with the actual experience in those industries.

Remembering that this study analyzes theoretical possibilities and consequences of reactor accidents, we might note here the judgments presented on (1) possible consequences of major accidents and (2) the likelihood of occurrence of such major reactor accidents.

The portion of the study dealing with consequences of theoretical accidents started with the assumption of a typical power reactor, of 500,000 kilowatts thermal power, in a characteristic power reactor location. Accidents were postulated to occur after 180 days of operation, when essentially full fission product inventories had been built up.

Three types of accidents which could cause serious public damages were assumed. Pessimistic (higher hazard) values were chosen for numerical estimates of many of the uncertain factors influencing the final magnitude of the estimated damages. It is believed that these theoretical estimates are greater than the damage which would actually occur even in the unlikely event of such accidents.

For the three types of assumed accidents, the theoretical estimates indicated that personal damage might range from a lower limit of none injured or killed to an upper limit, in the worst case, of about 3,400 killed and about 43,000 injured.

Theoretical property damages ranged from a lower limit of about one-half million dollars to an upper limit in the worst case of about

1827

## LEGISLATIVE HISTORY

$7 billion. This latter figure is largely due to assumed contamination of land with fission products.

Under adverse combinations of the conditions considered, it was estimated that people could be killed at distances up to 15 miles, and injured at distances of about 45 miles. Land contamination could extend for greater distances.

In the large majority of theoretical reactor accidents considered, the total assumed losses would not exceed a few hundred million dollars.

As to the probabilities of major reactor accidents, some experts held that numerical estimates of a quantity so vague and uncertain as the likelihood of occurrence of major reactor accidents have no meaning. They declined to express their feeling about this probability in numbers. Others, though admitting similar uncertainty, nevertheless ventured to express their opinions in numerical terms. Estimations so expressed of the probability of reactor accidents having major effects on the public ranged from a chance of 1 in 100,000 to 1 in a billion per year for each large reactor. However, whether numerically expressed or not, there was no disagreement in the opinion that the probability of major reactor accidents is exceedingly low.

Some of the reasons for this belief follow:

First, industry and Government are determined to maintain safety and protect the health and property of the public from nuclear hazards. The Congress has authorized, and we in the Commission are carrying out a program of close and careful regulation and inspection. Thus the potential hazard of this new industry has been recognized in advance of its development and brought under a strict system of safety control before the occurrence of the incidents which in other fields have marked the birth of new industry and have subsequently led to control.

Secondly, the challenge of this new and important venture in man's application of the forces of nature has attracted able and energetic men into the work of assuring safe design and operation.

In the third place, multi-million-dollar efforts in research and development, both public and private, are directed toward identifying and solving safety problems. We know of no other industry where so much effort has been and is being spent on the definition and solution of safety problems.

Fourthly, the cost to the industry and Government of reactor accidents, even of a minor nature, would be very high—much higher than for accidents in other industry. Self-interest, therefore, as well as public interest dictates avoidance of accidents.

To sum up, the report affirms that a major reactor accident is extremely unlikely. To reduce the matter of assumed hazards to comparative numbers, let us take the most pessimistic assumptions used and apply them to a case of 100 power reactors in operation in the United States.

Under these assumptions, the chances of a person being killed in any year by a reactor accident would be less than 1 in 50 million. By contrast, the present odds of being killed in any year by an automobile accident in the United States stand at about 1 in 5,000.

We are not surprised by the contents of the report, nor are we made complacent. The report serves to identify areas where continued research and development are needed, and areas where emphasis is needed in the further development of our regulatory program. It gives renewed emphasis to our belief that our research and development program and our regulatory program in the nuclear power field must continue with vigor to the end that the "conceivable" catastrophe shall never happen.

We would appreciate your regarding the attachment as an "advance" report. It is being reviewed for editorial and mechanical errors and

1828

## CASEIN—FREE IMPORTATION

omissions. Copies of the report as corrected will be furnished to you at an early date.

Sincerely yours,

HAROLD S. VANCE,
*Acting Chairman.*

Enclosure: Theoretical Possibilities and Consequences of Major Accidents in Large Nuclear Powerplants.

## CASEIN—FREE IMPORTATION

*For text of Act see p. 634*

Senate Report No. 846, Aug. 12, 1957 [To accompany H.R. 38]

House Report No. 974, Aug. 2, 1957 [To accompany H.R. 38]

The Senate Report is set out.

### Senate Report No. 846

THE Committee on Finance, to whom was referred the bill (H.R. 38) to amend the Tariff Act of 1930 to provide for the temporary free importation of casein, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### PURPOSE

The purpose of H.R. 38 is to suspend the import duty under paragraph 19 of title I of the Tariff Act of 1930, as amended, until March 31, 1960, on casein or lactarene and mixtures of which casein or lactarene is the component material of chief value.

### GENERAL STATEMENT

Casein (or lactarene) is derived from skim milk and is used primarily in the manufacture of coated paper, plastics, adhesives, paints, and edible derivatives. One of the chief uses of this product is in the manufacture of various types of coated papers. However, there is considerable use of the product as a basic raw material for production of water-resistant glue which is used in making exterior and other plywood products. It thus is a very important raw material not only to our domestic coated-paper industry, but also to our domestic building-supply industry.

Prior to the Tariff Act of 1922, casein or lactarene was free of duty, but in the act of 1922 a rate of 2½ cents per pound was established, and this duty was increased to 5½ cents per pound in the Tariff Act of 1930. The present rate of duty, in effect pursuant to trade agreements, is 2¾ cents per pound (2.2 cents per pound if the product comes from Cuba). The reduced rate of 2¾ cents per pound first became effective on November 15, 1941, pursuant to a trade agreement with Argentina, and was later included in a trade agreement with Uruguay and in the General Agreement on Tariffs and Trade.

Information presented to your committee indicates that, while domestic production and imports of casein have fluctuated during the past three decades, the general trend of domestic production has been downward and

1829