# EXHIBIT 4

## NUCLEAR OCCURRENCES

## ATOMIC ENERGY—EXTRAORDINARY NUCLEAR OCCURRENCES

*P.L. 89–645, see page 1052*

Senate Report (Atomic Energy Committee) No. 1605,
Sept. 16, 1966 [To accompany S. 3830]

House Report (Atomic Energy Committee) No. 2043,
Sept. 14, 1966 [To accompany H.R. 17685]

Cong. Record Vol. 112 (1966)

DATES OF CONSIDERATION AND PASSAGE

Senate Sept. 22, 1966

House Sept. 30, 1966

The Senate bill was passed in lieu of the House bill.

The Senate Report is set out.

### SENATE REPORT NO. 1605

**T**HE Joint Committee on Atomic Energy, having considered S. 3830 to amend the Atomic Energy Act of 1954, as amended, reports favorably thereon and recommends that the bill do pass.

#### SUMMARY OF THE BILL.

The bill, as recommended by the Joint Committee on Atomic Energy, would amend section 170 and related sections of the Atomic Energy Act of 1954, as amended, concerning private insurance and governmental indemnification with respect to nuclear incidents.

1. Emergency Assistance Payments (subsec. 170 m.).—The bill would authorize the Atomic Energy Commission to establish coordinated procedures with the nuclear liability insurance pools (Nuclear Energy Liability Insurance Association and Mutual Atomic Energy Liability Underwriters) for the prompt handling, investigation, and settlement of claims arising out of a nuclear incident. In accordance with this authority the insurers and the Commission could make financial assistance available to claimants immediately following a nuclear incident without requiring claimants to sign a release or otherwise compromise their claims. The bill specifically provides that any such payment shall not constitute an admission of liability but shall operate as a satisfaction to the extent thereof of any final settlement or judgment.

2. Waiver of Defenses (subsec. 170 n.(1)).—The bill would also authorize the AEC to incorporate provisions in its indemnity agreements, and to require incorporation of provisions in insurance policies and contracts furnished as proof of financial protection, which waive "any issue or defense as to the conduct of the claimant or fault of persons indemnified." The primary end result of these waivers would be to eliminate, first, any requirement that a claimant prove negligence ("fault") in order to recover for his damages, and second, any possible issue as to the claimant's con-

3201

## LEGISLATIVE HISTORY

tributary negligence or assumption of the risk. Similar authority would be conferred on the AEC respecting waivers of any issue or defense as to charitable or governmental immunity of the defendant; as well as any issue or defense based on any statute of limitations if suit is instituted within 3 years after the victim knows of his injury and its cause, and in any event within 10 years after the nuclear incident.

3. **Extraordinary Nuclear Occurrence (subsec. 11 j.).**—The bill provides that such waivers would apply with respect to any "extraordinary nuclear occurrence," as defined in the bill and explained below, which (a) arises out of or results from or occurs in the course of the construction, possession, or operation of a production or utilization facility, (b) arises out of or results from or occurs in the course of transportation of source material, byproduct material, or special nuclear material to or from a production or utilization facility, or (c) during the course of the contract activity arises out of or results from the possession, operation, or use by a Commission contractor or subcontractor of a device utilizing special nuclear material or byproduct material.

Under the bill the Commission would have the responsibility and authority to determine whether an "extraordinary nuclear occurrence" has taken place. An extraordinary nuclear occurrence is defined by the bill to mean—

> any event causing a discharge or dispersal of source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Commission determines to be substantial, and which the Commission determines has resulted or will probably result in substantial damages to persons offsite or property offsite.

This definition has been drafted so as to give the Commission broad discretion in determining whether an extraodinary nuclear occurrence has taken place. However, the Commission is required by the bill to establish criteria in writing setting forth the basis upon which such determination shall be made. The bill further provides that the Commission's determination as to whether or not an extraordinary nuclear occurrence has taken place will not be subject to either direct or collateral administrative or judicial review.

4. **Defenses Preserved (subsec. 170 n.(1)).**—The bill provides certain exceptions to the applicability of the waivers. The waivers shall not preclude a defense based upon a failure to take reasonable steps to mitigate damages, nor shall they apply to injury or damage to a claimant or to a claimant's property which is intentionally sustained by the claimant or which results from a nuclear incident intentionally and wrongfully caused by the claimant.

5. **Execution of Waivers (subsec. 170 n.(1)).**—It is expected that these waivers will be executed by both the insurers and the named insureds designated in policies of nuclear liability insurance required as proof of financial protection, as well as by the AEC and the licensees and contractors which are parties to the Commission's indemnity agreements. Persons furnishing proof of financial protection in a form other than nuclear liability insurance would similarly be required to waive defenses. Under the authority of this bill the Commission could also require the execution of such waivers by any other person (for example, a carrier of nuclear materials) who may be held liable for a nuclear incident and who seeks the benefit of the

3202

## NUCLEAR OCCURRENCES

insurance policy or contract furnished as proof of financial protection or the Commission's indemnity.

6. **Consolidation of Suits (subsec. 170 n.(2)).**—The bill provides that in the event of an extraordinary nuclear occurrence the U. S. district court in the district where such occurrence takes place (or, in the case of such an occurrence taking place outside the United States, the U. S. District Court for the District of Columbia) shall have original jurisdiction of any public liability action arising out of or resulting from the occurrence, without regard to the citizenship of any party or the amount in controversy. Moreover, the bill authorizes the possible removal to such district court of any public liability action arising from such an occurrence pending in any State or other U. S. district court, upon motion of the Commission or the defendant.

7. **Allocation of Insurance-Indemnity Fund (subsec. 170 o.).**—Finally, whenever the U. S. district court in the district where a nuclear incident occurs, or the U. S. District Court for the District of Columbia in case of a nuclear incident occurring outside the United States, determines that public liability from a single nuclear incident may exceed the limit of liability established by subsection 170 e. of the act, total payments made from the insurance-indemnity fund provided for by the act may not exceed 15 percent of such limit of liability without the prior approval of such court. Payments in excess of that figure could be made only after a determination by the court that they are or will be in accordance with a plan of distribution which has been approved by the court, or are not likely to prejudice the subsequent adoption and implementation by the court of a plan of distribution. The Commission would be required by the bill, and other interested persons would be authorized by the bill, to submit to the court a plan for the disposition of pending claims and for the distribution of remaining funds available. Authority to implement fully the foregoing responsibilities would also be conferred upon the court. Consistent with the present language of the act, this authority would include the power to limit the liability of persons indemnified.

The foregoing are the main features of the proposed legislation. An explanation of the policy supporting the major provisions of this bill is found in the section of this report entitled "Committee Comments." A detailed legal analysis of the entire bill is found in the section entitled "Section-by-Section Analysis."

### LEGISLATIVE HISTORY

In 1965 the Joint Committee recommended and there was enacted legislation (Public Law 89–210) which among other things extended the so-called Price-Anderson indemnity provisions of the Atomic Energy Act of 1954, as amended, for an additional 10 years, from August 1, 1967, to August 1, 1977. During the hearings which preceded enactment of this legislation a number of problem areas were identified relating to the means by which persons suffering damage from a nuclear incident might obtain rapid and adequate financial compensation.

There was concern expressed, for example, over the fact that there was no assurance that all State courts would impose a rule of strict liability in the event of a nuclear incident. Because of his inability to prove negligence the victim in such a case might, therefore, go without compensation

3203

## LEGISLATIVE HISTORY

for his injury or damage. Similarly, because of varying State law respecting the time within which such an action may be brought, and particularly because this limitation period in many States is considered inadequate for delayed manifestation of radiation injuries, there was concern that victims in different jurisdictions might be subjected to unequal and possibly unfair treatment.

The Atomic Energy Commission, in its study to determine whether the Price-Anderson Indemnity Act should be extended beyond August 1, 1967, concluded that additional study should be given to the possibility of further amending the act to establish the basis of liability thereunder, and to enacting a uniform statute of limitations for claims covered by the Price-Anderson Act. The Commission indicated during the 1965 hearings that such additional study would be undertaken. Others who testified at that time identified several related problems, and at least one witness strongly recommended that the necessary amendments to the act be enacted forthwith. The related issues which were identified included (1) the difficulty that could be expected if a large number of suits arising out of a serious nuclear incident were filed in different jurisdictions, (2) the problem of apportioning insurance and indemnity funds, and (3) the lack of coordinated procedures for the processing of claims for emergency relief.

Because of the complexities, uncertainties and matters of judgment involved in these matters, the Joint Committee concluded that further study should be given to these problems. However, rather than delay action on the extension, the committee decided to recommend the 10-year extension without taking formal action on these related matters. Nevertheless, the committee made it clear in its report on the extension legislation that the committee would return to the subject at the first opportunity. The report stated:

> This committee has always been vitally concerned with protecting the health and safety of the public and employees from the potential hazards which accompany the beneficial applications of nuclear energy. The committee is equally determined that the promise to the public, contained in the Price-Anderson Act, will not prove to be an illusory one. It is the clear intent of this legislation that if a member of the public ever is injured by a nuclear incident, he will not be subjected to a series of substantive and procedural hurdles which would prevent the speedy satisfaction of a legitimate claim.
>
> With that objective in mind, the committee plans to continue to inquire into possible means of further assuring that the public will receive prompt and adequate financial compensation for any damage resulting from potential nuclear hazards. Among other things, the committee expects to conduct one or more hearings on this subject as early as practicable. Such hearings may well indicate the need for further legislative action by Congress.[1]

Subsequently, on November 26, 1965, in anticipation of further inquiry into these matters by the committee during the forthcoming session of Congress, the executive director of the Committee wrote to the Commission specifically soliciting the Commission's views on the problem areas identified during the earlier hearings. There followed numerous meetings among

[1] See S.Rept.No. 650, 89th Cong., 1st sess., p. 13.

**3204**

## NUCLEAR OCCURRENCES

the Joint Committee and AEC staffs and representatives of private industry, including the utility, insurance and equipment manufacturing industries. The result of these efforts was H.R. 15913 and S. 3548, identical bills introduced on June 23, 1966, by Congressman Melvin Price and Senator Clinton P. Anderson.

Public hearings were held on these bills as summarized in the next section of this report. These hearings are published under the title "Proposed Amendments to Price-Anderson Act Relating to Waiver of Defenses."

The committee met in executive session on September 12, 1966, and voted without dissent to approve certain amendments to H.R. 15913 (S. 3548) which were incorporated in "clean bills" introduced on September 13, 1966, by Congressman Melvin Price as H.R. 17685, and on September 14, 1966, by Senator Clinton P. Anderson as S. 3830. The committee also approved the reporting of these bills without amendment and adopted this committee report.

### HEARINGS

Public hearings on H.R. 15913 and S. 3548 were held on July 19, 20, and 21, 1966, before the Joint Committee on Atomic Energy.

The following witnesses appeared on behalf of the U. S. Atomic Energy Commission:

James T. Ramey, Commissioner;
Gerald F. Tape, Commissioner;
R. E. Hollingsworth, General Manager;
Joseph F. Hennessey, General Counsel;
Bertram H. Schur, Associate General Counsel; and
Myron B. Kratzer, Director, Division of International Affairs.

Witnesses presenting the views of industry and the public are listed below in the order of their appearance:

Edison Electric Institute, J. Harris Ward, chairman, Commonwealth Edison Co., Jack Kearney, member of the staff of Edison Electric Institute, and Arthur Gehr, attorney for Commonwealth Edison Co.
United Nuclear Corp., Walter A. Hamilton, vice president.
General Public Utilities Corp., James B. Liberman, general counsel.
Arthur W. Murphy, professor, Columbia University School of Law.
New York State Thruway Authority, John P. MacArthur, special counsel.
Robert Lowenstein, attorney, Washington, D. C.
Nuclear Energy Liability Insurance Association, DeRoy C. Thomas, E. A. Cowie, Roger Fisher, and Lester Senger.
Mutual Atomic Energy Liability Underwriters, Wallace M. Smith and James H. Merritt.
National Coal Policy Conference, Inc., Joseph E. Moody, president.
National Coal Association, Brice O'Brien, general counsel.
Samuel Edlow, Robert F. Pitcher, John J. Bell, Alvin Shapiro, and Bernard Bechhoefer, Edlow & Isbrandtsen Associates, American Merchant Marine Institute, and Nuclear Fuel Services, Inc.
Mutual Atomic Energy Liability Underwriters, James H. Merritt.
Nuclear Energy Liability Insurance Association, Roger Fisher, Lester Senger, and Francis X. Boylan.
Nuclear Property Insurance Association, H. Sumner Stanley accompanied by H. S. Hirst, Mutual Atomic Energy Reinsurance Pool.

3205

# LEGISLATIVE HISTORY

## COMMITTEE COMMENTS

### A. Background

The Price-Anderson Act was enacted in 1957 for a twofold purpose:

First, to protect the public by assuring the availability of funds for the payment of claims arising from a catastrophic nuclear incident.

Second, to remove a deterrent to private industrial participation in the atomic energy program which flowed from the threat of tremendous potential liability claims. It was considered that enlarged private participation in this program would speed the further development of peaceful uses of atomic energy.

It is generally recognized that the possibility of a catastrophic nuclear incident is extremely remote because of, among other things, the safety requirements imposed by the AEC upon persons engaged in the atomic energy business. Nevertheless, an accident of uninsurable dimensions is conceivable.

The Price-Anderson Act accordingly affords protection to the public and to AEC licensees and contractors from the risks associated with atomic energy by providing for a program of private insurance and governmental indemnity amounting to a maximum of $560 million to cover damages that conceivably could arise from a nuclear incident.

The act further provides for a limitation of liability of all persons indemnified in the event of a catastrophic nuclear incident resulting in claims which exceed the total amount of private insurance and governmental indemnity, subject, of course, to future congressional action in light of the particular circumstances.

Since its enactment by Congress in 1957 one of the cardinal attributes of the Price-Anderson Act has been its minimal interference with State law. Under the Price-Anderson system, the claimant's right to recover from the fund established by the act is left to the tort law of the various States; the only interference with State law is a potential one, in that the limitation of liability feature of the act would come into play in the exceedingly remote contingency of a nuclear incident giving rise to damages in excess of the amount of financial responsibility required together with the amount of the governmental indemnity.

The policy decision to refrain from establishing the basis of liability under the statute was made in the knowledge that there are existing legal doctrines for imposing strict liability (i. e., liability of the defendant without the necessity of proving the defendant's "fault") and in the belief that, in view of the "omnibus" type coverage of the insurance policies and indemnity agreements provided for in the statute, courts would be constrained to ignore legal niceties and impose liability upon someone on one ground or another in the event of a nuclear incident. The belief that strict liability would be imposed in the event of a serious nuclear incident was, and is, shared by many, including distinguished legal scholars.

The various international conventions on third-party liability in the nuclear field which have been proposed for adoption since passage of the Price-Anderson Act have taken a different approach, however. The same may be said with respect to pertinent domestic legislation enacted by various foreign countries. These conventions and legislative enactments have

3206

## NUCLEAR OCCURRENCES

specifically provided for strict (or "absolute") liability for most nuclear incidents, and most of them provide for channeling of liability (i. e., exclusive liability on the part of the operator of the nuclear installation). Another basic characteristic of these regimes is the establishment of a period within which an injured person may initiate action to recover for his damage.

Within our own country, attempts to establish strict liability for nuclear incidents by State statute have met with failure. To date not one State has adopted the "Model Nuclear Facilities Liability Act," which was promulgated in 1961 by the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association. The model act provides for strict liability, channeling of liability, and a gross period of 10 years in which to sue.

Over the years increasing criticism has been directed at the Price-Anderson Act for its failure to establish strict liability as the basis of liability for suits covered by the Act. While commentators generally agree that strict liability would be imposed by most courts in the event of a large-scale nuclear incident, there are some jurisdictions which purport to reject the doctrine of strict liability. In these jurisdictions a claimant might be required to establish negligence in order to recover for his damage, a burden which might prove insurmountable where much of the relevant evidence has been destroyed in the nuclear incident.

Moreover, and perhaps more importantly, in a sizable number of States the law relative to strict liability is unsettled. Part of the reason for the uncertain state of the law concerning liability for nuclear incidents is the remarkable safety record of the nuclear industry which, happily, has spared the courts from acting in this area. It is feared by some legal experts, therefore, that the victims of a nuclear incident might have to engage in protracted litigation in these jurisdictions in order to benefit from the protection that the Price-Anderson Act was designed to afford them.

Finally, in the case of nuclear facilities and devices operated or used by Federal agencies, it has been observed that a victim of a nuclear incident might be denied protection entirely because of the "discretionary function" exception to the Federal Tort Claims Act.

As a consequence of the foregoing, there have been suggestions that a Federal statute should be enacted imposing strict liability for nuclear incidents covered by the Price-Anderson Act. Advocates of this proposal believe it would eliminate existing uncertainties and reduce the likelihood of unequal treatment of victims. They argue, additionally, that the appropriateness of a rule of strict liability is clear because, while the probability that a nuclear incident will ever occur is low, there is a possibility that great harm could result if the unexpected ever took place.

Opponents of such a Federal statute argue that it is unnecessary and inappropriate for the Federal Government to legislate in areas which the States are equipped to handle, particularly regarding those matters which have been within their traditional jurisdiction. This seems especially so, they contend, where nothing has so far indicated that the substantive rules of existing American law will not provide adequate protection if a nuclear incident should occur.

It has also been suggested by some that the adoption of statutory strict liability could inhibit the development and use of atomic energy for peaceful

3207

## LEGISLATIVE HISTORY

purposes. Such action, it is alleged, would single out the nuclear industry as one for which extraordinary rules of liability must be devised; it would stimulate public apprehension of the potential dangers of atomic activities; and it would subject the industry to a series of harassing and unfounded claims.

Many of these same arguments have been advanced for and against the establishment of a Federal statute of limitations for injuries and damages arising from a nuclear incident. Students of the subject agree that there is a problem: there is not only a wide variation among the States in the time allowed for asserting claims, but also a lack of recognition in many State statutes that the results of exposure to radiation may not become evident within the timespan normally allotted for more conventional injuries. The basic question, again, is whether reform should be accomplished by State or Federal law.

As previously indicated, other potential problems under the Price-Anderson Act have been pointed out. One of these relates to emergency assistance payments which the insurers and the AEC might make in the event of a nuclear incident. A question might be raised in this connection whether the AEC could make such payments in the absence of a final settlement with and release by the person to whom the payment is made. Without this explicit authority the Commission might not be able to make emergency assistance available to deserving victims of a nuclear incident who were unable or unwilling to enter into final settlements of their claims shortly after the incident.

The lack of provision in the act for possible consolidation in one Federal court of all suits arising out of a serious nuclear incident has also been cited as a shortcoming of the present regime. A large-scale nuclear incident might well injure persons in more than one State. The tort and procedural laws of the several States, however, vary in many respects. Thus one victim of a nuclear incident might be subject to different substantive and procedural laws than would apply to another victim simply by reason of an invisible State boundary line that separates them.

Moreover, in the extremely unlikely event of a nuclear disaster involving damages approaching or exceeding the limit of liability established by the act, knowledge by one court of what other affected courts were doing would be essential in the orderly distribution of Price-Anderson funds; however, in attempting to coordinate the handling of these matters by different courts it could be expected that efficiency would be impaired and possibly justice delayed. A related problem which arises in this connection is that of apportioning insurance and indemnity moneys in such a way as to reserve sufficient funds for victims whose injuries may not become manifest until long after the nuclear incident. In the event of a nuclear catastrophe involving damages approaching or exceeding the limit of liability, the extent of property damage should be fairly readily apparent; the determination of the amount of bodily injury inflicted presents a much more difficult problem, however, because the existence or the extent of possible latent injuries could not be determined with precision. Therefore, in such a case some provision would have to be made for setting aside a "delayed injury" fund from among the total funds available for distribution.

3208

## NUCLEAR OCCURRENCES

**B. Waiver of defenses: A preferable alternative to enactment of a new body of Federal tort law**

The question whether courts should apply legal principles akin to those of strict liability in the event of a serious nuclear incident seems to the committee to be free from dispute. The existing Price-Anderson system rests on the assumption that such principles will be so applied. All who have testified before the Joint Committee during the past 2 years have agreed that such principles should apply in such a case. Many have agreed also that some Federal legislative action should be taken to assure this result, because of existing legal uncertainties.

A similar consensus prevails concerning the need for improvement in State statutes of limitations as they relate to radiation injuries. One witness after another coming before the committee has acknowledged the inadequacy of the laws of many States in this respect.

If these uncertainties are to be removed and these deficiencies corrected, and if greater uniformity in the treatment of claimants is to be assured—as the committee is convinced they should be—then it appears to the committee that Federal legislative action is required. However, the committee does not believe it is necessary to go to the length of enacting substantive law—that is, a new body of Federal tort law—to achieve these ends. Essentially the same result, it is believed, can be accomplished through a Federal statute authorizing the Atomic Energy Commission to require that participants in the nuclear industry waive certain key defenses to liability that might otherwise be permissible under applicable State or Federal law.

The issues and defenses that would be waived are more fully described below in the section-by-section analysis. Suffice it to say at this point that, generally speaking, it is intended that the effect of these waivers will be to require a victim of an extraordinary nuclear occurrence, as that term is defined in the bill, to prove only that he or his property was damaged and that such damage was caused by the nuclear incident. Such waivers would be incorporated in AEC's indemnity agreements and in insurance policies and contracts which are required by the AEC to be furnished as proof of financial protection, and under mandate of Federal statute would be judicially enforceable in accordance with their terms.

This approach to the problems discussed above is in keeping with the approach followed in enacting the original Price-Anderson Act—namely, interfering with State law to the minimum extent necessary. In essence, the plan adopted permits the retention of State law with respect to the cause of action and the measure of damages, but the requirements specified for the insurance contracts and indemnity agreements provide the uniform rules needed to accomplish the bill's objectives. This approach, moreover, cements the new system firmly to the Price-Anderson Act without extending the new concepts to activities not covered by that act. The objective of the committee in drafting this bill has been to perfect the Price-Anderson law; this is not a measure designed either to accomplish a general revision of American tort law or to set precedents for activities in other fields.

An important advantage gained from following the approach of this bill—rather than attempting to enact a Federal statute prescribing strict liability for some or all nuclear incidents—is the avoidance of the severe difficulties that would be encountered in securing agreement on such a statute. Even assuming that a consensus could be obtained in favor of passage of such a



3209

# LEGISLATIVE HISTORY

statute in principle, many complex problems would remain. Although attempts have been made in this direction, there has been no agreement reached in this country as to what would be an acceptable version of a strict liability statute applicable to nuclear incidents. Some of the principles of strict liability are not entirely well defined, and many aspects of this problem are subject to dispute among courts and legal scholars. Furthermore, enactment of a Federal tort would require consideration of such matters as proof of damages and causation, and the possibility of continued validity of some portion of State law. This bill, on the other hand, seeks to isolate and deal effectively with certain problem areas in existing State and Federal law, leaving undisturbed the remaining body of the law.

Most important of all, perhaps, the means of accomplishing the desired objective reflected in this bill has the support of industry, including the insurance segment of the nuclear industry. The vast majority of witnesses testifying before the committee strongly favored this approach in lieu of enactment of a new Federal tort. The lone witness who said he would prefer to see Congress enact a Federal law of liability nevertheless agreed that if that alternative were not feasible a system of waivers would be a workable and acceptable solution to the problem. All who testified recognized that there are differing points of view—some of them very strongly held—within industry and the legal profession on the question of enactment of a Federal strict liability statute applicable to nuclear incidents. The unique system of waivers contemplated by this bill avoids these differences of opinion surrounding such a statute; at the same time it accomplishes essentially the same result.

The path charted by this bill not only substantially improves the protection of the public but gives strong indication of continuing and strengthening the partnership between Government and private industry that has characterized the Price-Anderson insurance and indemnity system throughout its 9 years of operation. The rather unique system which the Price-Anderson Act represents has been made possible by an exceptionally high degree of Government-industry cooperation and accommodation. This spirit of cooperation must continue to prevail if the act is to remain a meaningful amalgam of public and private responsibility. The committee therefore believes that the approach set out by this bill is to be preferred over equally efficacious but perhaps more divisive means to achieve the same goal. The committee also wishes to note specifically the highly constructive role played by representatives of the nuclear industry, including the nuclear insurance industry, in developing this proposed legislation. In the committee's view, this type of Government-industry cooperation should serve as a model for action in other areas of mutual concern.

## C. The concept of "extraordinary nuclear occurrence"

One of the Price-Anderson Act's two principal purposes is to protect the public by assuring the availability of funds for the payment of claims arising from a catastrophic nuclear incident. Hence, the necessity for the Price-Anderson Act has always been related to the remote possibility of a catastrophic, or at least serious, nuclear incident. "Catastrophe" protection is provided by a governmental indemnity of up to $500 million beyond the amount of private financial protection which the act requires be furnished by licensed nuclear facility operators.

3210

## NUCLEAR OCCURRENCES

Although the Price-Anderson governmental indemnity system was designed to become operative only in situations where any private financial protection required has first been exhausted, the beneficial aspects of the bill recommended by the committee are not so limited.  For example, a nuclear incident need not reach catastrophic proportions, or involve Government funds, before the waivers of defenses contemplated by this bill would apply.  Indeed, an incident involving only a very small fraction of the amount of private insurance available could well fall within the system of waivers.  At the same time, however, the bill has been drafted so that minor claims involving nuclear facilities or materials may remain subject to the traditional rules of tort law.  This has been accomplished by confining the applicability of the waivers to "extraordinary nuclear occurrences."

The inclusion of the "extraordinary nuclear occurrence" concept in the bill stems in major part from the desire of industry to preserve its customary legal defenses in situations where nothing untoward or unusual has occurred in the conduct of nuclear activities.  Expressions of concern over the possibility that waivers applicable to any "nuclear incident" would expose nuclear operators to a large number of nuisance suits were voiced by various segments of the industry.  The view seems widely held by industry representatives that they should be able to assert defenses permitted by State law in circumstances where the plaintiff's claim may be spurious.  It has also been argued that relatively minor claims lodged against nuclear facility operators do not represent the major public hazard against which the Price-Anderson Act was designed to provide protection.  Hence, it is urged that the application of the waivers should be limited to serious incidents.

The committee recognizes that inclusion of the "extraordinary nuclear occurrence" concept in this bill adds very considerably to the complexity of implementing the proposed legislation.  The committee has also considered very carefully the arguments in favor of eliminating this concept.  Nevertheless the committee is of the opinion, on balance, that there is no pressing need to invoke the mechanisms and procedures of the special waivers in situations which are not exceptional and which can well be taken care of by the traditional system of tort law.  Accordingly, in the absence of some extraordinary occurrence involving a nuclear facility or device or nuclear materials, traditional concepts should be allowed to prevail.  For this reason, and for the additional purpose of helping to assure that the waiver system will not be invoked in case of nuisance suits, the committee believes that a reasonable threshold should be satisfied before the special waiver provisions of the bill become operative.  In reaching this determination, the committee is also mindful that the special waivers authorized by this bill would deprive a defendant of certain defenses which might well be available to him even in a jurisdiction which would apply the doctrine of strict liability to a minor nuclear incident.

This threshold is identified by the term "extraordinary nuclear occurrence."  After considerable study, it was determined advisable to vest the Commission with authority to determine whether an "extraordinary nuclear occurrence" has taken place, rather than to define such an occurrence in the bill.  This decision rested in large measure on the difficulty of fixing a definition which would be suitable for a wide variety of circumstances, and the need for application of informed judgment to the facts of a particular case.  The possibility of litigation over the application of a statutory defini-

3211

## LEGISLATIVE HISTORY

tion to a specific case was also considered, which could frustrate the purposes of the proposed legislation. A more detailed discussion of the basis for determination by the Commission whether an "extraordinary nuclear occurrence" has taken place is found in the section-by-section analysis portion of this report.

The Commission is accorded wide latitude under the bill to determine whether or not such an "extraordinary nuclear occurrence" has taken place. The discretion conferred on the AEC is such that an event involving relatively small amounts of demonstrable damage could be held to be an "extraordinary nuclear occurrence." Once such a determination has been made the waivers would be fully applicable. Absent such a determination, a claimant would have exactly the same rights that he has today under existing law—including, perhaps, benefit of a rule of strict liability if applicable State law so provides. Thus, this bill in no way provides for deprivation of a claimant's existing rights.

The bill requires that the Commission establish criteria in writing setting forth the basis upon which such determination would be made in a particular case. The adoption and amendment of these criteria would be subject to rulemaking procedures, thus assuring that the public, various segments of the nuclear industry, and other interested persons will be afforded the opportunity to comment upon any proposed criteria prior to their final issuance. It is intended, however, that the Commission's determination as to whether an extraordinary nuclear occurrence has or has not taken place shall be deemed adjudication within the meaning of the Administrative Procedure Act; and that such cases of adjudication need not be determined on the record after opportunity for an agency hearing.

Because of the emergency nature of the system and the need for prompt action, the committee believes that the Commission's determination as to whether an "extraordinary nuclear occurrence" has or has not taken place should not be subject to judicial review. Aside from the fact that the Commission, from the standpoint of expertise, is in the best position to make the various findings necessary for any such determination, provision for normal judicial review of the Commission's determination would permit of the delays which inevitably flow from the appellate process. Such delays might subvert the whole purpose of the special system.

### D. Emergency assistance payments

One of the most beneficial aspects of the bill recommended by the committee may well be the provision for rendition of emergency assistance payments by the insurers and the AEC to victims of a nuclear incident. The private insurance companies are, of course, presently free to make emergency assistance payments without requiring final settlements or releases, and the committee understands that this practice is frequently followed with respect to other types of insurance coverage.

The extent of the Commission's present authority to make emergency assistance payments is not clear. This bill would remove this uncertainty. The bill would confer upon the Commission the authority to make financial assistance available to claimants immediately following a nuclear incident without requiring claimants to sign a release or otherwise compromise their claims. Under this authority payments for such immediate necessities as food and shelter, medical and hospital expenses, and the like could be made

3212

## NUCLEAR OCCURRENCES

to claimants on an emergency basis during the interim period before final settlements of claims are made. All that will be required of the claimant is an appropriate receipt signifying delivery of the partial payment, such payment to be credited against any final settlement or judgment. This authority, together with the Commission's authority to establish coordinated procedures with the private insurance pools for the prompt handling, investigation, and settlement of such claims, should help to ease the immediate problems arising from a serious nuclear incident.

The emergency assistance contemplated by the bill may be rendered by the insurers and the Commission in the event of any nuclear incident, whether or not the incident has been determined to be an "extraordinary nuclear occurrence." However, as noted below, the Commission could not make emergency assistance payments unless it appears to the Commission that any underlying financial protection required was likely to be exhausted. Moreover, the bill imposes no limit on the amount of money which could be paid to any individual victim of the incident; the committee believes it unwise to set a statutory ceiling on the amounts which the Commission could pay to victims, because the amount of damages would not be the same for all claimants. Flexibility is the keynote to this section of the bill and should not be discarded in the one area perhaps most difficult to predict with precision; namely, the extent of the assistance required by individual victims of the incident.

It should be noted in this connection, however, that the bill does establish an overall limit on the total amount of funds that can be dispersed without prior court approval where it appears that the damages arising from a nuclear incident may exceed the aggregate liability of the persons indemnified. In such case no more than 15 percent of the total funds available (i .e., 15 percent of $560 million in the case of large nuclear power reactors) could be distributed without the prior approval of the plan of distribution by the U. S. district court having jurisdiction. This measure would, of course, come into play only in the highly remote contingency of a nuclear catastrophe, and would prevent any unfairness in the distribution of funds in such a case. The method under which moneys in excess of the 15-percent limitation would be distributed is more fully described below in the section entitled "Allocation of Insurance and Indemnity Funds."

As noted above, emergency assistance payments may be made whether or not the nuclear incident has been determined by the Commission to be an "extraordinary nuclear occurrence." Of course, until such determination is made the special waiver-of-defenses system established by other provisions of the bill will not have been invoked. Nevertheless, pending a determination of whether or not the incident is "extraordinary," the insurers and the Commission would be expected by the committee to make emergency assistance payments in the spirit of the statute. It is anticipated that payments could be made on the basis of submittal by a claimant of an approved claim form alleging that the cause of his personal injury or property damage was the nuclear incident. If it appears from the nature of the injury or damage and from other relevant factors that the nuclear incident could reasonably have been the cause thereof, emergency relief could be given. To this extent a showing of probable causal relationship between the incident and the injury would be required, but no greater burden than this need be im-

## LEGISLATIVE HISTORY

posed on the claimant. Of course, care would be exercised to try to assure that interim payments will not be made for unfounded claims.

If a nuclear incident were to occur at a facility covered by underlying financial protection and the amount of financial protection were not likely to be exhausted by the resulting claims, the insurance pools would have the primary responsibility of handling emergency relief and making settlement of claims. Under the Price-Anderson Act, Government funds are to be expended only where there is no underlying financial protection or where that which was required is likely to be exhausted. The Commission and the insurance pools have, accordingly, established settlement and adjustment procedures for each of three possible contingencies: (1) where claims would be paid only by insurance, (2) where claims would be paid from both insurance and Price-Anderson funds, and (3) where payment would be entirely from Government funds. These existing arrangements would be revised to provide for the new settlement procedures and interim payments authorized by this bill.

Emergency financial assistance to victims of a nuclear incident immediately upon the happening thereof, without necessarily obtaining a release from the victim, should prove helpful in solving problems related to delayed manifestations of radiation injury. As noted above in the discussion concerning the need for an extended limitation period for injuries arising from radiation, the full extent of a radiation-caused injury may not become evident until long after the causal event. Yet, under the usual legal rules of merger and *res judicata*, a victim who brings suit and recovers for his immediate damages prior to manifestation of delayed injuries may find that no further damages are recoverable in a subsequent suit.

The interim payments procedures called for in this bill offer desirable flexibility for the insurance pools and the Commission to make funds available where there is demonstrable personal injury or property damage within a reasonably short time after an occurrence. Thus claimants would receive immediate relief even though the full extent of their injuries could not be immediately determined so as to permit a final settlement. Since no release would be required, further payments could be made for injuries of delayed emergence occurring within the limitations period, which period in the case of an extraordinary nuclear occurrence could be expanded to a maximum of 10 years by the waiver provisions of the bill. To this extent, therefore, this bill avoids the problem under existing law caused by the inability of claimants to split their causes of action.

It is reasonable to believe that the foregoing procedures, when coupled with the Commission's authority to enter into final settlements of claims, should result in the administrative processing of most claims arising from a nuclear incident. This, of course, would be all to the good for, in addition to saving claimants the time and expense of initiating litigation, the administrative processing of most claims would lessen the burdens that could otherwise fall upon the courts.

### E.   Consolidation of suits in a single Federal court

The motive that has impelled many of the bill's provisions discussed above—namely, the desire for more equitable and uniform treatment of victims of a nuclear incident—has also led the committee to include in the bill a provision authorizing the possible consolidation in one U.S.

3214

## NUCLEAR OCCURRENCES

district court of all law suits arising from an "extraordinary nuclear occurrence."

The bill confers upon the Federal district court in the district where the occurrence takes place original jurisdiction with respect to any public liability action arising out of or resulting from any such occurrence, without regard to the citizenship of any party or the amount in controversy. (Similar jurisdiction is reposed in the Federal district court for the District of Columbia in the case of an extraordinary nuclear occurrence taking place outside of the United States.) Additionally, and most importantly, the bill makes provision for the possible removal to such district court of any action pending in any State or other Federal district court upon motion of the Commission or defendant. This latter measure stems from the committee's recognition of the need to assure means of coordinated handling of all phases of litigation that could result from a large nuclear incident notwithstanding concerted settlement efforts.

While the committee believes that relatively few claims arising from such an incident would actually require litigation, a claimant who does feel constrained to take his claim to court should not be subjected to procedural requirements different from those which some other claimant might face. This bill would authorize all such claimants to sue in the same Federal district court, generally under the same rules of procedure. The bill, moreover, makes it possible, although it does not require, that all suits stemming from the extraordinary nuclear occurrence be litigated in one court—the United States district court located in the district where the extraordinary nuclear occurrence takes place. If the circumstances of the occurrence and the damage actions did not appear to the Commission or to the defendant to necessitate removal to this single Federal court, an action started in a State court or other Federal court could of course proceed to judgment in that court.

The absolute right of removal is important because it provides a mechanism for bringing before the same court all cases arising from the same set of circumstances—circumstances with which the court would become thoroughly familiar. Claimants and defendants would become acquainted with the approach taken by the court, the taking of depositions and other evidentiary problems would be simplified, and this would seem to be a deterrent to an excess number of cases actually going to trial. The end result, it is believed, would be more expeditious and uniform treatment of all parties. With no issue of the defendant's fault to litigate, the one court could direct itself to causal relationships and damages and would be in a position of continuing familiarity with all the facts necessary in passing on plans relative to distribution of funds and orders submitted for court approval. In the event that there is a relatively large volume of cases to be litigated, additional Federal judges could be assigned to assist the judges normally presiding in the district.

The constitutional authority of Congress to confer such original jurisdiction upon the Federal courts and to provide for the possible removal of State court and other Federal court actions to a designated Federal court seems clear. The committee is convinced, as is the executive branch,[2] that the conferral of these authorities upon the Federal judiciary

[2] See "Proposed Amendments to Price-Anderson Act Relating to Waiver of Defenses," hearings before the Joint Committee on Atomic Energy, July 19, 20, and 21, 1965, p. 37.

## LEGISLATIVE HISTORY

is within the ambit of Congress, constitutional powers. Paramount among the constitutional powers which may be relied upon in connection with Federal legislation on the matter of an "extraordinary nuclear occurrence" is the power to regulate commerce with foreign nations and among the several States. The relation to interstate commerce of a nuclear event of such magnitude is manifest. Not only would the materials involved in such an occurence in all likelihood have crossed State lines in moving to the nuclear facility, but the radiation and radioactive particles released by the event might well cross State boundaries in their flight. The disruptive effect which such an occurrence could have upon interstate commerce hardly needs elucidation. These considerations fairly compel the conclusion that an "extraordinary nuclear occurrence," as defined in the bill, is inexorably related to interstate commerce and subject to Congress' constitutional authority to regulate, control, foster, and protect the same.

### F.  Allocation of insurance and indemnity funds in case of catastrophe

During the committee's 1965 hearings concerning the Price-Anderson Act questions were raised relative to the desirability, in the administration of the insurance and indemnity fund made available by the act, of making appropriate allocations between personal injury and property damage as well for possible personal injuries of delayed manifestation. Concern was expressed in this connection that absent such a system of allocation a catastrophic nuclear incident involving damages approaching or in excess of the act's limit of liability might result in disproportionate sharing of the available funds and, possibly, exhaustion of the total fund prior to emergence of possible latent injuries in some victims.

In the year that has ensued since the 1965 hearings additional study has been given to these problems. It is evident that any plan of distribution must be responsive to the needs of the particular situation, and that therefore a specific legislative plan in advance of a large-scale nuclear incident is not feasible. The best solution to the problem, it appears, is to repose considerable discretion in the judiciary, with appropriate modification of the act to assure that funds disbursed in the event of a serious nuclear incident are distributed only in accordance with a court-approved plan of distribution.

To this end the bill recommended by the committee would amend the Price-Anderson Act to add authority to that which the act (subsection 170 e) presently vests in the Federal judiciary to oversee the distribution of funds in cases where public liability is likely to exceed the limit of liability. Specifically, the bill provides that whenever the U.S. district court in the district where a nuclear incident occurs determines that such limit of liability is likely to be exceeded, total payments from the Price-Anderson insurance-indemnity fund shall not exceed 15 percent of the limit of liability without prior approval of the court. This limitation, it must be emphasized, applies only in the highly improbable event that the aggregate liability of the persons indemnified is likely to be exceeded. Further, it is provided that the court shall not authorize payments in excess of the 15 percent ceiling unless the court determines that such payments are or will be in accordance with a plan of distribution which has been approved by the court, or such payments are not likely to prejudice

3216

## NUCLEAR OCCURRENCES

the subsequent adoption and implementation by the court of such a plan.

These provisions leave the Commission and the insurance pools free to distribute ample funds (up to a maximum of $84 million) in the form of emergency assistance and settlements while assuring that the bulk of the fund will be disbursed only after the court has passed judgment upon the feasibility of the plan of distribution of the remaining funds. In this connection it should be noted that the bill affords any interested person the opportunity to submit a proposed distribution plan to the court for its consideration, but specifically directs the Atomic Energy Commission to submit such a plan. The plan submitted to the court must include an allocation of appropriate amounts for personal injury claims, property damage claims, and possible latent injury claims which may not be discovered until a later time. Additional authorities to implement fully the foregoing provisions are conferred on the court by this bill.

The likelihood that the need to use these provisions will ever arise is exceedingly remote. Nevertheless, so long as even the theoretical possibility exists that such a need may arise, Congress should act accordingly. Whatever precautionary steps can reasonably be taken in advance to guard against and provide for the unexpected should be taken. It is with this purpose in mind that the foregoing revisions in the law are recommended. On the other hand, the committee is of the view with respect to this and other theoretical problems that could arise under the Price-Anderson legislation that there is no need to attempt to anticipate all such problems, or to develop unduly detailed arrangements which will probably never be called into play.

Not foreclosed, of course, are the actions which could be taken after the actual occurrence of a disastrous nuclear incident. Should the highly unlikely nevertheless come to pass, further congressional review of the situation would undoubtedly be undertaken with the view to possible action by Congress in the light of the particular incident. One obvious possibility, of course, would be for Congress to increase the limit of the Commission's responsibility under its indemnity agreements. This possibility was specifically recognized in the Joint Committee's report on the original Price-Anderson bills,[3] and in the committee's report last year recommending a 10-year extension of this legislation.[4] Another and perhaps complementary possibility, one that might be followed in the event that a flood of court cases arose from a nuclear incident in a Federal district court which found itself unable to dispose of them without delay, would be for Congress to provide within a reasonable time after the incident for disposition of the claims on an administrative basis. As noted above, the committee does not believe it necessary at this time to attempt to resolve all the problems which such contingencies might present.

[3] The committee's report (S.Rept. 296, 85th Cong., 1st sess., pp. 21 and 22), stated: "* * * the limit of the Commission's responsibility under these [indemnity] agreements is to be $500 million. This limit could be subject to upward revision by the Congress in the event of any one particular incident in which, after further congressional study, the Congress felt more appropriations would be in order.

"Subsection e limits the liability of the persons indemnified for each nuclear incident to $500 million together with the amount of financial protection required. Of course, Congress can change this act at any time after any particular incident. The Joint Committee wanted to be sure that any such changes in the act would be considered by it in the light of the particular incident."

[4] See S.Rept. 650, 89th Cong., 1st sess., pp. 6-7.

3217

## LEGISLATIVE HISTORY

### G. Other important policy considerations

Discussed below are some of the other important policy considerations which shaped the bill recommended by the committee.

1. Improvement of position of transportation industries.—About 1959 the conventional fire and property insurance carriers adopted a nuclear exclusion clause, as follows, which was inserted in existing policies:

> This policy does not insure against loss by nuclear reaction, or nuclear radiation, or radioactive contamination, all whether controlled, or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) insured against in this policy; however, subject to the foregoing and all provisions of this policy, direct loss by fire resulting from nuclear reaction, or nuclear radiation, or radioactive contamination is insured against by this policy.

The above exclusion of first-party property damage and loss of revenue coverage against the radioactive materials hazard was adopted by the insurance industry because of the formation of insurance pools (NELIA/MAELU and NEPIA/MAERP) which issued policies insuring against third-party liability and property damage arising out of nuclear risks. However, the nuclear exclusion in the conventional first-party property insurance policies applies without regard to whether or not the nuclear incident falls within the scope of the Price-Anderson indemnity system, which applies to nuclear reactors and certain other atomic energy operations.

The existence of this nuclear exclusion has been a continuing source of concern to bridge, tunnel, port, and toll road authorities. Among other problems, they believe they have had no way of assuring themselves that a nuclear shipment about to be conveyed over or through their facilities is in fact covered by nuclear liability insurance and Price-Anderson indemnity protection. Certain railroads engaged in the transportation of nuclear materials have voiced similar concern. To alleviate this problem the Commission has offered to issue a certification in appropriate form at the time of delivery to the carrier of radioactive material covered by Price-Anderson, which would certify that the specific materials, during specified transportation, are covered by a specified indemnity agreement.

More troublesome, perhaps, to the bridge, tunnel and like authorities has been the fact that they could not recover against NELIA/MAELU or the Commission for damage to the authority's own property without establishing liability on the part of a specific defendant or defendants. The authorities have feared that inability to prove negligence might result in their going uncompensated for destruction of, or damage to, their facilities and for sizable losses of revenues. As a result, many of the authorities have excluded from their facilities carriers of materials of the type subject to the nuclear exclusion clause. In order to eliminate this uncertainty one authority has recommended an amendment to the Price-Anderson Act which would establish a rule of absolute liability, and the authorities generally have suggested that the nuclear liability insurance policies and Price-Anderson indemnity agreements should discard the requirement of "legal liability."

This bill should assist substantially in meeting the objections of the bridge, tunnel, and like authorities to the scope of the Price-Anderson

Supplemental Appendix Page No. 1918

## NUCLEAR OCCURRENCES

Act. Accordingly, it should help to remove any current obstacles to transportation of atomic energy materials over the facilities of these authorities.

The system of waivers provided for by the bill would eliminate any issue of negligence in case of an event determined by the Commission to be an "extraordinary nuclear occurrence." The Commission has testified that an event resulting in damages in excess of $5 million would in all probability be determined to be an "extraordinary nuclear occurrence," while an event resulting in damages less than that could be so held (in accordance with published criteria) depending on the surrounding circumstances. In this connection the committee urges the Commission to be particularly mindful of the special problems associated with transportation of radioactive materials.

The committee also commends the continuing efforts of the bridge, tunnel, and like authorities, and the insurance industry, to resolve the remaining problems in this area.

2. Flexibility afforded the Commission in establishing conditions of waivers.—A fundamental characteristic of this bill is that it authorizes, rather than requires, specific action on the part of the AEC. Hence the conditions of the waivers to be incorporated in insurance policies or contracts furnished as proof of financial protection, and in AEC's indemnity agreements, are of utmost importance. These are the provisions to which the courts will be expected to look to determine the rights of the parties in litigation.

The Commission is accorded flexibility in establishing the conditions of the waivers authorized by the bill. The establishment of these conditions, both with respect to the insurance policies or contracts furnished as proof of financial protection and the indemnity agreements, will be accomplished in accordance with rulemaking proceedings. It is the committee's considered opinion that the technical and legal complexities and matters of expert judgment involved lend themselves more readily to administrative rulemaking proceedings than to legislative resolution.

However, the Commission's discretion in this regard is not entirely unfettered. The outer boundaries of the Commission's authority are delineated by the proposed subsection 170 n. of the act to be added by this bill. Moreover, much of what the Commission may do within these limits has already been given specific direction by the Commission's testimony on the bill and the guidance contained in this committee report. Furthermore, where it remains for the Commission to make the important and difficult decisions with respect to the contents and applicability of waivers that are necessary in implementation of the bill, the decision-making will be subject to rulemaking proceedings. This assures that industry and the public will have full opportunity to comment upon the proposed waivers prior to their final adoption. Lastly, the Commission under its statutory obligation to keep the Joint Committee "fully and currently informed" will be expected, as is customary, to work closely with the committee in assuring that the legislative purpose is effectuated.

Apart from the formulation of the conditions of the waivers, one of the important issues to be faced by the Commission relates to their applicability. The Commission will have to decide, for example, whether such waivers are to be incorporated in indemnity agreements covering the

3219

## LEGISLATIVE HISTORY

N. S. *Savannah* and in certain other indemnity agreements covering nuclear incidents occurring abroad. The arguments for and against doing so will have to be given careful consideration by the Commission.

With respect to nuclear incidents occurring domestically, the bill has been drawn so that the Commission has been authorized to require, in both its indemnity agreements and in the insurance policies and contracts furnished as proof of financial protection, waivers by the person most likely to be named as the defendant, or one of the defendants, in a damage action—namely, the private licensee, Commission contractor, or Federal agency using, shipping, or receiving the nuclear facility, device, or material giving rise to the extraordinary nuclear occurrence. It is likely that the waivers of defenses by these nuclear operators will be so drawn by the Commission as to cover situations arising not only when the nuclear material involved in the incident is in their possession but also when the material is being transported to or from their installation. Additionally, the Commission has said it plans to require waivers by other persons (for example, carriers of nuclear materials) who, though not parties to an insurance policy or indemnity agreement, are "persons indemnified" under the act and may be held liable for the nuclear occurrence. It is anticipated that waivers from such persons would be required as a condition of receiving the benefit of the insurance policies and Price-Anderson indemnity agreements. Of course, the Commission and other "indemnitors," as defined in this bill, would also waive defenses.

3. **Period of statute of limitations.**—The bill provides that the Commission may incorporate provisions in indemnity agreements and require provisions to be incorporated in policies or contracts furnished as proof of financial protection which waive—

> any issue or defense based on any statute of limitations if suit is instituted within three years from the date on which the claimant first knew, or reasonably could have known, of his injury or damage and the cause thereof, but in no event more than ten years after the date of the nuclear incident.

The 10-year gross limitations period which this bill establishes is a more equitable time period for asserting radiation-caused personal injury claims than is afforded under the laws of many States. The 10-year period settled upon by the committee is consistent with the gross period provided for in the Vienna Convention on Civil Liability for Nuclear Damage (1963), the Brussels Convention on the Liability of Operators of Nuclear Ships (1962), the Paris Convention on Third-Party Liability in the Field of Nuclear Energy (1960), and the laws of several foreign countries. This period also coincides with that which was recommended by the National Conference of Commissioners on Uniform State Laws in 1961.

Some commentators, however, have argued that while medical evidence is far from conclusive, there is indication that some radiation injuries may not become evident from 10 to 30 years, and perhaps even up to 50 years, after the radiation exposure. It is to be noted in this connection that many European countries have established a more liberal 30-year cutoff on such claims.

Those who have studied the question agree that it is difficult to suggest a "magic number" which will strike an equitable balance between the need

3220

## NUCLEAR OCCURRENCES

to quiet stale claims and the need to assure victims a reasonable time in which to discover and assert their claims.

It seems clear that the problem of delayed manifestation of injury will require continued study. If further studies demonstrate the desirability of extending the period, and if necessary action to improve their limitations statutes is not forthcoming from the States, the Joint Committee may consider the possibility of extending the length of the period waived under this bill. In the meantime, the 10-year period provided for by this bill represents a significant improvement over the limitations periods provided by many of the States. It is noted that the States have made considerable progress in recent years in improving their statutes of limitations applicable to radiation injuries subject to workmen's compensation.

It should also be noted that the 10-year period is not a maximum period for assertion of Price-Anderson covered claims, since the waiver authorized by the bill serves only to avoid the application of more restrictive State statutes of limitations. Such waiver leaves undisturbed the laws of those States which have enacted—or in the future may enact—longer periods of limitation. Moreover, it is intended that the waivers of other defenses, as authorized by this bill, would continue during such longer period of limitation established by State statute.

4. **Limitation of special waivers to certain categories of activities.**—The bill provides that the special waivers of defenses shall apply only to extraordinary nuclear occurrences which arise out of certain categories of activities presently covered by the Price-Anderson indemnity system, including the operation of nuclear reactors. This limitation is designed to restrict the special waivers to those activities which have a potential already identified for causing an extraordinary nuclear occurrence. There seems to be no pressing reason at this time to extend the special waivers to other activities for which the Commission does not presently exercise its authority under the Price-Anderson Act to require proof of financial protection by licensees of the Commission.

The committee understands that the Commission may in the future require proof of financial protection with respect to categories of activities not covered by this bill. At such time the Commission and the committee may consider whether legislation to enlarge such categories would be desirable.

5. **Proof of biological damage in alleged radiation injury cases.**—The committee continues to recognize that the problem of processing radiation injury cases, including the determination of whether a particular biological damage has been caused by a particular exposure to radiation, remains a substantial one. Although this bill can eliminate some of the major legal obstacles that might confront a claimant in the event of a nuclear incident, the bill does not purport to cure the problems of proving causal relationships between radiation exposure arising from a nuclear incident—whether or not it is an "extraordinary nuclear occurrence"— and alleged radiation injury. In many cases, the proof of such relationship can be exceedingly difficult, if not impossible.

The committee supports continued study by the Commission, with other interested agencies of Government, of the effects of radiation upon man. The results of this effort should help to provide the basic scientific information needed to assist in establishing the validity of claims

3221

## LEGISLATIVE HISTORY

based upon alleged radiation injury. In this connection, the fiscal year 1967 authorization act for the AEC (Public Law 89–428), included the sum of $86 million for the Commission's biology and medicine program.

6. International nuclear liability conventions.—The United States has participated extensively in the development of international conventions dealing with third-party liability in the field of nuclear energy. At least one of these conventions, as supplemented—the Paris Convention —will likely come into force before long.

The committee recognizes that there are clear advantages, in principle, to the development of acceptable international conventions in this field. As stated in the committee's 1965 report on the 10-year extension of the Price-Anderson Act:

> There is little reason to doubt that the problems of third-party liability involving international and maritime nuclear energy transactions will become more pronounced with time, in the absence of effective international agreements covering these subjects.[5]

The committee's hearings this year provided evidence that the problems of ocean transportation of nuclear materials are indeed becoming more acute. Nevertheless, there remain a number of problems which prevent adherence by the United States to any of these conventions as a means of resolving any difficulties which have been identified.

It is the committee's belief that enactment of the legislation recommended in this report will assist in the resolution of some of the problems which have prevented the United States from adhering to any of the conventions. The committee further believes this general subject warrants continued close attention by the executive and legislative branches, and by the nuclear industry.

## CONCLUSION

The Price-Anderson Act is clearly recognized as one of the cornerstones of the nuclear industry. In the 9 years of its existence, this act has well served its principal purpose of protecting the public and removing the deterrent to private industrial participation in the atomic energy program.

Nevertheless, the committee believes the Price-Anderson Act should be amended to provide for the waiver of certain defenses to legal liability which might frustrate the purposes of this remedial legislation, and to resolve a number of uncertainties as to the administration of the current system.

It is the committee's view that the bill recommended herein is the most appropriate and effective means to accomplish the purposes discussed in this report. The committee further considers that this bill significantly improves the protection to the public which is afforded by the Price-Anderson legislation, without operating to the detriment of the nuclear industry.

Finally, it should be noted that considerable effort will be required to implement fully the provisions of this bill. It may be that this effort will demonstrate the need for additional legislation to further the pur-

[5] S.Rept.No. 650, 89th Cong., 1st sess., p. 14.

3222

## NUCLEAR OCCURRENCES

poses discussed herein.  The committee agrees with the testimony of one distinguished witness, who has been associated with the Price-Anderson indemnity legislation since its inception, that the amendments proposed in this bill are potentially the most far reaching since the act was passed in 1957.  The continued close cooperation of private industry, and the Government, which has characterized the history of the Price-Anderson Act, should assure that the full benefits of this legislation are made available to the public as soon as possible.

### SECTION-BY-SECTION ANALYSIS

Section 1(a) (1) redesignates certain subsections of section 11 of the Atomic Energy Act of 1954, as amended (hereinafter referred to as the "act") to permit insertion of new definitions in alphabetical order.

Section 1(a) (2) amends the act by adding new subsection "j." to section 11 of the act which defines the term "extraordinary nuclear occurrence" to mean—

> any event causing a discharge or dispersal of source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Commission determines to be substantial, and which the Commission determines has resulted or will probably result in substantial damages to persons offsite or property offsite.

The Commission is directed to establish criteria in writing setting forth the basis upon which the Commission shall determine whether or not an extraordinary nuclear occurrence has taken place in a particular case.  Subsection 11 j. also defines the term "offsite" to mean away from "the location" or "the contract location" as defined in the applicable Commission indemnity agreement entered into pursuant to section 170.

Various elements must be present before the definition is met.  There must have been an identifiable event causing (a) a discharge or dispersal of nuclear material from its intended place of confinement, that is, the last confining barrier between the material and the public, in substantial amounts offsite; or (b) substantial radiation levels offsite.

The Commmmission will determine what is "substantial" in a particular case in accordance with the criteria, referred to above, which have been developed in advance of the event.  It is anticipated that the criteria may establish a quantitative test or tests applicable to different types of situations.

In addition, the Commission must determine whether the event has resulted or will probably result in "substantial damages" to persons or property offsite.  The amount of damages likely to follow from a particular event will be an estimate.  The Commission will determine the substantiality of damages to persons or property offsite in a particular case in accordance with the criteria, referred to above, which have been developed in advance of the event.  A reasonable rule of thumb which it is expected the Commission would follow is that if damages are estimated to exceed $5 million they would be considered substantial.  The Commission could, however, determine that damages below this figure are substantial, taking into consideration all relevant factors.

In establishing criteria, the Commission shall provide an opportunity to the various segments of the nuclear industry and other interested per-

3223

## LEGISLATIVE HISTORY

sons to comment, in accordance with its usual public rulemaking procedures, on criteria which the Commission would propose, prior to final issuance.

Once the criteria have been finally issued, the determination made thereunder by the Commission that there has, or there has not, been an extraordinary nuclear occurrence, will be final and conclusive, and no other official and no court shall have power or jurisdiction to review such determination. This is to assure that the Commission's determination can be neither appealed nor attacked collaterally.

Section 1(a) (3) amends the act by adding new subsection m. to section 11 of the act defining the term "indemnitor" to mean (1) any insurer with respect to his obligations under a policy of insurance furnished as proof of financial protection, (2) any licensee, contractor, or other person who is obligated under any other form of financial protection, with respect to such obligation, and (3) the Commission with respect to any obligation undertaken by it in an indemnity agreement entered into pursuant to section 170. The term thus encompasses the nuclear liability insurance pools (NELIA and MAELU), self-insurers, and the Commission, to the extent of their obligations. The term is later used in the amendments, (1) to indicate those persons who may enter into agreements with the Commission for prompt handling, investigation, and settlement of claims for public liability (subsec. 170 m.), (2) to identify those as to whom the special waivers are effective only with respect to obligations set forth in insurance policies or contracts furnished as proof of financial protection and in indemnity agreements (subsec. 170 n. (1)), and (3) to identify those who, together with other interested persons, may petition the court for a determination that public liability for a single nuclear incident may exceed the limit of liability under subsection 170 e., and who are mentioned in other respects in the special provisions of the bill dealing with allocation of the insurance and indemnity fund (subsec. 170 o.).

Section 1(a) (4) amends subsection 11 q. of the act (which was subsec. 11 o. prior to redesignation as provided in sec. 1(a) (1) of this amendment) to make it clear that the term "occurrence" as used in the definition of "nuclear incident" includes an "extraordinary nuclear occurrence." Thus, an "extraordinary nuclear occurrence," which causes the effects specified in subsection 11 q., is a "nuclear incident." Because subsections 170 c. and 170 d. provide that the Commission shall agree to indemnify for public liability arising from "nuclear incidents," this addition to the definition of "nuclear incident" makes clear that indemnity may be paid for liability arising out of extraordinary nuclear occurrences which, in fact, do cause the kind of injury or damage referred to in the definition of "nuclear incident."

Section 1(b) amends section 109 of the act by redesignating references therein to section 11 of the act consistent with the redesignation of certain subsections of section 11 as provided in section 1(a) (1) of this bill.

Section 2 deletes the last sentence of subsection 170 e. of the act. Under subsection 170 e. of the present act, provision is made for the unlikely event that damages may exceed the total fund available from financial protection and Price-Anderson indemnity. The U.S. district court having venue in bankruptcy matters over the location of the incident is authorized, in effect, to control the funds, limit liability, and apportion the pay-

3224

## NUCLEAR OCCURRENCES

ments. Since new subsection 170 o. continues this mechanism, but without reference to the district court having venue in bankruptcy and with expanded authority with respect to plans of distribution, the deleted language is no longer necessary.

Section 3 amends section 170 of the act by adding new subsections m., n., and o.

New Subsection 170 m. authorizes the Commission to enter into agreements with indemnitors, as defined in new subsection 11 m. of the act, to establish coordinated procedures for the prompt handling, investigation, and settlement of claims for public liability.

New subsection 170 m. authorizes the Commission and other indemnitors to make payments to, or for the aid of, claimants for the purpose of providing immediate assistance following a nuclear incident. These payments may be made without securing releases, and they shall not constitute an admission of the liability of any person indemnified or of any indemnitor. Such payments shall operate as a satisfaction to the extent thereof of any final settlement or judgment.

Where Commission funds are to be used in making emergency payments, any funds appropriated to the Commission are available for such payments.

New subsection 170 n. (1) authorizes the Commission to establish a system of waivers of defenses with respect to extraordinary nuclear occurrences to which insurance policies or contracts furnished as proof of financial protection or indemnity agreements apply. The system will not be coextensive with all Price-Anderson coverage. The waivers will be applicable only to extraordinary nuclear occurrences which—

(a) Arise out of or result from or occur in the course of the construction, possession, or operation of a production or utilization facility; or

(b) Arise out of or result from or occur in the course of transportation of source, byproduct, or special nuclear material to or from such a facility; or

(c) During the course of the contract activity, arise out of or result from the possession, operation, or use by a Commission contractor or subcontractor of a device utilizing special nuclear or byproduct material.

Category (a) is coextensive with nuclear liability insurance policies required as proof of financial protection and Price-Anderson indemnity coverage presently extended to utilization and production facilities.

Category (b) is also coextensive with nuclear liability insurance policies furnished as proof of financial protection and Price-Anderson indemnity agreements.

Category (c) contains the limitation "during the course of the contract activity" in order to exclude from the new system of waivers occurrences which involve liability of an AEC contractor or subcontractor for damage to others based upon a defective item produced under the contract where the occurrence transpires subsequent to delivery of the product by the contractor. The system would apply, however, if the accident occurred while the device was still in the custody of the AEC contractor or subcontractor. Thus, this limitation is intended to have only temporal application; it is not intended to create technical defenses

3225

## LEGISLATIVE HISTORY

but rather to impose a time limit based upon when the risk of liability to the contractor or subcontractor ceases.

The reference in category (c) to a "device" utilizing special nuclear or byproduct material includes within its scope SNAP auxiliary power and propulsion devices, Plowshare devices, and atomic weapons to the extent they are possessed, operated, or used in the course of the contract activity.

The system of waivers is effectuated by authorizing the Commission to incorporate provisions in existing and new indemnity agreements with licensees and contractors and to require provisions to be incorporated in existing and new policies or contracts furnished as proof of financial protection which waive certain defenses and issues. The Commission is thus authorized to require waivers of defenses and issues as to negligence ("fault") in policies or contracts furnished as proof of financial protection, and in Price-Anderson indemnity agreements. Such waivers will remove the possibility that a claim will be defeated on technical, legal grounds relating to issues of negligence ("fault"). Thus, the claimant, or plaintiff, on a showing that the AEC has determined pursuant to subsection 170 j. that there has been an "extraordinary nuclear occurrence," and the defendant's reasonable relationship thereto, will be able to proceed directly to his proof that the occurrence caused his personal injury or property damage arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of the nuclear material, the nature of the injuries or damage, and the amount of his damages. With respect to these remaining issues or defenses, the defendant can still invoke the traditional rules of proof and present evidence on his own behalf. Courts must still make determinations on these issues.

The waivers provided for under subsection 170 n. (1) not only waive any issue or defense as to the fault of persons indemnified, but also waive any issue or defense as to the conduct of the claimant. The latter waiver eliminates from any trial the issues of contributory negligence or assumption of risk on the part of the claimant. "Conduct of the claimant" should be interpreted broadly to include conduct of persons through whom the claimant derives his cause of action, as in the case, for example, of a representative suit.

To the extent that a court need not concern itself with proof of fault of persons indemnified, or the conduct of the claimant, plaintiffs will not be subject to varying rules of law in proving the public liability of defendants. By requiring potential defendants to agree to waive defenses the defendants' rights are restricted; concomitantly, to this extent, the rights of plaintiffs are enlarged. Just as the rights of persons who are injured are established by State law, the rights of defendants against whom liability is asserted are fixed by State law. What this subsection does is to authorize the AEC to require that defendants covered by financial protection and indemnity give up some of the rights they might otherwise assert.

In authorizing the Commission to require waivers as to the fault of persons indemnified, the intent is that waivers as to other defenses such as act of God, intervening third party, and proximate cause to the extent it is an element in establishing fault or negligence may also be required by the Commission. However, the waivers would save a defense

3226

## NUCLEAR OCCURRENCES

pertaining to the issue of causal relationship; i. e., the damages are not reasonably related to the occurrence. It is expected the Commission would also give consideration to permitting a defense that the injury or damage would not have resulted but for the abnormally sensitive character of the claimant's activity.

The incorporation of waivers of charitable or governmental immunity is also authorized. Provision for payment of indemnity irrespective of immunity is already found in subsection 170 k. of the act, which is an outgrowth of subsection 170 a., which provides in pertinent part:

> The Commission may require, as a further condition of issuing a license, that an applicant waive any immunity from public liability conferred by Federal or State law.

It is understood that the waivers required, under new subsection 170 n.(1), of other Federal agencies which are licensees or contractors of the Commission would be applicable in suits against the United States under the Federal Tort Claims Act. Thus, under the provision that the Commission has authority to require waivers of charitable or governmental immunity, the Commission also has authority to require other Federal agencies which are licensees or contractors to waive the "discretionary function" defense permitted by the Federal Tort Claims Act. The Commission would also have the authority to require the waiver of the defense of the statute of limitations applicable to a suit under the Federal Tort Claims Act.

Waivers of issues or defenses based on any statute of limitations may be required by the Commission if suit is instituted within 3 years from the date on which the claimant first knew, or reasonably could have known, of his injury or damage and the cause thereof, but in no event more than 10 years after the date of the nuclear incident. This provision serves to avoid the application of more restrictive State statutes of limitations which are not appropriate to claims for radiation injury.

All of the waivers incorporated in indemnity agreements or policies and contracts furnished as proof of financial protection shall be effective regardless of whether the issue or defense waived may otherwise be deemed jurisdictional or relating to an element in the cause of action. Thus, for example, if a State's decisional or statutory law provides that a necessary element in stating a cause of action in tort is that the State statute of limitations must not yet have run, a suit to which Price-Anderson waivers apply may not be dismissed for such failure to state a cause of action. Another example might be under the Federal Tort Claims Act concerning which it has been said that an allegation of negligence is necessary for the purpose of conferring jurisdiction upon the court. A suit to which Price-Anderson waivers apply may not, on that ground, be dismissed for lack of jurisdiction.

New subsection 170 n.(1) contains a provision that when so incorporated in indemnity agreements with licensees and contractors and in policies or contracts furnished as proof of financial protection, such waivers shall be judicially enforceable in accordance with their terms by the claimant against the person indemnified. This serves to assure that the claimant will not be treated merely as an incidental beneficiary by the court, but will be entitled to have the waivers enforced as to himself as a third-party beneficiary.

3227

## LEGISLATIVE HISTORY

There are a number of defenses which will not be waived. It is clear that the legitimate interests of all concerned are served by allowing persons indemnified to retain the right to defend against injury or damage to a claimant or a claimant's property which is either (1) intentionally sustained by the claimant, or (2) is a result of a nuclear incident intentionally and wrongfully caused by the claimant. A defense based upon a failure to take reasonable steps to mitigate damages is also retained. This, of course, does not mean that a failure to mitigate constitutes a complete defense to an entire claim; it does entitle the defendant to an offset for the amount found by a court to be appropriate in mitigation. Other than the specific exceptions of mitigation and claimant's wrongful conduct and the exceptions from the definition of public liability in subsection 11 w. of the act, as redesignated by this bill, the waivers may essentially waive all defenses. As noted above, the issues relating to the amount of damages and whether the occurrence led to the damages could still be litigated.

The last sentence of proposed subsection 170 n.(1) assures that, as to indemnitors, the waivers will be effective only with respect to the obligations set forth in the policies or contracts furnished as proof of financial protection and in the indemnity agreements, and further assures that the waivers will have no effect on any claim or portion thereof which is not within the protection afforded under the terms of such policies, contracts, and indemnity agreements, and the limit of liability provisions of subsection 170 e.

New subsection 170 n.(2) establishes the applicable venue and jurisdiction for public liability actions arising out of or resulting from an "extraordinary nuclear occurrence."

Under this subsection any action involving "public liability" (as defined in subsec. 11 w. of the act, as redesignated by this bill) arising out of or resulting from an extraordinary nuclear occurrence may be filed in the Federal courts without regard to the amount in controversy or diversity of citizenship. The venue is to be fixed in the U. S. district court in the district where the extraordinary nuclear occurrence takes place (that is, the district in which the first release of nuclear material or radioactivity occurs), and for an extraordinary nuclear occurrence taking place outside of the United States, in the District Court for the District of Columbia.

An action may be instituted in a State court or another U. S. district court, and, indeed, may be permitted to continue in such court if the circumstances of the occurrence and the action do not appear to the defendant or the Commission to necessitate removal. However, the absolute right of removal or transfer by the defendant or the Commission to the U. S. district court having venue under subsection 170 n. (2) would be assured. The last sentence of subsection 170 n. (2), referring to the effectiveness of process of the court throughout the United States, refers to all relevant types of process, such as that for instituting an action and that for requiring attendance of witnesses.

New subsection 170 o. provides certain specific authority for the U. S. district court in the district where a nuclear incident occurs (that is, the district in which the first release of nuclear material or radioactivity occurs), or the U. S. District Court for the District of Columbia in case of a nuclear incident occurring outside the United States, in place of the provision in the last sentence of the present subsection 170 e. which provides

3228

## NUCLEAR OCCURRENCES

inter alia for distribution of funds in a situation where the total claims from a single nuclear incident will probably exceed the limit of liability. By the new section, the appropriate court is given discretion to adopt such plan as it deems equitable; and the court is given guidance with respect to some factors which are essential to its consideration of a plan, such as an allocation of appropriate amounts for personal injury claims, property damage claims, and possible latent injury claims which may not be discovered until a later time.

Under this subsection, whenever the court, upon the petition of any indemnitor or other interested person, determines that public liability for a single nuclear incident may exceed the limit of liability under subsection 170 e., the following provisions are applicable.

1. Total payment as a result of the nuclear incident shall not exceed 15 percent of the limit of liability without the prior approval of the court. The limitation of 15 percent is applicable to any nuclear incident when the court determines that the limit of liability may be exceeded. Not only the emergency assistance payments permitted under proposed new subsection 170 m. but also any settlements are to be included within the 15 percent limitation. There would be no change in the Commission's present authority to settle any claims to which indemnity applies;

2. The court shall not authorize payments in excess of the 15 percent unless it determines that the payments are or will be in accordance with a plan of distribution approved by the court or that such payments are not likely to prejudice the subsequent adoption and implementation by the court of such a plan; and,

3. The Commission shall, and any other indemnitor or other interested person may, submit to the court a plan for the disposition of pending claims and for the distribution of remaining funds available. The court shall have all power necessary to approve, disapprove, or modify plans proposed, or to adopt another plan, and to determine the proportionate share of funds available for each claimant. Additional authority is provided to the court to issue orders of types described, in implementation of its mandate. Orders of the court implementing and enforcing the provisions of this section shall be effective throughout the United States.

The first sentence of new subsection 170 o. allows a petition by any indemnitor or "other interested person." This latter designation is intended to include not only "persons indemnified," as defined in the act, but also any person who claims injury or damage as a result of an extraordinary nuclear occurrence. It appears appropriate that a claimant should have standing to petition the court for a determination that the limit of liability may be exceeded, since his interests may be directly affected. It is also noted that under subsection 170 o. (3) "other interested persons" may submit a plan of distribution to the court upon a determination by the court that the limit of liability may be exceeded.