# EXHIBIT 5

| 100TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPT. 100-164<br>Part 1 |
|---|---|---|

# PRICE-ANDERSON AMENDMENTS ACT OF 1987

May 21, 1987.—Ordered to be printed

Mr. UDALL, from the Committee on Interior and Insular Affairs, submitted the following

# REPORT

together with

## ADDITIONAL VIEWS

[To accompany H.R. 1414]

[Including the cost estimate of the Congressional Budget Office]

The Committee on Interior and Insular Affairs, to whom was referred the bill (H.R. 1414) to amend the Price-Anderson provisions of the Atomic Energy Act of 1954 to extend and improve the procedures for liability and indemnification for nuclear incidents, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendments are as follows:

Page 3, strike line 6 and insert in lieu thereof: "adding after 'and costs' the following: '(excluding legal costs subject to subsection o. (1)(D), payment of which has not been authorized in accordance with such subsection o. (1)(D))'".

Page 13, line 3, strike "excluding the costs" and all that follows through "damage," on line 4 and insert the following: "including such legal costs as are authorized to be paid under subsection o. (1)(D),".

Page 26, insert after line 18 the following new subsection:

(d) LEGAL COSTS.—

(1) PAYMENT CRITERIA.—Section 170 o. of the Atomic Energy Act of 1954 (42 U.S.C. 2210(o)), as previously amended by this Act, is further amended by—

(A) inserting after the subsection designation the following: "PLAN FOR DISTRIBUTION OF FUNDS.— (1)";

91-006

H 443-25

2

(B) redesignating paragraphs (1) through (3) as subparagraphs (A) through (C); and

(C) adding at the end the following:

"(D) A court may authorize payment, from the amount of financial protection required by subsection b., of only such legal costs as are permitted under paragraph (2); provided that in the case of the legal costs of a defendant, a court may authorize payment from such amount of financial protection of only 70 percent of any amount of legal costs that are permitted under paragraph (2).

"(2) A court may authorize the payment of legal costs under paragraph (1)(D) only if the person requesting such payment has—

"(A) submitted to the court the amount of such payment requested; and

"(B) demonstrated to the court—

"(i) that such costs are reasonable and equitable; and

"(ii) that such person has—

"(I) litigated in good faith;

"(II) avoided unnecessary duplication of effort with that of other parties similarly situated;

"(III) not made frivolous claims or defenses; and

"(IV) not attempted to unreasonably delay the prompt settlement or adjudication of such claims.".

(2) DEFINITION OF LEGAL COSTS.—Section 11 of the Atomic Energy Act of 1954 (42 U.S.C. 2014), as previously amended by this Act, is further amended by adding at the end the following new subsection:

"ii. LEGAL COSTS.—As used in section 170, the term 'legal costs' means the costs incurred by a plaintiff or a defendant in initiating, prosecuting, investigating, settling, or defending claims or suits for damage arising under such section.".

Page 31, line 7, strike "170 o. (3)" and all that follows through "(42 U.S.C. 2210(o)(3))" on line 8 and insert the following: "170 o. (1)(C), as redesignated by section 11(d)(1) of the bill,".

Page 33, line 4, strike "paragraph (2)," and insert "subparagraph (B), as redesignated by section 11(d)(1) of the bill,".

Page 33, line 6, strike "paragraph (3)" and insert "subparagraph (C)".

Page 35 strike lines 5 through 8 and redesignate the following paragraph accordingly.

Page 9, line 12, strike "The Secretary" and all that follows through "subsection." on line 17 and insert the following:

All agreements of indemnification under which the Department of Energy (or its predecessor agencies) may be required to indemnify any person, shall be deemed to be amended, on the date of the enactment of the Price-Ander-

3

son Amendments Act of 1987, to reflect the amount of indemnity for public liability and any applicable financial protection required of the contractor under this subsection on such date.

Page 10, line 25, strike "d.".

Page 10, line 25, insert "subject to an agreement of indemnification under subsection d. of such section," after "activities".

Page 23, line 2, strike "undertaken" and all that follows through "contract," on line 4 and insert a comma.

Page 15, line 15, add a close quotation mark and a final period after the period.

Page 15, strike lines 16 through 18.

Page 31, beginning on line 1, strike "the second place it appears" and insert "in the matter immediately following subparagraph (F), as added by section 10(b)(3) of the bill".

Page 35, strike lines 14 through 24 and insert the following:

The amendments made by this Act shall become effective on the date of the enactment of this Act and shall be applicable with respect to nuclear incidents occurring on or after such date.

## I. Purpose and Summary of H.R. 1414

The purpose of the bill, as reported by the Committee on Interior and Insular Affairs, is to extend and amend the Price-Anderson Act, section 170 of the Atomic Energy Act of 1954, which provides public liability coverage for licensees of the Nuclear Regulatory Commission (NRC) and contractors of the Department of Energy (DOE). The bill extends the authority of the NRC and DOE to enter into indemnity agreements with their licensees and contractors, respectively, for an additional ten years. The bill also increases the liability of commercial nuclear power plants and the DOE under indemnity agreements with its contractors for public liability resulting from a nuclear accident and strengthens the congressional commitment to compensate the public fully and promptly for damages in excess of the statutory limitations on liability.

## II. Background

*Purpose of the current act*

Congress enacted the Price-Anderson Act in 1957:

(1) to ensure that adequate funds would be available to compensate the public for injuries resulting from nuclear activities; and

(2) to remove the threat of unlimited liability for a nuclear accident which was deterring private industry from participating in nuclear activities.

*Summary of the current act*

To ensure the availability of adequate compensation funds, the Act authorizes the NRC (a) to require its licensees to maintain financial protection to cover public liability claims and (b) to indemnify its licensees from public liability in an amount up to $500 million.

4

The Act requires large commercial power plants (those that have a rated capacity of 100,000 electrical kilowatts or more) to maintain two tiers of financial protection. The first tier, known as "primary financial protection," consists of commercial insurance or self-insurance in an amount equal to the maximum amount of commercial insurance available at reasonable cost (currently $160 million). The second tier is achieved through participation in an industry-wide self-insurance program. Participants in this program—all operators of large commercial power reactors—are obligated to pay a deferred premium of up to $5 million per nuclear reactor per accident in the event of an accident at any nuclear power plant that results in public liability exceeding the first tier of financial protection. If the 109 reactors now licensed each were required to pay the maximum $5 million deferred premium, the first and second tiers together would result in a fund of $705 million.

The Act gives the NRC discretion to require other licensees to maintain first-tier financial protection, in various amounts or not at all, based upon the risk presented by the licensed activity. NRC licensees other than large commercial power plants (such as university research reactors, other non-power reactors, and small power reactors) are not required to participate in the second-tier self-insurance program.

The Act also requires the NRC to indemnify all licensees for which it requires financial protection of less than $560 million from public liability in excess of the amount of financial protection required, up to $500 million. Nonprofit educational institutions licensed to operate reactors are exempt from the financial protection requirement but are indemnified against claims over $250,000, up to $500 million. Federal agencies licensed to operate nuclear reactors are also exempt from the financial protection requirement and are indemnified for all claims up to $500 million.

In addition, the Act authorizes, but does not require, DOE to indemnify private entities performing nuclear activities under contract for DOE in an amount up to $500 million. DOE is authorized to require financial protection of its contractors, but has not as a matter of policy.

To remove the deterrent to private participation in nuclear activities, the Act limits the liability of persons indemnified by NRC or DOE. The liability of large commercial power plants is limited to the aggregate of the first and second tiers. With 109 large commercial power plants now participating in the second-tier program, the aggregate liability of such plants is currently limited to $705 million. The liability of other NRC licensees and DOE contractors is limited to the sum of $500 million plus any financial protection of the licensee up to $560 million.

In the event that damages from a nuclear accident exceed the statutory limitation on liability, the Act states that Congress will review the incident and "take whatever action is deemed appropriate to protect the public from the consequences of a disaster of such magnitude." Thus, while the limitation on liability would bar legal recourse against persons indemnified under the Act for damages in excess of the limit, it was not intended to bar further relief of the public.

5

The financial protection arrangements, indemnities, and liability limitations cover any person who may be liable for damages from a nuclear accident, not just the licensee or contractor. Thus, if an accident results from the action of an architect, engineer, manufacturer of a reactor component, or even some unrelated party, the public injuries stemming from the accident would be covered by the licensee's insurance, the deferred premium pool, or the federal indemnity. This "omnibus coverage" feature effectively channels liability for the accident to the licensee or contractor even though others would be liable under ordinary tort law principles. The advantage to the public of "omnibus coverage" is that a victim's ability to obtain compensation is not dependent upon the victim being able to establish the legal liability of the person who actually caused the accident. Victims need only look to the licensee or contractor, and the financial protection or federal indemnity he maintains, for compensation.

Liability is determined under applicable state tort law. However, to further facilitate compensation of victims of a major nuclear accident, the Act requires persons indemnified thereunder to waive certain legal defenses in the event of an "extraordinary nuclear occurrence"—that is, a large-scale accident involving substantial off-site radiological contamination and damage to persons and property. The defenses waived include defenses based upon the due care of persons indemnified, charitable or sovereign immunity, and certain state statutes of limitation. In addition, the Act would consolidate in a single federal court public liability claims arising from an extraordinary nuclear occurrence.

### Licensees and contractors covered

Currently, there are 109 large commercial power plants and approximately 50 university research reactors, 7 Federal agency reactors, 16 non-power reactors, and 5 small power reactors licensed by the NRC and covered by the Price-Anderson Act. In addition, there are over 100 DOE contracts containing Price-Anderson protection. They cover approximately 50 prime contractors and 70,000 subcontractors and lower-tier suppliers.

### Claims history

The only major test of the Price-Anderson system to date involved the Three Mile Island accident in March 1979. Insured losses and related expenses resulting from the Three Mile Island accident have totaled about $50 million, all of which has been covered by first-tier insurance. Insured losses and related expenses arising from all other civilian activities have totaled about $7 million. In addition, payments for claims resulting from activities conducted under contract with DOE or the Atomic Energy Commission have totaled about $1.5 million.

### III. Need for Legislation

As enacted in 1957, the Price-Anderson Act authorized the Atonic Energy Commission (the predecessor of the NRC and DOE) to enter into indemnity agreements with its licensees and contractors only until August 1, 1967. In 1965 and again in 1975, Congress

6

extended this authority for successive ten-year periods. Unless extended again, however, NRC and DOE's authority to enter into new indemnity agreements and to limit the liability of future licensees and contractors will expire on August 1, 1987.

Expiration of the NRC's indemnification authority would result in two different liability systems. The NRC has taken the position that activities licensed (or granted a construction permit) by August 1, 1987 would continue to be covered by the limitation on liability, waivers of defenses, and financial protection requirements established by the existing Act. Activities licensed after that date would not be subject to the limitation on liability, the waivers of defenses, or, in the NRC's view, the financial protection requirements of existing law. Thus, in the event of a nuclear accident at a facility licensed after August 1, 1987, liability would have to be established without the benefit of the Act's waivers of defenses, and the public's ability to obtain compensation could be limited to the amount of insurance and assets of the individual licensee having the accident. This could prevent the public from recovering full compensation for damages resulting from an accident at such a facility.

Similarly, expiration of DOE's indemnification authority could have a profound effect on the Department's nuclear operations conducted through private contractors. Activities conducted pursuant to contracts executed by August 1, 1987 would continue to be covered by the existing Price-Anderson system. Unlike NRC licenses which may extend for up to 40 years, however, DOE contracts commonly expire within 5 years of execution and contracts executed after August 1, 1987 would not be protected by federal indemnification. Contracts for operation of the Los Alamos National Laboratory, the Lawrence Berkley and Lawrence Livermore National Laboratories, and the Hanford, Washington site, for example, expire on September 30, 1987 and renewals would not be eligible for Price-Anderson indemnification. Although DOE believes it could indemnify future contractors through other authority, these alternatives pose certain disadvantages compared with Price-Anderson indemnification. For example, the "omnibus" coverage of subcontractors and lower-tier suppliers, the waivers of defenses, and limitation of liability provided by the Price-Anderson Act would not apply.

The current Act required both NRC and DOE to report to Congress by August 1, 1983 whether the Act needed to be continued, modified, or repealed. Both agencies concluded that the Act should be extended though both recommended that certain modifications be made. Although the NRC was unable to determine whether failure to extend the Act would foreclose construction of additional nuclear power plants, the Commission did conclude that failure to extend the Act would deny the public the benefits of prompt availability and equitable distribution of compensation funds with respect to any plants constructed after August 1, 1987. The NRC recommended that the Act be extended, but that the present absolute limitation on liability be replaced with an annual limitations. The annual limitation would permit assessment of deferred premiums each year until all claims are paid. DOE concluded that extension of the Act was essential for private contractors to be willing to per-

7

form work on the Department's nuclear weapons, production, and research and development programs.

## IV. COMMITTEE ACTION

Two bills to amend the Price-Anderson Act were referred to the Committee on Interior and Insular Affairs during the 98th Congress. The Subcommittee on Energy and the Environment held a hearing on the bills on June 11, 1984.

Four bills to amend the Act were referred to the Committee early in the First Session of the 99th Congress. The Subcommittee on Energy and the Environment held hearings on the bills on June 4 and 6 and July 8, 1985.

A fifth bill, H.R. 3653 was introduced by Chairman Udall and referred to the Subcommittee on October 30, 1985. The Subcommittee agreed to use H.R. 3653 as the mark-up vehicle for consideration of amendments to the Price-Anderson Act. The Subcommittee met in open session to consider H.R. 3653 on October 29, November 19, December 3 and December 10, 1985. On December 10, 1985, the Subcommittee favorably reported H.R. 3653 as amended to the full Committee.

On April 23, April 30, and May 21, 1986, the full Committee considered and further amended the Subcommittee amendment to H.R. 3653. On May 21, 1986, the Committee, by voice vote, favorably reported the bill, with an amendment, to the House.

H.R. 3653 was sequentially referred to the Committee on Energy and Commerce and, with the exception of section 2 of the bill, to the Committee on Science and Technology. The Energy and Commerce Committee favorably reported the bill with an amendment on August 12, 1986 and the Science and Technology Committee favorably reported the bill with amendments on July 29, 1986.

On October 7, 1986, Chairman Udall introduced H.R. 5650, which reflected a compromise between the amendments of three House committees of jurisdiction as well as the two Senate bills. The Chairmen of the three House committees sought a rule making H.R. 5650 in order for consideration as original text of H.R. 3653 for purposes of limited amendment. The 99th Congress adjourned, however, before the bill could be brought to the floor.

On March 4, 1987, Chairman Udall and Mr. Sharp introduced H.R. 1414, which as identical to the 99th Congress's H.R. 5650 with four substantive exceptions. The Subcommittee on Energy and the Environment and the Energy and Commerce Committee's Subcommittee on Energy and Power held joint hearings on the bill on March 26 and 27, 1987.

The Subcommittee on Energy and the Environment met in open session to consider H.R. 1414 on April 2, 1987 and favorably reported the bill with one amendment to the full Committee. On May 6, 1987, the full Committee disapproved the Subcommittee amendment, adopted others and favorably reported the bill as amended to the House by voice vote.

8

## V. DISCUSSION OF ISSUES

### A. LIABILITY OF LARGE COMMERCIAL POWER PLANTS

H.R. 1414 increases the amount of funds available to compensate victims in the event of a nuclear incident at a large commercial power reactor from $750 million to $7,027 million (assuming 109 reactors participating in the second-tier, deferred premium program). As under existing law, the fund would be provided through two tiers of financial protection.

*First tier*

The current Act requires large commercial power reactors to maintain primary financial protection in an amount equal to the maximum amount of commercial liability insurance available at reasonable cost and on reasonable terms. Currently, the maximum amount of commercial liability insurance reasonably available is $160 million. H.R. 1414 retains this existing requirement.

*Second tier*

The current Act requires each large commercial power reactor to participate in a deferred premium program in which all participants would be assessed a deferred premium of not less than $2 million and not more than $5 million in the event of a nuclear accident which exceeds or appears likely to exceed the amount of first-tier financial protection required of large commercial power reactors. If the maximum deferred premium were assessed against each of the 109 reactors that now participate, the program would generate a fund of $545 million. The maximum amount will increase by $5 million with each new large commercial power reactor granted an operating license, and will decrease by that amount with each reactor whose license is terminated.

H.R. 1414 will eliminate the minimum amount and increase the maximum amount of the deferred premium from $5 million to $63 million per accident. If the maximum deferred premium were assessed against each of the 109 reactors that now participate in the program, the program would generate a fund of $6,867 million. The maximum amount will increase by $63 million with each new large commercial reactor granted an operating license, and will decrease by that amount with each reactor whose license is terminated.

In addition to prescribing a maximum amount for the deferred premium that may be assessed with respect to each nuclear incident, H.R. 1414 also limits to $10 million the amount of deferred premium that can be assessed against each reactor with respect to a single nuclear incident in any one year. The Committee concluded, based upon the 1983 report of the Nuclear Regulatory Commission (NUREG-0957), that an annual $10 million assessment would not impose undue financial strain upon the utilities operating large commercial power reactors. In addition, the Committee noted that an annual $10 million assessment would represent at most 3 percent (and in many cases less than 1 or 2 percent) of a utility's annual income from ratepayers.

Throughout the Committee's consideration of amendments to the Price-Anderson Act during both the 99th and 100th Congresses, a

9

consensus existed that the limitation on liability should be increased. The Committee was mindful that the original limitation was arbitrarily determined and had little relationship to the amount of claims likely to arise from a catastrophic accident. Even before enactment of the original Act in 1957, the Brookhaven National Laboratory had concluded that a severe accident could cause as much as $7 billion of property damage alone. While the $560 million limitation was more than adequate to pay the approximately $50 million of claims and related expenses that arose from the Three Mile Island accident, the Federal Insurance Administration estimated that a more severe accident at that plant could have resulted in $17 billion of offsite property losses.

From the outset of consideration of amendments to the Price-Anderson Act, nuclear utilities supported a doubling of the deferred premiums, thereby increasing the limitation on liability to about $1 billion. Critics of this proposal argued that it would provide insufficient funds to fully compensate victims of a catastrophic accident.

The Nuclear Regulatory Commission and various public interest groups, on the other hand, proposed replacing the current aggregate limitation on liability with an annual limitation that would permit assessment of deferred premiums indefinitely, until all liability claims are paid. Critics of this proposal argued that it would unfairly subject all nuclear utilities to unlimited liability for an accident that occurred at a plant operated by only one of them and would increase the cost of capital to all nuclear utilities even if no accident occurs.

As introduced in the 99th Congress, H.R. 3653 would have subjected utilities to an annual $10 million deferred premium for up to 10 years, increasing the aggregate limitation on liability to about $10 billion, as a compromise between the extremes of a $1 billion limitation and unlimited liability. The bill was amended, first by the Subcommittee to reduce the limitation on liability to about $2 billion, and then by the full Committee to increase the limitation to about $8 billion, before the Committee ultimately adopted a compromise limitation of about $6.5 billion, based upon a standard deferred premium of $63 million.

H.R. 1414 adopts the limitation on liability agreed to by the Committee in H.R. 3653 during the 99th Congress. The Committee has not changed the amount of the standard deferred premium but, because the number of plants available to pay deferred premiums has increased from 101 to 109 since the Committee reported H.R. 3653, the limitation on liability in H.R. 1414 has increased from about $6.5 billion to over $7 billion.

The Committee's compromise limitation substantially increases the amount of funds available to compensate victims of a catastrophic accident and places a larger share of the financial risk of such an accident on the nuclear industry than existing law. At the same time, the Committee believes that the compromise limitation would not unduly affect nuclear utilities. The Committee noted that a $63 million assessment represents less than one-third of the $200 million that the average nuclear utility already pays in annual premiums over the 40-year life of a reactor to insure the plant itself against onsite damages. Similarly, a $63 million assessment represents only about half of the $120 million that the aver-

10

age nuclear utility already pays in nuclear waste disposal fees over the 40-year life of a reactor. Moreover, unlike these other premiums and fees which are already being paid, the $63 million deferred premium would only be imposed to the extent there were a catastrophic nuclear accident that resulted in damages in excess of the primary financial protection.

Consistent with the NRC's indemnity agreements, the Committee intends that termination of a license would not affect the licensee's obligation to pay a deferred premium with respect to an accident that occurred while the licensee's indemnity agreement was in effect.

*Borrowing authority*

The Committee recognized that the establishment of an annual maximum that delays payment of the aggregate deferred premium for a period of years could result in adequate funds not being available to pay public liability claims when needed. Accordingly, the Committee took steps to strengthen and expand the NRC's existing obligation to pay public compensation in advance of the collection of deferred premiums from private industry if necessary for the protection of the public.

The current Act authorizes the NRC to establish measures to ensure that the deferred premiums will be paid when they are called for following a nuclear incident. To prevent a potential gap between the public protection pledged and the funds that may actually be available from private industry following an accident, the current Act authorizes the NRC to guarantee payment of the deferred premiums if the funds are not forthcoming from private industry on a timely basis. Indemnity agreements implementing this authority permit the NRC to recover from the licensee payments made on its behalf.

H.R. 1414 establishes a mechanism by which the NRC may borrow the funds necessary to meet its obligation under current law to ensure the availability of deferred premiums. The bill provides that, in the event the NRC is liable for deferred premiums under this obligation, the NRC must either request the Congress to appropriate sufficient funds to satisfy such payments or, to the extent approved in appropriation Acts, issue Treasury obligations. The Committee intends that, in addition to permitting the NRC to pay a licensee's deferred premium in the event the licensee defaults on its obligation when due, the amended section 170 b. (2) and (3) authorize the NRC to borrow from the Treasury up the aggregate maximum deferred premium assessments in advance of the year in which the annual installments are due. Thus, if deferred premiums of $63 million per reactor are needed to pay claims in the first year after an accident, but only $10 million per reactor is available under the annual maximum, the NRC could borrow the remaining $53 million per reactor from the Treasury. In subsequent years, as the licensees pay their annual assessments, the assessments would be used to pay principal and interest on the borrowed funds, up to the amount of the aggregate maximum deferred premium.

11

*Limitation on liability*

As under existing law, H.R. 1414 continues to limit the liability of large commercial power reactor licensees to the aggregate of the first and second tiers of financial protection required. Increases in both the first and second tier requirements, however, would result in nearly a ten-fold increase in the limitation on liability—from $705 million to $7,027 million based upon the 109 large commercial power reactors now in operation. Moreover, as under existing law, the limit on liability would continue to rise as more commercial insurance becomes available or additional large commercial power reactors are licensed. Conversely, however, the limit ultimately may decrease as reactors are decommissioned and are no longer required to participate in the second tier deferred premium program.

### B. LIABILITY OF OTHER NRC LICENSEES

H.R. 1414 does not change the liability of NRC licensees other than large commercial power reactors. The liability system applicable to other licensees will continue to be as follows:

*Nonprofit educational institutions*

Nonprofit educational institutions licensed to operate nuclear reactors will continue to be exempt from financial protection requirements, but will be eligible for an indemnity from liability in excess of $250,000, up to $500 million. Liability will continue to be limited to $500 million.

*Federal agencies*

Federal agencies licensed to operate nuclear reactors will continue to be exempt from financial protection requirements, but will be eligible for an indemnity from all liability up to $500 million. Liability will continue to be limited to $500 million.

*Other reactors*

All reactor licensees other than large commercial power reactor licensees, nonprofit educational institutions, or federal agency licensees will continue to be required to maintain financial protection in amounts established by regulation based on the type, size, and location of the reactor and other factors.

The NRC must indemnify licensees required to maintain financial protection of less than $560 million against liability in excess of the required level of financial protection. The maximum amount of the indemnity will continue to be $500 million, reduced by the amount that the licensee's required financial protection exceeds $60 million. Liability will continue to be limited to either $500 million plus the amount of financial protection required or $560 million, if the amount of financial protection required exceeds $60 million.

*Materials licensees*

The NRC will continue to have authority, in its discretion, to require persons licensed to possess radioactive materials to maintain financial protection. To date, the only materials licensees the NRC

12

has required to maintain financial protection are plutonium processing and fuel fabrication facilities.

*Other licensees*

Licensees not required to maintain financial protection are not eligible for a government indemnity and are not subject to a limitation on liability.

### C. LIABILITY OF DOE CONTRACTORS

H.R. 1414 increases the liability of DOE contractors for a nuclear incident arising from activities performed under contract for DOE from $500 million to the maximum amount of financial protection required of large commercial power reactors licensed by the NRC. Assuming there are 109 large commercial power reactors participating in the second-tier deferred premium program, the aggregate liability of the Federal Government for a nuclear incident arising from DOE contractor activities would be $7,027 million. H.R. 1414 also requires DOE to indemnify the contractor to the full extent of the contractor's liability.

In addition, H.R. 1414 clarifies the indemnification of contractual activities involving nuclear waste. Although such activities are not expressly mentioned in the current Act, DOE has taken the position that it has authority to indemnify such activities. H.R. 1414 affirms this interpretation by expressly stating that DOE shall indemnify all contractual activities involving the storage, handling, transportation, treatment, or disposal of, or research and development on, spent fuel, high-level radioactive waste, or transuranic waste, including activities authorized under the Waste Isolation Pilot Project under section 213 of Public Law 96–194.

In the past, Price-Anderson coverage of DOE contractor activities has not kept pace with the expanding coverage available for large commercial power reactors licensed by the NRC. H.R. 1414 would change this by increasing the aggregate liability for DOE contractors to the maximum amount of financial protection required of large commercial power reactors. In view of the recommendations made in the 1983 DOE report on Price-Anderson coverage, which recognized the need for equivalency, and in light of the similar risk associated with either class of activity, the Committee determined that coverage for DOE contractor activities should be equivalent to that for NRC licensee activities. Thus, the DOE contractor indemnity will increase automatically as new nuclear power plants are licensed. However, in an effort to stabilize the coverage of DOE contractors regardless of any future reductions in NRC reactor licensee coverage that might result from a decline in the number of commercial nuclear power plants in operation, the bill provides that the federal indemnity for DOE contractors will not be reduced in the event that the financial protection required of NRC commercial reactor licensees is reduced.

Under the current Act, DOE's authority to indemnify contractors is discretionary and extends only to contractors engaged in activities posing a risk of public liability for a *substantial* nuclear incident. H.R. 1414 eliminates the substantiality test and requires DOE

13

to indemnify all contractors conducting nuclear activities for DOE that involve the risk of public liability.

Under the current Act, the maximum amount of the indemnity is $500 million. H.R. 1414 requires DOE to indemnify the contractor to the full extent of the potential aggregate liability of the contractor. A Committee amendment to the bill deems all indemnity agreements under which DOE may be required to indemnify a contractor to be amended as of the date of enactment of H.R. 1414 to cover the full extent of the contractor's public liability.

The current Act authorizes DOE to require its contractors to maintain financial protection. As a matter of policy, however, DOE does not exercise this authority because the cost of any private insurance required of the contractor would be passed on to the Government. H.R. 1414 does not affect either DOE's authority to require financial protection or its policy of not requiring financial protection.

### D. LIABILITY FOR ACCIDENTS OCCURRING OUTSIDE THE UNITED STATES

The current Act limits liability for accidents occurring outside the United States to $100 million and establishes an identical limit on the amount of indemnification available. Congress added this limitation in 1962 "[i]n view of the uncertainties of foreign judicial systems and the possible incentive to foreign courts to render excessive judgments because of the available $500 million governmental indemnity." H.R. 1414 does not change this limitation.

### E. PUBLIC COMPENSATION IN EXCESS OF THE LIMITATION ON LIABILITY

*Congressional commitment*

The limitations on liability established in the Act are not intended to bar compensation of the public for damages in excess of those limitations. As stated by the Joint Committee on Atomic Energy in it report on the 1965 amendments to the bill, "the limitation of liability serves primarily as a device for facilitating further congressional review of such a situation, rather than an ultimate bar to further relief of the public." A 1975 amendment added this concept to the Act itself by providing that "in the event of a nuclear incident involving damages in excess of [the] amount of aggregate liability, the Congress will thoroughly review the particular incident and will take whatever action is deemed necessary and appropriate to protect the public from the consequences of a disaster of such magnitude."

H.R. 1414 would clarify and strengthen the existing Congressional commitment. The bill provides that in the event damages exceed the limitation on liability, the Congress will thoroughly review the particular incident and take whatever action is determined to be necessary to provide full and prompt compensation to the public for all public liability claims resulting from the accident.

In the event of such an accident, the NRC (in the case of an accident arising from an activity licensed by the NRC) or DOE (in the case of an accident arising from an activity performed under contract for DOE) would be required to survey the causes and extent of the damage and submit a public report thereon. In addition, the President would be required to submit to Congress:

14

    (1) an estimate of the amount of additional funds needed to compensate personal injuries and property damage;

    (2) recommendations for additional sources of funds to pay such compensation;

    (3) plans for disbursing such compensation, including recommendations for allocating funds for the payment of future latent-injury claims; and

    (4) recommendations for additional legislative authority needed to implement such compensation plans.

With respect to any nuclear incident arising from nuclear waste activities, if a court determines that public liability is likely to exceed the limit, and if Congress fails to act to provide full and prompt compensation for such liability within one year of receiving the President's compensation plan, the limitation on liability would be waived.

The Committee contemplates that if a future Congress appropriates funds from general revenues to pay compensation in excess of the limitation on liability, the Congress could enact a revenue measure applicable to one or more sectors of the economy to recover such funds. The Committee amendment expressly states that the Act's limitation on liability may not be construed to preclude Congress from enacting a revenue measure applicable to NRC licensees to recover such funds. This provision is not intended to create any new taxing authority, but merely to make it clear that no sector of the nuclear industry is exempt from assessments made necessary as a result of Federal compensation payments.

The Committee recognizes that electric utilities may enter into sale and leaseback financing transactions with respect to large commercial power reactors licensed by the NRC. During the term of any such lease, the lessor is a passive owner of title to such a facility (like a mortgagee or holder of a security interest) and is not licensed by the NRC. The Committee does not contemplate that such a revenue measure would apply to any party to a sale and leaseback transaction that is not licensed by the NRC to operate the facility. Nothing in this provision or in H.R. 1414 is intended to affect sale and leaseback financing.

*The proposed compensation commission*

In the 99th Congress, H.R. 3653, as originally introduced, provided for the creation of a federal compensation commission in the event of an accident exceeding the limitation on liability. The compensation commission (rather than the President, as under H.R. 1414) would have been required to report to Congress on the amount of funds needed to pay compensation in excess of the liability limit, to recommend how the additional funds should be raised, how those funds should be disbursed, and how much money should be set aside for the payment of future latent-injury claims. In addition, the compensation commission would have had exclusive jurisdiction over damage claims seeking compensation in excess of the applicable limitation on liability. The proposal raised numerous legal and practical questions that could not be resolved without thorough and extensive analysis. Accordingly, in 1985, the Subcommittee on Energy and Environment eliminated the provision establishing the compensation commission and, in its place, adopted a

15

provision requiring the President to establish a study commission to examine alternative means of fully compensating victims of a catastrophic nuclear accident exceeding the limitation on liability.

*The study commission*

H.R. 1414 retains the provision of H.R. 3653 requiring the President to establish a study commission to examine alternative means of compensating victims of a catastrophic nuclear accident and to make recommendations thereon to the Congress. The study commission is to be established in accordance with the Federal Advisory Committee Act, and shall consist of between 7 and 11 members appointed by the President and representative of a broad range of views and interests.

The study commission is to recommend to the Congress: (1) changes in civil procedures needed for prompt disposition of claims; (2) standards for establishing priorities among claims; and (3) provisions for addressing latent injury claims. The Committee intends that the study commission consider, among other alternatives for providing public compensation, the feasibility of establishing a compensation commission as proposed by H.R. 3653 as introduced in the 99th Congress.

The study commission's report is due two years after enactment of the bill and the commission will terminate two months after transmittal of the report to the Congress. Implementation of the study commission's recommendations would require further legislation.

### F. LEGAL COSTS

A 1975 amendment to the Act excluded from the limit on liability the costs of investigating, settling, and defending claims from those sections of the Act relating to the government indemnity. Because corresponding changes were not made to the sections relating to private financial protection, the Department of Justice concluded that the Act permitted payment of these costs from private financial protection funds.

As introduced, H.R. 1414 would have prohibited the use of private financial protection funds (either primary financial protection or deferred premiums) to pay costs of investigating, settling, and defending claims. The purpose of the prohibition on the use of financial protection funds to pay these costs was to prevent substantial reduction of the amount of funds available to pay public compensation.

The Committee adopted an amendment to H.R. 1414 permitting use of financial protection funds to pay the cost of investgating, settling, and defending claims except where the court having jurisdiction over such claims determines that public liability may exceed the limit on liability. Once such a determination is made, these costs can be paid from financial protection funds only if such payment is authorized by the court. The court could authorize payment of such costs only to the extent the costs are reasonable and equitable and the person requesting payment has:

(a) litigated in good faith;

16

(b) avoided unnecessary duplication of effort with other parties similarly situated;

(c) not made frivolous claims or defenses; and

(d) not attempted to unreasonably delay the prompt settlement or adjudication of such claims.

Moreover, the court may authorize payment from financial protection funds of only 70 percent of the defendant's legal costs that meet the foregoing test. The remaining 30 percent of the defendant's legal costs that meet this test and any legal costs that fail the test could be paid through additional assessments (such as deferred premium charges in excess of those required to be paid under 170 b.). The 70 percent limitation would be applied to the defendant's aggregate permissible legal costs, rather than to the primary and secondary layers of financial protection proportionally.

Only those costs that the court authorizes to be paid could be considered by the court in limiting a defendant's aggregate public liability. Costs not authorized by the court would not be deducted from the limit on liability and would not reduce the amount of funds available to pay damage claims.

H.R. 1414 makes no change to the 1975 amendment to the Price-Anderson Act that prohibits payment of legal costs from government indemnity funds.

## G. PRECAUTIONARY EVACUATIONS

The current Act provides compensation only for liability arising out of a "nuclear incident," which is defined in the Act as an occurrence causing personal injury or property damage as a result of the radioactive properties of nuclear materials. Both the Nuclear Regulatory Commission and the General Accounting Office have taken the position that this definition may not be broad enough to cover liability for the costs of a precautionary evacuation ordered when a radiation release appeared imminent but did not occur.

H.R. 1414 makes it clear that the Act does cover the costs of precautionary evacuations by redefining the "public liability" compensable under the Act to include liability arising out of precautionary evacuations as well as nuclear incidents. A "precautionary evacuation" is defined as the evacuation of the public within a specified area near a nuclear facility or transportation route that is prompted by an event that is not deemed a nuclear incident but that posed the threat of a nuclear incident and is ordered by an authorized State or local government official. This provision is not intended to create liability for precautionary evacuation expenses where no liability exists under state tort law, but only to provide compensation where such liability is established in accordance with state tort law.

## H. NUCLEAR SHIP "SAVANNAH"

A new subsection 1. was added to the Price-Anderson Act in 1958 to authorize the Atomic Energy Commission to indemnify contractors engaged in activities involving the nuclear ship *Savannah*. The *Savannah* was decommissioned in 1971 and this authority expired on August 1, 1977. H.R. 1414 eliminates the obsolete provision.

17

### I. STATUTE OF LIMITATIONS

The current Act authorizes the NRC and DOE to require their respective licensees and contractors to waive certain legal defenses to claims arising out of an "extraordinary nuclear occurrence," that is, a large-scale accident involving substantial off-site radiological contamination and damage to persons and property. Among the defenses waived are those based on a state statutes of limitations, but only if suit is instituted both within 3 years from the date the claimant knew or reasonably could have known of the injury or damage, and within 20 years after the date of the nuclear incident. Congress originally adopted the waiver to remove the bar to claims posed by restrictive statutes of limitations then in effect in many states. Since the waiver was first adopted in 1966, most states have abandoned the traditional "years-from-occurrence" limitation in favor of a "years-from-discovery" test. As a result, the standard set forth in the Act is more restrictive than the majority of state statutes. Moreover, because some radiation injuries may not become evident for more than 20 years after the nuclear incident, the current waiver may be ineffective to prevent restrictive state statutes from barring legitimate claims. Accordingly, H.R. 1414 eliminates the existing years-from-occurrence test, thereby basing the waiver solely on a 3-years-from-discovery rule.

### J. APPLICATION OF WAIVERS OF DEFENSES

Under current law, the waivers of defenses apply only to claims that arise out of an extraordinary nuclear occurrence involving either: (1) the construction, possession or operation of a production or utilization facility; (2) the transportation of nuclear material to or from a production or utilization facility; or (3) the possession, operation, or use by a DOE contractor or subcontractor of a nuclear device. Thus, the waivers would not apply to claims arising out of an extraordinary nuclear occurrence at a nuclear waste repository, in the course of transportation between a monitored retrievable storage facility and a nuclear waste repository, or involving indemnified nuclear materials licensees under section 53, 63, or 81 of the Atomic Energy Act. H.R. 1414 expands the applicability of the waivers of defenses to include activities involving indemnified materials licensees or nuclear waste.

### K. CONSOLIDATION OF CLAIMS

The current law provides that in the event of an extraordinary nuclear occurrence the U.S. district court in the district where the occurrence takes place (or, in the case of an extraordinary nuclear occurrence outside the United States, the U.S. District Court for the District of Columbia) will have original jurisdiction over any public liability action arising from the occurrence, without regard to the citizenship of any party or the amount in controversy. Moreover, the current Act authorizes the removal to such district court of any public liability action arising from the occurrence that is pending in any state court or other U.S. district court, upon the motion of the defendant or either the Secretary of Energy or NRC, as appropriate.

Supplemental Appendix Page No. 1948

18

These measures stem from the desire of Congress for equitable and uniform treatment of victims of a nuclear accident and the need to coordinate all phases of litigation that could result from a large nuclear accident. Moreover, consolidation of claims in a single court would be essential for the orderly distribution of the limited funds available and to assure reservation of sufficient funds for victims whose injuries may not become manifest until long after the accident.

The Three Mile Island accident demonstrated the difficulty of basing court jurisdiction on the distinction between nuclear incidents deemed to be extraordinary nuclear occurrences and those that are not. Immediately following the accident, before the NRC determined that it did not constitute an extraordinary nuclear occurrence, all claims arising out of the accident were consolidated in the U.S. District Court for the Middle District of Pennsylvania. Subsequent to the NRC's decision, the U.S. Court of Appeals for the Third Circuit held that the district court did not have jurisdiction and ordered dismissal of all pending suits arising out of the accident.

The need for consolidation of claims to ensure equitable and uniform treatment of victims and the orderly distribution of funds is just as great whether the claims arise from a nuclear incident that ultimately is deemed not to be an extraordinary nuclear occurrence or from an incident that is. For this reason, H.R. 1414 makes the Act's consolidation and removal provisions equally applicable to all nuclear incidents.

The Committee recognizes, of course, that Article III of the Constitution limits the types of cases that federal courts created under that Article may hear. For this reason, H.R. 1414 expressly states that any suit asserting public liability shall be deemed to be an action arising under the Price-Anderson Act, thereby making suits asserting public liability "Cases * * * arising under * * * the Laws of the United States" within the meaning of Article III. Rather than designing a new body of substantive law to govern such cases, however, the bill provides that the substantive rules for decision in such actions shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the Price-Anderson Act. The Committee believes that conferring on the Federal courts jurisdiction over claims arising out of all nuclear incidents in this manner is within the constitutional authority of Congress and notes that the Congress has used this approach in the Outer Continental Shelf Lands Act.

### L. SPECIAL CASELOAD MANAGEMENT PANEL

The Committee recognizes that the volume of litigation that could result from a catastrophic nuclear accident could exceed the resources of a single Federal district court. Accordingly, H.R. 1414 authorizes the chief judge of the court in which cases arising from a nuclear incident are consolidated to appoint a special caseload management panel to coordinate and assign such cases. The chief judge could exercise this authority either if the court determines that the aggregate amount of public liability is likely to exceed the primary financial protection or if the chief judge determines that

19

the caseload arising out of the accident will have an unusual impact on the court. Only U.S. district judges or circuit judges are eligible to serve on the panel. The panel may consolidate claims, assign cases, appoint special masters, promulgate special rules of court consistent with the Federal Rules of Civil Procedure, implement measures encouraging efficient resolution of cases, and submit damage estimates to the President.

### M. PUNITIVE DAMAGES

The current Act does not expressly state whether a court may award punitive damages in connection with a claim arising out of a nuclear incident. Nor does the Act expressly state whether private financial protection funds or government indemnity funds could be used to pay punitive damages if imposed. In 1984, in *Silkwood v. Kerr-McGee Corporation,* 464 U.S. 238, the U.S. Supreme Court resolved the first of these two issues when it held that the Atomic Energy Act, as amended by the Price-Anderson Act, does not prevent a court from imposing punitive damages under state tort law. The Court did not address the second issue, however, whether private financial protection or government indemnity funds available under the Price-Anderson Act could be used to pay a punitive damage award.

During the 99th Congress, the Subcommittee on Energy and the Environment approved an amendment to H.R. 3653 that would have prohibited use of either private financial protection or government indemnity funds available under the Act to pay punitive damage awards. The purpose of this amendment was to prevent the limited funds available for compensating actual injuries from being used to pay punitive awards. A serious question arose, however, whether the amendment subjected NRC licensees and DOE contractors to *unlimited* liability for punitive damages, thereby undermining one of the primary tenets of the Act. Accordingly, the Committee subsequently agreed to eliminate the amendment, thus restoring current law on the issue. Notwithstanding this action, the Committee remains opposed to punitive damage awards in connection with claims arising under the Price-Anderson Act because such awards could have the effect of diminishing the limited funds available to compensate actual injuries.

### N. NUCLEAR PHARMACIES

Nuclear pharmacies prepare and dispense radiopharmaceuticals—radioactive drugs used to diagnose and treat diseases. Because radiopharmaceuticals are compounded with byproduct material within the meaning of section 11 e. of the Atomic Energy Act of 1954, the manufacture and possession of radiopharmaceuticals are regulated either by the NRC or by "agreement" states under section 274 of the Atomic Energy Act.

The NRC has discretionary authority under section 170 a. of the existing Price-Anderson Act to require financial protection of, to indemnify, and to limit the liability of byproduct licensees, including nuclear pharmacies. The NRC has not exercised this authority, however, because it believes the amount and type of radioactive material handled by nuclear pharmacies would not result in public

20

liability in excess of available insurance. Indeed, radiopharmaceuticals contain extremely small amounts of radioactivity which decays naturally over a period of hours.

The NRC and this Committee are not aware of a single instance in which a nuclear pharmacy has been held liable for personal injuries or property damage resulting from radioactive emissions from a nuclear pharmacy. In the case of *Mallinckrodt, Inc.* v. *Bennett*, 698 S.W. 2d 854 (Mo. Ct. App. 1985), *cert. denied* 106 S. Ct. 2903 (1986), however, the Missouri Court of Appeals held that a radiopharmaceutical processing plant could be sued for damages resulting from radioactive emissions from such a plant. Although the *Mallinckrodt* case still has not been tried on the merits, nuclear pharmacies fear the Missouri decision exposes them to substantial liability. A spokesman for the nuclear pharmacies testified they are unable to insure against such liability.

The Subcommittee on Energy and the Environment adopted, but the Full Committee did not approve, an amendment to H.R. 1414 that would have: (1) required the NRC to indemnify nuclear pharmacies for any public liability in excess of $500,000 arising from nuclear incidents involving radiopharmaceuticals; (2) exempted nuclear pharmacies from Price–Anderson financial protection requirements; and (3) prohibited suits against nuclear pharmacies for public liability from emissions of radioactive materials at levels permitted by the NRC.

The NRC has testified that the Subcommittee amendment is neither necessary nor appropriate. The Commission noted that it has discretionary authority under section 170 a. of the existing Price-Anderson Act to require financial protection of nuclear pharmacies and other byproduct licensees. The legislative history of this provision makes it clear that Congress intended the NRC to exercise this authority only in "rare instances in which the licensee of the facility may have large quantities of materials or such quantities of especially dangerous or hazardous materials as to warrant the imposition of the provisions" of the Price-Anderson Act. A spokesman for the nuclear pharmacies testified that radiopharmaceuticals contain only "extremely small amounts of radioactivity" and the NRC has concluded that the amount of radioactive materials possessed by nuclear pharmacies could not result in the public liability of a magnitude warranting the extraordinary provisions of the Act.

Moreover, the Subcommittee amendment would have drastically increased the number of licensees indemnified by the NRC from about 145 to nearly 8,000. It would have required the federal government to indemnify all nuclear pharmacies or nuclear medicine departments of hospitals or clinics even though two-thirds of these institutions are regulated by the states rather than the federal government. Finally, it would have preempted state tort law by expressly prohibiting suits for damages resulting from emissions of radioactive materials at levels permitted by the NRC, despite the policy of only interfering with state tort law to the minimum extent necessary—a principle which has been embodied in the Price-Anderson Act for the last 30 years.

For the foregoing reasons, the Committee disapproved even a narrower substitute to the Subcommittee amendment. The Committee recognizes the valuable role played by the radiopharmaceu-

21

ticals in modern medicine and the difficulties presently faced by nuclear pharmacies in obtaining liability insurance. Nonetheless, the Committee is not convinced that the Price-Anderson Act should be used to address a problem of insurance availability that does not stem from the potential for a catastrophic nuclear accident. The Committee expects the NRC to monitor the effects of the insurance crisis on the nuclear pharmacies and to exercise its discretionary authority or to recommend additional legislation if necessary to ensure that the full benefits of nuclear medicine remain available to the public.

### O. LENGTH OF EXTENSION

H.R. 1414 extends the NRC and DOE's authority to enter into indemnity agreements under subsections c., d., and k. for an additional 10 years, until August 1, 1997. The length of extension is based upon the precedent set in the original Price-Anderson Act and followed in both the 1965 and 1975 extensions. Moreover, NRC has testified that the current generation of nuclear power plants will begin to be decommissioned around 1997. Unless additional nuclear power plants are ordered before then, the number of plants available to contribute deferred premiums to the compensation fund will decrease, thereby shrinking the aggregate amount of money available to compensate the public. This situation presents serious questions about the future operation of the deferred premium system which the Committee did not address but which will need to be considered before the Price-Anderson Act is extended beyond August 1, 1997.

### VI. EXPLANATION OF COMMITTEE AMENDMENTS

#### LEGAL COSTS

As introduced, H.R. 1414 would have prohibited payment of the costs of investigating, settling, and defending claims out of financial protection maintained pursuant to subsection 170 b. of the existing law. The Committee adopted an amendment to the bill to permit payment of these costs from financial protection, but only under certain circumstances. The Committee accomplished this result by amending subsection 170 o. of the existing law, which authorizes the U.S. district court having jurisdiction over claims subject to the Price-Anderson Act to allocate available compensation funds among claimants and to control payments whenever such court determines that public liability for a single nuclear incident may exceed the limit on liability established under subsection 170 e.

The Committee amendment adds a new subparagraph (D) to subsection o. (1) that expressly governs payment of "legal costs," which are defined by the amendment as the costs incurred by either claimants or defendants in initiating, prosecuting, investigating, settling or defending claims or suits for damage arising under the Price-Anderson Act.

The court's authority to control payment of legal costs under the amendment arises only when the court's current authority under subsection 170 o. to allocate funds and control payments arises—

22

that is, when the court determines that public liability for a single nuclear incident may exceed the limit on liability under subsection 170 e.

Once the court's authority to control payment of legal costs arises, any person requesting payment of legal costs from the amount of financial protection required by subsection 170 b. (i.e., the amount of insurance and, in the case of large commercial power reactors, the amount of deferred premiums) would be required to obtain court authorization of such payment. The court would first need to determine pursuant to a new paragraph (2) the amount of eligible legal costs based upon a demonstration by the person requesting payment that:

(1) such costs are reasonable and equitable, and

(2) such person has:

(a) litigated in good faith;

(b) avoided unnecessary duplication of effort with other parties similarly situated;

(c) not made frivolous claims or defenses; and

(d) not attempted to unreasonably delay the prompt settlement or adjudication of such claims.

Upon determining the amount of the eligible legal costs under paragraph (2), the court may authorize payment of such amount from the amount of financial protection required under subsection 170 b. In the case of a defendant's legal costs, however, the court may authorize payment of only 70 percent of the amount the court determines to be eligible under paragraph (2). The remaining 30 percent of the eligible legal costs and any legal costs the court determines to be ineligible under paragraph (2) could not be paid either by the amount of primary layer insurance proceeds or the secondary layer deferred premiums available under subsection 170 b. Nothing in this amendment is intended to preclude the payment of the remaining 30 percent of eligible legal costs or any ineligible legal costs through deferred premium charges in excess of those required to be paid under 170 b. In addition, nothing in the amendment is intended to require the court to apply the 70 percent limitation to the primary and secondary layers of financial protection proportionally.

The Committee amendment also amends subsection 170 b. of the existing Act to conform with the addition of the new subsection o. (1)(D). As amended, subsection b. provides that each licensee participating in the industry retrospective rating plan would pay a pro rata share of the aggregate public liability claims and costs—including legal costs not subject to subsection o. (1)(D) and legal costs subject to subsection o. (1)(D), payment of which is authorized in accordance with such subsection, but excluding legal costs subject to subsection o. (1)(D), payment of which has not been authorized in accordance with such subsection.

In addition, the Committee amendment also amends the provision of section 170 e. (1) establishing the limitation on aggregate public liability. Under the amendment, only those legal costs that are authorized to be paid under the new subsection o. (1)(D) could be considered by the court in limiting a defendant's aggregate public liability. Thus, legal costs authorized to be paid under subsection o. (1)(D) would be deducted from the limit on liability,

23

thereby reducing the amount available to pay damage claims. Legal costs not authorized to be paid under subsection o. (1)(D) would not be deducted from the limit on liability and would not effect the amount available to pay damage claims. Where the court does not determine that public liability may exceed the limit on liability, subsection o. (1)(D) would not apply.

The Committee amendment applies only to legal costs for which payment is requested from the amount of financial protection required of NRC licensees under subsection 170 b., that is, primary layer insurance proceeds and, in the case of large commercial power plants, secondary layer deferred premiums. The Committee amendment does not affect the exclusion of legal costs incurred by the NRC licensees and DOE contractors from federal indemnity agreements. Under the 1975 Hathaway Amendment to the Price-Anderson Act, the costs of investigating and settling claims and defending suits for damage are not indemnified under agreements of indemnification with the NRC and DOE under subsection 170 c. and 170 d., respectively. The Committee amendment is not intended to amend existing law or NRC or DOE practice over the past 12 years with respect to the treatment of legal costs under federal indemnity agreements.

### RETROACTIVE INDEMNIFICATION OF DOE CONTRACTORS

H.R. 1414 requires DOE to indemnify its contractors engaged in activities that involve the risk of public liability to the full extent of the aggregate public liability, which could be over $7 billion under current circumstances. To prevent former DOE contractors who were indemnified for no more than $500 million under current law from being subject to liability in excess of DOE indemnification, H.R. 1414 as introduced directed the Secretary to amend each indemnity agreement under section 170 d. to increase the indemnity from $500 million to the full extent of the aggregate public liability under H.R. 1414. To prevent the administrative inconvenience of physically amending all past and present DOE indemnity agreements, the Committee adopted an amendment that deems all such agreements to be amended to reflect the increased indemnity effective on the date of enactment of H.R. 1414.

### DEFINITION OF "NUCLEAR WASTE ACTIVITIES"

The Committee adopted a technical amendment to the definition of "nuclear waste activities" in section 4 of H.R. 1414. As amended, the definition applies wherever the term is used in the Price-Anderson Act and refers only to those nuclear waste activities subject to DOE indemnity agreements under section 170 d. of Act.

### DEFINITION OF "FULL AND PROMPT COMPENSATION"

Section 6 of H.R. 1414 commits Congress to provide "full and prompt compensation" to the public for claims resulting from a nuclear incident that exceeds the limit on liability. As introduced, the bill gave the term "full and prompt compensation" whatever meaning a future Congress might choose to give it in providing compensation. The Committee struck this definition because it appeared to weaken the commitment to provide full and prompt compensation.

24

### TECHNICAL AMENDMENT

This amendment further clarifies the execution of a technical amendment in section 16(a)(5) of the bill.

### EFFECTIVE DATE

As introduced, section 17 of H.R. 1414 provided that the bill would become effective on August 1, 1987, except for sections 9 and subsection 11(a) and 11(b), which were to become effective on the date of enactment of the bill. The Committee amended section 17 to make the entire bill effective on the date of enactment.

### VII. SECTION-BY-SECTION ANALYSIS OF H.R. 1414 AS AMENDED

*Section 1* entitles the act the "Price-Anderson Amendments Act of 1987."

*Section 2* amends section 170 b. of the Atomic Energy Act of 1954, which establishes financial protection requirements for NRC licensees, in several respects.

First, for clarity, section 2(a) draws a distinction between "primary" financial protection required of large commercial power reactors licensed by the NRC (those that have a rated capacity of 100,000 electrical kilowatts or more) and the "industry retrospective rating plan" in which section 170 b. of the Atomic Energy Act requires such reactors to participate. Section 2(a) makes no change in the amount of "primary" financial protection such reactors are required to maintain. Such reactors must continue to maintain the maximum amount of financial protection available from private sources at reasonable cost and on reasonable terms.

Second, section 2(b) directs the NRC to increase the maximum deferred premium that may be charged each large commercial power reactor following any nuclear incident from its current level of $5 million to $63 million. Section 2(b) limits the amount of the deferred premium that may be charged with respect to any nuclear incident in any one year to $10 million per reactor.

Third, section 2(b) restricts the amount of legal costs that may be charged to a licensee as part of the standard deferred premium paid by such licensee under section 170 b. Current law provides that "the amount which may be charged a licensee following any nuclear incident shall not exceed the licensee's pro rata share of the aggregate public liability claims and costs arising out of the nuclear incident." Section 2(b) would exclude from this amount legal costs subject to court authorization under subsection o. (1)(D) that the court has not authorized to be paid in accordance with such provision.

Fourth, section 2(c) eliminates the NRC's existing authority to establish a maximum amount of total deferred premiums that may be charged for all nuclear incidents in any one year, and its existing authority to charge some utilities smaller deferred premiums than others. In place of those provisions, section 2(c) provides the NRC new authority to assess lesser annual deferred premium, on a case by case basis, in the event of multiple nuclear incidents in one calendar year or because of undue financial hardship on a licensee operating multiple facilities. If a lesser yearly premium is assessed,



25

section 2(c) requires that the remainder of the standard premium be paid, with interest, within a reasonable time period.

Fifth, section 2(d) establishes procedures to be followed by the NRC in borrowing funds from the Treasury if necessary to compensate victims of a nuclear incident promptly, before deferred premiums are collected from licensees. This authority is needed to ensure that the full amount of financial protection provided by section 170 b. is available to pay claims promptly after an accident, even though all deferred premiums may not be collected for up to 7 years after the accident. Any funds borrowed from the Treasury under this authority would be repaid with interest from deferred premiums subsequently collected from the utilities in accordance with the annual maximum on deferred premiums.

*Section 3* extends the NRC's authority under section 170 c. of the Act to enter into indemnification agreements with licensees for which the NRC requires financial protection of less than $500 million (e.g. small power reactors and research reactors) for an additional ten years—until August 1, 1997.

*Section 4* makes major changes in section 170 d. of the current Act, which authorizes DOE to indemnify its contractors engaged in nuclear activities that involve the risk of public liability for a substantial nuclear incident.

In order to ensure that the public is adequately protected under this subsection, the Department's indemnification authority, which has heretofore been discretionary, is made mandatory for all DOE contracts involving risk of public liability for a nuclear incident. The provision in existing law limiting the Department's indemnification authority to the risk of public liability for a *substantial* nuclear incident is eliminated.

In addition, the Department's indemnification authority under this subsection is extended for an additional ten years—until August 1, 1997.

A new subparagraph (B) is added to section 170 d. (1) to clarify the application of the Price-Anderson Act to activities of the Department involving radioactive waste. The new subparagraph provides that indemnification under the Price-Anderson Act shall be the exclusive means by which the Secretary of Energy shall indemnify contractors for public liability arising from activities undertaken under contract for the Department involving the storage, handling, transportation, treatment, or disposal of, or research and development on, spent nuclear fuel, high-level radioactive waste, or transuranic waste. These activities would include, among others things, activities at the Waste Isolation Pilot Project authorized under section 213 of Public Law 96–194. In addition, the new subparagraph (B) provides that the waiver of any issue or defense as to charitable or governmental immunity authorized in the existing subsection n. (1) may be incorporated into agreements of indemnification for nuclear waste activities.

With respect to public liability claims arising out of activities funded by the Nuclear Waste Fund established by section 302 of the Nuclear Waste Policy Act of 1982, payment of valid claims would be made from such Fund, up to an amount not to exceed the maximum amount of financial protection required for large commercial power reactors under section 170 b. (1). Assuming there are

26

109 large commercial reactors required to maintain the maximum amount of financial protection at the time of a radioactive waste accident, the maximum amount payable from the Nuclear Waste Fund would be $7,027 million.

With respect to public liability claims arising out of activities not funded by the Nuclear Waste Fund, the source of funds to pay claims would be the same as that used for all other DOE contractor activities; that is, DOE appropriated funds.

Paragraphs (2) and (3) of the new section 170 d. provide for an increase in the amount of the federal indemnity for public liability claims arising out of or in connection with DOE contractual activities from the current level of $500 million to the full extent of the potential aggregate liability of the contractor.

In general, the maximum potential aggregate liability of a contractor—and of DOE under an indemnity agreement with the contractor—would be an amount equal to the sum of the two layers of financial protection required by section 170 b. (1) for large commercial power reactors licensed by the NRC. The amount of the indemnity will increase automatically as new nuclear power plants are licensed and the total amount of financial protection for such plants increases under section 170 b. (1). However, paragraph (3) provides that the Federal indemnity will not be reduced in the event that the financial protection required of NRC-licensed large commercial power reactors is reduced.

Under the new section 170 e. (3)(A), a contractor engaged in nuclear waste activities on behalf of DOE could be subject to unlimited public liability. In such circumstances, paragraph (2) requires DOE to indemnify the contractor against unlimited liability.

Paragraph (3) deems all current and past indemnification agreements under which DOE may be required to make indemnification payments to be amended to indemnify persons indemnified thereunder to the full extent of the aggregate public liability of such persons. Amendment of past indemnification agreements is necessary because a contractor may be held liable for claims arising from activities conducted pursuant to a DOE contract years after the contract has been performed and terminated. Paragraph (3) is intended to ensure that DOE will indemnify its former contractors to the full extent of the public liability arising from the contract activities notwithstanding any dollar limitation in the original indemnification agreement.

Paragraphs (4), (5), and (6) consist of unchanged provisions in the current Act. Paragraph numbering of these provisions was added to conform to the remainder of the subsection.

Section 4(b) amends section 11 of the Atomic Energy Act by adding definitions of the terms "high-level radioactive waste," "spent nuclear fuel," "transuranic waste," and "nuclear waste activities." The first two terms are given the meanings assigned to these terms in the Nuclear Waster Policy Act; the third term, which is not defined in the Nuclear Waste Policy Act, is given the meaning assigned to it in the NRC's regulations. The term "nuclear waste activities," as used in section 170, is defined as those activities subject to an indemnification agreement under section 170 d. that the Secretary of Energy is authorized to perform involving spent nuclear fuel, high-level radioactive waste or transuranic

27

waste. This includes those activities to be performed under the Waste Isolation Pilot Project.

*Section 5,* subsection (a) amends the definition of "public liability" in section 11 w. of the Atomic Energy Act to include legal liability arising out of or resulting from a precautionary evacuation as well as a nuclear incident. The definition of public liability as amended by section 5(a) makes it clear that all costs of responding to a nuclear incident or precautionary evacuation incurred by a State, or a political subdivision of a State, as well as such costs incurred by the public, are compensable.

Section 5(b) defines the term "precautionary evacuation." A precautionary evacuation is an evacuation of the public ordered by an authorized State or local government official and prompted by the perceived risk of injuries from a nuclear incident even though the event ultimately is not classified as a nuclear incident.

Section 5(c) makes clear that a court may only award costs of a precautionary evacuation if those costs are a public liability, as defined in section 11 w. of the Atomic Energy Act.

*Section 6* makes three significant changes in section 170 e. of the current Atomic Energy Act, which establishes the aggregate liability of persons indemnified for a single nuclear incident.

First, section 6 includes in the aggregate public liability for a single nuclear incident only those legal costs (defined in subsection 11(d) of the bill) that are authorized to be paid by the court in accordance with the new section 170 o. (1)(D), which is added by section 11(d) of the bill. Legal costs authorized to be paid under subsection o. (1)(D) would be deducted from the limit on liability, thereby reducing the amount available to pay damage claims. Legal costs not authorized to be paid under subsection o. (1)(D) would not be deducted from the limit on liability and would not affect the amount available to pay damage claims. Where the court does not determine that public liability may exceed the limit on liability, subsection o. (1)(D) would not apply. The new section 170 o. (1)(D) applies only to legal costs for which payment is requested from the amount of financial protection required by subsection 170 b. of the Act.

Second, section 6 increases the aggregate liability for a single nuclear incident for DOE contractors to the sum of the two layers of financial protection required of large commercial power reactors licensed by the NRC under section 170 b. or the amount of indemnity and financial protection required under paragraph (3) of subsection d., whichever is greater.

By its terms, section 6 otherwise maintains the current aggregate liability of all indemnified NRC licensees. By increasing the maximum deferred premium that may be charged each large commercial power reactor from $5 million to $63 million, however, the aggregate liability of such power reactors is substantially increased.

Third, section 6 clarifies and strengthens the Congressional commitment to compensate the public in full for claims resulting from a catastrophic accident exceeding the statutory limitation on liability. In the event of such an accident, the Congress will thoroughly review the accident in accordance with section 170 i. of the Atomic Energy Act, as amended by section 7 of the bill, and take whatever

28

action is determined to be necessary to provide full and prompt compensation to the public.

Section 6 also adds a new paragraph (3) to section 170 e. to ensure that the Congress will provide full and prompt compensation to victims of any nuclear incident involving radioactive waste in which claims exceed the maximum amount of funds available under section 170 d. (1)(B)(ii). Under the new paragraph (3), the limitation on liability for radioactive waste incidents would be waived if two conditions were met: if a court determined that liability from such an incident would likely exceed the limit and if Congress failed to act to provide full and prompt compensation for such liability within one year of receiving the President's compensation plan required under the new section 170 i. (2)(C).

In addition, section 6 adds a new paragraph (4) to section 170 e. which stipulates that the statutory limitation on liability may not be construed to preclude a future Congress from imposing additional revenue measures upon NRC licensees (or indeed any other class of persons) if necessary to provide funds to compensate victims of a nuclear accident.

Finally, section 6 renumbers as paragraph (5) the existing limitation of $100 million on indemnification for a nuclear incident occurring outside the United States.

*Section 7* amends section 170 i. of the Atomic Energy Act by establishing the requirements and procedures for congressional review of any nuclear incident that appears likely to exceed the statutory limitation on liability. As under current law, the NRC or DOE (as appropriate) would be required to report to the Congress on the causes and extent of damage following a catastrophic nuclear accident. In addition, section 7 would require the President: (a) to report to Congress on the amount of additional funds that will be needed to compensate damages in excess of the liability limit; (b) to recommend additional sources of funds for such compensation; (c) to propose specific plans for disbursing compensation to the public; and (d) to recommend any additional legislation necessary to implement the compensation plan. Implementation of the President's proposals would require additional congressional action.

*Section 8* would extend by 10 years—until August 1, 1997—the NRC's authority under section 170 k. of the current Act to indemnify certain nonprofit educational institutions licensed to operate nuclear research reactors.

*Section 9* amends section 170 l. by striking the now obsolete authority of the Atomic Energy Commission to indemnify contractor activities involving the nuclear ship *Savannah*, which has since been decommissioned. In place of this obsolete authority, section 9 adds new provisions requiring the President to establish a commission to study appropriate means of fully compensating the public in the event of a catastrophic nuclear accident exceeding the statutory limitations on liability. The study commission is required to recommend to the Congress: (a) changes in civil procedures needed for prompt disposition of claims; (b) standards for establishing priorities among claims; and (c) provisions for addressing latent injury claims. The study commission's report will be due two years after enactment of the bill and the commission will terminate two months after transmittal of the report. Implementation of the

29

study commission's recommendation would require further legislation.

*Section 10*, subsection (a) amends section 170 n. (1) of the current Act by eliminating the condition that a state statute of limitations be waived only if suit is filed within 20 years after the nuclear incident. As a result, the waiver of a state statute of limitation is conditioned only on suit being instituted within 3 years of the date the claimant knew or reasonably could have known of the injury.

Section 10(b) broadens the application of the waiver-of-defenses provisions of the existing Act to include extraordinary nuclear occurrences involving nuclear waste activities or nuclear materials licensees indemnified by the NRC.

*Section 11*, subsection (a) amends section 170 n. (2) of the Atomic Energy Act to make the consolidation of claims provisions of that paragraph applicable to all nuclear incidents, rather than just nuclear incidents deemed to constitute an "extraordinary nuclear occurrence." This change is necessary to ensure the equitable and uniform treatment of all victims and the coordination of all phases of litigation that could result from a large nuclear accident, even though the accident may not constitute an "extraordinary nuclear occurrence." Section 11(a) also permits consolidation and removal of public liability actions pending on the date of enactment of the bill.

Section 11(b) defines the term "public liability action" as any suit asserting public liability, and states that any such action arises under the Price-Anderson Act for purposes of Federal court jurisdiction. The subsection further provides that the substantive rules for decision in such an action are to be derived from the law of the state in which the nuclear incident occurs, unless inconsistent with the Price-Anderson Act.

Section 11(c) amends section 170 n. of the current Act to authorize the chief judge of the Federal district court in which claims are consolidated to establish a special case load management panel to assist the court in coordinating and assigning cases arising out of the nuclear incident and implementing measures for the equitable, prompt, and efficient resolution of such cases. This authority would be exercisable only if the aggregate amount of public liability is likely to exceed the amount of primary financial protection under section 170 b. of the Act or the amount of the federal indemnity under section 170 d., as appropriate, or if the caseload arising out of the nuclear incident will have an unusual impact on the work of the court. Only Federal district and circuit court judges are eligible to serve on such panel.

Section 11(d)(1) redesignates subsection o. of the existing law as paragraph o. (1), and adds a new subparagraph o. (1)(D) and a new paragraph (2).

Subsection 170 o. of the existing Price-Anderson Act authorizes the U.S. district court having jurisdiction over claims subject to the Price-Anderson Act to allocate available compensation funds among claimants and to control payments whenever such court determines that public liability for a single nuclear incident may exceed the limit on liability established under subsection 170 e.

The new subparagraph (D) authorizes the court to control the payment of "legal cost," which is defined by section 11(d)(2) of the

30

bill, whenever the court determines public liability may exceed the liability limit.

Once the court's authority to control payment of legal costs arises under subsection o. (1), any person requesting payment of legal costs from the amount of financial protection required by subsection 170 b. (i.e., the amount of insurance and, in the case of large commercial power reactors, the amount of deferred premiums) would be required to obtain court authorization of such payment. The court would first need to determine pursuant to a new paragraph 170 o. (2) the amount of eligible legal costs based upon a showing by the person requesting payment that:

(1) such costs are reasonable and equitable, and

(2) such person has:

    (a) litigated in good faith;

    (b) avoided unnecessary duplication of effort with other parties similarly situated;

    (c) not made frivolous claims or defenses; and

    (d) not attempted to unreasonably delay the prompt settlement or adjudication of such claims.

Upon determining the amount of the eligible legal costs under paragraph 170 o. (2), the court may authorize payment of such amount from the financial protection funds required under subsection 170 b. In the case of a defendant's legal costs, however, the court may authorize payment of only 70 percent of the amount the court determines to be eligible under paragraph (2). The remaining 30 percent of the eligible legal costs and any legal costs the court determines to be ineligible under paragraph (2) could not be paid either by the amount of primary layer insurance proceeds or the secondary layer deferred premiums available under subsection 170 b.

Section 11(d)(2) defines the term "legal costs" as the costs incurred by either a plaintiff or defendant in initiating, prosecuting, investigating, settling, or defending claims or suits for damage arising under the Price-Anderson Act.

*Section 12* amends section 170 p. of the current Act to require NRC and DOE to report to the Congress by August 1, 1993 on the need for continuation or modification of the Price-Anderson Act.

Section 12 also imposes annual reporting requirements on both NRC and DOE regarding activities under section 170 during each calendar year. There is a further requirement that DOE submit a report to Congress by February 1, 1988, regarding civil and criminal liabilities of DOE contractors engaged in certain misconduct at DOE facilities.

*Section 13* provides that the owner of an equity interest in a nuclear facility who leases such interest to the NRC-licensee that operates the facility does not become liable for public liability merely on the basis of such equity interest. The provision is intended to reaffirm that lessors in sale-leaseback financing arrangements involving nuclear power plants are not made liable under the Price-Anderson Act merely by reason of their status as lessors. Current law clearly channels public liability for a nuclear incident to the person with whom an indemnity agreement is executed or who is required to maintain financial protection—in the case of a nuclear power plant, the licensee. Section 13 is intended to merely reaffirm

31

that the "channelling" effect of current law is not affected by sale-and-leaseback financing.

*Section 14* bars courts from awarding punitive damages where the Federal government would be liable for such damages under any indemnification agreement.

*Section 15* requires the NRC to adjust the amount of the aggregate standard deferred premium once every five years to reflect the change in the consumer price index. The provision is intended to prevent the amount of available compensation from being eroded by the effect of inflation.

*Section 16* changes references to the "Commission" in the present Act to either the NRC, the Secretary of Energy, or both, as appropriate. It also changes references to the Joint Committee on Atomic Energy to the Congress, changes Revised Statutes citations to the United States Code citations, and makes other technical and conforming changes.

*Section 17* provides that the amendments to the Price-Anderson Act made by H.R. 1414 will become effective on the date of enactment thereof, and shall apply to any nuclear incident occurring on or after such date.

## VIII. CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, May 14, 1987.*

Hon. MORRIS K. UDALL,
*Chairman, Committee on Interior and Insular Affairs,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 1414, the Price-Anderson Amendments Act of 1987, as ordered reported by the House Committee on Interior and Insular Affairs, May 6, 1987. This bill would increase the government's potential financial liability in the event of a nuclear accident involving federal contractors and certain other types of nuclear accidents. Because there is no basis for predicting the number and magnitude of such incidents, CBO cannot estimate the cost of the increased liability. The bill also raises the maximum liability of operators of commercial nuclear power plants, thus decreasing the likelihood that an accident involving such a facility would exceed the liability limit and possibly necessitate government action.

CBO estimates that the bill's provision for a new Presidential Commission on Catastrophic Nuclear Accidents would cost approximately $500,000 per year, for fiscal years 1988 and 1989. No significant costs to the federal government would result from other provisions of H.R. 1414.

### BILL PURPOSE

H.R. 1414 extends and revises the Price-Anderson Act, which governs the liability and indemnification of federal licensees and contractors in the event of a nuclear accident. Under this law, the Nuclear Regulatory Commission (NRC) regulates and indemnifies licensees, and the Department of Energy (DOE) indemnifies its contractors.

32

Under current law, which expires on August 1, 1987, utilities are required to carry the maximum available private liability insurance, currently $160 million per reactor. For nuclear accident damages beyond this "primary layer" of compensation, each licensed reactor may be assessed a charge of $5 million per accident. The law calls these charges "deferred premiums"; they would not be assessed until an accident occurs. With 109 reactors currently licensed by the NRC, this "secondary layer" of nuclear accident insurance totals $545 million, for a total commercial liability of $705 million (under current law). Federal liability for nuclear accidents caused by DOE contractors is currently limited to $500 million.

H.R. 1414 raises the maximum liability for a nuclear accident involving commercial power plants and federal contractors from $705 million and $500 million, respectively, to an estimated $7.0 billion per incident. The bill sets the liability limit according to the amount of financial protection that the NRC requires commercial licensees to maintain from primary liability insurance (currently $160 million), and from deferred premiums levied on all other operating plants (up to $63 million per reactor, as determined by the NRC). In general, the aggregate deferred premium of $63 million per reactor, for each nuclear accident, is to be paid at a rate of no more than $10 million per year.

The bill provides the NRC with authority to assess certain facilities annual deferred premiums less than the standard deferred premium of $10 million per year under special circumstances. If the NRC reduces annual premiums, the licensee would have to pay the difference between the standard deferred premium and the reduced premium in later years, with interest at a rate determined by the Secretary of the Treasury.

The estimated $7.0 billion limit established by H.R. 1414 would be increased over time, because the bill requires the NRC to make inflation adjustments to the aggregate deferred premium at least once every five years. CBO estimates that the aggregate deferred premium would rise from $63 million per plant at the end of fiscal year 1987 to approximately $77 million per plant by the end of fiscal year 1992.

The bill includes instructions that the NRC shall request either an appropriation to meet any nuclear accident claims for which the commission is liable, or borrow the required funds from the Treasury. Any funds appropriated or borrowed to meet claim requirements shall be repaid to the Treasury from amounts made available by future deferred premiums, with interest. Special procedures are included in the bill for Congressional action on claims exceeding the above limits. However, the federal government is not liable for any claims beyond the indemnity provisions in the Price-Anderson Amendments Act. Specifically, the government has no legal liability for accidents caused by commercial reactor licensees (beyond what the NRC can collect in deferred premiums under the act); and the government's liability for accidents caused by DOE contractors is limited to the total of primary liability insurance and aggregate deferred premiums ($7.0 billion per incident under current insurance and premium assumptions).

H.R. 1414 explicitly makes federal indemnification applicable to certain activities or incidents. For example, it confirms that DOE

33

must indemnify contractors involved with its nuclear waste programs. Claims related to the Nuclear Waste Fund are to be paid directly from the fund. The bill also provides for the reimbursement of the cost of precautionary evacuations resulting from incidents involving contractors indemnified by the federal government under certain conditions.

H.R. 1414 also makes provision for the payment of certain legal costs incurred during the litigation of Price-Anderson insurance claims. A court may authorize the payment of legal costs from the amount of financial protection that is provided by the assessment of deferred premiums.

### BUDGET IMPACT

The increase, due to H.R. 1414, in the liability for accidents involving commercial pants would not directly affect the federal government's financial liability, because commercial licensees would be ultimately responsible for all accident claims up to the new liability limit. It is possible that the government would take action in the event of an accident with claims exceeding the licensees' liability, though no actions would be required under law. The increase in the commercial liability limit makes it less likely that such government involvement would occur in the event of a major nuclear accident. On the other hand, because the government fully indemnifies federal contractors, the increase in liability for incidents involving the contractors would be borne by the federal government. The liability and indemnification of other licensees would remain at current levels.

The provisions affecting the government's financial liability would not increase federal spending in fiscal year 1987 through 1992 unless a nuclear incident involving federal indemnification occurs in those years. If such an accident were to occur, enactment of the bill would increase the government's potential financial liability by an estimated $6.5 billion per accident for accidents caused by DOE contractors that are indemnified by DOE under current law. For certain incidents that may not be covered under current law, H.R. 1414 would establish the government's potential liability at an estimated $7.0 billion per incident. (For example, the bill confirms that the total Price-Anderson liability limit applies to federal nuclear waste programs.)

The limit on the federal government's liability is linked to the total commercial liability for a nuclear accident. The government's liability would increase in the future as a result of any increase in the number of commercial reactors with operating licenses, and as a result of increases in the inflation-adjusted premiums. However, the bill does not allow a reduction in federal liability in the event that the maximum amount of commercial liability is reduced (because of a reduction in the number of commercial reactors). This estimate assumes that commercial licensees would be required to maintain at least $160 million in primary liability insurance, and that the 109 reactors with operating licenses would be subject to the maximum deferred premiums. Raising the liability and indemnification limit is not expected to affect the government's costs for claims currently pending before the courts and DOE, because the

34

amount of alleged damages per incident does not exceed the liability limit in existing law.

H.R. 1414 requires that the President establish a Commission on Catastrophic Nuclear Accidents within 90 days after enactment of the bill. The commission shall consist of 7 to 11 members who must conduct a study of appropriate means of fully compensating victims of a catastrophic nuclear accident that exceeds the aggregate liability specified by H.R. 1414. A final report containing the commission's recommendations must be submitted to the Congress within two years of enactment of the bill. The estimated cost of establishing this Presidential commission is $500,000 per year, for fiscal years 1988 and 1989. The commission shall terminate two months after the required final report is submitted.

Other provisions in the bill are expected to have no significant impact on federal outlays.

No costs would be incurred by state or local governments as a result of enactment of this bill.

If you wish further details on this estimate, we will be pleased to provide them.

With best wishes,
Sincerely,

EDWARD M. GRAMLICH,
*Acting Director.*

### IX. INFLATIONARY IMPACT STATEMENT

As recommended by the Committee on Interior and Insular Affairs, H.R. 1414 is not expected to have any significant effect on inflation; however, in the event of a catastrophic nuclear accident significant expenditures would be involved pursuant to the legislation which may result in some inflationary consequences.

### X. COMMITTEE DETERMINATION ON ADVISORY COMMITTEE

Section 9 of the bill reported by the Committee amends section 170 l. of the Atomic Energy Act of 1954 (42 U.S.C. 2210(l)) to establish a Presidential Commission on Catastrophic Nuclear Accidents. In accordance with the requirements of section 5(b) of the Federal Advisory Committee Act (5 U.S.C. App.), the Committee has determined that the functions of the proposed commission are not and cannot be performed by one or more agencies or by an existing advisory committee, and cannot be performed by enlarging the mandate of an existing advisory committtee.

### XI. OVERSIGHT STATEMENT

The Committee has conducted hearings on the operation of the Price-Anderson Act for some time and will continue to maintain oversight activities over the implementation of this legislation. No recommendations were received by the Committee pursuant to Rule X.

35

## XII. COMMITTEE RECOMMENDATION

The Committee on Interior and Insular Affairs, by voice vote, ordered H.R. 1414, as amended, favorably reported to the House on May 6, 1987.

## XIII. CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### ATOMIC ENERGY ACT OF 1954

*       *       *       *       *       *

#### CHAPTER 2. DEFINITIONS

SEC. 11. DEFINITION.—The intent of Congress in the definitions as given in this section should be constructed from the words or phrases used in the definitions. As used in this Act:
a. * * *

*       *       *       *       *       *       *

j. The term "extraordinary nuclear occurrence" means any event causing a discharge or dispersal of source, special nuclear, or by-product material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the 【Commission】 *Nuclear Regulatory Commission or Secretary of Energy, as appropriate,* determines to be substantial, and which the 【Commission】 *Nuclear Regulatory Commission or the Secretary of Energy, as appropriate,* determines has resulted or will probably result in substantial damages to persons offsite or property offsite. Any determination by the 【Commission】 *Nuclear Regulatory Commission or the Secretary of Energy, as appropriate,* that such an event has, or has not, occurred shall be final and conclusive, and no other official or any court shall have power or jurisdiction to review any such determination. The 【Commission】 *Nuclear Regulatory Commission or the Secretary of Energy, as appropriate,* shall establish criteria in writing setting forth the basis upon which such determination shall be made. As used in this subsection, "offsite" means away from "the location" or the "contract location" as defined in the applicable 【Commission】 *Nuclear Regulatory Commission or the Secretary of Energy, as appropriate,* indemnity agreement, entered into pursuant to section 170.

*       *       *       *       *       *

m. The term "indemnitor" means (1) any insurer with respect to his obligations under a policy of insurance furnished as proof of financial protection; (2) any licensee, contractor or other person who is obligated under any other form of financial protection, with respect to such obligations; and (3) the 【Commission】 *Nuclear Regulatory Commission or the Secretary of Energy, as appropriate,* with

36

respect to any obligation undertaken by it in an indemnity agreement entered into pursuant to section 170.

⁎   ⁎   ⁎   ⁎   ⁎   ⁎   ⁎

q. The term "nuclear incident" means any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material: *Provided, however,* That as the term is used in [subsection] *section* 170 l., it shall include any such occurrence outside the United States: *And provided further,* That as the term is used in [subsection] *section* 170 d., it shall include any such occurrence outside the United States if such occurrence involves source, special nuclear, or byproduct material owned by, and used by or under contract with, the United States: *And provided further,* That as the term is used in [subsection] *section* 170 c., it shall include any such occurrence outside both the United States and any other nation if such occurrence arises out of or results from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material licensed pursuant to chapters 6, 7, 8, and 10 of this Act, which is used on connection with the operation of a licensed stationary production or utilization facility or which moves outside the territorial limits of the United States in transit from one person licensed by the [Commission] *Nuclear Regulatory Commission* to another person licensed by the [Commission] *Nuclear Regulatory Commission.*

⁎   ⁎   ⁎   ⁎   ⁎   ⁎   ⁎

t. The term "person indemnified" means (1) with respect to a nuclear incident occurring within the United States or outside the United States as the term is used in [subsection] *section* 170 c., and with respect to any nuclear incident in connection with the design, development, construction, operation, repair, maintenance, or use of the nuclear ship Savannah, the person with whom an indemnity agreement is executed or who is required to maintain financial protection, and any other person who may be liable for public liability or (2) with respect to any other nuclear incident occurring outside the United States, the person with whom an indemnity agreement is executed and any other person who may be liable for public liability by reason of his activities under any contract with the [Commission] *Secretary of Energy* or any project to which indemnification under the provisions of [subsection] *section* 170 d., has been extended or under any subcontract, purchase order, or other agreement, of any tier, under any such contract or project.

⁎   ⁎   ⁎   ⁎   ⁎   ⁎   ⁎

w. The term "public liability" means any legal liability arising out of or resulting from a nuclear incident or precautionary evacuation (including all reasonable additional costs incurred by a State, or a political subdivision of a State, in the course of responding to a nuclear incident or a precautionary evacuation), except: (i) claims under State or Federal workmen's compensation acts of employees

37

of persons indemnified who are employed at the site of and in connection with the activity where the nuclear incident occurs; (ii) claims arising out of an act of war; and (iii) whenever used in [subsections 170 a., c., and k.] *subsections a., c., and k. of section 170,* claims for loss of, or damage to, or loss of use of property which is located at the site of and used in connection with the licensed activity where the nuclear incident occurs. "Public liability" also includes damage to property of persons indemnified: *Provided,* That such property is covered under the terms of the financial protection required, except property which is located at the site of and used in connection with the activity where the nuclear incident occurs.

＊　　＊　　＊　　＊　　＊　　＊

*dd. The terms "high-level radioactive waste" and "spent nuclear fuel" have the meanings given such terms in section 2 of the Nuclear Waste Policy Act of 1982 (42 U.S.C. 10101).*

*ee. The term "transuranic waste" means material contaminated with elements that have an atomic number greater than 92, including neptunium, plutonium, americium, and curium, and that are in concentrations greater than 10 nanocuries per gram, or in such other concentrations as the Nuclear Regulatory Commission may prescribe to protect the public health and safety.*

*ff. The term "nuclear waste activities", as used in section 170, means activities subject to an agreement of indemnification under subsection d. of such section, that the Secretary of Energy is authorized to undertake, under this Act or any other law, involving the storage, handling, transportation, treatment, or disposal of, or research and development on, spent nuclear fuel, high-level radioactive waste, or transuranic waste, including (but not limited to) activities authorized to be carried out under the Waste Isolation Pilot Project under section 213 of Public Law 96-164 (93 Stat. 1265).*

*gg. The term "precautionary evacuation" means an evacuation of the public within a specified area near a nuclear facility, or the transportation route in the case of an accident involving transportation of source material, special nuclear material, byproduct material, high-level radioactive waste, spent nuclear fuel, or transuranic waste to or from a production or utilization facility, if the evacuation is—*

*(1) the result of any event that is not classified as a nuclear incident but that poses imminent danger of bodily injury or property damage from the radiological properties of source material, special nuclear material, byproduct material, high-level radioactive waste, spent nuclear fuel, or transuranic waste, and causes an evacuation; and*

*(2) initiated by an official of a State or a political subdivision of a State, who is authorized by State law to initiate such an evacuation and who reasonably determined that such an evacuation was necessary to protect the public health and safety.*

*hh. The term "public liability action", as used in section 170, means any suit asserting public liability. A public liability action shall be deemed to be an action arising under section 170, and the substantive rules for decision in such action shall be derived from*

38

*the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.*

ii. LEGAL COSTS.—*As used in section 170, the term "legal costs" means the costs incurred by a plaintiff or a defendant in initiating, prosecuting, investigating, settling, or defending claims or suits for damage arising under such section.*

\*         \*         \*         \*         \*         \*         \*

## CHAPTER 14. GENERAL AUTHORITY

\*         \*         \*         \*         \*         \*         \*

SEC. 170. INDEMNIFICATION AND LIMITATION OF LIABILITY.—

a. REQUIREMENT OF FINANCIAL PROTECTION FOR LICENSEES.— Each license issued under section 103 or 104 and each construction permit issued under section 185 shall, and each license issued under section 53, 63, or 81 may, for the public purposes cited in [subsection 2 i. of the Atomic Energy Act of 1954, as amended] *section 2 i.,* have as a condition of the license a requirement that the licensee have and maintain financial protection of such type and in such amounts as the [Commission] *Nuclear Regulatory Commission (in this section referred to as the "Commission")* in the exercise of its licensing and regulatory authority and responsibility shall require in accordance with subsection [170] b. to cover public liability claims. Whenever such financial protection is required it may be a further condition of the license that the licensee execute and maintain an indemnification agreement in accordance with subsection [170] c. The Commission may require, as a further condition of issuing a license, that an applicant waive any immunity from public liability conferred by Federal or State law.

b. AMOUNT AND TYPE OF FINANCIAL PROTECTION FOR LICENS- EES.—*(1)* The amount of *primary* financial protection required shall be the amount of liability insurance available from private sources, except that the Commission may establish a lesser amount on the basis of criteria set forth in writing, which it may revise from time to time, taking into consideration such factors as the following: [(1)] *(A)* the cost and terms of private insurance, [(2)] *(B)* the type, size, and location of the licensed activity and other factors pertaining to the hazard, and [(3)] *(C)* the nature and purpose of the licensed activity: *Provided,* That for facilities designed for producing substantial amounts of electricity and having a rated capacity of 100,000 electrical kilowatts or more, the amount of *primary* financial protection required shall be the maximum amount available at reasonable cost and on reasonable terms from private sources *(excluding the amount of private liability insurance available under the industry retrospective rating plan required in this subsection).* Such *primary* financial protection may include private insurance, private contractual indemnities, self-insurance, other proof of financial responsibility, or a combination of such measures and shall be subject to such terms and conditions as the Commission may, by rule, regulation, or order, prescribe. [In prescribing such terms and conditions for licensees required to have and maintain financial protection equal to the maximum amount of liability insurance available from private sources, the Commission shall, by rule initially prescribed not later than twelve months from the

39

date of enactment of this Act, include, in determining such maximum amount,] *The Commission shall require licensees that are required to have and maintain primary financial protection equal to the maximum amount of liability insurance available from private sources to maintain, in addition to such primary financial protection,* private liability insurance available under an industry retrospective rating plan providing for premium charges deferred in whole or major part until public liability from a nuclear incident exceeds or appears likely to exceed the level of the primary financial protection required of the licensee involved in the nuclear incident: *Provided,* That such insurance is available to, and required of, all of the licensees of such facilities without regard to the manner in which they obtain other types or amounts of such *primary* financial protection: *And provided further,* [That the standard deferred premium which may be charged following any nuclear incident under such a plan shall be not less than $2,000,000 nor more than $5,000,000 for each facility required to maintain the maximum amount of financial protection] *That the aggregate amount of the standard deferred premium that may be charged following any nuclear incident under such a plan shall not be more than $63,000,000 (but not more than $10,000,000 in any 1 year) for each facility required to maintain the maximum amount of primary financial protection: And provided further,* That the amount which may be charged a licensee following any nuclear incident shall not exceed the licensee's pro rata share of the aggregate public liability claims and costs *(excluding legal costs subject to subsection o. (1)(D), payment of which has not been authorized in accordance with such subsection o. (1)(D))* arises out of the nuclear incident. Payment of any State premium taxes which may be applicable to any deferred premium provided for in this Act shall be the responsibility of the licensee and shall not be included in the retrospective premium established by the Commission. [The Commission is authorized to establish a maximum amount which the aggregate deferred premiums charged for each facility within one calendar year may not exceed. The Commission may establish amounts less than the standard premium for individual facilities taking into account such factors as the facility's size, location, and other factors pertaining to the hazard.]

*(2)(A) The Commission may, on a case by case basis, assess annual deferred premium amounts less than the standard annual deferred premium amount assessed under paragraph (1)—*

*(i) for any facility, if more than one nuclear incident occurs in any one calendar year; or*

*(ii) for any licensee licensed to operate more than one facility, if the Commission determines that the financial impact of assessing the standard annual deferred premium amount under paragraph (1) would result in undue financial hardship to such licensee or the ratepayers of such licensee.*

*(B) In the event that the Commission assesses a lesser annual deferred premium amount under subparagraph (A), the Commission shall require payment of the difference between the standard annual deferred premium assessment under paragraph (1) and any such lesser annual deferred premium assessment within a reasonable period of time, with interest at a rate determined by the Secre-*

40

*tary of the Treasury on the basis of the current average market yield on outstanding marketable obligations of the United States of comparable maturities during the month preceding the date that the standard annual deferred premium assessment under paragraph (1) would become due.*

(3) The Commission shall establish such requirements as are necessary to assure availability of funds to meet any assessment of deferred premiums within a reasonable time when due, and may provide insurance or shall otherwise guarantee the payment of such premiums in the event it appears that the amount of such premiums will not be available on a timely basis through the resources of private industry and insurance. Any agreement by the Commission with a licensee or indemnitor to guarantee the payment of deferred premiums may contain such terms as the Commission deems appropriate to carry out the purposes of this section and to assure reimbursement to the Commission for its payments made due to the failure of such licensee or indemnitor to meet any of its obligations arising under or in connection with financial protection required under this subsection including without limitation terms creating liens upon the licensed facility and the revenues derived therefrom or any other property or revenues of such licensee to secure such reimbursement and consent to the automatic revocation of any license.

*(4)(A) In the event that, the funds available to pay valid claims in any year are insufficient as a result of the limitation on the amount of deferred premiums that may be required of a licensee in any year under paragraph (1) or (2), or the Commission is required to make reinsurance or guaranteed payments under paragraph (3), the Commission shall, in order to advance the necessary funds—*

*(i) request the Congress to appropriate sufficient funds to satisfy such payments; or*

*(ii) to the extent approved in appropriation Acts, issue to the Secretary of the Treasury obligations in such forms and denominations, bearing such maturities, and subject to such terms and conditions as may be agreed to by the Commission and the Secretary of the Treasury.*

*(B) Except for funds appropriated for purposes of making reinsurance or guaranteed payments under paragraph (3), any funds appropriated under subparagraph (A)(i) shall be repaid to the general fund of the United States Treasury from amounts made available by standard deferred premium assessments, with interest at a rate determined by the Secretary of the Treasury on the basis of the current average market yield on outstanding marketable obligations of the United States of comparable maturities during the month preceding the date that the funds appropriated under such subparagraph are made available.*

*(C) Except for funds appropriated for purposes of making reinsurance or guaranteed payments under paragraph (3), redemption of obligations issued under subparagraph (A)(ii) shall be made by the Commission from amounts made available by standard deferred premium assessments. Such obligations shall bear interest at a rate determined by the Secretary of the Treasury by taking into consideration the average market yield on outstanding marketable obligations to the United States of comparable maturities during the*

41

*month preceding the issuance of the obligations under this paragraph. The Secretary of the Treasury shall purchase any issued obligations, and for such purpose the Secretary of the Treasury may use as a public debt transaction the proceeds from the sale of any securities issued under chapter 31 of title 31, United States Code, and the purposes for which securities may be issued under such chapter are extended to include any purchase of such obligations. The Secretary of the Treasury may at any time sell any of the obligations acquired by the Secretary of the Treasury under this paragraph. All redemptions, purchases, and sales by the Secretary of the Treasury of obligations under this paragraph shall be treated as public debt transactions of the United States.*

c. INDEMNIFICATION OF LICENSEES BY NUCLEAR REGULATORY COMMISSION.—The Commission shall, with respect to licenses issued between August 30, 1954, and August 1, 【1987】 *1997*, for which it requires financial protection of less than $560,000,000, agree to indemnify and hold harmless the licensee and other persons indemnified, as their interest may appear, from public liability arising from nuclear incidents which is in excess of the level of financial protection required of the licensee. The aggregate indemnity for all persons indemnified in connection with each nuclear incident shall not exceed $500,000,000, excluding costs of investigating and settling claims and defending suits for damage: *Provided, however,* That this amount of indemnity shall be reduced by the amount that the financial protection required shall exceed $60,000,000. Such a contract of indemnification shall cover public liability arising out of or in connection with the licensed activity. With respect to any production or utilization facility for which a construction permit is issued between August 30, 1954, and August 1, 【1987】 *1997*, the requirements of this subsection shall apply to any license issued for such facility subsequently to August 1, 【1987】 *1997*.

【d. In addition to any other authority the Commission may have, the Commission is authorized until August 1, 1987, to enter into agreements of indemnification with its contractors for the construction or operation of production or utilization facilities or other activities under contracts for the benefit of the United States involving activities under the risk of public liability for a substantial nuclear incident. In such agreements of indemnification the Commission may require its contractor to provide and maintain financial protection of such a type and in such amounts as the Commission shall determine to be appropriate to cover public liability arising out of or in connection with the contractual activity, and shall indemnify the persons indemnified against such claims above the amount of the financial protection required, in the amount of $500,000,000, excluding costs of investigating and setting claims and defending suits for damage in the aggregate for all persons indemnified in connection with such contract and for each nuclear incident: *Provided,* That this amount of indemnity shall be reduced by the amount that the financial protection required shall exceed $60,000,000: *Provided further,* That in the case of nuclear incidents occurring outside the United States, the amount of the indemnity provided by the Commission shall not exceed $100,000,000. The provisions of this subsection may be applicable to lump sum as well as cost type contracts and to contracts and projects financed in whole

42

or in part by the Commission. A contractor with whom an agreement of indemnification has been executed and who is engaged in activities connected with the underground detonation of a nuclear explosive device shall be liable, to the extent so indemnified under this section, for injuries or damage sustained as a result of such detonation in the same manner and to the same extent as would a private person acting as principal, and no immunity or defense founded in the Federal, State, or municipal character of the contractor or of the work to be performed under the contract shall be effective to bar such liability.]

d. INDEMNIFICATION OF CONTRACTORS BY DEPARTMENT OF ENERGY.—(1)(A) In addition to any other authority the Secretary of Energy (in this section referred to as the "Secretary") may have, the Secretary shall, until August 1, 1997, enter into agreements of indemnification with any person who may conduct activities under a contract with the Department of Energy that involve the risk of public liability.

(B)(i)(I) For all nuclear waste activities, indemnification under subparagraph (A) shall be the exclusive means of indemnification under this section.

(II) In any such agreement of indemnification, the provisions relating to the waiver of any issue or defense as to charitable or governmental immunity, authorized in subsection n. (1) to be incorporated in agreements of indemnification, may also be made applicable to nuclear incidents arising out of nuclear waste activities.

(ii) For the purpose of compensating public liability claims, as defined in section 11 w., arising out of nuclear waste activities funded by the Nuclear Waste Fund established in section 302 of the Nuclear Waste Policy Act of 1982 (42 U.S.C. 10222), the Secretary shall make available funds from the Nuclear Waste Fund in an amount not to exceed the maximum amount of financial protection required of licensees under subsection b. and subject to the limitations in section 302(e)(2) of such Act.

(iii) Public liability claims arising out of nuclear waste activities not specified in clause (ii), shall be compensated in accordance with the provisions of this Act and, to the extent approved in appropriation Acts, from the general revenues of the Treasury.

(2) In agreements of indemnification entered into under paragraph (1), the Secretary may require the contractor to provide and maintain financial protection of such type and in such amounts as the Secretary shall determine to be appropriate to cover public liability arising out of or in connection with the contractual activity, and shall indemnify the persons indemnified against such claims above the amount of the financial protection required, to the full extent of the aggregate public liability of the persons indemnified for each nuclear incident, excluding costs of investigating and settling claims and defending suits for damage.

(3) Notwithstanding paragraph (2), if the maximum amount of financial protection required of licensees under subsection b. is increased by the Commission, the amount of indemnity, together with any financial protection required of the contractor, shall at all times remain equal to or greater than the maximum amount of financial protection required of licensees under subsection b. The amount of indemnity provided contractors under this subsection

43

*shall not, at any time, be reduced in the event that the maximum amount of financial protection required of licensees is reduced. All agreements of indemnification under which the Department of Energy (or its predecessor agencies) may be required to indemnify any person, shall be deemed to be amended, on the date of the enactment of the Price-Anderson Amendments Act of 1987, to reflect the amount of indemnity for public liability and any applicable financial protection required of the contractor under this subsection on such date.*

*(4) In the case of nuclear incidents occurring outside the United States, the amount of the indemnity provided by the Secretary under this subsection shall not exceed $100,000,000.*

*(5) The provisions of this subsection may be applicable to lump sum as well as cost type contracts and to contracts and projects financed in whole or in part by the Secretary.*

*(6) A contractor with whom an agreement of indemnification has been executed and who is engaged in activities connected with the underground detonation of a nuclear explosive device shall be liable, to the extent so indemnified under this section, for injuries or damage sustained as a result of such detonation in the same manner and to the same extent as would a private person acting as principal, and no immunity or defense founded in the Federal, State, or municipal character of the contractor or of the work to be performed under the contract shall be effective to bar such liability.*

[e. The aggregate liability for a single nuclear incident of persons indemnified, including the reasonable costs of investigating and settling claims and defending suits for damage, shall not exceed (1) the sum of $500,000,000 together with the amount of financial protection required of the licensee or contractor or (2) if the amount of financial protection required of the licensee exceeds $60,000,000, such aggregate liability shall not exceed the sum of $560,000,000 or the amount of financial protection required of the licensee, whichever amount is greater: *Provided,* That in the event of a nuclear incident involving damages in excess of that amount of aggregate liability, the Congress will thoroughly review the particular incident and will take whatever action is deemed necessary and appropriate to protect the public from the consequences of a disaster of such magnitude: *And provided further,* That with respect to any nuclear incident occurring outside of the United States to which an agreement of indemnification entered into under the provisions of subsection 170 d. is applicable, such aggregate liability shall not exceed the amount of $100,000,000 together with the amount of financial protection required of the contractor.]

e. LIMITATION ON AGGREGATE PUBLIC LIABILITY.—*(1) The aggregate public liability for a single nuclear incident of persons indemnified, including such legal costs as are authorized to be paid under subsection o. (1)(D), shall not exceed—*

*(A) in the case of facilities designed for producing substantial amounts of electricity and having a rated capacity of 100,000 electrical kilowatts or more, the maximum amount of financial protection required of such facilities under subsection b.;*

*(B) in the case of contractors with whom the Secretary has entered into an agreement of indemnification under subsection d., the maximum amount of financial protection required under*

44

subsection b., or the amount of indemnity and financial protection that may be required under paragraph (3) of subsection d., whichever amount is more; and

(C) in the case of all other licensees of the Commission required to maintain financial protection under this section—

(i) $500,000,000, together with the amount of financial protection required of the licensee; or

(ii) if the amount of financial protection required of the licensee exceeds $60,000,000, $560,000,000 or the amount of financial protection required of the licensee, whichever amount is more.

(2) In the event of a nuclear incident involving damages in excess of the amount of aggregate public liability under paragraph (1), the Congress will thoroughly review the particular incident in accordance with subsection i. and take whatever action is determined to be necessary (including approval of appropriate compensation plans and appropriation of funds) to provide full and prompt compensation to the public for all public liability claims resulting from a disaster of such magnitude.

(3)(A) The limitation on aggregate public liability established under paragraph (1) shall not apply to any nuclear incident arising from nuclear waste activities if—

(i) a court, acting pursuant to subsection o., determines in writing that public liability from such nuclear incident is likely to exceed the amount of aggregate public liability under paragraph (1); and

(ii) the Congress does not act to provide for the full and prompt compensation to the public for such public liability resulting from such nuclear incident within 1 year of the submission by the President to the Congress of a compensation plan under subsection i. (2)(C).

(B) Public liability arising under subparagraph (A) shall be compensated in accordance with the provisions of this Act and, to the extent approved in appropriation Acts, from the general revenues of the Treasury.

(4) No provision of paragraph (1) may be construed to preclude the Congress from enacting a revenue measure, applicable to licensees of the Commission required to maintain financial protection pursuant to subsection b., to fund any action undertaken pursuant to paragraph (2).

(5) With respect to any nuclear incident occurring outside of the United States to which an agreement of indemnification entered into under the provisions of subsection d. is applicable, such aggregate public liability shall not exceed the amount of $100,000,000, together with the amount of financial protection required of the contractor.

f. COLLECTION OF FEES BY NUCLEAR REGULATORY COMMISSION.— The Commission or the Secretary, as appropriate, is authorized to collect a fee from all persons with whom an indemnification agreement is executed under this section. This fee shall be $30 per year per thousand kilowatts of thermal energy capacity for facilities licensed under section 103: Provided, That the Commission or the Secretary, as appropriate, is authorized to reduce the fee for such facilities in reasonable relation to increases in financial protection

45

required above a level of $60,000,000. For facilities licensed under section 104, and for construction permits under section 185, the Commission is authorized to reduce the fee set forth above. The Commission shall establish criteria in writing for determination of the fee for facilities licensed under section 104, taking into consideration such factors as (1) the type, size, and location of facility involved, and other factors pertaining to the hazard, and (2) the nature and purpose of the facility. For other licenses, the Commission shall collect such nominal fees as it deems appropriate. No fee under this subsection shall be less than $100 per year.

g. *USE OF SERVICES OF PRIVATE INSURERS.*—In administering the provisions of this section, the Commission *or the Secretary, as appropriate,* shall use, to the maximum extent practicable, the facilities and services of private insurance organizations, and the Commission *or the Secretary, as appropriate,* may contract to pay a reasonable compensation for such services. Any contract made under the provisions of this subsection may be made without regard to the provisions of section 3709 of the Revised Statutes *(41 U.S.C. 5),* as amended, upon a showing by the Commission *or the Secretary, as appropriate,* that advertising is not reasonably practicable and advance payments may be made.

h. *CONDITIONS OF AGREEMENTS OF INDEMNIFICATION.*—The agreement of indemnification may contain such terms as the Commission *or the Secretary, as appropriate,* deems appropriate to carry out the purposes of this section. Such agreement shall provide that, when the Commission *or the Secretary, as appropriate,* makes a determination that the United States will probably be required to make indemnity payments under this section, the Commission *or the Secretary, as appropriate,* shall collaborate with any person indemnified and may approve the payment of any claim under the agreement of indemnification, appear through the Attorney General on behalf of the person indemnified, take charge of such action, and settle or defend any such action. The Commission *or the Secretary, as appropriate,* shall have final authority on behalf of the United States to settle or approve the settlement of any such claim on a fair and reasonable basis with due regard for the purposes of this Act. Such settlement shall not include expenses in connection with the claim incurred by the person indemnified.

[i. After any nuclear incident which will probably require payments by the United States under this section or which will probably result in public liability claims in excess of $560,000,000, the Commission shall make a survey of the causes and extent of damage which shall forthwith be reported to the Joint Committee, to the Congressmen of the affected districts, and to the Senators of the affected States, and, except for information which would cause serious damage to the national defense of the United States, all final findings shall be made available to the public, to the parties involved and to the courts. The Commission shall report to the Joint Committee by April 1, 1958, and every year thereafter on the operations under this section.]

i. *COMPENSATION PLANS.*—*(1) After any nuclear incident involving damages that are likely to exceed the amount of aggregate public liability under subsection e, (1), the Secretary or the Commission, as appropriate, shall—*

46

(A) make a survey of the causes and extent of damage; and

(B) expeditiously submit a report setting forth the results of such survey to the Congress, to the Representatives of the affected districts, to the Senators of the affected States, and (except for informaton that will cause serious damage to the national defense of the United States) to the public, to the parties involved, and to the courts.

(2) Not later than 90 days after any determination by a court, pursuant to subsection o., that the public liability from a single nuclear incident may exceed the amount of aggregate public liability under subsection e. (1) the President shall submit to the Congress—

(A) an estimate of the aggregate dollar value of personal injuries and property damage that arises from the nuclear incident and exceeds the amount of aggregate public liability under subsection e. (1);

(B) recommendations for additional sources of funds to pay claims exceeding the amount of aggregate public liability under subsection e. (1), which recommendations shall consider a broad range of possible sources of funds (including possible revenue measures on the sector of the economy, or on any other class, to which such revenue measures might be applied);

(C) 1 or more compensation plans, that either individually or collectively shall provide for full, equitable, and efficient compensation for all valid claims and contain a recommendation or recommendations as to the relief to be provided, including any recommendations that funds be allocated or set aside for the payment of claims that may arise as a result of latent injuries that may not be discovered until a later date; and

(D) any additional legislative authorities necessary to implement such compensation plan or plans.

j. CONTRACTS IN ADVANCE OF APPROPRIATIONS.—In administering the provisions of this section, the Commission *or the Secretary, as appropriate,* may make contracts in advance of appropriations and incur obligations without regard to [section 3679 of the Revised Statutes, as amended] *sections 1341, 1342, 1349, 1350, and 1351, and subchapter II of chapter 15, of title 31, United States Code.*

k. EXEMPTION FROM FINANCIAL PROTECTION REQUIREMENT FOR NONPROFIT EDUCATIONAL INSTITUTIONS.—With respect to any license issued pursuant to section 53, 63, 81, 104 a., or 104 c. for the conduct of educational activities to a person found by the Commission to be a nonprofit educational institution, the Commission shall exempt such licensee from the financial protection requirement of subsection [170] a. With respect to licenses issued between August 30, 1954, and August 1, [1987,] *1997,* for which the Commission grants such exemption:

(1) the Commission shall agree to indemnify and hold harmless the licensee and other persons indemnified, as their interests may appear, from public liability in excess of $250,000 arising from nuclear incidents. The aggregate indemnity for all persons indemnified in connection with each nuclear incident shall not exceed $500,000,000, excluding cost of investigating and settling claims and defending suits for damage;

(2) such contracts of indemnification shall cover public liability arising out of or in connection with the licensed activity;

47.

and shall include damage to property of persons indemnified, except property which is located at the site of and used in connection with the activity where the nuclear incident occurs; and

(3) such contracts of indemnification, when entered into with a licensee having immunity from public liability because it is a State agency, shall provide also that the Commission shall make payments under the contract on account of activities of the licensee in the same manner and to the same extent as the Commission would be required to do if the licensee were not such a State agency.

Any licensee may waive an exemption to which it is entitled under this subsection. With respect to any production or utilization facility for which a construction permit is issued between August 30, 1954, and August 1, [1987,] *1997*, the requirements of this subsection shall apply to any license issued for such facility subsequent to August 1, [1987.] *1997.*

[l. The Commission is authorized until August 1, 1977, to enter into an agreement of indemnification with any person engaged in the design, development, construction, operation, repair, and maintenance or use of the nuclear-powered ship authorized by section 716 of the Merchant Marine Act, 1936, and designated the "nuclear ship Savannah." In any such agreement of indemnification the Commission may require such person to provide and maintain financial protection of such a type and in such amounts as the Commission shall determine to be appropriate to cover public liability arising from a nuclear incident in connection with such design, development, construction, operation, repair, maintenance or use and shall indemnify the person indemnified against such claims above the amount of the financial protection required in the amount of $500,000,000 excluding costs of investigating and settling claims and defending suits for damage in the aggregate for all persons indemnified in connection with each nuclear incident: *Provided,* That this amount of indemnity shall be reduced by the amount that the financial protection required shall exceed $60,000,000.]

*l. PRESIDENTIAL COMMISSION ON CATASTROPHIC NUCLEAR ACCIDENTS.—(1) Not later than 90 days after the date of the enactment of the Price-Anderson Amendments Act of 1987, the President shall establish a commission (in this subsection referred to as the "study commission") in accordance with the Federal Advisory Committee Act (5 U.S.C. App.) to study means of fully compensating victims of a catastrophic nuclear accident that exceeds the amount of aggregate public liability under subsection e. (1).*

*(2)(A) The study commission shall consist of not less than 7 and not more than 11 members, who—*

*(i) shall be appointed by the President; and*

*(ii) shall be representative of a broad range of views and interests.*

*(B) The members of the study commission shall be appointed in a manner that ensures that not more than a mere majority of the members are of the same political party.*

*(C) Each member of the study commission shall hold office until the termination of the study commission, but may be removed by the President for inefficiency, neglect of duty, or malfeasance in office.*

48

*(D) Any vacancy in the study commission shall be filled in the manner in which the original appointment was made.*

*(E) The President shall designate 1 of the members of the study commission as chairperson, to serve at the pleasure of the President.*

*(3) The study commission shall conduct a comprehensive study of appropriate means of fully compensating victims of a catastrophic nuclear accident that exceeds the amount of aggregate public liability under subsection e. (1), and shall submit to the Congress a final report setting forth—*

*(A) recommendations for any changes in the laws and rules governing the liability or civil procedures that are necessary for the equitable, prompt, and efficient resolution and payment of all valid damage claims, including the advisability of adjudicating public liability claims through an administrative agency instead of the judicial system;*

*(B) recommendations for any standards or procedures that are necessary to establish priorities for the hearing, resolution, and payment of claims when awards are likely to exceed the amount of funds available within the specific time period; and*

*(C) recommendations for any special standards or procedures necessary to decide and pay claims for latent injuries caused by the nuclear incident.*

*(4)(A) The chairperson of the study commission may appoint and fix the compensation of a staff of such persons as may be necessary to discharge the responsibilities of the study commission, subject to the applicable provisions of the Federal Advisory Committee Act (5 U.S.C. App.) and title 5, United States Code.*

*(B) To the extent permitted by law and requested by the chairperson of the study commission, the Administrator of General Services shall provide the study commission with necessary administrative services, facilities, and support on a reimbursable basis.*

*(C) The Attorney General, the Secretary of Health and Human Services, and the Director of the Federal Emergency Management Agency shall, to the extent permitted by law and subject to the availability of funds, provide the study commission with such facilities, support, funds and services, including staff, as may be necessary for the effective performance of the functions of the study commission.*

*(D) The study commission may request any Executive agency to furnish such information, advice, or assistance as it determines to be necessary to carry out its functions. Each such agency is directed, to the extent permitted by law, to furnish such information, advice or assistance upon request by the chairperson of the study commission.*

*(E) Each member of the study commission may receive compensation at the maximum rate now or hereafter prescribed by law for each day such member is engaged in the work of the study commission. Each member may also receive travel expenses, including per diem in lieu of subsistence under sections 5702 and 5703 of title 5, United States Code.*

*(F) The functions of the President under the Federal Advisory Committee Act (5 U.S.C. App.) that are applicable to the study commission, except the function of reporting annually to the Congress, shall be performed by the Administrator of General Services.*

49

(5) *The final report required in paragraph (3) shall be submitted to the Congress not later than the expiration of the 2-year period beginning on the date of the enactment of the Price-Anderson Amendments Act of 1987.*

(6) *The study commission shall terminate upon the expiration of the 2-month period beginning on the date on which the final report required in paragraph (3) is submitted.*

m. COORDINATED PROCEDURES FOR PROMPT SETTLEMENT OF CLAIMS AND EMERGENCY ASSISTANCE.—The Commission *or the Secretary, as appropriate,* is authorized to enter into agreements with other indemnitors to establish coordinated procedures for the prompt handling, investigation, and settlement of claims for public liability. The Commission *or the Secretary, as appropriate,* and other indemnitors may make payments to, or for the aid of, claimants for the purpose of providing immediate assistance following a nuclear incident. Any funds appropriated to the Commission *or the Secretary, as appropriate,* shall be available for such payments. Such payments may be made without securing releases, shall not constitute an admission of the liability of any person indemnified or of any indemnitor, and shall operate as a satisfaction to the extent thereof of any final settlement or judgment.

n. WAIVER OF DEFENSES AND JUDICIAL PROCEDURES.—(1) With respect to any extraordinary nuclear occurrence to which an insurance policy or contract furnished as proof of financial protection or an indemnity agreement applies and which—

[(a)] *(A)* arises out of or results from or occurs in the course of the construction, possession, or operation of a production or utilization facility, [or]

[(b)] *(B)* arises out of or results from or occurs in the course of transportation of source material, byproduct material, or special nuclear material to or from a production or utilization facility, [or]

[(c)] *(C)* during the course of the contract activity arises out of or results from the possession, operation, or use by a [Commission] *Department of Energy* contractor or subcontractor of a device utilizing special nuclear material or byproduct material,

*(D) arises out of, results from, or occurs in the course of, the construction, possession, or operation of any facility licensed under section 53, 63, or 81, for which the Commission has imposed as a condition of the license a requirement that the licensee have and maintain financial protection under subsection a.,*

*(E) arises out of, results from, or occurs in the course of, transportation of source material, byproduct material, or special nuclear material to or from any facility licensed under section 53, 63, or 81, for which the Commission has imposed as a condition of the license a requirement that the licensee have and maintain financial protection under subsection a., or*

*(F) arises out of, results from, or occurs in the course of, nuclear waste activities,*

the Commission *or the Secretary, as appropriate,* may incorporate provisions in indemnity agreements with licensees and contractors under this section, and may require provisions to be incorporated

50

in insurance policies or contracts furnished as proof of financial protection, which waive (i) any issue or defense as to conduct of the claimant or fault of persons indemnified, (ii) any issue or defense as to charitable or governmental immunity, and (iii) any issue or defense based on any statute of limitations if suit is instituted within three years from the date on which the claimant first knew, or reasonably could have known, of his injury or damage and the cause thereof[, but in no event more than twenty years after the date of the nuclear incident]. The waiver of any such issue or defense shall be effective regardless of whether such issue or defense may otherwise be deemed jurisdictional or relating to an element in the cause of action. When so incorporated, such waivers shall be judicially enforceable in accordance with their terms by the claimant against the person indemnified. Such waivers shall not preclude a defense based upon a failure to take reasonable steps to mitigate damages, nor shall such waivers apply to injury or damage to a claimant or to a claimant's property which is intentionally sustained by the claimant or which results from a nuclear incident intentionally and wrongfully caused by the claimant. The waivers authorized in this subsection shall, as to indemnitors, be effective only with respect to those obligations set forth in the insurance policies or the contracts furnished as proof of financial protection and in the indemnity agreements. Such waivers shall not apply to, or prejudice the prosecution or defense of, any claim or portion of claim which is not within the protection afforded under (i) the terms of insurance policies or contracts furnished as proof of financial protection, or indemnity agreements, and (ii) the limit of liability provisions of subsection [170] e.

(2) With respect to any public liability action arising out of or resulting from [an extraordinary nuclear occurrence,] *a nuclear incident,* the United States district court in the district where the [extraordinary nuclear occurrence] *nuclear incident* takes place, or in the case of [an extraordinary nuclear occurrence] *a nuclear incident* taking place outside the United States, the United States District Court for the District of Columbia, shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy. Upon motion of the defendant or of the Commission *or the Secretary, as appropriate,* any such action pending in any State court *(including any such action pending on the date of the enactment of the Price-Anderson Amendments Act of 1987)* or United States district court shall be removed or transferred to the United States district court having venue under this subsection. Process of such district court shall be effective throughout the United States. *In any action that is or becomes removable pursuant to this paragraph, a petition for removal shall be filed within the period provided in section 1446 of title 28, United States Code, or within the 30-day period beginning on the date of the enactment of the Price-Anderson Amendments Act of 1987, whichever occurs later.*

(3)(A) *Following any nuclear incident, the chief judge of the United States district court having jurisdiction under paragraph (2) with respect to public liability actions (or the judicial council of the judicial circuit in which the nuclear incident occurs) may appoint a special caseload management panel (in this paragraph referred to as*

51

the "management panel") to coordinate and assign (but not necessarily hear themselves) cases arising out of the nuclear incident, if—

(i) the United States district court having jurisdiction under paragraph (2) determines that the aggregate amount of public liability is likely to exceed the amount of primary financial protection available under subsection b. (or an equivalent amount in the case of a contractor indemnified under subsection d.); or

(ii) The chief judge of the United States district court (or the judicial council of the judicial circuit) determines that cases arising out of the nuclear incident will have an unusual impact on the work of the court.

(B)(i) Each management panel shall consist only of members who are United States district judges or circuit judges.

(ii) Members of a management panel may include any United States district judge or circuit judge of another district court or court of appeals, if the chief judge of such other district court or court of appeals consents to such assignment.

(C) It shall be the function of each management panel—

(i) to consolidate related or similar claims for hearing or trial;

(ii) to establish priorities for the handling of different classes of cases;

(iii) to assign cases to a particular judge or special master;

(iv) to appoint special masters to hear particular types of cases, or particular elements or procedural steps of cases;

(v) to promulgate special rules of court, not inconsistent with the Federal Rules of Civil Procedure, to expedite cases or allow more equitable consideration of claims;

(vi) to implement such other measures, consistent with existing law and the Federal Rules of Civil Procedure, as will encourage the equitable, prompt, and efficient resolution of cases arising out of the nuclear incident; and

(vii) to assemble and submit to the President such data, available to the court, as may be useful in estimating the aggregate damages from the nuclear incident.

o. PLAN FOR DISTRIBUTION OF FUNDS.— (1) Whenever the United States district court in the district where a nuclear incident occurs, or the United States District Court for the District of Columbia in case of a nuclear incident occurring outside the United States, determines upon the petition of any indemnitor or other interested person that public liability from a single nuclear incident may exceed the limit of liability under [subsection 170 e.:] subsection e. (1):

[(1)] (A) Total payments made by or for all indemnitors as a result of such nuclear incident shall not exceed 15 per centum of such limit of liability without the prior approval of such court;

[(2)] (B) The court shall not authorize payments in excess of 15 per centum of such limit of liability unless the court determines that such payments are or will be in accordance with a plan of distribution which has been approved by the court or such payments are not likely to prejudice the subsequent adoption and implementation by the court of a plan of distribution

52

pursuant to [subparagraph (3) of this subsection (o)] *subpara-graph (c)*, and

[(3)] *(C)* The Commission *or the Secretary, as appropriate,* shall, and any other indemnitor other interested person may, submit to such district court a plan for the disposition of pending claims and for the distribution of remaining funds available. Such a plan shall include an allocation of appropriate amounts for personal injury claims, property damage claims, and possible latent injury claims which may not be discovered until a later time. Such court shall have all power necessary to approve, disapprove, or modify plans proposed, or to adopt another plan; and to determine the proportionate share of funds available for each claimant. The Commission *or the Secretary, as appropriate,* any other indemnitor, and any person indemnified shall be entitled to such orders as may be appropriate to implement and enforce the provisions of this section, including orders limiting the liability of the persons indemnified, orders approving or modifying the plan, orders staying the payment of claims and the execution of court judgments, orders apportioning the payments to be made to claimants, and orders permitting partial payments to be made before final determination of the total claims. The orders of such court shall be effective throughout the United States and shall include establishment of priorities between claimants and classes of claims, as necessary to insure the most equitable allocation of available funds.

*(D) A court may authorize payment, from the amount of financial protection required by subsection b., of only such legal costs as are permitted under paragraph (2); provided that in the case of the legal costs of a defendant, a court may authorize payment from such amount of financial protection of only 70 percent of any amount of legal costs that are permitted under paragraph (2).*

*(2) A court may authorize the payment of legal costs under paragraph (1)(D) only if the person requesting such payment has—*

*(A) submitted to the court the amount of such payment requested; and*

*(B) demonstrated to the court—*

*(i) that such costs are reasonable and equitable; and*

*(ii) that such person has—*

*(I) litigated in good faith;*

*(II) avoided unnecessary duplication of effort with that of other parties similarly situated;*

*(III) not made frivolous claims or defenses; and*

*(IV) not attempted to unreasonably delay the prompt settlement or adjudication of such claims.*

[(4) The Commission shall, within ninety days after a court shall have made such determination, deliver to the Joint Committee a supplement to the report prepared in accordance with subsection 170 i. of this Act setting forth the estimated requirements for full compensation and relief of all claimants, and recommendations as to the relief to be provided.]

p. *REPORTS TO CONGRESS.—(1)* The Commission [shall submit to the Congress by August 1, 1983, a detailed report] *and the Secre-*

53

tary shall submit to the Congress by August 1, 1983, detailed reports concerning the need for continuation or modification of the provisions of this section, taking into account the condition of the nuclear industry, availability of private insurance, and the state of knowledge concerning nuclear safety at that time, among other relevant factors, and shall include recommendations as to the repeal or modification of any of the provisions of this section.

(2) Not later than April 1 of each year, the Commission and the Secretary shall each submit an annual report to the Congress setting forth the activities under this section during the preceding calendar year.

(3) Not later than February 1, 1988, the Secretary shall submit a report to the Congress identifying and explaining the criminal and civil liabilities of all Department of Energy contractors and other persons indemnified who intentionally cause or attempt to cause a nuclear accident at a Department of Energy facility. The Secretary shall include in such report such recommendations as the Secretary determines to be appropriate for punishing such misconduct, enacting new provisions of law, or clarifying law in effect on August 1, 1987.

q. LIMITATION ON AWARDING OF PRECAUTIONARY EVACUATION COSTS.—No court may award costs ` ´ a precautionary evacuation unless such costs constitute a public liability.

r. LIMITATION ON LIABILITY OF LESSORS.—No person under a bona fide lease of any utilization or production facility (or part thereof or undivided interest therein) shall be liable by reason of an interest as lessor of such production or utilization facility, for any legal liability arising out of or resulting from a nuclear incident resulting from such facility, unless such facility is in the actual possession and control of such person at the time of the nuclear incident giving rise to such legal liability.

s. LIMITATION ON PUNITIVE DAMAGES.—No court may award punitive damages in any action with respect to a nuclear incident or precautionary evacuation against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident or evacuation.

t. INFLATION ADJUSTMENT.—(1) The Commission shall adjust the amount of the aggregate standard deferred premium under subsection b. (1) not less than once during each 5-year period following the date of the enactment of the Price-Anderson Amendments Act of 1987, in accordance with the aggregate percentage change in the Consumer Price Index since—

(A) such date of enactment, in the case of the first adjustment under this subsection; or

(B) the previous adjustment under this subsection.

(2) For purposes of this subsection, the term "Consumer Price Index" means the Consumer Price Index for all urban consumers published by the Secretary of Labor.

\*         \*         \*         \*         \*         \*         \*

## ADDITIONAL VIEWS

We opppose the final "legal costs" provision included in H.R. 1414 as reported by the Interior & Insular Affairs Committee. The amendment automatically and arbitrarily mandates the exclusion of 30 percent of legal costs determined by the court to be reasonable and equitable. This provision, while well intended, is fatally flawed because it renders the entire Price-Anderson insurance mechanism unworkable. Instead, we support a compromise amendment which retains current law by including all costs of investigating, settling, and defending claims within the Price-Anderson limit under the close and rigorous supervision of the court.

One of the most troubling aspects of the final legal costs amendment is the haphazard process in which it was considered and adopted at the full-Committee markup. The 30-percent exclusion provision was offered and debated in concept only. It was discussed and adopted by the Committee without ever being concretely committed to writing. Many Members, including the amendment's proponents, were uncertain of the scope and application of the proposed 30-percent exclusion of legal costs. The provision was finally drafted several days after the bill had been marked up and reported.

The inevitable result of any haphazard approval process is ambiguity. An example of uncertainty in this case is the application of the 30-percent exclusion to the first layer of private insurance in Price-Anderson. Mr. Gejdenson, the amendment's sponsor, contended before, during, and even after the markup that his intent was to exempt the primary insurance layer of financial protection from any exclusion of claims costs. Despite the obvious expressions of intent, the amendment drafted after the markup does not expressly exclude the first layer. We are encouraged, nonetheless, by the clarifying language in this report which suggests that the 30-percent claims costs exclusion does not necessarily apply to the first layer proportionally.

Even the most favorable reading of the 30-percent exclusion provision, however, greatly complicates the smooth functioning of the Price-Anderson insurance system. There are four central arguments that support the inclusion of all costs of investigating, settling, and defending claims within the Price-Anderson limits.

1. The exclusion of these necessary costs destroys Price-Anderson. In the first layer of private insurance, even the partial exclusion of defense costs results in uncertain, open-ended coverage. Accordingly, if the 30-percent exclusion applies to the first layer, the insurance pools would be forced to reduce their insurance capacity. In the second layer, the exclusion of any reasonable defense costs could cause the collapse of the deferred premium system. Without the certainty of claims costs being included within Price-Anderson,

(54)

55

the insurance pools would be unable to administer the second layer, jeopardizing the prompt payment of legitimate claims.

2. The exclusion of claims costs does not achieve its objective of reducing legal fees and maximizing the funds available to pay public compensatio... The 30-percent exclusion does not apply to the plaintiffs; plaintiff's attorneys could still get one-third or more of the total compensation paid to injured victims after expenses. The plaintiff's attorneys will continue to drive Price-Anderson litigation forcing the defendants to respond. Since plaintiffs initiate and dictate the pace of tort actions, the 30-percent exclusion of defendants costs does little to reduce legal costs.

3. The exclusion of claims costs is counterproductive. The adversarial tort system becomes unbalanced if one side (plaintiffs) collects costs and the other side (defendants) are denied part of their expenses. The insurance pools (who defend both the first and second layers) have an obligation to keep the Price-Anderson system honest by fending-off frivolous claims which only drain the funds available to pay meritorious claims. Without the full investigations and evaluation costs to separate legitimate claims from frivolous ones, there is little deterrent to the bringing of frivolous claims.

4. The full costs of investigating, settling, and defending claims are legitimate and essential component of Price-Anderson. These legal and administrative costs are inherent in our tort system. In addition, defense costs are now routinely included within the policy limit for other types of unique, unpredictable insurance such as medical malpractice, director and high officials liability, and slander and libel.

For these reasons, we believe Price-Anderson becomes unworkable unless the full amount of the reasonable and equitable defense costs are included within the Price-Anderson limit. As H.R. 1414 is considered by other Committees of jurisdiction, we hope the 30 percent exclusion can be remedied. We are also encouraged that the clarifying language in this report sets the foundation upon which corrective action can be taken. For without appropriate changes to the 30 percent claims cost exclusion, H.R. 1414 as reported by this Committee will seriously undermine the Price-Anderson compensation scheme.

Larry E. Craig.
James V. Hansen.
Elton Gallegly.
Robert J. Lagomarsino.
Ben Blaz.
Bill Emerson.
Dick Cheney.
Jerry Huckaby.
Don Young.
Beverly Byron.
Manuel Lujan, Jr.
Denny Smith.
Charles Pashayan, Jr.
Ron Marlenee.
John J. Rhodes III.

O