# EXHIBIT 6

LEGISLATIVE HISTORY
SENATE REPORT NO. 100-70

[page 69]

There is no justification for these contractors to be less accountable today than they were 30 years ago.

It is difficult to ensure adequate protection for citizens and communities near federal nuclear facilities if the contractors operating those facilities have no responsibility to conform to even a minimal level of care when managing sensitive operations.

Strong contractor accountability provisions represent sound public policy. They should be an integral part of any Price-Anderson legislation. The absence of strong accountability provisions in the committee bill was the major reason why I voted against reporting the measure. Given its importance, this issue will be discussed by the full Senate when it considers the Price-Anderson Act.

HOWARD M. METZENBAUM.

\*        \*        \*        \*        \*

SENATE REPORT NO. 100-218

[page 1]

The Committee on Environment and Public Works reports an original bill (S. 1865) to amend the Price-Anderson provisions of the Atomic Energy Act of 1954 to extend and improve the procedures for the protection of the public from nuclear accidents and recommends that the bill do pass.

I. GENERAL STATEMENT

This legislation, the Price-Anderson Act Amendments of 1987 (amending section 170 of the Atomic Energy Act of 1954, as amended, and related sections) extends and improves the procedures for compensating the public in the event of a nuclear incident arising from activities of Nuclear Regulatory Commission (NRC) licensees and Department of Energy (DOE) contractors involved in DOE's high-level nuclear waste program.

The bill increases the amount of funds that would be immediately available without the need for further Congressional action to compensate the public for damages resulting from nuclear incidents at large commercial nuclear power plants or as a result of activities involving DOE high-level waste contractors, sets forth the procedures to be followed with respect to damages that exceed this amount of available funds, including the procedures for Congressional review, and extends for thirty years the authority of the NRC and DOE to bring new licensees or high-level waste contractors within the coverage of the Price-Anderson system.

1476

PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408
[page 2]

## II. PURPOSE AND BACKGROUND

*A. History of the act*

In 1954, when Congress enacted the Atomic Energy Act of 1954 and thereby eliminated the federal government's monopoly over the ownership of nuclear materials and facilities, those in the private sector who were interested in participating in the atomic power industry were reluctant to risk significant financial resources on the new, and as yet untested, enterprise, given the potential for catastrophic accidents involving such materials or facilities and the unavailability of private insurance to cover public liability arising out of such a catastrophic accident.

In response to these concerns, Congress enacted the Price-Anderson Act in 1957, in order to remove the deterrent of potentially catastrophic liability.

The original Price-Anderson Act contained three central features. First, the Act established a limit on the aggregate liability of those who wished to undertake activities involving the handling or use of radioactive materials, either through contract with the Federal Government or under a license issued by the Federal Government for the private development of such activities. The limit on liability was initially set at the sum of $500,000,000 plus the amount of financial protection that a licensee or contractor could obtain under reasonable terms and conditions from private sources. In 1957, the amount of insurance available through private sources was $60,000,000.

Second, the 1957 Act provided that any person who might be held liable for public liability resulting from a nuclear incident, including not only the party directly engaged in the activity that results in the nuclear incident but any other person as well, was to be indemnified under the Price-Anderson system—the so-called "channeling of liability" or "omnibus coverage" provisions of the Act.

And third, the 1957 Act provided that all public liability claims that exceeded the required level of private financial protection would be indemnified by the Federal Government, up to the aggregate limit on liability.

In order to carry out the objectives of this Act, the Atomic Energy Commission (AEC) was authorized to enter into indemnity agreements with AEC licensees or contractors for a 10-year period, beginning in 1957.

In 1966, prior to the scheduled expiration of the Act, Congress revised and extended the Act for another 10 year period. The three central features of the 1957 Act were retained. At this time, however, Congress modified the Act to add a fourth key provision, referred to as the "waiver of defenses" provision, which significantly improved the system for swift and effective compensation of public liability claims. Under this modification, Congress provided that the party defendant in any action involving public liability arising from a large nuclear accident, referred to as an "extraordinary nuclear occurrence," could be required to waive—(1) any issue or defense as to conduct of the claimant or fault of persons indemnified, (2) any issue or defense as to charitable or governmental immunity; and (3) any issue or defense based on any statute of limitations, if

1477

LEGISLATIVE HISTORY
SENATE REPORT NO. 100–218

[page 3]

suit is instituted within three years from when the claimant first knew or reasonably could have known of his injury or damage (but in no event more than twenty years after the date of the nuclear incident).

In 1975, prior to the scheduled expiration of the Act in 1977, Congress once again amended and extended the Price-Anderson Act. At this time, in order to phase out the federal indemnity provided for under the Act, Congress adopted a provision establishing a system of retrospective premiums to be paid by licensees of large commercial nuclear powerplants (i.e., powerplants with a rated capacity of 100,000 electrical kilowatts or more). Under this provision, which is now reflected in the current law, each utility operating a large nuclear reactor licensed by the NRC is required to contribute up to $5,000,000 per reactor to cover public liability, in the event of an incident at that reactor or at any other reactor for which damages exceed the amount of available primary financial protection.

The 1975 reauthorization of the Act extended the aggregate limit on liability, and further provided that this amount shall be equal to the sum of the two layers of financial protection or $560,000, whichever is greater. Upon the licensing of the 80th reactor in 1982, these two layers provided $560,000,000 in financial protection and the layer of federal indemnity was thereby phased out.

With 111 large reactors currently licensed to operate, the amount currently available under Price-Anderson to compensate the public in the event of a nuclear incident is $715,000,000—$160,000,000 in primary insurance and $555,000,000 through the retrospective premium system ($5,000,000 multiplied by 111). In the event that public liability exceeds this amount, the 1975 amendments provided that the Congress will thoroughly review the situation and take whatever action it deems necessary to protect the public from the consequences of a disaster of such magnitude.

Other than the inclusion of the waiver of defenses provision in the 1966 amendments, the provisions of the Price-Anderson Act regarding the indemnification of DOE contractors have remained essentially the same since 1957. DOE contractors continue to be indemnified for all public liability up to $500 million, and liability is limited to this amount.

*B. Price-Anderson expiration*

The authority of the NRC to indemnify new licensees expired on August 1, 1987. NRC licensees that were covered under the Act prior to August 1, 1987 continue to be covered by the Act after August 1, 1987, under the same terms and conditions. A list of such licensees currently covered under the Act is contained in Appendix I. However, the coverage of the Act would not be available to any person receiving a license (or construction permit, in the case of a commercial reactor) from the NRC after August 1, 1987.

The DOE's authority to enter into new indemnity agreements under Price-Anderson also expired on August 1, 1987. Contractors with whom indemnification agreements have been executed by DOE prior to this date continue to be covered under the existing Price-Anderson Act, but no new indemnity agreements could be ex-

1478

PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408

[page 4]

ecuted under this Act after August 1, 1987. A list of contractors currently covered under the Act is contained in Appendix II.

### C. Claims experience

The experience with the claims arising out of the accident at Three Mile Island illustrates some of the key benefits resulting from the Price-Anderson system. The claims experience to date under the Price-Anderson Act is contained in Appendices III and IV.

### D. Need for reauthorization

The Price-Anderson system, including the waiver of defenses provisions, the omnibus coverage, and the predetermined sources of funding, provides persons seeking compensation for injuries as a result of a nuclear incident with significant advantages over the procedures and standards for recovery that might otherwise be applicable under State tort law. The Act also provides a mechanism whereby the federal government can continue to encourage private sector participation in the beneficial uses of nuclear materials.

An extension of the Price-Anderson Act's coverage to new licensees and to new high-level waste contractual activities is therefore in the public interest.

The existing Price-Anderson system, however, can and should be substantially modified in a manner that will better achieve the goal of providing in advance of any nuclear incident a mechanism for full compensation of the public that is equitable, efficient, reliable, and comprehensive. The Committee thus supports an extension of the Price-Anderson Act, with the modifications contained in this bill.

### III. Major Provisions of the Committee Bill

#### NUCLEAR REGULATORY COMMISSION LICENSEES

### A. Large commercial nuclear powerplants

The bill reported by the Committee extends the authority of the NRC to enter into indemnity agreements with large commercial nuclear powerplant licensees (i.e., those powerplants with a rated capacity of 100,000 electrical kilowatts or more) for an additional 30 years, from the current expiration date of August 1, 1987 to August 1, 2017.

For these licensees, the bill continues the primary and secondary financial protection provisions of the existing act by—(i) preserving the existing primary layer of financial protection, and (ii) expanding the secondary layer of financial protection by increasing the amount of the retrospective premium required for individual reactors from $5,000,000 to $60,000,000, to be assessed at a rate not to exceed $12,000,000 per year. The bill also includes detailed procedures establishing the steps to be taken in the event that damages exceed the amount of funds available through the primary and secondary layers of financial protection.

*1. Primary financial protection.*—Each licensee would be required to purchase the maximum amount of available private insurance (currently $160 million).

1479

LEGISLATIVE HISTORY
SENATE REPORT NO. 100-218

[page 5]

*2. Secondary financial protection.*—As under current law, each licensee would be required to contribute to a retrospective premium system in the event of an accident for which public liability exceeds the amount of primary insurance available. The bill raises the maximum amount that each licensee could be required to contribute to the retrospective premium system as a result of an accident from the present amount of $5,000,000 to the amount of $60,000,000. The bill further directs the NRC to adjust the maximum deferred premium annually to reflect the aggregate percentage change in the gross national product deflator.

Under this provision, a licensee could not be required to contribute more than $12,000,000 per accident in any one year. Thus, for example, if there occurred an accident of sufficient magnitude to require that each licensee contribute the maximum retrospective premium of $60,000,000, each licensee would have 5 years, at a rate of $12,000,000 per year, to meet its obligation. The authority of the NRC to establish the maximum amount which the aggregate deferred premiums charged for each facility within one calender year may not exceed (i.e., the total amount of such assessments payable in the same year) is retained under this bill.

In the event that public liability claims emerge at a rate faster than the funds made available through the retrospective premium system, the bill authorizes the NRC to borrow funds from the Treasury, subject to appropriations, to satisfy such claims. This provision is intended to ensure that the annual limitation on the amount that licensees are required to contribute does not limit the amount of compensation that may be paid in any one year, provided that the funds will eventually be collected through the annual retrospective assessment on licensees. This provision does not authorize the Commission to borrow funds in the event that licensees default on their responsibility to make payments under the retrospective assessment system. The bill provides that any funds that the NRC borrows from the Treasury, together with interest, are to be repaid from the unpaid balance of retroactive premiums.

The bill increases the amount of the maximum deferred premium in order to make available a larger pool of available funds and a larger contribution by nuclear licensees before any congressional action may be necessary. The increase should make the compensation system for damages within the amount provided by this larger pool more equitable, reliable, and efficient.

At the same time, it is neither feasible, prudent, nor equitable to establish a compensation system in advance of a nuclear incident that would require these licensees to pay for all damages resulting from such an incident. Accordingly, absent further congressional action, the bill limits the amount that nuclear licensees are required to contribute in the event of a catastrophic nuclear accident to the sum of the primary and secondary layers of financial protection.

*3. Claims in excess of primary and secondary financial protection.*—There does exist, however, an extremely small possibility of a catastrophic nuclear incident that could result in damages in excess of the amount of funds that would be available to compensate such claims under the primary and secondary layers of financial protection provided for in this bill. For such an incident, there

1480

PRICE–ANDERSON AMENDMENTS ACT

P.L. 100–408

[page 6]

should be a predictable system that will provide for the full compensation of such claims.

At the same time, because of the extraordinary nature of such an incident, as well as the potentially widespread consequences should such an incident occur, this legislation reflects the Committee's position that Congress should have the opportunity to review this situation following an accident, to ensure that the system for compensating any claims is equitable, efficient, and workable.

Accordingly, in an effort to achieve these two goals, the legislation reported by the Committee sets forth the procedures governing Congressional review of catastrophic accidents and compensation of accident victims for claims that exceed the amount of funds that would be available under the required primary and secondary layers of financial protection. Those procedures are summarized in this section.

Under the existing Price-Anderson Act, the adjudication of public liability claims in excess of the sum of the primary and secondary levels of financial protection is foreclosed by the imposition of an aggregate limit on liability. The removal of the aggregate limit on liability will permit courts to adjudicate public liability claims in excess of the amount of financial protection required of licensees. The bill further provides that for any such claims, the United States shall be deemed to be the liable party. In this regard, the bill provides that the United States shall assume the rights and liabilities of the indemnified person and that the Attorney General of the United States shall appear on behalf of the indemnified party.

The removal of the aggregate limit on liability is not intended to result in the imposition of any additional liabilities on indemnified licensees beyond those imposed under the primary and secondary levels of financial protection required in this bill. In this regard, the bill specifically provides that execution of judgments that exceed the primary and secondary levels of financial protection against any indemnified person is prohibited and that satisfaction of such judgments shall be made exclusively in accordance with the provisions of section 170 i. of this bill.

In the event that a court determines, through the adjudication of claims, that pulic liability claims exceed the amount of funds available from the primary and secondary layers of financial protection provided for under this legislation, section 170 i. (1) of this bill provides that the President is authorized to submit to Congress a plan to establish a funding mechanism for the payment of such excess claims and for Congress to consider the recommended plan under expedited procedures. This provision is intended to give the President the opportunity to recommend, and the Congress the opportunity to consider, alternative sources for the payment of such excess claims, together with recommendations for structuring the payment of such claims over time. The expedited procedures for Congressional review of any Presidential recommendation have been included in this legislation to provide greater assurance that the Congress will be able to fully consider and vote on proposals for alternative funding mechanisms.

The sources of funds for any alternate funding mechanism include any source of funds that the Congress would have the consti-

1481

LEGISLATIVE HISTORY
SENATE REPORT NO. 100-218

[page 7]

tutional authority to assess for each post-accident costs. The statutory limitation on payments required under the primary and secondary levels of financial protection should not be construed to preclude a future Congress from imposing additional revenue measures upon NRC licensees (or indeed any other class of persons) to provide funds to compensate victims of a nuclear accident.

If the Congress failed to approve a plan submitted by the President or to approve its own plan, then the bill provides that all excess claims will be paid from the Judgment Appropriation (31 U.S.C. 1304). The inclusion of this authority does not express a determination one way or the other with regard to whether the federal treasury is the preferred source of funding for public liability in excess of the primary and secondary levels of financial protection. Rather, this provision is intended to ensure that Congressional inaction does not mean that valid claims remain unpaid. The Judgment Appropriation is a permanent, indefinite appropriation established to make payments for monetary judgments awarded against the United States, and thus would need no further action by the Congress to be utilized under these circumstances.

The bill also includes procedures, contained in section 170 i.(2), to permit the President and the Congress an opportunity to review and modify the methods described above of determining compensation for catastrophic accidents, once such a catastrophic accident has occurred and prior to the adjudication of public liability claims. Accordingly, the bill provides special procedures for the President to submit and Congress to consider plans to establish alternative approaches for determining and satisfying public liability claims.

Specifically, the bill provides that if the President determines at any time after a nuclear incident that public liability claims may exceed the funds available under the primary and secondary layers of financial protection and so notifies Congress of this determination, the President may recommend to Congress that the adjudication of all claims for which a final judgment has not yet been rendered be suspended, while the President formulates and the Congress considers an alternate approach or approaches to the determination and satisfaction of claims. If the President recommends that the adjudication of claims be suspended, the bill requires the President to recommend such an alternate approach or approaches. The bill requires that the approach or approaches set forth a mechanism for the determination and full satisfaction of public liability for such incident. Any such plan or plans submitted by the President would be considered by Congress under expedited procedures.

In the event that Congress approves the President's recommended alternate approach for determining and satisfying claims, or adopts its own alternate approach, such alternate approach shall establish the exclusive procedures and substantive rights for the determination and satisfaction of such claims.

In the event that Congress fails to approve an alternative approach to the determination and satisfaction of such claims, those claims would be considered under the approach described earlier.

1482

PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408
[page 8]

### B. Other commercial reactor licensees

The bill extends the NRC's indemnification authority for an additional thirty years for NRC licensees other than large commercial nuclear power plants.

The NRC may require that commercial reactors other than large commercial reactors maintain financial protection in an amount determined by the NRC, based on the availability of private insurance, the type, size, purpose, and location of the facility, and other factors pertaining to the hazard. For those licensees required to maintain financial protection of less than $560,000,000, the NRC is required to indemnify such licensees for all public liability in excess of the amount of financial protection required of the licensee, provided that the aggregate indemnity shall not exceed $500,000,000, less the amount by which the licensee's financial protection exceeds $60,000,000. The liability of such licensees is limited to $500,000,000 plus the amount of financial protection required, but in no event more than $560,000,000.

### C. Federal agency reactors

Reactors operated by other federal agencies that are required to be operated under license from the NRC are not required to maintain financial protection, but continue to be indemnified by the NRC for liability up to $500,000,000, the limit on liability for such licensees.

### D. Non-profit and educational reactors

Non-profit educational institutions operating reactors licensed by the NRC are not required to maintain financial protection, although many have elected to do so on their own. The NRC is required to indemnify such licensees for liability in excess of $250,000 but not to exceed $500,000,000. Liability is limited to $500,000,000.

### E. Materials licensees

The NRC has the discretion to require materials licensees to obtain financial protection. For those materials licensees for which financial protection is required in an amount less than $560,000,000, the NRC is required to provide indemnification in the amount of $500,000,000, less the amount by which the financial protection required exceeds $60,000,000. Liability for licensees required to maintain financial protection is limited to $500,000,000 plus the amount of financial protection required, but in no event more than $560,000,000.

### F. Nuclear pharmacies

Nuclear pharmacies provide radioisotopes to hospitals and the medical profession for the diagnosis and treatment of various diseases and injuries. The use of these radiopharmaceuticals is widespread and essential for many activities in modern medicine. Information presented to the Committee indicated that nuclear pharmacies licensed by the NRC are unable to obtain adequate private insurance to cover liability in the event of a nuclear incident involving such materials. Accordingly, nuclear pharmacies today face many of the same obstacles faced by nuclear utilities and contrac-

1483

LEGISLATIVE HISTORY
SENATE REPORT NO. 100–218

[page 9]

tors with respect to the unavailability of adequate financial protection for activities involving nuclear materials. It is important to remove these obstacles in order to ensure a continued supply of these vitally important medical products.

Accordingly, the bill broadens the scope of Price-Anderson to cover nuclear incidents arising out of the operation of a nuclear pharmacy or hospital nuclear medicine department. The "related activities" covered by this section include the manufacture of the radiopharmaceuticals, since the intent of this provision is to remove barriers to the production and distribution of these items.

Indemnified pharmacies or departments licensed by the NRC will be exempt from the requirement that such licensees maintain financial protection, and will be indemnified by the NRC for public liability in excess of $250,000 but not in excess of $500,000,000. Liability of such licensees will be limited to $500,000,000.

Claims arising from the administration or misadministration of radiopharmaceuticals during diagnosis or therapy would not be covered by this provision. Thus, this provision does not provide federal indemnification or limited liability for malpractice suits against physicians, hospitals, or nuclear pharmacies using or dispensing radiopharmaceuticals. Similarly, it does not provide indemnification or limit liability for product liability suits against manufacturers, hospitals or nuclear pharmacies dispensing radiopharmaceuticals. The scope of the coverage provided by this provision is limited to releases of such materials as a result of activities other than patient diagnosis or therapy.

### DEPARTMENT OF ENERGY HIGH LEVEL WASTE CONTRACTORS

*A. Compensation and indemnification*

The bill extends DOE's indemnification authority for an additional thirty years for contractors involved in the storage or disposal of spent nuclear fuel, high-level radioactive waste, or transuranic waste, and thereby provides a mechanism for compensation for accidents arising out of these activities that is similar to the compensation mechanism for accidents at commercial nuclear power plants. The compensation system for damages arising from accidents performed under license or contract with the federal government should not depend upon the type of activity that caused the damage.

The Nuclear Waste Policy Act of 1982 established a framework for the national program to develop a permanent geologic repository for high-level radioactive waste and spent nuclear fuel. To gain public acceptance in potential host states for the repository and in states through which the waste may be transported it will be necessary to provide assurance that the citizens of such states will be fully compensated for any damages arising from the disposal, storage, or transportation of radioactive materials pursuant to this program. Additionally, because of the continued inadequacy of private insurance to cover the potential liability arising from the program, it appears that it will be necessary to continue to indemnify potential contractors in the program in order to secure their participation.

1484

PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408
[page 10]

Although an extension of DOE's authority under the current Act to indemnify its contractors would provide DOE with sufficient authority to indemnify contractors involved in the nuclear waste program, it is prudent to provide DOE explicitly with such authority in this extension of the Act so that there will not be an ambiguity when the DOE seeks to exercise such authority or in the unlikely event of an accident. Accordingly, the bill clarifies that DOE's authority to indemnify its contractors extends to those contractual activities involving the storage, transportation, and disposal of spent nuclear fuel, high-level radioactive waste, and transuranic waste. Thus, it would be clear that DOE has authority to enter into indemnification agreements with contractors for activities undertaken pursuant to the NWPA involving the risk of a nuclear incident.

As with accidents arising from activities of large commercial nuclear power plants, there would be no limit on liability for accidents involving the storage, disposal, or transportation of nuclear waste. Correspondingly, DOE would be required to provide indemnity for all public liability arising out of the indemnified activity, subject to the procedures and requirements set forth in section 170i.

In the event of a nuclear incident involving nuclear waste and requiring payment by DOE pursuant to an agreement of indemnification, the source of funds for such payments would depend upon the type of waste involved in the incident. The Nuclear Waste Fund is to be the source of funds for accidents involving waste produced as a result of the operation of commercial nuclear power plants. Liability arising from implementation of the NWPA is an additional cost of the program, and thus should be funded in a similar manner as the program itself. The Nuclear Waste Fund was established pursuant to section 302 of the NWPA to provide complete funding for the DOE activities undertaken pursuant to the NWPA. It consists of funds generated from a 1 mil per kilowatt-hour fee imposed upon the generation of electricity by commercial nuclear power plants, and funds to be deposited as a result of a charge to be imposed upon DOE for waste generated by its defense programs. Only the funds deposited from the fees imposed upon commercial reactors may be used as a source of funds for payments for accidents involving commercial waste.

Accidents involving other types of wastes are to be funded from the same sources as accidents involving other DOE contractors. Thus, for example, accidents involving waste generated by defense programs would be compensated from the general revenues of the Treasury. Accidents involving both commercially generated and non-commercially generated wastes would be compensated from both sources, with the proportion from each source depending on the corresponding proportion of waste from each source.

However, as with accidents involving large commercial nuclear power plants, there would be a limit on the amount that could be paid without further Congressional review. Thus, once liability from a waste accident reached the level that would have required Congressional action on a funding mechanism for excess damages had the accident arisen at a commercial power plant, Congressional action on a funding mechanism for damages greater than this

1485

LEGISLATIVE HISTORY
SENATE REPORT NO. 100–218
[page 11]

amount also would be required for accidents involving nuclear waste.

The procedures for Congressional review of Presidential plans for funding mechanisms, for the suspension of the adjudication of claims, and for the establishment of alternative methods of determining and satisfying claims would be the same for nuclear waste accidents as it is for accidents at large commercial nuclear plants, where liability exceeds the amount provided by the primary and secondary layers of financial protection for such plants. Thus, if the Congress failed to establish a funding mechanism or an alternative method for the adjudication of claims, then all public liability would be compensated from the judgment appropriation.

### B. Civil and criminal penalties

The bill includes provisions regarding civil and criminal penalties for violations by indemnified contractors of DOE nuclear-safety related rules, regulations, or orders regarding the storage, disposal, or transportation of nuclear waste. These provisions are identical to the civil and criminal penalty provisions adopted by the Senate Committee on Energy and Natural Resources in S. 748 (S. Rept. No. 100–70).

Civil and criminal penalties can be an effective deterrent to violations by contractors of DOE rules, regulations, and orders. Activities for which indemnification is provided present a risk of a nuclear incident and thus must be undertaken with the utmost care and safety. It is of crucial importance to the public health and safety and the protection of the environment that DOE regulations and orders governing the conduct of such activities be strictly followed. Accordingly, persons that fail to follow such rules, regulations, or orders should be subject to civil penalties, and any person that intentionally violates the Atomic Energy Act or nuclear safety-related rules, regulations, or orders should be subject to criminal penalties.

The civil and criminal penalties that would be available under this provision for violations of DOE rules, regulations, or orders by DOE contractors are similar to those already available for violations of NRC rules, regulations, or orders by NRC licensees. Thus, any contractor indemnified by DOE that violates a DOE regulation or order would be subject to a maximum civil penalty of $100,000 for each such violation. Knowing and willful violations of the Atomic Energy Act or DOE nuclear safety-related regulations, rules, or orders are subject to a maximum $25,000 fine or imprisonment not to exceed two years, or both.

The civil and criminal penalty provisions are not applicable to certain persons listed in the bill operating research and development facilities on a non-profit basis for DOE.

#### WAIVER OF DEFENSES

Persons indemnified under the bill by NRC or DOE would be required in the event of an ENO to waive—(1) any issue or defense as to conduct of the claimant or fault of persons indemnified, (2) any issue or defense as to charitable or governmental immunity; and (3) any issue or defense based on any statute of limitations, if suit is

1486

PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408

[page 12]

instituted within three years from when the claimant first knew or reasonably could have known of his injury or damage (but in no event more than thirty years after the date of the nuclear incident).

This generally preserves current law, but extends from twenty to thirty years the time on the statute of limitations waiver. The bill also clarifies that the waiver of defenses provision extends to accidents arising in the course of transportation of nuclear materials to or from, or from the construction or operation of, a nuclear waste storage or disposal facility. The bill also clarifies that the waiver of defenses provision applies to accidents arising from facilities licensed by the NRC to possess or store nuclear materials, for which the NRC requires financial protection.

LITIGATION COSTS

The bill allows attorneys' fees and costs of investigating, settling, and defending claims to be paid from the primary and secondary layers of financial protection. Past experience in toxic tort cases indicates, however, that these costs may be quite substantial, and may even be greater than the amount of funds provided for compensation. It is therefore necessary to provide for the review of these costs in order to minimize the expenditure of funds for purposes other than the compensation of victims.

The bill therefore provides that the district court shall review the costs associated with investigating, settling, prosecuting, and defending claims to determine whether such costs are reasonable and equitable, whether the party seeking such costs has litigated in good faith, avoided unnecessary duplication or delay, or made frivolous claims or defenses. After such review the court may provide for the awarding of such fees as the court deems appropriate.

LENGTH OF EXTENSION

The authority of NRC to provide Price-Anderson coverage to new licensees and the authority of DOE to indemnify high-level waste contractors is extended for thirty years.

This will permit Congress to reexamine the Act and to consider whether conditions in the nuclear industry have changed significantly by August 1, 2017, so as to warrant further modifications in the Act, if extended.

PUNITIVE DAMAGES

The bill clarifies that an award of punitive damages is prohibited if the award would result in any obligation of the United States to make any payments for public liability. This reflects the longstanding policy that the Federal government should not be liable for punitive damages.

Thus, all punitive damage awards would be prohibited in actions involving DOE contractors indemnified under section 170 r. Punitive damage awards also would be prohibited in suits against licensees covered by the retrospective premium system if, as a result of such an award, payments beyond the primary and secondary layers of financial protection would be necessary, since the United States is obligated to provide a source of funding for such claims.

1487

LEGISLATIVE HISTORY
SENATE REPORT NO. 100–218

[page 13]

The bill does not otherwise affect current law regarding punitive damages.

### FEDERAL JURISDICTION

Under current law, only claims arising from an ENO may be consolidated in federal court. In litigation following the Three Mile Island accident, the U.S. Court of Appeals for the Third Circuit held that federal courts do not have subject matter jurisdiction for claims arising out of a non-ENO nuclear incident. *Stibitz* v. *GPU*, 746 F.2d 993 (3d Cir. 1984), cert. denied, 105 S.Ct. 1187 (1985). The bill expands existing law to allow for the consolidation of claims arising out of any nuclear incident in federal district court.

The experience with claims following the TMI accident demonstrates the advantages of the ability to consolidate claims after the nuclear incident. Attorneys representing both plaintiffs and defendants in the TMI litigation testified before the Committee that the ability to consolidate claims in federal court would greatly benefit the process for determining compensation for claimants. The TMI accident, which was not an ENO, has resulted in over 150 separate cases against TMI defendants, with over 3,000 claimants, in various state and Federal courts. Many of the issues in these cases are similar. The availability of the provisions for consolidation of claims in the event of any nuclear incident, not just an ENO, would avoid the inefficiencies resulting from duplicative determinations of similar issues in multiple jurisdictions that may occur in the absence of consolidation.

Accordingly, the bill provides the federal district court in which the nuclear incident occurred with subject matter jurisdiction over claims arising from the nuclear incident. Any suit asserting public liability shall be deemed to be an action arising under the Price-Anderson Act, and the substantive law of decision shall be derived from the law of the State in which the incident occurred, in order to satisfy the Article III requirement that federal courts have jurisdiction over cases arising under the Constitution or under the laws of the United States.

### CASELOAD MANAGEMENT PANEL

The federal court in which Price-Anderson claims are consolidated may appoint a special caseload management panel to assist in managing cases. This is to provide for additional judicial resources for the adjudication of claims when the claims for public liability would present an unusual burden on the workload of the court.

### PRESIDENTIAL COMMISSION ON CATASTROPHIC NUCLEAR ACCIDENTS

Upon enactment of the bill, the President is required to establish a commission on catastrophic nuclear accidents to study the appropriate means for fully compensating victims of a catastrophic accident for which damages exceed the first two layers of financial protection for accidents at large commercial nuclear power plants or involving waste, or exceed the limit on aggregate liability for accidents for which there is an aggregate limit on liability. Such recommendations would be useful in the event of a catastrophic accident requiring further action by Congress.

1488

## PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408
[page 14]

### SECTION-BY-SECTION ANALYSIS

#### SECTION 1: SHORT TITLE

The short title of the bill is the "Price-Anderson Amendments Act of 1987".

#### SECTION 2: FINDINGS AND PURPOSES

This section sets forth Congressional findings and purposes.

#### SECTION 101: FINANCIAL PROTECTION

Section 101 amends section 170 b. of the Atomic Energy Act of 1954, which establishes the framework for the financial protection requirements for NRC licensees. This section provides for three major changes from current law.

The first change requires the NRC to increase the standard deferred premium which may be charged the licensee of each facility designed for producing substantial amounts of electricity and having a rated capacity of one hundred thousand electrical kilowatts or more. The increase is to be from the current level of $5,000,000 per facility to an amount not more than $60,000,000 per facility, but not more than $12 million in any one year.

The second major change directs the Commission to adjust annually, beginning one year after the date of enactment of this bill, the amount of the maximum deferred premium to reflect the aggregate percentage change in the gross national product deflator during the previous year.

The third change to existing law authorizes the Commission to borrow funds to pay public liability claims if such claims emerge at a rate that exceeds the rate at which the deferred premiums are collected. All such borrowing is subject to approval in advance in appropriation Acts.

The total amount of obligations that may be issued pursuant to this provision for any given nuclear incident (including any interest on such obligations) may not exceed the unpaid balance of deferred premiums to be assessed. All such obligations, including interest, shall be repaid from assessments to be collected as a result of the unpaid balance of deferred premiums to be assessed. This provision is not intended to authorize the Commission to issue obligations to cover defaults by its licensees for the payment of deferred premiums in connection with their financial protection requirements. This section retains the requirements of existing law for the Commission to establish requirements, as necessary, to assure the availability of funds to meet any assessment of deferred premiums.

Consistent with existing law, the NRC is authorized to (1) establish a maximum amount which the aggregate deferred premiums charged for each facility within one calendar year may not exceed (to take into account the possibility of multiple accidents); and (2) establish amounts less than the standard deferred premium for individual facilities taking into account such factors as the facility's size, location, and other factors pertaining to the hazard.

Also consistent with existing law, the Commission is directed to establish such requirements as are necessary to ensure the avail-

Supplemental Appendix Page No. 2000


## LEGISLATIVE HISTORY
SENATE REPORT NO. 100-218

[page 15]

ability of funds to meet any assessment of deferred premiums within a reasonable time when due. Specific options made available to the Commission under this provision include the creation of liens upon the licensed facility and the revenues derived therefrom or any other property or revenues of such licensee, and consent of the licensee to the automatic revocation of any license.

#### SECTION 102: NRC INDEMNIFICATION FOR PUBLIC LIABILITY

Section 102 amends section 170 c. of the Atomic Energy Act of 1954, as amended, which sets forth the obligations of the Commission to enter into indemnity agreements with licensees and contains an aggregate limit on such indemnities.

Under current law, the Commission is required to enter into indemnity contracts with those licensees for which it requires financial protection of less than $560,000,000. The aggregate indemnity is limited by statute to $500,000,000. However, this amount must be reduced to the extent that the financial protection required by the Commission of any licensee exceeds $60,000,000. The Commission has interpreted this directive as applying only to those licensees for which it has entered into an agreement of indemnification pursuant to section 170a.

Under the bill, existing law would be unaffected except with respect to those licensees required by the Commission to have and maintain financial protection equal to the maximum amount of liabilty insurance available from private sources (e.g., those utility reactors having a rated capacity equal too or greater than one hundred thousand electrical kilowatts). For these licensees, the Commission would be required to enter into contracts of indemnification covering all public liability arising from a nuclear incident which is in excess of the level of financial protection required of the licensee. Thus, the Commission would be required to indemnify each large commercial reactor for all public liability above the amount of liability covered by the annual retrospective premium system.

This section also authorizes the Commission to enter into contracts of indemnification as outlined above for licenses issued by the Commission during the next thirty years, until August 1, 2017.

#### SECTION 103: AGGREGATE LIABILITY FOR A SINGLE NUCLEAR INCIDENT

Section 103 amends section 170 e. of the Atomic Energy Act, as amended, which sets forth the aggregate liability of persons indemnified by the Commission for any single nuclear incident.

Under existing law, the aggregate liability, including the costs of investigating and settling claims and defending suits for damage, for any such idemnified licensee is limited to: (1) the sum of $500,000,000 plus the amount of financial protection required; or (2) if the amount of financial protection required exceeds $60,000,000 $560,000,000 or the amount of financial protection required of the licensee, whichever is greater.

This section of existing law also contains the Congressional commitment, in the event of a nuclear incident involving damages in excess of the aggregate liability limits, to "thoroughly review the particular incident and * * * take whatever action is deemed nec-

1490

PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408

[page 16]

essary and appropriate to protect the public from the consequences of a disaster of such magnitude."

The bill maintains existing law, except as it relates to public liability for nuclear incidents covered by the industry retrospective premium system or arising from activities of DOE contractors involving high-level nuclear waste for which indemnification is provided under new section 170 r.

The bill clarifies that for public liability arising from activities of large power reactors that does not exceed the total amount of financial protection provided by the annual retrospective premium system, no additional payments shall be required by or on behalf of person indemnified, if payments are provided in that year pursuant to such retrospective premium plan.

This section also provides that with respect to public liability arising from such commercial activities or indemnified high-level waste activities that does exceed the total amount of financial protection available that would be available for a single nuclear incident under the retrospective premium system: (1) the United States shall be substituted as the party defendant; (2) the execution of any judgments against persons indemnified, other than the United States, for public liability in excess of the amount available under the retrospective premium system is prohibited; and (3) the funds provided pursuant to the procedures in revised section 170 i. shall be the exclusive source of payments for such public liability claims.

Courts are prohibited from awarding punitive damages against any licensee covered by the retrospective premium system or any contractor if the United States would be obligated to make any payments of indemnification as a result of the award of punitive damages.

## SECTION 104: ROLE OF THE ATTORNEY GENERAL

Section 104 of the bill amends section 170 h. of the Atomic Energy Act of 1954, as amended, which authorizes the Commission to include in any agreement of indemnification terms deemed appropriate to carry out the purposes of section 170. This provision of existing law also authorizes the Commission to become involved in the settlement of claims, through the Attorney General, when it determines that the United States will probably become obligated to make indemnity payments under such an agreement.

This section of the bill, consistent with the revised nature of the indemnity agreements required for large utility reactors pursuant to section 101 of the bill and for DOE contractors under section 201 of the bill, and consistent with the removal of liability limits for the United States under such agreements, directs that the Attorney General shall be joined as a party defendant where public liability from a nuclear incident involving such indemnified party may exceed the amount of required financial protection.

## SECTION 105: CONGRESSIONAL REVIEW

Section 105 of the bill amends section 170 i. of the Atomic Energy Act, which currently requires a report to Congress for any nuclear incident that will probably result in public liability claims in excess of the current maximum limits of liability.

1491

LEGISLATIVE HISTORY
SENATE REPORT NO. 100-218
[page 17]

Under this section of the bill, new procedures are established for Congress to determine the proper source of funds for public liability in excess of the maximum amount of financial protection required by the retrospective premium assessments. New procedures are also established for the Congress to review the methods by which such public liability is determined. In the absence of any Congressional action the federal indemnity for such excess liability will be satisfied by the Judgment Appropriation (31 U.S.C. 1304).

Assuming Congress has not previously enacted an alternative compensation plan, as described below, once the damages for public liability as adjudicated by the courts exceed the amount of financial protection that is (or, for nuclear waste accidents, would have been, had the accident occurred at a commercial facility) available under the retrospective premium system, Congress would have 180 days of continuous session to enact a measure to provide the sums of money required to satisfy such excess public liability, or the excess amount would be satisfied out of the Judgment Appropriation. No payments could be made from the Judgment Appropriation prior to the expiration of the 180 day period.

The President is authorized to submit, within thirty days of a court's final judgment, an alternate funding plan to the Congress. Upon the introduction of an alternate funding plan, in the form of a joint resolution which would explicitly reference the alternate plan, the Committee to which such resolution is referred would have 90 days of continuous session to review the plan and determine whether or not to report it to the full Senate or House. If the resolution were not reported within this 90 day period, the Committee would be discharged and the resolution would be placed on the calendar of the Senate or House. The procedures applicable to this resolution are set forth in this section. Floor debate on the resolution would be limited to 100 hours, at which time it would be in order to move passage of the resolution.

Congress could develop its own funding alternative within the 180 day period referred to above, although any such alternative would not be subject to the same expedited procedures. The permissible scope of the Presidential funding plan would be limited to the establishment of a source of funding, for all or part of the judgment that has been rendered by the court, other than the Judgment Appropriation, or the estblishment of a structured settlement by, for example, specifying that the payments shall be spread over a reasonable period of time. These expedited procedures would be inapplicable to resolutions that contained matters other than the timing of payments, the source of payments, and proposed revenue measures.

Section 105 also contains procedure for Congressional consideration of Presidential plans for alternate methods of determining and satisfying public liability claims. If the President determines, after consulting with the NRC or DOE, as appropriate, and the Department of Justice, that: (1) public liability from a single nuclear incident may exceed the maximum amount of financial protection provided under the bill; (2) the Congress should consider an alternate mechanism for the determination and satisfaction of such liability; and (3) the adjudication of any public liability claims for which a final judgment has not yet been rendered should be sus-

1492

PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408

[page 18]

pended, then the President would be required to submit such determinations to the Congress.

Upon the submission of such determinations, the President also would be required to submit one or more plans for an alternate method for the determination and satisfaction of public liability from the nuclear incident. Once these communications are submitted to Congress, and after introduction in the form of joint resolutions, procedures parallel to those for the consideration of the Presidential funding plan would apply to the consideration of the Presidential plans for the suspension of the adjudication of claims and the establishment of alternative methods of determining compensation. However, (1) the time for Congressional review of the resolution for the suspension of the adjudication of claims would be limited to 45 days in Committee and 50 hours of floor debate; and (2) the time for review of the suggested alternative would be limited to 150 days in Committee and 100 hours of floor debate.

If Congress were to pass the first resolution, suspending further court adjudication of claims, but did not subsequently pass the second resolution within 180 days of its introduction, then the suspension of further court adjudications would be lifted at the expiration of that period.

### SECTION 106: NONPROFIT EDUCATIONAL AND NUCLEAR PHARMACY LICENSEES

Section 106 amends section 170 k. of the Atomic Energy Act of 1954, as amended, which currently requires the NRC to indemnify certain non-profit educational licensees for public liability and limits public liability to the amount of such indemnification.

This section extends by thirty years the requirement that the NRC exempt non-profit educational licensees from the requirements of financial protection, and the authority to enter into agreements with such licensees. As under existing law, such licensees are to be indemnified from public liability in excess of $250,000 arising from nuclear incidents, in the amount of $500,000,000. Aggregate liability is limited to $500,000,000.

The provisions of current law are extended to licenses issued for medical and related activities to persons operating nuclear pharmacies or hospital medicine department. It is the Committee's intent that "related activites" include the manufacture of the radiopharmaceuticals provided to persons operating nuclear pharmacies or hospital medicine departments. This section also states that such indemnification agreements would not cover public liability for, or preclude claims arising out of, the administration or misadminstration of radiopharmaceutical dispensed by nuclear pharmacies or nuclear medicine departments of hospitals in the course of diagnosis or therapy.

### SECTION 107: WAIVER OF DEFENSES

Section 107 amends section 170 n. of the Atomic Energy Act of 1954, as amended, which requires the waiver of various defense in the event of an extraordinary nuclear occurrence.

The bill generally preserves the provisions of current law regarding various circumstances in which the waiver of defenses is re-

1493

LEGISLATIVE HISTORY
SENATE REPORT NO. 100-218

[page 19]

quired, and the defenses required to be waived under those circumstances. It clarifies, however, that the waiver of defenses extends to ENO's arising out of activities at various facilities licensed by the NRC to store or possess nuclear materials, other than power reactors, for which the NRC requires financial protection. The waiver also extends to incidents arising from the transportation of nuclear materials to or from such a facility or to or from a nuclear waste storage or disposal facility, or at such a storage or disposal facility.

In addition, this section provides that the waiver of defenses provision related to the statute of limitations be extended from 10 to 30 years.

### SECTION 108: JUDICIAL PROCEDURES FOR LIABILITY IN EXCESS OF LIMIT OR FINANCIAL PROTECTION

Section 108 amends section 170 o. of the Atomic Energy Act of 1954, as amended, which sets forth judicial procedures to be followed in the event that public liability from a nuclear incident appears likely to exceed the limits on liability or the amount of financial protection required pursuant to the retrospective rating plan in the absence of such a limit.

The bill preserves the powers of the court under the current section. In addition, however, it directs the court to review the reasonableness of costs associated with the investigation, settlement, prosecution, and defense of claims, and to determine whether the party seeking such costs has: (1) litigated in good faith; (2) avoided unnecessary duplication of effort with that of other parties similarly situated; (3) made frivolous claims or defenses; and (4) attempted to unreasonably delay the prompt settlement or adjudication of such claims.

### SECTION 109: REPORT TO CONGRESS

Section 109 amends section 170 p. of the Atomic Energy Act of 1954, as amended, which requires the Commission and DOE to report to the Congress in advance of the expiration of the respective authorities under Price-Anderson on the need to continue or modify the existing system.

This section requires the Commission and DOE to report, prior to the expiration of the authority conferred under this bill, on the need to continue the Price-Anderson system, as amended by this bill, with recommendatons for whatever modifications are deemed appropriate.

### SECTION 110: CONFORMING AMENDMENTS

Section 110 makes a number of technical and conforming amendments to various provisions of section 170 of the Atomic Energy Act of 1954, as amended, to reflect previous Congressional decisions to split the functions of the Atomic Energy Commission between the Nuclear Regulatory Commission and the Department of Energy.

### SECTION 111: JUDICIAL REVIEW FOR NUCLEAR INCIDENTS

Section 111 amends section 170 n. of the Atomic Energy Act of 1954, as amended, by providing that any action under the Price-An-

1494

PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408

[page 20]

derson Act may be removed, upon the motion of any defendant, or the Commission or Secretary, to the United States district court in the district in which a nuclear incident has occurred.

This section also allows, under certain conditions, the court of jurisdiction to appoint a special caseload management panel to assign and coordinate cases arising out of a nuclear incident.

SECTION 112: PRESIDENTIAL COMMISSION ON CATASTROPHIC ACCIDENTS

Section 112 adds a new section 170 q. to the Atomic Energy Act of 1954, as amended. This subsection provides for the establishment of a Presidential commission, within 90 days of enactment of the bill, to study means of fully compensating victims of a catastrophic nuclear accident for damages which exceed the maximum amount of financial protection that would be available from the retrospective rating plan. The commission is required to issue a report to Congress at the conclusion of a two year period following the date of enactment of the legislation.

SECTION 113: LIABILITY OF LESSORS

This section adds a new section 170 s. of the Atomic Energy Act of 1954, as amended, to clarify that in a sale-leaseback arrangement, the liability for a nuclear incident remains with the utility-lessee, and not with the investor-lessor, unless the facility at which the incident occurred is in the actual possession and control of such person at the time of the nuclear accident.

SECTION 201: DOE HIGH-LEVEL WASTE CONTRACTORS

Section 201 adds a new section 170 r. to the Atomic Energy Act of 1954, as amended, to authorize the Department of Energy, through August 1, 2017, to indemnify its contractors undertaking activities involving the storage, transportation, or disposal of high-level radioactive waste, spent nuclear fuel, or transuranic waste, where such activities involve the risk of public liability for a nuclear incident. The bill clarifies that for such a waste activities, indemnification is to be provided by DOE rather than by the NRC through its authority to indemnify its licensees or any other authority.

With respect to accidents arising from activities involving waste generated in a commercial nuclear power reactor, funds for compensating public liability in an amount up to the maximum amount that would be available through the retrospective premium system for commercial licensees are to be paid from the Nuclear Waste Fund. The contribution to the Nuclear Waste Fund resulting from defense and other non-commercial Federal contributions are not to be used for payments required as a result of commercial waste accidents.

With respect to accidents arising from activities involving all other waste, funds for compensating public liability up to the maximum amount that would be available through the retrospective premium system for commercial licensees are to be paid from the source as would be used for other contractors indemnified by DOE.

With respect to accidents arising from activities involving both waste generated by commercial reactors and waste generated else-

1495

## LEGISLATIVE HISTORY
### SENATE REPORT NO. 100-218

[page 21]

where, the Secretary is to determine the proportion of waste from each source and provide funds in the appropriate proportional amount from the Nuclear Waste Fund and the source of funds for all other payments.

Any payments for public liability greater than the amount that would be available through the retrospective premium system, regardless of the source of waste involved, would be made in accordance with the procedures of section 170 i.

#### SECTIONS 202-205: CONFORMING CHANGES

These sections make conforming changes so that various procedural provisions of the Act apply to accidents arising out of indemnified waste activities as well as to accidents arising out of commercial activities covered by the industry retrospective rating plan.

#### SECTION 206: CIVIL PENALTIES FOR SAFETY VIOLATIONS

This section, which adds a new section 234A. to the Atomic Energy Act of 1954, as amended, provides for civil monetary penalties for violations of Department of Energy nuclear safety-related rules, regulations, or orders at waste storage or disposal facilities. The scope of the activities for which the penalties may be imposed under this section is limited to those activities for which indemnification agreements have been entered into pursuant to section 170 r. of this bill.

#### SECTION 207: CRIMINAL PENALTIES FOR SAFETY VIOLATIONS

Section 207 adds a new section 223 c. to the Atomic Energy Act of 1954, as amended, to provide for criminal penalties for knowing and willful violations of the Atomic Energy Act or Department of Energy nuclear safety-related rules, regulations, or orders.

Any director, officer, or employee of a person indemnified under an agreement of indemnification entered into pursuant to section 170 r. who, by act or omission, knowingly and willfully violates or causes to be violated any nuclear safety-related rule, regulation, or order, where such violation results in or, if undetected, would have resulted in a nuclear incident, shall be subject to a fine not to exceed $25,000, imprisonment not to exceed two years, or both. Escalated penalties are provided for subsequent criminal violations.

#### HEARINGS

The Subcommittee on Nuclear Regulation of the Committee on Environment and Public Works held three days of hearings in the 99th Congress (October 22 and 23, 1985; May 13, 1986) and one day of hearing in the 100th Congress (April 30, 1987) on bills to amend the Price-Anderson Act.

Testimony was received from the members of the Nuclear Regulatory Commission, representatives of the Department of Energy, including the Acting Assistant Secretary and Assistant Secretary for Nuclear Energy and the Director of the Office of Civilian Radioactive Waste Management, representatives from various States and state-sponsored organizations, a representative from an Indian tribe, industry representatives, environmentalists, insurance specialists, and persons with experience in claims for public liability.

1496

PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408

[page 22]

## ROLLCALL VOTES

Section 7(b) of rule XXVI of the Standing Rules of the Senate and the rules of the Committee on Environment and Public Works require that any rollcall votes taken during consideration of this bill be announced in this report.

Three rollcall votes were taken during the consideration of this bill by the Committee on Environment and Public Works. Senator Stafford offered an amendment to replace the procedures for claims in excess of the primary and secondary layers of financial protection with the requirement that Congress appropriate the funds required to satisfy such claims. The amendment failed by a vote of 8–8 for lack of a majority. In support of the amendment were Senators Stafford, Moynihan, Chafee, Mitchell, Durenberger, Baucus, Lautenberg, and Mikulski. In opposition were Senators Breaux, Simpson, Burdick, Symms, Reid, Warner, Graham, and Pressler.

Senator Moynihan offered an amendment to require that the Federal Emergency Management Agency provide to the NRC findings and determinations regarding the adequacy of emergency planning and preparedness prior to the issuance by the NRC of an operating license for a nuclear power plant, under criteria for the evaluation of emergency plans and preparedness at least as protective of the public health and safety as those in effect on August 1, 1987. The amendment failed by a vote of 8–8 for lack of a majority. In support of the amendment were Senators Moynihan, Stafford, Mitchell, Baucus, Lautenberg, Mikulski, Reid, and Graham. In opposition were Senators Burdick, Breaux, Chafee, Simpson, Symms, Durenberger, Warner, and Pressler.

The Committee ordered the bill to be reported by a unanimous rollcall vote.

## EVALUATION OF REGULATORY IMPACT

In accordance with section 11(b) of rule XXVI of the Standing Rules of the Senate, the Committee makes the following evaluation of the regulatory impact of the reported bill:

The bill amends and extends the basic indemnification and compensation system of the current Price-Anderson Act. There is no direct regulatory impact from the extension of the provisions of current law.

The bill amends current law by requiring the NRC to increase the maximum retrospective premium that may be charged following a nuclear incident from $5,000,000 to $60,000,000. The bill further requires the NRC to adjust annually the maximum retrospective premium to reflect the aggregate change in the gross national product deflator during the previous year. This increase would result in increased costs to licensees of large commercial nuclear power plants only in the extremely unlikely event of a nuclear accident with damages greater than the limit of liability under existing law, which is now approximately $175,000,000.

Current law is also amended by extending the minimum statute of limitations for certain extraordinary nuclear occurrences—those covered by the retrospective premium system and those incidents involving nuclear wastes—to thirty years from the date of the acci-

1497

LEGISLATIVE HISTORY
SENATE REPORT NO. 100–218

[page 23]

dent. A State would not be allowed to impose a shorter statute of limitations.

Section 8 expands the scope of coverage to include NRC licenses issued to persons operating pharmacies and to hospital nuclear medicine departments. The NRC has licensed 1800 medical institutions, 500 private practitioners, 20 mobile nuclear medicine services, 300 teletherapy services, 100 in vitro blood testing laboratories, 10 radiopharmaceuticals manufacturers, and 10 sealed source manufacturers that possibly would be affected by this section. Upon execution of an indemnity agreement, a licensee would not incur any additional costs or requirements.

The bill authorizes the imposition of civil and criminal penalties against indemnified contractors in the high-level waste program for violations of DOE safety-related rules, regulations, or orders, and criminal penalties for the intentional violation of requirements of the Atomic Energy Act or DOE safety-related rules, regulations, or orders. The bill does not provide DOE with any new authority regarding the issuance of such rules, regulations, or orders.

The civil and criminal penalty provisions should not impose any additional regulatory burdens upon contractors involved in the high-level waste program. Contractors of the Federal government are expected to comply with all applicable Federal laws, rules, regulations, and orders, regardless of the type of sanction imposed for violations thereof.

The bill creates a Presidential commission to study means of fully compensating victims of a catastrophic nuclear accident where public liability exceeds the maximum amount of financial protection required of licensees covered by the retrospective rating plan, or the limit on aggregate liability, as appropriate. The commission is to issue a report to Congress two years after the date of enactment of this legislation. The commission has the authority to recommend additional regulatory requirements, but does not have authority to impose any additional regulatory requirements.

COST OF LEGISLATION

Section 403 of the Congressional Budget and Impoundment Control Act requires each report to contain a statement of the cost of the reported bill prepared by the Congressional Budget Office. That statement follows:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, October 28, 1987.*

Hon. QUENTIN N. BURDICK,
*Chairman, Committee on Environment and Public Works,*
*U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed the Price-Anderson Amendments Act of 1987, as ordered reported by the Senate Committee on Environment and Public Works, August 4, 1987. This bill would increase the government's potential financial liability in the event of nuclear accident involving federal nuclear waste contractors and certain other types of nuclear accidents. Because there is no basis for predicting the number and magnitude of such incidents, CBO cannot estimate the cost of

1498

## PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408

[page 24]

the increased liability. The bill also raises the maximum liability of operators of commercial nuclear powerplants, thus decreasing the likelihood that an accident involving such a facility would exceed the liability limit and possibly necessitate government action. However, the bill makes the federal government liable for any claims that exceed the insurance coverage for commercial power plants.

CBO estimates that the bill's provision for a new Presidential Commission on Catastrophic Nuclear Accidents would cost approximately $500,000 per year, for fiscal years 1988 and 1989. No significant costs to the federal government would result from other provisions of the bill.

*Bill purpose*

The bill extends and revises the Price-Anderson Act, which governs the liability and indemnification of federal licensees and contractors in the event of a nuclear accident. Under this law, the Nuclear Regulatory Commission (NRC) regulates and indemnifies licensees, and the Department of Energy (DOE) indemnifies its contractors. The bill would extend NRC's indemnification authority for 30 years, until August 1, 2017. In addition, the bill authorizes DOE indemnification of nuclear waste contractors until August 1, 2017.

Under existing federal indemnification agreements, utilities are required to carry the maximum available private liability insurance, currently $160 million per reactor. For nuclear accident damages beyond this "primary layer" of compensation, each licensed reactor may be assessed a charge of $5 million per accident. The law calls these charges "deferred premiums"; they would not be assessed until an accident occurs. With 111 reactors currently licensed by the NRC, this "secondary layer" of nuclear accident insurance totals $555 million, for a total commercial liability of $715 million (under current law). Federal liability for nuclear accidents caused by DOE contractors is currently limited to $500 million. DOE's authority to indemnify its contractors expired on August 1, 1987.

The bill raises the maximum financial liability for a nuclear accident involving commercial power plants from $715 million to an estimated $6.8 billion per incident. The bill sets the liability limit according to the amount of financial protection that the NRC requires commercial licensees to maintain from primary liability insurance (currently $160 million), and from deferred premiums levied on all other operating plants (up to $60 million per reactor, as determined by the NRC). In general, the aggregate deferred premium of $60 million per reactor, for each nuclear accident, is to be paid at a rate of no more than $12 million per year. The bill provides the NRC with authority to assess certain facilities annual deferred premiums less than the standard deferred premium of $12 million per year under special circumstances.

The estimated $6.8 billion limit established by the bill would be increased over time, because the bill requires the NRC to make annual inflation adjustments to the aggregate deferred premium. CBO estimates that the aggregate deferred premium would rise from $60 million per plant to approximately $73 million per plant by the end of fiscal year 1992.

1499

## LEGISLATIVE HISTORY
### SENATE REPORT NO. 100-218
[page 25]

The bill directs the NRC to request an appropriation to borrow from the Treasury in order to meet any nuclear accident claims for which the commission is liable. For example, the NRC could borrow funds to meet a single-year demand for accident claims when such demand exceeds the annual receipts from deferred premium payments of $12 million per reactor. Funds borrowed by the NRC to meet claim requirements are limited to amounts that can be repaid to the Treasury, with interest, from future deferred premiums.

Special procedures are included in the bill for Congressional action on claims involving commercial power plants that exceed the above limits. Specifically, the government is made liable for nuclear accident claims that exceed the limited liability of commercial power plant licensees. The bill establishes rules and procedures for Congressional action to compensate accident victims for claims that exceed the commercial liability level. Claims that exceed the commercial liability level would be paid from a permanent, indefinite appropriation known as the Judgment Appropriation (31 U.S. Code 1304), or by an alternate funding plan approved by the Congress.

The Environment Committee's bill extends DOE's indemnification authority to contractors that are involved in nuclear waste activities. The bill does not limit the government's liability for any accidents involving nuclear waste contractors. Claims related to the Nuclear Waste Fund are to be paid directly from the fund, until claims exceed the maximum amount of financial protection required for commercial power plant licensees. Claims beyond the commercial limit ($6.8 billion for the current number of commercial reactors) could be paid by using the Judgment Appropriation, or from other sources, as the Congress deems appropriate.

The bill also authorizes DOE to assess civil penalties, up to $100,000 per day, again nuclear waste contractors who violate any rule, regulation or order related to nuclear safety, as prescribed by the Secretary of Energy.

### Budget impact

The increase in the liability for accidents involving commercial plants would not directly affect the federal government's financial liability, because commercial licensees would be ultimately responsible for all accident claims up to the new liability limit. However, the government would be required to take action in the event of an accident with claims exceeding the licensees' liability. The increase in the commercial liability limit makes it less likely that such government involvement would occur in the event of a major nuclear accident. On the other hand, because the government fully indemnifies federal contractors involved in nuclear waste activities, the increase in liability for incidents involving these contractors would be completely borne by the federal government. The liability and indemnification of other licensees would remain at current levels ($500 million in most cases).

The provisions affecting the government's financial liability would not increase federal spending in fiscal years 1987 through 1992 unless a nuclear incident involving federal indemnification occurs in those years. Enactment of the bill would result in unlim-

1500

## PRICE–ANDERSON AMENDMENTS ACT
P.L. 100–408

[page 26]

ited government liability for accidents caused by DOE nuclear waste contractors, and for commercial nuclear accidents that exceed the $6.8 billion limit on commercial financial liability.

The Environment Committee's bill requires that the President establish a Commission on Catastrophic Nuclear Accidents within 90 days after enactment of the bill. The commission shall consist of 7 to 11 members who must conduct a study of appropriate means of fully compensating victims of a catastrophic nuclear accident that exceeds the aggregate liability specified by the bill. A final report containing the commission's recommendations must be submitted to the Congress within two years of enactment of the bill. The estimated cost of establishing this Presidential commission is $500,000 per year, for fiscal years 1988 and 1989. The commission shall terminate two months after the required final report is submitted.

Other provisions in the bill are expected to have no significant impact on federal outlays.

No costs would be incurred by state or local governments as a result of enactment of this bill.

On June 8, 1987, CBO prepared an estimate of the budget impact of S. 748, the Price-Anderson Act Amendments Act of 1987, as ordered reported by the Senate Committee on Energy and Natural Resources, May 20, 1987. S. 748 extends and revises DOE's indemnification authority for federal contractors, but it does not contain any provisions that apply to operators of commercial nuclear reactors. S. 748 provides for indemnification of all DOE contractors, and sets a federal liability limit of $6 billion per nuclear accident, to be adjusted over time for inflation. In contrast, the Environment Committee's bill would impose no limit on the government's liability for accidents involving nuclear waste activities.

If you wish further details on this estimate, we will be pleased to provide them.

With best wishes,
    Sincerely,

EDWARD M. GRAMLICH,
*Acting Director.*

\*        \*        \*        \*        \*

1501

SIGNING STATEMENT
P.L. 100–408

## STATEMENT BY PRESIDENT OF THE UNITED STATES

### STATEMENT BY PRESIDENT RONALD REAGAN
### UPON SIGNING H.R. 1414

24 Weekly Compilation of Presidential Documents 1075, August 29, 1988

I have today signed into law H.R. 1414, legislation that extends for 15 years the Price-Anderson Act, the law that protects the public in the event of a nuclear accident and that makes feasible commercial nuclear power generation. This new legislation preserves the public's right to speedy compensation in the event of a nuclear accident and expands the level of protection to over 7 billion dollars.

I sign this legislation in the midst of a summer that has brought record temperatures to much of our country. As a consequence, many of our utilities find themselves near the limits of their power-generating capacity.

The current limits to our electrical generating capacity are already being felt: clocks losing time because of voltage reductions, temporary losses of power at moments of peak demand, and the necessity of employing backup generators at hospitals and like facilities that have this capacity to meet emergency needs.

The implication of this situation is clear: Our Nation must move forward into a new era of safe, economical, and clean nuclear power. Nuclear power, like our other domestic energy sources, is not subject to foreign supply interruptions and does not add to our balance-of-payments deficit. Nearly 100,000 megawatts of electricity are provided by nuclear power each year, enough to meet approximately 20 percent of the country's electricity demand. To replace this energy with electricity produced by oil would require two million barrels of oil per day, pump 350 million tons of carbon dioxide into the atmosphere each year, and, if the demand is not met from domestic reserves, worsen our trade deficit by more than 1 billion dollars per month to purchase foreign oil.

Enactment of an extension of Price-Anderson is the latest in our steps to assure a reliable, expanding supply of nuclear power for the Nation. The Nuclear Regulatory Commission is moving forward to improve the efficiency of its licensing process while still assuring that any safety questions are fully resolved before major new power plants are constructed. We have worked with the Congress to enact legislation that will put in place safe, environmentally sound disposal facilities for the low-level and high-level wastes that are the product of nuclear power plants. Private industry is developing improved nuclear reactor technologies that promise to be simpler, safer, and more economical. These steps are supplemented with this extension of Price-Anderson protections to assure a sound basis for operating these new reactors.

In signing H.R. 1414, I note the presence of one provision that warrants careful construction in order to avoid constitutional problems. Accordingly, I am stating my interpretation of that provision to make certain that the Act is implemented in a constitutional manner.

Under the Constitution the President enjoys plenary and exclusive authority to determine whether and when he should propose legislation to the Congress. Section 7 of H.R. 1414, however, might appear to require the

1502

## SIGNING STATEMENT
P.L. 100–408

President to submit legislation to the Congress under certain circumstances. In order to avoid constitutional difficulties, I will construe section 7 as recommendatory rather than obligatory.

Signing into law this extension of Price-Anderson protection for the public in 1988 is a reflection of the continuing commitment of this Administration and of the Congress to secure the public's right to a safe and economically secure future. To keep America strong, nuclear energy truly must realize its full potential as a technology. I am pleased to take this step to assure that goal.

THE WHITE HOUSE,                                          RONALD REAGAN
August 20, 1988.

1503