# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, *et al.*,

       Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

       Defendants.

---

# PART TWO:

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT AND BRIEF IN SUPPORT OF MOTION RE: STANDARDS

## PREEMPTION

---

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................iii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .............................................................................................................. 4

I.     THE ATOMIC ENERGY ACTS OF 1946 AND 1954 ........................................... 4

     A.     The Atomic Energy Act Of 1946 ................................................................ 5

     B.     The Atomic Energy Act Of 1954 ................................................................ 7

II.    THE AEC PUBLISHED THE STANDARDS THAT GOVERNED AEC OPERATIONS IN ITS OFFICIAL MANUAL OF INSTRUCTIONS. ................. 9

     A.     AEC Manual Chapter 0524: Genesis ......................................................... 10

     B.     AEC Manual Chapter 0524: The 1958 Version .......................................... 13

     C.     AEC Manual Chapter 0524: The 1963 Revision ........................................ 14

     D.     AEC Manual Chapter 0524: The 1968 Revision ........................................ 16

     E.     The AEC Affirmed Its Intention That The Standards For AEC Contractors And AEC Licensees Be Consistent. ........................................ 17

III.   ERDA PUBLISHED THE STANDARDS THAT GOVERNED ERDA OPERATIONS IN ITS OFFICIAL MANUAL OF INSTRUCTIONS. ................ 19

IV.   THE DOE RETAINED THE SAME NUMERICAL DOSE LIMITS UNTIL 1985 AND THEN LOWERED THEM. .................................................... 20

ARGUMENT .................................................................................................................. 22

I.     THE STANDARDS ISSUED BY THE AEC AND SUCCESSOR AGENCIES HAD "THE FORCE OF LAW". ...................................................... 22

     A.     The Atomic Energy Act Gave The AEC And Its Successors The Authority To Establish The Radiation Protection Standards That Governed Their Operations. ........................................................................ 23

i

**Page**

      B.     The AEC And Its Successors Complied With All Procedural Requirements Relating To The Adoption Of Radiation Protection Standards For Their Operations. ................................................. 24

      C.     The AEC And Its Successors Intended That The Radiation Protection Standards They Adopted For Their Operations Be Binding. .......................................................................... 25

           1.     The contracts issued by the AEC and it successors mandated that contractors comply with federal standards................................ 26

           2.     The context of the Manual confirms what its text says.................... 29

           3.     Extrinsic evidence removes any possible doubt............................... 30

II.    THE RADIATION STANDARDS ESTABLISHED BY THE AEC SET THE DUTY OF CARE AND PREEMPT COLORADO NUISANCE LAW. ....................................................................................................... 31

      A.     The Radiation Standards Established By The AEC Conflict With Colorado Nuisance Law. ............................................................ 32

      B.     The Conflict Between The AEC Release Limits Cannot Be Avoided Through ALARA. ....................................................................... 42

CONCLUSION ............................................................................................................... 43

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Adkins v. Chevron Corp.*,
    960 F. Supp. 2d 761 (E.D. Tenn. 2012) ........................................................................ 43

*Bohrmann v. Maine Yankee Atomic Power Co.*,
    926 F. Supp. 211 (D. Me. 1996) ................................................................................... 43

*Brodowy v. United States*,
    482 F.3d 1370 (Fed. Cir. 2007) .................................................................................... 23

*California v. FERC*,
    495 U.S. 490 (1990) ...................................................................................................... 37

*Carey v. Kerr-McGee Chemical Corp.*,
    60 F. Supp. 2d 800 (N.D. Ill. 1999) ............................................................................. 43

*Cipollone v. Liggett Grp.*,
    505 U.S. 504 (1992) ...................................................................................................... 33

*City of New York v. Permanent Mission of India to United Nations*,
    618 F.3d 172 (2d Cir. 2010) .......................................................................................... 24

*Cook v. Rockwell International Corp.*,
    618 (10th Cir. 2010) (Cook Appeal I) ................................................................... passim

*Corcoran v. New York Power Authority*
    935 F. Supp. 376 (S.D.N.Y. 1996) .............................................................................. 43

*Favreau v. United States*,
    317 F.3d 1346 n.11 (Fed. Cir. 2002) ............................................................................ 23

*Finestone v. Florida Power & Light Co.*,
    319 F. Supp. 2d 1347 (S.D. Fla. 2004) ........................................................................ 43

*Forest Guardians v. Babbitt*,
    174 F.3d 1178 (10th Cir. 1999) .................................................................................... 27

*Gade v. National Solid Wastes Management Association*,
    505 U.S. 88 (1992) .......................................................................................................... 4

**Page(s)**

*General Electric Co. v. Environmental Protection Agency*,
   290 F.3d 377 (D.C. Cir. 2002) ....................................................................... 22

*Hamlet v. United States*,
   63 F.3d 1097 (Fed. Cir. 1995) .............................................................. passim

*Hewitt v. Helms*,
   459 U.S. 460 (1983) .................................................................................. 27

*Hymas v. United States*,
   117 Fed. Cl. 466 (Fed. Cl. 2014) .............................................................. 23

*In re Hanford Nuclear Reservation Litigation*,
   534 F.3d 986 (9th Cir. 2008) ....................................................... 32, 40, 41

*In re TMI Litig. Cases Consol. II*,
   940 F.2d 832 (3d Cir. 1991) (*TMI II*) ........................................... 33, 35, 42

*In re TMI*,
   67 F.3d 1103 (3d Cir. 1995) (*TMI III*) .......................................... 17, 42

*Kurns v. Railroad Friction Products Corp.*,
   132 S. Ct. 1261 (2012) .............................................................................. 33

*McLandrich v. Southern California Edison Co.*,
   942 F. Supp. 457 (S.D. Cal. 1996) ............................................................ 43

*Morris v. U.S. Nuclear Regulatory Commission*,
   598 F.3d 677 (10th Cir. 2010) ................................................................. 17

*Mutual Pharmaceutical Co. v. Bartlett*,
   133 S. Ct. 2466 (2013) .............................................................................. 4

*Nieman v. NLO, Inc.*,
   108 F.3d 1546 (6th Cir. 1997) ........................................................... 33, 41

*Northern States Power Co. v. State of Minnesota*,
   447 F.2d 1143 (8th Cir. 1971) ........................................................... 38, 41

*O'Conner v. Commonwealth Edison Co.*,
   13 F.3d 1090 (7th Cir.) ...................................................................... 33, 41

iv

**Page(s)**

*Perpich v. Department of Defense*,
    496 U.S. 334 (1990) ..................................................................................... 41

*Pruner v. Department of Army*,
    755 F. Supp. 362 (D. Kan. 1991) ................................................................... 24

*Riegel v. Medtronic, Inc.*,
    552 U.S. 312 (2008) ............................................................................... 33, 40

*Roberts v. Florida Power & Light Co.*,
    146 F.3d 1305 (11th Cir. 1998)............................................................... 33, 41

*San Diego Building Trades Council v. Garmon*,
    359 U.S. 236 (1959) ..................................................................................... 34

*Silkwood v. Kerr-McGee Corp.*,
    464 U.S. 238 (1984) ............................................................................... 38, 42

*Skull Valley Band of Goshute Indians v. Nielson*,
    376 F.3d 1223 (10th Cir. 2004)....................................................... 36, 37, 38

*United States v. Gabaldon*,
    522 F.3d 1121 (10th Cir. 2008)..................................................................... 27

*United States v. Locke*,
    529 U.S. 89 (2000) ....................................................................................... 38

*United States v. Seward*,
    687 F.2d 1270 (10th Cir. 1982)............................................................... 19, 20

**Statutes**

10 C.F.R. Part 20 ................................................................................passim

42 U.S.C. § 2201 ...................................................................................... 9, 24

42 U.S.C. §§ 5841-53 ................................................................................... 19

5 U.S.C. § 553 ............................................................................................. 24

Atomic Energy Act of 1946, 60 Stat. 755 .......................................... 4, 5, 6, 9

Atomic Energy Act of 1954, 68 Stat. 919 ........................................... 4, 7, 8, 9

**Page(s)**

Energy Reorganization Act of 1974, 88 Stat. 1233,
   42 U.S.C. § 5801 ........................................................................................................... 19

Public Law No. 86-373, 73 Stat. 688 ................................................................................. 15

U.S. Const., Art. VI, cl. 2. ................................................................................................... 4

## PRELIMINARY STATEMENT

The question of preemption in this case remains unresolved.  In setting aside the nuisance verdict, the Tenth Circuit instructed this Court to address whether there are federal standards that applied to the plutonium releases at issue here and, if so, whether they conflict with the standard of care under Colorado tort law:

> On remand, the district court shall permit Defendants to identify the particular federal regulations or statutes they believe preempt state law. Specifically, the district court shall consider whether the federal standards Defendants identify carry the force of law or controlled Defendants' conduct with respect to the off-site contamination that occurred here. Defendants must also indicate the particular standards of care applicable to a state law trespass or nuisance claim they believe are in conflict with any such regulations.  Finally, the district court must determine whether any such federal standards actually conflict with the relevant state tort standards of care.

*Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1144 (10th Cir. 2010) (*Cook Appeal I*). And when it set a briefing schedule on plaintiffs' reinstatement theory, this Court identified preemption as one of the issues that still needed to be addressed if, following its ruling, the case went forward.  10/16/2012 Order (Dkt. 2334) ("The remaining issues (class re-certification, preemption, etc.) shall be treated if and as appropriate in light of my resolution concerning the reinstatement theory.").

Rocky Flats played a vital role in the production of nuclear weapons.  Throughout its existence, the plant was owned by the federal government and was operated under its direction and authority and in accordance with standards set by the federal government. Congress tasked the Atomic Energy Commission (AEC) and its successors with

responsibility for regulating nuclear safety and for developing the standards that governed the design and operation of nuclear plants. These agencies fulfilled that responsibility by setting standards for releases and exposures that, in their expert judgment, balanced the need for safety with the need for nuclear weapons. Defendants were required to follow these standards, including, as relevant here, those relating specifically to radiation exposure and plutonium emissions (the "AEC standards"). These standards established defendants' duty of care with respect to the actual or threatened exposures and plutonium releases at issue here. They conflict with and preempt the standard of care under Colorado nuisance law, because that law permits recovery no matter the magnitude of any claimed exposure or release. Because the jury was not instructed that defendants could not be found liable unless the releases and exposures at issue exceeded the AEC standards, judgment cannot be entered on the nuisance verdict.

The AEC standards were, by design, materially the same as those that the AEC (and later, the Nuclear Regulatory Commission) adopted for licensed commercial nuclear operations and published in the Code of Federal Regulations at 10 C.F.R. Part 20, and which federal appeals courts have consistently concluded preempt state law and establish the duty of care in cases alleging radiation injury. Both sets of standards were promulgated pursuant to the same statutory authority under the Atomic Energy Act, and both had the force of law. While the licensee standards followed the notice and comment rule-making procedures prescribed by the Administrative Procedure Act, and the

standards for nuclear weapons plants did not, that is because the Act does not apply to agency actions that, as is the case with nuclear weapons plants, involve a military function. 5 U.S.C. § 553(a)(1). The AEC complied with all procedural requirements relating to the adoption of standards for its own facilities, and it promulgated them in manuals that were part of its official issuance system. And just as AEC licensees were required by their licenses to comply with the standards that the AEC adopted for licensed activities, AEC contractors were required by their contracts to comply with the standards that the AEC adopted for its own operations.

Colorado nuisance law, as reflected in the jury instructions, permitted jurors to find that the Rocky Flats plant was a nuisance no matter how small the claimed exposures or plutonium releases and without regard to whether they exceeded the AEC standards that governed operations at the Rocky Flats plant. The jury was even told that it could find a nuisance if plutonium was present at the plant and there was simply a "risk" of a future release from the plant for any reason. Jurors deciding nuisance claims under Colorado law cannot second guess the AEC's expert judgment on matters that fall squarely within its exclusive authority.

At bottom, preemption exists to prevent precisely this type of conflict. Nuclear weapons and the operations that produce them are indispensable to the national defense. But they also are inherently controversial; no community wants nuclear weapons produced in its backyard. The purposes and objectives of the Atomic Energy Act would

3

be frustrated if states were free to impose, including through their tort law, standards of care stricter than those established by the federal agency in which Congress vested the exclusive authority to set the standards that govern the operation of nuclear weapons plants.  That is what happened here. Colorado nuisance law gave the jury complete discretion to decide what exposure and what releases were too much.  Where state standards conflict with federal standards, it is state law, not federal law, that must give way.  *See* U.S. Const., Art. VI, cl. 2; *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2473 (2013) (by operation of the Supremacy Clause, "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.") (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992)). Federal radiation standards necessarily provide the standard of care in cases claiming harm as a result of radiation exposure from federal nuclear operations.

## BACKGROUND

### I.     THE ATOMIC ENERGY ACTS OF 1946 AND 1954

Nuclear power has, from its inception, been subject to a comprehensive federal regulatory framework.  Both the Atomic Energy Act of 1946 and the Atomic Energy Act of 1954 vested federal experts with sweeping authority to build, own, operate, and regulate the AEC's own facilities—including the authority to promulgate radiation protection standards to govern their design, construction, and operation.

### A.      The Atomic Energy Act Of 1946

The Atomic Energy Act of 1946, 60 Stat. 755, (Ex. 1), created a system of complete federal control over all aspects of nuclear power, both military and otherwise. The whole point of the Act was to establish "[a] program for Government control of the production, ownership, and use of fissionable material to assure the common defense and security and to insure the broadest possible exploitation" of nuclear energy.  1946 Atomic Energy Act (AEA) § 1(b)(4).  The Act created the AEC and made it, in almost all respects, the "exclusive owner of all facilities for the production of fissionable material." *Id.* at § 4(c)(1).  The Act also nationalized all fissionable material—including plutonium—and gave ownership of all of it to the AEC.  *Id.* at §§ 4(b), (c); 5(a).

At the same time, the Act also vested in the AEC responsibility for developing the United States' nuclear weapons arsenal.  The AEC was authorized, subject to the "express consent and direction of the President," to "engage in the production of atomic bombs, atomic bomb parts, or other military weapons utilizing fissionable materials." *Id.* at § 6(a).  And to ensure that these powerful weapons did not fall in the wrong hands, the Act also required that military-related nuclear production occur in facilities owned by the AEC.  *Id.* at § 4.  In short, the AEC was "authorized and directed" to "provide for the production of fissionable materials ***in its own facilities***" in the quantities set by the President each year.  *Id.* at § 4 (c)(2) (emphasis added).

Congress also expressly empowered the AEC to regulate the health and safety aspects of nuclear power. Indeed, the Act broadly empowered the agency on this front, declaring that:

> (a) In the performance of its functions the Commission is authorized to . . .
>
> (2) ***establish by regulation or order*** such standards and instructions to govern the possession and use of fissionable and byproduct materials as ***the Commission may deem necessary or desirable to protect health or to minimize danger*** from explosions and other hazards to life or property[.]

*Id.* at § 12 (a)(2) (emphasis added).

Importantly, although the production of nuclear materials for military purposes could occur only in AEC-owned facilities, the Act authorized the AEC to hire private companies to operate those facilities—with a condition. Congress required that the AEC include in any operating contracts with these private companies express provisions obligating the contractor to comply with the AEC's safety regulations:

> The Commission is authorized and directed to produce or to provide for the production of fissionable material in its own facilities. To the extent deemed necessary, the Commission is authorized to make, or to continue in effect, contracts with persons obligating them to produce fissionable material in facilities owned by the Commission. ***Any contract entered into under this section shall contain provisions*** . . . ***obligating the contractor*** to make such reports to the Commission as it may deem appropriate with respect to his activities under the contract, to submit to frequent inspection by employees of the Commission of all such activities, ***and to comply with all safety and security regulations which may be prescribed by the Commission***.

*Id.* at § 4(c) (emphasis added).

### B.    The Atomic Energy Act Of 1954

Less than a decade later, the Atomic Energy Act was amended, primarily to permit private-sector involvement in the commercial nuclear power industry.  In particular, the Atomic Energy Act of 1954, 68 Stat. 919, (Ex. 2), enlarged the AEC's licensing authority, eased limitations on the ownership and use of nuclear materials and reactors, and permitted private ownership of nuclear power plants by utility companies.  1954 AEA Ch. 16.  To be sure, the AEC still retained full authority over all aspects of nuclear energy.  But it now had a dual regulatory role—one relating to licensees and the civilian development of nuclear energy for purposes of generating electricity, and the other relating to the military applications of nuclear energy and the production of nuclear weapons and their components at AEC facilities like Rocky Flats, where contractors processed plutonium and made plutonium triggers for nuclear weapons.

The 1954 Act designated three specific types of nuclear material that were subject to the exclusive authority of the AEC: source material (Ch. 7); byproduct material (Ch. 8); and special nuclear material (Ch. 6).  Plutonium is special nuclear material.  *Id.* § 11.2.  Congress was plain that these nuclear materials required national regulation, else the nation's "common defense and security" could be compromised.  *E.g.*, *id.* § 2.d ("The processing and utilization of source, byproduct, and special nuclear material must be regulated in the national interest and in order to provide for the common defense and security and to protect the health and safety of the public."); *id.* § 2.e ("[R]egulation by the United States of the production and utilization of atomic energy and of the facilities

7

used in connection therewith is necessary in the national interest to assure the common defense and security and to protect the health and safety of the public.").  The entire scheme was designed to provide "a program for Government control of the possession, use, and production of atomic energy and special nuclear material." *Id.* § 3.c.

The 1954 Act did not alter the AEC's exclusive control over the military aspects of nuclear power.  Like the 1946 Act, the 1954 Act authorized the AEC to engage in the production of atomic weapons and atomic weapon parts with the "consent and direction" of the President, and "authorized and directed" the AEC to provide for the production of special nuclear material in its own production facilities.  *Id.* §§ 91; 41.b.  The Act again authorized the AEC to hire private companies to operate these facilities, but, as before, required the AEC to include in the operating contracts provisions that obligated the contractor to "to comply with all safety and security regulations" prescribed by the AEC. *Id.* § 41(a)-(b).  And the AEC still retained broad authority to regulate the health and safety aspects of nuclear energy and establish protection standards that it deemed appropriate:

> In the performance of its functions the Commission is authorized to . . .
>
> b. ***establish by rule, regulation, or order***, such standards and instructions to govern the possession and use of special nuclear material, source material, and byproduct material as ***the Commission may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property*** . . .
>
> i. ***prescribe such regulations or orders*** as it may deem necessary . . . (3) to govern any activity authorized pursuant to this Act, including standards and restrictions governing the design, location, and operation of facilities used

8

in the conduct of such activity, in order ***to protect health and to minimize danger to life or property***.

*Id.* § 161(b), (i)(3) (emphasis added).

To this day, in all relevant respects, these key provisions of the Atomic Energy Acts of 1946 and 1954 remain in effect.  *See* 42 U.S.C. § 2201.

## II.   THE AEC PUBLISHED THE STANDARDS THAT GOVERNED AEC OPERATIONS IN ITS OFFICIAL MANUAL OF INSTRUCTIONS.

The above statutory background is essential to understanding why plaintiffs' claims are preempted. As Congress directed, the AEC and its successor agencies established radiation protection standards that governed activities at AEC facilities.  Dow and Rockwell were bound by these standards throughout the period they operated Rocky Flats.  Hence, by the plain text of these federal statutes, all operations of Dow and Rockwell were controlled by federal law.

In particular, the AEC memorialized the required federal standards in the "AEC Manual of Instructions," which the AEC adopted in the early 1950s as its "official issuance system."  12/7/1953 AEC Manual Ch. 0201-1 (Ex. 3).  The Manual was the AEC's chosen "medium for and definitive reference source of AEC-wide issuances deemed essential to the effective management of AEC."  *Id.* at Ch. 0201-03/031.  Manual chapters were regularly updated and "included every directive-type issuance which establishes or modifies organization, delegates authority, states a policy, prescribes a method or procedure, or ***establishes mandatory standards of operations***."  *Id.* (emphasis added); *see also* 9/2/1955 AEC Manual (Ex. 4) (same).  The Manual was unequivocally

binding on the AEC and its contractors, stating, "Manual Instructions . . . are mandatory, except as specifically provided therein, and shall be adhered to by all parts of the organization to which they apply."  12/7/1953 AEC Manual Ch. 0201-03/031(a).[1]  These "mandatory standards of operations" are the standards that applied to Rocky Flats and other AEC facilities.  And, as these Manual Chapters and the documents relating to them show, one of the AEC's goals in adopting them was to make them consistent with the standards that it adopted for AEC licensees and published in 10 C.F.R. Part 20 as "Standards for Protection Against Radiation."

### A.     AEC Manual Chapter 0524: Genesis

AEC Manual Chapter 0524 contained the radiation protection standards that the AEC established for its operations.  The first version of Chapter 0524 was entitled "Permissible Levels of Radiation Exposure" and became effective on February 1, 1958. (Ex. 5) Contemporaneous AEC memoranda confirm that the AEC intended that the standards contained in Chapter 0524 be legally binding and control the operations of AEC facilities.

The genesis of Chapter 0524 was AEC Staff Paper 985, which was prepared by the AEC's Director of Biology and Medicine.  (Ex. 6)  Staff papers were the "formal

---

[1]     The AEC Manual was issued under the authority of the AEC General Manager, a position created by the Atomic Energy Act and appointed by the President with the advice and consent of the Senate.  1946 AEA, § 2(a)(4)(A) (Ex. 1).  The Act provided that the General Manager "shall discharge such of the administrative and executive functions of the Commission as the Commission may direct."  *Id.*

means" the AEC used "for relaying information and recommendations upward to the AEC General Manager and through him, to the Commission."  12/7/53 AEC Manual Ch. 201-03/038 (Ex. 3).  The Staff Paper urged the full Commission to revise the radiation protection standards for AEC operations, formalize their adoption to make them legally binding, and publish them as Chapter 0524 in a newly proposed AEC Manual chapter, a draft of which was attached as Appendix C to Staff Paper 985.

Staff Paper 985 was a product of forward thinking.  Authoritative organizations such as the National Committee on Radiation Protection and Measurement (NCRP) and the International Commission on Radiological Protection (ICRP) had issued new recommendations on the maximum permissible level of radiation exposure.  Staff Paper 985 urged that if the AEC, as it traditionally did, "chooses to use the NCRP recommended levels in its operations," it should not just reference them, as it had in other Manual chapters (*e.g.*, Exs. 7 and 8), but adopt and restate them to ensure that they would have binding effect:

> Within the United States the NCRP is generally considered to be the authoritative source of standards in the field of radiation protection. It is not, however, a regulatory body and, hence, its recommendations are not binding on Government or private operations. Hence, if AEC chooses to use the NCRP recommended levels in its operations, it would be desirable for the AEC to adopt them formally and restate them in the context of AEC operations. Normally, revisions would be implemented administratively at the staff level. Since, however, the recent recommendation of the NCRP reflecting increased concern for genetic and life shortening effects represents the first major change since 1946, their adoption in AEC, contractor, and licensee operations is believed to be a matter of policy [requiring Commission approval].

Ex. 6 ¶ 5.

Staff Paper 985 emphasized that adoption of the new standards would help the AEC fulfill its statutory responsibilities for the health and safety of AEC operations, while still striking the right balance with the nation's production requirements:

> It is the judgment of the Director of the Division of Biology and Medicine that the adoption by the AEC of the revised and more conservative recommended maximum permissible levels of exposure, reflecting as they do the best available current scientific opinion, is necessary in order to fulfill the Commission's responsibilities for health and safety as set forth in the Act. ***The use of the revised NCRP recommended levels as guides in the Atomic Energy program assures optimum protection of the health of atomic workers and populations from exposure to radiation resulting from AEC activities, consistent with the necessity of conducting production, laboratory, and test operations***.

*Id.* ¶ 1 (emphasis added).

The AEC accepted the recommendations of Staff Paper 985 at its meeting on October 23, 1957, and formally "[a]pproved for use in AEC and AEC-contractor operations" the latest standards recommended by the NCRP.  11/4/1957 Memo (Ex. 9). W.B. McCool, the AEC Secretary, informed Charles Dunham, the Director of the AEC's Division of Biology and Medicine, of this decision in a memo dated November 4, 1957. *Id*.  Secretary McCool also reported that the Commission, as part of its decision, had "[n]oted" that Dunham would "issue an AEC Manual Chapter such as that contained in Appendix C to [Staff Paper] 985 adopting these recommendations for use by AEC and AEC-contractor operations," and that the Director of the AEC's Division of Civilian Application was to "revise for use by licensees 10 CFR, Part 20 on 'Standards for

Protection Against Radiation' . . . to make it consistent with these recommendations" and to present to the AEC in a separate paper the "proposed changes in regulations." *Id.* The following month, Oscar Smith, Director of the AEC's Division of Organization and Personnel, circulated, for review and approval, the proposed "AEC Manual Chapter 0524, Permissible Levels of Radiation Exposure," which "implements the recommendation of Staff Paper AEC 985." 12/10/1957 O.S. Smith Memo (Ex. 10).

### B.    AEC Manual Chapter 0524: The 1958 Version

Manual Chapter 0524 became effective on February 1, 1958.   (Ex. 5)   It is substantially the same as the version attached to Staff Paper 985.  Its express purpose was to establish binding standards for radiation exposure associated with AEC and AEC contractor operations:

> ***This chapter establishes rules governing the AEC and AEC contractors with respect to levels of radiation exposure*** for their personnel . . . and other persons who may be exposed to radiation from AEC and AEC contractor operations, and assigns responsibility for compliance with those levels.

Ex. 5, Ch. 0524-01 (emphasis added).

Lest there be any doubt that this established binding agency rules, Chapter 0524 further states that the standards prescribed were a product of formal agency action by the Commission and were to be "wholly complied with by AEC and AEC contractor personnel." *Id.* at Ch. 0524-02 (Policy).   Chapter 0524 included numerical limits governing radiation exposure.   It prohibited AEC operations from releasing to the

environment radioactive effluents in concentrations that might be expected to expose members of the general population to more than the specified numerical limits:

> when the exposure of population groups outside of controlled areas is considered, radioactive effluents from AEC operations **shall not be released** to the environment in amounts which might be expected to expose such members of the general population to more than an average whole body dose of 0.5 rem per year or to **an average concentration of radioactive materials in air and water greater than 1/10 of the maximum permissible concentrations (MCP's) recommended by the NCRP for occupational exposure**.

*Id.* at Ch. 0524-02.g  (emphasis added).  NBS Handbook 52, which the AEC adopted in its Chapter 550-05 and cites in Ch. 0524, contained a comprehensive listing of the NCRP's recommended "Maximum Permissible Concentrations in Air and Water" for numerous radionuclides.   (Ex. 11)   For plutonium, the recommended maximum permissible air concentration was 2 x $10^{-12}$ *u*Ci/ml of air, *id.*, which is the same as 2.0 picocuries per cubic meter of air, 2/3/1999 Frazier and Auxier Aff. ¶ 21 (Ex. 12).  Thus, under Chapter 0524, off-site releases could not exceed 10 percent of this value, *i.e.*, 0.2 picocuries per cubic meter of air.

### C.      AEC Manual Chapter 0524: The 1963 Revision

The AEC revised Chapter 0524 in 1963, renaming it "Standards for Radiation Protection."  (Ex. 13)  The reason for the revision—indeed, the stated objective—was "To establish radiation protection standards consistent with the Radiation Protection Guides recommended by the Federal Radiation Council and with the standards recommended by the Director of Regulation for licensees and approved by the

Commission." 8/12/1963 AEC Manual Ch. 0524-02.[2]   Once again, AEC contractor compliance with the standards specified in Chapter 0524 was mandatory: "The standards and instructions set forth in this chapter and appendix **apply to and shall be followed** by . . . **AEC contractors**."   *Id*. at Ch. 0524-05/051 (emphasis added); *see also id*. at Ch. 0524-05/052 ("These standards **shall** govern ionizing radiation exposure to AEC and AEC contractor personnel and to other individuals who may be exposed to ionizing radiation from operations of the AEC and AEC contractors." (emphasis added)).   Chapter 0524 included an appendix, "Appendix 0524," which specified standards that "**shall** be applied in conformance with the requirements of this chapter."   *Id*. at Ch. 0524-05/054 (emphasis added).

Section II of Appendix 0524 is titled "Radiation Protection Standards for Individuals and Population Groups in Uncontrolled Areas."[3]   It contains two sections. Section II.A specifies "[r]adiation dose standards for external and internal exposure."[4] Section II.B addresses "[r]adioactivity in effluents released to uncontrolled areas."

---

[2]   The Federal Radiation Council was an expert body created in 1959.  Its mandate was to advise the President "with respect to radiation matters, directly or indirectly affecting health" and to provide "guidance for all Federal agencies in the formulation of radiation standards and in the establishment and execution of programs of cooperation with States."  Public Law No. 86-373, 73 Stat. 688.

[3]   Chapter 0524 defined "uncontrolled area" as "any area access to which is not controlled by the AEC or AEC contractors."  8/12/1963 AEC Manual Ch. 0524-04/043.

[4]   For whole body exposures to individuals, the specified standard is 0.5 rem (500 millirem) a year.  *Id*.  For exposures based "on an average exposure to a suitable population sample" the standard is 0.17 rem (170 millirem) a year.  *Id*.  In addition, there are dose standards that apply to particular organs.

Section II.B.1 provides that, subject to a potential exception in Section II.B.2, "radioactivity in effluents released to uncontrolled areas shall not exceed the radiation protection standards specified in annex 1, table II." *Id.* The standards specified in Annex I, Table II, are in the form of air and water concentrations for listed radionuclides. The standard specified for insoluble plutonium-239 in air is 1 x $10^{-12}$ $u$Ci/ml of air, which is the same as 1 picocurie per cubic meter of air. 2/3/1999 Frazier and Auxier Aff. ¶ 60. The exception referenced in Section II.B.2, however, states that "[r]adioactivity in effluents may be released to uncontrolled areas in excess of the radiation protection standards specified in annex 1, table II," if, among other things, it is reasonably demonstrated that in uncontrolled areas "the average exposure of a suitable sample of an exposed population group is not in excess of one-third of annex 1, table II standards." 8/12/1963 AEC Manual App'x 0524 § II.B.2. Because Chapter 0524 set the maximum permissible concentration for the insoluble form of plutonium-239 at 1.0 pCi/m3, this provision effectively lowered the standard to 0.33 pCi/m3. 2/3/1999 Frazier and Auxier Aff. ¶ 61.

### D.     AEC Manual Chapter 0524: The 1968 Revision

The AEC issued another revised version of Chapter 0524, effective November 8, 1968. (Ex. 14) The revised chapter contains substantially the same provisions as the 1963 version[5] and has the same language mandating compliance with its provisions. *See,*

---

[5]     Some changes are editorial in nature. For example, the "Objective" section was modified slightly to state that the objective of Chapter 0524 was "[t]o establish radiation protection

*e.g.*, Ex. 14, Ch. 0524-05/051 ("The standards and instructions set forth in this chapter and appendix ***apply to, and shall be followed*** by, Headquarters Divisions and Offices, Field Offices, and ***AEC contractors***." (emphasis added)); *id.* at Ch. 0524-05/054 ("Appendix 0524 contains radiation protection standards which shall be applied in conformance with the requirements of this chapter."). The numerical limits prescribed as radiation protection standards in Section II of Appendix 0524 for individuals and population groups in uncontrolled areas were unchanged from the 1963 version. *Id.* at App'x 0524.

> **E.     The AEC Affirmed Its Intention That The Standards For AEC Contractors And AEC Licensees Be Consistent.**

The AEC had regulatory responsibility for both the peaceful and military applications of nuclear energy. In discharging its responsibilities for peaceful applications, the AEC published in 10 C.F.R. Part 20 the radiation protection standards that applied to AEC licensees and made compliance a condition of their licenses. 10 C.F.R. 20; *see also Morris v. United States Nuclear Regulatory Comm'n*, 598 F.3d 677, 685 (10th Cir. 2010); *In re TMI*, 67 F.3d 1103, 1108 (3d Cir. 1995) (*TMI III*). With respect to the military applications of nuclear energy and activities at AEC facilities, the AEC, as shown above, discharged its responsibilities by publishing in the AEC Manual

---

standards for AEC and AEC contractor operations consistent with the Radiation Protection Guides recommended by the Federal Radiation Council and with the standards approved by the Commission for the regulation of licensee operations." 11/8/1968 AEC Manual Ch. 0524-02.

the standards that governed AEC operations and making compliance by AEC contractors a condition of their contracts.

In performing this regulatory function, the AEC made clear its intention that the standards it established for AEC contractors in the Manuals and the standards it established for licensees in the Code of Federal Regulations should be consistent and comport with the recommendations of authoritative bodies such as the NCRP, the ICRP, and the Federal Radiation Council. That intention is embodied in Staff Paper 985, which urged that AEC adopt the "authoritative" standards of the NCRP for the regulation of AEC operations and noted that licensee standards were already "designed to be consistent with the basic recommendations of the NCRP." Ex. 6 ¶¶ 4, 5. It is also embodied in Manual Chapter 0524. *See*, *e.g.*, 8/12/1963 AEC Manual Ch. 0524-02 (Chapter 0524 revised "[t]o establish radiation protection standards consistent with the Radiation Protection Guides recommended by the Federal Radiation Council and with the standards recommended by the Director of Regulation for licensees and approved by the Commission."); 11/8/1968 AEC Manual Ch. 0524-02 (objective of Chapter 0524 is "[t]o establish radiation protection standards for AEC and AEC contractor operations consistent with the Radiation Protection Guides recommended by the Federal Radiation Council and with the standards approved by the Commission for the regulation of licensee operations.").

III.    **ERDA PUBLISHED THE STANDARDS THAT GOVERNED ERDA OPERATIONS IN ITS OFFICIAL MANUAL OF INSTRUCTIONS.**

The AEC was abolished in 1974, and its functions were divided and transferred to the newly formed Energy Research and Development Administration (ERDA) and NRC. *See* Energy Reorganization Act of 1974, 88 Stat. 1233, codified at 42 U.S.C. § 5801 *et seq*.  NRC became responsible for the AEC's commercial licensing and related regulatory functions.   *See* 42 U.S.C. §§ 5841-53.   ERDA was given "the Atomic Energy Commission's military and production activities and its general basic research activities." 42 U.S.C. § 5801(b).  ERDA's authority extended to Rocky Flats.  *United States v. Seward*, 687 F.2d 1270, 1271 (10th Cir. 1982).

ERDA existed for only a short time, from January 19, 1975 until October 1977. *Id.*.  ERDA continued the AEC Manual, renaming it the ERDA Manual, and in 1975, it approved and issued ERDA Manual Chapter 0524, which it updated in 1977.  (Ex. 15) This chapter is almost identical to its 1968 predecessor and is also entitled "Standards for Radiation Protection."  *Id.*, 3/30/1977 ERDA Manual Ch. 0524.  The objective was to "establish radiation protection standards for ERDA and ERDA contractor operations based upon the recommendations of the Federal Radiation Council, Environmental Protection Agency (EPA), and the National Council on Radiation Protection and Measurements."  *Id*. at Ch. 0524-01/012.  Appendix 0524 contained the numerical limits that governed exposures relating to "Individuals and Population Groups in Uncontrolled Areas."  *Id.* at App'x 0524.   The dose limits prescribed in Section II.A ("Radiation

19

Protection Standards for External and Internal Exposure") were unchanged from earlier years, as were the air and water concentrations listed in Annex A, Table II, for various radionuclides.  *Id.*

## IV.    THE DOE RETAINED THE SAME NUMERICAL DOSE LIMITS UNTIL 1985 AND THEN LOWERED THEM.

ERDA was reorganized in 1977 and replaced by the newly formed Department of Energy (DOE).  *Seward*, 687 F.2d at 1271.  The DOE did not continue the Manual system, but it accomplished the same objectives by issuing orders that embodied mandatory DOE policy pronouncements and directives, including the radiation protection standards that applied to DOE facilities (like Rocky Flats).

In 1980, DOE issued DOE Order 5480.1, which set forth the essential elements of the "Environmental Protection, Safety, and Health Protection Program for DOE Operations," and, the following year, DOE Order 5480.1A, which superseded Order 5480.1.  (Exs. 16 and 17)   Chapter XI contained the radiation standards that DOE established for use at DOE facilities.  5/5/1980 DOE Order 5480.1 Ch. XI.  The Order identified these standards as "***prescribed*** standards," which the Order defined as "standards adopted by DOE that define the minimum requirements that DOE and its ***contractors must comply with*** to the extent they apply to the activities being conducted." *Id.* ¶ 5.g (emphasis added).  The numerical standards were unchanged from earlier years. The later DOE Order stated, however, that "[e]xposures to members of the public shall be

as low as reasonably achievable levels within the standards prescribed" in Chapter II.4.b. 8/13/1981 DOE Order 5480.1A Ch. XI.4.b.

Finally, in 1985, the DOE issued a memorandum-order providing interim notification of a change in the radiation standards that applied to DOE facilities. (Ex. 18) The DOE stated that it was implementing the latest recommendations of the ICRP concerning how environmental programs should calculate potential radiation doses to the public and, in addition, it was adopting the air emission standards that the EPA had adopted as part of its NESHAP program. The effect of this change was to reduce the permissible air concentration of plutonium-239 in air to 0.04 picocuries per cubic meter of air. 2/3/1999 Frazier and Auxier Aff. ¶¶ 67-68. That standard remained in effect until operations at Rocky Flats ceased in 1989. *Id*. ¶ 68.

* * *

Table 1 below shows the maximum permissible concentration of plutonium in air for uncontrolled areas that the AEC and successor agencies promulgated as the standard for nuclear weapon production facilities.

| Table 1 | |
|---|---|
| Federal Plutonium Emission Standards | |
| Effective Date | Standard (pCi/m$^3$) |
| 2/1/58 | 0.2 |
| 8/12/63 | 0.33 |
| 8/5/85 | 0.04 |

The jury should have been instructed that to recover under a nuisance theory, they had to prove that plutonium releases from Rocky Flats exceeded these levels during the applicable time period or that the claimed exposures exceeded the dose limits prescribed in the AEC standards.[6]

## ARGUMENT

## I.   THE STANDARDS ISSUED BY THE AEC AND SUCCESSOR AGENCIES HAD "THE FORCE OF LAW".

It is clear that the first element of the preemption inquiry, whether the AEC standards "carry the force of law or control[] Defendants' conduct." *Cook Appeal I*, 618 F.3d at 1144, is satisfied.  Courts frequently consider whether agency pronouncements in manuals, memoranda, and documents have binding effect.  *See Gen. Elec. Co. v. Envtl. Protection Agency*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("Our cases likewise make clear that an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, . . . or is applied by the agency in a way that indicates it is binding  . . . .").   In deciding whether an agency pronouncement—including the provisions of an agency manual—has the force of law, courts sometimes consider four factors:

---

[6]   Plaintiffs risk expert, Dr. Goble, essentially conceded that plaintiffs could not show releases in excess of regulatory limits:  "[S]ome of the exposures for people living in the class area were really small. And significance, you might call sort of a policy to when you take it seriously. But some of these are very, very small exposures." Trial Tr. (11/2/2005) at 3661 (Goble) (Dkt. 1817.) *See also* 2/3/1999 Frazier and Auxier Aff. ¶¶ 88-91 (the plutonium in air concentration estimates of plaintiffs' expert, Dr. Goble, do not exceed allowable concentrations).

> [R]egardless of whether a provision of an agency's personnel manual or handbook was published or promulgated under the standards set out in the APA, such provision is a regulation entitled to the force and effect of law if (1) the promulgating agency was vested with the authority to create such a regulation; (2) the promulgating agency conformed to all procedural requirements, if any, in promulgating the regulation; (3) the promulgating agency intended the provision to establish a binding rule; and (4) the provision does not contravene a statute.

*Hamlet v. United States*, 63 F.3d 1097, 1105 (Fed. Cir. 1995).  Courts often apply these factors to conclude that agency pronouncements carry the force of law.  *See e.g.*, *Brodowy v. United States*, 482 F.3d 1370, 1375 (Fed. Cir. 2007) ("The FAA's adoption of the GS pay system in the 1996 Personnel Management System clearly qualifies as a regulation under that test."); *Favreau v. United States*, 317 F.3d 1346, 1353 n.11 (Fed. Cir. 2002) (applying *Hamlet* to hold that "[t]he Korb memo is a regulation entitled to the force and effect of law"); *Hymas v. United States*, 117 Fed. Cl. 466, 503 (Fed. Cl. 2014) (applying *Hamlet* to hold that "[t]he departmental manual is a binding agency directive"). Here, these criteria compel the conclusion that the AEC standards had the force of law and no less legal effect on the AEC and nuclear contractors than the parallel standards published in the Code of Federal Regulations for licensed nuclear activities.

### A.   The Atomic Energy Act Gave The AEC And Its Successors The Authority To Establish The Radiation Protection Standards That Governed Their Operations.

Congress  authorized the AEC to "establish by rule, regulation, or order, such standards and instructions to govern the possession and use of special nuclear material, source material, and byproduct material as the Commission may deem necessary or

desirable to promote the common defense and security or to protect health or to minimize danger to life or property."   42 U.S.C. § 2201 (b).   Moreover, the Commission was authorized to "prescribe such regulations or orders as it may deem necessary . . . to govern any activity authorized pursuant to this chapter, including standards and restrictions governing the design, location, and operation of facilities used in the conduct of such activity, in order to protect health and to minimize danger to life or property." 42 U.S.C. § 2201(i).  These broad authorizations confirm that the AEC and its successor agencies were "vested with the authority" to establish the federal radiation standards that governed their facilities.  *See Hamlet*, 63 F.3d at 1105.

> **B.     The AEC And Its Successors Complied With All Procedural Requirements Relating To The Adoption Of Radiation Protection Standards For Their Operations.**

These agencies satisfied their procedural duties in issuing regulations that governed their operations.  While the AEC Manual and successor directives did not go through notice-and-comment rulemaking, that is because the Administrative Procedure Act (APA) specifically exempts from its procedural requirements agency actions that, as here, involve a military function of the United States.  *See*   U.S.C. § 553 (a)(1) ("This section applies, according to the provisions thereof, except to the extent that there is involved— (1) a military or foreign affairs function of the United States[.]"); *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 201 (2d Cir. 2010); *cf. Pruner v. Dep't of Army*, 755 F. Supp. 362, 365 (D. Kan. 1991) (explaining that under the APA, not all regulations must be published).

Given what the APA says, it is hardly surprising that the AEC (and later, the NRC), followed the APA's notice-and-comment process for the federal radiation standards that applied to licensed commercial nuclear activities and codified them at 10 C.F.R. Part 20, but with respect to the standards that governed AEC facilities and the production of nuclear weapons, the AEC promulgated them by publishing them in its Manuals and, in the case of the DOE, other official pronouncements.  After all, it is hard to imagine something more clearly a "military function of the United States" than designing and manufacturing nuclear weapons.  Where, as here, the APA's procedures do not apply and Congress has not required other procedures, how an agency elects to announce policy does not deprive that policy of legal effect.  *See Hamlet*, 63 F.3d at 1105-06 (holding that since the manual's "promulgation was exempt from the strict procedural requirements found in the APA" and "Congress imposed no other procedural requirements for the promulgation of such an employee manual," it followed that the "manual is not infirm for reasons of its process of promulgation").

### C. The AEC And Its Successors Intended That The Radiation Protection Standards They Adopted For Their Operations Be Binding.

Similarly, there is no doubt that the Manual and successor directives were intended to be binding.  The Manual speaks for itself: "The standards and instructions set forth in this chapter and appendix ***apply to, and shall be followed*** by . . . ***AEC contractors***."  2/1/1958 AEC Manual (Ex. 5); *see also* 8/12/1963 AEC Manual Ch. 0524-04/051 (Ex. 13); 11/8/1968 AEC Manual Ch. 0524-05/051 (Ex. 14).  To determine

whether a provision was intended to be binding, Courts look to "(a) whether the language of the provision is mandatory or advisory; (b) whether the provision is 'substantive' or 'interpretive'; (c) the context in which the provision was promulgated; and (d) any other extrinsic evidence of intent." *Hamlet*, 63 F.3d at 1105. Here, each factor confirms that the Manuals and directives mean precisely what they say: as binding law, federal contractors had no choice but to follow their commands.

> **1.  The contracts issued by the AEC and it successors mandated that contractors comply with federal standards.**

The AEC (and successor agencies) hired Dow and later Rockwell to operate Rocky Flats. No matter how their contracts evolved, they always contained provisions requiring the contractors to comply with the agencies' safety regulations. It could not be otherwise: Congress expressly required that such terms be included in all such contracts.

Dow's original contract, for instance, is dated January 18, 1951. It contained the following provision requiring Dow to comply with safety regulations issued by the AEC:

> The Contractor shall take all steps and all precautions to protect health and to minimize danger from all hazards to life and property… as are or may be provided for in safety regulations entitled 'Atomic Energy Commission - Safety Regulations', as same may be hereafter revised, (on file in the office of the Commission), or as the Commission may direct p[u]rsuant thereto.

1/19/1951 Basic Contract No. AT(29-1)-1106, Art. XVIII, between AEC and Dow (Ex. 19). This language was later revised to provide that Dow "shall comply with all applicable health, safety and fire protection regulations and requirements (including reporting requirements) of the Commission." 6/19/1957 Contract Modification 55, at 42-

43 (Ex. 20).   Nor were these contracts outliers.   All iterations contained the same provision requiring compliance with federal standards.  *E.g.*, 7/1/1962 Modification 92, at 47 (Ex. 21); 7/7/1967 Modification 104, at 46 (Ex. 22) (same).[7]   The upshot is clear: Dow, like all other contractors that operated AEC facilities, was legally obligated to follow federal standards.

So too with Rockwell.   In 1975 Rockwell succeeded Dow as the contractor-operator of Rocky Flats.   Rockwell's contract contained the same language requiring compliance with federal standards.  1/8/1975 Rockwell Contract, at 55 (Ex. 23); *see also* 1/1/1989 Modification M124, at 123 (Ex. 24) ("The Contractor . . . shall comply with all applicable environment, safety and health regulations and requirements (including reporting requirements) of DOE.").   The word "shall"—used everywhere in these contracts—denotes a "mandatory" command. *See, e.g., Hewitt v. Helms*, 459 U.S. 460, 471 (1983) (stating that "shall" is "language of an unmistakably mandatory character"); *United States v. Gabaldon*, 522 F.3d 1121, 1125 (10th Cir. 2008) (analyzing text of a regulation and concluding, "[t]he word 'shall' indicates a mandatory duty"); *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) ("The Supreme Court and this circuit have made clear that when a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command.") (collecting authorities);

---

[7]   This language eventually became a standard provision of AEC contracts, AECPR 9-7.5004-8, and was published in the procurement section of the Code of Federal Regulations.

*Hamlet*, 63 F.3d at 1106 ("This ['shall'] language is certainly mandatory and not merely advisory.").

Chapter 0524 itself made plain that the standards it contained were both substantive and mandatory.  The version that went into effect on February 1, 1958 stated that the new Chapter "establishes rules governing the AEC and AEC contractors with respect to levels of radiation exposure for their personnel . . . and other persons who may be exposed to radiation from AEC and AEC contractor operations[,]" and that these were to be  "wholly complied with by AEC and AEC contractor personnel."  2/1/1958 AEC Manual Ch. 0524-01, Ch. 0524-02.  The provisions of Chapter 0524 were also mandatory with respect to potential off-site releases.  *Id.* at Ch. 0524-02.g ("radioactive effluents from AEC operations shall not be released to the environment in amounts. . .").

Later versions of Chapter 0524 also cast the substantive requirements in mandatory language.  The 1963 version stated that "[t]he standards and instructions set forth in this chapter and appendix apply to and shall be followed by Divisions and Offices, Headquarters, Field Offices, and AEC contractors."  8/12/1963 AEC Manual Ch. 0524-05/051; *see also id.* at Ch. 0425-05/052 ("These standards shall govern ionizing radiation exposure to AEC and AEC contractor personnel and to other individuals who may be exposed to ionizing radiation from operations of the AEC and AEC contractors.").   Section II.B.1 of Appendix 0524 stated that subject to a potential exception in Section II.B.2, "radioactivity in effluents released to uncontrolled areas shall

not exceed the radiation protection standards specified in annex 1, table II." *Id.* at App'x 0524 § II.B.1.   The provisions, by their terms and as the AEC intended, were both substantive and binding on AEC contractors.

### 2.      The context of the Manual confirms what its text says.

Even assuming there were any doubts about the Manual's "force of law" character, the contextual statements made at the time the Manual was first promulgated squelch them.   More than 50 years ago, the AEC made clear through AEC Staff Paper 985 (Ex. 6) that the agency intended to make the radiation standards it adopted for AEC operations legally binding.   The Paper explained that while the AEC had traditionally followed the standards recommended by the NCRP, those recommendations were not binding because the NCRP was not a regulatory body.    Staff Paper 985 thus recommended that if the AEC "chooses to use the NCRP recommended levels in its operations," it must not just reference them, but instead "adopt them formally" to ensure that they would have "binding" effect:

> Within the United States the NCRP is generally considered to be the authoritative source of standards in the field of radiation protection. It is not, however, a regulatory body and, hence, its recommendations are not binding on Government or private operations. Hence, if AEC chooses to use the NCRP recommended levels in its operations, it would be desirable for the AEC to adopt them formally and restate them in the context of AEC operations.

Ex. 6 ¶ 5.  The Commission did just what Staff Paper 985 recommended and adopted the standards that were published in what became Manual Ch. 0524.  12/10/1957 O.S. Smith Memo (Ex. 10).

### 3.      Extrinsic evidence removes any possible doubt.

Finally, extrinsic evidence confirms the Manual's regulatory character.  The AEC itself repeatedly declared its intention to have the same sorts of standards that governed AEC licensees apply to AEC contractors.  This is clear from Staff Paper 985, which advised, for instance, that the Commission both formally adopt the NCRP recommendations for use in AEC operations and modify Part 20 of the standards applicable to licensees "in light of the NCRP recommendations."  Ex. 6 ¶ 8.  The AEC accepted that recommendation.  11/4/1957 W.B. McCool Memo (confirming adoption); 12/10/1957 O.S. Smith Memo (stating that 10 C.F.R. Part 20 would "be modified to bring it into agreement with the permissible levels" the AEC adopted and published in Chapter 0524).  More evidence of this desire to maintain consistency is everywhere.  *See*, *e.g*., 8/12/1963 AEC Manual Ch. 0524-02 (Chapter 0524 revised "[t]o establish radiation protection standards consistent with the Radiation Protection Guides recommended by the Federal Radiation Council and with the standards recommended by the Director of Regulation for licensees and approved by the Commission."); 11/8/1968 AEC Manual Ch. 0524-02 (objective of Chapter 0524 is "[t]o establish radiation protection standards for AEC and AEC contractor operations consistent with the Radiation Protection Guides recommended by the Federal Radiation Council and with the standards approved by the Commission for the regulation of licensee operations.").  And that is why for most of the relevant period the numerical radiation standards that the AEC established for operations at its facilities were substantially the same as those published in 10 C.F.R. Part 20 that

applied to AEC licensees.  It would be anomalous indeed to conclude that the standards published in 10 C.F.R. Part 20 for licensed nuclear activity have the "force of law"—as multiple federal appellate Courts (Part II below) have held—but yet the same standards published in the AEC Manual pursuant to and in compliance with the same statutory authority do not.

And further confirming the binding nature of the federal standards found in the Manual is the extrinsic fact that the AEC did not elsewhere promulgate standards for its nuclear weapons sites.  The only place to find those standards was the Manual.  As the AEC itself said, it adopted the AEC Manual as its "official issuance system."  12/7/1953 AEC Manual Ch. 0201-1 (Ex. 3).  And time and again, the AEC was clear that Manual chapters included "every directive-type issuance" that "states a policy, prescribes a method or procedure, or establishes mandatory standards of operations . . . . Their provisions are mandatory, except as specifically provided therein, and shall be adhered to by all parts of the organization to which they apply."  *Id.* at Ch. 0201-1/031.a.  It is hard to imagine language more self-explanatory and categorical.

## II. THE RADIATION STANDARDS ESTABLISHED BY THE AEC SET THE DUTY OF CARE AND PREEMPT COLORADO NUISANCE LAW.

The Tenth Circuit directed that this Court (1) "shall consider whether the federal standards that Defendants identify carry the force of law or controlled Defendants' conduct with respect to the off-site contamination that occurred here," and (2) "must determine whether any such federal standards actually conflict with the relevant state tort

standards of care.  *Cook Appeal I*, 618 F.3d at 1144.  It is clear from the above that the first prong of this Court's inquiry is satisfied:  the AEC standards had the force of law and governed the operation of Rocky Flats.  The second prong is also met because the AEC's radiation standards "actually conflict with the relevant state tort standards of care."  *Id*.  Colorado nuisance law, as reflected in the jury instructions, permitted the jury to find that the Rocky Flats plant was a nuisance based on exposures and releases that were below the regulatory levels that the AEC and its successors, pursuant to their authority under the Atomic Energy Act, established for their nuclear weapons facilities. Indeed, the instructions permitted the jury to find liability based on the mere possibility of a release, no matter the reason.  The standard of care under Colorado nuisance law thus "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id*.  at 1143.

> ### A.    The Radiation Standards Established By The AEC Conflict With Colorado Nuisance Law.

As the Tenth Circuit acknowledged, every federal appeals court to consider the issue has concluded that state law conflicts with, and is preempted by, federal nuclear safety standards to the extent that state law would impose a different standard of care in cases claiming harm from regulated nuclear material.  *Cook Appeal I*,  618 F.3d at 1144 n.19 (noting that "at least five other circuits have concluded federal nuclear safety standards" apply the applicable duty of care in cases alleging harm from such material, "rather than traditional state tort standards of care"); *see also In re Hanford Nuclear*

*Reservation Litigation*, 534 F.3d 986, 1003 (9th Cir. 2008); *Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1308 (11th Cir. 1998); *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1553 (6th Cir. 1997); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir.); *In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 859–60 (3d Cir. 1991) (*TMI II*).

The preemption question in this case as framed by the Tenth Circuit is whether the AEC standards that governed plutonium releases from Rocky Flats "actually conflict with the relevant state tort standards of care." *Cook Appeal I*, 618 F.3d at 1144. So framed, the test is whether Colorado nuisance law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 1143. The preemption analysis does not change because the conflicting state law is state tort law, not a state regulation or statute. As the Supreme Court has recognized, tort law has important regulatory implications and is a powerful tool for shaping conduct and policy: "common-law liability is premised on the existence of a legal duty, and a tort judgment therefore establishes that the defendant has violated a state-law obligation. And while the common-law remedy is limited to damages, a liability award can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008) (citations and quotations omitted, quoting *Cipollone v. Liggett Grp.*, 505 U.S. 504, 522 (1992)); *see also Cipollone*, 505 U.S. at 522 ("[I]t is the essence of the common law to enforce duties that are either affirmative *requirements* or negative *prohibitions*."); *Kurns v. R.R. Friction Prods. Corp.*, 132 S. Ct.

1261, 1269 (2012) ("state regulation can be . . . effectively exerted through an award of damages" (quotation omitted, quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)).

The release limit the AEC established effective February 1, 1958 as the "permissible concentration of plutonium" in air was 0.2 pCi/m$^3$. *See* Table 1, *supra.*  The AEC lowered the permissible concentration to 0.33 pCi/m$^3$ effective August 12, 1963, and that level remained in effect until August 5, 1985, when the DOE lowered it to 0.04 pCi/m$^3$. *Id.*  The Colorado law jury instructions, however, did not require the jury to find, as a predicate of nuisance liability, that plutonium releases from Rocky Flats exceeded these levels or that the claimed exposures exceeded the dose limits prescribed as part of the AEC standards.  The jury was permitted to find that Rocky Flats was a nuisance without regard to the magnitude of the releases or exposures or their relationship to the AEC standards.  The jury had complete discretion to make its own judgment about whether exposures or releases, no matter how small, or even the mere possibility of a release, constituted an interference with the use and enjoyment of property.  Jury Instruction 3.7.

Rocky Flats played a vital role in the production of nuclear weapons, and its ability to satisfy the nation's requirements for nuclear weapons had important military and foreign policy implications.  That is precisely what the Atomic Energy Act contemplated when it created the AEC and made it responsible for nuclear weapons

production and for developing the standards that governed the design and operation of AEC weapon facilities.   1946 AEA, §§ 1(b)(4), 12(a).   The AEC and its successors fulfilled that responsibility by setting standards that, in their judgment, balanced the need for safety with the need for nuclear weapons and the plants that produce them.   *See, e.g.* Staff Paper 985 ¶ 11 ("The use of the revised NCRP recommended levels as guides in the Atomic Energy program assures optimum protection of the health of atomic workers and populations from exposure to radiation resulting from AEC activities, consistent with the necessity of conducting production, laboratory, and test operations.").

Colorado nuisance law impermissibly allowed the jury to usurp the regulatory authority Congress vested in the AEC.   The jury, because it was not required to find that any exposures and releases exceeded the levels specified in the AEC standards, was able to sidestep the determination that the AEC made pursuant to its standard-setting authority.   It was permitted to substitute its own judgment for what constitutes a permissible level of radiation exposure, how and at what production level nuclear facilities may operate, where those facilities should be located, what level of release is "too much", and, most importantly, the balance that should be struck between safety and national defense.   The Supremacy Clause exists to prevent precisely such second guessing.   Entering judgment on a nuisance verdict that was completely divorced from the AEC standards would "*frustrate the objectives of the federal law*."   *See TMI II*, 940 F.2d at 859 (internal quotations and citation omitted).

The Tenth Circuit recognized, and was "sympathetic" to, the conflicts raised by a jury verdict that was untethered to the federal standards that governed the operation of Rocky Flats.  *Cook Appeal I*, 618 F.3d at 1143-44 ("The Court is sympathetic to Defendants' generic argument that directing a nuclear facility to comply with federal safety regulations, while also permitting tort recovery under a generic state tort standard of care, may lead to confusion regarding the levels at which the facility must operate to avoid liability.").  That was not the first time the Tenth Circuit has confronted attempts by affected populations to second guess the judgments of an expert nuclear agency.  In *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223 (10th Cir. 2004), for instance, a group of companies took steps to build a spent nuclear fuel (SNF) storage facility on tribal land within the state of Utah.  Such facilities, like nuclear weapons plants, are inherently controversial, unpopular, and subject to a not-in-my-backyard mentality.  Yet nuclear production necessarily creates waste that must be disposed of.

The facility at issue in *Skull Valley* required approval of the Department of the Interior and the Bureau of Indian Affairs, a license from the NRC, and was to be subject to the "detailed requirements" of the NRC's federal regulations.  376 F.3d at 1228.  In response to this plan, Utah passed a series of statutes designed to prevent spent nuclear fuel from being stored within its borders.  One statute required the facility to pay the state an amount equal to at least 75% of the "unfunded potential liability" of the project, as determined by the state.  *Id.* at 1248.  This was to cover the possible "health and

economic costs" of an accidental release to the area outside the facility. *Id.* But the

NRC, the relevant federal agency with statutory jurisdiction, had already determined that

the facility's offsite liability insurance was sufficient. The Tenth Circuit concluded that

Utah's attempt to impose requirements over and above those found sufficient by the NRC

was in "conflict with the objectives of federal law":

> Those statutes allow the state of Utah to make an independent
> determination of "the dollar amount of the health and economic costs
> expected to result from a reasonably foreseeable accidental release of waste
> involving a transfer or storage facility, or during transportation of waste,
> within the exterior boundaries of the state" and subject the operator of an
> SNF storage facility to the loss of its license unless it pays 75% of that
> amount to the [Utah Department of Environmental Quality]. Under the
> federal licensing scheme however, it is not the states but rather the NRC
> that is vested with the authority to decide under what conditions to license
> an SNF storage facility. The Utah statutes are thus preempted by federal
> law.

*Id.* at 1250.

It was no defense in *Skull Valley* that Utah's requirements were more stringent

than the NRC's or that the facility could technically have complied with both sets of

requirements. It was enough that the Utah statutes "disrupt[ed] the balance that Congress

sought to achieve" through the Atomic Energy Act and its delegation of authority to the

NRC. *Id.* at 1251; *see also California v. FERC*, 495 U.S. 490, 506 (1990) ("FERC set the

conditions of the [dam] license, including the minimum stream flow, after considering

which requirements would best protect wildlife and ensure that the project would be

economically feasible, and thus further power development. Allowing California to

impose significantly higher minimum stream flow requirements would disturb and

conflict with the balance embodied in that considered federal agency determination." (citations omitted)); *Northern States Power Co. v. State of Minnesota*, 447 F.2d 1143, 1154 (8th Cir. 1971) ("Were the states allowed to impose stricter standards on the level of radioactive waste releases discharged from nuclear power plants, they might conceivably be so overprotective in the area of health and safety as to unnecessarily stultify the industrial development and use of atomic energy for the production of electric power . . . creat[ing] an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (quotations omitted)).

Here, as in *Skull Valley*, Congress vested federal agencies—the AEC and its successors—with the authority and responsibility for decisions regarding the safety of nuclear facilities, including the responsibility for setting the standards that govern exposures and releases associated with their operation. This makes sense, as the federal agencies have the resources and expertise needed to make what are inherently expert judgments requiring the agency to balance competing interests. *See Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 250 (1984) ("Congress' decision to prohibit the states from regulating the safety aspects of nuclear development was premised on its belief that the [Atomic Energy] Commission was more qualified to determine what type of safety standards should be enacted in this complex area."); *see also United States v. Locke*, 529 U.S. 89, 110 (2000) ("[A] federal official with an overview of all possible ramifications

38

of a particular requirement might be in the best position to balance all the competing interests.").

Here, the nuisance instruction not only permitted the jury to disregard the AEC's exposure standards and release limits, it also explicitly allowed the jury to substitute its own judgment for that of the AEC concerning the need for and benefits of the Rocky Flats plant. The jury was instructed that the first element of nuisance—interference— could be satisfied if class members were exposed to *any* plutonium and incurred *any* "increment of increased health risk," no matter how small the releases, how small the exposure, or how small the risk, and without regard to whether the exposures exceeded AEC standards. Jury Instruction 3.7; *see also* Jury Instruction 3.6. The jury was even told that the mere "risk" of a release—no matter the magnitude—was sufficient to find interference, and regardless of whether that risk was due to "natural forces, cleanup activity, [or] the conduct of others and/or accidents[.]" *Id.* By making the magnitude of any release irrelevant, this instruction permitted the jury to find a nuisance based on the mere location and existence of Rocky Flats, since there can never be "zero" risk of a release from a plant that processes and stores plutonium.

The jury was also told that in deciding whether the conduct at issue (releases that did not exceed AEC standards) constituted a nuisance, it needed to consider whether "the gravity of the harm" (releases within standards) "outweighs the utility of the conduct that caused it," including the "social value" of that conduct (plutonium trigger production)

and its "suitability" for the locality.  Jury Instructions 3.10-3.12.  But these are all matters that Congress vested in the AEC, not lay jurors who may oppose the existence of any nuclear weapons plant in their back yard.  It was for the AEC to decide the utility of the activities at Rocky Flats and to weigh the benefits against the costs and risks, not a lay jury.

The national interest in nuclear energy would be thwarted if individual juries were allowed to devise their own nuclear safety standards under state common law.  *See In re Hanford*, 534 F.3d at 1003 ("To allow a jury to decide on the basis of a state's reasonableness standard of care would 'put juries in charge of deciding the permissible levels of radiation exposure and, more generally, the adequacy of safety procedures at nuclear plants—issues that have explicitly been reserved to the federal government.'" (quoting *TMI III*, 67 F.3d at 1115)).[8]  The concern expressed by the Ninth Circuit applies with particular force here, where Colorado nuisance law permitted the jury to judge the national interest with respect to the operation of a weapons plant dedicated to the *military* applications of nuclear energy, not simply commercial uses.  It cannot be disputed that

---

[8]   The Supreme Court has noted the limitations of juries even in contexts that lack the implications of national defense, like tort claims regarding the design and labeling of a medical device:

> A state statute, or a regulation adopted by a state agency, could at least be expected to apply cost-benefit analysis similar to that applied by the experts at the FDA:  How many more lives will be saved by a device which, along with its greater effectiveness, brings a greater risk of harm?  A jury, on the other hand, sees only the cost of a more dangerous design, and is not concerned with its benefits; the patients who reaped those benefits are not represented in Court.

*Riegel*, 552 U.S. at 325.

military matters affecting, as here, the national defense and foreign policy are the exclusive purview of the federal government.  *See Perpich v. Dep't of Defense*, 496 U.S. 334, 351, 353 (1990) (stressing "the supremacy of federal power in the area of military affairs"); *see also Northern States Power Co.,* 447 F.2d at 1147 ("Congressional findings concerning the development, use and control of atomic energy demonstrate reliance upon the constitutionally granted powers over the common defense and security.").

It is no surprise, then, that the two circuit courts to have considered what standard of care applies to contractors fulfilling military nuclear functions have concluded that state tort law is preempted by the safety standards applicable to contractors.  *See In re Hanford*, 534 F.3d at 1003 ("[A]ny federal authorization would preempt state-derived standards of care. To allow a jury to decide on the basis of a state's reasonableness standard of care . . . . would undermine the purpose of a comprehensive and exclusive federal scheme for nuclear incident liability."); *Nieman*, 108 F.3d at 1552–53 (6th Cir. 1997).

Even in the context of commercial nuclear power, where the exclusive interest of the federal government is less, the three federal appeals Courts to have considered the issue have found that federal nuclear safety standards set the duty of care in suits alleging radiation injuries.  *See Roberts*, 146 F.3d at 1308 (11th Cir. 1998) ("[W]e join . . . in holding that federal safety regulations conclusively establish the duty of care owed in a public liability action."); *O'Conner,* 13 F.3d at 1105 ("[T]he pre-Amendments Act

preemption of state safety standards prevents application of a state standard of care at odds with federal safety standards. . . . '[A]ny state duty would infringe upon pervasive federal safety regulations in the field of nuclear safety, and thus would conflict with federal law.'" (quoting *TMI II*, 940 F.2d at 859)); *TMI II,* 940 F.2d at 859 ("Permitting the states to apply their own nuclear regulatory standards, in the form of the duty owed by nuclear defendants in tort, would, however, 'frustrate the objectives of the federal law.'. . . Consequently, the plaintiffs' rights will necessarily be determined, in part, by reference to federal law, namely the federal statutes and regulations governing the safety and operation of nuclear facilities." (quoting *Silkwood*, 464 U.S. at 257)).

### B.    The Conflict Between The AEC Release Limits Cannot Be Avoided Through ALARA.

All of the materials in which the AEC and successor agencies published the radiation protection standards that governed the nuclear weapons plants owned by the federal government include references to the radiation protection principle known as ALAP (as low as practicable) or, later, ALARA (as low as reasonably achievable). Plaintiffs have argued in the past that, in light of the ALARA principle, there can be no conflict between state law and the AEC standards.  Other Courts have considered this argument and rejected it, concluding that it is the numerical limits in the federal nuclear safety standards that supply the standard of care, not ALARA.  *See*, *e.g*.,  *TMI III*, 67 F.3d at 1115 (rejecting the use of ALARA, because a standard as "vague," "elusive," and "undeterminable" as ALARA "would give no real guidance to operators and would allow

juries to fix the standard case by case and plant by plant"); *Finestone v. Fla. Power & Light Co.*, 319 F. Supp. 2d 1347, 1349 (S.D. Fla. 2004) (citing cases); *Adkins v. Chevron Corp.*, 960 F. Supp. 2d 761, 772-73 (E.D. Tenn. 2012) (holding that allegations of "numerous stack violations," non-compliance with various license provisions and violation of the 10 C.F.R. § 20.201 regulation requiring a facility to "survey" its emissions were insufficient to state a claim for relief absent proof that releases had exceeded 10 C.F.R. Part 20 limits); *Corcoran v. N.Y. Power Auth.*, 935 F. Supp. 376, 388-89 (S.D.N.Y. 1996) (dismissing claims alleging "statutory liability" based on violation of various regulatory provisions such as the 10 C.F.R. § 20.201 requirement to conduct surveys to monitor effluent releases); *Carey v. Kerr-McGee Chem. Corp*., 60 F. Supp. 2d 800 (N.D. Ill. 1999) (same); *McLandrich v. S. Cal. Edison Co*., 942 F. Supp. 457 (S.D. Cal. 1996) (same); *Bohrmann v. Me. Yankee Atomic Power Co*., 926 F. Supp. 211 (D. Me. 1996) (same).  The same result should hold here.

## CONCLUSION

The Court should not enter judgment on the nuisance verdict, but, instead, set it aside on the ground that (1) the AEC standards establish defendants' duty of care with respect to the exposures and plutonium releases on which plaintiffs base their claim, and (2) those federal standards conflict with, and therefore preempt, Colorado nuisance law insofar as that law would permit recovery without proof that defendants violated the duty of care set forth in those federal standards.  Because plaintiffs were never required to prove that their alleged injuries result from plutonium releases that exceeded the

permissible concentration of plutonium in air specified in the federal standards, or result in radiation exposures that exceed the dose limits specified in those standards, the jury verdict in their favor cannot stand.

Date:  September 10, 2015

/s/ *Kevin T. Van Wart*
Kevin T. Van Wart, P.C.
Bradley H. Weidenhammer
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Phone: (312) 862-2000
Email: kvanwart@kirkland.com

Joseph Bronesky
SHERMAN & HOWARD LLC
633 Seventeenth Street, Suite 3000
Denver, CO 80202
(303) 297-2900

Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 10th day of September, 2015, he caused the foregoing submission to be served via the Court's ECF system on all participating counsel.

/s/ *Kevin T. Van Wart*
Kevin T. Van Wart, P.C.