# Exhibit 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

|  |  |
|---|---|
| MERILYN COOK, et al., <br> Plaintiffs, <br><br> v. <br><br> ROCKWELL INTERNATIONAL CORPORATION AND <br><br> THE DOW CHEMICAL COMPANY <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 90-K-181 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) AFFIDAVIT OF <br> ) DR. JOHN A. AUXIER and <br> ) DR. JOHN R. FRAZIER |

1. Our area of expertise is health physics. Our academic degrees and other qualifications are presented in Attachments 1 and 2.

2. We have studied carefully Dr. Robert Goble's report, the materials that he produced to support that report, and Dr. Goble's deposition. In this affidavit, we comment on the methodology and reliability of calculated concentrations of plutonium[1] in air made by Dr. Goble.

**Goble's Method for Estimating Concentrations of Radioactive Materials in Air Fails to Consider Data that Must be Taken into Account**

*Goble Used a Mathematical Model to Estimate Concentrations Of Radionuclides In Air*

3. Robert Goble offered opinions on the concentrations of airborne plutonium. He used a mathematical model to estimate concentrations of plutonium in air attributable to releases

---

[1] The term "plutonium" shall be understood here to mean any combination of the isotopes $^{239}$Pu and $^{240}$Pu, unless otherwise specified.

and without his own modification of that system.[51] In ICRP Publication 71, the current scientific consensus based on the ICRP's own modification of the ICRP 56 dose system,[52] inhalation doses per unit intake were *reduced* substantially. Goble presented ICRP Publication 71 dose conversion factors at the bottom of page 45 of his report, and Step 6 of his "Prescription for calculating intakes, doses, and risks" (page 44) calls for their use. But Goble did not present doses based on ICRP 71 at any place in his report. Doses based on ICRP Publication 71 would have been substantially lower than the ICRP 56 doses for the solubility distribution Goble assumed.

53.     Goble's method for estimating the concentrations of plutonium in air is seriously flawed, inconsistent with good scientific practice, and unreliable. There is very little overlap between his predictions and measurements in the environment, even in the later years of plant operations when several agencies routinely obtained plutonium-specific air measurements in the area of concern. Consequently, all subsequent calculations that involve concentrations of plutonium in air are flawed and unreliable.

## Goble's Reported Air Concentrations and Dose Estimates, When Taken At Face Value, Do Not Indicate An Excedence Of Applicable Federal Standards

54.     We have reviewed the applicable federal radiation dose standards for members of the general public during the years 1957-1989, and compared those standards to doses estimated by Goble for certain individuals who lived near the Rocky Flats Plant (RFP). We have also reviewed the federal guidelines for the concentrations of plutonium in air which were set to provide assurance that members of the general public exposed to concentrations at or below those guidelines would not receive doses in excess of those standards. We have compared these guidelines to concentrations of plutonium in air estimated by Goble. Goble's estimates for the concentration of plutonium in air are based on flawed methods, are unreliable, and overstate concentrations in air. His dose estimates rely on these concentration estimates, and, therefore,

---

[51] i.e., those sections including the phrase "assuming an uncertainty in relative biological effectiveness" in the heading.

[52] International Commission on Radiological Protection, 1995 "Age-Dependent Doses to Members of the Public from Intake of Radionuclides: Part 4 Inhalation Dose Coefficients," ICRP Publication 71, Pergamon Press, Oxford, England.

17

are also unreliable and exaggerated. Nevertheless, Goble's air concentration and dose estimates, even as produced and without correction, do not show excedence of applicable Federal standards.

*Federal Standards*

55. The U.S. Atomic Energy Commission (AEC) and its successors, the Energy Research and Development Administration (ERDA) and the Department of Energy (DOE), have specified standards for radiation dose to members of the general public consequent to operations of AEC/ERDA/DOE facilities. The AEC and its successors have also set specific guidelines for allowable concentrations of plutonium in air for members of the general public.

56. The standards for radiation doses to members of the general public in uncontrolled locations have been issued by the AEC/ERDA/DOE through Instructions, Manual Chapters, Orders, and in a limited number of cases, through memoranda.

57. The dose limitation standards used by the AEC and its successors for the general public were (and are) based on recommendations of national and international organizations for radiation protection, the National Council on Radiation Protection and Measurements (NCRP) and International Commission on Radiological Protection (ICRP), respectively. The recommendations of the NCRP and the ICRP were also incorporated in 10 CFR Part 20, "Standards for Protection Against Radiation". The ERDA/DOE dose standards in Instructions, Manual Chapters, and Orders applicable to offsite individuals were identical to the 10 CFR Part 20 standards.

58. These dose standards were determined by the NCRP and ICRP to be levels that are protective of human health, based on data available at the time.

59. AEC Manual Chapter 0550 was issued on August 29, 1957, and included reference to the NCRP recommendations of January 8, 1957. {"Codes and Standards for Health, Safety, and Fire Protection", Manual Chapter 0550, U.S. Atomic Energy Commission, August 29, 1957} (Attachment 3). The permissible external dose to the general public was 0.5 rem (500 millirem) per year to the whole body, and 1.5 rem (1500 millirem) per year to most organs. Those recommendations of the NCRP pertaining to radionuclides that could give an internal dose included the statement "[f]or individuals outside of controlled areas, the maximum permissible concentrations should be one-tenth of those for occupational exposures."

{"Maximum Permissible Radiation Exposures to Man, A Preliminary Statement of the National Committee on Radiation Protection and Measurement", Radiology, Vol. 68, p. 261, 1957} (Attachment 4). This requirement changed the applicable concentration for $^{239}$Pu in air in uncontrolled areas to 0.2 pCi/m$^3$, effective August 29, 1957. {"Codes and Standards for Health, Safety, and Fire Protection", Manual Chapter 0550, U.S. Atomic Energy Commission, August 29, 1957} (Attachment 3).

60. On August 12, 1963, the AEC issued Manual Chapter 0524, "Standards for Radiation Protection", which included an exposure standard of 0.5 rem (500 millirem) per year to the whole body and 1.5 rem (1500 millirem) per year to the thyroid or bone for individuals in uncontrolled areas. The corresponding standards for the average dose to a "suitable population sample" were 170 and 500 millirem, respectively. This document included a table of "Concentrations in Air and Water Above Natural Background", derived from the values in NBS Handbook 69, "Maximum Permissible Body Burdens and Maximum Permissible Concentrations of Radionuclides in Air and in Water for Occupational Exposure." {NBS Handbook 69, June 5, 1959} (Attachment 5). The applicable permissible concentration for the less soluble forms[53] of $^{239}$Pu in air listed in Manual Chapter 0524 was $1 \times 10^{-12}$ µCi/cm$^3$ (equal to 1 pCi/m$^3$). {AEC Manual Chapter 0524, August 12, 1963} (Attachment 5)

61. AEC Manual Chapter 0524 also included the provision that "the average exposure of a suitable sample of an exposed population group is not in excess of one-third of annex 1, table II standards." Therefore, the applicable permissible concentration of $^{239}$Pu in air in uncontrolled areas for a population group became 0.33 pCi/m$^3$ on August 12, 1963 (Attachment 5).

62. In March 1977 ERDA issued a revision of Manual Chapter 0524, "Standards for Radiation Protection". This revision specified annual standards for dose equivalent or dose commitment of 0.5 rem (500 millirem) to the whole body, gonads, or bone marrow, and 1.5 rem (1500 millirem) to other organs for individuals in uncontrolled areas at points of maximum

---

[53] Goble's assumptions regarding solubility (step 2, page 44 of his 1996 report) are expressed in the terms used in ICRP Publication 66, with "S" denoting slow pulmonary clearance and "M" denoting moderate pulmonary clearance. Goble assumed no plutonium in fast-clearing forms ("F"), the current designation for material that had been termed "S" for "soluble" in the ICRP Publication 2 system specified in federal standards through the 1980s.

19

probable exposure. (Attachment 6).

63. This 1977 revision to ERDA Manual Chapter 0524 also specified annual standards for the average dose equivalent or dose commitment of 0.17 rem (170 millirem) to the whole body, gonads, or bone marrow, and 0.5 rem (500 millirem) to other organs, the average being taken over "a suitable sample of the exposed population". The applicable permissible concentration of $^{239}$Pu in air continued to be 0.33 pCi/m$^3$.

64. The ERDA Manual Chapter 0524 dose and concentration standards for members of the general public continued in effect and were restated on May 5, 1980, when DOE issued DOE Order 5480.1, including "Chapter XI, Requirements for Radiation Protection" (Attachment 7).

65. On August 13, 1981, DOE issued Order DOE 5480.1A, "Environmental Protection, Safety, and Health Protection Program for DOE Operations." The DOE Order 5480.1 dose standards for members of the general public were restated in Order 5480.1A (Attachment 8).

66. DOE Order 5480.1A was superseded by DOE Order 5400.5 on February 8, 1990. {"Radiation Protection of the Public and the Environment", DOE Order 5400.5, U.S. Department of Energy, February, 1990}

67. On August 5, 1985, DOE adopted "an interim standard for DOE environmental activities for all exposure pathways", and the applicable dose standard was 100 millirem per year whole body dose equivalent for continuous exposure. The previous standard of 500 millirem in one year was retained for non-continuous exposures. ICRP Publications 26 et seq. were cited for purposes of implementation. The applicable concentration for air after August 5, 1985, was 0.04 pCi/m$^3$ {W. A. Vaughan, DOE Memorandum to Distribution, U.S. Department of Energy, August 5, 1985} (Attachment 9).

68. The annual radiation dose permitted (continuous exposures) under the 1985 interim standard for DOE environmental activities was approximately the dose associated with common diagnostic radiological procedures, such as a computed tomography (CT) examination. Table 3.27 of NCRP Report No. 100 (1989) lists an effective dose of 1.11 mSv (111 millirem) for CT exams of the head and body.

*Goble's Dose Estimates for the Plaintiffs*

69. In Attachment B to his 1996 Expert Report, Goble presented radiation dose estimates for the plaintiffs. All of the individual doses are derived by applying multiplicative factors to doses estimated for "Example A", a hypothetical woman "residing near the outer boundary of the chronic exposure monitoring area for the period 1957-1968".[54] (Goble presents these multiplicative factors rounded to one significant figure.)

70. For "Example A", Goble presented a range of dose estimates for the bone surface, the lung, and the liver. These organ doses can be converted to an upper bound effective dose using the organ weighting factors set forth in ICRP Publication 56, and conservatively assuming that doses to organs not considered by Goble contribute 20% to the effective dose.

71. Some of Goble's dose estimates were based directly on the ICRP Publication 56 dosimetry system, while others were based on Goble's modification of that system.[55] Goble acknowledges that the ICRP had adopted ICRP Publication 71, a more recent dosimetry system.[56] ICRP Publication 71 represents the current scientific consensus on inhalation dosimetry for the general public. The ICRP Publication 71 dose conversion factors formally superseded those in ICRP Publication 56[57]. Nevertheless, Goble did not present doses based on the updated ICRP Publication 71 dosimetry system, which would have yielded doses considerably lower than those presented in his report.[58]

72. Although Goble's dose estimates are flawed and unreliable for methodological

---

[54] Goble, 1996, first page of Attachment B.

[55] i.e., Goble's sections including the phrase "assuming an uncertainty in relative biological effectiveness" in the heading.

[56] Goble, 1996, Step 6 on page 44, tabulation on page 45.

[57] International Commission on Radiological Protection, 1995, "Age-Dependent Doses to Members of the Public from Intake of Radionuclides: Part 4 Inhalation Dose Coefficients," ICRP Publication 71, Pergamon Press, Oxford, England, page 1, paragraph 2.

[58] Over most of the operating history of RFP, the applicable standards were based on the ICRP Publication 2 dosimetry system and its immediate predecessors. In those systems, doses were calculated with different methods than those used in ICRP Publication 56 *et seq.* In particular, the *bone surface* doses calculated with ICRP 56 methods do not correspond to the ICRP 2 *bone* doses. Goble's exposure estimates, if used for calculating doses under the ICRP Publication 2 dosimetry system, would result in bone doses much lower than the bone surface doses that Goble calculated with the ICRP Publication 56 dosimetry system.

reasons, as we have discussed above, we have examined them to determine whether Goble's dose estimates for the plaintiffs, as presented, are in excess of applicable Federal standards.

73. Goble does not present single organ doses for each plaintiff, but an immense range of doses. For each organ dose, the 90% confidence interval[59] includes estimates that differ by at least a thousand-fold. The 90% confidence intervals for doses calculated with Goble's modification of the ICRP 56 dose system range up to a factor of 3000.

74. For a given plaintiff and organ, more than half of Goble's doses fall below his "50%ile" dose to an individual "mean invariability."

75. While disagreeing with Goble's methods, we have reviewed his *median* (i.e., "50%ile") dose estimates for individuals who are "mean in variability", and have found that none of these estimates exceed applicable federal standards.

76. We have also considered whether doses in the upper portions of Goble's distributions are in excess of applicable standards. All of Goble's "mean" doses to females occur above his 75th percentiles in "uncertainty".[60] Because Goble's dose distributions are extremely skewed, the "mean dose to the individual mean in variability" is much greater (by at least a factor of 10) than the "median dose to the individual mean in variability".[61]

77. In the following paragraphs, Goble's *mean* organ doses to the individual who is "mean in variability" and "assuming an uncertainty in relative biological effectiveness" are presented as annual dose rates in millirem per year. The committed effective dose rate, calculated as described above, is also shown. We disagree with the derivation of these doses, but for the purpose of illustration, compare them to applicable federal standards:

78. Goble estimated doses for Richard Bartlett for the years 1978-1989. Goble's mean annualized organ dose estimates (millirem/year) for those years for Richard Bartlett are: bone surface, 325, lung, 10, and liver, 13. These doses are far below the lowest applicable annual organ dose standard (1500 mrem) applicable between 1978 and 1989. The corresponding committed effective dose for Richard Bartlett during those years is 15 millirem

---

[59] That is, the span between Goble's "5%ile" and "95%ile" estimates.

[60] See, for example, the reports for cells O11, W11, and AA11 in his submitted Crystal Ball report file "!rpt-fin.tak".

[61] See the tabulated doses in Goble's Example A in his Attachment B.

22

for each year. This is below the lowest applicable annual effective dose standard (100 millirem) for those years.

79.  Goble estimated doses for Sally Bartlett for the years 1978-1989. Goble's mean annualized organ dose estimates (millirem/year) for those years for Sally Bartlett are: bone surface, 250, lung, 8, and liver, 10. These doses are far below the lowest applicable annual organ dose standard (1500 mrem) applicable between 1978 and 1989. The corresponding committed effective dose for Sally Bartlett for those years is 11 millirem for each year. This is below the lowest applicable annual effective dose standard (100 millirem) for those years.

80.  Goble estimated doses for Rhonda Deimer for the years 1984-1989. Goble's mean annualized organ dose estimates (millirem/year) for those years for Rhonda Deimer are: bone surface, 130, lung, 4, and liver, 5. These doses are far below the lowest applicable annual organ dose standard (1500 millirem) applicable between 1978 and 1989. The corresponding committed effective dose for those years is 6 millirem for each year. This is below the lowest applicable annual effective dose standard (100 millirem) for those years.

81.  Goble estimated doses for Thomas Deimer for the years 1984-1989. Goble's mean annualized organ dose estimates (millirem/year) for those years for Thomas Deimer are: bone surface, 170, lung, 5, and liver, 7. These doses are far below the lowest applicable annual organ dose standard (1500 millirem) between 1978 and 1989. The corresponding committed effective dose for those years is 8 millirem for each year. This is below the lowest applicable annual effective dose standard (100 millirem) for those years.

82.  Goble estimated doses for Michael Rice for the year 1989. Goble's mean annualized organ dose estimates (millirem/year) for that year for Michael Rice are: bone surface, 160, lung, 5, and liver, 6. These doses are far below the lowest applicable annual organ dose standard (1500 millirem) between 1978 and 1989. The corresponding committed effective dose for that year is 7 millirem. This is below the lowest applicable annual effective dose standard (100 millirem) for that year.

83.  Goble estimated doses for Peggy Sandoval for the years 1986-1989. Goble's mean annualized organ dose estimates (millirem/year) for those years for Peggy Sandoval are: bone surface, 130, lung, 4, and liver, 5. These doses are far below the lowest applicable annual organ dose standard (1500 millirem) between 1978 and 1989. The corresponding committed effective dose for those years is 6 millirem for each year. This is below the lowest applicable

annual effective dose standard (100 millirem) for those years.

84. Goble estimated doses for <u>Stephen Sandoval</u> for the years 1986-1989. Goble's mean annualized organ dose estimates (millirem/year) for those years for Stephen Sandoval are: bone surface, 160, lung, 5, and liver, 7. These doses are far below the lowest applicable annual organ dose standard (1500 millirem) between 1978 and 1989. The corresponding committed effective dose for those years is 7 millirem for each year. This is below the lowest applicable annual effective dose standard (100 millirem) for those years.

85. Goble estimated doses for <u>Dolores Schierkolk</u> for the years 1978-1989. Goble's mean annualized organ dose estimates (millirem/year) for those years for Dolores Schierkolk are: bone surface, 250, lung, 8, and liver, 10. These doses are far below the lowest applicable annual organ dose standard (1500 mrem) between 1978 and 1989. The corresponding committed effective dose for those years is 11 millirem for each year. This is below the lowest applicable annual effective dose standard (100 millirem) for those years.

86. Goble estimated doses for <u>William Schierkolk</u> for the years 1978-1989. Goble's mean annualized organ dose estimates (millirem/year) for those years for William Schierkolk are: bone surface, 325, lung, 10, and liver, 13. These doses are far below the lowest applicable annual organ dose standard (1500 mrem) between 1978 and 1989. The corresponding committed effective dose for those years is 15 millirem for each year. This is below the lowest applicable annual effective dose standard (100 millirem) for those years.

87. None of the organ or whole body doses reported above for these individual plaintiffs exceed the applicable federal dose standards.

*Goble's Concentrations of Plutonium in Air*

88. Goble's "50%ile" concentration estimates divide his range of concentration estimates into two equally likely groups. His "50%ile" concentration for plutonium in air in Sector 4B for the years 1965-1970, as reported in his Table 4.4, is 0.0015 becquerels per cubic meter, or 0.04 picocuries per cubic meter ($pCi/m^3$). This is far below the AEC manual Chapter 0524 concentration guide of 0.33 $pCi/m^3$. His mean concentration, 0.28 $pCi/m^3$, is also below this allowable concentration.

89. Goble estimates concentrations of plutonium in air for the years 1953-1964 by applying multipliers from his Table 4.5 to the Table 4.4 concentrations. The largest of these

multipliers is 0.1. Application of this multiplier to the Table 4.4 Sector 4B "50%ile" concentration produces a maximum value of 0.004 pCi/m$^3$, far less than 0.2 pCi/m$^3$, the most restrictive concentration guide during this period. His mean concentration, 0.028 pCi/m$^3$, is also below this allowable concentration.

90. Goble estimates concentrations of plutonium in air for the years after 1970 by applying the multiplier 0.003 from his Table 4.5 to the Table 4.4 concentrations. Application of this multiplier to the Table 4.4 Sector 4B "50%ile" concentration produces a value of 0.00012 pCi/m$^3$, far less than 0.04 pCi/m$^3$, the most restrictive concentration guideline during this period. His mean concentration, 0.0009 pCi/m$^3$, is also below this allowable concentration.

91. Goble's method for estimating concentrations of plutonium in air yields values that, more likely than not, are well below applicable federal guidelines for all years considered.

FEB- 3-99 WED 18:35        Auxier &                    FAX NO. 14236753677              P.02

FURTHER AFFIANT SAYETH NOT

*John R. Frazier* (signed)
John R. Frazier

WITNESS my hand and official seal this 3rd day of February, 1999

*Bradley L. Johnson* (signed)
NOTARY PUBLIC

My Commission Expires: 4-23-2002

[Notary Seal: BRADLEY L. JOHNSON, NOTARY PUBLIC AT LARGE, ANDERSON COUNTY, TN]

FURTHER AFFIANT SAYETH NOT

_____
John A. Auxier

WITNESS my hand and official seal this ___3___ day of __Feb.__, 1999

_____
NOTARY PUBLIC

My Commission Expires: _OCT. 27, 1999_

OFFICIAL SEAL
PATSY REYES
NOTARY PUBLIC - ARIZONA
PIMA COUNTY
My Comm. Expires Oct. 27, 1999