# Exhibit 6

Page 2959

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181(JLK)

MERILYN COOK, et al.,

    Plaintiffs,

vs.

ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
COMPANY,

    Defendants.

_____

REPORTER'S TRANSCRIPT
TRIAL TO JURY
VOLUME 19

_____

    Proceedings before the HONORABLE JOHN L. KANE, JR.,

Senior Judge, United States District Court for the District of

Colorado, commencing at 1:24 p.m., on the 27th day of October,

2005, in Courtroom A802, United States Courthouse, Denver,

Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Gwen Daniel, 901 19th Street,
Room A259, Denver, Colorado, 80294, (303) 629-9285

1   issue in this case is beside the point.  The issue here is that

2   he's not being called as a percipient witness.  He hasn't

3   offered any expert opinions on MUF.  He hasn't given us notice

4   of any such expert opinions.  And to get into the concept of

5   MUF with this witness would not be permissible.  If they want

6   to call him back as a percipient witness, then they're free to

7   do so.

8           In addition, the notion that an expert can just get up

9   and talk about anything that he knows about is directly

10  contrary to the rules.  That's why we have evidence, reports,

11  depositions and we go through the whole procedure.

12          MR. DAVIDOFF:  He was asked about this in his

13  deposition.  This is stuff that he did in this case, things

14  that he did as a consultant in this case.

15          MR. KURTENBACH:  Any opinions on this subject --

16          THE COURT:  I'm going to overrule your objection.

17      (In open court.)

18  BY MR. DAVIDOFF:

19  Q.  Now I just want to ask you what you did, and I want you

20  to -- I'm going to ask you to describe the process for the

21  jury.  You accompanied two attorneys from my firm who also had

22  gotten Q clearances, one of whom is Mr. Sorensen over here, to

23  look at documents on the subject of MUF; is that correct?

24  A.  Yes.

25  Q.  And they were classified documents; is that correct?

Page 3003

1   A.   Yes.

2   Q.   And still are today for the most part; is that correct?

3   A.   I have no idea, actually.

4   Q.   When you go to inspect these MUF documents, were you

5   escorted into a cubicle or a room?

6   A.   Yes.

7        MR. KURTENBACH:  Your Honor, can I have a continuing

8   objection?

9        THE COURT:  Yes.

10  BY MR. DAVIDOFF:

11  Q.   Could you describe the room for the jury, please.

12  A.   Well, there was at the time at Rocky Flats entire areas of

13  the plant that could not be accessed by individuals except

14  those with a proper clearance, and the reason was because

15  documents, or in some cases even physical objects were

16  sensitive information that we wouldn't want our enemies to get

17  ahold of, for example, terrorists or in those days the Soviets,

18  or even today the Soviets, Russians.  And in order to have

19  access to those areas one needs a proper security clearance.

20        The area to which I was granted access with these --

21  the first visit was with one attorney, Jonathan Auerbach, and

22  the second visit was with two, Auerbach plus David Sorensen who

23  is sitting in front of you.  We had access to what I would call

24  a library room, it was actually several rooms, but the

25  conception of it is a library, in which were stored numerous,

Page 3004

1   numerous voluminous reports.  And also there were catalogs of

2   the titles of those reports so that you could go down and look

3   at the titles rather than the reports themselves.

4          And we spent -- the first trip it was an afternoon and

5   then a full day and then a second morning, so two days.

6          The next trip was -- ended up being almost three days.

7   And what I was doing there with them -- they're attorneys, of

8   course, I'm the technical guy, was going down a list of

9   thousands of those titles of documents which had been

10  relevant -- or had something about material unaccounted for,

11  MUF, either in a title or something else that was related to

12  that, and tried to sort them into those documents which in my

13  judgment would be interesting and relevant to the case that the

14  plaintiffs were bringing and those that wouldn't.

15         And actually, it isn't just interesting or not,

16  there's a hierarchy.  For example, many of the documents were

17  just simply printouts of pages and pages of numbers which were

18  taken every day.  They would go around and weigh certain things

19  to make sure how much material was on hand in each different

20  place.  And those were less interesting than the summary

21  documents that were weekly or monthly or in some cases

22  quarterly in which there would be a document to summarize what

23  happened for the whole week or the whole month of November or

24  whatever it happened to be.

25  Q.  Now --

1    A.   And I sorted them out into those that were more

2    interesting, less interesting, and some that were just totally

3    uninteresting.

4    Q.   Now there were -- just so the jury can understand the

5    procedure, the Q cleared people are in a room -- I drew a box,

6    which is supposed to represent a room, it's probably a very

7    poor representation of a room, but -- and if you're in this

8    room, you can look at the documents; is that correct?

9    A.   Yes.

10   Q.   And you can talk to the other Q cleared person about the

11   documents if you're in the room; is that right?

12   A.   Yes, yes.

13   Q.   Now can you make notes in the room?

14   A.   If you make notes in the room, you can't take them out

15   unless they are cleared as being acceptable to leave the room.

16   Q.   So, in other words --

17   A.   And I made no such notes, by the way.

18   Q.   But if you do make notes, you couldn't take them out

19   anyways?

20   A.   Not unless some expert said, Those notes are not -- don't

21   compromise what's in this information.

22          And by the way, just so you'll understand, some of

23   what was going on was they were making bomb parts, and they

24   would weigh these things every day, a certain one -- I'm just

25   pretending -- would be 30 grams of something and 34 grams of

1    something else and maybe, you know, 1200 grams of something

2    else, and sometimes they would say what those parts were,

3    including even little drawings of what they were.  That's

4    sensitive information.

5    Q.  We weren't interested in that type --

6    A.  Of course, but -- of course, but that's what it was, was a

7    lot of it was numerical work in which people were weighing

8    material to try to figure out how much they had, let's say,

9    Wednesday afternoon.  Then they come back Thursday afternoon

10   and try to determine what they have then to make sure they

11   haven't lost any because, of course, if you lose something --

12   Q.  What I am trying to develop first is the process.  The

13   process is you can talk about it in the room; is that right?

14   A.  Yes.

15   Q.  If you go outside the room with this other person with the

16   Q clearance, are you allowed to talk about it outside the room?

17   A.  No.  I've learned from early on that you can't have

18   conversations about that stuff outside of the cleared area,

19   even if the other person is also cleared.

20   Q.  So in other words, if you and Mr. Sorensen after being in

21   the room talking about the documents were walking down 17th

22   Avenue or 17th Street here in Denver to a restaurant, you

23   couldn't talk about it?

24   A.  No.

25             MR. KURTENBACH:  Object to the form, your Honor.

1    A.  But in any event, anywhere except in that cleared area,

2    okay?  Just absolutely --

3    BY MR. DAVIDOFF:

4    Q.  So -- and in terms of actually getting a document out of

5    that room, what is the process if you were going to get the

6    document out of that room?

7    A.  Well, I had a clearance, so -- you ought to understand,

8    someone with a clearance can carry it himself or herself on

9    their own personal area to another cleared area or within the

10   cleared area, but if you wanted to take it outside of the

11   cleared -- you mean outside of the cleared area?

12   Q.  Yes, sir, outside the room.

13   A.  You couldn't do that unless that document was actually

14   approved and cleared for outside use by certain designated

15   people who are called classifying experts.  There are people

16   whose occupation is to classify documents as needed and to

17   declassify them if it's appropriate.  And unless something was

18   declassified by such an expert as being okay -- you have to

19   pretend that it then gets lost or published somewhere that you

20   wouldn't want -- and it's okay, unless that happens, those

21   documents cannot be released outside of the group of experts

22   who are inside the area.

23   Q.  It has to be inside the area?

24   A.  Yes, sir.

25   Q.  Were you able to -- were you able to determine from looking

1    at the documents, without describing what was in the documents,

2    which you obviously can't do --

3    A.   No.

4    Q.   -- how much of the -- how much of those documents would

5    have been at least relevant to the case that the plaintiffs are

6    bringing here?

7            MR. KURTENBACH:   I object to the form of the question,

8    your Honor, foundation.   It goes far beyond anything that this

9    man has offered an opinion on in this case, and we're now far

10   afield of any expert opinions.

11           THE COURT:   Overruled.

12   BY MR. DAVIDOFF:

13   Q.   Go ahead, sir.

14   A.   Of the documents I looked at, which were a few thousand, I

15   suppose, in fact, I remember thinking that's how many there

16   were, an important fraction, like a third or a half of them,

17   had some relevance, and a smaller number, perhaps dozens or a

18   hundred or two, were of higher relevance, that is, you know,

19   more relevant than the others.   And that hierarchy was because

20   sometimes after you read the summary document you would want to

21   go to the underlying stuff to dig more, but you would want to

22   start with the stuff that I considered of higher relevance and

23   then only dig more later.

24   Q.   All right.   And you also saw documents from how far back in

25   time?

MR. KURTENBACH: Your Honor, may we approach?

MR. DAVIDOFF: Your Honor, can I just conclude this line? I'm almost done here.

THE COURT: If he wants to, we will.

(At the bench.)

MR. BERNICK: At this point, if this examination continues, I think we have no choice but to move for a mistrial. I can't think of anything more prejudicial to this proceeding than for a witness to comment upon the substance of documents, saying they're relevant, and then say, I can't tell you why they're relevant, I can't tell you the content of the document, I can't tell you anything.

At this point there is no way to cross-examine, and at this point, for that matter, I'm not sure whether he's in compliance with the classification rules themselves.

THE COURT: I'm going to overrule the objection. All he's talking about so far is the difficulty in acquiring the information, and he's able to do that without giving an expert opinion on it, and he's doing that, as I consider, to be foundational work for one of the primary contentions of the plaintiffs in this case that -- and I am instructing the jury on that as to both sides, that some information and material is not available because of classification.

So unless he starts opining about whether the classification is necessary or not, if he gets into that sort

Page 3010

1    of issue I am going to -- I'm going to permit the testimony to

2    come in.

3              MR. BERNICK:  Let me be clear about the record I'm

4    making.  He can simply say there was information that wasn't

5    disclosed.  He opined -- not only opined, he said it's relevant

6    to this case.  His statement that it's relevant to this case is

7    the source of the prejudice.  We don't know what the statement

8    referred to.  We will never know what the statement referred

9    to, and the reason we'll never know what the statement referred

10   to is that he can't tell us what material he concluded was

11   relevant.

12             As a consequence, he has now made a statement that is

13   not amenable to cross-examination, may or may not violate the

14   classification laws.  It is a substantive statement.

15             I would further add, your Honor, there is zero

16   evidence, none whatsoever, that is ever going to come into this

17   court that there is such relevant information that has not been

18   disclosed.  No such submission has ever, ever been made nor

19   could it be -- if a submission was made that there was relevant

20   information that has not been disclosed, we would have to know

21   what that content is, and then we would have to have some kind

22   of hearing to determine whether that content, in fact, was

23   classified and what the content was.  They have made no such

24   predicate showing.

25             So your Honor would be allowing testimony, and you're

1    not only instructing the jury in a way that -- it is not an

2    instruction about the evidence, it is a statement by your

3    Honor, it is a finding by your Honor endorsing his testimony

4    that basically says -- this jury has not been allowed to see

5    and it's not been allowed to be produced, the relevant

6    information, which is the same way as saying that -- if your

7    Honor rules that way, that's fine, but that is about as clean

8    an issue as I can possibly think about for appeal, and I

9    believe that this jury has now been poisoned.

10           But on the basis of all the other statements that have

11   been made by counsel is all the more so -- the same kinds of

12   suggestions were made about the Sanchini, the picture that's

13   being painted is there's classified material that shows

14   malfeasance by these defendants, and the jury will never hear

15   about it, and they'll never even be able to follow the

16   instruction, because they don't know what the instruction

17   relates to.  How can they possibly weigh the importance of that

18   information if they don't know what it is or what it might have

19   been?  That statement that he just made is entirely

20   unreviewable.

21           So if that's your Honor's determination, we would move

22   for a mistrial, and we would move to dismiss and disband this

23   jury and start the trial all over again and further move to

24   take the matter up on appeal so we don't waste our time all

25   over again.  We have now been here four weeks, and to have this

Page 3012

1   statement made just makes a mockery of the idea that this trial

2   is going to be meaningful.

3          MR. DAVIDOFF:  I'm just going to say a couple of

4   things, if I may.  Several times at these sidebar conferences

5   Mr. Bernick has made the assertion, the false assertion, I

6   might add - maybe he doesn't know that it's false, but it is

7   false - that we have had access to classified documents and

8   that we had an opportunity to get the evidence from classified

9   documents and that RAC and ChemRisk and others did the same

10  thing.  We dispute that very, very -- could I just -- I would

11  like to speak.  Pardon me.  I haven't gotten to speak for a

12  long time.  I don't intend to speak long.  I don't think I have

13  the energy to do so.

14         The fact is that this witness and other witnesses --

15  they're going to call on cross Mr. Hoffman, the classification

16  officer at the plant, who is responsible for keeping most of

17  this stuff classified, who used to work for both Rockwell and

18  Dow before he went to work for DOE.  And the fact of the matter

19  is this stuff is from the '50s and '60s and '70s.  There is

20  absolutely no reason to keep it confidential, especially the

21  summary reports.

22         And we don't have any way -- I thought we were

23  entitled to a spoliation instruction, which your Honor has so

24  far declined to give, but at the very least we're entitled to

25  develop the facts, and the jury can draw the appropriate

Page 3013

1   inference, knowing that the Department of Energy is the

2   indemnitor in this case and is the owner of the facility and is

3   on the hook for the monetary damages.

4        So counsel's motion for a mistrial is mistaken, in my

5   view, and it should be denied.

6        MR. BERNICK:  The spoliation is a judicial

7   determination that the Court is obliged to make.  The findings

8   of fact -- the problem here is that there can be no findings of

9   fact, because according to you and according to your witness

10  the information has never even been known to the Court.

11       What he's saying now is that the Court should make a

12  determination that although it can't say what the information

13  is, because it's not before the Court, the jury somehow should

14  decide not only what the information is, but it's important to

15  the case.

16       And that's the basic problem, is that essentially what

17  your Honor is determining, being asked to determine, is that

18  the classification laws, rules, were misused to prevent access

19  by these parties to relevant information.  Or even not misuse,

20  maybe it's properly used.  The fact of the disclosure of that

21  information -- that is an improbable fact to find unless your

22  Honor has had access to this information, which I know your

23  Honor has not had access to.

24       So at this point we have an assertion that there is

25  material information that is out there, material to this jury,

Page 3014

1    that has not been disclosed.  It's an impossible determination

2    to make because no one has it.

3            THE COURT:  We've gone over this before at the

4    pretrial -- we've gone into this matter before, pretrial as

5    well, and it's something that I commented on before, and that

6    is that this is the dilemma that the Price-Anderson case has

7    presented to us.  I'm denying your motion for mistrial, we're

8    going to go ahead, and your objection is overruled.

9            MR. BERNICK:  Could we ask, your Honor -- so I don't

10   belabor --

11           THE COURT:  It's a continuing objection.

12           MR. BERNICK:  I understand that, but how does this

13   have -- how does the Price-Anderson Act assure that inevitably

14   in these cases there will be allegedly classified information

15   that is not available -- let's assume that the Department of

16   Energy is defending this case and they don't have the ability

17   to violate the -- the Department of Energy is defending this

18   case.  If we had them here in court, you could issue an order

19   saying, Produce the information, and they say, I'm sorry, we

20   can't, and then I would say, Well, we have not had access to

21   this information.  It's not implicit under the Price-Anderson

22   Act, it's implicit in the fact this is a routine case -- I'm

23   sorry to belabor this, it's a routine case, there are cases all

24   the time where classified information is placed at issue and

25   they can't go forward.

Page 3015

1    If your Honor wants the case to go forward, that's

2    fine.  But they are putting us in a position where they're able

3    to make -- have your Honor issue an instruction that is

4    literally outcome-determinative.  They assert -- by virtue of

5    their own ipse dixit they assert -- should we come in and say

6    no?  We submit information and it's not relevant?  By ipse

7    dixit they say your Honor endorses the proposition that the

8    information has been withheld, and if that's so, that's

9    essentially a way of saying we are being sanctioned.

10    THE COURT:  You're not being sanctioned.  It's not

11    saying that at all.  It's saying that we are confronted with

12    the dilemma where the legislation has two separate objectives

13    under the Atomic Energy Act, under Price-Anderson, to allow

14    this kind of litigation.  And under those circumstances, this

15    Court is not able to give the full story because of the

16    security classification.  I am making a record.  We'll see what

17    happens.

18    MR. BERNICK:  If that is the issue that your Honor

19    believes is present here, why isn't it incumbent upon the

20    plaintiffs to make a record like -- under Rule 104 under any

21    set of circumstances to justify the issuance of that order --

22    to justify the witness being able to make that testimony, and

23    there is no such record in this case, whatsoever, they never,

24    ever -- that I have seen that is relevant, and that has not

25    been made.  In fact, it says exactly the opposite, that they

1   saw -- I believe -- the witness believed it's there.  This

2   witness just testified he was there with one of their lawyers

3   and saw it, and yet you -- I believe your Honor is relieved of

4   the burden of providing a 104 --

5         MR. DAVIDOFF:  If I can briefly say a couple of

6   things.  That's a complete misconstruction of the record in

7   this case.  There was a trial about this ten years ago, and

8   these meetings were held and these declassification efforts

9   were made in the wake of that trial, and one of them -- one of

10  the three-day trips was in the wake of your Honor's contempt

11  order in November of 1995, and it was -- pardon me, the

12  Department of Energy made the decision that it was just going

13  to blanket wholesale keep all this information classified back

14  to 1952, deprive us of the opportunity to prove our case.

15        Your Honor may not grant an instruction, but there has

16  been an adequate record in this case, and Mr. Hoffman who is

17  going to be on their side, not ours, is going to be on the

18  witness stand.  He can testify about the fact that they made no

19  determinations, as he did in his deposition, they made no

20  substantive determinations, just blanket classified --

21        THE COURT:  You can take this up on appeal, if you

22  wish, but I'm going to go ahead and adhere to my ruling.

23        MR. DAVIDOFF:  Thank you.

24     (In open court.)

25        MR. DAVIDOFF:  I apologize for the delay, ladies and

Page 3017

1    gentlemen.

2         MR. BERNICK:  If the jury could please be instructed

3    that the matters that were taken up at sidebar are important

4    matters to this case.

5         THE COURT:  Well, there's no doubt that they are very

6    important matters, but I have to be the judge of the law and

7    you're the judge of the facts, and we have had the machine on

8    so that you aren't confused between what the legal issues are

9    and the factual issues.

10        MR. DAVIDOFF:  I have to almost take an aspirin when I

11   have to listen to that machine for more than five or ten

12   minutes, it's -- but it's effective.

13   BY MR. DAVIDOFF:

14   Q.  Dr. Budnitz, I just want to be sure that the picture here

15   is clear to the jury.  Once you and Mr. Sorenson walk out of

16   that classification room, you can no longer talk about the

17   relevance of those documents to anyone, including each other;

18   is that right?

19   A.  Outside of transporting it, of course, to another cleared

20   area, yes.

21   Q.  All right.  Now those documents that you inspected, could

22   you tell us what decades they were from?  Were any of them from

23   the 1950s?

24   A.  They started with the inception of the plant which, I

25   believe, is' 53, perhaps.

Page 3018

1    Q.   '52?

2    A.   Okay.  Anyway they started at the inception up to the

3    present day of that time which is 1995 or early '96.

4    Q.   Okay.  And the documents back in the '50s and in the '60s

5    and in the '70s had all been kept confidential and classified?

6    A.   I have no idea what their fate has been since that day.

7    Q.   Well, up to the time that you saw --

8    A.   The ones I saw were all classified at that time.

9    Q.   Now -- and you don't know since then whether they remained

10   classified or not?  And were some of the documents that you

11   felt were relevant from the 1950s or 1960s?

12          MR. KURTENBACH:  I object, your Honor.  In addition it

13   calls for a legal conclusion.

14          THE COURT:  Sustained.

15   BY MR. DAVIDOFF:

16   Q.   Were some of the documents that you thought were relevant

17   to where missing plutonium might be either within or without

18   the plant, the facts of where the missing plutonium might be,

19   from the 1950s or the 1960s?

20   A.   Yes.

21          MR. KURTENBACH:  Same, your Honor.

22          THE COURT:  Overruled.

23   A.   Yes, they span the entire period that I -- of the documents

24   I mentioned, which started at the beginning until --

25   BY MR. DAVIDOFF:

Page 3019

1   Q.   I think you told the jury you have a lot of classification

2   experience yourself; is that correct?

3   A.   Yes.

4   Q.   And did you -- other than the documents that were diagrams

5   of bombs or descriptions of how much went into bombs or out of

6   bombs, were there other documents that you felt -- did you feel

7   that there was a justification, for example, for classifying

8   old summary documents, summary documents from the 1950s and

9   1960s?

10          MR. KURTENBACH:  Your Honor, I object to the form of

11   the question.

12          THE COURT:  Sustained.

13   BY MR. DAVIDOFF:

14   Q.   What was your -- what was your view concerning the need to

15   keep classified summary documents from the '50s and the '60s?

16          MR. KURTENBACH:  Your Honor, I think this is beyond

17   this witness' expertise.

18          THE COURT:  Sustained.

19   BY MR. DAVIDOFF:

20   Q.   Do you have expertise in whether a document would reveal

21   national security information?

22   A.   Sometimes, but not always; that is, there may be reasons

23   that others know that I wouldn't know that would require

24   something to remain classified that I wouldn't know.

25   Q.   All right.  I'm going to go to a different topic.  Tell us

1    what you did in this case to go about your analysis in trial

2    Exhibits 1150 and 1151, the reports that you prepared for the

3    plaintiffs in this case.

4    A.   Well, each is such a major topic, I suppose I should start

5    with the one you pick and then we'll do the other one second.

6    Q.   Well, just generally tell the jury what kinds of things you

7    did.  What did you do to prepare to write your reports?

8    A.   Well, the plaintiffs' attorneys asked me to analyze and

9    evaluate the events that took place around the 1957 fire, the

10   1969 fire and a few other events, and to write up my evaluation

11   of those events and insights that they might provide about

12   Dow's management practices into a report.  I did that work and

13   I wrote the report.

14   Q.   Okay.  Did you review Dow documents?

15   A.   Yes, I reviewed -- well, then there's a second one. Should

16   I go to the second one or just do that one?

17   Q.   Go ahead.

18   A.   Then second from that, they asked me to review material,

19   documents and the like, relevant to the waste management

20   practices associated with the 903 pad and the releases that

21   came from that and the measurements of those releases and the

22   like, and to evaluate them, those documents and the practices

23   and the events and the measurements, and then to write an

24   evaluation in my technical capacity, write an evaluation of

25   what I thought of those events, and I did that and wrote that

1    but you have to have something on the drum that enables you to

2    identify that drum and go to some record to say what's inside

3    it.  Taken together, that's the system that is -- that one

4    would expect as a normal practice, as an acceptable practice.

5    Q.  Would it have been difficult to label and number the drums

6    in a way that the labels wouldn't be rubbed out over time?

7    A.  I don't believe so.

8    Q.  And would it have been difficult to keep good records of

9    the contents of the drums?

10   A.  I believe that was not only not difficult, but it was

11   universally used practically everywhere that I knew, so, of

12   course, it was just the standard practice.

13   Q.  But apparently not here?

14   A.  Clearly not here.

15   Q.  There is a statement on this -- there are some early

16   statements on this summary G569, and I would call your

17   attention to two documents, one is Plaintiffs' Exhibit P64 from

18   May 4th, 1970, which is a summary of on-site radioactive waste

19   disposal, which was written by EA Putzier, April 22nd, 1970.

20   The other document is Plaintiffs' Exhibit 1309, and that is

21   from July 9th, 1971, another Dow Chemical document, Rocky Flats

22   division, committee evaluation of plutonium levels in soil

23   within and surrounding U.S., AEC installation at Rocky Flats,

24   Colorado, the so-called Seed, S-E-E-D, report.  Do you have

25   both of those in front of you?

Page 3047

1    A.  Yes.

2    Q.  I'm going to ask you about some statements in those

3    documents.  Let's look --

4           MR. DAVIDOFF:  First of all, your Honor, I would offer

5    P64 and P1309.

6           MR. KURTENBACH:  Your Honor, we filed our objections

7    this morning.

8           THE COURT:  They're overruled, and the exhibits are

9    admitted.

10   BY MR. DAVIDOFF:

11   Q.  Okay.  Could you --

12   A.  I've got to find it.

13          MR. DAVIDOFF:  Can we show the jury the cover of P64,

14   and can you focus in on the author and the date, Mr. --

15   A.  This is the 364?

16   BY MR. DAVIDOFF:

17   Q.  No, this is P64, sir.

18          MR. KURTENBACH:  It's in volume 1, there's a spine

19   label that shows the volume.

20   BY MR. DAVIDOFF:

21   Q.  Now that P64 -- do you have them both?

22          MR. KURTENBACH:  I guess that's why we have cork

23   floors.

24   BY MR. DAVIDOFF:

25   Q.  P64, the Putzier report, I would like to focus your

Page 3048

1   attention on a few statements in there that are relevant to the

2   903 pad.  Could you turn to the page that's numbered 74889,

3   please.  And there's a column there "remarks" and toward the

4   middle there's an entry, "Quote from February 1959 progress

5   report.  Future problems:  The most pressing problem concerns

6   the storing of highly contaminated liquids in 55-gallon

7   capacity drums on the plant site and the urgent need for

8   treating and ultimate disposal.  There is every probability

9   that many of these drums are already leakers.  Their transport

10  to place of treatment will be tricky."

11          Now that statement is one of the ones that you have on

12  G569; is that correct, sir?

13  A.  Yes, I believe so.

14  Q.  Okay.  And let's look at page -- four pages further on in

15  the document, sir, page 074892 under "remarks," this is below

16  an entry from sometime during 1961.  This is right sort of in

17  the middle there "oil and stillbottoms."  That's it.

18          "Oil and stillbottoms, report of contamination from

19  leaking drums occurring in area and covering by service

20  department."

21          That's in 1961; is that correct, sir?

22  A.  Yes, it appears to be 7/61 which is July.  I was married

23  that month.

24  Q.  Congratulations.  You have a big birthday and you have a

25  big -- you'll have a big anniversary next year.  Okay.

Page 3049

1        So then waste disposal, if you look at the page that's

2   titled "August 17th, 1962," this is an attached letter from

3   1962 from Frank Butler to AH Sampson, and this is an attachment

4   to Mr. Putzier's 1970 report, and it's not an easy document to

5   read, it's 43 years old, but if we could focus on the first

6   paragraph there, "Subject:  Waste disposal."

7        MR. DAVIDOFF:  Actually, you need to go up a little

8   bit for the subject line, if you can.  "Subject:  Waste

9   disposal."

10  BY MR. DAVIDOFF:

11  Q.  "A question has been raised as to the necessity for the

12  Cab-O-Sil mixing facility.  The accompanying table lists the

13  general types and quantities of organic waste produced.  As

14  indicated some of these materials are burned in open pits, the

15  remaining materials are drummed and stored.  About 50 to 60

16  percent of these drums are badly corroded.  The contents of

17  several has already been spilled out on the ground in the

18  storage area.  Unless these materials are disposed of in the

19  very near future, a serious contamination problem will

20  develop."  And that's from August of 1962; is that correct?

21  A.  Yes, and that was one of the important things that I relied

22  on in my chronology of the events.

23  Q.  And you have this up here on G569, "About 50 to 60

24  percent"?

25  A.  Yes.

1    Q.   "50 to 60 percent of these drums are badly corroded.

2    Unless these materials are disposed of in the very near future

3    a serious contamination problem will develop"?

4    A.   Yeah.

5    Q.   And then the final statement from this lengthy document

6    that I want to focus your -- or the final document.  If you

7    look at the -- toward the very end, sir, four pages from the

8    end, begins a document, a four-page document, April 14th, 1970,

9    to Mr. Putzier, but from KJ Freiberg, both of whom were

10   officials in the Health Physics area.

11        That's from April 14th, 1970, from Freiberg of Health

12   Physics, to Mr. Putzier.  And if you look at No. 11 on page 2,

13   I think we're going to at least focus in on the numbers here,

14   page 2, paragraph numbered 11.

15        "Total number of drums originally in the field

16   numbered 5,237.  After transfer of contents, 4,826 drums were

17   transported to building 774 of which 3,572 contained plutonium

18   contaminated oil.

19        "Taking the total number of 5,237 drums minus 4,826

20   drums," this is paragraph 12, "containing 50 gallons each,

21   which were sent to building 774, leaves 411 drums to be

22   accounted for.  The best explanation for the 411 drums and the

23   volume contained within each follows:"

24        A says, "The drums were not all originally completely

25   full."

Page 3051

1          B says, "The volume taken up by the sludge which was

2      discarded with the empty barrels."

3          And C says, "Leakage out of the barrels and into the

4      ground within the storage area."

5          Finally, if you can look at paragraph No. 18, which is

6      on the next page, "In October 1968, weeds and vegetation were

7      burned off the 903 contaminated barrel storage area preparatory

8      to applying an asphalt cap over the area.  No airborne

9      contamination problems were encountered," it goes on to state.

10         What I would like you to do is if you can bring this

11     chronology up to date at least through 1967, and then we'll ask

12     you to tell the jury how they went about cleaning up the 903

13     area.

14     A.  During the period -- this figure on my left shows, during

15     the period from 1958 until the last year there is 1966, they

16     continued to add drums to the field.  By the way, a few were

17     removed, but they continued to add drums to the field, and you

18     can see the numbers going on.  And during all of that time, all

19     of those barrels continued to be exposed to the elements, even

20     though leakage had been originally -- corrosion had been

21     detected as early as we saw in the summer of '59, only nine

22     months after they started, and by the middle of '62, we have

23     records that 50 to 60 percent of the drums are seriously

24     corroded.  And then in 1964 we have records that a significant

25     number of drums had actually had their contents leak out into

Page 3052

1   the ground.

2          So what was going on was that they were adding new

3   drums to the field -- by the way, those drums had this

4   ethanolamine added into them, the new ones, to retard

5   corrosion.  But they -- until 1967, I think -- I would have to

6   find it, they had done nothing to remove the contaminated --

7   excuse me, they had done nothing to remove the drums that had

8   been corroding -- that had corroded, that had leaked, and the

9   contents were in the soil.

10          Now it's fair to say that -- you saw the drum field

11   picture.  They're packed as tightly as they can be.  You can't

12   walk between those drums.  They were put in as tightly as can

13   be.

14          So while the drums were sitting there, not very much,

15   if any, of the contamination that went into the soil is likely

16   to have become airborne and gone anywhere, it likely went down.

17   I don't think there's -- there's much that I would think would

18   have become airborne at that time.

19   Q.  When you say --

20   A.  But it was in the soil --

21   Q.  Excuse me, Doctor, when you say it went "down," you mean

22   down into the soil?

23   A.  Into the soil.  It went into the soil, and how deeply it

24   went into the soil wasn't known, because after all, there's

25   this big drum field, and they're out in the middle there, and

Page 3053

1    they hadn't done anything about it.

2            And what I'm here to tell you is that I was in another

3    large AEC laboratory at that time, actually in the middle '60s

4    I was still at Harvard, but I went to the Lawrence Berkeley Lab

5    in '67, and by the middle '70s I was a senior manager, and that

6    is absolutely an unacceptable waste management practice I know

7    of no other installation that managed any of the radioactive

8    wastes that I was involved in at that time or that I was

9    instructed to be working with in my early career in which such

10   practices had taken place, or once they were observed were

11   allowed to continue for so long.

12           And I have experience both as a worker with

13   radioactive materials and waste and then later on as a senior

14   manager in a large laboratory where we generated a whole lot of

15   radioactive wastes under my direct direction, people working

16   under me.  I myself did experiments that did that too.  And we

17   were always instructed from the start to be careful ourselves

18   as experimenters, be careful to put it in something that was to

19   be controlled, and the people in my laboratory then did

20   something with it that was controlled.

21           This example seems to me to be -- the word "egregious"

22   is a pretty strong word, but I'll use it, it's a pretty

23   remarkable example of an irresponsible practice.  That's a

24   strong word, but I use it carefully.

25   Q.  You might want to think of a synonym for egregious in

Page 3054

1   case --

2   A.   Yeah, well, irresponsible.   Egregious is beyond, way beyond

3   acceptable.   And I guess what my evaluation is based on is my

4   own work with radioactive materials all these years, and then

5   later on my work as a manager in which I understood what the

6   managerial responsibilities were to see to this not happening.

7           I have to say in my own laboratory at Lawrence

8   Berkeley Lab and then later on I was director of research of

9   the Regulatory Commission, and we had a whole lot of

10  laboratories doing work for us.   From time to time a

11  radioactive waste management problem would arise that hadn't

12  been anticipated, some new waste, or a more difficult waste to

13  handle came along that hadn't been anticipated when people who

14  were planning the work actually planned it.   And when that came

15  about, there was suddenly the need for different procedures or

16  a different approach, it was the manager's responsibility in

17  the operation out in the field to observe it, report it, get

18  the money to fix it.

19          And when you ask for money from the government, the

20  Atomic Energy Commission in those days, later was DOE, there's

21  never enough money to fund everything the laboratories want to

22  do, the priority was essentially always that money that was

23  necessary to secure safely -- radioactive materials and

24  radioactive activities received first priority, but only if,

25  and this is crucial, but only if the installation called

Page 3055

1   attention by asking for the money and giving it high priority.

2   Because there's no way that the people in the government, the

3   Atomic Energy Commission, later DOE, could generally know about

4   that.   I mean, sometimes they might, but generally it was

5   considered the responsibility of the operating contractors to

6   find the problem and call attention to it.

7          Now typically, and this is a very important point,

8   typically no standards were being violated early on.   The

9   operators would see an incipient problem, a problem that was

10  developing, it hadn't developed yet but it was about to

11  develop, and long before some standard was to be violated, of

12  course, they're held strictly to the standards, intervention

13  took place to make sure that you never even came close to it by

14  common sensical or even sometimes difficult engineering

15  solutions, sometimes there are easy solutions like here but

16  sometimes there were difficult solutions.

17         So I bring to you an evaluation in which my experience

18  is that if -- and from my own experience at these other

19  installations, if the Dow management had been as responsible as

20  I wished they had been, somewhere early on or somewhere in the

21  middle or somewhere towards the end but any number of places

22  here, intervention could have taken place that would have

23  prevented the leakage from the barrels into the soil, and later

24  on as we'll see, we haven't come to it yet, the dispersal of

25  the stuff into the soil, into the air as the drum field was

1  cleared and the grading took place, that's to come, you haven't

2  heard that chronology yet.

3          There's several places here where intervention could

4  have stopped the progression of events and stopped what

5  ultimately became a large release to the environment of

6  plutonium.

7  Q.  So your view is that Dow should have made this the number

8  one priority in its budget; is that --

9  A.  I'm not sure what number one means.

10         MR. KURTENBACH:  I object to the question, your Honor,

11  leading.

12         THE COURT:  Sustained.

13  A.  Yes.

14  BY MR. DAVIDOFF:

15  Q.  What was your view as to how Dow should have prioritized --

16  let me just finish the question, because then we'll have a

17  clearer record.

18         What was your view as to how Dow should have

19  prioritized the cleaning up of the 903 pad during the nine

20  years or so that these barrels were accumulated?

21  A.  Or actually the intervention before it needed cleaning up.

22  In my experience in these laboratories, and I'm now at another

23  one, Lawrence Livermore Laboratory, a small number of very high

24  priority health and safety things are identified and they're

25  given high priority, I don't know what number one means,

1   they're given a high enough priority -- the laboratory I work

2   at has a budget of $1.7 billion.  If you need some small amount

3   to fix some problem, it gets high priority because in the

4   scheme of things it's not a large amount.  In the scheme of

5   Rocky Flats, I have no idea what their budget was in 1959 or

6   1962 or 1964, but it doesn't matter what it was, these were

7   simple measures, not costly measures, these were measures that

8   probably didn't even require a separate appeal for funding from

9   the government, but perhaps they did.  Some of them were

10  rather -- so simple as to be almost unimaginably simple like

11  throwing a tarp over it.  Some are most costly, you've got to

12  bring it indoors and maybe a new facility you have to build.

13          But one way or the other, this needed to be assigned a

14  priority high enough to make sure that the release that

15  ultimately happened didn't happen.  And you know what?  For how

16  many years?  From 1959 or '60 or '61 when it began to be

17  evident until right to the end, that priority was not assigned

18  by the management, and hence the events proceeded to the

19  releases that happened predominantly in 1969, it's off of that

20  chart.  We'll come to those in a minute, I guess.

21  Q.  Right.  And before we get to when they finally started

22  cleaning this up after 1966, I want you to turn to

23  Exhibit P1309, Exhibit 1309.  There's just some portions of

24  that --

25          MR. DAVIDOFF:  Your Honor, I offer P1309 as well,

Page 3058

1    unless that's been received already.

2         THE COURT:  The other one has been received, and the

3    objection is noted and overruled.  It's admitted.

4         MR. DAVIDOFF:  Can we look at the cover page of that,

5    please.

6         Your Honor, can I clarify something for the jury here

7    about the exhibit numbering on this?

8         THE COURT:  Sure.

9         MR. DAVIDOFF:  Ladies and gentlemen, sometimes you'll

10   see on documents two exhibit numbers, for example, that Exhibit

11   No. P177 is not actually the exhibit number.  If you go down

12   below for this trial, you have to go down below and see

13   Exhibit P1309 is the exhibit number.  The reason you see that

14   sometimes is that sometimes these exhibits have been used

15   before in depositions, either in this case or in another case,

16   and that is confusing, and I apologize for the fact that the

17   numbers are not the same, but the logistics of getting ready

18   for a trial like this made it difficult.  So that is a little

19   confusing, and that's why you may sometimes see a different

20   number on the cover of a document.

21   BY MR. DAVIDOFF:

22   Q.  So, anyway, going back to the center here, this was titled

23   "Committee Evaluation of Plutonium Levels in Soil Within and

24   Surrounding USAEC Installation at Rocky Flats."  JRC was the

25   chairman.  There were four other Dow people there.  It was

Page 3059

1    prepared, if you'll go down below, by the Dow Chemical Company,

2    Rocky Flats division, and this is from July 9th, 1971, I

3    believe that's up in the upper left-hand corner.

4          There's just a few pages of this I would like to focus

5    your attention on, sir, and the jury's.

6          If you could turn to page -- the first page, I think,

7    of text where it says "introduction," and the numbers 322 are

8    in the lower right-hand corner, if you could go up to the top

9    where it says "introduction" there.

10         MR. DAVIDOFF:  I don't know if you've got the right

11   page yet.  That's it.  And go up to the top two paragraphs

12   where it says "introduction," please.  Thank you.

13   BY MR. DAVIDOFF:

14   Q.  "In July 1958, at the USAEC Rocky Flats installation, an

15   area on the plant site was designated as a temporary storage

16   area for contaminated oil drums.  Subsequently some of the

17   drums developed oil leaks and some plutonium contaminated oil

18   was deposited on the soil.  The area was later covered by an

19   asphalt pad."

20         Then if you could go to the next paragraph, and we'll

21   come back to this either later today or first thing Monday

22   morning.  "After a fire on May 11th, 1969, at Rocky Flats,

23   studies were conducted by the Health and Safety Laboratory,

24   HASL, of the USAEC and by the Colorado Committee on

25   Environmental Information concerning the possible release of

1    plutonium.  These investigations detected measurable amounts of

2    plutonium in the soil around the Rocky Flats plant.  The

3    epicenter quite clearly shows that this contamination could not

4    be attributed to the May 1969 fire but is due to the

5    resuspension and redistribution of contaminated soil from the

6    oil drum storage area."

7         Sir, do you know that to have been the 903 area that

8    we have been discussing?

9    A.  Yes.

10   Q.  Now if you could turn to page -- the pages ending in 327,

11   which is about five pages further on here.  And there's another

12   chronology on this page.  Well, up above, "An estimate of

13   leakage based upon a material balance around the drums

14   indicated that 5,000 gallons of oil containing about 86 grams

15   of plutonium leaked from the drums into the soil."

16        Incidentally, let me stop there for a second.  What do

17   you think about that estimate of the number of grams?

18   A.  The 86 gram estimate?

19   Q.  Yes, sir.

20   A.  Well, there's other information about how much leaked or at

21   least how much went off-site that leads me to conclude that

22   that 86 grams is too low a number, the correct number is larger

23   than that, and I can establish that later as we go along.

24   Q.  Okay.  Then I want to just look through this chronology,

25   which gives us a little more information.  The first date is