# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181-JLK

---

MERILYN COOK, *et al.*,

      Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

      Defendants.

---

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION RE "STANDARDS" AND REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF JUDGMENT AND REPONSE TO DEFENDANTS'

## "PART TWO" – "STANDARDS"

---

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   PROCEDURAL BACKGROUND .................................................................... 1

III.  ARGUMENT ....................................................................................................... 4

      A.   Defendants' "Standards" Argument has been Waived and Forfeited ................... 4

      B.   Defendants' So-called "Standards" Are Not Preemptive Regardless ................... 5

      C.   Defendants Cannot Show Conflict Preemption ....................................................... 7

      D.   Defendants' "Standards" Do Not Have the Force of Law ................................... 20

           1.   Defendants' "Standards": 1953-57 ...................................................... 20

           2.   Defendants' "Standards": 1957/58 ...................................................... 21

           3.   Defendants' "Standards": 1963-85 ...................................................... 23

           4.   Defendants' "Standards": 1985 ............................................................ 26

           5.   None of Defendants' "Standards" was issued pursuant to the APA ...... 27

           6.   There are no plutonium in soil standards. ............................................. 28

IV.  CONCLUSION .................................................................................................. 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Cases

*In the Matter of A.N. Tschaeche*,
    23 N.R.C. 461, 1986 WL 68730 (N.R.C. Apr. 23, 1986) .................................................18, 19

*Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc.*,
    959 F.2d 158 (10th Cir. 1992), *vac'd on other grounds and rem'd*,
    506 U.S. 910 (1992) *previous opinion adhered to*, 981 F.2d 1177
    (10th Cir. 1993)........................................................................................................8

*City of New York v. Permanent Mission of India to the United States*,
    618 F.3d 172 (2d Cir. 2010)....................................................................................27

*Clark v. State Farm Mut. Auto. Ins. Co.*,
    590 F.3d 1134 (10th Cir. 2009) ................................................................................5

*Cook v. Rockwell Int'l Corp.*,
    273 F. Supp. 2d 1175 (D. Colo. 2003).........................................................3, 9, 11

*Cook v. Rockwell Int'l Corp.*,
    564 F. Supp. 2d 1189 (D. Colo. 2008)....................................................................18

*Cook v. Rockwell Int'l Corp.*,
    618 F.3d 1127 (10th Cir. 2010) ......................................................................*passim*

*Cook v. Rockwell Int'l Corp.*,
    790 F.3d 1088 (10th Cir. 2015) ......................................................................*passim*

*Coyne & Delany Co. v. Selman*,
    98 F.3d 1457 (4th Cir. 1996) ....................................................................................7

*Freytag v. Commissioner of Internal Revenue*,
    501 U.S. 868 (1991)................................................................................................24

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988)..................................................................................................8

*Griffin v. Bryant*,
    30 F. Supp. 3d 1139 (D.N.M. 2014) ......................................................................17

*In re Hanford Nuclear Reservation Litig.*,
    534 F.3d 986 (9th Cir. 2008) ..................................................................................21

*Int'l Harvester Co. v. Sharoff*,
    202 F.2d 52 (10th Cir. 1953) ....................................................................................6

*Lombard v. Colorado Outdoor Educ. Ctr., Inc.*,
    187 P.3d 565 (Colo. 2008) ...................................................................................17

*McKay v. United States*,
    703 F.2d 464 (10th Cir. 1983) ............................................................................14

*People v. Coughlin*,
    304 P.3d 575 (Colo. App. 2011) .........................................................................17

*People v. Duran*,
    272 P.3d 1084 (Colo. App. 2011) .......................................................................17

*People v. Terry*,
    791 P.2d 374 (Colo. 1990) ..................................................................................24

*Petrella v. Brownback*,
    787 F.3d 1242 (10th Cir. 2015) ............................................................................5

*Phillips v. Calhoun*,
    956 F. 2d 949 (10th Cir. 1992) .............................................................................5

*Ramsey Winch, Inc. v. Henry*,
    555 F.3d 1199 (10th Cir. 2009) ............................................................................7

*Seifert v. Unified Gov't of Wyandotte Cnty./Kansas City*,
    779 F.3d 1141 (10th Cir. 2015) ............................................................................5

*Sheets v. Salt Lake Cnty.*,
    45 F.3d 1383 (10th Cir. 1995) ..............................................................................5

*Silkwood v. Kerr-McGee Corp.*,
    464 U.S. 238 (1984)..............................................................4, 7, 11, 12, 14, 16

*Silkwood v. Kerr-McGee Corp.*,
    485 F. Supp. 566 (W.D. Okla. 1979) .....................................................13, 14, 16

*Silkwood v. Kerr-McGee Corp.*,
    667 F.2d 908 (10th Cir. 1981), *rev'd on other grounds*,
    464 U.S. 238 (1984), *on remand* 769 F.2d 1451 (10th Cir. 1985) ..........................1, 10, 11, 13

*In re TMI Litig. Cases Consol. II*,
    940 F.2d 832 (3d Cir. 1991)..........................................................................8, 10

*United States v. Wheeler*,
    776 F.3d 736 (10th Cir. 2015) ............................................................................17

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
    305 F.3d 1152 (10th Cir. 2002) ............................................................................5

*Weston v. Harmatz,*
    335 F.3d 1247 (10th Cir. 2003) ...............................................................................5

*Woods v. Delgar Ltd.,*
    226 P.3d 1178 (Colo. App. 2009) ...........................................................................17

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ...........................................................................................7, 9

### STATUTES & OTHER AUTHORITIES

5 U.S.C. § 500, *et seq.*.............................................................................................2

5 U.S.C. § 553 (a)(1).................................................................................................27

42 U.S.C. § 2014(hh) ............................................................................................8, 12

Fed. R. Civ. P. 51(d)(1)...............................................................................................6

*Silkwood v. Kerr-McGee,* 1983 U.S. S. Ct. Briefs LEXIS 1568 (June 29, 1983) ........................13

Plaintiffs respond here to "Defendants' Motion Re Standards" (Doc. No. 2378), and "Part Two: Defendants' Opposition to Plaintiffs' Motion for Entry of Judgment and Brief in Support of Motion Re: Standards: Preemption" (Doc. No. 2374) ("Defs' Standards Br.").

## I.  INTRODUCTION

Having lost on their complete preemption argument in *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1093-94 (10th Cir. 2015) ("*Cook Appeal II*"), Defendants are trying to resurrect a "conflict" preemption argument based on an assortment of old documents that *Defendants themselves* objected to admitting into evidence at trial.  Defendants' latest preemption effort fails: the argument has been waived, is based on documents that lack the force of law and on their face do not apply to plutonium in soil, and regardless, neither Defendants nor their documents can overcome controlling decisions of the Tenth Circuit and the Supreme Court in *Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908, 912 (10th Cir. 1981), *rev'd on other grounds,* 464 U.S. 238 (1984), *on remand*, 769 F.2d 1451 (10th Cir. 1985), holding that state law controls and has not been preempted by the Atomic Energy Act.

## II.  PROCEDURAL BACKGROUND

In connection with their proposed jury instructions for trial in 2005, Defendants The Dow Chemical Company ("Dow") and Rockwell International Corp. ("Rockwell") cited to seven documents which they and their expert (Dr. John A. Auxier)[1] contended set forth certain federal numerical standards for plutonium-in-air and plutonium-in-water off-site of Rocky Flats.  *See* Defendants' Proposed Nuisance Instruction Nos. 14-15, 17-18.[2]  Defendants stated that the seven

---

[1] Dr. Auxier did not testify at trial; Defendants proffered Dr. John R. Frazier instead.

[2] These are collectively attached as Exh. 9 in the accompanying compendium of exhibits.  The proposed instructions are paginated App. 829-33, 838-41 because they were included in the Appendix in *Cook Appeal I.*

documents were attached to a prior filing, Doc. No. 978, Appendix B, an Affidavit of Dr. John Auxier dated July 29, 1997, at Attachments 2, 3, 8-12 to that affidavit.[3]

Defendants at no point – before, during, or after trial – identified any purported federal standards relating to *plutonium in soil* because none has ever been promulgated.  That was true throughout the history of Rocky Flats, at the time of trial,[4] and remains true today:  Defendants do not contend, even today, that any federal plutonium-in-soil standards exist.  Nor have Defendants ever contended that the so-called "standards" they rely on were promulgated in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. § 500, *et seq*. (and they were not).[5]

In the first appeal, the Tenth Circuit discussed Defendants' argument that so-called federal numerical standards somehow preempted Plaintiffs' claims under the Price-Anderson Act ("PAA") as amended in 1988.  *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1142-44 (10th Cir. 2010) ("*Cook Appeal I*").  The Tenth Circuit expressly noted that Defendants had *not* advanced a field preemption argument of any kind, but relied *exclusively* on conflict preemption. 618 F.3d at 1143 n.16.  In the second appeal, the Tenth Circuit pointedly "reaffirm[ed] the first panel's ruling that *Dow and Rockwell forfeited any field preemption argument long ago*."  *Cook Appeal II*, 790 F.3d at 1093-94 (all emphases added unless stated otherwise).

---

[3] Pertinent portions of the July 1997 Auxier Affidavit, with tabs/attachments 2, 3, 8-12, are attached as Exh. 3.  These same seven documents were marked as "Supplemental Appendix" ("SA") pages SA382-584 in *Cook Appeal I*.  A copy of SA382-584 is attached as Exh. 2.

[4] *See* Tr. 7549-50, 7590, 7644 (testimony by Defendants' expert, Dr. Frazier) (all cited transcript pages in Plaintiffs' briefs being filed today are collected as Exh. 1).

[5] As discussed further below, each concession alone is fatal to Defendants' preemption argument.

Remarkably, Defendants *objected at trial* to admission of the seven documents[6] they themselves relied on for their affirmative defense of conflict preemption.[7] Then, in their opening brief in *Cook Appeal I* in 2009 (as appellants in the first appeal), Defendants failed to acknowledge or identify the seven documents they had contended set forth the applicable standards, leaving it to Plaintiffs (the appellee in the first appeal) to discuss them.  618 F.3d at 1144 n.18.  The Tenth Circuit explained that it discussed Defendants' conflict preemption argument (based on the seven documents) because the issue would "arise again in the event of a re-trial" of Plaintiffs' PAA claims.  *Id.* at 1143 n.15.  The Tenth Circuit stated that nothing in the PAA itself expressly preempted the state law that otherwise would be incorporated into a PAA claim, *id.* at 1143, and declined to rule on whether the seven documents preempted "a plaintiff's *PAA Action*" due to conflict preemption, noting that *this* Court had not specifically analyzed the seven documents previously in its prior preemption opinion.  *Id.* at 1144.[8]

On remand from *Cook Appeal I* and in the second appeal, however, Plaintiffs explained that judgment could be entered on Plaintiffs' independent and proven Colorado state law nuisance claims, and asked the Tenth Circuit to remand "to the District Court so that it may recertify the Class and enter judgment in favor of Plaintiffs on Plaintiffs' proven Colorado nuisance claims."[9]  In their response before the Tenth Circuit in *Cook Appeal II*, Defendants

---

[6] *See* Tr. 7591, 7645-7648.

[7] *See Cook Appeal II*, 790 F.3d at 1092 ("potential preemption defenses, like most other affirmative defenses, *are forfeited if not made*.").

[8] *See Cook v. Rockwell Int'l Corp.*, 273 F. Supp.2d 1175 (D. Colo. 2003) ("*Cook IX*").

[9] Plaintiffs-Appellants' Principal Brief, Doc. No. 01019262216, at 60 (10th Cir. June 10, 2014) (Exh. 5).

*never suggested or argued* that Plaintiffs' independent state law claims were preempted by any numerical federal standards of any kind.[10]  Nor had Defendants made this argument below.[11]

Indeed, in *Cook Appeal II*, the Tenth Circuit explained that:

> In two separate appeals spanning many years the defendants have identified no lawful impediment to the entry of a state law nuisance judgment on the existing verdict.  They have shown no preemption by federal law, no error in the state law nuisance instructions, no mandate language specifically precluding this course.  *No other error of any kind is even now alleged.* . . .
>
> When the district court receives this case it should proceed to judgment on the existing nuisance verdict promptly, consistent with resolving the outstanding class action question, *wary of arguments that have already been rejected or forfeited.*  This long lingering litigation deserves to find resolution soon.

*Cook Appeal II*, 790 F.3d at 1104-05.

## III.   ARGUMENT

### A.   Defendants' "Standards" Argument has been Waived and Forfeited

Defendants could have raised their "standards" conflict argument on appeal in *Cook Appeal II*, but did not.[12]  Plaintiffs expressly asked the Tenth Circuit to remand and direct this Court to enter judgment based on Plaintiffs' proven Colorado nuisance claims.  Defendants argued that Plaintiffs had no independent state law claims but only federal PAA claims, but Defendants chose not to raise any argument that so-called federal numerical standards would

---

[10] *See* Brief of Defendant-Appellees, Doc. No. 01019278418 (10th Cir. July 14, 2014) (Exh. 6).

[11] *See* Defendants' Response Brief Pursuant to Order of October 16, 2012, filed March 11, 2013 (Doc. No. 2345).

[12] The Tenth Circuit also noted that, "the first panel's decision to defer certain issues" did not "preclude the defendants from raising them on remand if they really thought them sufficient to bar entry of judgment on the existing nuisance verdict."  790 F.3d at 1104 n.7.  During oral argument before the Tenth Circuit in *Cook Appeal II*, Plaintiffs' counsel stated he was "not sure" if the issue of alleged preemption by the seven documents had been waived by Defendants' failure to raise it during *Cook Appeal II*.  *See* Transcript (Exh. 7) (prepared at Plaintiffs' request from official recording obtained as a result of Defendants' motion) at 63:12.

prevent or preempt entry of judgment on an independent state claim. As the Tenth Circuit stated, "*[n]o other error of any kind is even now alleged*", and this Court must be "*wary of arguments that have already been rejected or forfeited.*" 790 F.3d at 1104-05. Defendants' strategy of attempting to perpetually re-raise issues long since decided, waived and/or forfeited cannot be tolerated or else this 25-year-old, "long lingering litigation" will never end[13] – contrary to the Tenth Circuit's mandate that this Court "proceed to judgment on the existing nuisance verdict promptly.…"[14]

## B. Defendants' So-called "Standards" Are Not Preemptive Regardless

Even if the Court elects to evaluate Defendants' so-called "standards," it should find that Defendants have not carried their burden to demonstrate that they conflict with *and* preempt Colorado tort law governing nuisance. As a preliminary matter, Defendants are limited now to the seven documents (tabs 2-3, 8-12 to the July 1997 Auxier Affidavit) that they contended at trial contained the alleged "standards" that purportedly conflict with and preempt Colorado law.

---

[13] *See Cook Appeal II*, 790 F.3d at 1092 ("potential preemption defenses, like most other affirmative defenses, *are forfeited if not made*.").

[14] *Cook Appeal II*, 790 F.3d at 1105. *See generally Seifert v. Unified Gov't of Wyandotte Cnty./Kansas City*, 779 F.3d 1141, 1156 (10th Cir. 2015) (where defendant-appellee had advanced argument in district court but failed to raise it on appeal, argument waived); *Sheets v. Salt Lake Cnty.*, 45 F.3d 1383, 1390 (10th Cir. 1995) (argument not proffered on appeal is waived); *Phillips v. Calhoun*, 956 F. 2d 949, 954 (10th Cir. 1992) (same); *Petrella v. Brownback*, 787 F.3d 1242, 1260 (10th Cir. 2015) ("In a conclusory argument, plaintiffs assert that the LOB cap violates their First Amendment right to petition the government. When issues are not adequately briefed, they are deemed waived."); *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1175 (10th Cir. 2002) ("issues will be deemed waived if they are not adequately briefed."); *Clark v. State Farm Mut. Auto. Ins. Co.*, 590 F.3d 1134, 1140 (10th Cir. 2009) ("Because they were not challenged on appeal in *Clark III*, both the case management order and the district court's denial of the motion to intervene have now become the law of the case and are binding on the parties."); *Weston v. Harmatz*, 335 F.3d 1247, 1255 (10th Cir. 2003) ("Under the law of the case doctrine, '[a] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.'") (quoting *Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 992 (10th Cir. 2003)).

Defendants cannot – nine years after trial – try to inject new "standards" that they failed to identify previously as part of their proposed jury instructions.[15]  At no point during trial, or in any post-trial motion, or during either appeal, did Defendants claim that any *other* federal "standards" existed other than the seven documents referenced in Defendants' proposed jury instructions.

Even assuming, *arguendo*, that Defendants have not completely waived and forfeited this entire "conflict" preemption argument, nothing in *Cook Appeal I* suggested Defendants could go back to the drawing board, years after trial, and identify purported "standards" they did not identify or proffer previously.  It cannot have been an error, for example, for this Court to fail to instruct the jury on (or not require Plaintiffs to satisfy) a "standard" that Defendants never identified and so waived long ago.  Defendants' conflict preemption argument (if considered at all) must rise or fall on the seven documents they previously identified.[16]

---

[15] *See* Fed. R. Civ. P. 51(d)(1) ("A party may assign as error . . . (B) a failure to give an instruction, *if* that party properly requested it . . . and properly objected."); *Int'l Harvester Co. v. Sharoff*, 202 F.2d 52, 55 (10th Cir. 1953) ("[N]o party may assign as error the refusal of the trial court to give requested instructions for the first time on appeal, unless he objects thereto before the jury retires to consider its verdict.").  It cannot have been "error" for this Court not to instruct the jury regarding a "standard" that Defendants' never proffered or identified.  *See also* note 14 and cases cited therein.

[16] The outcome of the conflict preemption analysis does not change, however, even if the Court were to consider all of Defendants' new exhibits. As exhibits to their latest brief, Defendants included five of the prior seven documents, *see* Defs' Standards Br. at Exhibit 8 (which is a copy of Attachment 8 to the July 1997 Auxier Aff.); Exh. 13 (which is an excerpt of Attachment 9 to the July 1997 Auxier Aff.); Exh. 16 (an excerpt of Attachment 10); Exh. 17 (excerpt of Attachment 11); and Exh. 18 (Attachment 12).  Though Defendants now cite to more documents, they did not submit any new affidavit of any kind discussing or explaining any of them (and with the trial long over, Defendants cannot proffer new expert testimony now).

### C.  Defendants Cannot Show Conflict Preemption

"Because Defendants advocate preemption, they bear the burden of showing that federal and state law conflict." *Cook Appeal I*, 618 F.3d at 1143 (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984)).

In *Cook Appeal II,* the Tenth Circuit explained that the Supreme Court has "distinguished between 'field' preemption (where Congress leaves 'no room' for state regulation in an entire area) and 'conflict' preemption (where Congress has expressed a more modest wish to displace individual state laws standing in the way of federal law)." *Cook Appeal II*, 790 F.3d at 1092. The Tenth Circuit confirmed that "Dow and Rockwell forfeited any field preemption argument long ago", and so Defendants must now show that the "more modest" conflict preemption applies to prohibit entry of judgment on Plaintiffs' proven state law nuisance claim.  Defendants cannot do so.

The Supreme Court has explained that there are

> two cornerstones of our pre-emption jurisprudence.  First, the purpose of Congress is the ultimate touchstone in every pre-emption case.  Second, [i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citations and internal quotation marks omitted).  The assumption against preemption "applies with greater force when the alleged conflict is in an area traditionally occupied by the States."  *Ramsey Winch, Inc. v. Henry*, 555 F.3d 1199, 1204 (10th Cir. 2009).  Such "traditional" areas "include[] common law tort liability."  *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1467 (4th Cir. 1996) (collecting cases).  *See Cook Appeal II*, 790 F.3d at 1094.

Defendants' earlier conflict preemption argument (in *Cook Appeal I*) relied heavily on the 1988 Amendments to the PAA, and cases from other jurisdictions, starting with *In re TMI Litig. Cases Consol. II*, 940 F.2d 832 (3d Cir. 1991), and its progeny.  But the PAA itself, 42 U.S.C. § 2014(hh) expressly *preserves* state rules of decision.  Regardless, Plaintiffs are now proceeding with a pure state law claim independent of the PAA, and the Tenth Circuit already explained that *TMI* and its progeny were based on "field preemption" not conflict preemption, and Defendants have waived any field preemption argument.  *See Cook Appeal I*, 618 F.3d at 1144 n. 19; *Cook Appeal II*, 790 F.3d at 1093-94.  Thus, Defendants' continued reliance on the *TMI* line of cases (*see* Defs' Standards Br. at 32-33) is inexplicable and inapposite.

Defendants cite the Atomic Energy Act ("AEA") of 1946 and 1954, and "standards" that Defendants say were issued pursuant to those acts.  *See* Defs' Standards Br. at 4-9.  Defendants suggest generally that permitting imposition of liability under state tort law may have an indirect regulatory effect and so in that sense "conflict" with federal standards (assuming they exist), but the Supreme Court has explained that: "Congress was willing to accept regulatory consequences of application of state tort law to radiation hazards even though direct state regulation of safety aspects of nuclear energy was pre-empted."  *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 186 (1988).  *See Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc.*, 959 F.2d 158, 163 (10th Cir. 1992) ("The Atomic Energy Act contains no preemption provision and reserves significant authority to the states. 'Further, the enactment and legislative history [of the AEA] make clear Congress' explicit judgment that state common law damage actions for injuries caused by nuclear operations should be permitted to continue.'") (citation omitted), *vac'd on other grounds and rem'd*, 506 U.S. 910 (1992), *previous opinion adhered to*, 981 F.2d 1177 (10th Cir. 1993).

With respect to conflict preemption, which Defendants here have the burden of demonstrating, "[s]tate law is preempted due to its conflict with federal law 'where it is *impossible* for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Cook Appeal I*, 618 F.3d at 1143 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)) (citation and quotation omitted). Defendants cannot demonstrate either requirement.

*First*, it is plainly possible for Defendants to comply with both the so-called numerical "federal standards" Defendants rely on and Colorado state tort law. *See Cook IX*, 273 F. Supp. 2d at 1192-93. *See also Wyeth*, 555 U.S. at 573 ("Impossibility pre-emption is a demanding defense."). Defendants do not and cannot contend otherwise.

*Second*, in applying "purposes and objectives" conflict preemption, a court should proceed with great caution before holding state law preempted because of the "vague and 'potentially boundless'" nature of the doctrine. *See Wyeth*, 555 U.S. at 587 (Thomas, J., concurring in the judgment) (citing *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 907 (2000) (Stevens, J., dissenting)).

Defendants describe the alleged conflict between Colorado state tort law and the purported federal numerical standards on which Defendants rely as follows:

> Colorado nuisance law impermissibly allowed the jury to usurp the regulatory authority Congress vested in the AEC. The jury, because it was not required to find that any exposures and releases exceeded the levels specified in the AEC standards, was able to sidestep the determination that the AEC made pursuant to its standard-setting authority. It was permitted to substitute its own judgment for what constitutes a permissible level of radiation exposure, how and at what production level nuclear facilities may operate, where those facilities should be located, what level of release is 'too much', and most importantly, the balance that should be struck between safety and national defense. The Supremacy Clause exists to

> prevent precisely such second guessing.  Entering judgment on a nuisance
> verdict that was completely divorced from the AEC standards would
> "frustrate the objectives of the federal law." *See TMI II*, 940 F.2d at 859
> (internal quotations and citation omitted).

*See* Defs' Standards Br. at 35 (emphasis omitted).

Defendants wrongly rely on *TMI*, a case about field preemption and therefore not helpful to Defendants because, as the Tenth Circuit held, Defendants long ago waived any field preemption argument.  Furthermore, the premise of Defendants' argument is that imposition of nuisance liability under Colorado law for proven damages suffered by Class members is necessarily "regulatory" (Defendants say the jury by awarding compensatory damages was purportedly deciding "how and at what production level nuclear facilities may operate" etc.), so in that sense "conflicts" with alleged federal standards, but that exact argument has been rejected by the Supreme Court and the Tenth Circuit.

Because Plaintiffs are proceeding solely with their state law nuisance claims, the preemption analyses of the Tenth Circuit and Supreme Court in *Silkwood* are controlling.  The plaintiff in *Silkwood*, like Plaintiffs here, proceeded with state law claims in federal court under diversity jurisdiction, and the Tenth Circuit *affirmed* the award of compensatory damages under state tort law standards, *including strict liability.  See Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908, 921 (10th Cir. 1981), *rev'd on other grounds,* 464 U.S. 238 (1984), *on remand*, 769 F.2d 1451 (10th Cir. 1985).

The Tenth Circuit rejected the argument that "the federal regulations determine the controlling standards".  667 F.2d at 921.  Instead, the Tenth Circuit stated that "a state can apply strict liability principles if it chooses."  *Id.*  Indeed, the Tenth Circuit stated that "[w]e have no doubt Oklahoma courts would apply strict liability to this case of escape of plutonium, a highly

toxic and dangerous substance."[17] *Id*.  This ruling was undisturbed by the Supreme Court and remains binding Tenth Circuit precedent.  This controlling ruling means that the so- called standards Defendants point to – even assuming they had the force of law, which they do not, and even assuming they applied to plutonium in soil off-site of Rocky Flats, which they do not – are not preemptive because even a defendant who complied with such "standards" may be found liable for compensatory damages under state tort law standards.

The Tenth Circuit initially held that *punitive* damages were preempted because the Court of Appeals viewed punitive damages as having a stronger and more direct regulatory effect.  667 F.2d at 922-23.  Yet even that holding was *reversed* by the Supreme Court.  The Supreme Court held that punitive damages – which plainly do have a more "regulatory" effect than compensatory damages – had *not* been preempted by the AEA or the PAA (which amended the AEA).  464 U.S. at 256.  The Supreme Court explained that:

> No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law *and the conclusion that a state may nevertheless award damages based on its own law of liability*.  But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them.  We can do no less.  *It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.*

*Silkwood*, 464 U.S. at 256.[18]

---

[17] *See Cook IX*, 273 F. Supp. 2d at 1192 (analyzing *Silkwood* and noting that in its initial *Silkwood* decision, the Tenth Circuit "held that state tort law rules, including a strict liability standard of care, are not preempted by federal nuclear safety regulations.")

[18] *See Cook IX*, 273 F. Supp. 2d at 1192 (the Supreme Court in its *Silkwood* decision held "that there was no conflict or frustration of congressional purpose in the application of state tort law to award punitive damages in a public liability action.  464 U.S. at 256, 258, 104 S.Ct. 615.  The Court's conclusion, based as it was on Congress' repeated declarations that state tort law was to

*All nine justices* in *Silkwood* agreed that Congress had approved the incidental regulatory effect of *compensatory* damages under state tort law:  "It is not at all surprising, however, that Congress would tolerate a jury-imposed negligence standard for awarding compensation.  *In its desire to promote nuclear power, Congress has never expressed an intention to allow a nuclear licensee to avoid paying for any injury it causes*."  464 U.S. at 268 (Blackmum, J., dissenting).  *Accord id.* at 275 ("Where injury is sustained as a result of the operation of a nuclear facility, *it is not contested* that compensatory damages under state law properly may be awarded.") (Powell, J., dissenting).

Defendants previously have suggested that *Silkwood* is allegedly distinguishable because in that case certain federal standards allegedly had been violated.[19]  But the *Silkwood* jury was instructed that it could find the defendant there strictly liable for property damage from plutonium contamination "without regard to the degree of care with which defendant Kerr-

_____

govern such actions, also demonstrates that there was not, under the pre-1988 Price-Anderson Act, any conflict or frustration of congressional purpose in the application of state tort law to award compensatory damages based on state tort standards of care.").  *See Cook Appeal II*, 790 F.3d at 1096 ("little in the [PAA's] history suggests an intent to preclude recovery or inhibit the operation of state tort law"); *id.* at 1098 (recognizing the distinction between "before-the-fact nuclear safety regulations" and "after-the-fact tort law remedies"); *id.* at 1099 (approving application of "preexisting state law principles" to Plaintiffs' nuisance claims here).

[19] *See* Opening Brief of Defendants-Appellants-Cross-Appellees, Case No. 08-1224, Doc. No. 1017648899 (Mar. 9, 2009), at 34 (Exh. 4).  Defendants also argued previously that *Silkwood* did not address the 1988 Amendments to the PAA but instead "involved common-law claims arising under state law", *id.* at 35, but of course now so does this case.  Similarly, the Tenth Circuit in *Cook Appeal I* discussed Defendants' conflict preemption argument in the context of a post-1988 *PAA* claim.  *See, e.g.*, 618 F.3d at 1143 n.17 ("*Silkwood* recognized Congress's willingness to accept the tension between the federal government's exclusive regulation of nuclear safety and the pre-1988 PAA's incorporation of state-law remedies.").  As Plaintiffs are proceeding independently of the PAA, *Silkwood* controls.  And even the 1988 Amendments to the PAA expressly incorporate *state law* unless it is plainly "inconsistent" with certain narrow provisions of the PAA that have no application here.  *See* 42 U.S.C. § 2014(hh); *Cook Appeal I*, 618 F.3d at 1143 ("We agree with the district court that § 2014(hh) does not expressly preempt state law.  The clear meaning of this section is that state law is only expressly preempted when it is inconsistent with the provisions of § 2210.").

McGee Nuclear Corporation carried on its activities at the Cimarron facility." *Silkwood v. Kerr-McGee Corp.*, 485 F. Supp. 566, 597 (W.D. Okla. 1979) (appendix containing jury instructions); *see also id.* at 604 (explaining plaintiff's strict liability theory).

The *Silkwood* jury instruction on strict liability under state law was *upheld* by the Tenth Circuit, *see* 667 F.2d at 921, and then left undisturbed by the Supreme Court.  In other words, regardless of any evidence that was presented at the *Silkwood* trial about alleged violations of any federal regulations, the jury was not required to *find* that any such violation had occurred in order to find defendant liable under Oklahoma state law.  To the contrary, the trial court instructed the jury that Kerr-McGee could be found strictly liable.  485 F. Supp. at 597, 604.  Moreover, the defendant in *Silkwood*, in (unsuccessfully) arguing against punitive damages in the Supreme Court, contended that "[i]n all material matters, Kerr-McGee was in compliance with federal regulations" but acknowledged that "[e]ven if compensatory damages do have some regulatory effect on radiation safety concerns, *they fall in an area specifically delegated to the states*."[20]

The plaintiff in *Silkwood* also proceeded, in the alternative, under a negligence theory. *See* 485 F. Supp. at 597, 604.  The *Silkwood* jury was instructed it could find Kerr-McGee negligent *even if* it complied with federal standards.  485 F. Supp. at 598 ("You are instructed, however, that *you are not bound by these standards*."); *id.* at 599 (same); *id.* ("such compliance would *not* necessarily preclude a finding of blameworthy conduct under all the facts and circumstances shown by the evidence.").  Thus, regardless of evidence in that case about alleged violations of federal standards, the jury there was instructed that even full compliance was *not* an automatic or complete defense (and certainly not preemptive), and the jury was *not* required to

---

[20] Brief for Appellees, *Silkwood v. Kerr-McGee* (June 29, 1983), 1983 U.S. S. Ct. Briefs LEXIS 1568 at *13, 50.

find that Kerr-McGee had violated any federal standard in order to find it liable under state tort law. Thus, Defendants' argument that *Silkwood* can be distinguished because certain federal standards were allegedly violated is wrong and irrelevant.  Indeed, the Tenth Circuit specifically found (in an earlier case relating to plutonium releases from Rocky Flats) that its original *Silkwood* ruling regarding compensatory damages applied to off-site plutonium releases *from Rocky Flats*.  *See McKay v. United States*, 703 F.2d 464, 469 (10th Cir. 1983) ("There are no legally significant facts that distinguish the claims in our case from those upheld in *Silkwood* or that justify dismissing our plaintiffs' compensatory damage claims.").[21]

Moreover, one of the "federal regulations" that the *Silkwood* defendant Kerr-McGee allegedly violated was the requirement that radiation releases be kept "as low as reasonably achievable", known as "ALARA."  *See* 485 F. Supp. at 581-85.  As the district court there found, AEC numerical radiation exposure regulations "are not intended to represent levels of radiation exposure at which no injury may be inflicted."  *Id.* at 580.  Thus, "[c]ompliance with [ALARA] cannot be demonstrated merely through control of escaped plutonium to within any absolute amount."  *Id.* at 585.  The Supreme Court noted trial testimony that defendant Kerr-McGee had violated ALARA, *Silkwood*, 464 U.S. at 243, and noted the district court's conclusion that in light of evidence of defendant's violations of ALARA, punitive damages could be awarded for "grossly negligent, reckless and willful conduct".  464 U.S. at 245.

In holding that punitive damages were *not* preempted, the Supreme Court explained that: "Congress . . . disclaimed any interest in promoting the development and utilization of atomic energy by means that fail to provide adequate remedies for those who are injured by exposure to hazardous nuclear materials."  464 U.S. at 257.

---

[21] *McKay* was decided after the Tenth Circuit's initial *Silkwood* decision, but before the Supreme Court had ruled.

As the Court knows, there was evidence here that similarly showed that Defendants violated ALARA.  The evidence showed, *inter alia*, that (1) by 1950, according to the Department of Energy, "[r]adiation protection scientists recommend[ed] that exposure be 'as low as reasonably achievable'"; P-1339 at ID06091 (DOE report); (2) one particle, one atom of plutonium, if inhaled, can cause cancer; Tr. 3639 (Goble), 5743-44 (Wing); (3) plutonium releases by Dow and Rockwell violated ALARA; Tr. 5287 ("one of the real failures at Rocky Flats is the failure to keep exposures, off-site exposures as low as reasonably achievable") (Cochran); Tr. 5322-28; PV-188 (Cochran).  Attached as Exh. 5 is Plaintiffs' opening brief in *Cook Appeal II*.  Pages 9-24 provides a detailed discussion of the trial evidence, with pinpoint citations, for the Court's convenience.

A particularly egregious example of Defendants' misconduct involved a waste site called the "903 Area," later the "903 Pad."  *See* Exh. 5 at 13-14 (discussing evidence at trial relating to the 903 Area).  Dow put thousands of drums of plutonium-contaminated waste outdoors, unprotected for up to ten years.  *E.g.*, P-223 (Dow document stating that more than 5000 drums of waste were put outdoors from 1958-68).  By 1959, Dow knew plutonium was leaking from these drums.  P-1309 at 000327; P-64 at 074889.  By 1962, Dow knew that "50-60 per cent of these drums [were] badly corroded"; several had "already spilled out on the ground" and "[u]nless these materials are disposed of in the very near future a serious contamination problem will develop." P-64 at 074928.  Yet for years Dow did virtually nothing.  *E.g.*, P-338 at US3086818.

After finally removing the drums, Dow left the plutonium-saturated, outside site unprotected and exposed for another year, despite knowing that plutonium would be blown off-site.  P-63 at 91182-83 (Dow document stating that Dow personnel were "fully aware of the

potential for materials to blow off plantsite" from the 903 Area, but upper Dow management

"was not excited enough about it to at least have some gravel brought in and put down."). As

one defense witness testified: "you folks who live here understand what these winters are like,

particular when you get high winds." Tr. 7751 (Weston).

The 903 Area represents an "egregious" and "remarkable example of an irresponsible

practice." Tr. 3025-40, 3043-57, 3060-66, 3072-76 (Budnitz) & PG-569, PG 502. Indeed, the

903 Area is "among the worst . . . if not the worst" example of reckless handing of radioactive

waste among all DOE nuclear sites across the country "because it went on for so long." Tr. 3076

(Budnitz). Plutonium released from the 903 Area contaminated, and remains throughout, the

Class Area. *E.g.*, P-149A; Tr. 3159-63 (Budnitz) & PG-613, PG-611.

As the trial court stated in *Silkwood*, "[s]urely defendants would not argue that punitive

damages would be inappropriate if a nuclear licensee knew of the time and manner of the

plutonium's escape, but did nothing to prevent it because the regulations did not require it." 485

F. Supp. at 584. Though Plaintiffs are no longer seeking to recover the punitive damage award

(of $200 million), the point remains: federal numerical standards (again, even assuming they

existed and had the force of law) were never intended to immunize a defendant, including for its

negligent or intentional[22] conduct, merely by claiming alleged compliance with such "numbers."

Defendants have argued previously that because it requires "reasonable" conduct,

ALARA may be entirely disregarded in favor of so-called "numerical standards." That is

incorrect. The Supreme Court in *Silkwood* expressly acknowledged the ALARA standard, 464

U.S. at 245, and requiring a defendant to act "reasonably" is ubiquitous in statutory and common

---

[22] *See* Jury Verdict Form, Doc. No. 2117, at 5, question 3 ("Do you find that the activity or activities causing the unreasonable and substantial interference by Dow were either 'intentional' or 'negligent' (*see Instruction Nos. 3.13 - 3.16)*?"; *id*. at 6, question 3 (same as to Rockwell).

law.[23]

Moreover, Defendants' off-site monitoring of plutonium was poor, incomplete, and riddled with flaws, and Defendants lost track of so much plutonium (more than 2600 pounds) and uranium (more than 650 pounds) (referred to as "material unaccounted for" or "MUF"), that off-site releases could be much higher than "official" estimates. *See* Exh. 5 at 18-20 (discussing trial evidence relating to flawed monitoring and MUF). There were major plutonium fires, for example, in both 1957 and 1969, that resulted in off-site releases,[24] but both times, fire cut the electricity to the plutonium air monitors, resulting in great uncertainties about the amount of plutonium released. Tr. 3178-79, 3204-07. *See also* P-1082 at III-5 (plutonium releases from the 903 Area remain "inherently uncertain" because of lack of reliable, contemporaneous data); Tr. 5579-97, 5606-36 (Cochran); Tr. 3677-78 (Goble); Tr. 3159-63 (Budnitz).

In addition, a scientific study of cancer incidence showed significantly elevated rates of cancer in off-site areas near Rocky Flats (including the Class Area), as compared to areas farther away, including 29% more lung cancer among women in certain time periods. Tr. 4808-43, 4862 (Clapp); PG-691 (study area); PG-800; PG-799 (results). These results are consistent with two prior cancer studies. Tr. 4800-05. The most likely explanation is plutonium exposures from

---

[23] *See, e.g.*, *United States v. Wheeler*, 776 F.3d 736, 740 (10th Cir. 2015) (approving jury instruction stating the "inquiry is how a reasonable person would have perceived the threat"); *People v. Coughlin*, 304 P.3d 575, 587-88 (Colo. App. 2011) (approving jury instruction addressing whether defendant "acted as a reasonable person would act in similar circumstances"); *People v. Duran*, 272 P.3d 1084, 1097 (Colo. App. 2011) (approving jury instruction regarding whether a person "reasonably believes that a lesser degree of force is inadequate, and has reasonable grounds to believe . . . that he . . . is in imminent danger"); *accord Woods v. Delgar Ltd.*, 226 P.3d 1178, 1183 (Colo. App. 2009) ("a legislative enactment can prescribe the standard of conduct of a reasonable person"); *Lombard v. Colorado Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 573 (Colo. 2008) ("statutes and ordinances can prescribe the standard of conduct of a reasonable person"); *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1174 (D.N.M. 2014) ("many statutes – as well as ordinary negligence law – hold people to the standard of a 'reasonable person'").

[24] *E.g.*, P-149A; P-338 at US3086854; P-533; P-1068 (report on 1957 fire); P-1069 (1969 fire).

Rocky Flats.  Tr. 4836, 5014.  The finding of excess cancers suggests that plutonium exposures "may have been greater" than previously estimated, "or that these exposures actually may be more carcinogenic to humans that we had thought."  Tr. 4947 (Clapp).[25]

As this Court concluded:  "[t]he jury heard evidence from which it could have concluded . . . that the environmental monitoring that Defendants conducted was not designed or implemented in a manner that would allow Defendants' compliance with environmental standards to be determined."  *Cook XIV*, 564 F. Supp. 2d 1189, 1213 (D. Colo. 2008).

Defendants say that the so-called "standards" they rely on are "materially the same as those" adopted by the Nuclear Regulatory Commission ("NRC") for licensed commercial nuclear operations, and "[b]oth sets of standards", Defendants say, "were promulgated pursuant to the same statutory authority under the Atomic Energy Act".  Defs' Standards Br. at 2.  Even assuming all this were true, however, the NRC has disclaimed any intent that its numerical exposure standards ought to be given preemptive legal effect.

The NRC *denied* a petition asking it to amend its regulations to provide "that the Commission's regulations must be violated before a *prima facie* case is pleaded on the issues of negligence and causation in any action to recover for injuries claimed to have resulted from exposure to ionizing radiation."  *In the Matter of A.N. Tschaeche*, 23 N.R.C. 461, 1986 WL 68730, at *1 (N.R.C. Apr. 23, 1986).  The NRC explained that the petition was contrary to the *Silkwood* decisions.  *Id*. at *2.

Moreover, the NRC explained that:

_____

[25] DOE has controlled much of the research into the health effects of plutonium exposure, but DOE's conflicting interests in protecting itself and its contractors while promoting nuclear energy and weaponry have compromised the scientific reliability of that research.  Tr. 5685-91, 5748, 5754-57, 5783-84 (Wing).

As the petitioner pointed out, the District Court [in *Silkwood*] considered the intent of the Atomic Energy Commission (AEC) in promulgating its radiation protection standards. *Because the AEC did not intend the standards to establish absolute safe levels of exposure below which no injury could occur, the court concluded that the standards were not dispositive of the issues of negligence or causation.* The petitioner urges that the NRC change the intent of its regulations to establish such absolute levels and thereby preclude a finding of negligence if a licensee complies with NRC standards. However, *the Commission has never taken the position that there is a level of radiation exposure below which one can conclusively presume that no injury will result. Rather, in view of scientific uncertainty about radiation exposure, the Commission has required its licensees to ensure that radiation exposures are kept "as low as is reasonably achievable." In short, the Commission lacks the technical basis to make the finding that the petitioner requests.*

1986 WL 68730, at *3.

Defendants cannot avoid the force of NRC's own position that it has no legal or scientific basis to render or recommend that its exposure standards are or should be preemptive.[26]

Defendants cite nothing remotely suggesting that the "purposes and objectives" of the Atomic Energy Act were to completely immunize companies for damages caused by releases of plutonium so long as releases to air and water were allegedly below ever-shifting numerical "standards."[27]

---

[26] *See also* P-1145 at 30 (United States General Accounting Office, *Nuclear Health and Safety: Consensus on Acceptable Radiation Risk to the Public is Lacking* (Sept. 1994) (stating that "federal radiation limits (however precise they may appear to be numerically) reflect a series of theories and assumptions about radiation effects. They are inherently imprecise, confronting fundamental scientific questions that may be answered only incrementally in coming years.").

[27] According to Defendants themselves, the so-called "permissible" amount in plutonium in air has been lowered by a factor of a *thousand* from its starting point till the time of trial. *See* Tr. 7606 (Frazier); PG-1003. This huge change echoes the NRC's own statement that "*the Commission has never taken the position that there is a level of radiation exposure below which one can conclusively presume that no injury will result. Rather, in view of scientific uncertainty about radiation exposure, the Commission has required its licensees to ensure that radiation exposures are kept 'as low as is reasonably achievable.'"* 1986 WL 68730, at *3. *See also* Tr. 7595 (Defendants' expert, Dr. Frazier, acknowledged that ALARA is founded in part on the recognition among scientists that there are many uncertainties about the exact health effects of exposure to radioactive materials).

19

### D.     Defendants' "Standards" Do Not Have the Force of Law

As discussed, even if Defendants' so-called "standards" had the force of law, they would not preempt Plaintiffs' state law claims.  But they do not have the force of law regardless.

According to Defendants' proposed jury instructions, the so-called "permissible concentration" of plutonium in air off-site from Rocky Flats from 1953-57 was 2.0 pCi/m³ (2 picocuries per cubic meter of air).  Defendants contended that this "permissible" level was lowered in 1957 to 0.2 pCi/m³; changed in 1963 to 0.33 pCi/m³; then to 0.04 pCi/m³ in 1985.[28] *See* Exh. 9.  These same numbers (for the period 1958-85) appear in Defendants' latest brief. *See* Defs' Standards Br. at 21 (Table 1).  We discuss these in turn.

### 1.     Defendants' "Standards": 1953-57

Defendants previously claimed that the so-called "permissible concentration" of plutonium in air off-site from Rocky Flats from 1953-57 was 2.0 pCi/m³, citing two documents attached to the July 1997 Auxier Affidavit, a 1951 letter and 1951 handbook.  *See* July 1997 Auxier Aff. ¶ 10 (discussing 1951 letter) (Attachment 2); ¶ 12 (discussing 1951 handbook) (Attachment 3). *See* SA382-87, SA388-422.  *See also* July 1997 Auxier Aff. at 6, Table 1 (listing alleged standards from 1951-1989).

At trial, Defendants used their Exhibit DX1638 to summarize what they claimed were the purported numerical "standards".  DX1638, however, was created by Defendants for trial. Remarkably, Defendants *objected* at trial to *Plaintiffs* introducing the *actual* seven documents that Defendants and their experts claimed *were* the actual "standards."  *See* Tr. 7591, 7645-7648. Defendants made no effort whatsoever to introduce these seven documents themselves into evidence.

---

[28] By time of trial, it had been lowered again, to 0.002 pCi/m³.  Tr. 7606 (Frazier).

In their most recent submission, however, Defendants omit any discussion of these two documents, drop any discussion of any "standards" allegedly applicable during the 1953-57 time period, and say the first so-called "standard" they are relying on was effective as of February 1, 1958. *See* Defs' Standards Br. at 21 (Table 1). Thus, Defendants have dropped (and now have waived again) any argument that any potentially applicable numerical federal plutonium "standards" existed before that time. Notably, the infamous 1957 plutonium fire occurred on September 11-12, 1957[29] – and so before *any* off-site plutonium standards allegedly even existed, according to Defendants. Where there are no alleged "standards," there can be no preemption.[30]

## 2.    Defendants' "Standards": 1957/58

Defendants at trial claimed that the so-called "permissible concentration" of plutonium in air off-site changed in 1957 to 0.2 pCi/m³, and their proposed jury instructions cited a portion of an AEC manual dated August 29, 1957, a document cited by Dr. Auxier. *See* July 1997 Auxier Aff. ¶ 21 (citing Attachment 8) (*see* SA423-432) (introduced by Plaintiffs at trial as P-1569). Dr. Auxier, in his affidavit, stated that the "standard" changed to 0.2 pCi/m³ on August 29, 1957. Auxier Aff., p. 6, Table 1. *Cf.* DX1638 (stating that "standard" changed in 1957).

The 1957 AEC manual, however, related only to employees on-site, not the public off-site. The document's "purpose" was "to specify minimum codes and standards that shall be used as basic guides to protection of AEC and AEC contractor personnel." *See* SA425. It says nothing about plutonium in soil, and as Defendants acknowledge, was not issued in accordance with the APA.

---

[29] *See* P-1068 (report on 1957 fire).

[30] *Cf. In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1004 (9th Cir. 2008) (no preemption possible where no federal standard is alleged to exist).

In Defendants' latest brief on "standards," Defendants include the August 29, 1957 document as an exhibit (Exh. 8), but Defendants now cite a brand new document. *See* Defendants' Exhibit 5.  It too is a portion of an AEC manual, though dated February 1, 1958. Defendants discuss this document in their brief, *see* Defs' Standards Br. at 10, and presumably it is the basis for the date appearing in Table 1 (at page 21 of Defendants' brief) stating that the "standard" of 0.2 pCi/m³ had an "Effective Date" of "2/1/58".  Defendants have not submitted any new affidavit discussing this document, however (and it is too late to do so), and it was not mentioned in, or attached to, the July 1997 Auxier Affidavit[31], nor in Defendants' proposed jury instructions.  Defendants cite no copy of it in the trial record.  Defendants cannot seek to rely on it now for the first time, nearly a decade after trial.

Even if the Court were to consider this document (it should not), the document says nothing about plutonium in soil, and as Defendants acknowledge, was not issued in accordance with the APA.  Nor does it propose to override ALARA.  Nor does it contain anything that suggests its intent or purpose is to completely displace and preempt state tort law.

Moreover, Defendants say (again, without citing to any trial testimony or evidence) that the "genesis" of the 1958 document was an "AEC Staff Paper 985" (Defs' Standards Br. at 10), which, in turn, discussed recommendations of the National Committee on Radiation Protection and Measurement (NCRP) and the International Commission on Radiological Protection (ICRP). *See* Defs' Standards Br. at 11.  According to Defendants (unsupported by citation to any testimony or evidence at trial), the AEC "formally" approved using the NCRP recommendations

---

[31] For reasons not explained, Defendants in their latest brief cite to a 1999 joint affidavit by Dr. Auxier and Dr. John R. Frazier.  *See* Defs' Standards Br. at Exh. 12.  This joint affidavit was not cited by Defendants in support of their proposed jury instructions (though it appears substantively similar to the July 1997 Auxier Affidavit).  Moreover, the 1999 Affidavit *also* cites to the August 29, 1957 AEC manual, *not* the one dated February 1, 1958.  *See* Defs' Standards Br., Exh. 12 at ¶ 59 ("AEC Manual Chapter 0550 was issued on August 29, 1957[.]").

in 1957, and Defendants in support cite a document dated November 4, 1957. *See* Defs'

Standards Br. at 12 (citing Exh. 9 to their brief). Defendants' own Exh. 9 states: "<u>Noted</u> that

AEC will continue its policy of keeping exposure to radiation at the lowest practicable level in

all cases[.]" Defs' Standards Br., Exh. 9 at 1 (emphasis in original). "As low as practical" is

equivalent to ALARA. *See* Tr. 7602. Thus, regardless of whether any numerical plutonium-in-

air standards existed for the 1957/58-1963 time period, Defendants also were bound to comply

with ALARA, which means that "numbers" were not intended to be, and were not, preemptive.

### 3.        Defendants' "Standards": 1963-85

Defendants at trial claimed that the so-called "permissible concentration" of plutonium in

air off-site changed in 1963 from 0.2 pCi/m³ to 0.33 pCi/m³. In their proposed jury instructions,

Defendants cited a portion of an AEC manual dated August 12, 1963, a document cited by Dr.

Auxier in his July 1997 Affidavit. *See* July 1997 Auxier Aff. ¶¶ 22-23 (citing Attachment 9 to

the Affidavit) (*see* SA433-469) (introduced by Plaintiffs at trial as P-1570). Dr. Auxier stated in

his affidavit that the "standard" changed to 0.33 pCi/m³ on August 12, 1963 and remained there

through August 4, 1985. *See* July 1997 Auxier Aff., p. 6, Table 1.

In their latest brief, Defendants cite this same document. *See* Defs' Standards Br. at 14

(citing Exh. 13, the same document as Attachment 9 to the July 1997 Auxier Affidavit (and the

same as P-1570)).

This document says nothing about plutonium in soil, and was not promulgated pursuant

to the APA. It also states that: "AEC operations *shall* be conducted in such manner as to assure

that radiation exposures to individuals and population groups are limited to the lowest practical

levels." *See* Defs' Standards Br., Exh. 13 at Chapter 0524-01/012.[32]  This document neither

provides nor suggests that the ALARA requirement may be disregarded in favor of numerical

guidelines.

     The document also says it is aimed primarily at on-site, plant personnel and while it says

exposures to a "suitable sample of an exposed population" should not exceed one-third of the

employee levels, the document nowhere explains what a "suitable sample" means or how it

should be determined.  *See* Tr. 7603.  Nothing in this document suggests it was intended to

supplant or preempt state tort law.

     In their latest brief, Defendants, as they did in their proposed jury instructions, say the so-

called "standard" remained 0.33 pCi/m³ from 1963 until it changed to 0.04 pCi/m³ on August 5,

1985.  *Cf.* Defs' Standards Br. at 21 (Table 1) to July 1997 Auxier Aff. at 6, Table 1; DX1638.

     In their latest brief, Defendants cite to some additional documents relating, they say, to

the 1963-85 period.  Because Defendants did not cite these documents in support of their

proposed jury instructions (nor do Defendants cite to any copies of them contained in the trial

---

[32] Defendants cite cases holding that the word "'shall' is 'language of an unmistakably mandatory character'".  *E.g.*, Defs' Standards Br. at 27 (quoting *Hewitt v. Helms*, 459 U.S. 460, 471 (1983)). A directive that Defendants "shall" comply with ALARA is no less mandatory and may not be disregarded.  *Cf. Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 877 (1991) ("Our cases consistently have expressed 'a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment.'") (citation omitted); *People v. Terry*, 791 P.2d 374, 376 (Colo. 1990) ("Courts should attempt to give effect to all parts of a statute, and constructions that would render meaningless a part of the statute should be avoided.").  Defendants also cite snippets of Dow and Rockwell contracts for operating Rocky Flats, *see* Defs' Standards Br. at Exhs. 19-24. Defendants' Exh. 19, at D 003960 [introduced by Plaintiffs at trial as P-1049] provides that Dow "shall take all steps and all precautions to protect health and to minimize danger from all hazards to life and property").  *See also* Defendants' Exh. 20 at 42 (Dow contract, similar); Exh. 21 at 47 (similar); Exh. 22 at 46 (similar); Exh. 23 at 55 (Rockwell contract, similar language); Exh. 24 at 123 (similar).  Notably, none of these contracts provides that Dow or Rockwell could ignore ALARA, nor that the so-called numerical "standards" Defendants rely on were, or were intended to be, preemptive of state tort law.

record), they should be disregarded.  Regardless, the first such "new" document, Exh. 14 to Defs' Standards Br., dated November 8, 1968 (*see* Defs' Standards Br. at 16), is very similar to Defendants' Exh. 13.  Like Defendants' Exh. 13, Defendants' Exh. 14 says nothing about plutonium in soil, was not promulgated under the APA, contains the ALARA requirement, and says nothing indicating it was intended to supplant state tort law.  *See* Defs' Standards Br., Exh. 14 at Chapter 0524-01/012.

The next "new" document is Defendants' Exh. 15, dated March 30, 1977.  *See* Defs' Standards Br. at 19.  Defendants did not cite this document in support of their proposed jury instructions, fail to cite a copy of it appearing anywhere in the trial record, and it should be disregarded.  Regardless, it says nothing about plutonium in soil, was not promulgated under the APA, contains an ALARA requirement, and says nothing indicating it was intended to supplant state tort law.  *See* Defs' Standards Br., Exh. 15 at Chapter 0524-01/011b.

Defendants next cite excerpts of two DOE orders from 1981.  *See* Defs' Standards Br. at 20 (citing DOE Order 5480.1 and DOE Order 5480.1A) (attached as Exhs. 16 and 17, respectively, to Defs' Standards Br.).  These same two DOE orders were cited by Defendants in their proposed jury instructions, and in the July 1997 Auxier Affidavit.  *See* July 1997 Auxier Aff., ¶¶ 24-25, citing Attachments 10-11 (SA470-545, 546-580) (introduced by Plaintiffs at trial as P-1571 and P-1572, respectively) (complete copies).

The two documents appear substantially the same (and so our discussion here applies to both).  DOE Order 5480.1A provides that: "If there are conflicts between prescribed standards in this chapter, or between this chapter and other chapters of this Order, the standards providing the greater protection shall govern."; and "In keeping with Department of Energy policy on lowest practicable exposures, exposures to the public shall be limited to as small a fraction of the

respective annual dose limits as is reasonably achievable."  *See* SA551, 560; P-1572.  The former

language ("If there are conflicts between prescribed standards in this chapter, or between this

chapter and other chapters of this Order, the standards providing the greater protection shall

govern.") was *left out* of the excerpt Defendants attached as Exh. 17 to their latest brief.  These

orders also say nothing about plutonium in soil, were not promulgated under the APA, and do

not suggest they were intended to supplant state tort standards.

### 4.    Defendants' "Standards": 1985

Defendants at trial claimed that the so-called "permissible concentration" of plutonium in

air off-site changed on August 5, 1985 from 0.33 pCi/m³ to 0.04 pCi/m³.  In their proposed jury

instructions, Defendants cited a DOE memorandum dated August 5, 1985, a document cited by

Dr. Auxier in his July 1997 Affidavit.  *See* July 1997 Auxier Aff. ¶ 27 (citing Attachment 12 to

the Affidavit) (*see* SA581-584) (introduced by Plaintiffs as P-1573).[33]  Defendants cite this same

document now, *see* Defs' Standards Br. at 21 (citing Exh. 18 to their brief) (copy of this same

DOE memorandum).

This memorandum attaches an excerpt from guidance from the NCRP.  *See* SA584.  The

NCRP excerpt states that it provides "recommendations" for "proposed rules" being considered

by the EPA, and states that a "draft" that is "still unpublished" includes the 100 mrem/yr

recommendation, an exposure level "considered to be associated" with a lifetime cancer risk of

"about one in a thousand."  *Id.*  It then states: "These recommendations on limits are only part of

a total system of dose limitation which must also include justification and considerations of

ALARA (As Low As Reasonably Achievable."  *Id.*

---

[33] The document actually discusses an "interim standard" of 100 mrem/yr "for DOE
environmental activities", but Defendants' own expert converted this to 0.04 pCi/m³.  *See* Tr.
7605-06, 7632 (Frazier).

Nothing in the memorandum addresses plutonium in soil, and Defendants do not contend it was issued pursuant to the APA.  Nor does anything in the memorandum suggest or state it was intended to preempt state tort law.

### 5.   None of Defendants' "Standards" was issued pursuant to the APA

Defendants admit that none of the so-called "standards" they rely upon was issued pursuant to the APA after notice and comment rule making.  Defendants cite a provision of the APA that provides: "This section applies … except to the extent that there is involved (1) a military or foreign affairs function of the United States." 5 U.S.C. § 553 (a)(1).  Defendants say that "it is hard to imagine something more clearly a 'military function of the United States' than designing and manufacturing nuclear weapons."  Defs' Standards Br. at 25.

This rhetoric is no substitute for precedent, however, and Defendants cite none on point. Defendants are claiming that their assorted documents pertain to the conduct of civilian contractors (Dow and Rockwell) and the health and safety of off-site, civilian populations. Defendants cite no case supporting their argument that under these circumstances, the APA does not apply, and no case whatsoever holding that any of the so-called "standards" they invoke is exempt from the APA.

Defendants instead cite *City of New York v. Permanent Mission of India to the United States,* 618 F.3d 172 (2d Cir. 2010) (Defs' Standards Br. at 24).  But that case construed the "foreign affairs" exception, not the "military function" exception, and the Second Circuit both acknowledged and "reaffirm[ed]" its earlier precedent that exceptions to the APA "*should be narrowly construed and only reluctantly countenanced*."  618 F.3d at 201 (citation omitted).

Even if one can characterize Rocky Flats as having had a "military" purpose, the issue here is not whether AEC or DOE "standards" *about how to put together nuclear bombs* needed

to be published pursuant to the APA for notice and public comment. But Defendants are relying on so-called "standards" that relate, or so Defendants claim, to civilian populations off-site. Yet Defendants cite nothing supporting their argument that these "standards" were exempt from the APA.[34]

### 6. There are no plutonium in soil standards.

Defendants have never contended that any federal plutonium in soil standards have ever been promulgated, whether pursuant to the APA or otherwise. Yet this case is about plutonium in soil - plutonium released by Defendants from Rocky Flats that has contaminated the Class Area. Neither DOE nor Defendants have ever lifted a finger to remediate this plutonium contamination, and as Dow admitted, once soil becomes contaminated with plutonium, "*it is a physical impossibility to remove it all*." P-1118 at 000841.

Given that there are no federal plutonium-in-soil standards, Defendants' entire preemption argument fails for that reason alone. Defendants previously have tried to dismiss this fatal obstacle to their argument as "semantics", arguing that the risk to Class members is from plutonium in air, and that therefore their so-called "standards" still apply. But if the AEC or DOE had ever actually concluded it was a simple "semantic" matter to convert their so-called plutonium-in-air "standards" to plutonium *in soil* standards, they could have issued such soil standards at any time over the last 60 years. Neither AEC nor DOE has ever done so. This gap cannot be filled by Defendants' counsel arguing about how to apply so-called plutonium in air "standards" to the state tort of nuisance founded on plutonium contamination of off-site soil where people live, work, and play.

---

[34] Defendants suggest that AEC/DOE was free to issue "standards" in any fashion it wished. Defs' Standards Br. at 25.

IV.     <u>**CONCLUSION**</u>

For all the reasons stated above, and in light of the entire record in this case, Defendants' latest preemption argument (and motion) should be rejected.


Dated:  October 23, 2015                    Respectfully submitted,

                                            */s/ Merrill G. Davidoff*
                                            Merrill G. Davidoff
                                            David F. Sorensen
                                            Jennifer MacNaughton
                                            Caitlin G. Coslett
                                            BERGER &MONTAGUE, P.C.
                                            1622 Locust Street
                                            Philadelphia, PA 19103
                                            (215) 875-3000

                                            Gary B. Blum
                                            Steven W. Kelly
                                            SILVER & DeBOSKEY, P.C.
                                            1801 York Street
                                            Denver, CO 80206
                                            (303) 399-3000

                                            Louise M. Roselle
                                            Paul M. DeMarco
                                            Markovits, Stock & De Marco, LLC
                                            119 E. Court Street, Suite 530
                                            Cincinnati, OH 45202
                                            (513) 651-3700

                                            Attorneys for Plaintiffs and the Class

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 23rd day of October 2015, he caused the foregoing submission to be served via the Court's ECF system on all participating counsel.

_/s/ Merrill G. Davidoff_
Merrill G. Davidoff
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000