# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181(JLK)

MERILYN COOK, et al.,

    Plaintiffs,

vs.

ROCKWELL INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY,

    Defendants.

_____

REPORTER'S TRANSCRIPT
TRIAL TO JURY
VOLUME 1

_____

      Proceedings before the HONORABLE JOHN L. KANE, JR.,

Senior Judge, United States District Court for the District of

Colorado, commencing at 9:00 a.m., on the 6th day of October,

2005, in Courtroom A802, United States Courthouse, Denver,

Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Therese Lindblom, 901 19th Street,
Room A259, Denver, Colorado, 80294, (303) 628-7877

Page 239

1    rendered by you against Dow or against Rockwell that the

2    federal government will have to pick up part or all of the tab.

3           Now -- so I think the question the Court and

4    Mr. Bernick and I are interested in is, if, in fact, the

5    federal government, because of its oversight of the plant and

6    ownership of the plant, had to pay for any judgment against Dow

7    and Rockwell, would that make any of you either more likely or

8    less likely, assuming that the facts were the same, to find

9    either in favor of the defendants or against the defendants?

10   Am I still confusing you or --

11   A.  No.

12   Q.  Have I helped you --

13          THE COURT:  What he wants to know is, would it make a

14   difference to you if the Department of Energy gets stuck with

15   the bill, if you should make an award?  Would that influence

16   you in any way?

17          (No response.)

18          Is that a fair summary?

19          MR. DAVIDOFF:  That is -- Your Honor, if that's the

20   answer -- I think I see everybody --

21          PROSPECTIVE JUROR:  I have a question about that.

22          MR. DAVIDOFF:  Question.

23          PROSPECTIVE JUROR:  If that's the case, why aren't

24   they also here participating in the trial?

25          MR. DAVIDOFF:  I wish I could explain the legalities

Page 240

1    of that, but I'm going to fob that one off to Judge Kane.

2              MR. BERNICK:  If I could follow up.

3              THE COURT:  All right.

4    BY MR. BERNICK:

5    Q.  Let's make this hard again.  Hard again.  And I want to go

6    back to what Mr. Davidoff said about the insurance company.  So

7    you've got the car accident, and the guy who is driving the car

8    has got insurance, and the case goes to court and goes to trial

9    before a jury.  The driver drove the car poorly, slammed into

10   poor Ms. Walters, and Ms. Walters sued, and it goes to the

11   jury.  Driver versus victim.  That's how it goes.  And in most

12   cases, you never see -- you will never see the insurance

13   company.  Okay.  Sometimes you'll expect there is insurance

14   there, but you won't be told that.

15             This case is different.  In this case, because it's a

16   government-owned facility, the Court has decided that the

17   conduct of the DOE, would be relevant to this case, and the

18   indemnity would come before you.  This case is somewhat

19   different.

20             Well, I say, how does it work?  Go back to the

21   insurance example.

22             Oftentimes a defendant will be represented by their

23   own lawyers, and the insurance company will maybe one day pay

24   the lawyers' bills and pay any verdict.  So the insurance

25   company can be there, as an insurance policy, but the defendant

Page 241

1    still defends itself with the defendants' own lawyers.

2            So I'm a private lawyer, from a private law firm.

3    I've worked for Dow Chemical for years and years and years in

4    many matters throughout the country.  Our firm has also done

5    work for Rockwell.  We consolidated the defense because they

6    didn't want to pay two bills.

7            I represent Rockwell, and I represent Dow.  I do not

8    represent the Government.  I do not represent the Department of

9    Energy.  They're represented by the Justice Department, and the

10   Justice Department is not going to be here in this case as a

11   party, and the Department of Energy is not going to be here as

12   a party, and the government is not going to be here as a party.

13   Why?  Because they're not a party, no suit has been filed

14   against the government or the Atomic Energy Commission, which

15   is the predecessor of the DOE, or the DOE, they just sued Dow

16   and Rockwell, but now it's pretty messy --

17           MR. DAVIDOFF:  Your Honor, I was upbraided for just

18   making references to my case --

19           MR. BERNICK:  I'll go on.

20           THE COURT:  Okay.

21           MR. DAVIDOFF:  That's all I've been hearing.

22           THE COURT:  Wait a minute.  Go ahead and make your

23   point.

24   BY MR. BERNICK:

25   Q.  Now we get to the hard question which is you now know why

1   it is that private lawyers are here representing these two

2   companies.  You now know that the government is in a sense an

3   insurance policy.  Also the Government's conduct is going to be

4   a question here.  But what I'm focused on, the question to you

5   is this:  Is, does the fact that the government may have to

6   pay, does it influence, will it influence how you determine

7   whether my clients, Dow and Rockwell, are liable?  That is,

8   because ultimately the government may pay, will that make you

9   more or less likely to say, oh, I can go ahead and find

10  liability under the law for Dow and Rockwell?  Just think about

11  that a little bit.

12  A.   I have another question, is there also a possibility that

13  the government would not be --

14       MR. DAVIDOFF:  Can we pass the microphone back because

15  she's asking a good question.

16  A.   So is there also a possibility that the government would

17  not pay at all but only Dow and Rockwell will pay since they

18  are the people in actuality being sued, as the named people

19  being sued?

20  BY MR. BERNICK:

21  Q.   The answer to the question is that the government does not

22  have to make a commitment in advance to pay for the outcome of

23  the trial.  They don't have to do that.  And, in fact -- I

24  won't get into the law, they don't have to do that.  Obviously,

25  I would represent to you -- I'm going to tell you straight up,

1   my clients are sure counting on it.  We are here -- the

2   indemnity is part of the government contract.  The government

3   contract is the contract pursuant to which Dow and Rockwell

4   came on the plant site and operated the plant.  It's all one

5   contract.  It has an indemnity provision, so this is really

6   part of the contractual relationship.  It's not especially done

7   for the case.  It's part of the contractual relationship.  So

8   there is a contract out there.

9           And if, in fact, we are held liable, we are clearly

10  going to invoke that contract.

11          Now, will the government pay, when will they pay, will

12  there be an issue about it, we don't know.  We're not counting

13  on there being an issue about it.  You shouldn't assume, I

14  think, probably, that there will be an issue about it.  But

15  it's not a done deal.  That's why I want to get back to the

16  basic question that I asked, it's kind of like -- this is why

17  it's a hard question.  If you knew the insurance company was

18  here standing behind the person who was the defendant in the

19  case in a car accident, if you knew the money was there, would

20  that make you more or less likely to find in favor of the

21  plaintiff?

22          Would that make a difference to any of you, make you

23  say the plaintiff doesn't have to prove up their case or I

24  don't have to weigh and follow the law precisely for the

25  plaintiff because the insurance is there or may be there?

Page 244

1    Anybody who believes this?  Really, really important.  Very

2    tempting, geez, United States Treasury is behind this case,

3    say, well, people may have been hurt, may not have been hurt.

4    I'm going to find liability because the government will

5    probably pay.  That's what we're getting at.  That's the

6    question that we'll be asking.

7         And I don't want you to answer that question, yeah,

8    I'll -- because I want to start this trial, I want to get this

9    case done just like Mr. Davidoff and the Court do, but I'm

10   obliged, in the same way that the Court and Mr. Davidoff are

11   obliged, to find out if the prospect of the United States being

12   behind this case, in the sense of being financially responsible

13   for it, will lessen or change in any way your adherence to the

14   law, including what the law requires that you find in order to

15   find for or against the defendants.

16        Is that clear?  Anybody who doesn't understand the

17   question or has further questions about it?

18   A.  I think in a sense that's clear, the insurance part is,

19   more to me, because if you ever go to file something on

20   insurance is involved, yes, they could contest whether or not

21   they should pay or not.  So in this case you're saying the

22   federal government could also contest, and it's not our job to

23   decide that.  Our job is to decide who is a nuisance.

24        You know, the defendants say these people,

25   Dow/Rockwell, presented a nuisance to them and had property

Page 245

1  damage and something of that sort.  We have to decide whether

2  that's true or not true, essentially.

3  Q.  If you think about it, plaintiff, insurance company, what

4  you have to decide in this case according to the Court's

5  instruction is plaintiff, defendant, plaintiff class, versus

6  Dow Chemical and Rockwell, that's what you'll be asked to

7  decide, knowledgeable about the fact that the government is

8  there as a potential indemnitor and as an actor.

9        Mr. Davidoff said he's going to try to show that the

10 government was complicit or did wrong.  You're going to hear

11 all of this about the government.  And all that I'm asking you

12 is, whether the fact of that indemnity, of that money

13 potentially being there, is going to influence the way that you

14 decide plaintiff versus defendant.

15 A.  That's one thing I don't understand is like if the

16 government could -- if he says the government was complicit in

17 doing wrong, and, of course, they're not here to defend

18 themselves, obviously you would have to act on their behalf at

19 that point; is that correct?

20 Q.  No.  All I'm going to do in this case is represent.  I got

21 only one obligation.  God bless his heart, as difficult as it

22 is, keeping track of the different parties, my obligation is to

23 my company clients.  I have no obligation to the Department of

24 Energy or Atomic Energy Agency which preceded it, to cooperate

25 with them in the defense of the case; in other words, these

1   companies have been sued, they have an obligation to cooperate

2   with the government.  The government has an obligation under

3   the contract to pay the tab if there is an adverse judgment.

4        But my obligation being here is the same, in a sense,

5   your obligation, it is the obligation to focus on the evidence

6   and the plaintiff and the defendant in this case, and the

7   indemnity is what we're really asking.  Will the fact of that

8   money potentially being there, will it affect the way that you

9   view the relationship between plaintiff and the defendants, the

10  law would be as fairly applied?

11       And -- you're asking all the right questions, but

12  can -- I know -- I see -- does anybody else have questions or

13  comments or feelings about this?  Because this is important.

14  We're obviously taking up your time at the end of the day.

15  This is a matter of vital importance, because it affects --

16  what the insurance company would say is, I'm irrelevant until

17  you all decide liability.  Is there liability?  That's probably

18  what the government would say, I'm irrelevant.  You ought to

19  first decide whether there is liability.  Mr. Davidoff will

20  present evidence saying the government itself was a problem.

21  I'm here representing the company, so I'm focused on whether

22  what you have heard is going to affect the way you look at

23  our --

24  A.  The only other thing I had thought of is that if he

25  represents -- if he says that the government caused a problem,

1    okay, and somehow the government could be telling Rockwell or

2    Dow's people to do something wrong, and Rockwell and Dow might

3    be telling them back, we shouldn't be doing that, but the

4    government forced them to do that or something like that, get

5    all muddled or anything.

6    Q.   That's something --

7    A.   That's --

8    Q.   That's something you will hear about.  The interaction

9    between the contractors and the government is something that

10   you will hear about.  And there is no dispute in this case.

11   But that when you judge the liability of the contractors, you

12   have to consider the context in which they're operating.

13        So if it comes out that the contractors were told, you

14   must do something, well, that would bear upon whether they were

15   negligent or whether they were intentional, and you're going to

16   hear that evidence.

17        The question of whether that should be considered is

18   not really what we're getting at.  What we're getting at is the

19   financial relationship, and the fact the government is

20   obviously a very solvent organization, the question is, does

21   the financial relationship influence your views?

22        Can we go down and ask people one by one whether

23   that's an issue?

24        MR. DAVIDOFF:  Yes, although, Your Honor, I think

25   there is some things that counsel said that I'm going to ask

1   the Court to correct.  I'm not going to correct them

2   unilaterally, but I may ask the Court to correct them.

3           THE COURT:  All right.

4           MR. DAVIDOFF:  I have no objection to each and every

5   juror being asked the question.

6   BY MR. BERNICK:

7   Q.  The question is, will the financial relationship which

8   you've now heard about influence your deliberations -- your

9   thinking about the evidence and the law in deciding the

10  liability between the plaintiff class and the defendants, Dow

11  and Rockwell?  Will it influence your views or not?

12          Start --

13  A.  No, Loretta Gussenbauer.

14  Q.  No.  From -- speak your name for the court reporter.

15  A.  No, Steve Gurian.

16  Q.  No?

17  A.  No, Bruce Blasy.

18  A.  No, Claudia Gidley.

19  A.  No, Linda Mroz.

20  A.  No, Teresa Youngquist.

21  A.  No, no, Dario Katardzic.

22  A.  No, Margaret Moreno.

23  A.  No, Monica Hughes.

24  A.  No, Paula La Bell-Dicamillo.

25  A.  No, Judith Laska.

 1    A.    No, Sarah Rounds.

 2    A.    Teresa Thomas, no.

 3    A.    Catherine Walters, no.

 4    A.    Edward Vaughn, no.

 5    A.    Michael Moore, no.

 6    A.    David Hepburn, no.

 7    A.    Randy Wolf, no.

 8              MR. DAVIDOFF:  Your Honor, I hate to keep the jury --

 9              THE COURT:  Go ahead.  I think we've got a chance of

10    getting a jury if we stay a few minutes late.

11              Please forgive me, ladies and gentlemen.

12              MR. DAVIDOFF:  I do want to raise the one issue, I

13    don't want to say it in front of the jury.

14              (Hearing at the bench.)

15              MR. DAVIDOFF:  Your Honor, obviously counsel is going

16    to try to argue that there is a distancing between Dow and

17    Rockwell and DOE.  I have a completely contrary view.  But I

18    think the jury should be told that DOE was afforded the

19    opportunity to take over the defense of this case.

20              MR. BERNICK:  Absolutely not.

21              MR. DAVIDOFF:  Excuse me, if I could finish -- you

22    know, if you want to --

23              THE COURT:  Just a minute.  Go ahead.

24              MR. DAVIDOFF:  DOE was afforded the opportunity to

25    take over the defense of this case, and they're much involved

1   BY MR. DAVIDOFF:

2          It is my privilege to give the beginning part of

3   the opening statement, and a considerable part of the end.

4   My name is Merrill Davidoff from Philadelphia.  We met

5   during the voir dire.

6          And I will be telling you about this case, about

7   the Rocky Flats Nuclear Weapon Plant which contaminated an

8   entire neighborhood.  This neighborhood that you see up

9   here on the screen and we also have a board back here at

10  the back of the jury room for your convenience.

11         I would like to start with some basics of what we

12  are going to try to do this morning and maybe a little bit

13  of what we are going to try to do in the trial.

14         Let me start, first of all -- if my voice drops and

15  you can't hear me, would you please let me know?  It

16  happens to me a lot.  I am from Berger & Montague.

17  Mr. Nordberg, Peter Nordberg is with my firm.  You will

18  see him in and out of the courtroom during the trial.

19         Mr. Sorensen, Mr. David Sorensen is also with my

20  firm.  You will see him in and out of the courtroom during

21  the trial.  Louise Roselle is co-counsel from Cincinnati

22  during this trial.  And Jean Geoppinger from -- her firm

23  is here.  You may see her in the courtroom from time to

24  time.

25

1          Also you may see Gary Blum from Silver & DeBoskey,

2     and Holly Shook who you will see a lot, I think, from

3     Silver & DeBoskey here in Denver.  I would like to

4     introduce to you to Mark Signorelli, because he is the

5     only one who can possibly make this technology work.

6          I don't think we will have the most fancy

7     technology in the trial.  I think you will see fancier

8     technology from the other side, but we will try to make

9     the evidence as understandable as we can.

10          Ms. Roselle and I will probably be here the most.

11     We pretty much don't know what to do with ourselves

12     outside of the courtroom.

13          I also want to introduce the class representatives,

14     who I think you may have met at voir dire.  This is Sally

15     Bartlett, and Dick Bartlett, her husband of, I believe, 47

16     years.  Merilyn Cook.  Trudy Babb, she and her -- she is

17     the widow of Lauren Babb, who was former mayor of Golden

18     Colorado who died unfortunately during the pendency of

19     this lawsuit.  And Mr. Bartlett was the mayor of Arvada,

20     Colorado back in the '60s.  You will hear about that.  And

21     Bill Schierkolk is another class representative who is

22     here.

23          I think you will see the class representatives not

24     only on the witness stand, but probably during the course

25     of the trial.  They represent the neighborhood property

1    owners in this neighborhood.  These defendants, of course,

2    are Dow and Rockwell about whom you will be hearing a

3    great deal.  And can all of you see this writing?  It is a

4    little faint over here.

5           Of course you will be hearing about the Department

6    of Energy.  The U.S. Government Department of Energy.

7    Their presence in this courtroom, they are indemnitor.

8    They are like the insurer for Dow and Rockwell, because

9    Dow and Rockwell ran a Government plant.

10          The case has been pending for many years, but we'll

11   have an advantage because 16 years will give us a

12   perspective.  We are going to have to go back, for the

13   most part, to the way it was in 1989 and 1990, which was a

14   very long time ago.  And in some cases, as you will hear

15   from Ms. Roselle, how it was back in the 1950s and even

16   earlier when Dow started running this plant.

17          Our job is to try to outline in this opening

18   statement what the plaintiffs believe the evidence in the

19   trial will show.  Now as you heard Judge Kane say in the

20   instructions, national security is not the issue in this

21   trial.  Nobody disputes that the United States military

22   and defense effort had an only obligation of military

23   necessity to produce atom bombs and produce atom bomb

24   parts.

25          What is at issue in this trial is intentional

1    entire neighborhood just northwest of Denver with

2    plutonium and other dangerous radioactive substances.

3    They lied about it and they covered it up for 37 years.

4           One building at the plant, the 776 and 777 building

5    was called by the national television media, five years

6    after the FBI raid in 1994, the most dangerous building in

7    America.  This was the 776 and 777 building, and you will

8    hear a lot about it during this trial.

9           This suit is brought by the plants' neighbors.

10   Their property was worth less because it was contaminated

11   with plutonium, one of the most dangerous substances known

12   to man.  For 50 years the defendants, Dow and Rockwell,

13   and after they left, the Department of Energy, repeatedly

14   told lies and half truths to their neighbors about what

15   really happened at the plant.

16          They covered up how much plutonium may have been

17   released.  It was, and still is, a huge cover up.  What we

18   will share with you and learn about this morning an over

19   the next few weeks, is the history of Rocky Flats and the

20   contamination that it caused.

21          The front range of the Rocky Mountains is one of

22   the most beautiful, desirable locations in America.  Clear

23   blue skies.  I am told there are 300 days of sunshine a

24   year, even though there hasn't been in the last couple of

25   days.  Breathtaking mountain views.

1        You will hear evidence in this trial of a lot of

2   name changes.  You have initials, spin, double talk.  When

3   things at Rocky Flats became embarrassing, names were

4   changed.  For example, AEC, Atomic Energy Commission, the

5   name was changed to Energy Research & Development

6   Administration, which conveniently took the name in common

7   out of it, and letters to the Department of Energy.

8        It is even worse at the Rocky Flats plant.  The

9   Rocky Flats plant started as the Rocky Flats Nuclear

10  Weapons Plant.  After the FBI raid, and what you will

11  learn about the criminal pleas, the grand jury

12  investigation, the prosecutor charges against Rockwell, is

13  they changed the name to the Rocky Flats Environmental

14  Technology Center.

15       And now, to try to convince the public that it is

16  safe and peaceful and serene, they have changed it to the

17  Rocky Flats National Wildlife Refuge, where they are going

18  to try to promote the myth that it is safe for animals and

19  children to roam and play.

20       This was done by the Department of Energy.  The

21  Government agency that over sees the plant for the U.S.

22  Government to cover up the consequences.  Dow and

23  Rockwell's wrongful conduct.  Why would DOE want to cover

24  up?  Because they were part of the negligent and wrongful

25  conduct.

1          DOE should have made sure that Dow and Rockwell

2    obeyed good waste practices and the environmental laws.

3    Instead, the DOE helped cover up violations of the law.

4    Instead of blowing the whistle on Rockwell we believe the

5    evidence will show DOE was part of the problem that caused

6    the FBI to raid a U.S. Government owned plant.

7          The plant is now called a wildlife refuge.  A fancy

8    and phoney name so DOE did not have to remove all of the

9    plutonium that was buried there.  You will hear

10   evidence -- I will see if I can figure out how to work

11   this little pointer here.

12         You will hear evidence the top 3 feet is subject to

13   a limit that was fought about originally, they wanted this

14   limit to be 13 times higher.  You will hear evidence the

15   next 3 feet is subject to a limit that actually is five

16   times as high as the Nevada atomic bomb test site, or

17   parts of it, where atom bombs were tested.  And you will

18   also hear, below 6 feet of top soil, where much plutonium

19   is still likely to be located, there is no limit

20   whatsoever.

21         And as Ms. Roselle will explain to you when she

22   discusses the science, this plutonium will remain in the

23   soil for many, many thousands of years.

24         The evidence will be that now that the plant is

25   torn down, growth and development in this neighborhood has

Page 492

1    the two checks.  There was another check for $2,000,000,

2    but Rockwell paid at that time the first or second largest

3    environmental fine in U.S. history.

4         There are three major issues during the 37 years

5    that Rocky Flats operated, that you will see from the

6    evidence, over and over.  Sloppy operations with no

7    respect for the dangers of plutonium, awful waste storage,

8    they were extremely reckless in handling nuclear waste,

9    they piled and buried it everywhere, and lying to the

10   neighbors and the public.

11        And, finally, after the 37 years, the FBI raid and

12   the plant shut down, you will see that the Department of

13   Energy, which is on the hook for Dow and Rockwell's

14   damages, continued the pattern.  The DOE, instead of

15   coming clean about Rocky Flats, promised the United States

16   public that it would come clean, but then it did the

17   following:

18        It continued to deceive the public as to what its

19   contractors had done.  It used its national security, top

20   secret rights, to conceal from you and from this court

21   massive amounts of evidence.  Why?  To spare itself public

22   embarrassment and to defeat the damages in this and other

23   cases.  Why?  The logical conclusion, we will argue to you

24   from the evidence, is because the DOE, under its account

25   with Dow and Rockwell is probably responsible to pay the

1    damages to the plaintiffs and the class members.

2         This case is the civil case.  13 years after the

3    criminal case, for the neighbors, this is the lawsuit to

4    compensate the innocent neighbors for damages caused by

5    plutonium in their backyards.  This is the only

6    opportunity for them to get compensation for that.

7    Compensation for their inability to get full value for

8    their properties and to get full use and enjoyment of

9    their properties.

10        The evidence will show these individuals were

11   harmed by reckless and intentional activities of Dow and

12   Rockwell.  This is their only day in court.  We will be

13   asking you to restore at least some of these neighbors'

14   rights that Dow and Rockwell stole from them.

15        Ladies and gentlemen, we have a complicated case to

16   show you in the weeks ahead.  We have many witnesses who

17   are going to be testifying.  They are going to have to

18   testify, in some cases, out of order or by depositions

19   where their testimony is read or shown by videotape.  And

20   because that's going to be a little disjointed since we

21   don't control most of the witnesses, we are going to try

22   to make a lengthy presentation, and if we start to bore

23   you, we may cut it down a bit.

24        Ms. Roselle and I will be dividing this

25   presentation and outline of what the evidence will show,

1    Protective measures used in the atomic energy program have

2    been so effective that the Commission's safety record is

3    better than in industry generally.

4          This was the first of many lies, misstatements, and

5    incorrect statements that would be told to the public

6    about Rocky Flats and the Atomic Energy Commission

7    programs over the next 50 years.

8          The site of Rocky Flats was a bad site from the

9    beginning.  They thought that the wind would blow the

10   pollution away from downtown Denver, but they were wrong.

11   Rocky Flats is right here in the corner here, in Jefferson

12   County.  It is this little thing right here on the map.

13   This is downtown Denver.  And the winds go southwest

14   towards Denver.

15         So from the beginning, they sited the plant in a

16   bad location.  They also knew that the plant was supposed

17   to be at least 25 miles away from a major population area

18   and, in fact, it was only 16 miles northwest of Denver.

19   And they also knew that the plant was supposed to be

20   larger than what they actually made the plant site.

21         At Hanford, Washington where they actually produced

22   plutonium for the bombs for World War II, the plant there

23   is over 500 square miles.  So the Atomic Energy Commission

24   was familiar with this concept that you want to keep the

25   plutonium as far away from the public as you can.  The

Page 538

1    evidence.  They had already confirmed it, yet this is what

2    Dow told the public.  They not only lied to the public,

3    but they tried to discredit a scientist with a long and

4    noble career.

5         You are going to hear a lot of evidence in this

6    case about lying.  Because of the shroud of secrecy, the

7    defendant and the Government were able for decades to get

8    away with whatever they wanted to say and without anyone

9    being the wiser.  And these half truths and lies were no

10   accident.  It was a conscience decision to do this.

11        In fact, you will see evidence where they wrote

12   down how they manipulated the facts that they told the

13   public.  You may see them continue to do this in this

14   courtroom.  Every memo or report that Dow or Rockwell

15   wrote that was available to the public had three themes.

16        Number one, never tell how much plutonium has been

17   released.  You will always talk in terms of concentration.

18   Picocuries per gram of soil.  Picocuries per litre of

19   water.  They never told total amounts.

20        Two, always say that the amount released is low

21   compared to standards.  And, three, never draw

22   conclusions.  Always say the studies are still ongoing.

23   Now, Dow knew that it was -- that the public was being

24   misled, and I am going to show you this document and

25   explain it to you.

Page 539

1           On February 18, 1970, there had been an Atomic

2      Energy Commission press release and an article that ran in

3      the Denver Post.  And the article was based on the press

4      release.  And Dow wrote one of the managers wrote a letter

5      on February 20, 1970, to another manager at Dow, where

6      they were talking about how this article in the Denver

7      Post, which was based on the news release, was incorrect.

8           And I have just excerpted some of the things that

9      were in the Dow letter.  The managers said the content of

10     the third paragraph is misleading to anyone not totally

11     familiar with the facts.

12          The third paragraph, under the sub-heading lung

13     hazard, is totally inaccurate.  The first paragraph, under

14     the 1957 fire, leaves many questions unanswered.  The

15     second paragraph under the 1957 fire is really bad.

16          The second paragraph under the heading fell on roof

17     is again misleading, even though not inaccurate.  So not

18     only were they manipulating what the public knew, they

19     knew that the public was being misled.

20          Okay.  In 1973, there was an episode involving

21     tritium.  Tritium is another radioactive material that

22     came to Rocky Flats, and it came to Rocky Flats in

23     material brought back for recycling.  To reclaim the

24     plutonium, these materials were brought back to Rocky

25     Flats for recycling, and came from all over the weapon

Page 570

1          (Video played.)

2          MR. DAVIDOFF:  This is -- we are stopping this for

3     a second.  This is a huge building and structure that was

4     built after Rockwell was fired to bring in the saltcrete

5     and to bring in the pondcrete, secure it, and store it

6     indoors, instead of outdoors on the football fields, where

7     it had been, the so-called football fields where it had

8     been stored.

9          (Video played.)

10         MR. DAVIDOFF:  And again, that was just No. 8 from

11    the 750 area, one of the tents that was set up during the

12    early years after the Rocky Flats plants was closed.  We

13    finally found this reference.

14         This is from the GAO report that was done for

15    Congressman Skaggs.  Public perception of the Rocky Flats

16    plant as a storage site for radioactive waste will be

17    difficult to dispel with two football-field-sized pads

18    full of waste.

19         Water runoff was the last of what we called the

20    four plagues that that too continued to be a problem under

21    Rockwell.  Water contaminated with radioactive hazardous

22    waste continued to run off the plant property, often

23    illegally, often into Woman Creek or Walnut Creek.

24         There were violations sent to the plant and, for

25    example, on April 10, 1989, before the two months before

1   the FBI raid, Rockwell employees flushed nitric acid into

2   the building waste lines.

3         There were many errors that occurred, and I am

4   going to truncate this a little bit or summarize it.

5   There was an overflow alarm that failed.  A tank

6   overflowed.  A containment berm had a hole in it, the acid

7   went out of the berm area into the sewer system.

8         That was the fourth.  This is down at the bottom.

9   This is at least the fourth such spill in the past two

10   months.  Two diesel spills, the chromium spill.  All have

11   involved some combination of worker error, faulty alarms,

12   and insufficient containment.

13         So as we saw with Dow, all four of the plagues that

14   plagued Dow, plagued Rockwell.  Fire continued under

15   Rockwell.  They were repeatedly sited for fire safety

16   violations, incinerator leaks in the plumes, illegal

17   operations, incinerator leaks in the valves that -- I

18   already told you the new incinerator they built never

19   worked properly.

20         Waste storage of saltcrete, and a pondcrete mess.

21   17,000 huge blocks of leaking radioactive waste packed in

22   cardboard boxes and parked outside so it can blow away

23   after it leaked.  And water runoff, spills, and a variety

24   of mishaps with water runoff at the plant.

25         Now, there was a difference, though, from the Dow

1     this case, were not told about MUF during the years when

2     Dow and Rockwell operated the plant.  It was a deep, dark

3     secret.  It was known to the operators, Dow and Rockwell,

4     to some people at DOE, and to no one else.

5          Now, we have some documents that go back to the

6     1940s that show how the classification was used.

7     Classification was used, and one of the reasons the

8     classification was used was to keep MUF secret.

9          This is an AEC document.  This is Exhibit 660 from

10    1947.  If you look at the top of this, it is a little hard

11    to read, it says:  Declassification of medical and

12    biological documents has become a considerable task.  All

13    researchers are anxious to have their work appear in the

14    journals as soon as possible.  When critical process steps

15    or materials are involved, the problem is greatly

16    simplified since all must abide by security.  However,

17    there are a large number of papers which do not violate

18    security, but do cause considerable concern to the Atomic

19    Energy Commission Insurance Branch and may well compromise

20    the public prestige and best interest of the commission.

21         Looking down a little further, following

22    consultations with the Atomic Energy Commission Insurance

23    Branch, the following declassification criteria appears

24    desirable.  If specific locations or activities of the

25    Atomic Energy Commission and/or its contractors are

Page 588

1    closely associated with statements and information which

2    would invite or tend to encourage claims against the

3    Atomic Energy Commission or its contractors, such portions

4    of articles to be published should be re-worded or

5    deleted.

6           The effective establishment of this policy

7    necessitates the view by the Atomic Energy Commission

8    Insurance Branch as well as by the medical division prior

9    declassification.

10          In other words, the classification was going to be

11   used not only for top secret military secrets,

12   classification was going to be used because the insurance

13   branch didn't want things getting out that would allow

14   claims to be made against the Atomic Energy Commission or

15   its contractors.  Now, this is 1947.

16          Skip ahead 30 years to 1977.  This is P-652.  If

17   you look at the top of this document, let's go to the

18   first page.

19          MR. BERNICK:  What is the date of this document.

20          MR. DAVIDOFF:  This is one we discussed on Friday.

21          MR. BERNICK:  Your Honor ruled on that at side bar.

22          MR. DAVIDOFF:  On Friday it was ruled --

23          MR. BERNICK:  I am sorry.  This colloquy should not

24   take place except for before the Court.

25          THE COURT:  That's right.  Come up here.

1    complete either before 1989 or after 1992 or it was never

2    complete.  So, therefore, the Dow and Rockwell are not

3    responsible for creating the nuisance.  And I will just

4    remind you, this article, what the evidence will show --

5    if we can just focus in on the lower left corner there.

6    Where it says flats won't come clean for years, this is

7    back in 1990.  January of 1990.

8         Flats won't come clean for years.  The task is

9    likely to continue well into the next century.  It sure

10   looked like it was pretty ongoing at that time.  Complete,

11   comparatively enduring.  It didn't look like there was an

12   end in sight in 1990.

13        And the evidence will show that, and we will ask

14   you to take yourselves back and try and place where the

15   market was and where the property class members were in

16   1990, looking at this daunting prospect that this

17   contaminated site would not be cleaned up for decades or

18   more.

19        Also, I think it is relevant to that that Dow

20   Rockwell and their indemnitor, the DOE, covered up the

21   crimes and covered up the missing plutonium, the MUF,

22   until after the FBI raid in 1989.  One thing that I should

23   have mentioned yesterday is that it really wasn't until

24   1994, 5 years later, that DOE even admitted that there

25   were 2,600 pounds of missing plutonium at Rocky Flats.

1   do we say happened at Rocky Flats?  All the fires.  All

2   the 903 pad, and the like.  So we will get into that.

3          And we are going to get into it kind of

4   sequentially.  When the plaintiffs class sued, as you

5   know, they sued Dow.  Dow is there from '52 to '75.  And

6   Rockwell which was there from '75 to 1990.  They did not

7   sue the Government.  The DOE is not a party to this case.

8          Much as they talk about, they decided not to sue

9   the Government.  They decided solely to sue us.  They say

10  there is an indemnity, and they talked about the limited

11  power of the Court; that this Court can't compel different

12  classification.

13         They brought that out.  I objected to it.  The

14  Court overruled my objection.  They brought that out.

15  This Court also, as I think you will probably hear,

16  doesn't control the Department of Energy.  Can't make the

17  Department of Energy show up.  Can't make the plaintiffs

18  sue the Department of Energy.  That was their choice.

19         But this Court also can't compel the Department of

20  Energy to pay.  That's subject to the jurisdiction of

21  somebody else.  So all that you have before you are these

22  defendants and the liability claimed as to them.

23  Remember, I said the idea is you first of all have to find

24  there is liability of the defendants before you consider

25  anything to do with the DOE.

1          The DOE is just an indemnitor.  DOE is not a party.

2     You can't find liability as to them.  You all committed to

3     a person that you would assess our liability without being

4     influenced at all on the question of whether ultimately

5     somebody might pay to have our liability resolved.

6          I don't know that.  I hope so.  I don't know that.

7     So always bear in mind, are they establishing our

8     liability, or are they arguing that the Government, who

9     they decided not to sue, should pay?

10         So I'm going to go through Dow, and then I will go

11    through Rockwell, and I am going to talk about the DOE and

12    what they say about the DOE in connection with the

13    question of whether it helps their claims of liability

14    against Dow and Rockwell.  Is there something that the DOE

15    did that really affects their ability to claim against us.

16         I will talk specifically about this classification,

17    missing plutonium, this covert scheme that they say has

18    now precluded you from properly deciding this case.  That

19    is basically where I am going.  I will try to move along

20    more quickly.  But it is going to be Dow, Rockwell, the

21    DOE.  And then we will get back to the question, is there

22    complete and comparatively enduring harm?

23         So let's begin with Dow.  And I am going to want

24    to -- I don't want to show it now, but I will want to show

25    the first slide here, No. 3, in just a moment, if that

1          And it shows they are blowing smoke in this case.

2    This is not a matter of guesswork, this is a matter of

3    serious science.  It has been published, accepted and all

4    they are trying to do is re-raise an issue in court that

5    the scientific community has long ago resolved and

6    accepted.

7          What is it that actually happened?  Why is it that

8    the plaintiffs in this case -- I want to show 165.  Why is

9    it that the plaintiffs in this case were so aggressive and

10   are so aggressive in going after the Department of Energy?

11   Look at all of the stuff.  Manipulated.  Covered it up.

12   Shrouded in secrecy.  Manipulated the facts.

13         There is so much intensity.  They are saying motive

14   and there are outright allegations of unlawful conduct

15   being lodged against the DOE.  Why?  It is that indemnity.

16   Their theory is that the indemnity was an incentive for

17   the Government to do all of these bad things.

18         But under the instructions from this Court, that

19   indemnity is solely for the purpose of determining whether

20   it had some bearing on the defendant's liability.  For

21   them to attack the DOE, to get you to say we want to get

22   to the DOE, they're the problem, is improper.  It is

23   contrary to the instructions in this case.  It puts the

24   DOE on trial, not the defendants on trial.  And that is

25   something that each and every one of you committed at the

1  beginning, not to allow to happen.

2       Remember all the time we spent with every single

3  one of you, because it was so important that indemnity

4  would not affect your ability to weigh what we do. Not

5  what the Government did, but what we did, so that my

6  client gets a fair trial. My client Dow and my client

7  Rockwell.

8       This is an appeal for you to ignore that

9  instruction and basically to say, you know, when I said I

10  wasn't going to be influenced, maybe now I will be

11  influenced, don't pay attention to that. Pay attention to

12  what is actually at issue in this case.

13       I am going to wind up now and make two more points

14  and be done. At this point I have talked about the impact

15  of this case on these plaintiffs on this class. And I

16  have said that has to be established on a class-wide

17  basis. And now I would say to you these questions are all

18  clearly answerable in the negative.

19       Will they be able to prove there is class-wide

20  plutonium in the soil? They won't be able to prove that.

21  They won't even try to prove it. They will try to use

22  contours to suggest everyone knows it is true, even when

23  most of the area has been bulldozed and developed.

24       Will they establish there is a class-wide

25  unreasonable risk? There is no chance of that. That is

1    A.   I was generally aware of the beryllium issue.

2    Q.   That's No. 8 there.   Now, I want to go down to the

3    recommendations for the Phase II study.   By the way, do you

4    know how many years later the Phase II study was completed?

5    A.   No, I do not.

6    Q.   Take a look at recommendation No. 3.   "Pursue with the

7    health advisory panel, the Colorado Department of Health and

8    the U.S. Department of Energy the aggressive declassification

9    of all documents needed to support study conclusions."   Do you

10   know whether that was done?

11   A.   No, I do not.

12   Q.   Are you aware of any of the MUF material unaccounted for

13   documents declassified by the Department of Energy for purposes

14   of the HAP study or for any other purpose?

15   A.   No, I have not seen those documents, and I am not aware of

16   them.

17   Q.   If those documents would not be classified, would that be

18   consistent with the spirit of that recommendation?

19           MR. BERNICK:   Objection, that calls for this witness

20   to interpret this recommendation.   That's fine with me, but

21   that opens the doors for some recross, and I want to reserve

22   that right.

23           THE COURT:   Objection sustained.

24   BY MR. DAVIDOFF:

25   Q.   If documents were not declassified aggressively that dealt

Page 1447

1   with MUF, looking at item No. 3 again, what does that say about

2   whether or not recommendation No. 3 was implemented?

3            MR. BERNICK:  Same objection.

4            THE COURT:  Sustained.

5            MR. DAVIDOFF:  I will move on.

6   BY MR. DAVIDOFF:

7   Q.  Now, I want to show you Exhibit DX58.  This is from the

8   Colorado Department of Health in August of 1999.  You were

9   shown this during cross-examination.

10  A.  Yes.

11  Q.  First of all, even if you agreed with all the findings of

12  this study, how long after the FBI raid would it have required

13  to find those facts out?

14           MR. BERNICK:  Well, I am sorry, which particular facts

15  are we talking about?

16           THE COURT:  I don't understand the question.  Can you

17  rephrase it, please?

18           MR. DAVIDOFF:  This -- I am trying to do it in a

19  non-leading fashion, Your Honor.

20           THE COURT:  I understand.

21           MR. DAVIDOFF:  And it is redirect, so it's difficult

22  sometimes.

23  BY MR. DAVIDOFF:

24  Q.  This study is done in August of 1999; is that correct?

25  A.  The findings.

1   attention there were elevated air concentration levels in that

2   area?

3   A.   Not that I knew of.

4   Q.   I am going to go back on what we said earlier.   I am going

5   to put none for that and none for this.   The elevated water,

6   did it ever come to your attention there were water

7   concentrations in excess of the off-site, the off-site

8   guidelines in that 771 outfall area?

9   A.   No one ever told me that, no.

10   Q.   And, in fact, as we just established, this 771 outfall was

11   also removed, correct?

12   A.   Right.

13   Q.   And was made public.   Let's turn our attention to the 903

14   pad.   Now, you testified this morning with respect to the 903

15   pad that you had some conversations with the folks at the plant

16   as to what their plans were for the materials that had been --

17   that were building up in the barrels on that pad; is that

18   right?

19   A.   That's right.

20   Q.   Okay.   And you knew that any liquid waste from the plant,

21   that there were difficult shipping issues that had to take

22   place with respect to anything that was liquid, right?

23   A.   That's right.

24   Q.   In fact, you had to get it to a solid before you could ship

25   it.   Wasn't that the way it worked?

Page 1659

1  A.  That's true.

2  Q.  And, in fact, it was the AEC who decided whether something

3  could be shipped or not, right?

4  A.  Yes, there was a division in the AEC that made those rules.

5  Q.  You said on your direct testimony when you talked to these

6  folks at the plant about what they were doing with the barrels

7  that were building up on the 903 pad, they said they hadn't

8  come up with a way to take care of the oils that were in the

9  drum at that time?

10  A.  True.

11  Q.  Were you involved in the research and development efforts

12  that were going on at the plant to try to develop a filtration

13  and centrifuge method to solidify those materials on the 903

14  pad?

15  A.  If I was, it was no more than doing the monitoring of

16  personnel.  I don't remember doing any of that.  That was

17  probably done by the -- I forgot the name of the type of

18  operator, but it was kind of a development type operation.  I

19  was not involved in it.

20  Q.  Were you involved in any of the research and development

21  that took place with respect to a distillation, trying to

22  distill it so it would become a solid so it could be shipped

23  off site?

24  A.  I remember vaguely doing -- well, being around some of

25  that, not doing it.  We could not do that kind of work.

Page 1670

1   impaneled in the State of Colorado 1989 or 1990, did their work

2   throughout that period of time, are you familiar with the fact

3   they took a look at this fire extensively and concluded that

4   virtually no plutonium got off site this plant as a result of

5   the '69 fire?

6   A.   When you say that, is it 1989 you are talking about?

7   Q.   Yeah.   In other words, there has been a huge dose

8   reconstruction study that was done between time period starting

9   up around the 1990 time period and ending in the 1990s where

10  they went back and looked at all the records and everything and

11  tried to come to a conclusion as to how much, if any, plutonium

12  got off site as a result of the '69 fire.

13  A.   No, I don't know anything about that.

14  Q.   So you are not aware they have concluded that there was

15  virtually nothing, no plutonium that got off site as a result

16  of that fire?

17          MR. DAVIDOFF:   Your Honor, this is a speech by

18  counsel.

19          THE COURT:   No, it isn't.   It's a question, and the

20  questions are not evidence; it's the answers.   The objection is

21  overruled.   He is just asking if you are aware of something.

22  A.   State it over, please.

23  BY MR. KURTENBACH:

24  Q.   Yes, sir.   You are not aware that the scientists who

25  conducted that study concluded that virtually no plutonium got

Page 3002

1  issue in this case is beside the point.  The issue here is that

2  he's not being called as a percipient witness.  He hasn't

3  offered any expert opinions on MUF.  He hasn't given us notice

4  of any such expert opinions.  And to get into the concept of

5  MUF with this witness would not be permissible.  If they want

6  to call him back as a percipient witness, then they're free to

7  do so.

8           In addition, the notion that an expert can just get up

9  and talk about anything that he knows about is directly

10 contrary to the rules.  That's why we have evidence, reports,

11 depositions and we go through the whole procedure.

12          MR. DAVIDOFF:  He was asked about this in his

13 deposition.  This is stuff that he did in this case, things

14 that he did as a consultant in this case.

15          MR. KURTENBACH:  Any opinions on this subject --

16          THE COURT:  I'm going to overrule your objection.

17    (In open court.)

18 BY MR. DAVIDOFF:

19 Q.  Now I just want to ask you what you did, and I want you

20 to -- I'm going to ask you to describe the process for the

21 jury.  You accompanied two attorneys from my firm who also had

22 gotten Q clearances, one of whom is Mr. Sorensen over here, to

23 look at documents on the subject of MUF; is that correct?

24 A.  Yes.

25 Q.  And they were classified documents; is that correct?

Page 3003

1    A.   Yes.

2    Q.   And still are today for the most part; is that correct?

3    A.   I have no idea, actually.

4    Q.   When you go to inspect these MUF documents, were you

5    escorted into a cubicle or a room?

6    A.   Yes.

7         MR. KURTENBACH:   Your Honor, can I have a continuing

8    objection?

9         THE COURT:   Yes.

10   BY MR. DAVIDOFF:

11   Q.   Could you describe the room for the jury, please.

12   A.   Well, there was at the time at Rocky Flats entire areas of

13   the plant that could not be accessed by individuals except

14   those with a proper clearance, and the reason was because

15   documents, or in some cases even physical objects were

16   sensitive information that we wouldn't want our enemies to get

17   ahold of, for example, terrorists or in those days the Soviets,

18   or even today the Soviets, Russians.  And in order to have

19   access to those areas one needs a proper security clearance.

20        The area to which I was granted access with these --

21   the first visit was with one attorney, Jonathan Auerbach, and

22   the second visit was with two, Auerbach plus David Sorensen who

23   is sitting in front of you.  We had access to what I would call

24   a library room, it was actually several rooms, but the

25   conception of it is a library, in which were stored numerous,

Page 3004

1   numerous voluminous reports.  And also there were catalogs of

2   the titles of those reports so that you could go down and look

3   at the titles rather than the reports themselves.

4           And we spent -- the first trip it was an afternoon and

5   then a full day and then a second morning, so two days.

6           The next trip was -- ended up being almost three days.

7   And what I was doing there with them -- they're attorneys, of

8   course, I'm the technical guy, was going down a list of

9   thousands of those titles of documents which had been

10  relevant -- or had something about material unaccounted for,

11  MUF, either in a title or something else that was related to

12  that, and tried to sort them into those documents which in my

13  judgment would be interesting and relevant to the case that the

14  plaintiffs were bringing and those that wouldn't.

15          And actually, it isn't just interesting or not,

16  there's a hierarchy.  For example, many of the documents were

17  just simply printouts of pages and pages of numbers which were

18  taken every day.  They would go around and weigh certain things

19  to make sure how much material was on hand in each different

20  place.  And those were less interesting than the summary

21  documents that were weekly or monthly or in some cases

22  quarterly in which there would be a document to summarize what

23  happened for the whole week or the whole month of November or

24  whatever it happened to be.

25  Q.  Now --

1   A.   And I sorted them out into those that were more

2   interesting, less interesting, and some that were just totally

3   uninteresting.

4   Q.   Now there were -- just so the jury can understand the

5   procedure, the Q cleared people are in a room -- I drew a box,

6   which is supposed to represent a room, it's probably a very

7   poor representation of a room, but -- and if you're in this

8   room, you can look at the documents; is that correct?

9   A.   Yes.

10  Q.   And you can talk to the other Q cleared person about the

11  documents if you're in the room; is that right?

12  A.   Yes, yes.

13  Q.   Now can you make notes in the room?

14  A.   If you make notes in the room, you can't take them out

15  unless they are cleared as being acceptable to leave the room.

16  Q.   So, in other words --

17  A.   And I made no such notes, by the way.

18  Q.   But if you do make notes, you couldn't take them out

19  anyways?

20  A.   Not unless some expert said, Those notes are not -- don't

21  compromise what's in this information.

22          And by the way, just so you'll understand, some of

23  what was going on was they were making bomb parts, and they

24  would weigh these things every day, a certain one -- I'm just

25  pretending -- would be 30 grams of something and 34 grams of

Page 3006

1  something else and maybe, you know, 1200 grams of something

2  else, and sometimes they would say what those parts were,

3  including even little drawings of what they were.  That's

4  sensitive information.

5  Q.  We weren't interested in that type --

6  A.  Of course, but -- of course, but that's what it was, was a

7  lot of it was numerical work in which people were weighing

8  material to try to figure out how much they had, let's say,

9  Wednesday afternoon.  Then they come back Thursday afternoon

10  and try to determine what they have then to make sure they

11  haven't lost any because, of course, if you lose something --

12  Q.  What I am trying to develop first is the process.  The

13  process is you can talk about it in the room; is that right?

14  A.  Yes.

15  Q.  If you go outside the room with this other person with the

16  Q clearance, are you allowed to talk about it outside the room?

17  A.  No.  I've learned from early on that you can't have

18  conversations about that stuff outside of the cleared area,

19  even if the other person is also cleared.

20  Q.  So in other words, if you and Mr. Sorensen after being in

21  the room talking about the documents were walking down 17th

22  Avenue or 17th Street here in Denver to a restaurant, you

23  couldn't talk about it?

24  A.  No.

25       MR. KURTENBACH:  Object to the form, your Honor.

Page 3007

1    A.   But in any event, anywhere except in that cleared area,

2    okay?   Just absolutely --

3    BY MR. DAVIDOFF:

4    Q.   So -- and in terms of actually getting a document out of

5    that room, what is the process if you were going to get the

6    document out of that room?

7    A.   Well, I had a clearance, so -- you ought to understand,

8    someone with a clearance can carry it himself or herself on

9    their own personal area to another cleared area or within the

10   cleared area, but if you wanted to take it outside of the

11   cleared -- you mean outside of the cleared area?

12   Q.   Yes, sir, outside the room.

13   A.   You couldn't do that unless that document was actually

14   approved and cleared for outside use by certain designated

15   people who are called classifying experts.   There are people

16   whose occupation is to classify documents as needed and to

17   declassify them if it's appropriate.   And unless something was

18   declassified by such an expert as being okay -- you have to

19   pretend that it then gets lost or published somewhere that you

20   wouldn't want -- and it's okay, unless that happens, those

21   documents cannot be released outside of the group of experts

22   who are inside the area.

23   Q.   It has to be inside the area?

24   A.   Yes, sir.

25   Q.   Were you able to -- were you able to determine from looking

1  at the documents, without describing what was in the documents,

2  which you obviously can't do --

3  A.  No.

4  Q.  -- how much of the -- how much of those documents would

5  have been at least relevant to the case that the plaintiffs are

6  bringing here?

7         MR. KURTENBACH:  I object to the form of the question,

8  your Honor, foundation.  It goes far beyond anything that this

9  man has offered an opinion on in this case, and we're now far

10  afield of any expert opinions.

11         THE COURT:  Overruled.

12  BY MR. DAVIDOFF:

13  Q.  Go ahead, sir.

14  A.  Of the documents I looked at, which were a few thousand, I

15  suppose, in fact, I remember thinking that's how many there

16  were, an important fraction, like a third or a half of them,

17  had some relevance, and a smaller number, perhaps dozens or a

18  hundred or two, were of higher relevance, that is, you know,

19  more relevant than the others.  And that hierarchy was because

20  sometimes after you read the summary document you would want to

21  go to the underlying stuff to dig more, but you would want to

22  start with the stuff that I considered of higher relevance and

23  then only dig more later.

24  Q.  All right.  And you also saw documents from how far back in

25  time?

MR. KURTENBACH: Your Honor, may we approach?

MR. DAVIDOFF: Your Honor, can I just conclude this line? I'm almost done here.

THE COURT: If he wants to, we will.

(At the bench.)

MR. BERNICK: At this point, if this examination continues, I think we have no choice but to move for a mistrial. I can't think of anything more prejudicial to this proceeding than for a witness to comment upon the substance of documents, saying they're relevant, and then say, I can't tell you why they're relevant, I can't tell you the content of the document, I can't tell you anything.

At this point there is no way to cross-examine, and at this point, for that matter, I'm not sure whether he's in compliance with the classification rules themselves.

THE COURT: I'm going to overrule the objection. All he's talking about so far is the difficulty in acquiring the information, and he's able to do that without giving an expert opinion on it, and he's doing that, as I consider, to be foundational work for one of the primary contentions of the plaintiffs in this case that -- and I am instructing the jury on that as to both sides, that some information and material is not available because of classification.

So unless he starts opining about whether the classification is necessary or not, if he gets into that sort

Page 3010

1   of issue I am going to -- I'm going to permit the testimony to

2   come in.

3           MR. BERNICK:  Let me be clear about the record I'm

4   making.  He can simply say there was information that wasn't

5   disclosed.  He opined -- not only opined, he said it's relevant

6   to this case.  His statement that it's relevant to this case is

7   the source of the prejudice.  We don't know what the statement

8   referred to.  We will never know what the statement referred

9   to, and the reason we'll never know what the statement referred

10  to is that he can't tell us what material he concluded was

11  relevant.

12          As a consequence, he has now made a statement that is

13  not amenable to cross-examination, may or may not violate the

14  classification laws.  It is a substantive statement.

15          I would further add, your Honor, there is zero

16  evidence, none whatsoever, that is ever going to come into this

17  court that there is such relevant information that has not been

18  disclosed.  No such submission has ever, ever been made nor

19  could it be -- if a submission was made that there was relevant

20  information that has not been disclosed, we would have to know

21  what that content is, and then we would have to have some kind

22  of hearing to determine whether that content, in fact, was

23  classified and what the content was.  They have made no such

24  predicate showing.

25          So your Honor would be allowing testimony, and you're

Page 3011

1    not only instructing the jury in a way that -- it is not an

2    instruction about the evidence, it is a statement by your

3    Honor, it is a finding by your Honor endorsing his testimony

4    that basically says -- this jury has not been allowed to see

5    and it's not been allowed to be produced, the relevant

6    information, which is the same way as saying that -- if your

7    Honor rules that way, that's fine, but that is about as clean

8    an issue as I can possibly think about for appeal, and I

9    believe that this jury has now been poisoned.

10           But on the basis of all the other statements that have

11   been made by counsel is all the more so -- the same kinds of

12   suggestions were made about the Sanchini, the picture that's

13   being painted is there's classified material that shows

14   malfeasance by these defendants, and the jury will never hear

15   about it, and they'll never even be able to follow the

16   instruction, because they don't know what the instruction

17   relates to.  How can they possibly weigh the importance of that

18   information if they don't know what it is or what it might have

19   been?  That statement that he just made is entirely

20   unreviewable.

21           So if that's your Honor's determination, we would move

22   for a mistrial, and we would move to dismiss and disband this

23   jury and start the trial all over again and further move to

24   take the matter up on appeal so we don't waste our time all

25   over again.  We have now been here four weeks, and to have this

1    statement made just makes a mockery of the idea that this trial

2    is going to be meaningful.

3         MR. DAVIDOFF:  I'm just going to say a couple of

4    things, if I may.  Several times at these sidebar conferences

5    Mr. Bernick has made the assertion, the false assertion, I

6    might add - maybe he doesn't know that it's false, but it is

7    false - that we have had access to classified documents and

8    that we had an opportunity to get the evidence from classified

9    documents and that RAC and ChemRisk and others did the same

10   thing.  We dispute that very, very -- could I just -- I would

11   like to speak.  Pardon me.  I haven't gotten to speak for a

12   long time.  I don't intend to speak long.  I don't think I have

13   the energy to do so.

14        The fact is that this witness and other witnesses --

15   they're going to call on cross Mr. Hoffman, the classification

16   officer at the plant, who is responsible for keeping most of

17   this stuff classified, who used to work for both Rockwell and

18   Dow before he went to work for DOE.  And the fact of the matter

19   is this stuff is from the '50s and '60s and '70s.  There is

20   absolutely no reason to keep it confidential, especially the

21   summary reports.

22        And we don't have any way -- I thought we were

23   entitled to a spoliation instruction, which your Honor has so

24   far declined to give, but at the very least we're entitled to

25   develop the facts, and the jury can draw the appropriate

Page 3013

1    inference, knowing that the Department of Energy is the

2    indemnitor in this case and is the owner of the facility and is

3    on the hook for the monetary damages.

4          So counsel's motion for a mistrial is mistaken, in my

5    view, and it should be denied.

6          MR. BERNICK:   The spoliation is a judicial

7    determination that the Court is obliged to make.   The findings

8    of fact -- the problem here is that there can be no findings of

9    fact, because according to you and according to your witness

10   the information has never even been known to the Court.

11         What he's saying now is that the Court should make a

12   determination that although it can't say what the information

13   is, because it's not before the Court, the jury somehow should

14   decide not only what the information is, but it's important to

15   the case.

16         And that's the basic problem, is that essentially what

17   your Honor is determining, being asked to determine, is that

18   the classification laws, rules, were misused to prevent access

19   by these parties to relevant information.   Or even not misuse,

20   maybe it's properly used.   The fact of the disclosure of that

21   information -- that is an improbable fact to find unless your

22   Honor has had access to this information, which I know your

23   Honor has not had access to.

24         So at this point we have an assertion that there is

25   material information that is out there, material to this jury,

Page 3014

1   that has not been disclosed.  It's an impossible determination

2   to make because no one has it.

3          THE COURT:  We've gone over this before at the

4   pretrial -- we've gone into this matter before, pretrial as

5   well, and it's something that I commented on before, and that

6   is that this is the dilemma that the Price-Anderson case has

7   presented to us.  I'm denying your motion for mistrial, we're

8   going to go ahead, and your objection is overruled.

9          MR. BERNICK:  Could we ask, your Honor -- so I don't

10  belabor --

11         THE COURT:  It's a continuing objection.

12         MR. BERNICK:  I understand that, but how does this

13  have -- how does the Price-Anderson Act assure that inevitably

14  in these cases there will be allegedly classified information

15  that is not available -- let's assume that the Department of

16  Energy is defending this case and they don't have the ability

17  to violate the -- the Department of Energy is defending this

18  case.  If we had them here in court, you could issue an order

19  saying, Produce the information, and they say, I'm sorry, we

20  can't, and then I would say, Well, we have not had access to

21  this information.  It's not implicit under the Price-Anderson

22  Act, it's implicit in the fact this is a routine case -- I'm

23  sorry to belabor this, it's a routine case, there are cases all

24  the time where classified information is placed at issue and

25  they can't go forward.

1          If your Honor wants the case to go forward, that's

2     fine.  But they are putting us in a position where they're able

3     to make -- have your Honor issue an instruction that is

4     literally outcome-determinative.  They assert -- by virtue of

5     their own ipse dixit they assert -- should we come in and say

6     no?  We submit information and it's not relevant?  By ipse

7     dixit they say your Honor endorses the proposition that the

8     information has been withheld, and if that's so, that's

9     essentially a way of saying we are being sanctioned.

10          THE COURT:  You're not being sanctioned.  It's not

11     saying that at all.  It's saying that we are confronted with

12     the dilemma where the legislation has two separate objectives

13     under the Atomic Energy Act, under Price-Anderson, to allow

14     this kind of litigation.  And under those circumstances, this

15     Court is not able to give the full story because of the

16     security classification.  I am making a record.  We'll see what

17     happens.

18          MR. BERNICK:  If that is the issue that your Honor

19     believes is present here, why isn't it incumbent upon the

20     plaintiffs to make a record like -- under Rule 104 under any

21     set of circumstances to justify the issuance of that order --

22     to justify the witness being able to make that testimony, and

23     there is no such record in this case, whatsoever, they never,

24     ever -- that I have seen that is relevant, and that has not

25     been made.  In fact, it says exactly the opposite, that they

Page 3016

1    saw -- I believe -- the witness believed it's there.  This

2    witness just testified he was there with one of their lawyers

3    and saw it, and yet you -- I believe your Honor is relieved of

4    the burden of providing a 104 --

5         MR. DAVIDOFF:  If I can briefly say a couple of

6    things.  That's a complete misconstruction of the record in

7    this case.  There was a trial about this ten years ago, and

8    these meetings were held and these declassification efforts

9    were made in the wake of that trial, and one of them -- one of

10   the three-day trips was in the wake of your Honor's contempt

11   order in November of 1995, and it was -- pardon me, the

12   Department of Energy made the decision that it was just going

13   to blanket wholesale keep all this information classified back

14   to 1952, deprive us of the opportunity to prove our case.

15        Your Honor may not grant an instruction, but there has

16   been an adequate record in this case, and Mr. Hoffman who is

17   going to be on their side, not ours, is going to be on the

18   witness stand.  He can testify about the fact that they made no

19   determinations, as he did in his deposition, they made no

20   substantive determinations, just blanket classified --

21        THE COURT:  You can take this up on appeal, if you

22   wish, but I'm going to go ahead and adhere to my ruling.

23        MR. DAVIDOFF:  Thank you.

24      (In open court.)

25        MR. DAVIDOFF:  I apologize for the delay, ladies and

1   gentlemen.

2        MR. BERNICK:  If the jury could please be instructed

3   that the matters that were taken up at sidebar are important

4   matters to this case.

5        THE COURT:  Well, there's no doubt that they are very

6   important matters, but I have to be the judge of the law and

7   you're the judge of the facts, and we have had the machine on

8   so that you aren't confused between what the legal issues are

9   and the factual issues.

10        MR. DAVIDOFF:  I have to almost take an aspirin when I

11   have to listen to that machine for more than five or ten

12   minutes, it's -- but it's effective.

13   BY MR. DAVIDOFF:

14   Q.  Dr. Budnitz, I just want to be sure that the picture here

15   is clear to the jury.  Once you and Mr. Sorenson walk out of

16   that classification room, you can no longer talk about the

17   relevance of those documents to anyone, including each other;

18   is that right?

19   A.  Outside of transporting it, of course, to another cleared

20   area, yes.

21   Q.  All right.  Now those documents that you inspected, could

22   you tell us what decades they were from?  Were any of them from

23   the 1950s?

24   A.  They started with the inception of the plant which, I

25   believe, is '53, perhaps.

1    Q.   '52?

2    A.   Okay.  Anyway they started at the inception up to the

3    present day of that time which is 1995 or early '96.

4    Q.   Okay.  And the documents back in the '50s and in the '60s

5    and in the '70s had all been kept confidential and classified?

6    A.   I have no idea what their fate has been since that day.

7    Q.   Well, up to the time that you saw --

8    A.   The ones I saw were all classified at that time.

9    Q.   Now -- and you don't know since then whether they remained

10   classified or not?  And were some of the documents that you

11   felt were relevant from the 1950s or 1960s?

12          MR. KURTENBACH:  I object, your Honor.  In addition it

13   calls for a legal conclusion.

14          THE COURT:  Sustained.

15   BY MR. DAVIDOFF:

16   Q.   Were some of the documents that you thought were relevant

17   to where missing plutonium might be either within or without

18   the plant, the facts of where the missing plutonium might be,

19   from the 1950s or the 1960s?

20   A.   Yes.

21          MR. KURTENBACH:  Same, your Honor.

22          THE COURT:  Overruled.

23   A.   Yes, they span the entire period that I -- of the documents

24   I mentioned, which started at the beginning until --

25   BY MR. DAVIDOFF:

1   Q.  I think you told the jury you have a lot of classification

2   experience yourself; is that correct?

3   A.  Yes.

4   Q.  And did you -- other than the documents that were diagrams

5   of bombs or descriptions of how much went into bombs or out of

6   bombs, were there other documents that you felt -- did you feel

7   that there was a justification, for example, for classifying

8   old summary documents, summary documents from the 1950s and

9   1960s?

10          MR. KURTENBACH:  Your Honor, I object to the form of

11  the question.

12          THE COURT:  Sustained.

13  BY MR. DAVIDOFF:

14  Q.  What was your -- what was your view concerning the need to

15  keep classified summary documents from the '50s and the '60s?

16          MR. KURTENBACH:  Your Honor, I think this is beyond

17  this witness' expertise.

18          THE COURT:  Sustained.

19  BY MR. DAVIDOFF:

20  Q.  Do you have expertise in whether a document would reveal

21  national security information?

22  A.  Sometimes, but not always; that is, there may be reasons

23  that others know that I wouldn't know that would require

24  something to remain classified that I wouldn't know.

25  Q.  All right.  I'm going to go to a different topic.  Tell us

1    what you did in this case to go about your analysis in trial

2    Exhibits 1150 and 1151, the reports that you prepared for the

3    plaintiffs in this case.

4    A.   Well, each is such a major topic, I suppose I should start

5    with the one you pick and then we'll do the other one second.

6    Q.   Well, just generally tell the jury what kinds of things you

7    did.  What did you do to prepare to write your reports?

8    A.   Well, the plaintiffs' attorneys asked me to analyze and

9    evaluate the events that took place around the 1957 fire, the

10   1969 fire and a few other events, and to write up my evaluation

11   of those events and insights that they might provide about

12   Dow's management practices into a report.  I did that work and

13   I wrote the report.

14   Q.   Okay.  Did you review Dow documents?

15   A.   Yes, I reviewed -- well, then there's a second one. Should

16   I go to the second one or just do that one?

17   Q.   Go ahead.

18   A.   Then second from that, they asked me to review material,

19   documents and the like, relevant to the waste management

20   practices associated with the 903 pad and the releases that

21   came from that and the measurements of those releases and the

22   like, and to evaluate them, those documents and the practices

23   and the events and the measurements, and then to write an

24   evaluation in my technical capacity, write an evaluation of

25   what I thought of those events, and I did that and wrote that

 1   they're fewer in number.

 2          THE COURT:  I'm assuming that counsel knows it has to

 3   be identified.

 4          MR. DAVIDOFF:  I do.

 5          THE COURT:  I'll let counsel do that in his own way.

 6   Go ahead.

 7          MR. DAVIDOFF:  I'll actually do that right now.

 8   BY MR. DAVIDOFF:

 9   Q.  Have you reviewed this demonstrative prior to its being

10   shown to the jury today?

11   A.  Yes.

12   Q.  This board that we prepared?  And are you using this

13   illustrative and as a demonstrative for your testimony?

14   A.  Yes.

15   Q.  Okay.  Would you -- you can go ahead, sir.

16   A.  Well, let me describe why there is material that needs to

17   be stored somewhere and what the material was that was stored

18   at this 903 area.

19          The business of the Rocky Flats plant was from start

20   to finish the manufacture of weapons part, parts that went into

21   the nuclear weapons, principally plutonium but some uranium and

22   some other materials too.  And much of the work of the

23   manufacture was machine work in which metals that came in --

24   plutonium metal, for example, came in from other large

25   installations in the AEC complex at that time had to be

Page 3026

1   transformed from bulk shapes like spheres or just bricks into

2   particularly machined parts that have very tight tolerance

3   dimensions that would then be the constituents of atomic or

4   nuclear bombs.

5           And the machining -- if you've ever been to a machine

6   shop or even if you haven't, the machining of metals with other

7   metals always requires lubrication in order that the machining

8   be smooth and effective, and at Rocky Flats, like everywhere

9   else, they have lubrication.  The lubricant that they used

10  predominantly in the early decades, certainly for the first

11  decade and a half, was an organic chemical called carbon

12  tetrachloride, carbon tet for short, CCl4.  It was a common, if

13  not the most common lubricant that was used in machine shops

14  everywhere at that time, it was just a common use, although

15  we've now banded everywhere because we understand something

16  about its toxicity that wasn't understood at that time.

17          So they used carbon tetrachloride to do the machining.

18  And if you start out with clean carbon tetrachloride, after a

19  while as you're machining these parts you get little flecks of

20  the machined material suspended into the machine -- into the

21  lubricant, just the way you get in the oil of your automobile,

22  it becomes contaminated with little flecks of metal, which you

23  perhaps have seen if you've ever seen your oil changed in your

24  car.

25          So fairly frequently they would take the carbon

Page 3027

1    tetrachloride that they were machining with and they would put

2    it in a waste drum and begin with new carbon tetrachloride that

3    was clean.  And that waste drum then they accumulated.  They

4    put them first in smaller containers and then in drums.  You

5    saw the pictures, perhaps.  They are 55-gallon drums that are

6    common all over the United States, and they put them in these

7    drums.

8         Before they put them in the drums right away, they

9    tried to do some filtering.  They pour it through a filter so

10   as to collect the largest pieces -- the larger pieces of metal

11   on the filter so they didn't go into the other stuff, but there

12   was always the finer material that went right through the

13   filter and remained contaminated.

14        And the contaminated carbon tetrachloride or -- there

15   were some other chemicals but it was mostly carbon

16   tetrachloride was collected in these drums.  And ultimately in

17   1958 the decision was made that they should begin storing them

18   in some single place on-site, and the 903 area was selected.

19   And as it says in 1958 -- I'm not going to vouch for these

20   numbers, but they're -- somebody has compiled them, and I've

21   reviewed them --

22   Q.   Could you look at Exhibit 223, which is the August 19th,

23   1970, Dow Chemical memorandum?

24   A.   Yeah.  So I'm vouching for them only in the sense that

25   somebody else wrote them down contemporaneously, and I accept

1   that, you know.  So if somebody else said 91 in 1958 I accept

2   that as factual.

3   Q.  Okay.  Dr. Budnitz, may I interrupt for just a second?  I'm

4   reluctant to do that.  Would you look at Exhibit P223, and it's

5   dated August 19th, 1970, and it's a Dow Chemical Company

6   memorandum to LM Joshel, titled "Summary, drum field activity"

7   from KW Calkins with a copy to Mr. HE Bowman.

8   A.  And it has these numbers in there.

9   Q.  It has attached to it a table "summary, drum field activity

10  for calendar year 1958."  It indicates that there were 91 drums

11  there?

12  A.  I accept that straight.  I'm sure you understand what I

13  mean by accepting it straight.  I'm relying on it because it

14  was contemporaneous by people who were there.

15  Q.  Dr. Budnitz, please just let me try to complete my

16  question.

17          The table contains for each year of the 903 area,

18  later 903 pad, starting in 1958 and continuing through 1968 --

19  '66, '67, '68, the number of drums rising to a total of 5,140

20  drums; is that correct?

21  A.  The largest number is in 1966, but 5,140 drums are shown,

22  which is what's up there.

23  Q.  And that's the --

24  A.  Right.

25  Q.  Are these the same --

Page 3029

1    A.  Yes.

2    Q.  Try -- before you say yes, it will be clearer for the

3    reporters if I can get a question and then get an answer.  And

4    I know your mind is faster than mine, believe me, but we'll see

5    if we can do it.

6           The numbers that are on this exhibit, G569, are from

7    the summary, drum field activity to the Calkins, Joshel memo

8    that was done at Dow on August 19th, 1970, from the table

9    summary drum field activity; is that correct, sir?

10   A.  Yes.

11   Q.  Now you can continue.

12   A.  Yes, no one would have any reason to doubt these numbers.

13   They were compiled by people who looked at records and compiled

14   them.  So I took them straight.

15   Q.  So this was an internal Dow memorandum?

16   A.  Yes.

17   Q.  And it's something that you would ordinarily rely on; is

18   that correct?

19   A.  Sure.  I wouldn't have any reason not to rely on it.

20   Q.  Okay.

21          MR. DAVIDOFF:  Incidentally, your Honor, so that the

22   jury can see what we're talking about, we proffer Exhibit P223,

23   which was authenticated in the deposition of Mr. Putzier.  Am I

24   pronouncing his name right or is it Petzier, Counsel?

25          MR. KURTENBACH:  Putzier, we have no objection.

Page 3030

1          THE COURT:  Putzier, he's a wide receiver, isn't he, a

2    receiver for the Denver Broncos now?  He's gone up in the

3    world.  Probably his grandson.  Yeah, it's admitted.

4          MR. DAVIDOFF:  Thank you, your Honor.

5    BY MR. DAVIDOFF:

6    Q.  Let's focus on the top of that table there, 1958, 91 drums.

7    Okay.  And then let's just go to the next year, for example,

8    which shows 606 drums, I believe.  That's where you got the

9    numbers for this demonstrative exhibit?

10   A.  That's where they're derived from.

11   Q.  Okay.  Could we go to the beginning of the document and --

12   let's focus on the first paragraph, if we could, please,

13   "Summary, drum field activity.  From the beginning of

14   operations at the Rocky Flats plant certain organic liquids

15   contaminated slightly with radioactive materials were generated

16   which required disposal.  Little consideration was given to

17   this in the initial design of the plant, apparently based on

18   the assumption that these materials could be packaged and

19   shipped for burial as were low level solid wastes."

20          Then if you look at the third paragraph, if we can

21   focus on that for a second?  No, I think it's the third

22   paragraph.  "These facts led to the establishment of a burial

23   mound," and the jury has heard a little bit about this before,

24   sir, "in 1954 at a location southeast of building 991 in the

25   eastern portion of the plant site.  For the most part liquids

Page 3031

1   contaminated with uranium, either depleted or enriched, were

2   buried there, but some drums containing plutonium contamination

3   were also transferred to that location.  Records do not

4   indicate that they were actually buried."

5          Then the next paragraph, "Meanwhile problems of

6   permanent disposal and of increasing quantities were recognized

7   and development studies were undertaken to determine a

8   satisfactory method of disposing of all such liquids.  As a

9   result of one study, the part IV addition of the plant included

10  a high speed centrifuge in building 776 to process plutonium

11  contaminated organic liquids.  It is not clear whether this was

12  expected to produce a product suitable for cold disposal or

13  not, but in any case the operation was disappointing and

14  resulted in a recommendation made in 1958 that a substitute

15  process such as distillation be developed for disposal."

16         Then on the next page --

17         MR. KURTENBACH:  Your Honor, at this point, with this

18  extensive reading of these documents, under 703, I think we're

19  entitled to a limiting instruction that these documents are not

20  being offered for the substance of the matter but just so that

21  the jury can assess the weight of this particular expert's

22  reliance upon them.

23         MR. DAVIDOFF:  I don't actually agree to the limiting

24  instruction, your Honor.

25         THE COURT:  Overruled.

1          MR. DAVIDOFF:   Thank you.

2    BY MR. DAVIDOFF:

3    Q.   Let me just continue.   I'm going to stop in a couple of

4    paragraphs, at least to catch my breath.

5          "During those years, the burning of uranium

6    contaminated oils had been tested as a disposal method and had

7    been adopted as an acceptable method.

8          "Faced with the prospect of rising quantities of

9    plutonium bearing oils, the amount in the burial mound was

10   moved south across the road to a fenced area in about July

11   1958, and when this area became filled, a location east of this

12   began to be used in October of 1968.   The latter location

13   subsequently became known as the, quote, drum field, unquote.

14   The additions to and deletions from the drum field are shown in

15   the attached table, based upon the best data available.

16         "Most of the drums transferred to the field" --

17         MR. DAVIDOFF:   Focus on that paragraph, I think you

18   need to go half and half for the jury, at least those of them

19   whose eyes are as bad as mine, to be able to read it.   The

20   first half of it.   Can you box just the top half of that

21   paragraph?

22   BY MR. DAVIDOFF:

23   Q.   "Most of the drums transferred to the field were nominal

24   55-gallon drums, but a significant number were 30-gallon drums.

25   Not all were completely full.   Approximately three-fourths of

1   the drums were plutonium contaminated, while most of the

2   balance contained uranium.  Of those containing plutonium, most

3   were lathe coolant consisting of a straight-chain hydrocarbon

4   mineral oil, Shell Vitrea, and carbon tetrachloride in varying

5   proportions.  Other liquids were involved, however, including

6   hydraulic oils, vacuum pump oil, trichloroethylene,

7   perchloroethylene, silicone oils, acetone stillbottoms" --

8           MR. DAVIDOFF:  I think you're going to need to go

9   down.

10  BY MR. DAVIDOFF:

11  Q.  "Acetone stillbottoms, etc.  Originally, contents of the

12  drums were indicated on the outside, but these markings were

13  made illegible through weathering, and no other good records

14  were kept of the contents.  Leakage of the oil was recognized

15  early, and in 1959 or possibly earlier, ethanolamine," I'm sure

16  you can pronounce that better than I can, sir, "was added to

17  the oil to reduce the corrosion rate of the steel drums."

18          I would like to stop there for the time being, at

19  least this gives the early background as to how the 903 pad or

20  the 903 area originated and the origination of barrel storage

21  on the drum field.  Could you give the jury your observations

22  on these events?

23  A.  Well, they began to put these drums outdoors in July of

24  1958, and as you saw, more accumulated each year -- well, it

25  shows until there were a few thousand.  They contained

1   corrosive materials on the inside.  These chemicals, especially

2   since there were different mixes of chemicals in different

3   drums, but even carbon tetrachloride itself, the carbon liquids

4   themselves are corrosive --

5   Q.  Dr. Budnitz, could you just slow down just a little bit.

6   She may have trouble catching it.  Were you referring to carbon

7   tetrachloride at one point?

8   A.  Yeah.

9   Q.  Is that CCl4that you referred to before?

10  A.  Yes.

11  Q.  And that was the -- one of the solvents -- the common

12  solvent that was used in the barrels?

13  A.  Yes.

14  Q.  Okay.  Go ahead, sir.

15  A.  I guess the bottom line is most of those solvents have

16  corrosive properties when they're put in drums and the mix of

17  them were different mixes of chemicals from drum to drum.

18          So in retrospect it's not surprising that corrosion

19  began to occur, although I think probably when they started it

20  they didn't expect it would occur as quickly as it did, but in

21  any event I can't read their minds.

22          By the middle of a year later, July of 1959, the

23  people who were handling the drum field began to notice small

24  corrosion in the drums.  And in order to inhibit that

25  corrosion, there's a chemical called ethanolamine, which

Page 3035

1  counsel just mentioned, which is a corrosion inhibitor.  It

2  doesn't stop corrosion, but it slows down the rate of corrosion

3  in chemicals like this, it was known to do that, and it -- they

4  began to add ethanolamine to the drums that were coming out of

5  the process and being put on the field.

6       That ethanolamine addition succeeded in slowing down

7  but did not succeed in stopping the corrosion of the drums.

8       And the next record that I've come across reveals that

9  by 1962, I may have to find the substance for this which we

10  will in a minute, by 1962 a significant fraction of the drums

11  had begun to leak, not just corrosion, you know, there's a

12  difference between corrosion, and then finally the corrosion

13  leads to a leak, corroded through, leaking so that the material

14  was leaking out of the drums and onto the soil beneath the

15  drums.  That leakage which began early on was by 1962 recorded

16  by the people at the -- in the operating unit to be

17  significant.

18       I think if we can find the right reference here, it

19  was thought to be in the neighborhood of half the drums were

20  leaking.  I just have to find the citation.

21  Q.  Can I stop you at 1962 for just a second?

22  A.  Yes, right.

23  Q.  At this point there's about somewhere between 2400 and 2500

24  drums stored on the area; is that correct, sir?

25  A.  Yes, sir.

1   Q.   And CC14, or carbon tetrachloride, I put the chemical

2   symbol up on that piece of paper there, is that a corrosive

3   chemical?

4   A.   Yes.   As I said, that plus the other things were corrosive,

5   that's what caused the corrosion.

6   Q.   Okay.   And corrosion, of course, is rusting, in other

7   words, rusting?

8   A.   Yeah.   The word "rusting" is a crude word for it, excuse

9   me, Counsel, because it's really a chemical process in which

10   the integrity of the container is compromised and finally you

11   get a leak.   But it's not just rusting, there's a set of

12   chemical processes that together are called corrosion of which

13   rusting is one but not the only.

14   Q.   Okay.   Now these -- the document we just read indicated

15   that approximately three-fourths of the drums were plutonium

16   contaminated while most of the balance contained uranium.   What

17   would your view be in terms of good practices at a weapons

18   plant or a nuclear facility of storing thousands of barrels

19   containing -- in the open air containing plutonium and carbon

20   tetrachloride?

21   A.   Well, I was caught by surprise when I read this first, that

22   with plutonium in the -- known to be in residues in this

23   material, and when corrosion was first observed and then later

24   on when leakage was observed that somebody in the management or

25   in the group didn't immediately step in and take that material

Page 3037

1    and put it somewhere else, put it into fresh drums, and then --

2    that weren't corroded, and then -- or even if they were, and

3    then move it indoors or put it under a cover or something.

4         There are any number of simple steps that you can

5    imagine.  It was out in the weather, where if you live around

6    here you know it snows and rains and the wind blows, and even a

7    simple measure as a cover could have made some difference as to

8    how much corrosion there was, especially for a tarpaulin, for

9    example, as just a simple measure.  I'm not suggesting that

10   particularly, but it's a simple measure.

11        But the proper thing would have been to do is to store

12   it indoors and to have a controlled environment or store it

13   under something, where there would not be a continuing

14   corrosion problem.

15        I was also struck by another remarkable thing, and

16   this is a really interesting, difficult problem for me.

17   They -- not just apparently, they shipped drums there with

18   labels as to the contents, and within a short while the

19   weathering had disintegrated those labels, so they had no idea

20   what was in each individual drum.  And that strikes me as a

21   pretty unusually difficult and egregious practice.

22        Everywhere where I work and have worked in the nuclear

23   business, when a drum is full of material, you have a label on

24   it, it says, you know, a date, and what's in it and where it

25   came from and where it's going and a number, drum No. 46 was

Page 3038

1    generated on a certain date, and it has a certain volume in it,

2    and it's some indication of which production line it came from,

3    whether it was uranium or plutonium or whether it was carbon

4    tetrachloride or whether it was one of these other chemicals.

5           And the reason why that is important is in part

6    because let's imagine you go out to a drum and you find out

7    that five gallons had leaked out the bottom, but actually you

8    couldn't tell how much leaked out the bottom because it was

9    leaking into the soil, it's very hard to know how much leaked

10   out the bottom, but imagine you went to a 55-gallon drum and

11   there was 40 gallons left in it, you would have no idea how

12   much leaked.  Anywhere -- of course, 55 is full.  And the

13   reason is because some of the drums weren't full.  If it was 40

14   gallons left in, it could have been one gallon leaked out,

15   because it started with 41, or it could have been 15, it

16   started full.

17          Without the records of knowing what was in each drum,

18   how much, and where it came from, they didn't know whether it

19   was plutonium contaminated or uranium contaminated.  They had

20   no idea.  Without that, when the leakage started, they also

21   didn't know which of those drums were more hazardous or toxic

22   and, hence, should be attacked more quickly, you know, if

23   there's a hundred or a thousand of them, you want to take the

24   ones more dangerous or troublesome first.  These are early on

25   practices in which it seems to me they were not using proper

1    waste management practices that could have enabled them to

2    manage the field of drums properly.

3              This is only the start of it, but this is at least up

4    until 1962 when -- which is only where we've reached in this

5    chronology so far.

6    Q.   Okay.  And the leakage that they detected in 1962, what

7    should the plant management have done immediately at that time?

8    A.   Well, one of a number of things.  As I said before, they

9    could have moved them indoors and transferred the material to

10   fresh drums that weren't leaking or corroding.  They could have

11   covered it over.  They could have put the drums on something

12   besides the dirt so that if small leakage occurred there would

13   be a pan that would collect it, and they could see the

14   collection, so it wasn't in the dirt, it was on something they

15   could see.

16             All of those waste management practices are common in

17   the industry that I have been working with for many years.  Any

18   one of them would have been a sensible thing to do so that they

19   could monitor what was going on.  Instead, none of that

20   happened, and they really didn't know except by seeing sort of

21   the gross outlines of this behavior how much leakage there had

22   been or what it was that had leaked.

23   Q.   And then when they noticed that the markings were made

24   illegible through the weathering and no other good records were

25   kept of the contents, as discussed on Plaintiffs' Exhibit 223,

Page 3040

1    the Dow document, what should they have been done with respect

2    to labeling, numbering and keeping records of these drums?

3    A.   Well, I'm not sure what they should have done with the ones

4    they didn't know what was in there.  They could have labeled

5    them unknown from a date.  But the new ones coming in they

6    could have labeled.  You know, having discovered this, there

7    was just -- by the late '60s, there was a continuing practice

8    and which they didn't know it was out there.

9    Q.   Could you carry the time line forward, if you can, from

10   1962?

11   A.   Yes, I can do this without the supporting documents which

12   we can furnish.

13   Q.   Which documents would you like to consult?  Would you like

14   to look at Mr. Putzier's report or --

15   A.   Yes.

16   Q.   That's trial Exhibit P64.

17   A.   There's also a committee under a man named JR Seed, later

18   called the Seed Committee, which in 1970 they were

19   investigating this whole affair for Dow.

20   Q.   Let me refer you to this document, sir.  That's trial

21   Exhibit 1309, if you want to lay your hands on that.

22            THE COURT:  Let's take the afternoon recess.  All

23   right?

24            MR. DAVIDOFF:  Sure, your Honor.

25       (Jury out at 3:19 p.m.)

1          MR. DAVIDOFF:  Before we move -- welcome back, ladies

2     and gentlemen.

3          THE COURT:  Uno momento.

4          MR. DAVIDOFF:  Sorry, your Honor.

5          THE COURT:  I want to tell you that Mr. Bernick was

6     required to leave the courtroom the afternoon.  He's not out on

7     a frolic of his own, and he wouldn't, by any circumstance, miss

8     a single opportunity to be here if it were otherwise possible

9     for him, but he had to leave, and he asked to be excused, and I

10    excused him, and you shouldn't worry about that.  He'll be back

11    on Monday, which you can worry about.

12    BY MR. DAVIDOFF:

13    Q.  Let's look at page 3, Dr. Budnitz, of Plaintiffs' Exhibit

14    223.  The only reason I want to show you this -- or one of the

15    reasons I want to show you this is there's a slight discrepancy

16    between the number of barrels here and the number of barrels

17    that you saw on that table that was attached.  It reads:

18    "After more startup problems, the final phase of emptying the

19    drum field began on January 23rd, 1967.  By this time the field

20    contained about 5240 drums, of which approximately 3,572

21    contained plutonium contamination.  The oldest drums and those

22    containing plutonium were processed first.  To the best of our

23    knowledge, the last of the plutonium was removed on January

24    25th, 1968.  The last of the oil was transferred to a new drum

25    on May 25th, 1968, and shipped to the disposal plant on June

Page 3044

1    5th, 1968.

2            You can put that document aside.

3            So one document, one table indicated 5,140 barrels and

4    another one indicated 5,240 barrels; is that correct, sir?

5    A.   Yes.

6    Q.   And you're not quite sure which is the correct figure; is

7    that right?

8    A.   Nor does it matter much.

9    Q.   All right.  Then roughly two-thirds to three-quarters of

10   them with plutonium contamination?

11   A.   That's what it said.

12   Q.   I want to see if we can clean up a few details of the

13   testimony that you've given so far, because you think so fast

14   and sometimes you talk so fast that we may miss some things.

15   You mentioned ethanolamine, and is that a corrosion inhibitor?

16   A.   Yes.

17   Q.   Does it completely inhibit corrosion or only slightly?

18   A.   It doesn't arrest corrosion, but it slows its rate down.

19   Q.   So with these drums out there for nine years or more, we're

20   up to 1967, or so, before they start to be cleaned up, would

21   the ethanolamine inhibit or stop the corrosion of the drums?

22   A.   Well, it clearly did not stop the corrosion completely

23   because corrosion continued.  I'm willing to accept that it

24   slowed it down, because I can't know what the rate would have

25   been if they hadn't used it, but -- so -- okay.

1    Q.   You mentioned that carbon tetrachloride was a solvent.   Do

2    you know whether carbon tetrachloride was used in the glove

3    boxes for plutonium operations?

4    A.   Yes.

5    Q.   Could you just -- let me just stop you.

6    A.   It was used in the glove boxes.

7    Q.   Let me just stop you for a second.   Could you explain to

8    the jury how the carbon tetrachloride was used in the glove

9    boxes as well as a solvent in other ways?

10   A.   Well, when they were machining the carbon tetrachloride was

11   used with the oil, I understood, the oil was the lubricant with

12   the carbon tetrachloride, and then the carbon tetrachloride

13   itself was used as a cleaning agent to pick up and clean

14   surfaces that had become contaminated with whatever they were

15   doing.

16   Q.   Back in the 1950s and 1960s, was it common -- was it

17   considered good practice to have a label on every drum of this

18   type?

19   A.   I would have considered that's good practice from the very

20   start of any industrial operation.

21   Q.   And should the label have been indelible, unable to be

22   erased or --

23   A.   Well, either that or a number that says "this is drum No.

24   42" is on it and then another place there's a record that says

25   what's inside it.   You don't have to say all that on the drum,

1    but you have to have something on the drum that enables you to

2    identify that drum and go to some record to say what's inside

3    it.  Taken together, that's the system that is -- that one

4    would expect as a normal practice, as an acceptable practice.

5    Q.  Would it have been difficult to label and number the drums

6    in a way that the labels wouldn't be rubbed out over time?

7    A.  I don't believe so.

8    Q.  And would it have been difficult to keep good records of

9    the contents of the drums?

10   A.  I believe that was not only not difficult, but it was

11   universally used practically everywhere that I knew, so, of

12   course, it was just the standard practice.

13   Q.  But apparently not here?

14   A.  Clearly not here.

15   Q.  There is a statement on this -- there are some early

16   statements on this summary G569, and I would call your

17   attention to two documents, one is Plaintiffs' Exhibit P64 from

18   May 4th, 1970, which is a summary of on-site radioactive waste

19   disposal, which was written by EA Putzier, April 22nd, 1970.

20   The other document is Plaintiffs' Exhibit 1309, and that is

21   from July 9th, 1971, another Dow Chemical document, Rocky Flats

22   division, committee evaluation of plutonium levels in soil

23   within and surrounding U.S., AEC installation at Rocky Flats,

24   Colorado, the so-called Seed, S-E-E-D, report.  Do you have

25   both of those in front of you?

1   A.   Yes.

2   Q.   I'm going to ask you about some statements in those

3   documents.  Let's look --

4        MR. DAVIDOFF:  First of all, your Honor, I would offer

5   P64 and P1309.

6        MR. KURTENBACH:  Your Honor, we filed our objections

7   this morning.

8        THE COURT:  They're overruled, and the exhibits are

9   admitted.

10  BY MR. DAVIDOFF:

11  Q.   Okay.  Could you --

12  A.   I've got to find it.

13       MR. DAVIDOFF:  Can we show the jury the cover of P64,

14  and can you focus in on the author and the date, Mr. --

15  A.   This is the 364?

16  BY MR. DAVIDOFF:

17  Q.   No, this is P64, sir.

18       MR. KURTENBACH:  It's in volume 1, there's a spine

19  label that shows the volume.

20  BY MR. DAVIDOFF:

21  Q.   Now that P64 -- do you have them both?

22       MR. KURTENBACH:  I guess that's why we have cork

23  floors.

24  BY MR. DAVIDOFF:

25  Q.   P64, the Putzier report, I would like to focus your

Page 3048

1    attention on a few statements in there that are relevant to the

2    903 pad.  Could you turn to the page that's numbered 74889,

3    please.  And there's a column there "remarks" and toward the

4    middle there's an entry, "Quote from February 1959 progress

5    report.  Future problems:  The most pressing problem concerns

6    the storing of highly contaminated liquids in 55-gallon

7    capacity drums on the plant site and the urgent need for

8    treating and ultimate disposal.  There is every probability

9    that many of these drums are already leakers.  Their transport

10   to place of treatment will be tricky."

11        Now that statement is one of the ones that you have on

12   G569; is that correct, sir?

13   A.  Yes, I believe so.

14   Q.  Okay.  And let's look at page -- four pages further on in

15   the document, sir, page 074892 under "remarks," this is below

16   an entry from sometime during 1961.  This is right sort of in

17   the middle there "oil and stillbottoms."  That's it.

18        "Oil and stillbottoms, report of contamination from

19   leaking drums occurring in area and covering by service

20   department."

21        That's in 1961; is that correct, sir?

22   A.  Yes, it appears to be 7/61 which is July.  I was married

23   that month.

24   Q.  Congratulations.  You have a big birthday and you have a

25   big -- you'll have a big anniversary next year.  Okay.

Page 3049

1          So then waste disposal, if you look at the page that's

2     titled "August 17th, 1962," this is an attached letter from

3     1962 from Frank Butler to AH Sampson, and this is an attachment

4     to Mr. Putzier's 1970 report, and it's not an easy document to

5     read, it's 43 years old, but if we could focus on the first

6     paragraph there, "Subject:  Waste disposal."

7          MR. DAVIDOFF:  Actually, you need to go up a little

8     bit for the subject line, if you can.  "Subject:  Waste

9     disposal."

10    BY MR. DAVIDOFF:

11    Q.  "A question has been raised as to the necessity for the

12    Cab-O-Sil mixing facility.  The accompanying table lists the

13    general types and quantities of organic waste produced.  As

14    indicated some of these materials are burned in open pits, the

15    remaining materials are drummed and stored.  About 50 to 60

16    percent of these drums are badly corroded.  The contents of

17    several has already been spilled out on the ground in the

18    storage area.  Unless these materials are disposed of in the

19    very near future, a serious contamination problem will

20    develop."  And that's from August of 1962; is that correct?

21    A.  Yes, and that was one of the important things that I relied

22    on in my chronology of the events.

23    Q.  And you have this up here on G569, "About 50 to 60

24    percent"?

25    A.  Yes.

Page 3050

1   Q.   "50 to 60 percent of these drums are badly corroded.

2   Unless these materials are disposed of in the very near future

3   a serious contamination problem will develop"?

4   A.   Yeah.

5   Q.   And then the final statement from this lengthy document

6   that I want to focus your -- or the final document.  If you

7   look at the -- toward the very end, sir, four pages from the

8   end, begins a document, a four-page document, April 14th, 1970,

9   to Mr. Putzier, but from KJ Freiberg, both of whom were

10  officials in the Health Physics area.

11          That's from April 14th, 1970, from Freiberg of Health

12  Physics, to Mr. Putzier.  And if you look at No. 11 on page 2,

13  I think we're going to at least focus in on the numbers here,

14  page 2, paragraph numbered 11.

15          "Total number of drums originally in the field

16  numbered 5,237.  After transfer of contents, 4,826 drums were

17  transported to building 774 of which 3,572 contained plutonium

18  contaminated oil.

19          "Taking the total number of 5,237 drums minus 4,826

20  drums," this is paragraph 12, "containing 50 gallons each,

21  which were sent to building 774, leaves 411 drums to be

22  accounted for.  The best explanation for the 411 drums and the

23  volume contained within each follows:"

24          A says, "The drums were not all originally completely

25  full."

Page 3051

1          B says, "The volume taken up by the sludge which was

2    discarded with the empty barrels."

3          And C says, "Leakage out of the barrels and into the

4    ground within the storage area."

5          Finally, if you can look at paragraph No. 18, which is

6    on the next page, "In October 1968, weeds and vegetation were

7    burned off the 903 contaminated barrel storage area preparatory

8    to applying an asphalt cap over the area.  No airborne

9    contamination problems were encountered," it goes on to state.

10         What I would like you to do is if you can bring this

11   chronology up to date at least through 1967, and then we'll ask

12   you to tell the jury how they went about cleaning up the 903

13   area.

14   A.  During the period -- this figure on my left shows, during

15   the period from 1958 until the last year there is 1966, they

16   continued to add drums to the field.  By the way, a few were

17   removed, but they continued to add drums to the field, and you

18   can see the numbers going on.  And during all of that time, all

19   of those barrels continued to be exposed to the elements, even

20   though leakage had been originally -- corrosion had been

21   detected as early as we saw in the summer of '59, only nine

22   months after they started, and by the middle of '62, we have

23   records that 50 to 60 percent of the drums are seriously

24   corroded.  And then in 1964 we have records that a significant

25   number of drums had actually had their contents leak out into

Page 3052

1    the ground.

2          So what was going on was that they were adding new

3    drums to the field -- by the way, those drums had this

4    ethanolamine added into them, the new ones, to retard

5    corrosion.  But they -- until 1967, I think -- I would have to

6    find it, they had done nothing to remove the contaminated --

7    excuse me, they had done nothing to remove the drums that had

8    been corroding -- that had corroded, that had leaked, and the

9    contents were in the soil.

10          Now it's fair to say that -- you saw the drum field

11   picture.  They're packed as tightly as they can be.  You can't

12   walk between those drums.  They were put in as tightly as can

13   be.

14          So while the drums were sitting there, not very much,

15   if any, of the contamination that went into the soil is likely

16   to have become airborne and gone anywhere, it likely went down.

17   I don't think there's -- there's much that I would think would

18   have become airborne at that time.

19   Q.   When you say --

20   A.   But it was in the soil --

21   Q.   Excuse me, Doctor, when you say it went "down," you mean

22   down into the soil?

23   A.   Into the soil.  It went into the soil, and how deeply it

24   went into the soil wasn't known, because after all, there's

25   this big drum field, and they're out in the middle there, and

Page 3053

1    they hadn't done anything about it.

2          And what I'm here to tell you is that I was in another

3    large AEC laboratory at that time, actually in the middle '60s

4    I was still at Harvard, but I went to the Lawrence Berkeley Lab

5    in '67, and by the middle '70s I was a senior manager, and that

6    is absolutely an unacceptable waste management practice I know

7    of no other installation that managed any of the radioactive

8    wastes that I was involved in at that time or that I was

9    instructed to be working with in my early career in which such

10   practices had taken place, or once they were observed were

11   allowed to continue for so long.

12         And I have experience both as a worker with

13   radioactive materials and waste and then later on as a senior

14   manager in a large laboratory where we generated a whole lot of

15   radioactive wastes under my direct direction, people working

16   under me.  I myself did experiments that did that too.  And we

17   were always instructed from the start to be careful ourselves

18   as experimenters, be careful to put it in something that was to

19   be controlled, and the people in my laboratory then did

20   something with it that was controlled.

21         This example seems to me to be -- the word "egregious"

22   is a pretty strong word, but I'll use it, it's a pretty

23   remarkable example of an irresponsible practice.  That's a

24   strong word, but I use it carefully.

25   Q.  You might want to think of a synonym for egregious in

Page 3054

1   case --

2   A.   Yeah, well, irresponsible.  Egregious is beyond, way beyond

3   acceptable.  And I guess what my evaluation is based on is my

4   own work with radioactive materials all these years, and then

5   later on my work as a manager in which I understood what the

6   managerial responsibilities were to see to this not happening.

7         I have to say in my own laboratory at Lawrence

8   Berkeley Lab and then later on I was director of research of

9   the Regulatory Commission, and we had a whole lot of

10  laboratories doing work for us.  From time to time a

11  radioactive waste management problem would arise that hadn't

12  been anticipated, some new waste, or a more difficult waste to

13  handle came along that hadn't been anticipated when people who

14  were planning the work actually planned it.  And when that came

15  about, there was suddenly the need for different procedures or

16  a different approach, it was the manager's responsibility in

17  the operation out in the field to observe it, report it, get

18  the money to fix it.

19        And when you ask for money from the government, the

20  Atomic Energy Commission in those days, later was DOE, there's

21  never enough money to fund everything the laboratories want to

22  do, the priority was essentially always that money that was

23  necessary to secure safely -- radioactive materials and

24  radioactive activities received first priority, but only if,

25  and this is crucial, but only if the installation called

Page 3055

1    attention by asking for the money and giving it high priority.

2    Because there's no way that the people in the government, the

3    Atomic Energy Commission, later DOE, could generally know about

4    that.   I mean, sometimes they might, but generally it was

5    considered the responsibility of the operating contractors to

6    find the problem and call attention to it.

7           Now typically, and this is a very important point,

8    typically no standards were being violated early on.   The

9    operators would see an incipient problem, a problem that was

10   developing, it hadn't developed yet but it was about to

11   develop, and long before some standard was to be violated, of

12   course, they're held strictly to the standards, intervention

13   took place to make sure that you never even came close to it by

14   common sensical or even sometimes difficult engineering

15   solutions, sometimes there are easy solutions like here but

16   sometimes there were difficult solutions.

17          So I bring to you an evaluation in which my experience

18   is that if -- and from my own experience at these other

19   installations, if the Dow management had been as responsible as

20   I wished they had been, somewhere early on or somewhere in the

21   middle or somewhere towards the end but any number of places

22   here, intervention could have taken place that would have

23   prevented the leakage from the barrels into the soil, and later

24   on as we'll see, we haven't come to it yet, the dispersal of

25   the stuff into the soil, into the air as the drum field was

Page 3056

1  cleared and the grading took place, that's to come, you haven't

2  heard that chronology yet.

3          There's several places here where intervention could

4  have stopped the progression of events and stopped what

5  ultimately became a large release to the environment of

6  plutonium.

7  Q.  So your view is that Dow should have made this the number

8  one priority in its budget; is that --

9  A.  I'm not sure what number one means.

10          MR. KURTENBACH:  I object to the question, your Honor,

11  leading.

12          THE COURT:  Sustained.

13  A.  Yes.

14  BY MR. DAVIDOFF:

15  Q.  What was your view as to how Dow should have prioritized --

16  let me just finish the question, because then we'll have a

17  clearer record.

18          What was your view as to how Dow should have

19  prioritized the cleaning up of the 903 pad during the nine

20  years or so that these barrels were accumulated?

21  A.  Or actually the intervention before it needed cleaning up.

22  In my experience in these laboratories, and I'm now at another

23  one, Lawrence Livermore Laboratory, a small number of very high

24  priority health and safety things are identified and they're

25  given high priority, I don't know what number one means,

1    they're given a high enough priority -- the laboratory I work

2    at has a budget of $1.7 billion. If you need some small amount

3    to fix some problem, it gets high priority because in the

4    scheme of things it's not a large amount. In the scheme of

5    Rocky Flats, I have no idea what their budget was in 1959 or

6    1962 or 1964, but it doesn't matter what it was, these were

7    simple measures, not costly measures, these were measures that

8    probably didn't even require a separate appeal for funding from

9    the government, but perhaps they did. Some of them were

10   rather -- so simple as to be almost unimaginably simple like

11   throwing a tarp over it. Some are most costly, you've got to

12   bring it indoors and maybe a new facility you have to build.

13          But one way or the other, this needed to be assigned a

14   priority high enough to make sure that the release that

15   ultimately happened didn't happen. And you know what? For how

16   many years? From 1959 or '60 or '61 when it began to be

17   evident until right to the end, that priority was not assigned

18   by the management, and hence the events proceeded to the

19   releases that happened predominantly in 1969, it's off of that

20   chart. We'll come to those in a minute, I guess.

21   Q. Right. And before we get to when they finally started

22   cleaning this up after 1966, I want you to turn to

23   Exhibit P1309, Exhibit 1309. There's just some portions of

24   that --

25          MR. DAVIDOFF: Your Honor, I offer P1309 as well,

Page 3060

1    plutonium.  These investigations detected measurable amounts of

2    plutonium in the soil around the Rocky Flats plant.  The

3    epicenter quite clearly shows that this contamination could not

4    be attributed to the May 1969 fire but is due to the

5    resuspension and redistribution of contaminated soil from the

6    oil drum storage area."

7            Sir, do you know that to have been the 903 area that

8    we have been discussing?

9    A.   Yes.

10   Q.   Now if you could turn to page -- the pages ending in 327,

11   which is about five pages further on here.  And there's another

12   chronology on this page.  Well, up above, "An estimate of

13   leakage based upon a material balance around the drums

14   indicated that 5,000 gallons of oil containing about 86 grams

15   of plutonium leaked from the drums into the soil."

16           Incidentally, let me stop there for a second.  What do

17   you think about that estimate of the number of grams?

18   A.   The 86 gram estimate?

19   Q.   Yes, sir.

20   A.   Well, there's other information about how much leaked or at

21   least how much went off-site that leads me to conclude that

22   that 86 grams is too low a number, the correct number is larger

23   than that, and I can establish that later as we go along.

24   Q.   Okay.  Then I want to just look through this chronology,

25   which gives us a little more information.  The first date is

1   "July 1958, Drum storage area established.  During subsequent

2   years, drums were continually added which primarily contained

3   plutonium contaminated machining oils. "

4           Those are the machining oils from the glove boxes,

5   sir?  Is that right?

6   A.  Yes, and other places, that's right, yeah.

7   Q.  And then, "July 1959, First drum leakage discovered.  Rust

8   inhibitor, ethanolamine," I have trouble with that word, "was

9   added to drums prior to storage to minimize confusion."

10          And then "January 1964" -- now this was a little

11  different than the other document we saw which was August 1962.

12  A.  252.

13  Q.  From August 1962?

14  A.  '62, I'm sorry.

15  Q.  About the corrosion of the drums, right.  "January 1964,

16  First evidence of large scale deterioration of drums reported.

17  Soil contaminated reported as increasing."  And then if we look

18  over on the next column on the next page there, June 1968 is

19  when they indicate the last drum was shipped to building 774

20  for processing.  "High winds spread waste contamination."

21          And then down at the bottom, November 1969, the last

22  entry.  I wish the quality of this document were better, sir.

23  "Asphalt containment cover" --

24  A.  Completed, I would say.

25  Q.  "Completed," I think, "including four sampling wells," and

Page 3062

1    then if we could go just below that, please, "The deposition of

2    the contamination in the soil of the drum storage area began

3    shortly after the drums were placed in the area."  If you could

4    just highlight that.  "Resuspension and redistribution of the

5    contamination, however, was certainly not a simple mathematical

6    function of time.  The quantity redistributed was directly

7    associated with removal of the drums which exposed the

8    contaminated soil, physical activity in the area, and the

9    periodic high winds found at Rocky Flats."

10            Now we may see some more documents about this, but I

11   want to ask you about these three phenomenon particularly.  The

12   physical activity in the area, do you recall what some of that

13   activity was?

14   A.   Yes.

15   Q.   Could you tell the jury, please?

16   A.   Well, in 1964 or so, they five -- and '5, in that time,

17   they removed some of the barrels to do some testing of a

18   process which they had developed which they thought might have

19   enabled them to stabilize the chemical composition of the waste

20   material, and that process didn't work very well.  And so in

21   that period there was a little bit of disturbance of the soil;

22   in other words, they would pick drums up and the soil is

23   exposed underneath in a way that makes it available for the

24   wind to pick up and blow it around.

25            Except for that 1964, 1965 there wasn't much physical

Page 3063

1    activity in the 903 pad area except adding new drums, until

2    1967 or -- I think it was 1967 when they began -- it says here,

3    "They began finally in 1967 to remove these drums and ship them

4    to another building where they put them in clean barrels for

5    ultimate disposition," and they did that in 1967.  Of course, I

6    want to remind you that was a whole bunch of years after the

7    other thing.  And as it said here, the last drum was shipped to

8    building 774 in June of 1967.

9              Now as they picked up each of those barrels, they

10   exposed soil.  And when they were done with it all, the whole

11   soil area had been exposed, it was just out in the open.  It

12   wasn't until a year later, or perhaps -- let me look here, a

13   year and a half later that they finally covered it with

14   asphalt.  Maybe it was even two years later.  I would have to

15   look at the thing.

16             So there was a period when they removed the drum, the

17   soil was contaminated, and it was sitting there so that when a

18   wind would come along it could disperse it.  And it wasn't

19   until much later that they put the asphalt on to finally seal

20   up what was underneath.

21             And, again, just to speak here -- there's

22   documentation to corroborate all of this chronology I'm talking

23   about.

24             That seems to me to be also an egregious, just an

25   irresponsible practice.  They could have removed ten drums at a

1  time and put asphalt on it. You can put asphalt on in very

2  small quantities. I just did it at home, you know, with a

3  little pad that we have. They could have done it bit by bit

4  and then finally covered it over properly at the end with

5  something smooth, but they didn't do it one at a time, they

6  removed all the drums, then waited another year and a half, and

7  then finally they put the asphalt on it.

8       And you know what? It's windy out there. You live

9  here in this country. You must understand this. And one

10  episode after another, there were a half a dozen, actually, of

11  high winds coming off the Front Range right out there, picked

12  this stuff up, and we have evidence that it picked it up and

13  correlated it with measurements that are made --

14  contemporaneously with that, and it blew it to the east great

15  distances. That would not have happened if they had taken

16  these drums up and covered it with asphalt, just simple things

17  like that they could have done which wouldn't have cost a lot.

18  It wouldn't have been difficult to do.

19       This has been the final example of a string of

20  activities where some simple intervention could have prevented

21  this contamination. And by then they knew the soil was

22  contaminated. That's what they were doing. They saw some of

23  the drums were leaked out, empty, and some were only half full.

24  They saw it in the soil. They knew it was out there. And yet,

25  strangely, Dow didn't even ask for the money for the asphalting

1   until this was done, instead of assigning it the priority it

2   deserved.

3          So I just offer you this as an example of a final sort

4   of capping of this event when a whole lot of stuff got blown

5   off-site that need not have happened.

6   Q.  Dr. Budnitz, let me go back.  Thank you.  Thank you for

7   setting the framework.

8          We have a time line, I think, G5 -- 502?  This is a

9   time line of the cleaning up of the -- on the cleaning up of

10  the site, and maybe this will help you to enable you to help

11  explain to the jury what happened.

12         Before January of 1967, when this time line starts,

13  we've got either 5,140 or 5,240, depending on whose count is

14  the more accurate, of these barrels leaking and corroded,

15  leaking into the ground.

16         Could you tell the jury what happens then?

17  A.  Well, by June of 1968 they had all been removed, so they

18  were being removed between the middle of '67 and the middle of

19  '68.  I just want to steer the jury to the top line.  JFMAMJ,

20  that's January, February, March, April, May, those are the

21  months.  Okay?  And that's -- and at the bottom too.  That's so

22  that you can key to the bottom scale.  There's this red figure

23  here, which is keyed to that bottom scale.  And what that

24  figure shows on the vertical axis shows a measure in one

25  particular air monitor, a so-called monitor S8, it's just a

1   particular air monitor that was east of the 903 area, and those

2   are the monthly average measured air concentrations of the

3   plutonium in that air monitor for January and then February and

4   March.  You can see each month plotted there, and then the dots

5   are connected.

6          And you can see that in January '67 there wasn't much,

7   and the peak seems to have occurred in October of 1968.

8          This monitor was making actually measurements every

9   day, and they had weekly averages and monthly averages.  What

10  you are showing here is monthly averages.  We actually have

11  every day if you wanted to see those.

12         But the thing I'm leading you to here is if you look

13  at the top of the time line, it took from early '67 until the

14  middle of 1968, it says 18 months to remove drums, January '67

15  begins the removal, June '68 removes the last of it.

16         During that period, the bottom figure from this

17  monitor S8 shows that there was -- there were apparently some

18  dispersal in September and then again in November of 1967 and

19  then more in January, February, March, April and May of 1968.

20  And then after they removed all the drums, the drum removal

21  activity itself, you just have to measure it, forklifts and the

22  like, stirs things up.  After they removed all the drums, there

23  was five months of inactivity before they started grading the

24  site for putting down the asphalt, and during that period there

25  wasn't much disturbance, and you see the monitor shows not much

Page 3067

1    getting off.

2            But then in 1968, in October, they started -- or maybe

3    it was November, they started to grade this with graders to

4    make it level in order to put the asphalt down.

5            And right in the middle of that grading, several high

6    winds came off the Front Range and dispersed the stuff, and we

7    know that, because they are correlated with the measurements in

8    this monitor S8.

9            Now another important thing for you to know is there

10   are monitors -- this is the monitor that's east of the site.

11   The Front Range, of course, is blowing west to east.  There

12   were other monitors south of the site and north of the site

13   that showed small but not large contamination like this,

14   telling us that, of course, it was correlated with that wind

15   coming from west to east, that pattern.  And later on the

16   pattern of dispersal in the soil which we're going to come to

17   later clearly demonstrates that it came from that pad and it

18   came from those wind events.

19           The other thing to tell you is that there are a few

20   high wind days that showed very high readings in the S8

21   monitor, but except for those high wind days, there was always

22   a little bit -- but other days the readings showed -- they

23   weren't zero, but they were rather smaller numbers like this --

24   more typical of what you see on the left side in early 1967, or

25   in this inactivity period.

Page 3072

1    opinions of Dow's management concerning the 903 pad.  What is

2    the G number on that?  The whole series.

3            MR. KURTENBACH:  Was this turned over as an exhibit?

4            MR. DAVIDOFF:  G508 --

5            MR. KURTENBACH:  Can I have a copy now?

6            MR. DAVIDOFF:  Can we show these graphics, starting at

7    G508?

8    BY MR. DAVIDOFF:

9    Q.  The first one is labeled "Failure to Label the Drums

10   Effectively, Poor Labels of Contents."  And I know you've

11   mentioned this but could you comment briefly on that.

12   A.  Yes.  Actually I've done so already.  I ought to say that

13   there's a list of things that he's about to show you that

14   actually came straight from my report and which are mine, not

15   counsel's, and which he's about to show you.  Yes, I commented

16   on the failure to label drums effectively ones before.

17   Q.  So the first item is, "Failure to label the drums

18   effectively and poor labels of contents"; is that correct?

19   A.  Correct.

20           MR. DAVIDOFF:  Can we show the next graphic, please?

21   BY MR. DAVIDOFF:

22   Q.  "Failure to protect drums from weather.  The drums were

23   left on the 903 pad unprotected for many years.  Many corroded

24   and leaked."

25   A.  Yes.

Page 3073

1   Q.   Again, this was the second management failure that you

2   identified?

3   A.   Yes.

4   Q.   Do you want to make some comments on it?

5   A.   I've already talked about that at length too, I believe.

6   Q.   Okay.  Let's go to the third one.  "Failure to keep good

7   records on the drums.  Drum labels were unreadable and, quote,

8   no other good records were kept of the contents, unquote.  Dow

9   letter April 19th, 1970."

10  A.   Yes, that could have easily been, by the way, first rather

11  than third because labeling the drums and keeps those records

12  are one and the same, it's a single practice which was a

13  failure.

14  Q.   Well, one of the things that you do with the drums is to

15  stamp a number into the drum; is that correct?

16  A.   Well, there are any number of ways of labeling drums.  You

17  can paint, you can stamp.  There are any number of ways of

18  making sure that even if it's out in the weather, which it

19  shouldn't have been, that you can note that that's drum 64.

20  And the records are kept somewhere else.

21  Q.   The fourth item is, "Failure to stop drum leakage.

22  Although chemicals were added against corrosion, drums remained

23  outside exposed to weather."  Was that --

24  A.   Yes, to elaborate on that again, although I said it before,

25  the way to stop the drum leakage was to move them indoors or to

1    cover them so that they were no longer exposed to the elements.

2    Q.  Go ahead, sir, finish your answer, please.

3    A.  There were any number of -- two or three things, any one of

4    which would have worked there, which I'm sure we could all

5    understand.

6    Q.  Okay.  Let us go to the next --

7    A.  Leaving them outside wasn't the one -- wasn't the answer.

8    Q.  All right.  Let's go -- "failure to adequately monitor and

9    record condition of area 903"?

10   A.  Yes.

11   Q.  Could you elaborate on that a little bit, please.

12   A.  Well, they didn't go and take soil samples and measure

13   them, even though that technology was easily available to them.

14   So they only knew that stuff had leaked into the subsurface,

15   but -- into the soil, but they didn't know how much.  They

16   didn't make measurements of that to ascertain how much was in

17   the soil.

18   Q.  All right.  And then can we look at the last point, and I

19   think we even have this on a board.  We have all six of them on

20   a board.  These are directly from your report, these six

21   conclusions about their management failures?

22   A.  Yes.

23   Q.  And the sixth one was, "Failure to prevent the spread of

24   contamination during the, quote, cleanup, unquote, of area

25   903"?

Page 3075

1  A.  Yes.

2  Q.  And what are some of the steps that could have been taken

3  to prevent the spread of contamination?

4  A.  I mentioned those before, they could have covered them.

5  They could have covered small areas at a time as they removed

6  the drums so that when a drum is removed the soil wasn't open.

7  They could have covered it with a tarpaulin or wooden houses or

8  with some building.  There are any number of several things

9  they could have done which would have left it unexposed rather

10  than exposed to the elements.

11          And then, by the way, you notice that after they had

12  cleaned the whole thing off, which is an 18-month process, it

13  was still another five months before they started the grading.

14  They didn't even start right away.  They could have started

15  halfway through or partway through, which is sort of an

16  intermediate step, which is what I was suggesting.  Any number

17  of easy things that I think we all can understand.

18  Q.  Now I take it you have been at many nuclear facilities,

19  including nuclear weapons facilities in your career, sir?

20  A.  Yes.

21  Q.  And have you ever seen this kind of management failures for

22  this extended a period of time --

23          MR. KURTENBACH:  Object to the form of the question,

24  leading.

25          MR. DAVIDOFF:  It's not leading, actually.  If he says

1   yes, I think Mr. Kurtenbach would be very happy.

2          THE COURT:  It is leading, and the objection is

3   sustained.  Rephrase it.

4   BY MR. DAVIDOFF:

5   Q.  Can you tell us -- can you tell us where, if ever, the many

6   other nuclear weapons and nuclear facilities that you have

7   visited you have seen management failures as -- for as long a

8   duration and to as great an extent as here?

9          MR. KURTENBACH:  Same objection, your Honor.  It

10  suggests the answer.

11         THE COURT:  It does.  Sustained.

12  BY MR. DAVIDOFF:

13  Q.  Without suggesting any answer to you, sir, can you please

14  tell the jury your assessment and your appraisal of these

15  management failures in light of your experience at many other

16  nuclear weapons facilities and nuclear facilities in your

17  40-plus-year career?

18  A.  Yes.  There are a couple of other instances around what we

19  call the AEC weapons complex and now the DOE complex which were

20  pretty egregious like this, there were a couple more.  This is

21  among the worst, okay, if not the worst, because it went on for

22  so long.  There are a couple of more, though, which I could

23  explore with you.  It doesn't excuse -- it doesn't excuse it,

24  because you should know that generally throughout the complex

25  these materials were handled very well.

1    Dr. Budnitz.

2    BY MR. DAVIDOFF:

3    Q.   Dr. Budnitz, I know this is highly technical, but we're

4    going to try to speed it up a little bit more, if we can.

5         Can we put up Exhibit G613, this is from page 34 of

6    your report, sir, you gave some estimates from Krey and Hardy

7    and Poet and Martell and ChemRisk of plutonium that escaped

8    outside the security fence in curies.  There is a little symbol

9    next to the Poet and Martell number.  What could -- could you

10   tell the jury what that symbol means?

11   A.   That means that they said it was greater than 6.6, that's

12   what that symbol means.

13   Q.   Okay.  And then your quote there, why don't you read the

14   jury your quote, just two sentences, and then explain what you

15   meant?

16   A.   It is crucial to emphasize, also, that the apparent

17   accuracy of these mean values, quoted to two significant

18   figures, is deceiving.  Based on our current state of

19   knowledge, the actual value could be perhaps over a few hundred

20   curies, without contradicting the measurements.

21   Q.   Okay.  Could you explain to the jury what you mean by that,

22   and give your reasons to --

23   A.   Well, there are uncertainties in several places in the way

24   these measurements are made, uncertainties in how the soil is

25   sampled, uncertainties in how the soil samples represent what's

1   actually there, uncertainties in the way the samples themselves

2   are -- that they do chemistry on the soil samples in order to

3   prepare them for counting, uncertainties in the way of count of

4   the radioactivity is done.

5          Crucially, you make measurements in a bunch of

6   individual, discrete places around the area, and then from

7   that, you try to sum up how much the total is in the whole --

8   we'll call it the map.  But, of course, they didn't measure

9   everywhere, they didn't measure in every -- in every bit of

10   soil, so they have to try to estimate from the things they did

11   measure what's in between.

12          And there could be places where plutonium accumulated

13   in between the places where they measured that could be higher.

14   By the way, there also could be places where it could be lower.

15   And because of that, there is uncertainty in how you interpret

16   the measurements that were made in terms of the total that

17   was -- that was actually out of the environment in the time

18   they made the measurements.

19          If you look at the uncertainties and try to figure out

20   what they could mean, and I've done that, and there are three

21   or four important sources of uncertainty, I conclude that these

22   numbers could be ten times as high, roughly, and still

23   consistent with the measurements.

24          Now, it's not as likely they are ten times as high as

25   they are, that they're twice as high or half as high.  The mean

Page 3161

1   estimates are likely to be in the range, if it's the correct

2   value, but it's possible, and certainly consistent with all the

3   measurements that were made, that considerably amounts of

4   plutonium could be out there -- excuse me, were out there at

5   the time, I have to say, were out there at the time, that --

6   that -- than the numbers that were quoted here.

7           I also -- when I talked about the apparent accuracy,

8   you can give two significant figures like 3.4 or whatever, but,

9   in fact, if you think that it's somewhere between 2 and 5, and

10  3.4 has kind of an accuracy to it that is deceptive unless

11  you're attentive to this fact that there is this range in which

12  it could be.

13  Q.  All right.  And you mentioned some uncertainties, several

14  uncertainties, one of them I'd like to call your attention to

15  is the HASL estimate, Health and Safety Lab estimate from the

16  Atomic Energy Commission, was their estimate different from

17  Mr. Freiburg's estimate?

18  A.  Yes, all the estimates differ in detail, they're all based

19  on different sets of measurements and all based on different

20  sampling locations and different ways of trying to sort out

21  from the sampling what the total is that is sort of in between

22  that they didn't sample.

23  Q.  Then you had a final conclusion on Dow's waste management

24  practices as they related to the 2 -- the 903 area, that's at

25  page 50 of your report, it's G511 -- 611, sorry.

Page 3162

1          MR. DAVIDOFF:  And was G613 received?  I want to make

2     sure that's received.

3          And then we offer G611 as well, Your Honor.

4     A.  I'm sorry.

5          MR. KURTENBACH:  Same objection, Your Honor.

6          THE COURT:  It's admitted over objection.

7          (Exhibit 611 admitted.)

8     BY MR. DAVIDOFF:

9     Q.  Let's show G611 -- and 611 and 613 are received.

10          I'll read it, maybe then you can explain --

11     A.  Point me to which page it's on.

12     Q.  Page 50 of your report, it should be on the screen in front

13     of you too, sir.

14     A.  I've got it, thank you, of course I have it.  And I can

15     just go straight to the -- to the -- to my overall conclusion,

16     and I said this several times before.

17          The poor waste management practices that Dow practiced

18     at that time were the direct reason why the radioactivity from

19     the 903 area ended up in the environment east of the plant.

20     There were -- and we went over this Thursday and some this

21     morning.

22          There were several places that -- where they could

23     have done -- excuse me, should have done the right thing,

24     better, and it wouldn't have happened.  I said there, had these

25     waste management practices been competent, these plutonium

Page 3163

1    releases would have been prevented from occurring in the first

2    place; would have been monitored and analyzed when and after

3    they occurred; and in any event, would have been understood

4    better by both the Dow Rocky Flats plant management and the

5    AEC.

6         I believe -- and this is the -- just says right there,

7    I'll paraphrase, for the Dow Rocky Flats plant not to have

8    prevented those releases in the first place, nor to have

9    monitored them when and after they occurred, was an egregious

10   breach of acceptable waste management practice.  The word

11   egregious is a pretty strong word.  I believe it was an

12   egregious breach of waste management practice.  Certainly after

13   it happened, or while it was happening, they didn't see where

14   it went.

15        That's my -- that's my bottom line conclusion about

16   the competence or the lack of competence of waste management

17   practices.

18   Q.  All right.  I want to move, Dr. Budnitz, to the two largest

19   fires, the two fires that the jury's heard the most about, the

20   1957, September 11, 1957, plutonium fire, and the May 11, 1969,

21   plutonium fire.

22        Did you write a separate report, P-1151, which has

23   been received, about those fires?

24   A.  Yes.

25   Q.  And did you -- did you study both fires to determine what

1    spread of fire was demonstrated quite dramatically in the fire

2    of May 11, 1969, and this was a memo from a gentleman Dunning

3    to a gentleman, Roser, which I quoted in my letter.  I suppose

4    we could find it, if you wish.

5    Q.   Okay.  Could you look at the G507A, the fifth point was

6    electric power, could you explain that to the jury.

7    A.   There is, of course, electrical power throughout these

8    facilities, and in 1957, the electrical power had two important

9    things that it did.  First, it produced illumination, light, so

10   that the firefighters could be effective.  And that was lost.

11   And secondly, it -- the electric power was running fans and

12   instruments which -- the fans to ventilate and instruments to

13   read the radioactive readings, and because of that loss of

14   electricity, they -- the firefighters had their effectiveness

15   compromised, and the instruments that we have to understand

16   what radioactive readings there were were compromised also.

17        So after the fire, there was a recommendation that

18   electrical power running throughout this -- this construction

19   facility -- excuse me, the facility for making bomb parts be

20   carefully isolated so as to minimize the possibility that it

21   would be lost in a fire.

22        And you can't eliminate the possibility, but you can

23   minimize it by placing the electrical service -- the electrical

24   buses in conduit or other protective metal casing, for example,

25   so that there is a way -- way less chance it will be

1    compromised.

2            And in 1969, the fire compromised the electric system

3    again, and the investigation came back again and again

4    identified that that recommendation had not been fully

5    implemented.

6            And, again, the firefighters had trouble, because of

7    the loss of lights.  And the monitors were out.  And, again,

8    the -- the fans and the filters weren't working as properly as

9    they could have.

10            MR. DAVIDOFF:  Now, can G503 through 507A be received,

11    Your Honor?  I think the objection has been overruled on those.

12            THE COURT:  Yes, they're admitted.

13            (Exhibit 503-507A2 admitted.)

14    BY MR. DAVIDOFF:

15    Q.  I'd like to go back to the 1957 report.

16            MR. DAVIDOFF:  Sorry, 507A2, 507A2, I was wrong on the

17    number.

18            THE COURT:  All right.

19            MR. DAVIDOFF:  Thank you.   And those are received.

20    BY MR. DAVIDOFF:

21    Q.  I want to go back to Exhibit 1290 --

22            MR. DAVIDOFF:  Can I get the Elmo, Ms. Bush.

23    BY MR. DAVIDOFF:

24    Q.  This is from page 2526 and -27 of the 1957 fire report,

25    under the heading, Recommendations.

Page 3204

1   776-777.

2   Q.  And to save time, sir, I'm going to read -- there are quite

3   a few conclusions under that, but we're going to move on now.

4          I'd like to look at two call-outs from your report.

5   One is G -- G539, under the heading "Contamination" -- and this

6   actually is going back to the G539, this is actually going back

7   to the 1957 fire, now.

8   A.  Go ahead, I don't think I've got it yet, but --

9   Q.  G639 is what I've -- oh, G639, my apologies.

10         If you could just read this excerpt from your report

11  to the jury and explain the significance.

12  A.  Yeah, let me find where it was in my report.

13  Q.  It's page 8 of your report, sir.

14  A.  Yeah, thank you.  This has to do with the 1957 fire.  The

15  investigation report did not -- that referenced 20 is to the

16  report -- did not state any conclusions about the possible

17  spread of plutonium contamination from the burned-out filters

18  and stack.  Because the fire resulted in a loss of electrical

19  power, it was not possible to determine the plutonium

20  concentration in the main exhaust duct from September 11

21  through September 18.  And by the way, the fire occurred on

22  September 11, right?  Let me look.

23  Q.  September 11, 1957.

24  A.  Yes, it was September 11, from September 11 until

25  September 18.  On September 19, the concentration emitted from

1  the main exhaust -- they finally must have restored power on

2  that date.  The concentration emitted from the main exhaust was

3  measured at 2086 disintegrations per minute per cubic meter

4  compared to 0.68 during the ten days prior to the fire.

5       Even nine days later, there was a very large amount

6  being emitted from the stack -- from the exhaust, main exhaust,

7  ten days -- that would have been eight days after the fire.

8  Q.  Okay.  Now, similar -- so, in other words -- in other

9  words, for eight days, there were no readings as to the --

10 A.  That's correct, that was because of the loss of

11 electricity.

12 Q.  Okay.  And even on the ninth day --

13 A.  It was very large.

14 Q.  It was something like 3,000 times as high as it was before?

15 A.  Well, whatever the numbers are, whatever the ratio of 2,000

16 something is to 0.68.

17 Q.  Okay.  Now, let's look at the 1969 fire, and let's look at

18 G640, which is a call-out from your report.  And before we show

19 that, just so that the jury can see, this is also under the

20 heading of "Contamination."

21      Under the heading of "Contamination" in your report, I

22 have this quote, could you explain what that means to the jury,

23 please.

24 A.  I've got to find it.

25 Q.  Page 16 of your fire report, which is P-1151.

1   A.   Thank you.

2        This is about the 1969 fire.

3   Q.   That's right.  Why don't we --

4   A.   Because they lost power -- the crucial point is here -- no,

5   that isn't what I was after, unless it is what you're after.

6   Q.   No, I think we need to go to the next page, page 16.  I

7   think we still need to go down below that.

8   A.   I'll -- I'll describe it to the Court and the jury as you

9   do it.

10       They had a -- an exhaust system in the plant that

11  collected the air from the glove boxes and from the room air,

12  and they ran them into a plenum -- a big duct space, where all

13  of the air was to go through these filters before it was

14  released to the air, to the outside, that was the filtering

15  system that in order to make sure nothing was released.

16       And that was -- that was main exhaust system.

17       Now, just read it here, in the middle of the three

18  lines down the second paragraph, it says, The power failed, the

19  power failed to the exhaust air samplers.  Keep going, the AEC

20  stated that there was evidence of fire downstream of the fourth

21  and final stages of the HEPA filters, meaning that these

22  filters were likely breached with potential plutonium.

23  Although the mainly -- I want -- without interruption, the

24  booster system 1 exhausted directly to the atmosphere without

25  passing through the main exhaust; therefore, the main exhaust

Page 3207

1    sampler didn't capture that.  Here is the crucial point.

2         It -- without going into the exhaust system, going

3    straight to the atmosphere, hence it wasn't going out the

4    filters, of course, the sampling system in the exhaust didn't

5    sample it either, because it wasn't going there.

6    Q.  Are there any reliable measures, then, of how much

7    plutonium may have escaped in the 1969 fire?

8    A.   There are estimates --

9         MR. KURTENBACH:  Object to the form of the question.

10        THE COURT:  Overruled.

11        THE WITNESS:  There are estimates based on the --

12   there are -- we have the following evidence:  There are some

13   estimates based on some measurements in the stack about how

14   much went out the stack.  But we know some of it didn't go out

15   the stack through the exhaust system; it went out through other

16   pathways.  And therefore, what went out the stack is certainly

17   an amount, but that -- more than that went out.  We don't know.

18   Those estimates, based on the source measurements, are not

19   reliable, although we -- although we have some measurements.

20        The most reliable way to figure out how much went out

21   is to look at the air monitoring of the measurements around the

22   site, around -- they had air monitors around the site and some

23   off-site, which they took measurements on, and you can use

24   those to try to figure out how much went where, the wind was

25   blowing in a certain direction, and so on.  And those are

Page 3639

1   Q.  How much plutonium 239 does it take to cause cancer?

2   A.  Well, the way we believe cancer works is that it -- it's a

3   process that happens at the cellular level.  So one radioactive

4   transformation can cause a cancer.  So down to one atom of

5   plutonium can cause a cancer.  Of course, the risk is bigger if

6   you have more plutonium.

7   Q.  What is the difference between insoluble and soluble

8   plutonium?

9   A.  Well, the difference is chemistry, it's what -- what's

10  combined chemically with the plutonium and whether or not that

11  stuff can be dissolved in water, which is what people are

12  mostly made of.

13          In -- for insoluble plutonium -- as a practical

14  matter, when insoluble plutonium is inhaled, the -- most of

15  that stays in the lung for quite a long time.  It's not easily

16  processed.  So insoluble plutonium is more of a hazard to the

17  lungs; soluble plutonium will be processed by the body and will

18  come more to bones and liver.

19  Q.  And is plutonium oxide an insoluble plutonium or a soluble

20  plutonium?

21  A.  Plutonium oxide is insoluble.

22  Q.  So does that mean that it will stay primarily in the lungs,

23  the hazard is primarily in the lungs?

24  A.  The biggest hazard is in the lungs.  It's not that the

25  lungs are incapable of getting rid of insoluble foreign matter.

1   an overview.

2   A.   Yeah, well, I -- I mean, when you mentioned my report, that

3   was 1996, so I'm not going to remember every one of them, even

4   if I tried to do it.

5        But the big reports were the initial study that was

6   done by ChemRisk Corporation, that was the first phase of the

7   Colorado Department of Energy study.  And there were the second

8   phase of that study, which was being done by Radiological

9   Associates -- oh, my goodness -- I call this RAC, R-A-C,

10  Radioactive Associates Corporation, and I sometimes forget what

11  the letters mean.

12       Anyway, they were in the really early midpoint of

13  their work, but there were a number of draft documents that

14  they had produced that I used.

15       And then there were lots of other documents that were

16  referred to in this work.  And I -- I looked at a bunch of

17  them, not every possibility.  And there is a pretty long

18  bibliography to my report.

19  Q.   Okay.  Do you have a security clearance?

20  A.   I do not.

21  Q.   Did you look at any classified documents?

22  A.   No.

23  Q.   Are there limitations in the available data about releases

24  to the public, in the documents that you looked at?

25  A.   In the documents -- when I was preparing my study and my

Page 3656

1   report, there were references in some of these documents,

2   pretty good -- some of the draft RAC documents to classified

3   material that would provide more information about some of the

4   things.

5          But how much of a limitation, I had no way of

6   evaluating that.  I was not looking at classified materials,

7   and I had no way of evaluating how much -- how important they

8   were.

9   Q.  Okay.  Were there any limitations with regard to what kind

10  of monitoring had been done at the time of the releases?

11  A.  Okay.  Now you're taxing my mind.

12         Could you maybe try --

13  Q.  You want me to ask a different question?

14  A.  Yeah, try a different question.

15  Q.  Okay.  When you went to do a dose reconstruction -- and

16  we'll get to what that is in a minute -- okay, were there data

17  such as off-site monitoring data that you would have liked to

18  have that didn't exist?

19  A.  Oh, okay.  I was being obsessed with classified documents.

20  But documents that didn't exist, it's easy to talk about.  And

21  it's important.  If you look at the dates from all of these

22  events, most of what we're talking about is -- are events that

23  occurred before 1970, the big events.  And there was really

24  very little off-site monitoring that was going on.  And what

25  monitoring there was, maybe we'll talk a little bit more about

Page 3657

1    it.

2          But what monitoring there was -- nobody was going out

3    there and looking to say how much plutonium has been released

4    off-site, who was exposed to it.  There was no systematic look

5    for this radioactive material.

6          And so everything we were doing, being in my small

7    report and these big studies, was trying to figure out the

8    history from very incomplete measurements and information.

9    Q.  Okay.  I would like now to ask you, do you have an opinion

10   as to how dangerous the exposures to radioactive and other

11   toxic materials were to people living in the area faced as a

12   result of the operations at Rocky Flats?

13         MR. KURTENBACH:  Object to the form, vague as to time

14   and vague as to the people living in the area.

15         MS. ROSELLE:  I'll rephrase it, Your Honor.

16         THE COURT:  All right.

17   BY MS. ROSELLE:

18   Q.  Do you have an opinion as to how dangerous the exposures to

19   plutonium were for the people who lived in the class area as a

20   result of the operations of Rocky Flats?

21         MR. KURTENBACH:  Your Honor, I wouldn't object to it

22   if it's just limited to the class members.

23         THE COURT:  Overruled.

24   BY MS. ROSELLE:

25   Q.  Okay.

1  A.  Yes, I have an opinion.

2  Q.  Okay.  And is your opinion on page 4 of your report?

3  A.  I'm not sure, but I'll check.

4        MR. KURTENBACH:  Your Honor, may I be heard on this

5  matter at side bar?  I think it is significant issue.

6        THE COURT:  All right.

7        (Hearing at the bench at 10:43 a.m.)

8        MR. KURTENBACH:  Your Honor, I'm not sure where she's

9  headed.  Page 4 of his report deals with medical monitoring, a

10  part of this case that's no longer with us.  And unless there

11  is something in particular you can point me to, the entirety of

12  this page deals with medical monitoring.  The heading says so

13  right now.

14        MS. ROSELLE:  All right.  The sentence I'm going to

15  show him was, in my judgment these exposures were significant

16  and sufficient to cause latent diseases among members of the

17  exposed group.  That's all I'm going to ask him about, Your

18  Honor.

19        THE COURT:  The objection is overruled.  It's

20  admissible.

21        (Hearing in open court at 10:44 a.m.)

22  BY MS. ROSELLE:

23  Q.  Did you find that sentence?

24  A.  Yeah, I think I did.

25  Q.  And could you -- this is from your 1996 report?

1    A.   Yes.

2              MS. ROSELLE:   This is Exhibit No. 1124, Your Honor.

3    We would move to admit Exhibit 1124 as redacted.

4              THE COURT:   It's admitted over objection.

5              (Exhibit 1124 admitted.)

6    BY MS. ROSELLE:

7    Q.   Would you turn please to page 4.

8    A.   Yes.

9    Q.   And would you tell the jury, please, Doctor, what your

10   opinion is.

11   A.   Okay.   My opinion is --

12   Q.   Just the one sentence.

13   A.   The one sentence -- I could probably point to the sentence.

14   I'm not -- I'm not good at this.

15            Okay.

16   Q.   You didn't do that; Mr. Signorelli did.

17   A.   Okay.   I waved this and the thing went the other way.

18            Anyway, this is the sentence we were all looking for,

19   that the people in the operations from Rocky Flats exposed

20   people to -- I will say now, radioactive elements, plutonium,

21   so that -- since that's what I'm talking about, and the

22   exposures were significant and sufficient to cause latent

23   diseases among members of the exposed group.

24   Q.   Okay.   And what is a latent disease?

25   A.   Well, cancer is a latent disease.   What we mean by a latent

Page 3660

1  disease is a disease that may appear long after the exposure

2  that caused it.  So, you know, if you're exposed to a germ for

3  a cold, and you get the disease two days later, even there you

4  might call that a latency period.  But in the case of cancer,

5  latency periods are ten years or more.

6  Q.  And what is the basis of this opinion?

7  A.  Okay.  The basis for this opinion is, one, the literature

8  shows clearly that plutonium was released off-site in

9  significant quantities and that there were -- and that people

10  off-site could -- would have inhaled this plutonium.  Plutonium

11  is radioactive and causes latent disease.

12  Q.  Okay.

13  A.  So it's a -- cancer, in particular.

14  Q.  Were the risks to all of the members of this class

15  significant?

16  A.  Okay.  Now, I want to be sure I'm saying this right,

17  because what I didn't do was carefully figure -- was -- the

18  definition of the class is something that I don't actually

19  truly know about, okay.

20        What I said was people living in the area.  And the --

21  and so let's talk about them.  Okay.

22        For people living in the area, the exposures and the

23  risks could have been really different, depending on when

24  people were there.

25        In particular, if people weren't there for, say, the

1    '57 fire, they wouldn't have had an exposure to the '57 fire.

2    So depending on where -- when they were there, depending on

3    where they -- where they were living or spending their time,

4    and depending on lots of other individual characteristics,

5    there would be quite a range of exposures and quite a range of

6    risks.

7    Q.   Okay.  So when you say, In my judgment these exposures were

8    significant and were sufficient to cause latent diseases among

9    members of the exposed group, you're not talking about everyone

10   that lived in the class area?  In other words, not everyone had

11   a significant exposure?

12   A.   Well, some of the exposures for people living in the class

13   area were really small.  And significance, you might call sort

14   of a policy to when you take it seriously.  But some of these

15   are very, very small exposures.  And, for instance, regulatory

16   agencies would not have been concerned about such exposures.

17   Q.   Okay.  We'll get back to the members of the class in a few

18   minutes.  I just want to make sure that the jury understands

19   that this statement refers to some members of the public, but

20   not everyone in the class; is that correct?

21   A.   This -- depending on what one means by "significant."  I

22   think everyone who is living there would have inhaled some

23   amount of plutonium.  And so everyone who was -- from my linear

24   curve, everyone who was living there would have had some risk.

25   But for many -- many such people, those risks would have been

Page 3662

1    extremely small.

2    Q.  Do you have an opinion to a reasonable degree of scientific

3    certainty whether there is an increased risk of cancer as a

4    result of the exposures to radio -- to plutonium at Rocky

5    Flats?

6    A.  Yes.  I think I just said that.

7    Q.  And what -- and could you just say it again, for the

8    record, please.

9    A.  All right.  Yes.  Even small amounts of inhaled plutonium

10   put people at risk of lung cancer.

11   Q.  Do you have an opinion to a reasonable degree of scientific

12   certainty that there are future risks of cancer from the

13   plutonium that remains in the soil --

14        MR. KURTENBACH:  Your Honor, object to that, goes

15   beyond this report, he did no work past '89 in terms of

16   calculating risks or exposures --

17        MS. ROSELLE:  That's not true, Your Honor, it is in

18   his report.

19        THE COURT:  It is, I'm familiar with that.  The

20   objection is overruled.

21   BY MS. ROSELLE:

22   Q.  You want me to start over?

23   A.  No, I think I got it.

24   Q.  Okay.

25   A.  Yes, I have an opinion about future risks.  And the -- and

Page 3677

1   health measurements from this early period.

2          So speculation aside, I think there isn't classified

3   information about the information that would have been most

4   helpful.  That information just doesn't exist.

5   Q.  Okay.  Will we ever know the risks for all the people in

6   the class area?

7   A.  No.  The -- no.  I mean, that's -- I've just been saying,

8   there are big uncertainties in all of this, and these

9   uncertainties in large part stem from information that just

10   doesn't exist.  So we're not going to be able to resolve that.

11   Q.  Okay.  Now, you prepared some charts that are summaries of

12   your opinion; is that correct, your opinions in this case?

13   A.  Yes.

14   Q.  Okay.  And the first chart I'd like to look at is the

15   summary of findings, high certainty, G-655.

16          What do you mean, Doctor, by high certainty?

17   A.  Okay.  These are findings that I think are pretty

18   uncontroversial, and that one can just -- based on the

19   knowledge one has and with the kind of confidence that one

20   asserts scientifically can say this happened.

21   Q.  Okay.  Could we go through them one by one.  And will you

22   discuss them with the jury.

23   A.  Yes.

24          Well, you want me to read them or --

25   Q.  Sure.

1   A.   Okay.   Plutonium was released from Rocky Flats, traveled

2   beyond the plant boundaries, it exposed people in the area of

3   the -- living in the area, and that exposure caused an

4   increased risk of cancer, where the risk was almost entirely of

5   cancer to the lung, bone and liver.

6        Okay.  And -- the highest -- I'll be cautious here.

7   The highest exposures occurred in the 1950s and '60s, resulted

8   from the '57 fire and from the releases from the pad, the 903

9   pad, those leaking drums.

10        After the pad was covered, there were continuing

11  exposures throughout operations, but they were routine

12  operations, and small amounts of resuspension, and the risks

13  associated with that are very low.  They're not zero on the no

14  threshold curve, but they're very low.

15        There is a great deal of uncertainty about the

16  magnitude of exposures and the risks.  And that's, I think,

17  what I mostly want to stress.  In my approach, my approach

18  relates to approaches taken by other people -- if you look

19  through the information that we have available and the

20  information we don't have available, one has to say that there

21  is an awful lot we don't know.  And one reason that we have so

22  much uncertainty is that there was not any systematic

23  environmental or health monitoring going on as part of the

24  process.

25        Then the final conclusion, I think, is really that --

Page 4173

1      And then we get -- the boss comes in, new DOE

2   secretary shows up in 1989, 1990, and now all of a sudden he's

3   got views about how to do things.

4      Now, they're entitled to have those views, that's

5   great, but they're judging with 20/20 hindsight.  They're

6   putting in a new political agenda.  That is fine.

7      I thought Admiral Watkins did a good job, looks great,

8   talks great, had great ideas, but he's coming in new against a

9   backdrop that he recognizes was old.

10      And he points out a very, very critical feature of

11   this, which takes you back to something that you told everybody

12   you were going to do in this case, and I will remind you of it.

13      The way it kind of works out, he says -- remember what

14   he says the problem is, he says it's a systemic problem.  The

15   DOE as a whole has got problems, as well as the contractors.

16      Now, here is the catch.  If it's the DOE's fault, or

17   if it's the contractor's fault.  In this case, if it was the

18   contractor's fault, under the law, if we did wrong, we pay.

19   But the way the plaintiffs are pursuing this case, remember,

20   with all of this evidence of the DOE problems, is that even if

21   it's the DOE's fault, it's still our fault.

22      And remember, you all committed that you would

23   learn -- you learned that the DOE had that indemnity running to

24   us, and each and every one of you committed to the fact of that

25   indemnity would not affect your judgment concerning my clients,

Page 4800

1    40 miles to the east and north of the plant show a slightly

2    higher value of 2.0 microcuries per square kilometer.  Do you

3    see that?

4    A.  Yes.

5    Q.  Is that what you are referring to?

6    A.  Yes, it is.

7    Q.  Now, in connection with your work in this case, did you

8    also review prior studies that have been done and published

9    concerning the rate or number of cancer cases in areas near

10   Rocky Flats as compared to areas further away?

11   A.  Yes, I did.

12   Q.  I am going to draw your attention to Exhibit P1374, if you

13   could find that, please.

14   A.  I have it.

15   Q.  And this is a study published by a Dr. Carl Johnson?

16   A.  Correct.

17   Q.  It's titled "Cancer Incidents in an Area Contaminated With

18   Radionuclides Near a Nuclear Installation," correct?

19   A.  Yes.

20   Q.  And the nuclear installation being referred to is Rocky

21   Flats; is that correct?

22   A.  Yes.

23   Q.  Did doctor -- have you met Dr. Johnson?

24   A.  I have.

25   Q.  He is deceased currently.  He is deceased?

1  A.  Yes.  He was alive when I met him, but he is deceased now.

2  Q.  Did Dr. Johnson look at rates of cancer among people living

3  near but off site of Rocky Flats?

4  A.  Yes.

5  Q.  As far as you can tell by looking at this study, did he

6  also use the Krey and Hardy study we were just discussing?

7  A.  Yes, he did.

8       MR. KURTENBACH:  Object to the form of that question,

9  Your Honor.

10       THE COURT:  Overruled.

11  BY MR. SORENSEN:

12  Q.  Do you know what kind of cancer data, if any, Dr. Johnson

13  collected?

14  A.  He collected cancer incidence data from something called

15  the Third National Cancer Survey which was prior to the

16  establishment of the Colorado Cancer Registry.

17  Q.  The Third National Cancer Survey, so that would not be

18  limited to Colorado; is that correct?

19  A.  Correct.

20  Q.  And do you know what types of cancers Dr. Johnson studied?

21  A.  Well, he studied a long list, basically all types combined

22  and then a lot of individual types.

23  Q.  And do you know generally speaking what areas he compared

24  with each other near Rocky Flats and further away?  Can you

25  describe that any more precisely?

1    A.  He looked at what he called the Denver metropolitan area,

2    and then he divided it up into quadrants, and one of the

3    quadrants was where Rocky Flats was located, so he compared the

4    rates in the different quadrants to the Denver metropolitan

5    statistical area.

6    Q.  ·And do you know what time period Dr. Johnson focused on

7    with respect to the diagnosis of the incidence of cancer?

8    ·A.  This was the period 1969 to 1971.

9    Q.  So this article came out in 1981; is that correct?

10   A.  Yes.

11   Q.  That you are looking at?

12   A.  Yes.

13   Q.  But he is looking at people who are diagnosed with cancer

14   between 1969 and 1971; is that right?

15   A.  Yes.

16   Q.  And could you summarize for the jury what Dr. Johnson

17   found?

18   A.  Well, in a general way, he found cancer was elevated in

19   this quadrant where Rocky Flats was located, and then some

20   specific types of cancer were also elevated.

21   Q.  Do you recall what particular types of cancer were

22   elevated?

23   A.  Lung cancer was one that I recall, and I believe testicular

24   cancer, rectal cancer and then all cancers combined.

25   Q.  If we could now move to and find Exhibit P1373, please.

1   A.   I have it.

2   Q.   And this is a study entitled "The Relation of the Rocky

3   Flats Plant and Other Factors to 1969, 1971 Cancer Incidence in

4   the Denver area"; is that correct?

5   A.   Yes.

6   Q.   And it's dated September 29th, 1981; is that correct?

7   A.   Yes.

8   Q.   And it's by a Stephen Chinn; is that correct?

9   A.   Right.

10  Q.   Have you met Stephen Chinn?

11  A.   No, I have not.

12  Q.   Is he alive?

13  A.   I don't know.

14  Q.   Now, did you review this study, P1373, in the course of

15  your work in this case?

16  A.   Yes, I did.

17  Q.   Could you please generally describe this study for the

18  jury.

19  A.   This was an attempt to update and refine Dr. Johnson's

20  study, the previous study, using the same basic data, but

21  trying to deal with things like how dense was the population in

22  the areas where the people lived or what socioeconomic class

23  were the people from and some other factors like that.

24  Q.   Do you know whether Stephen Chinn also made use of the same

25  Krey and Hardy map and plume that's been referred to a couple

Page 4804

1    times now?

2    A.  He did.

3    Q.  Was Chinn's study an attempt to respond or correct some of

4    the criticisms that have been made of Dr. Johnson's study?

5    A.  Yes.

6    Q.  Could you explain that, please?

7    A.  Well, one of the criticisms of Dr. Johnson's study was that

8    it inadequately controlled for confounding as it's called or

9    other factors which may actually increase the risk for some of

10   these cancers that weren't considered by Dr. Johnson in his

11   analysis.  The Chinn study did include some of these other

12   factors like socioeconomic status, for example.

13   Q.  And you used a word "confounding," correct?

14   A.  Yes.

15   Q.  I want -- tell me if this is an example of confounding, if

16   you would.  If you were studying people near Rocky Flats, but

17   unbeknownst to you there was also a uranium mill near Rocky

18   Flats, okay, and you were comparing that to areas further away,

19   would the uranium mill be, quote, a confounding factor that

20   also might be affecting cancer rates?

21   A.  Yes.

22          MR. KURTENBACH:  Object to the form.

23          THE COURT:  Overruled.

24   BY MR. SORENSEN:

25   Q.  Could you summarize for the jury what Stephen Chinn found

Page 4805

1    in this study?

2    A.   He also found elevated rates of cancer or elevated risk of

3    cancer in the area that was where the Rocky Flats was located.

4    He also found specific types of cancer.   There was a group that

5    he called radiosensitive cancers that included lung cancer,

6    leukemia, multiple myeloma and others that were elevated in the

7    area the Rocky Flats plant was located, so it basically had

8    similar finding to the Johnson finding but with some additional

9    enhancements.

10   Q.   You used a word "radiosensitive."   What does that mean?

11   A.   Cancers that are likely caused by or known to be caused by

12   ionizing radiation exposure.

13   Q.   Now, did you also review a study by a Kenny Crump in

14   connection with your work in this case?

15   A.   Yes, I did.

16   Q.   That study was published in 1987; is that correct?

17   A.   Yes.

18   Q.   And what did that -- well, before we get to that, did that

19   study also involve a study of people near Rocky Flats?

20   A.   Yes, it did.

21   Q.   And that study used some kind of a measure of how far

22   people were from the state capitol of Colorado?

23   A.   It did.

24   Q.   And what did that study find, do you know?

25   A.   Well, it was again -- he was looking at the initial same

Page 4808

1    connection with your work.  But does your work in this case,

2    which we will get to, depend in some way on the results of

3    those prior studies?

4    A.   No.

5    Q.   So what do you use those prior studies for?

6    A.   It was background.  It was to see what previous studies had

7    been done.

8    Q.   Now, in doing your study in this case, you requested data

9    from the Colorado Cancer Registry; is that right?

10   A.   Yes.

11   Q.   I would like to go through in some detail for the jury

12   exactly what data you requested and obtained, okay?

13   A.   Okay.

14   Q.   We are going to go one step at a time.  First, was there a

15   particular person at the cancer registry that you were dealing

16   with?

17   A.   I spoke to the director, Jack Finch was his name, still is

18   his name.

19   Q.   Do you know whether he is still the director?

20   A.   Yes, he is.

21   Q.   What time periods of diagnosis of cancer in Colorado did

22   you ask to receive data for?

23   A.   Well, I asked for the earliest time period that they had

24   complete data, that was 1979 up to 1983, that's a five-year

25   period, and then 1984 to 1988 is the next five years, and then

Page 4809

1     another time period, 1989 to 1992, I would have preferred 1993

2     but it wasn't available at the time.   So there were two 5-year

3     time periods and then one 4-year time period.

4     Q.   Are those the time periods you collected data for?

5     A.   Yes.

6     Q.   You mentioned 5-year time periods.   Is there some

7     significance to that period of time?

8     A.   Well, my fields, in epidemiology, that's a typical time

9     window or period of years to look at for trends.

10    Q.   The last time period, '89 to '92, is less than five years?

11    A.   Yes.

12    Q.   And why is that?

13    A.   They didn't have the full 1993 data available when I made

14    the request so they couldn't give me the data for that year.

15    Q.   And did you request data on all types of cancers or just

16    certain types?

17    A.   Well, I asked specifically for bone cancer and lung cancer

18    and then all other types combined.

19    Q.   And why bone and lung cancer separately?

20    A.   I was particularly interested in these two cancers because

21    plutonium causes cancer of these two types.

22    Q.   And did you also ask for data separated by men and women or

23    that you could identify men versus women?

24    A.   Yes.

25    Q.   And why did you ask for it to be separated that way?

Page 4810

1    A.   There are different rates for -- especially with lung

2    cancer, different rates for men and women, so it's useful to

3    look at them separately.

4    Q.   And you said different rates for lung cancer for men and

5    women.   Do men have a higher rate or do women have a higher

6    rate generally?

7    A.   Men have a higher rate.

8    Q.   Did you also seek to get the data by age of the person who

9    was diagnosed?

10   A.   Yes.

11   Q.   And what were those age groupings?

12   A.   I think the first was zero to 44 and then 65 to 70 --

13   sorry, 45 to 64, 65 to 74, 75 to 84 and then over 85.

14   Q.   And why did you want the data separated this way -- but

15   before I get to that question, these ages, is this the age of

16   the person at the date of diagnosis with cancer?

17   A.   Yes.

18   Q.   And why did you want the data separated this way by age?

19   A.   Again, it has to do with making sure that you are comparing

20   like with like.   You want to be able to adjust for any

21   differences in the patterns of cancer, so by looking at it or

22   actually requesting the data by these age groups, you can make

23   sure that the target population and the comparison population

24   have equivalent age groups in the comparisons, comparisons that

25   you are making.   You do what's called an adjusted risk

1    estimate.

2    Q.   Do cancer rates usually go up as people age?

3    A.   Yes.

4    Q.   Now, sir, what is your understanding of, if you have one,

5    of when the highest plutonium releases were from Rocky Flats

6    into the off-site environment?

7    A.   My understanding from reading the various documents that we

8    have discussed, it was in the late '50s to late '60s the

9    highest plutonium releases occurred.

10   Q.   And what does the word "latency" mean?

11   A.   Well, I feel latency refers to the time period between when

12   you are exposed to something that may cause cancer and when you

13   actually get a cancer that was from that cause, so it's a

14   period of years usually.

15   Q.   So for example, if someone walked out and be exposed to

16   some toxic substance, plutonium or some other substance,

17   latency would be the time between when they got exposed and

18   when they got sick?

19   A.   When they got exposed, yes.

20   Q.   That's latency.

21        Sir, what is -- what is the latency period for lung

22   cancer after a human being is exposed to plutonium, do you

23   know?

24   A.   My understanding of the literature it's from 20 up to maybe

25   30, 35 years.

Page 4812

1    Q.   And could that range of 20 to 35 years be even wider at

2    both ends?  Is that possible?

3    A.   It could be.  It depends upon how the plutonium is exerting

4    its effects.

5            MR. SORENSEN:  Your Honor, I am switching to another

6    topic.

7            THE COURT:  Is this a good time to take the break?

8            MR. SORENSEN:  It is.

9            THE COURT:  Okay.  We will be in recess for about 15

10   minutes, please.  3:05 p.m.

11       (Jury excused.)

12           THE COURT:  We will be in recess.

13       (Recess at 3:05 p.m.)

14       (Reconvened at 3:20 p.m.)

15           THE COURT:  Please go ahead, Mr. Sorensen.

16           MR. SORENSEN:  Thank you, Your Honor.

17   BY MR. SORENSEN:

18   Q.   Dr. Clapp, could you please identify what we are seeing on

19   the screen right now?

20   A.   I believe this is the area closest to the Rocky Flats plant

21   where the class of litigants in this matter are located.  It's

22   the red, pink and orange parts of this map.

23   Q.   So you understand the class area extends to what is the

24   kind of dark yellow or orangish contour?

25   A.   Yes.

1   Q.   First, is a copy of this map attached to your expert report

2   in this matter?

3   A.   Yes, it is.

4   Q.   Were you supplied with this particular map of the contours

5   by plaintiffs' counsel?

6   A.   Yes.

7   Q.   The numbers that appear on this particular map, 80021,

8   80005 and so forth, what are those numbers?

9   A.   Those are zip codes, postal zip codes.

10  Q.   And the different colors correspond to what, do you know,

11  in terms of plutonium concentrations?

12  A.   Well, there is a legend on the right that says plutonium

13  BQ/N2 which is becquerels per square meter, so the different

14  colors refer to different ranges of that concentration of

15  plutonium.

16  Q.   And your study in this case, you compared cancer rates in

17  certain zip codes or areas near Rocky Flats as compared to

18  areas farther away; is that correct?

19  A.   Yes.

20  Q.   And among the areas in the near area or exposed area are

21  the zip codes that appear there at 80021 and 80005; is that

22  correct?

23  A.   Yes.

24  Q.   Now, did you limit your exposed area to just those two zip

25  codes?

1    A.   No.

2    Q.   You included other areas --

3    A.   Yes.

4    Q.   -- as well; is that correct?

5    A.   Yes.

6    Q.   And why did you do that?

7    A.   Well, these were nearby areas that were included because

8    there were very few cases of cancer in those two zip codes, so

9    because there was so few cases, there wasn't going to be much

10   to analyze, and also there was evidence that there was exposure

11   further away in other zip codes, and so I had the data for

12   nearby zip codes that were also exposed.

13   Q.   Could we call up G691, please.

14        Now, the area in red, Dr. Clapp, is this your exposed

15   or target area?

16   A.   Yes.

17   Q.   And the black that's indicated is Rocky Flats, and I see

18   Standley Lake, and it lists various zip codes; is that correct?

19   A.   Yes.

20   Q.   And to be completely legible, these are listed in your

21   expert report, correct?

22   A.   Yes.

23   Q.   And they are what I have mentioned earlier, 80021, 80001,

24   80005, 80006, 80004, 80003, 80002, 80030, 80033 and 80034; is

25   that correct?

Page 4815

1    A.   Yes.

2    Q.   And this exposed area is generally east, southeast of Rocky

3    Flats; is that correct?

4    A.   That's correct.

5    Q.   Okay.  Now, what did you -- let me start again.  I believe

6    you testified that part of this exposed area was based on the

7    map we saw earlier and the Krey and Hardy study, correct?

8    A.   Yes.

9    Q.   And how about the rest of this shaded area, what did you

10   base that on, in terms of information about exposure?

11   A.   Well, there was another exposure model that was created by

12   another expert in this case 10 years ago, and that had to do

13   with airborne releases of volatile organic compounds,

14   chemicals, and so that was the exposed area that was defined by

15   this other report that I included in addition to the Krey and

16   Hardy model.

17   Q.   And the study area that we see includes zip codes that are

18   in the class area, but goes beyond it, correct?

19   A.   Yes.

20   Q.   Now, you say you obtained cancer data from the Colorado

21   Cancer Registry; is that right?

22   A.   Yes.

23   Q.   You obtained that data for these 10 zip codes; is that

24   right?

25   A.   Correct.

Page 4816

1  Q.  Broken out in the types of data that you described earlier?

2  A.  Yes, by age, by sex and by type of cancer.

3  Q.  And you compared this to an area farther away from Rocky

4  Flats; is that right?

5  A.  Yes.

6  Q.  Are these zip codes that you compared this target area to,

7  are they listed in your expert report?

8  A.  They are.

9  Q.  You compared the red area to three different kind of

10  versions of the -- I will call it the unexposed area; is that

11  correct?

12  A.  Yeah, lesser exposed area.

13  Q.  Lesser exposed, okay.  Before we get to that, in doing this

14  comparison of your red exposed area to other areas, did you

15  correct for the confounding effect of smoking?

16  A.  No, we didn't have information about smoking, so it was

17  really on how we did the comparison that was the correction, if

18  you will.

19  Q.  Before we get to that, how is smoking a confounding factor

20  in this kind of study?

21  A.  Well, if there were a difference in a proportion of people

22  who smoked cigarettes and also lived near Rocky Flats as

23  compared to people further away, then that would be -- smoking

24  causes lung cancer, so if the exposure from Rocky Flats also

25  caused lung cancer but they were also exposed to smoking

1   because they lived near Rocky Flats this study would be

2   confounded.  I know no evidence to suggest that people smoked

3   more cigarettes if they lived near Rocky Flats, but that's how

4   they would work.

5   Q.  You mentioned, although you didn't correct for smoking, you

6   did something else by comparing certain areas to each other; is

7   that correct?

8   A.  Yes.

9   Q.  Can you explain that, please?

10  A.  Here I tried to look at people who were in the general area

11  around the exposed area and were within a larger plume, as it

12  were, or a larger boundary, larger fence line that was

13  delineated by this expert report from 10 years ago, so they

14  were similar.  They were nearby and similar populations, and

15  many of them lived in the same county, actually.

16  Q.  How did you make sure that you were comparing like with

17  like in terms of the urbanicity or how urban these areas were?

18  A.  These were -- the outer area around this exposed area were

19  basically from the same general vicinity, same -- many were in

20  the same county and were not, you know, urban, predominantly

21  urban residents.

22  Q.  Mostly you are comparing different areas in Jefferson

23  County; is that correct?

24  A.  Yes, that's right.

25  Q.  One area in red I see to the right extends over into Adams

1  County; is that correct?

2  A.  Yes.

3  Q.  And why is that included?

4  A.  Well, that's actually a zip code that's in both counties.

5  It doesn't show up in this map but some of the residents who

6  have zip code 80030 live in Jefferson County and some live in

7  Adams.

8  Q.  Now, in doing this and zeroing in on this exposed area, did

9  you make any assumptions about the levels of exposure, the

10  amounts of exposure to hazardous substances?

11  A.  Not specific amounts, no, just that they were within this

12  boundary area.

13  Q.  Now, did you obtain enough data from the Colorado Cancer

14  Registry on bone cancer to reach any conclusions in this case?

15  A.  No.  Bone cancer is a very rare cancer, so looking at this

16  exposed cancer, there were very few cases even over this

17  14-year period, so it wasn't possible in my analysis to learn

18  much from that.

19  Q.  Now, with respect to lung cancer, did you do something

20  called computing age adjusted odds ratios?

21  A.  Yes, I did.

22  Q.  I want to explain, if I can, to the jury how this works.

23  It involves dividing fractions; is that right?

24  A.  Yes.

25  Q.  I am going to attempt to explain this.  I trust you can

Page 4819

1    help me do this.

2    A.   I will do my best.

3    Q.   I appreciate that.  All right.  So if, for example, you had

4    two towns and you are looking at the numbers of men and women

5    in each town, okay?  Let's take a very simple example to

6    illustrate the point.

7    A.   Okay.

8    Q.   So you have the numbers of men compared to the numbers of

9    women in one town, right?  That's a fraction?

10   A.   Yes.

11   Q.   Or a ratio?

12   A.   Yes.

13   Q.   And you call that town one?

14   A.   All right.

15   Q.   And now you are comparing it to town two.  You have numbers

16   of men and numbers of women, okay, that's another fraction or

17   ratio?

18   A.   That's right.

19   Q.   Now, if you fill in these numbers, let's say it comes out

20   to be 10 and 10, very small town, that would be a fraction of

21   one, correct?

22   A.   Correct.

23   Q.   So suppose the data on the other town you get 9 over 10.

24   There are fewer men than women, another fraction or ratio,

25   correct?

1  A.  Correct.

2  Q.  Now, to compute an adjusted -- or get to the adjusted odds

3  ratio, 10 over 10 is divided by 9 over 10; is that correct?

4  A.  Yes.

5  Q.  And in fractions, if I remember this correctly, what you do

6  is you flip 10 over 9, correct?

7  A.  Yes.

8  Q.  And then you multiply the numerator and then the

9  denominator, correct?

10  A.  That's correct.

11  Q.  Then you get 100 over 90, right?

12  A.  Yes.

13  Q.  And that's about 1.1?

14  A.  That's correct.

15  Q.  Approximately.  And what does 1.1 represent in this

16  example?

17  A.  Well, in this example it's an increased risk of being male

18  in these -- in the town one as compared to town two.

19  Q.  Okay.  And I want to go from this example to what you did

20  in this case.  Now, in this particular case, you did the same

21  kind of calculation only involving cancer data; is that

22  correct?

23  A.  Yes.

24  Q.  So we have -- okay.  In the exposed area, which is your red

25  area, correct?

Page 4821

1   A.   Yes.

2   Q.   You have numbers of lung cancer diagnosed cases, correct?

3   A.   Yes.

4   Q.   Which came from the Colorado Cancer Registry, correct?

5   A.   That's it.

6   Q.   That's in the numerator?

7   A.   Correct.

8   Q.   And in the denominator it's all cancers, correct?

9   A.   Except.

10   Q.   But not including lung or bone, correct?

11   A.   That's correct.

12   Q.   Because you were studying lung and bone?

13   A.   Yes.

14   Q.   We discussed bone earlier?

15   A.   Right.

16   Q.   Now, you compared that, and you divide it by the same

17   information for the less or unexposed area, correct?

18   A.   Correct.

19   Q.   And the same fraction.  So again, numbers of lung cancer

20   cases, again, from data obtained from the Colorado Cancer

21   Registry, correct?

22   A.   Yes.

23   Q.   Over all cancer cases, again, excluding or not including

24   lung and bone, correct?

25   A.   That's it.

Page 4822

1   Q.   So as before, what we had, 10 and 10, 9 and 10, you had

2   numbers where these words are placed, correct?

3   A.   Correct.

4   Q.   And then you, as we did before, did the math, you flipped

5   these around, multiplied and you calculated numbers, correct?

6   A.   Yes.

7   Q.   Okay.  Now, is this a standard way of doing this kind of

8   analysis in your field?

9   A.   Yes.  I have done it before in my own work.

10   Q.   I am sorry?

11   A.   I have also done it in my own work, this same analysis.

12   Q.   Now, I think it the idea is that whether it's exposed or

13   some other factor like men or women or something, if the

14   fractions come out to something other than one, when you do

15   this kind of fraction over this fraction, something other than

16   one, there is something different between the two areas.  Is

17   that what that means?

18   A.   That's what it means.

19   Q.   Now, you also adjusted for age differences, correct?

20   A.   Yes.

21   Q.   You didn't do just exactly the kind of calculation I just

22   described.  You did some adjusting for age, right?

23   A.   Yes.

24   Q.   Why did you do that?

25   A.   Well, again, it was to see if there was some distance in

Page 4823

1    the pattern of cancer by age in the different communities, so

2    the different areas in order to adjust for that you look at the

3    specific strata we call them, specific age groups, and each

4    group of people and then sum them up at the end.

5    Q.   And that adjustment changes slightly or changes the number

6    that you calculate; is that correct?

7    A.   Yes.

8    Q.   But that adjustment makes the calculation or the results

9    more accurate or reliable, correct?

10   A.   Yes.   It's what's called an adjusted odds ratio.   It's

11   preferable to just the total numbers.

12   Q.   Okay.   This is titled "Dr. Clapp's Results."   First, could

13   you identify this?   Is this a summary of the conclusions and

14   data in your report?

15   A.   Yes, it is.

16   Q.   Okay.   I want to go through this with some care so the jury

17   understands it.   First, it says scenario, scenario 1, 2 and 3.

18   Do you see that?

19   A.   Yes.

20   Q.   Could you explain what that means?

21   A.   We made this comparison of the exposed group to others in

22   three different ways.   Scenario 1 was we looked at the people

23   who were exposed and then compared them to everyone else that

24   we got data on from the Colorado Cancer Registry, and that

25   included even some people who the registry could not give us

Page 4824

1    what zip code they lived in because there was only one such

2    person in that zip code, and for confidentiality reasons they

3    wouldn't tell us which zip code it was.  So we had these extra

4    cases that we knew were in the general area that we were

5    interested in, but we couldn't tell whether they were in the

6    exposed or less exposed area.  So in Scenario 1 we just

7    compared the exposed to everyone else, and that's in the other

8    areas around the exposed area plus these extra ones we just

9    said arbitrarily we will call them less exposed.  So that is

10   what is represented in that top two lines, male and females for

11   the Scenario 1.

12         Then in Scenario 2 we did basically the same type of

13   analysis where we used exposed group compared to the lesser

14   exposed group, everyone outside the exposed area, then we

15   eliminated those so-called extra cases, what the Colorado

16   Cancer Registry called extra zips, they wouldn't tell us which

17   zips they were.  We just took those away, and we just compared

18   the people who lived in the exposed area and the people in the

19   lesser exposed area for whom we had zip codes.  That's Scenario

20   2, the middle lines.

21         And then Scenario 3 was keeping that same exposed

22   group and then used the outermost or the less exposed contour,

23   all the zip codes, the people in the zip codes that were in the

24   less exposed contour which is further away from Rocky Flats but

25   still within the area that we got data on, and we also

1    eliminated the extra zips, so that was Scenario 3.

2           And then we did it for different time periods and for

3    males and females.

4    Q.   Now, you were talking about extra zip codes, I wanted to be

5    clear.  There were certain zip codes that the Colorado Cancer

6    Registry wouldn't tell you what zip codes particular cancers

7    were associated with?

8    A.   Yes.

9    Q.   That's because there was perhaps one person in that zip

10   code for that time period --

11   A.   Yes.

12   Q.   -- that would violate their confidentiality.  Is that the

13   reason?

14   A.   That's the reason.

15   Q.   Okay.  Now, let's take this one at a time.  Scenario 1 for

16   males, you have three different time periods you discussed

17   earlier, and let's start with '79 to '83.  Again, these are the

18   years of diagnosis, correct?

19   A.   Correct.

20   Q.   And it says 1.12.  Do you see that?

21   A.   Yes.

22   Q.   Now, does that mean -- is the 1.12 equivalent to a 12

23   percent elevation or increase?

24   A.   Yes, 12 percent increase risk of lung cancer in particular.

25   Q.   Of lung cancer.  It's labeled lung cancer.  So this is --

Page 4826

1    1.12 means for men in the exposed area that we saw earlier

2    diagnosed in this time period, there was 12 percent more than

3    you might expect; is that correct?

4    A.   Yes.

5    Q.   And again, that calculation of 1.12, draw your attention

6    back to the board here, was done in the way that we have

7    described with the age adjustment that you described, correct?

8    A.   Yes.

9    Q.   So earlier with my men and women example when I came out to

10   1.1, that's the same kind of number that here is 1.12, correct?

11   A.   Correct.

12   Q.   If we can just go back for a moment.  Can I just have one

13   second?  Just to clarify something, when you were preparing the

14   exposed area, the red area that we saw earlier, that's your

15   target or exposed area, you are comparing it to an area you had

16   reason to believe was less exposed or not exposed to plutonium

17   or other things from Rocky Flats, correct?

18   A.   Yes.

19   Q.   That's essentially areas farther away in Jefferson County,

20   correct, you got data for?

21   A.   Correct.

22   Q.   Altered slightly between different scenarios in the way you

23   described it, correct?

24   A.   Yes.

25   Q.   Now, if we move over from men, Scenario 1, go all the way

Page 4827

1    to the right under '89 to '92, it says 1.09, do you see that?

2    A.   Yes.

3    Q.   That translates to a 9 percent elevated rate or amount of

4    lung cancer in men, correct?

5    A.   Yes.

6    Q.   In the exposed area, correct?

7    A.   That's right.

8    Q.   As compared to the less or unexposed area, correct?

9    A.   Yes.

10   Q.   Now, I want to draw your attention to the number in the

11   middle of that row which is .93.  Do you see that?

12   A.   I do.

13   Q.   Why is that below one, if you know?  Why -- it's above one

14   earlier and above one later and yet it's below one in the

15   middle period?

16   A.   That's how the data looked.  That's how -- we did the

17   calculation, that's the result we got.  I have no particular

18   detailed explanation of it.  It is what it is.

19   Q.   Now, let's move to Scenario 1 for women.  For '79 to '83,

20   it says .64; is that correct?

21   A.   Yes.

22   Q.   And what that means is that as compared to the unexposed or

23   less exposed area, there was less lung cancer among women in

24   the exposed area for that time period, correct?

25   A.   Yes.

1    Q. And then as we move over to '84 to '88 it goes to .94 which

2    is still below one, correct?

3    A. Yes.

4    Q. So still means there is somewhat less lung cancer among

5    women of that time period in the exposed compared to the

6    exposed area, correct?

7    A. Yes.

8    Q. Then we move over to '89 to '92, it's up to 1.27. Do you

9    see that?

10    A. Yes.

11    Q. Which means that there is 27 percent more lung cancer among

12    women in the exposed area for the period '89 to '92 as compared

13    to the less or unexposed area, correct?

14    A. Yes.

15    Q. And if we look at the other numbers, I just want to be

16    clear for the record, Scenario 2, for men, '79 to '83 is 1.10?

17    A. Yes.

18    Q. Which is a 10 percent elevation, correct?

19·    A. Yes.

20    Q. Moving over to '84 to '88, it says .91 which is a decrease?

21    A. Yes.

22    Q. A lesser amount?

23    A. Lesser amount than expected.

24    Q. The same dip that we saw above?

25    A. Correct.

1   Q.   Over '89 to '92 it's up to 1.09 or a 9 percent elevation?

2   A.   Correct.

3   Q.   And for women, again, the same trend or pattern is seen.

4   It starts here .63 in the '79 to '83 period up to .96, '84 to

5   '88 and up to 1.29 in '89 to '92, correct?

6   A.   Yes.

7   Q.   1.29 appears twice, that's the highest number here on this

8   chart, correct?

9   A.   Correct.

10  Q.   That, again, represents a 29 percent elevation of lung

11  cancer among women in the exposed area near Rocky Flats as

12  compared to areas that were less exposed, farther away,

13  correct?

14  A.   Yes.

15  Q.   Moving down to Scenario 3, again, for men in the '79 to

16  '83 period, it's 1.05, which again translates to a 5 percent

17  elevation of lung cancer among men?

18  A.   Correct.

19  Q.   In the exposed as compared to the less or unexposed areas?

20  A.   Yes.

21  Q.   Again, same dip we see in '84 to '88, 0.89?

22  A.   Yes.

23  Q.   Back up to 1.23 for the '89 to '93 period, correct?

24  A.   Yes.

25  Q.   That, again, translates into a 23 percent elevation of lung

Page 4830

1    cancer of men living in the exposed area near Rocky Flats as

2    described earlier as compared to areas farther away for un or

3    lesser exposed?

4    A.   That's correct.

5    Q.   To conclude, for women '79 to '83 in Scenario 3 it's .86,

6    again, below one.   Then to '84 to '88 it's 1.02, that's a

7    2 percent elevation, correct?

8    A.   Yes.

9    Q.   Then over to '89 to '92, it's again 1.29, the same number

10   for women in '89 to '92 for Scenario 2?

11   A.   Yes.

12   Q.   Has the same meaning?

13   A.   Correct.

14   Q.   A 29 percent elevation of lung cancer for women in the area

15   closest to Rocky Flats, the exposed area as defined, as

16   compared to lung cancer among women in the unexposed or lesser

17   exposed areas farther away, correct?

18   A.   That's what it means, yes.

19   Q.   And, again, these results are all just with respect to lung

20   cancer, correct?

21   A.   Yes.

22   Q.   Now, I wanted to ask you some questions about trends or

23   patterns, if any, that are shown here.   For women in each

24   scenario the numbers across time go up.   Do you see that?

25   A.   They go from the lowest in the earliest time period to the

Page 4831

1    highest in the latest time period, yes, that's what I mean by

2    trend over time.

3    Q.   In your opinion to a reasonable degree of scientific

4    certainty, does that trend correlate to increased rates of lung

5    cancer among women?  To a reasonable degree of scientific

6    certainty, what, if anything, does that trend for women

7    translate to or mean?

8    A.   That there is an increasing risk of lung cancer in this

9    exposed area as you go over time from 1979 to 1992.

10   Q.   And would that trend or increase have any relationship to

11   the idea of latency that you discussed earlier?

12   A.   It does.

13   Q.   And could you explain that, please?

14   A.   Well, if the period of maximum emissions and releases from

15   the Rocky Flats plant were in the late '50s to late '60s, this

16   later time period is when you would expect this lung cancer

17   that those emissions would have caused.

18   Q.   So in other words, if the maximum, for instance, plutonium

19   emissions in Rocky Flats were in the late '50s or late '60s,

20   the latency period means it's going to take 20, 25 or 30

21   years --

22          MR. KURTENBACH:  Object, Your Honor, leading the

23   witness.

24          THE COURT:  Sustained.

25   BY MR. SORENSEN:

Page 4832

1    Q.  If the maximum period of emissions that you assumed or

2    plutonium emissions from Rocky Flats from the late '50s to late

3    '60s, what relationship, if any, does that have to this trend

4    for women that shows an increase incidence in the '89 to

5    '92 time period?

6    A.  What I take from the latency window or the latency time

7    span is that the excess of lung cancer if it were caused by

8    these emissions would occur 20 to 30 years after the periods of

9    maximum emissions from the plant, and that corresponds roughly

10   to the last of the three time periods on this chart.

11   Q.  Okay.  Now, these numbers are depicting rates of cancer,

12   correct?

13   A.  Well, they are actually ratios, they are odds ratios, so

14   they reflect an underlying rate, but these are actually

15   expressed as ratios.

16   Q.  They reflect an underlying rate of cancer?

17   A.  They do, yes.

18   Q.  Or the numbers of cancer in the population?

19   A.  They do, yes.

20   Q.  Now, in your opinion as an expert, any of these particular

21   scenarios have more meaning to you or have more -- mean

22   something more than some other scenario?

23   A.  Well, the third scenario is the one I think is the most

24   defensible scientifically because it's the best contrast of who

25   is exposed and who is less exposed.  The two -- the Scenarios 1

Page 4833

1    or 2 -- Scenario 1 has its problem.  We had to use extra zips

2    in a way that may not be actually how they fell out.  We don't

3    know where they actually live.  And the second scenario has

4    that same problem actually.  The second scenario does not use

5    the extra zips, but it just compares with people close to the

6    Rocky Flats plant and then those immediately adjacent and

7    further out from the Rocky Flats plant.  So I think the third

8    scenario which looks at the furthest exposed group or the

9    lesser exposed group gives you a better contrast for what's

10   actually going on between the two groups.

11   Q.  When you say "better contrast," do you mean that Scenario 3

12   compares the exposed area to an area that you are more

13   confident has no or lesser exposures?  Is that what you mean?

14   A.  Yes.

15   Q.  That's more scientifically valid because it's -- you are

16   more accurately --

17        MR. KURTENBACH:  Suggests the answer.

18        THE COURT:  Sustained.

19   BY MR. SORENSEN:

20   Q.  Why is that more scientifically valid, if it is?

21   A.  Well, it's a judgment actually that researchers sometimes

22   do when they express their results.  They have what they call a

23   highest quartile, highest 25 percent compared to the lowest

24   25 percent, and they present that as a way of comparing who is

25   really exposed and who is not so exposed and what is the

1  relationship and the disease pattern in those two groups.  So

2  this is the same type of thing.  What I am doing in this

3  Scenario 3 is looking at the most exposed with the lesser

4  exposed that was, you know, furthest away.  It's a valid way of

5  presenting results.  It's used in published articles.

6  Q.  In your opinion to a reasonable degree of scientific

7  certainty, are the elevated lung cancer rates depicted in G799

8  associated with exposures to hazardous substances from Rocky

9  Flats?

10  A.  Yes.

11       MR. KURTENBACH:  I object, Your Honor.  It's a leading

12  question.

13       THE COURT:  It is.  Sustained, but it's been answered.

14  Try to not to lead anymore.  You are suggesting answers.

15  BY MR. SORENSEN:

16  Q.  Can you think of any other reason other than exposures to

17  Rocky Flats that would account for these elevated rates that we

18  see?

19       MR. KURTENBACH:  Your Honor, may we be heard at side

20  bar?

21       THE COURT:  All right.

22    (At the bench:)

23       MR. KURTENBACH:  They have made clear since the

24  beginning of the Daubert motions in this case that this is a

25  case based on plutonium.  They are now asking this witness to

1   conflate the VOC contours which were part of the medical

2   monitoring case with plutonium contours.  This is not something

3   that should be permitted.  This is a different case.  It's not

4   being tried here.  The VOC is not a part of this case.  They

5   indicated their only case is based on plutonium, and they

6   indicated that throughout the briefing that led up to this

7   trial.  I object to them making this conflation between VOCs

8   and plutonium with this witness after having stipulated that

9   that's not a part of this case.

10          MR. SORENSEN:  He has testified to the exposed area

11   principally first to the Krey/Hardy contours.  He explained why

12   the purposes -- why there was data collection and the amount of

13   data that extended beyond that in connection with other

14   contours.  He is comparing that to unexposed areas.  On cross

15   they can go into the change of validity of his results with

16   respect to plutonium, but they have known this all along.  It

17   is -- it includes the class area with respect to plutonium.

18   That's one of the exposures that's at issue here, and he is --

19   he has explained in detail exactly its connection to the study.

20          MR. DAVIDOFF:  Can I add one thing, Your Honor?  If

21   anything, the use of the contours that included the VOC

22   contours actually shows the results to subside from what they

23   otherwise would be.

24          MR. KURTENBACH:  This witness, his deposition, his

25   report doesn't talk at all about these VOC contours.  He talks

Page 4836

1    about plutonium, Krey and Hardy, plutonium contamination,

2    including with respect to the Johnson and Chinn, it's all

3    plutonium, plutonium, plutonium, Krey and Hard, Krey and Hardy,

4    Krey and Hardy.

5         MR. SORENSEN:  That is incorrect.  Mr. Kurtenbach took

6    his deposition.  That was gone into, the whole basis of

7    contours, why the exposed area was a lack of sufficient data,

8    what it was based on.

9         MR. KURTENBACH:  It had nothing to do with VOCs.

10        THE COURT:  Well, the objection is overruled.  Bring

11   it home and let's get on with it, okay?

12        (In open court:)

13   BY MR. SORENSEN:

14   Q.  Dr. Clapp, I was asking you, can you think of any reason

15   other than exposures to hazardous substances from Rocky Flats

16   that would account for the elevated rates of lung cancer that

17   are depicted in G799?

18        MR. KURTENBACH:  Object to the form of the question,

19   Your Honor.

20        THE COURT:  Overruled.

21   A.  I don't think there is any more likely explanation than

22   that the exposures of Rocky Flats were the explanation.

23   BY MR. SORENSEN:

24   Q.  Now, I want to ask you about some other information and

25   data that is contained in your report that is not showing up in

1   this graphic to explain a few concepts to the jury.  If you

2   could turn to your report, appendix two, and Scenario 2 for

3   women.  Tell me when you are there.

4   A.  I am there.

5   Q.  Okay.  Now, it says AOR, that stands for adjusted odds

6   ratio; is that correct?

7   A.  Yes.

8   Q.  It says 1.29; is that correct?

9   A.  Yes.

10   Q.  That's the 1.29 that appears on the screen in front of the

11   jury for women '89 to '92 in Scenario 2; is that correct?

12   A.  That's correct.

13   Q.  Now, in your report next to the 1.29, there are two other

14   numbers in brackets, .99-1.67.  Do you see that?

15   A.  Yes.

16   Q.  And there is -- similar types of bracketing numbers appear

17   next to, I believe, nearly all or all of the various numbers

18   that we see here, correct?

19   A.  Correct.

20   Q.  The numbers differ.  They are not all .99 to 1.67, but they

21   are of that nature.  There is a range, right?

22   A.  That's correct, yes.

23   Q.  Can you explain to the jury what that range means?

24   A.  This is -- this range of a low number to a higher number

25   around the number that we see on the screen there is what's

Page 4838

1   called a 95 percent confidence interval, and it's something

2   that epidemiologists calculate to give the impression of if you

3   were to do this same experiment, shall we say, or same study a

4   hundred times, what range would you expect this number on the

5   screen to fall within 95 times out of those hundred.  That's

6   what's meant by the 95 percent confidence interval.  It's a way

7   of expressing statistical significance.

8   Q.  You don't mean if this exact same study were performed a

9   hundred times, this same data?

10  A.  No.  It would be another study by researchers looking at

11  this same issue.

12  Q.  Perhaps in other areas?

13  A.  Yes.

14  Q.  Do you in your work generally outside of this case place

15  particular weight or rely on this particular test of

16  statistical significance that you just described?

17  A.  I calculate it.  I don't use it in a way of, you know -- it

18  doesn't contribute to my conclusion.  It doesn't lead me to a

19  conclusion.  It's a fact that I take into account based on the

20  data that I -- calculation that I have made.

21  Q.  Well, for example, the example we were looking at, the 1.29

22  number, followed by the bracketed numbers .99 to .167, does

23  that mean that -- what does it mean?  Is the 1.29 your best

24  estimate?

25  A.  Yes, that's what the 1.29 is.  That's what I think the real

1   relationship, that there is a 29 percent excess, and then the

2   95 percent confidence limit means or interval means that if you

3   did this same study 100 times, it would fall within the range

4   of .99 to 1.67 95 times out of a hundred, so it could be as low

5   as .99 or as high as 1.67, but I think what it really is is

6   1.29.

7   Q.   And did you calculate -- I think you mentioned calculate

8   something called P value?

9   A.   Not in this -- no, not in this report.  It's something

10   that -- it's the same basic data that you use to calculate a P

11   value, but here we have done the same type of exercise as a

12   confidence interval.

13   Q.   And does the fact that the ranges for some of these numbers

14   dip below one, does that detract in any way from the results

15   that you found?

16   A.   No.   The results are what they are, and these are the

17   ratios that represent those results, and the confidence

18   interval or the P value is simply more things to consider.

19   Q.   Are you aware that in the '50s and '60s fewer people were

20   living in Jefferson County than do today, for example?

21   A.   Yes.

22   Q.   And fewer people in the '50s and '60s than were living in

23   perhaps the '70s and '80s; is that right?

24   A.   That's my understanding, yes.

25   Q.   Does that change in population affect the validity of

Page 4840

1    results of your study at all?

2    A.   No.   These are the data from the Colorado Cancer Registry

3    for that time period, so they are based on whoever was living

4    there at the time and was diagnosed with cancer, so the fact

5    that there was an increase in population, there would be more

6    cancer unfortunately in an increased population and that's what

7    these numbers are based on.

8    Q.   But if there were fewer people living, for instance, in the

9    exposed area in the '60s, how do you know that the cancer

10   numbers you are picking up today or when you did your study

11   aren't of people who moved in in the '80s?

12   A.   We don't.   I don't.

13   Q.   But so then doesn't that have an effect on the validity of

14   your results, and if not, why not?

15   A.   The analysis that I did here was of people who lived in

16   these two specific areas when they were diagnosed.   That's a

17   valid comparison.   That's of interest, certainly a public

18   health interest.   If there were people who moved in and -- say

19   in the late '70s and were diagnosed with cancer in the early

20   1980s, they would be counted here, and, if anything, if they

21   were people who moved in that had the same baseline lung cancer

22   rate as everyone else, that would tend to lower whatever this

23   ratio is and make it less elevated than it otherwise is.

24          Again, that's not -- doesn't make this study invalid.

25   This is what it is.   These are the numbers of people diagnosed

1   when they lived in these zip code areas in these time periods.

2   So I don't think it really reduces the validity if there were

3   people who had moved in.  It's just, again, something to take

4   into consideration.

5   Q.  So in other words, as people were moving in to both the

6   exposed area and the unexposed or less exposed area --

7         MR. KURTENBACH:  Objection, suggesting the answer.

8         THE COURT:  Sustained.

9   BY MR. SORENSEN:

10  Q.  Would the increase in population in the exposed and

11  unexposed areas, if anything, would it make it harder to detect

12  any increase in lung cancer rates?

13  A.  Yes.

14  Q.  I was advised there may be a concern of lack of clarity to

15  Scenario 3.  I wanted to turn to that briefly, and then we will

16  be done.  If you can explain in your view why Scenario 3 is the

17  most defensible or valid of the results depicted here.

18  A.  It relates to how I answered the question about the

19  quartile and the lowest quartile in a study.  If you look at

20  the rate of disease and the most exposed, the top quartile of

21  exposure compared to the lowest quartile of exposure, that

22  ratio or that relationship is sort of the clearest reflection

23  of the exposure, the effect of the exposure.  There may be some

24  intermediate range or some intermediate level of exposure where

25  people are also getting disease at some increased risk, but it

Page 4842

1    won't be as -- the contrast will not be as stark as if you

2    looked at the highest exposed to the least exposed.

3         That's what Scenario 3 is here, an attempt to look at

4    what I consider to be the highest exposed population compared

5    to within these zip codes the ones that were the lowest

6    exposed.  And then that is the most, I would say, the most

7    valid contrast to look at in this kind of a study.

8    Q.  So in other words, you were trying to examine the effect of

9    exposure and you are comparing an exposed area, what you are

10   trying to do in that study is depict an unexposed area that

11   really has been exposed.

12        MR. KURTENBACH:  Objection to the form of the

13   question, suggesting the answer.

14        THE COURT:  Sustained.

15   BY MR. SORENSEN:

16   Q.  In Scenario 3, is it most valid -- what about the exposed

17   area in Scenario 3 makes it most useful or valid?

18   A.  That the comparison group, the ones that are not in the

19   target area or exposed area are still within the zip codes

20   where there is some exposure from this model that we had 10

21   years ago, but they are further away, and the levels of

22   exposure are less, so it's the least exposed group within this

23   study area compared to the most exposed group.

24   Q.  In your field, does the term "slicing and dicing" have any

25   meaning?

Page 4843

1   A.   Yes.

2   Q.   Could you explain to the jury what that means?

3   A.   Well, sometimes researchers will chop the data up into too

4   many slices, into too small subgroups so you just see hash, you

5   don't see anything.  Whatever signal that's there gets swamped

6   by the noise.  I have seen examples of this where researchers

7   have used seven different categories of exposure and so then

8   things bounce around because data are like that.  We are not

9   rats in a cage where if you -- if some substance like a

10  chemical or plutonium they will all respond the same way.

11          So when you slice up different levels of exposure, you

12  get different responses and different groups of people, and if

13  you slice it up enough, the whole thing becomes

14  uninterpretable, so that's what meant, the long way of saying,

15  by slicing and dicing.

16  Q.   Did you slice and dice here?

17  A.   No.

18          MR. SORENSEN:  May I take a moment to confer?

19          THE COURT:  Yes.

20          MR. SORENSEN:  I will just like to offer into evidence

21  the exhibits that have been shown, I will designate them PG800,

22  PG691, and PG799 that we have been discussing.

23          MR. KURTENBACH:  If they are offered for demonstrative

24  purposes, that's fine.

25          THE COURT:  That's it.  They are admitted for

Page 4862

1    cases to get a meaningful number for -- put the question in a

2    slightly different way.  You specifically did not study the

3    class area because you concluded that there would be too few

4    cases in just that area to get a meaningful result, so you had

5    to expand the area of your study and include an entire 10 zip

6    code range before you could get to the point you thought you

7    would have a sufficient number of diagnosed diseases where you

8    could get a meaningful result, correct?

9    A.  No, that's not correct.

10   Q.  In fact, didn't you testify, sir, that -- didn't you

11   testify that you thought that you needed to go beyond the class

12   area because in the class area there were too few cases to get

13   a meaningful result?  Didn't you just testify to that on direct

14   examination?

15   A.  I said that, but I also said there was an exposed area that

16   includes the class area.  I did include the class area in what

17   I defined as the exposed area.  I didn't exclude it.

18   Q.  Let's focus just on the class area, just on the area that's

19   been identified as the class area in this case, not even

20   limiting, not even limiting to class members, people who owned

21   property there as of June 7 of '89, but focus on the class area

22   in this case, the outer boundary of which is this area right

23   here, your testimony at deposition and on direct examination in

24   this case that there would be -- there was -- there would be

25   too few cases in that area in order to do a meaningful

Page 4947

1    that question.

2            THE COURT:  Sustained.

3    BY MR. SORENSEN:

4    Q.  You were asked some questions on cross about estimated

5    exposures of people living near Rocky Flats, estimated

6    exposures to plutonium.  Do you recall those questions?

7    A.  Yes, estimated by various authors using different data and

8    so forth.

9    Q.  Yes.  Now, if the estimated exposures are lower than you

10   would expect to result in lung cancer, do you follow me so far?

11   A.  So far.

12   Q.  Yet you do find an excess of lung cancer, does that, that

13   is the finding of excess of lung cancer, suggest anything one

14   way or the other to you about the accuracy of the estimated

15   exposures?

16   A.  Yes.

17   Q.  What does it suggest?

18   A.  Well, two things.  One is that the exposures may have been

19   greater than were estimated or that these exposures actually

20   may be more carcinogenic to humans than we had thought.

21   Q.  You were shown by defense counsel your study area, the 10

22   zip code area.  Do you recall the maps you were shown?

23   A.  Yes.

24   Q.  And defense counsel kept crossing out part of it.  Do you

25   recall those questions?

Page 4961

1    this trial that the class representatives are a bunch of horse

2    men and horse women who are not representative of the members

3    of the class, and we were calling two class members that lived

4    in subdivisions, in part for that reason and in part to show

5    that there were other class members living in subdivisions that

6    were distressed.  And I understand the rest of Your Honor's

7    rulings, and we respect them, but I do think she has a right to

8    testify to the emotional distress that led her to sell her

9    house in March of 1990.

10          THE COURT:  I would think that normally, but given the

11   rest of her testimony, I don't think that it's acceptable.  And

12   you can call the other witness to take care of that, and you

13   can bring out this generic question, but not with this witness

14   in the way it's been presented to me.

15          Now, let's get to the Hoffman matter.

16          MR. DAVIDOFF:  Do you want that now or after the

17   testimony today, Your Honor?

18          THE COURT:  I want to know before the jury ever sees

19   Mr. Hoffman what it is that you intend to bring out so I can

20   decide whether or not to permit him.

21          MR. DAVIDOFF:  He isn't going to be appearing today.

22   We can do that after the jury is dismissed for the day.  I have

23   a request if I could just -- I have a request.  Whenever we do

24   it, now or when the jury is dismissed, that just as Dr. Clapp

25   was excused and that was not to be -- since he is being called

Page 4962

1   on cross and the substance of it was not to be shared with

2   Dr. Clapp, this witness is being called as on cross, and I

3   don't think that the substance of how we plan to cross-examine

4   him properly can be shared with the witness.

5            THE COURT:  If he is here, then he can leave.

6            MR. DAVIDOFF:  I don't want the DOE attorneys or the

7   defense attorneys --

8            MR. BERNICK:  I don't know -- we will undertake or you

9   can undertake, I am indifferent, you probably talk to them more

10  than I do, we have no problem with the idea that they are

11  instructed not to talk with Mr. Hoffman concerning the

12  substance of what happens here this afternoon.  We certainly

13  will have no such contact.  I know that people from the DOE

14  were here earlier today, and I don't know whether they are

15  under the impression that Mr. Hoffman no longer needs to show

16  up today because these things were being taken up this

17  afternoon.  I am very confident that a telephone call can be

18  made and he can be here, so it seems to me that if Ms. Robb

19  goes on now, I think we are going to be done with her in plenty

20  of time to start with Mr. Hoffman's testimony, and I think we

21  should.  I think we should just get this show on the road.

22           THE COURT:  I told the jury to come back at

23  2:00 because I want to hear about Hoffman now and what the

24  situation is.

25           MR. DAVIDOFF:  I was under the impression from Your

Page 4963

1    Honor's --

2            THE COURT:  It's well taken.  I think you are right,

3    but I want to hear about it now, and let's see what we can do.

4            MR. DAVIDOFF:  There is a person from the DOE here.

5            THE COURT:  She understands she is not to discuss

6    anything with Mr. Hoffman.

7            MR. BERNICK:  Should she make a call now?

8            MR. DAVIDOFF:  I don't think, A, there will be time,

9    and B, I think if we are going to thrash this out, we ought to

10   thrash it out now or after Ms. Robb's testimony, and he has

11   already been told that he was excused.  The person that's here

12   from the DOE is not an attorney and not subject to rules of

13   court, so if we are going to have this discussion --

14           MR. BERNICK:  We will go make a telephone call.  We

15   are subject to rules of court.  We will find out where he is.

16           THE COURT:  Can we get to the point I have asked you

17   for first?  I want to know what it is we are dealing with, then

18   I can perhaps make a decision, a discrete decision.

19           MR. DAVIDOFF:  Yes, Your Honor, absolutely.  We do

20   have someone in the courtroom.

21           First of all, we attached a number of documents.  Most

22   of them were declassified as part of Hazel O'Leary's openness

23   initiative.  We filed a motion for the admission of those

24   documents.  I think that's adequately explained in the brief

25   that we filed.  There are portions of these documents that are

Page 4964

1   directly relevant to MUF and plutonium loss and portions

2   relative to classification decisions.  If Your Honor wants me

3   to run through these documents, I can.

4           THE COURT:  I do.  That is a paralegal taking notes in

5   the courtroom.

6           MR. BERNICK:  It's a public proceeding.

7           MR. DAVIDOFF:  Well, it is.  It's a public proceeding,

8   but if you are calling a witness on cross-examination and you

9   are required to spell out your cross-examination in advance, it

10  kind of defeats the purpose of cross-examination.

11          MR. BERNICK:  Did you file this under seal?

12          MR. DAVIDOFF:  No, we did not.  These documents, I

13  don't have a problem with any of these documents.  This

14  document was declassified in 1994.  It was written in 1964.

15  Declassified 30 years later as part of the so-called openness

16  initiative of former secretary of the DOE O'Leary, and it has

17  specific information on fire losses, how much was lost in the

18  building 71 fire which occurred on September 11, 1957.  I

19  cannot imagine any valid national security purpose for keeping

20  that information secret for 30 years.

21          You know what?  I should actually start by giving Your

22  Honor some background on Mr. Hoffman, if I may.

23          THE COURT:  All right.

24          MR. DAVIDOFF:  He was a classification officer first

25  for -- first he worked for Dow at the plant for a number of

Page 4965

1    years, I believe 10 or 11 years.  He was not a classification

2    officer at that time.  Then in 1973 he was made a Dow

3    classification officer.  In 1975 he became a Rockwell

4    classification officer for the next 14 or 15 years.  Many of

5    the documents that were either reviewed for classification

6    later in the '70s and even later than the '70s or were

7    classified for the first time in the '70s or '80s, Mr. Hoffman

8    was instrumental in that process.  We believe he was the top

9    classification officer for the two defendants.

10           For two years he then became a classification officer

11   for EG&G which was the successor contractor to Rockwell and

12   Dow.  And then he became a DOE classification officer, this is

13   from memory, but I believe it was in 1993 he became a DOE

14   classification officer and has, to our knowledge, remained a

15   DOE classification officer since then.

16           He was the highest ranking officer at the site,

17   classification officer.  He had frequent interaction with the

18   classification officers in Germantown, Maryland, and elsewhere

19   at DOE headquarters.

20           In fact, some of the classification decisions later

21   after Your Honor's contempt ruling were made at that level.

22   That's information that we would intend to elicit from him just

23   as a preview.  So he had a close relationship, we believe still

24   has a close relationship with the defendants in this case, and

25   certainly that was one of the motivations in our view for his

Page 4966

1   classification decision.

2          Now, this document which was classified in 1964 was

3   never classified until Ms. O'Leary's openness issue in 1994.

4   We do not believe that a fire loss of 6 kilograms, which is

5   about 13.2 pounds of plutonium in the 1957 fire which was kept

6   secret for years I might add, is something that had any valid

7   national security purpose to classify.  In fact, some of this

8   testimony we seek to elicit is that national security is, in

9   fact, the only relevant, only appropriate, the only appropriate

10  reason for classifying documents.

11         And even though this document was reclassified -- I

12  may not have been clear.  This document was never declassified

13  until 1994.  There is still portions of it that are still

14  whited out even in 1994.  This looks like some kind of error

15  here, but this is 84 kilograms in this report of unexplained

16  missing plutonium.  That's one of the documents, and there are

17  major portions of this document that remain classified to this

18  day that we intend to show him during his examination.

19         This document from 1947, which we moved for the

20  admission of this document in our brief, even though it

21  predates it, we think it's admissible on its face.  And it

22  shows on page -- the page No. 10 of the fax, I am not sure

23  which page it is of the document because that's obscured, the

24  Atomic Energy Commission as far back as the 1940s was looking

25  at speculation on the future genetic effects of radiation and

Page 4967

1   papers dealing with potential hazards to employees are

2   definitely prejudicial to the best interests of the Government.

3   Every such release is reflected in an increase in insurance

4   claims, increased difficulty in labor relations and adverse

5   public sentiment.

6          Then they go on to say that if specific -- following

7   consultation with the commission, insurance branch, the

8   following declassification criteria appears desirable.  If

9   specific locations or activities of the Atomic Energy

10  Commission and/or its contractors are closely associated with

11  statements and information which would invite or tend to

12  encourage claims against the AEC or its contractors, such

13  portions of articles to be published should be reworded or

14  deleted.  The effective establishment of this policy

15  necessitates review by the Atomic Energy Commission insurance

16  branch, as well as by the medical division prior to

17  declassification.  That policy was continued into the '70s and

18  '80s and '90s.

19         We have attached documents which show that.  This

20  document, Plaintiffs' Exhibit P654, June 30 of 1977, was a

21  meeting of the WCCC.  That was the weapons contractor

22  classification conference of which Mr. Hoffman actually was, I

23  believe, the chairman or cochairman in this time frame.  And

24  this is just one example from this document.

25         The question was asked, Is the "if in doubt classify"

1   philosophy an abuse?  And it goes on to say, ERDA, has reported

2   abuses.  We are now reporting administrative errors.  Examples

3   were cited of classification people being asked to assign NSI

4   classifications for political reasons.

5          Even more significant part of this document is on

6   June 30 of 1977, MUF figures, material unaccounted for, figures

7   will be released for all plants except Y12.  Y12 is Oak Ridge,

8   and the RFP is the Rocky Flats plant.  So as far back as 1977

9   that information is publicly released during the Carter

10  administration for other plants, but it was kept secret for the

11  Rocky Flats plant.  We need to have answers ready for the

12  inquiries that are sure to follow.

13         And in fact, part of what we would seek to elicit from

14  Mr. Hoffman in his testimony is when it was finally revealed in

15  the 1990 that there was 2600 pounds of missing plutonium in

16  that plant.  Mr. Hoffman was the signatory for this document at

17  the time he was at Rockwell, a Rockwell employee, not a DOE

18  employee.

19         The next document which is P655 is just to show that

20  Mr. Hoffman became the candidate, was elected as the WCCC

21  chairman right at this time period.

22         And then here in that document, agenda item 9, Update

23  on the classification status of MUF.  The term "inventory

24  difference" is now being used to designate what formerly was

25  called material unaccounted for or MUF.  No decision has been

Page 4969

1    made on what will be done next about ID presently considered

2    RD.  That stands for restricted data.  Rod Hoffman repeated the

3    Rocky Flats recommendation that DOC study the significance of

4    all Rocky Flats nuclear materials accountability statistics

5    before making a decision about the release of Rocky Flats ID

6    data.  That's after the decision was made to release that for

7    every other weapons plant in the United States with the

8    exception of Oak Ridge and Rocky Flats plant.

9           He was an active participant in keeping this

10   information secret.

11          Here is one from 1983 during the Rockwell era when

12   Mr. Hoffman was a Rockwell employee.  This is Plaintiffs'

13   Exhibit P653.  Basically I am just going to characterize it,

14   Your Honor, to save time.  Unexplainable inventory differences

15   continue to be a major deficiency of plutonium production

16   processes at Rocky Flats, and that continues here, and they

17   explain that.

18          Of course, this document, too -- all of these

19   documents that I am showing Your Honor were basically not

20   declassified until the '94, '95, '96 era.  They were all secret

21   at that time.  Most of the documents that we attached, Your

22   Honor, we specify in the brief were admitted at the contempt

23   hearing that was held in 1995.

24          Then there is Plaintiffs' Exhibit P652 and also P548.

25   These are the same document that went through a classification

Page 4970

1    review in the 1990s at two different times.  This one was

2    declassified on 7/12/95, and this one was declassified on

3    6/17/96.  Among other things, this document -- they white out

4    different portions of the same document.

5          This is a document where there is a comprehensive

6    study made after August of 1977 for four months on MUF, special

7    nuclear materials.  An extensive records search has been

8    conducted to assure DOE and Rockwell International that

9    unclassified data when associated with MUF did not exist that

10   could divulge classified production information or weapons

11   data.  During the past four months approximately 25

12   knowledgeable long-term employees have participated in a

13   records search to determine if any unclassified data existed.

14         This is -- this document goes on.  They reviewed

15   records at Dow Chemical.  They reviewed personal files.  Then

16   they consulted -- actually, if you look at page 3, Your Honor,

17   there is some whiteout still on this document in the form that

18   we have it.  Rockwell management and certain Dow Chemical

19   officials -- so even two and a half years or more after Dow has

20   been -- has relinquished the contractor responsibility, they

21   are still being consulted on keeping this stuff secret for

22   reasons that will soon emerge, feel that the declassification

23   and release of MUF including explanations for special nuclear

24   material at Rocky Flats could reveal production data, blank,

25   and possibly weapons information.  The following data is

1    presented in support of this position.

2              One of the factors was more time and attention is

3    devoted to MUF by the news media and the private sector which

4    gives a higher visibility to data which as it becomes more

5    accurate may also become a good indicator in the future to

6    correlate MUF, the production rates.

7              Then on this page, page 7, If MUF is declassified --

8    we have to recognize that this is being written after the

9    decision to declassify MUF at all the other plants except for

10   one other plant had already been made -- a gate will be opened

11   to generate further questions from the public sector until a

12   point is reached where the answer could involve classified

13   information.  If a statement were made at this sensitive point

14   that the answer would reveal classified data, this in itself

15   may be classified.  It seems prudent not to place ourselves in

16   this vulnerable position.  The thrust of that is to avoid

17   embarrassing questions where we might have to decline to

18   answer.  We are just not even going to start down that road.

19             But the most telling parts of the document are

20   paragraphs 8 and 10.  Anti nuclear environmentalists and

21   pacifist groups, the declassification and possible release of

22   MUF in this unfriendly environment whether due to

23   misunderstanding, lack of knowledge or misinterpretation could

24   seriously damage the posture of the Department of Energy,

25   Rockwell International and former contractor, the Dow Chemical

Page 4972

1    Company.

2            I mean, those purposes are flatly improper under the

3    national security statutes which enable them to classify in the

4    first place.

5            And then in No. 10, At the present time multimillion

6    dollar litigation action is being carried out against the

7    Department of Energy, Rockwell International and the Dow

8    Chemical Company.  Declassification of MUF and subsequent

9    release could have an adverse effect on the final court

10   decision or settlement which is also an improper purpose.  And

11   those -- that's not being introduced for proof of the

12   settlement in any other litigation; that's being introduced for

13   proof of the improper purpose.

14           There are two or three other documents in this set

15   that we submitted to the Court.  This is another one which was

16   declassified in 1996 but certain blanks were left in here.  And

17   it shows, for example, deuterium is this D for unclassified

18   purposes, and there is a blank there.  And there is a blank up

19   here.  This is to Mr. Hoffman, telex to Mr. Hoffman from

20   Germantown, Maryland, the headquarters, and they are still

21   blanking out information about a loss.

22           And one that I think is particularly significant, then

23   on the back of this document, it's the same thrust, is Church,

24   Church was the market, Church to be told what happened to the

25   term written off as NOL, non-operating loss.

Page 4973

1          Again, you know, an improper purpose for keeping

2    things secret.

3          This is one that may not have made it into the motion,

4    Your Honor, but this is another tritium release, not the 1973

5    one about which we heard so much, but a January 6 and 7, 1981,

6    tritium release in building 777 to glove box exhaust plenum 205

7    and 206 and subsequently to the environment.  And then there is

8    some history there, and then there is a section called

9    "Findings," and in the section called "Findings," everything is

10   basically whited out there on those findings.

11         There is further text in this document as to how it

12   occurred, and there is an estimated quantity of tritium

13   released to the environment was a tenth of a curie which is

14   3.7 billion disintegrations per second.  It's not a trivial

15   amount, but, you know, the Environmental Analysis and Health

16   Physics findings are whited out.  At least the copy I have does

17   not have an exhibit number.

18         So these are examples -- we have other examples that

19   we intend to show during this examination to show that the

20   classification had a very broad ambit at the Rocky Flats plant,

21   considerably broader, we believe, than at the other plants.

22         And I'll briefly outline the other areas I want to get

23   into.  I want to make a suggestion as to what Your Honor said

24   earlier today.  Your Honor suggested that the fact that DOE

25   cooperated with defense counsel for a number of years or with

Page 4974

1    the defendants for a number of years in litigation and

2    stonewalled the plaintiffs is not relevant.  The only thing I

3    would say is I think the appropriate way to handle that is with

4    a cautionary instruction, and the cautionary instruction would

5    be to the jury that defendants are indemnified by the

6    Department of Energy and it's perfectly appropriate and proper

7    for the defendants to cooperate with the Department of Energy,

8    but the inegalitarian treatment of the plaintiffs in their

9    document request for years by the Department of Energy is

10   relevant to what comes afterwards.

11         And what comes afterwards is in September of 1994

12   there is a stipulated order on discovery.  DOE flouts the

13   stipulated order.  Finally in November of 1995, 14 months

14   later, after a hearing in this court which Mr. Hoffman was one

15   of the percipient witnesses for the DOE, the Court holds the

16   DOE in contempt.

17         Then there are further proceedings.  This is relevant

18   to Mr. Kaufman and Mr. Hoffman.  We still can't pry these

19   materials out of DOE for months and months and months.  And

20   then when we finally do pry them out of DOE, virtually all of

21   them are whited out so as to -- all of the new material that

22   hadn't already been declassified as part of Hazel O'Leary's

23   openness initiative is whited out and rendered relatively or

24   perhaps totally useless to us.

25         Certainly the destination or the release or the escape

1    of MUF during specific months, specific quarters, from specific

2    buildings cannot be reconstructed from those documents in the

3    form that we ultimately have them.  And Mr. Hoffman maintains,

4    you know, insistently that this is because of national security

5    purposes, and I think the jury is entitled to draw its own

6    inference.

7            They may have the absolute right to classify things

8    for national security purposes, but the jury is entitled to

9    draw its own inferences.

10           Now, there is some more mundane things that I want to

11   elicit from Mr. Hoffman in addition to these documents, the

12   procedure, the fact that Q-cleared counsel could not, again,

13   get classification guides which are worthwhile.  I don't know

14   if the Court remembers that whole problem where Your Honor

15   finally ordered them to produce to us their classification

16   guides, and when we found them, they were in a form that was

17   totally unusable.

18           We want to bring out the process of classification.

19   Mr. Hoffman testified at the contempt hearing that it was a lot

20   easier to classify documents than to declassify them and that,

21   therefore, they had a proclivity for doing that.

22           He supervised the classification officers.  He

23   testified the contractor writes the guide.  I think that's an

24   important point, that Rockwell or Dow, as the case may be,

25   wrote the guides, not the DOE.  The DOE just approved the

1    guide.

2           There are -- he is going to certainly fight us on MUF.

3    He is going to say MUF is an accounting problem.  We think MUF

4    is a much more substantive problem, and we intend to go

5    directly after that issue with him.  We are going to talk to

6    him about the openness initiative by Secretary O'Leary.  Your

7    Honor may recall in the opening statement, I mentioned this

8    document and I think I held it up.  This was a press conference

9    and fact sheets that were handed out in June of 1994 by

10   Secretary O'Leary.  That was the first time the public was even

11   told that there was 2600 pounds, the amount of missing

12   plutonium at the Rocky Flats plant, so we would be offering

13   that document, and we would intend to take him through this

14   whole openness initiative starting with Secretary Watkins,

15   continuing with Secretary O'Leary, which died of boring in the

16   ensuing years.

17          Now, we took -- Mr. Sorensen took Mr. Hoffman's

18   deposition for three days or at least portions of three days,

19   and that testimony was taken during the many months that

20   followed Your Honor's contempt hearing.  And one thing that we

21   intended to bring out with Mr. Kaufman, as well as Mr. Hoffman,

22   is how the number of MUF documents escalated from 3,000 to

23   11,000 to 250,000 to 650,000, maybe there was an intermediate

24   step at 500,000, I am not sure, to 1.3 million.

25          And then they put on a crash program to basically,

1    quote, declassify these documents which resulted in them

2    largely remaining classified and largely remaining whited out

3    and largely remaining useless to the plaintiffs in producing

4    evidence in this case.

5        And I have a number of other exhibits that we will

6    use.  I think we filed exemplars of those in the motion for

7    admission of documents that we filed.  And the one thing I

8    would ask Your Honor to revisit about this morning's comments

9    is that I do think it is important to show from our perspective

10   not that it's improper for DOE to cooperate with the

11   defendants, because DOE indemnified the defendants, but that it

12   was improper and it shows their poor motives the fact that we

13   were stonewalled for years, and then when we finally got

14   documents, we got documents, over a million documents -- a

15   million pages of documents that were in a form that were

16   largely useless, largely -- certainly unable to prove anything

17   relating to where the MUF went.  And I think it's extremely

18   relevant, centrally relevant that despite the fact they were

19   held in contempt and despite the fact there were succeeding

20   orders after the contempt order that obliged them to do this in

21   good faith, it wasn't done in good faith.  It was done on a

22   blanket basis, and there was no individualized review of the

23   documents.

24       Now, there are a lot of little details that I have

25   left out here that we intend to elicit with Mr. Hoffman as to

Page 4978

1    how the process works, how the classification process works,

2    what's properly classified and what's not properly classified,

3    but I think the ill motives that are reflected in some of the

4    documents that we were able to get as a result of the openness

5    initiative that we attached to our brief shed light on those

6    motives.

7         MR. BERNICK:  I am not sure we have heard the totality

8    of the proffer because of all these other details that we

9    haven't heard of, but Your Honor gave us a fair and adequate

10   opportunity to talk about what the proffer was going to be.  I

11   think we have now heard a proffer.  It seems to me the

12   threshold issue is whether this is it.  Maybe it simply ought

13   to be it because the opportunity was here, and you have now

14   heard how they have used that opportunity.

15        It occurs to me -- actually, I don't know, again,

16   where Mr. Hoffman is, but procedurally it seemed to me the

17   appropriate posture for this is Rule 104.  Under Rule 104 Your

18   Honor can actually hear from Mr. Hoffman, hear the questions

19   put and make a judgment about how to proceed here on the basis

20   of Mr. Hoffman's testimony.  You can probably do it this

21   afternoon in fairly short order.  I suggest that not to

22   forestall bringing the jury back because I would also be happy

23   if Mr. Hoffman testified this afternoon.  I want to get on with

24   the case, and I know that Your Honor does as well.

25        But it seems to me that the real question -- there are

1    a couple questions.  I am going to propose the following

2    structure, Your Honor, for consideration of this matter.

3              Number one, what is the issue as to which this

4    evidence could be responsive?  And Your Honor, I know, this

5    morning in the context of a relatively free flowing discussion

6    came to grips with that question; that is, what is the

7    question?  What is the issue?  And the way that Your Honor

8    ultimately came out, and I am not -- we obviously realize this

9    is an in-process process, and I am not suggesting that Your

10   Honor formally ruled, but here is what Your Honor said.

11             This was in response to Mr. Davidoff's position, you

12   said, It's what you are able to do and not able to do.  It

13   isn't what the defense does, how much they paid, what the

14   Department of Energy does, how many people they have working on

15   this or not working on it when they make their decision.  None

16   of that matters.

17             If you have specific evidence that you have tried to

18   bring forth and you have been frustrated in your effort by the

19   classification, that's admissible, that and that alone.  All of

20   the rest of this business is what's causing the serious risk,

21   the serious risk of a -- either a mistrial or such fundamental

22   loss of fairness in the case that the case is thrown out.

23             That's where Your Honor drew the line this morning.  I

24   want to adopt that perspective, that test, and go through these

25   documents, then I want to come back to the question of whether,

Page 4980

1    well, gee, is that the right test or not.  And Your Honor knows

2    that at the end of the day our position is that none of this

3    should come in, period.

4         But Your Honor has determined that some of it is going

5    to come in, and I, therefore, want to come back and ask whether

6    this test is appropriate given what is before Your Honor.

7         If we use that test, that is our -- are these

8    documents, are these facts, this testimony relevant to what the

9    question is plaintiffs were able to get or not able to get, not

10   a single one of these documents is at all relevant.

11        We go back to 1947, this document that was shown here

12   that talks about -- actually it deals with medical policy.  In

13   the course of it, it talks about classification.  I judge by

14   the stamps here it is probably produced in the Hanford case.

15   It was produced in 1994, at least was declassified in 1994

16   which means they had absolutely to do -- nothing to do with the

17   declassification of this case.  It was probably part of that

18   openness policy.  In 1947 Rocky Flats doesn't even exist, so

19   whatever musings might be reflected here have nothing to do

20   with this case, nothing to do with current policy.

21        It really kind of highlights what's going on here,

22   which is this case now becomes yet another archeological

23   expedition, as we see, on the merits of cases often but very

24   rarely with respect to collateral issues such as privilege.

25   That document was numbered 660, Plaintiffs' 660.

1          The next document is this one, 1964, study of

2     unaccounted for plutonium losses.  This document has nothing to

3     do with declassification at all.  It's simply a document about

4     MUF.  That's what it talks about.  It makes a completely

5     unremarkable statement which was gathered here that after the

6     fire there was an addition to MUF which, of course, you expect.

7     You got tons of plutonium, however much plutonium was in the 71

8     building before the fire, a huge fire occurs.  There is all

9     kinds of waste abstract out of the place, all kinds of debris

10    from the fire.  You are going to lose the ability to count for

11    plutonium.  That's going to happen.  That's what MUF is all

12    about.

13         It says, okay, what was the fire loss?  They are

14    trying to come up with a total MUF.  Here is the fire loss.  We

15    think it's 6 kilograms.  It doesn't say anything about going

16    out the door, up the stack or anything.  This is a traditional

17    MUF calculation.  You look to the inventory you have before the

18    event, the inventory after the event, and the difference,

19    whatever the reason is, it's called MUF.  All this says is the

20    '57 fire, MUF was 6 kilograms.  Doesn't say it went out the

21    stack, doesn't say it went into the environment.  It simply

22    says it's not accounted for.  That's what MUF is all about.

23         This document says not a word about classification.

24    This document apparently was declassified in 1994, so it was

25    part of the sunshine declassification, had nothing to do with

1   the case, but clearly available to the plaintiffs, so we have

2   yet to see a document now or any indication they didn't receive

3   information.

4           We then go to the 1977 document, this is Plaintiffs'

5   Exhibit 664, authored, in fact, by Mr. Hoffman.  This deals

6   with the declassification in the 1970s with respect to the

7   other plants.  Now, we have to be very clear.  What was

8   declassified in the other plants was not any document relating

9   to MUF.  There was certain MUF figures, certain MUF

10  information.  MUF is reflected in their detailed documents

11  because the process document will lead to MUF.  MUF is

12  reflected in various summary documents with respect that the

13  entirety of the inventory is reconciled and the difference is

14  the inventory difference.

15          So when you think about it, in fact, this document

16  here back from 1964 was an effort to try to get that top

17  figure, so you try to build up to that top figure plant-wide.

18  In any given process, though, there will be material lost.  The

19  further you get down toward the process documents the more

20  sensitive they become because they reflect what's going on at

21  the facility.

22          So this is a top document.  In the 1970s the issue

23  was, should we do a declassification of the top numbers at all

24  these different facilities, not all MUF information, but the

25  top numbers.  And the decision was to do that with respect to

Page 4983

1   all the facilities except Y12 and Rocky Flats.  Why?  Because

2   at Y12 and Rocky Flats the inventory, the plants were so --

3   dedicated so closely to the final weapon parts that the

4   inventory differences could be much more revealing of what was

5   actually going on inside the plants; whereas inventory

6   differences at Savannah River and elsewhere, because their

7   final product was not as much the triggers, was much less

8   sensitive.

9          So they carved out Y12 and Rocky Flats not because

10  there was some special litigation at Rocky Flats, there was no

11  special litigation at Y12, but because the inventories there

12  were much closer to being revealing of the design weights of

13  the weapon parts, so that's why this decision was taken.  There

14  is nothing in this document to the contrary, and there is a

15  contemporaneous document that confirms that is so.

16         Therefore, this document reflects no improper purpose.

17  In fact, what was done in the 1970s was totally legitimate.  It

18  had nothing to do with litigation or with politics, and even

19  more to the point, this document doesn't have to do with the

20  Church case because it's a 1977 document.  It's got nothing to

21  do with the production of documents in the Cook case.  So this

22  document, too, was not something that somehow either provided

23  evidence for the fact they didn't get information or they

24  didn't get it, they got this.

25         So we are now on to that one.  Plaintiffs' 653, this

1    document here is a 1983 document.  What does it talk about?  It

2    talks all about MUF.  There is not a word in this document that

3    says, oh, we got to maintain this as classified for some

4    political or improper reason.  It's just another MUF document.

5              Now, this document was declassified in 1995.  It was

6    produced to the plaintiffs.  They do have it for purposes of

7    this litigation.  I don't see there are any redactions that are

8    left.  So this doesn't establish that they didn't get anything.

9              This document here, 658 and 652, which are the

10   documents that date back to the time of the Church litigation,

11   very problematic document.  Number one, we don't have any idea

12   of who wrote it.  The author to this document has never been

13   identified.

14             Number two, Mr. Hoffman was asked about it, and it

15   turns out he never saw the document himself prior to the time

16   his deposition was taken.

17             Number three, does this say -- this talks about

18   concerns with declassification, but it never reflects that any

19   of those concerns actually became material and resulted in any

20   declassification or classification policy even back in the

21   1970s.  It's just not there.  Nor does it have to do with the

22   Cook case.  It's got nothing to do with the Cook case.  The

23   Cook classification process took -- declassification process

24   took place in 1995, 1996, not back in the 1970s.

25             So I could go on.  Documents concerning the tritium

1   release, I asked for the exhibit number.  I was not given that

2   exhibit number.  Apparently there are additional documents

3   counsel intends to use.  I don't know what they are, so I can

4   only respond to what's here.

5        If we go back, therefore, to -- therefore, Your Honor,

6   to the touchstone, was there or was there not information these

7   plaintiffs received, not a single one of these documents has to

8   do with the production of information to these plaintiffs.

9   Indeed, every single one of these documents says -- deals with

10   a period of time before the Cook case.  Not a single one of

11   these documents deals with the declassification of the Cook

12   case.

13        So if Your Honor uses as a benchmark did they or did

14   they not get it, this entire line of examination is completely

15   irrelevant.  What this line of examination is designed to speak

16   to is a different test.  It's designed to speak to a spoliation

17   test.

18        This takes me to the instruction, Your Honor, Your

19   Honor's instruction.  Although we differ with the instruction,

20   Your Honor's instruction is not a spoliation instruction.  Your

21   Honor's instruction doesn't say that if the documents have not

22   been available you may draw an inference against the party

23   against whom the evidence is offered.  That would be a

24   spoliation instruction.  That would be to say these documents

25   were destroyed or made unavailable by reasonable litigation

Page 4986

1    and, therefore, the jury can draw an adverse inference.  That's

2    not the instruction.  All the instruction says is that you may

3    or may not draw an inference as to whether it would be

4    favorable.

5            Again, we think that's too suggestive of there being a

6    problem, but Your Honor in the instruction itself recognized

7    that it was not a spoliation instruction.  What they are trying

8    to do is to treat it as a spoliation instruction.  They are

9    trying to use this document, these documents to argue that, in

10   fact, the classification process was abused.

11           The brief they submitted to the Court actually says

12   so.  It comes right out and says the purpose of this evidence

13   is to show that the purpose of classification was to protect

14   information in order to protect the litigation or political

15   position of the Department of Energy or the Atomic Energy

16   Commission.  That's not a proper purpose.  That's a spoliation

17   purpose.

18           That's not a "do you have it" or "do you not have it";

19   that is, we don't have it because these people acted

20   improperly.  Your Honor has not issued that instruction.  There

21   is no such instruction.  It's in that booklet, and, therefore,

22   there is no predicate for them being able to say that these

23   documents were secreted by virtue of the classification process

24   for an improper purpose.

25           So number one, it's not the test that you articulated

Page 4987

1    this morning.  Number two, it is a test, what they are

2    suggesting, which is the why, it is a test that's a spoliation

3    test.  Number three, the evidence they provided so far has

4    nothing to do with Rocky Flats.  There is not a single document

5    here that says that the Rocky Flats declassification process or

6    the Cook case was thus tainted.  In other words, Your Honor, if

7    they were to say we don't have these documents in Cook because

8    they were improperly withheld, they should be giving you

9    evidence of that.  Where is the evidence that in the Cook case

10   things were not declassified for an improper purpose?  They

11   haven't given you one shred of evidence, not one piece of

12   evidence that the classification, declassification process in

13   Cook was imbalanced, tainted, done for in a proper purpose.

14        Then we finally get to the point that if Your Honor

15   were to allow them to make that suggestion in the Cook case,

16   not only would that be without any proffer of evidence to the

17   Court that's true, but it would further put this jury and this

18   Court in the position of having the jury determine whether the

19   classification was proper or not.  And as I said this morning,

20   that is not up to this jury, it's not up to this Court, and

21   it's also an inference, more a suggestion, that we cannot

22   possibly litigate or rebut because we don't have access to the

23   information that would be exculpatory information.

24        So on this question, this initial question of what the

25   purpose was of the classification -- of these documents and the

Page 4988

1    classification process, we would urge that Your Honor stand by

2    the litmus test you offered this morning, which is, does it

3    establish that these people got or did not get information

4    that's relevant to this case.  None of these documents, none of

5    the history does that.  It goes to a different issue, which is

6    spoliation, and this is not a spoliation case, at least they

7    have not introduced evidence that it is.

8           We then get the following litany of additional matters

9    they want to set before the Court.  Number one, the

10   relationship between the Department of Energy and the

11   defendants as being cooperative.  Now, it is just the most

12   outrageous suggestions that are being made.  As I told the jury

13   in opening argument, as I told the jury, yes, we have had a

14   relationship with the Department of Energy.  That's

15   unquestionably true.  As I have told the Court, the Court has

16   been informed previously and formerly, and I think, even as I

17   mentioned to the jury, yes, it's true in the initial parts of

18   this case, of course, we were dependent on the Department of

19   Energy.  We didn't know anything that was going on.  The

20   Department of Energy had been litigating these cases for years.

21   We were entitled to consult with the Department of Energy.  We

22   did so under a work product privilege because they were our

23   indemnitor.  That work product privilege has been sustained in

24   this case.

25          There is no reason why the jury should learn of this.

Page 4989

1    It's a collateral matter and simply designed to suggest that

2    somehow the lawyers sitting at this table on our side are

3    better informed and the playing field is uneven against the

4    plaintiffs and in favor of the defendants.

5         That makes us, frankly, Your Honor, witnesses to a

6    claim in this case.  I have explained to Your Honor before we

7    cannot proceed in this case if we are in a situation where the

8    evidence is coming in that relates to what it is that we did.

9    But to make it even more outrageous, all of that cooperation

10   resulted in the creation of these databases, the so-called Cook

11   database.  There is also an environmental monitoring file

12   database.  Mr. Davidoff misrepresented to the Court yesterday

13   they didn't see that.  That's just completely false.  Those

14   databases were among the very first documents produced in this

15   case.  All of the so-called cooperation led to a database of

16   documents, some of which have been declassified at that time.

17   It was all produced to the plaintiffs in this case.  Of course,

18   they are entitled to it.

19        None of that has to do with declassification that's at

20   issue here.  The declassification process that the plaintiffs

21   claim took place in 1994, 1995, we played no role in it.  We

22   had no place in it.  We had nothing to do with it.  And that's

23   the one they have taken issue with.  The whole idea that there

24   has been a cooperative relationship, it is extended to none of

25   the declassification process.  In fact, the Government in

1    agreeing to produce all these documents to these people.  They

2    did so over our explicit objection in court because we thought

3    it would delay the case.

4           Number two, they say they want to get into procedure,

5    that they were not permitted to have classification guides,

6    that the process of declassification and classification is

7    unfair.  Inevitably that is the same thing as litigating

8    whether the classification was proper or not.  The

9    classification guides are classified documents.  It's just the

10   way they are.  Otherwise people can't make the determinations

11   that they are supposed to make.  They can't get access to them.

12   We can't get access to them for purposes of using them in this

13   case.  To have the jury decide on whether those guides are

14   proper or improper is the same thing as having them pass on

15   classification.

16          Third, they want to have Mr. Hoffman talk about MUF.

17   I got no problem with Mr. Hoffman talking about MUF as a fact

18   witness to the extent it doesn't reveal classified information.

19   They want to ask him about MUF, I don't have a quarrel with

20   that.  The openness initiative, they want to show that was all

21   politically motivated.  And until that happened and all these

22   revelations were made about Rocky Flats, we are not here to

23   litigate the openness initiative.  That's a political issue.

24   And whatever their motives were and whether they were

25   noticeable or not is entirely irrelevant, because as a result

1    of the openness initiative, they did get figures for MUF, so

2    how can they say the openness initiative itself was somehow

3    improper or deprives them of information.

4         Finally they want to ask him about why the estimates

5    of the number of documents increased over time.  I don't have a

6    problem with that.  That's a matter of court record.  If they

7    want to ask how the estimate increased over time, I have no

8    issue with that.  I do, however, take issue with their being

9    able to suggest in any way, shape or form that because of the

10   escalation of number of documents the result was that they got

11   less.  And this is, again, a misrepresentation that's been made

12   to the Court.

13        The fact of the matter is, Your Honor, the fact of the

14   matter is there is not a word to the contrary in either one of

15   your contempt orders.  In fact, in your second contempt order

16   you specifically declined to find that there has been any

17   abuse, any abuse of the classification process.  What happened

18   in connection with those orders was that the Department, in

19   fact, geared up, dedicated increased resources to the effort.

20   The declassification process continued even after the

21   plaintiffs said they didn't want it to continue, and all the

22   documents ultimately ended up getting produced to these

23   plaintiffs.

24        There is zero showing, not one piece of evidence

25   that's before the Court that says that somehow the Department

Page 4992

1    of Energy did not properly declassify those documents.  There

2    is just none.  Now, the result may be that they don't get much

3    of these documents because they made a request that was

4    incredibly broad.  They made a request that we request process

5    documents.  The Department of Energy can't reveal process

6    documents because they contain classified information.  Your

7    Honor says, well, nobody here has ever asked for weapons

8    design.  Well, they did.

9         When they asked for all documents that relate to MUF,

10   those include documents that are down at the process and design

11   level.  So, of course, they are massively whited out.  If they

12   were to show Your Honor that somehow because of the volume of

13   documents that was processed the result was over redaction,

14   that would be an appropriate matter for Your Honor to consider

15   in some capacity, I guess, in connection with this case,

16   although I venture to say I don't know how Your Honor

17   substantively could review that, but they produced no such

18   evidence, nothing.  In fact, Your Honor's second order

19   specifically found there was no evidence that the

20   classification process or declassification process had been

21   abused.

22        I am sorry to go on for so long, but Mr. Davidoff

23   covered all the same issues.

24        THE COURT:  Mr. Davidoff, go ahead.

25        MR. DAVIDOFF:  First of all, I want to address the

Page 4993

1    relevance to the Cook case.  All of these documents are

2    relevant to the Cook case, even the AEC document from 1947

3    speaks of classification philosophy that is completely at

4    variance with what Mr. Hoffman testified to both in his

5    contempt hearing testimony and in his deposition testimony, and

6    so do the other documents.

7          And keeping documents secret to the fact that it was

8    Church litigation that was pending, and in one case even that's

9    not mentioned by name, as opposed to Cook litigation pending,

10   the fact was he was the chief Dow and then the chief Rockwell

11   classification officer when these decisions were made to keep

12   that secret, and what is notably absent from counsel's

13   recitation here is that all of this was kept secret at least

14   until the 1990s, and most of it, the vast majority of it, is

15   continuing to be kept secret.

16         Now, we have heard repetitively in this courtroom that

17   everything about Rocky Flats was known to the public in the

18   1970s and the 1980s.  This was all out in the open.  There were

19   headlines in the Denver Post.  I mean, that is malarky.  That

20   is malarky.  What wasn't known to the public was that there was

21   2600 pounds, 1192 kilograms of uncontrolled plutonium, and what

22   is still being kept from the public is where that plutonium

23   might have gone.  I mean, there hasn't been any substantial

24   declassification that we can discern since the mid '90s when

25   there was a wave of partial declassification of a little bit of

1    these documents.

2         And I urge Your Honor to look beyond the rhetoric.

3    Look at the documents.  Look at the language of the documents.

4    I don't see how the Court can find that those documents are not

5    probative of an intent.

6         Now, as to the specific questions that were raised on

7    the -- by counsel in his comments, I have a few other things to

8    show Your Honor.

9         MR. BERNICK:  That's fine.  We are going to want to

10   respond to any new material that counsel shows.  We haven't

11   seen any evidence of any of this material.

12        MR. DAVIDOFF:  This is P554, Your Honor.  This is --

13        MR. BERNICK:  I am sorry, which one?

14        MR. DAVIDOFF:  P554.  I am just going to point one

15   paragraph out here.

16        Further, the commission, this refers to the AEC, this

17   is from -- this is 1974, finds itself in the awkward position

18   of trying to argue that the information, this is referring to

19   MUF information, is very sensitive but at the same time that it

20   really only represents a bookkeeping number and does not

21   represent any lost or diverted material.  It is difficult to

22   have it both ways.

23        Then as to the point that these documents, that we

24   haven't shown that -- the documents have whited out pertinent

25   information, this is one that was declassified.  This is 1144,

Page 4995

1    and it was declassified.  It's like he had a Cook document and

2    it was classified.

3            MR. BERNICK:  This was not part of any of their

4    papers.  I don't have it.

5            MR. DAVIDOFF:  Your Honor, we don't have an obligation

6    to file a motion for admission of everything we are going to

7    use on cross-examination.

8            THE COURT:  Just tell me what it is.  Let's get to the

9    point.  We are keeping the jury waiting, and I want to get

10   moving.  All right.  Just go ahead.

11           MR. DAVIDOFF:  June of 1954 which was finally

12   declassified, it looks like 40 years later, explanation for

13   material unaccounted for, 71 plant.  Even when it is finally

14   declassified 39 years later, the unaccounted for loss of,

15   blank, then you go down below to the laboratory, of the total

16   unaccounted for loss of, blank, our opinion as to the cause of

17   approximately, blank.  An estimated, blank, loss occurred on an

18   explosion of peroxide cake.  An estimated, blank, loss material

19   occurred in the spec lab arc.  In this case, the total

20   material, this loss is estimated, blank, of the total material.

21   In this case, the total material was, blank, giving a loss of,

22   blank.  How this could possibly threaten national security

23   mystifies me.

24           Then the next page there was an estimated, blank, loss

25   on recovery of, blank.  Because of, blank, high reduction

1   efficiency on portions of this recovery material, an indication

2   was that the -- used on the plutonium nitrate was low, this

3   would account for, blank, of the laboratory loss.

4   Approximately and, blank, loss, a, blank, loss has occurred on

5   accepting, blank, of alloy Pu material.  By the way, this is

6   one of the documents we classified in the openness initiative

7   and then for the Cook case, and we still can't get useful

8   information from these documents.

9          A comment was made that a concession was made in

10  opening argument.  I have yet to see a case where the adverse

11  party is dependent in its proofs on the concessions that

12  defense counsel chooses to make in argument, either opening or

13  closing argument.  We have a right to put proofs on and

14  concessions are tactical, they may be relevant for purposes of

15  the defense lawyers, but we have a right to put proofs on.

16  Now, let's look at Mr. Hoffman's testimony.  I better read it

17  because it's out of my outline.

18          MR. BERNICK:  Can we have a page number.

19          MR. DAVIDOFF:  Yes, his deposition testimony at

20  page 209 and 210.

21          Question:  In reviewing and redacting the MUF

22  documents that were produced to the plaintiffs by DOE in

23  connection with the contempt order, did anyone on behalf of DOE

24  make any attempt on a document-by-document level to determine

25  whether information being deleted would actually pose a threat

Page 4997

1    to national security if it were not deleted?

2           Answer:  The documents were deleted in concern with

3    what information was indicated in the guide that it was

4    classified.

5           Other than that, though, was any attempt made to

6    determine if any individual document level, whether the

7    information was taken out, if left in, would, in fact, threaten

8    national security?

9           We did not make that analysis.

10          Then Mr. Siebert in his deposition at page 175

11   testified similarly.  He said there is not a specific detailed

12   analysis for each document or page that we were reviewing or

13   else we would never get through this process.

14          Finally, and this relates to Mr. Kaufman because it's

15   out of his deposition testimony that was taken last week.  And

16   it's relevant to Mr. Hoffman, too.

17          Page 203:  This is a yes-or-no question.  And for the

18   sake of this question, I'll assume it's privileged.  Did you

19   have any privileged conversations, yes or no, the subject of

20   which was DOE's views about whether the release of additional

21   MUF data would be embarrassing to DOE or its contractors, or

22   hurt the posture of DOE or its contractors?  Just say yes or

23   no.

24          Then there is a series of objections.

25          Answer:  Yes.

Page 4998

1           Well, for the record, I am going to continue.

2           Can you please describe the content of any of those

3    conversations?

4           I will assert the privilege.

5           I don't think the privilege was properly asserted

6    there because DOE does not have a right, as Mr. Hoffman

7    admitted, to classified documents to avoid embarrassment

8    whether it be in litigation or for political purposes.

9           Then there is on the next page:  Did you have any

10   conversations -- this is a yes-or-no question -- with DOE

11   in-house counsel the subject of which was whether release of

12   additional MUF information in this litigation would potentially

13   harm the interests of DOE and/or the defendants in this

14   litigation?

15          I'll assert the privilege.

16          Incidentally, that was a deposition that was taken by

17   the defendants, not by the plaintiffs.  We were blocked at

18   deposition; we have been blocked in discovery.  We have a right

19   to show the procedural history of this, I believe, Your Honor,

20   to the jury, and I am agreeable and I think it's not

21   inappropriate for Your Honor in his discretion to give a

22   cautionary instruction that the defendants had a right, since

23   the DOE was their indemnitor, to cooperate with their

24   indemnitor.

25          I do want to make two further comments for perhaps the

Page 4999

1    30th or 40th time in this trial I was accused of making two

2    misrepresentations.  I absolutely deny that.  That is not true.

3    What I said was there was cooperation with the defense counsel

4    and they received the documents that they received years before

5    we did.  That is absolutely true.  And that is a -- and then

6    later when we tried to get documents under a stipulated order

7    after 14 months of proceedings and then another 14 months of

8    proceedings, we were stonewalled at every turn.

9         The jury has a right to know that.  We have a right to

10   tell that to the jury in explaining to the jury why there is

11   little more about the 2600 pounds of MUF that we are able to

12   explain other than these few documents that are declassified as

13   part of Secretary O'Leary's initiative.  I think that is very

14   important.

15        I have one final comment, and I probably should have

16   mentioned this during the proffer as to Mr. Hoffman.  The Rocky

17   Flats plant closed in 1990, actually maybe you could argue

18   before 1990.  It didn't make weapons anymore.  Whatever

19   arguable excuses -- and I think in many cases they are excuses

20   and in some cases they are valid national security reasons such

21   as the design of a bomb pit or how much plutonium went into a

22   particular design of a bomb pit.  We really don't have any

23   interest in that, and we wouldn't have had any interest in

24   that.  We won't have any interest in that, but that plant

25   closed in 1990.

1           And any suggestion that production data from the '50s

2    or '60s or '70s could possibly be of national security

3    significance to the United States now is fatuous.  It is

4    absurd.  I tried to get that answer out of Mr. Budnitz, who was

5    a participant in at least some of these inspections during his

6    direct testimony.  And if I recall correctly, an objection was

7    made and it was sustained.  But Mr. Budnitz would have

8    testified to that, Mr. Cochran probably will testify to that,

9    and I think that there are other witnesses and, in fact,

10   Mr. Siebert, I believe, testified, who was a defendants'

11   classification officer, and Jessie Roberson.  There are some

12   notes from Jessie Roberson to the same effect.  I mean, it just

13   doesn't make sense that how much throughput there was in

14   building 881 in June of 1956 or how much MUF there was in

15   building 881 or building 771 in June of 1956 or the second

16   quarter of 1956 could possibly damage the national security

17   interests of the United States now, on its face, on its face is

18   an absolutely absurd proposition.

19           But that is the mantra that is being invoked directly

20   by DOE, derivatively by the defendants, to excuse the refusal

21   to declassify this information.  It's been terribly prejudicial

22   to us in this case.  We have extended thousands of man-hours

23   and a lot of grief trying to get information, and we have

24   largely been frustrated at every turn, and we have a right to

25   explain at least some of this procedural quandary that we are

Page 5001

1   in to the jury.

2           THE COURT:  Thank you.  Okay, go ahead.

3           MR. BERNICK:  Your Honor, I am sorry.

4           THE COURT:  Go ahead.

5           MR. BERNICK:  He has made all kinds of misstatements

6   again.

7           THE COURT:  Go ahead.  Just tell me.  I don't need all

8   of that.  Just tell me what you want.

9           MR. BERNICK:  I am going to begin small and then get

10  back to what Mr. Davidoff ended with.

11          With respect to the quotes from the Siebert

12  deposition, that's a complete misquotation of what Mr. Siebert

13  said, unsurprisingly.  Mr. Siebert, the question when you do

14  these page by page, declassification reviews, you literally go

15  page by page.  In fact, Mr. Hoffman in the same deposition that

16  was miscited says this literally line by line.  Every single

17  line gets reviewed.  In fact, the redaction you saw on the

18  screen reflects precisely that kind of approach.  It is a

19  surgical redaction process when that is possible.  Sometimes

20  it's not possible.

21          The question that was put to Mr. Siebert was, when you

22  make each redaction, do you make a record of which guideline

23  was implicated or why the redaction was made?  And the answer

24  to that is, no, they don't sit there when they go through

25  thousands and thousands of lines of text and in each case use a

1    classification guide.  In many cases -- I am sorry, Your Honor.

2         THE COURT:  I am just listening.

3         MR. BERNICK:  Well, in each case, many cases, because

4    these people had training, ultimately they don't have to resort

5    to the guys each time they make a redaction.  That's what

6    Mr. Siebert said.  That's what he said in his deposition and in

7    his affidavit to the Court.

8         With respect to the guidelines and whether the

9    guidelines were used by Mr. Hoffman, he says, well, was there

10   any finding that releasing this information would impair

11   national security?  And he said, other than the guidelines, no.

12   Well, of course, that's right.  They use the guidelines.  Don't

13   sit there and look up at the sky and say is this going to

14   implicate national security.  They use the guidelines and they

15   use the templates, so both of those quotations were entirely

16   out of context and completely misleading.  That's why I think

17   it's all the more important to have Mr. -- get Mr. Hoffman here

18   and have him testify so we can hear what the story is.

19        Mr. Davidoff showed you a document.  Mr. Davidoff

20   showed each and every one of those blanks saying, how can that

21   be sensitive?  How can that be sensitive?  How can we use it?

22   We know that's exactly what he is going to do with the jury.

23   He is going to each redaction and he is going to do boxes of

24   redactions and pages of redactions and say, how can this be?

25   How can we not know this?  How can we even try this case?

Page 5003

1  Enormously misleading, prejudicial, places in front of the jury

2  the question of whether the classification was done in good

3  faith.

4       He quoted from a deposition of Mr. Hoffman where

5  Mr. Kaufman, Mr. Kaufman was instructed on privilege ground not

6  to give the content of a conversation where a lawyer from the

7  Department of Justice apparently heard discussion of the role

8  of politics or some role in politics in the classification

9  process.  I don't know why the witness was permitted even to

10  answer yes or no, because inevitably it would create exactly

11  the inference that Mr. Davidoff seized upon, but that is no

12  evidence that, in fact, when this came to classification

13  politics at all was considered.  Indeed the testimony from

14  Mr. Hoffman himself was involved, Mr. Kaufman was not, but when

15  Mr. Hoffman was involved in doing the declassification, he said

16  I followed the law.  There was no issue of politics, no issue

17  of convenience.  That's the way it applies.

18       We then go to the process in this case.  Mr. Davidoff

19  now says, well, I didn't really say that we didn't get the

20  databases.  It's just the defendants got them years before.

21  Even that's not true.  Those databases were completed and

22  really, in fact, at the time almost right after they were

23  completed we volunteered to produce them.  They got them in a

24  very timely fashion literally 12 or 13 years ago.  Mr. Davidoff

25  then insists, gee, they still have been stonewalled.  We have

1    never gotten what we were entitled to get.  That's false.

2           They got every single scrap of discovery, including

3    all of the documents that they asked for to be declassified.

4    They got them in redacted form, but they got them.  So it all

5    comes down to a question not of whether they got the documents

6    but whether they got the parts of the documents that they were

7    entitled to get or whether instead they were barred by the

8    national security laws.  Again, that's not an issue that I can

9    consider, that you can consider, or the jury can consider.

10          I would further venture to say that all occurred by

11   1996, so nine years ago, nine years ago they were where they

12   are today.  Did they do anything about it?  No.  Why?  Because

13   they knew they had convinced Your Honor that they had been

14   misled, that they had been not been dealt with fairly, and they

15   were posturing to argue exactly as they are arguing to this

16   Court, that there has been spoliation.  There hasn't been

17   spoliation.

18          That then brings me finally to where it is we are

19   headed with all of this.  I am not sure why we are arguing it

20   if Your Honor is going to permit these witnesses to testify in

21   this fashion.  Mr. Davidoff, talk about cuts, Mr. Davidoff

22   stands up and he says, well, this is just absurd that the 881

23   throughput could still be a consequence to this nation.  That

24   is just fatuous and absurd.  It is fatuous and absurd that

25   Rocky Flats, which is no longer operating, could possibly be

Page 5005

1   the repository of confidential or national security

2   information.  What outrageous hubris.  Who does he think he is?

3   Who does the plaintiffs' counsel think that they are

4   to make -- pass judgments on what is in the national security

5   interests of the United States?  He thinks he is so good about

6   them, he knows so much?  They got classified information in

7   their heads.  Let them go out and tell the jury.  Let them feel

8   the burden of the law instead of arguing to the jury that

9   somehow our clients field the burden of the law.  It is not up

10  to Mr. Davidoff, it's not up to this jury, not up to anybody

11  here to pass on the national security laws, and that is nakedly

12  what is taking place.

13  THE COURT:  Thank you.  I am ready it rule now.  I

14  don't need 104 or further examination.  The offer of proof has

15  failed to show that the plaintiffs were denied any information

16  needed in this case.  I am not concerned with philosophical

17  issues, political issues or foot dragging by the Department of

18  Energy which was handled as it should have been handled in

19  terms of the contempt power of the Court, but it has nothing to

20  do with the factual determinations to be made by the jury here.

21  How difficult that is is a matter for pretrial case

22  management.  The evidence of the amount of most MUF data is

23  declassified and it is admissible for two reasons, one, it

24  represents plutonium that could have spread to the plaintiff

25  class members' land; and two, it has an effect on class owners

1    during a period of time with regard to the enjoyment of their

2    property and not knowing the extent of such pollution as there

3    was.

4           The evidence that some information that might be

5    admissible for plaintiffs was -- remains classified, is

6    admissible and that's it.  That's it.  I am not going to permit

7    any further testimony.  I am rejecting the offer of proof

8    that -- because there has been a failure to show plaintiffs

9    were denied any information dealing with this case.  You have

10   demonstrated quite clearly how difficult it was, and I am not

11   going to get into the wisdom of what's in the security

12   interests of the United States.  That's simply not a matter for

13   me to decide.

14          MR. DAVIDOFF:  Counsel for the defendants have

15   reargued many rulings, and I have tried to avoid that, but

16   there is one aspect of this, Your Honor, that I believe has to

17   at least -- I respectfully ask you to hear me out.  If Your

18   Honor wants to call the jury in so we don't detain them any

19   further, I am happy to do that after the jury is dismissed

20   after Ms. Robb's testimony, but I do want to be heard out on

21   some of the specific types of documents that we submitted with

22   our motion.  I think it is extremely prejudicial, Your Honor,

23   for those to be ruled out of bounds in this case.

24          And I think, you know --

25          THE COURT:  I will hear you later.  Let's get the jury

1    in.

2              (Jury present.)

3              THE COURT:  Go ahead.

4              MR. SORENSEN:  Thank you, Your Honor.

5         (Richard Clapp was previously sworn.)

6                   REDIRECT EXAMINATION CONTINUED

7    BY MR. SORENSEN:

8    Q.  Good afternoon, Dr. Clapp.

9    A.  Good afternoon.

10   Q.  Dr. Clapp, just a few more questions.

11   A.  Okay.

12   Q.  Could you turn to what was identified for you as

13   Defendants' Exhibit 606, please.

14   A.  I have it.

15   Q.  And do you recall being asked several questions on

16   cross-examination about this article?

17   A.  Yes.

18   Q.  And your name is one of the listed coauthors of this

19   article, correct?

20   A.  Correct.

21   Q.  Now, I believe you were explaining or attempting to explain

22   the purpose of this article having to do with looking at the

23   shape of the dose response curve.  Do you recall that?

24   A.  Yes.

25   Q.  Could you please explain that more for the jury, please?

Page 5014

1   there are a standard set above zero for things like

2   trichlorethylene or these other chemicals.

3   Q.  Dr. Clapp, in making judgments in your field, your

4   scientific field and making judgments from the kind of data you

5   collected in this case, particularly in G799, is the process of

6   making judgments from that kind of data simply a matter of

7   looking up statistical test or is it also a question of

8   scientific judgment?

9   A.  It's definitely a question of scientific judgment.  I would

10  say all of interpretation of epidemiological results are that.

11  Q.  Thank you.

12          MR. SORENSEN:  That's it.

13          THE COURT:  Thank you very much, Doctor.

14          Next witness, please.

15      (Gretchen Robb was sworn.)

16          THE WITNESS:  I swear.

17          THE COURT DEPUTY:  Please state your full name,

18  spelling your first and last names for the record.

19          THE WITNESS:  Gretchen Robb, G-R-E-T-C-H-E-N, R-O-B-B.

20          MR. DAVIDOFF:  Your Honor, if the Court please, Ellen

21  Noteware, my associate, is going to conduct the examination of

22  Mr. Robb.  This is Ellen Noteware from my firm, ladies and

23  gentlemen.

24          THE COURT:  She hasn't been before you before, but you

25  are welcome.

Page 5086

1    things that he doesn't have personal knowledge about.  What

2    they want to do is leave hanging the question of whether this

3    process was complete.  They also don't want to bring before the

4    jury the completion, but literally we're sitting here ten years

5    later and the other side has taken not one step to further

6    pursue the notion of getting more information out of the

7    Department of Energy.

8              So to the extent that they seek to slice this so

9    finely that Mr. Kaufman is gone and therefore the state of the

10   record is, gee, there are all these continuing swirling

11   problems, that's cutting it a little too fine.  And I'll inform

12   the other side and the Court, we intend to pursue broader

13   questions that they open the door for once they put Mr. Kaufman

14   on the stand.

15             THE COURT:  We'll take it one pitch at a time.

16             All right.  You ready?

17             MR. SORENSEN:  Yes.

18             THE COURT:  All right.  Bring in the jury.

19        (Jury in at 9:33 a.m.)

20             THE COURT:  Thank you.  And be seated, please.  And

21   good morning.  Sorry for the delay.

22             Mr. Sorensen, go ahead, please.

23             MR. SORENSEN:  Yes.  We call Mr. Richard Kaufman.

24             THE COURTROOM DEPUTY:  If you'd step right up here,

25   please.

Page 5100

1    written request to such external agencies to expedite -- that

2    means to speed up, right?

3    A    Right.

4    Q    -- the classification review -- turning to the next page --

5    of that document and shall produce such document within 14 days

6    after such external agency's authorized the release of that

7    document.

8         And here we're talking about documents that DOE or

9    classified documents that DOE does not have sole authority to

10   release; is that correct?

11   A    Yes.

12   Q    So it's requiring DOE as to those documents to make the

13   appropriate request under certain timetables to the appropriate

14   agency, correct?

15   A    Yes.

16   Q    And then it continues, this section on classification,

17   After such classification review is completed, DOE shall

18   provide such documents to class plaintiffs or specify the

19   grounds upon which such documents cannot be made available.

20   DOE shall not withhold any document in its entirety or only a

21   portion where only a portion of a document contains classified

22   material, but rather DOE shall make every effort to produce

23   such documents in redacted form.

24        Do you see that?

25   A    Yes.

1   Q   And redacted refers to DOE deleting or whiting out portions

2   of document, correct?

3   A   Anything that remained classified under the national

4   security act, yeah.

5   Q   Well, anything that DOE determines it needs to white out,

6   correct?

7   A   Well --

8         MR. BERNICK:  Objection to the form of the question.

9   He just answered it.

10        THE COURT:  Sustained.

11  BY MR. SORENSEN:

12  Q   If you could go back to page 12, just flip back for a

13  second.  It says, External agencies, do you see here at the

14  bottom?

15  A   Yes.

16  Q   What are these external agencies, do you know?

17  A   Well, it would be agencies other than DOE; in this case it

18  would have been primarily the Department of Defense, possibly

19  NSA, National Security Agency, but primarily Department of

20  Defense.

21  Q   'Cause the Department of Defense might have the authority

22  over certain classified documents that plaintiffs might

23  request; is that correct?

24  A   Yes.  Or joint authority, yes.

25  Q   Joint with the Department of Energy?

Page 5102

1    A    Yeah.   Or they may just have it on their own, yeah.

2    Q    Now, if you could turn to page 14 of this exhibit,

3    stipulated order, please.

4         You there?

5    A    Yes.

6    Q    Paragraph 25.  It states, Any deviation by DOE from

7    complying with any provision of this order shall constitute a

8    basis for contempt of court within the meaning of Rule 45(e),

9    Federal Rules of Civil Procedure, and subject DOE to the entry

10   upon application after citation of civil contempt and

11   additional sanctions as may be just.

12        Do you see that?

13   A    Yes.

14   Q    And Rule 45 that's being referred to here, that's a rule of

15   civil procedure governing subpoenas and contempt; is that

16   correct?

17   A    Well, subpoenas to third parties, yes.  And whatever

18   third -- not a party to the litigation, but it is someone who

19   is other than a party and you're requesting information from

20   them, yeah.

21   Q    Right.   You say DOE is not a party.  You understood that

22   DOE was an indemnitor of defendants, correct?

23   A    Yes.

24   Q    And what do you understand that to mean?

25   A    Well, they would pay any judgment in this case or

Page 5106

1    A    Yes.

2    Q    And it continues and ends, With any documents responsive to

3    these requests are classified, plaintiffs request that they be

4    declassified pursuant to the stipulated order.

5         Do you see that?

6    A    Yes.

7    Q    And that refers to the provision in the stipulated order we

8    were discussing where DOE's required to do certain things by

9    certain deadlines when we ask for -- when the plaintiffs ask

10   for classified documents, correct?

11   A    Yes.  Yes.

12   Q    All right.  Now, the attachments are news articles that

13   were sent to DOE, correct?

14        MR. BERNICK:  Objection.  These are all hearsay.

15        THE WITNESS:  Yeah, I don't know.

16        THE COURT:  The fact that they were sent is all right.

17   But -- yes, Mr. Sorensen.

18        MR. SORENSEN:  Goes to the relevance of our request as

19   we were explaining it to DOE.

20        THE COURT:  They're still hearsay.  The reference to

21   the newspaper reports is sustained.  The objection is sustained

22   as to the reports.  The fact that they were attached is not --

23        MR. SORENSEN:  Just to confirm, attached for --

24        THE COURT:  It's kind of a don't-ask-don't-tell

25   situation.  They're there and they were sent to him, but we're

Page 5107

1    not going to go into the content.

2            Okay.

3            MR. SORENSEN:  Thank you, Your Honor.

4            MR. BERNICK:  I guess I shouldn't ask.

5            THE COURT:  You already did.

6    BY MR. SORENSEN:

7    Q    Just so the record is clear, Mr. Kaufman, attached to

8    plaintiffs' request for MUF and MUF-related documents are

9    copies of two news articles both dated -- well, one is dated

10   June 27, 1994.  One is dated June 28, 1994, relating to DOE's

11   announcements about the amount of MUF at Rocky Flats; is that

12   correct?

13   A    Yes.

14   Q    Now, in that request, before we leave it, there's no

15   restriction or limitation stated in this request concerning the

16   types of MUF or MUF-related documents plaintiffs are seeking,

17   correct?

18   A    Not -- yes.  Correct.

19   Q    There is no such restriction, correct?

20   A    Correct.

21   Q    Now, once plaintiff submitted this request, P650, to you on

22   behalf of the Department of Energy, the two people principally

23   responsible for responding on behalf of the Department of

24   Energy were, one, Mr. Hoffman, we've mentioned, correct?

25   A    Yes.  Correct.

1    second?

2            THE COURT:  Yes.

3        (At the bench:)

4            MR. SORENSEN:  Your Honor, out of an abundance before

5    approaching, I wasn't sure whether I could mention the briefing

6    on the impoundment of documents.  I didn't want to mention

7    that.  You mentioned not to mention the issue of DOE taking

8    over the case, but I want to make clear I can mention the other

9    issue.

10           THE COURT:  The other issue.

11           MR. SORENSEN:  You wanted briefing on whether these

12   documents could be impounded by the United States marshal.

13           THE COURT:  I don't see what it does.  I think it's

14   probably just best not to.

15           Can we take a recess now.

16           MR. SORENSEN:  Sure.

17       (In open court:)

18           THE COURT:  Let's take a recess for about 15 minutes,

19   please.

20       (Jury out at 10:25 a.m.)

21       (Recess at 10:25 a.m.)

22       (Reconvened at 11:46 a.m.)

23           THE COURT:  Thank you.  I guess we'll all stand.

24           MR. SORENSEN:  Your Honor, I have a question before

25   the jury comes in.

Page 5124

1            THE COURT:  Be seated, please.

2            Yes, sir.

3            MR. SORENSEN:  I want to be clear, make sure I'm not

4     going over any lines.  Later -- or soon we're going to get to a

5     February hearing which I mentioned in my proffer, in which this

6     Court indicated that it was considering moving to evidentiary

7     sanctions for DOE's failure to produce documents.  I was going

8     to going to draw the witness's attention to it and introduce

9     it.

10           THE COURT:  I didn't enter any order.

11           MR. SORENSEN:  Correct.  You were stating on the

12    record that it's -- it's out.

13           THE COURT:  Don't go there.  I didn't do it.  It's not

14    a fact.

15           MR. SORENSEN:  And I take it the defendants are also

16    not permitted to go there, correct, I mean that the --

17           MR. BERNICK:  I'm surely not going to bring out

18    anything Your Honor didn't order.

19           THE COURT:  I didn't order it.  So don't bring it out.

20           All right.

21           MR. SORENSEN:  Glad I raised it.

22           THE COURT:  I missed most of the game yesterday which

23    makes me rather testy, but I did see that interception and

24    80-yard touchdown.

25           It's hard to be an agnostic when you see something

Page 5127

1    Q    Is he still the United States attorney for Colorado?

2    A    No.  Bill Leone is now.

3    Q    An assistant United States attorney Richard Kaufman; that's

4    you?

5    A    Yes.

6    Q    And submits the following report concerning new discovery

7    developments.

8              Do you see that?

9    A    Yes.

10   Q    The heading is MUF documents.  Those are the documents that

11   we've been discussing that plaintiffs requested back in

12   December of 1994, correct?

13   A    Yes.

14   Q    During the January 16, 1996, hearing, that's the hearing we

15   were just discussing, correct?

16   A    Yes.

17   Q    On Department of Energy's motion for extension of time to

18   comply with the Court's contempt order, November 13, 1995, the

19   Court ordered the DOE to prepare a plan which would ensure the

20   declassification of the 11,000 pages of MUF documents by

21   March 15, 1996, or in the alternative explain why it could not

22   be completed by that date.  The Court ordered DOE to submit its

23   plan by February 15, 1996.

24              Do you see that?

25   A    Yes.

1   Q    That's, again, referring to the deadline that we were

2   talking about earlier?

3   A    Yes.

4   Q    The March 15 --

5        Okay.

6        It goes on, paragraph 2, Based on information provided

7   to the undersigned counsel -- that refers to you and

8   Mr. Solano?

9   A    Yes.

10  Q    Undersigned counsel?

11  A    Let me check.

12  Q    Sure.

13  A    I signed it.  Mr. Solano didn't sign it, but I signed it on

14  behalf of the U.S. attorney's office.

15  Q    Right.  You're looking at page 3 of the document?

16  A    Yes.

17  Q    That's your signature?

18  A    Yes.

19  Q    So back to page 1.  The undersigned counsel refers to you,

20  correct?

21  A    Yes.

22  Q    All right.  Has represented to this Court and plaintiffs'

23  counsel, through pleadings and evidence at the contempt hearing

24  in July 1995 and as late as the hearing on January 16, 1996,

25  that the MUF collection consisted of 11,000 pages of classified

Page 5129

1  documents.

2           Do you see that?

3  A   Yes.

4  Q   I want to take you through this a bit.

5           You state or this pleading states -- well, it states,

6  the undersigned counsel -- that's you?

7  A   Yes.

8  Q   -- has represented to this Court and plaintiffs' counsel --

9  so you represented something to the Court and to the

10 plaintiffs -- through pleadings.  That's filings with the

11 court, correct?

12 A   One moment.

13 Q   That's what a pleading is?

14 A   Normally pleadings are complaint and answer, but motions

15 and papers to the court, yeah.

16 Q   And evidenced at the contempt hearing in July 1995, where

17 DOE presented witnesses, correct?

18 A   Yes.

19 Q   And as late as the hearing on January 16, 1996, which is

20 just a couple weeks before this, this piece of paper was filed,

21 correct?

22 A   Yes.

23 Q   That the MUF collection consisted of 11,000 pages of

24 classified documents.

25           Do you see that?

Page 5130

1    A    Yes.

2    Q    Now, could you explain for the jury lawyers' obligation

3    when they represent things to the court in pleadings, that they

4    have to have a good-faith basis to believe the facts they're

5    representing?  Could you explain that?

6            MR. BERNICK:  I object.  I don't know what the

7    relevance of that is.  Just a suggestion here that somehow

8    counsel behaved improperly.

9            THE COURT:  I don't think there's a suggestion of that

10   at all.

11           The objection is overruled.

12           THE WITNESS:  When you file with the court, you have

13   an obligation to be truthful.

14   BY MR. SORENSEN:

15   Q    And when you were representing to the plaintiffs and to the

16   Court prior to the date of this pleading that the collection of

17   MUF documents consists of 11,000 pages, you believed you were

18   being truthful, correct?

19   A    Yes.

20   Q    And you had relied on others for that information about the

21   volume of documents that were responsive to plaintiffs' request

22   for MUF documents, correct?

23   A    Yes.

24   Q    And you had relied specifically on Rodney Hoffman and Avi

25   Fingeret who we mentioned earlier, correct?

Page 5131

1    A    Yes.  Primarily on this one it would have been Mr. Hoffman

2    for MUF documents.

3    Q    So at this time he was the DOE classification officer at

4    Rocky Flats, correct?

5    A    Yes.

6    Q    So when you were telling plaintiffs and you were telling

7    the Court repeatedly that there were 11,000 pages of documents,

8    classified documents, responsive to plaintiffs' December 1994

9    request for MUF documents, you were relying on Mr. Hoffman,

10   correct?

11   A    Yes.

12   Q    This document goes on, page 2, paragraph 3.  For the first

13   time, on Friday, January 19, 1996, the undersigned counsel --

14   again, that's you, correct?

15   A    Yes.

16   Q    -- was informed the MUF collection may actually contain

17   between 400,000 and 500,000 pages of classified documents.

18           Do you see that?

19   A    Yes.

20   Q    Continues.  Undersigned counsel waited two weeks to bring

21   this to the Court's attention.  The two weeks, that's the time

22   between January 19, when you learned of this, and the date of

23   this filing, February 2, correct?

24   A    Yes.

25   Q    Okay.

1           Waited two weeks to bring this to the Court's

2     attention in order to verify the number of pages in the

3     documents.

4           It continues, DOE has today completed the count.

5     There are 670,000 pages of MUF documents which require

6     declassification.

7           Do you see that?

8     A     Yes.

9     Q     And then this document contains some other discussion of

10    other discovery issues, correct, other document developments?

11    A     Yes.

12    Q     And these 670,000 pages that DOE is talking about, they all

13    or virtually all of these documents were in existence back in

14    December 1994 when plaintiffs made their request for MUF and

15    MUF-related documents, correct?

16    A     Virtually all of them, yes.

17    Q     And in fact, all or virtually all of these documents were

18    in existence back when Department of Energy agreed to the

19    stipulated order that we discussed earlier in July 1994,

20    correct?

21    A     Yes.   Yes.

22    Q     And it was the Department of Energy that identified that

23    there were these additional 670,000 pages of documents,

24    correct?

25    A     Yes.

Page 5133

1    Q    Department of Energy did that, correct?

2    A    Yes.

3    Q    So at this time, as of the time of this filing, the

4    plaintiffs hadn't seen these documents, correct?

5          MR. BERNICK:  Objection.  Lack of foundation.

6          THE COURT:  Overruled.

7    BY MR. SORENSEN:

8    Q    Is that correct?

9    A    Well, you had been invited to see them.

10   Q    Plaintiffs did not -- it was the Department of Energy that

11   first identified the scope of these documents, the number,

12   correct?

13   A    Yes.

14   Q    Could you turn, please, to Exhibit P1213.

15   A    Okay.  I'm there.

16   Q    Now, this is another filing by the Department of Energy in

17   February of 1996, correct?

18   A    Just a -- let me look here; just a second.

19   Q    Sure.

20   A    Yes.

21   Q    And this is entitled "Status report and proposed

22   alternative plans to address discovery issues."  Do you see

23   that?

24   A    Yes.

25         MR. SORENSEN:  Your Honor, I offer P1213.

Page 5134

1          MR. BERNICK:  If Your Honor could just give me a

2    moment here.

3          THE COURT:  Please.

4          MR. BERNICK:  I have no additional objection beyond

5    the matters that have been discussed before the Court

6    previously.

7          THE COURT:  All right.  It's admitted.

8      (Exhibit 1213 admitted.)

9    BY MR. SORENSEN:

10   Q   This is the pleading, the title as I mentioned, in this

11   case.  Do you see that, Mr. Kaufman?

12   A   Yes.  Yes.

13   Q   Just to explain what this is.  It states, The United States

14   Department of, in by and through the United States attorney

15   Henry L. Solano, and assistant U.S. attorneys, Linda Surbaugh,

16   is that how you pronounce her name?

17   A   Yes.

18   Q   And Richard C. Kaufman submit this status report regarding

19   production, document production.

20          This report provides information, three areas.

21          1.  Status of production of nonclassified documents.

22          2.  Status of production of classified documents and

23   issues related thereto.

24          And 3.  Requests for authority to modify the

25   production process to allow for pre-declassification and

Page 5135

1   pre-production review and involvement of plaintiffs and their

2   agents to expedite discovery while protecting classified

3   information and possible discovery claims.

4          Do you see that?

5   A   Yes.

6   Q   Turn to page 2 of this document, please.

7          There, sir?

8   A   Uh-huh.

9          Excuse me.   Yes.

10  Q   I'm sorry?

11  A   Yes.

12  Q   There's a heading, "Classified document production."   Do

13  you see that?

14  A   Yes.

15  Q   And it states, DOE has identified over 700,000 pages of

16  documents that are responsive to plaintiffs' request for

17  production which are, and it goes over to page 3, currently

18  classified.   As indicated recently, this figure includes

19  approximately 677,000 pages of MUF documents.

20          Do you see that?

21  A   Yes.

22  Q   And it says, As indicated recently, that's referring to the

23  document we were just looking at, correct, the previous

24  exhibit?

25  A   Yes.

1   Q    Since the end of November 1995, these documents have been

2   undergoing a greatly expanded declassification and sanitization

3   process.  What does sanitization mean?

4   A    That's where the declassification process, if there's, you

5   know, national security information that still remains

6   classified, it is then redacted out.  There's three paragraphs,

7   for example, on a page and one of them has national security

8   information -- in this case nuclear weapons information -- then

9   that one paragraph is redacted from the document.

10  Q    So sanitization means whiting out or redacting; is that

11  correct?

12  A    Yes.

13  Q    And when you were talking about national security, you

14  don't have personal knowledge, correct, sir, of why DOE took

15  out any particular portion of any classified document, correct?

16          MR. BERNICK:  Objection.  If the question is focused

17  specifically on a particular document, I can understand that.

18  But if the question is more general; that is, whether he has no

19  idea of why DOE would withhold certain documents as being

20  classified, that's another kind of question.  And I think it's

21  unclear as to which one he's asking.

22          THE COURT:  It is ambiguous.

23  BY MR. SORENSEN:

24  Q    Mr. Kaufman, this document is talking about the process by

25  which DOE was taking out, deleting portions of MUF documents

Page 5137

1    plaintiffs have requested, correct?

2    A    Right.

3    Q    Now, when that process was occurring, you were not present,

4    correct?

5    A    Correct.

6    Q    Because you were not allowed to see the classified version

7    of these documents, correct?

8    A    Correct.

9    Q    So you don't have personal knowledge of what portions of

10   these documents were removed, correct?

11   A    Correct.

12   Q    Nor do you have personal knowledge of why portions of these

13   documents were removed, correct?

14        Personal knowledge.

15   A    Correct.

16   Q    If you could turn, please, sir, to page 5 of this document.

17        See that, sir?

18   A    Okay.

19        I'm there.

20   Q    All right.  Paragraph 13.

21        A sample review of the documents which have -- I

22   believe it should have said -- processed.  It says processed

23   through declassification and/or sanitization discloses that on

24   average approximately 75 percent of the text on each document

25   has been redacted.

Page 5138

1          Do you see that?

2    A    Yes.

3    Q    So that's saying DOE is telling us and the Court that of

4    these MUF documents that DOE has classified, MUF documents that

5    plaintiffs asked for and that DOE is producing, DOE is whiting

6    out, deleting, approximately 75 percent of the text of each

7    document, correct?

8    A    Yes.

9    Q    Goes on.  Thus, there is a question as to how helpful the

10   remaining portion would be to plaintiffs.

11          Do you see that?

12   A    Yes.

13   Q    And it continues.  A preliminary indication reveals that

14   DOE's lawful exercise of this protection of classified

15   information is in plaintiffs' view affecting their ability to

16   prepare their case.

17          Do you see that?

18   A    Yes.

19   Q    And this is something DOE filed with the Court, correct?

20   A    Yes.

21   Q    There was another hearing . . . there was another hearing

22   before the Court in February of 1996, correct?

23          Do you recall that?

24   A    Yes, I think that's what this document we were just looking

25   at pertains to.

1    Q    So this document we were just looking at was filed just

2    before the February 15, 1996, hearing before Judge Kane,

3    correct?

4    A    I think so, yes.

5    Q    And among the issues that were again in front of the Court

6    were DOE's production, or lack thereof, of MUF documents,

7    correct?

8    A    Well, it was the issue that there were so many more --

9    there was no way the March 15 deadline could be met because of

10   the increase in the number of pages.

11   Q    So that was one of the issues that DOE presented to the

12   Court in February 1996, correct?

13   A    Yes.

14   Q    So DOE was, among other things, telling the Court, there

15   was no way DOE could meet the March 15, 1996, deadline; is that

16   correct?

17   A    Right.  Based on the requirements of the declassification

18   process.

19   Q    Okay.  And you just were looking at a document where DOE

20   was saying that 75 percent of these documents were being whited

21   out.  Do you recall that?

22   A    Yes.

23   Q    And do you understand that in May 1996 plaintiffs, in fact,

24   advised DOE that because so much of the documents or some much

25   of the content of the documents was being whited out,

Page 5140

1   plaintiffs said to DOE as to a number of types of these

2   documents, you can stop sending them to us.

3           Do you recall that?

4   A   Well, I was off the case as of the end of February '96, and

5   I believe you just said in the question it was May 1996.

6   Q   Yes.

7   A   Counsel for the plaintiffs informed DOE of that, and I

8   guess the U.S. attorney's office, I was not involved in the

9   case then.  So I don't know that for sure.

10  Q   Okay.  Could you turn to Exhibit P1392, please.

11  A   Okay.

12  Q   Do you recognize this letter of May 10, 1996?

13  A   No.  Again, I was no longer handling the case after

14  February.  I mean, you brought this to the deposition a few

15  weeks ago that you took of me.  But I don't remember this

16  letter.  I was not involved in the case by this point in time.

17  Q   Just to clarify, you're referring to a deposition in this

18  case that occurred a few weeks ago; is that correct?

19  A   Yes.

20  Q   The defendants took your deposition, correct?

21  A   Yes.

22  Q   And then after the defendants asked you some questions, I

23  asked you some questions, correct?

24  A   Yes.

25  Q   Have you had the chance to read the transcript of your

Page 5141

1    deposition?

2    A    Yes.   I sent in the changes.

3    Q    So other than the changes, you indicated you gave truthful

4    and accurate testimony, correct?

5    A    Yes.

6    Q    Could you turn, please, to Exhibit P1209.

7         Do you see that?

8    A    Yes.

9    Q    Now, this is another filing by the Department of Energy now

10   in August of 1996.  Do you see that?

11   A    Yes.

12   Q    And it's titled "Status report, Department of Energy."  Do

13   you see that?

14   A    Yes.

15        MR. SORENSEN:   Your Honor, I'd move admission of

16   P1209.

17        MR. BERNICK:   You'd have to give me a moment to take a

18   look at it, Your Honor.

19        THE COURT:  All right.

20        MR. BERNICK:   The document has a series of letters

21   attached that we would object to.  They come from plaintiffs'

22   counsel.  And they would be -- they would obviously be hearsay

23   documents.  I don't know that they're really necessary to the

24   examination.

25        MR. SORENSEN:   I have no problem introducing the

Page 5142

1   exhibit with the letter deleted.

2        THE COURT:  Okay.  It's admitted, then, without the

3   letter.

4        (Exhibit 1209 admitted.)

5   BY MR. SORENSEN:

6   Q   So, again, this is filed in August 1996.  Do you see that,

7   sir?

8   A   Yes.

9   Q   And it's in this case.  And the title is as I described it,

10  correct?

11  A   Yes.

12  Q   All right.  Then just to give the jury some background as

13  to this filing.  It states, United States Department of Energy,

14  hereinafter referred to as DOE, or the department, by and

15  through United States Attorney Henry Solano, L. Solano, and

16  assistant U.S. attorney, Linda Surbaugh, and pursuant to this

17  Court's order, submits a status report regarding document

18  production.

19        Just for the jury's -- just to clarify, the Court at

20  this point had ordered DOE to submit regular status reports,

21  correct?

22        Are you aware that?

23  A   Yes, when I was still on the case, we were filing monthly

24  status reports, right.

25  Q   Because the Court had ordered DOE to do that, correct?

Page 5143

1   A    You may be correct.  I just don't remember.

2   Q    It goes on, This report is intended to supplement the

3   reports previously filed by DOE on January 4, 1996, and

4   February 13, 1996.  And provides information in the following

5   areas:

6            1.   Status of production of classified documents in

7   response to plaintiffs' request for MUF documents.

8            2.   Status of production of all other requests --

9   excuse me -- for classified documents.

10           And 3.  Status of production of nonclassified

11  documents including nonclassified MUF.

12           Do you see that?

13  A    Yes.

14  Q    Okay.  Now, just to continue.  Under the heading

15  "Production of classified MUF documents," in January 1996, DOE

16  informed this Court that its best estimate of the volume of

17  classified MUF documents is 677,211 pages.

18           Do you see that?

19  A    Yes.

20  Q    That's wrong, right, it was February '96?

21  A    It was February 2, 1996, not January 1996.

22  Q    Okay.  So that date is wrong, correct?

23  A    Yes.

24  Q    Okay.

25           This number actually turned out to be 679,364 pages.

Page 5144

1    Much later, due to extensive follow-up searches conducted by

2    DOE as it neared what it believed to be the completion of its

3    MUF production effort, an additional 671,098 pages of

4    classified MUF documents were located for a total of 1,356,575

5    pages.

6            Do you see that?

7    A    Yes.

8    Q    Now, these were classified MUF documents that DOE had

9    located, correct?

10   A    Well, you got to -- this was filed in August '96.  I left

11   the case in February of '96.  At that point in time my analogy

12   was 677,000 pages.  According to this, they found an additional

13   670,000 pages, but I don't personally have any knowledge of

14   that.

15   Q    Were you consulted at all by Mr. Solano or Miss Surbaugh

16   after you formally left the case?

17   A    From time to time, but I don't believe on this.

18   Q    Do you have any reason to doubt the numbers that appear

19   here?

20   A    No.

21   Q    Now, if you could turn to page 5, please.

22   A    I'm there.

23   Q    Paragraph 13.  Plaintiffs have asked DOE to identify the

24   originally estimated 11,000 pages of document.  Do you see

25   that?

1    understand -- what I have just read, what do you understand

2    that to mean?

3    A    That they are saying they can't identify which 11,000 pages

4    made up out of this total now of hundreds of thousands of

5    pages, which of those made up the original 11,000 pages.

6    Q    So as far as you know, DOE never produced to plaintiffs a

7    set of documents and said, here are the 11,000 pages that we

8    said had existed, correct?

9            MR. BERNICK:  Objection.  Assumes facts not in

10    evidence.  He also hasn't established foundation through this

11    witness concerning what the 11,000 actually represented.

12            THE COURT:  As of the date of his leaving, he may

13    answer as to how many pages were produced.  But otherwise,

14    sustained.

15    BY MR. SORENSEN:

16    Q    As of the date of your leaving this case, Mr. Kaufman, is

17    it correct that DOE never produced to plaintiffs a set of

18    11,000 pages that DOE said these are the 11,000 pages we told

19    you about; is that right?

20            MR. BERNICK:  Object to the form of the question.

21    Again, it assumes --

22            THE COURT:  Overruled.

23            MR. BERNICK:  It assumes there is a discrete set that

24    was the 11,000.

25            THE COURT:  Overruled.

Page 5147

1      THE WITNESS:  I don't know.  All I know is there were

2   677,000 pages when I left the case that had been identified,

3   and we were in the process, DOE had hired like 80 people to

4   come in and declassify these documents, and we were in the

5   process of producing them.

6   BY MR. SORENSEN:

7   Q   Now, it says in this document, DOE is now in compliance

8   with plaintiffs' MUF request.  You understand that to mean that

9   DOE had at this time, August '96, produced over a million pages

10  of mostly whited-out documents; is that correct?

11      MR. BERNICK:  Objection.  Lack of foundation.

12      THE COURT:  Sustained.

13  BY MR. SORENSEN:

14  Q   And it says, DOE is now in compliance, do you know what

15  that means?

16  A   Yes.  That means in terms of what we're talking about here,

17  compliance with the Court's orders.

18  Q   But more specifically, do you have any understanding of how

19  many documents, MUF documents, DOE had produced by August 1996?

20  A   As I mentioned earlier, I was not on the case then.  I have

21  no idea how many they had actually produced by August of '96.

22  Q   And did you personally review any portion of the redacted

23  documents that DOE was producing to plaintiffs?

24  A   I am sure I have seen some redacted MUF documents.  I'm

25  also sure I have not reviewed 677,000 pages of MUF documents.

Page 5148

1        MR. SORENSEN:  May I just take a moment?

2        THE COURT:  Yes.

3    (At the bench:)

4        MR. DAVIDOFF:  Your Honor, at his deposition that was

5    taken by the defendants, he was asked, I believe by

6    Mr. Sorensen, why he was removed from the case in February of

7    1996.  He was instructed by Mr. Taylor, I believe, not to

8    answer that question.  And we would like to ask him that

9    question.  We think it's directly relevant.

10        MR. BERNICK:  If he was instructed not to answer, then

11    I don't know what the answer would have been.  Therefore, they

12    can't make any proffer of relevance.  It's beyond the stretch,

13    and even if it was true that the removal was for some matter

14    that related to the case, that removal would be hearsay.

15        THE COURT:  Yeah.  I don't think you should go into

16    that.

17        MR. DAVIDOFF:  I do have a request that he --

18        THE COURT:  I think would require me to have a hearing

19    outside the presence of the jury with his counsel there, and I

20    cannot see it coming in under any circumstance.

21        MR. DAVIDOFF:  Well, that was actually my alternative

22    request, Your Honor.  If Your Honor doesn't deem it appropriate

23    for the jury to hear, we would like the answer to the question

24    on the record.  It could be outside the presence of the jury.

25        THE COURT:  I don't think it even -- I don't think

Page 5149

1    it's appropriate with anything in the case.  I have no idea why

2    he was taken off the case.

3           MR. DAVIDOFF:  Well, he was removed.  He was removed

4    from the case by the U.S. attorney, we believe, because he was

5    trying to cooperate with the plaintiffs in the orders of the

6    Court.

7           THE COURT:  Well, I mean, that's purely speculative.

8    I don't want to go there.

9           MR. SORENSEN:  I have another matter.

10          THE COURT:  What's that?

11          MR. SORENSEN:  There was a question I asked at his

12   deposition to which a privilege objection was not raised.  I

13   want to just be very clear.  I asked whether he had discussion,

14   Mr. Kaufman had discussions with other DOE counsel about

15   whether producing more MUF information would hurt the posture

16   of DOE and its contractors, and he said yes, he had such

17   conversations.  The answer is, yes, he did.

18          And am I permitted to ask that?

19          MR. BERNICK:  Your Honor has ruled on that three

20   different times now.

21          MR. SORENSEN:  Thank you.

22      (In open court:)

23   BY MR. SORENSEN:

24   Q   Just a couple of more questions, Mr. Kaufman.  You earlier

25   saw the Court's order holding DOE in contempt.  Do you recall

Page 5150

1    that?

2    A    Yes.

3    Q    To your knowledge, had DOE ever been held in contempt

4    before then?

5            MR. BERNICK:  Objection.  Relevance.

6            THE COURT:  With respect to this case; is that what

7    your question is?

8            MR. SORENSEN:  No, ever.

9            THE COURT:  The objection is sustained.  I don't know

10   about other cases.  We're not concerned with it.

11           MR. SORENSEN:  I have no other questions.

12           THE COURT:  Okay.

13                        CROSS-EXAMINATION

14   BY MR. BERNICK:

15   Q    I know you've been in the same situation before,

16   Mr. Kaufman, where you're shuffling around trying to figure out

17   what you're actually going to ask the witness.  I apologize.

18           MR. BERNICK:  Good morning, ladies and gentlemen.

19   BY MR. BERNICK:

20   Q    Mr. Kaufman, counsel wrote up on the board here a

21   definition MUF equals material unaccounted for.  And actually,

22   he brought out kind of your own sense about what MUF means.  Do

23   you recall that?

24   A    Yes, yes, I do.

25   Q    Do you have any personal knowledge based upon actual,

Page 5287

1  Q    I'm sorry, sir, were you in the middle of something?

2  A    Yes, I was.

3  Q    Sorry.

4  A    First is there's got to be a net benefit.  And I said, you

5  know, that's a given at Rocky Flats.  It was cold war, and we

6  were making warheads for national security purposes.

7       The second one is you have to maintain exposures as

8  low as reasonably achievable, taking into consideration

9  economic and social and other factors.  We can get the precise

10  words.  But you are not allowed to expose people to the maximum

11  limits, and there will be a lot of discussion about what the

12  permitted limits is.  You have to always remember, you must,

13  you have an obligation to maintain those exposures as low as

14  reasonably achievable.  It used to -- the phrase used to be as

15  low as practicable.  And that's called ALARA, as low as

16  reasonably achievable.  And I think that's one of the real

17  failures at Rocky Flats is the failure to keep exposures,

18  off-site exposures as low as reasonably achievable.  And that

19  comes before maximum allowable limits.

20  Q    Sir, this chart that -- here shows that even for workers,

21  for nuclear workers, the health protection standards

22  continually were lowered, lowered, lowered, up until 1990; is

23  that correct, sir?

24  A    That's correct.

25  Q    And that was the date of the BEIR V report, which was

Page 5322

1    Q    Transport is how does it get where it's going to get to

2    the -- a human being?

3    A    Correct.

4    Q    And dose is how much of it actually gets into the human

5    being's body.

6    A    And into individual organs in the body.

7    Q    Right.  And is -- are you saying that there are large

8    uncertainties, as the government said, with all three of these

9    mechanisms?

10   A    Yes.  And there's one more.  And that is what is your

11   cancer risk associated with a given dose of exposure.

12   Q    Is that individual cancer risk?

13   A    Yes.

14   Q    Does that also have large uncertainties and variability --

15   A    Well, it has some uncertainties.  And I would say the

16   differences of opinion today are not as large as they have been

17   in the past.  And most people in the profession, in the United

18   States, would rely on -- on the opinions of a standing

19   committee of the National Academy of Sciences for what those

20   risks are.  And that committee meets from time to time and puts

21   out reports from time to time.

22   Q    Let me just follow up and change subjects because we want

23   to show this video that you worked on with Dr. Budnitz and

24   Dr. Smallwood and other experts.

25            We've already heard at length from Dr. Budnitz about

1    the 1969 fire, the 1957 fire, the 903 pad, and other incidents.

2    And I know that you participated with him and you draw

3    conclusions about those same things in your report.  Because

4    we've already had detailed testimony about that, if you could

5    just give a summary, first, of your view on the fires, and then

6    I'm going to ask for a summary for your views on the 903 pad,

7    and then hopefully we'll get a chance to look at this video

8    that you were involved in preparing.

9    A    Well, first on --

10   Q    First on the two fires.

11   A    First on the fires.

12        First of all, in preparing -- in preparing the video,

13   I worked with Dr. Budnitz who's a fire expert.  I also read

14   some of the -- a number of documents, including multivolume

15   reports on the fires, and concur with Budnitz's expert opinion.

16   But he's the expert on the fire issue and the fire safety

17   issues.

18        I would have -- have a little different view in one

19   regard.  I think you should step back and not get hung up in a

20   debate between fire experts.  In my person judgment, the issue

21   is, should these fires have been allowed to happen.  And in my

22   opinion, the answer is unequivocally no.

23        You had a facility run by a chemical company that was

24   processing ton quantities of extremely hazardous material,

25   which -- and we've talked about the hazard.  And you treat --

Page 5324

1   and that material needs to be treated as if -- just as you

2   would treat a biological toxin at a facility that handles

3   extremely toxic materials or Asian flu or whatever.  I mean,

4   I'm not an expert in those areas; but I know you must be

5   extremely -- take extreme care to prevent this material from

6   getting out.

7            Now, Rocky Flats was what we call a GOCO facility,

8   meaning government owned contractor operated.  The government,

9   United States government owned the facility, but the contractor

10  operated it.  And the contractor had primary responsibility for

11  preventing those fires.

12           It's like -- it's like -- I was in the Navy.  It's

13  like a ship, an aircraft carrier, a cruiser, it's owned by the

14  government; but the operator is the captain of the ship, and if

15  you have an accident on the ship, you can rest assured that the

16  captain is going to be relieved of his command.  He is the

17  operator, primary responsibly -- responsible for the safety of

18  that ship.  And here you have a contractor who's the operator

19  of the plant and responsible for ensuring that those fires

20  don't happen.  And they happened, and now we're left with

21  trying to figure out what to do about it.

22           But I'm -- without being a fire expert, I'm a -- have

23  some expertise in the health and safety of these toxic

24  radioactive material, and it's -- in my professional opinion,

25  those fires should have been prevented, they should not have

Page 5325

1    occurred.

2            And to underline basic tenet of the health physics

3    profession is that exposures must be kept as low as reasonably

4    achievable because the risk of harm to individuals, primarily

5    cancer, from exposure is there all the way -- you know, you can

6    extrapolate down more or less linearly down to doses -- down to

7    zero, and there's always going to be harm.  So there -- that's

8    the basic tenet:  Keep the exposures as low as practical

9    practicable.  You cannot meet that basic tenet if you allow a

10   major industrial fire in a facility that is dealing with

11   extremely toxic material.

12           So from my perspective, they didn't do their job

13   because they allowed those fires to happen.  And that's the

14   message I would try to get across in -- here and in the video.

15   I mean, in the video, I --

16   Q   Sir, we'll come to the video --

17   A   Okay.

18   Q   We'll come to the video in a minute.

19           The two fires that occurred when Dow was the

20   contractor, the '57 and the '69 fire, has there ever been a

21   fire of the size of either of them at any other nuclear-weapons

22   facility in the United States, other than the Rocky Flats

23   plant.

24   A   The two major industrial fires were both at Rocky Flats

25   plant in '57, in 1957, and '59.

1   Q    I think you mis -- '69?

2   A    Going back, it's not just the fires incidentally, there are

3   other releases that shouldn't have happened, the 903 pad.

4   Q    That was my next question, so why don't you give us your

5   overview, just your overview because we've heard the details --

6   A    Well, the 903 pad, the releases shouldn't have happened.

7   It's the same argument.  Simple things could have been done

8   that weren't done.  And the releases -- you know, at one time

9   the expert opinion was that most of -- well, initially, early

10  on, people thought the major off-site releases were from the

11  '57 fire.  And then they had the '69 fire.  Then that woke

12  people up that lived in the area and people -- and Ed Martell

13  started making measurements of plutonium contamination

14  off-site.  And the growing scientific opinion was, lo and

15  behold, it wasn't the '57 fire that caused most of the off-site

16  releases, it was the 903 pad.

17          And now the experts that -- come back around and say,

18  no, that was wrong; we think it was the '57 fire that had the

19  highest releases.  The uncertainty in the releases from the 903

20  pad are not as great as the uncertainty in the releases from

21  the 1957 fire.

22  Q    The -- but just following up on the 903 pad, that started

23  in 1958, and it wasn't asphalted over until 1969.  Do you have

24  any comment on the fact that that was allowed to -- that

25  problem was allowed to fester for eleven years?

Page 5327

1    A    Well, it just -- it shouldn't happen.  I mean, they -- they
2    knew early on and -- you can dig out of these reports the
3    chronology and so forth.  They knew early on that when they
4    started putting these drums of contaminated material out on the
5    pad that the drums were -- some of the drums were corroding.
6    This was fairly soon after they started putting them out there
7    in 1958.  And they didn't address that problem as you would if
8    you were dealing with an extremely toxic material that could
9    get blown off-site in high winds that are prevalent in this
10   area of the United States.
11   Q    Were there other -- were there other waste sites at the
12   Rocky Flats facility that shouldn't have been allowed to occur?
13   A    There are numerous what would be called burial grounds for
14   low-level waste or transuranic contaminated waste, means
15   essentially most of the waste out here at the Rocky Flats is
16   transuranic contaminated waste which is a professional term
17   that means it's contaminated with uranium, plutonium, or other
18   heavy elements in excess of a certain concentration.
19           So there are numerous waste sites, and that's
20   another -- that's another area that should have been handled
21   differently, and we're left with a legacy of a lot of nuclear
22   waste buried in and around Rocky Flats that, in all likelihood,
23   is just not -- some of it was carted away, but a lot of it is
24   not going to be carted away to burial grounds that -- that
25   would lead to lower exposures in the future.

1   Q   All right.   Now, we'd like to show this video which is

2   PV188.

3           MR. DAVIDOFF:   I believe the Court has already ruled

4   that that can be received.

5           Is that correct, Your Honor?

6           THE COURT:   Yes.

7   BY MR. DAVIDOFF:

8   Q   And then you had a couple of comments on some of the text

9   on the video before we show that.   If you could give those to

10  us, I believe.

11          MR. BERNICK:   Your Honor, before we proceed with that,

12  when Your Honor says it is received, my assumption would be

13  it's received as a portion of his direct testimony as opposed

14  to actual documentary evidence.

15          THE COURT:   Yes.   It's a part of his testimony,

16  correct.

17          MR. DAVIDOFF:   Okay.   I thought the video itself, Your

18  Honor, was being received in evidence.

19          THE COURT:   Go ahead.

20  BY MR. DAVIDOFF:

21  Q   You had a couple of comments on some of the commentary --

22  the video was made in 1996; is that correct, sir?

23  A   That's correct.

24  Q   And you had a couple of comments on the commentary in the

25  video.   Would you give us those now, before we show the video

Page 5340

1   Q    I think you want . . .

2            MR. DAVIDOFF:  Can we blow that up a little bit?

3   Let's go to 105, first, if we can.

4   BY MR. DAVIDOFF:

5   Q    These were questions and answers that the Department of

6   Energy prepared, looking down toward the bottom?

7   A    Yes.

8   Q    And they also released figures on highly enriched uranium

9   MUF at Rocky Flats which was about 668 kilograms at that time;

10  is that correct, sir?

11  A    I believe that's correct.  I mean, we can look in the

12  document and confirm that.

13           MR. DAVIDOFF:  Sorry.

14           106, Mark, not 105.

15  BY MR. DAVIDOFF:

16  Q    There's question here at the bottom -- can we just focus on

17  the bottom Q and A.

18           Didn't material difference used to be called material

19  unaccounted for or MUF?

20           And then the DOE says, Yes, however the term inventory

21  difference is more descriptive of the actual situation, namely,

22  differences between accounting records and inventory by

23  physical identification and measurements.  Each inventory

24  difference accounting transaction is investigated and resolved

25  per Department of Energy orders.  The term MUF does not

Page 5341

1    accurately convey this process and procedure.

2              Do you have any comment on that?

3    A    Well, I don't completely agree with that.  I mean, once you

4    have a -- take an inventory at prescribed inventory period and

5    you estimate a MUF or an inventory difference, if that number

6    is outside of the range of comfort by the people involved, they

7    will initiate an investigation to see what may have caused that

8    large inventory difference.  And they may, through the course

9    of their investigations, that inventory may -- difference may

10   be reduced, and then you'll have a new MUF as a consequence of

11   the remaining material that's -- that's unaccounted for.

12             So at the end of the day, you still have material

13   unaccounted for, and I accept the Department of Energy's

14   numbers.  I don't have any basis for refuting the annual

15   plant-wide summaries of the MUFs that they released in the --

16   1994 and that are shown on the charts.

17   Q    All right.  Now, that's page 112.  Before -- while we're

18   putting that up, before this data was released on June 27,

19   1994, was the amount of missing and unaccounted for plutonium

20   fully known at the Rocky Flats plant?

21   A    Not publicly known, no.

22   Q    Okay.

23   A    There were -- there was a -- in around 1997, the MUF data

24   for a number of plants was -- a number of plants -- again,

25   these were annual summaries.

Page 5342

1    Q    Did you mean 1977?

2    A    1977, or thereabouts, is my recollection.  But the

3    Department of Energy withheld the MUF data for two plants, one

4    of which was Rocky Flats, the other the Y12 plant at Oak Ridge.

5    Q    That may not be clear on the record.  Let me just see.

6              In 1977, the annual MUF data and the cumulative MUF

7    data was released for all but two plants; is that what you

8    said, sir?

9    A    Correct.

10   Q    And it wasn't until 1994 that the cumulative MUF and the

11   annual MUF was released for the Rocky Flats plant and the Y12

12   plant at Oak Ridge; is that what you said?

13   A    Correct.

14   Q    And is there more than one plant at Oak Ridge, besides the

15   Y12 plant?

16   A    Yes, that was a gaseous fusion plant, it's no longer

17   operating, and a laboratory.

18   Q    Now, we reproduced to -- the video that you narrated this

19   slide, which is G876.

20              MR. DAVIDOFF:  And I would offer that, Your Honor.

21   It's a graphic.

22              And this is right out of the video that was already

23   admitted.  PV188.

24              THE COURT:  Just a minute.

25              MR. BERNICK:  I have no quarrel with this being

Page 5343

1   admitted for demonstrative purposes.

2           THE COURT:  All right.  It's admitted for that

3   purpose.

4       (Exhibit 876 admitted.)

5   BY MR. DAVIDOFF:

6   Q   Material unaccounted for or MUF is up at the top, and then

7   you've got five categories where the MUF can be; is that

8   correct, sir?

9   A   That's correct.

10  Q   Okay.  Could you tell the jury, explain these five

11  categories to the jury, if you would, please?

12  A   Well, at the end of your inventory period, the books don't

13  balance.  And if the MUF is positive, the way the formulas are

14  written, would imply that you're missing or cannot account for

15  some prescribed amount of material.  Now, the reason you've got

16  that uncertainty or that inventory difference is because it

17  went -- something happened.  Either that material went to some

18  waste site, outside the measurable area and was not accurately

19  reflected what your books say, or the -- or -- I mean, for

20  example, in the early days of Rocky Flats, they didn't measure

21  what went into a lot of those drums of waste, how much

22  plutonium was in there, and that accounted for much of the

23  early large MUFs.

24          Also it could be -- excuse me -- just a simple

25  bookkeeping error, arithmetic error or measurement error.  That

Page 5344

1    bookkeeping error should include also measurement error.  It

2    could include, and this is one you really worry about, some

3    insider in the plant walking out through the security fences

4    with plutonium.  Stealing it.  And that, that's the biggest

5    reason to keep track of this material so you don't lose bomb --

6    nuclear bomb's worth of material from these plants.

7            It could also end up in the ventilation ducts,

8    accumulate in the ventilation ducts, and you don't have a good

9    idea of how much is in those ducts.  You don't want that to

10   happen because if you get too much accumulation in the

11   ventilation ducts, you could run the risk of a criticality

12   accident and an explosion within that room.

13   Q    Can I stop you there for a second.

14   A    Yes.

15   Q    In fact, was there -- were there substantial quantities of

16   plutonium lost in ventilation ducts and pipes in the various

17   buildings at the Rocky Flats plant, at the end of the day?

18   A    At the end of the day, there was substantial quantities in

19   the ducts.  I have not kept track since 1996 or so of how much

20   was recovered when they dismantled these buildings in the

21   various ventilation ducts.  So they may have been -- there

22   actually may be a reduction or at least a change in the

23   plant-wide MUF number as of today as opposed to the number

24           Now --

25   Q    The --

Page 5345

1    A    Now, the final thing is it could have escaped.

2    Q    Before you get -- tell the jury the final thing and I'll go

3    back.

4    A    Finally, it could escape from the plant.  It could be lost.

5    Now, that's -- when you look at this historical big number, you

6    know, which is more than a ton of plutonium -- I mean, we know

7    that there's not a ton of plutonium lost to the environment.

8    Our best judgment or at least my best judgment is most of that

9    MUF is accounted for in the waste.  But there could be a

10   significant -- in terms of your health effects calculation,

11   there could be a substantial amount associated, for example,

12   with the 1957 fire.  Because if you look at the literature, in

13   1964, there was a big review of the MUF problem at Rocky Flats

14   because it had sort of recognized it had gotten out of control.

15   And in that report, there's a reference to the '57 fire and the

16   fact that MUF associated just in the glove box area where the

17   fire took place, the MUF for just that material balance area,

18   over the period of that fire, was, by the 1964 estimate, about

19   6 kilograms.

20        Other experts have -- since then have said it's

21   higher, you know, there's a 8.3 kilograms.  Number's not so --

22   difference isn't so important.

23        But 6 kilograms is 6,000 grams -- and remember we got

24   to divide that by 13.7.  And I can't do that in my head.

25        So that's -- is that right?

Page 5346

1          It's over, over 400 curies.  And if it were 8.3

2     divided by 13.7, it would be about 600 curies.

3          Now, if you look at the sort of range of expert

4     opinion on what was released from the '57 fire, the newest

5     number is, upper limit, best estimate, 21 curies, upper limit,

6     36 curies, and a MUF of 600 curies.

7          So you see --

8          MR. BERNICK:  Your Honor --

9     A    -- there's an opportunity --

10         MR. BERNICK:  Excuse me, Dr. Cochran.  If we could

11    have a reference point to the source and date of the numbers

12    that were just quoted.

13         MR. DAVIDOFF:  Well, Your Honor, I actually was going

14    to go right to it.  As soon as we're done with this, I'm going

15    to go right to a document at least on the first one.

16         THE COURT:  Okay.

17         MR. BERNICK:  It's very important.  He just testified,

18    I don't know if it was in response to your question, but you

19    certainly wrote it down, about the release estimates.  And I

20    want to know whether these release estimates postdate his

21    report.  That's why I'm asking.

22         THE COURT:  Okay.

23         MR. DAVIDOFF:  Well, actually, I'll clarify that.  The

24    8.3 grams, which is the latest estimate, does postdate your

25    report.

Page 5347

1          MR. BERNICK:  8.3 kilograms as a release estimate or

2     as a MUF estimate?

3          MR. DAVIDOFF:  As a MUF estimate.  Thank you,

4     Mr. Bernick, for correcting me.

5          THE COURT:  Go ahead.

6     BY MR. DAVIDOFF:

7     Q    The 8.3-kilogram MUF estimate, does that postdate your

8     report?

9     A    Yes.

10    Q    Okay.  The 6-kilogram MUF estimate from the 1957 fire,

11    that's discussed in your report; is that correct?

12    A    Yes.  The differences are not important.

13    Q    But we're going to the -- we're going to come to that

14    document in a moment.

15         I just want to clarify some of these terms if I can.

16    A material balance area could be 771 building where the 1957

17    fire occurred or portions of the 771 building itself.  Could

18    those be separate material balance areas?

19    A    I would presume that was the case.

20         MR. BERNICK:  Object.  He's not, I believe, supposed

21    to be presuming here, and --

22         THE COURT:  Sustained.

23         THE WITNESS:  I -- let me rephrase it, if I might.

24         MR. BERNICK:  Ask him.

25         THE WITNESS:  In the document --

Page 5348

1   BY MR. DAVIDOFF:

2   Q    Please rephrase it, Dr. Cochran.

3   A    In my report, I made reference to documents citing on the

4   order of a hundred material balance areas.  The logical

5   conclusion one would draw from that is that the major buildings

6   where plutonium work was handled had multiple material balance

7   areas within them.

8   Q    Okay.  Now, when Secretary O'Leary, as part of this

9   openness initiative, released the total MUF and the annual MUF

10  for the Rocky Flats plant, were the separate MUFs for the

11  material balance areas, the separate material balance areas

12  within the plant released at the same time?

13  A    No.  And also by the same token, you do inventories more

14  than once a year in these material balance areas; and so all

15  that was revealed was the arithmetic sum of the MUFs, summed

16  over all material balance areas and summed over inventory

17  periods for one year.

18          So you get a lot less useful information when that's

19  all you get.  It would be -- at least from my point of view in

20  preparing the report for this case, it would have been much

21  more useful to have the MUF data for individual mass balance

22  areas by inventory period.

23  Q    And inventory period was monthly or bimonthly; is that

24  correct, sir?

25  A    I think it differed.  I mean, the evidence indicates it

Page 5349

1   differed depending on the material balance area.

2   Q.  Let me just see if we can follow that up a little bit, and

3   then I need to come back to a couple of other items in your

4   slide here.

5            For example, has that -- have all those material

6   balance area MUFs for the different periods remained classified

7   since 1994?

8   A   Yes.

9   Q   And so even as of today, other than the annual MUF for the

10  plant, we don't have individual MUFs for material balance areas

11  for individual buildings or for monthly or bimonthly periods;

12  is that correct, sir?

13  A   We don't have it on an unclassified basis, and therefore I

14  have no access to it.

15  Q   And the public has no access to it?

16  A   That's correct.

17  Q   For example, let's take the 1957 fire.  We know that that

18  fire occurred on September 11, 1957, in the 771 building, then

19  known as the 71 building.

20           If you had the material balances for the 771 building

21  and you had the inventories during the months preceding and the

22  months -- and maybe even the months during the following year,

23  following the fire, would that be of material assistance to you

24  in analyzing the extent of the MUF from the 1957 fire and

25  possibly even the releases from the 1957 fire?

Page 5350

1    A    Yes.

2    Q    And that material was unavailable to us; is that correct,

3    sir?

4    A    It was not available to me.

5    Q    Now, let's go back to the ducts and pipes for a second

6    where there was a lot of plutonium lost at least in 1996 when

7    you made the video, PV188 that we just saw.

8         Are there any hazards other than what hazards other

9    than a criticality could occur with respect to material that

10   was caught up or lost in ducts and pipes in various buildings

11   of the plant?

12   A    Well, it would represent a risk if there were a fire

13   associated with those ducts or if there was a failure in the

14   filter system so that some of that material could have been

15   directly released.

16   Q    And just taking some somewhat less probable occurrences, if

17   there were an earthquake, which you mentioned on your video, or

18   a plane crash or a wind storm that took the roof of a building

19   off, would that also be a risk with respect to the plutonium

20   caught up in the ducts and pipes?

21   A    Yes.  As would other plutonium inventories in the plant.

22   Q    Now, has -- let's go back to some documents that you

23   reviewed in your report.

24        If we could look at P559, which is a May 21, 1971,

25   document.

Page 5351

1          MR. DAVIDOFF:  That is a Dow document, Your Honor,

2     which I think is admissible, if it can be received.

3          THE COURT:  No objection.  It's admitted.

4     (Exhibit 559 admitted.)

5     BY MR. DAVIDOFF:

6     Q    This is a -- this was by Mr. Bowman from the Dow plant

7     dated May 21, 1971.  And I want to read you some portions of

8     this and then ask you for some comments.  If we could go to the

9     first paragraph.  It looks like it's a presentation.  The title

10    is "Measurement and MUF Problems."  And it's -- incidentally,

11    before we actually do that, at the top it says, Not cleared for

12    public release.  Do you see that?

13    A    Yes.

14    Q    And then on the left side, there's a date of 6-26-96, as

15    the date that this document was finally declassified, 25 years

16    later; is that correct, sir?

17         MR. BERNICK:  Your Honor, again, this now goes over

18    the edge in terms of the test that Your Honor has announced.

19    The test that Your Honor has announced is that this material or

20    that information concerning release comes in to the extent that

21    it shows that the plaintiffs in this case did not have access

22    to the information.  They did have the access to this document,

23    and to go back over the history of its declassification --

24         MR. DAVIDOFF:  Your Honor, I object to the -- I object

25    to the speech by counsel.

Page 5352

1          MR. BERNICK:  Improper testimony to the jury.

2          THE COURT:  This isn't the purpose for which it is

3    offered.  Overruled.

4          MR. DAVIDOFF:  The speaking objection --

5          THE COURT:  That's enough.  Let's go on.

6    BY MR. DAVIDOFF:

7    Q    In the next few minutes, I'm going to try -- it was

8    declassified in 1996, correct, sir?

9    A    That's correct.

10   Q    And apparently this was a presentation to people that had

11   clearances in 1971.  In the next few minutes, I'm going to try

12   to and explore with you one of the most thoroughly researched

13   and audited complex, and speaking to myself, most perplexing

14   problems, MUF.

15         The next paragraph, please.

16         MUF is the acronym coined for the term material

17   unaccounted for in our plutonium operations.  Essentially it

18   means the difference between the amount of plutonium that

19   should be on hand based on our receipts and shipments and the

20   amount of material actually located and measured in our

21   physical inventory.  In making this calculation, the amount of

22   material shipped and/or measured waste discard has been

23   subtracted out as a normal operating loss, or N-O-L, making the

24   MUF truly a measure of the amount of material that cannot be

25   accounted for.

Page 5353

1          Sir, could you comment on what -- explain what he's

2    discussing here as the difference between measured waste

3    discard subtracted as an NOL or normal operating loss and the

4    MUF that cannot be accounted for?

5    A    Well, in the early days, they did not measure, certainly

6    not accurately, but they essentially did not measure the

7    plutonium going into the waste.  And so as a consequence, they

8    were getting very large MUFs.  As I mentioned earlier, by 1964,

9    when it was recognized that this MUF problem was -- and these

10   are my words, not theirs -- out of hand, they revised their

11   procedures and started to try to measure the amount of

12   plutonium that was in the waste or -- and they referred to it

13   as normal operating loss.

14          And that would mean that the subsequent MUFs more

15   accurately reflect what they don't know about where the

16   material is, but they are more confident that it is not in the

17   waste.  I mean, some of it could still be -- a MUF could still

18   be in the waste 'cause their analysis of normal operating

19   losses may have been incorrect as well.  But they've attempted

20   to subtract that out of the problem, from the problems.

21   Q    All right.  If we could go to the fourth paragraph.

22   There's a portion here I want to call your attention to.

23          MR. DAVIDOFF:  Can you go down a little lower, below

24   those brackets, please.

25   BY MR. DAVIDOFF:

Page 5354

1    Q    Historically -- thank you -- historically MUF has been a

2    problem with us since the beginning of operations in 1952.

3    Let's look at the last ten years.  From 1961 through fiscal

4    year 1970, my first slide shows the quantity of MUF each year.

5         And then that is still -- see those two brackets.

6    Does that indicate that the declassifier has taken out some

7    still classified information, even in 1996?

8    A    That is correct.

9    Q    Okay.  And then if we could go to the next page, at the top

10   of page 2, and those top two paragraphs.

11        He's further discussing this, and this is the

12   declassified version.  I have taken 1966 as one of the years in

13   question and plotted a monthly variation of the MUF as a

14   function of throughput.  This is shown on slide 3.

15        As you can see, there is extreme variation including

16   several months in which a negative MUF occurred.  The most

17   significant thing apparent in this slide is that one very bad

18   month is followed by a good month and vice versa.  These same

19   characteristics can be observed for any year plotted.

20        About a year ago, our mathematics group made a

21   statistical analysis of MUF as a function of throughput and

22   concluded there was no correlation between the two.

23        And then the next two lines are blanked out.  Do you

24   see that, sir?

25   A    Yes.

Page 5355

1   Q    And that's more still classified information withheld in

2   1996; is that correct?

3   A    That is correct.

4   Q    Okay.  And then it goes down to the next -- throughput, by

5   the way, is output, production; is that correct, sir?

6   A    That is correct.

7   Q    In a similar manner, we've examined MUF as a function of

8   normal operating loss and a workload as expressed by casting

9   charges.  In both cases we find that no correlations to be

10  drawn.

11        Then if we could look at page 3 in the paragraph

12  numbered three.  He's still making his presentation.

13        Historically analysis of the sludge leaving the waste

14  processing buildings has amounted to almost twice as much as

15  the total of the liquid streams shipped to the waste processing

16  facility.  Considerable effort has been expended to bring this

17  ratio down, blank, and efforts are continuing to reduce it even

18  further by improving sampling and analytical techniques.

19        That type of information was still being deleted in --

20  by classifiers in 1996; is that correct, sir?

21  A    That is correct.

22  Q    Then if we can look in 4.  However, if my hypothesis is

23  correct that MUF and quantity of nonspec or related measurement

24  is the problem -- and then he goes on to say, The most

25  difficult part is the measurement of the plutonium content of

Page 5356

1    drums whether it's a waste or recoverable residue.  And to save

2    time, I'll just -- if we can just show the rest of that, but

3    I'm not going to read through the rest of that.

4            Even in this document, which was largely declassified,

5    there was still important information that was not available;

6    is that correct, sir?

7    A    That is correct.

8    Q    You can -- let's look at the top of page 6, which there's a

9    paragraph numbered two there, that large paragraph.  It was

10   also known that the existing barrel counters gave erratic

11   results at high plutonium levels.  And here he's discussing the

12   difference in the plutonium counts in drums and the difficulty

13   that that posed in measuring MUF.

14           Is that correct?

15   A    That is correct.

16   Q    And then finally, if we can look at the last paragraph of

17   the document, which is on page 7 -- which is on page 7.  When

18   we look back at some of the problems, out-fall, ditches, ponds,

19   nitrate problems, MUF, and long-term waste management and

20   storage, the ultimate solution is to have the capability and

21   capacities to remove all plutonium from waste, and we are

22   working hard on this approach.

23           Is that right, sir?

24   A    That's what it says.

25   Q    And then if we can move to P10, which I think relates to

Page 5357

1    your 6-kilogram estimate on the 1957 fire.

2    A    Excuse me.  Which --

3    Q    P10.  And we're going to put that up on the screen to save

4    some time.

5         MR. DAVIDOFF:  Your Honor, I believe you already ruled

6    that this is admissible.

7         THE COURTROOM DEPUTY:  What's the exhibit number?

8         MR. DAVIDOFF:  P10.

9         I don't know whether it was received, Miss Bush, but

10   it was discussed by Judge Kane yesterday and ruled admissible.

11   BY MR. DAVIDOFF:

12   Q    Now, this is -- this document was also actually

13   declassified in 1995 or 1996; is that correct?

14   A    Around that time, yes.

15   Q    Do you recall actually getting this document declassified

16   before the plaintiffs did and furnishing it to us?

17   A    Yes.

18   Q    Now, if you could look at -- let's see if we can look at

19   the whole cover page.  It's titled "Study of Unaccounted For

20   Plutonium Losses" --

21   A    Let me correct.

22        I recall getting the document from DOE before you did,

23   before your law firm did.  And I recall providing it to you.

24   I -- my recollection is hazy on -- with regard to whether I

25   asked that it be declassified.  It may have been declassified

Page 5358

1   and just made available to me.

2   Q    The document was declassified after the 1994 openness

3   initiative?

4   A    Correct.

5   Q    Now, I want to look at some of the portions of this

6   document.  This is a document -- if we could focus right in the

7   middle there.

8         This document was originally generated in January of

9   1964 at Dow -- by Dow, and by Messrs. Zodtner and Rogers, but

10  it was kept secret, it was at least kept secret for 30 years?

11  A    Yes.

12  Q    Now, let's look at some of the discussion of the 1957 fire

13  in the 19 --

14        MR. BERNICK:  Your Honor, if I could have just a brief

15  sidebar.

16        THE COURT:  Okay.

17     (At the bench:)

18        THE COURT:  Okay.

19        MR. BERNICK:  This is just the kind of thing that only

20  serves to create friction in the courtroom.  Your Honor has

21  ruled that whether or not this was maintained as classified for

22  some period of time was -- it's irrelevant.  The question is

23  what did they have in this case.  And the witness has been very

24  consistent.  And Mr. Davidoff at every opportunity wants to

25  come right up to the line and without actually suggesting that

Page 5359

1    keeping it secret was wrong, to imply that it was wrong by

2    talking about how long it remained classified.  Well, it's

3    clear that all these documents were classified from the very

4    time they were created, so we all know how long they were

5    maintained as classified, but it's not relevant.  And, you

6    know, it's just this kind of thing that then requires that I

7    stand up, make an objection, come to sidebar, so that we can

8    get clarification for about the thousandth time about what is

9    and what is not in this case.

10          Now, the dialogue was very clear before we started

11   this morning with respect to that 1983 document that I said, I

12   don't have a problem if it comes in, but not insofar as the

13   classification element is concerned.

14          Oh, okay, I won't use it for that purpose.

15          And now we're seeing all these other documents where

16   exactly the same argument is being made; that is, it was

17   classified for such a long period of time, and it was only

18   classified sometime later.  That suggests improper withholding.

19   It doesn't serve to advance any other proposition because they

20   have it in this case.

21          MR. DAVIDOFF:  Can I just respond briefly, Your Honor?

22          THE COURT:  Yes.

23          MR. DAVIDOFF:  I didn't imply there was any

24   impropriety in the declassification.  This is directly relevant

25   to several reasons.  The defendants have made a major argument

1   all throughout this litigation and throughout this trial that

2   in the 19 -- early 1970s there was tremendous publicity about

3   this plant and all the facts about this plant and the dangers

4   posed by this plant were, quote, out there in the public arena.

5   And they've even introduced media articles from the early 1970s

6   which purport to show that.  And what I am trying to show,

7   among other things, and leaving aside the propriety or

8   impropriety of classification, is this information was not out

9   there.  It was only in the -- in the --

10          THE COURT:  Okay.  All right.  I understand what

11   you're saying.

12          The objection is sustained.  You may ask a question,

13   when did this become known to the public and leave away the

14   classification.  Just stay away from that and ask in terms of

15   when did it become known to the public.  That's a fair

16   rebuttal.

17          MR. DAVIDOFF:  Your Honor, can I just -- this won't

18   take but a second.

19          There's nothing much to say.  Just when we break for

20   lunch at twelve o'clock, I can put my other two grounds on the

21   record.  I didn't want to take the time of the jury in the

22   court to do that now.

23          THE COURT:  All right.  All right.  All right.

24      (In open court.)

25   BY MR. DAVIDOFF:

Page 5579

1    ChemRisk.

2    BY MR. DAVIDOFF:

3    Q    Now, incidentally, do you know why there had to be a RAC

4    phase I and a RAC phase II after ChemRisk?

5    A    I don't know precisely, no.  In my view --

6              MR. BERNICK:  Your Honor, if he doesn't know, that's a

7    question of fact.  He shouldn't speculate.

8              THE COURT:  Overruled.

9    BY MR. DAVIDOFF:

10   Q    Go ahead, sir.

11   A    In my view, the estimates in the ChemRisk analysis are --

12             MR. BERNICK:  Your Honor, that is completely without

13   foundation, and I would definitely need to recross on this.

14   There were very specific contractual provisions that spelled

15   this out.

16             THE COURT:  Go ahead, please.

17   BY MR. DAVIDOFF:

18   Q    Sir, you discussed the ChemRisk estimates in your first

19   report.  What was your view of the ChemRisk estimates?

20   A    My view is that they were -- they were low and there

21   were -- and they were below the uncertainty range of -- well

22   below the uncertainty range of -- with respect to emissions,

23   source terms and as a consequence with respect to dose and

24   risk.

25   Q    Do you know whether that was a widespread view at the time

Page 5580

1    when the ChemRisk reports were released?

2              MR. BERNICK:  A, it's leading; B, there is no

3    foundation for.  Objection.

4              THE COURT:  It is a leading question.  That objection

5    is sustained.

6              MR. DAVIDOFF:  Yes, sir.

7    BY MR. DAVIDOFF:

8    Q   Do you know whether or not that was a prevalent view of the

9    ChemRisk estimates when they were released?

10             MR. BERNICK:  There is no foundation.  This is not

11   competent testimony.

12             THE COURT:  Overruled.

13             THE WITNESS:  That was my belief.

14   BY MR. DAVIDOFF:

15   Q   That was not what, sir?

16   A   I say that was my belief.

17   Q   Now, let's take one example of the ChemRisk estimate and

18   compare it with the RAC II estimate that you were questioned

19   about.

20             Over here on this board, the ChemRisk estimate of the

21   '57 fire release was .05 curies?

22   A   That, as you may recall, was the maximum release estimated

23   by the ChemRisk group in their scientific judgment that would

24   be -- that was the upper limit on the risk.  And I believe

25   counselor for the defense indicated that that was the upper

Page 5581

1    limit range of any individual outside of the plant.

2    Q    And then what was the --

3    A    Excuse me.  I mean, that was the upper limit range of the

4    emissions with respect to the '57 fire.  I mean, the risk

5    number or the dose number.

6    Q    All right.  I have even less time than Mr. Bernick, a lot

7    less, so I'm going to skip right to RAC II.  What was the

8    comparable estimate of the total -- of the release for RAC II

9    on the '57 fire?

10   A    It was 36 curies, which is 720 times larger.

11   Q    36 curies.  Was that also the high end?

12   A    Yes.  Their midrange was 21 curies.

13   Q    21 was the midrange?

14   A    To be precise, their 50 percent.

15   Q    So the DOE -- just to do the math, sir, the DOE experts, 21

16   divided by .05, that one went up by a factor of 420 times?

17   A    No.  You should compare the .05 to the 36, which is 720

18   times.

19   Q    720 times greater?

20   A    Yes.

21   Q    So that's actually about 72,000 percent greater; is that

22   right.

23              72,000 percent, percent increase?

24   A    Yeah.

25   Q    720 times --

Page 5582

1   A   Times.

2   Q   -- increase from the first ChemRisk estimate, just from the

3   '57 fire, correct?

4   A   Correct.

5   Q   Up to the final RAC II estimate; is that right?

6   A   Yes.  And it gets worse with respect to the routine

7   emissions.

8   Q   Okay.  You want to tell us briefly what happens with

9   routine -- if you want to come up to the board at any point,

10   you can do a lot better job of this than I can, so please feel

11   free to do that.

12   A   Well, I probably don't need to at this stage.

13          With respect to the routine emissions, in the exchange

14   we had a few moments ago, I indicated that in my report it

15   showed that the ChemRisk routine emissions, as reported by

16   Ripple, et al., were on the order of 6 microcuries with a range

17   of 2.4 to 15 microcuries.

18   Q   2.4 to 15?

19   A   That was their range.  And the RAC group range was, was

20   midrange .1 curie and lower limit .09 curie, and the upper

21   limit, or upper-confidence limit, .24 curies.

22   Q   So that .24 curies would be 240,000 divided by 15, that

23   would be about a 9,000 time increase; is that right?

24          Did I do the math in my head right?

25   A   That sounds right.  I mean, it's a -- the conclusion I draw

Page 5583

1    from that is that one expert group makes an estimate and puts a

2    range of a confidence limit on that.  And then another expert

3    group comes in, as people learn more, and makes a new estimate,

4    and it's wildly larger than the earlier estimate.  It tells you

5    about the confidence one could have in any of these estimates,

6    particularly the lower -- particularly the previous one.  But

7    it sort of raises the question about if one went through this

8    process again with better information in the future, would --

9    would it be several orders of magnitude greater in terms of the

10   range and the midpoints.

11   Q    And an order of magnitude is not twice as large, it's ten

12   times as large?

13   A    Ten times as large.

14   Q    So several orders of magnitude could be --

15   A    A hundred times.

16          MR. BERNICK:  Objection, this is all complete

17   speculation.

18          THE COURT:  Overruled.

19          MR. DAVIDOFF:  Your Honor --

20          THE COURT:  Ask your question, please.

21          MR. DAVIDOFF:  Thank you.

22   BY THE COURTROOM DEPUTY:

23   Q    You were shown Exhibits 37 and 38 that were these ChemRisk

24   articles?

25   A    Yes.

Page 5584

1    Q    Written by Mongan, Ripple, and diTommaso; is that right?

2    A    That's correct.

3    Q    And incidentally, are any of those people certified health

4    physicists?

5    A    No.

6              MR. BERNICK:  Objection.  Lack of foundation.

7              THE COURT:  Overruled.

8              MR. BERNICK:  I'm sorry, was there an answer?

9              MR. DAVIDOFF:  I believe he said no.

10             THE WITNESS:  Yes.  None of those.  I looked up on the

11   web the other night in the alphabetic listing of certified

12   physicists, and I found none of those names on either the

13   current list or the emeritus list.

14   BY MR. DAVIDOFF:

15   Q    In fact, Dr. Till is not a certified health physicist?

16             MR. BERNICK:  Objection, he doesn't hold himself out

17   to be one.

18   A    He isn't presently one.  He has many qualifications as a

19   health physicist, but he's not certified.

20   BY MR. DAVIDOFF:

21   Q    But these examples in Defendants' Exhibit 37 and 38 that

22   were shown to you on cross-examination, these are the examples

23   that RAC II has taken up by factors of 720 or 72,000 percent or

24   in one case a factor of 9,000; is that correct?

25             MR. BERNICK:  Objection.  A, it's leading; B, he's

Page 5585

1  holding up all, and only two calculations have been

2  demonstrated.

3        THE COURT:  It is a leading question.

4  BY MR. DAVIDOFF:

5  Q   Is it or is it not correct?

6  A   The -- would you restate the question.

7  Q   These estimates in Exhibits 37 and 38 that were shown to

8  you, the ChemRisk estimates, are these -- and that were shown

9  to Dr. Budnitz in his cross-examination, are these the

10  estimates that have grown up by the factors that you've

11  identified that we wrote on the board here?

12  A   That is correct.

13        MR. BERNICK:  Objection to the form of the question.

14  There are many, many different calculations there.

15        THE COURT:  Overruled.

16        THE WITNESS:  That is correct.

17  BY MR. DAVIDOFF:

18  Q   Do you have a high degree of confidence even in the RAC II

19  final report which has raised these estimates by hundreds or

20  thousands of times from the original estimates?

21  A   I think that is a better estimate.  I think there's still

22  some factors with regard -- particularly with regard to

23  uncertainty that could push those numbers higher than the

24  numbers reported in those documents.  So I don't think that

25  represents the end of the story in terms of the risk.  I think

Page 5586

1  the risk, particularly because of the MUF issue, could be

2  substantially higher and because of some issues related to

3  nonuniformity of the spread of plutonium, once it's released,

4  risks at individual sites could be higher.

5          And I could also walk you through some of the

6  uncertainties that have built into the Monte Carlo

7  calculations.

8  Q   Could you do that, and recognizing that we want you to be

9  as concise as possible.

10 A   Yes.

11         MR. BERNICK:  I think at this point I would object

12 because it's never, ever been shown to us, produced to us --

13         THE COURT:  It's redirect examination, and it was

14 brought out on cross.  It doesn't have to be shown under any

15 circumstance.

16         Go ahead.

17 BY MR. DAVIDOFF:

18 Q   Sir, would you like to do that, and if you need the board,

19 if that would be helpful, let me know.

20         Sir, if you're at the board, you're not at a

21 microphone, and you need to raise your voice as high as

22 possible.

23         MR. DAVIDOFF:  While you're doing that, ladies and

24 gentlemen, if you have any difficulty hearing Dr. Cochran or

25 me, could you please let us know.

Page 5587

1          Thank you.

2          THE WITNESS:  Recall that in the calculation of risks,

3    defendants' counsel indicated you start with a source term

4    calculation, dose calculation, risk calculation.

5          I want to first start at the back end, at the

6    uncertainties associated with what happens once material is

7    taken into the body.  And I put some data in my report that

8    would hopefully help you all understand that.  And I'll start

9    with rem.

10          MR. BERNICK:  Your Honor, he's referring to notes that

11    really should be produced.

12          THE WITNESS:  I'm not using these notes.

13          THE COURT:  Go ahead.

14          THE WITNESS:  Start with rem.  And if you go to the

15    I-CR--- excuse me, EPA report, Federal Guidance Report Eleven,

16    which was written in 1988 and is still current today, you will

17    find that using the EPA model for what is inhaled -- now we're

18    talking about insoluble or plutonium oxide particles, the model

19    to calculate what dose you get, what whole body effective dose

20    you get from inhalation of plutonium in this insoluble form,

21    you will see that over here it would be 0.02 microcuries.

22    That's the same as 20 nanocuries, 20-billionths of a curie,

23    will give you equivalent whole body exposure of 5 rems.

24          The model, the dose model is the same, so you can

25    ratio up and down to see what kind of number for inhalation

Page 5588

1    would give you a different number.  For example, if we multiply

2    this number by 50 and get 1 microcurie, which we talked about

3    the other day when I first talked to you about what happens to

4    beagle dogs when you get down to this level.  Well, let's talk

5    about what happens to human beings.  This number is 50 times

6    larger, so it's a dose of 250.

7            Now, again, this is the EPA model, and in a moment, I

8    will tell you about uncertainties in these calculations and how

9    other experts, like RAC, will use a different model than the

10   EPA model and will come to different, slightly different -- or

11   somewhat different conclusions.

12           MR. BERNICK:  Your Honor, at this point he is now

13   pursuing dosimetry models, EPA dosimetry models that were never

14   the subject of my examination.

15           THE COURT:  The objection is overruled.  I distinctly

16   heard this kind of examination going on.

17           MR. BERNICK:  My point, Your Honor, is not to make an

18   objection, but that it is opening up a new area.

19           THE WITNESS:  As counsel indicated when we had the

20   discussions with me, you actually -- this is the whole body --

21   this is the dose to the whole body equivalent.  It's -- really

22   takes the dose to the lung and all the other organs and sums

23   them up with agreed-upon factors and calculates a number that's

24   equivalent to exposing your whole body to gamma rays or x-rays

25   so that everybody's working off of the same sort of sheet in

1    terms of calculating risk.

2           The actual dose to the lung that would give this

3    number, you would have to multiply it by 8.33, divided by 12.

4    So this number would be, for microcurie, would be about eight

5    times, about eight times that number for a human lung.

6           And we had a discussion about beagle dogs.  Beagle

7    dogs have smaller lungs, 70 grams versus a kilogram lung for a

8    human.  Their doses are even higher.  But we don't care about

9    any of that.  What we care about is risk, risk to human beings.

10          So let's take this number here, and this is where the

11   National Academy comes in because -- this is EPA now, getting

12   from here to here.  I'm using their model.  And then I'm going

13   to get rid of all of this 'cause I don't care about that.  I'm

14   going to use National Academy of Sciences and get from here to

15   a risk.  And roughly, if you average males and females

16   together -- it doesn't matter whether you're using the old BEIR

17   V numbers before my report or the current numbers; the change

18   hasn't been that much.

19          But it's on the order of a risk of one cancer

20   incidence in a thousand people for each rem.  So this would be

21   on the order of five cancers in a thousand people if that

22   were -- a thousand people were exposed at this level.

23          Now, let me just talk about -- well, let's go down

24   because you need some other useful numbers.  You have

25   microcuries, nanocuries.  We would like to get down to

Page 5590

1    picocuries, because you see that often.  So you have to --

2    well, let's first go to nanocuries.  1 nanocurie.  You would

3    have to divide this by 20, and so it would be 0.25 rems, and if

4    we went to 1 picocurie -- and remember, every time we go from a

5    microcurie to here, we're dividing by a thousand, and then

6    dividing by a thousand again.  You remember I told you to

7    divide these little particles up.

8           Now we're at 0.00025 rem.  And you use the same

9    multiplication factors.  So this would be 0.25 cancers in a

10   thousand people or one cancer in 4,000 people.  And you can do

11   the arithmetic as well as I can, probably better.

12   BY MR. DAVIDOFF:

13   Q    Sir, could you just complete that last calculation?

14   A    This one, for one picocurie?

15   Q    This would be one in 40,000 or one in 400,000?

16   A    It would be one in 4 million.

17   Q    Okay.

18   A    Now, you've heard a lot about what risk should we establish

19   as sort of an acceptable risk.  And I told you the other day

20   the starting point for this, these games we play is one in a

21   million, if you're talking about somebody imposing a risk on

22   you that you didn't ask for.  That's quite different from a

23   risk you voluntarily take by riding in airplanes or living in

24   Denver, Colorado.  But the issue is what are you going -- what

25   should other people be allowed to impose on you.

Page 5591

1        And the starting point for EPA would be one in a

2   million.  But the agreed upon by the federal agencies as

3   counsel indicated was one -- for the Rocky Flats cleanup site,

4   was one in a hundred thousand.  So if you -- one -- if you

5   wanted to get back to one in a million, that's like -- 4

6   picocuries would be one in a million.  And if we wanted to go

7   one in a hundred thousand, it would be 40 picocuries, inhaled.

8        I wrote it down wrong, didn't I?  40 picocuries.

9        One in a hundred thousand risk.

10       Now, what are the uncertainties in these calculations

11  I've just given you.  You will get expert testimony in this

12  case by other people who don't use the EPA model for how the

13  plutonium goes in the body.  My professional judgment is this

14  is a conservative model, and this is EPA's guidance to other

15  federal agencies.  But other experts are going to have their

16  own opinion about how this applies.  And you will hear or may

17  hear calculations like RAC's, which in this conversion give you

18  a factor of four times -- on the order of four times less,

19  assuming all the plutonium that's inhaled and gets into the

20  lung.

21       Now, there was no measurements of particle-size

22  distribution from the fire, to the 903 pad, so there's an

23  uncertainty about actually what size those particles were, and

24  RAC actually did several calculations assuming different sizes

25  of particles.  And if you assume very big particles, which is

Page 5592

1    different from what's been assumed, this factor could be not

2    four times less in terms of calculating the rem, but it could

3    be as much as 17 times less.  I mean, there are big

4    uncertainties in this calculation.

5          Over here, there used to be a lot of uncertainties and

6    arguments about what this number is.  It's kind of people have

7    kind of gotten together on that.  Largely the uncertainties are

8    within a factor of two or so.  There are differences between

9    men and women, so when you're giving average numbers, recognize

10   women are at higher risk, but their higher risk primarily is

11   because of breast cancer, and the plutonium isn't going to go

12   to your breasts.  That's not where you get the risk.

13         But there are factors of two over here, and so you can

14   get expert opinions in this case that are going to be less

15   conservative than the National Academy numbers.  You'll get

16   expert opinion that there are going to be less conservative by

17   EPA numbers by a big factor.

18         And there's one other factor, though.  And that's what

19   got out.  Now, you have these sort of four categories that I

20   look at and everybody talks about of routine emissions, two

21   fires, and then the 903 pad.  Now, when these expert people --

22   let me tell you, I didn't do these calculations.  I'm not

23   coming to you with my own set of calculations and saying I'm

24   better at this than RAC --

25         MR. BERNICK:  Your Honor, at this point, this is

Page 5593

1    really a peroration from a witness, it's not a response to a

2    question.   Indeed, it's not even particularly relevant.

3           THE COURT:   The objection is overruled.

4           Go ahead, please.

5           THE WITNESS:   What I can do for you is to tell you

6    what's going on in these other expert calculations and tell you

7    where the problems are.

8           Now, the first problem is when you look at ChemRisk.

9    In my professional judgment, I thought that cross-examination

10   of Mr. Budnitz was misleading because it was based on the

11   ChemRisk --

12          THE COURT:   Your Honor, this is --

13          THE COURT:   Sustained.

14          THE WITNESS:   Okay.

15   BY MR. DAVIDOFF:

16   Q   Sir, don't comment on the cross-examination of other

17   witnesses.

18   A   Okay.

19   Q   Thank you.

20   A   As we indicated earlier, if you look at routine

21   emissions -- now, this is where you should know the most about

22   what came out of that plant, all right?   This is routine

23   operations in the stack that should have been measured

24   properly, all the way through the plant.   Now, it's not the

25   biggest source of effects --

Page 5594

1          MR. BERNICK:  Your Honor, I didn't ask one question

2    with respect to stack emission, not one.

3          THE COURT:  Overruled.

4          THE WITNESS:  The routine emission calculation by

5    ChemRisk was .05 microcuries came out of that stack over that

6    history of that plant.  RAC comes in here with a number that's

7    a thousand times bigger, 16,000 times bigger, or something.

8    Don't hold me to the precise number.  Immensely bigger.  It

9    tells something about the quality of the routine emission

10   measurements, the quality of how well they studied that stack

11   and how well they kept the records at two different expert

12   groups that come forward in a period of less than five years

13   with differences of opinion about what was routinely emitted

14   that are a factor of 10,000 differences in their estimates.

15         Now you go to the fire.  Same problem with these two

16   ChemRisk --

17         MR. BERNICK:  Your Honor, if we could have the

18   witness, if he's not using the board, reassume the chair.

19         THE COURT:  Do you still need the board, Doctor?

20         THE WITNESS:  No.

21         THE COURT:  All right.

22         THE WITNESS:  On the '57 fire, the numbers, the best

23   estimate not of the -- this is the best estimate of the upper

24   limit.  The second group, the RAC group, comes in and tells you

25   that their best estimate, the upper limit is 720 times higher,

Page 5595

1   and a group of experts whose testimony you've -- has been

2   proffered in this case, made five years earlier.  That tells --

3   that just tells you something about uncertainties in these

4   kinds of estimates of the source term.  And those have to be

5   folded in with these other things.

6        Now, one critical issue, on the source term of the

7   '57 fire, there was six, now it's been corrected to eight --

8        MR. BERNICK:  Merrill, please save that.

9        THE WITNESS:  -- 8.3 kilograms of MUF saved from the

10  fire.  That's material from the glove box.  You heard counsel

11  when he was cross-examining me tell you that Mr. Voilleque, who

12  is a certified health physicist, works for RAC, he drew some

13  conclusions and which you saw in his report about the utility

14  of that MUF in making calculations.

15       Now, where I would agree with him is that you don't

16  start with the MUF data to make your calculations.  The MUF is

17  huge.  MUF is, over the years, is over a ton.  You, however,

18  should consider that, as he did, perhaps, in conjunction with

19  your calculations of what got out.  It's -- it has utility.

20  It's just not useful as the sole basis for calculating

21  environmental releases.  And its utility is this.

22       In that particular instance, that's 8.3 kilograms,

23  800 -- 8,300 grams.

24       13.7, that's 600 curies.  Now, RAC in their analysis

25  of that fire and to the extent that they considered MUF, their

Page 5596

1    upper range estimate of what was released was 36 curies, 36

2    compared to 600 curies that were also unaccounted for in the

3    room.

4             Now, that tells me -- and by the way, in that

5    particular fire, there was a period of hours when the -- when

6    the filter -- when the electricity was off and the filter

7    systems didn't work, and you got to guess what got out of the

8    plant.  And you guess from what went on before and what went on

9    after.  But there's an uncertainty of -- a substantial

10   uncertainty of what could have gotten out during that fire.

11   You have the same kind of problems with the other releases, but

12   they are not of the same consequences.

13            And finally, you have material unaccounted for

14   throughout this plant, throughout these years, that there may

15   have been releases.  We don't know.  I don't think we know that

16   most of the MUF -- and you should assume over 90 percent of the

17   MUF is accounted for as outlined in these various estimates

18   that we will put on the screen, most of it because it didn't

19   account for the waste properly; but some, even if it's at the

20   1 percent level, if some of that 1 percent MUF is unaccounted

21   for because it was released to the environment and not because

22   this was those other categories, that introduces a large

23   uncertainty in the subsequent -- in the subsequent

24   calculations.

25   BY MR. DAVIDOFF:

Page 5597

1   Q   Sir, I just want to clarify this because I think we're

2   coming up on the lunch break.   The 8.3 kilograms or 600 curies

3   was the RAC estimate of what was missing after the 1957 fire?

4   A   Yes.   It's not so different from the earlier estimate of

5   6-kilogram.

6   Q   The 6-kilogram one was in the Zodtner-Rogers report?

7   A   Yes.

8   Q   That was declassified -- in 1964, that was declassified in

9   1994.

10  A   Yes.

11  Q   8.3 kilograms that we have from RAC now of missing,

12  missing, missing plutonium after the '57 fire and their maximum

13  estimate of 36 curies, this is still only about 5 percent of

14  what was missing; is that correct?

15          They're only assuming at the maximum level that about

16  5 or 6 percent of that could have --

17          MR. BERNICK:   Objection, it's leading and

18  mischaracterizes completely the record.

19          MR. DAVIDOFF:   Sir, I'm trying to focus --

20          THE COURT:   The objection is overruled.   Answer the

21  question, if you can.

22          THE WITNESS:   First of all, the 36 isn't calculated

23  from the MUF number.   It's calculated from separate data.

24  BY MR. DAVIDOFF:

25  Q   Okay.

1    A    But it does represent about 6 percent of the total MUF.

2    And the way I think you should look at that is that the 36

3    could be substantially larger if you included an additional

4    contribution from the MUF.

5    Q    Okay.  And then when we were talking about the 720 before,

6    that was the RAC maximum divided by the ChemRisk maximum, and

7    it went up by a factor of 720 times?

8    A    That's right.  And all of those discussions of what's the

9    risk associated with 1.3 millirems of exposure, right off the

10   bat they're all off by a factor of 700.  They're low by a

11   factor of 700.  So --

12              MR. BERNICK:  Your Honor --

13              THE WITNESS:  So if you use the RAC --

14              MR. BERNICK:  -- that is a calculation that is

15   completely without foundation.  There's no way that even if I

16   opened the door, as I clearly did and knew I was doing, to this

17   subject matter, that that permits incompetent testimony that is

18   not founded under the rules by a calculation or by work

19   product.  We're now here into deep, deep speculation, and

20   there's no way that I have to cross-examine him.

21              THE COURT:  The objection is overruled.  We're taking

22   the noon recess.  Be back at 1:15 if the elevators are running.

23              THE COURTROOM DEPUTY:  All rise.

24   (Jury out at 12:03 p.m.)

25              THE COURT:  We'll be in recess.

Page 5606

1   situation?  She still drive?

2       (Jury in at 1:24 p.m.)

3          THE COURT:  Okay.  Thank you.  Good afternoon.  Be

4   seated, please.

5       (Thomas Cochran was recalled to the stand.)

6          MR. DAVIDOFF:  Welcome back, ladies and gentlemen.

7                    REDIRECT EXAMINATION CONTINUED

8   BY MR. DAVIDOFF:

9   Q   And Dr. Cochran.

10         We were on the final RAC II report before lunch.  If

11  you add up all the total of the releases that RAC II estimates,

12  am I correct that they add up to about 1 kilogram of plutonium?

13         MR. BERNICK:  Objection, lack of foundation.

14         MR. DAVIDOFF:  Well, let me ask it a different way.

15  BY MR. DAVIDOFF:

16  Q   In your estimates when you -- when you reviewed RAC I and

17  RAC II, what did the latest estimates add up to in terms of

18  converting curies back to kilograms or grams of plutonium, what

19  does it add up to?

20  A   Well, their median estimate adds up to 24, a little over

21  24 curies.  And I think you then multiply that by 13.7 again.

22         So I would say something on the order of 330 --

23  328.8 grams.

24  Q   So 24 curies times 13.7 is 328 grams?

25  A   Yeah, 329, yes.

Page 5607

1   Q   All right.  Now, in a -- in a -- in a pound, there are --

2   there are 454 grams, correct?

3   A   You want to convert that to --

4   Q   No, sir.  I'll get there, I promise.

5       There's 454 grams in a pound, correct?

6   A   Yes.

7   Q   Okay.  So even the RAC II, the highest of the three

8   estimates, is that --

9   A   No, that's the median.  The 328 is the median.  The higher

10  one would be 36 . . . it would be about, approximately

11  51 curies, roughly 700 grams.

12  Q   All right.  So the highest of the three estimates -- RAC II

13  is higher than RAC I; RAC I is higher than ChemRisk, correct?

14  A   That's correct.

15  Q   And RAC II, the median estimate is less than a pound of

16  plutonium, and the higher estimate is about a pound and a half

17  of plutonium, correct, or 1.6 pounds of plutonium?

18  A   Yeah, one and a half.

19  Q   454 into 700, is about 1.6 pounds?

20  A   Well, if you multiply 700 grams times two-point -- that's

21  .7 times 2.2.

22  Q   About 1.5 to 1.6?

23  A   About 1.54, one and a half pounds.

24  Q   So the RAC estimates, then, total RAC estimates, the latest

25  RAC estimates are either less than a pound, you take their

Page 5608

1   median estimate, and about 1.5 pounds if you take their upper

2   bound estimate of 51 curies; is that correct, sir?

3   A   That's correct.

4   Q   And I just want to relate that, if we can, for a minute.

5   You've got 2,620 pounds of MUF, correct?

6   A   That's correct.  But most of that would not be releases.

7            MR. BERNICK:   Sorry.

8            THE WITNESS:   Most of that would not be in the form of

9   releases to the environment.

10  BY MR. DAVIDOFF:

11  Q   Well, I was actually -- I was actually coming to that.  The

12  1 pound or the 1.5 pounds don't take account of any MUF; is

13  that true or not?

14           MR. BERNICK:   Go ahead.

15           THE WITNESS:   The RAC II considered it.  But they did

16  not include it in their Monte Carlo modeling.  So it's -- to

17  the best of my knowledge, it's -- it's not an entry in the

18  uncertainty -- in the direct calculations of the uncertainties

19  with respect to the Monte Carlo models.

20  BY MR. DAVIDOFF:

21  Q   So I want to get an idea of how that compares.  We saw,

22  incidentally, a statement from opening argument yesterday -- do

23  we have that?  Maybe it was a defendants' exhibit.

24           Well, what it said, just to save some time,

25  Dr. Cochran, what it said, at one point, I think, in Miss

1    Roselle's examination, there was a statement that the plant

2    managers had no idea of where the plutonium went.  I want to

3    show you another part of the opening argument, the opening

4    plaintiffs' argument, which I'll put up on the board here.

5         And I'm just going to ask you if this is in agreement

6    or not in agreement with your opinions.

7         And that brings us back to MUF, material unaccounted

8    for.  Beginning at the very earliest years of the plant, Dow

9    Chemical, then Rockwell, lost and could not keep track of the

10   plutonium that was on site.  And over a period of 37 years, the

11   amount of missing plutonium grew to 2600 pounds, 1.3 tons of

12   plutonium.

13        Now, remember the plant had over 14 tons on site, and

14   it had more plutonium than any other weapons plant in the

15   United States.  And there was 2600 more pounds that was missing

16   and unaccounted for, AWOL.

17        Now, there is no question that while some of this

18   plutonium probably escaped, much of it remained on the plant

19   grounds.  It was buried in unmarked waste sites and marked

20   waste sites throughout the plant property.

21        When it was buried, the high winds of the Front Range,

22   90 to a hundred miles per hour, would blow the dust and dirt

23   downwind and take much of the plutonium away.  But many pounds

24   of the plutonium was in the duct works of the various

25   industrial buildings of the plant.

Page 5610

1          What is clear is that 2600 pounds of plutonium went

2    missing, completely missing, and was never fully found, I think

3    that should say, to the public -- and I'll leave out the rest

4    which is how many people that could poison.

5          Is that -- is that in accord with your opinions, or is

6    there a -- or do you differ with that?

7          MR. BERNICK:  Your Honor, I don't think it's proper to

8    ask a witness to sign on to counsel's argument.  Number one,

9    it's leading.  Number two, it's not responsive to my cross,

10   which dealt with another statement that he made that still has

11   not been justified.  And so we'd object to the form of the

12   question.

13         THE COURT:  The form of the question, the objection is

14   sustained.  But you can ask him if there's another expert that

15   he agrees or disagrees, including the RAC report, and if so

16   why.

17         MR. DAVIDOFF:  What happened was another --

18         THE COURT:  I made my ruling.  I think the form was

19   wrong.

20         MR. DAVIDOFF:  Let me try it again.

21   BY MR. DAVIDOFF:

22   Q   Is the description of the MUF that most of it remained on

23   the plant property and duct works and buried waste sites and

24   elsewhere, and some of it escaped, is that a correct or

25   incorrect description?

1    A    Well, that leaves out -- that's not entirely correct

2    because it leaves out some of that that went into the waste

3    which was ultimately shipped to INEL.  And that portion I would

4    attribute, you know, during the early years, to -- as a

5    contributor to the MUF.  And that I've said previously I

6    thought the failure to adequately monitor the waste was the

7    major source of uncertainty that contributed to the MUF.

8    Q    All right.  Now, I want to come back to these numbers for a

9    second.  On RAC II, they are somewhere between less than a

10   pound to about 1.5 pounds of plutonium over the whole life of

11   the plant that escaped.  And we've got 2,620 pounds of MUF; is

12   that correct, sir?

13   A    That's approximately correct, yes.

14   Q    So if even 1 pound escaped, one more pound of the MUF

15   actually got off site, that would double the RAC II estimate of

16   the releases; is that correct?

17   A    Roughly, yes.

18   Q    And if 10 pounds got off, it would multiply it tenfold?

19   A    That is correct.

20   Q    And if a hundred pounds got off, it would multiply it a

21   hundred fold?

22   A    If that were true.  I mean, I don't have any basis for

23   saying that would be true.

24   Q    Another thousand 620 pounds of MUF, even if 95 percent of

25   it never got off the plant site, but only 5 percent did, if it

1    did, is that an uncertainty, is that one of the uncertainties

2    that you identified in your report?

3           MR. BERNICK:  He specifically identified in his

4    report.  I don't have an objection if it's specified in the

5    report.

6           THE WITNESS:  That is -- I mentioned uncertainties in

7    the report, and that is an example of an uncertainty associated

8    with these types of calculations.

9    BY MR. DAVIDOFF:

10   Q    And even 1 pound, which would be less than a tenth of a

11   percent of the MUF, would double the RAC estimates; is that

12   correct, sir?

13   A    That's correct.  But, you know, we don't know -- I don't

14   want to over -- I don't want to leave the impression that a

15   large fraction of that MUF was released off site.  I think the

16   proper way to address that is that it would -- it was not

17   adequately or fully accounted for in the Monte Carlo

18   calculations.  And there's an additional uncertainty in terms

19   of what the releases and doses are because of that.  And

20   they're in the upward direction, and it would only take a small

21   fraction.

22           For example, in the '57 fire, the 8 kilograms of MUF,

23   you know, even -- even if an additional two -- I don't know the

24   number, but just for purposes of understanding, let's say if an

25   additional 2 pounds were released and not accounted -- and they

Page 5613

1    would not be accounted for in these Monte Carlo calculations,

2    that would, in fact, triple the RAC numbers in terms of what

3    was released.

4    Q    All right.  And --

5    A    And it could be -- excuse me, it could be more, it could be

6    less.

7    Q    To your knowledge, did either ChemRisk or RAC I or RAC II

8    factor any MUF into any of their calculations?

9    A    They considered the MUF issue to the -- to the best of my

10   knowledge, they did not include it in the calculations.  Now,

11   presumably there would be someone associated with that group

12   who will be here eventually and they can answer that question.

13          But to the best of my knowledge, it's not included

14   because as you indicate -- as was indicated from the Voilleque

15   report -- and he's the one -- he's part of the RAC team -- he

16   said he didn't think it was appropriate to consider it.  I

17   think -- or words to that effect.

18   Q    All right.

19   A    And so I don't think he put it in the Monte Carlo

20   calculation.

21   Q    Now, I want to -- you were shown a Rogers report that was

22   done by EG&G in 1994.

23          MR. BERNICK:  Roberts.

24          MR. DAVIDOFF:  Roberts.  Thank you, Counsel.

25   BY MR. DAVIDOFF:

Page 5614

1    Q    Roberts report?

2    A    Okay.

3    Q    I don't have time to fish it out.  But the lower bound was

4    800 kilograms.  The upper bound was 1300 kilograms.  And the

5    midpoint, I think after we did some -- was 1150 in Mr. Rogers'

6    report -- Roberts' report; is that right?

7    A    Yes.

8    Q    And incidentally, just so the jury is clear, EG&G was a

9    successor contractor to Rockwell and Dow; is that correct?

10   A    Yes, associated with the cleanup.

11   Q    So they were a DOE contractor running Rocky Flats after --

12   in fact, immediately after Dow, then Rockwell, then EG&G?

13   A    Yes.

14   Q    They were in the same position at Dow, Rockwell, and EG&G,

15   essentially?

16   A    Except they were cleaning up as opposed to in the

17   production cycle.

18   Q    So this -- this study by Mr. Roberts was done by the DOE

19   contractor at the plant that left -- that came in immediately

20   after Rockwell; is that right?

21   A    Yes, that's my understanding.

22   Q    But even the midpoint of his estimates leaves 42 kilograms

23   or about a hundred pounds almost unaccounted for.

24         MR. BERNICK:  Objection to the form.  If you were to

25   assume the 1150 --

Page 5615

1        MR. DAVIDOFF:  Well, that's what was assumed on

2   cross-examination.

3        MR. BERNICK:  Not at all.

4        THE WITNESS:  I think both -- both of the attorneys

5   are not looking at this properly.

6   BY MR. DAVIDOFF:

7   Q   Okay.  Tell us how -- I'll ask you --

8        MR. BERNICK:  Neither one wants to hear why.

9   BY MR. DAVIDOFF:

10  Q   I'm going to ask you a real easy question.  Tell us the

11  proper way to look at it.

12  A   Well, Rogers -- he's making a -- you know, a -- his best

13  estimate of where could this have all gone that -- that's

14  recorded as MUF.  And as you see, there are huge uncertainties

15  on each of the -- or some of the contributions that he's

16  identified.

17       You know, if I were in his shoes and started doing the

18  same thing, the environmental release portion that should be in

19  his list would be small, unknown, absolutely unknown; but

20  the -- you know, if you just kind of want to get a rough idea

21  of where things went, these are the major contributions.  And I

22  don't dispute that, but I don't think you should get into this

23  fine-tuning of subtracting midrange of this, that, and the

24  other and saying this is a lot left.  I mean, he -- his number,

25  800 to 13-kilogram -- I mean his number for each of those

Page 5616

1    categories has a large uncertainty range in it, and, you know,

2    people just don't know where this is, which is why we call it

3    material unaccounted for.  You don't know where it is.

4    Q    He -- let's talk about it qualitatively, then, instead of

5    quantitatively; I think you made a good point, Dr. Cochran.

6         When he wrote his report, which was admitted, I think,

7    over our objection, 684, I believe it is, he listed four of

8    your five categories, but he didn't list the fifth one, did he?

9    A    That is correct.  He omitted releases to the environment.

10   And I think counsel for the defense called attention to that.

11   Q    So let's take a look at your list and just so you can

12   identify for the jury the one that he omitted.

13        Are we there?

14        MR. DAVIDOFF:  Miss Bush, we just need the --

15   BY MR. DAVIDOFF:

16   Q    In other words, he discussed waste.  And he also discussed

17   transshipment off site, bookkeeping errors which is related to

18   transshipment off site.  Theft, which he dismissed, correct?

19   A    Yes.

20   Q    Ducts and pipes, but the one thing he really didn't discuss

21   in there was the environment; is that right?

22   A    That's correct.

23   Q    Okay.  Now, this morning you said when you were questioned

24   about the ATSDR report --

25   A    Yes.

Page 5617

1    Q    You said -- you were quoted a limit by counsel of 100, 100

2    millirem per year, which is one-tenth of a rem, and you

3    commented that is exceeding -- this is a direct quote from you

4    this morning -- exceedingly large; I'm surprised.

5         Could you explain to the jury why you were surprised

6    at that exceedingly large estimate?

7    A    Yes.  As you heard earlier, the 100 millirems per year is

8    actually less exposure than you get from natural background

9    radiation and medical uses.  But it is not an appropriate --

10   let me -- let's --

11        MR. BERNICK:  Let me just interpose an objection.  At

12   this point I don't know that there's even a reference point to

13   the question.  The 100 millirem was never a recommendation.

14   And I think the witness is responding to it as if it's a

15   recommendation.  You got to get the reference point so we can

16   know what it is that we're talking about.

17        MR. DAVIDOFF:  Your Honor, I have limited time, and he

18   was -- he was explicitly shown an ATSDR document.  There was

19   100 millirem limit in there per year, and he stated exceedingly

20   large, I'm surprised, and was not given an opportunity to

21   explain.  I just want to --

22        MR. BERNICK:  If you'll help me with the document so

23   we know what we're talking about.

24        THE COURT:  Just identify if it's a document or a

25   transcript.

Page 5618

1          MR. DAVIDOFF:  I'm sorry, Your Honor.  It's a defense

2   document.

3          MR. BERNICK:  Go ahead and ask, I'll give it to you.

4   BY MR. DAVIDOFF:

5   Q   Do you recall that testimony, Dr. Cochran?

6   A   Yes, I do.

7   Q   Do you recall making the comment that I quoted?

8   A   Yes, I do.

9   Q   Could you explain the comment to the jury, please.

10  A   I was in the middle of trying to do that.  While 100

11  millirems per year is less than your natural exposure rate, I

12  want to relate it to the risk numbers that form the basis for

13  the EPA -- agreement between EPA and the state of Colorado and

14  DOE with regard to cleanup.  You recall the risk, the starting

15  risk number for an activity like this would, under the EPA

16  guidance, would be a lifetime risk of one in a million.  And

17  the agreement on the cleanup was of one in 100,000.  You

18  can't -- your chance of getting cancer would be one out of

19  100,000 persons.

20          Now, if you take 100 millirems, that's one-tenth of a

21  rem.  If you're lucky to live 70 years, that would mean and --

22  and exposed at that level for 70 years, you would be exposed to

23  7 rems.  And your cancer risk would be about seven out of a

24  thousand, which is far below one out of a hundred thousand.

25  And that's why I said I'm surprised that they would find that

1    an acceptable level for this activity.  Despite the fact you

2    have no consequence, really, unless you want to live in a hole

3    in the ground, you're going to get that from natural background

4    radiation.

5    Q    Well, this is added to the natural background radiation

6    that you get, sir; is that correct?

7    A    That's correct, and that would be an involuntary exposure.

8    Q    Let me just make sure that we quoted you correctly.

9         You said, your cancer risk would be about seven out of

10   a thousand.  And then you said, which is far below one out of a

11   hundred thousand.  Did you mean below or above?

12   A    Above.  I mean, your risk would be, under those

13   circumstances, would be much higher than would be in accord

14   with the federal guidance.

15   Q    Seven out of a thousand?

16   A    Yes.

17   Q    And that is more than one out of a hundred thousand; is

18   that correct?

19   A    Yes.

20   Q    So if a population were exposed to that, you would expect

21   seven additional cancers out of a thousand people?

22   A    If you had that population and if that population had a

23   average lifetime of 70 years and they were exposed at that

24   level for the entire 70-year period.

25   Q    You were asked about Monte Carlo calculations on

Page 5620

1   cross-examination, and you said that there are large

2   uncertainties in those calculations.  Could you briefly explain

3   that to the jury?  That was this morning.

4   A    Well, as you know, when you do these calculations, you're

5   doing each of those steps, the source term, the transport, the

6   dose modeling, the risk.  You're doing those or at least most

7   of those steps are -- have associated uncertainties with all of

8   the assumptions that go into them.

9          In a Monte Carlo technique, what you do is you -- you

10  do the calculation a lot -- let's say a million times.  And

11  every time you do the calculation, you go in and sample the

12  uncertainty, and it will have some distribution of how they

13  assumed that uncertainty.

14         So the calculation itself, after you get all through,

15  you've got, let's say, a million calculations, and they all

16  give different numbers.  And you can say 95 percent of those

17  results lie between here and here and the central result is

18  somewhere in the center.  And that's what RAC did.  And you see

19  precisely in their results how they propagated those

20  uncertainties to the final answer.

21         Risk, you remember the counselor showed this graph for

22  different places around Rocky Flats and large, large arrow bars

23  associated with what the risks were.  And he drew, sort of

24  interpreted correctly the one in a million, one in a hundred

25  thousand, so forth.

Page 5621

1        Those uncertainties that they propagated in their

2   model only include the uncertainties that are in the model.

3   They would not include, for example, mistakes, errors of

4   judgment, parameters that they decided didn't have a

5   significant uncertainty and they didn't want to deal with it.

6   And it wouldn't include MUF if MUF wasn't included in that

7   model.

8        So they have a range of uncertainties.  And one of the

9   points I tried to make was if you looked at the ChemRisk group,

10  that came before them, they made a similar assessment.  I don't

11  recall whether it was a Monte Carlo calculation.  But they did

12  similar modeling calculations, propagated the uncertainties.

13  And they came to some conclusions about what the range of

14  uncertainties were.  And then the next group of experts come

15  in, and their numbers are outside of this earlier group's range

16  for what -- what the releases were, for example.

17       So that shows you -- that's a perfect example that the

18  earlier group did not include uncertainties and they at least

19  didn't agree on other parameters that were included by the RAC

20  group.  And then for you, you've got, you're going to see,

21  presumably, the RAC numbers; we've discussed them here.  And

22  you've got to make a decision about what's missing from their

23  calculations, if there are any.  And of course their experts

24  are going to come in here and say, Your Honor, we're the

25  world's best experts -- they're not going to say that --

Page 5622

1   they're going to come in here and say that's our best

2   scientific judgment, and I'm going to -- I've told you that

3   there are some things that are not in that model that would

4   increase the uncertainties, and so some individuals could

5   receive risks that are substantially higher than the upper

6   range of even that model.

7          And I've also told you that the very fact that you see

8   these two calculations should give you great pause in

9   interpreting the testimony of any of these experts with regard

10  to how well they did that job.  They did -- I'm sure they did

11  the best job they thought they could do, but the -- the results

12  tell you how good this -- these calculations are.  And they're

13  not very good.

14  Q   Dr. Cochran, if there was a failure in the monitors, would

15  that affect their calculation of the source term?

16          MR. BERNICK:  That is RAC's calculation of the source

17  term?

18          MR. DAVIDOFF:  Any of the three.

19          MR. BERNICK:  Well, we ought to be pretty specific

20  because they're different.

21          THE COURT:  Well, you can ask the question of which

22  one, if any.

23          THE WITNESS:  It depends on how they treated it.  You

24  know, if there were failures -- there were problems in the

25  monitoring, it was inadequate monitoring, which I think is a

Page 5623

1    failure of the contractors, but you can model those

2    uncertainties or you can leave it out.  So it depends -- it

3    would depend on how they addressed each specific case.

4    BY MR. DAVIDOFF:

5    Q   Dr. Cochran, this morning you were asked the following

6    question, which I'll read to you.

7              Now I want to ask you a further question.  Not only do

8    you at least in what you've read not see that you can criticize

9    them -- this is ChemRisk that is being talked about -- but

10   isn't it true that you did not calculate, yourself, a source

11   term for the 1957 fire, and then there was some colloquy, and

12   your answer was, yes and no.  It doesn't lend itself to a

13   simple answer because you can do simple ratios.

14             Could you explain what you meant by that testimony,

15   sir?

16   A   Well, I -- as I indicated to you earlier, I did not do

17   calculations as I did not create my own models and run these

18   calculations.

19             I have looked at the results, and I can identify areas

20   where I think -- which I think represent deficiencies in the

21   calculations.  Of course RAC itself has indicated horrendous

22   deficiencies in the earlier calculations by ChemRisk.  And I

23   have indicated deficiencies, additional -- what I consider as

24   additional uncertainties associated with the RAC calculations.

25   And those uncertainties could lead to substantially higher risk

Page 5624

1    than were attributed in, for example, in the graph that was

2    shown to me earlier.

3    Q    You were shown --

4          MR. DAVIDOFF:  Can I have the ELMO, at least,

5    Miss Bush.

6    BY MR. DAVIDOFF:

7    Q    You were shown this Health Physics paper, position paper of

8    the Health Physics Society.  Do you recall that?

9    A    Yes.

10   Q    I want to show you two documents that you cited in your

11   report and ask you if these are directly relevant to the

12   Health -- the statements in the Health Physics paper.  One is

13   Plaintiffs' Exhibit 1401, an article by Thomas Grumbly,

14   undersecretary, U.S. Department of Energy.  Did you cite this

15   in your report?

16   A    Yes.  Yes.

17   Q    Is this relevant to that Health Physics paper?

18         MR. BERNICK:  If there's a statement, it has to be

19   established as being sufficiently reliable to support his

20   predicate opinion.

21         THE WITNESS:  The statement was made by --

22         MR. BERNICK:  I know exactly who made it, and he's not

23   a scientist.  We object because its -- it doesn't come in under

24   702 or 703.

25         THE COURT:  Objection overruled.  Go ahead.

Page 5625

1          MR. DAVIDOFF:   Thank you.

2   BY MR. DAVIDOFF:

3   Q    This is Plaintiffs' 1401.

4          We are concerned about plutonium for two reasons.   The

5   first is the health and safety of our workers in the

6   environment.   Plutonium is very toxic and radioactive and it

7   tends to destroy the containers we keep it in.   If too much

8   plutonium is brought too close together, that's criticality,

9   then national security.   Of course, only a few kilograms of

10  plutonium of any kind are needed to build a nuclear weapon.

11         And then at the end here, on the next page, Our

12  challenge for the next 50 years of the plutonium era is no less

13  difficult than the one that Robert Oppenheimer, Leslie Groves,

14  and their Manhattan project colleagues faced in 1942.   We must

15  shift from continuous processing of plutonium and building of

16  weapons to long-term storage and disposition of those same

17  weapons and materials.   Where once we valued production above

18  all else, today we must give equal consideration to safety,

19  health, the environment, and nonproliferation concerns.

20         MR. DAVIDOFF:   And then, Your Honor, is 1401 received?

21         MR. BERNICK:   Object to its being received into

22  evidence.   If he wants to use --

23         THE COURT:   Sustained.

24  BY MR. DAVIDOFF:

25  Q    1402.   This was a Dow study in your report on the safety of

1   plutonium handling facilities.  Did you include that in your

2   report, sir?

3   A    Yes.

4   Q    This is from -- by Milton Thompson from 1971; is that

5   right, sir?

6   A    Yes.

7   Q    And in the introductory paragraph, In addition to being one

8   of the most toxic elements known to man, plutonium and some

9   plutonium compound are highly pyrophoric, may spontaneously

10  ignite, some isotopes are fissionable creating a potential

11  nuclear safety problem, and all isotopes are radioactive,

12  creating a potential radiation problem.

13       My question is, which of the two sets of statements,

14  the ones by Grumbly, Dow Chemical, or the one in the Health

15  Physics bulletin do you consider to be the most reliable?

16  A    Well, I agree with Grumbly's statement and the statement

17  you just read.  Let me speak to the Health Physics statement.

18  I think the Health Physics Society was rightly concerned about

19  how these issues are portrayed in the newspapers, at times,

20  where people have made statements that plutonium is the most

21  toxic material known to man.  I agree with the Health Physics

22  Society that those extreme characterizations are incorrect.

23       I tried here to get away from these sort of newspaper

24  characterizations and give you some quantified results, and I

25  did that by showing you the relationship between picocuries of

1   plutonium particulates inhaled and what the scientific

2   calculations would be if you used the EPA recommended guidance

3   and the National Academy of Sciences recommended risk for a

4   given dose.  And so you can make your own judgments.

5           And basically at the microcurie level, if you were to

6   inhale a microcurie, you would -- you would be at a substantial

7   risk of getting cancer.  If you inhaled it at the nanocurie

8   level, your risk would be a thousand times less, and if you

9   inhaled it at a picocurie level, another thousand times less.

10  But I gave you the numbers so you can make your own quantified

11  judgments about this and we stay away from the -- from these

12  newspaper characterizations, some of which are in -- are

13  overstated.

14  Q   You were shown a document on cross which we used on direct

15  which was Plaintiffs' Exhibit 1144.

16          MR. DAVIDOFF:  Your Honor, before I leave,

17  Exhibit 1402 is a Dow document and an ancient document.  May

18  that be received.

19          MR. BERNICK:  No objection.

20          THE COURT:  Received.

21      (Exhibit 1402 admitted.)

22  BY MR. DAVIDOFF:

23  Q   You were shown this document, Plaintiffs' Exhibit 1144, on

24  direct and cross-examination.  You were also asked a lot of

25  questions about how plutonium is essentially an accountability

Page 5628

1  problem, an accounting problem, a bookkeeping problem, MUF.

2  A   Well --

3  Q   I didn't say that well.   You were asked a lot of questions

4  to the effect that MUF is a bookkeeping problem on

5  cross-examination; is that a fair statement?

6          MR. BERNICK:   Object to the characterization.

7          THE COURT:   He was asked, period.

8          THE WITNESS:   We discussed that --

9          THE COURT:   The objection is sustained.   Rephrase the

10  question.   He was asked and he did discuss accountability.

11  BY MR. DAVIDOFF:

12  Q   Could you look at Exhibit 1394, Plaintiffs' Exhibit 1394,

13  which was discussed in your report, it's a U.S. government

14  Albuquerque memorandum from September of 1985, to DOE people --

15  A   Plaintiffs' number which?

16  Q   1394.   I'll put it on the screen?

17  A   I have it.

18  Q   Did you rely on this document in your -- in your report?

19  A   I believe I did.

20  Q   This is from the Albuquerque office of DOE in 1985; is that

21  correct?

22  A   That's correct.

23  Q   Just the first paragraph, I'll call your attention to, It

24  has come to my attention that there may have been times when

25  large fissile material accountability differences have been

Page 5629

1   regarded by operations personnel as solely an accountability

2   problem.  I would like to stress that accountability

3   differences may, and in the case of large differences do,

4   represent a criticality safety and environmental-protection

5   concern.  Please be advised that appropriate contractor, area

6   office, and field office criticality safety and environmental

7   protection personnel must be notified when there is a

8   significant accountability discrepancy.

9   A   I agree with that.

10          MR. DAVIDOFF:  Your Honor, request that be received,

11  that's 1394.

12          MR. BERNICK:  No objection.

13          THE COURT:  It's admitted.

14      (Exhibit 1394 admitted.)

15  BY MR. DAVIDOFF:

16  Q   Now, before we leave the subject of MUF, let's talk about

17  the cleanup, about which you were also asked.

18          The Rocky Flats contractors and DOE acknowledged that

19  there were many pounds of MUF in the ducts and pipes and in

20  buried waste sites.  Is that a fair statement?

21  A   Yes.

22  Q   And perhaps elsewhere in the buildings, besides the ducts

23  and pipes; is that right?

24  A   Yes.

25  Q   Now, in 1996, when you wrote your report, those buildings

Page 5630

1   and those ducts and pipes were all still there; is that right?

2   A   Yes.

3   Q   And then they were torn down between roughly 2002 and 2005;

4   is that a fair statement?

5   A   Yes.  Most of them.  The plutonium, yes.

6   Q   While the MUF, the MUF plutonium was still in the ducts and

7   pipes and the buried waste sites and the buildings, in addition

8   to accidents, could the very act of, quote, deconstructing the

9   industrial buildings have posed a threat, or did it pose a

10  threat of a release of more MUF to the environment?

11        MR. BERNICK:  Objection.  There is no foundation for

12  his having done that analysis whatsoever.

13        MR. DAVIDOFF:  Your Honor, it's a question -- we're

14  not quantifying it.  And it was gone into on cross-examination.

15        THE COURT:  The objection is overruled.

16  BY MR. DAVIDOFF:

17  Q   Go ahead, sir.

18  A   The decontamination of the facility would definitely be a

19  potential source of additional release of plutonium from the

20  site.

21  Q   This morning you said that you had some qualms about the

22  cleanup standards.  Could you tell the jury what those are?

23        That was on cross-examination.

24  A   Well, can I use the -- well --

25  Q   Sure, absolutely.  I'd rather have you write on the board

1   than me, sir.?

2          MR. BERNICK:  We're waiting for Procrustes.

3          THE WITNESS:  My concern is about the cleanup and the

4   standards for cleanup.

5          Once again, the EPA provides -- which is the federal

6   agency responsible for providing guidance to other federal

7   agencies about radiation safety standards, you know, what

8   should be the occupational exposure standards, what should be

9   the cleanup standards and so forth, they start with a risk

10  number which we've talked about earlier, one in a million.

11  This is risk.

12         And they would say -- and they have -- they then

13  present tables where they have done their own calculations,

14  models.  They essentially model from plutonium on and in the

15  soil up to the person, over their lifetime to calculate these

16  risks.  And they would say, at this risk level -- and remember,

17  this is many times more stringent than the risk level we're

18  going to come to -- but at this risk level, they say, okay, we

19  don't think the -- for green field, for anybody, we don't think

20  the plutonium contamination level should exceed .002

21  picocuries.

22  BY MR. DAVIDOFF:

23  Q    You mean .007?

24  A    .0072 picocuries, excuse me.

25         And then for one in 100,000, of course that number is

Page 5632

1    just ten times greater.   0.072 picocuries.

2    Q    Per gram; is that right, sir?

3    A    Per gram.  Excuse me.  So that's this -- these are lifetime

4    risks.

5            Now, for the plant itself, the agreed upon by the

6    three -- by EPA, DOE, and state of Colorado, for the plant site

7    we're going to clean it up to 50 picocuries per gram.

8            Actually, and they said this was associated with --

9    actually, they said the number 116 picocuries per gram was

10   associated with this for a worker in a national wildlife

11   refuge.

12           Now, I want you to focus, just for a moment, on the

13   difference between this number and this number because they're

14   both associated with the same risk to an individual of one in a

15   hundred thousand.  This number is quite a bit larger than this

16   number.  And if I had my computer.

17   Q    Would you like a calculator?

18   A    116 over 0.072 is about sixteen hundred, sixteen hundred

19   times.

20           Now, what is going on here.  It's, clear as day, they

21   can't clean up the site to this level.  They made a judgment,

22   factoring in how much money they want to pay and so forth, that

23   they're only going to clean it up to this level; and in order

24   to clean it up to this level, they got to restrict its use.

25   And because they've got to have in their model that the person

1    that's exposed is only -- is exposed sixteen hundred times less

2    than the person -- the worst case, you know, the farmer who is

3    growing vegetables and so forth.

4           So they've made a -- the U.S. government has made a

5    decision that we're going to clean up to this standard on

6    site -- and actually it's only at the surface.  They ignore

7    this standard when you get down 6 feet below the ground and

8    talk about all the waste.  But even on the surface, this factor

9    of 16, I want to get back to uncertainties, you see the kind of

10   difference, the uncertainty in exposure depending on who you

11   are, what you do, and it's all -- it's all based on computer

12   modeling with the people guessing how the wind behaves and how

13   this stuff is resuspended from the ground and inhaled.

14          I would point out only one other thing.  In these

15   models, when they do these models, they're based on sort of

16   average conditions.  You know, they do the best job they can

17   about what people eat, where they work, how much time they're

18   indoors, how much time they're outdoors, and so forth.  But

19   there are uncertainties that are not in these calculations.

20   Like hot spots.  You may think it's 50 picocuries per gram, or

21   this, but you may measure here, but the distribution is not

22   uniform and that introduces an uncertainty with regard to how

23   well you know the measurement of the -- of the contamination of

24   the soil.  And by and large, those measurements are not known

25   very well in terms of accurately characterizing it.  There are

1    large uncertainties in characterizing that distribution.

2           And the other thing is -- I'll just give you an

3    example in terms of understanding how much you inhale.  If

4    you're in a suburb and you're on a clean street or a sidewalk

5    or roller-blading or whatever, you're not going to inhale much.

6    If you're out there, like I do, on the weekends and have to cut

7    the grass and you're sucking up a lot of stuff off the ground

8    and it's coming right at you out of the back of your lawn

9    mower, you're going to get a lot more.  Those kinds of things

10   are not in these models.  There's not a -- it's not a factor in

11   the EPA modeling about people who do lawn mowing.  I mean, they

12   do attempt to characterize workers and workers who are digging

13   in the soil and so forth.  So there is some attempt.  But there

14   are uncertain -- there are uncertainties, there are conditions

15   that just don't go into these models so that you can get doses

16   and risks above even those associated with the federal

17   guidance.

18          But there are also conservatisms in these models.  I

19   mean, the models try to, in terms of some assumptions, try to

20   make conservative assumptions which would -- would argue in the

21   opposite direction.

22   Q   Can I just clarify something.  This 50 picocuries per gram,

23   that's -- when you say the surface, do you mean the top 3 feet?

24   A   Yes.

25   Q   And then it's a thousand below that?

1   A    Correct.

2   Q    And is there any limit below 6 feet?

3   A    No, not to my knowledge.

4        That's on site.

5   Q    Sir, if you could look at this question that you were asked

6   on cross-examination.  This was about your background.

7   Mr. Bernick -- I'm sorry, counsel said, And is it also -- let

8   me just ask.  You told us that you had your sights set on

9   commercial reactors involving plutonium and those expired and

10  then you set your sights on the weapons plant or the weapons

11  complex.  Do you recall testifying to that effect?

12       Yes, for a very different purpose.

13       And then in the next answer, you said, you are mixing

14  apples and oranges.

15       Could you explain what you meant by that, please, sir?

16  A    Well, my work that I described to you in the '70s up

17  through about 1983, it actually goes on even today, was to

18  prevent the commercial use of plutonium, primarily because of

19  its -- risk associated with its use by terrorists and

20  nonweapons states getting nuclear weapons.  It has nothing to

21  do with the environmental issue.

22       And so my opposition to the commercial use of

23  plutonium is driven by nuclear nonproliferation concerns and

24  the concerns about the -- just a general -- restate it.

25       The inappropriate -- the unauthorized use of plutonium

1 for weapons, both by nonweapons states such as Iran, North

2 Korea, which now has weapons, I think, and also by nonstate

3 threats such as terrorists getting this material.  Has

4 absolutely nothing to do with the environmental implications.

5        I turned to the issue of the weapons plants because of

6 concern about the large number of weapons both in the United

7 States and Russians that were in the arsenals at that time.

8 They're no longer there.  They're not there in these numbers,

9 but in the mid '60s, the United States had over 30,000 nuclear

10 weapons in its arsenal.  And the Soviet Union had even more.

11 There's a great uncertainty in how many they had, but 40- or

12 50,000 nuclear weapons.  By the 1980s, those numbers had come

13 down, but each side still had on the order of 20- to 30,000

14 nuclear weapons.  And that, to me, represented a major risk,

15 and I devoted a decade of my time to trying to get us out of

16 the cold war, initially, by writing books about nuclear

17 weapons.

18        MR. DAVIDOFF:  I think my clock has run out,

19 Dr. Cochran, thank you.

20        Go ahead, Mr. Bernick.

21        MR. BERNICK:  Thank you.

22               RECROSS-EXAMINATION

23 BY MR. BERNICK:

24 Q  I only had three subjects, now I've got three and a half,

25 Dr. Cochran.

Page 5685

1  whether plutonium that is breathed in by humans causes cancer

2  and genetic changes?

3       MR. KURTENBACH:  Object to the form of the question,

4  Your Honor, there's no frame of reference whatsoever in terms

5  of amount or dose or anything else.

6       THE COURT:  Well, that's a matter that can be gone

7  into.  The objection is overruled.

8       THE WITNESS:  Yes, I believe that inhaled plutonium

9  inhaled by humans can cause cancer and genetic defects.

10 BY MS. ROSELLE:

11 Q  And can you tell the jury what the basis of your opinion

12 is.

13 A  My opinion is based on the review of the literature that we

14 did, studies of animals, and studies of cells and studies of

15 people exposed.

16 Q  Okay.  We'll come back to that in more detail.  Let's go on

17 to my next question.  Do you have an opinion whether DOE's role

18 in both producing nuclear weapons and funding the research into

19 the health effects of radioactivity is a conflict of interest?

20 A  I do have an opinion.

21      MR. KURTENBACH:  I object, for the reasons we've set

22 forth in the papers.

23      THE COURT:  Your objection is noted.  The objection is

24 overruled.

25      THE WITNESS:  Yes, I have an opinion.

1    BY MS. ROSELLE:

2    Q    What is your opinion?

3    A    I believe there is a conflict of interest.

4    Q    Okay.  And what is the basis of that opinion?

5    A    The basis of that opinion is the testimony received by the

6    panel I referred to earlier appointed by Admiral Watkins and

7    the opinions of the panel as well as the opinions of the

8    physicians' task force on epidemiologic research in this area

9    and opinions of other researchers and my own experiences

10   working in the field.

11   Q    Based on your education, training, and experience, as well

12   as the work you did in researching the published literature,

13   have you reached an opinion of the influence which the DOE, the

14   AEC, and ERDA have had on epidemiologic research?

15   A    Yes, I have.

16   Q    And what is your opinion?

17   A    My opinion is that because the research has been conducted

18   in a climate of secrecy and a concern over the possibility that

19   members of the public would not support the weapons program and

20   that workers and members of the public might seek compensation

21   or bring lawsuits, that the -- there has been an impact on how

22   epidemiologic research has been done.

23   Q    Okay.  And what do you base that on?

24   A    I base that on the same sorts of evidence that I spoke

25   about before:  The work of the secretarial panel appointed by

Page 5687

1    Admiral Watkins.  Also here the work of the advisory committee

2    on human radiation experimentation is very important, the

3    committee appointed by President Clinton, as well as work of

4    other researchers, including epidemiologists.

5    Q    Okay.  What -- you've talked about this panel appointed by

6    Admiral Watkins, and I believe the name of it is the

7    Secretarial Panel for the Evaluation of Epidemiologic Research

8    Activity; is that correct?

9    A    That's correct.

10   Q    Okay.  And it's known as the SPEERA report?

11   A    Yes.  It's known as the SPEERA report.

12   Q    Okay.  And what exactly was this committee and what's this

13   report?

14   A    Well, the committee was appointed by Admiral Watkins

15   because there had been public concerns expressed as well as

16   concerns of workers and public interest groups about conflicts

17   of interest in the Department of Energy's epidemiology program

18   and instances such as the -- the circumstance that I began to

19   tell you about with Dr. Greg Wilkinson at Los Alamos had come

20   out, and people were beginning to find out about that as well

21   as other cases in which people conducting research that was

22   beginning to find evidence of health impacts of low-level

23   radiation exposure ended up losing their funding or losing

24   their positions.

25            So pressure mounted, and Admiral Watkins ended up

Page 5688

1   appointing this panel comprised primary of academics, I believe

2   there may have been an attorney or two on the panel, to look

3   into the program, to call witnesses.  Dr. Wilkinson testified

4   there.  We reviewed his testimony.  We reviewed the testimony

5   of others.

6          And the SPEERA report, that's S-P-E-E-R-A, this is

7   this panel, they issued a report in 1990.  And one of the major

8   findings of the report was that there's a lack of credibility

9   in the Department of Energy epidemiology program.  And I'd like

10  to -- a quote from that report that we reviewed is, A recurrent

11  theme --

12         MR. KURTENBACH:  Your Honor, could we have some

13  identification of what it is he's reading from.

14         THE COURT:  Yes, you may.  A better foundation for

15  that, please.

16         MS. ROSELLE:  Sure.

17  BY MS. ROSELLE:

18  Q   Dr. Wing, in preparing to testify today, did you go through

19  all of your materials and make some notes?

20  A   I didn't go through all of my materials.  As I mentioned

21  earlier, we had a lot of materials.  But I did go through some

22  of the materials, and I did make some notes, some of which were

23  from this panel's report.

24  Q   Okay.  And did you type those notes, yourself?

25  A   Yes, I did.

Page 5689

1    Q    Okay.  And is that what you're reading from --

2    A    Yes.

3              THE COURT:  Who is it that's talking under the

4    circumstances?  We need to know where it came from, whether

5    it's an admission or not.  I can't tell.

6              MS. ROSELLE:  Oh, okay.

7    BY MS. ROSELLE:

8    Q    The SPEERA report, was that one of the items cited in your

9    report in this case?

10   A    Yes, it was.  We wrote extensively about the report of the

11   secretary's panel.

12   Q    Okay.  This is Secretary of Energy Admiral Watkins' panel?

13   A    That's right.

14   Q    And do you want to share with the jury one of the findings

15   from that report?

16   A    Yes.

17   Q    Okay.  And in order to share it with the jury, did you type

18   it up on a piece of paper so you wouldn't need to bring the

19   whole report?

20   A    I did.

21   Q    Okay.  And is that what you were reading from is your typed

22   notes?

23   A    I was beginning to read from the -- and I can clarify that

24   I did summarize these findings in our report; but I thought it

25   would be best to use the panel's own words just to be clear and

Page 5690

1    as authentic as possible.

2            MR. KURTENBACH:  Your Honor, as an initial matter, can

3    we see a copy of what he's reading from.

4            MS. ROSELLE:  Sure.

5            THE COURT:  Sure.

6            MS. ROSELLE:  No, you go look at it.

7            THE COURT:  He's entitled to bring notes if he needs

8    to.  You can look at it.

9            MR. KURTENBACH:  You can proceed.

10           MS. ROSELLE:  Well, he wants to read from them, so I

11   can't proceed.

12           MR. KURTENBACH:  Oh, there's nothing else but?

13           There's four pages, Counsel.  If we could get a copy

14   at the break, I'd appreciate it.

15           MS. ROSELLE:  Sure.

16           THE WITNESS:  Should I proceed?

17   BY MS. ROSELLE:

18   Q   You may proceed to tell the jury what the SPEERA panel said

19   in their own words.

20   A   They said, A recurrent theme of witnesses at every meeting

21   was a lack of credibility in the Department and its

22   epidemiologic activities.

23           And this is from the executive summary of the report.

24           They went on:  The panel believes that to restore

25   public trust, to assure the highest scientific quality, and to

Page 5691

1   assure the independence of investigators, the Department needs

2   an independent system for managing its analytic epidemiologic

3   research.

4          They furthermore recommended that the Department enter

5   into a memorandum of understanding with the U.S. Department of

6   Health and Human Services to take over the so-called analytic

7   studies, which were the studies to see whether radiation is

8   associated with health problems.

9          And finally, because they felt there was disarray of

10  the information that was collected about worker and

11  environmental exposures as well as the kind of medical concerns

12  related to those exposures, they recommended that there be

13  minimum standards set for the data that would be needed for

14  research on this topic, including the information about

15  radiation exposures, about chemical exposures, and about the

16  medical condition of the populations exposed.

17  Q   And after the SPEERA report was released in 1990, was the

18  task of doing epidemiologic studies and funding these studies

19  moved from the Department of Energy to Health and Human

20  Services?

21  A   Yes, it was.  But I think I need to be specific.  The --

22  the analytic, so-called analytic epidemiology, the studies

23  addressing these questions about, say, effects of low-level

24  radiation, the responsibility for that research was moved to

25  the Department of Health and Human Services, but the funding,

1    fairly easy, but for people who move around, it's a big

2    challenge.  Also, people spend different amounts of time at

3    home.  They spend different amounts of time in different parts

4    of the home.  Often a home has more radon, say, in the basement

5    or the lower floors than in the upper floors.  And those kinds

6    of things are really not well measured, and they tend to lead

7    to misclassification of exposure which in general tends to

8    reduce our ability to detect an effect.

9         And this is important.  And it's why often in

10   environmental epidemiology we're lucky if we can see something

11   because the measurements are often really difficult to make and

12   so going back to the analogy with looking for something, often

13   the lights aren't on.  And it's fairly dark.  It's hard to see

14   things.  So when we do see things, it means that we -- of

15   course, we have to be careful about making -- do we really

16   think that's what we're seeing, but we'd like to have more

17   light, which would be that we could follow people better to get

18   a better idea of their environmental exposures and the

19   outcomes.

20   Q    Okay.  Now I want to turn your attention to studies

21   involving plutonium.

22        What do the studies show about how much plutonium a

23   person needs to inhale or breathe before they can develop

24   cancer from the exposure?

25        MR. KURTENBACH:  I'll object to the form of that

Page 5744

1    question, develop cancer.

2            THE COURT:  Overruled.

3            THE WITNESS:  It's generally assumed that one particle

4    which can -- which emits alpha radiation -- and this would be

5    true for other alpha emitters, but certainly true for

6    plutonium -- that all you have to have is one particle because

7    unlike penetrating radiation where you're looking at the dose

8    often to the whole body because your whole body is being

9    exposed, this is a particle that can be lodged somewhere in the

10   body, and it heavily irradiates that very small, very tiny

11   microscopic area around the particle as the alpha particles are

12   emitted by the -- by this plutonium particle as it undergoes

13   radioactive decay.

14   BY MS. ROSELLE:

15   Q    Okay.  What is pharmacokinetics?

16   A    Pharmacokinetics.

17   Q    I'm sorry.

18   A    Pharmacokinetics, also sometimes biokinetics.

19           This is the study of where, when something's ingested

20   or inhaled, where does it go, where does the substance go in

21   the body.

22   Q    And what do the pharmacokinetics say about what happens to

23   plutonium once it's inside the body?

24   A    Well, there have been quite a few studies of what happens

25   to plutonium when it goes into the body, and there are animal

Page 5748

1   There's some evidence, but it tends not to be as specific as we

2   have for other types of radiation.

3   Q   And why is that?

4   A   Well, as I mentioned before, plutonium hadn't been around

5   that long.  It's not widely used.  It doesn't have applications

6   outside the nuclear industry; whereas other kinds of radiation

7   do.  And so it's really been up to the DOE and its contractors

8   to study plutonium.

9   Q   What medical studies are there that support your opinion

10   that plutonium causes cancer and genetic effects?

11   A   Well, since plutonium isn't used in medicine the way, as I

12   mentionedThoratrast, Thoratrast is used or x-rays are used, as

13   part of medicine, plutonium isn't used for any legitimate

14   medical purpose.  There really aren't these analogous studies

15   of plutonium.  There were people who were injected with

16   plutonium in the 1940s.  And they were followed up to some

17   degree.  There weren't that many.  And these were patients

18   who -- who weren't that well-studied.  So we didn't learn a

19   whole lot from those studies.

20          There are, however, what we call medical follow-up

21   studies of workers who were exposed.  And so if I can kind of

22   mix a little bit the occupational studies with the medical

23   follow-up studies, I'm going to distinguish the medical

24   follow-up studies of workers from epidemiologic studies because

25   these are studies that really don't have adequate sample size

Page 5754

1    studies of human exposures to plutonium, we have to rely -- to

2    understand the potential health effects of plutonium, we have

3    to also rely very importantly on studies of other alpha

4    emitters and studies of ionizing radiation in general,

5    including the sorts of external penetrating radiation that I

6    spoke about earlier, in order to get a good understanding of

7    plutonium health effects.

8    Q    What are the problems with the Department of Energy funding

9    the epidemiologic studies on plutonium?

10   A    Well, I could give a long answer to that question.  I'll

11   try to start out briefly.

12        Basically the Department of Energy and its contractors

13   have had an interest in pursuing the uses of plutonium, and

14   they've got an interest in -- in doing that without having to

15   worry too much about whether workers or the public are

16   affected.  Because it's been in the military --

17        MR. KURTENBACH:  Your Honor, pure speculation here in

18   terms of people's motivations.

19        THE COURT:  I don't know.  At this point -- there's no

20   foundation at this point.  Go ahead.

21        THE WITNESS:  I would mention that my opinion about

22   this is based upon the secretarial panel --

23        MR. KURTENBACH:  I'm sorry, was my objection sustained

24   in seeking further foundation?

25        THE COURT:  No, I said I don't know yet.  I expect the

Page 5755

1    foundation to come out.

2           MR. KURTENBACH:  The witness continued on?

3           THE COURT:  The witness can continue.

4           MR. KURTENBACH:  I have a second objection.  I think

5    Your Honor ruled yesterday, one of my objections, that

6    motivations like this are irrelevant.  I think that's exactly

7    Your Honor's ruling.  It sounds like with the answer of --

8    question and answer, we're getting into exactly that type of

9    area.

10          THE COURT:  I don't think this is motivation.

11   Overruled.  Go ahead.

12   BY MS. ROSELLE:

13   Q    Doctor?

14   A    There has been a culture at DOE, and listening to your

15   discussion of motivation, I think this is really very important

16   that we understand what we're talking about here.

17          I believe that most researchers and medical doctors

18   who have been involved in this kind of work have good

19   motivations.  I don't necessarily say all the time.  But I

20   think in general their motivations are good.  But they worked

21   in a culture that has affected their ability to investigate the

22   health effects of --

23          MR. KURTENBACH:  Your Honor, he's stating some sort of

24   personal opinion here.  We haven't had any further foundation

25   laid for this kind of personal opinion of this gentleman.

Page 5756

1          THE COURT:   The objection is overruled.

2          Go ahead.

3          THE WITNESS:   Several important commissions have

4    clearly stated that the DOE's work has been -- has represented

5    a conflict of interest, that there has been secrecy which is

6    bad for science in this area, and that the conflict of

7    interest -- the conflicts of interest has affected first the

8    kind of information we have to study health effects of

9    plutonium as well as the way other information from

10   epidemiology has been used to -- to -- to represent the health

11   effects of ionizing radiation generally.

12   BY MS. ROSELLE:

13   Q   Are there gaps in our knowledge of medical effects that you

14   listed in your report at page 32?

15   A   Yes.   And again, going back to the Agency for Toxic

16   Substance and Disease Registry, in their summary on plutonium

17   toxicity, they noted a great many gaps.   I'll -- I don't want

18   to list them all, but I'll just give you some examples.

19          They say that no studies were located regarding the

20   gastrointestinal, the cardiovascular, the renal, or dermal

21   effects of plutonium in humans or animals after inhalation

22   exposure.   They say that no studies were located regarding the

23   hematologic effects, those are the blood effects, in humans

24   after inhalation exposure.   They say that no studies were

25   located regarding the hepatic effects, the liver effects, in

1    humans after inhalation exposure.  And they go on, they make

2    quite a list of areas where they couldn't find any evidence and

3    they call it gaps in the literature.

4    Q   Okay.  On page 33 of your report, you list four conclusions

5    about what the evidence shows.  Would you tell the jury what

6    those conclusions are.

7    A   My conclusions are that health effects of plutonium have

8    been insufficiently investigated, despite evidence that it is a

9    serious health threat.

10        That DOE has removed funding from investigators who

11    found evidence of radiation effects.

12        That a climate of research has been created that makes

13    it difficult for critical research to be conducted.

14        And that DOE has been more interested in producing

15    nuclear weapons, promoting nuclear energy, protecting its

16    public image and guarding against litigation than in vigorously

17    pursuing research into radiation health effects in general and

18    plutonium health effects in particular.

19    Q   Why are those conclusions relevant to that case?

20    A   Because --

21        MR. KURTENBACH:  I object to the form of that, Your

22    Honor.

23        THE COURT:  Calls for a legal conclusion.

24        Let's take the break now for 15 minutes.

25        We'll come back.

Page 5783

1    A    Yes.  They represent the attitudes that prevailed at the

2    time and which were under investigation by the President's

3    advisory commission that affected the study of radiation health

4    effects in the DOE system.

5    Q    Okay.  What is the President's Task Force On the Health

6    Risks of Nuclear Weapons Production?

7    A    This was a task force that was appointed by a group called

8    The Physicians for Social Responsibility.  They looked into the

9    epidemiology program at the DOE.  This was in the period around

10   1990.  And it's important because this was an independent

11   group.  This is not a government panel.  But Physicians for

12   Social Responsibility is an independent group.

13   Q    And what did they find?

14   A    They reviewed the epidemiology program, and they found, and

15   I quote, The AEC, DOE epidemiology program is seriously flawed,

16   inadequate in scope and pace of work, underfunded in relation

17   to the studies that are needed, and burdened by an intrinsic

18   conflict of interest.  Further, they found that secrecy has

19   plagued the entire DOE operation and is totally inappropriate

20   in investigations of health and safety.

21          They concluded, in summary, the findings of

22   DOE-sponsored studies offer no firm basis for the repeatedly

23   expressed official position that the health of workers and the

24   public has been fully protected.

25   Q    In conclusion, Dr. Wing, how much trust can we put into

Page 5784

1    information about health risks about plutonium?

2              MR. KURTENBACH:  Object to the form, Your Honor.

3              THE COURT:  Overruled.

4              THE WITNESS:  Well, I think that any information we

5    get on health risks has to be considered in light of where it

6    comes from and what the -- the scientific culture is.  So let

7    me make clear, I would -- I think it's very important that we

8    have scientific research.  Science has some very important

9    strengths and advantages.  But scientists are not immune from

10   social and cultural influence, and this is increasingly true.

11   It's been increasingly a matter of academic inquiry in the last

12   30 to 40 years.

13             And I think here in the case of looking at the health

14   impacts of radiation and exposures from weapons facilities in

15   the United States, that there's clear evidence, which has been

16   uncovered by scientists and government commissions, that there

17   are problems of trust that exist.  They have been recognized.

18   That's why the Department of Energy epidemiology program was

19   moved out of the department, into the Department of Health and

20   Human Services, because there was concern, as many people have

21   put it, that it's a situation like the fox watching the

22   henhouse.  And so I think this really raises serious trust

23   questions.

24             MS. ROSELLE:  Thank you very much.

25             I have nothing further.

Page 6283

1    finally, he relied on several public-opinion surveys, including

2    the Flynn/Slovic survey which he chose, Decision Research, to

3    conduct the Flynn/Slovic survey for this, this research.

4         Stigma.  Properties in the class area near Rocky Flats

5    have been negatively impacted by the defendants' actions at the

6    nuclear weapons plant, and that impact was worsened by

7    disclosures and publicity before and after the 1989 FBI raid.

8    It stigmatized the property nearby to Rocky Flats.

9         I have only a couple, three minutes, so I'm going to

10   just briefly talk about punitive damages.  If you find that

11   Dow's and Rockwell's conduct was dangerous and reckless,

12   without regarding regard to the consequences and without

13   regard -- or without regard to the rights and safety of to the

14   members of the plaintiff class, that's jury instruction 3.27,

15   which we won't look at but is in your book, but that is the

16   instruction on punitive damages.  There are reasons to award

17   punitive damages in this case.

18        The irreparable pollution of water, soil, and

19   environment around Rocky Flats.  The defendants and their

20   indemnitor, the DOE, repeatedly lied to the public.  We saw

21   some of them this morning.  We saw a Dow press release where

22   Dr. Martell, P95, where Dr. Martell was trashed, and we saw

23   some of the ads that they ran in the wake of the FBI raid.  DOE

24   signed the triparty agreement even though they knew at the same

25   time how really bad the site was.  And here's this news release

1    found at the plant.

2         You heard all these documents read today.  How in the

3    world are you supposed to figure them out.  This is 410.  You

4    were very diligent in taking notes.  Look at all those numbers

5    that you saw here.  How in the world -- you're not going to

6    parse all those numbers.  They know that you're not going to

7    parse all the numbers.  They just want you to focus on the

8    headline.  Is that right, is that what the truth is all about?

9         Now, there are a lot of people that will parse those

10   numbers.  What did you think that ChemRisk did, what do you

11   think that RAC did.  They spent hundreds of hours poring

12   through and gathering all of these documents and analyzing,

13   presenting the results to the community, to peer-review groups

14   to make sense of it all.  Why are they doing this.  They know

15   that you'll just react to the numbers.  And they know that

16   you'll react to the headline that says, that says, forget about

17   what the standards are, there's radiation everywhere.

18        Here's another one that you were shown today -- or

19   yesterday.  Miss Roselle did a very nice job reading, as she

20   always does, but the evidence is the evidence.  This is

21   Plaintiffs' 27.  Look at all those columns.  Which one of you

22   was able to make sense of those columns.

23        Then they say, oh, there's ALARA, even though the

24   standards there are -- you can never reach the standards

25   because it's got to be as low as reasonably achievable.  Then

Page 6294

1    it turns out that ALARA even didn't become a formal standard

2    until the 1970s.  Before then, it was a policy.  And what does

3    ALARA say, as low as reasonably achievable.  What happens if

4    the contract that you signed says that the facility, the plant,

5    the equipment, the process, the patents, are all owned by the

6    federal government.  If you want to do anything, if you want to

7    spend more than $25,000, you need written advance approval from

8    the government.  And the government decides they don't want to

9    pay for a concrete cap over the top of the 903 pad, an asphalt

10   pad will do, that the government doesn't want to pay for a

11   ventilated structure to house the barrels in the meantime.

12   What does reasonably achievable mean if the government is

13   calling the shots, which they are supposed to do and must do

14   because they're running this show, what does it mean to say --

15   this contract said follow the standards.

16          We followed the standards.

17          Here's another one.  Dow did nothing after the 1970 --

18   1957 fire.  Remember that.  That was Budnitz, Dr. Budnitz,

19   never at a loss for words.  Just turns out he wasn't aware, he

20   hadn't read the entirety of the fire report in '69, hadn't read

21   any of the appraisals that said we were doing a good job.

22          We still get this stuff today.  This is Plaintiffs'

23   19, which was read in part.  This was all about fire

24   prevention, 1955.  What about issues in the '57 fire, should

25   you use water.  One of the big issues with the '69 fire is

Page 6295

1    should you have installed a sprinkler system.  Should you have

2    installed that before '69.  There's a big problem with water,

3    though.  Water and burning plutonium don't mix so well, and

4    that was known.  In fact, if the back side of the sheet had

5    been read, it says, Very little is known about what you should

6    use to put out a fire, but a lot is known about what you should

7    not use.  And guess what's first on the list.  Water.  Why.

8    Can you imagine fighting a fire where the sprinklers are going

9    and if it happens that too much plutonium is pushed together by

10   those sprinkler heads, you're gone?  Pretty serious business.

11   Pretty serious business for people to come in after the fact

12   and say, oh, what's wrong, just get in there and pump the water

13   in.

14        Rocky Flats turned into a waste dump.  That was

15   another headline.  Subtext was interesting.  To what extent,

16   why and how were there waste at Rocky Flats.

17        First, it's very clear that Rocky Flats generated

18   enormous quantities of waste.  Their own witness put on

19   evidence to the effect that 1.3 million pounds of waste is

20   generated.  It's probably every day or maybe every month,

21   whatever it is, it's a huge amount of waste.  There's no

22   question that boxcars of waste were shipped off site.  So what

23   stayed on the site was, what?  What stayed on the site is what

24   could not be shipped off because it wouldn't be accepted in

25   Idaho, it wouldn't be accepted in Nevada or the AEC or DOE

1  think your verdict should be, nor do I want you to guess or

2  speculate about my views of what verdict you should render.

3  You will decide what the facts are from the evidence that the

4  parties will present to you during the trial.

5        That evidence will consist of the sworn testimony of

6  witnesses on both direct and cross-examination, regardless of

7  who called the witness, documents and other things received

8  into evidence as exhibits and any facts on which the lawyers

9  agree or which I may instruct you to accept as true.

10        The following things are not evidence, and you must

11  not consider them as evidence in deciding the facts of this

12  case:

13        1.  Statements and arguments by lawyers are not

14  evidence.  The lawyers are not witnesses.  What they say in

15  their opening statements, their closing arguments and at other

16  times is intended to help you interpret the evidence, but it is

17  not evidence, period.  If the facts, as you remember them,

18  differ from the way the lawyers have stated them, your memory

19  of the facts controls.

20        2.  Questions and objections by the lawyers are not

21  evidence.  Lawyers have a duty to their clients to object when

22  they believe a question is improper under the rules of

23  evidence.  You should not be influenced by the objection or by

24  my ruling on it.

25        Testimony that has been excluded or stricken or that

1    material.

2            And so although the methods to measure plutonium

3    existed, they didn't exist in -- in those early years, they did

4    not exist until toward the mid to late '60s, 1960s for

5    measurement of these levels in soil down in the picocurie

6    range.  They just didn't exist.

7    BY MR. KURTENBACH:

8    Q.  Okay.  So when Dr. Budnitz told us that back in the early

9    1950s they could measure plutonium down at the microcurie

10   level, would that have been sufficient to pick up any plutonium

11   concentrations in the plutonium -- in the soil off-site the

12   Rocky Flats plant?

13   A.  Not at all.

14   Q.  And in fact, those concentrations which we've heard about,

15   which are actually lower than the picocurie per gram level, but

16   what's the relationship between the amount there and what could

17   be measured back in the early 1950s?

18   A.  About a million times lower.  And in fact, the early

19   measurements that they made of soil were for total long-lived

20   alpha in the soil which included the natural alpha emitters,

21   uranium and thorium and radium and some other natural alpha

22   emitters.

23   Q.  Now did the ICRP or the NCRP, do they have recommendations

24   for the amount of plutonium in soil?

25   A.  There are no standards that they've generated for -- issued

1    for -- or recommended for plutonium in soil.

2    Q.  I should have limited it.  I meant to limit my question to

3    the time that Dow and Rockwell were operating the plant.  Is

4    your answer the same for that time period?

5    A.  Yes, no standards for plutonium in soil.

6    Q.  How about the DOE?  Did it come up with a standard for

7    plutonium in soil during that time period?

8    A.  Not during that time frame to the best of my knowledge.

9    Q.  Okay.  Is there a reason why those organizations don't have

10   a plutonium in soil like they do a plutonium in air and

11   plutonium in water standard or recommendation?

12         MR. SORENSEN:  Objection, your Honor, goes beyond the

13   scope of the report.

14         THE COURT:  It's rebuttal.  Overruled.

15   A.  Well, yes.  The -- there's no direct pathway really from

16   plutonium in soil of any consequence whatsoever.  The pathways

17   of plutonium exposure will be from the air if you breathe it or

18   from water if you drink it.

19   BY MR. KURTENBACH:

20   Q.  Fair enough.  Now we've heard testimony in the trial

21   that -- I think it was, again, from Dr. Budnitz that back prior

22   to 1970 all that was being measured in the air by the folks at

23   the plant was total long-lived alpha, and there was some

24   suggestion that the total long-lived alpha did not provide an

25   adequate evaluation of the potential hazards regarding

1    about?

2    A.   That's correct, that's not my area of expertise.

3    Q.   The same is true of the Safe Drinking Water Act?

4    A.   That's true, I did not.

5    Q.   And the same is true of executive order 12088 signed by

6    Jimmy Carter, correct?  Do you know what that is?

7    A.   I read it a long time ago, but I don't remember it.

8    Q.   Okay.  So you offered no opinion about it, correct?

9    A.   No, I'm not sure what it is.  You didn't ask me about it in

10   my deposition last week, and I don't recall what it is.

11   Q.   Okay.  Fair enough.

12            You testified at your deposition here today that there

13   were no federal standards for plutonium in soil, correct?

14   A.   That's correct.

15   Q.   Okay.  Now let's go to the standards that you discussed in

16   your direct testimony.  Could you please turn to Exhibit P1563.

17   You'll find it in volume 3 of the exhibits in front of you.

18   A.   63 or 1563?

19   Q.   1563 in volume 3.

20   A.   Yes, I have it.

21   Q.   Are you there?

22   A.   Yes.

23   Q.   Okay.  Now this is a January 3rd, 1951, letter from the

24   Atomic Energy Commission to the General Electric Company of

25   Hanford, correct?

1    A.  Yes.

2    Q.  And this is one of the documents you cite, rely on in

3    forming your opinions about standards, correct?

4    A.  Yes.

5           MR. SORENSEN:  Your Honor, I move the admission of

6    P1563.

7           MR. KURTENBACH:  I'm not sure what the grounds for

8    that would be.  This is a plant document.  It's not admissible

9    through this witness.  If he wants to confront the witness with

10   it, it would be fine, but --

11          THE COURT:  All right.

12          MR. SORENSEN:  Well, your Honor, he cited it.  He just

13   testified he relied on it.  It's an ancient document, AEC

14   document --

15          THE COURT:  You may examine him on it.

16          MR. SORENSEN:  Can I show it to the jury?

17          THE COURT:  Yes.

18   BY MR. SORENSEN:

19   Q.  Do you see the date, it's in front of you on the screen,

20   also in the book, January 3rd, 1951?  Do you see that?

21   A.  Yes.

22   Q.  Okay.  Now the first paragraph states, "The attached

23   statements prepared by the division of biology and medicine,

24   AEC Washington office, specify the maximum permissible levels

25   of external radiation and the maximum permissible

Page 7595

1   connection with your work in this case, correct?

2   A.   Yes.

3   Q.   Okay.   If you could turn to page 11, please.

4   A.   Yes.

5   Q.   It states toward the bottom of the page, "Because of the

6   many uncertainties involved, this community recommends that

7   every effort be made to keep the concentrations of

8   radioisotopes in air and water and in the body to a minimum.

9   The goal should be no radioactive contamination of air and

10  water and of the body if it can be accomplished with reasonable

11  effort and expense."   That, again, is the ALARA concept?

12  A.   It's a statement of the ALARA principle, no quantitative

13  levels, but it's certainly a worthy goal.

14  Q.   And part of the ALARA principle is founded on the fact that

15  back then and continuing today a lot is unknown about the

16  health effects of plutonium and other radionuclides, correct?

17  A.   A tremendous amount.   More is known today than back then.

18  Q.   But that's part of what underlies the ALARA concept and

19  principle, correct?

20  A.   Part of it is because it is still uncertain, yes.

21  Q.   Okay.   Let's look at page 3 of the same document.   You

22  there, sir?

23  A.   Yes.

24  Q.   The heading is "Radioisotopes More Hazardous Inside The

25  Body Than Outside."

Page 7602

1  and it's one of the documents you reviewed and relied upon in

2  connection with your work in this case, correct?

3  A.  Yes, it is.

4  Q.  AEC.  I'm sorry, the date, August 12, 1963.  And this

5  states, sir, in Section 012, "AEC operations shall be conducted

6  in such manner as to assure that radiation exposures to

7  individuals and population groups are limited to the lowest

8  practical levels."  See that?

9  A.  Yes, practical levels.

10  Q.  Again, it's the ALAP or predecessor to ALARA, correct?

11  A.  That's correct.

12  Q.  Now I believe you testified at your deposition about this

13  document we have been talking about, you take the on-site

14  levels and divide by a third to get an off-site number.  Do you

15  recall that?

16  A.  No.

17  Q.  Okay.

18  A.  You take the off-site number and divide it by three.

19  Q.  The off-site number and divide it by three.

20  A.  Right.

21  Q.  Thank you.  Now could you turn to page 4 of this document?

22  Are you there, sir?

23  A.  Yes.

24  Q.  Okay.

25  A.  The number page 4?

Page 7603

1   Q.  Yes, at the bottom of the page.  Are you there?

2   A.  Yes.

3   Q.  And under C it states, "The average exposure of a suitable

4   sample of an exposed population group is not in excess of

5   one-third," and that refers to the standard.  Is that what

6   we're talking about?

7   A.  Yes, the annex 1 table II standards are for off-site

8   individuals already as though they're there 24 hours a day

9   seven days a week.

10  Q.  But this document nowhere explains what a, quote, suitable

11  sample of an exposed population means, does it?

12  A.  No.

13  Q.  So it doesn't say whether it includes or doesn't include

14  children, the elderly, sickly or anyone else for that matter,

15  correct?

16  A.  No, it just says suitable sample.

17  Q.  If you could turn to Exhibit P1571, please.

18  A.  Yes.

19  Q.  This is a DOE order dated August 13, 1971, that you cited

20  and reviewed in connection with your work in this case,

21  correct?

22  A.  Yes, I think the order initially came out in May 5th of

23  1980.  But this change is effective August 13th, 1981.

24  Q.  Okay.  Just to show the jury, DOE, and the date, order, and

25  this is going to be a little hard to find, because these pages

1   to just now, this one supersedes it.

2   Q.   Okay.   This is an August 13, '81, order, Department of

3   Energy.   And if you turn to page XI-5, about midway through the

4   document, are you there?

5   A.   Looks like a copy of the previous page.

6   Q.   Well, it states, "In keeping with the Department of Energy

7   policy on lowest practicable exposures, exposures to the public

8   shall be limited to as small a fraction of respective annual

9   dose limits as is reasonably achievable."  Again, that's the

10  ALARA principle, correct?

11  A.   Yes, that refers, as the previous one did, to the external

12  radiation dose limits noted above.

13  Q.   If you could turn to Exhibit P1573, please.

14  A.   Yes.

15  Q.   Are you there?

16  A.   Yes.

17  Q.   Now in your direct testimony you testified about changing

18  numbers and the numerical standards, and at some point it

19  changed, I believe you said, from .33 picocuries per liter to

20  .04.  Do you recall that?

21  A.   Yes, approximately .04.

22  Q.   Now the .04 is the number you calculated, correct?

23  A.   Yes, based on this -- based upon this memorandum and

24  directive.

25  Q.   Based on Exhibit P1573?

1   A.   Yes.   Using the methodology they describe.

2   Q.   I see.   Let me show the jury.   P1573 is a DOE memo dated

3   August 1985 that talks about a dose or exposure of 100

4   millirem, correct?

5   A.   That's part of it, yes.

6   Q.   That's part of it?

7   A.   Right.

8   Q.   And then you use that to then calculate the .04 number you

9   testified about; is that correct?

10  A.   As they instructed on the second page.

11  Q.   All I'm trying to make clear is that the .04 number does

12  not appear in this document; it's a number you calculated is

13  all I am trying to establish?

14  A.   That is exactly correct, yes.

15  Q.   Okay.   That takes us to about 1989, and I believe you

16  testified at your deposition last week that the polonium air

17  standard after 1989, and you mentioned it a bit in your direct,

18  changed again, and you testified again from .04 to .002.   Do

19  you recall that testimony?

20  A.   Yes.   In the deposition, yes.

21  Q.   Okay.   Well, we prepared a chart based on your testimony.

22          MR. SORENSEN:   Can we show G1003, please.

23          MR. KURTENBACH:   What's the number?

24          MR. SORENSEN:   G1003.

25  BY MR. SORENSEN:

1    that time span?

2    A.   Yes.   All of these are for soluble plutonium.

3    Q.   Okay.   So it has gone down by a factor of 50; is that

4    correct?

5    A.   Yes.

6    Q.   Okay.   Now I have a question mark under the "current."   Do

7    you know what the current standard is?

8    A.   I don't think it's changed.   I don't know of any that would

9    have changed it since '89.

10   Q.   Okay.   Well, I believe you testified that you calculated

11   the .04 air number from a hundred millirem dose number,

12   correct?

13   A.   Right.

14   Q.   Okay.   And then you said, I believe at your deposition,

15   that the reason the .04 has dropped for air down to .002 is

16   that the air pathway dose dropped from 100 millirem down to 10,

17   and then you said --

18   A.   Yes, but the -- the regulation implementing the Clean Air

19   Act air for plutonium used an older calculation model.   If you

20   just went down a factor of ten, you would go from .04 to .004,

21   but they used an older dose model, and that's how they got the

22   002.   And that's going from a hundred down to a ten, that would

23   be a ten.

24        But the actual -- in the regulations, they list the

25   plutonium as .002 for air.

Page 7644

1   more restrictive ones.  I don't know.

2   Q.   Okay.  Now I believe you testified on direct about pathways

3   of exposure in connection with your testimony that there were

4   no federal standards for plutonium soil.

5   A.   Right.

6   Q.   Do you recall that?

7   A.   Yes.

8   Q.   Have you heard of the term re-suspension?

9   A.   Yes.

10  Q.   What is re-suspension?

11  A.   It's an indirect pathway of exposure to soil, or material,

12  dust and soil, whereby the material is re-suspended in the air.

13  The air then becomes the pathway when you breathe the air.  So

14  it's an indirect pathway.

15  Q.   But it's a pathway by which plutonium and soil can get into

16  human lungs, correct?

17  A.   That's correct.  My testimony was for a direct pathway.

18  This is an indirect pathway.  Re-suspension typical numbers are

19  like one part in a million.  It's a very low fraction of that.

20  Of course, high winds can cause you to have greater amounts.

21  Q.   I see.  You personally performed no analysis of the amount

22  of plutonium or other substances, radioactive or otherwise,

23  that have escaped from Rocky Flats, correct?  You have

24  performed no such analysis?

25  A.   No, I relied on the RAC very complete determination of

Page 7645

1   that.

2   Q.  And you performed no analysis of your own, correct, of the

3   dose for exposure suffered by any person off-site of Rocky

4   Flats, correct?

5   A.  No, the RAC performed the dose calculations from the years

6   of operation, yes.  I did not do --

7   Q.  And, again, you performed no risk estimate or calculation

8   of your own having to do with the risks to the off-site

9   population near Rocky Flats arising from exposures to plutonium

10  and other substances from Rocky Flats, correct?

11  A.  I did not, that's correct.

12          MR. SORENSEN:  Your Honor, if I may just confer?

13          THE COURT:  Yes.

14          MR. SORENSEN:  Your Honor, I would just like to offer

15  the exhibits, other than demonstratives, shown the witness, the

16  DOE documents.  Can they be admitted at this time?

17          THE COURTROOM DEPUTY:  Exhibit numbers, please.

18          MR. SORENSEN:  I can go through them.  I'll go through

19  them.

20          MR. KURTENBACH:  I thought we handled this document by

21  document as we were going through the examination.

22          THE COURT:  If he hasn't offered them he wants to now,

23  so let's get it done.

24          MR. SORENSEN:  Correct.  That would be document 1563,

25  P1563, AEC letter; P1568 --

1          THE COURT:  Wait a minute.  Let him read that.  Do you

2     have an objection to that?

3          MR. KURTENBACH:  I do.  I mean, he confronted the

4     witness, which is I think the appropriate use of the document,

5     but to have the document admitted I don't think is appropriate.

6          THE COURT:  The objection is sustained.  Next.

7          MR. SORENSEN:  P1568, AEC manual chapter.

8          MR. KURTENBACH:  Same.  Same objection.

9          THE COURT:  Sustained.

10         MR. SORENSEN:  The documents he relied upon --

11         THE COURT:  You examined him on it, but the document

12    itself doesn't come in under the rule.  It's fine if you

13    examine him on it.

14         MR. SORENSEN:  Just for the record, I'll finish up,

15    P1569, also an AEC manual, I assume your ruling would be the

16    same.

17         MR. KURTENBACH:  Same objection.

18         THE COURT:  Yes.

19         MR. SORENSEN:  P1570, the same type of document.

20         MR. KURTENBACH:  Same.

21         THE COURT:  Same ruling, sustained.

22         MR. SORENSEN:  P1571, DOE order, same type of

23    document.

24         MR. KURTENBACH:  Same objection.

25         THE COURT:  Sustained.

Page 7647

1          MR. SORENSEN:  P1572 and P1573, same types of

2     documents.

3          THE COURT:  Sustained.

4          MR. SORENSEN:  And then the AEC letter, P1197, I was

5     just examining him on.

6          MR. KURTENBACH:  Same objection, your Honor.

7          MR. SORENSEN:  This is the AEC 1950 letter.

8          THE COURT:  Overruled.  That's an ancient document.

9     It can come in on its own.  Go ahead.

10          MR. SORENSEN:  Well, your Honor, I believe some of the

11     others were also qualified as ancient documents.

12          THE COURT:  They weren't offered for that.  I can't

13     tell.  They can't come in under the rule on expert witnesses he

14     was examined on.  That's what you offered -- the letter that

15     was from the AEC to Dr. Morgan is an ancient document.

16          MR. SORENSEN:  I see.  Then, your Honor, I would like

17     to --

18          MR. KURTENBACH:  I don't know this particular -- there

19     is an authentication requirement for ancient documents.

20          THE COURT:  Yeah.  He identified it.

21          MR. SORENSEN:  I'm sorry, your Honor, then my mistake,

22     I would like to reoffer -- I will start again, P1563, 1951,

23     ancient document.

24          MR. KURTENBACH:  Are we back in the first book now?

25          THE COURT:  Yeah.

1          MR. SORENSEN:  Volume 3.

2          MR. KURTENBACH:  I have the same objection, your

3     Honor.  I don't think the proper foundation has been laid for

4     all these documents.

5          THE COURT:  If he identified -- did he identify this

6     one?  I can't recall.

7          MR. SORENSEN:  Yes, he did as documents that he cited

8     and relied upon.

9          THE COURT:  He testified a couple of them he hadn't

10    seen before, and those are not going to come in under this

11    rule, but this one does.

12         MR. SORENSEN:  So 1563 is received?

13         THE COURT:  Right.

14         MR. SORENSEN:  And P1568, this is a 1954 ancient

15    document.

16         THE COURT:  All right, it's admitted.

17         MR. SORENSEN:  So 1568 is received.

18         MR. DAVIDOFF:  1564 is received.

19         MR. SORENSEN:  And P1569, this is a 1957 AEC document.

20         THE COURT:  I don't recall.  Does --

21         MR. SORENSEN:  He did, yes.

22         THE COURT:  Okay.  Then it's admitted.

23         MR. SORENSEN:  So 1569 is received.

24         Then P1570, an AEC 1963 document.

25         MR. KURTENBACH:  That's fine, your Honor.

Page 7751

1    contractor shall not make any material change in the system

2    without the approval of the contracting officer.  The property

3    management activities of the contractor under this contract

4    shall be subject to the inspection and audit by the commission

5    at all reasonable times."

6            Where it says the contractor shall not make any

7    material change in the system, that is the system of property

8    management, without approval of the contracting officer, is

9    that consistent or inconsistent with your own experience in

10   dealing with the prospect of Rockwell spending its own money?

11   A.   This is very consistent.  DOE owned that site.

12   Q.   Now we've seen from photographs that there were some number

13   of these pondcrete cardboard, you know, packaged, palleted,

14   lined, whatever, containers that were out there.  We've seen

15   some pictures showing that they deteriorated.  In fact, was

16   there deterioration of some of those containers?

17   A.   Oh, there certainly was.

18   Q.   Was it a significant number of them?

19   A.   Very significant number.  Once we went through the first

20   winter out there -- you folks who live here understand what

21   these winters are like, particularly when you get high winds

22   ripping the tarps off, water saturating the cardboard, snow

23   sitting on top of it, it degrades the cardboard very rapidly.

24   Q.   Okay.  There was also some pictures showing that not only

25   was the cardboard deteriorated, but some of the pondcrete had

1    you see that now, kind of?

2    A.   Yes, I can see it.

3    Q.   You had the 903 pad, and you had pondcrete.  And she said,

4    yes or no, are these things true; that is, the 903 pad, yes or

5    no, was it stored on the ground.  And you said yes, correct?

6    A.   Yes, I said that.

7    Q.   Now this all goes back years before you were there, right?

8    A.   Yes.

9    Q.   But as you understood it, it was stored on the ground,

10   there were leaky drums, there was no cover, there was no

11   containment, it was temporary, corroding from inside out.  Do

12   you recall that?

13   A.   Yes, I do.

14   Q.   I can't ask you yes or no, because that would be leading,

15   but I'll ask you whether or not, whether or not Dow could ship

16   those drums off-site?  Was Dow permitted to ship those drums

17   off-site?

18            MS. ROSELLE:  Objection, foundation.

19            THE COURT:  Overruled.

20   A.   My understanding is that Dow couldn't ship those drums.

21   BY MR. BERNICK:

22   Q.   I'm sorry?

23   A.   Could not ship those drums.

24   Q.   Another question:  Do you know whether or not Dow requested

25   that after the drums were removed and before the big winds came

1   that winter, whether Dow requested funding for an asphalt pad?

2   Do you know whether they did?

3   A.  Sir, I don't.  I do not know.

4   Q.  Do you know whether or not the DOE would approve money for

5   the cover that Dow asked for during that winter?

6           MS. ROSELLE:  Objection, foundation.

7           THE COURT:  Overruled.

8   BY MR. BERNICK:

9   Q.  Do you know?

10  A.  No, I don't.

11  Q.  Do you know whether or not Dow monitored the air right

12  off-site the 903 area during this period of time to make sure

13  there wasn't a problem?

14  A.  My understanding was they did.

15  Q.  Do you know whether or not the air concentration standards

16  that were then in place were, in fact, met during the entire

17  period of time that we're talking about here, '58 to '69?  Do

18  you know whether or not --

19  A.  My understanding was that the standards were met.

20  Q.  Fast forward to pondcrete, 1986 to 1989.

21          A little bit more knowledgeable about that period of

22  time?

23  A.  Unfortunately, yes.

24  Q.  We'll see.  You've got to be careful.

25          Could you ship that pondcrete off-site after the

Page 8082

1    compliance agreement went into place?

2    A.   Within a few months, no, we could not.

3    Q.   Did you ask for a facility to cover that area?

4    A.   Yes, we did.

5    Q.   For two years was that request approved?

6    A.   No, it was not.  I think it was closer to three.

7    Q.   Were there or were there not monitoring data gathered to

8    assure that there wasn't a problem of contamination spreading?

9    A.   Yes, there was.

10   Q.   Tell us whether or not at any point in time the air

11   concentration standards were violated?

12   A.   I can't ever remember seeing data that said they were

13   violated.

14   Q.   Okay.  Now you were shown a bunch of things after the --

15   well, we'll just go through them, and I'm really trying to get

16   through this, and we're getting close.  Okay?

17           You were shown all these Tiger team findings.  Do you

18   recall that?

19   A.   Yes, I do.

20   Q.   The jury heard from a Mr. Ozaki from Broomfield who talked

21   about a situation where the DOE was saying one thing and the

22   EPA was saying another in 1989.  I just say that by way of

23   doing a transition.

24           We then heard from Dr. Budnitz about what the DOE

25   appraisals were saying as opposed to what other people were

Page 8291

1    series of questions and responses.  I want to show you some

2    commentary that's been offered with respect to your testimony

3    or with respect to RAC and its work from other witnesses in the

4    case.  And I want to show you Exhibit DX1851, which quotes from

5    Dr. Selbin's testimony concerning 35 picocuries.

6              MR. BERNICK:  Any objection?

7              MS. ROSELLE:  No, your Honor.

8    BY MR. BERNICK:

9    Q.  Dr. Selbin testified --

10             MR. BERNICK:  We would offer DX1851, your Honor.

11             THE COURT:  It's admitted.

12   BY MR. BERNICK:

13   Q.  He testified, "Question:  Now when this was presented to

14   the SALOP," that's supposed to be the "RSALOP panel and DOE and

15   EPA, was there any depth limit on the 35 picocuries per gram

16   recommendation?"

17             And he said:  "No, there was not."

18             "No depth limit at all?"

19             "No."

20             In other words, Dr. Selbin says that when the RSALOP

21   recommendation was presented to the DOE, the idea was that 35

22   picocuries would be used not just for the top layers, but all

23   the way down; is that correct?

24   A.  No, it isn't.  Our soil depth was 20 centimeters, and we

25   had a lot of discussion with the panel about an appropriate

1        THE COURT:  No, it's not a question, and the jury

2   knows that statements of counsel are not evidence.

3        Go ahead.

4        MR. BERNICK:  Okay.

5   BY MR. BERNICK:

6   Q.  Do you have my question in mind, Dr. Till?

7   A.  If you don't mind repeating the question.

8   Q.  I'll repeat it again.  I knew I was going to get into

9   trouble.

10        Tell us in your own words what it is that RAC

11   concluded about whether the MUF information would be useful in

12   estimating exposures to people who were living off-site.

13   A.  Well, this was a matter of tremendous interest, not only to

14   citizens, but the Health Advisory Panel, and us as scientists

15   as well, but we took a very careful look at this issue.

16        Mr. Voilleque went in to look at -- focusing on the

17   1957 fire, just to see if this is a viable approach that you

18   could use as a scientist to estimate a source term.

19        What we concluded was you couldn't.  You just couldn't

20   do it.  And the reason was that the uncertainties were so big

21   in what you didn't know, in particular in the area of -- on

22   this graphic, waste, because the information is just not

23   available, just not good enough to do a mass difference type

24   approach to estimate a source term.

25   Q.  Given the environmental data that's available and given the

Page 9019

1   testimony.

2        THE COURT:  The arguments of counsel are not evidence,

3   nor are the statements of counsel.  But I think he's trying to

4   provide a background to get to the question so the witness

5   understands the question he is asking.

6        The objection is overruled.

7        MR. BERNICK:  Thank you, Your Honor.

8   BY MR. BERNICK:

9   Q   Are you familiar with the basic concept of using analogous

10  case studies to measure impact?

11  A   Yes, I am.

12  Q   Did you find that to be a productive or useful approach in

13  looking at the question of whether Rocky Flats had impacted

14  property values in this case?

15  A   No, I don't find that to be a productive approach.

16  Q   Why is that?

17  A   Well, because you have data from this area itself.  That

18  will allow you to investigate what's happened in this

19  particular area.  There's no reason to use analogous case

20  studies, even if you believe they are analogous.  And that's --

21  that's a difficult case to make for any particular study.  But

22  at the end of the day, you really don't have to look for

23  analogous situations whether or not you think that they apply

24  to the situation here because you have a wealth of data on

25  what's happened to property transactions within this area that

Page 10570

1    be substantial.  The risk does not have to be substantial.

2    Some increased risk.

3            But that is not the only way.  The other way is by

4    causing objective conditions that pose a demonstrable risk of

5    future harm to the class area.  And then you are referred to

6    some other instructions.  One or the other or both is enough to

7    show substantial interference.

8            If there is a demonstrable risk of future harm to the

9    class area as of the time when you find that the nuisance was

10   complete and comparatively enduring, you don't even have to

11   prove health risk.

12           But I want to talk about health risk because it's

13   important.  Dr. Till, the first point, it isn't the added risk

14   that has to be substantial; it's the interference that has to

15   be substantial.

16           The second point, Dr. Till's $6 million DOE funded

17   study says the risk -- it says the risk is increased for all

18   class members.  It specifically says that.  Dr. Till and

19   Dr. Clapp disagree on the degree of the risk, but there is no

20   disagreement that there is some increased risk for all class

21   members.  Dr. Till says that in the RAC reports.  He minimizes

22   it.  Dr. Clapp disagrees.

23           Third point, all of this money for Dr. Till came from

24   DOE, the $6 million at Rocky Flats, and we don't know how much

25   because there is no record of it, the seven other DOE sites