# EXHIBIT 4

**Nos. 08-1224, 08-1226, 08-1239**

# United States Court of Appeals
# for the Tenth Circuit

MERILYN COOK; WILLIAM SCHIERKOLK, JR.; DELORES SCHIERKOLK; RICHARD BARTLETT; LORREN BABB; GERTRUDE BABB; MICHAEL DEAN RICE; BANK WESTERN; THOMAS L. DEIMER; RHONDA J. DEIMER; STEPHEN SANDOVAL; PEGGY J. SANDOVAL; SALLY BARTLETT,

*Plaintiffs-Appellees-Cross-Appellants,*

v.

ROCKWELL INTERNATIONAL CORPORATION AND THE DOW CHEMICAL COMPANY,

*Defendants-Appellants-Cross-Appellees.*

On Appeal from the United States District Court
for the District of Colorado (Kane, J.)
Case No. 1:90-cv-00181-JLK

## OPENING BRIEF
## OF DEFENDANTS-APPELLANTS-CROSS-APPELLEES

David M. Bernick, P.C.                  Christopher Landau, P.C.
Douglas J. Kurtenbach, P.C.             John K. Crisham
Steven C. Seeger                        Philippa Scarlett
KIRKLAND & ELLIS LLP                    KIRKLAND & ELLIS LLP
200 East Randolph Drive                 655 Fifteenth Street, N.W.
Chicago, IL  60601                      Washington, DC  20005
(312) 861-2000                          (202) 879-5000

*Counsel for Defendants-Appellants-Cross-Appellees*

**ORAL ARGUMENT REQUESTED**

March 9, 2009

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, I hereby certify as follows:

1.     Defendant-appellant-cross-appellee Rockwell International Corporation merged with Boeing NA, Inc., was renamed Boeing North American, Inc., and then merged into The Boeing Company.  State Street Bank & Trust Company beneficially owns 10% or more of The Boeing Company's stock.

2.     Defendant-appellant-cross-appellee The Dow Chemical Company has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

                                         _/s/_____

                                       Christopher Landau, P.C.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC   20005
(202) 879-5000
*clandau@kirkland.com*

# TABLE OF CONTENTS

Page

STATEMENT OF RELATED APPEALS ............................................. xviii

INTRODUCTION ..................................................................... 1

STATEMENT OF JURISDICTION ............................................... 2

STATEMENT OF THE ISSUES ................................................. 5

STATEMENT OF THE CASE AND THE FACTS ................................... 6

    A.    The Rocky Flats Facility .......................................... 6

    B.    This Lawsuit ................................................... 8

SUMMARY OF ARGUMENT ................................................... 15

STANDARDS OF REVIEW ..................................................... 20

ARGUMENT ....................................................................... 22

I.    The District Court Erred By Holding That Federal Nuclear Safety Standards Do Not Provide The Standard Of Care For PAA Claims And Thereby Allowing Plaintiffs To Recover Under The PAA Without Proving Any Violation Of Those Standards ........................................................... 22

II.    The District Court Erred By Allowing Plaintiffs To Recover Under The PAA Based On Colorado Nuisance Law Without Proving Any Present Physical Injury Or Damage To Person Or Property, Or Loss Of Use Of Property. ......................... 38

    A.    The PAA Does Not Allow Recovery Based Solely On A Risk Of Injury .................................................. 44

        1.    A Present Risk Alone Cannot Give Rise To A PAA Claim. ....................................................... 44

        2.    A Future Risk Alone Cannot Give Rise To A PAA Claim. ....................................................... 46

B.      The District Court Erred In Its Interpretation And Application Of Colorado Nuisance Law. ............................... 48

        1.      A Scientifically Unfounded Risk Cannot Give Rise To Nuisance Liability. .......................................... 49

        2.      A Risk Of *Future* Injury Cannot Give Rise To Nuisance Liability........................................................59

III.    The District Court Erred By Allowing Plaintiffs To Recover Under The PAA Based On Colorado Trespass Law Without Proving Any Present Physical Injury Or Damage To Person Or Property, Or Loss Of Use Of Property. ..................................... 61

        A.      The District Court Erred Under The PAA By Allowing Plaintiffs To Recover On A Trespass Theory Without Showing Injury Or Damage To Person Or Property. ........... 63

        B.      The District Court Erred Under Colorado Trespass Law By Allowing Plaintiffs To Recover On A Trespass Theory Without Showing Injury Or Damage To Property. ....................................................................... 64

                1.      Colorado Law Requires A Plaintiff Alleging An Intangible Trespass To Show Injury Or Damage To Property................................................... 64

                2.      The Alleged Plutonium Contamination At Issue Here Is A Quintessential Intangible Trespass. ........... 68

IV.     The District Court Erred By Certifying A Class In Light Of Plaintiffs' Inability To Prove An Essential Element Of Their PAA Claims, Injury, On a Classwide Basis With Classwide Proof. ............................................................................. 77

V.      The District Court Erred By Allowing A "Damages Subclass" To Recover Compensatory Damages Based On The Prospect Of Future Injury. ........................................................... 85

VI.     The District Court Erred By Allowing Plaintiffs To Recover Punitive Damages. ......................................................... 95

Appellate Case: 08-1226   Document: 01017648899   Date Filed: 03/09/2009   Page: 5

VII.  The District Court Erred By Allowing Plaintiffs To Try Their Case Against The Federal Government, A Non-Party. ............... 100

    A.  The District Court Erred By Allowing Plaintiffs To Tell The Jury About The Federal Government's Indemnification Obligations. ............................................... 101

    B.  The District Court Erred By Allowing Plaintiffs To Make Highly Prejudicial And Inflammatory Allegations Against The Federal Government. .................. 106

VIII.  The District Court Erred By Awarding Plaintiffs More Than A Half-Billion Dollars In Prejudgment Interest On Their Property-Damage Claims Based On A Colorado Statute That Applies Only Where A Defendant Has "Wrongfully Withheld" Money Or Property From A "Creditor." ..................... 114

    A.  No Prejudgment Interest Award Is Warranted Here Because The Compensatory Damages Award Already Accounts For The Passage Of Time. ................................... 115

    B.  No Prejudgment Interest Award Is Warranted Here Because No Colorado Statute Authorizes Such An Award In Property-Damage Cases. ..................................... 123

CONCLUSION ..................................................................... 132

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abuan v. Level 3 Commc'ns, Inc.,*
 353 F.3d 1158 (10th Cir. 2003) ....................................................21

*Adams v. Cleveland-Cliffs Iron Co.,*
 602 N.W.2d 215 (Mich. Ct. App. 1999) ....................................66, 71

*Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp.,*
 959 F.2d 868 (10th Cir. 1992) ....................................................49

*Adkins v. Thomas Solvent Co.,*
 487 N.W.2d 715 (Mich. 1992)....................................................51, 52

*Allen v. Wal-Mart Stores, Inc.,*
 241 F.3d 1293 (10th Cir. 2001) ................................................48, 61

*Ballow v. Phico Ins. Co.,*
 878 P.2d 672 (Colo. 1994)............................................................131

*Bates v. Dep't of Corrections,*
 81 F.3d 1008 (10th Cir. 1996) ......................................................36

*Black v. Hieb's Enters., Inc.,*
 805 F.2d 360 (10th Cir. 1986) ....................................................101

*Blades v. Monsanto Co.,*
 400 F.3d 562 (8th Cir. 2005) ........................................................81

*Board of County Comm'rs of Arapahoe County v.*
 *Denver Bd. of Water Comm'rs,*
 718 P.2d 235 (Colo. 1986)............................................................130

*Board of County Comm'rs v. Slovek,*
 723 P.2d 1309 (Colo. 1986)............................................................91

*Bohrmann v. Maine Yankee Atomic Power Co.,*
 926 F. Supp. 211 (D. Maine 1996) ................................................27

v

*Borland v. Sanders Lead Co.*,
   369 So.2d 523 (Ala. 1979)......................................................66, 67

*Boughton v. Cotter Corp.*,
   10 F.3d 746 (10th Cir. 1993) ........................................................ 4

*Boughton v. Cotter Corp.*,
   65 F.3d 823 (10th Cir. 1995) ................................50, 51, 52, 53, 85

*Bradley v. American Smelting & Ref. Co.*,
   709 P.2d 782 (Wash. 1985)..............................................66, 67, 70

*Brock v. Casey Truck Sales, Inc.*,
   839 F.2d 872 (2d Cir. 1988)......................................................119

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ...........................................................31, 111

*Building & Constr. Dep't v. Rockwell Int'l Corp.*,
   7 F.3d 1487 (10th Cir. 1993) .....................................................80

*Burton v. R.J. Reynolds Tobacco Co.*,
   397 F.3d 906 (10th Cir. 2005) .............................................74, 125

*Carpenter v. Boeing Co.*,
   456 F.3d 1183 (10th Cir. 2006) ...........................................21, 78

*Choate v. Champion Home Builders Co.*,
   222 F.3d 788 (10th Cir. 2000) ...................................................32

*City & County of Denver v. Currigan*,
   362 P.2d 1060 (Colo. 1961).......................................................92

*City of Cleveland v. Peter Kiewit Sons' Co.*,
   624 F.2d 749 (6th Cir. 1980) ............................................102, 113

*City of New York v. FCC*,
   486 U.S. 57 (1988) ..................................................................30

*Colorado Visionary Academy v. Medtronic, Inc.*,
   397 F.3d 867 (10th Cir. 2005) ...................................................38

*Computer Sys. Eng'g, Inc. v. Quantel Corp.*,
    571 F. Supp. 1379 (D. Mass. 1983)
    *aff'd*, 740 F.2d 59 (1st Cir. 1984) ..................................................118

*Cook v. Rockwell Int'l Corp.*,
    151 F.R.D. 378 (D. Colo. 1993) (*Cook IV*) ..............10, 78, 79, 80, 82

*Cook v. Rockwell Int'l Corp.*,
    181 F.R.D. 473 (D. Colo. 1998) (*Cook VIII*) ........................10, 80, 82

*Cook v. Rockwell Int'l Corp.*,
    273 F. Supp. 2d 1175 (D. Colo. 2003) (*Cook IX*)....................*passim*

*Cook v. Rockwell Int'l Corp.*,
    358 F. Supp. 2d 1003 (D. Colo. 2004) (*Cook X*) ........................86, 94

*Cook v. Rockwell Int'l Corp.*,
    564 F. Supp. 2d 1189 (D. Colo. 2008) (*Cook XII*) ...................*passim*

*Cook v. Rockwell Int'l Corp.*,
    580 F. Supp. 2d 1071 (D. Colo. 2006) (*Cook XI*).............12, 102, 111

*Cook v. Rockwell Int'l Corp.*,
    755 F. Supp. 1468 (D. Colo. 1991) (*Cook I*) ..............9, 95, 96, 97, 99

*Corcoran v. New York Power Auth.*,
    202 F.3d 530 (2d Cir. 1999)...........................................................39

*Crosby v. National Foreign Trade Council*,
    530 U.S. 363 (2000) .......................................................................30

*Dang v. UNUM Life Ins. Co. of Am.*
    175 F.3d 1186 (10th Cir. 1999) ....................................................20

*Denver S. Park & Pac. R.R. v. Conway*,
    5 P. 142 (Colo. 1884)....................................................................126

*Department of the Navy v. Egan*,
    484 U.S. 518 (1988) .....................................................................112

*Dodge v. Cotter Corp.*,
    328 F.3d 1212 (10th Cir. 2003) ....................................101, 106, 113

*Draper v. Airco, Inc.*,
  580 F.2d 91 (3d Cir. 1978)..........................................................113

*Duke Power Co. v. Carolina Envtl. Study Group*,
  438 U.S. 59 (1978) ................................................................24, 41

*Dumontier v. Schlumberger Tech. Corp.*,
  543 F.3d 567 (9th Cir. 2008) ............................39, 41, 44, 46, 49, 63

*Eichel v. New York Cent. R.R. Co.*,
  375 U.S. 253 (1963) ...................................................................101

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) .......................................................................79

*Ellsberg v. Mitchell*,
  709 F.2d 51 (D.C. Cir. 1983) .....................................................112

*Emerson v. Kansas City S. Ry. Co.*,
  503 F.3d 1126 (10th Cir. 2007) .....................................................31

*English v. General Elec. Co.*,
  496 U.S. 72 (1990) .......................................................................22

*Erie R.R. Co. v. Tompkins*,
  304 U.S. 64 (1938) ..................................................................29, 49

*Estate of Korf v. A.O. Smith Harvestore Prods., Inc.*,
  917 F.2d 480 (10th Cir. 1990) ..............................................129, 132

*Farmers Reservoir & Irrigation Co. v. City of Golden*,
  113 P.3d 119 (Colo. 2005)..........................................................131

*Farnsworth Cannon, Inc. v. Grimes*,
  635 F.2d 268 (4th Cir. 1980) ......................................................112

*Farrell v. Klein Tools, Inc.*,
  866 F.2d 1294 (10th Cir. 1989) ...............................................48, 61

*Finestone v. Florida Power & Light Co.*,
  319 F. Supp. 2d 1347 (S.D. Fla. 2004)..........................................27

*Gariety v. Grant Thornton LLP,*
    368 F.3d 356 (4th Cir. 2004) .......................................................... 81

*Geier v. American Honda Motor Co.,*
    529 U.S. 861 (2000) ............................................................ 30, 31, 32

*General Tel. Co. of S.W. v. Falcon,*
    457 U.S. 147 (1982) ...................................................................... 78

*Golden v. CH2M Hill Hanford Group, Inc.,*
    528 F.3d 681 (9th Cir. 2008) ........................................ 41, 44, 46, 63

*Good Fund Ltd.-1972 v. Church,*
    540 F. Supp. 519 (D. Colo. 1982) ...................................................... 7

*Good v. Fluor Daniel Corp.,*
    222 F. Supp. 2d 1236 (E.D. Wash. 2002) ........................................ 27

*Goodyear Tire & Rubber Co. v. Holmes,*
    193 P.3d 821 (Colo. 2008) ................. 117, 119, 122, 124, 127-30, 132

*Great W. Sugar Co. v. KN Energy, Inc.,*
    778 P.2d 272 (Colo. Ct. App. 1989) .............................................. 117

*Green v. Castle Concrete Co.,*
    509 P.2d 588 (Colo. 1973) ........................................................ 59, 60

*Griffin v. Hilke,*
    804 F.2d 1052 (8th Cir. 1986) ...................................................... 101

*Hansberry v. Lee,*
    311 U.S. 32 (1940) ........................................................................ 78

*Hennessy v. Commonwealth Edison Co.,*
    764 F. Supp. 495 (N.D. Ill. 1991) .................................................. 27

*Henning v. Union Pac. R.R. Co.,*
    530 F.3d 1206 (10th Cir. 2008) ...................................................... 21

*Hoery v. United States,*
    64 P.3d 214 (Colo. 2003) ........................................ 54, 71, 72, 73, 86

*Holden v. Connex-Metalna Mgmt. Consulting GMBH,*
    302 F.3d 358 (5th Cir. 2002) ...................................................75, 125

*In re Berg Litig.,*
    293 F.3d 1127 (9th Cir. 2002) ..................................39, 41, 44, 46, 63

*In re Hanford Nuclear Reservation Litig.,*
    350 F. Supp. 2d 871 (E.D. Wash. 2004),
    *aff'd in part, rev'd in part,* 534 F.3d 986 (9th Cir. 2008) ...............28

*In re Hanford Nuclear Reservation Litig.,*
    534 F.3d 986 (9th Cir. 2008) ... 22, 25, 26, 28, 39, 41, 44, 46, 63, 105

*In re Hotel Tel. Charges,*
    500 F.2d 86 (9th Cir. 1974) ............................................................85

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d Cir. 2008).............................................................81

*In re Initial Pub. Offering Sec. Litig.,*
    471 F.3d 24 (2d Cir. 2006).........................................................21, 81

*In re New Motor Vehicles Canadian Export Antitrust Litig.,*
    522 F.3d 6 (1st Cir. 2008)................................................................81

*In re TMI Litig. Cases Consol. II,*
    940 F.2d 832 (3d Cir. 1991) (*TMI II*) ......................22, 25, 27, 35, 39

*In re TMI Litig.,*
    193 F.3d 613 (3d Cir. 1999) (*TMI IV*) ......................................42, 98

*In re TMI,*
    67 F.3d 1103 (3d Cir. 1995) (*TMI III*)......................................27, 98

*In re Wildewood Litig.,*
    52 F.3d 499 (4th Cir. 1995) ............................................................56

*In re Worldcom, Inc.,*
    546 F.3d 211 (2d Cir. 2008)............................................................67

*Interstate Brands Corp. v. Lily Transp. Corp.,*
    256 F. Supp. 2d 58 (D. Mass. 2003).............................................118

*Isbill Assocs., Inc. v. City & County of Denver,*
    666 P.2d 1117 (Colo. Ct. App. 1983) .......................................... 129

*John Larkin, Inc. v. Marceau,*
    959 A.2d 551 (Vt. 2008) ........................................................ 67, 74

*Johnson v. Elk Lake Sch. Dist.,*
    283 F.3d 138 (3d Cir. 2002) ................................................ 113, 126

*Kennedy v. Southern Cal. Edison Co.,*
    268 F.3d 763 (9th Cir. 2001) ....................................................... 41

*Kerr-McGee Corp. v. Farley,*
    115 F.3d 1498 (10th Cir. 1997) ................................................... 30

*Koller v. Pinnacle W. Capital Corp.,*
    No. CV-06-2031, 2007 WL 446357 (D. Ariz. Feb. 6, 2007) ...... 23, 28

*Koll-Irvine Ctr. Prop. Owners Ass'n v. County of Orange,*
    24 Cal. App. 4th 1036 (1994) ..................................................... 60

*Lamb v. Martin Marietta Energy Sys., Inc.,*
    835 F. Supp. 959 (W.D. Ky. 1993) ............................................... 27

*Library of Congress v. Shaw,*
    478 U.S. 310 (1986) ........................................................... 120, 121

*Lokos v. Detroit Edison,*
    67 F. Supp. 2d 740 (E.D. Mich. 1999) ..................................... 27, 28

*Loughridge v. Chiles Power Supply Co.,*
    431 F.3d 1268 (10th Cir. 2005) ................................... 114, 129, 132

*Lowell Staats Mining Co. v. Pioneer Uravan, Inc.,*
    878 F.2d 1259 (10th Cir. 1989) ..................... 114, 118, 123, 124, 132

*Lujan v. Regents of Univ. of Cal.,*
    69 F.3d 1511 (10th Cir. 1995) ................................................ 24, 42

*Lyell v. Renico,*
    470 F.3d 1177 (6th Cir. 2006) .................................................. 113

*Maddy v. Vulcan Materials Co.,*
    737 F. Supp. 1528 (D. Kan. 1990)..............................................65, 67

*Maryland v. Louisiana,*
    451 U.S. 725 (1981) ...................................................................30

*Matosantos Comm. Corp. v. SCA Tissue N. Am. LLC,*
    369 F. Supp. 2d 191 (D.P.R. 2005)...............................................101

*Maynard v. CIA,*
    986 F.2d 547 (1st Cir. 1993)........................................................112

*McCafferty v. Centerior Serv. Co.,*
    983 F. Supp. 715 (N.D. Ohio 1997)................................................27

*McCulloch v. Maryland,*
    17 U.S. 316 (1819) ......................................................................30

*McKay v. United States,*
    703 F.2d 464 (10th Cir. 1983) ........................................................7

*McLandrich v. Southern Cal. Edison Co.,*
    942 F. Supp. 457 (S.D. Cal. 1996)............................................23, 27

*Mesa Sand & Gravel Co. v. Landfill, Inc.,*
    776 P.2d 362 (Colo. 1989)............................123, 124, 127, 128, 130

*Midtec Paper Corp. v. United States,*
    857 F.2d 1487 (D.C. Cir. 1988) .....................................................58

*Miller v. Cudahy Co.,*
    858 F.2d 1449 (10th Cir. 1988) .....................................................86

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    259 F.3d 154 (3d Cir. 2001).......................................................21, 81

*Nicholson v. Connecticut Half-Way House, Inc.,*
    218 A.2d 383 (Conn. 1966) ...........................................................52

*Nieman v. NLO, Inc.,*
    108 F.3d 1546 (6th Cir. 1997) ......................................22, 27, 39, 86

*NLRB v. Bell Aerospace Co.,*
   416 U.S. 267 (1974) ........................................................................ 58

*Norman's Heritage Real Estate Co. v. Aetna Cas. & Sur. Co.,*
   727 F.2d 911 (10th Cir. 1984) ......................................................... 96

*O'Conner v. Commonwealth Edison Co.,*
   13 F.3d 1090 (7th Cir. 1994) .................................. 22, 27, 28, 35, 39

*O'Connor v. Boeing N. Am., Inc.,*
   Nos. CV 97-1554 DT *et al.,*
   2005 WL 6035255 (C.D. Cal. 2005) ................................................ 28

*O'Rear v. Fruehauf Corp.,*
   554 F.2d 1304 (5th Cir. 1977) ....................................................... 113

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev.*
   *Comm'n,* 461 U.S. 190 (1983) ......................................................... 22

*Padilla v. Lawrence,*
   685 P.2d 964 (N.M. Ct. App. 1984) ................................................. 71

*Patterson v. Mobil Oil Corp.,*
   241 F.3d 417 (5th Cir. 2001) ........................................................... 82

*Public Serv. Co. of Colo. v. Van Wyk,*
   27 P.3d 377 (Colo. 2001) ................................... 55, 57-59, 65, 67-73

*Regents of Univ. of Cal. v.*
   *Credit Suisse First Boston (USA) Inc.,*
   482 F.3d 372 (5th Cir. 2007) ........................................................... 81

*Riegel v. Medtronic, Inc.,*
   128 S. Ct. 999 (2008) ....................................................................... 22

*Roberts v. Florida Power & Light Co.,*
   146 F.3d 1305 (11th Cir. 1998) .................................... 22, 27, 28, 35

*Robinson v. Volkswagenwerk AG,*
   56 F.3d 1268 (10th Cir. 1995) ......................................................... 95

*Rockwell Int'l Corp. v. Wilhite*,
    143 S.W.3d 604 (Ky. Ct. App. 2003) .........................................70, 74

*Rodriguez v. Schutt*,
    914 P.2d 921 (Colo. 1996).............................................................123

*Rohrbaugh v. Celotex Corp.*,
    53 F.3d 1181 (10th Cir. 1995) .......................................................36

*Ryan v. City of Emmetsburg*,
    4 N.W.2d 435 (Iowa 1942).............................................................65

*Salve Regina College v. Russell*,
    499 U.S. 225 (1991) .......................................................................20

*San Diego Gas & Elec. Co. v. Superior Court*,
    920 P.2d 669 (Cal. 1996) ...............................................................66

*Satterfield v. J.M. Huber Corp.*,
    888 F. Supp. 1567 (N.D. Ga. 1995) ...............................................67

*Shook v. Board of County Comm'rs of County of El Paso*,
    543 F.3d 597 (10th Cir. 2008) .......................................................81

*Shriver v. Carter*,
    651 P.2d 436 (Colo. Ct. App. 1982) ..............................................96

*Silkwood v. Kerr-McGee Corp.*,
    464 U.S. 238 (1984) .........................................22, 24, 33, 34, 35, 98

*Silkwood v. Kerr-McGee Corp.*,
    485 F. Supp. 566 (W.D. Okla. 1979),
    *aff'd in part, rev'd in part*, 667 F.2d 908 (10th Cir. 1981),
    *rev'd in part*, 464 U.S. 238 (1984)...........................................34, 35

*Silkwood v. Kerr-McGee Corp.*,
    667 F.2d 908 (10th Cir. 1981),
    *rev'd in part*, 464 U.S. 238 (1984)...........................................35, 36

*Southeastern Liquid Fertilizer Co. v. Chapman*,
    120 S.E.2d 651 (Ga. 1961).............................................................60

*State Farm Mut. Auto. Ins. Co. v. Scholes,*
    601 F.2d 1151 (10th Cir. 1979) ........................................................ 4

*Stump v. Gates,*
    211 F.3d 527 (10th Cir. 2000) ................................... 101, 106, 113

*Szabo v. Bridgeport Machs., Inc.,*
    249 F.3d 672 (7th Cir. 2001) ........................................................ 81

*Taylor v. Sturgell,*
    128 S. Ct. 2161 (2008) ................................................................. 78

*Thackery v. Union Portland Cement Co.,*
    231 P. 813 (Utah 1924) ............................................................... 65

*Townsend v. Benya,*
    287 F. Supp. 2d 868 (N.D. Ill. 2003) ........................................ 101

*Trademark Research Corp. v. Maxwell Online, Inc.,*
    995 F.2d 326 (2d Cir. 1993) ................................................ 118, 122

*United States v. Gallant,*
    537 F.3d 1202 (10th Cir. 2008) .................................................. 38

*United States v. Hess,*
    194 F.3d 1164 (10th Cir. 1999) .................................................. 86

*United States v. Jesse,*
    744 P.2d 491 (Colo. 1987) ........................................................ 130

*United States v. Yarbrough,*
    527 F.3d 1092 (10th Cir. 2008) .................................................. 21

*Vallario v. Vandehey,*
    554 F.3d 1259 (10th Cir. 2009) ............................................ 78, 81

*Vitkus v. Beatrice Co.,*
    127 F.3d 936 (10th Cir. 1997) .................................................. 126

*Wade v. Emcasco Ins. Co.,*
    483 F.3d 657 (10th Cir. 2007) .................................................. 126

*Werbungs und Commerz Union Austalt v. Collectors' Guild, Ltd.*,
 930 F.2d 1021 (2d Cir. 1991).................................................................111

*Westfield Dev. Co. v. Rifle Inv. Assoc.*,
 786 P.2d 1112 (Colo. 1990)..................................................................131

*Wilcox v. Homestake Mining Co.*,
 401 F. Supp. 2d 1196 (D.N.M. 2005) ...................................................28

*Williams v. Oeder*,
 659 N.E.2d 379 (Ohio Ct. App. 1995) ..................................................71

*Windham v. American Brands, Inc.*,
 565 F.2d 59 (4th Cir. 1977) ..................................................................84

*Wood v. Hazelet*,
 237 P. 151 (Colo. 1925)........................................................................118

*WWC Holding Co. v. Sopkin*,
 488 F.3d 1262 (10th Cir. 2007) .............................................................20

*Wyoming v. United States*,
 279 F.3d 1214 (10th Cir. 2002) ......................................................31, 32

## Constitutions, Statutes, and Rules

28 U.S.C. § 1292(b) ....................................................................... 2, 4, 13

28 U.S.C. § 1331.....................................................................................2

28 U.S.C. § 1961....................................................................................14

28 U.S.C. § 2674....................................................................................98

42 U.S.C. § 12101..................................................................................52

42 U.S.C. § 2011....................................................................................26

42 U.S.C. § 2012....................................................................................24

42 U.S.C. § 2012(i) ................................................................................41

42 U.S.C. § 2014..............................................................................96, 99

42 U.S.C. § 2014(hh) .................................................. 26, 29, 30, 31, 32, 39

42 U.S.C. § 2014(q) ....................................... 16, 25, 40, 41, 44, 46, 63, 99

42 U.S.C. § 2014(w) ........................................................................ 25

42 U.S.C. § 2210 .................................................................... 1, 29, 30, 31

42 U.S.C. § 2210(n)(2) ........................................................................ 2

42 U.S.C. § 2210(s) ...................................................... 9, 18, 96, 97, 98

6 Colo. Code Regs. 1007-1, RH 4.21.1, RH 4.60.1 .................................. 56

Colo. Rev. Stat. § 13-21-101 ........................................................ 124, 125

Colo. Rev. Stat. § 13-80-102 ................................................................ 86

Colo. Rev. Stat. § 5-12-102 ........................................... 13, 14, 114, 123-32

Colo. Rev. Stat. § 5-12-102(1)(b) ........................................................ 127

Fed. R. Civ. P. 23 ............................................... 21, 77, 78, 79, 85

Fed. R. Civ. P. 23(b)(3) ................................................................ 80, 82

Fed. R. Civ. P. 37 ................................................................ 111

Fed. R. Civ. P. 54(b) ........................................................................ 2, 13

Fed. R. Evid. 411 .................................................. 19, 101, 104

U.S. Const. Art. VI, cl. 2 ................................................................ 30

**Other Authorities**

*Black's Law Dictionary* (8th ed. 2004) .................................................. 69

Cairns, Gregory B. & Trenennick, John C., Jr.,
    *Collecting Pre- and Post-Judgment Interest in Colorado:*
    *A Primer*,
    15 Colo. Law. 753 (1986) (reprinted at App. 3645-55) ................ 129

Colo. Dep't of Health,
    *A Risk Evaluation for the Colorado Plutonium-in-the-Soil*
    *Standard*,
    (Jan. 1976) (reprinted at App. 1062-90) ........................................57

Fed. R. Civ. P. 23 Advisory Committee Note (1966) ...............................85

H.R. Rep. No. 100-104 (1987) ...................................................................98

Keeton, W. Page *et al.*,
    *Prosser & Keeton on the Law of Torts* (5th ed. 1984) ....................65

Magill, Nicholas H.,
    *Interest as Damages in Colorado*,
    28 Dicta 285 (1951) (reprinted at App. 3624-29) ........................126

*Restatement (Second) of Torts* (1965) ...............................................*passim*

S. Rep. No. 100-218 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1476.........97

S. Rep. No. 100-70 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1424...........97

Speicker, Frank F. & Ruland, Edwin G.,
    *A Creditor's Right to Interest in Colorado*,
    35 U. Colo. L. Rev. 190 (1963) (reprinted at App. 3630-44) ........125

*Webster's II New College Dictionary* (3d ed. 2005) ..................................69

*Webster's Ninth New Collegiate Dictionary* (1988) .................................69

## STATEMENT OF RELATED APPEALS

Pursuant to 10th Cir. R. 28.2(C)(1), defendants-appellants-cross-appellees state that there are no prior or related appeals.

## INTRODUCTION

The $926 million judgment in this nineteen-year-old class action rests on layer upon layer of legal error.  The case arises under a federal statute, the Price-Anderson Act (PAA), 42 U.S.C. § 2210 *et seq.*, which strikes a balance between providing compensation for nuclear-related injuries, on the one hand, and fostering the development of nuclear energy, on the other.  The plaintiff class consists of the owners, as of June 7, 1989, of more than 15,000 parcels of property over a 30-square-mile area east of the Federal Government's former Rocky Flats nuclear weapons facility near Denver.  They allege that defendants, who operated that facility under contract with the Government, are responsible for plutonium emissions that diminished their property values.  The district court allowed the plaintiff class to establish liability on their PAA claims, and recover aggregate compensatory damages, punitive damages, and prejudgment interest without proving *any* violation of federal nuclear safety standards or *any* present physical injury to person or property, or loss of use of property.  The court thereby turned the Act on its head and distorted underlying rules of Colorado law.  This Court should reverse the judgment.

## STATEMENT OF JURISDICTION

The district court has subject-matter jurisdiction over this case under the Price-Anderson Act, 42 U.S.C. § 2210(n)(2), as well as the general federal-question statute, 28 U.S.C. § 1331.

Defendants have consistently maintained, however, that the jury's unallocated aggregate class action award provides no basis for a final appealable judgment. For this reason, defendants urged the district court to certify the key orders underlying that award for interlocutory appeal under 28 U.S.C. § 1292(b). *See* Defs.' Mem. in Support of Mot. for Cert. of Interlocutory Appeal (1/22/07), App. 2027-58. Plaintiffs opposed that motion, and insisted that the unallocated aggregate class action award did not preclude the entry of a partial final judgment under Fed. R. Civ. P. 54(b). The district court agreed with plaintiffs, and entered an ostensible Final Judgment on June 2, 2008. *See* Final Judgment (6/2/08), App. 2274-85. In light of that decision, defendants had no choice but to file their appeals out of an abundance of caution. *See* Rockwell Notice of Appeal (6/19/08), App. 2286-88; Dow Notice of Appeal (6/19/08), App. 2289-91. Defendants, however, promptly moved to vacate the judgment, dismiss the appeals, and remand for lack of

2

appellate jurisdiction. *See* Motion (7/2/08). This Court's Clerk referred that motion to the merits panel, *see* Order (8/14/08), thus setting the stage for this massive appeal to be fully briefed before the threshold jurisdictional question is addressed. Defendants asked the Court to review the Clerk's referral to the merits panel, *see* Motion (8/26/08), but the motions panel declined to do so, *see* Order (10/20/08).

Because the appellate jurisdiction issues presented here were fully briefed in connection with the motion to vacate the judgment, dismiss the appeals, and remand for lack of appellate jurisdiction, defendants will not burden this Court by repeating the arguments set forth in that motion, and hereby incorporate those arguments by reference. Defendants wish to emphasize, however, that they have no desire whatsoever to return to the district court for yet further proceedings in connection with the legally untenable jury verdicts. Defendants have consistently raised the appellate jurisdiction issues in this case out of a sense of duty and candor to this Court. Defendants would like nothing better than for this Court to address the important substantive issues presented by these appeals, particularly because they have been held

responsible for vast damages awards that have been held to accrue both pre-judgment and post-judgment interest in this nineteen-year-old case.

Given that the key substantive legal issues will have been fully briefed by the time this Court addresses the appellate jurisdiction issue, defendants respectfully urge the Court not simply to vacate the judgment and remand for further proceedings if the Court were ultimately to conclude that defendants were right all along with respect to appellate jurisdiction. It would be a colossal waste of resources for the district court to undertake the task of trying to allocate an aggregate damages award that cannot stand as a matter of law. Accordingly, if this Court were to conclude that it lacks appellate jurisdiction here, defendants respectfully urge this Court to treat these fully briefed appeals as petitions for mandamus, *see*, *e.g.*, *Boughton v. Cotter Corp.*, 10 F.3d 746, 750-51 (10th Cir. 1993); *State Farm Mut. Auto. Ins. Co. v. Scholes*, 601 F.2d 1151, 1154 (10th Cir. 1979), and to reverse the district court's orders on one or more of the grounds presented in these appeals. In that event, any proceedings on remand (which may include certification of an interlocutory appeal under 28 U.S.C. § 1292(b) to clarify additional legal issues) will focus on curing

rather than perpetuating the manifest legal errors identified by these appeals, and thereby bringing this overlong and convoluted litigation under control.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred by holding that federal nuclear safety standards do not provide the standard of care for PAA claims and thereby allowing plaintiffs to recover under the PAA without proving any violation of those standards.

2.    Whether the district court erred by allowing plaintiffs to recover under the PAA based on Colorado nuisance law without proving any present physical injury or damage to person or property, or loss of use of property.

3.    Whether the district court erred by allowing plaintiffs to recover under the PAA based on Colorado trespass law without proving any present physical injury or damage to person or property, or loss of use of property.

4.    Whether the district court erred by certifying a class in light of plaintiffs' inability to prove an essential element of their PAA claims, injury, on a classwide basis with classwide proof.

5.     Whether the district court erred by allowing a "Damages Subclass" to recover compensatory damages based on the prospect of future injury.

6.     Whether the district court erred by allowing plaintiffs to recover punitive damages.

7.     Whether the district court erred by allowing plaintiffs to try their case against the Federal Government, a non-party.

8.     Whether the district court erred by awarding plaintiffs more than a half-billion dollars in prejudgment interest.

## STATEMENT OF THE CASE AND THE FACTS

### A.     The Rocky Flats Facility

The United States Government established the Rocky Flats facility in the early 1950s, at the height of the Cold War, to produce nuclear weapons.  *See* Trial Tr. (10/11/05), at 430-32, 480, App. 2424-26, 2474 (Pre-Trial Jury Instruction 1.1); *id.* at 494, App. 2488.  Rather than operate the facility itself, the Government—first the Atomic Energy Commission (AEC), and then the Department of Energy (DOE)—turned to private contractors to handle the job.  *See id.* Defendant The Dow Chemical Company operated the facility from 1952

Case No. 1:90-cv-00181-JLK   Document 2385-6   filed 10/23/15   USDC Colorado   pg 27 of 156

Appellate Case: 08-1226   Document: 01017648899   Date Filed: 03/09/2009   Page: 26

to 1975, and defendant Rockwell International Corporation operated it from 1975 to 1989. *Id.*

There has long been substantial controversy over alleged emissions of plutonium from the Rocky Flats facility. Beginning in the late 1960s and early 1970s, a series of studies sponsored by federal and local authorities and by private groups found plutonium above background levels on certain properties near the facility. *See* Trial Tr. (10/27/05), at 3080-85, App. 2899-2904 (Budnitz). These studies were widely publicized, and led to both regulation and litigation. *See, e.g.*, *Good Fund Ltd.-1972 v. Church*, 540 F. Supp. 519 (D. Colo. 1982), *rev'd sub nom. McKay v. United States*, 703 F.2d 464 (10th Cir. 1983). Many of the properties at issue in this litigation were developed *after* that publicity and regulation. *See, e.g.*, Exh. DX2292, App. 3490.1.

In response to a series of "whistleblower" complaints about on-site contamination, agents from the Federal Bureau of Investigation, the Department of Justice, and the Environmental Protection Agency raided the Rocky Flats facility on June 7, 1989. *See* Jury Instruction 3.22, App. 1707-09; Trial Tr. (1/20/06), at 10649, App. 3428; Exh. P706, App. 3541-44; *see also* Trial Tr. (12/14/05), at 7925-26, App. 3153-54

(Norton). Rockwell, which operated the facility at that time, was subsequently charged with federal regulatory violations, pleaded guilty, and paid an \$18.5 million fine in 1992. *See* Defs.' Mot. *In Limine* No. 3 To Exclude Evidence of Rockwell's Guilty Plea (and Plea Conduct), at 3 & Exh. 5 (6/16/05), App. 1154-90; Trial Tr. (10/11/05), at 583, App. 2577. Those charges had nothing to do with any off-site contamination. *See id.*

With the end of the Cold War, the Rocky Flats facility shut down in 1992. The approximately 6500-acre plant site was extensively remediated, and is now a wildlife refuge. Following years of careful study, the federal Agency for Toxic Substances and Disease Registry (ATSDR) issued a report in 2005 finding that "the levels of off-site surface soil contamination [around Rocky Flats] are no apparent public health hazard for past, current and future exposures." Exh. DX454 at 76, App. 3450.85; *see also id.* at 35-37, App. 3450.44-46.

### B.   This Lawsuit

Thirteen named plaintiffs filed this PAA lawsuit against Dow and Rockwell on January 30, 1990, alleging that plutonium contamination from Rocky Flats lowered the value not only of their *own* properties but

also of all *other* properties within a 30-square-mile area east of the facility. *See* 2d Am. Compl., App. 289-320. Plaintiffs thus sought certification of a class of property owners within that area on the date of the FBI raid, *i.e.*, June 7, 1989. The case was originally assigned to Judge Lewis Babcock, and reassigned to Judge John L. Kane in December 1992.

In February 1991, as relevant here, the district court denied defendants' motions for summary judgment with respect to punitive damages. *See Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468, 1479-82 (D. Colo. 1991) (*Cook I*), App. 275-78; *see also Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1211-12 (D. Colo. 2003) (*Cook IX*), App. 569-70 (reaffirming *Cook I*). Although the court acknowledged that, under the plain terms of the PAA (as amended in 1988), punitive damages are *not* available against entities indemnified by the Federal Government, *see* 42 U.S.C. § 2210(s), the court inferred from that provision that punitive damages *were* available against entities indemnified by the Federal Government for releases that occurred before the effective date of the 1988 amendments. *See Cook I*, 755 F. Supp. at 1481, App. 278.

9

In October 1993, the district court granted plaintiffs' motion for class certification, and certified a class consisting of "[a]ll persons and entities owning an interest (including mortgagee and other security interests) in real property situated within the Property Class Area, exclusive of governmental entities, defendants, and defendants' affiliates, parents, and subsidiaries," as of June 7, 1989.  *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 382, 388-89 (D. Colo. 1993) (*Cook IV*), App. 360, 375-78; *see also Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 476 n.3 (D. Colo. 1998) (*Cook VIII*), App. 465-66 & n.3 (reaffirming class definition). (The Property Class Area was delineated on a map provided by plaintiffs, *see* App. 2279, and consisted of approximately 15,370 parcels of property, *see Cook VIII*, 181 F.R.D. at 476 n.3, App. 465-66 n.3.).

Much of the 1990s was taken up with massive fact discovery and summary judgment briefing.  For present purposes, it suffices to say that the district court denied defendants' motions for summary judgment, and the case proceeded toward trial on the property-damage claims of the certified class.

In July 2003, the district court issued an important ruling distilling many of its previous rulings and "clarif[ying] the scope of trial." *Cook IX*, 273 F. Supp. 2d at 1179, App. 498. In particular, the court held that federal nuclear safety standards do not provide the standard of care under the PAA, *see id.* at 1179-99, App. 498-541, and that plaintiffs could prevail on their PAA claims without establishing any present physical injury to person or property, *see id.* at 1199-1209, App. 542-64. With respect to compensatory damages, the court held that the plaintiff class could recover a lump sum representing the aggregate future diminution in value of all their properties resulting from defendants' "continuing torts" as measured on the date on which the torts became "complete" and "comparatively enduring." *Id.* at 1209-11, App. 564-68.

In May 2005, the district court split the certified class into two subclasses. *See* Order (5/17/05), at 15-16, App. 1146-47. The first (the so-called "Damages Subclass") consisted of "all Class members who owned property within the Class Area on the later of: (i) January 30, 1990, the date this action was filed; or (ii) the date on which the jury, per Restatement [(Second) of Torts] § 930(1) [(1965)], finds it appeared

11

the trespass and/or nuisance asserted by Plaintiffs would continue indefinitely." *Id*. at 15, App. 1146.  The second consisted of all other members of the Class.  *See id*. at 16, App. 1147.

Defendants moved *in limine* before trial to prevent plaintiffs from mentioning (1) the Federal Government's indemnification obligations to defendants, and (2) disputes over the Federal Government's classification of information and the fact that the district court had held the DOE in contempt of court in connection with discovery in this case. The district court, however, denied the motions on the ground that these points were relevant to the jury's consideration of the case.  *See Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1154-56 (D. Colo. 2006) (*Cook XI*), App. 1876-79.

The jury trial began in October 2005, and—after plaintiffs went out of their way to emphasize the Federal Government's indemnification obligations and to criticize the DOE's classification decisions and discovery conduct—the case was submitted to the jury in January 2006.  After several weeks of deliberations, the jury returned a verdict on February 14, 2006.  *See* Jury Verdict Form (2/14/06), App. 1606-35.  The jury found both defendants liable for both nuisance and

trespass, *see id.* at 1-13, App. 1606-18, and that the injurious situation had become "complete" and "comparatively enduring" at some point between January 1, 1988 and December 31, 1995, *see id.* at 14, 23, App. 1619, 1628. As relief, the jury awarded the plaintiff class (1) an aggregate total of $176,850,340 in compensatory damages from both defendants, (2) an aggregate total of $110,800,000 in punitive damages from defendant Dow, and (3) an aggregate total of $89,400,000 in punitive damages from defendant Rockwell. *See id.* at 15, 24, 26-27, App. 1620, 1629, 1631-32.

Plaintiffs thereafter moved for an award of prejudgment interest and the entry of a final appealable judgment under Fed. R. Civ. P. 54(b), while defendants moved for judgment as a matter of law, a new trial, and an interlocutory appeal of the key pretrial orders under 28 U.S.C. § 1292(b). The district court granted plaintiffs' motions and denied defendants' motions. *See Cook v. Rockwell Int'l Corp.*, 564 F. Supp. 2d 1189, 1214-15 (D. Colo. 2008) (*Cook XII*), App. 2240-41. In particular, the court concluded that Colo. Rev. Stat. § 5-12-102 applied here, and required an award of prejudgment interest at a

rate of 8% compounded annually from January 30, 1990 through the entry of judgment. *See id.* at 67, App. 2267.

On June 2, 2008, the court entered an ostensible Final Judgment in the amount of $377,050,340 in compensatory and punitive damages and $549,053,747 in prejudgment interest against both defendants, for a grand total of $926,104,087 (excluding post-judgment interest at the rate prescribed in 28 U.S.C. § 1961). *See Cook XII*, 564 F. Supp. 2d at 1197-1200, 1216-18, App. 2205-11, 2245-48; Final Judgment (6/2/08) at 3-4, App. 2276-77. Defendants timely appealed, *see* Rockwell Notice of Appeal (6/19/08), App. 2286-88; Dow Notice of Appeal (6/19/08), App. 2289-91, and plaintiffs cross-appealed, *see* Pls.' Notice of Cross-Appeal (7/1/08), App. 2292-94.

Defendants thereafter moved this Court to vacate the judgment, dismiss the appeals, and remand the case to the district court for lack of appellate jurisdiction, on the ground that substantial issues surrounding allocation of the aggregate classwide judgment rendered it non-final. *See* Motion (7/2/08). The Clerk's Office entered an order referring that motion to the merits panel, *see* Order (8/26/08), and a

motions panel of this Court declined to review that referral, *see* Order (10/20/08).

## SUMMARY OF ARGUMENT

The $926 million judgment in favor of the plaintiff class is based on a series of fundamental legal errors and thus cannot stand.

*First*, the district court erred by holding that federal nuclear safety standards do not define the duty of care for PAA claims, and thereby allowing plaintiffs to recover under the PAA without proving any violation of those standards.   The decision below conflicts with decisions by all five federal courts of appeals to have addressed this issue (the Third, Sixth, Seventh, Ninth, and Eleventh Circuits), which have held that federal nuclear safety standards preempt inconsistent state tort-law duties.  Nothing in the PAA remotely purports to override ordinary preemption principles, and the district court erred by assuming that the PAA's express preemption provision implicitly saves any state law beyond its scope from preemption.  Because plaintiffs never proved that defendants violated federal nuclear safety standards, the PAA judgment in their favor cannot stand.

*Second*, the district court erred by allowing plaintiffs to recover under the PAA based on Colorado nuisance law without proving any present physical injury or damage to person or property, or loss of use of property. As a threshold matter, plaintiffs cannot recover under the PAA itself based on purely *risk*-based theories of injury, because the statute by its terms limits recovery to "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of such property." 42 U.S.C. § 2014(q). And in any event, plaintiffs cannot recover under Colorado nuisance law based on either (1) a health risk that is scientifically unfounded, or (2) a future health risk. Because the court allowed plaintiffs to pursue a nuisance theory based on such risks, the nuisance verdict in their favor cannot stand.

*Third*, the district court erred by allowing plaintiffs to recover under the PAA based on Colorado trespass law without proving any present physical injury or damage to person or property, or loss of use of property. Once again, plaintiffs cannot recover under the PAA itself without proof of such injury or damage, or loss of use. And in any event, plaintiffs cannot recover for an intangible trespass under Colorado law without showing some injury or damage to property. The

16

alleged plutonium contamination at issue here is a quintessential intangible trespass under Colorado law because (as plaintiffs themselves and their experts freely acknowledged) it cannot be perceived by any of the senses. Because the court did not require plaintiffs to establish any present physical injury or damage to person or property from the alleged intangible trespass, the trespass verdict in their favor cannot stand.

*Fourth*, the district court erred by certifying a class in light of plaintiffs' inability to prove an essential element of their PAA claims, injury, on a classwide basis with classwide proof. The district court erred by holding that any inquiry into plaintiffs' ability to prove injury on a classwide basis with classwide proof was an impermissible inquiry into the "merits" of plaintiffs' claims; rather, it is an indispensable inquiry into the propriety of class certification. Where, as here, plaintiffs cannot establish an essential element of their claims on a classwide basis with classwide proof, common issues cannot "predominate" as a matter of law, and certification is unwarranted. Because the district court erred by certifying a class, the PAA judgment in favor of the class cannot stand.

17

*Fifth*, the district court erred by allowing a "Damages Subclass" to recover compensatory damages based on the prospect of future injury. While the court instructed the jury to award damages based on the diminution in value of *all* properties in the class area, the court also held that only the members of the "Damages Subclass" were entitled to recover such damages, which necessarily resulted in an excessive and inappropriate damages award.   Indeed, it is impossible even to ascertain membership in the "Damages Subclass," since that subclass is defined by reference to the date on which the alleged injury became "complete" and "comparatively enduring," but the jury never specified any such date, but only an *eight-year range* of dates.   Because the aggregate classwide damages award is based on these fundamental legal errors, the judgment cannot stand.

*Sixth*, the district court erred by allowing plaintiffs to recover punitive damages.   Although the PAA itself could not be any more explicit in barring punitive damages against defendants indemnified by the Federal Government, *see* 42 U.S.C. § 2210(s), the district court declared that this provision (which was part of the 1988 amendments to the statute) was not retroactive.   But, as the Third Circuit has

18

recognized, this provision simply *clarified* existing law, and did not implicitly authorize punitive damages that were previously unavailable. In any event, the punitive damages award cannot stand even under the district court's own analysis, because the jury was never asked to determine whether the relevant "nuclear incident" here occurred *before* or *after* the effective date of the 1988 amendments.

*Seventh*, the district court erred by allowing plaintiffs to try their case against the Federal Government, a non-party. The court violated Federal Rule of Evidence 411, which generally precludes a plaintiff from introducing evidence of indemnification, by giving plaintiffs free rein to tell the jury about the Federal Government's indemnification obligations to defendants. And the court erred by giving plaintiffs free rein to tell the jury about alleged document classification abuses and discovery misconduct by the Federal Government, which was not supposed to be on trial here. Above and beyond the court's fundamental legal errors, these trial errors individually and collectively deprived defendants of a fair trial.

And *eighth*, the district court erred by awarding plaintiffs more than a half-billion dollars in prejudgment interest. As an initial matter,

the jury here indisputably compensated plaintiffs for the passage of time by adjusting the compensatory damages for inflation, thus necessarily rendering an award of prejudgment interest duplicative. And in any event, the Colorado statute on which the district court relied applies only where a defendant has "wrongfully withheld" money or property from a "creditor," and thus does not apply to property-damage claims like those at issue here.

## STANDARDS OF REVIEW

A district court's legal conclusions, including its conclusions with respect to federal preemption, the proper interpretation of the PAA, the proper interpretation of Colorado law with respect to nuisance, trespass, compensatory damages, and prejudgment interest, are reviewed *de novo*. *See, e.g.*, *Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991); *WWC Holding Co. v. Sopkin*, 488 F.3d 1262, 1276 n.10 (10th Cir. 2007); *Dang v. UNUM Life Ins. Co. of Am.* 175 F.3d 1186, 1189 (10th Cir. 1999). This Court also reviews jury instructions *de novo*, examining them as a whole, to determine if they accurately inform the jury of the governing law; a new trial is in order "if the jury might have based its verdict on the erroneously given instruction."

*Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1221 (10th Cir. 2008) (internal quotations omitted).  The Court reviews evidentiary issues for abuse of discretion, *see, e.g., Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1171 (10th Cir. 2003), but a district court necessarily abuses its discretion by basing an evidentiary decision on an error of law, *see, e.g.*, *United States v. Yarbrough*, 527 F.3d 1092, 1101 (10th Cir. 2008).

A district court's ultimate decision to certify a class, based on consideration of multiple factors under Rule 23 of the Federal Rules of Civil Procedure, is reviewed for abuse of discretion, *see, e.g., Carpenter v. Boeing Co.*, 456 F.3d 1183, 1187 (10th Cir. 2006), but the threshold question whether the trial court applied the correct legal standard is a pure question of law subject to *de novo* review, *see, e.g., id.*; *see also In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165 (3d Cir. 2001).

## ARGUMENT

**I.   The District Court Erred By Holding That Federal Nuclear Safety Standards Do Not Provide The Standard Of Care For PAA Claims And Thereby Allowing Plaintiffs To Recover Under The PAA Without Proving Any Violation Of Those Standards.**

If ever a legal issue were settled, it is that nuclear safety standards are "the *exclusive* business of the Federal Government." *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 208 (1983) (emphasis added); *see also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 240-41 (1984) ("[S]tates are precluded from regulating the safety aspects of nuclear energy."); *English v. General Elec. Co.*, 496 U.S. 72, 81-83 (1990) (same).   It follows that federal nuclear safety standards preempt inconsistent state standards, whether imposed through statutes or regulations, on the one hand, or the tort system, on the other.   *See, e.g.*, *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1003 (9th Cir. 2008); *Roberts v. Florida Power & Light Co.*, 146 F.3d 1305, 1308 (11th Cir. 1998); *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1552-53 (6th Cir. 1997); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1100 (7th Cir. 1994); *In re TMI Litig. Cases Consol. II* (*TMI II*), 940 F.2d 832, 859-60 (3d Cir. 1991); *cf. Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1008 (2008) (rejecting

22

any distinction, for preemption purposes, between state regulation imposed by statutes or administrative regulation, on the one hand, and tort law, on the other).  If the Federal Government authorizes a certain level of nuclear emissions, state law may not forbid that level of emissions; federal nuclear safety standards thus provide a "'safe haven'" for nuclear operators.  *See, e.g.*, *Koller v. Pinnacle W. Capital Corp.*, No. CV-06-2031, 2007 WL 446357, at *3 (D. Ariz. 2007) (quoting *McLandrich v. Southern Cal. Edison Co.*, 942 F. Supp. 457, 465 n.7 (S.D. Cal. 1996)).

That straightforward point makes sense: allowing state law to regulate nuclear safety would thwart the Nation as a whole from harnessing nuclear energy for civilian or military use, because a "not in my backyard" mentality would frustrate the development of this important but controversial technology.  Through the PAA, Congress struck a balance between compensating the victims of nuclear incidents and fostering the development of nuclear energy and technology. Indeed, that point is explicit in the PAA itself, where Congress found that "[t]he development, utilization, and control of atomic energy for military and for all other purposes are vital to the common defense and

security," and that the PAA was necessary "[1] to protect the public and [2] to encourage the development of the atomic energy industry."   42 U.S.C. § 2012(a) & (i); *see also Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 64 (1978) (quoting § 2012(i) in noting the "dual purpose" of the PAA); *Lujan v. Regents of Univ. of Cal.*, 69 F.3d 1511, 1514 (10th Cir. 1995) (same).

Permitting the States to develop and apply their own nuclear safety standards on an *ad hoc* and *post hoc* basis through the tort system would upset this careful balance and thereby "frustrate the objectives of the federal law."   *TMI II*, 940 F.2d at 859 (internal quotations and citation omitted).   The national interest in nuclear energy would be thwarted if individual juries could devise their own nuclear safety standards under state common law.   *See, e.g.*, *Hanford*, 534 F.3d at 1003 ("To allow a jury to decide on the basis of a state's reasonableness standard of care would put juries in charge of deciding the permissible levels of radiation exposure and, more generally, the adequacy of safety procedures at nuclear plants—issues that have explicitly been reserved to the federal government.") (internal quotation omitted); *see also Silkwood*, 464 U.S. at 250 ("Congress' decision to

prohibit the states from regulating the safety aspects of nuclear development was premised on its belief that [the Federal Government] was more qualified to determine what type of safety standards should be enacted in this complex area.").

The 1988 PAA amendments completely federalized this area of the law by making a "public liability action" under the PAA, 42 U.S.C. § 2014(w), "the *exclusive* means of compensating victims for any and all claims arising out of nuclear incidents." *Hanford*, 534 F.3d at 1009 (emphasis added); *see also TMI II*, 940 F.2d at 854 ("A claim growing out of any nuclear incident is compensable under the terms of the [PAA] or *it is not compensable at all*.") (emphasis in original; citations omitted). The PAA defines a "nuclear incident" as "any occurrence … causing … bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material."  42 U.S.C. § 2014(q). For the most part, the PAA incorporates state law to provide the underlying rules of decision for a public liability action: "A public liability action shall be deemed to be an action arising under section

25

2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section."  42 U.S.C. § 2014(hh).

The district court below turned the PAA on its head, however, by holding that the state law incorporated by reference into the PAA is immune from preemption by any other federal law.  *See Cook IX*, 273 F. Supp. 2d at 1179-99, App. 498-541.  According to the district court, the PAA's *express* preemption of state law that is "inconsistent with the provisions of such section" necessarily forecloses any *implied* preemption by the PAA, the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, or any other federal law.  *See* 273 F. Supp. 2d at 1181, App. 499. In effect, thus, the district court turned the Price-Anderson Act into an engine of *reverse* preemption that strips federal nuclear safety standards of their preemptive force.  That approach has no basis in law or logic.

Indeed, that approach has been rejected by each and every one of the five federal courts of appeals to have considered the issue—the Third, Sixth, Seventh, Ninth and Eleventh Circuits.  *See Hanford*, 534

26

F.3d at 1003; *Roberts*, 146 F.3d at 1308; *Nieman*, 108 F.3d at 1552-53;

*O'Conner*, 13 F.3d at 1100; *TMI II*, 940 F.2d at 859-60.   Virtually all

district courts agree.   *See, e.g.*, *Finestone v. Florida Power & Light Co.*,

319 F. Supp. 2d 1347, 1348 (S.D. Fla. 2004); *Good v. Fluor Daniel Corp.*,

222 F. Supp. 2d 1236, 1247 & n.16 (E.D. Wash. 2002); *Lokos v. Detroit

Edison*, 67 F. Supp. 2d 740, 743 (E.D. Mich. 1999); *McCafferty v.

Centerior Serv. Co.*, 983 F. Supp. 715, 719 (N.D. Ohio 1997);

*McLandrich v. Southern Cal. Edison Co.*, 942 F. Supp. 457, 465-66 (S.D.

Cal. 1996); *Bohrmann v. Maine Yankee Atomic Power Co.*, 926 F. Supp.

211, 220 (D. Maine 1996); *Lamb v. Martin Marietta Energy Sys., Inc.*,

835 F. Supp. 959, 965 (W.D. Ky. 1993); *Hennessy v. Commonwealth

Edison Co.*, 764 F. Supp. 495, 501 (N.D. Ill. 1991).   As these courts

recognized, pervasive federal nuclear safety standards set the duty of

care applicable in public liability actions under the PAA, and state law

cannot alter that duty.   *See, e.g.*, *Roberts*, 146 F.3d at 1308; *Neiman*,

108 F.3d at 1553; *In re TMI*, 67 F.3d 1103, 1106-07 (3d Cir. 1995) (*TMI

III*); *O'Conner*, 13 F.3d at 1105; *TMI II*, 940 F.2d at 859-60.   "Imposing a

standard of care other than the federal regulations would disturb the

carefully crafted balance between private involvement and safety that

27

Congress has achieved." *O'Conner*, 13 F.3d at 1105.  Thus, regardless of the standard of care under *state* law, a PAA plaintiff must establish a violation of the standard of care under federal law, *i.e.*, the relevant federal nuclear safety regulations.  *See, e.g.*, *Roberts*, 146 F.3d at 1307; *O'Connor v. Boeing N. Am., Inc.*, Nos. CV 97-1554 DT *et al.*, 2005 WL 6035255, at *40 (C.D. Cal. 2005); *Lokos*, 67 F. Supp. 2d at 743.

The district court's recognition that its preemption ruling was "contrary to the existing weight of authority on this issue," *Cook IX*, 273 F. Supp. 2d at 1193, App. 517, was, if anything, a vast understatement: that ruling stood alone at the time it was rendered in 2003 and stands alone today.[1]  Indeed, other courts inside and outside this circuit have specifically criticized and rejected that ruling.  *See*, *e.g.*, *Koller*, 2007 WL 446357, at *2-3; *Wilcox v. Homestake Mining Co.*, 401 F. Supp. 2d 1196, 1201 (D.N.M. 2005); *O'Connor*, 2005 WL 6035255, at *40.

The district court's preemption analysis cannot withstand scrutiny.  The court placed great weight on the fact that "'the

---

[1] As far as defendants are aware, only one court has ever endorsed the district court's preemption ruling, *see In re Hanford Nuclear Reservation Litig.*, 350 F. Supp. 2d 871, 887 (E.D. Wash. 2004), and the Ninth Circuit specifically rejected that analysis on appeal, *see Hanford*, 534 F.3d at 1003.

substantive rules for decision'" in a public liability action under § 2210 of the PAA "'shall be derived from the law of the State in which the nuclear incident involved occurs, *unless such law is inconsistent with the provisions of such section.*'"  *Cook IX*, 273 F. Supp. 2d at 1188, App. 517 (quoting 42 U.S.C. § 2014(hh)) (emphasis added by district court). Because federal nuclear safety standards are not set forth in § 2210, according to the district court, those standards do not preempt the state law incorporated by reference into the PAA.  *See id.* at 1188-90, App. 517-22.

The flaw in that analysis is that the state law that is incorporated by reference into the PAA is *already* preempted by inconsistent federal law.  The fact that the PAA looks to state law for the "substantive rules for decision," 42 U.S.C. § 2014(hh), does not mean that the PAA suspends ordinary principles of preemption.  State law also provides the substantive rules of decision in diversity cases, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), but no one would suggest that the state law that is applied by federal courts in diversity cases is immune from ordinary principles of preemption.  It is axiomatic that when the Federal Government acts within the scope of its constitutional

authority—whether through statutes, *see, e.g.*, *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000), or regulations, *see City of New York v. FCC*, 486 U.S. 57, 63 (1988)—its actions trump state law to the extent the latter would frustrate the goals and purposes of the former, *see* U.S. Const. Art. VI, cl. 2; *Geier v. American Honda Motor Co.*, 529 U.S. 861, 884 (2000).  State law that conflicts with federal law is, to that extent, simply "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)).  Nothing in the PAA remotely purports to resurrect state law that is otherwise preempted by federal law.

Indeed, were the district court's analysis correct, the PAA would create an anomalous "federal-law-free" zone in which state law incorporated into the PAA—in contrast to all other state law—was wholly unconstrained by federal law, except for § 2210 of the PAA itself.  Needless to say, that approach would subvert the 1988 amendments to the PAA, which added § 2014(hh), since the whole point of those amendments was "to *expand* federal control over safety and liability issues involving the nuclear industry." *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1504 (10th Cir. 1997).  In other words, putting aside the

anomaly of interpreting a federal statute to create a "federal-law-free" zone as a general matter, it would be especially anomalous to interpret a federal statute to create a "federal-law-free" zone in an exclusively federal field like nuclear safety.

The district court, in short, drew an erroneous negative inference from the language of § 2014(hh). Because that provision expressly preempts state law inconsistent with § 2210, the court read that provision by implication to "un-preempt" state law inconsistent with all *other* provisions of federal law (including federal nuclear safety standards). *See Cook IX*, 273 F. Supp. at 1188-90, App. 517-22. But nothing in § 2014(hh) remotely purports to have such reverse-preemptive effect. To the contrary, it is well-established that Congress' inclusion of an express preemption clause "does not bar the ordinary working of conflict pre-emption principles." *Geier*, 529 U.S. at 869; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001); *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007); *Wyoming v. United States*, 279 F.3d 1214, 1234-35 & n.19 (10th Cir. 2002); *Choate v. Champion Home Builders Co.*, 222 F.3d 788, 794-

95 (10th Cir. 2000).   As this Court put it in *Wyoming*, quoting from *Geier*:

> Why, in any event, would Congress not have wanted ordinary pre-emption principles to apply where an actual conflict with a federal objective is at stake?   Some such principle is needed.   In its absence, state law could impose legal duties that would conflict directly with federal regulatory mandates ….   To the extent that such an interpretation of the saving provision reads into a particular federal law toleration of a conflict that those principles would otherwise forbid, it permits that law to defeat its own objectives, or potentially, as the Court has put it before, to "destroy itself."   We do not claim that Congress lacks the constitutional power to write a statute that mandates such a complex type of state/federal relationship.   But there is no reason to believe Congress has done so here.

*Wyoming*, 279 F.3d at 1235 (quoting *Geier*, 529 U.S. at 871-72).   That passage is a complete rejoinder to the district court's interpretation of § 2014(hh) of the PAA to suspend ordinary principles of conflict preemption.[2]

---

[2] The district court's reliance on legislative history was equally misplaced.   The court quoted at length from various committee reports for the general proposition that the PAA intended "minimal interference" with state law.   *See Cook IX*, 273 F. Supp. 2d at 1182-85, 1187, 1189-90, App. 506-10, 515-16, 520-21.   Defendants have no quarrel with that general proposition; it is indisputable that the PAA generally looks to state law for the substantive rules of decision in a PAA claim.   But that general proposition in no way suggests any intention to suspend the ordinary rules of conflict preemption.   Not one word in the legislative history supports the district court's decision that

32

The district court also erred by invoking the Supreme Court's *Silkwood* decision in support of its anomalous interpretation of the PAA. *See Cook IX*, 273 F. Supp. 2d at 1194, 1199, App. 522-27. In that decision—rendered prior to the 1988 PAA amendments creating an exclusive federal cause of action—the Court held that an award of punitive damages under state law did not intrude into the exclusively federal field of nuclear safety regulation. *See* 464 U.S. at 255-56. The district court below read *Silkwood* broadly to preserve "state tort law" from federal preemption in that field. 273 F. Supp. 2d at 1192, App. 525-26.

That interpretation of *Silkwood* is manifestly incorrect. The only issue before the Supreme Court in that case was whether the PAA preempted the state-law *remedy* of punitive damages, not whether federal nuclear safety standards preempted the imposition of state-law *liability* for federally authorized nuclear emissions. *See* 464 U.S. at 241, 250-51, 253, 255-56. To the contrary, as noted above, the *Silkwood* Court specifically reaffirmed that "states are precluded from regulating

---

the state law incorporated by reference into the PAA is immunized from preemption by any and all other sources of federal law.

33

the safety aspects of nuclear energy," *id.* at 240-41, and simply concluded that the Federal Government's "exclusive authority to set safety *standards* did not foreclose the use of state tort *remedies*," *id.* at 253 (emphasis added); *see also id.* at 250-51 (distinguishing between state-law "standards" and "remedies"). Nothing in *Silkwood* remotely suggests that state law could impose liability for federally authorized emissions; to the contrary, if anything, the Court's emphasis on the distinction between "standards" and "remedies" would make no sense if *neither* were preempted.

Indeed, *Silkwood* did not involve federally authorized nuclear emissions at all; to the contrary, the offsite nuclear exposure in that case greatly exceeded the relevant federal safety standards for offsite exposure. *See Silkwood v. Kerr-McGee Corp.*, 485 F. Supp. 566, 583 (W.D. Okla. 1979). Moreover, the *Silkwood* Court went to great lengths to highlight the narrowness of its decision, emphasizing that "[w]e do not suggest that there could never be an instance in which the federal law would preempt the recovery of damages based on state law. ... We perceive no such conflict or frustration *in the circumstances of this case*." 464 U.S. at 256 (emphasis added). Not surprisingly, the many

34

courts that have held that federal nuclear safety standards preempt state standards of care in PAA actions have had little difficulty distinguishing the Supreme Court's *Silkwood* decision. *See, e.g.*, *Roberts*, 146 F.3d at 1308 n.5; *O'Conner*, 13 F.3d at 1104-05 & n.13; *TMI II*, 940 F.2d at 859.

In a similar fashion, the district court overread this Court's *Silkwood* opinion, which was reversed in part by the Supreme Court. *See Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908 (10th Cir. 1981), *rev'd in part*, 464 U.S. 238 (1984). Again, that decision predated the 1988 PAA amendments, and involved common-law claims arising under state law. *See* 667 F.2d at 912 ("The action was based upon common law tort principles under Oklahoma law."). By definition, thus, that decision cannot dictate the proper scope of state law in a public liability action under the PAA.

In any event, as noted above, federal safety standards *were* violated in *Silkwood*. The exposure at issue there took place *outside* the nuclear plant, in a private apartment. *See* 485 F. Supp. at 583 ("As noted in the record, Silkwood's exposure took place at home in her apartment. ... [I]t exceeded by two and a half times the exposure

permitted to any other member of the public. … It is … clear that the circumstances under which Silkwood received the exposure were not embraced by the government regulations.").  This Court's holding was limited accordingly: "We do not think imposition of tort liability *in the instant case, in which a quantity of plutonium has escaped the plant site and caused damage*, will significantly interfere with federal regulation of Kerr-McGee's plant."  667 F.2d at 920 (emphasis added).  Contrary to the district court's assertion, *see Cook IX*, 273 F. Supp. 2d at 1185, App. 511-12, this Court did not hold (and had no occasion to hold, given the facts of that case) that the PAA allows the imposition of liability under state law for nuclear emissions within federally authorized levels.  Under these circumstances, any statements about the preemptive effect of federal regulations were unnecessary to the resolution of the case, and therefore non-binding *dicta.  See, e.g., Bates v. Dep't of Corrections*, 81 F.3d 1008, 1011 (10th Cir. 1996); *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1184 (10th Cir. 1995).

At bottom, the point here is simple: this Court need not and should not create a circuit conflict on whether federal nuclear safety standards provide the duty of care in actions under the PAA.  Because

the district court ruled that those standards do not provide that duty, it did not require plaintiffs to prove any violation of those standards, and indeed allowed plaintiffs' experts to testify at trial about alleged contamination that did not result from emissions in violation of federal health and safety standards. *See, e.g.*, Trial Tr. (11/2/05), at 3661, App. 2914 (Goble) ("[S]ome of the exposures for people living in the class area were really small … very, very small exposures.   And, for instance, regulatory agencies would not have been concerned about such exposures."); Trial Tr. (10/12/05), at 653, App. 2648 (opening statement) ("You may hear the excuse that Government standards were not violated.   One instruction I think you will hear in this case is that the Government standards are not relevant to whether there was negligence or not.").   And the court only compounded that error by rejecting defendants' proposed jury instructions that (1) plaintiffs had the burden of proving non-compliance with federal standards in proving a violation of a legal duty, or (2) in the alternative, compliance with federal standards is an affirmative defense.   *See* Order (12/7/06), at 46, App. 1973.   Accordingly, the judgment in plaintiffs' favor should be reversed, and the case remanded for a determination whether there is

any genuine dispute that defendants complied with the applicable federal nuclear safety standards.[3]

## II. The District Court Erred By Allowing Plaintiffs To Recover Under The PAA Based On Colorado Nuisance Law Without Proving Any Present Physical Injury Or Damage To Person Or Property, Or Loss Of Use Of Property.

Over and above its global error of allowing plaintiffs to recover under the PAA without proving a violation of federal nuclear safety standards, the district court erred by allowing plaintiffs to recover under the PAA based on Colorado nuisance law without proving any present physical injury or damage to person or property, or loss of use of property. *See Cook IX*, 273 F. Supp. 2d at 1201-09, App. 547-64. That error has two distinct components, one governed by federal law and the other by state law. Those two components reflect the hybrid nature of PAA claims.

---

[3] Although this federal preemption argument alone provides a sufficient basis for reversing the judgment, defendants respectfully submit that it would be in the interests of judicial economy and efficiency, not to mention fairness and justice, for this Court to proceed to address the other issues presented by this appeal to give the district court guidance on remand in this nineteen-year-old litigation. *See, e.g.*, *United States v. Gallant*, 537 F.3d 1202, 1234 (10th Cir. 2008); *Colorado Visionary Academy v. Medtronic, Inc.*, 397 F.3d 867, 876 (10th Cir. 2005).

As noted above, a "public liability action" under the PAA is the *exclusive* means for seeking redress for a nuclear-related injury; a plaintiff seeking such redress "can sue under the Price-Anderson Act, as amended [in 1988], or not at all." *Nieman,* 108 F.3d at 1553; *see also Hanford*, 534 F.3d at 1003; *In re Berg Litig.*, 293 F.3d 1127, 1132 (9th Cir. 2002); *Corcoran v. New York Power Auth.*, 202 F.3d 530, 537 (2d Cir. 1999); *O'Conner*, 13 F.3d at 1099; *TMI II*, 940 F.2d at 854. The PAA, however, generally looks to state law for the underlying "substantive rules for decision" in such an action. 42 U.S.C. § 2014(hh). To this extent, the PAA incorporates substantive state tort law by reference. A plaintiff may not bring a PAA claim without relying on some underlying state-law cause of action. *See, e.g.*, *Dumontier v. Schlumberger Tech. Corp.*, 543 F.3d 567, 570 (9th Cir. 2008).

The PAA's incorporation of state tort law, however, is not absolute. As noted in Section I above, the state tort law incorporated by reference into the PAA is itself subject to the ordinary preemptive force of federal law. In addition, the PAA imposes its own substantive limitations on state law. Of particular relevance here, a "public liability action" under the PAA is limited to claims arising from a "nuclear

39

incident," which (as noted above) is defined as "any occurrence ... causing ... bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material."  42 U.S.C. § 2014(q). Thus, as a matter of *federal* law, a plaintiff bringing a PAA claim must prove "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property," *id.*, regardless of whether the state tort law incorporated by reference into the PAA would otherwise require proof of such injury or damage, or loss of use of property.

To date, this issue has arisen most frequently in the context of PAA claims based on state-law medical-monitoring and emotional-distress causes of action.  Such claims have been brought by plaintiffs who allege exposure to radiation, but who have not manifested any present physical injury as a result of that exposure.  Regardless of whether state tort law would recognize such claims, they are not cognizable under the PAA as a matter of *federal* law because they do not involve the statutorily requisite "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property."  42

U.S.C. § 2014(q); *see, e.g.*, *Dumontier*, 543 F.3d at 570-71; *Hanford*, 534 F.3d at 1009; *Golden v. CH2M Hill Hanford Group, Inc.*, 528 F.3d 681, 683-84 (9th Cir. 2008); *Berg*, 293 F.2d at 1131. "[T]he Act prohibits recovery when [personal-injury] plaintiffs haven't suffered 'bodily injury, sickness, disease, or death'—even when the state cause of action doesn't have that limitation." *Dumontier*, 543 F.3d at 570 (quoting 42 U.S.C. § 2014(q)); *see also id.* at 569 ("Exposure to radioactive materials is compensable *only* if it causes one of the harms on [the statutory] list.") (emphasis added; citations omitted); *Berg*, 293 F.3d at 1131 ("[A]lthough [state] law permits emotional distress claims in the absence of physical injury, allowance of such claims here would be inconsistent with the Act's 'bodily injury' requirement.") (citation omitted).

These limitations on PAA claims comport with the Act's overall goal of striking a balance between providing compensation for victims of nuclear incidents, on the one hand, and limiting nuclear liability, on the other. *See, e.g.*, 42 U.S.C. § 2012(i); *Duke Power*, 438 U.S. at 64; *Dumontier*, 543 F.3d at 1170; *Berg*, 293 F.3d at 1132; *Kennedy v. Southern Cal. Edison Co.*, 268 F.3d 763, 767 (9th Cir. 2001); *In re TMI*

*Litig.*, 193 F.3d 613, 624 n.7 (3d Cir. 1999) (*TMI IV*); *Lujan*, 69 F.3d at 1514.   Such a balance serves not only to foster the development of nuclear energy and technology but also to prevent persons who have not suffered "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property" from diverting funds reserved for persons who have.

As noted above, the district court in this case allowed plaintiffs to recover under the PAA based on Colorado nuisance law without proving any present physical injury or damage to person or property, or loss of use of property, based solely on a *risk* of injury from defendants' activities.   In particular, the court allowed plaintiffs to present the jury with two separate and distinct risk-based nuisance theories, either of which could have supported the nuisance verdict in plaintiffs' favor. *First*, the court held that plaintiffs could establish a nuisance by proving that defendants' activities already had exposed them to "some increased health risk."   *See Cook IX*, 273 F. Supp. 2d at 1201-08, App. 549-60; Order (5/17/05), at 5, App. 1136; Jury Instructions 3.6-3.7, App. 1680-85; Trial Tr. (1/20/06), at 10631-35, App. 3410-14.   And *second*, the court held that plaintiffs could establish a nuisance by proving that

42

defendants' activities exposed them to a risk of *future* injury.  *See Cook IX*, 273 F. Supp. 2d at 1208, App. 561-63; Order (5/17/05), at 6, App. 1137; Jury Instruction 3.7, App. 1682-85; Trial Tr. (1/20/06), at 10632-35, App. 3411-14.

> Specifically, the court instructed the jury as follows:

> Plaintiffs claim that Defendants, through their operation of the Rocky Flats plant, caused a nuisance.  In order for the Plaintiff Class to recover from either Dow or Rockwell or both of them on their claim of nuisance, you must find Plaintiffs have proved each of the following elements by a preponderance of the evidence:

> 1.    Dow or Rockwell or both of them interfered with Class members' use and enjoyment of their properties in the Class Area *in one or both of these two ways*:

>> A.    [Nuisance theory #1:] By causing Class members to be exposed to plutonium and placing them at *some increased risk of health problems* as a result of this exposure ... ; *and/or*

>> B.    [Nuisance theory #2:] By causing objective conditions that pose a demonstrable *risk* of *future* harm to the Class Area ...;

Jury Instruction 3.6, App. 1680-81 (emphasis added); *see also* Trial Tr. (1/20/06), at 10631-32, App. 3410-11.

Each of these two nuisance theories is erroneous as a matter of both federal and state law.  *First*, any theory of risk-based injury fails to state a claim under the PAA as a matter of federal law.  And *second*, in

43

any event Colorado nuisance law does not allow recovery for either (1) a risk that is scientifically unfounded, or (2) a risk of future injury.  Each of these grounds is discussed in turn below.

## A.   The PAA Does Not Allow Recovery Based Solely On A Risk Of Injury.

As explained above, regardless of substantive state law, a plaintiff seeking to recover under the PAA must establish "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property" arising out of or resulting from nuclear emissions.  42 U.S.C. § 2014(q); *see also Dumontier*, 543 F.3d at 570-71; *Hanford*, 534 F.3d at 1009; *Golden*, 528 F.3d at 683; *Berg*, 293 F.2d at 1131.  Here, the district court erroneously relieved plaintiffs of this burden by allowing them to recover under not one but two expressly *risk*-based nuisance theories.  A risk of injury is not the same thing as an injury, and a plaintiff may not recover under the PAA for a risk of injury.

### 1.   A Present Risk Alone Cannot Give Rise To A PAA Claim.

Under plaintiffs' first nuisance theory, the district court allowed them to recover for having been exposed to "some increased health risk," without showing any present physical injury or damage to person or property, or loss of use of property.  *See Cook IX*, 273 F. Supp. 2d at

44

1201-08, App. 549-60; Order (5/17/05), at 5, App. 1136; Jury

Instructions 3.6-3.7, App. 1680-85; Trial Tr. (1/20/06), at 10631-35, App.

3410-14. As the court instructed the jury:

> The first possible form of class-wide interference is whether
> one or both of Defendants' activities at Rocky Flats
> interfered with Class members' use and enjoyment of their
> properties by causing Class members to be exposed to
> plutonium and placing them at *some increased risk* of health
> problems as a result of this exposure. To find that Plaintiffs
> proved this form of interference, you do not need to find that
> all Class members were exposed to plutonium at the same
> time or by the same methods or to the same degree or that
> they all incurred the same level of health risk as a result of
> exposure to plutonium. It is enough to find for purposes of
> this form of interference with use and enjoyment of property
> that the Class members were exposed to plutonium in some
> way as a result of one or both Defendants' activities and
> incurred *some increment of increased health risk* as a result.

Jury Instruction 3.7, App. 1682-85 (emphasis added); Trial Tr. (1/20/06),

at 10632-33, App. 3411-12. The district court thereby erred as a matter

of federal law.

The cases rejecting emotional-distress and medical-monitoring

claims under the PAA are squarely on point here. In those cases,

plaintiffs sought to recover either for *risk* of injury or *fear* of injury.

Those efforts, however, ran afoul of the federal requirement that a PAA

plaintiff prove "bodily injury, sickness, disease, or death, or loss of or

damage to property, or loss of use of property."  42 U.S.C. § 2014(q); *see
also Dumontier*, 543 F.3d at 570-71; *Hanford*, 534 F.3d at 1009-10;
*Golden*, 528 F.3d at 683; *Berg*, 293 F.3d at 1131-32.  Even where a
plaintiff has been exposed to radiation, and thus may fear some
increased health risk, and may indeed be subject to some increased
health risk, neither such fear nor such increased risk alone is actionable
under the PAA.  *See, e.g.*, *Dumontier*, 543 F.3d at 571 ("The [PAA] …
permits recovery for disease—not simply a risk of disease.  We have
previously held that such a risk isn't compensable.") (citing *Berg*, 293
F.3d at 1131); *Golden*, 528 F.3d at 683-84 ("[The plaintiff] can't show
that the exposure caused his physical injuries and without physical
injury, he can't recover for psychic harm arising from exposure to
radioactive materials.") (citing, *inter alia, Berg*, 293 F.3d at 1131).
Accordingly, the district court erred by allowing plaintiffs to recover
under the PAA based upon an increased health *risk* alone, independent
of any injury or damage to person or property, or loss of use of property.

### 2.   A Future Risk Alone Cannot Give Rise To A PAA Claim.

Plaintiffs' second nuisance theory is equally unavailing.  Under
that theory, the district court allowed them to recover for "a threat of

46

*future* harm caused by a defendant's activities … if these circumstances cause plaintiffs fear or anxiety that substantially interferes with their use and enjoyment of property." *Cook IX*, 273 F. Supp. 2d at 1208, App. 561-62 (emphasis added); *see also* Order (5/17/05), at 6, App. 1137. Specifically, the district court instructed the jury that: "In order for you to find interference based on the threat or risk of future harm, you also need not find that the future harm *will* occur and affect the whole of the Class Area.  You need only find that conditions exist that present the *potential* for such class-wide harm to occur."  Jury Instruction 3.7, App. 1683 (emphasis in original); *see also* Trial Tr. (1/20/06), at 10634, App. 3413.

Again, the cases rejecting emotional-distress and medical-monitoring claims are right on point.  A risk of *future* injury, by definition, is not a present physical injury to person or property, or loss of use of property.  To allow a plaintiff to sue under the PAA for a risk of future injury, as the Ninth Circuit has noted, "would allow a plaintiff to sue twice: first for [the threat of some future harm]; and then again when the plaintiff [actually suffers that harm]." *Berg*, 293 F.3d at 1133. The PAA does not allow such double recovery.  If and when plaintiffs or

their properties are actually injured by defendants' conduct, then they may seek redress under the PAA. The *risk* of a future injury is simply not actionable under the Act.

The bottom line here is that neither of the two nuisance theories that the district court allowed plaintiffs to present to the jury is cognizable under the PAA, and thus the jury's nuisance verdict cannot stand as a matter of law. And that would be true even if only one of the two theories were legally invalid, because the jury returned a general nuisance verdict, without specifying the theory on which that verdict was based. *See* Jury Verdict Form (2/14/06), at 23, App. 1628. Where it is not absolutely clear that a general verdict was based on a legally valid theory, the verdict cannot stand. *See*, *e.g.*, *Allen v. Wal-Mart Stores, Inc.*, 241 F.3d 1293, 1298 (10th Cir. 2001); *Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1301 (10th Cir. 1989).

## B. The District Court Erred In Its Interpretation And Application Of Colorado Nuisance Law.

The two nuisance theories endorsed by the district court, moreover, violated not only the PAA, but also Colorado law. Accordingly, wholly apart from the limitations imposed by the PAA, the jury's general nuisance verdict cannot stand, because a plaintiff cannot

48

recover under the PAA in the absence of a valid underlying state-law cause of action. *See, e.g.*, *Dumontier*, 543 F.3d at 570.

### 1.   A Scientifically Unfounded Risk Cannot Give Rise To Nuisance Liability.

The district court's first nuisance theory, based on "some increased health risk," fails for the simple reason that not just *any* increased risk gives rise to a nuisance claim under Colorado law. Nuisance is not an eggshell-skull tort, which is why it requires a plaintiff to prove that an alleged interference with the use and enjoyment of property is both "substantial" and "unreasonable."  As a matter of law, an interference cannot be "substantial" and "unreasonable" if it is based on a scientifically unfounded risk. Although no case from the Colorado Supreme Court directly addresses this issue, and this Court therefore must make an "*Erie* guess" about how that Court would resolve it, *see*, *e.g.*, *Erie*, 304 U.S. at 72-73; *Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp.*, 959 F.2d 868, 871 (10th Cir. 1992), there is strong evidence that the Colorado Supreme Court would reject the approach advanced by plaintiffs and adopted by the court below.

The best such evidence comes from this Court itself, which has already predicted how the Colorado Supreme Court would resolve this issue. *See Boughton v. Cotter Corp.*, 65 F.3d 823, 832-33 & n.13 (10th Cir. 1995). The plaintiffs there brought, *inter alia*, a Colorado-law nuisance claim alleging that emissions from a uranium mill interfered with their use and enjoyment of their property. Although the plaintiffs prevailed before a jury on liability, the district court prevented them from presenting evidence of their fears of contracting disease *either* to prove liability or to prove damages. *See id.* at 832. The plaintiffs appealed the exclusion of this evidence with respect to damages, and argued that evidence of a scientifically unfounded risk was relevant to nuisance *damages* even if it was not relevant (as they did not dispute) to nuisance *liability*. *See id.*

"Ironically," however, "although the plaintiffs argue[d] that the lower court confused proof of liability and proof of damages," they relied primarily on the Restatement comment "dealing not with damages but rather with proof of liability in a nuisance case." *Boughton*, 65 F.3d at 832. That comment provides, in relevant part, that a plaintiff may establish a nuisance claim based on "'fears and other mental reactions

50

common to the community …, *even though they may be without scientific foundation or other support in fact.*'"  *Id.* (quoting *Restatement (Second) of Torts* § 821F cmt. f (1965); emphasis added).  The comment then gives the following example:

> Thus, the presence of a leprosy sanatorium in the vicinity of a group of private residences may seriously interfere with the use and enjoyment of land because of the normal fear that it creates of possible contagion, even though leprosy is in fact so rarely transmitted through normal contacts that there is no practical possibility of communication of the disease.

*Restatement (Second) of Torts* § 821F cmt. f.

This Court predicted that the Colorado Supreme Court would reject that "'anachronistic'" position with respect to both nuisance liability and damages.  *Boughton*, 65 F.3d at 832 n.13 (quoting *Adkins v. Thomas Solvent Co.*, 487 N.W.2d 715, 726 (Mich. 1992)).  As this Court explained, that position would essentially give nuisance plaintiffs a license to discriminate "'based on unfounded fears regarding persons with AIDS moving into a neighborhood, the establishment of otherwise lawful group homes for the disabled, or unrelated persons living together.'"  *Id.* (quoting *Adkins*, 487 N.W.2d at 726).  Such discrimination based on a scientifically unfounded risk not only is

irrational, but may well be illegal under a host of federal and state statutes, including the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Regardless of what might have been the case in the past, there is simply no basis to think that an enlightened common-law court would conclude that property owners can show a "substantial" and "unreasonable" interference with the use and enjoyment of their property based on a scientifically unfounded risk. *See*, *e.g.*, *Adkins*, 487 N.W.2d at 724-25 ("[R]easonable minds cannot differ that diminished property value based on unfounded fear is not a substantial interference in and of itself."); *Nicholson v. Connecticut Half-Way House, Inc.*, 218 A.2d 383, 385-86 (Conn. 1966). In particular, nothing in Colorado law suggests that the Colorado Supreme Court would follow this "anachronistic" Restatement comment. "[W]e are not convinced that [the Colorado Supreme Court] would follow this particular comment from two decades ago, allowing compensation for wholly unfounded fears." *Boughton*, 65 F.3d at 832 n.13.

The district court below, however, took a different view of the matter. *See Cook IX*, 273 F. Supp. 2d at 1201-08, App. 549-60; *see also* Order (5/17/05), at 5, App. 1136. The court declared that it is

"questionable" to dismiss the Restatement comment as anachronistic, *Cook IX*, 273 F. Supp. 2d at 1205 n.28, App. 553 n.28, and rejected defendants' argument that Colorado law would not recognize a nuisance claim based on a scientifically unfounded risk, *see id.* at 1201-08, App. 549-60. Ironically, the district court purported to distinguish *Boughton* on the ground that the issue there involved nuisance damages, not liability. *See id.* at 1206, App. 557-58. As noted above, the whole reason that *Boughton* involved only damages is that the appellants there did not even *try* to argue that a scientifically unfounded risk could give rise to nuisance liability, and instead argued that evidence of such risk was admissible as evidence of damages even if not admissible as evidence of liability. The district court's assertion that this Court in *Boughton* "was careful to distinguish between evidence relevant to proving liability for nuisance and evidence relevant to proving any annoyance and discomfort damages once liability is established," *id.*, App. 557-58, is thus disingenuous, since that distinction was drawn by the appellants in *Boughton*, on the theory that evidence regarding damages is subject to a *lower* threshold than liability. At the very least, this Court's considered *dictum* in *Boughton* makes a persuasive case

why the Colorado Supreme Court would reject the sweeping nuisance theory advanced by plaintiffs and embraced by the district court.

The district court purported to base its contrary conclusion in part on the Colorado Supreme Court's decision in *Hoery v. United States*, 64 P.3d 214 (Colo. 2003). *See Cook IX*, 273 F. Supp. 2d at 1203, App. 550-51. According to the district court, *Hoery* "strongly suggests that proof of health risk is not an element" of a nuisance claim, because the Court did not discuss "the concept of health risk" in its discussion of nuisance. *Id.* But that is a manifest over-reading of *Hoery*. That case was certified to the Colorado Supreme Court by this Court to address two specific questions about whether alleged contamination was a "continuing tort" for purpose of the statute of limitations. *See Hoery*, 64 P.2d at 215. The issue before the Colorado court, thus, was not whether the challenged conduct was a nuisance, but whether any nuisance was a "continuing" one. In any event, as the district court acknowledged, there was no dispute in *Hoery* that the alleged contamination of the plaintiff's property far exceeded relevant safety standards. *See Cook IX*, 273 F. Supp. 2d at 1203, App. 551 (citing *Hoery*, 64 P.3d at 216 n.2). Accordingly, *Hoery* on its face did not present the issue whether a

scientifically unfounded risk can give rise to a "substantial and unreasonable" interference with the use and enjoyment of property, and hence a nuisance.

Quite to the contrary, the Colorado Supreme Court has emphasized that "an allegation of unreasonableness is *central* to a nuisance claim," and that the determination whether an interference is "unreasonable" depends on a balancing of "the social utility of the act causing the invasion" and "the harm of that invasion." *Public Serv. Co. of Colo. v. Van Wyk*, 27 P.3d 377, 392-93 (Colo. 2001) (emphasis added); *see also id.* at 393 ("The allegation of unreasonableness is the threshold to a nuisance claim, because without unreasonableness, there can be no intent to commit an invasion that unreasonably interferes with a plaintiff's use and enjoyment of his land.").

Where, as here, official safety regulators have already undertaken such balancing, their "determination of reasonableness *sets the standard* for the balance between the social utility of the [activity at issue] and possible harm to property." *Id.* at 393 (emphasis added); *see also id.* (explaining that where a governmental entity has "quantified the [invasion] level it deemed to be reasonable, then that [invasion]

level would *become the standard* for the level at which [the invasion] would not constitute an invasion interfering with [plaintiffs'] use and enjoyment of their property") (emphasis added).   That point makes sense, and accommodates the common law with the regulatory state: where alleged contamination does not rise to a level of toxicological concern (as determined by official safety regulators), there can be no "substantial and unreasonable" interference with property rights. *See, e.g.*, *In re Wildewood Litig.*, 52 F.3d 499, 503 (4th Cir. 1995) ("Because the TCE levels did not rise to the level of toxicological concern, the [plaintiffs] have presented no evidence that the use and enjoyment of their property was unreasonably interfered with by [the defendant].") (applying South Carolina law).

That straightforward point dooms the nuisance verdict, because—specifically as a result of Rocky Flats—since the 1970s the Colorado Department of Health (CDH) has set the level of plutonium that it considers to be a reasonable intrusion on property.   In particular, the CDH has adopted a 2.0 disintegrations per minute per gram (dpm/g) standard for permissible plutonium in the soil. *See* 6 Colo. Code Regs. 1007-1, RH 4.21.1, RH 4.60.1.   This standard was set by the CDH after

56

a thorough risk analysis, and is designed to be "ultraconservative." Colo. Dep't of Health, *A Risk Evaluation for the Colorado Plutonium-in-the-Soil Standard* (Jan. 1976), App. 1062-90.  Accordingly, any plaintiff who could not prove contamination in excess of that standard by definition has not been subjected to an "unreasonable" interference with property, and cannot state a nuisance claim as a matter of law.

The district court disagreed.  In the court's view, *Van Wyk* is limited to regulatory action that is "quasi-judicial" in nature, and "employ[s] much the same utility versus harm balancing test as applies in the nuisance context."  Mem. Op. Regarding Jury Instructions (12/7/06), at 39-40, App. 1966-67.  According to the court, "*Van Wyk*, therefore, does not stand for the general proposition that compliance with state or federal regulatory standards establishes the reasonableness of a claimed interference in a private nuisance action." *Id.*  The court dismissed the CDH's standards for plutonium in the soil as "regulatory standards … akin to zoning regulations and ordinances." *Id.* at 40, App. 1967.

Those asserted distinctions cannot withstand scrutiny.  Under basic principles of administrative law, agencies generally may operate

through either rulemaking or adjudication, *see, e.g.*, *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 293 (1974), and a rulemaking is not generally entitled to less deference than an adjudication, *see, e.g.*, *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1496 (D.C. Cir. 1988). Here, as in *Van Wyk*, official regulators balanced competing considerations, and an alleged interference with property rights that complies with their safety standards cannot be "unreasonable" as a matter of Colorado law.

By allowing plaintiffs to recover under a nuisance theory for "some increased health risk," *even if scientifically unfounded*, the district court erred. And plaintiffs took full advantage of that error, presenting the jury with expert testimony about public fears, even if scientifically unfounded, about health risks from radiation associated with nuclear energy. *See, e.g.*, Trial Tr. (11/7/05), at 4232-33, App. 2924.2-3 (Slovic); Trial Tr. (12/6/05), at 6663-65, App. 3114.1-3 (Hunsperger); Trial Tr. (11/2/05), at 3661, App. 2914 (Goble). Because the district court allowed plaintiffs to recover under an erroneous legal standard, the nuisance judgment in their favor cannot stand.

### 2.   A Risk Of *Future* Injury Cannot Give Rise To Nuisance Liability.

Similarly, the district court's second nuisance theory, based on the risk of a *future* injury, *see Cook IX*, 273 F. Supp. 2d at 1208, App. 561-63; Order (5/17/05), at 6, App. 1137, fails for the simple reason that such a risk does not give rise to a nuisance claim under Colorado law.  Again, the key point here is that nuisance law protects against a substantial and unreasonable interference with the use and enjoyment of property. *See, e.g.*, *Van Wyk*, 27 P.3d at 391.  A risk of *future* injury is not a substantial and unreasonable interference with the use or enjoyment of property, and hence is not actionable as a matter of law.

The Colorado Supreme Court virtually held as much in *Green v. Castle Concrete Co.*, 509 P.2d 588 (Colo. 1973), where it ordered the dismissal of a nuisance complaint brought against a concrete company that planned to open a limestone quarry.  As the court explained, "there must be a real and appreciable interference with the *present* usability of a person's land before he can have a cause of action" for nuisance.  *Id.* at 590-91 (emphasis added; internal quotation omitted).  Speculation as to *future* interference—*i.e.*, an "anticipatory nuisance," *id.* at 591—will not suffice.   Indeed, it is hard to see how a court could ever adjudicate

59

whether a risk of *future* interference involves a "substantial and unreasonable" interference, since by definition the interference has not yet transpired.   Other jurisdictions agree.   *See, e.g.*, *Koll-Irvine Ctr. Prop. Owners Ass'n v. County of Orange*, 24 Cal. App. 4th 1036, 1041-42 (1994) ("[A] private nuisance action cannot be maintained for an interference in the use and enjoyment of land caused solely by the fear of a *future* injury.") (emphasis added); *Southeastern Liquid Fertilizer Co. v. Chapman*, 120 S.E.2d 651, 653 (Ga. 1961) ("[I]t has long been recognized in Georgia that the mere apprehension of *future* injury from a nuisance which the complainant anticipates may be maintained in the future in the operation of a lawful business is not sufficient to authorize its abatement.") (emphasis added).

The district court, however, rejected these authorities, and held that plaintiffs could pursue a nuisance theory based on a risk of future injury.   *See Cook IX*, 273 F. Supp. 2d at 1208, App. 561-63.   In particular, the court purported to distinguish *Green* and *Koll-Irvine* on the ground that those cases were based "*solely* on the plaintiff's fear of future injury," whereas plaintiffs here also allege "current" injury.   *Id.* at 1208 & n.36, App. 562-63 & n.36 (emphasis added).   But, with all

60

respect, that distinction is baseless.  The district court allowed plaintiffs here to pursue a *separate and independent* nuisance theory based on the risk of future injury.  *See* Jury Instruction 3.6, App. 1680-81; *see also* Trial Tr. (1/20/06), at 10631-32, App. 3410-11.  The validity of that theory, which could have provided a basis for the jury's general nuisance verdict in and of itself, does not hinge on the validity of the plaintiffs' distinct theory based on the risk of current injury.  Because the two theories were presented to the jury as separate, the validity of the one has no bearing on the validity of the other.  To the contrary, as noted above, the entire nuisance verdict must fall if *either* theory is invalid.  *See, e.g.*, *Allen*, 241 F.3d at 1298; *Farrell*,  866 F.2d at 1301.

## III.  The District Court Erred By Allowing Plaintiffs To Recover Under The PAA Based On Colorado Trespass Law Without Proving Any Present Physical Injury Or Damage To Person Or Property, Or Loss Of Use Of Property.

The district court also erred by allowing plaintiffs to recover under the PAA based on Colorado trespass law without proving any present physical injury or damage to person or property, or loss of use of property.  *See Cook IX*, 273 F. Supp. 2d at 1196-1201, App. 542-47.  "Plaintiffs need not demonstrate that plutonium and other Plant-derived contaminants are present on their properties at levels of

61

toxicological concern or are otherwise causing damage to their properties in order to prevail on their trespass claim." *Id.* at 1201, App. 547. The court thereby rejected defendants' position that plaintiffs could recover for an intangible trespass *only* if they could prove injury or damage from the trespass. *See id.* The court instead instructed the jury that "Plaintiffs are <u>not</u> required to show that plutonium is present on the Class Properties at any particular level or concentration, that they suffered any bodily harm because of the plutonium or that the presence of the plutonium on the Class Properties damaged these properties in some other way." Jury Instruction 3.3, App. 1677 (emphasis in original); *see also* Trial Tr. (1/20/06), at 10629, App. 3408.

Again, as with plaintiffs' PAA claim based on Colorado nuisance law, the court thereby erred as a matter of both federal and state law. *First*, a claim not involving any injury or damage to person or property, or loss of use of property, is not actionable under the PAA regardless of state substantive law. And *second*, an intangible trespass—such as the alleged plutonium contamination at issue here—is not actionable under Colorado law in the absence of a showing of injury or damage to person or property. Each of these two grounds is discussed in turn below.

62

**A.    The District Court Erred Under The PAA By Allowing Plaintiffs To Recover On A Trespass Theory Without Showing Injury Or Damage To Person Or Property.**

As explained in detail in Section II above, it is well established that the PAA does not allow recovery in the absence of "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property."   42 U.S.C. § 2014(q).   Plaintiffs, however, persuaded the district court that they could recover on a trespass theory under Colorado law without showing any injury or damage to person or property.   Even assuming *arguendo* that plaintiffs were correct on this score (and, as explained in Part B below, they are not), the fact remains that plaintiffs cannot recover under the PAA—regardless of state law— without proving a present physical injury or damage to person or property, or loss of use of property.   Because the district court relieved plaintiffs of this burden on their trespass theory, the court took that theory beyond the ambit of the PAA, and accordingly the jury's trespass verdict cannot stand as a matter of federal law.   *See, e.g.*, *Dumontier*, 543 F.3d at 569-71; *Hanford*, 534 F.3d at 1009-10*; Golden*, 528 F.3d at 683; *Berg*, 293 F.3d at 1131.

**B.    The District Court Erred Under Colorado Trespass Law By Allowing Plaintiffs To Recover On A Trespass Theory Without Showing Injury Or Damage To Property.**

Above and beyond the point that plaintiffs' PAA claim based on Colorado trespass law fails under the PAA, it also fails under bedrock Colorado law.  There are two simple points here.  *First*, an intangible trespass is cognizable under Colorado law only when the plaintiff shows some injury or damage to property.  And *second*, the plutonium contamination alleged here is a quintessential intangible trespass, because that contamination is not perceptible to the senses—as plaintiffs themselves have acknowledged.  Each of these points is discussed in turn below.

**1.    Colorado Law Requires A Plaintiff Alleging An Intangible Trespass To Show Injury Or Damage To Property.**

As a threshold matter, there is no real dispute here over the fundamental proposition that Colorado law requires a plaintiff alleging an intangible trespass to show injury or damage to property.  Nor can there be any such dispute; Colorado law is crystal clear on this point.

Under traditional common law, in Colorado as elsewhere, a trespass consisted only of "a *physical* intrusion upon the property of

64

another without the proper permission from the person legally entitled to possession of that real estate." *Van Wyk*, 27 P.3d at 389 (emphasis added; citing cases); *see also Ryan v. City of Emmetsburg*, 4 N.W.2d 435, 438 (Iowa 1942); *Thackery v. Union Portland Cement Co.*, 231 P. 813, 814 (Utah 1924).   A "physical" intrusion is defined as a tangible intrusion, *i.e.*, one capable of being perceived by the senses.   *See, e.g.*, *Van Wyk*, 27 P.2d at 387-88; *see also Maddy v. Vulcan Materials Co.*, 737 F. Supp. 1528, 1539 (D. Kan. 1990) (applying Kansas law).   Upon establishing such a physical intrusion, a plaintiff need not in addition establish any resulting injury or damage.   "By intentionally entering the land possessed by someone else, or causing a thing or third person to enter the land, an individual becomes subject to liability for trespass, *whether or not he caused harm to any legally protected interest of the landowner*."   *Van Wyk*, 27 P.3d at 389 (emphasis added; citing *Restatement (Second) of Torts* § 158).   The theory behind this rule is that "only a tangible invasion can create the sort of interference with a plaintiff's possessory interest which trespass is intended to prevent." *Maddy*, 737 F. Supp. at 1539; *see also* W. Page Keeton *et al.*, *Prosser & Keeton on the Law of Torts* § 13, at 71 (5th ed. 1984) ("[T]he defendant's

act must result in an invasion of tangible matter.  Otherwise, there would be no use or interference with possession.") (footnote omitted).

In recent decades, however, some (although not all) common-law courts have departed from this traditional rule and recognized trespass liability for intangible trespasses, including imperceptible airborne particulates.  *See, e.g., San Diego Gas & Elec. Co. v. Superior Court*, 920 P.2d 669, 695-96 (Cal. 1996) (electric and magnetic fields); *Bradley v. American Smelting & Ref. Co.*, 709 P.2d 782, 787-90 (Wash. 1985) (microscopic airborne particles of heavy metals); *Borland v. Sanders Lead Co.*, 369 So.2d 523, 529 (Ala. 1979) (lead and sulfoxide particulates); *but see Adams v. Cleveland-Cliffs Iron Co.*, 602 N.W.2d 215, 218-25 (Mich. Ct. App. 1999) (refusing to recognize cause of action for intangible trespass).  While thus expanding the substantive reach of trespass law, however, these courts added an important limitation on such novel claims: a plaintiff alleging an intangible trespass, in sharp contrast to a plaintiff alleging a physical trespass, must establish injury or damage to property from the invasion to recover.  "The modern trend departs from the traditional rule by finding that intangible invasions of the plaintiff's property may constitute a trespass.  However, the modern

trend also departs from traditional trespass rules by refusing to infer damage as a matter of law." *Maddy*, 737 F. Supp. at 1539; *see also San Diego*, 920 P.2d at 695; *Bradley*, 709 P.2d at 791; *Borland*, 369 So.2d at 529; *cf. In re Worldcom, Inc.*, 546 F.3d 211, 217-18 (2d Cir. 2008) (declining to decide whether intangible intrusion could ever give rise to trespass liability under Kansas law because, at the very least, an intangible intrusion could not give rise to trespass liability without injury or damage to property); *Satterfield v. J.M. Huber Corp.*, 888 F. Supp. 1567, 1571-72 (N.D. Ga. 1995) (same under Georgia law); *John Larkin, Inc. v. Marceau*, 959 A.2d 551, 555 (Vt. 2008) (same under Vermont law).

The Colorado Supreme Court embraced this modern trend in *Van Wyk* in 2001. Although the *Van Wyk* court accepted the general proposition that an intangible invasion of property (in that case noise, electromagnetic fields, and radiation waves) could give rise to trespass liability, the court emphasized the corollary point that such liability required the plaintiff to prove some physical injury or damage from the invasion. "[W]e now hold that, in Colorado, an intangible intrusion may give rise to claim for trespass, *but only if an aggrieved party is able to*

*prove physical damage to the property caused by such intangible intrusion*." 27 P.3d at 390 (emphasis added); *see also id.* ("An intangible intrusion onto property cannot result in a trespass unless the intrusion causes physical damage to the property."). The *Van Wyk* court thus upheld the dismissal of the trespass claim at issue there on the ground that the plaintiffs had not alleged any "specific physical damage to their property" that was "serious or substantial" in nature. *Id.* at 390-91.

## 2. The Alleged Plutonium Contamination At Issue Here Is A Quintessential Intangible Trespass.

The district court below did not purport to disagree with any of the foregoing points; to the contrary, the court purported to accept them. *See Cook IX*, 273 F. Supp. 2d at 1199-1200, App. 545-46. The court, however, held that the plutonium contamination at issue here was "tangible" as a matter of law, and that no proof of injury or damage was therefore necessary to establish trespass liability. *See id.* at 1200-01, App. 546-47; Order Regarding Proposed Trespass Instructions (12/17/04), at 5, App. 1118 ("As stated in *Cook IX*, this is a traditional trespass case based on a physical intrusion on Class Properties."); *id.* at 6, App. 1119 ("[T]he presence of contamination on another's property is not an intangible trespass under Colorado law."); Mem. Op. Regarding

Jury Instructions (12/7/06), at 13, App. 1940 ("Under Colorado law, a trespass by means of a physical invasion of property, such as I had held was at issue in this case, does not require a showing of a certain magnitude of invasion to be actionable."). Accordingly, the court refused to instruct the jury that it needed to find some damage or injury to plaintiffs' properties before imposing trespass liability. *See* Jury Instructions 3.1-3.5, App. 1674-79; Trial Tr. (1/20/06), at 10627-30, App. 3406-09. The court thereby erred as a matter of law.

The issue here boils down to the meaning of the term "intangible" in the trespass context. Fortunately, the Colorado Supreme Court has spoken to this very issue, explaining that "the meaning of the term 'intangible' is something that is impalpable, or incapable of being felt by touch." *Van Wyk*, 27 P.3d at 387 (citing *Webster's Ninth New Collegiate Dictionary* 603, 628 (1988)). That definition comports with the ordinary meaning of tangibility. *See*, *e.g.*, *Black's Law Dictionary* 1494 (8th ed. 2004) (defining "tangible" as "1. Having or possessing physical form; corporeal. 2. Capable of being touched and seen; perceptible to the touch; capable of being possessed or realized"); *Webster's II New College Dictionary* 1153 (3d ed. 2005) (defining "tangible" as "Discernable by the

touch or capable of being touched"). The *Van Wyk* court thus had little difficulty concluding that the electromagnetic fields and radiation waves at issue there were intangible (and hence not actionable in trespass absent proof of actual injury), because "our senses are incapable of perceiving them." 27 P.3d at 388; *see also id.* at 387 ("Neither electromagnetic fields nor radiation waves produced by electric lines can be perceived by *any* of the senses."). The court further held that noise, "despite being perceptible through hearing, is impalpable, and thus, intangible." *Id.*

Under this approach, it follows that airborne particulates that cannot be perceived by any of the senses are intangible for purposes of trespass law. Indeed, the courts that have considered this issue have concluded just that. *See, e.g., Bradley*, 709 P.2d at 784, 787-91 (explaining that "[p]articulate matter [that is] ... composed of distinct particles of matter other than water ... cannot be detected by the human senses" and is therefore intangible); *Rockwell Int'l Corp. v. Wilhite*, 143 S.W.3d 604, 620 (Ky. Ct. App. 2003) ("When the 'thing' that has entered plaintiff's property is imperceptible to ordinary human senses, it does not so obviously infringe upon a landowner's right to exclusive

70

possession.") (internal quotation omitted); *Adams*, 602 N.W.2d at 223 ("[D]ust, along with other forms of airborne particulate, does not normally present itself as a significant physical intrusion" and is thus intangible as a matter of law.); *Williams v. Oeder*, 659 N.E.2d 379, 382-83 (Ohio Ct. App. 1995) (same); *Padilla v. Lawrence*, 685 P.2d 964, 971 (N.M. Ct. App. 1984) ("The entrance onto the property of blowing particulate matter also is not actionable as trespass in the absence of a finding that the matter settled upon and damaged plaintiffs' property.").

The district court acknowledged the "potentially expansive definition of an 'intangible intrusion' in *Van Wyk*," but held that the Colorado Supreme Court had recently "clarified" that definition in *Hoery*. *Cook IX*, 273 F. Supp. 2d at 1201, App. 545 (citing *Hoery*, 64 P.3d at 221-22). According to the district court, *Hoery* stands for the proposition that "the migration and presence of contaminants upon another's property constitutes a physical invasion that is actionable under the traditional rule of trespass." *Id.* Under this view, pollution is *always* a tangible trespass as a matter of law, "even though the pollution is present on the property in a form or at a concentration that is not perceptible to human senses." *Id.* Thus, *any* deposit of

71

plutonium, no matter how small or scientifically insignificant, is tangible as a matter of law.  That is, once again, a manifest over-reading of *Hoery* that would completely undo the careful balance struck in *Van Wyk* and remove Colorado trespass law from the mainstream of American jurisprudence.

As noted above, the Colorado Supreme Court in *Hoery* answered two specific questions certified by this Court about whether, and to what extent, contamination is a "continuing tort."  *See* 64 P.3d at 215. The issue before the Colorado court, thus, was not whether the challenged conduct was a trespass, but whether any trespass was a "continuing" tort.  In the course of addressing that issue, the *Hoery* court pointed out that "for purposes of answering the certified questions before us, *no dispute exists about whether the [defendant] released TCE into the ground and by doing so, invaded [the plaintiff's] property.*"  *Id.* at 222 (emphasis added).  The fact that "no dispute exist[ed]" on this point only underscores that *Hoery* did not render a holding on the substantive scope of Colorado trespass law.

Indeed, the very next sentence and citation in *Hoery* only confirms that *Hoery* is entirely consistent with *Van Wyk*: "The property invasion

72

constituted a trespass because the toxic pollution released by the [defendant] *physically* intruded upon [the plaintiff's] property without his permission."  64 P.3d at 222 (emphasis added; citing *Van Wyk*, 27 P.3d at 389).  As noted above, *Van Wyk* equated a "physical" intrusion with a "tangible" intrusion.  *See* 27 P.3d at 387-89.  Thus, the *Hoery* court expressly assumed (presumably because it was undisputed) that the intrusion there was physical and hence tangible.  By no stretch of the imagination does *Hoery*, as the district court declared, "necessarily mean[]" that the Colorado Supreme Court "does not consider the deposition of pollution (*which is after all a tangible matter*) onto another's property to be an intangible intrusion under Colorado law." *Cook IX*, 273 F. Supp. 2d at 1201, App. 546 (emphasis added).  Some pollution is tangible; other pollution is intangible—it all depends, as the *Van Wyk* court explained, on whether it is perceptible by the human senses or otherwise palpable.  *See* 27 P.3d at 387-88.  Nothing in *Hoery* remotely suggests, as the district court held, that *all* pollution is tangible as a matter of law.

It is hard to overstate the radical implications of the district court's trespass holding.  To allow property owners to establish liability

73

for a deposit of intangible pollution on their property without any showing of physical damage would "open the proverbial floodgates of litigation," given that "after a century and a half of industrialization there is most likely no land in the continental United States that is completely free from one or more potentially toxic or harmful substances." *Rockwell*, 143 S.W.3d at 621. Accordingly, the district court's approach would "authorize a suit by any landowner … against any individual or enterprise which has ever emitted a potentially harmful substance that can be detected on real property in any amount." *Id.*; *see also John Larkin*, 959 A.2d at 555 ("Because the ambient environment always contains particulate matter from many sources, such a technical reading of trespass would subject countless persons and entities to automatic liability for trespass absent any demonstrated injury. Plainly, that cannot be the law—and, as far as we can tell, no jurisdiction has so held."). The district court erred by taking Colorado trespass law into these uncharted waters; certainly that is not the role of a federal court applying state law. *See*, *e.g.*, *Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906, 913 (10th Cir. 2005) (rejecting request to "expand a theory" of state law "unlike any yet recognized by

the Kansas courts" because "[f]ederal court is not the place to press innovative theories of state law") (internal quotation omitted); *see also Holden v. Connex-Metalna Mgmt. Consulting GMBH*, 302 F.3d 358, 365 (5th Cir. 2002) ("As always, in conducting this inquiry into [the applicable substantive state law, the] task is to predict state law, not to create or modify it—that is, we are to apply existing [state] law, not to adopt innovative theories for the state.") (internal quotation omitted).

The record here leaves no doubt that the alleged deposits of plutonium on plaintiffs' properties are imperceptible to the human senses, and hence intangible as a matter of law.  In pre-trial written discovery, plaintiffs conceded that "the radionuclides and other hazardous substances released from Rocky Flats to which responding plaintiffs and members of the classes (and their properties) were exposed were *not perceptible to the senses*."  Rep. Pls.' Joint Resps. to Dow's 2d Set of Interrogs. (9/15/95), at 12, App. 391 (emphasis added). During opening statements, plaintiffs' counsel acknowledged that "you can't tell when you are exposed to radiation, because it's not detectable by any of your human senses.  You can't see it, you can't smell it, you can't taste it, you can't hear it, and you can't feel it."   Trial Tr.

(10/11/05), at 495-96, App. 2489-90.  At trial, plaintiffs' expert Shawn Smallwood testified that "our normal sensory perception cannot perceive" the alleged plutonium deposits at issue in this case.  Trial Tr. (11/3/05), at 4039, App. 2922; *see also id.* at 4040, App. 2923 ("Q. You would agree with [me] that, by any stretch of the common sense word 'intangible,' [plutonium particles a]re intangible, right?  A. Yes.").  And plaintiffs themselves testified that they could not sense plutonium particles on their properties.  *See* Trial Tr. (11/10/05), at 5028, App. 2928 (Robb); Trial Tr. (11/21/05), at 5956, App. 3088 (Whalen).

Nor did plaintiffs establish that the alleged intangible intrusion of plutonium onto their properties caused any serious or substantial injuries.  To the contrary, the record demonstrates just the opposite. *See* Trial Tr. (10/14/05), at 1060-61, App. 2857-58 (Bartlett); Trial Tr. (12/14/05), at 7958-69, App. 3162-73 (Norton); Trial Tr. (12/9/05), at 7341, App. 3131 (Raabe); Trial Tr. (12/9/05), at 7270-71, App. 3128-29 (Raabe); Trial Tr. (12/15/05), at 8273-81, 8282-83, App. 3184-92, 3193-94 (Till); Trial Tr. (12/16/05), at 8533-34, 8529-31, App. 3199-200, 3196-98 (Till); *see also* Exh. DX536 at 23-25, App. 3472-74; Exh. P1334 at 15-18, App. 3569-72; Exh. DX1187, App. 3486; Exh. DX1779a, App. 3487;

76

Exh. DX1843, App. 3488; Exh. DX1855, App. 3489; Exh. DX1856, App. 3490.  That is not surprising, because (as noted above) plaintiffs never established that the alleged contamination exceeded federal or state regulatory standards.

Accordingly, plaintiffs' trespass theory fails under state law as well as federal law, and hence the trespass verdict in plaintiffs' favor cannot stand.

## IV.   The District Court Erred By Certifying A Class In Light Of Plaintiffs' Inability To Prove An Essential Element Of Their PAA Claims, Injury, On a Classwide Basis With Classwide Proof.

The district court's substantive errors, discussed in detail above, contributed to an overarching procedural error: the court allowed plaintiffs to litigate their PAA claims on a classwide basis.  Had the court recognized that those claims required plaintiffs to establish injury, the court never could have certified a class, because plaintiffs could not and did not establish injury on a classwide basis with classwide proof.  Because the class certified here does not remotely pass muster under Rule 23 of the Federal Rules of Civil Procedure, this case never should have been tried on a classwide basis and the liability

judgment and aggregate damages award in favor of the class cannot stand.

Precisely because representative litigation is the exception, not the norm, in our legal system, *see, e.g., Taylor v. Sturgell*, 128 S. Ct. 2161, 2166-67 (2008); *General Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 155 (1982), and class certification raises serious due-process concerns, *see, e.g., Taylor*, 128 S. Ct. at 2166-67; *Hansberry v. Lee*, 311 U.S. 32, 40-43 (1940), a court must undertake a "rigorous analysis" of the requirements of Rule 23 of the Federal Rules of Civil Procedure before certifying a class, *Falcon*, 457 U.S. at 161.  Those requirements, as this Court recently underscored, have "teeth," *Vallario v. Vandehey*, 554 F.3d 1259, 1264 (10th Cir. 2009), and the abuse-of-discretion standard applicable to a district court's ultimate weighing of all the various factors relevant to class certification is not an excuse for glossing over the Rule's requirements, *see, e.g., id.* at 1264-65; *see also Carpenter*, 456 F.3d at 1187.

The court below, however, began its class certification analysis from the premise that it had "*broad discretion* in deciding whether to allow the maintenance of a class action."  *Cook IV*, 151 F.R.D. at 381,

App. 356 (emphasis added; internal quotation omitted).  According to the court, the standard for certifying a class, at least in the early stages of litigation, is "quite liberal."  *Id.*, App. 357.

The court specifically rejected defendants' argument "that the classes should not be certified because the definitions are so broad as to include persons who cannot sustain the burdens of claim for relief sought by the classes as a whole."  *Id.* at 383, App. 361.  According to the court, determining whether all plaintiffs in the putative class could establish liability on a classwide basis with classwide proof "would necessitate a preliminary hearing on the *merits* as part of the class certification determination," allegedly in violation of Rule 23 and the Supreme Court's decision in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).  *Cook IV*, 151 F.R.D. at 383, App. 362 (emphasis added). The court thus declared that, although "the parties have submitted a great deal of factual material, and defendants argued the facts of the case at length, there are relatively few facts that are crucial to class certification," apart from a factual inquiry into class definition and class size.  *Id.*, App. 362 (internal quotation omitted).  The court then asserted that the common issues regarding defendants' conduct

"represent the core of plaintiffs' action against defendants" and thus satisfied the predominance requirement of Rule 23(b)(3).  *Id.* at 389, App. 376-77.  Accordingly, the court certified a class consisting of "[a]ll persons and entities owning an interest (including mortgagee and other security interests) in real property situated within the Property Class Area, exclusive of governmental entities, defendants, and defendants' affiliates, parents, and subsidiaries," as of June 7, 1989.  *Id.* at 382, 388-89, App. 360, 375-77; *see also Cook VIII*, 181 F.R.D. at 476 n.3, App. 465-66 n.3 (reaffirming class definition). (The Property Class Area was delineated on a map provided by plaintiffs, *see* App. 2279, and consisted of approximately 15,370 parcels of property, *see Cook VIII*, 181 F.R.D. at 476 n.3, App. 465-66 n.3).[4]  Over defendants' continuing objections to class certification, the court ultimately concluded that a classwide trial was warranted to establish not only liability but also aggregate damages.  *See Cook IX*, 273 F. Supp. 2d at 1212-13, App. 570-71.

---

[4] The court also certified a separate non-opt-out class under Rule 23(b)(2) to pursue medical-monitoring claims.  *See Cook IV*, 151 F.R.D. at 382-88, App. 358-75.  The court subsequently decertified that class in light of this Court's decision in *Building & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993).  *See Cook VIII,* 181 F.R.D. at 478-80, App. 470-73.  The court refused, however, to decertify the property-damage class at issue here.  *See id.* at 480-82, App. 473-78.

The court erred as a matter of law by trying this case on a classwide basis. Contrary to the court's assertion, analyzing whether plaintiffs can prove the elements of their claims on a classwide basis with classwide proof is not an impermissible inquiry into the "merits" of the case, but an indispensable inquiry into the propriety of class certification. Indeed, this Court and other courts of appeals have made this very point repeatedly in case after case over the past decade. *See, e.g.*, *Vallario*, 554 F.3d at 1264-67; *Shook v. Board of County Comm'rs of County of El Paso*, 543 F.3d 597, 612 (10th Cir. 2008); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 316 (3d Cir. 2008); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 24 (1st Cir. 2008); *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA) Inc.*, 482 F.3d 372, 381 (5th Cir. 2007); *Initial Public Offering*, 471 F.3d at 41; *Blades v. Monsanto Co.*, 400 F.3d 562, 567-70 (8th Cir. 2005); *Gariety v. Grant Thornton LLP*, 368 F.3d 356, 366 (4th Cir. 2004); *Newton*, 259 F.3d at 166-67; *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). Unless plaintiffs can establish the elements of their claims on a classwide basis with classwide proof, common questions cannot "predominate" as a matter of law under Rule

23(b)(3), because individual trials on liability (not to mention damages) will always be necessary and thus "defeat the economies ordinarily associated with the class action device." *Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 419 (5th Cir. 2001).

"Plaintiffs' factual and legal *allegations* of liability," on which the district court relied here, *Cook VIII*, 181 F.R.D. at 480, App. 474 (emphasis added), are no substitute for an inquiry into whether plaintiffs can prove their claims on a classwide basis with classwide proof. *Alleging* classwide liability is not the same thing as *establishing* that liability can be proven, if at all, on a classwide basis with classwide proof. A court cannot conclude that common issues "predominate" in a case by simply asserting that there are common issues as to whether the defendant did something wrong, *see Cook IV*, 151 F.R.D. at 388-89, App. 375-77—an assertion made in every case in which class certification is sought.

Under the correct legal standard, this case simply could not be tried on a classwide basis. As noted in detail above, plaintiffs' claims require proof of individual injury as an element of *liability*, not just

*damages*.   Unless a particular plaintiff was *injured* by defendants'
conduct, that plaintiff has no PAA claim against them.

Plaintiffs never established that they could prove injury on a
classwide basis with classwide proof.  With respect to trespass, not one
of their experts ever testified that plutonium was actually present on all
class properties as of the time of trial, or that it was actually present on
all class properties as of June 7, 1989, the date by which the class was
defined.  Instead, plaintiffs relied on two studies from the 1970s, *see*
Krey & Hardy Study, Exh. P149A, App. 3491-540; Poet & Martell
Study, Exh. P939, App. 3545-52, neither of which remotely purported to
establish that *all* properties within the class area were contaminated.
*See* Exh. DX1167, App. 3485; Trial Tr. (10/31/05), at 3332, 3342-43,
App. 2906, 2908-09 (Budnitz); Trial Tr. (11/1/05), at 3572, App. 2911
(Budnitz).  And with respect to nuisance, plaintiffs never showed how
they could establish a substantial and unreasonable interference with
each class member's use or enjoyment of his or her property on a
classwide basis with classwide proof, especially given the great variance
in the alleged exposures to plutonium.  *See*, *e.g.*, Trial Tr. (11/2/05), at
3660-61, App. 2913-14 (Goble); Trial Tr. (12/15/05), at 8267-81, App.

3178-92 (Till); Exh. DV 1, App. 3656 (DVD).  Indeed, some plaintiffs did not even live on properties in the class area, *see, e.g.*, Trial Tr. (10/20/05), at 1953, App. 2870 (Babb); Trial Tr. (10/21/05), at 2042, App. 2877 (Cook), and others actually testified that they did not experience *any* interference with their use and enjoyment of their property, *see, e.g.*, Trial Tr. (10/20/05), at 1832, App. 2866 (Ozaki).

Needless to say, a court cannot sidestep the difficulties associated with establishing *liability* on a classwide basis by simply asserting that an aggregate *damages* award can be made on a classwide basis and then allocated among class members.  *See, e.g.*, *Cook IX*, 273 F. Supp. 2d at 1212-13, App. 570-71.  Because liability is a prerequisite for damages, a court cannot allow the recovery of damages on a classwide basis where, as here, the plaintiffs cannot establish liability on a classwide basis.  *See, e.g.*, *Windham v. American Brands, Inc.*, 565 F.2d 59, 66-67 (4th Cir. 1977).  Nor may a court justify class certification by simply declaring that aggregate damages will be allocated in some fashion in the future.  *See, e.g.*, *id.* at 72 ("Nor … can the difficulties inherent in proving individual damages be avoided by

the use of a form of 'fluid recovery.'"); *see also In re Hotel Tel. Charges,*
500 F.2d 86, 90 (9th Cir. 1974).

At the end of the day, this case underscores the foresight of the
drafters of modern Rule 23 in predicting that the class action
mechanism was not well suited for mass tort cases like this one:

> A 'mass accident' resulting in injuries to numerous persons
> is ordinarily not appropriate for a class action because of the
> likelihood that significant questions, not only of damages but
> of liability and defenses of liability, would be present,
> affecting the individuals in different ways.  In these
> circumstances an action conducted nominally as a class
> action would degenerate in practice into multiple lawsuits
> separately tried.

Fed. R. Civ. P. 23 Advisory Committee Note (1966) (internal quotations
omitted); *see also Boughton,* 65 F.3d at 826-27 (same).  Accordingly, the
classwide judgment here cannot stand, and in any remand this case
should proceed on an individual, not classwide, basis.

## V.   The District Court Erred By Allowing A "Damages Subclass" To Recover Compensatory Damages Based On The Prospect Of Future Injury.

The district court's class certification order profoundly distorted
the award of compensatory damages in this case, and the district court
erred by awarding such damages to a "Damages Subclass" distinct from
the class of property owners as of June 7, 1989, whose claims were tried

to the jury.  Accordingly, putting aside the fact that the $176,850,340 compensatory damages award necessarily falls along with the liability judgment or the class certification decision, the compensatory damages award also falls in its own right.

The district court started down the winding road that ultimately led to the damages award by concluding, in rejecting defendants' argument that plaintiffs' claims were time-barred, that the claims involved "continuing torts" as to which the statute of limitations was not a complete defense.  *See, e.g.*, *Cook IX*, 273 F. Supp. 2d at 1211, App. 566-68; *see also Cook v. Rockwell Int'l Corp.*, 358 F. Supp. 2d 1003, 1012-14 (D. Colo. 2004) (*Cook X*), App. 1106-10.  But even for continuing torts, the general rule is that recovery is allowed only as far back from the filing of the complaint as the statute of limitations will allow.  *See, e.g.*, *Hoery*, 64 P.3d at 217; *see also* Colo. Rev. Stat. § 13-80-102; *United States v. Hess*, 194 F.3d 1164, 1177 (10th Cir. 1999); *Miller v. Cudahy Co.*, 858 F.2d 1449, 1456 (10th Cir. 1988); *Nieman*, 108 F.3d at 1559.

The district court sought to sidestep that limitation on damages in continuing tort cases by relying on Section 930 of the *Restatement (Second) of Torts*, which suggests that plaintiffs may recover damages

for *future* injury to their property in such cases, on the theory that they should not have to sue repeatedly to recover such damages.  *See Cook IX*, 273 F. Supp. 2d at 1210, App. 566-68; *see also id.* at 1211, App. 566-68.   That provision, which predates the era of comprehensive environmental regulation, states in relevant part as follows:

> (1) If one causes continuing or recurrent tortious invasions on the land of another ... and it appears that the invasions will continue indefinitely, the other may at his election recover damages for the future invasions in the same action as that for the past invasions.
>
> ***
>
> (3) The damages for ... prospective invasions of land include compensation for
>
> ***
>
> (b) ... the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring ....

*Restatement (Second) of Torts* § 930.

Based on that provision, the court instructed the jury on damages as follows:

> Plaintiffs seek an award of actual damages based on the decrease in the value of properties in the Class Area caused by the trespass and/or nuisance committed by Dow or Rockwell or both of them.  This type of actual damages is sometimes called diminution in property value.

87

The diminution in property value that Plaintiffs may recover here is measured by the difference between the actual value of the Class Properties and the value these Properties would have had if Dow or Rockwell or both of them had not committed the trespass and/or nuisance proved by Plaintiffs. In other words, you must compare the actual value of the Class Properties to what their value would have been "but for" the trespass and/or nuisance, and the difference is the diminution in property value that Plaintiffs can recover as actual damages in this case.

In a case like this, the law requires that you measure the amount of any such diminution in Class property values at a particular point in time. That point is the time or time period when the injurious situation became "complete" and "comparatively enduring." The injurious situation is "complete" when the effects of the trespass or nuisance are known to their full extent. It is "comparatively enduring" when there is no reason to expect that these effects will end at a definite time in the future. When the injurious situation became "complete" and "comparatively enduring" in this case is a question you will decide as I will describe in just a moment.

* * *

Plaintiffs have … presented evidence … of the injurious effects of the alleged trespass and nuisance in the … period of 1988 through 1995. If you find these effects became "complete" and "comparatively enduring" at any time during this period, therefore, you may award actual damages to Plaintiffs measured as of the time you find the effects became "complete" and "comparatively enduring."

Jury Instruction 3.22, App. 1707-08; *see also* Trial Tr. (1/20/06), at

10647-50, App. 3426-29.  Under this approach, once the jury determined

when an injurious situation became "complete" and "comparatively

88

enduring," it was required to determine the average percentage diminution in property value for each of three distinct kinds of property: (1) vacant land, (2) commercial property, and (3) residential property. *See* Jury Verdict Form (2/14/06), at 15, 24, App. 1620, 1629; *see also* Order (5/17/05), at 16-17, App. 1147-48.

But this approach de-linked the damages calculation from the class definition: whereas the class was defined by reference to property ownership on June 7, 1989, the damages were calculated by reference to property ownership on the date on which any injury became "complete" and "comparatively enduring."   The jury, thus, was asked to award damages to a different group of people than the class.   *See* Order (5/17/05), at 15, App. 1146 ("[O]nly damages for prospective invasions pursuant to Restatement (Second) of Torts § 930(3)(b) will be determined in the class trial. … Liability for the entire Class will, however, be determined at the class trial.").

The district court attempted to deal with this issue by dividing the class into two subclasses: (1) the Damages Subclass, defined as property owners on the date the injury became "complete" and "comparatively enduring" (or, if such date was before the date of the complaint, *i.e.*,

January 30, 1990, the date of the complaint); and (2) the Other Subclass, defined as all other class members. *See id.* at 15-16, App. 1146-47. As the district court explained, only the Damages Subclass "is authorized to recover damages for the decrease in value of their Class properties caused by the prospect of the alleged trespass and/or nuisance (if proved by Plaintiffs) continuing into the future, measured at the time when the injurious situation became complete and comparatively enduring"; the Other Subclass is "not entitled to § 930(b)(3) damages because they did not own Class property when this action was filed and/or when the right to elect to recover damages for prospective invasions accrued under Restatement § 930(1)." *Id.* at 16, App. 1147.

Putting aside the obvious implications of this approach for the validity of the class, given the conflicting interests in relief of the Damages Subclass and the Other Subclass, the fact remains that this was not a permissible approach for calculating compensatory damages. The district court, after all, did not limit the aggregate damages awarded by the jury to the damages incurred by the Damages Subclass. To the contrary, the district court instructed the jury to award as

damages the "total dollar amount by which *Class Properties, as a whole*, were diminished or depressed in value" as a result of defendants' alleged wrongdoing.  Jury Verdict Form (2/14/06), at 15, 24, App. 1620, 1629 (emphasis added); *see also id.* (asking the jury to award "Aggregate Damages (*Entire Class*)" (emphasis added)).  The jury, in short, was asked to award damages under Restatement § 930 based on a theory of aggregate injury to *all* class members, but those damages were never intended for all class members, but only for the subclass whose claims were deemed to fit within the paradigm of § 930.  The jury thus awarded damages based on an alleged injury to persons who are not part of this lawsuit and who will not recover damages as a result of this lawsuit (*i.e.*, persons whose property allegedly diminished in value as a result of defendants' alleged wrongdoing, but did not own the property on the later of (1) the date on which the injury became complete and comparatively enduring, or (2) the date on which the complaint was filed).  With all respect, this approach makes no sense, and results in an impermissible windfall for plaintiffs (and corresponding impermissible punishment for defendants).  *See, e.g.*, *Board of County Comm'rs v. Slovek*, 723 P.2d 1309, 1316 (Colo. 1986)

("The trial court … must be vigilant not to award damages that exceed the goal of compensation and inflict punishment on the defendant.").

The district court's ostensible Final Judgment attempted to address this issue by limiting damages to the Damages Subclass. *See* Final Judgment (6/2/08) ¶¶ 3, 6-8, App. 2275-76. But that limitation solves nothing, because the fact remains that the jury awarded aggregate compensatory damages based on the diminution in value of *all* class properties. Nor did the district court solve this problem by providing that, after damages were awarded to the Damages Subclass through a complicated allocation process, any remaining funds "shall be assigned to a *cy pres* fund, for such subsequent distribution as the Court may later direct." Plan of Allocation (6/2/08) ¶ 14, App. 2285. The possibility of setting up a *cy pres* fund (which by definition is supposed to fulfill the parties' original intent, *see, e.g.*, *City & County of Denver v. Currigan*, 362 P.2d 1060, 1064 (Colo. 1961)), is not an excuse for adopting a damages model that is analytically flawed from the outset. There is simply no basis in law or logic for an aggregate compensatory damages award that was never calibrated to the persons entitled to recover damages in the first place.

In any event, even putting aside these fundamental *analytical* problems with the damages award, as a *practical* matter it is impossible to ascertain the identity of the Damages Subclass in this case. As noted above, the Damages Subclass is defined by reference to property ownership on the date that the injury became "complete" and "comparatively enduring" (or, if later, the date of the complaint). Order (5/17/05), at 15-16, App. 1146-47. But the jury was not asked to, and did not, determine a date on which the injury became "complete" and "comparatively enduring." Rather, the jury was asked only to determine a *range* of dates on which the injury became "complete" and "comparatively enduring." *See* Jury Verdict Form (2/14/06), at 14, 23, App. 1619, 1628 (asking jury to determine whether plaintiffs' injury became "'complete' and 'comparatively enduring' some time between January 1, 1988 and December 31, 1995"). Given that properties are continually bought and sold, there is no way to determine the Damages Subclass based on property ownership over such a large range of dates. In no way, shape, or form can an eight-year span of time serve as a proxy for a date certain. Because the jury did not specify the date on which the injurious situation became "complete" and "comparatively

enduring," there is no date on which to determine membership in the Damages Subclass and hence to award damages under the district court's (still analytically flawed) plan.

One final point is in order: putting aside all the foregoing problems with the award of aggregate damages under § 930, that provision requires the plaintiff to give the defendant an easement in exchange for damages. *See Restatement (Second) of Torts* § 930, cmt. b ("The exercise of the power of election [of this section], followed by satisfaction of a judgment for damages for prospective invasions, confers an easement or privilege to continue the invasions thus paid for in advance."). This provision only highlights that Section 930 predates the modern era of comprehensive environmental regulation, and essentially provides private "permission" to pollute. Although the district court originally indicated that it would enforce this limitation, *see Cook X*, 358 F. Supp. 2d at 1013-14, App. 1110 ("A judgment awarding damages for prospective invasions, if satisfied, will confer an easement to continue the invasions thus paid for in advance."), the court later reversed itself, *see Cook XII*, 564 F. Supp. 2d at 1207, App. 2225 (refusing to grant easements and instead concluding that the

"governing rule here is the familiar doctrine of res judicata or claim preclusion"). The court thereby erred: neither res judicata nor collateral estoppel can affect the legal rights of property owners who are not parties to this litigation. *See, e.g.*, *Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1273 (10th Cir. 1995). This point again only underscores that the award of aggregate Restatement § 930 damages in this case cannot stand.

## VI.   The District Court Erred By Allowing Plaintiffs To Recover Punitive Damages.

In addition to its errors regarding liability and compensatory damages, the district court also erred by allowing plaintiffs to recover punitive damages. As the district court noted, "[i]t is not contested that defendants have indemnity agreements with the United States," *Cook I*, 755 F. Supp. at 1480, App. 276; indeed, as explained in Section VII below, plaintiffs themselves highlighted that point at trial over defendants' objections. The jury awarded $110,800,000 in punitive damages against defendant Dow and $89,400,000 against defendant Rockwell, *see* Jury Verdict Form (2/14/06), at 26-27, App. 1631-32, and the court purported to enter final judgment on those awards, *see* Final Judgment (6/2/08), App. 2276-77. Putting aside the threshold fact that

the punitive damages awards cannot stand as a matter of law if the compensatory damages award falls, *see*, *e.g.*, *Norman's Heritage Real Estate Co. v. Aetna Cas. & Sur. Co.*, 727 F.2d 911, 916 (10th Cir. 1984); *Shriver v. Carter*, 651 P.2d 436, 440 (Colo. Ct. App. 1982), the punitive damages awards here are flawed in their own right for two basic reasons.

*First*, the PAA itself precludes awards of punitive damages against defendants to the extent they are indemnified by the Federal Government.  The statute provides in relevant part as follows:

> No court may award punitive damages in any action with respect to a nuclear incident … against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident ….

42 U.S.C. § 2210(s).  The district court sidestepped this provision by noting that it was among the 1988 amendments to the PAA, which took effect on August 20, 1988 and apply "'with respect to nuclear incidents occurring on or after such date.'"  *Cook I*, 755 F. Supp. at 1480, App. 276 (quoting 42 U.S.C. § 2014 note, Pub. L. 100-408, § 20(a), 102 Stat. 1066, 1084).  The court held that "Plaintiffs allege numerous releases that can be pinpointed in time *before* August 20, 1988.  As such, these

96

occurrences do not fall within 42 U.S.C. § 2210(s)." *Id.* at 1481, App. 278 (emphasis added); *see also Cook IX*, 273 F. Supp. 2d at 1211-12, App. 569-70 (reaffirming *Cook I*).

But that approach assumes that Section 2210(s) *changed*, rather than *clarified*, existing law. That assumption is incorrect. To the contrary, the legislative history of the 1988 amendments stresses that the point of § 2210(s) was to confirm what had *always* been understood: that the PAA does not allow punitive damages to be imposed on entities indemnified by the Federal Government. As explained in the relevant Senate Committee Report, § 2210(s) merely "*clarifies* that an award of punitive damages is prohibited if the award would result in any obligation of the United States to make any payments for public liability," and thus "reflects the *longstanding* policy that the Federal government should not be liable for punitive damages." S. Rep. No. 100-218, at 12 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1476, 1487 (emphasis added); *see also* S. Rep. No. 100-70, at 27 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1424, 1440 ("The provision insures that the Federal taxpayers will not have to pay punitive damages, consistent with established Federal policy, most forcefully stated in the Federal Tort

97

Claims Act (28 U.S.C. 2674), that punitive damages may not be awarded against the Federal Government.").

This point is entirely consistent with the Supreme Court's *Silkwood* decision, which held only that the PAA did not preclude an award of punitive damages against a private entity *not* indemnified by the Federal Government. *See* 464 U.S. at 251 & n.12; *see generally* H.R. Rep. No. 100-104, pt. 1, at 19 (May 21, 1987) ("The [*Silkwood*] Court did not address the … issue … whether … government indemnity funds available under the Price-Anderson Act could be used to pay a punitive damages award."); *TMI III*, 67 F.3d at 1122 (holding that, even with respect to pre-1988 nuclear incidents, punitive damages awards are available under the PAA only insofar "as the money to pay such awards does not come from the United States Treasury"); *see also TMI IV*, 193 F.3d at 627 n.13 (same).

*Second*, in any event, the district court never instructed the jury to determine when the "nuclear incidents" at issue here occurred, and such incidents may have occurred *after* the effective date of § 2210(s). Although, as noted above, the 1988 amendments apply "with respect to *nuclear incidents* occurring on or after" August 20, 1988, 42 U.S.C.

98

§ 2014 note, Pub. L. 100-408, § 20(a), 102 Stat. 1066, 1084 (emphasis added), the district court rejected defendants' motion for partial summary judgment on punitive damages by asserting that some "releases" and "occurrences" were alleged to have taken place before then, *see Cook I*, 755 F. Supp. at 1481, App. 278; *Cook IX*, 273 F. Supp. 2d at 1211-12, App. 569-70.  But those allegations do not control with respect to the timing of any "nuclear incident" here. "Nuclear incident," after all, is a defined term under the PAA, and is not synonymous with either "release" or "occurrence."  To the contrary, an "occurrence" is necessary but not sufficient for a "nuclear incident," which (as noted above) *also* requires physical injury to person or property, or loss of use of property, *see* 42 U.S.C. § 2014(q), which may not have happened (if at all) until after August 20, 1988, regardless of when any "release" or "occurrence" took place.  Thus, even assuming that the point were relevant, there is simply no way to know whether the jury here limited its awards of punitive damages to a "nuclear incident" that took place before August 20, 1988.

The jury instructions on punitive damages only compounded the error.  Over defendants' objection, the district court instructed the jury

that, in addressing punitive damages, "you can only consider the Defendant's *conduct* up to August 20, 1988, including *conduct* occurring before this date that resulted in harm on or after that date."  Jury Instruction 3.27, App. 1716 (emphasis added); *see also* Trial Tr. (1/20/06), at 10656, App. 3435.  But "conduct" before August 20, 1988 is not the same as a "nuclear incident" before August 20, 1988. Accordingly, under no circumstances can the punitive damages awards at issue here stand.

## VII. The District Court Erred By Allowing Plaintiffs To Try Their Case Against The Federal Government, A Non-Party.

Even putting aside the district court's errors with respect to the fundamental legal architecture of this case, the court also erred with respect to the conduct of the trial by allowing plaintiffs to try their case against the Federal Government, a non-party.  The court's errors on this score fall into two basic categories.  *First*, the court allowed plaintiffs to emphasize the Federal Government's indemnification obligations to defendants, in manifest violation of Federal Rule of Evidence 411.  And *second*, the court allowed plaintiffs to inflame the jury with allegations of Government misconduct, which had no place in this trial.  In a very real sense, the trial against defendants morphed

100

into a trial against the Federal Government, the ultimate "deep pocket," and the results of that trial therefore cannot stand.  *See, e.g.*, *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1229 (10th Cir. 2003); *Stump v. Gates*, 211 F.3d 527, 533-38 (10th Cir. 2000).

### A.   The District Court Erred By Allowing Plaintiffs To Tell The Jury About The Federal Government's Indemnification Obligations.

Because "[i]t has long been recognized that evidence showing that the defendant is insured creates a substantial likelihood of misuse," *Eichel v. New York Cent. R.R. Co.*, 375 U.S. 253, 255 (1963), there is a specific Federal Rule of Evidence, Rule 411, that generally precludes such evidence.  *See* Fed. R. Evid. 411 ("Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully," except insofar as such evidence is "offered for another purpose, such as … bias or prejudice of a witness."); *see generally Black v. Hieb's Enters., Inc.*, 805 F.2d 360, 365-66 (10th Cir. 1986); *Griffin v. Hilke*, 804 F.2d 1052, 1057-58 (8th Cir. 1986); *Matosantos Comm. Corp. v. SCA Tissue N. Am. LLC*, 369 F. Supp. 2d 191, 194-96 (D.P.R. 2005); *Townsend v. Benya*, 287 F. Supp. 2d 868, 874 (N.D. Ill. 2003).  The upshot of this Rule, as

every trial lawyer understands, is that "[w]ithout question, a trial lawyer is treading on dangerous ground and always approaches grounds for a mistrial by the mere mention of insurance when same is not at issue." *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 758 (6th Cir. 1980) (internal quotation omitted).

That point was not lost on the lawyers in this case, and defendants moved *in limine* before trial to preclude plaintiffs from mentioning indemnification to the jury. *See* Defs.' Mot. *In Limine* No. 4 To Exclude Evidence of Indemnification (6/16/05), App. 1191-1222. The district court, however, denied the motion on the categorical ground that "[a] great deal of the evidence in this case concerns studies, reports and investigations performed by or for the DOE concerning waste management practices at Rocky Flats and the plant's actual or threatened impact on off-site properties," and "evidence of DOE's indemnification is offered for and is relevant to the possible bias or prejudice of DOE-related witnesses and evidence." *Cook XI*, 580 F. Supp. 2d at 1154-55, App. 1876-78.

Plaintiffs took full advantage of that free pass, and brought up the Government's indemnification obligations early and often at trial, with

102

no nexus to the bias or prejudice of any witness. Indeed, the first reference appears at the outset of plaintiffs' opening statement to the jury: "Of course you will be hearing about the Department of Energy. The U.S. Government Department of Energy. Their presence in this courtroom, *they are indemnitor. They are like the insurer for Dow and Rockwell*, because Dow and Rockwell ran a Government plant." Trial Tr. (10/11/05), at 477, App. 2471 (emphasis added). Plaintiffs later repeated that point three more times in their opening statement. *See id.* at 492, App. 2486 ("[T]he Department of Energy … is on the hook for Dow and Rockwell's damages."); *id.* at 492-93, App. 2486-87 ("[T]he DOE, under its account with Dow and Rockwell is probably responsible to pay the damages to the plaintiffs and the class members."); Trial Tr. (10/12/05), at 652, App. 2647 (referring to "Dow and Rockwell and their indemnitor, the DOE").

And plaintiffs later elicited testimony about the DOE's indemnification obligations:

> Q:  Right. You say DOE is not a party. You understood that *DOE was an indemnitor* of defendants, correct?
>
> A:  Yes.
>
> Q:  And what do you understand that to mean?

A:   Well, *they would pay any judgment* in this case or settlement.

*See* Trial Tr. (11/14/05), at 5102, App. 2945 (Kaufman) (emphasis added).   What is telling is that plaintiffs were not making the indemnification point *defensively* to expose the "bias or prejudice of a witness," Fed. R. Evid. 411, but *offensively* to put the DOE on trial.

Plaintiffs returned to the same point during a mini-summation: "The defendants *and their indemnitor, the DOE*, repeatedly lied to the public." Trial Tr. (11/22/05), at 6283, App. 3095 (emphasis added).  And they ended their case on the same note, reminding the jury that the Federal Government would pay any judgment: "*DOE is on the hook for the judgment in this case*." Trial Tr. (1/20/06), at 10571, App. 3350 (emphasis added).   Indeed, plaintiffs asked the jury to rule against defendants in part to send a message to DOE.  "I am asking you to tell … *DOE* [that] this will not be tolerated anymore in our communities." *Id.* at 10603, App. 3382 (emphasis added).

The district court only compounded its error by rejecting a limiting instruction proposed by defendants explaining that evidence of indemnification "is not relevant to determining whether Defendants are liable to Plaintiffs in this case.  You should not assume that the DOE

104

will indemnify Defendants in the event of a judgment against Defendants in this case, nor should you speculate about whether such indemnification will occur." Defs.' Proposed Instructions, No. 1.10B (1/10/06), App. 1363. The court rejected that instruction on the ground that "[c]ounsel … questioned the jurors extensively regarding DOE's indemnification of Defendants during voir dire, and all jurors confirmed during this process that they would not consider this indemnification in determining Dow and Rockwell's liability." Mem. Op. Regarding Jury Instructions (12/7/06), at 85, App. 2012. But regardless of what questions the lawyers asked during voir dire, there was no reason for jurors to conclude—absent an instruction—that they were precluded from considering indemnification.

As the Ninth Circuit recently held in another PAA case in which plaintiffs wanted to introduce indemnification evidence, there is "no permissible ground on which Plaintiffs could introduce evidence of indemnification" except insofar as necessary to rebut *particular* evidence offered by defendants. *Hanford*, 534 F.3d at 1014. Because the district court made no real attempt to limit the use of

indemnification evidence, the court erred, and fundamentally undermined the fairness of the trial.

### B.   The District Court Erred By Allowing Plaintiffs To Make Highly Prejudicial And Inflammatory Allegations Against The Federal Government.

Once the district court held that the Government's conduct was relevant here by virtue of its indemnification obligations, moreover, plaintiffs proceeded to pollute the trial with allegations of Government misconduct, even though the Government is not a party to this lawsuit. These allegations further undermined the fundamental fairness of the trial, and require reversal of the judgment in plaintiffs' favor. *See, e.g.*, *Dodge*, 328 F.3d at 1229; *Stump*, 211 F.3d at 533-38.

A major theme for plaintiffs at trial was that defendants' alleged wrongdoing was part of a larger pattern of wrongdoing and deception at Rocky Flats in which the Government itself was complicit. Plaintiffs made that theme quite explicit in their opening statement:

> The DOE, instead of coming clean about Rocky Flats, promised the United States public that it would come clean, but then it did the following: It continued to *deceive the public* as to what its contractors had done. It used its national security, top-secret rights, to *conceal from you and from this Court massive amounts of evidence*. Why? To spare itself public embarrassment and to defeat the damages in this and other cases. Why? The logical conclusion, we

106

> will argue to you from the evidence, is because *the DOE,*
> under its account with Dow and Rockwell *is probably*
> *responsible to pay the damages to the plaintiffs and the class*
> *members.*

Trial Tr. (10/11/05), at 492-93, App. 2486-87 (emphasis added); *see also*

*id.* at 479, App. 2473 ("For 50 years the defendants, Dow and Rockwell,

and after they left, the Department of Energy, repeatedly told lies and

half truths to their neighbors about what really happened at the plant.

They covered up how much plutonium may have been released.  It was,

and still is, a huge cover-up."); *id.* at 487, App. 2481 ("Why would DOE

want to cover-up?   Because they were part of the negligent and

wrongful conduct."); *id.* at 488, App. 2482 ("[T]he DOE helped cover-up

violations of the law.… DOE was part of the problem that caused the

FBI to raid a U.S. Government owned plant."); *id.* at 509, App. 2503

("[The press release from the Federal Government dated March 23,

1951] was the first of many lies, misstatements, and incorrect

statements that would be told to the public about Rocky Flats and the

Atomic Energy Commission programs over the next 50 years."); *id.* at

538, App. 2532 ("You are going to hear a lot of evidence in this case

about lying.  Because of the shroud of secrecy, the defendant[s] and the

Government were able for decades to get away with whatever they

107

wanted to say and without anyone being the wiser.  And these half truths and lies were no accident.  It was a conscience [*sic*] decision to do this."); *id.* at 574, App. 2568 ("[T]his was a cover-up by DOE.").

Plaintiffs argued that the DOE carried out this "cover-up" in two main ways: (1) by abusing its document classification powers, and (2) by violating its discovery obligations in this case.

In particular, plaintiffs argued that the DOE had abused its classification powers by wrongfully classifying documents to avoid embarrassment and financial responsibility for wrongdoing at Rocky Flats.  *See, e.g.*, Trial Tr. (10/11/05), at 588, App. 2582 ("[C]lassification was going to be used because the insurance branch didn't want things getting out that would allow claims to be made against the Atomic Energy Commission or its contractors."); *id.* at 600, App. 2594 ("National security is supposed to prevent terrorists or enemies of the United States from getting information about how to build a bomb. That is not what these documents contained.  You saw the document from 1947 that showed their motives.  They wanted to keep claims from being made against the Atomic Energy Commission.").  Plaintiffs later proceeded to call several witnesses to testify about the DOE's allegedly

abusive classification of documents. *See* Trial Tr. (10/27/05), at 3002-20, App. 2880-98 (Budnitz); Trial Tr. (11/15/05), at 5340-59, App. 3065-84 (Cochran). Indeed, plaintiffs suggested that there were important documents about potential health risks from Rocky Flats that were *still* classified, thereby putting the public at risk. *See, e.g.*, Trial Tr. (10/11/05), at 599-606, App. 2593-2600 (opening statement).

Plaintiffs also told the jury that the district court had held the DOE in contempt of court as a discovery sanction in this case. *See, e.g.*, Trial Tr. (10/11/05), at 598, App. 2592 ("[I]n 1995, … this court held the DOE in contempt of court; that is almost unprecedented."); *id.* ("So what did the DOE do after being held in contempt of court in this court, in this case, for refusing to turn over documents relating to missing plutonium? Did it come clean? No. It has never come clean. It circled the wagons. It slammed the steel door of secrecy shut once again."). Plaintiffs later walked a former Assistant United States Attorney through the contempt finding against the DOE. *See* Trial Tr. (11/14/05), at 5087-150, 5203-17, App. 2930-93, 3046-60 (Kaufman). The court allowed plaintiffs to read from the contempt order, and then ask the witness "Do you see that?" For example:

Q:   'DOE violated paragraph 20 of the stipulated order by failing to make a written request for a classification review, failing to provide a copy of any such writing to plaintiffs, and failing to initiate a classification review of requested documents.   DOE has not provided the requested documents or filed objections to their request.' Do you see that?

A:   Yes.

                    *      *      *

Q:   And on page 12, the conclusion regarding plaintiffs' request for LANL documents, the order states, 'I find DOE by not producing the requested documents within 30 days or anytime thereafter has failed substantially to comply with the order.' Do you see that?

A:   Yes.

*Id.* at 5115, 5118-19, App. 2958, 2961-62.

None of these arguments was permissible, which is why defendants moved *in limine* before trial to preclude them.   *See* Defs.' Mot. *In Limine* No. 5 to Exclude Evid. of Document Classification Issues & Discovery Conduct by the Dep't of Energy (6/16/05), App. 1223-40. The district court, however, held otherwise:

This case is unusual in that the DOE, a non-party, controls a great deal of the information and documents describing operations and events at Rocky Flats.   Much of this information is relevant to the issues to be decided in this case, but is not available because it is classified as secret by the DOE.   It is not possible for the parties to present their

110

cases without mentioning that relevant information is classified and unavailable for use at trial.

The jury is also entitled to know the efforts Plaintiffs, or Defendants for that matter, made to obtain access to this information and why they are unable to present all of the evidence they sought. This information will assist the jury in understanding and evaluating the information, documents and other relevant evidence that is available and presented at trial regarding Rocky Flats operations and events.

*Cook XI*, 580 F. Supp. 2d at 1156, App. 1879. That argument is incorrect.

Imposing discovery sanctions is the role of the court, not the jury. *See* Fed. R. Civ. P. 37. Telling jurors about such sanctions only taints their consideration of the merits, and compromises the fundamental fairness of the trial. *See, e.g.*, *Werbungs und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1027 (2d Cir. 1991). The jury here had no business, thus, hearing about the fact that the district court had held the DOE in contempt of court as a discovery sanction. *See, e.g., id.* Given that evidence of a *party's* violation of a discovery order is legally irrelevant, it follows *a fortiori* that evidence of a *non-party's* violation of a discovery order is legally irrelevant.

Similarly, it is not the role of a jury in a civil lawsuit to second-guess decisions by a federal government agency. *See, e.g., Buckman*,

531 U.S. at 347-52.   That is especially true of decisions to classify information in the interests of national security: "[f]or reasons too obvious to call for enlarged discussion, the protection of classified information must be committed to the broad discretion of the agency responsible." *Department of the Navy v. Egan*, 484 U.S. 518, 529 (1988); *see also Maynard v. CIA*, 986 F.2d 547, 556 n.9 (1st Cir. 1993) ("We are not in a position to 'second-guess' the [agency's] conclusion regarding the need for continued classification of this material.") (internal quotation and citation omitted).   Where, as here, a federal agency has lawfully refused to disclose classified information, a factfinder may not draw a negative inference therefrom.   *See, e.g.*, *Ellsberg v. Mitchell*, 709 F.2d 51, 64-65 (D.C. Cir. 1983); *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 270-71 (4th Cir. 1980).

In light of plaintiffs' emphasis at trial on DOE wrongdoing, defendants requested an instruction to inform jurors that they could not hold defendants responsible for DOE's actions: "The Department of Energy is not a party to this case.  ...  You may not assess the liability of the DOE or seek to hold defendants liable for any wrongful conduct of the DOE."   *See* Defs.' Proposed Instructions (1/10/06), at No. 1.10A, App.

1361.   The court, however, rejected this proposed instruction as "unnecessary and inaccurate."  Mem. Op. Regarding Jury Instructions (12/7/06), at 84, App. 2011.

The court did instruct jurors that they could not second-guess the DOE's classification decisions—after months of hearing plaintiffs encourage them to do precisely that.  *See* Jury Instruction 1.9, App. 1657-58; Trial Tr. (1/20/06), at 10618-20, App. 3397-99.  But by then, it was too little, too late: the allegations of wrongful classification were so inflammatory that they irreversibly tainted the jury's decision.  *See*, *e.g.*, *Lyell v. Renico*, 470 F.3d 1177, 1189 (6th Cir. 2006); *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 148 (3d Cir. 2002); *Draper v. Airco, Inc.*, 580 F.2d 91, 97 (3d Cir. 1978); *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1309 (5th Cir. 1977).   And no instruction even purported to cure plaintiffs' emphasis on the contempt order against the DOE.  At the end of the day, thus, the conduct of the trial also requires reversal of the judgment.  *See, e.g.*, *Dodge*, 328 F.3d at 1229; *Stump*, 211 F.3d at 533-38; *Cleveland*, 624 F.2d at 758.

## VIII. The District Court Erred By Awarding Plaintiffs More Than A Half-Billion Dollars In Prejudgment Interest On Their Property-Damage Claims Based On A Colorado Statute That Applies Only Where A Defendant Has "Wrongfully Withheld" Money Or Property From A "Creditor."

The district court only compounded the foregoing errors by awarding plaintiffs an additional $549,053,747 in prejudgment interest on the award of $176,850,340 in compensatory damages, *see Cook XII*, 564 F. Supp. 2d at 1222-27, App. 2257-67; Final Judgment (6/2/08), at 3, App. 2276, which may be the largest award of prejudgment interest in the history of American law.  Because prejudgment interest (in sharp contrast to postjudgment interest) is considered a substantive component of a plaintiff's recovery, *see, e.g.*, *Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1288 (10th Cir. 2005); *Lowell Staats Mining Co. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1268 (10th Cir. 1989), the rules of decision for prejudgment interest in this PAA case are governed by Colorado law.  The district court awarded prejudgment interest here under a Colorado statute, Colo. Rev. Stat. § 5-12-102, at a rate of 8% compounded annually from January 30, 1990 through the entry of judgment on June 2, 2008.  *See Cook XII*, 564 F. Supp. 2d at 1227, App. 2267; *see also* Final Judgment (6/2/08), at 3, App. 2276.

114

Putting aside the fact that the district court's eye-popping award of more than a *half-billion* dollars in prejudgment interest would necessarily fall as a matter of law along with the compensatory damages award on which it is based, the award of prejudgment interest is flawed in its own right in two basic ways. *First*, the award represents an impermissible windfall because the jury (at plaintiffs' urging) already compensated them for the passage of time in calculating the underlying compensatory damages award. And *second*, the Colorado prejudgment interest statute on which the district court relied is limited to cases involving the wrongful "withholding [of] money or property" from "creditors," and simply does not apply in property-damage cases like this one. Each of these points mandates reversal of the district court's staggering prejudgment interest award, and each is discussed in turn below.

### A.    No Prejudgment Interest Award Is Warranted Here Because The Compensatory Damages Award Already Accounts For The Passage Of Time.

As an initial matter, the district court erred by awarding prejudgment interest here because plaintiffs requested and undeniably received compensation from the jury to account for the passage of time.

115

Plaintiffs specifically sought leave to pursue inflation-adjusted damages to compensate them for the "'time that has elapsed between the harm and the trial.'"  Pls.' Mem. in Opp'n to Defs.' Mot. to Excl. Evid. of Pls.' Consumer Price Index Adjust. for Property Damages (11/16/05), at 5, App. 1323 (quoting *Restatement (Second) of Torts* § 913(2)).  In asking the court to allow them to pursue such damages, plaintiffs appealed to the "fairness" of "adjusting the dollar value of plaintiffs' damages," arguing that it would serve the "cardinal objective of making the plaintiff whole."  *Id.* at 4-5, App. 1322-23; *see also id.* at 7, App. 1325 ("Plaintiffs seek to use the CPI *to adjust to current value* their monetary damages.") (emphasis modified).  Over defendants' objection, the district court allowed plaintiffs to pursue inflation-adjusted damages, *see* Order (11/30/05), App. 1132-34, and plaintiffs proceeded to do just that, presenting evidence regarding inflation and asking the jury to adjust any compensatory damages award accordingly.  *See*, *e.g.*, Exh. PG955, App. 3553; Trial Tr. (12/5/05), at 6418-22, 6466-67, 6480-81, App. 3097-3101, 3102-03, 3104-05 (Hunsperger); Trial Tr. (12/6/05), at 6571-72, 6583, 6629-30, 6633-34, App. 3107-08, 3109, 3111-14 (Hunsperger); Trial Tr. (12/7/05), at 6873-83, App. 3116-26.  The jury granted that

request, writing on the verdict form next to the damages calculations
that all numbers were "adjusted to 2005 CPI."   Jury Verdict Form
(2/14/06), at 15, 24, App. 1620, 1629.

Although there is no question that the jury accounted for the
passage of time in calculating compensatory damages, the district court
nonetheless insisted that it lacked "authority under Colorado law *not* to
award prejudgment interest if it is required by statute."  *Cook XII*, 564
F. Supp. 2d at 1224, App. 2261 (emphasis in original).   The court
thereby erred.  Even where a prejudgment interest statute is phrased in
mandatory terms, a court may not award prejudgment interest where
compensation for the passage of time is (or may have been) embedded in
a jury verdict.  *See, e.g.*, *Goodyear Tire & Rubber Co. v. Holmes*, 193
P.3d 821, 829 (Colo. 2008) ("Prejudgment interest is awarded to
compensate for the delay the plaintiff suffered in receiving his rightful
due.  If delay has been compensated by other portions of the judgment,
prejudgment interest will be improper.") (internal quotation omitted);
*Great W. Sugar Co. v. KN Energy, Inc.*, 778 P.2d 272, 276 (Colo. Ct.
App. 1989) ("[T]o the extent that an award made under the
[prejudgment interest] statute provides double compensation for the

117

same wrong, it cannot stand."); *see also Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 342 (2d Cir. 1993) (applying New York law); *Computer Sys. Eng'g, Inc. v. Quantel Corp.*, 571 F. Supp. 1379, 1383 (D. Mass. 1983) (applying Massachusetts law), *aff'd*, 740 F.2d 59, 71 (1st Cir. 1984); *Interstate Brands Corp. v. Lily Transp. Corp.*, 256 F. Supp. 2d 58, 62-63 (D. Mass. 2003) (same). Indeed, this Court itself has emphasized that, under Colorado law, a court may not award prejudgment interest unless it is "'*unquestionably clear* that the jury allowed *no* interest.'" *Lowell Staats*, 878 F.2d at 1268 (emphasis added; quoting *Wood v. Hazelet*, 237 P. 151, 152 (Colo. 1925)).

The reasoning for this rule makes perfect sense: because "interest is, by nature, an allowance for the time value of money, … awarding both interest and any other form of allowance for the time value of money is inherently duplicative." *Computer Sys. Eng'g,* 571 F. Supp. at 1383.

The district court insisted, however, that an adjustment for inflation is different than an adjustment for the time-value of money, and that the time-value of money "is *more* than mere inflation." *Cook XII*, 564 F. Supp. 2d at 1223, App. 2259 (emphasis added). Indeed, the

118

court noted, "the CPI inflation rate for the period in question was generally far below the 8% and 9% prejudgment interest rates set by statute." *Id.* at 1224, App. 2260.

The court thereby missed the point. While there is no question that inflation and the time-value of money are analytically and economically distinct concepts (and, contrary to the district court's suggestion, *see id.* at 1223, App. 2259, defendants have never suggested otherwise), there is also no question (as noted above) that the two concepts overlap, so that awarding prejudgment interest on an inflation-adjusted award would result in a windfall. *See, e.g., Goodyear*, 193 P.3d at 826 ("[T]he purpose of prejudgment interest is to reimburse the plaintiff for *inflation* and lost return.") (emphasis added); *id.* at 828 ("Prejudgment interest compensates the prevailing party for [1] the time value of money losses *caused by inflation* and [2] inability to earn a return on the money or property due to plaintiff as a result of the injury.") (emphasis added); *see also Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 880 (2d Cir. 1988) ("[P]rejudgment interest obviously serves the compensatory purpose by making up for the delay in receiving the money, during which time the employees were denied its

use, *and by partially offsetting the reduction in the value of the delayed wages caused by inflation*.") (emphasis added; internal quotation omitted).   Indeed, the U.S. Supreme Court has emphasized this very point:

> Interest and a delay factor, according to respondent, have distinct purposes: the former compensates for loss in the use of money, while the latter compensates for loss in the value of money.  We are not persuaded.  *Interest and a delay factor share an identical function.*  They are designed to compensate for the *belated receipt of money*.  The no-interest rule has been applied to prevent parties from holding the United States liable on claims grounded on the belated receipt of funds, even when characterized as compensation for delay.  *Thus, whether the loss to be compensated by an increase in a fee award stems from an opportunity cost or from the effects of inflation, the increase is prohibited by the no-interest rule.*

*Library of Congress v. Shaw*, 478 U.S. 310, 322 (1986) (emphasis added; citation omitted); *see also id.* at 322 n.7 (1986) ("An interest rate reflects not only the real opportunity cost of capital, but also the inflation rate."); *id.* at 322 ("[A]s a matter of economic theory, there may be a distinction between interest and a delay factor, but both are nonetheless prohibited by the no-interest rule.") (citations omitted); *id.* ("In essence, the inflation factor adjustment is a disguised interest award.") (internal quotation omitted).

A plaintiff who wishes to avoid such a windfall can simply refrain from seeking inflation-adjusted damages from the jury and instead seek an award of prejudgment interest from the court.  But a plaintiff cannot have it both ways.  Thus, when a plaintiff asks a jury to adjust a compensatory damages award for inflation, the plaintiff effectively elects not to seek prejudgment interest.  *See, e.g.*, *Computer Sys. Eng'g*, 571 F. Supp. at 1383 ("[H]aving chosen to prove damages at trial as it did, plaintiff has not met the burden of disentangling duplicative damages of its claim for the time value of money."); *see also id.* (where the plaintiff sought inflation-adjusted damages from the jury, "plaintiff's request for allowing [prejudgment] interest on the entire finding must be denied because such an allowance would almost certainly be duplicative to some extent").

Accordingly, the district court erred by holding that prejudgment interest was warranted here because the jury's inflation adjustment may be less than an award of prejudgment interest.  *See Cook XII*, 564 F. Supp. 2d at 1223-24, App. 2259-60.  Just the opposite is true: "where there is a *possibility* that the jury award already allowed interest, no further prejudgment interest can be recovered on the verdict."

*Trademark Research Corp.* 995 F.2d at 342 (emphasis added); *see also*
*Goodyear*, 193 P.3d at 829 ("If delay has been compensated by other
portions of the judgment, prejudgment interest will be improper.")
(internal quotation omitted); *Restatement (Second) of Torts* § 913(2),
cmt. c ("[T]he length of time elapsing before compensation is made is
not an improper element to consider in the awarding of damages.  It is,
however, improper, having found the amount that should be awarded as
compensation, to add to it a specific amount of interest.").

Here, of course, there is more than a mere "possibility" that the
jury compensated plaintiffs for delay: as noted above, the jury
specifically wrote on the verdict form that it had done so.  *See* Jury
Verdict Form (2/14/06), at 15, 24, App. 1620, 1629.  Accordingly, it was
"improper" for the court to award prejudgment interest on the inflation-
adjusted compensatory damages award, *Goodyear*, 193 P.3d at 829, and
the court's award of prejudgment interest cannot stand, *see, e.g.*,
*Trademark Research Corp.*, 995 F.2d at 342.

### B.   No Prejudgment Interest Award Is Warranted Here Because No Colorado Statute Authorizes Such An Award In Property-Damage Cases.

The district court also erred by awarding prejudgment interest here because the Colorado statute on which the court relied, Colo. Rev. Stat. § 5-12-102, is limited by its terms to cases involving the wrongful "withholding [of] money or property" from "creditors," and simply does not apply in property-damage cases like this one.  Because "[t]he right to interest, independent of an agreement to pay it, is statutory" under Colorado law, the absence of statutory authority precludes any award of non-contractual prejudgment interest.  *Lowell Staats*, 878 F.2d at 1268; *see also Rodriguez v. Schutt*, 914 P.2d 921, 925 (Colo. 1996).

As with any case of statutory interpretation, the language of the statute provides the starting point for the analysis.  *See*, *e.g.*, *Mesa Sand & Gravel Co. v. Landfill, Inc.*, 776 P.2d 362, 364 (Colo. 1989).  Section 5-12-102 provides in relevant part as follows:

**Statutory interest.**  (1)  [W]hen there is no agreement as to the rate thereof, *creditors* shall receive interest as follows:

(a)  When *money or property has been wrongfully withheld*, interest shall be an amount which fully recognizes the gain or benefit realized by the person *withholding such money or property* from the date of wrongful withholding to the date of payment or to the date judgment is entered, whichever first occurs; or, at the election of the claimant,

123

> (b)  Interest shall be at the rate of eight percent per annum compounded annually for *all moneys or the value of all property* after they are *wrongfully withheld* or after they become due to the date of payment or to the date judgment is entered, whichever first occurs.

Colo. Rev. Stat. § 5-12-102 (emphasis added).   The plain language makes it clear that this statute does not apply generally to *all* plaintiffs, but only to a subset of plaintiffs: "creditors" from whom "money or property has been wrongfully withheld."   *Id.*   It would be highly unusual, to say the least, to characterize the "wrong" of damaging property as the "withholding [of] money or property" from a "creditor." *Id.*   Thus, while failing to pay money or surrender property under a contract may trigger prejudgment interest under this provision, *see*, *e.g.*, *Mesa*, 776 P.2d at 364, *Lowell Staats*, 878 F.2d at 1267-70, damaging property would not, *see Goodyear*, 193 P.3d at 827 (emphasizing that § 5-12-102 "awards prejudgment interest from the date of 'wrongful withholding,'" not from the date of the underlying "wrong").

Indeed, Colorado has a *separate* statute authorizing prejudgment interest in personal-injury cases.  *See* Colo. Rev. Stat. § 13-21-101.  That statute is not limited to "creditors," but allows a "plaintiff" and "any

person" to recover prejudgment interest for personal injuries.  *Id.*  If *personal* injuries are not governed by § 5-12-102, it is hard to see how *property* injuries can be covered by that provision.  What plaintiffs are trying to do here, in a nutshell, is to extend § 5-12-102 to provide a property-damage analogue to § 13-21-101.  But that is a policy choice up to the Colorado legislature, not the courts, and especially not a federal court applying state substantive rules of decision.  *See, e.g.*, *Burton*, 397 F.3d at 913; *Holden*, 302 F.3d at 365.

The background of § 5-12-102 only confirms that it does not apply in property-damage cases.  The statute was adopted in its current form in 1979, and the annotator's note explains that the statute is so "similar" to its statutory predecessors that "relevant cases construing those provisions have been included in the annotations to this section." Colo. Rev. Stat. § 5-12-102 Annotation, Annotator's Note.  And under the predecessor statutes, the cases were "*uniform* in holding that no interest may be recovered in an action to recover damages for injury to property."  Frank F. Spiecker & Edwin G. Ruland, *A Creditor's Right to Interest in Colorado*, 35 U. Colo. L. Rev. 190, 201 (1963) (reprinted at App. 3630-44) (emphasis added) (citing, *inter alia*, *Denver S. Park &*

*Pac. R.R. v. Conway*, 5 P. 142, 151 (Colo. 1884)); *see also* Nicholas H. Magill, *Interest as Damages in Colorado*, 28 Dicta 285, 290 (1951) (reprinted at App. 3624-29) ("Interest in this state is a matter of statute, not of common law, and is recoverable only in cases enumerated in the statutes, and damages to property arising from the wrong or negligence of a defendant is not enumerated in the statute.").

To be sure, the proper interpretation of a Colorado statute is ultimately a matter of Colorado law, and this Court's task in applying state-law rules of decision is to predict how the Colorado Supreme Court would resolve a particular issue. *See, e.g.*, *Wade v. Emcasco Ins. Co.*, 483 F.3d 657, 665-66 (10th Cir. 2007).[5] That task is complicated here, because the Colorado Supreme Court has not always spoken with a clear and consistent voice on the meaning of § 5-12-102.

---

[5] In making that prediction, this Court is free to consider intermediate state appellate decisions, but is not bound by them. *See, e.g.*, *Johnson v. Riddle*, 305 F.3d 1107, 1118-19 (10th Cir. 2002) ("[L]ower state court decisions may be helpful, but they are not dispositive of a prediction of how the highest court in the state might rule on the issue."); *Vitkus v. Beatrice Co.*, 127 F.3d 936, 941 (10th Cir. 1997) (federal courts "not required to follow the rulings of intermediate state courts").

Although that court in the past has stated that the statute should be given "a liberal construction," *Mesa*, 776 P.2d at 365, the court also has emphasized that "[w]here the meaning is clear and no injustice would result, the statute must be interpreted as written without resort to other rules of statutory construction," *id.* at 364. The court's most recent pronouncement on the statute, in *Goodyear* (rendered after the judgment below) reaffirmed a textual approach. *See* 193 P.3d at 825 ("When the statutory language is unambiguous, we give effect to the plain and ordinary meaning of the statute without resorting to other rules of statutory construction."). In particular, the *Goodyear* court rejected the notion that § 5-12-102 authorizes awards of prejudgment interest in *all* cases other than personal-injury cases. *See* 193 P.3d at 825-26. The *Goodyear* court acknowledged that some *dicta* in *Mesa* supported that notion, but took pains to distinguish the *dicta* from the holding in *Mesa*. *See id.* at 826 (emphasizing that *Mesa* "decid[ed] only whether a party in a breach of contract case is entitled to recover prejudgment interest under § 5-12-102(1)(b)"). Thus, notwithstanding the *dicta* in *Mesa*, the *Goodyear* court emphasized that the statute was triggered *only* by a "wrongful withholding" of money or property. *See*

127

*id.* at 825. "Although the term 'wrongful withholding' may be difficult to apply in some circumstances, its plain meaning is clear. 'Wrongful withholding' indicates that the aggrieved party lost or was deprived of something to which she was otherwise entitled." *Id.*[6]

---

[6] Among the statements in the *Mesa* court's *dicta* is that "[t]he comprehensive scope of section 5-12-102 can be seen from its legislative history," including a statement allegedly made by one of the provision's sponsors in the State Senate (but nowhere reflected in the statutory text) that "*[a]ll plaintiffs* … are entitled to interest from the time the action accrued, not from the time judgment was entered, but from the time they were wronged." *See* 776 P.2d at 365 (emphasis modified; purporting to quote Audiotape Recording of Testimony before Senate Judiciary Committee on Senate Bill 463, March 12, 1979, 52nd General Assembly). But the audiotape, which is part of the record in this case, *see* Defs.' Resp. to Pls.' Mot. for Entry of Judgment (1/22/07), Exh. 5, App. 3663-3734 (transcript); Defs.' Reply Br. in Supp. of Mot. for Certification of Interlocutory Appeal (5/1/07), Exh. 2, App. 3662 (the audiotape), shows that the sponsor never said that. Rather, he said that the statute "maintains the principle [of] moratory interest or it says that in effect a plaintiff … is entitled to interest from the time the action accrued, not from the time the suit was started. Not from the time the judgment was entered, but from the time somebody was wronged." App. 3662 (CD-ROM containing audiotape; passage at approximately 5 minutes, 40 seconds into the audiotape); App. 3713 (transcript). In context, thus, this statement simply underscores that "section 5-12-102 codified the common law doctrine of moratory interest," *Goodyear*, 193 P.3d at 826, and does not remotely suggest that "[a]ll plaintiffs" are entitled to prejudgment interest under § 5-12-102. The genesis of this error appears to be the Colorado Court of Appeals' decision in *Isbill Assocs., Inc. v. City & County of Denver*, 666 P.2d 1117, 1121-22 (Colo. App. 1983), which was itself repudiated in *Goodyear*, *see* 193 P.3d at 825 n.4. *See generally* Gregory B. Cairns & John C. Trenennick, Jr., *Collecting Pre- and Post-Judgment Interest in*

Because § 5-12-102 is triggered only by a "wrongful withholding," and not by any wrongful act *per se*, the *Goodyear* court rejected a line of authority (including two decisions from this Court, *Loughridge*, 431 F.3d at 1288-91, and *Estate of Korf v. A.O. Smith Harvestore Prods., Inc.*, 917 F.2d 480, 486 (10th Cir. 1990)) stating that prejudgment interest begins to accrue under § 5-12-102 at the time of an underlying wrong.  *See Goodyear*, 193 P.3d at 825 n.4.  (In fairness, this Court based its reasoning in those decisions on a line of Colorado intermediate appellate court cases, including *Isbill Assocs., Inc. v. City & County of Denver*, 666 P.2d 1117 (Colo. Ct. App. 1983), that the Colorado Supreme Court repudiated in *Goodyear*, *see* 193 P.3d at 825 n.4, and this Court affirmatively noted in *Loughridge* that "we are concerned with the equities" of applying § 5-12-102 in that manner, 431 F.3d at 1288; *see also Goodyear*, 193 P.3d at 825 n.4 (noting that this Court in *Loughridge* "question[ed] the wisdom and fairness" of the relevant Colorado precedents).)

---

*Colorado: A Primer*, 15 Colo. Law. 753, 756 (1986) (reprinted at App. 3645-55) (noting that *Isbill* suggested that § 5-12-102 "applie[s] to all types of claims not specifically covered by other statutes … *[n]otwithstanding the language of the statute*") (emphasis added).

The district court below, however, relied on the very *dicta* in *Mesa*
that the Colorado Supreme Court subsequently repudiated in *Goodyear*.
*See Cook XII*, 564 F. Supp. 2d at 1225, App. 2262 (relying on "the long
line of Colorado Supreme Court and other cases that, contrary to
Defendants' position, have construed § 5-12-102 liberally to apply to *all
types of cases not involving personal injuries*") (emphasis added; citing,
*inter alia*, *Mesa*, 776 P.2d at 365).  But just as the Colorado Supreme
Court is not bound by its *dicta*, as opposed to its holdings, *see, e.g.,
Goodyear*, 193 P.3d at 825-26; *United States v. Jesse*, 744 P.2d 491, 503
(Colo. 1987); *Board of County Comm'rs of Arapahoe County v. Denver
Bd. of Water Comm'rs*, 718 P.2d 235, 245 (Colo. 1986), this Court is not
bound by the Colorado Supreme Court's *dicta*, as opposed to its
holdings.  Certainly, in predicting how a state supreme court would rule
on a particular issue, a federal court need not give the state court's prior
decisions greater weight than the state court itself would give them.

The key point here is that the Colorado Supreme Court has never
held that § 5-12-102 applies in property-damage cases, where the
"wrong" at issue by definition is not the "withholding of money or
property."  Although the district court asserted that "the Colorado

130

Supreme Court has affirmed a broad construction of the statute, *including its application in property damage cases*," *see Cook XII*, 564 F. Supp. 2d at 1225, App. 2263 (emphasis added), none of the three cases cited for that proposition was a property-damage case. *Westfield Dev. Co. v. Rifle Inv. Assoc.*, 786 P.2d 1112 (Colo. 1990), was an intentional-interference-with-contract case; the Colorado Supreme Court held that a defendant "wrongfully withholds" money or property from a plaintiff by wrongfully encumbering the plaintiff's property and thereby preventing the plaintiff from selling it. *See id.* at 1116-18, 1122. *Ballow v. Phico Ins. Co.*, 878 P.2d 672 (Colo. 1994), was a breach-of-contract case; the Colorado Supreme Court held that "one who is damaged by a breach of contract is entitled to recover prejudgment interest of eight percent annually from the time of the breach." *Id.* at 684. And *Farmers Reservoir & Irrigation Co. v. City of Golden*, 113 P.3d 119 (Colo. 2005) involved the question whether prejudgment interest is available on awards of costs and attorneys fees; the Colorado Supreme Court held that it is not. *See id.* at 132-35.

Nor, contrary to the district court's assertion, has *this* Court ever "recognized that § 5-12-102 applies to claims for property damages …."

*Cook XII*, 564 F. Supp. 2d at 1225, App. 2263 (citing *Loughridge*, 431 F.3d at 1288-89; *Korf*, 917 F.2d at 486; and *Lowell Staats*, 878 F.2d at 1270).  Putting aside the fact that all three of those cases preceded the Colorado Supreme Court's decision in *Goodyear* (which concluded that *Loughridge* and *Korf* were incorrectly decided on this point of Colorado law, *see* 193 P.3d at 825 n.4), none of those cases involved property damage.  *Loughridge* was a product-defect case in which the only question addressed was when prejudgment interest begins to accrue.  *See* 431 F.3d at 1288-90.  *Korf* was a fraud case.  *See* 917 F.2d at 486.  And *Lowell Staats* was a breach-of-contract case.  *See* 878 F.2d at 1267-70.

The bottom line here is that this Court need not, and should not, hold that § 5-12-102 authorizes an award of prejudgment interest in a property-damage case, like this one, where the "wrong" at issue does not involve the "withholding of money or property."  Accordingly, separate and apart from all the other grounds on which the judgment cannot stand, the award of prejudgment interest cannot stand.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment.

132

March 9, 2009                        Respectfully submitted,


                                     /s/
                                     _____

David M. Bernick, P.C.               Christopher Landau, P.C.
Douglas J. Kurtenbach, P.C.          John K. Crisham
Steven C. Seeger                     Philippa Scarlett
KIRKLAND & ELLIS LLP                 KIRKLAND & ELLIS LLP
200 East Randolph Drive              655 Fifteenth Street, N.W.
Chicago, IL   60601                  Washington, DC  20005
(312) 861-2000                       (202) 879-5000
                                     *clandau@kirkland.com*

*Counsel for Defendants-Appellants-Cross-Appellees*

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully submit that oral argument will assist this

Court in deciding the important legal issues presented by this appeal.

## CERTIFICATE OF TYPE-VOLUME COMPLIANCE

The undersigned certifies that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 27,646 words, as authorized by this Court's order of December 9, 2008.

_/s/_____

Christopher Landau, P.C.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC   20005
(202) 879-5000
*clandau@kirkland.com*

## CERTIFICATE OF DIGITAL-SUBMISSION COMPLIANCE

The undersigned hereby certifies that:

(1) all required privacy redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk; and

(2) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program (McAfee Enterprise 8.5 Virus Scan, updated as of March 9, 2009) and, according to the program, are free of viruses.

_____/s/_____

Christopher Landau, P.C.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC   20005
(202) 879-5000
*clandau@kirkland.com*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 9th day of March 2009, he caused two copies of the foregoing Brief of Defendants-Appellants-Cross-Appellants to be served upon the following attorneys by electronic mail and overnight delivery via Federal Express:

Peter B. Nordberg, Esq.
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
(215) 875-3000
*pnordberg@bm.net*

Louise M. Roselle, Esq.
WAITE, SCHNEIDER, BAYLESS & CHESLEY CO., L.P.A.
One West Fourth Street
Cincinnati, OH   45202
(513) 621-0267
*louiseroselle@wsbclaw.com*

Gary B. Blum, Esq.
SILVER & DEBOSKEY, P.C.
The Smith Mansion
1801 York Street
Denver, CO   80206
(303) 399-3000
*blumg@s-d.com*

_____/s/_____
Christopher Landau, P.C.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC   20005
(202) 879-5000
*clandau@kirkland.com*