# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, *et al.*,

       Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

       Defendants.

---

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION RE: STANDARDS

---

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..................................................................................iii

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT....................................................................................................... 2

I.     PLAINTIFFS DO NOT DISPUTE THE KEY PROPOSITIONS IN
       DEFENDANTS' OPENING BRIEF........................................................ 2

II.    PLAINTIFFS' OPPOSITION BRIEF CONFIRMS THAT THEIR
       PURPORTED STATE LAW NUISANCE CLAIM IS A PUBLIC
       LIABILITY ACTION UNDER THE PRICE-ANDERSON ACT. ......... 4

III.   PLAINTIFFS' WAIVER CLAIMS ARE WITHOUT MERIT. ............ 7

       A.     No Waiver Based On *Cook Appeal II*. ....................................... 7

              1.     Plaintiffs Ignore The Relevant Procedural History. .......... 8

                     a.     The October 16, 2012 Order Regarding Briefing
                            Schedule .................................................................... 8

                     b.     The January 28, 2014 Order.................................... 8

                     c.     The February 27, 2014 Order of Dismissal............. 9

                     d.     *Cook Appeal II* ....................................................... 9

              2.     Plaintiffs' Waiver Argument Is Meritless. ....................... 10

       B.     No Waiver Based On "Seven Documents."................................ 12

IV.    THE AEC STANDARDS CONFLICT WITH AND PREEMPT
       COLORADO NUISANCE LAW. ........................................................ 15

       A.     Defendants Have Identified The Standards That Preempt State Law......... 15

       B.     The AEC Standards Carried The Force Of Law. ....................... 16

              1.     Plaintiffs' APA Argument.................................................. 18

2.      Plaintiffs' "Plutonium In Soil Standard" Argument ........................ 20

3.      Plaintiffs' ALARA Argument .......................................................... 22

C.      Plaintiffs' Remaining Arguments Have No Merit. .................................... 24

1.      The *Silkwood* Decision .................................................................... 25

2.      Field Preemption ............................................................................... 27

CONCLUSION .......................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Adkins v. Chevron Corp.*,
    960 F. Supp. 2d 761 (E.D. Tenn. 2012) ................................................................23

*Bohrmann v. Maine Yankee Atomic Power Co.*,
    926 F. Supp. 211 (D. Me. 1996) ...........................................................................23

*Carey v. Kerr-McGee Chemical Corp.*,
    60 F. Supp. 2d 800 (N.D. Ill. 1999) ......................................................................23

*Cook v. Rockwell International Corp.*,
    273 F. Supp. 2d 1175 (D. Colo. 2003) ...........................................................passim

*Cook v. Rockwell International Corp.*,
    618 F.3d 1127 (10th Cir. 2010) ......................................................................passim

*Cook v. Rockwell Internationl Corp.*,
    790 F.3d 1088 (10th Cir. 2015) .............................................................................28

*Corcoran v. New York Power Authority*,
    935 F. Supp. 376 (S.D.N.Y. 1996) .......................................................................23

*English v. General Electric Co.*,
    496 U.S. 72 (1990) ........................................................................................28, 30

*Finestone v. Florida Power & Light Co.*,
    319 F. Supp. 2d 1347 (S.D. Fla. 2004) .................................................................23

*Froebel v. Meyer*,
    217 F.3d 928 (7th Cir. 2000) .................................................................................11

*In re Grand Jury*,
    604 F.2d 69 (10th Cir. 1979) .................................................................................11

*In re TMI Litigation Cases Consolidated II*,
    940 F.2d 832 (3d Cir. 1991) ......................................................................27, 29, 30

*In re TMI*,
    67 F.3d 1103 (3d Cir. 1995) ..................................................................................23

*McLandrich v. Southern California Edison Co.*,
    942 F. Supp. 457 (S.D. Cal. 1996) ........................................................ 23

*Mutual Pharmaceutical Co. v. Bartlett*,
    133 S. Ct. 2466 (2013) ........................................................................... 31

*O'Conner v. Commonwealth Edison Co.*,
    13 F.3d 1090 (7th Cir. 1994) ................................................................. 29

*Pacific Gas & Electric Co. v. State Energy Resources*
    *Conservation & Development Commission,*
    461 U.S. 190 (1983) ............................................................................... 31

*Silkwood v. Kerr-McGee Corp.*,
    667 F.2d 908 (10th Cir. 1981) ................................................... 25, 26, 27

*Utahns for Better Transportation v.*
    *United States Department of Transportation*
    305 F. 3d 1152 (10th Cir. 2002) ............................................................ 12

*Weaver v. United States*,
    98 F.3d 518 (10th Cir. 1996) ................................................................... 7

**Statutes**

10 C.F.R. Part 20 ......................................................................... 3, 19, 20, 23

42 U.S.C. § 2014 ...................................................................................... 5

42 U.S.C. § 2201 ...................................................................... 3, 17, 20

42 U.S.C. § 2210(n)(2) ............................................................................ 6

5 U.S.C. § 553 (a)(1) .............................................................................. 18

**Other Authorities**

Laurence H. Tribe, *American Constitutional Law* ........................................ 28

## PRELIMINARY STATEMENT

Plaintiffs' opposition brief studiously avoids the issue that the Tenth Circuit directed this Court to address on remand.  As the Court well knows, at this stage of the proceedings, it is irrelevant whether defendants' conduct was "egregious," whether defendants "violated ALARA," whether the plant's off-site monitoring was "riddled with flaws," or even whether plutonium releases from Rocky Flats violated federal emission standards (they did not).  Pls.' Standards Opp'n at 14-17 (Dkt. 2382).  Defendants, of course, disagree with all of these assertions.  At this stage, however, the **only** issue is whether the nuclear safety regulations identified in defendants' opening submission "carry the force of law or controlled Defendants' conduct with respect to the off-site contamination that occurred here" and, whether, as every federal appellate court to consider the issue has concluded, those standards "actually conflict with the relevant state tort standards of care."  *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1144 (10th Cir. 2010) (*Cook Appeal I*).

On that specific issue, plaintiffs—tellingly—have little to say.  While loudly asserting that the standards the Atomic Energy Commission (AEC) adopted for AEC operations do not have the force of law, they do not identify any legal principles to support that assertion.  They also have no answer for the evidence confirming the AEC's clear intention that its standards have binding legal effect.  Nor do they discuss the jury instructions on nuisance, much less attempt to refute defendants' showing that the standard of care under Colorado nuisance law (as reflected in those jury instructions)

conflicts with the AEC standards because it permitted jurors to find that the Rocky Flats plant was a nuisance based on nothing more than the "risk" of a future release into the class area.  The jury thus had complete discretion to override the regulatory authority the Atomic Energy Act vested in the AEC and they were allowed to decide for themselves what releases were too much and impose liability based on the mere existence, operation, and location of Rocky Flats.  That is not how federal law works.

At bottom, defendants' argument boils down to a simple point: federal radiation standards necessarily provide the standard of care in cases arising from the operation of federal nuclear weapons plants.  Plaintiffs have no answer for that simple point.

## ARGUMENT

### I.    PLAINTIFFS DO NOT DISPUTE THE KEY PROPOSITIONS IN DEFENDANTS' OPENING BRIEF.

Opting instead to devote page upon page of their briefing to tangential points, plaintiffs do not even attempt to dispute the building blocks of defendants' preemption argument.  *First*, plaintiffs do not dispute that (a) nuclear power is subject to a comprehensive federal regulatory framework, (b) the Atomic Energy Act vested in the Atomic Energy Commission (and successor agencies) the authority to regulate the design, construction, and operation of nuclear weapons plants, and (c) this authority included the authority to "establish by rule, regulation, or order, such standards and instructions . . . as the Commission may deem necessary or desirable . . . to protect health" and reduce the

hazards associated with the operation of AEC facilities.   42 U.S.C. § 2201(b), 42 U.S.C. § 2201(i); Defs.' Opening Standards Br. at 5-8 (Dkt. 2374).

*Second*, plaintiffs do not dispute that the radiation standards that the AEC adopted for its operations and published in the AEC Manual and successor publications are (a) the same standards that the AEC adopted for licensed commercial nuclear operations and published in 10 C.F.R. Part 20, and (b) the same standards that federal courts have repeatedly held provide the duty of care in cases alleging injury from regulated nuclear materials.  Defs.' Opening Standards Br. at 17-18, 32-33 (Dkt. 2374).

*Third*, plaintiffs do not dispute that the AEC Manual was the AEC's "official issuance system" and AEC contractors were required to comply with the standards and instructions it contained.  *Id*. at 6, 9-19, 25-27.

*Fourth*, plaintiffs do not dispute that the radiation standards the AEC adopted for AEC operations have and were intended to have binding legal effect.  *Id.* at 9-17, 25-31.

*Fifth*, although plaintiffs dispute their applicability, they do not dispute that five federal appellate courts have concluded that state law conflicts with and is preempted by federal nuclear safety standards to the extent that state law would impose a different standard of care in cases claiming harm from regulated nuclear material.  *Id.* at 32-33.

And *sixth*, plaintiffs do not dispute that the standard of care under Colorado nuisance law (as reflected in the jury instructions that were given at trial) permitted jurors to impose liability without regard to the magnitude of any plutonium releases or

exposures and even if there were no releases at all, but only the "risk" of a future release into the class area. *Id.* at 39; Jury Instructions 3.6-3.9 (Dkt. 2121).

The upshot of these building blocks is clear: plaintiffs' state law standards are preempted. Just as in the commercial context, where federal standards preempt conflicting state standards relating to the production of nuclear power, federal standards preempt conflicting state standards relating to the production of nuclear weapons. In both scenarios, Congress's scheme prevails. The Court need read this brief no further to reject plaintiffs' entire argument.

## II. PLAINTIFFS' OPPOSITION BRIEF CONFIRMS THAT THEIR PURPORTED STATE LAW NUISANCE CLAIM IS A PUBLIC LIABILITY ACTION UNDER THE PRICE-ANDERSON ACT.

Plaintiffs' arguments also fail, however, for an independent reason. An essential predicate of plaintiffs' theory is that they "are now proceeding with a pure state law claim independent of the PAA[.]"  Pls.' Standards Opp'n at 8 (Dkt. 2382); *see also id.* at 10 ("Plaintiffs are proceeding solely with their state law nuisance claims"); *id*. at 12 n.19 ("Plaintiffs are proceeding independently of the PAA").  No matter how often repeated, however, that assertion is demonstrably false. While it is true that plaintiffs no longer label their claim a Price-Anderson Act claim, that re-branding is only skin deep.

According to plaintiffs, the nub of their nuisance claim is that (1) the Rocky Flats plant released plutonium into the surrounding area, and (2) those plutonium releases caused "significantly elevated rates of cancer in off-site areas near Rocky Flats (including the Class Area)." *Id*. at 17; *see also id.* at 17-18.

But if that is their claim, and those are the facts that support it, then their claim *necessarily* is a public liability action under the Price-Anderson Act. The Act expressly defines (1) "public liability" as "any legal liability arising out of or resulting from a nuclear incident," 42 U.S.C. § 2014(w); (2) "public liability action" as "*any* suit asserting public liability," 42 U.S.C. § 2014(hh) (emphasis added); and (3) "nuclear incident" as "*any* occurrence" that causes "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q) (emphasis added). Notwithstanding their purported disavowal of any claim under the Price-Anderson Act, plaintiffs are still asserting a claim for public liability, *i.e.*, a claim based on an "occurrence" (the release of plutonium) that caused "bodily injury, sickness, disease, or death" (cancer) and property damage due to the "radioactive" or other "hazardous properties" of plutonium (special nuclear material under the Atomic Energy Act, 42 U.S.C. § 2014(aa)). 42 U.S.C. § 2014(q). By the plain text of federal law, plaintiffs' claim is one under the Price-Anderson Act.

Plaintiffs' strategic abandonment of their claim's Price-Anderson Act label does not change reality. The Act's application turns on substance, not labels. So long as plaintiffs base their nuisance claim on factual allegations of harm (including cancers and property contamination) from the "radioactive" or "other hazardous" properties of special

nuclear material, that claim is a public liability action under the Price-Anderson Act and is subject to the requirements of the Act.  Indeed, if plaintiffs had filed their re-branded "state law nuisance claim" in state court, defendants would have had a right to remove it to federal court precisely because their claim is a public liability action under the Price-Anderson Act by plaintiffs' own factual allegations.  42 U.S.C. § 2210(n)(2).

Although plaintiffs' motives for trying to re-brand their claim are transparent, the law does not work that way.  Indeed, plaintiffs do not even try to explain how the same principles of "waiver," "forfeiture," "law of the case," and "estoppel" that they so casually invoke throughout their briefing do not foreclose them from claiming now, at this late date, that this case is something completely different from what they have said for nearly twenty years it is: a public liability action under the Price-Anderson Act. Plaintiffs so often took this position, *e.g*., 6/4/97 Resp. to Defs.' Mot. for Summ. J. at 56 (Dkt. 961) ("As defendants correctly note, *this is a 'public liability action' under the Price-Anderson Act*."), that this Court had no hesitation concluding that "[n]one dispute this is a 'public liability action' arising under the Price-Anderson Act." *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1179 (D. Colo. 2003).  Plaintiffs even took that position after trial, 5/4/06 Pls.' Mot. for J. at 27 (Dkt. 2170) ("The trespass and nuisance claims presented to the jury were brought pursuant to, and are governed by, the Price-Anderson Act[.]"), and in the Tenth Circuit, 9/18/98 Pls.' Resp. to Defs.' Pet. for

Interlocutory Appeal at 1 ("This Price-Anderson case . . .).  They never told the Tenth Circuit in *Cook Appeal I* or the Supreme Court that their claim was anything else.

Plaintiffs' brief confirms that their purported state law nuisance claim depends on the same factual allegations that, as a matter of law, make it a public liability action. Calling an elephant a cat does not make it a cat.  *See, e.g.*, *Weaver v. United States*, 98 F.3d 518, 520 (10th Cir. 1996) ("We examine the substance of these allegations, rather than the plaintiff's labels, to determine their true nature.").  The Court should find that plaintiffs' claim remains a public liability action under the Price-Anderson Act.

## III.   PLAINTIFFS' WAIVER CLAIMS ARE WITHOUT MERIT.

Rather than engage with the merits of defendants' argument, plaintiffs retreat to baseless claims of "waiver" and "forfeiture."  We address them in turn.

### A.   No Waiver Based On *Cook Appeal II*.

Ignoring the history of this case, plaintiffs argue that defendants "waived and forfeited" this entire standards argument by not raising it as part of *Cook Appeal II*.  Pls.' Standards Opp'n at 4 (Dkt. 2382).  That argument fails because (1) this Court explicitly deferred the standards issue pending briefing and ruling on plaintiffs' reinstatement theory, and (2) plaintiffs' appeal was limited to this Court's January 28, 2014 order, which concluded that plaintiffs "may not litigate this case outside the [Price-Anderson Act]."  1/28/14 Order at 13 (Dkt. 2351).  Because this Court had not issued any ruling on the standards issue, there was nothing on that subject for the Tenth Circuit to review. There is no waiver or forfeiture under such circumstances.

1.      **Plaintiffs Ignore The Relevant Procedural History.**

Plaintiffs' opposition brief omits important facts concerning the procedural history of this case that are directly relevant to plaintiffs' waiver claim.

a.      **The October 16, 2012 Order Regarding Briefing Schedule**

The January 28, 2014 order from which plaintiffs appealed did not arise in a vacuum.  Nearly fifteen months earlier, this Court issued a scheduling order that set specific briefing priorities and directed the parties how the case would proceed.  The order instructed the parties that (1) they were to brief issues relating to plaintiffs' reinstatement theory, and (2) pending a ruling, the Court would **defer** consideration of other issues—including the standards issue—that the Tenth Circuit in *Cook Appeal I* had directed the Court to address on remand: "The remaining issues (class re-certification, preemption, etc.) shall be treated if and as appropriate in light of my resolution concerning the reinstatement theory."  10/16/12 Order at 1 (Dkt. 2334).

b.      **The January 28, 2014 Order**

As a result of its January 28, 2014 order, the Court never reached the standards question or the other issues (including class certification) that it had deferred.  That order rejected plaintiffs' reinstatement theory, concluding that a party that brings a PAA claim may not simultaneously pursue a state-law claim based on the same facts as the PAA claim and, therefore, "Plaintiffs may not litigate this case outside the PAA."  1/28/14 Order at 13 (Dkt. 2351).  That was the **only** issue the Court had decided since remand.  Acknowledging that other issues remained, the Court directed the parties to "prepare

a Joint Status Report discussing the most effective way to proceed that is consistent with this Order and the Tenth Circuit's mandate." *Id*. At the same time, noting "the extraordinary length of this litigation," the Court recommended that, instead of turning to other remaining issues, "both parties give serious consideration" to an immediate appeal of the January 28, 2014 order. *Id*. at 13 n.4.

### c.     The February 27, 2014 Order of Dismissal

The parties heeded the Court's recommendation. This resulted in the Court's February 27, 2014 "Order Approving Stipulated Dismissal with Prejudice and Entry of Final Judgment." (Dkt. 2356). That order recited the relevant history and made clear that the purpose of the stipulation was to do what this Court had recommended: enable plaintiffs to immediately appeal the Court's January 28, 2014 order. *Id*. at ¶¶ C-D, G, 2-3; *see also* 2/27/14 Judgment at ¶ 3 (Dkt. 2358) (judgment entered "[s]o that Plaintiffs may immediately appeal from the January 28 Order"). Needless to say, this Court did not purport to decide the merits of defendants' preemption theory.

### d.     *Cook Appeal II*

Before the Tenth Circuit, plaintiffs rightly disclaimed any argument that this Court had resolved the issue of preemption standards. As plaintiffs' counsel acknowledged during oral argument in *Cook Appeal II*, the standards question was still an open issue that this Court, pursuant to its scheduling orders, was to address in future proceedings. In response to questions from Judge Moritz, plaintiffs' counsel conceded that defendants "were given permission to raise [the standards issue] again on remand. . . . Of course we

haven't gotten to that stage yet."  11/20/14 Argument Tr. at 62 (Ex. 7 to Pls.' Standards

Opp'n (Dkt. 2382)).   At that point, Judge Gorsuch jumped in, prompting plaintiffs'

counsel to again acknowledge that this Court had deferred the standards issue:

> JUDGE GORSUCH: Well, what do you mean you haven't gotten to that stage yet?
>
> MR. DAVIDOFF: Well, when we were remanded, they were given the opportunity to do that [*i.e.*, show what standards governed plutonium releases and preemption state law].
>
> JUDGE GORSUCH: Yeah.  We don't have any of that here before us.
>
> MR. DAVIDOFF:  I completely agree.
>
> ·JUDGE GORSUCH: So what – what's the upshot of that?  Is it gone by the boards?  Is it –
>
> Mr. DAVIDOFF: They've either waived their right to do it or Judge Kane has – I'm not sure.  I'll be frank, I don't have an answer to that question, because *it was left open on the prior appeal.  And Judge Kane's briefing – Order on briefing basically told us to brief one question and then he didn't reach other questions.  To be completely candid with the Court, that may be open on remand to them*.

*Id*. at 62-63 (emphasis added).

### 2.    Plaintiffs' Waiver Argument Is Meritless.

Ignoring what they said to the Tenth Circuit and the history surrounding *Cook*

*Appeal II*, plaintiffs now argue that defendants should have raised their "numerical

federal standards" argument as part of that appeal, not because there was any ruling from

this Court that could have been the subject of an appeal, but because plaintiffs "expressly

asked the Tenth Circuit to remand and direct this Court to enter judgment based on

Plaintiffs' Colorado proven nuisance claims."  Pls.' Standards Opp'n at 3-5 (Dkt. 2382).

It is no overstatement that this waiver argument is preposterous. This Court deferred the standards issue (and other issues, including class certification), so there was no order on that subject from which either party could have appealed and no order on that subject for the Tenth Circuit to review and rule upon. This is especially true because defendants were *appellees* in that appeal. An appellee does not even need to file a brief; much less does an appellate court have to raise arguments that were not addressed by the district court. Plaintiffs ignore basic rules of appellate procedure. *See*, *e.g.*, *Froebel v. Meyer*, 217 F.3d 928, 933 (7th Cir. 2000) ("Because their position on appeal seeks only to maintain the status quo, we apply 'a degree of leniency' to [appellees'] failure to raise all possible grounds for affirming the lower court."). Indeed, had either party raised issues other than those this Court decided in its January 28, 2014 order, the Tenth Circuit might very well have rejected the argument as requesting an impermissible advisory opinion. *In re Grand Jury*, 604 F.2d 69, 72 (10th Cir. 1979).

Nor does it matter that plaintiffs listed "declining to recertify the class and declining to enter judgment" as an error in their *Cook Appeal II* "Statement of Issues." *Cook Appeal II* Pls.' Opening Br. at 5. Even leaving aside the fact that defendants were appellees and so had different briefing obligations than plaintiffs, the inclusion of that issue was perfunctory. Plaintiffs' 61-page appeal brief said nothing more about that issue and, instead, addressed only this Court's January 28, 2014 order. Even plaintiffs concede that dashing off a sentence without further development is insufficient to raise the issue

for appeal.  Pls.' Reply in Supp. of J. re Class Cert. at 13 n.24 (Dkt. 2381) (citing, *e.g.*, *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F. 3d 1152, 1175 (10th Cir. 2002) ("[I]ssues will be deemed waived if they are not adequately briefed.  We do not consider merely including an issue within a list to be adequate briefing.") (citation omitted)).

Here, there was not even a disputed decision on the federal standards issue that— plaintiffs ridiculously claim—defendants could have raised on appeal.  Defendants did not "waive" or "forfeit" any argument relating to the issue of the standards.

### B.    No Waiver Based On "Seven Documents."

Again distorting the history of this case, plaintiffs next claim that "Defendants are limited now to the seven documents . . . that they contended at trial contained the alleged 'standards' that purportedly conflict with and preempt Colorado law," and cannot "try to inject new 'standards' that they failed to identify previously as part of their proposed jury instructions."  Pls.' Standards Opp'n at 5-6 (Dkt. 2382).[1]

This argument is doubly flawed.  First, defendants are not trying to inject "new" standards into the case.  As plaintiffs eventually concede, defendants' position concerning the permissible concentrations of plutonium in air that governed operations at Rocky Flats (and other AEC facilities) has never changed:  $0.2 \text{ pCi/m}^3$ (effective

---

[1]    Plaintiffs also assert that defendants objected to the admission of these documents.  Pls.' Standards Opp'n at 1, 20 (Dkt. 2382).  They fail to note, however, the reason for the objection, which the Court sustained: these were expert reliance materials.  As the Court explained to plaintiffs' counsel, "You examined him on it, but the document itself doesn't come in under the rule."  12/12/05 Trial Tr. at 7646 (Dkt. 1890) (attached hereto as Ex. F).

February 1, 1958), 0.33 pCi/m$^3$ (effective August 12, 1963), and 0.04 pCi/m$^3$ (effective August 5, 1985). *Id.* at 20 ("These same numbers (for the period 1958-85) appear in Defendants' latest brief."); *id.* at 26 (noting defendants' longstanding position that effective August 5, 1985 the standard was 0.04 pCi/m$^3$). These air concentration standards (set out in Table 1 on page 21 of defendants' opening standards brief) are:

- The same standards contained in the July 1997 Affidavit of Dr. John Auxier (Dkt. 1787-6) (excerpts attached hereto as Ex. A);

- The same standards contained in the February 1999 Affidavit of Drs. Auxier and Frazier (Dkt. 1090) (excerpts attached hereto as Ex. B);

- The same standards contained in defendants' proposed jury instructions (excerpts attached as hereto Ex. C);

- And the same standards testified to by Dr. Frazier and summarized in DX1638 (attached as Ex. D), which was admitted without objection, 12/12/05 Trial Tr. at 7464 (Dkt. 1889), 10192 (Dkt. 2033) (attached hereto as Exs. G & H).

Second, nowhere did the Tenth Circuit in *Cook Appeal I* limit the types of materials defendants could use in support of their standards argument. Concluding that this Court had "never fully conducted" an analysis of the standards issue, 618 F.3d at 1144, and that the standards issue was not "adequately presented" on appeal, *id*. at 1144 n.18, the Tenth Circuit stated, without qualification, "On remand, the district court shall permit Defendants to identify the particular federal regulations or statutes they believe preempt state law." *Id*. at 1144. Suffice it to say, plaintiffs cannot point to any part of this decision that purports to limit defendants, on remand, to the seven documents plaintiffs cite in their opposition or to limit what this Court may consider in deciding

whether the standards defendants identify "carry the force of law or controlled Defendants' conduct with respect to the off-site contamination that occurred here." *Id*.

Finally, as to Exhibit 5 to defendants' opening standards brief, which is a section of the AEC Manual (Chapter 0524, Permissible Levels of Radiation Exposure) that became effective February 1, 1958, plaintiffs ignore that this document was specifically referenced in and superseded by the updated section of the AEC Manual attached as Exhibit 13 to defendants' opening standards brief.  Plaintiffs acknowledge that they have long had Exhibit 13, which is dated August 12, 1963.  The cover page states:

> Revised Chapter 0524, entitled, "Standards for Radiation Protection", replaces Chapter 0524, "Permissible Levels of Radiation Exposure." This chapter was revised to update the radiation protection standards to be consistent with the Radiation Protection Guides recommended by the Federal Radiation Council and to be consistent with basic radiation protection standards recommended by the Director of Regulation for licensees and approved by the Commission.

8/12/63 AEC Manual Ch. 0524 at 1 (Ex. 13 to Defs.' Opening Standards Br. (Dkt. 2374)).[2]

---

[2]   Plaintiffs do not dispute that, prior to the 1963 revision, and as reflected in Exhibit 5 to defendants' opening standards brief, the maximum permissible concentration for plutonium in air adopted by the AEC with respect to off-site releases was 0.2 picocuries per cubic meter of air, which is the same concentration the AEC specified in an earlier section of the AEC Manual, Chapter 550-05, which went into effect in 1957.  *See* Defs.' Opening Standards Br. at 13-14 (Dkt. 2374).  As explained in Staff Paper 985, which was exhibit 6 to defendants' opening brief, the reason the AEC issued Chapter 0524 was to ensure that these standards were binding, and not simply recommended.  *See id.* at 10-13.

## IV. THE AEC STANDARDS CONFLICT WITH AND PREEMPT COLORADO NUISANCE LAW.

The Tenth Circuit's mandate as it relates to standards is not complicated, despite plaintiffs' efforts to make it appear so.  That court outlined a straightforward four-stage approach.  First, defendants should identify "the particular federal regulations or statutes they believe preempt state law."  *Cook Appeal I*, 618 F.3d at 1144.  Second, this Court should consider "whether the federal standards Defendants identify carry the force of law or controlled Defendants' conduct with respect to the off-site contamination that occurred here."  *Id*.  Third, defendants should "indicate the particular standards of care applicable to a state law trespass or nuisance claim they believe are in conflict with any such regulations."  *Id*.  And finally, this Court should then determine "whether any such federal standards actually conflict with the relevant state tort standards of care."  *Id*.  Defendants followed this approach in their opening submission, and use it again here to respond to the arguments plaintiffs raise in their opposition brief.

### A. Defendants Have Identified The Standards That Preempt State Law.

Defendants' opening brief identifies the standards that preempt Colorado law.  Those standards include numerical limits on the maximum permissible concentration of plutonium in air that could be released to uncontrolled areas (*i.e*., areas outside the AEC facility)[3] and numerical limits on exposures (doses) to members of the general public.

---

[3] *See*, *e.g*., Section II.B, p. 4, of the 1963 version of AEC Manual Chapter 0524 (Ex. 13 to Defs.' Opening Standards Br. (Dkt. 2374)) (subject to specified exceptions, "radioactivity to effluents released in uncontrolled areas shall not exceed the radiation protection standards

Defs.' Opening Standards Br. at 9-21 (Dkt. 2374).  Defendants also attached the agency publications that contained these standards.

Although plaintiffs try to cloud reality, nowhere in their opposition brief do they dispute that the standard the AEC and successor agencies established as the maximum permissible concentration of plutonium in air was 0.2 picocuries (per cubic meter of air) (effective February 1, 1958), 0.33 picocuries (effective August 12, 1963), and 0.04 picocuries (effective August 5, 1985).  Nor do they identify even one instance in the long record of this case where they have disputed that these were the standards that applied to Rocky Flats and other AEC facilities.  That silence speaks volumes.[4]

### B.       The AEC Standards Carried The Force Of Law.

Defendants' opening brief shows that the standards the AEC (and successor agencies) adopted for AEC operations carry the force of law.  Defs.' Opening Standards Br. at 22-31 (Dkt. 2374).  First, the AEC had explicit authority under the Atomic Energy Act to establish "by rule, regulation, or order" such "standards and instructions" that they deemed "necessary or desirable" to "protect health or to minimize danger to life or

---

specified in annex 1, table II.  The point of release of such effluents shall be considered to be the point at which the effluents pass beyond the site boundary.  For the purpose of applying these standards, radioactivity concentrations in effluents may be averaged up to one year.").

[4]   Rather than candidly say "Yes, we do not dispute, have never disputed, and after nearly two decades of litigation have no basis to dispute what the numerical standards were during the 1958 to 1989 period," plaintiffs dance around the issue with non-committal phrasing noting only what "Defendants say" the numerical limits were during the relevant period.  *See, e.g.*, Pls.' Standards Opp'n at 8 (Dkt. 2382).  Plaintiffs have had ample time (decades) to show whether there is a factual basis to dispute what the numerical limits are.  There is not.

property."    42 U.S.C. § 2201(b); *see also* 42 U.S.C. § 2201(i).    Second, the AEC followed all procedural requirements relating to the issuance of these standards.    The AEC formally adopted them and then issued and published them in official orders and directives and in agency publications, including the AEC Manual, which was the AEC's official issuance system.   Third, the AEC and successor agencies intended these standards to have binding effect.   AEC Staff Paper 985 explicitly says that the purpose of formally adopting AEC Manual Chapter 0524 was to ensure it had binding effect.   Were it otherwise, the mandatory language of the AEC Manual chapters and the orders and directives of successor agencies, and the Dow and Rockwell contracts, which contained provisions requiring them to comply with the AEC's safety regulations, would make no sense.

Plaintiffs have no real response.   Although they assert that the AEC standards "do not have the force of law," Pls.' Standards Opp'n at 20-28 (Dkt. 2382), they never explain why not.   They do not dispute the AEC's authority to issue health and safety regulations, nor that the AEC adopted these standards with the intent that they be binding. They do not discuss AEC Staff Paper 985, which memorializes the AEC's intention (reflected in the AEC Manual) that the standards it adopted have binding effect.  Indeed, plaintiffs do not even provide the Court with a legal framework for assessing whether these standards (or agency pronouncements of any type) have the force of law.

Ultimately, plaintiffs have only three arguments: (1) the standards were not issued pursuant to the Administrative Procedure Act (APA); (2) the standards do not include a "plutonium in soil standard"; and (3) the federal documents setting the federal standard contain references to ALARA.  None of these arguments has any merit.

### 1.        Plaintiffs' APA Argument

Plaintiffs argue that the standards the AEC established for its operations do not have the force of law because they were not issued pursuant to the APA after notice-and-comment rulemaking.  Pls.' Standards Opp'n at 27-28 (Dkt. 2382).  But plaintiffs do not cite any authority even suggesting that the APA governs regulations relating to the operation of weapons plants owned by the United States.  The lack of such authority—despite the existence of the nuclear weapons production complex for nearly seven decades—is unsurprising given the plain text of the APA, which specifically exempts agency actions that, as here, involve a military function of the United States.  *See* 5 U.S.C. § 553(a)(1) ("This section applies, according to the provisions thereof, except to the extent that there is involved—(1) a military or foreign affairs function of the United States[.]").

No one disputes that nuclear weapons production at Rocky Flats "involves" a military function of the United States—nor could they.  The Atomic Energy Act is replete with provisions relating to atomic weapons, the importance of regulating nuclear material to "provide for the common defense and security," and the military's participation in issues relating to the supply and production of nuclear weapons.  *See* generally Atomic

Energy Act of 1954 (Ex. 2 to Defs.' Opening Standards Br. (Dkt. 2374)). The Act created within the AEC a "Division of Military Application," which was headed by "an active member of the Armed Forces[,]" *id.* at § 25.a, and established a Military Liaison Committee, whose head was to be appointed by the President and whose members were to be "representatives from each of the Departments of the Army, Navy, and Air Force," *id.* at § 27. The Act required that the AEC "consult with the Department of Defense" on "all atomic energy matters" that the Department deemed to "relate to military applications of atomic weapons or atomic energy, including the development, manufacture, use, and storage of atomic weapons[,]"*id.*, and specifically authorized the AEC to "engage in the production of atomic weapons" and to produce such quantities of such weapons and special nuclear material as the "President from time to time may direct" the AEC to deliver, *id.* at § 91. There can be no reasonable argument that nuclear weapons production is not a military function.

Of course, the 1954 Act also provided for the development of commercial nuclear reactors and other peaceful applications of nuclear power. *Id.* at Chapter 10, §§ 101-110. In discharging its regulatory responsibilities for these non-military applications, the AEC published its radiation protection standards in 10 C.F.R. Part 20, and for those standards, it followed the APA's notice and comment procedures and provision for publication of the proposed standards in the Federal Register. But while the AEC's standards for production at nuclear weapons plants were not required to also undergo notice and

comment, by design they had the same legal effect as the standards the AEC adopted for commercial licensees and were likewise consistent with the recommendations of authoritative organizations in the field of radiation protection: the NCRP, the Federal Radiation Council, and the ICRP.  Defs.' Opening Standards Br. at 10-14, 17-19, 21, 30-31 (Dkt. 2374).

It would be anomalous indeed to think that the standards published in 10 C.F.R. Part 20 for commercial nuclear activity have the "force of law"—as numerous federal appellate Courts have held—but yet the same standards for military nuclear activity published in the AEC Manual pursuant to and in compliance with the same statutory authority do not.  Plaintiffs do not even attempt to explain the incongruity of their position.

### 2.      Plaintiffs' "Plutonium In Soil Standard" Argument

Unable to dispute that the AEC adopted limits that governed exposures to the general public and the maximum permissible concentration of plutonium in air, plaintiffs argue that "this case is about plutonium in soil," and there can be no preemption because "there are no plutonium in soil standards."  Pls.' Standards Opp'n at 1, 28 (Dkt. 2382).

This argument is a *non sequitur*.  First, it ignores the scope of the AEC's regulatory authority.  The AEC's authority to regulate the health and safety aspects of nuclear production includes the discretion to determine how best to do so and what types of standards to adopt.  *See* 42 U.S.C. §§ 2201(b), 2201(i) (conferring on the AEC the authority to "prescribe such regulations or orders as it may deem necessary . . . ").

Plaintiffs have not cited a single case or statutory provision that would have required the AEC to separately regulate off-site hazards by setting limits on the permissible concentration of plutonium in soil, rather than setting limits on the permissible concentration of plutonium in air and on the exposures (doses) that could result from plant releases.  Plaintiffs cannot ask this Court to punish defendants for doing what federal law allowed.

Second, plaintiffs' soil argument ignores the standards that the AEC, in its discretion, adopted to address potential exposures associated with AEC operations.  The limits relating to exposures to the general public and the maximum permissible concentration of plutonium (and other radionuclides) in air necessarily limited the potential magnitude of off-site releases and exposures, including through soil. No authority even begins to suggest that the lack of a soil standard means that the federal radiation standards that govern off-site releases and exposures do not have the force of law and do not provide the duty of care in cases alleging harm from off-site releases.

Third, the AEC adopted standards that were consistent with the recommendations of authoritative organizations in the field of radiation protection, and plaintiffs have not identified any such organization that ever proposed a standard for the concentration of radionuclides in soil.  This is because separating soil from air in this context makes no sense: plutonium only accumulates in the soil through the air.  It would completely

nullify federal law if defendants could be liable for plutonium concentrations in the soil when those soil concentrations resulted from lawful concentrations in the air.

Finally, while plaintiffs assert that "this case is about plutonium in soil," Pls.' Standards Opp'n at 28 (Dkt. 2382), that argument contradicts their own nuisance claim as defined in the jury instructions.   To get around the problem that there was very little evidence of plutonium contamination, plaintiffs' position before, during, and after trial was that they did not need to prove there was *any* contamination on class properties because nuisance is a "non-trespassory invasion."[5]   The Court agreed.   As a result, the nuisance instruction said *nothing* about soil and did not require that the jury find that any property in the class area was contaminated with plutonium.   Jury Instructions 3.6-3.9 (Dkt. 2121).   To the contrary, the jury was instructed that even if there was no evidence of off-site contamination, it could impose liability and find a nuisance based on the mere "risk" of a release of plutonium into the class area.   Jury Instruction 3.7 (Dkt. 2121).

Plaintiffs' assertion that this case is about "plutonium in soil" is one more effort by plaintiffs to reinvent their claim.   That is not how federal litigation works.

### 3.   Plaintiffs' ALARA Argument

Plaintiffs next argue that the federal numerical limits for the concentration of plutonium in air and for radiation doses to the public do not have the force of law because

---

[5]   Plaintiffs' experts did not perform any soil sampling to confirm the location and extent of any plutonium in the class area.   Rather than risk generating unhelpful data, plaintiffs based their class area definition on a publication that was based on limited sampling conducted in 1970 and which not reflect the extensive development that occurred after 1970.

the same documents that prescribe these limits also contain references to the radiation protection principle known as ALARA (as low as reasonably achievable).   Pls.' Standards Opp'n at 22-24 (Dkt. 2382).  This argument is a dead-end.

As defendants pointed out in their opening brief, federal courts throughout the country *have consistently rejected this same argument*, concluding that the numerical limits in federal nuclear safety regulations supply the standard of care, not ALARA. Defs.' Opening Standards Br. at 42-43 (Dkt. 2374).[6]  As the Third Circuit explained:

> Adopting ALARA as part of the standard of care would put juries in charge of deciding the permissible levels of radiation exposure and, more generally, the adequacy of safety procedures at nuclear plants—issues that have explicitly been reserved to the federal government in general and the NRC specifically.  Adoption of a standard as vague as ALARA would give no real guidance to operators and would allow juries to fix the standard case by case and plant by plant.  An operator acting in the utmost good faith and diligence could still find itself liable for failing to meet such an elusive and undeterminable standard.  Our holding protects the public and provides owners and operators of nuclear power plants with a definitive standard by which their conduct will be measured.

*In re TMI*, 67 F.3d 1103, 1115 (3d Cir. 1995) (*TMI III*) (citation omitted).

Plaintiffs have no answer to any of these cases; they just ignore them.  But the cases' reasoning is sound: ALARA is so vague that making it the standard of care would

---

[6]   *See*, *e.g.*, *In re TMI*, 67 F.3d 1103, 1115 (3d Cir. 1995) (*TMI III*) (rejecting the use of the ALARA standard as "vague," "elusive," and "undeterminable"); *Adkins v. Chevron Corp.*, 960 F. Supp. 2d 761, 772-73 (E.D. Tenn. 2012) (similar); *Finestone v. Fla. Power & Light Co.*, 319 F. Supp. 2d 1347, 1349 (S.D. Fla. 2004) (similar); *Carey v. Kerr-McGee Chem. Corp.*, 60 F. Supp. 2d 800 (N.D. Ill. 1999) (similar); *Corcoran v. N.Y. Power Auth.*, 935 F. Supp. 376, 388-89 (S.D.N.Y. 1996) (dismissing claims alleging "statutory liability" based on violation of various regulatory provisions such as the 10 C.F.R. § 20.201 requirement to conduct surveys to monitor effluent releases); *McLandrich v. S. Cal. Edison Co.*, 942 F. Supp. 457 (S.D. Cal. 1996) (same); *Bohrmann v. Me. Yankee Atomic Power Co.*, 926 F. Supp. 211 (D. Me. 1996) (same).

allow juries to impose liability without regard to the magnitude of any releases that have occurred or the doses that have resulted. It would allow juries to second-guess the judgments that the Atomic Energy Act has entrusted to regulatory agencies. When it comes to nuclear technology, there is no reason to think Congress intended to hand off expert judgments to lay juries—in either the civilian or military context.

In any event, even if ALARA could be deemed a standard, treating ALARA as part of the federal scheme only would mean that the jury would have to consider compliance with ALARA in the context of the numerical limits, not—as plaintiffs implicitly seem to suggest—that there is no federal standard at all. Here, of course, the jury was not instructed on ALARA or the numerical limits that governed operations at AEC facilities or that the federal standards provided the duty of care.

Finally, given that the nuisance instruction did not require the jury to find that *any* releases had actually occurred (the threat of a release was enough), plaintiffs' ALARA argument is irrelevant. Jury Instruction 3.7 (Dkt. 2121). Under this instruction, the jury would have had no occasion to consider whether any releases could have been lower than they were. The mere risk of release was sufficient to impose liability.

### C.    Plaintiffs' Remaining Arguments Have No Merit.

Plaintiffs make no attempt to rebut defendants' showing that the AEC standards conflict with the standard of care under Colorado nuisance law. Defs.' Opening Standards Br. at 3-4, 31-42 (Dkt. 2374). In fact, their brief does not discuss any aspect of Colorado nuisance law, which, as reflected in the jury instructions, did not even require

the jury to find that any releases had actually occurred. Unconstrained by the need to find that any releases exceeded federal standards, the jury was able to impose liability based on the existence, location, and operation of Rocky Flats. Colorado law thus necessarily "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Cook Appeal I*, 618 F.3d at 1143 (quotations omitted).

None of plaintiffs' remaining arguments against preemption have merit.

### 1.    The *Silkwood* Decision

Plaintiffs devote page after page of their brief to the Tenth Circuit's *Silkwood* decision, *Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908 (10th Cir. 1981). They contend that it forecloses preemption argument and is dispositive that the conflict between Colorado nuisance law and federal standards simply does not matter. Pls.' Standards Opp'n at 10-16 (Dkt. 2382). Plaintiffs, however, made that *same* argument in *Cook Appeal I*, and the Tenth Circuit rejected it, concluding that "neither this court nor the Supreme Court has analyzed whether state tort standards of care, which may have some indirect effect on nuclear safety, are preempted by federal law." *Cook I Appeal*, 618 F.3d at 1143. Given what the Tenth Circuit has already said, plaintiffs' argument to this Court thus makes no sense: if the Tenth Circuit had agreed that *Silkwood* was dispositive, it would not have directed this Court to consider on remand whether federal radiation standards conflict with and preempt the standard of care under Colorado nuisance law.

Indeed, as the Tenth Circuit noted in *Cook Appeal I*, since *Silkwood*, five federal courts of appeals have analyzed the precise issue now before this Court, and they each concluded that federal radiation standards preempt state tort standards and provide the duty of care in cases claiming harm from nuclear material.  *Cook Appeal I*, 618 F.3d at 1144 n.19; Defs.' Opening Standards Br. at 32-33 (citing cases) (Dkt. 2374).  As those cases recognize, even outside the Price-Anderson Act federal laws and regulations preempt the standard of care, and the Act reflects Congress's intent to standardize this area of law and rein in some of the vagaries of state law.  *Id.*

Although the reasoning of these circuit cases is sound, plaintiffs do not discuss any of them (or, for that matter, any of the other cases defendants discuss in Section II.A of their opening brief).  They dismiss these cases on the hand-waving theory that plaintiffs "are proceeding solely with their state law nuisance claims," rather than under the Price-Anderson Act.  Pls.' Standards Opp'n at 10 (Dkt. 2382).  But as shown in Part I above, that premise is false: despite dropping the Price-Anderson label, plaintiffs' claim remains, in substance, a public liability action under the Price-Anderson Act.  Plaintiffs do not even attempt to explain how their claim is not a public liability action when, as framed by them, it arises from the release of plutonium and an alleged nuclear incident in the form of cancers and property damage allegedly caused by those releases.

But even if the Court were to accept the fiction that plaintiffs are not proceeding under the Price-Anderson Act, there is still the problem of the 1988 Amendments to the

Price-Anderson Act.  Those Amendments, like the Act itself, are part and parcel of the Atomic Energy Act, *In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 837 n.2 (3d Cir. 1991) (*TMI II*), and they reflect the standardization of this entire area of the law by creating, as five federal courts of appeals have held, an exclusively federal cause of action for claims alleging radiation injury.  Importantly, *Silkwood* was decided *before* the 1988 Amendments, so its preemption analysis does not account for the Atomic Energy Act as it exists today.  As all five of the federal appellate courts to consider the issue have concluded, the 1988 Amendments materially affect the question of preemption.  Hence, it does not matter that plaintiffs contend they are not proceeding under the Price-Anderson Act.  Because their claim is still based on the release of special nuclear material from a plant owned and regulated by the federal government, then federal radiation standards must provide the duty of care.

### 2.   Field Preemption

To get around the many cases holding that federal radiation standards provide the duty of care in cases such as this, plaintiffs argue that those cases were decided on the basis of "field preemption," and that defendants have waived any argument based on field preemption.  Pls.' Standards Opp'n at 7, 10 (Dkt. 2382).  Notably, plaintiffs do not cite and cannot point to any statement defendants ever made waiving any aspect of their preemption argument.

The incongruity of plaintiffs' waiver argument is apparent from the many briefs defendants have filed over the years concerning the preemptive effect of federal radiation

standards.  As the primary support for their position, defendants regularly cited, relied on, and discussed the same federal appeals court rulings that plaintiffs dismiss as "field preemption" cases and claim defendants "waived."  Defendants cited those cases in the briefs they submitted in the 1990s, in multiple pretrial reports leading up to trial, in their proposed jury instructions, and in their *Cook Appeal I* brief.  This Court was so familiar with these cases (and defendants' position concerning them) that it discussed them at length in its 2003 ruling addressing the standards question.  *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175 (D. Colo. 2003) (*Cook IX*).  Plaintiffs do not explain how defendants could have "waived" any preemption argument based on these cases given that defendants repeatedly cited them in support of their preemption position.   If defendants were not relying on these cases, there would have been no reason to cite them.

Once again, plaintiffs' argument is another attempt to elevate labels over substance.  Preemption nomenclature is not a model of clarity.  As the Supreme Court has explained, there are no rigid distinctions between types of preemption, and "[i]ndeed, field pre-emption may be understood as a species of conflict pre-emption." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990); *see also Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1092 (10th Cir. 2015) (*Cook Appeal II*) (explaining that "[p]reemption can come about in various ways" and that "labels 'are anything but analytically air-tight,'" (quoting Laurence H. Tribe, *American Constitutional Law* § 6–28, at 1177 (3d ed. 2000))).

The lack of rigid distinction has led to disagreements over preemption labels.  This Court, for example, earlier concluded that "the courts in *TMI II* and *O'Conner* found that federal nuclear safety regulations preempt state standards of care under standard *conflict* preemption analysis."  *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1193 (D. Colo. 2003) (emphasis added).  But the Tenth Circuit, looking at the exact same cases (which defendants had cited in support of their preemption argument), stated "it appears the courts' holdings were responsive to arguments involving *field* preemption," rather than conflict preemption.  *Cook Appeal I*, 618 F.3d at 1144 n.19 (emphasis added).

The confusion is understandable, as the *TMI II* and *O'Conner* courts stated their preemption holdings in terms that referred to *both* conflict and field preemption (which, of course, is a type of conflict preemption).  *See O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994) ("[S]tates are preempted from imposing a non-federal duty in tort, because any state duty would infringe upon pervasive federal safety regulations in the field of nuclear safety [referring to the field preemption test], and thus would conflict with federal law [referring to the conflict preemption test]." (quoting *TMI II*, 940 F.2d at 859).

One consequence of this confusion is that the Tenth Circuit said that defense counsel, at oral argument, "expressly stated their argument is premised on conflict preemption only."  *Cook Appeal I*, 618 F.3d at 1143 n.16.  But that statement must be read in context.  Defendants' briefs discussed and quoted extensively from the same cases

the Tenth Circuit said are field preemption cases and made clear that defendants relied on them for their preemption argument.  During oral argument, in response to questions from the panel, defense counsel stated that "field preemption and conflict preemption are very close relative[s] and it kind of depends how broadly you define the relevant field. . . . [Our theory] is at the intersection of field preemption and conflict preemption." 3/10/10 Argument Tr. at 5, 6 (attached hereto as Ex. E).  That statement is no different in substance from the Supreme Court's own articulation that "field pre-emption may be understood as a species of conflict pre-emption."  *English*, 496 U.S. at 79 n.5.  As the transcript shows, nowhere did defendants say they were not relying on the cases they had long cited in support of their preemption argument and on the preemption principles reflected in those cases.  In any event, as explained above, even the Third Circuit has called the frequently cited *TMI II* ruling a "conflict" preemption case.  *See TMI II*, 940 F.2d at 859 ("conflict with federal law").

Anyway, Plaintiffs' argument defies commonsense.  If the Tenth Circuit really believed that a federal standards argument is waived, it would not have remanded that very argument to this Court for further proceedings.  Federal appellate courts do not do futile things.  And even if all of the other cases holding that federal radiation standards provide the duty of care were decided on field preemption grounds, that would not change the fact that the imposition of the state law standard in this case would conflict with the purposes and objectives of Congress, and the standard is therefore preempted

under a conflict preemption analysis for the reasons explained above and in defendants' opening brief.

<u>**CONCLUSION**</u>

Nuclear weapons and the operations that produce them are indispensable to the national defense.  But they also are controversial; no community wants nuclear weapons produced in its backyard.  The purposes and objectives of the Atomic Energy Act would be frustrated if states could impose standards of care stricter than those established by the federal agency with the exclusive authority to set the standards that govern the operation of nuclear weapons plants.  Nuclear safety concerns are "the exclusive business of the federal government," *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 208, 212 (1983), and under the Supremacy Clause, where state standards conflict with federal standards, it is state law, not federal law, that must give way, *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2473 (2013).

The Court should not enter judgment on the nuisance verdict, but should set it aside on the ground that the federal standards (1) establish defendants' duty of care and (2) conflict with, and so preempt, Colorado nuisance law, which imposes liability regardless of whether the claimed exposures and releases exceed the federal limits and, indeed, regardless of whether any releases have actually occurred.

Date:  November 9, 2015

/s/ Kevin T. Van Wart
Kevin T. Van Wart, P.C.
Bradley H. Weidenhammer
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Phone: (312) 862-2000
Email: kvanwart@kirkland.com

Joseph Bronesky
SHERMAN & HOWARD LLC
633 Seventeenth Street, Suite 3000
Denver, CO 80202
(303) 297-2900

Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 9th day of November, 2015, he caused the foregoing submission to be served via the Court's ECF system on all participating counsel.

/s/ Kevin T. Van Wart
Kevin T. Van Wart, P.C.