# Exhibit A

FIN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

No. 90-K-181

MERILYN COOK, et al.,

      Plaintiffs,

        v.

ROCKWELL INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY,

      Defendants.

## PLAINTIFFS' PROPOSED PLAN FOR DETERMINATION
## OF COMPENSATORY DAMAGES

### I. INTRODUCTION

Pursuant to this Court's Order of April 14, 2004 (the "April 14 Order"), and this Court's

further Order of May 27, 2004 (the "May 27 Order"), plaintiffs respectfully submit this proposal

regarding determination of compensatory damages in this action.

### II. BACKGROUND

In the April 14 Order, the Court analyzed various elements of the parties' claims and

defenses, determining that some were capable of class-wide adjudication and others would

potentially require individual treatment. Specifically, the Court stated its views that the following

issues appear capable of class-wide determination:

1.   Whether defendants' intentional conduct caused a trespass by contaminating properties falling within the boundaries of the class area, *see* April 14 Order at 5-6;

2.   Whether defendants conducted an abnormally dangerous operation at Rocky Flats subjecting them to strict liability, *id.* at 6;

3.   Whether actual or threatened releases from the plant:

   (a)   pose a general health risk, *id.* at 8;

   (b)   are capable of causing class members to suffer fear, anxiety, or discomfort, *id.*;

   (c)   caused governmental authorities to limit the use of class properties, *id.*;

   (d)   caused other interference with use and enjoyment (depending on the nature of the interference), *id.*;

4.   Whether any claimed interference with use and enjoyment is substantial and unreasonable, *id.* at 8-9;

5.   If the statute of limitations defense is available under Colorado law for a nuisance arising from past releases causing on-going contamination that cannot be abated:

   (a)   whether the nuisance is abatable, *id.* at 16;

   (b)   when class members had constructive knowledge of the offending conditions, *id.*;

   (c)   when class members had constructive knowledge that the conditions were not abatable, *id.*;

6.   When the injury to class properties became complete and comparatively enduring for purposes of calculating damages as contemplated in RESTATEMENT (SECOND) OF TORTS § 930(3), *id.* at 18;

7.     Whether such factors as the timing of class members' purchases or sales, or the nature of their properties (i.e., residential, commercial, vacant land), could affect the diminution in property values, if any, suffered by individual class members, *id.* at 19;

8.     Potentially, the general quantitative effect, if any, of factors that might affect the magnitude of individual damage awards, *id.* at 19-20; and

9.     Exemplary damages, *id.* at 22.

The Court's April 14 Order identified the following issues as ones potentially calling for

individual treatment:

10.     Whether past or threatened releases from the plant have caused actual fear, anxiety and discomfort to class members, *id.* at 8;

11.     Whether defendants' conduct caused certain other forms of interference with use and enjoyment (depending on the nature of the interference), *id.* at 8;

12.     Claims of class members owning only mortgagee or other security interests in property, *id.* at 10;

13.     Certain issues presented by defendants' easement, assumption of the risk, and safety standards defenses, *id.* at 11;

14.     If the statute of limitations defense is available under Colorado law for a nuisance arising from past releases causing on-going contamination that cannot be abated:

(a)     when class members had actual knowledge of the offending conditions, *id.* at 16;

(b)     when class members had actual knowledge that the conditions were not abatable, *id.*;

15.     The effect, if any, of such factors as the timing of class members' purchases or sales, or the nature of their properties, on the diminution in property values, if any, suffered by individual class members and on individual damage awards, *id.* at 19-20.

In the April 14 Order, the Court directed the plaintiffs to submit a trial plan, after consultation

3

with defendants, addressing the potentially individual questions posed by items 10 through 15, above, and also directed the parties to file submissions addressing the possible waiver of the three affirmative defenses listed in item 13.

Based on the parties' submissions, the Court issued its May 27 Order, in which it was able to resolve some but not all of these issues. The Court addressed item 12 by accepting plaintiffs' proposal that claims by mortgagee interests be severed, *see* May 27 Order at 15 n.4, and largely resolved item 13 by limiting or striking the relevant defenses. Other issues, such as methods for addressing potentially individual issues surrounding interference with use and enjoyment (items 10 and 11) and the possibility of a state law defense based on regulatory standards (item 13), were deferred to the jury instruction phase. *Id.* at 5-7, 15.

The Court meanwhile expressed dissatisfaction with plaintiffs' treatment of compensatory damages, and directed plaintiffs to file a further submission on that subject, addressing the Court's concerns. Plaintiffs have taken the Court's admonitions to heart and hope that this submission will be more helpful. Plaintiffs do continue to believe that the damage regime prescribed in RESTATEMENT (SECOND) OF TORTS § 930 obviates the need to consider many of the potentially individual factual questions with which the Court has been concerned. However, we have also addressed alternative possibilities, and the additional questions posed by the Court.

### III. APPROACHES TO COMPENSATORY DAMAGES

#### A. Timing of Purchase and Sale

#### 1. The Immateriality of Purchase Under Section 930

The potential for individual damage issues presented by variations in the times that class members purchased or sold their properties depends, in part, on what the legally proper application of section 930 in such a situation may be, and also, in part, on the parties' positions and evidence relating to the trespass and nuisance claims at issue.

It is helpful to begin with a general conceptual discussion addressing the application of section 930 in such contexts. Section 930 provides:

(1) If one causes continuing or recurrent tortious invasions on the land of another by the maintenance of a structure or acts or operations not on the land of the other and it appears that the invasions will continue indefinitely, the other may at his election recover damages for the future invasions in the same action as that for the past invasions.

(2) If the future invasions would not be enjoined because the defendant's enterprise is affected with a public interest, the court in its discretion may rule that the plaintiff must recover for both past and future invasions in the single action.

(3) The damages for past and prospective invasions of land include compensation for

  (a) the harm caused by invasions prior to the time when the injurious situation became complete and comparatively enduring, and

  (b) either the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring, or the reasonable cost to the plaintiff of avoiding future invasions.

There are two primary questions that could arise concerning application of section 930 in situations where a property has been held by a succession of owners during the pendency of a nuisance or trespass. First, which of those owners may exercise the election contemplated in

5

subsection 930(1) to seek damages for future invasions? Second, what consequences flow for the quantum of damages for future invasions if the plaintiff purchased at a time when the property's value was already discounted by virtue of (existing or) threatened future invasions? These are the questions plaintiffs understand the Court to have posed in the April 14 Order, at 18 n.14, and in the May 27 Order, at 13 & n.3.

Comment b to section 930 affords clarification on both points. In pertinent part, it provides:

> The exercise of the power of election [to seek recovery for future harms], followed by satisfaction of a judgment for damages for prospective invasions, confers an easement or privilege to continue the invasions thus paid for in advance. This power to transfer an interest in the land passes to a grantee when the land invaded is conveyed. The grantor thereafter could recover only for the invasions occurring before the conveyance.

RESTATEMENT (SECOND) OF TORTS § 930 comment b.

Comment b affords very direct guidance on the first question presented by serial ownership of the relevant property (namely, which owner may bring an action under section 930 seeking damages for future invasions?). Suit in this case was commenced on January 30, 1990. By definition, all class members had acquired ownership interests in their properties as of that date. *See Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 382 (D. Colo. 1993) (defining class as all persons owning properties within class boundaries as of June 7, 1989). Under comment b, when each class member's predecessor owners sold the property to the relevant class member (or to another of the class member's predecessor owners), the original owner also transferred, as part of the sale, the power to recover damages for prospective invasions under section 930(3)(b). Predecessor owners

would thereafter be limited to an action for any separate pre-conveyance harms they may have suffered.[1]

The allocation of rights among successive holders of class properties under the regime prescribed in comment b to section 930 also carries implications for the second question involving

---

[1]Plaintiffs note that on this analysis, class members having owned property within the class boundaries as of June 7, 1989, but who transferred that property after that date and before the filing of this action, would not have had the power to maintain an action for future invasions at the time these proceedings were commenced. Plaintiffs do not believe that such class members form a significant percentage of the class as a whole. But whatever their number, plaintiffs acknowledge that this group's damages would present issues to which the timing and duration of their ownership would likely be relevant. One approach to this group would be to treat them as a subclass for whom liability issues could be determined in these proceedings, but whose damages could be considered in separate proceedings, either under some formula common to the subclass or on a completely individual basis. If it were determined that it did not appear until some later time that the injurious situation would continue indefinitely, this group might be larger. Plaintiffs contend that the harms from Rocky Flats became complete and enduring at some point during the period between the FBI raid on June 7, 1989, and Rockwell's guilty plea in 1992. To plaintiffs' understanding, it is defendants' position that this occurred, if at all, at some earlier date.

the timing of class members' purchases, i.e., the measure of damages for class members who may have purchased at a time when the property's value was already impaired.

As plaintiffs have stated in the past, it is plaintiffs' view that the damage measure in section 930(3)(b) applies irrespective of the price at which the property was previously purchased or later sold. In plaintiffs' view, this outcome is dictated by section 930's plain statement that the damage measure *is* "the decrease in the value of the land caused by the prospect of the continuance of the invasion," and that this decrease is measured "at the time" that the injurious situation became complete and enduring, rather than by reference, in whole or in part, to some different time. *See Soucy v. Royal*, 116 N.H. 170, 172-73, 359 A.2d 198, 200-01 (1976). What plaintiffs have not articulated satisfactorily in the past, perhaps, is how the allocation of rights set forth in comment b comports with plaintiffs' position on this point.

Consider a property whose value was already partially impaired at the time of a transfer. No one proposes, plaintiffs take it, that the occurrence of a sale, an utterly fortuitous event from the tortfeasor's point of view should completely exonerate the tortfeasor from liability to any and all owners for section 930(3)(b) damages. No one, that is, supposes that the sale should simply extinguish the claim altogether. Not only would such a rule harmonize poorly with Colorado's rejection of the "coming to the nuisance defense," *see Alison v. Smith*, 695 P.2d 791, 794 (Colo. Ct. App. 1984), but it would effectively permit the tortfeasor to condemn area properties, "allocat[ing] to himself a good deal of the value of the adjoining land." *See* RESTATEMENT (SECOND) OF TORTS §840D. Such a rule, moreover, would represent a windfall to the tortfeasor of the kind that Colorado courts rightly reject, *e.g.*, *Dare v. Sobul*, 674 P.2d 960, 963 (Colo. 1984), and would frustrate the deterrent objectives of Colorado tort law. *See Denver Publ'g Co. v. Bueno*, 54 P.3d 893, 897-98

8

(Colo. 2002) ("Torts are designed to encourage socially beneficial conduct and deter wrongful conduct.").

The more pertinent issue is how damages for the entire harm, and only the entire harm, should be allocated *among successive owners*.

On that issue of allocation, it might be felt that each successive owner should be entitled to damages not only for all present harms he suffers during ownership of the property, but also for all future harms allocable to events occurring during his tenure, or (more complicated still) for any diminution in value recognized by the market during his tenure and attributable to future harms that had become (or later became) complete and enduring. On such a view, a successor owner purchasing "at a discount," as defendants have put it, could be seen as enjoying a windfall at the expense of the prior owner, if damages for future invasions went to the successor rather than the prior owner during whose tenure the events causing them occurred.

But section 930 does not allocate damages in the manner just described. Rather, it divides them into two simple categories: damages for past harms and future harms. And it provides who may receive each. Damages for harms already suffered may be recovered, by whoever suffered them, up to the time that the injurious situation becomes complete and enduring under section 930(3)(a). For harms occurring after that time, damages are recoverable only under the future harm measure specified in section 930(3)(b), by the owner exercising the election for which section 930(1) provides. Illustration 1 to section 930 provides a concrete example:

> The A company, making illuminating gas from coal, established its plant near B's extensive greenhouse and florist establishment in 1930. The operations of the gas plant began in 1931 and fumes and smoke invaded the greenhouse and damaged the flowers. This damage, small at first, reached a peak in June, 1932, when the gas plant first began to be operated to full capacity. It has since been carried on at the same level and the damage to B's business has continued. In 1933 B sues A for

9

damages and at the trial elects complete compensation, once for all. B's damages will be measured by the loss of flowers and loss of profits down to June, 1932, and in addition by the difference between what a reasonable purchaser would have given for the property and business in June, 1932, in view of the existing and prospective nuisance and what he would have given if it were not there. No damages will be given for loss of flowers and profits from June, 1932, down to the time of trial.

To see how section 930's damage regime is affected by a purchase and sale of land in this example, suppose that sometime following the opening of the A company's plant in Illustration 1, B *sold* the smoke-infested greenhouse to P, without first having brought suit under section 930. Illustration 1 makes plain that both B and P may still sue to recover for any accomplished damages suffered because of loss of greenhouse flowers or lost profits (or, presumably, for physical or emotional distress they suffered because they endured the smoke), at least insofar as each suffered such damages prior to June 1932. B's right to recover for such past harms was not acquired by P on sale of the property, because a suit to recover for those harms, followed by the tortfeasor's satisfaction of judgment, would not confer on the tortfeasor an "easement or privilege" constituting an "interest in land" (which only a current owner would have power to bestow on the tortfeasor under the analysis in comment b to section 930). Both B and P, therefore, will receive the fair measure of damages for the accomplished harms each has already suffered.

The additional damages for future harm awardable under section 930(3)(b), however, are allocated entirely to P under comment b. That is because under comment b, B voluntarily conveyed them to P as part of the bundle of rights transferred with title to the property, for an agreed price. It was open to B to retain the property and bring suit for future harms himself, but instead B sold the property. In that sale, P was free to insist on a discount attributable to the property's diminished value in light of the nuisance, but B was likewise free to insist on a price that reflected the value of

10

the right to sue for future harms (e.g., the property's diminished market value, discounted by the probability of success and the expected costs of suit). What can be said for certain is that their minds met on some total price in the overall transaction that effected not only the transfer of the property but also, under comment b, the right to bring claims for future invasions. That P should be entitled to exercise the rights he thereby purchased from B poses no unfairness to anyone, and certainly not to B.

This allotment of damages between successive owners as prescribed section 930 makes good policy sense. Under it, every party is made whole, no party enjoys a true windfall, and any *arguable* windfall falls not to the tortfeasor but to those injured by the tortfeasor's misconduct. In particular, as to the damages for future harm, there is no allocational injustice as between B and P, because they freely bargained for B to transfer the right to sue for those damages to P, as part of the property's transfer at an agreed price. P has therefore enjoyed no true windfall, because he paid B for the right to maintain the action (much as someone might in an assignment of claims, without being thought to enjoy a windfall when he recovered on the claims). Meanwhile, there is no duplicative recovery for future harms, nor any prospect of a duplicative recovery, because only one party (P) will receive damages for them, measured by diminution in value, and the right of future holders to recover damages for those same harms will be extinguished with satisfaction of P's judgment. Finally, and importantly, the tortfeasor has received no windfall, because the sale of the property "an entirely fortuitous event, from the tortfeasor's standpoint" has not reduced the tortfeasor's exposure for the total damage it has caused. The compensatory damages the tortfeasor pays correspond to the total harm inflicted.

The Restatement's regime also makes policy sense for the additional reason that it permits a realistic and feasible calculation of diminution in value at a single definite time. *See* RESTATEMENT §930 comment d ("At the time when the injurious situation has become complete and enduring, the amount of depreciation because of the prospect of future invasion can be determined with greatest accuracy."). Selecting a single temporal reference point is all the more salutary in cases, like this case, where the tortious conduct has spanned many years, during which overall property values will have varied significantly over time for reasons quite apart from the value differential created by the nuisance or trespass, e.g., due to inflation, appreciation, interest rate fluctuations, and general economic conditions. Such factors obviously preclude individual comparisons between a property's discounted value as of (say) 1990 versus nominal purchase prices from ten or twenty or thirty years before. Indeed, plaintiffs believe that an expertçs attempt to rely on such a comparison would likely founder under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

It would be closer to the mark, perhaps, to form comparisons with reference to the (market-wide) *rates of discount* for earlier and later years. But even if section 930(3)(b)çs simpler damage measure were rejected in favor of that more complex approach, it would not follow that prior discounts were implicated on the record in this case. In fact, as we next explain, they are not.

## 2. One Possible Hybrid Damage Measure: Section 930 Meets Before-and-After

Plaintiffs believe their interpretation of section 930's damage measure, as outlined in the previous section, is legally sound. If it is, then there is no need for individual determinations involving the prices at which class members may have purchased their properties. However, in an

effort to address the Court's concerns, plaintiffs have also considered possible variations on section 930's damage measure and the allocational issues those interpretations would pose.

The most obvious such variation (for which, however, plaintiffs can discover no authority) would allot some portion of damages for future harms to each of multiple owners holding title to the property during the period in which the events causing the future harms unfolded (or, perhaps, during which the market *recognized* the diminution in value ultimately caused by those events ç a different question). This would essentially be a hybrid between section 930's damage measure and the "before-and-after" approach that defendants have so tirelessly extolled.

For example, suppose that the evidence established a five per cent diminution in value attributable to injurious conditions evolving during X's ownership of a property, and an additional five per cent attributable to new or exacerbated conditions evolving during Y's subsequent ownership. Under the interpretation of section 930's allocational formula to which plaintiffs subscribe, the total ten per cent diminution in value would be recoverable by Y. Under the alternative formula now under consideration, by contrast, X would be entitled to five per cent, and Y to five per cent.

Apart from the absence of authority sanctioning it, the problem with this damage model is that the factual scenario under consideration is entirely hypothetical. It is not presented on this record, in this case. Defendants have offered no expert testimony to support a claim that any fraction of diminution in class property values is attributable to events in one time period and the remainder to events in another. Indeed, the main burden of defendants' expert analysis, on this front, is to explain why data for periods predating the 1989 FBI raid were not even consulted. *See* Report of

13

John D. Dorchester, at 3-11 to 3-14 (Nov. 22, 1996) (virtually exclusive reliance on assessment data from 1993 onwards).

Nor is it readily apparent how defendants' experts might even speculate about allocating diminution to previous time periods, since it is their ultimate opinion that *there is zero diminution to allocate*. *See id.* at 7-15 ("We found no evidence of any diminution of value of real estate that could be attributed to Rocky Flats operations as its cause."); *see also* Report of Daniel M. Conway, at 1 ("[U]ndeveloped property value in the class area did not suffer any adverse impact from Rocky Flats either before or after June 7, 1989.c); *id.* at 1 ("[I]mproved commercial property value in the class area did not suffer any adverse impact from Rocky Flats either before or after June 7, 1989."). It is reasonable to expect, in an adversary system, that a party wishing to invoke a supposed prior market discount should come forward with evidence to establish its existence. Defendants have offered only party admissions negating it.

Finally, even if the alternative damage formula under discussion were found to enjoy support in legal authority, and even if some record evidence did suggest changes in the extent of diminution over time, plaintiffs believe a class trial could still establish a formula for determining individual damages. This Court observed in its April 14 Order that "the questions of if and when the market devalued the class properties as a result of Defendants' allegedly tortious conduct [are] subject to common proof." *See* April 14 Order at 21. Presented with common proof supporting the assignment of different shares of diminution to different time periods, jurors could be asked to assign the appropriate percentage of diminution to each relevant period, for each type of land (residential, vacant land, and commercial). Damages could then be allocated to class members based on the share

14

of overall diminution associated with that class member's period of ownership, for that class member's property type.

For example, suppose (again, quite hypothetically) that evidence existed which supported a two-step historical process, with properties of a given type being devalued by five per cent as of 1980, and by an additional five per cent in the following decade, for a total of ten per cent as of commencement of suit in 1990. Under the hybrid damage measure under discussion, this would effectively create two subclasses: a subclass of persons already owning their properties as of 1980, entitled to damages based on the full ten per cent diminution, and a subclass who acquired the properties after that time, entitled to only five per cent. The properties falling in each subclass would be ascertainable from sales records. Experts could calculate the total value of properties in each subclass (just as plaintiffs' expert, Mr. Hunsperger, has already done for the class as a whole), and the jury could determine an aggregate award for each subclass, with funds then allocated among subclass members as a function of their individual property's value under some common benchmark (e.g., assessed value). Additional expert work would need to be performed in this scenario -- primarily to ascertain the membership of the subclasses and estimate the overall value of properties falling within them. That expert work has not been performed to date because defendants have not offered any evidence to date, nor even taken the position to date, that diminution actually occurred in defined stages (or, indeed, at all). However, the same basic procedures that would apply to an aggregate award for the class as a whole, and its allocation among class members, would still govern in such circumstances, applied on a subclass basis.

It is difficult to be much more precise about the handling of phased diminution, in the absence of some actual position from defendants about the existence, timing, and quantum of any

previous diminution, and without knowing the nature of their contemplated evidence on these subjects. Of course, if class members are entitled to the full extent of diminution irrespective of their time of purchase, as argued above, then these complications would not arise.

## B. Other Supposed Individuating Factors

The specific potentially individual factors emphasized in the Court's April 14 Order and May 27 Order relate to the timing of plaintiffs' purchases and sales and the types of properties owned. We have already addressed those factors. In various contexts, however, defendants have also emphasized additional characteristics that can differentiate properties from one another – e.g., square footage, the number of bedrooms and bathrooms and fireplaces, the existence of a backyard fence, et cetera.

The short answer is that the issue *isn't* whether individual homes and properties possess features which differentiate them from one another in a way that affects their baseline value. The issue is how tortious conduct by the operators of Rocky Flats may have *diminished* that baseline value. We know of no appraisal methodology that would gauge that diminution by counting bedrooms in each property, and for good reason. Even in an action brought on an individual basis and concerning one solitary residential property, section 930's damage measure would require the trier of fact to compare the value of the plaintiff's four-bedroom house, *given* the nuisance, to what the value of *that same four-bedroom house* would have been, *but for* the nuisance. The number of bedrooms on each property is a constant, under section 930 and also under any reasonably conceivable alternative damage measure (e.g., before-and-after). The variable, in the diminution equation, is Rocky Flats.

It is true that baseline value itself is relevant to a determination of aggregate damages for the class as a whole, or for any subclasses the jury may consider separately. But nothing prevents defendants from contesting plaintiffs' experts' opinion on the aggregate value of class properties in each land category, whether based on a tally of all bedrooms and fireplaces within the class area or via some more plausible method. Nor, for that matter, does anything prevent defendants from arguing to the jury that the rate of diminution for two-bedroom houses is lower than for three-bedroom houses. Again, however, there are limits to how far plaintiffs can develop a trial plan to accommodate defense evidence whose very existence remains conjectural, to say nothing of its substantive content. If defendants do ultimately contend that some specific factor would cause variation in the level of diminution, the jury can simply be asked whether that is so, and what the differential is.

Finally, defendants may attempt to rebut plaintiffs' evidence of diminution attributable to Rocky Flats by arguing that any diminution purportedly measured in plaintiffs' investigations could actually be explained by reference to various property attributes not related to Rocky Flats. Such arguments, if successful, could lead a jury to conclude that plaintiffs had not carried their burden of persuasion on the issue of diminution. But that itself would be a class-wide conclusion. It would not call for the jury to evaluate the values of individual properties.

## C.  Different Types of Property

The Court has noted that whether factors such as property type can affect the level of diminution is capable of determination in class proceedings. *See* April 14 Order at 19.  The actual level of diminution specific to each property type can also be determined in this fashion.  Plaintiffs' principal property expert, Mr. Wayne Hunsperger, has estimated total diminution for residential properties in the class area at $169 million, in 1995 dollars, based on results from class-wide methodologies including analogous case studies, multiple regression analysis, and public opinion surveys.  His aggregate estimate of diminution for vacant land is $21 million. *See* Report of Wayne L. Hunsperger at 259 (Nov. 21, 1996) (the "Hunsperger Report").[2]  The analyses reflected in Mr. Hunsperger's estimates would permit jurors to assign not only an aggregate damage figure, but also a percentage diminution, to properties in each category.  Indeed, plaintiffs propose that the jurors be asked to respond to interrogatories asking them to do precisely that.  Defendants' experts, as already seen, estimate diminution in all categories to be zero.

## D.  The No-Damage Scenario

To plaintiffs' understanding, defendants' ultimate position is that on the merits, plaintiffs are entitled to no section 930(3)(b) damages at all.  As plaintiffs understand it, that position rests not merely on the position that defendants have committed no actionable wrong, but also on other grounds relating specifically to the element of damages.

First, as was seen above, defendants' experts deny that any property diminution attributable

---

[2]The Hunsperger Report is already on file with the Court.  An additional copy is being transmitted via separate cover for the Court's convenience.

to Rocky Flats has occurred at all within the class area, for any property type. Plaintiffs take the contrary position, of course, but each party's position rests on class-wide analyses.

Second, defendants are believed to contend that there is no predicate for section 930(3)(b) damages in any event, because there has never been a time during which it appeared that invasions from Rocky Flats would continue indefinitely under section 930(1), or at which those invasions became complete and comparatively enduring under section 930(3)(b). It appears that these are indeed jury questions. *See* RESTATEMENT § 930 comment b. They will pose no need for individual determinations, however, because they revolve around issues common to the class, including many of the issues relating to plant operations and environmental releases that the Court has already found to be capable of resolution in a common class trial.

Consideration should be given, however, to what effect a jury verdict for one or both defendants on section 930(3)(b) damages might have on other class member damages not falling (as it would turn out) under Rule 930(3)(b)'s ambit. Suppose, that is, that the jury found that the injurious situation created by Rocky Flats had *never* become complete and enduring. Class members' claims for future harms would then be resolved in defendants￠ favor, but potential claims by individual class members for other harms already suffered would meanwhile enjoy new life (because under section 930, such claims remain compensable at any time *until* the injurious situation does become complete and enduring). The Court may wish to give some thought to expressly limiting compensatory damage issues in the class trial to section 930(3)(b) damages, holding proceedings regarding other damages in abeyance pending the jury's verdict, which will afford the necessary guidance as to their potential availability.

### E.  Calculating and Allocating a Class-Wide Damage Award

Last year, this Court issued the following ruling on the availability of an aggregate damage

award in this litigation:

> Finally, Defendants continue to insist that a class-wide trial on damages is not possible because of individual issues such as exposure, dose, notice, property valuation and notice. Plaintiffs respond that damages can and should be decided in a class-wide trial in which they will present an aggregate damage theory in percentage and perhaps dollar amount, which (if accepted by the jury) would be applied or allocated after trial under a plan or formula approved by the court.
>
> As a result of the Colorado Supreme Court's Hoery decision and the scope of trial issues resolved in this decision, many of the individualized  determinations posited by Defendants are no longer a part of this case. The class-wide damages approach advocated by Plaintiffs is consistent with the general practice in mass tort and other class actions. See Albe Conte and Herbert B. Newberg, Newberg on Class Actions chs. 10, 17 (4th ed. 2002).  Accordingly, Plaintiffs may present evidence, consistent with evidentiary standards, and attempt to prove aggregate damages that fairly represent the collective value of the claims of individual class members in the same trial in which Defendants' liability, if any, to the Property Class is determined.
>
> Assuming Plaintiffs' compensatory damages are based solely on diminution in property value, such damages may be expressed as either a percentage reduction in the value of class members' properties caused by Defendants' allegedly tortious conduct or as an aggregate lump sum representing the total decrease  in the value of class properties.
>
> If class-wide liability and damages are found by the jury, the court will then, with the assistance of counsel, determine appropriate principles and procedures for distributing the compensatory and any exemplary damages awarded.   These principles and procedures will address, at a minimum, the division of damages among Property Class members, the disposition of any unclaimed funds and the measure and method of payment of attorney fees due to class counsel. See Strey v. Hunt Int'l Res. Corp., 696 F.2d 87 (10th Cir. 1982) (identifying these as necessary elements to final judgment based on jury's class-wide damage award); see generally Conte and Newberg §§ 10:12-10:25.

*See Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1212 (D. Colo. 2003) ["*Cook IX*"].[3]

---

[3]Plaintiffs incorporate by reference their briefs submitted in connection with the Court's 2003 ruling.

In light of that ruling and the Court's subsequent guidance, we address three aspects of proceedings on damages: (1) proof on damages at trial; (2) the structuring of the jury's verdict; and (3) allocation of damages to class members.

### 1. Proof of Damages at Trial

Plaintiffs' approach to proving damages in this litigation has been known to defendants for close to eight years. It was detailed in several expert reports submitted in November 1996, all of which are referenced or incorporated in the Hunsperger Report, also filed by plaintiffs at that time.

Mr. Hunsperger relied on several different methods to reach his opinions on damages. First, interviews were conducted with officials from area cities and counties and the State of Colorado, as well as with individual property owners, residential lenders, real estate appraisers, realtors, and other market participants. The information gathered supports a qualitative conclusion that negative market perceptions of properties around Rocky Flats influenced demand and placed downward pressures on real estate properties in the aftermath of the 1989 FBI raid. *See* Hunsperger Report at 9-14 (executive summary); *id.* at 78-118 (detail); *id.* at 119 (conclusions).

Second, twenty case studies from analogous settings were reviewed to examine the typical effects of environmental problems, to consider how the real estate market reacts to actual and perceived risk, to study how that reaction translates into effects on overall value, and to apply those findings in the Rocky Flats context. This component of the report supports qualitative judgments about market reactions to environmental disamenities, and how such market reactions can be quantitatively assessed. *See id.* at 16-22 (executive summary); *id.* at 121-74 (detail); *id.* at 175-77 (conclusions). Based on this analysis, the report estimates diminution for residential properties within the class area at 10%, for an aggregate total of $166 million. *Id.* at 177.

21

Third, market sales information was consulted, including price data for vacant land between the late 1980's and 1995 in five nearby geographic areas, inside and outside the class boundaries, with weighted average prices over time computed for each. Along with other quantitative and qualitative conclusions, this method supported an estimated diminution for vacant land in the class area of $4,436 per acre (actual price of vacant land of $10,351 per acre versus expected price without Rocky Flats of $14,787 per acre), and an aggregate diminution of approximately $21 million -- all in 1995 dollars. *See id.* at 32-33 (executive summary); *id.* at 178-218 (detail).

Fourth, a multiple regression analysis was conducted, giving percentage and aggregate diminutions for each year from 1988 through 1995, supporting an aggregate diminution estimate of $131 million for residential properties (excluding vacant land). *See id* . at 34-36 (executive summary); *id.* at 221-24 (detail).

Fifth, prior public opinion surveys were consulted, and a new survey conducted, to gauge public attitudes about Rocky Flats and risks associated with living in its vicinity, and to determine how such information could assist with damage estimates. *See id.* at 37-62 (executive summary); *id.* at 225-52 (detail).

Finally, in reliance on these various methods, Mr. Hunsperger offered an overall opinion on the aggregate diminution in the class area for residential properties ($169 million) and vacant land ($21 million).

Defendants are expected to contest the analyses performed by Mr. Hunsperger and plaintiffs' other experts aggressively, both during *Daubert* proceedings and at trial. From even this brief summary, however, it can be seen that Mr. Hunsperger's testimony answers to the description given in the Court's 2003 opinion. That is, it is "based solely on diminution in property value," and it

22

expresses diminution for different property types *both* as "a percentage reduction in the value of class members' properties" and "as an aggregate lump sum representing the total decrease in the value of class properties." *Cook IX*, 273 F. Supp. 2d at 1212. It can also be seen that plaintiffs' evidence, if admitted and credited by the jury, would support class-wide damage verdicts in both formats.

Plaintiffs believe defendants will seek to argue that if any diminution ever did occur, the property market later rebounded and erased it. In plaintiffs' belief, this argument fails to reckon with section 930's stipulation that diminution must be awarded by reference to the time period when the plant's injurious effects became complete and enduring – something that defendants are believed to contend occurred, if at all, sometime prior to commencement of this lawsuit. However, even if it were consistent with the governing damage measure, defendants' argument would not affect damages realized by class members selling their properties prior to any market rebound. To address this issue, the jury could be presented with data on such sales, or summary data, to which the diminution estimates generated by plaintiffs' experts for the relevant period could be applied, in something close to a straightforward exercise of arithmetic. Although this would involve some additional expert work not yet performed, it would not result in new opinions on the rate of diminution, but only in an application of those opinions to one particular subset of the class.

### 2. Structuring the Jury's Damage Verdict

Plaintiffs believe the jury should be asked to render a verdict on *both* aggregate damages and percentage diminution, for each relevant property type and period. Not only would a separate percentage verdict facilitate allocation of the aggregate award, as discussed below; it would also help to ensure that in the event of appellate reversal of the aggregate award, damage issues would not

need to be completely retried. If a verdict on percentage diminution survived appeal, damages could be gauged in subsequent proceedings (possibly individual ones) in which the parties litigated the underlying value of claimants' properties and submitted that question to the trier of fact. The applicable diminution percentage could then be applied to the resulting value. *See Greenhaw v. Lubbock County Beverage Ass'n*, 721 F.2d 1019, 1026-27 (5th Cir. 1983).

### 3. Allocation of Damages to Class Members

As noted in the Court's 2003 opinion in *Cook IX*, it will be necessary, following a verdict, to formulate a plan of allocation before a final judgment may be entered. *See Strey v. Hunt International Resources Corp.*, 696 F.2d 87 (10th Cir. 1982).

Once a valid judgment for aggregate damages is entered, defendants have no stake in the allocation of damages to class members. *See, e.g., Boeing Co. v. Van Gemert*, 44 U.S. 472 (1980); *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990) ("Where the only question is how to distribute the damages, the interests affected are not the defendant's but rather those of the silent class members."). At that point, allocation becomes a matter between the Court, class counsel, and the class members.

Allocation could reasonably follow claims procedures not unlike those outlined in the MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.66, for the context of administering class settlements (with due regard for the differences of that context). Class counsel or a claims administrator could make at least an initial presumptive determination of each class member's damages by any of several methods. For example, the class member's share of the aggregate damages could be computed based on the value of the class member's property as a share of the total value of all class member properties, as measured, for example, under the common metric provided

24

by tax assessment records. (The class properties are located within the confines of a single assessing authority, Jefferson County.) Alternatively, the percentage diminution figures reflected in the jury's verdict could be applied. If the Court wished, provision could be made for class members who believed their properties should be valued at a higher baseline level to be heard in some form of individual proceedings. Such proceedings need not be unwieldy, as they would focus exclusively on the valuation of the relevant properties. Realistically, a few class members with a substantial stake might avail themselves of such a process, but most could be expected to accept their presumptive damage award.

## IV. CONCLUSION

Plaintiffs are hopeful that this submission more fully addresses the issues and concerns that the Court has raised. Plaintiffs recognize that the issues are complex, but when all is said and done, plaintiffs do not believe those complexities to be unmanageable. So far as the record now discloses, proof of diminution at trial will be almost entirely common. If section 930's guidance, as plaintiffs construe it, is followed, then the trier of fact will not be required to evaluate whether individual class properties were purchased at any "discount," because the full measure of diminution will be compensable to class members. Alternatively, if a damage regime is followed in which such a discount would indeed be relevant, and if defendants can point to evidence that some portion of the discount should not be recoverable by plaintiffs having purchased their properties after a certain time, then the jury can be asked to quantify discounts for the relevant periods, and a verdict incorporating an appropriate aggregate award or percentage figures could still be rendered. Under either scenario, the Court would not face the concerns outlined in its April 14 Order at 18-19, n.14, involving a situation where an aggregate award would be significantly in excess of damages payable

will avert any need to retry the entire damages case in the event of appellate reversal of the aggregate award, and if the verdict is so structured, allocation of the award should not be an unduly complicated process, because presumptive allocations can be computed under a fair and objective mathematical formula.

Dated July 13, 2004.

Respectfully submitted,

Gary B. Blum
Steven W. Kelly
Silver & DeBoskey, P.C.
1801 York Street
Denver, CO 80206
(303) 399-3000

Merrill G. Davidoff
Peter Nordberg
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

## CERTIFICATE OF SERVICE

I certify that on this 13th day of July, 2004, I cause a true and correct copy of the foregoing **PLAINTIFFS' PROPOSED PLAN FOR DETERMINATION OF COMPENSATORY DAMAGES** to be served on counsel for defendants as listed below by overnight delivery to:

Douglas J. Kurtenbach, Esq.
Kirkland & Ellis, L.L.P.
Aon Center
200 East Randolph Drive
Chicago, IL 70701-6636

and by U. S. mail to:

Joseph J. Bronesky, Esq.
Sherman & Howard, L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO 80202-3624