# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-K-181

MERILYN COOK, *et al.*,

      Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

      Defendants.

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED PLAN FOR**
**DETERMINATION OF COMPENSATORY DAMAGES**

---

Pursuant to the Court's Order of April 14, 2004, defendants respectfully submit their

Response to Plaintiffs' Proposed Plan for Determination of Compensatory Damages.

**I.  INTRODUCTION**

On at least three occasions, this Court has asked plaintiffs to provide a proposal for trying

compensatory damages on a class-wide basis.  (*See, e.g.*, 5/28/04 Order at 12; 4/14/04 Order at

19–20; 2/12/01 Order at 10.)  For example, in its May 28, 2004 Order, the Court stated:

> I have directed Plaintiffs on at least two occasions, including in the April 14
> Order, to proposed a plan for fully resolving the compensatory damages issue that
> takes into account Defendants' argument regarding individual damages factors.
> *See* April 14 Order at 19–20; Memorandum and Order at 10 (Feb. 12, 2001).
> Plaintiffs have yet to produce such a plan or to recognize Defendants' right to
> have their individual damages arguments determined in some fashion.

(5/28/04 Order at 12.)  The Court further stated that "[i]f I determine Plaintiffs have not

presented an acceptable plan for determining compensatory damages, I will strongly consider

severing the compensatory damages issue from the class trial and decertifying it as a class issue." (*Id.* at 14.)

Plaintiffs' latest Proposed Plan for Determination of Compensatory Damages again fails to provide a workable (or constitutional) plan for trying compensatory damages in this case on a class-wide basis. Although plaintiffs' submission contains a theoretical discussion of Section 930 of the Restatement (Second) of Torts, plaintiffs fail to explain in concrete terms how a class-wide damages trial could be conducted. To the contrary, plaintiffs' submission only underscores several reasons why the issue of compensatory damages cannot be part of a class-wide trial in this case.

## II.     THE FOUR CRITERIA FOR DETERMINING WHAT CONSTITUTES A COMMON ISSUE THAT CAN BE PART OF A CLASS-WIDE TRIAL ARE NOT SATISFIED HERE.

There are four criteria for determining what constitutes a common issue that can be tried on a class-wide basis.

*First*, common issues must involve evidence that is *identical* with respect to all class members. If the evidence with respect to an issue is not identical with respect to all class members, then both parties are entitled to insist that such evidence be presented on a class member by class member basis. Any effort to present non-identical evidence as part of a class-wide trial would advantage plaintiffs impermissibly and violate the Rules Enabling Act. *See, e.g.*, *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998) (rejecting a trial plan that "permitted plaintiffs to strike [defendant] with selective allegations, which may or may not have been available o individual named plaintiffs").

Plaintiffs' statistical proof, or "extrapolation," cannot stand in for evidence that is identical for each individual class member. Statistical proofs are based on averages — they are not binding with respect to individuals. *See Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 319-

21 (5th Cir. 1998) (reversing damages award based on extrapolation rather than individual evidence).  Accordingly, the requirement that evidence be identical with respect to all class members means that there must be identical *individual* evidence (that is, identical *non-statistical* evidence) with respect to all class members.

*Second*, no evidence can be presented as part of a class-wide trial if it will be revisited by a second jury.  Such a re-trial of the same evidence would violate the Seventh Amendment.  *See, e.g., Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750 (5th Cir. 1996) ("The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues."); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) (defining the Seventh Amendment right as "a right to have juriable issues determined by the first jury impaneled to hear them . . . and not reexamined by another finder of fact").

*Third*, a class-wide trial can only occur if it can be conducted in such a way that the jury can understand the issues to be decided.  The jury must be able to comprehend the jury instructions and any special interrogatories and meaningfully answer them.

*Fourth*, it is *plaintiffs'* burden to articulate what constitutes a common issue that can be tried on a class-wide basis.  *See, e.g., Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (holding that plaintiff "bears the burden of demonstrating 'a suitable and realistic plan for trial of the class claims'"); *see also* Fed. R. Civ. P. 23(c)(1) advisory committee's note ("An increasing number of courts require a party requesting class certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof.").  As set forth below, plaintiffs have not met that burden here.

**III.   SECTION 930 DOES NOT ALTER THE FUNDAMENTAL RULE THAT A PARTICULAR PLAINTIFF CAN ONLY RECOVER DAMAGES WHICH THAT PLAINTIFF HAS SUFFERED.**

Colorado follows the universal rule that a tort plaintiff may only recover damages which that particular plaintiff has suffered.  *See Bd. of County Comm'rs v. Slovek*, 723 P.2d 1309, 1316 (Colo. 1986) ("The trial court must take as its principal guidance the goal of reimbursement of the plaintiff for losses actually suffered.").  Contrary to what plaintiffs' analysis suggests, Section 930 of the Restatement (Second of Torts) in no way alters this fundamental rule.  Section 930 provides:

> (1) If one causes continuing or recurrent tortious invasions on the land of another by the maintenance of a structure or acts or operations not on the land of the other and it appears that the invasions will continue indefinitely, the other may at his election recover damages for the future invasions in the same action as that for the past invasions.
>
> (2) If the future invasions would not be enjoined because the defendant's enterprise is affected with a public interest, the court in its discretion may rule that the plaintiff must recover for both past and invasions in a single action.
>
> (3) The damages for past and prospective invasions of land include compensation for
>
> (a) the harm caused by invasions prior to the time when the injurious situation became complete and comparatively enduring, and
>
> (b) either the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring, or the reasonable cost to the plaintiff of avoiding future invasions.

Restatement (Second) of Torts § 930.[1]

---

[1] Defendants maintain that Section 930 does not apply to plaintiffs' claims if they fail to prove that any contamination on class properties was reasonably abatable.  *See* Restatement (Second) of Torts § 929 cmt. a (outlining "before and after" measure of damages where "future losses are not contingent upon the continuance in the future of the defendant's wrongdoing"); *see also In re Hoery v. United States*, 64 P.3d 214, 222–23 (Colo. 2003) (holding that continuing damages are appropriate where "the contamination is not permanent — that is, it is remediable or abatable").

As stated in Section 930(3), the damages measures set forth here in Section 930 into two temporal categories, divided in time by the point "when the injurious situation became complete and comparatively enduring." *Id.* Section 930(3)(b) allows damages for "the decrease in the value of the land caused by the ***prospect*** of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring." *Id.* (emphasis added). Section 930(3)(a) allows damages for "the harm caused by invasions ***prior*** to the time when the injurious situation became complete and comparatively enduring." *Id.* (emphasis added). These two categories are analyzed in turn below.

## A.      Damages Caused by "The Prospect of the Continuance of the Invasions" Can Only Be Recovered by the Individual Who Suffered Those Damages.

One of the categories of damages available under Section 930 is "the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring." Restatement (Second) of Torts § 930(3)(b). Plaintiffs suggest that a class member can recover damages caused by "the prospect of the continuance of the invasions" ***even if those damages were not suffered by the plaintiff class member, but by a previous owner of the property***. (Pl. Br. at 6-12.) But plaintiffs' position is unsupported by either logic or Colorado case law.

Plaintiffs' analysis of damages caused by "the prospect of the continuance of the invasions" under Section 930 addresses whether a subsequent purchaser has the ***right*** to recover for the "prospect of the continuance of the invasions." (Pl. Br. at 6.) Plaintiffs do not address, however, if and how much in ***damages*** a subsequent purchaser may recover for the "prospect of the continuance of the invasions," given that he has purchased at a discount. But the latter question is precisely what this Court focused on in its May 28, 2004 Order:

> Restatement § 930 and its application in this action does not preclude Defendants from arguing and attempting to prove that individual class members have not

> suffered the full measure of any damages found pursuant to Section 930 because the market had discounted the value of their class property at the time they purchased it.

(5/28/04 Order at 13.)

Plaintiffs rely heavily upon comment b to Section 930. (Pl. Br. at 6.) Again, that comment addresses only whether a subsequent purchaser has the *right* to pursue an action for "the prospect of the continuance of the invasion." (*See* Pl. Br. at 6 ("Comment b affords very direct guidance on the first question presented by serial ownership of the relevant property (namely, *which owner may bring an action* under section 930 seeking damages for future invasions?)") (emphasis added).) Comment b simply does not address the issue of whether "class members [who] have not suffered the *full measure* of any *damages* found pursuant to Section 930 because the market had discounted the value of their class property at the time they purchased it," class members may nonetheless recover for damages they did not suffer. (5/28/04 Order at 13) (emphasis added). That is to say, although comment b addresses *whether* a subsequent purchaser has a right to a cause of action under certain circumstances, comment b is silent as to *how much* a subsequent purchaser may recover when the purchase price was already discounted.

Neither does Illustration 2 to Section 930 address the issue. Plaintiffs attempt to modify the illustration and add facts to it to illustrate their interpretation of Section 930. (Pl. Br. at 10-11). But Illustration 2 does not discuss a situation in which the property is transferred, and it provides no guidance on the issue of the allocation of damages when such a transfer has taken place at a discount.

Although Section 930 is silent on this issue, Colorado case law is not. Under established Colorado tort law, "the goal in compensating the property owner is to reimburse that owner *for*

*the actual loss suffered*." *Slovek*, 723 P.2d at 1314 (emphasis added).  Indeed, as the Colorado

Supreme Court held in *Slovek*:

> The trial court must take as its principal guidance the goal of reimbursement of
> the plaintiff for losses actually suffered, ***but must be vigilant not to award
> damages that exceed the goal of compensation and inflict punishment on the
> defendant*** . . . .

*Id.* at 1316 (emphasis added); *see also id.* at 1314 ("[T]he law of torts attempts primarily to put

an injured person in a position as nearly as possible equivalent to his position prior to the tort.");

*id.* at 1314–15 ("[W]e have recognized that different measures of damages . . . may be

appropriate under certain circumstances if the actual loss suffered is to be truly compensated.").

Similarly, in *Zwick v. Simpson*, 572 P.2d 133, 134 (Colo. 1977), the Colorado Supreme

Court held that "the goal of the law of compensatory damages is reimbursement of the plaintiff

for the actual loss suffered." *Id.* at 134; *see also Airborne, Inc. v. Denver Air Center, Inc.*, 832

P.2d 1086, 1091 (Colo. Ct. App. 1992) ("The purpose behind such damages is to make the

injured party whole by compensating the plaintiff for actual losses suffered.").  Indeed, Colorado

courts reject compensatory damages awards that exceed the amount of a plaintiff's actual loss.

*See Razi v. Schmitt*, 36 P.3d 102, 105 (Colo. Ct. App. 2001) (rejecting compensatory damages

award that "far exceed[ed] the amount of plaintiff's loss").

Without any citation to authority, plaintiffs assert that allowing a purchaser to recover for

the very discount which he enjoyed when he purchased the property would not result in a

"windfall" to that purchaser.  Plaintiffs state:

> In that sale, P was ***free to insist*** on a discount attributable to the property's
> diminished value in light of the nuisance, but B was likewise ***free to insist*** on a
> price that reflected the value of the right to sue for future harms (e.g., the
> property's diminished market value, discounted by the probability of success and
> the expected costs of suit).  What can be said for certain is that ***their minds met*** on
> some total price in the overall transaction that effected [sic] not only the transfer
> of the property but also, under comment b, the right to bring claims for future
> invasions.

(Pl. Br. at 11) (emphasis added).  But plaintiffs' argument only underscores why a class trial on compensatory damages is inappropriate.  According to plaintiffs, a purchaser is free to insist upon a "discount" of the property at the time of a particular sale, but a buyer is also free to insist upon receiving value for the transfer of the "right to sue."  Moreover, as plaintiffs acknowledge, both the value of the "discount" and the value of the "right to sue" are highly variable, *depending upon the bargaining that occurred in connection with a particular transaction*.  (*Id.* ("P was *free to insist* on a discount attributable to the property's diminished value in light of the nuisance, but B was likewise *free to insist* on a property that reflected the value of the right to sue for future harms.") (emphasis added).)  Indeed, following plaintiffs' own argument, the value of both the "Rocky Flats discount" and the "right to sue" associated with a particular sale can vary depending upon a wide range of factors, including:  (a) the relative levels of knowledge that the seller, the purchaser, and the market have about Rocky Flats at any particular point in time; and (b) the bargaining abilities of the parties.  Such potential variation in both the "Rocky Flats discount" and the value of the "right to sue" illustrates why — even under *plaintiffs'* approach to Section 930 — compensatory damages cannot be tried on a class-wide basis.  As set forth in greater detail *infra*, the record in this case contains a plethora of individualized evidence regarding, *inter alia*, the extent to which the "impact" of Rocky Flats was already reflected in the prices that class members paid for their properties, according to plaintiffs' own designated witnesses.

In short, Colorado law prohibits courts from awarding a tort plaintiff more than the damages he or she has suffered.  *See Slovek*, 723 P.2d at 1314; *Zwick*, 572 P.2d at 134; *see also Ario v. Metro. Airports Comm'n*, 367 N.W.2d 509, 515 (Minn. 1985) ("If, for example, plaintiff buys a Zone 1 house in 1980, he presumably buys at a market price already discounted for

8

aircraft noise existing at that time.  Plaintiff has no diminution in market value of his property

unless he shows that the noise level has increased since 1980 and such increase has measurably

depressed the value of his property.").  Nothing in Restatement Section 930 dictates (or permits)

otherwise.

**B.      Plaintiffs State That Damages Caused by Invasions before the "Injurious Situation Became Complete and Comparatively Enduring" Will Not Be Part of a Classwide Damages Trial.**

Plaintiffs state that when a piece of property is purchased, the purchaser does not acquire

the right to recover for *pre*-complete-and-comparatively-enduring damages.  (Pl. Br. at 10) ("B's

right to recover for such past harms was not acquired by P on sale of the property.").  Therefore,

according to plaintiffs' analysis, a class member who purchased, for example, on January 1,

1988, could only recover for pre-complete-and-comparatively-enduring harms that occurred on

or after January 1, 1988,[2] while a class member who purchased before that date could recover for

earlier pre-complete-and-comparatively-enduring harms (from his date of purchase on).

Accordingly, plaintiffs concede (as they must) that damages attributable to pre-complete-and-

comparatively-enduring invasions cannot be part of a class-wide damages trial.  (Pl. Br. at 7 n.1,

10).  However, because plaintiffs do not appear to be abandoning their claims for such damages,

under plaintiffs' own analysis, there must be individualized compensatory damages trials for all

of the class members in this case.  Given that these trials are necessary, plaintiffs have supplied

no rationale for why compensatory damages also should be tried in a class-wide trial.  Such a

bifurcation of the issue of damages also poses significant Seventh Amendment problems, in that

---

[2] As discussed below, the jury could place the "complete and comparatively enduring" point at any time following 1953 or later, if at all.

it requires determinations of overlapping issues by separate finders of fact. *See, e.g., Castano,* 84 F.3d at 750.

## IV.   PLAINTIFFS' ANALYSIS DEMONSTRATES WHY A CLASS-WIDE COMPENSATORY DAMAGES TRIAL IS UNWORKABLE.

According to plaintiffs' submission, one issue that must be tried on a class-wide basis is "[w]hen the injury to class properties became complete and comparatively enduring for purposes of calculating damages as contemplated in Restatement (Second) of Torts § 930." (Pl. Br. at 2.) It then follows that, until the jury determines the "complete and comparatively enduring" point, no damages could even be measured on a class-wide basis. This creates at least three fundamental infirmities in plaintiffs' plan for a class-wide trial on compensatory damages.

The first infirmity is that unless the "complete and comparatively enduring" point is found by the jury to coincide exactly with the filing of the Complaint on January 30, 1990, then damages could not be determined for a significant portion of the class at a class-wide trial. The jury could locate the "complete and comparatively enduring" point at any of these times:

- 1953, when the plant was built and operations began, a plausible scenario especially given that plaintiffs' experts have indicated that they were analyzing the data to determine the effect of "proximity to Rocky Flats" on class area properties; or

- 1965-1970, when, according to plaintiffs' experts, releases from Rocky Flats reached their peak; or

- 1970, when the contour on which plaintiffs' class definition was drawn by HASL as one of six plutonium in-soil contours reflecting contamination attributable to such pre-1970 releases, Ct. Rec. 919, Defs.' Reply Statement of Undisputed Facts in Supp. of Their Mots. for Summ. J. and Class Decertification ("SOF") at 301; Ct. Rec. 895; Defs. 1/3/97 Status Report at 7; Ct. Rec. 901, 1/7/97 Hearing Tr. at 25:3–26:4; or

- sometime in the 1970s, when, according to plaintiffs' expert Mr. Hunsperger, "the neighborhoods near Rocky Flats suffered a marketability problem," "homes in the surrounding neighborhoods became almost impossible to sell, and "[p]roperty values ... declined dramatically;" Wayne Hunsperger *et al.,* Community & Economic Impacts of the Rocky Mountain Arsenal on Commerce City, Colorado, Sept. 16, 1994, at 15; or

10

- never, as plaintiffs acknowledge the jury may find, perhaps in light of the fact that the plant closed in 1989 and is slated to be cleaned up and turned into a wildlife refuge by 2006.

Plaintiffs themselves do not suggest a specific date, but rather "contend that the harms from Rocky Flats became complete and enduring at some point during the period between the FBI raid on June 7, 1989, and Rockwell's guilty plea in 1992." (Pl. Br. at 7 n.1.)

It is undisputed that, if the jury places the "complete and comparatively enduring" point between the time of the FBI raid and the filing of the complaint (as plaintiffs themselves suggest), then class members who sold their properties after the complete-and-comparatively-enduring point but before the class date "would **not** have had the power to maintain an action for future invasions at the time these proceedings were commenced." (Pl. Br. at 7 n.1) (emphasis added). Moreover, plaintiffs concede (as they must) that damages for this group could not be determined as a part of a class trial. *Id.* ("[P]laintiffs acknowledge that this group's damages would present issues to which the timing and duration of their ownership would be relevant. . . . damages could be considered in separate proceedings.").[3]

This is a significant problem. As demonstrated in Table A on the following page, of the approximately 15,000 class members, nearly ten percent (at least 1,381) sold their properties between June 7, 1989 and January 30, 1990. Accordingly, if plaintiffs were correct that the

---

[3] Plaintiffs contend that "[o]ne approach to this group would be to treat them as a subclass for whom liability issues could be determined in these proceedings, but whose damages could be considered in separate proceedings, either under some formula common to the subclass or on a completely individual basis." *Id.* at 7 n.1. There are at least two problems with plaintiffs' proposal. First, such a bifurcation of proceedings would violate defendants' Seventh Amendment rights. *See Rhone-Poulenc*, 51 F.3d at 1303 (stating that bifurcation "must carve at the joint"); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 351–52 (S.D.N.Y. 2002) (finding that bifurcation of issues of "generic and specific liability" violates the Seventh Amendment). Second, plaintiffs' experts offer no damages opinions applicable to such a "subclass."

complete-and-comparatively-enduring point is the FBI raid (June 7, 1989), for example, then damages for approximately ten percent of the class cannot be determined as part of a class-wide trial.

**Table A:  The Years in Which Class Member
Parcels Were Bought and Sold**

| Year Bought | Number of Class Member Parcels Bought | | Year Sold | Number of Class Member Parcels Sold |
|---|---|---|---|---|
| 1901 | 1 | | 1989 (post 6/7) | 1,381 |
| 1907 | 1 | | 1990 | 1,437 |
| 1908 | 1 | | 1991 | 1,463 |
| 1923 | 1 | | 1992 | 1,166 |
| 1947 | 1 | | 1993 | 1,009 |
| 1954 | 1 | | 1994 | 678 |
| 1955 | 1 | | 1995 | 550 |
| 1956 | 3 | | 1996 | 455 |
| 1957 | 1 | | 1997 | 461 |
| 1958 | 4 | | 1998 | 429 |
| 1959 | 2 | | 1999 | 346 |
| 1960 | 1 | | 2000 | 330 |
| 1961 | 1 | | 2001 | 261 |
| 1962 | 1 | | 2002 | 226 |
| 1963 | 1 | | 2003 | 140 |
| 1964 | 2 | | | |
| 1965 | 3 | | | |
| 1966 | 1 | | | |
| 1967 | 4 | | | |
| 1968 | 6 | | | |
| 1969 | 2 | | | |
| 1970 | 8 | | | |
| 1971 | 52 | | | |
| 1972 | 155 | | | |
| 1973 | 181 | | | |
| 1974 | 119 | | | |
| 1975 | 198 | | | |
| 1976 | 300 | | | |
| 1977 | 664 | | | |
| 1978 | 756 | | | |
| 1979 | 665 | | | |
| 1980 | 499 | | | |
| 1981 | 534 | | | |
| 1982 | 528 | | | |
| 1983 | 798 | | | |
| 1984 | 1130 | | | |
| 1985 | 1148 | | | |
| 1986 | 1713 | | | |
| 1987 | 1729 | | | |
| 1988 | 1851 | | | |
| 1989 (pre 6/7) | 965 | | | |

A similar problem would arise if the jury were to place the "complete and comparatively enduring" point between the filing of the complaint and Rockwell's guilty plea on March 21, 1992. This is so because plaintiffs also contend that if a class member sold his property before the complete-and-comparatively-enduring point, such a class member could not bring an action "for the prospect of the continuance of the invasions." (Pl. Br. at 7 n.1) ("[i]f it were determined that it did not appear until some later time that the injurious situation would continue indefinitely, this group might be larger"). Assuming *arguendo* that plaintiffs are correct that the complete-and-comparatively-enduring point occurred as late as the Rockwell guilty plea (March 21, 1992), then more than 4,000 class members would have sold their properties before the complete-and-comparatively-enduring point. (*See* Table A, *supra*.) Accordingly, applying plaintiffs' own analysis, more than one-fourth of the class could not have their damages determined as part of the class trial. *Id.* ("[P]laintiffs acknowledge that this group's damages would present issues to which the timing and duration of their ownership would be relevant. . . . damages could be considered in separate proceedings.").

A second flaw in plaintiffs' plan is that, under plaintiffs' analysis, nobody will know the "complete and comparatively enduring" date *until the jury renders a verdict on what that date is*. Under Section 930, damages for the "prospect of the continuance of the invasions" are measured *as of* the complete-and-comparatively-enduring date. Restatement (Second) of Torts § 930(3)(a). Plaintiffs fail to explain how either party can present trial testimony about damages measured as of the complete-and-comparatively-enduring date, before either party knows what that date is.

Third, under plaintiffs' approach, the determination of which class members are covered by plaintiffs' damages evidence is contingent on the jury's verdict. For example, if the jury were

to determine that the complete-and-comparatively-enduring point was March 21, 1992, then the parties would learn *at the conclusion of the trial* that one-fourth of the class was not covered by the damages evidence that plaintiffs had presented at trial. When a trial is necessary to determine which class members the trial evidence applies to, class treatment is not appropriate in the first instance. *See, e.g., In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) (finding that litigation concerning failure of Firestone tires on Ford Explorers "is not manageable as a class action" where "[a]bout 20% of the Ford Explorers were shipped without Firestone tires"); *Broussard*, 155 F.3d at 344 (reversing class certification where evidence proffered for the class-wide trial did not apply to all class members).

Assuming *arguendo* that any class trial would involve a regression analysis or some other form of proof based on a study group like "the class," this uncertainty as to "who's in and who's out" creates significant problems with expert proof because those experts cannot know the group (if any) to be studied until after the trial ends. Plaintiffs acknowledge that the "study group" is not the class, because, at a minimum, some members of the class will be excluded for having "transferred their claims" (as plaintiffs would put it) before suing. But it could not be known who could be in any such study group, under plaintiffs' proposal, until after the jury returns a verdict.

## V.   PLAINTIFFS' PROPOSED "PLAN" IGNORES MOST INDIVIDUALIZED DAMAGES ISSUES.

Plaintiffs' memorandum addresses only three potential individualized issues relating to damages: time of purchase, property features, and property type. Because transaction timing is a critical individualized issue, plaintiffs devote the bulk of their brief to arguing that the Court should disregard individualized timing issues and the concerns that accompany them. Plaintiffs then brush aside their two other well-cabined "categories" of individualized evidence with little

analysis, arguing primarily that there is no individualized evidence in the case relating to these (or any other) individual issues that implicates damages.

Plaintiffs are mistaken.  There are myriad individualized issues and plaintiff-specific evidence that directly affect any damages analysis and would need to be factored into any trial plan.  Specifically, there is critical individualized evidence relating to (1) the timing of class members' purchases and sales; (2) the particular knowledge regarding Rocky Flats and any plutonium contamination that plaintiffs (and their grantors or grantees) carried into the class members' property transactions; (3) the particular circumstances surrounding class members' purchases and sales other than timing, such as whether the buyer or seller specifically required or gave a discount on the property because of anything related to Rocky Flats; (4) class members' property locations within the class area; (5) class members' property types; and (6) the type and amount of damages, if any, that particular plaintiffs suffered from any interference with the use and enjoyment of their properties.  These individualized issues directly affect whether, and to what degree, each plaintiff may have been damaged.  Plaintiffs' trial plan does not deal effectively with any of these issues.  This is not surprising; no class-wide damages trial in this case could take account of these important, plaintiff-specific factual issues.

The scope of individualized evidence in these various categories can be concretely illustrated from the expected trial testimony in this case.  Defendants have recently completed deposing most of plaintiffs' trial witnesses.  The majority of those witnesses are absent class members, plus a few other individuals who owned property in and around the class, and a real estate agent who buys and sells within the class.  The deposition testimony of the named plaintiffs, of plaintiffs' recently disclosed trial witnesses, and of a few other persons who own

class-area property all make clear that individualized evidence is critical to any damages analysis in this case.[4]

### A.   Individualized Issues Regarding When Plaintiffs Bought and Sold Their Properties Impact Any Damages Analysis.

It is self-evident that class members bought and sold their properties a different times. And as defendants have explained above, the time when each class member purchased and sold his or her individual property has damages implications.  Specifically, the level of discount, if any, at both the time of purchase and at the time of sale must be determined in order to calculate any actual damages suffered by a particular plaintiff.  This is not a mere theoretical concern. Many of plaintiffs' trial witnesses have already testified that *there was* a pre-existing discount in the area, that it has varied over time, and that it is now much lower than it once was.

### 1.   The Class Members Purchased at Various Discounts.

Numerous class members have testified that their properties were discounted when they bought them and that this discount was figured into the price that they paid for their properties. For example, Mr. Bartlett, a named plaintiff and real estate broker, testified that Rocky Flats has negatively affected property values in the area since the 1969 fire, and in particular that there was a slow-down in Arvada property sales following 1984 that he attributes to Rocky Flats. (R. Bartlett Dep. 129, 133.)  Likewise, Mr. Tomlinson, another class-member realtor, testified

---

[4] Defendants herein cite to testimony from the named plaintiffs (the Bartletts, the Babbs, the Schierkolks, and Ms. Cook), from class members listed by plaintiffs as trial witnesses (Mr. Dewey, Mr. Ladwig, Mr. Lund, Ms. McDaniel, Mr. Ozaki, Mr. Park, Ms. Schnoor, Mr. Stout, Mr. Tomlinson, and Ms. Whalen), from a class-area real estate agent listed by plaintiffs as a trial witness (Ms. Melichar), from a class-member real estate agent (Ms. Millage), from other persons who owned property in or near the class area who were named by plaintiffs as trial witnesses (Ms. Chabin, Mr. Montano, and Ms. White), and from a person who purchased property from two named plaintiffs (Mr. Amen, who purchased from the Babbs).  At least six of the cited named plaintiffs/class members (Mr. and Mrs. Bartlett, Mr. Babb, Mr. Dewey, Ms. Millage, and Mr. Tomlinson) are or have been real estate agents in the area.

that Rocky Flats has "always" had an impact on prices in the area, since at least the mid-1960s. (Tomlinson Dep. 28-29, 39.)  Other class members agree.  Mr. Lund testified that Rocky Flats had a "large" or "significant" impact on property values in the area since at least 1973.  (Lund Dep. 95-96, 98, 179, 187.)  Mr. Park similarly testified that area property values were harmed in the early 1980s when news of water contamination became known.  (Park Dep. 64-66.) Mr. Ozaki, a class member who is also the city/county manager for Broomfield, testified that he believes Rocky Flats has impacted properties since at least the 1970s.  (Ozaki Dep. 82, 45-48.) And Mr. Ladwig, who sold Ms. Cook her property and has owned other property in the class over time, testified that properties in the area had a discount since at least 1979.  (Ladwig Dep. 118–19) (Q:  "[I]n 1979 was it your understanding at the time that properties in the area were selling at a discount because of Rocky Flats?"  [Objection.]  A:  "Well, it certainly was.")

### 2.      Any Alleged Discounts Have Varied over Time.

In addition to testifying that there has been a substantial discount for property purchases in the class area for many decades, class members also testified that this discount has changed over time in a non-linear fashion.  For example, Mr. Tomlinson, a realtor, testified that the discounts at which he has purchased his homes in and near the class area have varied over time: "Some years, it's a bigger discount than others."  (Tomlinson Dep. 48.)  Mr. Lund testified similarly, noting that the discount did not move "in a straight line" in the years between when he believed that the discount began and culminated.  (Lund Dep. 179-80.)  Mr. Ozaki likewise testified that Rocky Flats' impact on housing prices in the area has "ebbed and flowed" over the years, depending on how present Rocky Flats was in the media at in any given time.  (Ozaki Dep. 82.)  Because of this variance in discounting, it would not be enough merely to know when any alleged discount began, but plaintiffs would also need to adduce evidence regarding the discount level during each particular class purchase or sale.

18

3.    **Any Alleged Discount Is Lower Now Than It Was in the Past.**

The class members and plaintiffs who testified that they believe that Rocky Flats has

caused property values to be discounted over time are nearly unanimous in their agreement that

any such discount is lower now than it was in the past.  For example, Mr. Babb, a named plaintiff

and realtor, testified that buyers' fears relating to Rocky Flats diminished after the plant shut

down in 1990.  (L. Babb. Dep. 150-51.)  Mr. Ozaki agrees, testifying that the fears and related

effects from Rocky Flats on property values began to decrease in 1990 with the closing of the

plant.  (Ozaki Dep. 87-88, 82-84)  Mr. Tomlinson, too, testified that any discount has decreased

with the final decommissioning of the plant.  (Tomlinson Dep. 91-92, 50-51.)  Mr. Ladwig

similarly testified that the clean-up of the plant has had a "huge" and "very positive" effect on

area property values.  (Ladwig Dep. 103.)  Moreover, numerous individuals who currently own

class-area properties have testified that they do not believe that there now is any discount from

Rocky Flats on their properties or those that they deal with as realtors, even if there had been a

discount in the past.  (*See, e.g.*, Dewey Dep. 68, 106-07; Chabin Dep. 192; Millage Dep. 29.)

4.    **To Determine If a Plaintiff Is Damaged and the Extent of Any Such Damage, One Must Determine the Discount, If Any, Associated with the Purchase and Sale Dates.**

Even if plaintiffs are correct that at some point there was a property-value discount

attributable to Rocky Flats, it would be critical to any damages assessment for each particular

plaintiffs to establish whether and to what degree the property was discounted when the plaintiff

purchased the property, and whether and to what degree the property was discounted upon a sale

by plaintiff (or is still discounted today, for plaintiffs who still hold the property).  Indeed,

Mr. Tomlinson, a realtor class member named as a witness by plaintiffs, made this point clearly,

testifying that whether he had suffered any "financial detriment" caused by Rocky Flats on each

of his homes near Rocky Flats would "vary depending on basically three things:  when [he]

purchased the home, when [he] sold the home, and what media events took place in between." (Tomlinson Dep. 98.)  Mr. Tomlinson went on to testify that because he purchased his home at (in his opinion) a higher discount than is in the marketplace today, he has probably not been harmed financially by Rocky Flats on that property.  (*Id.* 93-97.)  This is likely to be the circumstance for a substantial portion, if not a majority, of the class members.

**B.    Individualized Issues Regarding Particular Plaintiffs' Knowledge Impact Any Damages Analysis.**

Plaintiffs argue in their memorandum that the Court need not concern itself with purchasers who buy at a discount because "minds met" on some transaction price that contemplated rights to bring a future lawsuit for damages.  (Pl. Br. at 11.)  This "meeting of the minds" analysis itself implicates individual fact issues.  For example, to what degree, if any, the sales price at which prior owners sold to class members incorporated some "meeting of the minds" regarding potential recovery in a future lawsuit would depend on numerous individual issues, including what the buyer and seller each knew about any potential contamination or other actionable problem relating to Rocky Flats.  Obviously, without some level of knowledge regarding Rocky Flats and its effects, there could be no such "meeting of the minds."  The evidence regarding class members' knowledge (and the knowledge of those who sold to class members) regarding Rocky Flats, any potential contamination, and any potential property-value effects varied substantially among individual plaintiffs and individual transactions.

For example, many named plaintiffs and class members, such as the Bartletts, Mr. Babb, Mr. Ozaki, Mr. Tomlinson, and Mr. Dewey, were all fully aware at the time they purchased their class properties that Rocky Flats produced nuclear weapons, that there had been past accidents, that there had previously been restrictions on HUD loans in the Rocky Flats vicinity, and that radioactive material might be present on their properties.  (R. Bartlett Dep. 43, 51-52, 126,

129,160, 207-08, 224-25; S. Bartlett Dep. 70; L. Babb Dep. 25, 27-28, 79-80; G. Babb Dep. 224-26; Ozaki Dep. 32-36; 15-16; Tomlinson Dep. 68-71; Dewey Dep. 130-33.)  In contrast, one named plaintiff (Ms. Cook) and some class members, such as Ms. Whalen, claim that they knew little or nothing about any accidents or any possible plutonium contamination at the time they purchased their class-area properties.  (Cook Dep. 23-24, 26, 48; Whalen Dep. 88.)

Still other named plaintiffs and class members, such as the Schierkolks and Mr. Tomlinson, fall in between these extremes of knowledge.  At the time they purchased their properties, most knew of Rocky Flats' existence and mission, some knew of the fires while others did not, some knew of potential plutonium contamination while others did not, *etc.*  (*See, e.g.*, Tomlinson Dep. 70-71, 75-77, 150-51; D. Schierkolk Dep. 83-84, 123; W. Schierkolk Dep. 195-97.)  To know what kind of "meeting of the minds" took place — indeed, to know anything about what concerns or knowledge impacted any particular plaintiffs' transactions (and thus whether, and to what extent, a plaintiff may have been damaged) — is an individualized inquiry.

**C.**    **Individualized Issues Regarding the Specific Transactions in Which Plaintiffs Purchased and Sold Their Properties Impact Any Damages Analysis.**

In addition to class-property buyers' and sellers' knowledge, other individualized facts surrounding the class members' property purchases and sales affect damages issues.  For example, some plaintiffs and class members, such as Mr. Babb and Mrs. Bartlett, contend that they did not pay any discount when they purchased their properties.  (*See, e.g.*, L. Babb Dep. 30-31; S. Bartlett Dep. 50.)  Others, such as Mr. Dewey and Mr. Ozaki, testified that they did not seek any particular discount, but they do not know whether or not they paid any discount.  (Dewey Dep. 37, 53-54, 82; Ozaki Dep. 50.)  Still others, such as Mr. Tomlinson, forthrightly

admit that they paid discounts for their properties at the time they purchased them.  (*See, e.g.*, Tomlinson Dep. 30-32.)

The same scope of options exists when discussing possible sales.  Many class members, such as Ms. Schnoor, Ms. Millage, and Mr. Ozaki, testified that they had no difficulty selling some or all of their class-area properties and/or sold them at the prices they sought.  (Schnoor Dep. 68-70; Millage Dep. 43, 45; Ozaki Dep. 53-54.)  Others — primarily those owning horse properties within sight of the plant (the named plaintiffs and Ms. McDaniel) — claim to have had substantial problems selling their properties when they wanted, at a price they wanted, and attribute these problems to Rocky Flats.  (*See, e.g.*, McDaniel Dep. 55-56; G. Babb Dep. 137-39, 141, 171-72; Cook Dep. 167-70; R. Bartlett Dep. 136-38, 273-75; S. Bartlett Dep. 88-90, 95-102.)

Thus, whether a particular class member gave or received a discount in a purchase or sale — a critical issue to determining whether and to what extent any class member has been damaged — is not just a function of a fixed level of discount at a particular year, or the particular knowledge possessed by the buyer and seller relating to Rocky Flats.  It also depends on the circumstances of the particular transaction, including whether and to what extent the particular bidder(s) and seller in any given transaction were concerned about Rocky Flats.  The transactions related to one particular class property involving multiple class members and named plaintiffs can illustrate this point.

Mr. Ladwig owned property that he sold to Ms. Cook in 1983.  Mr. Ladwig testified that he sold that property to Ms. Cook at a discount because of its proximity to Rocky Flats.  (Ladwig Dep. 1¹3) ("Q. "Do you believe that Rocky Flats impacted the sale price of [the property sold to Merilyn Cook in 1983]?"  [Objection.]  A. "Absolutely.")  Ms. Cook later sold a portion of the

property that she had bought from the Ladwigs to her "very good friends" the Babbs. (Cook Dep. 124.)  The Babbs did not look around at other horse properties before buying from their friend. (G. Babb Dep. 80.)  Although the Babbs and Ms. Cook discussed Rocky Flats, they agreed that the property sale price was not discounted for any Rocky Flats concerns. (L. Babb Dep. 18-19.)  A few years later, after having some personal difficulties, the Babbs decided to sell their property.  The person who bought it was Mr. Amen.  Mr. Amen testified that he was aware of Rocky Flats, but was not concerned about it. (Amen Dep. 9.)  He called up Mr. Babb and asked how much Mr. Babb wanted for the property.  Mr. Babb asked for $137,500. (*Id.* 20, 25.) Mr. Amen immediately agreed to pay the full asking price (despite the fact that Mr. Babb could not at that time give clear title to the property, because he first had to finalize a voluntary foreclosure to have his former daughter-in-law removed from the title). (*Id.* 24-25, 53-54.) Indeed, Mr. Amen testified that he would have paid more if asked. (*Id.* 55.)

Other transactions also demonstrate significant individualized facts.  For example, Ms. McDaniel (who owned a horse property very close to Rocky Flats) claims that she specifically started with a lower asking price when selling her property than she otherwise would have on the advice of her real estate agent relating to Rocky Flats. (McDaniel Dep. 105.)  And after one potential buyer walked away from the deal upon learning that Rocky Flats was nearby, Ms. McDaniel accepted a still lower price from the next buyer. (*Id.* 49, 110.)  This transaction contrasts markedly for damages purposes with that of Mr. Ozaki, who picked a listing price without regard to Rocky Flats and got what he wanted for his property, or Mr. Tomlinson, who believes that he will sell his property at a lower discount than that at which he purchased the property. (Ozaki Dep. 53-54; Tomlinson Dep. 94-97.)  Defendants are entitled to put such evidence before the jury for individual determination.

**D.    Individualized Issues Regarding Where Each Plaintiffs' Property Is Located Impact Any Damages Analysis.**

A critical issue ignored by plaintiffs is the substantially different damages/effects that even their own witnesses allege Rocky Flats causes depending on where within the class area a given property lays. The named plaintiffs' properties on which they are claiming damages are all within about one mile of each other and of the Rocky Flats plant. Indeed, two named plaintiffs' properties are across the street from the plant. But the class itself extends about five miles from the Rocky Flats plant. Any damages analysis must take into account the different impact that Rocky Flats could have on properties situated much farther from the plant than the named plaintiffs' properties. Indeed, less than 1% of the class properties fall within the approximately one-mile distance from the plant where plaintiffs' horse properties are located. *See* Ex. A hereto, taken from Pl. 6/28/93 Mem in Supp. of Class Cert.

This is not a hypothetical concern. Ms. Melichar, a real estate agent whom plaintiffs listed as a trial witness, testified that in her experience, only a very small portion of what is the class area (the area where people can see the plant, near where the named plaintiffs' property is located) suffered any damages from Rocky Flats.[5] Mr. Tomlinson, a class member and real estate agent named by plaintiffs as a trial witness, also testified that properties closer to Rocky Flats were more substantially harmed or discounted than properties farther from the plant. (Tomlinson Dep. 129-31.)

Other witnesses have also indicated that a property's location within the class area matters. Ms. Millage, a class member and realtor, testified that the only area in which she has ever experienced any market concerns related to Rocky Flats in the 1990s and beyond was in the

---

[5] Ms. Melichar's deposition transcript has not yet been finalized, so no citations are available.

Walnut Grove subdivision (a community directly east of the plant), where residents can actually see the Rocky Flats plant. (Millage Dep. 29-30.) And Mr. Montano, another witness named by plaintiffs, testified that location has a lot to do with how much Rocky Flats affects properties, and that Arvada property values are not as directly negatively impacted by Rocky Flats as Westminster properties. (Montano Dep. 24-25.)

Perhaps most telling is the fact that Ms. Cook, the lead plaintiff in the case, is making a claim for her horse property across the street from the plaint, but specifically disclaims that she is seeking any recovery for her other class-area property, a single-family home that was located at the southern edge of the class area. (Cook Dep. 152, 15.)

### E.   Individualized Issues Regarding Types of Property Impact Any Damages Analysis.

All the named plaintiffs own or owned horse properties — larger "acreages" on which horses are kept and perhaps horse businesses are run. The overwhelming majority of the class properties, however, are not horse properties. Mr. Tomlinson, an absent class member realtor named by plaintiffs as a trial witness, testified that in his experience, horse properties were more greatly affected by Rocky Flats than other properties. (Tomlinson Dep. 174.) Indeed, as stated above, Ms. Cook testified that she is not even making a claim for damage on her class-area single-family home. Her only claim is for her horse property. (Cook Dep. 15.) Plaintiffs seek *de facto* to identify the entire class with the horse properties owned by the named plaintiffs, and to let the jury make damages determinations based on what occurred on those properties. But the evidence shows that these horse properties are not similar — even in how they might suffer damages — to the majority of the class properties.

**F.    Individualized Evidence Exists Regarding What Damages, If Any, Particular Plaintiffs Suffered from Any Interference with the Use and Enjoyment of Their Properties.**

Although plaintiffs' memorandum reads as if plaintiffs seek damages only for trespass, plaintiffs may also be seeking damages for nuisance; *i.e.*, damages for any unreasonable interference with use and enjoyment of their properties.  But the evidence is extremely differentiated regarding what impact, if any, Rocky Flats' operation and potential plutonium emissions had on class members' use and enjoyment of their properties (and thus on what damages they suffered from any such alleged interference).

For example, many class members (i) have never altered their way they have used their properties in any way because of any issue relating to Rocky Flats, (ii) have had no issues with zoning or other government restrictions on their property because of Rocky Flats, and (iii) have had no significant fears or concerns relating to any alleged risks from Rocky Flats.  (*See, e.g.*, Schnoor Dep. 66, 75-76; Lund Dep. 165-66, 168; Ozaki Dep. 76-77; Millage Dep. 67; Stout Dep. 139; Ladwig Dep. 67-68, 152-53; and *see* Chabin Dep. 192-93.)  In other words, numerous class members have had no damage from any interference with the use and enjoyment of their properties and readily admit this.

Other plaintiffs and class members have testified that they did not use or enjoy their property differently in any way because of Rocky Flats, but that they did experience some "fear" or "distress" from living near Rocky Flats.  (*See, e.g.*, G. Babb Dep. 217, 219, 226; L. Babb Dep. 110-11; Robb Dep. 64, 66-67.)  Still other plaintiffs and class members claim that they suffered tangible damage from lack of use and enjoyment of their properties.  For example, some assert difficulties in renting their class-area properties.  (*See, e.g.*, S. Bartlett Dep. 90-93.)  But others assert no such problems.  (*See, e.g.*, Millage Dep. 40; Ladwig Dep. 95-96.)

Similar individualized contrasts regarding any damages from interference with use and enjoyment abound.  For example, Ms. Cook claims that after the FBI raid, her horse customers did not want their children or animals drinking the water on her property.  (Cook Dep. 78-79.) She blames the failure of her horse business on Rocky Flats' publicity.  (*Id.* 80.)  Ms. McDaniel, another class member, similarly claims that she lost horse boarding and training revenue because of Rocky Flats.  (McDaniel Dep. 96-97.)  But the Babbs, who ran a horse business next door to Ms. Cook, do not believe that Rocky Flats had any impact on their horse business.  (L. Babb Dep. 99-100, 146.)  Nor does Mr. Amen, who purchased the Babbs' property and runs a successful horse boarding and training there to this day.  (Amen Dep. 56-57.)  Ms. White also ran a successful horse boarding and training facility that she does not believe was affected by Rocky Flats.[6]  And the Schierkolks have likewise been successful in boarding horses for money on their property.  (D. Schierkolk Dep. 25-27.)

But the Schierkolks assert different use and enjoyment interferences.  Mrs. Schierkolk claims that she experiences concern because of Rocky Flats, has purchased a water purifier, and has contacted a physician about the risks from Rocky Flats.  (D. Schierkolk Dep. 43-45.)  The Schierkolks also chose not to grow a garden at Dr. Johnson's suggestion.  (*Id.*)  Other class members likely have limited or altered their gardening activity.  (*See, e.g.,* Dewey Dep. 140; Park Dep. 138.)  And Ms. Whalen and Ms. McDaniel bought bottled water and limited where or how long their children could play outdoors.  (Whalen Dep. 83, 89; McDaniel Dep. 42-43, 154-55.)

---

[6] Ms. White's deposition transcript has not yet been finalized, so no citations are available.

These various purported Rocky Flats-related property interferences — from nothing at all to limiting where a child could play to an alleged inability to continue to run a successful business — implicate whether each class member has suffered an unreasonable interference with his or her use and enjoyment of his or her properties, and how and to what degree any such alleged interference damaged that class member.

## VI. PLAINTIFFS' ACCUSATION THAT DEFENDANTS' EXPERTS HAVE NOT LOOKED AT PRE-1989 DATA IS MISPLACED.

Seeking to defend their experts' failure to determine when any alleged discounts came into being, plaintiffs represent to the Court that "data for periods predating the 1989 FBI raid were not even consulted" by defendants' experts, citing to three pages from one report of one of defendants' several property-damage experts, appraiser Don Dorchester. (Pl. Br. at 13-14.) Not so. Defendants' experts have relied heavily on data pre-dating the FBI raid, as plaintiffs know well. Indeed, Mr. Dorchester himself relied throughout his report on data from the 1970s and 1980s. Virtually every page of his lengthy appendices contain such data. For example, Appendix I shows the prices of homes in the many different subdivisions or developments contained within the class area from 1970 through 1995. Appendix L contains approximately 15 charts showing data for the years from the early 1970s through the mid-1990s, and data from around Denver for the same time span in five separate tables. Appendix M shows aerial photographs throughout the 1980s and 1990s. These appendices reflect the data that Mr. Dorchester uses in a corresponding section of his main report, which is similarly replete with charts, graphs, and tables reflecting data from the 1970s, 1980s, 1990s, and before. Indeed, on the very pages plaintiffs cite in their misrepresentation, Mr. Dorchester explains that he obtained and relied upon data "for the period of January 1971 to December 1995." (Dorchester Rep. at 3-13.)

Defendants' other experts are similarly situated.  Mr. Wise, an economist who ran regressions to evaluate housing transactions data, specifically compared price indexes of houses in the class area and a "control" area for every year from 1974 to 1995, showing that the price indexes in the class and control were nearly identical for that period.  (See Ex. 2 to Wise Rep., attached hereto as Ex. B.)  This comparison demonstrates that if there were any class-wide "discount" from Rocky Flats, it was already in place by 1974.  Ms. Van Court, an appraiser and expert in horse properties, likewise evaluates data beginning in 1975.  (See, e.g., Figure at p. 8 of Van Court report.)  And Ms. Geneva Smart, a certified residential appraiser, analyses the 20-year period from 1976-96 in her report.  (See, e.g., Smart Rep. at 7, "All of the preceding factors, in varying degrees, have influenced property value in northeast Jefferson County over the past 20 years.")

## VII.  PLAINTIFFS' EXPERTS' ANALYSES DO NOT ALTER THE NEED FOR INDIVIDUALIZED DAMAGES INQUIRIES.

Plaintiffs make a broad-brush citation to Mr. Hunsperger's general methodology for arriving at a class-wide damages figure in an attempt to suggest that Mr. Hunsperger's methodologies somehow erase the individualized damages issues.  They do not.  Instead, Mr. Hunsperger's methodologies and findings (and those of Dr. Radke, whose analysis Mr. Hunsperger adopts wholesale as part of his damages assessment) either (1) do not address the issue of when any property damage occurred or (2) specifically demonstrate that some (but not necessarily all) class members bought at discounts.  Mr. Hunsperger's first "method" was merely interviewing market participants.  If the Court reviews that material, it is self-evident that it does not lend itself to any blanket, class-wide damages analysis (nor does it address the timing issues).  Mr. Hunsperger's other methods do not fare any better, as seen below.

29

A.     **Mr. Hunsperger's "Analogous Case Studies" Analysis Does Not Ameliorate (or Even Address) Individual Damages Issues, Including Whether and to What Degree Class Members Purchased at a Discount.**

In the "analogous case study" section of his report, Mr. Hunsperger purports to analyze "20 or so analogies or case studies" from all over the country, including reports submitted in other litigation, in an attempt to "provide an indication of possible loss in value around Rocky Flats." (*Id.* at 175.) After reviewing these "analogies," Mr. Hunsperger concludes: "Based on the studies presented, there is no doubt that property values around Rocky Flats are less than they would be had it not been for past releases of hazardous substances and continuing risk associated with materials stored on site." (*Id.* at 176.) Although the analogous case studies "illustrate[d] a wide range in loss in value," including "nominal loss" and "no loss," Mr. Hunsperger nevertheless concluded from them that the impact in this case "would likely have been at least an average of 10% across the class area." (*Id.* at 164, 177.)

Although the design of these "analogous" studies varied widely, there is no dispute that Mr. Hunsperger's meta-analysis does not attempt to differentiate particular "discounts" for the various years covered by those studies, or for the various years in which class members purchased (or sold) their class properties. Rather, Mr. Hunsperger simply selects a single "discount" — 10% — from his review of all twenty studies and then indiscriminately applies that entire 10% discount to all residential class properties indiscriminately and without regard to when the discount first occurred. Indeed, Mr. Hunsperger nowhere indicates that this is not the exact same discount that would have been enjoyed by many (if not all) class members when they purchased their class properties. And Mr. Hunsperger's conclusion that 10% is the amount by which "property values around Rocky Flats are less than they have been had it not been for past releases of hazardous substances and continuing risk associated with materials stored on site" (*id.*

30

at 176) is certainly consistent with a conclusion that, at least since the releases from Rocky Flats occurred, class properties have sold at this same alleged discount.

**B.    Mr. Hunsperger's "Market Sales Information" Analysis Also Does Not Address the Individualized Damages Issues.**

As plaintiffs mention in their brief, Mr. Hunsperger also analyzed what he calls "appreciation rates" using Multiple Listing Service data for certain official "MLS" sectors (but not the class area as such) in suburban Denver for the years 1989 and 1995. Mr. Hunsperger used the MLS data to determine the average sale price for single-family residences for various MLS sectors. He subtracted the 1989 average sales price from the 1995 average sale price for each sector, divided the difference by the number of years between 1989 and 1995, and then translated that amount into what he called a single "compound percent change rate per year for the period." (*Id.* at 214.) This approach does not even present data tailored to the class area. Nor does it provide a percent change in any given year between 1989 and 1995, but rather only an average change over the entire six-year period. As a result, Mr. Hunsperger's MLS analysis does not aid in trying compensatory damages on a class-wide basis.

**C.    Plaintiffs' Multiple-Regression Analysis Does Not Solve the Individual Damages Issues, But Instead Showcases Some of Them.**

Plaintiffs' expert, Dr. Radke, undertook a multiple-regression analysis in this case. Mr. Hunsperger incorporates wholesale Dr. Radke's 59-page multiple-regression report by summarizing it in a little over three pages of the Hunsperger report and providing no other discussion. (*Id.* at 221-24.) Dr. Radke's multiple-regression analysis, if believed, actually demonstrates that at least some — and perhaps most — class members bought at discounts.

For each year from 1988 through 1995, Dr. Radke compared the prices at which class-area residential properties sold to the prices at which other homes in suburban Denver sold. Dr. Radke then opined that, in 1988, class properties sold for approximately 8% less than

comparable properties in suburban Denver.  (Radke Rep. at p. 6, Table 1.)  Dr. Radke further

concluded that similar "discounts" were found by his analysis for every other year from 1988

through 1995.  Dr. Radke presented these discounts in a table in his report, reproduced here:

| | Property category | Mean undervaluation (within MPC) | $r^2$ | Confidence level |
|---|---|---|---|---|
| **Phase II** | | | | |
| 1988 | *single-residential* | -7.68% | .72 | 99.88% |
| 1989 | | -7.29% | | 99.88% |
| 1990 | | -9.33% | | 100% |
| 1991 | | -7.69% | | 99.99% |
| 1992 | | -9.18% | | 100% |
| 1993 | | -8.56% | | 100% |
| 1994 | | -7.50% | | 99.99% |
| 1995 | | -5.45% | | 99.24% |

These numbers, though they appear different, may well be the same.  Dr. Radke was

asked (repeatedly) whether these annual discount figures were different from each other, or

whether they were, statistically, the same number, under his analysis.  Dr. Radke conceded that

he could not testify that these numbers were statistically any different from one another.  (Radke

Dep. 332-336.)

Approximately 2,800 class members bought their class properties in 1988 or in the first

half of 1989 (*i.e.*, before June 7).  These 2,800 class members bought their properties at an 8%

discount, according to Dr. Radke's analysis.  And, because Dr. Radke cannot say that any yearly

discount following 1988 was in fact larger (or smaller) than the discount that he found in 1988,

plaintiffs cannot establish that any of those 2,800 class members who purchased in 1988 suffered

any diminution in their properties' value.  Thus, for example, were a jury somehow to conclude

that the date of the 1992 guilty plea was the time at which it became clear that the invasions from

Rocky Flats onto class property would continue indefinitely, as plaintiffs suggest as a possibility,

Dr. Radke's analysis would show no damage for these class members because the discounts that

32

Dr. Radke found in 1993, 1994 and 1995 were statistically the same as the discount he found in 1988.

This analysis applies, of course, not only to all class members who purchased in 1988 — the first year of Dr. Radke's analysis — but also to all class members who bought earlier. There is no reason to believe that, had Dr. Radke simply analyzed data for years 1987, 1986 and earlier, he would have found anything other than the same 8% discount that he contends he found in 1988. Certainly the jury would be free to conclude that, if the discount existed at all, it first appeared at any of a number of plausible times, from 1953 to the 1970's or other plausible dates.[7]

In sum, Dr. Radke's analysis purports to find an approximately 8% discount for class properties 1998, the year predating the class-membership date. He did not look before then, so he does not know when that discount arrived, or how it changed over time. Dr. Radke's post-1988 analysis does not show a statistically significant change in the discount. Thus, while his work thus does nothing to solve the timing problems, it does (if believed) suggest that any discount pre-dated the purchase dates of at least most class members.

---

[7] Conversely, Dr. Radke's asserted annual discounts in each year from 1988 to 1995 may in fact turn out to be statistically significantly different from his calculated discount for 1988, were he actually to perform the analysis to answer that question. If so, then, as can be seen from his table reproduced above, were the jury to conclude that the prospect of the continuance of the invasion became complete and comparatively enduring at the time of the FBI raid in mid-1989, as plaintiffs partially suggest, then class members who purchased in 1988 for a 7.68% discount would have actually enjoyed a benefit, because the 1989 discount had decreased to 7.29%. Were a jury to agree another of plaintiffs' proffered "complete and comparatively enduring" dates, the March 1992 guilty plea, then 1988 purchasers would have incurred the additional discount of 0.01% (based on the then most recently available data of 1991, which showed a discount of 7.69%).

**D.     Mr. Hunsperger's "Public Survey Opinions" Analysis Also Does Not Address the Critical Individual Damages Issues.**

The opinion surveys on which Mr. Hunsperger relies were not specific to the class area and were not tied to the class date (or indeed to any date).  Thus, like the "analogous case studies," they do not answer any of the individualized damages questions.

**E.     Mr. Hunsperger's Vacant-Land Analysis, Like Dr. Radke's Regression Analysis, Underscores the Discount Timing Issue.**

Mr. Hunsperger studied vacant-land sale prices for parcels larger than 10 acres in the class and other areas between "January 1, 1988 and December 31, 1995."  (Hunsperger Rep. at 179.)  He designed his analysis to "consider[] the impact the Rocky Flats Nuclear Weapons Plant may have had" on such vacant land.  (*Id.* at 178.)  He found that per-acre prices outside of the class in Jefferson County were virtually identical to those within the class area — $10,351 versus $10,621.  (*Id.* at 27.)  Nevertheless, Mr. Hunsperger concluded that "[t]he relatively low average price per acre" for class property that he claims to have found "may be the result of proximity to Rocky Flats, some impact from proximity to the Jefferson County airport (at least with respect to land use), and a lack of infrastructure within the area."  (*Id.*)  His vacant-land analysis nowhere mentions the prospect for the continuance of any invasions, nor the FBI raid, nor the guilty plea, nor any time period between the raid and the plea.

Underscoring both the individualization of the claims here and the problem with relying on averages, Mr. Hunsperger purports to have found that vacant-land prices differed from those of other study areas by a wide range:  from 3% to 146%.  (*Id.*)  Mr. Hunsperger concluded that "[t]hose parcels closest to the plant would be diminished to the largest extent, whereas, those parcels more distant from the plant would have the least impact," and that "[f]or vacant land, most of the value loss within the class area is located in the western section and is in closest proximity to the plant."  (*Id.* at 200.)  Based on this analysis, Mr. Hunsperger nevertheless

estimated that, "within the Class Area, vacant land prices have been diminished on the order of 20% to 50%," without specifying which percentage applies to which parcels. (*Id.*)  In the end, Mr. Hunsperger simply took the total acreage of vacant land in the class area — 4,812 acres per his calculations (which included all parcels less than 10 acres in size that were not even a part of his study group) — and stated: "But for Rocky Flats, that price average would have been $14,787 per acre.  This is expressed in 1995 dollars.  The differential equates to $4,436 per acre.  When applied to the 4,812 acres estimated to be within the class area, the estimated diminution in value is expressed in the following calculation: 4,812 acres x $4,436 = $21,000,000 (rounded)" (*Id.* at 200-01.)

Mr. Hunsperger's vacant-land analysis does not address any of the individual damages issues posed a potential class-wide damages trial, nor is it constructed to meet Section 930's requirements.  The analysis nowhere attributes any increased discount to "the prospect of the continuance of the invasions."  Nor does it show a "differential" or a "discount" for the time period between the raid and the guilty plea — the time when plaintiffs assert that the prospect for the continuance of the invasions became complete and comparatively enduring — that differs in any way from the differential or discount that his analysis shows already existed in 1988, a year when thousands of class members first purchased their class property.  To the contrary, Mr. Hunsperger's vacant-land analysis shows only one "discount" from 1988 through 1995.  Thus, those class members who purchased in 1988 bought at that discount, according to Mr. Hunsperger's analysis.  And, if they sold before 1996, then they did not suffer any increased "discount," according to Mr. Hunsperger's analysis.  Mr. Hunsperger did not look before 1988, so, as with Dr. Radke, we do not know when any alleged diminution came into being.

Moreover, Mr. Hunsperger attributes the discount he purports to find solely to "Rocky Flats" and "proximity to Rocky Flats" — a condition that a fact-finder certainly could conclude became "complete and comparatively enduring" in the early 1950s when the nuclear weapons plant was built and announced to the public. Finally, Mr. Hunsperger's conclusion that properties closer to the plant would be affected to a greater degree than properties farther from the plant (which is consistent with plaintiffs' fact-witness testimony) also precludes class treatment of the vacant-land class properties for damages purposes.

F.    **Dr. Radke's Other Conclusions Do Not Resolve Any Individual Damage Issues.**

In addition to offering an opinion on discounts for single-family homes, Dr. Radke also opines on Rocky Flats' impact on multi-residential property, vacant land, and commercial property. His period of study for each was 1983-1993. He found only one "discount" for each category. That is, he did not analyze the data on an annual (or any other periodic) basis; his "discount" was the same in 1983 as it was in 1984 as it was in 1985, *etc*. Thus, all class members who purchased any of these types of property between 1983 and June 7, 1989 (the class membership date) necessarily purchased at the same "discount" that existed (according to plaintiffs) when the prospect of the continuance of the invasions became complete and comparatively enduring sometime between the raid in 1989 and the guilty plea in 1992. No class member who owns such a property and purchased it in 1983 or later could possibly claim, based on Dr. Radke's evidence, that he or she suffered a loss.

G.    **Mr. Hunsperger's Own Previous Opinion Confirms That Any Discount Caused by Rocky Flats Substantially Pre-Dated Most Class Members' Ownership.**

There can be little doubt why plaintiffs have not adduced expert evidence about the origin of the alleged discount that their experts claim to have found:  that evidence would doom their

damages case.  Indeed, Mr. Hunsperger himself has already opined in another Denver-area

lawsuit that Rocky Flats "dramatically" affected property values in the area negatively as far

back as the 1970s:

> In the 1970's, the neighborhoods near Rocky Flats suffered a marketability
> problem.  During that time it became known that some contamination was
> escaping the Rocky Flats Plant by way of Walnut Creek in Jefferson County.  At
> that time, homes in the surrounding neighborhoods became almost impossible to
> sell.  Property values declined.  For a period, FHA and VA declined to insure loan
> in the neighborhood.  The consequences were severe.  Negative market
> perceptions combined with lack of government insured financing caused real
> estate values in many instances to decline dramatically.

Wayne Hunsperger *et al.*, Community & Economic Impacts of the Rocky Mountain Arsenal on

Commerce City, Colorado, Sept. 16, 1994, at 15.

## CONCLUSION

Having failed to answer the crucial question of when any discount occurred (or how any

such discount varied over time and property location), plaintiffs are now asking this Court to

cure their deficiency by ruling that the time when any purported discount occurred is legally

irrelevant.  But when any discount occurred is critical because, unless a plaintiff actually suffered

the loss, he or she cannot recover for it as a matter of established Colorado law and longstanding

tort principles.  Plaintiffs' plea for the Court to ignore critical timing and other individualized

damages issues should be denied.


Dated:  July 21, 2004                       Respectfully submitted,



                                            _____
                                            Joseph J. Bronesky
                                            SHERMAN & HOWARD LLC
                                            633 Seventeenth Street, Suite 3000
                                            Denver, CO  80202
                                            (303) 297-2900

David M. Bernick, P.C.
Douglas J. Kurtenbach
KIRKLAND & ELLIS LLP
200 E. Randolph Drive
Chicago, IL 60601
(312) 861-2000

Attorneys for Defendants ROCKWELL
INTERNATIONAL CORPORATION and THE
DOW CHEMICAL COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Defendants' Response to Plaintiffs' Proposed Plan for Determination of Compensatory Damages** was served this 21st day of July upon the following counsel by facsimile pursuant to agreement:

Merrill Davidoff. (Facsimile delivery)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103-6365

Peter Nordberg  (Facsimile delivery)
BERGER & MONTAGUE, P.C
c/o Denver Westin
1672 Lawrence Street
Denver, CO  80202

Gary Blum (Facsimile Delivery)
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206

EXHIBIT A

# 1993 LAND USE PARCELS IN PLUTONIUM EXPOSURE AREA

COLOR INTENSITY OF SUBSECTIONS PROPORTIONAL TO FREQUENCY

**Figure 5**





## TOTAL NUMBER OF PARCELS IN PLUTONIUM EXPOSURE AREA

Total Number of Parcels in Exposure Area:        15,370

SOURCES: Exposure Contours: By Dr. Jan Sayer
Property Data: Jefferson County Tax Assessment Rolls. 1993
Purchased through Metrolist, Inc.
Hydrography & Roads: USGS DLG. 1 : 100000        BE, INC.   May 1993



# EXHIBIT B



Exhibit 2
Class and Control Area Price Indexes
1974-1995