**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, *et al.*,

       Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

       Defendants.

**MEMORANDUM IN SUPPORT OF CLASS COUNSEL'S
MOTION FOR AWARD OF ATTORNEYS' FEES,
REIMBURSEMENT OF LITIGATION EXPENSES, AND
AWARD OF SERVICE PAYMENTS TO CLASS REPRESENTATIVES**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................... ii

I.      INTRODUCTION ............................................................................................1

    A.     The Complaint and the First Three Waves of Dispositive Motions ......................6

    B.     Discovery ............................................................................................7

         a.     Fact Discovery........................................................................8

         b.     The DOE Contempt Proceeding..................................................9

         c.     Expert Discovery ....................................................................10

    C.     Class Certification..................................................................................11

    D.     The Fourth and Fifth Waves of Dispositive Motions ...........................................12

    E.     Trial Preparation ..................................................................................12

    F.     The Four-Month Jury Trial .....................................................................13

    G.     The First Appeal, *Cook Appeal I* ...........................................................15

    H.     Remand and *Cook Appeal II* .................................................................16

    I.     Second Remand and Settlement................................................................17

III.    A FORTY PERCENT AWARD IS FAIR AND REASONABLE GIVEN THE
REMARKABLE RECOVERY FOR THE CLASS IN A CASE OF SUCH
EXTRAORDINARY LENGTH, RISK, AND DIFFICULTY ..........................................18

    A.     The Amount of Damages Involved and Result Obtained for the Class ................21

    B.     The Time and Labor Involved, and the Novelty and Difficulty of the
Litigation..............................................................................................22

    C.     The Skill, Experience, and Reputation of Class Counsel .....................................24

    D.     Preclusion of Other Employment..............................................................27

    E.     The Customary Contingent Fee ...............................................................28

    F.     Awards in Similar Cases.........................................................................30

    G.     Lodestar Cross-Check............................................................................32

III.    THE COURT SHOULD AWARD REIMBURSEMENT OF CLASS COUNSEL'S
REASONABLE AND NECESSARY LITIGATION EXPENSES ..................................36

IV.    THE REQUESTED SERVICE AWARDS TO THE CLASS
REPRESENTATIVES ARE APPROPRIATE IN LIGHT OF THEIR
UNWAVERING, 27-YEAR DEDICATION AND SACRIFICE ON BEHALF OF
THE CLASS ...............................................................................................37

V.    CONCLUSION...............................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page**

*Allapattah Servs., Inc. v. Exxon Corp.*,
   454 F. Supp. 2d 1185 (S.D. Fla. 2006) ............................................................................ passim

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany and Albany Cty. Bd. of Elections*,
   522 F.3d 182 (2d Cir. 2007)................................................................................................ 28

*Behrens v. Wometco Enters., Inc.*,
   118 F.R.D. 534 (S.D. Fla. 1988)........................................................................................ 29

*Blum v. Stenson*,
   465 U.S. 886 (1984)........................................................................................................... 19

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980)........................................................................................................... 18

*Brown v. Phillips Petroleum Co.*,
   838 F.2d 451 (10th Cir. 1988) ............................................................................ 20, 21, 25, 27

*Brown v. Pro Football, Inc.*,
   839 F. Supp. 905 (D.D.C. 1993)........................................................................................ 36

*Bussie v. Allmerica Fin. Corp.*,
   No. 97-cv-40204, 1999 WL 342042 (D. Mass. May 19, 1999)............................................. 19

*Cimarron Pipeline Const., Inc. v. Nat'l Council on Comp. Ins.*,
   Nos. 89-cv-822, 89-1186, 1993 WL 355466 (W.D. Okla. June 8, 1993).......................... 28, 31

*Cook v. Rockwell Int'l Corp.*,
   755 F. Supp. 1468 (D. Colo. 1991) ("*Cook I*")...................................................................... 7

*Cook v. Rockwell Int'l Corp.*,
   778 F. Supp. 512 (D. Colo. 1991) ("*Cook II*") ...................................................................... 7

*Cook v. Rockwell Int'l Corp.*,
   147 F.R.D. 237 (D. Colo. 1993) ("*Cook III*")........................................................................ 8

*Cook v. Rockwell Int'l Corp.*,
   151 F.R.D. 378 (D. Colo. 1993) ("*Cook IV*")...................................................................... 11

*Cook v. Rockwell Int'l Corp.*,
   907 F. Supp. 1460 (D. Colo. 1995) ("*Cook VI*") ................................................................ 10

*Cook v. Rockwell Int'l Corp.*,
    935 F. Supp. 1452 (D. Colo. 1996) ("*Cook VII*") .................................................... 10

*Cook v. Rockwell Int'l Corp.*,
    181 F.R.D. 473 (D. Colo. 1998) ("*Cook VIII*") .................................................. 11, 12

*Cook v. Rockwell Int'l Corp.*,
    273 F. Supp. 2d 1175 (D. Colo. 2003) ("*Cook IX*") ............................................. 12

*Cook v. Rockwell Int'l Corp.*,
    428 F. Supp. 2d 1152 (D. Colo. 2006) ("*Cook XII*") ............................................. 14

*Cook v. Rockwell Int'l Corp.*,
    580 F. Supp. 2d 1071 (D. Colo. 2006) ("*Cook XIII*")......................................... 13, 14

*Cook v. Rockwell Int'l Corp.*,
    564 F. Supp. 2d 1189 (D. Colo. 2008) ("*Cook XIV*") ........................................... 14

*Cook v. Rockwell Int'l Corp.*,
    618 F.3d 1127 (10th Cir. 2010) ("*Cook Appeal I*") ........................................... 3, 15

*Cook v. Rockwell Int'l Corp.*,
    790 F.3d 1088 (10th Cir. 2015) ("*Cook Appeal II*")................................. 2, 3, 17, 23

*Copeland v. Marshall*,
    641 F.2d 880 (D.C. Cir. 1980) ................................................................... 29

*Credit Default Swaps Antitrust Litig.. No. 13-md-02476*,
    2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)............................................................. 34

*Flournoy v. Honeywell Int'l, Inc.*,
    No. 05-cv-184, 2007 WL 1087279 (S.D. Ga. Apr. 6, 2007) .................................... 28

*Gottlieb v. Barry*,
    43 F.3d 474 (10th Cir. 1994) ..................................................................... 18

*Grant v. George Schumann Tire & Battery Co.*,
    908 F.2d 874 (11th Cir. 1990) ................................................................... 29

*Gudenkauf v. Stauffer Commc'ns, Inc.*,
    158 F.3d 1074 (10th Cir. 1998) ................................................................. 20

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983).............................................................................. 21

*In re Apollo Grp. Inc. Sec. Litig.*,
    No. 04-cv-2147-PHX, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012)........................ 24

*In re Auto. Refinishing Paint Antitrust Litig.*,
   2008 WL 63269 (E.D. Pa. Jan. 3, 2008) .................................................................. 35

*In re Checking Account Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) .................................................................. 32

*In re Copley Pharm., Inc.*,
   1 F. Supp. 2d 1407 (D. Wyo. 1998) ........................................................................ 27

*In re Crocs, Inc. Sec. Litig.*,
   No. 07-cv-02351-PAB, 2014 WL 4670886 (D. Colo. Sept. 18, 2014) ................... 36

*In re Enron Corp.*,
   586 F. Supp. 2d 732 (S.D. Tex. 2008) ............................................................... 33, 34

*In re Fine Paper Antitrust Litig.*,
   751 F.2d 562 (3d Cir. 1984) .................................................................................... 29

*In re Flonase Antitrust Litig.*,
   951 F. Supp. 2d 739 (E.D. Pa. 2013) ............................................................... 31, 35

*In re High-Tech Emp. Antitrust Litig.*,
   No. 11-cv-02509, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ............................ 39

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000) .............................................................................. 34

*In re Linerboard Antitrust Litig.*,
   No. 98-cv-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ................................. 21

*In re Motor Fuel Temperature Sales Practices Litig.*,
   271 F.R.D. 263 (D. Kan. 2010) ............................................................................... 37

*In re Qwest Sav. & Inv. Plan Erisa Litig.*,
   No. CIVA02CV00464-REBPAC, 2007 WL 295545 (D. Colo. Jan. 29, 2007) ....... 35

*In re Remeron Direct Purchaser Antitrust Litig.*,
   No. 03-cv-0085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) .................................... 28

*In re Revco Secs. Litig.*,
   No. 89-cv-593, 1992 WL 118800 (N.D. Oh. May 6, 1992) .................................... 39

*In re Revco Secs. Litig.*,
   No. 89-cv-593, 1993 WL 497188 (N.D. Oh. Sep. 14, 1993) .................................. 39

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005) .............................................................................. 32, 33

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
  No. 08-cv-397, 2013 WL 5505744 n.28 (D.N.J. Oct. 1, 2013) ................................ 34

*In re Se. Milk Antitrust Litig., No. 07-cv-208*,
  2013 WL 2155387 (E.D. Tenn. May 17, 2013) .................................................. 19, 32

*In re Sprint Corp. ERISA Litig.*,
  443 F. Supp. 2d 1249 (D. Kan. 2006) ................................................................... 18

*In re StockerYale, Inc. Sec. Litig.*,
  No. 1:05CV00177-SM, 2007 WL 4589772 (D.N.H. Dec. 18, 2007) ...................... 35

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) ............................................................................... 28

*In re TFT-LCD [Direct Purchaser] Antitrust Litig.*,
  No. 07-md-01827, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) .......................... 32

*In re TFT-LCD [Indirect Purchaser] Antitrust Litig.*,
  2013 WL 1365900 & n.11 (N.D. Cal. Apr. 3, 2013) .............................................. 32

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
  No. 02-md-1468-JWL, 2011 WL 1808038 (D. Kan. May 12, 2011) ........... 24, 31, 35

*In re Vitamins Antitrust Litig.*,
  No. 99-md-197, 2001 WL 34312839 (D.D.C. July 16, 2001) ................................ 32

*In re Wash. Pub. Power Supply Sys. Secs. Litig.*,
  19 F.3d 1291 (9th Cir. 1994) ............................................................................... 29

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) .................................................................. 19

*In re: Urethane Antitrust Litig.*,
  No. 04-1616-JWL, 2016 WL 4060156 (D. Kan. July 29, 2016) ....................... 31, 33

*Initial Pub. Off. Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) .................................................................. 32

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ............................................................................... 20

*Klein v. PDG Remediation, Inc.*,
  No. 95-cv-4954, 1999 WL 38179 (S.D.N.Y. Jan. 28, 1999) ................................. 31

*Knight v. Red Door Salons, Inc.*,
  No. 08-cv-01520, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ............................... 29

*Lazy Oil Co. v. Witco Corp.*,
  95 F. Supp. 2d 290 (W.D. Pa. 1997) ...................................................................... 36

*Lewis v. Wal-Mart Stores, Inc.*,
  No. 02-cv-0944, 2006 WL 3505851 (N.D. Okla. Dec. 4, 2006) .......................... 4, 31

*Lucas v. Kmart Corp.*,
  No. 99-cv-01923-JLK, 2006 WL 2729260 (D. Colo. July 27, 2006)...................... 29

*McNeely v. Nat'l Mobile Health Care, LLC*,
  No. 07-cv-933, 2008 WL 4816510 n.9 (W.D. Okla. Oct. 27, 2008) ...................... 21

*Montague v. Dixie Nat. Life Ins. Co.*,
  CIV.A. 3:09-00687, 2011 WL 3626541 (D.S.C. Aug. 17, 2011)........................... 28

*Moore v. United States*,
  63 Fed. Cl. 781 (Fed. Cl. 2005) ............................................................................ 31

*Norman v. Housing Auth. of City of Montgomery*,
  836 F.2d 1292 (11th Cir. 1988) ............................................................................. 29

*Perez v. Asurion Corp.*,
  No. 06-cv-20734, 2007 WL 2591180 (S.D. Fla. Aug. 8, 2007) ............................. 29

*Rosenbaum v. MacAllister*,
  64 F.3d 1439 (10th Cir. 1995) ............................................................................... 18

*Schwartz v. TXU Corp.*,
  No. 02-cv-2243, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ............................. 25

*Shaw v. Interthinx, Inc.*,
  No. 13-cv-01229-REB, 2015 WL 1867861 (D. Colo. Apr. 22, 2015) ........................ 19, 31, 38

*Smith v. Krispy Kreme Doughnut Corp., No. 05-cv-00187*,
  2007 WL 119157 (M.D.N.C. Jan. 10, 2007) .......................................................... 25

*Smith v. Vill. of Maywood*,
  17 F.3d 219 (7th Cir. 1994) ................................................................................... 33

*Stanger v. China Elec. Motor, Inc.*,
  812 F.3d 734 (9th Cir. 2016) ................................................................................. 29

*Stanley v. U.S. Steel Co.*,
  No. 04-cv-74654, 2009 WL 4646647 (E.D. Mich. Dec. 8, 2009) .......................... 29

*Titanium Dioxide Antitrust Litig., 10–cv–00318*,
  2013 WL 6577029 (D. Md. Dec. 13, 2013)....................................................... 32, 39

*Tuten v. United Airlines, Inc.*,
 41 F. Supp. 3d 1003 (D. Colo. 2014) ....................................................................... 39

*UFCW Local 880-Retail Food Emp'rs Joint Pension Fund v. Newmont Min. Corp.*,
 352 F. App'x 232 (10th Cir. 2009) ........................................................................... 37

*United States v. Anglin & Stevenson*,
 145 F.2d 622 (10th Cir.1944) .................................................................................. 20

*United Telecommc'ns Sec. Litig., No. 90-cv2251*,
 1994 WL 326007 (D. Kan. June 1, 1994) ................................................................ 31

*Uselton v. Commercial Lovelace Motor Freight*,
 9 F.3d 849 (10th Cir. 1993) ..................................................................................... 20

*Vaszlavik v. Storage Tech. Corp.*,
 No. 95–B–2525, 2000 WL 1268824 (D. Colo. Mar. 9, 2000) ................................. 30

*Vizcaino v. Microsoft Corp.*,
 290 F.3d 1043 (9th Cir. 2002) ............................................................................ 21, 33

*Whittington v. Taco Bell of Am., Inc.*,
 No. 10-cv-01884-KMT, 2013 WL 6022972 (D. Colo. Nov. 13, 2013) ................. 4, 30

*Williams v. Sprint/United Mgmt. Co.*,
 No. 03-cv-2200-JWL, 2007 WL 2694029 (D. Kan. Sept. 11, 2007) .................... 4, 30

## I.       INTRODUCTION

The $375 million proposed settlement in this case is an extraordinary result in an extraordinary case.  As this Court is all too familiar, this is one of the longest-running, hardest-fought class actions in United States history.  Plaintiffs Merilyn Cook, Richard and Sally Bartlett, and William and Delores Schierkolk[1] (collectively, "Class Representatives" or "Plaintiffs"), a handful of individual landowners downwind of the Rocky Flats nuclear weapons facility, represented by determined and dogged counsel, faced off against powerful defendants with nearly unlimited litigation resources pursuing a scorched-earth strategy ever since the case was first filed in January 1990.  It would be nearly impossible to overstate the obstacles that Plaintiffs had to overcome – including a seemingly case-ending adverse ruling by the Tenth Circuit Court of Appeals in 2010 – to secure this remarkable recovery for the thousands of property owners harmed by plutonium released from Rocky Flats.  The Class Representatives and Class Counsel – led by Berger & Montague, P.C. and including counsel from Silver & Deboskey, P.C and from Waite, Schneider, Bayless & Chesley Co., L.P.A. ("WSBC") who now practice with Markovits, Stock & De Marco, LLC – persevered through 27 years of highly contentious litigation that generated no less than fifteen published opinions by this Court and two by the Tenth Circuit, that featured a four-month jury trial after more than a decade of discovery, massive motion practice and even a four-day bench trial about the discovery misconduct and intransigence of the United States Department of Energy ("DOE), Defendants' indemnitor.  Indeed, in 2009 – long before this long-running saga reached its conclusion – the Public Justice Foundation recognized Class Counsel for their efforts by bestowing its prestigious Trial Lawyer of the Year award to Merrill G. Davidoff, Peter Nordberg, David F. Sorensen, Ellen Noteware,

---

[1] Delores Schierkolk is deceased, but William Schierkolk is her heir and representative.

and Jennifer MacNaughton of Berger & Montague, P.C. in Philadelphia; Louise Roselle and Jean Geoppinger McCoy, then of Waite, Schneider, Bayless & Chesley Co., LPA in Cincinnati; and Gary Blum, Steve Kelly, and Bruce DeBoskey of Silver & DeBoskey, P.C. in Denver.[2]  The $375 million settlement is the largest of its kind relating to offsite contamination from one of the nation's former nuclear weapons facilities and will provide the Class with a net recovery larger than the jury's compensatory damage award (not including interest).

Plaintiffs now move for an award of attorneys' fees, reimbursement of costs and expenses, and for service awards for the Class Representatives, who persevered for themselves and the thousands of their neighbors they agreed to represent so many years ago.  We set forth highlights of the history of this case in the accompanying declaration from lead counsel Merrill G. Davidoff (the "Davidoff Decl.", attached as Ex. 1).  The history of this case is also written in the *fifteen* published opinions of this Court, and two by the Tenth Circuit Court of Appeals.  No declaration, and no brief, however, can fully capture and convey the sheer persistence and tenacity required of Plaintiffs and Plaintiffs' counsel to achieve this remarkable result.  As the Tenth Circuit remarked in the second appeal: "It took a titanic fifteen years for the case to reach a jury."  *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1090 (10th Cir. 2015) ("*Cook Appeal II*"). And that four-month jury trial happened over *ten years ago.*

Plaintiffs' counsel took on this case 27 years ago with no promise or guarantee of payment for their work, or of reimbursement of the millions of dollars that were required to support and fund this case.  Frankly, many plaintiffs and many plaintiffs' lawyers would have given up long ago, particularly after the Tenth Circuit dealt a devastating blow to the case in

---

[2] *See* http://publicjustice.net/sites/default/files/news-releases/2009%20TLOY%20WINNERS%20(News%20Release).pdf.

2010, vacating the judgment and class certification, embracing a brand-new argument from the Defendants about the Price-Anderson Act, and apparently leaving Plaintiffs with no way forward. *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127 (10th Cir. 2010) ("*Cook Appeal I*"). And *that* was more than six years ago.

But Plaintiffs regrouped, fought on, and eventually emerged victorious, convincing the Tenth Circuit in *Cook Appeal II* to issue the first appellate decision in the country plainly and indisputably holding that the PAA does not completely preempt state law claims, and demonstrating to the Court of Appeals – through, *inter alia*, a detailed analysis of the jury charge, verdict, and what *Cook Appeal I* actually did, and did not, hold – that despite *Cook Appeal I*, "all the ingredients required for a state law nuisance judgment were present and accounted for and a judgment on that claim should issue forthwith."  *Cook Appeal II*, 790 F.3d at 1091.

Plaintiffs' trailblazing, turnabout victory in *Cook Appeal II* set the stage, at long last, for eventual settlement – though in keeping with the history of this case, not without much more work including a second round of *certiorari* briefing to the U.S. Supreme Court and briefing of numerous issues in this Court on remand.  But with both sides facing years of more delay, and uncertainty and risk in the Supreme Court – Defendants were seeking to overturn *Cook II* and leave *Cook I* intact while Plaintiffs were seeking the opposite – the parties finally engaged in meaningful settlement talks and reached the proposed $375 million settlement on May 18, 2016, one day before the Supreme Court was originally scheduled to convene and rule upon the competing *certiorari* petitions.

The Court granted the settlement preliminary approval on August 5, 2016 (Doc. 2416), and a final approval hearing is scheduled for April 28, 2017.  Plaintiffs now move for an award

of attorneys' fees, costs and expenses, and service awards.  Plaintiffs respectfully move for an attorneys' fee award of forty percent of the settlement amount, consistent with the Notice provided to the Class.[3]  We recognize that such a fee is significant.  We believe the law and the extraordinary facts of this case fully support the request.  Similarly the Class Representatives – some of whom did not live to see this day – deserve significant service awards.  Finally, Plaintiffs seek reimbursement of over $7 million in incurred costs and expenses that were fairly and reasonably expended litigating this case.

Other courts, including within this Circuit, have acknowledged that a forty percent fee falls within an acceptable range of fee awards, even though none of those other cases even approached the considerable risk, length, and complexity of this litigation.  *See, e.g. Whittington v. Taco Bell of Am., Inc.*, No. 10-cv-01884-KMT, 2013 WL 6022972, at *6 (D. Colo. Nov. 13, 2013) (awarding fees and costs totaling 39% of settlement amount after three years of litigation and before trial); *Williams v. Sprint/United Mgmt. Co*., No. 03-cv-2200-JWL, 2007 WL 2694029, at *6 (D. Kan. Sept. 11, 2007) (awarding a 35% fee plus expenses after four years of litigation and before trial); *Lewis v. Wal-Mart Stores, Inc*., No. 02-cv-0944, 2006 WL 3505851, at *1 (N.D. Okla. Dec. 4, 2006) ("A contingency fee of one-third is relatively standard in lawsuits that settle *before* trial") (emphasis added); *In re Melridge, Inc. Sec. Litig.*, No. 87-cv-1426, Doc. 2419 (D. Or. Apr. 15, 1996) (awarding a 40% fee plus expenses in an eight-year litigation after jury trial and appeal).[4]  Courts have long recognized that class counsel and the class should have aligned interests in this type of matter, such that counsel are both compensated

---

[3] *See* Ex. 16, Notice of Settlement, at Question 10.

[4] The *Melridge* Order, along with all of the other unpublished orders cited in this filing are combined and attached, with an index, as Ex. 15.

for risk and rewarded for success, especially where, as here, the Class receives significant benefit from Class Counsel's decades of work.

Likewise, Class Counsel's request for reimbursement of $7,094,863.65 in reasonable litigation costs and expenses, *e.g.*, as costs for experts, deposition services, transcripts, trial expenses, travel, printing expenses, and electronic research (*see* Davidoff Decl. ¶¶ 253, 257-259, & Tables 1, 3), is reasonable and well-supported.  The bulk of these expenses were incurred over a decade ago, and as long as 27 years ago.

Plaintiffs further request that the Court approve total service awards of $780,000 for the Class Representatives to be apportioned as follows:  $260,000 for Merilyn Cook, $260,000 for Richard and Sally Bartlett, and $260,000 for William and Delores Schierkolk.[5]  The Class Representatives were the driving force of this litigation from the beginning.  They persevered through over two decades of litigation, participated fully in discovery and provided valuable testimony at trial, and refused to give up even when the odds of success appeared dim.  It is no exaggeration to say that without these Class Representatives' work and dedication, this case and the $375 million settlement would not have been possible.

Attached to this brief are the declarations of Plaintiffs' counsel: (1) Declaration of Merrill G. Davidoff of Berger & Montague, P.C., lead counsel (Ex. 1) ("Davidoff Decl."); (2) Declaration of Steven W. Kelly of Silver & DeBoskey, A Professional Corporation (Ex. 2) ("Kelly Decl."); (3) Declaration of Terence R. Coates of Markovits, Stock & DeMarco, LLC (Ex. 3) ("Coates Decl."); (4) Declaration of Eric W. Goering, assignee of Waite, Schneider, Bayless &  Chesley Co. L.P.A. (Ex. 4) ("Goering Decl."); (5) Declaration of Nicholas E. Chimicles of Chimicles & Tikellis LLP (Ex. 5) ("Chimicles Decl."); (6) Declaration of Jeffrey

---

[5] The $260,000 will be paid to William Schierkolk since Delores Schierkolk is deceased.

A. Lamken of MoloLamken LLP (Ex. 6) ("Lamken Decl."); (7) Declaration of Michael Barrett of Ray & Barrett, formerly known as Connerton, Ray & Simon (Ex. 7) ("Barrett Decl."); (8) Declaration of R. Bruce McNew of Taylor & McNew, LLP, formerly Taylor, Gruver, & McNew, P.A. (Ex. 8) ("McNew Decl."); (9) Declaration of Kenneth A. Jacobsen of Jacobsen Law Offices LLC (Ex. 9) ("Jacobsen Decl."); and (10) Declaration of Marcy G. Glenn of Holland & Hart LLP (Ex. 10) ("Glenn Decl.").

## II.    HISTORY OF THE LITIGATION

This Court, having presided over this case since December 1992, including the four-month trial, is familiar with its history, which is discussed in the attached declaration of lead counsel Merrill G. Davidoff.  Here, we provide a summary of this history.  We have also attached as a single combined exhibit the fifteen published opinions of this Court and the two by the Tenth Circuit, totaling 331 pages.  *See* Ex. 11.

### A.    The Complaint and the First Three Waves of Dispositive Motions

In June 1989, the FBI conducted an unprecedented raid on the Rocky Flats nuclear weapons plant, seeking evidence of environmental crimes.  This was a watershed moment in the history of the plant.  For decades, the DOE had kept neighboring residents in the dark about environmental and safety conditions at Rocky Flats, and efforts by the EPA and the Colorado Department of Health to bring the plant into compliance had dragged on with no concrete resolution.  In the wake of the FBI raid, the Class Representatives – alarmed about what the FBI raid and criminal investigation signaled about threats to their health and property, and eager to take matters into their own hands to finally uncover the truth – engaged Class Counsel to investigate potential claims.  *See* Davidoff Decl. ¶¶ 5, 262, 264.

On January 30, 1990, after months of intensive factual and legal research by Class Counsel, the Class Representatives filed their initial complaint, asserting Colorado nuisance and

trespass claims, as well as claims under the federal Price-Anderson Act ("PAA"), arising from Defendants' releases of plutonium from Rocky Flats. Davidoff Decl. ¶ 5. The complaint sought certification of two overlapping classes: an "economic harm" class of property owners downwind of Rocky Flats and a medical monitoring class of natural persons residing or working within six miles of Rocky Flats (excluding Rocky Flats employees). Complaint and Jury Demand (Jan. 30, 1990), at ¶ 56; *see also* Davidoff Decl. ¶ 5. Plaintiffs filed a first amended complaint on April 17, 1990. *Id.* ¶ 6.

Plaintiffs' complaint was met with a barrage of dispositive motions: Defendants The Dow Chemical Company ("Dow") and Rockwell International Corp. ("Rockwell") filed three separate motions to dismiss, and Dow filed a fourth motion for summary judgment on statute of limitations grounds. Davidoff Decl. ¶ 7. After laborious briefing by Class Counsel, the Court denied those motions in *Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468 (D. Colo. 1991) ("*Cook I*"). Davidoff Decl. ¶¶ 7-8.

On April 8, 1991, Plaintiffs filed their second amended complaint, which provoked yet another motion to dismiss by Rockwell. After the parties fully briefed that motion, the Court issued its decision in *Cook v. Rockwell Int'l Corp.*, 778 F. Supp. 512 (D. Colo. 1991) ("*Cook II*"), denying Rockwell's motion as to most claims. Davidoff Decl. ¶¶ 9-11.

### B.    Discovery

Discovery in this case was hard-fought at every turn. Defendants strenuously resisted Plaintiffs' efforts to obtain necessary documents and information. Plaintiffs' investigation was made even more complicated because many critically important materials were in the hands of the DOE, and EG&G, the contractor that succeeded Rockwell as manager and operator of Rocky Flats. As a result of these complications and numerous DOE discovery violations, the main phase of merits discovery occupied a substantial portion of the 1990s, with additional third-party

discovery taking place up to and even during the trial in 2005-2006.  Davidoff Decl. ¶¶ 12-53, 103-104.

<blockquote>a.      **Fact Discovery**</blockquote>

Discovery finally started in 1992, after the delay occasioned by Defendants' repeated motions to dismiss and for summary judgment and by Defendants' motion for a protective order. Davidoff Decl. ¶ 12.  The Magistrate Judge initially limited discovery yet ordered Plaintiffs to prepare a detailed statement of the basis of their claims, including expert reports and a list of the hazardous substances to which they had been exposed, by November 1992.  Plaintiffs attempted to comply with this order despite the fact that Defendants had stalled or refused to produce the necessary information.  In *Cook v. Rockwell Int'l Corp.*, 147 F.R.D. 237 (D. Colo. 1993) ("*Cook III*"), Judge Kane modified the Magistrate Judge's order, opened up discovery, and extended the deadline for submitting expert reports.  Davidoff Decl. ¶¶ 13-19.

Once discovery began in earnest, Dow and Rockwell also asserted that, having left Rocky Flats, they did not have possession, custody, or control of many documents relevant to this case. Class Counsel thus served 66 document subpoenas on DOE, as well as the EPA, EG&G, the Colorado Department of Health, ChemRisk (a division of consulting firm McLaren-Hart, Inc.), Radiological Assessment Corporation ("RAC")[6], and the University of California, which operates the Los Alamos National Laboratory which conducted epidemiological studies and health assessments of Rocky Flats workers, focusing on the human health effects of plutonium exposure.  Davidoff Decl. ¶ 21.  In total, Class Counsel's efforts yielded approximately 800 boxes of paper documents plus 173 boxes of DOE documents relating to "material unaccounted

---

[6] ChemRisk and RAC were companies engaged by DOE to perform a "dose reconstruction" analysis of hazardous substances released from Rocky Flats.  *Id.* ¶ 21.

for" or "MUF" at Rocky Flats, which refers to nuclear material that was missing and/or not accounted for in the plant's inventory balance. *Id.* ¶ 25. Class Counsel conducted an extensive review of these materials. *Id.* ¶¶ 24, 27. Class Counsel also pursued wide-ranging informal discovery. *Id.* ¶ 26.

The deposition program in this case was extensive: Class Counsel took 99 depositions of fact witnesses, and defended or attended 52 more, including the depositions of the Class Representatives. *Id.* ¶¶ 28-31. Many of these depositions were taken before the Federal Rules were amended to limit depositions to seven hours, and indeed a number spanned several days. Class Counsel even conducted 14 days' worth of depositions (of 12 witnesses) in the few days before trial or *during the trial itself*. *Id.* ¶¶ 68, 145.

### b. The DOE Contempt Proceeding

Plaintiffs' discovery efforts were hindered by the fact that the DOE – which, as Defendants' indemnitor, had a vested interest in defeating Plaintiffs' claims – controlled much of the evidence. Plaintiffs' subpoenas to DOE were met by a pattern of foot-dragging, evasiveness, and promises of cooperation that were quickly and repeatedly broken. Class Counsel filed a motion to hold DOE in contempt, which was seemingly resolved by way of a stipulated order. But when DOE again failed to cooperate, Class Counsel filed a second motion for contempt sanctions. The Court held a four-day evidentiary hearing (essentially a bench trial), complete with sworn testimony from a DOE classification officer and one of Plaintiffs' experts on the subject of plutonium exposure and releases (Dr. Thomas Cochran), who explained, *inter alia*, why the requested materials were important to analyzing the alleged accuracy of official claims of the amount of plutonium released from Rocky Flats. On November 13, 1995, the Court

granted Plaintiffs' motion for contempt sanctions.  *See Cook v. Rockwell Int'l Corp.*, 907 F. Supp. 1460 (D. Colo. 1995) ("*Cook VI*").[7]

The contempt sanctions did not, however, ultimately result in Plaintiffs receiving the information they sought.  For one major collection – the records of plutonium that went missing at Rocky Flats, or "Material Unaccounted For" ("MUF") – DOE again delayed complying with several Court-ordered deadlines.  Plaintiffs moved a second time for contempt sanctions. While the motion was pending, DOE continued its declassification review and began producing dozens of boxes of documents so heavily redacted as to be largely empty of useful content.  The Court denied Plaintiffs' motion, opting instead to continue monitoring DOE's compliance.  *See Cook v. Rockwell Int'l Corp.*, 935 F. Supp. 1452 (D. Colo. 1996) ("*Cook VII*").

For several years afterward, the parties continued to struggle with DOE's discovery compliance, with Plaintiffs filing an additional motion to compel and DOE moving for another protective order.  Two Berger & Montague, P.C. attorneys also went through the arduous process of obtaining "Q" clearances to allow them to review classified documents and identify classified documents for potential declassification and production.  Davidoff Decl. ¶¶ 52-53.

### c.      Expert Discovery

Pursuant to Court-ordered deadlines, the parties disclosed their experts and served expert reports in 1995 and 1996, with further rebuttal or supplemental reports served in 1997.  By 1997, Plaintiffs submitted 21 reports by 19 experts, and Defendants submitted 31 expert reports or declarations.  Davidoff Decl. ¶ 60-65.  This case implicated not only the complex, nearly forty-year operating history of Rocky Flats, but also complex issues of off-site radiation dose

---

[7] DOE later agreed to pay Plaintiffs $500,000 pursuant to the Court's order; these funds were used for costs and expenses of this case and that deduction is reflected in the amount of reimbursement being sought.  *See* Davidoff Decl. ¶¶ 3, 258.

reconstruction because of flaws and gaps in contemporaneous monitoring and measurements, research into the health effects of plutonium exposure and the distorting effects on that research of DOE control over much of the key data, measurement of the effects of plutonium releases on property values on a classwide, aggregate basis, and more. *Id.* & ¶¶ 119, 149, 152-161.

In August of 1997 and April of 1998, Defendants moved to strike *all* of Plaintiffs' experts. After the parties had fully briefed these voluminous and highly technical motions, the Court denied them, opting to defer ruling on the admissibility of the testimony until such time as Plaintiffs sought to rely on those experts at a hearing or at trial. *See Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 487-89 (D. Colo. 1998) ("*Cook VIII*").

In 1998 and 1999, and again in 2004 and 2005 as the case neared trial, Defendants submitted supplemental reports and declarations, bringing their total to 46 reports from 25 experts. Davidoff Decl. ¶¶ 64-65.

## C.     Class Certification

The first round of class certification briefing took place in the latter half of 1993. Plaintiffs moved to certify both the property and medical monitoring classes. In support of their motion, Plaintiffs filed a detailed memorandum of law supported by four expert witness declarations discussing how to model the dispersion of contamination from Rocky Flats, the common impact of that contamination on property values, dose reconstruction, and the health effects of exposures to the hazardous substances released by Rocky Flats. Defendants' voluminous briefs in opposition to class certification challenged nearly every Rule 23 element. Plaintiffs' 65-page reply brief carefully refuted these arguments. Davidoff Decl. ¶¶ 70-72.

On October 8, 1993, the Court certified the property and medical monitoring classes. *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D. Colo. 1993) ("*Cook IV*").

Next, in 1996 through 1998, Defendants moved to decertify both classes, once again disputing nearly every Rule 23 element.  In *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473 (D. Colo. 1998) ("*Cook VIII*"), the Court granted the motion to decertify the medical monitoring class in light of changes in the law, but reaffirmed certification of the property class.  Class Counsel proposed, and the Court approved, a revised Class notice, which was then distributed to the Class under the supervision of the Court-appointed neutral opt-out agent, Phyllis Knight, and Class Counsel, in 1999.  Davidoff Decl. ¶¶ 91-92.

### D.    The Fourth and Fifth Waves of Dispositive Motions

Along with the first round of *Daubert* briefing, from 1996 through 1998, Defendants filed several more rounds of dispositive or partially dispositive motions.  In addition, Plaintiffs moved for partial summary judgment on several discrete issues.  Davidoff Decl. ¶¶ 76-79.  After yet more briefing, the Court issued its lengthy opinion in *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473 (D. Colo. 1998) ("*Cook VIII*"), resolving the outstanding motions.

### E.    Trial Preparation

From late 2000 through late 2004, in the context of submitting their proposed trial plan and jury instructions to the Court, the parties engaged in substantial back-and-forth briefing over issues affecting the scope of the class trial.  These issues included which elements of Plaintiffs' claims could be tried on a class-wide basis; what effect the statute of limitations should have on Plaintiffs' claims; whether alleged federal nuclear emissions standards preempted Plaintiffs' claims; and finer points of how Colorado nuisance and trespass law would apply to radioactive contamination.  Davidoff Decl. ¶¶ 106-115.  The Court resolved some of these issues in its pivotal ruling in *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175 (D. Colo. 2003) ("*Cook IX*"), and further clarified the standards governing this case in its jury instructions issued before trial.  Davidoff Decl. ¶¶ 124-130.

In 2005, with an October trial date looming, the parties engaged in more hotly contested briefing over *Daubert* motions and motions *in limine*.  Defendants again moved to exclude every one of Plaintiffs' experts and major portions of their proposed trial evidence, while Plaintiffs filed much more targeted motions.  *Id.* ¶¶ 134-138.  As the Court observed, the briefing alone amounted to approximately 1,000 pages, with an additional 5,400 pages of exhibits.  *Id.* ¶ 134. After hearing four days of highly technical argument on these issues, the Court ruled from the bench, denying Defendants' motions and granting some of Plaintiffs'.  *Id.* ¶ 139.  Later, when Defendants belatedly disclosed another expert on the eve of trial, Class Counsel quickly drafted a motion to exclude her testimony, which the Court granted.  *Id.* ¶¶ 141-142.

## F.       The Four-Month Jury Trial

The trial lasted four months (exclusive of jury deliberations), from October 6, 2005 through January 20, 2006.  The jury heard testimony from five Class Representatives, 15 lay witnesses, and 19 experts, plus two witnesses who testified by deposition designation.[8]  Davidoff Decl. ¶¶ 143-149.  The jury was shown hundreds of exhibits and demonstratives.  *Id.* ¶ 162.

Even during the rush of trial, the parties were engaged in intense motions practice, with over 300 substantive motions filed during the trial itself.  *Id.* ¶¶ 164-166.  The "daily deluge of filings" became so intense that the Court finally issued an order imposing time limits on motions affecting the testimony of scheduled witnesses and requiring specific justification for raising any matters that were previously ruled upon or that could have been raised at the *Daubert* and motions *in limine* stage.  *Id.* ¶¶ 165, 167 (quoting *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1081-81 (D. Colo. 2006) ("*Cook XIII*")).  These and other new substantive issues raised

---

[8] One expert witness, Mr. Flynn, testified live but became ill during the trial and was unable to continue. The Court allowed Plaintiffs to use deposition designations in lieu of his live testimony. Davidoff Decl. ¶ 144.  In the totals above, only his live trial testimony is counted.

during trial, including Defendants' previously-undisclosed (and ultimately unsupported) theory that the plutonium in the class area had been removed by development, required intensive briefing and argument.  *Id.* & ¶¶ 168-170.

Plaintiffs also briefed a lengthy opposition to Defendants' motion for judgment as a matter of law, turning around a 96-page brief, with extensive citation to the trial record, in less than four weeks during trial and over the winter holiday.  *Id.* ¶ 172.  The Court denied Defendants' initial motion and their renewed motion filed at the end of trial.  *Id.* ¶¶ 172-173.

On February 14, 2006, after 17 days of deliberations, the jury returned a verdict for the Plaintiffs on both the trespass and nuisance claims.  *Id.* ¶¶ 174-177.  The jury awarded $176.8 million in compensatory damages and $200 million in exemplary damages.  *Id.*

Post-trial briefing occurred in 2006 and 2007.  Defendants filed a motion to interview Juror "X", who left the deliberations after 2 ½ days in emotional distress, and was excused by the Court.  *Id.* ¶ 179.  Class Counsel quickly drafted a brief opposing this motion (Doc. 2137, under seal), which demanded in-depth research into the principles and policies restricting access to jurors, and on April 18, 2006, the Court denied Defendants' motion, finding that Fed. R. Evid. 606(b) "precludes the fishing expedition requested by Defendants." *Cook v. Rockwell Int'l Corp.*, 428 F. Supp. 2d 1152, 1155 (D. Colo. 2006) ("*Cook XII*").  Davidoff Decl. ¶ 179.  Defendants also filed a post-trial motion for judgment as a matter of law or a new trial, and the parties filed competing submissions as to how the Court might enter judgment to facilitate an appeal.  *Id.* ¶¶ 181-182.  The Court decided these matters and, on May 20, 2008 and June 2, 2008, entered judgment for Plaintiffs and the Class.  *Id.* ¶ 183; *Cook v. Rockwell Int'l Corp.*, 564 F. Supp. 2d 1189 (D. Colo. 2008) ("*Cook XIV*"); Doc. No. 2264.

### G.   The First Appeal, *Cook Appeal I*

Defendants appealed the judgment to the Tenth Circuit, and Plaintiffs filed a limited cross-appeal on certain issues.  Davidoff Decl. ¶¶ 184-186.  On appeal, Defendants did not challenge the sufficiency of the evidence generally, or the admissibility of Plaintiffs' expert testimony.  Instead, they raised several new and repackaged dispositive legal issues, arguing *inter alia*: preemption by alleged federal nuclear emissions standards; a brand new argument that the PAA contained a threshold requirement that Plaintiffs prove a "nuclear incident", which the Act defines as physical injury, damage to property, or loss of use of property; Colorado nuisance law would not allow recovery for unfounded fears; Colorado trespass law would treat plutonium contamination as an intangible trespass requiring proof of property damage, not simply presence of contamination; the trial structure allowed Plaintiffs to obtain a judgment without proving injury on a class-wide basis; the Court improperly allowed recovery of diminution in property values for risks of future harm under Rest.2d Torts § 930; and the punitive damages and pre-judgment interest were improperly awarded.  *Id.* ¶¶ 185-191.

The Tenth Circuit heard oral argument on March 10, 2010.  *Id.* ¶ 194.  Afterward, and despite the fact that Defendants had not previously raised the issue of any purported PAA threshold requirement in nearly 20 years of litigation, the Tenth Circuit asked for supplemental briefing on that issue (framed then as a question of subject matter jurisdiction), which both sides provided.  *Id.* ¶ 195.

On September 3, 2010, the Tenth Circuit issued its decision vacating the judgment and class certification, and remanding back to the district court.  *Cook Appeal I*, 618 F.3d 1127.  The Tenth Circuit adopted Defendants' new argument, reading into the PAA a new threshold requirement of proof of a "nuclear incident" above and beyond the requirements of Colorado law, and remanded for a new trial to require Plaintiffs to prove that "element" of the PAA claim.

15

*Id.* ¶ 196.  *Cook Appeal I* also vacated the District Court's entry of judgment on Plaintiffs' trespass claims, holding that Colorado courts would consider plutonium contamination to be an intangible trespass, and vacated class certification in light of these rulings.  *Id.* ¶¶ 199-200.  The punitive damages instructions were also disapproved.  *Id.* ¶ 201.  Crucially, however, *Cook Appeal I* held that the jury was properly instructed on the Colorado nuisance claim.  *Id.* ¶ 198.

Plaintiffs petitioned for review in the Supreme Court, but their petition was denied.  *Id.* ¶¶ 203-205.

## H.    Remand and *Cook Appeal II*

On remand, Class Counsel embarked on a creative strategy to resurrect the nuisance judgment, using what the Tenth Circuit would later describe as "judicial jiu-jitsu": Class Counsel no longer pursued a PAA claim since *Cook Appeal I* held that the jury had not been required to find a "nuclear incident", as the Tenth Circuit had interpreted that term and had held was required by the PAA, and instead argued their case was now an ordinary Colorado nuisance law case proceeding under diversity and pendent jurisdiction, alleged since the litigation's inception, and that the Court should again enter judgment for Plaintiffs, recertify the class, and award damages under state law based on the existing nuisance verdict.  *Id.* ¶ 207.  In response, Defendants argued, *inter alia*, that the PAA preempted Plaintiffs' state law nuisance claims, and that the Court could not enter judgment for Plaintiffs because of *Cook Appeal I* and the mandate rule.  *Id.* ¶¶ 209-211.

This Court held that the PAA preempted Plaintiffs' state law claims, prompting Plaintiffs' appeal to the Tenth Circuit.  *Id.* ¶ 212.  On the second appeal, the Tenth Circuit reversed, rejecting Defendants' various preemption arguments, and remanded to this Court.  The Tenth Circuit stated:

> In the end, Dow and Rockwell appear to have persuaded even the plaintiffs that this case does not involve a nuclear incident within the meaning of the Price-Anderson Act — at least in light of the statutory construction the defendants urged and this court adopted in the first appeal. But that does not mean the defendants are insulated from any liability — or that the jury's verdict is a pointless piece of paper. In two separate appeals spanning many years the defendants have identified no lawful impediment to the entry of a state law nuisance judgment on the existing verdict. They have shown no preemption by federal law, no error in the state law nuisance instructions, no mandate language specifically precluding this course. No other error of any kind is even now alleged.

*Cook Appeal II*, 790 F.3d at 1104.  The Tenth Circuit recognized that Plaintiffs have "an existing nuisance verdict" and instructed this Court to "proceed to judgment on the existing nuisance verdict promptly" because "[t]his long lingering litigation deserves to find resolution soon."  *Id.* at 1099, 1105.

Subsequently, Defendants filed a Petition for Panel Rehearing and/or Rehearing *En Banc*, which the Tenth Circuit denied on July 20, 2015.  *See* Order, *Cook v. Rockwell Int'l*, App. Case: 14-1112, Doc. 01019462356 (10th Cir. Jul. 20, 2015), previously filed with this Court at Doc. 2367-5.

Defendants then petitioned for review in the Supreme Court.  Plaintiffs opposed the petition, and also filed a conditional cross-petition asking the Supreme Court to review *Cook Appeal I* if and only if the Supreme Court agreed to review *Cook Appeal II*.  Davidoff Decl. ¶ 226.  Defendants' petition and Plaintiffs' conditional cross-petition were pending, and nearing decision, when the settlement was reached on May 18, 2016.

## I.    Second Remand and Settlement

On remand once again, Plaintiffs, consistent with the Tenth Circuit's mandate, promptly filed a motion seeking entry of judgment on Plaintiffs' nuisance claims.  Defendants opposed Plaintiffs' motion, and the parties engaged in extensive briefing concerning the propriety of class certification, the existence of alleged "trial errors" Defendants claimed affected the verdict,

possible preemption by alleged federal nuclear standards (yet again), and the proper method of calculating pre- and post-judgment interest.  Davidoff Decl. ¶¶ 228-230.

In addition, during this same time period, as discussed above, the parties were also briefing Defendants' petition for *certiorari* in the Supreme Court and Plaintiffs' conditional cross-petition.  *Id.* ¶ 226.

Simultaneously with this intense briefing at both the District Court and Supreme Court, the parties engaged in an extensive mediation process.  *Id.* ¶ 232.  Although no resolution was reached during an in-person mediation in October 2015, the parties continued to negotiate with the assistance of the highly-qualified mediator until they reached a settlement on May 18, 2016. *Id.* ¶¶ 232-233.

## III.    A FORTY PERCENT AWARD IS FAIR AND REASONABLE GIVEN THE REMARKABLE RECOVERY FOR THE CLASS IN A CASE OF SUCH EXTRAORDINARY LENGTH, RISK, AND DIFFICULTY

Class Counsel has earned a forty percent fee, which is reasonable given the history of this litigation.  It is well-settled that a fee award is appropriate when a common fund is created for class members through the efforts of counsel.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[T]his Court has recognized consistently that a [lawyer] who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.") (citations omitted); *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994) (same).

In the Tenth Circuit, a percentage-of-the-fund is the preferred method for awarding fees in a common fund case.  *See Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995); *Gottlieb*, 43 F.3d at 482-83; *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1269 (D. Kan. 2006) ("preferred method").  "The Tenth Circuit favors the common fund approach, as opposed to the lodestar method, because a percentage of the common fund is less subjective than

the lodestar plus multiplier approach . . . and is the better suited approach when class counsel were retained on a contingent fee basis, as in this case." *Shaw v. Interthinx, Inc.*, No. 13-cv-01229-REB, 2015 WL 1867861, at *5 (D. Colo. Apr. 22, 2015) (internal quotations, citation omitted).

The "vast majority" of courts of appeal nationwide now direct or permit district courts to award a percentage fee from a common fund. *See* MANUAL FOR COMPLEX LITIGATION, Fourth § 14.121 (2004); *see also Blum v. Stenson*, 465 U.S. 886, 899 n.16 (1984) ("[U]nder the common fund doctrine . . . a reasonable fee is based on a percentage of the fund bestowed on the class[.]"). The percentage method provides "appropriate financial incentives" necessary to "attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005). "From a public policy standpoint," moreover, "the [percentage] method of calculating fees more appropriately aligns the interests of the class with the interests of class counsel—the larger the value of the settlement, the larger the value of the fee award." *Bussie v. Allmerica Fin. Corp.,* No. 97-cv-40204, 1999 WL 342042, at *2 (D. Mass. May 19, 1999) (internal quotation, citation omitted); *accord In re Se. Milk Antitrust Litig.*, No. 07-cv-208, 2013 WL 2155387, at *2 (E.D. Tenn. May 17, 2013) ("percentage-of-the-fund method . . . clearly appears to have become the preferred method in common fund cases" and properly "reflects the results achieved by class counsel"). The percentage method also has the endorsement of commentators, including the Third Circuit task forces on class action attorney fees. *See Report of Third Circuit Task Force: Court Awarded Attorney Fees*, 108 F.R.D. 237, 255-56 (1985); *Report of Third Circuit Task Force: Selection of Class Counsel*, 208 F.R.D. 340, 355 (2002) ("A percentage fee, tailored to the realities of the particular case, remains superior to any other means

of determining a reasonable fee for class counsel."). *See also* Declaration of Professor Charles Silver on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees, Ex. 12 ("Silver Decl."), ¶ 80; *id.* ¶¶ 27, 30, 52.

Courts in the Tenth Circuit consider the twelve factors originally articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) in adjudicating class action fee requests:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee – this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-55 (10th Cir. 1988). The weight given to each factor varies, and "rarely are all of the *Johnson* factors applicable" to the analysis. *Uselton v. Commercial Lovelace Motor Freight*, 9 F.3d 849, 854 (10th Cir. 1993); *see also Gudenkauf v. Stauffer Commc'ns, Inc*., 158 F.3d 1074, 1083 (10th Cir. 1998) ("We have never held that a district court abuses its discretion by failing to specifically address each *Johnson* factor."); *Brown*, 838 F.2d at 456 (citation omitted).

The fee requested here is well supported by the *Johnson* factors. In addition, as the Tenth Circuit has held, "[a]n award of attorneys' fees is a matter uniquely within the discretion of the trial judge who 'has intimate knowledge of the efforts expended and the value of the services rendered.'" *Brown*, 838 F.2d at 453 (quoting *United States v. Anglin & Stevenson*, 145 F.2d 622, 630 (10th Cir.1944)).

**A.      The Amount of Damages Involved and Result Obtained for the Class**

The most important factor in determining an appropriate fee in this case is the result

achieved for the Class.  *See Brown*, 838 F.2d at 456 ("the amount involved and the results

obtained may be given greater weight when, as in this case, the trial judge determines that the

recovery was highly contingent and that the efforts of counsel were instrumental in realizing

recovery on behalf of the class").[9]  As the *Manual for Complex Litigation* explains, the factor

generally "given the greatest emphasis is the size of the fund created, because a common fund is

itself the measure of success and represents the benchmark from which a reasonable fee will be

awarded."  MANUAL FOR COMPLEX LITIGATION, Fourth § 14:121 (2004) (citation and internal

quotation marks omitted).  *See also Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185,

1204-05 (S.D. Fla. 2006) ("Factors indicating 'exceptional success' include success achieved

under unusually difficult or risky circumstances and the size of plaintiffs' recovery.").

Class Counsel obtained a $375 million settlement, which appears to be the largest

settlement of any Price-Anderson Act lawsuit in history.  *See* Silver Decl. ¶¶ 60, 80.  It is more

than twice the $176.8 million the jury awarded in compensatory damages on the Class's nuisance

claims.  The settlement far exceeds the normal range of recovery in cases settling before trial,

which tend to settle for a fraction of single damages.  *See, e.g.*, *In re Linerboard Antitrust Litig*.,

No. 98-cv-5055, 2004 WL 1221350, at *4 (E.D. Pa. June 2, 2004) (collecting cases approving

settlements of 5.35% to 28% of potential damages), *amended*, 2004 WL 1240775 (E.D. Pa. June

4, 2004).

---

[9] *See also Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1048 (9th Cir. 2002) ("Exceptional results are
a relevant circumstance."); *McNeely v. Nat'l Mobile Health Care, LLC*, No. 07-cv-933, 2008 WL
4816510, at *18 n.9 (W.D. Okla. Oct. 27, 2008) (counsel's "willingness to prosecute this matter on a
contingent basis . . . ordinarily shifts the analytical focus away from hours spent on the case to the
ultimate result class counsel has obtained").  *See generally Hensley v. Eckerhart*, 461 U.S. 424, 436
(1983) (the "critical factor is the degree of success obtained").

In addition, the settlement provides for a guaranteed cash recovery payable after final approval, with no funds reverting to Defendants at any time or for any reason.  Defendants have already deposited $2.5 million of the total settlement into an escrow account to cover notice and administration costs, and the remaining settlement funds are required to be paid no later than July 28, 2017.

The exceptional results achieved and benefits conferred on the Class strongly support Class Counsel's fee application.

**B.      The Time and Labor Involved, and the Novelty and Difficulty of the Litigation**

Two of the *Johnson* factors – the time and labor involved, and the novelty and difficulty of the questions presented – overwhelmingly support Class Counsel's fee request.  This case demanded far more of counsel than the typical litigation activities associated with class action or environmental litigation.  The length and difficulty of this case were extraordinary.

As summarized above, and as discussed in greater detail in the attached Davidoff Declaration, each stage of this litigation was bitterly and strenuously contested.  Major case milestones such as dispositive motions, class certification, *Daubert* motions, and appeals were litigated two, three, or more times.  Class Counsel also faced the challenge of obtaining the necessary documents and information from recalcitrant Defendants and the then-current Rocky Flats plant management, as well as Defendants' indemnitor, the Department of Energy, which set up every obstacle possible, up to and including being held in contempt and then withholding information under its unreviewable classification powers.  Davidoff Decl. ¶¶ 12-53.  Class Counsel prosecuted this case through a four-month jury trial, years of post-trial proceedings, two appeals, and two remands back to this Court.  *Id.* ¶¶ 143-230.  The case docket spans over 2,400 entries in this Court alone.  The parties collectively served 67 expert reports, *id.* ¶¶ 60, 62, 64-65;

conducted 151 lay witness and 46 expert witness depositions, *id*. ¶¶ 29, 31, 68-69; and produced and reviewed approximately a thousand boxes of documents, *id*. ¶¶ 25, 58.  The trial lasted four months and the jury heard testimony from 41 witnesses.  *Id*. ¶ 162.  The case generated fifteen published opinions in this Court and two published opinions by the Tenth Circuit.  As this Court remarked, this case has generated "what is quite possibly the largest docket of any District of Colorado case to date."  Order Certifying Settlement Class, Doc. 2396, at 8 (May 19, 2016).

It is also fair to say that a raft of novel and unsettled legal issues necessitated considerable briefing, argument, and evidentiary work.  Cases alleging nuclear torts (whether under the Price-Anderson Act or state law) are not common, and the law in this area evolved considerably over the course of this litigation – as exemplified by *Cook Appeal I*'s surprise embrace of a brand new PAA element never raised in the District Court.  This change necessitated Class Counsel's successful "judicial jiu jitsu", *Cook Appeal II*, 790 F.3d at 1091.  Davidoff Decl. ¶¶ 207, 221-225.  During the pretrial phase, Class Counsel argued a number of unsettled issues of Colorado tort law, including whether radioactive plutonium particles should be considered a tangible or an intangible trespass, and whether ongoing contamination or the threat of future contamination constituted a continuing nuisance.  *Id*. ¶¶ 109, 112, 131.  Counsel's reliance on the Restatement (Second) of Torts § 930 in order to claim damages for the ongoing contamination of properties in the Class Area was a pioneering use of the continuing tort doctrine in the context of environmental contamination.  *Id*. ¶¶ 112, 131-133.  Class Counsel worked with the Court to develop an innovative, feasible way to segregate common class claims in order to proceed with a class-wide trial.  *Id*. ¶¶ 106-133.  And Class Counsel encountered numerous other changes in the law along the way, including those leading to the decertification of the medical monitoring class, *id*. ¶¶ 76, 81, and Supreme Court decisions over the past 27

years pertaining to class certification that Defendants cited in their numerous attempts to decertify the Class.

The ultimate recovery for the Class is all the more impressive in light of the countless risks and pitfalls that Class Counsel had to manage and overcome in order to achieve the outstanding $375 settlement for the Class, which was reached after trial, after two appeals to the Tenth Circuit, and after two rounds of Supreme Court *certiorari* petition briefing.  *See Allapattah*, 454 F. Supp. 2d at 1193 ("The most apparent feature distinguishing this class action from virtually every other class action in the reported federal decisions is obviously that it did not settle before trial."); *In re Apollo Grp. Inc. Sec. Litig.*, No. 04-cv-2147-PHX, 2012 WL 1378677, at *7 (D. Ariz. Apr. 20, 2012) (granting fee request of 33.33% where Class Counsel pursued the case for seven years, through trial and one appeal).[10]  Given the complexities of the case, the duration of this litigation, and the skill, time, and experience required to navigate the issues, this factor strongly supports the requested fee.

C.      The Skill, Experience, and Reputation of Class Counsel

Class Counsel litigated this case aggressively and at the highest level on behalf of the Class for 27 years.  Defendants were large, sophisticated corporations represented by skilled, nationally-respected trial and appellate attorneys with practically unlimited resources at their

---

[10] *See also In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-md-1468-JWL, 2011 WL 1808038, at *2 (D. Kan. May 12, 2011) ("The Court finds that such an award, of one-third of the total amount of the judgment fund paid by AT & T, represents a reasonable and appropriate fee in this case, in light of the following factors present here: counsel devoted significant time[3] and labor to a complex case, over a period of more than eight years, involving extensive pretrial motion practice and briefing, trial, posttrial motions, and an appeal") (footnote omitted).

disposal.  Davidoff Decl. ¶¶ 4, 163.  Class Counsel was able to recover $375 million for the Class despite the Defendants, DOE, and their lawyers, which further supports this fee request.[11]

By qualifications and experience, the *Cook* team was impressive.  Lead Counsel Berger & Montague, P.C. (*see* Order Certifying Settlement Class, Doc. 2396, at ¶ 9) are among the most experienced class-action litigators in the country.[12]  Founded over 45 years ago as one of the nation's first class action specialty firms, Berger & Montague has a long and storied track record of success, including other historic environmental cases such as the *Exxon Valdez Oil Spill* litigation, the *In re Louisville Explosions Litigation*, the *Three Mile Island* litigation, and the *School Asbestos Litigation*.  Today Berger & Montague engages primarily (more than 90%) in complex litigation on the plaintiffs' side in the areas of antitrust, securities, insurance, consumer fraud, environmental, and employment law.  The firm also handles complex financial litigation and represents relators in qui tam cases and 401(K) plan participants in cases alleging imprudent investments in company stock.  Berger & Montague expended 121,258.33 hours on this case, which represents 75.61 percent of all hours of all Plaintiffs' counsel combined.  Davidoff Decl. ¶¶ 3, 253 & Table 1.  And Berger & Montague also shouldered the vast bulk of the out-of-pocket

---

[11] *See Brown*, 838 F.2d at 455 ("quality of opposing counsel" supports fee application); *Smith v. Krispy Kreme Doughnut Corp.*, No. 05-cv-00187, 2007 WL 119157, at *2 (M.D.N.C. Jan. 10, 2007) ("Additional skill is required when the opponent is a sophisticated corporation with sophisticated counsel."); *Schwartz v. TXU Corp.*, No. 02-cv-2243, 2005 WL 3148350, at *29-30 (N.D. Tex. Nov. 8, 2005) ("The standing of opposing counsel should be weighed in determining the fee, because such standing reflects the challenge faced by plaintiffs' attorneys.  The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation.") (internal citation omitted).

[12] *See* Ex. 13 (Berger & Montague, P.C. resume).  Berger & Montague devoted its best attorneys to this case, including the late and highly-respected Peter Nordberg, as well as David F. Sorensen and Eric. L. Cramer, both now managing shareholders on the firm's Executive Committee, and Merrill G. Davidoff, now firm Chairman.  Davidoff Decl. ¶ 3 n.2.

financial burden, expending $5,720,704.75 or 80.63 percent of all costs and expenses for which reimbursement is being sought. *Id.*

Plaintiffs were also represented by the law firms of Silver & Deboskey, P.C. and Waite, Schneider, Bayless & Chesley Co., L.P.A.[13]  Silver & DeBoskey is a Denver law firm with more than 35 years of experience litigating on behalf of clients ranging from individuals to Fortune 500 companies, including experience in environmental law.  Markovits, Stock & DeMarco, LLC is a boutique law firm that represents businesses, classes, and individuals in federal and state courts across the nation, and includes experienced trial lawyer Louise Roselle, now at the Markovits firm and formerly of WSBC.  Ms. Roselle was co-trial counsel and presented part of both the opening and closing statements, in addition to presenting and cross-examining many witnesses.  *See* Coates Decl. at ¶ 2; Goering Decl. at ¶¶ 1-2.  Other counsel also participated and contributed to this remarkable result.  *See* Davidoff Decl. ¶ 253 & Table 1.

The well-regarded Public Justice Foundation[14] has recognized Class Counsel's exemplary work in this difficult case by naming the Rocky Flats trial team their 2009 Trial Lawyers of the Year.  *Id.* ¶ 178.

Berger & Montague, P.C., along with Silver & Deboskey, P.C., Markovits, and Stock & De Marco, LLC, and Holland & Hart LLP (a well-respected Denver commercial litigation firm), drafted the first round of Tenth Circuit appellate briefs.  Berger & Montague took the lead on

---

[13] Waite, Schneider represented Plaintiffs until August 2012, and then the attorneys who served as Class Counsel from Waite, Schneider joined Markovits, Stock & De Marco, LLC.  *See* Coates Decl. at ¶ 2; Goering Decl. at ¶¶ 1-2.

[14] The Public Justice Foundation is a not-for-profit, 501(c)(3) charitable membership organization that supports Public Justice's cutting-edge litigation and educates the public about the critical issues it addresses. The Public Justice Foundation's membership includes leading trial lawyers, appellate lawyers, consumer advocates, environmental attorneys, employment lawyers, civil rights attorneys, class action specialists, law professors, law students, public interest advocates, and other people who care about justice.  *See* http://www.publicjustice.net/.

both the first and second round of Tenth Circuit briefing.  The Supreme Court *certiorari* petition work was led by nationally recognized appellate lawyer Jeffrey Lamken, a former Assistant to the United States Solicitor General, and his colleagues at the MoloLamken firm, one of an elite handful of firms nationwide that specializes in litigation before the United States Supreme Court, with significant assistance from and involvement by attorneys from Berger & Montague, P.C., Silver & Deboskey, P.C., and Markovits, and Stock & De Marco, LLC.[15]

In short, Class Counsel's qualifications, experience, and quality of work throughout the case support the requested forty percent fee award.  More importantly, the $375 million settlement amount – despite *Cook Appeal I* – speaks for itself and provides the best metric for evaluating Class Counsel's skill and advocacy on behalf of the Class.  *See In re Copley Pharm., Inc.*, 1 F. Supp. 2d 1407, 1414 (D. Wyo. 1998) ("While it is beyond dispute that class counsel are among the nation's most experienced, reputable, and skilled plaintiff's attorneys, class counsel's skill is further demonstrated by the result achieved.").

### D.        Preclusion of Other Employment

Class Counsel have handled this matter for 27 years, decades longer than most class actions.  Owing to the substantial demands and long duration of the case, they also have necessarily forgone numerous other litigation opportunities.  *See* Silver Decl. ¶ 74.  This factor likewise supports the requested fee award.  *See Brown*, 838 F.2d at 455 (granting fee application and emphasizing that substantial work on the litigation "precluded or reduced their opportunity for other employment"); *Allapattah*, 454 F. Supp. 2d at 1209 ("Taking on this resource-sapping, risk-based venture also precluded Class Counsel from accepting other contingent matters during the period of representation.").

---

[15] For more information about MoloLamken's practice, *see* http://www.mololamken.com.

### E.    The Customary Contingent Fee

To compensate counsel for the risks and delay inherent in contingent class actions, and to ensure vigorous enforcement, attorney's fees should reflect, at a minimum, what is typically agreed to by clients and attorneys.  "[A] district court should consider the rate [a] reasonable, paying client would pay, and use that rate to calculate the presumptively reasonable fee."  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany and Albany Cty. Bd. of Elections,* 522 F.3d 182, 193 (2d Cir. 2007).  *See also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."); Silver Decl. ¶ 28; *see also id.* ¶¶ 20-37.

A forty percent (40%) fee from the settlement fund is appropriate, and consistent with what is typically agreed to by clients and attorneys.  "In non-class contingency fee litigation, a 30% to 40% contingency fee is typical."  *Montague v. Dixie Nat. Life Ins. Co.*, CIV.A. 3:09-00687, 2011 WL 3626541, at *2-3 (D.S.C. Aug. 17, 2011).  *See also Cimarron Pipeline Const., Inc. v. Nat'l Council on Comp. Ins.*, Nos. 89-cv-822, 89-1186, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993) ("Fees in the range of 30-40% of any amount recovered are common in complex and other cases taken on a contingent fee basis."); *In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-cv-0085, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation."); *Flournoy v. Honeywell Int'l, Inc.*, No. 05-cv-184, 2007 WL 1087279, at *2 (S.D. Ga. Apr. 6, 2007) ("Forty percent fee contracts are common for complex and difficult litigation. . . .").

Contingent-fee litigation is risky in general, and particularly so in matters like this one, which is why courts in the Tenth Circuit and elsewhere view the uncertainty of contingent

28

litigation—and the risk of non-payment and delay in receiving any payment—as supporting the requested fee award.  *See, e.g. In re Stanley v. U.S. Steel Co.,* No. 04-cv-74654, 2009 WL 4646647, at *3 (E.D. Mich. Dec. 8, 2009) ("A contingency fee arrangement often justifies an increase in the award of attorneys' fees[.]") (internal quotations, citation omitted); *Lucas v. Kmart Corp.*, No. 99-cv-01923-JLK, 2006 WL 2729260, at *6 (D. Colo. July 27, 2006) ("Given the risk of non-recovery, this factor weighs heavily in favor of the requested fee.") (citation omitted); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 587 (3d Cir. 1984) (noting that courts should adjust "the lodestar amount for (1) the risk of lack of success inherent in the lawsuit, and (2) the time value of compensation long delayed.").[16]

Class Counsel accepted this case on a completely contingent basis.  If the case had failed, they would have received nothing, no matter how many years, hours and millions of dollars had been expended.  At each stage, Class Counsel's investment of time and expense has been at their

---

[16] *See also Knight v. Red Door Salons, Inc.,* No. 08-cv-01520, 2009 WL 248367, at *6 (N.D. Cal. Feb. 2, 2009) ("This substantial outlay [of time and expenses], when there was a risk that none of it would be recovered, further supports the award of the requested fees."); *Perez v. Asurion Corp.*, No. 06-cv-20734, 2007 WL 2591180, at *4 (S.D. Fla. Aug. 8, 2007) ("Class Counsel prosecuted this class action on a purely contingent basis, thereby assuming the risk of non-payment for a considerable amount of work over an extended period of time.  Thus, the contingency risk in this case was substantial."); *Allapattah,* 454 F. Supp. 2d at 1215 (finding this factor weighs "heavily in favor of" granting the requested fee); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988) (if a "'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing"); *Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988) (noting that "where there is a delay [in payment] the court should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than historic rates."); *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1305 (9th Cir. 1994) (holding that the lower court's failure to increase fees for certain attorneys "inadequately compensate the firm for the delay in receiving its fees"); *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 739-40 (9th Cir. 2016) (holding that lower court's failure to apply two modifiers to the adjusted lodestar—namely, compensation for delay in payment and the risk of litigation—was an abuse of discretion); *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C. Cir. 1980) ("The delay in receipt of payment for services rendered is an additional factor that may be incorporated into a contingency adjustment."); *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 880 (11th Cir. 1990) ("Lodestar rates may be enhanced based on risk of non-recovery, excellent or exceptional results, or delay in receipt of payment.").

own risk, with recovery dependent on success.  Given the considerable risk, with no guarantee of recovery, the legal team should be compensated for their efforts in securing excellent results for the Class.

**F.      Awards in Similar Cases**

As the preceding history of the case shows, this was a one-of-a-kind litigation in light of the work done, risks surmounted, duration (27 years), and results for the Class—making it difficult to offer a comparison to fee awards in "similar" matters.  Nevertheless, forty percent of the settlement fund is reasonable and justified by extensive Rule 23 authority.

The court in *In re Melridge, Inc. Sec. Litig.*, CV 87-1426-FR, Doc. 2419 (D. Or. Apr. 15, 1996) awarded a 40% fee plus expenses, citing the "eight years of intense litigation," a jury trial, and one round of briefing and argument before the court of appeals, "which produced one of the most voluminous case files in the history of this District."  *Id.* at 2.  Mr. Davidoff was lead counsel in the *Melridge* case.  This case has lasted more than three times as long and went through two appeals.  Other cases that were far less eventful have warranted fees approaching 40%.  *See, e.g. Whittington v. Taco Bell of Am., Inc.*, No. 10-cv-01884-KMT, 2013 WL 6022972, at *6 (D. Colo. Nov. 13, 2013) (approving fee award in FLSA action with $2.49 million settlement reached after three years of litigation, during discovery: "Together the fees and costs amount to approximately 39% of the fund as a whole. This is within the normal range for a contingent fee award."); *Vaszlavik v. Storage Tech. Corp.*, No. 95–B–2525, 2000 WL 1268824, *4 (D. Colo. Mar. 9, 2000) (noting a "30% common fund fee award is in the middle of the ordinary 20%-50% range and is presumptively reasonable"; awarding 30% fee plus costs in a class action that settled prior to the court ruling on summary judgment and was litigated for four years); *Williams v. Sprint/United Mgmt. Co.*, No. 03-cv-2200-JWL, 2007 WL 2694029, at *6 (D. Kan. Sept. 11, 2007) (awarding 35% of $57 million common fund; case settled before trial after

four years of litigation); *Lewis v. Wal-Mart Stores, Inc.*, No. 02-cv-0944-CVE, 2006 WL 3505851, at *1 (N.D. Okla. Dec. 4, 2006) (awarding one-third of the settlement fund in case settling after less than four years and before trial, where counsel estimated they had spent over 4,000 hours on the case); *Cimarron Pipeline Const., Inc. v. Nat'l Council on Comp. Ins.*, No. 89-cv-822-RGT, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993) (awarding one-third fee where settlement reached before trial).[17]

The requested forty percent fee is also reasonable and consistent with precedent in so-called "megafund" cases, which are among the most complex and risky matters.  Where, as here, class counsel achieved superior results in the face of extreme risk, courts have not hesitated to award fees of 30% or more from nine-figure recoveries and, indeed, courts have rejected arguments that percentage fees should be reduced in large-recovery cases because doing so would be "antithetical to the percentage of the recovery method . . . the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained."  *Allapattah*, 454 F. Supp. 2d at 1213 (awarding 31.33% fee from $1.06 billion settlement).  *See also In re: Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *6 (D. Kan. July 29, 2016) (awarding 33.33% fee and citing *Allapattah*: "class counsel achieved extraordinary success in a very long litigation.  Thus, use of a declining-scale approach is not

---

[17] *See also Moore v. United States*, 63 Fed. Cl. 781, 787 (Fed. Cl. 2005) ("one-third is a typical recovery"); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 748-52 (E.D. Pa. 2013) ("in the last two-and-a-half years, courts in eight direct purchaser antitrust actions approved one-third fees"); *Universal Service Fund*, 2011 WL 1808038, at *2 ("an award of one-third of the fund falls within the range of awards deemed reasonable by courts") (citation omitted); *Shaw*, 2015 WL 1867861, at *6 ("The customary fee awarded to class counsel in a common fund settlement is approximately one third of the total economic benefit bestowed on the class.") (citation omitted); *In re United Telecommc'ns Sec. Litig.*, No. 90-cv2251, 1994 WL 326007, at *3 (D. Kan. June 1, 1994) (awarding 33.3% of settlement fund); *Klein v. PDG Remediation, Inc.*, No. 95-cv-4954, 1999 WL 38179, at *4 (S.D.N.Y. Jan. 28, 1999) ("33% of the settlement fund . . . is within the range of reasonable attorney fees awarded in the Second Circuit").

appropriate here, and the Court will award fees based on the unique circumstances of the case."); Silver Decl. ¶¶ 68-72.[18]

Few cases last 27 years and involve a four-month trial, two separate appeals, two separate rounds of Supreme Court *certiorari* briefing, and the unique legal challenges of this case. *See* Silver Decl. ¶ 47; *see also id.* ¶¶ 47, 78-80. The requested fee is well supported.

### G. Lodestar Cross-Check

Courts sometimes use a lodestar "cross-check" analysis to confirm the reasonableness of a requested common fund fee award. *See* Manual for Complex Litigation, Fourth §21.724; *Newberg on Class Actions* § 15:85 (5th ed. 2015). The cross-check involves calculating class counsel's total lodestar and applying a case-specific "multiplier" to account for risk, outcome,

---

[18] *See also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302-03 (3d Cir. 2005) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund"); *In re TFT-LCD [Direct Purchaser] Antitrust Litig.*, No. 07-md-01827, 2011 WL 7575003, at *1 (N.D. Cal. Dec. 27, 2011) (30% fee from $405 million fund in case that settled before trial and was assisted by numerous guilty pleas); *In re TFT-LCD [Indirect Purchaser] Antitrust Litig.*, 2013 WL 1365900, at *8 & n.11 (N.D. Cal. Apr. 3, 2013) (30% fee to all counsel including state attorneys from $1.08 billion fund in case that settled before trial and was assisted by numerous guilty pleas); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (30% fee from $410 million fund in case that settled before class certification, with court explaining that "courts nationwide have repeatedly awarded fees of 30 percent or higher in so-called 'megafund' settlements"); *Dahl v. Bain Capital Partners, LLC*, No. 1:07-cv-12388, Doc. Nos. 1051 and 1095 (D. Mass. Feb. 2, 2015) (33% fee from $590.5 million fund in antitrust case that settled before class certification); *In re Vitamins Antitrust Litig.*, No. 99-md-197, 2001 WL 34312839, at *10-14 (D.D.C. July 16, 2001) (34% fee from $359 million fund in antitrust cartel case that settled before trial and was assisted by criminal prosecutions and guilty pleas); *In re Initial Pub. Off. Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (one-third fee from $510 million fund in case that settled before trial); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, Doc. No. 543, at *17 (D. Del. 2009) (one-third fee from $250 million fund in case that settled before verdict); *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 07-md-1894, Doc. No. 521 (D. Conn. 2014) (one-third fee from $297 million fund in case that settled before summary judgment); *Standard Iron Works v. ArcelorMittal*, No. 08-cv-5214, Doc. No. 539, at ¶¶ 2-8 (N.D. Ill. 2014) (33% fee from $163.9 million fund in case that settled before class certification); *In re Titanium Dioxide Antitrust Litig.*, 10–cv–00318, 2013 WL 6577029, *1 (D. Md. Dec. 13, 2013) (one-third fee from $163.5 million fund in case that settled before trial); *Southeastern Milk*, 2013 WL 2155387, *8 (one-third fee from $158.6 million fund in case that settled before trial); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09-cv-07666, Doc. Nos. 693, 697, 697-1 and 701 (N.D. Ill. 2014) (one-third fee from $128 million fund in case that settled before class certification).

quality of work, and other case-specific factors.  *Id.  See also Rite Aid*, 396 F.3d at 305-06 (explaining the cross-check method and emphasizing that it requires "neither mathematical precision nor bean-counting").

Typical multipliers range from one to four depending on the facts, with many courts awarding multipliers larger than four on case-specific grounds.  *See, e.g.*, *Vizcaino*, 290 F.3d at 1050-51 & n.6 (awarding 3.65 multiplier from $96.9 million settlement fund, and noting standard 1-4 multiplier range); *Newberg on Class Actions* § 14.6 (4th ed. 2009) ("multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied"); *In re Enron Corp.*, 586 F. Supp. 2d 732, 799-803 (S.D. Tex. 2008) (approving 5.2 multiplier and $688 million fee award, and collecting similar cases); *Urethane*, 2016 WL 4060156, at *7 (approving a fee yielding a multiplier of approximately 3.2, and noting that a multiplier of up to 4 or 5 "would fall within the range of multipliers accepted by a number [of] courts in megafund cases."); Silver Decl. ¶¶ 75-77.

The Court can evaluate Class Counsel's work by comparing the lodestar for litigating this case for 27 years to the total fees requested using (1) the total lodestar from the beginning of the case to the end; and (2) the total requested fee:

  1)    Since the case began in 1990, Class Counsel have devoted 160,381 hours to representing the Class.[19]  *See* Davidoff Decl. ¶¶ 3, 253 & Table 1.  Based on current hourly rates—which is the appropriate metric in a protracted case such as this one[20]—the total lodestar from inception to March 31, 2016 is $62,134,107.05.

---

[19] This does not include any time spent on this motion for fees, reimbursement of expenses, and service awards for the Class Representatives.

[20] Use of current billing rates is appropriate to account for the delay of payment when a case is protracted (as distinct from the risk of loss, quality of work, and results obtained, which are compensated by the "multiplier").  *See Smith v. Vill. of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994) (ordering lower court to compensate for delay in payment of attorneys' fees using either "current rates or past rates with interest") ("Judgment should have been entered within a reasonable period of time using either the attorney's 1988 rate or a past rate with interest to compensate for the delay until the time of payment."); *Enron*, 586 F. Supp. 2d at 779; *see also Vizcaino*, 290 F.3d at 1050-51 (awarding 3.65 multiplier based on

2)      The requested fee from the settlement fund is $150 million (40% of $375 million).

Using the total case lodestar as a cross-check, the fee requested from the settlement yields an aggregate multiplier of 2.41 at current hourly rates (calculated by dividing $150 million in total requested fees by the $62,134,107.05 lodestar figure).  This method provides an accurate picture of the fee request in the context of the work performed and success achieved over the life of the case.

The requested multiplier is fair and reasonable under the circumstances.  A multiplier of 2.41 at current rates is appropriate for all the case-specific reasons explained at length above, including the work done, risks surmounted, extremely long delay, the quality of Class Counsel's representation, and the results secured over 27 years of highly complex litigation.  *See Newberg on Class Actions* §15:87 (5th ed. 2015) (substantial multiplier is appropriate where case was risky, time-consuming, involved wrongdoing uncovered by counsel in the first instance, and delivered exceptional results).  This multiplier is much lower than the multipliers approved in other cases that did not involve 27 years of litigation, a four-month trial, extensive pretrial and post-trial briefing, two separate rounds of appeals briefing and decision in the Tenth Circuit, and two rounds of *certiorari* petition briefing at the Supreme Court.[21]

---

current rates); *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. 08-cv-397, 2013 WL 5505744, at *33 n.28 (D.N.J. Oct. 1, 2013), *appeal dismissed* (Apr. 17, 2014); *In re Rent–Way Sec. Litig.*, 305 F. Supp. 2d 491, 517 n. 10 (W.D. Pa. 2003); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 195 (E.D. Pa. 2000).  Where an attorney ceased to work for the firms involved, the attorney's last billing rate at the firm was used.

[21] *See Newberg* § 15:87; *Enron*, 586 F. Supp. 2d at 799-803 (5.2 multiplier and $688 million fee award justified by "the unmatched size of the recovery, the obstacles and risks . . . and the skill and commitment exhibited by counsel") (collecting similar cases); *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-02476, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) ($253.8 million fee and multiplier "just over 6" in case that settled *before* class certification); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, slip op., at *16-17 (D. Del. Apr. 23, 2009) (Doc. No. 543) (Order and Final Judgment Approving Settlement, Awarding Attorneys' Fees and Expenses, Awarding Representative Plaintiff

For all of the reasons explained above, the Court should grant Class Counsel's requested fee of forty percent of the settlement fund.[22]  This fee is well within the range of awards in other

---

Incentive Awards, Approving Plan of Allocation, and Ordering Dismissal as to All Defendants) (one-third fee and 3.93 multiplier from $250 million fund; settled during trial); *Flonase*, 951 F. Supp. 2d at 750-51 (one-third fee and 2.99 multiplier from $150 million fund, explaining that one to four is the standard multiplier range).

[22] We request that the Court authorize Lead Counsel (Berger & Montague, P.C.) to allocate the total fees awarded between and among Class Counsel in a manner that, in the opinion of Lead Counsel (Berger & Montague), fairly compensates each firm in view of its contribution to the prosecution of Plaintiffs' claims.  *See* [Proposed] Order Awarding Attorneys' Fees filed herewith, at ¶ 9; *In re Hypodermic Prods. Antitrust Litig.,* No. 05-cv-1602, Doc. No. 461, ¶ 14 (D.N.J. Apr. 10, 2013) ("Direct Purchaser Plaintiffs' Lead Class Counsel shall allocate the fees and expenses among all of the Direct Purchaser Plaintiffs' counsel."); *In re Metoprolol Succinate Antitrust Litig.*, No. 06-00052, Doc. No. 194, at 9 (D. Del. Feb. 21, 2012) ("Lead Counsel shall allocate the fees and expenses among all of the Class Counsel."); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, Doc. No. 543 at 17 (D. Del. 2009) ("Lead Counsel shall allocate the fees and expenses among all of the Class Counsel"); *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 07-md-1894, Doc. No. 521, at ¶ 15 (D. Conn. 2014) ("Lead Class Counsel shall allocate the fees and expenses among all of the Class Counsel."); *In re StockerYale, Inc. Sec. Litig.*, No. 1:05CV00177-SM, 2007 WL 4589772, at *6 (D.N.H. Dec. 18, 2007) ("The award of attorneys' fees shall be allocated among Plaintiffs' Counsel in a fashion which, in the opinion and sole discretion of Lead Plaintiffs' Counsel, fairly compensates Plaintiffs' Counsel for their respective contributions to the prosecution of the Action."); *In re Qwest Sav. & Inv. Plan Erisa Litig.*, No. CIVA02CV00464-REBPAC, 2007 WL 295545, at *2 (D. Colo. Jan. 29, 2007) ("Lead Counsel shall allocate the award of attorney fees among Plaintiffs' Counsel in the manner in which they, in their sole discretion, believe reflects the contributions of such counsel to the prosecution of this Litigation."); *In re Auto. Refinishing Paint Antitrust Litig.*, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008) ("Courts generally approve joint fee applications which request a single aggregate fee award with allocations to specific firms to be determined by Co-Lead Counsel, who are most familiar with the work done by each firm and each firm's overall contribution to the litigation."); *Universal Serv. Fund*, 2011 WL 1808038, at *3 ("Co-Lead Counsel for plaintiffs shall determine the uses and distribution of the fee award in their good faith best judgment."); *In re Urethane Antitrust Litig.*, MDL No. 1616, Doc. No. 3276, at ¶ 4 (D. Kan. Jul. 29, 2016) ("The award of attorneys' fees shall be allocated among plaintiffs' counsel by agreement among Co-Lead Counsel in a manner that, in Co-Lead Counsel's good-faith judgment, reflects each plaintiffs' counsel's contribution to the institution, prosecution and resolution of the litigation against Defendants."); *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-02237, Doc. No. 113, ¶ 17 (S.D.N.Y. Nov. 28, 2011) ("Co-Lead Counsel shall allocate the fees and expenses among all of the Class Counsel"); *Mylan Pharms. Inc., et al. v. Warner Chilcott Pub. Ltd. Co., et al.*, No. 12-3824, Doc. No. 665, at 14 (E.D. Pa. Sept. 15, 2014) ("Co-Lead Counsel shall allocate the fees among Class Counsel."); *Meijer, Inc., et al. v. Abbott Labs.*, No. 07-5985, Doc. No. 514, at ¶ 11 (N.D. Cal. Aug. 11, 2011) ("The award of Attorneys' Fees and Expenses shall be allocated among Class Counsel in a fashion which, in the opinion of Co-Lead Counsel, fairly compensates Class Counsel for their respective contributions in the prosecution of this Action."); *Standard Iron Works v. ArcelorMittal*, No. 08-cv-5214, Doc. No. 539, at ¶ 9 (N.D. Ill. 2014) (33% fee from $163.9 million fund in case that settled before class certification) ("The Court directs that Co-Lead Counsel allocate the fee award among co-counsel in a reasonable manner consistent with Co-Lead Counsel's assessment of each firm's contribution to the prosecution of the case."); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09-cv-07666, Doc. Nos. 693, ¶ 7(d) (N.D. Ill. 2014)

cases – all or nearly all of which were decades shorter than this litigation.  In addition, the *Johnson* factors support the grant of a forty percent fee here, which is fair and reasonable compensation for Class Counsel's outstanding and tireless work for 27 years on behalf of the Class.

### III.  THE COURT SHOULD AWARD REIMBURSEMENT OF CLASS COUNSEL'S REASONABLE AND NECESSARY LITIGATION EXPENSES

Class Counsel respectfully request that the Court also award reimbursement of reasonable costs and expenses incurred.  Courts routinely award class counsel normal and reasonable out-of-pocket costs such as "computer research, investigation, and experts/consultants."  *In re Crocs, Inc. Sec. Litig.*, No. 07-cv-02351-PAB, 2014 WL 4670886, at *5 (D. Colo. Sept. 18, 2014).[23] The Settlement Agreement expressly authorizes payment to counsel of expenses from the Settlement Fund, subject to Court approval.[24]

---

("The attorneys' fees and expenses shall be allocated amongst Plaintiffs' Counsel by Class Counsel Richard A. Koffman and Charles E. Tompkins in a manner which, in Class Counsel's good-faith judgment, accurately reflects each of such Plaintiffs' Counsel's contributions to the establishment, prosecution, and resolution of this litigation.").  Here, Berger & Montague is Lead Counsel, has directed this case from its inception, and has expended, by far, the most time and money to the case.  *See* Davidoff Decl. ¶¶ 1, 3, 253 & Table 1.

The proposed orders provide that no payment shall be made to Waite, Schneider, Bayless & Chesley Co., L.P.A. until such time as either (a) all relevant parties consent in writing; or (b) there is a final judicial adjudication as to the appropriate legal entity or entities to which such payment shall be directed.  It further provides that any issue relating to payment to Waite, Schneider, Bayless & Chesley Co., L.P.A., including as to the appropriate legal entity or entities to receive such payment, shall not affect or delay Lead Counsel's authority or ability to distribute attorneys' fees or expenses to any other firm.

[23] *See also Brown v. Pro Football, Inc.*, 839 F. Supp. 905, 916 (D.D.C. 1993) ("Plaintiffs' out-of-pocket costs for telephone, telecopier, air and local couriers, postage, photocopying, Westlaw research, secretarial overtime, and counsels' travel expenses are routinely billed to fee-paying clients, and thus are all compensable as part of a reasonable attorney's fee") (citations omitted); *see also Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 344 (W.D. Pa. 1997) (awarding costs for "copying expenses, travel and lodging expenses, telephone and telecopy expenses and other litigation expenses").

[24] *See* Ex. 14, Settlement Agreement ¶ 2.  *See also* Ex. 16, Notice of Settlement, at Question 10.

Class Counsel have incurred reasonable costs and expenses totaling $7,094,863.65. *See* Davidoff Decl. ¶¶ 3, 253 & Table 1. These unreimbursed expenses include items typically billed to fee-paying clients, such as expert costs, jury consultant and mock trial costs, document repository rent, document management, travel, photocopying, overnight mail, deposition services and transcripts, long-distance telephone, and electronic research, among others. *Id.* All of these reasonable costs and expenses were directly related and necessary to Class Counsel's efforts to litigate this matter and to achieve the best possible result for the Class. *See* Davidoff Decl. ¶¶ 257-259; Kelly Decl. ¶ 6; Coates Decl. ¶ 5; Goering Decl. ¶ 5; Chimicles Decl. ¶ 5; Lamken Decl. ¶ 8; Barrett Decl. ¶ 5; Glenn Decl. ¶ 5.[25]

Accordingly, the Court should award reimbursement of Class Counsel's reasonable expenses of $7,094,863.65.

## IV. THE REQUESTED SERVICE AWARDS TO THE CLASS REPRESENTATIVES ARE APPROPRIATE IN LIGHT OF THEIR UNWAVERING, 27-YEAR DEDICATION AND SACRIFICE ON BEHALF OF THE CLASS

"At the conclusion of a class action, the class representatives are eligible for a special payment in recognition of their service to the class." *Newberg on Class Actions* § 17:1 (5th ed. 2015). In the Tenth Circuit, "a class representative may be entitled to an award for personal risk incurred or additional effort and expertise provided for the benefit of the class." *UFCW Local 880-Retail Food Emp'rs Joint Pension Fund v. Newmont Min. Corp.*, 352 F. App'x 232, 235 (10th Cir. 2009) (internal quotation, citation omitted). *See also In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 263, 293 (D. Kan. 2010) ("Courts have found that incentive awards to class representatives are justified if necessary to induce individuals to become named

---

[25] Taylor & McNew, LLP (formerly Taylor, Gruver & McNew, P.A.) and Jacobsen Law Offices LLC are not seeking reimbursement of any expenses incurred in connection with this litigation. *See* McNew Decl. ¶ 5; Jacobsen Decl.; Davidoff Decl. ¶ 253 & Table 1.

representatives, or to compensate them for personal risk incurred or additional effort and expertise provided for the benefit of the class.").  In applying this standard, district courts in this Circuit have considered the following factors: "(1) the actions that the class representative took to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; and (3) the amount of time and effort the class representative expended in pursuing the litigation."  *Shaw*, 2015 WL 1867861, at *8.

The *Cook* Class Representatives have earned significant service awards for their arduous work on behalf of the Class, which was instrumental in achieving this historic result.  These plaintiffs – Merilyn Cook, Richard and Sally Bartlett, and William and Delores Schierkolk[26] – stepped forward in the first instance to obtain counsel and initiate this litigation, Davidoff Decl. ¶ 262, after which they devoted 27 years of attention to the case.  These five Class Representatives collectively sat for eight days of depositions, and responded to 331 document requests, 453 interrogatories, and 38 requests to admit.  *Id*. ¶¶ 267-268.  They assisted Class Counsel with their informal discovery efforts and served as supervisors and advisors to Class Counsel throughout this litigation.  *Id*. ¶¶ 26, 261-262, 264-265.  They regularly attended pretrial hearings and the 51 days of trial.  *Id*. ¶¶ 266.  One of the Class Representatives, Ms. Cook, worked to help save the case from an earlier threat.  In the late 1990s, the DOE pressed Congress for legislation that would have ended the case.  Ms. Cook, then living in Missouri, met with then-Senator John Ashcroft to lobby against the bill, which was not passed.  *Id*. ¶ 270.  The Class Representatives remained committed to the case even after the unexpected, heartbreaking reversal in the first Tenth Circuit appeal, and supported Class Counsel's last-ditch effort to rescue the nuisance law

---

[26] Sadly, three of the previous property class representatives – Lorren Babb, Gertrude Babb, and Delores Schierkolk – died before this settlement was reached.

judgment.  *Id.* ¶ 269.  And they gave their advice on, and ultimately approval of, the Settlement.  *Id.* ¶ 265.

Most importantly, the Class Representatives' decades-long commitment to the case conferred an outstanding benefit on the Class.  Without named plaintiffs willing to step forward and undertake the responsibilities summarized above, the $375 million class-wide recovery would not have been possible.[27]

Indeed, the total requested service award of $780,000 represents just 0.21% of the $375 million settlement fund, a small percentage when compared to service awards approved in other class actions where the class representatives were not required to oversee litigation for 27 years.[28]

---

[27] *See generally In re Revco Secs. Litig.*, No. 89-cv-593, 1992 WL 118800, at *7 (N.D. Oh. May 6, 1992) (awarding class representative $200,000 following $29,750,000 settlement); *In re Revco Secs. Litig.*, No. 89-cv-593, 1993 WL 497188, at *3-6 (N.D. Oh. Sep. 14, 1993) (awarding supplemental awards of $90,000 to class representative who previously received service award of $200,000); *In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-02509, 2015 WL 5158730, at *17-18 (N.D. Cal. Sept. 2, 2015) (awarding $100,000 to $140,000 to each of five class representatives following final approval of settlements amounting to $415 million); *Marchbanks Truck Serv. v. Comdata Network, Inc.*, No. 07–cv–1078, Doc. No. 713 at 2, 8 (E.D. Pa. July 14, 2014) (approving $130 million settlement of antitrust class action, including service award of $150,000 to one class representative and service awards of $75,000 to each of two other class representatives); *In re Neurontin Antitrust Litig.*, No. 02-cv-1830, Doc. No. 114 at ¶ 31 (D.N.J. Aug. 6, 2014) (approving $190 million settlement and granting awards of $100,000 to each class representative); *Titanium Dioxide*, 2013 WL 6577029, at *1 (awarding $125,000 to lead class representative out of $163.5 million settlement); *In re Urethane Antitrust Litig.*, MDL No. 1616, Doc. No. 3276, at ¶ 5 (D. Kan. Jul. 29, 2016) (awarding service awards of $150,000-200,000 to class representatives); *Ivax Corp. v. Aztec Peroxides, LLC*, No. 02-cv-00593, Doc. No. 78 at 2 (D.D.C. Aug. 24, 2005) (awarding service awards of $100,000 to each class representative in an antitrust price-fixing class action, to be paid out of the $21 million in settlement funds); *In Re Graphite Electrodes Antitrust Litig.*, No. 97-cv-04182, Doc. 315 (E.D. Pa. Sept. 8, 2003) (awarding three class representatives $80,000 each in connection with settlements reached prior to trial after awarding them $50,000 each in a prior order for a previous settlement).

[28] *See, e.g.*, *Tuten v. United Airlines, Inc.*, 41 F. Supp. 3d 1003, 1006 (D. Colo. 2014) (approving $15,000 award to class representative, which represented 0.24% of the $6.15 million settlement, in case litigated for less than two years); *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-cv-02237, Doc. No. 113 (S.D.N.Y. Nov. 28, 2011) (awarding service awards totaling $90,000, or .44% of the settlement amount of $20.25 million, in case lasting seven years); *Mylan Pharms. Inc., et al. v. Warner Chilcott Pub. Ltd. Co., et al.*, No. 12-cv-3824, Doc. No. 665 (E.D. Pa. Sept. 15, 2014) (awarding service awards totaling

In sum, the service awards are fair and reasonable in light of what the Class Representatives did and achieved on the Class's behalf during 27 years of litigation, through lengthy pretrial proceedings, a four-month trial, and 8 years of appellate proceedings.

## V.    CONCLUSION

For the foregoing reasons, Class Counsel respectfully request that the Court grant their petition, award the requested attorneys' fees and expenses, award the requested service awards to the named plaintiffs, and authorize Lead Counsel to distribute the attorneys' fees in a manner that, in their judgment, fairly compensates each firm in view of its contribution to the prosecution of the Class's claims.  Class Counsel has filed herewith Proposed Orders granting the requested relief.

---

$150,000, or 1.00% of the settlement amount of $15 million "in recognition of the work these Plaintiffs undertook in representing the Class" in case litigated for just over two years); *In re Hypodermic Prods. Antitrust Litig.,* No. 05-cv-1602, Doc. No. 461 (D.N.J. Apr. 10, 2013) (awarding service awards totaling $245,000, or .54% of the settlement amount of $45 million, for "assist[ing] in the prosecution of this case by, among other things, production of documents and electronic data, providing written discovery responses, supplying affidavits, and regular communication with Direct Purchaser Plaintiffs' counsel"); *Rochester Drug Co-Operative, Inc. v. Braintree Labs., Inc.,* No. 07-cv-00142, Doc No. 243 (D. Del. May 31, 2012) (awarding service awards totaling $180,000, or 1.04% of the settlement amount of $17.25 million in case litigated for five years); *In re Nifedipine Antitrust Litig.,* No. 03-mc-223, Doc. No. 333 (D.D.C. Jan. 31, 2011) (awarding service awards totaling $240,000, or .69% of the settlement amount of $35 million in an eight-year case); *Meijer, Inc., et al. v. Abbott Labs.,* No. 07-cv-5985, Doc. No. 514 (N.D. Cal. Aug. 11, 2011) (awarding service awards totaling $180,000, or .35% of the settlement amount of $52 million); *Meijer, Inc., et al. v. Barr Pharms., Inc.,* No. 05-cv-2195, Doc. No. 210 (D.D.C. Apr. 20, 2009) (awarding service awards totaling $250,000, or 1.14 % of the settlement amount of $22 million, in a four-year case); *In re Prandin Direct Purchaser Antitrust Litig.,* No. 10-cv-12141, Doc. No. 68 (E.D. Mich Jan. 20, 2015) (awarding service awards totaling $100,000, or .53 % of the settlement amount of $19 million, after five years of litigation); *In re Skelaxin (Metaxalone) Antitrust Litig.,* No. 12-md-2343, Doc. Nos. 722, 747 (E.D. Tenn. June 30, 2014) (awarding service awards totaling $250,000, or 0.34 % of the settlement amount of $73 million); *In re Metoprolol Succinate Antitrust Litig.,* No. 06-00052, Doc. Nos. 192, 194 (D. Del. Feb. 21, 2012) (awarding service awards totaling $150,000, or 0.75 % of the settlement amount of $20 million in a six-year case).  *See also* Eisenberg, Theodore and Miller, Geoffrey P., "Incentive Awards to Class Action Plaintiffs: An Empirical Study," 53 UCLA L. REV. 1303, at 1338-39 (2006) (analyzing service awards in cases from 1993-2002 and concluding that "[w]hen given, incentive awards constituted, on average, 0.16 percent of the class recovery").

Dated: January 12, 2017

Respectfully submitted,

*/s/ Merrill G. Davidoff*

Merrill G. Davidoff
David F. Sorensen
Jennifer MacNaughton
Caitlin G. Coslett
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

*Lead Counsel for the Class*

Gary B. Blum
Steven W. Kelly
SILVER & DeBOSKEY, P.C.
1801 York Street
Denver, CO 80206
(303) 399-3000

Louise M. Roselle
Paul M. De Marco
MARKOVITS, STOCK & DE MARCO, LLC
119 E. Court Street, Suite 530
Cincinnati, OH 45202
(513) 651-3700

*Attorneys for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 12th day of January, 2017, he caused the foregoing submission to be served via the Court's ECF system on all participating counsel.

*/s/ Merrill G. Davidoff*
Merrill G. Davidoff
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000