# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181-JLK

---

MERILYN COOK, *et al.*,

       Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

       Defendants.

---

## DECLARATION OF MERRILL G. DAVIDOFF IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE PAYMENTS TO CLASS REPRESENTATIVES

---

# TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................................................ 1

II.    **HISTORY OF THE LITIGATION** ................................................................ 3

    A.  **The Initial and Amended Complaints** ...................................................... 3

    B.  **First Wave of Motions to Dismiss and *Cook I* (Feb. 3, 1991)** ...................... 4

    C.  **Second Wave of Motion to Dismiss Briefing and *Cook II*** ........................ 5

    D.  **Fact Discovery** ...................................................................................... 6

        1.  **The Magistrate Judge's *Lone Pine* Order and *Cook III*** .................... 6

        2.  **Overview of Document Discovery and Interrogatories to Defendants and Third Parties** ..................................................................................... 8

        3.  **Depositions of Fact Witnesses** .............................................................. 11

        4.  ***Cook V* (Apr. 12, 1995)** ...................................................................... 24

        5.  **Counsel's Attempts to Obtain Important Information From DOE** ............ 25

        6.  **The Contempt Hearing and Sanctions; *Cook VI* (Nov. 13, 1995)** .......... 26

        7.  **Further Efforts to Obtain DOE's Compliance; *Cook VII* (Aug. 8, 1996)** ........... 27

        8.  **Class Counsel Obtain Security Clearances to Speed Up Declassification and Production of DOE Materials** ............................................................ 29

    E.  **Defendants' Discovery to Plaintiffs** ...................................................... 30

    F.  **Expert Discovery** .................................................................................. 31

    G.  **First Round of Class Certification and *Cook IV* (Oct. 8, 1993)** ................. 42

    H.  **Summary Judgment and *Daubert* Briefing; *Cook VIII* (July 29, 1998)** .............. 44

    I.  **First and Revised Class Notices** ............................................................ 47

    J.  **Rule 104(a) Hearing on Expert Testimony** .......................................... 48

    K.  **Further Discovery 1998-2000** ................................................................ 50

    L.  **Disputes Over Scope of Class Trial and Trial Plan; *Cook IX* (July 24, 2003)** ........... 50

    M.  **Jury Instructions Briefing** .................................................................... 55

    N.  **The Court Adopts the Restatement § 930 Approach to Statute of Limitations; *Cook X* (Dec. 17, 2004)** ................................................ 58

    O.  ***Daubert* Motions and Motions *in Limine*; *Cook XI* and *Cook XIII*** ............ 59

    P.  **Trial and Verdict** .................................................................................. 63

        1.  **Preparation and Presentation of Testimony and Evidence** .................. 63

        2.  **Proliferation of Motions Practice During Trial** .................................. 72

        3.  **Briefing on Defendants' "Bulldozer Theory"** ...................................... 73

    **4.   Defendants' Motion(s) for Judgment as a Matter of Law** ................................... 75

    **5.   The Verdict** ................................................................................................ 75

  **Q.  Post-Trial Briefing on Departure of Jury Member;** *Cook XII* .................................. 76

  **R.  Defendants' Renewed Motion for Judgment as a Matter of Law;** *Cook XIV* **(May 20, 2008)** ................................................................................................ 77

  **S.   First Tenth Circuit Appeal (***Cook Appeal I***, Sept. 3, 2010)** ............................................ 77

  **T.   Remand to District Court and** *Cook XV* **(as modified Feb. 27, 2014)** ........................ 82

  **U.  Second Tenth Circuit Appeal (***Cook Appeal II***, June 23, 2015)** ................................. 84

  **V.  Second Remand to District Court** ...................................................................... 88

**III.   MEDIATION ATTEMPTS AND THE SETTLEMENT** .............................................. 89

  **A.  Earlier Mediation Attempts** ............................................................................. 89

  **B.  The Settlement** .............................................................................................. 89

  **C.  Preliminary Approval of the Settlement** ............................................................ 89

  **D.  Notice to the Class** ........................................................................................ 91

  **E.  Summary of Attorneys' Fees and Unreimbursed Expenses** ........................................ 94

**IV.   THE EFFORTS OF THE CLASS REPRESENTATIVES ON BEHALF OF THE CLASS** ................................................................................................................. 100

**V.   CONCLUSION** ........................................................................................... 104

## I.   INTRODUCTION

1.       I, Merrill G. Davidoff, am a managing shareholder (recently appointed Chairman) at Berger & Montague, P.C., the Court-appointed Lead Counsel for the Settlement Class. I have been involved in this case from its inception and was lead trial counsel for Plaintiffs for the trial that began on October 6, 2005 and culminated in a jury verdict for the Plaintiffs on February 14, 2006. I respectfully submit this declaration in support of Class Counsel's application for:

     a.     An award of attorneys' fees totaling $150,000,000, which is equal to 40% of the $375 million Settlement Fund, plus a proportionate share of the interest on the Settlement Fund as it accrues;

     b.     Reimbursement of reasonable expenses totaling $7,094,863.65 that were necessarily incurred in the prosecution of the Class's claims against Defendants; and

     c.     Service payments totaling $780,000 to the Class Representatives to be apportioned as follows:  $260,000 for Merilyn Cook, $260,000 for Richard and Sally Bartlett, and $260,000 for William Schierkolk.[1]

2.       Berger & Montague has played a central, leading role in this litigation throughout its 27-year (and counting) history, from the pre-complaint investigation and filing of the first complaint in January 1990, through years of discovery battles with Defendants and their indemnitor, the United States Department of Energy ("DOE"), through waves and waves of Defendants' motion practice aimed at derailing or ending the case, through complicated and comprehensive expert discovery and analysis, through complex and contentious pretrial

---

[1] The service payments, attorneys' fees, and reimbursement of expenses are to be paid from the Settlement Fund only if and after the Settlement becomes final in accordance with paragraph 3(d) of the Settlement Agreement.

1

proceedings leading to a four-month jury trial, through two rounds of appeals to the Tenth Circuit and two rounds of *certiorari* petitions to the U.S. Supreme Court, and two rounds of remand proceedings, through months of intense settlement talks culminating in a path-breaking $375 million settlement signed in May 2016, and continuing since through designing and implementing a national campaign of class notice and claim filing. I am fully familiar with the history of this litigation from its inception.

3.      As discussed below, the law firms who represented the Plaintiffs in this case expended a combined 160,380.93 hours of work on this case on behalf of Plaintiffs and the Class (not including any time spent on this motion for award of attorneys' fees, reimbursement of litigation expenses, and award of service payments to class representatives).  Of this, my firm expended 121,258.33 hours, or 75.61% of the total.[2]  This total time translates into a total combined lodestar for all firms (calculated as total hours worked times either current hourly rates, or the last rate at the time the individual left the firm's employ, whichever is applicable) of $62,134,107.05.  The firms also expended a combined total of $7,094,863.65 in out of pocket costs to fund this extraordinarily complex and contentious case, after crediting $500,000 received from DOE (*see* Doc. Nos. 835, 847), all of which was used for litigation expenses.  Of this total, my firm expended $5,720,704.75, or 80.63% of the total.  Each firm's lodestar and expenses are set forth in Table 1 below.

4.      This time and these funds were expended without any promise or guarantee of success or repayment.  Defendants The Dow Chemical Company and Rockwell International Corporation were defended by some of the top defense firms in the country (Shea & Gardner for

---

[2] My firm devoted our best attorneys to this case, including the late and highly-respected Peter Nordberg, as well as David F. Sorensen and Eric. L. Cramer, both on the firm's Executive Committee.  In addition, I am now firm Chairman.

Rockwell; Kirkland & Ellis for Dow and later both Defendants).  As the history of the case demonstrates, the $375 million settlement was the result of dogged effort and persistence by Plaintiffs and Plaintiffs' counsel in the face of endless resistance. I also offer my opinion that it featured some of the most creative legal work by any plaintiffs' counsel in any case anywhere.

## II.   HISTORY OF THE LITIGATION

### A.  The Initial and Amended Complaints

5.      After a detailed investigation by counsel and with the important assistance of the representative Plaintiffs themselves, Plaintiffs filed their initial complaint on January 30, 1990, following the FBI's dawn raid of Rocky Flats on June 6, 1989 to investigate potential environmental crimes. The case was initially assigned to Judge Babcock. Plaintiffs alleged that Defendants were responsible for the release of radioactive plutonium and other hazardous substances into the surrounding environment, contaminating private property and jeopardizing people's health. Dow had managed Rocky Flats from 1951 to 1975; Rockwell from 1975 to 1989.  Both operated the Rocky Flats Plant under contracts with the DOE and its predecessors. Rocky Flats, located about 16 miles northwest of Denver, Colorado, made plutonium "pits" or triggers used in thermonuclear weapons. The complaint pled claims under Colorado tort law (alleging diversity jurisdiction and original jurisdiction under the Price-Anderson Act ("PAA"), 42 U.S.C. §2210 *et seq.*) for negligence, strict liability, private nuisance, trespass, misrepresentation and concealment, and outrageous conduct, as well as a claim under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* Compl. ¶¶ 2-3, 66-115 (no docket number). The complaint sought certification of two partially overlapping classes: an "economic harm" class of property owners whose property "was or could have been damaged" by actual or threatened releases of

radioactive and/or other hazardous substances from Rocky Flats, and a medical monitoring class of natural persons residing or working within six miles of Rocky Flats (excluding Rocky Flats employees). *Id*. ¶ 56. Although the exact parameters of the economic harm class were not defined, it was clear that many if not most of the property class members who were natural persons would also fall within the medical monitoring class. ¶ 57.

6.      On April 17, 1990, Plaintiffs filed their first amended complaint (no docket number). The amended complaint added further specificity to the "economic harm" class, now limiting it to owners of property within five miles of the Rocky Flats facility. *Id*. ¶ 62. The substantive causes of action and bases for jurisdiction remained otherwise substantially the same. ¶¶ 2-3, 72-121.

## B.  First Wave of Motions to Dismiss and *Cook I* (Feb. 3, 1991)

7.      On April 30, 1990, Defendants each filed a motion to dismiss (no docket number). In addition, also on April 30, Dow filed a lengthy brief in support of its summary judgment motion on statute of limitations grounds, arguing that publicity and events predating the FBI raid of Rocky Flats on June 6, 1989 (including previous litigation by a few local landowners, state government enforcement actions, anti-nuclear protests outside the plant, and federal government studies of environmental problems at Rocky Flats) precluded recovery under each of Plaintiffs' claims. Dow filed an additional motion to dismiss on July 6, 1990 (Doc. 5). In response to Defendants' flurry of motions, Plaintiffs filed two opposition briefs on July 30, 1990 (Docs. 19 & 20) totaling 115 pages with 15 exhibits.  My firm led the briefing efforts to oppose Defendants' motions. The Court heard oral argument on December 21, 1990. Bruce DeBoskey of Silver & DeBoskey and I argued for the Plaintiffs.

8.      The Court issued its decision on February 13, 1991. *Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468 (D. Colo. 1991) ("*Cook I*"). This was the first of what would become *fifteen* published District Court decisions in this case, to say nothing of numerous unpublished orders and rulings. The Court denied the motions to dismiss except as they pertained to misrepresentation and concealment, certain types of relief sought under the CERCLA and medical monitoring claims, and injunctive relief to "prevent further releases" of hazardous material from Rocky Flats. The Court also limited the punitive damages to those accruing before August 20, 1988, the date the PAA was amended to preclude punitive damages. The Court also denied the motions to dismiss based on statute of limitations and sovereign immunity. Lastly, the Court denied the motion to dismiss the outrageous conduct claim provided that Plaintiffs filed an amended complaint adding allegations pertaining to severe emotional distress, an element of that claim.

9.      On April 8, 1991, as directed by the Court in *Cook I*, Plaintiffs filed their second amended complaint (Doc. 52). Plaintiffs again asserted PAA and diversity jurisdiction (*id.* ¶¶ 3-4), and again sought certification of overlapping property and medical monitoring classes (*id.* ¶ 85). Defendants answered on May 8 (Docs. 58 & 61).

**C.  Second Wave of Motion to Dismiss Briefing and *Cook II***

10.     On May 8, 1991, Rockwell filed the third motion to dismiss in this case (Doc. 62), and Plaintiffs briefed their opposition (Doc. 76). Rockwell's motion largely re-argued points that the Court had already decided in *Cook I*, but Plaintiffs responded and clarified the legal basis for their medical monitoring claim.

11.     On November 26, 1991, the Court issued its ruling, largely rejecting Rockwell's arguments. *Cook v. Rockwell Int'l Corp.*, 778 F. Supp. 512 (D. Colo. 1991) ("*Cook II*"). The

Court upheld the medical monitoring relief based on Plaintiffs' argument that studies would focus on just the specific individuals seeking medical monitoring. *Id*. at 514-15. The Court also, *inter alia,* upheld the claim for medical monitoring as injunctive relief. *Id*. at 515.

### D.  Fact Discovery

#### 1.   The Magistrate Judge's *Lone Pine* Order and *Cook III*

12.     While the various motions to dismiss were pending, Rockwell moved for a protective order (Motion filed May 14, 1990) (no docket number) to stay discovery, which delayed Plaintiffs' discovery efforts until the summer of 1992.

13.     Following the decision in *Cook II*, both sides filed proposed discovery plans, but the Court took no action until Rockwell tendered its guilty plea in the criminal proceedings in mid-1992.  Rockwell pled guilty to five felonies and five misdemeanors involving environmental crimes and paid a then-record $18.5 million fine.  Judge Babcock then directed Magistrate Judge Abram to convene the first discovery conference of the litigation.

14.     Defendants persuaded Magistrate Judge Abram to adopt a so-called "*Lone Pine*" approach, under which Plaintiffs, though still barred from conducting virtually any discovery, were required to state the factual basis of their claims (*e.g.*, quantification of releases from the plant and Plaintiffs' exposures to hazardous substances) in precise detail.[3] (Doc. 98) The Magistrate Judge also ordered Defendants to produce certain databases and other documents. (*Id.*) In a later order, the Magistrate Judge ordered Plaintiffs to produce expert reports and other materials by November, 1992 (Doc. 110).

---

[3] "*Lone Pine*" refers to *Lore v. Lone Pine Corp*., No. L-33606-85, 1986 WL 637507, at *1-2 (N.J. Super. Ct. Law Div. Jan. 1, 1986), a toxic tort case in which the court ordered the plaintiffs to set forth their evidence of exposure and causation that formed the basis of their complaint, prior to discovery.

15.     Although Plaintiffs argued that the delay in obtaining the discovery material impeded their efforts to prepare the statement of factual basis and expert reports, the Magistrate Judge denied Plaintiffs' motion for an extension of time, and also denied Plaintiffs' motion to compel discovery from the Rocky Flats Environmental Master File ("EMF") and of materials presented to the grand jury in the criminal prosecution of Rockwell (Doc. 141).

16.     Per Magistrate Judge Abram's order, Plaintiffs submitted preliminary substance-by-substance estimates of their exposures. Statement of Factual Basis for Plaintiffs' Claims, filed Aug. 14, 1992 (no docket number). Having obtained only very limited discovery, Plaintiffs based these estimates on publicly available information and the work of two experts, Dr. Jan Beyea (a nuclear physicist and expert in nuclear accidents) and Dr. Edward P. Radford (an epidemiologist with expertise on radiation health effects; now deceased). *Id*. at 7 n.4.  Defendants found considerable fault with the estimates, but did not attempt to move for summary judgment. Instead, they filed a motion under Fed. R. Civ. P. 11 and 37, seeking dismissal of the class claims as a sanction (Doc. 147). Defendants argued that Plaintiffs' filing did not comply with the Magistrate Judge's orders to prepare a statement of factual basis. The parties fully briefed Defendants' motion to dismiss as well as other discovery motions.  *See* Doc. 145 (Defendants' brief); Doc. 157 (Plaintiffs').  My firm led the briefing efforts for Plaintiffs.

17.     On December 30, 1992, Magistrate Judge Abram issued an order on various discovery motions, granting motions to quash subpoenas directed to DOE and EG&G (the successor contractor to Rockwell), denying Plaintiffs' motion to compel discovery, and finding Plaintiffs' *Lone Pine* statement to be insufficient. (Doc. 150). The Magistrate Judge ordered Plaintiffs to provide an even-more-detailed statement of factual basis and expert reports supporting their claims by January 15, 1993.  *Id.*

18.    Plaintiffs appealed the Magistrate Judge's order (*see* Doc. 158). The Court heard oral argument on March 15, 1993. Bruce DeBoskey of Silver & DeBoskey argued for the Plaintiffs.

19.    On March 26, 1993, Judge Kane (newly assigned to the case as of December 11, 1992, *see* Doc. 146) modified the Magistrate Judge's order to allow further discovery, denied the motion to dismiss, and set deadlines for additional discovery. *Cook v. Rockwell Int'l Corp.*, 147 F.R.D. 237 (D. Colo. 1993) ("*Cook III*").  The Court's lengthy recitation of the procedural history at that juncture began by noting that "The discovery history of this case is not pretty." *Id.* at 240.  That was an understatement.  In a nutshell, although the Magistrate Judge (as urged by the Defendants) had ordered Plaintiffs to provide a statement of the factual basis of their claims, including a listing of the hazardous substances and doses to which each Plaintiff had been exposed, Defendants continually threw up roadblocks to impede Plaintiffs' access to the evidence in Defendants' hands (and in the possession of DOE) that was needed to comply with the Magistrate Judge's order. This Court overturned the Magistrate Judge's limitations on certain discovery and granted an extension of time for Plaintiffs to submit their expert reports. *Id.* at 245. The Court also denied the Defendants' third round of motions to dismiss. *Id.* at 246-47. This order also fully (and finally) opened up discovery for the first time – more than three years after the case had been filed.

## 2.   Overview of Document Discovery and Interrogatories to Defendants and Third Parties

20.    As noted above, Plaintiffs served their first discovery requests in 1991, but Defendants succeeded in delaying their obligation to respond until mid-1992.  As discovery continued and Class Counsel refined their knowledge of the facts and of the documents and

witnesses of interest at Rocky Flats, Plaintiffs issued additional requests. By the time fact discovery closed, Plaintiffs had served a total of 120 requests for production on Defendants.

21.     Dow and Rockwell also stated that, having left Rocky Flats, they did not have possession, custody or control of many documents relevant to this case. Class Counsel thus served 66 document subpoenas on DOE, as well as the EPA; EG&G; the Colorado Department of Health; ChemRisk (a division of consulting firm McLaren-Hart, Inc.) and Radiological Assessment Corporation ("RAC"), both companies engaged by DOE to perform a "dose reconstruction" analysis of hazardous substances released from Rocky Flats; and the University of California, the operator of the Los Alamos National Laboratory which conducted epidemiological studies and health assessments of Rocky Flats workers, focusing on the human health effects of plutonium exposure.

22.     These subpoenas contained a total of 638 requests seeking categories of documents and information, plus additional requests seeking over 17,000 known, specific documents identified by the document's file number or other objective descriptor.

23.     Class Counsel's efforts ultimately resulted in the production of millions of pages of material.

24.     Throughout the 1990s and beyond, Class Counsel mobilized a team of reviewers drawn mostly from Class Counsel's own staff, along with judiciously employed contract attorneys and non-attorney "first cut" reviewers, most working under the direction of my firm.

25.     Much of the document production was made in paper form, which made the review process much more laborious than modern electronic productions. Approximately 800 boxes of paper documents were produced by Defendants or third parties. These included: documents produced by DOE, Dow, Rockwell, and EG&G relating to plant operations and

environmental monitoring; materials provided to the grand jury during the criminal investigation of Rockwell; documents collected in connection with a 1970s lawsuit, *The Good Fund, Ltd. – 1972 v. Church*, Civ.A. No. 75-M-1111 (D. Colo.), alleging offsite contamination due to Rocky Flats; documents collected by ChemRisk and RAC, companies engaged by DOE to perform a dose reconstruction study in the area around Rocky Flats; documents collected by Doty & Associates, another company hired to study historical spills, releases, or incidents at Rocky Flats that may have resulted in offsite contamination; materials collected by Woodward-Clyde Consultants, a company engaged to conduct an environmental risk evaluation; materials from the Los Alamos National Laboratory relating to its studies of the health effects of plutonium and Rocky Flats workers; materials produced by the EPA relating to monitoring of Rocky Flats; and materials produced by the Colorado Department of Health relating to its environmental monitoring of Rocky Flats and attempts to bring the plant into compliance with environmental laws.  As discussed further below, DOE wound up producing 173 boxes of largely-redacted documents relating to "material unaccounted for" ("MUF"), which refers to plutonium and uranium that entered Rocky Flats but could not be accounted for as having left, and so was "missing".

26.     Class Counsel also pursued extensive informal discovery. Counsel made contact with government officials, community organizations, researchers, environmental activists, landowners, and others with knowledge about Rocky Flats and the contamination in the Class area. The Class Representatives were instrumental in making some of these introductions. Class Counsel also conducted research and retrieved relevant information from the Rocky Flats reading room at the Front Range Community College library.

27.     In addition, rather than simply copying and delivering certain voluminous collections of documents, Defendants or DOE made the collections available for Class Counsel to review on-site in order to pare down and copy selected materials.

### 3.   Depositions of Fact Witnesses

28.     In tandem with Class Counsel's document discovery efforts, Class Counsel undertook an ongoing effort to identify party and third-party fact witnesses and depose those witnesses. After serving notices of deposition, Class Counsel engaged in meet-and-confers with Defendants' counsel and/or representatives for third party witnesses about the timing and other logistics of those depositions, often coordinating with counsel for other plaintiff groups. In total, Class Counsel took 99 depositions of Defendants' current and former employees or corporate representatives, DOE employees or representatives, and other third-party fact witnesses.  Many of these depositions were conducted before the Federal Rules were amended to limit depositions to 7 hours, *see* Fed.R. Civ.P. 30, Advisory Cmte. Notes to 2000 Amendment, and, in fact, several depositions extended over multiple days, as noted below.

29.     The following chart reflects the 99 fact and 30(b)(6) depositions taken by Class Counsel over the course of this litigation. Of these, 69 were taken by my firm, Berger & Montague, and for two more, Berger & Montague attorneys questioned the witness as second chair.  The depositions resulted in 22,539 total pages of testimony.

### *DEPOSITIONS TAKEN BY CLASS COUNSEL*

| Witness Deposed | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Wilson, Andrea [EG&G Rocky Flats legal administrator] | 5/25/1994 | Jonathan Auerbach (B&M) | 214 |

| Witness Deposed | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Honan, Thomas [Rockwell manager of records & Info Management] | 6/3/1994 | Christopher T. Reyna (C&T)[4] | 104 |
| Henderson, Judy [Rockwell employee] | 1/16/1995 | Kenneth A. Jacobsen (C&T) | 317 |
| DiGiallonardo, Lewis [RF employee] | 1/17/1995 | Bruce DeBoskey (S&D[5]) | 233 |
| Burkins, Joan [DOE 30(b)6 witness- Records custodian] | 1/18/1995 | David F. Sorensen (B&M) | 92 |
| Choffres, Eileen [DOE 30(b)6 witness- Records custodian] | 1/18/1995 | Mr. Sorensen (B&M) | 22 |
| Crowe, Richard [DOE 30(b)6 witness- Records custodian] | 1/18/1995 | Mr. Auerbach (B&M) | 16 |
| Gilberson, Mark [DOE 30(b)6 witness- Records custodian] | 1/18/1995 | Mr. Auerbach (B&M) | 41 |
| Hudson, Michelle [DOE 30(b)6 witness- Records custodian] | 1/18/1995 | Mr. Sorensen (B&M) | 47 |
| Jones, Robert [DOE 30(b)6 witness- Records custodian] | 1/18/1995 | Mr. Auerbach (B&M) | 41 |
| Kennedy, Carol [DOE 30(b)6 witness- Records custodian] | 1/18/1995 | Mr. Sorensen (B&M) | 212 |
| Ogbazghi, Joan [DOE 30(b)6 witness- Records custodian] | 1/18/1995 | Mr. Auerbach (B&M) | 29 |

---

[4] C&T refers to Chimicles & Tikellis, LLP.

[5] Silver & DeBoskey P.C.

| Witness Deposed | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Palmer, Gary [DOE 30(b)6 witness- Records custodian] | 1/18/1995 | Mr. Auerbach (B&M) | 33 |
| Voight, Alvin [RF employee] | 1/18/1995 | Mr. DeBoskey (S&D) | 185 |
| Weiner, Lawrence [DOE 30(b)6 witness- Records custodian] | 1/18/1995 | Mr. Auerbach (B&M) | 84 |
| Witner, Fred [DOE 30(b)6 witness- Records custodian] | 1/18/1995 | Mr. Auerbach (B&M) | 56 |
| Gasprow, Lesley [DOE 30(b)6 witness- Records custodian] | 1/19/1995 | Mr. Sorensen (B&M) | 38 |
| Hays, Laura [DOE 30(b)6 witness- Records custodian] | 1/19/1995 | Mr. Auerbach (B&M) | 36 |
| Logan, Pamela & Geraldine Camasta [DOE 30(b)6 witness- Records custodian] | 1/19/1995 | Mr. Sorensen (B&M) | 109 |
| Morris, Kristine [DOE 30(b)6 witness- Records custodian] | 1/19/1995 | Mr. Auerbach (B&M) | 36 |
| Hazle, Al [CDH employee] | 1/19/1995 1/20/1995 1/20/1995 | Mr. Jacobsen (C&T) | 735 |
| Rosen, Rita [AML 30(b)(6) witness - Records Custodian] | 1/23/1995 | Daniel Berger (B&M) | 175 |
| Boss, Merlyn [RF employee] | 1/25/1995 1/26/1995 | Mr. Davidoff (B&M) | 504 |
| Epp, John [Dow employee] | 2/23/1995 | Mr. DeBoskey (S&D) & Mr. Auerbach (B&M) | 245 |

| Witness Deposed | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Piltingsrud, Clarence [RF employee] | 3/1/1995 3/2/1995 | Mr. Davidoff (B&M) | 487 |
| Putzier, Anthony [RF employee] | 3/15/1995 3/16/1995 | Mr. Davidoff (B&M) | 318 |
| Rogers, Robert [RF employee] | 3/22/1995 | Mr. Jacobsen (C&T) | 154 |
| Hayne, Ralph [RF employee] | 3/21/1995 3/29/1995 | David Kreutzer (WSBC) | 259 |
| Illsley, Charles [RF employee] | 3/30/1995 | R. Bruce Mr. McNew (TGM)[6] | 384 |
| Sattler, Hans [Dow employee] | 5/2/1995 | Mr. Kreutzer (WSBC) | 70 |
| Kaiser, Stephen [RF employee] | 5/4/1995 | Mr. Kreutzer (WSBC) | 88 |
| Teel, Ronald [RF employee] | 5/9/1995 | Mr. Sorensen (B&M) | 117 |
| Arnold, Patrick [RF employee] | 5/16/1995 | Mr. Reyna (C&T) | 146 |
| Schubert, Allen [RF employee] | 5/18/1995 | Mr. Reyna (C&T) | 181 |
| Culpepper, James [Atomic Energy Commission employee] | 5/23/1995 | Mr. McNew (TGM) | 42 |

---

[6] TGM refers to Taylor, Gruver & McNew, P.A.

| Witness Deposed | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Hickle, Gordon [Rockwell and RF employee] | 5/23/1995 | Mr. Kreutzer (WSBC) | 196 |
| Kercher, Ann [RF employee] | 5/25/1995 | Ms. Roselle (WSBC[7]) | 245 |
| Williams, Greg [RF employee] | 5/31/1995 | Eric L. Cramer (B&M) | 119 |
| Hawes, Ralph [Rockwell employee] | 6/13/1995 | Mr. Nordberg (B&M) | 152 |
| Barrick, Charles [RF employee] | 3/9/1995 3/10/1995 7/12/1995 | Mr. Jacobsen and J. David Stoner (C&T) | 787 |
| Fryback, Norman [RF employee] | 3/22/1995 3/23/1995 7/13/1995 | Mr. Nordberg (B&M) | 220 |
| Thompson, Milton [RF employee] | 7/25/1995 7/26/1995 | Mr. Cramer (B&M) | 401 |
| Goldberg, Edward [DOE -Acting mgr of RF after FBI raid; independent] | 8/1/1995 | Mr. McNew (WL&B) | 93 |
| Applehans, Russell [RF employee] | 8/3/1995 | Mr. Kreutzer (WSBC) | 112 |
| Setlock, George [RF employee] | 8/7/1995 8/8/1995 8/9/1995 | Mr. Cramer and Bernadette Rappold (both B&M) | 666 |
| Morgan, Bryan [attorney for Rockwell during grand jury investigation] | 8/15/1995 | Mr. Sorensen (B&M) | 166 |

---

[7] Waite, Schneider, Bayless & Chesley Co., L.P.A. Ms. Roselle, and her colleague Mr. DeMarco, now practice with the law firm of Markovits, Stock & DeMarco, LLC.  *See* Ex. 3, Declaration of Terence R. Coates of Markovits, Stock & DeMarco, LLC, at ¶ 2; Ex. 4, Declaration of Eric W. Goering, assignee of Waite, Schneider, Bayless & Chesley Co. L.P.A., at ¶ 2.

| Witness Deposed | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Naimon, Ed [RF employee] | 8/15/1995 | Mr. Cramer (B&M) | 222 |
| Hoyal, James [DOE Contracting Officer for Waste Isolation Pilot Plant] | 8/17/1995 | Mr. McNew (TGM) | 38 |
| Vejvoda, Edward [RF employee] | 10/19/1995 10/20/1995 | Mr. Kreutzer (WSBC) and Ms. Rappold (B&M) | 335 |
| Hardy, Edward [Author of Pu soil sampling study] | 10/23/1995 10/24/1995 10/25/1995 10/26/1995 | Ronald Simon (CRS)[8] | 1401 |
| Vogel, Robert [RF employee] | 11/15/1995 11/16/1995 | Mr. Cramer (B&M) | 483 |
| Freiberg, Kenneth [RF employee] | 11/28/1995 11/29/1995 | Mr. Sorensen (B&M) | 354 |
| Whiteman, Albert [DOE employee] | 3/12/1996 | Mr. McNew (TGM) and Mr. Cramer (B&M) | 205 |
| Donnelly, Harold [AEC] | 3/14/1996 | Mr. Cramer (B&M) | 152 |
| Krupar, Joseph [DOE employee] | 11/13/1995 4/9/1996 | Ms. Rappold & Mr. Cramer (both B&M) | 289 |
| Siebert, A. Bryan [DOE- Declassification] | 4/15/1996 4/16/1996 | Mr. Sorensen (B&M) | 450 |
| Lindsay, Dana [DOE employee] | 4/19/1996 | Mr. Sorensen (B&M) | 149 |
| Watkins, James [Secretary of Energy] | 4/22/1996 | Mr. Jacobsen (C&T) | 239 |

---

[8] CRS refers to Connerton, Ray & Simon.

| Witness Deposed | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| DelPizzo, Richard [RF employee] | 5/15/1996 | Mr. Cramer (B&M) | 150 |
| Jierree, Candice [RF employee - Rocky Mountain Remediation Services] | 5/21/1996 | Mr. McNew (TGM) | 224 |
| Burke, John F. [DOE employee] | 5/22/1996 | Mr. Sorensen (B&M) | 150 |
| Owen, J. Bruce [RF employee] | 5/23/1996 5/24/1996 | Mr. Cramer (B&M) | 499 |
| Swenson, Barbara [Rocky Flats manager of records management for EG&G] | 5/25/1996 | Mr. Auerbach (B&M) | 185 |
| Krey, Phillip [EML consultant, author of soil sampling study] | 5/7/1996 5/8/1996 6/18/1996 6/19/1996 6/20/1996 | Mr. Auerbach & Mr. Cramer (both B&M) | 1385 |
| Willging, James [Dow employee] | 6/25/1996 6/26/1996 | Mr. Sorensen (B&M) | 333 |
| Facer, Gordon [DOE employee] | 7/9/1996 7/10/1996 | Ms. Roselle (WSBC) | 335 |
| Englemann, Rudolph [DOE employee] | 7/11/1996 | Mr. Auerbach (B&M) | 299 |
| Love, Charles M. [RF employee] | 8/21/1996 8/22/1996 | Ms. Roselle (WSBC) | 270 |
| Silverman, Mark A. [RF employee] | 7/23/1996 7/24/1996 9/10/1996 | Mr.Davidoff and Mr. Cramer (both B&M) | 646 |

| Witness Deposed | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Walker, Mary [DOE Assistant Secretary] | 9/17/1996 | Mr. Jacobsen (C&T) | 225 |
| Roberson, Jessie Mae Hill [RF employee] | 2/10/1997 | Mr. Cramer (B&M) | 260 |
| Hoffman, Rod [DOE employee] | 06/16/97 06/17/97 06/18/97 | Mr. Sorensen (B&M) | 475 |
| Terry, Robert [Health Physicist] | 1/8/2004 | Mr. Nordberg (B&M) | 132 |
| Whalen, Karen [Class member] | 5/13/2004 | Ms. MacNaughton (B&M) | 116 |
| Amen, William [Merilyn Cook's neighbor] | 5/17/2004 | Louise Roselle (WSBC) | 63 |
| McDaniel, Cynthia [Potential class member] | 5/17/2004 | Ms. MacNaughton (B&M) | 182 |
| Moorehouse, Richard [Real estate broker] | 5/21/2004 | Ms. MacNaughton (B&M) | 109 |
| LaVelle, James [Member of RF Health Advisory Panel] | 5/24/2004 | Mr. Nordberg (B&M) | 111 |
| Dunshee, Donald [President of the Jefferson Economic Development Council] | 6/2/2004 | Ellen Noteware (B&M) | 97 |
| Elms, Michael [published a document for the Rocky Mountain Land Use Institute on development agreements] | 6/2/2004 | Ms. MacNaughton (B&M) | 114 |

| Witness Deposed | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Shinneman, David [Planning manager of the City of Westminster] | 6/3/2004 | Ms. Noteware (B&M) | 101 |
| Oglesby, Kirk [Westminster senior planner] | 6/10/2004 | Mr. Nordberg (B&M) | 84 |
| Ware, Terrence [Broomfield Planning Director] | 6/10/2004 | Mr. Nordberg (B&M) | 17 |
| Turner, Richard [Director of Planning and Zoning for Jefferson County] | 6/11/2004 | Ms. MacNaughton (B&M) | 143 |
| Foreman, Lee D. [Attorney for Rockwell] | 6/16/2004 | Ms. Noteware (B&M) | 264 |
| Fiehweg, Robert [EG&G employee] | 6/17/2004 | Ms. Noteware (B&M) | 199 |
| Slack, Donald [Architect] | 6/17/2004 | Ms. MacNaughton (B&M) | 71 |
| Wodell, Lynn [Jefferson County manager of open space acquisitions] | 6/18/2004 | Ms. MacNaughton (B&M) | 86 |
| Brindle, Dan [Jefferson County Director of Public Works] | 6/21/2004 | Ms. Noteware (B&M) | 96 |
| Hauptman, Ronald [Real estate developer] | 6/22/2004 | Ms. Noteware (B&M) | 132 |
| Osborn, John [Real estate developer] | 7/14/2004 | Ms. MacNaughton (B&M) | 109 |
| Schell, Ralph [Jefferson County Open Space Director ] | 7/21/2004 | Ms. Noteware (B&M) | 65 |

| Witness Deposed | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Bowman, Herb [Dow employee] | 7/22/2004 | Ms. Noteware (B&M) | 249 |
| Biggs, Walter Gale [Meteorologist, member of Rocky Flats Cleanup Commission] | 7/29/2004 | Gary Blum (S&D)[9] | 237 |
| Hobbs, Farell [Rocky Flats Closure Site Services] | 9/28/2004 | Ms. Noteware (B&M) | 168 |
| Thigpen, Roy [Had land agreement with Ms. Cook] | 11/20/2004 | Ms. MacNaughton (B&M) | 96 |
| Ascanio, Xavier [DOE 30(b)6 witness- Records custodian] | 1/19/2005 | Mr. Sorensen (B&M) | 65 |
| Weston, William [RF employee] | 12/9/2005 12/10/2005 (during trial) | Mr. Sorensen (B&M) | 344 |
| Voilleque, Paul [AEC employee - health physicist] | 12/16/2005 (during trial) | Mr. Sorensen (B&M) | 329 |

30.     In addition, Class Counsel (primarily my firm) attended the depositions of 52 witnesses either in a formal defense role, or as "friendly" counsel not formally representing the witness. These were mostly witnesses who appeared on Plaintiffs' proposed trial witness lists.

31.     The following chart reflects these 52 depositions defended or attended by Class Counsel. Of these, 30 were attended by lawyers from my firm, Berger & Montague.

---

[9] S&D refers to Silver & DeBoskey P.C.

### DEPOSITIONS ATTENDED OR DEFENDED BY CLASS COUNSEL

| Witness Attended or Defended | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Babb, Loren [Class representative; effect of Rocky Flats on use and enjoyment of property and property values] | 7/7/1993 | Mr. Simon (CRS) | 162 |
| Nowlin, David [Field Corporation employee] | 7/8/1993 7/9/1993 | Mr. Simon (CRS) and Mr. DeBoskey (S&D) | 291 |
| Bartlett, Richard [Class representative; effect of Rocky Flats on use and enjoyment of property and property values] | 7/13/1993 7/14/1993 | Steven Kelly (S&D) | 287 |
| Rice, Michael Dean [Class rep. - medical monitoring] | 7/16/1993 | Mr. Kelly (S&D) | 123 |
| Bartlett, Sally [Class representative; effect of Rocky Flats on use and enjoyment of property and property values] | 7/15/1993 7/30/1993 | Mr. Kelly (S&D) | 291 |
| Deimer, Rhonda [Class rep property & medical monitoring] | 9/19/1994 | Mr. Kelly (S&D) | 247 |
| Deimer, Thomas [Class rep property & medical monitoring] | 9/20/1994 | Mr. Kelly (S&D) | 175 |
| Schierkolk, William [Class representative] | 10/26/1994 | Mr. Kelly (S&D) | 251 |
| Shearer, Cynthia Hodge [Class member] | 1/29/1995 | Mr. DeBoskey and Mr. Kelly (S&D) | 172 |
| Schierkolk, Delores [Class representative] | 3/9/1995 | Mr. Kelly (S&D) | 217 |
| Zaharias, David [Real estate investment professional] | 5/1/1995 | Mr. Kelly (S&D) | 84 |
| Sandoval, Stephen [Class rep. - medical monitoring] | 5/11/1995 | Mr. DeBoskey (S&D) | 135 |

| Witness Attended or Defended | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Schwartz, Ralph<br>[Former president of Bank Western] | 5/11/1995 | Mr. DeBoskey (S&D) | 62 |
| Ten Eyck, Thomas<br>[Real estate broker] | 5/17/1995<br>6/6/1995 | Mr. Kelly (S&D) | 220 |
| Long, Howard<br>[RF employee] | 6/15/1995 | Mr. Auerbach (B&M) | 247 |
| Tallman, Daniel<br>[RF employee] | 6/20/1995 | Ms. MacNaughton (B&M) | 143 |
| Hines, Deborah<br>[Real estate investment professional] | 8/17/1995 | Mr. Kelly (S&D) | 112 |
| Knickerbocker, Ron<br>[Real estate investment professional | 8/18/1995 | Mr. Kelly (S&D) | 105 |
| DeArmant, Maggie<br>[Real Estate Broker - involved w/ selling the Bartlett's property] | 10/26/1995 | Mr. Kelly (S&D) | 73 |
| Valentin, Frank<br>[Bank Western employee] | 10/1994<br>4/25/1995<br>5/8/1995<br>11/9/1995 | Mr. DeBoskey (S&D) | 423 |
| Robb, Gretchen<br>[Class member] | 5/11/2004 | Ms. MacNaughton (B&M) | 112 |
| Dewey, Roger<br>[Class member] | 5/12/2004 | Ms. Noteware (B&M) | 236 |
| Montano, Thomas<br>[Attempted to sell a property just outside the class area] | 5/12/2004 | Ms. MacNaughton (B&M) | 160 |
| Cassidy, Samuel<br>[Professor at the University of Denver & served on a committee called Rocky Flats Local Impact Initiative] | 5/18/2004 | Ms. Roselle (WSBC) | 92 |
| Schnoor, Kathryn<br>[Broomfield Superintendent of Environmental Affairs] | 5/19/2004 | Ms. Roselle (WSBC) | 83 |
| Ozaki, Charles<br>[Broomfield city manager] | 5/20/2004 | Ms. MacNaughton (B&M) | 97 |

| Witness Attended or Defended | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Holeman, Timothy [Senior advisor to governor Roy Romer, in Policy and Research Office] | 5/24/2004 | Ms. Noteware (B&M) | 183 |
| Bartelson, Michael [Broomfield deputy director of public works] | 5/25/2004 | Ms. Noteware (B&M) | 83 |
| Chabin, Susan [Class member] | 5/25/2004 | Mr. Nordberg (B&M) | 196 |
| Ackland, Len [University of Col. Professor & Editor of Bulletin of Atomic Scientists] | 5/26/2004 | Mr. Nordberg (B&M) | 223 |
| Ladwig, Edward [Class member] | 5/26/2004 | Ms. Noteware (B&M) | 171 |
| Honness, Kevin [RF doc reviewer exposed to radiation] | 6/1/2004 | Ms. MacNaughton (B&M) | 113 |
| Brever, Jacqueline [RF employee] | 6/4/2004 | Mr. Nordberg (B&M) | 341 |
| Ray, John A. [RF employee] | 6/4/2004 | Ms. Noteware (B&M) | 288 |
| Lund, Peter [Class member] | 6/8/2004 | Ms. Noteware (B&M) | 192 |
| Avery, Ronald [RF employee] | 6/9/2004 | Mr. Nordberg (B&M) | 225 |
| Stout, Kenneth [Class member] | 6/9/2004 | Ms. MacNaughton (B&M) | 159 |
| Bowman, Joseph [Geologist] | 6/10/2004 | Ms. MacNaughton (B&M) | 147 |
| Park, Donald [Class member] | 6/15/2004 | Jean Geoppinger McCoy (WSBC) | 115 |
| Tomlinson, Edward [Class member,  realtor] | 6/16/2004 | Ms. MacNaughton (B&M) | 189 |
| Millage, Deborah [Class member - real estate sales] | 6/18/2004 | Ms. Noteware (B&M) | 110 |
| Smith, William F. [EPA Resident Agent in Charge of the Denver Office] | 6/24/2004 | Ms. Noteware (B&M) | 225 |

| Witness Attended or Defended | Deposition Date | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| White, Miriam [Class member] | 7/12/2004 | Ms. MacNaughton (B&M) | 171 |
| Melichar, Nancy [Class member] | 7/13/2004 | Ms. MacNaughton (B&M) | 72 |
| Poet, Stuart [Author of Plutonium-239 and Americum-241 Contamination in the Denver Area (Oct. 1972)] | 7/20/2004 | Mr. Sorensen (B&M) | 203 |
| Griffin, F. O'Neill [Partner with Alkire Investment Company] | 8/18/2004 | Ms. Noteware (B&M) | 144 |
| Banister, Karen [Class member] | 10/3/2005 | Mr. Davidoff (B&M) | 82 |
| Lipsky, Jon [FBI agent] | 10/16/2005 (during trial) | Mr. Nordberg (B&M) | 271 |
| Minshall, David Ray [Media relations - television] | 10/17/2005 (during trial) | Ms. Noteware (B&M) | 147 |
| McKinley, Wesley Paul [Rocky Flats grand jury foreman and state representative, House District 64] | 10/18/2005 (during trial) | Mr. Nordberg (B&M) | 156 |
| Selbin, Joel [Member of Rocky Flats Soil Action Level Oversight Panel] | 11/9/2005 (during trial) | Ms. Geoppinger McCoy (WSBC) | 172 |
| McKay, Charles [Class member] | 09/28/2005 11/15/2005 (during trial) | Mr. Davidoff (B&M) | 231 |

### 4. *Cook V* (Apr. 12, 1995)

32.    Plaintiffs objected to many of Defendants' discovery requests on the ground that they were contention-style discovery. The requests sought the Plaintiffs' positions or evidence regarding subjects such as off-site contamination and dose reconstruction studies. As discovery

on these subjects was still underway and Plaintiffs' experts had not yet completed their analysis

of the evidence, Plaintiffs objected.

33.     On April 12, 1995, the Court issued a published opinion denying Plaintiffs'

motion for reconsideration of the Court's minute order granting a motion to compel. *Cook v.*

*Rockwell Int'l Corp.,* 161 F.R.D. 103 (D. Colo. 1995) ("*Cook V*").

### 5.   Counsel's Attempts to Obtain Important Information From DOE

34.     In 1993 and 1994, Plaintiffs served numerous document subpoenas on DOE. The

information sought included documents relating to quantities of nuclear material that went

missing at Rocky Flats (known as "material unaccounted for" or "MUF"); documents dealing

with regulatory compliance; specific DOE documents cited in indices provided by the Colorado

Department of Health; documents the existence of which was revealed during a deposition of a

DOE Environmental Measurements Laboratory ("EML") custodian; computer tapes revealed to

be in the possession of EG&G but belonging to DOE; DOE documents relating to studies of the

health effects of plutonium exposure, including involving Rocky Flats workers; and requests

following up for further information on materials previously produced by DOE. The subpoenas

also sought identification of any Rocky Flats document repositories. Some of these materials fell

within the scope of Plaintiffs' prior discovery requests to EG&G, but were not identified or

produced until Plaintiffs learned of their existence and specifically requested them from DOE.

35.     Class Counsel devoted countless hours to following up on their discovery requests

to the DOE and attempting to negotiate access to the materials.

36.     DOE agreed to comply with the subpoenas, but later reneged on that agreement.

Class Counsel therefore filed a motion to compel January 31, 1994. (Doc. 233)

37.     On March 28, 1994, Magistrate Judge Borchers denied plaintiffs' motion to compel.  (Doc. 256)  He ruled that because DOE had not filed any objections to any of the subpoenas, Plaintiffs' "exclusive remedy" against DOE was "to seek an order of contempt." Accordingly, Plaintiffs moved on April 13, 1994, to have DOE held in contempt. (Doc. 261)

38.     Plaintiffs and DOE then began negotiating to resolve the motion for contempt by stipulation.  At a June 7, 1994 status hearing, Daniel Berger from my firm presented a draft stipulated order resolving most of the issues between Plaintiffs and DOE, and the parties indicated they would continue to work out the remaining points of contention.  Given this apparent agreement, the Court deferred ruling on Plaintiffs' renewed motion (Doc. 320).

39.     That agreement, however, was fleeting, and in light of DOE's continued failure to comply, on June 22, 1994 Plaintiffs renewed their motion for contempt sanctions (Doc. 339, 346).

40.     Negotiations with DOE resumed, and at a hearing before Magistrate Judge Borchers on July 18, 1994, the parties submitted a final joint stipulated order (the "Stipulated Order") to the Court setting forth an agreed scope and timeline for DOE's production of documents. I argued for the Plaintiffs at the July 18, 1994 hearing.

41.     At this point, the Defendants stepped in to try to block Plaintiffs' discovery from DOE. On July 22, 1994, Defendants filed objections seeking to limit the Stipulated Order's scope and effectiveness. (Doc. 365). Magistrate Judge Borchers eventually overruled all these objections, *see* Doc. 398, and entered the Stipulated Order on September 13, 1994 (Doc. 399).

### 6.  The Contempt Hearing and Sanctions; *Cook VI* (Nov. 13, 1995)

42.     DOE, having just agreed to comply with discovery in the Stipulated Order, then resisted and continued to evade Plaintiffs' attempts to secure the documents it had agreed to

produce, so on April 7, 1995, Plaintiffs moved yet again to hold DOE in contempt (Docs. 513-514). On April 25, 1995, Plaintiffs filed a second motion to hold DOE in contempt for failure to produce additional materials (the evidence in possession of the Los Alamos National Laboratory ("LANL") (Docs. 530and 532).

43.     Beginning on July 20, 1995, the Court held a four-day evidentiary hearing on Plaintiffs' contempt motion (in effect, a four-day bench trial), which included sworn testimony from a DOE classification officer and one of Plaintiffs' experts on nuclear facilities and the health effects of plutonium exposure, Dr. Thomas Cochran, who explained why the wrongfully withheld DOE materials were important to his analysis. (Docs. 629, 630, 634, 635).  My firm led the effort to have DOE held in contempt, and I conducted the four-day hearing on behalf of Plaintiffs.

44.     On November 13, 1995, the Court granted Plaintiffs' motion. *Cook v. Rockwell Int'l Corp.,* 907 F. Supp. 1460 (D. Colo. 1995) ("*Cook VI*"). The Court found that DOE had not even attempted to begin the classification reviews it claimed were holding up the production of several collections, and reviewed and rejected each the DOE's additional excuses for its non-compliance, and order DOE to comply and produced the requested discovery. *Id*. at 1463-68. The Court ordered DOE to comply with the earlier consent order and produce the requested materials within 30 days, awarded Plaintiffs fees and costs for their efforts from the date the DOE agreed to the stipulated order through the date of the contempt order, and set a date for a joint status report regarding compliance with the Order. *Id*. at 1468.

### 7.  Further Efforts to Obtain DOE's Compliance; *Cook VII* (Aug. 8, 1996)

45.     In the ensuing months, DOE produced some of the requested materials, and sought and received two extensions of time to complete its production. On February 2, 1996, the

day after the Court-ordered deadline to produce the MUF documents, DOE filed a "Notice of New Discovery Developments" (Doc. 762). The notice revealed that DOE's prior status reports had drastically understated the volume of the MUF documents. Previously, DOE had repeatedly estimated (including in the sworn testimony by its classification officer, Rodney Hoffman) that it needed to conduct a classification review of approximately 3,000 documents (or 11,000 pages) of documents relating to MUF (*see, e.g.*, DOE Opp'n to Contempt, ¶ 20) (Doc. 815, filed Apr. 25, 1996), and had stuck with that estimate as late as the January 16, 1996 hearing. *See* Doc. 760 (hearing transcript). But less than a month later, in its February 2 filing, DOE revealed that the number was in fact *670,000* pages (Doc. 762). DOE did not provide an estimate for the time this review would take, but indicated it would present a "plan" for doing so on February 15. *Id.* DOE also revealed that the then-current Rocky Flats contractor had discovered an additional 1,500 rolls of microfilm at the plant that contained responsive documents, plus three "platters", or computer hard disks, which were not compatible with modern computer or software. *Id.*[10]

46.      In light of these revelations and DOE's long-standing pattern of stonewalling and obstructionism, and given that the lesser sanctions of Court orders and a contempt order had already proven ineffective, on February 12, 1996, Plaintiffs again moved for sanctions. However, this time, Class Counsel asked the Court to order DOE (as the owner of Rocky Flats and the indemnitor of both Defendants) to assume control of the litigation so that the Court could impose the more meaningful sanction of a default judgment. Class Counsel also sought the impoundment of relevant documents in DOE's custody.  (Docs. 771-772)

---

[10] Ultimately, approximately 1.5 million pages of MUF documents were "produced" (usually in heavily or entirely redacted form).

47.  The Court heard arguments on Plaintiffs' motion for sanctions on February 15, 1996. I argued for Plaintiffs.

48.  In addition to opposing Plaintiffs' motion, on March 8, 1996, DOE moved for a protective order seeking relief from its obligation to produce the MUF documents, to which it had previously agreed in the Stipulated Order (Doc. 796).

49.  While Plaintiffs' motion was pending, DOE continued its classification review, but that rushed review left many of the documents so heavily redacted as to be largely empty of useful content. *See Cook v. Rockwell Int'l Corp.,* 935 F. Supp. 1452, 1466-67 (D. Colo. 1996) ("*Cook VII*").

50.  After considering the parties' thorough briefs, the Court denied Plaintiffs' motion, opting instead to continue monitoring DOE's compliance. *Cook VII*, 935 F. Supp. at 1463-64, 1472-73. The Court granted DOE's motion for relief from the March 15, 1996 deadline for production of the MUF documents, but otherwise denied the motion for a protective order. *Id.* at 1470. As the Court explained, it lacked the authority to second-guess DOE's classification decisions.

51.  For several years thereafter, Plaintiffs continued to push DOE to comply with its discovery obligations, including filing an additional motion to compel and oppositions to DOE's motion for a protective order (Docs. 856, 876). The parties continued their discovery efforts, and DOE continued to file regular status reports on those efforts (as ordered by the Court) through October of 2003 (*see* Doc. 1213).

### 8.  Class Counsel Obtain Security Clearances to Speed Up Declassification and Production of DOE Materials

52.  In order to expedite the review and declassification of DOE documents, two attorneys from my firm, David F. Sorensen (now also a managing shareholder of Berger &

Montague) and Jonathan Auerbach, engaged in the laborious process of obtaining "Q" clearances to view classified information. To obtain Q clearances, these attorneys filled out lengthy applications documenting minute and personal details about their life history; travelled to Albuquerque, NM for two days of testing that included written psychological evaluations, polygraph examination, urine tests, and interviews; submitted to a searching background investigation which included government personnel interviewing these attorneys' friends and neighbors.

53.     Counsel's efforts were well invested. Having Q clearances allowed these attorneys to review classified DOE documents on-site at several DOE sites and flag targeted, relevant materials for potential declassification. This significantly accelerated the process of obtaining relevant DOE documents.  This review yielded a number of relevant and useful documents, including Trial Exhibit P-652, which listed DOE's rationales for not declassifying information relating to MUF. Some of those rationales are primarily self-interested, such as avoiding problems for DOE, Rockwell, or Dow caused by "[a]ntinuclear environmentalists and pacifist groups", or fears of "an adverse effect on the final court decision or settlement" in litigation against Defendants and DOE.

**E.  Defendants' Discovery to Plaintiffs**

54.     Another major task for Class Counsel was responding to Defendants' discovery requests. Altogether, Defendants served 35 various sets of Interrogatories, Requests to Produce, or Requests to Admit. These consisted of: 730 interrogatories; 88 separate requests to admit; and 729 requests for production.

55.     Class Counsel objected to a number of these requests as burdensome or irrelevant, and engaged in extensive meet and confer discussions with Defendants in an attempt to narrow the scope of the information to be produced.

56.     Much of the information Defendants sought was of evidence assembled by Class Counsel in order to prosecute the case, which required work by Class Counsel to identify relevant information in their possession and formulate an appropriate response.

57.     Other of Defendants' requests sought information directly from the Class Representatives. Class Counsel assisted each Class Representative in identifying and searching for documents and information in response to Defendants' requests, and worked closely with the Class Representatives to draft accurate responses to requests for admission and interrogatories. Each Class Representative's contribution to this effort is detailed below in Section IV.

58.     In total, Class Counsel and the Class Representatives produced numerous boxes of paper documents, responded to 35 sets of discovery requests encompassing 730 interrogatories, 729 requests for production, and 88 requests for admissions.

### F.  Expert Discovery

59.     This case involved a wealth of highly technical and specialized evidence that could not be explained by lay witnesses and documents alone. Plaintiffs needed to prove, *inter alia*, what the appropriate standard of care was for the operation of a nuclear weapons facility generally, and for safe handling of plutonium specifically; the health risks of plutonium exposure; the pathways by which Class members were exposed or were at risk of being exposed to plutonium; and how the effect of the contamination and health risks from Rocky Flats had affected property values in the Class area.

31

60.     In order to present these matters to the jury, Plaintiffs needed to consult with a long list of expert witnesses. Plaintiffs eventually engaged 19 experts who submitted a total of 21 reports.

61.     Each of those reports required intense effort on the part of Class Counsel to structure each expert's assignment, communicate with the expert to ensure the expert's analysis complied with legal standards; and provide the expert with relevant evidence and information to consider in his or her report. My firm largely managed these efforts.

62.     The following charts reflect all expert reports submitted by Plaintiffs in this case:

### 63. *PLAINTIFFS' EXPERT REPORTS*

| Plaintiffs' Expert | Date Of Report(s) | Pages In Report(s) |
|---|---|---|
| Blumberg, Baruch [Cancer etiology and prevention] (now deceased) | 11/21/1996 | 19 |
| Budnitz, Robert [Management practices after the  fire & waste management practices associated with the 903-Area Plutonium release] | 11/21/1996 Budnitz "fire" report Budnitz & North "waste" report | 102 109 |
| Clapp, Richard [Epidemiologic evidence of health effects in residents near the Rocky Flats plant in Jefferson County] | 11/13/1996 | 79 |
| Cochran, Thomas [Plutonium Inventory Differences at the RF Plant and Their Relationship to Environmental Releases] | 11/21/1996 Cochran "Overview" Report Cochran "MUF" Report | 54 35 |
| Cochrane, Harold [Economist] | (undated) | 4 |
| Flynn, James [The June 6, 1989 FBI Raid at Rocky Flats, Colorado: Risk, Media, and Stigma/Rocky Flats Health and Housing Survey] (now deceased) | 7/5/1996 11/19/1996 | 39 88 |

| Plaintiffs' Expert | Date Of Report(s) | Pages In Report(s) |
|---|---|---|
| Goble, Robert<br>[Exposures from Releases of Plutonium and Other Toxic Substances at Rocky Flats] | 11/24/1996 | 129 |
| Gochfeld, Michael<br>[Medical Screening/Surveillance] | 11/22/1996 | 63 |
| Hunsperger, Wayne<br>[Rocky Flats Nuclear Weapons Plant Property Impact Study] | 11/21/1996 | 452 |
| Lehman, Linda<br>[Contaminated groundwater] | 11/24/1996 | 14 |
| Mayer, Larry<br>[Biostatician, trained as a physician] | 11/25/1996 | 29 |
| North, Warner<br>[Management of waste and associated operations at RF] | [*see* Budnitz & North report, above] | |
| Radford, Edward<br>[Medical monitoring]<br>(now deceased) | (undated) | 73 |
| Radke, John<br>[Measuring the Effects of Proximity to the Rocky Flats Nuclear Weapons Plant on Property Values] | 11/25/1996 | 115 |
| Slovic, Paul<br>[Factors Influencing Risk Assessment, Risk Perception, and Risk Acceptance] | 11/19/1996 | 43 |
| Smallwood, K. Shawn<br>[Role of soil bioturbation] | 11/23/1996 | 149 |
| Stillwagon, Gary<br>[Annual limits on intake of Plutonium/Permissable doses of radiation] | 11/24/1996 | 38 |

| Plaintiffs' Expert | Date Of Report(s) | Pages In Report(s) |
|---|---|---|
| Teitelbaum, Daniel [Toxicology, dose reconstruction calculations] | 11/20/1996 | 5 |
| Wing, Steve [A Critical Review of the US DOE Efforts to Investigate the Human Health Effects of Plutonium] (now deceased) | 11/21/1996 | 74 |

64.    Similarly, Defendants engaged 27 of their own experts, who submitted a total of 46 reports. Class Counsel were required to study and assimilate the information in each of these often very dense and technical reports in order to formulate a plan of response.

65.    The following charts reflect all expert reports submitted by Defendants in this case:

### *DEFENDANTS' EXPERT REPORTS*

| Defendants' Expert | Date Of Report(s) | Pages In Reports(s) |
|---|---|---|
| Auxier, John [Health Physicist- Report re Environmental Releases at the RF plant] | 11/25/1996 3/19/1997 7/29/1997 2/3/1999 | 227 16 20 251 |
| Benedek, Elissa [Psychiatric and Psychological evaluations] | 11/18/1996 | 11 |
| Blaha, Frank [Environmental Engineer - Waste management history of the RF plant (1952-1989)] | 11/25/1996 8/6/2004 | 89 12 |
| Conway, Daniel [Effects of Rocky Flats on Undeveloped Real Estate Values] | 11/22/1996 8/6/2004 | 15 109 |

| Defendants' Expert | Date Of Report(s) | Pages In Reports(s) |
|---|---|---|
| d'Arge, Ralph<br>[Economist - property value diminution] | 11/23/1996<br>3/18/1997<br>8/6/2004 | 41<br>51<br>101 |
| Dorchester, John<br>[property value] | 11/22/1996<br>3/17/1997<br>8/2/2004 | 150<br>28<br>100 |
| Frazier, John R.<br>[environmental releases at the RF plant] | 8/6/2004 | 9 |
| Fry, Shirley<br>[occupational radiation epidemiologist] | n/a | n/a |
| Grogan, Helen<br>[RAC Historical Dose reconstruction] | n/a | n/a |
| Hewlett, Richard<br>[Chief historian for AEC - summary of history] | 11/23/1996 | 52 |
| Holl, Jack<br>[A Summary History of the Establishment of the US Atomic Energy Commission's Nuclear Weapon Fabrication Plant at Rocky Flats] | 8/5/2004<br>"Holl/Hewlett Report" | 62 |
| Howe, Geoffrey<br>[Epidemiologic Issues] | 11/21/1996<br>2/19/1997 | 93 |
| Kahneman, Daniel<br>[Princeton psychology professor – regarding perceptions of property value loss] | 11/25/1996<br>3/18/1997 | 18<br>33 |
| Martin, James<br>[Radiation protection expert] | 11/22/1996<br>8/2004 | 15<br>3 |
| McFadden, Daniel<br>[Economist - Property Value] | 4/16/1997<br>5/22/1998 | 48<br>50 |

| Defendants' Expert | Date Of Report(s) | Pages In Reports(s) |
|---|---|---|
| Mettler, Fred<br>[director of NCRP, an ICRP commissioner, and the U.S. rep on UNSCEAR ] | (undated) | 86 |
| Miller, Anthony<br>[Technical discussion of medical monitoring from a public health point of view] | 11/20/1996 | 19 |
| Putzier, Edward<br>[RF environmental monitoring program] | (undated) | 3 |
| Raabe, Otto<br>[health risks from Pu exposure] | 11/19/1996<br>3/16/1997 | 75<br>8 |
| Rodricks, Joseph<br>[Risks Associated with Historical Releases of Nonradioactive Chemicals] | 11/21/1996<br>2/19/1997<br>3/12/1997<br>8/5/2004 | 328 |
| Smart, Geneva<br>[Value Influences on Residential Real Estate] | 11/22/1996 | 26 |
| Till, John<br>[Historical Public Exposures Studies on RF] | 8/6/2004 | 70 |
| VanCourt, Laurie<br>[Real Estate consulting] | 11/20/1996 | 50 |
| Wecker, William<br>[Statistician - Health Risks] | 3/19/1997 | 17 |
| Whicker, F. Ward<br>(and S.A. Ibrahim)<br>[Plutonium and Americium in the Environs of Rocky Flats: Spatial Distribution, Environmental Transport, and Human Exposure] | 11/21/1996<br>8/6/2004<br>1/14/2005 | 75 |
| Whipple, Chris<br>(& Annette Shipp)<br>[Risk Assessments] | 2/20/1997<br>8/8/2004 | 9<br>31 |

| Defendants' Expert | Date Of Report(s) | Pages In Reports(s) |
|---|---|---|
| Wise, Kenneth<br>[Impacts on Property Values] | 11/24/1996<br>8/6/2004 | 32<br>23 |

66.     Nearly all of these experts were deposed, and some for multiple days. Each deposition taken by Class Counsel demanded intense preparation, including studying the reports, legal research and extensive consultation with Plaintiffs' own experts to analyze the defense expert's work and design deposition questions to identify any methodological or other flaws.

67.     Altogether, Class Counsel deposed 26 of Defendants' experts over 30 days, generating 6,702 transcript pages. Class Counsel defended their own experts at 23 days of depositions.  My firm conducted 14 of the depositions of Defendants' experts, and prepared and defended 16 of the Plaintiffs' experts for their depositions.

68.     The following chart summarizes the depositions of defense experts taken by Class Counsel in this case:

| Defendants' Expert | Date(s) Of Deposition | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Auxier, John<br>[Health Physicist- Report re Environmental Releases at the RF plant] | 04/10/97<br>04/11/97 | Mr. Auerbach (B&M) | 257 |
| Benedek, Elissa<br>[Psychiatric and Psychological evaluations] | 3/20/1997 | Mr. DeBoskey (S&D) | 266 |
| Blaha, Frank<br>[Environmental Engineer - Waste management history of the RF plant (1952-1989)] | 3/27/1997 | Mr. Cramer (B&M) | 356 |

| Defendants' Expert | Date(s) Of Deposition | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Conway, Daniel [Effects of Rocky Flats on Undeveloped Real Estate Values] | 3/5/1997 | Mr. Sorensen (B&M) | 143 |
| d'Arge, Ralph [Economist - property value diminution] | 3/28/1997 | Mr. Sorensen (B&M) | 212 |
| Dorchester, John [property value] | 4/29/1997 4/30/1997 | Ms. Roselle (WSBC) | 466 |
| Frazier, John R. [environmental releases at the RF plant and alleged standards] | 12/5/2005 (during trial) | Mr. Sorensen (B&M) | 247 |
| Fry, Shirley [occupational radiation epidemiologist] | 12/7/2005 (during trial) | Ms. Geoppinger McCoy (WSBC) | 189 |
| Grogan, Helen [RAC Historical Dose reconstruction] | 12/2/2005 (during trial) | Ms. Roselle (WSBC) | 198 |
| Hewlett, Richard [Chief historian for AEC - summary of history] | 2/19/1997 | Mr. Simon (CRS) | 109 |
| Howe, Geoffrey [Epidemiologic Issues] | 3/26/1997 | Ms. Roselle (WSBC) | 241 |
| Kahneman, Daniel [Princeton psychology professor - impressions of property value loss] | 4/18/1997 | Mr. Sorensen (B&M) | 281 |
| Martin, James [Radiation protection expert] | 2/13/1997 | Mr. Simon (CRS) | 119 |
| McFadden, Daniel [Economist - Property Value] | 5/27/1998 | Mr. Sorensen (B&M) | 232 |

| Defendants' Expert | Date(s) Of Deposition | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Mettler, Fred [director of NCRP, an ICRP commissioner, and the U.S. rep on UNSCEAR ] | 4/8/1997 | Mr. DeBoskey (S&D) | 205 |
| Miller, Anthony [Technical discussion of medical monitoring from a public health point of view] | 2/13/1997 | Mr. Simon (CRS) | 126 |
| Putzier, Edward [RF environmental monitoring program] | 4/11/1997 | Mr. Cramer (B&M) | 224 |
| Raabe, Otto [health risks from Pu exposure] | 4/8/1997 | Mr. Berger (B&M) | 262 |
| Rodricks, Joseph [Risks Associated with Historical Releases of Nonradioactive Chemicals] | 3/13/1997 | Mr. Cramer (B&M) | 305 |
| Smart, Geneva [Value Influences on Residential Real Estate ] | 3/18/1997 | Ms. Roselle (WSBC) | 218 |
| Till, John [Historical Public Exposures Studies on RF] | 12/1/2005 (during trial) | Ms. Roselle (WSBC) | 236 |
| VanCourt, Laurie [Real Estate consulting] | 3/11/1997 | Ms. Roselle (WSBC) | 216 |
| Wecker, William [Statistician - Health Risks] | 5/7/1997 | Mr. Auerbach (B&M) | 234 |

| Defendants' Expert | Date(s) Of Deposition | Responsible Attorney | Transcript Pages |
|---|---|---|---|
| Whicker, F. Ward (and S.A. Ibrahim) [Plutonium and Americium in the Environs of Rocky Flats: Spatial Distribution, Environmental Transport, and Human Exposure] | 04/24/97 04/25/97 | Mr. Auerbach (B&M) | 665 |
| Whipple, Chris (& Annette Shipp) [Risk Assessments] | 4/28/1997 | Mr. Cramer (B&M) | 261 |
| Wise, Kenneth [Impacts on Property Values] | 04/14/1997 04/15/1997 | Mr. Sorensen (B&M) | 434 |

69.     The following chart summarizes the depositions of Plaintiffs' experts in this case

and identified the lawyer representing Plaintiffs and defending the deposition:

| Plaintiffs' Expert | Date Of Deposition | Plaintiffs' Attorney | Transcript Pages |
|---|---|---|---|
| Blumberg, Baruch [Cancer etiology and prevention] (now deceased) | 3/31/1997 | Mr. Auerbach (B&M) | 178 |
| Budnitz, Robert [Management practices after the fire & waste management practices associated with the 903-Area Plutonium release] | 04/24/97 04/25/97 | Mr. Sorensen (B&M) | 656 |
| Clapp, Richard [Epidemiologic evidence of health effects in residents near the Rocky Flats plant in Jefferson County] | 2/26/1997 | Mr. Auerbach (B&M) | 317 |

| Plaintiffs' Expert | Date Of Deposition | Plaintiffs' Attorney | Transcript Pages |
|---|---|---|---|
| Cochran, Thomas [Plutonium Inventory Differences at the RF Plant and Their Relationship to Environmental Releases] | 3/20/1997 | Mr. Sorensen (B&M) | 280 |
| Cochrane, Harold [Economist] | 3/4/1997 | Mr. Nordberg (B&M) | 132 |
| Flynn, James [The June 6, 1989 FBI Raid at Rocky Flats, Colorado: Risk, Media, and Stigma/Rocky Flats Health and Housing Survey] (now deceased) | 3/27/1997 | Mr. Auerbach (B&M) | 214 |
| Goble, Robert [Exposures from Releases of Plutonium and Other Toxic Substances at Rocky Flats] | 04/29/97 04/30/97 | Mr. Auerbach (B&M) | 536 |
| Gochfeld, Michael [Medical Screening/Surveillance] | 4/16/1997 | Mr. Auerbach (B&M) | 335 |
| Hunsperger, Wayne [Rocky Flats Numclear Weapons Plant Property Impact Study] | 04/24/97 04/25/97 | Mr. Davidoff (B&M) | 545 |
| Lehman, Linda [Contaminated groundwater] | 3/20/1997 | Ms. Roselle (WSBC) | 209 |
| Mayer, Larry [Biostatician, trained as a physician] | 2/28/1997 | Mr. Auerbach (B&M) | 266 |
| North, D. Warner [management of waste and associated operations at RF] | 3/21/1997 | Mr. Cramer (B&M) | 402 |
| Radford, Edward [medical monitoring] (now deceased) | 3/31/1997 | Mr. Berger (B&M) | 253 |

| Plaintiffs' Expert | Date Of Deposition | Plaintiffs' Attorney | Transcript Pages |
|---|---|---|---|
| Radke, John<br>[Measuring the Effects of Proximity to the Rocky Flats Nuclear Weapons Plant on Property Values] | 03/31/97<br>04/01/97 | Mr. Nordberg (B&M) | 450 |
| Slovic, Paul<br>[Factors Influencing Risk Assessment, Risk Perception, and Risk Acceptance] | 3/26/1997 | Mr. Nordberg (B&M) | 237 |
| Smallwood, K. Shawn<br>[role of soil bioturbation] | 3/21/1997 | Mr. Auerbach (B&M) | 284 |
| Stillwagon, Gary<br>[Annual limits on intake of Plutonium/Permissable doses of radiation] | 2/24/1997 | Ms. Roselle (WSBC) | 258 |
| Teitelbaum, Daniel<br>[Toxicology, dose reconstruction] | 5/1/1997 | Mr. DeBoskey (S&D) | 199 |
| Wing, Steve<br>[A Critical Review of the US DOE Efforts to Investigate the Human Health Effects of Plutonium]<br>(now deceased) | 3/18/1997 | Mr. Berger (B&M) | 256 |

**G. First Round of Class Certification and *Cook IV* (Oct. 8, 1993)**

70.     Briefing on Plaintiffs' motion to certify the property and medical monitoring

classes took place in the latter half of 1993. *See* Docs 197-204, 219-220 (Plaintiffs'

submissions); Docs. 210, 213 (Defendants' submissions). As part of this effort, Plaintiffs

engaged four expert witnesses who submitted declarations in support of class certification.

Wayne Hunsperger, a licensed property appraiser, discussed how the impact of the

environmental conditions at Rocky Flats would be common to the class.  Dr. John Radke, a

geographer and Geographic Information Systems (GIS) modeling expert, created population

maps and land parcel maps reflecting plutonium exposure, population, and property parcels in the proposed class areas. Dr. Jan Beyea, a nuclear physicist with expertise in dose reconstruction, examined the evidence collected to date and opined on methods of modeling exposure levels for individuals working or living near Rocky Flats based on geography and demographics, including the results of his preliminary dose reconstructions for exposures to plutonium and VOCs ("volatile organic compounds"). And Dr. Michael Gochfeld, a professor of occupational medicine, analyzed Dr. Beyea's preliminary dose reconstruction and opined on both the potential health effects of exposures at those levels and the benefits of a population-based medical surveillance program for exposed individuals. *See* Docs. 199-204 (Plaintiffs' appendices).

71.     In response to Plaintiffs' submission, Defendants each drafted voluminous briefs taking a scattershot approach, challenging nearly every Rule 23 element, even those such as numerosity that are not normally controversial.

72.     Plaintiffs carefully refuted all of these arguments in a 65-page brief with nine exhibits (Docs. 219-220). Plaintiffs' brief pointed out that many of Defendants' characterizations of the factual record and their attacks on the sufficiency of Plaintiffs' proof were actually disputed issues that would apply to the entire class; cleared up Defendants' attempt to muddy the waters on the proposed class definitions; and set forth the evidence supporting each Rule 23 element.  My firm led the briefing team.

73.     The Court heard over three hours of oral argument on class certification on October 1, 1993. I argued for the Plaintiffs.

74.     On October 8, 1993, the Court certified both the property and medical monitoring classes. *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D. Colo. 1993) ("*Cook IV*"). The Medical Monitoring Class was defined as "natural persons" who lived or had lived within the Medical

Monitoring Class Area. *Cook IV*, 151 F.R.D. at 382. The Property Class was defined as "[a]ll Persons and entities owning an interest … in real property situated with the Property Class Area…" *Id*. at 382. Thus, many if not most of the Property Class members who are natural persons and who lived on their properties would have also been included in the Medical Monitoring Class.

### H.  Summary Judgment and *Daubert* Briefing; *Cook VIII* (July 29, 1998)

75.     On September 23, 1996, Dow filed a motion for summary judgment, again arguing that Plaintiffs' claims were barred by the statute of limitations (Doc. 851), echoing the arguments Dow had raised in its 1991 summary judgment filing that had been decided in *Cook I*, 755 F. Supp. at 1482-83. Plaintiffs moved to strike the renewed motion as procedurally deficient (Doc. 859). On October 22, 1996, the Court granted Plaintiffs' motion (Doc. 868).

76.     Between December, 1996 and April, 1998, the parties filed numerous dispositive or partially dispositive motions. Defendants moved a fifth time to dismiss the case and moved to decertify the property and medical monitoring classes (Doc. 884). Plaintiffs moved for partial summary judgment on three discrete issues: that strict liability should apply because Defendants' operation of Rocky Flats was an abnormally dangerous activity; that strict liability should apply because Defendants' operation of the plant was an absolute nuisance; and that Rockwell committed the acts to which it had pled guilty in 1992 (Doc. 889). Additionally, after the Court-ordered deadline for filing all dispositive motions (which was an attempt to rein in Defendants' incessant filing and re-filing of such motions), Defendants filed their sixth such motion, which they claimed was prompted by information learned during the depositions of Plaintiffs' experts (Doc. 973). Lastly, Defendants moved to strike *all* of Plaintiffs' experts (Docs. 981, 984) plus an

additional motion to strike Plaintiffs' expert Dr. Radke (Doc. 1004) based on his alleged lack of cooperation with discovery.

77.     Class Counsel, again led by my firm, mobilized a heroic effort to respond to Defendants' filings. Plaintiffs' opposition to summary judgment and decertification (Docs. 961-962) totaled 165 pages with 48 exhibits. Plaintiffs' motion to strike Defendants' motions to strike Plaintiffs' experts and for summary judgment based on expert discovery, in which Plaintiffs argued that Defendants' motions were too late under the Court's scheduling order, spanned 26 pages and 7 exhibits. (Doc. 989). Class Counsel filed an opposition to the motion to strike Dr. Radke (Doc. 1023), arguing that Defendants' motion (which was premised on Dr. Radke's purported non-compliance with discovery) was in fact based on a controversy manufactured by Defendants. As part of their opposition, Plaintiffs cross-moved for an order barring further, harassing discovery requests on Dr. Radke.

78.     In their substantive opposition to summary judgment (Doc. 961), Class Counsel once again set out in extensive detail the elements of their trespass and nuisance claims, and again demonstrated that, under Colorado law, the question of whether earlier publicity about problems at Rocky Flats was sufficient to trigger the statute of limitations, especially in light of Defendants' public reassurances, was a question of fact for the jury.

79.     Defendants responded with a reply brief (Docs. 1028-1029) that totaled 41 pages, with 2 exhibits.

80.     On July 29, 1998, the Court, after tunneling through this mountain of paperwork, issued its opinion in *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473 (D. Colo. 1998) ("*Cook VIII*").

81.     First, the Court decertified the medical monitoring class in light of changes in the law governing 23(b)(2) injunctive relief classes, but reaffirmed certification of the property class under Rule 23(b)(3), despite Defendants' renewed challenges under every Rule 23(b)(a) and (b)(3) element. *Id*. at 480-482.

82.     Second, the Court denied Dow's motion for summary judgment on statute of limitations grounds, reaffirming Judge Babcock's rejection of Defendants' statute of limitations arguments in *Cook I*. The Court found a genuine issue of material fact existed as to whether the legal claims accrued outside of the limitations period, given that the record did not clearly show that the named Plaintiffs or the Class had actual or constructive knowledge of their claims, and the evidence did not establish when any diminution in value occurred and that plutonium remained in the environment, putting Class members at risk of continuing releases and exposures. *Id*. at 484.

83.     Third, the Court denied summary judgment on the trespass and nuisance claims, finding that Plaintiffs had presented sufficient evidence that the diminution in value suffered by the Property Class was the result of actual invasion by plutonium or interference with the Class members' use and enjoyment of their property, not simply stigma and negative publicity. *Id*. at 485-86.

84.     Fourth, the Court denied Plaintiffs' more limited motion for partial summary judgment on three discrete issues: strict liability, absolute nuisance, and a ruling that Rockwell committed the acts to which it pled guilty. *Id*. at 486-87.

85.     Fifth, the Court granted Plaintiffs' motion to strike additional motions for summary judgment based on expert discovery that Defendants filed after the Court-ordered deadline for dispositive motions. *Id*. at 487.

86.     Sixth, the Court denied Defendants' motions to exclude Plaintiffs' experts, finding that such a decision was premature as Plaintiffs had not yet sought to rely on those experts at a hearing or at trial. *Id*. at 487-489.

87.     On August 20, 1998, Defendants moved the Court to certify its decision for interlocutory appeal under 28 U.S.C. § 1292(b) (Doc. 1042). The Court granted Defendants' motion on August 27 (Doc. 1046).

88.     Defendants filed their petition for appeal in the Tenth Circuit, and Plaintiffs filed a response. *Cook v. Rockwell Int'l Corp*., Nos. 98-533 & 98-534 (10th Cir.). The Tenth Circuit denied Defendants' petition on October 8, 1998.

**I.   First and Revised Class Notices**

89.     Simultaneously with the extensive briefing on discovery and dispositive motions, Plaintiffs diligently worked to issue notice to the classes. Plaintiffs had initially moved on January 3, 1995 for an order approving their proposed class notices to the property and medical monitoring classes (Doc. 445). The Court approved the form of notice on February 10, 1995 (Doc. 480). The Court also appointed Phyllis Knight as a neutral opt-out agent. *Id.* at 13-14.

90.     On August 20, 1998, as directed by the Court in *Cook VIII*, Plaintiffs moved for approval to issue revised class notices (Doc. 1041). Defendants opposed various aspects of the notice, precipitating further briefing.

91.     On December 3, 1998, Judge Kane granted Plaintiffs' motion and approved the revised class notice (Doc. 1063). The Court granted approved a further revised notice on January 5, 1999 (Doc. 1071).

92.     Over the course of several months in 1999, Class Counsel worked diligently with the claims administrator and Ms. Knight to ensure that this notice was distributed thoroughly and

efficiently to reach the maximum number of Class members possible. Ms. Knight served as the neutral opt-out agent until May 22, 2000. (*See* Doc. 1148, Report of Neutral Opt-Out Agent; Motion for Order for Payment of Fees; and Motion for Order Regarding Transition Procedures; Doc. 1154, Amended Order Discharging Neutral Opt-Out Agent and Determining Mootness of Motions.)

### J.   Rule 104(a) Hearing on Expert Testimony

93.    *Cook VIII* would not spell the end of Defendants' efforts to exclude Plaintiffs' experts. On November 19, 1998, Defendants filed a motion for a hearing under Federal Rule of Evidence Rule 104(a) to determine the admissibility and qualifications of Plaintiffs' witnesses (Doc. 1060), and another motion asking the Court to order a pretrial plan and set a trial date (Doc. 1061). Defendants argued that the Court should decide the admissibility of expert testimony during the pretrial phase, rather than waiting until trial as the Court in *Cook VIII* had proposed to do.

94.    On December 3, 1998, the Court granted in part and denied in part Defendants' motions (Doc. 1063), ordering a Rule 104(a) hearing on the admissibility of scientific expert testimony but waiting to order the filing of a pretrial plan or to set a trial date until after that hearing.

95.    On Plaintiffs' motion (Doc. 1067), the Court modified its December 3, 1998 Order to allow Plaintiffs to file a response to Defendants' motion to strike, and for Defendants to file a reply.

96.    On January 26, 1999, Plaintiffs filed a response brief totaling 199 pages and ten *volumes* of exhibits (Docs. 1078 & 1079). Plaintiffs filed corrected materials on February 5, 1999 (Docs. 1093, 1099). The brief contained a detailed recitation of the governing law on

*Daubert* and FRE 702, and explored every technical nuance of Plaintiffs' 18 potential trial experts' qualifications, methodologies, and relevance to the issues to be tried. Peter Nordberg led a team of attorneys from my firm in this momentous effort.

97.     On February 4, 1999, Defendants filed a 142-page reply brief, complete with a voluminous supplemental appendix and ten rebuttal expert reports, including some from previously-undisclosed experts (Doc. 1089). Instead of shoring up their earlier arguments or responding to points raised by Plaintiffs in their response brief, Defendants' reply – admitting that their initial motion to strike was merely "designed to give the court a preview" of their objections to Plaintiffs' experts, *id.* at 1 – launched a barrage of entirely new attacks against many of Plaintiffs' experts.

98.     Plaintiffs filed an objection to Defendants' new brief on February 5, 1999 (Doc. 1094).

99.     The Rule 104(a) hearing took place on February 8 and 9, 1999, for two full days. Peter Nordberg, Eric L. Cramer, David F. Sorensen, and I argued for the Plaintiffs. Despite having received Defendants' voluminous "reply" brief on the eve of the hearing, Class Counsel worked assiduously to prepare for this hearing and respond to Defendants' arguments – both old and new. Both sides prepared and offered a wealth of exhibits illustrating the key points in their arguments.

100.     In March 12, 1999, Class Counsel filed a sur-reply to Defendants' motion to strike our experts (Doc. 1115) that totaled 40 pages and 15 exhibits, addressing the most salient points raised in Defendants' initial motion to strike and at the oral argument.

101.     Defendants filed a short response to the sur-reply on March 25, 1999 (Doc. 1119).

102.    Defendants' motion remained undecided until the early 2000s. In its order dated February 12, 2001 (Doc. 1176), the Court stated its intention to resolve the outstanding expert issues once the parties had presented a trial plan defining the issues and witnesses to be presented at trial. Plaintiffs filed a motion to strike Defendants' original motion to strike on December 5, 2002 (Doc. 1202), but the Court later denied it as moot (Doc. 1212, filed Sept. 11, 2003), opting to require the parties to brief their *Daubert* arguments in light of the Court's July 24, 2003 opinion (*Cook v. Rockwell Int'l Corp.*, 273 F. Supp.2d 1175 (D. Colo. 2003) ("*Cook IX*")) clarifying a number of the substantive issues for trial.

**K.  Further Discovery 1998-2000**

103.    As mentioned above, Class Counsel continued to receive discovery from DOE until the 2000s.

104.    In addition, between 1998 and 2000, Bruce DeBoskey and I travelled extensively in the Denver area interviewing additional potential witnesses. Many of these individuals had contacted Silver & DeBoskey in response to the Class notice.

105.    On April 1, 1999, the case was again reassigned from Judge Kane to Judge Matsch (Doc. 1124). Judge Matsch held one hearing on June 25, 1999, where he attempted to give the parties some direction on the outstanding "scope of trial" issues. Then, on August 2, 2000, the case was reassigned back to Judge Kane (Doc. 1157).

**L.  Disputes Over Scope of Class Trial and Trial Plan; *Cook IX* (July 24, 2003)**

106.    The Court's deadline for filing dispositive motions would not spell the end of Defendants' attempts to chip away at the Class's claims. Between late 2000 and 2004 the parties (as directed by the Court) made several attempts to submit a joint pretrial order, but their competing proposals to the Court did not generate a workable trial plan. *See* Order at 1-3 (May

28, 2004, Doc. 1235) (discussing procedural history). This difficulty was due in no small part to the fact that, in lieu of simply submitting the requested lists of issues or evidence to be presented at trial, Defendants used their filings to re-argue class certification or raise new and increasingly complex arguments regarding the legal tenability of Plaintiffs' claims. *See*, *e.g.*, Report Concerning Opinion Testimony Pertinent to Trial Issues (Doc. 1137, Jul. 30, 1999); Proposed Pretrial Plan (Doc. 1180, filed Feb. 26, 2001).

107.    Several core issues kept reappearing in the parties' submissions. First, Defendants insisted that, as an element of their PAA claims, Plaintiffs must prove that any releases of radioactivity from Rocky Flats must exceed so-called federal nuclear emissions standards. *E.g.*, Defendants' Status Report (Doc. 1126, filed May 11, 1999); Defendants' Report  Concerning Opinion Testimony Pertinent to Trial Issues, at 11 (Doc. 1137, filed Jul. 30, 1999); Defendants' Proposed Pretrial Plan, at 2 (Doc. 1180, filed Feb. 26, 2001).

108.    Plaintiffs (in, *inter alia*, their March, 21, 2001 filing, Doc. 1186) refuted this quasi-conflict preemption argument at length, arguing that the PAA explicitly preserved state law as the rules of decision in a PAA case (as demonstrated both by the PAA text and its legislative history), and that decades of case law interpreting the PAA had upheld this principle. They also pointed out, *inter alia*, that Defendants had not cited any federal standards for the allegedly permissible levels of plutonium in soil.

109.    Second, Defendants argued that under Colorado trespass law, Plaintiffs must show some "substantial" physical damage to their property, not simply what Defendants argued was a supposedly "*de minimis*" presence of plutonium contamination. In response, Plaintiffs cited binding Colorado trespass law holding that a trespass occurs based on an invasion of property, and that physical damage is not an element of a trespass claim. *See* Doc. 1186 at 33-34.

51

110.     Third, Defendants argued that to prove the plutonium caused a nuisance, Plaintiffs would have to show that it existed on the Plaintiffs' properties in an amount sufficient to cause toxicological concern. *E.g.*, Doc. 1180 at 2-3. In response, Plaintiffs thoroughly researched Colorado law and demonstrated that nuisance is distinct from trespass in that it does not require any physical invasion of the land, and that the standard for judging a nuisance was whether the interference was substantial and unreasonable under community norms. *See* Doc. 1186 at 34-43.

111.     Fourth, Defendants continued to characterize Plaintiffs' evidence of diminution in property values as reflecting mere "market stigma" caused by proximity to Rocky Flats, rather than any actual nuisance or trespass caused by Defendants. Plaintiffs responded that they had provided sufficient evidence to show that any market stigma was in fact the direct result of the hazards and contamination caused by Rocky Flats, and further, that evidence of market stigma could itself indicate that a nuisance was substantial and unreasonable. Doc. 1186 at 41-43.

112.     Fifth, in response to Defendants' statute of limitations argument and their insistence that damages should be measured by comparing property values before and after a triggering event (which relied on their characterization of Plaintiffs' claims as based on pre-1970 releases), Plaintiffs argued that applying those rules would be inappropriate in this case, where Plaintiffs alleged an ongoing tort. Instead, Plaintiffs argued that the proper measure of damages should be the diminution in value compared to what property values would be, but for the trespass and nuisance. Plaintiffs cited the Restatement (Second) of Torts, § 930, which allows a plaintiff to opt to recover for past and future invasions in the same action, at the point in time when "the injurious situation became complete and comparatively enduring". *See, e.g.*, Plaintiffs' Response to Defendants' Status Report at 21-22 n.32 (Doc. 1129, filed May 28, 1999); Plaintiffs' Proposed Pretrial Plan, at 4, 7-8 (Doc. 1181, filed Feb. 26, 2001).

113.    My firm took the lead on briefing these numerous rounds of disputes over the proposed trial plan.

114.    Class Counsel engaged in numerous meet-and-confer calls and correspondence with defense counsel to attempt to reach resolution on at least some issues. However, given Defendants' gambit to use the pretrial process as a way to pare down the class's claims, there was no middle ground between the parties' positions.

115.    The Court held a pretrial planning hearing on February 28, 2001 to attempt to address some of these issues. I presented the Plaintiffs' positions.

116.    In order to resolve the issues that were standing in the way of a trial plan, on July 24, 2003 the Court issued its decision in *Cook v. Rockwell Int'l Corp.*, 273 F. Supp.2d 1175 (D. Colo. 2003) ("*Cook IX*"). In that key opinion, the Court agreed with many of Plaintiffs' positions and ruled as follows:

117.    First, the Court rejected Defendants' claim that alleged federal nuclear emissions standards should preempt Plaintiffs' tort claims. *Id*. at 1179-99. The Court gave a thorough recitation of federal preemption principles and the history and text of the PAA to hold that none of the various types of preemption applied in this case.

118.    Second, the Court held that Colorado Courts would treat radioactive plutonium contamination as a "tangible" trespass, and thus Plaintiffs and the Class were not required to establish any further physical damage to their property or contamination at a level sufficient to pose a health risk as Colorado would require for an "intangible" trespass. *Id*. at 1199-201.[11]

_____

[11] This holding was later reversed in *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127 (10th Cir. 2010) ("*Cook Appeal I*").

119.     Third, the Court rejected Defendants' argument that proof of a health risk was required for Plaintiffs' nuisance claim under Colorado law. The Court clarified that under Colorado law, the significance of an alleged interference with a plaintiff's use and enjoyment of their property would be judged according to what a normal member of the community would find to cause discomfort, annoyance, or fear, even if those reactions would not have a scientific foundation. *Id*. at 1203-08. (The Court would later limit consideration of class members' fear or emotional discomfort – scientifically-founded or not – to a potential, later stage of the case after the class trial on the class-wide forms of interference with use and enjoyment. *See* Doc. 1338 (May 17, 2005 Order) at 4-6; Doc. 2121 (final jury instructions) at 40-43 (Instruction 3.7), 76-77 (Instruction 3.28)).  The Court also observed that a "threat of future harm" could constitute a nuisance if that threat was sufficient to cause disturbance to a normal person. *Id*. at 1208.

120.     Fourth, the Court clarified that the jury could not base a finding of nuisance on mere proximity or market stigma due to Rocky Flats, and that a mere decrease in property value is not an interference with use and enjoyment of property, but at the same time, diminution in value could be evidence "that actual contamination or other claimed factors of interference are substantial and unreasonable enough to give rise to nuisance liability." *Id*. at 1209.

121.     Fifth, the Court adopted Class Counsel's proposal that damages be awarded and calculated based on the Restatement § 930: that is, the Court would consider this action to be Plaintiffs' and the Class's election to bring one action to recover for both past and future invasions, and the measure of damages would thus be the diminution of value at the point when the tort "became complete and comparatively enduring." *Id*. at 1210 (quoting Rest.2d Torts § 930(3)).

122.     Sixth, the Court held that Plaintiffs could not seek punitive damages for plutonium releases occurring after the 1988 amendments to the Price-Anderson Act. *Id.* at 1211-12.

123.     Seventh, the Court rejected the Defendants' renewed protestations that individualized damages issues should preclude a class trial, holding that if Plaintiffs could establish an aggregate damages amount at trial, the Court would later develop a procedure for distributing that award to individual Class members. *Id.* at 1212.

**M. Jury Instructions Briefing**

124.     Between July and September, 2004, the parties engaged in the first volley of briefing on their competing proposed jury instructions. The instructions were briefed in three phases: trespass, nuisance, and damages. *See* Order, May 3, 2004 (Doc. 1226). For each phase, the parties exchanged their instructions in advance, and then each party filed a package of material consisting of their own proposed instructions footnoted with the legal authority supporting each instruction; objections and legal argument in opposition to the opponent's proposed instructions; and a proposed verdict form. After the parties filed their proposals for each phase, the opposing party filed responsive briefing, and for some instructions there were replies and surreplies. Plaintiffs' filings are found at Docs. 1244 (Trespass), 2211 (Nuisance), 1259 (Reply to Defendants' Objections to Proposed Jury Instructions – Nuisance Claims), and 1272 (Phase III damages). My firm took primary responsibility for drafting these submissions.

125.     The Court held three hearings relating to the parties' competing proposals: on July 22, 2004, September 8, 2004, and October 22, 2004. I argued for the Plaintiffs at all three hearings, and Peter Nordberg also argued at the October hearing.

126.   The Court gave its rulings on the trespass instructions on December 17, 2004 (Doc. 1311). However, as the volume of briefing and number of proposed instructions continued to grow, the Court did not issue a complete list of instructions until October 11, 2005, when the newly-empaneled jury was instructed at the outset of trial. *See* Order, Feb. 16, 2006, at 1 (Doc. 2121).

127.   In addition, after the main rounds of briefing the parties submitted some specific amended or supplemental jury instructions, triggering yet more briefing, including sets of supplemental instructions filed on the eve of trial and even during the trial itself. *See* Docs. 1436 (Plaintiffs' Proposed Supplemental Instructions and Objections to Defendants' Supplemental Instructions, filed Sept. 6, 2005); 1445 (Defendants' Submission of Supplemental Jury Instructions and Jury Verdict Form, and Objections to Plaintiffs' Supplemental Jury Instructions, filed Sept. 16, 2005), 1454-1455 (Defendants' Submission of Supplemental Jury Instructions, filed Sept. 23, 2005), 1456 (Plaintiffs' Proposed Limiting Instruction: Utility Versus Harm, filed Sept. 23, 2005); 1469 (Plaintiffs' Objections to Defendants' Supplemental Jury Instructions, filed Sept. 29, 2005); 1470 (Defendants' Submission of Their Objections to Proposed Limiting Instruction, filed Sept. 29, 2005), 1498 (Defendants' Objection to Giving a Punitive Damages Instruction, filed Oct. 10, 2005), 1499 (Defendants' Submission of Limiting Instructions Pursuant to the 10/7/05 Hearing and a Related Statement by Defendants, filed Oct. 10, 2005), 1589 (Plaintiffs' Proposed Jury Instructions re Representation of Witnesses at Depositions, filed Nov. 4, 2005), 1679 (Plaintiffs' Proposed Jury Instructions Regarding Deposition Testimony of Dr. James Flynn, filed Nov. 17, 2005), 1755 (Defendants' Proposed Jury Instructions Regarding Stigma Evidence and Class Members, filed Dec. 7, 2005) & 1783 (Supplement, filed Dec. 11, 2005), 1768 (Defendants' Proposed Jury Instructions Regarding the Type of Compensatory

Damages that Can Be Awarded, filed Dec. 8, 2005), 1885 (Plaintiffs' Proposed Revisions to Jury Instructions, filed Dec. 22, 2005), 1958 (Defendants' Proposed Changes to Preliminary Jury Instructions, filed Jan. 10, 2006), 1963 (Defendants' Proposed Jury Verdict Forms, filed Jan. 11, 2006), 1978 (Plaintiffs' Proposed Revisions to Jury Instructions, filed Jan. 13, 2006), 2009 (Defendants' Proposed Jury Instructions Regarding Corporate Retention of Expert Witnesses, filed Jan. 17, 2006), 2013 (Defendants' Reply in Support of Their Proposed Instruction on Corporate Retention of Expert Witnesses, filed Jan. 18, 2006), 2015 (Defendants' Objections to Jury Instructions and Verdict Form, filed Jan. 18, 2006), 2018 (Plaintiffs' Statement in Opposition to Defendants' Oral Motion to Reconsider Revisions to Instruction 3.5, filed Jan. 18, 2006), 2019 (Defendants' Motion to Strike Portions of Jury Instruction No. 3.5, filed Jan. 19, 2006), 2020 (Defendants' Motion for Clarification and Defendants' Statement Regarding the Court's Ruling Relating to Jury Instruction No. 3.5, filed Jan. 19, 2006), 2012 (Plaintiffs' Response to Defendants' Proposed Instruction on Corporate Retention of Expert Witnesses, filed Jan. 18, 2006), 2019 (Defendants' Motion to Strike Portions of Jury Instruction No. 3.5, filed Jan. 19, 2006), 2023 (Defendants' Objections to Additional and Revised Jury Instructions, filed Jan. 19, 2006), 2029 (Defendants' Objections to Jury Instructions, filed Jan. 20, 2006), 2027 (Plaintiffs'  Objections to Final Jury Instructions and Verdict Form, filed Jan. 20, 2006), 2029 (Defendants' Objections to Jury Instructions, filed Jan. 20, 2006), 2031 (Defendants' Proposed Change to Instruction No. 3.28, filed Jan. 20, 2006), 2038 (Plaintiffs' Opposition to Defendants' Proposed Change to Jury Instruction No. 3.28), 2052 (Plaintiffs' Proposed Supplemental Jury Instruction, filed Jan. 25, 2006).

128.     Defendants' unrelenting attacks on the jury instructions required repeated responses from Class Counsel, usually via oral argument in court. For the Plaintiffs, my firm took the lead on briefing and arguing these issues.

129.     The Court issued final instructions on January 18, 2006 before closing arguments, *see* Docs. 2074 & 2121 at 1, and then the Court gave some additional instructions on January 26, *see* Doc. 2121 at 2.

130.     The proposed instructions dealt not only with the minutiae of Colorado trespass, nuisance, and damages, but also included limiting instructions on a wide range of evidentiary issues such as evidence regarding the DOE's involvement at Rocky Flats, evidence of past publicity, and how to interpret the fact that certain requested evidence had been withheld as classified. Further, the instructions and the verdict form (based on extensive briefing by the parties) were structured to provide the jury's decision on both the wholly class-wide claims (such as trespass or nuisance based on risk), and on elements of non-class-wide claims (such as nuisance based on individual emotional distress) that would require later proceedings to decide the individualized issues. The resulting instructions and verdict form were unavoidably complex. The Court's 96-page Memorandum Opinion re: Jury Instructions, 2006 U.S. Dist. LEXIS 89515 (D. Colo. Dec. 7, 2006) (Doc. 2205), which issued long after the dust had settled from the trial and from heated post-trial motions practice, reflects that complexity.

### N.  The Court Adopts the Restatement § 930 Approach to Statute of Limitations; *Cook X* (Dec. 17, 2004)

131.     As mentioned above, in the course of briefing the parties' competing proposals for jury instructions, one major sticking point was the Defendants' repeated argument that the statute of limitations should limit or bar Plaintiffs' claims. This issue generated particularly complex arguments on both sides. The Defendants argued for the application of Colorado's

statute of limitations for permanent torts, which ran from the date that Plaintiffs and the Class members knew or should have known of the invasion. Plaintiffs, in turn, argued that under Colorado law, plutonium contamination would be considered a continuing tort. Class Counsel also argued for an innovative application of the Restatement (Second) of Torts § 930's rule for continuing torts. *See, e.g.*, Docs. 1254 (filed Aug. 4, 2004); 1269 (filed Sept. 1, 2004).   Again, our firm led the briefing on this issue.

132.    The Court heard argument on this issue at the September 8, 2004 status conference. Peter Nordberg and I argued for the Plaintiffs.

133.    In *Cook v. Rockwell Int'l Corp.*, 358 F. Supp. 2d 1003 (D. Colo. 2004) ("*Cook X*"), after carefully considering the parties' arguments and outlining a comprehensive survey of Colorado precedent, other states' precedent, and the policy issues involved, the Court held that the trespass and nuisance at issue were continuing torts. The Court ratified Plaintiffs' reliance on the Restatement § 930, under which Plaintiffs elected "to seek recovery of prospective damages for this continuing invasion, which is 'the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring.'" *Id*. at 1013 (quoting Rest.2d Torts § 930).

### O. *Daubert* Motions and Motions *in Limine*; *Cook XI* and *Cook XIII*

134.    On February 11, 2005 the Court issued a scheduling order setting a trial date of October 3, 2005. (Doc. 1325). On May 17, 2005 the Court entered another scheduling order (Doc. 1338) setting deadlines for motions to exclude expert testimony and motions *in limine*. The parties filed these materials on June 16, 2005 (Docs. 1350-1352, 1354-1380).

As the Court's opinion on these motions would later recount:

Defendants responded by filing nineteen motions seeking to exclude all testimony by Plaintiffs' eleven designated expert witnesses and much of Plaintiffs'

anticipated lay evidence. Defs.' Mot. to Exclude Expert Witness Test. Relating to Damages (Doc. 1371); Defs.' Mot. to Exclude Expert Witness Test. Relating to Defs.' Conduct (Doc. 1374); Defs.' Mot. to Exclude Expert Witness Test. Relating to Risk (Doc. 1376/1380); Defs.' Mots. in Limine Nos. 1-16 (Docs. 1354-69). Plaintiffs filed two, more limited motions seeking to exclude or limit the testimony of eleven of the eighteen or more expert witnesses designated by Defendants and to exclude certain lay evidence. *See* Pls.' Mot. to Exclude Test. of Certain Defense Expert Witnesses (Doc. 1350); Pls.' Omnibus Mot. in Limine (Doc. 1341). By the time briefing was completed on these motions, Plaintiffs had submitted nearly 300 pages of argument and Defendants had submitted more than 700 pages. Together, the parties provided approximately 5400 additional pages of exhibits to be considered in connection with their motions.

*Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1079 (D. Colo. 2006) ("*Cook XIII*"). My firm was primarily responsible for this complicated and voluminous briefing.

135.    Plaintiffs' 128-page brief in response to Defendants' scattershot *Daubert* filing (Doc. 1399, filed July 11, 2005) established the qualifications, credibility, and relevance of each expert's testimony. The brief engaged with obscure, technical arguments such as: the fact that the three methods of real estate appraisal that Defendants claimed were preferable (cost, income capitalization, and sales) were not well suited to the task of measuring damages in the Class Area; Dr. Radke's use of the "weighted least squares" regression format; Defendants' multiple alleged sources of bias in the Flynn and Slovic public opinion survey, and Drs. Flynn and Slovic's compliance with established scientific survey techniques; the fact that Dr. Goble's statistical confidence ranges on his estimates of cancer risk were within acceptable parameters; the minutiae of Dr. Goble's assumptions behind his estimates of the amount and dispersion of radioactive contamination from Rocky Flats; the fact that Dr. Clapp's estimates of cancer incidence in the Class Area due to Rocky Flats were conservative due to the long latency period of cancer and the dilution of his sample by individuals moving into and out of the Class Area; and the methodological and evidentiary bases for Drs. Cochran and Budnitz's assessments of Defendants' failure to comply with established safety guidelines. These and other arguments

required Class Counsel to work closely with the expert witnesses in order to understand and explain the science behind each expert's methodology.

136.    In opposition to Defendants' motions *in limine*, Plaintiffs grouped them by general category or theme and then set forth the arguments undermining each one. On the FBI raid, grand jury investigation, and guilty plea, Plaintiffs argued these events were relevant to public perception of Rocky Flats and therefore damages, and refuted Defendants' characterization of the guilty plea as somehow exonerating Rockwell. On Defendants' motion to exclude mention of DOE's indemnification agreements with Dow and Rockwell, Plaintiffs distinguished indemnification from evidence of insurance (as barred by FRE 411 when used to show negligent or wrongful conduct), and also explained that this evidence was offered for a permissible purpose under Rule 411: to show DOE's "bias or prejudice", Fed.R.Evid. 411, which was relevant to issues including the credibility of DOE witnesses and DOE-sponsored dose reconstruction studies. Plaintiffs also demonstrated how Defendants' motions to bar evidence of DOE's discovery misconduct, hazardous substances other than plutonium, health hazards to Rocky Flats workers, incidents occurring "wholly within buildings", plutonium releases that did not disperse class-wide, MUF, and other subjects were overly broad or amorphous, and demonstrated how each of those topics was relevant to the issues to be tried. And on Defendants' motion to limit opinion testimony by lay witnesses (such as Plaintiffs' witness Gale Biggs), Plaintiffs demonstrated that the Federal Rules of Evidence and governing case law allow opinion testimony by a lay witness when that testimony is based on his or her personal knowledge or perceptions.

137.    In their affirmative motion *in limine* (Doc. 1341), Plaintiffs set out the case for excluding certain targeted categories of evidence: namely, appreciation of property values after

the date that the Class's injury became complete and comparatively enduring (through which Defendants would seek an end-run around the Court's rejection of their proposed "before and after" measure of damages or their defense of set-off); class members' prior knowledge of Rocky Flats (which Defendants would likely seek to offer in support of their discredited "coming to the nuisance" defense); opinion testimony by Defendants' realtor witnesses (which was more properly considered expert testimony because it pertained to the market as a whole, not just the witnesses' own perceptions); Defendants' evidence of alleged regulatory standards (which Plaintiffs had previously shown was not how Colorado nuisance law judges the reasonableness of an interference with use and enjoyment); and Defendants' attempt to recount Cold War history (which risked prejudicing the jury).

138.   The Court heard four days of argument (July 28, 2005 through August 3, 2005) on the *Daubert* motions and motions *in limine*. *See* Docs. 1412, 1413, 1414, 1416, 1417. *See also* Docs. 1431-1434 (hearing transcripts). Peter Nordberg, David F. Sorensen, and I (all from Berger & Montague) argued for Plaintiffs.

139.   On August 22, 2005 (Doc. 1430 at 3-9, 14-15) and September 13, 2005 (Doc. 1443) the Court issued bench rulings on the *Daubert* motions and motions *in limine*, outlining the evidence it would permit or exclude so as to assist the parties with their trial preparations without delaying the trial date, but postponing a detailed written opinion.

140.   The Court later issued a nearly 200-page opinion on December 7, 2006 (*Cook XIII*, 580 F. Supp. 2d 1071), explaining its rulings on the *Daubert* motions and motions *in limine* that it had announced from the bench before trial. The opinion contained a scholarly exposition of the standards for expert qualifications, the reliability of expert testimony, and principles of relevancy. It analyzed each expert or evidentiary item in great detail, and thoughtfully weighed

the parties' highly technical arguments regarding the science behind their experts' analyses.
Ultimately the Court denied the motions to exclude all ten of Plaintiffs' trial experts, excluded
one of Defendant's experts (in addition to Dr. Fry, who was the subject of the Court's December
2005 ruling), and limited the testimony of four defense experts. Additionally, the Court denied
all 15 of Defendants' motions *in limine*, though leaving open the possibility of imposing limits
on certain evidence if the circumstances would require it. The Court granted (in whole or in part)
seven of Plaintiffs' motions *in limine*, and denied one.

141.    Shortly before the trial was to begin, and after the Court's bench ruling denying
the Defendants' motion to exclude the testimony of Plaintiffs' expert Dr. Wing, Defendants
belatedly disclosed a new expert, Dr. Fry, whose testimony they offered to rebut Dr. Wing. As
the trial continued, Class Counsel devoted additional resources to briefing a motion to exclude
Dr. Fry and two other newly-announced defense experts, Dr. Grogan, and Mr. Voilleque. (Doc.
1728, filed Dec. 4, 2005). My firm led the briefing effort.

142.    On December 15, 2005, the Court granted the motion to exclude Dr. Fry. *Cook v.
Rockwell Int'l Corp.*, 233 F.R.D. 598 (D. Colo. 2005) ("*Cook XI*"). On January 3, 2006, the
Court granted the motion to exclude Mr. Voilleque and denied as moot the motion to exclude Dr.
Grogan, whom Defendants no longer planned to call to testify (Doc. 1919).

**P.  Trial and Verdict**

**1.  Preparation and Presentation of Testimony and Evidence**

143.    The jury was selected on October 6, 2005, and opening statements began on
October 11.  Ms. Roselle (then with WSBC) and I gave the opening statement on behalf of
Plaintiffs.  The trial lasted through January 20, 2006 (verdict was reached February 14, 2006).

144.     Plaintiffs called five Class Representatives to testify, plus 14 fact witnesses and 10 expert witnesses. Plaintiffs offered deposition designations in lieu of live testimony for two of these fact witnesses, plus one expert witness (Mr. Flynn) who had begun to testify but became ill and could not continue. Berger & Montague attorneys (Merrill G. Davidoff, David F. Sorensen, and Ellen Noteware) presented the direct testimony from 15 of those witnesses (including five experts); and Ms. Roselle, then with WSBC and who now practices with Markovitz, Stock, and DeMarco, took 12 witnesses.

145.     Class Counsel's trial team worked diligently to prepare each of those witnesses to testify, including developing the themes for questioning, selecting exhibits, and preparing them for cross-examination. This work occurred during the trial day, in the mornings and evenings during trial, and on the weekends.  Class Counsel even conducted 12 days' worth of depositions (of 10 witnesses) during the few days before trial or during the trial itself. Nine days' worth of these depositions were by lawyers at my firm.

146.     Defendants called three fact and nine expert witnesses to testify. Mr. Sorensen and I cross-examined six of those witnesses, and Ms. Roselle cross-examined six.

147.     Cross-examination of defense witnesses involved intense preparation. Class Counsel were required not only to assemble in advance their own witness outlines and exhibits, but also to take notes and review the daily transcript of each witness's testimony for points to raise on cross.

148.     The following chart documents the fact witnesses who testified at trial:

| Fact Witness | Date(s) of Testimony | Affiliation & Subject Of Testimony | Responsible Attorney |
|---|---|---|---|
| Sally Bartlett | 10/14/05 | Class representative; effect of Rocky Flats on use and enjoyment of property and property values | Ms. Roselle (WSBC) |

| Fact Witness | Date(s) of Testimony | Affiliation & Subject Of Testimony | Responsible Attorney |
|---|---|---|---|
| Richard Bartlett | 10/14/05 | Class representative; effect of Rocky Flats on use and enjoyment of property and property values | Mr. Davidoff (B&M) |
| Tim Holeman | 10/14/05 - 10/18/05 | Local government official; effect of Rocky Flats on Jefferson Cty. real estate and business | Mr. Davidoff (B&M) |
| John Ray | 10/18/05 - 10/19/05 | Former Rocky Flats employee; deficiencies in safety and waste handling practices | Mr. Davidoff (B&M) |
| Charles Ozaki | 10/19/05 - 10/20/05 | Broomfield city manager; chronic environmental hazards at Rocky Flats, state and city efforts to pressure Rockwell to bring plant into compliance and to contain and remediate areas, public's reaction to the 1989 FBI raid | Mr. Davidoff (B&M) |
| William Schierkolk | 10/20/05 | Class representative; effect of Rocky Flats on use and enjoyment of property and property values | Ms. Roselle (WSBC) |
| Gertrude Babb | 10/20/05 | Class representative; effect of Rocky Flats on use and enjoyment of property and property values | Ms. Roselle (WSBC) |
| Merilyn Cook | 10/20/05 - 10/21/05 10/24/05 | Class representative; effect of Rocky Flats on use and enjoyment of property and property values | Ms. Roselle (WSBC) |
| Jon Lipsky | 10/24/05 - 10/27/05 11/02/05 | Former FBI agent; FBI investigation of environmental crimes at Rocky Flats | Mr. Davidoff (B&M) |
| Ron Avery | 11/02/05 - 11/03/05 | Former Rocky Flats employee; safety practices and midnight burning of radioactive waste | Ms. Roselle (WSBC) |
| James Watkins | 11/04/05 | US Navy Admiral and Secretary of Energy; environmental problems at RF | Via videotaped deposition (deposition taken by Chimicles, introduction at trial by Ms. Roselle) |
| Sam Cassidy | 11/08/05 | President of Jefferson County Economic Council; risks posed by Rocky Flats stigmatized properties in the Class Area | Mr. Davidoff (B&M) |
| Gale Biggs | 11/08/05 - 11/09/05 | Chaired a committee for the governor of Colorado investigating air monitoring at Rocky Flats; | Ms. Roselle (WSBC) |

| Fact Witness | Date(s) of Testimony | Affiliation & Subject Of Testimony | Responsible Attorney |
|---|---|---|---|
| | | deficiencies in environmental monitoring for plutonium releases | |
| Gretchen Robb | 11/10/05 | Property owner; provided testimony relevant to the existence of a nuisance | Ms. Noteware (B&M) |
| Richard Kaufman | 11/14/05 | DOE classification officer; DOE classification process | Mr. Sorensen (B&M) |
| Karen Whalen | 11/21/05 | Property owner; provided testimony relevant to the existence of a nuisance | Ms. Roselle (WSBC) |
| Joe Bowman | 11/21/05 | Fact witness, investor in undeveloped land in the Class Area; risks posed by Rocky Flats stigmatized properties in the Class Area | Mr. Davidoff (B&M) |
| A. Bryan Siebert | 12/05/05 | DOE employee; declassification | Via deposition transcript (deposition taken by Mr. Sorensen; testimony read by Ms. Noteware) |
| Joel Selbin | 12/08/05 | Fact witness and member of the Rocky Flats Soil Action Levels Oversight Panel; ways in which plutonium travels from the plant site | Mr. Davidoff (B&M) |
| William Weston | 12/13/05 - 12/14/05 | RF employee | Ms. Roselle (WSBC) |
| Michael Norton | 12/14/05 | Federal prosecutor; grand jury investigation of Rocky Flats and decision to settle | Mr. Davidoff (B&M) |
| John Osborn | 01/05/06 | Real estate developer | Mr. Davidoff (B&M) |

149.    The following chart summarizes the testimony of the expert witnesses who

testified at trial:

| Expert Witness | Date(s) of Testimony | Affiliation & Subject Of Testimony | Responsible Attorney |
|---|---|---|---|
| John Radke | 10/26/05 | Plaintiffs' expert; depressed property values in the Class Area | Ms. Roselle (WSBC) |
| Bob Budnitz | 10/27/05 10/31/05 - 11/01/05 | Plaintiffs' expert - Former NRC officer; nuclear safety standards and Dow's failure to comply | Mr. Davidoff (B&M) |

| Expert Witness | Date(s) of Testimony | Affiliation & Subject Of Testimony | Responsible Attorney |
|---|---|---|---|
| Rob Goble | 11/02/05 | Plaintiffs' expert - Health risks of plutonium; class-wide exposures | Ms. Roselle (WSBC) |
| Shawn Smallwood | 11/03/05 - 11/04/05 | Plaintiffs' expert - Ecologist; how plant, animal, and wind activity can expose and redistribute buried contamination | Mr. Sorensen (B&M) |
| Paul Slovic | 11/07/05 | Plaintiffs' expert; researched media coverage of the FBI raid and conducted a public opinion survey, property values | Ms. Roselle (WSBC) |
| James Flynn (witness not able to complete his live testimony due to illness) | 11/07/05 - 11/08/05 | Plaintiffs' expert; researched media coverage of the FBI raid and conducted a public opinion survey | Ms. Roselle (WSBC) |
| Richard Clapp | 11/09/05 - 11/10/05 | Plaintiffs' expert - Epidemiologist; study showing heightened cancer risk in area near Rocky Flats | Mr. Sorensen (B&M) |
| Thomas Cochran | 11/14/05 - 11/16/05 | Plaintiffs' expert - Physicist; Rockwell's failure to comply with safety standards | Mr. Davidoff (B&M) |
| Steve Wing | 11/16/05 - 11/17/05 | Plaintiffs' expert - Epidemiologist; health effects of radiation, DOE influence on scientific research | Ms. Roselle (WSBC) |
| James Flynn | 12/05/05 | Plaintiffs' expert; researched media coverage of the FBI raid and conducted a public opinion survey, property values | Via deposition transcript (deposition taken by defense counsel; testimony read at trial by Ms. Roselle) |
| Wayne Hunsperger | 12/05/05 - 12/08/05 | Plaintiffs' expert; property values | Mr. Davidoff (B&M) |
| Otto Raabe | 12/09/05 | Defendants' expert; health risks of plutonium | Ms. Roselle (WSBC) |
| John Frazier | 12/12/05 | Defendants' expert; "standards" | Mr. Sorensen (B&M) |
| John Till | 12/15/05 - 12/16/05 | Defendants' expert; RAC does reconstruction study | Ms. Roselle (WSBC) |
| Frank Blaha | 01/04/06 | Defendants' expert; waste management practices at RF | Ms. Roselle (WSBC) |
| Kenneth Wise | 01/05/06 - 01/06/06 | Defendants' expert; impact of RF on property values | Mr. Davidoff (B&M) |
| Ralph d'Arge | 01/09/06 | Defendants' expert, economist; impact of RF on property values | Mr. Sorensen (B&M) |

| Expert Witness | Date(s) of Testimony | Affiliation & Subject Of Testimony | Responsible Attorney |
|---|---|---|---|
| John Dorchester | 01/09/06 - 01/10/06 | Defendants' expert; impact of RF on property values | Ms. Roselle (WSBC) |
| William Wecker | 01/11/06 | Defendants' expert, statistician; health risks | Ms. Roselle (WSBC) |
| Dan McFadden | 01/12/06 | Defendants' expert, economist; impact of RF on property values | Mr. Davidoff (B&M) |

150.    In presenting their case, Class Counsel worked closely with Infographics, a trial technology and graphic presentation consultant. For months leading up to the trial, Class Counsel and Infographics' design experts worked together to craft demonstrative exhibits for key concepts and for use with expert witness testimony. These demonstratives were critical to help the jury understand this complex case by simplifying difficult concepts. Also, much of the information in this case needed to be shown, not explained, such as maps or graphics showing the depth of soil affected by plutonium contamination. This close collaboration between Class Counsel and Infographics continued through practically every day during the trial. In addition, Class Counsel and Infographics met daily during trial to review the next day's exhibits and themes, in order to prepare the Infographics technicians who would run the presentation displays in the Courtroom.

151.    Class Counsel invested a tremendous amount of time preparing the special visual presentation that accompanied each expert's testimony, as well as working extensively with each expert to distill his complex and technical testimony into a form that would be comprehensible to the jury.

152.    Dr. John Radke, a geographer, was a professor at the University of California at Berkeley, and director of Berkeley's Applied Environment Geographic Information System Laboratory (AEGIS). Dr. Radke walked the jury through his highly complex regression analysis that measured the effect of proximity to Rocky Flats on property values in the Class Area, while

controlling for a wide range of other factors that can affect property values such as demographics and local amenities or disamenities.

153.    Dr. Robert Budnitz, a physicist, former senior officer at the U.S. Nuclear Regulatory Commission, and former senior manager at the Lawrence Berkeley Laboratory, testified about the pervasive pattern of mishandling of radioactive and toxic materials and routine disregard for basic safety practices during Dow's tenure. He described both major and minor incidents, including the catastrophic plutonium fires that occurred in 1957 and 1969, and the infamous 903 Pad storage area where leaking drums of radioactive waste were stored outside for years. He also explained to the jury how these incidents resulted from Dow's disregard for established industry procedures and guidelines for the safe handling of nuclear material and the improper design of the plant.

154.    Dr. Robert Goble, a physicist, explained his study estimating offsite concentrations of plutonium and attendant exposures within the Class Area. He also described the mechanisms through which plutonium can enter the body and damage human tissue.

155.    Dr. Shawn Smallwood, a systems ecologist, explained to the jury how the activity of flora and fauna on the Rocky Flats plant site can and will continue to unearth buried contaminated soil and disperse it downwind. Dr. Smallwood played for the jury video recordings he had made of prairie dogs digging their burrows, showing how these animals throw large amounts of soil into the air as they dig. He also narrated pictures he had taken during tours of the plant site which showed animal and insect activity, such as rodent burrows and harvester ant mounds, in areas known to be highly contaminated.

156.    Drs. Paul Slovic and James Flynn are experts in the field of risk assessment and public perception of risk. They conducted a scientifically validated public opinion survey that

indicated that attitudes about Rocky Flats had stigmatized property in the Class Area. Dr. Slovic, a professor of psychology, also testified about psychological principles that affect how people perceive different types of risks, and why radiation risk tends to elicit an especially negative reaction.

157.    Dr. Richard Clapp, an epidemiologist, testified about his study showing an increased risk of cancer near Rocky Flats including in the Class Area.

158.    Dr. Thomas Cochran, a nuclear physicist and noted expert on nuclear weapons, provided the jury with an overview of Rocky Flats operations, with a focus on safety procedures. In order to help illustrate Dr. Cochran's testimony about manufacturing processes inside the by-then-shuttered plant, Class Counsel engaged an animation graphics specialist to produce a video (which Dr. Cochran narrated) illustrating the plant history, the design and use of plant equipment such as the "glove boxes" (where workers could handle highly radioactive materials from behind a protective shield), waste handling practices, criticality safety procedures, and major incidents such as the plutonium fires, the 903 Pad, and the pondcrete and saltcrete mishaps. Dr. Cochran assessed both major incidents at Rocky Flats such as the fires and 903 Pad, and Defendants' poor track record on safety in other areas.

159.    Dr. Cochran also testified about how Rocky Flats' serious MUF imbalance both indicated that Defendants' management practices were deficient and likely caused a downward bias in any estimates of releases from the plant and dose reconstruction studies.

160.    Dr. Steven Wing (now deceased), a professor of epidemiology who specialized in studying the health effects of radiation, discussed the current state of medical knowledge about the biological effects of plutonium exposure and explained how the DOE's near-monopoly over

research into the health effects of radiation had tainted the body of scientific research by understating the risks.

161.    Wayne Hunsperger, MAI, is a certified real estate appraiser, property consultant, and was the president of Hunsperger & Weston, Ltd., located in Englewood, Colorado. Mr. Hunsperger presented his exhaustive, multi-faceted analysis of the impact of the Rocky Flats Plant and the 1989 FBI raid on the properties in the Property Class. He explained to the jury how he used five independent methods of estimating diminution of property value: (1) real estate market research; (2) analogous case studies; (3) comparison of market sales data; (4) multiple regression analysis; and (5) the public opinion surveys conducted by Flynn and Slovic and surveys or reports by other entities. Class Counsel collaborated extensively with Mr. Hunsperger and the InfoGraphics team to create a lengthy and detailed slide presentation consisting of over 100 slides, with graphs, maps, and other demonstratives, to present this rather abstract, technical material in a manner that would be comprehensible to the jury.

162.    Altogether, the jury heard nearly four months of testimony, from 41 lay and expert witnesses, in a trial spanning over 10,000 pages of transcript. A total of 385 exhibits, 200 demonstrative or graphic exhibits, and 21 videos were admitted into evidence, and the jury saw numerous additional demonstrative or other exhibits that were not formally admitted into evidence. The trial itself lasted 51 days, not including jury deliberations, which lasted a further 17 days.

163.    It bears noting that the tremendous amount of work demanded of Class Counsel throughout the trial – preparing witnesses and exhibits, filing motions *in limine* and the like, taking discovery on Defendants' newly-revealed evidence, and responding to Defendants' constant barrage of motions practice (as described below) – was accomplished by a relatively

small, streamlined team of attorneys, paralegals, and staff. Only nine attorneys formed the core

trial team in Denver, supported by two or three paralegals, plus the Infographics team. Yet this

lean, efficient group took on one of the most preeminent defense trial firms in the country,

financed by the seemingly limitless resources of the Department of Energy as Defendants'

indemnitor.

### 2. Proliferation of Motions Practice During Trial

164.    Simultaneously with preparing and presenting their trial evidence to the jury,

Plaintiffs' counsel were constantly busy responding to a barrage of filings by Defendants and in

drafting their own objections and memoranda to deal with issues that arose during the trial. The

docket between October 6, 2005 (day one of trial) through January 20, 2006 (closing arguments)

ballooned by over 500 additional docket entries.

165.    In its Order Limiting Motions Practice During Trial (Doc. 1626, filed Nov. 10,

2005), the Court gave a snapshot of the situation:

> This toxic tort class action is now in its sixth week of jury trial. During the course
> of trial, I have been met with near- daily motions practice. The practice is
> accelerating. Since noon yesterday, I have received eight motions on the docket.
> Seven were filed by Defendants, one by Plaintiffs. I received five of the motions
> today alone, and as I write, it is only the lunch hour. Five of the seven Motions
> filed since noon yesterday are motions in limine to strike, exclude or otherwise
> limit witness testimony. Two of the Motions, both of which I received today – one
> before going on the bench at 8:30 a.m. and one alluded to but not received until
> lunchtime – relate to witnesses and testimony scheduled for today.

*Id*. at 1. The Court also recalled the intense motions practice during trial in its post-trial opinion

formalizing its bench rulings on the various evidentiary motions:

> [T]he parties filed approximately 300 additional substantive motions, written
> objections, proposed jury instructions and related legal memoranda during the
> trial that required my attention when I was not presiding in the Courtroom. …
> These filings presented well in excess of a thousand additional pages of legal
> argument and thousands of pages of supporting material regarding issues that in
> most instances had to be decided almost immediately in order for the trial to

72

> continue. This daily deluge of filings as well as matters raised during the parties' Courtroom presentations consumed all of my and my staff's time during trial. This pace continued through the three weeks of jury deliberations, as every question from the jury prompted new disputes and argument by the parties.

*Cook XIII*, 580 F. Supp. 2d 1071, 1081-81 (D. Colo. 2006).

166.    This "deluge of filings" included matters as diverse as filings regarding jury instructions (as mentioned above); motions to admit specific evidence and objections to evidence; motions to exclude or compel production of newly-disclosed evidence (*e.g.*, Docs. 1784, 1830, 1882, 1955, 1980); various administrative filings such as those to correct numbering of exhibits; a written motion by Defendants for a mistrial (Doc. 1903), as well as orders denying Defendants' numerous oral motions for a mistrial, *see* Docs. 1606, 1607, 1684, 1912, 1939, 2066; and various motions to clarify the Court's prior rulings, *e.g.*, Docs. 1723, 1724, 2000.

167.    The Court's Order Limiting Motions Practice (Doc. 1626), *supra*, attempted to bring some order to this chaos by requiring that all filings affecting a witness's testimony be filed four working days before the witness would be called, and that any filings raising matters that were previously ruled upon or that could have been raised in the *Daubert* and motions *in limine* briefing must state a specific justification for raising the matter at that point. *Id.*

### 3.   Briefing on Defendants' "Bulldozer Theory"

168.    During the course of the case, defense counsel had admitted on the record, on multiple occasions, what soil testing by the Atomic Energy Commission ("AEC") (predecessor to the DOE) and independent researchers had long confirmed: that properties in the class area were contaminated with plutonium from Rocky Flats. *See* Doc. 2206, at 2-3. But in December of 2004, Defendants argued for the first time that the plutonium contamination had been displaced by construction activity, and submitted new expert declarations relating proposed trial testimony by their experts on this subject. *Id.* at 3-4.

169.    Class Counsel moved to exclude this evidence. The Court struck one of the experts' opinions as untimely but allowed the second to testify, and otherwise did not preclude Defendants from arguing this theory to the jury. *Id*. at 5-6.

170.    However, at trial Defendants did not call that expert, but instead had their dose reconstruction expert, Dr. Till, opine on the subject of plutonium removal. *Id*. at 8-9. Dr. Till's testimony on the "bulldozer theory" consisted mainly of a short section of a newly-produced videotape presented by defense counsel, *see* Trial Transcript at 8203-04, 8206, 8285, 8390-92, on which the narrator (not Dr. Till) described development activities in the class area. Dr. Till's sole statement regarding the "bulldozer theory" during his direct testimony was a brief observation agreeing with defense counsel's video. Trial Tr. at 8285 ("There's tremendous development in the class area. I mean, there's no question about that. It has been disturbed."). Plaintiffs moved to strike Dr. Till's "bulldozer" testimony because it had not been disclosed in compliance with Rule 26(a) (Doc. 1980), and submitted a proposed limiting instruction to the jury (Doc. 1978, at Ex. A, p. 6-7). Plaintiffs also moved for judgment as a matter of law on the "bulldozer theory" based on a lack of evidentiary support (Doc. 1979). The Court ruled from the bench, granting the motion to strike (Jan. 17, 2006 Trial Tr. at 10188), and issued limiting instructions to the jury to disregard the theory (*see* Doc. 2206 at 11-12). Defendants filed numerous briefs objecting to these instructions (*see* Doc. 2206 at 12-13), which Plaintiffs opposed.

171.    After trial, the Court formalized its bench rulings in its December 7, 2006 opinion on the "bulldozer theory" (Doc. 2206). The Court held that not only did Defendants' proposed testimony by Dr. Till lack any probative value on the issue, but the other evidence Defendants did present at trial likewise could not sustain their theory. *Id*. at 9, 17-19.

74

### 4.   Defendants' Motion(s) for Judgment as a Matter of Law

172.     On December 8, 2005, after the close of Plaintiffs' case-in-chief, Defendants moved for judgment as a matter of law (Doc. 1771). Plaintiffs responded on January 11, 2006 (Doc. 1962), filing a 96-page brief that painstakingly recounted the evidence presented during the first two months of the trial that supported each element of their claims. My firm led the briefing for Plaintiffs. The Court denied the motion on January 13, 2006 (Doc. 1977).

173.     Defendants filed a renewed motion on January 17, 2006 (Doc. 2010). Class counsel filed a terse response on January 20 (Doc. 2028) relying on their earlier brief. The Court denied the motion the same day (Doc. 2032).

### 5.   The Verdict

174.     Closing arguments were held on January 18-20, 2006.  Louise Roselle and I split the initial closing argument, and I presented the rebuttal closing argument.  The jury began deliberations on January 20. Deliberations lasted for 17 days, as the jury, informed by an 88 page set of instructions, worked its way through 31 separately numbered questions on the verdict form.

175.     On January 25, 2006, after 2 ½ days of deliberations, one juror ("Juror X") left the deliberations room in emotional distress. As this juror was no longer able to carry out her duties, the Court excused her.

176.     During deliberations, the jury sent the Court several requests or questions regarding its instructions. These required Class Counsel to analyze the request or question, discuss possible responses with Defendants and the Court, and file explanations for Plaintiffs' positions. *See* Docs. 2075, 2076, 2087, 2089, 2091, 2097, 2098, 2102, 2105, 2108, 2111.

177.    On February 14, 2006, the jury returned a verdict: they found both Dow and Rockwell liable on the nuisance and trespass claims, and awarded $ 176.8 million in compensatory damages and $200 million in exemplary damages. *See* Doc. 2117 (verdict form). The Court later held that Plaintiffs were entitled to prejudgment interest on the compensatory damages amount (Doc. 2261).

178.    In recognition of this outstanding verdict for the Class, in 2009 the Public Justice Foundation honored the Rocky Flats trial team as Trial Lawyers of the Year. The individuals so honored were: myself, Peter Nordberg, David F. Sorensen, Ellen Noteware, and Jennifer MacNaughton of Berger & Montague; Louise Roselle and Jean Geoppinger McCoy from WSBC; and Gary Blum, Steve Kelly, and Bruce DeBoskey of Silver & DeBoskey.

### Q.  Post-Trial Briefing on Departure of Jury Member; *Cook XII*

179.    As discussed above, Juror X had left the deliberations after 2 ½ days. On February 16, 2006, two days after the verdict was returned, Defendants filed a motion seeking to interview Juror X (Doc. 2129, under seal). Class Counsel quickly drafted a brief opposing this motion (Doc. 2137, under seal), which demanded in-depth research into the principles and policies restricting access to jurors.  My firm took the lead on this briefing for Plaintiffs. On April 18, 2006, the Court denied Defendants' motion, finding that Fed. R. Evid. 606(b) "precludes the fishing expedition requested by Defendants." *Cook v. Rockwell Int'l Corp.*, 428 F. Supp. 2d 1152, 1155 (D. Colo. 2006) ("*Cook XII*").

180.    On May 9, 2006, Defendants filed a renewed motion for mistrial due to allegations raised by Defendants and Juror X (Doc. 2175). On May 10, before Plaintiffs could respond, the Court denied the motion (Doc. 2179). Undeterred, Defendants made contact with Juror X and obtained a statement from this juror. On July 20, 2006 Defendants filed yet another

motion for mistrial based on information in that statement (Doc. 2195). Plaintiffs responded on

January 21, 2006 (Doc. 2199). The Court denied that motion on December 7, 2006 (Doc. 2203),

and again chastised Defendants' attempt to invade the jury's deliberations' and rejected

Defendants' claims of prejudice as unfounded.

### R.  Defendants' Renewed Motion for Judgment as a Matter of Law; *Cook XIV* (May 20, 2008)

181.    Other post-trial briefing continued. On January 22, 2007, Defendants filed a

renewed motion for judgment as matter of law and for a new trial or, in alternative, for remittitur

of damages, attacking various aspects of the Court's conduct of the class-wide trial, its

evidentiary rulings, alleged inconsistencies in the jury's verdict, the amount of the damages

awards, and the legality of the exemplary damages. (Doc. 2220).  Class Counsel filed an

opposition (Doc. 2237) that relied mainly on Plaintiffs' earlier brief field on January 11, 2006

(Doc. 1962).  My firm led the briefing effort for Plaintiffs.

182.    Additionally, the parties filed competing proposals for how the Court could enter

a judgment on the class verdict in order to facilitate an immediate appeal, without waiting for the

further proceedings needed to allocate damages to individual class members. (Docs. 2169, 2222).

183.    On May 20, 2008, the Court entered an order denying the Defendants' motions,

granting Plaintiffs' motion for entry of a final judgment under Rule 54(b) on the property class's

claims, and granting the Plaintiffs' motion to apply pre-judgment interest. *Cook v. Rockwell Int'l

Corp.*, 564 F. Supp. 2d 1189 (D. Colo. 2008) ("*Cook XIV*"). The Court entered the final

judgment and a Plan of Allocation for the class judgment on June 2, 2008. Doc. 2264.

### S.  First Tenth Circuit Appeal (*Cook Appeal I*, Sept. 3, 2010)

184.    Defendants each filed notices of appeal on June 19, 2008 (Docs. 2276 & 2277). In

the Tenth Circuit, Defendants moved to vacate the judgment and remand the case for lack of

appellate jurisdiction, arguing that the district Court should have entered a partial judgment under Fed.R. Civ.P. 54(b) rather than a final judgment appealable under 28 U.S.C. §1292(b). *Cook v. Rockwell Int'l Corp.*, Nos. 08-1224, 08-1226, & 08-1239 (10th Cir. Jul. 2, 2008). The Tenth Circuit clerk of Court issued an order stating that the merits panel would review Defendants' motion. Order, No. 08-1224 (10th Cir. Aug. 14, 2008). This order precipitated yet more briefing by Defendants, who moved for review, arguing the clerk of Court lacked the authority to act on their motion for remand and arguing that the Court should hear their motion before the parties briefed their appellate arguments. Nos. 08-1224, 08-1226, & 08-1239 (10th Cir. Aug. 26, 2008). Plaintiffs responded to this motion on September 15, 2008. My firm led the briefing effort on this issue.  The Court of Appeals denied Defendants' motion for review on October 20, 2008.

185.    Defendants filed their principal appeal brief on March 9, 2009. Defendants raised numerous issues, including a new argument, never mentioned in the preceding two decades of litigation, that the PAA contained an additional element (above and beyond state law requirements) requiring proof of a "nuclear incident", which the Act defines as an occurrence causing "loss of or damage to property, or loss of use of property".

186.    On July 7, 2009, Plaintiffs filed a 137-page brief in opposition to Defendants' appeal and in support of Plaintiffs' cross-appeal on certain limited rulings by the district Court. My firm led the briefing for Plaintiffs, with able assistance from Steve Kelly of Silver & DeBoskey, Paul DeMarco of WSBC, and Marcy Glenn of Holland & Hart.  The brief responded to each of Defendants' many arguments.

187.    Plaintiffs did not devote much space to Defendants' "novel" PAA argument, pointing out simply that (a) they had never raised the argument before, and (b) that neither the

text nor the legislative history of the Act was consistent with any Congressional intent to impose some additional element over and beyond the elements of state tort law.

188.     Plaintiffs responded to Defendants' (renewed) argument that alleged federal nuclear standards preempted Colorado's duty of care by explaining, at length, how the PAA's text, history, and precedent intended for state tort law standards to apply, and how none of the documents Defendants cited rose to the level of an official federal regulation.

189.     Plaintiffs briefed a lengthy and exhaustive exposition of Colorado nuisance and trespass law in response to Defendants' arguments regarding the sufficiency of the jury instructions.

190.     Plaintiffs also refuted each of Defendants' claims of prejudice arising from evidence admitted at trial (which arguments had previously been raised in Defendants' motions *in limine*).

191.     Lastly, Plaintiffs briefed the law regarding punitive damages under the PAA and the standards for pre-judgment interest.

192.      Both parties filed reply briefs. My firm again led the briefing for the Plaintiffs, together with Mr. Kelly, Mr. DeMarco, and Ms. Glenn. All told, the parties' main briefing totaled 396 pages, with the appendices spanning nearly 6,000 pages.

193.     Further, while the appeal was pending, Plaintiffs filed several notices of supplemental authority and responses to Defendants' supplemental authority filings. *See Cook v. Rockwell Int'l Corp.*, No. 08-1224, Plaintiffs' Letter re Supplemental Authority *June v Union Carbide* (filed Sept. 2, 2009); Plaintiffs' Response Letter to Defs Letter re Supplemental Authority (filed Oct. 9, 2009); Plaintiffs' Letter re Supplemental Authority *DG v Devaughn*

(filed Mar. 4, 2010); Plaintiffs' Letter re Supplemental Authority *Morrison v Nat'l Australia Bank* (filed June 30, 2010).

194.    The Tenth Circuit heard a lengthy oral argument on March 10, 2010. Peter Nordberg of my firm argued for Plaintiffs. Tragically, Peter passed away not long after the argument in April 2010.

195.    On May 11, 2010, the Tenth Circuit ordered supplemental briefing on issues relating to an argument Defendants raised for the first time in their appeal brief, that they had never before argued to the district Court during the preceding 20 years of litigation: whether the PAA imposes a jurisdictional requirement that plaintiffs must establish a "nuclear incident", defined as "loss of or damage to property, or loss of use of property", and what evidence in the record established a nuclear incident. Order, *Cook v. Rockwell Int'l Corp.*, No 08-1224 (10th Cir. May 11, 2010). The parties each filed a supplemental brief on May 26 and a response brief on June 8, 2010. My firm led this effort along with Ms. Glenn, Mr. Demarco, and Mr. Kelly.

196.    On September 3, 2010, the Tenth Circuit issued its decision vacating the judgment and class certification, and remanding back to the district Court. *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127 (10th Cir. 2010) ("*Cook Appeal I*"). The Court adopted Defendants' new argument that the PAA required proof of a "nuclear incident", although as a substantive element of a PAA claim, not as a jurisdictional prerequisite. *Id*. at 1039. The Court held that "damage to property" required contamination above an (unspecified) level – that is, something more than "mere contamination" – whereas the trespass jury instructions (applying Colorado law) stated that Plaintiffs were not required to show any particular level of plutonium on their properties. *Id*. at 1141.  For the nuisance instructions, the Court held that "loss of use" under the PAA required proof that the class members were "depriv[ed] … of a specific use", such as by being forced to

evacuate, rather than simply suffering an "interference with use and enjoyment" of property, as the jury was instructed under Colorado law. *Id*. at 1142. The Court held that Plaintiffs' evidence of health risk was not enough; Plaintiffs would have to show "the particular level of risk created by Defendants' conduct had the effect of actually depriving them of a specific use." *Id*.

197.    On conflict preemption, the Court also gave Defendants an opportunity to supplement the record regarding any federal regulations that they alleged conflicted with state tort law standards. *Id*. at 1143-44.

198.    The Court held, however, that the jury had been properly instructed on Colorado nuisance law, *id.* at 1145, except that it predicted a nuisance instruction dealing with irrational fears (actually intended for a later phase of the case, as Plaintiffs would make clear) would have been decided differently by the Colorado courts. *Id*. at 1146.

199.    The Court of Appeals held that the trespass jury instructions were erroneous because Colorado law would consider plutonium to be an intangible trespass requiring proof of additional physical damage to the Plaintiffs' property, *id*. at 1148-49.

200.    The Court vacated class certification in a short paragraph because the District Court had not considered whether class-wide evidence could establish the newly-announced threshold element of a "nuclear incident", as defined by the panel.

201.    Lastly, the Court held that for purposes of punitive damages (which are available for nuclear incidents occurring before the 1988 PAA Amendments only), under the PAA's language, both the "occurrence" that led to contamination, and the contamination reaching neighboring properties, would have had to have taken place before 1988 in order to recover punitive damages.

202.     Plaintiffs filed a petition for rehearing *en banc* on October 1, 2010, which was denied over a vehement dissent by Judge Lucero. *Cook v. Rockwell Int'l Corp.*, No. 08-1224 (10th Cir. Dec. 9, 2010).

203.     On May 6, 2011, Class Counsel, with the help of the Supreme Court specialty firm, MoloLamken, filed their petition for *certiorari* to the United States Supreme Court. *Cook v. Rockwell Int'l Corp.*, No. 10-1377 (S. Ct. May 6, 2011). My firm and other Plaintiffs' counsel worked closely with MoloLamken to clarify and develop the legal theories to be argued and to locate materials from the factual record needed to make our arguments.

204.     Defendants filed an opposition (S.Ct. Aug. 10, 2011), and Plaintiffs filed a reply (S.Ct. Aug. 24, 2011) and, later, a supplemental brief (S.Ct. Jun. 5, 2012).

205.     On October 3, 2011, the Court invited the U.S. Solicitor General to file an *amicus* brief expressing the views of the United States. In December 2011, Mr. Sorensen and I, Louise Roselle from WSBC, and Jeffrey Lamken and Robert Kry from MoloLamken, met with counsel from the Solicitor General's office before the *amicus* brief was filed. The Solicitor General filed an *amicus* brief in support of Defendants. (S.Ct. May 24, 2012). On June 25, 2012, the Supreme Court denied *certiorari*.

**T.  Remand to District Court and *Cook XV* (as modified Feb. 27, 2014)**

206.     On remand from the Tenth Circuit, the parties submitted a joint status report regarding the future of the litigation. (Doc. 2326, filed Aug. 7, 2012).

207.     Although the Tenth Circuit's decision appeared at first glance to be a near total defeat, we did not give up. Instead, we engaged, as Tenth Circuit later characterized it, in "a little judicial jiu jitsu", *Cook v. Rockwell Int'l Corp.*, 790F.3d 1088, 1091 (10th Cir. 2015) ("*Cook Appeal II*"): given the Tenth Circuit's prior holding that a "nuclear incident" had not been proven

as required for a PAA claim, and given that the jury had been instructed on the elements of Colorado nuisance law and the Court of Appeals had affirmed those instructions, and given that we had always argued that this Court had diversity jurisdiction in addition to original jurisdiction under the PAA, we proposed that this Court recertify the Class and enter judgment for the Class on a Colorado state law nuisance claim, based on the jury's original verdict.

208.    Thus, in the joint status report, Class Counsel proposed that the parties should brief the issue of reinstating the judgment under Colorado nuisance law, and also brief (as directed by the Tenth Circuit) whether Defendants could identify any controlling federal nuclear regulations that would support conflict preemption.

209.    Defendants opposed the notion of entering judgment on a state law claim. Defendants also argued that the parties should first address whether the Price-Anderson Act preempted a state law claim that was based on the same facts as a PAA claim.

210.    The Court ordered briefing on the preemption issue and on whether the existing jury verdict would support a new judgment under Colorado law (Doc. 2334).

211.    The parties fully briefed both issues. *See* Docs. 2344 (Plaintiffs' Opening Brief Pursuant to Order of Oct. 16, 2012, filed Jan. 9, 2013); 2345 (Defendants' Response Brief to Order of Oct. 16, 2012, filed Mar. 11, 2013); 2350 (Plaintiffs' Reply Brief). Defendants argued, *inter alia*, that the PAA preempted Plaintiffs' state law nuisance claims and that the Court could not enter judgment for Plaintiffs because of *Cook Appeal I* and the mandate rule.  My firm led the briefing for Plaintiffs.  Among other things, our firm presented a comprehensive, 50-state survey of state nuisance law, showing that every state in the country provided that a plaintiff could recover for nuisance upon a showing of a substantial *interference* with use and enjoyment

of property, and no state required proof of physical damage to or a complete "loss" of use of property. *See* Doc. 2344, at Ex. 7.

212.     On January 28, 2014 (with further modification on February 27, 2014), the Court issued its ruling deciding that the PAA did in fact preempt Plaintiffs' state law claims. *Cook v. Rockwell Int'l Corp.*, 13 F. Supp. 3d 1153 (D. Colo. 2014) ("*Cook XV*").

**U.  Second Tenth Circuit Appeal (*Cook Appeal II*, June 23, 2015)**

213.     In light of the practical infeasibility of re-trying their now 24-year-old case under the Tenth Circuit's new PAA standard, Plaintiffs stipulated to dismissal and entry of judgment in order to facilitate an immediate appeal of the Court's *Cook XV* preemption ruling.  Doc. 2355. The Court entered judgment on February 27, 2014. (Doc. 2356). Plaintiffs filed their Notice of Appeal on March 25, 2014 (Doc. 2359).

214.     On appeal, the Tenth Circuit issued an order that the parties should address in their briefing whether the Court had jurisdiction over a live "case or controversy" under Article III, given that the parties had stipulated to dismissal in the District Court. (10th Cir. No. 14-1112, filed Apr. 16, 2014).

215.     On May 6, 2014, Defendants moved the Tenth Circuit to assign the appeal to the same panel that had decided *Cook Appeal I*. Class Counsel (led by my firm) filed an opposition on May 16, 2014. The Court of Appeals denied Defendants' motion on May 20, 2014.

216.     The parties filed their appeal briefs. Plaintiffs' opening brief spanned 60 pages of meticulous research on complex topics in preemption law and PAA legislative history and precedent, and carefully analyzed the jury instructions and the Court's rulings on Plaintiffs' nuisance claim. My firm led the briefing for Plaintiffs.  Defendants' filed a 51-page response

(filed July 14, 2014) and Plaintiffs filed a 28-page reply brief (filed Aug. 1, 2014).  Once again, my firm led the briefing for Plaintiffs.

217.    In our briefs, we again argued (as we had before this Court) that the PAA did not preempt the Class's Colorado nuisance law claim. We argued that Defendants had waived complete and field preemption arguments, provided the Court of Appeals with a detailed explanation of the obscure doctrines of complete preemption and explained why it did not apply. We also set forth a highly detailed exposition of the text and legislative history of the PAA and the case law interpreting the Act to demonstrate that Congress did not intend for the PAA to expressly preempt non-nuclear-incident state law claims. We showed that the overriding intent behind the PAA was to protect *both* the nuclear industry *and* the public and not simply immunize nuclear operators from all liability, and to preserve substantive state law as the rules of decision for PAA claims, and again presented our 50-state survey showing that every state defined a nuisance as an "interference with use and enjoyment" of property, not a "loss of use" of property.

218.    Relevant to the latter point, we also argued that it would raise constitutional due process problems if the Court were to interpret the PAA as eliminating all traditional common-law remedies to individuals harmed by a federal nuclear installation where the injury did not rise to the level of a "nuclear incident" as defined by *Cook Appeal I*. We again cited our survey of the traditional common law of all 50 states showing that every state recognizes a nuisance claim based on an interference with use and enjoyment of property, without requiring proof of "loss of use" or physical damage, as *Cook Appeal I*'s interpretation of the PAA did.

219.    Regarding the jury instructions, we argued and explained that the *Cook Appeal I* panel had held the jury was properly instructed on Colorado nuisance law, allowing the district court to enter judgment based on that verdict. We also explained that the *Cook Appeal I* panel's

holding that Colorado courts would not recognize a nuisance based on fears "without scientific foundation or other support in fact," *Cook Appeal I*, 618 F.3d at 1145-46 (quoting Jury Instruction no. 3.28) related only to a potential, future stage of the case, not to the class-wide forms of interference with use and enjoyment that the jury had found in the class trial – namely, a proven health risk and a risk of future harm.

220.    The Tenth Circuit Court heard oral argument on Nov. 20, 2014. I argued for Plaintiffs.

221.    On June 23, 2015, five years after vacating the original judgment in *Cook Appeal I*, the Tenth Circuit reversed *Cook XV*, vacated the latest judgment dismissal, and remanded to this Court. *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015) ("*Cook Appeal II*"). The Court of Appeals rejected Defendants' various preemption arguments, holding (as Plaintiffs had argued) Defendants had not raised implied or conflict preemption, *id*. at 1092, and that they had forfeited a field preemption argument by failing to raise it during the first appeal:

> At that point the plaintiffs had a judgment in their favor under both state and federal law. The defendants argued that the federal component of the judgment was infected by instructional error and required a remand, but they never suggested a freestanding state tort judgment would be preempted and precluded. In fact, this court explained that though the defendants had "allude[d] to field preemption in their brief" in the first appeal, they "never develop[ed] the issue." *Cook [Appeal I]*, 618 F.3d at 1143 n. 16. And just as it's important to raise a preemption defense or risk losing it, it's important to raise it in a timely manner.

*Cook Appeal II*, 790 F.3d at 1093.

222.    The Tenth Circuit also held that, even if it could ignore Defendants' waiver, "nothing in [the PAA's] language, structure, or history favors the defendants' curious statutory construction over the plaintiffs' prosaic one—let alone favors it so clearly that we might overcome the presumption against preemption.." *Id*. at 1094; *see also id*. at 1095-96 ("[I]t's hard to conjure a reason why Congress would allow plaintiffs to recover for a full panoply of injuries

in the event of a large nuclear incident but insist they get nothing for a lesser nuclear occurrence.").

223.    Further, the Court recognized that the due process problem we had raised was "no trivial argument," *id*. at 1099 n.3, but held it did not need to resolve that issue.

224.    The Court rejected the Defendants' alternative argument, that the *Cook Appeal I* panel's mandate required a new trial. *Id*. at 1099-1102. The Court agreed with our interpretation of the first panel's holding that the jury had been properly instructed on Colorado nuisance law, and rejected the Defendants' attempt to distract from that ruling, recognizing (as we had shown through a meticulous dissection of the jury instructions and this Court's orders) that the first panel's concerns with the nuisance instructions pertained to potential future proceedings that were not relevant to the issues before the Court. *Id*. at 1099-1101.

225.    The Court of Appeals directed this Court to "proceed to judgment on the existing nuisance verdict promptly, consistent with resolving the outstanding class action question, wary of arguments that have already been rejected or forfeited." *Cook Appeal II*, 790 F.3d at 1105.

226.    Defendants petitioned the Supreme Court for *certiorari*. *The Dow Chem. Co. v. Cook*, No. 15-791 (S.Ct. filed Dec. 17, 2015). Class Counsel again associated with MoloLamken to assist with the *certiorari* briefing. Again, my firm worked closely with the MoloLamken team and other Plaintiffs' counsel in developing and refining our legal theories and factual discussions. On January 15, 2016, Plaintiffs filed a separate cross-petition requesting that, should the Court decide to hear Defendants' petition on *Cook Appeal II*, the Court should also review the decision in *Cook Appeal I. Cook v. The Dow Chem. Co.*, No. 15-911 (S.Ct. filed Jan. 15, 2016). Next, on March 4, 2016, Plaintiffs filed their opposition to Defendants' petition. Class Counsel also filed a reply on their cross-petition on May 8, 2016.

227.    On May 18, 2016, the parties stipulated to dismiss both *certiorari* petitions in light of their settlement, reached that day.

## V.  Second Remand to District Court

228.    At the same time as the parties were briefing their petitions for *certiorari*, Plaintiffs continued to push for entry of judgment in the district Court on the preexisting nuisance law verdict. On August 4, 2015, Plaintiffs filed their Motion for Entry of Judgment (Doc. 2367), and a corrected version on August 26 (Doc. 2371), which sought entry of judgment on a state nuisance law claim based on the existing verdict, and certification of the property class. My firm led the briefing for Plaintiffs.

229.    On September 10, 2015, Defendants responded by filing four lengthy briefs: an opposition to class certification (Doc. 2373), a brief in support of their motion to set aside the jury verdict based on preemption by federal nuclear safety standards (Docs. 2374 & 2378), a brief pointing out alleged "trial errors" regarding the admission of certain evidence that Defendants claimed precluded entry of judgment (Doc. 2377), and an objection to the judgment amount to dispute the calculation of prejudgment and post-judgment interest) (Doc. 2376).

230.    On October 23, 2015, Class Counsel filed four detailed response briefs totaling 116 pages (Docs. 2381-84).  My firm led the briefing for Plaintiffs. These four briefs set forth, in painstaking detail, the legal and factual basis for rejecting all of Defendants' challenges. Although these matters were fully briefed, the Court never ruled on them because the parties reached a settlement.

### III.    MEDIATION ATTEMPTS AND THE SETTLEMENT

#### A.  Earlier Mediation Attempts

231.    Earlier in the case, Plaintiffs had made attempts to mediate before neutral mediators. A mediation even took place in 1996 but there was no chance of any agreement.

#### B.  The Settlement

232.    In 2015 and 2016, while the briefing advanced before the district Court on remand after *Cook Appeal II*, and while the parties pursued their cross-petitions for *certiorari* before the Supreme Court, the parties were simultaneously engaged in settlement talks facilitated by a mediator, Retired Federal Judge Layn R. Phillips. In connection with the mediation, the parties each submitted detailed mediation statements. My firm led the drafting for the Plaintiffs. On October 30, 2015, Class Plaintiffs, Dow, and Rockwell participated in a mediation session with Judge Phillips. Although the parties left that meeting without reaching agreement, they continued to negotiate (with Judge Phillips serving as intermediary) well into 2016.

233.    Finally, on May 18, 2016, the parties filed a stipulation of settlement and motion to certify a settlement class (Docs. 2393 & 2394). The $375 million settlement is the largest ever involving offsite exposures and releases from one of the nation's nuclear weapons plants.  Even after deduction of any attorney's fees and expenses awarded, the net recovery for the Class will be larger than the compensatory damage award by the jury (not counting interest).

#### C.  Preliminary Approval of the Settlement

234.    On May 18, 2016, Class Counsel filed their motion to certify the Settlement Class. (Doc. 2394). My firm drafted this motion. The Court granted the motion the next day. (Doc. 2396)  On July 15, 2016, Plaintiffs filed an unopposed motion for amendment or

correction of the Court's order certifying settlement class (also drafted by my firm) (Docs. 2403-2404), which was granted the same day. (Doc. 2405)

235.    On July 15, 2016, Class Counsel moved for preliminary approval of the Settlement, approval of the proposed plan of allocation, approval of the form and manner of notice, approval of the proposed claim form, and appointment of a proposed settlement and claims administrator. (Docs. 2406-2408). Plaintiffs' filing attached the settlement agreement itself, carefully crafted proposed Class notices, a detailed plan for issuing notice (described in further detail below), and a proposed claim form.  Class Counsel also drafted a proposed plan of allocation for the settlement fund, and requested that the Court set a schedule leading up to and including a Fairness Hearing.  My firm led the drafting of all of these materials.

236.    On July 25, 2016, Defendants filed a response to Plaintiffs' preliminary approval of the Settlement, approval of the proposed plan of allocation, approval of the form and manner of notice, approval of the proposed claim form, and appointment of a proposed settlement and claims administrator.  (Doc. 2410)

237.    On August 4, 2016, the Court held a hearing concerning Plaintiffs' motion for preliminary approval of the Settlement, approval of the proposed plan of allocation, approval of the form and manner of notice, approval of the proposed claim form, and appointment of a proposed settlement and claims administrator.  I represented the Plaintiffs at this hearing.

238.    On August 5, 2016, the Court granted preliminary approval of the proposed Settlement, preliminary approval of proposed plan of allocation, approved the proposed forms and manner of notice to the Class, approved the proposed claim form, and approved the proposed schedule.  (Doc. 2416)

239.     Also on August 5, 2016, the Court appointed Heffler Claims Group ("Heffler") as Settlement and Claims Administrator.  (Doc. 2417)  The Court also appointed The Huntington National Bank as Escrow Agent.  (Doc. 2418)

**D.  Notice to the Class**

240.     My firm worked closely with the Court-appointed Settlement and Claims Administrator, Heffler, to implement the Court-approved Notice Plan, which is set forth in detail at Docs. 2407-5, 2408.

241.     My firm supervised and spearheaded efforts to finalize and format the Notices and Claim Forms, which Heffler mailed to all reasonably identifiable Class members on or about September 14, 2016.  (Declaration of Jeanne C. Finegan, APR Concerning Implementation and Adequacy of Class Member Notification, Doc. 2432, at ¶¶ 7-12.)

242.     As part of the Court-approved Notice Plan, Heffler designed and continues to maintain an informational website (www.RockyFlatsSettlement.com) on which the Settlement, claim form, notices and other important Court documents are posted and available for download. (*Id.* at ¶ 13.) My firm oversaw the development of the informational website.

243.     Heffler also maintains a toll-free information phone line for Class members to call 24 hours a day, 7 days a week for more information about the Settlement, including but not limited to requesting copies of the Notice and Claim Form.  (*Id.* at ¶ 14.)  Mr. Sorensen and Ms. Coslett from my firm participated in a training for Heffler personnel managing and staffing the settlement information phone lines.  In addition, my firm works with Heffler to manage numerous inquiries from potential Class members as needed.

244.     As part of the Notice Plan, Heffler published the Court-approved short-form notice ("Summary Notice") in several nationally circulated consumer magazines and in 48

newspapers in Denver and Colorado.  (*Id.* at ¶¶ 15-16.)  My firm supervised preparation of the Summary Notice.

245.    Heffler also produced a television commercial, which was aired 85 times nationwide over cable TV networks for two weeks beginning September 19, 2016 through October 2, 2016.  (*Id.*  at ¶ 17.)  My firm reviewed, revised, and ultimately approved the television commercial.  The 30-second commercials aired throughout the day, with emphasis on prime time, in programing such as *The Situation Room, Anderson Cooper 360, The O'Reilly Factor, Hannity, Fox & Friends*, among many others.  (*Id.*)

246.    Heffler aired over 1,100 commercials on local broadcast television, cable television networks, and radio stations in the Denver Designated Market Area ("DMA"), which includes the Class Area, Denver, and most of the counties in Colorado, with the exception of those in the Grand Junction-Montrose and Colorado Springs-Pueblo DMAs.  (*Id.*  at ¶ 18.)  My firm reviewed, revised, and ultimately approved the radio commercials.

247.    The Notice Plan also includes online display banner advertising with a nationwide reach, utilizing banner advertising inventory from: *AOL, Conversant, Yahoo!, Xaxis, the Google Display Network, AppNexus,* and Social Media Networks: Facebook and Twitter.  In total, banner ads were served nationwide to over 3,100 web properties.  (*Id.*  at ¶¶ 19-21.)  Visitors could "click" on the banner and then link directly to the Rocky Flats Settlement Website for more information.  (*Id.*)  In addition, banners ads were targeted to Adults 35+ in the Denver market through the AOL Network, Facebook, and on local newspaper, radio and television websites through AppNexus.  (*Id.*)  Mobile ads were geo targeted to the zip codes surrounding the Rocky Flats area as well as top apps and mobile websites throughout the Denver DMA.  (*Id.*)  My firm reviewed and approved the banner ads that were used.

248.    Additionally, the online component of the Notice Plan included online pre-roll video advertisements and Native advertisements.  (*Id.* at ¶ 22.)  Advertisements were served nationwide on the *Xaxis* network across various web properties as pre-roll ads.[12]  (*Id.*) Each advertisement linked to the Settlement Website.  (*Id.*)

249.    In order to take advantage of the popularity and penetration of smartphones, the Notice Plan also included advertising on mobile websites and applications specifically targeted to reach potential Class members.  (*Id.* at ¶ 23.)  Mobile banners were served across a nationwide premium network of mobile apps and websites, and users could "click" on the banner and then be linked directly to the Settlement Website for more information.  (*Id.*)

250.    In accordance with the Court-approved Notice Plan, Heffler used the social platform Facebook to serve banner advertisements to adults across the United States, with a particularly targeted focus on those who also have friends and family in living in Colorado and those who live near Rocky Flats and surrounding areas.  (*Id.* at ¶ 24.)  In addition, advertisements were served on Twitter, appearing as sponsored tweets targeting adults nationwide with information about the proposed settlement and links to the Settlement Website. (*Id.* at ¶ 25.)

251.    Heffler also engaged in third party outreach as part of the Notice Plan.  Heffler distributed settlement information packets to the Rocky Flats "Downwinders" community organization and conducted outreach and sent information about the Settlement, including the Notice, to local universities who are sponsoring a health survey for the Rocky Flats area.  (*Id.* at

---

[12] Online "pre-roll" ads appear prior to an online video being presented.  When viewers click on a certain online video link they must watch a short commercial (here, about the Rocky Flats Settlement) before the video content.

¶¶ 26-27.)  My firm reviewed, revised, and ultimately approved the communications sent to these third parties.

252.     In accordance with the Court-approved Notice Plan, a multimedia news release was issued over PR Newswire's US1 newslines on September 19, 2016 at 9:17 a.m. EST.  (*Id.* at ¶ 28.)  My firm reviewed, revised, and ultimately approved the multimedia news release.

### E.  Summary of Attorneys' Fees and Unreimbursed Expenses

253.     The following chart, Table 1, summarizes the aggregate time and necessary and reasonable expenses of all Class Counsel, as set forth in more detail in the separate firm declarations of Class Counsel. *See* Exs. 2-10 to the Memorandum in Support of Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Award of Service Payments to Class Representatives.

| TABLE 1 | | | |
|---|---|---|---|
| **FIRM** | **HOURS** | **LODESTAR** | **EXPENSES** |
| **Berger & Montague**<br>*(see Tables 2 & 3 below)* | 121,258.33 | $49,302,170.05 | $5,720,704.75 |
| **Silver & DeBoskey, A Professional Corporation**<br>*(see Ex. 2,[13] Declaration of Steven W. Kelly of Silver & DeBoskey, A Professional Corporation, at ¶¶ 3-6 & Ex. 1 thereto)* | 9,960.5 | $2,697,641.00 | $355,555.35 |
| **Markovits, Stock & DeMarco, LLC**<br>*(see Ex. 3, Declaration of Terence R. Coates of Markovits, Stock & DeMarco, LLC, at ¶¶ 3-5 & Ex. 1 thereto)* | 326.5 | $218,635.00 | $1,329.72 |

---

[13] Unless otherwise noted, all exhibit numbers included herein reference exhibits to the Memorandum in Support of Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Award of Service Payments to Class Representatives.

| TABLE 1 | | | |
|---|---|---|---|
| **FIRM** | **HOURS** | **LODESTAR** | **EXPENSES** |
| **Waite, Schneider, Bayless & Chesley Co. L.P.A.**<br><br>*(see Ex. 4, Declaration of Eric W. Goering, Assignee of Waite, Schneider, Bayless & Chesley Co. L.P.A., at ¶¶ 3-5 & Ex. 2 thereto)* | 12,127.20 | $4,046,287.50 | $531,773.98 |
| **Chimicles of Chimicles & Tikellis LLP**<br><br>*(see Ex. 5, Declaration of Nicholas E. Chimicles of Chimicles & Tikellis LLP, at ¶¶ 3-5 & Ex. 1 thereto)* | 10,306.50 | $3,238,933.75 | $372,805.71 |
| **MoloLamken LLP**<br><br>*(see Ex. 6, Declaration of Jeffrey A. Lamken of MoloLamken LLP, at ¶¶ 4, 8 & Ex. 1 thereto)* | 1,145.3 | $781,737.50 | $10,806.91 |
| **Ray & Barrett, formerly known as Connerton, Ray & Simon**<br><br>*(see Ex. 7, Declaration of Michael Barrett of Ray & Barrett, formerly known as Connerton, Ray & Simon, at ¶¶ 3-5 & Ex. 1 thereto)* | 4,087 | $1,153,256.25 | $93,261.74 |
| **Taylor & McNew, LLP, formerly Taylor, Gruver, & McNew, P.A.**<br><br>*(see Ex. 8, Declaration of R. Bruce McNew of Taylor & McNew, LLP, formerly Taylor, Gruver, & McNew, P.A., at ¶¶ 3-5 & Ex. 1 thereto)* | 305 | $205,875.00 | $0 |
| **Jacobsen Law Offices LLC**<br><br>*(see Ex. 9, Declaration of Kenneth A. Jacobsen of Jacobsen Law Offices LLC, at ¶¶ 3-4 & Ex. 1 thereto)* | 64 | $48,000.00 | $0 |
| **Holland & Hart LLP**<br><br>*(see Ex. 10, Declaration of Marcy G. Glenn of Holland & Hart LLP, at ¶¶ 3-5 & Ex. 1 thereto)* | 800.6 | $441,571.00 | $8,625.49 |
| **TOTALS** | **160,380.93** | **$62,134,107.05** | **$7,094,863.65** |

254.    Based upon the lodestar set forth above, the requested forty percent (40%) fee results in a multiplier of 2.41.

255.    Professor Charles Silver, a legal ethics expert, has opined that Class Counsel's requested fee is both ethically proper and fully justified. *See* Report of Professor Charles Silver (attached as Ex. 12 to the Memorandum in Support of Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Award of Service Payments to Class Representatives).

256.    The total number of hours expended by my firm, Berger & Montague, P.C., from inception through December 16, 2016, is 121,258.33 hours, excluding all time spent on work in connection with Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Award of Service Payments to Class Representatives.  Table 2 below is a summary of the time spent by my firm's attorneys and professional support staff who were involved in this litigation, and the lodestar calculation based on my firm's current usual and customary hourly billing rates.  Our firm has detailed time descriptions showing how this time was spent, which is available upon request.

| TABLE 2 | | | | |
|---|---|---|---|---|
| **PROFESSIONAL** | **STATUS**[14] | **TOTAL HOURS** | **CURRENT HOURLY RATE**[15] | **TOTAL LODESTAR** |
| Merrill G. Davidoff | A | 6,571.4 | $950 | $6,242,830.00 |
| David F. Sorensen | A | 10,515.7 | $855 | $8,990,923.50 |
| Peter B. Nordberg | A | 13,693.4 | $575 | $7,873,705.00 |
| Eric L. Cramer | A | 5,086.38 | $925 | $4,704,901.50 |
| Ellen T. Noteware | A | 2,957.35 | $625 | $1,848,343.75 |
| Jennifer E. MacNaughton | A | 5,042.20 | $550 | $2,773,210.00 |
| Caitlin G. Coslett | A | 1,961.2 | $490 | $960,988.00 |
| Anne N. Ebbesen | P | 7,308.12 | $320 | $2,338,598.40 |
| Karen M. Markert | P | 3,285.45 | $320 | $1,051,344.00 |
| Other Attorneys | A | 17,638.33 | | $6,323,080.10 |
| Other Paralegals | P | 47,198.8 | | $6,194,245.80 |
| **TOTALS** | | **121,258.33** | | **$49,302,170.05** |

257.    Berger & Montague is seeking reimbursement for $5,720,704.75 in net expenses

Berger & Montague incurred in connection with the prosecution of this litigation.

258.    In total, Berger & Montague spent $6,423,088.10 in expenses, as set forth in

Table 3 below.  However, Berger & Montague also managed a litigation fund on behalf of

---

[14] A = Attorney; P = Paralegal or Other Professional Consultant.

[15] For attorneys and support staff employees who worked on this matter and who are still active and employed at Berger & Montague, P.C., the current hourly rate is the hourly rate effective for these individuals in 2016.  For attorneys and support staff who are no longer employed at our firm, the current hourly rate is equal to the attorney's or employee's hourly billing rate effective at the time they stopped working at Berger & Montague, P.C. (Peter Nordberg's rate is his rate at the time of his death.)

Plaintiffs, which received a total of $187,500 in contributions from other firms representing

Plaintiffs.[16]  In addition, Berger & Montague received $500,000.00 from the DOE that was used

to defray litigation costs and expenses.  *See* Doc. Nos. 835, 847.  The Berger & Montague

litigation fund bank account also earned $14,883.35 in interest.  As a result, Berger & Montague

is seeking reimbursement for $5,720,704.75 in net expenses incurred, which is equal to the

difference between the $6,423,088.10 in expenses that Berger & Montague paid out in

connection with this litigation less the $187,500 of contributions to the Berger & Montague

litigation fund by other firms that are included on these other firms' declarations that are also

being filed in support of Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement

of Litigation Expenses, and Award of Service Payments to Class Representatives in the above-

captioned case, less the $500,000.00 payment from the DOE (which was applied to litigation

costs and expenses), and less the amount of interest earned on the litigation fund bank account,

$14,883.35.

| **TABLE 3** | |
| :---: | :---: |
| **EXPENSE** | **AMOUNT** |
| Litigation Fund Contribution(s) | $126,315.00 |
| Travel/Office/Hotel/Meals | $883,557.18 |
| Copying Services | $1,250,529.25 |
| Research Services | $813,542.38 |
| Telephone/Teleconference/Fax | $48,422.23 |
| FedEx/Messengers/Postage | $73,125.89 |

---

[16] I understand that other firms representing the Plaintiffs are seeking reimbursement of $187,500 for their contributions to the Berger & Montague litigation fund.  In addition, I understand that there was another litigation fund managed by Silver & DeBoskey, which also received contributions from law firms representing the Plaintiffs.  The contributions to and expenditures from the Silver & DeBoskey litigation fund are addressed in Ex. 2, Steven W. Kelly's declaration.

| TABLE 3 | |
|---|---|
| **EXPENSE** | **AMOUNT** |
| Court Reporters / Deposition Expenses / Transcripts | $181,304.70 |
| Expert Fees | $2,570,593.07 |
| Witness Fees | $3,222.66 |
| Professional / Contract Services | $455,649.88 |
| Court Fees | $12,839.66 |
| Bank Charges | $2,214.69 |
| Other (misc.) | $1,771.51 |
| **TOTAL** | **$6,423,088.10** |
| Contributions By Other Law Firms That Are Reflected On Their Declarations | $187,500 |
| Interest Earned on the Litigation Fund Bank Account | $14,883.35 |
| DOE Payment to Berger & Montague, P.C., as attorneys for the Plaintiffs | $500,000.00 |
| **AMOUNT BERGER & MONGATUGE IS SEEKING IN REIMBURSEMENTS** <br><br> *(EQUAL TO TOTAL EXPENSES PAID LESS THE CONTRIBUTIONS BY OTHER FIRMS THAT ARE REFLECTED IN THEIR DECLARATIONS AND LESS THE INTEREST EARNED ON BANK ACCOUNTS)* | **$5,720,704.75** <br><br> *(equal to $6,423,088.10 - ($187,500 + $14,883.35 + $500,000))* |

259.    The expenses incurred in this action are reflected on my firm's books and records, which are maintained in the ordinary course of business and prepared from invoices, receipts, credit card bills, cancelled checks and wire transfer notices, expense vouchers, check records, and other source materials, and they represent an accurate recordation of the expenses incurred.

260.    A firm biography and the biography of each attorney currently employed with Berger & Montague who has devoted significant time to this case is attached as Ex. 13 to the

Memorandum in Support of Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Award of Service Payments to Class Representatives.

## IV.   THE EFFORTS OF THE CLASS REPRESENTATIVES ON BEHALF OF THE CLASS

261.   The Class Representatives have each made tremendous contributions to prosecuting the Property Class's claims against Dow and Rockwell. They actively protected the Class's interests by filing the suit on behalf of the Class and maintaining close supervision of and active participation in the litigation throughout its long history. Sadly, this litigation outlived three of the initial seven Property Class Representatives: Lorren Babb passed away before trial; Gertrude Babb, who testified at trial, passed in 2008; and Delores Schierkolk passed in 2009.

262.   The Class Representatives were the impetus behind this case. In the wake of the FBI raid in June 1989, they met with other concerned neighbors, retained Class Counsel, and stepped forward to lead this case on behalf of their neighbors downwind of Rocky Flats.

263.   The Class Representatives are or were pillars of their community:

a.   Dick Bartlett served in the navy during the Korean War. He was Mayor of Arvada from 1965 to 1969. (Tr. at 890.) He was active in community service, including serving on the Jefferson County Parks and Recreation board, and the state board. (Tr. at 892.) Upon the 100-year anniversary of the City of Arvada, he was honored as one of the 100 people who most contributed to the City. (Tr. at 890; Trial Ex. 1193.) He was also a real estate broker and developer. (Tr. at 946-47.)

   b.   Sally Bartlett worked as a nurse with the Colorado Department of Health, and also as a realtor for a time. Like her husband, she was active in community and charity work. (Tr. at 886-892, 955.)

   c.   Merilyn Cook founded her own business, a well-regarded horse stable, which she worked hard to build and grow over many years. (Tr. at 1982-1989.)

   d.   William Schierkolk served in the Navy during the Korean War. (Tr. at 1884-85.) He worked for over 30 years as a mechanic at International Harvester, and then when the plant closed he went into business for himself as a landlord. (Tr. at 1891-92.)

264.   During Class Counsel's investigation that led to the filing of the initial Complaint, throughout discovery, and leading up to trial, the Class Representatives served as invaluable sources of information and links to other knowledgeable members of the community.

265.   The Class Representatives monitored and supervised the litigation from start to finish. For example, in drafting the Complaints, they advised on the types of claims that would be most consistent with their injuries. They read each of the Complaints and offered feedback, and approved each for filing. They also worked closely with Class Counsel during the mediation attempts, reviewing and advising on the parties' competing proposals and ultimately approving the final Settlement.  In the 1990s, the Class Representatives had many strategy meetings with me and Mr. DeBoskey; this continued in the 2000s with me, Ms. Roselle, Mr. Blum, and Mr. Kelly.

266.   The Class Representatives reliably attended Court proceedings and the trial itself. To the best of Class Counsel's recollection, at least one (and usually several) of the Class

Representatives made the time to attend all or nearly all of the 50 hearings or conferences held in this case over the years. Further, the then-surviving Representatives attended nearly every day of the 51-day trial.

267.    Each of the Class Representatives dutifully responded to extensive – arguably oppressive – discovery requests over the years. Defendants served four sets of document requests, two sets of interrogatories, and two sets of requests for admission directed specifically at the Class Representatives.[17] The Class Representatives served the following responses:

### CLASS REPRESENTATIVES' RESPONSES TO DOW DISCOVERY

| Class Representative | Document Requests | Interrogatories | Requests for Admission |
|---|---|---|---|
| Merilyn Cook | 32 | 61 | 7 |
| Richard & Sally Bartlett | 32 | 61 | 7 |
| William & Delores Schierkolk | 32 | 61 | 7 |

### CLASS REPRESENTATIVES' RESPONSES TO ROCKWELL DISCOVERY

| Class Representative | Document Requests | Interrogatories | Requests for Admission |
|---|---|---|---|
| Merilyn Cook | 47 | 54 | 3 |
| Richard Bartlett | 47 | 54 | 3 |
| Sally Bartlett | 47 | 54 | 3 |
| William Schierkolk | 47 | 53 | 4 |
| Delores Schierkolk | 47 | 53 | 4 |

---

[17] In addition, Class Counsel assisted deceased Property Class representatives Lorren and Gertrude Babb in responding to a total of 70 of document requests, 106 interrogatories, and 15 requests for admission.

268.    The surviving Class Representatives also collectively sat for eight depositions

spanning 45 hours (inclusive of breaks):

| Class Representative | Deposition Date(s) | Total Hours |
|---|---|---|
| Merilyn Cook | July 14, 1993<br>July 15, 1993 | 10.6 |
| Richard Bartlett | July 13, 1993<br>July 14, 1993 | 11.8 |
| Sally Bartlett | July 15, 1993<br>July 30, 1993 | 9 |
| William Schierkolk | March 9, 1995 | 7.25 |
| Delores Schierkolk | October 26, 1994 | 6.4 |

269.    Though any litigation has its highs and lows, the true test of the Class

Representatives' dedication came when the Tenth Circuit vacated the judgment. The

Representatives had slogged through two decades' worth of hard-fought litigation, a lengthy

class trial, and a resounding victory before the jury, only to seemingly lose it all in a

heartbreaking reversal of fortune. It would have been understandable if any of the

Representatives had chosen to give up, perhaps seeking a token individual settlement from the

Defendants to abandon what might have been left of their claims. But, despite the long odds,

they did not give up: each Representative whole-heartedly affirmed their commitment to the

Class, and encouraged Class Counsel to go forward with their last-ditch efforts to salvage the

jury's findings as a state law claim.

270.    One of the Class Representatives, Ms. Cook, worked to help save the case from

an earlier threat. In the late 1990s, the DOE pressed for legislation that would have ended the

case. Ms. Cook, then living in Missouri, met with then-Senator John Ashcroft to lobby against

the bill, which was not passed.

271.    In recognition of the Class Representatives' extraordinary perseverance and

lengthy service to the Class, Class Counsel have requested service payments of $260,000 for

Merilyn Cook, $260,000 for Richard and Sally Bartlett, and $260,000 for William and Delores Schierkolk. Given the Class Representatives' tireless commitment to this case and the Class; their investment of thousands of hours of unpaid labor to investigate, initiate, advise, and supervise this litigation; their steadfastness in the face of oppressive discovery demands by the Defendants; and their refusal to give up even when defeat loomed, Class Counsel feel these awards are eminently well deserved.

## V.  CONCLUSION

272.    When this case was filed in 1990, neither Class Counsel nor the Class Representatives expected it would take 27 years to resolve. This case has been the longest and one of the most bitterly hard-fought cases of my entire career. It has also been the occasion to lead a remarkable team of attorneys who rose to every challenge thrown at them, crafting superlative work product and achieving a decisive victory for the Class. It was also a great privilege to represent incredibly dedicated Class Representatives. It is my opinion, based on my long career as a member of a leading class action firm, that the requested attorneys' fees, expenses, and service payments are well earned.

Dated: January 12, 2017

Merrill G. Davidoff