# Exhibit 11



LEXSEE 755 F. SUPP. 1468

**MERILYN COOK, WILLIAM JR. and DELORES SCHIERKOLK, RICHARD and SALLY BARTLETT and LORREN and GERTRUDE BABB, BANK WESTERN, a federal savings bank, a federally chartered savings bank, and FIELD SAVINGS CORPORATION, a Colorado corporation, on their own behalf and as representatives of a class of persons and entities suffering economic harm; and MICHAEL DEAN RICE, THOMAS L. and RHONDA J. DEIMER, and STEPHEN M. and PEGGY J. SANDOVAL, on their own behalf and as representative of a class of similarly situated residents and workers, Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION, a Delaware corporation, and THE DOW CHEMICAL COMPANY, a Delaware corporation, Defendants**

**Civil Action No. 90-B-181**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*755 F. Supp. 1468*; *1991 U.S. Dist. LEXIS 1861*

**February 13, 1991, Decided
February 13, 1991, Filed**

**COUNSEL:** **[\*\*1]** For Plaintiffs: Bruce H. DeBoskey, Esq., Steven W. Kelly, Esq., Silver & DeBoskey, P.C., Denver, Colorado, Ronald Simon, Esq., David Elbaor, Esq., Richard J. Fiesta, Esq., Connerton, Ray and Simon, Washington, District of Columbia, Merrill Davidoff, Esq., Berger & Montague, P.C., Philadelphia, Pennsylvania, Robert Golten, Esq., Fredericks & Pelcyger, Boulder, Colorado, Stanley M. Chesley, Esq., Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, Ohio.

For Deft, Rockwell: Joseph J. Bronesky, Esq., Christopher Lane, Esq., Sherman & Howard, Denver, Colorado, John D. Aldock, Esq., James R. Bird, Esq., Michael S. Giannotto, Esq., Shea & Gardner, Washington, District of Columbia.

For Deft, Dow: Mark S. Lillie, Esq., John A. DeSisto, Esq., Kirkland & Ellis, Denver, Colorado, David M. Bernick, Esq., Kevin T. Van Wart, Kirkland & Ellis, Chicago, Illinois.

**JUDGES:** Lewis T. Babcock, United States District Judge.

**OPINION BY:** BABCOCK

**OPINION**

**[\*1471]** MEMORANDUM OPINION AND ORDER

LEWIS T. BABCOCK, UNITED STATES DISTRICT JUDGE

Plaintiffs are individuals and businesses who own land near the Rocky Flats Nuclear Weapons Plant (Rocky Flats). They sue on their own behalf and as representatives of a class of others similarly situated. No class certification has issued.

Rocky Flats is owned by the United States **[\*\*2]** and operates under the jurisdiction of the U.S. Department of Energy (DOE). Under a series of

755 F. Supp. 1468, *1471; 1991 U.S. Dist. LEXIS 1861, **2

management contracts with the Atomic Energy Commission and later with the DOE, defendant Dow Chemical Company (Dow) operated the plant from 1951 through June 1975. Defendant Rockwell International Corporation (Rockwell) similarly operated the plant from July 1975 until December 31, 1989. Plaintiffs allege that they have incurred injury and damages caused by releases or threatened releases of hazardous substances from Rocky Flats.

There are three types of causes of action alleged. First, plaintiffs seek to recover "response costs" under section 107 of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), *42 U.S.C. § 9607*. Second, plaintiffs seek damages under the Price Anderson Act, *42 U.S.C. §§ 2211-2284*. Third, they seek damages under Colorado common law based on diversity jurisdiction.

Price Anderson borrows the substantive law of the state in which an alleged nuclear incident took place, which here is Colorado. *See 42 U.S.C. § 2014(hh)*. Accordingly, the claims under Price Anderson and under Colorado common law are identical: negligence; strict liability; **[**3]** private nuisance; trespass; misrepresentation and concealment; outrageous conduct; and punitive damages.

## I. SUMMARY OF RULINGS

Before me are numerous motions to dismiss or for summary judgment filed by Dow and Rockwell and various motions by plaintiffs to *amend. I* hold that: (1) the portion of plaintiffs' CERCLA claim that seeks costs incurred after judgment in this case fails to state a claim upon which relief may be granted; (2) the portion of plaintiffs' CERCLA claim that seeks to recover the prejudgment costs of medical testing to monitor the health effects of defendants' alleged releases of hazardous substances fails to state a claim upon which relief may be granted; however, the portion of plaintiffs' CERCLA claim that seeks to recover the prejudgment costs of medical testing necessary to monitor the environmental effects of defendants' alleged releases is cognizable; (3) plaintiffs' CERCLA claim is deficient for failure to plead at least one cognizable response cost incurred before this action was filed by each named plaintiff who is asserting a CERCLA claim, but they should be granted leave to amend; (4) plaintiffs' Price Anderson and Colorado common law claim for **[**4]** individualized medical monitoring is cognizable but deficient for failure to

adequately plead exposure to a hazardous substance; plaintiffs should be granted leave to amend; (5) plaintiffs' Price Anderson and Colorado common law claim for general scientific studies is not cognizable and fails to state a claim upon which relief may be granted; (6) plaintiffs' claim for outrageous conduct is cognizable but deficient for failure to plead adequately the elements of severe emotional distress and requisite intent; plaintiffs should be granted leave to amend; (7) plaintiffs' claim for misrepresentation and concealment is fatally defective because they can prove no set of facts that would entitle them to relief and any effort to amend would be futile; (8) genuine questions of material fact exist whether plaintiffs may be entitled to punitive damages arising out of nuclear incidents occurring before August 20, 1988 and I cannot say that plaintiffs are entitled to judgment as a matter of law as to these incidents; (9) as to nuclear incidents occurring on or after August 20, 1988, no genuine issues of material fact remain for resolution and defendants are entitled to judgment on plaintiffs' claim **[**5]** for punitive damages as a matter of law; (10) genuine issues of material fact remain whether plaintiffs' actions against Dow are barred by the applicable statute of limitations; (11) injunctive relief to prevent Rockwell's "further releases of plutonium **[*1472]** and radioactive and non-radioactive substances for Rocky Flats" would be ineffectual, and thus, Rockwell's motion to dismiss this claim should be granted; (12) defendants' motions for summary judgment on plaintiffs' claims for a fund to finance future scientific studies are made moot by my dismissal of these claims.

## II. LEGAL STANDARD

For the purposes of a motion to dismiss, I accept all factual allegations as true and resolve all reasonable inferences in favor of the plaintiff. *Tri-Crown, Inc. v. American Federal Sav. & Loan, Ass'n, 908 F.2d 578, 582 (10th Cir. 1990).* "A case should not be dismissed for failure to state a claim unless the court determines beyond doubt that the plaintiff can prove no set of facts which entitle him to relief." *Id.*

In deciding a motion for summary judgment the evidence and any possible inferences are viewed in the light most favorable to the party opposing summary judgment. *Merrick v. Northern* **[**6]** *Natural Gas Co., 911 F.2d 426, 429 (10th Cir. 1990).* Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitle to judgment as a matter of law.

Page 3

755 F. Supp. 1468, *1472; 1991 U.S. Dist. LEXIS 1861, **6

*Fed. R. Civ. P. 56(c)*. A genuine issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

## III. DISCUSSION

### A. *CERCLA*

Plaintiffs allege that defendants violated section 107(a) of CERCLA, *42 U.S.C. § 9607(a)*. CERCLA was designed to facilitate cleanup of environmental contamination caused by releases of hazardous substances. *Colorado v. Idarado Mining Co., 916 F.2d 1486, 1488 (10th Cir. 1990)*. To promote this aim, Congress created a private cause of action where certain "response costs" could be recovered against those who contributed to dumping hazardous waste at a site. *42 U.S.C. § 9607(a)*; *Idarado, 916 F.2d at 1488*.

To state a claim under *section 9607(a)*, a plaintiff must allege that: (1) the waste disposal site is a "facility" as defined by *42 U.S.C. § 9601(9)*; (2) a "release" or "threatened release" of any "hazardous substance" has occurred, *§ 9607(a)(4)*; and (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that are consistent with the national contingency plan, *§§ 9607(a)(4) & (a)(4)(B)*. *See Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1152 (9th Cir. 1989)*. In addition, the defendant must fall within one of the classes of persons subject to CERCLA's liability provision. *§ 9607(a)(1)-(4)*.

In this case, plaintiffs have sued past operators of a facility under *section 9607(a)(1)*. Plaintiffs seek "response costs incurred by [plaintiffs] pursuant to CERCLA, including the creation of a fund to finance independent scientific studies of exposure to hazardous substances . . . ." Amended Complaint, Prayer For Relief para. d.

Defendants argue that the CERCLA claim should be dismissed in whole or in part because: (1) the costs of post-judgment studies are not recoverable under CERCLA; (2) medical monitoring costs are not available under CERCLA; and (3) plaintiffs have failed to plead a cognizable response cost incurred prior to filing this suit.

I hold that the costs of post-judgment studies are not available under CERCLA and grant defendants' motions

to dismiss the portion of the complaint [**8] that seeks such relief. I also grant defendants' motions to dismiss the portion of plaintiffs' CERCLA claim that seeks to recover the costs of medical testing to monitor the health effects of defendants' releases. However, I deny defendants' motions concerning the portion of plaintiffs' CERCLA claim that seeks to recover the costs of medical testing necessary to monitor the environmental effects of defendants' releases. Finally, I conclude that plaintiffs' CERCLA claim is deficient for failure to plead at least one cognizable response cost incurred before this action was filed by each named plaintiff who is asserting a [*1473] CERCLA claim, but they should be granted leave to amend.

Defendants argue that the CERCLA claim should be dismissed because post-judgment costs are not recoverable under CERCLA. As plaintiffs acknowledge, CERCLA allows recovery only of costs that have been incurred by a plaintiff before judgment. *E.g., Williams v. Allied Automotive Autolite Div., 704 F. Supp. 782, 784 (N.D. Ohio 1988)*. Here, it is unclear whether plaintiffs are seeking money to finance post-judgment studies. However, to the extent that they are, defendants' motions are well taken. In so far as the [**9] complaint seeks response costs incurred prior to judgment, defendants' motions to dismiss will be denied.

Defendants also seek to dismiss the portion of the complaint that seeks medical monitoring costs under CERCLA. Plaintiffs' request for relief under CERCLA does not specifically seek medical monitoring. However, as plaintiffs acknowledge, the studies they envision entail "the study of bioaccumulation of hazardous substances in human[s] and . . . epidemiological studies." Plaintiffs' Brief at 49.

*Section 9607(a)(4)* allows recovery for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." The "national contingency plan" is a set of regulations governing CERCLA response cost action. *See* 40 C.F.R. Part 300. The phrase "necessary costs of response" is not defined. However, "response" is defined as "remove, removal, remedy and remedial action." *42 U.S.C. § 9601(25)*. "Remove" means the

> clean up or removal of released hazardous substances from the environment, . . . such actions as may be

necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, . . . or the taking of such other **[**10]** actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or a threat of release.

*42 U.S.C. § 9601(23)*. Subsection 23 lists security fencing, provision of alternative water supplies, and temporary evacuation and housing as specific examples.

"Remedy" or "remedial action" means "those actions consistent with permanent remedy taken instead of or in addition to removal actions . . . to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." *42 U.S.C. § 9601(24)*. Specific examples include containment or diversion actions, treatment or incineration, provision for alternative water supplies, "and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment." *Id.*

Courts are divided on whether a claim for costs of medical monitoring are cognizable under section 107 of CERCLA. *Compare e.g., Brewer v. Ravan, 680 F. Supp. 1176 (M.D. Tenn. 1988)* (medical monitoring cognizable); *Williams, 704 F. Supp. 782* **[**11]** (same) *with Ambrogi v. Gould, Inc., 750 F. Supp. 1233 (M.D. Pa. 1990)* (medical monitoring not cognizable); *Werlein v. United States, 746 F. Supp. 887 (D. Minn. 1990)* (same); *Coburn v. Sun Chemical Corp., 1988 U.S. Dist. LEXIS 12548, 28* Env't. Rep. Cas. (BNA) 1665 (E.D. Pa. 1988) (same).

In *Brewer*, the court denied a motion to dismiss a claim for medical testing under CERCLA, stating:

CERCLA's legislative history clearly indicates that medical expenses incurred *in the treatment of personal injuries or disease* caused by an unlawful release or discharge of hazardous substances are not recoverable under *section 9607(a)*. . . . To the extent that plaintiffs seek to recover the cost of medical testing and screening conducted *to assess the effect of the*

*release or discharge on public health problems presented by the release*, however, they present a cognizable claim under *section 9607(a)*.

*Brewer, 680 F. Supp. at 1176* (emphasis in original). The court reasoned that "public health related medical tests and screening clearly are necessary to 'monitor, assess, [or] evaluate a release' and therefore **[*1474]** constitute 'removal' under *section 9601(23)*. *Id.*

*Coburn* rejected this rational **[**12]** in striking plaintiffs' request for medical monitoring costs under CERCLA. First, the court stated that CERCLA's definitions of "response" and "remedy and remedial action" contain no "references whatsoever to medical expenses of any kind nor do they give any inferences that such expenses are recoverable. . . ." 28 Env't Rep. Cas. at 1670. The court then noted that CERCLA does contain health assessment or health effects study provisions, *see § 9604(i)*, but that these provisions are applied and administered apart from the liability provisions of section 107. 28 Env't Rep. Cas. at 1670. Next, the court examined CERCLA's legislative history. It pointed out that the original Senate Superfund Bill contemplated including medical monitoring under CERCLA. The court quoted Senator Randolf commenting on the bill which became CERCLA: "we have deleted the federal cause of action for medical expenses or property or income loss." *Id.* (quoting 126 Cong. Rec. S314964 (daily ed. Nov. 24, 1980)). Finally, the court expressly refused to follow *Brewer's* holding that medical testing may constitute a "response" cost. "Quite simply, we find it difficult to understand how future medical testing and **[**13]** monitoring of persons who were exposed to contaminated well water prior to the remedial measures currently underway will do anything to 'monitor, assess, [or] evaluate a release' of contamination from the site." *Id.* at 1671.

The recent decision of *Ambrogi* followed *Coburn*, while emphasizing two points not stressed in the *Coburn* analysis. First, *Ambrogi* noted that the 1986 SARA amendments to CERCLA allow individuals or physicians to petition the Agency for Toxic Substances and Disease Registry (ATSDR) for a health assessment of a given site. *See Ambrogi, 750 F. Supp. at 1249* (citing *42 U.S.C. § 9604(i)(6)(B)*). The court reasoned that CERCLA thus contemplated health studies and that the sole avenue for receiving such studies was through the ATSDR. *Ambrogi*

755 F. Supp. 1468, *1474; 1991 U.S. Dist. LEXIS 1861, **13

also noted that because most states now allow tort claims for medical monitoring, CERCLA does not allow such a claim because "Congress surely did not intend to create an overlap between traditional state tort claims and a 'new' CERCLA federal toxic tort action." *Id. at 1250*.

The *Coburn* line of cases is persuasive authority that the costs of medical testing to monitor the *health* effects of a release **[**14]** or threatened release are not recoverable under *section 9607(a)*. However, I conclude that the costs of medical testing necessary to monitor the *environmental* effects of a release or threatened release fall within the definition of "remove."

CERCLA was designed to facilitate the cleanup of toxic substances from the environment. *Idarado, 916 F.2d at 1488*. In certain cases, scientific tests may be necessary to determine, for example, the existence or extent of contamination to the environment. If plaintiffs can show that medical testing is necessary to monitor the environmental effects of a "release" or "threatened release," the costs of such medical testing plainly fall within the purview of *section 9601(25)*. Such testing is distinct from the health assessment studies available under *section 9604(i)* and from a claim for medical monitoring available under Colorado common law. *See infra*. Moreover, if the environmental effects of a release could not be monitored adequately without some medical testing, it would be incompatible with CERCLA not to allow recovery for the costs of such tests. *Cf. Werlein, 746 F. Supp. at 904 n. 18*.

Accordingly, defendants' motions to dismiss **[**15]** will be denied as to the portion of plaintiffs' CERCLA claim that seeks to recover the costs of medical testing necessary to monitor the environmental effects of defendants' alleged releases. Defendants' motions to dismiss will be granted for all other medical testing costs sought under CERCLA.

Defendants also argue that the complaint is defective for failure to specify at least one cognizable response cost. I agree, but conclude that plaintiffs should be granted leave to amend.

As stated above a plaintiff must incur response costs consistent with the **[*1475]** "national contingency plan." The complaint reads:

As a proximate result of the releases and threatened releases of hazardous

substances into the environment surrounding Rocky Flats, plaintiffs William Jr. and Delores Schierkolk, Richard and Sally Bartlett, and members of plaintiff Class I have incurred and will continue to incur necessary response costs consistent with the National Contingency Plan.

Amended Complaint, para. 118.

Conclusory allegations which merely mirror the terms of the statute are insufficient. The complaint must specify at least one cognizable response cost incurred by each named plaintiff prior to filing the lawsuit. **[**16]** As was stated by the Ninth Circuit in *Ascon*:

Requiring a CERCLA claimant to plead a cognizable response will assist in the proper processing of these actions. There has been extensive litigation over which types of response costs are recoverable in a section 107(a) action. . . . If a plaintiff ultimately fails to show a proper response cost, then he will fail to prove his prima facie case. . . . It therefore makes sense to impose a pleading requirement that a claimant must allege at least one type of response cost cognizable under CERCLA in order to make out a prima facie case.

*866 F.2d at 1154. See also McGregor v. Industrial Excess Landfill, Inc., 856 F.2d 39, 42 (6th Cir. 1988)* (per curium); *Ambrogi, 750 F. Supp. at 1250-53 (M.D. Pa. 1990); Jones v. Inmont Corp., 584 F. Supp. 1425, 1429 (S.D. Ohio 1984)*.

Such a requirement is consistent with the notice pleading requirement of the Federal Rules of Civil Procedure. Pleadings do more than merely give notice; they also serve to identify meritless claims at an early stage in the litigation. As was stated in *Conley v. Gibson, 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*, "all the Rules require is 'a short and plain statement of the claim' **[**17]** that will give the defendant fair notice of what the plaintiff's claim is *and the grounds upon which it rests." Id. at 47* (emphasis added) (quoting *Fed. R. Civ. P. 8(a)*). This last phrase from *Conley* suggests that the Federal Rules '"do contemplate a statement of circumstances, occurrences, and events in support of the claim being

755 F. Supp. 1468, *1475; 1991 U.S. Dist. LEXIS 1861, **17

presented.'" *McGregor, 856 F.2d at 42* (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1215 (1969)).

In certain types of cases, a plaintiff may not rest on mere conclusory allegations that trace the language of the statute. "[A] complaint in a complex, multi-party suit may require more information than a simple, single party case." *Mountain View Pharmacy v. Abbott Laboratories, 630 F.2d 1383, 1386-87 (10th Cir. 1980). See also Blinder, Robinson & Co. v. United States SEC., 748 F.2d 1415, 1386-87 (10th Cir. 1984), cert. denied, 471 U.S. 1125, 86 L. Ed. 2d 272, 105 S. Ct. 2655 (1985).* In a complex case such as this, it is consistent with the Federal Rules to ferret out meritless claims at the outset. *See Fed. R. Civ. P. 1.* As the Supreme Court has stated, "in a case of this magnitude, a district court must retain the power to insist upon some specificity [**18] in pleading before allowing a potentially massive factual controversy to proceed." *Associated General Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 528 n. 17, 74 L. Ed. 2d 723, 103 S. Ct. 897 (1983)* (dictum).

Plaintiffs concede that CERCLA requires that they incur some response cost prior to filing their complaint. If plaintiffs have incurred no cognizable response costs, it is appropriate to dispose of the CERCLA claim at the outset. On the other hand, if plaintiffs have incurred cognizable response costs, it presents an undue burden to identify them in the complaint. I conclude that to withstand a 12(b)(6) motion to dismiss, plaintiffs must identify in their complaint at least prefiling response cost cognizable under CERCLA.

Plaintiffs argue that there should be no need to plead previously incurred response costs because attorney fees are a cognizable response cost under CERCLA. Plaintiffs argue that the preparation of a CERCLA claim necessarily entails legal expense. [*1476] Thus, there should be no need to recite that fact in the complaint.

Authority is divided as to whether a private party's attorney fees are recoverable under CERCLA. *Compare Pease & Curren Refining, Inc. v. Spectrolab, [**19] Inc., 744 F. Supp. 945, 949-952 (C.D. Cal. 1990)* (attorney fees recoverable by private party) *with T & E Industries, Inc. v. Safety Light Corp., 680 F. Supp. 696 (D.N.J. 1988)* (attorney fees not recoverable by private party). However, even assuming that attorney fees are recoverable by a private party, plaintiffs' argument still

lacks merit.

CERCLA's private right of action is meant to compensate plaintiffs for "necessary costs of response. *42 U.S.C. § 9607(a)(4)(B).* If no costs have been incurred, then it is unnecessary to incur attorney fees to begin an enforcement proceeding. A plaintiff who has incurred no costs, except for litigation expenses, prior to the filing of a CERCLA action has incurred no "necessary costs of response" under *§ 9607(a).*

Plaintiffs move for leave to amend under *Fed. R. Civ. P. 15(a).* This motion will be granted and defendants' motions to dismiss this claim will be denied provided that plaintiffs file an adequate amended complaint within 20 days. The complaint must plead at least one cognizable response cost incurred prior to the filing of this action by each named plaintiff who is asserting a CERCLA claim.

B. *Medical Monitoring Under Price Anderson [**20] and Colorado Common Law*

Plaintiffs Michael Dean Rice (Rice), Thomas and Rhonda Deimer (collectively, the Deimers), and Stephen and Peggy Sandoval (collectively, the Sandovals) plead a claim for medical monitoring and health studies, not under CERCLA, but under Price Anderson and Colorado common law. For relief they seek the costs of individual periodic monitoring and a fund to finance "independent scientific studies of adverse health effects in the population living and working around Rocky Flats and of exposure of the population to radioactive and other hazardous substances." Amended Complaint at 24. Rockwell moves to dismiss their claim for these generalized scientific studies. Rockwell also argues that the claim for medical monitoring is deficient for failure to allege exposure to a toxic substance. I agree that the claim for generalized scientific studies must be dismissed, but I conclude that, with leave to amend, plaintiffs may state a cognizable claim for the costs of individual medical monitoring.

Alleged exposure to toxic substances raise unique issues under traditional common law tort theory. For instance, injuries resulting from exposure to toxic substances are often latent. [**21] This latency presents seemingly insurmountable problems of proof when analyzed under traditional tort theory because, under traditional tort theory, physical injury must be proved as an element of liability.

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 8 of 332

Page 7

755 F. Supp. 1468, *1476; 1991 U.S. Dist. LEXIS 1861, **21

In response to this problem courts have recognized "non-traditional" tort claims, which afford relief even though a plaintiff has not yet manifested present physical injury. Thus, courts have allowed claims for emotional distress suffered because of fear of contracting a toxic exposure disease. *See, e.g., Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1206 (6th Cir. 1988)* (applying Tennessee law). Other courts have recognized claims for enhanced risk of future harm. *See, e.g., Hagerty v. L & L Marine Services, Inc., 788 F.2d 315, 319 (5th Cir. 1986).* Courts have also recognized claims for "medical monitoring." *See, e.g., In re: Paoli Railroad Yard PCB Litigation, 916 F.2d 829 (3d Cir. 1990).*

A claim for medical monitoring is distinct from a claim for enhanced risk of future harm. "An action for medical monitoring seeks to recover only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm, whereas an enhanced **[**22]** risk claim seeks compensation for the anticipated harm itself, proportionately reduced to reflect the chance that it will not occur." *Id. at 850.* In this case, plaintiffs do not seek damages for the anticipated harm itself. Plaintiffs' Brief at 30. Rather, they seek medical monitoring and surveillance services. **[*1477]** As such, I need only analyze the tort of medical monitoring.

The theory behind a claim for medical monitoring is simple. When a plaintiff is exposed to a hazardous substance, it is often sound medical practice to seek periodic medical monitoring to ascertain whether the plaintiff has contracted a disease. Because this need for medical monitoring was caused by a defendant's tortious acts or omissions, a defendant may be required to pay the cost of monitoring. This theory is illustrated by the hypothetical discussed by the D.C. Circuit in *Friends For All Children, Inc. v. Lockheed Aircraft Corp., 241 U.S. App. D.C. 83, 746 F.2d 816, 825 (D.C. Cir. 1984):*

Jones is knocked down by a motorbike when Smith is riding through a red light. Jones lands on his head with some force. Understandably shaken, Jones enters a hospital where doctors recommend that he undergo a battery of tests to determine whether **[**23]** he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations.

From our example, it is clear that even in the absence of physical injury Jones ought to be able to recover the cost for the various diagnostic examinations proximately caused by Smith's negligence action.

Courts have generally accepted tort claims for medical monitoring. *See Paoli Railroad, 916 F.2d at 850-52.* In *Paoli Railroad,* the Third Circuit followed the weight of authority and predicted that the Pennsylvania Supreme Court would allow a cause of action for medical monitoring. *916 F.2d at 852.* The court listed the following elements necessary to establish a cause of action for medical monitoring:

i. Plaintiff was significantly exposed to a proven hazardous substance through the [tortious] actions of defendant;

ii. As a proximate result of exposure, plaintiff suffers an increased risk of contracting a serious latent disease;

iii. That increased risk makes periodic diagnostic medical examinations reasonably necessary; and

iv. Monitoring and testing procedures exist which make the early detection **[**24]** and treatment of the disease possible and beneficial.

*Id. See also Ayers v. Township of Jackson, 106 N.J. 557, 525 A.2d 287, 312 (1987).*

Although Colorado has yet to do so, I conclude that the Colorado Supreme Court would probably recognize, in an appropriate case, a tort claim for medical monitoring.

1. Individual medical monitoring

Plaintiffs' complaint is deficient in pleading a claim for individual medical monitoring because it fails to allege that plaintiffs have been exposed to a toxic substance. *See Paoli Railroad, 916 F.2d at 852; Askey v. Occidental Chemical Corp., 102 A.D.2d 130, 477 N.Y.S.2d 242, 248 (N.Y. App. Div. 1984).*

755 F. Supp. 1468, *1477; 1991 U.S. Dist. LEXIS 1861, **24

Plaintiffs argue that they have alleged exposure in paragraphs 17 and 44 of their amended complaint. Paragraph 17 of plaintiffs' amended complaint reads in part: "defendants . . . have caused a *risk* of injury to persons living and working in the vicinity of [Rocky Flats]." (Emphasis added). As plaintiffs point out in their brief, "injury" in non-traditional tort cases refers not to physical harm but instead to the invasion of any legally protected interest. Plaintiffs' Brief at 30. In this case the alleged injury is exposure to a hazardous substance. Accordingly, **[**25]** the allegation of "risk of injury" simply means risk of exposure. Mere risk of exposure is insufficient.

In paragraph 44 of the amended complaint plaintiffs allege that defendants caused "the creation of an excess, but presently unmeasured, risk of harm from adverse health effects." Again, the allegation of mere risk of exposure and not exposure in fact is inadequate.

Because plaintiffs might be able to correct this pleading deficiency, their claim for individual medical monitoring will not now be dismissed. Instead, plaintiffs' motion for leave to amend will be granted. Plaintiffs have 20 days to file an adequate amended complaint which alleges that Rice, the Deimers, and the Sandovals have each **[*1478]** been significantly exposed to a proven hazardous substance.

2. Fund for scientific studies

Even assuming that the Colorado Supreme Court would recognize a tort claim for individualized medical monitoring, I do not believe that the Colorado Supreme Court would recognize as cognizable plaintiffs' claim for generalized scientific studies.

A medical monitoring claim compensates a plaintiff for diagnostic treatment, a tangible and quantifiable item of damage caused by a defendant's tortious conduct. **[**26]** Such relief is akin to future medical expenses. The claim does not compensate a plaintiff for testing others to determine the odds that a particular person might contract a disease. *See, e.g., Paoli Railroad, 916 F.2d at 850* ("an action for medical monitoring seeks to recover only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm"); *Ayers, 525 A.2d at 314* (relief should insure that "medical-surveillance damages will be paid only to compensate for medical examinations and tests actually administered").

Plaintiffs have cited no authority for their common law claims to recover the costs of generalized scientific studies. I discern no basis for such a claim. Thus, I hold that the scientific studies requested by plaintiffs here are not recoverable under a medical monitoring cause of action. Accordingly, Rockwell's motion to dismiss the portions of the complaint that seek such studies will be granted.

C. *Outrageous Conduct*

Defendants move to dismiss plaintiffs' claim of outrageous conduct. This motion will also be denied provided that plaintiffs file an adequate amended complaint within 20 days.

The tort of outrageous conduct **[**27]** was first recognized by Colorado in *Rugg v. McCarty, 173 Colo. 170, 476 P.2d 753 (1970)*. The *Rugg* court adopted verbatim the elements of the tort from the *Restatement (Second) of Torts § 46*:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Rugg, 476 P.2d at 756*.

The tort has four elements: (1) defendant's conduct must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; and (4) the emotional distress must be severe. *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 703 F.2d 1152, 1158 (10th Cir. 1981)* (applying Colorado law), *cert. denied, 464 U.S. 824, 78 L. Ed. 2d 99, 104 S. Ct. 92 (1983)*.

Defendants argue that plaintiffs' claim of outrageous conduct should be dismissed for four reasons: (1) plaintiffs do not allege any conduct on the part of defendants that a reasonable jury could conclude was outrageous; (2) plaintiffs do not allege the type, nature, or extent of the severe emotional distress; (3) plaintiffs do not allege that they suffer from severe **[**28]** emotional distress; and (4) plaintiffs do not allege that either of the defendants acted with the requisite state of mind.

The first argument is without merit. The complaint

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 10 of 332

Page 9

755 F. Supp. 1468, *1478; 1991 U.S. Dist. LEXIS 1861, **28

alleges sufficient conduct on the part of defendants to allow a jury to conclude that the defendants' conduct was outrageous.

Defendants' second argument is also without merit. Defendants maintain that conclusory allegations of severe emotional distress without factual allegations which indicate the nature or extent of any mental suffering are insufficient. However, I conclude that plaintiffs' allegations in this regard are sufficient.

Defendants' third argument is persuasive. Severe emotional distress is an element of the tort of outrageous conduct. Plaintiffs have not pleaded this element. The complaint is thus defective.

Defendants' fourth argument is also persuasive.

The requisite intent is present where the actor desires to inflict severe emotional **[*1479]** distress and knows that it is substantially certain to result from his conduct, or where he acts recklessly "in deliberate disregard of a high degree of probability that the emotional distress will follow."

*Malandris, 703 F.2d at 1159* (quoting *Restatement* **[**29]** *(Second) of Torts § 46, comment i*).

The complaint does not allege that defendants intended to inflict severe emotional distress or that defendants acted "recklessly in the deliberate disregard of the high probability that emotional distress will follow."

Plaintiffs have moved for leave to amend their complaint under *Fed. R. Civ. P. 15(a)*. Such leave should be freely granted. Accordingly, the motions to dismiss the outrageous conduct claim will be denied provided that plaintiffs file an adequate amended complaint within 20 days.

### D. *Misrepresentation and Concealment*

Defendants move to dismiss plaintiffs' claims for misrepresentation and concealment, contending that plaintiffs failed to plead these claims with particularity as required by *Fed. R. Civ. P. 9(b)*. Because the complaint is fatally defective in failing to plead detrimental reliance, defendants' motions to dismiss this claim will be granted.

Detrimental reliance is an element of a misrepresentation or concealment claim under Colorado law. *Alzado v. Blinder, Robinson & Co., 752 P.2d 544, 558 (Colo. 1988)* (misrepresentation); *Eckley v. Colorado Real Estate Comm'n, 752 P.2d 68, 78 (Colo. 1988)* (concealment). This element **[**30]** must be pled with particularity. *Learning Works, Inc. v. Learning Annex, Inc., 830 F.2d 541, 546 (4th Cir. 1987)*.

Plaintiffs' allegation of detrimental reliance is that they "relied upon [the alleged misrepresentations and concealments] in refraining until the present from seeking redress or pursuing remedial action" with the result that "many of the releases of hazardous substances into the environment have been compounded by the passage of time." Amended Complaint at paras. 101-02. Such allegations may counter a statute of limitations defense. *See First Interstate Bank, N.A. v. Piper Aircraft Corp., 744 P.2d 1197 (Colo. 1987)*. However, these allegations are insufficient as a matter of law to establish detrimental reliance. *Werman v. Malone, 750 F. Supp. 21, 23 (D. Me. 1990)* (dismissing misrepresentation claim where only detrimental reliance alleged was that plaintiffs refrained from filing suit as a result of defendants' misrepresentations).

Plaintiffs again request leave to file an amended complaint under *Fed. R. Civ. P. 15(b)*. Although leave to amend is to be freely granted, such leave need not be granted where the defective pleading cannot be cured. *Foman v. Davis,* **[**31]** *371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*; *Schepp v. Fremont County, 900 F.2d 1448, 1451 (10th Cir. 1990)*. It is apparent from plaintiffs' complaint viewed in its entirety that the detrimental reliance allegedly suffered by plaintiffs is insufficient as a matter of law to establish this element of their claim. Amending this count would be futile. Thus, plaintiffs' motion for leave to amend this claim for relief will be denied and defendants' motions to dismiss this claim will be granted.

### E. *Punitive Damages*

Defendants contend that because the United States is required to indemnify them for an award of punitive damages, such an award is barred by *42 U.S.C. § 2210(s)* and sovereign immunity. Rockwell's motion concerning this claim is for summary judgment. Dow's motion is one to dismiss under *Fed. R. Civ. P. 12(b)(6)*. Because I consider matters outside of the pleadings, Dow's motion is treated as a motion for summary judgment under *Rule*

Page 10

755 F. Supp. 1468, *1479; 1991 U.S. Dist. LEXIS 1861, **31

*56. See Fed. R. Civ. P. 12(b)(6)*. I hold that punitive damages for nuclear incidents occurring on or after August 20, 1988 are barred by *section 2210(s)*. However, I further hold that punitive damages for nuclear incidents occurring before that date are not barred **[**32]** by *section 2210(s)* or by sovereign immunity.

1. *Section 2210(s)*

*42 U.S.C. § 2210(s)* reads:

> **[*1480]** No court may award punitive damages in any action with respect to a nuclear incident . . . against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident . . . .

This section "shall become effective on the date of the enactment of this Act [August 20, 1988] and shall be applicable with respect to nuclear incidents occurring on or after such date." Pub. L. 100-104, § 20(a), Historical and Statutory Notes to *42 U.S.C.A. § 2014 (West Supp. 1990)*.

a. *Incidents Occurring On or After August 20, 1988*

Plaintiffs seek punitive damages for nuclear incidents occurring after August 20, 1988. It is not contested that defendants have indemnity agreements with the United States. The indemnification agreements show that the United States is obligated to indemnify defendants should either of them be required to pay damages in this "nuclear incident" case. Plaintiffs maintain that at this early stage of the case it is unclear whether the United States is "obligated" to pay for an award of punitive damages, and, consequently, it is **[**33]** unclear whether *section 2210(s)* applies. Thus, plaintiffs argue, the issue is not ripe for adjudication or they require discovery under *Fed. R. Civ. P. 56(f)*. Plaintiffs misread *section 2210(s)*.

For this section to apply, it is not necessary that the United States be obligated to make *payments for punitive damages*. Rather, it is only necessary that "the United States [be] obligated to make *payments* under an agreement of indemnification covering [a nuclear] incident." *42 U.S.C. § 2210(s)* (emphasis added). The obligation to indemnify for damages generally, not the obligation to indemnify for punitive damages, triggers

application of the statute.

This construction of the statute is supported by the legislative history to *section 2210(s)*. The Senate Reports make clear that this section was meant to prohibit punitive damages against any DOE contractor indemnified under Price Anderson. *See* S. Rep. No. 100-218, 100th Cong., 1st Sess. 12, *reprinted in* 1988 U.S. Code Cong. & Admin. News 1476, 1487 (under *section 2210(s)*, "punitive damage awards would be prohibited in actions involving DOE contractors indemnified under" Price Anderson); S. Rep. No. 100-70, 100th Cong., 1st Sess. **[**34]** 27, *reprinted in* 1988 U.S. Code Cong. & Admin. News 1424, 1440 (*section 2210(s)* "prohibits courts from awarding punitive damages under State law in any action that involves a nuclear incident if the action is brought against a Department of Energy contractor, subcontractor or supplier indemnified under the Price Anderson Act").

Plaintiffs also contend that defendants do not have standing to raise this issue because it must be raised by the government. I disagree. *Section 2210(s)* bars punitive damages in any action against a contractor indemnified under Price Anderson. Thus, the contractor can raise this defense.

b. *Incidents Occurring Before August 20, 1988*

Defendants contend that *section 2210(s)* bars all of plaintiffs' claims for punitive damages because they seek recovery for an extended, ongoing "nuclear incident" which began before, but occurred, at least in part, after August 20, 1988. I need not decide whether punitive damages arising out of an extended "nuclear incident" that began before August 20, 1988 and continued unabated until after that date are barred by *section 2210(s)*, because, to the contrary, plaintiffs have alleged distinct "nuclear incidents" occurring before **[**35]** August 20, 1988.

As defined in *42 U.S.C. § 2014(q)*, "nuclear incident" means:

> any occurrence . . . within the United States causing . . . bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or

Page 11

755 F. Supp. 1468, *1480; 1991 U.S. Dist. LEXIS 1861, **35

byproduct material . . . .

The legislative history makes clear that a release may be either a distinct occurrence or an ongoing occurrence over a long period of time.

> [*1481] While most incidents will be happenings that can be pinpointed in time -- such as a runaway reactor or an inadvertent exposure to radiation -- it is not thought that an incident would necessarily have to occur within any relatively short period of time. For instance, the steady exposure to radiation, such as from an undetected leak of radio-active materials from a storage bin, could constitute an incident.

S. Rep. No. 296, 85th Cong., 1st Session 16, *reprinted in* 1957 U.S. Code Cong. & Admin. News 1803, 1817.

Plaintiffs allege numerous releases that can be pinpointed in time before August 20, 1988. As such, these occurrences do not fall within [**36] *42 U.S.C. § 2210(s)*.

2. Sovereign immunity

Defendants next contend that even if *section 2210(s)* does not bar an award of punitive damages for all of plaintiffs' claims, such damages are barred by sovereign immunity. Under the doctrine of sovereign immunity the United States cannot be sued without its consent. Defendants are obviously not the United States. However, they claim that because the United States is required to indemnify them for an award of punitive damages, and because the United States has not consented to be sued for punitive damages, sovereign immunity precludes such an award. Even assuming that the United States is obligated to indemnify defendants for an eventual award of punitive damages, sovereign immunity does not bar the punitive damage claim here.

An indemnity agreement between the federal government and its contractor does not cloak the contractor with sovereign immunity. *Rochester Methodist Hospital v. Travelers Insurance Co., 728 F.2d 1006, 1012-16 (8th Cir. 1984)*; *Foster v. Day & Zimmermann, Inc., 502 F.2d 867, 873-74 (8th Cir. 1974)*; *Whitaker v. Harvell-Kilgore Corp., 418 F.2d 1010, 1014 (5th Cir.*

*1969)*; *Group Health, Inc. v. Blue Cross Ass'n,* [**37] *625 F. Supp. 69, 74-76 (S.D.N.Y. 1985)*; *see also Brady v. Roosevelt Steamship Co., 317 U.S. 575, 87 L. Ed. 471, 63 S. Ct. 425 (1943)*; *Griess v. Colorado, 841 F.2d 1042, 1044-47 (10th Cir. 1988)* (state's obligation to indemnify defendants does not cloak defendants with state's *Eleventh Amendment* immunity).

Defendants attempt to distinguish these cases by arguing that this case concerns more than a "mere contractual indemnitee" of the United States. The Price Anderson Act authorizes indemnification agreements. *42 U.S.C. § 2210(d)*. It authorizes the United States to "take charge" and "settle or defend any such action." *42 U.S.C. § 2210(h)*. In addition, under regulation, the DOE may "require the prior approval of DOE" before any settlement by a contractor. *48 C.F.R. § 952.250-70(f)*.

These distinctions make no difference. Sovereign immunity attaches only to "claims . . . that *by their nature must* be paid from public funds, not actions directed against individuals that may ultimately be satisfied with state monies solely because the [government] has chosen to provide indemnification." *Griess, 841 F.2d at 1046* (emphasis added).

Moreover, before the 1988 amendments to Price Anderson, the United States was [**38] permitted, but not required, to enter into indemnification agreements. *42 U.S.C.S. § 2210(d) (1973)*. Thus, for occurrences not covered by *section 2210(s)*, any duty to indemnify was not mandated by statute. In *Brady*, the Supreme Court rejected the argument that a suit against a private party should be treated as a suit against the United States because the private party had an indemnification agreement with the United States. The Court stated, "if [plaintiff] had a cause of action against [the private-party defendant], it is difficult to see how she could be deprived of it by reason of a contract between [defendant] and the [United States]. . . . At least in the absence of a clear Congressional policy to that end, we cannot go so far." *Brady, 317 U.S. at 583-84*.

Defendants' reliance on cases holding that sovereign immunity applies where a judgment will expend credit upon the federal treasury, *e.g., Brown v. General Services Administration, 425 U.S. 820, 826-27, 48 L. Ed. 2d 402, 96 S. Ct. 1961 (1976)*, is similarly misplaced. In this case, [*1482] a judgment would not be against the United States, it would be against the defendants. Any federal monies would not go to pay the judgment, but to pay

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 13 of 332

Page 12

755 F. Supp. 1468, *1482; 1991 U.S. Dist. LEXIS 1861, **38

defendants based **[\*\*39]** on an independent contract. These are not "claims . . . that by their nature must be paid from public funds." *Griess, 841 F.2d at 1046.* Consequently, sovereign immunity does not attach.

Defendants also rely on *In re Three Mile Island Litigation, 605 F. Supp. 778, 784 (M.D. Pa. 1985),* in which the court disallowed punitive damages based on the government's duty to indemnify. This authority is not persuasive. It applied the doctrine of sovereign immunity without discussing the long line of cases holding that an indemnity agreement does not cloak a private party with sovereign immunity.

### 3. Col. Rev. Stat. § 13-21-102(2)

Lastly, defendants contend that because they are no longer operating the plant and because the DOE will indemnify them for any award of punitive damages, such damages are not available here since they "could not possibly serve any of the purposes for which [punitive] damages are permissible." Rockwell's Memorandum in Support of its Motions for Partial Summary Judgment on Plaintiffs' Claims For Exemplary Damages at 16.

Even assuming that the DOE must indemnify defendants for an eventual award of punitive damages, summary judgment is inappropriate. Under *Col. Rev.* **[\*\*40]** *Stat. § 13-21-102(2),* a court has discretion to disallow an award of punitive damages where the purposes for such damages would not be served. However, this section permits a court to reduce or disallow punitive damages only after such damages have been awarded. *See, e.g.,* 13-21-102(2)(b) (punitive damages may be reduced or disallowed if, among other things, "the conduct *which resulted in the award* has ceased) (emphasis added). Accordingly, under Colorado law disallowance of punitive damages because their award would serve no purpose is premature before trial.

### F. Statute of Limitations

Dow moves for summary judgment on all claims against it based on the statute of limitations. Because Dow has not met its burden, this motion is denied.

Plaintiffs have three types of claims: CERCLA claims; common law actions based on diversity; and the Price Anderson claims. Although the parties agree that Colorado law controls the diversity action, they disagree whether federal or Colorado law governs accrual of

claims under the Price Anderson Act. This dispute is immaterial because both Colorado and the Tenth Circuit apply the same accrual standard: the limitations period begins to run when **[\*\*41]** the person suffering legal injury knows or in the exercise of reasonable diligence should have known of the injury and its cause. *See Colo. Rev. Stat. § 13-80-108; Ebrahimi v. E.F. Hutton & Co., 852 F.2d 516, 523 (10th Cir. 1988).*

The parties further dispute whether the Price Anderson claims have the same limitations period as the analogous diversity claims. On the theory that the Price Anderson Act is "silent" on what limitations period should apply, Dow contends that *Colo. Rev. Stat. § 13-80-102(g)* should apply. This section establishes a two-year limitations period for "all actions upon liability created by a federal statute where no period of limitations is provided in said federal statute."

This section does not apply because Price Anderson does provide a period of limitations. The Price Anderson Act mandates application of state substantive law. Statutes of limitations are substantive. *Walker v. Armco Steel Corp., 446 U.S. 740, 750-53, 64 L. Ed. 2d 659, 100 S. Ct. 1978 (1980).* Thus, for plaintiffs' Price Anderson claims, the Colorado statute of limitations specific to each state claim applies.

The parties also dispute whether claims arising before July 1, 1986 are covered by a six-year statute of **[\*\*42]** limitations. Before its amendment in 1986, *Colo. Rev. Stat. § 13-80-110* provided a six-year limitations period for all actions "for waste and for trespass upon land" and for "all other actions on the case, except actions for slander and libel." "The statute of limitation in effect when a cause of action accrues **[\*1483]** governs the time within which a civil action must be commenced." *Rauschenberger v. Radetsky, 745 P.2d 640, 642 (Colo. 1987).* Here, genuine issues of material fact remain as to when these actions accrued. Thus, it is unclear whether the six-year limitations period should apply.

Dow argues that, as a matter of law, the pervasive publicity surrounding Rocky Flats would have necessarily put a reasonable person on constructive notice of his or her claims long before even 1984 and, thus, all the claims are barred. I disagree.

The crux of the complaint is that because of Dow's tortious behavior, hazardous substances invaded plaintiffs' property and caused damages. Some plaintiffs

Page 13

755 F. Supp. 1468, *1483; 1991 U.S. Dist. LEXIS 1861, **42

live as far as six miles from Rocky Flats. The record does not establish when plaintiffs knew or should have known that hazardous substances allegedly released while Dow was operating Rocky Flats reached **[\*\*43]** their property. Thus, the record does not establish when plaintiffs knew or should have known of their causes of action. Accordingly, Dow's motion for summary judgment based on the statute of limitations is denied.

### G. *Injunction to Prevent Further Releases*

Plaintiffs, among other things, seek an injunction "preventing further releases of plutonium and radioactive and non-radioactive substances from Rocky Flats." Amended Complaint para. e. Rockwell moves to dismiss this claim for relief because such relief cannot be granted in this case. I agree and will grant Rockwell's motion.

A court will not grant an injunction when it would be ineffectual. *Thournir v. Buchanan, 710 F.2d 1461, 1463 & n. 2 (10th Cir. 1983)*; *United States v. Parish of St. Bernard, 756 F.2d 1116, 1123 (5th Cir. 1985)* ("it is black letter law than an injunction will not issue when it would be ineffectual"), *cert. denied, 474 U.S. 1070, 88 L. Ed. 2d 801, 106 S. Ct. 830 (1986)*.

The complaint acknowledges that Rockwell no longer operates Rocky Flats. Amended Complaint para. 19. As such, Rockwell does not have the power to "prevent further releases" from the plant.

Plaintiffs argue that Rockwell can be ordered to "assist" in preventing further **[\*\*44]** releases by disclosing certain information. The complaint does not request assistance or disclosure of information. Rather, it requests that Rockwell be enjoined to prevent further releases. Rockwell simply has no power or ability to comply with such an injunction.

Plaintiffs also argue that Rockwell's motion should be denied because an injunction can be enforced against certain third parties who have notice of the injunction. Plaintiffs argument is fallacious because my power to effect injunctive relief against third parties derives from a valid injunction in the first instance against Rockwell, a party to this action. If, as here, I cannot enjoin Rockwell, then I cannot enjoin third parties not named in the complaint.

Accordingly, Rockwell's motion to dismiss plaintiffs' claim for an injunction to "prevent further releases" is

granted.

### H. *Mootness and Lack of Grounds for Injunctive Relief*

Defendants' motions for summary judgment on plaintiffs' claims for a fund to finance future scientific studies are made moot by my dismissal of those claims.

Accordingly, it is ORDERED that:

(1) defendants' motions to dismiss the CERCLA claim for post-judgment costs are GRANTED; defendants' motions **[\*\*45]** to dismiss the CERCLA claims for medical monitoring are DENIED as to the portion of plaintiffs' CERCLA claim that seeks to recover the costs of medical testing necessary to monitor the environmental effects of defendants' alleged releases; defendants' motions to dismiss are GRANTED for all other medical testing costs sought under CERCLA; defendants' motions to dismiss the entire CERCLA claim are DENIED provided that plaintiffs file an adequate amended complaint within 20 days;

(2) Rockwell's motion to dismiss the portion of plaintiffs' claim for medical monitoring that seeks general scientific studies is GRANTED; Rockwell's motion to dismiss the entire claim for medical monitoring **[\*1484]** is DENIED provided that plaintiffs file an adequate amended complaint within 20 days;

(3) defendants' motions to dismiss the outrageous conduct claim are DENIED provided that plaintiffs file an adequate amended complaint within 20 days;

(4) defendants' motions to dismiss the misrepresentation and concealment claim are GRANTED;

(5) defendants' motions for summary judgment on the claim for punitive damages are GRANTED for such damages arising out of nuclear incidents occurring on or after August 20, **[\*\*46]** 1988. The motions are DENIED for punitive damages arising out of nuclear incidents occurring before August 20, 1988;

(6) Dow's motion for summary judgment based on the statute of limitations is DENIED;

(7) Rockwell's motion to dismiss plaintiffs' claim for an injunction to "prevent further releases" is GRANTED;

(8) defendants' motions for summary judgment based

755 F. Supp. 1468, *1484; 1991 U.S. Dist. LEXIS 1861, **46

on mootness and lack of grounds for equitable relief are
DENIED.



LEXSEE 778 F. SUPP. 512

**MERILYN COOK, WILLIAM JR. and DELORES SCHIERKOLK, RICHARD and SALLY BARTLETT and LORREN and GERTRUDE BABB, BANK WESTERN, a federal savings bank, a federally chartered savings bank, and FIELD SAVINGS CORPORATION, a Colorado corporation, on their own behalf and as representatives of a class of persons and entities suffering economic harm; and MICHAEL DEAN RICE, THOMAS L. and RHONDA J. DEIMER, and STEPHEN M. and PEGGY J. SANDOVAL, on their own behalf and as representative of a class of similarly situated residents and workers, Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION, a Delaware corporation, and THE DOW CHEMICAL COMPANY, a Delaware corporation, Defendants.**

**Civil Action No. 90-B-181**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*778 F. Supp. 512*; *1991 U.S. Dist. LEXIS 17370*

**November 26, 1991, Decided**
**November 26, 1991, Filed**

**COUNSEL:** **[\*\*1]** FOR PLAINTIFFS: Bruce H. DeBoskey, Esq., Steven W. Kelly, Esq., Silver & DeBoskey, P.C., 1290 Broadway, Suite 700, Denver, CO 80203-5607. Ronald Simon, Esq., David Elbaor, Esq., Richard J. Fiesta, Esq., Connerton, Ray and Simon, 1920 L Street, N.W. 4th Floor, Washington, D.C. 20036-5004. Merrill Davidoff, Esq., David Berger, Esq., Peter B. Nordberg, Esq., John R. Taylor, Esq., Berger & Montague, P.C., 1622 Locust Street, Philadelphia, PA 19103-6365. Robert Golten, Esq., Fredericks & Pelcyger, 1881 9th Street, Suite 216, Boulder, CO 80302. Stanley M. Chesley, Esq., Waite, Schneider, Bayless, & Chesley Co., L.P.A., 1513 Central Trust Tower, Cincinnati, OH 45202

FOR DEFT, DOW: Mark S. Lillie, Esq., John A. DeSisto, Esq., Kirkland & Ellis, 1999 Broadway, Suite 4000, Denver, CO 80202. David M. Bernick, Esq., Kevin T. Van Wart, Esq., Kirkland & Ellis, 200 East Randolph Drive, Chicago, IL 60601. Sidney Rooks, Esq., The Dow Chemical Company, 2030 Willard H. Dow Center, Midland, MI 48674

FOR DEFT, ROCKWELL: Joseph J. Bronesky, Esq., Christopher Lane, Esq., Sherman & Howard, 633 17th Street, Suite 3000, Denver, CO 80202. John D. Aldock, Esq., James R. Bird, Esq., Michael S. Giannotto, Esq., **[\*\*2]** Franklin D. Kramer, Esq., Timothy P. Brooks, Esq., Shea & Gardner, 1800 Massachusetts Ave., N.W. Washington, D.C. 20036

**JUDGES:** BABCOCK

**OPINION BY:** LEWIS T. BABCOCK

**OPINION**

[\*514] MEMORANDUM OPINION AND ORDER

Babcock, J.

Plaintiffs are individuals who own land near the Rocky Flats Nuclear Weapons Plant (Rocky Flats) and

778 F. Supp. 512, *514; 1991 U.S. Dist. LEXIS 17370, **2

two banks, Bank Western and Field Savings Corporation (collectively, the Banks), that hold security interest on land near Rocky Flats. Defendants Rockwell International Corporation (Rockwell) and Dow Chemical Company (Dow) are former operators of the plant. Plaintiffs seek to recover: (1) "response costs" under section 107 of the Comprehensive Environmental Response, Compensation and Liability Act, *42 U.S.C. § 9607*; (2) damages under the Price Anderson Act, 42 U.S.C. § 2211-2284; and (3) damages for Colorado common law torts with jurisdiction based on diversity. The claims under the Price Anderson Act and Colorado common law are identical.

Rockwell moves to dismiss and/or strike: (1) plaintiffs' claim for "retrospective and prospective population based health surveys"; (2) plaintiffs' request for medical monitoring "injunctive relief"; and (3) the Banks' claims for violations of the Price Anderson Act **[**3]** and Colorado common law. The matter is adequately briefed and oral argument will not materially assist me. For the reasons stated below, I grant the motion to dismiss the Banks' trespass claims and deny the remainder of the motion.

## I. STANDARD

For the purposes of a motion to dismiss, I accept all factual allegations as true and resolve all reasonable inferences in favor of the plaintiff. *Tri-Crown, Inc. v. American Fed. Sav. & Loan, Ass'n.*, 908 F.2d 578, 582 (10th Cir. 1990). "A case should not be dismissed for failure to state a claim unless the court determines beyond doubt that the plaintiff can prove no set of facts which entitle him to relief." *Id.*

## II. ANALYSIS

### A. Population-Based Health Studies

In an earlier preceding in this case, I stated:

Although Colorado has yet to do so, I conclude that the Colorado Supreme Court would probably recognize, in an appropriate case, a tort claim for medical monitoring.

. . . .

Even assuming that the Colorado Supreme Court would recognize a tort claim for individualized medical

monitoring, I do not believe that the Colorado Supreme Court would recognize as cognizable plaintiffs' claim for generalized scientific studies.

**[**4]** A medical monitoring claim compensates a plaintiff for diagnostic treatment, a tangible and quantifiable item of damage caused by a defendant's tortious conduct. Such relief is akin to future medical expenses. The claim does not compensate a plaintiff for testing others to determine the odds that a particular person might contract a disease. . . .

Plaintiffs have cited no authority for their common law claims to recover the costs of generalized scientific studies. I discern no basis for such a claim. Thus, I hold that the scientific studies requested by plaintiffs here are not recoverable under a medical monitoring cause of action. Accordingly, Rockwell's motion to dismiss the portions of the complaint that seek such studies will be granted.

*Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468, 1477-78 (D. Colo. 1991).

I reaffirm my holding that generalized population based scientific studies are not cognizable in a medical monitoring cause of action. However, plaintiffs, in their brief, profess that "the population-based health surveys sought in the Amended Complaint are limited to *specific individuals for whom medical testing and screening will be furnished.*" **[**5]** Plaintiffs' Memorandum in Opposition at 6 (emphasis in original). What plaintiffs apparently seek are funds to pool the data derived from the medical tests *of the exposed plaintiffs.*

**[*515]** Assuming, as I must at this juncture, that pooling the results of these diagnostic medical examinations is reasonably necessary to detect the onset of disease, I conclude that this relief is cognizable in a medical monitoring cause of action. Pooling the examination results is a reasonable complement to normal diagnostic testing that furthers the objective behind the tort--to assure the early diagnosis of a latent disease.

### B. Injunctive Relief

For relief on their medical monitoring claim, plaintiffs seek a fund to finance medical monitoring services. Second Amended Complaint Prayer for Relief para b. "If and to the extent that complete medical

Page 3

778 F. Supp. 512, *515; 1991 U.S. Dist. LEXIS 17370, **5

surveillance relief is unavailable at law," plaintiffs seek "medical monitoring and surveillance services in the form of injunctive relief. Second Amended Complaint Prayer for Relief para. c. Rockwell moves to dismiss the claim for "injunctive relief" for two reasons. First, Rockwell argues that this request for relief was not contained in the first amended **[**6]** complaint and leave to amend the complaint in this fashion was not granted. I disagree because the first amended complaint, liberally construed, states an equitable claim for medical monitoring relief.

Second, Rockwell argues that dismissal is appropriate because a medical monitoring claim is not cognizable as "injunctive relief." I conclude that dismissal of this claim is not appropriate.

Plaintiffs' relief in a medical monitoring claim can take two forms. First, plaintiffs can be awarded a lump some of money. Second, plaintiffs can be awarded a lump sum which is placed into a fund that is administered by the court. *See, e.g., Ayers v. Township of Jackson, 106 N.J. 557, 525 A.2d 287, 313-14 (N.J. 1987).* I construe plaintiffs' Prayer for Relief para. c as a request for a court administered fund. Construed as such, plaintiffs state a valid claim for relief. *See, e.g., id.*

However, while acknowledging that a court administered fund involves use of the court's equitable power, Rockwell argues that a claim for such a fund is not one for "injunctive relief" that can provide the basis for class certification under *Federal Rule of Civil Procedure 23(b)(2).* That question is not ripe **[**7]** for decision.

C. The Banks' Tort Claims

The Banks allege the following claims under the Price Anderson Act and Colorado common law: negligence, strict or absolute liability, private nuisance, trespass, and exemplary damages. Rockwell moves to dismiss these claims, arguing that, as mortgagees, the Banks have no claim upon which relief can be granted. I conclude that the Banks' trespass claims must be dismissed and that the Banks' remaining tort claims are cognizable.

The Banks' trespass claims must be dismissed because, in Colorado, one must have either title to or possession of property to maintain an action for trespass. *Sullivan v. Clements, 1 Colo. 261 (1871); Plotkin v. Club Valencia Condominium Ass'n, 717 P.2d 1027, 1028*

*(Colo. App. 1986).* Thus, when a mortgagee is not in possession of the land, "an action of trespass [can]not be maintained." *Vaughn v. Grigsby, 8 Colo. App. 373, 46 P. 624, 625 (Colo. App. 1896); see also Pueblo & A. V. R. C. v. Beshoar , 8 Colo. 32, 5 P. 639 (Colo. 1884).* Because the Banks do not allege that they are in possession of the land, I grant Rockwell's motion to dismiss their trespass claims. Although **[**8]** Dow has not joined in Rockwell's motion, I conclude that the Banks' trespass claims against Dow should be dismissed for the same reasons. *See Hall v. Bellmon, 935 F.2d 1106 1109-10 (10th Cir. 1991)* (allowing for *sua sponte* dismissal).

Except for the trespass claims, the Banks' tort claims are cognizable. In Colorado, "a suit may be maintained by a mortgagee, or a beneficiary in a trust deed, for an injury done to his security. He need not have possession or right to possession of the land. His right of action grows out of the impairment of his security." *Vaughn, 46 P. at 625; see also Equitable Sec. Co.* **[*516]** *v. Montrose & D. Canal Co., 20 Colo. App. 465, 79 P. 747 (Colo. App. 1905)* (mortgagee allowed to bring suit for impairment of its security before foreclosure); *Arnold v. Broad, 15 Colo. App. 389, 62 P. 577 (Colo. App. 1900)* (mortgagee allowed to bring claim "on the general hypothesis that he may bring suit and recovery damages wherever there has been an unlawful impairment of his security"). I conclude that under *Vaughn* and its progeny, the Banks' remaining tort claims are cognizable.

Rockwell argues that a plaintiff must have either **[**9]** an ownership or possessory interest in the real property to state a claim for nuisance. I disagree. Unlike trespass, a nuisance claim does not require ownership or possession of land to state a valid claim. Rather, as long as the plaintiff has a sufficient interest in the land, it may bring an action for nuisance even if it is not the owner or possessor of the land. *See Restatement (Second) of Torts § 821E(c)* (1979). In Colorado, a mortgagee has a sufficient interest in mortgaged property to sue for "an injury done to its security." *See Vaughn, 46 P. at 625.* It follows that a mortgagee has a sufficient interest in the property to maintain suit if the injury was caused by defendants' nuisance. Rockwell's reliance on *Miller v. Carnation Co., 39 Colo. App. 1, 564 P.2d 127, 130 (Colo. App. 1977)* and *Lowder v. Tina Marie Homes, Inc., 43 Colo. App. 225, 601 P.2d 657, 658 (Colo. App. 1979)*, is misplaced because neither concerned whether the holder of a security interest in real property could

778 F. Supp. 512, *516; 1991 U.S. Dist. LEXIS 17370, **9

bring an action for nuisance. Rather, both of these cases were nuisance actions brought by the owner or occupier of real property.

Rockwell next argues that the Banks' tort **[\*\*10]** claims are barred by the "economic loss rule." In Colorado, "the economic loss rule prevents recovery for negligence when the duty breached is a contractual duty and the harm incurred is the result of failure of the purpose of the contract." *Jardel Enters., Inc. v. Triconsultants, Inc., 770 P.2d 1301, 1303 (Colo. App. 1988)*. Rockwell argues that I should extend this doctrine outside of the contractual duty context to bar all of the Banks' tort claims. Because such an extension is inconsistent with *Vaughn* and its progeny, which allow a mortgagee to recover for injury to its security, I decline to extend the economic loss rule to bar the Banks' claims. *Cf. Lutz Farms v. Asgrow Seed Co.* 948 F.2d 638, (10th Cir. Oct. 25, 1991).

Finally, Rockwell argues that dismissal is appropriate because it is vulnerable to double recovery. This argument is without merit because there is no risk of double recovery. Rather, damages will be apportioned according to Colorado law. *See Arnold, 62 P. at 578.*

Accordingly, it is ORDERED THAT:

(1) Rockwell's Motion to Dismiss and/or Strike is GRANTED IN PART AND DENIED IN **[\*\*11]** PART; and

(2) the trespass claims of plaintiffs Banks Western and Field Savings Corporation are dismissed.

Dated: November 26, 1991 in Denver, Colorado.

BY THE COURT

LEWIS T. BABCOCK, JUDGE



LEXSEE 147 F.R.D. 237

**MERILYN COOK, et. al., Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION, a Delaware corporation, and THE DOW CHEMICAL COMPANY, a Delaware corporation, Defendants.**

**Civil Action No. 90-K-181**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*147 F.R.D. 237; 1993 U.S. Dist. LEXIS 3843*

**March 26, 1993, Decided
March 26, 1993, Filed**

**DISPOSITION:** [**1] IT IS ORDERED THAT Plaintiffs' motion for the scheduling of further proceedings is GRANTED as specified herein; and IT IS FURTHER ORDERED THAT Plaintiffs and Defendants' earlier motions for the entry of a pretrial or case management order are DENIED as moot; and IT IS FURTHER ORDERED THAT Plaintiffs' objections to and appeal from the magistrate judge's December 30, 1992 orders are GRANTED IN PART and DENIED IN PART as provided herein; and IT IS FURTHER ORDERED THAT Defendants' motions to dismiss under *Rules 11* and *37* are DENIED.

**JUDGES:** KANE, JR.

**OPINION BY:** JOHN L. KANE, JR.

**OPINION**

[*239] MEMORANDUM OPINION AND ORDER

KANE, J.

This case is before me on: (1) Plaintiffs' appeal from two orders entered by Magistrate Judge Abram on December 30, 1992, and (2) Defendants Rockwell International, Inc. and Dow Chemical Company's motions to dismiss the case under *Rules 11* and *37*. Both

Plaintiffs' and Defendants' motions focus on the same fundamental question: whether Plaintiffs in this toxic tort litigation should be permitted further discovery regarding the release of hazardous substances at Rocky Flats, or whether this action should be dismissed because they are unable to state with certainty that they have been exposed [**2] to potentially dangerous amounts of specific hazardous substances.

This is a technically complex case. The information necessary to support Plaintiffs' factual allegations has been largely within the control of the Defendants and third parties. To date, Plaintiffs have had limited discovery and little time to analyze the results of that discovery. Therefore, despite the deferential standard governing review of the magistrate judge's discovery orders, I will modify the orders, deny the motions to dismiss, and establish further discovery and case prosecution deadlines through a scheduling or pretrial order.

I. *Facts.*

On January 30, 1990, a number of individuals, Bank Western and the Field Corporation (a subsidiary of Bank Western) (collectively, "Plaintiffs") filed this putative class action. These parties live on or hold an interest in real property located near the Rocky Flats weapons production facility located northwest of Denver,

147 F.R.D. 237, *239; 1993 U.S. Dist. LEXIS 3843, **2

Colorado. Rocky Flats is [*240] owned by the U.S. Department of Energy ("DOE"). Defendant Dow operated Rocky Flats from its inception in the early 1950's to June 30, 1975. Defendant Rockwell operated it from the latter date to December 31, 1989. EG&G [**3] Rocky Flats, Inc. ("EG&G") is currently the facility's contractor.

Plaintiffs allege that during their operation of Rocky Flats, Dow and Rockwell released radioactive and non-radioactive substances into the surrounding area which damaged their property and could have adverse health consequences. In their second amended complaint, Plaintiffs request class certification [1] and plead claims under Colorado common law, the Price Anderson Act (which incorporates common law), *see 42 U.S.C. §§ 2014(hh), 2210*, and the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), *see 42 U.S.C. § 9607*. Their identical common law and Price Anderson claims sound in negligence, strict liability, private nuisance, and outrageous conduct. They seek damages on these claims for property and other economic harm, mental and emotional distress and medical monitoring, plus exemplary damages. They request response costs under CERCLA.

1    Plaintiffs allege two classes. The landowner and Business Class is represented by individuals, Bank Western and the Field Corporation, all of whom own or hold an interest in real property located near Rocky Flats. This subclass seeks $ 250,000,000 in damages for economic harm to property values as a result of hazardous substances released from Rocky Flats. The Medical Monitoring subclass consists of persons allegedly exposed to hazardous substances who seek the creation of a $ 150,000,000 fund for the regular screening, early detection and prevention of cancer and other latent diseases. This subclass does not allege any personal injury or damages from the exposure per se. Both classes seek the payment of CERCLA response costs to members who have incurred them, exemplary damages of $ 300,000,000 and injunctive relief. Class certification proceedings have not yet taken place.

[**4]    The discovery history of this case is not pretty. Plaintiffs first served discovery on April 19, 1990, shortly after the case was filed. Dow and Rockwell quickly moved to dismiss or for summary judgment. [2] On May 14, 1990, they also moved for a protective order pending resolution of these dispositive motions, effectively staying discovery by operation of then Local Rule 403.A. The motion for protective order was never adjudicated. Once the motions to dismiss and for summary judgment were resolved, both parties suggested various discovery proposals. Plaintiffs moved for a case management order and Defendants again moved for a stay of discovery, arguing it should not be permitted because the case had no factual basis. The court did not rule on these motions. For the most part, discovery did not commence until this past summer.

2    In two published opinions, Judge Babcock granted Rockwell and Dow's motions to dismiss several claims alleged in Plaintiffs' first and second amended complaints. *See Cook v. Rockwell Int'l, 755 F. Supp. 1468, 1472-76 (D. Colo. 1991)* (dismissing CERCLA claims for future monitoring costs and costs for monitoring health effects of hazardous releases, and common law claims for general scientific studies, misrepresentation and concealment and injunctive relief); *Cook v. Rockwell Int'l Corp., 778 F. Supp. 512 (D. Colo. 1991)* (dismissing Bank Western and the Field Corporation's trespass claim).

[**5]    On April 16, 1992, the case was referred to Chief Magistrate Judge Abram for a scheduling conference and entry of a discovery scheduling order. On May 15, 1992, Plaintiffs filed a notice in this case that they had petitioned the court in *United States v. Rockwell International Corp.,* No. 92-CR-107, for disclosure of certain grand jury materials in that criminal case. Chief Judge Finesilver denied the petition on May 20, 1992, finding that the Plaintiffs had not advanced "good and sufficient" reasons for disclosure of the materials. [3]

3    In June, 1992, however, the magistrate judge ordered Rockwell to produce a bibliographic list of documents provided to the grand jury to give Plaintiffs the opportunity to request specific information.

On June 29, 1992 the magistrate judge conducted a scheduling conference, and the following day entered an order requiring Defendants to produce "the databases and indices that exist as to the *Church,* ChemRisk, Doty & Associates and grand jury documents." [4] Plaintiffs, in [**6]    turn, were ordered to [*241] provide a specific statement of facts supporting each of the individual

Page 3

147 F.R.D. 237, *241; 1993 U.S. Dist. LEXIS 3843, **6

plaintiffs' claims, including the identification of each hazardous substance to which he or she was exposed, the amount of the exposure and any experts relied on to establish such exposure, plus an explanation of the basis for any medical monitoring, CERCLA, or property damage claims. Apart from these matters, no comprehensive scheduling order was entered at this time.

> 4   The *Church* documents are materials collected in connection with a 1970's lawsuit alleging offsite contamination from Rocky Flats. *See Good Fund, Ltd. - 1972 v. Church, 540 F. Supp. 519 (D. Colo. 1982), rev'd sub nom. McKay v. United States, 703 F.2d 464 (10th Cir. 1983).* The ChemRisk documents are documents collected by ChemRisk, the contractor conducting a government-sponsored assessment of public health risks described in further detail below. The Doty & Associates documents are from a similar study conducted in 1991 to provide a listing of all spills, releases or other incidents involving hazardous substances at Rocky Flats. Defendants refer to these document sets as the "core documents" in this case.

**[**7]** On August 17, 1992, Plaintiffs moved to compel Dow and Rockwell's compliance with the magistrate judge's June 30 order. They alleged that, while Defendants had provided computerized databases to the grand jury documents, they had not provided the *Church,* ChemRisk and Doty & Associates documents in computer-readable form. Dow and Rockwell opposed the motion.

On September 2, 1992, the magistrate judge held another scheduling conference. First, he granted Plaintiffs' motion to compel production of the *Church,* ChemRisk and Doty & Associates documents on disk, reasoning that "to require the plaintiffs to sort manually when database disks are available, is not reasonable." He also entered the first true scheduling order in this case, establishing limits on the number of interrogatories and requests for production and a deadline for their completion, a schedule for depositions, deadlines for discovery of fact and expert witnesses and dates for settlement, status and pretrial conferences.

On September 23, 1992, Magistrate Judge Abram issued a second order concerning the factual basis for Plaintiffs' claims and Dow and Rockwell's production of computerized databases. This order **[**8]** was apparently

in response to Dow and Rockwell's objections to Plaintiffs' Statement of Factual Basis, served on Dow and Rockwell on August 14 in compliance with the magistrate judge's June 30, 1992 order. In his September 23 order, the magistrate judge found the Plaintiffs' statement to be inadequate and directed them to answer seven specific questions with respect to the claims of each individual plaintiff by September 30, 1992. In addition, he ordered Plaintiffs to pay Dow and Rockwell $ 40,000 to reimburse them for half of their cost in optically screening documents provided to Plaintiffs on computer disk.

Plaintiffs objected and moved for reconsideration of the September 23 order, asking the court to withdraw the most recent questions or grant them additional time to answer. They argued that Dow and Rockwell had recently propounded voluminous discovery, they needed more time to respond to it and to digest materials provided through their own discovery, and their responses to Defendants' discovery would likely be responsive to the court's questions. On October 19, 1992, the magistrate judge granted reconsideration of his order in part, relieving Plaintiffs of the responsibility **[**9]** of answering interrogatories relating to their "Statement of Factual Basis" until the submission of their expert report. 5

> 5   In addition, on October 16, 1992, the magistrate judge granted Plaintiffs' motion for protective order, permitting them to respond to Rockwell's discovery requests by November 16, 1992 and to defer responding to Dow's discovery. Plaintiffs' motion was based on Defendants' duplicative discovery requests.

On November 6, 1992, Plaintiffs moved for an extension of November 13, 1992 deadline for providing their expert reports under *Fed. R. Civ. P. 26(b)(4)(A)(i).* Plaintiffs argued that their expert's preparation of a dose reconstruction analysis, by which they could calculate the individual plaintiff's exposure to hazardous substances, had been substantially delayed by Defendants' failure to provide the computerized form of critical documents and to identify the current custodian of other records. Dow and Rockwell opposed the motion, arguing that Plaintiffs were attempting to evade the requirement **[**10]** to disclose the factual basis for their claims.

**[*242]** On November 23, 1992, Rockwell filed an objection to subpoenas directed to the DOE and EG&G

147 F.R.D. 237, *242; 1993 U.S. Dist. LEXIS 3843, **10

requesting the production of documents provided to the grand jury in *United States v. Rockwell International Corporation*. Rockwell argued that the subpoenas violated *Fed. R. Crim. P. 6(e)*. On November 24, 1992, the DOE also moved to quash the subpoenas, making some additional objections. First, the DOE contended that Plaintiffs' request for indices and databases to the Environmental Master File ("EMF") and related files produced at the facility was onerous and would result in the production of millions of pages of documents. [6] It likewise objected to the production of documents generated in the grand jury proceedings, claiming they were too voluminous, protected by *Rule 6(e)* and much of the material had already been produced. Finally, the DOE asserted that some of the documents were classified. EG&G filed a similar motion. Plaintiffs responded by moving to compel on December 8, 1992.

> 6    The EMF is the extensive, baseline file of environmental information collected at Rocky Flats over many years.

[**11] On December 30, 1992, Magistrate Judge Abram issued two orders disposing of these discovery motions. In the first order (the "Expert Discovery Order"), he denied Plaintiffs' motion to establish a revised expert discovery timetable, reasoning that "the plaintiffs have had nearly two years to obtain their own soil, air and water tests as well as the determination of any lost market value of property," and that they had sufficient time to prepare their expert reports. (Expert Discovery Order at 1-2.) [7] In the second order (the "Document Discovery Order"), the magistrate judge granted the motions to quash Plaintiffs' subpoenas. He held that Plaintiffs were precluded from seeking grand jury documents through the "back door," and that they must be requested from Chief Judge Finesilver. He rejected Plaintiffs' requests for discovery of the EMF and related indices and databases, holding that Plaintiffs had not "established the necessity for such a voluminous request," since Plaintiffs had already received most of the information gathered by ChemRisk and Doty & Associates and used in their studies.

> 7    In addition, he granted Rockwell's November 16, 1992 motion to compel the production of all medical records for any plaintiff asserting a medical monitoring or emotional distress claim. This portion of the Expert Discovery Order is not contested.

[**12] Finally, the magistrate judge ruled that Plaintiffs had several times failed to comply with his orders to define the factual basis of their claims. Under his view, the claims and issues of proof in the case were simple and did not require extensive factual discovery. He denied Plaintiffs further document discovery unless they could "establish that they have reviewed the documents produced and the various studies made available to them, . . . the document requested has not been located, the specific reason for the need of the document, and the attempts by the party to locate the document through public reports or the reports provided to the plaintiffs." (Document Discovery Order at 4.) In addition, he ordered them to respond to his September 23, 1992 order by setting forth the specific facts and expert reports they would rely on to establish liability and damages.

On January 15, 1993, Plaintiffs filed objections to and an appeal from the Expert Discovery Order and the Document Discovery Order. Their appeal centers on two areas: (1) the continuation of discovery and preparation of expert reports and (2) discovery of the grand jury materials. Before entry of the December 30 orders, [**13] on December 10 and 11, 1992, Dow and Rockwell respectively moved to dismiss this action under *Fed. R. Civ. P. 11* and *37*. Defendants argued that Plaintiffs had consistently failed to comply with the magistrate judge's orders to identify a specific factual basis for their claims and their inability to do so mandated dismissal of the case.

II. *Plaintiffs' Appeal of Magistrate Judge Abram's December 30 Orders.*

Review of the magistrate judge's December 30, 1992 orders is a deferential one. Magistrate judges are authorized under *28 U.S.C. § 636(b)(1)(A)* to hear and determine any pretrial matter except for certain [*243] dispositive motions listed therein. *See 28 U.S.C. § 636(b)(1)(A)*. Review of a magistrate judge's ruling under this section is subject to the clearly erroneous or contrary to law standard. *Clark v. Poulton, 963 F.2d 1361, 1363* (10th Cir.), *cert. denied, 121 L. Ed. 2d 566, 113 S. Ct. 635 (1992)*; *Smith v. Colorado Interstate Gas Co., 794 F. Supp. 1035, 1040 (D. Colo. 1992)*. An order is clearly erroneous when the reviewing [**14] court on the entire evidence is left with the definite and firm conviction that a mistake has been made. *See Hirschfeld v. New Mexico Corrections Dept., 916 F.2d 572, 580 (10th Cir. 1990)*;

*Davidovich v. Welton (In re Davidovich), 901 F.2d 1533, 1536 (10th Cir. 1990).*

A. *Continuation of Discovery and Preparation of Expert Reports.*

Plaintiffs take issue with portions of both the Expert Discovery Order and the Document Discovery Order. First, they contend that the magistrate judge erred in limiting further discovery of documents relating to hazardous substances handled at Rocky Flats. Second, they argue that the magistrate erred in rejecting their request for an extension of time to prepare expert reports which would permit the completion of a dose reconstruction analysis. Plaintiffs' objections relating to the discovery of grand jury documents are discussed separately, below.

In the Document Discovery order, the magistrate judge denied Plaintiffs' motions to compel, limiting their ability to require production of additional information on environmental conditions at Rocky Flats. He reasoned that Plaintiffs could [**15] rely on data in the public record and studies already made available to them to establish their exposure to hazardous substances. These include the ChemRisk study, commissioned by the Colorado Department of Health, and the Doty & Associates study provided to Plaintiffs in August, 1992. This puts Plaintiffs between a rock and hard place.

Reports available in the public sector document the routine mishandling of hazardous substances at Rocky Flats. *(See, e.g.,* Pl. Mem. Opp. Mot. Dismiss at 11 n. 15, 15 n. 16 & Ex. E.) These same public documents indicate, however, that a central problem at Rocky Flats has been the lack of adequate monitoring of the handling and disposal of hazardous substances. One report notes: "The Rocky Flats groundwater monitoring system had never met RCRA [Resource Conservation and Recovery Act] requirements, making it extremely difficult to track the extent, direction or movement of contaminants from the plant." (Pl. Mem. Opp. Mot. Dismiss, Ex. E at 74; *see also* Decl. Dr. Jan Beyea at 9.) In addition, the facility itself was closed in 1989 by the Environmental Protection Agency because of concerns over safety, and Rockwell has plead guilty to ten [**16] criminal violations under RCRA and the Clean Water Act. Thus, while information in the public sector supports Plaintiffs' contention that there have been releases which could detrimentally affect them, it also shows that data collection at the facility on actual releases cannot provide a solid basis for dose estimation.

Inadequate data on releases of contaminants from Rocky Flats led the Colorado Department of Health to commission the ChemRisk study, which is designed to estimate the amount of hazardous substances released from Rocky Flats and to determine the probable health effects from those releases. *(See* Dow Mot. Dismiss, Ex. B. at 1.) The ChemRisk study, however, is to date incomplete. Preliminary results of the first phase of the study, a toxicological review and dose reconstruction, are not due until September 1993. The second phase, a quantitative risk assessment, will not be completed for several years. *(See* Letter from CDH to Court of 2/8/93 at 1; Decl. Dr. Jan Beyea at 10 n. 7.)

Furthermore, it is not clear that documents culled by ChemRisk constitute all the data germane to Plaintiffs' claims. Although Dow and Rockwell argue that the core documents already [**17] provided are a complete collection of the relevant information available from Rocky Flats' files, Plaintiffs should be given a fair chance to determine whether there is additional information not considered in the ChemRisk or other studies which could impact dose estimation or their CERCLA claims, rather than being required to accept ipso facto the preliminary results of [*244] the ChemRisk study. Examination of the EMF and related files is therefore necessary. The magistrate judge placed limits on this discovery, however, requiring Plaintiffs to first show, among other things, that no document they were requesting had already been provided to them. Yet to make this showing Plaintiffs must, at minimum, be permitted to review the indices to these files so they can determine what information, in addition to the ChemRisk documents, is there and what has already been obtained.

Second, in the Expert Discovery Order, the magistrate judge denied Plaintiffs' motion for an extension of time to submit their expert reports, finding that they had more than two years to obtain their own soil, air and water tests, indicating his view that any expert report or dose reconstruction analysis could be based [**18] simply on measurements of existing levels of contaminants in the air, soil and bodies of the individual plaintiffs. This is rarely true. "Proof of pathway [to exposure], medical and economic causation in hazardous waste cases can be difficult to adduce. Usually, neither the chemicals in question nor their action in the environment can be directly observed." 3 Susan M.

147 F.R.D. 237, *244; 1993 U.S. Dist. LEXIS 3843, **18

Cooke, *The Law of Hazardous Waste* § 17.02[2][b] (1992).

Here, Plaintiffs' expert, Dr. Jan Beyea, states that current measurements are only one factor considered in determining Plaintiffs' exposure. Other factors include quantities of material consumed at Rocky Flats, epidemiological studies and monitored emissions. This data is used to model Plaintiffs' likely exposure to contaminants which can no longer be measured directly. *(See* Pl. Mem. Supp. Mot. Revised Expert Disc. Timetable, Decl. Dr. Jan Beyea at 7, 8; *see also* Dow's Reply Br. Supp. Mot. Dismiss, Ex. H at 1-2) ("Since past concentrations of radionuclides and chemicals in air, water, soil and food cannot be directly measured[,] available information must be used to estimate or 'reconstruct' doses received by off-site individuals.") In addition, **[**19]** measurements of other substances, such as plutonium, are not static, and "concentrations can change not only with respect to the distance and direction from the Rocky Flats Plant, but over time as well." (Rockwell Reply Mem. Supp. Mot. Dismiss, Ex. & at 1; *see also* Decl. Dr. Jan Beyea at 3 n. 1, 5 n. 3.) Thus, to complete an accurate and realistic estimate of Plaintiffs' exposure to hazardous substances, their experts must review data on both consumption and emissions of hazardous materials at Rocky Flats--information within Defendants, DOE and EG&G's control. Soil, air and body testing is not enough

Finally, the foregoing rulings by the magistrate judge are based on some misstatements of substantive law. First, Plaintiffs have asserted CERCLA claims in addition to their common law claims. Contrary to the magistrate judge's conclusion, *(see* Document Discovery Order at 3), Plaintiffs need not show *existing* contamination of their bodies or properties to establish their CERCLA claims. *Dedham Water Co. v. Cumberland Farms Dairy, 889 F.2d 1146, 1152-54 (1st Cir. 1989).* Instead, CERCLA permits private parties to recover necessary costs in **[**20]** response to an actual or "threatened" release of a hazardous substance. *See 42 U.S.C. § 9607(a)(4).* Courts broadly construe the phrase "threatened release." *Amland Properties Corp. v. Aluminum Co. of Am., 711 F. Supp. 784, 792-93 (D.N.J. 1989).* For example, "threatened releases have been found to include: a defendant's mere ownership of 'corroding and deteriorating tanks,' a defendant's 'lack of expertise in handling hazardous waste,' or a defendant's 'failure to license the facility.'" *Dedham Water Co., 889 F.2d at*

1152 (citations omitted). Even for an actual release, there is no quantitative requirement on the amount of the release, *see Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 669 (5th Cir. 1989),* nor any requirement that the plaintiff present evidence of off-site contamination. *See United States v. Mottolo, 695 F. Supp. 615, 623 (D. N.H. 1988).*

In addition, the magistrate judge observed that Plaintiffs' common law claims for loss in the market value of their property "require a showing of *existing contamination* **[**21]** and a loss of market value." (Document Discovery Order at 3.) This is an unsettled issue of law. While some courts hold that common law claims for damages for loss in **[*245]** property value due to the presence of hazardous substances requires proof of existing contamination, *see Adkins v. Thomas Solvent Co., 440 Mich. 293, 487 N.W.2d 715 (Mich. 1992)* (upholding summary judgment in nuisance action based on public's unfounded fear of contamination), others permit a claim based on loss in value based on a public perception that the property is contaminated. *See DeSario v. Industrial Excess Landfill, Inc., 68 Ohio App. 3d 117, 587 N.E.2d 454, 461 (Ohio App. 1991)* (public perception of contamination can support private nuisance claim); *Allen v. Uni-First Corp., 151 Vt. 229, 558 A.2d 961 (Vt. 1988)* (error in failing to instruct jury on damages based on evidence of public perception of widespread contamination). [8]

> [8]   Defendants argue that the magistrate judge's conclusion is based on Judge Babcock's February 13, 1991 order. *See 755 F. Supp. at 1483.* The language they rely on was the judge's paraphrasing of the Plaintiffs' claims in connection with his ruling on Dow's statute of limitations defense. Nor is the *Church* case dispositive. That case does not hold that damages can never be absent proof of actual contamination. In any event, the magistrate judges' ruling cannot be considered dispositive on this substantive issue.

**[**22]** Reviewing the entire record, I am left with the definite and firm conviction that error occurred. Accordingly, I modify the portions of the magistrate judge's Document Discovery Order denying Plaintiffs' motions to compel and the Expert Discovery Order denying an extension for submission of expert reports. First, Plaintiffs shall be permitted additional discovery of environmental records generated at Rocky Flats without

147 F.R.D. 237, *245; 1993 U.S. Dist. LEXIS 3843, **22

the limitations imposed in the Document Discovery Order. Nevertheless, I agree that the subpoenas served on the DOE and EG&G were overbroad in requesting the production of "all databases and indices" of the EMF and related files currently maintained by EG&G. After those subpoenas were served, however, Plaintiffs, the DOE and EG&G had apparently reached a tentative agreement narrowing many of the requests before further discovery was stayed by the magistrate judge's orders. *(See, e.g.,* Resp. EG&G Pls.' Appeal, Ex. A--Affid. Barbara Swenson.)* The magistrate judge shall determine whether areas of dispute still remain, but the blanket limitations on all future document discovery are lifted. In addition, Plaintiffs will not be required to submit their expert **[**23]** reports until they have had a fair opportunity to identify, procure and digest any relevant documents produced through this further discovery.

B. *Discovery of Grand Jury Materials.*

Plaintiffs also take issue with the magistrate judge's finding that the grand jury materials in *United States v. Rockwell International, Inc.* are not discoverable absent the consent of Chief Judge Finesilver. They dispute the magistrate judge's application of the Tenth Circuit's decision in *Anaya v. United States, 815 F.2d 1373, 1379 (10th Cir. 1987),* to this dispute.

In *Anaya,* the court held that the focus of *Fed. R. Crim. P. 6(e)* is "whether the information requested will actually subvert the secrecy veiling what took place before the grand jury." *Id. at 1378.* In *Anaya,* the IRS obtained materials generated in an FBI investigation. Some of the materials were given to the grand jury, but those sought by the IRS were never presented to it and were kept physically separated. *See id. at 1376.* Because the grand jury never actually reviewed the materials sought in *Anaya,* the Tenth Circuit **[**24]** held that their production would not reveal matters occurring before it. *Id. at 1379-80.*

In contrast, Plaintiffs seek the production of "all indices and databases related to documents seized by the FBI and subpoenaed by the Grand Jury in relation to *United States v. Rockwell." (See* App. Mem. Supp. Pls.' Mot. Compel., Subpoena Att. A at 6.) In essence, they seek to piggyback on the very same discovery the grand jury conducted. This is impermissible under *Anaya.*

"It is not the information itself, but the fact that the grand jury was considering that information which is

protected by *Rule 6(e)*." *Anaya, 815 F.2d at 1379.* For this reason, the court in *Anaya* cited with approval the decisions in *Fund for Constitutional Government v. National Archives, 211 U.S. App. D.C. 267, 656 F.2d 856 (D.C. Cir. 1981)* and *In re Sealed Case, 255 U.S. App. D.C. 340, 801 F.2d 1379 (D.C. Cir. 1986),* where the movants sought disclosure of materials actually presented **[*246]** to the grand jury. *See 815 F.2d at 1379.* While materials relevant to Plaintiffs' case may overlap with those subpoenaed **[**25]** in *United States v. Rockwell International Corporation,* Plaintiffs must obtain those documents because they are relevant to their claims in this case, not simply because they were provided to the grand jury in its criminal investigation of Rockwell. For this reason, I uphold the magistrate judge's denial of Plaintiffs' motion to compel the production of the grand jury materials.

III. *Dow and Rockwell's Motions to Dismiss Under Rules 11 and 37.*

Moving to dismiss under *Rules 11* and *37,* Defendants argue that Plaintiffs' complaint was without factual basis when it was filed and Plaintiffs have failed to comply with the magistrate judge's scheduling order requiring them to identify the factual basis of their claims. Defendants focus specifically on Plaintiffs' alleged failure to demonstrate they were actually exposed to a hazardous substance. I deny these motions.

*Rule 11* requires an attorney signing a pleading to have read the pleading, made a reasonable inquiry into its factual and legal basis, and not filed it for an improper purpose. *See Fed. R. Civ. P. 11.* In determining whether an attorney has made a reasonable factual inquiry, "'the standard is one of reasonableness **[**26]** under the circumstances.'" *Business Guides, Inc. v. Chromatic Communications Enter., Inc., 498 U.S. 533, 111 S. Ct. 922, 933, 112 L. Ed. 2d 1140 (1991)* (citation omitted). The adequacy of Plaintiffs' factual investigation is measured at the time of filing. *See Fed. R. Civ. P. 11,* advisory committee note ("The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading was submitted.") How much time the attorney had for investigation, whether the defendant permitted the plaintiff access to material information, the complexity of the factual issues, and the need for discovery to develop the factual circumstances supporting the claim are all factors which bear on this determination.

147 F.R.D. 237, *246; 1993 U.S. Dist. LEXIS 3843, **26

*See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1335 at 65 (1990).

Plaintiffs' second amended complaint was filed April 8, 1991. At that time, it was public knowledge that Rocky Flats had been closed after an FBI and EPA raid of the facility due to safety concerns about the handling of hazardous substances, and a grand jury had been empaneled to investigate environmental [**27] crimes at Rocky Flats after the raid. These reports were sufficient to provide a foundation for Plaintiffs' claims. *Cf. Kamerman v. Steinberg, 113 F.R.D. 511, 514-15 (S.D.N.Y. 1986)* (news articles and public documents provide a reasonable factual basis for claims based on securities violations).

Furthermore, much of the information necessary to calculate accurately Plaintiffs' exposure to hazardous substances was classified and had been in Defendants' control or the control of third parties. Plaintiffs were denied any meaningful discovery until the summer of 1992, well over a year after the second amended complaint was filed. In these circumstances, Plaintiffs were justified in filing their complaint even if they could not identify the specific substances to which they were exposed. *See, e.g., Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 95 (3d Cir. 1988)* (difficulty of proving claim and complexity of factual issues, especially where proof is in the defendant's control, mandates denial of *Rule 11* sanctions); *Mohammed v. Union Carbide, 606 F. Supp. 252, 253 (E.D. Mich. 1985)* (recognizing [**28] same principle).

Moreover, assuming that Plaintiffs' had a continuing duty under *Rule 11* to review and reexamine the factual basis for their complaint, which they do not, *see* 5A Charles A. Wright & Arthur R. Miller, *supra*, § 1333 at 52-53 & n. 23 (citing cases), events since the filing of the complaint, if anything, favor Plaintiffs' case. The grand jury in *United States v. Rockwell International, Inc.* has found evidence of widespread environmental misconduct by Rockwell and the DOE. [9] Defendant Rockwell plead guilty [*247] to ten environmental crimes, and it is fair to infer that these crimes could have had public health consequences, particularly for those living near the facility. In addition, the CDH-commissioned ChemRisk study preliminarily identified a number of materials handled at Rocky Flats which mandate in-depth study of public health impact.

9   Rockwell deprecates this by pointing to the

U.S. Attorney's report, which criticizes many of the grand jury's findings as unfounded. I must note, however, that the U.S. Attorney's office likewise has not been immune to criticism. The chairman of the Senate subcommittee reviewing the Rocky Flats criminal investigation noted

a troubling lack of public accountability in the Federal Government. Serious environmental crimes were committed, but no individuals were held responsible. The crimes were attributed to a "culture" at DOE--not the actions of responsible individuals. This is the white collar equivalent of blaming armed robbery on "society"--not the individual holding the gun.

Second, it should be noted that the most important thing that Federal prosecutors bargained away in negotiations with Rockwell was the truth. By entering into this plea agreement, the prosecutors bargained away the right to fully and accurately inform the American people and the Congress about the conditions, activities, and crimes at the Rocky Flats facility. Conditions that, I might add, continue to this day even though Rockwell has been replaced as the facility's contractor.

(Pls.' Mem. Opp. Defs.' Mot. Dismiss, Ex. E at 4) (letter from Chairman of Investigations Subcommittee to Chairman of Committee on Science, Space & Technology forwarding report on Rocky Flats investigation). Furthermore, this same report noted that there was evidence of criminal conduct at Rocky Flats which had the potential for offsite consequences, but that "all of those charges were dropped or revised into permit or storage violations

147 F.R.D. 237, *247; 1993 U.S. Dist. LEXIS 3843, **28

because of Rockwell's fear that they would increase the potential of civil litigation and liability for the company." *(Id.* at 66.)

[**29] Defendants nevertheless insist that the complaint was deficient because Plaintiffs have not plead with specificity the hazardous substances to which they or their properties were allegedly exposed. Defendants import a requirement into *Rule 11* that does not exist. As the court explained in *Frantz v. United States Powerlifting Federation,*

> Rule 8 determines how much information has to be in the complaint--not much, as both the language of Rule 8 and the forms attached to the Rules show. The complaint should contain a "short and plain statement of the claim showing that the pleader is entitled to relief", Rule 8(a)(2). It is not only unnecessary but also undesirable to plead facts beyond limning the nature of the claim (with exceptions, see Rule 9, that do not concern us). Bloated, argumentative pleadings are a bane of modern practice. *Rule 11* requires not that counsel *plead* facts but that counsel *know* facts after conducting a reasonable investigation--and then only enough to make it reasonable to press litigation to the point of seeking discovery. *Rule 11* neither modifies the "notice pleading" approach of the federal rules nor requires counsel to prove the case [**30] in advance of discovery.

*836 F.2d 1063, 1067-68 (7th Cir. 1987).* For these reasons, I reject Defendants' contention that there is no *Rule 11* basis for the complaint.

Defendants also argue that the case must be dismissed under *Rule 37* for Plaintiffs' failure to obey the magistrate judge's order to supplement their statement of the factual basis of their claims. *Rule 37* authorizes the court to take action against any party who fails to obey, among other things, a scheduling order. *See Fed. R. Civ. P. 37(b)(2).* Plaintiffs were required to file their initial statement before they had received most of the documents Defendants deemed relevant to this case, and

the supplemental statement was due shortly thereafter. Despite being denied discovery for more than two years, Plaintiffs have provided the affidavit of their expert identifying substances to which they have been exposed based on the selective data already obtained.

Defendants take issue, however, with the veracity of these assertions. For example, Rockwell suggests that the chemicals to which Plaintiffs allege they were exposed were present in "trivial amounts" and complains that Plaintiffs [**31] do not explain how their experts calculated concentrations of certain chemicals. Similarly, Dow argues that the CDH has consistently monitored emissions from Rocky Flats since a well-publicized fire in 1969 and that it has never found that the public is at risk from releases [*248] from the facility. [10] Defendants' disputes with Plaintiffs' factual contentions can be resolved at trial; they are not the proper basis for a dismissal under *Rule 11* or *37. See Mary Ann Pensiero, Inc., 847 F.2d at 95* ("A requirement that counsel, before filing a complaint, secure the type of proof necessary to withstand a motion for summary judgment would set a pre-filing standard beyond that contemplated by *Rule 11*).

> 10    I note that this contention is facially inconsistent with the CDH's decision to commission the ChemRisk study, which is specifically targeted at determining the amount and danger from hazardous materials likely released from Rocky Flats.

In sum, while there is need to strike a balance between [**32] giving Plaintiffs a fair chance at discovery and protecting Defendants from a lawsuit which may have no factual basis, if Plaintiffs' case is as meritless as Defendants suggest, Defendants can easily prevail on summary judgment. Any costs of discovery can then be apportioned fairly. The discovery rules were promulgated so that "civil trials in the federal courts no longer need be carried on in the dark." *Hickman v. Taylor, 329 U.S. 495, 500 (1947).* [11] Plaintiffs have demonstrated a *Rule 11* basis for their case; they should be permitted "a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Procter & Gamble Co., 356 U.S. 677, 682-83, 2 L. Ed. 2d 1077, 78 S. Ct. 983 (1958).* I deny the motions to dismiss.

> 11    I remain a critic of the Federal Rules of Procedure believing them to be outdated and dysfunctional. Nevertheless, judicial discipline

147 F.R.D. 237, *248; 1993 U.S. Dist. LEXIS 3843, **32

requires that I apply the law as I think it is and not as I think it ought to be.

IV.  [**33] *Additional Orders.*

This case is remanded to Magistrate Judge Borchers with directions to convene the parties and enter a new case management order consistent with the views expressed in this memorandum opinion. The order should note that the magistrate judge will determine any further discovery disputes and appeals of discovery orders, if any, will be handled by me on an expedited basis. The order should reflect my earlier ruling that Plaintiffs' class certification motion shall be filed on or before April 25, 1993, Defendants' response to the motion shall be filed on or before May 25, 1993 and Plaintiffs' reply, if any, shall be filed on or before June 25, 1993. Finally, the order should include prompt dates, immediate resumption of document discovery, the provision of expert reports and a date for a status conference before me in not more than eight months. Accordingly,

IT IS ORDERED THAT Plaintiffs' motion for the scheduling of further proceedings is GRANTED as specified herein; and

IT IS FURTHER ORDERED THAT Plaintiffs and Defendants' earlier motions for the entry of a pretrial or case management order are DENIED as moot; and

IT IS FURTHER ORDERED THAT Plaintiffs' objections [**34] to and appeal from the magistrate judge's December 30, 1992 orders are GRANTED IN PART and DENIED IN PART as provided herein; and

IT IS FURTHER ORDERED THAT Defendants' motions to dismiss under *Rules 11* and *37* are DENIED.

Dated this 26th day of March, 1993 at Denver, Colorado.

JOHN L. KANE, JR., U.S. SENIOR DISTRICT COURT JUDGE



LEXSEE 151 F.R.D. 378

**MERILYN COOK, et al., Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION, a Delaware Corporation, and THE DOW CHEMICAL COMPANY, a Delaware Corporation, Defendants.**

**Civil Action No. 90-K-181**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*151 F.R.D. 378; 1993 U.S. Dist. LEXIS 14672*

**October 8, 1993, Decided
October 8, 1993, Filed**

**DISPOSITION:** **[**1]** IT IS ORDERED THAT Plaintiffs' motion for class certification is GRANTED.

**COUNSEL:** For Plaintiffs: Bruce H. DeBoskey, Esq., Silver & DeBoskey, Denver, CO.

For Rockwell, Defendant: Franklin D. Kramer, Esq., Shea & Gardner, Washington, DC. For Dow Chemical, Defendant: Mark S. Lillie, Esq., Kirkland & Ellis, DC Box 09.

**JUDGES:** KANE, JR.

**OPINION BY:** JOHN L. KANE, JR.

**OPINION**

**[*380]** ORDER REGARDING CLASS CERTIFICATION

KANE, J.

This case is before me on plaintiffs' motion to certify two classes, a medical monitoring class and a property class pursuant to *Fed. R. Civ. P. 23*. Certification for the medical monitoring class is sought under *Rule 23(b)(2)* or, in the alternative, under *Rule 23(b)(3)*. Certification of the property class' damage claims is requested solely

under *Rule 23(b)(3)*.

I. *Facts and Procedural Background*

On January 30, 1990, a number of individuals, Bank Western and the Field Corporation (a subsidiary of Bank Western) (collectively, "plaintiffs") filed this putative class action. These parties live on or hold an interest in real property located near the Rocky Flats weapons production facility in northwest Denver, Colorado ("Rocky Flats"). Rocky Flats is owned by the U.S. Department of Energy. Defendant, The Dow **[**2]** Chemical Company ("Dow"), operated Rocky Flats from its inception in the early 1950's to June 30, 1975. Defendant, Rockwell International Corporation ("Rockwell"), operated it from the latter date to December 31, 1989. Dow and Rockwell are collectively referred to as "defendants."

Class plaintiffs are fourteen individuals and business entities who sue on behalf of and seek certification of two classes, a medical monitoring class and a property class. Plaintiffs allege that during their operation of Rocky Flats, Dow and Rockwell released radioactive and non-radioactive substances into the surrounding area which damaged their property and could have adverse impacts on their health. In their second amended complaint, plaintiffs request class certification and plead claims under Colorado common law, the Price Anderson

151 F.R.D. 378, *380; 1993 U.S. Dist. LEXIS 14672, **2

Act (which incorporates common law), *42 U.S.C. §§ 2014(hh), 2210*, and the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), *42 U.S.C. § 9607*. Their identical common law and Price Anderson claims sound in negligence, strict liability, private nuisance, and outrageous conduct. **[**3]** They seek damages on these claims for property and other economic harm, mental and emotional distress and medical monitoring, plus exemplary damages. They request response costs under CERCLA.

II. *Certification of the Medical Monitoring Class and Property Class*

A. *General Principles*

In determining whether the plaintiffs' cause of action is suitable for determination on a classwide basis, the provisions of *Rule 23* must be followed. *McCarthy v. Kleindienst, 239 U.S. App. D.C. 247, 741 F.2d 1406, 1412 n. 6 (D.C. Cir. 1984)*. Whether a class may be certified is in the discretion of the court. *Gulf Oil Co. v. Bernard, 452 U.S. 89, 100,* **[*381]** *68 L. Ed. 2d 693, 101 S. Ct. 2193 (1981)*. "An inquiry into the merits of the claims of the representative or the class is inappropriate when making the decision whether the action should be certified under *Rule 23*." 7A Charles A. Wright et al., *Federal Practice and Procedure* § 1759 at 99 (1986); *see also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1970); Redditt v. Mississippi Extended Care Centers, Inc., 718 F.2d 1381, 1387-88 (5th Cir. 1983); Joseph v. General Motors Corp., 109 F.R.D. 635, 637 (D. Colo. 1986)*. **[**4]** A court is obliged to determine only whether the requirements of *Rule 23* have been satisfied. *See Kahan v. Rosenstiel, 424 F.2d 161, 169* (3d Cir.), *cert. denied, 398 U.S. 950, 26 L. Ed. 2d 290, 90 S. Ct. 1870 (1970)*. On the other hand, in determining whether the requirements of *Rule 23* have been met, it is often necessary to analyze the substantive claims and defenses of the parties and the essential elements of those claims and defenses. *See Hurwitz v. R.B. Jones Corp., 76 F.R.D. 149, 157 (W.D. Mo. 1977)*. However, there is a distinction between identifying the issues that the case will present for purposes of determining whether the requirements of *Rule 23* have been met and deciding those issues on the merits. *See id.*

"A court has broad discretion in deciding whether to allow the maintenance of a class action." 7B Wright, *supra* § 1785 at 119; *see also Weiss v. York Hosp., 745 F.2d 786, 808 (3d Cir. 1984), cert. denied, 470 U.S. 1060, 84 L. Ed. 2d 836, 105 S. Ct. 1777 (1985)*. Certification is not irreversible and may be altered or amended as the case progresses towards resolution on the merits. **[**5]** *Fed. R. Civ. P. 23(c)(1), 23(c)(4)(B)*; *Joseph, 109 F.R.D. at 638*; *see also* 7B Wright, *supra* § 1785 at 128. This power to change the class certification decision has encouraged many courts to be quite liberal in certifying a class when that decision is made at an early stage, noting that the action always can be decertified or the class description altered if later events suggest that it is appropriate to do so. *Esplin v. Hirschi, 402 F.2d 94, 99 (10th Cir. 1968), cert. denied 394 U.S. 928, 22 L. Ed. 2d 459, 89 S. Ct. 1194 (1969)*; *see also* 7B Wright, *supra* § 1785 at 131.

The party invoking *Rule 23* has the burden of showing that all of the prerequisites to utilizing the class action procedure have been satisfied. *Taylor v. Safeway Stores, Inc., 524 F.2d 263, 270 (10th Cir. 1975); Spivak v. Petro-Lewis Corp., 120 F.R.D. 693, 695 (D. Colo. 1987)*; 7A Wright, *supra*, § 1759 at 102. In order for this action to be maintained as a class action, plaintiffs must first establish that the four requirements of *Fed. R. Civ. P. 23(a)* are satisfied. These requirements **[**6]** are: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. These requirements are often referred to as numerosity, commonality, typicality, and adequacy of representation.

Second, plaintiffs must establish that the case fits within one of the three subcategories of *Rule 23(b)*. In the present case, plaintiffs seek certification for a medical monitoring class under *Rule 23(b)(2)* or, in the alternative, under *Rule 23(b)(3)* and certification for a property class under *Rule 23(b)(3)*. Under subsection (b)(2), plaintiffs must establish that the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Under subsection (b)(3), Plaintiffs must establish that the questions of law and fact common to the class predominate over any questions affecting **[**7]** only individual members (predominance), and that a class action is superior to other available methods for the fair and efficient

151 F.R.D. 378, *381; 1993 U.S. Dist. LEXIS 14672, **7

adjudication of the controversy (superiority).

Bearing in mind these general principles, each of the prerequisites to class certification is considered below to determine whether each has been met in respect of the two classes for which plaintiffs seek certification.

[*382]   B. *The Requirements of Rule 23(a)*

1. *Numerosity*

*Rule 23(a)(1)* provides that a class action may be maintained only if "the class is so numerous that joinder of all members is impracticable." To satisfy the requirements of *Rule 23(a)*, plaintiffs must first adequately define each class and then establish that each class is so numerous that joinder of all members is impracticable.

In determining whether the proposed class meets *Rule 23(a)*'s numerosity requirement, I must first determine whether the class is sufficiently defined so that potential class members can be identified. *Joseph, 109 F.R.D. at 638*; *see also Rodriguez v. Bar-S Food Co., 567 F. Supp. 1241, 1247 (D. Colo. 1983)*. However, the class does not have to be so [**8] ascertainable that every potential member can be identified at the commencement of the action. *Ashe v. Board of Elections in the City of New York, 124 F.R.D. 45, 47 (E.D.N.Y. 1989)*; 7A Wright, *supra* § 1760 at 117. "If the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." 7A Wright, *supra* § 1760 at 118; *see also Alliance to End Repression v. Rochford, 565 F.2d 975, 977-78 (7th Cir. 1977)*. However, the requirement that there be a class will not be deemed satisfied unless the description of it is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member. *Rodriguez v. U.S. Department of the Treasury, 131 F.R.D. 1, 7 (D.D.C. 1990)*; *Joseph, 109 F.R.D. at 639*.

Plaintiffs propose the following definition for the medical monitoring class: "All natural persons residing or having resided during the operating history of Rocky Flats within the boundaries of the Medical Monitoring Class Area." (Pl.'s Mem. Supp. [**9] Mot. Cl. Certif. at 22.) The "Medical Monitoring Class Area" is defined with reference to geographical representations of exposure or dose levels (alluding to exposure to plutonium and volatile organic compounds ("VOCs"))

received by segments of the exposed population, known as "dose or exposure contours". Dose or exposure contours are depicted geographically as lines ringing Rocky Flats and, according to plaintiffs, correspond to average minimal cumulative doses received by the population living within a particular contour over time. The medical monitoring plaintiffs do not allege personal injury resulting from exposure to releases from Rocky Flats, nor do they purport to seek damages for past, present or future injury. Rather, they seek diagnostic testing and medical screening "to promote the early detection and prevention of cancer and other latent diseases." Plaintiffs estimate that there are 43,361 persons living within the medical monitoring class area according to the 1990 census.

Plaintiffs seek to define the property class as: "All Persons and entities owning an interest (including mortgagee and other security interests) in real property situated within the Property Class [**10] Area, exclusive of governmental entities, defendants, and defendants' affiliates, parents, and subsidiaries." *(Id. at 23.)* The "Property Class Area" is defined with reference to geographical representations of the area bounded by the plutonium contour and the complaint supplies the operative date of ownership as June 7, 1989 *(See* Second Am. Compl. P 85). The property class seeks damages for diminution of property values, interference with use and enjoyment of the land, and discomfort and annoyance to the landowners. Plaintiffs allege that there are approximately 15,370 parcels of property, of which an estimated 13,364 are residential properties and, of the remaining parcels, approximately 1766 belong to the vacant land use category.

Dow and Rockwell have criticized the definitions of the medical monitoring class and property class as overbroad as to area and have criticized the plutonium and VOC dose or exposure contours which are tied to average exposure. Rockwell also criticizes the definitions as overbroad as to time, in including in the medical monitoring class all persons who lived within the defined contours "during the operational history of the Rocky Flats" and in the [**11] property class all current owners of an interest in real property (with certain exclusions). The medical monitoring class definition includes any person who lived [*383] in these areas between 1952 and 1989, for however brief their period of residence. Rockwell argues that, without a durational limit on class membership, many persons would be included in the

151 F.R.D. 378, *383; 1993 U.S. Dist. LEXIS 14672, **11

class who are not entitled to recover because they were not sufficiently exposed and that identifying and contacting persons who lived in the area for relatively short periods of time would prove to be considerably difficult. Rockwell also extensively addresses the issue of medical monitoring and argues that medical monitoring claims are unsuitable for class certification.

The objections of Dow and Rockwell are addressed to the merits of plaintiffs' claims. In essence, defendants argue that the classes should not be certified because the definitions are so broad as to include persons who cannot sustain the burdens of claim for relief sought by the classes as a whole. However, to evaluate issues such as the appropriateness of plutonium and VOC dose or exposure contours, the absence of durational limit on class membership and the suitability [**12] of the remedy of medical monitoring would necessitate a preliminary hearing on the merits as part of the class certification determination. Such preliminary hearing is not authorized by *Rule 23* and was expressly repudiated by the Supreme Court in *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974). See also Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982);* 7B Wright, *supra* § 1785 at 125-27. As was pointed out in *Boggs v. Divested Atomic Corp.,*

> Although the parties have submitted a great deal of factual material, and defendants argued the facts of the case at length, there are relatively few facts that are crucial to class certification. Essentially, the facts can be subdivided into two categories: Those relating to class definition (that is, evidence that something occurred to distinguish the members of the class from the general public), and to class size. The balance of the issues raised by this motion are primarily, if not completely, legal ones.

*141 F.R.D. 58, 60 (S.D. Ohio 1991).*

The Court's approach in *Boggs* is in point here. The two relevant [**13] questions to be addressed with regard to class definition are: (1) is there evidence that hazardous radioactive or non-radioactive substances were discharged beyond the borders of Rocky Flats, and (2) if so, have those substances travelled beyond the boundaries

of the "Medical Monitoring Area" and "Property Class Area" as defined by plaintiffs? *See id. at 61.*

The parties agree that, from time to time, hazardous radioactive and non-radioactive materials have escaped beyond the borders of Rocky Flats. Defendants downplay the significance of the releases, however; they do not deny them. Thus, for purposes of this class action motion, there is preliminary evidence that radioactive and non-radioactive materials have left Rocky Flats.

Additionally, plaintiffs are required to justify the definitions of the classes. As noted in *Boggs:* "Although the class definition is subject to refinement based upon further development of the record, there should be some evidence at this stage of the case that plaintiffs' definition is reasonable. This requires an examination of plaintiffs' evidence of the dispersion of hazardous emissions." *Id. at 61-62.* [**14] In his declaration, plaintiffs' expert, Dr. Jan Beyea, acknowledges that "these estimates of dose and exposure are preliminary and are likely to be refined and adjusted as further information is obtained during the course of discovery." (Decl. Dr. Jan Beyea P 4.) Defendants' argument against the estimates is not focused on the fact of dispersion of hazardous radioactive and non-radioactive substances, but on the amount and effect of dispersion of such substances. Defendants, relying on their experts' declarations, argue that the dispersion of the materials to class members attributable to the plant are minimal and not significant enough to cause either a reasonable risk of health effects or any loss of property value.

Although these amounts are perceived by defendants as minimal, it appears that persons living within the medical monitoring area, i.e. the plutonium and VOC dose or exposure contours, and properties located within the property class area, i.e. the plutonium contour as defined by plaintiffs, can [*384] reasonably be said to have been exposed to some hazardous radioactive and non-radioactive materials originating inside the boundaries of Rocky Flats. These persons can thereby [**15] be differentiated from more distant members of the public. This is unlike *Daigle v. Shell Oil Co.,* where the court found that plaintiffs had "failed to identify any logical reason . . . for drawing the boundaries where they did." *133 F.R.D. 600, 603 (D. Colo. 1990).* Individual members of the classes still will be required to submit evidence concerning their particularized damage claims in the trial on the merits of the action. Therefore, I find

151 F.R.D. 378, *384; 1993 U.S. Dist. LEXIS 14672, **15

that plaintiffs' choice of the plutonium and VOC contours to define class members bears a reasonable relationship to the evidence of record at this point, and that the definitions of both the medical monitoring class and the property class are sufficiently definite to permit analysis of the *Rule 23* factors governing class certification. [1]

> 1   In their reply brief, plaintiffs address the issue of whether there should be a minimal durational requirement of residence for members of the medical monitoring class. Plaintiffs state: "After consultation with our experts, the best we can say is this: it currently appears unlikely that a one-year duration-of-residence requirement would exclude many claimants with significant exposures. Any more stringent requirement could run the risk of excluding numerous persons with meritorious claims." Because of the tentative nature of this estimate, and the absence of direct expert evidence in this regard, I do not rule that a durational residency requirement be included in the definition of the medical monitoring class at this time. As discovery proceeds, if clarity is reached concerning the estimated time that a class member would have to have lived in the medical monitoring area for there to have been a sufficient amount of exposure to warrant medical monitoring, I may exercise my powers under *Rule 23(c)* to alter or amend the definition of the medical monitoring class.

[**16]   *Rule 23(a)(1)* requires that the class be so numerous that joinder of all members is impracticable. Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required. *See Arkansas Educ. Ass'n v. Board of Educ. of Portland, 446 F.2d 763, 766-67 (8th Cir. 1971).* "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *General Tel. Co. v. EEOC, 446 U.S. 318, 330, 64 L. Ed. 2d 319, 100 S. Ct. 1698 (1990).*

As regards the size of the two classes, plaintiffs estimate that there are 43,361 persons living within the medical monitoring class area, according to the 1990 census, and 15,370 parcels of land in the property class area. The court's remarks in *Boggs* are pertinent here: "Although plaintiffs' counsel may be required at some

point and for purposes of giving notice, not only to determine the precise size of the class but the names and addresses of all the members, it is sufficient for certification purposes to conclude that the class numbers in the thousands and there [**17] is some geographic dispersion of class members. Factually both elements are present here." *141 F.R.D. at 62.*

Rockwell does not allege specifically that plaintiffs have not satisfied the numerosity requirement. Contrary to Dow's assertions, the fact that the classes may initially include persons who do not have claims or who do not wish to assert claims against Defendants is not important at this stage of the litigation, unless it can be shown that most, if not all, of the potential class members have no claims to be asserted by the class representatives. *Joseph, 109 F.R.D. at 639.* There is no evidence that most of the potential class members have no claims against Defendants and Dow's assertion that only this single lawsuit, involving only fifteen persons, is pending, does not prove otherwise. The potential classes in this case number in the thousands and, following the above general principles, joinder of all members in a single lawsuit would be impracticable. Therefore, I find that the required numerosity showing has been made.

2. *Commonality*

*Rule 23(a)(2)* provides that a class may be maintained only if "there are questions [**18] of law or fact common to the class." This does not require that all the questions of law or fact raised by the dispute be common; nor does it establish any quantitative or qualitative test of commonality. *Joseph, 109 F.R.D. at 640.* "Unlike *Rule 23(b)(3)*, [*385] which also requires that such common questions predominate over individual questions, the existence of significant common legal or factual issues is enough to satisfy *Rule 23(a)(2)*'s threshold commonality requirement." *Boggs, 141 F.R.D. 58 at 64.* Plaintiffs have identified common questions of law and fact. Common questions include whether defendants' operation of Rocky Flats involved an ultrahazardous activity, premising strict liability, and posed an unreasonable risk of harm, constituting negligence, and/or amounted to interference with the use or enjoyment of property constituting a nuisance. Defendants argue that proof with respect to the foregoing would vary from class member to class member because each claimant lived in the area at different times and would have been affected in a different way by

Page 6

151 F.R.D. 378, *385; 1993 U.S. Dist. LEXIS 14672, **18

operations of either Dow or Rockwell which varied over time. With these **[**19]** differences, defendants claim that the commonality requirement cannot be met.

However, although Dow and Rockwell may have operated the plant at different times and there may have been differing amounts of releases of hazardous substances affecting different individuals at different times, this does not negate that there are some questions of law or fact common to the two classes. In *Sterling v. Velsicol Chemical Corp., 855 F.2d 1188 (6th Cir. 1988)*, a class was certified for personal injury and property damage for persons near a landfill after chemicals leaked into a water supply. There, the court noted:

> "In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible."

**[**20]** *Id. at 1197*. Moreover, the existence of more than one defendant does not defeat class certification. *See, e.g., Boggs, 141 F.R.D. 58* (where the court certified a class of plaintiffs in an action against different defendants who operated the Portsmouth Gaseous Diffusion Plant at different times.) Conceivably, the court may, as the action proceeds, exercise its authority under *Rule 23(c)(1)* and *Rule 23(c)(4)* to amend its order with regard to class certification before the decision on the merits to allow class treatment for only some of the issues or to divide the original classes into subclasses and treat each subclass as a class. I find that plaintiffs have satisfied the threshold requirement of commonality.

### 3. *Typicality*

The third prerequisite in *Rule 23(a)* provides that a class action may be maintained only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." So long as there is a nexus between the class representatives' claims or defenses and the common questions of fact or law which unite the class, the typicality requirement is satisfied. *Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984)*, **[**21]** *cert. denied, 470 U.S. 1004, 84 L. Ed. 2d 379, 105 S. Ct. 1357 (1985)*; *Joseph, 109 F.R.D. at 640*. The positions of the named plaintiffs and the potential class members do not have to be identical. "Thus, the requirement may be satisfied even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the representative parties and the other members of the class." 7A Wright, *supra* § 1764 at 235-41.

Plaintiffs contend that their property and medical monitoring claims arise from the same course of conduct by defendants at Rocky Flats and that they share common legal and remedial theories with the members of the classes. Rockwell attempts to dispute typicality of the claims of plaintiffs Bank Western and Field Corporation, who seek damages for impairment of their security in two tracts of land being held for future development, currently in their possession following defaults by the borrowers. Applying the above stated principles, even though some of the facts underlying each person's claims may vary, these factual differences do not create any conflict between plaintiffs and **[*386]** the **[**22]** potential class members. The claims arise from the same set of circumstances, the release of hazardous nuclear and non-nuclear substances from the plant during its operation by Dow and Rockwell.

Rockwell also denies typicality based on its position that the bank plaintiffs will be subject to a statute of limitations defense. However, such a contention cannot serve to bar a class certification in that an inquiry into a claimed affirmative defense impermissibly allows an issue going to the merits of the litigation to intrude upon the class certification analysis required by *Rule 23*. *Rishcoff v. Commodity Fluctuations Sys., Inc., 111 F.R.D. 381, 382 (E.D. Pa. 1986)*; *Fickinger v. C.I. Planning Corp., 103 F.R.D. 529, 532 (E.D. Pa. 1984)*.

Dow further challenges typicality on the ground that claims based on exposure, risk, and contamination require individual proof that will vary with each claimant. However, as the court noted in *In re Asbestos School Litigation, 104 F.R.D. 422 (E.D. Pa. 1984)*, differences in

151 F.R.D. 378, *386; 1993 U.S. Dist. LEXIS 14672, **22

the situation of each plaintiff or each class member do not necessarily defeat typicality. **[**23]** "While the focus is on the relatedness of the named plaintiffs' claims and those of the class members, the harm suffered by the named plaintiffs may differ in degree from that suffered by the other members of the class so long as the harm suffered is of the same type." *Id. at 430.*

I find that plaintiffs' claims are typical of those of the classes they seek to represent. Again, the court may, as the action proceeds on the merits, exercise its authority under *Rule 23(c)(1)* and *Rule 23(c)(4)* to amend its order with regard to class certification before the decision on the merits to allow class treatment for only some of the issues or to divide the original classes into subclasses and treat each subclass as a class.

### 4. *Adequacy of Representation*

*Rule 23(a)(4)* provides that a class action can be maintained only if "the representative parties will fairly and adequately protect the interests of the class." What constitutes adequate representation is a question of fact that depends on the circumstances of each case. *McGowan v. Faulkner Concrete Pipe Co., 659 F.2d 554, 559 (5th Cir. 1981).* Criteria for assessing adequacy of representation **[**24]** include whether the plaintiff has common interests with the class members and whether the representative will vigorously prosecute the interests of the class through qualified counsel. *Day v. NLO, Inc., 144 F.R.D. 330, 334 (S.D. Ohio 1992).* The plaintiff has the initial burden to show facts to support a finding that it will adequately protect the interests of the class. 2 Robert Newberg, *Newberg on Class Actions,* § 7.24 at 7-80 to -81 (3d ed. 1992).

In most cases, adequate representation presumptions are usually invoked in the absence of contrary evidence by the party opposing the class. On the issue of no conflict with the class, one of the tests for adequate representation, the presumption fairly arises because of the difficulty of proving negative facts. On the issue of professional competence of counsel for the class representative, the presumption fairly arises that all members of the bar in good standing are competent. Finally, on the issue of intent to prosecute the action vigorously, the favorable presumption

arises because the test involves future conduct of persons, which cannot fairly be prejudged adversely.

If there are any doubts about **[**25]** adequate representation or potential conflicts, they should be resolved in favor of upholding the class, subject to later possible reconsideration, or subclasses might be created initially.

*Id. at 7-81* to -82 (citations omitted).

Dow challenges the adequacy of those named plaintiffs who have already been deposed based on their deposition testimony regarding their understanding of the nature of their claims. Dow further maintains that claims that the named plaintiffs might have already are subject to dismissal based on the statute of limitations. First, Dow's arguments are essentially addressed to the merits of plaintiffs' claims, and therefore, must be reserved for a later determination of the case on the merits. Secondly, plaintiffs have asserted claims both typical of the other class **[*387]** members, and subject to typical defenses. There is no allegation of other factors which make plaintiff representatives antagonistic to or in conflict with the objectives of those they purport to represent. "If there is more than one named representative, it is not necessary that all the representatives meet the *Rule 23(a)(4)* standard; as long as one of the representatives is adequate, the requirement **[**26]** will be met." 7A Wright, *supra* § 1765 at 277. To date, defendants have not deposed all named plaintiffs nor have defendants challenged the competence of plaintiffs' counsel. A factor in determining the vigor of representation is the representatives' resources to investigate class claims and to contact other class members. *Boggs, 141 F.R.D. at 66; see also Bowen v. General Motors Corp. A.C. Spark Plug Div., 542 F. Supp. 94, 100-02 (N.D. Ohio 1981).* Dow repeatedly states that plaintiffs' counsel have pursued a number of class actions. Apparently, they are qualified to prepare the case for trial and to try it.

I find that the named plaintiffs adequately represent the interest of the class as a whole and that the requirements of *Rule 23(a)(4)* have been satisfied.

### C. *The Requirements of Rule 23(b)*

### 1. *The Requirements of Rule 23(b)(2) (Medical Monitoring Class)*

151 F.R.D. 378, *387; 1993 U.S. Dist. LEXIS 14672, **26

Plaintiffs seek the court's injunctive powers "in shaping an integrated, class-wide medical monitoring program" and, accordingly, request certification of the medical monitoring class under *Rule 23(b)(2)*. This rule provides that a class action is appropriate **[**27]** when "the party opposing the class has acted or refused to act on grounds generally applicable to the class," and the representatives are seeking "final injunctive relief or corresponding declaratory relief."

Courts have differed in their responses to requests for certification of medical monitoring claims in the form of injunctive relief. As Dow has noted, many decisions classify medical monitoring costs as an item of damage, the traditional remedy at law. *See Ball v. Joy Technologies, Inc., 958 F.2d 36, 39 (4th Cir. 1991), cert. denied, 116 L. Ed. 2d 780, 112 S. Ct. 876 (1992); Hagerty v. L & L Marine Servs., Inc., 788 F.2d 315, 319 (5th Cir. 1986).* Such classification appears more appropriate where plaintiffs merely seek the costs of medical monitoring from plaintiffs. Here, however, the plaintiffs seek relief similar to that sought in *Day v. NLO, Inc.* Plaintiffs in *Day* requested the court to "establish an elaborate medical monitoring program of its own, managed by court-appointed court supervised trustees, pursuant to which a plaintiff is monitored by particular physicians and the medical data utilized **[**28]** for group studies." *144 F.R.D. at 335.* The district court in *Day*, relying on authorities such as *Werlein v. U.S., 746 F. Supp. 887 (D. Minn. 1990),* and *Barth v. Firestone Tire & Rubber Co., 661 F. Supp. 193 (N.D. Cal. 1987),* held that, in such circumstances, the relief constitutes injunctive relief as required by *Rule 23(b)(2). 144 F.R.D. at 335.*

In *In re NLO, Inc., 5 F.3d 154, 1993 WL 356412 (6th Cir. 1993),* the circuit court upheld the *Day* court's reasoning and denied defendants' mandamus petition challenging class certification under *Rule 23(b)(2).* The court noted that, "although none of the cases relied upon by the district court specifically hold that medical monitoring claims are cognizable under *Rule 23(b)(2)*, they generally support the proposition that such relief is injunctive in nature." *Id. at *6.*

Dow argues that *Rule 23(b)(2)* requires that the ongoing conduct of the defendant be the subject of the relief that is being sought and that, since neither Dow nor Rockwell now conduct operations at Rocky Flats and plaintiffs do not seek to enjoin any conduct by Dow **[**29]** or Rockwell, the action should not be classified

under *Rule 23(b)(2).* To the contrary, injunctive relief embraces all forms of judicial orders, whether they be mandatory or prohibitory. *See* 7A Wright, *supra* § 1775 at 457-458; *see, e.g., Bolton v. Murray Envelope Corp., 553 F.2d 881 at 885.* Moreover, the *Day* Court did not regard the lack of ongoing conduct on the part of defendants as a factor mitigating against granting injunctive relief under *Rule 23(b)(2).* There the court was considering the claims of *former* employees, independent contractors and business invitees of a feed materials production facility against the operators **[*388]** of the facility alleging that the *former* operators negligently or intentionally exposed them to dangerous levels of radioactive and hazardous materials.

Dow further argues that any injunctive relief will not apply to the class as a whole because of the individualized nature of each individual's claim. However, common evidence would be required to establish the level and nature of injury or disease by substances released from Rocky Flats and the causal connection, if any, between the release of the substances and **[**30]** any injuries or disease allegedly sustained. Therefore, despite the fact that there would be some issues of individual proof, injunctive relief in the form of medical monitoring would seem appropriate to the class as a whole.

Class members in an action where a class has been certified under (b)(2) do not have the option of opting out of the class and a judgment will be binding and will have a *res judicata* effect as to the whole class. However, where a class has been certified under (b)(3), class members may opt out of the class and, a judgment will not have a *res judicata* effect on those who elect to do so. When class certification is validly sought in the alternative under *Rule 23(b)(2)* and *(b)(3)*, a mandatory (b)(2) class is preferred. *Bing v. Roadway Express, Inc., 485 F.2d 441, 447 (5th Cir. 1973); see also* 7A Wright, *supra* § 1775 at 491-92. Therefore, I find that plaintiffs have satisfied the requirements of *Rule 23(b)(2)* and that the medical monitoring class be certified under that rule.

2. *The Requirements of Rule 23(b)(3) (Property Class)*

Since I have determined that the medical monitoring should class be certified under *Rule* **[**31]** *23(b)(2),* I consider the issue of certification under *Rule 23(b)(3)* only with reference to the property class. *Rule 23(b)(3)* authorizes a class action when "the court finds that questions of law or fact common to the members of the

151 F.R.D. 378, *388; 1993 U.S. Dist. LEXIS 14672, **31

class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

a. *Predominance of Common Questions of Law or Fact*

In determining whether common issues predominate, some courts have held that an action can be brought under subsection (b)(3) even though there is not a complete identity relating to all class members, as long as a "common nucleus of operative facts" is present. *See Esplin, 402 F.2d at 99*; *Joseph, 109 F.R.D. at 641.*

The common questions need not be dispositive of the entire action. In other words, "predominate" should not be automatically equated with "determinative" or "significant." Therefore, when one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under [**32] *Rule 23(b)(3)* even though other important matters will have to be tried separately.

7A Wright, *supra* § 1778 at 528-29.

To determine whether plaintiffs have satisfied the predominance requirement, I must first identify the relevant factual and legal issues, and the elements of the claims and defenses in the case. *Joseph, 109 F.R.D. at 641.* Plaintiffs' common law and Price Anderson claims sound in negligence, strict liability, private nuisance, and outrageous conduct. Defendants argue that with respect to each of these claims, individual questions predominate over any common questions. As defendants have pointed out, there are some questions of fact and law in this case which will require individualized proof relating to the nature and use of the different parcels of property, including the time when each plaintiff lived in the area, the duration of each plaintiff's stay in the area and possible statute of limitations defenses. On the other hand, plaintiffs have demonstrated that this case presents many common issues of law and fact, including whether the operation of Rocky Flats constitutes an ultrahazardous activity; whether defendants exercised [**33] reasonable care to prevent the release of

hazardous radioactive and nonradioactive materials from Rocky Flats; what materials were released, in what quantities; what caused the releases; what precautions to avoid emissions were taken; whether the geographic dispersion of the releases in the surrounding [*389] environment was reasonably foreseeable; and whether defendants engaged in intentional, reckless, willful, or wanton conduct. These common issues represent the core of plaintiffs' action against defendants and to the extent that the claim of each plaintiff depends upon proof concerning these common issues, it would serve no purpose to force multiple trials to hear the same evidence and decide the same issues. As I remarked in *Joseph,* "were plaintiffs to bring separate actions, these questions would necessarily be relitigated over and over, and the same evidence would be presented in each case." *109 F.R.D. at 642.*

Therefore, I find that, as concerns the property class, a common nucleus of operative facts exists and that the common questions of law and fact predominate over those issues requiring individualized proof.

b. *Superiority of the Class Action*

[**34] The last prerequisite for class certification under *Rule 23(b)(3)* is that the class action be "superior to other available methods for the fair and efficient adjudication of the controversy." Rockwell proposes an alternative method of adjudication, namely, the filing of individual claims by plaintiffs, which can then be consolidated under *Fed. R. Civ. P. 42(a)* and, after discovery has proceeded, the possibility of the court selecting a "bellwether" plaintiff or group of plaintiffs to further litigate the claims. However, this would subject each plaintiff to expensive and duplicative discovery and would, no doubt lead to discrepancies in court findings in the various cases, even at the pre-trial stage. Relitigation or repetitive discovery of the same core issues would be grossly inefficient and wasteful of the resources of the parties and the courts. Therefore, I find that litigating the issues concerning the property class as a class action would be superior to any other method of adjudication.

To defer certification of the proposed classes pending further development of the factual and expert record would not serve judicial economy. Moreover, *Rule 23(c)(1)* provides that "as soon [**35] as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." As the action proceeds, I may exercise

151 F.R.D. 378, *389; 1993 U.S. Dist. LEXIS 14672, **35

my powers under *Rule 23(c)* to alter or amend my decision regarding the certification of the medical monitoring class and/or the property class or to divide these classes into subclasses. If individual questions arise during the course of litigation, which render the action unmanageable, I have the power at that time to dismiss the class action and permit each plaintiff to proceed only on behalf of himself or herself. With these considerations in mind, I find that plaintiffs have established the prerequisites for certification of the property class under

*Rule 23(b)(3)*. Accordingly,

IT IS ORDERED THAT Plaintiffs' motion for class certification is GRANTED.

Dated this 8th day of October, 1993 at Denver, Colorado.

JOHN L. KANE, JR., U.S. SENIOR DISTRICT COURT JUDGE



LEXSEE 161 F.R.D. 103

**MERILYN COOK, et al., Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION, a Delaware Corporation, and THE DOW CHEMICAL COMPANY, a Delaware Corporation, Defendants.**

**Civil Action No. 90-K-181**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*161 F.R.D. 103; 1995 U.S. Dist. LEXIS 4986*

**April 12, 1995, Decided
April 12, 1995, FILED**

**DISPOSITION:** [**1] Plaintiffs' motion for reconsideration DENIED.

**COUNSEL:** For SALLY BARTLETT, plaintiff: Daniel R. Satriana, Jr. Hall & Evans, United States District Court, Denver, CO U.S.A., Bruce H. Beboskey, Steven William Kelly, Silver & Deboskey, P.C., Denver, CO U.S.A., Merrill Davidoff, Jonathan Auerbach, David F. Sorensen, Bernadette M. Rappold, Eric L. Cramer, Stanley B. Siegel, Berger & Montague, P.C., Philadelphia, PA U.S.A. Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH U.S.A. Kenneth A. Jacobsen, John David Stoner, Christopher Thomas Reyna, Chimicles, Jacobsen & Tikellis, Haverford, PA U.S.A. David Evans Kreutzer, David E. Kreutzer, Esq., Boulder, CO U.S.A. Ronald Simon, Connerton, Ray & Simon, Washington, DC U.S.A. R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE USA.

For WILLIAM SCHIERKOLK, JR., PEGGY J. SANDOVAL, STEPHEN SANDOVAL, RHONDA J. DEIMER, THOMAS L. DEIMER, MERILYN COOK, RICHARD BARTLETT, BANK WESTERN, DELORES SCHIERKOLK, MICHAEL DEAN RICE, GERTRUDE BABB, LORREN BABB, plaintiffs: Jonathan Auerbach, (See above). David F. Sorensen (See above). Bernadette M. Rappold, (See above). Eric L. Cramer, (See above).

Stanley B. Siegel, (See above). Kenneth A. Jacobsen, (See above). John David Stoner, (See above). Christopher Thomas Reyna, (See above). David Evans Kreutzer, (See above). R. Bruce McNew, (See above).

For MICHAEL DEAN RICE, plaintiff: Eric L. Cramer, (See above). Stanley B. Siegle, (See above). Christopher Thomas Reyna, (See above). David Evans Kreutzer, (See above). R. Bruce McNew, (See above).

For DOW CHEMICAL COMPANY, ROCKWELL INTERNATIONAL CORPORATION, defendants: Joseph J. Bronesky, Christopher Lane, Sherman & Howard, United States District Court, Denver, CO U.S.A. Mark S. Lillie, David M. Bernick, Douglas J. Kurtenbach, S. Jonathan Silverman, Douglas M. Poland, Kirkland & Ellis, Chicago, IL U.S.A. Louis W. Pribila, Dow Chemical Company, Midland, MI U.S.A. Lester C. Houtz, Bartlit & Scott, Denver, CO USA.

For NORMAN P. CYPHER, GEORGE H. SETLOCK, intervenors: Patrick J. Burke, Patrick J. Burke Law Office, Denver, CO USA. Dean S. Neuwirth, Jacobs, Chase, Frick, Kleinkopf & Kelley LLC, Denver, CO USA.

**JUDGES:** JOHN L. KANE, JR., SENIOR DISTRICT COURT JUDGE

161 F.R.D. 103, *; 1995 U.S. Dist. LEXIS 4986, **1

**OPINION BY:** JOHN L. KANE, JR.

**OPINION**

[*104]  ORDER REGARDING MOTION FOR RECONSIDERATION

KANE, J.

Before me is Plaintiff's motion for reconsideration of the minute order entered on February 22, 1995, granting Defendant Rockwell International Corporation's motion to compel production of documents from Plaintiffs. I deny the motion.

Rockwell's motion to compel was dated and served February 16, 1995. Plaintiffs had not filed a response when I issued the minute order. On March 7, 1995, Plaintiffs filed their motion for reconsideration. Rockwell obtained leave to file a memorandum in opposition. [1]

> 1   Magistrate Judge Borchers has scheduled oral argument on all pending discovery motions for April 24, 1995. Pending before Magistrate Judge Borchers are two motions of Dow to compel answers to interrogatories. Plaintiffs maintain there is a substantial similarity between the motions of Rockwell and Dow and requested that oral argument regarding them be scheduled simultaneously. However, since Plaintiffs' motion for reconsideration concerning Rockwell's motion is pending before me and I do not think oral argument will assist me, I am ruling now before Magistrate Judge Borchers entertains oral argument.

[**2]  Before the February 22, 1995 minute order, Plaintiffs refused to provide any substantive response to Rockwell's Requests which were served on May 31, 1994. Instead, Plaintiffs filed blanket objections to all of the Requests to the effect that: (1) Rockwell's "contention-style discovery" was "premature" (2) and, as a consequence, "unduly burdensome;" (3) most of the Requests will be the subject of expert testimony; and (4) production of the requested documents will be the subject of expert testimony; and (4) production of the requested documents would be "invasive of Plaintiffs' counsel's work product" or violative of attorney-client privilege.

Rockwell's Requests served on May 31, 1994 and its motion to compel sought: (1) the production of documents that Plaintiffs have not disclosed; (2) the production of a privilege log, as required by *Fed. R. Civ. P. 26(b)(5)*, identifying those documents Plaintiffs are withholding from production; and (3) "contention-style" discovery of documents Plaintiffs consider relevant to certain of their assertions and the issues in this lawsuit.

In their motion for reconsideration of the minute order, Plaintiffs request me to vacate the order in its [**3] entirety and to deny Rockwell's motion to compel. Plaintiffs' first contention is that there are no more documents to be produced because "Rockwell already possesses, or plaintiffs have already agreed to produce virtually every document in Rockwell's motion." (Pls.' Memo. Supp. Mot. Recons. at 2.) Before the [*105] minute order, Plaintiffs had only made blanket objections to the Requests and had not agreed to produce a single document. Subsequent agreement by Plaintiffs to produce certain documents does not constitute a valid ground on which to vacate the minute order.

The fact that the moving party is already in possession of documents it seeks to obtain by inspection, is not necessarily a sufficient reason for denying discovery. *See Weiner v. Bache Halsey Stuart, Inc., 76 F.R.D. 624, 625 (S.D. Fla. 1977)*. "The purpose of the discovery rules is not only to elicit unknown facts, but also to narrow and define the issues, and for this purpose it is often necessary to use discovery about known facts." 8 Charles A. Wright et al., *Federal Practice & Procedure,* § 2014 (1994).

Plaintiffs' other contention in its motion for reconsideration is that the Requests constitute "expert discovery" [**4] which is premature under the court's scheduling order. Plaintiffs refer to Requests numbered 10 and 11 which relate to conclusions reached by ChemRisk, the phase one contractor for the reconstruction project commissioned by the Colorado Department of Health. Request 10(a) asks:

> If you dispute any of the following statements by ChemRisk, produce all documents that support, contradict or relate to your position:
>
> a. "Information obtained on a number of the materials of concern has indicated that based on the

161 F.R.D. 103, *105; 1995 U.S. Dist. LEXIS 4986, **4

nature of their use and potential for release they do not warrant further investigation from the standpoint of potential off-site impacts. These include: Benzene, Cadmium Compounds, Chromium Compounds, Formaldehyde, Hydrazine, Lead Compounds, Mercury, Nickel Compounds, Nitric Acid" (Task 3 & 4 Final Draft Report at 256 (August 1992)).

(Mem. Supp. Rockwell's Mot. Compel Produc. Docs., Ex. 1 at 13.)

Plaintiffs state this request relates to the identification of which hazardous substances used at Rocky Flats may have caused harm to the surrounding community. Plaintiffs argue they can identify the hazardous substances at issue only through their experts and that, [**5] per the scheduling order, Plaintiffs' experts are not required to express an opinion about whether any substance should be at issue in this litigation until May 5, 1995. [2]

2   The approved scheduling order provides on May 5, 1995: "Status conference at 2 p.m. in Courtroom C-401 plaintiffs identify hazardous substances at issue; all parties identify planned testimonial experts and subject of expected experts' testimony." (Scheduling Order attached to Court's Min. Order Jan. 4, 1994.)

Request 11 asks Plaintiffs to provide relevant documents if they disagree with ChemRisk's conclusions as to the level of routine releases of various radionuclides and volatile organic compounds that ChemRisk investigated. Plaintiffs again argue they cannot respond to this Request without consulting their experts and therefore the document request seeks expert opinions.

Similarly, Plaintiffs maintain Requests 1 through 9, 15 and 17 all "involve complex scientific issues that must be addressed through expert testimony." (Pls.' Memo.

[**6] Supp. Mot. Recons. at 7.) [3] Requests 1, 2, 9, 15 and 17, quote specific allegations that Plaintiffs have made in documents filed with the court and ask Plaintiffs to identify those documents which relate to the quoted assertions. Requests 7 and 8, like 10 and 11 discussed above, request documents relating to plaintiffs' claims that Rockwell allowed significant toxic emissions from the Rocky Flats Plant. Requests 3-6 seek documents relating to Plaintiffs' claims that Rockwell breached relevant standards of care in connection with its management of the Rocky Flats Plant.

3   In their motion for reconsideration, Plaintiffs state they "will identify documents in response to Requests 14(a) and 16; and will consider withdrawing or limiting their claim for legal 'response costs' under CERCLA (the subject of Rockwell request number 13)." (Pls'. Memo. Supp. Mot. Recons. at 7 n.11.) Plaintiffs do not mention Requests 12, 14(b), 18, and 19 in their motion for reconsideration.

In Rockwell's initial memorandum in support [**7] of its motion to compel production of documents, it cites two cases, *Bohannon v.* [*106] *Honda Motor Co., 127 F.R.D. 536 (D. Kan. 1989)* and *King v. E.F. Hutton & Co., 117 F.R.D. 2 (D.D.C. 1987)*. These cases hold that even if complete answers to discovery requests may require the answering party to consult with experts, such considerations do not transform permissible factual discovery into "expert discovery." In their motion for reconsideration, Plaintiffs do not rebut *Bohannon* or *King;* nor do they cite any authority in support of their position.

In *Bohannon,* plaintiff sought to avoid answering an interrogatory question asking him to "describe with particularity the alleged defect in the Honda ATV vehicle" that allegedly caused his injuries, arguing that the question would require his expert to evaluate the material in his possession. The court rejected that position, noting:

An interrogatory may properly inquire into a party's contentions in the case. *Hercules, Inc. v. Exxon Corp., 434 F. Supp. 136, 157 (D. Del. 1977).* Plaintiff is not entitled to withhold discovery information until he has obtained to his own satisfaction all discovery from

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 43 of 332

Page 4

161 F.R.D. 103, *106; 1995 U.S. Dist. LEXIS 4986, **7

Honda. Plaintiff [**8] must be aware of some defect in the vehicle which forms the basis of his own complaint. Accordingly, he has a duty to answer the interrogatory with whatever information he has. *Fed. R. Civ. P. 26(e)* provides ample procedure for supplementing a response, if necessary.

*Bohannon, 127 F.R.D. at 538.*

In *King,* a securities fraud and civil RICO action, plaintiffs were asked to describe with particularity the components of every loss alleged in the complaint, the amount of each component and how the amount was determined. Plaintiffs objected that the methodology for calculation of their losses would be provided by their contemplated expert witness and described the interrogatories as contention interrogatories which need not be answered with completeness until a formal pretrial conference or even at a later time. The *King* court rejected plaintiffs' objections, stating:

> It is no answer for plaintiffs to assert they will need discovery or to consult with an expert to determine their losses. They should have answered the interrogatories with such information as they then possessed, and pursuant to *Rule 26(e), F.R.Civ.P.* the plaintiffs have the option,

indeed even [**9] the duty, to supplement their answers to these interrogatories to reflect refinements or corrections to the factual representations as to their asserted losses up to the time of the final pretrial conference under *Rule 16, F.R.Civ.P.*

*117 F.R.D. at 5.*

The principles in *Bohannon* and *King* apply here. Rockwell's requests seek to discover the factual bases and documents relevant to allegations Plaintiffs have made in the course of this litigation. Although Plaintiffs may need to consult their experts before responding to the Requests, this does not excuse them from responding to the Requests with the information they possess. They may later supplement their responses under *Federal Rule of Civil Procedure 26(e).* Accordingly,

IT IS ORDERED THAT Plaintiffs' motion for reconsideration of the minute order granting Rockwell's motion to compel production of documents is DENIED.

Dated this 12 day of April, 1995 at Denver, Colorado.

JOHN L. KANE, JR.

SENIOR DISTRICT COURT JUDGE



LEXSEE 907 F. SUPP. 1460

**MERILYN COOK, et al., Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION, a Delaware Corporation, and THE DOW CHEMICAL COMPANY, a Delaware Corporation.**

**Civil Action No. 90-K-181**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*907 F. Supp. 1460*; *1995 U.S. Dist. LEXIS 17226*

**November 13, 1995, Decided**
**November 13, 1995, FILED**

**COUNSEL:** **[**1]** For Rockwell International Corporation, Defendant: John D. Aldock, Heather H. Anderson, Timothy P. Brooks, Patrick M. Hanlon, Amy Horton, Michael K. Isenman, Franklin D. Kramer, Edward J. Naughton, Valerie E. Ross, Wendy S. White, Goodwin Procter, LLP-DC, Washington, DC; David M. Bernick, Stephanie A. Brennan, James M. Golden, Douglas J. Kurtenbach, Mark S. Lillie, John E. Tangren, Kirkland & Ellis, LLP-Chicago, Chicago, IL; Joseph John Bronesky, Sherman & Howard, L.L.C.-Denver, Denver, CO; Martin Thomas Tully, Katten Muchin Rosenam, LLP-Chicago, Chicago, IL; Joseph F. Yenouskas, Morgan, Lewis & Bockius, LLP-Virginia, McLean, VA.

For Bank Western, Delores Schierkolk, Gertrude Babb, Lorren Babb, Michael Dean Rice, Peggy J. Sandoval, Rhonda J. Deimer, Richard Bartlett, Sally Bartlett, Stephen Sandoval, Thomas L. Deimer, William Schierkolk, Jr., Merilyn Cook, Plaintiffs: Jonathan Auerback, Eric L. Cramer, Merrill Gene Davidoff, Peter B. Nordberg,, Ellen T. Noteware, Bernadette M. Rappold, Stanley B. Siegel, David F. Sorensen, Berger & Montague, P.C., Philadelphia, PA; Gary B. Blum, Holly Brons Shook, Silver & DeBosky, P.C., Denver, CO; Jean Marie Geoppinger, Louise M. Roselle, Waite, Schneider, Bayless & Chesley, Co., L.P.A., Cincinnati, OH; Kenneth A. Jacobsen, Jacobsen Law Offices, LLC, Wallingford,

PA; David Evans Kreutzer, Colorado Attorney General's Office-Department of Law, Denver, CO; Jennifer E. MacNaughton, Jennifer E. MacNaughton, Attorney at Law, Philadelphia, PA; R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE; Christopher Thomas Reyna, John David Stoner, Chimicles & Tikellis, L.L.C., Haverford, PA.

For Sally Bartlett, Plaintiff: Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Co., L.P.A., Cincinnati, OH; Bruce H. DeBoskey, Steven William Kelly, Silver & Deboskey, P.C., Denver, CO; Daniel R. Striana, Jr., Clisham, Satriana & Biscan, LLC, Denver, CO; Ronald Simon, Simon & Associates, Washington, DC.

For Dow Chemical Company, Defendant: David M. Bernick, Stephanie A. Brennan, James M. Golden, Douglas J. Kurtenbach, Mark S. Lillie, S. Jonathan Silverman, John E. Tangren, Kirkland & Ellis, LLP-Chicago, Chicago, IL; Joseph John Bronesky, Christopher Lane, Sherman & Howard, L.L.C.-Denver, Denver, CO; Lester C. Houtz, Bartlit, Beck, Herman, Palenchar & Scott, LLP-Denver, Denver, CO; Douglas M. Poland, LaFollette, Godfrey & Kahn, Madison, WI; Louis W. Pribila, Dow Chemical Company, Midland, MI.

For George H. Setlock, Norman P. Cypher, Intervenors: Patrick J. Burke, Dean Steven, Neuwirth, Patrick J. Burke, P.C., Denver, CO.

907 F. Supp. 1460, *; 1995 U.S. Dist. LEXIS 17226, **1

For United States Department of Energy, Interested Party: Stephen D. Taylor, U.S. Attorney's Office-Denver, Denver, CO; Carlotta P. Wells, U.S. Department of Justice - DC-Civil Division, Washington, DC.

**JUDGES:** JOHN L. KANE, JR., U.S. SENIOR DISTRICT COURT JUDGE

**OPINION BY:** JOHN L. KANE, JR.

**OPINION**

[*1462] MEMORANDUM OPINION AND ORDER RE CONTEMPT

KANE, J.

The United States Department of Energy ("DOE") is the owner of the Rocky Flats nuclear weapons production facility located northwest of Denver, Colorado. DOE contracted with Defendants Dow Chemical Company and Rockwell International Corporation to operate Rocky Flats. Plaintiffs allege during operation of Rocky Flats, Dow and Rockwell released hazardous substances into the surrounding area damaging Plaintiffs' property and increasing their risk of adverse health consequences.

During the course of pretrial discovery in 1993, Plaintiffs served subpoenas duces tecum upon DOE requesting production of documents related to the Rocky Flats weapons plant. DOE did not file objections to the subpoenas, nor motions to quash or for protective orders.

In January 1994 Plaintiffs moved to compel compliance. In March 1994 Magistrate Judge Borchers [**2] ruled because DOE is not a party to the litigation, Plaintiffs exclusive remedy was to seek an order of contempt pursuant to *Fed. R. Civ. P. 45*. Plaintiffs therefore moved in April 1994 to hold DOE in contempt. On July 8, 1994, in order to resolve the contempt motion, DOE entered into a proposed Stipulated Order ("Order") which was made a court order by Magistrate Judge Borchers on September 13, 1994.

Plaintiffs move to hold DOE in contempt for alleged failure to produce documents pursuant to the Order. They also seek a cure of the alleged violations of the Order as well as [*1463] an award of their attorney fees, costs, and expenses.

Failure to produce a pertinent document in a

proceeding before a magistrate, after having been ordered to do so, constitutes a contempt of the district court for the district wherein the magistrate is sitting. *28 U.S.C. § 636(e)*. Under *§ 636(e)*, a magistrate does not have power to hold anyone in contempt and, therefore, must certify an act of contempt to a judge of the district court.

On May 30, 1995, Magistrate Judge Borchers certified the contempt motions to this court. In his certification, he stated he was satisfied DOE did not comply fully with the [**3] Order. Under *§ 636(e)*, I must hear the evidence and determine if there has been an act of contempt. I have heard the evidence and find DOE has violated the Order and is in contempt of this court.

I. *Standards for Contempt*.

The Order provides:

Any deviation by DOE from compliance with any provision of this order shall constitute a basis for Contempt of Court within the meaning of *Rule 45(e) Fed.R.Civ.P.* and subject DOE to the entry, upon application, of a Citation of Civil Contempt and such additional sanctions as may be just.

(Order, P 25 at 14.) *Rule 45(e)* states "failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued."

A district court has broad discretion in using its contempt powers to require adherence to court orders and a review of a district court's finding of contempt is limited to determining whether the court abused its discretion. *O'Connor v. Midwest Pipe Fabrications, Inc., 972 F.2d 1204, 1209 (10th Cir. 1992); United States v. Riewe, 676 F.2d 418, 420-21 (10th Cir. 1982)*.

In civil contempt cases the proof of contempt must be clear and convincing. [**4] *Heinold Hog Market, Inc. v. McCoy, 700 F.2d 611, 614 (10th Cir. 1983); United States v. Professional Air Traffic Controllers Organization, Local 504, 703 F.2d 443, 445 (10th Cir. 1983)*. To make a prima facie showing of contempt, however, the party seeking a finding of contempt bears the burden of persuading the court of defendant's failure to comply, and need not prove ability to comply. *Heinold at 615*. The defendant then bears the burden of producing

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 46 of 332

Page 3

907 F. Supp. 1460, *1463; 1995 U.S. Dist. LEXIS 17226, **4

sufficient detailed evidence of inability to comply. *Id.* The party seeking a finding of contempt would then have the additional burden of persuading the court the defendant is able to comply. *Id.*

II. *Merits.*

The Order requires DOE to provide unclassified documents within thirty days. (Order P 21 at 13.) As to Plaintiffs' requests for classified documents, the Order requires DOE to make a written request for expedited classification review within seven days and promptly provide a copy of such request to Plaintiffs. (Order P 20 at 12-13.) The Order further requires DOE to complete the review within thirty days or show good cause for an exception. *Id.*

1. *Requests for Documents Relating to Missing Materials.*

[**5] Plaintiffs contend DOE violated the Order because it failed to provide documents, requested in December 1994, relating to missing quantities of nuclear materials at Rocky Flats.

In June 1994, DOE revealed to the public large quantities of plutonium and uranium were missing from Rocky Flats. Plaintiffs sent DOE a letter in December 1994 requesting documents pertaining to the missing substances and requesting any classified documents be reviewed and declassified pursuant to the Order. Plaintiffs have made repeated follow-up requests for the documents and/or evidence of the initiation of a classification review. DOE has failed to initiate a classification review or provide any writing, regardless of date, initiating such a review.

DOE contends it would be impossible or impracticable for its personnel to complete a classification review because it asserts such a review would entail 4000 personnel hours and expenditure of $ 100,000. In the more than seven months between the time of Plaintiffs' requests and the contempt hearing, however, [*1464] DOE has not even attempted to begin a classification review. Also, any alleged impossibility or impracticability existed at the time DOE voluntarily [**6] entered into the Order in July 1994 and DOE did not file a motion for protective order asking to be relieved of its obligations under the Order.

DOE violated P 20 of the Stipulated Order by failing

to make a written request for classification review; failing to provide a copy of any such writing to Plaintiffs; and failing to initiate a classification review of the requested documents. DOE has not provided the requested documents or filed objections to the request.

I find DOE has failed substantially to comply with the Order in this regard.

2. *Plaintiffs' November 7, 1994 Request.*

Plaintiffs contend DOE violated the Order because it failed to provide documents requested on November 7, 1994.

On November 7, 1994, Plaintiffs made a request for documents and posed a number of questions concerning indices provided by DOE. DOE did not respond. Plaintiffs sent a follow up letter on November 29, 1994. Some requested documents were produced but others were withheld.

On March 3, 1995, Plaintiffs wrote DOE and stated they were prepared to send document reviewers immediately to inspect the documents requested on November 7, 1994. In April, 1995 Plaintiffs filed these motions to hold DOE [**7] in contempt. On May 17, 1995, DOE informed Plaintiffs some of the requested documents were ready for inspection. On May 26, 1995, DOE informed Plaintiffs some documents could not be produced and failed to identify which documents could not be produced or state the reasons therefor. Plaintiffs have repeatedly asked for an identification of the documents withheld and the reasons for the nonproduction. To date, DOE has not responded with this information.

DOE does not claim it has begun a classification review. DOE failed to produce requested unclassified documents within thirty days of the request; failed to initiate a classification review of classified documents in writing within seven days of the request; and failed to complete its classification review within thirty days or show good cause why it could not do so. I find DOE has failed substantially to comply with the Order in this regard.

3. *Plaintiffs' November 23, 1994 Request.*

Plaintiffs contend DOE violated the Order because it failed to provide documents requested on November 23,

Page 4

907 F. Supp. 1460, *1464; 1995 U.S. Dist. LEXIS 17226, **7

1994.

On November 23, 1994 Plaintiffs submitted a list of ninety-eight documents to be produced. DOE has not provided Plaintiffs with a written [**8] request for expedited classification review.

DOE asserts it was impossible to provide Plaintiffs with a request for expedited classification review within seven days because Plaintiffs' document list was not from a DOE index but, rather, from an index provided by a consultant to the Colorado Department of Health; DOE did not know within seven days whether any of the documents were classified; and, many of the documents were improperly identified and could not be found because the titles, names and dates did not match those at Rocky Flats.

While it may have been "impossible" to provide a written request for classification review within seven days, DOE does not explain why it has not yet produced such a writing. DOE seems to be contending if it cannot comply with the specific deadlines provided in the Order it may disregard the Order altogether. This argument is hardly persuasive.

DOE has not completed the classification review within thirty days of the Order and asserts it was impossible to do so. On December 15, 1994, Plaintiffs received unclassified and declassified documents and a status report indicating many documents could not be located. At a January 5, 1995 meeting, Plaintiffs [**9] were given another update and agreed that, as other classified documents were located, they would send a representative to Rocky Flats to determine which documents Plaintiffs wished declassified. On February 9, 1995, Plaintiffs were given a third update which informed Plaintiffs that [*1465] twenty six documents could not be located, seven additional documents were enclosed, and eleven documents required a radiological survey. Plaintiffs received status reports on May 2 and May 5, 1995 indicating thirteen documents could not be located.

While the parties may have agreed to a different procedure for reviewing and declassifying documents, a majority of the requested documents have not been produced and DOE has declassified only five of fifty-seven classified documents requested in November 1994. Again DOE seems to be contending if it cannot comply with the specific deadlines provided in the Order it may disregard the Order altogether. I find DOE has

failed substantially to comply with the Order in this regard.

4. *Documents Requested from EML.*

Plaintiffs contend DOE violated the Order because it failed to provide unclassified documents located at the Environmental Measurements Laboratory [**10] in New York City ("EML") within thirty days.

EML conducted a number of Rocky Flats studies. Plaintiffs deposed the EML custodian of records on January 23, 1995. The deposition revealed that discoverable material had not been produced and several document collections may not have been thoroughly searched. During the deposition, DOE agreed to produce a number of additional documents and provide certain information. Plaintiffs sent DOE letters on February 2, 1995 and March 1, 1995 again requesting the documents. In its response to Plaintiffs' motion to hold DOE in contempt, DOE asserted the requested documents would soon be available. DOE produced the documents four months after the request.

DOE asserts it substantially complied with the Order. In this regard, Plaintiffs have not established DOE has failed substantially to comply with the Order.

5. *Failure to Identify Computer Tapes.*

Plaintiffs contend DOE violated the Order by failing to identify computer tapes containing Rocky Flats related documents.

The Order required DOE to identify all Rocky Flats related documents not previously identified by DOE or known to Plaintiffs by July 31, 1994, (Order P 3), and to use its best [**11] efforts to identify and locate all Rocky Flats-related documents and document collections, (Order P 21).

In March 1995 EG & G disclosed to Plaintiffs the existence of 257 computer tapes, located at the plant for at least six years, containing millions of pages of documents potentially responsive to Plaintiffs' subpoenas. The tapes are owned by DOE and in the custody of EG & G, the DOE management and operating contractor at Rocky Flats.

Plaintiffs assert these tapes have been at the plant for years; ninety are duplicates of tapes seized by the FBI in 1989 during the criminal proceedings against Rockwell;

907 F. Supp. 1460, *1465; 1995 U.S. Dist. LEXIS 17226, **11

and, thus, DOE was required to inform Plaintiffs of them by July 31, 1994.

The manager of EG & G's Record Department testified she was aware of the tapes since June 1989 and had been reminded of their existence at various times since 1989. She asserts, however, she forgot about the tapes until she was reminded about them in January or February of 1995. According to the manager, until that date she had not connected the tapes of which she had previous knowledge with discovery requests.

I find DOE, in failing to identify the computer tapes, has not complied substantially with the **[**12]** Order.

6. *Delayed Processing of Security Clearances.*

Plaintiffs contend DOE violated the Order by failing to process Plaintiffs' two security clearance applications in a timely manner.

The Order provides DOE shall furnish Plaintiffs with sufficient clearances to permit Plaintiffs to review unclassified documents. (Order P 1(d).)

Plaintiffs submitted two applications for expedited clearances on December 6, 1994. It takes an average of forty-five days for an application to be processed. Required testing could not be performed, however, until the applications were forwarded by DOE's **[*1466]** general counsel to the DOE security office. They were not forwarded for two months with no explanation for the delay. The applicants received their clearances in March 1995.

DOE asserts by order dated February 9, 1995, Magistrate Judge Borchers, in denying Plaintiffs' motion for an order requiring DOE to process additional security clearances, ruled that access to classified documents was not covered by the Order; the magistrate judge also determined DOE had not unreasonably delayed processing Plaintiffs' security clearance requests and I affirmed that ruling. Thus, the court has already addressed **[**13]** the security clearance issue and it is not considered with the instant motion for contempt.

7. *Documents in the Custody of Los Alamos National Laboratory.*

In a separate motion, Plaintiffs contend DOE violated the Order because it failed to provide documents in the custody of Los Alamos National Laboratory

("LANL"), a facility owned by DOE and operated by the Regents of the University of California on behalf of DOE. DOE owns and/or controls all requested documents in LANL's custody.

Plaintiffs, by letter dated December 14, 1994, requested documents at LANL relating to health assessments and epidemiological studies which focused on human health effects of plutonium exposure. Plaintiffs assert after the 1969 fire at Rocky Flats, DOE augmented efforts at Los Alamos to determine the health effects of plutonium exposure. As a result, LANL undertook a study of workers exposed to plutonium which included workers exposed during the Manhattan Project. In 1976 LANL undertook the "Plutonium Workers Study", an epidemiological study of all workers in the DOE weapons system exposed to plutonium, including an analysis of 5,400 Rocky Flats workers. There was also a study of plutonium exposures **[**14]** through wounds, which included Rocky Flats workers, and a study of plutonium concentration in human tissue.

In February 1995, after receiving no response, Plaintiffs telephoned LANL's counsel who stated he had lost Plaintiffs' letter. Plaintiffs immediately faxed and mailed copies to him. In March 1995 LANL produced publicly available published articles relating to the studies. Plaintiffs have received no further documents in response to their requests.

DOE asserts requested documents pertaining to facilities other than Rocky Flats are not relevant and, therefore, have refused to produce such documents. Magistrate Judge Borchers, in overruling Defendants' objections to the Order, specifically held production of documents pursuant to the Order should not be precluded or delayed by virtue of relevance disputes. DOE did not file a motion for protective order or otherwise seek judicial relief from the requests.

With regard to documents pertaining to the Rocky Flats facilities, DOE asserts it understood Plaintiffs did not seek actual production of the documents but, rather, sought only to be permitted to inspect the documents at LANL. It further asserts these documents have been available **[**15]** since August 1994 and the only reason these documents have not been produced is Plaintiffs' failure to ask to inspect the documents. I find this assertion incredible.

I find DOE, by not producing the requested

Page 6

907 F. Supp. 1460, *1466; 1995 U.S. Dist. LEXIS 17226, **15

documents within thirty days, or at any time thereafter, has failed substantially to comply with the Order.

8. *Documents located in Germantown, Maryland.*

Before the Order was signed by DOE in July, 1994 Plaintiffs requested classified documents located in Germantown.

With respect to any document over which federal agencies other than DOE must consent to release, the Order provides DOE shall make a written request, within seven days, to such agency to expedite the classification review of the document. (Order P 20 at 12-13.)

By letter dated September 20, 1994, within seven days of the entry of the Order as a court order, DOE's counsel informed Plaintiffs classified documents had been sent to [*1467] various federal agencies for classification review.

Plaintiffs contend a letter from DOE's counsel did not constitute written proof DOE had requested the agencies to initiate a classification review. I find, however, DOE complied substantially with the Order.

9. *Rocky Flats Database.*

[**16] By letter dated November 8, 1994, Plaintiffs requested production of a Rocky Flats database in the custody of LANL. On December 1, 1994, DOE informed Plaintiffs it was asking Defendants' attorneys whether they had objections based on privilege. DOE asserts it has not received a response from Defendants and, therefore, has not produced the documents.

On July 22, 1994, Defendants filed objections to the entry of the Order on grounds of relevance, privilege and time limitations. Following a hearing on August 15, 1994, Magistrate Judge Borchers overruled all of Defendants' objections; found Plaintiffs had made valid and legitimate requests for documents but Defendants had fought to preclude access to the documents; and, held relevance objections were to be resolved at a later time before trial. Paragraph 19 of the Order expressly prohibits delay for privilege review and provides neither DOE nor defendants waive any right to assert privilege by producing documents pursuant to the Order.

DOE asserts the Order applies only to privileges asserted by DOE and it cannot waive any privilege of the Defendants. This assertion is entirely fatuous. Plaintiffs

contend the Order applies to all documents [**17] under DOE's control.

I agree with Plaintiffs and find DOE has failed substantially to comply with the Order.

10. *OU-3 Documents.*

Plaintiffs contend DOE violated the Order by taking eight months to produce documents relating to off-site areas. The documents were requested in December 1994 and produced on August 8, 1995. I find there has been substantial compliance with the Order in this regard.

11. *Pre-Production Relevance and Classification Reviews.*

Plaintiffs contend DOE violated the Order because the attorney principally responsible for its compliance with the Order testified DOE conducted pre-production relevance reviews and unclassified documents underwent a classification review before production. The Order prohibits pre-production relevance reviews but is silent as to classification reviews of unclassified documents.

I make no finding here regarding the issue of substantial compliance with the Order. However, I caution DOE to comply with the Order in its prohibition of pre-production relevance reviews.

III. *Relief.*

Determination of the correct sanction for a discovery violation is a fact-specific inquiry the district court is best qualified to make. *Ehrenhaus* [**18] *v. Reynolds, 965 F.2d 916, 920 (10th Cir. 1992).*

The sanction of civil contempt serves two remedial purposes: (1) to enforce compliance with an order of the court, and (2) to compensate for losses caused by the noncompliance. *O'Connor v. Midwest Pipe Fabrications, Inc., 972 F.2d 1204, 1211 (10th Cir. 1992).* The remedial aspects outweigh the punitive considerations and, thus, the primary beneficiaries of such an order are the individual litigants. *Ager v. Jane C. Stormont Hosp. & Training School for Nurses, 622 F.2d 496, 500 (10th Cir. 1980).*

Where the purpose of the sanction is coercive, the court must consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in

907 F. Supp. 1460, *1467; 1995 U.S. Dist. LEXIS 17226, **18

bringing about the result desired. *O'Connor v. Midwest Pipe Fabrications, Inc., 972 F.2d 1204, 1211 (10th Cir. 1992).* A court must exercise the least possible power adequate to the end proposed. *Id.* To be consistent with these principles, coercive civil sanctions may only continue until terminated by compliance. *Id.; Professional Air Traffic Controllers, 703 F.2d at 445.*

On the other hand, if a fine is imposed for compensatory **[**19]** purposes, the **[*1468]** amount of the fine must be based upon the complainant's actual losses sustained as a result of the contumacy. *O'Connor v. Midwest Pipe Fabrications, Inc., 972 F.2d 1204, 1211 (10th Cir. 1992).* Moreover, in the absence of evidence showing the amount of the loss, any sum awarded by the court is speculative and therefore arbitrary. *Id.* The court must have some basis for determining not only the amount, but the reasonableness of costs claimed. *Allied Materials Corp. v. Superior Products Co., 620 F.2d 224, 227 (10th Cir. 1980).*

IV. *Conclusion.*

DOE's assertion that it is unable to comply with the Order is untenable. DOE voluntarily agreed to the Order, with full knowledge of the documents in its possession and the terms of the Order, to resolve Plaintiffs' prior contempt motion against it. Relying upon DOE's agreement to the Order, the court did not adjudicate Plaintiffs' prior contempt motion. DOE did not object when the Order was entered it lacked the ability to comply with its terms, nor did DOE file any motion for protective order.

For reasons stated above, I find DOE has failed substantially to comply with the Order in the several respects delineated **[**20]** above.

IT IS ORDERED THAT:

1. DOE shall pay Plaintiffs their reasonable attorney fees, costs, and expenses for all their efforts to secure production of documents in DOE's control from July 8, 1994 (the date DOE agreed to entry of the Order) through the date of this order, including all fees, costs, and expenses incurred in Plaintiffs' prosecution of their motions for contempt. On or before December 14, 1995, Plaintiffs shall submit their request for attorney fees, costs, and expenses, with supporting documentation for those matters only for which I have found DOE in contempt. DOE may file objections to the request on or before January 2, 1996. If objections are filed, the cause will be set for evidentiary hearing and additional costs incident to that hearing may be imposed as well.

2. DOE shall comply with the Order in all respects and in particular with regard to Plaintiffs' requests for documents relating to missing materials, Plaintiffs' November 7, 1994 request, Plaintiffs' November 23, 1994 request, the identification of computer tapes, documents located at LANL, and the Rocky Flats database, as discussed above. DOE shall comply with the time framework provided in the Order **[**21]** as if all Plaintiffs' requests had been made on the date of the filing of this order. DOE shall bear all costs and expenses associated with its compliance with this order and the stipulated Order.

3. The parties shall within forty-five days of the filing of this order file a status report regarding compliance with this Order. I defer any further order on issues of contempt or sanctions until I have reviewed such status report.

Dated this 13 day of November, 1995 at Denver, Colorado.

JOHN L. KANE, JR.

U.S. SENIOR DISTRICT COURT JUDGE



LEXSEE 935 F. SUPP. 1452

**MERILYN COOK, et al., Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION, a Delaware Corporation, and THE DOW CHEMICAL COMPANY, a Delaware Corporation. Defendants.**

**Civil Action No. 90-K-181**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*935 F. Supp. 1452; 1996 U.S. Dist. LEXIS 11524; 27 ELR 20072*

**August 8, 1996, Decided
August 8, 1996, FILED**

**COUNSEL:** [**1] Attorney(s) for Plaintiffs:

Bruce H. DeBoskey, Esq., Steven W. Kelly, Esq., Silver & DeBoskey, Denver, CO.

Stanley M. Chesley, Esq, Waite, Schneider, et al., Cincinnati, OH.

R. Bruce McNew, Esq., Greenville, DE.

Ronald Simon, Esq., Connerton, Ray & Simon, Washington, DC.

Daniel Satriana, Esq., Sean R. Gallagher, Esq., Hall and Evans, Denver, CO.

Merrill Davidoff, Esq., Daniel Berger, Esq., Peter B. Nordberg, Esq., Berger & Montague, Philadelphia, PA.

Robert, Golten, Esq, Boulder, CO.

Kenneth A. Jacobsen, Esq., John D. Stoner, Esq, Christopher T. Reyna, Esq., Chimicles, Jacobsen & Tikellis, Haverford, PA.

Attorney(s) for Defendants:

Richard Kaufman, Esq., U.S. Attorney's Office, Denver, CO.

Dana C. Lindsay, Esq., Office of Chief Counsel B0115, U.S. DOE, Rocky Flats Field Office, Golden, CO.

Joseph J. Bronesky, Esq., Christopher Lane, Esq., Sherman & Howard, Denver, CO.

Mark S. Raffman, Esq., Patrick Hanlon, Esq., Washington, DC.

Mark S. Lillie, Esq., Douglas J. Kurtenbach, Esq., Kirkland & Ellis, Chicago, IL.

**JUDGES:** JOHN L. KANE, JR., U.S. SENIOR DISTRICT COURT JUDGE

**OPINION BY:** JOHN L. KANE, JR.

**OPINION**

[*1454] MEMORANDUM OPINION AND [**2] ORDERS

KANE, J.

The United States Department of Energy ("DOE") is the owner of the Rocky Flats nuclear weapons production facility located northwest of Denver, Colorado. It contracted with Defendants, Rockwell International Corporation and The Dow Chemical Company, to operate Rocky Flats. Plaintiffs allege during operation of Rocky

935 F. Supp. 1452, *1454; 1996 U.S. Dist. LEXIS 11524, **2;
27 ELR 20072

Flats, Dow and Rockwell released hazardous substances into the surrounding area damaging Plaintiffs' property and increasing their risk of adverse health consequences.

Pending are Plaintiffs' Supplemental Motion for Sanctions against the United States Department of Energy in Contempt (filed February 12, 1996); Dow's Motion for Protective Order (filed March 4, 1996); Department of Energy's Motion for a Protective Order (filed March 8, 1996); and Plaintiffs' Motion that the United States Department of Energy be Held in Contempt re: Document Requests dated June 23 and August 28, 1995 (filed April 5, 1996).

Trial is set for January 27, 1997.

I. Background.

In my Memorandum Opinion and Order re Contempt dated November 13, 1996 ("Contempt Order"), I held DOE had failed substantially to comply in several respects with the Stipulated Order made an [**3] order of court on September 13, 1994. *Cook v. Rockwell Int'l Corp., 907 F. Supp. 1460, 1468 (D. Colo. 1995).*

I ordered DOE to comply with the Stipulated Order and to pay Plaintiffs their reasonable fees, costs and expenses for all their efforts to secure production of documents in DOE's control from July 8, 1994 (the date DOE agreed to entry of the Stipulated Order) through November 13, 1996. I further ordered the parties to file a status report within forty-five days regarding compliance.

Specifically, I ordered DOE, within thirty days, to produce to Plaintiffs the following:

1. All documents not yet produced in response to Plaintiffs' letter of request of November 7, 1994;

2. All materials unaccounted for ("MUF") documents requested in Plaintiffs' letter dated December 14, 1994 relating to missing quantities of nuclear materials at Rocky Flats;

3. All documents not yet produced in response to Plaintiffs' request letter of November 13, 1994;

4. The 257 VAX computer tapes at Rocky Flats; and

5. All documents not yet produced in response to Plaintiffs' request letter to the Los Alamos National Laboratory ("LANL") dated December 14, 1994;

6. The Rocky Flats database located [**4] at LANL and requested by Plaintiffs in a letter dated November 8, 1995.

I further ordered the September 13, 1994 date of the original Stipulated Order changed to November 13, 1995 which new date would be the keystone date for determining compliance with the Stipulated Order.

I deferred any further order on issues of contempt or sanctions until I had viewed such status report.

At a status conference on November 14, 1995, I ordered the United States Attorney's Office to contact the Chief of Staff of DOE, or if unable to do so, to contact the Secretary of Energy for the purpose of designating an official of DOE to ensure compliance with the Stipulated Order and the Contempt Order.

On November 27, 1995, DOE filed a Notice of Compliance with the Court's Order of November 14, 1995 stating that Richard Rosenzeig, DOE Chief of Staff, had appointed Dana C. Lindsay, DOE Chief Counsel at Rocky Flats, as the person directly responsible [*1455] for compliance with the Stipulated Order and the Contempt Order.

On December 13, 1995, DOE filed United States Department of Energy's Unopposed Motion for Extension of Time, requesting a nine day extension to December 22, 1995 to comply with the Contempt Order. [**5] The extension was requested in order to complete negotiations between Plaintiffs' counsel and DOE to establish a production schedule acceptable to Plaintiffs. On December 15, 1995, I granted the extension.

On December 22, 1995, DOE filed a Motion for Extension of time to Comply with Contempt Order. DOE stated, in addition to the document requests covered by the Contempt Order, Plaintiffs had made further requests for documents or finding aids commencing on August 17, 1995. DOE noted, since taking charge of document production for DOE on November 22, 1995, Lindsay had increased the resources in support of DOE's document production effort, including appointing twelve additional declassifiers and four administrative support staffers to assist in the declassification and sanitization of classified documents.

DOE's motion stated with regard to Plaintiffs':

935 F. Supp. 1452, *1455; 1996 U.S. Dist. LEXIS 11524, **5;
27 ELR 20072

1. November 7, 1994 request: DOE had produced all documents requested, including written explanations concerning the partial destruction of some of the documents in four of the sixty-nine files requested.

2. November 23, 1994 Request: DOE had produced all except sixteen of the ninety-eight requested documents, which sixteen could [**6] not be located.

3. December 14, 1994 Request for MUF documents: This involved the declassification and sanitization of over 11,000 pages of classified documents held at Rocky Flats. DOE stated, even with the resources added by Lindsay, it would take DOE until June 30, 1996 to declassify and sanitize the remaining MUF documents and that production would occur on a rolling production basis.

4. Request for VAX tapes: DOE could produce the 257 tapes in its possession but they would not be in readable form and DOE had made repeated attempts to bring the database on line to make the tapes readable. DOE had signed a contract with Digital Equipment Corporation ("DEC") in this regard. DOE requested until January 5, 1996 to provide Plaintiffs' counsel and the court with a report concerning the status of the VAX tapes.

5. Request for LANL Documents: This involved the production, bar coding and Bate stamping of 150,000 pages of documents. To expedite the production, DOE had entered a contract with IT/IS Litidex, a computerized litigation support firm to copy, Bate stamp, bar code and perform the Privacy Act review for these documents. DOE estimated the documents could be delivered to Plaintiffs [**7] on computer media by January 31, 1996 and the Privacy Act Review completed by February 21, 1996.

6. November 8, 1994 Request for Rocky Flats Database: The database was produced to Plaintiffs on November 1, 1995 on computer media.

In addition, Lindsay had on December 13, 1995, sent Plaintiffs' counsel a letter updating the status of document production and stating an extension until January 31, 1996 was needed to produce the balance of the documents.

DOE requested extensions to June 30, 1996 to declassify and sanitize the classified MUF documents, January 5, 1996 to file a report concerning the feasibility

of bringing the VAX tapes on line and January 31, 1996 to produce the LANL documents on electronic media and the documents not yet produced outlined in Lindsay's December 13, 1995 status letter.

I set DOE's Motion for Extension of Time to Comply with Contempt Order for hearing on January 16, 1996.

On January 4, 1996, DOE filed U.S. Department of Energy's Status Report on Document Production. On January 12, 1996, Plaintiffs filed Plaintiffs' Status Report re: The United States Department of Energy's Compliance with the Court's Order dated November 13, 1995, Holding DOE in Contempt, [**8] and Plaintiffs' Response to DOE's Motion for Extension of Time.

[*1456] On January 16, 1996, I held a hearing on DOE's Motion for Extension of Time to Comply with Contempt Order. I granted DOE an extension until January 31, 1996 to produce all documents not yet produced in response to Plaintiffs' request letter of November 7, 1994. I ordered all other documents, excluding the VAX computer tapes and the MUF documents, to be produced by February 1, 1996.

Concerning DOE's production of documents from Los Alamos National Laboratory (LANL), I directed the parties to submit a protective order regarding the Privacy Act to the court by Friday January 19, 1996. I stated if this was not accomplished I would draft my own order on Monday January 22, 1996.

I ordered DOE to complete its searchable database on the VAX documents by March 15, 1996.

With regard to the MUF documents, I set a further hearing on Thursday February 15, 1996. I stated:

If there isn't a plan for declassifying these documents and turning them over by March 15, I want a specific proposal identifying who the people are that are making these decisions and the responsible people as to why it cannot be accomplished by that time. [**9] I want legal arguments on two considerations. One is the authority of this Court to require the Department of Energy to take over the defense of this case under *42 USC 2210(h)*. And, the other issue that I'm concerned about is the authority of this

Page 4

935 F. Supp. 1452, *1456; 1996 U.S. Dist. LEXIS 11524, **9;
27 ELR 20072

Court to order all of these documents impounded in the custody of the U.S. Marshal.

(Tr. Jan. 16, 1996 at 28-29.)

On January 22, 1996, the parties filed a Joint Stipulated Order regarding Production of Epidemiological Documents at LANL. I signed the order on that date.

On February 2, 1996, DOE filed United States Department of Energy's Notice of New Discovery Developments. DOE filed this document with reference to the January 16, 1996 order requiring it to prepare a plan to ensure the declassification of the 11,000 MUF documents by March 15, 1996, or, in the alternative, to explain why such declassification could not be completed by that date.

DOE noted it had previously estimated the MUF collection to consist of 11,000 pages of classified documents. On January 19, 1996, counsel for DOE was informed the actual number was between 400,000 and 500,000 pages. On February 2, 1996, DOE completed the count and advised counsel there were **[\*\*10]** 670,000 pages of MUF documents requiring declassification. [1]

> 1   Dana Lindsay discusses in her affidavit attached to DOE's Corrected Status Report submitted on February 14, 1996 that on December 7, 1995, at a meeting, Plaintiff's counsel advised the request for MUF documents included "MUF-related" documents. She states it was only on January 22, 1996, she was informed by John Lazor and Dan Cannon of Head Quarters Office of Declassification that they had identified ten to twelve types of MUF documents. On February 2, 1996, a final tally of 677, 211 pages of MUF documents was made.

DOE stated, in response to the new development, Lindsay had increased the declassification staff from fourteen to twenty-eight. DOE stated it would present a plan on February 15, 1996 to comply with the January 16, 1996 order.

In addition, DOE reported counsel for Kaiser-Hill, the present operator of Rocky Flats, informed counsel for DOE on January 26, 1996 that 1,000 reels of microfilm containing documents were found at Rocky Flats. **[\*\*11]**

The documents were unclassified and each reel contained an index. DOE immediately assigned four individuals to copy the indices.

On February 1, 1996, DOE located an additional 500 reels for a total of 1,500. DOE intended to forward the indices to Plaintiffs' counsel after they were copied and the first shipment was to be mailed on February 5, 1996.

DOE had also located three platters. A platter is the center of a hard disc which holds all of the electrical charges and data on a hard disc. The platters operated on a DEC computer utilizing Saturn software. Neither the DEC computer nor the software exist currently.

On February 5, 1996, Plaintiffs' Response to DOE's "Notice of New Discovery Developments" **[\*1457]** was filed. Plaintiffs asserted "it appears that for the better part of a year, DOE has permitted its counsel to serve, unwittingly, as the conduit for testimony and representations to this Court that DOE knew, or should have known, to be false." (Pls.' Resp. DOE's "Notice New Discovery Developments" at 1.) Plaintiffs demanded a fuller explanation from DOE and stated the development would affect their position as to the appropriate sanctions to be imposed on DOE.

II. Plaintiffs' **[\*\*12]** Supplemental Motion for Sanctions against the United States Department of Energy.

On February 12, 1996, Plaintiffs' Supplemental Motion for Sanctions against the United States Department of Energy was filed. Plaintiffs assert the Price-Anderson Act, *42 U.S.C § 2210(h)* and DOE's operating contracts with Defendants confer authority on DOE to control the defense of this case. They argue it is within my authority to (1) direct DOE to purge itself of contempt by exercising its right to control the litigation so that it might submit to an order imposing preclusive sanctions; (2) rely on the court's inherent power to impose such sanctions even if DOE did not assume the defense; (3) impose the sanction of default, or the striking of defenses on certain liability issues; (4) order the impoundment of documents by the United States Marshals.

Plaintiffs rely on the following provision of the Price-Anderson Act:

(h)   Conditions of agreements of

935 F. Supp. 1452, *1457; 1996 U.S. Dist. LEXIS 11524, **12;
27 ELR 20072

indemnification

The agreement of indemnification may contain such terms as the Commission or the Secretary, as appropriate deems appropriate to carry out the purposes of this section. Such agreement shall provide that, when the Commission or [**13] the Secretary, as appropriate, makes a determination that the United States will probably be required to make indemnity payments under this section, the Commission or the Secretary, as appropriate, shall collaborate with any person indemnified and may approve the payment of any claim under the agreement of indemnification, appear through the Attorney General on behalf of the person indemnified, take charge of such action, and settle or defend any such action. The Commission or the Secretary, as appropriate, shall have final authority on behalf of the United States to settle or approve the settlement of any such claim on a fair and reasonable basis with due regard for the purposes of this chapter. Such settlement shall not include expenses in connection with the claim incurred by the person indemnified.

*42 U.S.C § 2210(h).* [2] They anticipate DOE's argument that under the statutory and contractual provisions, DOE has sole discretion to determine whether to undertake the defense of the action and that its decision is not subject to judicial review.

2   The Price-Anderson Act was enacted in 1957 as an amendment to the Atomic Energy Act to encourage private sector investment in the development of nuclear power by limiting the liability of private owners and operators in the event of a nuclear accident.

[**14] Plaintiffs acknowledge this might be true if DOE were not a contemnor. However, because DOE is a contemnor, Plaintiffs maintain the question is not one of judicial review but of remedy. Plaintiffs assert they do not seek a judicial determination whether any DOE decision concerning this litigation was within the agency's sound administrative discretion. Rather they ask

me to order DOE to purge itself of contempt by exercising its lawful authority. Plaintiffs maintain I have this power in civil contempt proceedings because I may fashion any order which promotes remedial purposes of coercing compliance or compensating persons injured by the contemnor's conduct.

Plaintiffs' desire is that DOE take over the defense of the action, and, in doing so, submit to warranted dispositive sanctions. They acknowledge neither *Federal Rule of Civil Procedure 37*, which expressly provides for evidentiary sanctions but pertains to named parties, nor Rule 45, which pertains to nonparties but does not expressly provide for evidentiary sanctions, precisely fits this situation. However, Plaintiffs assert, under these circumstances, I may rely on inherent power to "fill the gap."

[*1458] Plaintiffs review the factors [**15] that should be considered in the choice of sanctions against DOE as outlined in *Ehrenhaus v. Reynolds, 965 F.2d 916, 921 (10th Cir. 1992)*. They assert (1) they have suffered prejudice as a result of DOE's violations of the Stipulated Order, the Contempt Order and the January 16, 1996 order directing it to produce the MUF documents by March 16, 1996; (2) DOE has wrongfully and substantially interfered with the judicial process; (3) DOE's conduct merits a finding that it has acted willfully and in bad faith; (4) DOE has been warned that its conduct could result in preclusive evidentiary sanctions; (5) the inefficacy of any sanction short of default or the striking of defenses to cure the prejudice suffered by Plaintiffs.

In addition, Plaintiffs maintain I have general authority to order the U.S. Marshals Service to impound discovery-related documents and that Congress has expressly authorized United States Marshals to enforce court orders. See *28 U.S.C. § 566*.

According to Plaintiffs: "Impoundment is especially justified here, where the record reflects apparent destruction of relevant documents by DOE during the course of this litigation, and where DOE's accounts of the nature [**16] and volume of responsive documents have been shown to be unreliable." (Pls.' Mem. Supp. Supplemental Mot. Sanctions at 24.) Plaintiffs suggest the classified documents, including the MUF documents, be impounded in the custody of the United States Marshals at the site pending the completion of DOE's declassification review. They fear moving classified

935 F. Supp. 1452, *1458; 1996 U.S. Dist. LEXIS 11524, **16;
27 ELR 20072

documents from the site could further delay their production. Plaintiffs request that henceforth DOE access to the documents should be monitored and supervised by the United States Marshals, unless Plaintiffs and DOE agree to other arrangements. This, Plaintiffs suggest will "help ensure the integrity of the documents, while maintaining DOE's accountability for their production." (Id. at 25.)

On February 13, 1996, DOE filed its Status Report and Proposed Alternative Plans to Address Discovery Issues. On February 14, 1996, I granted DOE's Motion to File Corrected Status Report and Proposed Alternative Plans to Address Discovery Issues Pending.

In an affidavit attached to DOE's status report, Lindsay described DOE's production efforts and compliance with requests for production after the update provided at the January 16, 1996 hearing. **[**17]** She stated all nonclassified documents responsive to the pending requests had been identified or would be produced or available by March 15, 1996.

The report stated DOE had identified over 700,000 pages of documents responsive to Plaintiffs' requests for production which were currently classified. The figure included approximately 667,000 pages of MUF documents. Since November 1995, the documents had been undergoing a greatly expanded declassification and sanitization process with an increase of staff from 17 to 70 and a further anticipated increase to 82 by February 16, 1996.

At the current level of staffing and using current review procedures, DOE anticipated completion of the production process by October 7, 1996. Through a modified quality assurance process under consideration, the anticipated completion date could be moved up to August 8, 1996. DOE asserted the set date for production of March 16, 1996 could not be met.

The documents have been classified pursuant to The Atomic Energy Act of 1954 and Executive Order 12958. Bryan Siebert, Director of DOE's Office for Declassification, stated in an affidavit attached to the status report that he had determined the classified documents **[**18]** must undergo the declassification and/or sanitization process and that the processes currently used and proposed to be utilized were consistent with and required by DOE and Rocky Flats classification guidelines.

As an alternative to current procedures, DOE proposed it would expedite the clearance process for a reasonable number of individuals, in addition to the two representatives of Plaintiffs who already had appropriate clearance to review classified documents, to allow Plaintiffs' attorneys and expert witnesses access for a pre-declassification and/or **[*1459]** sanitization review of the classified documents. DOE submitted this review would provide for Plaintiffs' involvement in the identification and prioritization of documents subject to the declassification and/or sanitization process and potentially reduce the production schedule if some documents were determined by Plaintiffs to be of little or no use. Documents identified by Plaintiffs as priority would go to the head of the review and production line.

DOE offered another alternative plan for modification of the stipulation and discovery process. Under the plan, Plaintiffs and Defendants would designate attorneys and expert witnesses **[**19]** for expedited clearance processing. DOE would immediately provide two copies of classified documents and indices located in separate secure facilities for access and use by the parties for review and preliminary use by individuals holding clearances. The access would be granted while preserving the classified designation of the documents. Except for use by expert witnesses who had received clearances, parties would designate those documents they wished for further use in discovery or at trial. DOE would process those documents for declassification and/or sanitization. If there were any disagreement concerning this effort, upon written request, DOE would re-review the documents and render a final opinion on declassification and/or sanitization. The review would be subject to in camera review by the court.

As part of this proposed alternative plan, expert witness reports could be prepared both by identifying and containing the classified information and documents being relied upon. All reports and supporting documents should be provided for declassification and/or sanitization review of only those portions that contain or are derived from classified information. The results thereof **[**20]** would be returned to the submitting party and upon written request, be subject to a final re-review and opinion on the declassification and/or sanitization decision. The final review would be subject to in camera review by the court.

DOE stated certain privileges might apply to

935 F. Supp. 1452, *1459; 1996 U.S. Dist. LEXIS 11524, **20;
27 ELR 20072

disclosure of classified documents and to any classified documents relied on or used by witnesses or in expert reports which might restrict their use in litigation.

On February 13, 1996, both DOE and Dow filed briefs addressing my authority to require DOE to take over the defense of the case and to impound documents into the custody of the U.S. Marshal. DOE asserts the Price-Anderson Act provides the Secretary of DOE with absolute discretion to determine whether to refer the defense of the case to the Attorney General. In these circumstances, DOE argues, the Administrative Procedure Act (APA), *5 U.S.C. § 701(a)(2)*, precludes judicial review of such determinations and, thus, does not authorize this court to order the government to take over the defense of this case.

DOE argues the fact that I have held it in contempt for failing to meet discovery obligations does not provide a basis for me to compel the Secretary [**21] to take an action committed to the agency's discretion by law. It contends that, in any event, such action would be meaningless because the effect of a determination that DOE should take over the defense of the case would be a substitution of counsel, not of party defendants. Thus, it states, my ability to enforce the contempt order with respect to DOE would not be affected.

Dow maintains I do not have the power to force DOE to take charge of this action for purposes of imposing "sanctions having an evidentiary effect" because, under the Federal Rules of Civil Procedure, such sanctions cannot be imposed upon the parties for the conduct of non-parties. Dow further states there is no precedent under the Price-Anderson Act or elsewhere empowering me to force DOE to take over this action so that such sanctions could be issued. It asserts the weight of authority demonstrates I lack the authority even to review a decision by the Secretary to "take charge" of an action under *§ 2210(h)*, much less force the Secretary to make such a decision. Finally, Dow urges me to examine the significance of the discovery at issue before issuing further sanctions.

[*1460] While DOE agrees I have general authority [**22] to order the United States Marshal to impound discovery-related documents, it argues such impoundment is not warranted in this case. DOE maintains a few of the documents responsive to Plaintiffs' November 7, 1994 request were destroyed inadvertently and there has been no allegation nor finding that they

were destroyed with wilful intent to circumvent the discovery process.

DOE further asserts impoundment, by placing the documents under seal, would make them inaccessible to employees at the Rocky Flats site and impede the ability of the current contractor and DOE to accomplish their environmental restoration and waste management activities. Alternatively, if the documents were to remain accessible but under the United States Marshal's control, a significant number of Marshal's service personnel would have to be deployed to the Rocky Flats site to maintain custody and control of the documents posing so many practical and logistical problems as to be infeasible. Similarly logistical issues would arise if the Marshals were to take custody and control of the large number of documents containing classified information.

At a hearing on February 15, 1996, Henry Solano, United States Attorney [**23] for the District of Colorado, representing DOE, iterated the classified documents under DOE's control required declassification review and DOE's two proposed alternative plans for focusing the declassification process.

Plaintiffs' counsel argued DOE had obstructed vital discovery in the case and continued to engage in a coverup, evidenced by its purporting to have only recently discovered the existence of 660,000 documents. Plaintiffs noted the 1994 Stipulated Order required DOE to search and identify every repository of Rocky Flats, including all old documents sent to federal record centers. Plaintiffs requested me to order the U.S. Marshal's Office to assume control of the documents and sought preclusive sanctions.

At the hearing, I granted Defendants and DOE twenty days to respond to Plaintiffs' Supplemental Motion for Sanctions against the United States Department of Energy and Rockwell twenty days to brief the two issues on which I had requested authority.

I ordered Plaintiffs to submit a list of those individuals for whom they wanted security clearances to DOE and ordered DOE to handle the clearances on an expedited basis.

I deferred any further ruling but indicated I was [**24] considering evidentiary sanctions and referred the parties to *Mammoth Oil Co. v. United States, 275 U.S. 13, 72 L. Ed. 137, 48 S. Ct. 1 (1927)*.

935 F. Supp. 1452, *1460; 1996 U.S. Dist. LEXIS 11524, **24;
27 ELR 20072

On February 26, 1996, Plaintiffs' Response to DOE's "Status Report and Proposed Alternative Plans to Address Discovery Issues" was filed. Plaintiffs assert DOE has not complied with the January 16, 1996 order to file "a plan for declassifying [the MUF] documents and turning them over by March 15." (Tr. Proceedings Mot. Ext. Time Jan. 16, 1996 at 28.)

Plaintiffs reject DOE's alternative proposals and its undertaking to complete its discovery responses by October 7, 1996. They state this would undo the Stipulated Order and shift to Plaintiffs the burden of purging DOE of contempt.

Plaintiffs reject DOE's proposal to allow Plaintiffs' representatives access to the data only in a classified setting because this would involve Plaintiffs' experts, consultants and counsel being forced to spend the next few months on site. They also find it unacceptable that DOE would vet their expert reports for classification purposes.

Plaintiffs assert they should be entitled to visit the plant and designate documents for declassification and production, **[**25]** a right already existing under the Stipulated Order. However, they maintain DOE should discharge its duty under the Stipulated Order to complete a declassification review.

Plaintiffs also argue DOE's status report does not afford a detailed explanation as to why the number of MUF documents was so grossly underestimated and why DOE took two weeks to disclose the discovery of the underestimation under the guise of wanting **[*1461]** to produce a precise count of the volume of MUF documents. [3]

> 3  On February 29, 1996, DOE and Plaintiffs filed a Stipulated Order Regarding Production of Certain Records Kept at the Rocky Flats Environmental Technology Site. The stipulation states Plaintiffs requested DOE to produce certain electronic mail files ("e-mail") pursuant to the Stipulated Order of September 13, 1994 and the parties also contemplate the production of certain material stored on microfilm at Rocky Flats.

On March 4, 1996, the Department of Energy's Memorandum of Law in Opposition to Plaintiffs' Motion for Supplemental **[**26]** Sanctions was filed. DOE urges me to deny Plaintiffs' request that it take over the defense of this lawsuit and/or become or be treated as a defendant so that I may then impose preclusive evidentiary sanctions against DOE. Restating its earlier arguments, DOE argues I lack the authority to require it, as a non-party, to take over the defense of the case or to treat DOE as a Defendant; and that because Congress has not waived the United States' sovereign immunity under the Price-Anderson Act, I lack the authority to make or treat DOE as a defendant.

DOE again asserts Plaintiffs' reliance on *42 U.S.C. § 2210(h)* as authority for me to order DOE to take over the defense is misplaced. Under that section DOE may choose to "appear through the Attorney General on behalf of the person indemnified, take charge of such action, and settle or defend such action." DOE maintains the section delegates to DOE, rather than the court, the right to decide on a case-by-case basis whether to appear through the Attorney General on behalf of its contractors.

DOE further argues, because Plaintiffs chose not to sue the United States under the Federal Tort Claims Act ("FTCA"), the only relevant statute under **[**27]** which Congress has waived the United States' sovereign immunity, I lack jurisdiction to treat DOE as a party. Because Plaintiffs have never exhausted their administrative remedies under the FTCA, DOE argues, I have no subject matter jurisdiction over the United States as a party in any FTCA claim. DOE also states, contrary to Plaintiffs' assertion, it is not the "real party in interest" but is a separate entity from DOW and Rockwell.

DOE further opposes the sanctions Plaintiffs ask me to impose because, it states, it has been held in civil, rather than criminal, contempt. Civil contempt sanctions should pressure the contemnor to change its behavior and, unlike criminal contempt sanctions, should not be punitive for a completed act of disobedience. DOE points out, to compensate Plaintiffs for any injury resulting from DOE's delay in producing the relevant documents, I have ordered DOE to pay Plaintiffs' attorney fees, costs and expenses for all their efforts to secure the relevant documents, including their motion for contempt.

DOE concludes because I lack authority to require it to be a defendant or to assume control of the case, there is no basis for imposing sanctions, such as **[**28]** a default judgment or preclusive evidentiary sanctions, on it.

It cites legal precedent and principles of due process precluding a court from prejudicing a party's substantive

935 F. Supp. 1452, *1461; 1996 U.S. Dist. LEXIS 11524, **28; 27 ELR 20072

rights unless the party itself has wilfully failed to comply with the court's order. DOE distinguishes the Mammoth Oil case, which, it maintains, reflects a narrow exception to the basic rule, that when the culpable non-party is the "principal representative" of a party, preclusive evidentiary sanctions may be appropriate.

In Mammoth Oil, the Court held a negative inference could be drawn against a civil defendant because of the failure of a non-party to testify to rebut the government's allegations. The opinion indicates the government had accused agents of the defendant corporation, including Sinclair, the non-party who failed to testify, of having conspired to defraud the government. *Mammoth Oil, 275 U.S. at 36.* In concluding there had been no error in allowing the government to benefit from the negative inference produced by Sinclair's failure to testify, the Court recognized the government had "introduced evidence which, uncontradicted and unexplained, was sufficient to sustain its charge." **[**29]** *Id. at 52.* The Court noted Sinclair was not only an agent of the Mammoth Oil Company, but also the **[*1462]** corporation's founder and "principle representative." *275 U.S. at 52.* As such, it was "as if [Sinclair] personally held the [fraudulent] lease [was the] defendant, and failed to testify." *Id. at 52.*

DOE argues, although Plaintiffs may allege DOE has the real economic stake in the defense of this lawsuit, they have not and cannot claim DOE was the principal representative of Dow and Rockwell since DOE neither principally represents nor owns and controls Dow or Rockwell. Accordingly, DOE submits Mammoth Oil does not provide authority for me to impose preclusive sanctions on Defendants for the actions of DOE.

Finally, DOE argues the Atomic Energy Act, *42 U.S.C. § 2011 et seq.*, prevents the disclosure of classified material and at this time much of the material that is the subject of discovery disputes is classified. DOE asserts, because the statutory presumption and privilege protecting the information must be maintained until the material is properly declassified, I may not impose evidentiary sanctions due to DOE's non-disclosure of privileged materials.

On March **[**30]** 4, 1996, Rockwell filed its opposition to Plaintiffs' motion for supplemental sanctions against DOE. In essence, Rockwell argues only a party to an action may "submit" to evidentiary sanctions, the striking of defenses or a default judgment

and DOE is not a party to the lawsuit. Rockwell asserts the indemnity relationship between DOE and Rockwell does not provide justification for ignoring this critical point and treating Rockwell and DOE as if they were one entity for purposes of this motion.

Also filed on March 4, 1996 was Dow's Memorandum in Opposition to Plaintiffs' Motion for Sanctions and in Support of Dow's Motion for Protective Order. Dow addresses Plaintiffs' request that I direct DOE to assume the defense of this case and submit to entry of default on liability and other preclusive sanctions. In Dow's view, these requests for relief emanate from the contractual relationships between the DOE and Dow and Rockwell. It maintains because exclusive jurisdiction to resolve such contractual issues lies with the Court of Claims under the Tucker Act, I lack jurisdiction to grant the relief sought. Further, it asserts Plaintiffs in essence seek specific performance of a government **[**31]** contract, relief which Dow argues is not available against the government. See *Spectrum Leasing Corp. v. United States, 246 U.S. App. D.C. 258, 764 F.2d 891, 893 n.2 (D.C. Cir. 1985).* Finally, Dow contends Plaintiffs lack standing to seek any relief under the DOE contracts with Dow and Rockwell as they are not parties to those contracts.

On March 25, 1996, Plaintiffs' Reply Memorandum in Support of Plaintiffs' Supplemental Motion for Sanctions against the United States Department of Energy was filed. Plaintiffs refer to the five factors described in Ehrenhaus v. Reynolds, as "criteria for the district court to consider prior to imposing dismissal as a sanction" *965 F.2d at 921* and urge, based on the record, a default sanction or the striking of defenses to cure the prejudice suffered by Plaintiffs.

Plaintiffs maintain DOE has acted in concert with Dow and Rockwell and should not be treated as a Defendant, but as a contemnor who should compensate its victims. Plaintiffs reiterate their request for entry of default judgment, the striking of all defenses, or the entry of preclusive evidentiary sanctions on the issues of (1) releases of plutonium and other radionuclides from **[**32]** Rocky Flats; and (2) the health effects of exposure to plutonium and other radionuclides, issues relating to the MUF and LANL documents respectively.

Citing among other cases, *Mammoth Oil, 275 U.S. at 51-53,* Plaintiffs argue DOE has failed to produce the MUF documents despite three court orders that these

935 F. Supp. 1452, *1462; 1996 U.S. Dist. LEXIS 11524, **32;
27 ELR 20072

documents are relevant to the issue of releases of nuclear material from Rocky Flats, that they are within DOE's control and that DOE is the "principal representative" of the named Defendants. They assert imposing a default judgment or, at minimum, barring the defense from presenting any affirmative evidence on the issue of the releases of plutonium and other radionuclides, would prevent DOE from frustrating **[*1463]** Plaintiffs' ability to prosecute their claims in a timely way.

If sanctions short of default are imposed, Plaintiffs ask that evidentiary sanctions be entered with respect to the LANL documents. The Contempt Order found DOE to have failed substantially to comply with the Stipulated Order in failing to produce the LANL documents. *Cook v. Rockwell Int'l Corp., 907 F. Supp. at 1466*. On January 31, 1996, DOE produced the LANL documents which include documents relating to **[**33]** studies which have examined the health effects of plutonium on humans. Plaintiffs claim this belated production does not cure the prejudice they have suffered because of the delay and that I should, at minimum, bar Defendants from contesting Plaintiffs' evidence regarding the health effects of exposure to plutonium and other radionuclides.

Discussion of Plaintiffs' Supplemental Motion for Sanctions against DOE.

In the November 13, 1996 Contempt Order, I found DOE had failed substantially to comply with the Stipulated Order in several respects, ordered compliance with the Stipulated Order under a new time framework, ordered DOE to pay Plaintiffs their reasonable attorney fees, costs and expenses for all their efforts to secure production of documents in DOE's control from July 8, 1994 to the date of the Contempt Order, and ordered the parties to file within forty-five days a status report concerning compliance with the Contempt Order and the Stipulated Order. I deferred any further order on issues of contempt or sanctions until I reviewed the status report.

On February 12, 1996, Plaintiffs filed their supplemental motion for sanctions against DOE, urging me to order DOE to exercise **[**34]** its powers under the Price-Anderson Act and DOE's operating contracts with Defendants to control the defense of this case so that it might submit to an order imposing preclusive sanctions; rely on inherent power to impose such sanctions even if DOE did not assume the defense; impose the sanction of default, or the striking of defenses on certain liability issues; and order the impoundment of documents by the

United States Marshals.

The Contempt Order was one finding DOE in civil contempt for having failed substantially to comply with the Stipulated Order in several respects outlined in the Contempt Order.

> The sanction of civil contempt serves two remedial purposes: (1) to enforce compliance with an order of the court, and (2) to compensate for losses caused by the non-compliance. The sanctions to be imposed are to be remedial or coercive, but not penal, and are to be adapted to the particular circumstances of each case.

*NLRB v. Monfort, Inc., 29 F.3d 525, 528 (10th Cir. 1994)* (citations omitted).

"'In selecting contempt sanctions, a court is obliged to use the "least possible power adequate to the end proposed."'" *Spallone v. United States, 493 U.S. 265, 276,* **[**35]** *107 L. Ed. 2d 644, 110 S. Ct. 625 (1990)* (quoting *United States v. City of Yonkers, 856 F.2d 444, 454 (2d Cir. 1988))* (quoting *Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 231, 5 L. Ed. 242 (1821))*.

Having reviewed the extensive briefs and status reports filed by the parties relating to the issue of DOE's compliance with the Contempt Order and Stipulated Order, I conclude no further sanctions against DOE are warranted at this time. DOE has increased its declassification staff and expended significant additional resources in an effort to comply. It has and is taking affirmative steps to purge itself of contempt and to comply with the Stipulated Order, Contempt Order and rulings at status conferences earlier this year. Plaintiffs have to a degree been compensated by DOE for the loss caused by the non-compliance by being awarded their costs incurred in enforcing compliance with their discovery requests. [4]

> 4   I requested Plaintiffs to submit their requests for such fees, costs, and expenses, which they did on December 15, 1995. A settlement was reached concerning Plaintiffs request. On June 21, 1996, I approved Plaintiffs' and DOE's Stipulated Order re: Plaintiffs' Request of December 15, 1995, for Attorney Fees, Costs and Expenses whereby DOE

935 F. Supp. 1452, *1463; 1996 U.S. Dist. LEXIS 11524, **35;
27 ELR 20072

agreed to pay Plaintiffs the sum of $ 500,000.00.

[**36]  [*1464]  I have considered and rejected the possibility of directing DOE, as a contemnor, to exercise its right to control the litigation so that it may submit to an order imposing preclusive sanctions. Nor do I see fit to impose the sanction of default on Dow and Rockwell or the striking of defenses on certain liability issues for the contemptible actions of DOE, a non-party. Finally, although I am empowered to order the impoundment of documents by the United States Marshals, I conclude such impoundment would not serve a remedial purpose. Nor do I consider DOE's delay in production of the LANL documents warrants that Defendants be barred from contesting Plaintiffs' evidence regarding the health effects of exposure to plutonium and other radionuclides.

III. Dow's Motion for a Protective Order.

On March 4, 1996, Dow filed a motion for a protective order supported by Dow's Memorandum in Opposition to Plaintiffs' Motion for Sanctions and In Support of Dow's Motion for Protective Order. 5 Dow requests I "abandon reliance upon the Stipulated Order's provision that any information that is in any way 'Rocky Flats-related' is subject to discovery." (Dow's Mot. Protective Order at 1.) It requests [**37] me "to initiate that process by requiring plaintiffs to demonstrate how the MUF documents that they have requested be reviewed for declassification are material to their claims, and by ordering that further discovery be limited to documents for which such a showing has been made." (Id. at 1-2.)

> 5  Dow states in moving for a protective order it accepts my "invitation" to do so, referring to my statement at the February 15, 1996 hearing:
>
> > There is a stipulation, and the way the courts work is when the parties come forward with a stipulation, the court generally approves it, and that's what's happened here. If you think there are grounds to get relief from that stipulation, then the way to approach it is to file a motion with a brief and give the other side a chance to consider it and respond to that with a brief. I will entertain that at any time because you are

entitled to file it.

> (Dow's Memo. Ex. F., Tr. Hearing Feb. 15, 1996 at 35.)

Dow notes at the time of entry of the Stipulated Order, Magistrate [**38] Judge Borchers acknowledged DOE "may have upwards of twenty-one million documents concerning Rocky Flats," (Mem. Op. & Order Sept. 12, 1994 at 2), and that "the breadth and scope of the documents is to be resolved at a later time," (id. at 3).

Dow argues a protective order should issue regarding the MUF documents because "none of the numerous scientific groups that have studied the plant have found information about MUF to be useful in assessing releases from the plant." (Dow's Mem. Opp'n Pls.' Mot. Sanctions & Supp. Dow's Mot. Protective Order at 16.)

On March 11, 1996, Plaintiffs' Response to Dow's "Motion for Protective Order" was filed. Plaintiffs argue Magistrate Judge Borchers rejected essentially the same relief sought by Dow in 1994 when he noted DOE, a non-party, was willing to make available large numbers of documents sought through a subpoena duces tecum for their production. (Mem. Op. & Order Sept. 12, 1994 at 3.) The magistrate judge stated: "The admissibility of documents provided will be resolved at a later date. Defendants have no standing to object to the breadth of the agreement. Appropriate objections as to relevance and admissibility may be made prior to trial." [**39] (Id.)

Plaintiffs assert Dow did not object to the ruling of the magistrate judge and is bound thereby. They further argue because DOE did not join in Dow's objections to the proposed Stipulated Order in 1994, and does not join in this motion for a protective order, 6 Dow should not be heard to assert DOE's interests via a motion for a protective order under *Federal Rule of Civil Procedure 26(c)*. 7 Plaintiffs note under Local Rule 30.1(b), the filing of a motion under *Rule 26(c)* "shall stay [*1465] the discovery to which the motion is directed until further order of the court." D.C.Colo.LR 30.1(b). They request summary denial or striking of Dow's motion or an order clarifying DOE's duties under the Stipulated Order and Contempt Order will not be stayed pending resolution of Dow's motion.

> 6  DOE's Motion for A Protective Order was filed on March 8, 1996, four days after that of Dow.

935 F. Supp. 1452, *1465; 1996 U.S. Dist. LEXIS 11524, **39;
27 ELR 20072

7  *Rule 26(c)* pertinently provides: "Upon motion by a party or by the person from whom discovery is sought . . . the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." *Fed. R. Civ. P. 26(c)*.

**[**40]** Dow's Reply in Support of its Motion for Protective Order was filed on March 25, 1996. Dow argues Plaintiffs' procedural objections to its motion are without merit because of my statement at the February 15, 1996 hearing that a motion for a protective order is the appropriate way for Dow to seek relief from Plaintiffs' discovery to the DOE and because "Dow has a clear interest in putting an end to the production of millions of pages of irrelevant material which Dow will nevertheless have to review." (Dow's Reply Supp. Mot. Protective Order at 2.) Dow states Plaintiffs' opposition to its motion does not attempt to demonstrate the discovery they seek, i.e., that the MUF documents are relevant in that they will resolve any factual issue in the case.

It cites the provision in *Rule 26(c)* that a motion for a protective order may be brought by a "party or by the person from whom discovery is sought" and the court's power to control the discovery process under *Rule 26(b)(2)*. 8

8  *Rule 26(b)(2)* states in pertinent part:

The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the

parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. The court may act on its own initiative after reasonable notice or pursuant to a motion [for a protective order] under subdivision (c).

**[**41]** On April 19, 1996, I issued an Interim Order stating neither Dow's motion for a protective nor that of DOE filed on March 8, 1996, discussed below, would serve to stay discovery nor to relieve DOE of its obligations under the Stipulated Order pending further order.

Discussion of DOW's Motion for a Protective Order.

DOW has standing to file this motion based on *Rule 26(c)* which permits "a party or . . . the person from whom discovery is sought" to file a motion for a protective order.

However, as mentioned below regarding DOE's motion for a protective order, DOW's motion is somewhat moot because DOE should by now be near completion of its review of the MUF documents. Briefly, however, I agree with Plaintiffs that Magistrate Judge Borchers, in entering his September 12, 1994 Memorandum Opinion and Order, considered and rejected the essence of the arguments now raised by Dow in its motion for a protective order when he ruled on Defendants' objections to the proposed Stipulated Order. The magistrate judge acknowledged that pursuant to the Stipulated Order a huge number of documents would be released by DOE but maintained Defendants had no standing to object to the breadth of the **[**42]** order but were restricted to appropriate objections as to relevance and admissibility before trial.

Dow's basis for its motion for protective order is that the MUF documents are not relevant. Plaintiffs dispute this. The parties disagree as to the significance of Plaintiffs' experts' comments in this regard. Considering DOE appears to be near completion of its review of the MUF documents, the issue of their relevance is one which DOW should raise in the context of their admissibility at trial.

935 F. Supp. 1452, *1465; 1996 U.S. Dist. LEXIS 11524, **42;
27 ELR 20072

IV. United States Department of Energy's Motion for a Protective Order.

In this motion, filed on March 8, 1996, DOE seeks relief from paragraph 20 of the Stipulated Order in connection with Plaintiffs' request for all MUF and MUF-related documents. That paragraph sets forth the procedures DOE is to follow in reviewing **[*1466]** documents requested by Plaintiffs containing classified information for possible declassification. In pertinent part, Paragraph 20 provides:

> Within seven days from the date that Class Plaintiffs designate a document or document collection for review, DOE shall make a request in writing to the appropriate organizations or entities charged with undertaking classification **[**43]** review . . . requesting such organizations or entities to conduct a classification review on an expedited basis; and

> a. With respect to any document over which DOE has plenary authority to declassify that document, DOE shall complete classification review within thirty days after such document is requested by Class Plaintiffs, except for good cause shown and in which case parties will attempt to agree to a mutually acceptable resolution as to any documents so identified by DOE. Barring such resolution, the matter will be submitted to the Magistrate Judge for disposition . . . .

> . . . .

> c. After such classification review is completed, DOE shall provide such documents to Class Plaintiffs or specify the grounds upon which such documents cannot be made available. DOE shall not withhold any document in its entirety where only a portion of the document contains classified material, but rather DOE shall make every effort to produce such documents in redacted form.

(Stip. Order re Produc. Docs. Pls.' Subpoenas at 12-13.)

DOE asserts because a substantial portion of the information in the MUF documents is subject to a statutory privilege, it should be relieved of its obligation **[**44]** to perform a declassification review of the documents. According to DOE, at the time it entered into the Stipulated Order, it did not anticipate Plaintiffs would submit a request for hundreds of thousands of pages of documents, a substantial portion of which would remain classified even after a declassification review. The agency asserts when it first received Plaintiffs' December 14, 1994 request for MUF documents, it believed the total page count was 11,000. After it realized, under a broad interpretation of Plaintiffs' request, the total pages were at least 677,000, DOE proposed a plan allowing Plaintiffs access to these documents, even though they contained highly sensitive information regarding nuclear weapons, and DOE continued its declassification review. (See DOE's Feb. 13, 1996 Status Report and Proposed Alternative Plans to Address Disc. Issues Pending.) DOE maintains, however, at the time of filing of this motion, it has gained a more complete understanding about the precise information in the MUF documents and believes a wholesale declassification is a futile exercise.

Through the motion for a protective order, DOE seeks relief from the provisions of paragraph 20 of **[**45]** the Stipulated Order and those parts of the Contempt Order relating to the declassification of the MUF documents. It notes under these orders and the rulings in status conferences earlier this year, DOE was required to review the MUF documents by March 15, 1996.

In its February 13, 1996 Status Report and Proposed Alternative Plans to Address Discovery Issues, DOE stated it could not complete a declassification review of the approximately 677,000 pages of MUF documents by March 15, 1996 and that if it were to review each page of the MUF documents, the task could not be completed before August 8, 1996. [9]

> 9   In fact the status report stated at the then current level of staffing, using current review procedures, DOE anticipated completion of the production process by October 7, 1996 and that through a modified quality assurance process, the completion date could be moved up to August 8, 1996.

DOE asserts a majority of the information contained in the MUF documents is classified "restricted data" under the self-executing **[**46]** terms of the Atomic

935 F. Supp. 1452, *1466; 1996 U.S. Dist. LEXIS 11524, **46;
27 ELR 20072

Energy Act, *42 U.S.C. § 2011, et seq.* [10] It further states a significant **[*1467]** amount of the restricted data contained in the MUF documents cannot be declassified under either the statute or DOE's implementing guidelines because the disclosure of such information reasonably may be expected to harm the national security by, *inter alia*, imparting proven nuclear weapon design information to would-be proliferators. Sanitization of the MUF documents to the point where nothing of substance can be disclosed is necessitated by Congress' mandate in the Atomic Energy Act to protect restricted data.

> 10   The Atomic Energy Act defines "restricted data" as "all data concerning (1) design, manufacture, or utilization of atomic weapons; (2) the production of special nuclear material; or (3) the use of special nuclear material in the production of energy . . . ." *42 U.S.C. § 2014(y).*

Accordingly, DOE argues Plaintiffs may not be able to use a significant amount of information in the MUF documents for **[**47]** any purpose in this case. Therefore, DOE does not believe any interest ultimately will be served by a declassification review of the voluminous MUF documents.

DOE maintains its sampling of fifteen categories of the classified MUF documents, described in detail in the motion, demonstrates that at the end of the declassification review, Plaintiffs would end up with little more information than that currently available to them.

Plaintiffs' Opposition to United States Department of Energy's Motion for a Protective Order was filed on May 21, 1996. Plaintiffs point out that, in opposing their motion for contempt, DOE raised similar arguments to those it does now, namely that the review of documents for declassification would be unduly time consuming, expensive and futile because the MUF documents would be sanitized to the point that only information about yearly inventory differences would remain.

Plaintiffs cite the Contempt Order, rejecting these arguments and noting "any alleged impossibility or impracticability existed at the time DOE voluntarily entered the [Stipulated] Order." *Cook v. Rockwell Int'l Corp., 907 F. Supp. at 1464.* In Plaintiffs' view, the only change is that **[**48]** after increasing its estimate of the volume of responsive documents by several hundred thousand pages, DOE has now spent enormous sums initiating a declassification review. Plaintiffs maintain

this so-called "review" does not represent a good faith effort to conduct a declassification analysis.

They agree there is no point in DOE spending its resources on a review that produces documents so heavily redacted as to be of marginal utility. For this reason, on May 10, 1996, Plaintiffs asked DOE, pending further notice of ruling, to suspend the review for fourteen of the fifteen categories of MUF documents described in DOE's motion. According to Plaintiffs, the fourteen categories consist of voluminous periodic reports and computer runs representing raw data, and have generally emerged from the DOE review with little useful information intact. [11]

> 11   DOE apparently has not suspended any part of its review.

Plaintiffs note, under *Rule 26(c)*, DOE has the burden of showing good cause why a protective order should issue. **[**49]** They criticize DOE's exclusive reliance on two affidavits executed by Bryan Siebert, the director of DOE's Office for Declassification, in support of its contention that producing the MUF documents would be futile because DOE must remove virtually all the information contained in the documents. Plaintiffs further criticize the seventy-four document sampling of the 677,000 pages of MUF documents on which Siebert's affidavit rests. [12]

> 12   In a further declaration attached to DOE's reply, Siebert states he misstated the size of the sample in his deposition. He declares the 74 sampled documents themselves consist of approximately 42,000 pages which were taken from a significantly larger number of pages that had been reviewed up until that time. He states, at his deposition, he confused the number of pages in the sample with the total number of pages that had been reviewed.

Plaintiffs state they asked DOE to allow them to inspect the classification guides which Siebert testified in his deposition contain the criteria **[**50]** being applied by DOE's reviewers. The purpose of such inspection, Plaintiffs assert, is to shed light on whether they reflect the same national security concerns as those expressed in Siebert's affidavits and whether they mandate the redaction of data being deleted from the MUF documents. DOE however refused to allow counsel for Plaintiffs who have security clearances to inspect the classification guides on **[*1468]** the grounds that the

935 F. Supp. 1452, *1468; 1996 U.S. Dist. LEXIS 11524, **50;
27 ELR 20072

Atomic Energy Act charges DOE with the controlling, dissemination and declassification of restricted data, an exclusively executive function, not subject to challenge. Therefore, DOE refused to allow Plaintiffs' counsel access to the guides because they could not articulate a "need to know" the contents of the guides.

They challenge Doe's defense of its redactions on the basis that much of the information in the MUF documents constitutes "restricted data" as defined under the Atomic Energy Act. Plaintiffs maintain the mere fact the information may originate as "restricted data" does not prevent its declassification. They cite § 2162 of the Atomic Energy Act which confers on the DOE the authority to declassify data and remove it from the category of "restricted **[**51]** data."

Plaintiffs make three proposals on the issue of how to maximize their useful access to the MUF documents in the time remaining. First, they submit DOE's motion should be denied. Second, Plaintiffs suggest their cleared counsel, experts and consultants be given free access to the MUF and other documents at the plant, at DOE's expense, including the cost of travel, lodging, and the relevant experts' and consultants' time and that such access to classified material be without concern that their notes or mental impressions will be transmitted to Defendants, i.e. that I should direct any DOE contractor or personnel who may acquire access to such information in the course of assisting Plaintiffs to "keep it to themselves." (Pls.' Opp'n United States DOE's Mot. Protective Order at 22.) Third, they request me to direct DOE to "devote its compliance resources to a serious effort at meeting plaintiffs' other outstanding requests." (Id.)

In its reply, filed on June 7, 1996, DOE maintains Plaintiffs' allegation that it has undertaken its review for sanitization and production of the MUF documents in "bad faith" is nothing but a bare assertion, unsupported by any evidence. DOE asserts **[**52]** Rocky Flats plant made pits of nuclear weapons, being the source of all nuclear energy either released in a single stage weapon or driving the secondary in a thermonuclear weapon. It states the MUF documents contain information relating to the design, components, function, and military utilization of the pits manufactured at Rocky Flats. Therefore, DOE maintains, it was entirely foreseeable that it would be forced to redact substantial portions of the classified information they contain.

DOE argues Siebert's affidavits, sworn statements of an agency official attesting to the sensitivity of material that may not be produced without creating a reasonable danger of harm to the national interest, are sufficient to establish the privileged nature of the information in question. It cites Ellsberg v. Mitchell, where the court held "when assessing claims of a state secrets privilege, a trial judge properly may rely on affidavits and other secondary sources more often than he might when evaluating assertions of other evidentiary privileges." *228 U.S. App. D.C. 225, 709 F.2d 51, 58 (D.C. Cir. 1983)*, (footnote omitted), cert. denied, *465 U.S. 1038 (1984)*.

Further, DOE asserts the agency official need not personally **[**53]** review each of the documents in question but may rely on a sample of those documents, as did Siebert. In this regard, DOE cites Northrop Corp. v. McDonnell Douglas Corp., where the court stated "[a] sampling procedure appears to us to be a sound alternative to the illogical alternative of requiring [the agency] to conduct a full search of its files" where the agency claimed a search would be burdensome and fruitless because of the state secrets privilege. *243 U.S. App. D.C. 19, 751 F.2d 395, 405 (D.C. Cir. 1984)*.

For these reasons, DOE contends the Siebert affidavits sufficiently establish its good faith and an additional *in camera* review is unnecessary. DOE would be willing, however, to provide classified materials or an explanation in an *in camera, ex parte* proceeding should I have doubts about the legitimacy of DOE's sanitization review.

While DOE acknowledges the sanitization process at Rocky Flats is not perfect and some declassification errors occur, particularly in light of the vast quantity of MUF documents, such mistakes do not suggest **[*1469]** DOE has reviewed the MUF documents in bad faith.

As concerns Plaintiffs' demand for access to DOE's classification guides to test DOE's good faith **[**54]** in conducting the sanitization process, DOE argues Plaintiffs have no right to "second-guess" the accuracy or correctness of its declassification decisions. DOE cites *Halperin v. CIA, 203 U.S. App. D.C. 110, 629 F.2d 144, 148 (D.C. Cir. 1980)* in this regard. There, the court held summary judgment may be granted on the basis of agency affidavits if they contain

reasonable specificity of detail rather than merely conclusory statements, and if

935 F. Supp. 1452, *1469; 1996 U.S. Dist. LEXIS 11524, **54;
27 ELR 20072

they are not called into question by contradictory evidence in the record or by evidence of agency bad faith in the absence of evidence of an agency's bad faith.

If the agency's statements meet this standard, the court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency. Judges, moreover, lack the expertise necessary to second-guess such agency opinions in the typical national security [Freedom of Information Act] case.

Id.

DOE states, nevertheless, reserving its right to object to the use of the guides by Plaintiffs, and, subject to an appropriate protective order, it is willing [**55] to provide Plaintiffs' cleared counsel access to those classification guides that are unclassified and that have been used in the review of the MUF documents, as well as a sanitized version of those classified guides which contain readily segregable declassified information. Such access would be at Rocky Flats.

DOE iterates if I were to conclude its affidavits do not establish its good faith, the appropriate procedure is *ex parte, in camera* review. It maintains Plaintiffs' counsel, even those who have security clearances, have no right to participate. It cites Ellsberg, 709 F.2d at 61, concerning a state secrets privilege claim, where the appeals court held it to be well settled that a trial judge assessing the legitimacy of such claim should not permit the requesters' counsel to participate in an *in camera* investigation of putatively privileged material.

DOE reasserts its motion for a protective order validly relies on the Atomic Energy Act's absolute privilege not to disclose nuclear secrets.

Plaintiffs filed a surreply on July 5, 1996, for the stated purpose of addressing DOE's proposal in its reply of an *ex parte, in camera* review of its declassification guides [**56] and its contention that an agency may

invoke national security to withhold documents that the agency has merely sampled. They maintain the Northrop and Ellsberg cases cited by DOE are distinguishable as involving the state secrets privilege and not standing for the position that an agency may claim a privilege based on its review of only a sample of the documents in controversy.

Discussion of DOE's Motion for a Protective Order.

My January 16, 1996 order required DOE to prepare a plan to ensure the declassification of the 11,000 MUF documents by March 15, 1996, or, in the alternative, to explain why such declassification could not be completed by that date. DOE stated in its February 15, 1996 status report that if it were to review each page of the MUF documents under a modified quality assurance process, the task could not be completed before August 8, 1996. DOE has apparently been reviewing MUF documents since that date. Presumably, therefore, at this time, it is nearing completion of the review of MUF documents and the motion for a protective order is somewhat moot.

Plaintiffs have suggested to DOE that it abandon its review of the MUF documents in fourteen categories [**57] identified by DOE because of the futility of the nature of the documents released after sanitization. DOE has continued to conduct the review of these categories, presumably because it is required to do so pursuant to the Stipulated Order and the Contempt Order. Accordingly, I order DOE relieved of its duty to conduct a classification review of those documents which Plaintiffs have suggested they cease reviewing.

[*1470] I grant DOE's motion for a protective order insofar as it seeks relief from the March 15, 1996 deadline for review of MUF documents and order DOE to submit a status report regarding the production of documents responsive to Plaintiffs' requests, including that for MUF-related documents, and the anticipated completion thereof. Once received, I will be in a position to set a realistic new date by which DOE should have completed the declassification of the MUF documents not included in the fourteen categories of documents concerning which Plaintiff has requested DOE to cease its classification review.

Other than relieving DOE of its March 15, 1996 deadline and of the duty to review those documents in the fourteen categories, I deny DOE's motion. It has not shown good cause [**58] why it should be wholly

935 F. Supp. 1452, *1470; 1996 U.S. Dist. LEXIS 11524, **58;
27 ELR 20072

relieved of its stipulated duty to undertake a classification review of the MUF documents and, even if they contain classified material to "make every effort to produce such documents in redacted form." (Stipulated Order at 12-13.)

Moreover, I noted in the Contempt Order that "any alleged impossibility or impracticability existed at the time DOE voluntarily entered into the [Stipulated] Order . . . ." *Cook, 907 F. Supp. at 1464.*

While I sympathize with Plaintiffs' position that the secrecy surrounding the declassification process leaves the process open to abuse, they have not produced any evidence of bad faith concerning the manner in which DOE has conducted the declassification process to warrant an investigation into that process at this time. For this reason, I make no order regarding Plaintiffs' demand for the classification guides, other than that Plaintiffs and DOE should consider an appropriate protective order regarding the classification guides.

Similarly, I make no order regarding Plaintiffs' other requests, including that for free access to the MUF and other documents at the plant at DOE's expense.

V. Plaintiffs' Motion that the United **[**59]** States Department of Energy be held in Contempt re: Document Requests dated June 23 and August 24, 1995.

On April 5, 1996, Plaintiffs filed this further motion requesting that DOE be held in contempt regarding Plaintiffs' June 23, 1995 and August 28, 1995 document requests. Plaintiffs state during the pendency of this litigation DOE has made several highly publicized announcements about "missing" and "unaccounted for" plutonium at Rocky Flats and other weapons facilities. In particular, they refer to DOE's public disclosures in December 1993, June 1994 and February 1996. For each of the disclosures, DOE prepared written materials for distribution to the media. Plaintiffs assert the disclosures have resulted from internal DOE studies concerning the types of MUF information the agency wishes to reveal.

In document requests dated June 23, 1995 and August 28, 1995, Plaintiffs requested DOE to produce all documents relating to studies it has conducted of the declassification of MUF information at Rocky Flats. In the June 23, 1996 request, Plaintiffs stated:

It appears that DOE and/or its contractors studied the declassification of

MUF documents and information at Rocky Flats during **[**60]** at least two periods. First in relation to the Church litigation in the 1970's; and second, in connection with DOE's release of gross MUF numbers in 1994. We request that DOE produce all documents (regardless of the document's date or location) on this topic, i.e. the possible declassification of MUF information pertaining to Rocky Flats and the consideration of legal and/or political factors.

(Mem. Supp. Pls.' Mot. DOE be held in Contempt re: Doc. Reqs. June 23 & Aug. 28, 1995, Ex. A.)

On August 28, 1995, Plaintiffs sent a follow-up request to DOE, noting it had not complied with the June 23, 1995 request within the thirty-day deadline under the Stipulated Order. In that letter, Plaintiffs stated:

We request once again that DOE produce all analyses, studies, reports and other documents relating to the declassification **[*1471]** of MUF information at Rocky Flats. This request encompasses, but is not limited to, the two studies which DOE apparently conducted in or around 1977 and 1994.

*Id. at 3.*)

Plaintiffs state DOE has produced some documents in response to these requests but that nearly all of those produced date from the 1970's and 1980's. Conspicuously **[**61]** missing, they assert, are documents relating to DOE's 1993, 1994 and 1996 disclosures or documents relating to its "Fundamental Review" of its classification policies launched in March 1995 encompassing MUF information. [13] (See id., Ex. D.)

13  Plaintiffs' motion was filed on April 5, 1996, DOE's opposition on April 25, 1996, and Plaintiffs' reply brief on May 7, 1996. It is possible that DOE has since the completion of briefing produced further responsive documents.

In opposition to this motion, DOE maintains Plaintiffs are attempting to recharacterize their claim which resulted in the Contempt Order, that DOE has violated the Stipulated Order by failing to produce MUF

935 F. Supp. 1452, *1471; 1996 U.S. Dist. LEXIS 11524, **61;
27 ELR 20072

documents. DOE asserts that order encompasses the June 23 and August 28, 1995 requests which are subsumed by Plaintiffs' December 14, 1994 request for all MUF-related documents.

DOE states, since appointing Lindsay to be responsible for its discovery compliance, it has produced a significant amount of material in response to Plaintiffs' [**62] discovery requests, including that for MUF-related documents and documents relating to the declassification of MUF information pertaining to Rocky Flats. DOE states the search for responsive documents continues. In an affidavit of Lindsay attached to DOE's opposition, she outlines DOE's efforts to respond and states additional documents were produced to Plaintiffs on March 8, April 11, 15, and 24, 1996.

DOE urges me to deny Plaintiffs' new motion for contempt because it has already been adjudicated and because DOE is in the process of substantially complying with Plaintiffs' discovery requests and moving toward total compliance with the MUF-related document request.

In reply, Plaintiffs assert DOE has reversed its stance, noting its earlier objection to Plaintiffs' Request for Attorneys [sic] Fees, Costs, and Expenses regarding the request for fees related to the August 28, 1995 letter request because it represented a new document request not subject to the Contempt Order. Plaintiffs state, since DOE concedes the June and August 1995 requests seeking documents about its classification policies and decisions regarding MUF are encompassed by the Contempt Order, I should proceed directly [**63] to evidentiary sanctions tailored to the subject matter of these requests. According to Plaintiffs, the requests were aimed at eliciting additional evidence that DOE has abused its classification powers to shield itself and its indemnitees, the Defendants, from legal liability, and evidence that DOE refuses to disclose MUF information that poses no national security risk.

Plaintiffs maintain DOE concedes it has not produced all documents responsive to the June and August 1995 requests to date, let alone by the March 15, 1996 deadline. They request me to impose compensatory evidentiary sanctions based on the inference that the documents, if produced, would prove that DOE has abused its classification authority to serve its litigation interests.

In particular, Plaintiffs state DOE has mostly failed

to produce documents relating to its "openness" disclosures and refuses to produce documents relating to its "fundamental" classification review, which it states, are subject to a "deliberative process privilege."

Plaintiffs attach to their motion a copy of a document entitled "Draft Report for Public Comment - February 1, 1996 - Fundamental Classification Policy Review." (Pls.' Mot. DOE [**64] be held in contempt re Doc. Reqs. June 23 & Aug. 28, 1995, Ex. D.) The Draft Report was released at a February 6, 1996 press conference of the Secretary of Energy. It reflects the Secretary commissioned the president of Sandia National Laboratories to appoint a group comprised primarily of non-federal [*1472] technical and policy experts to undertake a fundamental review of department-wide classification policies and procedures.

DOE states the Draft Report, released solely for the purpose of soliciting public comment on the recommendations of the review group, has not been acted upon by DOE and will not be until other federal agencies have had an opportunity to review the report and recommendations as well as to provide comments to the Secretary of Energy. It asserts, at this point, both the proceedings of the group leading to the draft report and the materials and documents generated in that process are subject to the deliberative process privilege and a significant portion of the documents contain classified information.

"The deliberative process privilege 'shields from public disclosure confidential inter-agency memoranda on matters of law or policy.'" *Texaco Puerto Rico v. Department* [**65] *of Consumer Affairs, 60 F.3d 867, 884 (1st Cir. 1995)* (quoting *National Wildlife Fed'n v. United States Forest Serv., 861 F.2d 1114, 1116 (9th Cir. 1988)).* "The privilege rests on a policy affording reasonable security to the decision-making process within a government agency." Id.

Plaintiffs argue DOE's deliberative process objection is untimely and it has never moved for a protective order on that ground. Moreover Plaintiffs cite authority that the deliberative process privilege "'must be formally asserted and delineated in order to be raised properly.'" *Friedman v. Bache Halsey Stuart Shields, Inc., 238 U.S. App. D.C. 190, 738 F.2d 1336, 1342 (D.C. Cir. 1984)* (quoting *Kerr v. United States District Court, 511 F.2d 192, 198 (9th Cir. 1975),* aff'd, *426 U.S. 394, 48 L. Ed. 2d 725, 96 S. Ct. 2119 (1976)).* Plaintiffs state DOE has not identified a

935 F. Supp. 1452, *1472; 1996 U.S. Dist. LEXIS 11524, **65;
27 ELR 20072

single document to which the privilege applies and has not shown the documents reflect predecisional agency deliberations. They assert the privilege is within the court's discretion and may be overridden by plaintiffs' need for the documents. They point out it is routinely denied "where the documents may shed light on [**66] alleged government malfeasance." Id. (citations omitted).

Plaintiffs maintain the draft report supports the idea that DOE has engaged in overclassification and that this subject is plainly relevant to this litigation and that Plaintiffs have a need for these documents. They note DOE does not contend the documents specifically responsive to the June 23 and August 28 requests are voluminous. They further note DOE's pending motion for a protective order does not apply to these requests because the "sampling" of documents which DOE performed does not include the type of documents responsive to these requests.

Plaintiffs seek, as a compensatory evidentiary sanction, that I deem it established that DOE has wrongfully abused its classification power to withhold probative MUF evidence relating to Rocky Flats to shield itself and its indemnitees, the Defendants, from legal liability.

Discussion of Plaintiffs' Motion that DOE be Held in Contempt re: Document Requests dated June 23 and August 28, 1995.

DOE asserts in its response to this motion that the June 23 and August 28, 1995 requests are encompassed by the Contempt Order relating to the failure of DOE to comply with Plaintiffs' [**67] December 14, 1995 request for MUF-related documents. Plaintiffs do not contest this in their reply and amend their request to one for evidentiary sanctions similar to those sought in their supplemental motion for sanctions discussed above.

Plaintiffs concede DOE has to a very limited extent complied with the June 23 and August 28, 1995 requests. With regard to Plaintiffs' requests for the documents relating to the draft report concerning the fundamental classification policy review, since DOE has not adopted the draft report, it seems premature and somewhat of a fishing expedition for Plaintiffs to seek to compel the release of documents relating to the draft report in the hope that they will shed light on whether DOE has engaged in overclassification regarding the MUF-related documents.

For the reasons stated in relation to the supplemental motion for sanctions, I do not consider further sanctions are warranted [*1473] pursuant to the Contempt Order. However, I order Plaintiffs and DOE each to submit a status report within twenty days regarding the production of documents responsive to Plaintiffs' requests, including that for MUF-related documents, since, according to DOE, the search for [**68] and production of responsive documents has been ongoing.

VI. Orders.

For the aforesaid reasons,

IT IS ORDERED THAT Plaintiffs' Supplemental Motion for Sanctions against the United States Department of Energy is DENIED;

IT IS FURTHER ORDERED THAT Dow's Motion for a Protective Order is DENIED;

IT IS FURTHER ORDERED THAT the United States Department of Energy's Motion for a Protective Order is GRANTED insofar as it seeks relief from the March 15, 1996 deadline for review of "materials unaccounted for" ("MUF-related") documents;

IT IS FURTHER ORDERED THAT the United States Department of Energy is relieved of its duty to conduct a declassification review of documents responsive to Plaintiffs' December 1994 "materials unaccounted for" ("MUF-related") documents request falling in the categories enumerated in Plaintiffs' counsel's letter of May 10, 1996 addressed to Henry L. Solano, Esq. and Dana C. Lindsay, Esq.;

IT IS FURTHER ORDERED THAT Plaintiffs and the United States Department of Energy are each to file a status report within twenty days of the date of this order regarding the production of documents responsive to Plaintiffs' requests, including that for MUF-related documents, [**69] and the anticipated completion date thereof;

IT IS FURTHER ORDERED THAT the United States Department of Energy's Motion for a Protective Order is DENIED in all other respects;

IT IS FURTHER ORDERED THAT Plaintiffs' Motion that the United States Department of Energy be held in Contempt re: Document Requests dated June 23 and August 24, 1995 is DENIED.

935 F. Supp. 1452, *1473; 1996 U.S. Dist. LEXIS 11524, **69;
27 ELR 20072

Dated this 8 day of August, 1996 at Denver, Colorado.          U.S. SENIOR DISTRICT COURT JUDGE

JOHN L. KANE, JR.



LEXSEE 181 F.R.D. 473

**MERILYN COOK, et al., Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION, a Delaware Corporation, and THE DOW CHEMICAL COMPANY, a Delaware Corporation. Defendants.**

**Civil Action No. 90-K-181**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*181 F.R.D. 473*; *1998 U.S. Dist. LEXIS 11865*

**July 28, 1998, Decided**
**July 29, 1998, Filed**

**SUBSEQUENT HISTORY:** Motions ruled upon by *Cook v. Rockwell Int'l Corp., 2003 U.S. Dist. LEXIS 12927 (D. Colo., July 24, 2003)*

**PRIOR HISTORY:** *Cook v. Rockwell Int'l Corp., 935 F. Supp. 1452, 1996 U.S. Dist. LEXIS 11524 (D. Colo., 1996)*

**DISPOSITION:** **[**1]** Defendants' Motion for Class Decertification GRANTED in part and DENIED in part; Dow's motion for summary judgment on statute of limitations grounds DENIED; Defendants' Combined Motion for Summary Judgment on Plaintiffs' trespass and nuisance claims DENIED; Class Plaintiffs' Motion for Partial Summary Judgment DENIED; Plaintiffs' Motion to Strike Defendants' Fifth Wave of Dispositive Motions and Defendants' Related Motion to Strike Plaintiffs' Experts GRANTED; Defendants' Motion for Summary Judgment based on Expert Discovery and Defendants' Motion to Strike Plaintiffs' Experts STRICKEN; Defendants' Motion under *Rule 37(c)(1)* to Preclude Testimony of Plaintiffs' Expert Witness, Dr. John Radke DENIED.

**COUNSEL:** For SALLY BARTLETT, plaintiff: Daniel R. Satriana, Jr., Hall & Evans, United States District Court, Bruce H. Deboskey, Steven William Kelly, Silver

& Deboskey, P.C., Denver, CO U.S.A.

For SALLY BARTLETT, plaintiff: Merrill Davidoff, Berger & Montague, P.C., Philadelphia, PA U.S.A.

For SALLY BARTLETT, WILLIAM SCHIERKOLK, JR., PEGGY J. SANDOVAL, STEPHEN SANDOVAL, RHONDA J. DEIMER, THOMAS L. DEIMER, MERILYN COOK, MICHAEL DEAN RICE, RICHARD BARTLETT, BANK WESTERN, DELORES SCHIERKOLK, GERTRUDE BABB, LORREN BABB, plaintiffs: Jonathan Auerbach, David F. Sorensen, Bernadette M. Rappold, Eric L. Cramer, Stanley B. Siegel, Berger & Montague, P.C., Philadelphia, PA U.S.A.

For SALLY BARTLETT, plaintiff: Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH U.S.A.

For SALLY BARTLETT, WILLIAM SCHIERKOLK, JR., PEGGY J. SANDOVAL, STEPHEN SANDOVAL, RHONDA J. DEIMER, THOMAS L. DEIMER, MERILYN COOK, MICHAEL DEAN RICE, RICHARD BARTLETT, BANK WESTERN, DELORES SCHIERKOLK, GERTRUDE BABB, LORREN BABB, plaintiffs: Kenneth A. Jacobsen, John David Stoner, Christopher Thomas Reyna, Chimicles & Tikellis, L.L.P., Haverford, PA U.S.A.

181 F.R.D. 473, *; 1998 U.S. Dist. LEXIS 11865, **1

For SALLY BARTLETT, WILLIAM SCHIERKOLK, JR., PEGGY J. SANDOVAL, STEPHEN SANDOVAL, RHONDA J. DEIMER, THOMAS L. DEIMER, MERILYN COOK, MICHAEL DEAN RICE, RICHARD BARTLETT, BANK WESTERN, DELORES SCHIERKOLK, GERTRUDE BABB, LORREN BABB, plaintiffs: David Evans Kreutzer, Attorney General's Office, Denver, CO U.S.A.

For SALLY BARTLETT, WILLIAM SCHIERKOLK, JR., PEGGY J. SANDOVAL, STEPHEN SANDOVAL, RHONDA J. DEIMER, THOMAS L. DEIMER, MERILYN COOK, MICHAEL DEAN RICE, RICHARD BARTLETT, BANK WESTERN, DELORES SCHIERKOLK, GERTRUDE BABB, LORREN BABB, plaintiffs: R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE USA.

For SALLY BARTLETT, plaintiff: Ronald Simon, Simon & Associates, Washington, DC USA.

For DOW CHEMICAL COMPANY, ROCKWELL INTERNATIONAL CORPORATION, defendants: Joseph J. Bronesky, Sherman & Howard, United States District Court, Denver, CO U.S.A.

For DOW CHEMICAL COMPANY, defendant: Christopher Lane, Sherman & Howard, United States District Court, Lester C. Houtz, Bartlit, Beck, Herman, Palenchar & Scott, Denver, CO U.S.A.

For DOW CHEMICAL COMPANY, ROCKWELL INTERNATIONAL CORPORATION, defendants: Mark S. Lillie, David M. Bernick, Kirkland & Ellis, Chicago, IL USA.

For DOW CHEMICAL COMPANY, defendant: Douglas J. Kurtenbach, S. Jonathan Silverman, Douglas M. Poland, Kirkland & Ellis, Chicago, IL USA.

For DOW CHEMICAL COMPANY, defendant: Louis W. Pribila, Dow Chemical Company, Midland, MI U.S.A.

For ROCKWELL INTERNATIONAL CORPORATION, defendant: Timothy P. Brooks, John D. Aldock, Patrick M. Hanlon, Michael K. Isenman, Edward J. Naughton, Wendy S. White, Valerie E. Ross, Heather H. Anderson, Amy Horton, Shea & Gardner, Washington, DC U.S.A.

For ROCKWELL INTERNATIONAL CORPORATION, defendant: Martin Thomas Tully, Kirkland & Ellis,

Chicago, IL USA.

**JUDGES:** JOHN L. KANE, JR., U.S. SENIOR DISTRICT COURT JUDGE.

**OPINION BY:** JOHN L. KANE, JR.

**OPINION**

[*475] MEMORANDUM OPINION AND ORDER ON PENDING MOTIONS

KANE, J.

On January 30, 1990, a number of individuals, Bank Western and the Field Corporation (a subsidiary of Bank Western) (collectively, "Plaintiffs") filed this class action. These parties live on or hold an interest in real property located near the Rocky Flats weapons production facility northwest of Denver, Colorado ("Rocky Flats"). Rocky Flats [**2] is owned by the U.S. Department of Energy. The Dow Chemical Company ("Dow"), operated Rocky Flats from its inception in the early 1950's to June 30, 1975 and Rockwell International Corporation ("Rockwell") operated it from the latter date to December 31, 1989.

By order dated October 8, 1993, I certified two partially overlapping classes in this litigation, a Property Class under *Fed. R. Civ. P. 23(b)(3)*, consisting of persons owning an interest in real property within a defined area near Rocky Flats as of June 7, 1989, and a Medical Monitoring Class pursuant to *Fed. R. Civ. P. 23(b)(2)*, comprising persons having resided within a slightly larger area near Rocky Flats at any time from 1952 through 1989. Cook v. Rockwell Int'l Corp. ("Cook IV"), *151 F.R.D. 378, 389 (D. Colo. 1993)*. I noted certification was not irreversible and might be altered or amended as the case [*476] progressed toward resolution on the merits. *Id. at 381*.

Plaintiffs allege Dow and Rockwell, during their operation of Rocky Flats, released radioactive and non-radioactive substances into the surrounding area which damaged their property and could have adverse impacts on their health. The Second Amended Class Action [**3] Complaint (filed on April 8, 1991) seeks class certification and pleads claims under Colorado common law, the Price Anderson Act (which incorporates common law), *42 U.S.C. §§ 2014(hh)*, *2210*, and the Comprehensive Environmental Response

181 F.R.D. 473, *476; 1998 U.S. Dist. LEXIS 11865, **3

Compensation and Liability Act (CERCLA), *42 U.S.C. § 9607*. Plaintiffs' identical common law and Price Anderson claims sound in negligence, strict liability, private nuisance, trespass, and outrageous conduct. They seek compensatory damages for the representatives and members of the Property Class; damages "in the form of a fund to finance medical monitoring services," (Second Am. Class Action Coml.. at 28), or in the alternative "medical monitoring and surveillance services in the form of injunctive relief," (id. at 29), for the representatives and members of the Medical Monitoring Class; response costs under CERCLA; exemplary damages; permanent injunctive relief relating to making public all information necessary to alert the public to the risks posed by Rocky Flats; as well as interest, attorney fees, and costs.

Pending are Defendants' Combined Motions for Summary Judgment [1] and Decertification of the Classes (filed December 9, 1996), Class [**4] Plaintiffs' Motion for Partial Summary Judgment (filed December 12, 1996), Defendants' Motion for Summary Judgment Based on Expert Discovery (filed August 5, 1997), Defendants' Motion to Strike Plaintiffs' Experts (filed August 29, 1997), and Defendants' Motion under *Rule 37(c)(1)* to Preclude Testimony of Plaintiffs' Expert Witness, Dr. John Radke, based upon findings of Magistrate Judge Borchers that Plaintiffs had violated Rule 26(a)(2) (filed April 21, 1998). I grant Defendants' motion for decertification of the Medical Monitoring Class, but deny it as regards the Property Class. My rulings on the several remaining motions follow the decertification analysis.

[1]   This includes Dow's motion on statute of limitations grounds and a combined motion of the Defendants on the trespass and nuisance claims.

I. Motion for Decertification of Classes.

In the Order Regarding Class Certification, I discussed the general principles applicable to class certification. See *Cook IV, 151 F.R.D. at 380-81*. I examined [**5] the law and the facts and determined Plaintiffs had satisfied the requirements of *Rule 23(a)*, namely numerosity, commonality, typicality, and adequacy of representation in respect of both classes. I certified a Medical Monitoring Class [2] under *Rule 23(b)(2)* (without an opt out option) and a Property Class [3] under *Rule 23(b)(3)* (with an opt out option) *Id. at 382-89*.

[2]   The Medical Monitoring Class is defined as:

"All natural persons residing or having resided during the operating history of Rocky Flats within the boundaries of the Medical Monitoring Class Area." *Cook IV, 151 F.R.D. at 382*. The "Medical Monitoring Class Area" is defined with reference to geographical representations of exposure or dose levels (alluding to exposure to plutonium and volatile organic compounds ("VOCs")) received by segments of the exposed population, known as "does or exposure contours." Id. Dose or exposure contours are depicted geographically as lines ringing Rocky Flats and, according to Plaintiffs, correspond to average minimal cumulative doses received by the population living within a particular contour over time. Plaintiffs estimate that there are 43,361 persons living within the Medical Monitoring Class Area according to the 1990 census. Id.

[**6]

[3]   The Property Class is defined as: "All Persons and entities owning an interest (including mortgagee and other security interests) in real property situated within the Property Class Area, exclusive of governmental entities, defendants, and defendants' affiliates, parents, and subsidiaries." *Cook IV, 151 F.R.D. at 382*. The "Property Class Area" is defined with reference to geographical representations of the area bounded by the plutonium contour and the complaint supplies the operative date of ownership as June 7, 1989. Id. This area allegedly includes approximately 15,370 parcels of property, of which an estimated 13,364 are residential properties and, of the remaining parcels, approximately 1766 belong to the vacant land use category. Id.

Dow and Rockwell now seek decertification of both classes. They argue, based on recent federal circuit and district court decisions [*477] denying class certification in mass tort cases and the record developed here, this case fails to satisfy any of the prerequisites of *Fed. R. Civ. P. 23(a)* or *(b)(3)*. Defendants maintain it presents highly individualized [**7] claims and no single common course of conduct, destroying commonality, predominance, adequacy of representation and superiority of class adjudication. Nor, they assert, is there any "track record" of previous trials of Plaintiffs' "novel" and "immature" claims. They argue, moreover, the prevailing law holds that the Medical Monitoring Class should not

181 F.R.D. 473, *477; 1998 U.S. Dist. LEXIS 11865, **7

be certified under *Rule 23(b)(2)* as such a claim is essentially a suit for damages. Finally, they submit, the class definitions are inadequate.

Once a class is certified, "the parties can be expected to rely on it and conduct discovery, prepare for trial, and engage in settlement discussions on the assumption that in the normal course of events it will not be altered except for good cause. Sometimes, however, developments in the litigation, such as the discovery of new facts or changes in parties or in the substantive or procedural law, will necessitate reconsideration of the earlier order and the granting or denial of certification or redefinition of the class." Manual for Complex Litigation Third (1995), § 30.18 at 223. In the certification ruling, I addressed each of the relevant *Rule 23* requirements and determined all of the [**8] Plaintiffs' claims "arise from the same set of circumstances, the release of hazardous nuclear and non-nuclear substances from the [Rocky Flats] plant during its operation by Dow and Rockwell." *Cook IV, 151 F.R.D. at 385*. Since then, in addition to extensive discovery in this case, there have been many circuit and district court decisions relating to certification of mass tort actions.

A. Bar on Class Certification in Mass Tort Actions.

Defendants argue recent Supreme Court and circuit court decisions bar class certification in mass tort cases. Their reliance on *Amchem Products, Inc. v. George Windsor, 138 L. Ed. 2d 689, 117 S. Ct. 2231 (1997)* is misplaced in that it concerned the legitimacy under *Rule 23* of a class-certification sought to achieve global settlement of current and future asbestos-related claims. The class proposed for certification encompassed hundreds of thousands, perhaps millions, of individuals each of whom was or some day might have been adversely affected by past exposure to asbestos products manufactured by one or more of the twenty defendant companies. The Court expressly stated it had granted review to decide the role settlement might play under [**9] existing *Rule 23* in determining the propriety of class certification, id. *117 S. Ct. at 2247*, and noted, "no settlement class is as sprawling as this one," *id. at 2250*. This case concerns neither the role of settlement under *Rule 23* nor settlement classes.

Defendants further rely on recent circuit court decisions [4] concerning mass tort cases which have found that individualized issues precluded class certification. None is a Tenth Circuit decision, nor prohibits class

certification of mass torts per se, nor concerns a class certified in *Rule 23(b)(2)* (where it is not necessary to make a finding of "predominance"), nor involves claims for property damage. All five involved nationwide class actions and conflict of law problems because differing state laws would govern liability, neither of which is the case here. Moreover, "these Circuit Courts seemed to ignore the essence of *Rule 23* because of their philosophical disagreement with the effects of *Rule 23*." *In re Telectronics Pacing Systems, Inc., 172 F.R.D. 271, 276 (S.D.Ohio 1997)*.

    4   Defendants cite *Valentino v. Carter-Wallace, Inc., 97 F.3d 1227 (9th Cir. 1996)*; *Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir. 1996)*; *Georgine v. Amchem Prods., Inc., 83 F.3d 610 (3d. Cir.)*, aff'd, *117 S. Ct. 2231 (1997)*; *In re American Medical Systems, Inc., 75 F.3d 1069 (6th Cir. 1996)*; *In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293 (7th Cir.)*, cert. denied, *516 U.S. 867, 133 L. Ed. 2d 122, 116 S. Ct. 184 (1995)*.

[**10] A further focus of Defendants is the unpublished decision in Satsky v. Paramount Communications, Inc., No. 90-S-1561, slip. op. (D. Colo. March 13, 1996), a case concerning alleged contamination of the Eagle River, Colorado, downstream from the Eagle Mine, [*478] and involving, inter alia, individual water rights issues. Judge Daniel B. Sparr determined private individual issues predominated and refused to certify a property class. Significantly, however, Judge Sparr noted: "Whether, on balance, individual issues predominate over common issues and whether the advantages of a class action outweigh the potential problems are determinations that are generally best left to the trial court." Id. at 24.

Defendants also cite *Ilhardt v. A.O. Smith Corporation, 168 F.R.D. 613 (S.D. Ohio 1996)*, concerning a class conditionally certified including all persons in the continental United States who purchased or leased agricultural storage silos, allegedly defective in design. They assert Plaintiffs fail to respond to key substantive holdings in Ilhardt that the applicable law has changed and that individual issues unique to each class member present a nearly insurmountable burden [**11] on the district court. A key distinguishing issue in that case, however, is that "the Court and the jury would need to simultaneously apply [sic] the varying and inconsistent laws of more than 40 states concerning what constitutes a

181 F.R.D. 473, *478; 1998 U.S. Dist. LEXIS 11865, **11

product defect under strict products liability," *id. at 620.*

There is no absolute bar to class certification in mass tort cases. [5] Nor has there been a reversal of the class certification decisions relied upon in the initial certification. As in every instance, whether class certification is appropriate depends on a consideration of the elements of *Fed. R. Civ. P. 23* in the circumstances of the case. Decertification is warranted where materially changed or clarified circumstances have been shown that would make the continuation of the class action improper. See *Williams v. DeRobertis, 1992 U.S. Dist. LEXIS 16227, 1992 WL 315201, at *1 (N.D. Ill. Oct. 23, 1992)* (citing *Robin v. Doctors Officenters Corp., 686 F. Supp. 199, 203 (N.D. Ill. 1988)*); see also 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 7.47 at 7-146 (3d ed. 1992). I therefore consider whether Defendants have made such showing.

5   Some courts trace their reluctance to apply *Rule 23* to mass exposure cases to the following statement in the Advisory Committee Notes to 1966 Amendment to *Fed.R.Civ.P. 23(b)(3)* ("Notes"): "A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways." The Notes have, however, been the subject of considerable criticism by courts and legal commentators, including the authors of the original Notes. See, e.g., Bruce H. Nielson, Was the 1966 Advisory Committee Right?: Suggested Revisions of *Rule 23* to Allow More Frequent Use of Class Actions in Mass Tort Litigation, 25 Harv. J. on Legis. 461, 461-62 (1988) (praising judges who have certified class actions in the mass product liability context despite the admonition of *Rule 23*, because the notes do not recognize the practical problems inherent in bringing individual actions in mass tort litigation). A member of the Advisory Committee has stated: "I am profoundly convinced now that [saying that mass torts are inappropriate for class certification] is untrue. Unless we can use the class action and devices built on the class action, our judicial system is simply not going to be able to cope with the challenge of the mass repetitive wrong . . . ." Herbert Newberg & Alba Conte, Newberg on

Class Actions, § 17.07, at 17-20 (3d ed. 1992) (citing Professor Charles Alan Wright, In Re: School Asbestos Litigation Master File 830268 (ED Pa) Class Action Argument, July 30, 1984, Tr 106).

[**12]  B. Decertification of the Medical Monitoring Class under *Rule 23(b)(2).*

Defendants again argue the medical monitoring claim seeks money damages, not equitable relief, and therefore cannot properly be certified as a *Rule 23(b)(2)* class. Under this rule, a class action is appropriate when "the party opposing the class has acted or refused to act on grounds generally applicable to the class," and the representatives are seeking "final injunctive relief or corresponding declaratory relief." *Fed.R.Civ.P. 23(b)(2).*

I previously determined the type of relief sought here, a medical monitoring program managed by a court-appointed and court-supervised trustee under which a plaintiff is monitored by particular physicians and the medical data utilized for group studies, constituted injunctive relief. *Cook IV, 151 F.R.D. at 387.* In the initial certification opinion, I noted courts had differed in their responses to requests for certification of medical monitoring claims in the form of injunctive relief. Id. Relying primarily on [*479] *Day v. NLO, Inc., 144 F.R.D. 330, 335 (S.D. Ohio 1992),* [6] and *In re NLO, Inc., 5 F.3d 154, 159 (6th Cir. 1993),* I found the classification of such [**13] claims as damages claims was appropriate where plaintiffs merely sought the costs of medical monitoring. I further determined where, as here, Plaintiffs sought diagnostic testing and medical screening necessary to facilitate the early detection and permit the early treatment of disease, rather than damages for past, present or future injury, such relief constituted injunctive relief as required by *Rule 23(b)(2). Cook IV, 151 F.R.D. at 387-88.* Three weeks after that opinion, the Tenth Circuit ruled, albeit not in the context of class certification, where almost identical medical monitoring relief was sought for the workers of Rocky Flats, that such relief was "essentially a suit for damages." *Building & Construction Dept. v. Rockwell Int'l Corp., 7 F.3d 1487, 1492 (10th Cir. 1993).* Defendants argue medical monitoring relief cannot be considered injunctive in light of that decision.

6   *Day v. NLO, Inc., 144 F.R.D. 330, 335 (S.D. Ohio 1992)* was vacated in part on other grounds in *In re NLO, Inc., 5 F.3d 154 (6th Cir. 1993).*

[**14] Building & Construction Trades Department, AFL-CIO v. Rockwell International Corporation was filed by the same attorneys representing Plaintiffs here, at the same time, and raising many similar claims arising out of alleged misconduct of Dow and Rockwell which exposed workers at Rocky Flats to unsafe levels of radioactive and non-radioactive hazardous substances. [7] Relief was sought in the form of a court supervised fund to finance a program of medical monitoring for the current and former employees of Rocky Flats. The court of appeals affirmed the district court decision [8] dismissing the workers' case on defendants' motion for summary judgment, finding that it was a claim for "personal injury" within the coverage of the Colorado Workmen's Compensation Act, *Colo. Rev. Stat. §§ 8-42-102, 8-52-102 (1986 Repl. Vol.)*, and was thus barred by the exclusivity provisions of that act. Although the court did not address the issue of whether a class claim for medical monitoring could be sustained under *Rule 23(b)(2)*, [9] it distinguished the case from those which had applied the "prudential mootness" doctrine. [10] Whereas the others had "involved a request for prospective equitable relief [**15] by declaratory judgment or injunction," id. *7 F.3d at 1492*, the Tenth Circuit held the suit for "the establishment of a court supervised fund to finance a program of medical monitoring for affected workers" was "essentially a suit for damages," *id. at 1490, 1492*.

7   The designated district court case number of Building & Construction Trades Department, AFL-CIO v. Rockwell International Corporation was 90-B-180, with the case being assigned to Judge Lewis T. Babcock. The related instant case was also initially assigned to Judge Babcock but was latter reassigned to me.

8   Judge Babcock granted summary judgment for Defendants in *Building & Construction Trades Department, AFL-CIO v. Rockwell International Corporation, 756 F. Supp. 492 (D. Colo. 1991).* Plaintiffs appealed after the court denied amendment in *Building & Construction Department, AFL-CIO v. Rockwell International Corporation, 758 F. Supp. 1428 (D. Colo. 1991).*

9   Plaintiffs sued on their own behalf and as representatives of present and former Rocky Flats employees, but no certification issued before the dismissal of the case. See *Building & Constr. Trades Dep't., 756 F. Supp. at 493.*

[**16]

10   The doctrine of "prudential mootness" holds that "in some circumstances, a controversy, not [constitutionally] moot, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Building & Constr. Dep't v. Rockwell, 7 F.3d at 1491-92* (further quotation omitted).

In opposing the decertification, Plaintiffs do not address this pivotal decision. Instead, they rely on recent district court decisions holding that a request for a court-supervised medical monitoring program constitutes injunctive relief and is appropriately certified under *Rule 23(b)(2)*. See, e.g., *Yslava v. Hughes Aircraft Co., 845 F. Supp. 705, 713 (D. Ariz. 1993)* (relying on *Day v. NLO, Inc., 144 F.R.D. at 330*); *Gibbs v. EI DuPont De Nemours & Co., Inc., 876 F. Supp. 475, 481 (W.D.N.Y. 1995).*

In *Boughton v. Cotter Corp., 65 F.3d 823, 827 (10th Cir. 1995)*, the Tenth Circuit iterated the test for certification under *Rule 23(b)(2)* is not the relief sought by plaintiffs [*480] but whether the [**17] crux of the action is for money damages. While recognizing that certification of a medical monitoring class under *Rule 23(b)(2)* is legally permissible, the court found the district court had not abused its discretion in refusing to certify such a class where the relief sought was primarily monetary damages. Id. See also *Harding v. Tambrands Inc., 165 F.R.D. 623, 632 (D. Kan. 1996)* (denying certification of a medical monitoring class as the relief sought was primarily money damages).

Since the initial certification opinion, the Tenth Circuit has stated unequivocally that the identical type of medical monitoring relief to that sought here is "essentially for damages." *Building & Construction Dept. v. Rockwell Int'l Corp., 7 F.3d at 1492*. I am therefore constrained to reverse my previous finding and to conclude that the instant medical monitoring claim seeks primarily money damages. In these circumstances the certification of the medical monitoring class under *Rule 23(b)(2)* is inappropriate and I hereby decertify that class.

C. Requirements of *Rules 23(a)* and *(b)(3)*.

Because I decertify the medical monitoring class, I consider whether the requirements of *Rules 23(a)* and [**18] *(b)(3)* are still met with regard only to the

181 F.R.D. 473, *480; 1998 U.S. Dist. LEXIS 11865, **18

Property Class.

1. Commonality and Predominance.

Defendants assert this case presents too many individualized issues and no single common course of conduct to satisfy the *Rule 23(a)(2)* requirements that "there are questions of law or fact common to the class" and the *Rule 23(b)(3)* requirement that such common questions predominate over any questions affecting only individual members of the class. They maintain each of the five Property Class representatives' claims and the evidence related to them present a highly individualized set of circumstances and this would hold true for each of the more than 15,000 parcels in the class. As concerns the misrepresentation and concealment claims, Defendants assert questions of individual reliance and resultant harm predominate over common issues and the statute of limitations may bar some Plaintiffs but not others.

Under the commonality and predominance requirements, the claims of class members need not be factually identical. Indeed, if this were the standard, it would be rare, if even possible, to obtain class certification. *Putnam v. Davies, 169 F.R.D. 89, 93 (S.D. Ohio 1996)*. Although [**19] some of the facts underlying each Plaintiff's claims may vary, the claims arise from the same set of broad circumstances, the release of hazardous substances form Rocky Flats during its operation by Defendants. Nor do the factual differences create any serious conflict between the representative Plaintiffs and the class members. See *Cook IV, 151 F.R.D. at 387*. Significant elements of Plaintiffs' case in chief relating to tortious releases of hazardous substances will be presented through the testimony of five experts. This testimony will apply to the classes as a whole. Defendants also assert a class-wide defense that no class-area property contains plutonium in excess of the Colorado standard.

Plaintiffs' factual and legal allegations of liability constitute similar common issues that would be a significant part of any individual case. Although the claims for misrepresentation and concealment involve questions of individual reliance and resultant harm and the statute of limitations defense might bar the claims of some Plaintiffs not others, the commonality of impact of the alleged releases outweighs these variances. I conclude the individual issues do not destroy the commonality [**20] and predominance requirements.

2. Typicality and Adequacy of Representation.

The same individualized evidence, Defendants maintain, destroys the *Rule 23(a)(3)* requirements that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Similarly, they aver, the variation in the class representatives' claims creates a tension between their interests and those of the other class members nullifying the *Rule 23(a)(4)* requirement that they "will fairly and adequately protect the interests of the class."

[*481] According to Defendants, the Property Class representatives, four families and one corporation owning relatively large parcels in a mostly undeveloped area near the plant, bear no relationship to the more than 98% of the property owners in the class living on the outskirts of the class area, whose properties have been exposed to much lower levels of Rocky Flats' emissions. Moreover, while the representatives each bought their property in the 1970's, the majority of class members bought their single family homes in the mid- to late-1980's.

Under *Rule 23(a)*, the threshold for typicality is low and the claims asserted by the class representative [**21] need only be typical of, not identical to, those of other class members. *Cook IV, 151 F.R.D. at 385*. The claims of the Property Class representatives are based on the same legal theories as those brought on behalf of the classes. They will advance the interests of the Property Class because all representatives own property allegedly exposed to hazardous substances due to Defendants' conduct. While it is true that many different types of property exist within the Property Class, all owners of property within the class will seek similar remedies, mainly money damages, for any injury caused to the property from Defendants' alleged releases of harmful substances. The type of property in question is an individual issue that will address the amount of damages available to the claimant rather than the nature of the remedy itself. While the representatives may not be identically situated with all other class members, because they share the same injury and interest of potentially contaminated property, their claims are typical of those of the members of the Property Class. Thus, although the alleged harm suffered by the representatives may differ in degree from that suffered by the other [**22] class members and require individual proof, it is essentially of the same type and does not destroy typicality.

The class representatives' complete understanding of

181 F.R.D. 473, *481; 1998 U.S. Dist. LEXIS 11865, **22

the legal basis for the claims is not required by *Rule 23*. See *In re Telectronics Pacing Systems, Inc., 172 F.R.D. at 282*. I have no reason to doubt the qualifications or experience of Plaintiffs' counsel nor their capability of conducting the proposed class litigation. I remain of the view that the Property Class representatives' claims satisfy the typicality requirement and that the class is adequately represented.

3. Superiority.

Defendants argue the *Rule 23(b)(3)* requirement applicable to the Property Class certification is not met, namely that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. They maintain recent decisions have focussed on whether claims are "novel" or "immature," and if so, have required a sufficient "track record" of previous trials of those claims before certification can be permitted; and have held the severance of "common issues" from the remainder of the case violates the *Seventh Amendment*. According to Defendants, the **[**23]** individual issues permeating nearly every aspect of this case would necessitate myriads of "mini-trials" on issues such as exposure, dose, susceptibility to disease, location, lifestyle, contamination, property valuation, notice. This would destroy any purported efficiencies gained from certification. Further, *Rule 23* is not satisfied because Plaintiffs have not proposed a structure for trying the case.

Some courts have avoided class actions in the mass accident or tort setting, fearing that differences between individual plaintiffs on issues of liability and defenses of liability, as well as damages, would result in "mini-trials" overshadowing the common disposition for the class. Class certification in this case is, however, superior to the alternative of repeating, hundreds of times over, litigation of common issues. As one commentator has observed: "The case by case mode of adjudication magnifies this burden [of litigating complex issues] by requiring the parties and courts to reinvent the wheel for each claim." David Rosenberg, Class Actions for Mass Torts: Doing Individual Justice by Collective Means, *62 Ind.L.J. 561, 563-564, 570-571 (1987)* (footnotes omitted) (cited **[**24]** in *In re Copley Pharmaceutical, Inc., 161 F.R.D. 456, 466 (D. Wyo. 1995)).*

While the manageability of the issues in this case will no doubt prove difficult, resolution **[*482]** of the common issues will materially advance the resolution of

the case itself. Significantly, in this instance, there are no apparent conflict of law issues. Moreover, the cost of retaining experts alone demonstrates that none of the property claims could be brought individually. Nor is a track record of prior individual trials as proof of a finding of superiority under *Rule 23(b)(3)* feasible "if the stakes to each class member were too slight to repay the costs of suit, even though the aggregate stakes were very large and would repay the costs of a consolidated proceeding." *Rhone-Poulenc, 51 F.3d at 1300*. These factors, coupled with the significant complexities and expense incurred in the discovery process to date and extensive motion practice associated with this case, support a finding of superiority of the class action as it relates to the Property Class to other available methods of adjudication. Defendants have failed to adduce evidence sufficient to persuade me that the requirements of *Rule 23(a)* and **[**25]** *(b)(3)* are no longer met in relation to the Property Damage Class

4. Adequacy of Class Definition.

In the initial certification decision I rejected Defendants' class definition arguments as largely focusing on the merits of the case. *Cook IV, 151 F.R.D. at 382-84*. Defendants now premise their argument on a misrepresentation of that holding, namely that the class definitions would be fatally inadequate if any person outside of the class area were exposed to hazardous substances released from Rocky Flats because class members could not be differentiated from more distant members of the public. This was not the case. Rather, I held the class must be adequately defined so that those properties located within the property class area, i.e., "the plutonium contour as defined by plaintiffs, can reasonably be said to have been exposed to some hazardous radioactive and non-radioactive materials originating inside the boundaries of Rocky Flats," differentiating them from "more distant members of the public." Id. Earlier, Defendants argued the class definitions were over inclusive. Now, they apparently argue they are under inclusive. The fact that properties beyond the contours **[**26]** may have been so exposed does not render the class definition inadequate. The issue at trial will be whether the evidence shows that the properties within the contours, not without, were so exposed. Any further argument relating to the contours and adequacy of the definition of the Property Class goes to the merits and must await trial. Thus, I deny decertification of the Property Class.

181 F.R.D. 473, *482; 1998 U.S. Dist. LEXIS 11865, **26

II. Dow's Motion for Summary Judgment on Statute of Limitations Grounds.

Dow seeks summary judgment on all claims against it, asserting Plaintiffs' claims are time-barred as they had both constructive and actual knowledge of their claims against Dow outside the applicable limitations period. The instant decision is informed by that of Judge Babcock in which he denied Dow's motion for summary judgment on all claims against it based on the statute of limitations. See *Cook v. Rockwell Int'l Corp., 755 F. Supp. 1468, 1482 (D. Colo. 1991)* ("Cook I"). Judge Babcock held, *inter alia*, that both Colorado and the Tenth Circuit apply the same accrual standard in that "the limitations period begins to run when the person suffering legal injury knows or in the exercise of reasonable diligence [**27] should have known of the injury and its cause." Id. (citing *Colo. Rev. Stat. § 13-80-108* and *Ebrahimi v. E.F. Hutton & Co., 852 F.2d 516, 523 (10th Cir. 1988)).* Judge Babcock further held the Price Anderson Act mandates application of state substantive law, that statutes of limitations are substantive, and that "for Plaintiffs' Price Anderson claims, the Colorado statute of limitations specific to each state claim applies." Id. He noted it was unclear as to claims arising before July 1, 1986, before the amendment of *Colo. Rev. Stat. 13-80-110,* whether the former six-year limitations period or the amended period should apply as this question turned on when the claims accrued and "genuine issues of material fact remain as to when the actions accrued." *Id. 755 F. Supp. at 1482-83.* Judge Babcock added, "the record does not establish when plaintiffs knew or should have known that hazardous substances allegedly released while Dow was operating Rocky Flats [*483] reached their property [and therefore] does not establish when plaintiffs knew or should have known of their causes of action." *Id. at 1483.*

In October 1996, in striking Dow's September 20, 1996 motion for summary judgment, I [**28] noted it was not on the basis that Judge Babcock had already ruled on the statute of limitations issue, as he had stated there were insufficient facts to make that decision at that time. Dow now contends the factual record developed since Judge Babcock's decision discloses no issue of material fact as to whether Plaintiffs actually knew or should have known of their causes of action.

In considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Maughan v. SW Servicing, Inc., 758 F.2d 1381, 1387 (10th Cir. 1985).* While cases involving statute of limitations defenses frequently lend themselves to summary disposition, a court should not grant summary judgment for the defendant if there is a viable issue of fact as to when the limitations period began. Id. If the statute of limitations depends on disputed facts, summary judgment is inappropriate. *Wolf v. Preferred Risk Life Ins. Co., 728 F.2d 1304, 1306 (10th Cir. 1984);* see also *Conmar Corp. v. Mitsui & Co., 858 F.2d 499, 500-501 (9th Cir. 1988)* (finding summary judgment inappropriate where there were genuine issues of material fact as to whether information [**29] was available to place a plaintiff on constructive notice of its claims and whether the lack of such information was due to the defendant's fraudulent concealment sufficient to toll the statute of limitations).

"It is settled law in the majority of circuits that the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury." *Maughan, 758 F.2d at 1387.* "Summary judgment cannot be granted unless the evidence is so clear that there is no genuine factual issue." *Id. at 1388* (further quotation omitted). Even a diligent plaintiff inquiring into the hazards posed by radiation

> is confronted with a mass of complex, controversial and rapidly changing scientific data and opinions. Lacking the resources and knowledge necessary to carry out their own research into causation, potential plaintiffs must rely on potential defendants -- the government and large commercial enterprises -- which have the resources to carry out the necessary studies.

*Id. at 1385.* "The leap from a plaintiff's alleged knowledge of the various news articles to actual or constructive knowledge of his or her cause of action [**30] involves factual issues which are inappropriate for summary judgment." *Id. at 1387.* I find such leap precludes summary judgment on whether Plaintiffs knew or should have known of the causal connection between the running of Rocky Flats by Dow and their current causes of action.

This case was filed as a Price-Anderson Act "public

181 F.R.D. 473, *483; 1998 U.S. Dist. LEXIS 11865, **30

liability action." [11] That act provides "the substantive rules for decision" in public liability actions "shall be derived from the law of the State in which the nuclear incident involved occurs." *42 U.S.C. § 2014(hh)*. Thus for Plaintiffs' Price Anderson claims, the Colorado statute of limitations specific to each state claim applies. Plaintiffs assert six causes of action, negligence, strict liability, nuisance, trespass, outrageous conduct, and exemplary damages.

> 11    Under the Price-Anderson Act, the term "public liability action" means any suit asserting "public liability," which, in turn, is defined as "any legal liability arising out of or resulting from a nuclear incident." *42 U.S.C. § 2014(w)*. "Nuclear incident" is defined as "any occurrence . . . causing . . . bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of [nuclear materials]." *42 U.S.C. § 2014(q)*.

[**31] Colorado law currently prescribes a two-year statute of limitations in actions for negligence, strict liability, trespass, nuisance and outrageous conduct. *Colo. Rev. Stat. § 13-80-102* (1997). Insofar as Plaintiffs assert claims against Dow accruing on or after July 1, 1986, this period applies. To the extent that such claims accrued before July 1, 1986, they are governed by the Colorado limitations periods in force at the time of the accrual. *Cook I, 755 F. Supp. at 1483*.

[*484] Before its amendment In 1986, *Colorado Revised Statutes § 13-80-110* provided a six-year limitations period for all actions "for waste and for trespass upon land" and for "all other actions on the case, except actions for slander and libel." Defendants assert even if the six-year limitations period applies, Plaintiffs' claims are time-barred as the motion is based on evidence of notice and actual knowledge that existed before January 30, 1984, six years before the filing of Plaintiffs' complaint.

Judge Babcock has already determined, under the applicable accrual standard, the limitations period begins to run when the person suffering legal injury knows or in the exercise of reasonable diligence should have [**32] known of the injury and its cause. *Cook I, 755 F. Supp. at 1482*. Rejecting Dow's argument that pervasive publicity surrounding Rocky Flats would necessarily

have put a reasonable person on constructive notice of his or her claims long before even 1984, Judge Babcock stated:

> The crux of the complaint is that because of Dow's tortious behavior, hazardous substances invaded plaintiffs' property and caused damages. Some plaintiffs live as far as six miles from Rocky Flats. The record does not establish when plaintiffs knew or should have known that hazardous substances allegedly released while Dow was operating Rocky Flats reached their property. Thus, the record does not establish when plaintiffs knew or should have known of their causes of action. Accordingly, Dow's motion for summary judgment based on the statute of limitations is denied.

*Id. at 1483*.

Plaintiffs maintain the answer has not changed and the factual question of whether the publicity Dow cites is legally sufficient to uphold a directed verdict in Dow's favor on its statute of limitations defense remains a jury question. Dow persists there is unrebutted evidence that Plaintiffs had sufficient facts to [**33] put them on notice of their claims. It maintains Plaintiffs admitted in their depositions actual knowledge of their claims outside of the limitations period; there are hundreds of newspaper articles from the 1970's reporting the same allegations that Plaintiffs hope to prove here; there are numerous public investigations and reports, many of which Plaintiffs' experts rely on, that demonstrate Plaintiffs' actual and constructive notice; the contamination defining their class was widely publicized beginning February 1970 (the Property Class is defined by a 1970 contamination contour); and Plaintiffs, like those in the Church litigation, [12] were on notice of their claims by the early 1970's.

> 12    The Church lawsuit, filed Inthe 1970's, also alleged offsite contamination from Rocky Flats. See *Good Fund, Ltd.--1972 v. Church, 540 F. Supp. 519 (D. Colo.1982)*, rev'd sub nom. *McKay v. United States, 703 F.2d 464 (10th Cir. 1983)*.

Either actual or constructive knowledge of an action outside the limitations [**34] period bars the claim.

181 F.R.D. 473, *484; 1998 U.S. Dist. LEXIS 11865, **34

*Ebrahimi v. E.F. Hutton & Co., Inc., 852 F.2d at 520.* Dow must prove the legal injury occurred outside the limitations period and Plaintiffs knew or should have known it occurred. This Dow has not done. For example, one element of Plaintiffs' property damage claim is diminution in value. Dow points to no evidence, however, that the diminution occurred outside the limitations period. In fact, its experts deny any diminution attributable to Rocky Flats. According to Plaintiffs' response to Defendants' Statement of Undisputed Facts, and the expert reports cited, plutonium released during Dow's tenure remains in the environment today, and releases and exposures attributable to Dow's misconduct continue to occur and threaten to occur in the future. Moreover, as reflected in many of Dow's exhibits, for many years, all questions about Rocky Flats met with unstinting denials and Panglossian reassurances from the plant operators and from high officials of the state and federal governments. Reasonable class members could have credited these assurances.

Dow cites testimony of certain Plaintiffs which it asserts demonstrates that they had actual knowledge of their causes **[**35]** of action against Dow outside the limitations period. For the aforesaid reasons, however, I find genuine issues of material fact, coupled with complex issues of causation, preclude summary **[*485]** judgment as to the issue of when such Plaintiffs knew or should have known of the existence of their causes of action.

III. Defendants' Combined Motion for Summary Judgment

Plaintiffs' trespass and nuisance ("property damage") claims are for diminution in value of their properties allegedly caused by contamination of the properties through the deposit of plutonium and other hazardous substances upon the surface of Plaintiffs' properties. Dow and Rockwell seek summary judgment on these claims which, they assert, fail as a matter of law because they are based merely on the publicity and the controversy generated by the 1989 FBI raid of Rocky Flats. Plaintiffs maintain these claims are based on diminution in value of their properties caused by contamination attributable to Dow and Rockwell, rather than by stigma and public perception.

Trespass is "the physical intrusion upon property of another without the permission of the person lawfully entitled to the possession of the real estate." *Burt* **[**36]**

*v. Beautiful Savior Lutheran Church, 809 P.2d 1064, 1067 (Colo. Ct. App. 1990).* Stated otherwise, it is "any entry upon, under, or above the surface of the real estate of another without the permission or invitation of the person lawfully entitled to possession of the real estate." *Denver & Rio Grande W. R.R. Co. v. Forster, 773 P.2d 612, 613 (Colo. App. 1989).*

Defendants argue Plaintiffs cannot satisfy the requirement of a physical invasion of and entry upon property, because their trespass claim is based on stigma and public perception, nor can Plaintiffs satisfy the element of causation. Plaintiffs assert a prima facie case of trespass exists against both Dow and Rockwell in that each engaged in conduct which resulted in the entry and deposition, without permission, of plutonium and other hazardous substances upon the surface of Plaintiffs' properties.

"Private nuisance is a non-trespassory invasion of another's interest in the private use and enjoyment of his land." *Allison v. Smith, 695 P.2d 791, 793-94 (Colo. App. 1984).* "[A] plaintiff must show that the defendant unreasonably and substantially interfered with the use and enjoyment of his property." *Id. at 794.* **[**37]** This involves a factual determination concerning "whether the various factors of interference asserted by the plaintiffs as to their use and enjoyment of their home were a substantial invasion of their interests as measured by the standard of their effect upon a normal person in the same or similar circumstances." Id.

There are countless ways to interfere with the use and enjoyment of land including interference with the physical condition of the land itself, disturbance in the comfort or conveniences of the occupant including his peace of mind, and threat of future injury that is a present menace and interference with enjoyment. The essence of private nuisance is the protection of a property owner's or occupier's reasonable comfort in occupation of the land in question. It involves "not only a defect, but threatening or impending danger . . . to the property rights or health of persons sustaining peculiar relations to the same. . . ."

181 F.R.D. 473, *485; 1998 U.S. Dist. LEXIS 11865, **37

*Adkins v. Thomas Solvent Co., 440 Mich. 293, 487 N.W.2d 715, 719 (Mich. 1992)* (further citations omitted). In Colorado, too, an actual threat to health and safety is a legally cognizable harm. *Boryla v. Pash, 960 P.2d 123, 1998 Colo. LEXIS 444, 1998 WL 326818, at* [**38] *6 (Colo. June 15, 1998)* (discussing the principles applicable to the evaluation fear of cancer claims in medical malpractice cases and toxic exposure cases).

Defendants argue Plaintiffs cannot prove, as required, that Defendants unreasonably and substantially interfered with the use and enjoyment of their property. Plaintiffs maintain, by creating an impending threat to their health, safety and property, through physical invasion of their land, and the resultant property stigmatization and loss in value, Defendants have disturbed their reasonable comfort in occupation of their property.

I find genuine issues of material fact exist in the record to date as to the actual physical invasion of Plaintiffs' land through contamination emanating from Rocky Flats as well as to the severity and impact of the threat from contamination emanating from the [*486] plant. These complex issues of causation preclude summary judgment both on the trespass and nuisance claims.

IV. Class Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek summary judgment on the following points: (1) Defendants' operation of Rocky Flats constituted an abnormally dangerous activity rendering them strictly liable [**39] for all harm resulting from that activity; (2) Defendants' operation of Rocky Flats involved conduct so dangerous to life and property and so abnormal and out of place in its surroundings as to constitute an absolute nuisance, resulting in their being strictly liable on the nuisance claims; (3) Rockwell committed those acts to which it pleaded guilty in United States v. Rockwell Int'l Corp., No. 92-CR-107 (D. Colo.). [13]

13   I reject Defendants' argument that Plaintiffs' motion is procedurally defective in that, contrary to the dictates of *Rule 56*, it does not seek to resolve any single claim in the lawsuit in its entirety. *Rule 56(a)* provides a party may seek summary judgment upon "all or part" of a claim. Additionally, *Rule 56(d)* states a court may "make

an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly." *Fed.R.Civ.P. Rule 56(d)*. "It is now well established that a court may 'grant' partial summary 'judgment' that establishes the existence or nonexistence of certain facts, even though no actual judgment is entered on a claim." 11 J. Moore, Moore's Federal Practice P 56.40[2] at 56-279 (3d ed. 1998) (footnote omitted). "A partial summary judgment ruling may dispose of only a single issue relevant to a claim. . . . In availing itself of the ability granted by *Rule 56* to issue orders which resolve significant questions, a court can focus the litigation on the true matters in controversy." Id. at 56-280 to 56-281.

[**40]   In Colorado, one who engages in abnormally dangerous activity is strictly liable for any damages proximately caused to other persons, land, or chattels by that activity. *Garden of the Gods Village v. Hellman, 133 Colo. 286, 294 P.2d 597 (Colo. 1956)*; *Daigle v. Shell Oil Co., 972 F.2d 1527, 1544-45 (10th Cir. 1992)*. It is the function of the court to determine whether an enterprise is abnormally dangerous. *Restatement of Torts (Second) § 520 comment (1)*. Factors to be taken into account include the existence of a high degree of risk of harm to the person or land of others, the likelihood that the resultant harm will be great, and an inability to eliminate the risk by the exercise of reasonable care. These factors require "a particularized inquiry" into the activity alleged to be "ultrahazardous" or "abnormally dangerous." *Daigle, 972 F.2d at 1544* (commenting that to impose an inflexible strict liability rule even on an activity such as blasting without consideration of the circumstances would be incorrect).

Here, Plaintiffs do not set out relevant undisputed facts warranting a ruling that the activities of Defendants at Rocky Flats were abnormally dangerous. Rather, [**41] they rely on cases which have held that processing, use and storage of radioactive materials are abnormally dangerous activities. See, e.g., *Silkwood v. Kerr-McGee Corp., 667 F.2d 908 (10th Cir. 1981)*, rev'd on other grounds, *464 U.S. 238, 78 L. Ed. 2d 443, 104 S. Ct. 615 (1984)* (concluding that the processing of

181 F.R.D. 473, *486; 1998 U.S. Dist. LEXIS 11865, **41

plutonium at a nuclear fuel plant was an abnormally dangerous activity).

Similarly absolute nuisance exists in "those nuisance situations which result from abnormal and unduly hazardous activities" or "where the defendant's pursuit of its own purposes on its own land is clearly an unreasonable act in view of surrounding circumstances." *Northwest Water Corp. v. Pennetta, 29 Colo. App. 1, 479 P.2d 398, 401 (Colo. Ct. App. 1970).* Both alternatives involve factual issues not canvassed by the Plaintiffs. See id. (holding that whether the defendants' use of the water tank alleged to constitute an absolute nuisance was unreasonable in relation to its location was a fact question for the jury). Because Plaintiffs have not shown an absence of any genuine issue as to any material fact regarding the issues of strict liability and absolute nuisance, summary judgment on [**42] these issues is inappropriate. [14]

> 14   I do not reach Defendants' argument that the 1988 amendments to the Price-Anderson Act preclude state law strict liability claims nor that they cannot be held strictly liable for conducting an abnormally dangerous activity because *Restatement (Second) Of Torts § 521* (1077) precludes such liability for the "pursuance of public duty."

[*487]   I also deny Plaintiffs' request for a ruling that Rockwell committed those acts to which it pleaded guilty in United States v. Rockwell International Corporation, No. 92-CR-107 (D. Colo.). See *McCormick v. United States, 539 F. Supp. 1179, 1183 (D. Colo. 1982)* (holding a guilty plea admissible in a subsequent civil action as an admission but denying "the application of collateral estoppel against a party who, having pleaded guilty to a criminal charge, seeks for the first time to litigate his cause in a civil action").

V.   Defendants' Motion for Summary Judgment Based on Expert Discovery (filed August 5, 1997) and Class Plaintiffs' [**43] Motion to Strike.

Dow and Rockwell seek summary judgment on the grounds that the undisputed evidence shows (1) Defendants complied with applicable federal standards governing releases of nuclear materials, thus entitling them to summary judgment on all claims brought under the Price Anderson Act; (2) Plaintiffs have not met their baseline burden to demonstrate significant exposure or

risk as required to sustain their medical monitoring claims; and (3) Plaintiffs have not adduced evidence sufficient to sustain their nuisance and trespass claims. On August 29, 1997, Defendants' Motion to Strike Plaintiffs' Experts was filed, seeking to strike as inadmissible and irrelevant the expert evidence upon which Plaintiffs base their opposition to Defendants' Motion for Summary Judgment. On November 6, 1997, in response to these motions, Class Plaintiffs' Motion to Strike Defendants' Fifth Wave of Dispositive Motions and Defendants' Related Motion to Strike Plaintiffs' Experts was filed.

Plaintiffs seek to strike Defendants' Motion for Summary Judgment filed August 5, 1997 and Defendants' motion to strike all testimony by all of Plaintiffs' experts filed August 29, 1997 as untimely and noncompliant [**44] with the court's December 1996 deadline. They set out the complex procedural and motions history of the case and cite my remarks at the status conference held on October 2, 1996. On that date, I reluctantly vacated the January 21, 1997 trial date. I struck Defendants' then pending motions without prejudice and set "a deadline of December 1, 1996 for the defendants to file whatever motions you want, consolidated." (Status Conference Tr. Proceedings, Oct. 22, 1996 at 4.) I iterated, "December 1 is a deadline for all motions, any and all motions that go to the merits of the litigation." (*Id. at 6.*) Counsel representing Dow stated: "I want to make sure that we comply with Your Honor's concern about motion practice. We have a statute of limitations motion for summary judgment. There's going to be a property summary judgment motion that we refer to in our papers, and I clearly understand the Court's injunction to file those by December 1." *Id. at 22.*)

Nevertheless, on August 5, 1997, eight months after the deadline, Defendants, without seeking leave, filed three additional motions for summary judgment. Apparently cognizant of the motions' untimeliness, Defendants assert the motions [**45] are reliant on the deposition testimony of Plaintiffs' experts taken between December and May of 1997. They do not deny that they had possession of Plaintiffs' expert reports as of the December 1996 deadline but maintain they could not have filed the motions for summary judgment based on the experts' opinions within eight business days after receiving the voluminous reports.

In light of the clear order at the October 22, 1996

181 F.R.D. 473, *487; 1998 U.S. Dist. LEXIS 11865, **45

status conference, I strike Defendants' summary judgment motions filed on August 5, 1997.

VI. Defendants' Motion to Strike Plaintiffs' Experts (filed August 29, 1997) and Class Plaintiffs' Motion to Strike.

Defendants seek to strike Plaintiffs' "three core experts," Robert Goble, John Radke and Wayne Hunsperger on the grounds that their opinions in their reports and depositions do not meet the standards for the admissibility of expert testimony. They also seek to strike as irrelevant Plaintiffs' remaining experts. In doing so, Defendants **[*488]** anticipated that Plaintiffs would rely on such testimony in responding to the August 29, 1997 summary judgment motions. Plaintiffs, however, in response to those motions and this motion to strike, filed their own Motion **[**46]** to Strike Defendants' Fifth Wave of Dispositive Motions and Defendants' Related Motion to Strike Plaintiffs' Experts. At this time, therefore, Plaintiffs have neither offered nor relied upon the testimony of their experts. Until such time as they do so, I decline to determine the admissibility of the extensive and technically complex testimony and strike Defendants' motion in this regard. See *United States v. Nunez, 658 F. Supp. 828, 839 (D. Colo. 1987)* (holding "this court is not required to determine the admissibility of evidence until it is offered").

VII. Defendants' Motion under *Rule 37(c)(1)* to Preclude Testimony of Plaintiffs' Expert Witness, Dr. John Radke, based upon findings of Magistrate Judge Borchers that Plaintiffs have violated Rule 26(a)(2) (filed April 21, 1998).

On March 31, 1998, Magistrate Judge Borchers entered an order, inter alia, granting in part and denying in part Defendants' motion to compel the production of material relied on by John Radke, Ph.D. Plaintiffs retained Dr. Radke to examine the property values of land and buildings near Rocky Flats. Dr. Radke completed his report in 1996 entitled "Measuring the Effects of Proximity to the Rocky **[**47]** Flats Nuclear Weapons Plant on Property Values." He is one of five experts designated by Plaintiffs to support their allegation that real estate in the class diminished in value as a result of proximity to Rocky Flats. After receiving Dr. Radke's report, counsel for Defendants requested documentation and information used in its preparation. Various communications took place and, while Plaintiffs provided some materials, no resolution was reached in relation to certain requests.

Dr. Radke's deposition commenced on March 31, 1997. Defendants filed their motion to compel together with requests for a protective order to preclude the deposition of Daniel McFadden, Ph.D. until Plaintiffs produced all requested documents and for sanctions and attorney fees. The magistrate judge denied the motion insofar as it sought to compel certain requested computer files, X-Y coordinates, dates of transactions used in "Phase 1" and "Phase II," and output from regressions, on the grounds that such data did not exist. He stated in relation to the dates of transactions used in "Phase I" and "Phase II," that if I were to conclude that certain information underlying the results of Dr. Radke did not exist, **[**48]** and that his work could not be replicated, I might preclude the admission of results. The magistrate judge deferred the request for sanctions under *Fed. R. Civ. P. 37*, stating they were available only where the court found there to have been a violation of a discovery order. In light of the non-existence of the material sought and the resultant denial of the major part of the motion to compel, a sanction under *Rule 37* was "not available at this time." (Mem. Op. & Order March 31, 1998 at 9.)

Defendants now seek to preclude the use of Dr. Radke's testimony at trial or in responding to summary judgment motions. They assert the magistrate judge made all findings necessary to determine that Plaintiffs, without substantial justification, have failed to disclose information as required by Rule 26, thus triggering the automatic preclusion sanction of *Rule 37(c)(1)*. [15]

> 15   Thus, Defendants seek to strike Dr. Radke's opinion both in this motion (for failure to comply with Rule 26) and in their August 29, 1997 motion (based on lack of qualification and the resulting methodological errors in his report).

**[**49]** Defendants correctly point out that *Rule 37(c)(1)* precludes the use of undisclosed evidence "at trial, at a hearing, or on a motion." They cite the Tenth Circuit's observation that "a trial court should determine whether an expert's testimony would be admissible at trial before considering that testimony in ruling on a motion for summary judgment." *Powell v. Fournet, 1992 U.S. App. LEXIS 15377, 1992 WL 150085 at *2 (10th Cir. June 25, 1992).* Plaintiffs have not, however, yet sought to rely on Dr. Radke's evidence "at trial, at a hearing, or on a motion." Accordingly, I **[*489]** deny Defendants' motion to preclude such testimony. [16] See *United States v. Nunez, 658 F. Supp. at 839.*

16   The facts relied on and relief sought in this motion are identical to the facts considered and the relief denied by the magistrate judge. Defendants' more appropriate course of action would have been to seek reconsideration or to file an objection to the magistrate judge's denial of *Rule 37(1)* sanctions.

VIII. Conclusion.

For the aforesaid reasons, I **[\*\*50]** grant Defendants' motion for decertification of the Medical Monitoring Class, but deny it as regards the Property Class. Accordingly,

IT IS ORDERED THAT Defendants' Motion for Class Decertification is GRANTED with regard to the Medical Monitoring Class, which is hereby decertified, and is DENIED with regard to the Property Class;

IT IS FURTHER ORDERED THAT Dow's motion for summary judgment on statute of limitations grounds is DENIED;

IT IS FURTHER ORDERED THAT Defendants' Combined Motion for Summary Judgment on Plaintiffs' trespass and nuisance claims is DENIED;

IT IS FURTHER ORDERED THAT Class Plaintiffs' Motion for Partial Summary Judgment is DENIED;

IT IS FURTHER ORDERED THAT Plaintiffs' Motion to Strike Defendants' Fifth Wave of Dispositive Motions and Defendants' Related Motion to Strike Plaintiffs' Experts is GRANTED;

IT IS FURTHER ORDERED THAT Defendants' Motion for Summary Judgment based on Expert Discovery and Defendants' Motion to Strike Plaintiffs' Experts are STRICKEN;

IT IS FURTHER ORDERED THAT Defendants' Motion under *Rule 37(c)(1)* to Preclude Testimony of Plaintiffs' Expert Witness, Dr. John Radke is DENIED;

IT IS FURTHER ORDERED THAT Plaintiffs shall file a **[\*\*51]** revised Class Notice consistent with this opinion on or before August 20, 1998.

Dated this 28 day of July, 1998 at Denver, Colorado.

JOHN L. KANE, JR.

U.S. SENIOR DISTRICT COURT JUDGE



LEXSEE 273 F. SUPP. 2D 1175

**MERILYN COOK, et al., Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION AND THE DOW CHEMICAL COMPANY, Defendants.**

**Civil Action No. 90-K-181**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*273 F. Supp. 2d 1175*; *2003 U.S. Dist. LEXIS 12927*; *57 ERC (BNA) 1294*

**July 24, 2003, Decided**
**July 24, 2003, Filed**

**SUBSEQUENT HISTORY:** Later proceeding at *Cook v. Rockwell Int'l Corp., 2004 U.S. Dist. LEXIS 27360 (D. Colo., Dec. 17, 2004)*

**PRIOR HISTORY:** *Cook v. Rockwell Int'l Corp., 181 F.R.D. 473, 1998 U.S. Dist. LEXIS 11865 (D. Colo., 1998)*

**COUNSEL: [**1]** For SALLY BARTLETT, plaintiff: Daniel R. Satriana, Jr., Hall & Evans, United States District Court, Denver, CO U.S.A. Bruce H. Deboskey, Steven William Kelly, Silver & Deboskey, P.C., Denver, CO U.S.A. Merrill Davidoff, Jonathan Auerbach, David F. Sorensen, Bernadette M. Rappold, Eric L. Cramer, Stanley B. Siegel, Berger & Montague, P.C., Philadelphia, PA U.S.A. Stanley M. Chesley, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH U.S.A. John David Stoner, Christopher Thomas Reyna, Chimicles & Tikellis, L.L.P., Haverford, PA U.S.A. David Evans Kreutzer, Attorney General's Office, Natural Resources Unit, Denver, CO U.S.A. R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE USA. Ronald Simon, Simon & Associates, Washington, DC USA. Kenneth A. Jacobsen, Kenneth A. Jacobsen Law Offices, Media, PA USA.

For WILLIAM SCHIERKOLK, JR., MERILYN COOK, PEGGY J. SANDOVAL, STEPHEN SANDOVAL, RHONDA J. DEIMER, THOMAS L. DEIMER, BANK WESTERN, DELORES SCHIERKOLK, MICHAEL DEAN RICE, GERTRUDE BABB, LORREN BABB, RICHARD BARTLETT, plaintiffs: Jonathan Auerbach, David F. Sorensen, Bernadette M. Rappold, Eric L. Cramer, Stanley B. Siegel, Berger & Montague, P.C., Philadelphia, PA [**2]** U.S.A. John David Stoner, Christopher Thomas Reyna, Chimicles & Tikellis, L.L.P., Haverford, PA U.S.A. David Evans Kreutzer, Attorney General's Office, Natural Resources Unit, Denver, CO U.S.A. R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE USA. Kenneth A. Jacobsen, Kenneth A. Jacobsen Law Offices, Media, PA USA.

For MICHAEL DEAN RICE, plaintiff: Eric L. Cramer, Stanley B. Siegel, Berger & Montague, P.C., Philadelphia, PA U.S.A. Christopher Thomas Reyna, Chimicles & Tikellis, L.L.P., Haverford, PA U.S.A. David Evans Kreutzer, Attorney General's Office, Natural Resources Unit, Denver, CO U.S.A. R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE USA.

For ROCKWELL INTERNATIONAL CORPORATION, defendant: Joseph J. Bronesky, Sherman & Howard, United States District Court, Denver, CO U.S.A. Timothy P. Brooks, John D. Aldock, Patrick M. Hanlon, Michael K. Isenman, Edward J. Naughton, Wendy S. White, Valerie E. Ross, Heather H. Anderson, Amy Horton, Shea & Gardner, Washington, DC U.S.A. Mark S. Lillie, David M. Bernick, Martin Thomas Tully, Kirkland &

273 F. Supp. 2d 1175, *; 2003 U.S. Dist. LEXIS 12927, **2;
57 ERC (BNA) 1294

Ellis, Chicago, IL USA.

For DOW CHEMICAL COMPANY, defendant: Joseph J. Bronesky, Christopher Lane, Sherman **[**3]** & Howard, United States District Court, Denver, CO U.S.A. Mark S. Lillie, David M. Bernick, Douglas J. Kurtenbach, S. Jonathan Silverman, Douglas M. Poland, Kirkland & Ellis, Chicago, IL USA. Louis W. Pribila, Dow Chemical Company, Midland, MI U.S.A. Lester C. Houtz, Bartlit, Beck, Herman, Palenchar & Scott, Denver, CO USA.

**JUDGES:** John L. Kane, Senior District Judge, United States District Court.

**OPINION BY:** John L. Kane

**OPINION**

**[*1178] MEMORANDUM OPINION AND ORDER**

Kane, J.

This action arises from operations at the Rocky Flats Nuclear Weapons Plant ("Rocky Flats" or "Plant"), a former nuclear weapon manufacturing facility owned by the United States and once operated by Defendants Dow Chemical Company ("Dow") and Rockwell International Corporation ("Rockwell") under government contract. Plaintiffs are individuals and businesses who own land or interests in land and/or reside near Rocky Flats. Plaintiffs, on their own behalf and as representatives of a class of others similarly situated, assert claims for trespass, private nuisance, negligence, strict liability, outrageous conduct and exemplary damages against Dow and Rockwell.

The claims arise from allegations regarding actual or threatened **[**4]** releases of plutonium and other hazardous substances from the Plant. Plaintiffs allege these releases have caused and continue to cause damage to Plaintiffs' and class properties and to create a risk of adverse health consequences. They seek compensatory **[*1179]** damages relating to the properties, damages or injunctive relief to provide medical monitoring services, exemplary damages, permanent injunctive relief and attorney fees and costs.

A class has been certified as to the property-related claims, *see Cook v. Rockwell Int'l Corp. ("Cook IV"), 151*

*F.R.D. 378 (D. Colo. 1993)*, which is defined in part by the contours of a plutonium "plume" extending approximately six miles from the Plant based on measurements of plutonium in off-site soils. According to Plaintiffs' most recent statement, the Property Class seeks compensatory damages for diminution in the value of their properties and exemplary damages under theories of trespass, nuisance, negligence and strict liability. A separate class was initially certified with respect to Plaintiffs' request for medical monitoring services, but was later decertified. *See Cook v. Rockwell Int'l Corp. ("Cook VIII"), 181 F.R.D. 473, 480 (D. Colo. 1998)*. **[**5]** The Property Class claims and individual medical monitoring and other claims are bifurcated for trial, with the Property Class claims to be tried first.

In connection with certain pretrial evidentiary motions and failed efforts to prepare a stipulated pretrial order, the parties have argued and extensively briefed their disagreements regarding various elements of the Property Class claims and the issues to be tried in the first phase of this action. [1] As set forth below, this memorandum opinion and order decides the issues raised by the parties and thus clarifies the scope of trial in the Property Class phase of this action.

> 1   The parties' arguments regarding the issues addressed in this memorandum opinion and order were set forth in connection with all or some of the following proceedings: briefing and oral argument regarding Defendants' Motion to Strike Plaintiffs' Experts, filed August 29, 1997; the June 25, 1999 hearing before Judge Matsch and pre- and post-hearing submissions filed in May and July, 1999; the February 28, 2001 status conference; the parties' proposed pretrial plans and Class Plaintiffs' Response to Defendants' Report Concerning Opinion Testimony Pertinent to Trial Issues, filed March 21, 2001. In some instances, the parties and the court also addressed these issues in whole or in part in connection with dispositive motions filed earlier in this action.

 **[**6]** I. Violation of Federal Nuclear Safety Standards as an Element of Plaintiffs' Tort Claims

None dispute this is a "public liability action" arising under the Price-Anderson Act, *42 U.S.C. § 2210* ("Price-Anderson" or "Act"), because it is an action in which Plaintiffs seek to impose liability arising out of or resulting from a "nuclear incident." [2] *See 42 U.S.C. §*

273 F. Supp. 2d 1175, *1179; 2003 U.S. Dist. LEXIS 12927, **6;
57 ERC (BNA) 1294

2014(w), (hh). Section 2014(hh) of the Act directs that "the substantive rules for decision in such an action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of [the Price-Anderson Act]." *42 U.S.C. § 2014(hh)*. Defendants admit this statutory provision permits Plaintiffs to assert claims based on Colorado tort law in this action, but contend it nonetheless preempts the heart of these tort claims, which is imposition of a state law-based standard of care on Defendants' conduct. Preemption is required under the Act, Defendants argue, because the strict liability and negligence standards of care that would govern Plaintiffs' **[*1180]** claims under Colorado law are **[**7]** inconsistent with federal nuclear safety standards for the release of plutonium in air and water. Defendants maintain, in turn, that these federal standards are part of Price-Anderson's "regulatory scheme." As a result, Defendants assert that under the Price-Anderson Act Plaintiffs must prove Defendants released plutonium in excess of federal nuclear safety standards in order to prevail on each of their otherwise state law-based tort claims.

> 2    A "nuclear incident" is "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material . . .." *42 U.S.C. § 2014(q)*.

Defendants' authorities for this proposition are *In re TMI Litigation Cases Consol. II ("TMI II"), 940 F.2d 832 (3d Cir. 1991)*, **[**8]** *O'Conner v. Commonwealth Edison Co., 13 F.3d 1090 (7th Cir. 1994)*, and their progeny. After a careful review of these decisions, the subject statutory language and other relevant authority, however, I am persuaded that Congress did not intend for federal regulatory standards to preempt state law standards of care in Price-Anderson public liability actions. I therefore reject Defendants' contention that Plaintiffs must prove Defendants violated federal standards as an element of their tort claims.

A. Law of Federal Preemption

The law of federal preemption is founded in Congress' power to preempt state law under *Article VI of the Supremacy Clause*, which provides that the laws of the United States are "the supreme Law of the Land; . . . any Thing in the Constitution or the Laws of any state to the Contrary notwithstanding." *U.S. Const. Art. VI, cl. 2*; *see United States v. Wagoner County Real Estate, 278 F.3d 1091, 1096 (10th Cir. 2002)*. The "ultimate touchstone" of any preemption analysis, therefore, is whether Congress intended federal law to preempt state law. *Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 135 L. Ed. 2d 700, 116 S. Ct. 2240 (1996)*; **[**9]** *Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 120 L. Ed. 2d 407, 112 S. Ct. 2608 (1992)*.

"Congress' intent may be explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Cipollone, 505 U.S. at 516* (internal quotation omitted). Congressional intent in the first instance, generally termed express preemption, is determined primarily by reference to the plain language of the clause in question, "which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 123 L. Ed. 2d 387, 113 S. Ct. 1732 (1993)* (quoted in *Sprietsma v. Mercury Marine, 537 U.S. 51, 123 S. Ct. 518, 526, 154 L. Ed. 2d 466 (2002))*. Other relevant considerations are the structure and purpose of the statute encompassing the preemption provision "as revealed not only in the text but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic, 518 U.S. at 486*.

Congress' intent to preempt state **[**10]** law may also be implied in two situations: (1) "where the state law regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" (field preemption); and (2) where state law "actually conflicts with federal law" (conflict preemption) either because "it is impossible for a private party to comply with both state and federal requirements" or "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. General Electric Co., 496 U.S. 72, 79, 110 L. Ed. 2d 65, 110 S. Ct. 2270 (1990)* (internal quotation omitted); *see Sprietsma, 123 S. Ct. at 527*; *Choate v. Champion Home Builders Co., 222 F.3d 788, 795 (10th Cir. 2000)*. Preemption in these instances is based on the assumption that Congress would not want state law to **[*1181]** apply if any of these circumstances exist. *See Geier v. American Honda*

273 F. Supp. 2d 1175, *1181; 2003 U.S. Dist. LEXIS 12927, **10; 57 ERC (BNA) 1294

*Motor Co., 529 U.S. 861, 873, 146 L. Ed. 2d 914, 120 S. Ct. 1913 (2000)*; *see English, 496 U.S. at 79 n.5*. This assumption may be overcome, however, by evidence that Congress was willing to tolerate continued state regulation **[**11]** or application of state law in circumstances in which implied preemption would otherwise be found. *See Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 186, 100 L. Ed. 2d 158, 108 S. Ct. 1704 (1988)* (incidental state regulation in field exclusively occupied by federal regulation not preempted because federal statute indicated Congress was willing to accept any potential conflict between federal regulation and such indirect state regulation); *Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 256, 78 L. Ed. 2d 443, 104 S. Ct. 615 (1984)* (state tort law indirectly regulating field exclusively occupied by federal regulation not preempted because relevant legislative history demonstrated Congress intended that state tort law would continue to apply in this field); *see also Geier, 529 U.S. at 872* (Congress may enact federal law that tolerates a conflict between federal and state law that would otherwise impliedly preempt the state law).

Given these standards and authority, the question presented by Defendants' contention regarding the applicable duty of care in this action is whether Congress expressly or impliedly intended to preempt state tort **[**12]** law standards of care from the state law that, pursuant to the Price-Anderson Act, provides the substantive rules for deciding public liability actions brought pursuant to this Act.

B. Relevant History of Price-Anderson Act

Defendants' preemption argument is based on *42 U.S.C. § 2014(hh)*, which defines a "public liability action" under Price-Anderson and further provides:

> A public liability action shall be deemed to be an action arising under *section 2210* of this title [Price-Anderson Act], and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.

Although *section 2014(hh)* was added to Price-Anderson in 1988, the history and law relevant to

construing and applying this statutory provision begins nearly fifty years ago.

1. Atomic Energy Act of 1954

Congress enacted the Atomic Energy Act of 1954 ("AEA") to enable the private sector to participate in what had been a federal monopoly in the use, control and ownership of nuclear technology. [3] Pub. L. No. 83-703, 68 Stat. 919 (1954) (codified **[**13]** as amended at *42 U.S.C. §§ 2011-2297h-13*); *see Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 206-07, 75 L. Ed. 2d 752, 103 S. Ct. 1713 (1983)*. The AEA provided that any private entities involved in this technology must be licensed by the Atomic Energy Commission ("AEC") [4] and granted the AEC exclusive jurisdiction to license and regulate the construction and **[*1182]** operation of all nuclear facilities and the disposal of related materials to protect national security, public health and safety. *See 42 U.S.C. § 2021(c)*; *English, 496 U.S. at 81*. As a result of the extensive licensing and regulatory scheme created by the Commission pursuant to this authority, the Supreme Court has consistently held that Congress intended the AEA and the federal government to occupy and preempt "the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." *Pac. Gas & Elec., 461 U.S. at 206-08, 213*.

> [3]   The AEA of 1954 amended the original Atomic Energy Act, enacted in 1946, which had granted the federal government exclusive authority over the possession and use of nuclear materials. *See* Pub. L. No. 79-585, 60 Stat. 755 (1946).

**[**14]**
> [4]   Congress abolished the AEC in 1974 and transferred most of its functions to the Nuclear Regulatory Commission ("NRC"). *See* Pub. L. No. 93-438, § 104, 88 Stat. 1233, 1237 (1974) (codified as amended at *42 U.S.C. § 5814*). Both are referred to herein as "the Commission."

Notwithstanding the allowances granted in the AEA, private industry was reluctant to enter the nuclear field unless it had protection from the potentially vast liability that would result from a significant accident at a nuclear power plant. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 64, 57 L. Ed. 2d 595, 98 S. Ct. 2620 (1978)*; S. Rep. No. 85-296 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1803, 1803-05. Congress

responded in 1957 by enacting the Price-Anderson Act as an amendment to the AEA. *See* Pub. L. No. 85-256, 71 Stat. 576 (1957) (codified in *42 U.S.C. § 2210*, with relevant definitions included in *42 U.S.C. § 2014*); *Duke Power, 438 U.S. at 63-64*.

2. 1957 Price-Anderson Act

Congress' **[**15]** purpose in Price-Anderson was two-fold: "to remove the economic impediments in order to stimulate the private development of electric energy by nuclear power while simultaneously providing the public compensation in the event of a catastrophic nuclear incident." *Duke Power, 438 U.S. at 83*; *see id. at 64*; *42 U.S.C. § 2012(i)*. To achieve these objectives, Congress created a comprehensive, compensation-oriented system of liability insurance and indemnification for federal nuclear contractors and licensees that both limited their potential financial exposure in the event of a "nuclear incident" (defined to include any incident that results in any form of damages arising from the hazardous properties of materials used in the atomic energy program) [5] and created a ready source of funds from which to compensate victims of nuclear incidents. *See* S. Rep. No. 100-70, at 14 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1424, 1426.

5  *See* Pub. L. No. 85-256, § 3, 71 Stat. 576 (1957) (codified as amended at *42 U.S.C. § 2014(q)*); *supra* n.2.

**[**16]** The basic components of the Price-Anderson liability and compensation system as originally enacted were: (1) a cap on the aggregate liability arising out of or resulting from any single nuclear incident; (2) the requirement that federal nuclear licensees obtain private insurance or other financial protection up to a stated amount for such public liability; (3) the federal government's agreement to indemnify licensees and other potentially liable persons for public liability in excess of this private financial protection up to the amount of the liability cap; [6] (4) "omnibus **[*1183]** coverage" that effectively channeled liability for a nuclear incident to federal licensees or contractors even though others would be liable under ordinary tort principles; and (5) provisions for the federal courts to determine if liability for a nuclear incident exceeds the statutory liability cap, and, if it does, to manage and allocate the pool of available funds to those damaged as a result of the incident. *See* Pub. L. No. 85-256, § 4, 71 Stat. at 576-77 (codified as amended at *42 U.S.C. § 2210*

); S. Rep. No. 85-296 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1803; H.R. Rep. No. 100-104(I), **[**17]** at 5 (1987); *see generally* Berkowitz, 13 Harv. Envtl. L. Rev. 1, 7-11.

6  Congress phased out the federal indemnity for nuclear incidents at commercial facilities as part of its 1975 amendment and extension of the Price-Anderson scheme. *See* Pub. L. No. 94-197, 89 Stat. 1111 (1975); S. Rep. No. 100-70, at 15 (1987), *reprinted in* 1988 U.S.C.C.A.N. at 1428; *see generally* Dan M. Berkowitz, *Price-Anderson Act: Model Compensation Legislation?-- The Sixty-Three Million Dollar Question*, 13 Harv. Envtl. L. Rev. 1, 14-16 (1989). This second-tier of Price-Anderson financial protection was replaced by an industry-funded self-insurance pool consisting of "retrospective premiums" paid by NRC licensees in the event of an accident exceeding the coverage available from private insurance. *See* Pub. L. No. 94-197, 89 Stat. 1111 (1975); S. Rep. No. 100-70, at 15 (1987), *reprinted in* 1988 U.S.C.C.A.N. at 1428.

The Price-Anderson Act as enacted in 1957 and the insurance and indemnity **[**18]** system it created were not intended by Congress to create a federal cause of action or to preempt application of state tort law in public liability actions. Instead, as stated by the Joint Committee on Atomic Energy in 1957, one of the "basic principles" of the Price-Anderson system was its limited interference with State law:

Since the rights of third parties who are injured are established by State law, there is no interference with the State law until there is a likelihood that the damages exceed the amount of financial responsibility required together with the amount of the indemnity. At that point the Federal interference is limited to the prohibition of making payments through the State courts and to prorating the proceeds available.

S. Rep. 85-296, *reprinted in* 1957 U.S.C.C.A.N. at 1810 (quoted in *Silkwood, 464 U.S. at 252*). Thus, while the Price-Anderson system authorized the federal court "to issue orders declaring the liability limited and staying the payment of claims and the execution of court

273 F. Supp. 2d 1175, *1183; 2003 U.S. Dist. LEXIS 12927, **18;
57 ERC (BNA) 1294

judgments[,] . . . the right of the State courts to establish the liability of the persons involved in the normal way is maintained." *Id.* at 1823.

**[**19]** 3. 1966 Price-Anderson Amendments Act

In 1966, Congress extensively considered the role of federal and state law in public liability actions as part of its reauthorization and amendment of the Price-Anderson Act and system. *See, e.g.,* S. Rep. No. 89-1605 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201. The comments of the Joint Committee on Atomic Energy on this amendment begin by reiterating that "since its enactment by Congress in 1957 one of the cardinal attributes of the Price-Anderson Act has been its minimal interference with State law." *Id.* at 3206. The Committee reported this attribute reflected Congress' "policy decision to refrain from establishing the basis of liability under the statute," with the result that "under the Price-Anderson system, the claimant's right to recover from the fund established by the act is left to the tort law of the various States." *Id.*

By 1966, however, Congress and others were concerned that some aspects of state tort law might interfere with Price-Anderson's goal of providing speedy and equitable compensation to victims of nuclear incidents. In particular, Congress was concerned that the tort law of some states might not **[**20]** impose strict liability on defendants in the event of a nuclear incident, which the Joint Committee on Atomic Energy reported was contrary to Congress' assumptions and intent in establishing Price-Anderson's compensation system. *See id.* at 3206-07 (policy decision not to establish statutory standard of liability based on knowledge of strict liability doctrine and belief that courts would "ignore legal niceties and impose liabilities upon someone on one ground or another in the event of a nuclear incident"); *id.* at 3209 ("existing Price-Anderson system rests on **[*1184]** assumption" that courts would apply "legal principles akin to those of strict liability in the event of a serious nuclear incident"). Congress was also concerned the many state tort statutes of limitation were too short for the results of radiation exposure to be known and acted upon by those injured as a result of a nuclear incident. *Id.* at 3208, 3220-21. In both instances, Congress determined that reform was necessary, with the only question being "whether reform should be accomplished by State or Federal law." *Id.* at 3208.

Congress took an intermediate approach to these issues. It opted not to enact a "new **[**21]** body of

Federal tort law" and instead addressed its concerns by authorizing the AEC "to require participants in the nuclear industry to waive certain key defenses to liability that might otherwise be permissible under applicable State or Federal law." S. Rep. No. 89-1605, *reprinted in* 1966 U.S.C.C.A.N. at 3209; *see* Pub. L. No. 89-645, § 3, 80 Stat. 891, 892 (codified as amended at *42 U.S.C. § 2210(n)(1)*). The defenses to be waived included any issue or defense based on the fault of the nuclear actor or the conduct of the injured party or any statute of limitations that would bar a suit filed within ten years of the nuclear incident and within three years of when the claimant knew or reasonably could have known of the injury and its cause. *Id.* Congress anticipated and intended that the effect of these waivers would be, among other things, to impose strict liability on affected defendants. [7] S. Rep. No. 89-1605, *reprinted in* 1966 U.S.C.C.A.N. at 3209; *Duke Power, 438 U.S. at 65-66.* Congress believed this approach was preferable to direct federal legislation imposing a strict liability standard of care in public liability actions **[**22]** because it was "in keeping with the approach followed in enacting the original Price-Anderson Act-namely, interfering with State law to the minimum extent necessary." S. Rep. No. 89-1605, *reprinted in* 1966 U.S.C.C.A.N. at 3209; *Duke Power, 438 U.S. at 65-66.*

> 7    Congress also intended the statute of limitations defense waiver would effectively supplant any state statutes of limitation that were more restrictive than the limitations period stated in Price-Anderson. *See* S. Rep. No. 89-1605, *reprinted in* 1966 U.S.C.C.A.N. at 3220-21.

Congress further limited the effect of the 1966 amendments on state tort law by applying the new defense waiver provision only to public liability actions arising from an "extraordinary nuclear occurrence" ("ENO"), defined as a nuclear incident the Commission finds is "substantial" and "has resulted or will probably result in substantial damages" to offsite persons or property. *See* Pub. L. No. 89-645, §§ 1(a)(2), 3, 80 Stat. at 891, 892 (codified as amended **[**23]** at *42 U.S.C. §§ 2014(j), 2210(n)(1)*). The Joint Committee reported this limitation was based on its determination that "the traditional system of tort law" was adequate to address nuclear incidents not deemed ENOs. S. Rep. No. 89-1605, *reprinted in* 1966 U.S.C.C.A.N. at 3211. Under the Price-Anderson Act and system as amended in 1966, therefore, Congress intended non-ENO incidents to

"remain subject to the traditional rules of tort law," *id.*, including "a rule of strict liability if applicable State law so provides." *Id.* at 3212.

Even as it reaffirmed the Price-Anderson system's deference to state law in public liability actions, Congress also in 1966 for the first time provided a grant of federal jurisdiction for certain actions arising from nuclear incidents. Pub. L. No. 89-645, § 3, 80 Stat. at 892. Specifically, the 1966 Amendments Act added to Price-Anderson a provision conferring upon the United States district court in the district **[*1185]** in which an extraordinary nuclear occurrence takes place original jurisdiction with respect to any public liability action arising out of or resulting from such an ENO, without regard to the citizenship of the parties **[**24]** or the amount in controversy. *Id.* The provision, codified at *42 U.S.C. § 2210(n)(2)*, further granted defendants and the Commission the absolute right to remove any ENO-related action pending in state court or another federal court to the federal district court in the district in which the ENO occurred. *Id.* "If the circumstances of the occurrence and the damage actions did not appear to the Commission or the defendant to necessitate removal to a single Federal court, [however,] an action started in State court or other Federal court could of course proceed to judgment in that court." *Id.* at 3215; *see Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1504-05 (10th Cir. 1997)* (rejecting contention that *section 2210(n)(2)* creates exclusive federal court jurisdiction over covered incidents). Congress' purpose in providing the option of federal jurisdiction was to provide a mechanism for consolidating before the same court all cases arising from the same ENO so that case management could be coordinated and more expeditious, equitable and uniform results achieved. *See* S. Rep. No. 89-1605, *reprinted in* 1966 U.S.C.C.A.N. at 3208, 3214-15.

**[**25]** 4. *Silkwood* Decisions

It was against this backdrop that the Tenth Circuit had the opportunity in *Silkwood v. Kerr-McGee Corp, 667 F.2d 908 (10th Cir. 1981)*, to consider the same issue presented by the Defendants in this action: whether federal nuclear safety regulations preempt state tort standards of care in an action arising from a nuclear incident. In *Silkwood*, much like this case, the plaintiff asserted claims based on state tort law to recover compensatory and punitive damages for property and other damage caused by plutonium releases from a

nuclear facility. *Id.* at 912, 920-21. As in this case, the defendant plant operator asserted it could not be liable for such releases if it had substantially complied with applicable federal safety regulations because the pervasive federal regulation of nuclear energy had preempted strict liability and other state law-based standards of care. *Id.* at 920.

The Tenth Circuit began its analysis of this issue by reiterating the rule that "the determination whether the federal scheme precludes state rules is primarily a matter of the intent of Congress." *Id.* Based on the legislative **[**26]** history of the Price-Anderson Act discussed above, the court found Congress intended for claims arising from nuclear incidents below the level of an ENO to be subject to state tort law, including standards of care such as strict liability. *See id.* at 921. Accordingly, the court rejected the defendant's argument that federal nuclear safety regulations had preempted state tort standards of care and affirmed the jury's property damage award under a state law strict liability standard. *Id.*

The Tenth Circuit did, however, find that federal law impliedly preempted any award of punitive damages under state law. The court based this holding on the AEA's complete occupation of the field of nuclear safety regulation and precedent holding that this federal regulation preempted states from exercising regulatory authority over radiation hazards. *Id.* at 922 (citing *Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8th Cir. 1971), aff'd mem., 405 U.S. 1035, 31 L. Ed. 2d 576, 92 S. Ct. 1307 (1972))*. The court reasoned that a judicial award of punitive damages pursuant to state law was preempted under these circumstances because it "competes substantially **[**27]** with the AEC (NRC) in its regulation of radiation hazards associated **[*1186]** with plants handling nuclear material" and because such an award, "as punishment for bad practices or to deter future practices involving exposure to radiation[,] is no less intrusive than direct legislative acts of the state." *Id. at 923*. The court acknowledged this holding was somewhat at odds with its conclusion that Congress intended for nuclear tort actions to be determined under state rather than federal standards, but justified this result by finding that the Price-Anderson Act and its legislative history implicitly assumed that only compensatory damages would be awarded in such actions. *See id. at 922*.

On appeal, the Supreme Court reversed the Tenth

273 F. Supp. 2d 1175, *1186; 2003 U.S. Dist. LEXIS 12927, **27;
57 ERC (BNA) 1294

Circuit's ruling that state authorized punitive damage awards were impliedly preempted by the federal government's occupation of the field of nuclear safety. [8] *Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 78 L. Ed. 2d 443, 104 S. Ct. 615 (1984).* The Court began its analysis by confirming its ruling in *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 75 L. Ed. 2d 752, 103 S. Ct. 1713 (1983),* [**28] that the AEA preempts states from regulating the safety aspects of nuclear materials. *464 U.S. at 249-50.* The Court also acknowledged that this fact, standing alone, "arguably would disallow resort to state-law remedies by those suffering injuries from radiation in a nuclear plant" because such remedies can indirectly regulate nuclear safety. *Id. at 250-51*; *see id. at 249.*

> [8] The Tenth Circuit's decision on the applicable standard of care was not before the Supreme Court, but, as discussed *infra*, the Court's analysis of the punitive damages preemption issue is fully consistent with and supportive of the Tenth Circuit's decision on this issue.

Based on a thorough examination of the substance and legislative history of the AEA and the Price-Anderson Act, however, the Court concluded there was "ample evidence that Congress had no intention of forbidding the states from providing such remedies," even though Congress was fully aware of and intended for regulation [**29] of nuclear safety issues to be an exclusively federal matter. *Id. at 251*; *see id. at 251-256* (analyzing acts and relevant legislative history). Rather, the Court found, based on the Price-Anderson Act legislative history set out above, that "Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted," *id. at 255*, and that "state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents." *Id. at 256.* Thus, the Court held, "insofar as damages for radiation injury are concerned, preemption should not be judged on the basis that the federal government has so completely occupied the field of safety that state remedies are foreclosed but on whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of federal law." *Id.* The Court found, based on the extensive legislative history described above, that there was no such conflict or frustration of federal

objectives in the award of punitive [**30] damages under state tort law in public liability actions and therefore held such awards were not preempted by federal law. *Id. at 256, 258.*

Given the Tenth Circuit's and Supreme Court's *Silkwood* decisions, there is no question that the AEA and the Price-Anderson Act as they existed at the time of the Supreme Court's 1984 *Silkwood* decision did not expressly or impliedly preempt state tort law standards of care in [*1187] favor of a federal standard of compliance with applicable federal safety regulations. Defendants essentially concede this point but argue that a change in the law since the *Silkwood* decisions compels a different result today. That change occurred in 1988 when once again Congress extended and amended the Price-Anderson Act.

5. 1988 Amendments Act

The focus of the 1988 Price-Anderson Amendments Act was on extending and increasing the pool of funds available to compensate victims of a nuclear incident and on extending, clarifying and in some cases expanding the reach of various aspects of the existing Price-Anderson system. *See, e.g.,* Pub. L. No. 100-408, 102 Stat. 1066 (1988); S. Rep. No. 100-218, at 4-13 (1987) (summarizing major provisions), [**31] *reprinted in* 1988 U.S.C.C.A.N 1476, 1479-1488. One of the issues considered by Congress in this process was whether to expand Price-Anderson's grant of optional federal jurisdiction to include all actions asserting liability relating to a nuclear incident, rather than limiting it only to actions arising from ENOs as was provided in the 1966 amendments. Based on the difficulties encountered in consolidating the multitude of actions that arose from the 1979 accident at Three Mile Island, which the NRC did not designate an ENO, [9] Congress determined that "the need for consolidation of claims to ensure equitable and uniform treatment of victims and the orderly distribution of funds is just as great whether the claims arise from a nuclear incident that ultimately is deemed not to be an extraordinary nuclear occurrence or from an incident that is." H.R. Rep. No. 100-104(I), at 18; *see* S. Rep. No. 100-218, at 13, *reprinted in* 1988 U.S.C.C.A.N. at 1488; H.R. Rep. No. 100-104(II), at 19 (1987); *El Paso Natural Gas Co. v. Neztsosie, 526 U.S. 473, 477, 143 L. Ed. 2d 635, 119 S. Ct. 1430 (1999).* Accordingly, Congress amended *section 2210(n)(2) of the Act*, which had [**32] conferred original and removal jurisdiction to actions

273 F. Supp. 2d 1175, *1187; 2003 U.S. Dist. LEXIS 12927, **32;
57 ERC (BNA) 1294

arising from ENOs, so that it applied to any action arising from a nuclear incident. *See* Pub. L. No. 100-408, § 11(a), 102 Stat. at 1076 (codified at *42 U.S.C. § 2210(n)(2)*); H.R. Rep. No. 100-104(I), at 18; S. Rep. No. 100-218, at 13, *reprinted in* 1988 U.S.C.C.A.N. at 1488; H.R. Rep. No. 100-104(II), at 19.

> 9   Neither the AEC before its demise nor the NRC has designated a nuclear incident as an ENO.

In so doing, Congress recognized that Article III of the Constitution limits the types of cases that federal courts may hear to those "arising under . . . the Laws of the United States." *See* H.R. Rep. No. 100-104(I), at 18. To avoid any questions as to the constitutionality of federal jurisdiction over all actions arising from a nuclear incident, Congress added a new provision to the AEA defining a "public liability action" as used in the Price-Anderson Act, and stating that any such action "shall be deemed to be an action **[**33]** arising under" the Price-Anderson Act. Pub. L. No. 100-408, § 11(b), 102 Stat. at 1076; *see* H.R. Rep. No. 100-104(I), at 18; S. Rep. No. 100-218, at 13, *reprinted in* 1988 U.S.C.C.A.N. at 1488. In this same new provision, codified at *42 U.S.C. § 2014(hh)*, Congress further directed that "the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." *Id.*

C. Preemption Analysis

As stated earlier, the question presented here is whether Congress intended **[*1188]** through the 1988 Amendments Act, expressly or by implication, to preempt state tort law standards of care from the state law that, pursuant to the *section 2014(hh) of the Price-Anderson Act*, provides the substantive rules for deciding Price-Anderson public liability actions. Each possibility is examined in turn.

1. Express preemption

The crucial language added to the Price-Anderson Act in 1988 as relevant here is Congress' provision that "the substantive rules for decision in [a public liability action arising under *42 U.S.C. § 2210*] **[**34]** shall be derived from the law of the State in which the nuclear incident involves occurs, *unless such law is inconsistent with the provisions of such section." Id. § 2014(hh)*

(emphasis added). *Section 2210* sets out the system of insurance, indemnification, limited liability and compensation procedures established by the Price-Anderson Act, as amended, to deal with personal injury or property loss resulting from a nuclear accident. *See 42 U.S.C. § 2210* (codifying § 170 of the AEA as enacted in 1957 and subsequently amended).

In interpreting these statutory provisions, I begin, as always, with the plain language of the statute, as it necessarily contains the best evidence of Congress' preemptive intent. *See CSX Transp., Inc., 507 U.S. at 664*; *New Mexico Cattle Growers Ass'n v. U.S. Fish and Wildlife Serv., 248 F.3d 1277, 1281-82 (10th Cir. 2001)*. In so doing, I must assume Congress expressed its legislative intent through the ordinary meaning of the words it chose to use. *New Mexico Cattle Growers, 248 F.3d at 1282*. Unless the language of the statute is ambiguous, it is improper for me to consult legislative **[**35]** history in determining congressional intent. *Id.*

Defendants assert that the federal regulatory standards governing nuclear safety "are part of Price-Anderson's regulatory scheme" so that reliance on anything other than a federal standard of care would be "inconsistent with" *section 2210* and thus barred by *section 2014(hh)*. They fail to point to any language in *section 2210* supporting this contention, however, and my review of this provision has revealed none. The Price-Anderson Act as amended and codified in *section 2210* did not create a regulatory scheme addressing nuclear safety concerns, but rather established a system for insuring and managing the consequences of nuclear accidents. The federal nuclear safety regulations upon which Defendants rely were and are promulgated and imposed pursuant to other provisions of the AEA, *see, e.g.*, *42 U.S.C. § 2201(b)* (authorizing Commission to establish health, safety and other standards governing the possession and use of special nuclear, source and byproduct materials); *id. §§ 2073, 2093, 2111, 2133, 2134* (granting Commission exclusive jurisdiction to license and regulate transfer, delivery, receipt, acquisition, **[**36]** possession and use of such materials), and are not referenced or otherwise incorporated in *section 2210* or the insurance and compensation system it creates. Nothing in the plain language of *section 2210*, therefore, suggests there is any inconsistency between this section and the imposition of liability based on state tort law standards of care that differ from the standard set by federal nuclear safety

regulations.

The plain language of *section 2014(hh)*, providing as it does that "the substantive rules for decision in [public liability] actions shall be derived from state law . . .," also indicates Congress intended for state law, including state standards of care, to continue as the substantive law governing public liability actions brought under the Price-Anderson Act. Congress is presumed **[*1189]** to know the existing law pertinent to the legislation it enacts, *see e.g., Goodyear Atomic Corp., 486 U.S. at 184-85*, and absent "clear manifestations of contrary intent," it is also presumed that Congress intended a new or revised statute to be harmonious with existing law and its judicial construction. *United States v. Langley, 62 F.3d 602, 605 (4th Cir. 1995)*; **[**37]** *Estate of Wood v. Comm'r, 909 F.2d 1155, 1160 (8th Cir. 1990)*. At the time of the 1988 Amendments Act, the state of the law, pursuant to the Tenth Circuit and Supreme Court's decisions in *Silkwood*, was that state tort law, including state standards of care, was the governing law in actions seeking to impose liability for a nuclear incident, notwithstanding the federal government's complete occupation of the field of nuclear safety.

If Congress had intended to change this law and preempt state law relating to nuclear safety issues, it could have omitted the direction to apply state law in *section 2014(hh)*, employed standard preemption language barring resort to state standards of care or at least provided that state law would govern unless inconsistent with "federal law." It did none of these things. Instead Congress specifically provided in *section 2014(hh)* that public liability actions brought pursuant to Price-Anderson would remain subject to state law and carefully limited preemption of state law only to instances in which it conflicted with *section 2210*, *i.e.*, the Price-Anderson system. [10] Far from clearly manifesting an intent to change the existing **[**38]** law of non-preemption of state standards of care, therefore, the plain language of *section 2014(hh)* demonstrates Congress intended to preserve it. *Cf. Day v. NLO, Inc., 3 F.3d 153, 154 n.1 (6th Cir. 1993)* (1988 amendments "not intended to alter the state law nature of the underlying tort claims").

10   There are undoubtedly attributes of the Price-Anderson system that are or might be inconsistent with state law and thus could preempt conflicting state law pursuant to *section 2014(hh)*.

One obvious example is Price-Anderson's limit on damage awards from a single nuclear incident. *See 42 U.S.C. § 2210(e)*. Other possible conflicts between Price-Anderson and state tort law include application of Price-Anderson's limits on the availability of fault-based and other defenses in some instances, on who may be held liable for a nuclear incident and on when an injured party may recover evacuation costs or be awarded punitive damages. *See* John F. McNett, "Nuclear Indemnity for Government Contractors Under the Price-Anderson Act: 1988 Amendments," 19 Pub. Cont. L.J. 1, 6 (Fall 1989) (citing *42 U.S.C. § 2210(q), (s), (r), (d)(1)(B)(i)(II)*). The Ninth Circuit has also applied *section 2014(hh)* to hold that Washington law permitting a claim for emotional distress without bodily injury is inconsistent with the Price-Anderson Act and preempted by it because bodily injury is a jurisdictional prerequisite to a public liability action under the Act. *In re Berg Litigation, 293 F.3d 1127, 1131 (9th Cir. 2002)*.

**[**39]** An examination of the legislative history of the 1988 amendments, although unnecessary given the plain language of the relevant statutory provisions, also fails to reveal any evidence that Congress intended by these amendments to preempt state negligence or strict liability standards of care in favor of a federal standard. This history recounts, without a hint of criticism, that under the Price-Anderson system liability in case of a nuclear incident "is determined according to applicable state tort law," H.R. Rep. No. 100-104(III), at 16 (1987); H.R. Rep. No. 100-104(I), at 5. Even more to the point, Congress stated in 1988 that claims regarding nuclear incidents not subject to the special defense waiver provisions for ENOs are determined under "the standard of proof specified by state tort law." H.R. Rep. No. 100-104(III), at 15.

**[*1190]** The various committee reports further indicate that Congress' sole reason for expanding federal jurisdiction under the Price-Anderson Act to all actions arising from a nuclear incident was to simplify and improve compensation procedures by allowing consolidation of these actions in a single federal court. *See* S. Rep. No. 100-218, at 13, *reprinted* **[**40]** *in* 1988 U.S.C.C.A.N. at 1488; H.R. Rep. No. 100-104(I), at 17-18; H.R. Rep. No. 100-104(II), at 19; H.R. Rep. No. 100-104(III), at 30. The committee reports also echo the

273 F. Supp. 2d 1175, *1190; 2003 U.S. Dist. LEXIS 12927, **40; 57 ERC (BNA) 1294

plain language of *section 2014(hh)* that the substantive law of decision in these new federal actions is to be derived from the law of the state in which the nuclear incident occurred unless that law is inconsistent with the Price-Anderson Act. *See* S. Rep. No. 100-218, at 13 (1987), *reprinted in* 1988 U.S.C.C.A.N. at 1488; H.R. Rep. No. 100-104(I), at 17; H.R. Rep. No. 100-104(II), at 19; H.R. Rep. No. 100-104(III), at 30-31. Nothing in the legislative history of the 1988 amendments, therefore, suggests that Congress intended to change the existing law that public liability actions were to be determined under state tort law, including state standards of care.

2. Implied preemption

a. Field preemption

It was well-established even before the 1988 Amendments Act that the federal government completely occupies the field of nuclear safety regulation and has thereby preempted states from enforcing their own nuclear safety regulations. *See, e.g., Silkwood, 464 U.S. at 250; Pacific Gas & Elec. Co., 461 U.S. at 212-13.* [**41] As the Supreme Court acknowledged in *Silkwood* and elsewhere, the prospect of an award of compensatory or punitive damages for radiation-based injuries under state common law can also indirectly regulate nuclear safety matters by affecting the conduct and policy of nuclear operators. *See Silkwood, 464 U.S. at 249-51, 256; English, 496 U.S. at 85-86 (1990); Goodyear Atomic Corp., 486 U.S. at 185-86; see also Cipollone, 505 U.S. at 521 (1992)* (state regulation can be as effectively exerted through an award of damages under common law as affirmative state enactments).

In *Silkwood*, the Supreme Court nonetheless expressly found that Congress did not intend for "traditional principles of state tort law," including the prospect of punitive damage awards, to be preempted by the federal government's occupation of the nuclear safety field. *464 U.S. at 255-56.* The Court recognized the apparent incongruity of its holding but held it was bound by what Congress intended:

No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion **[**42]** that a state may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the

legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.

*Id. at 256.* Accordingly, the Court held that "insofar as damages for radiation injuries are concerned," preemption could *not* be implied from the federal government's occupation of the field of nuclear safety. *Id.*

**[*1191]** Once again, there is nothing in the plain language or legislative history of the 1988 amendments suggesting Congress believed this analysis was in error or that it had a different preemptive intent when it enacted *section 2014(hh)* and the rest of the 1988 Amendments Act. This is particularly noteworthy because Congress specifically considered **[**43]** the Supreme Court's *Silkwood* decision during its deliberations on the 1988 amendments. Some members of Congress were concerned that the Supreme Court's determination that punitive damages could be imposed under state tort law in public liability actions could, in some circumstances, result in the federal government becoming obligated to pay punitive damages and diminish the limited funds available to compensate actual injuries resulting from a nuclear incident. H.R. Rep. No. 100-104(I), at 19; *see* S. Rep. No. 100-218, at 12, *reprinted in* 1988 U.S.C.C.A.N. at 1487. Congress ultimately resolved these concerns by amending Price-Anderson to prohibit courts from awarding punitive damages against any person "on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering" the relevant nuclear incident. [11] Pub. L. No. 100-408, § 14, 102 Stat. at 1078 (codified at *42 U.S.C. § 2210(s)*); *see In re TMI ("TMI III"), 67 F.3d 1119, 1126 (3rd Cir. 1995).*

11   This limitation only applies "with respect to nuclear incidents occurring on or after Aug. 20, 1988." *42 U.S.C. § 2210* note (1988) (effective date of 1988 Amendments Act); *see supra* Section V.B.

273 F. Supp. 2d 1175, *1191; 2003 U.S. Dist. LEXIS 12927, **43; 57 ERC (BNA) 1294

[**44] The legislative history for this provision states that the 1988 Amendments Act "does not otherwise affect current law regarding punitive damages," S. Rep. No. 100-218, at 12, *reprinted in* 1988 U.S.C.C.A.N. at 1488, and the Tenth Circuit and other courts that have considered the issue in any depth have concluded Congress did not intend for the 1988 Amendments Act to change the result or overturn the reasoning of the Supreme Court in *Silkwood. See, e.g., Farley, 115 F.3d at 1503* (1988 Amendments Act did not supersede Supreme Court's *Silkwood* decision but rather responded to its holding that punitive damages could be awarded in any public liability action); *TMI III, 67 F.3d at 1124-25* (unambiguous language of 1988 Act makes clear that Congress did not intend to change *Silkwood* result). There is no question, therefore, that the Supreme Court's analysis of congressional intent and field preemption in *Silkwood* remains good law today.

Nor is there any question that this Supreme Court analysis compels the conclusion that Congress did not intend for federal occupation of the field of nuclear safety regulation to preempt state tort law standards [**45] of care. In *Silkwood*, the Court specifically found Congress intended to allow a state to "award damages based on its law of liability," to permit "the award of damages based on the state law of negligence or strict liability," and to make "state-law remedies, in whatever form they might take," available "to those injured by nuclear incidents." *Silkwood, 464 U.S. at 256*. These findings encompass and preserve from preemption the state law standards of care Defendants seek to supplant in this action.

The Supreme Court's subsequent characterization of its *Silkwood* decision bolsters this conclusion. In 1988, for example, the Court stated *Silkwood* stood for the proposition that "Congress was willing to accept [the] regulatory consequences of application of state tort law to radiation hazards even though direct state regulation of safety aspects of nuclear energy was preempted." *Goodyear Atomic Corp.,* [*1192] *486 U.S. at 186*. In more recent decisions, the Court has reiterated it found in *Silkwood* that Congress did not intend for the Price-Anderson Act to preempt "state tort remedies for radiation-based injuries" and "traditional state tort principles [**46] of the duty of care." *English, 496 U.S. at 85-86* (*Silkwood* decision largely based on "legislative history suggesting that Congress did not intend to include in the pre-empted field state tort remedies for radiation-based injuries"); *Buckman Co. v. Plaintiffs'*

*Legal Comm., 531 U.S. 341, 352, 148 L. Ed. 2d 854, 121 S. Ct. 1012 (2001)* (*Silkwood* decision concerned "traditional state tort law principles of the duty of care" and turned on "specific statutory evidence" of Congress' intent). This authority further supports the conclusion that state standards of care are not impliedly preempted by the federal government's undisputed occupation of the field of nuclear safety regulation and preemption of affirmative state regulation of nuclear safety concerns. [12]

12   The Supreme Court has also recognized in the years since *Silkwood* that there are legitimate reasons for Congress to preserve state tort law claims, including their jury-imposed standards of care, in the face of federal regulation of the relevant field. It has stated, for example, that it is "perfectly rational for Congress not to pre-empt [state] common-law claims, which--unlike most administrative and legislative regulations--necessarily perform an important remedial role in compensating accident victims." *Sprietsma, 123 S. Ct. at 527*. Congress' preservation of such claims even when they may impose a different standard than required under federal regulations reflects "a congressional determination that occasional nonuniformity [between federal safety standards and jury-imposed state safety standards] is a small price to pay for a system in which juries not only create, but also enforce, safety standards, while simultaneously providing necessary compensation to victims." *Geier, 529 U.S. at 871*. While this analysis is not directly on point in this action, which does not involve complete preemption of state tort law, it is instructive given that one of the overarching objectives of the Price-Anderson system is to ensure that those injured by nuclear incidents receive just and equitable compensation.

[**47] b. Conflict preemption

As noted earlier, congressional intent to preempt state law may also be implied if state law actually conflicts with federal law because "it is impossible for a private party to comply with both state and federal requirements" or "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English, 496 U.S. at 79*. In its *Silkwood* decision, the Tenth Circuit implicitly found no such conflict when it held that state tort law rules,

273 F. Supp. 2d 1175, *1192; 2003 U.S. Dist. LEXIS 12927, **47;
57 ERC (BNA) 1294

including a strict liability standard of care, are not preempted by federal nuclear safety regulations. *See 667 F.2d at 920-21.*

The Supreme Court addressed the conflict preemption issue more directly in its *Silkwood* decision, holding that there was no conflict or frustration of congressional purpose in the application of state tort law to award punitive damages in a public liability action. *464 U.S. at 256, 258.* The Court's conclusion, based as it was on Congress' repeated declarations that state tort law was to govern in such actions, also demonstrates that there was not, under the pre-1988 Price-Anderson Act, any conflict **[**48]** or frustration of congressional purpose in the application of state tort law to award compensatory damages based on state tort standards of care.

Congress' enactment of the 1988 Amendments Act does not change this conclusion. First and most importantly, as described earlier, the plain language of the Amendments Act and its legislative history indicate Congress maintained its historic intent that state tort law, including state standards of care, govern actions seeking to impose liability for a nuclear incident. **[*1193]** As in all preemption analyses, this intent is determinative. *See Medtronic, 518 U.S. at 485*; *Cipollone, 505 U.S. at 516.*

Nothing in the 1988 Amendments Act, its legislative history or any other law, moreover, suggests it is physically impossible for a private party to comply with both federal nuclear safety requirements and state common laws standards of care. *Cf. Cleveland v. Piper Aircraft Corp., 985 F.2d 1438, 1444-45 (10th Cir. 1993)* (finding no irreconcilable conflict between federal regulation and common law standards, especially where Congress indicated it did not want to bar states from imposing additional or more **[**49]** stringent standards). There also can be no frustration of "the full purposes and objectives of Congress" in the use of state tort standards of care when those purposes and objectives specifically include the use of such traditional principles of state law to decide public liability actions. *See 42 U.S.C. § 2014(hh)*; *supra* Section I.B (discussing relevant legislative history and *Silkwood* decisions).

The conclusion that there is no frustration of congressional purpose in application of a state rather than federal regulatory standard of care is further demonstrated by Congress' explicit intent to create, through waiver of affirmative defenses, what amounts to

*de facto* strict liability for extraordinary nuclear occurrences. *See TMI II, 940 F.2d at 870 n.3* (Scirica, J., concurring). This strict liability standard of care is fundamentally inconsistent with a federal standard of care that precludes liability absent proof of non-compliance with federal safety regulations, yet it has been part of the Price-Anderson system since 1966. Congress, in fact, specifically reiterated its intent that strict liability be the standard of care for **[**50]** ENOs when it reauthorized the waiver requirements in the 1988 Amendments Act, *see, e.g.*, H.R. Rep. No. 100-104(III), at 15 (Price-Anderson imposes "Federal strict liability or 'no-fault' standard" for any extraordinary nuclear occurrence), and earlier expressed its intent that strict liability, when available under state tort law, would apply in cases arising from non-ENO nuclear incidents. *See S. Rep. No. 89-1605, reprinted in 1966 U.S.C.C.A.N. at 3212.* If Congress intended to permit strict liability in these cases, it follows that it also intended to permit less intrusive, fault-based state standards of care that might be more stringent than federal regulatory standards. *See TMI II, 940 F.2d at 870 n.3* (Scirica, J. concurring).

### 3. *TMI II, O'Conner* and their progeny

I am aware my holding that federal regulations do not preempt state standards of care in Price-Anderson public liability actions is contrary to the existing weight of authority on the issue. Virtually all of this authority relies, with little independent analysis, on two decisions: *In re TMI Litigation Cases Consol. II, 940 F.2d 832 (3rd Cir. 1991)*, and *O'Conner v. Commonwealth Edison Co., 13 F.3d 1090 (7th Cir. 1994).* **[**51]** The courts in these two decisions justify their finding of preemption on two grounds, neither of which survives careful scrutiny.

First, the courts in *TMI II* and *O'Conner* found that federal nuclear safety regulations preempt state standards of care under standard conflict preemption analysis: "permitting the states to apply their own nuclear regulatory standards, in the form of the duty owed by nuclear defendants in tort, would . . . frustrate the objectives of federal law" because "any state duty would infringe upon pervasive federal regulation in the field of nuclear safety, and would thus conflict with federal law." *TMI II, 940 F.2d at 859-60* (citing *Pac. Gas & Elec. Co., 461 U.S. at 204*); *see O'Conner, 13 F.3d at 1105.* **[*1194]** This justification, however, while facially consistent with the general law of implied preemption, is flawed in several important respects. First, it does not

rely in any fashion on the 1988 Amendments Act, and thus is based on the same law and legislative history in existence when *Silkwood* was decided. It is therefore contrary to binding pre-1988 authority in this circuit, stated in *Silkwood*, that federal **[\*\*52]** standards do not preempt state standards of care in public liability actions. *See 667 F.2d at 920-21.*

Just as importantly, this justification is directly contrary to the Supreme Court's *Silkwood* decision. The Supreme Court found Congress intended to allow "a state [to] award damages based on its own law of liability," notwithstanding the federal government's exclusive authority to regulate nuclear safety matters and the consequent preemption of direct state regulation of such matters. *464 U.S. at 256*; *see id. at 249-50*. As a result, the Court mandated that the question of preemption in damage claims for radiation injury "should not be judged on the basis that the federal government has so completely occupied the field of safety that state remedies are foreclosed." *464 U.S. at 256.* By basing their preemption decisions on the "pervasive federal regulation in the field of nuclear safety," *TMI II, 940 F.2d at 859*, and findings that "the field of nuclear safety has been occupied by federal regulation; there is no room for state law," *O'Conner, 13 F.3d at 1105*, the *TMI II* and *O'Conner* **[\*\*53]** courts violated the Supreme Court's directive and its binding determination of congressional intent. [13]

13   The Third Circuit's decision in *TMI II* also ignores its own prior authority that the Price-Anderson Act's legislative history is "replete with indications that Congress never intended to displace state tort law with respect to the issues of liability and recoverable damages for nuclear accidents." *Kiick v. Metropolitan Edison Co., 784 F.2d 490, 493 (3rd Cir. 1986).*

The majority opinion in *TMI II* [14] attempts to evade the force of the Supreme Court's holding in *Silkwood* by seizing on the Court's acknowledgment in that decision that there might be instances in which federal law would preempt the recovery of damages under state law based on "an irreconcilable conflict between the federal and state standards" or the conclusion that "the imposition of a state standard in a damages action would frustrate the objectives of the federal law." *TMI II, 940 F.2d at 859* **[\*\*54]** (quoting *Silkwood, 464 U.S. at 256*). The Third Circuit then concluded that such conflict preemption

must be implied because imposition of state standards of care would frustrate Congress' intent that the federal government exclusively regulate nuclear safety. *Id.*

14   Judge Scirica did not join the majority's determination of the preemption issue. *See TMI II, 940 F.2d at 870.*

This rationale, however, is merely a repackaging of the field preemption argument the Supreme Court rejected in *Silkwood* based on the undisputed legislative history that Congress had intended for state tort law rules, including "the state law of negligence or strict liability," to apply in public liability actions notwithstanding the pervasive federal regulation of nuclear safety. *464 U.S. at 256.* Consistent with this determination, the Court in *Silkwood* also found no conflict or frustration of congressional purpose in the application of state law in these actions, *id.*, and specifically **[\*\*55]** rejected the defendant's submission that allowing plaintiffs to recover under state law principles conflicted with Congress' intent to preclude dual federal and state regulation of radiation hazards. *Id. at 258.* Under these circumstances, there is **[\*1195]** no merit to the contention of the *TMI II* and *O'Conner* courts that state standards of care are preempted because they frustrate Congress' intent to preclude state regulation of nuclear safety. [15]

15   The *TMI II* court tries to distinguish the Supreme Court's decision on conflict preemption by stating it was based on the Court's conclusion that an award of punitive damages would not impede Congress' goal of promoting nuclear safety. *940 F.2d at 859* (citing *Silkwood, 464 U.S. at 257*). The textual basis for this characterization of the Supreme Court's decision is unclear, however, and in any event is overwhelmed by the Court's discussion in *Silkwood* of Congress' specific intent that state law govern public liability actions even though states are preempted from regulating the safety aspects of nuclear development. *See 464 U.S. at 250-56.*

**[\*\*56]** The second justification for preemption of state standards of care, asserted by the *O'Conner* court, invokes the 1988 Amendments Act. This justification concludes that use of state standards of care in public liability actions violates the 1988 Act's provision, codified in *section 2014(hh)*, that state law only applies as long as it is consistent with the Price-Anderson Act. *See O'Conner, 13 F.3d at 1105.* The court bases this

decision on a summary finding that federal nuclear safety regulations are part of Price-Anderson's "statutory scheme." *Id.* The basis for the court's finding on this point is unclear, but appears to be an attempted linkage of the Price-Anderson Act's undisputed intent "to protect the public," *see, e.g., 42 U.S.C. § 2012*, with the fact that federal regulation of nuclear energy is also intended to protect the public. *See 13 F.3d at 1105* (citing Price-Anderson's goal of protecting the public).

That both the Price-Anderson Act and federal nuclear safety regulations may serve the same broad purpose is not a basis for finding these regulations are part of the Price-Anderson Act and its statutory scheme. **[**57]** [16] As discussed earlier, the *O'Conner* court's findings that federal safety regulations are part of the Price-Anderson Act and that they therefore preempt state law-based standards of care contradict the plain language of *section 2014(hh)* and *section 2210*, as well as the legislative history of the 1988 Amendments Act. *See supra* Section I.C.1. The *O'Conner* court's further statement that "imposing a standard of care other than the federal regulations would disturb the carefully crafted balance between private involvement and safety that Congress has achieved," *13 F.3d at 1105*, is contradicted by these same authorities and the forty plus year history demonstrating Congress' intent that state tort law rules, including strict liability and other state standards of care, provide the substantive rule of decision in actions arising from nuclear incidents.

> 16    The court's apparent rationale also ignores that the two federal regimes actually serve quite different purposes, as federal nuclear safety regulations are intended to protect the public at large by preventing the occurrence of a nuclear incident, while the Price-Anderson Act and system are intended to protect members of the public injured as a result of such an incident by ensuring that they receive compensation for their injuries. *Compare 42 U.S.C. § 2201(b)* (authorizing NRC to promulgate regulations "to protect health or to minimize danger to life and property") *with id. § 2210* (establishing indemnification and compensation system in case of nuclear incident).

**[**58]** Without acknowledging Congress' historical intent that state tort law govern public liability actions, the *O'Conner* court attempts to rebut the relevance of this history by reciting a single statement from one of the five committee reports on the 1988 Act: "the [pre-1988] Price-Anderson system, including the waiver of defenses provisions, the omnibus coverage, and the predetermined sources of funding, provides persons seeking compensation for injuries **[*1196]** as a result of a nuclear incident with significant advantages over the procedures and standards for recovery that might otherwise be applicable under State tort law." *13 F.3d at 1100* (citing S. Rep. No. 100-218, at 4). The court asserts this statement demonstrates Congress' explicit recognition and intent that under the 1988 Amendments Act "state law would operate in the context of a complex federal scheme which would mold and shape any cause of action grounded in state law." *Id.*

Even when read in isolation, the quoted committee statement does not support the court's conclusion, as the statement does no more than accurately report that the Price-Anderson system, both before and after the 1988 Amendments, provides **[**59]** less stringent federal standards (*i.e., de facto* strict liability standard in some cases, omnibus coverage) and other advantages (guaranteed pool of funds to pay damages) than would be available to injured parties in the absence of this federal system. *See, e.g.,* H.R. Rep. No. 100-104(III), at 14 (discussing how Price-Anderson's "conscious departure[s] from ordinary tort law" benefit injured members of the public). Furthermore, the committee made this statement to justify its conclusion that the Price-Anderson system should be reauthorized, not that it should be changed in the fundamental manner asserted by the *O'Conner* court. *See* S. Rep. No. 100-218, at 4, *reprinted in* 1988 U.S.C.C.A.N. at 1479.

In deciding that federal regulatory standards preempt state common law standards in public liability actions, the *TMI II* and *O'Conner* courts also appear to have assumed to some degree that because Congress provided in 1988 that actions asserting liability for all nuclear incidents "arise under" the federal Price-Anderson Act and are thus subject to federal jurisdiction, it must also have intended to impose federal law, including federal standards of care, in **[**60]** these actions. *See, e.g., TMI II, 940 F.2d at 858* (through the 1988 Amendments Act, Congress placed "an overlay of federal law upon the rights and remedies previously available under state law"). This assumption is contrary to Congress' explicit direction in the 1988 Act that state law would continue to provide the substantive laws of decision in these actions.

273 F. Supp. 2d 1175, *1196; 2003 U.S. Dist. LEXIS 12927, **60;
57 ERC (BNA) 1294

*See 42 U.S.C. § 2014(hh)*. It also is rebutted by the legislative history of the 1966 amendments to Price-Anderson, in which Congress first extended federal jurisdiction to certain public liability actions, while also declaring its intent that all public liability actions remain subject to state law. *See supra* Section I.B.3. That Congress at the same time took steps to establish what amounts to a *de facto* standard of strict liability for the same actions for which it granted federal jurisdiction (*i.e.*, those arising from extraordinary nuclear occurrences), *see id.*, further demonstrates that Congress did not intend for the creation of the federal cause of action to impose a standard of care measured by compliance with federal regulations. *See TMI II, 940 F.2d at 870 n.3* **[**61]** (Scirica, J., concurring)

Finally, the context in which the standard of care question arose appears to have influenced the *TMI II* and *O'Conner* courts in their decisions. In both cases, the sole or primary question before the courts was not the standard of care in a public liability action arising under the Price-Anderson Act, but rather whether Congress had exceeded its constitutional authority in conferring federal subject matter jurisdiction over such actions. *See TMI II, 940 F.2d at 835; O'Conner, 13 F.3d at 1094-1101*. The courts' concern was Article III, section 2 of the Constitution, which, as relevant here, authorizes Congress to extend subject matter jurisdiction to all cases and controversies "arising **[*1197]** under . . . the Laws of the United States."

The Supreme Court has held that "pure jurisdictional statutes" that "seek 'to do nothing more that grant jurisdiction over a particular class of cases' cannot support Article III 'arising under jurisdiction.'" *Mesa v. California, 489 U.S. 121, 136, 103 L. Ed. 2d 99, 109 S. Ct. 959 (1989)* (quoting *Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 496, 76 L. Ed. 2d 81, 103 S. Ct. 1962 (1983))*. **[**62]** It is also well established, however, that Article III "arising under" jurisdiction [17] exists where every action said to arise under a federal statute "necessarily involves application of a body of federal substantive law." *Verlinden, 461 U.S. at 497*. Accordingly, the conclusion of the *TMI II* and *O'Conner* courts that federal rather than state law sets the standard of care for actions "arising under" the Price-Anderson Act eliminated any question that they were correct in ultimately holding that Congress acted within its Article III authority when it conferred federal jurisdiction on such actions. *See TMI II, 940 F.2d at 860* (Congress did

not exceed its constitutional authority in conferring federal jurisdiction over public liability actions because plaintiffs' rights will necessarily be determined in part by reference to federal nuclear safety regulations, so that "important federal questions . . . are indispensable ingredients of the public liability action"); *O'Conner, 13 F.3d at 1101* (because the duty a defendant owes to a plaintiff in a public liability action is dictated by federal law, "any public liability action has **[**63]** significant federal ingredients which satisfy arising under jurisdiction").

> 17   Article III "arising under" jurisdiction is distinct from and broader than statutory "arising under" jurisdiction pursuant to *28 U.S.C. § 1331*, the statute granting district courts general federal question jurisdiction over any case that "arises under" the laws of the United States. *See Verlinden, 461 U.S. at 494-95*. Thus, the "well-pleaded complaint" rule, which requires that a federal question appear on the face of a well-pleaded complaint for federal question jurisdiction to exist pursuant to *section 1331*, is not relevant to determining the constitutional power of Congress to confer jurisdiction on the federal courts through the Price-Anderson Act or some other statute. *Id. at 495* (quoting *Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 379 n.51, 3 L. Ed. 2d 368, 79 S. Ct. 468 (1959))*.

The difficulty with these courts' reliance on this factor to determine **[**64]** the constitutionality of Congress' jurisdictional grant is at least three-fold. First, as detailed above, the courts disregarded Congress' intent that state law supply the standard of care in public liability actions. Second, they apparently assumed that Congress may *only* extend federal jurisdiction to a category of cases if *all* such cases necessarily will involve application of a substantive body of federal law. As the Supreme Court made clear in *Verlinden*, however, this is not the case: "Congress may confer on the federal courts jurisdiction over any case or controversy that *might* call for the application of federal law." *461 U.S. at 492* (emphasis added). [18] Thus, there is no suggestion in *Verlinden* or the other authority cited by the *TMI II* and *O'Conner* courts that the only situation in which Congress may properly confer federal jurisdiction under Article III is when all cases within the jurisdictional **[*1198]** grant involve application of substantive federal law.

18  The Supreme Court was fully aware that this statement of Article III "arising jurisdiction" was so broad as to raise questions about the precise boundaries of Congress' constitutional authority, but found it unnecessary to decide the issue because the suit before them, and the federal statute on which it was based, necessarily and in all instances "raised questions of substantive federal law at the very outset, and hence clearly 'arises under' federal law, as that term is used in Article III." *Id.*

[**65] Third, the constitutional analysis of the *TMI II* and *O'Conner* courts fails to recognize that Congress' grant of federal jurisdiction in the Price-Anderson Act may be upheld without reference to a federal standard of care. This was the conclusion of Judge Scirica in a thoughtful concurrence in the *TMI II* action, in which, among other things, he criticized the majority's conclusion that Congress intended to preempt state standards of care that do not conform to federal regulation. *940 F.2d at 870*; *see id. at 863-64*. Judge Scirica noted that the constitutionality of Congress' grant of optional federal jurisdiction to public liability actions raised the issue noted but not decided in *Verlinden*: the extent to which Congress may confer federal jurisdiction over a class of actions that may, but will not necessarily, implicate substantive federal questions. *Id. at 865*. He then carefully analyzed the ways in which substantive federal issues might be implicated in public liability actions deemed to arise under the Price-Anderson Act, *see id. at 868-77*, and concluded the likelihood that such federal questions would [**66] be present, combined with the need to protect a federal court's ability to implement the Price-Anderson system for the orderly disposition of large-scale nuclear accident litigation, were sufficient to permit the conferral of federal jurisdiction under Article III. *Id. at 866, 876-77*. I concur in his analysis and conclusion.

I also offer an additional rationale for the constitutionality of Congress' decision to establish federal jurisdiction over Price-Anderson public liability actions. The existence of a federal question is implicit in every public liability action because every such action by definition arises out of or results from source, special nuclear or byproduct material. *See 42 U.S.C. § 2014(q), (w), (hh)*. Use and possession of these nuclear materials was originally the exclusive province of the federal government, and while the AEA of 1954 authorized

non-federal actors to participate in this monopoly, it did so only as to actors who obtained an appropriate federal license or contract. *See, e.g., Duke Power, 438 U.S. at 63*; *42 U.S.C. §§ 2011-2297h-13*. The use and possession of these materials [**67] by federal licensees and contractors is further subject to strict regulation by federal authorities, reflecting Congress' determination in the AEA to create "a program for Government control of the possession, use, and production of atomic energy and special nuclear material, whether owned by the Government or others, so directed as to make the maximum contribution to the common defense and security and the national welfare." *42 U.S.C. § 2013(c)*; *see Duke Power, 438 U.S. at 63*. Congress' establishment of special liability, choice of law, federal indemnification and compensation standards and procedures for nuclear incidents is a further manifestation of the inherently federal nature of nuclear materials and activities. Under these circumstances, as in the seminal case of *Osborn v. Bank of the United States, 22 U.S. (9 Wheat) 738, 6 L. Ed. 204 (1824)*, the federal nuclear program "itself is the first ingredient in the case,--is its origin,--is that from which every other part arises." *Id. at 825*. Thus, Price-Anderson's conferral of federal jurisdiction on public liability actions arising from source, special nuclear [**68] and byproduct materials is not a "pure jurisdictional statute," but rather is part of the entire federal program, "arising under . . . the Laws of the United States," for controlling and managing these materials and their risks. *See id. at 825-26*.

Perhaps motivated by a desire for a sure basis on which to uphold the constitutionality of Congress' conferral of federal jurisdiction over cases such as this, the *TMI II* [*1199] and *O'Conner* courts ignored the principle that is at the heart of any preemption analysis: congressional intent. *See, e.g., Medtronic, 518 U.S. at 485-86* ("any understanding of the scope of a pre-emption statute must rest primarily on 'a fair understanding of *congressional purpose*;'" (emphasis in original)). Relying without question on the federal preemption of state law found by *TMI II* and *O'Conner*, courts now routinely hold that public liability actions are only "nominally" governed by state law rules of decision, notwithstanding Congress' plain language to the contrary in the 1988 Amendments Act and related legislative history. *See Good v. Fluor Daniel Corp., 222 F. Supp. 2d 1236, 1247 (E.D.Wash. 2002)*; [**69] *see also* Dan Guttman, *Price-Anderson Act Reauthorization: Due Diligence Is in Order*, *32 Envtl. L. Rep. 10594, 10600 (May 2002)*

273 F. Supp. 2d 1175, *1199; 2003 U.S. Dist. LEXIS 12927, **69; 57 ERC (BNA) 1294

(noting conflict between Act's policy that state law principles determine damage claims and case law imposing federal duty of care). This conclusion turns congressional intent on its head and is contrary to binding Supreme Court and Tenth Circuit authority. For all of these reasons, I hold that federal nuclear safety regulations do not preempt state law standards of care in an action brought under the Price-Anderson Act and therefore reject Defendants' contention that Plaintiffs must prove Defendants violated these regulations as an element of their tort claims.

II. Trespass Claim

The elements of the tort of trespass under Colorado law [19] are "a physical intrusion upon property of another without the proper permission from the person legally entitled to possession of that property." *In re Hoery v. United States, 64 P.3d 214, 217 (Colo. 2003); Cook VIII, 181 F.R.D. at 485*. Defendants contend the first element, that a "physical intrusion" have occurred, can only be demonstrated in this case by proof [**70] that plutonium or other contaminants attributable to Plant operations are present on class properties *and* have caused actual and substantial damage to these properties. [20] This requirement, Defendants further assert, can only be satisfied by a showing that Plant contaminants have come to be located on these properties at levels "of toxicological concern," *i.e.*, at levels that scientific evidence demonstrates pose a health risk. Otherwise, Defendants contend, the presence of plutonium contamination on class properties is *de minimis* and does not, as a matter of law, constitute a trespass under Colorado law. Plaintiffs respond that the tort of trespass traditionally is complete without proof of harm and that Colorado follows this rule.

19   As Plaintiffs' tort claims are governed by Colorado law, my task is to ascertain and apply Colorado law so that the result obtained in federal court is the same as would be reached in a Colorado court. *See Adams-Arapahoe School Dist. No. 28-J v. GAF Corp., 959 F.2d 868, 870 (10th Cir. 1992)*. Where there is no authoritative precedent from Colorado's highest court on a given issue, I must predict how the Colorado Supreme Court would rule. *Id. at 871*.

[**71]

20   In *Cook VIII*, I denied summary judgment on Plaintiffs' trespass claim on the ground that

genuine issues of fact exist as to the actual physical invasion of Plaintiffs' land through contamination emanating from Rocky Flats. *181 F.R.D. at 485-86*.

The tort of trespass is predicated upon and intended to protect the plaintiff's right to exclusive possession of its property. *See* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 13, at 67, 70 (5th ed. 1984); *Restatement (Second) of Torts § 163 cmt. d* (1965). Intentionally entering or causing a person or thing to enter land in the possession of another infringes on this right, and renders a defendant liable for trespass irrespective [*1200] of whether the defendant's intrusion causes actual harm to the land or its possessor. *See, e.g., Restatement, §§ 158, 163*; Prosser and Keeton § 13, at 70-71; *Gill v. LDI, 19 F. Supp. 2d 1188, 1197-98 (W.D. Wash. 1998)* ("Where there is an actual entry upon the land, either by the defendant or some tangible thing intruding on the land because of the defendant's [**72] actions, interference with the exclusive right of possession is assumed."). Thus, under the traditional rule, proof that the trespassory invasion caused actual damages is not required to establish liability, and the plaintiff is always entitled to recover at least nominal damages. *See, e.g., Adams v. Cleveland-Cliffs Iron Co., 237 Mich. App. 51, 602 N.W.2d 215, 219 (Mich. App. 1999); In re Burbank Envtl. Litig., 42 F. Supp. 2d 976, 984 (C.D. Cal. 1998); Bradley v. Am. Smelting & Ref. Co., 104 Wn.2d 677, 709 P.2d 782, 787 (Wash. 1985)*.

This rule was developed, and is readily applied, in the context of persons or things physically entering onto the property of another, *see, e.g.*, Prosser and Keeton § 13, at 70-71, and there is no question Colorado follows the traditional rule in such cases. *See, e.g., Hoery, 64 P.3d at 217; Gerrity Oil & Gas Corp. v. Magness, 946 P.2d 913, 933 (Colo. 1997); Burt v. Beautiful Savior Lutheran Church, 809 P.2d 1064, 1067 (Colo. 1990)*. Over time, however, litigants have pushed the envelope of what constitutes a trespassory invasion of property by asserting [**73] trespass claims based on intangible phenomena such as light, noise, electromagnetic fields and airborne gases. Some courts and commentators deny that such "intangible intrusions" are actionable at trespass at all, because they do not, in and of themselves, infringe on the right to exclude others from property. *See, e.g., Adams, 602 N.W.2d at 222-23*. Other courts have allowed trespass claims based on intangible intrusions, but only upon proof that actual and substantial damages resulted.

273 F. Supp. 2d 1175, *1200; 2003 U.S. Dist. LEXIS 12927, **73; 57 ERC (BNA) 1294

[21] *See, e.g., San Diego Gas & Elec. Co. v. Superior Court, 13 Cal. 4th 893, 55 Cal. Rptr. 2d 724, 920 P.2d 669, 695 (Cal. 1996); Maddy v. Vulcan Materials Co., 737 F. Supp. 1528, 1540-41 (D. Kan. 1990); Bradley, 709 P.2d at 790-91; Borland v. Sanders Lead Co., 369 So.2d 523, 529-30 (Ala. 1979).*

> 21   In these jurisdictions, the tort of "intangible trespass" more closely resembles the tort of nuisance than traditional trespass. *See, e.g.,* Prosser and Keeton § 13, at 71-72; *Adams, 602 N.W.2d at 219-22*.

[**74] Some of the courts recognizing "intangible trespass" have extended the concept of intangible intrusions triggering the requirement to prove actual damages to cases involving the deposition of contaminants on a property. These courts reason that the presence of such contaminants is not perceptible and therefore does not infringe on the right to exclusive possession of property, so actual damages must be shown. *See Bradley, 709 P.2d at 791; Borland, 369 So.2d at 529-30*. It is these cases Defendants invoke in asserting that Plaintiffs must prove actual harm resulting from the presence of plutonium or other Plant contaminants on their property, by proving the contamination poses a scientifically demonstrated health risk, in order to establish liability for trespass.

In *Public Service Co. of Colorado v. Van Wyk, 27 P.3d 377 (Colo. 2001)*, the Colorado Supreme Court joined the modern trend by recognizing that an intangible intrusion onto another's property may constitute a trespass, but only upon proof that the intangible intrusion caused physical damage to the property. *See id. at 390*. In so doing, it distinguished between [**75] trespass based on a "physical entry" and one based on an "intangible intrusion," *id. at 389*, which it defined as "something that is impalpable, [*1201] or incapable of being felt by touch." *Id. at 387*. The court concluded that the intruding forces at issue in *Van Wyk*, noise, electromagnetic fields and radiation waves emitted by power lines, were all intangible rather than physical invasions, *id. at 387-88*, and were only actionable as trespass upon proof that the intrusion caused specific physical damage to the plaintiff's property. *Id. at 391*.

Despite its potentially expansive definition of an "intangible intrusion" in *Van Wyk*, the Colorado Supreme Court recently clarified in *In re Hoery* that the migration and presence of contaminants upon another's property

constitutes a physical invasion that is actionable under the traditional rule of trespass. [22] *See Hoery, 64 P.3d at 221-222*. The alleged trespass in *Hoery* was the presence of the chemical TCE in groundwater and soil beneath the plaintiff's property as a result of the migration of TCE-contaminated groundwater from the defendant's property. [**76] *See id. at 222*. The Colorado court held this "constituted a trespass because the toxic pollution released by the [defendant] physically intruded upon [plaintiff's] property without his permission." *Id. at 222*. Given the distinction the court made in *Van Wyk* between physical and intangible intrusions, this conclusion necessarily means the court does not consider the deposition of pollution (which is after all a tangible matter) onto another's property to be an intangible intrusion under Colorado law, even though the pollution is present on the property in a form or at a concentration that is not perceptible to human senses. [23] *See Van Wyk, 27 P.3d at 389* (distinguishing between physical entry upon the land of another, which is a trespass without more, and the question of whether an intangible intrusion may constitute a trespass); *accord San Diego Gas, 920 P.2d at 695* (cited with approval in *Van Wyk, 27 P.3d at 390*) (intangible intrusions actionable in trespass if accompanied by actual damage to defendant's property *or* deposition of particulate matter on the property); *Maryland Heights Leasing, Inc. v. Mallinckrodt, Inc., 706 S.W.2d 218, 226 (Mo. Ct. App. 1985)* [**77] (deposit of radioactive materials on plaintiff's property supports traditional trespass claim). As it is well established that Colorado law does not require proof of actual damages to prove trespass based on a physical intrusion upon property, *see Hoery, 64 P.3d at 217*, Plaintiffs need not demonstrate that plutonium and other Plant-derived contaminants are present on their properties at levels of toxicological concern or are otherwise causing damage to their properties in order to prevail on their trespass claim.

> 22   The Colorado Supreme Court issued *Hoery* earlier this year in response to the Tenth Circuit's certification to it of unresolved questions of Colorado law that controlled a 2001 appeal of an environmental contamination action from this court. *See Hoery, 64 P.3d at 215*. The *Hoery* decision resolved or clarified a number of difficult issues of Colorado trespass and nuisance law that had previously perplexed litigants and this court and contributed to the delay and uncertainty in proceeding with diversity environmental contamination actions here.

273 F. Supp. 2d 1175, *1201; 2003 U.S. Dist. LEXIS 12927, **78; 57 ERC (BNA) 1294

[**78]

23    The TCE was detected in groundwater underlying plaintiff Hoery's property at a concentration of 20 micrograms per liter. *64 P.3d at 216 n.2.*

III. Private Nuisance Claim

A. Health Risk as an Element of the Claim

Private nuisance is a tort against land predicated on the right of an individual to use and enjoy his property. *See Hoery, 64 P.3d at 218* & n.5; Prosser and Keeton § 87, at 622 (distinguishing between right of exclusive possession underlying trespass claim and right to use and enjoy property underlying nuisance **[*1202]** claim). To establish liability for private nuisance under Colorado law, the plaintiff must prove the defendant engaged in "an intentional, negligent, or unreasonably dangerous activity resulting in the unreasonable and substantial interference with [the] plaintiff's use and enjoyment of her property." *Van Wyk, 27 P.3d at 391; see Hoery, 64 P.3d at 218; Cook VIII, 181 F.R.D. at 485.* Continuing their theme, Defendants assert that as a matter of law Plaintiffs cannot prove Defendants unreasonably **[**79]** and substantially interfered with Plaintiffs' use and enjoyment of their properties unless they show plutonium contamination is present on their properties at levels posing an actual, scientifically verifiable health risk. 24

24    Defendants previously made this argument in a motion for summary judgment that was denied because of genuine issues of fact regarding Plant-related contamination and its effects. *See Cook VIII, 181 F.R.D. at 485-86.*

Under Colorado law, whether the defendant has unreasonably and substantially interfered with the plaintiff's use and enjoyment of his property is a factual question to be decided by the trier of fact. *Van Wyk, 27 P.3d at 391.* In making this determination, the trier of fact must weigh the gravity of the harm and the utility of the conduct causing the harm. *Id.* To be substantial and unreasonable, the interference generally "must be significant enough that a normal person in the community would find it offensive, annoying, or inconvenient. **[**80]** " *Id.* (citing *Restatement § 821F*); *see Haas v. Lavin, 625 F.2d 1384, 1389 (10th Cir. 1980)* (quoting *Lowder v. Tina Marie Homes, Inc., 43 Colo. App. 225, 601 P.2d 657, 658 (Colo. Ct. App. 1979)).* 25 In other words, "'whether the various factors of interference

asserted by the plaintiffs as to their use and enjoyment of their home were a substantial invasion of their interests [is] measured by the standard of their effect upon a normal person in the same or similar circumstances.'" *Cook VIII, 181 F.R.D. at 485* (quoting *Allison v. Smith, 695 P.2d 791, 794 (Colo. App. 1984)).*

25    Others have stated distinct standards for unreasonable and substantial interference: substantial interference means significant harm to the plaintiff as measured by the reaction of a normal member of the community, Prosser and Keeton § 88, at 626; *Restatement § 821F*; and unreasonable interference means it would be unreasonable to permit the defendant to cause such an amount of harm without compensating for it. Prosser and Keeton § 88, at 626; *see Restatement § 826 cmt. b.*

[**81]    Plaintiffs assert Defendants have substantially and unreasonably interfered with their use and enjoyment of their properties by: (1) conducting activities at Rocky Flats that have resulted in actual contamination of the class area with plutonium from the Plant, which in turn has created measurable toxicological risks for Plaintiffs and resulted in rationally grounded apprehension regarding known and potential risks associated with this contamination; (2) improperly burying and storing hazardous waste at the Plant, giving rise to ongoing contamination of class properties and a reasonable concern these conditions will lead to additional offsite releases and risks; and (3) misleading the community as to these conditions and activities, thus increasing Plaintiffs' uncertainty and apprehension. Defendants' position is that the only relevant factor cited by Plaintiffs is the alleged current contamination of their properties and that this circumstance, as a matter of law, only constitutes a substantial interference with the use and enjoyment of property if the contamination poses a measurable and verifiable health risk.

I disagree. As previously established in this case, under the law of **[**82]** nuisance there are countless ways in which a defendant can substantially interfere with a plaintiff's **[*1203]** use and enjoyment of land, "'including interference with the physical condition of the land itself, disturbance in the comfort or conveniences of the occupant including his peace of mind, and threat of future injury that is a present menace and interference with enjoyment.'" *Id.* (quoting *Adkins v. Thomas Solvent*

273 F. Supp. 2d 1175, *1203; 2003 U.S. Dist. LEXIS 12927, **82; 57 ERC (BNA) 1294

*Co.*, 440 Mich. 293, 487 N.W.2d 715, 720 (Mich. 1992)); *see* Prosser and Keeton § 87, at 620 ("virtually any disturbance of the enjoyment of property may amount to a nuisance" so long as it is substantial and unreasonable from the perspective of a normal person). Thus, while activities that cause a physical intrusion or detrimental change in the condition of plaintiff's land can and usually are found to constitute a nuisance, *see Restatement § 821F cmt. d*; Prosser and Keeton § 88, at 627, such a physical change or intrusion is not required to prove substantial and unreasonable interference with the plaintiff's right to use and enjoy its property. *See* Prosser and Keeton § 87, at 619-20; *Lewis v. General Elec. Co., 37 F. Supp. 2d 55, 61 (D. Mass. 1999)*; [**83] *Adkins, 487 N.W.2d at 721* & n.12. Other circumstances may properly be considered and relied upon by a jury to find nuisance liability if these circumstances result from the defendant's activities and cause fear, anxiety, discomfort or some other condition that substantially interferes with the plaintiff's use and enjoyment of property. *See, e.g., Cook VIII, 181 F.R.D. at 485*; Prosser and Keeton § 87, at 620.

I am also not persuaded that verifiable health risk is required to prove nuisance in cases involving a physical intrusion or detrimental change to the property resulting from the presence of contamination there. First, the Colorado Supreme Court's recent decision in *Hoery* strongly suggests that proof of health risk is not an element of such a claim. In that case, the Colorado court held that the ongoing presence of the chemical TCE in groundwater and soil beneath the plaintiff's property as a result of the migration of TCE-contaminated groundwater from the defendant's property constituted a continuing nuisance under Colorado law. *See 64 P.2d at 216, 222.* In so holding, the court reported in a footnote that TCE was present [**84] in groundwater beneath the plaintiff's property at a concentration of 20 micrograms per liter, which is four times Colorado's health-based standard for TCE in drinking water. *Id. at 216 n.2.* The plaintiff in *Hoery* did not use the groundwater for drinking water, but used it to irrigate his lawn and vegetable garden. *Id. at 216.* Rather than considering whether use of the contaminated water for this purpose and/or the presence of contaminated soil on the property posed a health risk of any kind, the Colorado court declared without more that the TCE contamination on the property "constituted a nuisance because [it] substantially invaded [plaintiff's] interest in the use and enjoyment of his property." *Id. at 222.* The omission of the concept of health risk from the

court's discussion supports my conclusion that Colorado law does not require that contamination pose an actual or verifiable health risk in order for it to be found a private nuisance.

This conclusion is also consistent with relevant statements of law in the Restatement of Torts and Prosser and Keeton on the Law of Torts, both of which are frequently relied upon by the [**85] Colorado courts in deciding questions of nuisance law. *See, e.g., Hoery, 64 P.3d at 218* & n.5; *Van Wyk, 27 P.3d at 391-92, 394-95; Baughman v. Cosler, 169 Colo. 534, 459 P.2d 294, 299 (Colo. 1969). Section 821F of the Restatement* and its supporting commentary, relied upon by the Colorado Supreme Court in *Van Wyk,* states that a significant invasion of another's interest in the use and enjoyment of property exists "if normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable." [26] [*1204] *Restatement § 821F & cmt. d; see Van Wyk, 27 P.3d at 391* (citing *Restatement § 821F*). The comments to this section further provide as relevant here: "In determining whether the harm would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account, *even though they may be without scientific foundation or other support in fact." Restatement, § 821F cmt. f* (emphasis added). Thus, the Restatement explains, a landowner's fear of possible contagion from a neighboring leprosy sanatarium [**86] can disturb his peace of mind sufficiently for it to constitute a private nuisance, even though the possibility of contagion is so remote that this fear is unfounded as a practical matter. *See id.* Prosser and Keeton make statements to the same effect. *See* Prosser and Keeton § 87, at 620, § 88, at 629. Likewise, under this rule, the existence of contamination on a property may constitute a nuisance, even if it does not pose a currently measurable or verifiable risk to the property or its occupants, if the jury finds the contamination, alone or in combination with other alleged factors of interference, would cause a normal member of the community in the same or similar circumstances to experience sufficient fear, anxiety or other discomfort that the community member would find the contamination (and/or other factors of interference) seriously offensive, annoying or inconvenient. *See Restatement § 821F & cmt. d; Van Wyk, 27 P.3d at 391* (stating test for substantial and unreasonable interference). [27]

273 F. Supp. 2d 1175, *1204; 2003 U.S. Dist. LEXIS 12927, **86; 57 ERC (BNA) 1294

26   This standard is intended to prevent a finding of nuisance for property owners who are hypersensitive to the allegedly offending conditions and to allow nuisance to be found even where the property owners have, by continued exposure, become inured to the conditions. *See Restatement, § 821F cmt. d.*

[**87]

27   Actual contamination that does not pose a demonstrable health risk to property occupants might also substantially interfere with the use and enjoyment of property in other ways, such as by causing government authorities to place restrictions on the property's use and sale, *see, e.g., Exxon Corp. v. Yarema, 69 Md. App. 124, 516 A.2d 990, 1005 (Md. Ct. Spec. App. 1986),* or by putting plants or animals on the property at risk.

The Tenth Circuit in dicta has questioned whether the Colorado Supreme Court or any court would follow the Restatement rule allowing nuisance liability to be premised on a landowner's unfounded fear of risks associated with a neighboring property. *See Boughton v. Cotter Corp., 65 F.3d 823, 832 n.13 (10th Cir. 1995).* The court's apparent concern, quoting from the Michigan Supreme Court's decision in *Adkins v. Thomas Solvent Co., 440 Mich. 293, 487 N.W.2d 715 (Mich. 1992),* was that such a rule could lead to "anachronistic" results such as a group home for AIDS patients or disabled persons being held nuisances based on the [**88] unfounded fears of neighbors the such facilities posed a health risk to them. [28] *65 F.3d at 832 n.13* (citing *Adkins, 487 N.W.2d at 726*). The issue in *Adkins,* however, was not whether a landowner's concerns must be grounded in fact before a jury can decide that these concerns substantially interfered with the landowner's use and enjoyment of property. Rather it was whether the unfounded fears of *unrelated third parties* that cause a decline in a property's value can constitute a substantial interference with *the landowner's* interest in the use and enjoyment of the [*1205] property. *See Adkins, 487 N.W.2d at 724-26 &* nn.32, 34. The Michigan court held it could not because depreciation in a property's market value, standing alone, is not a substantial interference with an individual's use and enjoyment of the property. [29] *See id. at 725.* The Michigan court further noted the *Adkins* plaintiffs had failed to allege either actual or potential contamination of their properties or that the conditions created by the defendants caused them fear, anxiety or other discomfort.

*Id. at 725-26.* As a result, the Michigan court held the [**89] plaintiffs had failed to allege any interference at all in their use and enjoyment of property and hence had failed to state a nuisance claim as a matter of law. *Id. at 725, 726.*

28   The use of the term "anachronistic" in the 1995 *Boughton* and 1992 *Adkins* decisions to describe the Restatement rule approving reliance on unfounded fears of landowners is itself questionable given that the rule had been stated and endorsed in the Restatement and Prosser and Keeton a relatively few years before these decisions were issued. *See Restatement, § 821F cmt. f* (published 1979); Prosser and Keeton § 87, at 620, § 88, at 629 (published 1984).

29   The *Adkins* court did recognize that property depreciation is generally a proper element of damages in a nuisance action to be considered when and if liability for nuisance is otherwise established by proof that defendant's activities substantially interfered with the property owner's use and enjoyment of property. *487 N.W.2d at 725.* The court also specified that it was not deciding whether unfounded public fears that depress property values could support an award of damages where a basis for nuisance liability was otherwise established. *Id. at 721 n.13.*

[**90]   I read the Michigan court's discussion as suggesting that the result would have been different if the *Adkins* plaintiffs had alleged actual contamination of their properties as a result of the defendant's actions or that the defendant's actions had caused them personal fear, annoyance or discomfort. [30] *See Lewis, 37 F. Supp. 2d at 61* (also reading *Adkins* in this manner). In fact, courts continue to approve nuisance claims based on actual property contamination and landowners' concerns regarding this contamination, without regard to whether the contamination poses an actual health risk. *See, e.g., id.* (allegations of personal fear of contamination and of health risk to family sufficient to state private nuisance claim); *Berry v. Armstrong Rubber Co., 989 F.2d 822, 829 (5th Cir. 1993)* (under Mississippi law, actual contamination of property supports nuisance claim even if contamination does not reach dangerous levels); *Phillips v. Davis Timber Co., 468 So.2d 72, 78 (Miss. 1985)* (same); *see also* Prosser and Keeton § 88, at 627 (noting courts normally impose nuisance liability on defendants whose knowing contamination [**91] of

273 F. Supp. 2d 1175, *1205; 2003 U.S. Dist. LEXIS 12927, **91; 57 ERC (BNA) 1294

plaintiff's land has affected the land's rental or market value). [31]

> 30   For example, the *Adkins* court criticized the proposed rule that nuisance liability could be established based solely on decreased property value caused by third party fear of contamination because it would permit recovery "even if the polluted groundwater had neither strayed from defendants' own property nor disturbed a plaintiff's enjoyment by fear that it would do so." *487 N.W.2d at 725-27.*
>
> 31   Other courts have also allowed nuisance claims based on environmental contamination to proceed even where there was no evidence that the plaintiffs' property was in fact contaminated. *DeSario v. Industrial Excess Landfill, Inc., 68 Ohio App. 3d 117, 587 N.E.2d 454, 461 (Ohio App. 1991)* (class damages recoverable on private nuisance theory based on perception of contamination irrespective of actual contamination) (called into question by *Chance v. BP Chemicals, Inc., 77 Ohio St. 3d 17, 670 N.E.2d 985 (Ohio 1996)*); *Allen v. Uni-First Corp., 151 Vt. 229, 558 A.2d 961, 963-65 (Vt. 1988)* (evidence that property values decreased based on public perception of contamination sufficient for jury to find private nuisance). The courts in these cases necessarily did not view proof of verifiable health risk from contamination to be a prerequisite to nuisance liability. As previously noted, however, there is a split in authority regarding whether nuisance liability premised on contamination attributable to the defendant can be proved absent present contamination of the plaintiff's property. *See Cook v. Rockwell ("Cook III"), 147 F.R.D. 237, 244-45 (D. Colo. 1993)*. It does not appear that this issue need be addressed in this case given Plaintiffs' assertions that both their properties and the class properties are contaminated with plutonium from Rocky Flats.

[**92]   [*1206]   A concern about "anachronistic" results in nuisance suits should also be ameliorated by the legal principle, incorporated in the Restatement and followed in Colorado, that substantial interference with the plaintiff's use and enjoyment of property is measured by the reaction of a normal member of the community facing the same or similar conditions as the plaintiff.

*Restatement § 821F & cmt. d*; *Van Wyk, 27 P.3d at 391*. In assessing how a member of the community would react, the finder of fact takes in account the character and habits of the relevant community, [32] as well as the experiences, attitudes and knowledge of its members. *See Restatement § 821F cmt. e*; Prosser and Keeton § 88, at 627-29. These factors change over time as communities change, social attitudes evolve and more and better information about health and other risks posed by contamination and other potentially offending conditions becomes available to and accepted by the community. Thus, the leprosy sanatorium or the AIDS treatment center that might have disturbed the peace of mind of community members and constituted a nuisance in the past likely would not be deemed a nuisance in most communities [**93] today because their members now have a better understanding of the actual risk, or non-risk, posed by such facilities. *See Exxon Corp. v. Yarema. 69 Md. App. 124, 516 A.2d 990, 1003 (Md. Ct. Spec. App. 1986)*. That the reaction of the normal community member is the standard for deciding substantial interference with a property owner's use and enjoyment of property therefore protects against findings of nuisance that do not reflect current social attitudes and scientific information.

> 32   The community to be considered is the community in which the affected property is located, rather than a community encompassing the general public as a whole. *See Restatement, § 821F cmt. e.*

Defendants also cite the Tenth Circuit's decision in *Boughton* as establishing a rule that nuisance and trespass claims require scientific proof of real harm or current risk. The legal issue considered and decided by the Tenth Circuit in *Boughton*, however, was whether an unfounded fear of contracting a disease is [**94] compensable under Colorado law as an item of "annoyance and discomfort" damages in a nuisance or trespass action. [33] *65 F.3d at 831-33* & n.13. In holding it was not, the Tenth Circuit was careful to distinguish between evidence relevant to proving liability for nuisance and evidence relevant to proving any annoyance and discomfort damages once liability is established. *65 F.3d at 832-33*. The court stated that fear of disease might prove nuisance liability by showing how the utility or desirability of a property had been affected by the defendant's activities, even though these same fears would not be compensable as annoyance and discomfort

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 109 of 332

Page 24

273 F. Supp. 2d 1175, *1206; 2003 U.S. Dist. LEXIS 12927, **94; 57 ERC (BNA) 1294

damages once liability was found. *Id. at 833.* The court also declared that if nuisance liability was established based on fear of disease, damages could still be awarded for loss of value to the property. [34] *Id.* The Tenth [*1207] Circuit's decision does not, therefore, support Defendants' contention that proof of verifiable health risk is necessary to establish liability for nuisance.

33    Under Colorado law, annoyance and discomfort damages are a separate element of damages compensating the plaintiff for personal injury suffered as a result of injury to plaintiff's property. *Board of County Commrs. v. Slovek, 723 P.2d 1309, 1318 (Colo. 1986); see Webster v. Boone, 992 P.2d 1183, 1185 (Colo. App. 2000)* (distinguishing between nuisance damages based on diminution in property values and damages based on discomfort and annoyance to the property owner).

[**95]

34    The court's different treatment of these damage elements likely reflects that the interest in being free from discomfort and annoyance in the use of land is in the nature of a property interest and hence receives greater legal protection than a plaintiff's personal interest in being free from discomfort and annoyance. *See Restatement § 821D cmt. b; cf. Slovek, 723 P.2d at 1318* (discomfort and annoyance damages reflect personal injury to the landowner resulting from injury to property).

Defendants also rely on authority from other jurisdictions for the proposition that proof of actual health risk is required to establish substantial interference with the use and enjoyment of property in environmental contamination cases. These decisions, however, either: set out no authority or rationale for this holding, *see In re Wildewood Litig., 52 F.3d 499, 503 (4th Cir. 1995); Brooks v. E.I. Du Pont de Nemours & Co., 944 F. Supp. 448, 449 (E.D.N.C. 1996)*; fail to provide any basis in nuisance law for this rule, *see Graham v. Canadian Nat'l Railway Co., 749 F. Supp. 1300, 1318-19 (D. Vt. 1990)*; [**96] rely on an incomplete account of the relevant Restatement rules, *see Lamb v. Martin Marietta Energy Sys., Inc., 835 F. Supp. 959, 969-70 (W.D. Ky. 1993)* (relying on *Restatement § 821F* and its comments without considering *comment f*); improperly merge the question of nuisance liability with the question of whether damages may be awarded for the property

owner's mental distress once liability is established, *see Bradley v. Am. Smelting & Refining Co., 635 F. Supp. 1154, 1157-58 (W.D. Wash. 1986)*; rely on other factors not present here, *see Lamb, 835 F. Supp. at 969* (finding health risk must be proved in part because liability precluded on other grounds if contamination was below federally mandated safety levels); or do not stand for the proposition asserted, *see Nat'l Tel. Coop. Ass'n v. Exxon Corp., 38 F. Supp. 2d 1, 13-14 (D.D.C. 1998)* (private nuisance claim fails because only cited interference with use and enjoyment of property was diminution in property value). As a result, to the extent these authorities support Defendants' arguments, I do not find them persuasive.

Finally, a rule requiring Plaintiffs to prove [**97] an actual or verifiable health risk in order to prove contamination substantially interferes with the use and enjoyment of property would also be inconsistent with Colorado law assigning the jury the task of making this determination based on the reaction of a normal community member to the contamination. *See, e.g., Van Wyk, 27 P.3d at 391; Northwest Water Corp. v. Pennetta, 29 Colo. App. 1, 479 P.2d 398, 401 (Colo. Ct. App. 1971)* (substantial interference question must be submitted to jury unless the evidence and reasonable inferences therefrom are such that reasonable persons could only reach one conclusion). Defendants' proposed rule would strip the jury of much of this function by decreeing that a normal member of the affected community would not and could not experience fear, annoyance or discomfort amounting to substantial interference with the use and enjoyment of property unless current science has determined the contamination poses a "real" and unacceptable level of health risk. This conclusion ignores other factors that might be present and might influence a community member's reaction to the contamination, including but not limited to: uncertainty [**98] regarding the extent of past, present and future contamination and exposure; a lack of unanimity in the scientific community regarding the short and long-term risks posed by a particular contaminant; uncertainty based on the possibility that future science may determine a contaminant poses a greater risk than is currently believed; and the extent to which reliable information regarding these and related topics is available to the community. [35] The rule is also inconsistent with Colorado law because it relies on the experience and knowledge of the scientific [*1208] community to determine whether substantial interference has occurred,

273 F. Supp. 2d 1175, *1208; 2003 U.S. Dist. LEXIS 12927, **98; 57 ERC (BNA) 1294

rather than on the reaction of a member of the community affected by the contamination.

35   Defendants' proposed rule also ignores other factors of interference that contamination might cause a property owner, such as legal and practical limitations on the use of the property. *See supra* n.27.

B. Other Alleged Limitations on Nuisance Claim

Defendants also complain that Plaintiffs in [**99] this case impermissibly seek recovery in nuisance based on the mere proximity of their properties to Rocky Flats. I concur that Colorado law does not permit a finding of substantial interference with the use and enjoyment of property based solely on the existence of a neighboring facility that causes property values to diminish. *See, e.g., Staley v. Sagel, 841 P.2d 379, 382 (Colo. Ct. App. 1992)* (diminution in value attributable to proximity to neighboring hog facility insufficient to establish nuisance liability). As *Staley* makes clear, however, proof of actions at the facility that result in substantial interference with a plaintiff's interests are sufficient to establish nuisance. *See id. at 381; see also Allison, 695 P.2d at 794* (legitimate activity may become private nuisance if it is unreasonably operated). Plaintiffs' allegations that Defendants' actions at the Plant resulted in actual contamination of their properties and a risk of future contamination that substantially interfere with their use and enjoyment of property meet this test.

Defendants next seek to limit Plaintiffs' nuisance claim by asserting that Colorado [**100] law does not permit recovery in nuisance based on a threat of future harm. As noted above, however, it is already established in this case and recognized in other courts that a threat of future harm caused by a defendant's activities may be properly considered and relied upon by a jury if these circumstances cause plaintiffs fear or anxiety that substantially interferes with their use and enjoyment of property. [36] *See, e.g., Cook VIII, 181 F.R.D. at 485; Lewis, 37 F. Supp. 2d at 61* (legitimate concern regarding risk of future contamination and associated health risks sufficient to state claim for private nuisance); *Adkins, 487 N.W.2d at 720* ("threatening or impending danger to the property rights or health of persons" may constitute private nuisance).

36   Some courts do not recognize a private nuisance based solely on the plaintiff's fear of future injury. *See Koll-Irvine Ctr. Prop. Owners Ass'n v. County of Orange, 24 Cal. App. 4th 1036, 29 Cal. Rptr.2d 664, 667-68 (Cal. Ct. App. 1994).* This rule has no application where, as here, nuisance is alleged based on both current and potential future injury.

[**101]   Defendants' primary authority for a departure from this general rule is *Green v. Castle Concrete Co., 181 Colo. 309, 509 P.2d 588 (Colo. 1973)*, a case in which the Colorado Supreme Court considered whether operation of a quarry could be enjoined as a nuisance before operations began. The court reversed the injunction issued by the lower court on the grounds that it was based on speculation as to the quarry's future harmful effects on neighboring properties and that the quarry operator had not been given the opportunity to demonstrate it could use methods that would avoid these effects. *Id. at 591.* The court cautioned that its decision was "merely a holding that broad injunctive powers may not be used in advance to prohibit lawful business activity which may not be a nuisance." *Id.* This case has little application here, where concern regarding the risk of future harm is not the sole basis for Plaintiffs' nuisance claim and where both the alleged current and future harm arise from decades of operations and alleged wrongful activities at Rocky Flats. [37]

37   Defendants' reliance on *Adams-Arapahoe School Dist. No. 28-J v. GAF Corp., 959 F.2d 868 (10th Cir. 1992)*, is also misplaced. In this case, the Tenth Circuit held negligence liability requires proof of actual physical injury and therefore could not be premised solely on the possibility of future contamination of the plaintiff's property. *Id. at 872.* Not only was this decision based on negligence rather than nuisance principles, to the extent it is applicable, the requirement of actual physical injury is met here if, as alleged, the class properties are contaminated with plutonium from Rocky Flats.

[**102]   [*1209]   Finally, the parties directly and indirectly debate the role that Plaintiffs' proof of decreased property values has with respect to their nuisance claim. As suggested earlier, a decrease in the value of Plaintiffs' properties is not, in and of itself, an interference with the Plaintiffs' use and enjoyment of these properties. *See Adkins, 487 N.W.2d at 725; Oliver v. AT&T Wireless Servs., 76 Cal. App. 4th 521, 90 Cal.*

273 F. Supp. 2d 1175, *1209; 2003 U.S. Dist. LEXIS 12927, **102;
57 ERC (BNA) 1294

*Rptr. 2d 491, 500 (Cal. Ct. App. 1999)*; *Edgcomb v. Lower Valley Power & Light, 922 P.2d 850, 860 (Wyo. 1996)*. In order to prove such interference, Plaintiffs must demonstrate actual contamination of their property and/or other circumstances, such as their own fear regarding current or potential health risks posed by Rocky Flats, that interfere with their use and enjoyment of their land.

Evidence that the affected property's value has depreciated may be evidence, however, that actual contamination or other claimed factors of interference are substantial and unreasonable enough to give rise to nuisance liability. *See* Prosser and Keeton § 88, at 627-28. This conclusion flows again from the rule that the reaction **[**103]** of a normal member of the affected community is the measure of whether a claimed interference is substantial and unreasonable. *See id.* So long as the "market" on which the property values are based has substantially the same general characteristics and information base as the affected community, the reaction of the market to the claimed interference, as demonstrated by the value it places on the property, is also evidence of the normal community member's reaction to the claimed interference and whether the member would view the interference as substantial and unreasonable. [38]

> 38   As discussed in the following section, evidence regarding a diminution in the value of class properties is also relevant to determining the damages to be awarded if the jury finds Defendants liable for nuisance.

## V. Determination and Measure of Damages

### A. Compensatory Damages

Defendants have also assailed Plaintiffs' theory and evidence regarding compensatory damages on a number of legal and other grounds. Many of these issues **[**104]** were addressed but not finally resolved by Judge Matsch at the June 25, 1999 Status Hearing in this action.

One such issue is Defendants' contention that Colorado law requires Plaintiffs to prove a diminution in property values before and after a specific event in order to prevail on their trespass and nuisance claims. The specific event Defendants have in mind is the June, 1989 FBI raid on Rocky Flats that establishes the date for membership in the Property Class. Plaintiffs retort that Colorado law is not as rigid as Defendants contend and

allows it to prove damages caused by Defendants' conduct by demonstrating the value class properties would have "but for" Defendants' alleged nuisance and trespass.

At the Status Conference, Judge Matsch rejected Defendants' attempt to limit potential damages to any decrease in the value of class properties immediately before and after the FBI raid. In Judge Matsch's view, this damages approach is not appropriate in a continuing trespass **[*1210]** and nuisance case such as this one. The proper approach, he suggested, is that stated in *section 930 of the Restatement (Second) of Torts*, which provides that the decrease in the value of land caused by a continuing **[**105]** tortious invasion of land is measured "at the time when the injurious situation became complete and comparatively enduring." *Id.* § 930(3).

I agree with Judge Matsch's preliminary assessment and therefore hold the approach set forth in Restatement *section 930(3)*, rather than the before-and-after model advocated by Defendants, is the proper method for measuring Plaintiffs' diminution in value damages (if any) in this action. This conclusion is consistent with the Colorado Supreme Court's decision in *Board of County Commissioners v. Slovek, 723 P.2d 1309 (Colo. 1986)*, in which the court stated "the measure of damages for injury to real property is not invariable" and the goal in all cases is to compensate the property owner for the actual loss suffered. *Id. at 1314* (quotation omitted); *see id. at 1316*. "No one rule is sufficient or desirable as a measure of damages in realty-damage cases" and the "older tendency to seek a single rule has now largely given way in practice to a more flexible approach" as needed to achieve the goal of reimbursing the plaintiff for losses actually suffered. *Id. at 1316 n.6* (quoting **[**106]** D. Dobbs, Handbook on the Law of Remedies § 5.1, at 311 (1973)). The approach initially outlined by Judge Matsch achieves this result.

Defendants have also complained repeatedly that Plaintiffs' "but for" model for measuring decreased property values must be rejected because it does not prove that Defendants' alleged trespass and/or nuisance, rather than mere proximity to Rocky Flats, caused the claimed diminution in value. I disagree. Evidence that class properties have a lower value than comparable properties not in proximity to Rocky Flats, coupled with evidence of Defendants' alleged contamination of these properties and mismanagement of Rocky Flats, is

Case No. 1:90-cv-00181-JLK  Document 2435-12  filed 01/12/17  USDC Colorado  pg 112 of 332

Page 27

273 F. Supp. 2d 1175, *1210; 2003 U.S. Dist. LEXIS 12927, **106;
57 ERC (BNA) 1294

sufficient to allow the jury to infer that diminution in the value of class properties is the result of Defendants' activities and not the result solely of the proximity of these properties to the Plant. 39

> 39 Defendants are, of course, entitled to argue and present evidence challenging Plaintiffs' assertion that any decrease in the value of their properties was caused by Defendants' alleged trespass and nuisance, rather than by mere proximity to the Plant or other factors.

[**107] Defendants also argue Plaintiffs are precluded as a matter of law from recovering damages for diminution in property value under their trespass and nuisance claims because their claims are for continuing trespass and nuisance as opposed to permanent trespass and nuisance. 40 This is so because, under the traditional rule, a continuing trespass or nuisance is defined as a harm that can be abated, making any damages suffered as a result of the continuing tort temporary in nature. *See, e.g., Miller v. Cudahy Co., 858 F.2d 1449, 1454 (10th Cir. 1988)* (applying Kansas law). As a result, courts following the traditional rule generally limit damages in such cases to the reasonable cost of repairing the damage, diminution in the rental or use value of the property and the like during the limitations period preceding commencement of the suit. *See id. at 1456-57.* If the trespass or nuisance is [*1211] not abated, the plaintiff is required to bring successive actions for these temporary damages until abatement occurs. *See, e.g., FDIC v. Jackson-Shaw Partners No. 46, Ltd., 850 F. Supp. 839, 842 (N.D. Cal. 1994).* The traditional rule bars recovery of [**108] diminution in the market value of the property, which includes compensation for prospective harm, except in cases in which the property invasion is deemed unabatable and hence permanent. *See Miller, 858 F.2d at 1456; Jackson-Shaw, 850 F. Supp. at 842.*

> 40 Whether the claimed trespass and nuisance are permanent or continuing in character also has implications for when these claims are deemed to accrue under Colorado law. *See, e.g., Hoery, 64 P.3d at 223* ("Under Colorado law, a tortfeasor's liability for continuing trespass and nuisance creates a new cause of action each day the property invasion continues.").

As a result of the Colorado Supreme Court's recent decision in *Hoery*, there is no longer any question that the continuing presence of contamination on a plaintiff's property is a continuing trespass and nuisance. *See 64 P.3d at 222* ("failure of [the defendant] to remove the pollution from [the plaintiff's] property which it wrongfully [**109] placed there constitutes a continuing property invasion for the entire time the contamination remains"). This determination does not bar Plaintiffs from recovering damages based on diminution in property value, however, assuming Defendants are found liable on one or both of these continuing tort claims. As described earlier, the Colorado Supreme Court has embraced a flexible approach to determining the appropriate measure of damages for injury to real property. *See Slovek, 723 P.2d at 1314-1316* & n.6. This flexibility allows a departure from the ordinary rule when necessary to compensate for the plaintiffs' actual loss. *Id. at 1314-15.*

As acknowledged by Defendants, *section 930 of the Restatement* provides such a departure from the ordinary rule by allowing a party injured by continuing tortious invasions on its property to elect to recover damages for both past and future invasions, including diminution in property value, so as to avoid the necessity of having to bring successive actions as the invasions continue. *Restatement § 930(1) & cmt. b.* I agree with Judge Matsch that this approach to measuring damages is appropriate under the circumstances [**110] of this case to compensate Plaintiffs and class members for losses they claim to have suffered as a result of Defendants' alleged trespass and nuisance.

B. Exemplary Damages

Defendants have also renewed their contention that Plaintiffs are precluded by *section 2210(s)* of the Price-Anderson Act from seeking exemplary or punitive damages in this action. This section provides: "No court may award punitive damages in any action with respect to a nuclear incident . . . against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident. . . ." *42 U.S.C. § 2210(s).* This provision only applies, however, "with respect to nuclear incidents occurring on or after" August 20, 1988, its date of enactment. Pub. L. No. 100-408, § 20(a), 102 Stat. at 1084; *TMI III, 67 F.3d at 1124.* Defendants argue Plaintiffs' punitive damage claim is barred under this provision because the "nuclear incident" at issue here is property damage that, under Plaintiffs' theory of the case,

273 F. Supp. 2d 1175, *1211; 2003 U.S. Dist. LEXIS 12927, **110; 57 ERC (BNA) 1294

necessarily occurred after June, 1989.

This issue was previously addressed in *Cook v. Rockwell Int'l Corp. ("Cook I"), 755 F. Supp. 1468 (D. Colo. 1991)*. **[\*\*111]** In that decision, which remains the law of the case, the court denied Defendants' motion for summary judgment against Plaintiffs' punitive damages claim on the ground Plaintiffs had alleged distinct nuclear incidents occurring before August 20, 1988. *Id. at 1480-81*. This holding was based on the statutory definition of "nuclear incident," which, as relevant here, is "any *occurrence* within the United States causing . . . damage to property . . . arising out **[\*1212]** of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear, or byproduct material." *42 U.S.C. § 2014(q)* (emphasis added); *see Cook I, 755 F. Supp. at 1480*. The *Cook I* court deemed a release of plutonium to be an "occurrence" under this definition and this conclusion is consistent with recent case law. *See 755 F. Supp. at 1480-81; Carey v. Kerr-McGee Chemical Corp., 60 F. Supp. 2d 800, 805 (N.D. Ill. 1999)* ("occurrence" as used in definition of "nuclear incident" means "happening or event"). It is the date of such occurrences, not the date on which the relevant occurrences caused **[\*\*112]** property damage, that determines application of the section's bar on punitive damage. *See 755 F. Supp. at 1481*; Pub. L. 100-408 § 20(a), 102 Stat. at 1084. Accordingly, it remains the law of the case that Plaintiffs may seek punitive damages, to the extent available under Colorado law, with respect to occurrences, including releases of plutonium, they prove took place before August 20, 1988. *See Cook I, 755 F. Supp. at 1481*.

C. Class-wide Damages

Finally, Defendants continue to insist that a class-wide trial on damages is not possible because of individual issues such as exposure, dose, notice, property valuation and notice. Plaintiffs respond that damages can and should be decided in a class-wide trial in which they will present an aggregate damage theory in percentage and perhaps dollar amount, which (if accepted by the jury) would be applied or allocated after trial under a plan or formula approved by the court.

As a result of the Colorado Supreme Court's *Hoery* decision and the scope of trial issues resolved in this decision, many of the individualized determinations posited by Defendants are no longer a part of this case. The class-wide **[\*\*113]** damages approach advocated by

Plaintiffs is consistent with the general practice in mass tort and other class actions. *See* Albe Conte and Herbert B. Newberg, Newberg on Class Actions chs. 10, 17 (4th ed. 2002). Accordingly, Plaintiffs may present evidence, consistent with evidentiary standards, and attempt to prove aggregate damages that fairly represent the collective value of the claims of individual class members in the same trial in which Defendants' liability, if any, to the Property Class is determined. Assuming Plaintiffs' compensatory damages are based solely on diminution in property value, such damages may be expressed as either a percentage reduction in the value of class members' properties caused by Defendants' allegedly tortious conduct or as an aggregate lump sum representing the total decrease in the value of class properties.

If class-wide liability and damages are found by the jury, the court will then, with the assistance of counsel, determine appropriate principles and procedures for distributing the compensatory and any exemplary damages awarded. These principles and procedures will address, at a minimum, the division of damages among Property Class members, **[\*\*114]** the disposition of any unclaimed funds and the measure and method of payment of attorney fees due to class counsel. *See Strey v. Hunt Int'l Res. Corp., 696 F.2d 87 (10th Cir. 1982)* (identifying these as necessary elements to final judgment based on jury's class-wide damage award); *see generally* Conte and Newberg §§ 10:12-10:25.

VI. Conclusion

In summary, for the reasons stated above I rule as follows:

1. The Price-Anderson Act does not require that Plaintiffs prove Defendants violated federal regulatory standards as an element of their tort claims.

**[\*1213]** 2. Colorado law does not require that Plaintiffs prove contamination on their properties poses a health risk or otherwise caused actual or substantial damage to their properties as an element of their trespass claim.

3. Colorado law does not require that Plaintiffs prove contamination on their properties poses an actual or verifiable health risk as an element of their private

273 F. Supp. 2d 1175, *1213; 2003 U.S. Dist. LEXIS 12927, **114;
57 ERC (BNA) 1294

nuisance claim.

4. Under Colorado law, a facility does not constitute a nuisance solely because its proximity to neighboring properties causes their value to decline, but may be a nuisance if actions at the facility **[**115]** result in a substantial and unreasonable interference with the use and enjoyment of neighboring properties.

5. That Plaintiffs' and class properties have decreased in value is not an interference with Plaintiffs' and class members' use and enjoyment of their properties. Evidence that these properties have decreased in value, however, may be relevant to the jury's determination of whether any legitimate factors of interference are substantial and unreasonable enough to constitute a nuisance and to its determination of damages if it finds liability for nuisance and/or trespass.

6. Under the circumstances of this case, Colorado law permits recovery in nuisance based on a threat of future harm.

7. Compensatory damages, if any, in this case will be determined in accordance with *section 930 of the Restatement (Second) of Torts*.

8. Plaintiffs may seek punitive damages, to the extent available under Colorado law, with respect to releases of plutonium and other occurrences they prove took place before August 20, 1988.

9. Defendants' liability to the Property Class on the Property Class claims and related damages, if any, will be tried and determined in a single trial. **[**116]**

The parties will be contacted shortly to schedule a conference at which a trial date will be set.

Dated this 24 day of July, 2003.

John L. Kane, Senior District Judge

United States District Court



LEXSEE 358 F. SUPP. 2D 1003

**MERILYN COOK, et al., Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION AND THE DOW CHEMICAL COMPANY, Defendants.**

**Civil Action No. 90-K-181**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*358 F. Supp. 2d 1003*; *2004 U.S. Dist. LEXIS 27360*; *60 ERC (BNA) 1017*

**December 17, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion granted by *Cook v. Rockwell Int'l Corp., 2005 U.S. Dist. LEXIS 37882 (D. Colo., Dec. 15, 2005)*

**PRIOR HISTORY:** *Cook v. Rockwell Int'l Corp., 273 F. Supp. 2d 1175, 2003 U.S. Dist. LEXIS 12927 (D. Colo., 2003)*

**DISPOSITION:** Court ruled on proposed instructions on Plaintiffs' trespass claim and related affirmative defenses.

**COUNSEL:** **[**1]** For Merilyn Cook, William Schierkolk, Jr., Delores Schierkolk, Richard Bartlett, Lorren Babb, Gertrude Babb, Michael Dean Rice, Bank Western, Thomas L. Deimer, Rhonda J. Deimer, Stephen Sandoval, Peggy J. Sandoval, Plaintiffs: Bernadette M. Rappold, David F. Sorensen, Eric L. Cramer, Jonathan Auerbach, Stanley B. Siegel, Berger & Montague, P.C., Philadelphia, PA; Christopher Thomas Reyna, John David Stoner, Chimicles & Tikellis, L.L.P., Haverford, PA; David Evans Kreutzer, Attorney General's Office-CO Natural Resources & Enviro, Natural Resources & Environment Section, Denver, CO; Kenneth A. Jacobsen, Kenneth A. Jacobsen Law Offices, Media, PA; R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE.

For Michael Dean Rice, Plaintiff: Christopher Thomas Reyna, Chimicles & Tikellis, L.L.P., Haverford, PA;

David Evans Kreutzer, Attorney General's Office-CO Natural Resources & Enviro, Natural Resources & Environment Section, Denver, CO; Eric L. Cramer, Stanley B. Siegel, Berger & Montague, P.C., Philadelphia, PA; R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE.

For Sally Bartlett, Plaintiff: Bernadette M. Rappold, David F. Sorensen, Eric L. Cramer, Jonathan Auerbach, **[**2]** Stanley B. Siegel, Berger & Montague, P.C., Philadelphia, PA; Bruce H. DeBoskey, Silver & Deboskey, P.C., Denver, CO; Christopher Thomas Reyna, John David Stoner, Chimicles & Tikellis, L.L.P., Haverford, PA; Daniel R. Satriana, Jr., Clisham, Satriana & Biscan, LLC, Denver, CO; David Evans Kreutzer, Attorney General's Office-CO Natural Resources & Enviro, Natural Resources & Environment Section, Denver, CO; Kenneth A. Jacobsen, Kenneth A. Jacobsen Law Offices, Media, PA; Merrill Davidoff, Berger & Montague, P.C., Philadelphia, PA; R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE; Ronald Simon, Simon & Associates, Washington, DC; Stanley M. Chesley, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH; Steven William Kelly, Silver & Deboskey, P.C., Denver, CO.

For Rockwell International Corporation, Defendant: Amy Horton, Edward J. Naughton, Heather H. Anderson, John D. Aldock, Patrick M. Hanlon, Timothy P. Brooks, Valerie E. Ross, Wendy S. White, Goodwin Procter, LLP-DC, Washington, DC; David M. Bernick, Mark S.

358 F. Supp. 2d 1003, *; 2004 U.S. Dist. LEXIS 27360, **2;
60 ERC (BNA) 1017

Lillie, Martin Thomas Tully, Kirkland & Ellis-Illinois, Chicago, IL; Joseph J. Bronesky, Sherman & Howard, United States District Court Box 12, Denver, [**3] CO; Michael K. Isenman, Goodwin Procter, LLP-DC, Washington, DC.

For Dow Chemical Company, Defendant: Christopher Lane, Sherman & Howard, United States District Court Box 12, Denver, CO; David M. Bernick, Douglas J. Kurtenbach, Mark S. Lillie, S. Jonathan Silverman, Kirkland & Ellis-Illinois, Chicago, IL; Douglas M. Poland, LaFollette Godfrey & Kahn, SC, Madison, WI; Joseph J. Bronesky, Lester C. Houtz, Bartlit, Beck, Herman, Palenchar & Scott, LLP-Colorado, Denver, CO; Louis W. Pribila, Dow Chemical Company, Midland, MI.

**JUDGES:** John L. Kane, Senior District Judge.

**OPINION BY:** John L. Kane

**OPINION**

**[*1004] MEMORANDUM OPINION AND ORDER**

Kane, J.

The parties have submitted proposed instructions on Plaintiffs' trespass claim and related affirmative defenses. The most significant issue presented by these proposed instructions and the parties' respective objections thereto concerns Defendants' assertion of a statute of limitations defense premised on the trespass claim constituting a permanent rather than a continuing tort. Defendants contend the alleged deposition of plutonium from the Rocky Flats Nuclear Weapons Plant on Plaintiffs' and other class members' properties (collectively "Class [**4] Properties") constitutes a permanent tort under Colorado law because this contamination is not abatable by reasonable measures and at a reasonable cost. [1] *See* Defs.' Proposed Trespass Instruction Nos. 1, 2. As a result, Defendants argue, the trespass claim accrued and the statute of limitations began to run on the claim when the class members knew or should have known both that plutonium had come to be located on their property and that this plutonium contamination resulted from Defendants' acts at Rocky Flats. *See* Defs.' Proposed Trespass Instruction No. 10 (Statute of Limitations -- Trespass). Under Defendants' theory, both the question of whether the alleged plutonium contamination is reasonably abatable, so as to determine whether the

trespass claim is permanent or not, and when the statute of limitations began to run on the trespass claim if it is deemed permanent, are questions to be presented to the jury.

> 1   For background information on this case and its procedural history, see *Cook v. Rockwell Int'l Corp., 273 F. Supp. 2d 1175,1178-79 (D. Colo. 2003).*

[**5] Plaintiffs counter that the ongoing presence of plutonium on Class Properties constitutes a continuing trespass as a matter of Colorado law, with the result that "for statute of limitations purposes, the claim does not begin to accrue until the tortious conduct has ceased." *Hoery v. United States, 64 P.3d 214, 218 (Colo. 2003).* If Plaintiffs are correct, then Defendants do not have a limitations defense to liability on the trespass claim because the statute of limitations has not yet begun to run on this claim.

The question of whether the alleged contamination of Class Properties is a permanent or continuing trespass under Colorado law turns on interpretation of *Hoery v. United States, 64 P.3d 214, 218 (Colo. 2003).* In *Hoery,* the Colorado Supreme Court, answering two questions certified to it by the Tenth Circuit, held that the ongoing, unauthorized presence of toxic contaminants on the plaintiff's property constituted a continuing trespass under Colorado law. *Id. at 222.* In *Cook IX,* I relied on this holding to find that the continuing presence of plutonium on the Class Properties, if proven, would constitute a continuing trespass. [*1005] *Cook v. Rockwell Int'l Corp. (Cook IX), 273 F. Supp. 2d 1175, 1211 (D. Colo. 2003).* [**6]

In response to further argument by Defendants on this point, I examined *Hoery* in more detail in my Order of April 14, 2004. I generally confirmed my initial reading of *Hoery* and conclusion based on it, but acknowledged certain language in the decision might be read otherwise and that the parties had not had an opportunity to brief the issue. *Id. at 12-14.* As a result, I allowed the parties to address the question of whether the contamination at issue constituted a continuing or permanent tort under Colorado law in connection with their proffered instructions on the trespass claim and related affirmative defenses.

In this additional briefing and oral argument, Defendants argue that *Hoery* must be read as holding that

358 F. Supp. 2d 1003, *1005; 2004 U.S. Dist. LEXIS 27360, **6; 60 ERC (BNA) 1017

a trespass or other property invasion is permanent for statute of limitations and other purposes if *either:* (1) the property invasion *will* continue indefinitely because it cannot be removed or otherwise abated by reasonable measures and at a reasonable cost; *or* (2) the property invasion is abatable but *should* continue indefinitely because it serves a socially beneficial purpose. Defendants further assert that to the extent any discussion **[**7]** in *Hoery* is inconsistent with their interpretation of Colorado law, it is only because the *Hoery* court did not fully address the permanent tort concept in light of the questions certified to it by the Tenth Circuit.

After further careful review of the *Hoery* decision, I find Defendants' contentions cannot be reconciled with the Colorado Supreme Court's analysis and holdings in that case. The relevant question certified to the Colorado court was precisely the question presented in this case: "Does the ongoing presence of . . . toxic chemicals on plaintiff's property [allegedly caused by the defendant] constitute continuing trespass and/or nuisance under Colorado law." *Hoery, 64 P.3d at 215.* This question arose because the district court had dismissed Hoery's trespass and nuisance claims on statute of limitations grounds based on its findings that: (1) these claims were for permanent rather than continuing torts under both federal and Colorado law; [2] (2) these claims accrued no later than 1995, when Hoery knew or should have known that his property might be contaminated as a result of the defendant's activities; and (3) as a result of the foregoing, Hoery's **[**8]** claims were time-barred because Hoery asserted them after the limitations period, measured from the 1995 accrual date, had passed. *Id. at 216-17; Hoery v. United States,* No. 01-1100, Certification of State Law Questions at 3 (10th Cir. July 31, 2002); *Hoery v. United States,* No. 99-D-864, Order at 6-7, 9-10 & n.3 (D. Colo. Jan. 3, 2001). On appeal, Hoery did not challenge the district court's determination that he knew or should have known of the contamination by 1995, but rather challenged the district court's predicate determination that his trespass and nuisance claims were permanent tort claims barred by the statute of limitations if not asserted within the limitations period measured from that date. *See Hoery, 64 P.3d at 217;* Appellant's Opening Br. at 12, *In re Hoery,* No. 01-1100 (10th Cir.). Thus, the very issue presented on appeal and certified to the Colorado Supreme Court was whether Hoery's claims were permanent or continuing torts for the purpose of deciding the defendant's statute of limitations defense. [3]

2   Federal law was relevant to this question because Hoery sued the United States under the Federal Tort Claims Act, *28 U.S.C. §§ 1346(b)(1), 2671-80.*

**[**9]**

3   Hoery asserted single claims for trespass and nuisance in his complaint, not separate claims for permanent trespass and nuisance and for continuing trespass and nuisance as Defendants suggest in asserting that Hoery's "permanent" claims were not presented to the Tenth Circuit or Colorado Supreme Court for review. *See* Complaint, *Hoery v. United States,* No. 99-D-864 (D. Colo.).

**[*1006]** The Colorado Supreme Court's analysis of the certified questions [4] reflects that it understood this was the issue presented. After first reviewing the underlying torts of trespass and nuisance, the Colorado court analyzed what it described as "the distinctions between continuing' and permanent' torts under Colorado law." *Hoery, 64 P.3d at 217.* Citing the Restatement (Second) of Torts, its 1907 decision in *Wright v. Ulrich, 40 Colo. 437, 91 P. 43 (Colo. 1907)* and other authority, the court declared that a tortious property invasion constitutes a continuing tort "so long as the offending object remains and continues to cause the plaintiff harm." *64 P.3d at 218; see id. at 220.* **[**10]** The court further stated that each continuance of the intrusion amounts to another wrong giving rise to a new cause of action, so that for statute of limitations purposes, the claim does not finally accrue until the tortious intrusion has ceased. *Id. at 218.*

4   The second question certified to the Colorado court was whether the continued migration of toxic chemicals from the defendant's property to the plaintiff's property, allegedly caused by the defendant, constituted continuing trespass and nuisance under Colorado law. *See Hoery, 64 P.3d at 215.*

The Colorado Supreme Court declared that a permanent trespass or nuisance is an exception to this general rule for continuing intrusions, and is deemed to exist only in "those unique factual situations" in which a trespass or nuisance that continues in fact "would and should continue indefinitely." *Id. at 218, 220, 222.* This exception arises, the court explained, out of nearly one hundred year-old precedent concerning **[**11]** ongoing

358 F. Supp. 2d 1003, *1006; 2004 U.S. Dist. LEXIS 27360, **11; 60 ERC (BNA) 1017

trespass and nuisance caused by irrigation ditches and railway lines that were treated as permanent property invasions because they arose from structures that were intended to be permanent and represented enterprises deemed vital to the future development of the state. *See id. at 219-20*. Thus, the court concluded, "Colorado law recognizes the concepts of continuing trespass and nuisance for those property invasions where a defendant fails to stop or remove continuing, harmful physical conditions that are wrongfully placed on the land. The only exception is a factual situation -- such as an irrigation ditch or a railway line -- where the property invasion will and should continue indefinitely because defendants, with lawful authority, constructed a socially beneficial structure intended to be permanent." *Id. at 220* (footnote omitted).

After this review and summary of Colorado law, the *Hoery* court turned to the certified questions of whether the ongoing presence and continuing migration of toxic chemicals each constitutes continuing trespass or nuisance under Colorado law. *Id. at 220*. Based on the cited Colorado precedent **[**12]** and authority from other jurisdictions, the court first rejected the defendant's contention that the ongoing presence or migration of contaminants onto another's property constituted a permanent rather than a continuing tort if the conduct causing the contamination had ceased. *See id. at 220-21*. It then applied the general rule and exception described above to conclude in succession that: the presence of contamination on the plaintiff's property constituted trespass and nuisance under Colorado law, *id. at 222*; these property invasions were continuing in nature; *id.*, and that the permanent tort exception for invasions that "will arid should continue" did not apply because the record indicated the contamination could be removed and because "the continued contamination does not benefit the development of our state." **[*1007]** *Id. at 222-23*. As a result, the *Hoery* court answered the questions posed to it by the Tenth Circuit in the affirmative, holding that the ongoing, unauthorized presence of contamination on another's property constitutes continuing trespass and nuisance under Colorado law. *Id. at 223*.

The *Hoery* **[**13]** decision thus stands for the rule that a tort based on a property invasion that continues in fact is a continuing tort, for which new causes of action continue to accrue, unless two conditions are met: (1) the invasion will continue indefinitely; and (2) the invasion should continue indefinitely because it is integral to an enterprise vital to the development of the state. If these two conditions are met, then the property invasion is deemed a permanent tort in spite of its ongoing nature.

Defendants' contention that *Hoery's* two conditions for establishing a permanent trespass or nuisance should be stated in the disjunctive, so that proof that an invasion will continue indefinitely is enough in itself for a permanent tort to be found, is not persuasive given the *Hoery* court's statement not once but three times that the permanent tort exception only applies to invasions that "will *and* should continue indefinitely." *Id. at 219, 220, 222* (emphasis added). The only time the court stated these conditions in the disjunctive is when, after examining the record before it, it found there was no indication the contamination at issue met either condition. *Id. at 222* **[**14]** ("The record does not indicate that . . . the ongoing presence of toxic pollution plumes under Hoery's residential property will or should continue indefinitely."). This statement is in no way inconsistent with the *Hoery* court's statement, in the very same paragraph and elsewhere in the opinion, that the permanent tort exception only applies to continuing property invasions that both "will and should continue." That both conditions must be met for an ongoing invasion to be deemed permanent is further underscored by Justice Kourlis' dissent, which criticizes the majority's decision precisely because it made the permanent tort determination dependent in part on an evaluation of whether the invasion "should continue" because of its perceived social benefits. *See id. at 229* (Kourlis, J., dissenting).

Defendants assert the Colorado Supreme Court's decisions in *Wright v. Ulrich, 40 Colo. 437, 91 P. 43 (Colo. 1907)*, and *Middelkamp v. Bessemer Irrigating Ditch Co., 46 Colo. 102, 103 P. 280 (Colo. 1909)*, support their proposed rule that the ability to abate the alleged property invasion through reasonable measures and at a reasonable cost determines whether the invasion **[**15]** is continuing or permanent for statute of limitations purposes. They further cite as support for this proposition the *Hoery* court's statements that a tortfeasor's "failure to remove" a thing tortiously placed on the land constitutes a continuing tort and that the continuing tort designation creates an incentive for the tortfeasor to take corrective action. *See 64 P.3d at 218, 220, 223*. These statements, Defendants argue, demonstrate the *Hoery* court assumed as a threshold matter that a continuing property invasion was one that could in fact be removed

358 F. Supp. 2d 1003, *1007; 2004 U.S. Dist. LEXIS 27360, **15;
60 ERC (BNA) 1017

or abated, and thus necessitates a finding that an invasion that cannot be reasonably abated is a permanent tort as a matter of Colorado law. 5

> 5   Defendants also cite *Arcade Water District v. United States, 940 F.2d 1265 (9th Cir. 1991)*, and certain other cases cited in *Hoery* as evidence that the Colorado court intended non-abatable property invasions to be deemed permanent without regard to the social benefit component of the *Hoery* test. The *Hoery* court, however, cited these cases in support of its separate ruling that an ongoing invasion can be deemed continuing even if the conduct causing it has ceased. *See 64 P.3d at 221*. There is no indication in *Hoery* that the Colorado Supreme Court adopted or approved these cases' discussion of the abatability question.

[**16]   [*1008]   That *Wright* and *Middelkamp* might be read to support all or some of Defendants' position independent of the *Hoery* decision is immaterial to my determination of Colorado law on this issue. The *Hoery* court carefully examined both of these decisions and other historic Colorado cases in determining whether ongoing contamination constituted a continuing or permanent tort for statute of limitations purposes under Colorado law. Following the thorough and comprehensive analysis described above, the court stated its conclusion that in order to constitute a permanent tort under Colorado law, an ongoing property invasion must be of a nature that both will continue indefinitely and should continue indefinitely because of the social benefit conferred. It is simply not credible given this analysis and conclusion that the *Hoery* court assumed without stating that a permanent tort could be demonstrated solely by showing that an ongoing invasion would continue indefinitely because it could not be abated. There is also no support in this decision for Defendants' further contention that an invasion that is abatable but only through unreasonable measures or at unreasonable cost must [**17]   be deemed a permanent tort under Colorado law. 6

> 6   I also note that Defendants improperly assume that whether a property invasion is abatable and whether it will continue indefinitely are equivalent and interchangeable concepts. That an invasion can be abated, even with reasonable measures and at a reasonable cost, does not necessarily mean that it will be abated. *See* Order

of April 14, 2004 at 15 n. 12. As noted by Professor McCormick in a seminal law review article, this circumstance and others sometimes cited as all-sufficient indicia of permanency are properly viewed as evidence relevant to the question of whether the invasion will continue indefinitely, and are not necessarily determinative of it. *See* Charles T. McCormick, *Damages for Anticipated Injury to Land*, 37 Harv. L. Rev. 574, 596 (1924).

Defendants next argue this reading of *Hoery* must be incorrect because it would put Colorado out of step with the "basic rule," purportedly approved by courts and commentators alike, [**18]   that a property invasion is deemed a continuing tort for statute of limitations purposes "only when the invasion is abatable -- that is only if the defendants are able to remove the harmful condition." Defs.' Response to Pls.' Br. on Statute of Limitations at 2 (Aug. 18, 2004). It is axiomatic, however, that the Colorado Supreme Court may adopt whatever rule it believes is consistent with Colorado law and public policy in this instance. As described above, the Colorado court has clearly stated that proof that the property invasion is ongoing renders it a continuing tort *unless* the defendant can demonstrate both that it "will continue indefinitely," which it might do by proving the invasion was not capable of abatement, *and* that the invasion serves a socially beneficial purpose. I am not authorized to second-guess this judgment.

Second, Defendants are incorrect in asserting that the two-part test declared by the *Hoery* court represents an unprecedented departure from a generally accepted rule for distinguishing between continuing and permanent torts based on whether the invasion is capable of abatement. In fact, no such generally accepted rule exists. As noted by Justice [**19]   Kourlis in her dissenting opinion, the question of how to differentiate between permanent and continuing trespasses and nuisances has vexed and perplexed the Colorado Supreme Court and other courts for over a century. *64 P.3d at 224* (Kourlis, J.). This has led to multiple, conflicting lines of authority among and even within jurisdictions on how to distinguish between the two categories of property invasions when an invasion [*1009]   is ongoing. *See, e.g., id. at 224* (Kourlis, J., dissenting). As a result, the consistent conclusion of distinguished commentators who have attempted to find order in this area of law is that there is no general rule for distinguishing between

358 F. Supp. 2d 1003, *1009; 2004 U.S. Dist. LEXIS 27360, **19; 60 ERC (BNA) 1017

continuing and permanent property invasions for statute of limitations and other purposes. *See, e.g.*, W. Page Keeton *et al.*, Prosser and Keeton on the Law of Torts § 13, at 84 (5th ed. 1984) (courts are "not in accord in dealing with this question"); 1 Fowler V. Harper *et al.*, The Law of Torts § 1.7, at 1:32 (3rd ed. 1996 & Supp. 2004) (tests for distinction "are clouded by doubt and confusion."); 1 Dan B. Dobbs, The Law of Torts § 57, at 115 (2001) ("conflicting decisions and factual **[**20]** variety make statement of a general rule perilous"); Charles T. McCormick, *Damages for Anticipated Injury to Land*, 37 Harv. L. Rev. 574, 580 (1924) (law distinguishing between continuing and permanent property invasions is one of "irreconcilable contradiction and hopeless confusion").

It is true that some courts, perhaps in an attempt to bring clarity to an otherwise clouded field, at times cite the ability to abate the alleged property invasion as the determinative factor in deciding whether the invasion is permanent or continuing for statute of limitations and/or other purposes. *See, e.g., Mangini v. Aerojet-General Corp.*, 230 Cal. App. 3d 1125, 1148, 281 Cal. Rptr. 827 (Cal. Ct. App. 1991). This practice is subject to criticism on a number of grounds, however, *see Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 284-88, 48 Tex. Sup. Ct. J. 6 (Tex. 2004); *see also* McCormick, 37 Harv. L. Rev. at 591-96 (criticizing reliance on circumstances such as abatability "as all-sufficient indicia of permanency"), [7] and in any event is not followed by other courts that, like the Colorado Supreme Court in *Hoery*, focus on the ongoing nature of the property **[**21]** invasion in determining when the cause of action accrues for statute of limitations purposes.

    7  *See infra* note 6.

The New York state courts, for example, have held an encroaching structure is a continuing trespass giving rise to successive causes of action for purposes of applying the statute of limitations. *509 Sixth Ave. Corp. v. New York City Transit Auth.*, 15 N.Y.2d 48, 203 N.E.2d 486, 488, 255 N.Y.S.2d 89 (N.Y. 1964); *Fifty-Five Corp. v. 10 West 66th St. Corp.*, 220 A.D.2d 278, 632 N.Y.S.2d 106, 107 (N.Y. App. Div. 1995). That the invasion is permanent because it cannot be abated or for some other reason is irrelevant to this determination. *See 509 Sixth Ave. Corp.*, 203 N.E.2d at 488 (holding encroaching subway tunnel to be continuing trespass because "although the nature of the structure may be permanent,

the nature of the trespass is continuing"); *Fifty-Five Corp.*, 632 N.Y.S.2d at 107 (permanent excavation and backfill on plaintiff's property constituted continuing trespass).

Similarly, the **[**22]** federal district courts in Washington, following a decision by the Washington Supreme Court, have consistently held that claims for trespass and nuisance based on ongoing soil contamination are continuing torts and that "such claims are not barred by the statute of limitations so long as the intruding substance remains in the ground." *See, e.g., In re ASARCO/Vashon-Maury Island Litig.*, 2001 U.S. Dist. LEXIS 7154, 2001 U.S. Dist. LEXIS 7154, at *12-15 (summarizing cases and citing *Bradley v. American Smelting & Refining Co.*, 709 P.2d 782, 791-92, 104 Wn.2d 677 (Wash. 1985)). This, of course, is the same general rule stated by the *Hoery* court for determining whether alleged contamination is a continuing trespass or nuisance under Colorado law. *See 64 P.3d at 218, 220, 222.*

The Georgia Supreme Court, relying on the Restatement (Second) of Torts, has **[*1010]** likewise held that the statute of limitations for an ongoing or recurring property invasion that is likely to continue indefinitely does not preclude recovery for any damages other than those occurring outside the limitations period measured from the filing of suit. *Cox v. Cambridge Square Towne Houses, Inc.*, 239 Ga. 127, 236 S.E.2d 73, 75 (Ga. 1975). **[**23]** This result is fundamentally at odds with Defendants' proposed non-abatement rule, which would hold a non-abatable and hence indefinitely continuing property invasion a permanent tort barred in its entirety if plaintiffs knew or should have known of its harm and its cause outside of the limitations period.

The *Cox* case and the other examples cited above demonstrate there is no merit to Defendants' contention that the *Hoery* decision is so out-of-step with general jurisprudence in this area that it cannot mean what it says and must be interpreted as supporting Defendants' proposed rule that an ongoing trespass or nuisance is a permanent rather than a continuing tort for statute of limitations purposes if it is not reasonably (or otherwise) abatable.

The Georgia Supreme Court's decision in *Cox* addresses a related issue raised by Defendants, which is whether Plaintiffs may recover prospective damages, that is any decrease in the value of Class Properties caused by

358 F. Supp. 2d 1003, *1010; 2004 U.S. Dist. LEXIS 27360, **23;
60 ERC (BNA) 1017

Defendants' tortious acts, if the allegedly ongoing contamination of these properties is a continuing trespass or nuisance for statute of limitations purposes. I previously addressed this issue in *Cook IX*, but **[**24]** will expound on my analysis here for Defendants' benefit.

As noted in *Cook IX* and elsewhere, the classification of an ongoing trespass or nuisance as "continuing" or "permanent" has historically determined both when the cause of action accrues for statute of limitations purposes and what damages may be recovered. *See, e.g., Cook IX, 273 F. Supp. 2d at 1210-11; Cox, 236 S.E.2d at 74;* Harper, Law of Torts § 1.7, at 1:31-33; Dobbs, Law of Torts § 57, at 115 & n.1. In cases in which the ongoing invasion was deemed to be a continuing trespass or nuisance, the courts generally held a new cause of action accrued each day the invasion persisted and allowed recovery for all harms occurring with the relevant limitations period up to the date of suit or trial. *See, e.g.,* Dobbs, Law of Torts § 57, at 116; Harper, Law of Torts § 1.7, at 1:31; *see also Cook IX, 273 F. Supp. 2d at 1210-11* (describing damages available under traditional rule). In general, however, the courts declined to award damages for prospective or anticipated harm, usually measured by the diminution in property value caused by the prospect of the invasion continuing **[**25]** into the future, [8] because they were unwilling to presume that the trespass or nuisance would continue indefinitely. *See, e.g., Spaulding v. Cameron, 38 Cal. 2d 265, 239 P.2d 625, 627 (Cal. 1952)* (Traynor, J.); Dobbs, Law of Torts § 57, at 116. Instead, the courts allowed injured parties to bring a succession of suits for past damages occurring within the most recent limitations period as long as the invasion persisted. *Cook IX, 273 F. Supp. 2d at 1210-11; Spaulding, 239 P.2d at 627;* Dobbs, Law of Torts § 57, at 116; Harper, Law of Torts § 1.7, at 1:31.

> [8] Diminution in property value allows the injured party to recover the anticipated loss it will incur in the future due to the property being less saleable than it would be in the absence of the trespass or nuisance. *See, e.g.,* McCormick, 37 Harv. L. Rev. at 583; *Restatement (Second) of Torts § 930 cmt. b* (1979).

Application of this continuing tort rule sometimes led to **[**26]** what courts deemed undesirable results, such as subjecting socially beneficial but intrusive enterprises to ongoing liability for tortious property invasions and/or barring injured parties from **[*1011]**

being fully compensated for trespasses and nuisances that for whatever reason were likely to continue indefinitely. In an attempt to avoid these results, courts developed and applied the concept of "permanent" trespass and nuisance to certain kinds of ongoing property invasions. *See Spaulding, 239 P.2d at 627;* McCormick, 37 Harv. L. Rev. at 584-85, 589-90. [9] The cause of action for property invasions deemed "permanent" under this concept generally are held to accrue upon the initial trespass or nuisance, and all damages, past and prospective, must be recovered in a single suit brought within the limitations period following the claim's accrual. *See, e.g.,* Harper, Law of Torts § 1.7, at 1:32-33; Dobbs, Law of Torts § 57, at 115; Prosser & Keeton § 13, at 84.

> [9] Much of the early case law and commentary on this subject concerned ongoing or recurring nuisances deemed permanent, but this concept was subsequently extended to ongoing trespasses as well. *See, e.g.,* Harper, Law of Torts § 1.7, at 1:32-33; Dobbs, Law of Torts § 57. Colorado law holds the law of continuing nuisances and continuing trespasses to be the same, *Wright, 91 P. at 44,* and the Colorado Supreme Court made no distinction in *Hoery* between the permanent tort exception as applied to ongoing nuisances and trespasses. *See 64 P.3d at 219-20.*

**[**27]** The most common and accepted application of the permanent trespass and nuisance concept to ongoing intrusions has been in cases in which the intrusion is necessary to the operation of a public utility or other socially beneficial structure intended to be permanent. Harper, Law of Torts § 1.7, at 1:33 (quoting *Spaulding, 239 P.2d at 627*); Dobbs, Law of Torts § 57, at 116; Charles T. McCormick, Handbook on the Law of Damages § 127, at 506 (1935). This application is reflected in the *Hoery* court's definition of a permanent trespass or nuisance as one that both will continue and should continue because it is integral to an enterprise vital to the development of the state. *See Hoery, 64 P.3d at 220.*

Application of the "permanent" invasion rule outside this context, however, led courts into a maze of "irreconcilable contradiction and hopeless confusion" as the various tests for "permanency" advanced by different courts, including Defendants' preferred non-abatability test, frequently proved "too vague, and too difficult to

358 F. Supp. 2d 1003, *1011; 2004 U.S. Dist. LEXIS 27360, **27;
60 ERC (BNA) 1017

apply in advance, to make them satisfactory guides to a litigant or a counselor, however convenient they may be as formulae [**28] to place before a jury." McCormick, 37 Harv. L. Rev. at 592; *see* Harper, Law of Torts § 1.7, at 1:33-34; Prosser & Keeton § 13, at 84; *see also* Dobbs, Law of Torts § 57, at 116-18 (classification is partly a matter of fact and partly of policy, with result that "it is not easy to find harmony in case results"). The high stakes of the determination, particularly with respect to application of the statute of limitations and recovery of prospective damages, also strained the courts and placed the parties at risk of serious injustice if they guessed wrong on whether a particular ongoing trespass or nuisance would ultimately be deemed continuing or permanent. [10]

  10   As Justice Traynor famously observed:

> To attempt categorically to classify . . . a nuisance as either permanent or not may lead to serious injustice to one or the other of the parties. Thus, if the plaintiff assumes it is not permanent and sues only for past damages, he may be met with the plea of res judicata in a later action for additional injury if the court then decides the nuisance was permanent in character from its inception. Similarly, if the initial injury is slight and the plaintiff delays suit until he has suffered substantial damage and the court then determines that the nuisance was permanent, the defendant may be able to raise the defense that the statute of limitations ran from the time of the initial injury. On the other hand, if the defendant is willing and able to abate the nuisance, it is unfair to award damages on the theory that it will continue.

*Spaulding v. Cameron, 239 P.2d at 628* (citations omitted); *see also* McCormick, 37 Harv. L. Rev. at 591-93 ("the permanent nuisance' theory, when coupled with a rule of thumb definition of permanent' and Procrustean requirement that a single action be brought. . . . presents a dilemma to the plaintiff, with unnecessarily drastic penalties for guessing wrong.").

[**29]  [*1012]  In light of these practical difficulties and the "uncertain and illogical nature" of the permanent and continuing tort distinctions being made by the courts as a result, *see* Prosser & Keeton § 13, at 84, influential commentators suggested over time that the courts move away from the all-in-one concept for continuing and permanent property invasions in favor of an approach that recognized ongoing property invasions as continuing torts while also granting the party injured by such invasions the option, if it appeared the invasion would continue indefinitely, of recovering all damages in a single suit, including prospective or "permanent" damages measured by the diminution in value of the property caused by the prospect of the invasion's continuance. *See, e.g.*, Harper, Law of Torts § 1.7, at 1:34-35; Prosser & Keeton § 13, at 84; McCormick, Law of Damages § 127, at 511-14; McCormick, 37 Harv. L. Rev. at 596-601; 4 J. G. Sutherland, A Treatise on the Law of Damages § 1046, at 3874 (4th ed. 1916). This approach was adopted by the authors of the Restatement and is reflected in *sections 161* and *930 of the Restatement (Second) of Torts* [**30]  . [11] *See id.*, §§ *161, 930*; *Cox, 236 S.E.2d at 74*. A number of courts have adopted and applied the Restatement approach to allow plaintiffs injured by continuing invasions to elect to recover prospective damages, *see, e.g., Cox, 236 S.E.2d at 74-75* (finding "Restatement's approach to dealing with continuing nuisances is both comprehensive and workable"); *Shults v. Champion Int'l Corp., 821 F. Supp. 517, 519-20 (E.D. Tenn. 1992)* (applying North Carolina law); *see also Spaulding, 239 P.2d at 628* (in doubtful cases, plaintiff has right to elect whether to treat invasion as permanent or not), and it has been applied by federal courts predicting how a state supreme court would rule if presented with the question. *See Reynolds Metals Co. v. Wand, 308 F.2d 504, 510 (9th Cir. 1962)* (applying Oregon law).

  11   Consistent with the historic origin of the "permanent" trespass and nuisance concept, the Restatement also recognizes that a different rule may apply when the enterprise causing the trespass or nuisance is a public utility or provides an essential public service. *Restatement (Second) of Torts § 930(2) & cmt. c.*

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 123 of 332

Page 9

358 F. Supp. 2d 1003, *1012; 2004 U.S. Dist. LEXIS 27360, **30;
60 ERC (BNA) 1017

[**31] Consistent with the Restatement approach, the Supreme Court has sanctioned the award of diminution of property value (prospective damages) for an invasion it deemed continuing for statute of limitations purposes because limiting the plaintiff's remedy to that available for a continuing nuisance, *i.e.*, past damages recoverable through a succession of actions, "would be so onerous as to deny to [the plaintiff] adequate relief." *See City of Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 340, 77 L. Ed. 1208, 53 S. Ct. 602 (1933)* (applying Missouri law). Other courts have similarly recognized that a trespass or nuisance may be classified and treated as continuing for statute of limitations purposes and permanent for purposes of awarding prospective damages. *See, e.g., Beatty v. Washington Metro. Area Transit Auth., 274 U.S. App. D.C. 25, 860 F.2d 1117, 1125 (D.C. Cir. 1988); Shaw v. City of Rupert, 106 Idaho 526, 681 P.2d 1001, 1003 (Idaho 1984)* (that precedent might deem invasion to be continuing for statute of limitations purposes did not preclude plaintiff from recovering diminution in property value if [*1013] invasion probably would continue indefinitely).

After examining the Restatement [**32] and other authority, I predicted in *Cook IX* that the Colorado Supreme Court would follow the Restatement approach if presented with the question of whether prospective damages may be recovered in a continuing trespass and nuisance case such as this. *See Cook IX, 273 F. Supp. 2d at 1211*. This conclusion is consistent with the Colorado Supreme Court's citation of the Restatement in deciding what constitutes a continuing trespass and nuisance under Colorado law, *see Hoery, 64 P.3d at 218*, and its adoption of a flexible approach to determining the appropriate measure of damages for injury to real property. *See Cook IX, 273 F. Supp. 2d at 1210, 1211* (discussing *Board of County Comm'rs v. Slovek, 723 P.2d 1309 (Colo. 1986)*). I further note there is precedent for this approach in Colorado, as the Colorado Court of Appeals has previously allowed diminution in property value to be awarded in a case in which the trespass was deemed a continuing tort for statute of limitations purposes. *See Consol. Home Supply Ditch & Reservoir Co. v. Hamlin, 40 P. 582, 584, 587, 6 Colo. App. 341 (Colo. Ct. App. 1894)* (affirming trial court [**33] holding that action was for continuing nuisance and hence was not barred by statute of limitations, while also approving award of diminution in property's value as a result of the nuisance). Accordingly, I reiterate my decision in *Cook IX* that

Plaintiffs, upon proof of liability and compliance with the requirements of *section 930 of the Restatement*, may recover prospective damages in this action for continuing trespass and nuisance. [12]

> 12   In so holding, I am aware that the *Hoery* decision states in a footnote that damages for continuing torts are limited to injuries sustained up to the time of suit, *64 P.3d at 219 n.7*, but note this statement is dicta as the issue of the damages recoverable by a party injured by a continuing property invasion was not presented to the Colorado Supreme Court for decision or otherwise discussed by it.

In conclusion, for the reasons stated above, I hold the alleged presence of plutonium from Rocky Flats on Plaintiffs' and class members' properties constitutes [**34] a continuing tort under Colorado law because, like the contamination at issue in *Hoery*, it allegedly remains on the property and, even if it will remain there indefinitely, is not a permanent tort because it does not serve a socially beneficial purpose. *See Hoery, 64 P.3d at 223* ("continued contamination does not benefit the development of our state" and "no sound public policy supports the classification of contamination from the release of toxic chemicals as a permanent property invasion."). As permitted by *Restatement section 930*, Plaintiffs may elect, and have elected, to seek recovery of prospective damages for this continuing invasion, which is "the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring." *Restatement (Second) of Torts, § 930(3)(b)*. In order to recover prospective damages under this authority, Plaintiffs must prove not only liability in trespass or nuisance, but also that the tortious invasion "will probably continue indefinitely" because "there is no reason to expect its termination [**35] at any definite time in the future." *Id., § 930 cmt. b*. Defendants may defeat this showing, and thus preclude Plaintiffs from recovering prospective damages, by demonstrating that they or others have abated or remedied the trespass or nuisance or are about to do so. *See id.* A judgment awarding damages for prospective invasions, if satisfied, will confer an easement to continue the invasions thus [*1014] paid for in advance. *Restatement (Second) of Torts § 930 cmt. b*. [13]

> 13   The parties' additional arguments regarding

358 F. Supp. 2d 1003, *1014; 2004 U.S. Dist. LEXIS 27360, **35;
60 ERC (BNA) 1017

the damages that may be recovered in this action and the proper jury instructions on this subject will be decided separately.

IT IS SO ORDERED.

Dated this 17th day of December, 2004.

John L. Kane, Senior District Judge

United States District Court

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 125 of 332

Cook v. Rockwell Intern. Corp., 233 F.R.D. 598 (2005)

233 F.R.D. 598
United States District Court,
D. Colorado.

Merilyn COOK, et al., Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and the Dow Chemical Company, Defendants.

No. Civ.A. 90CV181JLK.
|
Dec. 15, 2005.

**Synopsis**

**Background:** Class action was brought by landowners against operators of nuclear weapons manufacturing plant, seeking to recover for damage to their property interests caused by releases of plutonium and other hazardous substances from plant. Plaintiffs moved to exclude rebuttal testimony of defense expert.

**Holdings:** The District Court, Kane, Senior District Judge, held that:

[1] defendants did not establish they were substantially justified in not disclosing expert witness they offered in rebuttal of plaintiffs' expert witness, and thus testimony of their expert would be excluded at trial, and

[2] intended rebuttal testimony of defendants' expert was expert testimony subject to expert disclosure requirements.

Motion granted.

West Headnotes (3)

**[1]**   **Federal Civil Procedure**
     Failure to Respond;Sanctions

Party who fails to make expert disclosure may not present the expert testimony at trial, and sanction is mandatory unless the non-disclosing party shows substantial justification or that the failure to disclose was harmless. Fed.Rules Civ.Proc.Rules 26(a), 37(c)(1), 28 U.S.C.A.

9 Cases that cite this headnote

**[2]**   **Federal Civil Procedure**
     Failure to Respond;Sanctions

Defendants did not establish they were substantially justified in not disclosing expert witness they offered in rebuttal of plaintiffs' expert witness, based on allegation that plaintiffs' inadvertent omission of their expert from their preliminary witness list led them to believe he would not testify at trial, and thus testimony of defendants' expert would be excluded from trial; any confusion as to whether plaintiffs' expert would testify was temporary, and plaintiffs' final decision on whether to call expert at trial had nothing to do with defendants' obligation to provide disclosure. Fed.Rules Civ.Proc.Rules 26(a), 37(c)(1), 28 U.S.C.A.

8 Cases that cite this headnote

**[3]**   **Federal Civil Procedure**
     Evidentiary Matters

Intended rebuttal testimony of defendants' expert was expert testimony subject to expert disclosure requirements, notwithstanding defendants' assertion that their expert would factually testify as to work in the field of epidemiology at the Department of Energy (DOE) as a lay witness; defendants stated that their expert's testimony was intended to rebut testimony of plaintiff's expert that DOE epidemiological studies were not credible, and there was no question that defense expert's intended testimony would be based on her knowledge and expertise in epidemiology. Fed.Rules Civ.Proc.Rule 26(a), 28 U.S.C.A.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*599** Bernadette M. Rappold, David F. Sorensen, Ellen T. Noteware, Eric L. Cramer, Jennifer E. Macnaughton, Jonathan Auerbach, Peter B. Nordberg, Stanley B. Siegel, Merrill Gene Davidoff, Berger & Montague, P.C., Philadelphia, PA, Christopher Thomas Reyna, John David Stoner, Chimicles & Tikellis, L.L.P., Haverford, PA, David Evans Kreutzer, Colorado Department of Law, Gary B. Blum, Holly Brons Shook, Bruce H. DeBoskey, Steven William Kelly, Silver & Deboskey, P.C., Daniel R. Satriana, Jr., Clisham, Satriana & Biscan, LLC, Denver, CO, Jean Marie Geoppinger, Louise M. Roselle, Stanley M. Chesley, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH, Kenneth A. Jacobsen, Jacobsen Law Offices, LLC, Wallingford, PA, R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE, Ronald Simon, Simon & Associates, Washington, DC, for Plaintiffs.

Amy Horton, Edward J. Naughton, Timothy P. Brooks, Wendy S. White, Goodwin Procter, LLP, Carlotta P. Wells, U.S. Department of Justice, Washington, DC, David M. Bernick, Douglas J. Kurtenbach, Mark S. Lillie, John E. Tangren, Stephanie A. Brennan, S. Jonathan Silverman, Kirkland & Ellis, Martin Thomas Tully, Katten Muchin Rosenman, LLP, Chicago, IL, Joseph John Bronesky, Christopher Lane, Sherman & Howard, L.L.C., Lester C. Houtz, Bartlit, Beck, Herman, Palenchar & Scott, Stephen D. Taylor, U.S. Attorney's Office, Denver, CO, Douglas M. Poland, Lafollette, Godfrey & Kahn, Madison, WI, Louis W. Pribila, Dow Chemical Company, Midland, MI, for Defendants.

U.S. Dept. of Energy, Rocky Flats Project Office, Broomfield, CO, pro se.

Dean Steven Neuwirth, Patrick J. Burke, Burke & Neuwirth, PC, Denver, CO, for Intervenors.

## ORDER ON MOTION TO EXCLUDE TESTIMONY OF DR. SHIRLEY FRY

KANE, Senior District Judge.

This matter is before me on Plaintiffs' motion to exclude the testimony of Dr. Shirley Fry, as set forth in their Motion to Exclude the Testimonies of Fry, Grogan and Voilleque (Docket # 1728), filed December 4, 2005.

Having carefully considered the motion with respect to Dr. Fry, the parties' subsequent briefing on this subject, the relevant record and all applicable legal authorities, and being fully advised in the premises, I rule as follows:

Defendants offer Dr. Fry in rebuttal to the testimony of Plaintiffs' expert Dr. Steven Wing. In compliance with Federal Rule of Civil Procedure 26 and the deadlines for expert disclosure I ordered in this case, Plaintiffs designated Dr. Wing as an expert in this matter in May, 1995, and provided his expert report to Defendants in November, 1996. Pursuant to Rule 26(a)(2)(C), Defendants were required to identify and provide an expert report for any expert evidence they intended to present to contradict or rebut Dr. Wing's expert testimony within 30 days of Plaintiffs' disclosure of Dr. Wing's expert report. Fed.R.Civ.P. 26(a)(2)(C); *see, e.g., Eckelkamp v. Beste,* 315 F.3d 863, 872 (8th Cir.2002); *Finley v. Marathon Oil Co.,* 75 F.3d 1225, 1230 (7th Cir.1996) (Posner, J.); *Complaint of Kreta Shipping, S.A.,* 181 F.R.D. 273, 276 (S.D.N.Y.1998). Defendants did not disclose an expert to rebut Dr. Wing's expert testimony in December, 1996, as required, and did not request any extension of time to do so. Instead, on October 7, 2005, at the start of trial and immediately after I denied Defendants' *Daubert* motion to exclude Dr. Wing's testimony, Defendants for the first time declared their intent to call Dr. Fry as a rebuttal witness to Dr. Wing. Defendants had not identified Dr. Fry as a **\*600** potential witness, expert or otherwise, on any of their previous witness lists. [1]

[1] Rule 37(c)(1) provides that a party who without substantial justification fails to disclose information required by Rule 26(a) may not present this information as evidence at trial. This sanction is mandatory unless the non-disclosing party shows substantial justification or that the failure to disclose was harmless. *See, e.g.,* Fed.R.Civ.P. 37(c)(1) (Adv. Comm. Note 1993); *see Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 952-53 (10th Cir.2002). [2] This rule applies to rebuttal expert testimony that was not disclosed in compliance with Rule 26(a). *See, e.g., Finley,* 75 F.3d at 1230 (affirming exclusion of rebuttal evidence presented by expert witness because the evidence was not disclosed as required by Rule 26(a)); *Congressional Air, Ltd. v. Beech Aircraft Corp.,* 176 F.R.D. 513, 515-16 (D.Md.1997) (same). Accordingly, unless Defendants had substantial justification for failing to disclose Dr. Fry's testimony in December, 1996, she

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                    2

may not testify as a expert in rebuttal to Dr. Wing's properly disclosed expert testimony. [3]

**[2]**   The only justification offered by Defendants for their failure to disclose Dr. Fry is that Plaintiffs' inadvertent omission of Dr. Wing from their December, 2003 preliminary witness list led them to believe Dr. Wing would not testify at trial. Any confusion on this score was temporary, however, as Plaintiffs notified Defendants in July, 2004, more than a year before trial, that Dr. Wing was still a potential expert witness in this case. More importantly, Plaintiffs' final decision on whether to call Dr. Wing at trial has nothing to do with the timing of Defendants' obligation under the Federal Rules to provide disclosure of any expert testimony in rebuttal to Dr. Wing's testimony. That obligation was triggered in November, 1996 when Plaintiffs disclosed Dr. Wing's intended expert testimony, and required Defendants to disclose any expert evidence to contradict or rebut Dr. Wing's expert testimony 30 days later, in December, 1996. [4]

Defendants argue I ruled that Dr. Fry could testify in rebuttal to Dr. Wing based on statements I made on October 7, 2005, immediately after Defendants for the first time stated their intent to call Dr. Fry as a rebuttal witness. Plaintiffs had had no discovery at that time regarding Dr. Fry and the scope of her intended testimony. Although Dr. Fry has not submitted an expert report, she was deposed by Plaintiffs on December 7. I now make my final ruling based on this more complete record.

Under this record, I hold that Dr. Fry may not present expert testimony in this case, in rebuttal to Dr. Wing or otherwise, because Defendants failed to comply with the expert disclosure requirements set out above and that failure was not substantially justified or harmless.

**\*601**   **[3]**   That brings me to Defendants' final argument, which is that Dr. Fry's intended rebuttal testimony is not expert testimony at all and thus is not subject to these disclosure requirements, or, for that matter, the reliability requirements for expert testimony set forth in Fed.R.Evid. 702. Defendants assert this is so because Dr. Fry has personal knowledge of Dr. Wing and "of the field of epidemiology at DOE" as a result of her years of experience as a DOE epidemiologist. *See* Defs.' Resp. (Docket # 1745) at 4; Defs.' Resp. to Pls.' Supp. (Docket # 1823) at 2. As a consequence, Defendants argue, Dr.

Fry "can factually testify as to the work with which she is familiar" at DOE as a lay witness under Fed.R.Evid. 701. *See* Defs' Resp. (# 1745) at 4.

Defendants assert they will question Dr. Fry regarding two specific areas of which she has personal knowledge: (1) "attempts to influence or limit epidemiological studies of workers at DOE nuclear facilities, including [Dr. Wing's] own mortality study of Oak Ridge workers; and (2) the structure of the DOE radiation epidemiology program and the studies conducted under that program." Defs' Resp. to Pls' Supp. (Docket # 1823) at 1. Defendants have stated that Dr. Fry's testimony on these subjects is intended to rebut Dr. Wing's testimony suggesting "that the DOE epidemiological studies were not credible, were inadequate and that the DOE's purported 'conflict of interest' affected that science." Defs' Resp. (Docket # 1745) at 4.

An expert witness is "a witness qualified as an expert by knowledge, skill, experience, training or education" whose "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. By definition, therefore, an expert witness has personal knowledge of their field and of the matters on which they are to testify, or they would not be qualified to testify as an expert. As a result, that Dr. Fry has personal knowledge of the subjects on which she is to testify is not determinative of whether she is testifying as a lay fact witness or as an expert witness. [5]

The Federal Rules of Evidence require that a witness' testimony be scrutinized under the rules regulating expert testimony to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed.R.Evid. 701 Adv. Comm. Notes (2000 Am.). This requirement is to ensure "that a party will not evade the expert witness disclosure requirements set forth in Fed.R.Civ.P. 26 ... by simply calling an expert witness in the guise of a layperson." *Id.*

"The distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." Fed.R.Evid. 702 Adv. Comm.

Case No. 1:90-cv-00181-JLK Document 2435-12 filed 01/12/17 USDC Colorado pg 128 of 332

Cook v. Rockwell Intern. Corp., 233 F.R.D. 598 (2005)

Notes (2000 Am.). The Tenth Circuit has stated this test as follows:

> When the subject matter of proffered testimony constitutes "scientific, technical, or other specialized knowledge," the witness must be qualified as an expert under Rule 702. Rule 701 applies only if the witness is not testifying as an expert. Indeed, the rule expressly prohibits the admission of testimony as lay witness opinion if it is based on specialized knowledge. In other words, a person may testify as a lay witness only if his opinions or inferences do not require specialized knowledge and could be reached by any ordinary person.

*Lifewise Master Funding v. Telebank,* 374 F.3d 917, 929 (10th Cir.2004) (internal quotations and citations omitted).

There can be no question that Dr. Fry's intended testimony would be based on her knowledge and alleged expertise in epidemiology [6] and thus on scientific, technical and **\*602** specialized knowledge, rather than

knowledge or a process of reasoning familiar to the layman in everyday life. The subjects on which Defendants intend to question her require this specialized knowledge, and any opinions she might express on the identified subjects would be based on it. This conclusion is confirmed by my review of the examples of Dr. Fry's intended testimony set forth by Defendants in their December 9 response. [7] *See* Defs.' Resp. (Docket # 1777) at 3-4.

Accordingly, I find Defendants are offering Dr. Fry as an expert witness, without having disclosed her and her testimony as required by Fed.R.Civ.P. 26(a). This failure to disclose was not substantially justified and is not harmless. Plaintiffs' motion to exclude Dr. Fry's testimony is, therefore, granted.

IT IS SO ORDERED.

**All Citations**

233 F.R.D. 598

Footnotes

1    On November 11, 2005, after the conclusion of the expert testimony of Dr. Richard Clapp, another of Plaintiffs' long-disclosed expert witnesses, Defendants announced their intention also to elicit testimony from Dr. Fry in rebuttal to Dr. Clapp's trial testimony. *See* Defendants' Statement Concerning Its [sic] Trial Witness List (Docket # 1630), filed November 11, 2005. Defendants' maintained that position until three days ago, when they announced they would limit Dr. Fry's testimony to rebuttal of Dr. Wing. *See* Defs.' Resp. (Docket # 1823) at 1.

2    The Tenth Circuit has stated that the following factors should be considered in determining whether the failure to disclose was substantially justified or harmless: (1) the prejudice or surprise to Plaintiffs, as the party against whom the testimony is offered; (2) the ability of Plaintiffs to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) Defendants' bad faith or willfulness. *Jacobsen,* 287 F.3d at 953-54. Although neither party addressed these factors in their briefing, I considered them in reaching my conclusions here.

3    Rule 37(c)(1) permits the use of undisclosed information at trial if the failure to disclose was harmless. Defendants have not argued that their failure to disclose Dr. Fry as a rebuttal witness was harmless, and I find no basis in the record for such a conclusion. Dr. Fry was not disclosed as a witness until the eve of trial and never filed an expert report of any kind. That Plaintiffs were able to take her deposition, during trial and barely a week before her scheduled testimony, does not cure the prejudice that resulted from this untimely and incomplete disclosure.

4    Rule 26(a) authorizes courts to set a different time and sequence for expert disclosures, but none was set for expert rebuttal reports here.

5    Fed.R.Evid. 701, moreover, specifically prohibits lay opinion testimony, even when based on personal knowledge, if the opinion or inference is based on scientific, technical or other specialized knowledge.

6    I say "alleged expertise" not as a comment on Dr. Fry's qualifications to testify as an expert, but rather to point out that her qualifications and the reliability of her testimony were never tested under Fed.R.Evid. 702 because she was not timely, or otherwise, disclosed as an expert witness.

7    One of the examples Defendants give, that Dr. Fry will testify regarding the reasons for Mancuso's dismissal from the Oak Ridge Associated Universities in 1974, might constitute non-expert evidence but it is nonetheless not admissible

because it is not based on her personal knowledge. *See* Fry Dep. at 103 (Dr. Fry reports she has no personal knowledge of anything done at ORAU before 1978).

---

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.



LEXSEE 428 F. SUPP. 2D 1152

**MERILYN COOK, et al., Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION AND THE DOW CHEMICAL COMPANY, Defendants.**

**Civil Action No. 90-K-181**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*428 F. Supp. 2d 1152*; *2006 U.S. Dist. LEXIS 44753*

**April 18, 2006, Decided**
**April 18, 2006, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Cook v. Rockwell Int'l Corp., 2006 U.S. Dist. LEXIS 29379 (D. Colo., May 10, 2006)*

**PRIOR HISTORY:** *Cook v. Rockwell Int'l Corp., 2006 U.S. Dist. LEXIS 13246 (D. Colo., Mar. 13, 2006)*

**COUNSEL:** **[**1]** For Merilyn Cook, William Schierkolk, Jr., Delores Schierkolk, Richard Bartlett, Lorren Babb, Gertrude Babb, Michael Dean Rice, Bank Western, Michael Dean Rice, Thomas L. Deimer, Rhonda J. Deimer, Stephen Sandoval, Peggy J. Sandoval, Plaintiffs: Bernadette M. Rappold, David F. Sorensen, Ellen T. Noteware, Eric L. Cramer, Jennifer E. MacNaughton, Jonathan Auerbach, Peter B. Nordberg, Stanley B. Siegel, Merrill Gene Davidoff, Berger & Montague, P.C., Philadelphia, PA; Christopher Thomas Reyna, John David Stoner, Chimicles & Tikellis, L.L.P., Haverford, PA; David Evans Kreutzer, Colorado Department of Law, Denver, CO; Gary B. Blum, Holly Brons Shook, Silver & DeBoskey, P.C., Denver, CO; Jean Marie Geoppinger, Louise M. Roselle, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH; Kenneth A. Jacobsen, Jacobsen Law Offices, LLC, Wallingford, PA; R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE.

For Sally Bartlett, Plaintiff: Bernadette M. Rappold, David F. Sorensen, Ellen T. Noteware, Eric L. Cramer, Jennifer E. MacNaughton, Jonathan Auerbach, Peter B. Nordberg, Stanley B. Siegel, Merrill Gene Davidoff, Berger & Montague, P.C., Philadelphia, PA; Bruce H. DeBoskey, **[**2]** Silver & Deboskey, P.C., Denver, CO; Christopher Thomas Reyna, John David Stoner, Chimicles & Tikellis, L.L.P., Haverford, PA; Daniel R. Satriana, Jr., Clisham, Satriana & Biscan, LLC, Denver, CO; David Evans Kreutzer, Colorado Department of Law, Denver, CO; Gary B. Blum, Holly Brons Shook, Steven William Kelly, Silver & DeBoskey, P.C., Denver, CO; Jean Marie Geoppinger, Louise M. Roselle, Stanley M. Chesley, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH; Kenneth A. Jacobsen, Jacobsen Law Offices, LLC, Wallingford, PA; R. Bruce McNew, Taylor, Gruver & McNew, P.A., Greenville, DE; Ronald Simon, Simon & Associates, Washington, DC.

For Rockwell International Corporation, Defendant: Amy Horton, Edward J. Naughton, Timothy P. Brooks, Wendy S. White Goodwin Procter, LLP-DC, Washington, DC; David M. Bernick, Douglas J. Kurtenbach, Mark S. Lillie, John E. Tangren, Stephanie A. Brennan, Kirkland & Ellis, P.C.-Illinois, Chicago, IL; Joseph John Bronesky, Sherman & Howard, L.L.C.-Denver, Denver, CO; Martin Thomas Tully, Katten Muchin Rosenman, LLP, Chicago, IL.

For Dow Chemical Company, Defendant: Christopher Lane, Joseph John Bronesky, Sherman & Howard, L.L.C.-Denver, **[**3]** Denver, CO; David M. Bernick,

428 F. Supp. 2d 1152, *; 2006 U.S. Dist. LEXIS 44753, **3

Douglas J. Kurtenbach, Mark S. Lillie, John E. Tangren, Stephanie A. Brennan, S. Jonathan Silverman, Kirkland & Ellis, P.C.-Illinois, Chicago, IL; Douglas M. Poland, LaFollette, Godfrey & Kahn, Madison, WI; Lester C. Houtz, Bartlit, Beck, Herman, Palenchar & Scott-Colorado, Denver, CO; Louis W. Pribila, Dow Chemical Company, Midland, MI.

For United States Department of Energy, US Dept. of Energy, Interested Parties: Carlotta P. Wells, U.S. Department of Justice-DC-Civil Divisional # 7150, Washington, DC; Stephen D. Taylor, U.S. Attorney's Office-Denver, Denver, CO.

**JUDGES:** John L. Kane, SENIOR U.S. DISTRICT JUDGE.

**OPINION BY:** John L. Kane

**OPINION**

[*1153] **AMENDED ORDER ON PENDING MOTIONS FILED UNDER SEAL (DOCS. 2122, 2123, 2156) AND TO PRESERVE JURY NOTES (DOC. 2124)**

Kane, J.

This matter is before me on Defendants' Motion to Speak with Juror (Filed Under Seal) (Doc. 2122), Defendants' Motion to Unseal Redacted Version of Juror Notes and Transcripts (Filed Under Seal) (Doc. 2123), Defendants' Motion to Preserve Jury Notes (Doc. 2124), and Defendants' Motion to Correct Error in Transcription (Filed Under Seal) (Doc. 2156). Being fully advised of their premises [**4] and the applicable law, I issue the following rulings:

1. Defendants' Motion to Speak with Juror (Filed Under Seal) (Doc. 2122).

Citing *United States v. Samet, 207 F. Supp. 2d 269 (S.D.N.Y. 2002)*, Defendants move under *D.C.COLO.LCiv.R 47.1* for an order (1) allowing them to speak with Juror X [1] and (2) disclosing "any communications the Court or Court personnel have had with [Juror X] following her exit from the jury room." The Motion is **DENIED** in both regards under *Tanner v. United States, 483 U.S. 107, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987)* and *F.R.E. 606(b)*.

1   Defendants' repeated use of Juror X's name in their briefing, even if filed under seal, is unnecessary and contravenes my explicit order in this case that filings *not* do so. *See* Order (Doc. 2115), dated February 14, 2006. Administrative errors resulting in the inadvertent release of sealed documents are not unprecedented.

District courts have wide discretion to shield jurors from post-trial "fishing [**5] expeditions" carried out by losing attorneys interested in casting doubt on the jury's verdict or deliberations process. *See e.g. United States v. Hall, 424 F. Supp. 508, 538-39 (W.D.Okla.1975), aff'd, 536 F.2d 313 (10th Cir.1976)*. "There are many cogent reasons militating against post-verdict inquiry into jurors' motives for decision. The jurors themselves ought not to be subjected to harassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain.'" *Id. at 538* (quoting *United States v. Crosby, 294 F.2d 928, 950 (2d Cir. 1961), cert. den'd., 368 U.S. 984, 82 S. Ct. 599, 7 L. Ed. 2d 523 (1962))*.

*Samet*, Defendants' principle authority for the relief requested, provides a single case in which a court, in a criminal prosecution, deemed it necessary to declare a mistrial rather than continue with fewer than 12 jurors when a juror sent communications and made statements, *during* the course of deliberations, suggesting she held a minority view on the merits of the case, was experiencing [**6] pressure from other jurors to change her vote, had changed her vote on some counts, and no longer believed she could deliberate fairly. Finding the limited exception for proceeding with fewer than 12 jurors in criminal cases set forth in *Fed. R. Crim. P. 23(b)* could not be invoked without violating jury secrecy, the district court declared a mistrial. *207 F. Supp.2d at 277 & n.4*.

*Samet* is completely distinguishable on its facts from the scenario that presented itself in the *Cook v. Rockwell* case on January 25th when Juror X left the jury deliberation room in distress. Had Defendants pursued their motion for mistrial at [*1154] that time (which motion was anticipated and suggested orally but never formally pursued with a written motion or briefing) I would have denied it both because *Samet* was inapplicable [2] and because, quite simply, Juror X was excused for cause because she was no longer able to perform her duties. With no indication that Juror X held

428 F. Supp. 2d 1152, *1154; 2006 U.S. Dist. LEXIS 44753, **6

*any* view on the merits of the case at that time (which was two days into what became 18 days of deliberations), minority or otherwise, no indication that she was being pressured [**7] to change any such "view," and no indication that she was leaving because she could no longer deliberate fairly -- and with the remaining jurors' public assurance that they could continue to do so-there was simply no basis for declaring a mistrial at that time. Fishing for such indices *now*, however, after the remaining jurors deliberated for 15 additional days and returned a verdict against Defendants, is not only unsupported by *Samet*, but is in direct contravention of *Rule 606(b) of the Federal Rules of Evidence* and the sound, centuries-old legal and public policy considerations underlying that Rule.

2   *Samet* is a criminal case decided under *Fed. R. Crim. P 23(b)* where 12-man jury and unanimous verdict considerations significantly impact the discharge of a juror for cause during the course of deliberations. While the modern trend is that the prosecution and defendant may stipulate at any time before verdict to a jury of fewer than 12 members in criminal cases, the practice is limited and closely scrutinized for *Sixth Amendment* considerations. *See generally*, C. Wright, Federal Practice & Procedure: Criminal 3d § 371 (3d ed. 2000). Specifically, *Rule 23* was amended in 1977 to allow the parties to stipulate that a valid verdict may be returned by a jury of fewer than 12 should the court find it necessary to excuse one or more jurors for cause. It was amended in 1983 to allow the court even without a stipulation to proceed with 11 jurors "if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict." *See id.* (quoting *Rule 23* as amended). Because of the constitutional imperative of a unanimous verdict, however, courts in criminal cases must avoid the risk of excusing a holdout juror and ensure that any juror excused for cause once deliberations have started not be excused based any views that juror may have on the merits of the government's case. *See id.* at n. 19 (collecting cases). Where this cannot be done, an appropriate course may be, as in *Samet*, to declare a mistrial. In civil cases, where parties may stipulate to a nonunanimous verdict under *Fed. R. Civ. P. 48* (and the parties did so here), the constitutional concerns are not the same. Even in the criminal context, moreover,

the option of declaring a mistrial is discretionary, and not compelled. In the absence of evidence that a judge's decision to excuse a juror for inability to perform duties was influenced by a juror's view of the case, the refusal to declare a mistrial is not error. *See U.S. v. Gonzalez-Soberal, 109 F.3d 64 (1st Cir. 1997).*

[**8]   Defendants raised all manner of issues on January 25th in the wake of Juror X's discharge, but in the end, failed to formalize their motion for mistrial or to provide briefing they promised was forthcoming. [3] Instead, Defendants allowed the jury to continue deliberating for three full weeks after Juror X's dismissal, not following up on the issue, and instead, acted in a manner entirely inconsistent with any objection to allowing the jury to continue its deliberations to final verdict or a desire to have the issue resolved before final verdict was reached.

3

MR BERNICK: "[W]e intend to file a motion for a mistrial that more fully sets out both the facts that relate to this case." (Tr. at 10745.)

* * *

THE COURT: "[D]efense counsel has asked for time to file some matters on a motion for mistrial [and] I'll defer any ruling until I receive those." (Tr. at 10754.)

It should be noted that these statements are set forth in parts of the January 25, 2006 hearing transcripts I am unsealing pursuant to my order issued *infra*, at Section 2.

[**9]   For example, one of Defendants' first actions after Juror X's dismissal on January 25th was to revisit their stipulation to [*1155] allow a consensus verdict with up to two dissenters per verdict form question, stating that having lost two jurors, they were "not prepared to accept less than [a] unanimous verdict." (Tr. at 10764-65.) Defendants revealed a change of heart over the noon hour, however, *reaffirming* in response to a

428 F. Supp. 2d 1152, *1155; 2006 U.S. Dist. LEXIS 44753, **9

question submitted by the newly convened 10-member jury their original agreement to allow a binding vote with two dissents, expressly acknowledging that this meant an 8-2 vote would be binding, and repeating that agreement on the record. (Tr. at 10765.) [4] Defendants made no objection then or at any time thereafter to the jury continuing to deliberate with 10, rather than 11, jurors.

[4]

> THE COURT: Had a question from the jury right after you left, and I think you got it. And what's your position with regard to the jury question? Do we still have to have nine yes or no votes, or is it eight to two, equals ten total jurors.
>
> MR. BERNICK: Well, we understand the plaintiffs have taken the position that eight to two is enough, and we're in agreement with that position.

[**10] During the course of the following three weeks, moreover, Defendants filed numerous responses to at least eight questions/requests by the jury as it deliberated, but neither requested that deliberations be halted nor filed any briefing in support of their *Samet*-based suggestion that Juror X's departure without questioning her somehow created or revealed an insurmountable taint on the jury requiring mistrial. Instead, Defendants waited until *after* the jury reached its verdict and *after* the verdict went against them to reassert the specter that Juror X "may" have been a dissenting juror who "may" have been rousted from the jury based on that dissent such that they should be allowed to investigate that specter post-verdict to determine whether a mistrial or new trial is warranted now. Had the verdict gone their way, Defendants would have received the benefit of their hedge and we would undoubtedly have heard nothing further from them on the issue. [5]

> [5] Evidence of Defendants' "hedge" is apparent in their briefing, which quite obviously was prepared after January 25th but *before* the jury's verdict, but held until after the final verdict was issued. From footnote 1 of the Motion:
>
> Plaintiffs also cite to *Federal*

> *Rule of Evidence 606(b)*, but that rule simply indicates that upon inquiry into a verdict *(which we do not yet have here)*, a juror cannot become a witness concerning the jury's deliberations.

(Emphasis mine.)

[**11] Once a jury has deliberated to verdict, *Samet*, even if it were to apply in this case, falls away and no reasonable argument can be made that anything other than *FRE 606(b)* governs a *post hoc* inquiry into a potential "taint" in the deliberative process, particularly one that ostensibly occurred two days into an 18-day deliberation process and after a four month, exceedingly complex trial. In this case, *Rule 606(b)* governs the issues raised and precludes the fishing expedition requested by Defendants.

*FRE 606(b)* prohibits jurors from testifying "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith," and prohibits a juror's affidavit or evidence of any juror's statement concerning any such matter from being received by a Court for purposes of questioning the validity of a verdict.

The Rule is a codification of principles dating back to the 18th century and long [**12] held inviolate in our system of laws. *See* [*1156] *McDonald v. Pless, 238 U.S. 264, 269, 35 S. Ct. 783, 59 L. Ed. 1300 (1915)*(citing the 1785 ruling of Lord Mansfield in *Vaise v. Delaval*, 1 T.R. 11, and concluding it "is unquestionably the general rule that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict"). The Supreme Court wrote specifically about the nature and underpinnings of *Rule 606(b)* in *Tanner v. United States, 483 U.S. 107, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987)*, reiterating the substantial policy considerations underlying the Rule and reviewing case law treating allegations of the physical or mental incompetence of a juror as falling squarely within its prohibitions.

The exceptions to the Rule are few and narrowly construed. While a juror may not testify about matters that affected her mind or emotions to assent or dissent

428 F. Supp. 2d 1152, *1156; 2006 U.S. Dist. LEXIS 44753, **12

from a verdict, she may testify on the question of whether "extraneous prejudicial information was improperly brought to Juror X's attention [such as newspaper accounts or the like]" or "whether any outside influence was improperly brought to bear upon any juror." *Tanner, 483 U.S. at 121* **[**13]** (quoting *FRE 606(b)*). There has been no suggestion in this case that extraneous prejudicial information was brought to the jury's attention in deliberations or that influence from anything outside the jury deliberations process was brought to bear. A juror's mental state or mental incompetence is conclusively an "internal" matter into which inquiry may not be made, *see Tanner at 117-18* (collecting cases), as is the assertion, fundamental to Defendants' claims of impropriety here, that other jurors involved in the deliberations exercised influence over her. *See McDonald, 238 U.S. at 267* ("public injury [] would result if jurors were permitted to testify as to what had happened in the jury room"); *United States v. Stansfield, 101 F.3d 909, 914 (3d Cir. 1996)*("Testimony concerning intimidation or harrassment of one juror by another falls squarely within the core prohibition of the Rule.")(quoted favorably in *Robinson v. Gibson, 35 Fed. Appx. 715 (10th Cir. 2002)*(unpublished decision)).

The Tenth Circuit has been adamant in enforcing these principles in the face of the very sort of evidence Defendants **[**14]** seek to discover. *See, e.g., United States v. Voigt, 877 F.2d 1465, 1469-70 (10th Cir. 1989)*(citing *United States v. Miller, 806 F.2d 223 (10th Cir. 1986)* and *United States v. Jelsma, 630 F.2d 778 (10th Cir. 1980)*). In *Miller*, for example, the Tenth Circuit affirmed the trial court's denial of defendant's motion to make inquiry of a juror who reportedly had told her pastor that she may have misunderstood the court's instructions and may have been unduly influenced by the other jurors. *806 F.2d at 225* ("settled law" that juror testimony is inadmissible to impeach a verdict except where the proffered testimony relates to *extraneous* prejudicial information or the fact of *outside* influence being improperly brought to bear upon any juror, neither of which was implicated by juror's statements). In *Jelsma*, the Tenth Circuit stated *Rule 606(b)* "specifically precludes judicial 'inquiry into the validity of a verdict'" and refused to consider affidavits of jurors presented by appellant to impeach it. *630 F.2d at 779*. Defendants repeatedly urge the unfairness or discord of a rule that might allow intra-jury **[**15]** intimidation to proceed unchecked, but the Supreme Court, in *McDonald*, has explicitly rejected that sentiment. "Precluding this

evidence represents a choice of the 'lesser of two evils' -- not redressing a private litigant's injury in favor of upholding the public policy promoting private and unassailable juror deliberations." *McDonald at 267-68*; *see Tanner, 438 U.S. at 120*.

[*1157]  Defendants here seek to inquire as to the circumstances that existed in the deliberation room when Juror X was excused in order to determine whether Juror X was a dissenting juror who may have become incapacitated and left the jury as a result of undue influence brought to bear against her during the deliberations process by other jurors. Even *if* Defendants were to establish such a state of affairs existed on January 25th and brought such evidence before the court, binding authority from the Supreme Court and this Circuit would preclude its admission for any post-verdict relief Defendants may seek. [6] As a result, there is no basis for granting Defendants relief from the general local court rule prohibiting counsel from communicating with jurors to allow them to contact an individual **[**16]** juror who was dismissed two days into deliberations and did not deliberate to verdict.

> 6  Defendants in their Supplemental Reply shift their focus to suggest their factfinding is necessary to "complete the record" as it existed on January 25, 2006, when Juror X was excused. I disagree. To the extent Defendants' position is *a post hoc* attempt to establish that mistrial was warranted as of January 25 (because, now that they have lost, Defendants would like to argue that forcing the issue of speaking with Juror X at that time may have resulted in grounds, under their overbroad interpretation of *Samet*, for mistrial) it is rejected. The Tenth Circuit has more than ample "record" on which to consider any purported error on my part to rule on a motion for mistrial effective January 25, 2006 that was never formally asserted, briefed or pursued before a final verdict was reached. Speaking with Juror X now would add nothing to that record and would be in flagrant violation of *FRE 606(b)*.

[**17]  The situation here is similar to that decried by the district court in *United States v. Miller, 284 F. Supp. 220 (D. Conn. 1968)*, quoted favorably in *Hall*:

> 'To maintain the integrity of our jury system for reaching final decisions

requires that its internal process shall be inviolable, even in court proceedings. . . . Leaving jurors at the mercy of investigators for both sides to probe into their conduct would make the already difficult task of obtaining competent citizens willing to serve as jurors well nigh impossible. In this case, the whole purpose of the jury investigation conducted by the defendants was to rake up the past in an effort to find some basis for reading into it some features which the defense would like to stress on another motion for a new trial.'

*U.S. v. Hall, 424 F. Supp. 508, 538 (W.D. Ok. 1975).*

The foregoing, *Rule 606(b)* and the long-standing principles of law it codifies form the basis, by themselves, for denying Defendants' Motion. I take a moment, however, to illuminate the contrived nature of Defendants' assertion that a *Samet*-like mistrial may have been warranted in this case at any time, depending **[**18]** on "facts" that Defendants sought first to elicit in interviews with Juror X and/or the remaining jurors on January 25th, and now seek to elicit from Juror X alone post-verdict.

First, Defendants seek to ascertain whether Juror X held views favorable to Defendants at the time she was excused. This is important under Defendants' theory because "if" Juror X held views favorable to Defendants, then she "may" have been the third vote in Defendants' favor and her continued participation in deliberations may have altered the outcome on the questions ultimately answered 8-2 against them. Mot. to Speak with Juror (Doc. 2122) at 1. There is absolutely no indication anywhere, however, that Juror X held any particular views on the merits of the case, favorable to Defendants or otherwise and contrary to the views of a majority of jurors, at the time she was excused. Juror X completed two days of **[*1158]** an 18-day deliberations process and did not participate in the verdict ultimately reached. Similarly, whether Juror X's hypothetical dissent in favor of Defendants on January 25th would have remained static through the remaining three weeks of deliberations is unknowable, by Juror X or anyone else. Finally, **[**19]** Juror X could not have changed the outcome on the majority of the questions, in any event, that were answered 9-1 and 10-0. Allowing Defendants to question

Juror X in an attempt to ascertain the unascertainable would be futile and foolish, and in any event would not yield any evidence admissible to impeach the verdict or support a new trial for the reasons stated earlier. [7]

> [7] Defendants attempt at various places in their briefing to distinguish between evidence admissible to impeach a verdict under *Rule 606(b)* (conceding evidence is not admissible for that purpose) and evidence admissible to support an argument regarding the basis for a mistrial *before* a verdict is reached. Besides the futility of that argument given the fact that this jury *did* proceed to final verdict, the argument fails on its merits. The principles underlying *FRE 606(b)* do not limit themselves to only post-verdict inquiries into the deliberations process. Both *McDonald* and *Tanner* as well as a litany of cases cited under them reveal that the sanctity of jury deliberations exists and must be observed throughout the deliberations process.

**[**20]** Even assuming Juror X was a dissenting juror with views favorable to Defendants at the time she was excused, this eventuality was something entirely anticipated by Defendants and no basis for surprise. Defendants agreed at the outset of the trial to be bound by answers reached by the jury with up to two dissenters (as long as there were at least 10 jurors), so the potential that Juror X "may" have been a dissenter at the time she was excused was neither shocking nor unanticipated. As stated above, moreover, Defendants reaffirmed that agreement *after* Juror X's departure, fully aware that she may have been a "dissenting" vote. The difference is, at the time Juror X left, Defendants did not know whether Juror X's potentially "dissenting" vote would have worked in their favor or against it (as would have been the case if Juror X been pro-plaintiffs when the majority of jurors were pro-defendants).

Even if it could be determined that Juror X held a "minority" view of the case and favored Defendants at the time she was excused, there would, under Defendants' *Samet*-based theory, have to be some kind of nexus between Juror X's distress and that view. Defendants suggest Juror X's **[**21]** distress may have been the result of being pressured of "bullied" as a result of her minority views, and claim it is necessary to speak to her to determine if that was so. Again, in *Samet*, this nexus -- or certainly an inference of it-was established by the juror

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 136 of 332

Page 7

428 F. Supp. 2d 1152, *1158; 2006 U.S. Dist. LEXIS 44753, **21

herself, who explicitly told the Court she was being pressured to change her vote and could no longer deliberate fairly as a result. There is *no* indication of such pressure (or the premise underlying it that Juror X held a minority view on the merits of the case that favored Defendants in the instant case and to suggest it reveals a fundamental cynicism regarding the jury process and a willingness to impugn the character of the remaining jurors utterly belied by the circumstances of this case. [8]

> [8]   I note the jurors in this case were repeatedly offered guidance in the jury instructions to reach their "own conscientious decision[s]," and "not to come to a decision simply because other jurors think it is right." *See* Instruction 4.2 (entitled "Jury -- Deliberations). In Instruction 4.3, jurors were provided suggestions regarding the role of the Presiding Juror. Each member of the jury was urged to be allowed "to speak and be heard" and to refrain from "promot[ing] his or her personal opinions by coercion or intimidation or bullying of others." Instruction 4.3 -- the longest instruction at four full pages -- also provides suggestions regarding concepts such as "active listening," the right to individual opinion, and the taking of breaks so that differences in views can be discussed calmly. The instruction charges the Presiding Juror not only with the job of monitoring any "bullying" behavior, but calls for the Presiding Juror voluntarily to step down or be replaced by a majority vote if he fails to do so. None of the many communications sent by the jury during the deliberations process gave any indications that the jurors were not complying with these guidelines. Defendants' attempt to paint the Presiding Juror's rejected request the day before Juror X was excused for a conference with me as an indication that bullying may be taking place is beyond tenuous and is rejected.

**[**22]   [*1159]**   In sum, Defendants' position that the jury deliberations process in this case may have involved bullying or intimidation of dissenting jurors and that this possibility warrants investigation is contrary to established law, agonistic, and conditioned on successive and intertwining layers of the rankest speculation. The suggestion that Juror X was rousted from the jury on the basis of her favorable views to Defendants is belied by the fact that the remaining jurors included up to two dissenters and deliberated without incident for 15 days

after she was excused. After the special verdict form was read, I polled the jurors and each represented that the verdict form indeed represented his or her verdict. There is no indication that anything other than the internal workings of the jury and the effect of those workings on Juror X's mind or emotions were at play on January 25th, 2006, when Juror X was excused.

> Public policy requires a finality to litigation. And common fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts. Jurors will not be able to function effectively if their deliberations [**23] are to be scrutinized in post-trial litigation. In the interest of protecting the jury system and the citizens who make it work, *Rule 606* should not permit any inquiry into the internal deliberations of the jurors.

*F.R.E. 606(b)*, Advisory Committee Notes (citing Senate Report No. 93-1277). The conclusion reached by the district judge in *Hall* is equally apt here:

> The Court has an obligation to the members of the jury in this case to safeguard them from harassment and annoyance and to afford them deserved protection after they have faithfully and conscientiously discharged their duties in an unpleasant and disheartening trial of more than usual duration. As said Defendants cite no "extraneous prejudicial information" or "outside influence" having been improperly brought to the jury's attention, the Court declines, in its discretion, to grant the desired interviews of the trial jurors on these assertions, interviews which are obviously sought for the purpose of browsing among the thoughts of the members of the jury, interviews which would amount to a pure fishing expedition inspired by adverse verdicts of conviction. The Defendants [**24] cite no authority that permits such an excursion unsupported at the outset by any allegation of impropriety. The record will reveal that the Court meticulously and repeatedly instructed the jury against any such impropriety and further implicitly

428 F. Supp. 2d 1152, *1159; 2006 U.S. Dist. LEXIS 44753, **24

and repeatedly charged the jury to report any such violation to the Court at their earliest opportunity. No report was made. The fishing expedition desired by the Defendants has been condemned as being useless and harmful to the jury system. [Citations omitted.]

*424 F. Supp. at 538-539.*

The Motion to Speak to Juror is **DENIED.**

**[*1160]** 2. Defendants' Motion to Unseal Redacted Version of Juror Notes and Transcripts (Doc. 2123) (Filed Under Seal).

In this Motion, Defendants request an order unsealing (1) a redacted version of the jury notes that the Court previously ordered sealed; and (2) a redacted version of the 11/25/06 [sic] hearing transcripts. I **GRANT** the Motion in part and **DENY** it in part. I deny the request to unseal the two sealed jury notes, however "redacted," because no purpose besides compromising Juror X's identity and privacy interests would be served thereby. Even if anything comprehensible **[**25]** remained after appropriate redaction, it would not be admissible to impeach the jury's verdict. The request to unseal redacted versions of the two sealed jury notes in this case is **DENIED.**

The request to unseal redacted versions of the January 25, 2006 hearing transcripts is appropriate, however the redactions proposed by Defendants are underinclusive. I have reviewed the transcripts and will unseal them with additional confidential material redacted.

3. Defendants' Motion to Preserve Jury Notes (Doc. 2136).

In this Motion, Defendants ask that I "preserve all of the notes created or used by the jurors during their deliberations" as "evidence" supporting their objection to my refusal to require the jury to retrieve their notes to answer Defendants' post-verdict question regarding the basis for their punitive damages calculation. While it is unclear how or when the notes could ever be accessed for this point -- because they are not part of the record and are inadmissible under *FRE 606(b)* to probe the jury's internal deliberations -- Plaintiffs have no objection to their continuing to be lodged in my chambers and I will

therefore **GRANT [**26]** the Motion for the time being.

It should be understood that the jurors had access to unlimited blank spiral stenographic notebooks from the outset of this case and took volumes of notes. I have, of course, not looked at these notes but it is fair to surmise that it would be difficult, if not impossible, to even distinguish notes taken during the course of the four-month trial from notes made during deliberations, if, indeed, any were taken during the deliberations period. I frankly cannot imagine what use counsel or the court of appeals could ever make of these notes, but for the time being, I will continue to lodge them here.

4. Defendants' Motion to Correct Error in Transcription (Doc. 2156) (Filed Under Seal).

Defendants move to "correct" the transcription of a single sentence from the January 25, 2006 hearing transcript, asserting the transcription omitted a word which reversed the argument defense counsel was making. Specifically, the transcript at page 10723, line 3, currently reflects that defense counsel stated: "I think the Court has absolutely no discretion to inquire into the circumstances" when what defense counsel "actually" stated was "I think the Court has absolutely **[**27]** no discretion **but** to inquire into the circumstances." While unsurprising that counsel does not allow for the possibility that it was he who misspoke rather than the court reporter who erred in transcribing, this is much ado about nothing. Judges, witnesses -- even counsel -- occasionally misspeak, and court reporters occasionally misapprehend, on the record. Where an omitted "but" or "not" changes the meaning of a sentence in a manner inconsistent with the context in which it is made, reviewing courts are capable of **[*1161]** reading the sentence in its overall context. I read the subject sentence accordingly, and it did not affect my decisions one way or the other.

Based on all of the foregoing,

1. Defendants' Motion to Speak with Juror (Filed Under Seal) (Doc. 2122) is **DENIED;**

2. Defendants' Motion to Unseal Redacted Version of Juror Notes and Transcripts (Filed Under Seal) (Doc. 2123), is **GRANTED IN PART** with certain additional redactions;

3. Defendants' Motion to Preserve Jury Notes (Doc.

428 F. Supp. 2d 1152, *1161; 2006 U.S. Dist. LEXIS 44753, **27

2124), is **GRANTED**; and

4. Defendants' Motion to Correct Error in Transcription (Filed Under Seal) (Doc. 2156) is **DENIED**.

Dated this 18th day of April, **[**28]** 2006, *nunc pro*

*tunc* to March 13, 2006.

**s/ John L. Kane**

SENIOR U.S. DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, et al.,

     Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION AND THE DOW CHEMICAL
COMPANY,

     Defendants.

---

**MEMORANDUM OPINION REGARDING DEFENDANTS' THEORY
OF PLUTONIUM REMOVAL THROUGH REAL ESTATE DEVELOPMENT**

---

Kane, J.

     I today issued a memorandum opinion describing the process, proposals and rulings that

resulted in the final instructions to the jury in this action. *See* Mem. Op. re: Jury Instructions

(Dec. 7, 2006). One of the issues that arose near the end of this process was Plaintiffs' proposal

that I instruct the jury that Defendants had presented no evidence that any plutonium deposited in

the Class Area had been removed by them or any other person. *See* Pls.' Proposed Revisions to

Jury Instructions (Doc. 1978), Ex. A (proposing new paragraph in Instruction No. 3.5).

Although stated generally, this proposal was directed at Defendants' theory that plutonium

deposited in the Class Area from Rocky Flats had been removed from at least some properties in

this Area through construction and development activities.

     I ultimately instructed the jury to disregard this theory as a result of Defendants' failure to

present competent evidence in support of it, in spite of representations that they would do so

during the extensive pretrial process I employed pursuant to Federal Rules of Civil Procedure 16

and 23(d) to narrow and define the issues to be tried in this complex class action.  Because the

background to my decision on this jury instruction issue is extensive, I write separately here rather

than including this discussion in my jury instruction opinion.

The background to my decision begins with the definition of the property class ("Class")

as persons (other than governmental entities and Defendants and their affiliates, parents and

subsidiaries) owning property in a specified "Class Area" on a particular date.  *See Cook v.*

*Rockwell Int'l Corp. ("Cook IV")*, 151 F.R.D. 378, 382 (D. Colo. 1993).  The Class Area is

defined as the area bounded by a contour line that depicts a "plume" of plutonium contamination

in soils as a result of releases from the Rocky Flats plant.  This contour line was generated by

scientists in 1970 based on soil sampling in the vicinity of Rocky Flats.

One of the elements of Plaintiffs' trespass claim was that plutonium released from Rocky

Flats by one or both Defendants is present on Class members' properties in the Class Area.  On at

least three occasions during the pretrial planning process, Defendants represented to the court that

they did not dispute that these properties are and continue to be contaminated with plutonium

from Rocky Flats.  In July, 2004, for example, during the extended jury instruction process that

was used to narrow the issues to be tried on a class-wide basis, counsel for Defendants stated

with respect to the presence of plutonium particles on Class properties: "I don't know why we're

trying that issue to the jury at all.  There is no question but the fact that at least with respect to

most, if not all, of the people who were described as being class members, there is plutonium

present on their property and it came from no place other than Rocky Flats.  We don't need to

2

submit that issue to the jury."  July 22, 2004 Hr'g Tr. at 31.[1]  Defense counsel further stated:

"Yes, the plutonium is there because of the conduct, our conduct, on this government facility.

And it's there.  And it's there when they [class members] were there at the time that the class was

defined because the class was defined by reference to a plutonium plume."  *Id.* at 33.  Defendants

made similar representations to the court regarding the presence of plutonium in the Class Area in

June, 1999, and again in July, 2005.  *See* June 25, 1999 Hr'g Tr. (Doc. 1133) at 18-21; July 28,

2005 Hr'g Tr. (Doc. 1434) at 112-15.[2]

In December 2004, I relied on Defendants' 2004 statements to prepare jury instructions on

the trespass claim[3] that included a stipulation that "plutonium from the Rocky Flats plant has been

deposited on the Class Properties and continues to be present there."  Order re: Proposed

Trespass Instructions (Doc. 1311) [hereinafter "Trespass Instructions Order"], Attach. A at 2.  I

gave Defendants the opportunity to object to this proposed stipulation, but required that any

---

[1]      I discovered during preparation of this opinion that the transcript for this hearing
had not been entered in the docket for this action.  I have ordered that this error be corrected.

[2]      Defendants made their July 2004 statements in response to my 2003 ruling that the
physical presence of plutonium on Class Properties constituted a trespass under Colorado law and
that proof of harm resulting from this physical invasion was not required to establish liability.  *See
Cook v. Rockwell Int'l Corp. ("Cook IX")*, 273 F. Supp. 2d  1175, 1199-1201 (D. Colo. 2003).  I
revisited that ruling following the July 2004 hearing and reaffirmed it in the December, 2004,
order on the parties' proposed instructions on the trespass claim.  *See* Order re: Proposed
Trespass Instructions (Doc. 1311) at 5-6.

[3]      As is my practice, I required that the jury instructions be prepared before trial so
they could be provided to the jury at the start of trial and used by counsel during their arguments
and presentation of evidence.  In this case, I also used the process of preparing jury instructions to
narrow and define the issues to be tried.  *See* Mem. Op. re: Jury Instructions at 1-5 (Dec. 7,
2006).

objection "identify the evidence the party intends to present at trial to dispute" the stipulation. Trespass Instructions Order at 8.

Defendants timely filed objections to the stipulation. Defs.' Objs. to Identification of Stipulated Facts (Doc. 1315). In their objections, Defendants did not dispute that plutonium from Rocky Flats had at one time been deposited throughout the Class Area, but rather disputed that plutonium continued to be present on all properties in the Class Area owned by Class members. *See id.* at 3-5. Defendants based this objection on the theory that construction and development activities in the Class Area since 1970 had removed plutonium from at least some individual Class properties. *See id.* at 4-5.

As the evidence to be presented at trial to support this theory and dispute the continuing presence of plutonium throughout the Class Area, Defendants submitted declarations from Dr. F. Ward Whicker and Mr. Peter Elzi. In his declaration, Dr. Whicker, one of Defendants' designated experts, stated that plutonium from Rocky Flats had been deposited in the Class Area before 1970, Defs.' Objs., Ex. 5 (Jan. 2005 Whicker Decl.), ¶ 1.A, that "essentially all" of this plutonium was located in the top nine inches of undisturbed soils, *id.*, ¶ 1.B, that human disturbance of plutonium-contaminated soils through development and other activities made it difficult or impossible to measure plutonium concentration in the soil, *id.*, ¶ 1.C, 1.D, 10-13, and that because of these considerations plus development in the Class Area "it is not possible to scientifically demonstrate the presence of [Rocky Flats] plutonium now" on the majority of Class properties, *id.*, ¶ 1.D. In his separate declaration, Mr. Elzi, a real estate appraiser, reported that approximately one-third of the privately held land in the Class Area had been graded or otherwise disturbed as part of development activities since 1980, *see* Defs.' Objs., Ex. 4 (Jan. 2005 Elzi

4

Decl.), ¶ 9, that grading as part of property development typically disturbed the first foot or two of soil, *id.*, ¶ 2, and that additional "cuts and fills" of up to 20 feet might be required to balance or level a site, *id*.

Plaintiffs rightly pointed out in response that the declarations of Dr. Whicker and Mr. Elzi did not dispute that plutonium from Rocky Flats had been deposited throughout the Class Area as of 1970. They further and accurately noted that the declarations were evidence that plutonium-contaminated soil was moved or redistributed on a parcel during grading and site development, but that they made no claim that any soil, let alone all potentially contaminated surface soils on one or more individual Class properties, had been physically removed and transported to another site as would be necessary for all pre-existing Rocky Flats-derived plutonium on a Class property to be removed through development activities.

In reply, Defendants submitted a second declaration by Mr. Elzi, in which he stated that development in the Class Area had resulted in the removal of top soil from some individual Class properties during the development of larger parcels, and identified two locations, the Westmoor Business Park and the Five Parks area, in which such removal had allegedly occurred. Defs.' Reply to Pls' Resp. to Objs. (Doc. 1330), Ex. 5 (Supplemental Elzi Decl.), ¶¶ 2-4. Defendants also submitted a second declaration by Dr. Whicker, in which he stated that "it is highly likely" that the top few feet of soil, *i.e.*, the soil in which one would expect to find plutonium contamination from Rocky Flats, had been totally removed during development of some of the smaller Class parcels. *Id.*, Ex. 3 (Supplemental Whicker Decl.), ¶ 4.

Upon Plaintiffs' motion before trial, I excluded Dr. Whicker's two declarations and the opinions expressed therein because they were not disclosed in his expert report as required by

Rule 26(a). *See* Sept. 13, 2005 Tr. at 9; Mem. Op. re: *Daubert* Mots. and Mots. in Limine,

Section II.B.1 (Dec. 7, 2006). This left Mr. Elzi's declarations as the evidence Defendants

offered to present at trial to dispute that the plutonium from Rocky Flats continued to be present

on all Class Properties.

 After careful consideration, I decided that the evidence presented in Mr. Elzi's second

declaration was sufficient to permit Defendants to present their "removal through development"

theory at trial to dispute Plaintiffs' claim of continued plutonium contamination throughout the

Class Area. I reached this conclusion with reluctance due to Defendants' prior admissions on this

subject, but relied on Defendants' most recent representations of the evidence they would present

at trial to allow the issue to be tried. *See* Mem. Op. re: Jury Instructions, Section I.A.2 (Dec. 7,

2006).

 Accordingly, I revised the trespass instructions to delete the previously stated stipulation,

and instead instructed the jury at the start of trial in October, 2005, that "Defendants admit that

plutonium from Rocky Flats is present in the Class Area but dispute that it is located throughout

this area." Oct. 11, 2005 Trial Tr. at 433 (reading Instruction No. 1.1). I further instructed the

jury that Plaintiffs had the burden of proving that "Plutonium from Rocky Flats is present on the

Class Properties." Oct. 11, 2005 Trial Tr. at 444 (reading Instruction No. 3.2). "Class

Properties" were defined as the properties owned by Class members in the Class Area. *Id.* The

jurors were also provided with written copies of the jury instructions at this time for reference

during trial. *See* Mem. Op. re: Jury Instructions, Attach. A (Dec. 7, 2006).

 In their case-in-chief, Plaintiffs presented evidence that various soil sampling studies had

concluded that plutonium from Rocky Flats was deposited throughout the Class Area and beyond,

that no effort had been made to remove plutonium from the Class Area, and that if removal had

been attempted it likely would not have been successful.  *See, e.g.*, P-149A (1970 Krey & Hardy

study); DX477 (1994 Jones & Zhang study); P-1131 (1989 aerial gamma survey), P-1118 (Dow

summary of environmental incidents affecting soils).  Plaintiffs also presented evidence from

which the jury could conclude that even if all plutonium had been removed from properties within

the Class Area, these properties would be re-contaminated as a result of the continued migration

of plutonium from the Rocky Flats site.  *See, e.g.*, Nov. 3, 2005 Trial Tr. at 3996-4001

(Smallwood testimony); Nov. 4, 2005 Trial Tr. at 4121, 4123 (same); Dec. 8, 2005 Trial Tr.

at 7056-59 (Selbin testimony).  I held this evidence was sufficient for a reasonable jury to find for

Plaintiffs on their trespass claims.  *See* Order Denying Defs.' Mot. for J. as a Matter of Law

(Doc. 1977).

      In response to Plaintiffs' evidence of continuing plutonium contamination throughout the

Class Area, Defendants argued and presented evidence that the cited soil studies could not be

relied upon to establish that plutonium had ever been present throughout the Class Area.  They

also presented evidence that any Rocky Flats-derived plutonium in the Class Area had been

deposited there before 1970 and that extensive residential and other development occurred in the

Class Area after this date.  Defense counsel further suggested in their opening statement, in mini-

summations during the trial[4] and through their questioning of witnesses that Plaintiffs could not

prove that any plutonium deposited in the Class Area before 1970 remained there because

bulldozing and soil removal during construction and grading had caused all plutonium to be

---

      [4]     At the end of most weeks of trial, counsel were granted 30 minutes each to
summarize their view of the evidence presented the preceding week and to inform the jury of what
to expect in the coming week.

removed from developed properties.  *See, e.g.*, Oct. 12, 2005 Trial Tr. at 840; Dec. 16, 2005

Trial Tr. at 8528-29, 8553.  Defendants did not, however, present Mr. Elzi or any other evidence

that development activities had resulted in the physical removal of all potentially contaminated soil

from any properties in the Class Area.  Neither did they identify any specific locations in the Class

Area where plutonium removal through development had allegedly occurred.[5]

In fact, the only evidence Defendants presented at trial in putative support of their

"removal through development" theory was the testimony of their dose reconstruction expert,

Dr. John Till, and the final minute of an 11 and a half minute videotape intended to illustrate his

testimony.  *See* Dec. 15, 2005 Trial Tr. at 8204; Ex. DV0001.  Upon Plaintiffs' subsequent

motion, however, I struck Dr. Till's expert testimony on this subject because it had not been

---

[5]        The latter omission is significant because Defendants' "plutonium removal through
development" theory applied at best to only one-third of Class members' land in the Class Area.
*See* Jan. 2005 Elzi Decl., ¶ 9 (reporting that 3465 of the 10,100 acres of privately held land in the
Class Area have been graded or otherwise disturbed through real estate development).  It would
have been possible, therefore, to create sub-classes within the Class Area to reflect the geographic
areas in which Defendants alleged development had resulted in the removal of all Rocky Flats
plutonium and other areas in which no real estate development had occurred, *see* Fed. R. Civ.
P. 23(c)(1)(C) (authorizing revisions to class certification), so that the jury could decide
separately whether Plaintiffs had sustained their burden of proving contamination in the areas in
which Defendants disputed the continued presence of Rocky Flats plutonium based on
development there as opposed to those areas in which no such dispute existed.  Defendants were
aware of this possibility because it had been raised several times before and during trial.  *See, e.g.*,
Apr. 14, 2004 Order (Doc. 1220) at 9 (notifying parties class certification would be modified if
"evidence shows that contamination caused by one or both Defendants does not encompass all of
the class properties"); Pls.' Proposed Revisions to Jury Instructions at 3-4 (Doc. 1885); Oct. 22,
2004 Tr. (Doc. 1286) at 27-28; *see also Cook IV*, 151 F.R.D. at 389 (noting property class might
be divided into subclasses).  As demonstrated by Mr. Elzi's second declaration, Defendants had
evidence identifying properties within the Class Area that were subject to their plutonium removal
through development theory, but they opted not to present it.

8

previously disclosed in compliance with Rule 26(a).  *See* Jan. 17, 2006 Trial Tr. at 10188; Pls.'

Mot. to Strike Test. of Dr. John Till re: "Bulldozer Theory" (Doc. 1980).[6]

Even if admitted, Dr. Till's testimony and the video excerpt regarding development in the

Class Area provided scant support for Defendants' plutonium removal theory.  The video clip

regarding development activities was not prepared by Dr. Till, but rather by defense counsel in the

days before Dr. Till testified.  *See* Dec. 15, 2005 Trial Tr. at 8204, 8206; Dec. 16, 2005 Trial Tr.

at 8390-93.  This portion of the videotape abruptly veered away from the expert testimony

disclosed in Dr. Till's expert report, which addressed dose reconstruction work performed by

Dr. Till and his RAC colleagues, to the unrelated topic of development in the Class Area.  *See*

DV0001.  The narrator then reported, and the video portrayed, that significant development had

occurred in the Class Area since 1970; that buildings, concrete and asphalt now cover some of

what used to be undisturbed soil in the Class Area and that several feet of soil are excavated when

the foundation for a new house is prepared.  *See id.*

Dr. Till's only comment during his direct examination regarding development in the Class

Area and the video's treatment of it was that "[t]here's tremendous development in the class area.

I mean, there's no question about that.  It has been disturbed."  *See* Dec. 15, 2005 Trial Tr.

at 8285.  When pressed on cross-examination regarding the consequences of this development to

the continuing presence of plutonium in the Class Area, Dr. Till responded with the circular

statement that plutonium would no longer be present "if a bulldozer comes in, pushes the stuff off

---

[6]     Plaintiffs timely objected before and during Dr. Till's testimony that various subjects addressed in the video and his testimony, including development and construction activities in the Class Area, were not addressed by Dr. Till in his expert report and were beyond his area of expertise.  Pls' Objs. to Exs. to Be Used With Dr. John Till (Doc. 1837) at 1-2; Dec. 15, 2005 Trial Tr. at 8204, 8350.

– or it's hauled somewhere, it's not there, it's gone somewhere else." Dec. 16, 2005 Trial Tr. at 8449. At no time during his testimony did Dr. Till state that plutonium-contaminated soil had been removed from any location or property in the Class Area through this process.

Neither Dr. Till's statements nor the video excerpt were evidence that topsoil potentially contaminated with plutonium was removed from a Class property during development or were sufficient for such an inference to be drawn. Rather, at best they were evidence only that some plutonium-contaminated soil in the Class Area may have been disturbed or covered by asphalt or concrete as a result of development activities there.[7]

Following the close of Defendants' case on January 12, Plaintiffs moved to revise the jury instructions, as previously described, *see* Pls.' Proposed Revisions to Jury Instructions (No. 1978), Ex. A (proposing revisions to Instruction No. 3.5), and to strike Dr. Till's testimony touching on Defendants' "removal through development" or "bulldozer" theory, *see* Pls.' Mot. to Strike Test. of Dr. Till re: "Bulldozer Theory" (Doc. 1980). At the same time, Plaintiffs separately moved for judgment as a matter of law on Defendants' "removal through development" theory on the ground that it was unsupported by competent evidence. Pls.' Mot. for J. as a Matter of Law (Doc. 1979). After requesting and receiving briefing from Defendants over the holiday weekend, I construed Plaintiffs' second motion as a motion to bar presentation of this

---

[7]       Defendants also cited certain of Dr. Till's testimony on redirect examination as evidence supporting their "removal through development" theory. In the cited testimony, however, Dr. Till only testified that plutonium would have to be close to the surface to pose a risk of suspension in the air, and that development activities that disturbed the layer of plutonium-contaminated soil by burying or encapsulating it could affect this risk. Dec. 16, 2005 Trial Tr. at 8528–29. Thus, this testimony addresses the risk posed by plutonium present in developed portions of the Class Area, and is not relevant to the separate question of whether plutonium continues to be present there.

theory and granted it and the separate motion to strike Dr. Till's testimony from the bench at the

resumption of trial on January 17.  Jan. 17, 2006 Trial Tr. at 10188.[8]

  With Plaintiffs' closing argument scheduled to begin the following morning, I prepared

two jury instructions the evening of January 17 to inform the jury of these decisions.  The first

instruction, Instruction No. 2.2B, directed the jury to disregard Dr. Till's testimony to the extent

it suggested that plutonium in the Class Area had been removed through construction and

development activities.[9]  In the second instruction, a revised version of Instruction No. 3.5,

I added a paragraph informing the jury that I had ruled Defendants' "removal through

development" theory could not be presented to them and that they should disregard the argument

they had previously heard from counsel about it.[10]  I deemed this addition to be more direct and

---

[8]      In their motion, Plaintiffs also sought judgment as a matter of law on Defendants'
affirmative defense of setoff.  I denied this portion of their motion.  Jan. 17, 2006 Trial Tr.
at 10188.

[9]      Instruction 2.2B, titled "Dr. Till's Testimony Regarding Removal of Plutonium,"
stated:

> I have stricken from the evidence the testimony of Dr. Till in which he stated or
> suggested that plutonium present in the Class Area has been removed by
> bulldozing and other construction and development activities.  You are not to
> consider Dr. Till's testimony on this subject for any purpose.

[10]     The added paragraph in Instruction No. 3.5 stated:

> You have also heard argument that plutonium has been removed from properties in
> the Class Area as a result of bulldozing, soil excavation and other disturbance
> during real estate construction and development activities in the Class Area.  You
> are to disregard all such argument because I recently ruled that it cannot be
> presented or considered in deciding the trespass claims.  For purposes of deciding
> the trespass claims, therefore, the notion that plutonium has been removed from
> the Class Area through development and construction activities is irrelevant.

11

consistent with my January 17 rulings than Plaintiffs' proposed revision to Instruction No. 3.5 on this point.

As a courtesy, I directed that both new Instruction No. 2.2B and revised Instruction No. 3.5 be emailed to counsel when they were completed the evening of January 17. Unfortunately, the email to defense counsel was sent to an incorrect email address, so they did not receive the revised instructions until noon the next day, January 18, when they arrived for the start of Plaintiffs' closing argument.

At the end of the day, after Plaintiffs completed their closing, Defendants orally moved for reconsideration or revision of Instruction No. 3.5 so that they could argue their "removal through development" theory in their closing argument the next day. After reviewing Defendants' arguments and the materials they submitted at this time, I confirmed that they reiterated arguments and evidence Defendants had previously submitted and I had considered in making my January 17 ruling. I therefore denied the motion and informed counsel for both sides of this decision by email at 6:15 PM on January 18 because it was not possible to provide them with a written order after business hours, yet Defendants had asked to be informed of my ruling as soon as possible.[11] Not satisfied with my decision, Defendants emailed a request for "clarification" and

---

[11]     That e-mail message, sent by my staff at my direction, stated as follows:

> Counsel - Judge Kane asked me to inform you that Defendants' oral motion to delete the third paragraph of Instruction No. 3.5, regarding the contention that plutonium has been removed from the Class Area as a result of development activities, is DENIED. Consistent with Instruction No. 3.5 and Judge Kane's January 17 ruling on Plaintiffs' motion for judgment as a matter of law on this point (construed as a motion in limine), Defendants may not present this argument to the jury. Defendants may reference development in the Class Area as relevant to other issues, but not in connection with the alleged removal of plutonium or liability on the trespass claim. A confirming order will be entered tomorrow.

reconsideration 30 minutes later, to which I responded consistent with my prior rulings.[12]  The next morning, before beginning their closing arguments, Defendants filed a written motion for reconsideration and to strike the new paragraph in Instruction No. 3.5, *see* Defs.' Mot. for Clarification re: Court's Ruling on Jury Instruction No. 3.5 (Doc. 2020), which I denied from the bench before Defendants began their closing.

In their various motions for reconsideration regarding the disputed instruction, Defendants made four basic arguments.  First, they contended that the timing of my decision to preclude their "removal through development" theory was prejudicial.  Plaintiffs could not bring their motion to exclude this theory for lack of supporting evidence, however, and I could not rule on it, until Defendants finished putting on their evidence.  Defendants concluded their case on Thursday, January 12.  Plaintiffs filed their motion for judgment as a matter of law on Defendants' removal theory and its affirmative defense of setoff on Saturday, January 14, and Defendants filed their response the morning of Tuesday, January 17.  I granted the portion of the motion relating to Defendants' removal theory from the bench that same afternoon.  The issue could not have been raised and decided any sooner than it was.

---

[12]     Defendants' followup email message was:  "Mr. Bernick asks whether defendants will be permitted to argue the development issue in connection with continuing trespass or CCE." My response, also sent by my staff at my direction, was:

> Judge Kane was informed of your question and asked me to notify you that, consistent with his prior rulings, Defendants will not be permitted to argue, in any context, that development activities in the Class Area have resulted or will or could result in the removal of plutonium from all or part of the class area.  If defendants mean something else when they refer to the "development issue," then the answer may be different.

Second, Defendants complained they were prejudiced because they did not understand my January 17 bench ruling to have excluded their "removal through development" theory, but thought it only barred their use of Dr. Till's testimony to support this theory.  This complaint is based on a selective reading of the transcript of my January 17 ruling.[13]  First, I ruled separately on Plaintiffs' motion to strike this portion of Dr. Till's testimony and on Plaintiffs' distinct motion for judgment as a matter of law on this theory.  *See* Jan. 17, 2006 Trial Tr. at 10188.  Defendants' professed understanding of my decisions reads out of the record my ruling on the second motion, which was sufficient to put Defendants on notice that they would not be permitted to argue their "removal through development" theory.

Furthermore, in response to a question from defense counsel regarding evidence about "the status of plutonium on the plaintiffs' class properties" in light of my rulings, I stated that Defendants were free to argue that plutonium had been removed by natural causes or that it was impossible to determine how much plutonium is present in the Class Area based on estimates and studies, but not "the idea of having a picture of a bulldozer and then saying, well, it's all been removed."  *Id.* at 10189.

In their motions for reconsideration, Defendants ignored these rulings and statements and instead focused on the exchange that immediately followed:

> [DEFENSE COUNSEL]:  There has been extensive testimony about the fact of there being development and the impact of development on the soil.
>
> THE COURT: You can argue that, but you can't use Dr. Till to say, I don't know anything –

---

[13]     As was customary each day of trial, the transcript for the January 17 proceedings was e-mailed to the parties before 7:00 PM that evening.

[DEFENSE COUNSEL]: That's fine.  I understand.

Defendants asserted after the fact that they did not understand my just-announced ruling on Plaintiffs' motion for judgment as a matter of law, or, in the alternative, that I gutted this ruling moments after it was announced by allowing Defendants through this exchange to argue their "removal through development" theory as long as they did not use Dr. Till's testimony for this purpose.  This is wishful thinking at best.  The whole of the record accurately reflects that I granted Plaintiffs' motion to exclude Defendants' "removal through development" theory.  The exchange upon which Defendants rely is consistent with ruling because, in fact, evidence regarding the fact of development was not stricken, as it was relevant to other issues in the case.  For example, I did not strike evidence or argument that development activities and related soil disturbance and road and building construction had occurred and impacted plutonium-contaminated soil in other ways, such as by decreasing any health risk contaminated soil posed by capping or burying it so that it was less available for remobilization in wind events or through bioturbation.  What was stricken, as a complete reading of Plaintiffs' motion and my January 17 rulings make clear, was Defendants' unsupported argument that Plaintiffs could not prove the continuing presence of plutonium on Class properties because real estate development had resulted in the removal of all Rocky Flats-derived plutonium from one or more of these properties.

Defendants also complained they were prejudiced because they did not receive a copy of revised Instruction No. 3.5 until noon on January 18.  The challenged revision, however, merely implemented my ruling of the previous day, of which Defendants had been apprised.  Defendants had also been aware since January 14, when Plaintiffs filed their motion, that their "removal

15

through development" theory was under review and could be barred, and had at least the evening

of January 18 to revise their closing argument to conform it to Instruction No. 3.5 as revised.  I

found no prejudice from the timing of Defendants' receipt of revised Instruction No. 3.5 under

these circumstances.

Third, Defendants argued that my January 17 ruling and revised Instruction No. 3.5

essentially granted Plaintiffs judgment as a matter of a law on one of the elements of their trespass

claims, that plutonium from Rocky Flats is present on Class Properties.  Not so.  As I stated on

January 17, Defendants remained free to argue Plaintiffs had not met their burden of proving the

presence of Rocky Flats plutonium by reference to other evidence, such as their evidence that the

plutonium contamination estimates and soil studies presented by Plaintiffs were too out-dated or

relied on too few sampling points to prove the presence of plutonium contamination throughout

the Class Area.  *See, e.g.*, Jan. 17, 2006 Trial Tr. at 10189.[14]

Finally, Defendants asserted the new language in Instruction No. 3.5 should be stricken

and they should be allowed to argue their "removal through development" theory because they

presented sufficient evidence for a juror to "reasonably infer from the fact that an undisturbed

parcel has been developed that plutonium does not continue to be present on such parcels."

Defs.' Mot. for Clarification re: Court's Ruling on Jury Instruction No. 3.5 (Doc. 2020) at 4.

Most of the evidence Defendants pointed to in this regard, however, was their evidence of general

development in the Class Area after 1970.  *See, e.g.*, Defs' Resp. to Pls.' Mot. for J. as a Matter

---

[14]     Defendants were, however, fortunate that I allowed them to present these
arguments, given that they contradicted the representations Defendants made to the court before
trial that they did not dispute that plutonium from Rocky Flats had been deposited throughout the
Class Area at one time.  *See supra* at 2-4.

16

of Law (Doc. 2001) at 13-14.  Just as was the case when Defendants first proffered this category

of evidence and their "removal through development" theory in the 2004 trial planning process,

what was missing was any evidence stating or suggesting that this development could or did result

in all pre-existing plutonium contamination from Rocky Flats being removed from any Class

property.  Evidence of soil disturbance is not evidence of soil removal.

During the pretrial planning process, Defendants filled this evidentiary gap by presenting

evidence, in Mr. Elzi's second declaration, that development at some locations in the Class Area

had resulted in the removal of all potentially contaminated surface soils from some Class

properties.  As I stated earlier, this was supposed to be evidence that Defendants would present at

trial to dispute the presence of plutonium contamination throughout the Class Area.  *See* Trespass

Instruction Order at 8.  I relied on Defendants' representation that they would present Mr. Elzi or

equivalent evidence of actual removal at trial in deciding not to enforce Defendants' prior

statements on the subject of the continuing presence of plutonium from Rocky Flat on the Class

Properties.  Defendants did not, however, offer Mr. Elzi or other competent evidence on this

point at trial.[15]

Defendants also cited the testimony of Plaintiffs' expert Dr. Smallwood as evidence from

which a jury could infer that development activities had led to the removal of plutonium from one

or more Class Properties.  Dr. Smallwood was one of Plaintiffs' experts on the risks posed by

plutonium and other contamination on and off the Rocky Flats plant site.  A significant portion of

---

[15]     For the reasons set out earlier, Dr. Till's testimony relating to Defendants' "removal through development" theory was excluded and, even if had been admitted, did not constitute evidence that plutonium deposited on the Class Properties on or before 1970 was removed from any Class property as a result of its development after this period.

his direct testimony concerned the risk that Rocky Flats plutonium that had been deposited in soils could be remobilized through the natural forces of burrowing animals and wind.

On cross-examination, defense counsel asked Dr. Smallwood a series of questions directed at whether development in the Class Area had affected the extent of animal burrowing and other biological activities that contributed to this risk. *See* Nov. 3, 2005 Trial Tr. at 4079-81. In the course of this inquiry, defense counsel also asked Dr. Smallwood whether he could say with reasonable scientific certainty that he actually knew that plutonium from Rocky Flats was still present in soil at which development had occurred. *Id.* at 4081. Dr. Smallwood, who had not addressed this issue in his expert report, answered straightforwardly that he did not know and that it would depend on the nature of the development. *Id.*; *see also id.* at 4083 (Dr. Smallwood responding "I don't know" and "I couldn't tell you" to similar questions).

Defendants asserted based on these statements that "plaintiffs' own expert admitted that (depending upon the nature of development) development could remove plutonium from class properties," Defs.' Resp. to Pls.' Mot. for J. as a Matter of Law (Doc. 2001) at 17, and that the cited testimony by Dr. Smallwood was sufficient for the jury to infer that all plutonium was, in fact, removed from one or more Class properties as a result of their development after 1970. This is not a fair reading of Dr. Smallwood's testimony. The condition Dr. Smallwood placed on his answer highlights what is missing from Defendants' case, which is any evidence that the nature of development in the Class Area was such that a reasonable juror could conclude that Rocky Flats plutonium deposited on Class properties before 1970 was no longer present on some of them because it had been physically removed during the course of development.

In spite of their pretrial representations, Defendants failed to present evidence supporting their "removal through development" theory, but rather sought to invite the jury to speculate that such actual removal had occurred on one or more Class properties.  In the absence of any supporting evidence and under the circumstances of this case, I refused to allow the jury to engage in this speculation.

For the foregoing reasons, I granted Plaintiffs' motion to preclude Defendants from presenting their unsupported "removal through development" theory to the jury, denied Defendants' motions for reconsideration of that decision, and instructed the jury to disregard this theory in Instruction No. 3.5.

Dated this 7th day of December, 2006.

<u>s/John L. Kane</u>
John L. Kane, Senior District Judge
United States District Court



LEXSEE 580 F. SUPP. 2D 1071

**MERILYN COOK, et al., Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION AND THE DOW CHEMICAL COMPANY, Defendants.**

**Civil Action No. 90-cv-00181-JLK**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*580 F. Supp. 2d 1071*; *2006 U.S. Dist. LEXIS 89121*

**December 7, 2006, Decided**
**December 7, 2006, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, Motion denied by *Cook v. Rockwell Int'l Corp., 2006 U.S. Dist. LEXIS 89123 (D. Colo., Dec. 7, 2006)*

**PRIOR HISTORY:** *Cook v. Rockwell Int'l Corp., 2006 U.S. Dist. LEXIS 29379 (D. Colo., May 10, 2006)*

**COUNSEL:** **[**1]** For Merilyn Cook, Plaintiff: Bernadette M. Rappold, LEAD ATTORNEY, David F. Sorensen, LEAD ATTORNEY, Ellen T. Noteware, LEAD ATTORNEY, Eric L. Cramer, LEAD ATTORNEY, Jennifer E. MacNaughton, LEAD ATTORNEY, Jonathan Auerbach, LEAD ATTORNEY, Peter B. Nordberg, LEAD ATTORNEY, Stanley B. Siegel, LEAD ATTORNEY, Merrill Gene Davidoff, Berger & Montague, P.C., Philadelphia, PA; Christopher Thomas Reyna, LEAD ATTORNEY, John David Stoner, LEAD ATTORNEY, Chimicles & Tikellis, L.L.P., Haverford, PA; David Evans Kreutzer, LEAD ATTORNEY, Colorado Department of Law, Denver, CO; Gary B. Blum, LEAD ATTORNEY, Holly Brons Shook, LEAD ATTORNEY, Silver & DeBoskey, P.C., Denver, CO; Jean Marie Geoppinger, LEAD ATTORNEY, Louise M. Roselle, LEAD ATTORNEY, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH; Kenneth A. Jacobsen, LEAD ATTORNEY, Jacobsen Law Offices, LLC, Wallingford, PA; R. Bruce McNew, LEAD ATTORNEY, Taylor, Gruver & McNew, P.A., Greenville, DE.

For Rockwell International Corporation, Defendant: Amy Horton, LEAD ATTORNEY, Goodwin Procter, LLP-DC, Washington, DC; David M. Bernick, LEAD ATTORNEY, Douglas J. Kurtenbach, LEAD ATTORNEY, Mark S. Lillie, LEAD ATTORNEY, Martin Thomas **[**2]** Tully, LEAD ATTORNEY, John E. Tangren, Stephanie A. Brennan, Kirkland & Ellis, P.C.-Chicago, Chicago, IL; Edward J. Naughton, LEAD ATTORNEY, Timothy P. Brooks, LEAD ATTORNEY, Wendy S. White, LEAD ATTORNEY, Goodwin Procter, LLP-DC, Washington, DC; Joseph John Bronesky, LEAD ATTORNEY, Sherman & Howard, L.L.C.-Denver, Denver, CO.

For Dow Chemical Company, Defendant: Christopher Lane, LEAD ATTORNEY, Sherman & Howard, L.L.C.-Denver, Denver, CO; David M. Bernick, LEAD ATTORNEY, Douglas J. Kurtenbach, LEAD ATTORNEY, Mark S. Lillie, LEAD ATTORNEY, Jonathan Silverman, LEAD ATTORNEY, John E. Tangren, Stephanie A. Brennan, Kirkland & Ellis, P.C.-Chicago, Chicago, IL; Douglas M. Poland, LEAD ATTORNEY, LaFollette, Godfrey & Kahn, Madison, WI; Joseph John Bronesky, LEAD ATTORNEY, Sherman & Howard, L.L.C.-Denver, Denver, CO; Lester C. Houtz, LEAD ATTORNEY, Bartlit, Beck, Herman, Palenchar & Scott-Colorado, Denver, CO; Louis W. Pribila, LEAD ATTORNEY, Dow Chemical Company,

580 F. Supp. 2d 1071, *; 2006 U.S. Dist. LEXIS 89121, **2

Midland, MI.

**JUDGES:** John L. Kane, Senior Judge.

**OPINION BY:** John L. Kane

**OPINION**

[*1077]   MEMORANDUM   OPINION REGARDING *DAUBERT* MOTIONS AND MOTIONS IN LIMINE

Kane, J.

[*1078]   **Table of Contents**

| | |
|---|---|
| Introduction | 1 |
| Standard for Review of Expert Witness Testimony | 6 |
| Analysis | 14 |
| I. Defendants' Daubert Motions and Motions in Limine | 14 |
| A. Defendants' Relevancy Standard | 15 |
| B. Motion to Exclude Plaintiffs' Expert Witness Testimony Relating to Risk | 19 |
| | 19 |
| 1. Dr. Robert Goble | 19 |
| 2. Dr. Richard Clapp | 31 |
| 3. Dr. Steven Wing | 51 |
| 4. Dr. K. Shawn Smallwood | 54 |
| C. Motion to Exclude Plaintiffs' Expert Witness Testimony Relating to Damages | 59 |
| 1. Dr. John Radke | 59 |
| 2. Dr. Paul Slovic and Dr. James Flynn | 84 |
| 3. Wayne Hunsperger | 96 |
| D. Defendants' Motion to Exclude Plaintiffs' Expert Witness Testimony Relating to Conduct and Associated Motions in Limine | 115 |
| 1. Motions in limine to exclude conduct evidence (Nos. 6-12) | 116 |
| 2. Motion to exclude expert testimony by Dr. Robert Budnitz | 131 |
| 3. Motion to exclude expert testimony by Dr. Thomas Cochran | 134 |
| E. Defendants' Additional Motions in Limine | 137 |
| 1. Motions to exclude evidence regarding the FBI raid, grand jury investigation and | 138 |

580 F. Supp. 2d 1071, *1078; 2006 U.S. Dist. LEXIS 89121, **2

| | |
|---|---|
| Rockwell's guilty pleas (Nos. 1-3) | |
| 2. Motions to exclude evidence | 141 |
| regarding other lawsuits (Nos. 14 & 15) | |
| 3. Motions to exclude evidence involving | 143 |
| the Department of Energy (Nos. 4 & 5) | |
| 4. Motion to exclude certain lay | 146 |
| witness testimony (No. 13) | |
| 5. Motion to exclude evidence | 148 |
| regarding remediation costs (No. 16) | |
| II. Plaintiffs' Daubert Motion and Motion in Limine | 149 |
| A. Request to Exclude Certain | 149 |
| Expert Testimony in its Entirety | |
| 1. Daniel Conway | 149 |
| 2. John Dorchester | 154 |
| 3. Geneva Smart | 162 |
| 4. Dr. Jack M. Holl | 164 |
| B. Request to Limit Certain Expert Testimony | 167 |
| 1. Dr. Ward Whicker | 167 |
| 2. Laurie Van Court | 175 |
| 3. Expert testimony regarding the ability to abate | 176 |
| plutonium contamination in the Class Area | |
| 4. Expert testimony regarding | 177 |
| RAC and Chem Risk studies | |
| C. Request to Exclude Certain Expert and Lay Evidence | 178 |
| 1. Evidence of Class Area property values after 1992 | 178 |
| 2. Evidence of Class Members' | 183 |
| knowledge of Rocky Flats problems | |
| 3. Evidence of Defendants' alleged | 185 |
| compliance with regulatory standards | |
| D. Request to Exclude Certain Lay Evidence | 186 |
| 1. National security evidence | 186 |
| 2. Lay testimony by real estate agents | 186 |
| 3. Lay testimony by Roy Thigpen | 188 |
| Conclusion | 189 |

**[*1079]   [**3] Introduction**

580 F. Supp. 2d 1071, *1079; 2006 U.S. Dist. LEXIS 89121, **3

This class action presents claims for trespass and nuisance against the former operators of the Rocky Flats Nuclear Weapons Plant ("Rocky Flats") near Denver. The named Plaintiffs represent a class of individuals and businesses that owned property in a defined area (the "Class Area") adjoining the plant site as of June 7, 1989. 1 Plaintiffs seek damages for the diminished value of Class members' properties as a result of Defendants' alleged trespass and nuisance.

> 1    Plaintiffs also assert medical monitoring claims in this action and were initially successful in certifying a separate class with respect to them. *See Cook v. Rockwell Int'l Corp. (Cook IV), 151 F.R.D. 378, 389 (D. Colo. 1993).* The medical monitoring class was later decertified, *see Cook v. Rockwell Int'l Corp. (Cook VIII), 181 F.R.D. 473, 480 (D. Colo. 1998),* and Plaintiffs' individual medical monitoring claims have been severed for trial, Order (Doc. 1235) at 15. All references to trial in this memorandum opinion are to trial on the property class claims for trespass and nuisance.

[**4]  In February 2005, I set the class claims for an eight to ten week jury trial commencing on October 3, 2005. *See* Order (Doc. 1325). 2 As part of the run-up to trial, I ordered the parties to file any motions challenging the admissibility of expert witness testimony ("*Daubert* motions") and any other motions in limine no later than June 16, 2005. *See* Order on Scheduling and Jury Instruction Issues (Doc. 1338) at 1 (May 17, 2005)[hereinafter "May 2005 Order"]; Minute Order (Doc. 1340).

> 2   For additional information on the nature of this action and the challenges in bringing it to trial, see *Cook v. Rockwell International Corp. (Cook IX), 273 F. Supp. 2d 1175, 1178-79 (D. Colo. 2003),* Order (Doc. 1235) at 1-4, 10-11 (May 28, 2004), and Memorandum and Order in Advance of February 28, 2001 Hearing (Doc. 1176) at 3-9.

Defendants responded by filing nineteen motions seeking to exclude all testimony by Plaintiffs' eleven designated expert witnesses and much of Plaintiffs' anticipated lay [**5] evidence. Defs.' Mot. to Exclude Expert Witness Test. Relating to Damages (Doc. 1371); Defs.' Mot. to Exclude Expert Witness Test. Relating to Defs.' Conduct (Doc. 1374); Defs.' Mot. to Exclude Expert Witness Test. Relating to Risk (Doc. 1376/1380);

Defs.' Mots. in Limine Nos. 1-16 (Docs. 1354-69). Plaintiffs filed two, more limited motions seeking to exclude or limit the testimony of eleven of the eighteen or more expert witnesses designated by Defendants and to exclude certain lay evidence. *See* Pls.' Mot. to Exclude Test. of Certain Defense Expert Witnesses (Doc. 1350); Pls.' Omnibus Mot. in Limine (Doc. 1341). By the time briefing was completed on these motions, Plaintiffs had submitted nearly 300 pages of argument and Defendants had submitted more than 700 pages. Together, the parties provided approximately 5400 additional pages of exhibits to be considered in connection with their motions.

I heard oral argument on the parties' *Daubert* motions and motions in limine on July 28-29 and August 2-3, 2005. I offered the parties the opportunity to present live testimony at this hearing, but both declined. *See* Order (Doc. 1349); Jt. Statement re: Hr'g on *Daubert* Mots. [**6] and Mots. in Limine (Doc. 1403). Upon review of the parties' *Daubert* motions, I also determined that live testimony was not necessary for me to decide them.

After careful consideration of the parties' arguments, exhibits and authorities, I decided their respective motions in a series of pretrial bench rulings. Aug. 22, 2005 Tr. (Doc. 1430) at 3-9, 14-15 (ruling on Defendants' *Daubert* motions and Motions [*1080] in Limine Nos. 1-12, 14-15); Sept. 13, 2005 Tr. (Doc. 1443) at 4-10 (ruling on all of Plaintiffs' motions except those seeking to exclude national security evidence and certain lay opinion testimony); Sept. 22, 2005 Tr. (Doc. 1459) at 4-10 (ruling on all remaining motions). I also granted Defendants leave to file an additional *Daubert* motion regarding one of Plaintiffs' expert witnesses, *see* Defs.' Mot. to Exclude Test. of Dr. Steven Wing (Doc. 1444), and decided that motion before trial as well, *see* Order (Doc. 1483). In general, I denied Defendants' *Daubert* motions and granted in part and denied in part their motions in limine, and granted in part and denied in part Plaintiffs' *Daubert* motion and motion in limine. All of these rulings were reported in [**7] summary fashion so they could be provided to the parties as soon as possible and incorporated in their trial preparations. 3

> 3    I described these rulings as "preliminary" when they were issued to convey to the parties that the rulings would be reported with additional explanation in a written opinion and that they might be fine-tuned in minor ways in the process.

580 F. Supp. 2d 1071, *1080; 2006 U.S. Dist. LEXIS 89121, **7

*See* Aug. 22, 2005 Tr. at 4; Sept. 13, 2005 Tr. at 4; Sept. 22, 2005 Tr. at 4.

At the time of these summary rulings, I recognized my obligation under governing Tenth Circuit authority to make specific findings on the record sufficient for the appellate court to review my conclusions regarding the admissibility of the challenged expert witness testimony and to confirm that I had properly exercised my "gatekeeping" function with regard to this testimony. Aug 22, 2005 Tr. at 4; Sept. 13, 2005 Tr. at 4; Sept. 22, 2005 Tr. at 4; *see Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1232 (10th Cir. 2004)*; *Dodge v. Cotter Corp., 328 F.3d 1212, 1225 (10th Cir. 2003)*. [**8] In light of the number, length and complexity of the parties' *Daubert* motions, meeting this obligation required a written opinion reporting my findings and rationale. Given the nature of the parties' *Daubert* motions, however, as well as the need to complete the jury instructions and to deal with a plethora of additional pretrial motions and other matters, [4] it was not possible to prepare this written opinion before trial. Delaying the start of trial to allow the opinion to be completed was not an option given the difficulty of scheduling a trial of this length and the long delays the parties had already suffered in this action. The parties were prepared to go to trial in this fifteen year old case, and any further delay would have imposed an undue hardship on them and their counsel.

> 4   It is my practice to instruct the jury at the beginning of trial and to provide jurors with copies of the instructions at this time so they are informed about the issues they are to decide when the parties present their evidence. If changes to the instructions are required by events during trial, these changes are made and communicated to the jury. *See generally* Mem. Op. re: Jury Instructions (Dec. 7, 2006).

[**9] Accordingly, my intent at the time I made my rulings was to transform the notes and preliminary drafts that I had relied on in rendering them into a comprehensive written decision meeting the Tenth Circuit's requirements during the course of what ultimately became a four and half month trial. This too proved impossible, however, as the parties filed approximately 300 additional substantive motions, written objections, proposed jury instructions and related legal memoranda during the trial that required my attention when I was not presiding in the courtroom. [5]

*See* Order Limiting Mots. Practice During Trial (Doc. 1626) (describing trial motion practice). [*1081] These filings presented well in excess of a thousand additional pages of legal argument and thousands of pages of supporting material regarding issues that in most instances had to be decided almost immediately in order for the trial to continue. This daily deluge of filings as well as matters raised during the parties' courtroom presentations consumed all of my and my staff's time during trial. This pace continued through the three weeks of jury deliberations, as every question from the jury prompted new disputes and argument [**10] by the parties.

> 5   Defendants were responsible for approximately two-thirds of these filings, which included additional motions in limine to strike Plaintiffs' expert and lay testimony and written objections to most of the more than 600 exhibits offered by Plaintiffs.

I am issuing this written opinion today as one of four memorandum opinions setting out the rationale for my rulings on various motions and disputes that were decided before, during and after the class trial. [6] I opted to issue all of these opinions at one time rather than in seriatim as they were completed because some of them address related issues and because I wanted to ensure that the parties had all relevant opinions in hand before they filed any final motions in this case.

> 6   In addition to this opinion, I have today issued two opinions setting out the basis for my rulings on jury instructions proposed by the parties before and during trial, *see* Mem. Op. re: Jury Instructions.; Mem. Op. re: Defs.' Theory of Plutonium Removal, and a third decision ruling on Defendants' most recent post-trial motion for mistrial, *see* Mem. Op. re: Defs.' Second Renewed and New Mot. for Mistrial.

[**11] This opinion reports my findings and rationale for ruling as I did on the parties' pretrial evidentiary motions. It is based on the arguments and materials presented by the parties in connection with their June, 2005 motions. In some instances, such as when the parties cited evidence or authorities but did not provide adequate (or any) excerpts of these materials in their supporting exhibits, I made an effort to locate and retrieve the cited material from the pretrial case record or from public sources. [7] I did not, however, make a

580 F. Supp. 2d 1071, *1081; 2006 U.S. Dist. LEXIS 89121, **11

comprehensive search of the thousands of filings in this case or all potential sources to find materials that were cited but not adequately produced in connection with these motions.

> 7    Defendants filed an earlier motion to strike Plaintiffs' expert witness testimony, Defs.' Mot. to Strike Pls.' Experts (Doc. 981) (Aug. 29, 1997), which I struck initially because it was premature, *see Cook v. Rockwell Int'l Corp. (Cook VIII), 181 F.R.D. 473, 487-88 (D. Colo. 1998)*, and later declined to reconsider because the extensive relevancy arguments advanced in it did not reflect my subsequent decisions defining the issues to be tried in the class trial, *see* Order (Doc. 1220) at 24 (Apr. 14, 2004). I did, however, consider some of the complete expert reports and affidavits produced in connection with this 1997 motion when the excerpted versions produced with the parties' June, 2005 motions were not adequate for my review.

[**12]  Many of the parties' pretrial motions sought exclusion of broad categories of evidence, and my pretrial rulings were correspondingly broad. Some of these rulings were refined during trial to address discrete issues that emerged concerning specific testimony or items of evidence falling within these categories. The analysis in this decision, however, is written from the broad, pretrial perspective and does not, with one exception noted in the text, include consideration of arguments, issues or rulings that occurred during trial. The analysis is written in the present tense because it reflects my thinking at the time I issued my pretrial rulings and reports the findings that would have accompanied these rulings if circumstances had permitted it.

This opinion begins with a statement of the standard I utilized in reviewing the parties' motions to exclude expert witness testimony. It next reports my analysis of first Defendants' expert witness motions and motions in limine and then Plaintiffs' motions. The decision concludes with a **[*1082]** summary of the rulings on each of the parties' motions, as initially reported in my pretrial bench rulings.

### Standard for Review of Expert Witness Testimony

[**13]  My review of the parties' motions to exclude

expert testimony is governed by *Rule 702 of the Federal Rules of Evidence* and *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, and its progeny. In *Daubert*, the Supreme Court held that *Rule 702* had replaced the former standard for admission of expert witness testimony with a "flexible" inquiry focused on determining whether the proffered expert testimony is both relevant and reliable. *Daubert, 509 U.S. at 589, 594-95.* The Court stated *Rule 702* requires a trial judge faced with a proffer of scientific expert testimony to determine at the outset whether the testimony is admissible under this standard. *Id. at 592.* The Supreme Court clarified in its subsequent *Kumho Tire* decision that this "gatekeeping" obligation and *Rule 702's* relevance and reliability standard also applies to proffers of non-scientific expert testimony. *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).*

In 2000, the Supreme Court approved amendments to *Rule 702* to conform it to the principles of *Daubert* and its progeny. As amended, [**14] *Rule 702* states the following requirements for admission of expert testimony: (1) the proffered expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue;" (2) the witness must be "qualified as an expert by knowledge, skill, experience, training, or education;" and (3) the proffered testimony must be "based upon sufficient facts or data," "the product of reliable principles and methods;" and the product of the reliable application of these principles and methods to the facts of the case. *Fed. R. Evid. 702.* Like the parties in this case, I will refer to these requirements in short-hand as "relevance" or "fit," "qualifications" and "reliability."

To fulfill the mandatory gatekeeper function declared by *Daubert* and *Rule 702*, I must conduct a two-part inquiry. In one part, I determine if the expert's proffered testimony has "a reliable basis in the knowledge and experience of his [or her] discipline." *Bitler, 400 F.3d at 1232-33* (citing *Daubert, 509 U.S. at 592*). This requires that I conduct "a preliminary inquiry" into the expert's qualifications and "whether the reasoning [**15] or methodology underlying the testimony" is reliable under the standards set by *Rule 702. Id. at 1233.* In the second part, I consider "whether the proposed testimony is sufficiently 'relevant to the task at hand.'" *Id. at 1234* (quoting *Daubert, 509 U.S. at 597*).

580 F. Supp. 2d 1071, *1082; 2006 U.S. Dist. LEXIS 89121, **15

As directed by the Tenth Circuit, I must also make "specific factual findings on the record that are sufficient for an appellate court to review" my conclusions on these points. *Id. at 1232*. Within this framework, I have "broad discretion . . . both in deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." *Dodge, 328 F.3d at 1223; see Kumho Tire, 526 U.S. at 141-42; Bitler, 400 F.3d at 1232*.

A key but sometimes forgotten principle of *Rule 702* and *Daubert* is that *Rule 702*, both before and after *Daubert*, was intended to relax traditional barriers to admission of expert opinion testimony. *See, e.g., Daubert, 509 U.S. at 588*. Accordingly, courts are in agreement that *Rule 702* mandates a liberal standard **[**16]** for the admissibility of expert testimony. *See Daubert, 509 U.S. at 588* (*Rule 702* is part of "liberal thrust" of Federal Rules of Evidence); *see generally* **[*1083]** 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence § 702.02[1]* (2d ed. 2005) (collecting cases). As the Advisory Committee to the 2000 amendments to *Rule 702* noted with apparent approval, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."

That being said, the proponent of an expert witness must demonstrate that the expert's proffered testimony meets *Rule 702*'s requirements -- relevance/fit, qualifications and reliability - before the expert's testimony will be admitted. *See Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir. 2001); Mitchell v. Gencorp Inc., 165 F.3d 778, 781-82 (10th Cir. 1999)*. Not surprisingly given the contentious nature of this case, the parties disagree on the showing that must be made to satisfy each of these requirements. Accordingly, I set out below the standard I employed in deciding the parties' **[**17]** *Daubert* motions.

*Relevance/fit*

*Rule 702* requires that the proffered expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." *Fed. R. Evid. 702*. The Supreme Court stated in *Daubert* that this requirement goes primarily to relevance, because "expert testimony that does not relate to any issue in the case is not relevant and, ergo, non-helpful." *509 U.S. at 591*. It is also well-settled that expert testimony explaining general principles is admissible, without application of these principles to the facts of the case, if the explanation would assist the trier of fact and is found to be reliable. *Fed. R. Evid. 702* 2000 advisory committee's note.

Consistent with these authorities, the Tenth Circuit has set the standard for this *Rule 702* requirement by reference to *Federal Rule of Evidence 401*, which defines relevant evidence as "'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" **[**18]** *Bitler, 400 F.3d at 1234* (quoting *Fed. R. Evid. 401*). Scientifically valid and reliable expert testimony that is not relevant to an issue of consequence to the case does not "fit" because it will not assist the trier of fact. *See id.; Daubert, 509 U.S. at 591*.

The Tenth Circuit takes a liberal approach to the question of whether proffered expert testimony will assist the jury. "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The jury is intelligent enough to ignore what is unhelpful in its deliberations." *Robinson v. Mo. Pac. R.R. Co., 16 F.3d 1083, 1090 (10th Cir. 1994)* (quotation omitted); *see also Weinstein, § 702.03[2][c]* (concluding based on case review that trial judges should approach exclusion based on this *Rule 702* requirement gingerly "and should admit the testimony if there is any chance at all it will be beneficial to the finder of fact.").

In their *Daubert* motions, Defendants assign a much more restrictive meaning to the "assist **[**19]** the trier of fact" requirement. Relying on *Daubert's* reference to "fit" as a short-hand for this requirement and language they incorrectly attribute to the Supreme Court, Defendants argue that the proffered testimony of virtually all of Plaintiffs' experts does not "fit" this case because the testimony is not sufficient to prove one or more of the elements of Plaintiffs' claims. [8] This is an incorrect **[*1084]** statement of the relevance/fit standard for the reasons just stated, and because it confuses the threshold question of whether an expert's evidence is admissible with the separate question of whether it is sufficient to prove a particular point. *See Maiorana v. United States Mineral Prods. Co. (In re Joint E. & S. Dist. Asbestos Litig.), 52 F.3d 1124, 1132 (2nd Cir. 1995)* (distinguishing between inquiry into admissibility of

580 F. Supp. 2d 1071, *1084; 2006 U.S. Dist. LEXIS 89121, **19

expert evidence and "a sufficiency inquiry, which asks whether the collective weight of a litigant's evidence is adequate to present a jury question."). Neither *Rule 702* nor *Daubert* require that an expert's testimony prove an element of the offering party's case for it to be admissible. *See, e.g., Adams v. Ameritech Servs., Inc., 231 F.3d 414, 425 (7th Cir. 2000)* ("First, **[\*\*20]** the question before us is not whether the reports proffered by the plaintiffs prove the entire case; it is whether they were prepared in a reliable and statistically sound way, such that they contained relevant evidence that a trier of fact would have been entitled to consider."); *City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 564-65 (11th Cir. 1998)* (expert's study and testimony "need not prove plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury."); *Ambrosini v. Labarraque, 322 U.S. App. D.C. 19, 101 F.3d 129, 135 (D.C. Cir. 1996)* ("fitness prong of the Daubert admissibility analysis primarily concerns relevance" and "not whether the testimony satisfies the plaintiffs' [burden of proof]"). Defendants' confusion of the distinct concepts of the admissibility of evidence and its sufficiency as a matter of proof is a recurring flaw in their arguments as will be demonstrated shortly.

> 8   Defendants asserted in their briefing that the Supreme Court declared in *Daubert* that in order for expert testimony to "fit" and thereby assist the trier of fact, it must "logically advance[] a material aspect of the proposing party's case." Defs.' Intro. and Overview to Mot. to Exclude Expert Witness Test. (Doc. 1378) at 3, 12. In fact, this language is not found in the Supreme Court's *Daubert* decision, but rather in the Ninth Circuit's *Daubert II* decision on remand from the Supreme Court. *See 43 F.3d 1311, 1315 (9th Cir. 1994)*. Contrary to Defendants' suggestion, I also do not find that this statement supports a higher standard for "relevance" or "fit" than the Tenth Circuit standard described above.

**[\*\*21]** *Qualifications*

As part of the reliability inquiry under *Rule 702*, I must determine whether the witness is qualified to testify as an expert. The standard for this determination is whether the witness is an expert on the subject in question based on his knowledge, skill, experience, training or education. *Fed. R. Evid. 702*. The Tenth

Circuit and other courts have held that this standard should be construed and applied liberally. *See, e.g., United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)*; *Weinstein*, § 702.04[1][a] (summarizing cases).

The expert's proffered testimony must, of course, be within the scope of his established expertise. Expertise in a specialized area directly related to the issue in question is generally not required, however, as long the expert "stays within the reasonable confines of his subject area." *Ralston, 275 F.3d at 970* (internal quotation omitted); *Wheeler v. John Deere Co., 935 F.2d 1090, 1100 (10th Cir. 1991)*; *see generally Weinstein*, § 702.04[1][a]. In general "a lack of specialization does not affect the admissibility of [the expert] **[\*\*22]** opinion, but only its weight." *Ralston, 275 F.3d at 970* (internal quotation omitted); *Wheeler, 935 F.2d at 1100*.

*Reliable methodology*

Expert testimony must be based on a reliable methodology to be admissible. *See, e.g., Bitler, 400 F.3d at 1232*. This does not mean, however, that the offering **[\*1085]** party must prove "that the expert is indisputably correct" for the expert evidence to be admissible. *Id. at 1233* (quoting *Mitchell, 165 F.3d at 781*). Rather, the party need only prove that "the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy *Rule 702*'s reliability requirements." *Id. at 1233*. "The evidentiary requirement of reliability is lower than the merits standard of correctness," *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994)* (quoted with approval in *Fed. R. Evid. 702* 2000 advisory committee's note), and gaps or inconsistencies in an expert's reasoning may go to the weight of the expert evidence, not its admissibility, *see, e.g.,* **[\*\*23]** *Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 186 (2nd Cir. 2001)*. As the Supreme Court acknowledged in *Daubert*, expert evidence can be "shaky" and yet still admissible, and may be attacked through the traditional means of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert, 509 U.S. at 596*. Maintaining this distinction between the evidentiary requirement of reliability and the higher standard of whether the expert's conclusions are correct or sufficient to prove the merits "is indeed significant as it preserves the fact finding role of the jury." *In re TMI Litig., 193 F.3d 613, 665 n.90 (3rd Cir. 1999)*.

Accordingly, my task in considering the reliability of

580 F. Supp. 2d 1071, *1085; 2006 U.S. Dist. LEXIS 89121, **23

each of the challenged expert's methodology is to ensure that the "expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire, 526 U.S. at 152*. If this test is met and the expert's testimony is otherwise admissible, [**24] it is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of competing experts' opinions should be credited. The ultimate determination of whether expert testimony is correct and "reliable" in this sense remains with the jury.

The nature of my reliability review under *Rule 702* is further informed by the Rule's statement of the three areas of inquiry for determining whether an expert's methodology is sufficiently reliable for his testimony to be admitted. The first of these is whether the testimony is based on sufficient facts or data. *See Fed. R. Evid. 702(1)*. This is a quantitative rather than a qualitative standard, *i.e.*, the question is whether the expert considered *enough* information to make the proffered opinion reliable. *Fed. R. Evid. 702* 2000 advisory committee's note. That the expert relied on disputed facts in reaching his opinion does not render the expert's opinion unreliable under this test. *Id.*

The second area of inquiry is whether the expert used reliable principles and methodologies in reaching his [**25] opinion. *Fed. R. Evid. 702(2)*. In *Daubert*, the Supreme Court noted a number of factors that could be relevant to deciding the reliability of a scientific method or principle, including whether the method can be tested in some objective sense, its known or potential rate of error, any peer review or publication, and its general acceptance in the scientific community. *509 U.S. at 593-94; see Fed. R. Evid. 702* 2000 advisory committee's note (summarizing *Daubert* factors). Even though the Supreme Court took pains to describe this list as non-exclusive and non-dispositive, and the inquiry in general as flexible and fact-driven, *see 509 U.S. at 593-94*, some courts, commentators and counsel have seized on these "*Daubert* factors" as a checklist for making the reliability [*1086] determination. *Kumho Tire* and other authority have since clarified that this is not the case and that, depending on the circumstances presented, the *Daubert* factors and/or any number of other factors may be relevant to determining the reliability of the methodology used to produce a particular expert opinion. [**26] *See, e.g., Kumho Tire, 526 U.S. at 150; Bitler, 400 F.3d at 1233; Fed. R. Evid. 702* 2000 advisory committee's note (summarizing cases).

The third component of the reliability inquiry assumes the witness used reliable principles and methods in forming his opinions, and focuses instead on whether the witness applied these principles and methods reliably to the facts of the case. *Fed. R. Evid. 702(3)*. This by necessity is a fact-specific inquiry.

Finally, in considering the parties' *Daubert* motions, I have kept in mind the Supreme Court's admonition in *Daubert* that *Rule 702* is not designed to promote an "exhaustive search for cosmic understanding," but rather provides a means "for the particularized resolution of legal disputes." *509 U.S. at 597*. As a result, "it is the specific relation between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute, and not asymptotic perfection, that renders testimony both reliable and relevant." *Bitler, 400 F.3d at 1234*.

**Analysis**

### I. Defendants' [**27] *Daubert* Motions and Motions in Limine

Defendants filed a multitude of lengthy motions seeking to exclude most of Plaintiffs' proffered evidence in this case. Some of Defendants' arguments were sound and supported by appropriate authority, but many others were not. Rather, Defendants appear to have employed in these motions an approach aptly described by the Tenth Circuit in another context as "throw - as - much - mud - against - the - wall - as - you - can - and - hope - some - of - it - sticks." *Dodd Ins. Servs., Inc. v. Royal Ins. Co., 935 F.2d 1152, 1158 (10th Cir. 1991)*. This approach resulted in an undifferentiated mass of plausible and implausible arguments, which complicated the process of deciding and reporting on these motions.

My review also revealed that in a number of instances Defendants misreported the relevant evidence, prior rulings in this case and/or relevant legal authority in making their arguments. In other instances, Defendants relied on what they declared was the governing legal standard without providing authority that the standard existed or applied in this situation. Examples of these practices are included in the analysis of Defendants' [**28] individual motions.

580 F. Supp. 2d 1071, *1086; 2006 U.S. Dist. LEXIS 89121, **28

## A. Defendants' Relevancy Standard

Most of Defendants' *Daubert* motions and motions in limine regarding Plaintiffs' evidence of risk and conduct are based in whole or in part on the premise that the only evidence relevant to the property class claims is evidence that can be tied directly to common and class-wide contamination or health risk. *See infra* Section I.B (regarding Defendants' motions to exclude risk evidence), Section 1.D (regarding Defendants' motions to exclude conduct evidence). Defendants further assert that evidence of many incidents and practices at Rocky Flats is irrelevant because Plaintiffs will not be able prove that it meets this test. *See, e.g., id.* This relevancy standard, purportedly based on my past rulings defining the parties' claims and defenses, is flawed in several fundamental respects.

Defendants' first error is in defining relevant evidence only as direct evidence pertaining to certain issues. The Federal Rules of Evidence define relevant evidence **[*1087]** broadly as "evidence having *any tendency* to make the existence of *any fact that is of consequence* to the determination of the action more probable or less probable **[**29]** than it would be without the evidence." *Fed. R. Evid. 401* (emphasis added). This a liberal standard that incorporates notions of both materiality and probativity. *United States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998)*. Both direct and circumstantial evidence, as well evidence that is essentially background or contextual in nature, may be relevant under this rule. *Fed. R. Evid. 401* & advisory committee's note. In addition, evidence need not be conclusive or highly probative to satisfy *Rule 401* -- "even a minimal probability" that the asserted fact exists will suffice. *McVeigh, 153 F.3d at 1190.*

Defendants' relevancy standard is further flawed in its narrow definition of the facts "of consequence to the determination of this action" to include only the physical invasion element of Plaintiffs' trespass claims and the interference element of their nuisance claims. A fact is "of consequence" under *Rule 401* "when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict." *McVeigh, 153 F.3d at 1190.* **[**30]** The class trial in this action will require the jury to determine facts beyond these two elements and their focus on the existence of or potential for class-wide contamination or risk attributable to Rocky Flats. These

additional issues include, but are not limited to, whether the conduct that caused or contributed to any physical invasion or interference was negligent or intentional, the property market's knowledge of and response to the alleged trespass and nuisance, and whether Defendants' conduct was wilful and wanton so that punitive damages should be awarded. *See, e.g., Cook v. Rockwell Int'l Corp. ("Cook IX"),273 F. Supp. 2d 1175, 1199-1212 (D. Colo. 2003)* (stating elements of Plaintiffs' trespass and nuisance claims and standards for determining damages). Facts beyond these may also be of consequence because they provide a basis for making an inference about these or other issues necessary to the verdict. *See McVeigh, 153 F.3d at 1190; Fed. R. Evid. 401* advisory committee's note ("fact to be proved may be ultimate, intermediate, or evidentiary; it matters not, so long as it is of consequence to the determination **[**31]** of the action.").

Defendants also err in asserting that evidence relating to contamination or risk is only relevant if it applies in common to every Class member or the entirety of the Class Area. It should be self-evident that the question to be decided is not whether a single item of evidence demonstrates a common or class-wide effect, but rather whether Plaintiffs' evidence as a whole demonstrates class-wide liability and damages. Defendants' argument in this regard confuses the sufficiency of an item of evidence with its relevance.

Defendants' relevancy arguments also frequently misstate the forms of interference with the use and enjoyment of property to be tried in connection with the class nuisance claims. I have previously examined Plaintiffs' asserted forms of interference and identified two that could support a finding of class-wide interference with the use and enjoyment of property: (1) alleged interference in the form of current human health risk arising from past or on-going exposure to plutonium released from Rocky Flats as a result of one or both of Defendants' activities there; [9] and (2) alleged interference in the **[*1088]** form of a demonstrable risk of future harm to Class **[**32]** properties based on objective conditions caused by Defendants' activities at Rocky Flats. May 2005 Order at 4-6. Many of Defendants' relevancy arguments omit any mention of the second potential basis for a class-wide finding of interference, and when it is addressed, Defendants appear to assume this basis only makes relevant evidence proving that some common, class-wide health risk *will* occur in the future. *See, e.g.*, Defs.' Combined Reply in Supp. of

580 F. Supp. 2d 1071, *1088; 2006 U.S. Dist. LEXIS 89121, **32

Mots. in Limine (Doc. 1410) at 8. This is not correct. Evidence that has any tendency to show that objective conditions caused by Defendants create a demonstrable *risk* of harm that has the *potential* to affect all of the Class Area is relevant to this potential form of class-wide interference. *See* Mem. Op. re: Jury Instructions, Section II.C.2 (regarding Defendants' proposed revisions to Instruction No. 3.6 (elements of nuisance claim)).

> 9    I also allowed proof of such class-wide interference arising from exposure to non-plutonium substances if Plaintiffs demonstrated that all Class members were exposed to such substances and all suffered some increased health risk as a result. May 2005 Order at 5. Plaintiffs have since stated they do not intend to assert interference on this basis. *See* Pls.' Cons. Mem. in Opp'n to Defs.' Mots. in Limine (Doc. 1395) at 21.

[**33]   In addition, Defendants' relevancy arguments largely ignore a third form of interference with the use and enjoyment of property that I held may be determined in part at the class trial, which is whether Defendants' conduct at Rocky Flats was capable of causing Class members to be fearful, anxious or otherwise disturbed by the real or perceived risks posed by the facility. The "generic causation" question of whether Defendants' conduct is capable of causing this form of interference with the use and enjoyment of Class properties will be decided by the jury in the class trial, leaving to future proceedings (if necessary) the separate question of whether particular Class members in fact suffered this form of interference with the right to use and enjoy property. [10] *See* May 2005 Order at 6-7.

> 10   Although the parties and I sometimes refer to this generic causation question as "generic emotional distress," I note that this question is not part of an emotional distress claim, but rather addresses a form of interference with the right to use and enjoy property that can establish liability for nuisance if the other elements of a nuisance claim are proved. *See, e.g., Cook IX, 273 F. Supp. 2d at 1203-04.*

[**34]   This summary identifies the major, persistent flaws Defendants advanced in the relevance and fit arguments in their *Daubert* motions and motions in limine. In light of the extensive briefing and oral argument by Defendants on these motions, however, I cannot say that I have addressed all such flaws in this section. Accordingly, the parties should not assume that a particular interpretation of my past rulings or asserted standard for determining relevant evidence in the class trial has been approved simply because I have not called it out and corrected it here.

## B. Motion to Exclude Plaintiffs' Expert Witness Testimony Relating to Risk

Plaintiffs offered four expert witnesses to testify at trial regarding the health and other risks posed by Rocky Flats: Dr. Robert Goble, Dr. Richard Clapp, Dr. K. Shawn Smallwood and Dr. Steven Wing. Defendants moved to exclude testimony by Drs. Goble, Clapp and Smallwood on June 16, 2005, [11] *see* Defs.' Am. Mot. to Exclude Expert Test. Relating to Risk (Doc. 1380) [hereinafter "Defs.' Mot. re: Pls.' Risk Experts"], and subsequently moved to exclude Dr. Wing's testimony, Defs.' Mot. to Exclude Test. of Dr. Steven Wing (Doc. [*1089] 1444). [12] [**35] I address the admissibility of each of these witnesses' proffered testimony in turn.

> 11   Defendants also sought in this motion to exclude testimony by Dr. Lawrence Mayer, another of Plaintiffs' previously designated risk experts. This portion of Defendants' motion was rendered moot by Plaintiffs' decision not to call Dr. Mayer. *See* Pls.' Cons. Mem. in Opp'n to Defs.' Mots. to Exclude Expert Test. (Doc. 1399) at 1 n.1.
>
> 12   I permitted Defendants to file their motion to exclude Dr. Wing's testimony after the pretrial deadline because Plaintiffs had inadvertently omitted Dr. Wing from the witness list they submitted in the December 10, 2003 Joint Status Report, which was the most recent witness list exchanged by the parties before the June, 2005 deadline. I rejected Defendants' request that I exclude Dr. Wing's testimony solely on the basis of Plaintiffs' omission, however, as Plaintiffs had long ago properly designated Dr. Wing as an expert in this proceeding and Defendants had ample notice after the December, 2003 Status Report that Plaintiffs intended to call him. *See* Aug. 22, 2005 Tr. at 15-16.

### [**36] 1. Dr. Robert Goble

Dr. Goble is Plaintiffs' dose reconstruction expert. He holds a Ph.D. in physics and since 1976 has taught

580 F. Supp. 2d 1071, *1089; 2006 U.S. Dist. LEXIS 89121, **36

and conducted research on energy and environmental science and policy at Clark University. He has performed research on human health risk and risk assessment in the past for the United States Environmental Protection Agency, the National Science Foundation and the United States Department of Energy, among others. *See* Pls.' Cons. Mem. in Opp'n to Defs.' Mots. to Exclude Expert Test. (Doc. 1399) [hereinafter "Pls.' Cons. *Daubert* Resp."], Ex. 15, App. A at 1-2.

Dr. Goble authored an 82-page expert report for this case that addressed a number of subjects, including exposure to plutonium released from Rocky Flats and associated health risks. Pls.' Cons. *Daubert* Resp., Ex. 15 [hereinafter "Goble Report"]. This is the only subject on which Plaintiffs offer Dr. Goble's testimony in the property class trial. [13] Defendants do not challenge Dr. Goble's qualifications to render opinions on this subject, and I find Dr. Goble qualified to testify as an expert on it.

> 13   In his report, Dr. Goble also assessed risks arising from the release of four toxic substances from Rocky Flats in addition to plutonium. *See* Goble Report. Defendants' motion to exclude Dr. Goble's testimony at the property class trial regarding these additional, non-plutonium substances is moot as a result of Plaintiffs' decision not to present Dr. Goble's testimony on these substances.

[**37] In his report, Dr. Goble estimated the exposures to plutonium to people living near Rocky Flats and assessed the risks experienced as a result. His risk assessment is based on inhalation of plutonium, and he relied on information regarding plutonium concentrations in soil and other data to estimate the concentration of plutonium in air, and hence exposure, at various periods from 1954 to 1989. He then used these exposure estimates to estimate the radiation doses that resulted and the associated risk of disease. *Id.* at 14-16.

Dr. Goble reported the existence of substantial uncertainty and variability in the underlying data and each step in his analysis. Accordingly, a key component of Dr. Goble's assessment was a quantitative treatment of both uncertainty and variability as they relate to plutonium exposure and risk. [14] *See, e.g.*, Goble Report at 13. Dr. Goble employed the widely recognized Monte Carlo simulation method to accomplish this and to develop estimates of the quantitative ranges within which plutonium releases, exposures, doses and risks have

likely fallen. He expressed his estimates at stated levels of confidence. [15]

> 14   "Uncertainty" in this context refers to the "imperfect knowledge" of the level of exposure to plutonium, doses and the likelihood of disease attributable to them, while "variability" is the certainty that some individuals will have higher exposures than average, some will have higher doses for the same exposure and some are particularly likely to have a disease caused by doses. *See* Goble Report at 7, Fig. 2.2.

[**38]

> 15   "Confidence levels" or "intervals" are a common method of expressing the likelihood that the true value falls within the stated range. *See, e.g.*, Michael D. Green et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 333, 360-61 (2d ed. 2000). For example, if a value is estimated as falling in a certain range at a 90 percent confidence level, then there is a probability of 90 percent that the true value falls within the given range. *Id.* at 360.

[*1090] Defendants do not dispute that the principles and methods relied upon by Dr. Goble are reliable and that he utilized sufficient facts and data in conducting his analysis, as required by *Rule 702*. They contend, however, that Dr. Goble's expert testimony regarding plutonium exposure and risk should nonetheless be excluded in its entirety because it does not fit the issues to be decided in the class trial and because he did not apply his methods reliably to the facts of this case.

*Relevance/fit*

Defendants principally argue that Dr. Goble's plutonium exposure and risk testimony does not fit the issues [**39] to be tried because the dose and health estimates he calculated showed a large variability of exposure and risk and he did not attempt to quantify the magnitude of any plutonium exposure and risk experienced in common by every class member. This, Defendants argue, violates the supposed rule that all evidence of any kind must be applicable and common to the class as a whole in order to be relevant to and fit the class trial. As stated earlier, however, no such rule exists in this case. Evidence regarding plutonium releases to the Class Area and the resulting exposure and risk is relevant to the Plaintiffs' claim that Defendants' activities at

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 170 of 332

Page 13

580 F. Supp. 2d 1071, *1090; 2006 U.S. Dist. LEXIS 89121, **39

Rocky Flats constitute a nuisance because they have caused some increment of health risk to the class. *See* May 2005 Order at 4-5 (describing one form of interference with use and enjoyment of property to be tried on a class-wide basis). Dr. Goble's intended testimony will assist the jury in deciding this issue. That Dr. Goble's analysis describes a range of exposures and risks does not change this conclusion.

Defendants also argue Dr. Goble's estimates are not relevant because they do not apply to the Class Area. Defendants contend this is **[**40]** so because Dr. Goble based his estimates of plutonium-in-air concentrations during the key 1965-70 time period on data from three locations, none of which is in the Class Area. [16] As Dr. Goble stated in his report, however, these locations were selected to provide a reasonable representation of conditions inside the proposed medical monitoring region. Goble Report at 29. The proposed medical monitoring region generally encompasses the property Class Area. *See, e.g., id.* at Figure 2.1a (depicting the proposed medical monitoring region and the plutonium contour that defines the property class area). Dr. Goble's analysis regarding air concentrations in 1965-70 is, therefore, relevant to the property Class Area.

> 16     It was during the 1965-70 period that plutonium was released into the environment from leaking barrels at the 903 pad at Rocky Flats. It is undisputed that releases from the 903 pad were a major source of off-site plutonium exposure and contamination.

*Reliability*

Defendants assert Dr. Goble **[**41]** made multiple errors in applying his methodology to assess plutonium exposure and risk arising from Rocky Flats, and that these alleged errors render his expert testimony unreliable and inadmissible under *Rule 702*. I disagree for the following reasons.

First, Defendants argue that the range of estimated exposures, doses and risks found by Dr. Goble at the various confidence levels are simply too broad to be reliable. It is true that for a given confidence level, a narrower range indicates a more precise estimate, while a broad range **[*1091]** indicates an estimate that may include substantial random error. David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, in *Reference Manual on Scientific Evidence* 83, 119 & n.120 (2d ed.

2000) [hereinafter *"Ref. Guide on Statistics"*]. Defendants do not, however, point to any mistake in Dr. Goble's method or analysis that caused the broad ranges he reports for various confidence intervals. Rather, Dr. Goble explained in his 1996 expert report and 1999 declaration that these ranges resulted from the large uncertainties in the available information and variability in individual responses to plutonium exposure. *See* Goble Report **[**42]** at 36-48; Pls.' Cons. *Daubert* Resp., Ex. 16 [hereinafter "Goble Decl."] at 8-10. It is undisputed that risk assessors commonly deal with such uncertainties in their analyses and that broad estimated ranges of exposure, dose and risk may result from them. The existence of such uncertainties, and the consequences that flow from them in estimating plutonium exposure, dose and health risk associated with Rocky Flats, may affect the weight to be accorded to Dr. Goble's testimony but do not provide a basis for finding his work and conclusions unreliable within the meaning of *Rule 702*.

Defendants cite three cases for the proposition that courts have found statistical estimates thousands of times narrower than Dr. Goble's "scientifically unreliable" and hence inadmissible under *Rule 702*. *See* Defs.' Mot. re: Pls.' Risk Experts at 8-9. None of the cited cases stand for this proposition, as all concern instances in which the court or fact finder admitted and considered the statistical evidence in reaching a decision on the merits. *See Turpin v. Merrell Dow Pharm., Inc., 959 F.2d 1349, 1353, 1357 (6th Cir. 1992)* (deciding case on basis of sufficiency of the evidence **[**43]** and specifically finding that the challenged statistical studies "constitute evidence on which a jury might ground" its verdict); *United States v. ASCAP, 1989 U.S. Dist. LEXIS 13154, Civ. 13-95 (WCC), (S.D.N.Y. Oct. 12, 1989)* (magistrate judge sitting as trier of fact accords little weight to statistical evidence having broad confidence intervals), *aff'd sub nom. ASCAP v. Showtime/Movie Channel, 912 F.2d 563 (2nd Cir. 1990)* (magistrate judge decision reprinted as appendix, *912 F.2d 572, 591)*; *Haim v. Secretary of Dep't of Health & Human Servs*, 1993 U.S. Claims LEXIS 145, No. 90-1031V, 1993 WL 346392, at *6 (Fed. Cl. Ct. Aug. 27, 1993)* (special master sitting as finder of fact weighs expert testimony). Thus, these cases demonstrate that Defendants' complaints regarding the breadth of Dr. Goble's ranges go to the weight that the finder of fact may assign them, and not to the separate question of whether his testimony is admissible.

Defendants' second basis for asserting that Dr.

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 171 of 332

Page 14

580 F. Supp. 2d 1071, *1091; 2006 U.S. Dist. LEXIS 89121, **43

Goble's work is unreliable is that he failed to engage in hypothesis-testing, which Defendants assert is necessary for any reliable scientific endeavor. There should be [**44] no question, however, that scientific endeavor takes many forms, many of which do not involve hypothesis testing. *See* Goble Decl. at 2-3 (citing, among others, the work of Darwin and Einstein). Dr. Goble explained at length in his 1999 Declaration why hypothesis testing frequently is not feasible or appropriate in the risk assessment context, and why this mode of inquiry was not appropriate to his analysis of risk arising from Rocky Flats. *Id.* at 3-9. Defendants offer no rebuttal to this reasoned explanation.

Defendants next argue Dr. Goble's expert testimony must be stricken due to his allegedly improper reliance on 95th percentile estimates. The portion of Dr. Goble's report cited by Defendants, however, conveys Dr. Goble's recommendation that the 95th percentile risk level be considered in designing a medical monitoring program. [*1092] *See* Goble Report at 22-25. Medical monitoring is not part of the trial on Plaintiffs' property class claims. Plaintiffs intend in the property class trial to offer Dr. Goble's testimony regarding the various ranges he calculated for exposure, dose and risk. There is no "reliance" on the 95th percentile range, improper or otherwise, in reporting [**45] these ranges to the jury in the property class trial.

Defendants further assert Dr. Goble's proposed testimony is unreliable because he failed to compare and calibrate his estimates of plutonium-in-air concentrations for the 1965-70 time period, which Dr. Goble modeled from plutonium soil concentration data, with available air monitoring data from this period. Defendants contend such a comparison of computer-modeled estimates and "real world data" is a mandatory component of any modeling exercise, and that the results of any computerized model that omits this step are *per se* unreliable and inadmissible under *Rule 702*. Defendants cite their experts' statements and excerpts from scientific authority quoted by their experts in support of this proposition. They submitted no legal authority supporting this alleged rule. Defendants further assert that the actual plutonium-in-air concentrations measured at Rocky Flats establish that Dr. Goble's soil-based air concentration estimates are as much as 1,000 times too high, which in turn render his dose and risk estimates unreliable.

The scientific authority quoted by Defendants'

experts is consistent with what common sense tells us: that [**46] a comparison of modeled estimates and "real world data" can aid in establishing the credibility of the modeled results, but is not always possible or informative. *See, e.g.*, App. to Defs.' Mot. re: Pls.' Risk Experts (Doc. 1377), Ex. 10, PP 11-12 (quoting scientific papers describing the desirability of comparing simulation models against environmental monitoring results "whenever possible"). Relevant environmental monitoring data, for example, may not be available or may itself be suspect.

The accuracy of the air monitoring data on which Defendants rely is a vigorously disputed issue in this case. Dr. Goble explained in his 1996 expert report and 1999 declaration why he believed the available air monitoring data were too sparse and unreliable to set bounds on his estimated exposures based on plutonium soil concentrations. [17] *See* Goble Report at 29; Goble Decl. at 10-12. Defendants and their experts disagree, and assert the available air monitoring data are the most reliable indicator of the concentration of plutonium in air. This is a classic disagreement between experts that goes to the credibility of each expert's opinions, not to the reliability of their methodology within [**47] the meaning of *Rule 702*. It is the jury's function in this instance to weigh the expert's competing views and determine their respective credibility.

> [17] In addition, Dr. Goble used some air monitoring data from 1971-1989 to estimate the ranges of exposure during this time period, and explained why he viewed this observed data as more reliable than that available for the 1965-70 time period. *See* Goble Decl. at 12.

Defendants make two further arguments challenging the reliability of Dr. Goble's methodology as he applied it, both relating to his estimates for plutonium air concentrations. First, Defendants argue that Dr. Goble used an improper value in estimating plutonium air concentrations in the 1965-70 time period. As stated earlier, Dr. Goble based his estimated ranges of exposure during this period on plutonium soil concentrations. One of the factors in the model he used to estimate air concentration from soil data was the velocity at [*1093] which airborne plutonium is deposited. Dr. Goble drew his velocity [**48] value from an expert judgment elicitation assessing dispersion and deposition uncertainties in modeling the consequences of a nuclear

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 172 of 332

Page 15

580 F. Supp. 2d 1071, *1093; 2006 U.S. Dist. LEXIS 89121, **48

accident. *See* Goble Report at 37 (citing U.S. Nuclear Regulatory Commission and Commission of European Communities, *Probabilistic Accident Consequence Uncertainty Analysis: Dispersion and Deposition Uncertainty Assessment, Vols. I-III,* NUREG/CR-6244 (1995) [hereinafter "NUREG/CR-6244"]). The elicitation was funded and directed jointly by the U.S. Nuclear Regulatory Commission and the Commission of European Communities to "develop credible and traceable uncertainty distributions" for these input variables. NUREG/CR-6244, Vol. I (Main Report) at ES-1. [18] The deposition velocity used by Dr. Goble was the result of the equal weighting scheme used by the NRC and European authors to aggregate and report the results of the experts' assessments. *See id.* at 3-9 to 3-10.

> [18]     In spite of their extensive argument concerning this document in connection with Defendants' challenge to Dr. Goble's testimony, neither party included a copy of it in any court filings made in connection with Defendants' motion. Although it is likely the document can be found elsewhere in the voluminous, 15-year long record for this case, I have not searched for it there and instead, to the extent necessary, take judicial notice of this government document, which is publically available through numerous sources, including the Internet. *See* NUREG/CR-6244 (Main Report), http://www.osti.gov/bridge/product.biblio.jsp?query_id=2&page=0&osti_id=10125585.

[**49] Defendants assert Dr. Goble was not justified in relying on the deposition velocities reported in NUREG/CR-6244 because the equal weighting scheme used in the study to aggregate the results of the participating experts was itself unreliable. Defendants base this contention entirely on Appendix D to NUREG/CR-6244, in which the study authors discuss alternate, performance-based weighting methods for aggregating the distributions elicited from experts, and apply one such method to the elicited results for comparison purposes. *See id.*, Vol. III, Appendix D; *see also id*, Vol. I, at 3-10. Using the performance-based method selected, the deposition assessments of seven of the eight experts received a calibration score below the significance level. *Id.*, Vol. III at D-5.

It is clear from the entirety of Appendix D that the NRC and European researchers who directed the study

did not consider this result to be determinative of the credibility of these experts' work, and did not view the particular performance-based weighting scheme applied in Appendix D with the same confidence as the equal weighting method they used to derive the deposition velocity relied upon by Dr. Goble. [**50] *See, e.g., id.* at D-4 to D-5; *see also* Goble Decl. at 14 (discussing Appendix D). Defendants also do not dispute that equal weighting of expert results has been used in other expert elicitation studies in this field, *see id.* at D-4, or the reliability of the expert elicitation process itself. It was the results of the equal weighting scheme that were published as the study's findings, not the alternate scheme discussed in Appendix D. Finally, Defendants have not presented evidence that anyone other than its paid experts considers the NUREG/CR-6244 velocities used by Dr. Goble to be unreliable. For all of these reasons, I find no basis to hold Dr. Goble's work unreliable and inadmissible as a result of his use of deposition velocities published in NUREG/CR-6244.

Moving beyond their general challenge to Dr. Goble's reliance on NUREG/CR-6244, Defendants assert Dr. Goble erred in selecting from it the velocities stated for one micron particles. Observed data from Rocky Flats, Defendants argue, demonstrate [*1094] that the average particle size is much larger than one micron, and that the estimated concentration of plutonium in air decreases by several orders of magnitude if deposition [**51] velocities from NUREG/CR-6244 corresponding to this larger size are used.

Dr. Goble responded in his 1999 Declaration to both this criticism and the related complaint that the NUREG/CR-6244 deposition velocities he utilized were based on different wind speeds than occurred during some of the wind-borne plutonium releases from the 903 pad in the 1965-70 period. *See* Goble Decl. at 16-18. This response included a reasoned explanation by Dr. Goble for his choice of the one micron deposition velocity and his decision not to stratify for different wind speeds. That Defendants' experts apparently disagree with Dr. Goble's choices and believe that more accurate results could have been achieved by use of different inputs does not render Dr. Goble's work unreliable and inadmissible under *Rule 702*.

Last but not least, Defendants complain vigorously that Dr. Goble's analysis is unreliable because he improperly used a "multiplier" of plutonium releases in

580 F. Supp. 2d 1071, *1094; 2006 U.S. Dist. LEXIS 89121, **51

1965-70 to estimate plutonium releases and exposures in other time periods. Defendants contend courts assessing *Daubert* issues have identified use of a multiplier as a "telltale sign" of a lack of reliability, Aug. 2, 2005 Tr. at 497; **[\*\*52]** *see* Defs.' Intro. & Overview to Mot. to Exclude Expert Witness Test. (Doc. 1378) at 12, and that Dr. Goble arbitrarily selected the multiplier he used.

There are at least two fundamental problems with Defendants' argument. First, they cite no authority supporting their assertion that courts consider use of a multiplier a sign that an expert analysis is unreliable. The only authority cited in support of this proposition, *In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3rd Cir. 1994)*, does not address this issue. Instead, it affirms the district court's holding that there was no scientific justification for an expert's recalculation of certain blood test results. *Id. at 772-73*. That this recalculation involved the use of a multiplier played no part in this decision. Moreover, the Third Circuit noted that the recalculation, presumably using a multiplier, might be acceptable in other circumstances. *Id. at 773*.

Second, Defendants misstate Dr. Goble's methodology in making this argument. As he made clear in his expert report and 1999 Declaration, Dr. Goble did not rely on a multiplier to estimate plutonium releases and air concentrations **[\*\*53]** in the periods preceding and following the 1965-70 releases from the 903 pad. Instead, Dr. Goble used various period-specific data, including air monitoring data he considered of sufficient reliability, to estimate plutonium releases from 1954 to 1964 and from 1971 to 1989. Goble Report at 13-14, 38-41; Goble Decl. at 18 & n.15. He then converted the estimated plutonium releases for each period into a percentage of the 1965-70 releases for computational ease in calculating exposure and dose ranges and to capture what he considered to be the better characterization of uncertainty in the 1965-70 data. *See* Goble Report at 41-42, Table 4.2; Goble Decl. at 18. Thus, while Dr. Goble *expressed* his estimated plutonium releases for these other periods as a multiplier of the 1965-70 releases for purposes of subsequent calculations, he did not *base* these estimates on the 1965-70 releases or some multiplier thereof. What little effort Defendants made to challenge the method by which Dr. Goble arrived at these multipliers is incomplete and not persuasive. Defendants' contention that Dr. Goble relied on arbitrarily selected multipliers of 1965-70 plutonium releases for these other periods, **[\*\*54]** therefore, and

their arguments **[\*1095]** against admission of his testimony on this basis, are without merit.

For all of the reasons stated above, I find no merit in Defendants' challenges to the relevance and reliability of Dr. Goble's intended testimony under *Rule 702*. Plaintiffs have demonstrated that Dr. Goble's testimony is relevant to this action and that it is the product of the "same level of intellectual rigor that characterizes the practice of an expert in the field." *Kumho Tire, 526 U.S. at 152*. Dr. Goble's expert testimony is therefore admissible under *Rule 702*.

**2. Dr. Richard Clapp**

Dr. Clapp is an epidemiologist with a Master of Public Health degree from Harvard University and a Doctor of Science degree from Boston University's School of Public Health, where he is currently a Professor in the Department of Environmental Health. From 1980-89, Dr. Clapp served as Director of the Massachusetts Cancer Registry in the Massachusetts Department of Public Health. He is a member of several professional organizations and has published a number of studies on cancer and other diseases in peer-reviewed scientific journals. He also has advised graduate students and had **[\*\*55]** other experience in research on the health effects of emissions from U.S. nuclear facilities, and has been qualified as an expert in numerous federal and state courts. Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 4 [hereinafter "Clapp Report"] P 1.

Epidemiological studies seek to determine whether there is an association between exposure to a particular agent or agents and disease. Michael D. Green *et al*, *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 333, 337, 348 (2d ed. 2000) [hereinafter *"Ref. Guide on Epidemiology"*]. An association exists when exposure and disease occur more frequently together than one would expect by chance. *Id.* at 348. Epidemiological studies frequently express the existence and strength of any observed association between exposure and disease as "relative risk." *Id.* A relative risk of 1.0, also referred to as the "null hypothesis," signifies that no association between exposure and disease was observed. *Id.* at 349; *see DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 945, 947 (3rd Cir. 1990)*. If the relative risk is greater than 1.0, then there is a positive association because **[\*\*56]** the risk in the exposed individuals or group is greater than the risk in unexposed individuals or groups.

580 F. Supp. 2d 1071, *1095; 2006 U.S. Dist. LEXIS 89121, **56

*Ref. Guide on Epidemiology* at 349.

Where there is a positive association between the exposure and disease, epidemiologists consider further whether the association represents a causal relationship between exposure to the agent and the disease. *See id.* at 348-49, 374-75. However, "epidemiology cannot objectively prove causation; rather causation is a judgment by epidemiologists and others interpreting epidemiological data." *Id.* at 374.

For this case, Dr. Clapp conducted an epidemiological study to assess the pattern of cancer incidence in relation to an exposure source, the Rocky Flats plant. *Id.*; Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 5 [hereinafter "Clapp Dep."] at 214. To accomplish this, Dr. Clapp analyzed cancer incidence data obtained from the Colorado Central Cancer Registry to compare the odds of a person developing lung or bone cancer in a target geographic area immediately east and south of the Rocky Flats plant with the odds of developing these cancers in more distant areas of Jefferson County. Dr. Clapp used zip codes to define the target [**57] area, which includes all or most of the Class Area, and also to define the separate reference area. Clapp Report P 8 & App. 3. Dr. Clapp selected the [*1096] zip codes for the target area based on whether the centroid of the zip code area was found within the inner two contours of Krey and Hardy's mapping of plutonium contamination in soil around Rocky Flats. *Id.* Krey and Hardy's plutonium contours also define the Class Area.

Dr. Clapp employed a standard epidemiologic methodology, known as age-standardized odds ratio analysis, to perform his comparison. [19] *See id.* P 8. The methodology used by Dr. Clapp is also known as an ecological study or analysis. Dr. Clapp performed comparisons for three time periods, 1979-83, 1984-88 and 1989-92, and, in the case of lung cancer, analyzed the data for men and women separately.

> [19] Defendants' expert, Dr. Geoffrey R. Howe, referred to this method as proportionate cancer incidence analysis. *See* Pls.' Cons. *Daubert* Resp., Ex. 35 at 164-65.

By calculating and comparing [**58] the odds ratios for the target area population with the corresponding odds ratios for the reference area population, Dr. Clapp found there was an increased incidence of both bone and lung cancers in the target population in the two plutonium

contours closest to Rocky Flats, *see id.* P 8-10, which he concluded was "indicative of an on-going health effect" related to proximity to Rocky Flats, *id.* P 12. Dr. Clapp testified in deposition that he had used the exact same methodology employed in reaching these conclusions in several published, peer-reviewed works and in expert testimony admitted in at least four trials. *See* Clapp Dep. at 300-03.

Defendants argue Dr. Clapp's expert testimony should be excluded in its entirety under *Rule 702* because it is not relevant to the issues to be tried and because both his methodology and the conclusions he drew from it are unreliable. Defendants do not challenge Dr. Clapp's qualifications, which are clearly sufficient.

*Relevance/fit*

Defendants' principal argument here is that Dr. Clapp did not analyze risks for persons who owned property in the Class Area as of the Class membership, June 7, 1989, with the result that the increased [**59] cancer incidence he reported is neither common to the Class nor class-wide. [20] As a result, according to Defendants, Dr. Clapp's study cannot demonstrate a common or class-wide risk and is therefore irrelevant to this action. Defendants' argument misses the point. It is not Plaintiffs' burden to show that all or some Class members have been diagnosed with cancer or some other disease because of exposure to plutonium or other hazardous substances released from Rocky Flats. The issue, as presented by Plaintiffs' nuisance claims, is one of risk, *e.g.*, whether Defendants interfered with the use and enjoyment of Class properties because past, current or potential future exposure to plutonium or other toxic substances released from Rocky Flats poses an increased health risk to occupants of the Class Area. Evidence that the population [*1097] residing in the reportedly plutonium-contaminated area adjoining the plant has experienced an increased incidence of lung and bone cancer is relevant to this question and will assist the jury in deciding it.

> [20] Specifically, Defendants point to the fact that members of the Class purchased their properties at different periods, including just before the Class membership date, and to Dr. Clapp's testimony that the latency period for lung cancer is approximately 20-35 years and for bone cancer is approximately 10-25 years. *See* App. to Defs.' Mot. re: Pls.' Risk Experts (Doc. 1377), Ex. 5

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 175 of 332

Page 18

580 F. Supp. 2d 1071, *1097; 2006 U.S. Dist. LEXIS 89121, **59

(excerpts from Clapp deposition) at 100-03. Taken together, Defendants assert, this means that Dr. Clapp's study of cancer incidences between 1979 and 1992 fails to address any actual increase in lung and bone cancer incidences among Class members, because the latency period for many Class members has not yet run, and, turning this proposition around, does not reflect the results of any plutonium exposure to the many Class members who purchased their Class properties after 1982, the last period of exposure reflected in Dr. Clapp's results using his latency periods.

[**60] Defendants next argue Dr. Clapp's testimony is irrelevant because his target area is larger than the Class Area. There is no dispute, however, that Dr. Clapp's zip-coded defined target area encompasses all or most of the Class Area. This renders his study relevant to the question of risk to persons in the Class Area. That his target area includes some additional areas slightly further from the plant, and presumably having lower levels of plutonium in soil and fewer airborne contaminants as a result, does not change this conclusion.

Defendants finally contend that Dr. Clapp's work is irrelevant because he failed to take into account or assess plutonium exposure. This argument misreads Dr. Clapp's study. As described above, Dr. Clapp defined his target area by reference to the Class Area, which itself is defined by the reported pattern of plutonium contamination caused by releases of plutonium from the plant. Thus his study takes account of plutonium exposure. Defendants' further complaint that Dr. Clapp did not perform a formal exposure assessment as part of his study has no bearing on the relevance or "fit" of his intended testimony. [21]

21 Defendants also make no showing that such a formal assessment is required to establish the reliability of the type of epidemiological study Dr. Clapp performed.

[**61] *Reliability*

Defendants argue Dr. Clapp's study and conclusions are unreliable and hence inadmissible for numerous reasons, starting with his use of an ecology study as his method of analysis. Relying primarily on the opinion of their rebuttal expert, Dr. Geoffrey Howe, Defendants assert that ecological studies are inherently unreliable and therefore inadmissible under *Rule 702*. Ecological

studies, however, are one of several methods of epidemiological study that are well-recognized and accepted in the scientific community. [22] *See, e.g., Ref. Guide on Epidemiology* at 344-45; Kenneth J. Rothman & Sander Greenland, *Modern Epidemiology* 77, 459-80 (2nd ed. 1998). Both the scientific community and courts considering such studies view them as useful for establishing associations between exposure to a particular condition and disease, but as relatively weak evidence for establishing a conclusive or definitive causal relationship between exposure and the disease in question. *See, e.g., Ref. Guide on Epidemiology* at 344 (ecological studies "may be useful for establishing associations but they rarely provide definitive causal answers"); *Modern Epidemiology* at 78 (ecological [**62] studies useful for detecting associations between exposure and disease occurrence); *Ruff v. Ensign-Bickford Indus., Inc., 168 F. Supp. 2d 1271, 1282 (D. Utah 2001)* (ecological studies generally provide "relatively weak evidence for establishing a conclusive cause and effect relationship"); *In re Hanford Nuclear Reservation Litig., 1998 U.S. Dist. LEXIS 15028, No. CY-91-3015-AAM, 1998 WL 775340 at *106 (E.D. Wash Aug. 21, 1998)* (same), *rev'd on other grounds, 292 F.3d 1124 (9th Cir. 2002)*. This relative weakness as to causation goes to the weight to be accorded ecological studies in proving causation, and does not render these studies or opinions [*1098] based on them *per se* unreliable as a matter of science or law. *See In re Hanford, 1998 U.S. Dist. LEXIS 15028, 1998 WL 775340 at *106*. Dr. Clapp, in fact, reported he has testified as an expert based on this same methodology on at least four occasions, Clapp Dep. at 300-03, and Defendants cite no case in which a court excluded expert testimony regarding an ecological study on the ground that such testimony was inherently unreliable. [23]

22 An "ecological" or "aggregate" epidemiology study focuses on a comparison of groups, rather than individuals as is the case in other types of epidemiological studies. *See, e.g., Ref. Guide on Epidemiology* at 344; *Modern Epidemiology* at 77. Ecological studies are widely used in the field because they offer many practical advantages over other types of epidemiological studies. *See Modern Epidemiology* at 462, 469.

[**63]

23 The only evidence cited or provided by Defendants concerning the reliability of ecological studies, other than their expert's affidavit, is an excerpt from a 1995 National

580 F. Supp. 2d 1071, *1098; 2006 U.S. Dist. LEXIS 89121, **63

Research Council publication. The excerpt provided by Defendants is too incomplete to determine the context informing its comments on ecological studies. *See* App. to Defs.' Mot. re: Pls.' Risk Experts (Doc. 1377), Ex. 28. Even taken at face value, however, the comments there are not determinative in light of the scientific and legal authority cited above.

Defendants next claim that Dr. Clapp's study and the conclusions he drew from it are unreliable because they failed to comply with four factors or criteria for drawing causal interferences from epidemiological studies: accounting for known confounders, temporal trend, biological plausibility, and dose-response relationship.

Defendants cite no authority, scientific or legal, that compliance with all, or even one, of these factors is required for Dr. Clapp's methodology and conclusions to be deemed sufficiently reliable to be admissible under *Rule 702*. The scientific **[**64]** consensus is, in fact, to the contrary. It identifies Defendants' list of factors as some of the nine factors or lenses that guide epidemiologists in making judgments about causation. *Ref. Guide on Epidemiology* at 375. These factors are not tests for determining the reliability of any study or the causal inferences drawn from it, as Austin Bradford Hill, the author of these factors, made clear:

> What I do not believe -- and this has been suggested -- [is] that we can usefully lay down some hard-and-fast rules of evidence that must be obeyed before we can accept cause and effect. None of my nine viewpoints [factors] can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as *sine qua non*.

A.B. Hill, *The Environment and Disease: Association or Causation*, 58 Proceedings of the Royal Society of Medicine 295, 299 (1965). The Reference Manual on Scientific Evidence and other authority are in accord with this view. *See, e.g., Ref. Guide on Epidemiology* at 375; *Modern Epidemiology* at 28 ("there is no necessary or sufficient criterion for determining whether an observed association is causal").

Defendants' **[**65]** specific complaints regarding each factor as a basis for challenging the reliability and admissibility of Dr. Clapp's study and conclusions are also unsupported or unpersuasive. As defense expert Dr. Howe acknowledged, ecological studies in general do not account for known confounders. *See* App. to Defs.' Mot. Re: Pls.' Risk Experts (Doc. 1377), Ex. 27 [hereinafter "Howe Aff."] P 16; Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 34 [hereinafter "Howe Report"] at 12-13. This is one of the reasons that ecological studies, while recognized and accepted in the scientific community, are viewed as less probative of causation than some other types of epidemiological studies. As stated earlier, the relative weakness of ecological studies on causation issues, because of confounding or other standard concerns, goes to the weight to be accorded to these studies, and does not render them inadmissible. [24]

> [24]   The same is true of Defendants' contention that Dr. Clapp's methodology is unreliable because, due to migration in and out of the target area, he could not guarantee that each individual who reported a cancer incidence while living in the target area had actually been exposed to releases of plutonium or other toxic chemicals from Rocky Flats. *See* Defs.' Mot. re: Pls.' Risk Experts at 49. This migration-related problem is, according to Dr. Howe, another standard limitation on ecological studies, *see* Howe Report at 12-13, and as a result goes to the weight of Dr. Clapp's testimony.

**[*1099]** **[**66]** Defendants next assert Dr. Clapp's conclusions are scientifically unreliable because he testified at his deposition that he found no consistent temporal trend in the incidence of lung and bone cancer. Defendants do not explain why this fact is of significance here, and did not include in the record enough of Dr. Clapp's deposition testimony for me to determine exactly what Dr. Clapp and the questioner were referring to in their discussion of temporal trends. The scientific literature establishes, however, that the focus of this "factor" is more properly on the temporal or chronological relationship of exposure and disease, that is, whether the putative cause preceded the putative effect. *See, e.g., Ref. Guide on Epidemiology* at 376; *Modern Epidemiology* at 25. Defendants do not and cannot make any argument that the excess lung and bone cancer incidences found by Dr. Clapp during the 1979-92 study period preceded Defendants' activities at Rocky Flats.

580 F. Supp. 2d 1071, *1099; 2006 U.S. Dist. LEXIS 89121, **66

Defendants' assertion that Dr. Clapp's expert testimony must be excluded because his opinions are not biologically plausible is also not persuasive. Defendants cite only the opinion of their rebuttal expert, Dr. Howe, for this [**67] position. Dr. Howe based his opinion in part on his view that ecological studies assessing radiation exposure and cancer incidence do not produce biologically plausible results as compared to the results of his preferred methodology, risk projection modeling. *See* Howe Aff. P 17; Howe Report at 4-5, 11-12, 13, 21. Dr. Howe also criticized the biological plausibility of Dr. Clapp's study and conclusions because Dr. Clapp did not design and interpret his ecological study according to Dr. Howe's preferred approach for such studies. Howe Report at 15-17, 21. It is not my role here, however, to determine whether Dr. Howe or Dr. Clapp's methodology is the most reliable. It is only to decide, as a threshold matter, whether Dr. Clapp's testimony is the product of reliable principles and methodologies reliably applied to sufficient and appropriate data. *Fed. R. Evid.* 702; *see Ruiz-Troche v. Pepsi Cola, 161 F.3d 77, 85 (1st Cir. 1998)* ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.") (quoted with approval in Fed. R. Evid. 2000 advisory committee's [**68] notes). The disagreements between Drs. Clapp and Howe on the best methodology to use and the biological plausibility of the results obtained from their competing methodologies do not cast doubt on this threshold question, but rather go to the weight of their respective testimony.

Defendants also argue Dr. Clapp's testimony must be excluded because "Plaintiffs failed to meet their burden of establishing Dr. Clapp's rate of error." Defs.' Mot. re: Pls.' Risk Experts at 51. Defendants cite no authority establishing that Plaintiffs have a "burden" of establishing Dr. Clapp's rate of error or that a study that does not include a calculated "rate of error" is *per se* inadmissible. 25 Moreover, Defendants ignore that Dr. Clapp calculated confidence intervals for his results, which is a recognized and accepted statistical [*1100] method for assessing whether these results were the result of random error. *See Ref. Guide on Epidemiology* at 354. In his deposition, Dr. Clapp testified there was no way to provide a more general estimate of the possibility that the results of his study did not reflect the truth. *See* App. to Defs.' Mot. re: Pls.' Risk Experts (Doc. 1377), Ex. 5 (excerpts from [**69] Clapp deposition) at 307. Defendants have not argued or presented evidence that

this statement was inaccurate or that there is, in fact, a method by which an overall "rate of error" can be calculated for an epidemiological study.

25   The Supreme Court in *Daubert* identified the "rate of error" in an expert's work as one of the factors that may be relevant to deciding its reliability, *see 509 U.S. at 594*, but that does not make production of a "rate of error" a litmus test for determining the admissibility of an expert's work. *See, e.g., Kumho Tire, 526 U.S. at 149-50; Bitler, 400 F.3d at 1233*.

Finally, Defendants assert that Dr. Clapp's expert testimony is unreliable and must be excluded because his study did not produce statistically significant results. "Statistical significance" assesses the probability that a particular outcome is due to random variation in the study population, that is, is due to chance rather than a true association between the exposure [**70] and disease. *See Ref. Guide on Epidemiology* at 354; *DeLuca, 911 F.2d at 946-47*. With respect to an epidemiological study, it involves the calculation of the "p-value" for any association between an agent and disease observed in the study, and a comparison of this value to a preselected significance level. *See Ref. Guide on Epidemiology* at 357; *Modern Epidemiology* at 184; *DeLuca, 911 F.2d at 947*. The most commonly utilized significance level in science is .05, but this is recognized to be an arbitrary selection and other significance levels can and have been used. *See, e.g., Ref. Guide on Epidemiology* at 357-58.

If the p-value for a particular study result is less than the selected significance level, then that result is said to be "statistically significant," which means the probability that the observed association is the result of chance rather than a true association is less than the stated significance level. *Ref. Guide on Epidemiology* at 357 & n.64; *DeLuca, 911 F.2d at 947*. If the p-value is greater than the significance level, then the result is said to be statistically insignificant, which means there is [**71] insufficient evidence at the selected significance level to reject the "null hypothesis" of the observed association being a product of chance rather than a true association. Sander Greenland, *The Need for Critical Appraisal of Expert Witnesses in Epidemiology and Statistics*, 39 Wake Forest L. Rev. 291, 298 (2004). It is important to note that "statistically insignificant" results do *not* indicate that it is probable the results were a product of chance or that they otherwise do not reflect a true

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 178 of 332

Page 21

580 F. Supp. 2d 1071, *1100; 2006 U.S. Dist. LEXIS 89121, **71

association. *See id.*; *Ref. Guide on Epidemiology* at 357 n.64 (commenting that some courts have confused this issue); *id.* at 358 n.67 (significance testing does not assess whether the null hypothesis, *i.e.*, that there is no real association, is true). [26]

> 26  The statistical significance or nonsignificance of study results also does not address the magnitude of any association found by the study. For example, a study may find a very weak association between an agent and disease and yet be "statistically significant," or may find a strong association but, because of the sample size, not be statistically significant. *See, e.g., Ref. Guide on Epidemiology* at 359 & n.71. In other words, "[s]tatistically significant results are not necessarily significant (important), and significant (important) results are not necessarily 'statistically significant.'" David Egilman et al., *Proving Causation: The Use and Abuse of Medical and Scientific Evidence Inside the Courtroom -- An Epidemiologist's Critique of the Judicial Interpretation of the Daubert Ruling*, 58 Food & Drug L.J. 223, 238 (2003).

[**72] An alternate means of assessing the probability of random error in study results is through the use of confidence intervals. *Ref. Guide on Epidemiology* at 354-55; *DeLuca, 911 F.2d at 947-48*. A confidence interval is a range of values, [*1101] calculated from the results of a study, within which the true value is likely to fall. *Ref. Guide on Epidemiology* at 360; *see DeLuca, 911 F.2d at 948*. A 95% confidence interval for an epidemiological study, for example, "is constructed with enough width so that one can be confident that it is only 5% likely that the relative risk attained would have occurred if the true parameter, i.e., the actual unknown relationship between the two studied variables, were outside the confidence interval." *DeLuca, 911 F.2d at 948*. The width of the interval reflects the possibility that the relative risk, that is the observed association between exposure and disease, is a product of random error. *See Ref. Guide on Epidemiology* at 360. This method of assessing study results is viewed as superior to significance testing by some leading epidemiologists. *See DeLuca, 911 F.2d at 946-48* (describing [**73] views of Kenneth J. Rothman in his epidemiology text book, *Modern Epidemiology*); *Ref. Guide on Epidemiology* at 360 & n.75 ("Calculation of a confidence interval permits a more refined assessment of appropriate inferences

about the association found in an epidemiological study," citing views of Rothman and others).

Although it need not be used for this purpose, a confidence interval can also be used to infer the p-value and thus can be used as a surrogate test for significance. A 95% confidence interval, for example, that does not include the null hypothesis (relative risk of 1.0, which indicates no association between the agent and disease) indicates that there is a less than 5% chance that the observed association is the result of random error or chance. *See Ref. Guide on Epidemiology* at 361. This is equivalent to a p-value of less than .05, meaning the study result is "statistically significant." *Id.* Conversely, if the null point falls within the 95% confidence interval, then the study result is not deemed "statistically significant" under a significance level of .05. *See id.*; *DeLuca, 911 F.2d at 948*.

In this case, Dr. Clapp calculated confidence [**74] intervals for the results of his study, but did not calculate their p-value. *See* App. to Defs.' Mot. re: Pls.' Risk Experts (Doc. 1377), Ex. 5 (excerpts from Clapp deposition) at 226. He also testified at his deposition that he did not consider statistical significance in interpreting these results and that this was consistent with his general practice in interpreting studies such as this. *Id.* at 126-27.

When questioned on the subject, Dr. Clapp further testified that the confidence intervals for his results did not indicate an excess of lung cancer in any time period or for any exposure scenario that would be considered statistically significant under the conventional .05 significance level. *Id.* at 128. This testimony differs from that of defense expert Dr. Howe, who acknowledged finding a statistically significant increase in the incidence of lung cancer in the 1989-92 period for men residing within the plutonium contours closest to Rocky Flats in the confidence levels he generated in a recreation of Dr. Clapp's study. *See* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 35 [hereinafter "Howe Dep."] at 194; Howe Report, Table 5. Dr. Howe discounted this outcome because [**75] he preferred a different method of grouping the study population that did not produce any statistically significant results, and because he considered a finding of one or more statistically significant results itself a matter of chance given the number of results generated under Dr. Clapp's study design. [27] [*1102] *See* Howe Report at 19-20; Howe Dep. at 194.

> 27  Defendants allege Dr. Clapp, by dividing his

580 F. Supp. 2d 1071, *1102; 2006 U.S. Dist. LEXIS 89121, **75

study population into 24 overlapping groups, deliberately "designed his analysis so as to substantially increase his chances of finding a statistically significant result purely by random chance." Defs.' Mot. re: Pls.' Risk Experts at n.11. I find no basis for this personal attack on Dr. Clapp and the integrity of his study. Dr. Clapp provided a reasoned, science-based explanation for his study design and study groups, and nothing in the record suggests any improper purpose in his design or analysis.

Defendants argue that the lack of statistically significant results reported by Dr. Clapp renders his study unreliable [**76] as a matter of science and inadmissible as a matter of law under *Rule 702*. [28] In addition to disregarding the statistically significant results for excess lung cancer reported by Dr. Howe, this contention is based on Defendants' assertion that "[t]o *prove* with expert evidence that it is more likely than not that plaintiffs were placed at an increased risk by exposure to hazardous substances, a party must make a threshold showing that the expert's study reveals statistically significant results." Defs.' Mot. re: Pls.' Risk Experts at 44 (emphasis added). This argument, of course, confuses the threshold question of admissibility of expert evidence with the separate question of its sufficiency to prove a factual issue. *See, e.g., In re Joint E. & S. Dist. Asbestos Litig., 52 F.3d at 1132* (distinguishing inquiry into threshold question of whether expert evidence is admissible from inquiry into whether this and other evidence is sufficient to present jury question); *see also Obrey v. Johnson, 400 F.3d 691, 696 (9th Cir. 2005)* (same and stating "[a]s a general matter, so long as the evidence is relevant and the methods employed are sound, neither [**77] the usefulness nor the strength of statistical proof determines admissibility under *Rule 702*.").

> 28   Defendants do not challenge the reliability of Dr. Clapp's work based on the confidence intervals he reported.

Defendants nonetheless implied in their briefs and in oral argument that statistical significance is a threshold requirement for establishing the admissibility of expert testimony involving the use of statistics. They failed, however, to cite any scientific or legal authority for this proposition with respect to epidemiological studies or in general.

In fact, as admitted by Defendants' own expert, Dr. Howe, there is a considerable dispute in the scientific community about the necessity or even relevance of statistical significance testing to epidemiological studies. Howe Dep. at 201-203; *see Ref. Guide on Epidemiology* at 359-60; Greenland, *The Need for Critical Appraisal*, *39 Wake Forest L. Rev. at 299* ("Significance testing is neither necessary nor appropriate as a requirement for [**78] drawing inferences from epidemiological data;" internal quotation omitted); *Modern Epidemiology* at 183-84 (explaining historical basis of significance testing and its limits as applied to epidemiological studies). This dispute, and the corresponding move by some in this field away from using p-values and "statistical significance" as a means of determining what conclusions and inferences can be reliably drawn from an epidemiological study, has been recognized by the courts, *see, e.g., DeLuca, 911 F.2d at 946-48*, and influential commentators and epidemiologists. [29] *See, e.g.*, Greenland, *Need for Critical Appraisal*, *39 Wake Forest L. Rev. at 297-301* (criticizing misuse of statistical significance in legal proceedings, and particularly improper assumption that a finding of nonsignificance demonstrates that an observed association is false because it is most likely a product of chance); David Egilman et al., *Proving Causation: The Use and Abuse of Medical and Scientific Evidence Inside the Courtroom - An* [*1103] *Epidemiologist's Critique of the Judicial Interpretation of the Daubert Ruling, 58 Food & Drug L.J. 223, 236-41 (2003)* (significance [**79] testing "is merely a statistical tool that is frequently - and often inappropriately - utilized in the process of testing inferences. The notion expressed by some courts that epidemiologists only draw inferences from data that demonstrate 'statistical significance' is not true."). Defendants' assertion that an epidemiological study must produce "statistically significant" results to satisfy the "reliability" prong of *Rule 702* is thus contrary to some of the evolving views in this field of science and provides no basis for excluding Dr. Clapp's testimony. [30] The statistical significance or insignificance of Dr. Clapp's results may affect the weight given to his testimony, but does not determine its admissibility under *Rule 702*. [31]

> 29   Dr. Howe described the movement in epidemiology away from use of statistical significance as "reasonably widespread." Howe Dep. at 203.
> 30   Reliance on statistical significance to determine the admissibility of expert evidence has

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 180 of 332

Page 23

580 F. Supp. 2d 1071, *1103; 2006 U.S. Dist. LEXIS 89121, **79

been rejected by courts in other contexts as well. *See, e.g., Kadas v. MCI Systemhouse Corp., 255 F.3d 359, 362 (7th Cir. 2001)* (age discrimination suit). As Judge Posner observed in criticizing such reliance, "[l]itigation generally is not fussy about evidence; much eyewitness and other nonquantitative evidence is subject to significant possibility of error, yet no effort is made to exclude it if doesn't satisfy some counterpart to the 5 percent significance test." *Id.*

**[**80]**

31    Some courts have stated or suggested that statistically significant epidemiological studies are required for a party to meet its burden of producing *prima facie* evidence of medical causation. *See, e.g., Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307, 312*, as amended, *884 F.2d 166 (5th Cir. 1989)*; *but see, e.g., Allen v. United States, 588 F. Supp. 247, 417 (D. Utah 1984)* ("The cold statement that a given relationship is not 'statistically significant' cannot be read to mean there is no probability of a relationship."). In light of the reevaluation of "statistical significance" in epidemiology as described above, *Brock* and other decisions using statistical significance as a bright-line test for the sufficiency of causation evidence may be subject to reevaluation. Even if this were not the case, the showing necessary to meet the burden of proof on medical causation is distinct from the question presented here, which is whether Dr. Clapp's epidemiological study is sufficiently grounded in reliable principles and methodology for its results to be admitted and considered by the jury in connection with Plaintiffs' nuisance claim.

**[**81]** In sum, after considering all of the parties' arguments concerning Dr. Clapp's methodology, I find that Dr. Clapp, in conducting his study and reporting its conclusions, employed scientifically sound methods and based his conclusions on facts that satisfy *Rule 702*'s reliability requirements. I therefore find Plaintiffs have met their burden of demonstrating that Dr. Clapp's methodology is reliable within the meaning of *Rule 702* and that it is admissible in this action. Defendants' criticisms of Dr. Clapp's methods and conclusions, considered singly or collectively, are matters that go to the weight of his testimony and that may be tested through vigorous cross-examination and the presentation of rebuttal evidence.

I will break here from reporting the basis of my pretrial rulings on the parties' *Daubert* motions to address briefly an additional motion to exclude Dr. Clapp's testimony filed by Defendants, this time during trial in the middle of Dr. Clapp's testimony. I denied the motion from the bench after a recess, but told the parties at the time that I would address it further in this written decision. *See* Order Limiting Mots. Practice During Trial (Doc. 1626) at 2.

In **[**82]** their second attempt to strike and exclude Dr. Clapp's testimony, Defendants renewed their unsuccessful argument that Dr. Clapp's testimony was inadmissible because his epidemiological study did not produce statistically significant results. The only difference between Defendants' original and renewed argument was their **[*1104]** assertion for the first time that the Tenth Circuit had specifically rejected "Dr. Clapp's blase attitude towards statistical significance" and "adopted statistical significance at the 95-percent confidence level as a [sic] evidentiary threshold for epidemiological studies." Defs.' Mot. to Strike and Exclude Test. of Dr. Richard Clapp (Doc. 1620) at 4. Defendants represented the Tenth Circuit had established this unequivocal rule in two decisions, *Renaud v. Martin Marietta Corp., 972 F.2d 304 (10th Cir. 1992)*, and *Boughton v. Cotter Corp., 65 F.3d 823 (10th Cir. 1995)*. 32 In fact, neither decision stands for any such proposition.

32    Defendants offered no explanation for failing to mention either of these allegedly controlling decisions in their June, 2005, motion to exclude Dr. Clapp's expert testimony.

**[**83]** In *Renaud*, residents of a Denver suburb alleged they had been exposed to toxic chemicals released from the defendant's manufacturing facility and that this exposure had caused them to suffer a variety of injuries. *See Renaud, 972 F.2d at 305.* Plaintiffs' theory of exposure, based on expert reports and testimony, was that waste water containing a certain level of toxic chemicals had been discharged by the defendant into local surface and ground waters on a regular basis for more than a decade, and that these chemicals had made their way to a near-by water treatment plant and from there to the plaintiffs' homes through the city water supply system. *Id. at 307.* All of the expert evidence offered in support of this theory rested on a single data point, a water sample collected in a wastewater pond at

580 F. Supp. 2d 1071, *1104; 2006 U.S. Dist. LEXIS 89121, **83

the defendant's facility. *Id.*

On summary judgment, the district court considered whether the plaintiffs had presented a *prima facie* case that contaminants from the defendant's facility had reached the plaintiffs' taps in quantities sufficient to cause the injuries they alleged. *Renaud v. Martin Marietta Corp., 749 F. Supp. 1545, 1548 (D. Colo. 1990).* **[**84]** Invoking the testimony of the court's appointed geochemical expert that "[i]t is unsound scientific practice to select one concentration measured at a single location and point in time and apply it to describe continuous releases of contaminants over an 11-year period," the district court excluded the conclusions of plaintiffs' exposure experts, *id. at 1553,* and therefore granted summary judgment against the plaintiffs based on their failure to present evidence that they were ever exposed to toxic chemicals from the defendant's facility. *Id. at 1555.*

In its decision, the district court also commented in dicta that the *Renaud* plaintiffs could have but did not offer epidemiological studies as indirect or circumstantial evidence of exposure, [33] and that "even if plaintiffs had been able to prove exposure by their direct evidence, they would have been required to submit epidemiological evidence in support of their causation contentions." [34] *Id. at 1554-55.* In the course of these comments, the court observed that the Fifth Circuit, "when addressing a similar argument," had found that a plaintiff's "'failure to present statistically **[**85]** significant epidemiological proof that Bendectin causes limb reduction defects to be fatal to their case.'" *Id. at 1555* (quoting *Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307, 313, 315,* **[*1105]** as amended, *884 F.2d 166 (5th Cir. 1989)*). [35]

[33] The Reference Manual on Scientific Evidence criticizes this assertion, reporting that the district court in *Renaud* "confused the role of epidemiology in proving causation with the issue of plaintiffs' exposure to the alleged carcinogen." *Ref. Guide on Epidemiology* at 344 n.28.

[34] Although Plaintiffs did not present epidemiological evidence to prove causation, they did present Dr. Clapp and another expert to testify in rebuttal to the epidemiological study offered by the defendants. *See 749 F. Supp. at 1551.*

[35] It should go without saying that the district court did not by this statement "adopt[] statistical significance at the 95-percent confidence level" as

the test for proof of medical causation, and even if it had, that this test would go to the sufficiency of epidemiological evidence to prove this issue, and not to the separate question of whether an epidemiological study is admissible for this or some other purpose. *See supra* note 31.

**[**86]** On appeal, the Tenth Circuit stated that the central issue before it was "the propriety of the District Court's observation regarding the single water sample used as a basis for plaintiffs' extrapolations." *Renaud, 972 F.2d at 308.* The Tenth Circuit agreed this extrapolation was unsound, and affirmed the district court's decision to exclude the conclusions of the plaintiffs' exposure experts and to grant summary judgment against plaintiffs based on their failure to make a *prima facie* showing of exposure. *See id.* The Tenth Circuit's only comment on epidemiological studies was to "question, but leave for another day, the dicta of the Court below that a supporting epidemiological study was required here even had there been acceptable direct proof of exposure." *Id. at 308 n.7.* The court made no mention of statistical significance or any test for the admission of epidemiological studies. In short, there is nothing in the Tenth Circuit's decision in *Renaud,* and next to nothing in the lower court's decision, to support Defendants' repeated declarations in their trial motion and at oral argument, *see* Nov. 10, 2005 Trial Tr. at 4891-4901, that **[**87]** the Tenth Circuit (or any other court) has adopted a rule barring admission of any epidemiological study that was not statistically significant at the 95-percent confidence level. Defendants fare no better in their reliance on *Boughton v. Cotter Corporation.*

Defendants represent that the Tenth Circuit in *Boughton* "affirmed the exclusion of another cancer study on the grounds that 'none of the observed levels of cancer were elevated to a statistically significant level.'" Defs.' Mot. to Strike and Exclude Test. of Dr. Clapp at 4 (quoting *Boughton, 65 F.3d at 835 n.20*). This is simply incorrect. In *Boughton,* the Tenth Circuit considered whether the district court had abused its discretion in excluding evidence of the plaintiffs' fears of cancer and other disease to show damages for "annoyance and discomfort" under nuisance and trespass theories of recovery. *Boughton, 65 F.3d at 831.* The district court's decision was based on its legal conclusion that fear of contracting a disease is compensable under Colorado law as part of "annoyance and discomfort" damages only if the fear of disease is grounded in substantial evidence. [36]

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 182 of 332

Page 25

580 F. Supp. 2d 1071, *1105; 2006 U.S. Dist. LEXIS 89121, **87

*See id. at 834-35.* **[\*\*88]** The Tenth Circuit affirmed this legal interpretation, and also found no abuse of discretion in the trial court's decision to exclude evidence of the plaintiffs' fears, because the sole evidence of risk offered by the plaintiffs, an epidemiological cancer study that did not produce statistically significant results, was insufficient to meet this test. *Id. at 835* & n.20. The Tenth Circuit never considered, let alone decided, whether the cancer study was admissible, but rather considered only whether it was sufficient to demonstrate a factual basis for the plaintiffs' claimed fear of cancer. Again, this is a sufficiency determination, which is distinct from an admissibility determination. *Boughton*, therefore, sets no threshold for the admission of epidemiological studies under *Rule 702*.

> 36    This is not an issue in this case because Plaintiffs do not seek damages for annoyance and discomfort, which is a separate category of damages for nuisance and trespass under Colorado law. *See Cook IX, 273 F. Supp. 2d at 1206-07.*

**[\*1106]   [\*\*89] 3. Dr. Steven Wing**

Dr. Wing is a professor of epidemiology who specializes in studying the health effects of radiation and has extensive experience in evaluating radiation health effects among workers at U.S. Department of Energy (DOE) nuclear facilities. In his expert report, Dr. Wing addressed two subjects: (1) the state of scientific knowledge on human health effects resulting from exposure to plutonium; and (2) the DOE's role in research regarding radiation health effects. Based on his survey of relevant literature and professional experience with both subjects, Dr. Wing concluded that DOE's control of research into radiation health issues has led to gaps in current scientific knowledge about the health effects of plutonium, an understatement of the risks associated with exposure to plutonium, and the promulgation of standards for radiation exposure based on inadequate information regarding the human health effects of plutonium exposure. *See* Pls.' Opp'n to Defs.' Mot. to Exclude Test. of Dr. Wing (Doc. 1472), Ex. 1 [hereinafter "Wing Report"] at 5.

Defendants do not challenge Dr. Wing's qualifications to testify as proposed, and I find he is qualified to do so.

**[\*\*90]** Defendants argue I must exclude Dr. Wing's proposed expert testimony in its entirety because it will not assist the trier of fact and is the product of unreliable methodology and insufficient facts and data. For the reasons stated below, I disagree and find Dr. Wing's proffered testimony admissible under *Rule 702*.

*Relevance/fit*

Dr. Wing's testimony regarding the state of knowledge concerning the health effects of plutonium exposure and the adequacy of current radiation exposure standards will assist the jury in deciding whether exposure to plutonium poses a health risk, which is relevant to Plaintiffs' contention, in connection with their nuisance claims, that the health risk posed by plutonium exposure has interfered with the use and enjoyment of property. *See* May 2005 Order at 5. Dr. Wing's intended testimony regarding radiation exposure standards, and the DOE's role in the research on which they are based, is also relevant to the jury's consideration of Defendants' evidence and arguments that rely in whole or in part on these standards or on the current state of knowledge regarding the health effects of plutonium exposure. *See, e.g.*, Pls.' Opp'n to Defs.' Mot. to **[\*\*91]** Exclude Test. of Dr. Steven Wing (Doc. 1472), Ex. 2 (excerpts of report by Defendants' expert Dr. Auxier) & Ex. 3 (excerpts of report by Defendants' expert Dr. Frazier). Defendants' contention that Dr. Wing's testimony is irrelevant because it does not address the conduct of Dow or Rockwell or seek to determine the actual health risk to Class members from exposure to Rocky Flats plutonium are both strawman arguments, as neither subject need be addressed for Dr. Wing's testimony to be relevant and helpful to the jury. Lastly, I find no merit in Defendants' assertion that Dr. Wing's testimony would not assist the jury and/or would usurp its function of weighing the evidence because the jury could just as easily review all of the voluminous scientific materials Dr. Wing collected and reviewed and draw its own conclusions from them. The scientific expertise and experience utilized by Dr. Wing in his review cannot be duplicated by the jury.

*Reliability*

With respect to reliability, Defendants allege Dr. Wing "formulated his opinions based on a few historical documents selected by plaintiffs' counsel," and assert on this basis that his intended testimony is based on insufficient facts **[\*\*92]** and data. Defs.' Mot. to Exclude Test. of Dr. **[\*1107]** Steven Wing (Doc. 1444) at 7. This statement and argument misrepresent Dr. Wing's expert

580 F. Supp. 2d 1071, *1107; 2006 U.S. Dist. LEXIS 89121, **92

report, in which he detailed the exhaustive search he and his assistants conducted of international biomedical literature to collect and review information concerning the health hazards of plutonium, their search for and review of relevant documents in the database of the Health Division of the Los Alamos National Laboratory and their review of other relevant materials gathered from national and international sources. *See* Wing Report at 5. That Plaintiffs' counsel provided Dr. Wing with a relative handful of documents is neither improper nor any grounds to disregard the vast amount of material Dr. Wing and his assistants collected and that he reviewed to prepare his expert report and testimony.

Defendants also seek to exclude Dr. Wing's testimony based on the rule that any expert testimony that "does not lend itself to any means of testing or verification" must be excluded as unreliable. Defs.' Mot. to Exclude Test. of Dr. Wing at 5. Defendants cite no authority for this supposed rule. To the extent Defendants are relying on the *Daubert* court's [**93] statement of this and other factors for assessing the reliability of expert testimony, it is beyond question that these factors do not apply in all instances and are not automatically determinative in any event. *See, e.g., Kumho Tire Co., 526 U.S. at 150-51; Bitler, 400 F.3d at 1233*. Defendants have not, moreover, identified any means of "testing" Dr. Wing's literature search and review. They also have not pointed to any omissions in his literature review or any other errors in the method Dr. Wing used to arrive at his conclusions. My review of Dr. Wing's report also failed to disclose any reason to doubt the reliability of his methodology.

Defendants disagree with the conclusions Dr. Wing reached based upon his review. This fact does not render his method or conclusions unreliable under *Rule 702*. Their further allegation that Dr. Wing was biased in his review based on his involvement in the *TMI* litigation is a matter that goes to his credibility and the weight to be accorded his opinions.

### 4. Dr. K. Shawn Smallwood

Dr. Smallwood is an ecologist who specializes in systems ecology. Systems ecologists assess ecological conditions, pressures [**94] and vulnerabilities across large geographic areas using a multi-disciplinary approach that identifies and integrates information relevant to the assessment. Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 27 [hereinafter "Smallwood Report"] at

1. Dr. Smallwood holds a Ph.D in ecology and has extensive professional experience in systems ecology. *See id.* & Smallwood curriculum vitae. His research, including the results of a six-year study of pocket gophers, has been published in peer-reviewed journals. *See id.*

For this action, Dr. Smallwood performed a study to evaluate the role of soil bioturbation, or soil turnover due to biological activity, as a mechanism for exposing Rocky Flats contaminants to winds that could transport them to other locations, including off-site. As part of his study, Dr. Smallwood made three visits to the Rocky Flats site over a three month period to evaluate the activities of pocket gophers, other burrowing animals and plants at specific waste disposal areas identified by Defendants, DOE and its contractors at the plant site, including the area in and around the 903 pad. In a lengthy and detailed expert report, Dr. Smallwood reported his observations [**95] of "abundant" animal burrowing and soil excavation in and around the 903 pad, in buried waste trenches and in other areas of known soil [*1108] contamination at the plant site. Smallwood Report at 3-14.

Dr. Smallwood synthesized the information gathered during his site visits with information obtained through an extensive literature review on burrowing animals and soil and other physical and biological characteristics of the Rocky Flats Plant and environs to assess the impacts of burrowing animals on soil contamination at Rocky Flats and beyond. *Id.* at 14-44. Based on this study, Dr. Smallwood concluded that the hazardous materials released, spilled, dumped and buried at the site by Defendants had been and would continue to be redistributed and brought to the surface through bioturbation of soils, where these materials could be entrained by the characteristic high winds in the area and transported to other locations, including off-site. *Id.* at 14, 45-49. He concluded this exposure pathway had not been adequately studied or monitored in the past. Finally, he concluded that, as a result of the process of bioturbation, a substantial quantity of toxic material released at Rocky Flats [**96] likely had been transported off-site, and that people off-site and downwind of the plant site "have been and continue to be at risk of exposure to dangerous materials generated by Rocky Flats operations." *Id.* at 49.

There is apparently no dispute that Dr. Smallwood has published the core elements of his Rocky Flats study

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 184 of 332

Page 27

580 F. Supp. 2d 1071, *1108; 2006 U.S. Dist. LEXIS 89121, **96

and site-specific research in eight separate articles in established scientific journals. He has also presented key elements of his Rocky Flats study to several peer conferences. *See* Pls.' Cons. *Daubert* Resp. at 85-86 & n.66.

Defendants assert all of Dr. Smallwood's proffered testimony should be stricken for a variety of reasons, none of which have merit. Defendants protest, for example, that Dr. Smallwood's testimony does not "fit" this action because Dr. Smallwood did not relate his opinions directly to the Class Area. This argument assumes a requirement that does not exist. It is or should be undisputed that the Class Area is located downwind of the Rocky Flats plant and its potential sources of soil contamination. Dr. Smallwood's proffered testimony regarding the processes by which contaminant-bearing soils from Rocky Flats are available for dispersion [**97] to downwind areas, and his conclusions regarding the current and future risk of continuing exposure to plutonium and other toxic materials through this process, are relevant to the interference element of Plaintiffs' nuisance claims and will assist the jury in deciding them.

Defendants also assert that Dr. Smallwood is not qualified to render any opinions relating to the fate and transport of Rocky Flats contaminants through the process of bioturbation and wind entrainment because he is not qualified to quantify the amount of plutonium or other dangerous contaminants transported to off-site locations, to model the alleged dispersion of these air-borne contaminants, or to quantify radiation doses or the resulting health risk. This argument errs in assuming that any or all of these tasks are a prerequisite to forming the opinions set forth in Dr. Smallwood's report. Defendants provide no scientific or legal support for these assumptions and none is apparent to me. Dr. Smallwood's conclusions regarding the past dispersion of contaminant-bearing soils made available through bioturbation and the risk of future exposure through this pathway all flow from and are part of his analysis of [**98] the process of bioturbation at the plant site and the biological and physical characteristics of the Rocky Flats site. These subjects and analyses are all within Dr. Smallwood's area of expertise. His conclusion, for example, that quantities of dangerous materials from Rocky Flats have been transported [*1109] off-site through the process set out in his report is based on his calculation of the fraction of contaminant-bearing soils that is made available for wind dispersion each year, a subject that is within his area of expertise. Defendants' challenge to Dr. Smallwood's qualitative description of this amount as "substantial" goes to the weight of his testimony and may be addressed on cross-examination. [37]

> [37] Defendants also argue Dr. Smallwood's conclusions regarding future risk are unreliable and without foundation because the waste and disposal areas he examined in 1996 have all now been fully remediated. This factual assertion is largely unsupported in the pretrial record and is undoubtedly disputed by the parties. Whether Dr. Smallwood's study and conclusions are now incorrect because of evidence of changed conditions at the plant site is, moreover, a matter that the jury can decide in assessing the weight and credibility of his testimony.

[**99] Defendants contend Plaintiffs intend to elicit trial opinions from Dr. Smallwood on the potential health risk to Class members from off-site releases of Rocky Flats contaminants, and that he is unqualified to testify on this subject. Dr. Smallwood concluded in his report that the suspended and resuspended plutonium at Rocky Flats is respirable based on studies of plutonium uptake by three species of animals in the vicinity of Rocky Flats. Smallwood Report at 45. This conclusion is within his area of expertise.

The only other portion of Dr. Smallwood's report that touches on potential health risk is a short discussion on how the rate of soil bioturbation can be used to estimate airborne releases of specific contaminants in Rocky Flats soil. To illustrate how this could be accomplished, Dr. Smallwood provided a calculation, based on certain conditions and assumptions, regarding the amount of hexavalent chromium released from Rocky Flats and, in the calculation's final line, the predicted lifetime risk from the calculated releases. Dr. Smallwood's report made clear this was merely an "illustrative example" of how the rate of soil bioturbation could be used to estimate releases and risk. [**100] *Id.* at 46. Dr. Smallwood, as a systems ecologist trained to collect and integrate information from multiple disciplines, is qualified to illustrate how the information on soil bioturbation that he collected and generated can be used for these purposes.

In his expert report Dr. Smallwood also concluded that the ambient air monitoring stations on and off the Rocky Flats site were inadequate to detect and measure

580 F. Supp. 2d 1071, *1109; 2006 U.S. Dist. LEXIS 89121, **100

the past and chronic releases of contaminants caused by the resuspension of surface soils through soil bioturbation. *See id.* at 28. Defendants assert this opinion must be excluded because Dr. Smallwood is not qualified to testify as an air monitoring expert and because the opinion is based on insufficient facts and data. Dr. Smallwood is not, however, testifying as an expert on all aspects of Rocky Flats' air monitoring program, but only on whether the monitoring stations at Rocky Flats would capture the kind of contaminant releases that were the subject of his report. Dr. Smallwood has experience evaluating air monitoring programs, *see* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 28 [hereinafter "Smallwood Dep."] at 65-66, and his work evaluating environmental **[**101]** surveillance and monitoring at nuclear weapons production facilities, including Rocky Flats, has been published in a peer-reviewed journal. *See* Pls.' Cons. *Daubert* Resp., Ex. 29 (Michael L. Morrison, K. Shawn Smallwood & Jan Beyea, *Monitoring the dispersal of contaminants by wildlife at nuclear weapons production and waste storage facilities*, 17 The Environmentalist 289 (1997)). He reported reviewing various information sources, including maps showing the locations of air **[*1110]** monitoring stations, some air monitoring data, and other information, to support his opinion that the Rocky Flats air monitoring stations were too diffuse in the landscape and were not the appropriate height to detect the chronic release of materials through bioturbation. *See* Smallwood Report at 28; Smallwood Dep. at 56, 64. Dr. Smallwood is sufficiently qualified to testify regarding this subject under *Rule 702*, and his opinion is based on sufficient facts and data. That he does not specialize in evaluating air monitoring systems does not affect the admissibility of his opinion but rather its weight. *See, e.g., Ralston, 275 F.3d at 970.*

For the reasons stated above, I find Dr. Smallwood's **[**102]** proposed expert testimony satisfies the requirements for admission under *Rule 702*. Defendants' motion to exclude his testimony and the testimony of Drs. Goble, Clapp and Wing is denied.

## C. Motion to Exclude Plaintiffs' Expert Witness Testimony Relating to Damages

Plaintiffs offered the testimony of four expert witnesses relating to damages: Drs. John Radke, James Flynn and Paul Slovic and Mr. Wayne Hunsperger. Mr. Hunsperger is Plaintiffs' primary damages expert, and he incorporates the work of Drs. Radke, Flynn and Slovic

into his expert report and opinions.

Defendants move to exclude the proffered testimony of each of these witnesses on the grounds that each is unqualified, their proffered testimony will not assist the trier of fact and none used a reliable methodology. *See* Defs.' Am. Br. in Supp. of Mot. to Exclude Expert Witness Test. Relating to Damages (Doc. 1379) [hereinafter "Defs.' Mot. re: Pls.' Damages Experts"]. I address the admissibility of each expert's testimony in turn.

### 1. Dr. John Radke

Dr. Radke holds a Ph.D. in geography from the University of British Columbia. He has held teaching and research positions at Temple University and the University **[**103]** of Pennsylvania. He is currently a tenured professor at the University of California at Berkeley, where he holds appointments in the Department of Landscape Architecture and Environmental Planning, the Department of City and Regional Planning, and the Department of Geography. He is also the director of the Applied Environment Geographic Information Systems ("AEGIS") Laboratory at Berkeley, and has served as an associate dean of computing at the university.

Dr. Radke's proposed expert testimony reports on a three-phase market impact analysis he conducted to assess the effect of proximity to Rocky Flats on property values. *See* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 23 [hereinafter "Radke Report"] at 2. To perform this analysis, Dr. Radke developed a computerized model that used multiple regression analysis to identify, quantify and explain differences in the value of properties near Rocky Flats and properties located elsewhere in the Denver area. *Id.* at 3.

Multiple regression analysis is a standard quantitative method for understanding the relationship between a "dependent variable," a variable to be explained, and "explanatory" or "independent" variables that are **[**104]** thought to produce or be associated with changes in the dependent variable. *See* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in *Reference Manual on Scientific Evidence* 179, 181 (2d ed. 2000) [hereinafter *"Ref. Guide on Multiple Regression"*]. For his regression analysis, Dr. Radke established property value as the dependant variable and developed a large number of explanatory variables with a

580 F. Supp. 2d 1071, *1110; 2006 U.S. Dist. LEXIS 89121, **104

potential to affect [*1111] property value. Dr. Radke's analysis, for example, incorporated standard variables regarding the physical attributes of the individual property being analyzed, such as the size of the parcel and the size, age and attributes of any buildings on it. Radke Report at 4, 11-12, 24, 32-33. Employing his expertise in geographic information systems ("GIS") and spatial modeling, Dr. Radke also developed and incorporated additional variables relating to location-based characteristics of the property, such as neighboring land use, employment levels, demographic data, crime and poverty, traffic volume, accessibility to open space, topography, viewshed and auto travel time to employment and other locations. Id. at 4, 12, 25-32, 33.

In Phase I of his [**105] study, Dr. Radke and his staff at the AEGIS laboratory measured the effect of proximity to Rocky Flats on the value of three categories of property: commercial properties, multi-residential properties and vacant land. Id. at 2, 23-32. His Phase I data set consisted of records for approximately 10,000 real estate transactions for these categories of property obtained from a commercial source. Id. at 23. The data set included all transactions in these categories that occurred from 1983 to the end of 1993. Id. Because there was not sufficient data to perform a year-by-year analysis for each property category, Dr. Radke pooled the sales records for each property category for this 11-year period. Id. at 5. For the period as a whole, Phase I of Dr. Radke's study reported mean undervaluations for Rocky Flats area properties of approximately 22 percent for multi-residential properties, 32 percent for vacant land and 53 percent for commercial properties. Id. at 6. The confidence level reported for these results ranged from 85 to 93 percent. Id. at 6-7.

In Phase II of his study, Dr. Radke analyzed the effect of proximity to Rocky Flats on the value of a fourth category [**106] of properties, single family residential properties. His data set consisted of sales records obtained from the Multiple Listing Service ("MLS") for the Denver area for the period of 1988 to 1995. Id. at 32. This data set contains almost 100 percent of the transactions involving single family residences in the Class Area, and was large enough to permit a regression analysis for each of these years that compared the sales prices for these Class Area properties to prices of randomly selected single family residential properties elsewhere in the Denver region. Id. at 32. Based on this analysis, Dr. Radke reported undervaluation attributable

to proximity to Rocky Flats in each of these years ranging from 5.45 percent to 9.33 percent. The confidence levels for these results approached or equaled 100 percent. Id. at 6.

In Phase III of his study, Dr. Radke determined the actual number of properties and acreage of vacant land tracts in the Class Area and evaluated the loss in property value for each property category based on the results of Phases I and II of his study. Id. at 7, 47-48.

*Qualifications*

Defendants argue Dr. Radke is not qualified to testify regarding his [**107] Rocky Flats study because he has not previously performed a multiple regression analysis regarding property values and has virtually no education or experience that is relevant to his study. This contention is based on a distorted account of Dr. Radke's deposition testimony. In fact, Dr. Radke testified that his collegiate and graduate level work included extensive course work and study in quantitative (statistical) analysis, which includes multiple regression analysis. He also testified that he teaches quantitative methods, including regression analysis, at the University of California at Berkeley, has performed multiple regression [*1112] analyses on a number of occasions in the AEGIS lab and has performed a multiple regression analysis for the purpose of valuing property for instructional purposes. Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 24 (Radke Dep.) at 56-59, 85-86; Supplement to Defs.' Mot. to Strike Pls.' Expert Witnesses (Doc. 1426), Ex. 2 (Radke Dep.) at 171. As a result, Dr. Radke has expertise in the field of regression analysis. It is not necessary that he specialize in regression analyses regarding the value of real estate for him to qualify as an expert regarding the [**108] regression analysis he performed for this case. *See, e.g., Wheeler, 935 F.2d at 1100* ("lack of specialization does not affect the admissibility of the opinion but only its weight"); *Stagl v. Delta Air Lines, 117 F.3d 76, 81-82 (2nd Cir. 1997)* (rejecting contention that specific expertise required when expert had general expertise in the relevant field). Dr. Radke's analysis and intended testimony also are based in part on his undisputed expertise in geographic information systems, spatial modeling and computing. In light of Dr. Radke's education, experience and knowledge in these fields and in multiple regression analysis, I find Dr. Radke is qualified to testify regarding the matters addressed in his expert report.

580 F. Supp. 2d 1071, *1112; 2006 U.S. Dist. LEXIS 89121, **108

*Relevance/fit*

Defendants maintain Dr. Radke's study and expert testimony, as well as the testimony of Plaintiffs' other damages experts, must be excluded because it is not relevant to and does not fit this action. Defendants' primary argument here is that Plaintiffs' damages experts assessed the diminution in property value based on the proximity of properties to Rocky Flats, instead of any diminution in these properties' value due **[**109]** to Defendants' alleged trespass or nuisance.

I am not persuaded by this argument. First, it assumes that proximity to Rocky Flats and Defendants' alleged trespass and nuisance are independent concepts. *See, e.g.,* Defs.' Mot. re: Pls.' Damages Experts at 8 ("Any property diminution caused by proximity to Rocky Flats is not actionable in this case.") This is not correct. There is a close relationship between proximity to Rocky Flats and the alleged trespass and nuisance, because proximity to the plant determines whether properties are subject to the off-site contamination and alleged risks that underlie these claims. It is for this reason that I previously held that "[e]vidence that class properties have a lower value than comparable properties not in proximity to Rocky Flats, coupled with evidence of Defendants' alleged contamination of these properties and mismanagement of Rocky Flats, is sufficient to allow the jury to infer that diminution in the value of class properties is the result of Defendants' activities and not the result solely of the proximity of these properties to the Plant." *Cook IX, 273 F. Supp. 2d at 1210*. The testimony of Dr. Radke and others **[**110]** regarding reduced property values based on proximity to Rocky Flats is, therefore, relevant to and "fits" this action, and will assist the jury in deciding whether Defendants' alleged trespass and nuisance to the neighboring Class properties caused a diminution in these properties' value.

Defendants ignore this prior ruling and insist that the testimony of Dr. Radke and Plaintiffs' other damages experts should be excluded because, in effect, these experts did not determine whether some or all of the diminution in value they report might be the product of a general concern about the risk of living near a nuclear facility, as opposed to a response to Defendants' specific operations at Rocky Flats and the trespass and nuisance that allegedly resulted from these operations. Defendants may present evidence and argue to the jury that this is the case. *See Cook IX, 273 F. Supp. 2d at 1210 n.39*. The jury

will **[*1113]** also be instructed that they may only award damages caused by any trespass or nuisance they find was committed, and may not award damages based only on a property's proximity to Rocky Flats. Mem. Op. re: Jury Instructions, Attach. A ("Start of Trial Instructions"), No. **[**111]** 3.24 (Dec. 7, 2006). The fact remains, however, that the properties allegedly harmed by Defendants' tortious conduct are proximate to Rocky Flats, which renders evidence that these properties have a diminished value relevant to the jury's determination of damages.

In addition, in terms of Dr. Radke's regression analysis, Defendants' complaint would have required Dr. Radke to develop and include additional explanatory variables that differentiated between any price effect caused by generalized concerns about proximity to a nuclear facility and any effect caused by Defendants' alleged misconduct in operating this particular nuclear facility. Even if this were possible, [38] the Supreme Court and other courts have held that the actual or alleged omission of explanatory variables from a regression analysis normally affects the weight of the analysis, but does not render it inadmissible. *See Bazemore v. Friday, 478 U.S. 385, 400, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986)*; *Watson v. City of Kansas City, 857 F.2d 690, 695 (10th Cir. 1988)*; *Cullen v. Ind Univ. Bd. of Trs., 338 F.3d 693, 701 n.4 (7th Cir. 2003)*. A regression analysis "that includes less than all measurable variables" **[**112]** may also be sufficient to prove a plaintiff's case. *Bazemore, 478 U.S. at 400* (internal quotation omitted). This is a matter for the finder of fact to decide. *See, e.g., Maitland v. Univ. of Minn., 155 F.3d 1013, 1017 (8th Cir. 1998)* (it is for the finder of fact to consider any omitted variables in determining the weight to accord study results). Thus, there is no merit to Defendants' contention that Dr. Radke's regression analysis must be excluded because it does not include additional variables.

[38]   Defendants do not suggest how or even if Dr. Radke could have modified his statistical analysis to quantify or differentiate between the price effect of proximity to Rocky Flats and the trespass and nuisance allegedly created by Defendants' activities there and any price effect based on the proximity to a generic nuclear facility that did not have this history.

Defendants also maintain that exclusion is required under *Koger v. Reno, 321 U.S. App. D.C. 182, 98 F.3d*

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 188 of 332

Page 31

580 F. Supp. 2d 1071, *1113; 2006 U.S. Dist. LEXIS 89121, **112

*631 (D.C. Cir. 1996)*. **[**113]** In *Koger*, the D.C. Circuit considered whether the district court was clearly erroneous in an age discrimination suit in finding at the close of a non-jury trial that the plaintiffs had failed to carry their burden of proving discriminatory intent. *Id. at 632, 634*. The sole evidence offered in support of discrimination at the stage of promotion was a regression analysis showing that younger employees in general had a greater chance of promotion than older employees. *Id. at 636-37*. The district court found this evidence was not sufficient to prove discriminatory intent because it did not show a disparity in promotions that disfavored employees who were 40 or older and thus protected under the ADEA. *Id. at 637*. This decision, therefore, speaks to the probative weight and sufficiency of a regression analysis to the finder of fact, and not to whether an analysis is relevant and admissible under *Rule 702*.

At this point, Defendants also have not presented anything more than speculation that all or some of the diminution in property values measured by Dr. Radke may be attributable to what they call "non-actionable" factors, such as generalized **[**114]** aversion to nuclear facilities, rather than to Defendants' "actionable conduct" of operating this particular nuclear facility in a **[*1114]** manner that imposed a trespass and/or nuisance on neighboring properties. Even if Defendants had presented evidence supporting this view, moreover, this consideration would go to the weight and sufficiency of Dr. Radke's testimony to prove the damages caused by Defendants' conduct, and not to the separate question of whether Dr. Radke's testimony is relevant and admissible under *Rule 702*.

Defendants cite six cases as establishing that an expert's analysis on damages "is ***inadmissible*** under *Daubert*" if it does not distinguish "the impact of a defendant's actionable conduct . . . from a defendant's non-actionable conduct." Defs.' Mot. re: Pls.' Damages Experts at 9-10 (emphasis in original). First, because of the close relationship between the proximity of a property to Rocky Flats and the alleged trespass and nuisance, I do not believe this case presents the clear-cut distinction between "actionable" and "non-actionable" conduct that was present in the cases cited by Defendants. Second, Defendants have again confused the issues of admissibility **[**115]** of evidence and its sufficiency to prove a material issue, as five of the cited cases do not address the admissibility of the expert's analysis under *Daubert* or otherwise, but rather consider the sufficiency

of this evidence to prove different matters. *See Schmidt & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 415 (7th Cir. 1992)* (cited in Defs.' Mot. re: Damages Experts at 9-10); *City of Vernon v. S. Cal. Edison Co., 955 F.2d 1361, 1372 (9th Cir. 1992)* (same); *Isaken v. Vermont Castings, Inc., 825 F.2d 1158, 1165 (7th Cir. 1987)* (same); *Farley Transp. Co. v. Santa Fe Transp. Co., 786 F.2d 1342, 1352 (9th Cir. 1985)* (same); *In re Oracle Sec. Litig., 829 F. Supp. 1176, 1181 (N.D. Cal. 1993)* (same). I am not persuaded that the one cited case that does exclude an expert's damages analysis under *Daubert, In re Executive Telecard, Ltd. Sec. Litig., 979 F. Supp. 1021, 1025-26 (S.D.N.Y. 1997)*, establishes the general rule asserted by Defendants or requires exclusion of Dr. Radke's study. [39]

> 39  Nor am I persuaded by Defendants' argument that exclusion is required by the discussion of damages apportionment in the Reference Manual on Scientific Evidence. *See* Robert E. Hall & Victoria A. Lazear, *Reference Guide on Estimation of Economic Losses in Damages Awards*, in *Reference Manual on Scientific Evidence* 277, 305-07 (2d ed. 2000). Even assuming I was bound by these authors' views, their discussion concerns cases in which it was relatively undisputed that something more than the defendant's actionable conduct had caused at least part of the claimed damages. That is not the case here. The authors' discussion also does not appear directed at the admissibility of a damages analysis, but rather at its sufficiency to prove damages caused by a defendant's actionable conduct.

**[**116]** Defendants also argue that Dr. Radke's proffered testimony and that of Plaintiffs' other damages experts does not fit and therefore must be excluded because: (1) none of their opinions states in so many words the date or period on which the "injurious situation became complete and comparatively enduring," which is the date on which damages are to be measured in this case pursuant to *§ 930 of the Restatement (Second) of Torts, Cook IX, 273 F. Supp. 2d at 1210*, and (2) the experts otherwise fail to couch their analysis and conclusions in the same language as *Restatement § 930*. These experts' opinions, however, all pertain to diminution in Class Area property values (which is the measure of damages for prospective invasions under *Restatement § 930*) during the period (1989-1992) that

Plaintiffs assert is the proper time for damages to be measured. There is no basis, therefore, for Defendants' assertion that this expert testimony does not "fit" the issues to be decided in this action.

[*1115] Finally, Defendants argue that Dr. Radke's study and testimony and that of Plaintiffs' other damages experts is irrelevant because it is over or under-inclusive [**117] of the Class in one or more respects. Some of these arguments are based on misconceptions regarding Plaintiffs' burden of proof, including that Plaintiffs are required to prove the diminution in property value at the time each class member purchased their properties. *See* May 2005 Order at 17-18 (Defendants bear burden of proving any setoff for Class members purchasing their properties at a discount). Others improperly assume that only transactions involving class members are probative of the diminution in Class property values. There is no basis for excluding Dr. Radke's regression analysis and testimony on these grounds.

*Reliability*

Defendants do not dispute that the type of regression analysis performed by Dr. Radke, referred to as hedonic price modeling, is an accepted and reliable method for assessing the effect of a variable on property values. *See, e.g., In re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348, 1359 (N.D.Ga. 2000)* ("Regression analysis is a well-worn statistical technique used in a variety of contexts to examine the nature of the relation, if any, between two or more variables."). They assert, however, based on the testimony [**118] of their rebuttal expert witness, Dr. Daniel McFadden, that Dr. Radke's study and proffered testimony are unreliable and hence inadmissible under *Rule 702* because Dr. Radke made two "fundamental methodological errors" in performing his analysis.

The first alleged error concerns Dr. Radke's application of "factor analysis" to account for and eliminate the problem of multicollinearity. Multicollinearity exists when two or more of the "independent variables" in a regression model are perfectly or highly correlated with each other. *See Ref. Guide on Statistics* at 166; *Ref. Guide on Multiple Regression* at 197, 224. The existence of multicollinearity can cause regression parameters to be estimated imprecisely and thus interfere with the predictive power of the regression analysis. Radke Report at 4; *see Ref. Guide on Multiple Regression* at 197, 224; *In re High*

*Fructose Corn Syrup Antitrust Lit., 295 F.3d 651, 660-61 (7th Cir. 2002).*

Dr. Radke considered some of the location-based characteristics included in his regression to be highly correlated. To counter this influence, he applied an unquestionably established statistical technique, factor analysis, to extract [**119] the common variation shared by the correlated variables. *See* Radke Report at 4, 19-20; Jae-on Kim & Charles W. Mueller, Introduction to Factor Analysis 9-10 (1978). The result of this process was the development of composite variables to replace the highly correlated variables in the regression analysis. Radke Report at 4.

Defendants' expert, Dr. McFadden, a Nobel award winner in econometrics, disagreed with Dr. Radke's use of factor analysis to reduce multicollinearity among the explanatory variables. *See* App. to Defs.' Mot. re: Pls.' Damages Experts (Doc. 1373), Ex. 10 [hereinafter "1999 McFadden Aff."] at 44-45. In his view, factor analysis was unnecessary to improve the predictive power of the regression and could worsen it by introducing bias. *Id.* Defendants do not indicate whether Dr. McFadden provided some alternative method for dealing with multicollinearity, or whether he believed it was not a concern in a regression analysis to determine the relationship between property value and proximity to Rocky Flats.

Defendants cite no authority, other than Dr. McFadden's opinion, that Dr. Radke's use of factor analysis was unsound. In addition, as noted earlier, disputes [**120] regarding the failure to include variables in a [*1116] regression analysis affect the probativeness of the analysis' results, but not its admissibility. *Bazemore, 478 U.S. at 400*; *see Watson, 857 F.2d at 695.* Dr. Radke's omission of highly correlated explanatory variables and replacement of them with consolidated variables derived through factor analysis falls within this rule. Other courts, moreover, have admitted expert testimony in the face of expert disagreement regarding the proper treatment of multicollinearity in the regression analysis. *See In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d at 660-61* (refusing to second-guess district court's admission of regression analyses that addressed multicollinearity in different ways). I see no reason for a different result here.

The second methodological flaw alleged by

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 190 of 332

Page 33

580 F. Supp. 2d 1071, *1116; 2006 U.S. Dist. LEXIS 89121, **120

Defendants concerns Dr. Radke's use of an established statistical technique known as "weighted least squares" estimation in Phase II of his analysis. [40] Dr. Radke stated he used this technique to balance the influence of 100 percent sampling inside the Class Area and 4 percent sampling in the greater Denver area, [**121] so as to ensure that the regression results reflected the property market of these two areas. Radke Report at 45; *see* App. to Defs.' Mot. re: Pls.' Damages Experts (Doc. 1373), Ex. 4 (Radke Dep.) at 393-95. Dr. McFadden asserts this is a blatant statistical error because, he asserts, use of this technique, as opposed to "ordinary least squares," contradicts the Gauss-Markov theorem and is only appropriate to correct for heteroscedasticity. [41]

> 40   Although Defendants assert this as a general criticism of Dr. Radke's study, both Dr. Radke and Dr. McFadden discuss this technique only in relation to Phase II of the study. *See* Radke Report at 45; 1999 McFadden Aff. at 54.
>
> 41   Heteroscedasticity exists "[w]hen the error associated with a multiple regression model has a nonconstant variance; that is, the error values associated with some observations are typically high, whereas the values associated with other observations are typically low." *Ref. Guide on Multiple Regression* at 223.

Plaintiffs do [**122] not dispute that if the conditions of the Gauss-Markov theorem are met, one of which is that the data are homoscedastic, then ordinary or unweighted least squares is the best technique to employ. *See* Aug. 2, 2005 Tr. at 416. It also appears undisputed that use of weighted least squares is a proper method for correcting for heteroscedasticity of data. *Id.* What is not clear is whether the data here were, in fact, heteroscedastic or whether Dr. McFadden is correct that weighted least squares can *only* be used if this condition is met, so that use of this technique in any other circumstances is improper under accepted statistical principles. Neither party addressed these questions adequately in their briefing and argument. [42]

> 42   Plaintiffs asserted that Defendants' expert Dr. Kenneth Wise testified at deposition that the Phase II data might well be heteroscedastic, but the deposition excerpt referenced and provided by Plaintiffs does not include this statement. *See* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 37 (Wise Dep.) at 64. Dr. McFadden and Defendants both

assert use of weighted least squares in the absence of heteroscedasticity violates fundamental regression principles, and cite some statistical authority to this effect, but did not include copies of this authority in the exhibits supporting their motion.

[**123] The ultimate question here, however, is whether the use of weighted least squares, even if technically improper, so undermined Dr. Radke's use of an otherwise reliable methodology that his Phase II study must be deemed unreliable and inadmissible under *Rule 702*. *See Paoli, 35 F.3d at 746* (flaw in expert's method only warrants exclusion "if the flaw is large enough that the expert lacks good grounds for his or her conclusions;" internal quotation [*1117] omitted). Defendants argue the alleged error had this effect, because when Dr. McFadden ran Dr. Radke's Phase II analysis with ordinary rather than weighted least squares, he found no property value effect whatsoever due to proximity to Rocky Flats.

In fact, the record reveals that Dr. McFadden modified Dr. Radke's analysis in several significant respects in addition to using an unweighted regression. *See* 1999 McFadden Aff. at 55; Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 36 [hereinafter "McFadden Dep."] at 85-89. These additional modifications included using ordinary rather than stepwise regression, eliminating factor analysis, adding one or more explanatory variables and revising Dr. Radke's proximity variables [**124] "in order to obtain direct estimates of the impact of the FBI raid and publicity." 1999 McFadden Aff. at 55; *see* McFadden Dep. at 85-89. [43] Under these circumstances, it is not possible to determine if any effect can be attributed to Dr. Radke's allegedly improper use of weighted rather than ordinary least squares estimation. [44]

> 43   Dr. McFadden reported making similar modifications to Dr. Radke's Phase I study as well. *See* 1999 McFadden Aff. at 49; McFadden Dep. at 85-89.
>
> 44   The last "correction" Dr. McFadden made to Dr. Radke's analysis is also instructive. It is clear from this correction and other elements of Dr. McFadden's report that he assumed that the question to be determined was the "price effects of the 1989 FBI raid." 1999 McFadden Aff. at 59; *see id.* at 24-25; Exs. to Pls.' Mem. in Opp'n to Defs.' Mot. Under *R. 37(c)(1)* (Doc. 1024), Ex. E

580 F. Supp. 2d 1071, *1117; 2006 U.S. Dist. LEXIS 89121, **124

(McFadden expert report) at 5-6, 13-14. Towards this end, Dr. McFadden criticized Dr. Radke's study for not focusing on property values before and after the FBI raid and for not taking steps to eliminate any proximity-related discount that existed before the raid. *See, e.g.,* 1999 McFadden Aff. at 24-25. Dr. McFadden apparently took these corrective steps in his revision of Dr. Radke's model. The measure of damages in this case, however, is not the price differential before and after the FBI raid, it is the difference in price but for Defendants' alleged trespass and nuisance on designated properties in proximity to Rocky Flats. *See, e.g., Cook IX, 273 F. Supp. 2d at 1209-10.* While one of Dr. Radke's objectives in his study was to determine if there was a causative link between the FBI raid and depressed real estate values, *see* Radke Report at 3, the majority of his study and conclusions are focused on determining the market impact, if any, of Rocky Flats on area property values over time, *see, e.g., id* at 6-8; App. to Defs.' Mot. re: Pls.' Damages Experts (Doc. 1373), Ex. 4 (Radke Dep.) at 442 (study measured effect of proximity to Rocky Flats, not just effect of the FBI raid there). As a result, Dr. Radke's regression model is more consistent with the "but for" question and measure of damages than the narrower and legally erroneous "before and after" the FBI raid question and damages measure assumed by Dr. McFadden. The lack of price effect reported by Dr. McFadden in his revised regressions, therefore, may be explained as much or more by his redefinition of the question to be answered than by his correction of Dr. Radke's alleged methodological errors.

[**125] After careful consideration of the parties' arguments and the reports of Drs. Radke and McFadden, I am persuaded that Plaintiffs have carried their burden of demonstrating that Dr. Radke's study and testimony are sufficiently reliable to be admissible under *Rule 702.* The alleged errors in Dr. Radke's otherwise reliable methodology do not rise to a level that warrants exclusion, but rather bear on the probativeness of his testimony and his credibility. [45] Dr. Radke explained the basis for his use of factor analysis and least weighted squares in his report and deposition, and Defendants may test his explanation and assumptions on cross-examination and through Dr. McFadden's rebuttal

testimony. [*1118] *See United States v. Cavely, 318 F.3d 987, 997-98 (10th Cir. 2003)* (challenges to the assumptions underlying expert's testimony go the weight of expert's testimony, not its admissibility).

> 45   The same is true of Defendants' additional arguments that Dr. Radke erred in his calculation of damages to vacant land due to proximity to Rocky Flats and that Dr. Radke's control area may be biased in one or more respects.

[**126] *Disclosure issues*

Finally, Defendants argue Dr. Radke's expert testimony must be excluded as a discovery sanction or under *Daubert* because he did not produce certain information requested by Defendants. This contention has an extensive history in this case, which is relevant to my decision here.

This history begins in August 1996 when Plaintiffs timely served Defendants with Dr. Radke's lengthy and detailed expert report. Defendants subsequently requested by letter that Plaintiffs and Dr. Radke provide documents and computer files in forty-four enumerated categories to enable Defendants "to evaluate" his report. Defs.' Mot. to Compel (Doc. 992), Ex. B (Letter dated Jan. 13, 1997, from S. Jonathan Silverman to Merrill G. Davidoff) at 1. Some of these requests were relatively specific, while others were extremely broad and/or would have required Dr. Radke to create new documents and databases for Defendants. *See id.*

In response to these informal discovery requests, Plaintiffs and Dr. Radke provided Defendants with extensive computerized data, documents, direction and explanation in nine separate transmittals. Dr. Radke reported that he and his staff devoted over 300 hours [**127] to this effort. *See* Pls.' Mem. in Opp'n to Defs.' Mot. Under *R. 37(c)(1)* (Doc. 1023), Attach. (Radke Decl.). Plaintiffs repeatedly requested that Defendants pay for the expert fees and other costs of producing these materials, but Defendants refused.

In March, 1997, after Defendants' informal discovery requests and Plaintiffs' responses, Defendants deposed Dr. Radke for two days. A month later, Defendants' expert, Dr. McFadden, issued a thirty-page rebuttal report to Dr. Radke's study. *See* Exs. to Pls.' Mem. in Opp'n to Defs.' Mot. Under *R. 37(c)(1)* (Doc. 1024), Ex. E [hereinafter "McFadden Report"]. In it, Dr. McFadden

asserted Dr. Radke had made several important methodological errors, as previously described. He also complained that Dr. Radke had not produced certain documentation that the National Science Foundation and major journals required be retained and made available regarding published economic studies so that interested scientists could replicate the studies. [46] *Id.* at 4. Nonetheless, Dr. McFadden reported that he had "examined the methodological, statistical, and technical procedures followed by Dr. Radke," *id.* at 4, and that an associate was able [**128] to replicate Dr. Radke's Phase I regression analysis and his Phase II analysis and results, *see id.* at 2, 15, 21. [47]

> [46]   Specifically, Dr. McFadden criticized Dr. Radke for not maintaining a log of certain portions of his analysis that he performed interactively and for providing incomplete documentation on the method he used to sample single-family residential sales in the control area, the models he used to construct certain location-based variables, and details on certain of his damages calculations. *See* McFadden Report at 4, 6, 8, 18, 29.
>
> [47]   In his deposition, Dr. McFadden explained that he used "replicable" to mean that "I can take someone's description background documentation in which they say what they have done and, by using their descriptions and their data and so forth, I can reproduce mechanically what they did." Exs. to Pls.' Mem. in Opp'n to Defs.' Mot. Under *R. 37(c)(1)* (Doc. 1024), Ex. G (excerpts from McFadden deposition) at 179.

Several months later, Defendants moved to exclude [**129] Dr. Radke's report and expert testimony under *Rule 702* and *Daubert*. Defs.' Mot. to Strike Pls.' Experts (Doc. 981). In support of their motion, Defendants argued, based on their evaluation of Dr. Radke's report, the additional information he produced and Dr. McFadden's rebuttal [*1119] report, that Dr. Radke's intended expert testimony was neither relevant nor reliable. Defs.' Br. in Supp. of Mot. to Strike Pls.' Experts (Doc. 984) at 29-36. Notably, Defendants did not assert that Dr. Radke's expert report or subsequently produced documentation was inadequate for any purpose. [48]

> [48]   This motion to strike was itself later stricken. *See supra* note 7.

Shortly thereafter, Plaintiffs sought to depose Dr.

McFadden regarding his rebuttal report. Defendants responded by filing a motion for protective order to postpone Dr. McFadden's deposition. The basis of this motion was Defendants' assertion that Plaintiffs should be compelled to produce additional information regarding Dr. Radke's analysis before Dr. McFadden was [**130] deposed. *See* Defs.' Mot. to Compel and for Protective Order (Doc. 992). Defendants detailed seven categories of information they believed should be produced, all of which they asserted should have been but were not produced in response to their previous informal letter requests. [49] *See id.* at 1 & Ex. A.

> [49]   Defendants had not requested any of this information through interrogatories or the other traditional discovery methods authorized by the Federal Rules.

Plaintiffs opposed Defendants' motions on various grounds, including Dr. Radke's testimony in deposition that the information already produced, *i.e.*, his expert report and the additional materials produced in 1997, were sufficient to enable a researcher knowledgeable in the field to understand Dr. Radke's methodology and reproduce the same results from his data (except for random variation in the sampling process). *See* Pls.' Resp. to Defs.' Mot. to Compel (Doc. 998), Ex. K (excerpts from Radke deposition) at 129. Plaintiffs further pointed [**131] to Dr. McFadden's rebuttal report and Defendants' motion to strike Dr. Radke's testimony as evidence that Defendants had more than sufficient information to evaluate and challenge Dr. Radke's work. In addition, Plaintiffs reported they had already produced much of the requested information to Defendants or that it was otherwise available to Defendants. They also reported that certain of Defendants' requests would unnecessarily require Dr. Radke to generate new documents or computer files and that Dr. Radke estimated it would require one full time staff person four months to search for and retrieve the additional, exceedingly detailed information Defendants sought from the University of California at Berkeley's back-up computer media. Pls.' Resp. to Defs.' Mot. to Compel at 3-7.

In a heated reply, Defendants characterized Plaintiffs' response as an admission that all of the information they requested had either been lost or destroyed. *See* Defs.' Reply in Supp. of Mot. to Compel (Doc. 1002). They further asserted that *Rule 26* required

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 193 of 332

Page 36

580 F. Supp. 2d 1071, *1119; 2006 U.S. Dist. LEXIS 89121, **131

Plaintiffs and Dr. Radke to disclose the requested information and moved that Dr. Radke be precluded from testifying as a sanction for his alleged [**132] misconduct and failure to disclose. *See, e.g., id.* at 5, 10, 19, 27. Plaintiffs did not have an opportunity to respond to Defendants' latest assertions and request for sanctions before Defendants' motion was decided.

Essentially all of Defendants' motion was denied by Magistrate Judge Borchers, to whom all discovery matters were referred at that time, in an order entered on March 31, 1998. *See* Mem. Op. and Order (Doc. 1003) [hereinafter "March 1998 Order"]. The rationale for his decision on the motion to compel was that the information sought by Defendants did not exist and therefore could not be produced. [50] At [*1120] two points, the magistrate judge speculated about whether it was possible to replicate Dr. Radke's work without certain of this information and, if not, that this might be a basis on which to exclude his testimony. *See id.* at 6, 7. He stated that sanctions were not available under Federal *Rule 37*, however, because no discovery order had yet been violated. *See id.* at 8-9. He also denied Defendants' request to postpone Dr. McFadden's deposition.

> 50    Magistrate Judge Borchers granted the motion to compel with respect to some limited geographic data. *See* March 1998 Order at 7, 9.

[**133] Defendants did not file any objections to the magistrate judge's order. Instead, some weeks later they filed a separate motion in the district court to exclude Dr. Radke's testimony under *Rule 37(c)(1)*. Defendants based their motion on the magistrate judge's alleged findings that Plaintiffs had violated *Rule 26(a)(2)* by failing to produce the information sought by Defendants in their Motion to Compel and that this lack of compliance was neither substantially justified nor harmless. *See* Defs.' Mot. Under *R. 37(c)(1)* (Doc. 1004); Defs.' Mem. in Supp. of Mot. Under *R. 37(c)(1)* (Doc. 1007). Plaintiffs opposed the motion on numerous grounds, including that Defendants had mischaracterized the magistrate judge's findings and order and were improperly attempting an end-run around his refusal to impose sanctions under *Rule 37*. Pls.' Mem. in Opp'n to Defs.' Mot. Under *R. 37(c)(1)* (Doc. 1023).

I denied Defendants' motion for sanctions, holding that it was premature because Plaintiffs had not yet sought to rely on Dr. Radke's expert testimony. *Cook v. Rockwell Int'l Corp. (Cook VIII)*, 181 F.R.D. 473, 488-89

*(D. Colo. 1998)*. I also found at that time that "[t]he facts relied [**134] on and relief sought in this motion are identical to the facts considered and the relief denied by the magistrate judge. Defendants' more appropriate course of action would have been to seek reconsideration or to file an objection to the magistrate judge's denial of *Rule 37(c)(1)* sanctions." *Id.* at 489 n. 16.

Now, seven years later, Defendants have renewed their argument that Dr. Radke's testimony should be excluded under *Rule 37(c)(1)* as a sanction for his failure to provide the information requested in Defendants' January, 1998 Motion to Compel. I again deny Defendants' motion.

First, as I stated in 1998, the proper method for Defendants to raise this issue before me was to file an objection to the magistrate judge's denial of *Rule 37* sanctions. *Rule 72* requires a party to file any objection to a magistrate judge's order on a matter such as this within 10 days of being served with the order. *Fed. R. Civ. P. 72(a)*. Defendants did not timely or otherwise file objections to the magistrate judge's order. [51] By failing to object, Defendants waived the right to challenge the magistrate judge's denial of *Rule 37* sanctions and, [**135] necessarily, waived the right to seek the same relief before me through a separate motion for *Rule 37* sanctions. *See Fed. R. Civ. P. 72(a)* (party that fails to timely object may not assert error in magistrate judge's ruling); *Frontier Refining, Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 706 (10th Cir. 1998) (failure to file timely objection waives right to appeal magistrate judge ruling); *Sunview Condominium Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964 (1st Cir. 1997) (party that fails to file timely objection to magistrate judge ruling may not resurrect issue in different venue).

> 51    Even if Defendants' *Rule 37* motion could be construed as an objection to the magistrate judge's order, it would have been untimely under *Fed. R. Civ. P. 72(a)* because it was filed nearly three weeks after service of the order.

[*1121] Defendants' request for *Rule 37* sanctions is also subject to denial on the merits. Defendants [**136] assert that the magistrate judge's March 31, 1998 order adjudicated and found that Dr. Radke's expert report was incomplete and therefore violated *Rule 26(a)(2)*. [52] They further assert that the magistrate judge found this lack of disclosure was neither substantially justified nor harmless, which would trigger the automatic

580 F. Supp. 2d 1071, *1121; 2006 U.S. Dist. LEXIS 89121, **136

sanction of precluding Dr. Radke's testimony under *Rule 37(c)(1)*. [53] *See* Defs.' Mem. in Supp. of Mot. Under *R. 37(c)(1)* (Doc. 1007); Defs.' Mot. re: Pls.' Damages Experts at 28-29 (incorporating 1998 *Rule 37* motion). The magistrate judge, however, made no findings with respect to Dr. Radke's expert report or his compliance with *Rule 26(a)(2)*. He also made no findings as to whether any lack of disclosure was substantially justified or harmless. Moreover, notwithstanding his misgivings about some of Dr. Radke's disclosures, the magistrate judge affirmatively denied Defendants' request for sanctions under *Rule 37*. Under these circumstances, there is no basis for asserting that the magistrate judge made findings that require the imposition of sanctions under *Rule 37(c)(1)*. [54]

> 52   As relevant here, *Rule 26(a)(2)* requires a party to produce a written report for each expert witness that contains "a complete statement of all opinions to be expressed and the basis and reasons therefor" and "the data or other information considered by the witness in forming the opinions." *Fed. R. Civ. P. 26(a)(2)(B)*.

[**137]

> 53   *Rule 37(c)(1)* provides that "[a] party that without substantial justification fails to disclose information required by *Rule 26(a)* . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." *Fed. R. Civ. P. 37(c)(1)*.

> 54   Defendants also assert that the magistrate judge found that the information Defendants requested "no longer exis[ted]" or had "disappeared," thus implying that he had found some kind of misconduct or spoliation of relevant evidence by Dr. Radke or Plaintiffs. *See, e.g.,* Defs.' Mot. re: Pls.' Damages Experts at 28, 29; Defs.' Mem. in Supp. of Mot. Under *R. 37(c)(1)* at 1. In fact, the magistrate judge stated only that most of the material "does not exist," without addressing whether it had ever existed in the form requested by Defendants. *See, e.g.,* March 1998 Order at 4, 5, 7. Even these statements by the magistrate judge are subject to question, however, as the record before him was that most of the information at issue was available in the back-up files of the University of California at Berkeley's computing system or from third-party vendors, had already been produced, and/or existed in a

form other than that requested by Defendants. Thus, the magistrate judge's statements that most of these materials did not exist at best oversimplified an admittedly complicated factual situation and at worst were clearly erroneous. Because Plaintiffs were the prevailing party under the magistrate judge's order, they had no reason or basis to file objections to the order to correct the magistrate judge's statements.

[**138]   I have also examined Dr. Radke's expert report and disclosures in light of Defendants' complaints and find no violation of *Rule 26(a)(2)*. Defendants assert *Rule 26(a)(2)* was violated, because, they argue, without the detailed working notes, intermediate results and computer records they requested, their rebuttal expert could not replicate all of Dr. Radke's results when he reviewed and tested the methodology set forth in Dr. Radke's expert report and other disclosures. *Rule 26(a)(2)*'s requirements that the expert's report include his opinions and reasoning and "the data or other information considered by the witness in forming the opinions" do not, however, require that the expert report contain, or be accompanied by, all of the expert's working notes or recordings. *Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 35 (1st Cir. 2004)*. Nor is there any suggestion in *Rule 26(a)(2)* that an expert report is incomplete unless it contains [*1122] sufficient information and detail for an opposing expert to replicate and verify in all respects both the method and results described in the report. [55]

> 55   Nor does *Rule 26(a)(2)* require that an expert report contain all the information that a scientific journal might require an author of a published paper to retain or all of the information that the authors of the Reference Manual on Scientific Evidence suggest can be helpful in resolving disagreements about statistical studies.

[**139]   The purpose of *Rule 26(a)(2)*'s expert disclosure requirements is to eliminate surprise and provide the opposing party with enough information regarding the expert's opinions and methodology to prepare efficiently for deposition, any pretrial motions and trial. *See Sylla- Sawdon v. Uniroyal Goodrich Tire. Co., 47 F.3d 277, 284 (8th Cir. 1995); Nguyen v. IBP, Inc., 162 F.R.D. 675, 682 (D. Kan. 1995)*. Dr. Radke's detailed, 82-page expert report (including appendices) and other disclosures were sufficient to enable Defendants to depose Dr. Radke, to retain a rebuttal

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 195 of 332

Page 38

580 F. Supp. 2d 1071, *1122; 2006 U.S. Dist. LEXIS 89121, **139

expert who prepared a lengthy rebuttal report analyzing and critiquing Dr. Radke's methodology, and to file a motion to strike Dr. Radke's testimony based on this critique. Based on these circumstances and my own review of Dr. Radke's expert report, I find it complied with *Rule 26(a)(2)*.

Defendants' argument also confuses the expert reporting requirements of *Rule 26(a)(2)* with the considerations for assessing the admissibility of an expert's opinions under *Rule 702 of the Federal Rules of Evidence*. Whether an expert's method or theory can or has been tested [**140] is one of the factors that can be relevant to determining whether an expert's testimony is reliable enough to be admissible. *See Fed. R. Evid. 702* 2000 advisory committee's note; *Daubert, 509 U.S. at 593*. It is not a factor for assessing compliance with *Rule 26(a)(2)*'s expert disclosure requirements.

I have also considered Dr. McFadden's complaints regarding inadequate disclosure in deciding whether Dr. Radke's testimony satisfies the requirements for admission under *Rule 702* and *Daubert*. I find these complaints do not warrant exclusion of Dr. Radke's expert testimony. First, Dr. McFadden's rebuttal report and various affidavits establishes that he was in fact able to evaluate, test and indeed replicate much of Dr. Radke's work and results, including his Phase I and Phase II methodology and his Phase II results. *See, e.g.*, McFadden Report at 2, 15, 21; 1999 McFadden Aff. at 4, 49, 55. Thus, Dr. Radke's methodology could be and was tested by Dr. McFadden, notwithstanding Dr. Radke's allegedly inadequate disclosures.

The gist of Dr. McFadden's complaints is that he was not able to replicate Dr. Radke's construction of some [**141] location-based variables or "verify" all of his regression results. Dr. McFadden blames both circumstances on inadequate disclosure by Dr. Radke, and presumably Dr. McFadden would have had more success in his efforts if Dr. Radke had produced all of the voluminous information requested by Defendants. Dr. Radke, however, testified that he produced sufficient information that "persons knowledgeable in the relevant disciplines" would be able to reproduce his methodology and results. Pls.' Mem. in Opp'n to Defs.' Mot. Under *R. 37(c)(1)* (Doc. 1023), Attach. (Radke Decl., dated June 11, 1998), PP 6, 9; Pls.' Resp. to Defs.' Mot. to Compel (Doc. 998), Ex. K (Radke Dep.) at 129. The dispute between the two experts about whether Dr. Radke's

methods and results could be fully replicated, at all or from the information he provided, presents a jury question that requires consideration of both experts' qualifications and methodology. [56] Any [*1123] suggestion that an opposing expert must be able to "verify" the correctness of an expert's work before it can be admitted also misstates the standard for admission of expert evidence under *Rule 702*. *See Bitler, 400 F.3d at 1233* (not necessary [**142] for party to demonstrate expert is indisputably correct to establish reliability under *Rule 702*); *Paoli, 35 F.3d at 744* ("evidentiary requirement of reliability is lower than the merits standard of correctness"). As a result of these considerations and the fact that Dr. McFadden admittedly was able to test and evaluate most of Dr. Radke's work, I find that his remaining complaints go to the weight and credibility of Dr. Radke's proffered testimony, and not to whether it is admissible.

> [56] For example, Dr. McFadden's chief complaint concerns his inability to replicate Dr. Radke's use of GIS and gravity modeling techniques to construct certain location-based variables. It is unclear from the record, however, whether Dr. McFadden has experience or expertise in these fields.

Finally, Defendants' authority for excluding Dr. Radke's expert testimony under *Daubert* based on his allegedly inadequate disclosure does not withstand scrutiny. Defendants assert "[w]here, as here an expert has failed [**143] to document his work and make it available for review - thereby rendering his opinions non-replicable and non-testable -- courts have consistently excluded such testimony under *Daubert*." Defs.' Mot. re: Pls.' Damages Experts at 29 (citing *Reed v. Binder, 165 F.R.D. 424 (D.N.J. 1996)* and *Nguyen v. IBP, Inc., 162 F.R.D. 675 (D. Kan. 1995)*). In addition to over-stating Dr. McFadden's actual complaints, this statement is not supported by either of the cited cases. Neither case addresses the admissibility of expert testimony under *Daubert* or *Rule 702*. Nor did the courts in these cases address a situation in which an expert's opinion was "non-replicable or non-testable" due to lack of disclosure. They instead considered whether expert reports that were grossly deficient in failing to provide multiple categories of information required by *Rule 26(a)(2)* warranted sanctions. *See Reed, 165 F.R.D. at 429-31*; *Nguyen, 162 F.R.D. at 679-82*. In neither case did the court exclude the expert's testimony. [57]

Accordingly, neither case supports any element of the proposition for which they are cited, or Defendants' more general **[\*\*144]** argument that Dr. Radke's regression analysis and testimony should be excluded for lack of adequate disclosure.

> 57   In *Reed*, the court found barring the expert's testimony to be unduly harsh and instead required the party whose experts had made the inadequate disclosure to bear the fees charged by their experts for the discovery depositions. *165 F.R.D. at 431*. *In Nguyen*, the court allowed the offending party to provide a supplemental disclosure to correct the deficiencies in the expert's report. *162 F.R.D. at 682*.

**2. Dr. Paul Slovic and Dr. James Flynn**

Drs. Slovic and Flynn are social scientists associated with Decision Research Institute, a nonprofit research institute specializing in the study of human judgment, decision making and risk assessment. Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 25 [hereinafter "Slovic Report"] at 1; *id.*, Ex. 11 (Flynn curriculum vitae) at 1. Dr. Slovic, the President of Decision Research, holds a Ph.D. in psychology from the University **[\*\*145]** of Michigan and is a professor of psychology at the University of Oregon. His lengthy curriculum vitae demonstrates that he has more than 30 years experience in researching human behavior in situations of risk, and is recognized as a leading authority in the field of risk perceptions and their effects on human decision-making. *See* Slovic Report at 1-2 & attach. (Slovic curriculum vitae). His work is extensively **[\*1124]** published and he has served as a consultant to numerous companies and government agencies. His experience includes service on the Board of Directors for the National Council on Radiation Protection and Measurements and the Board on Radioactive Waste Management of the National Research Council/National Academy of Sciences. *See id.*

Dr. James Flynn is a senior research associate at Decision Research who specializes in risk communications, survey research, socioeconomic impact assessment, community studies and public planning. Pls.' Cons. *Daubert* Resp., Ex. 11 (Flynn curriculum vitae) at 1. He has over 20 years experience directing, managing and conducting research in these fields for a wide range of federal, state and local governments and private-sector clients. **[\*\*146]** *Id.* at 1-2. He has significant experience in the study of public perception of risk, especially

regarding risks from radiation. *See id.* at 2-3. This experience includes surveys and other research performed for the U.S. Nuclear Regulatory Commission and the U.S. Department of Energy's Low Dose Research Program on Risk Communication. *Id.* at 2. Dr. Flynn's work in this and related fields is widely published. *See id.*; Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 12 [hereinafter "Flynn Dep."] at 212-14.

Drs. Slovic and Flynn prepared three expert reports regarding their intended expert testimony in this case. The first, authored by both experts, is their "Final Report: Rocky Flats Health and Housing Survey." Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 13 [hereinafter "Survey Report"]. It reports the results of a public opinion survey designed by Decision Research Institute and executed by the University of Maryland Survey Research Center to obtain information relating to the effects of the Rocky Flats plant on property values in the potentially affected communities of Arvada and Westminster (which include the Class Area). *See id.* at 1-3. In a second expert report, **[\*\*147]** "Factors Influencing Risk Assessment, Risk Perception, and Risk Acceptance," Dr. Slovic describes the social and psychological factors that influence the perception and acceptance of risk in society and relates these factors to the perception and acceptance of risks associated with the release of radioactive materials from Rocky Flats. *See* Slovic Report. In a third report, titled "The June 6, 1989 FBI Raid at Rocky Flats, Colorado: Risk, Media, and Stigma," Drs. Flynn and Slovic present the results of an examination of Denver area newspaper stories resulting from the FBI raid and relate them to the perception of risk and the potential stigma associated with Rocky Flats. Exs. to Pls.' Resp. to Defs.' Mot. to Strike Pls.' Experts (Doc. 1079), Ex. 8 [hereinafter "Media Report"]. The Survey Report and Media Report have been peer reviewed and published. *See* James Flynn, *et al.*, *Risk, Media, and Stigma at Rocky Flats*, 18 Risk Analysis 715 (1998).

Although Defendants seek to exclude all expert testimony by Drs. Flynn and Slovic, their arguments are directed almost exclusively to their proffered testimony regarding the public opinion survey that is the subject of the Survey **[\*\*148]** Report. Accordingly, I will address the admissibility of this testimony first before addressing the admissibility of the expert testimony disclosed in the Slovic and Media Reports.

**a. Survey Report**

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 197
of 332

Page 40

580 F. Supp. 2d 1071, *1124; 2006 U.S. Dist. LEXIS 89121, **148

The Survey Report describes a public opinion survey Drs. Flynn and Slovic designed to assess the public's perception of Rocky Flats and its effect on the desirability and value of properties in the Class Area ("Flynn/Slovic survey"). The survey's target population was residents of the Denver metropolitan area and of Arvada **[*1125]** and Westminster who had purchased or been actively involved in the housing market the previous five years or who planned to purchase a home in the area in the next few years. Survey Report at 1-2. The survey was conducted by telephone interview between August 31, 1995 and October 1, 1996. *Id.* at 2-3. All interviews were conducted by staff from the University of Maryland Survey Research Center Telephone Facility, *id.*, and neither the interviewers nor the respondents knew the identity of the party that had commissioned the survey, Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 10 [hereinafter "Flynn & Hunsperger Resp."] at 12.

In the first half of the **[**149]** survey, the interviewer asked a series of questions to determine whether the respondent was part of the target population of actual or likely home buyers. Survey Report at 4. If so, then the interviewer proceeded to ask general questions about Arvada and Westminster, which encompass the Class Area, and another Denver area community. *Id.* Respondents were asked to rate the communities on a list of ten community characteristics and to answer open-ended questions about them. *Id.* None of the questions during this portion of the interview mentioned Rocky Flats. *Id.* at 5.

The second half of the interview was designed to isolate the respondent's perception of Rocky Flats. *Id.* at 6. It began with questions asking if the respondent had heard about the Rocky Flats nuclear weapons plant and where it is located relative to Denver. *Id.* The interviewer then asked the respondent to state up to three things that came to mind when they thought of Rocky Flats, and to provide an overall impression of the plant using a scale of "strongly positive" to "strongly negative." *Id.* Respondents were then asked if Rocky Flats made homes in the Arvada/Westminster area more or less desirable. **[**150]** *Id.* at 7. Next, they were asked whether they believed the existing two-mile buffer zone around the facility provided adequate protection or whether a 4-6 mile zone or some greater distance would be adequate. *Id.* at 9.

The interviewer then presented a progression of

scenarios to respondents that were designed to determine how Rocky Flats would influence the decision to purchase a home. Respondents were first asked whether they would purchase an otherwise desirable house located 2-4 miles from Rocky Flats and, if not, whether they would purchase the same house at a distance of 4-6 miles from Rocky Flats. *Id.* at 11. Respondents who answered "no" to both scenarios were then asked if they would purchase the same house at a distance of 4-6 miles from Rocky Flats at a $ 5000 discount and, if that was refused, at a $ 10,000 discount. *Id.* Respondents who were not willing to purchase with either discount were then given the opportunity to state the discount at which they would purchase the house. *Id.* at 11-12. Respondents who answered that they would not purchase a house within 4-6 miles of Rocky Flats at any discount were recorded as having rejected distance and price discounts **[**151]** for property within six miles of Rocky Flats. [58] *Id.* at 11-12. Respondents who were willing to purchase a house 4-6 miles from Rocky Flats at a discounted price of some amount were also asked if they would accept a house within 2-4 miles of Rocky Flats with the same or another discount. *Id.* at 12.

>    58   The Class Area extends approximately six miles from Rocky Flats.

Finally, following these housing scenario questions, the interviewers asked respondents about their knowledge or opinions about specific issues involving Rocky Flats. Questions included whether the respondent believed Rocky Flats posed a health risk, whether it had affected the value of **[*1126]** near-by properties and was safe, and whether they had heard about the FBI raid. *Id.* at 17-21.

The Survey Report included statistical summaries of the responses to each set of questions, generally distinguishing between residents of the Denver metro area and of the Arvada/Westminster area. Based on the survey results, most notably including that 46.2 % **[**152]** of Denver area residents reported they would not purchase a house within six miles of Rocky Flats at any price, Drs. Flynn and Slovic concluded that the history and reputation of Rocky Flats made housing near the plant less desirable and caused downward pressure on property values in this area. *Id.* at 21-23.

*Qualifications*

Defendants assert neither Dr. Flynn nor Dr. Stovic

580 F. Supp. 2d 1071, *1126; 2006 U.S. Dist. LEXIS 89121, **152

has any credentials that qualify them to design, conduct or testify as an expert regarding a public opinion survey. This assertion is belied by both witnesses' extensive experience and training in decision-making and opinion research, including the design and performance of public opinion surveys. In fact, Defendants' rebuttal expert, Dr. Daniel Kahneman, testified that Dr. Slovic has made important contributions in this field. Supplemental App. to Defs.' Reply Br. in Supp. of Mot. to Strike Pls.' Experts (Doc. 1092), Vol. III, Ex. 12 [hereinafter "Kahneman Report"] at 2. [59] Defendants' further complaint that Drs. Flynn and Slovic are not experts in real estate valuation improperly assumes that such expertise was required to design and perform the public opinion survey and to testify regarding its results. [**153] I find Drs. Flynn and Slovic are qualified to testify as experts regarding the public opinion survey that is the subject of their Survey Report.

> [59] Defendants submitted only short excerpts from Dr. Kahneman's rebuttal report in support of their June 2005 motion to exclude Plaintiffs' damages experts. See App. to Defs.' Mot. re: Pls.' Damages Experts (Doc. 1373), Ex. 17. Defendants previously submitted Dr. Kahneman's complete report, which is cited above and elsewhere in this opinion, in connection with their 1997 motion to strike Plaintiffs' experts.

*Relevance/fit*

Defendants assert that expert testimony regarding the Flynn/Slovic survey and report is inadmissible under *Rule 702* because it does not "fit" any issue in the case. I disagree. The survey and other work of Drs. Flynn and Slovic was directed at determining how the public perceived Rocky Flats and whether activities at the plant and publicity related to it had resulted in a stigma that negatively affected the value of properties in the Class [**154] Area. *See* Hunsperger & Flynn Resp. at 2-4; Survey Report at 1, 21 -23. Drs. Flynn and Slovic's testimony on their survey, therefore, is relevant to and will assist the jury in determining whether Rocky Flats, and Defendants' alleged misconduct there, caused a diminution in the value of properties in the Class Area. [60]

> [60] To the extent Defendants dispute the relevance of the Flynn/Slovic survey results based on "mere proximity" and other arguments discussed above with respect to Dr. Radke's testimony, these arguments are rejected for the

reasons stated there. *See supra* Section I.C. 1.

Defendants' true complaint regarding the Flynn/Slovic survey and their Survey Report is that Wayne Hunsperger, Plaintiffs' appraisal and lead damages expert, should not have relied on their survey results in reaching his own conclusions about the existence and especially the amount of damages caused by Defendants. This contention, however, goes to the reliability of Mr. Hunsperger's methodology in [*1127] arriving at his opinions, [**155] and not to the relevance of the Flynn/Slovic survey to the issues to be decided in this case. The survey is relevant to and fits this case without reference to Mr. Hunsperger's use of it. [61]

> [61] I address Mr. Hunsperger's use of the Flynn/Slovic survey results later in this opinion. *See infra* Section I.C.3.e.

*Reliability*

The Flynn/Slovic survey and Drs. Flynn and Slovic's analyses of its results have been peer reviewed and published, *see* James Flynn, *et al., Risk, Media, and Stigma at Rocky Flats*, 18 Risk Analysis 715 (1998), which is an indicator of reliability under *Rule 702. See Daubert, 509 U.S. at 593-94.* The Survey Report and the more recent statement of Dr. Flynn and others, *see* Flynn & Hunsperger Resp. at 9-14, also makes a strong showing that the Flynn/Slovic survey was conducted according to generally recognized survey principles as identified in the Federal Judicial Center's Manual for Complex Litigation and Reference Manual on Scientific Evidence. *See* Manual [**156] for Complex Litigation, Fourth § 11.493 (2004); Shari S. Diamond, *Reference Guide on Survey Research*, in *Reference Manual on Scientific Evidence* [hereinafter *"Ref. Guide on Survey Research"*] 229 (2d ed. 2000). [62] Defendants, however, assert the survey design was unreliable in several respects and that all testimony regarding it must be excluded as a consequence. None of Defendants' complaints warrants exclusion of this testimony.

> [62] Relevant factors to be considered in determining whether the survey conformed to these standards include whether: (1) the survey was designed to address relevant questions; (2) the population was properly chosen and defined; (3) the sample chosen was representative of that population; (4) the data gathered was accurately reported; (5) the data was analyzed in accordance

with accepted statistical principles; (6) the questions asked were clear and not leading; (7) the survey was conducted by qualified persons following the proper interview procedures; and (8) the process was conducted so as to ensure objectivity. *See* Manual for Complex Litigation, Fourth § 11.493; *Ref. Guide on Survey Research* at 236-72.

[**157] Defendants first invoke the rebuttal report of their expert, Dr. Daniel Kahneman, to argue that the survey design was inherently biased and unrealistic in ways that resulted in inflated estimates of any adverse effect of Rocky Flats on neighboring property values. Even if these allegations had merit, the rule in the Tenth Circuit is that "[t]echnical and methodological deficiencies in the survey . . . bear on the weight of the evidence, not the survey's admissibility." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1544 (10th Cir. 1996); see also E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292-93 (9th Cir. 1992)* (same). Alleged "deficiencies" that bear only on the weight of survey evidence under this authority include allegations that the survey questions did not accurately reflect market conditions and were "slanted, leading, and ambiguous." *Harolds, 82 F.3d at 1546 n.9.* Thus, Dr. Kahneman's criticisms of the survey design are matters to be raised at trial and considered by the jury and are not grounds for excluding Drs. Flynn and Slovic's testimony regarding their public opinion survey.

My independent [**158] review of the Survey Report and Dr. Kahneman's rebuttal report confirms that his criticisms do not provide grounds for excluding testimony regarding the Flynn/Slovic survey. The sequence of the survey questions, for example, does not appear inherently biased, and any doubts on this score can be addressed through the traditional adversary process before the jury. While Defendants complain that the survey contains an [*1128] upwards "anchoring bias" in its use of $ 5000 and $ 10,000 as initial discount options in the housing scenario portion of the survey, Dr. Kahneman only speculated that this could be the case. *See* Kahneman Report at 11. Drs. Flynn and Slovic, meanwhile, explained how and why these discount amounts were chosen, *see* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 26 [hereinafter "Slovic Dep."] at 160-63; *id.*, Ex. 12 (Flynn Dep.) at 201-04, and Dr. Slovic disagreed that an upward anchor bias necessarily resulted from them, *see* Slovic Dep. at 162-63, 167-69.

The dispute between these experts regarding possible upward anchor bias in the stated discount amounts and its implications goes to the weight of the survey evidence and does not warrant exclusion. Dr. Kahneman's [**159] additional concerns that the survey results might have been skewed by presenting an unrealistic representation of how Rocky Flats and any risks it poses would be considered in a house purchase decision similarly are matters that may be decided by the jury.

Defendants also assert the Flynn/Slovic survey is unreliable and must be excluded because it does not meet the guidelines for a contingent valuation survey performed as part of a natural resource damages assessment under the federal Oil Pollution Act. *See* Defs.' Mot. re: Pls.' Damages Experts at 36-37 (citing *Report of the NOAA Panel on Contingent Valuation, 58 Fed. Reg. 4601,* App. I (Jan. 11, 1993)). The short answer to this assertion is that Defendants have failed to show these guidelines have any application here. The NOAA guidelines describe contingent valuation as a survey-based method for determining the economic value of "existence" or "passive-use" values in natural resources where there is no direct market or other behavioral evidence of that economic value. *See 58 Fed. Reg. at 4602-03.* Dr. Ralph C. d'Arge, Defendants' rebuttal expert on this subject, and Dr. Slovic similarly agree that [**160] a contingent valuation survey is a survey that seeks to determine the economic value of something that is not ordinarily bought and sold and thus does not have a well defined market or market price. *See* Defs.' Supplemental App. to Defs.' Reply Br. in Supp. of Mot. to Strike Pls.' Experts (Doc. 1092), Vol. III, Ex. 10 [hereinafter "D'Arge Suppl. Report"] at 3; Slovic Dep. at 207-08. There is a market for Class properties, and Drs. Flynn and Slovic designed their survey to assess that market's response to problems at Rocky Flats. *See, e.g.*, Flynn & Hunsperger Resp. at 13-14 (survey directed at possible causal link between market effects and Rocky Flats). Drs. Flynn and Slovic also both testified that they did not design their survey to be a contingent valuation study, Slovic Dep. at 129; Flynn Dep. at 47, and Defendants have not cited to anything in the NOAA panel guidelines or other authority in the field suggesting it should be evaluated as a contingent valuation study. Hence, the NOAA panel guidelines have no application here.

Defendants also asserted in passing in their reply brief and more strongly at oral argument that the

580 F. Supp. 2d 1071, *1128; 2006 U.S. Dist. LEXIS 89121, **160

Flynn/Slovic survey and related testimony are [**161] unreliable because the group surveyed was not limited to persons already living in Arvada and Westminster or those who affirmed they would consider living there. Although Defendants stated that rebuttal expert Dr. d'Arge identified this as a significant problem in his report, his criticism there was brief and only in the context of the survey's presumed status as a contingent valuation study directed at those claiming to have been damaged by Rocky Flats, *i.e.*, residents of Arvada and Westminster. *See* D'Arge Suppl. Report at 7, 10. Dr. d'Arge's testimony does not, therefore, support Defendants' much broader argument that the survey group was improperly large. Even if it did, I would find that [*1129] this issue also goes to the weight to be accorded to the survey by the finder of fact. [63]

> [63]   Defendants' tardy assertion of this argument may be an attempt to seek exclusion pursuant to the Tenth Circuit's statement in *Harold* that a survey should be excluded "'when the sample is clearly not representative of the universe it is intended to reflect.'" *82 F.3d at 1544* (quoting *Bank of Utah v. Commercial Sec. Bank, 369 F.2d 19, 27 (10th Cir. 1966)*). As stated above, Defendants presented no evidence that the survey sample here was clearly unrepresentative, and I find no basis for excluding it on this ground. In their reply brief, Defendants also argue that exclusion is required under *Harold* because the survey does not meet the criteria for the admission of survey evidence as an exception to the hearsay rule. *See* Defs.' Reply in Supp. of Mot. to Exclude Expert Witness Test. (Doc. 1411) at 23-24; *Harolds, 82 F.3d at 1544*. This, of course, is not a challenge to the reliability of the survey or its admission under *Rule 702*, and, is a contention that should have been raised by the June 16, 2005 deadline for filing all motions challenging the admission of expert testimony. I nonetheless have considered it and find it to be without merit.

**[**162]  b. Slovic Report**

Defendants argue Dr. Slovic's proffered testimony as disclosed in this separate report is inadmissible under *Rule 702* because it will not assist the jury in deciding either liability or damages. I disagree. The testimony proffered in this report addresses risk perception generally and as it relates to Rocky Flats. *See* Slovic

Report. Dr. Slovic's testimony on these subjects will assist the jury in understanding why the market has acted as Plaintiffs allege in response to the types of environmental problems reported at Rocky Flats. It is, therefore, relevant to the jury's determination of damages. There is also no question that expert testimony that seeks "to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case" is admissible under *Rule 702*. *Fed. R. Evid. 702* 2000 advisory committee's note. In light of these considerations, Dr. Slovic's undisputed qualifications to testify on these subjects and the absence of any questions regarding the reliability of the methods he used in arriving at the opinions stated in this report, I find the expert testimony [**163] disclosed in the Slovic Report is admissible under *Rule 702*.

**c. Media Report**

Although Defendants' motion seeks to exclude all expert testimony by Drs. Flynn and Slovic, Defendants' briefing in support of their motion does not address the testimony proffered in these experts' Media Report. When questioned on this point at oral argument, Defendants responded that the opinions and information disclosed in this report should be excluded because they concern the FBI raid and related publicity, all evidence of which, according to Defendants, is irrelevant to any issue in this action.

This contention is the subject of Defendants' Motion in Limine No. 1, which is discussed below. I reject this contention with respect to the testimony disclosed in Drs. Slovic and Flynn's Media Report for the same reasons I state below for denying Defendants' Motion in Limine No. 1. *See infra* Section I.E.1. There is no question that Drs. Slovic and Flynn are qualified to undertake this kind of social science research and, as demonstrated by the peer review and publication of the Media Report, that their methodology was sound. Accordingly, the expert opinions expressed in the Media Report meet *Rule* [**164]  *702*'s requirements and are admissible.

**3. Wayne Hunsperger**

Wayne L. Hunsperger is Plaintiffs' primary property damages expert. He is a [*1130] certified real estate appraiser and property consultant with more than thirty years of experience in valuing and appraising real property. *See* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 19, Attach. (Hunsperger *vitae*). He is the president of

580 F. Supp. 2d 1071, *1130; 2006 U.S. Dist. LEXIS 89121, **164

Hunsperger & Weston, a Colorado-based real estate appraisal and consulting firm, and holds the highest designation (MAI) from the Appraisal Institute, the leading association of professional real estate appraisers. *Id.* at 2.

Mr. Hunsperger has particular knowledge and experience regarding the effect of hazardous materials on the value of real property and the valuation of environmentally impaired properties. He has written and taught extensively on these subjects for many years and has performed valuations of Superfund sites in Colorado and numerous other area-wide analyses of property affected by toxic waste sites. *Id.* at 3. Mr. Hunsperger's clients for this and other appraisal work have included the United States Department of Justice, the U.S. Environmental Protection Agency, the United **[\*\*165]** States Army, the cities of Denver, Colorado Springs, and Aurora, and major banks and businesses. *Id.* He has also qualified and testified as an expert witness on property valuation issues in federal and state courts. *Id.* at 4.

In this action, Mr. Hunsperger and his firm conducted an analysis of real property in the Class Area to determine if Class property values had been impacted by Rocky Flats and, if so, to what extent. Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 19 [hereinafter "Hunsperger Report"] at 1, 2. The analysis incorporated five different, multi-disciplinary approaches to these questions: real estate market research; review of analogous case studies; analysis of market sales data and information; multiple regression analysis; and review of public opinion surveys. *Id.* at 2. The latter two approaches incorporate the work of Dr. Radke and Drs. Flynn and Slovic.

Mr. Hunsperger's methodology and the results of his analysis are detailed in his exhaustive 260-page expert report and accompanying appendices. *See* Hunsperger Report. Based on consideration of all five approaches, Mr. Hunsperger concluded that Rocky Flats had diminished the value of property in **[\*\*166]** the Class Area, and estimated the amount of this diminution in value, in 1995 dollars, at $ 169 million for residential properties and $ 21 million for vacant land. *Id.* at 259.

Defendants argue Mr. Hunsperger's proffered expert testimony is inadmissible in its entirety under *Rule 702* for multiple reasons. Upon a thorough review of Mr. Hunsperger's report and careful consideration of the parties' arguments and other submissions, I find his

proffered testimony is admissible. Mr. Hunsperger is unquestionably qualified to testify as proposed, his analysis is reliable within the meaning of *Rule 702* and it will assist the jury in determining a fact in issue, namely damages. The basis for this decision and for rejecting Defendants' many contrary arguments is set out below.

Defendants begin their challenges to Mr. Hunsperger's testimony with the summary assertion that his entire approach is unreliable because it did not include a "mass appraisal" or utilize any of the three approaches traditionally used by professional appraisers for estimating the market value of properties, *i.e.*, the "Cost Approach," "Income Capitalization Approach," and "Sales Comparison Approaches." Defendants **[\*\*167]** have not, however, pointed to any evidence stating that these methods are appropriate for investigating and assessing the diminution in property value caused by environmental concerns on an area-wide basis, or, even if they are, that these approaches are the exclusive **[\*1131]** methods for performing such an analysis. Mr. Hunsperger and Plaintiffs, meanwhile, have presented evidence that the Appraisal Standards Board and authorities in the field recognize that "[e]stimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods," including the specialized methods utilized by Mr. Hunsperger in his analysis. Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 42 (Uniform Standards of Professional Appraisal Practice (USPAP), Advisory Opinion 9 (2004)); *see id*, Ex. 38 (Thomas O. Jackson, *Methods and Techniques for Contaminated Property Valuation*, The Appraisal Journal 311 (Oct. 2003)) [hereinafter "Jackson, *Contaminated Property*"]. [64] In addition, an assignment such as this may be considered real estate consulting and/or market impact analysis, and thus may involve the use of methods and techniques **[\*\*168]** other than the three traditional methods for appraising individual properties. *See* Hunsperger Report at 64; Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 39 (Richard J. Roddewig, *Choosing the Right Analytical Tool for the Job*, The Appraisal Journal 320 (July 1998)). Accordingly, there is no merit to this challenge to Mr. Hunsperger's work and proffered testimony.

[64]   At least one commentator has noted, in fact, that the value of environmentally impaired property "can rarely be estimated through one of the traditional approaches to value," and that other approaches must be used. Jackson, *Contaminated*

580 F. Supp. 2d 1071, *1131; 2006 U.S. Dist. LEXIS 89121, **168

*Property* at 314.

Defendants next renew their arguments that the work of Mr. Hunsperger and Plaintiffs' other damages experts is irrelevant for various reasons, including that Mr. Hunsperger did not specify that the diminution in value he determined was attributable to Defendants' alleged trespass and nuisance towards the Class Area, as opposed to mere proximity to Rocky Flats. I addressed this and Defendants' **[**169]** other relevance arguments earlier, in connection with Defendants' arguments to exclude Dr. Radke's testimony, and reject them here for reasons stated earlier. *See supra* Section I.C.1. [65]

> [65] In addition, I note that Mr. Hunsperger in fact specified that his study assessed the "stigma" effect of Rocky Flats, which did not "relate simply to proximity to Rocky Flats," Hunsperger Report at 74, but rather to "past, present and future risk associated with Rocky Flats, including the likelihood that the class area has been exposed to plutonium" from the site, *id.* at 71. This definition is consistent with Plaintiffs' claim for damages resulting from Defendants' alleged trespass and nuisance.

Defendants also allege that each of the five approaches utilized by Mr. Hunsperger is deficient under *Rule 702* for one or more reasons, and that these deficiencies alone or in combination require that his testimony be excluded. No one of these approaches stands alone, however, and all must ultimately be considered in the **[**170]** context of Mr. Hunsperger's study as a whole. With this consideration in mind, I examine each approach and Defendants' arguments in turn.

**a. Real estate market research**

In this portion of his study, Mr. Hunsperger conducted field research regarding the property market in the area around Rocky Flats, including the Class Area. This research consisted of interviews with a host of market participants, including representatives from eight municipalities, two counties, the State of Colorado, various quasi-public entities, residential lenders, mortgage insurers, real estate appraisers, realtors, builders and individual property owners, and review of documents relating to governmental land use policies and risks posed by Rocky Flats. *See* Hunsperger Report at 7-15, 78-120. The purpose **[*1132]** of this research was

to allow Mr. Hunsperger to form a qualitative opinion about the impact of Rocky Flats on the Class Area property market and values and to inform and support his other work in analyzing this impact. *See id.* at 78, 253.

Based on this research and his training and experience, Hunsperger concluded, among other things, that "the after effects of the 1989 FBI raid and proximity **[**171]** to the Rocky Flats Nuclear Weapons Plant combine to reduce the overall market demand for properties in [the Class Area]. The resulting loss in demand clearly places downward pressure on real estate prices." Hunsperger Report at 15. Mr. Hunsperger did not rely on this market research approach to quantify any diminution in value caused by Rocky Flats.

There is no question that this type of field research is widely and properly used by real estate professionals in assessing the impact of environmental disamenities on property values. *See, e.g.*, Jackson, *Contaminated Property* at 311. Mr. Hunsperger is qualified by his training, knowledge and experience to engage in this kind of research.

Nor should there be any question that the results of Mr. Hunsperger's research regarding the market's perception of Rocky Flats and its impact on area property values will assist the jury. It is relevant to the jury's determination of damages standing alone and as one of the bases for Mr. Hunsperger's ultimate conclusion, based on the totality of his work, that Rocky Flats has caused a diminution in the value of Class properties.

Defendants nonetheless contend Mr. Hunsperger's testimony regarding **[**172]** his market research is not admissible under *Rule 702* because it does not quantify any diminution in property value due to a trespass or nuisance on the date on which the alleged injury became complete and comparatively enduring. This argument fails for the reasons stated earlier in this opinion. *See supra* Section I.C.1.

Defendants also argue that Mr. Hunsperger's proffered testimony regarding his market interviews and research must be excluded because it is an improper effort to admit hearsay testimony. *Rule 703*, however, states that if the facts or data relied upon by an expert are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," then these facts or data need not be admissible in evidence in order for the expert's opinion or

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 203 of 332

Page 46

580 F. Supp. 2d 1071, *1132; 2006 U.S. Dist. LEXIS 89121, **172

inference to be admitted. *Fed. R. Evid. 703.* Market research that includes interviews with market participants is a common component of a study regarding valuation of an environmentally impaired property, *see* Jackson, *Contaminated Property* at 318, and so the results of these interviews are "of a type reasonably relied upon by experts" in this **[**173]** field. *Rule 703*, therefore, permits Mr. Hunsperger to testify regarding the opinions and inferences he reached based on his interviews with market participants.

*Rule 703* also provides that an expert witness may not disclose to the jury any inadmissible facts or data he relied upon without prior court approval. *Fed. R. Evid. 703.* If Mr. Hunsperger seeks to testify at trial regarding specific conversations he had with market participants, I will then consider whether this testimony should be admitted under *Rule 703*. His conclusions and findings based on these conversations, however, are admissible under both *Rules 702* and *703* for the reasons just stated. 66

> 66    Defendants cite excerpts from the trial transcript in "*Escamilla v. Asarco, Inc*, No. 91 CV 5716 (D. Colo. 1993)," in support of their argument for exclusion of Mr. Hunsperger's market research testimony. Defendants err in identifying *Escamilla* as a case brought in the federal district court. It was brought and tried in Colorado state court. *See Escamilla v. Asarco, Inc.*, No. 91-CV-5716 (Dist. Ct. Denver Cty., Colo.). Defendants also did not attach the cited transcript pages to their motion, but I was able to locate them in a previous filing. *See* Defs.' Supplemental App. to Defs.' Reply Br. in Supp. of Mot. to Strike Pls.' Experts (Doc. 1092), Vol. III, Ex.13. Consistent with my just stated ruling, the state judge in that case only sustained objections to Mr. Hunsperger testifying about specific conversations he had with market participants. *See id.* He did not bar Mr. Hunsperger from testifying regarding his research process and the conclusions he drew from these interviews. *See id.*

**[*1133]  [**174]  b. Analogous case study**

In this portion of his study, Mr. Hunsperger collected information regarding thirteen area-wide property studies, including academic, government-funded and litigation-related analyses, that examined the impact on neighboring properties of more than thirty sites posing contamination or other environmental concerns. 67 *See* Hunsperger Report at 121-77; *see also id.* at 16-22. Mr. Hunsperger analyzed these studies and conducted follow-up interviews with most of their authors. *See id.* at 16, 121. His purposes in doing so were to identify appropriate methodologies for assessing the property effects of environmental problems, to examine the effects of environmental problems in other settings, to consider how the real estate market reacts to actual or perceived risk, to study how that reaction translates into an effect on property values and then to apply the results of this analysis to Rocky Flats and the neighboring Class Area. *See id.*

> 67    Two of the cited case studies addressed multiple sites. *See* Hunsperger Report at 141-43 (Case Study No. 7), 144-47 (Case Study No. 8).

**[**175]** Based on his review and analysis, Mr. Hunsperger concluded, among other things, that multiple regression analyses and public opinion surveys are commonly used techniques for measuring market reaction to environmental conditions. *Id.* at 22, 176. He also concluded that in almost all cases properties suffer some loss in value due to actual contamination and/or proximity to a negative environmental condition, with the amount of the loss varying from nominal to as much as 50 percent. *Id.* at 22, 175-77. Based on the latter finding and his review of the individual case studies, Mr. Hunsperger further concluded that these studies indicated a likely 10 percent average diminution in the value of residential property across the Class Area following the FBI raid. *Id.* at 177. Applying this percentage to the 1995 average sales prices for single family and attached residences in the Class Area, Mr. Hunsperger estimated the total loss in value to residential properties to be $ 166 million in 1995 dollars. *Id.* Mr. Hunsperger considered this damages estimate in arriving at his final opinion on the amount of damages to residential properties in the Class Area. *Id.* at 259.

Defendants' **[**176]** primary challenge to Mr. Hunsperger's case study method is that it simply is not a valid or reliable property valuation methodology. Plaintiffs, however, have presented ample evidence that this method has been recognized and endorsed by the Appraisal Institute 68 and other authorities in the property valuation field for situations in which large numbers of properties are affected by an environmental risk or

stigma. *See, e.g.*, Jackson, *Contaminated Property* at 311; Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 40 (Richard J. Roddewig, *Classifying the Level of Risk and Stigma Affected Contaminated Property*, The Appraisal Journal 98 (Jan. 1999)) at 98-99; Exs. to Pls.' Surreply **[*1134]** re: Defs.' Mot. to Strike Pls.' Experts (Doc. 1116), Ex. 8 (Appraisal Institute, *Environmental Risk and the Real Estate Appraisal Process*, at M-9 to M-11 (Mar. 1994)). [69]

68   The Appraisal Institute is the non-profit corporation that sets professional standards for real estate appraisers and consultants.

69   The use and acceptance of the case study method to assess price effects also disposes of Defendants' related argument that the case studies considered by Mr. Hunsperger and any conclusions he drew from them are irrelevant and must be excluded from this action because they concern different properties in different markets and thus are not probative of damages here.

**[**177]** Defendants next contend Mr. Hunsperger's use of this methodology is unreliable because the case studies he utilized are neither representative nor demonstrably reliable, and do not include studies that found no damage from an environmental disamenity. In fact, however, Mr. Hunsperger collected and reviewed studies from a variety of sources that examined properties across the country that were affected by relevant environmental conditions. The selected studies report a range of impacts on these properties, including negligible or no loss in value. *See* Hunsperger Report at 18-21, 123-63. Although Defendants speculate that Mr. Hunsperger's sample is not representative, they did not present expert or other evidence suggesting this was so. [70] The same is true with respect to Defendants' assertion that the case studies considered by Mr. Hunsperger may be unreliable because Mr. Hunsperger did not independently verify the validity and reliability of the multiple regression analyses and public opinion surveys that informed some of them.

70   In support of this argument Defendants reference a list of case studies summarized in an undated addendum to a seminar titled "Environmental Risk and the Real Estate Appraisal Process." *See* App. to Defs.' Mot. re: Pls.' Damages Experts (Doc. 1373), Ex. 22. Many of these case studies, drawn solely from

professional literature, concern municipal landfills, electrical transmission lines, asbestos and other environmental risks of little or no relevance here. Several of the remaining case studies were considered by Mr. Hunsperger. Defendants made no showing that their case study list was itself complete or representative.

**[**178]** Furthermore, to the extent Defendants' complaints here have any merit, they go to alleged weaknesses in the data relied upon by Mr. Hunsperger. Such weaknesses "go to the weight the jury should . . . give[] [his] opinions, they [do] not render [his] testimony too speculative as a matter of law" to be admitted. *Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1519 (10th Cir. 1995)*; *see United States v. 14.38 Acres of Land, 80 F.3d 1074, 1079 (5th Cir. 1996)* (perceived flaws in expert's testimony, including that expert relied on an allegedly unreliable opinion by another expert, "are matters properly tested in the crucible of adversarial proceedings; they are not the basis for truncating that process."); *United States v. 0.161 Acres of Land, 837 F.2d 1036, 1039-41 (11th Cir. 1988)* (same with regard to expert opinion based on information regarding 145 land sales where expert was not familiar with the specifics of the sales). This is particularly true given that Mr. Hunsperger's analogous case study method and conclusions are only part of the basis for his ultimate conclusions regarding the existence and amount of damages caused **[**179]** by Rocky Flats.

Finally, Defendants argue the damages estimate Mr. Hunsperger made based on this approach is unreliable because it is not reproducible. Mr. Hunsperger's report, however, sets out the process he followed in arriving at this estimate and identifies the information he considered in this process. *See* Hunsperger Report at 121-77. Mr. Hunsperger's discussion of the case studies in his report, including his comments relating and comparing many of **[*1135]** them to the situation at Rocky Flats, adequately identifies the studies that he believed were most relevant to his analysis. *See id.* at 164-74. This information was or should have been sufficient to allow Defendants or their experts to evaluate and challenge Mr. Hunsperger's reasoning and results. *See Daubert, 509 U.S. at 593*. Defendants' disagreement with the conclusions Mr. Hunsperger reached based on this process and his knowledge and experience in the real estate field is not a basis for finding these conclusions unreliable. Mr. Hunsperger's proffered testimony regarding this portion

of his study is reliable within the meaning of *Rule 702* and is admissible.

### c. Market sales analysis

In this component **[**180]** of his study, Mr. Hunsperger considered market sales data and information to assess the possible impact of Rocky Flats on the price of single-family housing and vacant land in the Class Area. Hunsperger Report at 23-33, 178-220.

With respect to single-family housing, Mr. Hunsperger sought to compare the rate of appreciation or depreciation in housing prices over time within the Class Area with the rate of price appreciation or depreciation in other metropolitan submarkets. *Id.* at 202. To accomplish this, Mr. Hunsperger obtained data from the MLS on residential sales from 1989 to 1995 in the Class Area, other non-mountain, suburban submarkets within Jefferson County and four other MLS submarkets. *Id.* Mr. Hunsperger used these data to calculate the compound appreciation/depreciation rate for this six-year period for condominium and detached single-family homes in each submarket. As part of this analysis, Mr. Hunsperger also commissioned a local marketing firm to compare the pricing of new home construction in the Class Area with comparable new residential construction in these same areas. *Id.* at 217-220.

Based on the results of both sets of comparisons, Mr. Hunsperger **[**181]** concluded that existing and new single-family residences in the Class Area had the lowest appreciation rates of the areas studied, which resulted in a loss in value relative to homes in other areas over the typical seven-year holding period. *Id.* at 30, 33, 256. He did not quantify the amount of this loss in this component of his study.

With respect to vacant land, Mr. Hunsperger obtained sales data on all vacant land sales in the Class Area and four other areas he viewed as similar for the period 1988 through 1995, and used these data to calculate an overall average price per acre for each area for each year. *See id.* at 178-92. Mr. Hunsperger also investigated the circumstances of a number of individual land sales in detail. *Id.* at 193-98.

Based on these vacant land sales data and investigations, Mr. Hunsperger concluded that vacant land within the Class Area had the lowest average price per acre of any of the five areas studied, with the average

price differential ranging from 3 percent to 146 percent. *Id.* at 199. He also concluded the relatively low average price per acre for the Class Area was attributable to several factors, including proximity to Rocky Flats. **[**182]** *Id.* Based on all of the data and information, he estimated the overall diminution in vacant land value attributable to proximity to Rocky Flats to be 30 percent. *Id.* at 199-200. He then applied this percentage diminution in value to estimate total damages to vacant land in the Class Area at $ 21 million (in 1995 dollars). *Id.* at 200-01.

Defendants argue none of Mr. Hunsperger's conclusions or analysis as just described are admissible under *Rule 702*. Specifically, Defendants assert Mr. Hunsperger's analysis of residential sales data **[*1136]** and relative rates of appreciation is irrelevant and that both his residential property and vacant land analyses are unreliable. I find no merit to these contentions.

Mr. Hunsperger's market sales analysis of residential sales is relevant because it supports his opinion that residential property has been diminished in value due to Rocky Flats and will assist the jury in deciding this issue more generally.

As to the reliability of this study, there can be no question that the analysis of sales data is a sound and accepted method for addressing real estate valuation issues, and that Mr. Hunsperger's method for calculating the relative rates **[**183]** of appreciation was also sound. Defendants assert Mr. Hunsperger's analysis of residential sales is nonetheless unreliable because he did not show his results were statistically significant, but they fail to provide any evidence or authority that significance testing is necessary or even possible for this type of market data analysis. Defendants' final challenge, that Mr. Hunsperger should have designed his residential sales analysis to focus more narrowly on the Class Area, is a matter that goes to the credibility and weight of Mr. Hunsperger's analysis, and does not render it inadmissible.

Defendants' primary challenge to the reliability of Mr. Hunsperger's vacant land analysis is that it is based on too few land sales with too much variance in pricing for any reliable conclusions to be drawn. They do not dispute, however, that Mr. Hunsperger incorporated all available land sales data in his analysis, and that the methodology he used in his analysis and in reaching his conclusions is clearly stated and capable of testing. [71]

Defendants' challenges to Mr. Hunsperger's vacant land analysis are matters to be raised through the adversarial process, and do not provide a basis for exclusion. [**184]

> 71  "Testing" in this context means the method is capable of being challenged in some objective sense or can be reasonably assessed for reliability. *See Daubert, 509 U.S. at 593*; *Fed. R. Evid. 702* 2000 advisory committee's note. It does not mean that the method has been tested or "verified" and found to be correct. *See, e.g.. Bitler, 400 F.3d at 1233*; *Paoli, 35 F.3d at 744* ("evidentiary requirement of reliability is lower than the merits standard of correctness").

### d. Multiple regression analysis

In this approach, Mr. Hunsperger considered and applied the results of Dr. Radke's multiple regression analysis. Hunsperger Report at 34-36, 221-24. Based on these results, Mr. Hunsperger concluded that diminution in property value is persistent within the Class Area and that the loss in value spiked after the 1989 FBI raid. *Id.* at 35, 222-23. He also used the annual diminution in value reported by Dr. Radke for 1988 through [**185] 1995 to calculate an 8 percent average loss in value during this period, which he used to calculate an area-wide diminution in value for single-family detached and attached housing in the Class Area totaling $ 131 million (in 1995 dollars). *Id.* at 36, 223.

It is undisputed that multiple regression analysis is an accepted method for estimating the effects of environmental contamination and risks on real property. *See, e.g.*, Jackson, *Contaminated Property* at 311. I previously examined Dr. Radke's regression analysis and found it admissible under *Rule 702. See supra* Section I.C.1. Contrary to Defendants' suggestion, there is no requirement that Mr. Hunsperger also be qualified as an expert in regression analysis in order to incorporate the results of this analysis in his own work. Mr. Hunsperger's application of Dr. Radke's results is also straightforward and capable of being tested. Accordingly, I find no basis to exclude Mr. Hunsperger's testimony [*1137] based on the multiple regression component of his damages study.

### e. Review of public opinion surveys

In this final approach to assessing the effect of Rocky Flats on area property values, Mr. Hunsperger reviewed the [**186] results of three public opinion surveys prepared for the City of Broomfield, City of Arvada and Rocky Flats Community Relations Department, respectively, that measured the public's perceptions of Rocky Flats and its effects on neighboring areas. Hunsperger Report at 37-62, 225-52. Mr. Hunsperger also commissioned a fourth, more in-depth opinion survey from Decision Research, which is the Flynn/Slovic survey discussed earlier in this decision. *Id.* at 37, 225. Two of the surveys were conducted soon after the 1989 FBI raid, and the others in 1994 and 1995. *Id.* at 37, 43, 45, 47.

Mr. Hunsperger considered the surveys' results to assess how the public perceived technological, environmental and/or health risks relating to Rocky Flats and the extent of their knowledge concerning these matters. *Id.* at 37-62, 225-52. Based on his review, Mr. Hunsperger concluded the surveys' results indicated that a large majority of the public held a negative perception of Rocky Flats, was concerned about health risks caused by the plant and believed that Rocky Flats had negatively affected property values in the area. *Id.* at 61-62, 251. He further concluded these negative perceptions and [**187] concerns were persistent and adversely affected area property values. *Id.*

Mr. Hunsperger also used the results of the housing scenario/discount questions from the Flynn/Slovic survey to estimate the average diminution in value to single-family homes in the Class Area as a result of apprehension about Rocky Flats. *Id.* at 251-52. Based on this calculation and the estimated number of residential properties in the Class Area, Mr. Hunsperger estimated the total diminution in value to residential Class properties to be approximately $ 210 million (in 1995 dollars). *Id.* at 252. Mr. Hunsperger considered this estimate, along with the estimates derived from the multiple regression and analogous case study approaches, in arriving at his final conclusion that concerns about Rocky Flats had diminished the value of residential properties in the Class Area in the amount of $ 169 million (in 1995 dollars). *Id.* at 259.

Although Defendants seek to exclude all of Mr. Hunsperger's proffered testimony regarding the public opinion survey approach, they only challenge one aspect of that approach: Mr. Hunsperger's use of the responses to the housing scenario/discount questions in the

580 F. Supp. 2d 1071, *1137; 2006 U.S. Dist. LEXIS 89121, **187

Flynn/Slovic [**188] survey to generate an estimate of damages to residential properties in the Class Area. Defendants' arguments focus on the reliability of this approach to estimating diminution in property value.

With respect to the reliability question, Plaintiffs have presented evidence that real estate professionals can and do use the results of public opinion surveys in assessing the effect of environmental stigma on real property values. *See* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 43 (Albert R. Wilson, *The Need for Standards in the Application of Statistical and Survey Research to Real Estate Valuation Practice* 13-15 (2002) (reporting that formal market surveys are "frequently undertaken to demonstrate quantitatively how market participants did or might behave in a transactional setting" and proposing standards based on the *Reference Guide on Survey Research*)); Hunsperger Report at 123-24, 138-40, 157-59 (identifying several cases in which survey research was used in assessing the effect of an environmental disamenity on property value). This evidence includes a decision by the [*1138] New Mexico Supreme Court affirming admission of a public opinion survey that asked respondents to [**189] estimate the percentage value increase or decrease to real property caused by a local environmental disamenity, and holding that the plaintiffs' property expert could rely on the survey results in quantifying the diminution in value of the plaintiffs' property. *City of Santa Fe v. Komis, 114 N.M. 659, 845 P.2d 753, 757, 758-59 (N.M. 1992)*. The Tenth Circuit has also affirmed that public survey results may be admitted and relied upon by an expert to estimate damages. *See Harolds, 82 F.3d at 1546*. Thus, Mr. Hunsperger's use of a public opinion survey as part of his process for estimating damages for diminution in property value is in concept a reliable methodology under *Rule 702*. [72]

> [72] Defendants contend Mr. Hunsperger is not qualified to use the survey results in any fashion because he is not an expert in designing, administering or interpreting raw data from public opinion surveys. Mr. Hunsperger, however, need not be qualified as an expert in these matters in order to incorporate the Flynn/Slovic survey results in his own work, particularly when I have already found that the survey is relevant, reliable and admissible in its own right. *See supra* Section I.C.2.a.

[**190] I previously found over Defendants' objection that the Flynn/Slovic survey was sufficiently reliable under survey research criteria to be admissible. *See supra* Section I.C.2.a. Defendants argue Mr. Hunsperger's use of the Flynn/Slovic survey results is nonetheless unreliable and inadmissible because Drs. Flynn and Slovic testified they did not design the survey specifically to estimate diminution in property value. I disagree. While Drs. Flynn and Slovic testified at deposition and in subsequent affidavits that they did not design their survey to measure the precise diminution in property value in the Class Area, they also testified that they knew when they designed the survey that Mr. Hunsperger intended to use its results in his valuation work, that Mr. Hunsperger consulted with Dr. Flynn about how he planned to use the survey results for this purpose, and that Drs. Flynn and Slovic agreed then and as of the date of their 1999 affidavits that Mr. Hunsperger's use of the survey results to estimate diminution in value was logical and reasonable. *See* Flynn Dep. at 106-08; Slovic Dep. at 139-41; Exs. to Pls.' Surreply re: Defs.' Mot. to Strike Pls.' Experts (Doc. 1116), Ex. [**191] 11 (Flynn Aff.), PP 6-9, & Ex. 12 (Slovic Aff.), PP 6-10. Therefore, far from undermining the reliability of Mr. Hunsperger's use of the survey results, Drs. Flynn and Slovic's testimony tends to support it.

Defendants also argue or at least strongly imply that Mr. Hunsperger's use of the housing scenario/discount portion of the survey is unreliable because Drs. Flynn and Slovic did not design their survey as a contingent valuation survey meeting the NOAA panel guidelines. The unstated assumption in this argument is that results from a public opinion survey, especially one that includes hypothetical questions, cannot be used by a real estate expert to estimate diminution in property value unless it is a contingent valuation survey meeting these requirements.

Defendants did not produce any evidence in connection with this *Daubert* motion supporting this assumption. The only evidence in the record that I am aware of that might support it is a statement by defense rebuttal expert Dr. d'Arge to the effect that any survey containing hypothetical valuation questions by definition is a contingent valuation survey that should be evaluated under the NOAA panel guidelines. *See* D'Arge [**192] Suppl. Report at 4. [73] [*1139] Dr. d'Arge does not provide any support of this assertion, however, and, as

580 F. Supp. 2d 1071, *1139; 2006 U.S. Dist. LEXIS 89121, **192

noted earlier, there is nothing in the NOAA panel guidelines that suggests they apply in this situation. *See supra* Section I.C.2.a. I will not make a finding that contingent valuation methodology and standards apply here, and render Mr. Hunsperger's use of the Flynn/Slovic survey results unreliable and inadmissible, based solely on Dr. d'Arge's statement. The jury can hear from both Mr. Hunsperger and Dr. d'Arge regarding the alleged deficiencies in the survey design as relevant to quantification of damages and make its own determination. [74]

> 73    The excerpt of Dr. d'Arge's supplemental report submitted by Defendants in support of this *Daubert* motion did not include this statement. I instead reviewed the complete copy of Dr. d'Arge's supplemental report as submitted by Defendants in connection with their 1997 motion to strike Plaintiffs' experts. *See* Defs.' Supplemental App. to Defs.' Reply Br. in Supp. of Mot. to Strike Pls.' Experts (Doc. 1092), Vol. III, Ex. 10. For reasons described earlier, I have not conducted a comprehensive review of the enormous record in this case to locate all materials that may be relevant to the issues decided here.

**[**193]**

> 74    It is also important to reiterate that Mr. Hunsperger did not rely solely or even primarily on the results of Drs. Flynn and Slovic's housing and discount scenarios to estimate damages, but rather based his damages estimate on the totality of his analysis, which included analyses based on market sales data, that is the actual performance of individuals in the market, and other relevant information.

Defendants next argue again that Mr. Hunsperger's use of the housing scenario/discount survey responses was unreliable because the survey design included anchor bias and other design defects that render its "discount" results unreliable. As discussed earlier, the assertion of anchor bias is speculative and it and Defendants' other complaints of this nature go to the weight to be accorded to the survey results and testimony based on them. *See supra* Section I.C.2.a.

Defendants also argue that, even if Mr. Hunsperger could in principle utilize the Flynn/Slovic survey results in estimating damages, his calculation of the estimated

diminution in residential property values from these results is **[**194]** arbitrary and involves too great an analytical gap between the survey results and his conclusions to be reliable. In particular, Defendants complain about the manner in which Mr. Hunsperger incorporated into his calculations the 46.2% of respondents who indicated they would not purchase a residence within six miles of Rocky Flats at any price.

I have considered Defendants' arguments on this point and conclude Mr. Hunsperger's calculations are sufficiently reliable to be admitted. Mr. Hunsperger employed a reasoned and transparent analytical process to estimate class-wide diminution in value based on the mean discounts reported by Drs. Flynn and Slovic from their survey's results. *See* Hunsperger Report at 251-52. While there is room for disagreement on some of the steps taken or omitted in this process, Mr. Hunsperger's calculations were not arbitrary and were rationally connected to the survey results. To the extent there are analytical gaps in Mr. Hunsperger's calculations, they are not so great that they render his calculations unreliable and inadmissible. Defendants' criticisms, therefore, again go the weight of Mr. Hunsperger's testimony on this approach, not its admissibility.

**[**195]**  For the reasons stated above, I find Mr. Hunsperger's proffered testimony regarding his public opinion survey approach, including his use of the Flynn/Slovic survey results as part of his damage quantification effort, is sufficiently reliable to be admitted under *Rule 702*. This approach and its contribution to Mr. Hunsperger's overall damages estimate, even if as "shaky" as Defendants allege, are matters that may be presented to the jury and tested through the adversarial process. *See Daubert, 509 U.S. at 596* **[*1140]** ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). The jury will make the ultimate determination of whether Mr. Hunsperger's work in its entirety is credible and persuasive as to the amount of any damages suffered by the Class.

Overall, I find Mr. Hunsperger employed "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" in his property impact study and the opinions he formed based on it. *See Kumho Tire, 526 U.S. at 152*. His expert testimony is **[**196]** admissible under *Rule 702*.

580 F. Supp. 2d 1071, *1140; 2006 U.S. Dist. LEXIS 89121, **196

**D. Defendants' Motion to Exclude Plaintiffs' Expert Witness Testimony Relating to Conduct and Associated Motions in Limine**

Plaintiffs intend to offer evidence at the class trial regarding Defendants' allegedly pervasive mismanagement of radioactive and toxic materials at Rocky Flats, including expert testimony from Drs. Robert Budnitz and Thomas Cochran. [75] In seven overlapping motions in limine and a *Daubert* motion, Defendants move to exclude all testimony by Drs. Budnitz and Cochran and most of Plaintiffs' other "conduct evidence" primarily on the ground that it is irrelevant. Defendants also assert Drs. Budnitz's and Cochran's proffered testimony must be excluded because neither is qualified and their testimony is unreliable.

> 75  Plaintiffs originally designated a third expert witness, Dr. D. Warner North, to testify regarding Defendants' conduct at the plant, but notified Defendants and the court in July, 2005, that they did not intend to call him. *See* Pls.' Cons. *Daubert* Mot. at 94 n.83.

**[**197]** Defendants' motions in limine regarding conduct evidence encompass all of the relevance/fit arguments asserted against Drs. Budnitz's and Cochran's proffered expert testimony. Accordingly, I discuss these motions in limine first, and then address Defendants' additional arguments for exclusion of Drs. Budnitz's and Cochran's testimony.

**1. Motions in limine to exclude conduct evidence (Nos. 6-12)**

In Motions in Limine Nos. 6 through 12, Defendants seek to exclude virtually all evidence regarding Defendants' conduct and practices at the Rocky Flats plant. *See* Defs.' Mots. in Limine Nos. 6-12 (Docs. 1359-65). Although Defendants assert other grounds for exclusion in these motions, a key tenet of each is Defendants' contention that evidence concerning their conduct at the Rocky Flats plant is only relevant and admissible if it relates directly to an incident that Plaintiffs can prove caused plutonium to be released to the entirety of the Class Area. *See id.*

As described earlier in this decision, Defendants' asserted relevance standard misreads both *Rule 401 of the Federal Rules of Evidence* and the law of the case regarding the issues to **[**198]** be tried. *See supra*

Section I.A. To review briefly, *Rule 401* declares a liberal relevancy standard that incorporates notions of both materiality and probativity. *McVeigh, 153 F.3d at 1190*. A fact is material or "of consequence" under *Rule 401* "when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict." *Id.* Limiting evidence concerning Defendants' conduct at the plant to incidents that directly or indisputably caused plutonium contamination to the entire Class Area is contrary to this standard and the law of the case, which in fact establishes multiple issues to which "conduct evidence" may be relevant. *See supra* Section I.A and discussion herein.

**[*1141]** *Rule 401* also sets a "very low" bar for the degree of probative value required under the rule, so that "even a minimal degree of probability -- *i.e.*, 'any tendency' -- that the asserted fact exists is sufficient to find the proffered evidence relevant." *Id.* (quoting *Rule 401*). Defendants therefore err in their assumption that evidence must be highly probative or even conclusive regarding a consequential **[**199]** fact before the evidence can be found relevant under *Rule 401*.

Many of Defendants' arguments against the relevance of Plaintiffs' conduct evidence fall away once their improper relevance standard is removed. My additional reasons for denying each of Defendants' conduct-related motions in limine are set out below. Because these motions seek exclusion of broad, overlapping categories of evidence, my decisions and rationale are necessarily broad as well. Issues relating to discrete items of evidence falling with these categories may arise at trial and will decided then.

**a. Defendants' Motion in Limine No. 6**

In this motion Defendants seek an order barring Plaintiffs, their witnesses and attorneys from offering or mentioning any evidence related to the use of substances other than plutonium at Rocky Flats, including evidence that any non-plutonium hazardous or toxic substances from Rocky Flats were released into the environment or created a risk of harm. *See* Defs.' Mot. in Limine No. 6 (Doc. 1359) at 1. This motion is denied for the following reasons.

Defendants first assert all evidence relating to substances other than plutonium at Rocky Flats is irrelevant, principally **[**200]** because it is undisputed that Plaintiffs' trespass claims and part of their nuisance

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 210 of 332

Page 53

580 F. Supp. 2d 1071, *1141; 2006 U.S. Dist. LEXIS 89121, **200

claims relate solely to plutonium. Consistent with their pleadings, however, Plaintiffs' pre-trial statement of claims declares that their nuisance claims are based in part on "threatened future releases of plutonium *and other hazardous substances.*" Pls.' Statement of Claims (Doc. 1419) at 4 (emphasis added). Hence, evidence regarding Defendants' use and disposal of hazardous substances other than plutonium at Rocky Flats is relevant to the future risk component of Plaintiffs' nuisance claims.

Defendants argue this category of evidence is nonetheless irrelevant because Plaintiffs will not be able to prove that any non-plutonium toxic substances used at the plant pose a continuing risk of harm to the Class as a whole. This contention is without merit, as it relates to the sufficiency of this evidence, and not to whether it is relevant and admissible under the Federal Rules of Evidence.

Evidence regarding Defendants' alleged misconduct in handling, storing and disposing of hazardous substances other than plutonium is also probative of a second element of Plaintiffs' nuisance claim, which is whether **[**201]** Defendants acted negligently or intentionally in causing any unreasonable and substantial interference with the use and enjoyment of property. *See Cook IX, 273 F. Supp. 2d at 1202* (stating elements of nuisance claim). For purposes of the class trial, this element requires Plaintiffs to prove (among other things) that Defendants' negligent or intentional conduct caused Class members to be exposed to plutonium released from the plant and/or that their conduct created conditions at the plant that pose a demonstrable risk of future harm to the Class Area. *See* May 2005 Order at 4-6; Start of Trial Instructions, No. 3.6. Evidence tending to show a pattern of negligent misconduct by one or both Defendants in the handling of dangerous materials at Rocky Flats is relevant and admissible to show that Defendants acted negligently in **[*1142]** the particular acts that injured the Class. *See Elliot v. Turner Constr. Co., 381 F.3d 995, 1004 (10th Cir. 2004)* (evidence tending to establish a pattern of negligence by defendant in overall project admissible regarding defendant's alleged negligence in specific aspect of project that injured plaintiff); *Silkwood v. Kerr-McGee Corp. ("Silkwood II"), 769 F.2d 1451, 1455-56 (10th Cir. 1985)* **[**202]** (in a personal injury suit against operator of nuclear facility, "jury may permissibly infer from a pattern of negligence likely to cause a particular injury that such negligence did indeed

cause the injury"); *see also Bradbury v. Phillips Petroleum Co., 815 F.2d 1356, 1364 (10th Cir. 1987)* (evidence of a pattern of trespass and property damage by defendant admissible to prove recklessness and other elements of plaintiff's claims, even though none of the other incidents involved injury to the plaintiff and were dissimilar in other respects). As a result, evidence that Defendants had a pattern of negligence in handling plutonium and other dangerous substances at the plant is material and probative of Plaintiffs' nuisance claims even if some of the misconduct alleged by Plaintiffs did not itself cause the Class Area to become contaminated or pose a risk of future harm there.

Evidence regarding Defendants' use and disposal of hazardous substances other than plutonium is also relevant to the generic causation question to be decided by the jury [76] and to the jury's determination of any punitive damages. *See Silkwood II, 769 F.2d at 1455-56* (evidence of **[**203]** general pattern of misconduct meeting punitive damages standard sufficient for jury to infer same type of misconduct caused plaintiff's injuries and justified punitive damages award). Thus, evidence of Defendants' conduct relating to non-plutonium hazardous or toxic substances at Rocky Flats is relevant to several facts of consequence to the determination of this action. [77]

> [76]  *See supra* note 10 and accompanying text.
> [77]  Because Defendants' alleged pattern of misconduct in their handling, storage and disposal of hazardous or toxic substances in the aggregate is relevant to the issues just noted, I also reject Defendants' assertion that evidence of Defendants' alleged misconduct must be evaluated for relevance on a substance-by-substance basis.

Defendants also argue that all evidence regarding non-plutonium substances must be excluded pursuant to *Federal Rule of Evidence 404(b)*, which bars admission of "evidence of other crimes, wrongs or acts" when offered to show **[**204]** the defendant's bad character and that the defendant likely acted in conformity with that character in connection with the conduct at issue. *Fed. R. Evid. 404(b)*; *see, e.g., United States v. Maden, 114 F.3d 155, 157 (10th Cir. 1997)*. By its terms, however, the Rule only applies to evidence of "other" bad acts, that is bad acts that are extrinsic to the acts at issue in the suit. *See Fed. R. Evid. 404(b)*; *Elliot, 381 F.3d at 1004*; *see generally* 2 Jack B. Weinstein & Margaret A.

580 F. Supp. 2d 1071, *1142; 2006 U.S. Dist. LEXIS 89121, **204

Berger, *Weinstein's Federal Evidence § 404.20[2][b]* (2nd ed. 2005) (collecting and summarizing cases). "Evidence is extrinsic if it involves an act wholly apart from and not intricately related to the asserted claim." *Elliot, 381 F.3d at 1004*. Here, as just described, Defendants' alleged mishandling of hazardous and toxic materials other than plutonium at Rocky Flats is not "wholly apart" from the asserted claims and is in fact related to them. *Rule 404(b)* might be appropriately invoked if Plaintiffs sought to introduce evidence that Defendants mishandled [**205] plutonium or other toxic materials at some facility other than Rocky Flats, but it does not apply to evidence of their alleged negligence in handling these materials at Rocky Flats.

[*1143] Defendants argued at length against this conclusion at oral argument, asserting that evidence of a pattern of conduct at Rocky Flats is neither relevant nor intrinsic to Plaintiffs' claims. This argument ignores Plaintiffs' allegation that Defendants' mishandling of non-plutonium substances created conditions at the plant that pose a risk of future harm to the Class. It also fails to address squarely the Tenth Circuit's decision in *Elliot*. In that case, the Tenth Circuit considered whether *Rule 404(b)* barred admission of evidence that the defendant had been negligent in various acts at a job site separate from the act that injured the plaintiff. *381 F.3d at 1003-04*. The Tenth Circuit found the Rule did not apply to this evidence of additional negligent conduct, reasoning that evidence of a pattern of negligence by the defendant at the particular job site was directly related and therefore intrinsic to the question of the defendant's negligence in causing the plaintiff's injury. *Elliot, 381 F.3d at 1004*. [**206] The same is true in this case.

In addition, even if I were to find *Rule 404(b)* applicable here, it would not bar admission of evidence relating to Defendants' alleged mismanagement of non-plutonium materials. *Rule 404(b)* is a rule of inclusion and allows evidence of "other" bad acts to be admitted so long as the evidence is not offered to prove bad character or a propensity to act as alleged. *See, e.g., United States v. Sarracino, 131 F.3d 943, 949 (10th Cir. 1997)*; *Maden, 114 F.3d at 157*. For the reasons stated earlier, evidence regarding Defendants' management of toxic materials other than plutonium is relevant to multiple issues to be decided in the class trial, and therefore serves other proper purposes as permitted by the rule. Accordingly, even if *Rule 404(b)* were applicable here, I find no basis for excluding all evidence relating to

non-plutonium substances pursuant to it.

Finally, Defendants argue this category of evidence must be excluded under *Rule 403* because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury and by considerations of undue delay or waste of [**207] time. Defendants' arguments in this regard are premised largely on their contention that all such evidence is irrelevant to the matters to be decided by the jury, which is incorrect for the reasons stated above. Balancing the probative weight of this category of evidence against Defendants' concerns, I find no basis under *Rule 403* for the blanket exclusion sought by Defendants.

**b. Defendants' Motion in Limine No. 7**

In this motion, Defendants seek to exclude "evidence related to employee health and safety at Rocky Flats" on the ground that all such evidence is irrelevant, would be unduly prejudicial to Defendants, and constitutes evidence of past bad acts inadmissible under *Rule 404(b)*. Defs'. Mot. in Limine No. 7 (Doc. 1360) at 1; July 28, 2005 Hr'g Tr. (Doc. 1434) at 40. This motion is denied.

I agree with Defendants that the general issue of worker health and safety at Rocky Flats is not part of this action, but the blanket exclusion Defendants seek is unnecessary and overbroad. First, the exclusion is unnecessary because there is no indication in the record that Plaintiffs intend to try the issue of worker health and safety. [78] Second, the relief sought by Defendants is [**208] overbroad because some evidence that might be described as "relating to" worker health and safety may be relevant if, for example, it concerns plutonium [*1144] escaping containment in the workplace and being released to the environment or Defendants' pattern of conduct in handling plutonium and other hazardous substances at the plant. Specific evidence "relating to" worker health and safety may also be relevant in other ways that I cannot anticipate in the abstract. Thus, while some or even most evidence in this broad category of evidence may indeed be irrelevant to this action, this does not justify the blanket exclusion requested by Defendants.

> 78   Nor would I allow Plaintiffs to do so given the nature of the claims they have asserted.

I also am not persuaded that admission of any evidence relating to worker health and safety poses a danger of unfair prejudice and confusion of the issues

that outweighs its probative value. This question cannot be decided in the abstract as proposed by Defendants. For the reasons stated **[**209]** in the previous section, I also find no merit in Defendants' contention that *Rule 404(b)* applies here and bars admission of all evidence falling into this category.

### c. Defendants' Motion in Limine No. 8

In this motion Defendants seek to exclude all evidence "related to releases, incidents and conditions that occurred wholly within buildings at Rocky Flats" on the ground that such releases, incidents and conditions, by definition, could have no off-site environmental effect and hence are irrelevant to both the trespass and nuisance claims. Defs.' Mot. in Limine No. 8 (Doc. 1361) at 1. Defendants also argue that admission of any such evidence would be unfairly prejudicial under *Rule 403* and would violate *Rule 404(b)*'s stricture against admission of propensity evidence.

Once again, the blanket exclusion Defendants seek is overbroad. By Defendants' account, this motion would bar, among other things, all evidence regarding plutonium fires that were contained within buildings, all conditions in buildings that raised criticality concerns and numerous other incidents that resulted in a loss of containment of plutonium or tend to show a pattern of mishandling plutonium and other hazardous **[**210]** substances. For the reasons described earlier, evidence of this sort is relevant, at minimum, to the question of whether Defendants were negligent in causing any interference with Class members' use and enjoyment of property. Some of the evidence Defendants seek to exclude in this motion may also be probative as circumstantial evidence of past releases (*e.g.*, evidence of plutonium in ductwork venting to the outside environment) or of waste storage and disposal practices that resulted in conditions that pose a continuing risk of future harm to the Class. [79] Because this evidence is intrinsic to Plaintiffs' claims and theory of the case, it is not evidence of prior bad acts subject to *Rule 404(b)*. [80] Finally, I am not persuaded that the probative value of this category of evidence is substantially outweighed by the danger of unfair prejudice or confusion of the issues.

[79] Defendants assert that the demolition of these plant buildings and the on-going plant cleanup have eliminated this possibility and therefore render evidence of incidents and releases within these buildings irrelevant. Plaintiffs dispute this

assertion, which in any event goes to the sufficiency of Plaintiffs' evidence on this point, not its relevance.

**[**211]**

[80] Even if *Rule 404(b)* were applicable here, I would also find, as stated earlier, that this evidence is offered for a proper purpose and is therefore admissible under the rule.

Defendants assert all evidence relating to releases that occurred solely within buildings also must be excluded pursuant to Magistrate Judge Borcher's 1994 ruling in a discovery dispute that Dow need not produce information regarding releases within a building that affected only employees within the building. Mem. Op. & **[*1145]** Order (Doc. 327) at 2. The context for this ruling and its basis is not clear from Judge Borchers' order, however. More importantly, the scope of this action, and with it the evidence relevant to Plaintiffs' property damage claims, has evolved in the years since Judge Borchers' order. My determination, based on the current status of this action and the issues to be decided in the class trial, is that evidence of releases, incidents and conditions occurring solely within buildings may be relevant to one or more of these issues as described above. Defendants' motion to exclude all evidence in this category **[**212]** is, therefore, denied.

### d. Defendants' Motion in Limine No. 9

In this motion, Defendants seek to exclude all evidence or references relating to what they call "inventory difference" and what Plaintiffs and others refer to as "material unaccounted for" or "MUF." Defs.' Mot. in Limine No. 9 (Doc. 1362) at 1. MUF refers to plutonium, uranium and other radioactive materials that cannot be accounted for by plant operators. *See Cook v. Rockwell Int'l Corp. ("Cook VI"), 907 F. Supp. 1460, 1463 (D. Colo. 1995)*. The existence and quantity of MUF at any given time is determined by comparing the quantity of these materials that accounting records report present at the site with the quantity of materials determined to be on hand through physical inspection and analysis. *See* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 7 (Cochran MUF Report) at 3 (citing DOE definition). It is undisputed that the cumulative MUF during Defendants' operation of Rocky Flats is more than 2,600 pounds. [81]

[81] This is not the first time questions concerning MUF evidence have arisen in this litigation. In

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 213 of 332

Page 56

580 F. Supp. 2d 1071, *1145; 2006 U.S. Dist. LEXIS 89121, **212

1995, I found the DOE in contempt for failing to produce documents relating to MUF. *Cook VI, 907 F. Supp. at 1463-64, 1468*; *see also Cook v. Rockwell Int'l Corp. ("Cook VII"), 935 F. Supp. 1452 (D. Colo. 1996)*(discussing additional issues relating to production or access to DOE's MUF documents).

[**213] Defendants argue that evidence concerning MUF is irrelevant to Plaintiffs' trespass and nuisance claims because Plaintiffs cannot prove that any MUF was released to the environment where it was or could have been transported to the Class Area. Defendants also argue affirmatively that all MUF for the site can be largely explained by accounting errors, errors or omissions in estimating the amount of plutonium contained in waste shipped off-site and by the unreported presence of plutonium-containing residue in processing equipment and the like. They further assert MUF data is irrelevant because, according to their experts and a government contractor, the data cannot be used to estimate the quantity, if any, of the unaccounted for plutonium that was released to the environment. [82]

> 82   It bears mentioning that much of the debate in this action about MUF and whether it includes any unreported releases to the on-or off-site environment are the result of the federal government's decision to classify and withhold much potentially explanatory MUF-related information.

[**214] Defendants' assertion that Plaintiffs must be able to prove MUF was or could be released to the Class Area to establish its relevance once again improperly applies a standard of proof to determine relevancy. *See Fed. R. Evid. Rule 401* (relevant evidence is evidence "having *any tendency* to make the existence of any fact that is of consequence . . . more or less probable than it would be without the evidence;" emphasis added.); *see generally* Charles Alan Wright & Kenneth W. Graham, Jr., 22 Fed. Practice and Procedure: Evidence § 5165 at 50-51 (1978 & Supp. 2006) ("judge may not consider the weight of the evidence in determining relevance" [*1146] under *Rule 401*); *see also supra* Section I.A (discussing relevancy standard). Under the proper, *Rule 401* standard, MUF evidence is relevant because it has a tendency to make the existence of several facts of consequence more or less probable than they would be without this evidence.

For example, Defendants' inability to account for 2,600 pounds of plutonium in their Rocky Flats operations is relevant to the question of whether Defendants were negligent in their management of plutonium and its risks, [**215] which bears on the "intent or negligence" element of Plaintiffs' nuisance claim. In *Silkwood*, the Tenth Circuit found that a nuclear plant operator's inability to account for as little as 23 pounds of plutonium was "notable" evidence of a pattern of gross negligence relevant to a claim arising from the off-site release of plutonium. *See Silkwood II, 769 F.2d at 1455-56* (affirming award of punitive damages on claim for property damage caused by contamination of off-site property). That Defendants cannot account for 2,600 pounds of plutonium and other radioactive materials is unquestionably relevant to their care, or lack thereof, in managing these materials.

MUF-related data is also relevant to determining whether plutonium from Rocky Flats has been released into the environment, where it either has or may in the future be transported by natural forces to the Class Area. This relevance is demonstrated by various investigators' use of MUF data in estimating the amount of plutonium released during the 1957 fire and other events, and by the efforts of RAC and earlier investigators to account for MUF and to utilize MUF data to assess whether any portion of it might [**216] represent unreported releases to the environment. *See* Cochran MUF Report at 11-13 (identifying studies); Defs.' Mot. in Limine No. 9, Ex. 2. Contrary to Defendants' assertions, it is not necessary for MUF data to produce quantitative estimates of unreported plutonium releases for MUF data to be relevant to this issue. Defendants' contention that MUF may be accounted for through means other than unreported releases goes to the weight and sufficiency of this evidence with respect to releases, not its relevance.

In addition, the existence and amount of MUF for the site is relevant to the generic causation question to be answered by the jury and to the credibility of witnesses testifying about matters such as the amount of plutonium released from Rocky Flats and its associated risks.

I have also considered Defendants' contention that all MUF-related evidence should be excluded under *Rule 403* because its probative value is substantially outweighed by its potential to create unfair prejudice or confusion of the issues. I am not persuaded either that MUF evidence has the lack of probative value argued by

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 214 of 332

Page 57

580 F. Supp. 2d 1071, *1146; 2006 U.S. Dist. LEXIS 89121, **216

Defendants or that the risk of unfair prejudice or confusion is large enough to [**217] outweigh substantially this value. Finally, I find no basis for exclusion under *Rule 404(b)* for the reasons stated earlier.

### e. Defendants' Motion in Limine No. 10

In this motion, Defendants seek to exclude all evidence or direct or indirect mention of "past risks that never materialized," which they describe as the risk of fires, criticality events [83] or other events at Rocky Flats that might have resulted in plutonium or other toxic materials being released into the environment if they had occurred. *See* Defs.' Mot. in Limine No. **[*1147]** 10 (Doc. 1363) at 3, 8; *see id.* at 1-2. Defendants include in this category all evidence regarding at least one event that did occur, the 1969 fire at the plant, that would describe how close the fire allegedly came to causing a catastrophic environmental disaster. *Id.* at 5. The focus of this amorphous motion, however, appears to be testimony or evidence regarding Defendants' management of plutonium-related risks and how their operating practices may have contributed to the creation of such risks. *Id.* at 3-4, 5-6, 10.

> 83   A criticality event occurs when too much fissile material is unintentionally brought together and forms a critical mass, which creates an uncontrolled nuclear chain reaction. *See* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 6 (Cochran Overview Report) at 28.

**[**218]** Defendants argue this and other "past risk" evidence is irrelevant because none of these potential events or catastrophic consequences occurred, and they cannot occur now, because the conditions giving rise to these risks have been eliminated through the plant shut-down and subsequent cleanup. They further argue that such evidence should be excluded under *Rule 403* because it would unfairly prejudice Defendants, confuse the jury and waste trial time and resources.

This motion is denied. Defendants are free to argue that Rocky Flats does not pose a risk of current or future harm to the Class Area (as relevant to Plaintiffs' nuisance claims) because the plant has been dismantled and all on-site conditions that might give rise to such off-site harm have been fully abated through the site cleanup. Whether the cleanup is in fact complete and has removed all plutonium and other toxic materials that might be remobilized and pose a current or future risk to the Class

Area is disputed, however, and thus presents a factual issue to be decided by the jury. I will not do as Defendants suggest and usurp the jury's function by deciding this factual issue in the context of Defendants' evidentiary [**219]** motions.

I further find that evidence regarding "past risks" and Defendants' management of them is relevant to this action. For the reasons stated earlier, the degree of care Defendants exhibited in managing plutonium and other dangerous substances at the plant is relevant to whether Defendants acted negligently in creating conditions that resulted in plutonium being released to the Class Area or created conditions that could lead to future harm. *See supra* Section I.D.1.a. Evidence of these matters is also relevant to the generic causation question and the jury's determination of any punitive damages. *See id.*

The probative value of this general category of evidence is not substantially outweighed by the risk of unfair prejudice or confusion of the issues. While there may be specific items of evidence within this poorly defined category that require a different analysis, I will not exclude all evidence within it based on this possibility. Any complaints regarding specific items of evidence will be addressed at trial.

### f. Defendants' Motion in Limine No. 11

In this motion, Defendants seek to exclude all evidence of plutonium-related incidents and practices that "Plaintiffs [**220]** cannot prove impacted (or could someday impact) the entire Class Area." Defs.' Mot. in Limine No. 11 (Doc. 1364). This category of evidence includes, according to Defendants, all evidence or mention of the 1969 fire and other "minor" plutonium fires at the plant and all evidence or mention of Defendants' handling, use and storage of plutonium during the many years of plant operation. *See id.* at 5-10. Defendants contend all such evidence is irrelevant and/or subject to exclusion under *Rules 403* and *404(b)*.

This motion is founded on the proposition that only evidence that can and has been linked directly to a past or potential release of plutonium that affects the Class as a whole is relevant to this action. This **[*1148]** proposition is incorrect for all of the reasons stated earlier in this decision. *See supra* Section 1.A. Defendants also err in suggesting that an item of evidence must "prove" a consequential fact in order to be relevant. *See supra id.*; Section I.D.I (introduction).

580 F. Supp. 2d 1071, *1148; 2006 U.S. Dist. LEXIS 89121, **220

For the reasons stated above with respect to Defendants' overlapping motions, evidence relating to Defendants' handling, use and management of plutonium, including fires and other incidents that occurred [**221] in the course of this conduct, is relevant to multiple issues in this action. It also does not as a category pose a risk of prejudice or confusion warranting exclusion and is not "bad character" evidence presented for an improper purpose. Because this category of evidence is relevant and not subject to exclusion on the cited bases, Defendants' motion is denied.

### g. Defendants' Motion in Limine No. 12

In their final conduct-related motion in limine, Defendants seek to exclude all evidence that does not apply to the Class as a whole. This motion is based on Defendants' contention that the relevant and admissible evidence in this class action is evidence "that would be admissible in each of the individual trials for each class member, were such trials to occur." Defs.' Combined Reply in Supp. of Mots. in Limine (Doc. 1410), Tab 12, at 1. As a result, Defendants argue, all evidence relating to "incidents, conditions, occurrences or activities that do not impact the entire class" must be excluded. Defs.' Mot. in Limine No. 12 (Doc. 1365) at 4. As examples of evidence that should be excluded under this motion, Defendants identify evidence concerning the release of plutonium or other [**222] toxic materials via surface or ground water to some but not all of the Class Area and all expert evidence that does not specifically study and assess the whole of the Class Area. See id. at 7-9.

Defendants' legal contention and the relevancy standard Defendants advance based on it finds no support in *Rule 401* or the law relating to class trials. *See supra* Section I.A. There is no logic to or basis for Defendants' assumption that because Plaintiffs must prove liability and damages for the Class as a whole, only evidence that applies to each and every Class member is relevant and should be admitted. The question is whether the evidence as a whole proves class-wide liability and damages, not whether specific items of evidence do. *See id.*

There is ample evidence within this broad category of evidence that is relevant and admissible in this action for all of the reasons stated above and elsewhere in this decision. Accordingly, I deny Defendants' motion to exclude this category of evidence.

### 2. Motion to exclude expert testimony by Dr. Robert

### Budnitz

Dr. Robert Budnitz is a former senior officer with the United States Nuclear Regulatory Commission (NRC) and a frequent [**223] consultant to the NRC, DOE, and other domestic and foreign government agencies on nuclear safety issues. *See* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 1 [hereinafter "Budnitz 903 Pad Report"], Attach. A (Budnitz statement of qualifications). Dr. Budnitz has extensive academic credentials and professional experience in the field of nuclear energy and safety, including, as most pertinent here: participation in the development of NRC's fire regulations and guidance for nuclear facilities; evaluating and investigating nuclear waste management programs at Three Mile Island, the Hanford Nuclear Reservation and other federal facilities for the NRC, DOE and/or its contractors; and chairing a special committee created by the National Academy of Sciences to study [*1149] management of nuclear waste. *See id.*; Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 3 [hereinafter "Budnitz Dep."] at 380-81, 390-94, 621-23. For several years Dr. Budnitz also managed the largest division within the DOE's Lawrence Berkeley Laboratory, Budnitz 903 Pad Report, Attach. A at 2, which he testified carried out a wide range of activities in research and engineering development that covered most of the disciplines [**224] involved in managing a facility such as Rocky Flats, *see* Budnitz Dep. at 307-08. He has published approximately 90 articles and reports, most of which relate to nuclear safety, monitoring and/or waste management. *See* Budnitz 903 Pad Report, Attach. B (list of publications).

Dr. Budnitz authored two expert reports for this case, one covering the major Rocky Flats fires of 1957 and 1969 and other incidents, *see* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 2 [hereinafter "Budnitz Fires Report"], and another concerning waste management practices associated with the 903 pad plutonium releases, *see* Budnitz 903 Pad Report. Both of these reports also discuss and state conclusions regarding Dow's management and safety practices from 1945-69 and how they contributed to the 1969 fire and plutonium releases from the 903 pad. In addition, Dr. Budnitz contributed a discussion of criticality concerns during Defendants' Rocky Flats operations to a report authored primarily by another of Plaintiffs' experts. [84] *See* Pls.' Cons. *Daubert* Resp., Ex. 21 at 62-64.

84   Plaintiffs notified the court before trial that

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 216
of 332

Page 59

580 F. Supp. 2d 1071, *1149; 2006 U.S. Dist. LEXIS 89121, **224

they did not intend to call this second expert, Dr. D. Warner North, at trial. *See supra* note 75.

[**225] Defendants seek to exclude Dr. Budnitz's proffered testimony as disclosed in these expert reports on the grounds that his testimony is entirely irrelevant, he is not qualified to testify on these subjects, his intended testimony will not assist the jury and his testimony is not reliable. To the contrary, I find Dr. Budnitz and his proposed testimony meets each of these *Rule 702* requirements and is therefore admissible. More specifically:

I reject Defendants' challenge to the relevance of Dr. Budnitz's proffered testimony for the reasons stated in connection with Motions in Limine Nos. 6-12 discussed above. I reject Defendants' challenge to Dr. Budnitz's qualifications because their arguments are based on an incomplete and distorted account of his knowledge, experience, training and education in the relevant fields. A review of Dr. Budnitz's complete statement of qualifications and related deposition testimony, none of which is challenged by Defendants, reveals he is thoroughly qualified to testify as disclosed in his expert reports.

Defendants' argument that Dr. Budnitz's testimony will not assist the jury also fails. It is premised on Defendants' contention that Dr. Budnitz's testimony [**226] is no more than a summary of documentary evidence that the jury could just as easily review and digest itself to reach any relevant conclusions. Safety and operating practices at a nuclear production facility are, however, highly specialized matters not within the province of an ordinary juror. They are, therefore, a proper subject for expert testimony. *See, e.g., United States v. Mulder, 273 F.3d 91, 101-102 (2nd Cir. 2001)* (expert testimony concerning matters that are not well known or commonly understood is admissible); *see generally* 4 *Weinstein* § 702.03[1] (collecting cases). Dr. Budnitz is an expert in these matters, and it is clear from a fair reading of his reports that he drew extensively on his specialized knowledge and experience to review, analyze and summarize available [*1150] information and to reach conclusions regarding the adequacy of Dow's safety and waste management practices. It was also perfectly proper for Dr. Budnitz to consider documentary evidence and pre-existing investigative reports in evaluating Dow's conduct, and to interpret and summarize the information he collected through this process to assist the jury in understanding these [**227] practices and the bases for his conclusions about them. One of Defendants' experts, Dr. Frank J. Blaha, similarly reviewed and summarized historic documentary materials in his own report regarding waste management practices at Rocky Flats. *See* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 30.

Dr. Budnitz's evaluation and conclusions also satisfy *Rule 702*'s reliability requirement. Dr. Budnitz assessed Defendants' conduct according to the practices and standards of care in the industry, including the overarching "ALARA" principle that radiation exposures and impacts should be kept "as low as reasonably achievable." *See, e.g.,* Budnitz Dep. at 571-72; Budnitz 903 Pad Report at 41-50 (concluding Dow failed to utilize readily available measures that would have prevented offsite releases of plutonium from the 903 pad and assessed its impact once it occurred); Budnitz Fire Report at 2 (comparing fire-safety practices at Rocky Flats with practices at other AEC facilities managed by different contractors). This assessment was based on Dr. Budnitz's extensive experience and expertise in safety and risk management at nuclear facilities. While Defendants argue Dr. Budnitz should also [**228] have evaluated their conduct according to unspecified federal regulatory standards or written safety procedures, neither sets the standard of care in this case. *See Cook IX, 273 F. Supp. 2d at 1199* (state law standard of care governs action); Mem. Op. on Jury Instructions, Section II.B (regarding Defendants' proposed nuisance Instruction No. 7). At best, Defendants' contentions here go to the weight of Dr. Budnitz's testimony regarding Defendants' conduct, and do not affect its reliability and admission under *Rule 702*.

### 3. Motion to exclude expert testimony by Dr. Thomas Cochran

Dr. Thomas Cochran is a senior scientist and the director of the nuclear program at the Natural Resources Defense Council, Inc. (NRDC). Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 6 [hereinafter "Cochran Overview Report"], Attach. (Cochran curriculum vitae) at 1. He received his master's degree and Ph.D in physics from Vanderbilt University, where his master's level work involved health physics and his Ph.D dissertation was in nuclear physics. *Id.* at 4. Dr. Cochran has written several books, including two on U.S. nuclear weapon production facilities, and more than fifty articles, [**229] reports

and papers on nuclear facilities, nuclear weapons, and arms control, including on plutonium toxicity and radiation protection standards. *See id.* at 6-15. Dr. Cochran has been an advisor to the DOE and NRC, including service on the DOE's Environmental Management Board and the NRC's Advisory Panel for the Decontamination of the Three Mile Island Unit 2 and its Safety Goals Workshop. *Id.* at 2-3. He has testified on numerous occasions before Congressional committees on nuclear energy, weapons and waste. *See id.* at 3.

Dr. Cochran authored two expert reports in this litigation, an overview of Rocky Flats operations and health and safety practices, particularly as they relate to actual or potential off-site releases of plutonium, and another on plutonium inventory differences at Rocky Flats. *See* Cochran Overview Report; Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 7 [hereinafter "Cochran MUF Report"]. More specifically, in his Overview Report, Dr. Cochran provides a basic primer on [*1151] nuclear weapons and their manufacture, including the technical subjects of radioactivity and radiation, plutonium and health physics (health effects of exposure to radiation); discusses [**230] the major known releases of plutonium from Rocky Flats and Dow and Rockwell's waste management practices; and concludes based on his review and analysis that both Defendants operated Rocky Flats without proper regard for the hazards posed by plutonium and other toxic substances present there. *See* Cochran Overview Report. In his MUF Report, Dr. Cochran defines and explains MUF, summarizes the history of MUF accounting at Rocky Flats and concludes, based on his analysis, that Dow was grossly negligent in failing to account for such a large amount of plutonium and that the amount of MUF at Rocky Flats casts doubt on official estimates of the quantity of plutonium released to the off-site environment. *See* Cochran MUF Report.

Defendants seek to exclude Dr. Cochran's proffered expert testimony for much the same reasons they advanced with respect to Dr. Budnitz's testimony, and I reject them for much the same reasons stated above.

First, Dr. Cochran's testimony regarding Defendants' operations and MUF at Rocky Flats is relevant for the reasons stated earlier in connection with Defendants' motions in limine. His proffered testimony providing an overview of nuclear weapons design, [**231] plutonium weapons fabrication and processing at Rocky Flats, the ALARA principle, health physics and the characteristics

and risks of radioactivity and plutonium, *see* Cochran Overview Report at 1-23, will assist the jury by providing helpful background on these complex technical matters, which are not within the common knowledge of most jurors. His intended testimony regarding off-site releases of plutonium, criticality, MUF and pondcrete, based on his review and analysis of relevant documentary materials and including the conclusions he drew from this analysis, *see id.* at 23-30; Cochran MUF Report, will also assist the jury.

Dr. Cochran also has sufficient knowledge and experience concerning both the general and specific subjects addressed in his reports, including MUF and events that caused off-site releases, to qualify as an expert under *Rule 702*. *See, e.g.,* Cochran Overview Report, Attach. (Cochran curriculum vitae); Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 8 [hereinafter "Cochran Dep."] at 16, 40-42, 97, 101, 106. Defendants' complaint that Dr. Cochran does not specialize in some of these matters again bears on the weight of his testimony and does not render [**232] it inadmissible. *See, e.g., Ralston, 275 F.3d at 970*.

Finally, as to reliability, Dr. Cochran utilized his knowledge and experience to assess Defendants' Rocky Flats operations against industry standards and practices, including the ALARA principle. *See, e.g.,* Cochran Overview Report at 14-15; Cochran Dep. at 218-22. The bases for his conclusions are clearly stated and his conclusions flow logically from them. While Defendants and their experts apparently believe Dr. Cochran should have employed different standards and reached different conclusions, this does not render his methods and conclusions "unverifiable" as Defendants suggest or require exclusion of his testimony. I find Dr. Cochran employed the same level of intellectual rigor in his work on this case that characterizes the practice of an expert in this field. For this reason and the others stated above, Dr. Cochran's proffered testimony is reliable and otherwise admissible under *Rule 702*.

### E. Defendants' Additional Motions in Limine

Defendants filed nine motions in limine in addition to those discussed in the previous [*1152] section. Like Defendants' other motions in limine, these motions and their [**233] supporting arguments push the limits of in limine consideration. While I have decided these motions based on the arguments they present, discrete evidence falling within these motions may require additional

580 F. Supp. 2d 1071, *1152; 2006 U.S. Dist. LEXIS 89121, **233

consideration during trial, and warrant different treatment, depending on the specific evidence offered and circumstances as they develop at trial.

**1. Motions to exclude evidence regarding the FBI raid, grand jury investigation and Rockwell's guilty pleas (Nos. 1-3)**

In these motions, Defendants seek to exclude all evidence and mention of the FBI raid of Rocky Flats in 1989, its underlying allegations and attendant publicity; all evidence and mention of the subsequent grand jury investigation, its outcome and the resulting controversy; and all evidence relating to Rockwell's 1992 guilty pleas to environmental crimes at Rocky Flats, all conduct underlying these pleas and all publicity regarding them. *See* Defs.' Mots. in Limine Nos. 1-3 (Docs. 1354-56). Defendants argue all such evidence is inadmissible because it is irrelevant to any issue of consequence, constitutes improper propensity evidence barred by *Rule 404(b)* and/or poses such a danger of unfair prejudice and waste **[**234]** of trial time that it should be excluded under *Rule 403*.

These motions are denied in part and granted in part. The fact of each of these events, and the conduct and alleged conduct that were the subject of the FBI raid, the grand jury investigation and Rockwell's guilty pleas, are relevant to issues to be decided in the class trial. These events are interwoven with virtually everything that occurred at or concerning Rocky Flats between the late 1980s and early 1990s. It would be impossible to tell the story of Rocky Flats, and thus provide the jury with a context for other relevant testimony and evidence, without mention of the FBI raid and its aftermath. The criminal investigation also scrutinized or touched on much of Rockwell's conduct relating to hazardous substances at the plant during the plant's last years of operation. As described earlier, evidence of this conduct is relevant to whether Rockwell acted negligently with respect to these substances and any harm suffered by the Class, whether conditions at the plant pose a risk of future harm and punitive damages. *See supra* Section I.D.1. Much of the publicity surrounding the FBI raid and its aftermath is also relevant to **[**235]** the issue of compensatory damages because it goes to the market's knowledge of environmental concerns and conditions associated with the plant.

I am not persuaded that *Rules 404(b)* or *403* require that this general category of evidence be excluded. This

evidence does not pertain to "other" bad acts by Rockwell, but rather relates to an alleged pattern of misconduct by Rockwell that underlies Plaintiffs' claims. As such, *Rule 404(b)* and its bar against propensity evidence do not apply. *See supra* Section I.D.1. Defendants' concerns about the risk of prejudice can and will be addressed through appropriate limiting instructions, as discussed below. [85]

> [85] Defendants also argue that all evidence and mention of the special grand jury proceedings must be excluded because the secrecy of these proceedings would otherwise be compromised. I will not admit evidence regarding matters occurring before the special grand jury. *See Fed. R. Crim. P. 6(e)(2)*. However, the relief sought by Defendants is not required to protect grand jury secrecy.
>
> In addition, some of Plaintiffs' evidence regarding Rockwell's conduct no doubt was presented to the grand jury. This fact does not bar its admission in this action, but whether this evidence was presented to the grand jury is irrelevant.

**[*1153]** **[**236]** Defendants' Motions in Limine Nos. 1-3 are therefore denied to the extent they seek a blanket order excluding evidence regarding the fact of the FBI raid, the grand jury investigation and Rockwell's guilty pleas, the conduct and alleged conduct by Rockwell that were the subject of these proceedings, and publicity regarding this conduct and these events.

I am persuaded, however, that a subset of the evidence falling within the scope of these motions requires different treatment. That subset relates to the controversy concerning the Department of Justice's prosecution of Rockwell, including the so-called runaway grand jury. It is clear from the parties' motions and briefing that Rockwell intends to argue and present evidence that federal prosecutors ultimately exonerated it of all charges of environmental misconduct, except those to which it pled guilty. [86] Plaintiffs intend to rebut this contention by introducing evidence that there are other, less innocent explanations for the prosecutors' failure to pursue additional charges against Rockwell.

> [86] Defendants relied heavily on this proposition in their various motions in limine to assert, as a matter of fact, that all allegations made against

580 F. Supp. 2d 1071, *1153; 2006 U.S. Dist. LEXIS 89121, **236

Rockwell in the criminal investigation were false. Plaintiffs dispute this fact as stated above.

[**237] The question of whether the U.S. Attorney and the Department of Justice (DOJ) properly discharged their duties in investigating and prosecuting Rockwell is not relevant to the matters to be determined in this action. Even if it were, the probative value of this evidence is substantially outweighed by its potential to confuse the issues and needlessly extend the length and complexity of the trial. Accordingly, I intend to bar Defendants from arguing or presenting evidence that the U.S. Attorney and the DOJ ultimately exonerated Rockwell from most of the conduct that had been alleged in the FBI search warrant. For the same reasons, I will not allow Plaintiffs to argue or introduce evidence relating to the runaway grand jury, the congressional investigation into the DOJ's prosecution of Rockwell or similar evidence that might tend to show that the Department of Justice acted improperly in failing to prosecute Rockwell more vigorously.

I will also instruct the jury that it should not view the fact that the FBI issued a warrant based on certain allegations, that the grand jury failed to issue indictments or that Rockwell did not plead guilty to additional crimes as evidence that Rockwell [**238] did or did not engage in additional environmental misconduct (i.e., misconduct beyond that to which it pled guilty) during its tenure at the plant. The jury will be instructed to make its findings based on the evidence of Rockwell's conduct presented at trial, and not on the fact that the FBI made or investigated certain allegations or the outcome of the criminal prosecution. See Start of Trial Instructions, Nos. 2.4, 2.5.

The line I have drawn between admissible and inadmissible evidence relating to the FBI raid and its aftermath should be viewed as a broad outline that may be refined as evidence is presented and the trial unfolds. I also recognize that this line may raise questions regarding the admissibility of specific items of evidence, especially news accounts that might be used as a backdoor to introduce evidence about the controversy regarding the grand jury and the federal government's prosecution of Rockwell. Whether certain exhibits will be admitted or questioning permitted [*1154] under this standard will likely be an exhibit-by-exhibit and question-by-question determination.

## 2. Motions to exclude evidence regarding other lawsuits (Nos. 14 & 15)

In their Motion in [**239] Limine No. 14, Defendants seek to exclude evidence or mention of any other lawsuits filed against either Defendant. Defs.' Mot. in Limine No. 14 (Doc. 1367). In their Motion in Limine No. 15, Defendants seek this same relief with respect to a specific criminal proceeding against Rockwell in connection with its operation of a facility in Santa Susana, California. Defs.' Mot. in Limine No. 15 (Doc. 1368). In response, Plaintiffs have represented that they do not intend to present evidence of or mention the Santa Susana proceeding at trial. This concession renders Defendants' Motion in Limine No. 15 moot, and it is denied on this basis.

With respect to Motion in Limine No. 14, Plaintiffs assert that they intend to present evidence regarding two other lawsuits against Defendants: the criminal proceeding against Rockwell that resulted its 1992 guilty pleas as described in the preceding section and *Church v. Dow Chemical Co.*, No. 75-M-1162 (D. Colo.), which also concerns Rocky Flats. I will therefore construe Motion in Limine No. 14 as a motion to exclude evidence and reference to these two law suits.

The fact of both of these suits is relevant to this action because both are part [**240] of the history of Rocky Flats. It is not possible to tell that story and provide a context for other relevant testimony and evidence in this case without reference to them. Rockwell's 1992 guilty pleas and associated legal proceedings are also relevant for the other reasons stated in the preceding section. *See supra* Section I.E.1 (regarding Defendants' Motion in Limine Nos. 1-3). As Defendants admit in the subject motion, evidence regarding the 1975 *Church* litigation is also relevant to issues such as when the public (market) was aware of environmental concerns and risks at Rocky Flats. *See* Defs.' Mot. in Limine No. 14 at 3 n.4 (asserting Defendants may seek to introduce evidence regarding the *Church* litigation for this purpose).

I therefore deny Defendants' Motion in Limine No. 14 to exclude all evidence of other lawsuits, but hold Plaintiffs may only present evidence regarding the criminal proceedings against Rockwell as provided in my ruling on Defendants' Motions in Limine Nos. 1-3. With respect to the *Church* litigation, Plaintiffs may present evidence and reference the fact of this litigation only. I find no basis under *Rule 403* for excluding the evidence [**241] just described because the probative value of

580 F. Supp. 2d 1071, *1154; 2006 U.S. Dist. LEXIS 89121, **241

this evidence is not substantially outweighed by the risk of unfair prejudice or confusion of the issues. Defendants' concerns in this regard will be mitigated by my instructing the jury that it should not consider the fact of either lawsuit, or the allegations made therein, in deciding whether Dow or Rockwell engaged in any of the conduct alleged by Plaintiffs in this action. *See* Start of Trial Instructions, Nos. 2.4 -- 2.6.

### 3. Motions to exclude evidence involving the Department of Energy (Nos. 4 & 5)

#### a. Defendants' Motion in Limine No. 4

In this motion Defendants seek an order prohibiting Plaintiffs from presenting any evidence or making any reference to the DOE's general indemnification obligations under the Price-Anderson Act, *see Cook IX, 273 F. Supp. 2d at 1182-83*, or any specific agreement to indemnify Defendants for costs arising from their operation of Rocky Flats, including the damages sought in this action. *See* Defs.' Mot. in **[*1155]** Limine No. 4 (Doc. 1357) at 1-2. Defendants assert all such evidence is irrelevant and should also be excluded pursuant to *Rule 403* and *Rule 411*. I disagree and therefore **[**242]** deny Defendants' motion.

A great deal of the evidence in this case concerns studies, reports and investigations conducted by or for the DOE concerning waste management practices at Rocky Flats and the plant's actual or threatened impact on off-site properties. A number of the anticipated witnesses at trial are DOE officials and employees or frequent consultants or expert witnesses for the DOE. Much of this DOE-related evidence is critical to the determination of liability in this action. Evidence that the DOE is Defendants' indemnitor is relevant to showing the DOE's interest and stake in the outcome in this litigation, which in turn is relevant to the credibility of these witnesses and the trustworthiness of other evidence originating with or within the control of the DOE. [87]

[87]   Defendants urge that I follow the district court in *Hanford*, which excluded evidence of DOE indemnification as irrelevant in a recent trial. *See In re Hanford Nuclear Reservation Litig., 1918 U.S. Dist. LEXIS 15028, No. CV-91-3015*, Order re: Final Pretrial Conf. (Doc. 1874) at 8 (E.D Wash. Apr. 18, 2005). My understanding is that this case presented somewhat different issues than are presented here.

Nonetheless, to the extent my decision that evidence of DOE's indemnification is relevant is inconsistent with the *Hanford* court's decision, I respectfully disagree with that decision.

**[**243]**  I am not persuaded that the probative value of this evidence is substantially outweighed by the risk of undue prejudice or confusion of the issues as required for exclusion under *Rule 403*. The jury is fully capable of distinguishing between the DOE and Defendants, and whatever risk exists that the jury will improperly consider DOE's "deep pockets" in determining damages does not outweigh the probative value of this evidence with respect to the credibility of DOE witnesses and other evidence. [88]

[88]   Indeed, it is equally plausible to assume a jury, taxpayers all, would have the opposite reaction to DOE's indemnification. My experience teaches me that jurors do neither.

Defendants' reliance on *Rule 411* is also misplaced. This rule provides, as relevant here:

Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered **[**244]** for another purpose, such as . . . bias or prejudice of a witness.

*Fed. R. Evid. 411*. Assuming *Rule 411* applies to evidence of statutory indemnification obligations, it does not bar the admission of such evidence when it is offered for a purpose other than proving the defendant's conduct was wrongful. *See id.; see, e.g., Conde v. Starlight I, Inc., 103 F.3d 210, 214 (1st Cir. 1997); Corbett v. Borandi, 375 F.2d 265, 268 (3rd Cir. 1967)*. Here, as just described, evidence of DOE's indemnification is offered for and is relevant to the possible bias or prejudice of DOE-related witnesses and evidence. Accordingly, *Rule 411*, even if applicable here, does not require exclusion of this evidence.

#### b. Defendants' Motion in Limine No. 5

In this motion Defendants seek an order prohibiting Plaintiffs from presenting any evidence or making any

580 F. Supp. 2d 1071, *1155; 2006 U.S. Dist. LEXIS 89121, **244

reference to the DOE's classification of documents, its declassification review process and its conduct in response to discovery requests in this case. *See* Defs.' Mot. in Limine No. 5 (Doc. 1358) at 1. Defendants contend all **[*1156]** such evidence is irrelevant and, even **[**245]** if it were relevant, should be excluded because it is unfairly prejudicial to them and could cause jury confusion.

This motion is denied. This case is unusual in that the DOE, a non-party, controls a great deal of the information and documents describing operations and events at Rocky Flats. Much of this information is relevant to the issues to be decided in this case, but is not available because it is classified as secret by the DOE. It is not possible for the parties to present their cases without mentioning that relevant information is classified and unavailable for use at trial.

The jury is also entitled to know the efforts Plaintiffs, or Defendants for that matter, made to obtain access to this information and why they are unable to present all of the evidence they sought. This information will assist the jury in understanding and evaluating the information, documents and other relevant evidence that is available and presented at trial regarding Rocky Flats operations and events. Defendants' concerns about undue prejudice and confusion can and will be addressed through an appropriate limiting instruction. *See* Start of Trial Instructions, No. 1.9.

Discrete issues concerning **[**246]** specific evidence in this category will be resolved as they emerge during trial. The blanket order in limine sought by Defendants is not feasible or appropriate.

### 4. Motion to exclude certain lay witness testimony (No. 13)

Defendants here move to exclude all testimony by three lay witnesses identified by Plaintiffs: Len Ackland, W. Gale Biggs and Stuart Poet. Defs.' Mot. in Limine No. 13 (Doc. 1366).

Len Ackland is a journalism professor and author of a book on the history of Rocky Flats. Plaintiffs state they intend to call him to testify about the information about Rocky Flats that was available to the public based on the knowledge he acquired about media coverage of Rocky Flats during his book research. [89] Pls.' Cons. Mem. in Opp. to Defs.' Mots. in Limine (Doc. 1395) at 31.

Plaintiffs also indicate Mr. Ackland may testify about the difficulties he personally encountered during his research in trying to obtain Rocky Flats-related documents and information from the DOE and other government sources. *Id.*

> 89   Plaintiffs state they will not ask Mr. Ackland to testify to the truth of any statements found in media coverage, but rather only that these media statements were available to the public. *Id.*

**[**247]** Dr. Gale Biggs is a meteorologist and citizen activist who participated in several groups and projects addressing environmental issues at Rocky Flats, including the Rocky Flats Scientific Monitoring Panel (later known as the Citizens Advisory Board) appointed by Governor Romer and the Citizen's Soil Sampling Committee of the Health Advisory Panel. Plaintiffs report that Dr. Biggs will testify about the historical events surrounding his involvement with Rocky Flats, including the fact that the Governor's panel found Rocky Flats' environmental monitoring systems inadequate in various ways. *Id.* at 32.

Stuart Poet is a scientist who participated in the first soil sampling study that found plutonium from Rocky Flats in soil in the Class Area. Plaintiffs report that he will testify regarding the history, events and findings of this study. *Id.*

Each of these witnesses' proffered testimony is relevant to facts of consequence to the determination of this action. I am not persuaded by Defendants' arguments that the probative value of this evidence is substantially outweighed by the danger of unfair **[*1157]** prejudice or confusion of the issues, if any, that might result from its presentation.

**[**248]** Defendants also argue the testimony of each of these witnesses must be excluded because it consists entirely of lay opinions that do not meet the requirements of Federal Rule of

Evidence 701. *Rule 701* provides that a lay witness may testify in the form of opinions or inferences when these opinions or inferences are: "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of *Rule 702.*" *Fed. R. Evid. 701.*

*Rule 701* by its terms only concerns opinion testimony by a lay witness, and thus has no application to lay witness testimony that is factual in nature. *See United States v. Caballero, 277 F.3d 1235, 1247 (10th Cir. 2002)* (testimony regarding facts experienced or observed by witness proffers no opinion, lay or expert). The anticipated testimony of Mr. Ackland, Dr. Biggs and Mr. Poet, as described by Plaintiffs, is largely if not entirely factual in nature and thus is not subject to the requirements for admission of lay opinion testimony. [**249] [90] If these witnesses offer any opinion testimony at trial, I will decide at that time whether it is admissible under *Rule 701*.

> 90    That each of these witnesses may have specialized knowledge in journalism or science does not automatically require that their testimony be reviewed as lay or expert opinion testimony under *Rule 701* or *702*. *See Fed. R. Evid.701* 2000 advisory committee's note (*Rule 701* "does not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*.") (emphasis in original); *Caballero, 277 F.3d at 1247* ("Witnesses need not testify as experts simply because they are experts -- the nature and object of their testimony determines whether the procedural protections of *Rule 702* apply.").

For the reasons stated above, Defendants' motion to exclude these witnesses' testimony is denied.

## 5. Motion to exclude evidence regarding remediation costs (No. 16)

In this motion, Defendants seek to exclude all [**250] evidence or mention of the actual or estimated cost of dismantling and cleaning up the Rocky Flats plant and plant site, and to exclude evidence of costs incurred by Defendants to remediate environmental conditions at the site during their periods of operation. *See* Defs.' Mot. in Limine No. 16 (Doc. 1369). This motion is granted.

Plaintiffs assert this cost evidence is relevant to inform the jury of the severity of contamination and the difficulty of cleaning it up, which they contend are relevant to the question of whether the plant poses a continuing threat of off-site releases. Evidence regarding the cost of remedial efforts at the plant, however, is at best indirect evidence of these matters and has relatively little probative value with respect to the material question (in the nuisance context) of whether conditions arising

from Defendants' Rocky Flats operations pose a future risk of harm to the Class.

The low probative value of this evidence must be balanced against the risk of unfair prejudice and confusion of the issues it presents. I find this risk is significant, because the sheer cost of just the post-operation cleanup, reportedly estimated to be as high as $ 7.6 [**251] billion, may overwhelm and inflame the jury and distract it from consideration of other, more probative evidence. As a result, I find the risk of undue prejudice and confusion posed by this evidence substantially outweighs its [*1158] low probative value, and therefore exclude it pursuant to *Rule 403*.

## II. Plaintiffs' *Daubert* Motion and Motion in Limine

In their *Daubert* motion, Plaintiffs move to exclude the testimony of five of the eighteen or more experts designated by Defendants and to limit the testimony of six other defense experts in certain respects. *See* Pls.' Mem. in Supp. of Mot. to Exclude Test. of Certain Defense Expert Witnesses (Doc. 1351) [hereinafter "Pls.' *Daubert* Mot."]. In their motion in limine, Plaintiffs seek to exclude certain additional expert and lay evidence. *See* Pls.' Omnibus Mot. in Limine (Doc. 1341) [hereinafter "Pls.' Mot. in Limine"]. I address both motions below, beginning with Plaintiffs' arguments to exclude or limit certain expert testimony, and then proceeding to their motion in limine.

### A. Request to Exclude Certain Expert Testimony in its Entirety

Plaintiffs move to exclude all expert testimony proffered by defense [**252] witnesses Daniel Conway, John Dorchester, Geneva Smart and Dr. Jack Holl. I examine the proposed testimony of each witness in turn.

### 1. Daniel Conway

Daniel Conway is an urban economist and the president, principal and director of economic and market research for a Denver area firm. He holds an Urban Land Economics degree from the University of Wisconsin, has served as an honorarium instructor at local universities and has published many articles on various topics. App. to Pls.' Mot. to Exclude Test. of Certain Defense Expert Witnesses (Doc. 1352) [hereinafter "App. to Pls.' *Daubert* Mot."], Tab 3 at 13-14, Tab 4 at 27-28 (Conway

580 F. Supp. 2d 1071, *1158; 2006 U.S. Dist. LEXIS 89121, **252

statement of qualifications).

In 1996, Mr. Conway authored a 14-page expert report in this litigation opining that the Rocky Flats plant had not adversely affected the value of undeveloped real estate and improved commercial real estate in the Class Area. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 3 [hereinafter "Conway Report"]. Mr. Conway stated the basis of this opinion was his "experience and the data typically relied upon by developmental forecasters." *Id.* at 1. These data reported employment growth, population growth, **[**253]** household formations, retail/commercial construction and the addition of office and industrial space in the Class Area and surrounding communities from 1980 to 1996. *Id.* at 1-2. Mr. Conway concluded that, in terms of these "indicators," undeveloped properties and developed commercial properties in the Class Area performed at least as well, if not better, than those in the northwest Denver area, Jefferson County and the Denver metro region. *Id.* at 1. Based on this conclusion, he further opined that Rocky Flats had had no effect on the value of undeveloped and commercial properties in the Class Area from the plant's 1954 inception through 1996. *Id.*

In 2004, Mr. Conway authored a supplemental expert report updating his 1996 report and conclusions to include data from 1997 through mid-2004. App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 4 [hereinafter "Conway Suppl. Report"]. In it Mr. Conway reiterated his opinion that Rocky Flats had not adversely affected the value of undeveloped and commercial properties in the Class Area. *Id.* at 1. Mr. Conway further reported that he had recently interviewed and/or reviewed the deposition transcripts of a number of public officials, **[**254]** developers, builders and other stakeholders doing business in the Class Area and that these interviews and depositions demonstrated that Rocky Flats had not diminished the pace of development and construction in the Class Area or negatively **[*1159]** impacted the value of homes, commercial buildings or land in the area. *Id.* at 25.

The proponent of an expert witness has the burden of demonstrating that the expert's testimony is sufficiently reliable to be admitted under *Rule 702*. *See Mitchell, 165 F.3d at 781-82*; *Ralston, 275 F.3d at 970 n.4*. "The expert's assurance that the methodology and supporting data is reliable will not suffice" to carry this burden. *Mitchell, 165 F.3d at 781*.

Plaintiffs move to exclude Mr. Conway's testimony on the ground that neither he nor Defendants have demonstrated that his opinion regarding Rocky Flat's effect on Class Area property values is the product of a reliable methodology. I agree and find Defendants have not carried their burden of demonstrating that Mr. Conway's testimony is sufficiently reliable to be admitted under *Rule 702*.

As just described, Mr. Conway's opinion that Rocky Flats has had no adverse **[**255]** impact on the value of undeveloped and commercial properties in the Class Area is based primarily on his evaluation of five "indicators." Although he states these indicators are "typically relied upon by development forecasters," Conway Report at 1; Conway Suppl. Report at 1, neither he nor Defendants provide any support, other than Mr. Conway's assurance, for this statement. Nor do Mr. Conway and Defendants explain how the work of "development forecasters" relates to the question of whether Rocky Flats has affected Class Area property values.

Fundamentally, therefore, Mr. Conway and Defendants have failed to show that Mr. Conway's methodology of determining and comparing the rate of population, job and development growth in the Class Area, Jefferson County and the Denver metro area provides a reliable basis for his expert opinion that Rocky Flats has not negatively affected property values in the Class Area. The question to be decided by the jury is not whether Rocky Flats (or, more properly, Defendants' trespass and/or nuisance) negatively affected growth and development in the Class Area, but whether the *value* of residential, commercial and undeveloped property in the Class **[**256]** Area has been harmed by this conduct. While the rate of growth and development in the Class Area may have some relevance to this question, Mr. Conway and Defendants do not explain that relevance or, more importantly, demonstrate how a comparison of these data for a limited period of time is a reliable method for opining that Rocky Flats has had no adverse impact on property values in the Class Area. Without a linkage between these "indicators," real estate values, and Rocky Flats, there is, in the words of the Supreme Court, "simply too great an analytical gap between the data and the opinion proffered" for Mr. Conway's testimony to be admitted. *Joiner, 522 U.S. at 146*.

To the extent Mr. Conway relied on his experience to reach his conclusions on value, *Rule 702* requires that he

580 F. Supp. 2d 1071, *1159; 2006 U.S. Dist. LEXIS 89121, **256

"'explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *United States v. Fredette, 315 F.3d 1235, 1240 (10th Cir. 2003)* (quoting *Fed. R. Evid. 702* 2000 advisory committee's note). Mr. Conway did not provide this explanation **[**257]** and therefore no showing was made that his proposed testimony rests on a reliable foundation as required by *Rule 702*. [91] *See* **[*1160]** *id.*

> 91   Mr. Conway's reliance in his 2004 supplemental report on the interviews and review of deposition testimony he later conducted does not change this conclusion. Neither this methodology nor the results of it were disclosed as a basis for Mr. Conway's expert opinion in his 1996 report. Supplementing Mr. Conway's report some eight years later to include this methodology and material exceeds the bounds of permissible supplementation of expert testimony under the Federal Rules. *See infra* Section II.B.1 (regarding challenge to Dr. Whicker's supplemental expert disclosures). A party that fails to disclose information as required by *Rule 26(a)* is not permitted to use such information at trial unless the party's failure to disclose was substantially justified or harmless. *Fed. R. Civ. P. 37(c)(1)*. As Mr. Conway's improper supplementation to include this additional material is neither substantially justified nor harmless at this late stage of the case, I will not consider it here.

**[**258]** Defendants argue that certain of Mr. Conway's testimony regarding the pace of development in the Class Area relative to other areas should be admitted because it rebuts anticipated testimony from Plaintiffs' expert Wayne Hunsperger on this point. It is not clear to me from a review of the portions of Mr. Hunsperger's expert report cited by Defendants that he intends to testify regarding the pace of development, job growth and the like in the Class Area. *See* Defs.' Resp. to Pls.' Mot. to Exclude Test. of Certain Defense Witnesses (Doc. 1398) [hereinafter "Defs.' Resp. to Pls.' *Daubert* Mot."] at 37 (citing Hunsperger Report at 63, 252). If Mr. Hunsperger does so testify, then I will consider whether Mr. Conway may testify in rebuttal on this point. Mr. Conway may not, however, testify regarding his valuation conclusions, because I find them unreliable for the reasons stated above.

Plaintiffs' motion to exclude the proffered testimony of defense expert Daniel Conway is, therefore, granted except as it may be relevant and appropriate in rebuttal.

**2. John Dorchester**

John Dorchester holds a Masters Degree in Land Economics, the MAI (Member Appraisal Institute) designation **[**259]** from the Appraisal Institute and the CRE (Counselor of Real Estate) designation from the Counselors of Real Estate. He has forty-five years of experience in real estate valuation, is a past president of the American Institute of Real Estate Appraisers (now known as the Appraisal Institute) and has served on the International Valuation Standards Committee for many years. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 6 [hereinafter "Dorchester Report"] at 1-5 to 1-6.

In 1996, Mr. Dorchester and his company authored a 142-page expert report (not including appendices) directed at the question of "whether there was a basis for plaintiffs' claims that real property in the property class area had been economically harmed by operations and management of the Rocky Flats Plant." *Id.* at 1-5. Mr. Dorchester authored a 9-page supplement to this report in 2004. App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 7 [hereinafter "Dorchester Suppl. Report"]. In both, Mr. Dorchester concluded Defendants' operation of Rocky Flats did not cause a decrease in property values or other economic harm in the Class Area. Dorchester Report at 7-15; Dorchester Suppl. Report at 9. According to his **[**260]** expert reports, Mr. Dorchester also intends to testify and render opinions on a number of other diverse topics, including the history of operations at Rocky Flats, the risks posed by the plant, the nature of the Class property claims and whether the named Plaintiffs suffered economic harm with respect to their individual properties. *See, e.g.*, Dorchester Report at 7-1 to 7-16.

Plaintiffs have moved to exclude all of Mr. Dorchester's intended testimony on the ground that he failed to demonstrate that the methodologies he used in reaching his valuation opinion are reliable and that other aspects of his intended testimony are **[*1161]** either irrelevant or beyond his expertise as an appraiser. [92]

> 92   Although the discussion that follows focuses on Mr. Dorchester's 1996 expert report, it applies equally to the opinions set forth in Mr. Dorchester's 2004 supplemental report.

580 F. Supp. 2d 1071, *1161; 2006 U.S. Dist. LEXIS 89121, **260

Mr. Dorchester's 1996 report is difficult to review and analyze under the *Rule 702* criteria because it rambles and perseverates through numerous [**261] topics, some of which have only marginal relevance to the issues addressed in the report. The relationship of much of Mr. Dorchester's prolix discussion to his conclusions regarding Rocky Flats' effect on property values is also difficult to discern in many instances.

As best I can determine, Mr. Dorchester set out the methodologies he used to determine whether operations at Rocky Flats have caused any economic harm to the Class in Chapter 3 of his report. *Id.* at 3-14 to 3-16. Although he listed six different study methods there, [93] they break down into three separate analyses: (1) analysis of the pace and pattern of development around Rocky Flats; (2) analysis of news reports and anecdotal data; and (3) analysis of real estate prices and price trends in the vicinity of Rocky Flats. *See id.* at 5-1 to 5-52. [94] Mr. Dorchester provided additional information about these analyses and his conclusions based on them in Chapters 4, 5 and 7 and Appendix L. I examine the reliability of Mr. Dorchester's proffered testimony regarding each of these analyses in turn.

93   The admissibility of Mr. Dorchester's seventh listed study, an analysis of the named Plaintiffs' claims, and the conclusions he drew from it is addressed separately below.

[**262]

94   An additional study methodology reportedly undertaken by Mr. Dorchester, titled "analysis of expert opinion," consisted of his interviews with unnamed "Denver area real estate experts," government officials and agency staff personnel and "others who could furnish information about Rocky Flats." Dorchester Report at 3-16. In Chapter 5, however, where Mr. Dorchester reported on how he conducted his overall study and the results it produced, he did not discuss this method, how it was implemented or any conclusions he drew from it. The only further mention of this "expert opinion analysis" methodology in the 1996 report that I could locate is a single summary paragraph in the report's conclusion to the effect that these interviews confirmed Mr. Dorchester's conclusions. *Id.* at 7-5.

Mr. Dorchester's development-related analysis consisted of a lengthy examination of the history of development in the Denver metropolitan area and in the vicinity of Rocky Flats, as well as a discussion of some of the factors that might explain this history. *Id.* at 3-14; *see id.* at 4-1 to 4-23, 5-1 to 5-36. Based [**263] on this analysis, Mr. Dorchester concluded the pattern of development in the vicinity of Rocky Flats "appears to be reasonable and understandable" and "do[es] not evidence a reluctance of the market to develop towards or in proximity to Rocky Flats." *Id.* at 7-3. Based on his analysis of demographic and economic data, Mr. Dorchester further concluded that "the rate and nature of growth in the property class area are not consistent with indicators of economic harm" identified in his report. *Id.* at 7-4.

The difficulty with this development-based analysis, as with Mr. Conway's proffered testimony, is that neither Mr. Dorchester nor Defendants link this analysis to land values or the key damages issue to be decided by the jury: whether there is a difference between the actual value of the Class Properties and the value these properties would have had but for Defendants' alleged trespass and nuisance through operation of Rocky Flats. Mr. Dorchester, like Mr. Conway, provided no authority or explanation demonstrating that analysis of development patterns and related demographic and economic data is a reliable or accepted method for answering this question. [*1162] It was Defendants' burden [**264] to prove that Mr. Dorchester's development-based analysis is a reliable method for assessing the effect of an externality, such as Rocky Flats, on the *value* of affected properties. [95] Defendants failed to carry that burden with respect to this portion of Mr. Dorchester's study. [96]

95   Defendants assert the reliability of all of Mr. Dorchester's methods is established by Mr. Dorchester's statements in a supplemental declaration that the methods he used are "the most appropriate and generally expected" research methodologies for testing for economic harm to real property. *See* Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398) at 45 (quoting Ex. 26 (Dorchester Decl.), P 2.11). I could not verify Mr. Dorchester's reported statements, however, because the declaration included in Defendants' appendix does not contain the quoted language or address the reliability of Mr. Dorchester's methodology. *See id.*, Ex. 26. More importantly,

even if Defendants had submitted a declaration by Mr. Dorchester to this effect, it would not be sufficient to establish the reliability of his methodology. *See, e.g., Mitchell, 165 F.3d at 781* ("The expert's assurance that the methodology and supporting data is reliable will not suffice."); *Fed. R. Evid. 702* 2000 advisory commitee's note ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'").

**[**265]**

96   Mr. Dorchester's proffered testimony on the history or pattern of development in the vicinity of Rocky Flats may, however, be admissible in rebuttal to testimony by Plaintiffs' witnesses on these issues. *See supra* Section II.A.1 (regarding use of Mr. Conway's testimony in rebuttal).

Defendants also failed to carry their burden with respect to Mr. Dorchester's second methodology, his analysis of news reports and anecdotal data. Mr. Dorchester reported he gathered 950 articles regarding Rocky Flats that were published in Denver newspapers between 1951 and 1989. *Id.* at 5-38. He explained he collected and reviewed this information "to identify the nature, extent, and types of information that was publicly available" regarding Rocky Flats at various points in time. *Id.* at 5-36 to 5-38; *see id.* at 3-14 to 3-15. He then concluded "it is apparent that the [publicly available] information did not deter development from occurring in the Rocky Flats environs, nor does it appear that it reduced development timing." *Id.* at 7-4. He also reported that discussions with "various experts, **[**266]** " who were not identified, confirmed these conclusions. *Id.* at 7-5.

Neither Mr. Dorchester nor Defendants link his review of newspaper articles and his conclusions regarding their effect on development in the vicinity of Rocky Flats to his opinion that the value of Class properties has not been diminished by Defendants' operations at Rocky Flats. Mr. Dorchester's reported but unsubstantiated discussions with unspecified "experts" also do not provide a reliable basis for these conclusions. *See* Fed. R. Evid. 2000 advisory committee's notes ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"). Accordingly, Defendants have failed to carry their burden of demonstrating that this analysis was a reliable method for determining whether Defendants' alleged misconduct has negatively affected the value of Class properties.

In his third approach to assessing any economic harm caused by Defendants' Rocky Flats operations, Mr. Dorchester performed a number of price studies for Denver, the northwest Denver metropolitan area and the Class Area and environs. *Id.* at 5-39 to 5-51. Mr. Dorchester's basic methodology, which he refers to as **[**267]** his "time series methodology," *see id.*, App. L, was to determine the average price of homes sold in these various markets from the early 1970s through 1994 using MLS and other available data. *See id.* at 5-39. He then examined the price **[*1163]** trend in each analysis area to determine average price variability and to compare this variability to what he expected to occur with normal market shifts over time. *Id.* at 5-40. According to Mr. Dorchester, any "unexplained variation" or "shock" in these price trends would indicate that an "abnormality, such as adverse economic effects of a contaminating situation or event, may have occurred." *Id.*; *see id.* at L-3. Mr. Dorchester concluded that his price trend series for the Class Area and environs showed "no observable 'shocks' that would evidence significant changes in pricing" that might be attributable to Rocky Flats. *Id.* at 7-6; *see id.* at 5-48, L-6 to L-7.

Plaintiffs' first complaint is again that Mr. Dorchester and Defendants have not carried their burden of demonstrating that Mr. Dorchester's time series methodology is a reliable method of showing whether and to what extent Rocky Flats and Defendants' conduct there **[**268]** has affected real property values in the Class Area. They also argue that his method of examining pricing trends to identify "shocks" to Class property values, especially before and after the FBI raid, is too subjective to yield reliable results and is not consistent with the "but for" measure of damages that is governs this action.

Defendants cite a footnote in the Reference Manual on Scientific Evidence and two antitrust cases as establishing that use of a time series analysis to detect market reaction is a generally accepted methodology. Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398) at 47 (citing *Ref. Guide on Multiple Regression* at 191 & n.31; *Allapattah Servs., Inc. v. Exxon Corp., 61 F. Supp. 2d 1335, 1348 (S.D. Fla. 1999)*; *In re Industrial Silicon Antitrust Litig.*, 1998 U.S. Dist. LEXIS 20459, No. 95-2104, 95-1131, 96-2003, 96-2111, 96-2338, 1998 WL 1031507, at *2-3 (W.D. Pa. Oct. 13, 1998)). The cited authorities have some relevance, but are not conclusive. The cited passage in the Reference Manual, for example,

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 227 of 332

Page 70

580 F. Supp. 2d 1071, *1163; 2006 U.S. Dist. LEXIS 89121, **268

states only that "moving average time-series models" are "appropriate when nonlinearities are important." *Ref. Guide on Multiple Regression* at 191 & n. [**269] 31. The Reference Manual further states that "the expert should be prepared to explain why any chosen method . . . was more suitable than the alternatives." *Id.* at 191. The question here is whether Mr. Dorchester has sufficiently explained his pricing method and why it is suitable and reliable to assess whether Defendants' alleged misconduct at Rocky Flats affected Class property values. This is a close question but I find Mr. Dorchester and Defendants provided enough explanation and authority regarding this form of analysis to demonstrate its reliability within the meaning of *Rule 702*. Plaintiffs' complaint that Mr. Dorchester's method of looking for pricing "shocks" is subjective and inconsistent with the "but for" measure of damages has some merit, but I find it goes to the weight to be accorded Mr. Dorchester's testimony, and does not render his testimony inadmissible. [97] Accordingly, I find Mr. Dorchester's proffered expert testimony regarding the pricing studies he performed and the conclusions he reached based on them, as set forth in the subsection of Chapter 5 titled "Real Estate Prices and Price Trends" and in related portions of his 1996 report, is admissible. Plaintiffs' [**270] motion to exclude this portion of his testimony is denied.

> [97]   If Plaintiffs are concerned that Mr. Dorchester's testimony on pricing trends might confuse the jury into applying something other than the "but for" damages measure, they may propose a limiting instruction addressing this concern.

Plaintiffs also seek to exclude Mr. Dorchester's testimony regarding each of the named Plaintiffs' properties. As disclosed in his expert report, this proffered testimony consists of Mr. Dorchester's summary [*1164] of each named Plaintiff's deposition testimony and document production regarding their Class property or properties, *see* Dorchester Report at 6-1 to 6-6, followed by commentary and the conclusion for each that there is no basis for finding any economic harm to their properties attributable to Rocky Flats. *See id.* at 7-6 to 7-13. For each property, Mr. Dorchester based the latter conclusion "on the other studies we performed" and the absence "of evidence to the contrary." *See id.* at 7-8 to 7-12.

Plaintiffs [**271] argue that the opinions offered by

Mr. Dorchester based on this process are unreliable because his review was cursory and based on incomplete information. They also contend his discussion regarding each of the named Plaintiffs' properties is irrelevant because he did not rely on it in stating his ultimate conclusions regarding the lack of economic harm to each property. I agree on both points and therefore find Mr. Dorchester's proffered expert testimony on this subject inadmissible.

The remainder of Mr. Dorchester's testimony as disclosed in his expert report is also excluded because it is irrelevant and/or beyond his area of expertise. In Chapter 1 of his report, for example, Mr. Dorchester provided a verbose statement of his assignment as well as his interpretation of the Plaintiffs' damages claims as stated in their Second Amended Complaint and a 1993 Declaration filed by Plaintiffs' expert Wayne Hunsperger. This discussion is not evidence, is out-of-date and is beyond Mr. Dorchester's expertise as a property appraiser.

In Chapter 2 of his report, Mr. Dorchester set out a 19-page "brief" history of Rocky Flats. This history begins with Rocky Flats' origins in the Cold War, discusses [**272] the site selection process, reports on historical operations at the Plant, includes 12 pages opining on Rocky Flats' many positive contributions to the local and Denver area economy and its lack of negative effect on development or the environment, and closes with a discussion of the "history of public controversy surrounding Rocky Flats." *Id.* at 2-1 to 2-19. Testimony on these subjects is beyond Mr. Dorchester's appraisal expertise and is not relevant to his opinion regarding alleged diminution in Class property values. Contrary to Defendants' assertion, this historical summary is in no way similar to the half-page, bare-bones account of Rocky Flats' history in Mr. Hunsperger's expert report. *Compare* Dorchester Report at 2-1 to 2-19 *with* Hunsperger Report at 73.

Plaintiffs' motion to exclude Mr. Dorchester's testimony is granted in part and denied in part as stated above.

### 3. Geneva Smart

Geneva Smart is a Certified Residential Appraiser in Colorado and Senior Residential Appraiser member of the Appraisal Institute. She has 20 years of residential real estate appraisal experience in Boulder County and

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 228 of 332

Page 71

580 F. Supp. 2d 1071, *1164; 2006 U.S. Dist. LEXIS 89121, **272

surrounding areas.

For this litigation, Ms. Smart authored [**273] a 14-page expert report in which she opined that Rocky Flats has not had a negative effect on the value of the named Plaintiffs' individual properties or the value of other residential properties in northeast Jefferson County. App. to Pls.' *Daubert* Mot. (Doc. 1352), Ex. 12 [hereinafter "Smart Report"] at 9, 14. Ms. Smart stated in her report that these conclusions were based on her review of area maps, Plaintiffs' depositions, certain property appraisals, the Denver and Boulder area MultiList Services, and Jefferson County Assessor Records, as well as telephone interviews with officials with the Jefferson County Assessor's Office, Jefferson County Mapping Office, and Jefferson County School Administration. *Id.* at 2. She also cited as sources her years of experience in the area and discussions with real estate agents, [*1165] homeowners and appraisers over the years. *Id.* at 2, 11. Plaintiffs move to exclude Ms. Smart's proffered testimony on the ground that it is biased and based on a cursory, inadequate and therefore unreliable methodology.

Ms. Smart's deposition testimony regarding the bases for her conclusions demonstrates that her methodology was indeed unreliable for purposes [**274] of offering an expert opinion. Ms. Smart reported in her deposition that she informed defense counsel at their first meeting, before she was retained as an expert witness or done any investigation, that she believed Rocky Flats had not negatively affected property values. App. to Pls.' *Daubert* Mot. (Doc. 1352), Ex. 13 [hereinafter "Smart Dep."] at 26, 160. Her primary method of confirming this conclusion before writing her report was to review approximately 100 appraisals made between 1988 and 1993 by a single company that were selected for her by Defendants. *Id.* at 32, 45-46, 56-57. The conversations with various Jefferson County officials she cites in her expert report were minimal and did not address any potential property value effects of Rocky Flats. *Id.* at 81-85, 143-44, 147-50 (regarding contacts with Jefferson County's Assessor's office, mapping office and School District).

Ms. Smart also testified that her use of the MultiList database of home sales and conversations with real estate agents or home owners consisted only of her impression of these sources over the years, and did not include any systematic or scientific survey or even any inquiry in

connection [**275] with her expert report. *See id.* at 151-154 (Multilist and conversations with realtors); 182-84 (conversations with homeowners). Ms. Smart testified she did not rely on the deposition transcripts she reviewed, *id.* at 144, or some of the few interviews she had with appraisers because they did not support her previously announced conclusion, *see id.* at 154-60.

Ms. Smart also does not explain how her experience in the area allowed her to reach her conclusions. Her deposition, in fact, reveals that she had only performed one appraisal in the Class Area in the previous five years and that she knew very little about Rocky Flats and the problems ascribed to it that might affect area property values. *See id.* at 95-100, 152-53. As a result, it is unclear how her appraisal experience would allow her to opine that there was no value effect attributable to a property's proximity to Rocky Flats. *See, e.g., Fredette, 315 F.3d at 1239-40* (expert opinion is unreliable when there is no clear link between expert's experience and the conclusions reached).

Finally, neither Ms. Smart nor Defendants produced evidence demonstrating that her reported use of these sources [**276] and overall methodology are consistent with the level of intellectual rigor that characterizes the practice of an expert in the relevant field of property appraisal and valuation. *See Kumho Tire, 526 U.S. at 152* (stating standard for reliability determination). Under these circumstances, I find Defendants have not carried their burden of establishing that Ms. Smart's proffered expert opinions are based on sufficient facts and data and are the product of a reliable methodology reliably applied. As a result, I find her expert testimony is inadmissible under *Rule 702*.

### 4. Dr. Jack M. Holl

Dr. Jack M. Holl is a historian who, with Dr. Richard Hewlett, prepared a 45-page expert report in this case. App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 11 [hereinafter "Holl/Hewlett Report"]. [98] This report [*1166] discloses that the majority of Dr. Holl's proffered testimony consists of information regarding the "Dawn of the Nuclear Age" before and during World War II, *id.* at 3-11, the United States' efforts immediately after the war to maintain its nuclear monopoly and develop a nuclear weapons stockpile, *id.* at 11-19, and the acceleration and expansion of the United [**277] States' nuclear weapon program in the late 1940s and early 1950s in response to international crises, the Soviet

580 F. Supp. 2d 1071, *1166; 2006 U.S. Dist. LEXIS 89121, **277

Union's development of nuclear technology and the discovery of Soviet espionage directed at the United States' nuclear weapons program, *id.* at 20-27. The remainder of Dr. Holl's intended testimony describes the federal government's decision to construct a new nuclear weapons fabrication plant, its decision to build this plant at the Rocky Flats site, and the construction and subsequent expansion of the Rocky Flats plant. *See id.* at 27-38.

> 98   Defendants originally designated Dr. Hewlett as an expert witness and disclosed his expert report in 1996. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 10. Defendants state that Dr. Hewlett's health subsequently deteriorated and will prevent him from testifying at trial. Defendants have designated Dr. Holl, a former colleague of Dr. Hewlett, to testify in his stead. The Holl/Hewlett Report, produced as a supplemental report in 2004, appears to be a somewhat edited version of Dr. Hewlett's 1996 expert report.

[**278]   Plaintiffs move to exclude all testimony on these subjects. They assert the proffered expert testimony of Dr. Holl is irrelevant to their property damage claims, or, to the extent it has any probative value, that this value is outweighed by the danger of unfair prejudice and juror confusion because this testimony seeks to play on jurors' patriotic sentiments by suggesting that Defendants' operations at Rocky Flats were so beneficial to national security that any harm caused to the plant's neighbors should be disregarded. Plaintiffs also contend Dr. Holl's account of the Cold War arms race will not assist the jury and will waste valuable trial time because the jury does not need an expert's assistance to understand that the Rocky Flats plant played a role in protecting national security during the Cold War.

I grant this motion in part and deny it in part. One of the issues to be decided in this case in connection with Plaintiffs' nuisance claims is whether any proven interference with Class members' use and enjoyment of property is unreasonable. Under Colorado law and the Restatement (Second) of Torts, determination of this issue requires the jury to consider whether the gravity of [**279] the harm caused by Defendants' conduct outweighs the utility of that conduct. *See Cook IX, 273 F. Supp. 2d at 1202.* To assess the utility of Defendants' conduct, the jury must consider several factors, including

the primary purpose of Defendants' conduct and the social value of that purpose, *i.e.*, the extent to which achievement of this purpose generally advances or protects the public good. *See Restatement (Second) of Torts § 828* & *cmt. e*; *see also* Mem. Op. re: Jury Instructions, Section II.B (discussing *Restatement § 828* in connection with Defendants' proposed nuisance Instruction No. 6). Consideration of the primary purpose of the Rocky Flats plant and the social value of that purpose is thus relevant to this action.

As I understand the parties' arguments, it is undisputed that the primary purpose or mission of Rocky Flats was to produce nuclear weapon components and that this mission advanced the public good by protecting national security. Defendants nonetheless apparently intend to introduce a great deal of evidence on this subject, including the expert testimony set forth in the Holl/Hewlett Report.

[*1167]   Dr. Holl's [**280] proffered testimony regarding the "dawn of the nuclear age" in World War II, the origins of the Cold War armament race and related Soviet espionage, has little to no probative value here. Whatever probative value this testimony might have in providing a background to the federal government's decision to construct and operate Rocky Flats is substantially outweighed by the danger of unfair prejudice and confusion of the issues, and will needlessly waste trial time. This is particularly true given the lack of dispute regarding Rocky Flats' mission and the social value of that mission, and the capability of a lay jury to understand this mission and its value without expert assistance. 99

> 99   Defendants argue Dr. Holl's testimony regarding the beginnings and nature of the Cold War threat to national security is highly probative and admissible because a showing that events at Rocky Flats resulted from national security needs will prove that these events were reasonable, and thereby defeat Defendants' nuisance claims. *See, e.g.*, Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398) at 58-60. This is not correct. As stated above, the reasonableness of any interference with Plaintiffs' use and enjoyment of property depends on the balance between the utility of Defendants' conduct and the harm it causes. The utility of Defendants' conduct, in turn, depends on more than just the social value it provided, and includes

580 F. Supp. 2d 1071, *1167; 2006 U.S. Dist. LEXIS 89121, **280

consideration of whether Defendants took all steps practicable to avoid all or part of the harms they allegedly caused. *See Restatement (Second) of Torts § 828*; *see generally* Mem. Op. re: Jury Instructions, Section II.B (discussing Defendants' proposed nuisance Instruction No. 6). The undisputed fact that Rocky Flats served national security needs is not, therefore, determinative of the reasonableness of the alleged interference.

[**281] Dr. Holl's proffered testimony regarding events directly relating to the establishment, siting and operation of Rocky Flats does not present these concerns to the same degree. In addition, testimony on these subjects may be relevant to help explain the plant's operations over time, as demonstrated by the proffered testimony of Plaintiffs' expert Dr. Cochran on these subjects. *See* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 6 (Cochran Overview Report).

Accordingly, I grant Plaintiffs' motion to exclude expert testimony by Dr. Holl on the background, "pre-Rocky Flats" subjects set out in the Holl/Hewitt Report at pages 1-27. Dr. Holl may, however, testify regarding the history of Rocky Flats' creation and expansion as generally set out beginning on page 27 of the Holl/Hewitt report under the title "Project Apple-Establishing Rocky Flats" and continuing to the end of the report.

## B. Request to Limit Certain Expert Testimony

### 1. Dr. Ward Whicker

In 1991, Defendants retained Dr. F. Ward Whicker, a professor in Colorado State University's Department of Environmental and Radiological Health Sciences, to sample and measure the distribution and transport of plutonium and [**282] other radionuclides in the off-site environs of the Rocky Flats plant and to assess related human exposure to these substances. Upon receiving additional funding from the Colorado Department of Public Health and Environment, Dr. Whicker extended this sampling program to include certain on-site areas. App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 17 [hereinafter "Whicker Report"].

Defendants designated Dr. Whicker as one of their expert witnesses, and in November, 1996, disclosed his intended expert testimony in a voluminous report as required by *Rule 26(a)*. In his expert report, Dr. Whicker

described his sampling study, provided the data generated [*1168] by it and interpreted these data to state conclusions regarding the spatial distribution and environmental transport of plutonium and americium in the soils and vegetation on and adjacent to Rocky Flats. 100 *Id.* at 2. Plaintiffs deposed Dr. Whicker concerning his expert testimony as disclosed in this report in April, 1997.

> 100   In his report, Dr. Whicker also provided the preliminary results of an on-going study designed to measure the potential magnitude of human exposure to plutonium released from Rocky Flats and of studies to assess the level of plutonium and other radioactive substances in Great Western Reservoir sediments and ambient natural background radiation levels along the Colorado Front Range. *See* Whicker Report at 1-2.

[**283] Subsequently, in 2004 and 2005, Defendants produced additional statements by Dr. Whicker describing his intended expert testimony. The first, produced in August, 2004, is titled "Supplemental Expert Report." *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 18 [hereinafter "Whicker Suppl. Report"]. In it, Dr. Whicker discussed and stated opinions on a number of topics beyond his sampling study and its results, including: the difficulty of measuring plutonium levels in soil; the procedures used and results generated by other, earlier studies that measured plutonium in Rocky Flats area soil; potentially relevant regulatory and other environmental standards for plutonium in soil and how plutonium levels near Rocky Flats compare to these standards; potential changes in plutonium levels in soil over time; and the feasibility and justification for removing plutonium from Class members' properties. *See id.* at 2. Dr. Whicker stated his 1996 report was "the starting point" for these additional analyses and opinions. *Id.* at 1.

In a second supplemental submission, a declaration dated January 14, 2005, Dr. Whicker set out additional discussion and opinions, including opinions [**284] relating to the effect of soil disturbance on measurements of plutonium concentrations in soil and whether it was possible to demonstrate scientifically that plutonium from Rocky Flats remains on Class properties that have been disturbed through development, agriculture or landscaping. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 19 [hereinafter "First Whicker Decl."]. In a final

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 231
of 332

Page 74

580 F. Supp. 2d 1071, *1168; 2006 U.S. Dist. LEXIS 89121, **284

declaration, dated March 16, 2005, Dr. Whicker expanded on the opinions stated in his January 2005 declaration and responded to arguments made by Plaintiffs in response to it. *See* Defs.' Reply to Pls.' Resp. to Objs. to Identification of Stip. Facts (Doc. 1330), Ex. 3 [hereinafter "Second Whicker Decl."]. [101]

> 101    Defendants submitted Dr. Whicker's declarations in support of objections to a proposed stipulation (based on Defendants' admissions) that the Class Area was contaminated with plutonium from Rocky Flats. *See* Defs.' Objs. to Identification of Stip. Facts (Doc. 1315); Defs.' Reply to Pls.' Resp. to Objs. To Identification of Stip. Facts (Doc. 1330). Although Plaintiffs did not specifically identify Dr. Whicker's second declaration in their *Daubert* motion, their arguments there clearly encompass it.

**[**285]** Plaintiffs have moved to exclude testimony regarding portions of Dr. Whicker's 2004 supplemental report and 2005 declarations on the ground that the proffered testimony was not disclosed in his original 1996 expert report as required by *Rule 26(a)* and exceeds the bounds of supplemental expert disclosure permitted by the *Rule 26(e)*. Specifically, Plaintiffs seek to exclude testimony by Dr. Whicker regarding: (1) the difficulty of measuring or detecting plutonium in soil, *see* Whicker Suppl. Report at 3-5; First and Second Whicker Decls. *passim*; (2) governmental or agency standards for permissible levels of plutonium in soil and how plutonium soil levels near Rocky Flats compare to these **[*1169]** standards, *see* Whicker Suppl. Report at 9-10; (3) possible ways in which plutonium in soil can be disturbed, *see id.* at 11; First Whicker Decl., PP 11-12, 14, 17; Second Whicker Decl., *passim*; and (4) the unfeasibility of removing plutonium from Class properties, *see* Whicker Suppl. Report at 11-13.

*Rule 26(a)(2)* requires parties to produce a written report by each expert witness that includes "a complete statement of all opinions to be expressed [by that witness] and the basis **[**286]** and reasons therefor." *Fed. R. Civ. P. 26(a)(2)*; *see Miller v. Pfizer, Inc., 356 F.3d 1326, 1332 (10th Cir. 2004)*. This report must be "detailed and complete" and state "the testimony the witness is expected to present during direct examination, together with the reasons therefor." *Fed. R. Civ. P. 26* 1993 advisory committee's note. The expert's report must be produced by the court-ordered deadline, which in this

case was in November, 1996. A party that fails to disclose expert testimony in compliance with these rules may not present the expert's testimony at trial unless the failure to disclose was substantially justified or harmless. *See Fed. R. Civ. P. 37(c)(1)*.

*Rule 26(e)(1)* permits, indeed requires, that an expert supplement his report and disclosures in certain limited circumstances. Those circumstances are when the party or expert learns the information previously disclosed is incomplete or incorrect in some material respect. *See Fed. R. Civ. P. 26(e)*; *Jacobsen v. Deseret Book Co., 287 F.3d 936, 953-54 (10th Cir. 2002)*. **[**287]** [102] This provision is "not intended to provide an extension of the expert designation and report production deadlines" and may not be used for this purpose. *Metro Ford Truck Sales, Inc. v. Ford Motor Co., 145 F.3d 320, 324 (5th Cir. 1998)*. Permissible supplementation under the Rules instead "means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Keener v. United States, 181 F.R.D. 639, 640 (D. Mont. 1998)*; *see Beller v. United States, 221 F.R.D. 689, 694-95 (D.N.M. 2003)*.

> 102    A party may also be ordered by the court to supplement or correct an expert's disclosure to include information thereafter acquired. *See Fed. R. Civ. P. 26(e)*. In this case, supplementation in accordance with the Rules was authorized by court order. *See* Minute Order (Doc. 1238) (June 17, 2004). The deadline for service of any supplemental expert reports was July 30, 2004 for Plaintiffs and August 6, 2004 for Defendants. *See id.*

**[**288]** A supplemental expert report that states additional opinions or rationales or seeks to "strengthen" or "deepen" opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion under *Rule 37(c)*. *Beller, 221 F.R.D. at 695*; *see Keener, 181 F.R.D. at 641-42*; *Minebea Co., Ltd. v. Papst, 231 F.R.D. 3, 6 (D.D.C. 2005)*. "To rule otherwise would create a system where preliminary [expert] reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given." *Beller, 221 F.R.D. at 695*. This result would be the antithesis of the full expert

580 F. Supp. 2d 1071, *1169; 2006 U.S. Dist. LEXIS 89121, **288

disclosure requirements stated in *Rule 26(a)*.

The opinions and discussion in Dr. Whicker's 2004 and 2005 supplemental disclosures that are challenged by Plaintiffs are improper supplements to his 1996 expert disclosures under these standards. I have reviewed these disclosures and Dr. Whicker's 1996 expert report and there is no question that Dr. Whicker's proffered **[\*\*289]** testimony on the points identified by Plaintiffs are not attempts to correct inaccuracies **[\*1170]** in the 1996 report or to complete it based on information that was not available then. Rather, this testimony offers new or expanded opinions and discussion based largely on information that was available at the time of Dr. Whicker's initial disclosures. Such "supplementation" is not permitted under the Federal Rules. [103]

> 103   Neither party produced a complete copy of Dr. Whicker's 1996 report in their briefing on Plaintiffs' motion to exclude portions of his testimony. At my request, Defendants provided the court with a complete copy of this report for my review in deciding this motion. I have since discovered Defendants did not enter the complete report in the record at this time. In order to complete the record on this issue, I have directed the court clerk to enter the copy of Dr. Whicker's November 21, 1996 report that I received from Defendants on September 2, 2005 into the case record.

Defendants argue Dr. Whicker's **[\*\*290]** supplemental disclosures are proper because they concern "topics expressly addressed" in his 1996 report. Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398) at 76. The 1996 report excerpts cited by Defendants, however, do not demonstrate that Dr. Whicker expressly addressed or provided opinions on the topics that are the subject of Plaintiffs' motion, but rather that he made a handful of mostly passing references to these subjects in the course of describing his sampling study and the conclusions he drew from it. [104] Moreover, even if Dr. Whicker had expressly addressed these topics in his 1996 report, supplementation would only be permitted under the Rules to correct inaccuracies in the 1996 report or to complete it based on information that was not available when the report was issued. *See Keener, 181 F.R.D. at 640; Beller, 221 F.R.D. at 694-95*. Defendants make no showing that Dr. Whicker's 2004 and 2005 supplemental disclosures satisfy either circumstance. [105]

104   In addition, there are significant discrepancies between Dr. Whicker's report as disclosed in 1996 and some of the purported report excerpts cited, produced and relied upon by Defendants in opposition to Plaintiffs' *Daubert* motion. *Compare* 1996 Whicker Report, Chapter 2 (titled "Draft (11-19-96) Inventory Estimates of <239>Pu in Soil East of Rocky Flats") *with* Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398), Ex. 39A (expanded version of 1996 draft published in 7 Technology 497-507 (2000)); *compare* 1996 Whicker Report, Chapter 11 (data table titled "Americium-241 and Cesium-137 Activity Concentrations and Inventories at Macroplots Along the A Transect") *with* Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398), Ex. 39C at 276-285 (excerpt from article published in 76 Health Physics (Mar. 1999) that apparently discusses the data reported in Chapter 11 of Dr. Whicker's 1996 expert report).

**[\*\*291]**

105   In addition, Dr. Whicker's 2005 declarations were not timely produced. The court-ordered deadline for Defendants to serve any supplemental expert disclosures was August 6, 2004. *See* Minute Order (Doc. 1238).

Defendants also argue my 2003 and 2004 rulings narrowing and defining the issues to be tried in this action constitute new information justifying Dr. Whicker's 2004 and 2005 supplemental disclosures. Court rulings, however, do not constitute new information justifying supplementation under *Rule 26(e)*. Granting parties carte blanche to serve a supplemental round of expert reports setting out new and revised opinions based on pretrial rulings would undermine the expert disclosure requirements set forth in *Rule 26(a)*.

Even if this were not the case, there is no merit to Defendants' suggestion that *Cook IX* and other pretrial decisions introduced new elements to the case that necessitated additional expert testimony. Dr. Whicker's supplemental disclosures were directed to the issue of whether the Class Area is contaminated with plutonium from Rocky Flats. This issue has been part **[\*\*292]** of this case from the beginning because it is an element of Plaintiffs' trespass claim. **[\*1171]** Defendants' suggestion that they were not aware of this issue until the 2003 *Cook IX* decision is not credible. In fact, Defendants' decision to supplement Dr. Whicker's 1996

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 233 of 332

Page 76

580 F. Supp. 2d 1071, *1171; 2006 U.S. Dist. LEXIS 89121, **292

report to add opinions regarding matters such as the effect of soil disturbance on plutonium measurement and the reliability of pre-development soil sampling results to establish existing contamination, *see, e.g.,* First and Second Whicker Decls., appears to be the result of Defendants' tactical decision to dispute a previously conceded point -- that the Class Area is in fact contaminated with plutonium from Rocky Flats. *See* Mem. Op. re: Jury Instructions, Section I.A.2 (discussing Defendants' representations on this issue). The Federal Rules do not permit a party to supplement previously disclosed expert testimony for such a purpose. *See Minebea, 231 F.R.D. at 6* (*Rule 26(e)* does not permit parties to file supplemental reports whenever they believe such reports would be 'desirable' or 'necessary' to their case."); *cf. Schweizer v. DEKALB Swine Breeders, Inc., 954 F. Supp. 1495, 1509-10 (D. Kan. 1997)* **[**293]** (party may not expand expert's opinions after disclosure deadline to defend summary judgment motion). Accordingly, I find Dr. Whicker's discussion and opinions in his 2004 and 2005 supplements as identified by Plaintiffs were not disclosed as required by *Rule 26(a)* and are not permissible supplements under *Rule 26(e)*.

Pursuant to *Rule 37(c)(1)*, Dr. Whicker may not testify regarding these matters unless the failure to disclose this testimony was substantially justified or harmless. *See Jacobsen, 287 F.3d at 952-53*. In determining whether either circumstance exists, I consider the following factors: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing the testimony would disrupt the trial; and (4) the offering party's bad faith or willfulness. *Id. at 953*.

I find Defendants' violation of the expert disclosure rules with respect to Dr. Whicker was neither harmless nor substantially justified. Expert discovery closed years before Dr. Whicker's supplemental disclosures. At the time the supplemental report and declarations were served, the **[**294]** court and the parties were engaged in the lengthy and difficult process of narrowing and defining the issues to be tried and preparing for trial following more than a decade of discovery and pretrial motions practice. Defendants' improper attempt to supplement and expand Dr. Whicker's expert testimony in the middle of this process, more than seven years after Dr. Whicker's testimony was disclosed and six years after Plaintiffs deposed Dr. Whicker based on this disclosure,

prejudiced Plaintiffs in their preparation for trial. Reopening expert discovery to allow Plaintiffs to depose Dr. Whicker and designate a rebuttal expert if desired to cure this prejudice was not a just or viable option at this late stage of trial preparation, especially given the interrelated nature of much of the expert testimony in this case. Allowing introduction of Dr. Whicker's supplemental testimony under these circumstances would have disrupted the trial and possibly delayed it. Given the length of the anticipated trial and the busy schedules of both the court and trial counsel, abandoning the current trial date also would have likely necessitated yet another lengthy delay in this case. While I do not find **[**295]** Defendants acted in bad faith in failing to disclose Dr. Whicker's additional testimony in his 1996 report, their contention that they were not aware of the need for this testimony until after my 2003 decision in *Cook IX* is not credible.

For all of these reasons, I find Defendants' failure to disclose the supplemental **[*1172]** testimony challenged by Plaintiffs was neither harmless nor substantially justified. Plaintiffs' motion to exclude this testimony is granted.

## 2. Laurie Van Court

Laurie Van Court is a Colorado certified appraiser holding the MAI designation from the Appraisal Institute. She prepared a 30-page report for this litigation regarding the factors that may affect horse-related properties and businesses and how these factors may have influenced the value of the properties and horse businesses of named Plaintiffs Merilyn Cook, Loren and Gertrude Babb, and Richard and Sally Bartlett. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 15 [hereinafter "Van Court Report"] at 1-2.

Plaintiffs move to exclude Ms. Van Court's proffered testimony on four subjects: the management of horse properties generally; the financial state of these Plaintiffs' horse businesses; **[**296]** the value of Ms. Cook's and the Babbs' properties; and Ms. Cook's alleged debts. Plaintiffs argue Ms. Van Court's opinions on these subjects as disclosed in her report are irrelevant and unsupported.

Based on my review of Ms. Van Court's expert report and excerpts from her deposition as provided by the parties, I grant Plaintiffs' motion in part and deny it in part. I find Ms. Van Court's intended testimony regarding

580 F. Supp. 2d 1071, *1172; 2006 U.S. Dist. LEXIS 89121, **296

Ms. Cook's alleged debts, the Thigpen transactions, the horse business and the participation of Ms. Cook, the Babbs and the Bartletts in the horse business are irrelevant. They are therefore excluded except on rebuttal and then only if such issue or issues are raised by Plaintiffs. Ms. Van Court may testify regarding the real property owned by Ms. Cook, the Babbs and the Bartletts.

### 3. Expert testimony regarding the ability to abate plutonium contamination in the Class Area

Several of Defendants' experts offer opinions on the feasibility or desirability of removing plutonium contamination from the Class Area. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Ex. 9 [hereinafter "Frazier/Auxier Report"] at 3; Whicker Suppl. Report at 11-13. [106] Plaintiffs move **[**297]** to exclude testimony on this subject on the ground that it irrelevant and unfairly prejudicial and that the opinions offered represent personal views unsupported by any methodology.

> 106   The cited portion of the Dr. Whicker's supplemental report is also excluded for the reasons stated in Section II.B.1 above.

This motion is granted. Whether it is feasible or desirable to abate the plutonium in the Class Area is not an issue to be decided in this action. *See Cook v. Rockwell Int'l Corp.* ("*Cook X*"), *358 F. Supp. 2d 1003, 1007-08 (2004).* The relevant question with respect to abatement of plutonium contamination in the Class Area is rather whether abatement has actually occurred or is about to occur. *See id. at 1013.* Neither Dr. Frazier nor Dr. Whicker's proffered testimony on abatement goes to this question, and instead consists of speculation about whether plutonium abatement might be feasible or whether removal of the plutonium would be less desirable than the status quo. To the **[**298]** extent this proffered testimony has any probative value in deciding whether abatement has occurred or is imminent, that value is substantially outweighed by the risk of unfair prejudice and confusion of the issues by the jury.

### 4. Expert testimony regarding RAC and Chem Risk studies

Studies conducted by ChemRisk and the Risk Assessment Corporation **[*1173]** ("RAC") regarding the Rocky Flats plant are among the scientific studies

discussed and relied upon in the expert disclosures of at least four of Defendants' expert witnesses: Drs. John Till, Chris Whipple, John Auxier and John Frazier. Plaintiffs move to limit these experts' testimony with respect to the ChemRisk and RAC studies on the ground that repeated presentation of these studies through multiple experts would be prejudicial, needlessly cumulative and a waste of trial time. In further briefing on this motion, Plaintiffs clarified that they do not object to Defendants' experts relying on the ChemRisk and RAC study results in reaching their conclusions, but rather seek to prevent repetitive presentations of the study reports themselves. *See* Pls.' Reply in Supp. of *Daubert* Mot. (Doc. 1408) at 4.

This motion is granted. **[**299]** The original and/or supplemental reports of defense experts Drs. John Till, Chris Whipple and John Frazier (substituting for Dr. John Auxier and adopting Dr. Auxier's 1996 expert report) all describe and/or rely in varying degrees on the ChemRisk and RAC studies. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 14 [hereinafter "Till Report"]; *id.*, Tab 20 [hereinafter "Whipple Suppl. Report"] at 6-11; *id.*, Tab 1 [hereinafter "Auxier Report"], Chs. IX & X; *id.*, Tab 9 [hereinafter "Frazier Suppl. Report"] at 2-3. Each expert may rely on these studies to support their respective opinions and may reference them as appropriate in their testimony to support their opinions. They will not, however, be permitted to waste trial time by needlessly presenting cumulative testimony regarding the methodologies and findings of the ChemRisk and RAC studies. *See* Fed. R. Evid. 403; *Marsee v. United States Tobacco Co.,* 866 F.2d 319, 324 (10th Cir. 1989) (trial court has discretion to exclude repetitive and cumulative expert testimony).

The potential for such unnecessary cumulative testimony is demonstrated in particular **[**300]** by the overlap between what Defendants describe as Dr. Till's "foundation testimony" regarding the processes employed and the conclusions reached in the RAC study and underlying ChemRisk study, *see* Till Report, and Dr. Frazier's proffered testimony regarding the same subjects, *see* Auxier Report, Chs. IX & X. Dr. Whipple's intended testimony as set forth in his 2004 supplemental report does not present these same concerns to the extent it compares and contrasts the ChemRisk and RAC study processes with those employed by some of Plaintiffs' experts.

580 F. Supp. 2d 1071, *1173; 2006 U.S. Dist. LEXIS 89121, **300

## C. Request to Exclude Certain Expert and Lay Evidence

### 1. Evidence of Class Area property values after 1992

In both their *Daubert* motion and motion in limine, Plaintiffs argue that evidence regarding Class Area property values after 1992 should be excluded because it is irrelevant and prejudicial. *See* Pls.' *Daubert* Mot. at 5 (seeking to exclude certain testimony by Mr. Conway, Mr. Dorchester and Dr. Wise); Pls.' Mot. in Limine at 1-3. Plaintiffs separately challenge several exhibits included in Dr. Wise's expert reports on this same basis. *See* Pls.' *Daubert* Mot. at 19-22 (moving to exclude Exs. 5 [**301] & 8 of Dr. Wise's 1996 report and Exs. 6 & 9 of his 2004 supplemental report).

As Plaintiffs properly noted at oral argument, this motion addresses two categories of evidence that are subject to different analysis. The first category is evidence regarding absolute property values in the Class Area after 1992. The second is evidence regarding Class Area property values relative to property values [*1174] in other parts of the Denver metro area after this date.

Absolute property values. Defendants seek to present expert and lay evidence that property values in the Class Area have increased in absolute terms since 1992, including the rate of appreciation in their value. Plaintiffs argue this evidence is not relevant to the jury's determination of damages because it does not comport with the "but for" measure of damages governing this action. More particularly, Plaintiffs assert that evidence of absolute property values and appreciation rates for Class properties, without comparison to the value and appreciation rate of other properties not affected by Rocky Flats, cannot assist the jury in deciding the difference (if any) between the actual value of the Class properties and the value these [**302] properties would have had but for Defendants' alleged trespass and/or nuisance. Plaintiffs further argue that admission of evidence regarding absolute Class property values and appreciation rates would be unfairly prejudicial and confusing, not only because it would invite the jury to ignore the "but for" damages measure, but also because it would improperly suggest that no damages can have occurred, or that any damages have been erased, as a result of increasing Class Area property values. [107]

[107]   Plaintiffs do not object to expert testimony that is based on consideration of absolute property

values and rates of appreciation or incidental mention of such data, but urge that charts and other evidence showing or highlighting the upward curve of absolute property values in the Class Area over time be excluded.

Defendants' counter-argument centers on the jury's determination of the point in time at which to measure any damages suffered by the Class. As explained in prior opinions and the jury instructions, this [**303] measuring point is the time when the injurious situation (allegedly) caused by Defendants became "complete" and "comparatively enduring." *See, e.g.*, *Cook IX*, 273 F. Supp. 2d at 1210 (citing *Restatement (Second) of Torts § 930*); May 2005 Order at 15-16; Start of Trial Instructions, No. 3.22. "Complete" in this context means the effects of Defendants' alleged trespass or nuisance were known to their full extent. "Comparatively enduring" means there was no reason to expect that these effects will end at a definite time in the future. *See* Start of Trial Instructions, No. 3.22; *Restatement (Second) of Torts § 930 cmts. b, d*.

Plaintiffs assert this "CCE time" is the period between the FBI raid on the plant in June, 1989, and Rockwell's guilty plea to environmental crimes in March, 1992. Defendants dispute that the injurious situation became complete and comparatively enduring at this or any other time. Nonetheless, they assert that evidence of absolute property values in the Class Area after 1992 is relevant and necessary for the jury to find damages if the jury determines that the CCE period [**304] occurred sometime after 1992. Defendants further argue that this probative value outweighs the risk of prejudice, which can be abated by a limiting instruction if necessary. [108]

[108]   Defendants also argue that evidence of an increase in Class Area property values is relevant to the jury's determination of whether any interference with the use and enjoyment of Class properties is substantial as required to find liability for nuisance. This argument is based on statements in *Cook IX* that evidence that the interference caused property values to depreciate is relevant to determining whether the interference is substantial. *See 273 F. Supp. 2d at 1209*; *see also* Start of Trial Instructions, No. 3.9 (instructing the jury on this point). Evidence that property values have appreciated or depreciated is not relevant to the "substantial" interference

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 236 of 332

Page 79

580 F. Supp. 2d 1071, *1174; 2006 U.S. Dist. LEXIS 89121, **304

determination in the abstract, however, but only if it is linked to a claimed interference in some fashion. *See* Start of Trial Instructions, No. 3.9.

[*1175] [**305] Plaintiffs have defined their claims based on the injurious situation becoming complete and comparatively enduring in the 1989-92 time period. *See*, e.g., Pls.' Statement of Claims (Doc. 1419) at 5-6. Accordingly, the jury will be instructed to decide whether Plaintiffs have proved the injurious situation became complete and comparatively enduring in this time period. *See* Start of Trial Instructions, No. 3.22. If the jury finds Plaintiffs have not carried this burden, then no damages will be awarded. *See id.* Plaintiffs are the master of their claims and if they do not wish to give the jury the option of awarding damages based on a CCE time falling outside of the 1989-92 period, then Defendants cannot force that option on them.

As a result, any changes in absolute property values in the Class Area in the post-1992 period, without more, are not relevant to determining either the amount of any damages suffered by the Class or when the injurious situation allegedly caused by Defendants' Rocky Flats operations became complete and comparatively enduring. The relevant evidence on these questions is evidence of *relative* property values, that is how any changes in Class Area [**306] property values compare to changes in the value of properties not affected by Rocky Flats. Evidence of absolute property values, without this comparison, is not probative of these questions.

I further find that any probative value that evidence of absolute property values and appreciation rates might have is substantially outweighed by the risk of unfair prejudice and juror confusion. Presentation of such evidence would distract the jury from the proper "but for" measure of damages and improperly suggest that Plaintiffs were not harmed or should bear any harm they suffered because their properties have appreciated in value in absolute terms.

This situation presents many of the same concerns considered by the Tenth Circuit in *Perlmutter v. United States Gypsum Co., 4 F.3d 864 (10th Cir. 1993)*, a product liability action brought by the developers of a shopping mall to recover the costs of asbestos removal from the company that made the asbestos-containing materials at issue. The defendants sought to introduce evidence of the large profit the plaintiffs received in selling the mall after the asbestos removal. *Id. at 871.*

The Tenth Circuit affirmed the [**307] trial court's exclusion of this evidence, finding that it was "potentially very prejudicial" because the jury could have understood it "to show that, despite any loss occasioned by the removal and replacement of [defendant's asbestos-containing material], the Northglenn Mall project was very lucrative and the Developers benefited [sic] greatly. This might have persuaded the jury that the Developers could afford to bear any loss associated with the removal of [defendant's material]." *Id.* These same considerations apply here, and substantially outweigh any probative value that evidence of Class Area absolute property values and appreciation rates might have.

Relative property values. As the preceding discussion makes clear, a different analysis applies to evidence of relative property values after 1992. Such evidence comparing property values in the Class Area with property values in areas not affected by Defendants' alleged wrongdoing at Rocky Flats is consistent with and relevant to the "but for" measure of damages. Evidence of relative property values is also relevant to determining whether the injurious situation caused by Defendants became "complete" and "comparatively [**308] enduring" between 1989 and 1992 as Plaintiffs allege.

Presentation of evidence of relative property values poses some risk of unfair [*1176] prejudice and confusion of the issues in that a jury might view the mere fact of appreciating Class Area property values as an indication that the Class has not suffered any true harm from Defendants' alleged conduct or is able to bear that harm. *See Perlmutter, 4 F.3d at 871.* I find this risk, however, does not substantially outweigh the probative value of this evidence as just described.

Accordingly, I grant Plaintiffs' motion to exclude evidence of post-1992 property values in part and deny it in part. The motion is granted with respect to evidence of absolute property values in the Class Area after 1992 for the reasons stated above. It is denied with respect to post-1992 evidence of relative property values. Because evidence of relative property values still poses some risk of unfair prejudice and juror confusion, Plaintiffs may propose a limiting instruction addressing this concern.

These rulings also dictate the result of Plaintiffs' motion to exclude the cited exhibits in Dr. Wise's 1996 and 2004 expert reports. These exhibits [**309] compare property values and related sales information in the Class Area with that of properties in other areas and as such are

580 F. Supp. 2d 1071, *1176; 2006 U.S. Dist. LEXIS 89121, **309

evidence of relative property values. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 21 (1996 Wise Report), Exs. 5, 8; *id.*, Tab 22 (2004 Wise Suppl. Report), Exs. 6, 9. Plaintiffs' motion to exclude these exhibits is, therefore, denied.

**2. Evidence of Class Members' knowledge of Rocky Flats problems**

In both their motion in limine and *Daubert* motion, Plaintiffs move to exclude evidence intended to show that Plaintiffs or Class members knew or should have known about problems at Rocky Flats before they bought their property or before the FBI raid. *See* Pls.' Mot. in Limine at 8; Pls.' *Daubert* Mot. at 6 (referencing portions of Mr. Dorchester's expert reports). Plaintiffs argue such evidence is irrelevant and therefore inadmissible as a result of my prior rulings, that the defenses of statute of limitations and assumption of the risk, and the closely related defense of coming to the nuisance, are not available in this action. *See Cook X, 358 F. Supp. 2d at 1004, 1013*; May 2005 Order at 19-20. Plaintiffs further assert **[**310]** such evidence is inadmissible even if relevant because its probative value (if any) is substantially outweighed by the danger that it will mislead and confuse the jury into improperly blaming class members for any harm they suffered.

Defendants argue that evidence of both actual and constructive Class member knowledge at the time they purchased their Class properties is relevant and admissible with respect to various issues beyond the rejected affirmative defenses. In reply and at oral argument, Plaintiffs acknowledged that such evidence might be relevant to some of these issues, and clarified that the relief they seek is confirmation that, consistent with my prior rulings, evidence concerning individual Plaintiffs' or Class members' actual or constructive knowledge of environmental and other problems at Rocky Flats cannot be offered to show or argue that Plaintiffs or the Class came to the nuisance or assumed the risk or that Plaintiffs' claims are barred by the statute of limitations. *See, e.g.*, Pls.' Reply in Supp. of Mot. in Limine (Doc. 1409) at 3-4.

Plaintiffs' motion is granted as narrowed in the preceding paragraph. Consistent with Colorado law and my prior rulings, Defendants **[**311]** are precluded from offering evidence or arguing or suggesting to the jury that Plaintiffs' trespass or nuisance claims are barred because individual Plaintiffs or all or some of the Class knew or

**[*1177]** should have known of the alleged trespass or nuisance or related problems associated with Defendants' activities at Rocky Flats when they purchased their properties in the Class Area. Evidence concerning Plaintiffs' or Class members' actual or constructive knowledge will only be permitted if it is relevant and admissible for some other purpose, and if the risk of unfair prejudice and confusion of the issues does not substantially outweigh the evidence's probative value.

**3. Evidence of Defendants' alleged compliance with regulatory standards**

In their motion in limine and *Daubert* motion, Plaintiffs also move to exclude evidence of Defendants' alleged compliance with state or federal regulatory standards at Rocky Flats. *See* Pls.' Mot. in Limine at 8-10; Pls.' *Daubert* Mot. at 7-8 (referencing portions of expert reports produced by Drs. Auxier, Frazier and Whicker). Plaintiffs contend this evidence is inadmissible because it is irrelevant to any claim or defense in this case **[**312]** and carries a high risk of unfair prejudice and jury confusion.

Plaintiffs' motions on this point are denied. Evidence that Defendants complied with relevant regulatory standards is relevant to the negligent conduct element of Plaintiffs' nuisance claims and to the issue of punitive damages. [109] *See Bayer v. Crested Butte Mountain Resort, Inc., 960 P.2d 70, 78 (Colo. 1998)*; *Silkwood v. Kerr-McGee Corp., 485 F. Supp. 566, 578-80, 584 (W.D. Okla. 1979), rev'd in part on other grounds, 667 F.2d 908 (10th Cir. 1982), rev'd 464 U.S. 238, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984)*. I am not persuaded that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice or jury confusion. Plaintiffs may, if they wish, submit a limiting instruction addressing their concern that the jury could mistakenly give such evidence undue weight.

[109]   Defendants' further argument regarding the relevance of this evidence, namely their assertion that proof of compliance with state and federal regulatory standards conclusively establishes that the alleged nuisance was reasonable and therefore not actionable under Colorado law, was extensively briefed in connection the parties' proposed jury instructions. This argument, which I rejected, is addressed in the separate jury instruction opinion issued this date. *See* Mem. Op. re: Jury Instructions, Section II.B (regarding

580 F. Supp. 2d 1071, *1177; 2006 U.S. Dist. LEXIS 89121, **312

Defendants' proposed nuisance Instruction No. 7).

**[**313] D. Request to Exclude Certain Lay Evidence**

**1. National security evidence**

Plaintiffs move to exclude evidence offered to show that Defendants' conduct was justified by the demands of national security. The scope of Defendants' intended evidence on this point is set forth in "Defendants' Statement Regarding National Security Evidence" (Doc. 1442), filed September 14, 2005, at my direction.

This motion in limine and Plaintiffs' arguments in support of it parallel those asserted in connection with Plaintiffs' motion to exclude expert testimony by Dr. Jack Holl regarding the Cold War armaments race and the role of the Rocky Flats plant in building the United States' nuclear weapons stockpile. I granted that motion in part and denied it in part. *See supra* Section II.A.4. I do the same with respect to this motion in limine for the reasons stated earlier. *See id.*

Accordingly, I exclude Defendants' proffered evidence regarding "Weapons Program and the Cold War" as reported in Section I of their September 14 statement, and deny Plaintiffs' motion to exclude evidence regarding the subjects set forth in the Sections II-V of Defendants' September 14 statement. I will, however, **[**314]** scrutinize **[*1178]** any evidence that is ultimately offered on the subjects set forth in Sections II-V to ensure that is otherwise admissible and is not needlessly cumulative.

**2. Lay testimony by real estate agents**

Plaintiffs have moved to exclude certain lay testimony by Defendants' real estate agent witnesses. *See* Pls.' Mot. in Limine at 3-5. Plaintiffs do not object to these witnesses testifying about their personal knowledge of transactions in which they participated, including whether participants in these transactions expressed concerns or requested a discount because of problems associated with Rocky Flats. Plaintiffs have requested that I bar these real estate agent witnesses from generalizing from this personal knowledge to offer opinion testimony on whether and how problems at Rocky Flats affected the market for properties in the Class Area as a whole.

This request is governed by *Federal Rule of Evidence 701*, which provides that a lay witness may only offer opinion testimony if the opinion is: "(1) rationally based on the perception of the witness; (2) helpful to a clear understanding of the witness' testimony or the determination **[**315]** of a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge within the scope of *Rule 702*." Plaintiffs contend that opinion testimony extrapolating the personal experience of these real estate agents to the market for Class Area properties as a whole does not meet *Rule 701*'s requirements because the agents would then be giving opinions about transactions in which they did not participate, so that their opinions would not be "rationally based on the perception of the witness," and because this extrapolation from personal experience to generalized conclusions would require these witnesses to use their specialized knowledge as real estate agents.

Defendants respond that their real estate agent witnesses are entitled to testify regarding the facts of any transactions in which they participated, including the lack of effect Rocky Flats had on these transactions. This may be true, but it is not responsive to the issue presented, which is whether *Rule 701* authorizes lay testimony by these witnesses that draws inferences or offers opinions on Rocky Flats' effect on the market as a whole, which indisputably includes transactions in which these witnesses did **[**316]** not participate. I find *Rule 701* does not permit such testimony. The cases cited by Defendants do not go to this larger issue, and instead involve situations in which the lay witness was offering opinions about specific events or circumstances based on their personal participation or knowledge of these events or circumstances.

The analysis of the court in *Estate of Michel Dunia v. Comm'r, T.C. Memo 2004-123, No. 6115-00, 2004 WL 1119603 (U.S. Tax Ct. May 20, 2004)*, is instructive here. In that case, the court considered whether a general partner in a venture that had purchased the land at issue could give lay opinion testimony regarding the value of the land at a time when the partnership did not own the property. The court held he could not because he lacked personal knowledge of the land in question at the valuation date, with the result that his lay opinion would necessarily have been "based upon the specialized knowledge derived from his experience as a real estate developer." *Id.* Similarly, while Defendants' real estate agent witnesses have participated in transactions in the Class Area, they could only state broad opinions

encompassing transactions in which **[**317]** they did not participate, and the market as a whole, by drawing on their extrinsic and **[*1179]** specialized knowledge as real estate professionals.

Accordingly, for the reasons stated above, I grant Plaintiffs' motion on this point and bar Defendants' real estate agent witnesses from opining on whether or how Rocky Flats and Defendants' activities there affected any transactions in which these witnesses did not personally participate or how Rocky Flats affected the market for Class properties as a whole.

### 3. Lay testimony by Roy Thigpen

Plaintiffs move to exclude testimony by lay witness Roy Thigpen. *See* Pls.' Mot. in Limine at 5-8. His anticipated testimony, as described by both parties, concerns his participation in real estate transactions with named Plaintiff Merilyn Cook in 1984-85. *See id.* at 5; Defs.' Resp. to Pls.' Mot. in Limine (Doc. 1394) at 18-24. Mr. Thigpen reportedly will testify that he purchased a parcel of land from Ms. Cook in December, 1984, but then defaulted on the loan in 1985, which allowed Ms. Cook to assume his mortgage and thereby re-acquire the property. Mr. Thigpen testified at deposition that he did not view the 1984 sale as an arms-length transaction, **[**318]** and that it was arranged by a mutual acquaintance with the intent that Ms. Cook would re-acquire the property, subject to the mortgage, to help her consolidate her debts. Plaintiffs seek to exclude this testimony on the grounds that it is irrelevant and would be unfairly prejudicial.

This motion is granted in part and denied in part. Mr. Thigpen's account of his 1984-85 dealings with Ms. Cook

are of marginal relevance at best to any issue to be decided by the jury. It also poses a substantial risk of unfair prejudice, jury confusion and waste of trial time. His testimony is primarily a personal attack on Ms. Cook, who is but one member of a class of thousands. It would unnecessarily confuse the jury and consume trial time as Plaintiffs countered Mr. Thigpen's account with Ms. Cook's version of events and evidence drawing Mr. Thigpen's own credibility into question. What little probative value Mr. Thigpen's testimony might have is substantially outweighed by these risks and will therefore be excluded. However, if Ms. Cook testifies regarding her dealings with Mr. Thigpen, Defendants may present Mr. Thigpen in rebuttal as appropriate.

### Conclusion

For the reasons stated above, **[**319]** Defendants' motions to exclude expert testimony by Plaintiffs' experts (Docs. 1371, 1374, 1376/1380) were denied; Defendants' motions in limine Nos. 1-16 (Docs. 1354-69) were granted in part and denied in part; and Plaintiffs' motion to exclude testimony of certain defense expert witnesses (Doc. 1350) and omnibus motion in limine (Doc. 1341) were granted in part and denied in part. Each of these decisions was issued in summary form before trial in the bench rulings cited in the introduction to this memorandum opinion.

Dated this 7th day of December, 2006.

s/ John L. Kane

Senior Judge

United States District Court



LEXSEE 564 F. SUPP. 2D 1189

**MERILYN COOK, et al., Plaintiffs, v. ROCKWELL INTERNATIONAL CORPORATION AND THE DOW CHEMICAL COMPANY, Defendants.**

**Civil Action No. 90-cv-00181-JLK**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*564 F. Supp. 2d 1189*; *2008 U.S. Dist. LEXIS 45031*

**May 20, 2008, Decided**
**May 20, 2008, Filed**

**SUBSEQUENT HISTORY:** Judgment entered by *Cook v. Rockwell Int'l Corp., 564 F. Supp. 2d 1189, 2008 U.S. Dist. LEXIS 52909 (D. Colo., June 2, 2008)*

**PRIOR HISTORY:** *Cook v. Rockwell Int'l Corp., 2006 U.S. Dist. LEXIS 89544 (D. Colo., Dec. 7, 2006)*

**COUNSEL:** **[**1]** For Merilyn Cook, Plaintiff: Bernadette M. Rappold, Jonathan Auerbach, Peter B. Nordberg, Stanley B. Siegel, David F. Sorensen, Ellen T. Noteware, Eric L. Cramer, LEAD ATTORNEYS, Merrill Gene Davidoff, Berger & Montague, P.C., Philadelphia, PA; Christopher Thomas Reyna, John David Stoner, LEAD ATTORNEYS, Chimicles & Tikellis, L.L.P., Haverford, PA; David Evans Kreutzer, LEAD ATTORNEY, Colorado Attorney General's Office-Department of Law, Denver, CO; Gary B. Blum, Holly Brons Shook, LEAD ATTORNEYS, Steven William Kelly, Silver & DeBoskey, P.C., Denver, CO; Jean Marie Geoppinger, Louise M. Roselle, LEAD ATTORNEYS, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH; Kenneth A. Jacobsen, LEAD ATTORNEY, Jacobsen Law Offices, LLC, Wallingford, PA; R. Bruce McNew, LEAD ATTORNEY, Taylor, Gruver & McNew, P.A., Greenville, DE.

For William Schierkolk, Jr., Delores Schierkolk, Richard Bartlett, Lorren Babb, Gertrude Babb, Michael Dean Rice, Bank Western, Michael Dean Rice, Thomas L. Deimer, Rhonda J. Deimer, Stephen Sandoval, Peggy J. Sandoval, Plaintiffs: Bernadette M. Rappold, Jonathan Auerbach, Peter B. Nordberg, Stanley B. Siegel, David F. Sorensen, Ellen T. Noteware, Eric L. Cramer, **[**2]** LEAD ATTORNEYS, Merrill Gene Davidoff, Berger & Montague, P.C., Philadelphia, PA; Christopher Thomas Reyna, John David Stoner, LEAD ATTORNEYS, Chimicles & Tikellis, L.L.P., Haverford, PA; David Evans Kreutzer, LEAD ATTORNEY, Colorado Attorney General's Office-Department of Law, Denver, CO; Gary B. Blum, Holly Brons Shook, LEAD ATTORNEYS, Steven William Kelly, Silver & DeBoskey, P.C., Denver, CO; Jean Marie Geoppinger, Louise M. Roselle LEAD ATTORNEYS, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH; Kenneth A. Jacobsen, LEAD ATTORNEY, Jacobsen Law Offices, LLC, Wallingford, PA; R. Bruce McNew, LEAD ATTORNEY, Taylor, Gruver & McNew, P.A., Greenville, DE.

For Sally Bartlett, Plaintiff: Bernadette M. Rappold, Jonathan Auerbach, Peter B. Nordberg, Stanley B. Siegel, David F. Sorensen, Ellen T. Noteware, Eric L. Cramer, LEAD ATTORNEYS, Merrill Gene Davidoff, Berger & Montague, P.C., Philadelphia, PA; Christopher Thomas Reyna, John David Stoner, LEAD ATTORNEYS, Chimicles & Tikellis, L.L.P., Haverford, PA; Daniel R. Satriana, Jr., LEAD ATTORNEY, Clisham, Satriana & Biscan, LLC, Denver, CO; David Evans Kreutzer, LEAD

564 F. Supp. 2d 1189, *; 2008 U.S. Dist. LEXIS 45031, **2

ATTORNEY, Colorado Attorney General's Office-Department of Law, Denver, CO; Gary **[**3]** B. Blum, Holly Brons Shook, Bruce H. DeBoskey, LEAD ATTORNEYS, Steven William Kelly, Silver & DeBoskey, P.C., Denver, CO; Jean Marie Geoppinger, Louise M. Roselle, Stanley M. Chesley, LEAD ATTORNEYS, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH; Kenneth A. Jacobsen, LEAD ATTORNEY, Jacobsen Law Offices, LLC, Wallingford, PA; R. Bruce McNew, LEAD ATTORNEY, Taylor, Gruver & McNew, P.A., Greenville, DE; Ronald Simon, LEAD ATTORNEY, Simon & Associates, Washington, DC.

For Rockwell International Corporation, Defendant: Amy Horton, Edward J. Naughton, Timothy P. Brooks, Wendy S. White, LEAD ATTORNEYS, Goodwin Procter, LLP-DC, Washington, DC; David M. Bernick, Douglas J. Kurtenbach, Mark S. Lillie, LEAD ATTORNEYS, James M. Golden, Stephanie A. Brennan, Kirkland & Ellis, LLP-Chicago, Chicago, IL; Joseph John Bronesky, LEAD ATTORNEY, Sherman & Howard, L.L.C.-Denver, Denver, CO; Martin Thomas Tully, LEAD ATTORNEY, Katten Muchin Rosenman, LLP-Chicago, Chicago, IL.

For Dow Chemical Company, Defendant: Christopher Lane, Joseph John Bronesky, LEAD ATTORNEYS, Sherman & Howard, L.L.C.-Denver, Denver, CO; David M. Bernick, Douglas J. Kurtenbach, Mark S. Lillie, LEAD ATTORNEYS, James **[**4]** M. Golden, Stephanie A. Brennan, Kirkland & Ellis, LLP-Chicago, Chicago, IL; Douglas M. Poland, LEAD ATTORNEY, LaFollette, Godfrey & Kahn, Madison, WI; Lester C. Houtz, LEAD ATTORNEY, Bartlit, Beck, Herman, Palenchar & Scott, LLP-Denver, Denver, CO; Louis W. Pribila, LEAD ATTORNEY, Dow Chemical Company, Midland, MI; S. Jonathan Silverman, LEAD ATTORNEY, Kirkland & Ellis-Illinois, Chicago, IL.

For United States Department of Energy, Interested Party: Carlotta P. Wells, LEAD ATTORNEY, U.S. Department of Justice-DC-Civil Division-# 7150, Washington, DC; Stephen D. Taylor, LEAD ATTORNEY, U.S. Attorney's Office-Denver, Denver, CO.

For US Dept. of Energy, Interested Party: Carlotta P. Wells, LEAD ATTORNEY, U.S. Department of Justice-DC-Civil Division-# 7150, Washington, DC; Stephen D. Taylor, U.S. Attorney's Office-Denver,

Denver, CO.

**JUDGES:** John L. Kane, Senior District Judge.

**OPINION BY:** John L. Kane

**OPINION**

**[*1195]  MEMORANDUM OPINION AND ORDER ON PENDING MOTIONS**

Kane, J.

On February 14, 2006, the jury returned a verdict in the class trial on Plaintiffs' trespass and property claims finding for Plaintiffs and against Defendants on both claims and awarding Plaintiffs compensatory and exemplary damages. This matter is now before **[**5]** me on Defendants' renewed motion for judgment as a matter of a law pursuant to *Rule 50(b)* and their motion for new trial or, in the alternative, for remittitur of damages pursuant to *Rule 59*. For the reasons stated below, I deny both motions.

Both parties have also submitted motions directed at putting the claims and issues decided in the course of the class trial in a posture for immediate appeal. Upon consideration of their competing proposals, I have determined that final judgment on the claims decided in the class trial shall be entered pursuant to *Federal Rule of Civil Procedure 54(b)*. **[*1196]** The substance of the final judgment and related plan of allocation to be entered is set out in Section III below.

**Discussion**

*I. Defendants' Renewed Motion for Judgment as a Matter of Law*

Defendants moved for judgment as a matter of law under *Rule 50(a)* at the close of Plaintiffs' case and again at the close of evidence. I review Defendants' latest *Rule 50* motion under the same standard as their previous motions.

Under *Rule 50*, judgment as a matter of law in favor of Defendants is warranted "only if the evidence points but one way and is susceptible to no reasonable inferences supporting [Plaintiffs]." **[**6]** *Snyder v. City of Moab, 354 F.3d 1179, 1184 (10th Cir. 2003)*; *see Fed. R. Civ. P. 50(a)*. In making this determination, I must

564 F. Supp. 2d 1189, *1196; 2008 U.S. Dist. LEXIS 45031, **6

view the evidence and any inferences to be drawn from it most favorably to the Plaintiffs, as the non-moving party. *Baty v. Willamette Indus., Inc., 172 F.3d 1232, 1241 (10th Cir. 1999), overruled on other grounds, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).* I also must "refrain from weighing the evidence, passing on the credibility of witnesses or substituting [my] judgment for that of the jury." *Brown v. Wal-Mart Stores, Inc., 11 F.3d 1559, 1563 (10th Cir. 1993); see Baty, 172 F.3d at 1241.*

I denied Defendants' first and second *Rule 50* motions based on my determination that, viewing the evidence and all reasonable inferences therefrom in the light most favorable to Plaintiffs, there was a sufficient basis for a reasonable jury to find for Plaintiffs on each of the issues identified by Defendants in their motions. In their most recent *Rule 50* motion, Defendants seek judgment on the same issues as in their previous motions relying on much the same arguments as before. Having carefully considered these renewed arguments and Plaintiffs' response **[**7]** under the standard for decision stated above, I again find that there was a legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs on each of the issues challenged by Defendants. Accordingly, I deny Defendants' Renewed Motion for Judgment as a Matter of Law.

*II. Defendants' Motion for New Trial and Alternative Motion for Remittitur of Damages*

Defendants have also moved pursuant to *Rule 59(a)* for the jury's verdicts to be set aside and a new trial ordered based on alleged inconsistencies and excesses in the jury's verdicts and other alleged errors committed before, during and after trial. In the alternative, Defendants seek remittitur of the jury's compensatory and exemplary damages verdicts.

*Rule 59 of the Federal Rules of Civil Procedure* provides that a court may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." *Fed. R. Civ. P. 59(a)(1)(A).* Granting a new trial is only appropriate, however, where the claimed error substantially and adversely affects the rights of a party. *See Sanjuan v. IBP, Inc., 160 F.3d 1291, 1297 (10th Cir. 1998); Fed. R. Civ. P. 61.* The burden of **[**8]** showing an error having this prejudicial effect rests on the party seeking the new trial. *See Streber v. Hunter, 221 F.3d 701, 736 (5th Cir. 2000); Clarksville-Montgomery*

County Sch. Sys. v. U.S. Gypsum Co., 925 F.2d 993, 1002 (6th Cir. 1991); see generally 11 Charles Alan Wright et al., Federal Practice & Procedure: Civil § 2803, at 47 (2d ed. 1995 & Supp. 2007) (collecting cases). The decision of **[*1197]** whether to grant a new trial rests within the sound discretion of the district court. *See Shugart v. Cent. Rural Elec. Co-op, 110 F.3d 1501, 1506 (10th Cir. 1997); York v. Am. Tel. & Tel. Co., 95 F.3d 948, 958 (10th Cir. 1996).* While federal law governs the procedural aspects of a motion for new trial or remittitur, state law sets the substantive standards in this action, *see 42 U.S.C. § 2014(hh); Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 426-39, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996),* except to the extent that a federal constitutional challenge is raised.

Defendants devote nearly three-fourths of their voluminous *Rule 59* motion to rearguing my decisions to proceed with a class trial, to admit certain lay and expert evidence, to reject certain of Defendants' proposed jury instructions and overrule their objections **[**9]** to other instructions, and to deny Defendants' multiple motions for mistrial. Each of the challenged decisions was reached after reasoned consideration of extensive written and/or oral argument from both parties. After careful review of Defendants' most recent arguments regarding these matters, I find no basis for reconsidering these decisions. Accordingly, I deny Defendants' motion for new trial based on the claimed errors in my previous decisions. [1]

> 1   In so holding, I did not find it necessary to make findings on whether Defendants have waived any of the arguments now asserted by failing to raise them at the appropriate time before or during trial or on whether any of the errors claimed by Defendants substantially and adversely affected their rights as would be required for a new trial to be ordered.

The remainder of Defendants' arguments for new trial are based on alleged inconsistencies or excesses in the jury's compensatory and exemplary damages verdicts. I examine each of these arguments in turn, as well as Defendants' alternative motion for remittitur of damages.

*A. Request for New Trial Based on Alleged Inconsistencies in the Jury's Damages Verdicts*

Defendants assert a new trial **[**10]** is required because the jury's answers to the damages interrogatories

564 F. Supp. 2d 1189, *1197; 2008 U.S. Dist. LEXIS 45031, **10

in the jury verdict form are inconsistent in various respects. In order for a new trial to be ordered on this basis, Defendants must "show that any verdict inconsistency demonstrates either confusion or abuse on the jury's part." *Domann v. Vigil, 261 F.3d 980, 983 (10th Cir. 2001)* (internal quotation omitted). Special interrogatory answers that are "irreconcilably inconsistent" because they are "logically incompatible" indicate such jury confusion or abuse of power. *See Loughridge v. Chiles Power Supply Co., 431 F.3d 1268, 1275 (10th Cir. 2005)*. In determining whether there is any inconsistency meeting this standard, I "must accept any reasonable view of the case that makes the jury's answers consistent," and consider the verdict in light of the instructions given to the jury, among other factors. *Id.* (internal quotations omitted).

The jury answers challenged by Defendants are not "logically incompatible" or even inconsistent. Far from indicating that the jury was confused or abused its power in determining damages, these answers indicate a diligent effort by the jury to follow the instructions they received regarding **[**11]** determination of damages. Defendants' complaints, as a result, are more properly directed to the jury instructions and verdict form than to any inconsistency in the jury's verdicts. [2]

> 2    As discussed below, in many instances Defendants failed to object to the jury instructions and portions of the jury verdict form that they now challenge.

**[*1198]**  There is no inconsistency, for example, in the jury's determination of identical compensatory damages for the trespass and nuisance claims. The jury was instructed to determine any compensatory damages resulting from a trespass or nuisance committed by the Defendants separately, and informed that the court would apply the rule prohibiting multiple recovery of the same damages when it issued judgment on the jury's verdict. Notice of Final Jury Instructions (Doc. 2121) [hereinafter "Final Jury Instructions"], No. 3.26 ("Multiple Recovery Prohibited"). [3] Following this and other instructions and the corresponding interrogatories in the verdict form, the jury found both Defendants liable on both theories of liability and determined that the aggregate damages to the Class [4] on each claim were $ 176,850,340. Jury Verdict Form (Doc. 2117) at 15, 24. All concede, **[**12]** and I found following the jury's verdict, *see* 2/14/06 Tr. at 10800-01, that these responses reflect the jury's

determination that Defendants' proven trespass and nuisance caused the same damages: a reduction in the aggregate value of the Class Properties of $ 176,850,340. [5]

> 3    Defendants proposed this instruction. *See* Defs.' Submission of Phase III Jury Instructions and Jury Verdict Forms (Doc. 1271) at 64-65 (Defs.' Proposed Damages Instruction No. 3.14 - Multiple Recovery Prohibited).
> 4    The jury instructions defined the "Class" as "persons who owned property in a specific, defined area, known as the 'Class Area,' near the Rocky Flats Nuclear Weapons Plant on June 7, 1989." Final Jury Instructions, No. 1.1.
> 5    The jury instructions defined "Class Properties" as properties owned by Class members as of June 7, 1989 that are located in the Class Area. Final Jury Instructions, No. 3.2.

The damages verdicts on each claim reflect the jury's determination that the Defendants' trespass and nuisance each bore the requisite causal relationship to the entire diminution in value suffered by the Class Properties. This determination is consistent with the evidence presented indicating that some conduct **[**13]** by each Defendant contributed to both the continuing trespass and nuisance, and with authority recognizing that the same conduct can contribute to liability under both theories. *See, e.g., Borland v. Sanders Lead Co., 369 So. 2d 523, 527 (Ala. 1979)* ("trespass and nuisance are separate torts for the protection of different interest invaded," but "the same conduct on the part of a defendant may, and often does, result in actionable invasion of both interests."). It is also consistent with the evidence presented on damages and with the jury instructions and legal rule setting the same measure of damages for both types of tortious invasions. *See* Final Jury Instructions, No. 3.22; *Restatement (Second) of Torts § 930(3)(b)* (1979) (measure of damages for continuing tortious invasions of land is the decrease in the value of land caused by the prospect of invasion continuing). [6] There is, therefore, no inconsistency in the jury's answers concerning the aggregate damages to the Class caused by the Defendants' continuing trespass and nuisance. Defendants' concern about multiple recovery of the same damages will, as I stated in the relevant jury instruction and when the jury's verdict was announced, **[**14]** be addressed in the final judgment on the jury's verdict.

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 244 of 332

Page 5
564 F. Supp. 2d 1189, *1198; 2008 U.S. Dist. LEXIS 45031, **14

6   Unless otherwise noted, all references to the Restatement in this memorandum opinion and order are to the Restatement (Second) of Torts (1979).

Nor is there any inconsistency in the jury's allocation of fault in the verdict form between Dow and Rockwell for their trespass and nuisance. Under the evidence **[*1199]** presented, the jury could reasonably apportion fault differently between the Defendants for the trespass through contamination of the Class Properties and for the Defendants' unreasonable and substantial interference in the use and enjoyment of these Properties as found in the nuisance claim. In particular, the jury's apportionment to Dow of 90% fault for the trespass and 30% for the nuisance and to Rockwell of 10% fault for the trespass and 70% fault for the nuisance is reasonable and consistent under the evidence presented.

Defendants' attempt to create an inconsistency in the verdict by characterizing the jury's apportionment of fault as an allocation of loss causation or damages is unavailing. Colorado's pro rata liability statute required that the jury separately determine the total damages sustained by Plaintiffs and the **[**15]** percentage "fault" attributable to each Defendant. *Colo. Rev. Stat. § 13-21-111.5(2).* The jury instruction for the latter determination is titled "Apportioning Fault Between the Defendants." Final Jury Instructions, No. 3.19A. This instruction and the corresponding interrogatories in the verdict form are modeled on language approved by the Colorado Supreme Court for this jury determination. *See* Colo. Jury Instructions (Fourth) Civ. §§ 9:29-9:29B. The jury followed these instructions and apportioned fault for the trespass and for the nuisance between the Defendants. It is the duty of the Court, not the jury, to prorate each Defendant's liability based on the jury's allocation of fault between them. *See Lira v. Davis, 832 P.2d 240, 242 (Colo. 1992)* (after jury determines total compensatory damages, court applies pro rata liability statute and enters judgment against each defendant for compensatory damages "apportioned in accordance with the percentage of fault attributable to that defendant" found by the jury). The jury was not charged with determining loss allocation and did not do so.

It appears Defendants' true complaint here is not that the jury's apportionment of fault on the two **[**16]** claims is irreconcilably inconsistent but rather that the jury's answers in the verdict form did not sufficiently fix the compensatory damages to be awarded against each Defendant. In fact, the jury made the factual findings on compensatory damages that were required of it, leaving to the Court the task of applying the rule against multiple recovery and the pro rata liability statute. As described in Section III, this task is readily accomplished without disregarding any of the jury's factual findings or engaging in speculation regarding what the jury actually determined. As a result, there is no cause for a new trial on the ground that the jury did not make sufficient findings for judgment on compensatory damages to be entered against each Defendant.

I also note that Defendants' complaints about what they perceive as the jury's uncertain allocation of compensatory damages between them is of little practical significance if, as Defendants have maintained throughout this action, they are both fully indemnified here by the U.S. Department of Energy (DOE) pursuant to their contracts to operate Rocky Flats Nuclear Weapons Plant for the federal government. That the DOE has controlled the **[**17]** joint defense of its indemnitees 7 may also explain Defendants' failure throughout the long history of this action to raise the **[*1200]** comparative fault of the other as a defense or to take other action to protect their interests as against the other, even when invited to do so by this Court. Thus, while I find no inconsistency in the jury's allocation of fault between the Defendants as required by the jury instructions and Colorado law, I also am dubious that any error on this point would substantially and adversely affect either Defendant's rights as a result of their joint indemnification by the DOE and their or the DOE's apparent decision not to protect the interests of each Defendant against the other in this action.

7   In their memorandum opposing Defendants' *Rule 59* motion, Plaintiffs cite statements to this effect by Rockwell in a Form 10-Q filing with the United States Securities and Exchange Commission. *See* Pls.' Mem. of Law in Opp'n to Defs.' Mot. for New Trial or Remittitur (Doc. 2239) at 6-7 & n.4. Defendants do not dispute these statements in their reply brief.

Defendants also claim that inconsistencies in the jury's determination of exemplary damages require a new trial. Specifically, **[**18]** they contend the jury's award of these damages is irreconcilably inconsistent with its determination of compensatory damages, because the

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 245 of 332

Page 6

564 F. Supp. 2d 1189, *1200; 2008 U.S. Dist. LEXIS 45031, **18

total amount of exemplary damages awarded exceeds the amount of compensatory damages found by the jury. This result is internally inconsistent, Defendants argue, because it violates the jury instructions and Colorado's statutory cap on exemplary damages awards.

Defendants' complaint does not state an inconsistency in the jury's verdicts, but rather a claimed "violation" in the jury's determination of exemplary damages. Even if Defendants were correct that the jury "violated" the jury instructions or the statutory cap on exemplary damages as claimed, this would not be cause for a new trial. Resolution of this issue would require no more than a judicial adjustment of the exemplary damages award in entering judgment in accordance with Colorado law. *See Lira, 832 P.2d at 246* (applying Colorado exemplary damages statute to limit amount of jury's exemplary damage award to amount of compensatory damages due after pro rata apportionment); *see also id.* (remanding for entry of judgment consistent with opinion, rather than for new trial, after determining that **[\*\*19]** jury's award of exemplary damages exceeded statutorily permitted amount).

In fact, Defendants are incorrect that the jury's exemplary damages award violated Instruction No. 3.27, and its direction that any exemplary damages "you award may not be more than the amount you awarded as actual damages against the Defendant or Defendants." From the jury's perspective, its verdict assessed compensatory damages of $ 353.7 million, the sum of the $ 176.8 million in actual damages it found on the trespass claim and on the nuisance claim, with the result that the sum of exemplary damages awarded against Dow and Rockwell, $ 200.2 million, did not exceed the amount of compensatory damages stated in the verdict. It is only upon application of the prohibition on multiple recovery to the jury's compensatory damages determinations, a task reserved for the court under Instruction No. 3.26, that the total amount of compensatory damages due from Defendants, $ 176.8 million, becomes less than the aggregate exemplary damages determined by the jury.

Further, for the reasons stated in Section III below, I find the jury's exemplary damages awards against each Defendant do not exceed Colorado's statutory cap on **[\*\*20]** exemplary damages. *See infra* Section III.B.1.

*B. Request for New Trial or Remittitur Based on Excessive Compensatory and Exemplary Damages*

Defendants assert a new trial or remittitur is also required because the jury's compensatory and exemplary damages determinations are excessive on one or more grounds. I review each of Defendants' contentions in turn.

**[\*1201]**  *1. Compensatory damages award*

I begin with Defendants' contention that the jury's compensatory damages determinations must be set aside because they are clearly unsupported by the evidence. As support for this contention, Defendants incorporate the legal and evidentiary arguments asserted in support of their Renewed Motion for Judgment as a Matter of Law (Doc. 2220).

Under both Colorado and federal law, a jury's determination of damages is inviolate unless the damages award is so excessive or inadequate "as to shock the judicial conscience." *Higgs v. Dist. Court, 713 P.2d 840, 860-61 (Colo. 1985)*; *Dodoo v. Seagate Tech., Inc., 235 F.3d 522, 531 (10th Cir. 2000)*; *Palmer v. City of Monticello, 31 F.3d 1499, 1508 (10th Cir. 1994)*. If the trial court determines the damages award is excessive under this test, then it may reduce or remit the **[\*\*21]** jury's damages verdict by the amount of the damages found to be excessive, or, alternatively, set aside the verdict and order a new trial on damages alone if the plaintiff refuses to accept the remittitur. *Higgs, 713 P.2d at 861*; *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 703 F.2d 1152, 1168 (10th Cir. 1981)*; *see Mason v. Texaco, Inc., 948 F.2d 1546, 1560 (10th Cir. 1991)*. If, however, the court finds further that the damages awarded are so excessive as to raise "an irresistible inference" that "passion, prejudice, corruption or other improper cause invaded the trial," then the court must order a new trial on all issues because it is impossible to determine the degree to which these factors affected the jury generally and therefore influenced the determination of liability. *Higgs, 713 P.2d at 861*; *Malandris, 703 F.2d at 1168*; *see Mason, 948 F.2d at 1560*.

I find the jury's compensatory damages verdicts are not excessive. The question of what damages, if any, were caused by Defendants' wrongful conduct was vigorously litigated at trial. Plaintiffs presented ample evidence, including both expert and lay witness testimony, that, if credited, established the fact and amount **[\*\*22]** of compensatory damages caused by this conduct. Defendants countered with their own array of expert and lay witness testimony that, if credited by the

564 F. Supp. 2d 1189, *1201; 2008 U.S. Dist. LEXIS 45031, **22

jury, would have caused it to find that no actual damages had resulted from any trespass or nuisance committed by Defendants. The jury's compensatory damages determination, therefore, turned on its assessment of conflicting evidence and the credibility of the parties' numerous experts and other witnesses. After several weeks of deliberations, the jury returned a verdict assessing $ 176.8 million in compensatory damages on each claim, some $ 70 million *less* than the $ 248 million in compensatory damages Plaintiffs had requested the jury find on each claim based on the evidence before it. *See* 1/18/06 Tr. at 10,350 (trespass), 10,352 (nuisance). Having considered the evidence presented and the jury's verdicts, I find the jury's determination of compensatory damages is neither against the weight of the evidence nor otherwise a shock to this judicial conscience. As a result, I find neither a new trial nor remittitur is warranted on the ground the compensatory damages verdicts are excessive under the evidence presented.

Defendants next contend **[**23]** the jury's determinations of compensatory damages must be set aside and a new trial ordered because these determinations improperly include damages to properties that were not owned by Class members on January 30, 1990, the date this action was filed. This contention invokes my Order of May 17, 2005 (Doc. 1338) [hereinafter "May 2005 Order"], which was one of a series of pretrial orders delineating the issues to be tried and decided in the class trial.

**[*1202]** In the May 2005 Order, I addressed a number of issues, including whether and how compensatory damages would be addressed in the class trial. *See* May 2005 Order at 14-20. Based on the parties' extensive submissions on the subject, I ruled that while liability for the entire Class would be determined in the class trial, the only compensatory damages to be tried would be damages caused by the prospect of any proven trespass or nuisance continuing indefinitely, as set forth in *Restatement § 930(3)(b)*. [8] *Id.* at 15. As relevant here, this Restatement section provides that the measure of damages for such "future" or "prospective invasions" is "the decrease in the value of the land caused by the prospect of the continuance of the invasion measured **[**24]** at the time when the injurious situation became complete and comparatively enduring." *Id.*

    8    Consideration of whether and how Class members might seek to recover damages for past

or present invasions pursuant to *Restatement §§ 930(3)(a)* and/or *929* was deferred until sometime after the class trial. May 2005 Order at 15.

*Restatement § 930* further provides that a property owner injured by a continuing tortious invasion, such as the trespass and nuisance found here by the jury, may elect to recover this type of damage for continuing tortious invasions if "it appears that the invasions will continue indefinitely." *Restatement § 930(1)* (cited in May 2005 Order at 15). In this case, Plaintiffs elected to seek damages for the decrease in property values caused by Defendants' continuing tortious invasions on January 30, 1990, when they filed suit seeking to recover these damages on behalf of a Class defined as persons owning property in the Class Area as of June 7, 1989. *See* May 2005 Order at 15-16; Order re: Instruction No. 3.28 (Doc. 2064) at 1-8 (regarding application of *Restatement § 930(1)* and *§ 930(3)(b)* to this action). Whether this election is valid depends (in part) on Plaintiffs' subsequent **[**25]** demonstration of if and when it appeared that Defendants' wrongful invasions "will continue indefinitely." *See Restatement § 930(1)*.

An additional consideration here is that some number of Class members, reportedly representing approximately 10% of the Class Properties, sold the property they owned in the Class Area between the June 7, 1989 date used to define the Class and January 30, 1990, when Plaintiffs filed suit and elected to recover prospective damages on the Class's behalf. As a result, these Class members could not participate in the election to recover prospective damages that occurred upon the filing of this action.

Based on this consideration and others stated in the May 2005 Order, I declared in that Order that the Class would be divided into two subclasses for purposes of determining the "prospective damages" that could be recovered for any continuing trespass or nuisance found by the jury at the class trial. The first subclass, which I will refer to as the "Prospective Damages Subclass" or just the "Damages Subclass," consists of all Class members who owned property in the Class Area on January 30, 1990 or the date on which the jury, pursuant to *Restatement § 930(1)*, **[**26]** found that Defendants' continuing tortious invasions would continue indefinitely, whichever was later. May 2005 Order at 15. This subclass, I found, was authorized to recover damages for these prospective or future tortious invasions, that is, the

564 F. Supp. 2d 1189, *1202; 2008 U.S. Dist. LEXIS 45031, **26

decrease in the value of their Class Properties, as provided in *Restatement § 930(3)(b)*. *Id.* at 15-16. I further found that "[t]he compensatory damages, if any, to be awarded to this subclass, will be determined *based* **[*1203]** *on the jury's findings* in the class trial." [9] *Id.* at 16 (emphasis added). I stated that the availability and means of determining any compensatory damages due to the second subclass, consisting of all other Class members, would be decided at some point after the class trial. *Id.*

> 9   In the May 2005 Order, I also set out the findings to be made by the jury, *see id.* at 16-17, but later determined that these findings were unnecessarily complicated and that the process and findings set out in Instruction No. 3.22 were sufficient and consistent with the May 2005 Order. *See* Mem. Op. re: Jury Instructions (Doc. 2205) at 61-62.

Defendants now argue that the jury's assessment of compensatory damages at the class trial was improper and must **[**27]** be set aside because the jury was instructed to determine the decrease in value of the Class Properties as a whole, without distinguishing between properties corresponding to the two subclasses set out in the May 2005 Order.

I find no merit to Defendants' argument for two reasons. First, assuming that the jury should not have been instructed to determine the aggregate decrease in value for all Class Properties, Defendants failed to object to this instruction and, in fact, actively sought for the jury to be instructed in just this manner at the close of trial. The relevant background here is that after considering the parties' briefing and proposed instructions on the jury's determination of damages at the class trial, I prepared instructions directing the jury to determine the aggregate decrease in the value of properties within the Class Area and percentage decrease in property values, if any, caused by any continuing trespass and/or nuisance by one or both Defendants. *See* Final Jury Instructions, Nos. 3.20-3.23. As is my practice, I provided these and other substantive instructions to the parties and the jury before opening arguments began, with notice that the instructions would **[**28]** be revised if necessary as the trial progressed. *See generally* Mem. Op. re: Jury Instructions (Doc. 2205) at 3 & n.4 (describing jury instruction process). Neither party objected at this time to the instructions directing the jury to assess any decrease

in property values for all properties in the Class Area.

Near the end of trial, I directed the parties to submit any proposed revisions to the jury instructions of record and a proposed jury verdict form. Defendants submitted extensive proposed revisions and objections to these instructions, including those regarding determination of compensatory damages. Defendants did not, however, object to the compensatory damages instructions on the ground that they improperly failed to limit the jury's damages determination to the decrease in value of Class Properties owned by members of the Damages Subclass. To the contrary, Defendants requested that the key damages instruction, No. 3.22 ("Measure of Actual Damages") be revised to emphasize and reemphasize that the jury was to decide any decrease in value for "all of the properties in the Class Area. *See* Defs.' Proposed Changes to Prelim. Jury Instructions (Doc. 1958), Ex. A at 89-92 (requesting **[**29]** that "all" be inserted before every reference to properties in the Class Area). [10] Defendants also submitted proposed jury verdict forms that required the jury to determine compensatory damages for all Class Properties, using the same language as in their proposed revisions to **[*1204]** Instruction No. 3.22. *See* Defs.' Proposed Jury Verdict Forms (Doc. 1963), Exs. A & B at 3-4, 5-6 (asking whether Plaintiffs proved Defendants' trespass or nuisance "caused the actual value of all of the Class Properties to be less than what the value of these properties would have been" but for the trespass or nuisance). [11] Nor did Defendants object to the final jury instructions and verdict form on the ground that they failed to limit the jury's compensatory damages determination to the Damages Subclass. In short, Defendants did nothing from the initial presentation of the jury instructions at the start of trial through the end of trial to call this alleged error to my attention, and, in fact, invited this approach by pressing for damages to be determined for "all of" the properties in the Class Area. [12]

> 10   I did not adopt these proposed revisions because the damages and other instructions already adequately **[**30]** communicated this concept. *See* Mem. Op. re: Jury Instructions at 75.
> 11   Defendants argue they cannot be held accountable for the compensatory damages portion of this proposed Jury Verdict Form because I had directed the parties to prepare their proposed forms "consistent with the current jury instructions." *See* Order on Jury Instruction

564 F. Supp. 2d 1189, *1204; 2008 U.S. Dist. LEXIS 45031, **30

Submissions (Doc. 1929) at 2. Defendants are correct that the then current jury instructions directed the jury to determine the decrease in property values for the Class as a whole. Defendants' concurrence with this approach, however, is demonstrated by their separate proposed revisions to these instructions, which sought to emphasize this approach, not revise it. *See* Defs.' Proposed Changes to Prelim. Jury Instructions (Doc. 1958), Ex. A at 89-92. The order cited by Defendants also placed no restrictions on the parties' proposed revisions to the jury instructions, and Defendants in fact proposed any number of instruction revisions that were not consistent with the instructions then of record.

12  Defendants cite their objection throughout the pretrial period to compensatory damages being determined on anything other than an individual basis as preserving **[**31]** their right to object to the jury's determination of damages for the Class as a whole as opposed to just the Damages Subclass. This general objection, however, is patently insufficient for this purpose. *See Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1127-28 (10th Cir. 2004)* (party must raise an objection "distinctly" and "make abundantly clear the grounds and basis for its objection"); *Unit Drilling Co. v. Enron Oil & Gas Co., 108 F.3d 1186, 1190 (10th Cir. 1997)* (party "waived its right to claim error in the instructions by failing to object specifically at trial to the defect in the jury instructions of which it now complains"); *Fed. R. Civ. P. 51.* For the same reasons, Defendants' criticism of Plaintiffs' proposed compensatory damages plan in July, 2004, on the ground that some portion of the Class would not be entitled to recover damages for prospective invasions under the plan, is also insufficient. This criticism was made in a lengthy memorandum filed more than a year before trial commenced, before any jury instructions on damages had even been proposed, and in the context of opposing any kind of class trial on compensatory damages. *See* Defs.' Resp. to Pls.' Proposed Plan for **[**32]** Determination of Compensatory Damages (Doc. 1247) at 11-14; *see also Abuan v. Level 3 Commc'ns, Inc., 353 F.3d 1158, 1172-73 (10th Cir. 2003)* (arguments made in connection with summary judgment motion did not constitute specific objection to

subsequent jury instructions). Even if this were not the case, Defendants' subsequent actions during the class trial seeking to have compensatory damages determined for "all of" the Class Properties waived the right to complain that the jury instructions were erroneous for doing so and that the verdict must be set aside as a result.

The second difficulty with Defendants' argument here is that the jury instructions, the verdict form and the jury's verdict on compensatory damages, are not, in fact, at odds with the plan for deciding compensatory damages set forth in the May 2005 Order. In this Order I held that: (1) damages for prospective invasions, *i.e.,* any decrease in property value caused by Defendants' continuing tortious invasions, would be decided at the class trial; (2) per *Restatement § 930(1),* only Class members who owned property within the Class Area on the later of January 30, 1990, when this action was filed, or the date on which the **[**33]** jury found it appeared **[*1205]** the tortious invasions would continue indefinitely, were entitled to recover damages for prospective invasions; and (3) any damages for prospective invasions to be awarded to this subclass would "be determined based on the jury's findings in the class trial." May 2005 Order at 15-16. Pursuant to the jury instructions and verdict form, the jury at the class trial made all of the findings necessary to award damages to the Damages Subclass under this plan.

First, the jury was directed to decide whether it appeared on or before January 30, 1990, or on some other date, that the trespass or nuisance by Dow or Rockwell would continue indefinitely. *See* Final Jury Instructions, No. 3.28. The jury found that this condition existed on or before January 30, 1990. *See* Jury Verdict Form at 28-29. Pursuant to *Restatement § 930(1)* and the May 2005 Order, this determination establishes that the right to recover prospective damages existed on January 30, 1990, when the election to seek these damages was made by the filing of this action, and thereby defines the "Prospective Damages Subclass" entitled to recover these damages as the Class members who owned properties in the Class **[**34]** Area on this date. From this jury finding, identification of the members of this subclass and their corresponding properties within the Class Area is a ministerial task to be accomplished as part of the damages allocation plan based on county real estate records. *See infra* Section III.B.

564 F. Supp. 2d 1189, *1205; 2008 U.S. Dist. LEXIS 45031, **34

Second, the jury was asked to and did determine any decrease in the value of all properties in the Class Area caused by any continuing trespass or nuisance by Defendants, and, as directed, expressed their findings by property category (residential properties, commercial properties and vacant land) and in the aggregate and by percentage. *See* Final Jury Instructions, No. 3.23; Jury Verdict Form at 15, 24. As described in Section III below, these factual findings are sufficient to allocate the aggregate damages found by the jury to individual Class Properties based on county property records. This allocation can be applied to properties owned by members of the Prospective Damages Subclass as well as those owned by the second subclass. The compensatory damages to be awarded and distributed to the Prospective Damages Subclass, therefore, can be readily determined from the jury's verdict, just as contemplated **[**35]** by the May 2005 Order, and no additional factual findings by the jury are required. [13] As a result, even if Defendants had preserved a right to object to the jury's verdict because it determined prospective damages for all Class Properties, no grounds would exist for setting aside the jury's compensatory damages verdict and ordering a new trial on this basis.

> 13   The question of what disposition should be made of the damages caused by Defendants' continuing trespass and nuisance to properties in the Class Area that were owned by Class members not in the Damages Subclass is addressed in Section III below.

Defendants next contend that a new trial is required because the jury was not instructed to determine the exact date on which the injurious situation caused by Defendants became complete and comparatively enduring or that it must limit its damages assessment to properties owned by Class members on this date. This contention suffers from a number of flaws, beginning with its misreading of the *Restatement. Restatement § 930(3)(b)* does not, as Defendants assert, require that damages for prospective invasions be "awarded" as of a specific date. *See* Defs.' Mem. in Supp. of Mot. **[*1206]** for New Trial **[**36]** (Doc. 2225) at 20; Defs.' Reply in Supp. of Mot. for New Trial (Doc. 2249) at 5. Rather, it states clearly that when an injured party is empowered to and does elect to recover damages for continuation of an invasion into the future, such as occurred here, these damages are to be "measured" at the "time" when the injurious situation became complete and comparatively

enduring. *Restatement § 930(3)(b).* This is precisely what the jury was instructed to do, *see* Final Jury Instructions, No. 3.22, and what it did do, *see* Jury Verdict Form at 15, 24.

Nor can Defendants be heard to complain at this late date about this supposed error in the jury instructions and verdict form. Although the Defendants made many challenges to the instructions and verdict form presented to the jury, nowhere did they assert that the jury's deliberations and verdict on compensatory damages must be limited to Class members who owned their Class Property on a specific date the jury determined the injurious situation caused by Defendants became complete and comparatively enduring. To the contrary, as described earlier, Defendants affirmatively pressed near the close of trial for instructions directing the jury to determine **[**37]** compensatory damages for "all of the Class Properties" and to measure any "diminution in all Class property values" as of the time the injurious situation caused by Defendants became complete and comparatively enduring. *See* Defs.' Proposed Changes to Prelim. Jury Instructions (Doc. 1958), Ex. A at 89-92. In this same submission, they also did not request that the jury be directed to decide a specific date on which this condition came into existence, and made no argument that this finding was required for any reason. *See id.,* Ex. A at 91, 93 (requesting only that jury be instructed to determine whether injurious situation became complete and comparatively enduring at all, before being asked to decide whether it became so during the time period alleged by Plaintiffs).

Defendants did include a question on this point in their January 11, 2006 proposed jury verdict form, but they offered no objection or rationale for requesting that the "CCE date" be specifically determined, and instead represented (consistent with my order) that their proposed verdict form was prepared in view of the current jury instructions. Defs.' Proposed Jury Verdict Forms (Doc. 1963) at 1 n.1. Those instructions (as **[**38]** well as Defendants' proposed revisions to them) did not require such a finding. Nor did Defendants assert in connection with this proposed interrogatory, or otherwise, that the jury was required to limit its damages assessment to Class members who owned Class Properties on this date. As a result, Defendants did not make the specific objection to the jury instructions and verdict form necessary to assert the error now claimed. *See Bitler, 391 F.3d at 1127-28* (objecting party must make position

564 F. Supp. 2d 1189, *1206; 2008 U.S. Dist. LEXIS 45031, **38

"abundantly clear" and state grounds in terms that are "obvious, plain or unmistakeable") (citations and internal quotations omitted).

I find no greater merit in Defendants' contention that the jury's verdict on compensatory damages must be set aside "to account for Class Members who decline to accept an easement on their properties." Defs.' Mem. in Supp. of Mot. for New Trial (Doc. 2225) at 22. This contention is raised for the first time in Defendants' post-trial motions and is thus subject to waiver for the same reasons stated above.

This untimely objection also elevates a comment to *Restatement § 930(3)(b)* and dicta in a prior decision in this case to a rule of law that, Defendants insist, requires **[**39]** that a formal easement be granted and recorded for each Class property that authorizes Defendants' continuing trespass and nuisance on it. Based on **[*1207]** this premise, Defendants further assert the verdict must be set aside because some Class members may refuse to grant or accept the necessary easement. Defendants, who provide no other authority for the alleged easement requirement, read too much into both of the cited statements.

The referenced Restatement comment discusses an injured party's right to elect to be compensated "once and for all" for an indefinitely continuing invasion. *Restatement § 930 cmt. b.* It concludes that "[t]he exercise of the power of election, followed by satisfaction of a judgment for damages for prospective invasions, confers an easement or privilege to continue the invasions thus paid for in advance." *Id.* In *Cook X,* I referred to this concept in even more summary fashion, noting that if the Class prevailed in its election to recover for prospective damages, satisfaction of its judgment would confer "an easement" for the tortious invasions to continue without payment of additional compensation. *See See Cook v. Rockwell Int'l Corp. ("Cook X"), 358 F. Supp. 2d 1003, 1013-14 (D. Colo. 2004).* **[**40]** Other courts have used the terms "license," "grant," "consent" or waiver to refer to this concept. *See Severt v. Beckley Coals, Inc., 153 W. Va. 600, 170 S.E.2d 577, 582-83 (W. Va. 1969)* (license or grant); *Slater v. Shell Oil Co., 58 Cal. App. 2d 864, 137 P.2d 713, 715-16 (Cal. Ct. App. 1943)* (consent and waiver); *Strange v. Cleveland, C., C. & St. L. Ry. Co., 245 Ill. 246, 91 N.E. 1036, 1038 (Ill. 1910)* (consent). No doubt other courts and commentators have described this concept in other terms and by reference to other legal theories as well.

No matter the term or language used, the common principle behind all of these expressions is that damages for continuation of a tortious invasion into the future can only be demanded and received once, and that satisfaction of a judgment for such damages precludes successors to the affected properties from recovering these same damages. *Cf. Severt, 170 S.E.2d at 583* (once future damages are recovered "there can be no second recovery for [the nuisance's] continuance;" internal quotation omitted). Thus, the governing rule here is the familiar doctrine of res judicata or claim preclusion. Application of that doctrine to the judgment in this action does not require or rely on some formal or theoretical **[**41]** process based on the grant or acceptance of an easement or like interest by members of the Class.

Defendants' concern that successive owners of the Class Properties, as nonparties to this action, will not be bound by this judgment is belied by the general rule that a successor to an interest in property that is the subject of a pending or completed action at the time of transfer is bound by the judgment to the same degree as the parties. *See Restatement (Second) of Judgments §§ 43-44 (1982 & Supp. 2007).* As a practical matter, I also think it is highly unlikely that any persons who have acquired or may acquire property in the Class Area since the commencement of this action will be inspired by the example of this long and hard-fought suit to bring their own claims for continuation of the invasion against Defendants. Were any to do so, Defendants are fully capable of defending their interests in such a suit by, among other things, asserting the satisfaction of judgment in this case as a defense. The conveyance of an easement is not required for this purpose, and none is required by the cited Restatement comment or any prior decision in this case.

Defendants also argue the jury's verdict **[**42]** on compensatory damages must be set aside because its determination of aggregate Class damages improperly includes Class members who suffered no damages or less than average damages. This is a reprise of arguments previously made by **[*1208]** Defendants in support of their long-standing objections to a class trial of any kind on compensatory damages. I have considered and rejected these arguments on numerous occasions before, during and after trial, *see, e.g.,* May 2005 Order at 19-20; Mem. Op. re: Jury Instructions (Doc. 2205) at 62-65, and

564 F. Supp. 2d 1189, *1208; 2008 U.S. Dist. LEXIS 45031, **42

Defendants provide no grounds for me to reconsider these decisions.

Finally, Defendants assert the jury's compensatory damages verdict must be set aside or reduced, because the jury improperly included damages incurred by Class members who previously released their claims against Defendants. The only Class members cited by Defendants in this regard are Charles and Perry McKay, who in the mid-1980's executed a release of certain claims against Defendants in settlement of *McKay v. United States* and related litigation, *540 F. Supp. 519 (D. Colo.)* (collectively "the *Church* litigation").

Although Defendants have been aware for many **[**43]** years that the McKays were members of the Class in this action, they do not point to any instance in the pretrial planning process or during trial in which they asserted a defense based on the release of claims by the McKays or any other Class member or otherwise raised the issue of such releases in connection with the damages sought by Plaintiffs. Nor do Defendants identify any instance in which they requested a jury instruction or verdict form question on this subject or objected to the Court's jury instructions or verdict form on this basis. In fact, this contention should have been raised before trial, *see, e.g.,* Mem. and Order of Feb. 12, 2001 (Doc. 1176) at 10 (requiring Defendants to state each defense to Plaintiffs' claims they intended to try); Order of Sept. 11, 2003 (Doc. 1212) at 2 (requiring parties to specify all claims and defenses to be tried); or (assuming the issue was preserved for trial) through the presentation of evidence regarding the McKays' release and property holdings in the Class Area and argument that compensatory damages should be reduced as a result. [14] Defendants did none of these things and may not now assert that their failure to present this issue **[**44]** requires a new trial or a reduction in the jury's compensatory damages verdicts.

> 14   Defendants included Charles McKay in their witness lists during trial, but did not call him. Defendants do not deny that he was available, and within the range of a subpoena, to testify.

### 2. Exemplary damages awards

Defendants argue that the jury's determination of exemplary damages is excessive and must be set aside because it is not supported by the evidence, is unconstitutional, is not permitted by the Price-Anderson

Act and/or is improper as a result of Defendants' alleged compliance with standards. If these arguments are not successful, Defendants request that I exercise my discretion under Colorado law to disallow or reduce the jury's exemplary damages verdict because the exemplary damages will not have a deterrent effect on Defendants or others. After careful consideration of these arguments, I find they present no basis for vacating or reducing the jury's verdict.

### *Sufficiency of the evidence*

Defendants' challenge in this motion to the sufficiency of the evidence to support the jury's exemplary damages award constitutes another after-the-fact challenge to the court's instructions to the jury on this **[**45]** subject. In connection with Plaintiffs' claim for exemplary damages, I instructed the jury, as pertinent here, that it could only award exemplary damages against Dow or Rockwell if it found beyond a **[*1209]** reasonable doubt that the company's conduct in committing the trespass and/or nuisance was "willful and wanton." Final Jury Instructions, No. 3.27; Jury Verdict Form at 26-27. "Willful and wanton" conduct was defined as "an act or omission purposefully committed by the Defendant in question, who must have realized that the conduct was dangerous, and which conduct was done heedlessly and recklessly, either without regard to the consequences, or without regard to the rights and safety of others, particularly the Plaintiff Class." This language is drawn almost verbatim from the standard Colorado Jury Instruction on this subject, *see* Colo. Jury Instructions (Fourth) Civ. § 9:30; *see also id.,* § 5:3, Notes on Use (directing that Instruction 9:30 be used to define "willful and wanton" in instruction on exemplary damages), which itself closely tracks the definition for this term provided in Colorado's exemplary damages statute. *See Colo. Rev. Stat. § 13-21-102(1)(b)* (defining "willful and wanton **[**46]** conduct"). There was ample evidence supporting the jury's award of exemplary damages against both Dow and Rockwell under this standard.

Defendants now contend, however, that Colorado law required Plaintiffs to prove something more before exemplary damages could be awarded against them: that each Defendant had an "evil intent" or "wrongful motive" or acted with the purpose of injuring the Plaintiffs. Because Plaintiffs failed to prove this element beyond a reasonable doubt, Defendants assert, the jury's award of

564 F. Supp. 2d 1189, *1209; 2008 U.S. Dist. LEXIS 45031, **46

exemplary damages is contrary to law and must be set aside.

Defendants cite to no instance in which they proposed that the jury be instructed that "evil intent," "wrongful motive" or their equivalent was part of Plaintiffs' burden of proof, or objected that the Court's instructions to the jury did not include this requirement. In fact, Defendants' own proposed instruction defining "willful and wanton conduct" is functionally the same as the instruction ultimately given. *Compare* Defs.' Submission of Phase III Jury Instructions (Doc. 1271) at 66 (Proposed Damages Instruction No. 3.15) *with* Final Jury Instructions, No. 3.27. Defendants' challenge to the instruction on Plaintiffs' **[**47]** burden of proof is, therefore, untimely at minimum. *See Fed. R. Civ. P. 51(c), (d)*.

If Defendants had made a timely objection on this basis, it would have been overruled. In Colorado, exemplary damages are only available pursuant to *Colo. Rev. Stat. § 13-21-102. See Tri-Aspen Constr. Co. v. Johnson, 714 P.2d 484, 485 (Colo. 1986)*. The primary authority Defendants cite in support of this statute requiring proof of "evil intent" or "wrongful motive," the just referenced *Tri-Aspen* decision, considered an earlier version of this statute, one that did not include the term "willful and wanton conduct" or the statutory definition of this term employed in the jury instructions in this case. Instead, Colorado's exemplary damages statute at the time of the *Tri-Aspen* decision authorized an award of exemplary damages when the injury complained of was attended by "circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings." *See id. at 486* (quoting applicable statute). The Colorado Legislature amended *Colo. Rev. Stat. § 13-21-102* shortly after this decision to delete "or insult, or a wanton and reckless disregard of the injured party's **[**48]** rights and feelings" from the statute and replace it with the current "or willful and wanton conduct." 1986 Colo. Sess. Laws 675 (H.B. 1197), § 1. It also added a new provision defining "willful and wanton conduct" at this time. *Id.* It is this statutory provision, and not the *Tri-Aspen* court's discussion of the prior statute and case law interpreting it, that governed the **[*1210]** jury's determination of exemplary damages in this action.

Even if this were not the case, the *Tri-Aspen* decision still fails to support Defendants' argument. The Colorado Supreme Court declared in *Tri-Aspen* that an award of

exemplary damages under the prior statute was justified if the plaintiff proved beyond a reasonable doubt that the defendant acted with evil intent and with the purpose of injuring the plaintiff *or* with a wanton and reckless disregard of the plaintiffs rights. *See 714 P.2d at 486; see also id. at 488* (claim for exemplary damages requires proof that the defendant "acted with an evil intent or wrongful motive *or* created and then purposefully disregarded a substantial risk of harm") (emphasis added, internal citation omitted). The court also specifically disapproved language from a prior Colorado decision, **[**49]** relied upon by Defendants, that incorporated the concept of "wrongful motive" into the definition of "wanton and reckless disregard." *Id. at 486 n.3* (rejecting this "more demanding requirement"). [15] As a result, even if *Tri-Aspen* and related authority regarding the meaning of "wanton and reckless disregard" is relevant to the current Colorado exemplary damages statute and its definition of "willful and wanton conduct," it does not support Defendants' contention that "evil motive" or "wrongful purpose" must be proved to establish this conduct and to recover exemplary damages.

> [15]   Instead, the Colorado court declared that the most accurate definition of "wanton and reckless disregard" for purposes of the exemplary damages statute then in effect was "conduct that creates a substantial risk of harm to another and is purposefully performed with an awareness of the risk in disregard of the consequences." *Id. at 486* (quoting *Palmer v. A.H. Robins Co., 684 P.2d 187, 215 (Colo. 1984)).*

*Constitutionality*

Defendants' assertion that the jury's exemplary damages verdicts are unconstitutional fares no better. A punitive damages award is unconstitutional if it is "grossly excessive" in relation to a State's **[**50]** legitimate interests in punishing unlawful conduct and deterring its repetition. *BMW of N. Am. v. Gore, 517 U.S. 559, 568, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)*. To determine whether this is the case, the court must determine if the defendant received "fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Id. at 574; United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F.3d 1207, 1232 (10th Cir. 2000)*. Three factors guide analysis of whether adequate notice was provided: (1) the degree of reprehensibility of the

564 F. Supp. 2d 1189, *1210; 2008 U.S. Dist. LEXIS 45031, **50

defendant's conduct; (2) the ratio of the punitive damages award to the actual or potential harm inflicted on the plaintiff; and (3) a comparison of the punitive damages award with the civil and criminal penalties that could be imposed for comparable misconduct. *Wharf, 210 F.3d at 1232*; *see BMW, 517 U.S. at 574-75*. The absence of one of these guideposts, however, is not determinative of whether the defendant received adequate notice of the magnitude of the punitive damages award that could be imposed for its misconduct. *Wharf, 210 F.3d at 1233*.

As to the first guidepost, the Supreme Court has noted a number of factors **[\*\*51]** that bear on the reprehensibility of the defendant's conduct and whether the nature of that conduct provided the defendant with adequate notice of the punitive damages that could be awarded against it. These factors include: whether any physical harm resulted from the conduct, *BMW, 517 U.S. at 576*; if the harm was only economic, whether it was **[\*1211]** done intentionally through affirmative acts of misconduct or was suffered by a financially vulnerable target, *id.*; whether the defendant acted intentionally or with reckless disregard for the health and safety of others, *id*; whether the defendant's misconduct was repeated, *id. at 577*; whether the harm suffered resulted from some form of malice, trickery or deceit as opposed to mere accident, *State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003)*; and whether the conduct risked harm to many as opposed to a few, *Philip Morris USA v. Williams, 549 U.S. 346, 127 S. Ct. 1057, 1065, 166 L. Ed. 2d 940 (2007)*.

Viewed in the light most favorable to Plaintiffs and the jury's verdict, the evidence in this case shows the presence of a number of the factors the Supreme Court has identified as indicating reprehensible conduct that would provide a defendant with notice of the **[\*\*52]** magnitude of punitive damages that could be awarded against it. The harm involved was not purely economic, but rather physical contamination of Class members' properties and substantial interference with Class members' right to use and enjoy their properties. There was ample evidence that the conduct by each Defendant that caused this harm was intentional and/or undertaken with conscious disregard of the Class members' health and safety. Defendants' misconduct affected approximately 15,000 individual properties and hence thousands of landowners, who suffered a decrease in the value of properties that oftentimes represented their

single largest economic asset. Defendants' misconduct was not the result of a single incident, but rather a series of incidents and also routine practices over decades of operating Rocky Flats, some of which were attended by circumstances of dishonesty, subterfuge and deceit. All of these factors indicate Defendants' conduct was reprehensible to a degree that should have put Defendants on notice of the magnitude of punitive damages that could be awarded against them.

As for the ratio of punitive damages to the actual or potential harm, that ratio is capped by **[\*\*53]** statute at one-to-one for each defendant, far below the ratios that have raised constitutional concerns. *See, e.g., BMW, 517 U.S. at 582* (500 to 1 ratio); *State Farm, 538 U.S. at 424-25* (finding 145 to 1 ratio of constitutional concern and stating "single-digit multipliers are more likely to comport with due process").

As for the final guidepost noted by the Supreme Court, it is difficult to predict what amount of civil and criminal penalties could be assessed against each Defendant for comparable misconduct. While the federal environmental laws can impose very substantial fines against corporations that knowingly or improperly release or dispose of hazardous substances, *see, e.g., 33 U.S.C. § 1319(c), (d)* (authorizing criminal fines of up to $ 50,000/day for knowing violations and civil penalties of up to $ 25,000/day for violations of the Clean Water Act); *42 U.S.C. § 6928(d), (g)* (authorizing criminal penalties of up to $ 50,000/day for knowing violations and civil penalties of up to $ 25,000/day for violations of RCRA's hazardous waste management requirements), the many instances of misconduct considered by the jury cannot be easily compared to the various environmental statutes **[\*\*54]** that might apply. The difficulty in making this comparison, however, or even the possible existence of a disparity between the potentially available fines and the amount of exemplary damages awarded here, does not compel the conclusion that the jury's exemplary damages awards are unconstitutional. As the Tenth Circuit **[\*1212]** has noted, the comparison between available civil and criminal penalties and an exemplary damages award "is only one of the indicators of whether a defendant is on notice of the magnitude of the award that may be imposed based on the defendant's misconduct." *Wharf, 210 F.3d at 1233*. The Colorado exemplary damages statute, *Colo. Rev. Stat. § 13-21-102*, puts a defendant on notice that exemplary damages may be imposed in an amount up to the actual harm caused.

564 F. Supp. 2d 1189, *1212; 2008 U.S. Dist. LEXIS 45031, **54

*Wharf,* 210 F.3d at 1233 (discussing *§ 13-21-102(1)(a)*). This notice, combined with the magnitude of actual harm caused by Defendants' misconduct and the reprehensible nature of that conduct, provided the Defendants with fair notice of the severity of the penalty that might be imposed. The jury's exemplary damages awards were not, therefore, unconstitutional under the standard enunciated in *BMW* and *Wharf.*

In their reply **[\*\*55]** in support of their *Rule 59* motion, Defendants raise an additional, entirely new challenge to the constitutionality of the exemplary damages award in this action: that Instruction No. 3.27 is unconstitutional under *Philip Morris USA v. Williams, 549 U.S. 346, 127 S. Ct. 1057, 166 L. Ed. 2d 940 (2007)* because it defines "willful and wanton conduct" in part as "conduct that was done heedlessly and recklessly, either without regard to the consequences, or without regard to the rights and safety of others, particularly the Plaintiff Class." The reference to "the rights and safety of others," Defendants argue, renders this instruction and the exemplary damages awards based on it unconstitutional because, under *Philip Morris,* a jury may not consider harm to others in deciding whether to impose punitive damages. Defs.' Reply (Doc. 2249) at 25-26.

The reference to "the rights and safety of others" in Instruction No. 3.27 is a quotation from the definition of "willful and wanton conduct" provided in Colorado's exemplary damages statute. *Colo. Rev. Stat. § 13-21-102(1)(b).* Defendants are thus inviting me to hold this statute unconstitutional, an invitation that I decline. 16 I do not read *Philip Morris* as broadly as Defendants, **[\*\*56]** and do not agree that either Instruction No. 3.27 or the evidence and argument at trial created a significant risk that the jury based its exemplary damages determination on a desire to punish Defendants for causing injury to anyone not before the court. *Cf. Philip Morris, 127 S. Ct. at 1065* (when the evidence or argument presented raises a "significant" risk that the jury will seek to punish the defendant for causing harm to others, the court should, upon request, take action to protect against this risk). The jury's exemplary damages determination was not unconstitutional on this or any other basis.

> 16    In addition, a party challenging the constitutionality of a state statute in an action to which the state is a nonparty must file written notice with the court identifying the challenged

statute and describing the grounds on which unconstitutionality is asserted. D.C.COLO.LCivR 24.1(B). It must also serve a copy of this notice on the state attorney general and file proof of this service. *Id.* The state is then provided an opportunity to intervene and to present evidence and argument regarding the constitutionality of the challenged statute. *See 28 U.S.C. § 2403(b).*

*Discretion to disallow* **[\*\*57]** *or reduce exemplary damages awards*

I also decline Defendants' invitation that I exercise my discretion under *Colo. Rev. Stat. § 13-21-102(2)* to disallow or reduce the jury's exemplary damages awards. This provision authorizes the court to reduce an exemplary damages award "to the extent that: (a) The deterrent **[\*1213]** effect of the damages has been accomplished; or (b) The conduct which resulted in the award has ceased; or (c) The purpose of such damages has otherwise been served." *Id.* While Defendants' operation of the Rocky Flats plant has obviously ceased, the effects of their conduct there, the continuing trespass and nuisance found by the jury, has not. I also cannot agree with Defendants that the deterrent effect of the damages has been accomplished or the purposes of the damages has been served. At minimum, the damages award will deter Defendants and other corporations that presently or may in the future operate hazardous manufacturing facilities from managing their facilities and the risks they pose in the manner that led to the trespass and nuisance the jury found was committed here.

*Compliance with standards*

Defendants also contend the jury's exemplary damages awards must be set aside **[\*\*58]** as a result of their compliance with "applicable standards" during their operation of Rocky Flats. I disagree. The only legal authority Defendants cite in support of this contention, *Alley v. Gubser Development Co., 785 F.2d 849 (10th Cir. 1986),* held only that a manufacturer's mere use of wood products containing formaldehyde, in a manner consistent with prevailing industry practice and without evidence that the manufacturer knew or should have known of the potential harm that could result, was not enough to sustain an exemplary damages award in an action arising from exposure to formaldehyde gas released from these products. *Id. at 856.* This holding does not establish a legal rule that exemplary damages are barred whenever a defendant shows it has complied

Case No. 1:90-cv-00181-JLK   Document 2435-12   filed 01/12/17   USDC Colorado   pg 255 of 332

Page 16

564 F. Supp. 2d 1189, *1213; 2008 U.S. Dist. LEXIS 45031, **58

with industry practice or "applicable standards."

In addition, even if such a rule existed, the jury heard extensive evidence from which it could have found Defendants' conduct violated any reasonable standard of industrial care. Further, Defendants do not specify the "standards" with which they allegedly complied, and the jury was not asked to and did not make any findings that the Defendants complied with standards. In fact, the **[**59]** jury heard evidence from which it could have concluded Defendants did not comply with some potentially applicable standards and/or that the environmental monitoring that Defendants conducted was not designed or implemented in a manner that would allow Defendants' compliance with environmental standards to be determined. In short, there is no basis for setting aside the jury's exemplary damages awards on the basis of Defendants' alleged compliance with standards.

*Price-Anderson Act*

Defendants' final challenge to the exemplary damages awards, that they are barred by the 1988 Amendments to the Price-Anderson Act, has been considered and rejected on multiple occasions in this action and need not be addressed again. *See, e.g., Cook v. Rockwell Int'l Corp. ("Cook IX"), 273 F. Supp. 2d 1175, 1211-12 (D. Colo. 2003); Cook v. Rockwell Int'l Corp. ("Cook I"), 755 F. Supp. 1468, 1479-81 (D. Colo. 1991).*

*C. Remittitur of Damages*

As an alternative to their motion for new trial, Defendants request remittitur of the jury's compensatory and exemplary damages awards. Remittitur is the process by which a court reduces or proposes to reduce the damages awarded in a jury verdict upon finding that the award **[**60]** is grossly and manifestly excessive or inadequate. *See Garhart ex rel. Tinsman v. Columbia/Healthone, L.L.C., 95 P.3d 571, 582 [*1214] (Colo. 2004)* (citing, among other sources, Black's Law Dictionary 1298 (7th ed. 1999)); *Foradori v. Harris, 523 F.3d 477, 2008 WL 853559, at *21 (5th Cir. 2008).* It is an alternative to ordering a new trial on these grounds, and the successful claimant may decline the offer of remittitur and receive a new trial instead. *See, e.g., Foradori, 523 F.3d 477, [WL] at *21; Lightfoot v. Union Carbide Corp., 110 F.3d 898, 914-915 (2d Cir. 1997); O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438, 1447-48 (10th Cir. 1987).* Thus, a necessary prerequisite to remittitur is a finding that grounds exist to order a new

trial if remittitur is not accepted. *Foradori, 523 F.3d 477, [WL] at *21.*

For the reasons described in the preceding section, I find no grounds that require the jury's damages awards to be set aside and either a new trial or remittitur in lieu of a new trial be ordered. Accordingly, I deny Defendants' alternative motion for remittitur of damages.

This does not mean, however, that the jury's verdict is not subject to judicial adjustment. As described earlier, three legal rules or **[**61]** statutes must be applied to the jury's verdict before judgment may be entered. They are the rule against multiple recovery, Colorado's pro rata liability statute and Colorado's statutory cap on the amount of exemplary damages. Judicial adjustment of the verdict through application of these rules is a matter of law determined by the court in the course of entering judgment. *See Lira, 832 P.2d at 242* (court applies pro rata liability statute before entering judgment); *id. at 244 n.4* (describing process as one of "judicial adjustment"). These potential adjustments are discussed in the following section.

*III. Post-Trial Motions Regarding Posture for Appeal*

The class trial and jury verdict at its close resolved many but not all of the issues presented by this action. For example, the medical monitoring claims of the individual Plaintiffs were bifurcated from the class trial and remain to be decided. *See Cook IX, 273 F. Supp. 2d at 1179.* The allocation and distribution of the jury's property damage verdicts to the Class as appropriate also must be accomplished. All parties agree, nonetheless, that the most efficient manner for this action to proceed, if possible, is to put the claims decided **[**62]** in the property class trial in a posture for appeal before the parties and the court invest additional time and resources in this action. Accordingly, following the close of trial, I invited the parties to state their views on the best method by which to put the matters decided in the class trial in a posture for appeal.

Defendants responded by requesting that I certify four orders in this action for interlocutory appeal pursuant to *28 U.S.C. § 1292(b).* Plaintiffs oppose this approach and propose instead that I direct entry of judgment on the property class claims pursuant to *Rule 54(b) of the Federal Rules of Civil Procedure.* Plaintiffs also proposed a form of judgment and plan of allocation in connection with their motion. For the reasons set forth

564 F. Supp. 2d 1189, *1214; 2008 U.S. Dist. LEXIS 45031, **62

below, I deny Defendants' motion for interlocutory appeal and grant in part and deny in part Plaintiffs' *Rule 54(b)* motion.

### A. Defendants' Motion for Interlocutory Appeal

Defendants propose that this matter be presented to the Tenth Circuit through certification of four orders for interlocutory appeal pursuant to *28 U.S.C. § 1292(b)*: (1) the Memorandum Opinion and Order of July 24, 2003 (Doc. 1210) (published as *Cook IX*); and (2) the Memorandum **[**63]** Opinion and Order of December 17, 2004 (Doc. 1312) (*Cook X*), both of which addressed various long-standing legal disputes between the parties in order to clarify the scope of trial on the property class claims; (3) the Order of May **[*1215]** 17, 2005 on Scheduling and Jury Instruction Issues (Doc. 1338), which further addressed the scope of the upcoming property class trial; and (4) the Memorandum Opinion Regarding Jury Instructions of December 7, 2006 (Doc. 2205), which reported the basis of jury instruction decisions issued before, during and at the close of the property class trial.

*Section 1292(b)* provides that an order that is otherwise not appealable may be appealed if the district judge states in writing that: (1) the order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and (2) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." *28 U.S.C. § 1292(b)*. If such certification is made, the Tenth Circuit then has discretion to permit the appeal upon timely application by one of the parties. *See id.*

I find interlocutory appeal of the pretrial orders and decisions identified by Defendants **[**64]** meet neither of the statutory criteria. A number of the issues addressed in the orders and cited by Defendants are not, in my view, issues on which there is a substantial ground for a difference of opinion. More importantly, interlocutory appeal of any or all of these orders at this point in the action is highly unlikely to materially advance the ultimate termination of this litigation. [17] The class trial on Plaintiffs' property claims has already occurred. The four orders address some but by no means all of Defendants' many complaints about the court's legal, evidentiary and other rulings related to this trial, *see, e.g.*, Defs.' Renewed Mot. for J. as a Matter of Law (Doc. 2220); Mot. for New Trial or Remittitur (Doc. 2224), and so it is highly doubtful that affirmation of these orders would do anything more than set the stage for an additional round of appeals by Defendants. Nor is it at all clear that success by Defendants on appeal of these orders might materially advance the termination of this litigation because remand for a new trial, rather than dismissal of the property class claims, would be the likely result. In addition, if Defendants truly believed that interlocutory appeal **[**65]** of these orders might materially advance the ultimate termination of this litigation, they should have sought interlocutory appeal when the decisions were issued, not years later, after trial defined in part by the principles set forth in these pretrial decisions has been concluded and a verdict entered against Defendants.

> 17    For the same reason, the orders do not involve "controlling questions of law," at this point in the litigation at least. *See* 16 Charles A. Wright et al., Federal Practice & Procedure: Jurisdiction § 3930, at 426 (2d ed. 1996) ("a question is controlling . . . if interlocutory reversal might save time for the district court, and time and expense for the litigants.").

### B. Plaintiffs' Motion for Entry of Judgment

*Rule 54(b)* permits me to direct entry of final judgment as to fewer than all claims or parties in an action upon an express determination that the judgment on these matters is final and that there is no just reason to delay entry of judgment. *Stockman's Water Co., LLC v. Vaca Partners, L.P., 425 F.3d 1263, 1265 (10th Cir. 2005)*; *see Fed. R. Civ. P. 54(b)*. The purpose of this provision is to make an immediate appeal available when the rule's requirements are met. **[**66]** *See Okla. Tpk. Auth. v. Bruner, 259 F.3d 1236, 1241 (10th Cir. 2001)*. In making the required determinations, I must weigh "*Rule 54(b)*'s policy of preventing piecemeal appeals against the inequities that could result from delaying an appeal." *Stockman's, 425 F.3d at 1265*. Factors to consider include "'whether the claims under review [are] separable from the others remaining to be adjudicated and whether the nature of the **[*1216]** claims already determined [are] such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals.'" *Id.* (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8, 100 S. Ct. 1460, 64 L. Ed. 2d 1 (1980)*).

A decision is final and subject to appeal if it "'leaves nothing for the court to do but execute judgment.'" *Copeland v. Toyota Motor Sales U.S.A., Inc., 136 F.3d*

564 F. Supp. 2d 1189, *1216; 2008 U.S. Dist. LEXIS 45031, **66

*1249, 1252 (10th Cir. 1998)* (quoting *Catlin v. United States, 324 U.S. 229, 233, 65 S. Ct. 631, 89 L. Ed. 911 (1945)).* In addition, a judgment is final "even if it does not reduce the damages to a sum certain if [it] sufficiently disposes of the factual and legal issues and any unresolved issues are sufficiently ministerial that there would be no likelihood of further appeal." *Id. at 1252* (internal quotations and **[**67]** citations omitted). In the class action context, a judgment that awards damages in favor of the plaintiff class is final when it "establishes both the formula that will determine the division of damages among class members and the principles that will guide the disposition of any unclaimed funds." *Strey v. Hunt Int'l Res. Corp., 696 F.2d 87, 88 (10th Cir. 1982).*

### 1. Plaintiffs' proposed form of judgment

Plaintiffs contend a judgment meeting these finality requirements can be entered in this action and have proposed a form of judgment to this end. *See* [Pls.' Corrected Proposed] Final Judgment, Ex. A to Pls.' Statement re: Corrected Proposed Form of J. (Doc. 2243). Defendants oppose Plaintiffs' proposed form of judgment, and dispute that any judgment can be entered at this time because a "host of complicated issues" must be decided before judgment can be entered on the jury's verdict. These issues, however, relate to matters such as a plan for allocating the class damages award to class members, the disposition of unclaimed funds and the availability and amount of pre- and post-judgment interest, all of which have now been extensively argued by the parties in the context of this and the **[**68]** parties' other post-trial motions. Accordingly, these matters are now ripe for decision so that final judgment on the claims tried and decided at the property class trial can be entered. My decision on these matters and Defendants' other objections to Plaintiffs' proposed form of judgment is as follows:

### Amount of damages awarded against each Defendant

As described earlier in this decision, the jury's compensatory and exemplary damages awards are subject to judicial adjustment before entry of judgment in accordance with the rule against multiple recovery, Colorado's pro rata liability statute and Colorado's statutory cap on the amount of exemplary damages. I have previously stated, and Plaintiffs do not dispute, that application of the rule against multiple recovery reduces the total compensatory damages owed by Dow and Rockwell to $ 176.8 million, the aggregate damages to

the Class found by the jury on both the trespass and nuisance claims. Application of the two statutory limits on damages is disputed, however.

As required by Colorado's pro rata liability statute, the jury determined each Defendant's fault for the trespass and nuisance it found the Defendants had committed. The jury **[**69]** found Dow 90% at fault for the trespass on Class Properties and 30% at fault for the nuisance Defendants committed, and Rockwell 10% at fault for the trespass and 70% at fault for the nuisance.

Based on these findings, Plaintiffs propose that the judgment award compensatory damages of $ 176,850,340 plus prejudgment interest. The proposed judgment **[*1217]** states that Dow is responsible for $ 159,165,306 (90% of the $ 176.8 million in trespass damages found by the jury) plus prejudgment interest, and Rockwell for $ 123,795,238 (70% of the $ 176.8 million in nuisance damages found by the jury) plus prejudgment interest, while also providing, as just stated, that the total amount recovered from the two Defendants is limited to the $ 176.8 million found by the jury, plus prejudgment interest. The exact amount of compensatory damages to be recovered from each Defendant within these parameters would not be set forth in the judgment, allowing Plaintiffs to decide whether to collect the maximum amount due from one Defendant and the remainder of the $ 176.8 million total judgment (plus prejudgment interest) from the other, or to collect the total amount owed by Dow and Rockwell on some other basis consistent **[**70]** with the judgment's requirements.

Plaintiffs' proposal complies with the rule against multiple recovery and also Colorado's pro rata liability statute. Defendants dispute the latter conclusion, arguing that no judgment can be entered consistent with the statute because the jury assigned different percentages of fault to the Defendants on the trespass and nuisance claims. As discussed earlier in this opinion, however, the jury's allocation of fault on the two claims is not inconsistent and is supported by the evidence. In addition, Colorado's pro rata liability statute requires only that the jury return a special verdict "determining the percentage of . . . fault attributable to each of the parties . . . and the total amount of damages sustained by each claimant," and then directs the court to enter judgment "based on the jury's special findings." *Colo. Rev. Stat. § 13-21-111.5(2).* The statute further directs that "no

564 F. Supp. 2d 1189, *1217; 2008 U.S. Dist. LEXIS 45031, **70

defendant shall be liable for an amount greater than that represented by the degree or percentage of the . . . fault attributable to such defendant that produced the claimed . . . damage." *Id. § 13-21-111.5(1)*. The judgment to be entered under Plaintiffs' proposal meets **[**71]** all of these requirements, as it is based on the jury's special findings allocating fault between Dow and Rockwell on each claim, and ensures that neither Defendant is liable for an amount greater than that represented by the degree of fault found by the jury on one of the two claims decided.

Defendants also protest that the proposed judgment fails to state with specificity a sum certain that each Defendant must pay, and that such specificity is required in order for final judgment to enter. The authority Defendants cite in support of this proposition, however, states only that a final judgment sets out a sum certain to be recovered by the prevailing party, *see Albright v. UNUM Life Ins. Co., 59 F.3d 1089, 1092 (10th Cir. 1995)*, a condition that is met here by reference to the $ 176.8 million in actual damages found by the jury that is to be recovered by Plaintiffs. Judgments in cases involving joint and several liability similarly state the amount to be recovered by the plaintiff without specifying a sum certain to be paid by each liable party and yet are routinely entered and approved. I see no reason why the flexibility allowed in these forms of judgment is not also available here **[**72]** to enter final judgment based on the jury's special findings. In addition, Defendants' concern on this point appears more technical than real, given the practical consideration that DOE, as indemnitor for both Defendants, presumably will pay the entire $ 176.8 million in compensatory damages found by the jury regardless of how this amount is allocated between the Defendants. For all of these reasons, I will adopt Plaintiffs' proposed form of judgment as to compensatory **[*1218]** damages. [18]

> [18]   If it were necessary to declare in the judgment a sum certain owed by each Defendant, this sum could be calculated based on the jury's allocation of fault on both the trespass and nuisance claims and the determination that trespass and nuisance caused $ 176.8 million in damages (after application of the rule against multiple recovery). Under this approach, the 90% fault the jury found for Dow's contribution to the trespass and the 30% fault the jury attributed to Dow for the nuisance would yield an overall fault

allocation of 60% (90% + 30% divided by 2) for the wrongdoing by Dow that caused the $ 176.8 million in total damages found by the jury. The same calculation yields an allocation of 40% (10% **[**73]** trespass fault + 70% nuisance fault divided by 2) for Rockwell's wrongdoing. Under this approach, therefore, the sum certain owed by Dow for the harm the jury found it caused would be $ 106,110,204 (60% of the total compensatory damages of $ 176,850,340) and Rockwell's share would be $ 70,740,136 (40% of the total compensatory damages of $ 176,850,340). This approach takes full account of the jury's findings and requires no speculation as to them.

As for exemplary damages, *Colo. Rev. Stat. § 13-21-102*, as interpreted by the Colorado Supreme Court in *Lira v. Davis, 832 P.2d 240 (Colo. 1992)*, limits liability for exemplary damages to the amount of actual or compensatory damages owed by the defendant after application of the pro rata liability statute. [19] *See id. at 245-46*. Thus, where application of the pro rata liability statute results in a reduction of the compensatory damages owed by a defendant, it is this reduced compensatory amount that is considered in setting the limit on the exemplary damages that can be recovered from that defendant. *Id. at 246*.

> [19]   The Colorado Supreme Court uses the terms "actual damages" and "compensatory damages" interchangeably in discussing the statutory **[**74]** cap on exemplary damages set by *Colo. Rev. Stat. § 13-21-102*. *See Lira, 832 P.2d at 241 n.1*.

Plaintiffs contend that, under this authority, the cap on exemplary damages recoverable from Dow is $ 159.1 million, representing Dow's 90% fault for the trespass, and $ 123.8 million for Rockwell, representing its 70% fault for the nuisance. If this position is correct, Plaintiffs are entitled to recover the full amount of exemplary damages assessed by the jury against each Defendant, $ 110.8 million against Dow and $ 89.4 million against Rockwell, because both amounts are less than the individual caps posited by Plaintiffs. Defendants object, arguing that this outcome would violate *§ 13-21-102* because the total amount of exemplary damages awarded under this approach ($ 110.8 million + $ 89.4 million = $ 200.2 million) would exceed the $ 176.8 million in total compensatory damages to be recovered from Dow and Rockwell after application of the rule against multiple

564 F. Supp. 2d 1189, *1218; 2008 U.S. Dist. LEXIS 45031, **74

recovery.

As relevant here, *§ 13-21-102* provides:

In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances **[**75]** of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages. The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party.

*Colo. Rev. Stat. § 13-21-102(1)(a).*

On its face, the statute does not address the question presented, which is whether the amount of exemplary damages awarded against an individual defendant must be reduced on the ground that the total exemplary damages awarded against all defendants **[*1219]** exceeds the total compensatory damages awarded against these defendants.

The Colorado Supreme Court's decision in *Lira* provides guidance on this issue. In *Lira,* the court considered whether exemplary damages awards are subject to reduction under Colorado's comparative negligence statute, *Colo. Rev. Stat. § 13-21-111*, and the state's pro rata liability statute, *Colo. Rev. Stat. § 13-21-111.5*. The court first determined that exemplary damages are not subject to reduction by application of the comparative negligence statute. *Lira, 832 P.2d at 243*. Its rationale was that reducing an exemplary damages **[**76]** award by the plaintiff's percentage of comparative negligence would be inconsistent with the focus of exemplary damages, which is the defendant's misconduct, and with the purpose of exemplary damages, which is to punish the defendant and deter the misconduct. *Id. at 242-43*. It also emphasized that the amount of an exemplary damages award "should be based on a consideration of the 'severity of the injury perpetrated on the injured party by the wrongdoer.'" *Id. at 243* (quoting *Kirk v. Denver Pub. Co., 818 P.2d 262, 266 (Colo. 1991))*.

The court continued its focus on the wrongdoer's

conduct in determining that the pro rata liability statute limits exemplary damages to the compensatory damages awarded against an individual defendant after application of the jury's fault determinations for that defendant. The court concluded this result effectuated the legislature's intent to "effectively double[] the potential liability of a wrongdoing party." *Id. at 245-46* (quoting remarks by Representative Grant, one of the bill's sponsors). It stated further that "[The legislation sponsor's] statements focused on the liability of the tortfeasor. Since under the comparative negligence and pro rata liability **[**77]** statutes, one of several negligent persons is only responsible for damages in accordance with his determined percentage of fault, that party's liability for punitive damages should be no greater than the amount of actual damages he owes." *Id. at 246*.

In this case, the jury found Dow 90% at fault for the trespass and Rockwell 70% at fault for the nuisance. As stated above, Colorado's pro rata liability statute limits actual damages owed by each of these defendant to these percentages of the actual damages found by the jury. Setting the statutory cap established in *§ 13-21-102(1)(a)* at the amounts calculated based on the jury's allocation of fault to each Defendant on each claim is consistent with *Lira's* emphasis on the wrongdoing committed by the individual tortfeasor and its concern that the purpose of exemplary damages - to punish and deter a defendant's wrongdoing - be served. [20] Providing an individual defendant with some additional reduction in the exemplary damages awarded, as Defendants propose, based on the total compensatory damages awarded against all defendants, would shift the focus of the exemplary damages cap away from the individual defendant's wrongdoing and weaken the **[**78]** punitive and deterrent purposes of exemplary damages awards.

20   This result is also consistent with Colorado case law finding that the Colorado legislature's intent in *§ 13-21-102(1)(a)* was "to limit the punitive damages awarded on a particular tort claim to the amount of actual damages awarded on that same claim." *Hensley v. Tri-QSI Denver Corp., 98 P.3d 965, 968 (Colo. Ct. App. 2004)*.

My conclusion that the jury's exemplary damages awards are within the statutory cap on exemplary damages is bolstered by considering another component of compensatory damages that is included in determining the amount of the **[*1220]** cap: prejudgment interest. [21]

564 F. Supp. 2d 1189, *1220; 2008 U.S. Dist. LEXIS 45031, **78

Colorado courts have repeatedly held that prejudgment interest is an element of compensatory damages. *See, e.g., Seaward Const. Co. v. Bradley,* 817 P.2d 971, 976 (Colo. 1991); *Allstate Ins. Co. y. Starke,* 797 P.2d 14, 19 (Colo. 1990); *Witt v. State Farm Mut. Auto. Ins. Co.,* 942 P.2d 1326, 1327 (Colo. Ct. App. 1997). The Tenth Circuit and other courts are in accord with this view. *Webco Indus., Inc. v. Thermatool Corp.,* 278 F.3d 1120, 1134 (10th Cir. 2002); *Johnson v. Cont'l Airlines Corp.* 964 F.2d 1059, 1062 (10th Cir. 1992) (collecting cases).

> 21   Defendants **[**79]** cite Instruction No. 3.27 and statements regarding this instruction in the Memorandum Opinion Regarding Jury Instructions as amounting to a legal ruling that prejudgment interest cannot be considered in determining the statutory cap on exemplary damages. Not so. This issue was not raised in connection with Instruction No. 3.27 and hence is addressed here for the first time.

In *James v. Coors Brewing Co.,* 73 F. Supp. 2d 1250 (D. Colo. 1999), Judge Babcock considered this case law and *Colo. Rev. Stat. § 13-21-102* and concluded that prejudgment interest on damages is part of "actual damages" to be considered in determining the one-to-one actual damages to exemplary damages cap set by the Colorado statute. *Id. at 1255.* This analysis is sound and has been followed by this and other courts. *Mower v. Centry 1 Chevrolet, Inc.,* No. 02-cv-01632-MSK-MEH, 2006 WL 2729265, *23 (D. Colo. June 16, 2006); *see also Tait v. Hartford Underwriters Ins. Co.,* 49 P.3d 337, 340 (Colo. Ct. App. 2001) (noting without comment that the district court calculated the statutory cap on exemplary damages as the amount of compensatory damages awarded plus prejudgment interest). Accordingly, I find that the statutory **[**80]** cap on each Defendant's liability for exemplary damages in this case includes the prejudgment interest each Defendant is required to pay on the compensatory damages recovered from it. Given the substantial prejudgment interest award to be included in the judgment, as discussed below, the sum of prejudgment interest and the amount due and ultimately recovered from each Defendant will exceed the amount of exemplary damages awarded by the jury against Dow and Rockwell under any reasonably conceivable scenario. Accordingly, no reduction of these damages awards is required, and judgment will be entered on the jury's exemplary damages verdicts.

*Allocation of damages*

Plaintiffs propose a Plan of Allocation that provides for the appointment of a Claims Administrator, defines the duties and authorities of the Claims Administrator and sets forth the procedures for determining the disposition of the compensatory and exemplary damages, attorney fees, expenses, costs and pre- and post-judgment interest awarded in the final judgment ("Judgment Fund"), including the substantive principles and procedures that will govern distribution of the "Net Class Award" (the Judgment Fund less certain **[**81]** fees, expenses, costs and awards).

In summary, Plaintiffs propose that the Claims Administrator begin the allocation process by consulting appropriate records and data from Jefferson County and other suitable and reliable sources to identify the properties and property owners satisfying the Class definition and to sort them into the three property categories set forth in the jury's verdict: commercial, residential and vacant. [22] Pls.' Reply in Supp. of Mot. for Entry of J. (Doc. 2240), Ex. B (Pls.' **[*1221]** Rev. Proposed Plan of Allocation), p 8. For each of these three property categories, the Claims Administrator would then compute the category's share of the Net Class Award, with the total sum allocable to each category bearing the same ratio to the Net Class Award as the jury's determination of compensatory damages for that category bears to the total of all compensatory damages found by the jury for the three combined categories. *Id.,* P 9. Based on Jefferson County tax assessment records, the Claims Administrator would then determine, for each property in the Prospective Damages Subclass, the property's assessed value and from it calculate the fraction of this value relative to the total **[**82]** assessed value of all properties in the Damages Subclass within the same category (the property's "Fractional Allocable Share"). *Id.,* P 10. Subject to such equitable adjustments as the Claims Administrator might recommend and I might adopt, the Claims Administrator would then compute an award for each property in the Damages Subclass, based on the property's Fractional Allocable Share of the Net Class Award for the relevant property category. *Id.,* P 11. The Proposed Allocation based on these principles and procedures would then be submitted to the Court for approval, along with a proposed process for notifying members of the Class of their awards (if any) under the Proposed Allocation, granting them an opportunity to seek adjustment of these awards, and making payment.

564 F. Supp. 2d 1189, *1221; 2008 U.S. Dist. LEXIS 45031, **82

*Id.,* P 12. Plaintiffs' proposed Plan of Allocation further provides that any funds that remain unclaimed, after a due allowance period for late claims, would be distributed to members of the Damages Subclass on a pro rata basis to assist in making them whole notwithstanding payment of attorney fees, expenses and administrative costs from the Judgment Fund. *Id.,* P 13. Plaintiffs do not expect the amount of these unclaimed **[**83]** funds to be substantial. 23 Plaintiffs submit the Declaration of Wayne L. Hunsperger, one of their real estate experts from the property class trial, to attest that this process is feasible and reasonable.

> 22   Both parties have relied on records such as these for this purpose in the course of this litigation.
>
> 23   Given the long and litigious history of this case, the charge against the Judgment Fund for attorney fees and expenses alone is likely to exceed the amount of unclaimed funds to be distributed to the Prospective Damages Subclass in this manner.

Having reviewed Plaintiffs' proposed plan and Defendants' objections to it, I adopt the plan with the following adjustment. As described earlier in this opinion, only Class members who owned property within the Class Area on January 30, 1990, when this action was filed and the date on which the jury found it appeared the tortious invasions would continue indefinitely, are entitled to recover damages for prospective invasions to Class Properties. *See supra* Section II.B.1. In identifying the members of the Class and their corresponding properties, as described above, the Claims Administrator shall identify and categorize members of this subclass, **[**84]** the "Prospective Damages Subclass," and the other subclass ("Non-Prospective Damages Subclass"), which consists of Class members who sold their Class Properties before January 30, 1990. This identification shall be based on Jefferson County records or other appropriate, reliable records that are used to identify the members of the Class as a whole. The distinction between these two subclasses and the prospective damages allocable to the Class Properties corresponding to members of each subclass shall be maintained throughout development of the allocation plan described above.

This process will result in some portion of the Net Class Award being allocated to properties once owned by members of the **[*1222]** Non-Prospective Damages

Subclass, who cannot claim these prospective damages under the Court's prior rulings. *See supra* Section II.B.1. Nonetheless, there is no question under the jury's verdicts that these damages exist and were caused by the Defendants' continuing trespass and nuisance.

Courts and commentators have recognized a variety of methods for disposing of unclaimed portions of class damage awards. *See Brewer v. S. Union Co., No. 83-F-1174, 1987 U.S. Dist. LEXIS 15940, *7-18 (D. Colo. Aug. 13, 1987)*; **[**85]** *see generally* 3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions §§ 10:13-25 (4th ed. 2002). After considering these options, the substantive purposes of the claims of this action and the equities involved, I have determined that the portion of the Net Class Award allocable to the Non-Prospective Damages Class will be distributed to the indirect benefit of the Class in accordance with *cy pres* principles. Although the Tenth Circuit has not spoken on *cy pres* distributions of class damages, there is precedent for this approach in this court. *See Brewer, at *17-19.* Once the amount of monies subject to this distribution has been determined under the approved allocation plan, I shall direct the Plaintiffs to identify options for the distribution of these monies in accordance with *cy pres* principles. These principles envision that the monies will be put to their "next best use" in keeping with the intent of the statutes and other law upon which the Plaintiffs' property class claims are based. *See id at *13-16.*

The Plan of Allocation described herein will be entered by separate order. Execution of this Plan, and of the judgment as a whole, is stayed until such time as either **[**86]** Defendant files a timely notice of appeal from the judgment or the time allowed for filing any such appeal has expired.

*Prejudgment interest*

Plaintiffs request that the judgment on the jury's verdicts include prejudgment interest. Whether prejudgment interest may be recovered is a matter of Colorado law. 24 In Colorado, the right to prejudgment interest is governed by statute, and it must be awarded in cases to which the statute applies. *See Colo. Rev. Stat. § 5-12-102(1)* (covered parties "shall receive" prejudgment interest); *id. § 13-21-101(1)* ("it is the duty of the court" to award prejudgment interest in cases falling within the statute); *see also Todd v. Bear Valley Village Apts., 980 P.2d 973, 981 (Colo. 1999)* (trial court's award of prejudgment interest under Colorado statute is "a

564 F. Supp. 2d 1189, *1222; 2008 U.S. Dist. LEXIS 45031, **86

ministerial act that is mandatory and does not require the exercise of judgment or discretion;" internal quotation omitted). The purpose of this mandatory award, under Colorado law, is to compensate the plaintiff for the loss of earnings on the actual damages due to their delayed payment and also to encourage the settlement of cases both before and after trial. *See Allstate Ins. Co., 797 P.2d at 19* [**87] ("prejudgment interest is an element of compensatory damages in actions for personal injuries, awarded to compensate the plaintiff for the time value of the award eventually obtained against the tortfeasor."); *Mesa Sand & Gravel Co. v. Landfill, Inc., 776 P.2d 362, 364 (Colo. 1989)* (purpose of prejudgment interest "is to discourage a person [*1223] responsible for payment of a claim to stall and delay payments until judgment or settlement"); *Stevens v. Humana of Delaware, Inc., 832 P.2d 1076, 1081 (Colo. Ct. App. 1992)* ("prejudgment interest serves not only the purpose of compensating a party for the loss of use of money but is also used to encourage the settlement of cases both pre- and post-trial"); *Voight v. Colo. Mountain Club, 819 P.2d 1088, 1092-93 (Colo. Ct. App. 1991)* (same).

> 24   This is so because the trespass and nuisance claims decided by the jury were brought pursuant to the Price-Anderson Act ("Act"), which directs that state law provide the substantive rules of decision in the action. *42 U.S.C. § 2014(hh)*. The entitlement to prejudgment interest is a substantive matter, *see Webco Indus., 278 F.3d at 1134*, and is therefore governed by Colorado law under the Act.

Defendants argue Plaintiffs [**88] are not entitled to recover prejudgment interest on the jury's verdict on three grounds. First, they contend that prejudgment interest is precluded because the jury, at Plaintiffs' request, awarded damages that included an inflation adjustment, based on the Consumer Price Index ("CPI"), through 2005. This inflation adjustment, Defendants contend, is the equivalent of prejudgment interest prescribed by Colorado statute, with the result that an award of prejudgment interest would amount to a duplicate, and improper, payment to Plaintiffs.

Defendants cite no Colorado authority, or authority from other jurisdictions for that matter, holding that prejudgment interest is not available when the damages awarded by a jury include an adjustment for inflation. 25 The premise underlying Defendants' argument, that a

CPI-adjustment is equivalent to the statutorily-directed award of prejudgment interest, is also incorrect. Colorado courts have repeatedly held that prejudgment interest is intended to compensate the plaintiff for the "loss of earnings," "loss of use," and "time value" of the money due from the defendant. *See, e.g., Coale v. Dow Chem. Co., 701 P.2d 885, 890 (Colo. Ct. App. 1985)*; *Stevens, 832 P.2d at 1081*; [**89] *Allstate Ins. Co., 797 P.2d at 19*. That this concept is more than mere inflation is obvious on its face, as has been recognized by other courts. *See United States v. City of Warren, 138 F.3d 1083, 1096 (6th Cir. 1998)* (district court abused its discretion in utilizing CPI to assess prejudgment interest because "merely adjusting the dollars the plaintiff would have earned to compensate for diminished purchasing power because of inflation does not compensate for the lost use of the money"); *Chandler v. Bombardier Capital, Inc., 44 F.3d 80, 84 (2nd Cir. 1994)* (award of prejudgment interest for loss of use of inflation-adjusted damages did not constitute double recovery because the inflation adjustment did not compensate for the lost use of the money); *Clinchfield Coal Co. v. Fed. Mine Safey & Health Review Comm'n, 282 U.S. App. D.C. 368, 895 F.2d 773, 780 (D.C. Cir. 1990)* (rejecting award of prejudgment interest that provided "compensation for losses through inflation but none for the capacity of wealth to generate more wealth"); *Evans v. Connecticut, 967 F. Supp. 673, 684 n.15 (D. Conn. 1997)* (awarding prejudgment interest on damages award that had been adjusted to compensate [*1224] for inflation because inflation [**90] adjustment did "not calculat[e] the value of the money as if it had been given to [plaintiff] for his use or for investment"), *aff'd, 24 Fed. Appx. 35 (2nd Cir. 2001)*. 26 It is also undisputed that the CPI inflation rate for the period in question was generally far below the 8% and 9% prejudgment interest rates set by statute, which further indicates the Colorado legislature did not intend for prejudgment interest to compensate only for inflation. Defendants' contention also gives no weight to the second purpose served by an award of prejudgment interest, which is to encourage settlement. Finally, Defendants cite no case law indicating that I have authority under Colorado law *not* to award prejudgment interest if it is required by statute.

> 25   The case law Defendants cite for this proposition does not address this question and often is, at best, tangentially related to it. Defendants' attempt to portray the Tenth Circuit's decision in *Lowell Staats Mining Co. v. Pioneer*

564 F. Supp. 2d 1189, *1224; 2008 U.S. Dist. LEXIS 45031, **90

*Uravan, Inc., 878 F.2d 1259 (10th Cir. 1989)*, as supporting their position is particularly strained. In the passage relied upon by Defendants, the court merely held that the district court did not err in reserving the issue **[**91]** of interest computation to itself. *Id. at 1268-69.* Nor does the quotation from the 1925 Colorado Supreme Court case the Tenth Circuit cited in support of this holding establish or support the proposition that a plaintiff cannot recover prejudgment interest under Colorado law if the damages awarded include an inflation adjustment. *See id.* (quoting *Wood v. Hazelet, 77 Colo. 442, 237 P. 151, 152 (Colo. 1925)*). In fact, the *Lowell* decision, which reversed the district court's decision not to award prejudgment interest, actually supports the proposition that a district court *must* award prejudgment interest where required by Colorado statute. *See id. at 1270.*

26   Defendants' attempt to discredit this authority based on the Supreme Court's earlier decision in *Library of Congress v. Shaw, 478 U.S. 310, 106 S. Ct. 2957, 92 L. Ed. 2d 250 (1986)*, is not persuasive. The Court in *Shaw* did not address the question presented here, and its statements regarding the bar sovereign immunity imposes on recovery of prejudgment interest on *Title VII* attorney fee awards against the federal government is not inconsistent with the authority cited above.

Defendants next contend that Plaintiffs are not entitled to recover prejudgment interest because neither of **[**92]** the Colorado statutes providing for an award of prejudgment interest applies here. While I agree that the Colorado statute governing prejudgment interest in personal injury actions does not apply, 27 I find the second potentially applicable statute, *Colo. Rev. Stat. § 5-12-102*, applies here and mandates that the judgment include prejudgment interest at the statutory rate of 8% per annum, compounded annually. *See id. § 5-12-102(1)(b).*

27   Plaintiffs argue this statute, *Colo. Rev. Stat. § 13-21-101*, and its provision for prejudgment interest at a rate of 9% per annum, applies here because the Colorado Court of Appeals has determined that nuisance awards affording compensation for annoyance and discomfort are governed by this statute. *See Miller v. Carnation*

*Co., 39 Colo. App. 1, 564 P.2d 127, 132 (Colo. Ct. App. 1977)*. The *Miller* case and other Colorado authority, however, also establish that a nuisance award for annoyance and discomfort is distinct from an award for diminution in a property's value as a result of the nuisance. *See id. at 130*; *Bd. of County Comm'rs v. Slovek, 723 P.2d 1309, 1318 (Colo. 1986)*; *Webster v. Boone, 992 P.2d 1183, 1185 (Colo. Ct. App. 1999)*; *see also Cook IX, 273 F. Supp. 2d at 1206-07 & n.33* **[**93]** (recognizing distinction). In this case, the only nuisance damages sought by Plaintiffs, and awarded by the jury, were for the diminished value of the Class Properties caused by Defendants' nuisance.

*Section 5-12-102(1)*, titled "Statutory Interest," provides as relevant here:

Except as provided in *section 13-21-101, C.R.S.*, when there is no agreement as to the rate thereof, creditors shall receive interest as follows:

(a) When money or property has been wrongfully withheld, interest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property from the date of wrongful withholding to the date payment is made or to the date judgment is entered, whichever first occurs; or, at the election of the claimant,

(b) Interest shall be at the rate of eight percent per annum compounded annually for all moneys or the value of all property after they are wrongfully withheld or after they become due to the date of payment or to the date judgment is entered, whichever first occurs.

Defendants assert this statute applies only in actions arising from consumer credit transactions, basing this contention on their analysis of the statute and its legislative **[**94]** history and the erroneous contention that the statute is part of Colorado's **[*1225]** Consumer Credit Code. 28 In so doing, Defendants dismiss the long line of Colorado Supreme Court and other cases that, contrary to Defendants' position, have construed §

564 F. Supp. 2d 1189, *1225; 2008 U.S. Dist. LEXIS 45031, **94

5-12-102 liberally to apply to all types of cases not involving personal injuries. 29 For example, in *Mesa Sand & Gravel Co. v. Landfill, Inc., 776 P.2d 362 (Colo. 1989)*, the Colorado Supreme Court stated that "[i]n cases other than in 'actions brought to recover damages for personal injuries sustained by any person resulting from or occasioned by the tort of any other person, corporation, association, or partnership' under [*Colo. Rev. Stat*] § 13-21-101, a prevailing party may recover prejudgment interest under *section 5-12-102*." *Id. at 363*. The court further declared § *5-12-102* "was not designed to distinguish between classes of prevailing parties in permitting recovery of prejudgment interest" and approved the statute's application to a breach of contract claim. *Id. at 365*. In subsequent decisions, the Colorado Supreme Court has affirmed this broad construction of the statute, including its application in property damage cases. *See Westfield Dev. Co. v. Rifle Inv. Assocs., 786 P.2d 1112, 1122 (Colo. 1990)* **[**95]** (approving award of prejudgment interest under statute to pecuniary damages caused by intentional interference with contract because liberal construction of statute was necessary "to effectuate the legislative purpose of compensating parties for the loss of money or property to which they are entitled."); *Ballow v. PHICO Ins. Co., 878 P.2d 672, 683 (Colo. 1994)* ("In cases other than 'actions brought to recover damages for personal injuries' under [*Colo. Rev. Stat.*] § 13-21-101, a prevailing party may recover prejudgment interest under *section 5-12-102*"); *Farmers Reservoir & Irrigation Co. v. Golden, 113 P.3d 119, 133 (Colo. 2005)* (holding § *5-12-102(1)-(3)* codifies the doctrine of moratory interest in contract and property damage cases, so that "[t]he right to recover prejudgment interest for damages other than those resulting from personal injuries is a matter of law determined under *section 5-12-102*.").

The Tenth Circuit has also recognized that § *5-12-102* applies to claims for property damages and other actions not involving consumer credit transactions. *See, e.g., Loughridge v. Chiles Power Supply Co., 431 F.3d 1268, 1288-89 (10th Cir. 2005)* (recognizing that "prejudgment interest in non-personal injury actions is available" under § *5-12-102(1)* and applying statute to determine prejudgment interest to be awarded in property damage case); *Estate of Korf v. A.O. Smith Harvestore Prods., Inc., 917 F.2d 480, 486 (10th Cir. 1990)* (applying § *5-12-102* to claim for property damages because, under the Colorado Supreme Court's decisions in *Mesa Sand* and *Westfield*, "victims of tortious conduct are clearly entitled to prejudgment interest under the statute."); *Lowell Staats Mining Co. v. Pioneer Uravan, Inc., 878 F.2d 1259, 1270 (10th Cir. 1989)* (holding § *5-12-102* entitled plaintiff to prejudgment interest on breach of contract claim).

Defendants essentially argue that these cases **[**97]** were wrongly decided because they rely, directly or indirectly, on an alleged mistranscription of a statement by the sponsor of the legislation that became § *5-12-102*. I disagree that Defendants' **[*1226]** report of this sponsor statement, even if accurate, supports Defendants' narrow reading of the statute or casts doubt on the Colorado courts' construction of it. 30 Even if this were not the case, "it is the duty of the [federal court] to ascertain from all the available data what the state law is and apply it rather than to prescribe a different view, however superior it may appear." *Lowell, 878 F.2d at 1269* (quoting *West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237, 61 S. Ct. 179, 85 L. Ed. 139 (1940))*. I am not at liberty, therefore, to depart from the Colorado Supreme Court's construction of § *5-12-102*, even if I were inclined to do so.

---

28    The Consumer Credit Code consists of Articles 1 through 9 of Title 5 of the Colorado Revised Statutes. *Colo. Rev. Stat. § 5-1-101*. The prejudgment interest statute is found in Article 12 of Title 5. *See id. § 5-12-102*.

29    "The term 'creditors' used in the statute [*Colo. Rev. Stat. § 5-12-102*] **[**96]** has been construed broadly to include all claimants who have been damaged by the actions of another." *Stansbury v. Comm'r Internal Revenue Serv., 102 F.3d 1088, 1093 n.6 (10th Cir. 1996)* (internal quotation omitted).

30  The chief difference between the transcription cited by the Colorado Supreme Court and that asserted by Defendants is that the Colorado Supreme Court reports the legislation's sponsor stated "*All* plaintiffs, or defendants who counterclaim, for that matter, are entitled to interest," *Mesa Sand, 776 P.2d at 365* (emphasis added), while Defendants contend he actually stated "*a* plaintiff, **[**98]** or for that matter a defendant who counterclaims, is entitled to interest." Defs.' Resp. to Pls.' Mot. for Entry of J. (Doc. 2226) at 45 (emphasis added).

564 F. Supp. 2d 1189, *1226; 2008 U.S. Dist. LEXIS 45031, **98

Defendants conclude their challenge to the award of any prejudgment interest in this action by contending that the compensatory damages awarded by the jury were for "future losses," and as such have not been "withheld" as required for prejudgment interest to be awarded under *§ 5-12-102*. Defendants' argument confuses the basis for liability in this action, that Defendants' tortious invasions will continue into the future, with the measure of damages for Defendants' on-going invasions. Pursuant to *Restatement § 930(3)(b)*, the jury determined damages for "the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring." *Restatement § 930(3)(b)*; *see* Jury Verdict Form at 14-15, 23-24. The jury's verdict, therefore, determined the damages caused by Defendants' continuing invasions that existed at the time the injurious situation became complete and comparatively enduring. In other words, the damages found by the jury **[**99]** were to remedy an existing wrong. As a result, Plaintiffs are entitled to an award of prejudgment interest under *§ 5-12-102*. *See Loughridge*, 431 F.3d at 1290-91 (rejecting assertion that prejudgment interest was not available under Colorado law for award of future repair costs, finding these damages were "to remedy [plaintiffs'] past, not future injury" arising from defendant's wrong); *see also Wharf*, 210 F.3d at 1233-34 (rejecting argument that *§ 5-12-102* was inapplicable because contract damages characterized as "right to future income" could not be "wrongfully withheld" within meaning of statute).

Plaintiffs' entitlement to prejudgment interest under *§ 5-12-102* is also supported by Colorado authority holding that prejudgment interest "accrues in a property damage case from the time the cause of action accrued; in other words, from the date on which the injured party was wronged." *Fed. Ins. Co. v. Ferrellgas, Inc.*, 961 P.2d 511, 514 (Colo. Ct. App. 1997); *see Isbill Assocs., Inc. v. Denver*, 666 P.2d 1117, 1122 (Colo. Ct. App. 1983) (upholding prejudgment interest award from time property was damaged). By statute, prejudgment interest is awarded "from the date of wrongful withholding." **[**100]** *Colo. Rev. Stat. § 5-12-102(1)(a)*. Thus, the Colorado courts deem damages to be "wrongfully withheld" as of the date on which the wrong occurred. *See Seaward*, 817 P.2d at 975 ("addition of prejudgment interest to a judgment for compensatory **[*1227]** damages recognizes that the loss caused by the tortious conduct occurred at the time of the resulting injury but that the damages paid to compensate for that loss are not

received by the injured party until later.") There is no question that the wrong here, Defendants' continuing tortious invasions, has occurred and that the damages attributable to this wrong have been wrongfully withheld since then.

The jury found that it appeared on or before January 30, 1990 that any trespass or nuisance by Rockwell and Dow would continue indefinitely. Jury Verdict Form at 28-29. This finding, coupled with the jury's determination that both Dow and Rockwell were liable for continuing trespass and nuisance, establishes that Plaintiffs' trespass and nuisance claims accrued, and the wrongs occurred, no later than January 30, 1990. Accordingly, pursuant to *§ 5-12-102(1)*, Plaintiffs are entitled to recover prejudgment interest on the compensatory damages awarded by **[**101]** the jury, at a rate of 8% per annum compounded annually, from January 30, 1990 through the date of payment or the date judgment is entered, whichever occurs first. *Colo. Rev. Stat. § 5-12-102(1)(b)*.

In their Motion for Entry of Judgment, Plaintiffs also requested an award of prejudgment interest on the jury's exemplary damages award, measured from the date of the jury's verdict awarding these damages. This start date was an attempt to accommodate Colorado case law declaring that prejudgment interest is not available on exemplary damages in part because these damages are not "wrongfully withheld" until they are awarded by a jury. *See Seaward*, 817 P.2d at 975-76; *Coale*, 701 P.2d at 890. Plaintiffs subsequently acknowledged that the Colorado Court of Appeals' decision in *Fail v. Community Hospital*, 946 P.2d 573 (Colo. Ct. App. 1997), which noted that a jury verdict is not conclusive until final judgment is entered on it, *id. at 582*, called this attempted accommodation into question. I agree and therefore deny Plaintiffs' request for an award of prejudgment interest on exemplary damages.

*Postjudgment interest*

There is no question that Plaintiffs are entitled to recover postjudgment interest, **[**102]** but the parties dispute whether the applicable rate is set by federal or Colorado law. In *Transpower Constructors v. Grand River Dam Authority*, 905 F.2d 1413 (10th Cir. 1990), the Tenth Circuit considered whether federal or state law governed the determination of postjudgment interest in a diversity action, in which the substantive rules of decision were drawn from state law. The Tenth Circuit determined that the federal statute, *28 U.S.C. § 1961*,

564 F. Supp. 2d 1189, *1227; 2008 U.S. Dist. LEXIS 45031, **102

applied, because the imposition of postjudgment interest, while "rationally capable of classification as either" substantive or procedural, was most properly viewed as a procedural rule. *Transpower, 905 F.2d at 1424*. Here, the Price-Anderson Act directs only that "the substantive rules for decision" shall be derived from state law. *42 U.S.C. § 2014(hh)*. As a procedural rule, therefore, postjudgment interest is not subject to this provision, with the result that the federal statute, *28 U.S.C. § 1961*, governs the entitlement to, and rate of, postjudgment interest in this action.

*Defendants' additional objections to Plaintiffs' proposed judgment*

I have considered Defendants' additional objections to Plaintiffs' proposed judgment and find them [**103] to be without merit. In particular, I find the references to The Boeing Company in Paragraph 4 of Plaintiffs' Corrected Proposed Final Judgment (Doc. 2243-2) to be consistent with the [*1228] representation made to this Court by Rockwell and The Boeing Company that The Boeing Company, as the successor-in-interest to Rockwell, is answerable for any judgment rendered against Rockwell in this suit. *See Joint Submission re: Pls.' Mot. to Amend Caption or Compl. or to Substitute Rockwell's Successor Cos. as Parties in Interest (Doc. 2193); id.*, Ex. A (Doc. 2193-2) (Statement/Description of Successor Interest by Rockwell and Boeing).

*2. Entry of final judgment under Rule 54(b)*

I further find that judgment, as described above, shall be entered pursuant to *Rule 54(b) of the Federal Rules of Civil Procedure*.

In so holding, I specifically find that the judgment to be entered is a final order under *Rule 54(b)*. This is so because it is the ultimate disposition of Plaintiffs' claims to recover prospective damages for the continuing trespass and nuisance the jury found Dow and Rockwell had committed. *See Okla. Tpk., 259 F.3d at 1242* (stating standard). These claims are distinct and separable from the remaining [**104] claims in this case. Defendants' liability and the total prospective damages owed on these claims has been decided on the merits, leaving only the amount due to each member of the Class entitled to recover these damages (the Prospective Damages Subclass as defined herein) to be determined.

As required to establish finality under *Strey v. Hunt*

*International Resources Corp., 696 F.2d 87 (10th Cir. 1987)*, I have approved a Plan of Allocation that sets forth the procedures and formula for the division of damages among members of the Prospective Damages Subclass and the principles that will guide disposition of unclaimed funds. Even if issues and disputes arise in computing each member's damages entitlement under this Plan, these issues are not similar to, and in fact are separable from, the trespass, nuisance and prospective damages claims decided by the judgment to be entered. In addition, while it is very unlikely that the issues Defendants have indicated they will seek to appeal as a result of the judgment will be mooted or altered by the allocation and disbursement of these damages in accordance with the Plan of Allocation, the judgment also stays execution of the Plan until after any [**105] appeal of the judgment is decided. Accordingly, the judgment is final under *Rule 54(b). See Parks v. Pavkovic, 753 F.2d 1397, 1401-02 (7th Cir. 1985)* (Posner, J.) (describing circumstances in which finality is achieved when damages due to individual class members remain to be decided); *see also Strey, 696 F.2d at 88* (order deciding liability and class damages not a final judgment until it also states formula for dividing damages among class members and principles guiding disposition of any unclaimed funds).

I have also determined, as required by *Rule 54(b)*, that there is no just reason to delay entry of this final judgment. No one can seriously dispute that the class trial determined the central claims and issues in this action: each Defendants' liability for continuing trespass and nuisance and the decrease in the value of Class Properties caused by these continuing tortious invasions. The class trial was the product of an extraordinarily long and contentious pretrial process that consumed substantial private and judicial resources and required a number of hotly disputed legal, factual and evidentiary issues to be decided. Substantial additional time and resources will be required [**106] to execute the Plan of Allocation approved in this memorandum opinion and to resolve the remaining claims in this action. It would be inefficient and uneconomical for the parties and the court to proceed with this allocation and other [*1229] claims before the parties have an opportunity to appeal the jury's verdicts on the claims decided in the class trial.

Immediate appeal of the final judgment also does not pose a risk of piecemeal appeals. Although Plaintiffs' medical monitoring claims, and perhaps claims for

564 F. Supp. 2d 1189, *1229; 2008 U.S. Dist. LEXIS 45031, **106

additional damages for the proven trespass and nuisance pursuant to *Restatement § 929*, in theory remain pending, these claims are distinct and separate from those decided in the final judgment to be entered on the jury's verdicts. In addition, even if there are subsequent appeals from adjudication of these claims or from the allocation of the damages awarded as a result of the class trial, it is highly unlikely they would present the same issues that the parties have indicated they may raise on appeal from the class trial. Nor can I conceive of a situation (other than settlement) in which appellate review of the issues raised by the class trial would be mooted by any future developments **[**107]** in this case.

Finally, this action has been pending now for 18 years. The parties, and especially the members of the Plaintiff Class, deserve as speedy a resolution of this case as is possible under the Federal Rules. The opportunity for immediate appeal of the jury's verdicts under *Rule 54(b)*, which would allow all of the parties' concerns regarding the class trial to be heard and decided once and for all, is by far the best means of achieving this end. There is simply no just reason to delay this action further by continuing proceedings in this court when appeal is virtually certain and may affect the nature of these additional proceedings.

**Conclusion**

For the reasons stated above:

1. Defendants' Renewed Motion for Judgment as a Matter of Law (Doc. 2220) is denied.

2. Defendants' Motion for a New Trial or, in the Alternative, for a Remittitur of Damages (Doc. 2224) is denied.

3. Defendants' Motion for Certification of Interlocutory Appeal (Doc. 2222) is denied.

4. Plaintiffs' Motion for Entry of Judgment (Doc. 2169) is granted in part and denied in part as follows:

A. Final judgment on the jury's verdicts in the property class trial, in a form consistent with this Memorandum Opinion, shall **[**108]** be entered under *Federal Rule of Civil Procedure 54(b)*;

B. A Plan of Allocation, in a form consistent with this Memorandum Opinion, shall be entered for the sum of all compensatory and exemplary damages awarded in this judgment, inclusive of such attorney fees, expenses, costs and pre- and post-judgment interest as have been or may be awarded to Plaintiffs and the Class;

C. Plaintiffs shall prepare and submit to the Court a revised proposed Final Judgment and Plan of Allocation that reflects the rulings set forth in this Memorandum Opinion;

D. Execution of the Final Judgment and Plan of Allocation entered by the Court, as well as proceedings to recover attorney fees, costs and expenses, is stayed until such time as a party files a timely notice of appeal of the Final Judgment or the time for doing so expires. An additional stay of execution may also be obtained upon proper application under **[*1230]** *Federal Rule of Civil Procedure 62(d)*.

IT IS SO ORDERED.

564 F. Supp. 2d 1189, *1230; 2008 U.S. Dist. LEXIS 45031, **108

Dated this 20th day of May, 2008.                    John L. Kane, Senior District Judge

   /s/ John L. Kane                                    United States District Court

71 ERC 1609, 77 Fed.R.Serv.3d 555

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Barfield v. Sho-Me Power Elec. Co-op., W.D.Mo., August 21, 2015

618 F.3d 1127
United States Court of Appeals,
Tenth Circuit.

Merilyn COOK; William Schierkolk, Jr.; Delores Schierkolk; Richard Bartlett; Lorren Babb; Gertrude Babb; Michael Dean Rice; Bank Western; Thomas L. Deimer; Rhonda J. Deimer; Stephen Sandoval; Peggy J. Sandoval; Sally Bartlett, Plaintiffs–Appellees–Cross–Appellants,
v.
ROCKWELL INTERNATIONAL CORPORATION and Dow Chemical Company, Defendants–Appellants–Cross–Appellees,
American Nuclear Insurers; Nuclear Energy Institute, Inc., Amici Curiae.

Nos. 08–1224, 08–1226, 08–1239. | Sept. 3, 2010.

**Synopsis**
**Background:** Property owners filed class action against operators of nuclear weapons manufacturing plant to recover for damages caused by releases of plutonium and other hazardous substances from plant. The United States District Court for the District of Colorado, John L. Kane, J., 564 F.Supp.2d 1189, denied operators' motion for judgment as matter of law and motion for new trial or, in alternative, for remittitur of damages after jury verdict in owners'

favor. Parties appealed.

**Holdings:** The Court of Appeals, Murphy, Circuit Judge, held that:

[1] certified judgment that did not distribute aggregate class award among individual members was "final" for purposes of appeal;

[2] currently existing actual physical injury to property was necessary to establish "damage to property" under Price-Anderson Act (PAA);

[3] loss of use, as required for "loss of use of property" claim under PAA, may occur through presence of radioactive materials;

[4] state law was preempted in "public liability action" under PAA only when it was inconsistent with provisions of PAA;

[5] owners were required to prove actual physical damage to their property in order to prevail on their trespass claims under PAA;

[6] PAA did not preclude punitive damages against operators of nuclear weapons manufacturing plant before 1988; and

[7] willful and wanton conduct by operators that contributed to release of plutonium could be considered when deciding whether to award punitive damages only if release of plutonium both occurred prior to August 20, 1988, and ultimately caused injury to owners of real property that allegedly had been damaged by releases of plutonium particles and other hazardous substances

71 ERC 1609, 77 Fed.R.Serv.3d 555

from nuclear weapons manufacturing plant.

Reversed and remanded.

West Headnotes (41)

[1] **Federal Courts**
👉Determination of question of jurisdiction

The first obligation of the Court of Appeals is to assure itself of jurisdiction to address the merits of an appeal.

1 Cases that cite this headnote

[2] **Federal Courts**
👉Torts in general

A plaintiff need not establish a "nuclear incident" in order to proceed in federal court with a PAA action when another basis for federal jurisdiction is present. Price–Anderson Act, § 4(n)(2), 42 U.S.C.A. § 2210(n)(2).

1 Cases that cite this headnote

[3] **Federal Courts**
👉Torts in general

Any suit "asserting public liability" under the PAA is a civil action arising under the laws of the United States over which a federal court has federal question subject matter jurisdiction. 28 U.S.C.A. § 1331; Price–Anderson Act, § 4, 42 U.S.C.A. § 2210.

5 Cases that cite this headnote

[4] **Federal Courts**
👉Damages

Certified judgment that did not distribute aggregate class award among individual members was "final" for purposes of appeal, where district court had attached plan of allocation to judgment which provided thorough framework for determining each individual class member's damages and explained how unclaimed funds would be distributed; although certain class members might challenge ultimate allocation of damages to them, guidelines provided by plan were straightforward and mechanical and any such challenges would not have affected total damages owed by defendants, which had been clearly identified in that judgment. Fed.Rules Civ.Proc.Rule 54(b), 28

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

U.S.C.A.

2 Cases that cite this headnote

[5] **Federal Courts**
☛Damages
**Federal Courts**
☛Particular Actions and Rulings

An order that determines liability but leaves damages to be calculated is not final for purposes of certification to appeal. Fed.Rules Civ.Proc.Rule 54(b), 28 U.S.C.A.

1 Cases that cite this headnote

[6] **Environmental Law**
☛Private right of action; citizen suits

Mere presence of plutonium on real property was not per se injurious to that property, and thus was not sufficient for "damage to property" claim under PAA. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

[7] **Environmental Law**

☛Private right of action; citizen suits

Currently existing actual physical injury to property was necessary to establish "damage to property" under PAA. Price–Anderson Act, §§ 3(q), 4(n)(2), 42 U.S.C.A. §§ 2014(q), 2210(n)(2).

Cases that cite this headnote

[8] **Federal Courts**
☛Requests and failure to give instructions; refusal of requested charge
**Federal Courts**
☛Defects, objections, and amendments; striking brief

Issue of whether district court erred by refusing to instruct jury that "nuclear incident" had to be established as threshold element of PAA claim could be considered on the merits, despite defendants' arguable failure to preserve it, where plaintiffs themselves had failed to adequately present any such forfeiture argument in their appellate brief by making only brief reference to defendants' lack of citations to rulings below in explaining difficulty they had in responding to certain arguments. Price–Anderson Act, § 3, 42 U.S.C.A. § 2014.

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

1 Cases that cite this headnote

[9]   **Environmental Law**
🔑Private right of action; citizen suits

Presence of nuclear incident was hallmark of public liability action under PAA; thus, mere assertion of liability arising out of nuclear incident was not sufficient for claim under PAA. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

2 Cases that cite this headnote

[10]   **Federal Civil Procedure**
🔑Construction and Effect of Charge as a Whole
**Federal Courts**
🔑Standing

The Court of Appeals reviews de novo whether the district court's jury instructions as a whole correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards.

Cases that cite this headnote

[11]   **Environmental Law**
🔑Private right of action; citizen suits

A plaintiff must establish an injury sufficient to constitute a nuclear incident as a threshold, substantive element of any PAA claim. Price–Anderson Act, §§ 3(q), 4(n)(2), 42 U.S.C.A. §§ 2014(q), 2210(n)(2).

1 Cases that cite this headnote

[12]   **Environmental Law**
🔑Private right of action; citizen suits

Only an existing physical injury constitutes "bodily injury" under the PAA; the mere subclinical effects of radiation exposure are insufficient. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

[13]   **Environmental Law**
🔑Private right of action; citizen suits

Diminution of property values could not establish fact of injury or damage on "damage to property" or

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

"loss of use of property" claim under PAA. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

[14] **Environmental Law**
🔑 Private right of action;  citizen suits

The PAA requires a showing of actual physical injury to the properties themselves rather than a mere decline in the properties' value. Price–Anderson Act, § 4(n)(2), 42 U.S.C.A. § 2210(n)(2).

Cases that cite this headnote

[15] **Environmental Law**
🔑 Private right of action;  citizen suits

Loss of use, as required for "loss of use of property" claim under PAA, may occur through presence of radioactive materials, since presence of those materials creates sufficiently high risk to health. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

[16] **Environmental Law**
🔑 Private right of action;  citizen suits

More than a mere interference with an owner's use is necessary for a "loss of use of property" claim under the PAA; a particular use of the property actually must be lost. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

[17] **Environmental Law**
🔑 Private right of action;  citizen suits

Where the evidence indicates the property has been affected by the radioactive material to such an extent that an otherwise appropriate use of the property is lost, a plaintiff has established the threshold injury element of his PAA claim. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

[18] **Environmental Law**
🔑 Private right of action;  citizen suits

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

Plaintiffs asserting a "loss of use of property" claim under the PAA must prove that the particular level of risk created by the defendants' conduct had the effect of actually depriving them of a specific use. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

[19] **Federal Courts**
Torts in general

Whether federal law preempts state tort law is a question of law that is reviewed de novo.

3 Cases that cite this headnote

[20] **Environmental Law**
Federal preemption
**States**
Environment; nuclear projects

State law was preempted in "public liability action" under PAA only when it was inconsistent with provisions of PAA. Price–Anderson Act, §§ 3(hh), 4, 42 U.S.C.A. §§ 2014(hh), 2210.

2 Cases that cite this headnote

[21] **Environmental Law**
Private right of action; citizen suits

The existence of a nuclear incident is a threshold element of a claim under the Price-Anderson Act (PAA). Price–Anderson Act, §§ 3(q), 4(n)(2), 42 U.S.C.A. §§ 2014(q), 2210(n)(2).

1 Cases that cite this headnote

[22] **Federal Courts**
Questions Considered

Court of Appeals properly could decide questions of law raised in appeal that were certain to arise again in event of re-trial in order to guide district court on remand, although Court's ruling that plaintiffs had to establish existence of nuclear incident as threshold element of their claims independently warranted remand. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

1 Cases that cite this headnote

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

[23] **States**
⚷ Conflicting or conforming laws or regulations

State law is preempted due to its conflict with federal law where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

1 Cases that cite this headnote

[24] **States**
⚷ Preemption in general

The advocate of preemption bears the burden of showing that federal and state law conflict.

5 Cases that cite this headnote

[25] **Nuisance**
⚷ Nature and extent of injury or danger

Under Colorado law, a plaintiff asserting a nuisance claim must establish an interference with the use and enjoyment of his property that is both "substantial" and "unreasonable."

Cases that cite this headnote

[26] **Environmental Law**
⚷ Private right of action; citizen suits
**Nuisance**
⚷ Nature and extent of injury or danger

Under the Price-Anderson Act (PAA), a jury may find the presence of radioactive contamination creates an actual risk to health and thereby interferes with a plaintiff's use or enjoyment of his land in Colorado if the contamination disturbs the plaintiff's comfort and convenience, including his peace of mind, with respect to his continued use of the land; however, any interference with a plaintiff's use and enjoyment of his property must be both "substantial" and "unreasonable." Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

[27] **Nuisance**
⚷ Nature and extent of injury or danger

Under Colorado nuisance law, an interference is deemed "substantial"

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

if it would have been offensive or caused inconvenience or annoyance to a reasonable person in the community.

Cases that cite this headnote

[28]   **Nuisance**
👉Nature and extent of injury or danger

When determining under Colorado nuisance law whether an interference is "unreasonable," a jury must weigh the gravity of the harm and the utility of the conduct causing that harm.

Cases that cite this headnote

[29]   **Nuisance**
👉Nature and extent of injury or danger

A scientifically unfounded risk cannot rise to the level of an unreasonable and substantial interference, as required for a nuisance claim under Colorado law.

1 Cases that cite this headnote

[30]   **Nuisance**
👉Nature and extent of injury or danger

Under Colorado law, recovery premised on a finding that an interference, in the form of anxiety or fear of health risks, is "substantial" and "unreasonable" cannot be permitted on a nuisance claim under Colorado law, as predicted by federal Court of Appeals, unless that anxiety is supported by some scientific evidence.

Cases that cite this headnote

[31]   **Environmental Law**
👉Private right of action;  citizen suits
**Trespass**
👉Injury to property

Owners of real property in Colorado that allegedly had been damaged by releases of plutonium particles and other hazardous substances from nuclear weapons manufacturing plant were required to prove actual physical damage to their property in order to prevail on their trespass claims under PAA, since trespass was intangible; although those particles had mass and were physically present on the land, particles were impalpable and

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

imperceptible by the senses. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

**[32]** **Environmental Law**
🔑 Private right of action; citizen suits

A plaintiff may establish any injury listed by the PAA to meet the PAA's threshold requirement of proving that a nuclear incident occurred. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

**[33]** **Environmental Law**
🔑 Private right of action; citizen suits
**Trespass**
🔑 Injury to property

A plaintiff who establishes a loss of use of property has met his threshold requirement under the PAA, but still must prove physical damage to the property in order to prevail on a Colorado intangible trespass claim. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

**[34]** **Trespass**
🔑 Trespass to Real Property
**Trespass**
🔑 Injury to property

To prevail under a traditional Colorado trespass claim, a plaintiff must establish only a physical intrusion upon the property of another without the proper permission from the person legally entitled to possession; a plaintiff need not establish any injury to his legally protected interest in the land or damage to the land itself.

Cases that cite this headnote

**[35]** **Trespass**
🔑 Injury to property

Under Colorado law, an intangible trespass claim requires an aggrieved party to prove physical damage to the property was caused by such intangible intrusion.

1 Cases that cite this headnote

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

[36] **Trespass**

🔑 Trespass to Real Property

Under Colorado law, whether a trespass claim falls under the traditional rubric or must be pursued as an intangible trespass is determined by whether the intrusion is palpable.

1 Cases that cite this headnote

[37] **Environmental Law**

🔑 Private right of action; citizen suits

Price-Anderson Act (PAA) did not preclude punitive damages against operators of nuclear weapons manufacturing plant before 1988 that had agreement with federal government requiring government to indemnify them for any such damages. Atomic Energy Act of 1954, § 1 et seq., 42 U.S.C.A. § 2011 et seq.

Cases that cite this headnote

[38] **Environmental Law**

🔑 Private right of action; citizen suits

Willful and wanton conduct by operators that contributed to release of plutonium could be considered when deciding whether to award punitive damages on claim under PAA only if release of plutonium both occurred prior to August 20, 1988, and ultimately caused injury to owners of real property in Colorado that allegedly had been damaged by releases of plutonium particles and other hazardous substances from nuclear weapons manufacturing plant, regardless of whether injury manifested itself before or after that date, since injury resulting from conduct was compensated separately. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

[39] **Damages**

🔑 Nature and Theory of Damages Additional to Compensation

**Damages**

🔑 Grounds for Exemplary Damages

Under Colorado law, the purpose of punitive damages is to punish the defendant's willful and wanton conduct and deter others from engaging in similar conduct.

1 Cases that cite this headnote

[40] **Environmental Law**

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

🔑 Private right of action; citizen suits

When determining under the PAA whether a particular occurrence is a nuclear incident, the jury must simply determine whether that occurrence ultimately caused one of the specified injuries; if so, the occurrence constitutes a nuclear incident. Price–Anderson Act, § 3(q), 42 U.S.C.A. § 2014(q).

Cases that cite this headnote

[41]   **Federal Courts**
🔑 Appellees; necessity of filing cross-appeal

A party who prevails in the district court is permitted to conditionally raise issues in a cross-appeal because if the appellate court decides to vacate or modify the trial court's judgment, the judgment may become adverse to the cross-appellant's interests.

3 Cases that cite this headnote

## Attorneys and Law Firms

**\*1132** Christopher Landau, P.C., Kirkland & Ellis LLP, Washington, DC (John K.

Crisham and Philippa Scarlett, Kirkland & Ellis LLP, Washington, DC; David M. Bernick, P.C., Douglas J. Kurtenbach, P.C. and Steven C. Seeger, Kirkland & Ellis LLP, Chicago, IL, with him on the briefs), Attorneys for Defendants–Appellants/Cross–Appellees.

Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA (Peter Nordberg and David F. Sorensen, Berger & Montague, P.C., Philadelphia, PA; Gary B. Blum and Steven W. Kelly, Silver & DeBoskey, P.C., Denver, CO, with him on the briefs), Attorneys for Plaintiffs–Appellees/Cross–Appellants.

Marjorie J. Berger, American Nuclear Insurers, Glastonbury, CT; Simon A. Steel, Harkins Cunningham LLP, Washington, DC; and John G. Harkins, Jr., Harkins Cunningham LLP, Philadelphia, PA, on the brief for American Nuclear Insurers, Amicus Curiae.

Ellen C. Ginsberg, Esq, Michael A. Bauser, Esq., Anne W. Cottingham, Esq., and Jerry Bonanno, Esq., Nuclear Energy Institute, Inc.; Donald E. Jose, Esq., Jose & Associates, Malvern, PA; and Charles F. Rysavy, Esq., K & L Gates LLP, Newark, NJ, on the brief for Nuclear Energy Institute, Inc., Amicus Curiae.

Before MURPHY, ANDERSON, and HOLMES, Circuit Judges.

MURPHY, Circuit Judge.

## I. INTRODUCTION

The owners of property near the former Rocky Flats Nuclear Weapons Plant ("Rocky Flats") filed a class action against the facility's operators under the Price–Anderson Act ("PAA"), alleging trespass and nuisance claims arising from the release of plutonium particles onto their properties. The district court conducted a **\*1133** lengthy trial, resulting in a jury verdict in favor of the plaintiff class. After a series of post-trial motions, the district court entered judgment in favor of Plaintiffs, awarding a total of just over $926 million, inclusive of compensatory damages, punitive damages, and prejudgment interest. Defendants, Dow Chemical Company ("Dow") and Rockwell International Corporation ("Rockwell"), timely appealed the judgment, and the class members filed a timely cross-appeal.

Exercising appellate jurisdiction pursuant to 28 U.S.C. § 1291, this court **REVERSES** and **REMANDS** the case to the district court. We **DIRECT** the district court to vacate the judgment and conduct further proceedings not inconsistent with this opinion.

## II. BACKGROUND

Rocky Flats, located near Denver, Colorado, was established by the United States Government in the 1950s to produce nuclear weapon components. The government contracted with Dow to operate the facility from 1952 to 1975, and then with Rockwell from 1975 to 1989. Operations at Rocky Flats ceased in June 1989 after the Federal Bureau of Investigation and the Environmental Protection Agency searched

the facility. Rockwell was subsequently charged with, and ultimately pleaded guilty to, certain environmental crimes at the site. The facility has since undergone remediation efforts and is now designated as a wildlife refuge.

Property owners, whose properties lie within a thirty square mile area east of Rocky Flats, filed this class action on January 30, 1990, alleging a public liability action under the PAA involving trespass and nuisance claims against Dow and Rockwell. A public liability action is an action asserting legal liability arising from a nuclear incident.[1] Plaintiffs' most recent amended complaint alleged the release of plutonium at Rocky Flats resulted in the contamination of the class members' properties. Plaintiffs sought compensatory damages, measured by the diminution of property values, as well as punitive damages.

[1]   Though the PAA provides a federal cause of action, Congress has not eliminated considerations of state law in the PAA context. The PAA provides: "A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." 42 U.S.C. § 2014(hh).

In October 1993, the district court certified a class consisting of "[a]ll persons and entities owning an interest (including mortgagee and other security interests) in real property situated within the Property Class Area, exclusive of governmental entities, defendants, and defendants' affiliates, parents, and subsidiaries" as of June 7, 1989. In May 2005, the district court split the certified class into two subclasses:

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

The first sub-class shall consist of all Class members who owned property within the Class Area on the later of: (i) January 30, 1990, the date this action was filed; or (ii) the date on which the jury, per Restatement [(Second) of Torts] § 930(1), finds it appeared the trespass and/or nuisance asserted by Plaintiffs would continue indefinitely.... The second sub-class consists of all other Class members.

The district court generally referred to the first subclass as the "Prospective Damages Subclass" and the second as the "Non–Prospective Damages Subclass."

After over fifteen years of litigation, the district court conducted a four-month jury trial between October 2005 and January **\*1134** 2006. In accordance with the district court's construction of Colorado law,[2] the jury instructions did not require Plaintiffs to establish either an actual injury to their properties or a loss of use of their properties. With respect to the nuisance claims, the district court instructed the jury that Plaintiffs could establish Defendants' conduct interfered with the use and enjoyment of the class properties by proving Defendants' conduct exposed Plaintiffs to "some increased risk of health problems" or caused conditions "that pose a demonstrable risk of future harm to the Class Area." As to Plaintiffs' trespass claims, the district court instructed the jury, "Plaintiffs are *not*

required to show that plutonium is present on the Class Properties at any particular level or concentration, that they suffered any bodily harm because of the plutonium or that the presence of plutonium on the Class Properties damaged these properties in some other way."

[2]      See supra n. 1.

Plaintiffs' evidence regarding the effects of plutonium on their properties consisted of expert testimony indicating any plutonium exposure, no matter how small, increases the risk of cancer. Plaintiffs' experts did not testify, however, regarding the level of risk of developing cancer from exposure to plutonium released at Rocky Flats. Rather, they suggested any increased risk was small and unquantifiable.

The jury deliberated for three weeks and ultimately returned a verdict in favor of the plaintiff class on each of the trespass and nuisance claims. The jury awarded $176,850,340.00 in compensatory damages on the trespass claims and awarded the same amount on the nuisance claims, based on the diminution of the value of the properties. The jury also awarded punitive damages totaling $110,800,000.00 against Dow and $89,400,000.00 against Rockwell.

After a long series of post-trial motions, the district court entered a final judgment against Defendants on June 2, 2008, pursuant to Federal Rule of Civil Procedure 54(b). Including prejudgment interest, the court ordered compensatory damages against Dow in the amount of

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

$653,313,678.05 and against Rockwell in the amount of $508,132,861.39. The judgment further stated, however, the total compensatory damages recovered by the plaintiff class shall not exceed $725,904,087.00. Punitive damages were ordered in the same amounts the jury awarded. Thus, the judgment awarded a total of just over $926 million to the plaintiff class, including prejudgment interest. The district court's judgment, however, did not allocate damages to individual class members.[3] Rather, the district court attached a Plan of Allocation to the judgment, which provides for the appointment of a claims administrator to make recommendations as to how the lump sum identified in the judgment should be distributed. The Plan of Allocation also provides a framework for calculating each class member's share and distributing any unclaimed funds. Dow and Rockwell timely appealed the district court's judgment and the class members filed a timely cross-appeal.

---

[3]   The parties indicated a desire to appeal prior to determining how damages should be distributed to individual class members. Plaintiffs sought a final appealable judgment under Federal Rule of Civil Procedure 54(b), while Defendants sought an interlocutory appeal as to certain orders only, pursuant to 28 U.S.C. § 1292. The district court opted to enter a final judgment under Rule 54(b). In doing so, it determined the total amount of compensatory and punitive damages, as well as the amount of prejudgment interest due from each Defendant. Execution of the judgment was stayed to permit Defendants to appeal. The judgment also includes the district court's Rule 54(b) certification that "there is no just reason for delay[ing]" entry of judgment.

## *1135 III. DISCUSSION

### A. Jurisdiction

[1] Before addressing the merits of an appeal, this court's first obligation is to assure itself of jurisdiction to do so. *1mage Software, Inc. v. Reynolds & Reynolds Co.,* 459 F.3d 1044, 1048 (10th Cir.2006). This appeal involves two jurisdictional issues: whether the district court properly exercised subject matter jurisdiction over this action and whether the district court entered an appealable final judgment.

### 1. Subject Matter Jurisdiction

This court sua sponte raised the issue of whether the district court properly exercised subject matter jurisdiction over this action.[4] The court's concern arose from the language of 42 U.S.C. § 2210(n)(2), which provides: "With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place ... shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy." At first glance, the statute appears to require proof of a "nuclear incident"[5] to permit federal subject matter jurisdiction over a PAA action. Even assuming it imposes a jurisdictional requirement, however, closer inspection indicates 42 U.S.C. § 2210(n)(2) is not the sole source of federal jurisdiction over a PAA action.

---

[4]   This court ordered the parties to submit supplemental briefing directed to the question of whether 42 U.S.C. § 2210(n)(2) imposes the jurisdictional requirement of establishing a "nuclear incident." *See* Fed.R.Civ.P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Estate of Harshman v. Jackson Hole Mountain Resort Corp.,* 379 F.3d 1161, 1164 (10th

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

Cir.2004) ("Because lack of federal jurisdiction cannot be waived or be overcome by an agreement of the parties, we must satisfy ourselves not only of our own jurisdiction, but also that of the lower courts in the cause under review." (quotations omitted)); *Citizens Concerned for Separation of Church & State v. City & County of Denver,* 628 F.2d 1289, 1301 (10th Cir.1980) ("A federal court must in every case, and at every stage of the proceeding, satisfy itself as to its own jurisdiction, and the court is not bound by the acts or pleadings of the parties."). Supplemental briefing was also ordered on the state of the record and whether remand is necessary, assuming § 2210(n)(2) imposes a jurisdictional requirement.

5    "Nuclear incident" is defined as "any occurrence ... causing ... bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q).

Although the complete history of the PAA need not be repeated, a brief overview of its evolution, which this court described more fully in *Kerr–McGee Corp. v. Farley,* 115 F.3d 1498, 1503–04 (10th Cir.1997), is helpful. *See also In re TMI Litig.,* 193 F.3d 613, 624 n. 7 (3d Cir.1999), *amended by* 199 F.3d 158 (3d Cir.2000); *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1095–97 (7th Cir.1994). In 1954, Congress enacted the Atomic Energy Act ("AEA") "to facilitate a transition from a federal government monopoly over the production and use of atomic materials to a regime in which private industry also would have a role in their production and use." *Kerr–McGee Corp.,* 115 F.3d at 1503. To further encourage private development in the nuclear energy field, Congress amended the AEA in 1957 by enacting the PAA, which "creat[ed] specific protections from tort liability for the nuclear industry." *Id.* At that time, however, Congress opted not to

create a federal cause of action for nuclear torts, but instead permitted tort recovery under traditional state causes of action. *Id.* Accordingly, **\*1136** unless the diversity statute applied or the action resulted from an "extraordinary nuclear occurrence,"[6] nuclear-related tort claims typically could not proceed in federal court. *See In re TMI Litig. Cases Consol. II,* 940 F.2d 832, 853 n. 18 (3d Cir.1991).

6    "Extraordinary nuclear occurrence" is defined as: any event causing a discharge or dispersal of source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines to be substantial, and which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines has resulted or will probably result in substantial damages to persons offsite or property offsite.

42 U.S.C. § 2014(j).

The PAA was amended several times in subsequent years, most notably in 1988 when Congress created a federal cause of action for nuclear torts, thereby expanding federal jurisdiction over such claims. *Kerr–McGee Corp.,* 115 F.3d at 1503. 42 U.S.C. § 2210(n)(2) now provides:

> With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place ... shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy. Upon motion

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)
71 ERC 1609, 77 Fed.R.Serv.3d 555

of the defendant or of the [Nuclear Regulatory] Commission or the Secretary [of Energy], as appropriate, any such action pending in any State court (including any such action pending on August 20, 1988) or United States district court shall be removed or transferred to the United States district court having venue under this subsection.

Accordingly, the 1988 Amendments made it clear that any action asserting public liability can be originally filed in or removed to the appropriate federal district court. In doing so, Congress also designated the particular venue in which any such action must be tried if it is to proceed in federal court; i.e., "the United States district court in the district where the nuclear incident takes place." These Amendments, however, did not create exclusive federal jurisdiction over PAA actions. *Kerr–McGee,* 115 F.3d at 1504–05. Indeed, the express language of 42 U.S.C. § 2210(n)(2) makes it clear state courts are free to resolve PAA actions unless a defendant, the Nuclear Regulatory Commission, or the Secretary of Energy opts to remove the action to federal court.

[2] As indicated, this court was concerned that 42 U.S.C. § 2210(n)(2) could be read as limiting federal jurisdiction to public liability actions "arising out of or resulting from a nuclear incident," thus requiring proof of a nuclear incident as a jurisdictional element. We see no indication, however,

that Congress intended 42 U.S.C. § 2210(n)(2) to be the sole source of federal jurisdiction over PAA actions. Rather, Congress expanded federal jurisdiction to ensure that actions involving a "nuclear incident" can proceed from their inception in federal court, even if the parties cannot otherwise establish the requirements of 28 U.S.C. § 1332. Congress did not, however, eliminate a party's right to proceed in federal court when other jurisdictional bases exist. Accordingly, a plaintiff need not establish a "nuclear incident" under 42 U.S.C. § 2210(n)(2) in order to proceed in federal court with a PAA action when another basis for federal jurisdiction is present.[7]

7   Because any jurisdictional requirements in 42 U.S.C. § 2210(n)(2) only apply to federal courts, a remarkable anomaly would arise if § 2210(n)(2) was the sole source of federal jurisdiction, demanding proof of a nuclear incident as a jurisdictional prerequisite. If a plaintiff was unable to establish a nuclear incident, the federal district court would be compelled to dismiss for lack of subject matter jurisdiction. The jurisdictional dismissal would not, however, necessarily prevent a plaintiff from proceeding with their PAA action in state court, where any jurisdictional language in § 2210(n)(2) would be inapplicable and proof of a nuclear incident would have no jurisdictional relevance. The strange result would be that no federal court could exercise subject matter jurisdiction; only state courts could reach the merits of the plaintiff's federal cause of action under the PAA. Such a result would make no sense given Congress's intent to permit plaintiffs to pursue public liability actions in federal court. *Cf. infra* Section III(B) (holding a plaintiff must nonetheless always establish a nuclear incident as a threshold element of a PAA claim).

*1137 [3] Indeed, jurisdictional grounds will always exist for a plaintiff's properly pleaded PAA claim. As we previously explained, Congress's 1988 Amendments created a new federal cause of action, known as a "public liability action." 42 U.S.C. §

2014(hh) provides:

> The term 'public liability action,' as used in section 2210 of this title, means any suit asserting public liability. A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.

As a result, any suit "asserting public liability" under 42 U.S.C. § 2210 is a civil action arising under the laws of the United States over which a federal court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

Accordingly, we need not decide whether the district court had subject matter jurisdiction under 42 U.S.C. § 2210(n)(2), because the district court clearly had subject matter jurisdiction under 28 U.S.C. § 1331.[8]

8    Plaintiffs' complaint alleged subject matter jurisdiction under the PAA, 42 U.S.C. § 2210(n)(2), the federal question statute, 28 U.S.C. § 1331, and the diversity jurisdiction statute, 28 U.S.C. § 1332. Plaintiffs' complaint also alleged jurisdiction under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(b). Plaintiffs make no argument on appeal that CERCLA is the source of federal jurisdiction, and they only presented their PAA trespass and nuisance claims to the jury.

## 2. Finality of the Judgment

[4] [5] Having concluded the district court's exercise of subject matter jurisdiction was proper, we now turn to Defendants' motion to dismiss this appeal for lack of subject matter jurisdiction. Specifically, Defendants argue the district court's judgment is not sufficiently final to warrant certification under Federal Rule of Civil Procedure 54(b). Rule 54(b) allows the district court to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties" so long as "the district court expressly determines that there is no just reason for delay." The general rule, however, is that an order which "determines liability but leaves damages to be calculated is not final." *Harbert v. Healthcare Servs. Group, Inc.,* 391 F.3d 1140, 1145 (10th Cir.2004). Nonetheless, in *Strey v. Hunt International Resources Corp.*, this court explained that when damages are not allocated to specific class members, the resolution of class liability claims may warrant Rule 54(b) certification if "the district court establishes both the formula that will determine the division of damages among class members and the principles that will guide the disposition of any unclaimed funds." 696 F.2d 87, 88 (10th Cir.1982).

Here, the district court purported to enter judgment under Rule 54(b), stating **\*1138** the total damages against each Defendant and determining there is no just reason for delaying entry of judgment. The judgment did not, however, distribute the aggregate class award among individual members. Instead the district court attached a Plan of Allocation to the judgment, which provides

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

a thorough framework for determining each individual class member's damages. Having thoroughly reviewed the Plan of Allocation, we conclude it complies with the requirements of *Strey.*

The Plan of Allocation provides for the appointment of a claims administrator, who is directed to determine the proper allocation of damages based on specific data. The claims administrator must determine ownership of each class property as of the relevant dates as well as each property's assessed value based on county property and tax records. This value is to be expressed as a fraction of the total value of all properties within the same category, specifically residential, commercial, or vacant property. The class administrator is directed to use this fraction to determine the total damages to be allocated to each property and make recommendations to the district court based on this calculation. The Plan of Allocation also provides for the distribution of any unclaimed funds.

The Plan of Allocation simply requires the application of mathematical principles to a formula involving identifiable property records and the jury's verdict. In doing so, the Plan of Allocation directs the method of allocating damages among the individual class members, while also explaining how unclaimed funds shall be distributed. Contrary to Defendants' argument, the Plan of Allocation does not require resolution of complex issues or calculations. While it is true that certain class members may wish to challenge the ultimate allocation of damages to them, the guidelines provided by the Plan of Allocation are straightforward and mechanical. Moreover, any such challenges

would not affect the total damages owed by Defendants, which are clearly identified in the judgment. Consequently, this court concludes the Plan of Allocation's basic formula for determining individual damages sufficiently complies with *Strey* and the Rule 54(b) judgment entered by the district court is final. Defendants' motion to dismiss for lack of appellate jurisdiction is therefore denied.

### B. Threshold Elements of a PAA Claim

[6] [7] [8] Turning to the merits of the appeal, Defendants argue the district court erred by refusing to instruct the jury that in order for Plaintiffs to prevail on their PAA claims, they must establish a "nuclear incident" occurred by showing "loss of or damage to property, or loss of use of property." As an initial matter, we note that an issue was raised at oral argument as to whether or not Defendants forfeited this argument. It is arguable Defendants failed to preserve the issue of whether a "nuclear incident" must be established as a threshold element of a plaintiff's PAA claim. Nonetheless, Plaintiffs themselves failed to adequately present any such forfeiture argument in their appellate brief. At oral argument, Plaintiffs admitted they did not expressly raise a forfeiture argument, but instead asserted that their brief sufficiently presented the argument by generic references to Defendants' "novel Price–Anderson argument" and Defendants' failure to "identify with clarity the specific rulings of which [they] seek review, or the locations in the record where [their] points were raised." We disagree. Plaintiffs' brief only makes reference to Defendants' lack of citations to

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

rulings below in explaining the difficulty they had in responding to certain arguments. The brief does not raise a forfeiture challenge. **\*1139** Accordingly, Plaintiffs have themselves forfeited any forfeiture argument they may have on this issue, and this court will consider the merits of Defendants' argument. *See United States v. Heckenliable,* 446 F.3d 1048, 1049 n. 3 (10th Cir.2006) (explaining the government "waived the waiver" by failing to argue defendant forfeited his challenge on appeal); *see also Soo Line R. Co. v. St. Louis Sw. Ry. Co.,* 125 F.3d 481, 483 n. 2 (7th Cir.1997) (holding plaintiff "waived any waiver defense it might have had" by failing to argue defendant forfeited its appellate argument due to a judicial admission).

[9]  [10]  This court "review[s] de novo whether, as a whole, the district court's jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." *Martinez v. Caterpillar, Inc.,* 572 F.3d 1129, 1132 (10th Cir.2009) (quotation omitted). As we previously mentioned, the 1988 Amendments to the PAA created a federal cause of action known as a "public liability action." A "public liability action ... means any suit asserting public liability." 42 U.S.C. § 2014(hh). In turn, "public liability" is defined as "any legal liability arising out of or resulting from a nuclear incident." 42 U.S.C. § 2014(w).

In keeping with these definitions, Defendants argue Plaintiffs must establish that any liability does in fact arise out of or result from a nuclear incident. A "nuclear incident" is defined as "any occurrence ...

causing ... bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q). Consequently, Defendants argue Plaintiffs must prove as a threshold element of their PAA claims that they suffered one of the injuries enumerated in 42 U.S.C. § 2014(q).

This court analyzed a similar question in *June v. Union Carbide Corp.,* 577 F.3d 1234 (10th Cir.2009). There, defendants' uranium mining and milling operations exposed nearby residents to radiation to such an extent that the community had to be evacuated and all structures were razed as part of the remediation effort. *Id.* at 1236–37. One-hundred-fifty-two plaintiffs claimed the mining and milling operations increased their risk of developing radiation-related illnesses and pursued medical monitoring claims to help detect the onset of disease. *Id.* at 1237. This court affirmed the dismissal of the medical monitoring claims because they did not implicate "bodily injury," which was the only potentially applicable injury under § 2014(q). *Id.* at 1248–52.

[11] Though *June* did not expressly determine the circumstances in which a plaintiff must establish injury,[9] we now confirm that the occurrence of a nuclear incident, and thus a sufficient injury under § 2014(q), constitutes a threshold element of any PAA claim. Consequently, we reject Plaintiffs' suggestion that they need only *assert* liability arising out of a nuclear **\*1140** incident. The presence of a nuclear incident

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

is the hallmark of a public liability action. Were a plaintiff only required to plead the presence of a nuclear incident, but never establish one, a "public liability action" would be completely indistinguishable from whichever state tort claim a particular PAA action incorporates. In creating a federal cause of action under the PAA, however, Congress made clear its intention to limit recovery to the discrete group of injuries enumerated in § 2014(q) while simultaneously utilizing state law to frame the "substantive rules for decision."[10] 42 U.S.C. § 2210(hh). Plaintiffs provide no reason why we should render the statute's nuclear incident requirement superfluous outside of the pleading stage. See 42 U.S.C. § 2014(w). Accordingly, we conclude a plaintiff must establish an injury sufficient to constitute a nuclear incident as a threshold, substantive element of any PAA claim.

[9]   In *June,* the district court dismissed the medical monitoring claims without prejudice for lack of subject matter jurisdiction under 42 U.S.C. § 2210(n)(2). *See June v. Union Carbide Corp.,* 577 F.3d 1234, 1248 (10th Cir.2009). On appeal, defendants argued dismissal should have been with prejudice because "bodily injury" is an element of a PAA claim rather than a jurisdictional requirement. *Id.* at 1248 n. 8. This court, however, did not resolve whether "bodily injury" is a jurisdictional requirement because defendants had not cross-appealed with respect to that issue. *Id.* Additionally, this court noted the standard of appellate review is the same regardless of whether "bodily injury" is treated as a jurisdictional requirement or an element of a plaintiff's PAA claim. *Id.*

[10]   Indeed, 42 U.S.C. § 2014(hh) provides that state law provides the substantive rules for decision, "unless such law is inconsistent with the provisions of [42 U.S.C. § 2210]." A "public liability action" arising under § 2210, however, incorporates definitions provided by § 2014, including § 2014(q) which defines "nuclear incident."

[12]   The only injuries listed in § 2014(q) which can establish a nuclear incident in the case at hand are "loss of or damage to property" and "loss of use of property."[11] This court has never defined these terms either individually or in a manner that would differentiate one from the other. Our recent decision in *June,* however, provides significant guidance. As we previously noted, the plaintiffs in *June* claimed the defendants' uranium operations increased their risk of developing health problems and thus pursued medical monitoring claims. 577 F.3d at 1237. The district court determined medical monitoring claims do not involve a "bodily injury" and dismissed the action. *Id.* at 1248. This court affirmed and held "DNA damage and cell death" do not constitute a bodily injury in the absence of the manifestation of an actual disease or injury, despite the increased risk of developing disease in the future. *Id.* at 1248–49. In short, *June* makes clear that only an existing physical injury constitutes "bodily injury" under the PAA; the mere subclinical effects of radiation exposure are insufficient. *Id.* at 1249.

[11]   Plaintiffs have never argued their claims involve "bodily injury." Indeed, their decision to pursue classic property tort claims, trespass and nuisance, makes it clear they seek recovery for injuries to a property interest rather than "bodily injury."

Our characterization of "damage to property" is informed by the analysis in *June,* as the logic applies equally to the issue before us in this appeal. Just as an existing physical injury to one's body is necessary to establish "bodily injury," so too is an existing physical injury to property necessary to establish "damage to property."

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

Without a demonstrable manifestation of injury, the presence of plutonium can, at best, only establish a risk of future damage to property. As this court indicated in *June,* however, mere risk of future damage is insufficient. *Id.* at 1249. Rather, the physical damage must actually be manifest at the time the PAA claim is asserted. This requirement does not heighten a plaintiff's burden of proof, but simply provides that a plaintiff wishing to sue under the PAA for a nuclear-related property injury involving "damage to property" must first establish actual damage to the property in question.

Here, Plaintiffs argue the mere presence of radioactive plutonium particles on their property establishes the requisite damage. In their supplemental brief, Plaintiffs point out a "nuclear incident" is defined as any **\*1141** enumerated injury "arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of ... special nuclear ... material." 42 U.S.C. § 2014(q). Without question, "special nuclear material" includes plutonium. 42 U.S.C. § 2014(aa). According to Plaintiffs, this compels the conclusion that plutonium contamination itself is enough to establish "damage to property." This argument misses the point. The statute does not indicate that the mere presence of plutonium is per se injurious to property. If mere contamination without actual damage were enough, Congress could have easily listed "contamination" as an injury falling within 42 U.S.C. § 2014(q)'s definition of "nuclear incident." Instead, Congress required a showing of "damage to property."

[13] [14] In order to prove plutonium-related "damage to property," Plaintiffs must

necessarily establish that plutonium particles released from Rocky Flats caused a detectable level of actual damage to the class properties.[12] Jury Instruction No. 3.3 confirmed that Plaintiffs must prove the presence of plutonium on class properties to prevail on their trespass claim. The language of Instruction No. 3.3, however, underscored the limited nature of that proof: "Plaintiffs are *not* required to show that plutonium is present on the Class Properties at any particular level or concentration, that they suffered any bodily harm because of the plutonium or that the presence of plutonium on the Class Properties damaged these properties in some other way." Accordingly, Plaintiffs were never required to, and did not, present evidence of actual physical damage to the property.

[12]   In their supplemental brief, Plaintiffs also suggest that diminution of their property values establishes "damage to property" or "loss of use of property." Diminution of value, however, cannot establish the fact of injury or damage. Otherwise, reduced value stemming from factors unrelated to any actual property injury, such as unfounded public fear regarding the effects of minor radiation exposure, could establish "damage to property" and "loss of use of property." Public perception and the stigma it may attach to the property in question can drastically affect property values, regardless of the presence or absence of any actual injury or health risk. Instead, courts have traditionally utilized diminution of value as a measurement of damages rather than proof of the fact of damage. *See, e.g.,* Restatement (Second) of Torts § 929(1)(a); *Smith v. Kan. Gas Serv. Co.,* 285 Kan. 33, 169 P.3d 1052, 1061–62 (2007) (collecting cases in the nuisance context). Plaintiffs have cited no cases from any jurisdiction suggesting a different approach should apply here. We conclude the PAA requires a showing of actual physical injury to the properties themselves rather than a mere decline in the properties' value.

[15] [16] "Damage to property" is not, however, the only property injury that a plaintiff can prove to establish the PAA threshold element of a nuclear incident; a

plaintiff who establishes a "loss of use of property" may also recover under the PAA. The express statutory language indicates that more than a mere interference with an owner's use is necessary; a particular use of the property must actually be lost.

[17] Plaintiffs did present evidence relevant to a loss of use. Specifically, they tried their nuisance claims under the theory that the presence of plutonium particles on their properties places them at an increased risk of health problems. We agree that when the presence of radioactive materials creates a sufficiently high risk to health, a loss of use may in fact occur. For instance, a residential or business use may be lost due to an increased risk to health so high that no reasonable person would freely choose to live on or work at the property. Similarly, agricultural use may be lost where the soil can no longer produce crops that are safe for consumption due to the presence of the **\*1142** radioactive substance. In short, where the evidence indicates the property has been affected by the radioactive material to such an extent that an otherwise appropriate use of the property is lost, a plaintiff has established the threshold injury element of his PAA claim.[13]

<hr>

[13]    We note the instant case does not require, and the examples provided do not necessarily represent, development of a complete list of circumstances in which a plaintiff can establish a "loss of use."

[18] Here, Plaintiffs were never required to establish a "loss of use of property." Instead, Jury Instruction No. 3.6 only required the jury to find that Defendants "interfered with Class members' use and enjoyment of their properties" in one of two ways: (1) "[b]y

causing Class members to be exposed to plutonium and placing them at some increased risk of health problems" or (2) "[b]y causing objective conditions that pose a demonstrable risk of future harm to the Class Area." Plaintiffs' experts merely testified that *any* exposure to plutonium whatsoever increases the risk of health problems to some degree. Without an accompanying estimate or calculation of the increased risk, however, this evidence is insufficient to establish a loss of use under 42 U.S.C. § 2014(q). Plaintiffs must instead prove that the particular level of risk created by Defendants' conduct had the effect of actually depriving them of a specific use.

During supplemental briefing, this court directed Plaintiffs to identify any evidence presented at trial that could establish a loss of use of property.[14] Plaintiffs' supplemental brief confirms they attempted to make out their PAA claims solely by establishing an increased health risk. Plaintiffs' submissions, however, do not reveal evidence of an increased health risk that would be sufficient to permit a reasonable fact-finder to find a loss of use. Indeed, Plaintiffs' experts testified only that the actual dosage of radiation to which Plaintiffs have been exposed creates a small and unquantifiable increased risk of health problems. Nonetheless, we need not review the sufficiency of the evidence, as the jury was never properly instructed on the threshold elements of Plaintiffs' PAA claims. On remand, Plaintiffs will be tasked with producing additional evidence that could support a jury's finding that a nuclear incident occurred, in the form of "loss of or damage to property, or loss of use of property" under 42 U.S.C. § 2014(q).

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

14    Though the purpose of this inquiry pertained to the related jurisdictional issue, *see supra* n. 4, the ultimate question of whether Plaintiffs suffered a loss of use is the same.

Because the jury was not properly instructed on an essential element of Plaintiffs' PAA claims, the verdict must be set aside and the case remanded for further proceedings not inconsistent with this opinion.

### C. Federal Preemption

[19] [20] [21] [22] Defendants also challenge the district court's ruling that federal nuclear safety standards do not preempt state tort standards of care under the PAA.[15] Essentially, Defendants argue they are exempt from liability if their conduct complied with federal nuclear safety standards, even if they could be held liable under a more restrictive state tort standard of care. Whether federal law preempts state tort *1143 law is a question of law which this court reviews de novo. *Dobbs v. Anthem Blue Cross & Blue Shield,* 475 F.3d 1176, 1177 (10th Cir.2007).

15    While this court's ruling that Plaintiffs must establish the existence of a nuclear incident as a threshold element of their claims independently warrants remand, it is proper to nonetheless decide questions of law raised in this appeal that are certain to arise again in the event of a re-trial in order to guide the district court on remand. *See Colo. Visionary Acad. v. Medtronic, Inc.,* 397 F.3d 867, 876 (10th Cir.2005).

Plaintiffs argue the language of § 2014(hh) makes it clear state tort standards of care apply to a PAA action. Defendants argue, on the other hand, that because state tort standards of care conflict with the PAA scheme, they are preempted by federal nuclear safety regulations.

42 U.S.C. § 2014(hh) provides:

> A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.

We agree with the district court that § 2014(hh) does not expressly preempt state law. The clear meaning of this section is that state law is only expressly preempted when it is inconsistent with the provisions of § 2210. *See June,* 577 F.3d at 1237; *Lujan v. Regents of Univ. of Cal.,* 69 F.3d 1511, 1518 (10th Cir.1995). The parties agree § 2210 itself contains no federal safety standards that could provide the standard of care in a PAA action. Instead, § 2210 primarily addresses the indemnification and limitation of liability components of the PAA. Accordingly, § 2014(hh) does not expressly preempt state tort law.

[23] Defendants' remaining preemption arguments focus on conflict preemption.[16] State law is preempted due to its conflict with federal law "where it is impossible for a private party to comply with both state and federal requirements, or where state law

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. Gen. Elec. Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (citation and quotations omitted). Defendants argue the federal government's regulation of nuclear safety conflicts with the application of state tort law in a public liability action. While the Supreme Court has indicated only the federal government can directly regulate nuclear safety, neither this court nor the Supreme Court has analyzed whether state tort standards of care, which may have some indirect effect on nuclear safety, are preempted by federal law. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 208, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

16    Defendants allude to field preemption in their brief, but never develop the issue. At oral argument, counsel was given an opportunity to clarify the nature of Defendants' argument and expressly stated their argument is premised on conflict preemption only. Accordingly, this court does not address field preemption.

[24]    Because Defendants advocate preemption, they bear the burden of showing that federal and state law conflict. *See Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 255, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). The court is sympathetic to Defendants' generic argument that directing a nuclear facility to comply with federal safety regulations, while also permitting tort recovery under a generic state tort standard of care, may lead to confusion regarding the levels at which the facility must operate to avoid liability.[17] The existence of such a conflict could defeat one of the PAA's primary purposes, the encouragement of

private nuclear development. The **\*1144** record, however, is not clear as to the particular federal regulations or statutes Defendants believe actually conflict with any applicable state tort standards of care during the relevant periods. Nor do Defendants pinpoint any state tort standards of care in the trespass and nuisance context they believe have been displaced by federal nuclear safety regulations.

17    We note, however, *Silkwood* recognized Congress's willingness to accept the tension between the federal government's exclusive regulation of nuclear safety and the pre–1988 PAA's incorporation of state-law remedies. *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 255–56, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984).

The district court's orders shed no additional light on this issue. The district court never fully conducted this analysis because it believed the Supreme Court's decision in *Silkwood* established Congress's intent that state tort law broadly govern public liability actions. In *Silkwood,* the Supreme Court concluded punitive damages could be awarded against the operator of a nuclear facility because under the then-existing statutory scheme, including the pre–1988 PAA, Congress intended to permit any tort remedies available under the applicable state law. *Id.* at 256, 104 S.Ct. 615. Applying that principle here, the district court determined the 1988 Amendments did not alter this regime, but rather expressly maintained the applicability of state tort law in PAA actions. *See* 42 U.S.C. § 2014(hh).

But the PAA's requirement that "the substantive rules for decision in ... [a public liability action] shall be derived from the law of the State in which the nuclear

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

incident involved occurs" does not displace otherwise applicable federal law. 42 U.S.C. § 2014(hh). It merely provides that the PAA itself does not displace state law, unless there is a conflict with § 2210. There are other possible sources of federal law that might preempt state law, and the PAA does not expressly make these standards irrelevant to resolving a plaintiff's PAA action. If Defendants are able to identify federal statutes, regulations, or other binding safety standards that controlled their conduct with respect to the class properties during the relevant time period, the district court must determine whether those particular standards are in conflict with any applicable state tort standard of care.[18]

[18] Plaintiffs' brief describes the documents which Defendants presented to the district court. These documents appear to reference the applicable safety standards Defendants believe control. The documents include various letters, handbooks, manuals, memos, and Department of Energy Orders. Although it is not clear that any of the standards mentioned in these documents have the force of law or would have controlled the sort of off-site contamination that occurred here, these issues have not been adequately presented to this court. Without a thorough analysis of the statutes or regulations Defendants believe governed their conduct, this court cannot determine whether any conflict exists.

On remand, the district court shall permit Defendants to identify the particular federal regulations or statutes they believe preempt state law. Specifically, the district court shall consider whether the federal standards Defendants identify carry the force of law or controlled Defendants' conduct with respect to the off-site contamination that occurred here. Defendants must also indicate the particular standards of care applicable to a state law trespass or nuisance claim they believe are in conflict with any such

regulations. Finally, the district court must determine whether any such federal standards actually conflict with the relevant state tort standards of care.[19]

[19] This court is aware that at least five other circuits have concluded federal nuclear safety standards control in a PAA action, rather than traditional state tort standards of care. See In re Hanford Nuclear Reservation Litig., 534 F.3d 986, 1003 (9th Cir.2008); Roberts v. Fla. Power & Light Co., 146 F.3d 1305, 1308 (11th Cir.1998); Nieman v. NLO, Inc., 108 F.3d 1546, 1552–53 (6th Cir.1997); O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1100 (7th Cir.1994); In re TMI Litig. Cases Consol. II, 940 F.2d 832, 859–60 (3d Cir.1991). In these cases, however, it appears the courts' holdings were responsive to arguments involving field preemption. As previously mentioned, supra n. 16, Defendants have not presented a field preemption argument in this appeal. Rather, they have presented only a conflict preemption argument. This court is unable to find any circuit decision based on the conflict preemption argument Defendants present in this appeal.

## *1145 D. Plaintiffs' Nuisance Claims

Defendants next argue the district court's instructions on Plaintiffs' nuisance claims were legally incorrect. Specifically, Defendants argue Colorado law does not permit a risk-based theory of nuisance which lacks scientific foundation. Defendants also argue that in order to prove they substantially and unreasonably interfered with Plaintiffs' use and enjoyment of their property, Colorado law requires Plaintiffs to show Defendants' emissions exceeded any relevant federal or state safety standards. The court reviews these questions of law de novo. Martinez, 572 F.3d at 1132.

## 1. Irrational Fear as a "Substantial" and "Unreasonable" Interference

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

[25] [26] [27] [28] Under Colorado law, a plaintiff asserting a nuisance claim must establish an interference with the use and enjoyment of his property that is both "substantial" and "unreasonable."[20] *Public Serv. Co. of Colo. v. Van Wyk,* 27 P.3d 377, 391 (Colo.2001). The district court instructed the jury that Plaintiffs could meet their burden of establishing an interference with the use and enjoyment of their properties if they proved plutonium contamination from the activities at Rocky Flats exposed them to either "some increased risk of health problems" or "a demonstrable risk of future harm." We agree with the district court that a jury may find the presence of radioactive contamination creates an actual risk to health and thereby interferes with a plaintiff's use or enjoyment of his land if the contamination disturbs the plaintiff's comfort and convenience, including his peace of mind, with respect to his continued use of the land. *See Cook v. Rockwell Int'l Corp.,* 273 F.Supp.2d 1175, 1203–04 (D.Colo.2003). But that is not the end of the inquiry. Any interference with a plaintiff's use and enjoyment of his property must be both "substantial" and "unreasonable." Under Colorado law, an interference is deemed "substantial" if "it would have been offensive or caused inconvenience or annoyance to a reasonable person in the community." *Saint John's Church in Wilderness v. Scott,* 194 P.3d 475, 479 (Colo.App.2008). In determining whether an interference is "unreasonable," the jury "must weigh the gravity of the harm and the utility of the conduct causing that harm." *Van Wyk,* 27 P.3d at 391.

---

[20]   On its face, the state-law "interference with use" standard presents a lower threshold than the PAA's "loss of use" standard. Accordingly, if a plaintiff

establishes a "loss of use" under the PAA, he necessarily establishes an "interference with use" under Colorado law. This does not, however, relieve a plaintiff of his burden of establishing the additional nuisance requirements under Colorado law that any interference must also be "substantial" and "unreasonable."

[29] The jury was properly instructed on the elements of a nuisance claim as well as the definitions of "substantial" and "unreasonable." While the resolution of these issues typically involves questions of fact, a scientifically unfounded risk cannot rise to the level of an unreasonable and substantial interference. To the extent Plaintiffs rely on anxiety from an increased risk to their health as an interference with the use and enjoyment of their properties, that anxiety must arise from scientifically verifiable evidence regarding the risk and cannot be wholly irrational. The district court concluded otherwise in light of its review **\*1146** of Restatement (Second) of Torts § 821F, cmt. f, which states:

> In determining whether the harm would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account, even though they may be without scientific foundation or other support in fact. Thus the presence of a leprosy sanatarium in the vicinity of a group of private residences may seriously interfere with the use and

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

enjoyment of land because of the normal fear that it creates of possible contagion, even though leprosy is in fact so rarely transmitted through normal contacts that there is no practical possibility of communication of the disease.

This court previously cast doubt on whether Colorado would follow this rule, given the potential for anachronistic results. *Boughton v. Cotter Corp.,* 65 F.3d 823, 832 n. 13 (10th Cir.1995). Instead, we suggested in *Boughton* that Colorado courts would "require[ ] some evidence to substantiate the fears." *Id.* Otherwise, a plaintiff could state a viable nuisance claim any time neighboring property owners contracted a misunderstood disease, whether contagious or not. Such a result would be absurd.

[30] Plaintiffs are unable to point to any Colorado case in the fifteen years since *Boughton* that has endorsed the Restatement's position. More importantly, the Restatement conflicts with Colorado's "unreasonableness" requirement, which expressly requires the trier of fact to "weigh the gravity of the harm and the utility of the conduct causing that harm." *Van Wyk,* 27 P.3d at 391. No reasonable jury could find that irrational anxiety about a risk that cannot be scientifically verified tips this balance so as to render the interference unreasonable. Accordingly, we now confirm what we previously suggested in *Boughton* and predict that the Colorado Supreme Court would not permit recovery premised on a finding that an interference, in the form of

anxiety or fear of health risks, is "substantial" and "unreasonable" unless that anxiety is supported by some scientific evidence. The district court erred in concluding otherwise.

## 2. The Role of Federal and State Safety Standards

Defendants also argue the district court erred in trying the nuisance claims without reference to applicable federal and state safety regulations. Specifically, Defendants argue the jury should have been instructed that if plutonium contamination in the property class area falls within the applicable federal or state safety levels, it cannot be deemed "unreasonable." The Defendants point to the Colorado Supreme Court's decision in *Van Wyk,* where the plaintiffs claimed the defendant's upgrades to electrical lines created an intentional nuisance due to increased noise, electromagnetic fields, and radiation particles invading the property. *Id.* at 382. The defendant argued the relevant agency's approval of the voltage involved in the upgrades rendered any interference per se reasonable. *Id.* at 393. The Colorado Supreme Court indicated that to the extent an agency's regulations actually quantify the standard of reasonableness for the particular conduct involved, this determination controls in the nuisance context. *Id.* Under the facts of *Van Wyk,* however, the court concluded the agency's determination of reasonableness "lacked any specificity with respect to electromagnetic fields and noise" such that the complaint stated a viable nuisance claim because it alleged the defendant's conduct was unreasonable to the

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

extent it exceeded the noise and electromagnetic fields the agency anticipated might occur. *Id.* at 393–94. Under the circumstances, the court concluded the plaintiffs sufficiently pleaded a nuisance claim.

**\*1147** In light of *Van Wyk,* Defendants proposed jury instructions stating Defendants' release of plutonium could only be found unreasonable if the release did not comply with controlling state and federal standards. The district court rejected this instruction, concluding *Van Wyk* dealt with quasi-judicial determinations that differ in nature from the federal and state regulations identified in Defendants' proposed jury instructions. The district court believed the safety regulations offered by Defendants were more akin to zoning regulations and ordinances and, under Colorado case law, compliance with zoning statutes does not insulate a defendant from nuisance liability. *Hobbs v. Smith,* 177 Colo. 299, 493 P.2d 1352, 1354–55 (1972).

This court need not decide whether *Van Wyk* applies here because we agree with the district court's alternative ruling that none of the regulations referenced in Defendants' proposed jury instructions are on point. For instance, Defendants rely on a regulation issued by the Colorado State Board of Health which states, "Contamination of the soil in excess of 2.0 disintegrations per minute (0.03 Bq) of plutonium per gram of dry soil ... presents a sufficient hazard to the public health to require the utilization of special techniques of construction upon property so contaminated." 6 Colo.Code Regs. 1007–1:4.60. This regulation says nothing about the minimum level at which

such contamination becomes unreasonable. It merely indicates special care must be taken for construction on property contaminated at the particular level indicated. Similarly, Defendants point to documents issued by the Atomic Energy Commission and the Department of Energy. It is not clear whether any of these documents have the force of law or apply to safety levels outside a nuclear facility, and the issue is inadequately briefed for resolution here.[21]

21    As we previously noted, it is unclear whether Defendants seek to rely on these particular documents as preempting state law. As the issue has not been briefed, the court declines to address the question of whether these documents create a conflict between federal and state law.

Accordingly, Defendants have failed to establish that any of the state or federal standards referenced in their proposed jury instructions overcome the general rule that the jury must determine whether a given interference is "unreasonable" by weighing the harm against the utility of the interference.

### E. Plaintiffs' Trespass Claims

[31] Defendants next argue the district court erred in failing to require Plaintiffs to prove physical damage to the property as part of their trespass claims. According to Defendants, this is because Plaintiffs can only pursue intangible trespass claims, given the nature of the contamination at issue. The court reviews this question of law de novo. *Martinez,* 572 F.3d at 1132.

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

[32] [33] We note Defendants' position that Plaintiffs must establish physical damage to the property as an element of their trespass claims overlaps with the PAA's "damage to property" standard. A plaintiff, however, is not limited to proving damage to property in order to proceed with a PAA claim. Rather, a plaintiff may establish any of the injuries listed in 42 U.S.C. § 2014(q) to meet the PAA's threshold requirement of proving a nuclear incident occurred. For instance, a plaintiff who establishes a loss of use of their property has met his threshold requirement under § 2014(q), but must still prove physical damage to the property in order to prevail on a Colorado intangible trespass claim. Accordingly, we proceed to the issue of whether Plaintiffs' trespass claims *1148 must be tried under an intangible trespass theory.

[34] [35] The parties agree that to prevail under a traditional Colorado trespass claim, a plaintiff must establish only "a physical intrusion upon the property of another without the proper permission from the person legally entitled to possession." Van Wyk, 27 P.3d at 389. A plaintiff need not establish any injury to his legally protected interest in the land or damage to the land itself. Id. In Van Wyk, the Colorado Supreme Court recognized the viability of trespass claims involving invasions that are intangible, such as noise, radiation, or electromagnetic fields. Id. at 390. Unlike a traditional trespass claim, however, the court made it clear an intangible trespass claim requires "an aggrieved party ... to prove physical damage to the property [was] caused by such intangible intrusion." Id. Defendants argue the instant case can only proceed as an intangible trespass claim,

requiring the plaintiff class to establish the existence of physical damage to their properties in order to prevail. Consequently, we must determine whether the Colorado Supreme Court would require a trespass claim involving the invasion of plutonium particles onto real property to proceed as a traditional or intangible trespass claim.

In Van Wyk, the Colorado Supreme Court defined "intangible invasion" in the context of the plaintiffs' inverse condemnation claim, and the court held that invasions in the forms of noise, electromagnetic fields, and radiation waves are intangible invasions. Id. at 387. The court explained:

> The meaning of the term "intangible" is something that is impalpable, or incapable of being felt by touch.... We conclude that noise, despite being perceptible through hearing, is impalpable, and thus, intangible.
>
> Similarly, we also conclude that electromagnetic fields and radiation waves emitted by powerlines are intangible. Neither electromagnetic fields nor radiation waves produced by electric lines can be perceived by any of the senses. Instead, they are both similar to television and radio waves, which surround us at all times but which are completely imperceptible.... While such waves and fields might have some sort of physical effect upon the body, electromagnetic fields and radiation waves of the type at issue here are ubiquitous and our senses are incapable of perceiving them. As such, we agree ... that electromagnetic fields and radiation waves emitted by powerlines are

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

intangible intrusions upon land.

*Id.* at 387–88 (citations omitted).

In recognizing that other jurisdictions permitted trespass claims involving intangible intrusions to proceed, the Colorado Supreme Court did more than examine cases involving non-physical intrusions such as noise, electromagnetic fields, and radiation waves. The court also examined cases involving the deposit of particulate not visible to the human eye, as well as the deposit of radioactive materials. *Id.* at 390. At no time did the court in *Van Wyk* draw a distinction excepting these impalpable intrusions from its general analysis.

[36] It is clear from the Colorado Supreme Court's discussion of this issue in *Van Wyk* that, under Colorado law, whether a trespass claim falls under the traditional rubric or must be pursued as an intangible trespass is determined by whether the intrusion is palpable. Plaintiffs do not dispute that the plutonium particles present on their properties are impalpable and imperceptible by the senses. Although we recognize the particles in question have mass and are physically present on the land, our interpretation of Colorado law compels us to conclude that because the particles are **\*1149** impalpable, the trespass alleged here must be tried as an intangible trespass. Consequently, Plaintiffs are required to prove actual physical damage to their properties in order to prevail on their trespass claims.

Plaintiffs argue the discussion of intangible invasions in *Van Wyk* should not control

because a more recent case, *Hoery v. United States (In re Hoery),* 64 P.3d 214 (Colo.2003), recognized that contamination physically present within property supports a traditional trespass claim. In *Hoery,* the Colorado Supreme Court's decision addressed only the two narrow questions certified by the Tenth Circuit pertaining to whether the contamination of the property constituted a continuing trespass or nuisance. We agree with Defendants that, in *Hoery,* the Colorado Supreme Court treated the presence of contaminants as if it were not in dispute. Indeed, the decision explains, "For purposes of answering the certified questions before us, no dispute exists about whether the United States released TCE into the ground and by doing so, invaded Hoary's property." *Id.* at 222. Because no dispute existed, the *Hoery* court only examined whether the facts in question could support a claim that the trespass or nuisance was continuing. The case does not stand for the proposition that impalpable contamination of property constitutes a tangible invasion that can be tried as a traditional trespass claim. In fact, it is not clear from *Hoery* whether the contamination in question was impalpable. The Colorado Supreme Court never discussed the issue because it was not presented.

Jury Instruction No. 3.3 directed that to prove their trespass claims,

> Plaintiffs are *not* required to show that plutonium is present on the Class Properties at any particular level or concentration, that they suffered any bodily harm because of the

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

plutonium or that the presence of plutonium on the Class Properties damaged these properties in some other way.

This was erroneous as a matter of Colorado law and on remand, Plaintiffs shall be required to prove the plutonium contamination caused "physical damage to the property" in order to prevail on their trespass claims. *Van Wyk,* 27 P.3d at 390.

### F. Class Certification

As the district court's class certification analysis failed to consider whether Plaintiffs could establish various elements of their PAA claims, supplied both by federal and state law, this court must reverse the district court's class certification ruling. Upon remand, the district court shall revisit the class certification question to determine whether Plaintiffs can establish the elements of their claims, including the PAA threshold requirements, on a class-wide basis. Because we now reverse the district court's class certification ruling, we need not reach the question of whether the district court's subdivision of the class for damages purposes was proper.

### G. Punitive Damages

[37] Defendants also argue the district court erred in instructing the jury that it could award punitive damages in the instant action. Defendants argue the PAA precludes punitive damages against them because their agreement with the federal government requires the government to indemnify them for any such damages. The court reviews this question of law de novo. *Martinez,* 572 F.3d at 1132.

In 1988, the PAA was amended to preclude awards of punitive damages when a defendant in a PAA action will be indemnified by the federal government for damages.[22] It states:

[22] There is no dispute that Defendants have entered into indemnification agreements with the government.

**\*1150** No court may award punitive damages in any action with respect to a nuclear incident ... against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident....

42 U.S.C. § 2210(s). The district court concluded this provision applied only as to nuclear incidents occurring on or after August 20, 1988, the date the amendments took effect, and permitted Plaintiffs to pursue punitive damages with respect to nuclear incidents on or after that date.

This court agrees that § 2210(s) is only applicable to nuclear incidents occurring on or after August 20, 1988. Defendants do not dispute that Congress opted not to make § 2210(s) retroactive. Consequently, the bar against punitive damages in this section does not apply to any conduct occurring before the 1988 Amendments took effect. The Supreme Court's decision in *Silkwood* recognized the availability of punitive damages under the PAA, prior to the 1988

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

Amendments, without reference to an exception in the presence of an indemnity agreement. 464 U.S. at 255–56, 104 S.Ct. 615. Rather, the Court recognized that "in enacting and amending the [PAA], Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents." Id. at 256, 104 S.Ct. 615. The Silkwood decision made it clear that prior to the enactment of the 1988 Amendments, federal law included no prohibition whatsoever on the availability of punitive damages.

Defendants argue, however, that § 2210(s) merely codified the law as it already existed prior to the 1988 Amendments. But Defendants cite to no binding legal authority suggesting punitive damages were always barred when an indemnification agreement was in place. Nor do Defendants point to any pre–1988 Amendments case prohibiting punitive damages in such an instance. Additionally, the Defendants never explain why the federal government is not entitled to enter into a binding agreement to indemnify a party for punitive damages.

Instead, Defendants rely on two sentences from a Senate Report which states, "The bill clarifies that an award of punitive damages is prohibited if the award would result in any obligation of the United States to make any payments for public liability. This reflects the longstanding policy that the Federal government should not be liable for punitive damages." S.Rep. No. 100–218, at 11 (1987), reprinted in 1988 U.S.C.C.A.N. 1476, 1487. The Senate Report cited by the Defendants, however, could just as easily be read to conflict with Defendants' position,

because after describing the provisions relating to punitive damages, the Report states, "The bill does not otherwise affect current law regarding punitive damages." Id. This suggests those portions of the 1988 Amendments dealing with punitive damages did alter the law as it existed at that time, and the bar against punitive damages for post–1988 Amendments conduct is the only alteration to the then-existing scheme. Absent any indication punitive damages against an indemnified party were prohibited prior to the 1988 Amendments, we cannot agree with Defendants' position.[23]

---

[23]   The parties do not dispute that punitive damages have always been, and continue to be, available against defendants who have no indemnification agreement with the government. See Silkwood, 464 U.S. at 251 n. 12 & 256, 104 S.Ct. 615.

---

[38]   Defendants also argue that even if punitive damages are recoverable under the pre–1988 PAA, the district court's instruction was erroneous as a matter of law. *1151 Specifically, Defendants argue the district court erred by permitting the jury to award punitive damages based on conduct occurring prior to August 20, 1988, even if Plaintiffs sustained no injury prior to that date. In issuing its ruling, the district court noted that the definition of "nuclear incident" refers to "any occurrence within the United States causing ... damage to property ... arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q). Focusing on "occurrence," the district court reasoned, "It is the date of such occurrences, not the date on which the relevant occurrences caused property

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

damage, that determines application of the section's bar on punitive damages awards." *Cook,* 273 F.Supp.2d at 1212. As a result, the court instructed the jury:

> For Plaintiffs to recover punitive damages, they must prove beyond a "reasonable doubt" that the conduct of the Defendant that committed the trespass and/or nuisance was "wilful and wanton." In deciding this question with respect to any conduct relating to plutonium or other radioactive materials, you can only consider the Defendant's conduct up to August 20, 1988, including conduct occurring before this date that resulted in harm on or after that date.

Defendants argue this instruction was error, because it is undisputed the 1988 Amendments bar punitive damages against indemnified parties with respect to any "nuclear incident" occurring after August 20, 1988. Because any occurrence deemed a nuclear incident must cause some injury, Defendants suggest that no nuclear incident can exist until the date of the injury. In other words, Defendants believe the jury should not have been permitted to consider any conduct unless it actually caused a PAA injury under 42 U.S.C. § 2014(q) prior to August 20, 1988. According to Defendants, by instructing the jury it could consider conduct occurring prior to August 20, 1988, which did not result in a PAA injury until after August 20, 1988, the district court equated "conduct" with "nuclear incident" and allowed the jury to consider nuclear incidents for which punitive damages are expressly barred by the PAA's 1988 Amendments.

[39] Defendants confuse the findings necessary to establish a compensable injury, however, with the findings necessary to support a punitive damages award. As explained earlier, a plaintiff cannot proceed with a PAA claim unless it first establishes a nuclear incident occurred. 42 U.S.C. § 2210(n)(2). A plaintiff must establish that the occurrence in question actually caused a PAA injury. 42 U.S.C. § 2014(q). All elements of the PAA claim must be proved to recover compensatory damages for the injury. With respect to punitive damages, however, once a plaintiff establishes a nuclear incident, the jury's focus must turn to the conduct of the defendant rather than the injury sustained by the plaintiff. The purpose of punitive damages is to punish the defendant's willful and wanton conduct and deter others from engaging in similar conduct. *Lira v. Shelter Ins. Co.,* 913 P.2d 514, 517 (Colo.1996). The injury resulting from the conduct is compensated separately.

[40] As the district court ruled, the statutory definition makes it clear the relevant date of any nuclear incident is the date of the "occurrence," not the date of the injury. Section 2014(q) defines a "nuclear incident" as "any occurrence ... causing ... bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the

radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." In determining whether a **\*1152** particular occurrence is a nuclear incident, the jury must simply determine whether that occurrence ultimately caused one of the specified injuries. If so, the occurrence constitutes a nuclear incident. Had Congress intended for the injury to control the timing of the nuclear incident, it could have defined nuclear incident as "the infliction of an injury upon person or property arising from the use of nuclear substances." Instead, Congress focused the definition on an "occurrence," the event which sets the causal chain in motion. Therefore, the date of the occurrence controls when determining whether the nuclear incident took place prior to August 20, 1988.

For instance, if a defendant's release of plutonium in 1985 caused an injury in 1990, a proper explanation of that event in light of the statutory definition would be that the 1985 occurrence was a nuclear incident because it ultimately caused a PAA injury. It would be nonsensical to say the 1990 injury constitutes the nuclear incident even though the conduct occurred years before. The definition directly ties the "occurrence" to the "nuclear incident."

While the district court's decision to focus on the date of the occurrence was correct, its instruction failed to instruct the jury how to identify the date of the occurrence. Here, the "occurrence" constituting a nuclear incident in a PAA action must arise from Defendants' release of plutonium onto Plaintiffs' properties. The jury instruction ultimately given, however, permits consideration of Defendants' conduct prior to August 20, 1988, regardless of whether an "occurrence" causing Plaintiffs' injury took place prior to that date. This is an important distinction, because certain conduct prior to August 20, 1988, might contribute to a nuclear incident, even though the release of plutonium might not have occurred until after August 20, 1988. For instance, if a defendant began improperly storing drums containing nuclear waste in 1987 and consistently failed to maintain them, but no waste leaked from the drums until after August 21, 1988, a jury could not find the "occurrence" took place prior to August 20, 1988.

The district court's jury instruction should have required the jury to determine whether any nuclear incident occurred prior to August 20, 1988. If so, the jury could then consider whether the conduct causing any nuclear incident occurring before August 20, 1988, was wilful and wanton beyond a reasonable doubt. In the event this case is re-tried, the jury should be instructed that in deciding whether to award punitive damages, it may consider Defendants' conduct that contributed to a release of plutonium only if the release of plutonium *both* occurred prior to August 20, 1988, *and* ultimately caused Plaintiffs' injury, regardless of whether the injury manifested itself before or after that date. If the jury finds beyond a reasonable doubt that such conduct was willful and wanton, the jury is permitted to award punitive damages against Defendants.

### H. Defendants' Remaining Challenges

Cook v. Rockwell Intern. Corp., 618 F.3d 1127 (2010)

71 ERC 1609, 77 Fed.R.Serv.3d 555

The court declines to reach Defendants' evidentiary challenges to Plaintiffs' trial references to the government's indemnity obligations or the Department of Energy's failure to fully comply with discovery. Because the case must be remanded on other grounds, the court need not address whether the district court abused its discretion with respect to evidentiary issues that may not arise during a new trial. Likewise, the court will not address Defendants' challenge to the district court's post-trial award of prejudgment interest. This issue may not arise on remand, and if it does, any error can easily be rectified in a future appeal without necessitating a new trial.

*1153 *I. Plaintiffs' Cross–Appeal*

[41] Plaintiffs have presented their cross-appeal on conditional issues to be raised only if they lose related issues presented in Defendants' primary appeal. As to a number of these issues, Defendants argue Plaintiffs cannot present their cross-appeal in a conditional manner. Defendants are incorrect. A party who prevails in the district court is permitted to conditionally raise issues in a cross-appeal because if the appellate court decides to vacate or modify the trial court's judgment, the judgment may become adverse to the cross-appellant's interests. *United States ex rel. Burlbaw v. Orenduff,* 548 F.3d 931, 942 (10th Cir.2008).

Some, but not all, of Plaintiff's cross-appeal issues are challenges this court could address in order to guide the district court on remand. Nevertheless, any issues raised on cross-appeal must be adequately presented. *See Berna v. Chater,* 101 F.3d 631, 632 (10th Cir.1996). As Plaintiffs have failed to do so, we decline to consider the cross-appeal.

**IV. CONCLUSION**

For the foregoing reasons, this court **DENIES** Defendants' motion to dismiss for lack of subject matter jurisdiction and **DENIES** all other motions pending before this court as moot. Additionally, this court **REVERSES** and **REMANDS** the case to the district court. We **DIRECT** the district court to vacate the judgment and conduct further proceedings not inconsistent with this opinion.

**All Citations**

618 F.3d 1127, 71 ERC 1609, 77 Fed.R.Serv.3d 555

End of Document       © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

**790 F.3d 1088**
**United States Court of Appeals,**
**Tenth Circuit.**

Merilyn COOK; William Schierkolk,
Jr.; Delores Schierkolk; Richard
Bartlett; Sally Bartlett; Lorren Babb;
Gertrude Babb, Plaintiffs–Appellants,
and
Michael Dean Rice; Bank Western;
Thomas L. Deimer; Rhonda J.
Deimer; Stephen Sandoval; Peggy J.
Sandoval, Plaintiffs,
v.
ROCKWELL INTERNATIONAL
CORPORATION; Dow Chemical
Company, Defendants–Appellees.

No. 14–1112. | June 23, 2015.

**Synopsis**
**Background:** Property owners filed class
action under Price–Anderson Act and state
tort law against operators of nuclear
weapons manufacturing plant to recover for
damages caused by releases of plutonium
and other hazardous substances from plant.
After jury verdict in owners' favor, the
District Court, 564 F.Supp.2d 1189, denied
operators' motion for judgment as matter of
law (JMOL) and motion for new trial or, in
alternative, for remittitur of damages, and
operators appealed. The Court of Appeals,
618 F.3d 1127, reversed and remanded. On
remand, the United States District Court for
the District of Colorado, Kane, Senior
Judge, 13 F.Supp.3d 1153, entered judgment
in operators' favor, and owners appealed.

**Holdings:** The Court of Appeals, Gorsuch,
Circuit Judge, held that:

[1] operators forfeited argument that
Price–Anderson Act expressly preempted
state tort claims;

[2] Price–Anderson Act did not preempt
owners' nuisance claim; and

[3] mandate rule did not prevent district court
from entering judgment on owners' state law
nuisance claim.

Vacated and remanded.

Moritz, Circuit Judge, concurred in
judgment and filed opinion.

West Headnotes (5)

[1] **Federal Courts**
🔑 Powers, Duties, and Proceedings
of Lower Court After Remand

Operators of nuclear weapons
manufacturing plant forfeited
argument that Price–Anderson Act
expressly preempted state tort claims
by property owners who asserted but
failed to prove that their damages
were caused by nuclear incident,
where operators argued on their
appeal of judgment finding them

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

liable under Act that federal component of judgment was infected by instructional error and required remand, but they never suggested freestanding state tort judgment would be preempted and precluded. Price–Anderson Act, § 3, 42 U.S.C.A. § 2014.

Cases that cite this headnote

[2]   **Nuisance**
      Nature and form of remedy
      **States**
      Particular cases, preemption or supersession

Price–Anderson Act did not preempt property owners' claim under Colorado nuisance law against operators of nuclear weapons manufacturing plant based on their improper disposal of radioactive materials, where owners pled but failed to prove nuclear incident, and their claims were not of sort that implicated Act and its textually manifest concerns related to liability limitation and indemnification. Price–Anderson Act, § 3, 42 U.S.C.A. § 2014.

Cases that cite this headnote

[3]   **States**

Congressional intent

To extent that Congress's statutory direction is susceptible to more than one reading, courts have duty to accept reading that disfavors preemption, which is only heightened where area of law in question is one of traditional state regulation like public health and safety.

Cases that cite this headnote

[4]   **Federal Courts**
      Complete preemption
      **States**
      Preemption in general

Complete preemption arises when Congress affords defendants not only affirmative defense against state law claims, but also right to remove dispute to federal court, ensuring that preemption question itself is decided in federal, rather than state, forum.

Cases that cite this headnote

[5]   **Federal Courts**
      Mandate

Mandate rule did not prevent district court from entering judgment on

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

property owners' state law nuisance claim based on nuclear weapons manufacturing plant operators' purportedly improper disposal of radioactive waste after Court of Appeals ruled that owners had failed to prove that their damages were caused by "nuclear incident" within meaning of Price–Anderson Act, where Court of Appeals held that jury was properly instructed on elements of nuisance claim, operators did not dispute that evidence presented at trial sufficed to support nuisance verdict, and nothing in panel's decision specifically precluded district court from entering new judgment on nuisance claim on basis of existing jury verdict. Price–Anderson Act, § 3, 42 U.S.C.A. § 2014.

Cases that cite this headnote

## Attorneys and Law Firms

**\*1089** Merrill G. Davidoff of Berger & Montague, P.C., Philadelphia, PA (David F. Sorensen, Jennifer MacNaughton, and Caitlin G. Coslett of Berger & Montague, P.C., Philadelphia, PA, and Gary B. Blum and Steven W. Kelly of Silver & DeBoskey, P.C., Denver, CO, with him on the briefs), for Plaintiffs–Appellants.

Christopher Landau of Kirkland & Ellis LLP, Washington, D.C. (Rebecca Taibleson of Kirkland & Ellis LLP, Washington, D.C.,

and Kevin T. Van Wart and Bradley H. Weidenhammer of Kirkland & Ellis LLP, Chicago, IL, with him on the brief), for Defendants–Appellees.

Before GORSUCH, PHILLIPS, and MORITZ, Circuit Judges.

## Opinion

GORSUCH, Circuit Judge.

Harnessing nuclear energy is a delicate business. So is the statute before us. Originally passed in the 1950s in an era captivated by the promise of nuclear power and amended in the 1980s in the aftermath of the Three Mile Island meltdown when prevailing public sentiment was perhaps less sanguine, the Price–Anderson Act seeks both to promote the private nuclear energy industry and, simultaneously, to ensure relief for those injured by it. In this appeal, we consider how far Congress went in reshaping state tort claims involving what the Act delicately refers to as nuclear "incidents" and "occurrences"—and what our own prior encounter with this case has to say on the subject.

**\*1090 I**

The beginnings of our dispute trace back generations. During the Cold War, the Rocky Flats plant served as home to a nuclear weapons production facility. Located just sixteen miles from downtown Denver, the plant was operated first by Dow, then by Rockwell, under contracts with the

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

federal government. But everything ground to a halt in 1989. That's when FBI agents raided the plant and unearthed evidence of environmental crimes. It turns out plant workers had mishandled radioactive waste for years. Some had been poured into the ground and leached into nearby bodies of water. Some had been released into the air and filtered its way into the soil throughout the area. As news of all this emerged, the plant's neighbors saw their property values plummet. And soon enough they followed the government's criminal action with a civil suit of their own, citing both the federal Price–Anderson Act and state nuisance law as grounds for relief.

It took a titanic fifteen years for the case to reach a jury. No doubt a testament to contemporary civil litigation practices that ensure before any trial is held every stone will be overturned in discovery—even if it means forcing everyone to endure the sort of staggering delay and (no doubt) equally staggering expense the parties endured here. Somehow, though, this case managed to survive the usually lethal gauntlet of pretrial proceedings and stagger its way to trial. There the jury found for the plaintiffs and the district court approved roughly $177 million in compensatory damages and $200 million in punitive damages—as well as $549 million in prejudgment interest, thanks again to all the pretrial delay.

That, though, was hardly the end of it. Next the case found its way to appeal—for the first time. On appeal, the defendants argued that the district court had failed to instruct the jury properly about the terms of the Price–Anderson Act. Under the Act, any lawsuit asserting liability for a "nuclear

incident" is automatically considered a federal action that can be brought in (or removed to) federal court. *See* 42 U.S.C. §§ 2014(w), 2014(hh), 2210(n)(2). And if that assertion is proven at trial—if the jury finds that a nuclear incident actually occurred and harmed the plaintiffs—a number of special rules kick in, including rules limiting the liability of certain defendants and requiring the government to pay any damages not covered by insurance. *See id.* § 2210(c)-(e). Unsurprisingly given these generous financial protections, defendants often have as much incentive as plaintiffs to accept that any harm they caused stemmed from a nuclear incident.

But in this particular case Dow and Rockwell made a curious tactical decision. They argued that the district court's jury instructions about what constitutes a nuclear incident were too permissive. To prove that a nuclear incident has damaged real property the Act requires a plaintiff to show the "loss of or damage to property, or loss of use of property." *Id.* § 2014(q). According to the defendants, this meant the district court should have required the plaintiffs to prove at trial physical damage to their property or the loss of a specific, particularized use of their property—not mere contamination by radioactive materials or reduced property values. Of course, in the long run an argument along these lines promised to restrict the Act's application, including the benefits it affords defendants. But in the short run it offered a way to overturn the district court's judgment in this case. And Dow and Rockwell leapt at the chance.

The defendants' tactical decision seemed to pay off. This court agreed that the district

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

court's jury instructions about what does and doesn't qualify as a nuclear **1091** incident were too permissive. On this basis, it vacated the district court's judgment and remanded the case for further proceedings in light of the Act's correct construction. *Cook v. Rockwell Int'l Corp.,* 618 F.3d 1127, 1138–42, 1153 (10th Cir.2010).

But that's when things took an interesting turn. Trying their hand at a little judicial jiu-jitsu, the plaintiffs sought to turn the defendants' victory against them. Back before the district court on remand the plaintiffs disclaimed any effort to prove a nuclear incident for purposes of the Price–Anderson Act. Forget the Act and the benefits it provides to both sides, they said, we renounce them. Accepting the premise that they couldn't prove a nuclear incident—at least as the term was interpreted by this court—the plaintiffs argued this meant only that the Act's liability limiting and indemnification protections fall away, leaving background state tort law to operate normally.[1] What's more, the plaintiffs submitted, everything needed for a judgment on a state law nuisance claim already existed. The operative complaint expressly sought relief under Colorado nuisance law. At trial, the district court instructed the jury on Colorado nuisance law and the jury returned a state law nuisance verdict in accordance with those instructions. In the first appeal, this court held that "[t]he jury was properly instructed on the elements of a nuisance claim." *Id.* at 1145. And no one has ever challenged the sufficiency of the evidence in the record. The state law nuisance verdict, moreover, was untainted by any error identified in the first appeal: this court

reversed only because of an instructional error concerning what's needed to prove a nuclear incident under the Act, not what's required to prove a nuisance under Colorado law. So, the plaintiffs argued, all the ingredients required for a state law nuisance judgment were present and accounted for and a judgment on that claim should issue forthwith. Perhaps the defendants' push in the first appeal for a narrow definition of what qualifies as a nuclear incident won them the battle, but it lost them the war—failing to eliminate the plaintiffs' state law claim and serving only to narrow now and in the future both sides' ability to secure the benefits of the Price–Anderson Act.[2]

---

[1]   The defendants didn't (and don't) challenge this move, and surely would be judicially estopped from doing so in any event. In the last appeal, they claimed that the plaintiffs couldn't prove a nuclear incident given the governing law and the facts of this case. Appellants' Supplemental Br. at 13, *Cook,* 618 F.3d 1127 (Nos.08–1224, 08–1226, 08–1239) ("[P]laintiffs did not and could not prove their claims of a classwide 'nuclear incident.' "). So it would be pretty difficult for them to argue otherwise now: "[A]bsent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (quoting 18 Charles Alan Wright et al., *Federal Practice and Procedure* § 4477, at 782 (1981)).

[2]   Neither do we doubt that subject matter jurisdiction would exist to support a state law nuisance judgment, even supposing the Price–Anderson Act's grant of federal question jurisdiction dissipated when the plaintiffs gave up their effort to assert or prove a nuclear incident. After all, the complaint alleged that the parties were completely diverse and asked for damages in excess of the statutory minimum. *See* 28 U.S.C. § 1332 (1988). Likewise, the district court retained pendent jurisdiction to consider the state law nuisance claim given the advanced stage of this litigation and the resources it had already consumed. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Russillo v. Scarborough,* 935 F.2d 1167, 1172 n. 5

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

(10th Cir.1991).

This put the defendants in a pickle. Having prevailed on the argument that this case doesn't involve a nuclear incident *1092 sufficient to implicate the federal statutory regime, now they had to conjure some reason why entering a judgment on the existing state law nuisance verdict would be legally impermissible. Ultimately the defendants settled on two arguments. First, they contended, the Price–Anderson Act prevents it. While everyone agrees that the Act provides a federal forum when a nuclear incident is asserted, and that it affords certain liability protections and guarantees if a nuclear incident is proven, Dow and Rockwell now suggested the Act does something more and entirely different. They argued to the district court that the Act *also* preempts and precludes any state law recovery where (as here) a nuclear incident is asserted but ultimately unproven. In this way, the defendants suggested, the Act embodies a sort of go-big-or-go-home rule of liability. If you allege and successfully prove a full–blown nuclear incident your recovery may be assured by the full faith and credit of the federal government. But if you allege and then fail to prove a nuclear incident you are barred from recovery of any kind—even if you can establish a qualifying state law nuisance. Second, Dow and Rockwell argued that this court's mandate in the first appeal independently barred the plaintiffs from securing relief on their existing state law nuisance verdict. So even if the plaintiffs' state law claim isn't preempted any recovery is just as effectively foreclosed.

Ultimately, the district court sided with the defendants on both points and so here we are again. This time on the plaintiffs' appeal asking us to reverse the district court's preemption ruling and its holding about the scope of this court's mandate.

## II

We begin with the preemption question. Preemption can come about in various ways and it's no simple thing or our ambition to attempt a complete taxonomy. Still, it's fair to say the Supreme Court has distinguished between "express" preemption (where Congress explicitly indicates its intent to supplant state law) and "implied" preemption (where some other aspect of a statute is said to suggest such an intent). *See, e.g., Altria Grp., Inc. v. Good,* 555 U.S. 70, 76–77, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008). And it's fair to say the Court has distinguished between "field" preemption (where Congress leaves "no room" for state regulation in an entire area) and "conflict" preemption (where Congress has expressed a more modest wish to displace individual state laws standing in the way of federal law). *Arizona v. United States,* ——U.S. ——, 132 S.Ct. 2492, 2500–01, 183 L.Ed.2d 351 (2012).

Of course, these labels "are anything but analytically air-tight." Laurence H. Tribe, *American Constitutional Law* § 6–28, at 1177 (3d ed.2000). But they do shed some light on what arguments are—and aren't—before us. Examining the defendants' submissions, it's clear that Dow

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

and Rockwell fail to invoke implied preemption doctrine and even appear to disclaim reliance on it. *See* Appellees' Br. 35. Neither do the companies depend on more modest conflict preemption principles—and potential preemption defenses, like most other affirmative defenses, are forfeited if not made. *See, e.g., Mauldin v. Worldcom, Inc.,* 263 F.3d 1205, 1211 (10th Cir.2001). So the only preemption argument at issue before us is the suggestion that the Price–Anderson Act expressly preempts and precludes relief for the field of claims that assert but fail to prove a nuclear incident. And with our hands now around the parameters of the argument before us, we can see it quickly encounters two separate and independently dispositive problems. *See Woods v. Interstate Realty Co.,* 337 U.S. 535, 537, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949).

## *1093 A

[1] The first problem is a procedural one: the defendants forfeited any contention along these lines in the first appeal. At that point the plaintiffs had a judgment in their favor under both state and federal law. The defendants argued that the federal component of the judgment was infected by instructional error and required a remand, but they never suggested a freestanding state tort judgment would be preempted and precluded. In fact, this court explained that though the defendants had "allude[d] to field preemption in their brief" in the first appeal, they "never develop[ed] the issue." *Cook,* 618 F.3d at 1143 n. 16. And just as it's important to raise a preemption defense or risk losing it, it's important to raise it in a timely manner. This court has long explained that non-jurisdictional arguments a party forfeits on appeal "may not be asserted ... on remand." *Dow Chem. Corp. v. Weevil–Cide Co.,* 897 F.2d 481, 486 n. 4 (10th Cir.1990). So it appears the defendants had no business attempting a field preemption affirmative defense following the first appeal, and the district court had no business adopting it. After all, at some point it becomes too late to try out promising new theories, gangly litigation must be shaped and defined, and finality has to become more than a faint hope. Maybe especially when it comes to a new defense raised on remand some twenty-five years after the case began.

Dow and Rockwell don't dispute these legal principles, only their application to this case. Whatever the first panel may have said, they insist they have always presented a field preemption defense to any freestanding state law nuisance claim, including in the first appeal. The defendants note that the district court on remand agreed with their self-assessment on this score. But under law of the case doctrine what governs is the first panel's holding that the defendants failed to develop the argument—not the defendants' or the district court's insistence otherwise on remand—for in our legal order the parties and trial courts aren't usually free to revisit issues an appellate court has resolved. Neither do the defendants attempt to invoke any recognized exception to the doctrine that might allow us to upset this, the normal order of things. *See United States v. Alvarez,* 142 F.3d 1243, 1247 (10th Cir.1998).

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

Instead, the defendants reply that the first panel spoke at most to an entirely different line of argument than the one they now seek to raise. According to Dow and Rockwell, the panel's holding that they had foregone any field preemption argument wasn't directed to the field preemption question they currently wish to pursue (does the Act preclude any state forms of relief when a nuclear incident is asserted but unproven?), but to a separate preemption question (when must state tort law standards of care give way in a claim because they conflict with particular terms found in the Price–Anderson Act?).

We admit this may not be a frivolous reading of the prior panel's opinion, but it is surely an odd one. The term "field preemption," after all, doesn't refer to situations where some specific conflict exists between federal and state rules of law but to situations where the federal government has so fully occupied an entire field that no room remains for the operation of state law at all. Conflict on a grand scale, not a discrete one. *See supra* at 1092–93. Yet under the defendants' reading of the first panel's decision we must assume that the panel was confused about this much and found forfeited a field preemption argument about what is at most a conflict preemption question. Unsurprisingly, we are unwilling to give such an uncharitable gloss to our colleagues' handiwork and **\*1094** reaffirm the first panel's ruling that Dow and Rockwell forfeited any field preemption argument long ago.

## B

[2] Even if we were to overlook this procedural problem a substantive one would soon emerge for we see no field preemption in the Act of the sort the defendants describe. When it comes to the preemptive force of the Act the parties present us with two very different narratives: one entirely familiar, the other more than a little incongruous. On the plaintiffs' reading, the Act embodies an arrangement much like that found in the Class Action Fairness Act and similar statutes, one in which Congress hasn't preempted an entire field but provided a federal forum and certain specific rules for larger cases while allowing smaller cases more or less to go their own way. *See* 28 U.S.C. § 1332(d); *Estate of Pew v. Cardarelli,* 527 F.3d 25, 26 (2d Cir.2008). On the defendants' reading, meanwhile, the Act guarantees recovery for plaintiffs who plead and prove a nuclear incident even as it preempts and precludes any recovery for plaintiffs who plead a nuclear incident but ultimately prove only a lesser state law nuisance. So on the defendants' view an affirmative defense (field preemption) is, literally, complete and effective upon a plaintiff's mistaken assertion of fact (the existence of a nuclear incident). Maybe this regime the defendants imagine isn't metaphysically impossible but stating it in concise terms does make you wonder. A wonder that grows even larger when you consider the defendants' suggestion that their affirmative defense would serve to preclude small claims even as the statute it stems from admittedly guarantees recovery for larger ones.

[3] When confronted with competing

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

preemption narratives like these the Supreme Court has instructed us to "start with the assumption that the historic police powers of the States were not to be superseded ... unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). So to the extent Congress's statutory direction is susceptible to more than one reading, we have the "duty to accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005). A duty that is only "heightened" where (as here) the area of law in question is one of traditional state regulation like public health and safety. *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 334, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008). These presumptions seek to ensure "that the federal-state balance will not be disturbed unintentionally by Congress or unnecessarily by the courts." *Id.* (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)) (internal quotation marks omitted). And applying the traditional tools of statutory interpretation to the Act before us, it quickly becomes clear that nothing in its language, structure, or history favors the defendants' curious statutory construction over the plaintiffs' prosaic one—let alone favors it so clearly that we might overcome the presumption against preemption.

Start with the text. The Price–Anderson Act applies to "any suit asserting public liability." 42 U.S.C. § 2014(hh). It defines "public liability" to mean "any legal liability arising out of or resulting from a nuclear incident." *Id.* § 2014(w). A "nuclear incident," meanwhile, refers to "any occurrence" that causes "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties" of nuclear materials. *Id.* § 2014(q). Together, then, "a 'public **\*1095** liability action' is a suit in which a party asserts that another party bears any legal liability arising out of an incident in which the hazardous properties of radioactive material caused bodily injury, sickness, or property damage." *Cotroneo v. Shaw Env't & Infrastructure, Inc.,* 639 F.3d 186, 194 (5th Cir.2011). And, as we've seen, special rules apply when a party pursues a public liability action. For starters, the suit is "deemed to be an action arising under" federal law: not only may plaintiffs file their complaints in federal court, but defendants may remove any qualifying suit from state court, too. 42 U.S.C. § 2014(hh); *see id.* § 2210(n)(2). If a plaintiff goes beyond merely asserting the existence of a nuclear incident—actually convincing the factfinder such an incident took place—the Act proceeds to limit the amount of liability certain defendants may face and it obligates the government to underwrite certain of these losses. *Id.* § 2210(c)-(e). All the while, though, the Act stipulates that state law provides the "substantive rules for decision" in the action except to the extent state law proves "inconsistent" with the terms of § 2210. *Id.* § 2014(hh).

Where does any of this language—expressly—preempt and preclude all state law tort recoveries for plaintiffs who plead but do not prove nuclear incidents? We just don't see it. Congress knows well how to preempt a field

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

expressly when it wishes. In the Occupational Safety and Health Act, for example, it explicitly required states wishing to regulate in the field to submit their plans for approval by the Secretary of Labor. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 111–13, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (Kennedy, J., concurring in part and concurring in the judgment). There's just nothing like that in the statutory text before us.

The defendants insist § 2014(hh) does the job. But, again, that section merely affords a federal forum when a nuclear incident is "assert[ed]" and provides a modest form of conflict preemption once the case is underway: normal state law principles continue to govern unless they conflict with the rules found in § 2210. So, for example, once a nuclear incident is proven § 2210(e)'s limitations on "aggregate public liability for a single nuclear incident" apply, notwithstanding the availability of greater damages under state law. Nothing in this language speaks to what happens when a nuclear incident is alleged but unproven. And certainly nothing in it dictates that injured parties in such circumstances are forbidden from seeking or securing traditional state law remedies.

Surrounding textual features confirm the point. Consider § 2014(q), which defines the term "nuclear incident" to mean an "occurrence" that causes "bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property." From this language, it's clear Congress anticipated the possibility of lesser nuclear "occurrences" that fail to rise to the level of nuclear "incidents"—it even gave them a name. And in that light, the absence of any accompanying statutory bar to state tort recovery in cases involving these lesser "occurrences" takes on an even more deliberate hue. Consider as well § 2014(w), which defines "public liability" to mean "any legal liability arising out of or resulting from a nuclear incident." 42 U.S.C. § 2014(w). From this, it appears that once injuries sufficient to trigger a nuclear incident finding are proven the Act contemplates recovery (and liability limitations and indemnification) for "*any* " injuries flowing from that incident, even those that aren't themselves sufficient to trigger a nuclear incident finding. And it's hard to conjure a reason why Congress would allow plaintiffs to recover **\*1096** for a full panoply of injuries in the event of a large nuclear incident but insist they get nothing for a lesser nuclear occurrence. Certainly the defendants don't offer this court any rationale that might explain such a rule.

Looking beyond textual clues to take in the larger statutory structure does nothing to alter our impression. Not only can federal claims for larger nuclear incidents subject to the Act's limitations and benefits coexist with state law claims for lesser nuclear occurrences, they can do so quite sensibly. Larger occurrences that qualify as nuclear incidents can threaten to bankrupt nuclear power providers and leave victims un-(or under-) compensated. In these cases, it's understandable why Congress might intercede to provide liability caps and indemnification. Meanwhile, smaller occurrences are less likely to raise the same concerns, so it's equally understandable why Congress might not prevent state law from

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

running its course with respect to them. Our case illustrates the point. At trial, Dow and Rockwell's liability for compensatory damages totaled roughly $177 million. The Act, meanwhile, currently caps federal contractors' liability for nuclear incidents at approximately $12.7 *billion. See id. § 2210(d)(2), (e)(1)(B); Adjustment of Indemnification for Inflation, 78 Fed.Reg. 56,868 (Sept. 16, 2013).* Indeed, even if we count the $200 million in punitive damages and $549 million in prejudgment interest—for a total of $926 million—we still come only 7.29% of the way to the $12.7 billion cap. The claims here thus simply do not appear to be of the sort that implicate the Act and its textually manifest concerns related to liability limitation and indemnification.

A study of the Act's history yields still more evidence pointing in the same direction. There's much in that history suggesting Congress passed the Act to improve the manageability of complex litigation, to ensure that liabilities arising from large nuclear incidents don't shutter the nuclear industry, and to guarantee compensation for victims who otherwise might be left trying to squeeze damages out of firms bankrupted by enormous awards. *See, e.g., Duke Power Co. v. Carolina Envtl. Study Grp., Inc.,* 438 U.S. 59, 64, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (noting that "the risk of potentially vast liability in the event of a nuclear accident *of a sizable magnitude* " motivated Congress to pass the Act (emphasis added)); *id.* at 83, 98 S.Ct. 2620 ("As we read the Act and its legislative history, it is clear that Congress' purpose was ... to stimulate the private development of electric energy by nuclear power while simultaneously

providing the public compensation in the event of a *catastrophic nuclear incident.*" (emphasis added)). Meanwhile, little in the Act's history suggests an intent to preclude recovery or inhibit the operation of state tort law in cases involving lesser nuclear occurrences that don't give rise to the sorts of injuries and damages involved in more serious nuclear incidents. Indeed, the evidence suggests that Congress sought to "minim[ize] interference with State law" so that "the only interference with State law is ... in the exceedingly remote contingency of a nuclear incident giving rise to damages in excess of the amount of financial responsibility required together with the amount of the governmental indemnity." S.Rep. No. 89–1605, at 6 (1966); *see also* H.R.Rep. No. 100–104, pt. 1, at 20 (1987).

The backdrop to the Act's 1988 amendments is consistent with this understanding, too. It appears Congress passed those amendments, which included § 2014(hh), in an effort to smooth and speed the recovery process for victims after witnessing the aftermath of the Three Mile Island incident, which resulted in a fair amount of litigation chaos: "over 150 **\*1097** separate cases against TMI defendants, with over 3,000 claimants, in various state and Federal courts." S.Rep. No. 100–218, at 13 (1987), 1988 U.S.C.C.A.N. 1476, 1488. Yet, as one of our colleagues has pointed out, Dow and Rockwell's reading of the law (no recovery absent a full-blown nuclear incident) would have the surprising effect of barring recovery "in the event of a future accident exactly like Three Mile Island," because "Three Mile Island does not appear to have caused" the sort of grave injuries required to establish a nuclear incident under § 2014(q). *Cotroneo,* 639

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

F.3d at 206 (Dennis, J., concurring in part and dissenting in part).

Even if nothing in the language, structure, or history of the Price–Anderson Act allows us to overcome the presumption against preemption and adopt the defendants' unlikely reading of the Act, Dow and Rockwell argue Supreme Court precedent requires us to reach that result all the same. Here they rest heavily on *El Paso Natural Gas Co. v. Neztsosie,* 526 U.S. 473, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999), a decision in which the Supreme Court referred to § 2014(hh) as an "unusual preemption provision" and stated that the Act's "structure, in which a public liability action becomes a federal action, but one decided under substantive state-law rules of decision that do not conflict with the Price–Anderson Act, resembles what we have spoken of as 'complete pre-emption doctrine.' " *Id.* at 484 & n. 6, 119 S.Ct. 1430 (citation omitted) (quoting *Caterpillar Inc. v. Williams,* 482 U.S. 386, 393, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)).

[4] We don't see anything in these remarks at odds with what we've said. As *Neztsosie* indicated, the Act's operation does indeed "resemble" what's sometimes called complete preemption. A subspecies of field preemption, complete preemption arises when Congress affords defendants not only an affirmative defense against state law claims, but also the right to remove the dispute to federal court—ensuring that the preemption question itself is decided in a federal (rather than a state) forum. *See Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 6–8, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003); *Devon Energy Prod. Co. v. Mosaic*

*Potash Carlsbad, Inc.,* 693 F.3d 1195, 1203–04 & n. 4 (10th Cir.2012). And we do have something like that here: the Act provides a federal forum for cases asserting liability arising out of a nuclear incident. At the same time, though, *Neztsosie* was right to suggest that the Act is "unusual" compared to true complete preemption statutes. For while the Act provides a federal forum it also does much to preserve state rules of decision—quite unlike in true complete preemption statutes where federal law provides the "exclusive cause of action." *Anderson,* 539 U.S. at 8, 123 S.Ct. 2058. Confirming the point that ours is not a true complete preemption statute, a few years after *Neztsosie* the Supreme Court itself noted that it's so far encountered only three such statutes—and acknowledged the Price–Anderson Act is not among them. *See id.* at 8–9, 123 S.Ct. 2058.

Without help from the main authority on which they stake their claim in this appeal, the defendants seek support from other Supreme Court decisions suggesting that "the federal government has occupied the entire field of nuclear safety concerns." Appellees' Br. 27 (citing *PG & E Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 212, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *English v. Gen. Elec. Co.,* 496 U.S. 72, 82, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 249, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)). But the panel in the first appeal already explained why and how the defendants overread these decisions and we see no reason or authority that might allow us to deviate from its *1098 explanation. *See Cook,* 618 F.3d at 1143–44 & n. 17. As the first panel explained, these

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

cases recognize that Congress has authorized the federal government alone to promulgate before-the-fact nuclear safety regulations but—at the same time—has done little to forbid states from indirectly regulating nuclear safety through the operation of traditional after-the-fact tort law remedies. So, for example, in *Silkwood* the Supreme Court explained that "Congress' decision to prohibit the states from regulating the safety aspects of nuclear development" did nothing to undermine the "ample evidence that Congress had no intention of forbidding the states from providing [traditional tort] remedies." *464 U.S. at 250–51, 104 S.Ct. 615*. Indeed, the Court expressly acknowledged that "the discussion preceding [the Price–Anderson Act's] enactment and subsequent amendment indicates that Congress assumed that persons injured by nuclear accidents were free to utilize existing state tort law remedies." *Id.* at 251–52, 104 S.Ct. 615 (footnote omitted). Neither is this arrangement remotely unusual. Often Congress entrusts before-the-fact regulation to a federal agency while leaving at least some room for after-the-fact state law tort suits. It has done so in the field of motor vehicle safety. *See, e.g., Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 867–68, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). It has done so in the field of medical devices. *See, e.g., Caplinger v. Medtronic, Inc.,* 784 F.3d 1335, 1337–38 (10th Cir.2015). And all the statutory evidence before us suggests it has done the same thing here.

Lacking any Supreme Court precedent to support their atextual result, Dow and Rockwell are left to lean on cases from other circuits. But like *Neztsosie,* most of these

decisions just don't address the question before us. One case on which the defendants place great emphasis simply says that "[t]he PAA is the exclusive means of compensating victims for any and all claims arising out of nuclear incidents." *In re Hanford Nuclear Reservation Litig.,* 534 F.3d 986, 1009 (9th Cir.2007). But precisely no one disputes this beside-the-point point. The issue before us isn't what happens in the event of a nuclear incident, but (again) what happens in the face of a lesser occurrence. A pair of later Ninth Circuit cases come closer to the mark, holding that "*any* suit *seeking* compensation for a nuclear incident is preempted by the Act." *Dumontier v. Schlumberger Tech. Corp.,* 543 F.3d 567, 571 (9th Cir.2008) (second emphasis added); *see also Golden v. CH2M Hill Hanford Grp., Inc.,* 528 F.3d 681, 683–84 (9th Cir.2008) (same). But by way of support for this notion they cite only *Hanford's* holding that the Act is the exclusive means of compensating victims of nuclear incidents, offering nothing to explain how or why the Act might preclude relief in cases involving lesser occurrences.

Perhaps the only case the defendants cite that much helps them is *Cotroneo,* a split decision from the Fifth Circuit. There the majority did find for the defendants but in doing so failed to identify any provision of the Act that expressly preempts and precludes state law claims in the absence of a nuclear incident. Instead, the court reasoned more generally that to allow parties to recover under state law for lesser occurrences would "circumvent the entire scheme governing public liability actions." *639 F.3d at 197.* Of course, this seems a good bit like an implied preemption

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

argument—a suggestion that state suits offend some underlying statutory policy, not any express statutory language—and thus an argument Dow and Rockwell appear to have disclaimed in this appeal. *See supra* at 1092–93. But even on its own terms, we have as much difficulty with this argument as Judge Dennis did in dissent, for we fail to discern how our reading of the Act "circumvents" anything. *See Cotroneo,* **\*1099** 639 F.3d at 200–02 (Dennis, J., concurring in part and dissenting in part). As we've seen, there's nothing inconsistent about a statutory scheme that provides federal jurisdiction over certain claims to ensure their streamlined processing—and that includes special rules like liability caps for a subset of those claims involving nuclear incidents—while permitting claims involving lesser occurrences to proceed to decision under preexisting state law principles. If anything and again, it's the alternative interpretation of the statute—as foreclosing small claims while guaranteeing larger ones—that appears a good deal less likely in light of the Act's language, structure, and history.[3]

---

[3]   If we were to adopt the defendants' interpretation of the Act as barring any recovery in cases involving lesser nuclear occurrences, the plaintiffs contend we would encounter a serious constitutional problem. As a matter of due process, they argue, Congress cannot eliminate longstanding common law rights without providing any "reasonable alternative remedy" unless there is a "compelling" reason to do so. *PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 93–94, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (Marshall, J., concurring). This is of course no trivial argument, but because we find the defendants' reading of the statute unconvincing on its own terms it is also one we happily need not reach or resolve.

## III

[5]   Unpersuaded that the Act preempts and precludes a state law nuisance claim when a nuclear incident is asserted but unproven, we arrive at the second question presented in this appeal: does this court's mandate in the first appeal require much the same result anyway? On remand, the plaintiffs acknowledged that this court identified errors of federal law in the district court's jury instructions and a judgment under the Price–Anderson Act was no longer possible. But, they argued, this court identified no error associated with their state law nuisance verdict and so nothing prevented the district court from entering a new judgment on their state law nuisance verdict standing alone. Dow and Rockwell replied that, even putting aside their inventive preemption argument, this court's mandate in the first appeal precluded the plaintiffs' proposed course. And, again, the district court agreed with them. But how might this be? As we've seen, the defendants don't suggest that the first panel considered the preemption argument they now offer, adopted it, and ruled the plaintiffs' state law claim precluded on this basis: much to the contrary, the defendants insist that this court *didn't* address their field preemption argument in the first appeal. *See supra* at 1093. So what exactly is it in the first panel's decision that prohibited the district court on remand from entering judgment on the plaintiffs' state law nuisance claim? Dow and Rockwell offer two theories.

## A

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

They begin by suggesting that the first panel "explicitly disapproved of the nuisance theory presented at trial under Colorado law." Appellees' Br. 44. Here, then, it turns out we confront a comparatively modest argument about Colorado state nuisance law and this court's treatment of it in the first appeal. In the defendants' view, the plaintiffs are not entitled to a judgment on the existing nuisance verdict because this court found the nuisance theory presented at trial legally erroneous under Colorado law. As modest as it is, though, the argument is no more successful for it. Far from "disapproving" the plaintiffs' state law nuisance theory, the panel in the first appeal held that "[t]he jury was properly instructed on the elements of a nuisance claim." **1100 *Cook,* 618 F.3d at 1145. Just the opposite of what the defendants contend.

Neither does the defendants' argument get any better when you try to untangle its many and stringy particulars. When it came to state nuisance law in the first appeal, the defendants spent most of their time attacking a district court pretrial order the parties refer to as *Cook IX. See* Appellants' Opening Br. at 4861, *Cook,* 618 F.3d 1127 (Nos. 08–1224, 08–1226, 08–1239) (citing *Cook v. Rockwell Int'l Corp. (Cook IX),* 273 F.Supp.2d 1175, 1201–08 (D.Colo.2003)). In that pretrial order the district court suggested that a plaintiff's individualized anxiety or fear might be enough on its own to give rise to a nuisance claim in Colorado. And this court in the first appeal did indicate that the district court's understanding on this point was in error. *Cook,* 618 F.3d at 1145–46. But by the time of the first appeal, nothing turned on *Cook IX's* pretrial discussion. By then a trial had taken place

and the district court had issued jury instructions on the elements of Colorado nuisance law. And it's the law as instructed to the jury, not the law as discussed in tentative pretrial opinions, that matters. *See Lederman v. Frontier Fire Prot., Inc.,* 685 F.3d 1151, 1155 (10th Cir.2012) (explaining that after trial the relevant inquiry is "whether the jury was misled in any way and whether it had an understanding of the issues and its duty to decide those issues" (brackets omitted)).

When it comes to the consequential jury instructions, moreover, not only did this court expressly hold them proper, it did so for good reason. The defendants in the first appeal complained that language in Instructions 3.6 and 3.7 might suggest that "some increased health risk" was enough to sustain a state nuisance claim. But courts review jury instructions as a whole, not in "artificial isolation." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). And reading the instructions as a whole, it's impossible to understand them as authorizing a judgment for the plaintiffs based solely on "some increased health risk." The district court did tell the jury that increased health risk stemming from the defendants' damage to the plaintiffs' property could constitute a form of "interfere[nce]" with the plaintiffs' "use and enjoyment" of their property for purposes of state nuisance law. But Instruction 3.6 went on to say that the plaintiffs also had to prove that the degree of the defendants' interference was "both 'unreasonable' and 'substantial.'" Instruction 3.9 explained that an interference is "substantial" only if a "normal person in the community would find it offensive, annoying or inconvenient."

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

Instruction 3.10 added that to find an interference "unreasonable" the plaintiffs had to prove that "the gravity of the harm outweigh[ed] the utility of the conduct that caused it." And Instructions 3.11 and 3.12 set forth a series of factors for the jury to balance when conducting this analysis. Before finding liability, then, the jury had to weigh the overall social utility of the defendants' actions from an "objective perspective" and couldn't rely solely on individual plaintiffs' subjective fears and anxieties or the possibility of "some" increased health risk.[4] Given this, it is altogether unsurprising that the first panel held "[t]he jury was properly instructed on the elements of a nuisance claim as well as the definitions of 'substantial' and 'unreasonable.'" *Cook,* 618 F.3d at 1145.

[4] The only instruction that asked the jury to assess individual plaintiffs' subjective reactions was Instruction 3.28, which had nothing to do with the nuisance instructions that appeared in Instructions 3.6 through 3.17. If anything, its appearance *outside* the context of the court's nuisance instructions serves to underscore its absence *inside* that context.

**\*1101** At this point you might wonder why the panel in the first appeal bothered to discuss and disapprove of the incorrect understanding of state nuisance law found in the *Cook IX* pretrial order when the panel expressly found the different formulation of state nuisance law embodied in the operative jury instructions entirely acceptable. The answer is both simple and sensible: even if the first panel could've avoided some of the issues briefed before it, it judged it "proper to nonetheless decide questions of law raised in this appeal that are certain to arise again ... on remand." *Id.* at 1142 n. 15. The panel was well aware that the plaintiffs might ask

the district court to apply the more forgiving *Cook IX* standard in further proceedings on remand and quite rightly sought to discourage that possibility, avoid fifteen more years of squabbling, and inch the case toward resolution by clarifying the guiding principles for remand on a range of issues the parties briefed to the court.

So we find ourselves looping back to where we began. This court never "expressly disapproved" the district court's Colorado law nuisance instructions. To the contrary, in the first appeal the defendants never meaningfully challenged the jury's instructions on state nuisance law and, in any event, this court expressly approved them. The only thing disapproved in the first appeal was an inoperative pretrial order. Neither did Dow and Rockwell dispute that the evidence presented at trial sufficed to support a common law nuisance verdict under the legally correct instructions the district court issued to the jury. So when it came to a state law nuisance claim, by the end of the first appeal there existed a properly instructed jury, legally sufficient evidence, and a favorable jury verdict—elements that usually guarantee a judgment for the plaintiffs, not preclude one. *See Lloyd v. Grynberg,* 464 F.2d 622, 625 (10th Cir.1972) ("The law is clear that an appellate court will not upset or disturb a jury verdict if the case has been submitted upon proper and adequate instructions and the verdict is supported by the evidence.").

**B**

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

At this point the defendants hold but one more card to play. They suggest that, whatever the first panel's intentions may have been, the language it used in its mandate barred the district court as a formal matter from entering a state law nuisance judgment on the basis of the existing jury verdict. Of course, the defendants can't offer any reason why the first panel's mandate should have operated this way. For example, they (again) don't contend that the prior panel considered the preemption question we've addressed and rejected the analysis we've given. And by this point they can't contend that the first panel found error in the district court's nuisance instructions or any other aspect of the nuisance verdict. So it is that the defendants ask us to suppose that the mandate precluded entry of a nuisance judgment on remand for no good reason, accidentally even.

We decline this invitation. "The scope of the mandate ... is carved out by exclusion: unless the district court's discretion is specifically cabined, it may exercise discretion on what may be heard." *Dish Network Corp. v. Arrowood Indem. Co.,* 772 F.3d 856, 864 (10th Cir.2014) (brackets omitted). And examining the mandate from the first appeal, we see nothing that "specifically" precluded the district court from entering a new judgment on a common law nuisance claim on the basis of the existing jury verdict. Rather, after rejecting the district court's understanding of what qualifies as a nuclear incident for purposes of the Price–Anderson Act, the panel's opinion ended this way: "[T]his court **REVERSES** and **REMANDS** the **\*1102** case to the district court. We **DIRECT** the district court to vacate the judgment and

conduct further proceedings not inconsistent with this opinion." *Cook,* 618 F.3d at 1153. It opened with identical language. *See id.* at 1133. By its plain terms, this language prevented the district court from entering a new judgment predicated on any erroneous understanding of the Price–Anderson Act. But beyond that the mandate didn't specifically prevent anything. Indeed, if anything its use of the double negative suggested that the district court was left with maximum room to maneuver on remand—expressly allowing the district court to undertake any proceedings "not inconsistent" with this court's opinion.

Nothing about this should come as a surprise. After a court of appeals vacates a judgment a district court on remand often will enter a new judgment in the same party's favor on the existing record if one can be had unaffected by the error found in the appeal. That's what happened in *Dish Network* when the district court entered a new order granting summary judgment after this court considered and rejected a previous order granting summary judgment on different grounds. *See* 772 F.3d at 865–66. That's what happens all the time after an appellate court reverses a judgment following a jury trial because of an error affecting one claim but not others and the district court proceeds to fashion a new judgment using only the portions of the existing verdict unaffected by that error.[5] We discern no reason why a different result should obtain here, where a judgment implicating the Act's protections is no longer possible but all the elements necessary for a judgment under state law are present and unaffected by any error identified in the first appeal, or on remand

790 F.3d 1088, 80 ERC 2172

for that matter.

5 *See, e.g., United States v. Hicks,* 146 F.3d 1198, 1200–01 (10th Cir.1998) (affirming district court's entry of judgment on unaffected counts after remand without necessity of new trial); *Reeder–Simco GMC, Inc. v. Volvo GM Heavy Truck Corp.,* 497 F.3d 805, 807 (8th Cir.2007) (recounting district court's entry of modified judgment on remand on unaffected claims following reversal by Supreme Court); *O'Hagan v. Soto,* 565 F.Supp. 422, 425–26, 429 (S.D.N.Y.1983) (noting that initial judgment as to question of liability survived subsequent vacaturs on question of damages); *Ponte v. Real,* 471 U.S. 491, 503 n. 4, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985) (Stevens, J., concurring in part) (collecting examples where judgment on federal claim is reversed but state law judgments are permitted to stand); *see also Harvey v. Richards,* 11 F. Cas. 740, 745 (C.C.D.Mass.1814) (Story, J.) ("At common law, if a plaintiff obtain a judgment in an inferior tribunal, which is reversed in the appellate court, it is very clear, that the reversal operates no further, than to nullify the original judgment.")

One wrinkle remains—though it's a wrinkle the defendants don't pursue and thus have waived any complaint about. *See United States v. Gama–Bastidas,* 222 F.3d 779, 784 (10th Cir.2000) (discussing the non-jurisdictional nature of the mandate rule). In one spot in the middle of its opinion the first panel explained its intentions a little differently, writing that "[b]ecause the jury was not properly instructed on an essential element of Plaintiffs' PAA claims [the definition of 'nuclear incident'], the verdict must be set aside and the case remanded for further proceedings not inconsistent with this opinion." *Cook,* 618 F.3d at 1142. Here alone the panel spoke of setting aside a verdict rather than just the judgment. But even if the defendants had pursued an argument based on this language, it's plain to us that the panel didn't mean to preclude the entry of a new judgment based on the existing state law nuisance verdict. The panel referred here only to the plaintiffs'

"PAA claims" and identified only an error of federal, not state, law (the lack of a "proper [ ] instruct[ion]" **\*1103** about the term "nuclear incident"). *Id.* There is no suggestion in this discussion or anywhere of an error in the state law aspects of the jury's verdict. Indeed, our understanding on this score is reinforced by the context in which this sentence appears: at the end and as a summary of the panel's discussion of the Price–Anderson Act and its nuclear incident requirement. This discussion is separate from the specifically captioned discussion of the plaintiffs' state law nuisance allegations that endorsed the district court's jury instructions. Finally, our conclusion is cemented by the language at either end of the opinion that makes no mention of any error in the nuisance verdict and discusses only a reversal of the judgment. In discerning the terms of an earlier court's mandate, some courts examine the whole of the opinion and some place particular stress on any language at the end or beginning summarizing the court's instructions.[6] Either way, all roads in this case lead to the same place: a conclusion that the first panel did not specifically preclude the district court from entering a new judgment predicated on an error-free state law nuisance verdict.

6 *Compare, e.g., Apponi v. Sunshine Biscuits, Inc.,* 809 F.2d 1210, 1217 (6th Cir.1987) (looking to "the entire opinion of the court"), *and Procter & Gamble Co. v. Haugen,* 317 F.3d 1121, 1126 (10th Cir.2003) (same), *with, e.g., Hicks v. Gates Rubber Co.,* 928 F.2d 966, 968–69 (10th Cir.1991) (focusing on the final paragraph), *and Gibson v. Worley Mills, Inc.,* 620 F.2d 567, 567 (5th Cir.1980) (per curiam) (referring to an opinion's "last paragraph" as "the mandate").

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

## C

Our concurring colleague sees a few things differently but, happily, we agree on the important things. We agree that the Price–Anderson Act does not preempt and preclude a freestanding state law nuisance claim when a nuclear incident is alleged but unproven. *See supra* Part II.B. We agree that the defendants' primary mandate argument—suggesting that the first panel expressly disapproved the plaintiffs' state law nuisance theory—is mistaken. *See supra* Part III.A. We even agree that the first panel's mandate, as a formal matter, can't be read to preclude the entry of a freestanding state law nuisance judgment. *See supra* Part III.B. To be sure, our colleague would remand the case for another trial on the plaintiffs' state law nuisance claim rather than permit the entry of a judgment now based on the existing nuisance verdict. But that's a pretty small distance between us. It's a distance, too, that stems only from slight differences in how we read the first panel's mandate: as we've explained we see nothing in the mandate specifically precluding entry of a judgment based on the existing nuisance verdict; the concurrence does, though it reads the mandate as allowing a second trial on the same claim.

Unfortunately, we cannot close that small gap remaining between us. For one thing, the concurrence doesn't explain how we might vacate the district court's judgment and send the case back for a new trial when the plaintiffs didn't ask for a new trial on remand and don't now. Neither do we see how we might remand for a new trial if, as the concurrence suggests, the plaintiffs' briefing in this appeal waived any complaint about the district court's mandate ruling. After all, that ruling held the plaintiffs' state law claims not "pursuable" and, if unchallenged, it would seem to supply a basis for affirmance, not reversal. For our part, of course, we do not believe that the plaintiffs waived any complaint about the district court's mandate ruling—indeed, the defendants have never suggested as much, and we are not inclined to pursue an argument for the defendants that they have not pursued for themselves. **\*1104** *See Cook,* 618 F.3d at 1138–39. Finally, we just don't see how the first panel's mandate "specifically" prohibited the entry of a judgment based on the existing nuisance verdict. Of course, the concurrence points to the wrinkle we've just discussed—language in the middle of the opinion suggesting the possibility of setting aside the jury's verdict, not just the judgment. But here again the concurrence would have us rest on a forfeitable argument that Dow and Rockwell haven't presented. And it would have us focus on language from the middle of an opinion—without reference to the language at the opinion's beginning or end, and without reference even to language in the surrounding paragraph that discusses errors only in the application of federal, not state, law. While we are aware of different views on the question whether an appellate mandate should be read to include only the formal instructional language at the beginning and end of an opinion or should be discerned in light of the whole of an opinion, *see supra* at 1103 n. 6, we are aware of no authority suggesting we should focus only on isolated language in the middle of an opinion.[7]

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

7   Even if the first panel opinion contains no express mandate requiring a new trial, the concurrence suggests we should draw the same message by inference from indirect evidence. But as we've seen, the mandate rule operates by exclusion and any avenue a court of appeals does not specifically foreclose remains available on remand. *See supra* at 1101–02. Beyond that, we are unable to agree with the inferences the concurrence draws from the indirect evidence it cites. The concurrence emphasizes the plaintiffs' repeated request that we "reinstate the verdict," arguing that it shows even the plaintiffs recognize our prior decision as having overturned the verdict on their state law nuisance claim. But the plaintiffs have consistently claimed that no error identified in the first appeal touched their state law claim, that nothing in the Act preempts that claim, and that there's nothing stopping a court from entering judgment on it now. We agree that it would have been more accurate to call this an argument for "reinstating the judgment based on an error-free verdict" rather than "reinstating the verdict." But the plaintiffs' imprecise wording surely cannot alter the scope of this court's mandate (or even obscure the nature of their remedial request). Neither are we able to agree with the significance the concurrence attaches to the first panel's decision not to address certain claims of error because they might not arise in the event of a new trial. We don't doubt it's possible the prior panel thought it likely the plaintiffs would want to seek the Act's benefits on remand and pursue a new trial under the Act. But a mandate isn't governed by what's in someone's head; it's governed by what's on the page. So an appellate court's inability to imagine every tactical decision a party may make months or years later on remand does not dictate the scope of the mandate written in its opinion. Neither, of course, did the first panel's decision to defer certain issues preclude the defendants from raising them on remand if they really thought them sufficient to bar entry of judgment on the existing nuisance verdict.

## IV

In the end, Dow and Rockwell appear to have persuaded even the plaintiffs that this case does not involve a nuclear incident within the meaning of the Price–Anderson Act—at least in light of the statutory construction the defendants urged and this court adopted in the first appeal. But that does not mean the defendants are insulated from any liability—or that the jury's verdict is a pointless piece of paper. In two separate appeals spanning many years the defendants have identified no lawful impediment to the entry of a state law nuisance judgment on the existing verdict. They have shown no preemption by federal law, no error in the state law nuisance instructions, no mandate language specifically precluding this course. No other error of any kind is even now alleged.

**\*1105** In this light, we can well understand why the plaintiffs on remand renounced a new trial and sought entry of a judgment based on the existing nuisance verdict. Indeed, without some specific mandate or identified error requiring so much we can imagine only injustice flowing from any effort to gin up the machinery of trial for a second pass over terrain it took fifteen years for the first trial to mow through. Injustice not only in the needless financial expense and the waste of judicial resources, but injustice in the human costs associated with trying to piece together faded memories and long since filed away evidence, the emotional ordeal parties and witnesses must endure in any retrial, the waste of the work already performed by a diligent and properly instructed jury, and the waiting—the waiting everyone would have to endure for a final result in a case where everyone's already waited too long, longer even than the lives of today's college graduates. When the district court receives this case it should proceed to judgment on the existing nuisance verdict promptly, consistent with resolving the outstanding class action question, wary of arguments that have already been rejected or forfeited. This long

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

lingering litigation deserves to find resolution soon. The judgment of the district court is vacated and the case is remanded for proceedings consistent with this opinion.

MORITZ, Circuit Judge, concurring in the judgment.

I respectfully concur in the judgment. Unlike the majority, I conclude the panel in *Cook v. Rockwell International Corp.,* 618 F.3d 1127 (10th Cir.2010) (*Cook I* ) left no portion of the jury's verdict intact, so I would affirm the district court's determination that the mandate rule precludes "reinstatement" of any portion of the judgment. But because the *Cook I* panel remanded all of the claims before it to the district court, I would hold that any state law nuisance claims remain pending requiring our consideration of the district court's alternative conclusion that the Price–Anderson Act ("PAA") preempted any independent state law nuisance claim.

On the PAA issue, I disagree with the majority's conclusion that the law of the case doctrine precludes the defendants' preemption argument. But I agree with the majority that the PAA does not preempt the plaintiffs' state law claims. And consistent with the majority's ultimate disposition, I would remand this case to district court. Finally, while the majority holds that an independent state law "verdict" survived *Cook I* and on remand the district court can simply reenter judgment on that verdict, I conclude otherwise. I would place the plaintiffs in the same position on remand as directed by the *Cook I* panel—with an opportunity to retry their remaining claim.

### *The plaintiffs waived any challenge to the district court's application of the mandate rule.*

Initially, the majority acknowledges that the district court entered alternative rulings: the PAA preempted the plaintiffs' claims and, in any event, the mandate rule precluded reinstatement of the verdict. Maj. Op. at 1092. Yet, the majority later downplays the defendants' mandate preclusion argument, referring to it as just another "card to play" Maj. Op. at 1101. But critically, although it is the plaintiffs and not the defendants who challenge the district court's ruling this time around, plaintiffs devote less than 50 words of their 60–page brief to the district court's alternative ruling. Moreover, their two-sentence commentary is confined to a footnote. Aplt. Br. at 25 n. 29.

I find this solitary footnote plainly insufficient to challenge the district court's application of the mandate rule. *See* **\*1106** *Hill v. Kemp,* 478 F.3d 1236, 1255 n. 24 (10th Cir.2007) (refusing to consider arguments raised in footnotes and characterizing them as "perfunctory"); *Hardeman v. City of Albuquerque,* 377 F.3d 1106, 1122 (10th Cir.2004) (concluding issues raised in a footnote and "unaccompanied by some effort at developed argumentation are deemed waived" (citation and internal quotation marks omitted)). Further, because the plaintiffs failed to challenge an independent and alternative ground for the district court's decision, I would affirm the district court's

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

judgment on this issue without considering plaintiffs' asserted challenge. *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 877 (10th Cir.2004) (refusing to address plaintiff's challenge to summary judgment ruling because plaintiff failed to challenge alternative grounds for district court's ruling; thus, plaintiff could not prevail even if successful on challenged ruling).

### *The majority redefines the remedy sought by the plaintiffs.*

Even if the plaintiffs' short footnote adequately challenged the district court's alternative ruling, I would uphold the district court's conclusion that the mandate rule prohibited it from "reinstating" any freestanding state law nuisance verdict the jury may have rendered. But before discussing this issue it is helpful to clarify a confusing aspect of the majority's opinion.

In reversing the district court the majority relies on a rationale never argued by the plaintiffs. In the district court and on appeal, the plaintiffs plainly and consistently recognized that the *Cook I* mandate vacated any independent state law nuisance verdict.[1] As discussed in-depth below, on this point the plaintiffs and I agree—the *Cook I* mandate nullified the entire jury verdict. Where I depart from the plaintiffs' position is in considering their argument—made solely in their reply brief—that the district court had the power to reinstate that verdict.

Consistent with that request, on appeal the plaintiffs' repeatedly argue for reinstatement of *the verdict,* not the judgment. Aplt. Opening Br. at 7, 25, 28, 33, 36, 41, 49 (stating the plaintiffs asked for reinstatement of the jury verdict and arguing a reinstatement of the jury verdict is possible); Aplt. Reply Br. at 21, 25, 27, 28 (same).

The majority, however, departs from the plaintiffs' briefing one step earlier. Presumably recognizing the flawed nature of the plaintiffs' assertion, the majority holds the *Cook I* panel did not vacate any state law verdict. Instead, according to the majority, the state law nuisance verdict somehow *survived* the *Cook I* panel's mandate ordering that "the verdict" be set aside, "the case" reversed and remanded, and "the judgment" vacated. And, the majority concludes, because that verdict was "unaffected by any error" found in the appeal, it was poised for the district court to reenter judgment on the verdict on remand. Maj. Op. at 1102.

While at first glance, this may seem a matter of semantics, the majority's new approach is both significant and essential to its ultimate disposition. When this disposition is coupled with the majority's direction to "proceed to judgment on the existing nuisance verdict promptly"—it requires the district court on remand to enter judgment for the plaintiffs on their state law nuisance claim. Maj. Op. at 1104–05.

For the reasons developed below, the district court properly rejected the plaintiffs' flawed argument. My point here is simply to note that by ignoring their argument and manufacturing a new one, the **\*1107** majority implicitly rejects the plaintiffs' only argument on appeal. Regardless, I have

---

1   Following this court's remand in *Cook I,* the plaintiffs sought "reinstatement *of the jury's verdict* " and then entry of judgment based on that verdict. Jnt. Status Rpt. at 1, Aug. 7, 2012, ECF No. 2326 (emphasis added).

addressed below my reasons for rejecting both the plaintiffs' argument and the majority's entirely distinct rationale.

### The district court lacked any authority to reinstate a jury verdict vacated by the Cook I panel.

Setting aside for the moment the majority's rationale, I find fundamentally flawed the plaintiffs' argument that the district court could reinstate a vacated verdict.[2] Simply stated, if the *Cook I* mandate vacated the verdict (and as discussed in the next section, I agree that it did), then the district court on remand lacked any authority to enter judgment on a verdict absent a new trial and new verdict.

[2]  As previously noted, the plaintiffs' opening brief contains essentially no argument regarding the district court's mandate ruling, resulting in their failure to challenge that alternative ruling. In their reply brief, plaintiffs argue the vacated verdict could be reinstated. Generally, arguments not made until a reply brief are waived. *See United States v. Wayne,* 591 F.3d 1326, 1336 n. 9 (10th Cir.2010). Nevertheless, I consider the plaintiffs' tardy argument in the interest of fully vetting the issues presented.

The plaintiffs assert that unless the panel's mandate specifically prohibited reinstatement of the jury's verdict, the district court possessed authority to reinstate it. In support, they rely primarily on authorities that concern resentencing after a remand. *See* Aplt. Reply Br. at 26. But the plaintiffs overlook a critical distinction between a vacated sentence and a vacated jury verdict—namely, the fact-finder on remand. When an appellate court remands a case for resentencing after vacating a

sentence, it's as if the sentencing never occurred and the judge, as the arbiter of the resentencing, begins again. *See United States v. Keifer,* 198 F.3d 798, 801 (10th Cir.1999). In contrast, when an appellate court remands a case after vacating a jury verdict, it's as if the case had never been tried and the jury, as the arbiter of culpability, decides the outcome. *Cf. Wheeler v. John Deere Co.,* 935 F.2d 1090, 1096 (10th Cir.1991) (noting that a prior panel's reversal of the verdict meant "the first verdict became null and void in its entirety"). Tellingly, the plaintiffs cite no authority indicating that after an appellate court nullifies a jury verdict, a district court can reenter a verdict without the benefit of a jury's fact-finding.

Accordingly, addressing only the challenge arguably raised by the plaintiffs, I would hold that the district court properly concluded it lacked any power to reinstate a verdict vacated by this court. *See Estate of Whitlock v. C.I.R.,* 547 F.2d 506, 509–10 (10th Cir.1976) (noting a district court is powerless to do anything "contrary to the letter or spirit of the mandate as construed in light of the opinion deciding the case").

### Neither the record nor the law supports the majority's novel approach.

Finally, even if the plaintiffs had challenged the district court's mandate ruling and had raised the theory now espoused by the majority, I would nevertheless disagree with the majority's decision. My core dispute with the majority is simple. The majority concludes that when a panel of this court is

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

unaware that claims are before it and does not affirmatively find error, the panel essentially affirms such verdicts by default and leaves them in limbo, awaiting only the district court's blessing through a reentry of some portion of the judgment. I conclude that when a panel of this court is unaware claims are before it and makes clear in its opinion that the entire case is remanded for a new trial, the panel has in fact done what it intended to do—remand the entire case.

## *1108 The majority's approach relies upon several faulty presumptions.

Although not readily apparent, much of the majority's analysis relies upon the assumption that the verdict rendered by the jury in this case was severable. And the majority further assumes that when the *Cook I* panel directed the district court to "vacate *the judgment,*" the panel vacated only part of the verdict—i.e., the verdict as it related to the PAA nuisance and trespass claims. The majority opinion further presumes that the panel somehow left intact (or "error-free," as the majority characterizes it) any independent state law nuisance verdict. Maj. Op. at 1101–02. Thus, while the majority apparently recognizes that a district court has no authority to reinstate a jury's *verdict* once that verdict has been vacated, it declares that wasn't necessary here because a portion of the verdict was "unaffected by any error" and the district court merely needed to reinstate that portion of *the judgment.* Maj. Op. at 1102.

As I've noted, the majority's interpretation of *Cook I* conflicts even with what the

parties understood the mandate directed. But more critically, nothing in *Cook I* indicates the panel found "the verdict" severable or that it intended to affirm or preserve as error-free *any* portion of the jury's verdict. Instead, the language and structure of the opinion, which must inform what the mandate directed, leads to the opposite conclusion.[3] *Cherokee Nation v. Oklahoma,* 461 F.2d 674, 677–78 (10th Cir.1972) (stating a lower court should look to the opinion itself to "ascertain the intent of the mandate").

[3]  While I endeavor to demonstrate in these few pages why the panel's direction to reverse and remand "the case" and "vacate the judgment" was a clear mandate to vacate the entire verdict, the panel's opinion speaks for itself and a careful reading of the opinion best demonstrates this conclusion. In particular, I would direct the reader to the *Cook I* panel's ultimate holding on page 1142 directing the "verdict [ ] be set aside and the case remanded for further proceedings not inconsistent with this opinion" and to footnote 15 immediately following the first sentence of the next section, recognizing that all that follows is dicta, provided for guidance on remand. 618 F.3d at 1142 & n. 15.

## The defendants appealed *all* of the plaintiffs' claims.

Before discussing the language in *Cook I* the majority relies upon in concluding a portion of the verdict remained error-free, I first consider something *not* found in the majority opinion that is essential to understanding the scope of the mandate—i.e., a discussion of the issues and claims the parties placed before the *Cook I* panel. That discussion, of course, begins with consideration of the decision appealed from.

*Cook v. Rockwell Intern. Corp.*, Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

Here, the parties do not dispute that the verdict rendered by the jury on February 14, 2006, included both the PAA claims and state law claims. Nor do they dispute that the district court granted summary judgment on the entire verdict in its June 2, 2008, "Final Judgment." *See* Final Judgment at 3, *Cook I,* 618 F.3d 1127 (10th Cir.2010) ("The claims for relief as to which final judgment is hereby entered include *all claims* by Plaintiffs in this action arising from prospective invasions of their interests in land pursuant to the Price–Anderson Act, 42 U.S.C. § 2210[and] *Colorado law....*" (emphasis added)). Similarly, the parties do not dispute that the defendants appealed from the Final Judgment of June 2, 2008, and that in doing so they expansively identified that "Judgment" to include any and all claims on which final judgment was entered. Moreover, the defendants challenged the entire verdict on both state and federal grounds. Thus, the defendants clearly placed the entire verdict before the Cook I panel, not just some part of the verdict.

**\*1109 The *Cook I* panel addressed in dicta some of the issues related to the state law claims, but did so explicitly and solely for purposes of guidance on remand.**

With that understanding, it becomes clear that if, as the majority suggests, the *Cook I* panel vacated only a portion of the verdict and somehow left intact severable and independent verdicts on state law claims, the panel would have been required to reach a

holding on any appellate arguments impacting those verdicts. Instead, the panel did *just the opposite.* On page 1142, the panel concludes the binding portion of its opinion with the following paragraph:

> Because the jury was not properly instructed on an essential element of Plaintiffs' PAA claims, *the verdict* must be set aside and the case remanded for further proceedings not inconsistent with this opinion. 618 F.3d at 1142 (emphasis added).

After reaching this decision, the panel proceeded to consider several additional issues, including a discussion of substantive state law issues the majority relies on here. Importantly, the *Cook I* panel neither suggested nor implied that it considered these additional issues because they pertained to some portion of the challenged verdict that it had not disposed of by setting aside "the verdict." Instead, it explicitly indicated otherwise, noting in a footnote following the first sentence of dicta that it provided the remaining discussion for guidance on remand:

> While this court's ruling that Plaintiffs must establish the existence of a nuclear incident as a threshold element of their claims independently warrants remand, it is proper to nonetheless decide questions of law

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

raised in this appeal *that are certain to arise again in the event of a re-trial* [sic] *in order to guide the district court. Id.* at 1142 n. 15 (emphasis added).

Thus, all of the remaining issues the panel chose to address were addressed solely because they involved questions of law certain to arise on retrial.

The majority makes much of the *Cook I* panel's conclusion "expressly" finding the nuisance jury instructions proper. Maj. Op. at 1100. But like everything else that came after page 24 of *Cook I,* that discussion was dicta. As such, it was unnecessary to the only holding in the case—that the jury was not properly instructed on the PAA claim. *See Thompson v. Weyerhaeuser Co., 582 F.3d 1125, 1130 (10th Cir.2009)* (explaining "dicta" as a statement "not necessarily involved nor essential to the determination of the case at hand" (citations and internal quotation marks omitted)).

In finding that any verdict on the state law nuisance claim was error-free, the majority downplays the *Cook I* panel's conclusion that the district court erred in *Cook v. Rockwell International Corp., 273 F.Supp.2d 1175, 1195 (D.Colo.2003)* (*Cook IX* ) by holding that nuclear material is a nuisance if it "disturbs the plaintiff's comfort and convenience, including his peace of mind." *Cook I, 618 F.3d at 1145.* The majority characterizes this finding as inconsequential, reasoning the *Cook I* panel included it only because "the plaintiffs might ask the district court to apply the more forgiving *Cook IX* " standard on remand.

Maj. Op. at 1101. In short, because this discussion doesn't support its conclusion regarding an "error-free" state law nuisance verdict, the majority recognizes it as dicta.

In sum, while the *Cook I* panel's dicta didn't disapprove of the nuisance instructions, it also plainly didn't find the trial to have been error-free as to that claim.

**\*1110 The panel left unresolved several issues relating to the state law claims because they would arise on remand.**

The majority's opinion auspiciously overlooks another critical conclusion in *Cook I* confirming the scope of *Cook I's* mandate—the panel's explicit decision to decline to address significant evidentiary issues raised by the defendants that pertained to the state law verdicts the majority now says remained error-free. I am referring here to the *Cook I* panel's statement after completing its review of legal issues for guidance purposes:

> The court declines to reach Defendants' evidentiary challenges to Plaintiffs' trial references to the government's indemnity obligations or the Department of Energy's failure to fully comply with discovery. *Because the case must be remanded on other grounds, the court need not address whether the district court abused its discretion with*

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

*respect to evidentiary issues that may not arise during a new trial.* Likewise, the court will not address Defendants' challenge to the district court's post-trial award of prejudgment interest. This issue may not arise on remand, and if it does, any error can easily be rectified in a future appeal without necessitating a new trial. *Cook I,* 618 F.3d at 1152 (emphasis added).

Unquestionably, the panel here was referring to the defendants' appeal argument that two erroneous evidentiary rulings tainted *the entire verdict*—not just the PAA portion of the verdict. Specifically, the defendants alleged the district court abused its discretion in permitting the plaintiffs to point out to the jury "early and often" that the federal government had an obligation to indemnify Rockwell and Dow. Defendants Br. at 102, *Cook I,* 618 F.3d 1127 (10th Cir.2010) (No. 08–1224). The defendants further asserted that the district court erred in repeatedly allowing the plaintiffs to suggest that the federal government concealed from them and the public evidence indicating the existence of a problem at Rocky Flats, inculpating the defendants by proxy. *Id.* at 106–113.

The *Cook I* panel's explicit decision to pass on these significant evidentiary challenges makes sense *only* if the panel reversed the entire jury verdict. Stated another way, even if the majority is technically accurate that any state law nuisance verdict was untainted

by any error found in *Cook I,* that was *not* because the panel affirmed or preserved some portion of the verdict as error free. Instead, the panel *intentionally* declined to examine all the assertions of error because it had already vacated the entire verdict and it explicitly elected not to address evidentiary arguments that might not arise in a new trial.

**The plaintiffs' opportunity to correct the opinion or alter the mandate has long since passed.**

Finally, the majority suggests that a district court on remand can enter judgment for the same party on different grounds and that "happens all the time." Maj. Op. at 1102. But in my view, the cases the majority cites have no relevance here. None of those cases permit a district court, when a jury's verdict has been vacated and the entire case remanded for a new trial, to "reinstate" any portion of the verdict. Nor do any of those cases stand for the proposition that when an appellate court vacates a verdict but considers for guidance purposes issues that may arise on retrial, a district court may consider portions of the verdict to which these issues pertain to be error-free.

Accepting my premise that the *Cook I* panel vacated the entire verdict, the plaintiffs' remedy becomes clear. And this **\*1111** remedy truly is one that parties rely upon all the time, although it is not a remedy the district court could provide. Rather, if the jury rendered severable and independent verdicts on the plaintiffs' state law claims and the *Cook I* panel inadvertently or otherwise set aside those verdicts, the

Cook v. Rockwell Intern. Corp., Nuclear Reg. Rep. P 20,757 (2015)

790 F.3d 1088, 80 ERC 2172

plaintiffs had a *very* simple means of correcting that misunderstanding and preserving such substantial claims. Namely, the plaintiffs could have filed a motion for rehearing or clarification of the mandate before the mandate became final. *See* Fed. R.App. P. 40(a)(2) ("The petition [for rehearing] must state with particularity each point of law or fact that the petitioner believes the court has overlooked...."); 10th Cir. R. 40.1; *see also Abel v. West,* 932 F.2d 898, 898–99 (10th Cir.1991) (modifying dispositional language of a prior opinion on "petition for writ of mandamus or an alternative for clarification of mandate"). Or, after the mandate became final, they could have filed a motion to amend the mandate. 10th Cir. R. 41.2 (providing for motion to recall mandate).

But the plaintiffs never sought to correct the panel's decision setting aside the verdict. Nor did they challenge the panel's decision to provide only guidance on remand for some issues and to avoid others despite the relevance of these issues to their state law claims. Instead, the plaintiffs waited until all of their numerous post-appeal efforts to reverse *Cook I* had been exhausted and they had returned to the district court to seek "reinstatement" of a portion of the jury's verdict—a remedy that the district court was powerless to provide. *See Briggs v. Penn. R.R. Co.,* 334 U.S. 304, 306, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948) (discussing that absent the aggrieved party successfully "mov[ing] to amend the mandate," a lower court is powerless to go beyond the mandate's terms).

*On remand the PAA would not preclude plaintiffs from retrying their state law nuisance claim.*

Because I conclude the *Cook I* mandate remanding the entire case precluded the district court from granting the plaintiffs' request to reinstate the state law verdict, I would also address whether the defendants' PAA preemption argument precluded the nuisance claim from being retried.

In this regard, I disagree with the majority's initial conclusion that the preemption issue is controlled by the law of the case. The law of the case doctrine does not apply to dicta and the *Cook I* panel's footnote indicating the defendants had not made a field preemption argument is dicta. *See In re Meridian Reserve, Inc.,* 87 F.3d 406, 410 (10th Cir.1996) (noting dicta is not subject to the law of the case doctrine). Moreover, the law of the case applies only to an "actual decision." Wright and Miller, *Federal Practice and Procedure* § 4478 (2d ed.). Because the *Cook I* panel did not pass on whether the PAA preempts independent state law claims, I would hold the law of the case doctrine does not apply.

Accordingly, I would reach the issue of the preemptive effect of the PAA. And on this issue, I agree with the majority's resolution and I would hold the plaintiffs were not precluded from retrying their nuisance claim and remand the case for further proceedings.

*Conclusion*

The *Cook I* mandate remanded the entire

790 F.3d 1088, 80 ERC 2172

case for a new trial, leaving no portion of the jury's verdict intact. Thus, the district court on remand was powerless to reinstate any part of that verdict or the judgment on that verdict. While the mandate precluded the plaintiffs' desired remedy on remand—i.e., the verdict's reinstatement—the district court's proper rejection of that remedy did not alter the fact that **1112** the *Cook I* panel had remanded the plaintiffs' state law nuisance claim and that claim remained pending even after the plaintiffs dismissed their PAA claims. The potential for retrial of the nuisance claim requires consideration of the district court's alternative ruling that the PAA preempted the plaintiffs' state law claims. On that issue I disagree with the majority's conclusion that the law of the case precluded the defendants' preemption argument. But consistent with the majority, I would reject that argument.

In the end, I would remand this case to the district court where the plaintiffs will be in the same position mandated by the *Cook I* panel—with the potential to retry their remaining state law nuisance claim.

## All Citations

Nuclear Reg. Rep. P 20,757, 790 F.3d 1088, 80 ERC 2172

---

End of Document                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.