# Exhibit 12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-00181-JLK

---

MERILYN COOK, *et al.*,

Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

Defendants.

---

**DECLARATION OF PROFESSOR CHARLES SILVER ON THE REASONABLENESS OF CLASS COUNSEL'S REQUESTED AWARD OF ATTORNEYS' FEES**

---

I, Charles Silver, declare as follows:

## I. SUMMARY OF OPINIONS

1. This case is unique.

- By age, it ranks in the top one-hundredth of one percent of all cases and is the longest-lived class action of which I know.
- In terms of recovery, it also ranks in the top one percent.
- In having had a class certified for litigation (rather than for settlement only) and been tried to a successful jury verdict, it falls into a tiny minority of the cases once again.
- In having persevered in the face of an adverse ruling from the Tenth Circuit that seemed to have gutted the case, and ultimately convincing that same court that the jury verdict on the Colorado nuisance claim was proper.

By virtue of combining all of these features, this class action is literally in a category of its own.  I feel lucky to have learned about this lawsuit and privileged to submit a report in support of Class Counsel's application for fees.

2.      It is clear that Class Counsel bore enormous costs and risks, and did so for an extraordinary amount of time.  When thinking about the amount that Class Counsel should receive in fees, a central question is how much Class Members would rationally have agreed to pay Class Counsel to embark on this venture had face-to-face bargaining occurred 27 years ago, when Class Counsel commenced litigation on their behalf.

3.      The market for legal services in which sophisticated clients hire lawyers on contingency to handle large commercial cases provides the best evidence with which to answer this question.   Although this market has never been surveyed comprehensively, enough is known to say with certainty that sophisticated clients normally pay 33-40 percent of their recoveries as fees, even in cases with enormous financial stakes.  Even higher fees are sometimes paid in some kinds of cases, such as patent litigation and medical malpractice  There is also evidence that fees at the high end of this range tend to prevail when lawyers bear litigation costs, as Class Counsel did here, and when lawsuits progress into advanced stages of litigation, as this one also did.

4.      I therefore conclude that Class Counsel's request for 40 percent of the recovery as fees is fair and reasonable.

## II.    CREDENTIALS

5.      In this Declaration, I offer my perspective as an expert on class actions, attorneys' fees, and legal ethics, subjects I have studied and written about for years.  My résumé appears below in Appendix A.

6.      I have testified as an expert on attorneys' fees many times.  Judges have cited or relied upon my opinions when awarding fees in the following major cases, as well as many smaller

ones: *In re: Urethane Antitrust Litigation*, No. 04-1616-JWL, 2016 WL 4060156 (D. Kan. July 29, 2016) ($974 million recovery); *San Allen, Inc. v. Buehrer, Administrator, Ohio Bureau of Workers' Compensation*, (Ohio Common Pleas—Cuyahoga County, 2014) (recovery of $420 million); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012) ($200 million recovery); *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) ($410 million recovery); *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($7.2 billion recovery); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (recovery in excess of $1 billion).

7.      Professionally, I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media.  I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.  I received tenure in 1991.  Since then I have been a Visiting Professor at the University of Michigan School of Law, the Vanderbilt University Law School, and the Harvard Law School.

8.      From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's Principles of the Law of Aggregate Litigation (2010).  Many courts have cited the Principles with approval, including the U.S. Supreme Court.

9.      I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for 30 years.  I have published over 80 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Declaration.  In 2015, two coauthors and I published a major study of fee awards in securities class actions in the Columbia Law Review.  Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An*

*Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371 (2015). My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996) and the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004), and the RESTATEMENT (THIRD) OF THE LAW OF RESTITUTION AND UNJUST ENRICHMENT. In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

10. Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field. For example, I am a coauthor of William T. Barker and Charles Silver, PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (LexisNexis Mathew Bender, Updated 2014). I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association. I have also taught the subject of legal ethics for years, including a specialized course titled Professional Responsibility for Civil Litigators that includes a good deal of material on aggregate lawsuits and lawyers' fees.

## III. DOCUMENTS REVIEWED

11. When preparing this Declaration, I was provided the items listed below, which, unless noted otherwise, were generated in connection with this case. I may have reviewed other items including, without limitation, cases, treatises, news reports, correspondence, and published scholarly works.

- Documents Related to the Settlement:
  - Settlement Agreement, dated May 18, 2016
  - Long Form Notice

- Dkt. No. 2396 – May 19, 2016 Order Certifying Settlement Class
  - Dkt. No. 2405 – Order Granting Plaintiffs' Unopposed Motion for Amendment or Correction of the Court's Order Certifying Settlement Class
  - Dkt. Nos. 2406 & 2407 – Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement, Approval of Proposed Plan of Allocation of the Settlement Fund, Approval of Proposed Forms and Manner of Notice to the Class, Approval of Proposed Claim Form, Appointment of Escrow Agent, Appointment of Settlement and Claims Administrator, and Approval of Proposed Schedule and Plaintiffs Memorandum in Support, plus exhibits thereto
  - Dkt. 2416 – Order Granting Preliminary Approval of Proposed Class Action Settlement, Preliminary Approval of Proposed Plan of Allocation, Approval of Proposed Forms and Manner of Notice to the Class, Approval of Proposed Claim Form, and Approval of Proposed Schedule
  - Dkt. 2417 – Order Appointing the Heffler Claims Group as Settlement and Claims Administrator
  - Dkt. 2417 – Order Appointing The Huntington National Bank as Escrow Agent
- Trial Documents (D. Colo., Case No. 90-cv-00181-JLK):
  - Dkt. No. 2117 – Completed Jury Verdict Form (2/14/2006)
  - Dkt. No. 2121 – Notice of Final Jury Instructions (2/16/2006)
- Published Opinions:
  - *Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468 (D. Colo. 1991) (*"Cook I")*
  - *Cook v. Rockwell Int'l Corp.*, 778 F. Supp. 512 (D. Colo. 1991) (*"Cook II")*
  - *Cook v. Rockwell Int'l Corp.*, 147 F.R.D. 237 (D. Colo. 1993) (*"Cook III")*
  - *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D. Colo. 1993) (*"Cook IV")*
  - *Cook v. Rockwell Int'l Corp.*, 161 F.R.D. 103 (D. Colo. 1995) (*"Cook V")*
  - *Cook v. Rockwell Int'l Corp.*, 907 F. Supp. 1460 (D. Colo. 1995) (*"Cook VI")*
  - *Cook v. Rockwell Int'l Corp.*, 935 F. Supp. 1452 (D. Colo. 1996) ("*Cook VII")*
  - *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473 (D. Colo. 1998) *("Cook VIII")*
  - *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175 (D. Colo. 2003) ("*Cook IX")*
  - *Cook v. Rockwell Int'l Corp.*, 358 F. Supp. 2d 1003 (D. Colo. 2004) ("*Cook X")*
  - *Cook v. Rockwell Int'l Corp.*, 233 F.R.D 598 (D. Colo. 2005) ("*Cook XI")*
  - *Cook v. Rockwell Int'l Corp.*, 428 F. Supp. 2d 1152 (D. Colo. 2006) ("*Cook XII")*
  - *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071 (D. Colo. 2006) ("*Cook XIII")*
  - *Cook v. Rockwell Int'l Corp.*, 564 F. Supp. 2d 1189 (D. Colo. 2008) ("*Cook XIV*")
  - *Cook v. Rockwell Int'l Corp.*, 618 F.3d. 1127 (10th Cir. 2010) ("*Cook Appeal I*")
  - *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015) ("*Cook Appeal II*")

- Briefing in connection with the motions pending in the District Court at the time of Settlement (D. Colo., Case No. 90-cv-00181-JLK):
    - Dkt. No. 2371 – August 26, 2015 – Plaintiffs' Notice of Filing a Corrected Motion for Entry of Judgment
    - Dkt. No. 2371 – August 26, 2015 – Exhibits 3-10 (*from* Docket No. 2367)
    - Dkt. No. 2372 – September 10, 2015 – Defendants' Response to Plaintiffs' Motion for Entry of Judgment
    - Dkt. No. 2373 – September 10, 2015 - Part One – Defendants' Opposition to Plaintiffs' Motion for Entry of Judgment – Class Cert
    - Dkt. No. 2374 – September 10, 2015 – Part Two – Defendants' Opposition to Plaintiffs' Motion for Entry of Judgment – Preemption – Exhibits 1-15
    - Dkt. No. 2375 – September 10, 2015 – Part Two – Defendants' Opposition to Plaintiffs' Motion for Entry of Judgment – Preemption – Exhibits 16-24
    - Dkt. No. 2376 – September 10, 2015 – Brief in Opposition to [2367] Motion for Judgment Part Four – Judgment Amount
    - Dkt. No. 2377 – September 10, 2015 – Brief in Opposition to [2367] Motion for Judgment Part Three – Unaddressed Trial Errors
    - Dkt. No. 2378 – September 10, 2015 – Defendants' Motion re Standards
    - Dkt. No. 2381 – October 23, 2015 – Plaintiffs' Reply in Support of Motion for Entry of Judgment and Response to Defendants' Part One – Class Cert
    - Dkt. No. 2382 – October 23, 2015 – Plaintiffs' Opposition to Defendants' Motion re Standards and Response to Defendants' Part Two – Standards
    - Dkt. No. 2383 – October 23, 2015 – Plaintiffs' Reply in Support and Response to Defendants' Part Three – Alleged Trial Errors
    - Dkt. No. 2384 – October 23, 2015 – Plaintiffs' Reply in Support and Response to Defendants' Part Four – Judgment Amount
    - Dkt. No. 2385 – October 23, 2015 – Exhibit
    - Dkt. No. 2386 – November 9, 2015 - Defendants' Reply to Response to Motion re Standards
    - Dkt. No. 2387 – November 9, 2015 – Defendants' Motion for Leave to File Supplemental Brief re Class Certification [2367]/Motion for Judgment
    - Dkt. No. 2388 – November 17, 2015 – Plaintiffs' Reply to Defendants' Motion for Leave to File Sur-Reply [DE2387]
- Supreme Court *certiorari* briefing in connection with *Cook Appeal II* that was pending at the time the settlement was reached
    - Docket – 15-791 (Defendants' Petition for *Certiorari*)
        - December 17, 2015 – Defendants' *Certiorari* Petition
        - March 4, 2016 – Plaintiffs' Brief in Opposition
        - May 2, 2016 – Defendants' Reply in Support of Cert Petition
    - Docket – 15-911 (Plaintiffs' Conditional Cross-Petition for *Certiorari*)
        - Plaintiffs' Cross-Petition
        - Defendants' Brief in Opposition to Plaintiffs' Cross-Petition
        - Plaintiffs' Cross-Petition Reply
        - May 18, 2016 – Agreed Motion to Dismiss the Case
        - May 19, 2016 – Order Dismissing the Case

## IV.    FACTUAL BACKGROUND

12.    The Court is thoroughly familiar with the history of this lawsuit, which is also fully described in the papers accompanying the motion for settlement approval, the motion for an award of attorneys' fees, and Lead Counsel Merrill Davidoff's declaration.  Consequently, for present purposes a brief sketch of the major developments will suffice.

13.    This lawsuit is 27 years old.  The Plaintiffs, who filed their complaint in 1990, are a class of owners of real property located near the former Rocky Flats weapons production facility. The Defendants are private contractors hired by the U.S. Government to operate the facility.

14.    The Plaintiffs asserted civil claims for nuisance and trespass arising under Colorado law and federal claims arising under the Price-Anderson Act.  They alleged that plutonium emissions from the facility interfered with the use and enjoyment of their property and impaired the value of their lands.

15.    In 1993, the Court certified a Property Class of persons and entities that owned land within a defined geographical area.  Several years of discovery and motions practice followed, including exchanges of numerous expert reports and the consideration of Defendants' motions to decertify the class, to exclude Plaintiffs' experts, and for summary judgment.

16.    The class trial took place over a four-month period spanning 2005 and 2006.  The jury heard testimony from forty-one lay and expert witnesses and viewed hundreds of exhibits. After deliberating for seventeen days, the jurors returned a verdict for the Plaintiffs on both the negligence and trespass theories, awarding $177 million in compensatory damages and $200 million in punitive damages.

17.    In 2008, the Court entered a partial final judgment on the jury verdict for $926 million, owing to the accumulation of prejudgment interest.  The Defendants appealed the final judgment and the Tenth Circuit reversed.  *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127 (10th Cir.

2010) ("*Cook Appeal I*").  Adopting a new argument raised by Defendants on appeal, the Tenth Circuit held that the Price-Anderson Act required proof of a "nuclear incident" above and beyond proof required under Colorado state law for a nuisance or trespass claim, and so found that the jury instructions were in error.  The Tenth Circuit also held that the jury instructions on punitive damages were in error, and that class certification had to be vacated because the District Court had not determined whether class certification was appropriate given the newly announced Price-Anderson Act requirement.  The Tenth Circuit did hold, however, that the instructions relating to the Colorado nuisance claim were correct.  The Plaintiffs' attempt to obtain Supreme Court review was unavailing.

18.     On remand, the Court addressed the issue of pre-emption of state law claims by the Price-Anderson Act and found that the claims were pre-empted.  The Plaintiffs appealed to the Tenth Circuit, which again reversed, this time in Plaintiffs' favor, finding that the District Court could reinstate the judgment on the Colorado nuisance claim.  *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015) ("*Cook Appeal II*").  The Defendants sought review in the Supreme Court, which Plaintiffs opposed.  Plaintiffs also asked the Supreme Court, if it agreed to review *Cook Appeal II*, to also review *Cook Appeal I*.

19.     A flurry of motions activity then occurred in this Court.  At the same time, the parties entered into mediation and the proposed settlement agreement that is now before the Court for approval was finally reached, just before a decision from the Supreme Court was due.

## V.     THE FEE AWARD SHOULD REFLECT LAWYERS' MARKET RATES

20.     In my academic writings, I have repeatedly urged judges to apply market rates when awarding fees out of common fund recoveries in class actions.  I did so in the first article I published after becoming a law professor and, much more recently, in an article I prepared for an academic conference on securities litigation earlier this year.  See Charles Silver, *A Restitutionary*

*Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1991) (hereinafter *Restitutionary Theory*); and Charles Silver, *The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions*, *presented at* the Fourth Annual Workshop on Corporate & Securities Litigation, Chicago, IL, Sept. 30-Oct 1, 2016, and *forthcoming in* Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds., RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION (2017) (hereinafter "*Mimic-the-Market Method*").   Altogether, I have espoused this view hundreds of times in published writings, conference presentations, live testimony, and expert witness reports.

21.    The reasons for mimicking the market are several.  I will briefly summarize them here.  First, class counsel's right to compensation arises under the law of restitution and unjust enrichment, and that body of law normally uses service providers' usual and customary charges as the measure of compensation.  The reason is simple.  Restitution operates in contexts where it is impracticable for parties to contract for payments in advance.  It then reasons that, had no impediment to contracting existed, a beneficiary and a service provider would have settled on the market rate because there would have been no reason for the former to pay more or for the latter to accept less.

22.    Second, market rates incentivize lawyers to represent class members zealously, as both Rule 23(a)(4) of the Federal Rules of Civil Procedure and the Due Process Clause require.  Again, the thinking is straightforward.  When sophisticated clients hire lawyers, they use fee formulas that encourage their attorneys to maximize the expected net value of their claims, that is, the amounts they expect to keep after deducting attorneys' fees and litigation costs.  Class members would want to achieve the same object if they were able to hire lawyers directly.  They cannot do so, however, so Rule 23 and the Due Process Clause fill the gap by requiring judges to incentivize

lawyers properly for them.  The mimic-the-market approach makes this task easy by providing an objective basis upon which the soundness of fee arrangements may be tested.  Arrangements like those used by sophisticated clients pass the test; all other arrangements fail.

23.     Third, the mimic-the-market approach guides judges' discretion and reduces the likelihood that improper considerations will influence the size of fee awards.  By itself, the multi-factor approach used in many circuits, including the Tenth, does neither.  As Judge D. Brock Hornby observed, the multi-factor approach "offers little predictability," "would support equally a fee award of 16%, 20%, 25%, 30%, or 33-1/3%," "is not a rule of law or even a principle," "allows uncabined discretion to the fee-awarding judge," employs "factors [that] seem inconsistent with … [the goal of] creat[ing] incentives for the lawyer to get the most recovery for the class by the most efficient manner," and "consume[s] significant lawyer and judicial resources."  *Nilsen v. York County*, 400 F.Supp.2d 266, 277-278 (D. Me. 2005).  Judge Frank Easterbrook, who sits on the Seventh Circuit, put the matter more succinctly, writing that "a list of factors without a rule of decision is just a chopped salad." *In re Synthroid Mktg. Litig*., 264 F.3d 712, 719 (7th Cir. 2001).  "[A]ny method other than looking to prevailing market rates assures random and potentially perverse results." *Id.*

24.     The mimic-the-market approach's potential to minimize the impact of the hindsight bias is especially important.  The hindsight bias is a known defect in human reasoning that causes people who know about actual outcomes to misestimate *ex ante* risks.  If allowed to operate, the hindsight bias would bias fee awards downward by causing judges to under-estimate litigation risks.  This would hurt class members by weakening their lawyers' incentives.  The mimic-the-market approach ensures that lawyers will represent class members zealously by focusing judges'

attentions on the terms that real clients actually use when hiring attorneys. Because those terms take account of ex ante risks correctly, desirable incentives are preserved.

25. Judge Easterbrook wrote about this problem in *Synthroid*:

> On remand the district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed). The best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees. They strike their bargains before work begins…. Only *ex ante* can bargaining occur in the shadow of the litigation's uncertainty[.]… [T]he court must set a fee by approximating the terms that would have been agreed to *ex ante*, had negotiations occurred.

*In re Synthroid Mktg. Litig.*, 264 F.3d at 718–19.

26. It is especially important to guard against the deleterious influence of the hindsight bias and other improper considerations in mega-fund cases. Again, the reasoning is straightforward. In the largest cases, two things are true: class members have the most at stake and, consequently, the most to lose when lawyers' incentives are mismanaged; and judges feel the greatest pressure to keep fee awards down. The mimic-the-market approach therefore has the most potential to ensure zealous representation in mega-fund cases, where there is reason to fear that judges would otherwise set fees too low.

27. In sum, the mimic-the-market approach has many advantages and no obvious downside. Because it requires judges to use market rates when awarding fees in class actions, it is easy to apply, objective, and ensures that lawyers will represent absent class members zealously. And because sophisticated clients routinely use percentage-based fees when hiring lawyers on

contingency, it frees judges from having to be fee auditors, too.  This may be why the mimic-the-market approach is rapidly gaining adherents.

## VI.    MORE AND MORE JUDGES ARE MIMICKING THE MARKET WHEN AWARDING FEES IN CLASS ACTIONS

28.    As mentioned, my 1991 article, *Restitutionary Theory*, introduced the idea that judges should mimic the market when awarding fees in class actions.  Thereafter, the idea quickly took root and spread.  Only a year or so later, the Seventh Circuit embraced this approach in *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 572 (7th Cir. 1992), where Judge Richard A. Posner wrote that "[t]he object in awarding a reasonable attorney's fee [from a class action settlement] ... is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." *See also id.* at 568 ("[I]t is not the function of judges . . . to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order.").[1]  Since then, Seventh Circuit judges adhering to this doctrine have awarded fees at market rates, even in class actions with large recoveries.  For example, in *Standard Iron Works v. ArcelorMittal et al.*, No. 08 C 5214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014), which settled for $164 million,

---

[1] Many Seventh Circuit cases support this rule.  *See, e.g.*, *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011) ("When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys."); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718–19 (7th Cir. 2001) ("We have held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.").  District Court decisions in the Seventh Circuit applying the mimic-the-market approach include *Beesley v. Intl. Paper Co.*, No. 3:06-CV-703-DRH-CJP, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) ("In common fund cases, 'the measure of what is reasonable [as an attorney fee] is what an attorney would receive from a paying client in a similar case.'"); and *Stumpf v. Pyod, LLC*, No. 12 C 4688, 2013 WL 6123156, at *1 (N.D. Ill. Nov. 20, 2013) (In a certified class action, "counsel is entitled to the fee that counsel would have received 'from a paying client in a similar case.'").

the district court found "that a 33% fee comport[ed] with the prevailing market rate for legal services of similar quality in similar cases."

29. The Second Circuit endorsed the principle of using market rates a few years later. In *Goldberger v. Integrated Resources, Inc*., 209 F.3d 43, 52 (2d Cir. 2000), it observed that "market rates, where available, are the ideal proxy for [lawyers'] compensation." The Second Circuit's only concern was the difficulty of "know[ing] precisely what fees common fund plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel." *Id*. This, of course, is an *endorsement* of the mimic-the-market approach, not a criticism. When the evidence supports a solid inference regarding the terms that would have been set in the market for legal services, the market rate should determine the fee.

30. Although no other circuit has formally adopted the mimic-the-market approach, a look at the cases reveals that district court judges everywhere take guidance from the market routinely. In *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1211 (S.D. Fla. 2006), a case from the Eleventh Circuit discussed in more detail below, Judge Alan Gold agreed that "the more appropriate measure of a reasonable percentage is the market rate for a contingent fee in commercial cases" and awarded a fee of 31.33 percent from a billion-dollar recovery. In the First Circuit, District Court Judge D. Brock Hornby has applied the mimic-the-market approach repeatedly, and has gained adherents among his brethren. *See Nilsen v. York County*, 400 F. Supp. 2d 266, 277-278 (D. Me. 2005) (endorsing market-based approach);[2] and *In re Cabletron Systems*,

[2] In addition to *Nilsen v. York County*, 400 F. Supp. 2d 266, 277-278 (D. Me. 2005), discussed in the text, Judge Hornby applied the mimic-the-market approach in *Scovil v. FedEx Ground Package System, Inc*., No. 1:10-CV-515-DBH, 2014 WL 1057079, at *5 (D. Me. Mar. 14, 2014); *In re New Motor Vehicles Canadian Export Antitrust Litigation*, 842 F. Supp. 2d 346 (D. Me. 2012); and *Prescott v. Prudential Ins. Co. of America*, No. 2:09-CV-00322-DBH, 2011 WL 6662288, at *2

*Inc. Securities Litigation*, 239 F.R.D. 30 (D. N.H. 2006) (Judge Smith) (following *Nilsen*). And in the Ninth Circuit, Judge Helen J. Frye took the market into account when awarding 40 percent of a $29.25 million partial settlement as fees *In re: Melridge, Inc. Securities Litigation*, No. CV 87-1426-FR (D. Oregon, Apr. 15, 1996). She observed that, "[i]n Portland[, Oregon], it is normal for contingent fee arrangements entered into at arm's length to provide for a fee of one-third of the recovery if settlement is reached prior to trial, with a larger percentage of 40% if the case proceeds to trial." Combining all of the partial settlements in *Melridge*, the total fee award was 37 percent of the $56.5 million aggregate recovery

31. Formally, the Tenth Circuit requires district court judges to apply the so-called *Johnson* factors. *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-55 (10th Cir. 1988) (citing *Johnson v. Georgia Hwy. Expr., Inc.*, 488 F.2d 714 (5th Cir. 1974)). That being clear, it is nonetheless true that Tenth Circuit judges often mimic the market too. They use the fifth *Johnson* factor—the customary fee—as a basis for taking account of market rates.

32. Consider, for example, Judge Timothy D. DeGiusti's decision to award 40 percent of the recovery as fees in *Chieftain Royalty Co. v. Laredo Petroleum, Inc.*, 2015 WL 2254606, at *4 (W.D. Okla. May 13, 2015). He observed that "[t]he market rate for Class Counsel's legal services also informs the determination of a reasonable percentage to be awarded from the common fund as attorneys' fees." As support, Judge DeGiusti cited *Millsap v. McDonnell Douglas Corp.*, 2003 WL 21277124, at *6 (N.D. Okla. May 28, 2003), where Judge Sven Holmes said plainly that "[i]n setting a reasonable amount of attorney fees to be awarded to Class Counsel in this case, the Court will consider ... the market rate for Class Counsel's services." In turn, Judge Holmes took

---

(D. Me. Dec. 20, 2011).

guidance from Judge Easterbrook's opinion in *Synthroid.*  See *Millsap*, 2003 WL 21277124, at *7 (citing *Synthroid*).

33.     *In re: Urethane Antitrust Litigation*, 2016 WL 4060156 (D. Kan. July 29, 2016), is the most recent Tenth Circuit case in which a district court judge followed the market's lead. There, Judge John W. Lungstrum, who sits on the District Court of Kansas, found that "a one-third fee is customary in contingent-fee cases, and … is often higher for complex cases or cases that proceed to trial."  *Id.*, at *5.[3]  He awarded one-third of the $974 million class action settlement recovery as fees.

34.     *Urethane* provides solid precedent for the fee award requested here because it and this case have several important features in common.  Both were tried to juries on behalf of a certified litigation class, both produced favorable verdicts that survived appeals, and both generated mega-fund recoveries.  The main difference between the cases is that *Urethane* resolved more quickly.  It lasted 11 years, a long time but less than half of this case's twenty-seven.  I discuss *Urethane* further below.

35.     It being clear that support for the use of market rates is both widespread and growing, it remains to consider the fees that clients typically agree to pay when hiring attorneys on contingency.

## VII.    A SURVEY OF PREVAILING MARKET RATES

36.     In this section, I discuss what is known about the fees that clients pay when hiring lawyers on contingency.  With but two exceptions, neither of which applies here, the evidence

---

[3] I submitted an expert report in support of the fee application in that case.  The court relied on my report when it referred to "Counsel's expert [who] identified 34 megafund cases with settlement of at least $100 million in which the court awarded fees of 30 percent or higher." *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *6.

shows that when sophisticated clients serve as plaintiffs in high-stakes commercial lawsuits—including but not limited to class actions—they typically pay their lawyers 25-40 percent of their gross recoveries, with fees in the 33.33-40 percent range being especially common.

37. Tenth Circuit judges have known this for years. In 1993, Ralph G. Thompson, then Chief Judge of the Western District of Oklahoma, made the following observation when awarding class counsel one-third of a $35 million common fund recovery: “Fees in the range of 30–40% of any amount recovered are common in complex and other cases taken on a contingent fee basis.” *Cimarron Pipeline Constr., Inc. v. Nat’l Council on Compensation Ins.*, No. CIV 89-1186-T, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993). To my knowledge, judges generally agree that the market rate falls in this range.

**A. Fees Promised by Sophisticated Named Plaintiffs in Class Actions**

38. In the course of my studies of class actions and expert witness engagements, I have gathered information about the fees that named plaintiffs agree to pay when hiring lawyers to handle class actions. This information strongly supports the conclusion that contingent fees normally fall within the 25-40 percent range, and cluster more narrowly with 33.33-40 percent.

39. Consider first the series of antitrust class actions against pharma companies listed in Table 1. The class members were drug wholesalers who appeared in the cases repeatedly, including several of Fortune 500 size or bigger. Many had in-house or personal counsel monitoring the litigations. The potential damages in several of the cases were enormous. One case, *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015), settled for over $500 million, and the series as a whole recovered more than $1 billion. In all of the cases the wholesalers actively supported fee awards in what I have identified as the normal range. Many submitted declarations or letters urging judges to pay the indicated amounts. Seeing that these sophisticated clients believed that class counsel (including some counsel from

Berger & Montague, who are Lead Counsel in this case) had earned the dollars they requested, the

presiding judges gave great weight to their opinions.

| TABLE 1. RECOVERIES AND FEE AWARDS IN PHARMACEUTICAL ANTITRUST CASES, SORTED BY SETTLEMENT DATE | | |
|---|---|---|
| **Case** | **Recovery (millions)** | **Fee Award** |
| *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015) | $512 | 27.5% plus expenses |
| *In re Doryx Antitrust Litig.*, No. 12-3824 (E.D. Pa. Sept. 15, 2014) | $15 | 33⅓% plus expenses |
| *In re Neurontin Antitrust Litig.*, No. 02-1830 (D.N.J. Aug. 6, 2014) | $191 | 33⅓% plus expenses |
| *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-cv-83 (E.D. Tenn. June 30, 2014) | $73 | 33⅓% plus expenses |
| *In re Flonase Antitrust Litig.*, No. 08-cv-3149 (E.D. Pa. June 14, 2013) | $150 | 33⅓% plus expenses |
| *In re Wellbutrin XL Antitrust Litig.*, No. 08-cv-2431 (E.D. Pa. Nov. 7, 2012) | $37.50 | 33⅓% plus expenses |
| *Rochester Drug Co-Operative, Inc. v. Braintree Labs., Inc.*, No. 07-142 (D. Del. May 31, 2012) | $17.25 | 33⅓% plus expenses |
| *In re DDAVP Antitrust Litig.*, No. 05-2237 (S.D.N.Y. Nov. 28, 2011) | $20.25 | 33⅓% plus expenses |
| *In re Wellbutrin SR Antitrust Litig.*, No. 04-5525 (E.D. Pa. Nov. 21, 2011) | $49 | 33⅓% plus expenses |
| *Meijer, Inc. v. Abbott Labs.*, No. C07-5985 CW (N.D. Cal. Aug. 11, 2011) | $52 | 33⅓% plus expenses |
| *In re Nifedipine Antitrust Litig.*, No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011) | $35 | 33⅓% plus expenses |
| *In re Oxycontin Antitrust Litig.*, No. 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011) | $16 | 33⅓% plus expenses |
| *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-340 (D. Del. April 23, 2009) | $250 | 33⅓% plus expenses |
| *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) | $75 | 33⅓% plus expenses |
| *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, 2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) | $74 | 33⅓% plus expenses |
| *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) | $175 | 33⅓% plus expenses |
| *In re Buspirone Antitrust Litig.*, No. 01-CV-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) | $220 | 33⅓% plus expenses |
| *In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D. Mich. Nov. 26, 2002) | $110 | 30% plus expenses |

41. The examples just described are not part of a new trend. Sophisticated clients have been paying fees of 33 percent or more in antitrust cases for years. A famous case from the 1980s involved the Texas law firm of Vinson & Elkins (V&E). ETSI Pipeline Project (EPP) hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline. In a sworn affidavit, Harry Reasoner, then V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as they were incurred, but all legal fees were contingent upon a successful outcome. We were paid 1/3 of all amounts received by way of settlement or judgment. We litigated the matter for 5 years. At the conclusion, we had settled with all defendants for a total of $634,900,000.00. As a result, a total of $211,633,333.00 was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities Litigation*, MDL No. 551 (D. Arizona, Nov. 30, 1990). Note that the fee was one-third even though the client bore litigation costs. Had V&E been asked to shoulder those too, the fee would likely have been 40 percent, as shown by the discussion of patent cases below.

42. Antitrust cases are not unique. Sophisticated named plaintiffs agree to pay similar fees in large class actions of other types. Consider *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct.), a RICO class actions that produced a $297 million settlement. One of the named plaintiffs, Thomas & King Inc., was formerly one of the largest operators of Applebee's franchises in the United States and the nation's eighth-largest restaurant franchise company overall, with approximately 7,500 employees. The other named plaintiff, Catholic Healthcare West/Dignity Health, was the fifth largest health system in the nation and the largest provider of non-profit hospital services in California. Both clients were represented by

private counsel when they retained and negotiated fees with class counsel, and both agreed that the fee award might be as high as 40 percent. The court awarded one-third of the recovery as fees.

43. *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), was a lawsuit filed by minority investors that settled for relief valued at about $81 million. Five sophisticated investors served as named plaintiffs. Two, FURSA Alternative Strategies LLC and RAMIUS LLC, were, respectively, a hedge fund manager and a global investment manager. All five clients agreed to pay 35 percent of the gross class-wide recovery as fees, with expenses to be separately reimbursed. The 35 percent fee was bargained down after initially being set at over 40 percent.

44. In all the cases just discussed, the named plaintiffs were sophisticated businesses with significant resources and ready access to the market for legal services. Their willingness to promise fees ranging from one-third to 40 percent in large commercial class actions shows clearly that, in their judgment, fees in this range were reasonable.[4]

**B. Contingent Fees in Patent Cases**

45. There are many reports of percentage fees of one-third or higher being paid in patent cases, which, like antitrust cases, often involve difficult technical and empirical issues. Indeed, the usual patent case is often less risky and protracted than the typical antitrust litigation because

[4] Examples of sizeable contingent fees can also be found in cases involving business clients who intervened in class actions. In *In re Synthroid Marketing Litig*., 264 F.3d 712, 719 (7th Cir. 2001), Judge Frank Easterbrook reported that, *after a settlement was already on the table*, "a group of more than 100 [third party payers] . . . contracted with two law firms to represent them. . . . [T]he contracts provided for a 25% contingent fee at maximum." In an expert witness report submitted in the *High Fructose Corn Syrup Antitrust Litigation*, Professor John C. Coffee, Jr. reported that Gray & Co., an opt-out claimant, promised its lawyers 33-40 percent of the recovery in parallel litigation, depending on the time of settlement. *Declaration of John C. Coffee, Jr*., submitted in *In re High Fructose Corn Syrup Antitrust Litigation*, M.D.L. 1087, Dkt. No. 1421 (C.D. Ill. Oct. 7, 2004), pp. 1-2. Notably, neither of these situations (*Synthroid* or *High Fructose*) presented anywhere near the risk for the lawyers associated with litigating a complex class action case from scratch.

patent plaintiffs rarely face the risks and delay of class certification.  This makes the fees paid in patent litigation a conservative point of comparison.

46.     The most famous example of the prevalence of fees of one-third or more in high-stakes patent lawsuits involves the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactured the Blackberry.  NTP, the plaintiff, promised its law firm, Wiley Rein & Fielding (WRF), a one-third contingent fee.  When the case settled for $612.5 million, WRF received more than $200 million in fees.  Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, at D03.

47.     The terms in WRF's fee agreement were typical, as Professor David L. Schwartz learned by interviewing 44 experienced patent lawyers and reviewing 42 contingent fee agreements that were used in patent cases.  Professor Schwartz reported that, across the board, fee percentages fell within the range I have described as normal, typically clustered within 33-40 percent, and increased with case duration and appeals.

> On the whole, the contingent rates are similar to the "one-third" that a stereotypical contingent personal injury lawyer charges.  There are two main ways of setting the fees for the contingent fee lawyer: a graduated rate and a flat rate.  Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery.  The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates.  As the case continued, the lawyer's percentage increased.  Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALABAMA LAW REVIEW 335, 360 (2012).  In a case like this one that lasted 27 years and was settled after trial and two appeals, the highest graduated rate would apply.

48.     Professor Schwartz did not have a random sample of engagement contracts used in patent cases to consider.  But his conclusions are consistent with both the examples discussed

above and with reports found in patent blogs, case reports, and other publications. For example, the following passage appeared in Matt Cutler, *Contingent Fee Patent Litigation, and Other Options*.

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not pay any legal fees for the representation. Instead, the law firm only gets paid from damages obtained in a verdict or settlement. Typically, the law firm will receive between 33-50% of the recovered damages, depending on several factors—a strictly results-based system.

Matt Cutler, *Contingent Fee Patent Litigation, and Other Options*, PATENT LITIGATION, http://ipr-pgr.com/patent-litigationlaw-updates/cost-contained-u-s-patent-litigation. Mr. Culter's observation that fees sometimes run as high as 50 percent comports with Professor Schwartz's finding that the average rate through appeal was 40.2 percent.

49. Sophisticated clients sometimes use scales of percentages in patent cases, but when they do the percentages seem not to fall below 25 percent. *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP, et al.*, 105 S.W.3d 244 (Tex. Appls.—Houston, 2003), provides an example. There, a sophisticated client "agreed to pay the [l]awyers a contingency fee pursuant to a sliding scale: 25% of the first $32 million recovered by Tanox, 33 1/3% of recovery from $32 million to $60 million, 40% of recovery from $60 million to $200 million, and 25% of recovery over $200 million." *Id*. at 248-249. The agreement also contained other provisions favorable to the lawyers, including a promise of "$100 million if they obtained a permanent injunction." "The total fees Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from royalties were capped at $300 million." *Id*. at 249. Like NTP in the *Blackberry* litigation, Tanox agreed to pay both high percentages and a potentially enormous amount.

**C. Contingent Fees In Other Commercial Litigations**

50. Turning from patent lawsuits to matters of other types, many examples show that compensation as a significant percentage of recovery is common. In 2012, the U.S. Court of

Appeals for the Tenth Circuit decided a case involving a dispute over the fee that a business client owed the law firm of Susman & Godfrey (S&G).  S&G had handled an oil and gas matter for the client on the following terms.  "Under the Fee Agreement, [the client] agreed to pay [S&G] 30% 'of the sum recovered by settlement or judgment,'" subject to caps based on when the lawsuit was resolved. *Grynberg Production Corp. v. Susman Godfrey, L.L.P.*, No. 10-1248, 2012 U.S. App. LEXIS 3316, at *2 (10th Cir. February 16, 2012).  "[T]he Fee Agreement capped fees at $50 million if the case settled within one year after the action was filed." *Id.* The fee agreement thus entitled S&G to be paid $50 million for a year's worth of work—and that is what an arbitrator decided S&G should receive, subject to an offset of less than $2 million that, for present purposes, is irrelevant.  The Tenth Circuit affirmed the fee award.

51.    Based on what lawyers who write about fee arrangements in business cases have said, contingent percentages of one-third or more remain common today.  In 2011, THE ADVOCATE, a journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial Law Developments and Doctrine."  It included an article on alternative fee arrangements, according to which:

> A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOCATE (TEXAS) 20 (2011).

52. I could add examples to those already discussed, but the point has been made. When seeking to recover money in lengthy and risky commercial lawsuits involving large stakes, sophisticated business clients often pay contingent fees equal to or greater than one-third of the recovery plus expenses. They pay such percentage fees when the risks and costs of litigation warrant the expenditure, because they are better off hiring lawyers at market rates than giving up on their claims. To be clear, I am not saying that sophisticated business clients always pay fees in this range; they will pay less when they can hire competent lawyers on more attractive terms. The point is just that they know how the market for legal services works: risks require offsetting rewards.

**D. Two Exceptions**

53. I mentioned at the outset that there are two exceptions to the rule that sophisticated clients typically pay fees within the 25-40 percent range, with fees of 33.33-40 percent being especially common. One exceptional category includes personal injury lawsuits brought in the wake of commercial airplane accidents. In these cases, fees are said to fall near 20 percent because the defendants usually concede liability, leaving only damages to be proven. Because liability is routinely denied in class actions of all types, and obviously was vigorously contested here, airplane accident cases are irrelevant.

54. The other exceptional category encompasses securities fraud class actions led by public pension funds. In these cases, fee percentages are sometimes lower and declining scales are sometimes employed. Nothing should be inferred from these cases, however, for three reasons.

55. First, public pension funds are politically-controlled and may have agendas that deviate from maximizing class members' recoveries. Professor John C. Coffee, Jr., the country's leading authority on class action lawsuits, previously made this point by offering political pressure as the explanation for public pension funds' unique behavior.

> I am aware that "declining" percentage of the recovery fee formulas are used by some public pension funds, serving as lead plaintiffs in the securities class action context. However, I have never seen such a fee contract used in the antitrust context; nor, in any context, have I seen a large corporation negotiate such a contract (they have instead typically used straight percentage of the recovery formulas). My belief is that public pension funds prefer the "declining percentage" formula largely for political reasons, while private corporations disdain such formula for economic reasons. That is, public pension funds are frequently administered by elected political officials who are potentially subject to media and political criticism for conferring "windfall" fees on their attorneys. Necessarily, they seek to avoid criticism, and the declining percentage formula seems primarily a defensive strategy to protect political officials from such criticism. Corroborating this conclusion is the rareness of its use by private corporations (as Coca-Cola, PepsiCo and Admiral Beverage have implicitly confirmed in this case [by paying straight percentage fees in the typical range].

*Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation*, M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), ¶ 22. According to Professor Coffee, then, public pension funds do themselves and other investors a disservice by using inferior fee arrangements. They may look good on paper because they appear to be keeping lawyers' fees low, but they actually endanger investors.

56. *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (D. Md. 2000), where the court concluded that the market price for the legal services supported a 40% fee, provides an example supporting Professor Coffee's assessment that the market is not fond of declining percentage scales. There, the bankruptcy trustee wanted to assert claims against Ernst & Young. He looked for counsel willing to accept a declining scale of fee percentages, found no takers, and ultimately agreed to pay a law firm a straight 40 percent of the recovery. Ernst & Young subsequently settled for $185 million, at which point the law firm applied for $71.2 million in fees, 21 times its lodestar. The bankruptcy judge granted the request, writing: "Viewed at the outset of this representation, with special counsel advancing expenses on a contingency basis and facing the uncertainties and risks posed by this representation, the 40% contingent fee was reasonable, necessary, and within a market range." 244 B.R. 327 at 335. The court's logic is impeccable.

57. Second, securities class actions often entail smaller risks than class actions of other types. Because they are the most common type of class action, the issues they raise tend to have been litigated often, making outcomes more predictable. This is one reason why many securities class actions resolve fairly quickly, and why many settle after a defendant's initial motion to dismiss is denied. The median case in which dollars are recovered lasts about three and a half years. Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371, 1389 (2015) (reporting a median length of 3.5 years for securities fraud class actions that settled with payments).[5] Securities class actions also tend to have accompanying features, like governmental investigations, earnings restatements, or large stock price declines, that make them somewhat less difficult. To be clear, they are still risky and expensive lawsuits, and the lawyers who handle them should be fairly paid. The point is only that the identified differences make it perilous to reason from securities class actions to class actions of other types.

58. Third, in typical securities fraud cases, lawyers know much more about the merits than they usually do in cases of other types. In most cases, lawyers must initially rely on clients for information. But law firms that specialize in securities litigation know more than their clients do about the activities of the companies they sue for fraud. The lawyers monitor clients' investment portfolios, track companies' stock prices and financial reports, and know about earnings restatements and governmental investigations. They sometimes have access to former employees with inside information too. Because the fees that lawyers demand for taking cases on

[5] A study of class actions in four federal district courts found median time periods from filing the complaint to closing for settled non-securities class actions ranging from "eleven and thirteen months" on the low end to "thirty-six and fifty months" on the high end. Thomas E. Willging et al., AN EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 16 (Federal Judicial Center 1996).

contingency reflect both their estimates of case strength and damages and their confidence that their estimates are right, fees naturally vary with the amount and quality of the available information. If securities lawyers tend to know more about the merits than lawyers who handle cases of other types, their fee demands should be lower.

59. I cannot be certain that the reasons just mentioned are correct, but I am certain that this case bears little resemblance to the typical securities fraud class action. In the dataset that my coauthors and I created for our 2015 COLUMBIA LAW REVIEW article, which contained over 400 cases, the longest-lived securities class action resolved in less than 14 years. This case has already lasted almost twice that long. In securities cases, classes certified for litigation purposes and tried on a class-wide basis are uncommon. Here, a litigation class was certified and tried on a class basis. Finally, the law governing class certification in securities cases is much more settled than the law that applied to this case, which involved novel liability theories that are rarely built into class-action trial plans and submitted to courts for review.

**VIII. AWARDS IN SIMILAR CASES**

60. For a host of reasons, it is very difficult to find cases that are comparable to this one. Although other cases involving claims under the Price-Anderson Act have been tried, a Westlaw search did not turn up a verdict that was even close in size to the one secured here. The largest appears to be the non-binding $136 million verdict obtained after a summary jury trial in *In re Fernald Litig.*, 1989 WL 267039, at *2 (S.D. Ohio Sept. 29, 1989). The case later settled for $73 million. *In re Fernald Litig.*, No. C-1-85-149, 1989 WL 267039, at *2 (S.D. Ohio Sept. 29, 1989) ($73 million); Other searches turned up class action settlements in Price-Anderson Act cases, including one that was large but still much smaller than this one. *In re Three Mile Island Litig.*, 557 F. Supp. 96, 97 (M.D. Pa. 1982) ($25 million). Insofar as I have been able to learn, this

litigation has produced the largest recovery ever in a case brought under the Price-Anderson Act. And, of course, no class action I know of has lasted as long as this one.

61. Given the difficulty of finding comparable cases, I will first discuss fee award practices in class actions in general. Then, I will discuss a few cases that are comparable to this one in at least some respects.

**A. Class Action Fee Award Practices In General**

62. I previously mentioned *Chieftain Royalty Co. v. Laredo Petroleum, Inc.*, in which Judge DeGiusti noted the propriety of relying on market rates when awarding 40 percent of the recovery as fees. He also commented on fee award tendencies in the Tenth Circuit, writing that:

> An award of forty percent (40%) of the settlement value is well within the range of acceptable fee awards in common fund cases. *See, e.g.*, *Chieftain Royalty Co. [v. QEP Energy Company]*, No. CIV–11–212–R, Dkt. No. 182 at *6 (W.D. Okla. May 31, 2013) (awarding a fee of $46.5 million, which represented approximately 39% of the cash portion of a $155 million settlement); *CompSource [Okla. v. BNY Mellon, N.A.*, No. CIV–08–469–KEW], 2012 U.S. Dist. LEXIS 185061, at *23, [2012 WL 6864701] (E.D. Okla. Oct. 25, 2012), ("25% is on the low end of the range of acceptable fee awards in common fund cases, which ranges between 22% and 37%, and more in some cases"); *Vaszlavik v. Storage Tech. Corp.*, No. 95–B–2525, 2000 U.S. Dist. LEXIS 21140, at *9, 2000 WL 1268824 (D. Colo. Mar. 9, 2000) ("A 30% common fund fee award is in the middle of the ordinary 20%–50% range and is presumptively reasonable."); *Cimarron Pipeline Constr., Inc. v. Nat'l Council on Compensation Ins.*, Nos. CIV 89–822–T & CIV–1186–T, 1993 U.S. Dist. LEXIS 19969, at *4, 1993 WL 355466 (W.D. Okla. June 8, 1993) ("Fees in the range of 30–40% of any amount recovered are common in complex and other cases taken on a contingent fee basis.").

*Chieftain Royalty Co. v. Laredo Petroleum, Inc.*, 2015 WL 2254606, at *3.[6] Obviously, the range identified in the cases cited by Judge DeGiusti overlaps fairly closely with the range of percentages that sophisticated clients commonly pay in large commercial litigations.

---

[6] Although Judge DeGiusti put the award in *Chieftain Royalty Co. v. QEP Energy Company*, No. 5:11-cv-00212-R, Dkt. No. 182 at *6 (W.D. Okla. May 31, 2013), at 30 percent, the court actually awarded a 39% fee on the cash portion of the settlement, which was $115 million.

63.     In a study of all federal class actions that settled in 2006 or 2007, Professor Brian Fitzpatrick confirmed that the range of fee awards mirrors the private market fairly well.  He found that the vast majority of fee awards (exclusive of costs) ran from 25 percent of the recovery to 40 percent, and that more awards fell into the 30-35 percent range than any other.  Brian T. Fitzpatrick, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811, 834 Fig. 4 (2010).

64.     It is sometimes suggested that as recoveries rise fee percentages should fall. Although some judges adhere to this practice, which is known as the "increase/decrease" rule in the literature on fee awards, many do not and even those who embrace it seem to use it selectively. They invoke it as needed to prevent lawyers from collecting windfalls, but they are perfectly willing to award normal fee percentages in mega-fund cases when warranted by the risks and costs. Table 2 documents this point empirically.  It lists 35 litigations with settlements of $100 million or more (the traditional mega-fund threshold) in which fee awards equaled or exceeded 30 percent.

| Table 2. Mega-Fund Class Actions with Fee Awards of 30 Percent or More | | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 1 | *In re Merry-Go-Round Enterprises, Inc.* , 244 B.R. 327 (Bankr. D. Md. 2000)[5] | $185 | 40.00% |
| 2 | *In re Combustion, Inc.*, 968 F.Supp. 1116 (W.D.La.1997) | $127 | 36.00% |
| 3 | *In re Managed care Litig. (Aetna)* , 2003 WL 22850070 (S.D. Fla, Oct. 24, 2003; and *In re Managed Care Litig. (Cigna)* , 1:00-1334-MD-01334 (S.D. Fla Feb. 2, 2004)[11] | $310 | 35.50% |
| 4 | *In re Vitamins Antitrust Litig.* , No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 | 34.60% |
| 5 | *In re: Urethane Antitrust Litig* ., No. 04-1616-JWL, 2016 WL 4060156, at *4 (D. Kan. July 29, 2016) | $974 | 33.33% |
| 6 | *In re U.S. Foodservice, Inc. Pricing Litig.,* No. 3:07-md-1894 (AWT) (D. Ct. Dec. 9, 2014) | $297 | 33.33% |
| 7 | *In re Tricor Direct Purchaser Litig.* , D. Del. 05-340-SLR, Doc. No. 543 (2009) | $250 | 33.33% |
| 8 | *In re Neurontin Antitrust Litigation* , D.N.J. 2:02-cv-01830, Doc. No. 114 | $190 | 33.33% |
| 9 | *Standard Iron Works v. Arcelormittal et al.* , No. 08-C-5214 (N.D. Ill., Oct. 22, 2014) | $164 | 33.33% |
| 10 | *In re Titanium Dioxide Antitrust Litig.,* 10-CV-00318 (D. Maryland, Dec. 13, 2013) | $164 | 33.33% |
| 11 | *In re Flonase Antitrust Litig.* , 951 F. Supp. 2d 739 (E.D. Pa. 2013) | $150 | 33.33% |
| 12 | *City of Greenville v. Syngenta Crop Protection,* No. 3:10-cv-00188 (S.D. Ill. Oct. 23, 2012) | $105 | 33.33% |
| 13 | *In re Initial Pub. Offering Sec. Litig* ., 671 F.Supp.2d 467 (S.D.N.Y. 2009) | $510 | 33.30% |
| 14 | *In re Buspirone Antitrust Litig.,* No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003)[3] | $220 | 33.30% |
| 15 | *In re Relafen Antitrust Litig., No. 01-12239,* 2004 U.S. Dist. LEXIS 28801 (D. Mass. Apr. 9, 2004) | $175 | 33.30% |
| 16 | *In re OSB Antitrust Litig.,* Master File No. 06-826 (March 4, 2009) | $111 | 33.30% |
| 17 | *Kirk Dahl et al. v. Bain Capital Partners LLC et al* ., No. 1:07-cv-12388 (D. Mass. Jan. , 2015) | $590 | 33.00% |
| 18 | *In re Apollo Group Inc. Securities Litigation* , 2012 WL 1378677, at *9 (D.Ariz., April 20, 2012) | $145 | 33.00% |
| 19 | *San Allen, Inc. v. Buehrer, Admin., Ohio Bureau of Workers' Compensation* , CV-07-644950 (Common Pleas, Cuyahoga Cty, OH Nov. 25, 2014) | $420.0 | 32.70% |

| Table 2. Mega-Fund Class Actions with Fee Awards of 30 Percent or More | | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 20 | *In re Automotive Refinishing Paint Antitrust* Litigation, MDL No. 1426 (E.D. Pa. Jan. 3, 2008) | $106 | 32.70% |
| 21 | *Weatherford Roofing Co., et al. v. Employers National Ins. Co.*, No. 91-05637 (116th Dist. Ct, Dallas, TX) (Dec. 1, 1995) | $190 | 31.60% |
| 22 | *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1,060 | 31.33% |
| 23 | *In Re (Bank of America) Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330 (S.D. Fla. 2011) | $410 | 30.00% |
| 24 | *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) | $220 | 30.00% |
| 25 | *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. 2004) | $203 | 30.00% |
| 26 | *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D.Okla. Jan. 2, 1990) | $185 | 30.00% |
| 27 | *In re: (Chase Bank) Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. Dec., 19, 2012) | $162 | 30.00% |
| 28 | *Chieftain Royalty Co. v. QEP Energy Co.*, Case No. CIV-11-212-R (W.D. Okla. May 31, 2013) | $155 | 30.00% |
| 29 | *In re: (Citizens Bank) Checking Account Overdraft Litig.*, No. 1:09 MD-02036 (S.D. Fla. Mar. 12, 2013) | $137.5 | 30.00% |
| 30 | *In re Informix Corp. Sec. Litig.*, Master File No. C-97-1289-CRB (N.D.Cal. Nov. 2, 1999) | $132 | 30.00% |
| 31 | *Kurzweil v. Philip Morris Co., Inc.*, Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 | 30.00% |
| 32 | *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D.Pa.2000) | $111 | 30.00% |
| 33 | *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632 (N.D.Tex. Apr. 9, 2010) | $110 | 30.00% |
| 34 | *In re Cardizem CD Antitrust Litig.*, No. 99-MD-1278, at 18-20 (E.D.Mich. Nov. 26, 2002) | $110 | 30.00% |
| 35 | *In re Prison Realty Sec. Litig.*, Civil Action No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D.Tenn. Feb. 9, 2001) | $104 | 30.00% |

[1] Although technically not a class action, this case is equivalent to a class action in which the fee was negotiated ex ante.

[2] Value of the combined settlements taken from Judge Gold's opinion in *Allapattah v. Exxon*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006)

[3] The global settlement exceeded $500 million, of which $220 million was reserved for the Direct Purchaser Class. The trial court approved a fee equal to 33 1/3% of the Direct Purchaser fund.

66.     Several things must be kept in mind when considering Table 2.  First, the list is *not* complete.  Because no comprehensive dataset of mega-fund class actions exists, I cannot say with certainty how many time judges have awarded fees of 30 percent or more in cases with recoveries of at least $100 million.  Often, when I update the table, I discover additional cases.

67.     Second, mega-fund settlements are rare.  Focusing on securities class actions, Cornerstone Research observed that "[d]espite the publicity that often accompanies mega-settlements, ... only 7 percent of cases have settled for $100 million or higher."  Ellen M. Ryan and Laura E. Simmons, SECURITIES CLASS ACTION SETTLEMENTS—2011 REVIEW AND ANALYSIS 4 (Cornerstone Research 2012), https://www.cornerstone.com/GetAttachment/22345269-75a0-4fc2-a459-62345cf23488/Securities-Settlements-2011-Review-and-Analysis.pdf.          Small settlements are the norm.  More than half the securities class actions in Cornerstone Research's dataset settled for less than $10 million.

68.     Third, because mega-fund settlements are rare, the 35 cases listed in Table 2 actually document a significant tendency on the part of judges to award fees of 30 percent or more in large cases.  As explained above, these cases show that the prevailing judicial practice is *not* to reduce fee percentages automatically as recoveries grow; it is to award fees that are warranted in light of the circumstances, which can justify substantial percentages in even the largest cases.  When class actions last for years, are tried and appealed, or require lawyers to absorb large risks and costs for other reasons, judges recognize the fact and regulate lawyers' compensation accordingly.

69.     This is certainly the attitude Judge Lungstrum displayed in *Urethane*, one of the few cases that (at least to some extent) compares to this one in terms of difficulty, duration, and accomplishment.  He rejected the assertion, made by objectors, that "in the Tenth Circuit [] fee

award percentages decrease as settlement funds increase." *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *5. To the contrary, he pointed out, under Tenth Circuit case law "the fee percentage must be determined on a case-by-case basis, based on a weighing of the applicable *Johnson* factors." *Id*. He then refused to apply the "increase/decrease" rule for a raft of reasons:

- A diminishing scale has "no reasonable application" in a case that was tried, appealed, and produced a landmark recovery;
- The contention that diminishing percentages should apply "fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is great risk of no recovery";
- A declining scale "is antithetical to the percentage of the recovery method …, the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained. By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for the Class Counsel to settle too early for too little"; and
- Many judges have awarded percentages "up to and exceeding one-third of the fund" in cases "with settlements of at least $100 million."

**B. Fee Awards In Somewhat-Comparable Class Actions**

70. As mentioned, in *Urethane*, Judge Lungstrum awarded a one-third fee on a $974 million recovery. He did so because he was convinced that the facts justified the award. Two paragraphs in his opinion are worth quoting at length.

> Hundreds of millions were at stake here, and counsel achieved incredible success on the merits of the claims, earning a verdict of over $400 million that would be trebled and eventually obtaining settlements totaling over $974 million (much more than double the amount of damages). Liability on these claims was far from certain,

> and thus the case presented a great deal of risk, as counsel was required to advance all expenses and attorney time to litigate a hard-fought case against highly experienced opposing counsel hired by a defendant with ample resources. The case was not settled pretrial for a percentage of the damages, nor was it settled on appeal for a steep discount from the judgment amount; instead counsel litigated the case to a verdict and an appellate affirmance. Counsel achieved this verdict and judgment without the benefit of a government investigation or prosecution of members of the alleged antitrust conspiracy. The subject matter was complex and not easily digestible by a lay jury, and there were no personal injuries to heighten sympathy. ***In almost 25 years of service on the bench, this Court has not experienced a more remarkable result.*** This enormous success in a highly contingent case favors an award of a substantial percentage of the Dow settlement fund to the counsel who achieved that success for the class members.

*In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *4 (emphasis added).

> The Court concludes, based on a consideration of those applicable factors, that a percentage award at the top end of the range is warranted and reasonable here. All cases present unique circumstances, but it is difficult to imagine a case in which an award at the highest percentage would be more appropriate than in this case. As already discussed, counsel achieved an incredible result for the class, in a case with an extreme amount of risk at all stages of the litigation, and they obtained that result because they won what is reported to be one of the largest verdicts of its kind in United States history. Counsel had to build this case on their own, without the help of a governmental investigation or prosecution, after other counsel had declined to pursue it, and they toiled for many years, at great expense to themselves, with a very real risk that they would not recover anything from this defendant.

*Id*. at *6.

71. The resemblance between this case and *Urethane* is plain. The main differences are that this case lasted far longer, was risker because the liability theories were more novel, and produced a smaller recovery, although still a mega-fund. A fee at the top end of the scale was warranted in *Urethane* and is also warranted here.

72. In *Urethane*, Judge Lungstrum drew heavily on *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006), a case in which I also provided an expert report. There, after 14 years of litigation against Exxon Corp., the case settled for $1.06 billion, after being

tried twice and creating new authority on diversity jurisdiction in the Supreme Court.[7] Recognizing that the lawyers bore enormous risks, the trial judge awarded a 31.33 percent fee. In some respects, however, *Allapattah Services* was less risky than both *Urethane* and this case. It was a breach of contract action in which thousands of dealers with similar contracts sued Exxon for discounts they claimed to be owed. The merits were typical, not arcane. Class certification was also easier because the common issues were more obvious.

73. *San Allen, Inc. v. Buehrer* is another somewhat comparable litigation, though much shorter in duration. There, class counsel sued an arm of the State of Ohio and challenged the legality of an insurance program that enjoyed enormous political support. The complaint sought almost a billion dollars in premium refunds, an unheard-of sum for a governmental entity to pay. During 7 years of hard-fought litigation against an opponent with an essentially unlimited defense budget, class counsel prevailed on class certification after a contested trial court hearing, fended off challenges to the class on appeal twice, won on the merits at a bench trial that lasted 7 days, obtained a judgment in excess of $859 million, preserved $651 million of the judgment after an appeal and subsequent proceedings, and convinced the State to make $420 million in relief available in settlement. Recognizing the risks class counsel bore, the trial judge awarded 32.5 percent of the recovery as fees. *San Allen, Inc. v. Buehrer, Admin., Ohio Bureau of Workers' Compensation*, CV-07-644950 (Common Pleas, Cuyahoga Cty, OH Nov. 25, 2014). The fee was in the same range as that requested here, even though the trial was much shorter and case resolved in one-fourth the time.

74. Having focused on the duration of this lawsuit and referenced the *Johnson* factors, I will add here that one of those factors gives weight to "the preclusion of other employment by

[7] *See Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005).

the attorney due to acceptance of the case." *Johnson*, 488 F.2d at 718.  Some amount of preclusion is normal, indeed inevitable, whenever a law firm takes a new case because the resources devoted to it cannot be used elsewhere.  But this case is truly exceptional because it saddled the law firms serving as Class Counsel with an enormous, non-diversifiable risk for an exceptionally long time.  There is only so much risk that a contingent-fee law firm can handle at one time.  Above that ceiling, internal strife and division are likely to arise as partners and associates question the soundness of a firm's business model, prefer representations that generate guaranteed fees to contingent fee matters, or leave the firm and go their own ways.  Because the risk associated with the Rocky Flats litigation was carried by the Class Counsel firms for so long, it necessarily impacted the firms' ability to take on new matters that also entailed serious non-payment risks.

## IX.   CLASS COUNSEL'S REQUESTED MULTIPLIER IS REASONABLE

75.     A fee of 40 percent here would result in a multiplier below 2.5, based on current hourly rates.  Judges tend to award higher lodestar multipliers in cases with larger recoveries.  *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248, 274 (2010) (finding that multipliers correlate strongly with settlement size).  Judges have also granted large multipliers in cases where the circumstances warrant.  As Judge Melinda Harmon noted when approving a 5.2 multiplier from the massive *Enron* settlement, many courts have approved multipliers of 4 or greater to account for risk, results, the market rate for legal services, and other relevant factors.  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 752 (S.D. Tex. 2008).  A survey of settlements and fee awards published by CLASS ACTION REPORTS bears out these observations.  It reports an average multiplier of 4.5 for the largest cases—those with settlements exceeding $100 million—and multipliers in individual mega-fund cases reaching as high as 21.8.  *Attorney Fee Awards in Common Fund Class Actions*, 24 CLASS ACTION REPORTS 4 (April 2003).

76.     *Urethane*, an antitrust case discussed at length above, supports the fee multiplier that Class Counsel requests.  There, the multiplier was 3.2.  *Lawrence E. Jaffe Pension Plan v. Household International, Inc.*, No. 1:02-cv-05893 (N.D. Ill. Nov. 10, 2016), the only securities fraud case I know of that compares to this one, does too.  There, litigation lasted for 14 years, during which time a class was certified for litigation, the case was tried to a successful result, and the verdict was appealed and partly invalidated.  *Household International* was also unique in that class counsel, by requiring the defendant to post a supersedeas bond, incurred liability for $13 million in appellate litigation costs.  When the case eventually settled for $1.575 billion, the court awarded the requested fee of 24.68 percent, which worked out to a lodestar multiplier of 3.7.

77.     Plainly, a district court judge has discretion to approve a lodestar multiplier in the 3-4 range, or even greater when the circumstances warrant.  This case presents the best reason for doing so.  The main purpose of lodestar multipliers is to compensate lawyers for bearing risks, and the risks Class Counsel bore in this litigation were enormous.  High risks and high rewards go hand-in-hand in the private market for legal services, as previously explained.  To incentivize lawyers to handle risky class actions, judges should preserve the connection when awarding fees from common funds.

## X.     CONCLUSION

78.     This case has lasted almost as long as my academic career, which started in 1987. What terms would I have demanded back then if the University of Texas School of Law had asked me to teach for the better part of 3 decades while waiting the entire time to be paid?  The sun and the moon might have done.  And if the Law School had made my right to compensation contingent in some way, such as by tying it to my student evaluation scores?  Then I'd have wanted the stars as well.

79. This is my (admittedly silly) way of saying that I cannot imagine standing in Class Counsel's shoes. Who can wait 27 years to be paid? Who can invest millions of dollars in resources in a project that takes that long to mature, and that might never yield a recovery? Who can sustain the effort level that is needed to prevail in the face of mighty opposition the entire time? Only attorneys who are truly exceptional. And when, at the end of it all, they garner a mega-fund recovery, they deserve an extraordinary reward. Forty percent isn't enough, in my opinion, and is certainly reasonable.

80. Class Counsel have secured the largest-ever verdict in a Price-Anderson Act and the largest-ever Price-Anderson Act class action settlement involving a nuclear weapons facility. This remarkable achievement, obtained after 27 year of litigation, was possible only because Class Counsel persevered in the face of extraordinary costs and risks. Had paying clients hired these lawyers on contingency to handle this litigation, the best available evidence shows that they would have had to pay 33-40 percent of their gross recoveries as fees. Because the market for legal services provides the best guidance as to the value of lawyers' services, judges should apply similar percentages when awarding fees from common funds. In fact, this is what many federal judges already do, including those who are bound to apply the factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). Federal judges also apply market-based fee percentages in cases that generate mega-fund recoveries, when the litigation risks warrant. Because this class action was exceptionally risky, produced an exceptional result, and took unbelievably long to resolve, I conclude that Class Counsel's request for 40 percent of the recovery as fees is fair and reasonable.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

January 11, 2017

CHARLES SILVER

EXHIBIT A

RESUME OF PROFESSOR CHARLES SILVER