# Exhibit 15

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIRK DAHL, et al., Individually and on Behalf of All Others Similarly Situated,<br>    Plaintiffs,<br><br>vs.<br><br>BAIN CAPITAL PARTNERS, LLC, et al.,<br>    Defendants. | Lead Case No. 1:07-cv-12388-WGY<br><br>**PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, LITIGATION EXPENSES, AND NAMED PLAINTIFF SERVICE AWARDS** |

Lead Counsel, on behalf of all Plaintiffs' Counsel, respectfully submit this Motion for an Award of Attorneys' Fees, Litigation Expenses, and Named Plaintiff Service Awards. As set forth in the accompanying Memorandum in Support of an Award of Attorneys' Fees, Litigation Expenses, and Named Plaintiff Service Awards ("Fee Memorandum"); Declaration of Co-Lead Counsel in Support of Named Plaintiffs' Motions for Final Approval of Settlements and Supplemental Plan of Allocation of Settlement Proceeds and for an Award of Attorneys' Fees and Expenses; and Declaration of Daryl F. Scott in Support of Co-Lead Counsel's Application for Award of Attorneys' Fees, Litigation Expenses, and Named Plaintiff Service Awards, Plaintiffs' Counsel ask that this Court award fees in the amount of $194,865,000 (33% of the $590,500,000 common fund), as well as costs and expenses totaling $12,028,514.99. In addition to fees and expenses, Plaintiffs' Counsel also request that the Court approve total service awards in the amount of $25,000 each for Police and Fire Department Retirement System of the City of Detroit ("Detroit PFRS") and Omaha Police and Fire Department Retirement System (Omaha PFRS"), as well as $10,000 for Dr. Dahl and $5,000 for Mr. Wojno. Named Plaintiffs made significant time commitments on behalf of the Class during the seven-year litigation. The total amount of incentive awards requested for all Named Plaintiffs is $65,000.

In further support of this Motion, Plaintiffs' Counsel have filed herewith the aforementioned Fee Memorandum. For the reasons stated therein, Plaintiffs' Counsel request

that their Motion be granted.

## **LOCAL RULE 7.1 CERTIFICATION**

Pursuant to D. Mass. Local Rule 7.1(a)(2), the undersigned hereby certifies that counsel for

Plaintiffs has conferred with counsel for Settling Defendants, and that Settling Defendants take

no position as to the relief requested by this Motion.

Dated: November 13, 2014                    Respectfully submitted,

*s/ Stacey P. Slaughter*
K. Craig Wildfang (admitted *pro hac vice*)
Thomas J. Undlin (admitted *pro hac vice*)
Stacey P. Slaughter (admitted *pro hac vice*)
George D. Carroll (admitted *pro hac vice*)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P
2800 LaSalle Plaza
800 LaSalle A venue South
Minneapolis, MN 55402-2015
(612) 349-8500
kcwildfang@rkmc.com
tjundlin@rkmc.com
spslaughter@rkmc.com
gdcarroll@rkmc.com

Lisa A. Furnald (BBO #631059)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P
800 Boylston Street, 25th Floor
Boston, MA 02199
(617) 267-2300
lafurnald@rkmc.com

Patrick J. Coughlin (admitted *pro hac vice*)
David W. Mitchell (admitted *pro hac vice*)
Randi D. Bandman (admitted *pro hac vice*)
Phong L. Tran (admitted *pro hac vice*)
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058
patc@rgrdlaw.com
davidm@rdrdlaw.com
ptran@rdrdlaw.com

Christopher M. Burke (admitted *pro hac vice*)
Walter W. Noss (admitted *pro hac vice*)
Kristen M. Anderson (admitted *pro hac vice*)
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 233-4565
cburke@scott-scott. com
wnoss@scott-scott.com
kanderson@scott-scott. com

David R. Scott
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
(860) 537-3818

*Co-Lead Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2014, I caused the foregoing to be served via the Electronic Filing System on all of Settling Defendants' counsel of record and via email on all attorneys who have agreed to accept service via email at defendantsprivatequity@scott-scott.com.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 13, 2014.

s/ Stacey P. Slaughter
Stacey P. Slaughter (admitted *pro hac vice*)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P
2800 LaSalle Plaza
800 LaSalle A venue South
Minneapolis, MN 55402-2015
(612) 349-8500
spslaughter@rkmc.com

85363346.1

CLOSED,CONSOLIDATED,LEAD

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:07-cv-12388-WGY

Klein et al v. Bain Capital Partners, LLC et al
Assigned to: Judge William G. Young
Cause: 15:1 Antitrust Litigation

Date Filed: 12/28/2007
Date Terminated: 09/30/2014
Jury Demand: Both
Nature of Suit: 430 Banks and Banking
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 02/02/2015 | 1095 | Judge William G. Young: ELECTRONIC ORDER entered granting re 1051 MOTION for Attorney Fees *Plaintiffs' Motion for an Award of Attorneys' Fees, Litigation Expenses, And Named Plaintiff Service Awards* filed by City of Omaha Police and Fire Retirement System, Police and Fire Retirement System of the City of Detroit, Michael Wojno, Kirk Dahl (Paine, Matthew) (Entered: 02/02/2015) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/16/2016 16:45:49 | | | |
| **PACER Login:** | bergmont:4423709:0 | **Client Code:** | 89168-000 |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-12388-WGY Starting with document: 1095 Ending with document: 1095 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: DDAVP DIRECT PURCHASER ANTITRUST LITIGATION | 05 Civ. 2237 (CS) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | (ELECTRONICALLY FILED) |

## [PROPOSED] ORDER AND FINAL JUDGMENT APPROVING SETTLEMENT BETWEEN DIRECT PURCHASER CLASS PLAINTIFFS AND DEFENDANTS FERRING B.V., FERRING PHARMACEUTICALS, INC., AND AVENTIS PHARMACEUTICALS, INC.

Pursuant to Rules 23(e) and 54(b) of the Federal Rules of Civil Procedure, and in accordance with the terms of the settlement agreement (the "Settlement" or "Settlement Agreement") between Plaintiffs Louisiana Wholesale Drug Co., Inc. ("LWD"), Rochester Drug Co-operative, Inc. ("RDC"), Meijer Inc., and Meijer Distribution, Inc. (collectively, "Meijer") (all, together ("Direct Purchaser Plaintiffs" or "Plaintiffs"); and Ferring B.V., Ferring Pharmaceuticals, Inc., (collectively, "Ferring") and Aventis Pharmaceuticals, Inc., ("Aventis") (all, together, "Defendants"), dated August 2, 2011, and upon Direct Purchaser Class Plaintiffs' Motion for Final Approval of the Settlement and all memoranda and affidavits submitted in support thereof, it is hereby:

**ORDERED, ADJUDGED AND DECREED THAT:**

1.    This Order and Final Judgment incorporates by reference the definitions in the Settlement Agreement and all terms used herein shall have the same meanings set forth in the Settlement Agreement. (D.E # 89-1). The certified Class is set forth as follows:

> All persons and entities in the United States that purchased DDAVP in tablet form directly from one or more of the Defendants at any time from February 18, 2001 through December 31, 2010 (the "Class Period"). Excluded from the Class are Defendants, their parents, employees, subsidiaries and affiliates, and federal government entities.[1]

2.     This Court has jurisdiction over this Direct Purchaser Class Action and each of the parties to the Settlement Agreement including all Class members.

3.     As set forth in more detail in the Settlement Agreement, Defendants have agreed to pay a total of $20,250,000, plus accrued interest, to settle this Action.

4.     As required by this Court in its Preliminary Approval Order, notice of the proposed settlement with Defendants was mailed by first-class mail to all members of the Class.   Such notice to members of the Class is hereby determined to be fully in compliance with requirements of Fed. R. Civ. P. 23(e) and due process and is found to be the best notice practicable under the circumstances and to constitute due and sufficient notice to all entities entitled thereto.

5.     Due and adequate notice of the proceedings having been given to the Class and a full opportunity having been offered to the Class to participate in the fairness hearing, it is hereby determined that all Class Members are bound by this Order and Final Judgment.

6.     The settlement of this Direct Purchaser Class Action as to Defendants was not the product of collusion between Direct Purchaser Plaintiffs and Defendants or their respective counsel, but rather was the result of *bona fide* and arm's-length negotiations conducted in good

---

[1] The Preliminary Approval Order (D.E. #90), dated August 15, 2011, previously defined the Class as:

> All persons and entities in the United States that purchased DDAVP in tablet form directly from one or more of the Defendants at any time from February 18, 2001 through December 31, 2010 (the "Class Period"). Excluded from the Class are Defendants, their parents, subsidiaries and affiliates, employees, and federal government entities.

The definition as set forth herein mirrors the definition as defined by the parties in their Settlement Agreement. There is no material change between the class definition as set forth herein and as forth in the Preliminary Approval Order.

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 8 of
229
Case 7:05-cv-02237-CS   Document 113   Filed 11/28/11   Page 3 of 10
Case 7:05-cv-02237-CS   Document 99-1   Filed 10/24/11   Page 3 of 10

faith between Class Counsel and Defendants' Counsel.

7.     The Court has held a hearing to consider the fairness, reasonableness and adequacy
of the proposed settlement, and has been advised that there have been no objections to the
settlement from any members of the Class.

8.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court hereby
finally approves in all respects the Settlement as set forth in the Settlement Agreement and finds
that the Settlement is in all respects, fair, reasonable, adequate, and in the best interests of the
Class. The Court further approves the establishment of the Settlement Fund upon the terms and
conditions set forth in the Settlement Agreement. The Parties are hereby directed to carry out the
Settlement in accordance with its terms and provisions.

9.     The Court approves the Plan of Allocation of the Net Settlement Fund as proposed
by Class Counsel. Rust Consulting, Inc., the firm retained by Class Counsel as the claims
administrator, will distribute the Net Settlement Fund to the Class pursuant to the Plan of
Allocation.

10.     All claims in the above-captioned action against Defendants are hereby dismissed
with prejudice, and without costs, with such dismissal subject only to compliance by the Parties
with the terms and conditions of the Settlement Agreement and this Order and Final Judgment,
over which the Court retains jurisdiction. All Released Claims (as defined in ¶ 11 below) of
Direct Purchaser Plaintiffs and the Direct Purchaser Class in the above-captioned Action are
released and dismissed with prejudice, and, except as provided for in the Settlement Agreement,
without costs.

11.     Upon the occurrence of the Effective Date and in consideration of payment of the
Settlement Amount specified in Paragraph 6 of the Settlement Agreement, Plaintiffs and all

Case No. 1:90-cv-00181-JLK Document 2435-16 filed 01/12/17 USDC Colorado pg 9 of 229
Case 7:05-cv-02237-CS Document 113 Filed 11/28/11 Page 4 of 10
Case 7:05-cv-02237-CS Document 99-1 Filed 10/24/11 Page 4 of 10

Class Members, on behalf of themselves and their respective past and present parents,

subsidiaries, affiliates, officers, directors, employees, agents, attorneys, servants, representatives

(and the parents' subsidiaries' and affiliates' past and present officers, directors, employees,

agents, attorneys servants, and representatives), and the predecessors, successors, heirs,

executors, administrators, representatives, and assigns of each of the foregoing (the "Releasors"),

hereby release and forever discharge, and covenant not to sue, or to authorize anyone to sue on

their behalf, or to support anyone financially or administratively in suing, or to prosecute any

pending or previously filed suit against Defendants and their past and present parents,

subsidiaries, affiliates. officers, directors, employees, agents, attorneys, servants, representatives

(and the parents' subsidiaries' and affiliates' past and present officers, directors, employees,

agents, attorneys, servants, and representatives), and the predecessors, successors, heirs,

executors, administrators, representatives, and assigns of each of the foregoing (the "Releasees"),

with respect to, in connection with, or relating to any and all past, present, or future liabilities,

claims, demands, obligations, suits, damages. levies, executions, judgments, debts, charges,

actions, or causes of action, at law or in equity, whether class, individual, or otherwise in nature,

and whether known or unknown, arising out of or relating to purchases of DDAVP and/or

generic versions of DDAVP at any time prior to the Effective Date and arising under the

Sherman Act, 15 U.S.C. §§ 1 & 2, et seq., or any other federal or state statute or common law

relating to antitrust, unfair competition, unfair practices, price discrimination, unitary pricing,

trade practice, consumer protection, or civil conspiracy claims (the "Released Claims"). The

Released Claims include, but are not limited to, any and all claims relating to or arising out of the

facts. occurrences, transactions, or other matters alleged or asserted in this Action, or that could

have been alleged or asserted in this Action, or that could constitute a continuation of any of the

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 10 of 229
Case 7:05-cv-02237-CS   Document 113   Filed 11/28/11   Page 5 of 10
Case 7:05-cv-02237-CS   Document 99-1   Filed 10/24/11   Page 5 of 10

facts, occurrences, transactions, or other matters alleged or asserted in this Action. However, the Settlement Agreement is not intended to release anyone other than the Releasees, nor any claims described in Paragraph 12 of the Settlement Agreement.

12.    In addition, each Releasor hereby expressly waives and releases, upon the Settlement Agreement becoming final, any and all provisions, rights, and/or benefits conferred by § 1542 of the California Civil Code, which reads:

> Section 1542. General Release; extent. A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor; or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code.

13.    Each Releasor may hereafter discover facts other than or different from those which he, she, or it knows or believes to be true with respect to the claims that are the subject matter of the Release. Nonetheless, upon the Effective Date each Releasor hereby expressly waives and fully, finally and forever settles and releases, any known or unknown, suspected or unsuspected, contingent or noncontingent claim that is the subject matter of Paragraph 10 of the Settlement Agreement, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

14.    Each Releasor also hereby expressly waives and fully, finally and forever settles and releases any and all claims it may have against Defendants under § 17200, *et seq.*, of the California Business and Professions Code, as those claims are expressly incorporated into Paragraph 10 of the Settlement Agreement.

15.    Notwithstanding the releases contained in Paragraphs 10 and 11 of the Settlement Agreement, the Releasors and Defendants expressly agree that the Settlement and release only

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 11 of
229
Case 7:05-cv-02237-CS   Document 113   Filed 11/28/11   Page 6 of 10
Case 7:05-cv-02237-CS   Document 99-1   Filed 10/24/11   Page 6 of 10

releases the Releasees as defined above, and that the parties do not intend the Settlement

Agreement, any part hereof or any other aspect of the proposed Settlement or release, to release

or otherwise affect in any way any rights a Releasor has or may have against any other party or

entity whatsoever other than the Releasees with respect to the releases contained in Paragraphs

10 and 11 of the Settlement Agreement. The intent of the Settlement is to effect a complete and

total resolution of this Action and all claims that were or could have been asserted relating to the

allegations in this Action, but is not intended to release any claims arising in the ordinary course

of business between Releasors and the Releasees concerning product liability, breach of contract,

breach of warranty, or personal injury, or other claim unrelated to the allegations in this Action.

All Class Members shall be forever enjoined and barred from asserting any of the matters, claims

or causes of action released by the Settlement Agreement, and all Class Members shall be

deemed to have forever released any and all such matters, claims and causes of action as

provided for in the Settlement Agreement.

      16.    Class Counsel have moved for an award of attorneys' fees and reimbursement of

expenses. Pursuant to Rules 23(h)(3), 54(d) and 52(a) of the Federal Rules of Civil Procedure,

this Court makes the following findings of fact and conclusions of law:

            a.     that the Settlement confers a substantial benefit on the Direct Purchaser

Class;

            b.     that the value conferred on the Direct Purchaser Class is immediate and

readily quantifiable, in that, upon this Judgment becoming final, each Direct Purchaser Class

member who duly submits and executes a Claim Form will receive a cash payment that

represents a portion of the total overcharge allegedly incurred as a result of the conduct

challenged in this lawsuit;

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 12 of 229
Case 7:05-cv-02237-CS   Document 113   Filed 11/28/11   Page 7 of 10
Case 7:05-cv-02237-CS   Document 99-1   Filed 10/24/11   Page 7 of 10

c.      that Class Counsel effectively pursued the claims on behalf of the
members of the Direct Purchaser Class before this Court in this complex case, and expended
7,361 hours in so doing, resulting in a lodestar of $3,512,289.50 at the normal and customary
hourly rates of these law firms, which time was expended with no guarantee it would be
compensated;

d.      that the Settlement was obtained as a direct result of Class Counsel's
skillful advocacy;

e.      that the Settlement was negotiated in good-faith and in the absence of
collusion;

f.      that during the prosecution of this Class Action, Class Counsel incurred
expenses in the amount of $148,222.40, which I find were reasonable and necessary to the
representation of the Direct Purchaser Class and the prosecution of this lawsuit, and for which
Class Counsel had no guarantee of reimbursement;

g.      that Direct Purchaser Class members were advised in the Notice of
Proposed Settlement of Class Action, which notice was approved by this Court, that Class
Counsel intended to move for an award of attorneys' fees in an amount up to 33⅓% of the gross
Settlement Fund (including the interest accrued thereon) created by the Settlement, plus
reimbursement of reasonable costs and expenses incurred in the prosecution of this action;

h.      that Class Counsel did, in fact, move for an award of attorneys' fees in the
amount of 33⅓% of the gross Settlement Fund (including the interest accrued thereon), plus
reimbursement of reasonable costs and expenses incurred in the prosecution of this action, which
motion has been on the docket and publicly available since September 13, 2011;

i.      that no member of the Class, which is composed of dozens of business

7

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 13 of 229
Case 7:05-cv-02237-CS   Document 113   Filed 11/28/11   Page 8 of 10
Case 7:05-cv-02237-CS   Document 99-1   Filed 10/24/11   Page 8 of 10

entities, has objected to the award of attorneys' fees or expenses sought by Class Counsel;

       j.    that counsel who recover a common fund for the benefit of persons other than themselves or their clients are entitled to a reasonable attorneys' fee from the fund as a whole. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984);

       k.    that the requested 33⅓% fee award is well within the applicable range of reasonable percentage fund awards, and results in a modest multiplier of 1.9; and

       l.    that counsel representing the three largest class members, AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation, have each submitted letters supporting both the settlement and class counsel's fee request.

17.    Accordingly, Direct Purchaser Plaintiffs' Class Counsel are hereby awarded attorneys' fees in the amount of 33⅓% of the gross, or 6,750,000 plus interest through this date. The Court finds this award to be fair and reasonable. Further, Direct Purchaser Plaintiffs' Class Counsel are hereby awarded $148,222.40 out of the Settlement Fund to reimburse their expenses incurred in the prosecution of this lawsuit, which the Court finds to be fair and reasonable, and which amount shall be paid to Direct Purchaser Class Counsel from the Settlement Fund in accordance with the terms of the Settlement Agreement. Co-Lead Counsel shall allocate the fees and expenses among all of the Class Counsel.

18.    The Court authorizes disbursements or distributions of up to $150,000 from the Settlement Fund for expenses related to providing notice of to the Class, expenses associated with administering the Settlement, and any payments and expenses incurred in connection with taxation matters relating to the Settlement.

19.    Neither this Order and Final Judgment, the Settlement Agreement, nor any of its

8

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 14 of 229
Case 7:05-cv-02237-CS   Document 113   Filed 11/28/11   Page 9 of 10
Case 7:05-cv-02237-CS   Document 99-1   Filed 10/24/11   Page 9 of 10

terms or the negotiations or papers related thereto shall constitute evidence or an admission by

any party or Releasee, that any acts of wrongdoing have been committed, and they shall not be

deemed to create any inference that there is any liability therefore.  Neither this Order and Final

Judgment, the Settlement Agreement, nor any of the terms or negotiations or papers related

thereto shall be offered or received in evidence or used for any purpose whatsoever, in this or

any other matter or proceeding in any court, administrative agency, arbitration or other tribunal,

other than as expressly set forth in the Settlement Agreement.

20.    Without affecting the finality of this judgment, the Court retains exclusive

jurisdiction over the Settlement Agreement, including the administration and consummation of

the Settlement Agreement, the Plan of Allocation, and in order to determine any issues relating

to attorneys' fees and expenses and any distribution to members of the Class.  In addition,

without affecting the finality of this judgment, Defendants and each member of the Class hereby

irrevocably submit to the exclusive jurisdiction of the United States District Court for the

Southern District of New York, for any suit, action, proceeding or dispute arising out of or

relating to the Settlement Agreement or the applicability of the Settlement Agreement, including,

without limitation any suit, action, proceeding or dispute relating to the release provisions

therein.

21.    The Class Representatives (LWD, RDC and Meijer) are each hereby awarded

$30,000 out of the Settlement Fund, for representing the Direct Purchaser Class, which amount is

in addition to whatever monies these plaintiffs will receive from the Settlement Fund pursuant to

the Plan of Allocation. The Court finds these awards to be fair and reasonable.

22.    The Court finds that the notice provided by the Defendants to the U.S. Attorney

General and all the State Attorneys General pursuant to the requirements of 28 U.S.C. §1715(b),

mailed on August 26, 2011 by United States Certified Mail, meets the notice requirements of the Class Action Fairness Act, and that final judgment approving the settlement may be entered on or after November 24, 2011 under 28 U.S.C. §1715(d).

23.    In the event the Settlement does not become final in accordance with paragraph 5 of the Settlement Agreement, this Order and Final Judgment shall be rendered null and void as provided by the Settlement Agreement, shall be vacated, and all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement.

24.    The Court hereby directs that this judgment be entered by the clerk forthwith pursuant to Federal Rule of Civil Procedure 54(b). The direction of the entry of final judgment pursuant to Rule 54(b) is appropriate and proper because this judgment fully and finally adjudicates the claims of the Direct Purchaser Plaintiffs and the Direct Purchaser Class against all Defendants in this action, allows consummation of the Settlement, and will expedite the distribution of the Settlement proceeds to the Direct Purchaser Class members.

SO ORDERED this the *28th* day of *November*, 2011.


_____
Hon. Cathy Seibel
United States District Judge
New York, New York

10

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: GRAPHITE ELECTRODES          :      Master File No. 97-CV-4182
ANTITRUST LITIGATION                :      MDL No. 1244
                                    :
                                    :
THIS DOCUMENT RELATES TO:           :
*Kentucky Electric Steel, Inc., et al.*   :
*v. Mitsubishi Corporation, et al.*       :
Civil Action No. 99-CV-482 (E.D.Pa.)  :
                                    :

**FILED** SEP – 8 2003

### ORDER APPROVING CLASS REPRESENTATIVES'
### PETITION FOR INCENTIVE PAYMENTS

AND NOW, this ___8___ day of ___Sep___, 2003 upon consideration of "Class

Representatives' Petition for Incentive Payments"("Petition"), the Court finds as follows:

1.     The Notice of the proposed settlements with Mitsubishi Corporation, Mitsubishi

International Corporation and Nippon Carbon, Ltd., advised Class Members that the three (3) Class

Representatives in this litigation intended to petition for incentive awards in the amount of $80,000

each.

2.     The Notice advised Class Members of their right to object to the Petition.

3.     No Class Member has objected to the Petition.

4.     The Court finds that public policy favors an award of incentive payments to the three

(3) Class Representatives in this litigation who have expended significant time and effort on behalf

of the Class. The Court notes that such awards are routinely provided to the named plaintiffs for the

services they provide and the risks they incur in pursuing litigation on behalf of the absent class

members. *See, Cullen v. Whitman Medical Corporation*, 197 F.R.D. 136, 145 (E.D. Pa. 2000).

9/8/03

5.      Therefore, the Court grants the Petition and awards $80,000 each to the Class

Representatives, Carpenter Technology Corporation, Cascade Steel Rolling Mills and Kentucky

Electric Steel, Inc.  Co-lead Counsel for the Class are directed to pay these awards from the

Settlement Funds.

6.      The Court further expressly finds under Rule 54 (b) of the Federal Rules of Civil

Procedure that there is no just reason for delay and directs the entry of this Order as a final judgment.

**BY THE COURT:**

Honorable Charles R. Weiner
United States District Judge

ENTERED

SEP - 9 2003

CLERK OF COURT

- 2 -

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE HYPODERMIC PRODUCTS ANTITRUST LITIGATION | Master Docket No. 05-cv-1602 (JLL/MAH) |
| THIS DOCUMENT RELATES TO ALL DIRECT PURCHASER ACTIONS | MDL Docket No. 1730 |

### (PROPOSED) ORDER AND FINAL JUDGMENT APPROVING DIRECT PURCHASER CLASS SETTLEMENT, AWARDING ATTORNEYS' FEES AND EXPENSES, AWARDING INCENTIVE AWARDS TO CLASS REPRESENTATIVES, APPROVING PLAN OF ALLOCATION, AND DISMISSING CLAIMS AGAINST DEFENDANT

This Court, having considered (a) the Direct Purchaser Plaintiffs' Motion for Entry of an Order Granting Final Approval of the Direct Purchaser Class Settlement and Memorandum in Support thereof; (b) the Direct Purchaser Plaintiffs' Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards for Class Representatives, Memorandum in Support thereof, and Amendment thereto; (c) Declaration of Lead Class Counsel Bruce E. Gerstein in Support of Direct Purchaser Plaintiffs' Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards for Class Representatives, (d) Direct Purchaser Class Counsel's  Report Regarding Class Notice Program and Opt-Outs; (e) Affidavit of Michael Rosenbaum of Berdon Claims Administration LLC re: Mailing and Publication of Notice and Requests for Exclusion; and having

held a hearing on March 8, 2013; and having considered all of the submissions and arguments with respect thereto; pursuant to Fed. R. Civ. P. 23 and 54, and in accordance with the terms of the Settlement Agreement between Direct Purchaser Plaintiffs and Defendant Becton, Dickinson and Company ("BD"), dated April 27, 2009 ("Settlement Agreement"), it is hereby **ORDERED, ADJUDGED, and DECREED that:**

1.     This Order and Final Judgment incorporates by reference the definitions in the Settlement Agreement and all terms used herein shall have the same meanings set forth in the Settlement Agreement.

2.     The Court finds that: (i) each of the Direct Purchaser Plaintiffs has direct purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act for all BD Hypodermic Products they purchased from BD; (ii) the Healthcare Plaintiffs[1] do not have direct purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act for any BD Hypodermic Products they purchased from or through a distributor or other intermediary, and (iii) only those purchasers of BD Hypodermic Products who purchased those products from BD and were invoiced by BD for those products have direct

---

[1]     The Healthcare Plaintiffs include MedStar Health Inc.; MedStar-Georgetown Medical Center, Inc.; National Rehabilitation Hospital, Inc.; Washington Hospital Center Corporation; and Hebrew Home for the Aged, who filed suit against BD on behalf of themselves and a proposed class of indirect purchasers and entities that purchased BD Hypodermic Products "through BD's authorized distributors."

purchaser standing to assert damage claims against BD under Section 4 of the

Clayton Act with respect to Class Purchases (defined in ¶ 3 below).

     3.     As set forth in the Preliminary Approval Order (Doc. No. 444), dated

November 15, 2012, the certified Direct Purchaser Class is defined as follows:

> All persons or entities (and assignees of claims from such persons and
> entities) who (1) purchased BD Hypodermic Products in the United
> States from BD at any time during the period of March 23, 2001
> through April 27, 2009 (the "Class Period"), and (2) were invoiced by
> BD for said purchases. The Direct Purchaser Class excludes BD, BD's
> parents, subsidiaries and affiliates, and United States Government
> Entities and the following entity that opted out of the Direct Purchaser
> Class: VWR International, LLC, f/k/a VWR International, Inc., f/k/a
> VWR Scientific Products Corporation, f/k/a VWR Corporation, f/k/a
> VWR Scientific Inc.

Persons or entities who purchased BD Hypodermic Products in the United

States from BD during the Class Period and were invoiced by BD for said

purchases are entities who appear in the "bill to" or "sold to" fields of BD's

electronic sales data for those purchases ("Class Purchases").

   "BD Hypodermic Products" are defined as products sold by BD in the

following device categories:

> (a) safety and conventional hypodermic needles and syringes;
> (b) safety and conventional blood collection devices, inclusive of needles, blood
> collection tubes and tube holders;
> (c) safety and conventional IV catheters, including winged IV catheters;
> (d) safety and conventional insulin delivery devices.

     4.     The Court has jurisdiction over this case, *In re Hypodermic Products*

*Direct Purchaser Antitrust Litig.*, Master Docket No. 05-cv-1602 ("Action"), and

each of the Direct Purchaser Class members for all matters relating to this Action, the Settlement, including (without limitation) all matters relating to the administration, interpretation, effectuation, and/or enforcement of the Settlement and this Order.

5.    As required by this Court in the Preliminary Approval Order, Notice of the proposed Settlement was mailed by first-class mail to all members of the Direct Purchaser Class to each Class member's last known address as reflected in BD's sales database, and by publication of the Summary Notice in the December 2012 editions of the industry journal, *Modern Healthcare*.  The Notice was also posted, along with relevant settlement documents, on the web site of the Court-appointed Claims Administrator, Berdon Claims Administration LLC, www.berdonclaims.com.   Such notice to members of the Direct Purchaser Class is hereby determined to be fully in compliance with the requirements of Fed. R. Civ. P. 23(e) and due process of law and is found to be the best notice practicable under the circumstances and to constitute due and sufficient notice to all entities entitled thereto.

6.    Due and adequate notice of the proceedings having been given to the Direct Purchaser Class and a full opportunity having been offered to the Direct Purchaser Class to participate in the March 8, 2012 Fairness Hearing, it is hereby

determined that all Direct Purchaser Class members are bound by this Order and Final Judgment.

7.     The Settlement of this Direct Purchaser Class Action was not the product of collusion between the Direct Purchaser Plaintiffs and BD or their respective counsel, but rather was the result of *bona fide* and arm's-length negotiations conducted in good faith between Class Counsel[2] and BD's counsel.

8.     The Court has held a hearing to consider the fairness, reasonableness and adequacy of the proposed Settlement, and has been advised that only one Class member, VWR International, LLC, f/k/a VWR International, Inc., f/k/a VWR Scientific Products Corporation, f/k/a VWR Corporation, f/k/a VWR Scientific Inc., elected to opt-out of the Class, there have been no objections to the Settlement from any members of the Class,[3] and also four members of the Class, who

---

[2] By Order dated November 15, 2012, this Court appointed the following law firms to serve as Class Counsel under Rule 23(g):

| Lead Counsel: | Garwin Gerstein & Fisher LLP |
| Liaison Counsel: | Cohn Lifland Pearlman Herrmann & Knopf LLP |
| Executive Committee: | Berger & Montague, P.C. |
| | Odom & Des Roches LLP |
| | Smith Segura & Raphael LLP |
| | Hagens Berman Sobol Shapiro, LLP |
| | RodaNast PC (n/k/a NastLaw LLC) |

Doc. No. 444 at ¶44.

[3] Two of the Healthcare Plaintiffs, MedStar Health Inc. and MedStar-Georgetown Medical Center, Inc. objected to the Settlement on January 14, 2013. Doc. No. 451. As neither appears in the "bill to" or "sold to" fields of BD's

collectively comprise about half of all Class purchases, have explicitly stated their support for the Settlement and Class Counsel's requested attorneys' fees, reimbursement of expenses, and incentive awards to each of the seven named Class Representatives.

9.     Pursuant to Fed. R. Civ. P. 23, this Court hereby approves the Settlement between the Direct Purchaser Plaintiff Class and BD, and finds that the Settlement is, in all respects, fair, reasonable, and adequate, and in the best interest of the members of the Direct Purchaser Class, and within a range that responsible and experienced attorneys could accept considering all relevant risks and factors of litigation.  Accordingly, the Settlement shall be consummated in accordance with the terms and provisions of the Settlement Agreement.  The Settlement is fair, reasonable, and adequate in light of the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), as follows:

(a)     the case was highly complex, expensive and time consuming, and would have continued to be so if the case had not been settled;

(b)     only one Class member elected to opt-out of the Class, there were no objections to the Settlement by Class members, and four Class members, who collectively comprise about half of all Class purchases, expressed affirmative support for the Settlement;

---

electronic sales data, MedStar Health Inc. and MedStar-Georgetown Medical Center, Inc. are not members of the Class certified by this Court.

(c)     because the case settled after a significant amount of discovery was taken, after more than 2.5 million pages of documents had been produced and reviewed, Class Counsel had an appreciation of the strengths and weaknesses of their case before negotiating the Settlement;

(d)     Class Counsel and the Class would have faced numerous and substantial risks in establishing both liability and damages if they had decided to continue to litigate rather than settle;

(e)     the Settlement amount is well within the range of reasonableness in light of the best possible recovery and the risks the parties would have faced if the case had continued to verdicts on both liability and damages; and

(f)     the Settlement also satisfies the additional factors for evaluating class settlements set forth in *In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1998).

10.     The Court approves the Plan of Allocation of the Settlement proceeds (net of attorneys' fees, reimbursed expenses, incentive awards, and costs of notice and claims administration) as proposed by Class Counsel in the Plan of Allocation described in the Direct Purchaser Plaintiffs' Memorandum in Support of their Motion for Entry of an Order Granting Final Approval of the Direct Purchaser Class Settlement, and summarized in the Notice to the Direct Purchaser Class. The Plan of Allocation proposes to distribute the net Settlement proceeds among the

members of the Direct Purchaser Class *pro rata* based on each member's Class Purchases of BD Hypodermic Products, and does so fairly and efficiently. It directs Berdon Claims Administration LLC, the firm retained by Direct Purchaser Plaintiffs' Counsel and approved by the Court in the Preliminary Approval Order as the Claims Administrator, to distribute the net Settlement proceeds in the manner provided in the Plan of Allocation.

11. All claims in the Direct Purchaser Action against BD, including by those members of the Direct Purchaser Class who have not timely excluded themselves from the Direct Purchaser Class, are hereby dismissed with prejudice, and without costs, with such dismissal subject only to compliance by the Parties with the terms and conditions of the Settlement Agreement and this Final Order and Judgment, over which the Court retains exclusive jurisdiction, including the administration and consummation of the Settlement;

12. This judgment of dismissal is final and appealable;

13. In accordance with the Settlement Agreement, upon the Settlement becoming final in accordance with its terms:

(a) BD and its present and former parents, subsidiaries, divisions, departments, affiliates, stockholders, officers, directors, employees, agents and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing) (the "Released

8

Parties") are and shall be released and forever discharged from any and all claims, rights, demands, obligations, damages, actions or causes of action, or liabilities whatsoever, known or unknown, fixed or contingent, in law or in equity, (i) arising under 15 U.S.C. §§ 1, 2 and 14 concerning the sale by BD of BD Hypodermic Products to the Direct Purchaser Class members from the beginning of time through the date of this Settlement Agreement, or (ii) that have been or could have been asserted by the Direct Purchaser Plaintiffs or any member of the Direct Purchaser Class either in the Direct Purchaser Class Action in this Court or in any other action or proceeding in this Court or any other court or forum arising out of, or based upon, the conduct alleged in the Second Consolidated Amended Class Action Complaint, filed May 10, 2006 (the "Complaint") or in any other complaint or pleading filed in this action, whether based on federal, state, local, statutory, or common law, or any other law, rule, or regulation, or (iii) arising from or related in any way to the administration, allocation, or distribution of the Settlement Fund (collectively, the "Released Claims"), that Direct Purchaser Plaintiffs or any member or members of the Direct Purchaser Class who has (have) not timely excluded itself (themselves) from the Direct Purchaser Class (including any past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, subsidiaries, partners, heirs, executors, administrators,

9

purchasers, predecessors, successors and assigns, acting in their capacity as such),

whether or not they object to the Settlement and whether or not they make a claim

upon or participate in the Settlement Fund, ever had, now has, or hereafter can,

shall or may have, directly, representatively, derivatively or in any other capacity.

Each member of the Direct Purchaser Class hereby covenants and agrees that it

shall not, hereafter, seek to establish liability against any Released Party based, in

whole or in part, upon any of the Released Claims.

(b)    In addition, each Direct Purchaser Class member expressly

waives and releases, upon the Settlement Agreement becoming final, any and all

provisions, rights and benefits conferred by § 1542 of the California Civil Code,

which states:

> Section 1542.  Certain Claims Not Affected by General
> Release.  A general release does not extend to claims
> which the creditor does not know or suspect to exist in
> his or her favor at the time of executing the release,
> which if known by him or her must have materially
> affected his or her settlement with the debtor.

or by any law of any state or territory of the United States, or principle of common

law, which is similar, comparable or equivalent to § 1542 of the California Civil

Code.  Each Direct Purchaser Class member may hereafter discover facts other

than or different from those which he, she or it knows or believes to be true with

respect to the claims which are the subject matter of this paragraph 11, but each

Direct Purchaser Class member hereby expressly waives and fully, finally and

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 28 of
Case 2:05-cv-01602-JLL-MAH   Document 464   Filed 04/10/13   Page 11 of 17 PageID: 20011
229

forever settles and releases, upon this Settlement Agreement becoming final, any

known or unknown, suspected or unsuspected, contingent or non-contingent claim

that would otherwise fall within the definition of Released Claims, whether or not

concealed or hidden; without regard to the subsequent discovery or existence of

such different or additional facts.   For the avoidance of doubt, each Direct

Purchaser Class member also hereby expressly waives and fully, finally and

forever settles and releases any and all claims it may have against any Released

Party under §17200, *et seq.,* of the California Business and Professions Code or

any similar, comparable or equivalent provision of the law of any other state or

territory of the United States or other jurisdiction, which claims are hereby

expressly incorporated into the definition of Released Claims.

   14. Direct Purchaser Plaintiffs' counsel have moved for an award of

attorneys' fees and reimbursement of expenses.   Pursuant to Rules 23(h)(3) and

54(d) of the Federal Rules of Civil Procedure, and pursuant to the factors for

assessing the reasonableness of a class action fee request as set forth in *Gunter v.*

*Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000), this Court makes

the following findings of fact and conclusions of law:

    (a) the Settlement confers a monetary benefit on the Direct

Purchaser Class that is substantial, both in absolute terms and when assessed in

light of the risks of establishing liability and damages in this case;

Case No. 1:90-cv-00181-JLK  Document 2435-16  filed 01/12/17  USDC Colorado  pg 29 of
Case 2:05-cv-01602-JLL-MAH  Document 464  Filed 04/10/13  Page 12 of 17 PageID: 20012
229

(b)     there were no objections by Direct Purchaser Class members to the requested fee award of one-third of the Settlement Fund, or such objections are overruled;

(c)     Direct Purchaser Plaintiffs' counsel have effectively and efficiently prosecuted this difficult and complex action on behalf of the members of the Direct Purchaser Class, with no guarantee they would be compensated;

(d)     Direct Purchaser Plaintiffs' counsel undertook numerous and significant risks of nonpayment in connection with the prosecution of this action;

(e)     Direct Purchaser Plaintiffs' counsel have reasonably expended over 76,000 hours, and incurred substantial out of pocket expenses, in prosecuting this action, with no guarantee of recovery;

(f)     fee awards similar to the fee requested by Direct Purchaser Plaintiffs' counsel here have been awarded in similar cases, including numerous Direct Purchaser antitrust class actions similarly alleging anticompetitive practices;

(g)     the Settlement achieved for the benefit of the Direct Purchaser Class was obtained as a direct result of Direct Purchaser Plaintiffs' counsel's skillful advocacy;

(h)     the Settlement was reached following negotiations held in good-faith and in the absence of collusion;

(i)     the "percentage-of-the-fund" method is the proper method for

calculating attorneys' fees in common fund class actions in this Circuit (*see, e.g.,*
*In re Rite Aid Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005));

(j)     Direct Purchaser Class members were advised in the Notice of
Proposed Settlement of Class Action, which notice was approved by this Court,
that Direct Purchaser Plaintiffs' counsel intended to move for an award of
attorneys' fees in an amount up to 33-1/3% of the gross Settlement Fund (including
the interest accrued thereon), plus reimbursement of reasonable costs and expenses
incurred in the prosecution of this action;

(k)     Direct Purchaser Plaintiffs' counsel did, in fact, move for an
award of attorneys' fees in the amount of 33-1/3% of the gross Settlement Fund
(including the interest accrued thereon), plus reimbursement of reasonable costs
and expenses incurred in the prosecution of this action, which motion has been on
the docket and publicly available since December 31, 2012;

(l)     As detailed in Direct Purchaser Plaintiffs' counsel's affidavits,
a one-third fee award would equate to a lodestar multiplier of approximately .45.
An examination of recently approved multipliers in other Direct Purchaser class
actions similarly alleging anticompetitive practices in a medical device market
reveals that the multiplier requested here is well within the acceptable range;

(m)     in light of the factors and findings described above, the
requested 33-1/3% fee award is within the applicable range of reasonable

13

percentage fund awards.

Accordingly, Direct Purchaser Plaintiffs' counsel are hereby awarded attorneys' fees in the amount of $ 15,000,000.00 from the Settlement Fund, plus one-third of the interest earned on the Settlement proceeds from December 3, 2012 (the date of funding of the Settlement Fund) to the date of payment, at the same net interest rate earned by the Settlement Fund. The Court finds this award to be fair and reasonable.

Further, Direct Purchaser Plaintiffs' counsel are hereby awarded $ 2,266,501.56 out of the Settlement Fund to reimburse them for the expenses they incurred in the prosecution of this lawsuit, which expenses the Court finds to be fair, and reasonably incurred to achieve the benefits to the Direct Purchaser Class obtained in the Settlement to the Direct Purchaser Class.

The awarded fees and expenses shall be paid to Direct Purchaser Plaintiffs' counsel from the Settlement Fund in accordance with the terms of the Settlement Agreement. Direct Purchaser Plaintiffs' Lead Class Counsel shall allocate the fees and expenses among all of the Direct Purchaser Plaintiffs' counsel.

15. Neither this Order and Final Judgment, the Settlement Agreement, nor any and all negotiations, documents and discussions associated with it shall be deemed or construed to be an admission or evidence of any violation of any statute or law, of any liability or wrongdoing by BD, or of the truth of any of the claims or

Case No. 1:90-cv-00181-JLK  Document 2435-16  filed 01/12/17  USDC Colorado  pg 32 of
Case 2:05-cv-01602-JLL-MAH  Document 464  Filed 04/10/13  Page 15 of 17 PageID: 20015
229

allegations contained in any complaint or any other pleading or document, and

evidence thereof shall not be discoverable, admissible or otherwise used directly or

indirectly, in any way by Direct Purchaser Plaintiffs or BD, whether in this Direct

Purchaser Class Action or in any other action or proceeding; nor shall the

Settlement Agreement be used or referred to in any subsequent motion for class

certification made by any party to this Action.

16.    Without affecting the finality of this judgment, the Court retains

exclusive jurisdiction over the Settlement, and the Settlement Agreement,

including the administration and consummation of the Settlement Agreement, the

Plan of Allocation, and in order to determine any issues relating to attorneys' fees

and expenses and any distribution to members of the Direct Purchaser Class. In

addition, without affecting the finality of this judgment, BD and each member of

the Direct Purchaser Class hereby irrevocably submit to the exclusive jurisdiction

of the Court for any suit, action, proceeding or dispute arising out of or relating to

the Settlement Agreement or the applicability of the Settlement Agreement,

including, without limitation any suit, action, proceeding or dispute relating to the

release provisions herein, except that this submission to the Court's jurisdiction

shall not prohibit (a) the assertion in the forum in which a claim is brought that the

release included in the Settlement Agreement is a defense, in whole or in part, to

such claim or, (b) in the event that such a defense is asserted in that forum, the determination of its merits in that forum.

17.    The Direct Purchaser Class Representatives actively participated and assisted in the prosecution of this case by, among other things, production of documents and electronic data, providing written discovery responses, supplying affidavits, and regular communication with Direct Purchaser Plaintiffs' counsel. Accordingly, Direct Purchaser   Class Representatives (namely   Louisiana Wholesale Drug Company, Inc., Rochester Drug Co-Operative, Inc., JM Smith Corporation d/b/a Smith Drug Company, American Sales Company, Inc., SAJ Distributors, Inc., Dik Drug Company, and Park Surgical Co., Inc.) are each hereby awarded thirty-five thousand dollars $35,000.00 out of the Settlement Fund, for representing the Direct Purchaser Class, which amount is in addition to whatever monies these plaintiffs will receive from the Settlement Fund pursuant to the Plan of Allocation.  The Court finds these awards to be fair and reasonable.

18.    In the event the Settlement does not become final in accordance with paragraph 19 of the Settlement Agreement, this Order and Final Judgment shall be rendered null and void as provided by the Settlement Agreement, shall be vacated, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement,

and the Settlement Agreement shall not be used or referred to in any subsequent motion for class certification made by any party to this Action.

19.    The Court hereby directs that this judgment be entered by the clerk forthwith pursuant to Federal Rule of Civil Procedure 54(b).  The direction of the entry of final judgment pursuant to Rule 54(b) is appropriate and proper because this judgment fully and finally adjudicates the claims of the Direct Purchaser Plaintiffs and the Direct Purchaser Class against BD in this action, allows consummation of the Settlement, and will expedite the distribution of the Settlement proceeds to the Direct Purchaser Class members.

**SO ORDERED this** _10_ **day of** _april_ ___ **, 2013**


_____
JOSE L. LINARES
UNITED STATES DISTRICT JUDGE

17

FILED

```
1   MERRILL G. DAVIDOFF
    JOHN R. TAYLOR
2   BERGER & MONTAGUE, P.C.
    1622 Locust Street                          1995 APR 15  A 9: 24
3   Philadelphia PA  19103
    Telephone:  (215) 875-3000                  CLERK U.S. DISTRICT COURT
4                                               DISTRICT OF OREGON
    N. ROBERT STOLL, OSB No. 69165              PORTLAND OREGON
5   GARY M. BERNE, OSB No. 77407                BY_____
    STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
6   209 SW Oak Street
    Portland OR  97204
7   Telephone:  (503) 227-1601

8   Of Attorneys for Plaintiffs

9
                IN THE UNITED STATES DISTRICT COURT
10
                   FOR THE DISTRICT OF OREGON
11
    In Re MELRIDGE, INC.        )    Consolidated Actions
12  SECURITIES LITIGATION       )    Maintained Under Master
                                )    File No. CV 87-1426-FR
13                              )
                                )    ORDER REGARDING FEES AND COSTS
14                              )

15       Upon consideration of the Petition of Class Counsel for an

16  Award of Attorneys' Fees and the Memorandum of Law and affidavits

17  submitted in support thereof; and the affidavits of Gary M. Berne

18  and John R. Taylor regarding unreimbursed costs of litigation; and

19  based on this Court's own observations and familiarity with the

20  history of the case, it is hereby ORDERED as follows:

21  1.    The Petition of Class Counsel for an Award of Attorneys' Fees

22  is hereby GRANTED, and Class Counsel are authorized to receive a

23  fee award of $11.7 million, or 40% of the principal proceeds of the

24  Boettcher Settlement.  This fee shall be in addition to the $8.41

25  million in fees previously authorized by this Court, and shall be

26  without prejudice to Class Counsel's right to seek an additional
```

PAGE 1 -   ORDER REGARDING FEES AND COSTS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S. W. OAK STREET
PORTLAND, OREGON  97204
TEL. (503) 227-1600 • FAX (503) 227-6840

42768.1 6260 0

1  award of fees to be paid out of any future recoveries on behalf of

2  the Class.   The reasonableness of this fee award is supported by

3  the following considerations:

4       a.   The   efforts   of   Class   Counsel,   resulting   in   partial

5  settlements totaling $54.25 million, plus additional substantial

6  verdicts   against   the   non-settling   defendants,   have   conferred

7  substantial benefits on the Class and represents an outstanding

8  result.

9       b.   In order to bring about this result, Class Counsel were

10  required to devote an unusual amount of time and effort over more

11  than eight years of intense litigation which included a four-month

12  long jury trial and full briefing and argument of an appeal before

13  the Ninth Circuit Court of Appeals, and which produced one of the

14  most voluminous case files in the history of this District.

15       c.   Throughout   the   course   of   their   representation,   the

16  attorneys at Berger & Montague and Stoll, Stoll, Berne, Lokting &

17  Shlachter who have worked on this case have exhibited an unusual

18  degree   of   skill   and   diligence,   and   have   had   to   contend   with

19  opposing counsel who also displayed unusual skill and diligence.

20       d.   This   has   been   a   highly   complex   litigation   which   has

21  presented a large variety of novel and difficult legal issues.

22       e.   Class   Counsel   undertook   this   representation   on   a

23  contingent basis, with the understanding that their compensation

24  would be dependent on the result obtained for the Class.   Class

25  Counsel   have   had   to   devote   considerable   resources   to   this

26  litigation over an extended period.   Thus, Class Counsel have faced

PAGE 2 -    ORDER REGARDING FEES AND COSTS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S. W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 · FAX (503) 227-6840

42768.1 6260 0

1  considerable risks, and have only been partially compensated to
2  date.

3      f.    The requested fee award represents 40% of the $29.25
4  million in proceeds from the Boettcher Settlement, and will bring
5  Class Counsel's overall fee to 37% of the $54.25 million in total
6  settlement proceeds.  In Portland, it is normal for contingent fee
7  arrangements entered into at arm's length to provide for a fee of
8  one-third of the recovery if settlement is reached prior to trial,
9  with a larger percentage of 40% if the case proceeds to trial.

10      g.    The requested fee is consistent with other common fund
11  cases in which courts have awarded similar percentages of the
12  recovery even where the case has not proceeded to trial.[1]

13      h.    Petitioners have expended a total of 87,076 hours in this
14  litigation, worth $14,613,317.72 when valued at the respective
15  firms' current hourly rates.  *See Bouman v. Block*, 940 F.2d 1211,

16  ———————————————————

17  [1]*See, e.g., In re Crazy Eddie Securities Litigation*, 1993 Fed.
    Sec. L. Rpt. (CCH) ¶97,653 (E.D.N.Y. 1993) (awarding fees of $14.2
18  million or 33.8% of proposed settlement fund); *Employee Benefit
    Plans Securities Litigation*, 1993 Fed. Sec. L. Rpt. (CCH) ¶97,669
19  (D. Minn. 1993) (33-1/3% of Settlement Fund); *Cimarron Pipeline
    Construction v. NCC*, 1993-1 Trade Cases (CCH) ¶70,310 (W.D. Okl.
20  1993) (33-1/3% of a $35.4 million fund); *In re RJR Nabisco Inc.
    Securities Litigation*, 1992 Fed. Sec. L. Rpt. (CCH) ¶96,984
21  (S.D.N.Y. 1992) ($17.7 million dollars or 25% of Settlement); *In Re
    Melridge Securities Litigation,* Consolidated Actions Maintained
22  Under Master File no. CV87-1426-FR (D. Or. March 19, 1992)(30% of
    6.8 million in partial settlements); *In re Consumer Power Company
23  Securities*, Case No. 83 CV 6448AA (E.D. Mich. 1991) (30% of $31
    million dollar fund); *In re Rospatch Securities Litigation*, No. 1-
24  90-Cv. 806 (E.D. Mich. 1993) (33-1/3% of 1.037 supplemental
    settlement); *Kazanos v. Millicom Inc.*, 1993 Fed. Sec. L. Rpt. (CCH)
25  ¶97,255 (S.D.N.Y. 1992) (33%); *Ressler v. Jacobson*, 1993 Fed. Sec.
    L. Rpt. (CCH) ¶97,224 (M.D. Fla. 1992); *In re Gulf Oil/Cities
26  Service Tender Offer Lit.*, 142 F.R.D. 588 (S.D.N.Y. 1992) (30%); *In
    re Home Shopping Network Securities*, Civ. No. 87-428 (M.D. Fla.
    Order of Oct. 15, 1991) (33%).

PAGE 3 -     ORDER REGARDING FEES AND COSTS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S. W. OAK STREET
PORTLAND, OREGON  97204
TEL. (503) 227-1600 · FAX (503) 227-6840

42768.1 6260 0

1   1235 (9th Cir. 1991) (In order to compensate for the delay in

2   payment, courts typically approve the valuation of time at current

3   hourly rates.). The current fee, together with the fees which have

4   already been awarded, will yield an overall fee of $20.11 million.

5   This is only 1.376 times the lodestar in this case. The requested

6   fee award is therefore highly conservative in light of the numerous

7   cases where courts have awarded fees amounting to two, three or

8   four times the lodestar amount.

9        i.   Every Class member is well-motivated to speak up if he or

10  she believes that the requested fee is unreasonable. Pursuant to

11  the Court's Order dated September 13, 1993, the Class was notified

12  that Class Counsel would seek a fee of up to 40% of any future

13  recovery against Boettcher, and were invited to voice any objection

14  at the hearing that was held on November 1, 1993. No Class member

15  voiced any objection in response to that notice. More recently,

16  pursuant to the Order dated March 7, 1996, the Class was again

17  informed of petitioners' intention to seek a fee of 40%, and were

18  again invited to voice any objections. This second notice was

19  mailed to all of the persons or entities who previously submitted

20  valid claims. Notice was also published in the national edition of

21  the Wall Street Journal and in the Oregonian. In response to this

22  second notice, only two Class members have objected to the proposed

23  fee award, and neither objector has demonstrated that the requested

24  fee is unreasonable under the governing legal standards. The

25  requested fee, like the Proposed Boettcher Settlement, appears to

26  enjoy the support of the overwhelming majority of the Class

PAGE 4 -    ORDER REGARDING FEES AND COSTS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S. W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 · FAX (503) 227-6840

42768.1 6260 0

1  members.

2  2.   In addition to the fees authorized by Paragraph 1 of this

3  Order, Class Counsel are authorized to receive $358,718.55 as

4  reimbursement of costs which Class Counsel have advanced in

5  furtherance of the litigation on behalf of the Class.   The Court

6  finds that the requested costs, as set forth in the affidavits of

7  Gary M. Berne and John R. Taylor, are reasonable and necessary to

8  bring this case to trial and for post-trial matters.

9  3.   The awards of fees and costs authorized hereby shall be

10  disbursed from the funds established by the settlements which the

11  Court has approved, including without limitation the Boettcher

12  Settlement.

13  DATED: this 15th day of April, 1996

14                                    BY THE COURT

15

16                                    _____
                                       Hon. Helen J. Frye

17                                    United States District Judge

18

19

    Presented by:
20

21

22  _____
    N. ROBERT STOLL, OSB No. 69165

23  GARY M. BERNE, OSB No. 77407
    STOLL STOLL BERNE LOKTING & SHLACHTER

24

25

26


PAGE 5 -    ORDER REGARDING FEES AND COSTS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S. W. OAK STREET
PORTLAND, OREGON  97204
TEL. (503) 227-1600 · FAX (503) 227-6840

42768.1 6260 0

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE METOPROLOL SUCCINATE DIRECT PURCHASER ANTITRUST LITIGATION | C.A. No. 06-052 - MPT |
| THIS DOCUMENT RELATES TO: Direct Purchaser Action | |

**DIRECT PURCHASER PLAINTIFFS' BRIEF
IN SUPPORT OF THEIR UNOPPOSED MOTION
<u>FOR FINAL APPROVAL OF PROPOSED SETTLEMENT</u>**

Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
ROSENTHAL, MONHAIT & GODDESS, PA
Suite 1401, 919 Market Street, P.O. Box. 1070
Wilmington, DE 19899
jgoddess@rmglaw.com
jzeldin@rmgglaw.com
(302) 565-4433

*Liaison Counsel for Direct Purchaser Class Plaintiffs*

**ADDITIONAL COUNSEL ON SIGNATURE PAGE**

January 11, 2012

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iii

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND .................................................................................................. 2

      A.    PLAINTIFFS' CLAIMS .............................................................................. 2

      B .   DISCOVERY, NEGOTIATIONS, & THE PROPOSED SETTLEMENT................................ 3

III.  ARGUMENT ....................................................................................................... 4

      A.    FINAL APPROVAL OF THE SETTLEMENT IS APPROPRIATE........................................ 4

            1.    Settlements of Antitrust Class Actions Are Encouraged ............................ 4

            2.    The Proposed Settlement Should Be Approved As Fair,
                  Reasonable, and Adequate ........................................................................ 5

                  a.    Standards for Court Approval of a Settlement................................. 5

                  b.    Evaluation of the Settlement Under the *Girsh* Factors ................... 7

                        i.     The complexity, expense, and likely duration of the
                               litigation. ........................................................................... 7

                        ii.    The reaction of the Class to the Settlement ........................ 8

                        iii.   The stage of the proceedings and the amount of
                               discovery completed ............................................................ 9

                        iv.    The risks of establishing liability ...................................... 10

                        v.     The risks of maintaining the class action through
                               trial ................................................................................... 11

                        vi.    The ability of defendants to withstand a greater
                               judgment ........................................................................... 11

                        vii.   The range of reasonableness of the settlement fund
                               in light of the best possible recovery and all the
                               attendant risks of litigation................................................ 12

                  c.    Evaluation Under The Relevant *Prudential* Factors..................... 14

i

i.    Factors that bear on the maturity of the underlying substantive issues ........................................................... 14

ii.    Results achieved by settlement for individual class members versus the results achieved – or likely to be achieved – for other claimants ..................................... 14

iii.    Whether class or subclass members are accorded the right to opt out of the settlement ................................. 14

iv.    Whether any provisions for attorneys' fees are reasonable ...................................................................... 15

v.    Whether the procedure for processing individual claims under the settlement is fair and reasonable ............ 15

3.    Adequate Notice Was Provided to the Class Consistent With the Court's Order Preliminarily Approving the Settlement ............................ 16

B.    THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION ................................... 17

C.    THE NOTICE REQUIREMENTS OF THE CLASS ACTION FAIRNESS ACT HAVE BEEN SATISFIED .............................................................................................. 20

IV.    CONCLUSION ........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Boone v. City of Philadelphia,*
    668 F. Supp. 2d 693 (E.D. Pa. 2009) ........................................................................9

*Bradburn Parent Teacher Store, Inc. v. 3M,*
    513 F. Supp. 2d 322 (E.D. Pa. 2007) ......................................................................17

*Careccio v. BMW of N. Am. LLC,*
    2010 U.S. Dist. LEXIS 42063 (D.N.J. Apr. 29, 2010) ..............................................17

*In re Cendant Corp. Litig.,*
    264 F.3d 201 (3d Cir. 2001) ..............................................................................5, 11

*Chakejian v. Equifax Info. Services, LLC,*
    275 F.R.D. 201 (E.D. Pa. 2011) ..................................................................11, 14, 17

*Comer v. Life Ins. Co.,*
    2011 U.S. Dist. LEXIS 36042 (D.S.C. Mar. 31, 2011) ............................................17

*Cullen v. Whitman Med Corp.,*
    197 F.R.D. 136 (E.D. Pa. 2000) ..........................................................................9, 12

*D.R. v M.R. v. East Brunswick Bd. of Educ.,*
    109 F.3d 896 (3d Cir. 1997) ....................................................................................4

*Fisher Bros., Inc. v. Mueller Brass Co.,*
    630 F. Supp. 493 (E.D. Pa. 1985) ..........................................................................13

*Fisher Bros. v. Phelps Dodge Indus., Inc.,*
    604 F. Supp. 446 (E.D. Pa. 1985) ......................................................................7, 13

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,*
    55 F.3d 768 (3rd Cir. 1995) ....................................................................................4

*Hall v. Best Buy Co., Inc.,*
    274 F.R.D. 154 (E.D. Pa. 2011) ..............................................................................6

*In re Ikon Office Solutions, Inc., Sec. Litig.,*
    194 F.R.D. 166 (E.D. Pa. 2000) ........................................................................7, 17

*In re Ins. Brokerage Antitrust Litig.,*
    579 F.3d 241 (3d Cir. 2009) ..............................................................................6, 15

iii

*In re Linerboard Antitrust Litig.*,
   296 F. Supp. 2d 568 (E.D. Pa. 2003) ..................................................................7, 13

*In re Linerboard Antitrust Litig.*,
   321 F. Supp. 2d 619 (E.D. Pa. 2004) .................................................................. *passim*

*Meijer, Inc. v. 3M*,
   Civ. A. 04-5871, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) .................................8

*In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*,
   C.A. Nos. 06-52, 06-71, 2010 WL 1485328 (D. Del. Apr. 13, 2010) ........................3

*Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*,
   381 U.S. 311 (1965).................................................................................................5

*Nichols v. SmithKline Beecham Corp.*,
   Civ. A. 00-6222, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ..........................16, 17

*In re Pet Food Products Liab. Litig.*,
   629 F.3d 333 (3d Cir. 2010).....................................................................................7

*Pichler v. UNITE*,
   775 F. Supp. 2d 754 (E.D. Pa. 2011) ........................................................................7

*Pillsbury Co. v. Conboy*,
   459 U.S. 248 (1983).................................................................................................5

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998)................................................................................ *passim*

*Reibstein v. Rite Aid Corp.*,
   761 F. Supp. 2d 241 (E.D. Pa. 2011) ......................................................................11

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979).................................................................................................5

*In re Remeron*,
   Civ. A. 02-2007, 04-5126, 2005 WL 2230314 (D.N.J. Sept. 13, 2005)...................13

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
   Civ. A. 03-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) ..........................7, 13

*Sullivan v. DB Investments, Inc.*,
   __ F.3d __, 2011 WL 6367740 (3d Cir. Dec. 20, 2011)...........................................5

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004)............................................................................... *passim*

*Williams v. First National Bank,*
   216 U.S. 582 (1910)................................................................................................4

*Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.,*
   758 F.2d 86 (3d Cir. 1985)....................................................................................17

STATUTES

28 U.S.C. § 1715(d) ...................................................................................................20

Class Action Fairness Act, or CAFA, 28 U.S.C. § 1715, *et seq.* ..............................20

§ 2 of the Sherman Act, 15 U.S.C. § 2.................................................................2, 10

OTHER AUTHORITIES

Fed. R. Civ. P. 23(e) ............................................................................................16, 20

Fed. R. Civ. P. 23(e)(2)................................................................................................5

## I.     INTRODUCTION

Plaintiffs Meijer Inc./Meijer Distribution, Inc. (collectively "Meijer"), Rochester Drug Co-operative, Inc., and American Sales Company (collectively "Plaintiffs" or "Class Representatives"), on behalf of the certified Class, respectfully submit this Brief in Support of Their Unopposed Motion for Final Approval of Proposed Settlement.

After engaging in years-long litigation that included extensive discovery, motion practice, and several formal mediations over many months conducted under court supervision, Plaintiffs and Defendants AstraZeneca Pharmaceuticals LP, AstraZeneca LP, AstraZeneca AB, and Aktiebolaget Hassle (collectively "AZ" or "Defendants"), entered into a proposed settlement (the "Settlement") providing for the payment of $20 million (the "Settlement Fund") to members of the Direct Purchaser Class (as defined below), plus up to $750,000 toward administrative expenses.   This Settlement provides a positive result that enables the Class to avoid the uncertainties and delays of continuing to litigation.   As shown below, and supported by the Declaration of Eric L. Cramer ("Cramer Declaration" or "Cramer Decl."), which was previously filed with the Court on December 19, 2011 (D.I. No. 189), the proposed Settlement is in all respects fair, reasonable, and adequate, and merits final approval by this Court.

The favorable reaction of this sophisticated Class, which includes multi-billion dollar corporations, three of whom have written in to express their unambiguous support for the Settlement, confirms its fairness and reasonableness.   Notice to the Class of the proposed Settlement, which included notice of Plaintiffs' Counsel's intent to seek an award of attorneys' fees and Reimbursement of Expenses, was mailed to all members of the Class on November 22, 2011 and described the precise terms of the Settlement.   *See* Declaration of Tina M. Chiango Regarding Dissemination of Notice to the Class, dated Jan. 10, 2012 ("Chiango Decl.") at ¶ 8,

1

attached as Ex. 1. After receiving such notice, no Class member (all of which are sophisticated businesses) has requested exclusion from the Class or objected to the Settlement. *Id.* at ¶ 8. The deadlines for making either such requests were December 28, 2011, and January 4, 2012, respectively. *See id.*, Ex. A at 5, 7.

## II. BACKGROUND

### A. PLAINTIFFS' CLAIMS

This is an antitrust class action brought on behalf of a now certified class of direct purchasers of the prescription drug Toprol-XL from AZ. Pursuant to the Court's November 16, 2011 Order granting preliminary approval of the Settlement, the Court certified the following Class:

> All persons and entities in the United States (including, for avoidance of doubt, persons and entities in Puerto Rico) who purchased Toprol-XL from any of the Defendants at any time from May 5, 2005 through September 23, 2011 (the "Class Period") (including persons and entities having received assignments or partial assignments of rights from direct purchasers of Toprol-XL).[1]

Plaintiffs assert a claim for monopolization against all Defendants under Section 2 of the Sherman Act, 15 U.S.C. § 2.

In this case, Plaintiffs charged that AZ used fraudulently obtained patents and prosecuted sham patent infringement suits to impede the approval and market entry of generic extended release metoprolol succinate ("MS-XL") products – products that AZ knew would be far less expensive than AZ's branded MS-XL product, Toprol-XL. To block generic competition,

---

[1] Excluded from the proposed Class are Defendants and their parents, employees, subsidiaries, and affiliates, and federal governmental entities. Also excluded from the Class are non-Class direct purchaser plaintiffs in *Walgreen Co., et al. v. AstraZeneca Pharmaceuticals LP, et al.,* 10-cv-580 (GMS) (D. Del.) and *CVS Pharmacy Inc., et al. v. AstraZeneca Pharmaceuticals, LP, et al.,* 10-cv-897 (GMS) (D. Del.) (the "Opt-Out Actions"), namely Rite Aid Corp., Rite Aid Hdqtrs. Corp., CVS Pharmacy, Inc., Caremark L.L.C., JCG (PJC) USA, LLC, Maxi Drug, Inc. D/B/A Brooks Pharmacy, Eckerd Corporation, Walgreen Co., The Kroger Co., Safeway Inc., HEB Grocery Company LP, and Supervalu Inc., both for the claims these entities are pursuing directly and for the claims they are pursuing based upon assignments or partial assignments of claims from certain members of the Class as described in

Plaintiffs claim that AZ engaged in a three-part anticompetitive scheme: (1) procuring patents through fraud; (2) wrongfully listing those patents in the FDA Orange Book; and (3) prosecuting baseless patent litigation. *See In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, 2010 WL 1485328, at **13-16 (D. Del. April 13, 2010) (the "MTD Opinion or "MTD Op."). Plaintiffs allege that this conduct delayed the market entry of MS-XL generics, and thereby caused the Class to overpay for MS-XL products. *See id.* at **7-8. Plaintiffs' allegations are described in more detail in this Court's MTD Opinion.

AZ has raised numerous defenses to Plaintiffs' claims, including, *inter alia*, that none of the generic competitors whom Plaintiffs have claimed were delayed in entering the market received approval by the FDA until several months after the alleged sham patent cases were resolved; that when the generics ultimately did get to market, their entry was short-lived due to FDA mandated recalls; and that AZ's partial victory in the Federal Circuit in the underlying patent case (reversing summary judgment that had been granted against AZ) makes Plaintiffs' claims that the patent case was a sham untenable.

## B.   DISCOVERY, NEGOTIATIONS, & THE PROPOSED SETTLEMENT

The Settlement Agreement was reached after more than a year of extensive discovery, and several in-person and phone meetings, mediation sessions, presentations, and discussions over the course of several months among highly experienced counsel – much of which was conducted under Court supervision. Moreover, the Settlement came about only after Plaintiffs had thoroughly examined the legal and factual bases for this Action, having reviewed more than 1 million pages of documents produced by Defendants and third parties, and taken 12 depositions (including several taken in Sweden) of AZ's past and current employees with

the complaints filed in the Opt-Out Actions.

3

relevant knowledge of the facts underlying Plaintiffs' allegations. Plaintiffs pursued extensive third-party discovery from generic manufacturers of MS-XL, as well as non-discovery investigation. Finally, Plaintiffs also engaged experts on issues relating to the reasonableness or AZ's conduct before the Patent and Trademark Office, the readiness of generics to come to market earlier absent the challenged conduct, whether AZ preserved monopoly power by allegedly delaying generic entry, and the probable amount of damages incurred by the Class.

The Settlement provides for a total cash payment of $20 million to the Class in exchange for dismissal of the litigation with prejudice and release of all claims. In addition, AZ has agreed to pay up to $750,000 toward the cost of notice, claims administration and distribution. Moreover, as summarized in the Class Notice and detailed below, Plaintiffs propose an allocation plan that will award Class members their respective shares of the Net Settlement Fund (*i.e.*, net of Court awarded attorneys' fees, Plaintiff service awards, and litigation expenses) *pro rata* based on each entity's purchases of Toprol-XL from AZ during the Class Period as reflected in AZ's sales records. All monies in the Net Settlement Fund will be distributed to the Class.

## III.   ARGUMENT

### A.   FINAL APPROVAL OF THE SETTLEMENT IS APPROPRIATE

#### 1.   Settlements of Antitrust Class Actions Are Encouraged

Final approval is appropriate here for several reasons. First, the law favors and encourages settlements of lawsuits. *See Williams v. First National Bank*, 216 U.S. 582, 595 (1910); *D.R. v M.R. v. East Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997). Courts particularly encourage settlements in complex litigation because settlements promote the interest of judicial economy, and litigants should be encouraged to determine their respective rights among themselves. *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55

4

F.3d 768, 784 (3rd Cir. 1995) ("[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation").

Moreover, there is a strong public interest in private antitrust litigation generally. *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979). This Settlement serves the public interest in that it provides substantial compensation to the Class for the overcharges they allegedly paid, and it may also help curb similar anti-competitive behavior by others in the marketplace. *See Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 318 (1965) ("private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws"). This is a particularly meaningful factor in the context of the pharmaceutical industry, where the potential cost caused by efforts to prevent or delay entry of less expensive generic products is well-known.[2]

### 2. The Proposed Settlement Should Be Approved As Fair, Reasonable, and Adequate

#### a. Standards for Court Approval of a Settlement

This Settlement should be approved under the prevailing standards. A class action settlement warrants final approval if it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Sullivan v. DB Investments, Inc.*, __ F.3d __, 2011 WL 6367740, at *28 (3d Cir. Dec. 20, 2011).[3] The Third Circuit has held that an initial presumption of fairness applies when a district court finds that the factors have been met to support a settlement's preliminary approval. *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001). As noted above, the Court has

---

[2] *Federal Trade Commission Pay For Delay*: How Drug Company Pay-Offs Cost Consumers Billions (January 2010), p. 1 ("[G]eneric price[s] can be as much as 90 percent less than brand prices."), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf (Last visited Jan. 9, 2012).

[3] This recent Third Circuit opinion also supports Plaintiffs' Motion for An Award of Attorneys' Fees. *See Sullivan,*

made such a determination here, having preliminarily approved the Settlement by its order dated

November 16, 2011.

To further guide courts in assessing whether a settlement warrants final approval, the

Third Circuit has identified nine factors (often called the *Girsh* factors) to consider:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009) (citing *Girsh v. Jepson,*

521 F.2d 153, 157 (3d Cir. 1975)).   No one factor by itself is dispositive.   *Hall v. Best Buy Co.,*

*Inc.*, 274 F.R.D. 154, 169 (E.D. Pa. 2011).

In addition to the *Girsh* factors, the Third Circuit has more recently held that district

courts should also consider an additional set of factors (known as the *Prudential* factors):

- the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;
- the existence and probable outcome of claims by other classes and subclasses;
- the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants;
- whether class or subclass members are accorded the right to opt out of the settlement;
- whether any provisions for attorneys' fees are reasonable; and
- whether the procedure for processing individual claims under the settlement is fair and reasonable.

---

__ F3d. __, 2011 WL at **38-40.

*In re Pet Food Products Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010) (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998)). Only the *Prudential* factors that are relevant to the litigation in question need be addressed. *Prudential*, 148 F.3d at 323-24.[4]

District courts must make findings on each of the *Girsh* factors and, where appropriate, the *Prudential* factors, and may not simply substitute assurances from or conclusions by the parties for independent analysis of the settlement. *Pet Food*, 629 F.3d at 350. "The professional judgment of counsel involved in the litigation" is, however, "entitled to significant weight." *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985). Counsel should not be held to "an impossible standard, as a settlement is virtually always a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000) (citations, internal quotations omitted).

The Settlement meets each of the relevant factors for final approval.

### b.   Evaluation of the Settlement Under the *Girsh* Factors

#### i.   The complexity, expense, and likely duration of the litigation.

Antitrust class actions are "arguably the most complex action[s] to prosecute" as "[t]he legal and factual issues involved are always numerous and uncertain in outcome." *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, Civ. A. 03-4578, 2005 WL 1213926, at *11 (E.D. Pa. May 19, 2005) (quoting *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)). This case was no exception.

---

[4] At least one court has suggested that where the *Girsh* factors clearly establish the fairness, reasonableness, and adequacy of a settlement, consideration of additional factors is not necessary. *Pichler v. UNITE*, 775 F. Supp. 2d

While discovery was nearly complete when this case settled, much still remained to be done, and the Settlement thus saved substantial time and expense. Specifically, the parties were working to prepare expert reports and to begin briefing summary judgment motions. If summary judgment motions had not ended the case, pretrial preparations, trial, post-trial motions, and appeals would have followed. These matters would have collectively required, without question, substantial time and expense for the Court, the parties, and counsel. Settlements that save such time and expenses are favored, and this factor thus supports final approval. *See Warfarin*, 391 F.3d at 536; *Meijer, Inc. v. 3M*, Civ. A. 04-5871, 2006 WL 2382718, at \*13 (E.D. Pa. Aug. 14, 2006).

### ii.    The reaction of the Class to the Settlement

Class reaction has been unambiguously positive. There have not been any objections to the Settlement, and no entity opted out upon receiving the Settlement Notice. The Class members in this case are sophisticated businesses, most with relatively large potential claims. When few or no objections come from such a class such as this, the Third Circuit has remarked that this is "particularly telling." *Warfarin*, 391 F.3d at 536; *see In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 629 (E.D. Pa. 2004).

Moreover, the three largest pharmaceutical distributors in the country – class members whose claims (including those of their subsidiaries) collectively represent the majority of the total recovery, and who thus have the greatest financial stake in the Settlement Fund – have each submitted letters supporting the Settlement. *See* Cramer Decl. Exs. 1-3 (letter from Thomas L. Long, Esq., counsel for Cardinal Health, dated Sept. 27, 2011; letter from Richard A. Ardoin, Esq., Assistant General Counsel for McKesson Corporation, dated Oct. 3, 2011; and letter from

---

754, 758 (E.D. Pa. 2011). Thus, Plaintiffs address only relevant *Prudential* factors. *See infra* at 14-16.

Donald W. Myers, Esq. counsel for AmerisourceBergen Co., dated Sept. 27, 2011). These letters explain that these three companies, which will make the largest claims for recovery from the Settlement in this case, having been informed of the facts, circumstances, legal hurdles, and other risks involved in this case, each support the proposed Settlement as fair, reasonable, and adequate. *See* Cramer Decl. Exs. 1-3. Their support reinforces the conclusion that the Settlement is in the best interest of the Class. This factor therefore supports approval.

### iii.   The stage of the proceedings and the amount of discovery completed

Courts use the procedural stage of a case at the time of settlement as a lens through which to assess whether counsel adequately appreciated the merits of the case before negotiating that settlement. *Warfarin,* 391 F.3d at 537 (citations omitted). "[C]ourts generally recognize that a proposed class action settlement is presumptively valid where . . . the parties engaged in arm's length negotiations after meaningful discovery." *Cullen v. Whitman Med Corp.,* 197 F.R.D. 136, 144-45 (E.D. Pa. 2000); *see also Linerboard,* 321 F. Supp. 2d at 630. Settlements reached after discovery "are more likely to reflect the true value of the claim." *Boone v. City of Philadelphia,* 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (citing *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1314 (3d Cir. 1993)).

Here, fact discovery was near completion when the Settlement was reached. Plaintiffs had reviewed and analyzed over one million pages of documents; subpoenaed third parties; taken 12 depositions; litigated discovery disputes; conducted substantial non-discovery investigation; and worked with experts in economics and the pharmaceutical industry to prepare for class certification, summary judgment, and trial. Thus, Plaintiffs' counsel was able to accurately weigh the merits of Plaintiffs' case against the risks of continuing to litigate. *See Prudential,* 148

F.3d at 319 (inquiry into the type and amount of discovery the parties have undertaken aims to ensure that a proposed settlement is the product of "informed negotiations"). This factor, too, supports final approval of the Settlement.

### iv. The risks of establishing liability

This factor weighs the likelihood of ultimate success against the benefits of an immediate settlement. The existence of obstacles to plaintiffs' success at trial weighs in favor of settlement. *Warfarin,* 391 F.3d at 537; *Prudential,* 148 F.3d at 319.

Plaintiffs were seeking to establish Defendants' liability under Section 2 of the Sherman Act, for, *inter alia*, procuring patents through fraud; wrongfully listing those patents in the FDA Orange Book; and prosecuting baseless patent litigation. Plaintiffs faced multiple hurdles in combating the numerous legal and factually-based defenses AZ had proffered (or was planning to proffer), including that (1) Plaintiffs lacked antitrust standing; (2) the record ultimately would not support a claim for fraud, an argument supported, in part, by AZ's partial victory in the Federal Circuit; (3) the patent lawsuits were not shams; (4) none of the generic competitors whose products were alleged delayed in entering the market had received tentative FDA approval until after the patent cases had resolved; (5) the eventual generic entry was short-lived. AZ also was prepared to argue that Plaintiffs could not establish damages due to the problems proving earlier generic entry in the but-for world. AZ was also contesting class certification, despite the fact that similar classes are routinely approved by district courts around the country in analogous types of cases. And even if Plaintiffs had succeeded in establishing liability and damages in spite of these obstacles, they would have faced the challenge of sustaining that outcome on appeal.

10

In light of the Settlement's immediate $20 million recovery for the Class, this factor weighs strongly in favor of final approval.

### v.     The risks of maintaining the class action through trial

Although the motion for class certification was pending at the time the Settlement was reached, numerous courts have certified similar classes of direct purchasers bringing antitrust claims against manufacturers allegedly seeking to delay generic competition in the pharmaceutical industry. *See* Memorandum of Law in Support of Motion for Preliminary Approval (docket no. 178) at 7 & n.5. It is therefore highly likely that the Court would have certified the Class here.

Although a district court may decertify or modify a class action at any time if it proves to be unmanageable, *see Warfarin,* 391 F.3d at 537, Plaintiffs did not foresee any manageability problems arising at trial. On balance, this factor, which measures the likelihood of maintaining a certified class throughout trial, *see id.,* is thus neutral in this case. *See Cendant,* 264 F.3d at 239 (holding that this factor was neutral where the risk of decertification appeared to be extremely slight); *Linerboard,* 321 F. Supp. 2d at 631 (holding that this factor did not counsel either in favor of or against approval where no particular risk of decertification had been identified).

### vi.     The ability of defendants to withstand a greater judgment

The ability of a defendant to withstand a greater judgment is most relevant in cases where the amount of the settlement is less than might ordinarily be agreed upon by plaintiffs but defendant's financial circumstances cannot accommodate a higher payment. *Reibstein v. Rite Aid Corp.,* 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011); *Chakejian v. Equifax Info. Services, LLC,* 275 F.R.D. 201, 214 (E.D. Pa. 2011). Such circumstances do not exist here.

11

Further, courts have recognized that whether the defendant would have had the resources to pay more in settlement is not relevant where considered only in a vacuum, divorced from considerations of whether the settlement is fair in light of the legal issues and circumstances involved in the case. *See Warfarin,* 391 F.3d at 538. This case involved many difficult legal issues, presented substantial risks that Plaintiffs would either not prevail or would be required to spend substantial additional time and expenses pursuing the case to its ultimate end, and the settlement negotiations, as with the case generally, were hard-fought by Defendants. The amount that Plaintiffs obtained in settlement is an excellent benefit on its face, and an even better result when these considerations are taken into account. The theoretical ability of Defendants to pay more, considered absent this context, is not relevant to determining the reasonableness of this settlement. *See id.*

### vii.    The range of reasonableness of the settlement fund in light of the best possible recovery and all the attendant risks of litigation

In combination, the final two *Girsh* factors assesses "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin,* 391 F.3d at 538. They "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Id.* (citation omitted).

Assessment of a settlement, however, need not be tied to an exact formula. *See Prudential,* 148 F.3d at 322. The Third Circuit has cautioned against demands that a settlement approach the maximum possible recovery, noting that a settlement is, after all, a compromise. *Id.* at 316-17. Accordingly, a settlement may still be within a reasonable range, even though it represents only a fraction of the potential recovery. *Cullen,* 197 F.R.D. at 144; *Linerboard,* 321

12

F. Supp. 2d at 632; *see also Fisher Bros.*, 604 F. Supp. at 451 ("The court must review a settlement to determine whether it falls within a 'range of reasonableness,' not whether it is the most favorable possible result of litigation.").

Here, the Settlement falls within the range of settlements that are worthy of final approval as fair, reasonable, and adequate. The proposed Settlement totaling $20 million cash (plus an additional amount up to $750,000 toward costs of notice and claims administration) is reasonable both in absolute terms and in light of the circumstances of this litigation. Further, estimates of damages ranged from $31.5 million (assuming a 1-month delay in generic entry) to $280.6 million (assuming a 12-month delay in generic entry), and thus the Settlement amounts to between 7.12% and 64% of single damages in this case. Such a settlement is clearly within the range of reasonableness.[5] Indeed, in another antitrust case recently settled on behalf of nearly the same class of direct purchasers alleging similar conduct, the district court in the Southern District of New York noted that the $20.25 million settlement represented "a substantial sum," and, weighing the risks of establishing liability and damages "against the guarantee of this large a sum for a class of somewhere in the range of 50 plaintiffs," found the proposed settlement was adequate and reasonable. *See In re DDAVP Direct Purchaser Antitrust Litig.*, Civ. A. 05-2237 (S.D.N.Y. Nov. 2, 2011), Trans. at 12-13 (attached as Ex. 2).

Furthermore, the proposed Settlement enables Class members to receive the immediate benefit of $20 million while avoiding the uncertainties inherent in continuing to litigate this

---

[5] *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) (upholding approval of settlement equal to 33% of estimated damages); *In re Remeron*, Civ. A. 02-2007, 04-5126, 2005 WL 2230314, at *24 (D.N.J. Sept. 13, 2005) (noting that settlement representing about 1/3 of damages was "quite a substantial recovery"); *Stop & Shop*, 2005 WL 1213926, at *9 (noting that settlement amounting to 11.4% of damages "compares favorably with the settlements reached in other complex class action lawsuits"); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d at 581 (collecting antitrust cases with settlements ranging from 5% to 28% of estimated damages, and approving settlement representing 36% of damages). *See also In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619 (E.D. Pa. 2004) (settlement representing 1.62 percent of sales); *Fisher Bros., Inc. v.*

complex antitrust class action. Even assuming Plaintiffs succeeded in litigating this action through trial and appeals, such a course would require years before final resolution and receipt of any funds. Thus, this factor also supports final approval.

### c. Evaluation Under The Relevant *Prudential* Factors

#### i. Factors that bear on the maturity of the underlying substantive issues

As discussed above, this case was settled after the near completion of discovery, and after hard-fought settlement negotiations conducted under the supervision of the Court. That the underlying substantive issues were so well-developed further supports approval of this settlement. *See Chakejian,* 275 F.R.D. at 215 (finding that where the underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of the case, and mediation efforts undertaken," this factor supported approval of the settlement).

#### ii. Results achieved by settlement for individual class members versus the results achieved – or likely to be achieved – for other claimants

The plaintiffs in the Opt-Out Actions continue to pursue their case against AZ, with no assurances that they will prevail or be able to settle on terms comparable to those provided to the Class in the Settlement. Thus, the Settlement obtains better results for the Class than those achieved so far by other claimants, with the substantial risk of non-recovery eliminated in favor of a settlement payment now.

#### iii. Whether class or subclass members are accorded the right to opt out of the settlement

As discussed above, class members were given the opportunity to opt out of the Class. Some had previously done so by filing their own claims in the Opt-Out Actions, *see supra* n.1,

---

*Mueller Brass Co.,* 630 F. Supp. 493, 499 (E.D. Pa. 1985) (settlements representing 3 per cent and under of sales).

but no Class member requested exclusion from the Class upon receipt of the Settlement Notice by the December 28, 2011 deadline (or thereafter). Thus, this factor thus also supports final approval. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 259 n.17 (3d Cir. 2009) (fact that some class members opted out weighed in favor of settlement).

### iv. Whether any provisions for attorneys' fees are reasonable

On this point, Plaintiffs incorporate by reference their Motion for An Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to the Representative Plaintiffs Awards and supporting brief, declaration, and exhibits, which were separately filed on December 19, 2011. (D.I. Nos. 187, 188 & 189). For the reasons set forth therein, the attorneys' fees and costs sought by counsel are within accepted ranges and reasonable.

### v. Whether the procedure for processing individual claims under the settlement is fair and reasonable

Each notice that was individually mailed to class members included was approved by this Court in its Preliminary Approval Order (D.I. No. 186 at ¶ 4), and Class members will receive a copy of the claim form. *See* Chiango Decl., Ex. A at 6. In addition, the Notice, claim form, and other materials will be made available on www.toproldirectsettlement.hrsclaims.com, the website dedicated to this settlement and maintained by the court-appointed claims administrator, Heffler, Radetich & Saitta LLP ("Heffler" or the "Claims Administrator").

As explained in more detail below, the Court has authorized Heffler, which is experienced in administering class action settlements, to receive and process Class members' claims, with the supervision of counsel for the Class. Class members will be provided with

15

information reflecting their purchases, as reflected in AZ's Toprol XL sales records, and will be advised of their proposed *pro rata* share.  Class members will then be provided with an opportunity to evaluate the information and proposed *pro rata* payment based on their own data.  A deadline for class member submissions will be set, and after all timely inquiries have been addressed and adjustments made, if any, claims payments will be distributed to Class members from the Net Settlement Fund.[6]  Those distributions will be made on *a pro rata* basis, according to Class members' purchases of Toprol XL during the Class Period.  The plan of allocation does not grant preferential treatment to any class member and is thus fair and reasonable.  In further support of this point, Plaintiffs incorporate their discussions of the notice and plan of allocation, below.

### 3.    Adequate Notice Was Provided to the Class Consistent With the Court's Order Preliminarily Approving the Settlement

The due process requirements of the Fifth Amendment and the Federal Rules of Civil Procedure require that adequate notice of a proposed settlement be given to class members.  *Nichols v. SmithKline Beecham Corp.*, Civ. A. 00-6222, 2005 WL 950616, at *9 (E.D. Pa. Apr. 22, 2005); Fed. R. Civ. P. 23(e).  "The Rule 23(e) notice is designed to summarize the litigation and the settlement and to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential,* 148 F.3d at 326-27 (citation, internal quotation marks omitted).  The Fifth Amendment's due process requirements are satisfied by the "combination of reasonable notice, the opportunity to be heard and the opportunity to withdraw from the class." *Id.* at 306.

---

[6] As defined in the Settlement Agreement and the Notice, the Net Settlement Fund is the amount remaining in the settlement fund for distribution for approved claims after reduction for payment of taxes, attorneys' fees, any awards to the class representatives and disbursements for such costs and expenses as approved by the Court.

As described above, individual notice of the Settlement was provided by first class mail, and notice (along with other information) was made (and remains) available on the website of the Claims Administrator, all consistent with this Court's November 16, 2011 Preliminary Approval Order. Notification by first-class mailing to each potential class member is sufficient to satisfy Rule 23 requirements and due process concerns. *See Chakejian v. Equifax Info. Servs.*, 275 F.R.D. 201, 207 (E.D. Pa. June 14, 2011); *Careccio v. BMW of N. Am. LLC*, 2010 U.S. Dist. LEXIS 42063, at *26 (D.N.J. Apr. 29, 2010); *Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 329 (E.D. Pa. 2007); *see also Comer v. Life Ins. Co.*, 2011 U.S. Dist. LEXIS 36042, at *4 (D.S.C. Mar. 31, 2011) (notice by first class mail alone found sufficient, where identity of 84 class members was readily ascertainable from defendant's records).

The content of the notice is also sufficiently clear, detailed, and instructive to satisfy due process. The notice informs Class members of the claims involved in this case, *inter alia*, the terms of the Settlement, the definition of the Class and Class Period, the attorneys' fee request, the date and location of the final fairness hearing, the opportunity to attend and speak at the hearing, the opportunity to object, the role of Class Counsel, and how to obtain additional information. *See Prudential,* 148 F.3d at 328; *Nichols,* 2005 WL 950616, at *9.

### B.   THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

"Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *Ikon Office Solutions,* 194 F.R.D. at 184 (citation, internal quotation marks omitted). Generally, an allocation plan is reasonable if it reimburses class members based on the type and extent of their injuries. *Id.* (citation omitted). The proposed Allocation Plan meets this standard. It is similar to plans that have previously been

17

approved by courts in analogous cases and implemented with a high degree of success and efficiency.

On November 22, 2011, the Claims Administrator sent Class members a copy of the approved Settlement Notice by first-class mail. The Notice mailed to the Class advised them that "the Net Settlement Fund will be allocated to Class Members on a *pro rata* basis," which is the method of allocation now proposed. No Class member has asked to be excluded from, or has objected to, the Settlement. The deadlines for a Class member to exclude itself from the Class or object to the Settlement were December 28, 2011, and January 4, 2012, respectively.

Plaintiffs propose the following Plan of Allocation for the proceeds of the proposed Settlement in this case, net of Court approved attorneys' fees, costs of litigation, and administration costs ("Net Settlement Fund"): pay the Net Settlement Fund to members of the Class who submit claims ("Claimants") *pro rata* based on each class member's aggregate share of the total class purchases of Toprol XL during the Class Period.[7] Plaintiffs propose the following schedule to govern the allocation process:

- 30 days after entry of order finally approving the Settlement: Mailing of Claim Forms to all Class Members;[8]
- 90 days after entry of order finally approving the Settlement: Deadline for Claimants to submit executed Claim Forms to the Claims Administrator; and[9]
- 150 days after entry of order finally approving the Settlement: Class Counsel submit to Court motion for distribution of Net Settlement Fund, supported by Declaration of Claims Administrator.

---

[7] Because Defendants' sales database produced in the litigation does not extend through the entire Class Period, the Claims Administrator may, for administration purposes only, rely on data through the (slightly shorter) period reflected in Defendants' sales database (instead of through the date of the Settlement Agreement). Because the administration is being done *pro rata*, this should not unfairly prejudice one class member over another as the same administration period will be used for all claimants.

[8] The claims forms will include estimates of qualifying purchases during the Class Period based on Defendants' sales data.

[9] Claimants will be required to either accept the Claims Administrator estimate or prove individual purchase data supporting an alternative estimate.

To be specific, the allocation proposal is as follows: for each Class member who submits a claim, the Court appointed claims administrator shall: (a) sum the total combined purchases made by each claimant in units of Toprol XL during the Class Period, (b) calculate each claimant's percentage share by dividing each claimant's total qualifying purchases of Toprol XL by the total combined qualifying purchases (in units) of Toprol XL made by all claimants combined, and then (c) multiply each claimant's percentage share by the total dollars in the Net Settlement Fund. This formula will yield each claimant's distribution share in dollars.

In order to ensure uniformity, the claims administrator shall use the transactional sales database that was produced by AZ during the litigation. For illustrative purposes, take a claimant for whom AZ's transactional sales database showed that it purchased one million units of Toprol XL during the Class Period. The Claims Administrator would take that figure (1 million units) and divide that by the total amount of units to Toprol XL purchased during the Class Period by all claimants to get that claimant's percentage share of the total. For these purposes, let's assume that the all claimants combined bought 100 million units of Toprol XL during the Class Period. Thus, in this example, the claimant's percentage share would be 1 million divided by 100 million, or 1%. That claimant's share would then be multiplied by the Net Settlement Fund to yield the claimant's net distribution amount in dollars. If the Net Settlement Fund were $10 million, in this example, the claimant would receive 1% of $10 million or $100,000.

This proposal has the benefit of accuracy, efficiency, and simplicity. Similar proposals have been approved for use in administration of a number of settlements in cases involving pharmaceutical pricing of antitrust claims that the undersigned Class Counsel has prosecuted.

Plaintiffs respectfully submit that the proposed plan of allocation is fair and reasonable, and should be approved.

### C.     THE NOTICE REQUIREMENTS OF THE CLASS ACTION FAIRNESS ACT HAVE BEEN SATISFIED

The Class Action Fairness Act, or CAFA, 28 U.S.C. § 1715, *et seq.*, requires each Defendant to notify appropriate State and Federal official of the proposed settlement. No sooner than 90 days after notification, the Court may enter an order granting approval of the settlement. 28 U.S.C. § 1715(d). Here, Defendants provided notice of the proposed settlement to the appropriate State and Federal officials on October 4, 2011. *See* Letter from John W. Treece to the Attorney General of the United States and the Attorney General of each of the United States, attached as Ex. 3. Due to a delay in receipt of the CAFA notice by the Oklahoma Attorney General resulting from a change of address, however, which resulted in CAFA notice to the Oklahoma Attorney General being re-sent on November 18, 2011, the 90-day period has been extended. This Court may enter its order on or after February 16, 2012.

## IV.     CONCLUSION

For the reasons detailed above, and in other supporting documents, including the Cramer Declaration and exhibits thereto, the Direct Purchaser Class and Class Counsel respectfully request that the Court enter the proposed Order and Final Judgment, which, *inter alia*, grants final approval to the Settlement pursuant to Fed. R. Civ. P. 23(e), and approve the above-described Allocation Plan.

20

Dated: January 11, 2012

ROSENTHAL, MONHAIT & GODDESS, PA

Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
Suite 1401, 919 Market Street, P.O. Box. 1070
Wilmington, DE 19899
jgoddess@rmglaw.com
jzeldin@rmgglaw.com
(302) 565-4433
*Liaison Counsel for Direct Purchaser Class*

Linda P. Nussbaum
John D. Radice
Shelly L. Friedland
Adam Steinfeld
GRANT & EISENHOFFER P.A.
485 Lexington Avenue
New York, NY 10017
(646) 722-8504

Eric L. Cramer
Ellen Noteware
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

Thomas M. Sobol
David S. Nalven
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway
Cambridge, MA 02142
(617) 482-3700

*Co-Lead Counsel for Direct Purchaser Class*

Peter Kohn
Luke Smith
FARUQI & FARUQI, LLP
101 Greenwood Ave., Suite 600
Jenkintown, PA 19046
(215) 277-5770

Barry Taus
Kevin Landau
Archana Tamoshunas
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
(212) 931-0704

*Additional Counsel for Direct Purchaser Class Plaintiffs*

21

EXHIBIT 2

```
                                                                    1
        1b2imeim ag              DECISION
  1     UNITED STATES DISTRICT COURT
  1     SOUTHERN DISTRICT OF NEW YORK
  2     ------------------------------x
  2
  3     MEIJER, INC., et al.,
  3
  4                  Plaintiffs,
  4
  5             v.                        05 Civ, 2237 CS, et al
  5
  6     FERRING B.V., et al.,
  6
  7                  Defendants.
  7
  8     ------------------------------x
  8
  9                                       White Plains, N.Y.
  9                                       November 2, 2011
 10                                       2:00 p.m.
 10
 11     Before:
 11
 12                        HON. CATHY SEIBEL,
 12
 13                                     District Judge
 13
 14                        APPEARANCES
 14     KAPLAN FOX & KILSHEIMER
 15          Attorney for Meijer, et al.
 15     JOHN DANIEL RADICE
 16
 16     BERGER & MONTAGUE
 17          Attorney for Meijer, et al.
 17     DANIEL C. SIMONS
 18     DAVID SORENSEN
 18
 19     GARWIN GERSTEIN & FISHER
 19          Attorney for Rochester
 20     DAN LITVIN
 20
 21     ARNOLD & POTTER
 21          Attorney for Defendant Ferring
 22     BARBARA HELEN WOOTTON
 22
 23     JONES DAY
 23          Attorney for Defendant Aventis
 24     JULIA ELIZABETH McEVOY
 24
 25
 25
          SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

2

1b2imeim ag               DECISION

 1
 1                              DECISION
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

         SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

```
                                                              3
     1b2imeim ag              DECISION
 1            THE COURTROOM DEPUTY:  Meijer v. Ferring, et al.
 2            THE COURT:  Let me make sure I know who's who.
 3   Mr. Simons.
 4            MR. SIMONS:  That's me.
 5            THE COURT:  Mr. Radice.
 6            MR. RADICE:  That's me, your Honor.
 7            THE COURT:  Mr. Litvin.
 8            MR. LITVIN:  That's me, your Honor.
 9            THE COURT:  Mr. Sorensen.
10            MR. SORENSEN:  Yes, your Honor.
11            THE COURT:  Okay.  And Ms Wootton.
12            MS WOOTTON:  Yes, your Honor.
13            THE COURT:  And Ms McEvoy.
14            MS McEVOY:  Yes, your Honor.
15            THE COURT:  Good afternoon.  We are here for a
16   fairness hearing.  I know I can't enter any final orders until
17   November 24th for the reasons stated in Ms McEvoy's October
18   24th letter, but we can still go forward with the fairness
19   hearing.  Is there anybody here to object to the fairness of
20   the settlement?
21            MR. SORENSEN:  Your Honor, as far as I know, no one
22   has objected.
23            THE COURT:  I haven't heard anything from anyone
24   either.  So I am prepared to make findings.  Anything you want
25   to say first?
          SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300
```

```
                                                                4
     1b2imeim ag              DECISION
 1         MR. SORENSEN:  No.
 2         THE COURT:  Okay.  I guess technically it is the
 3   direct purchaser plaintiff's motion for entry of this order
 4   granting final approval of settlement which is docket number
 5   99.  They are asking me under Rule 23 to approve the proposed
 6   settlement and plan of allocation, certify the class for
 7   purposes of settlement, award class counsel attorney's fees and
 8   costs, and approve service awards for the named plaintiffs.
 9         Just by way of background, the case deals with an
10   antidiuretic drug sold under the brand name DDAVP, the generic
11   name is Desmopressin Acetate.  The plaintiffs alleged that the
12   defendants engaged in an unlawful scheme to maintain a
13   monopoly, that they fraudulently obtained a patent and then
14   instituted litigation against at least one generic competitor,
15   knowing that doing so would automatically prohibit the FDA from
16   granting approval to any generic manufacturers for up to 30
17   months, and other similar conduct.  Plaintiffs claim that
18   without the defendant's conduct, plaintiffs would have access
19   to substantially cheaper genetic versions of DDAVP.
20         There are two separate cases which have been
21   consolidated, the indirect purchaser's case and this one, the
22   direct purchasers' case.  Both sets of plaintiffs filed class
23   action complaints against defendant Aventis Pharmaceuticals,
24   Ferring B.V. and Ferring Pharmaceuticals.  Judge Brieant
25   consolidated the cases and then dismissed both complaints and
           SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

5

```
1b2imeim ag                DECISION
```

1  he was reversed, first in 2009 in the direct purchaser action,
2  and since that time the settlement that's proposed today has
3  been reached.
4        On August 15th I entered an order granting preliminary
5  approval and preliminarily certified the class in an order that
6  was docketed as docket entry 90.  The class consists of all
7  persons and entities in the U.S. that purchased DDAVP in tablet
8  form directly from one or more of the defendants from February
9  18, 2001 through December 31, 2010.  I found in the preliminary
10 ruling that the terms of the proposed settlement satisfy Rules
11 23(a) and 23(b)(3) and I approved the proposed notification
12 plan, set deadlines and procedures for objections to the
13 settlement or requests for exclusions, and I scheduled the
14 final approval hearing for today.
15        Under the proposed settlement, the defendants will pay
16 a total of $20,250,000, all but three and a half million from
17 Ferring, the rest from Aventis.  The proposal includes
18 $6,750,000 in attorney's fees, $148,222.40 for out-of-pocket
19 litigation expenses incurred by class counsel on behalf of the
20 class, and three ten thousand dollars service payments to each
21 of the three direct purchaser class plaintiffs.  What will be
22 left is $13,261,777.60 to be distributed on a pro rata basis,
23 depending on each class member's total unit purchases of
24 branded DDAVP tablets during the class period.
25        Nobody has objected to the settlement that the lawyers

```
                                                              6
        1b2imeim ag               DECISION
   1    or I are aware of, and I take it nobody has opted out either,
   2    is that correct?
   3              MR. SORENSEN:  No, your Honor, no one has opted out.
   4              If I may, your Honor, I may have misherd you, but I
   5    believe you said that the service awards were ten thousand
   6    dollars each.  We were requesting thirty thousand dollars each.
   7              THE COURT:  I guess I thought it was 30,000 total.
   8    It's 30,000 times three.  You're right, 30,000 for each of the
   9    three, my mistake.
  10              The legal standard is that a class action can be
  11    settled only with court approval after a hearing and a judicial
  12    finding that the settlement is fair, reasonable and adequate.
  13    Under Rule 23(b)(2) when the settlement is negotiated before
  14    the class is certified the proposed settlement is subject to a
  15    higher degree of scrutiny in assessing its fairness.  The
  16    settlement class has to meet all the Rule 23 requirements
  17    except under Rule 23(b)(3)(D) whether the trial would present
  18    intractable management problems goes by the wayside because the
  19    proposal is for a settlement, not a trial.  But the other
  20    Rule 23 requirements remain undiluted, even heightened in the
  21    settlement context.  That's Amchem Products v. Windsor, 521
  22    U.S. 591, 619.
  23              The Rule 23(e) inquiry regarding the fairness of the
  24    the settlement cannot supplant the inquiries under Rules 23(a)
  25    and(b) regarding whether the requirements for class
            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

```
                                                               7
        1b2imeim ag              DECISION
   1    certification have been met.  Rule 23(a) sets forth the four
   2    requirements, I won't read the statute but we all know what
   3    they are:  Numerosity, commonality, typicality and adequacy of
   4    representation.  And in addition, there is an implied
   5    requirement that there be an identifiable class.  If the
   6    requirements of Rule 23(a) are met I then move on to determine
   7    whether one of the subsections of 23(b) is met.  Here the class
   8    seeks certification under Rule 23(b)(3), so plaintiff has to
   9    show that questions of law or fact common to class members
  10    predominate over questions affecting individual members and
  11    that the class action device is superior to any other method of
  12    adjudication.
  13            I already found at the preliminary stage that the
  14    class satisfies the elements of 23(a) and 23(b)(3) and nothing
  15    has happened since then to change my mind, so I now rule
  16    finally that the class is sufficiently numerous, seems to
  17    consist of at least 50 business entities located throughout the
  18    U.S., there are common questions of law and fact, given that
  19    all class members purchased DDAVP tablets directly from one of
  20    the defendants, I find the attorneys are sufficiently qualified
  21    to represent the interests of the class, and I find the common
  22    questions of law and fact predominate over any questions that
  23    are unique to any particular individual, and that in light of
  24    those, the claims are best adjudicated through the class
  25    action.
            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

8

```
1b2imeim ag                    DECISION
 1              Here the question is whether defendant's conduct
 2     improperly kept the price of the tablets higher than it should
 3     have been, and that is a common question which, as the Supreme
 4     Court required in the recent Wal-Mart case should have a common
 5     answer in order for commonality to be satisfied.  And it does
 6     have a common answer in that whatever answer there is, and I
 7     recognize neither side is pursuing a final finding on that
 8     subject, it's going to apply equally to all class members.  So
 9     I find that Rule 23(a) and Rule 23(b)(3) are met.
10              I then turn to Rule 23(e)(2) for the procedural and
11     substantive fairness, reasonableness and adequacy of the
12     settlement.  On the procedural side, I look at the negotiating
13     process that led to the settlement, and on the substantive side
14     I look at the settlement's terms.  With respect to procedural
15     fairness I have to insure that the settlement resulted from
16     arm's length negotiations and that plaintiff's counsel have the
17     experience and ability and have engaged in the discovery
18     necessary to effective representation.  That's the D'Amato case
19     from the Second Circuit, 236 F.3d 85.  A settlement that's the
20     product of arm's length negotiations between experienced
21     counsel enjoys the presumption of fairness.  There is a strong
22     judicial policy in favor of settlement, but courts must
23     nonetheless pay close attention to the negotiations and look in
24     particular for evidence that they were conducted at arm's
25     length, that sufficient discovery was conducted, and the
              SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300
```

```
                                                         9
         1b2imeim ag              DECISION
 1   counsel have sufficient ability and experience to represent the
 2   plaintiffs and the class.  If there were evidence of bad faith
 3   or collusion that would indicate a lack of procedural fairness,
 4   that might warrant rejection of the proposed settlement.
 5        I find based on the papers that have been submitted
 6   that the settlement is the product of good faith arm's length
 7   negotiations between experienced counsel.  Further, plaintiff's
 8   counsel reviewed substantial documents regarding the
 9   defendant's attempt to enforce a patent against a prospective
10   manufacturer of a generic form of DDAVP.  Plaintiffs' counsel
11   further constructed damages models based on transactional sales
12   models acquired from the defendant, evaluated the strength and
13   weaknesses of their position, and had a series of negotiations
14   with the defendant leading to the proposed settlement.  So I
15   find it was procedurally fair.
16        Substantively, I have to consider the nine Grinnell
17   factors.  That's City of Detroit v. Grinnell Corp. 495 F.2d
18   448, 463, Second Circuit case of 1974.  I won't read them all
19   here but I'll talk about them one-by-one.  But first let me
20   note that not every factor must weigh in favor of the
21   settlement, but rather I have to consider the totality of the
22   factors in light of the circumstances of the case.
23        First, the complexity, expense and likely duration of
24   the litigation.  The plaintiffs concede that although they've
25   already looked at a large number of documents that have been
         SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

10

1b2imeim ag                    DECISION
1    produced, there would still be quite a bit more discovery if
2    the case were to continue, both fact and expert discovery.
3    There would certainly be motion practice.  And then obviously a
4    trial and an appeal resulting in significant additional costs
5    and delaying the resolution of the case.  So to quote In re
6    American Bank Note Holographics, 127 F.Supp.2d 418, 425,
7    Southern District case from 2001, settlement at this juncture
8    results in a substantial and tangible present recovery without
9    the attendant risk and delays of trial.  So this factor weighs
10   in favor of settlement.
11            Next is the reaction of the class to the settlement
12   which is gauged by the extent of objections.  Here there have
13   been no objections and no opt out and in fact the three class
14   members with the largest potential recovery have written
15   letters giving unqualified support of the settlement and the
16   attorneys fee motion.  Further, the class is composed largely
17   of sophisticated business entities such as pharmacies and
18   wholesalers and they certainly would have had the means and
19   sophistication to object if the settlement didn't strike them
20   as fair.
21            Next stage of the proceedings is the amount of
22   discovery completed.  The relevant inquiry is whether the
23   plaintiffs have obtained a sufficient understanding of the case
24   to gauge the strength and the weaknesses of their claims and
25   the adequacy of the settlement.  There does not have to have
            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

11

1b2imeim ag                    DECISION

```
 1   been extensive discovery as long as there is sufficient factual
 2   investigation to enable the court to intelligently appraise the
 3   settlement.  Here it's clear that significant time and person
 4   hours have been expended to investigate the claims and defenses
 5   and analyze the facts and law in a complex antitrust matter,
 6   further complicated by intricate patents and FDA regulatory
 7   issues.  Further, there have been almost seven years of
 8   litigation including trips to the Circuit and a petition for
 9   cert.  And it appears to me based on what's before me that the
10   plaintiffs have entered the proposed agreement with a thorough
11   understanding of their case and after properly evaluating the
12   strength and weaknesses of their claims and after months of
13   negotiations which suggests that the parties have a keen
14   understanding of each other's positions and the risks involved.
15            Next is the risk of establishing liability which I
16   will consider together with the risk of establishing damages
17   and maintaining the class throughout the trial.  Grinnell
18   specifically says to consider those factors and it requires me
19   to do so, to consider legal theories and factual situations
20   without the benefit of a fully developed record and thus I must
21   heed the Supreme Court's admonition in Carson v. American
22   Brands, 450 U.S. 79, 88, not to decide the merits of the case
23   or to resolve unsettled legal questions, but rather only to
24   assess the risks of litigation against the certainty of
25   recovery under the proposed settlement.  See In Re Global
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

12

```
      1b2imeim ag              DECISION
 1    Crossing, 225 F.R.D.436, 456, Southern District case from 2004.
 2         Here the defendants have consistently denied all their
 3    claims and have asserted various defenses including that their
 4    conduct was at all times lawful, that it was in furtherance of
 5    legitimate business interests, and that their petitioning
 6    activity, including the citizen petition then filed, was
 7    subject to immunity from antitrust laws, and that in any event,
 8    their actions had no effect on competition, the public or the
 9    proposed class.
10         Antitrust cases such as this are very complex,
11    demonstrated by the years of litigation to get even this far.
12    Clearly the risk is great in future litigation.
13         Next is the ability of defendants to withstand a
14    greater judgment.  Obviously a settlement like this is not
15    going to put the defendants at a risk of bankruptcy or under
16    severe economic hardship and I'm sure they could withstand a
17    significantly greater judgment.  So that factor militates
18    against the settlement.  But it's only one factor.  And the
19    mere ability to withstand a greater judgment does not suggest
20    that the settlement is unfair.  D'Amato at page 86.
21         And finally, the last two factors are the range of
22    reasonableness of the settlement seen in light of the best
23    possible recovery and in light of all the attendant risks of
24    litigation.  The 20.25 million dollar award in this case is a
25    substantial sum and considering the complexity of the issues
           SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

13

1b2imeim ag                    DECISION

1   and the risks attendant to establishing liability and damages
2   at trial and the length of time that further litigation would
3   consume, and balancing all that against the guarantee of this
4   large a sum for a class of somewhere in the range of 50
5   plaintiffs, the settlement amount seems adequate and reasonable
6   to me.
7            So I also conclude that the settlement is
8   substantively fair.
9            I now consider the plan of allocation which has to
10  meet the same standards of fair, reasonable and adequate.  The
11  proposal doesn't have to be the allocation formula that I think
12  is best as long as it has a reasonable, rational basis, and
13  where it's recommended by experienced and competent class
14  counsel it likely has such a basis.  Here it seems eminently
15  reasonable to me that a pro rata allocation of the settlement
16  fund, depending on each class member's prospective unit
17  purchases of the DDAVP product during the class period, is
18  completely fair.  Nobody has objected, the plan was negotiated,
19  and it seems like a very sensible way to proceed.  And other
20  similar plans have been approved in this district.  See, for
21  example, In Re Veeco Instruments, 2007 Westlaw 4115809 at pages
22  13 to 14, and In Re Global Crossing, 225 F.R.D. 463.
23           Next is the application for attorney's fees and
24  expenses.  Class counsel have asked me for one-third of the
25  fund, 6.75 million, as well as a little over $148,000 for
        SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

```
                                                                      14
         1b2imeim ag              DECISION
    1    out-of-pocket expenses.  Where, as here, a class action
    2    settlement creates a common fund, plaintiffs' counsel is
    3    entitled to a reasonable fee set by the Court to be taken by
    4    the fund.  And in assessing the reasonableness of the fee, I
    5    have to consider the time and labor expended by counsel, the
    6    magnitude of the litigation, the risk of the litigation, the
    7    quality of the representation, the size of the fee in relation
    8    to the settlement, and public policy considerations.  That's
    9    Goldberger v. Integrated Resources, 209 F.3d 43, 50.  Courts
   10    can use either the lodestar or percentage method to calculate
   11    the reasonable fee; the latter seems to be preferred.  And
   12    whichever method is employed the other is often used as a cross
   13    check.  Under the percentage method, the benefits are that
   14    calculating a reasonable percentage of the fund relieves the
   15    court of the cumbersome, enervating and often surrealistic
   16    process of evaluating fee petitions, that's Savoie v. Merchants
   17    Bank, 166 F.3d 456, 460.  I don't want to undertake a
   18    cumbersome, enervating and often surrealistic process.  Under
   19    the lodestar method, the court scrutinizes the fee petition to
   20    ascertain the number of hours reasonably billed to the class
   21    and then multiplies that figure by an appropriate hourly rate
   22    to calculate the lodestar and then may enhance the lodestar by
   23    a multiplier, taking into account such factors as the
   24    contingent nature of the expected compensation for services
   25    rendered, the consequent risk of nonpayment viewed as of the
              SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

```
                                                              15
          1b2imeim ag              DECISION
    1   time of filing of the suit, the quality of the representation,
    2   and the results achieved.  In Re Ivan F. Boesky Securities
    3   Litigation, 888 F.Supp., 551, 562.  See also Goldberger, 209
    4   F.3d at 47.
    5           I am applying the percentage method here.  It appears
    6   that the 33 1/3 percent requested is within the range of
    7   percentages awarded in this district, at the high end.  See,
    8   for example, In Re APAC Teleservices, 1999 LEXIS 17908, page 2;
    9   Newman v. Caribiner International, 99 Civ 2271, October 19,
   10   2001; Hicks v. Stanley, 2009 LEXIS 24980 at page 9; and Maley,
   11   186 F.Supp.2d at 358.
   12           Using the lodestar method as a cross check, class
   13   counsel calculated that they've spent about 7,361 hours on the
   14   case resulting in a bill at their regular hourly rates of a
   15   little over three and a half million dollars, which would
   16   require a multiplier of 1.9 to add up to the one-third of the
   17   settlement fund that they requested, which is a relatively low
   18   multiplier, suggesting that the fee calculated by the
   19   percentage method is reasonable.  In Re NASDAQ Market-Makers
   20   Antitrust Litigation, 187 F.R.D. 465, 489, a Southern District
   21   case from 1998, approving a multiplier of 3.97 on a billion
   22   dollar settlement and noting that multipliers of between 3 and
   23   4 1/2 are approved.
   24           As for litigation expenses, it's well-settled that
   25   counsel who create a common fund are entitled to reimbursement
            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

16

1b2imeim ag                    DECISION

```
 1   of all litigation costs and expenses.  Here that number is
 2   148,230.  To date, including the costs of computerized
 3   research, creation of an electronic document database, and cost
 4   for third-party data, copies, teleconferences and travels,
 5   because plaintiff's counsel was proceeding on a contingent fee
 6   basis, they had a strong expensive to keep expenses at a legal
 7   level, and I conclude that they did so.  See In Re Marsh ERISA
 8   Litigation, 187 F.R.D. 128, 150; and Bellifemine v.
 9   Sanofi-Aventis, 2010 Westlaw 3119374 at page 7.
10        In light of the above, and that class counsel got this
11   result at rather substantial risk to themselves and put in a
12   substantial amount of time and succeeded in getting the
13   dismissal by the district court reversed by the Second Circuit,
14   and considering the settlement in relation to, excuse me, the
15   fee in relation to the settlement and the magnitude of the
16   litigation, I find that the requested fee is reasonable, as are
17   the expenses.
18        Finally, service awards which are compensatory
19   payments beyond a class member's applicable share of the
20   ultimate recovery may be awarded to class representatives who
21   take on a variety of risks and tasks when they commence
22   representative actions.  That is Strougo v. Bassini, 258
23   F.Supp.2d, 254, 264.  Case law in this and other circuits fully
24   support compensating class representatives for their work on
25   behalf of the class which has benefited from their
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

17

1b2imeim ag                    DECISION

1    representation.  See, for example, Marsh, 265 F.R.D. 150-51
2    approving 15,000 for each of the three class representatives;
3    and In Re Lorazepam & Clorazepate Antitrust Litigation, 2003
4    Westlaw 22037741 out of the District of Columbia, approving
5    $20,000 service awards for four class representatives in a
6    pharmaceutical direct purchaser settlement.
7              Here the request is for 30,000 apiece, which is a lot,
8    to be made to the three class representatives, Meijer, Inc. and
9    Meijer distribution, Inc., Louisiana Wholesale Drug Company and
10   Rochester Drug Cooperative, Inc.  Class counsel represents that
11   without the representatives, the common fund wouldn't exist
12   because it was they who came forward and initiated the
13   litigation, stayed in close contact with class counsel, and
14   acted as private attorneys general seeking a remedy for what
15   appeared to be a public wrong.  Although the award is on the
16   high side of the total sum, it is small in relation to the size
17   of the fund from which the award may be made.  See Domberger v.
18   Metropolitan Life Insurance Co., 203 F.R.D. 118, 125, Second
19   Circuit from 2001.  And so I grant the request for service
20   awards.
21             And therefore, it is my intention on the appointed
22   date, which I guess is November 24th to sign the proposed order
23   and final judgment approving the settlement.  Anything more I
24   should do now?  Did I hit everything I'm supposed to hit?
25             MR. SORENSEN:  I believe you did, your Honor.
         SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

```
                                                          18
     1b2imeim ag               DECISION
 1           THE COURT:  All right.  Pleasure doing business with
 2  you.
 3           MR. SORENSEN:  Thank you, your Honor.
 4           THE COURT:  I guess I'll be seeing you ladies again at
 5  some point.  Unless you can do some magic with the indirect
 6  purchasers.  Which I recognize is a different settle of fish.
 7           MR. SORENSEN:  I would just note that November 24th is
 8  Thanksgiving.
 9           THE COURT:  The court is closed the following day as
10  well, so I will get to this on the following Monday, which I
11  believe is November 28th.
12           (Record closed)
13
14
15
16
17
18
19
20
21
22
23
24
25

          SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

# EXHIBIT 3



| | | |
|---|---|---|
| SIDLEY AUSTIN LLP | BEIJING | NEW YORK |
| ONE SOUTH DEARBORN | BRUSSELS | PALO ALTO |
| CHICAGO, IL 60603 | CHICAGO | SAN FRANCISCO |
| (312) 853 7000 | DALLAS | SHANGHAI |
| (312) 853 7036 FAX | FRANKFURT | SINGAPORE |
| | GENEVA | SYDNEY |
| | HONG KONG | TOKYO |
| | LONDON | WASHINGTON, D.C. |
| | LOS ANGELES | |

jtreece@sidley.com
(312) 853-2937

FOUNDED 1866


October 4, 2011


**VIA U.S. MAIL**

The Attorney General of the United States          The Attorney General of each of the United States
Office of the United States Attorney General       (Addresses listed on Exhibit A hereto)
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001


      Re:   In re Metoprolol Succinate Direct Purchaser Antitrust Litigation
             Civil Action No. 06-cv-52 (GMS)

Dear Attorneys General:

      Pursuant to Title 28, section 1715 of the United States Code, AstraZeneca
Pharmaceuticals LP, AstraZeneca LP, AstraZeneca AB and Aktiebolaget Hässle (collectively
"AstraZeneca") hereby give notice of a proposed settlement in the above-captioned consolidated
class actions pending in the United States District Court for the District of Delaware (the
"Court"), in which AstraZeneca is a defendant.

**Compliance with 28 U.S.C. § 1715(b)**

      Under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715(b), certain
documents are to be provided to appropriate State and Federal officials in connection with a
proposed class action settlement. Each of these documents is addressed below and included in
the accompanying Compact Disc (CD).

    1.  28 U.S.C. § 1715(b)(1)—Complaint and Related Materials.

      The Consolidated Class Action Complaint, filed on June 5, 2006, is included in
      the enclosed CD as Exhibit B (this document can also be accessed via PACER, as
      Docket #15 in Case No. 1:06-cv-00052-GMS in the District of Delaware).

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships



The Attorney General of the United States
The Attorney General of each of the United States
October 4, 2011
Page 2

2. 28 U.S.C. § 1715(b)(2)—Notice of Any Scheduled Judicial Hearing.

A motion for preliminary approval of the settlement was filed on September 26, 2011, and seeks a final approval hearing before the Honorable Gregory M. Sleet for the United States District Court for the District of Delaware. A particular date and time for the hearing has not yet been set. A copy of the Direct Purchaser Plaintiffs' Unopposed Motion for Class Certification in Light of Settlement, Appointment of Class Counsel, Preliminary Approval of Proposed Settlement, Approval of Form of and Manner of Notice, Appointment of a Claims Administrator, and Setting the Settlement Schedule and Final Approval Hearing and the accompanying Proposed Order (without the accompanying exhibits) is included in the enclosed CD as Exhibit C.

3. 28 U.S.C. § 1715(b)(3)—Notification to Class Members.

The proposed notification to be sent to class members upon approval by the Court, which advises the members of the proposed settlement of the class action and their rights to request exclusion from the class action, is included in the enclosed CD as Exhibit D.

4. 28 U.S.C. § 1715(b)(4)—Class Action Settlement Agreement.

The Settlement Agreement and Release (the "Settlement Agreement") entered into and filed by the parties is included in the enclosed CD as Exhibit E.

5. 28 U.S.C. § 1715(b)(5)—Settlement or Other Agreement Between Defendant's Counsel and Class Counsel.

A copy of the parties' Escrow Agreement is included in the enclosed CD as Exhibit F. In addition, the Settlement Agreement, at paragraph 15, references a side-letter agreement between Plaintiffs and Defendants granting Defendants certain rights, including the opportunity to withdraw from the Settlement if a certain number of Class members opt out of the Class and proposed Settlement. The terms that would trigger Defendants' right to withdraw are being kept confidential, and the side-letter agreement thus is not enclosed. Such provisions are "typically not disclosed and [] kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out." *In re Healthsouth Corp. Secs. Litig.*, 2009 U.S. App. LEXIS 13035, at *4 (11th Cir. 2009). The parties will provide the side-letter agreement for *in camera* inspection to the District Court upon request.



The Attorney General of the United States
The Attorney General of each of the United States
October 4, 2011
Page 3

6. 28 U.S.C. § 1715(b)(6)—Final Judgment

There has been no final judgment or notice of dismissal, so no such document is presently available. The hearing to determine whether to give final approval to the proposed class action settlement has not yet been scheduled.

7. 28 U.S.C. § 1715(b)(7)— Class Members in Each State And Estimated Proportionate Shares

A spreadsheet that sets forth the names of direct purchaser class members and the estimated proportionate share of the claims of such members, by State, is enclosed as Exhibit G. This information is based on AstraZeneca's available sales data. This information does not include a listing of class members that are assignees of the direct purchaser class members, because identifying such assignee information is not reasonably available to AstraZeneca. Finally, Exhibit G includes highly confidential, non-public, commercial and financial information, and AstraZeneca requests that this information be protected from disclosure as confidential commercial and financial information under Federal and State FOIA laws. *See, e.,g.*, 5 U.S.C. § 552(b)(4).

8. 28 U.S.C. § 1715(b)(8)—Judicial Opinions Related to the Settlement

We do not believe that any decision rendered by the Court to date constitutes a written judicial opinion relating to the materials described under Title 28 U.S.C. §§ 1715(b)(8).

**Timeliness of this Notice**

This notice is timely under CAFA. Under 28 U.S.C. § 1715(b), the notice must be served "not later than 10 days after a proposed settlement of a class action is filed in court." The settlement was filed with the Court on September 26, 2011, and thus is within ten days of this notice. In addition, under 28 U.S.C. § 1715(d) , "[a]n order giving final approval of a proposed settlement may not be issued earlier than 90 days after" service of the notice. This notice will comply with that deadline as well because AstraZeneca will request that the final approval hearing take place on a date that is consistent with § 1715(d).

\* \* \* \*



The Attorney General of the United States
The Attorney General of each of the United States
October 4, 2011
Page 4


       Please contact me at the number listed above if you require any additional materials or need any further information.

                         Sincerely,

                         John W. Treece
                         *Counsel for Defendants AstraZeneca*
                         *Pharmaceuticals LP, AstraZeneca LP,*
                         *AstraZeneca AB and Aktiebolaget Hassle*


Enclosures: Exhibit A through G

cc:    The Attorney General of each of the United States
       (Addresses listed on Exhibit A hereto)

Attorney General of the State of Alabama
Office of the Attorney General
Alabama State House
500 Dexter Avenue
Montgomery, AL 36130

Attorney General of the State of Alaska
Office of the Attorney General
P.O. Box 110300
Juneau, AK 99811-0300

Attorney General of the State of Arizona
Office of the Attorney General
1275 West Washington Street
Phoenix, AZ 85007

Attorney General of the State of Arkansas
Office of the Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201

Attorney General of the State of California
Office of the Attorney General
California Department of Justice
Attn: Public Inquiry Unit
1300 I St., Ste. 1740
Sacramento, CA 95814

Attorney General of the State of Colorado
Office of the Attorney General
1525 Sherman St., 7th Floor
Denver, CO 80203

Attorney General of the State of Connecticut
Office of the Attorney General
55 Elm Street
Hartford, CT 06141-0120

Attorney General of the State of Delaware
Office of the Attorney General
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

Attorney General of the State of Florida
Office of the Attorney General
The Capitol PL-01
Tallahassee, FL 32399-1050

Attorney General of the State of Georgia
Office of the Attorney General
40 Capitol Square SW
Atlanta, GA 30334

Attorney General of the State of Hawaii
Office of the Attorney General
425 Queen Street
Honolulu, HI 96813

Attorney General of the State of Idaho
Office of the Attorney General
700 W. Jefferson Street
P.O. Box 83720
Boise, ID 83720-0010

Attorney General of the State of Illinois
Office of the Attorney General
100 West Randolph Street
Chicago, IL 60601

Attorney General of the State of Indiana
Office of the Attorney General
Indiana Government Center South
402 West Washington Street
Indianapolis, IN 46204

Attorney General of the State of Iowa
Office of the Attorney General
1305 East Walnut Street
Des Moines, IA 50319

Attorney General of the State of Kansas
Office of the Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612-1597

Attorney General of the State of Kentucky
Office of the Attorney General
The Capitol, Suite 118
700 Capitol Avenue
Frankfort, KY 40601-3449

Attorney General of the State of Louisiana
Office of the Attorney General
P.O. Box 94095
Baton Rouge, LA 70804-4095

Attorney General of the State of Maine
Office of the Attorney General
Burton M. Cross Building
6 State House Station, 6th Floor
Augusta, ME 04333

Attorney General of the State of Maryland
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202

Attorney General of the State of Massachusetts
Office of the Attorney General
McCormack Building
One Ashburton Place
Boston, MA 02108

Attorney General of the State of Michigan
Office of the Attorney General
G. Mennen Williams Building, 7th Floor
525 W. Ottawa St.
P.O. Box 30212
Lansing, MI 48909

Attorney General of the State of Minnesota
Office of the Attorney General
State Capitol, Ste. 102
St. Paul, MN 55155

Attorney General of the State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 37205-0220

Attorney General of the State of Missouri
Office of the Attorney General
Supreme Court Building
207 W. High St.
P.O. Box 899
Jefferson City, MO 65102

Attorney General of the State of Montana
Office of the Attorney General
Department of Justice
215 N. Sanders
Helena, MT 59620-1401

Attorney General of the State of Nebraska
Office of the Attorney General
State Capitol
P.O. Box 98920
Lincoln, NE 68509-8920

Attorney General of the State of Nevada
Office of the Attorney General
Nevada Department of Justice
Carson City Office
100 North Carson Street
Carson City, NV 89701-4717

Attorney General of the State of New Hampshire
Office of the Attorney General
33 Capitol Street
Concord, NH 03301

Attorney General of the State of New Jersey
Office of the Attorney General
Richard J. Hughes Justice Complex
25 Market St., CN 080
Trenton, NJ 08625

Attorney General of the State of New Mexico
Office of the Attorney General
P.O. Drawer 1508
Santa Fe, NM 87504-1508

Attorney General of the State of New York
Office of the Attorney General
The Capitol
Albany, NY 12224-0341

Attorney General of the State of North Carolina
Office of the Attorney General
Dept. of Justice
P.O. Box 629
Raleigh, NC 27602-0629

Attorney General of the State of North Dakota
Office of the Attorney General
State Capitol
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505

Attorney General of the State of Ohio
Office of the Attorney General
State Office Tower
30 E. Broad Street, 17th Floor
Columbus, OH 43266-0410

Attorney General of the State of Oklahoma
Office of the Attorney General
State Capitol, Rm. 112
2300 N. Lincoln Blvd.
Oklahoma City, OK 73105

Attorney General of the State of Oregon
Office of the Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096

Attorney General of the State of Pennsylvania
Office of the Attorney General
1600 Strawberry Square
Harrisburg, PA 17120

Attorney General of the State of Rhode Island
Office of the Attorney General
150 South Main Street
Providence, RI 02903

Attorney General of the State of South Carolina
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211

Attorney General of the State of South Dakota
Office of the Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501

Attorney General of the State of Tennessee
Office of the Attorney General
500 Charlotte Ave.
Nashville, TN 37243

Attorney General of the State of Texas
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548

Attorney General of the State of Utah
Office of the Attorney General
State Capitol, Rm. 236
Salt Lake City, UT 84114-0810

Attorney General of the State of Vermont
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001

Attorney General of the State of Virginia
Office of the Attorney General
900 East Main Street
Richmond, VA 23219

Attorney General of the State of Washington
Office of the Attorney General
P.O. Box 40100
1125 Washington Street, SE
Olympia, WA 98504-0100

Attorney General of the State of West Virginia
Office of the Attorney General
State Capitol
1900 Kanawha Blvd. E.
Charleston, WV 25305

Attorney General of the State of Wisconsin
Office of the Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

Attorney General of the State of Wyoming
Office of the Attorney General
State Capitol Bldg.
Cheyenne, WY 82002

The Attorney General of the United States
Office of the United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Attorney General of the District of Columbia
Office of the Attorney General
John A. Wilson Building
1350 Pennsylvania Avenue, NW
Suite 409
Washington, D.C. 20009

Attorney General of Puerto Rico
Guillermo Somoza-Colombani
GPO Box 902192
San Juan, PR 00902-0192

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

In re METOPROLOL SUCCINATE
ANTITRUST LITIGATION

Civil Action No. 06-52-MPT

THIS DOCUMENT RELATES TO:

Direct Purchaser Action

## [PROPOSED] ORDER AND FINAL JUDGMENT APPROVING SETTLEMENT, AWARDING ATTORNEYS' FEES AND EXPENSES, AWARDING REPRESENTATIVE PLAINTIFFS INCENTIVE AWARDS, APPROVING PLAN OF ALLOCATION, AND ORDERING DISMISSAL AS TO ALL DEFENDANTS

The Court, having considered (a) the Direct Purchaser Class Plaintiffs' Motion for Final Settlement Approval; (b) the Brief in Support of the Direct Purchaser Class Plaintiffs' Motion for Final Settlement Approval; (c) the Direct Purchaser Class Plaintiffs' Motion for an Award of Attorneys' Fees, Reimbursement of Expenses and Payment of Incentive Awards; (d) the Direct Purchaser Class Plaintiffs' Brief in Support of their Motion for an Award of Attorneys' Fees, Reimbursement of Expenses and Payment of Incentive Awards to the Representative Plaintiffs; (e) the Declaration of Co-Lead Counsel Eric L. Cramer; and having held a hearing on February 21, 2012; and having considered all of the submissions and arguments with respect thereto; pursuant to Rules 23 and 54 of the Federal Rules of Civil Procedure, and in accordance with the terms of the settlement agreement between Direct Purchaser Class Plaintiffs ("Plaintiffs") and AstraZeneca Pharmaceuticals LP, AstraZeneca LP, AstraZeneca AB, and Aktiebolget Hassle (collectively "Defendants"), dated September 23, 2011 (the "Settlement Agreement"), it is hereby:

**ORDERED, ADJUDGED AND DECREED that:**

1.     This Order and Final Judgment incorporates by reference the definitions in the

Settlement Agreement, and all terms used herein shall have the same meanings set forth in the

Settlement Agreement.  As set forth in the Court's Order (D.I. No. 186), dated November 16,

2011 ("Preliminary Approval Order"), the Class is defined as follows:

> All persons and entities in the United States (including, for avoidance of doubt, persons
> and entities in Puerto Rico) who purchased Toprol-XL directly from any of the
> Defendants at any time from May 5, 2005 through September 23, 2011 (the "Class
> Period"), including persons and entities who have received assignments or partial
> assignments of rights from direct purchasers of Toprol-XL.  Excluded from the Class are
> Defendants and their parents, employees, subsidiaries, and affiliates, and federal
> government agencies.  Also excluded from the class are non-class direct purchaser
> plaintiffs in *Walgreen Co., et al. v. AstraZeneca Pharmaceuticals LP, et al.*, No. 10-cv-
> 580 (GMS) (D. Del.), and *CVS Pharmacy Inc., et al. v. AstraZeneca Pharmaceuticals,
> LP, et al.*, No. 10-cv-897 (GMS) (D. Del.) (the "Opt-Out Actions"), namely Rite Aid
> Corp., Rite Aid Hdqtrs. Corp., CVS Pharmacy, Inc., Caremark L.L.C., JCG (PJC) USA,
> LLC, Maxi Drug, Inc., D/B/A Brooks Pharmacy, Eckerd Corporation, Walgreen Co.,
> The Kroger Co., Safeway Inc., HEB Grocery Company LP, and Supervalu Inc., both for
> the claims these entities are pursuing directly and for the claims they are pursing based
> upon assignments or partial assignments of claims from certain members of the Class as
> described in the complaints filed in the Opt-Out Actions.

2.     This Court has jurisdiction over these actions and over each of the parties and over

all members of the Class.  As set forth in more detail in the Settlement Agreement, Defendants

have agreed to pay a total of $20 million, plus accrued interest, and up to $750,000 in settlement

administration costs to settle this Action.

3.     As required by this Court in the Preliminary Approval Order, notice of the

proposed Settlement was mailed by first-class mail to all members of the Class to the last known

address from Defendants' sales database of each entity within the definition of the Class.  The

notice was also posted, along with relevant litigation and settlement documents, on the website

created specifically for the purpose of advising Class members of the fact and terms of the

settlement. *See* www.toproldirectsettlement.hrsclaims.com.  Such notice to members of the Class

2

is hereby determined to be fully in compliance with requirements of Fed. R. Civ. P. 23(e) and

due process of law and is found to be the best notice practicable under the circumstances and to

constitute due and sufficient notice to all entities entitled thereto.

4.     Due and adequate notice of the proceedings having been given to the Class and a

full opportunity having been offered to the Class to participate in the fairness hearing, it is

hereby determined that all Class Members are bound by this Final Order and Judgment.

5.     The Settlement of this Direct Purchaser Class Action was not the product of

collusion between Plaintiffs and Defendants or their respective counsel, but rather was the result

of *bona fide* and arm's-length negotiations conducted in good faith between Class Counsel and

Defendants' Counsel.

6.     The Court has held a hearing to consider the fairness, reasonableness and adequacy

of the proposed Settlement, and has been advised that there have been no objections to the

Settlement from any members of the Class, and also that several members of the Class have

explicitly stated their support for the Settlement and Class Counsel's requested attorneys' fees,

and the incentive awards for the named Plaintiffs.

7.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby

approves the Settlement, and finds that the Settlement is, in all respects, fair, reasonable and

adequate to Class members. Accordingly, the Settlement shall be consummated in accordance

with the terms and provisions of the Settlement Agreement. The Settlement is fair, reasonable

and adequate in light of the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), as

follows:

       (a)     this case was highly complex, expensive and time consuming, and would

have continued to be so if the case had not settled;

3

(b)     there were no objections to the Settlement by Class members, and several Class members expressed affirmative support for the Settlement;

(c)     because the case settled near the conclusion of discovery, after more than one million pages of documents had been produced and 12 depositions had been taken, Class Counsel had an appreciation of the strengths and weaknesses of their case before negotiating the Settlement;

(d)     Class Counsel and the Class would have faced numerous and substantial risks in establishing both liability and damages if they had decided to continue to litigate rather than settle;

(e)     the Settlement amount is well within the range of reasonableness in light of the best possible recovery and the risks the parties would have faced if the case had continued to verdicts as to both liability and damages; and

(f)     the Settlement also satisfies the additional factors for evaluating class settlements set forth in *In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d Cir. 1998).

8.      The Court approves the Plan of Allocation of the Settlement proceeds (net of attorneys' fees, reimbursed expenses and incentive awards) proposed by Class Counsel in the Plan of Allocation (the "Plan") described in the Brief in Support of the Direct Purchaser Class Plaintiffs' Motion for Final Settlement Approval. The Plan proposes to distribute the net Settlement proceeds *pro rata* based on Class members' purchases of Toprol-XL during the Class Period, and does so fairly and efficiently. It directs Heffler, Radetich & Saitta, LLP, the Claims Administration firm retained by Class Counsel and approved by the Court in the Preliminary

4

Approval Order, to distribute the net Settlement proceeds to Class members in the manner provided in the Plan.

9.  All claims in the above-captioned action against Defendants are hereby dismissed with prejudice, and without costs.

10.  In accordance with the Settlement Agreement, upon the Settlement becoming final in accordance with its terms:

(a)  Defendants and their past, present and future parents, subsidiaries, divisions, affiliates, stockholders, officers, directors, insurers, general or limited partners, employees, agents, attorneys and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing) (the "Released Parties") are and shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action, damages, and liabilities, of any nature whatsoever (whether such claims, demands, actions, suits, causes of action, damages, or liabilities arise or are incurred before, during or after the date hereof), including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that Plaintiffs or any member or members of the Class who has (have) not timely excluded itself (themselves) from the Class (including any past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, subsidiaries, partners, heirs, executors, administrators, purchasers, predecessors, successors and assigns, acting in their capacity as such), whether or not they object to the Settlement and whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, representatively, derivatively or in any other capacity, to the extent arising out of or relating to:

5

1)      any conduct alleged, or conduct relating to extended release metoprolol succinate that could have been alleged, in the Action;

2)      any conduct relating to obtaining, maintaining, or enforcement of United States Patent Number 5,081,154 or United States Patent Number 5,001,161 or United States Patent Number 4,957,745, including the alleged improper bringing, maintaining, defending or otherwise participating in litigation concerning any such patents;

3)      any conduct relating to extended release metoprolol succinate and the listing of United States Patent Numbers 5,081,154, 5,000,161 and 4,957,745 in the United States FDA publication known as the Approved Drug Products With Therapeutic Equivalence Evaluations, commonly referred to as the "Orange Book;"

provided only that such conduct occurred or allegedly occurred prior to the date of this Settlement – except as expressly provided for in paragraph 14 of the Settlement Agreement (the "Released Claims"). Plaintiffs and each member of the Class shall not sue or otherwise seek to establish or impose liability against any Released Party based, in whole or in part, on any of the Released Claims.

(b)      In addition, the Court finds that each class member has expressly waived and released, upon the Settlement Agreement becoming final, any and all provisions, rights, benefits conferred by §1542 of the California Civil Code, which reads:

> **Section 1542.  General Release—Claims Extinguished.**
> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

6

or by any law of any state or territory of the United States or other jurisdiction, or principle of
common law, which is similar, comparable or equivalent to §1542 of the California Civil Code.
Each Class member may hereafter discover facts other than or different from those which he, she
or it knows or believes to be true with respect to the claims which are the subject matter of this
Paragraph 10, but each Class member hereby expressly waives and fully, finally and forever
settles and releases, upon the Settlement Agreement's becoming final, any known or unknown,
suspect or unsuspected, contingent or non-contingent claim that would otherwise fall within the
definition of Released Claims, whether or not concealed or hidden, without regard to the
subsequent discovery or existence of such different or additional facts. For the avoidance of
doubt, the Court finds that each Class member has expressly waived and fully, finally and
forever settlement and released any and all claims it may have against any Released party under
§17200, *et seq.*, of the California Business and Professions Code or any similar, comparable or
equivalent provision of the law of any other state or territory of the United States or other
jurisdiction, which claims are hereby expressly incorporated into the definition of Released
Claims.

11.    Class Counsel have moved for an award of attorneys' fees and reimbursement of
expenses. Pursuant to Rules 23(h)(3) and 54(d) of the Federal Rules of Civil Procedure, and
pursuant to the factors for assessing the reasonableness of a class action fee request as set forth in
*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000), this Court makes the
following findings of fact and conclusions of law:

(a)    the Settlement confers a monetary benefit on the Class that is substantial,
both in absolute terms and when assessed in light of the risks of establishing liability and
damages in this case;

7

(b)     there were no objections by Class members to the requested fee award of
one-third of the Settlement Fund, and in fact, numerous Class members, with purchases
representing roughly 70% of the aggregate Class purchases, have affirmatively expressed their
support for and lack of objection to the requested fee;

(c)     Class Counsel have effectively and efficiently prosecuted this difficult and
complex action on behalf of the members of the Class for several years, with no guarantee they
would be compensated;

(d)     Class Counsel undertook numerous and significant risks of nonpayment in
connection with the prosecution of this action;

(e)     Class Counsel have reasonably expended thousands of hours, and incurred
hundreds of thousands of dollars in out-of-pocket expenses, in prosecuting this action, with no
guarantee of recovery;

(f)     fee awards similar to the fee requested by Class Counsel here have been
awarded in similar cases, including numerous Hatch-Waxman antitrust class actions similarly
alleging impeded entry of generic drugs;

(g)     the Settlement achieved for the benefit of the Class was obtained as a direct
result of Class Counsel's skillful advocacy;

(h)     the Settlement was reached following negotiations held in good-faith and in
the absence of collusion;

(i)     the "percentage-of-the-fund" method is the proper method for calculating
attorneys' fees in common fund class action in this Circuit (*see, e.g.*, *In re Rite Aid Sec. Litig.*,
396 F.3d 294, 305 (3d Cir. 2005));

(j)     Class members were advised in the Notice of Proposed Settlement of Class

8

Action, which notice was approved by this Court, that Class Counsel intended to move for an award of attorneys' fees in an amount up to 33-1/3% of the gross Settlement Fund, reimbursement of reasonable costs and expenses incurred in the prosecution of this action;

(k)     Class Counsel did, in fact, move for an award of attorneys' fees in the amount of 33-1/3% of the gross Settlement Fund, plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action, which motion has been publicly available since December 19, 2011 through public filing on the docket of this Action and posting on the website created specifically for the purpose of advising Class members of the fact and terms of the settlement at www.toproldirectsettlement.hrsclaims.com;

(l)     As detailed in Class Counsel's declarations, a one-third fee award would equate to a lodestar multiplier of less than 1, less than approved multipliers greater than 1 in other Hatch-Waxman class actions similarly alleging impeded generic competition;

(m)     in light of the factors and findings described above, the requested 33-1/3% fee award is within the applicable range of reasonable percentage fund awards.

Accordingly, Class Counsel are hereby awarded attorneys' fees in the amount of $6,666,666.00 from the Settlement Fund. The Court finds this award to be fair and reasonable.

Further Class Counsel are hereby awarded $493,598.24 out of the Settlement Fund to reimburse them for the expenses they incurred in the prosecution of this lawsuit, which expenses the Court finds to be fair, and reasonably incurred to achieve the benefits to the Class obtained in the Settlement to the Class.

The awarded fees and expenses shall be paid to Class Counsel from the Settlement Fund in accordance with the terms of the Settlement Agreement. Lead Counsel shall allocate the fees and expenses among all of the Class Counsel.

9

12.     Neither this Final Order and Judgment, the Settlement Agreement, nor any and all negotiations, documents and discussions associated with it shall be deemed or construed to be an admission or evidence of any violation of any statute or law, of any liability or wrongdoing by Defendants, or of the truth of any of the claims or allegations contained in any complaint or any other pleading or document, and evidence thereof shall not be discoverable, admissible or otherwise used directly or indirectly, in any way by or against Plaintiffs or Defendants, whether in this Direct Purchaser Class Action or in any other proceeding.

13.     Without affecting the finality of this judgment, the Court retains exclusive jurisdiction over the Settlement Agreement, including the administration and consummation of the Settlement Agreement, the Plan of Allocation, and in order to determine any issues relating to attorneys' fees and expenses and any distribution to members of the Class. In addition, without affecting the finality of this judgment, Defendants and each member of the Class hereby irrevocably submit to the exclusive jurisdiction of the Court for any suit, action, proceeding or dispute arising out of or relating to the Settlement Agreement or the applicability of the Settlement Agreement, including, without limitation any suit, action, proceeding or dispute relating to the release provisions therein, except that this submission to the Court's jurisdiction shall not prohibit (a) the assertion of the forum in which a claim is brought that the release included in the Settlement Agreement is a defense, in whole or in part, to such claim or, (b) in the event that such a defense is asserted in that forum, the determination of its merits in that forum.

14.     The three Class Representatives are each hereby each awarded $50,000 out of the Settlement Fund, for representing the Class, which amount is in addition to whatever monies

these Plaintiffs will receive from the Settlement Fund pursuant to the Plan of Allocation. The Court finds these awards to be fair and reasonable.

15.    In the event the Settlement does not become final in accordance with paragraph 5 of the Settlement Agreement, this Order and Final Judgment shall be rendered null and void as provided by the Settlement Agreement, shall be vacated, and all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement.

16.    The Court hereby directs that this judgment be entered by the clerk forthwith pursuant to Federal Rules of Civil Procedure 54(b). The direction of the entry of final judgment pursuant to Rule 54(b) is appropriate and proper because this judgment fully and finally adjudicates the claims of the Plaintiffs and the Class against all Defendants in this action, allows consummation of the Settlement, and will expedite the distribution of the Settlement proceeds to the Class members.

SO ORDERED this the  21  day of  February , 2012.


Hon. Mary Pat Thynge
U.S. District Court for the District of Delaware

11

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

*In re Neurontin Antitrust Litigation*

THIS DOCUMENT RELATES TO:

LOUISIANA WHOLESALE DRUG
COMPANY, INC., MEIJER, INC. and
MEIJER DISTRIBUTION, INC., on behalf of
themselves and all others similarly
situated,

Civil Action No. 02-1830
Civil Action No. 02-2731

                    Plaintiffs,

          v.

PFIZER, INC. and WARNER-LAMBERT
CO.,

                    Defendants.

## FINAL JUDGMENT AND ORDER OF DISMISSAL APPROVING
## PROPOSED CLASS SETTLEMENT AND DISMISSING ACTIONS

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, and in accordance with

the terms of the Settlement Agreement dated April 17, 2014, it is hereby ORDERED as follows:

1.       This Final Judgment and Order of Dismissal hereby incorporates by reference the

definitions in the Settlement Agreement among the parties to these actions on file with this

Court, and all capitalized terms used and not otherwise defined herein shall have the meanings

set forth in the Settlement Agreement.

2.       The Court has jurisdiction over these actions and over each of the parties and over

1

all members of the Class.

3.      The notice of settlement (in the forms presented to this Court as Exhibits B-1 and B-2 to the Settlement Agreement) (the "Notice") directed to the members of the Class, constituted the best notice practicable under the circumstances.    In making this determination, the Court finds that the Notice provided for individual notice to all Class members who were identified through reasonable efforts.    Pursuant to, and in accordance with, Rule 23 of the Federal Rules of Civil Procedure, the Court hereby finds that the Notice provided Class members due and adequate notice of the Settlement, the Settlement Agreement, these proceedings and the rights of Class members to object to the Settlement.

4.      The Court held a preliminary fairness hearing on May 1, 2014 and a final fairness hearing on July 31, 2014, regarding the reasonableness of the parties' settlement. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement, and finds that the Settlement is, in all respects, fair, reasonable and adequate to Class members. Accordingly, the Settlement shall be consummated in accordance with the terms and provisions of the Settlement Agreement.[1]

---

[1] The Court has fully considered the *Girsh* factors and finds that, considered together, the factors overwhelming favor approval of the Class settlement. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998). As the Court indicated at the fairness hearing, every issue in this complex antitrust case has been vigorously litigated by both sides for over twelve years. Class Plaintiffs faced significant risks in taking the case to trial, which this Court has discussed in its opinions on dispositive motions and recent status conferences. This Court agrees with counsel's position, as discussed in the extensive briefing and supporting affidavits, that the Settlement Agreement is fair and reasonable for all Class members. The value of the settlement to the Class is confirmed by the fact that no members of the Class of identifiable, sophisticated business

5.      The Court hereby approves the Plan of Allocation of the Settlement Fund as proposed by Class Counsel (the "Plan"), which was summarized in the Notice of Proposed Settlement. The Claims Administrator is directed to distribute the net Settlement Fund as provided in the Plan.

6.      The Court has certified a Class consisting of "[a]ll persons or entities in the United States that purchased Neurontin from Pfizer at any time during the period of December 11, 2002 through August 31, 2008 and who have purchased generic gabapentin.   Excluded from the Class are Defendants and each of their respective parents, employees, subsidiaries, affiliates, and franchisees, and all government entities."

7.      Also excluded from the Class are CVS Pharmacy Inc., Caremark, L.L.C., Rite Aid Corporation, Rite Aid HDQTRS Corp., Walgreen Co., American Sales Co, Inc., HEB Grocery Co. LP, Safeway Inc., SuperValu Inc., and The Kroger Co., in their own right as direct purchasers of Neurontin from Pfizer and as assignees limited to their purchases of Neurontin from Class members.

8.      The Court has found that the Class meets all the requirements of Fed. R. Civ. P. 23.   The Class, made up of sophisticated business entities, had a full and fair opportunity to request exclusion at the time of class certification and, therefore, there is no reason for the Court to afford a new opportunity to individual Class members to request exclusion who had an earlier opportunity to request exclusion but did not do so.

_____

entities have objected, rather many have explicitly approved of the Settlement.

9.      The Court has appointed Louisiana Wholesale Drug company, Inc., Meijer, Inc., and Meijer Distribution, Inc. as class representatives (the "Class Representatives").

10.     The Court has found that Co-Lead Counsel, listed below, along with other Class Counsel, have fairly and adequately represented the interests of the Class and satisfied the requirements of Fed. R. Civ. P. 23(g):

> Bruce E. Gerstein, Esq.
> GARWIN GERSTEIN & FISHER LLP
> 88 Pine Street, 10th Floor
> New York, NY 10005
>
> Richard J. Kilsheimer, Esq.
> KAPLAN FOX & KILSHEIMER LLP
> 850 Third Avenue, 14th Floor
> New York, NY 10022

11.     The following actions are hereby dismissed with prejudice, as provided in the Settlement Agreement, and without costs, except as provided for herein and in the Settlement Agreement:

- *Louisiana Wholesale Drug Company, Inc., et al. v. Pfizer, Inc. and Warner-Lambert,* No. 2:02-cv-01830-FSH (D.N.J.)

- *Meijer, Inc., et al. v. Pfizer, Inc. and Warner-Lambert*, No. 2:02-cv-02731 (D.N.J.)

12.     Each of the foregoing dismissals shall become effective upon the date the Settlement becomes final in accordance with paragraph 4 of the Settlement Agreement.

13.     Upon this Settlement becoming final in accordance with paragraph 4 of the Settlement Agreement, Defendants and their past, present and future parents, subsidiaries, divisions, affiliates, joint ventures, stockholders, officers, directors, management, supervisory

4

boards, insurers, general or limited partners, employees, agents, trustees, associates, attorneys and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing) (the "Released Parties") are and shall be unconditionally, fully and finally released and forever discharged from all manner of claims, debts, obligations, demands, actions, suits, causes of action, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, accrued in whole or in part, in law or equity, that Plaintiffs or any member or members of the Class (including any of their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such) (the "Releasors"), whether or not they object to the Settlement and whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, representatively, derivatively or in any other capacity, arising out of or relating in any way to any conduct alleged or asserted in any of Plaintiffs' complaints filed   in this Class Action, relating to any alleged delay in the marketing, sale, manufacture, pricing, or purchase of, or the enforcement of intellectual property related to Neurontin or its generic equivalents, prior to the date hereof, except the Settlement does not release any claims between Plaintiffs, members of the Class and the Released Parties concerning product liability, breach of contract, breach of warranty or personal injury (the "Released Claims").

14.     In addition, Plaintiffs and each Class member, on behalf of themselves and all

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 114
of 229
Case 2:02-cv-01830-MCA-JBC   Document 1127   Filed 08/06/14   Page 6 of 13 PageID: 6911

other Releasors, hereby expressly waive, release and forever discharge, upon the Settlement

becoming final, any and all provisions, rights and benefits conferred by § 1542 of the California

Civil Code, which reads:

> Section 1542.   General Release; extent.   A general release does not extend
> to claims which the creditor does not know or suspect to exist in his or her
> favor at the time of executing the release, which if known by him or her
> must have materially affected his or her settlement with the debtor;

or by any law of any state or territory of the United States or other jurisdiction, or principle of

common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code.

Each Class member may hereafter discover facts other than or different from those which he, she

or it knows or believes to be true with respect to the claims which are the subject matter of this

paragraph 13, but each Class member hereby expressly waives and fully, finally and forever settles,

releases and discharges, upon this Settlement becoming final, any known or unknown, suspected

or unsuspected, asserted or un-asserted, contingent or non-contingent claim that would otherwise

fall within the definition of Released Claims, whether or not concealed or hidden, without regard

to the subsequent discovery or existence of such different or additional facts.   Each Class member

also hereby expressly waives and fully, finally and forever settles, releases and discharges any and

all claims it may have against any Released Party under § 17200, *et seq*, of the California Business

and Professions Code or any similar, comparable or equivalent provision of the law of any other

state or territory of the United States or other jurisdiction, which claims are expressly incorporated

into the definition of Released Claims.

15.    The releases set forth in paragraphs 13 and 14 of this Order shall not release any

claims between Plaintiffs, Class members and the Released Parties concerning product liability,

breach of contract, breach of warranty, or personal injury.

16.     Upon consideration of Class Counsel's petition for fees, costs and expenses, Co-Lead Counsel, on behalf of all counsel for the Class, are hereby awarded attorneys' fees in the amount of 33⅓% of the Settlement Fund and costs and expenses totaling $2,213,537.35, together with a proportionate share of the interest thereon from the date the funds are deposited in the Escrow Account until payment of such attorneys' fees, costs and expenses, at the rate earned by the Settlement Fund, to be paid solely from the Settlement Fund and only if and after the Settlement becomes final in accordance with paragraph 4 of the Settlement Agreement.   Upon consideration of Class Counsel's petition for incentive payments for Plaintiffs in these actions, LWD and Meijer are each hereby awarded an incentive award in the amount of $100,000.00, to be paid solely from the Settlement Fund, and only if and after the Settlement becomes final in accordance with paragraph 4 of the Settlement Agreement.   Co-Lead Counsel shall allocate and distribute such attorneys' fees, costs and expenses among the various Class Counsel that have participated in this litigation.   Co-Lead Counsel shall distribute such incentive awards to the Plaintiffs as provided herein.   The Released Parties (as defined in paragraph 10 of the Settlement Agreement) shall have no responsibility for, and no liability whatsoever with respect to, any payment or disbursement of attorneys' fees, expenses, costs or incentive awards among Class Counsel and/or Plaintiffs, or with respect to any allocation of attorneys' fees, expenses, costs or incentive awards to any other person or entity who may assert any claim thereto.   The attorneys' fees, costs and expenses, and incentive award authorized and approved by this Final Judgment and Order shall be paid to Co-Lead Counsel within five (5) business days after this

Settlement becomes final pursuant to paragraph 4 of the Settlement Agreement and in accordance with the terms of the Settlement Agreement and the Escrow Agreement.   The attorneys' fees, costs and expenses, and incentive awards authorized and approved by this Final Judgment and Order shall constitute full and final satisfaction of any and all claims that Plaintiffs and any Class member, and their respective counsel, may have or assert for reimbursement of fees, costs, and expenses, and incentive awards, and Plaintiffs and members of the Class, and their respective counsel, shall not seek or demand payment of any fees and/or costs and/or expenses and/or incentive awards from any source other than the Settlement Fund.   The Court retains exclusive jurisdiction over the Settlement and the Settlement Agreement as described therein, including the award of attorneys' fees to Plaintiffs' Counsel, the reimbursement of expenses, the award of incentive payments to Plaintiffs, and the administration and consummation of the Settlement, and over this Final Judgment and Order.

17.     The Court finds that this Final Judgment and order adjudicates all of the claims, rights and liabilities of the parties to the Settlement Agreement (including the members of the Class), and is final and shall be immediately appealable.   Neither this Order nor the Settlement Agreement nor any other Settlement-related document shall constitute any evidence or admission of liability by Defendants or any other Released Party, nor shall either the Settlement Agreement or this Order or any other Settlement-related document be offered in evidence or used for any other purpose in this or any other matter or proceeding except as may be necessary to consummate or enforce the Settlement Agreement of the terms of this Order or if offered by any Released Party in responding to any action purporting to assert Released Claims.

8

18.    Class Counsel for the Direct Purchaser Class Plaintiffs have moved for an award of attorneys' fees, reimbursement of expenses, and incentive awards for class representatives. (Doc. No. 749).  Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, and pursuant to the factors for assessing the reasonableness of a class action fee request as set forth in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000), this Court makes the following findings of fact and conclusions of law with respect to Class Counsel's request for an award of attorneys' fees, reimbursement of expenses, and incentive awards for Class Representatives:

19.    The Settlement of $190,416,438.36 million (the "Settlement Fund"), representing the agreed-upon $190 million plus 1% per annum interest that had accrued from March 14, 2014 (the date that the parties first orally agreed to the Settlement's terms) to June 2, 2014 (the date that defendants deposited such amount into an escrow account held in trust by UBS AG that is earning interest for the benefit of the Class), plus interest on the Settlement Fund from June 2, 2014, confers a monetary benefit on the Direct Purchaser Class that is substantial, both in absolute terms and when assessed in light of the risks of establishing liability and damages in this case.   The Settlement was reached following negotiations held in good-faith and in the absence of collusion, with the aid of a highly-renowned mediator, over the course of three mediation sessions, covering six days.

20.    The Court-approved Notice of Proposed Settlement of Class Action (Doc. No. 727) advised Class Members that Class Counsel intended to move for an award of attorneys' fees in an amount up to 33-1/3% of the gross Settlement Fund (including the interest accrued thereon), plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action.

21.     Class Counsel have moved for an award of attorneys' fees in the amount of 33-1/3% of the gross Settlement Fund (including the interest accrued thereon), plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action, which such motion has been on the docket and publicly available since July 1, 2014.

22.     In prosecuting this action, Class Counsel expended over 60,570 hours of uncompensated time, and incurred substantial out of pocket expenses, with no guarantee of recovery.   Class Counsel's hours were reasonably expended in this complex case that was vigorously litigated for over twelve years, and their time was expended at significant risk of nonpayment.

23.     No Class Members objected to Class Counsel's fee request.   In fact, as described below, the reaction of the Class has been entirely positive and supportive of the Settlement generally and Class Counsel's requested fee award specifically.

24.     The Settlement achieved for the benefit of the Direct Purchaser Class was obtained as a direct result of Class Counsel's skillful advocacy.   This is confirmed by the entirely positive reaction of the Class Members to the Settlement and Class Counsel's request for a fee award of 33-1/3% of the Settlement.   Outside antitrust counsel for the country's three largest pharmaceutical distributors, who made in excess of 70% of the branded and generic Neurontin purchases at issue in this case, wrote to the Court on behalf of their clients to express their clients' support for the Settlement and Class Counsel's request for an award of one-third of the Settlement amount.   *See* Exhibits 2-4 to the Joint Declaration of Bruce E. Gerstein and Richard J. Kilsheimer in Support of Direct Purchaser Class Plaintiffs' Motions for Final Approval of Settlement and for

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 119
of 229
Case 2:02-cv-01830-MCA-JBC   Document 114-9   Filed 08/06/14   Page 11 of 13 PageID: 6916

an Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to Class Representatives (the "Joint Declaration" or "Joint Decl.," Doc. No. 748-5) (Doc. Nos. 748-7 – 748-9) (letters to the Court from outside counsel to AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation).   In addition, a number of other Class Members wrote directly to the Court stating their belief that Class Counsel's requested fees are justified in light of the time and expense that Class Counsel expended prosecuting and favorably resolving this complex litigation.   *See* Exhibits 5-12 to the Joint Declaration (Doc. Nos. 748-9 – 748-17) (letters from Class Members Burlington Drug Company, Inc., Dakota Drug, Inc., Drogueria Betances, Inc., King Drug Company of Florence, Inc., Miami-Luken, Inc., Prescription Supply, Inc., J M Smith Corporation d/b/a Smith Drug Co., and Value Drug Co.).   All of the above-mentioned Class Members who have written to the Court to express their support for the Settlement and Class Counsel's fee request account for approximately 93% of the purchases at issue in this litigation.

25.     The "percentage-of-the-fund" method is the proper method for calculating attorneys' fees in common fund class actions in this Circuit.   *See, e.g., In re Rite Aid Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005).   The Court concludes that that the fees requested by Class Counsel are comparable to recent awards in similar cases in the Third Circuit and elsewhere, including direct purchaser class actions similarly alleging anticompetitive practices in the pharmaceutical industry.

26.     The Court finds that Class Counsel's request for a 33-1/3% fee is consistent with what would have been negotiated for a contingent-fee case of this complexity.   For example, the current and former presidents of class representative Louisiana Wholesale Drug Co., Inc. ("LWD")

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 120
of 229
Case 2:02-cv-01830-MCA-JBC   Document 1429   Filed 08/06/14   Page 12 of 13 PageID: 6917

attested that "had LWD retained the law firms and/or attorneys . . . to represent it in an individual action in this complex litigation, LWD would have retained these same attorneys based on a 33 1/3% contingency fee in the event of settlement or compromise without trial and/or based on a 40% contingency fee in the event of trial, with any applicable contingency fee percentage computed in addition to out-of-pocket expenses."   Exhibit 13 to the Joint Decl., Declaration of Chad Gielen, President/Chief Executive Office of LWD, at ¶ 6, and Exhibit 14 to the Joint Decl., Declaration of Gayle White, former President and General Manager of LWD, at ¶ 3.   Furthermore, the letters from the Class Members supporting Class Counsel's fee award is further evidence that the 33-1/3% fee award is consistent with what those entities would have assented to had they retained Class Counsel in private litigation.

27.     As detailed in Class Counsel's affidavits, a one-third fee award would equate to a lodestar multiplier of approximately 1.99.    The Court concludes that, based on recently-approved multipliers in other Third Circuit antitrust class actions alleging similar anticompetitive practices in the pharmaceutical market, the multiplier requested here is well within the acceptable range. *See, e.g., In re Flonase Antitrust Litigation*, 951 F. Supp. 2d 739, 750 (E.D. Pa. 2013) (approving 33 1/3% fee award of $150 million settlement that amounted to multiplier of 2.99).

28.     In light of the factors and findings described above, the Court finds that the requested 33-1/3% fee award is within the applicable range of reasonable percentage fund awards.

29.     The Court finds this fee award is reasonable pursuant to Federal Rule of Civil Procedure 23(h).   The Court orders that Class Counsel request for attorneys' fees of 33-1/3% of the Settlement Fund, which equates to $63,472,146.12, plus one-third of the interest earned on the

Settlement Fund from June 2, 2014 (the date of funding of the Settlement Fund) to the date of payment, at the same net interest rate earned by the Settlement Fund, is granted.

30.    Further, the Court orders that Class Counsel is awarded $2,213,537.35 out of the Settlement Fund to reimburse them for the expenses incurred in prosecution of this case, which such expenses the Court finds to be fair and reasonably incurred to achieve the benefits to the Direct Purchaser Class obtained by the Settlement.

31.    Further, the Court orders payment of two incentive awards of $100,000 each for each of the Class Representatives – one incentive award of $100,000 to LWD and one incentive award to "Meijer", which consists of Meijer, Inc. and Meijer Distribution, Inc. (together, "Meijer") – for their active participation and assistance in the prosecution of this case, including responding to document requests and interrogatories, appearing for deposition and keeping apprised of the progress of the case, including settlement efforts.   The Class Representatives' efforts contributed to the benefits conferred upon the Class through the Settlement.   In addition, no Class Member has objected to the awarding of these incentive awards.   Moreover, the three largest pharmaceutical distributors have specifically supported granting incentive awards in the requested amounts.   *See* Exhibits 2-4 to the Joint Decl. (Doc. Nos. 748-7 – 748-9) (letters to the Court from outside counsel to AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation).

IT IS SO ORDERED.

Dated: 8-6-14

Hon. Faith S. Hochberg, U.S.D.J.

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 122
of 229
Case 1:03-mc-00223-RJL   Document 333   Filed 01/31/11   Page 1 of 5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE NIFEDIPINE ANTITRUST LITIGATION  : | Civil Action No. |
|   : | 1:03-MC-223 (RJL) |
| _____ : | |
|   : | MDL No. 1515 |
| THIS DOCUMENT RELATES TO:  : | |
|   : | |
| SAJ DISTRIBUTORS, INC., et al.,  : | |
| v.  : | |
| BIOVAIL CORPORATION, et al.  : | |
| Case No.: 1:02:CV01931  : | |
|   : | |
| MEIJER, INC., et al.,  : | |
| v.  : | |
| BIOVAIL CORPORATION, et al.  : | |
| Case No.: 1:02:CV7852  : | |
|   : | |
| INDEPENDENT DRUG CO.,  : | |
| v.  : | |
| BIOVAIL CORPORATION, et al.  : | |
| Case No.: 1:02CV01354  : | |
|   : | |
| ROCHESTER DRUG COOPERATIVE,  : | |
| v.  : | |
| BIOVAIL CORPORATION, et al.  : | |
| Case No.: 1:03CV1473  : | |
| _____ : | |

## ORDER GRANTING CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF ADDITIONAL EXPENSES AND AWARDS TO CERTIFIED CLASS REPRESENTATIVES

This Court, having considered: (a) Class Counsel's Motion for an Award of Attorneys'

Fees, Reimbursement of Additional Expenses and Awards to Certified Class Representatives; (b)

Compendium of Firm Declarations in Support of Motion for Attorneys' Fees; (c) the

Memorandum of Law in Support of Class Counsel's Motion for an Award of Attorneys' Fees,

Reimbursement of Additional Expenses and Awards to Certified Class Representatives; and (d)

the Supplemental Declaration of Richard J. Kilsheimer, and having held a hearing on January 31, 2011 and having considered all of the submissions and arguments with respect thereto, it is hereby **ORDERED, ADJUDGED, and DECREED that:**

1.      Class Counsel have moved for an award of attorneys' fees and reimbursement of additional expenses.  Pursuant to Rules 23(h)(3), 54(d) and 52(a) of the Federal Rules of Civil Procedure, this Court makes the following findings of fact and conclusions of law:

(a)      that the Teva Settlement and the Biovail/Elan Settlement both confer a substantial benefit on the Class;

(b)      that the value conferred on the Class is immediate and readily quantifiable and represents a substantial portion of the total overcharge allegedly incurred as a result of the conduct challenged in this lawsuit;

(c)      that Class Counsel effectively pursued the claims on behalf of the members of the Class before this Court in this complex case, and reasonably expended 31,030.50 hours in so doing, resulting in a total lodestar of $14,101,078.45 at the normal and customary current hourly rates of those law firms, which was expended with no guarantee it would be compensated;

(d)      that the Teva Settlement and the Biovail/Elan Settlement were both obtained as a direct result of Class Counsel's skillful advocacy;

(e)      that Plaintiffs' Counsel incurred additional expenses in the amount of $5,024.33 that were not included in the previous Motion for Reimbursement of Expenses which was filed on November 5, 2010, which I find were reasonable and necessary to the representation of the Class and the prosecution of this lawsuit, and for which Class Counsel had no guarantee of reimbursement;

(f)     that notice of Class Counsel's intent to move for attorneys' fees not to exceed 33-1/3% of the $35 million total Settlement Fund created by the Teva Settlement and the Biovail/Elan Settlement, plus reimbursement of certain additional out-of-pocket Expenses not to exceed $50,000, which were incurred after Class Counsel moved for an award of Expenses on November 5, 2010 and an award of $60,000 to each of the certified Class Representatives[1] for their efforts on behalf of the Class;

(g)     that Class Counsel did, in fact, move for an award of attorneys' fees in the amount of 33-1/3% of the total Settlement Fund (including the interest accrued thereon), plus reimbursement of certain additional out-of-pocket Expenses not to exceed $50,000, which were incurred after Class Counsel moved for an award of Expenses on November 5, 2010 and an award of $60,000 to each of the certified Class Representatives;

(h)     that no member of the Class has objected to the award of attorneys' fees, reimbursement of the additional expenses sought by Class Counsel or the award of $60,000 to each of the certified Class Representatives;

(i)     that counsel who recover a common fund for the benefit of persons other than themselves or their clients are entitled to a reasonable attorneys' fee from the fund as a whole. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984);

(j)     that the requested 33-1/3% fee award is well within the applicable range of reasonable percentage fund awards, and results in a negative multiplier;

---

[1]     The certified Class Representatives are: 1) SAJ Distributors, Inc. and Stephen L. LaFrance Holdings, Inc. (treated as one entity); 2) Meijer, Inc. and Meijer Distribution, Inc. (treated as one entity); 3) Independent Drug Company; and 4) Rochester Drug Cooperative.

        (k)     that the additional expenses were necessarily incurred in the prosecution of this litigation; and

        (l)     that the Class Representatives have actively fulfilled their obligations to the Class.

2.     Accordingly, Class Counsel are hereby awarded attorneys' fees in the amount of 33-1/3% of the Settlement Fund, or a total fee award of $11,666,667.00, plus interest earned thereon until the date of payment.  The Court finds this award to be fair and reasonable.  Further, Class Counsel are hereby awarded $5,024.33 out of the Settlement Fund to reimburse their additional expenses which were not included in their prior motion for reimbursement of expenses filed on November 5, 2010, which the Court finds to be fair and reasonable, and which amount shall be paid to Class Counsel from the Settlement Fund in accordance with the terms of the Settlement Agreement.  Class Counsel shall allocate the fees and expenses among all of the counsel representing Plaintiffs based upon their evaluation of the contribution of such counsel to the prosecution and resolution of this litigation.

3.     The four Class Representatives are each hereby awarded $60,000 out of the Settlement Fund, for their efforts representing the Class, which amount is in addition to whatever monies these Plaintiffs will receive from the Settlement Fund pursuant to the Plan of Allocation. The Court finds these awards to be fair and reasonable.

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 126
of 229
Case 1:03-mc-00223-RJL   Document 333   Filed 01/31/11   Page 5 of 5

4.      Without affecting the finality of this Order, the Court shall retain continuing

jurisdiction over this matter to resolve disputes, if any, that may arise from the provisions of this

Order.

                                    **SO ORDERED.**

Dated: _____, 2011

                                    _____
                                    HON. RICHARD J. LEON
                                    UNITED STATES DISTRICT JUDGE

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 127
of 229
Case: 1:09-cv-07666 Document #: 693 Filed: 01/22/14 Page 1 of 3 PageID #:8998

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: PLASMA-DERIVATIVE PROTEIN THERAPIES ANTITRUST LITIGATION | Case No. 09 C 7666 MDL No. 2109 Judge Joan B. Gottschall Magistrate Judge Arlander Keys |
| This Document Relates To All Actions | |

## [PROPOSED] ORDER GRANTING CLASS PLAINTIFFS' MOTION FOR INTERIM AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

The Court, having considered Class Plaintiffs' Motion for Award of Attorneys' Fees and Reimbursement of Expenses (the "Motion"), and the memorandum and declarations in support thereof, and after a duly noticed hearing, hereby finds that:

1.     The Motion seeks an award of attorneys' fees of 33 1/3% of the $64,000,000 Settlement Fund created by the settlement payments from CSL Limited, CSL Behring LLC, CSL Plasma Inc. (collectively, "CSL") and the Plasma Protein Therapeutics Association ("PPTA") (collectively with CSL, "Settling Defendants"). Class Counsel Richard A. Koffman and Charles E. Tompkins, of Cohen Milstein Sellers & Toll PLLC and Williams Montgomery & John Ltd., respectively, also seek an order awarding reimbursement of $4,095,879.19 in expenses incurred in connection with the prosecution of this action.

2.     The amount of attorneys' fees requested is fair and reasonable under the "percentage-of-the-fund" method. This is confirmed by a lodestar "cross-check," which reveals a negative multiplier, based upon 92,281.66 hours of work and a collective lodestar of $37,033,138.22.

3.     The attorneys' fees requested were entirely contingent upon success. Class Counsel risked time and effort, and advanced significant costs and expenses with no ultimate

1833058.1

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 128
Case: 1:09-cv-07666 Document #: 693 Filed: 01/22/14 Page 2 of 3 PageID #:8999
of 229

guarantee of compensation. The award of 33 1/3% is warranted for reasons set out in Class Counsel's moving papers.

4.    Given the risks involved in this case, the effort put forth by Plaintiffs' Counsel, the level of sophistication of the work done, and the extraordinary results achieved for the Class, an award of 33 1/3% is justified.

5.    The expenses sought, as detailed in the Joint Declaration attached to Plaintiffs' brief, were incurred in connection with the prosecution of the litigation for the benefit of the Class, and were reasonable and necessary.

6.    Therefore, upon consideration of the Motion and accompanying declarations, and based upon all matters of record including the pleadings and papers filed in this action and oral argument given at the hearing on this matter, the Court hereby finds the following: (1) the attorneys' fees requested are reasonable and proper; and (2) the expenses requested were necessary, reasonable and proper.

7.    IT IS HEREBY ORDERED AND DECREED:

(a)    Class Counsel are awarded attorneys' fees for distribution to Plaintiffs' Counsel in the amount of $21,333,333 equal to 33 1/3% of the $64,000,000 added to the Settlement Fund. Class Counsel may be paid 33 1/3% of $64,000,000 immediately upon entry of this Order.

(b)    Plaintiffs' Counsel are awarded $4,095,879.19 in reimbursement of expenses incurred in connection with the prosecution of this action.

(c)    The attorneys' fees and reimbursement of expenses shall be paid from the Settlement Fund.

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 129
of 229
Case: 1:09-cv-07666 Document #: 693 Filed: 01/22/14 Page 3 of 3 PageID #:9000

(d)     The attorneys' fees and expenses shall be allocated amongst Plaintiffs' Counsel by Class Counsel Richard A. Koffman and Charles E. Tompkins in a manner which, in Class Counsel's good-faith judgment, accurately reflects each of such Plaintiffs' Counsel's contributions to the establishment, prosecution, and resolution of this litigation.

IT IS SO ORDERED this _____ day of _____, 2014

_____
Honorable Joan B. Gottschall
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: PLASMA-DERIVATIVE PROTEIN THERAPIES ANTITRUST LITIGATION | Case No. 09 C 7666 MDL No. 2109 Judge Joan B. Gottschall Magistrate Judge Arlander Keys |
| This Document Relates To All Actions | |

**<u>PLAINTIFFS' MOTION FOR A FINAL AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND APPROVAL OF INCENTIVE AWARDS FOR THE CLASS REPRESENTATIVES</u>**

Plaintiffs respectfully move this Court for entry of an Order approving the requested award of attorney's fees in the amount of one-third the Settlement Fund ($21.33 million), reimbursement of litigation expenses ($280,971.12), and the approval of incentive awards of $50,0000 for each of the three Class Representatives from the settlement with Defendants Baxter International, Inc. and Baxter Healthcare Corporation (collectively "Baxter"). In support of this motion, Plaintiffs provide the attached Memorandum of Law, the Joint Declaration of Richard A. Koffman and Charles E. Tompkins, and the accompanying exhibits.

Dated: March 10, 2014 

Respectfully submitted,

*s/Charles E. Tompkins*
**WILLIAMS MONTGOMERY & JOHN LTD.**
Charles E. Tompkins
Anthony J. O'Neill
Bethany C. Teska
233 S. Wacker Dr., Suite 6100
Chicago, IL 60606
***Plaintiffs' Steering Committee***

*s/Richard A. Koffman*
**COHEN MILSTEIN SELLERS & TOLL**
Richard A. Koffman
Benjamin D. Brown
Christopher J. Cormier

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 131
of 229
Case: 1:09-cv-07666 Document #: 697 Filed: 03/10/14 Page 2 of 3 PageID #:9181

Emmy L. Levens
1100 New York Ave, NW, Suite 500 West
Washington, D.C. 20005
***Plaintiffs' Steering Committee***

*s/Deborah H. Bornstein*
**FREEBORN & PETERS LLP**
Deborah H. Bornstein
David C. Gustman
311 S. Wacker Dr., Suite 3000
Chicago, IL 60606
***Plaintiffs' Liaison Counsel***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served upon All Counsel of Record by e-mail on this 10th day of March, 2014.

*s/Emmy L. Levens*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE: PLASMA-DERIVATIVE PROTEIN
THERAPIES ANTITRUST LITIGATION

This Document Relates To All Actions

Case No. 09 C 7666
MDL No. 2109
Judge Joan B. Gottschall
Magistrate Judge Arlander Keys

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A FINAL AWARD OF ATTORNEYS' FEES,  REIMBURSEMENT OF EXPENSES, AND APPROVAL OF INCENTIVE AWARDS FOR CLASS REPRESENTATIVES**

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Richard A. Koffman
Benjamin D. Brown
Christopher J. Cormier
Emmy L. Levens
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005

*Plaintiffs' Steering Committee*

**WILLIAMS MONTGOMERY & JOHN LTD.**
Charles E. Tompkins
Anthony J. O'Neill
Bethany C. Teska
233 S. Wacker Drive
Suite 6100
Chicago, Il 60606

*Plaintiffs' Steering Committee*

**FREEBORN & PETERS LLP**
David Gustman
Deborah H. Bornstein
311 S. Wacker Drive
Suite 3000
Chicago, IL 60606

*Plaintiffs' Liaison Counsel*

# TABLE OF CONTENTS

**Page**

I.    THE REQUESTED ATTORNEYS' FEES ARE FAIR AND REASONABLE................ 4

    A.    The Requested Fees are Fair and Reasonable as a Percentage of the Fund............ 5

    B.    The Lodestar/Multiplier Method Confirms the Requested Attorneys' Fees are Fair and Reasonable ........................................................................................ 7

    C.    The Quality of Legal Services Rendered Supports the Fee Request .................... 13

    D.    To Date, No Class Member Has Objected to the Fee and Expense Request........ 14

II.   THE REQUEST FOR REIMBURSEMENT OF COSTS AND EXPENSES IS FAIR AND REASONABLE. ........................................................................................ 15

III.  INCENTIVE AWARDS FOR THE CLASS REPRESENTATIVES ARE WARRANTED AND THE AMOUNT REQUESTED IS REASONABLE.................... 17

IV.   CONCLUSION .................................................................................................................. 20

i

1858796.1

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 135
of 229
Case: 1:09-cv-07666 Document #: 697-9 Filed: 03/10/14 Page 3 of 28 PageID #:9185

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)................................................................................4

*Hawaii v. Standard Oil Co. of California*, 405 U.S. 251 (1972)....................................4

*Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) ......................................... *passim*

*In re Cont'l Ill. Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) ..................................................... *passim*

*Florin v. Nationsbank of Ga., N.A. ("Florin I")*,
    34 F.3d 560 (7th Cir. 1994) ...............................................................4, 5, 8

*Florin v. Nationsbank of Ga., N.A. ("Florin II")*,
    60 F.3d 1245 (7th Cir. 1995) ..............................................................8, 9

*Gaskill v. Gordon*,
    160 F.3d 361 (7th Cir. 1998) ...........................................................5, 8, 9

*Halverson v. Convenient Food Mart, Inc.*,
    458 F.2d 927 (7th Cir. 1972) ................................................................4

*Kirchoff v. Flynn*,
    786 F.2d 320 (7th Cir. 1986) ...............................................................13

*Luciano v. Olsten Corp.*,
    109 F.3d 111 (2d Cir. 1997)................................................................13

*Skelton v. Gen. Motors Corp.*,
    860 F.2d 250 (7th Cir. 1988) ...............................................................9

*Smith v. Vill. of Maywood*,
    17 F.3d 219 (7th Cir. 1994) ...............................................................10

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) .......................................................... *passim*

i

*Taubenfeld v. Aon Corp.*
    415 F.3d 597 (7th Cir. 2005) ..........................................................................................4, 5, 6

*United States Football League v. Nat'l Football League,*
    887 F.2d 408 (2d Cir. 1989)....................................................................................................9

*Aspacher v. Rosenthal Collins Group,*
    No. 00 C 7520, 2001 U.S. Dist. LEXIS 19464 (N.D. Ill. Nov. 6, 2001)................................13

*Been v. O.K. Indus., Inc.,* No. CIV-02-285-RAW, 2011 U.S. Dist. LEXIS 115151, at *33-
    36 (E.D. Okla. Aug. 16, 2011) ........................................................................................19, 20

*In re Buspirone Antitrust Litig.,*
    No. 01-CV-7951 (JGK) (S.D.N.Y. April 1, 2003) ...................................................................7

*Campbell v. Advantage Sales & Mktg. LLC,*
    No. 09–01430, 2012 WL 1424417 (S.D. Ind. Apr. 24, 2012) .................................................6

*In re Clark Oil & Refining Corp. Antitrust Litig.,*
    422 F.Supp. 503 (E.D. Wis. 1976).........................................................................................4

*Cooper v. IBM Pers. Pension Plan,*
    No. 99 -829-GPM, 2005 U.S. Dist. LEXIS 17071 (S.D. Ill. Aug. 16, 2005)...........................5

*In re Dun & Bradstreet Credit Servs. Customer Litig.,* 130 F.R.D. 366, 373-74 (S.D.
    Ohio 1990) .............................................................................................................................20

*Edmonds v. United States,*
    658 F. Supp. 1126 (D.S.C. 1987).....................................................................................13, 14

*Goldsmith v. Tech. Solutions Co.,*
    No. 92 C 4374, 1995 U.S. Dist. LEXIS 15093 (N.D. Ill. Oct. 10, 1995) ............................6, 7

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers,*
    212 F.R.D. 400 (E.D. Wis. 2002) ....................................................................................6, 7, 8

*Heder v. City of Two Rivers,*
    255 F. Supp. 2d 947 (E.D. Wis. 2003).................................................................................10

*Hershey v. ExxonMobil Oil Corp.,* No. 07-1300-JTM, 2012 U.S. Dist. LEXIS 153803, at
    *43 (D. Kan. Oct. 26, 2012)...............................................................................................20

*In re Ikon Office Solutions, Inc. Sec. Litig.,*
    194 F.R.D. 166 (E.D. Pa. 2000)..........................................................................................16

1858796.1

*Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) ........................................20

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) ........................................................................7

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 264 F.R.D. 438, 448 (N.D. Ill.
    2009) .............................................................................................................19

*In re Lawnmower Engine Horsepower Marketing & Sales Practices Litig.*, 733 F. Supp.
    2d 997, 1016 (E.D. Wis. 2010) ........................................................................18, 19

*In re Linerboard Antitrust Litig.*,
    No. MDL 1261, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) ........................9

*Long v. Trans World Airlines, Inc.*,
    No. 86 C 7521, 1993 U.S. Dist. LEXIS 5063 (N.D. Ill. Apr. 15, 1993)..................7

*Lucken Family Ltd. P'ship, LLLP, v. Ultra Res., Inc.*, 09-cv-01543-REB-KMT, 2010 U.S.
    Dist. LEXIS 144366, at *16-*17 (D. Colo. Dec. 22, 2010) ..................................19

*McKinnie v. JP Morgan Chase Bank, N.A.*,
    678 F.Supp.2d 806 (E.D. Wis. 2009) ......................................................................6

*Miltland Raleigh-Durham v. Myers*,
    840 F. Supp. 235 (S.D.N.Y. 1993) ........................................................................16

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ..........................................................................13

*North Shore Hematology-Oncology Associates, P.C. v. Bristol Myers Squibb Co.*,
    No. 1:04cv248 (EGS) (D.D.C. Nov. 30, 2004)........................................................7

*In re Prudential Sec. Ltd. P'ship Litig.*,
    985 F. Supp. 410 (S.D.N.Y. 1997)..........................................................................7

*In re Ready–Mixed Concrete Antitrust Litig.*,
    No. 05–00979, 2010 WL 3282591 (S.D. Ind. Aug. 17, 2010) ................................6

*In re Relafen Antitrust Litig.*,
    No. 01-12239-WGY (D. Mass. April 9, 2004) ......................................................7

*In re Remeron Direct Purchaser Antitrust Litig.*,
    2005 WL 3008808, at *12 - *14 (D. N.J. Nov. 9, 2005) ....................................7, 15

1858796.1

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 138
of 229
Case: 1:09-cv-07666 Document #: 697-9 Filed: 03/10/14 Page 6 of 28 PageID #:9188

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
    No. 97 C 7694, 2001 U.S. Dist. LEXIS 20397 (N.D. Ill. Dec. 6, 2001) ..............................6, 7

*Ryskamp v. Looney*, No. 10-cv-00842-WJM-KLM, 2012 U.S. Dist. LEXIS 114190, at
    *18-19 (D. Colo. Aug. 14, 2012) ...........................................................................20

*Schulte v. Fifth Third Bank*, 805 F.Supp. 2d 560, 600-601 (N.D. Ill. 2011) .................................17

*Spicer v. Chicago Bd. Options Exch., Inc.*,
    844 F. Supp. 1226 (N.D. Ill. 1993) ................................................................................16, 17

*In re Terazosin Hydrocholride Antitrust Litig.*,
    No. 99-MDL-1317 (S.D.Fla. Apr. 19, 2005) ..........................................................7

*In re Trans Union Corp. Privacy Litig.*,
    *No. 00 C 4729,* 2009 U.S. Dist. LEXIS 116934 (N.D. Ill. October 1, 2009),
    *modified and remanded by,* 629 F.3d 741 (7th Cir. 2011)....................................5, 7

*In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC) (JO), 2012 U.S. Dist. LEXIS
    152275, at *35-36 (E.D.N.Y. Oct. 22, 2012)..........................................................20

## OTHER AUTHORITIES

Rule 23(h) of the Federal Rules of Civil Procedure ........................................................1

William B. Rubenstein, Newberg on Class Actions § 14:6 (4th ed.) .............................7

iv

This case involves allegations that the two largest manufacturers of life-sustaining biologic therapies conspired to restrict the supply and increase the prices of those therapies in violation of the antitrust laws.  Following a lengthy pre-filing investigation, Class Counsel and their legal team have engaged in nearly five years of intensive litigation, during which they have: successfully filed a detailed Consolidated Amended Complaint; defeated two motions to dismiss; engaged in extensive discovery-related motion practice; reviewed more than 11 million pages of documents; taken and defended more than sixty depositions on three separate continents; retained and consulted two preeminent economists (and defended their depositions); submitted several hundred pages of briefing and other materials in support of Plaintiff's motion for class certification; and engaged in protracted, arm's length settlement negotiations with all three Defendants.  All of these efforts have now come to fruition, as Class Counsel have reached a Settlement with the final remaining defendant, Baxter, for $64 million. This brings the total relief to the Class to $128 million.  As explained more fully in the simultaneously filed Motion for Final Approval of the Baxter Settlement, this is a truly excellent result for the Class.

Class Counsel – Richard A. Koffman and Charles E. Tompkins, and their respective law firms[1] – hereby submit this memorandum in support of their Motion for a Final Award of Attorneys' Fees and Reimbursement of Litigation Expenses pursuant to Rule 23(h) of the Federal Rules of Civil Procedure.   As compensation for their considerable work on behalf of the

---

[1] Class Counsel have been ably assisted throughout by a team of experienced attorneys from many of the nation's top plaintiffs' firms, including Liaison Counsel from Freeborn & Peters LLP.

1

Class, Class Counsel seek an award of one-third of the Settlement fund, $21,333,333.33.[2]

Counsel respectfully submit that this fee is eminently fair and reasonable given that Plaintiffs'

counsel have invested over 94,000 professional hours, valued at more than $37.75 million, and

invested $5 million in out-of-pocket expenses, all without any guarantee of payment or

reimbursement.  This extraordinary investment apparently mirrors Defendants':  Baxter stated in

open Court that it had engaged one hundred contract attorneys to work on this matter[3] and CSL

publicly acknowledged that it had spent more than $20 million in legal fees related to this suit,

and expected to spend $20 million more if the case were litigated to conclusion.  Applying

simple mathematics and logic to these facts, the three Defendants' total legal fees to date are

likely in excess of $50 million.

      Counsel also asks that the Court approve an incentive award of $50,000 for each of the

Class Representatives in this matter.  The Class Representatives have collectively spent

thousands of hours prosecuting this matter on behalf of the Class, and their efforts have been

critical to the successful result achieved for the Class.  The Class Representatives devoted

significant resources to the case despite the fact that each of the Class Representatives'

---

[2] Attached as Exhibit 1 is the Joint Declaration of Richard A. Koffman and Charles E. Tompkins in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and Class Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Approval of Incentive Awards for Class Representatives (the "Joint Declaration" or "Joint Decl."), which contains a description of the history of the litigation, the claims asserted, the investigation and discovery undertaken, the negotiation and substance of the Settlement, and the substantial risks and uncertainties presented by and overcome in this litigation.

Class Counsel will submit shortly the detailed declarations and time entries for each Firm requesting attorneys' fees in this case for the Court's review *in camera*.

[3] Tr. of Hearing held on Feb. 15, 2012 at 6, ECF No. 456.

2

1858796.1

respective recoveries from the Settlement is comparatively small.  The Class Representatives took seriously their responsibilities as "private attorneys general" enforcing the antitrust laws, and each took significant risks and made enormous sacrifices to that end.  As the requested incentive awards collectively amount to only .1% of the total recovery to the Class and individually are de minimus in relation to the recovery obtained by other members of the Class, the requested payments are both justified and reasonable.

To date, no Class Member has objected to either the proposed Settlement, to Class Counsel's request for fees and expenses, or to the award of $50,000 to each of the Class Representatives.[4]  Additionally, not a single class member opted out of the settlement before the March 3, 2014 opt-out deadline.  Given the sophisticated nature of most members of the Settlement Class, which include hospitals and national drug distributors with legal counsel of their own, the fact that *none* of them has opted out speaks volumes about the quality of the settlement and underscores the excellent result achieved by Class Counsel and the Class Representatives.

Both Class Counsel and the Class Representatives devoted tremendous time and effort to the prosecution of the Class's claims, and their efforts paid off.  The requested attorneys' fees and incentive awards are both conservative and amply justified in light of the investment, risks, and excellent results obtained for the Class.

---

[4] The deadline for objections is March 31, 2014.  If any objections are received, they will be addressed in Class Counsel's reply submission, which will be filed on April 14, 2014.

1858796.1

## ARGUMENT

## I.     THE REQUESTED ATTORNEYS' FEES ARE FAIR AND REASONABLE.

It is well-settled that attorneys who, by their efforts, create a common fund for the benefit

of a class are entitled to reasonable compensation for their services.  *Boeing Co. v. Van Gemert*,

444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of

persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as

a whole"); *Florin v. Nationsbank of Ga., N.A. ("Florin I")*, 34 F.3d 560, 563 (7th Cir. 1994)

("When a case results in the creation of a common fund for the benefit of the plaintiff class, the

common fund doctrine allows plaintiffs' attorneys to petition the court to recover its fees out of

the fund.").  Courts have recognized that, in addition to providing just compensation, substantial

counsel fees encourage forceful prosecution of cases.  *See Halverson v. Convenient Food Mart,

Inc.*, 458 F.2d 927, 931 n.5 (7th Cir. 1972).  Moreover, providing reasonable attorneys' fees in

successful private antitrust actions promotes "[p]rivate antitrust litigation [which] is widely

recognized as an effective supplement to government enforcement of the antitrust laws and

contributes to the maintenance of a competitive economy."  *In re Clark Oil & Refining Corp.

Antitrust Litig.*, 422 F. Supp. 503, 510 (E.D. Wis. 1976), citing *Hawaii v. Standard Oil Co. of

Cal.*, 405 U.S. 251, 262 (1972).

In making the determination regarding the appropriate amount of attorneys' fees to be

awarded to counsel who have successfully prosecuted litigation on behalf of a class, the Seventh

Circuit has instructed:  "[W]hen deciding on appropriate fee levels in common-fund cases, courts

must do their best to award counsel the market price for legal services, in light of the risk of

nonpayment and the normal rate of compensation in the market at the time."  *Taubenfeld v. Aon*

4

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 143
of 229
Case: 1:09-cv-07666 Document #: 697-1 Filed: 03/10/14 Page 11 of 28 PageID #:9193

*Corp.*, 415 F.3d 597, 599 (7th Cir. 2005); s*ee also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (same).  In affirming an award of fees equal to nearly one-third of the settlement fund plus expenses, the Seventh Circuit considered, among others, the following factors: (1) "awards made by courts in other class actions" which "amount[ed] to 30-39% of the settlement fund"; (2) "the quality of legal services rendered"; and (3) "the contingent nature of the case." *Taubenfeld*, 415 F.3d at 600.  An examination of these three factors demonstrates that an award of attorneys' fees equal to one-third the settlement amount is both fair and reasonable.

### A.     The Requested Fees are Fair and Reasonable as a Percentage of the Fund.

The Seventh Circuit has strongly endorsed the percentage of the fund method, pursuant to which fees are awarded as a percentage of the total recovery, because it most closely approximates the manner in which attorneys are compensated in the marketplace for contingent fee work.  *See Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund . . . in recognition of the fact that most suits for damages in this country are handled on the plaintiff's side on a contingent-fee basis").[5]  The Seventh Circuit has also recognized "that there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration."  *Florin I*, 34 F.3d at 566; *In re Trans Union Corp. Privacy Litig.*, No. 00 C 4729, 2009 U.S. Dist. LEXIS 116934, at *13 (N.D. Ill. Oct. 1, 2009), *modified and*

---

[5] *Cooper v. IBM Pers. Pension Plan*, No. 99 -829-GPM, 2005 U.S. Dist. LEXIS 17071, at *13 (S.D. Ill. Aug. 16, 2005) ("'[T]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class,' particularly where that percentage of the benefit approach replicates the market").

5

*remanded by*, 629 F.3d 741 (7th Cir. 2011) (same); *see also In re Cont'l Ill. Sec. Litig.*, 962 F.2d

566, 573 (7th Cir. 1992) (noting it is easier to award a percentage "than it would be to hassle

over every item or category of hours and expense and what multiple to fix and so forth").[6]

      The fee award requested here, amounting to one-third of the recovery, is reasonable and

well justified in light of the significant risks faced in the litigation, the obstacles overcome, and

the quality of Class Counsel's work.  Moreover, the requested fee is also plainly consistent with

fee awards made by courts in other, similar cases.  In complex class action cases like this one,

percentages in the range of 33% to 40% of the recovery have been held appropriate within the

Seventh Circuit.  *See Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001

U.S. Dist. LEXIS 20397, at *10 (N.D. Ill. Dec. 6, 2001) ("A customary contingency fee would

range from 33 1/3% to 40% of the amount recovered."); *Goldsmith v. Tech. Solutions Co.*, No.

92 C 4374, 1995 U.S. Dist. LEXIS 15093, at *27 (N.D. Ill. Oct. 10, 1995) ("Thus, where the

percentage method is utilized, courts in this District commonly award attorneys' fees equal to

approximately one-third or more of the recovery.").[7]  Moreover, an award of one-third the

---

[6] Although the Seventh Circuit has strongly endorsed the percentage method, district courts retain discretion to choose either the percentage or lodestar method of calculating fees.  *In re Trans Union*, 2009 U.S. Dist. LEXIS 116934, at *13.

[7] *See also, e.g., Campbell v. Advantage Sales & Mktg. LLC*, No. 09–01430-LJM-MJD, 2012 WL 1424417, at *2 (S.D. Ind. Apr. 24, 2012) (awarding one-third of recovery as attorneys' fees); *In re Ready–Mixed Concrete Antitrust Litig.*, No. 1:05-cv-00979-SEB-TAB, 2010 WL 3282591, at *3 (S.D. Ind. Aug. 17, 2010) (awarding 33.3% of the common fund as fees in direct-purchaser antitrust action ); *Taubenfeld*, 415 F.3d at 598 (affirming award of 30%); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 816 (E.D. Wis. 2009) (awarding 30% of common fund); *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 417 (E.D. Wis. 2002) (approving 30% fee award); *Retsky*, 2001 U.S. Dist. LEXIS 20397, at *10 - *11 (awarding 33 1/3% of fund); *Goldsmith*, 1995 U.S. Dist. LEXIS

6

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 145
of 229
Case: 1:09-cv-07666 Document #: 697-1 Filed: 03/10/14 Page 13 of 28 PageID #:9195

Settlement is consistent with other complex antitrust actions involving the pharmaceutical industry. *See*, *e.g.*, *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ. 03-0085 FSH, 2005 WL 3008808, at *12 - *14 (D. N.J. Nov. 9, 2005) (33.3% in direct-purchaser antitrust suit in pharmaceutical industry).[8]  Finally, "Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery."  William B. Rubenstein, Newberg on Class Actions § 14:6 (4th ed.). Accordingly, Class Counsel request that the court adopt the percentage of the fund approach – as it did with respect to the prior Settlement with CSL and PPTA – and award one-third of the Settlement fund as attorneys' fees.

### B.    The Lodestar/Multiplier Method Confirms the Requested Attorneys' Fees are Fair and Reasonable

Using the lodestar/multiplier method as a cross-check confirms the appropriateness of the requested fees.  *See, e.g., In re Trans Union*, 2009 U.S. Dist. LEXIS 116934, at *6.  The lodestar/multiplier method entails multiplying the number of hours each attorney or other

---

15093, at *27 - *28 (awarding fee of 33 1/3%); *Long v. Trans World Airlines, Inc.*, No. 86 C 7521, 1993 U.S. Dist. LEXIS 5063, at *6 (N.D. Ill. Apr. 15, 1993) (32% of settlement or $1.3 million); *see also In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (33.3% of $586 million settlement).

[8] *See also* Order and Final Judgment at §12, *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, No. 01-12239-WGY (D. Mass. Apr. 9, 2004), ECF No. 297 (awarding 33.3% fee of a $175 million settlement); Minute Order and Final Judgment, *In re Buspirone Antitrust Litig.*, 211 F.R.D. 249, No. 01-CV-07951 (JGK) (S.D.N.Y. Apr. 17, 2003) (awarding a 33.3% fee of a $220 million settlement); Final Order and Judgment Approving Settlement Between Class Plaintiff and Defendant Bristol-Myers Squibb Company at §14, *North Shore Hematology-Oncology Assoc., P.C. v. Bristol Myers Squibb Co.*, No. 1:04-cv-248 (EGS) (D.D.C. Nov. 30, 2004), ECF No. 30 (awarding a 33.3% fee of a $50 million settlement); Order and Final Judgment at §24, *In re Terazosin Hydrocholride Antitrust Litig.*, 352 F. Supp. 2d 1279, No. 99-MD-1317 (S.D. Fla. Apr. 19, 2005), ECF No. 1557; (awarding a 33.3% fee of a $72.5 million settlement).

1858796.1

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 146
of 229
Case: 1:09-cv-07666 Document #: 697-17 Filed: 03/10/14 Page 14 of 28 PageID #:9196

professional expended on the case by his or her hourly rate to derive the lodestar figure.  *See, e.g.*, *Great Neck*, 212 F.R.D. at 411.  The court then typically adjusts the lodestar, by applying a multiplier, to reflect factors such as the contingent nature of the case, the consequent risk of non-payment (or under-payment), and the quality of work performed.

"[A] risk multiplier is not merely available in a common fund case but mandated, if the court finds that counsel 'had no sure source of compensation for the services.'"  *Florin I*, 34 F.3d at 565 (quoting *In re Continental Ill. Sec. Litig.,* 962 F.2d 566, 569 (7th Cir. 1992)) ("the need for such an adjustment is particularly acute in class action suits").[9]  There are numerous class actions in which plaintiffs' counsel expended thousands of hours and advanced significant litigation expenses and yet received no remuneration whatsoever, despite their hard work and expertise.  At the outset of this litigation, there was no guarantee this would not be one of those class actions.

As the Seventh Circuit has emphasized, "court[s] must also be careful to sustain the incentive for attorneys to continue to represent such clients on an 'inescapably contingent' basis."  *Florin v. Nationsbank of Ga., N.A. ("Florin II")*, 60 F.3d 1245, 1247 (7th Cir. 1995) (quoting *In re Continental Ill. Sec. Litig.*, 962 F.2d at 569).  *See also Gaskill*, 160 F.3d at 363 (recognizing contingent-fee contracts "shift part of the risk of loss from client to lawyer").  This

---

[9] *See also In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 985 F. Supp. 410, 414 (S.D.N.Y. 1997) ("Because counsel who rendered services were not being compensated for their work as it was being performed and because of the significant risk that they might never receive any compensation if the action was unsuccessful, courts have, when warranted, applied a multiplier to the lodestar to arrive at a fair contingent fee.").

Case No. 1:90-cv-00181-JLK  Document 2435-16  filed 01/12/17  USDC Colorado  pg 147
of 229
Case: 1:09-cv-07666 Document #: 697-1 Filed: 03/10/14 Page 15 of 28 PageID #:9197

is particularly true in complex antitrust matters, which are notoriously complex and risky, and frequently involve unpredictable "battles of experts."  *See*, *e.g.*, *In re Linerboard Antitrust Litig.*, No. MDL 1261, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) (using a multiplier to "reflect the risks of nonpayment facing counsel, to serve as an incentive for counsel to undertake socially beneficial litigation, or as a reward to counsel for an extraordinary result" in a complex antitrust matter); *see also Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988) ("The stronger the defense, the higher the risk involved in bringing the suit and the greater the multiplier necessary to compensate plaintiff's attorney for bringing the action.").

From the very outset, no matter how strong Class Counsel believed the case to be, there existed the significant possibility Defendants might prevail on motion, at trial, or on appeal – and hence Class Counsel would receive no compensation for their work on behalf of the Class. Plainly, Class Counsel here were not "assured of a paycheck."  *See Florin II*, 60 F.3d at 1247. Nonetheless, they collectively risked significant amounts of time and money to achieve a recovery for the Class.

Here, Plaintiffs' counsel collectively expended approximately 94,000 hours of professional time[10] prosecuting the Class's claims.  Joint Decl. ¶ 24.  Counsel's total lodestar, derived by multiplying the number of hours by each firm's historical hourly rates, amounts to approximately $39 million.  *Id.*  The requested fee of $21,333,333.33 reflects only a .56%

---

[10] Since it is customary to bill paralegals at hourly rates, it is appropriate to include their time in the lodestar.  *In re Cont'l*, 962 F.2d at 569.  Courts have recognized the economic value of using paralegals to do work that otherwise would have to be performed by attorneys.  *See id.*; *United States Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir. 1989).

multiplier. *Id.* ¶ 26. However, this Court approved an identical award from the CSL/PPTA Settlement. *See* Dkt. No. 693. Taking that award, along with the award requested here, into consideration, Class Counsel have requested a total fee only slightly larger than their total lodestar in the case – a multiplier of approximately 1.13. This is particularly conservative given that Class Counsel's lodestar was calculated using historical rates and includes only time invested since this Court's appointment of Plaintiffs' Steering Committee.[11] Courts have held use of *current* rates is appropriate to compensate counsel for the loss of use of funds. *See Smith v. Vill. of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994) ("A court may elect to use . . . current rates . . . as acceptable compensation for the delay in payment of fees."); *Heder v. City of Two Rivers*, 255 F. Supp. 2d 947, 958 (E.D. Wis. 2003) ("awarding fees at the current rate . . . . is an accepted method"). Using current rates rather than historical rates, and including time spent on pre-filing investigations, the total fees sought from both settlements would likely be less than Class Counsel's lodestar.

Given the risks Class Counsel embraced in bringing this case, and the overwhelming case law supporting the use of risk multipliers, the fees requested are plainly conservative and reasonable. As discussed in greater detail in the Joint Declaration, during the course of this litigation Class Counsel have, among other things:

- Researched the law pertinent to the claims against Defendants and the potential

---

[11] Class Counsel, in an effort to be conservative in their billing, have included in their fee applications only time spent since this Court's appointment of Plaintiffs' Steering Committee, thereby excluding significant time spent on counsel's pre-filing investigations and briefing of leadership issues. Additionally, Class Counsel have not sought compensation for time spent preparing this and their previous application for attorneys' fees and reimbursement of expenses.

10

defenses thereto;

- Prepared a detailed and comprehensive amended complaint based on the extensive factual and expert information Class Counsel collected;

- Researched and drafted comprehensive briefs (and assembled supporting materials) in opposition to Defendants' motion to dismiss;

- Prepared and served numerous discovery requests on Defendants;

- Briefed and argued numerous discovery disputes before Magistrate Judge Keys (and resolved numerous other discovery disputes amicably without involving the Court);

- Prepared and served subpoenas for the production of documents on seventeen third parties;

- Filed FOIA requests with the United Stated Department of Health and Human Services and the Food and Drug Administration Center for Biologics Evaluation and Research for documents relevant to a shortage of Ig or albumin, and reviewed those documents.

- Engaged in protracted negotiation of discovery issues with Defendants and third parties including the negotiation of an ESI protocol and protective order as well as extensive briefing regarding the adequacy of Defendant PPTA's document production;

- Reviewed and analyzed over 11 million pages of documents produced in this litigation;

- Reviewed tens of thousands of pages of other information concerning the Plasma industry, including: (a) Market Research Bureau Reports; (b) transcripts from the Advisory Committee on Blood Safety and Availability; (c) the Defendants' press releases; (d) transcripts of CSL's and Baxter's quarterly analyst conference calls; (e) news articles regarding consolidation in the plasma industry and alleged shortages of products; and (f) materials from the Federal Trade Commission's investigation and complaint challenging CSL's proposed acquisition of Talecris;

- Defended the Class Representatives' depositions;

- Deposed more than sixty witnesses on three continents;

- Located and interviewed former employees of Defendants and leaders from relevant patient populations;

11

- Retained and consulted two preeminent economists – Dr. Richard Frank and Dr. Raymond Hartman – to analyze the Class's claims, to examine whether the economics of the industry support the Class's theory of conspiracy, to estimate damages, and to assess various issues relating to proving damages;

- Prepared and filed the motions, briefs, and Declarations – totaling several hundred pages – in support of Class Certification;

- Conducted arm's-length settlement negotiations with Defendants' counsel;

- Prepared and negotiated the Settlement Agreements and relevant exhibits;

- Prepared the motions and briefs in support of Preliminary Approval and Final Approval of the proposed Settlements;

- Coordinated issuance of Notice and various settlement administration-related matters with the Claims Administrator and with the escrow agent that is presently holding the Settlement Fund assets in an interest-bearing account for the benefit of the Class; and

- Communicated with the Class Representatives with updates on litigation status throughout.

*See* Joint Decl. ¶ 7.

Class Counsel have made every effort to be efficient in litigating this Action. As much as possible, Class Counsel managed the assignment of work in this case to avoid unnecessarily duplicative or overlapping work. Where appropriate, work was assigned to junior lawyers, paralegals, and others with lower hourly rates, and hourly rates for first-level document review were capped at $400/hr., even for senior attorneys who typically bill at higher hourly rates.

Courts have held the hourly rates to be applied in calculating the lodestar are those normally charged for similar work by attorneys of comparable skill and experience in the community where the attorney practices. *See In re Synthroid*, 264 F.3d at 718 ("when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 151
of 229
Case: 1:09-cv-07666 Document #: 697-1 Filed: 03/10/14 Page 19 of 28 PageID #:9201

compensation in the market at the time").[12]  "The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate."  *Aspacher v. Rosenthal Collins Grp.*, No. 00 C 7520, 2001 U.S. Dist. LEXIS 19464, at *5 (N.D. Ill. Nov. 6, 2001) (quoting *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1310 (7th Cir. 1996)).  *See also In re Cont'l*, 962 F.2d at 569 ("lawyers . . . are entitled to be compensated at market rates").

The hourly fee rates claimed by Plaintiffs' Counsel are the same as the regular rates historically charged for their services and which have been approved in other complex class action litigation.  Joint Decl. ¶ 26.  In short, the hours expended by Plaintiffs' Counsel, which produced the Settlement now before the Court, were reasonable in view of the work performed, the stage of the proceedings reached, and the complexity of the claims and defenses asserted.

## C.     The Quality of Legal Services Rendered Supports the Fee Request

Class Counsel respectfully submit that they rendered superior representation to the Class through their efforts and persistence in litigating the Action.  The "prosecution and management of a complex national class action requires unique legal skills and abilities."  *Edmonds v. United States*, 658 F. Supp. 1126, 1137 (D.S.C. 1987).  Class Counsel practice extensively in the highly

---

[12] *See also Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("[w]hen the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee is the 'market rate'") (internal citations not included*); Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) ("[t]he 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation'") (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (appropriate rate in performing lodestar analysis is "the rate 'normally charged for similar work by attorneys of like skill in the area,' taking into account factors such as the experience of the attorney performing the work and the type of work performed") (quoting *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir. 1977)) .

13

challenging field of antitrust litigation and have skillfully litigated these types of actions in courts across the country.  *See* Joint Decl. ¶ 28.  This expertise proved essential in litigating the Class's claims.

Throughout the course of this case, Class Counsel were confronted with a number of legal and factual obstacles to establishing, among other things, an illegal conspiracy among Defendants, class-wide antitrust impact, and damages.  Defendants have consistently argued that Plaintiffs would not be able to prove Defendants *agreed* to reduce the supply of plasma-derivative protein therapies, as opposed to merely acting interdependently in an oligopolistic market.  Had the case not settled, Defendants undoubtedly would have contested class-wide impact and damages, as well.

However, despite the complexity of the issues and the substantial difficulties of establishing liability and damages, Class Counsel helped the Class achieve an excellent recovery. Only the skillful and persistent efforts of Class Counsel enabled the Class to secure $64 million in this final settlement and $128 million in total.

### D.      To Date, No Class Member Has Objected to the Fee and Expense Request

In accordance with the Court's Order for Notice and Hearing, dated January 8, 2014, more than 2000 copies of the Notice of (i) Pendency and Proposed Settlement of Class Action; (ii) Settlement Fairness Hearing; and (iii) Motion for Attorneys' Fees, Reimbursement of Litigation Expenses and Approval of Incentive Awards for the Class Representatives (the "Notice"), and the Proof of Claim and Release form were distributed to potential Class Members. *See* Declaration of Lauren Edwardson of Epiq, the Settlement Administrator in the Action, Regarding Mailing of the Notice and Proof of Claim; Publication of the Internet Ads; and Report

14

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 153
of 229
Case: 1:09-cv-07666 Document #: 697-1 Filed: 03/10/14 Page 21 of 28 PageID #:9203

on Requests for Exclusion, attached to Plaintiffs' Motion for Final Approval of the Baxter

Settlement as Exhibit 2, at ¶¶ 5-6.  In addition, information regarding the settlement was posted

on several websites[13] identified as regularly visited by class members.  *See id* ¶¶ 12-15.

The Notice advised Class Members that Class Counsel would be seeking fees of up to 33

1/3% of the Settlement Fund and reimbursement of expenses, along with $50,000 incentive

awards for each Class Representatives.  *See* Long-Form Notice at 7, attached as Exhibit A to

Garcia Declaration.  The Notice further apprised Class Members of their right to object to the

motion for fees and expenses.  The Court-established deadline for filing objections is March 31,

2014, and if any objections are received, they will be addressed in Class Counsel's reply

submission to be filed on April 14, 2014.  To date, no Class Member has objected.  That not a

single Class Member has objected to the motion for fees and expenses to date underscores the

reasonableness of the fee and expense award sought, especially where, as here, the Class is

comprised of many sophisticated hospitals and national distributors more than capable of

objecting should they believe the requested fees to be unreasonable.[14]  *See In re Remeron*, 2005

WL 3008808, at *13 ("The lack of objections from the Class supports the reasonableness of the

fee request.").

## II.     THE REQUEST FOR REIMBURSEMENT OF COSTS AND EXPENSES IS FAIR AND REASONABLE.

Class Counsel seek reimbursement from the Settlement Fund of $280,971.12 in litigation

---

[13] These websites included Hospital and Health Networks, HEM/ONC Today, Medical Economics, and Modern Healthcare.

[14] As noted above, the fact that no class members opted out of the settlement by the March 3 deadline (or since) is a testament to the quality of the settlement achieved.

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 154
of 229
Case: 1:09-cv-07666 Document #: 697-1 Filed: 03/10/14 Page 22 of 28 PageID #:9204

expenses reasonably and actually incurred by Class Counsel in connection with commencing and

prosecuting the claims against the Defendants.  Courts regularly award reimbursement of the

expenses counsel incurred in prosecuting the litigation.  *See Spicer v. Chicago Bd. Options

Exch., Inc.*, 844 F. Supp. 1226, 1256 (N.D. Ill. 1993) (detailing and awarding expenses incurred

during litigation); *Miltland Raleigh-Durham v. Myers*, 840 F. Supp. 235, 239 (S.D.N.Y. 1993)

("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and

customarily charged to their clients, as long as they 'were incidental and necessary to the

representation' of those clients.") (quoting *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*,

818 F.2d 278, 283 (2d Cir. 1987)).[15]  The vast majority of Class Counsel's expenses (more than

$4.5 million) were reimbursed out of the prior CSL/PPTA Settlement.  The remaining expenses,

detailed more fully in the Joint Declaration and declarations attached to the compendium, reflect

primarily: (1) the maintenance of Plaintiffs' document database, (2) conferences with Plaintiffs'

experts to resolve Settlement notice and administration matters, and (3) travel for Court-ordered

hearings, and (4) copying and mailing expenses related to court filings.  Joint Decl. ¶¶ 36-39.

As these expenses were critical to achieving the excellent result obtained for the Class, and fully

reasonable in light of the demands of complex antitrust litigation and the market for these types

of litigation support services, Class Counsel ask that their remaining unreimbursed expenses be

reimbursed from the Settlement fund.

---

[15] *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 192 (E.D. Pa. 2000) ("Counsel for
each firm has submitted an affidavit attesting to the unreimbursed expenses paid out, and the
court sees no reason to disallow any particular category or claim.").

16

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 155
of 229
Case: 1:09-cv-07666 Document #: 697-1 Filed: 03/10/14 Page 23 of 28 PageID #:9205

**III.     INCENTIVE AWARDS FOR THE CLASS REPRESENTATIVES ARE
WARRANTED AND THE AMOUNT REQUESTED IS REASONABLE.**

"Incentive awards are justified when necessary to induce individuals to become named
representatives." *Synthroid* , 264 F.3d at 722–23.  In determining whether incentive awards are
appropriate, "relevant factors include the actions the plaintiff has taken to protect the interests of
the class, the degree to which the class has benefitted from those actions, and the amount of time
and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004,
1016 (7th Cir. 1998); *Spicer v. Chicago Bd. Options Exch.*, *Inc.*, 844 F. Supp. 1226, 1267 (N.D.
Ill.1993).

Here, incentive payments of $50,000 to each of the Class Representatives are reasonable
and appropriate.  To begin, simply by agreeing to serve as a named plaintiff the Class
Representatives opened themselves up to scrutiny and attention which, in and of itself, has been
found worthy of some type of remuneration. *See Schulte v. Fifth Third Bank*, 805 F.Supp. 2d
560, 600-01 (N.D. Ill. 2011).   But the efforts of the Class Representatives in this matter went
much further than this.  All three Class Representatives provided essential assistance in the
litigation by locating and producing responsive documents and information, participating in
teleconferences and meetings with counsel, making employees available to counsel, preparing
for and sitting for depositions, maintaining expensive legacy document systems, and
participating in a quarterly review of their document retention policies to ensure compliance with
the Court-ordered litigation hold.  Decl. of Linda S. Tyler in Support of Petition for Incentive
Award to Named Plaintiff University of Utah (attached hereto as Exhibit 3); Decl. of
Giteshchandra Patel in Support of Petition for Incentive Award to Named Plaintiff Ravi Patel,

17

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 156
of 229
Case: 1:09-cv-07666 Document #: 697-1 Filed: 03/10/14 Page 24 of 28 PageID #:9206

M.D., Inc. d/b/a Comprehensive Blood and Cancer Center (attached hereto as Exhibit 4); Decl.

of LCDA. Moraima Torres Toro in Support of Petition for Incentive Award to Named Plaintiff

Hospital Damas, Inc.  (attached hereto as Exhibit 5). This substantial effort was time-consuming:

each of the three named plaintiffs spent hundreds of hours in the prosecution of this case.  *Id.*

Not only did the Class Representatives exert this tremendous effort despite the

understanding that their individual recovery was likely to be small, they did so knowing that such

an effort would require them to invest significant time and resources to benefit the Class as a

whole.   It additionally bears mention that the Class Representatives undertook this effort despite

a risk that the Defendants, who the Class Representatives remained dependent upon for the

purchase of medication and therapies throughout the litigation, would retaliate against them in

some manner.[16]  Given the substantial efforts involved in serving as a Class Representative in

this litigation and the risks of retaliation, it is not surprising that there is no evidence that any

member of the Class was willing to serve as a named plaintiff absent the possibility of an

incentive award.  Joint Decl. ¶¶ 40-41.  As such, this is precisely the type of case in which the

Seventh Circuit has found incentive payments to be appropriate.  *See Synthroid*, 264 F.3d at

722–23

Notably, the incentive awards requested here collectively amount to only .1% of the total

recovery to the Class – an almost negligible percentage.  Reducing each class member's recovery

by 0.1% to compensate the Class Representatives for the risks and efforts they undertook to

_____

[16] To Defendants' credit, there is no evidence of such retaliation in this matter, but each Class
Representative ran the risk of retaliation by stepping forward to prosecute these claims on behalf
of the Class.

18

benefit the Class as a whole is more than reasonable under the circumstances of this case. *See Cook*, 142 F.3d at 1016 (7th Cir. 1998) (approving settlement that amounted to .19% of Settlement Fund); *In re Lawnmower Engine Horsepower Marketing & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1016 (E.D. Wis. 2010) (approving incentive payments to class representatives where the total award "is only a tiny percentage (0.12%) of the class's overall recovery"). Moreover, it bears mention that the requested incentive awards amount to a small fraction of the recoveries obtained by many of the larger Class members. Here, the recovery for some members of the Class is measured in the millions of dollars. Thus, there is no concern that the Class Representatives will be disproportionately compensated. *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 264 F.R.D. 438, 448 (N.D. Ill. 2009) (refusing to award incentive payments 125 times greater than the maximum recovery of any similar Class member). Indeed, as discussed previously, were the requested incentive award unfair or unreasonable in any way, it is highly likely that absent class members would have objected. That they did not serves only to reinforce the appropriateness of the requested award.

Finally, $50,000 incentive awards are reasonable in light of the efforts required and the recovery obtained for the Class. *See Cook*, 142 F.3d at 1016 (affirming incentive award of $25,000 of $13 million Settlement fund); *Lucken Family Ltd. P'ship, LLLP, v. Ultra Res., Inc.*, 09-cv-01543-REB-KMT, 2010 U.S. Dist. LEXIS 144366, at *16-*17 (D. Colo. Dec. 22, 2010) (noting *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 251 (S.D. Ohio 1991) (approving incentive awards of $50,000 for each of 6 class representatives, for a total of $300,000 out of a settlement fund of $56.6 million, which was 0.56% of the common fund) and *In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (approving

19

1858796.1

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 158
of 229
Case: 1:09-cv-07666 Document #: 697-1 Filed: 03/10/14 Page 26 of 28 PageID #:9208

$5,000 incentive award to each plaintiff where settlement was valued at $1.75 million)).[17]

The efforts of the Class Representatives were absolutely essential to the Class's recovery, *see* Joint Decl. ¶¶ 40-41, and the Class Representatives should be rewarded accordingly.  *See Cook*, 142 F.3d at 1016 (7th Cir. 1998).

## CONCLUSION

Class Counsel respectfully request that the Court approve their motion for an award of attorneys' fees equal to one third of the Settlement Fund (approximately $21.33 million).  In addition, Class Counsel requests an award of $280,971.12 from the Settlement Fund for reimbursement of their actual costs and expenses incurred in connection with their representation of the Class in this Action and not previously reimbursed.  Finally, Counsel asks that the Court grant their request to award each of the three Class Representatives $50,000 in recognition of their significant efforts on behalf the Settlement Classes.

---

[17] *See also Been v. O.K. Indus., Inc.*, No. CIV-02-285-RAW, 2011 U.S. Dist. LEXIS 115151, at *33-36 (E.D. Okla. Aug. 16, 2011) (approving incentive awards of $100,000 for each of five class representatives for a total of $500,000); *Hershey v. ExxonMobil Oil Corp.*, No. 07-1300-JTM, 2012 U.S. Dist. LEXIS 153803, at *43 (D. Kan. Oct. 26, 2012) (approving an incentive award of $60,500 plus accrued interest); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving awards of $300,000 to each of four class representatives); *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC) (JO), 2012 U.S. Dist. LEXIS 152275, at *35-36 (E.D.N.Y. Oct. 22, 2012) (approving incentive awards of $50,000 to each of two class representatives); *cf. Ryskamp v. Looney*, No. 10-cv-00842-WJM-KLM, 2012 U.S. Dist. LEXIS 114190, at *18-19 (D. Colo. Aug. 14, 2012) (approving a $50,000 incentive award to the lead plaintiff in a derivative action, not a class action, and citing *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (approving incentive awards of either $55,000 or $35,000 to each of 5 representative plaintiffs)).

1858796.1

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 159
of 229
Case: 1:09-cv-07666 Document #: 697-1 Filed: 03/10/14 Page 27 of 28 PageID #:9209

Dated: March 10, 2014

Respectfully submitted,


/s/ Richard A. Koffman_____

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Richard A. Koffman
Benjamin D. Brown
Christopher J. Cormier
Emmy L. Levens
1100 New York Ave, NW, Suite 500 West
Washington DC 20005
***Plaintiffs' Steering Committee***


**FREEBORN & PETERS LLP**

David C. Gustman
Deborah H. Bornstein
311 S. Wacker Dr., Suite 3000
Chicago, IL 60606
***Plaintiffs' Liaison Counsel***

/s/ Charles E. Tompkins_____

**WILLIAMS MONTGOMERY & JOHN LTD.**

Charles E. Tompkins
Anthony J. O'Neill
Bethany C. Teska
233 S. Wacker Dr., Suite 6100
Chicago, Il 60606
***Plaintiffs' Steering Committee***

21

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document was served upon All Counsel of Record by e-mail on this 10th day of March, 2014.

<u>*Emmy L. Levens*</u>

22

1858796.1

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 161
of 229
Case: 1:09-cv-07666 Document #: 702 Filed: 04/16/14 Page 1 of 1 PageID #:9405

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6,1
### Eastern Division

In Re: Plasma–Derivative Protein Therapies
Antitrust Litigation, et al.

|  |  |
|---|---|
| | Plaintiff, |
| v. | Case No.: |
| | 1:09–cv–07666 |
| | Honorable Joan B. Gottschall |
| CSL Limited, et al. | |
| | Defendant. |

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, April 16, 2014:

MINUTE entry before the Honorable Joan B. Gottschall: Motion hearing held. Plaintiff's Unopposed Motion for Final Approval of Class Settlement with Baxter [696] and Motion for Final Award of Attorneys' Fees, Reimbursement of Expenses, and Approval of Incentive Awards for Class Representatives [697] are granted. Judgment is entered dismissing with prejudice from this action Defendants Baxter International, Inc. and Baxter Healthcare Corporation. Enter Order and Judgment. Civil case terminated. This order relates to all member cases associated with MDL 2109. MDL 2109 terminated. Mailed notice(ef, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN RE PRANDIN DIRECT PURCHASER ANTITRUST LITIGATION | C.A. No. 2:10-cv-12141-AC-DAS |
| | Judge Avern Cohn |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Magistrate Judge Donald A. Scheer |

## ORDER AND FINAL JUDGMENT
## APPROVING CLASS ACTION SETTLEMENT

**WHEREAS,** Plaintiffs American Sales Company, LLC and Rochester Drug Co-Operative, Inc.  ("Plaintiffs") executed a Settlement Agreement with Defendants Novo Nordisk A/S and Novo Nordisk, Inc. ("Defendants") to fully resolve this antitrust class action case;[1]

**WHEREAS,** on October 2, 2014, this Court granted preliminary approval of the proposed settlement;[2]

**WHEREAS,** on November 18, 2014, Plaintiffs moved for an award of attorneys' fees, reimbursement of expenses, and payment of incentive awards to the class representatives;

**WHEREAS,** on December 16, 2014, Plaintiffs moved for an order of final approval of the Settlement of this action;

---

[1] Settlement Agreement (Doc. No. 58-2).
[2] Order, October 2, 2014 (Doc. No. 64) ¶ 4.

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 163
2:10-cv-12141-AC-DAS   Doc # 68   Filed 01/20/15   Pg 2 of 22   Pg ID 2455
of 229

**WHEREAS,** on January 14, 2014, the Court held a fairness hearing in this action;

**NOW, THEREFORE,** this 20th day of January, 2015, upon the motions of Plaintiffs and all papers submitted and proceeding held herein, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** as follows:

## I.    Jurisdiction

1.    This Court has personal jurisdiction over the Plaintiffs, the class, and Defendants, and subject matter jurisdiction over the action.

## II.    Certification of the Class

2.    The Court previously certified for settlement purposes the following class:  All persons and entities in the United States and its Territories who purchased Prandin directly from Defendants from May 6, 2009 until the June 30, 2014.  Excluded from the Class are Defendants and their parents, employees, subsidiaries, and affiliates, and all federal governmental entities.[3]

## III.    Notice to the Class

3.    The Court previously approved the form and method of notice employed here.  The notice constituted the most effective and best notice practicable under the circumstances and was due and sufficient notice for all other

---

[3] *Id.* ¶ 2.

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 164
2:10-cv-12141-AC-DAS   Doc # 68   Filed 01/20/15   Pg 3 of 22   Pg ID 2456
of 229

purposes to all potential class members entitled to receive notice.[4]

4.      Class Counsel, through court-appointed Settlement Administrator
Rust Consulting, Inc., caused notice to be provided to all class members in full
compliance with the requirements of Fed. R. Civ. P. 23 and due process by first
class mail on or about October 17, 2014.  The deadline for objecting or requesting
exclusion was December 1, 2014.  No class member has objected or requested
exclusion from the class.[5]

## IV.   Final Approval of the Settlement

5.      The Settlement resulted from the parties' detailed investigation of the
facts and substantial motion practice.  It was reached only after arm's-length
negotiations, undertaken in good faith by Class Counsel and counsel for
Defendants.

6.      The Settlement provides a recovery for the class in the amount of $19
million in cash.

7.      The Court has evaluated the proposed settlement under Rule 23 of the
Federal Rules of Civil Procedure, as well as relevant Sixth Circuit jurisprudence,
including the factors set forth in *Int'l Union, United Auto., Aerospace & Agric.*

---

[4] *Id.* ¶ 5.
[5] As of the date of Plaintiffs' final approval submission, no class member had
objected or requested exclusion.  Declaration of Kathy Larson of Rust Consulting,
Inc. ("Larson Decl.") at ¶ 3.  Class Counsel confirmed at the fairness hearing that
no such requests had been received since then.

*Implement Workers of Am. (UAW) v. General Motors Corp.*, 497 F.3d 615, 632

(6th Cir. 2007), finding as follows:

      a.    *The likelihood of success on the merits weighed against the*

*amount and form of the relief offered in the settlement.*  "The fairness of

each settlement turns in large part on the strength of the parties' legal

dispute."[6]  When considering the fairness of a class action settlement, courts

assess it "with regard to a 'range of reasonableness,' which 'recognizes the

uncertainties of law and fact in any particular case and the concomitant risks

and costs necessarily inherent in taking any litigation to completion.'"[7]  This

case involved numerous, complex legal issues and Plaintiffs' success was

not certain.  The risk of the class ultimately receiving nothing was

substantial.  "All litigation poses risks of course, but antitrust litigation

especially so."[8]  These risks must be weighed against the settlement

consideration: $19 million in cash, which is plainly valuable to the class

members.  Weighing the risk and uncertainty of litigation against the

settlement benefits tilts the scale toward approval.

      b.    *The complexity, expense, and likely duration of further*

---

[6] *In re S.E. Milk Antitrust Litig.*, 2:07-CV-208, 2013 WL 2155379, at *3 (E.D. Tenn. May 17, 2013).

[7] *In re Packaged Ice Antitrust Litig.*, Case No. 08-MDL-01952, 2011 WL 6209188, at *10 (E.D. Mich. Dec. 13, 2011).

[8] *In re Southeastern Milk*, 2013 WL 2155379, at *4.

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 166
of 229
2:10-cv-12141-AC-DAS   Doc # 68   Filed 01/20/15   Pg 5 of 22   Pg ID 2458

*litigation.* "Settlements should represent 'a compromise which has been reached after the risks, expense and delay of further litigation have been assessed.'"[9]  "[T]he prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery."[10]  This is particularly true for class actions, which are "inherently complex."[11]  "[S]ettlement avoids the costs, delays, and multitude of other problems associated with them."[12]  In the absence of this settlement, litigation would have continued for years at significant additional expense.  This settlement ensures that class members will receive their recoveries without further delay and without incurring further expense.

        c.    *The opinions of Class Counsel and class representatives.*  In deciding whether a proposed settlement warrants approval, Class Counsel's judgment "that the settlement is in the best interest of the Class 'is entitled to significant weight, and supports the fairness of the class settlement.'"[13]

---

[9] *In re Cardizem CD Antitrust Litigation*, 218 F.R.D. 508, 523 (E.D. Mich. 2003) (quoting *Williams v. Vukovich,* 720 F. 2d 909, 921-23 (6th Cir. 1983)).
[10] *Id.*
[11] *In re Southeastern Milk*, 2013 WL 2155379, at *5 (citing *In re Telectronics Pacing Sys., Inc.,* 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001)).
[12] *Id.*
[13] *In re Southeastern Milk*, 2013 WL 2155379, at *5; *In re Packaged Ice Antitrust Litig.,* Case No. 08-MD-01952, 2011 WL 717519, at *11 (E.D. Mich. Feb. 22, 2011) (quoting *Sheick v. Auto. Component Carrier LLC*, Case No. 2:09-cv-14429, 2010 WL 4136958, at *18 (E.D. Mich. Oct. 18, 2010); *In re Packaged Ice*, 2011 WL 6209188, at *12.

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 167
of 229
2:10-cv-12141-AC-DAS   Doc # 68   Filed 01/20/15   Pg 6 of 22   Pg ID 2459

Class Counsel have extensive experience in handling pharmaceutical

antitrust and other complex litigation.[14]  They negotiated this settlement at

arm's-length over a period of months with well-respected and experienced

counsel for Defendants.  Each class representative also has experience in

litigating pharmaceutical antitrust cases and evaluated the strength of the

settlement, finding that it was fair and reasonable.

       d.     *The amount of discovery engaged in by the parties*.  Plaintiffs

undertook a substantial investigation of the case.  Ultimately, Plaintiffs

reviewed over 300,000 pages of documents of Caraco documents produced

pursuant to subpoena.[15]  Class Counsel's thorough analysis of the documents

fully informed the decision to enter into the settlement and Class Counsel

had sufficient information to allow them to evaluate the fairness of the

settlement.[16]

       e.     *The reaction of absent class members*.  The absent class

members also support the settlement.  After receiving individual, mailed

notice, no member of the class objected to the settlement and no member of

---

[14] *See* Declaration of Co-Lead Counsel in Support of Plaintiffs' Motion for
Preliminary Approval ("Co-Lead Counsel Decl.") dated September 12, 2014 (Doc.
No. 66) ¶¶ 27-31.

[15] *Id.* ¶¶ 19, 21.

[16] *In re Southeastern Milk*, 2013 WL 2155379, at *5 ("Counsel's recommendation
and that of the class representatives is clearly supported by an incredibly extensive
base of data and this gives added weight and deference to the judgment of trial
counsel and the class representatives.").

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 168
2:10-cv-12141-AC-DAS   Doc # 68   Filed 01/20/15   Pg 7 of 22   Pg ID 2460
of 229

the class opted out.[17]   Counsel for each of the three largest wholesalers –

Cardinal Health, Inc., AmerisourceBergen Corporation, and McKesson

Corporation – have written to the Court directly and affirmatively support

the Settlement.   "[T]he scarcity of objections-relative to the number of class

members overall-indicates broad support for the settlement among Class

Members."[18]

       f.    *The good faith of settlement negotiations.*   There is a

presumption that settlement negotiations were conducted in good faith and

that the resulting agreement was reached without collusion, unless there is

evidence to the contrary.[19]   Here, settlement came after years of hard-fought

litigation.   Class Counsel have extensive experience in proper management

of pharmaceutical antitrust class actions and they negotiated this settlement

at arm's-length with Defendants' counsel.

       g.    *The public interest.*   "[T]here is a strong public interest in

---

[17] *See* Larson Decl. ¶7.

[18] *In re Southeastern Milk*, 2013 WL 2155379, at *6; *Sheick*, 2010 WL 4136958, at
*22; *In re Cardizem*, 218 F.R.D. at 527 ("[i]f only a small number of objections are
received, that fact can be viewed as indicative of the adequacy of the settlement").

[19] *In re Southeastern Milk*, 2013 WL 2155379, at *6; *Telectronics*, 137 F. Supp. 2d
at 1018 (citing Herbert Newberg & Alba Conte, *Newberg on Class Actions* §11.51
(3d ed. 1992) ("Courts respect the integrity of counsel and presume the absence of
fraud or collusion in negotiating the settlement, unless evidence to the contrary is
offered."); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of
Am. (UAW) v. Ford Motor Co.*, Case Nos. 05-74730, 06-10331, 2006 WL
1984363, at *26 (E.D. Mich. July 13, 2006); *Sheick*, 2010 WL 4136958, at **19-
20.

encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources."[20]  The settlement also "ends potentially long and protracted litigation among these parties and frees the Court's valuable judicial resources."[21]  "Society's interests are clearly furthered by the private prosecution of civil cases which further important public policy goals, such as vigorous competition by marketplace competitors."[22]  This litigation, which sought to hold Defendants accountable for their allegedly anticompetitive scheme, serves these public policy goals.  The resolution of the case through settlement further benefits the public by providing prompt compensation to those directly injured by Defendants' alleged actions.

8.  The Court previously preliminarily approved the plan of distribution to be employed here.  The plan of distribution of the Settlement Fund (Doc. No. 58-5) calls for distribution of the settlement amount, net of attorneys' fees and expenses, incentive awards to the class representatives, and other costs as shall be

---

[20] *In re Cardizem*, 218 F.R.D. at 530 (quoting *Granada Invs. Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)).  *Accord In re Packaged Ice*, 2011 WL 6209188, at *15.

[21] *In re Southeastern Milk*, 2013 WL 2155387, at *7(citing *In re Broadwing, Inc., ERISA Litig.*, 252 F.R.D. 369, 376 (S.D. Ohio 2006)).

[22] *Id.* at *5 (citing *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws.")).  *See also Cardizem*, 218 F.R.D. at 534 ("Society also benefits from the prosecution and settlement of private antitrust litigation.").

allowed by the Court, to all class members pro rata based on the total units of Prandin purchased directly from Defendants during the class period.  The proposed distribution plan, attached hereto as Exhibit A, satisfies the requirements of Fed. R. Civ. P. 23(e) and due process, is fair, reasonable and adequate, and is therefore are finally approved.

9.     Upon consideration of the above factors and the record in this case, the Settlement Agreement and each of its terms are finally approved as fair, reasonable, and adequate within the meaning of Rule 23 of the Federal Rules of Civil Procedure, and the parties are directed to consummate the settlement according to its terms.

## V.     Award of attorneys' fees, reimbursement of expenses, and payment of incentive awards to the class representatives.

10.     The Settlement confers a substantial benefit on the class and the value is immediate and readily quantifiable.

11.     Class Counsel vigorously and effectively pursued class members' claims before this Court.

12.     The Settlement Fund is a "common fund," and courts have long recognized that a lawyer who recovers such a fund is entitled to a reasonable attorneys' fee from that fund as a whole.[23]

---

[23] *See Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980); *Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984).

13.     The percentage-of-the-fund method is the proper method to compensate Class Counsel in this litigation.  The Court concurs with the observations made by other courts, such as: the lodestar method is cumbersome; the percentage-of-the-fund approach more accurately reflects the result achieved; and the percentage-of-the-fund approach has the virtue of reducing the incentive for plaintiffs' attorneys to over-litigate or "churn" cases.[24]

14.     The Court recognizes that the trend in "common fund cases has been toward use of the percentage method."[25]

15.     The Court finds that the requested counsel fee of one-third of the settlement fund is fair and reasonable and fully justified.  The Court finds it is within the range of fees ordinarily awarded.  The Court also finds that the award is within the range of fee awards in settlements of this type.[26]

---

[24] *In re Southeastern Milk Antitrust Litig.,* 2013 WL 2155387, at *2; *In re F&M Distrib., Inc. Sec. Litig.,* Case No. 95-CV-71778-DT, 1999 U.S. Dist. LEXIS 11090, at *8 (E.D. Mich. June 29, 1999).

[25] *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 532 (E.D. Mich. 2003) (courts in the Sixth Circuit have "indicated a preference for the percentage-of-the-fund method in common fund cases.").

[26] *In re Skelaxin Antitrust Litig.,* No. 12-cv-83, Doc. 747 (E.D. Tenn. June 30, 2014) (in direct purchaser pharmaceutical antitrust action, awarding a one-third fee on a $73 million settlement recovery); *In re Southeastern Milk,* 2013 WL 2155387, at *3 ("attorneys' fees requested represent one-third of the settlement fund. Although the total fee requested is a very large amount . . . the percentage requested is certainly within the range of fees often awarded in common fund cases, both nationwide and in the Sixth Circuit."); *In re Tricor Direct Purchaser Antitrust Litig.,* No. 05–340, Order and Final Judgment Approving Settlement, Awarding Attorneys' Fees and Expenses, Awarding Representative Plaintiff

16.     The Court looked at the following factors to determine the

reasonableness of the percentage:

- the value of the benefit rendered to the plaintiff class;
- the value of the services on an hourly basis;
- whether the services were undertaken on a contingent fee basis;
- society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others;
- the complexity of the litigation; and
- the professional skill and standing of counsel involved on both sides.

After examination of these factors, the Court finds that these factors support

the requested award.[27]

17.     The results achieved in this case fully support the requested fee.  The

Settlement in this case provides a clear benefit to the class: an immediate and

certain payment, divided among a limited national class of direct purchasers, of

$19 million in cash, less attorneys' fees, expenses, administration costs, and

awards to the named Plaintiffs.

18.     A one-third fee recovery in this matter would equate to a multiplier

of 3.01 to the lodestar incurred through October 31, 2014.  This level multiplier is

Incentive Awards, Approving Plan of Allocation, and Ordering Dismissal as to All Defendants at ¶ 11 (D. Del. Apr. 23, 2009) (approving one-third fee, equaling approximately $83 million); *In re Packaged Ice Antitrust Litig.*, Case No. 08-MDL-01952, 2011 U.S. Dist. LEXIS 150427, at **76-77 ( E.D. Mich. Dec. 13, 2011) ("Importantly, the requested award of close to 30% appears to be a fairly well-accepted ratio in cases of this type and generally in complex class actions.").
[27] *Moulton v. United States Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009) (*quoting Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)).

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 173
of 229
2:10-cv-12141-AC-DAS   Doc # 68   Filed 01/20/15   Pg 12 of 22   Pg ID 2465

reasonable in light of what has been routinely accepted as fair and reasonable in

complex matters such as this one.[28]  Multipliers much higher than the one

requested here are also commonplace in complex pharmaceutical antitrust class

actions.[29]

19.     Class Counsel bore significant risks.  In particular, Plaintiffs here

faced substantial obstacles in attempting to establish antitrust liability, causation,

and damages.  The Court or the jury could have found that Caraco's inability to

come to market, notwithstanding Novo's alleged conduct, prevented Plaintiffs from

proving causation and damages.[30]

20.     Antitrust class actions are inherently complex.  The legal and factual

---

[28] *See, e.g., Bailey v. AK Steel Corp.*, Case No. 1:06-cv-468, 2008 U.S. Dist. LEXIS
18838, at *7 (S.D. Ohio Feb. 28, 2008) (awarding multiplier of 3.04, noting that
"[c]ourts typically ... increas[e] the lodestar amount by a multiple of several times
itself" and identifying a "normal range of between two and five"); *Manners v.
American General Life Ins. Co.*, Civil Action No. 3-98-0266, 1999 U.S. Dist.
LEXIS 22880, at *93 (M.D. Tenn. Aug 11, 1999) (3.8 multiplier); *In re Cardinal
Health Sec. Litig.*, 528 F. Supp. 2d. 752, 770 (S.D. Ohio 2007) (multiplier of 5.9).
[29] *See, e.g.*, *Cardizem*, 218 F.R.D. at 533 (noting that direct purchaser class
plaintiffs received a fee award that equated to a lodestar multiplier of 3.7).  *See
also Tricor,* No. 05–340, Order and Final Judgment Approving Settlement,
Awarding Attorneys' Fees and Expenses, Awarding Representative Plaintiff
Incentive Awards, Approving Plan of Allocation, and Ordering Dismissal as to All
Defendants at ¶ 11 (approving lodestar multiplier of 3.93); *Meijer, Inc. v. 3M*, No.
04-5871, 2006 WL 2382718 (E.D. Pa Aug. 14, 2006), at *24 (approving a
percentage fee award that translated to a 4.77 multiplier in case that settled after
one year).
[30] *See Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 859-61 (D.C. Cir. 2008) (generic
manufacturer Andrx was experiencing concurrent manufacturing problems, and the
FDA did not approve Andrx's ANDA until one year after Biovail withdrew its
claim that that the patent covered Tiazac, proving fatal to the antitrust claim).

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 174
of 229
2:10-cv-12141-AC-DAS   Doc # 68   Filed 01/20/15   Pg 13 of 22   Pg ID 2466

issues are complicated and highly uncertain in outcome.  This case was no

exception.  As the court noted in *Packaged Ice*, "[t]his antitrust litigation, like all

litigation of its species, promises to be extremely complex and time intensive and

there is no question that if settlement fails, the Defendants will mount a strong

defense."[31]

21.     Class Counsel are qualified in this complex area and performed well

during the case.  Several of these firms have also been actively engaged in antitrust

litigation in the pharmaceutical industry for well over a decade.  Class Counsel

demonstrated this experience and skill in the efficient and effective prosecution of

this action, and in achieving a relatively quick resolution.  As one court observed,

"[t]the quality of work performed in a case that settles before trial is best measured

by the benefit obtained."[32]

22.     Counsel for the three largest wholesalers, together accounting for the

---

[31] 2011 U.S. Dist. LEXIS 150427, at *76 (citing *In re Linerboard Antitrust Litig.*,
292 F. Supp. 2d 631, 639 (E.D. Pa. 2003)).  *See also Cardizem*, 218 F.R.D. at 533
("Antitrust class actions are inherently complex . . . this extraordinarily complex
case raised a multitude of difficult issues in the areas of antitrust law, patent law,
and laws governing pharmaceutical drugs.").

[32] *Behrens v. Wometco Ent., Inc.*, 118 F.R.D 534, 547-48 (S.D. Fla. 1988).  *See also
In re Delphi Corp. Securities, Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 504
(E.D. Mich. 2008) ("The ability of Lead Counsel to negotiate a favorable
settlement in the face of formidable legal opposition further evidences the
reasonableness of the fee award requested."), *F&M Distrib.,* 1999 U.S. Dist.
LEXIS 11090, at *19 ("The skill and competence of the attorneys for the plaintiffs
was evident, especially when viewed on the basis of the results that they obtained
in this case, while the excellent advocacy skills of the defense counsel . . . were
equally evident").

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 175
of 229
2:10-cv-12141-AC-DAS   Doc # 68   filed 01/20/15   Pg 14 of 22   Pg ID 2467

majority of purchases subject to the settlement, have written the Court directly

affirmatively supporting Class Counsel's fee and expense request.

23.     The Court, therefore, awards Class Counsel attorneys' fees in the

amount of $6,333,000.00 (six million, three hundred thirty-three thousand dollars),

*i.e.* one third of the $19 million Settlement Fund, as attorneys' fees, to be allocated

among Class Counsel, as well as approving reimbursement of $147,975.82 in

expenses, which expenses were reasonable and necessary to the representation of

the Class.

24.     Numerous courts have found it appropriate to specially reward

named class plaintiffs for the benefits they have conferred.  As the court noted in

*Lonardo v. Travelers Indemnity Company*:

> Courts within the Sixth Circuit…recognize that, in common
> fund cases and where the settlement agreement provides for
> incentive awards, class representatives who have had extensive
> involvement in a class action litigation deserve compensation
> above and beyond amounts to which they are entitled to by
> virtue of class membership alone.[33]

---

[33] 706 F. Supp. 2d 766, 787 (N.D. Ohio 2010).  *See also In re Skelaxin Antitrust
Litigation,* No. 12-cv-83, Doc. 747 (E.D. Tenn. June 30, 2014) (in direct purchaser
pharmaceutical antitrust action, awarding a $50,000 incentive award to each class
representative); *Cardizem*, 218 F.R.D. at 535-36 (awarding $75,000 each to the
corporate class representatives); *Meijer, Inc., et al. v. Barr Pharma., Inc.,* C.A. No.
05-2195, Order and Final Judgment, at ¶ 17 (D. D.C. Apr. 20, 2009) (awarding
$50,000 to five class representatives – a total of $250,000); *Tricor,* No. 05–340,
Order and Final Judgment Approving Settlement, Awarding Attorneys' Fees and
Expenses, Awarding Representative Plaintiff Incentive Awards, Approving Plan of
Allocation, and Ordering Dismissal as to All Defendants at ¶ 14 (awarding $50,000
to each of three class representatives).

Case No. 1:90-cv-00181-JLK   Document 2435-16   filed 01/12/17   USDC Colorado   pg 176
of 229
2:10-cv-12141-AC-DAS   Doc # 68   Filed 01/20/15   Pg 15 of 22   Pg ID 2468

25.      The Class Representatives American Sales Company, LLC and

Rochester Drug Co-Operative, Inc. diligently and completely fulfilled their

obligations to the Class.  They stepped forward and pursued the Class's interests

by filing suit on behalf of the members of the Class and undertaking the

responsibilities attendant upon serving as a named plaintiff.  The Class

Representatives also participated in the settlement.

26.      The Class Representatives are each granted an award of $50,000

each, payable from the Settlement Fund, for their role in bringing about this

recovery on behalf of the Class.

**VI.     Entry of Final Judgment Binding on the Class and Dismissal of the
Case With Prejudice**

27.      No class member timely and validly requested exclusion from the

class.  All class members, therefore, are and will forever remain, bound by this

Order and Final Judgment.

28.      This class action is dismissed with prejudice and in its entirety, on the

merits, as to Defendants.  This dismissal shall not affect, in any way, Plaintiffs' or

class members' rights to pursue any claims other than those released, as set forth in

the Settlement Agreement.

29.      Plaintiffs and all members of the class are permanently enjoined and

barred from instituting, commencing, or prosecuting any action or other

proceeding asserting any released claims, as set forth in the Settlement Agreement, against any released party, either directly, individually, representatively, derivatively, or in any other capacity, by whatever means, in any local, state, or federal court, or in any agency or other authority or arbitral or other forum wherever located.

30.     In no event shall Defendants be obligated to pay anything in addition to the $19 million settlement fund created pursuant to the Settlement Agreement, including without limitation, attorneys' fees, awards to the named class representatives for their efforts on behalf of the class, escrow costs, taxes, or any other cost or expense arising from or to be paid as part of the settlement.

31.     This Order and Final Judgment does not settle or compromise any claims by Plaintiffs or the class against persons or entities other than the released parties, as set forth in the Settlement Agreement.  All rights against any other person or entity are specifically reserved.

32.     The settlement, this Order and Final Judgment, and/or any and all negotiations, documents, and discussions associated with it shall be without prejudice to the rights of any party, shall not deemed or construed to be an admission or evidence of any kind, including without limitation of any violation of any statute or law or any liability or wrongdoing by Defendants or an acknowledgement of defenses by Plaintiffs, or the truth of any of the claims or

allegations contained in any pleading in this case or the standing of any party to assert claims against Defendants or defenses Plaintiffs, and evidence thereof shall not be discoverable or used directly or indirectly, by any party or any third party, in any way, whether in this class action or in any other action or proceeding of any kind whatsoever, civil, criminal or otherwise, before any court, tribunal, administrative agency, regulatory body or other similar entity, provided, however, that nothing contained herein shall preclude use of the Settlement Agreement or this Order and Final Judgment in any proceeding to enforce the Settlement Agreement.

33.     Without affecting the finality of this Order and Final Judgment, this Court retains exclusive and continuing jurisdiction over the Settlement and the Settlement Agreement, including the Settlement Fund and the administration, consummation, and interpretation of the settlement and Settlement Agreement.

34.     The escrow account established by the parties has been approved by the Court.[34]  Defendants have deposited $19 million as the settlement fund into that escrow account pursuant to the Settlement Agreement, and that escrow fund, including any accrued interest, is approved as a Qualified Settlement Fund pursuant to Internal Revenue Code Section 468B and the Treasury Regulations promulgated thereunder.

---

[34] Order, October 2, 2014, ¶ 11.

35.     Pursuant to Federal Rule of Civil Procedure 54, the Court finds that there is no just reason for delay and hereby directs the entry of final judgment of dismissal forthwith as to Defendants.


SO ORDERED this 20th day of January, 2015


S/ Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE[*]



I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, January 20, 2015, by electronic and/or ordinary mail.

S/Sakne Chami
Case Manager, (313) 234-5160

---

[*]This Order and Final Judgment Approving Class Action Settlement was prepared by Class Counsel and signed after review by the Court.

# Exhibit A

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN RE PRANDIN DIRECT PURCHASER ANTITRUST LITIGATION | C.A. No. 2:10-cv-12141-AC-DAS<br><br>Judge Avern Cohn |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Magistrate Judge Donald A. Scheer |

## PLAN OF DISTRIBUTION

Plaintiffs propose to distribute the net settlement fund (*i.e.*, the gross settlement fund, net of any attorneys' fees, reimbursed litigation expenses, class representative incentive awards, and/or settlement administration costs approved by the Court), to class members *pro rata* based on each class member's aggregate share of the total class purchases of Prandin during the class period. Plaintiffs propose the following schedule to govern the distribution process:

| | |
|---|---|
| 15 days after entry of final approval order | Settlement administrator will mail claim forms to all class members. The claims forms will include estimated calculations by the settlement administrator of each class member's qualifying purchases, in units, during the class period, based on the Prandin sales data produced by Defendants. |

| 45 days after entry of final approval order | Class members' deadline to submit executed claim forms to the settlement administrator.  Class members must either accept the settlement administrator's estimated calculation or provide their Prandin purchase data proving a revised aggregate purchase amount. |
|---|---|
| 90 days after entry of final approval order | Class counsel will submit to the Court a motion for distribution of the net settlement fund supported by a declaration of settlement administrator verifying compliance with the plan of distribution. |

Each class member's distribution amount will be calculated by the settlement administrator, with the assistance of plaintiff's economist if necessary, as follows: for each class member that submits a claim, the settlement administrator will: (a) sum the total combined purchases made by each class member during the class period; (b) calculate each class member's percentage share of purchases of Prandin  by dividing each class member's total qualifying purchases in units by the total combined qualifying purchases (in units) made by all class members combined; and then (c) multiply each class member's percentage share of purchases of Prandin by the total dollars in the net settlement fund.

To ensure uniformity, the settlement administrator will use the transactional sales database produced by Defendants during the litigation to make a calculated estimate of each class member's purchases of Prandin during the class period. Notwithstanding the foregoing, any class member may provide the claim

administrator with data or information concerning its Prandin purchases that may supplement or correct purchase information drawn from the transactional sales database produced by Defendants during the litigation.

For illustrative purposes, take a class member for whom the manufacturers' sales data combined showed that it purchased one million units of Prandin during the class period. The settlement administrator would first take that figure (one million units) and divide it by the total amount of Prandin in units purchased during the class period by all class members to get that class member's percentage share of the total. For these purposes, assume that all class members combined bought one hundred (100) million units of Prandin during the class period. Thus, in this example, the class member's percentage share of purchases of Prandin would be one million units divided by one hundred (100) million units, or 1%. That class member's share would then be multiplied by the net settlement fund allocable to all class members to yield the class member's net distribution amount in dollars. If the net settlement fund were $10 million, in this example, the class member would receive 1% of $10 million or $100,000.

Plaintiffs respectfully submit that the proposed plan of distribution is fair, reasonable, and adequate, and should be approved.

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In Re:<br><br>**SKELAXIN (METAXALONE) ANTITRUST LITIGATION** | **Lead Case No. 2:12-cv-83**<br><br>**MDL No. 2343**<br><br>**Judge Curtis L. Collier** |
| **THIS DOCUMENT RELATES TO:**<br><br>**All Direct Purchaser Class Actions** | |

**MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S
MOTION FOR AN AWARD OF ATTORNEY FEES, REIMBURSEMENT
OF EXPENSES, AND AWARDS FOR THE NAMED PLAINTIFFS**

## **TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................................... 1

II.   FACTUAL BACKGROUND.................................................................................... 3

    A.   Drug manufacturers must get FDA approval to market drugs; this regulatory framework can be abused by drug manufacturers to stifle or prevent competition. ........................................... 3

    B.   Defendants: King and Mutual. .......................................................................... 5

    C.   Elan and King secure the Food Effect Patents. ................................................. 5

    D.   The FDA allows the "carve out" of the food effect language in March 2004 and King files a meritless petition, designed only to cause delay, to overturn that decision. ............................... 7

    E.   King and Mutual entered a conspiracy to further delay generic competition. ..................... 7

    F.   King and Mutual accomplish the conspiracy through sham petitions to the FDA and the continuation and initiation of sham patent infringement actions. ................................ 9

III.  HISTORY OF THE LITIGATION ................................................................ 11

    A.   The litigation track. ..................................................................................... 12

        1.   Discovery ............................................................................................... 12

        2.   Experts.................................................................................................... 16

        3.   Class Certification Proceedings ................................................................ 16

    B.   The mediation track. ................................................................................... 17

    C.   The settlement negotiations. ......................................................................... 19

    D.   Preliminary approval.................................................................................... 19

IV.   ARGUMENT.......................................................................................... 20

    A.   Class counsel's compensation derives from the benefits created by the litigation............ 20

    B.   The "percentage method" is appropriate in this case and class counsel's one-third fee is fair and reasonable.................................................................................................. 20

        1.   Application of the Sixth Circuit's reasonableness factors support class counsel's request for a one-third fee........................................................................................... 23

    C.   Courts disfavor the declining percentage approach to awarding fees............................... 33

i

D.   Class counsel's expenses are reasonable and were necessarily incurred to achieve the benefit obtained...................................................................................................................... 35

E.   Awards for the named Plaintiffs are appropriate and reasonable. ..................................... 37

V.   CONCLUSION....................................................................................................................... 38

ii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

FEDERAL CASES

*Bailey v. AK Steel Corp.*, Case No. 1:06-cv-468, 2008 U.S. Dist. LEXIS 18838
(S.D. Ohio Feb. 28, 2008)..........................................................................................27

*Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005)...........................................25

*Behrens v. Wometco Ent., Inc.*, 118 F.R.D 534 (S.D. Fla. 1988) ............................28, 33

*Blum v. Stenson*, 465 U.S. 886 (1984) ...........................................................................20

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)............................................................20

*Bowling v. Pfizer, Inc.*, 102 F.3d 777 (6th Cir. 1996)....................................................24

*Brown v. Pro Football, Inc.*, 839 F. Supp. 905 (D.D.C. 1993).....................................36

*Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885).........................................20

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ......................................................17

*Connectivity Sys. Inc. v. Nat'l City Bank*, Case No. 2:08-cv-1119, 2011 U.S. Dist.
LEXIS 7829 (S.D. Ohio Jan. 25, 2011) ....................................................................24

*Dick v. Sprint Communs. Co. L.P.*, 297 F.R.D. 283 (W.D. Ky. 2014) ....................24, 28

*Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973) .......................................29

*Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240
(S.D. Ohio 1991)........................................................................................................37

*Fournier v. PFS Invs., Inc.*, 997 F. Supp. 828 (E.D. Mich. 1998).................................20

*FTC v. Actavis, Inc.*, 570 U.S. --- (2013).......................................................................18

*Gottlieb v. Wiles*, 150 F.R.D. 174 (D. Colo. 1993)........................................................36

*Hainey v. Parrott,* Case No. 02-CV-733, 2007 U.S. Dist. LEXIS 98444 (S.D. Ohio
Nov. 6, 2007) .............................................................................................................37

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972).........................................................20

*In re: AT&T Corp. Sec. Litig.*, 455 F.3d 160 (3d Cir. 2006) .........................................24

*In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369 (S.D. Ohio 2006) ........................26

*In re Cardinal Health Sec. Litig.*, 528 F. Supp. 2d. 752 (S.D. Ohio 2007) ............................27, 28

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003) ............................... passim

*In re Combustion Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) ........................................................34

*In re Delphi Corp. Securities, Derivative & "ERISA" Litig.*, 248 F.R.D. 483 (E.D. Mich. 2008) ...............................................................................................................................33

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993) ............................33

*In re Dun & Bradstreet Credit Services Customer Litig.*, 130 F.R.D. 366 (S.D. Ohio 1990) .......................................................................................................................................37

*In re Folding Carton Antitrust Litig.*, 84 F.R.D. 245 (N.D. Ill. 1979) ..........................................30

*In re Foundry Resins Antitrust Litig.*, No. 04-mdl-1638 (S.D. Ohio March 31, 2008) .......................................................................................................................................22

*In re F&M Distributors Inc. Securities Litigation* , Case No. 95-CV-71778-DT, 1999 U.S. Dist. LEXIS 11090 (E.D. Mich. June 29, 1999)............................................ passim

*In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) ..............................34

*In re Packaged Ice Antitrust Litig.*, Case No. 08-MDL-01952, 2011 U.S. Dist. LEXIS 150427 (E.D. Mich. Dec. 13, 2011) ......................................................................22, 31

*In re: Remeron Direct Purchaser Antitrust Litig.*, Civ. No. 03-0085, 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005)..........................................................................27, 36

*In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294 (3d. Cir. 2005).......................................................34

*In re Southeastern Milk Antitrust Litig.*, Master File No. 2:08-MD-1000, 2013 U.S. Dist. LEXIS 70167 (E.D. Tenn. May 17, 2013) ............................................................. passim

*In re: Southeastern Milk Antitrust Litig.*, Case. No. 08-md-01000, Memorandum Opinion and Order (E.D. Tenn. July 11, 2012) .................................................................21, 35

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) ..........................................................33

*In re: Tricor Direct Purchaser Antitrust Litig.,* No. 05-340, Order (D. Del. Apr. 23, 2009) ..................................................................................................................................27, 37

*In re: UnumProvident Corp. Derivative Litigation*, MDL Case No. 03-md-1552, 2010 U.S. Dist. LEXIS 4326 (E.D. Tenn. Jan. 20, 2010)..................................................25, 26

*In re Vitamins Antitrust Litig.,* Misc. No. 99-197 (TFH), 2001 U.S. Dist. LEXIS 25067 (D.D.C. July 13, 2001).....................................................................................................34

iv

*Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981)..........................................................................28

*King Pharms., Inc. v. Eon Labs, Inc.*, 593 F. Supp. 2d 501 (E.D.N.Y. 2009)..............................11

*King Pharms., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267 (Fed. Cir. 2010) .........................................11

*Kizer v. Summit Partners, L.P.*, Case No. 11-cv-00038, Memorandum (E.D. Tenn.
    July 10, 2012)..........................................................................................................................21

*Lanni v. State of New Jersey*, 259 F.3d 146 (3d Cir. 2001).........................................................26

*Lonardo v. Travelers Indemnity Company* , 706 F. Supp. 2d 766 (N.D. Ohio 2010)
    ..................................................................................................................................................37

*Manners v. American Gen. Life Ins. Co.*, Civil Action No. 3-98-0266, 1999 U.S.
    Dist. LEXIS 22880 (M.D. Tenn. Aug. 11, 1999) ....................................................................27

*Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289 (2012) ......................................6

*McHugh v. Olympia Entm't, Inc.*, 37 Fed. Appx. 730 (6th Cir. 2002) ..........................................25

*MCI Commc'ns Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) ...................28

*Meijer, Inc. v. 3M*, No. 04-5871, 2006 WL 2382718 (E.D. Pa Aug. 14, 2006) ...........................27

*Meijer, Inc., et al. v. Barr Pharma., Inc. (Ovcon Antitrust Litig.)*, C.A. No. 05-2195,
    Order and Final Judgment (D. D.C. Apr. 20, 2009) ................................................................37

*Minnesota Min. & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311
    (1965)........................................................................................................................................20

*Moulton v. United States Steel Corp.*, 581 F.3d 344 (6th Cir. 2009)............................................23

*Pillsbury Co. v. Conboy*, 459 U.S. 248 (1983) .............................................................................20

*Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188 (6th Cir. Ohio 1974). ..................................28

*Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513 (6th Cir. 1993)..................................20, 21

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) .......................................................................20, 30

*Rosenbaum v. MacAllister*, 64 F.3d 1439 (10th Cir. 1995) .........................................................20

*Smillie v. Park Chem. Co.*, 710 F.2d 271 (6th Cir. 1983)............................................................20

*Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939) ..................................................................20

*Stanley v. United States Steel Co.*, Case No. 04-74654, 2009 U.S. Dist. LEXIS
    114065 (E.D. Mich. Dec. 8, 2009)..................................................................................22, 28

v

*Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521 (E.D. Ky. 2010) .....................22

*Trustees v. Greenbough*, 105 U.S. 527 (1882) ................................................................................20

*United States Football League v. National Football League*, 644 F. Supp. 1040 (S.D.N.Y. 1986)....................................................................................................................28

*Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011) ...............................................................17

*West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710 (S.D.N.Y. 1970) ....................................28

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

21 C.F.R. § 320.1(e)...........................................................................................................................4

21 U.S.C. § 301 *et seq.*......................................................................................................................3

21 U.S.C. § 355(j)...............................................................................................................................4

**OTHER: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

*Court-Awarded Attorney Fees*, Report of the Third Circuit Task Force, October 8, 1985 ...........21

*Generic Drug Entry Prior to Patent Expiration: An FTC* Study, 108 F.R.D. 237 (1985) ..............3

Counsel for the direct purchaser class plaintiffs in the above-captioned matter ("class counsel") respectfully submit this Memorandum in Support of Class Counsel's Joint Petition for Attorney Fees, Reimbursement of Expenses, and Awards for the Named Plaintiffs.

## I.    INTRODUCTION

The direct purchaser class plaintiffs' claims against Defendants in this consolidated action have been settled for $73 million in cash (the "settlement fund").[1]   This settlement achieved for the benefit of direct purchasers is a result of class counsel's skill, perseverance, and hard work; that skill, perseverance, and hard work are detailed herein and in the Declaration of Thomas M. Sobol submitted herewith.[2]   These efforts included an exhaustive factual investigation and discovery effort, including review and analysis of over one million pages of documents obtained from Defendants and several nonparties; responding to Defendants' discovery requests to Plaintiffs; engaging in extensive discovery battles involving multiple motion to compel; researching and drafting motions, including the opposition to Defendants' motions to dismiss and a motion for class certification, appearing and arguing at hearings; working with experts concerning class certification, damages and antitrust injury (causation) issues; and successfully mediating and then negotiating the terms of this settlement agreement with counsel for Defendants.

Class counsel's discovery efforts were not only successful, but were highly organized and efficient in addressing the myriad complex issues raised by Plaintiffs' claims and Defendants' defenses (including highly technical regulatory, financial, patent, and pharmaceutical manufacturing issues).[3]

To date, class counsel's efforts have been without compensation of any kind.   Class

---

[1]  Defendants funded the settlement as of June 5, 2014 and the fund will begin to accrue interest.   Such interest also will be paid to members of the class.

[2]  *See* Declaration of Thomas M. Sobol ("Sobol Decl.") filed herewith.

[3]  *See* Sobol Decl. ¶¶ 10-19.

1

counsel have expended approximately 22,500 hours in the past two and a half years, the compensation for which has been wholly contingent upon the result achieved.[4]   Under applicable jurisprudence, the percentage-of-the-fund method is the proper method of compensating class counsel.   The nature and duration of the litigation, as well as the exceptional result of class counsel's efforts in this litigation, justify an attorney fee award of one-third of the Settlement Fund.   This percentage has been approved in decisions in the Sixth Circuit, is justified by the relevant factors identified by this Circuit, and is in line with fees awarded in many substantially similar complex antitrust class actions.   Accordingly, class counsel respectfully request that the Court award fees equal to one-third of the Settlement Fund.

In addition, class counsel request reimbursement of approximately $540,000 in out-of-pocket expenses and an award of $50,000 for each for the named Plaintiffs.[5]   Class counsel have submitted documentation supporting the existence and reasonableness of the expenses incurred.[6]   And, $50,000 awards for named plaintiff are customary in litigation like this, especially in light of the discovery burden placed upon class representatives in antitrust cases.

In support for these requests, class counsel have obtained the opinions of Dean Hill Rivkin, the College of Law Distinguished Professor at the University of Tennessee College of Law in Knoxville, Tennessee and Ronald J. Berke, of Berke, Berke & Berke, Chattanooga, Tennessee, a highly respected and experienced practitioner.[7]   Both opine that the fee requested is appropriate in this case and is consistent with this Court's jurisprudence.

---

[4] *Id.* at ¶ 53.

[5] Named Plaintiffs are Professional Drug Company, Inc., Meijer, Inc. and Meijer Distribution, Inc. (collectively "Meijer"), Rochester Drug Co-Operative, Inc., Ahold USA, Inc., and Stephen L. LaFrance Holdings, Inc. and its wholly-owned subsidiary Stephen L. LaFrance Pharmacy, Inc. d/b/a SAJ Distributors (collectively "LaFrance").

[6] *See* Sobol Decl. ¶¶ 57-61.

[7] *See* Declaration of Professor Dean Hill Rivkin and Declaration of Ronald J. Berke, filed herewith.   Class counsel paid these experts themselves and make no claim for reimbursement from the settlement fund.

2

## II.   FACTUAL BACKGROUND

Metaxalone has been available in the United States since 1962.   For nearly 50 years, it was only available as a brand product, known as Skelaxin.   In the early 2000s, manufacturers began efforts to bring a generic to market, but Defendants' alleged anticompetitive scheme delayed generic entry for nearly ten years.   The direct purchasers' Consolidated Class Action Complaint[8] details how King, first acting alone and then in concert with Mutual, used baseless patent litigation, baseless petitions to the Food and Drug Administration ("FDA"), and an unlawful reverse payment agreement to delay generic competition for Skelaxin.

**A.    Drug manufacturers must get FDA approval to market drugs; this regulatory framework can be abused by drug manufacturers to stifle or prevent competition.**

The FDA must approve a prescription drug, whether brand or generic, before it can be commercially marketed in the United States.   In 1984, Congress promulgated the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Act, in an effort to incentivize generic entry and to streamline the generic approval process and allow generic drugs to come to market as quickly and as inexpensively as possible.[9]

Hatch-Waxman amended the Food, Drug and Cosmetic Act[10] to eliminate the need for a generic manufacturer to file a New Drug Application ("NDA") in order to obtain FDA approval. NDAs require a drug manufacturer to demonstrate that a drug is both safe and effective for its intended use, which generally requires years of expensive clinical research to establish.   Under Hatch-Waxman, a generic manufacturer files an Abbreviated New Drug Application ("ANDA") and relies on the safety and efficacy data already supplied to the FDA in the brand manufacturer's

---

[8] Direct Purchasers' Consolidated Class Action Complaint and Jury Demand, filed November 2, 2012 (Dkt. No. 31).

[9] *See Generic Drug Entry Prior to Patent Expiration: An FTC Study*, at p. i Executive Summary (FTC July 2002) available at:   http://ftc.gov/reports/generic-drug-entry-prior-patent-expiration-ftc-study (last visited May 28, 2014).

[10]  21 U.S.C. §301 *et seq.*

3

NDA.[11]   The ANDA-filer must demonstrate only that its product contains the same active ingredients as and is "bioequivalent" to its branded NDA counterpart.[12]

Hatch-Waxman provides a critical incentive to the first generic manufacturer to file an ANDA with a so-called "Paragraph IV" certification: a 180-day exclusivity period during which no other ANDA-filer can compete for generic sales.   A Paragraph IV certification asserts that the generic does not infringe any patent listed in the FDA's Orange Book as covering the brand name drug or that any such patent is invalid.[13]   Until the first-filer has had the opportunity to enjoy that 180-day exclusivity period, successive ANDA filers are generally foreclosed from the marketplace.[14]   Alternatively, a generic company can file a "section viii" certification, requesting that the FDA permit the generic manufacturer to "carve out" from its product label any language or use that would otherwise infringe the listed patent.[15]

Upon receipt of the Paragraph IV certification, the brand manufacturer NDA-holder can file a patent infringement suit.   The filing of such a suit triggers an automatic 30-month stay of the first-filer's ANDA approval.[16]   By law, the 30-month stay forecloses approval of the ANDA regardless of whether there is any merit to the patent infringement suit – i.e., the patent holder does

---

[11] *See* 21 U.S.C. § 355(j).

[12] *See* 21 U.S.C. §§ 355(j)(2)(A)(ii) and (iv); § 355(j)(8)(B).   "Bioequivalence means the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study."   21 C.F.R. § 320.1(e).

[13] *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

[14] *See Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions: An FTC Staff Study*, at p. 5 (FTC Jan. 2010) (noting pay-for-delay settlement with first filers can "prevent *all* generic entry" and "[t]his cork-in-the-bottle effect occurs because every subsequent generic entrant has to wait until the first generic has been marketed for 180 days") available at:   http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf (last visited May 28, 2014).

[15] *See* 21 U.S.C. § 355(j)(2)(A)(viii).   A generic seeking approval under section viii has no expectation of market exclusivity, and, assuming there is a generic company that has filed a Paragraph IV certification and is eligible for 180 days of market exclusivity, may have to wait for another generic's exclusivity period to expire before it can expect FDA approval to come to market.   If the section viii certification is approved by the FDA and the patent-protected language can be carved out, however, the patent holder has no claim of infringement to pursue.

[16] *See* 21 U.S.C. § 355(j)(5)(B)(iii).

4

not have to demonstrate any likelihood of success on the merits for the stay to occur and FDA action forestalled.   Absent a court order declaring the patent invalid or not infringed, both the first-filer and successive ANDA filers are effectively blocked from the marketplace.   And the longer the patent litigation can be maintained, the longer that the brand NDA holder can continue to sell its product at monopoly prices.   Thus, there are rich incentives for a brand manufacturer to prolong the patent suit for as long as possible.

Generic drugs are typically sold at a significantly discounted price as compared to the brand, and the impact of generic entry is well-known, swift, and devastating to brand companies' revenues and profits.   State generic-substitution laws and related mechanisms cause a rapid shift of sales from the brand to generic.   As a result, the brand and generic may both benefit by delaying generic entry; by conspiring with each other, as Plaintiffs contend that Defendants did here, the two companies can split the unlawful monopoly rents captured during this period of delay, all to the harm of purchasers and competition generally.

**B.     Defendants: King and Mutual.**

In 2003, King purchased the rights to Skelaxin, a muscle relaxant, from Elan.   The original compound patent covering metaxalone expired in 1979 and Elan (though not a named defendant) had sought to shield Skelaxin from generic competition through an anticompetitive scheme.   King, too, wanted to protect Skelaxin from generic competition and so continued – and expanded upon – Elan's anticompetitive scheme.   The scheme included enlisting Mutual, a potential generic competitor, to help it block all generic competition.

Mutual at first worked to develop its own generic version of Skelaxin, but later changed course and used its research to help King block generic competition.

**C.     Elan and King secure the Food Effect Patents.**

In the early 2000s, Elan filed for two patents related to Skelaxin: the 6,407,128 ("'128")

5

and 6,683,102 ("'102") Patents (collectively, the "Food Effect Patents"), both of which purported to cover a method of increasing the bioavailability of metaxalone by administering it with food and including information about that increase in bioavailability in the product label.   The '128 Patent issued in June 2002, and Elan immediately listed it in FDA's Orange Book as claiming (covering) metaxalone.   The '102 Patent issued in January 2004, after King had acquired Skelaxin from Elan; King likewise immediately listed that patent in the Orange Book.

The Food Effect Patents were obviously invalid and there was no reasonable chance they would withstand judicial scrutiny.   There was nothing novel about taking metaxalone with food (as had been done for over forty years).   In addition, the properties of metaxalone were simply unpatentable phenomena of nature.   As the Supreme Court stated, in summing up decades of settled patent jurisprudence: "Einstein could not patent his celebrated law that E=mc$^2$; nor could Newton have patented the law of gravity.   Such discoveries are 'manifestations of . . . nature, free to all men and reserved exclusively to none.'"[17]

Despite their invalidity, the Food Effect Patents afforded Elan, and later King, the opportunity to block FDA approval of generic metaxalone products for at least 30 months when asserted in litigation.   Elan sued putative generic competitors Sandoz and CorePharma in early 2003, alleging infringement of the '128 Patent.   Just months after purchasing Skelaxin from Elan, King sued Mutual in March 2004, alleging infringement of the '102 Patent, and continued the '128 Patent actions against Sandoz and CorePharma.   King knew, like Elan before it, that the patents would not withstand judicial scrutiny.   Instead, their value resulted solely from the 30-month stay that filing a patent infringement suit – no matter how meritless – would trigger.

---

[17] *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289, 1293 (2012) (citations omitted).

**D.**      **The FDA allows the "carve out" of the food effect language in March 2004 and King files a meritless petition, designed only to cause delay, to overturn that decision.**

In March 2004, however, King suffered a significant blow.   The FDA decided to permit ANDA filers to carve out from their product label the language allegedly protected by the '128 Patent (the "Food Effect Language") because "metaxalone has a long history of safe use" and few reported adverse events after 40 years on the market without the Food Effect Language in the label. Requiring the inclusion of the Food Effect Language could only be justified, the FDA stated, by a properly designed clinical study demonstrating actual safety or efficacy effects from the purported food effect.   The studies King had submitted were merely bioavailability studies showing an absorption difference when Skelaxin was taken with food; the studies did not show that this absorption difference made any difference with respect to safety or efficacy.   Indeed, the studies had not been designed to evaluate that issue.

In the wake of the FDA decision, King could no longer rely solely upon its meritless patent suits to prevent generic competition.   Generic competitors could simply carve out the language protected by the Food Effect Patents – and thus circumvent the '102 and '128 Patents.

Knowing that the FDA's practice was to postpone ANDA approval decisions while related petitions for FDA action were pending, King, a few weeks later and citing nothing new, asked the FDA to rescind its March 2004 decision permitting the carve out of the Food Effect Language.   In support of this request, King provided none of the data or properly designed clinical studies the FDA had already stated it needed to consider changing its decision.   King's petition was baseless and designed simply for delay.

**E.**      **King and Mutual entered a conspiracy to further delay generic competition.**

In 2005, King approached Mutual about a joint effort to halt generic competition for Skelaxin.   Mutual earlier had tried to join Elan in blocking all generic competition, but (after

7

pocketing $5 million from Elan) had returned to developing its own generic.   In 2003, Mutual filed a "section viii" statement seeking to carve out from its label for its potential generic the language claimed by the '128 Patent; given this, Mutual now stood to benefit from the FDA's March 2004 decision allowing the carve out of the Food Effect Language.

Mutual was also the first generic company to make a Paragraph IV certification as to the '102 Patent, entitling it to share exclusivity with Sandoz on the 400 mg generic Skelaxin.[18]   King had sued Mutual over the '102 Patent, despite knowing the patent was invalid.

Mutual also knew that the Food Effect Patents were invalid.   Mutual publicly stated that while they were engaged in litigation with King, they intended to launch upon FDA approval, reflecting that Mutual viewed the risk of patent liability as quite low.[19]

Nevertheless, Mutual was more than willing to conspire with King to eliminate all generic competition to Skelaxin, knowing it could make more money by sharing in King's monopoly brand profits than by selling its own generic.   In late 2005, the two companies agreed to work together to perpetuate King's Skelaxin monopoly and illegally divide the market for metaxalone, with Mutual abandoning its effort to get approval for a generic metaxalone product.   As part of this agreement, King received a license to intellectual property held by Mutual (including what would later become a third patent purportedly covering metaxalone – the 7,122,566 Patent ("'566")) and Mutual received $35 million and a promise of significant future royalties on all sales of *brand* Skelaxin.   The royalty payments ensured that Mutual would never do anything to undermine King's monopoly, including invalidate King's patents or launch a generic version of

---

[18]  In November 2004, Sandoz filed the first application for a generic 800 mg version of Skelaxin, with Paragraph IV certifications to the Food Effect Patents, entitling Sandoz to 180 days of exclusivity.   King filed a baseless patent suit against Sandoz, resulting in a 30 month stay of FDA approval.

[19]

http://www.prnewswire.com/news-releases/urlmutual-pharmaceutical-company-provides-litigation-update-7175424 7.html (last visited May 28, 2014).

8

Skelaxin, because Mutual would make more money from royalties on King's brand sales than it ever could make with its own generic.

**F.      King and Mutual accomplish the conspiracy through sham petitions to the FDA and the continuation and initiation of sham patent infringement actions.**

Having formed their conspiracy to block generic competition, King and Mutual turned their attention to blocking another would-be generic competitor nearing FDA approval: Sandoz. Just days after signing the agreement, Mutual filed a supplemental petition with the FDA reversing its position on the Food Effect Language.   After achieving its goal of allowing a carve-out, Mutual suddenly argued that the language should *not* be carved out of labels for generic metaxalone.   To support its flip-flop, Mutual pointed to data from a handful of studies, none of which was designed to or did demonstrate any clinical safety or efficacy effects of the Food Effect Language.[20]   Mutual did not tell the FDA that King paid for this change of heart; instead, Mutual reminded the FDA of its own pending ANDA for metaxalone to mislead the FDA into believing that Mutual still intended to market a generic.

Mutual filed subsequent petitions supporting King's request that the FDA reconsider its March 2004 decision to permit generic companies to carve out of their labels the language allegedly covered by King's Food Effect Patents.   None of the petitions had merit; each was premised upon King's patents, which both King and Mutual knew were invalid, and none offered any data from studies designed to demonstrate actual clinical relevance of any of the alleged "safety" information that Mutual or King ostensibly wanted the FDA to act upon.   And in each petition, Mutual falsely portrayed itself as actively seeking approval of its own generic, masking its complicity with King in delaying generic entry.

---

[20]  Indeed, neither King nor Mutual, in any of the many petitions they filed with the FDA, ever offered data from any clinical studies designed to demonstrate actual safety or efficacy effects.

These concerted actions were intended to, and did, delay the FDA's approval of generic metaxalone.   When the FDA finally approved the first generic in 2010 (manufactured by Sandoz), the FDA specifically cited the petition campaign about the Food Effect Language in the label as the cause of the delay.

King and Mutual also used patent infringement actions to unlawfully block generic competition from Sandoz.   When they entered their agreement in late 2005, King and Mutual were, at least nominally, adversaries in litigation over infringement of the '102 Patent, which was slated for trial in October 2006.   Rather than dismiss the case once Mutual had agreed with King not to come to market (thus mooting any controversy between them), King and Mutual instead misled the Hon. Lawrence F. Stengel of the United States District Court for the Eastern District of Pennsylvania, and sought a stay of the action on the pretextual grounds that they were waiting for the FDA to decide whether the Food Effect Language could be carved out of the label for generic metaxalone.   They did not inform Judge Stengel that King had paid Mutual millions of dollars, that Mutual was now receiving royalties on every sale of branded Skelaxin, and that Mutual no longer possessed the intention of ever marketing a generic Skelaxin product.

Had it proceeded, the King-Mutual litigation would have resulted in a judgment of invalidity of the '102 Patent.   As explained above, both of the Food Effect Patents, like the later '566 Patent held by King and Mutual, attempted to patent the laws of nature and practices that had been followed for more than 40 years; as such, they were inherently invalid.   Indeed, every judge that has analyzed the Food Effect Patents has found them invalid.   In 2009, after considering little more than the patents and several pieces of prior art that demonstrated patients had been taking Skelaxin with food safely for decades, the Hon. David G. Trager of the United States District Court for the Eastern District of New York found both the '128 and '102 Patents invalid at

10

Sandoz's insistence.[21]   The Federal Circuit affirmed Judge Trager's ruling a year later.[22]   And in further litigation by King and Mutual against Sandoz, a jury found the '566 Patent (that also purported to cover a natural property of metaxalone and the communication of that property to patients) invalid.   The '102 and '128 Patent litigation did nothing but tie up Sandoz's resources and distract it from prosecuting its ANDA.[23]

Sandoz ultimately won FDA approval of its generic in 2010 and launched.   CorePharma, another generic company that had filed an ANDA to launch generic Skelaxin, launched an authorized generic, based on a deal with King, at the same time.   (An authorized generic refers to generic drugs that are put on the market by the NDA holder – i.e., the brand company itself – as opposed to a generic put on the market by the ANDA-holder – i.e., a third party generic).   Mutual, however, has never entered the market because of its conspiracy with King.

The direct purchasers alleged that had it not conspired with King, Mutual would have quickly prevailed in its patent litigation with King and launched a generic Skelaxin product before 2010 and Mutual would still be on the market today.   Moreover, had Mutual not conspired with King, Mutual never would have aided King in petitioning the FDA to obstruct approval of generic metaxalone, and, therefore, Sandoz would have been approved by the FDA long before it actually was in 2010.

### III.     HISTORY OF THE LITIGATION

This is an antitrust class action brought on behalf of a certified class of direct purchasers of the prescription drug Skelaxin, defined by the Court as follows:

---

[21]   *King Pharms., Inc. v. Eon Labs, Inc.*, 593 F. Supp. 2d 501, 515 (E.D.N.Y. 2009).

[22]   *King Pharms., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1283 (Fed. Cir. 2010).

[23]   King used the '566 patent to obtain a TRO once Sandoz got FDA approval, but the TRO was quickly dissolved, and the court subsequently denied King's request for a preliminary injunction.

> All persons or entities in the United States and its territories who purchased Skelaxin directly from King at any time during the period November 4, 2005 through and until April 30, 2014 (the "Class Period").

> Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.

The direct purchasers filed their initial complaints in January 2012 and, after transfer and coordination in this Court by the Judicial Panel on Multidistrict Litigation, a consolidated complaint was filed on November 2, 2012.[24]   The Court promptly determined that this case would proceed on two tracks, litigation and mediation.   Both tracks were instrumental to resolving this case.[25]

## A.     The litigation track.

The first hurdle the direct purchasers encountered was the motion to dismiss filed by Defendants.   While the direct purchasers believed in the strength of the case, Defendants raised several challenging arguments, including that: (1) direct purchasers had not sufficiently pled that Defendants caused their injuries; (2) the First Amendment protected Defendants' conduct; and (3) the Sherman Act's four-year statute of limitations time-barred direct purchasers' claims.   After extensive briefing and lengthy oral argument (led by class counsel), the Court denied the motion to dismiss on May 20, 2013.[26]

### 1.     Discovery

The discovery process was intense.   The Court set a discovery deadline of December 31, 2013, leaving roughly seven months to complete fact discovery after the Court decided the motion to dismiss, and the direct purchasers were determined to hold to the Court's ambitious schedule.

---

[24] Consolidated Class Action Complaint and Jury Demand, filed November 2, 2012 (Dkt. No. 31).

[25] *See* Sobol Decl. ¶ 8.

[26] Order, filed May 20, 2013 (Dkt. No. 201).

The parties sought relief from Magistrate Judge Carter on several occasions to keep the case moving apace.

In October 2012, because Defendants resisted commencing full discovery before a decision on the motion to dismiss, the parties agreed on specific types of documents that Defendants would produce early in exchange for the deferral of remaining production until after a decision on the motion to dismiss.   These were (1) sales and pricing data for Skelaxin (and generics, obtained via subpoena); (2) internal projections regarding generic entry; (3) materials produced in the *Jabo's Pharmacy, Inc. v. King Pharmaceuticals, Inc.* state court case; (4) materials produced and court filings in the underlying patent litigations; (5) communications between King and Mutual leading to Defendants' 2005 "pay-for-delay" agreement; and (6) internal communications and communications with the FDA regarding the various petitions concerning Skelaxin and its would-be generic competitors.

After many battles, Defendants completed production of these initial categories of documents in April 2013.   The direct purchasers immediately went to work reviewing and analyzing the documents.[27]   The direct purchasers simultaneously engaged in extensive nonparty discovery of various generic manufacturers (namely Sandoz, CorePharma, and Teva) and, in preparation for class certification, several generics-only distributors.[28]

Once the Court decided the motion to dismiss, full discovery of Defendants proceeded in earnest.   The parties met and conferred for months on custodians and the scope of Defendants' productions.   To further this process, the direct purchasers took Rule 30(b)(6) depositions of King and Mutual on document custodians and electronically stored information in late May and early June of 2013.

---

[27] *See* Sobol Decl. ¶ 12.

[28] *See id.* ¶ 11.

13

King and Mutual did not begin significant production of documents in response to these requests until late August 2013 and both substantially completed their productions in October 2013.   Because Defendants did not begin producing these voluminous documents until four months before the end of discovery, the direct purchasers had a short amount of time to review a large number of documents.   To move as efficiently as possible, the direct purchasers worked in cooperation with all other plaintiff groups.   This required class counsel (and counsel for the other plaintiff groups) to drop other projects and immediately focus on analyzing Defendants' documents, and identify, notice, and prepare for depositions of Defendants' witnesses as quickly as possible.

This intensive and time consuming process generated substantial evidence that allowed the direct purchasers to better understand the strengths and weaknesses in the case and helped lead to the eventual settlement.   Ultimately, Defendants produced over 315,000 documents, containing nearly 4.5 million pages, and plaintiffs (including the direct purchasers) examined over half of those documents in little more than two months using targeted electronic searching to focus on the most relevant documents.[29]

The direct purchasers also responded to detailed contention interrogatories served by Defendants, which necessitated additional intense work to analyze Defendants' documents as the teams reviewing those documents now also were tasked with drafting responses to Defendants' contention interrogatories and locating the documents that would support those responses.   Like the document review itself, this was done on an aggressive schedule, with the work requiring all hands on deck to be completed on time.[30]

---

[29] *See id.* ¶ 16.

[30] *See id.* ¶¶ 17-18.

Because of the short time frame remaining in the discovery schedule, counsel were assigned to take depositions of Defendants' witnesses early and then began working to schedule the depositions.   Numerous depositions of Defendants' witnesses were scheduled and noticed for November and December 2013 and class counsel, in conjunction with counsel for the other plaintiff groups, were in the midst of vigorously preparing for those depositions when settlement was reached in November 2013.

While class counsel aggressively pursued discovery from Defendants, they were also shepherding the class representatives through their discovery obligations.   Each class representative produced documents and electronic data in response to Defendants' requests and produced at least one 30(b)(6) witness to testify both as to class certification issues and as to document production issues.   In some cases, the class representatives produced multiple witnesses.[31]

One of the most contentious aspects of the discovery process was Defendants' service of numerous Rule 45 Subpoenas on absent members of the direct purchaser class.   The direct purchasers filed a motion for a protective order, seeking to require Defendants to withdraw the subpoenas.[32]   On June 10, 2013, Magistrate Judge Carter granted significant portions of the direct purchasers' motion for a protective order, finding many of the requests irrelevant or aimed at information protected by the attorney-client or work-product privilege.[33]

But the issue returned when, on September 5, 2013, Defendants appealed the Magistrate Judge's decision that the subpoenas to absent class members sought irrelevant information and

---

[31] *See id.* ¶ 20.

[32] Motion for Protective Order Directing Defendants to Withdraw the Subpoenas Served on Absent Class Members, filed May 8, 2013 (Dkt. No. 177).

[33] Order on Direct Purchaser Plaintiffs' Motion for a Protective Order, filed June 10, 2013 (Dkt. 230).

thus would not be enforced by this Court.[34]   The direct purchasers again opposed Defendants' attempts to obtain information from absent class members on September 23, 2013.   The motion became moot when the parties reached settlement.[35]

### 2.   Experts

While discovery proceeded, the direct purchasers also worked with experts to help build their case.   In addition to economist Meredith Rosenthal, Ph.D. (discussed below), who provided expert reports on class certification issues, the direct purchasers also worked with a series of other experts whose identity had yet to be disclosed to Defendants.   These experts included a manufacturing and regulatory expert (to address and opine on issues relating to the readiness, willingness, and ability of Mutual and other generics to enter the market earlier absent the challenged conduct), an FDA expert (to address and opine on issues relating to the lack of scientific and regulatory support for the petitions to the FDA), and a chemistry expert (to address matters relating to formulation issues associated with metaxalone).

### 3.   Class Certification Proceedings

The direct purchasers filed, and Defendants opposed, a motion for class certification, with both sides submitting reports by experts; briefing was complete at the end of August 2013.[36]   The direct purchasers engaged economist Meredith Rosenthal, Ph.D., who submitted two expert declarations and whose impact and damages methodology has previously been accepted by courts

---

[34] Appeal of Magistrate Judge Opinion, filed September 5, 2013 (Dkt. 368).

[35] *See* Sobol Decl. ¶ 25.

[36] Motion to Certify Class, filed May 6, 2013 (Dkt. 165); Defendants' Opposition to Direct Purchaser Class Plaintiffs' Motion to Certify Class, filed July 29, 2013, but docketed March 25, 2014 (Dkt. 560); Reply, filed August 23, 2013 (Dkt. 346).

16

for purposes of certifying analogous classes in similar kinds of antitrust cases.    Dr. Rosenthal was deposed on May 28, 2013.[37]

The direct purchasers were fully prepared to argue the motion at the hearing scheduled for November 20, 2013 when the case settled.    The direct purchasers had invested hundreds of hours collecting the necessary data, working with Dr. Rosenthal while she analyzed whether antitrust impact could be shown on a class-wide basis, and drafting the memorandum and reply that supported the direct purchasers' motion for class certification.    This was no small undertaking as recent Supreme Court decisions have had a significant impact on class certification proceedings.[38]

## B.    The mediation track.

While the litigation was proceeding, at the Court's direction, the parties were also mediating the case before the Hon. Jennifer B. Coffman.

After appointment of Judge Coffman as the mediator on February 5, 2013, the parties were immediately ordered to begin preparing a strategic mediation plan, which was to include very specific information.    Drafting this document was an enormous undertaking, which required the direct purchasers to take a hard look at the case, without the benefit of full discovery, at a very early stage.[39]

After receiving and considering the strategic mediation plans, Judge Coffman convened an initial mediation session on March 21 and 22, 2013.    At Judge Coffman's request, in addition to mediation and trial counsel, personnel from named Plaintiffs Stephen L. LaFrance Holding, Inc., Stephen L. LaFrance Pharmacy, Inc. d/b/a SAJ Distributors, Rochester Drug Co-Operative, Inc.,

---

[37] *See* Sobol Decl. ¶ 27.

[38] *See id.* ¶¶ 27-28.   *See also, e.g., Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011); *Comcast Corp. v. Behrend,* 133 S. Ct. 1426 (2013).

[39] *See* Sobol Decl. ¶¶ 29-30.    The parties later submitted amended strategic mediation plans on July 8, 2013, which updated the detailed initial submission and provided additional information to Judge Coffman on: 1) the impact of the litigation history between the parties and their counsel and 2) whether the case was mediation-worthy.   *See id.* ¶ 37.

Meijer, Inc., Meijer Distribution, Inc. and Professional Drug Company, Inc. attended the mediation with their separate counsel.   The initial session allowed the parties to lay the groundwork for future mediation sessions.[40]

Consistent with the discussion at the first mediation session, Judge Coffman requested that the parties submit separate phased discovery plans on April 26, 2013.   These plans outlined discovery goals that the parties hoped would be accomplished by four deadlines – May 1, 2013, July 1, 2013, September 1, 2013, and November 1, 2013.   For the most part, the direct purchasers met all of their discovery goals on the planned schedule.   Through the summer of 2013, the Mediator required the parties to make additional submissions about the impact of *FTC v. Actavis, Inc.*, 570 U.S. --- (2013) and exchange early settlement offers, along with explanations justifying those demands and offers.[41]

Judge Coffman met with the counsel for the plaintiff groups in Cincinnati on July 30, 2013 and discussed multiple items, with primary emphasis on various strategies and procedures that might enhance settlement opportunities.[42]

All parties met with Judge Coffman for the second time on September 10, 2013.   After the mediation session, Judge Coffman laid out additional plans to move the mediation forward, including the making of and response to settlement demands and the possibility of summary jury trial.[43]

The direct purchasers submitted bi-monthly mediation reports to the Court in June, August, October, and December 2013 and in February, April, and June 2014.   Before settlement, these

---

[40] *See id.* ¶¶ 31-32.

[41] *See id.* ¶¶ 34-36.

[42] *See id.* ¶ 38.

[43] *See id.* ¶ 40.

were detailed documents, describing the progress of the mediation and the direct purchasers' efforts to resolve the case.   Since settlement has been reached, the direct purchasers have used the mediation reports to update the Court on the status of the settlement.

## C.      The settlement negotiations.

Because of the open dialogue fostered by the mediation process, the parties were in a good position to negotiate when settlement talks began in earnest in the fall of 2013.   The direct purchasers were fully prepared, having engaged in intensive discovery efforts and researched the strengths and weaknesses of the case.   The final negotiations were intense, requiring a lengthy in-person meeting and then numerous phone calls and communications to finalize the agreement.[44]

## D.      Preliminary approval.

The direct purchasers then began to draft the documents necessary to obtain preliminary approval of a class action settlement, including the motion for preliminary approval, memorandum, proposed order, distribution plan, notice plan, and notice materials.   The direct purchasers ultimately moved for preliminary approval of the settlement on February 28, 2014. The court granted preliminary approval of the settlement in open Court on April 22, 2014, entering a formal order on April 30, 2014.   Pursuant to the order, the settlement administrator, Rust Consulting, Inc., will mail notice of the settlement to the Class on or about June 16, 2014 (approximately forty-five days from preliminary approval by this Court).   The deadline for members of the Class to opt out of or object to the settlement is about July 31, 2014 (forty-five days from the notice date).[45]

---

[44] *See* Sobol Decl. ¶¶ 44-45.

[45] *See id.* ¶¶ 46-49.

## IV.     ARGUMENT

**A.     Class counsel's compensation derives from the benefits created by the litigation.**

Courts have long recognized that a lawyer who recovers a "common fund" is entitled to a reasonable attorney fee from the fund as a whole.[46]   The rationale for such awards is that "persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched . . . ."[47]

In decisions involving the computation of a common fund fee award, the Supreme Court consistently has held that it is appropriate for the fee to be determined on a percentage-of-the-fund basis.[48]   In a percentage fee award, the fee is measured by the benefit conferred upon the class.

The Supreme Court has repeatedly recognized the importance of private antitrust litigation as a necessary and desirable tool to assure the effective enforcement of the antitrust laws.[49]   Fee awards similar to that requested here encourage and support meritorious class actions, and thereby promote private enforcement of, and compliance with, the antitrust laws.

**B.     The "percentage method" is appropriate in this case and class counsel's one-third fee is fair and reasonable.**

Although the Sixth Circuit has left to the trial court's discretion as to whether to apply the lodestar or percentage-of-the-fund method to awards of attorney fees,[50] courts within the Sixth Circuit recognize the clear trend "toward adoption of a percentage of the fund method" in common

---

[46] *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983).

[47] *Boeing,* 444 U.S. at 478; *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1444 (10th Cir. 1995); *Fournier v. PFS Invs., Inc.*, 997 F. Supp. 828, 830 (E.D. Mich. 1998).

[48] *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("under the 'common fund doctrine,' . . . a reasonable fee [is] based on a percentage of the fund bestowed on the class"); *see also Trustees v. Greenough*, 105 U.S. 527, 532 (1882); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 124-25 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-66 (1939).

[49] *See, e.g.*, *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); *Minnesota Min. & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 318-19 (1965).

[50] *See Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993).

20

fund cases.[51]   As the court held in *In re F&M Distributors Inc. Securities Litigation*:

> [T]he Court concludes that the percentage-of-the-fund method
> should be applied for two reasons.   First, the lodestar method is too
> cumbersome and time-consuming of the resources of the Court.
> Second, and more importantly, the "percentage of the fund"
> approach "more accurately reflects the result achieved."[52]

For these same reasons, the "percentage-of-the-fund" method should be applied here.[53]

The primary question before this Court is the appropriate percentage of the settlement fund to be awarded as attorney fees.   As this Court has noted, "fee awards in common fund cases generally are calculated as a percentage of the fund created, with the percentages awarded typically ranging from 20 to 50 percent of the common fund created."[54]

Within the Sixth Circuit, awards of one-third of a common fund are typical, particularly in the resolution of complex litigation.   Very recently, in *Southeastern Milk*, the court awarded a pair of fees, each one-third of settlements worth approximately $150 million apiece (plus expenses).[55] In making the second such award, the court noted that "attorneys' fees requested represent one-third of the settlement fund.   Although the total fee requested is a very large amount . . .   the percentage requested is certainly within the range of fees often awarded in common fund cases,

---

[51] *In re Southeastern Milk Antitrust Litig.*, Master File No. 2:08-MD-1000, 2013 U.S. Dist. LEXIS 70167, at *13 (E.D. Tenn. May 17, 2013) (quoting *Stanley v. United States Steel Co.*, Case No. 04-74654, 2009 U.S. Dist. LEXIS 114065, at **4-5 (E.D. Mich. Dec. 8, 2009)) ("Use of the percentage method also decreases the burden imposed on the Court by eliminating a full-blown, detailed and time consuming lodestar analysis while assuring that the beneficiaries do not experience undue delay in receiving their share of the settlement.").   *See also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 532 (E.D. Mich. 2003) (Courts in the Sixth Circuit have "indicated their preference for the percentage-of-the-fund method in common fund cases."); *Rawlings*, 9 F.3d at 515.

[52] Case No. 95-CV-71778-DT, 1999 U.S. Dist. LEXIS 11090, at *8 (E.D. Mich. June 29, 1999) (internal citations omitted).

[53] *See Court-Awarded Attorney Fees*, Report of the Third Circuit Task Force, October 8, 1985, reprinted at 108 F.R.D. 237 (1985) (recommending that in common fund cases, attorney fees be based on a reasonable percentage of the settlement fund created).   *See also* Rivkin Decl. ¶¶ 18-20.

[54] *Kizer v. Summit Partners, L.P.*, Case No. 11-cv-00038, Memorandum at p. 8 (E.D. Tenn. July 10, 2012) (Collier, J.) (Dkt. No. 33) (quoting *Wise v. Popoff*, 835 F. Supp. 977, 980 (E.D. Mich. 1993)), attached as Exh. 1.

[55] *See* 2013 U.S. Dist. LEXIS 70167, at **15-16; *In re: Southeastern Milk Antitrust Litig.*, Case. No. 08-md-01000, Memorandum Opinion and Order (E.D. Tenn. July 11, 2012) (Dkt. No. 1897), attached as Exh. 2.

both nationwide and in the Sixth Circuit."[56]   And, *Southeastern Milk* is only the latest in a line of Sixth Circuit authority that support fee awards of 30% or higher.[57]

The requested fee is also consistent with prior practice in other direct purchaser class actions involving allegations of overcharges arising from suppressed generic drug competition.[58] The following table summarizes 16 cases that support a one-third fee in such matters from Circuits across the country:

| Direct Purchaser Generic Suppression Antitrust Class Action Settlements One-Third Attorney Fees Awarded | | |
|---|---|---|
| **Date** | **Case Name** | **Settlement Amount** |
| 06-14-13 | *In re Flonase Antitrust Litig.,* E.D. Pa. 08-3149 | $150M |
| 11-07-12 | *In re Wellbutrin XL Antitrust Litig.,* E.D. Pa. 08-2431 | $37.5M |
| 05-31-12 | *Rochester Drug Co-Operative, Inc., v. Braintree Laboratories, Inc.,* D. Del. 07-142-SLR | $17.5M |
| 01-12-12 | *In re Metoprolol Succinate Antitrust Litig.,* D. Del. 06-52-MPT | $20M |
| 11-28-11 | *In re DDAVP Direct Purchaser Antitrust Litig.,* S.D.N.Y. 05-2237 | $20.25M |
| 11-21-11 | *In re Wellbutrin SR Antitrust Litig.,* E.D. Pa. 04-5525 | $49M |
| 08-11-11 | *Meijer, Inc. v. Abbott Labs.,* N.D. Cal. 07-05985-CW | $52M |

---

[56] *Southeastern Milk,* 2013 U.S. Dist. LEXIS 70167, at **15-16 (citing *Bessey v. Packerland Plainwell, Inc.,* Case No. 4:06-cv-95, 2007 WL 3173972, at *4 (W.D. Mich. Oct. 26, 2007) (approving an award of 33 percent, including costs and expenses, and noting that "[e]mpirical studies show that . . . fee awards in class actions average around one-third of recovery" (internal quotes removed)).   *See* Rivkin Decl. ¶¶ 28-29.

[57] *See, e.g., In re Packaged Ice Antitrust Litig.,* Case No. 08-MDL-01952, 2011 U.S. Dist. LEXIS 150427, **76-77 (E.D. Mich. Dec. 13, 2011) ("Importantly, the requested award of close to 30% appears to be a fairly well-accepted ratio in cases of this type and generally in complex class actions."); *In re Foundry Resins Antitrust Litig.,* No. 04-mdl-1638, Order at p. 1 (S.D. Ohio March 31, 2008) (Dkt. No. 247) (awarding 33 1/3% of a $14.1 million settlement), attached as Exh. 3.   *See also Thacker v. Chesapeake Appalachia, L.L.C.,* 695 F. Supp. 2d 521, 528 (E.D. Ky. 2010) ("Using the percentage approach, courts in this jurisdiction and beyond have regularly determined that 30% fee awards are reasonable."); *Stanley,* 2009 U.S. Dist. LEXIS 114065, at **8-9 ("Class counsel seek a fee which is 30% of the total recovery. This is within the range of approved percentages."); *F&M Distrib.,* 1999 U.S. Dist. LEXIS 11090, at *10 ("the excellent performance of the attorneys merits an award of thirty percent of the settlement fund").

[58] *See* Rivkin Decl. ¶ 32.

| 01-31-11 | *In re Nifedipine Antitrust Litig.*, D.D.C. 03-mc-223-RJL | $35M |
|---|---|---|
| 01-25-11 | *In re Oxycontin Antitrust Litig.*, S.D.N.Y. 04-md-1603-SHS | $16M |
| 04-23-09 | *In re Tricor Direct Purchaser Litig.*, D. Del. 05-340-SLR | $250M |
| 04-20-09 | *Meijer, Inc. v. Barr Pharms., Inc.*, D.D.C. 05-2195 | $22M |
| 11-09-05 | *In re Remeron Direct Purchaser Antitrust Litig.*, D.N.J. 03-0085 | $75M |
| 04-19-05 | *In re Terazosin Hydrochloride Antitrust Litig.*, S.D. Fla. 99-MDL-1317 | $74M |
| 09-28-04 | *North Shore Hematology-Oncology Assoc., P.C. v. Bristol-Myers Squibb Co.*, D.D.C. 04-248-EGS | $50M |
| 04-09-04 | *In re Relafen Antitrust Litig.*, D. Mass. 01-12239-WHY | $175M |
| 04-11-03 | *La. Wholesale Drug Co. v. Bristol-Myers Squibb Co.*, S.D.N.Y. 01-MD-1410-JGK | $220M |

The one-third of the settlement fund fee requested by class counsel here is within the accepted range of reasonable attorney fees recoverable in common fund cases.

### 1.    Application of the Sixth Circuit's reasonableness factors support class counsel's request for a one-third fee.

The Sixth Circuit has set forth factors that should be evaluated when determining the reasonableness of an attorney fee request:

> (1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.[59]

Application of these factors to this case confirms that the fee requested is well within the reasonable range.

---

[59] *Moulton v. United States Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009) (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996) (these are commonly called the *Bowling* or *Ramey* factors)).

23

a.      *The value of the benefit rendered to the Class.*

Courts within the Sixth Circuit consider the value of the result achieved a primary factor in making a fee award.[60]   As such, an assessment of value must take into account the risk of no recovery following trial.[61]   Here, the $73 million recovery for the Class is outstanding in light of all the risks and uncertainties in this case.

The results achieved in this case fully support the requested fee.   The settlement in this case provides a clear benefit to the Class: an immediate and certain payment, divided among a limited national class of known direct purchasers, of $73 million in cash, plus accrued interest, less attorney fees, expenses, administration costs, and awards to the named Plaintiffs, as may be awarded by the Court.

In determining a fee award, courts will credit the role of counsel in creating the ultimate benefit.[62]   In the instant case, the Class would have made no recovery at all for the wrongs alleged in this action, but for the efforts of class counsel to research, develop and zealously litigate these claims.[63]   Unlike in some antitrust cases, the commencement of this action did not follow a government lawsuit or investigation.   Rather, the development of this case depended on the investigation and efforts of class counsel.   This factor further supports the fee request.[64]

---

[60]  *See Bowling*, 922 F. Supp. at 1280 ("Most important among these factors are the value of the benefit rendered to the plaintiff class and the value of Counsel's services on an hourly basis.").

[61]  *See Dick v. Sprint Communs. Co. L.P.*, 297 F.R.D. 283, 299 (W.D. Ky. 2014).

[62]  *See Connectivity Sys. Inc. v. Nat'l City Bank*, Case No. 2:08-cv-1119, 2011 U.S. Dist. LEXIS 7829, at *36 (S.D. Ohio Jan. 25, 2011) ("Plaintiffs' Counsel identified and asserted claims concerning Defendant's alleged operations and, as a result, secured a substantial benefit for the Settlement Class.").

[63]  *See* Sobol Decl. ¶ 50.

[64]  *See In re: AT&T Corp. Sec. Litig.*, 455 F.3d 160, 173 (3d Cir. 2006) (that "class counsel was not aided by the efforts of any governmental group, and the entire value of the benefits accruing to class members is properly attributable to the efforts of class counsel . . . strengthens the District Court's conclusion that the fee award was fair and reasonable.").

24

Furthermore, the named Plaintiffs actively support class counsel's fee request.[65]   Their affirmative approval of the requested fee also should be accorded weight.   All of these named Plaintiffs have served as class representatives in similar cases in the past and have experience in reviewing settlements and attorney fee requests.   After doing so here, they found both the settlement and the requested fee to be fair and reasonable.

For these reasons, the $73 million recovery is an outstanding result in light of all the risks and uncertainties in this case.

> b.   *The value of class counsel's services on an hourly basis.*

When applying the percentage-of-the-fund method, courts will look at the hours expended by counsel, either as a factor in the fee analysis, or as an independent cross-check.[66]   Counsel's lodestar is determined by multiplying "the number of hours reasonably expended on the case by a reasonable hourly rate."[67]   In a complex, multidistrict litigation, reasonable hourly rates may be determined with reference "to national markets, an area of specialization, or any other market [the court believes] is appropriate to fully compensate attorneys in individual cases."[68]   The hourly

---

[65] *See* Sobol Decl. ¶ 60 and attached exhibits.

[66] Frequently, courts do not require the submission of detailed time records in support of a lodestar cross-check.   As the court observed in *Southeastern Milk*:

> Counsel have provided to the Court summary schedules indicating the number of hours spent by the attorneys involved in this litigation and the lodestar calculation based on historical billing rates. Those schedules were prepared from contemporaneous time records not produced by counsel. Unlike the situation when the Court employs the lodestar method in full, "the hours documented by counsel need not be exhaustively scrutinized by the district court" where a lodestar cross-check is used.

2013 U.S. Dist. LEXIS 70167, at *15 (quoting *In re WorldCom Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005)).

[67] *Barnes v. City of Cincinnati*, 401 F.3d 729, 745 (6th Cir. 2005).

[68] *McHugh v. Olympia Entm't, Inc.*, 37 Fed. Appx. 730, 740 (6th Cir. 2002) ("A court's choice not to apply local market rates for attorney fees is not an abuse of discretion."); *see also In re: UnumProvident Corp. Derivative Litigation*, MDL Case No. 03-md-1552, 2010 U.S. Dist. LEXIS 4326, at **19-20 (E.D. Tenn. Jan. 20, 2010) (Collier, J.) (approving rates charged by out-of-town counsel where the case involved complex questions of law and defendants were represented by "large New York firms") (citing *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995)).

rates charged by counsel in this case are reasonable and appropriate for complex, antitrust litigation.[69]

Class counsel have been litigating this case for over two years, and spent approximately 22,500 hours opposing and arguing Defendants' motion to dismiss, engaging in discovery battles and completing discovery on an expedited basis to keep to the Court's schedule, drafting and arguing the direct purchasers' motion for class certification, and mediating the case before Judge Coffman.[70]   The significant investment of time required by this action necessarily precluded class counsel's opportunity to work on other matters.   The considerable amount of time and effort expended by class counsel resulted in a meaningful settlement.[71]

Class counsel expended more than $10,000,000 in attorney time and approximately $540,000 in expenses in prosecuting this case[72] and was (and is) prepared to put at risk considerably more time and money had the litigation not settled.[73]   When attorney fees are awarded, the current market rate, not the rate at the time the services were performed, is to be used.[74]   The percentage of fees requested by class counsel are reasonable in light of the risk and the quality and quantity of work expended by class counsel.[75]

A one-third fee recovery in this matter would equate to a lodestar multiplier of

---

[69] *See* Sobol Decl. ¶¶ 56-59; Rivkin Decl. ¶ 33; Berke Decl. ¶ 7.

[70] *See* Sobol Decl. ¶¶ 56-59.

[71] *See* Rivkin Decl. ¶¶ 10-11.

[72] *See* Sobol Decl. at ¶ 55.   The firms submitted their aggregate time and rates for each timekeeper.   Reported hours and stated hourly rates are used to provide a conservative estimate of the aggregate, cumulative value in the case. This approach will not necessarily be binding for allocation of fees among the law firms.

[73] This does not include the time spent preparing the fee application documents, or the expense in retaining Professor Rivkin, Mr. Berke or Mr. Zagrodny.

[74] *See UnumProvident Corp.*, 2010 U.S. Dist. LEXIS 4326, at *17 (citing *Barnes*, 401 F. 3d. at 745 (approving use of current rates to compensate for delay in payment); *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 381 (S.D. Ohio 2006); *see also Lanni v. State of New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001) ("When attorney's fees are awarded, the current market rate must be used.")

[75] *See also* Rivkin Decl. ¶¶ 13, 30-31.

approximately 2.1-2.4.   This multiplier is at the lower end of what been routinely accepted as fair and reasonable in complex matters such as this one.[76]   Multipliers much higher than this are also commonplace in complex pharmaceutical antitrust class actions.[77]

Further, to ensure that the time and expenses charged to the Class were fair and reasonable, class counsel engaged the services of an independent auditor, Robert Zagrodny, CPA to examine all time and expenses billed in this case.[78]   Each lawyer and professional involved in the case was required to keep and periodically submit contemporaneous time records of the work performed and each firm submitted an affidavit to lead counsel attesting to the firm's time and expenses. Lead counsel provided Mr. Zagrodny with uniform rates to be applied to each timekeeper based on experience and position to provide the Court with a highly conservative, aggregate "value" of all services.   The auditor found the hourly value of the services performed by all professionals on behalf of the class of direct purchasers to be in the range of $10,760,000.   Mr. Zagrodny also reviewed all firms' expense records and receipts to ensure the expenses are adequately documented and generally reasonable.[79]

       *c.*      *The contingent nature of the fee.*

A fair fee must also recognize the undesirable characteristics of a contingent antitrust

---

[76] *See, e.g., Bailey v. AK Steel Corp.*, Case No.1:06-cv-468, 2008 U.S. Dist. LEXIS 18838, at *7 (S.D. Ohio Feb. 28, 2008) (awarding multiplier of 3.04, noting that "[c]ourts typically ... increas[e] the lodestar amount by a multiple of several times itself" and identifying a "normal range of between two and five"); *Manners v. American Gen. Life Ins. Co.*, Civil Action No. 3-98-0266, 1999 U.S. Dist. LEXIS 22880, at *93 (M.D. Tenn. Aug. 11, 1999) (3.8 multiplier); *In re Cardinal Health Sec. Litig.*, 528 F. Supp. 2d. 752, 767, 770 (S.D. Ohio 2007) (multiplier of 5.9); *Meijer, Inc. v. 3M*, No. 04-5871, 2006 WL 2382718, at *24 (E.D. Pa Aug. 14, 2006) (approving a percentage fee award that translated to a 4.77 multiplier in case that settled after one year).

[77] *See, e.g.*, *Cardizem*, 218 F.R.D. at 533 (noting that direct purchaser class plaintiffs received a 30% fee award that equated to lodestar multiplier of 3.7); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05–340, Order and Final Judgment Approving Settlement, Awarding Attorneys' Fees and Expenses, Awarding Representative Plaintiff Incentive Awards, Approving Plan of Allocation, and Ordering Dismissal as to All Defendants at ¶ 11 (D. Del. Apr. 23, 2009) (Dkt. No. 543) (approving one-third fee where lodestar multiplier was 3.93), attached as Exh. 4; *In re: Remeron Direct Purchaser Antitrust Litig.*, Civ. No. 03-0085, 2005 U.S. Dist. LEXIS 27013, at **47-48 (D. N.J. Nov. 9, 2005) (multiplier of 1.8 is on the "low end of the spectrum").

[78] *See* Sobol Decl. ¶¶ 57-61.

[79] Mr. Zagrodny's report is attached to the Sobol Decl. as Exh. D.

action, including the uncertain nature of the fee, the wholly contingent outlay of large out-of-pocket sums by plaintiffs, and the fact that the risk of failure and nonpayment in an antitrust case are extremely high.   Accordingly, Courts in this Circuit recognize that the risk of the litigation is an important factor to consider when awarding fees.[80]

A contingency fee arrangement often justifies an increase in the award of attorney fees. This rule helps assure that the contingency fee arrangement endures.   If this "bonus" methodology did not exist, very few lawyers could take on representation of a class given the significant time, effort, and money involved, combined with the risks of no recovery of any fees.[81] Courts assess this risk as of the commencement of the action.[82]

Moreover, success before a jury in complex litigation is highly unpredictable.   As one court observed in another antitrust class action: "It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced."[83] The history of antitrust litigation is replete with cases in which plaintiffs succeeded at trial on liability, but recovered no damages or very small damages at trial or after appeal.[84]   The case of

---

[80] *Stanley*, 2009 U.S. Dist. LEXIS 114065, at *8 ("Numerous cases recognize that the contingent fee risk is an important factor in determining the fee award.").

[81] *Behrens v. Wometco Ent., Inc.*, 118 F.R.D 534, 584 (S.D. Fla. 1988); *see also Ramey*, 508 F.2d at 1197; *Southeastern Milk*, 2013 U.S. Dist. LEXIS 70167, at *22 ("If counsel are not rewarded for this risk, few attorneys will undertake the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.") (internal quote omitted); *accord Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981) ("Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result.") *rev'd on other grounds*, *Int'l Woodworkers of Am. v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986).

[82] *See Cardinal Health*, 528 F. Supp. 2d at 766 ("Lead Counsel took this case on a contingent fee basis.   At the time that Lead Counsel undertook the prosecution of this action, it accepted the risk of investing substantial time and expenses without any assurance of being compensated."); *Dick*, 297 F.R.D. at 300 ("Class counsel spent considerable time on this case at the risk of receiving no compensation.").

[83] *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971).

[84] *See, e.g.*, *United States Football League v. National Football League*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986) ("the jury chose to award plaintiffs only nominal damages, concluding that the USFL had suffered only $1.00 in damages"), *aff'd*, 842 F.2d 1335 (2d Cir. 1988); *MCI Commc'ns Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1166-67 (7th Cir. 1983) (antitrust judgment was remanded for new trial and damages).

*Eisen v. Carlisle & Jacquelin*, illustrates the risks faced by class counsel.[85]   *Eisen* was brought as an antitrust class action.   After two trips to the Second Circuit and one to the Supreme Court, plaintiffs, the putative class and their counsel recovered nothing.

This case is no exception to the rule.   When class counsel undertook the representation of the direct purchasers and the Class, they had no assurances that *any* fees would be received.[86] Class counsel were very much aware, however, that they would have to work many thousands of hours, and invest hundreds of thousands of dollars, in pursuing this case over an extended period of time before having even a possibility of recovering a fee.[87]   In so doing, class counsel deferred engaging in more traditional work that would have otherwise paid by the hour and not required large outlays of cash for expenses.

Class counsel alone bore numerous risks, including: (a) that the matter would be dismissed *via* a Rule 12(b)(6) motion; (b) the difficulties of demonstrating that King's patent infringement lawsuits not only had no realistic expectation of success (i.e., were objectively baseless), but were also filed with the subjective intent of interfering with King's competition in the market for Skelaxin; (c) that the Court would find that King and Mutual's baseless petitions to the FDA were protected under the *Noerr-Pennington* doctrine; (d) that the jury could find that Sandoz's withdrawal from the market for generic metaxalone prevented the direct purchasers from proving causation and damages; (e) that the jury could find that, regardless of the allegedly baseless litigation, FDA petitions, and the King-Mutual agreement not to compete, none of Mutual, Sandoz, CorePharma or other generic manufacturers were ready or able to enter the market for

---

[85]  479 F.2d 1005 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 156 (1974).

[86]  *See* Sobol Decl. ¶ 53.

[87]  *Id.*

generic metaxalone prior to 2010.[88]   And, these risks are heightened in the class action context.

To date, class counsel have received no compensation during the course of this litigation, yet have spent approximately 22,500 hours vigorously pushing this matter forward, and incurred approximately $540,000 in expenses.[89]

   d. *Society's stake in the litigation.*

Prosecution of private antitrust actions helps ensure compliance with the antitrust laws and performs an important societal function.[90]   As the court explained in *Southeastern Milk*:

> Finally, failing to fully compensate class counsel for the excellent work done and the various substantial risks taken would undermine society's interest in the private litigation of antitrust cases. Society's interests are clearly furthered by the private prosecution of civil cases which further important public policy goals, such as vigorous competition by marketplace competitors.[91]

This case – both the litigation and the result – sends a message that purchasers of pharmaceutical products will not tolerate collusive behavior that unnecessarily and illegally raises the prices of pharmaceutical products.   The end result of this deterrent effect is increased competition, a benefit to all purchasers of pharmaceutical products.   Society gains by compensating class counsel for the excellent results achieved in this case, particularly considering the risks encountered in reaching this result, and such that they will have an incentive to pursue additional cases similar to this one.

---

[88] *See id.* ¶ 54.

[89] *See id.* ¶¶ 58-59, 61 for a full description of the work performed and financial burdens carried.

[90] *Reiter*, 442 U.S. at 344.

[91] 2013 U.S. Dist. LEXIS 70167, at *23 (citing *Pillsbury*, 459 U.S. at 262-63 ("This court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws.")).   *See also Cardizem*, 218 F.R.D. at 534 ("Society also benefits from the prosecution and settlement of private antitrust litigation."); *In re Folding Carton Antitrust Litig.*, 84 F.R.D. 245, 260 (N.D. Ill. 1979) (there is a "need in making fee awards to encourage attorneys to bring class actions to vindicate public policy (e.g., the antitrust laws) as well as the specific rights of private individuals.").

e.      *The complexity of the case.*

Antitrust class actions are inherently and arguably the most complex class action cases to prosecute – the legal and factual issues are always complicated and highly uncertain in outcome. As the court noted in *Packaged Ice*, "[t]his antitrust litigation, like all litigation of its species, promises to be extremely complex and time intensive and there is no question that if settlement fails, the Defendants will mount a strong defense."[92]   Again, this case fits that bill.[93]

In addition to the legal issues involved in briefing, *inter alia*, the Rule 12(b)(6) and class certification motions, class counsel spent thousands of hours addressing complex issues regarding numerous highly technical matters, including: (1) regulatory issues arising out of the Hatch-Waxman Act affecting King, Mutual, Sandoz and CorePharma; (2) patent law issues relevant to the patent litigation underlying the illegal agreement at the center of this case; (3) the scientific and production processes involved with inventing, manufacturing, and commercializing metaxalone; and (4) the FDA regulations applicable to reviewing and approving pharmaceutical products and new manufacturing facilities/processes involving low-solubility drug products like metaxalone.[94]

50.      Defendants signaled early on that one of their defenses would be to challenge plaintiffs' ability to demonstrate that any generic was ready and able to come to market.   Plaintiffs responded by assigning a group of attorneys to mine the documents Defendants produced for evidence that Mutual would have been ready and willing to launch its version of generic metaxalone, had it not come to the "pay-for-delay" agreement with King.   Plaintiffs also

---

[92]  2011 U.S. Dist. LEXIS 150427, at *76 (citing *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003)).   *See also Cardizem*, 218 F.R.D. at 533 ("Antitrust class actions are inherently complex . . . this extraordinarily complex case raised a multitude of difficult issues in the areas of antitrust law, patent law, and laws governing pharmaceutical drugs.").

[93]  *See* Berke Decl. at ¶¶ 6, 10.

[94]  *See* Sobol Decl. ¶ 51.

31

thoroughly investigated King's understanding of the impact generic competition on its sales of Skelaxin and all plans it made to stave off that competition, including procuring invalid patents and submitting sham petitions to the FDA.[95]

Class counsel alone bore the following risks: (a) that the matter would be dismissed *via* a Rule 12(b)(6) motion; (b) the difficulties of demonstrating that King's patent infringement lawsuits not only had no realistic expectation of success (*i.e.*, were objectively baseless), but were also filed with the subjective intent of interfering with King's competition in the market for Skelaxin; (c) that the Court would find that King and Mutual's baseless petitions to the FDA were protected under the *Noerr-Pennington* doctrine; (d) that the jury could find that Sandoz's withdrawal from the market for generic metaxalone prevented direct purchasers from proving causation and damages; and (e) that the jury could find that, regardless of the allegedly baseless litigation, petitions, and the King-Mutual agreement not to compete, none of Mutual, Sandoz, CorePharma, or any other generic manufacturer were ready or able to enter the market for generic metaxalone prior to 2010.

Class counsel submit that the complexity of the issues involved in the prosecution of this litigation, as well as the extensive work and coordination of class counsel, supports the one third fee requested.[96]

        *f.*      *The skill, experience and reputation of class counsel.*

Class counsel include some of the preeminent antitrust firms in the country with decades of experience in prosecuting complex actions.   Several of these firms have also been actively engaged in antitrust litigation (class and non-class) in the pharmaceutical industry for well over a

---

[95] *See* Sobol Decl. ¶ 52.

[96] *See F&M Distrib.*, 1999 U.S. Dist. LEXIS 11090, at *12 (approving fee award because attorneys had to "survive numerous motions to dismiss," "face[] vigorous opposition to their efforts to obtain class certification," and "manage complex discovery").   *See also* Rivkin Decl. ¶¶ 12, 16, 30; Berke Decl. ¶¶ 6, 8, 13.

decade.   Class counsel demonstrated this experience and skill in the efficient and effective prosecution of this action, including the beneficial settlement entered into with Defendants.   As one court observed, "[t]the quality of work performed in a case that settles before trial is best measured by the benefit obtained."[97]   And class counsel obtained a substantial benefit for the Class here.   That class counsel obtained this result despite the skill and vigorous advocacy demonstrated by the Defendants' counsel further support the fee request.[98]

## C.   Courts disfavor the declining percentage approach to awarding fees.

A handful of courts have indicated that as settlement funds grow larger than some arbitrary number, such as $100 million (sometimes referred to as "megafunds"), a lower percentage should be applied when awarding attorney fees.[99]   This approach (sometimes termed a "declining percentage approach") has become widely disfavored for misaligning the interests of counsel and the class.   As noted antitrust jurist of the Seventh Circuit, Judge Easterbrook, observed, imposing fee caps in megafund cases provides a disincentive for class counsel to pursue the largest recovery possible for the class:

> [The district judge held that] [f]ees in "megafund" cases should be capped at 10% of the recovery...although she recognized that fees of 30% and more are common and proper in smaller cases.   This means that counsel for the consumer class could have received $22 million in fees had they settled for $74 million but were limited to $8.2 million in fees because they obtained an extra $14 million for their clients.... Why there should be such a notch is a mystery.   Markets would not tolerate that effect.[100]

Similarly, the court in *Ikon* rejected such an approach for failing to recognize the enormous

---

[97] *Behrens*, 118 F.R.D. at 547-48.

[98] *See, e.g., In re Delphi Corp. Securities, Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 504 (E.D. Mich. 2008) ("The ability of Lead Counsel to negotiate a favorable settlement in the face of formidable legal opposition further evidences the reasonableness of the fee award requested."); *F&M Distrib.*, 1999 U.S. Dist. LEXIS 11090, at *19 ("The skill and competence of the attorneys for the plaintiffs was evident, especially when viewed on the basis of the results that they obtained in this case, while the excellent advocacy skills of the defense counsel . . . were equally evident").

[99] *See, e.g., In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993).

[100] *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001).

risk of non-recovery that class counsel undertakes in prosecuting complex class actions:

> [Such an approach] casts doubt on the whole process by which courts award fees by creating a separate, largely unarticulated set of rules for cases in which the recovery is particularly sizeable. I t is difficult to discern any consistent principle in reducing large awards other than an inchoate feeling that it is simply inappropriate to award attorneys' fees above some unspecified dollar amount, even if all of the other factors ordinarily considered relevant in determining the percentage would support a higher percentage.   Such an approach also fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is great risk of no recovery.   Nor does it give sufficient weight to the fact that "large attorneys' fees serve to motivate capable counsel to undertake these actions."[101]

Within the Sixth Circuit, the *Southeastern Milk* court explicitly rejected the declining percentage approach, even for settlements *exceeding* $100 million:

> This Court finds, however, that such an inverse approach would not be appropriate in this case for several reasons.   First, the Court has not found any Sixth Circuit case endorsing such an approach.   Second, a declining percentage-of-the fund based on the size of the settlement "can create an incentive to settle quickly and cheaply when the returns to effort are highest" and discourage counsel from "investing additional time and maximizing plaintiffs' recovery."   In addition, the Court sees no good reason why class action lawyers who represent clients on a contingency-fee basis in a case such as this should receive lower fees on a percentage basis than due contingency-fee lawyers in litigation representing individual clients, which typically amount to 33% or more of the recovery.   Lastly, such an approach would penalize these class action attorneys given the actual number of hours spent on the case, rather than compensate them fairly.   In other words, the requested fees do not result in an excessive windfall for class counsel.[102]

In light of the factual record, including the complexity of the case, the enormous risk of non-payment undertaken by class counsel, and the named Plaintiffs' approval and support of the fee request, class counsel respectfully submit that the Court should not apply the declining

---

[101] *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) (internal citation omitted).   Other courts echo their reasoning.   *See, e.g.*, *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302-03 (3d. Cir. 2005) ("there is no rule that a district court must apply a declining percentage reduction"); *In re Vitamins Antitrust Litig.*, Misc. No. 99-197 (TFH), 2001 U.S. Dist. LEXIS 25067, at **55, 72 (D.D.C. July 13, 2001) (awarding 33.7% of $365 million); *In re Combustion Inc.*, 968 F. Supp. 1116, 1140 (W.D. La. 1997) (awarding 36% of $127 million). Indeed, in the other pharmaceutical antitrust class actions involving settlement funds of even $100 million or more, class counsel has been awarded fees of 30-33$^1/_3$%.   *See supra* at pages 2-23.

[102] 2013 U.S. Dist. LEXIS 70167, at **29-31 (quoting *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 80 (S.D.N.Y. 2000)).

percentage approach in this case.

**D.      Class counsel's expenses are reasonable and were necessarily incurred to achieve the benefit obtained.**

Class counsel incurred substantial out-of-pocket expenses in prosecuting this litigation.[103]

To ensure that the expenses charged to the class were appropriate, class counsel hired an auditor at their own expense, to perform an audit of all expenses submitted.   The auditor concluded that the expenses included proper documentation and conformed to the expense guidelines provided by class counsel.

Plaintiffs and their counsel who have created a common fund for the benefit of a class are entitled to be reimbursed for their out-of-pocket expenses reasonably incurred in creating the fund.[104]   The touchstone for reimbursing expenses is whether they are of the type typically billed to paying clients in the similar cases.[105]   The categories of expenses for which class counsel seek reimbursement here are the type of expenses routinely charged to hourly fee-paying clients and, therefore, should be reimbursed out of the common fund.[106]

A large component of these expenses consists of fees paid to experts and consultants who were instrumental in, among other things, helping class counsel certify the Class, quantify the Class's damages, and obtain this favorable settlement.[107]   These expert expenses are reasonable and were necessarily incurred in obtaining this result for the Class.[108]   Other expenses include the

---

[103]   *See* Sobol Decl. ¶ 61; Berke Decl. ¶ 11.

[104]   *See F&M Distrib.*, 1999 U.S. Dist. LEXIS 11090, at *20 ("Expense awards are customary when litigants have created a common settlement fund for the benefit of a class.").

[105]   *See Cardizem*, 218 F.R.D. at 535.

[106]   *See id.* ("Class Counsel is entitled to reimbursement of all reasonable out-of-pocket litigation costs and expenses in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document productions, consulting with experts and consultants, travel, and other litigation related-expenses."); *see also Southeastern Milk*, 2013 U.S. Dist. LEXIS 70167, at *32-33.

[107]   *See* Sobol Decl. ¶¶ 26-27.

[108]   *See Southeastern Milk*, Case. No. 08-md-01000, Memorandum Opinion and Order, at p. 10.

costs of computerized research.   These are the actual charges for computerized factual and legal research services such as LEXIS and Westlaw.   It is standard practice for attorneys to use LEXIS and Westlaw to assist them in researching legal issues.   Indeed, courts recognize that these tools create efficiencies in litigation and, ultimately, save clients money.   In approving expenses for computerized research, the court in *Gottlieb v. Wiles*[109] underscored the time-saving attributes of computerized research as a reason reimbursement should be encouraged.   The court also noted that hourly fee-paying clients reimburse counsel for such computerized legal research.[110]

In addition, class counsel were required to travel in connection with this litigation for depositions, hearings and meetings with potential witnesses and consultants, and thus incurred considerable costs for travel, meals, and lodging.   The expenses in this category are reasonable in amount and are properly charged against the fund created.[111]

Other expenses for which class counsel are seeking reimbursement (i.e., copying costs, postage) are also customarily charged to paying clients.[112]

Class counsel made individual contributions a common litigation fund, which was in turn used to pay reasonable common expenses such as expert fees, scanning and copying costs for Defendants' document productions, filing fees and court reporting fees.   The contributions for which class counsel seek reimbursement have been used in payment for such expenses.

Class counsel believe that the expenses were all reasonably incurred, are reasonable in amount and should be reimbursed in full.

---

[109]  150 F.R.D. 174, 186 (D. Colo. 1993), *rev'd on other grounds sub nom., Gottlieb v. Barry*, 43 F.3d 474 (10th Cir. 1994).

[110]  *Id.*

[111]  *See Remeron,* 2005 U.S. Dist. LEXIS 27013, at *49.

[112]  *See Brown v. Pro Football, Inc.*, 839 F. Supp. 905, 916 (D.D.C. 1993) (citing *Missouri v. Jenkins*, 491 U.S. 274, 286 (1989), for the proposition that "[p]laintiffs' out-of-pocket costs for telephone, telecopier, air and local couriers, postage, photocopying, Westlaw research, secretarial overtime, and counsels' travel expenses are routinely billed to fee-paying clients, and thus are all compensable as part of a reasonable attorneys' fee").

36

E.      **Awards for the named Plaintiffs are appropriate and reasonable.**

Here, the named the direct purchasers made a substantial sacrifice to step forward and prosecute this litigation on behalf of the Class.   Numerous courts have found it appropriate to specially reward named class plaintiffs for the benefits they have conferred.   As the court noted in *Lonardo v. Travelers Indemnity Company*:

> Courts within the Sixth Circuit…recognize that, in common fund cases and where the settlement agreement provides for incentive awards, class representatives who have had extensive involvement in a class action litigation deserve compensation above and beyond amounts to which they are entitled to by virtue of class membership alone.[113]

Class counsel request the Court approve awards in the amount of $50,000 to each of the named Plaintiffs.   Awards in such amounts are customary in litigation such as this.[114]   The named Plaintiffs diligently and completely fulfilled their obligations to the Class.[115]   They stepped forward and pursued the Class' interests by retaining counsel, filing suit on behalf of the members of the Class and undertaking the responsibilities attendant to serving as a named plaintiff, including sitting for multiple depositions on both document production and merits issues, and collecting and producing thousands of documents, tens of thousands of lines of data, and other

---

[113] 706 F. Supp. 2d 766, 787 (N.D. Ohio 2010).   *See also Hainey v. Parrott,* Case No. 02-CV-733, 2007 U.S. Dist. LEXIS 98444, at *17 (S.D. Ohio Nov. 6, 2007) (approving awards of $50,000 each for class representatives out of a settlement fund of $6 million), *In re Dun & Bradstreet Credit Services Customer Litig*., 130 F.R.D. 366, 374 (S.D. Ohio 1990) (two awards of $55,000 and three awards of $35,000); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp*., 137 F.R.D. 240, 250-51 (S.D. Ohio 1991) ($50,000 each to 6 named plaintiffs).

[114] *See, e.g., In re Cardizem CD Antitrust Litig.*, 218 F.R.D. at 535-36 (awarding $75,000 each to the corporate class representatives); *Meijer, Inc., et al. v. Barr Pharma., Inc. (Ovcon Antitrust Litig.),* C.A. No. 05-2195, Order and Final Judgment, at ¶ 17 (D. D.C. Apr. 20, 2009) (Dkt. No. 210) (awarding $50,000 to five class representatives – a total of $250,000), attached as Exh. 5; *Tricor,* No. 05–340, Order and Final Judgment at ¶ 14 (awarding $50,000 to each of three class representatives).

[115] *See* Declarations of Class Representatives, attached as Exhs. A-C to Sobol Decl.   One class representative was recently purchased by Walgreens, an opt-out direct purchaser in this litigation, and thus has not taken an affirmative position on the fee request.

information in response to Defendants' document requests and interrogatories.[116]   The named

Plaintiffs also participated in the settlement negotiations and attended the first Mediation Session

in Cincinnati, Ohio at the request of Judge Coffman.[117]

For these reasons, class counsel submit that the requested awards for the named Plaintiffs

are both appropriate and reasonable in amount.

## V.    CONCLUSION

Without any guarantee of success, class counsel pursued this litigation at their own risk and

expense for several years.   For the reasons set forth above, class counsel respectfully request the

Court to approve the fee and expense application and enter an order awarding class counsel a fee of

$24,333,333 plus accrued interest, and $540,000 in out-of-pocket expenses.   Class counsel also

request that the named Plaintiffs be awarded $50,000 each for their participation in the prosecution

of this action.

Dated: June 6, 2014                         Respectfully submitted,

                                            /s/ Thomas M. Sobol
                                            Thomas M. Sobol
                                            David S. Nalven
                                            Lauren G. Barnes
                                            Hagens Berman Sobol Shapiro LLP
                                            55 Cambridge Parkway, Suite 301
                                            Cambridge, MA 02142
                                            Tel: (617) 482-3700
                                            *Lead Counsel for Direct Purchaser Class*

Peter Kohn                                  David F. Sorensen
Joseph T. Lukens                            Eric L. Cramer
A. Luke Smith                               Andrew Curley
Sarah Westby                                Caitlin G. Coslett
Faruqi & Faruqi, LLP                        Berger & Montague, P.C.

---

[116] *Id.*

[117] *See* Sobol Decl. ¶31.

101 Greenwood Avenue
Jenkintown, PA 19046
Tel: (215) 277-5770

Barry Taus
Kevin Landau
Taus, Cebulash & Landau PC
80 Maiden Lane, Suite 1204
New York, NY 10038
Tel: (646) 873-7654

Michael L. Roberts
Debra Gaw Josephson
Stephanie Egner
Roberts Law Firm, P.A.
20 Rahling Circle
Little Rock, AR 72223
Tel: (501) 821-5575

Joseph M. Vanek
David P. Germaine
Vanek, Vickers & Masini, P.C.
55 West Monroe Street, Suite 3500
Chicago, IL 60603
Tel: (312) 224-1500

John Radice
Radice Law Firm
34 Sunset Blvd
Long Beach, NJ 08008
Tel: (646) 386-7688

Gary Brewer
Brewer & Terry PC
1702 West Andrew Johnson Hwy.
P.O. Box 2046
Morristown, TN 37816
Tel: (423) 587-2730

1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000

Dianne M. Nast
Erin C. Burns
NastLaw LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300

Linda P. Nussbaum
Jay W. Eisenhofer
Adam Steinfeld
Bradley J. Demuth
Grant & Eisenhofer, P.A.
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8504

Roberta D. Liebenberg
Paul Costa
Louis C. Ricciardi
Fine, Kaplan, and Black, RPC
1835 Market Street, 28th Floor
Philadelphia, PA 19103
Tel: (215) 567-6565

Charles F. Barrett
6518 Highway 100, Suite 210
Nashville, TN 37205
Tel: (615) 515-3393

Paul E. Slater
Sperling & Slater
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Tel: (312) 641-3200