IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, *et al.*,

        Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

        Defendants.

---

CO-LEAD TRIAL COUNSEL'S
OBJECTION TO THE ALLOCATION OF ATTORNEY FEES

---

In its April 28, 2017 Order, this Court granted $150 million in attorney fees to Class Counsel and directed Lead Counsel Berger & Montague ("BM") to "allocate and distribute such attorney fees among the various Class Counsel which have participated in this litigation in such manner as Lead Counsel believes reflects each counsel's contribution to the prosecution of this litigation." Order Awarding Att'y Fees (Doc. 2468) at ¶ 9. The Court added: "Should there be any disputes that cannot be resolved by agreement, they shall be brought within 90 days from the date hereof before this Court, which maintains continuing exclusive jurisdiction over this matter, the settlement and its administration, and all related issues including attorney fees." *Id*.

Co-lead trial counsel Louise Roselle objects on several grounds to BM's allocations and to the process it used to arrive at them:

- BM repeatedly rejected all requests for a transparent allocation process. BM decided on the allocations and threatened to make the distributions in accordance with them, without providing all co-counsel a list of the allocation amounts for all other co-counsel, without providing all co-counsel an opportunity to voice concerns, give input, or object, and without first disclosing the amounts to the class representatives and obtaining their written consent.

- BM has rejected the notion of awarding personal bonuses to individual attorneys whose work contributed significantly to the success of this litigation and who are no longer with the law firms for which they performed the bulk of that work. Of the $150 million fee award approved by this Court, no personal bonuses have been awarded for the contributions made by the late Peter Nordberg, without whom plaintiffs could not have succeeded; by co-lead trial counsel Louise Roselle, who was involved in the case for 27 years and handled more witnesses at trial than any other lawyer; or by her two colleagues at the now defunct Waite, Schneider, Bayless & Chesley Co., L.P.A. ("WSBC"), Jean Geoppinger McCoy, a member of the plaintiffs' trial team, and Paul De Marco, a member of the plaintiffs' appellate team.

- BM intends to pay a disproportionately low multiplier of 1.6 to Ms. Roselle and Mr. De Marco's current law firm, Markovits, Stock & DeMarco, LLC ("MSD"), through which they continued to represent the class in this case over the past five years. This multiplier is on a par with the multiplier that BM granted to several law firms that have not been actively involved in this case for more than a decade or, in some cases, more than two decades; and from what we know anecdotally it appears to be much lower than the effective multipliers granted to every other firm that still actively represented the class at the time of the settlement.

Ms. Roselle respectfully asks the Court to review and inquire into the allocations and to modify them as it sees fit.

## STATEMENT OF OBJECTIONS BY
## LOUISE M. ROSELLE, CO-LEAD TRIAL COUNSEL

### <u>Introduction</u>

As a class action practitioner for three decades, as one of the few attorneys on the plaintiffs' side who has been involved in this case from the very beginning, and as co-lead trial counsel for plaintiffs, I believe I have unique perspectives to offer the Court on each counsel's contribution to the prosecution of this litigation. I have taken part in all aspects of this lawsuit for almost three decades, along with my colleagues Paul De Marco and Jean Geoppinger McCoy. More often than not in later years, up to the time of his tragic death, our involvement in this case was at the behest of our good friend and colleague Peter Nordberg.

Mr. De Marco, Ms. Geoppinger McCoy, and I have almost 80 years of class action or complex litigation experience between us, ranging from multiple environmental class actions involving the nation's nuclear weapons plants, to complex cases against pharmaceutical companies, product manufacturers, and utilities, to the case brought by the survivors of those killed when Libya bombed Pan Am Flight 103 over Lockerbie, Scotland, to class actions brought by Holocaust survivors against Swiss, Austrian, and German banks, and the German and Austrian governments. We have observed settlements of which the class counsel should be ashamed, and hard-won settlements, such as this one, of which the class counsel should be and are immensely proud. And we have witnessed fee disputes in class actions—disputes between class counsel and

3

non-class counsel, and disputes among class counsel, over allocation issues. While I realize that fee disputes in some class actions are inevitable, I had hoped that this case would be different. As a long-time class action practitioner, I personally never expected to object to a fee allocation made in any class action of which I was a part, and I have never come close to doing so in the past. In my 45-year legal career, though, I have made it a point to stand up and speak out against whatever I thought was wrong. I feel it is my obligation to speak out against several aspects of the allocations made by BM among the Class Counsel that from my perspective are just not right. This is why I am raising the following objections[1] to the manner in which BM has handled the allocations that the Court assigned to it, none of which could be resolved by agreement:

1) BM's lack of transparency, its refusal to disclose to all co-counsel the exact amounts being allocated to all other co-counsel, and its failure to disclose these amounts to the class representatives, much less obtain their consent, pursuant to Rule 1.5(d) of the Colorado Rules of Professional Conduct;

2) BM's failure to allocate any portion of the $150 million in fees to Mykaila Nordberg, the widow of Peter Nordberg;

3) BM's refusal to allocate any portion of the $150 million in fees to me or to my colleagues, Ms. Geoppinger McCoy and Mr. De Marco, for our contributions to this case while at WSBC, which no longer operates as a law firm; and

---

[1] In the course of this memorandum, I will cite many facts to support my objections. Because much of the material backing up my factual assertions is still privileged and/or subject to work product protection and thus would require waivers, I have not attached it to this motion out of an abundance of caution. Should the Court decide it wishes to see this material, I await the Court's instructions on how to proceed.

4)   BM's disproportionately low allocation to my current law firm, Markovits, Stock & DeMarco, LLC ("MSD"), which I joined in August 2012 along with Paul De Marco, and through which we both have remained involved in this case for the past five years.

### Factual Background

I have been part of the team representing plaintiffs in this case since it was initiated in January 1990. This was one of four radiation cases filed that month by BM and by my law firm at the time, WSBC, along with other law firms. I was an employee of WSBC between February 1987 and August 2012. BM and WSBC were the only firms actively involved in all four cases from the start. From their inception, Paul De Marco, my colleague at WSBC, and I worked on all four cases with Peter Nordberg. Based on a division-of-labor understanding among the co-counsel, WSBC and a Washington, D.C. firm initially took the lead on the case set in Ohio (the Fernald workers class action), BM and its Colorado co-counsel initially took the lead on the two cases set in Colorado (this case and the Rocky Flats workers litigation), and BM and WSBC worked together along with other co-counsel on the case set in Washington state (the Hanford downwinders litigation). The Rocky Flats workers litigation ended first, by dismissal. The Fernald workers class action settled in the middle of the second jury trial in 1994, and WSBC and BM shared in the eventual class counsel fee, to the best of my recollection. The Hanford case ended last year, and BM, WSBC, and MSD all shared in the fees.

After 27 years of hard fought litigation, and despite the efforts of Dow, Rockwell and the U.S. Department of Energy to thwart us at every turn, the co-counsel for the class achieved a ground-breaking settlement in this case, the result of more than 160,000 hours of tireless work, in the motion and discovery trenches, at trial, and in the court of appeals. As the Court recently noted, the statistics compiled by the class co-counsel are impressive: 99 fact depositions taken comprising 22,539 pages of testimony, 52 other depositions defended or attended, 46 expert depositions, 35 sets of discovery encompassing 730 interrogatories, 729 requests for production and 88 requests for admissions, four months of trial, 300 substantive trial motions, 385 exhibits, 200 demonstratives, 21 videos, 41 testifying witnesses, more than 10,000 pages of transcript, 2,465 docket entries, two appeals, two petitions for *certiorari* and 15 reported decisions. Hr'g. Tr., Apr. 28, 2017 (Doc. 2473) ("Approval Tr."), at 29-30.

My involvement in the Rocky Flats litigation began on November 27, 1989, when Robert "Bob" Golten contacted me to ask whether I would be interested in joining the team of lawyers preparing to sue Dow and Rockwell in the wake of the FBI's June 6, 1989 dawn raid of Rocky Flats to investigate potential environmental crimes. Shortly thereafter, I traveled to Denver and met with potential clients for the first time. From that day forward, I was part of the plaintiffs' legal team—from the pre-complaint investigation to the filing of the initial complaint, through years of discovery battles with defendants and the DOE, waves and waves of motion practice, complicated and

comprehensive expert discovery and analysis, complex and contentious pre-trial proceedings leading to a four-month jury trial, two rounds of appeals to the Tenth Circuit, two rounds of *certiorari* petitions before the Supreme Court, and two rounds of remand proceedings, and then through months of intense settlement negotiations, culminating in the $375 million settlement that the Court approved on April 28, 2017.

Between 1989 and 2004, I met with potential witnesses, attended a public meeting regarding Rocky Flats, took and defended fact depositions, worked with plaintiffs' experts and defended their depositions, and took the depositions of defendants' experts. I reviewed pleadings and Court orders, attended court hearings, and met and conferred with clients, co-counsel, experts, and opposing counsel. I attended strategy meetings with co-counsel and class representatives and participated in hundreds, if not thousands, of telephone calls regarding the case.

I do not have to tell the Court what Peter Nordberg meant to this case. From 1990 until his death on April 17, 2010 at the age of 54, Peter performed multiples roles that no one else could have performed, without which plaintiffs would not have succeeded in this case.[2] He was the architect of the plaintiffs' case, as well as its meticulous builder, its pilot, and its navigator. As the Court recently observed, Peter "was truly inimitable

---

[2]      *See* Exhibit A, "*Berger & Montague Partner, and Brilliant Legal Thinker, Peter Nordberg Dies at 54*" (tribute to Peter Nordberg posted on April 18, 2010 on BM's website) ("No member of our Rocky Flats trial team contributed more to the verdict and judgment that we obtained, and the Public Justice Trial Lawyer of the Year award that was bestowed on our firm in 2009 as a result of our efforts.").

in his grasp and articulation of the many complex issues presented." Approval Tr. at 9. So when Peter called me in 2004 to let me know he needed help with the upcoming trial in this case, I cleared my schedule.

Peter called, in April 2004, and asked if I would serve as co-lead trial counsel with Merrill Davidoff. I agreed and immediately began trial preparation in earnest, including extensive work on plaintiffs' trial plan and mock trial focus groups. On August 26, 2004, I traveled to Philadelphia for the first trial strategy meeting. On September 12, 2005, placing my other cases and my personal life on hold, I relocated to Denver for the duration of the trial. Jean Geoppinger McCoy joined me and the trial team a week later. For more than four months, until the case went to the jury on January 20, 2006, we worked day and night and most weekends preparing for and trying the case.

At the outset of the trial, Mr. Davidoff introduced the jury to the various members of plaintiffs' trial team:

> I am from Berger & Montague. Mr. Nordberg, Peter Nordberg is with my firm. You will see him in and out of the courtroom during the trial. Mr. Sorensen, Mr. David Sorensen is also with my firm. You will see him in and out of the courtroom during the trial. Louise Roselle is co-counsel from Cincinnati during this trial. And Jean Geoppinger from—her firm is here. You may see her in the courtroom from time to time. Also you may see Gary Blum from Silver & DeBoskey, and Holly Shook who you will see a lot, I think, from Silver & DeBoskey here in Denver. . . . Ms. Roselle and I will probably be here the most. We pretty much don't know what to do with ourselves outside of the courtroom.

Trial Tr., Vol. IV-A, Oct. 11, 2005 (Doc. 1788), at 475-76. I was present for every day of the trial, except when I was preparing the next day's fact or expert witness' testimony. I was the first of plaintiffs' attorneys to substantively address the jury, delivering the initial portion of plaintiffs' opening statement. Decl. of Merrill G. Davidoff in Supp. Class Counsel's Mot. Award of Att'ys' Fees, Reimb. of Exp. & Serv. Pmts. to Class Rep. (Doc. 2435-2) ("Davidoff Decl.") at ¶ 143. Over the next four months, with the assistance of Ms. Geoppinger McCoy, I presented the direct testimony of eight of plaintiffs' nineteen fact witnesses, including four of the five class representatives, and cross-examined one defense fact witness. *Id.* at ¶ 148.[3] I also presented the direct testimony of five of plaintiffs' ten expert witnesses—more than any other plaintiffs' counsel. *Id.* at ¶ 149. I cross-examined five of defendants' nine expert witnesses—more than any other plaintiffs' counsel. *Id.* Of the 31 total witnesses at trial, I presented or cross-examined 19 (61 percent) of them—again, more than any other plaintiffs' counsel. *Id.* at ¶¶ 148-49. After all of the evidence was presented, I guided the jury through plaintiffs' evidence during closing arguments. *Id.* at ¶ 174.

For every hour spent in the courtroom, there were myriad hours of preparation. As Mr. Davidoff recently stated:

> Class Counsel's trial team worked diligently to prepare each of those witnesses to testify, including developing the themes for questioning, selecting exhibits, and preparing them for cross-examination. This work

---

[3] I presented one fact witness, James Watkins, via deposition.

occurred during the trial day, in the mornings and evenings during trial, and on weekends.

*Id.* at ¶ 145. Each evening, after the jury was released for the day, I would return to plaintiffs' "war room," where I would meet with Ms. Geoppinger McCoy and other trial team members to review the day's events, strategize and divvy up assignments. Ms. Geoppinger McCoy and I would then work late into the night and early the following morning to prepare for my upcoming witnesses. Throughout those many months, I also spent countless hours working with the class representatives and acting as liaison with lead defense counsel David Bernick, as I was the one of the only plaintiffs' counsel with whom he had a cordial relationship.[4]

When I left for court each morning, Ms. Geoppinger McCoy would not only begin preparing the witnesses I would be taking the following day (*see*, *e.g.*, Doc. 1904, 1914 (moving to exclude expert testimony); Doc. 1922 (objections to exhibits)), she also would work with Peter Nordberg, David Sorensen and the rest of plaintiffs' trial team to prepare other witnesses, "respond[] to [the] barrage of filings by Defendants" and "draft[] . . . objections and memoranda to deal with issues that arose during the trial." Davidoff Decl. at ¶ 164. Among other tasks, Ms. Geoppinger McCoy handled almost all of the deposition designation objections and issues. *See* Doc. 1644, 1652, 1671, 1702, 1782, 1899. She also worked closely with plaintiffs' jury consultant in preparing for *voir*

---

[4]     Mr. Bernick had been opposing counsel to Mr. De Marco and me in the Fernald workers class action, which had settled in 1994.

*dire*, and with plaintiffs' trial technology and graphic presentation consultant to help prepare demonstratives, including those I used during my portion of the opening statement, with my witnesses, and during my closing argument. *See* Davidoff Decl. at ¶ 150.

In addition to supporting me, assisting with motion practice, defending a mid-trial deposition (*id.* at ¶ 31), and her other "war room" duties, Ms. Geoppinger McCoy deposed Dr. Shirley Fry (*id.* at ¶ 68), whom defendants belatedly identified as a new expert after the Court denied their motion to exclude the testimony of plaintiffs' expert Dr. Wing (*id.* at ¶ 141), and handled the supplemental briefing (Doc. 1914) that resulted in the Court granting plaintiffs' motion to exclude Dr. Fry. *See Cook v. Rockwell Int'l Corp.*, 233 F.R.D. 598 (D. Colo. 2005).

On February 14, 2006, Ms. Geoppinger McCoy and I returned to Denver to witness the jury render its verdict in favor of plaintiffs. On June 19, 2008, two years and four months after the verdict, and following extensive pre-judgment motion practice, defendants filed their notice of appeal. I continued to serve as a member of the Rocky Flats team throughout the appellate and settlement process, strategizing with co-counsel, maintaining contact with the class representatives, meeting with attorneys from the Office of the Solicitor General, and participating in settlement negotiations and the mediation that ultimately led to the settlement of the litigation.

Ms. Geoppinger McCoy and I were among the attorneys recognized in 2009 as "Trial Lawyers of the Year" by the Public Justice Foundation for our work on the Rocky Flats trial team. Mr. Davidoff told the Court on April 28, 2017 that "Louise Roselle is one of the most noted toxic tort lawyers in the United States," and that "Jean Geoppinger . . . was an important part of the trial team." Approval Tr. at 22, 24.

Mr. Davidoff also described Paul De Marco, an appellate lawyer formerly with WSBC and now with MSD, as "very valuable on the appeals." *Id*. at 22. Although Mr. De Marco was involved in the beginning of this case, his primary involvement followed the verdict. All it took was an email in January 2007 from Peter Nordberg describing issues related to the class's crucial motion for entry of judgment, to which he appended:

> P.S. to Paul:  I'm delighted at the rumor that you might be available to lend a hand. I'll prepare a little care package for you, and we can talk.

In addition to seeking his help with briefing related to the judgment entry, Peter Nordberg also called upon Mr. De Marco in January 2010 to work with other co-counsel, principally Marcy Glenn of Holland & Hart, in setting up, coordinating, and taking part in three moot court sessions in preparation for the oral argument in *Cook Appeal I*.

Mr. De Marco was part of the appellate team right up to the day of that argument and indeed beyond, helping Mr. Nordberg with post-argument research and motion drafting and making arrangements for WSBC to compensate the moot court "judges." After Peter Nordberg died suddenly on April 17, 2010, it fell to the reconstituted

appellate team—which at first consisted of Marcy Glenn, Steve Kelly of Silver & DeBoskey, and Paul De Marco, and then, after a time, David Sorensen of BM as well—to take charge of responding to the Tenth Circuit panel's request for supplemental briefing and, after the adverse decision in *Cook Appeal I*, crafting the petition for rehearing, as well as other briefing.

A review of the emails and drafts exchanged by plaintiffs' counsel in the immediate aftermath of the decision in *Cook Appeal I* makes clear that the seeds of the arguments that ultimately prevailed in *Cook Appeal II* were planted by the appellate team, including Mr. De Marco, during the late summer and fall of 2010, while Mr. De Marco and I were still at WSBC. Later that year, based on his experience practicing before the Supreme Court, Mr. De Marco also spearheaded the search for a Supreme Court practitioner to handle the *certiorari* petition, which eventually led to the hiring of Jeffrey Lamken and MoloLamken. Even after leaving WSBC and helping to found MSD in August 2012, Mr. De Marco continued working on this case, including taking part in drafting plaintiffs' filings on remand from *Cook Appeal I* in 2012-2013, particularly the portion of the briefing on the continued viability of the jury's verdict on the nuisance claim brought under Colorado law and why the "mandate rule" did not foreclose reinstating that verdict.

## The Lack of a Transparent Allocation Process

On May 11, 2017, two weeks after the Court awarded $150 million in fees to Class Counsel, Mr. De Marco sent an email to Mr. Davidoff, with copies to all co-counsel who had recently been active in the case, suggesting

> that the fee allocation process should be completely transparent and interactive, so that all counsel copied on this email can provide input and pose questions directly to you before any action is taken, so that all of these counsel know in advance how the fees will be allocated and the basis for that allocation, and so that all of these counsel have the opportunity to supply you with additional information. I believe this approach would give us the best chance of avoiding disputes.

Later the same day, Mr. Davidoff responded by email, stating in part:

> I think I am sufficiently familiar with the contributions of all counsel in this case to make a fair allocation as I have been lead counsel throughout and of course worked closely with Peter and our entire team. Also some firms will be favored by their "deals" including local counsel, Marcy [Glenn], and Supreme Court counsel. If you have some further questions please call me.

Mr. Davidoff added: "I believe everyone will be satisfied with the allocations, which have not yet been decided, and will be discussed with counsel before payment."

Mr. De Marco spoke to Mr. Davidoff the following day, May 12, 2017, and asked him to consider awarding personal bonuses to individual lawyers who, like Mr. De Marco and me, were separated from the firms for which we performed the bulk of our work in this case. Mr. Davidoff told Mr. De Marco that he did not believe he could do this and that he could only make allocations to law firms. Mr. Davidoff encouraged Mr. De Marco to try to secure part of the WSBC share.

14

On July 11, 2017, after hearing nothing further from BM concerning the promised

allocations, Mr. De Marco sent another email to Mr. Davidoff, stating in part:

> As you know, the deadline for filing objections to the Rocky Flats fee
> allocations is fast approaching. When you and I spoke on May 12, you
> seemed to have all of the allocations already in mind, but two months
> have passed and we still have not received your intended
> allocations. When do you intend to announce to all co-counsel what every
> counsel's share will be? In the interest of transparency, do you intend to
> supply Berger & Montague's time records to all co-counsel at the time you
> reveal your intended allocations, given that all co-counsel shared their
> time records with you?  When you and I spoke on May 12, I asked if you
> are willing to pay personal bonuses to individual counsel who contributed
> to the result, given that a number of us have been separated from the
> firms we were with when we made those contributions, whether as
> members of the trial team or as members of the appellate team. You
> rejected my suggestion when we spoke on May 12, saying you would only
> make allocations to law firms, not individual counsel. Have you given any
> further consideration to this issue?

Mr. Davidoff responded later that day that "our time was filed with the Court in the fee

petition," that "Waite, Schneider and your firm are both being allocated 1.6 times

lodestar," and that he was "not going to engage in 'negotiations' with firms . . . ." He

also stated that "Supreme Court Counsel and Holland & Hart," along with another law

firm he did not identify, "are getting *higher* multipliers than our multiplier, often much

higher." (emphasis original). Mr. Davidoff added that "[a]ny firm that has a problem

can go to Judge Kane."

Mr. De Marco sent a follow-up email the next day, stating in part:

> Rereading your email from yesterday, I assume you mean that you will
> reveal your intended co-counsel allocations next week, not that you will
> make the actual distributions next week without revealing the allocations

in advance. To do otherwise would preempt any objections to your allocations, which are specifically provided for in Judge Kane's order. I understood you to say in your letter of May 8 that, if there are any disputes by co-counsel regarding the allocations, no distributions would take place until the disputes were resolved. If that is *not* your intention, and you really do plan to make distributions without first giving your co-counsel notice of your intended allocations and an opportunity to object, please say so. My law firm, for one, plans to object if you follow through with your plan to make an allocation to us in accordance with your email from yesterday. As I said in my May 11 email, Merrill, I believe this process should be transparent, such that every co-counsel is made aware of every other co-counsel's intended allocation in advance of distributions.

(emphasis original). Mr. Davidoff wrote back: "If you plan to object we will hold back your allocation (for your firm). Otherwise my email of yesterday again answers your questions. No one else has objected to their indicated allocation, including Mr. Goering. And there is no basis to hold back allocations to other firms because of your objection."

Mr. De Marco sent another email the same day, copying co-counsel and stating in part:

In my email of May 11, I asked you to adopt a completely transparent fee allocation process in which all co-counsel would be notified simultaneously of the proposed allocation to each of them, in advance of any distributions. Given that we all worked together—many of us for more than 26 years—to achieve this successful result, I was hopeful you would agree to my request. So far, though, the process has not been transparent. Just yesterday, you informed me that you intend to make distributions next week without, it appears, first disclosing to each of us your intended allocations for all co-counsel. Merrill, if you are determined to use this approach, please be aware that it creates the appearance that you are trying to make it difficult to unwind your allocations. I request that you reconsider your approach and give each co-counsel notice of all the allocations you intend to make to co-counsel and an opportunity to

> object, and that you defer fee distributions until after any such objections
> have been resolved.

All indications are that BM intends to make distributions to all law firms except MSD and WSBC (through Eric Goering, Esq., the assignee of its assets).

The process utilized by BM to carry out its allocation assignment was fatally flawed in a number of respects. First, it was flawed because there was no transparency. BM repeatedly refused to send out to all co-counsel a list of the allocations, intended or actual, leaving us to guess which co-counsel received what allocations. Thus, we do not know for certain what allocations BM made to any of the firms that may already have received distributions. Indeed, we do not know BM's allocation to itself, although we surmise it is in the neighborhood of $115-120 million. Unfortunately, Mr. Davidoff has not been definitive enough about BM's multiplier for us to be sure.

The court reversed an allocation under similar circumstances in *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 227 (5th Cir. 2008). There, because the fee allocation list was sealed, the attorneys objecting to the allocation could not even compare their awards to those of other attorneys. The court in *High Sulfur* indicated that lead counsel must at least act with enough transparency to allow attorneys challenging their allocations to know their fellow attorneys' allocations. *Id.* at 232. "One cannot even compare apples to oranges without knowing what the oranges are." *Id.* "After all," the court in *High Sulfur* observed, "'[a]llocation means proportion; how does the share [one] counsel is taking compare to the shares others are getting?'"

*Id.*, quoting *In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 234 (D.D.C. 2005). Because BM refused to distribute to all co-counsel a list of allocations to all other co-counsel, its process was inherently flawed and thus its product should not stand. *See High Sulfur*, 517 F.3d at 232; *see also In re Vitamins*, 398 F. Supp. 2d at 234 (lead counsel responsible for fee allocation must "apply a universally fair standard of allocation to all participants, including itself").

Second, BM's process was flawed because, in addition to refusing to disclose the fee allocations to all co-counsel, it appears BM also has failed to disclose them to the class representatives, much less to seek their clients' consent. Rule 1.5(d) of the Colorado Rules of Professional Conduct states that, before attorneys not in the same firm may lawfully divide fees, their division must be disclosed to the clients and their clients' consent to the division must be confirmed in writing. If this rule applies—and I see no reason why it would not—BM has not, to my knowledge, followed it.

Third, BM's process was flawed because it was predicated not on ensuring that the allocations were transparent and fair and that all co-counsel had an opportunity to be heard on any objections before distributions were made, but on BM finalizing the allocations and hurrying to make the distributions before the due date for submitting objections to this Court. As noted above, Mr. De Marco stated in a July 12 email to Mr. Davidoff that rushing to make the distributions before objections are filed

> creates the appearance that you are trying to make it difficult to unwind your allocations. I request that you reconsider your approach and give

> each co-counsel notice of all the allocations you intend to make to co-counsel and an opportunity to object, and that you defer fee distributions until after any such objections have been resolved.

We do not know if BM has made any distributions to co-counsel. What we do know is that BM refused to defer the distributions, even knowing that there would be objections.

This approach drew sharp criticism from the court in *High Sulfur*:

> Indeed, it appears designed to forestall fee disputes by creating an incentive for the attorneys to "take their money and run" as soon as they signed the release of claims. More significant, immediate payments erect a serious obstacle to re-allocating fees, should the court later alter its award. The court, as its order acknowledges, would be placed in the difficult position of collecting pro rata sums from dozens of attorneys. Immediate payment essentially discouraged the court from trying to unscramble an unfair or erroneous initial allocation.

*High Sulfur*, 517 F.3d at 231.

In response to this objection, BM may urge the Court to defer to its judgment as Lead Counsel regarding the relative contributions of co-counsel and leave the allocations and any already accomplished distributions in place. First off, the relative efforts of, and benefits conferred upon the class by, co-counsel are always proper bases for a court's refusal to approve a fee allocation. *See In re FPI/Agretech Sec. Litig.*, 105 F.3d 469 (9th Cir. 1997).  While a court can assign the task of dividing up an aggregate fee award to a lead class counsel, or to a committee composed of class counsel, *cf. Longden v. Sunderman*, 979 F.2d 1095 (5th Cir. 1992), doing so does not mean a court cannot review such allocations. Indeed, some courts have suggested it is the court's responsibility to closely scrutinize the attorneys' fee allocation, especially when the

attorneys recommending the allocation have a financial interest in the resulting awards. *High Sulfur*, 517 F.3d at 227; *see also Turner v. Murphy Oil USA, Inc.*, 582 F. Supp. 2d 797, 808 (E.D. La. 2008). The court in *High Sulfur* observed that a court has an independent duty under Rule 23 to the class and to the public to ensure that attorneys' fees are divided up fairly among plaintiffs' counsel. *High Sulfur*, 517 F.3d at 227. A lack of transparency about the allocation of individual fee awards creates a perception that attorneys are acting out of self-interest. *Id.*

While a particular lead class counsel may indeed be in a better position than a court to evaluate the contributions of all counsel seeking recovery of fees, courts confronting similar situations have declined simply to defer to lead counsel's allocations, "in no small part, because 'counsel have inherent conflicts.' *In re Diet Drugs Prod. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring). As Judge Ambro noted, 'They make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?' *Id.*" *High Sulfur*, 517 F.3d at 234-35.

Courts also have recognized the "'direct conflict of interest'" of lead counsel in such circumstances: they are determining "'how to proceed on matters near and dear—dividing a limited fund among themselves and other firms. Such a direct conflict of interest strongly suggests that affording substantial deference is inappropriate.'" *Id.* at 235, quoting *Diet Drugs*, 401 F.3d at 173-74. "Although the proposed allocation 'may

ultimately be fair, careful attention must be paid to the procedures by which the allocation is set.'" *Id.*, quoting *Diet Drugs*, at 173-74. BM's secretive and self-serving allocation process cries out for immediate non-deferential judicial review and for adjustments to the allocations.

**BM's Refusal to Award Personal Bonuses**

BM rejected the notion of awarding any personal bonuses for contributions made by individual attorneys who since have separated from their original firms. When Ms. Geoppinger McCoy recently sent Mr. Davidoff an email joining in our request that he consider awarding personal bonuses to the separated lawyers who made significant contributions to this case, Mr. Davidoff called the request "completely improper. The time was devoted by the FIRMS, and individual lawyers' time was devoted on behalf of the firms for which they were working . . . ."

This intransigent position on BM's part portends dire consequences, first and foremost, for Mykaila Nordberg, the widow of Peter Nordberg. It suggests BM is unwilling to make any allocation to her at this stage out of the $150 million fee award, which should shock the conscience of anyone familiar with Peter's herculean efforts on behalf of the class and his immense contributions to plaintiffs' success in this case. A personal share for Peter should be awarded now to Ms. Nordberg out of the $150 million award and should not be deferred a minute longer. Peter's contributions should be measured *now*, against those of every other co-counsel, all of whom stand on his

shoulders; and his widow should receive an award *now*, based on his immense contributions. She should not have to rely on BM to do the right thing at some point down the line, out of sight of this Court. Because of the unusual circumstances, I respectfully urge the Court to intervene in and oversee the process by which Ms. Nordberg receives a portion of this award, ensuring that she is treated with absolute fairness and paid promptly.

As for the personal bonuses that Ms. Geoppinger McCoy, Mr. De Marco, and I have asked BM to award for contributions we made to the success of the case while employed by WSBC, I think it is important to make clear that BM has never disputed the value of our contributions to this case. Indeed, Mr. Davidoff has consistently praised our contributions. Rather, the only impediment to the requested payments seems to be that BM believes it is *not allowed* to grant such personal bonuses and that only WSBC's "receiver/assignee" can. Thus, Mr. Davidoff repeatedly has referred us to Mr. Goering, to whom WSBC's assets were assigned for the benefit of the firm's creditors pursuant to the order of an Ohio probate judge.

With all due respect to Mr. Davidoff, BM has it backwards:  Mr. Goering cannot reward former WSBC lawyers for their contributions to this case by paying them personal bonuses, but BM (or, if BM is unwilling, this Court) has the power to do so out of the $150 million fee award.

WSBC no longer operates as a law firm. Its assets have been assigned to Mr. Goering, to be used solely for the benefit of its creditors. It is a safe proposition for Mr. Davidoff to direct Ms. Geoppinger McCoy, Mr. De Marco, and me, as former employees of WSBC, to plead our case for personal bonuses to Mr. Goering, as the court-appointed assignee of our former law firm's assets. Mr. Davidoff knows full well that this is a dry hole, for two distinct reasons. First, as Mr. Davidoff is aware, by order of the Supreme Court of Ohio, Mr. Goering has *no* authority to take any action whatsoever as assignee of WSBC's assets. That court's stay order prevents him from taking any action right now. Mr. Goering's lawyer has apprised Mr. Davidoff of this. So even if Mr. Goering thought we were worthy of personal bonuses, his lack of authority to do anything makes it useless for us to plead our case for such allocations to him. He would need court approval to act at all at this point, much less to act in this fashion. Second, even if Mr. Goering could take some action—any action—right now or at some point in the near future, he would only be allowed to act *for the benefit of WSBC's creditors*. Mr. De Marco, Ms. Geoppinger McCoy, and I were WSBC employees until 2012. We have asked Mr. Davidoff to make allocations to us for our work on this case not because we believe WSBC is legally obligated to make these payments to us as former employees, but because we believe our work while at WSBC contributed to the successful resolution of this case and warrants such awards. These are the reasons why we

petitioned Mr. Davidoff for personal allocations and why, upon being rebuffed by him, we are bringing the same petitions before this Court, instead of to Mr. Goering.

Based on his recent email to Ms. Geoppinger McCoy, Mr. Davidoff apparently perceives himself as restricted to making payments to law firms, not individual lawyers, for contributions to this case. There is nothing in the Court's April 28, 2017 Order that places any such restriction on BM. The Order simply states that the $150 million award is to be allocated in a manner that "reflects *each counsel's* contribution to the prosecution of this litigation." Doc. 2468, pp. 4-5 (emphasis added). "Each counsel" means *each lawyer*, not each law firm. Lawyers practice law and represent clients; law firms do not.[5] This interpretation is consistent with a court's obligation to ensure that its fee award is distributed "among the various plaintiffs' attorneys, which may include class counsel, court-designated lead and liaison counsel, and individual plaintiff's counsel." *Manual for Complex Litigation* § 14.11 (4th ed. 2004).

The notion that only lawyers' law firms, not the individual lawyers themselves, may receive awards for the lawyers' contributions in a class action was dispelled by the court in *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291

---

[5]    *Nat'l Union Fire Ins. Co. v. Wuerth,* 122 Ohio St. 3d 594, 597-98, 913 N.E.2d 939 (2009); *Harris v. Performance Transp., LLC,* No. 8:14-cv-2913-T-23EAJ, 2015 WL 12915715, *1 (M.D. Fla., Dec. 21, 2015).

(9th Cir. 1994). In that case, class counsel[6] argued that the district court erred by awarding "quality of representation" multipliers to 11 of the 291 individual attorneys for their exceptional efforts on behalf of the class. *Id.* at 1304. In rejecting this contention, the court of appeals stated:

> Instead, Class Counsel contend that multipliers should be awarded to entire firms, not to individual attorneys, although they offer no authority for this proposition. . . . . The authority that does exist on the issue is contrary to Class Counsel's position. The practice of awarding quality of representation multipliers to individual attorneys has been approved of in several cases. *See, e.g., In re "Agent Orange"* [*Prod. Liab. Litig.*], 818 F.2d [226,] 234-35 [(2d Cir. 1987)]; *In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal.1977) (stating that the court must "analyze the quality of the performance of the various lawyers individually" and awarding a range of multipliers (from three to one) to individual attorneys with different levels of involvement in the case). We do not find this practice problematic, and hold that the district court did not abuse its discretion in awarding quality of representation multipliers to individual attorneys rather than to firms.

*Id.* at 1304-05.

Given that Mr. Davidoff has never questioned that Mr. Nordberg, Mr. De Marco, Ms. Geoppinger McCoy, and I as individual lawyers conferred significant benefits on the class, Peter's contributions and ours should be measured as individual lawyers, and BM should be permitted to grant personal "quality of representation" bonuses to Ms. Nordberg and to the three individual lawyers formerly employed by WSBC. *Washington Public Power*, 19 F.3d 1304-05; *see also Gottlieb v. Barry*, 43 F.3d 474, 488-89 (10th Cir. 1994)

---

[6]     BM was among the class counsel in *Washington Public Power. See* 19 F.3d at 1305-06.

(where the lead counsel affirmed that the individual attorneys conferred a benefit on the class, the court rejected any distinction between class counsel and the individual attorneys and failed to see why class counsel should be compensated while those "on whose shoulders class counsel admittedly stood, should be wholly uncompensated").

The authority to apply enhancements based on the quality of an individual attorney's representation in a class action stems from precedents in statutory fee cases, which since have been extended to common fund class actions. *See Washington Public Power*, 19 F.3d at 1303-04; *see also Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546 (1986); *Blum v. Stenson*, 465 U.S. 886, 897 (1984); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 697-99 (9th Cir. 1996); *Loranger v. Stierheim*, 3 F.3d 356, 362-63 (11th Cir. 1993); *Clayton v. Thurman*, 775 F.2d 1096, 1098 (10th Cir. 1985); *Garrity v. Sununu*, 752 F.2d 727, 739-40 (1st Cir. 1984). Even if these precedents did not exist, the Court still could make equitable adjustments to the allocation based the highly unusual circumstances involved in this case—where one of the class counsel has died and the law firm for which three others performed the bulk of their work in the case is now defunct. *See In re Copley Pharm., Inc.*, 50 F. Supp. 2d 1141, 1153 (D. Wyo. 1999), *aff'd*, 232 F.3d 900 (10th Cir. 2000) (the question for the court is where an "equitable allocation lay"); *High Sulfur*, 517 F.3d at 232 (the court's task is "to compare the contributions of all plaintiffs' attorneys in order to determine if the fee allocation was equitable").

## The Disproportionately Low Multiplier Assigned to MSD

BM has notified my current firm, MSD, that it will receive a multiplier of 1.6, which when applied to MSD's lodestar equates to an award of approximately $349,816 ($218,635 times 1.6). I understand from information BM supplied to Mr. Goering that at least five law firms, including MSD, have been granted a 1.6 multiplier. We surmise that the four other firms BM has in mind are WSBC and three firms that, like WSBC, were no longer actively involved in representing the class at the time of the settlement.

As best we can tell from BM's scant information, every other law firm still actively involved in the case at that point has received a higher, in some cases evidently much higher, multiplier than MSD. MSD, like every other firm still involved at the time of the settlement, put time and effort into this case when it appeared essentially valueless, *i.e.*, after the Tenth Circuit originally vacated the jury verdict. MSD, mainly through Mr. De Marco and me, remained involved in this case from the firm's inception in 2012 through the settlement and wishes to remain involved going forward.

I understand that Mr. Davidoff has been critical of WSBC's involvement in the case based on his opinion that WSBC did not continuously participate in this case. While I believe his criticisms of WSBC are overstated, to my knowledge there has been no similar criticism of MSD's participation in this litigation, nor would there be any basis for it. Immediately after forming MSD in August 2012, Mr. De Marco resumed working on this case, including taking part in drafting plaintiffs' filings on remand from

27

*Cook Appeal I* in 2012-2013, particularly the briefing on reinstating the state-law nuisance verdict and the "mandate rule." I myself remained an active participant in this litigation after joining MSD in August 2012 and have continued to keep the remaining class representatives updated on all material developments in the case. The fact that plaintiffs did not lose the benefit of the experience and institutional memory that Mr. De Marco and I have always brought to the class counsel team is a credit to MSD, which took a risk on this case as a brand new law firm. Although Mr. Davidoff has suggested that MSD took no risk at all because it "did not contribute to expenses," MSD did take risk by paying its own expenses, including travel costs, and was never asked to contribute any other expenses. MSD also took risk by assigning two of its senior lawyers to help with the task of resuscitating this case. MSD shouldered such risk from 2012 to the present—in other words, for its entire existence—while other firms that long before had the capacity to shoulder risk simply ceased contributing time and effort to the case. And yet it appears MSD is being compensated on a par with firms that long ago "went dark" on this case.

Having agreed in 2012 to take part as a brand new law firm in a case that then appeared lifeless, MSD should be compensated at the highest end of the multiplier, not what appears to be the lowest. Only BM seems to know what the respective firms' allocations and effective multipliers are, but it is safe to say no firm still active in the case at the time it settled received an effective multiplier even remotely as low as the 1.6

28

multiplier that BM has assigned to MSD. Indeed, we are given to understand that because of "fee arrangements," several firms are receiving what amount to multipliers several times higher than MSD's. There simply is no reasonable basis for such a disparity. I ask that the Court review MSD's allocation and modify it appropriately in light of the allocations to other firms that still were representing the class at the time of the settlement.

## Conclusion

Unless the Court intervenes, it appears inevitable that, due to highly unusual circumstances in a case that has lasted 27 years, Lead Counsel Berger & Montague will unfairly allocate to itself $115-120 million of the $150 million fee award and deny fair allocations to Peter Nordberg (through his widow Mykaila), Jean Geoppinger McCoy, Paul De Marco, me, and my current firm—MSD—for the significant contributions made in this case. If allowed to occur without judicial intervention, this would be a manifest injustice. I respectfully urge the Court to intervene immediately, review Lead Counsel's allocations and the process used to arrive at them, prevent the injustice that is about to occur, and modify the allocations as the Court sees fit.

July 27, 2017

Respectfully submitted,

*s/ Louise M. Roselle*

_____

Louise M. Roselle
MARKOVITS, STOCK & DE MARCO, LLC
3825 Edwards Road, Suite 650
Cincinnati, Ohio  45209
lroselle@msdlegal.com
(513) 651-3700


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing pleading was served upon all counsel of record, via the Court's CM/ECF system, this 27th day of July, 2017.


*s/ Louise M. Roselle*

_____

Louise M. Roselle