# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181-JLK

---

MERILYN COOK, *et al.*,

      Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

      Defendants.

---

## LEAD CLASS COUNSEL'S RESPONSE TO ORDER DATED JULY 28, 2017 REGARDING WHETHER A SPECIAL MASTER SHOULD BE APPOINTED

---

## I.   **INTRODUCTION AND SUMMARY**

On July 27, 2017, one of the Class Counsel, Louise Roselle, filed an Objection to the Allocation of Attorney Fees, Doc. 2474 (the "Objection").[1]  By Order dated July 28, 2017, the Court stayed distribution of attorney fees (none had yet been distributed)[2] and directed counsel to address "whether a Special Master should be appointed to resolve the fee distribution issues that have arisen."  Doc. 2479 at ¶ 2.

Court-appointed Lead Counsel for the Class, Berger & Montague, P.C., respects and understands the Court's concerns.  We respectfully submit that no Special Master is called for, because the "issues that have arisen" are legal, not factual; those legal issues are straightforward and narrow; and any recommendations by a special master regarding these legal issues would be reviewed *de novo* by this Court under Fed. R. Civ. P. 53(f)(4) regardless.[3]  Special masters ordinarily are appointed to help resolve factual issues that are wholly absent here.  All other Class Counsel agree with Lead Counsel that no special master is needed.[4]

The primary legal issue is straightforward.  The Objectors acknowledge they worked on this case primarily while employees of the law firm Waite, Schneider, Bayless & Chesley, Co.

---

[1] Paul De Marco and Jean Geoppinger McCoy ("Ms. Geoppinger"), who both worked with Ms. Roselle while all three were employees of Waite, Schneider, Bayless, and Chesley, Co., L.P.A. then joined the Objection (as did Ms. Roselle's and Mr. De Marco's current law firm, Markovits, Stock & De Marco). *See* Doc. 2476.  We shall refer to Ms. Roselle, Mr. De Marco and Ms. Geoppinger, collectively, as the "Objectors".  We shall refer to the firm of Markovits, Stock & De Marco, LLC as "MSD", as do the Objectors.

[2] *See* Lead Class Counsel's Motion to File Response(s) to Louise Roselle's Objection to the Allocation of Attorney Fees *In Camera*, filed July 28, 2017 (Doc. 2480) at 1 n.1.

[3] "The Court must decide de novo all objections to conclusions of law made or recommended by a master."  Fed. R. Civ. P, 53(f)(4).

[4] Eric W. Goering, assignee of Waite, Schneider, Bayless & Chesley Co. L.P.A., previously reported that he is unable to take a position on the allocation of fees because of a stay order issued by the Ohio Supreme Court (a copy of the Ohio Court order is attached as Exh. 1).

L.P.A. ("WSBC").  They acknowledge that *all their time before and at trial and through the first appeal to the Tenth Circuit and petition for certiorari to the Supreme Court*, was included and claimed in the lodestar fee submission by the assignee of WSBC.[5]  The Court ordered at the Final Fairness Hearing on April 28, 2017, that the portion of the fee allocated to WSBC should be "paid to the receiver of that law firm.  And it's up to anyone that wants it to go make their claims there.  They're certainly not going to make it in this court."[6]  Objector Ms. Roselle attended the Final Fairness Hearing but said nothing.[7]  The Objectors state that Mr. Goering "would only be allowed to act *for the benefit of WSBC's creditors*," and the Objectors do *not* claim that "WSBC is legally obligated" to pay them "as former employees".[8]  May the Objectors nevertheless seek what they call "personal bonuses" – money presumably paid directly to them

---

[5] *See* Declaration of Eric W. Goering, assignee of Waite, Schneider, Bayless & Chesley Co. L.P.A., filed Jan. 12, 2017 (Doc. 2435-5) at ¶ 1 ("I have legal custody and control of WSBC assets, files, and records including those relating to its participation as class counsel in this case, and the legal authority to submit this Declaration."); at ¶ 2 ("WSBC acted as counsel to Plaintiffs ....until August 2012" and "At trial, WSBC attorneys, Louise Roselle and Jean Geoppinger McCoy, played significant roles" and later "Paul De Marco [while at WSBC]" contributed.). *More than 93%* of Objectors' total time was spent while they were employees of WSBC, including *all* their time leading up to, and at, trial and through the conclusion of the first appeal to the Tenth Circuit and the Supreme Court.  None of this is in dispute. As Ms. Roselle admits: "I was an employee of WSBC between February 1987 and August 2012."  Objection at 5.  The Objectors expended a combined 4,628.35 hours working on this case while they were employees of WSBC.  *See* Goering Declaration (Doc. 2435-5) at 11.  By comparison, the combined time of the Objectors after they left WSBC in August 2012 is 300.5 hours.  *See* Declaration of Terrence R. Coates of Markovits, Stock & DeMarco, LLC, filed Jan. 12, 2017 (Doc. 2435-4) ("Coates Decl.") at Exh. 1 thereto (listing 124.4 hours for Mr. De Marco; 176.1 hours for Ms. Roselle).  Objector Ms. Geoppinger did not work on this case except as an employee of WSBC, and all of her time was included in the time submitted by Mr. Goering as assignee of WSBC. The Supreme Court denied Plaintiffs' petition for *certiorari* seeking review of *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127 (10th Cir. 2010) ("*Cook Appeal I*") on June 25, 2012, while Ms. Roselle and Mr. De Marco were still employed by WSBC.  *See* 567 U.S. 934 (June 25, 2012).

[6] *See* Reporter's Transcript, Final Fairness Hearing (April 28, 2017) ("Tr.") at 32:9-11 (attached for the Court's convenience as Exh. 2).

[7] Tr. at 2 (noting appearances of counsel).

[8] Objection at 23 (emphasis in original).

as individuals – "for contributions [] made to the success of the case *while [they were] employed by WSBC*"?[9]  We believe the answer is plainly *no*.

Any "personal bonuses" – no matter what they are called or labelled – paid to the Objectors on account of, in recognition of, or in some other way related to their work *while at WSBC*, would be subject to immediate challenge and recapture by the WSBC assignee and/or hundreds of judgment creditors who previously asked this Court to be named real parties in interest regarding any fees allocated to WSBC.[10]  In short, the Objectors' request for "personal bonuses" has no legal basis and appears to be an effort to divert fees otherwise payable to their former firm (and its court-appointed assignee), bypassing the judicially-supervised proceedings governing the disposition of their former firm's assets.

The Objectors demand these "personal bonuses" *without having first obtained the approval* of (1) the WSBC assignee, or (2) the Ohio state courts presiding over WSBC's assignment[11] and challenges thereto,[12] or (3) the Ohio federal court presiding over related litigation[13]; or (4) the Kentucky court presiding over proceedings by hundreds of judgment

---

[9] Objection at 22 (emphasis added).

[10] *See* Motion for Substitute as Real Parties in Interest, dated Nov. 2, 2016 (Doc. 2420); Memorandum in Support of Movants' Motion to Substitute as Real Parties In Interest, dated Nov. 2, 2016 (Doc. 2420-1). The Court denied the Motion, suggesting that it was, *inter alia*, premature.  Order Denying Motion to Substitute as Real Parties In Interest (ECF No. 2420), dated Jan 9, 2017 (Doc. 2433).

[11] *See In re Waite, Schneider, Bayless & Chesley Co., L.P.A.*, Case No. 2016003659 (Hamilton County, Ohio Court of Common Pleas, Probate Division).

[12] *See McGirr v. The Honorable Ralph Winkler*, No. 2017-474 (Ohio Supreme Court).

[13] *See McGirr v. Rehme*, No. 1:16-cv-00464-RHC (S.D. Ohio).  *See McGirr v. Rehme*, 2017 WL 1426456 (S.D. Oh. Apr. 21, 2017) (granting preliminary injunction against Mr. Chesley, WSBC, and Thomas F. Rehme, identified in the complaint pending in that court as "secretary" of WSBC.  *See McGirr v. Rehme*, No. 1:16-cv-464, Complaint for Fraudulent Conveyance, Injunctive Relief and Accounting, filed April 12, 2016 at ¶ 2 (S.D. Ohio).

creditors seeking to execute on a $42 million judgment against WSBC's former 100% owner,

Stanley Chesley,[14] or (5) those same judgment creditors.

As the Objectors themselves explain:

> WSBC no longer operates as a law firm. Its assets have been assigned to Mr.
> Goering, to be used solely for the benefit of its creditors. . . . by order of the
> Supreme Court of Ohio, Mr. Goering has *no* authority to take any action
> whatsoever as assignee of WSBC's assets.[15] … Mr. Goering's lawyer has
> apprised Mr. Davidoff of this. So even if Mr. Goering thought we were worthy of
> personal bonuses, his lack of authority to do anything makes it useless for us to
> plead our case for such allocations to him. He would need court approval to act at
> all this point. … Second, even if Mr. Goering could take some action – any
> action – right now or at some point in the near future, he would only be allowed to
> act *for the benefit of WSBC's creditors. Mr. De Marco, Ms. Geoppinger McCoy,
> and I were WSBC employees until 2012.* We have asked Mr. Davidoff to make
> allocations to us for our work on this case *not because we believe WSBC is legally
> obligated to make these payments to us as former employees*, but because we
> believe our work **while at WSBC** contributed to the successful resolution of this
> case and warrants such awards.[16]

The Objectors thus ask Lead Class Counsel, Berger & Montague, to pay them "personal

bonuses" because of their "work *while at WSBC*" – and thereby deprive the WSBC assignee and

the WSBC creditors of these very same funds – even though they acknowledge the WSBC

assignee is not legally obligated to pay them those "personal bonuses" and in fact cannot pay

---

[14] *See Abbott v. Chesley,* 503 S.W.3d 148, 151 n.4 (Ky. 2016) ("It is noteworthy that Chesley was the sole
shareholder of WSBC."). The hundreds of judgment creditors are individuals (or their estates) who were
injured by the diet drug fen-phen, obtained a $200 million settlement, but then learned that most of the
money went to lawyers (including Mr. Chesley) and a "sham" non-profit created by the lawyers. *See
Chesley v. Abbott,* __S.W.3d__, 2017 WL 943973, at *1 (Ky. App. Mar. 10, 2017) ("The manufacturers
of the drug agreed to a settlement in gross of $200,450,000.00. However, the plaintiffs received only
$73,296,864.96. Approximately $20,500,000.00 was diverted to fund a sham non-profit organization
created by the attorneys involved in the litigation. The attorneys divided the balance of the settlement
proceeds, amounting to roughly $106,000,000.00.").

[15] The referenced Order of the Ohio Supreme Court, dated April 17, 2017, is attached for the Court's
convenience as Exh. 1. Nothing in that Order would appear to prevent the WSBC assignee from seeking
relief in response to any Order by this Court to award "personal bonuses."

[16] Objection at 23 (first and second emphases in original, additional emphases added).

such "personal bonuses" without "court approval" (presumably referring to approval by the Supreme Court of Ohio).  Nor have these Objectors, who are all Ohio lawyers, apparently sought relief from the Ohio and Kentucky Courts with jurisdiction over both the WSBC insolvency and creditor proceedings, and these lawyers.[17]  WSBC's creditors, including hundreds of judgment creditors proceeding in Kentucky, no doubt would object to "personal bonuses" being paid to former WSBC lawyers for work done while at the firm rather than to the WSBC assignee (Mr. Goering) or to them as creditors.  The Objectors thus seek an end-run around the court-supervised proceedings related to WSBC's assets through a request for "personal bonuses" – a request that Lead Counsel has *no power to grant*.

Lead Counsel is not unsympathetic to the situation in which the Objectors find themselves.  They are former employees of a firm being operated for the benefit of creditors because of the misconduct of the firm's owner, Mr. Chesley.  But the Objectors direct their frustration at the wrong target.  The Objectors have long known about the troubles of their former firm – they left WSBC in 2012, Mr. Chesley was disbarred in Kentucky in 2013, he resigned his Ohio law license in 2013, and a $42 million judgement was entered against him in Kentucky in 2014.  Yet the Objectors never approached this Court or any Class Counsel to our knowledge about receiving "personal bonuses" before Class Counsel filed the Fee Motion on January 12, 2017.[18]  The Objectors said nothing to this Court or to Lead Counsel when *all of the*

---

[17] One of the Objectors, Mr. De Marco, filed a "Proof of Claim Form" in *In re Waite, Schneider, Bayless & Chesley Co., L.P.A.*, Case No. 2016003659 (Hamilton County, Ohio Court of Common Pleas, Probate Division).  But the Claim Form, dated April 27, 2017 (the day before the Final Fairness Hearing), says nothing about *Cook v. Rockwell*, and mentions only a claim for deferred compensation that he claims became due when fees from another matter were received by WSBC.  A copy of Mr. De Marco's Claim Form is attached for the Court's convenience as Exh. 3.

[18] *See* Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Award of Service Payments to Class Representatives, dated Jan. 12, 2017 (Doc. No. 2434) ("Fee

*Objectors' time before and through trial* and through August 2012 was submitted by Mr. Goering as assignee of WSBC.  The Objectors said nothing about "personal bonuses" at the final fairness hearing on April 28, 2017 (which Ms. Roselle attended), even though the Court considered and decided the issue of total fees to award and expressly ordered that fees allocated to WSBC would be "paid to the receiver of that law firm."  The Objectors thereafter raised the issue of "personal bonuses" with Lead Counsel for the Class, but the Objectors have never explained how Lead Counsel could legally pay "personal bonuses" for time the *Objectors expended while employees of WSBC*, without clear and express approval of all courts presiding over litigation relating to WSBC's assets, and without clear and express releases by all WSBC creditors and all the judgment creditors who have been fighting for years to collect on their $42 million judgment against Mr. Chesley.

Any payment of "personal bonuses" directly to the Objectors for work they performed while employed by WSBC would require a concomitant reduction in any allocation to WSBC to avoid double-counting.  Hence, if the Court were to approve "personal bonuses," the Court would be obliged to make explicit that no such double-counting should occur, and also to authorize Lead Counsel to reduce any allocation to WSBC by the same amount as any "bonus" paid to the Objectors for their time spent while employees of WSBC.[19]  Lead Counsel respectfully suggest, however, that any such Order by the Court would both be unprecedented and would likely spark more litigation, as the WSBC assignee may seek permission from the

---

Motion").  As noted, the Objectors are seeking a share of the Court-awarded fees as individual claimants. It was thus incumbent on each of them to file a separate fee petition with the Court on their personal behalf by the January 12, 2017 deadline.  This they did not do.  Failing to do so deprives them of standing to assert any objection to Lead Counsel's allocation decisions since none of them was covered as individuals by this Court's fee Award.  *See* Fed. R. Civ. P. 23(h)(1) ("A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets.").

[19] We have searched and no authority appears to exist for such "bonuses."  As discussed below, Objectors themselves cite no relevant authority.

Ohio Supreme Court to object to any such order, and hundreds of judgment creditors may be expected to take action in one or more courts to prevent such "bonuses" from diminishing funds otherwise claimed by them.

A second legal issue improperly interjected and discussed in the Objection, but one which is contrived and not before the Court, is whether this Court has the authority (or jurisdiction) to intervene into an internal decision by Berger & Montague concerning the division of its share of the total fee, *i.e.*, any voluntary gift/payment the firm will make out of its share of the attorney fees to the estate of one of its former lawyers, Peter Nordberg, who tragically died in April 2010. When the firm makes a final decision about the amount of the gift/payment to honor its beloved former colleague, that matter will be between Berger & Montague and Mr. Nordberg's estate, of which Ms. Mykaila Nordberg is Executrix. The Objectors are not counsel for Ms. Nordberg, and it is unseemly for the Objectors to inject the passing of Mr. Nordberg into their quest for their own "personal bonuses."[20]

There are more than 90 attorneys (many no longer employed by their former firms) whose time is included in the lodestar declarations submitted by Berger & Montague and other firms in connection with Class Counsel's Motion for Attorney Fees. We respectfully submit that *individual compensation decisions* regarding these attorneys by their respective firms are not

_____

[20] Mr. Nordberg was a brilliant lawyer who joined Berger & Montague as an associate on January 29, 1990, and was assigned to the *Cook v. Rockwell* case, which had been originated by other counsel. He later became a shareholder.  He was a fabulous writer, among his other talents, but he died six years before the settlement in this case was reached, and before the second Tenth Circuit appeal, which paved the way for settlement.  We use the words "voluntary" and "gift/payment" because there is no written or oral agreement between Peter Nordberg and Berger & Montague that, given his untimely death (and even regardless of his death), would require the sharing of any fees with his estate or anyone else claiming on his behalf.  To be clear: there is no factual basis at all to suggest that Berger & Montague is mistreating Mr. Nordberg's estate or its Executrix.  Berger & Montague has previously told Ms. Nordberg that the firm intends to make a substantial voluntary gift/payment to Mr. Nordberg's estate from Berger & Montague's share of the fees, out of the firm's friendship and affection for him, and to honor his work.

before the Court and not an appropriate matter for this Court to address.  Lead Counsel have searched for but are unaware of any class action case anywhere ever where the court intervened into *internal compensation decisions* of law firms, *i.e.*, where a Rule 23 supervising court ordered not merely that Firm X would receive a multiplier of Y for its lodestar or for the work of a particular lawyer, but also ordered how much former or current individual lawyers at that firm must be compensated by their firms *as* individual lawyers – regardless of, and overriding, a firm's own internal compensation structure, ownership or management.

The primary case on which Objectors rely is *In re Washington Public Power Supply System Securities Litig.*, 19 F.3d 1291 (9th Cir. 1994).  Objectors say that the Ninth Circuit upheld "quality of representation" multipliers to "11 of the 291 individual attorneys for their exceptional efforts on behalf of the class."  Objection at 25 (citing *Washington Public Power Supply*, 19 F.3d at 1304).  Objectors, however, misrepresent that case.  The district court, whose lengthy opinion the Ninth Circuit reviewed, did single out some lawyers for higher multipliers. But *in every instance*, it made the award to the lawyer's *law firm*, *not* the individual lawyer, including for one lawyer who was deceased at the time of the award.[21]  The case, thus, simply

---

[21] *See In re Washington Pub. Power Supply Sys. Sec. Litig.*, 779 F. Supp. 1063 (D. Ariz. 1990), at 1104 ("The Court was deeply saddened to learn of the death of Mr. Bernstein in August of this year."); at 1110 ("For the work of Mr. Bernstein, *the firm* will receive a multiple of 1.4 times the lodestar amount"; "For the work of Mr. Klafter, *the firm* will receive a multiple of 1.2 times the lodestar amount"; "For the work of Mr. Berman, *the firm* will receive a multiple of 1.2 times the lodestar amount"); at 1125 ("For the work of Mr. Weiss, *the firm* will receive a multiple of 1.5 times the lodestar amount"; "For the work of Mr. Schulman, *the firm* will receive a multiple of 1.2 times the lodestar amount"; "For the work of Mr. Simon, *the firm* will receive a multiple of 1.25 times the lodestar amount"); at 1134 ("For the work of Mr. Irwin, *the firm* will receive a multiple of 1.3 times the lodestar amount"; "For the work of Mr. Binney, *the firm* will receive a multiple of 1.2 times the lodestar amount"; "For the work of Mr. Berman, *the firm* will receive a multiple of 1.2 times the lodestar amount"); at 1158 ("For the work of Mr. Kipling, *the firm* will receive a multiple of 1.1 times the lodestar amount"; "For the work of Mr Schulman, *the firm* will receive a multiple of 1.2 times the lodestar amount"); at 1170 ("I believe an upward adjustment of the lodestar award is merited, for reasons previously discussed herein, for the participation and contributions of Mr. Meehan. *The firm will accordingly receive an award* reflecting a multiple of 1.2 times his lodestar

states that a district court need not apply a uniform multiplier across all lawyers at a firm,[22] *not* that lawyers whose time was expended *while in the employ of a law firm* are entitled to "personal" fees paid directly to them, bypassing their law firm.[23]  No other case Objectors cite holds that attorney fee awards should be paid directly to attorneys as opposed to their law firms.

There is no reason for a Special Master to address these legal issues.  Such an appointment would mean more costs and more delay in a case that has already taken decades to resolve.[24]  Any legal determination by a Special Master would have to be reviewed by this Court de *novo* anyway.  Any delay thankfully would not delay payments to Class members (the claims process is continuing through the efforts of the settlement and claims administrator, Lead Counsel Berger & Montague, and local counsel Silver & DeBoskey).  But counsel have labored on this case for nearly three decades without payment.  The Objectors' legally baseless demand has already had the unfortunate effect of penalizing many other counsel by delaying their receipt of compensation.  Appointment of a Special Master will needlessly compound that penalty.  And the Court previously ordered: "Any issue relating to payment to Waite Schneider, Bayless &

---

amount"); and at 1176 ("I believe an upward adjustment of the lodestar award is merited, for reasons previously discussed herein, for the participation and contributions of Mr. Peckel. *The firm will accordingly receive an award* reflecting a multiple of 1.25 times the lodestar amount . . . for his work") (all emphases added) (the district court opinion reflects upward adjustments for firms for 13 lawyers). The Ninth Circuit held the district court did not abuse its discretion in making these awards (19 F.3d at 1304-05) while vacating and remanding on other issues.

[22] The Objectors, of course, are not asking that *WSBC* receive the benefit of any "bonus."  Rather, they want such "bonuses" paid directly to them.

[23] *See In re Burlington N., Inc. Emp't Practices Litig.,* 810 F.2d 601, 609 (7th Cir. 1986) (district court *erred* in purporting to set amounts to be paid to individual lawyers and paralegals) ("we therefore reverse this portion of the district court's order and direct that the award be paid to the respective law firms, not the individual attorneys and paralegals").  No case that we have found, and no case Objectors cite, holds that a court in deciding allocations of fees from a class action may delve into the internal compensation decisions of firms and decide for firms what individual lawyers must be paid.

[24] *See* Fed. R. Civ. P. 53(a)(3) ("In appointing a master, the court must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay."); Rule 53(g) (discussing compensation of a special master).

Chesley Co., L.P.A., including as to the appropriate legal entity or entities to receive such payment, shall not affect or delay Lead Counsel's authority or ability to distribute attorney fees or expenses to any other firm."  Order Granting Reimbursement of Litigation Expenses, dated April 28, 2017 (Doc. 2467) at 2 n.2.

Once these threshold legal issues are cleared away, what remains is a minor dispute over a relatively small amount of money.  The MSD firm wants a larger multiplier for the work it did starting in late 2012.  But even if that firm were awarded the same multiplier as Lead Counsel – hardly an equitable result as Lead Counsel have devoted 27 years to the case, managed the vast bulk of the discovery and of Plaintiffs' experts, handled the four-day bench hearing in 1995 regarding the Department of Energy, led the trial team in 2005-06 and both appellate briefing teams, and contributed $5.72 million in out-of-pocket costs, while MSD spent a total of 326.5 hours on the case since August 2012 and contributed next to nothing to costs[25] – the difference is about $153,000, or  about 0.1 percent of the total fee award of $150 million.  Lead Counsel believe that, if further discussions with MSD cannot resolve the issue of MSD's multiplier by agreement, this small issue should be decided on briefs.

In short, the Court should (1) not appoint a Special Master; (2) provide counsel 30 days to meet and confer regarding MSD's minor dispute; and (3) otherwise overrule the Objection.

---

[25] *See* Coates Decl. (Doc. 2435-4) at ¶ 3 (firm was "founded in August 2012" and Ms. Roselle, Mr. De Marco and others spent time on the case "[s]ince 2012"); ¶ 5 (listing $1,329.72 in total costs).

## II.    **PROCEDURAL HISTORY**

By Orders dated April 28, 2017, the Court granted final approval to the $375 million settlement.[26] It awarded service payments to the Class Representatives totaling $780,000,[27] costs of $7,094,863.65 to reimburse counsel for out-of-pocket expenses,[28] and attorney fees of 40% of the Settlement Fund.[29]  No appeals were filed from any of these Orders.

In its Fee Order, the Court directed that "Lead Counsel for the Class, Berger & Montague, shall allocate and distribute such attorney fees among the various Class Counsel which have participated in this litigation in such manner as Lead Counsel believes reflects each counsel's contribution to the prosecution of this litigation."  Fee Order at ¶ 9 (footnotes omitted). The Fee Motion filed on January 12, 2017 included a proposed form of order with essentially identical language.[30]  The Objectors did not object to this proposed provision, which the Court approved.  Nor did the Objectors suggest or seek any particular protocol or procedure they wished to have followed.

Lead Counsel Berger & Montague has borne the vast bulk of the out-of-pocket expenses of this case over its 27-year history ($5.72 million; more than 80% of the total) and devoted more than 75% of all hours as submitted by all Class Counsel in connection with counsel's motion for fees.[31]

---

[26] Doc. 2471 (the "Final Approval Order").

[27] Doc. 2469.  As no appeals were filed from this Order, the service awards have been distributed. The costs also have also been distributed.

[28] Doc. 2467 (the "Cost Order").

[29] Doc. 2468 (the "Fee Order").

[30] *See* Doc. 2434-1 at 4-5.

[31] Declaration of Merrill G. Davidoff In Support of Class Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Service Payments to Class Representatives, filed Jan. 12, 2017 (Doc. 2435-2) ("Davidoff Decl.") at 94-95 (lodestar and costs reported by each law firm).  Berger &

Additional counsel submitted declarations in connection with, and in support of, the Fee Motion, with each declaration detailing the firm's lodestar and expenses.[32]

None of the Objectors filed any "personal" declarations or fee requests of any kind whatsoever.  The vast majority of the time of all three Objectors related to this case was contained in the Goering Declaration.[33]  Mr. Goering stated under penalty of perjury (and the Objectors do not dispute) that he is "the assignee of [WSBC] in *In re Waite, Schneider, Bayless & Chesley Co. L.P.A.*, Case No. 2016003659, pending in the Probate Court of Hamilton County, Ohio, which is an assignment for the benefit of creditors action pursuant to Chapter 1301 of the Ohio Revised Code."  Goering Declaration at ¶ 1 (Doc. 2435-5).

Mr. Goering further stated that:

> Pursuant to Ohio law and the [Assignment for the Benefit of Creditors] Order, I have legal custody and control of WSBC assets, files, and records including those relating to its participation as class counsel in this case, and the legal authority to submit this Declaration.  I have discussed WSBC's representation in this case with former WSBC attorneys who performed significant legal work in this matter and I have reviewed WSBC records.  I submit this Declaration in support of Class Counsel's motion for award of attorneys' fees, reimbursement of litigation expenses, and award of service payments to Class representatives[.]

---

Montague has devoted additional time since, and has also discovered since filing the Fee Motion that some of its time from early years was inadvertently not included in the Fee Motion.  Berger & Montague may seek to submit such additional time in the event of further proceedings before a special master or the Court.

[32] *See* Declaration of Steven W. Kelly of Silver & DeBoskey, A Professional Corporation (Doc. 2435-3); Declaration of Terrence R. Coates of Markovits, Stock & DeMarco, LLC (Doc. 2435-4); Declaration of Eric W. Goering, assignee of Waite, Schneider, Bayless & Chesley Co. L.P.A. (Doc. 2435-5); Declaration of Nicholas E. Chimicles of Chimicles & Tikellis LLP (Doc. 2435-6); Declaration of Jeffrey A. Lamken of MoloLamken LLP (Doc. 2435-7); Declaration of Michael Barrett of Ray & Barrett, formerly known as Connerton, Ray & Simon (Doc. 2435-8); Declaration of R. Bruce McNew of Taylor & McNew, LLP, formerly Taylor, Gruver & McNew, P.A. (Doc. 2435-9); Declaration of Kenneth A. Jacobsen of Jacobsen Law Offices LLC (Doc. 2435-10); and Declaration of Marcy G. Glenn of Holland & Hart LLP (Doc. 2435-11).

[33] *See* Goering Declaration (Doc. 2435-5) at 11 (listing 2,700.35 hours for Ms. Roselle; 682.5 hours for Paul De Marco; and 1,245.5 hours for Jean Goeppinger (now Jean Goeppinger McCoy)); *compare* Coates Decl. (for MSD) (Doc. 2435-4) at Exh.1 thereto (listing 176.1 hours for Ms. Roselle and 124.4 hours for Mr. De Marco since August 2012).

*Id.* Mr. Goering then summarized the work of *all three Objectors* while they were in the paid employ of WSBC, including work the Objectors did during and after trial in 2005-06 and through the conclusion of the first appeal to the Tenth Circuit and the Supreme Court. *Id.* at ¶ 2.

In response to a motion by judgment creditors who sought to be substituted for WSBC and its former 100% owner, Stanley Chesley,[34] Mr. Goering through counsel stated that:

(1)    "In August 2014, the [creditors] obtained a judgment against Mr. Chesley [in Kentucky], and the other defendants, jointly and severally, in the amount of $42,000,000";[35]

(2)    "Mr. Chesley was disbarred in Kentucky in 201[3], and he resigned his Ohio law license and retired from the practice of law in April 2013."[36];

(3)    "On September 12, 2016, WSBC exercised its statutory right under Ohio law, pursuant to Ohio Revised Code Section 1301.01, *et. seq.*, to file a Deed of Assignment for the Benefit of Creditors ('ABC') . . . Using this statutory process, WSBC transferred all right, title, and interest in all of its assets (including its right to receive a portion of the attorney's fees and costs awarded in this case) to Mr. Goering."[37];

---

[34] *See* Motion for Substitute as Real Parties in Interest, dated Nov. 2, 2016 (Doc. 2420); Memorandum in Support of Movants' Motion to Substitute as Real Parties Interest, dated Nov. 2, 2016 (Doc. 2420-1).

[35] *See* Eric W. Goering, Assignee's Memorandum in Opposition to Abbott Movants' Motion to Substitute as Real Parties in Interest, filed Dec. 9, 2016 (Doc. 2430) ("Goering Mem.") at 3.  *See also* exhibits thereto.

[36] Goering Mem. at 3.

[37] *Id.* at 5.

(4)     "On November 2, 2016, Mr. Goering filed an Inventory in the ABC proceeding that lists, among WSBC's other receivables, the potential fees that may be paid to WSBC in this litigation."[38];

(5)     "[T]here is no disputing that the attorneys' fee interest in this matter is an asset of the ABC, and not Mr. Chesley, or WSBC."[39];

(6)     "WSBC assigned all of its assets to Goering, as assignee, in the ABC. The Deed of Assignment transferred 'all right, title, and interest in and to all property of any description, real and personal, including, without limitation, accounts, receivables, contract rights, chattel paper, notes, rights to payment, legal claims....'"[40]; and

(7)     "Jurisdiction in ABC matters has been vested exclusively in the probate court under Ohio law since the enactment of the statute in 1859."[41]

None of the Objectors filed anything in response to Mr. Goering's December 9, 2016 submission. This Court denied the judgment creditors' motion on January 9, 2017, finding, *inter alia*, that it was premature. Doc. 2433. To our knowledge, Objectors have not attempted to intervene in the Ohio proceedings.[42]

Class Counsel filed their Fee Motion on January 12, 2017. Doc. 2434. The Court granted it on April 28, 2017. Doc. 2468. At no time while the Fee Motion was pending did any of the Objectors file anything with the Court suggesting in any way that they had some

---

[38] *Id.* at 6.

[39] *Id.* at 7.

[40] *Id.* at 9-10.

[41] *Id.* at 10.

[42] As noted, one of the Objectors, Mr. De Marco, filed a Proof of Claim Form in Ohio (attached as Exh. 3), but that Claim said nothing about this case.

"personal" claim to fees for the time that had been submitted by Mr. Goering as assignee of WSBC.  One of the Objectors, Ms. Roselle, attended the final approval hearing on April 28, 2017.  She said nothing concerning any right to "personal" payment for her time at WSBC, even after the Court ordered that WSBC's share of the attorney fees should be "paid to the receiver of that law firm."[43]

After the time for appeals from the Fee Order expired, Lead Counsel communicated a plan for allocating fees, drawing on Lead Counsel's own direct knowledge of the firms' contributions to the case, and communicated with each law firm that had submitted time and expenses.  In essence: (1) Certain firms (local counsel Silver & DeBoskey, appellate counsel Holland & Hart, and Supreme Court counsel MoloLamken) would be allocated fees totaling approximately $20 million reflecting their work and in compliance with prior agreements.[44]  (2) Most firms would receive the identical 1.6 lodestar multiplier (MSD, WSBC, Chimicles & Tikellis, Taylor & McNew, and Jacobsen Law Offices).  And (3) one firm, Ray & Barrett, would receive a 1.0 multiplier.  That would leave Lead Counsel, Berger & Montague, with a multiplier of approximately 2.3 (as of this writing) – less than the overall average of 2.41, despite having taken on greater than the bulk of the burdens and risk.[45]  These proposed allocations were

---

[43] Tr. at 32:9.

[44] MoloLamken would receive $4 million; Silver & DeBoskey 10% of the remainder (the total fee less $4 million, multiplied by 10%); and Holland & Hart (Ms. Glenn's firm) would receive a 2.5 multiplier for their time.  Deducting those allocations from $150 million leaves approximately $130.3 million for the remaining firms.

[45] Berger & Montague shouldered a greatly disproportionate share of the millions of out-of-pocket dollars required to prosecute this case due to the failure of co-counsel, WSBC and Connerton, Ray & Simon, to live up to their funding commitments of one-third (1/3) each.  Berger & Montague also did a disproportionate share of the work.  A higher multiplier than 2.3, therefore, would have been amply justified.  Lowering the multiplier for Berger & Montague will not help the Objectors *unless* they are legally entitled to "personal bonuses" for work they performed while employees of WSBC, so again, that threshold legal issue should be resolved first and does not require a Special Master.

communicated to the various counsel in writing and over the phone.[46]  None of the other counsel

objected to the proposed allocations.

On July 27, 2017, one of the Class Counsel, Louise Roselle, then filed an Objection.

Doc. 2474.[47]

---

[46] Objectors complain about allegedly inadequate "transparency", but again, the Objectors asked for no particular procedures when the Fee Motion was filed, and acquiesced to the Court authorizing "Lead Counsel for the Class, Berger & Montague" to allocate the fees "in such manner as Lead Counsel believes reflects each counsel's contribution to the prosecution of this litigation."  Fee Order (Doc. 2468) at ¶ 9. The Objectors' desire for "personal bonuses" foundered because the Objectors failed to provide Lead Counsel with any legal basis for any such "bonuses."  That has nothing whatsoever to do with "transparency".  Moreover, Lead Counsel did provide the Objectors with substantial information concerning allocations to other counsel.  *See, e.g.*, Exh. 4 (emails to and from Terry Coates, managing partner of MSD).  Indeed, one of the cases Objectors themselves cite rejected the argument that all counsel were entitled to know the allocations to all other counsel, explaining that:

> The objectors contend that they needed to know what other attorneys were getting to assess the value of their own efforts.  However, the objectors have not persuaded the Court.  Each attorney knew the aggregate award amount and knew their respective role in the case. Lead counsel was faced with an unenviable dilemma, he had to allocate an award where nobody would agree if anybody knew what the other was making. The Court appreciates the fact that getting 19 people to agree on any issue is difficult enough without having $19.5 million at stake.  Given this, the only way Lead Counsel could arrive at an agreement was to negotiate one-on-one.  *This procedure was fair and in the end, wise*. The Court has no doubt this was Lead Counsel's best option given the circumstances and commends him for handing his responsibilities as he did.  Likewise, there is no evidence that Lead Counsel implemented this procedure to "cheat" any firm.  As such, the Court rejects such a notion today.

*In re Copley Pharm., Inc.*, 50 F. Supp. 2d 1141, 1150-51 (D. Wy. 1999) (emphasis added), *aff'd*, 232 F.3d 900 (10th Cir. 2000).  *See also* 50 F. Supp. 2d at 1146 (same); at 1149 ("[W]hen the Court became aware that class counsel could not reach a unanimous stipulation, it necessarily gave substantial deference to Lead Counsel's proposed allocation."; "Even today the Court should and must rely, to a degree, on the voice of Lead Counsel on the responsibilities of class counsel members, quality of their work, and novelty of issues involved.  It was Lead Counsel who managed plaintiffs' case.").

[47] Ms. Roselle calls herself "Co-Lead Trial Counsel" Objection at 2, 3, without stating the basis for that self-designation.  She observes that 197 depositions were taken and defended in this case, Objection at 6, but omits that Lead Counsel Berger & Montague was responsible for 132 of them, while the Objectors, collectively, were responsible for 17.  *See* Davidoff Decl. (Doc. 2435-2) at ¶¶ 29, 31, 68-69.  Mr. Davidoff led the trial team and Berger & Montague sent at least 6 persons to trial, often more.  Ms. Roselle's employer, Mr. Chesley, renounced WSBC's obligation to pay one-third (1/3) of expenses and devote one-third (1/3) of the time in 1992 and, with finality, in 1995.  Ms. Roselle assisted at trial because of an agreement where Berger & Montague assisted her in *Hanford* bellwether trials, where she was lead counsel, and, in exchange, she assisted at the *Cook* trial.  None of these inter-firm issues affects the legality of the "personal bonuses" the Objectors seek, and so no special master is needed to examine them.

III.     <u>**ARGUMENT**</u>

    **A.  The Objections Present Straightforward, Threshold Issues of Law**

No special master is needed because the Objections present threshold issues of law that are straightforward, and the pertinent facts are few and not in dispute:

1.      The vast majority of Class Counsel, including the firm receiving the lowest proposed multiplier, have not objected to the proposed allocations.  In fact, each Plaintiffs' firm except WSBC and MSD has authorized Lead Counsel to file this brief under their signature.

2.      The Objectors performed the vast bulk (more than 93%) of their work on this case while employed by WSBC, including *all* time before and during trial and through the conclusion of the first appeal to the Tenth Circuit and the Supreme Court.

3.      All the Objectors' time spent working on this case while they were employed by WSBC was submitted as part of Class Counsel's Fee Motion by Eric Goering, as assignee of WSBC pursuant to an assignment for benefit of creditors pursuant to Ohio law.  As Ms. Roselle states: "I was an employee of WSBC between February 1987 and August 2012."  Objection at 5.  *See* Goering Declaration at Exhibit 2 thereto (Doc. 2435-5) (identifying total time expended on this case by all three Objectors while they were employed by WSBC).

4.      When the Fee Motion was filed on January 12, 2017, the Objectors knew that *all their time spent at WSBC was being submitted by Mr. Goering as assignee of WSBC*. The Fee Motion and all supporting papers were filed publicly and Mr. Goering himself states he consulted with former WSBC lawyers before

submitting his declaration,[48] yet Objectors never filed any objection, nor made any request that any of their time be denominated "personal" time or otherwise not counted as part of *WSBC's* time.

5.      Ms. Roselle attended the final approval hearing on April 28, 2017, yet said nothing whatsoever about "personal bonuses" or any other issue related to the allocation of fees.

6.      Lead Counsel propose awarding WSBC a 1.6 multiplier, which would result in a fee of approximately $6.47 million. The Objectors have not sought a higher multiplier for WSBC, as they acknowledge they have no legal claim to that fee. Objectors state that Mr. Goering "cannot reward former WSBC lawyers for their contributions to this case by paying them personal bonuses[.]" Objection at 22.

7.      The Objectors further acknowledge that they do "not believe WSBC is legally obligated" to share any portion of its allocated fee with them as former employees. *Id*. at 23.

These undisputed facts demonstrate that the Objectors' arguments fail as a matter of law. Their grievance arises from their unfortunate position as former employees of WSBC, an entity whose assets are now subject to claims of numerous creditors and which is mired in numerous legal proceedings in multiple courts. No Special Master can change any of that.

The Objectors have provided no legal basis – to Lead Counsel or to this Court – that would allow them to receive a "personal bonus" for work done while they were employees of WSBC. Regardless of whether that "bonus" is taken from the fee otherwise payable to the

---

[48] *See* Goering Declaration (Doc. 2435-5) at ¶ 1 ("I have discussed WSBC's representation in this case with former WSBC attorneys who performed significant legal work in this matter").

WSBC assignee, the multiplier to WSBC is raised to accommodate some "bonus", or the "bonus" is nominally deducted from the overall fee award, the Objectors admit they seek a "bonus" "for contributions [] made to the success of the case *while [they were] employed by WSBC*".[49]  Any compensation for the work they performed at WSBC would be owed to that firm and now to its assignee for the benefit of creditors.[50]  Any order to pay the Objectors' "personal bonuses" for their work "while employed by WSBC" would be subject to serious challenge by Mr. Goering and/or creditors,[51] and Lead Counsel understood the Court to have expressed a desire not to become involved in the ongoing disputes about WSBC (*see* Tr. at 31-32), a desire that Lead Counsel shares.

### B.  Peter Nordberg's Death Provides No Cause for a Special Master

The Objectors' unfortunate effort to exploit the untimely death of Berger & Montague's former colleague, Peter Nordberg, provides no basis to appoint a special master.  There is no current dispute between Berger & Montague and Ms. Nordberg, who is the Executrix of Mr. Nordberg's estate.  The firm has told Ms. Nordberg more than once that, out of the firm's friendship and affection for Peter and to honor his work in this case, the firm intends to make a substantial voluntary gift/payment to his estate out of the firm's own share of the fees.  The

---

[49] Objection at 22 (emphasis added).

[50] *See In re Burlington N., Inc. Emp't Practices Litig.*, 810 F.2d at 609 (reversing award of fees to individual attorneys and paralegals rather than their law firms); *In re Daddy's Money of Clearwater, Inc.*, 187 B.R. 750, 757 (M.D. Fla. 1995) (rejecting attorney's argument that he was a secured bankruptcy creditor where the contingent fee arrangement on which he relied was between the debtor and the attorney's law firm and "was never assigned to" the attorney).

[51] *See, e.g.*, Motion to Substitute As Real Parties In Interest, filed Nov. 2, 2016, at 6 (Doc. 2420) (listing numerous parties claiming an interest in "any fee income due to WSBC.").  These obstacles would remain no matter how any "personal bonus" was characterized or paid.  For example, if the multiplier to WSBC were raised to accommodate a "personal bonus," the WSBC assignee likely would still be duty bound to seek to reclaim it, and the creditors would still likely challenge it.  The same is true if "bonuses" were deducted from the overall fee because, in the end, the Objectors themselves say their request is based on work they did "while employed by WSBC."  Objection at 22.

19

attorneys who worked with Peter (especially Mr. Davidoff and Mr. Sorensen) considered him a dear friend and colleague, and take offense at the unfounded implication that Berger & Montague will fail to honor this assurance.  Berger & Montague currently has over 60 lawyers, in addition to a support staff of 46, and its normal practice is to make compensation decisions for current personnel near the end of the calendar year, when the full financial picture of the firm for that year is known.  Determining the gift/payment to Mr. Nordberg's estate will occur at that time, if the *Cook* fees are received this year.

The Objectors do not represent Mr. Nordberg's estate or Ms. Nordberg and therefore have no standing to interpose themselves into that matter.  In discussing Mr. Nordberg, the Objectors imply that this Court should involve itself in deciding the individual take-home compensation of individual lawyers.  That assertion finds absolutely no support in any case we have found, and none in any case Objectors cite.  Individual compensation at law firms is a function of a number of internal factors, including relative ownership interest in the firm, role of the lawyer in firm management, the particular compensation system of the firm, the financing of a case (including one that lasts an inexorable length of time, as this case did), the origination of the case, the lawyer's contribution to the result, and other factors.  No court anywhere that we are aware of has held – or even suggested – that in allocating a class fee award among law firms who participated as class counsel, the court may direct how much a firm must pay its current or former individual lawyers.

The various fee declarations submitted in this matter identify 90 lawyers (and more lawyers are not listed by name) – in addition to Mr. Nordberg – who devoted time to this long-running matter.  All these lawyers, including Mr. Nordberg, were compensated by their firms every year according to whatever compensation arrangement pertained at that firm and for that

lawyer.  Many of the lawyers – in addition to Mr. Nordberg – are no longer with their former firms.  What, if anything, these individual lawyers (or their estates) are paid out of the *Cook* fee is between those lawyers and their current (or former) law firms.  Fee divisions between lawyers and firms are not before this Court, *and any such issues have nothing to do with the allocation of fees among law firms.*

### C.  Colorado Rule of Professional Conduct 1.5 Is Not Relevant to the Objection

In what appears to be an off-hand comment,[52] Objectors assert that Colorado RPC 1.5(d) required Lead Counsel to obtain their clients' written consent to Lead Counsel's implementation of this Court's Order to "allocate and distribute such attorney fees among the various Class Counsel which have participated in this litigation in such manner as Lead Counsel believes reflects each counsel's contribution to the prosecution of this litigation."  Fee Order at ¶ 9. Objectors cite no law to support their assertion and none has been found.[53]  Rule 1.5(d) was not written to address the specific allocation of fees previously awarded by the Court under the common fund doctrine.

Significantly, neither MSD nor the Objectors have presented a fee-sharing agreement to the Court that any of them seek to enforce.  However, the 1989 fee agreements initially entered with the Class representatives expressly authorized the law firms to associate with additional

---

[52] Objection at 18.

[53] Notably, Objectors do not say whose consent they believe to be necessary – all Class members or all Class representatives.  To the extent Objectors argue that the Class representatives alone must give their written consent, they did so in the 1989 contingency fee agreements, in which the class representatives agreed in writing that, among other possibilities, and in the event a recovery is obtained on behalf of the class under an equitable fund doctrine, counsel would receive "as our fee that amount or percentage awarded by the Court."  To the extent Objectors believe that Lead Counsel should obtain the consent of all Class members, that is plainly impractical, which is why courts are responsible for attorney fee determinations in common fund cases.  *See e.g.*, *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216, 220, 224 (2nd Cir. 1987).

counsel.  This consent established counsel's compliance with any Rule 1.5(d) requirements.  The Court's role is to establish what portion of the recovery should be awarded as fees and resolve any disputes.  *See* Fed. R. Civ. P. 23(h).

The purpose of Rule 1.5(d) is to protect clients, which is the role the Court serves when awarding fees in class actions.  *Brody v. Hellman*, 167 P.3d 192, 205 (Colo. App. 2007) ("In a common fund case, the court takes on the role of fiduciary for the beneficiaries of the fund when awarding fees.").  In *Brody*, the court specifically held that any fee agreement with clients in a class action not only did not control the fee award, it need not even be examined by the court to determine that an award of fees is appropriate, reasonable, and in compliance with the Colorado ethics rules.  *Id*. at 199, 205.

Finally, and as is true of many of Objectors' assertions, the time to assert a novel argument that any division of fees required written consent from clients was in response to the Fee Motion and prior to this Court's Order directing Lead Counsel to undertake the allocation.  The Fee Order is now final and Objectors cannot now challenge that directive as invalid.

### D.  MSD's Complaint is Very Minor and Provides No Reason for a Special Master

Ms. Roselle and Mr. De Marco's new firm, MSD, seeks a higher multiplier for its lodestar of $218,635.  MSD does not state what multiplier it seeks, but the amount in dispute here is small in the context of this case.  Even if MSD were allocated the same multiplier as Lead Counsel – which we do not believe would be justified or justifiable under any metric – the difference would be $153,044.50 (*i.e.*, the difference between the 1.6 multiplier Lead Counsel

proposed to apply to MSD's lodestar and the 2.3 multiplier that would apply to Lead Counsel's lodestar).[54]  That is about 0.1% of the $150 million award.

That small amount in dispute does not justify reference to a Special Master.  We propose that counsel be directed to meet and confer to explore resolving the MSD multiplier issue and, if that fails, then counsel should file simple briefs, with potentially oral argument if the Court believes that would be helpful.

## IV.   <u>CONCLUSION</u>

The legal positions asserted by Objectors are unsupported and untimely. There are no factual disputes here, only straightforward legal ones, and the Court should not appoint a Special Master.  The Court should enter the accompanying proposed Order granting the following relief:

1) Declining to appoint a Special Master because it is apparent that the Objection raises straightforward legal issues, not factual disputes;

2) Overruling the Objectors' objections, with the sole exception of the objection as to the amount of the fee distribution to Markovits, Stock & De Marco, LLC;

3) Ordering Class Counsel to meet and confer regarding the multiplier and fee distribution due to Markovits, Stock & De Marco, LLC and further ordering Class Counsel to advise the Court within 30 days whether Class Counsel has been able to resolve this remaining dispute by agreement; and

4) Directing Lead Counsel to distribute the attorney fee award in accordance with the allocations already determined by Lead Counsel, except that Lead Counsel shall hold back and not distribute $153,044.50 unless and until there is a

---

[54] Here is the calculation:  (2.3 x $218,635) - (1.6 x $218,635) = $153,044.50.  MSD's lodestar of $218,635 is shown in the Coates Decl. (Doc. 2435-4) at Exh. 1.

resolution of the only remaining dispute, which is the amount of the fee to be distributed to Markovits, Stock & De Marco, LLC.

Dated:  August 11, 2017

Respectfully submitted,

*/s/ Merrill G. Davidoff*
Merrill G. Davidoff
David F. Sorensen
Caitlin G. Coslett
BERGER &MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

*Lead Counsel for Plaintiffs and the Class*

*Brief Joined By:*

Gary B. Blum, Esq.
Steven W. Kelly, Esq.
Silver & DeBoskey,
  A Professional Corporation
The Smith Mansion
1801 York Street
Denver, CO  80206

Nicholas E. Chimicles, Esq.
Chimicles & Tikellis LLP
361 West Lancaster Avenue
Haverford, PA 19041

Jeffrey A. Lamken, Esq.
MoloLamken LLP
600 New Hampshire Ave, NW
Washington, D.C. 20037

R. Bruce McNew, Esq.
Taylor & McNew, LLP
  (f/k/a Taylor, Gruver & McNew, P.A.)

Michael Barrett, Esq.
Ray & Barrett
  (f/k/a Connerton, Ray & Simon)

Kenneth A. Jacobsen, Esq.
Jacobsen Law Offices LLC
5 East Rose Valley Road
Wallingford, PA 19086

Marcy G. Glenn, Esq.
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80202

*Attorneys for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 11th day of August, 2017, he caused the foregoing

submission to be served via the Court's ECF system on all participating counsel.


*/s/ Merrill G. Davidoff*
Merrill G. Davidoff
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000